**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

**Plaintiff,**

**v.**

**FACEBOOK, INC.**
1601 Willow Road
Menlo Park, CA 94025

**Defendant.**

Case No.: **1:20-cv-03590**

**PUBLIC REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

---

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), by its designated attorneys, petitions this Court pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), for a permanent injunction and other equitable relief against Defendant Facebook, Inc. ("Facebook"), to undo and prevent its anticompetitive conduct and unfair methods of competition in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## I.  NATURE OF THE CASE

1.      Facebook is the world's dominant online social network.  More than 3 billion people regularly use Facebook's services to connect with friends and family and enrich their social lives.  But not content with attracting and retaining users through competition on the merits, Facebook has maintained its monopoly position by buying up companies that present competitive threats and by imposing restrictive policies that unjustifiably hinder actual or potential rivals that Facebook does not or cannot acquire.

1

2.      Facebook holds monopoly power in the market for personal social networking services ("personal social networking" or "personal social networking services") in the United States, which it enjoys primarily through its control of the largest and most profitable social network in the world, known internally at Facebook as "Facebook Blue," and to much of the world simply as "Facebook."

3.      In the United States, Facebook Blue has more than ████████ daily users and more than ████████ monthly users.  No other social network of comparable scale exists in the United States.

4.      Facebook's unmatched position has provided it with staggering profits.  Facebook monetizes its personal social networking monopoly principally by selling advertising, which exploits a rich set of data about users' activities, interests, and affiliations to target advertisements to users.  Last year alone, Facebook generated revenues of more than $70 billion and profits of more than $18.5 billion.

5.      Since toppling early rival Myspace and achieving monopoly power, Facebook has turned to playing defense through anticompetitive means.  After identifying two significant competitive threats to its dominant position—Instagram and WhatsApp—Facebook moved to squelch those threats by buying the companies, reflecting CEO Mark Zuckerberg's view, expressed in a 2008 email, that "*it is better to buy than compete.*"  To further entrench its position, Facebook has also imposed anticompetitive conditions that restricted access to its valuable platform—conditions that Facebook personnel recognized as "anti user[,]" "hypocritical" in light of Facebook's purported mission of enabling sharing, and a signal that "we're scared that we can't compete on our own merits."

6.      As Facebook has long recognized, its personal social networking monopoly is protected by high barriers to entry, including strong network effects.  In particular, because a personal social network is generally more valuable to a user when more of that user's friends and family are already members, a new entrant faces significant difficulties in attracting a sufficient user base to compete with Facebook.  Facebook's internal documents confirm that it is very difficult to win users with a social networking product built around a particular social "mechanic" (i.e., a particular way to connect and interact with others, such as photo-sharing) that is already being used by an incumbent with dominant scale.  Even an entrant with a "better" product often cannot succeed against the overwhelming network effects enjoyed by a dominant personal social network.

7.      Despite strong network effects, important competitive threats to a dominant personal social networking provider can emerge, particularly during periods of technological or social transition and particularly if the newcomer is differentiated from the incumbent in a manner that exploits the technological or social transition.  During such periods, a competitor may be able to gain scale despite the network effects enjoyed by the incumbent.

8.      Accordingly, Facebook's leadership has learned and recognized that the sharpest competitive threats to Facebook Blue come not from "Facebook clones," but from differentiated services and during periods of transition.

9.      In an effort to preserve its monopoly in the provision of personal social networking, Facebook has, for many years, continued to engage in a course of anticompetitive conduct with the aim of suppressing, neutralizing, and deterring serious competitive threats to Facebook Blue. This course of conduct has had three main elements:  acquiring Instagram, acquiring WhatsApp, and the anticompetitive conditioning of access to its platform to suppress competition.

10.    **Instagram Acquisition.**    In 2012, Facebook acquired Instagram, the most significant personal social networking competitor to emerge since Facebook Blue launched.

11.    Instagram—a mobile-first app that enables users to engage in personal social networking with family and friends through taking, editing, sharing, and commenting on photographs—emerged at a critical time of technological and social transition, when users of personal social networking were migrating from desktop computers to smartphones and toward a greater use of photo-based sharing.  Smartphones combined high-quality cameras with mobile access to the internet, which gave consumers new ways to share moments from their lives.  By satisfying users' demand for excellence in photo handling, social networking, and user experience via their smartphones, Instagram quickly seized a particularly strong position as a fast-growing provider of personal social networking.  As users increasingly demanded and prioritized personal social networking services on their smartphones, and connecting with friends and family through photo-sharing, Instagram became an existential threat to Facebook Blue's personal social networking monopoly.

12.    Facebook initially tried to compete with Instagram on the merits by improving its own mobile photo-sharing features.  But by September 2011, Mr. Zuckerberg saw that Facebook had fallen far behind, writing internally:  "In the time it has taken us to get ou[r] act together on this[,] Instagram has become a large and viable competitor to us on mobile photos, which will increasingly be the future of photos."

13.    So Facebook fell back on the philosophy that "it is better to buy than compete."  In February 2012, Mr. Zuckerberg acknowledged that if left independent—or in the hands of another acquirer like Google or Apple—Instagram threatened to leave Facebook Blue "very behind in both functionality and brand on how one of the core use cases of Facebook will evolve in the mobile

4

world."   Emphasizing that this was a "really scary" outcome for Facebook, Mr. Zuckerberg

suggested "we might want to consider paying a lot of money" for Instagram.

14.     Mr. Zuckerberg recognized that by acquiring and controlling Instagram, Facebook

would not only squelch the direct threat that Instagram posed, but also significantly hinder another

firm from using photo-sharing on mobile phones to gain popularity as a provider of personal social

networking.   As Mr. Zuckerberg explained to Chief Financial Officer David Ebersman in an email,

controlling Instagram would secure Facebook's enduring dominance around one of the few social

mechanics that could provide a footing for a competing personal social networking provider:

> [T]here are network effects around social products and a finite number of different
> social mechanics to invent.  Once someone wins at a specific mechanic, it's difficult
> for others to supplant them without doing something different.   It's possible
> someone beats Instagram by building something that is better to the point that they
> get network migration, but this is harder as long as Instagram keeps running as a
> product.  [Integrating Instagram's functions into Facebook] is also a factor but in
> reality we already know these companies' social dynamics and will integrate them
> over the next 12-24 months anyway.  The integration plan involves building their
> mechanics into our products rather than directly integrating their products if that
> makes sense. . . . [O]ne way of looking at this is that what we're really buying is
> time.   *Even if some new competitors spring[] up, buying Instagram, Path,
> Foursquare, etc now will give us a year or more to integrate their dynamics before
> anyone can get close to their scale again.   Within that time, if we incorporate the
> social mechanics they were using, those new products won't get much traction since
> we'll already have their mechanics deployed at scale.*  (Emphasis added.)

15.     On April 9, 2012—the day Facebook announced it was acquiring Instagram—Mr.

Zuckerberg wrote privately to a colleague to celebrate suppressing the threat:  "I remember your

internal post about how Instagram was our threat and not Google+.  You were basically right.  One

thing about startups though is you can often acquire them."

16.     The Instagram acquisition has given Facebook control over its most significant

personal social networking competitor, which both neutralizes the direct threat that Instagram

posed by itself, and, additionally, makes it more difficult for other firms to use photo-sharing via

smartphones to gain traction in personal social networking.  Through its control of Instagram, Facebook has attempted to prevent Instagram from "cannibalizing" Facebook Blue, confirming that an independent Instagram would constitute a significant threat to Facebook's personal social networking monopoly.  Despite Facebook's efforts, Facebook Blue has lost users and engagement to Instagram ████████████████████████████████████████████

████

17.     **WhatsApp Acquisition.**  After neutralizing the threat from Instagram, Facebook turned to what it considered "the next biggest consumer risk" for Facebook Blue:  the risk that an app offering mobile messaging services would *enter* the personal social networking market, either by adding personal social networking features or by launching a spinoff personal social networking app.  Facebook identified the popular and widely used mobile messaging app, WhatsApp, as the most significant threat in this regard.  Once again, though, rather than investing and innovating in an effort to out-compete WhatsApp, Facebook responded to the competitive threat by acquiring it.

18.     By early 2012, the risk that a successful mobile messaging app available on multiple mobile operating systems could break into personal social networking had become a strategic focus for the company's leadership.  In an April 2012 email, for example, Mr. Zuckerberg identified a troubling global trend of "messaging apps . . . using messages as a springboard to build more general mobile social networks."  And by October 2012, the threat was widely recognized within Facebook, with a Facebook business growth director predicting internally that "[t]his might be the biggest threat we've ever faced as a company."

19.     Facebook's attention soon focused on WhatsApp, which, by 2012, had become a uniquely threatening competitor in mobile messaging and an obvious candidate to enter the personal social networking market.  Not locked into a single mobile operating system like Apple's

iMessage, nor heavily localized in parts of Asia like LINE, Kakao, or WeChat, WhatsApp was the clear "category leader" in mobile messaging.  In an August 2013 email, the head of Facebook's internal mergers and acquisitions ("M&A") group warned that WhatsApp's "kind of mobile messaging is a wedge into broader social activity/sharing on mobile we have historically led in web."

20.    Once again, Facebook decided it was better to buy than compete.  After Facebook announced the acquisition of WhatsApp, employees internally celebrated the acquisition of "probably the only company which could have grown into the next FB purely on mobile[.]"  Other industry observers shared that view.  For example, investment bank SunTrust Robinson Humphrey observed in an analyst report:  "We think WhatsApp and Facebook were likely to more closely resemble each other over time, potentially creating noteworthy competition, which can now be avoided."

21.    Just as with Instagram, WhatsApp presented a powerful threat to Facebook's personal social networking monopoly, which Facebook targeted for acquisition rather than competition.  Facebook's control of WhatsApp both neutralizes WhatsApp as a direct threat and, separately, makes it harder for future mobile messaging apps to acquire scale and threaten to enter personal social networking.

22.    **Anticompetitive Conditioning.**  In addition to its strategy of acquiring competitive threats to its personal social networking monopoly, Facebook has, over many years, announced and enforced anticompetitive conditions on access to its valuable platform interconnections, such as the application programming interfaces ("APIs") that it makes available to third-party software applications.

23.     In order to communicate with Facebook (i.e., send data to Facebook Blue, or retrieve data from Facebook Blue) third-party apps must use Facebook APIs.  For many years— and continuously until a recent suspension under the glare of international antitrust and regulatory scrutiny—Facebook has made key APIs available to third-party apps *only* on the condition that they refrain from providing the same core functions that Facebook offers, including through Facebook Blue and Facebook Messenger, and from connecting with or promoting other social networks.

24.     This conduct—which is motivated by a desire to weaken and hinder potential competitive threats—harms competition and helps maintain Facebook's monopoly in personal social networking, in at least two ways.

25.     First, announcing these anticompetitive conditions changed the incentives of third-party apps that relied upon the Facebook ecosystem, by deterring them from including features and functionalities that might compete with Facebook or from working in certain ways with other firms that compete with Facebook.  This deterrence suppresses the emergence of threats to Facebook's personal social networking monopoly.

26.     Second, enforcing the anticompetitive conditions by terminating access to valuable APIs hinders and prevents promising apps from evolving into competitors that could threaten Facebook's personal social networking monopoly.

27.     **Harm to Competition.**  Through at least the foregoing conduct, Facebook suppresses, deters, hinders, and eliminates personal social networking competition, and maintains its monopoly power in the U.S. personal social networking market, through means other than merits competition.  In doing so, Facebook deprives users of personal social networking in the United States of the benefits of competition, including increased choice, quality, and innovation.

8

Facebook cannot justify this substantial harm to competition with claimed efficiencies, procompetitive benefits, or business justifications that could not be achieved through other means.

28.     By suppressing, neutralizing, and deterring the emergence and growth of personal social networking rivals, Facebook also suppresses meaningful competition for the sale of advertising.  Personal social networking providers typically monetize through the sale of advertising; thus, more competition in personal social networking is also likely to mean more competition in the provision of advertising.  By monopolizing personal social networking, Facebook thereby also deprives advertisers of the benefits of competition, such as lower advertising prices and increased choice, quality, and innovation related to advertising.

29.     Today, Facebook's course of conduct to unlawfully maintain its personal social networking monopoly continues, and must be enjoined.  Facebook continues to hold and operate Instagram and WhatsApp, and continues to keep them positioned to provide a protective "moat" around its personal social networking monopoly.  Facebook continues to look for competitive threats, and will seek to acquire them unless enjoined.  Likewise, Facebook's imposition of anticompetitive conditions on APIs continued until suspended—at least for the time being—in the glare of attention from governments and regulators around the globe.  Facebook will resume those policies or equivalent measures unless enjoined.

## II.  JURISDICTION AND VENUE

### A.  Jurisdiction

30.     This Court has subject matter jurisdiction over this action pursuant to Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. § 1331, 1137(a), and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against

restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

31.     This Court has personal jurisdiction over Facebook because Facebook has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

32.     Facebook's general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

33.     Facebook is, and at all relevant times has been, a corporation, as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**B.  Venue**

34.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b)(1), and 15 U.S.C. § 53(b).  Facebook resides, transacts business, and is found in this district.

### III.  THE PARTIES

35.     Plaintiff FTC is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices in the District of Columbia.  The Commission is vested with authority and responsibility for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces and to seek equitable remedies.

36.     The FTC is authorized to bring this case in federal court because it has reason to believe that Defendant Facebook is violating or is about to violate a provision of law enforced by the Federal Trade Commission, and this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

37.     Defendant Facebook is a publicly traded, for-profit company, incorporated in Delaware and with its principal place of business at 1601 Willow Road, Menlo Park, CA 94025. Facebook's principal businesses are in technologies that facilitate digital interactions and communications, including Facebook Blue, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and WhatsApp, which provides mobile messaging services.

## IV.  INDUSTRY BACKGROUND

### A.  The Rise of Personal Social Networking and Facebook

38.     In the early 2000s, the widespread use of personal computers enabled a new way of connecting and communicating with other people online:  social networking with friends and family.  Friendster, launched in March 2003, was one of the first personal social networks to gain significant popularity, and Myspace followed soon after.  Half a year later, in February 2004, Mr. Zuckerberg and his Harvard College classmates launched Facebook (then styled "TheFacebook").

39.     In contrast to the limited functionalities of email and messaging, personal social networking gained popularity by providing a distinct and richer way for people to maintain personal connections.  Personal social networking enables people to stay up to date and share personal content with friends and family, and is an integral part of the daily lives of millions of Americans.

40.     Through an account on a personal social network, people can post content about their own lives and interests, and view what personal connections have posted.  In doing so, they can stay up to date about the lives of people they care about.  During a single session, a person can read about one friend's recent vacation, another friend's thoughts on a local restaurant, and a relative's wedding announcement.  And then the person can post her own content, and interact

with her friends' posts, through comments, replies, and reactions.   Thus, personal social networking gives people a personalized social space in which they can share content with their personal connections.

41.     Facebook launched first on college campuses, but within a few years it had expanded to the general public.  Soon after that, Facebook surpassed both Friendster and Myspace, presenting itself as a more premium, private, and personal social networking experience.  By 2009, Facebook had established itself as the most popular personal social networking provider in the United States and the world.  Facebook has remained the number one provider of personal social networking in the United States and the world ever since.

42.     Historically, personal social networking providers have refrained from charging a monetary price for providing personal social networking to users, relying instead on monetizing user data and engagement through advertising.  Personal social networking providers compete for users on a variety of factors, including quality of the user experience, functionality, and privacy protection options, among others.

**B.   Facebook's Business Model:  Selling Advertising Based on Detailed User Data**

43.     While there are other ways in which personal social networking could be monetized, Facebook has chosen to monetize its businesses by selling advertising that is displayed to users based on the personal data about their lives that Facebook collects.

44.     This has been highly profitable for Facebook.  Advertisers pay billions—nearly $70 billion in 2019—to display their ads to specific "audiences" of Facebook Blue and Instagram users, created by Facebook using proprietary algorithms that analyze the vast quantity of user data the company collects regarding its users.  This allows advertisers to target different campaigns and

messages to different groups of users.  Ads displayed by Facebook are interspersed with—and can be similar in appearance to—user-generated content on each personal social network.

45.     Facebook has recognized the unique characteristics of the advertising that a personal social network can offer ("social advertising").  For example, in earnings calls, Facebook Chief Operating Officer ("COO") Sheryl Sandberg described Facebook Blue as the "world's first global platform that lets marketers personalize their messages at unprecedented scale," and called Facebook Blue and Instagram the "two most important mobile advertising platforms" in the world.

46.     Social advertising is distinct from other forms of advertising, including other forms of display advertising, search advertising, and "offline" advertising (e.g., television, radio, and print).

47.     Social advertising is a distinctive form of display advertising.  Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or apps when a user visits or uses them.  Display advertising is distinct from "offline" advertising, such as TV, radio, and print advertising, because it offers the ability to reach consumers during their online activity (including during their use of mobile devices like smartphones and tablets), allows for interactive ads, and permits rich ad targeting to users using personal data generated and collected through their online activity.  Display advertising is also distinct from search advertising, which is a form of digital advertising that is shown to a person when he or she enters a specific search term in an online search engine, like Google or Bing.  Advertisers buy search advertising to target consumers who are actively inquiring about a particular type of product or service.  By contrast, display advertising reaches consumers who are not actively querying a search engine, including consumers who may be further from making a specific purchase decision.

48.     Social advertising is a type of display advertising, but it is distinct in several ways from the non-social display advertising on websites and apps that are not personal social networks. For example, in part because users must log in to a personal social network with unique user credentials, social advertising enables advertisers to target users based on personalized data regarding users' personal connections, activities, identity, demographics, interests, and hobbies. Also, in contrast to display advertising on other websites and apps, social advertising leverages high engagement and frequent contact with users, as well as the integration of advertisements directly into a user's feed of content generated by personal connections (including ads that resemble "native" content and boosted content). Social advertising also facilitates forms of engagement with the advertisement that are not available with other forms of display advertising—such as allowing a user to share an advertisement with a personal connection, or to "like" or follow an advertiser's page. Among other things, the foregoing characteristics enable social advertising providers to sell advertisers access to personally targeted "audiences" of highly engaged users, and to reach users that need not be actively searching for—or even aware of—the advertised product or service.

49.     As Ms. Sandberg emphasized in a 2012 earnings call: "[O]n the question of where advertisers are, you know as I've said before, we are a third thing. We're not TV, we're not search. We are social advertising." Facebook in particular has a preeminent ability to target users with advertising due to its scale, its high level of user engagement, and its ability to track users both on and off Facebook properties to measure outcomes.

50.     Facebook's social advertising business, serving ads to users of its personal social networks reflecting its vast access to data, is extraordinarily profitable. According to its public

earnings reports, Facebook earns "substantially all of [its] revenue from selling advertising placements to marketers."

## V.  RELEVANT MARKET AND MONOPOLY POWER

### A.  Personal Social Networking in the United States

51.     The provision of personal social networking services ("personal social networking" or "personal social networking services") in the United States is a relevant market.

52.     Personal social networking services are a relevant product market.  Personal social networking services consist of online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space.  Personal social networking services are a unique and distinct type of online service.  Three key elements distinguish personal social networking services from other forms of online services provided to users.

53.     First, personal social networking services are built on a social graph that maps the connections between users and their friends, family, and other personal connections.  The social graph forms the foundation upon which users connect and communicate with their personal connections, and can reflect friendships, online conversations, a desire to see someone's updates, visits to places, and other shared connections to personal interests and activities, including groups, locations, businesses, artists, and hobbies.  Personal social networking providers use the social graph as the backbone for the features they offer users, including the two other key elements of personal social networking discussed below.

54.     Second, personal social networking services include features that many users regularly employ to interact with personal connections and share their personal experiences in a shared social space, including in a one-to-many "broadcast" format.  In this shared social space,

which may include a news feed or other similar feature, users share content—such as personal updates, interests, photos, news, and videos—with their personal connections. Personal social networking providers can use the social graph to inform what content they display to users in the shared social space and when. This generally applies to all forms of content on the personal social networking service, including user-created content like user "news feed" posts, publisher-created content like news articles, and advertisements.

55.    Third, personal social networking services include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections. The social graph also supports this feature by informing which connections are suggested or available to users.

56.    The relevant geographic market is the United States. The United States is a relevant geographic market for personal social networking services due to several factors, including differences in broadband access and social norms that vary at the country level. In addition, network effects between users are generally stronger between users in the same country, because for most users the vast majority of relevant friends, family, and other personal connections reside in the same country as the user. Accordingly, users in the United States predominately share with other users in the United States. For users in the United States, a personal social networking service that is not popular in the United States, even if it is popular in another country, is therefore not reasonably interchangeable with a personal social networking service that is popular in the United States. Facebook and other industry participants recognize these distinctions and track their performance, and that of rivals, separately by country.

57.    While users may engage with other websites and apps, other types of internet services are not adequate substitutes for personal social networking.

58.     Personal social networking is distinct from, and not reasonably interchangeable with, specialized social networking services like those that focus on professional (e.g., LinkedIn) or interest-based (e.g., Strava) connections.  Specialized networks are designed for, and are utilized by users primarily for, sharing a narrow and highly specialized category of content with a narrow and highly specialized set of users for a narrow and distinct set of purposes.

59.     Personal social networking is distinct from, and not reasonably interchangeable with, online video or audio consumption-focused services such as YouTube, Spotify, Netflix, and Hulu.  Users employ such services primarily for the passive consumption and posting of specific media content (e.g., videos or music) from and to a wide audience of often unknown users.  These services are not used primarily to communicate with friends, family, and other personal connections.

60.     Personal social networking is distinct from, and not reasonably interchangeable with, mobile messaging services.  Mobile messaging services do not feature a shared social space in which users can interact, and do not rely upon a social graph that supports users in making connections and sharing experiences with friends and family.  Indeed, users of mobile messaging services generally do not and cannot query a mobile messaging service to find contact information they do not already possess, nor can they query the service to find other users connected to the people, places, things, and interests that matter to them.  Instead, users of mobile messaging services employ such services primarily to send communications to a small and discrete set of people generally limited to a set of contacts entered by each user.  Mr. Zuckerberg described this distinction in a 2019 post, calling personal social networking providers like Facebook Blue "the digital equivalent of a town square," and contrasting the private communication offered by mobile messaging apps like WhatsApp as "the digital equivalent of the living room."

B. **Facebook's Monopoly Power**

61.     Facebook provides personal social networking to users via its Facebook Blue and Instagram services.

62.     Facebook Blue has been the dominant personal social networking provider in the United States since at least 2011.  From the beginning, Mr. Zuckerberg has described Facebook Blue as being "about real connections to actual friends, so the stories coming in are of interest to the people receiving them, since they are significant to the person creating them." ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Indeed, in August 2020, Mr. Zuckerberg testified that "the use cases that we've focused on the most over time are helping you connect . . . with your friends and family."  Similarly, Ms. Sandberg testified in September 2020 that the value Facebook Blue provides to its users is "helping you stay in touch with friends and family and helping you know what's going on with them in a very efficient way."

63.     Instagram provided personal social networking at the time Facebook acquired it. Instagram's founders set out to build a "mobile social network" and succeeded in doing so.  Since its founding, Instagram has provided the defining features of personal social networking, including maintaining a social graph with personal connections, enabling users to interact with their personal connections and share their personal experiences via a shared social space, including in a one-to-many "broadcast" format, and offering features that allow each user to find and connect with other users, to build a network of personal connections.

64.     Facebook holds monopoly power in the provision of personal social networking in the United States, and has held such power continuously since at least 2011.  Facebook has

maintained a dominant share of the U.S. personal social networking market (in excess of 60%) since that time, until the present day.  It is likely to continue to hold monopoly power for the foreseeable future.

65.     Facebook's dominant position in the U.S. personal social networking market is durable, due to significant entry barriers, including direct network effects and high switching costs. Direct network effects refer to user-to-user effects that make a personal social network more valuable as more users join the service.  Direct network effects are a significant barrier to entry into personal social networking.   Specifically, because a core purpose of personal social networking is to connect and engage with personal connections, it is very difficult for a new entrant to displace an established personal social network in which users' friends and family already participate.

66.     A potential entrant in personal social networking services also would have to overcome users' reluctance to incur high switching costs.  Over time, users of a personal social network build more connections and develop a history of posts and shared experiences, which they would lose by switching to another personal social networking provider.  Further, these switching costs can increase over time—a form of a "ratchet effect"—as each user's collection of content and connections, and investment of effort in building each, continually builds with use of the service.

67.     Providers of personal social networking typically sell advertising that they display to their users.  Any positive indirect network effects (i.e., increases in the value of one service as a function of usage of another) between a personal social networking provider's services to users and its sale of advertising to advertisers operate in only one direction:  users either are indifferent

to the amount of advertising that the personal social networking provider displays, or would prefer fewer or no advertisements.

## VI.  ANTICOMPETITIVE CONDUCT

### A.  Facebook's Efforts to Deter, Suppress, and Neutralize Personal Social Networking Competition

68.     Personal social networking is characterized by strong network effects:  a provider's service is generally more valuable to a user when more of the user's friends and family are using that service.  Once a personal social network has achieved dominant scale, these effects make competition and entry harder, even for a rival that users perceive as offering a higher quality product.

69.     As a result, and as Facebook well understands, the most significant competitive threats to Facebook Blue may come not from near clones of Facebook Blue, but from differentiated products that offer users a distinctive way of interacting with friends and family for which Facebook Blue is not optimized.  As Mr. Zuckerberg explained in a February 2012 email:  "Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different."

70.     Facebook's leadership also understands that Facebook Blue's personal social networking monopoly is most vulnerable at moments of disruption and transition, when a competitor may be better placed than Facebook Blue to exploit changes in technology or consumer behavior.  A crucial transition of this kind occurred from about 2010 to 2014 with the proliferation of smartphones, which transformed the way that users consumed digital services.  Mr. Zuckerberg and other executives realized that Facebook Blue offered a relatively poor experience for mobile users, and that this made Facebook's monopoly position more vulnerable than it had ever been.

71.     Facebook navigated this period of transition, and has maintained its monopoly power in personal social networking thereafter, not by competing on the merits, but rather through a course of anticompetitive conduct spanning years.  This course of conduct includes at least:

    a.  the acquisition and continued control of Instagram, which has neutralized a significant independent personal social networking provider;

    b.  the acquisition and continued control of WhatsApp, which has neutralized a significant competitive threat to Facebook's personal social networking monopoly; and

    c.  the imposition and enforcement of anticompetitive conditions on access to APIs in order to suppress and deter competitive threats to its personal social networking monopoly.

72.     This conduct reflects a deeply rooted view within Facebook that, as Mr. Zuckerberg put it in a June 2008 internal email, "it is better to buy than compete."  This view recurs in Facebook's internal documents.  For example, Mr. Zuckerberg noted after the announcement of the Instagram acquisition that "we can likely always just buy any competitive startups."

73.     Consistent with this approach, and in addition to the conduct identified above and described in more detail below, Facebook has tried and failed to buy other companies that have drawn its competitive attention, including Twitter and Snapchat.  For example, in lamenting that Twitter had "turned down [Facebook's] offer" to be acquired in November 2008, Mr. Zuckerberg wrote:  "I was looking forward to the extra time that would have given us to get our product in order without having to worry about a competitor growing."  Similarly, Facebook has made multiple overtures to acquire Snapchat over the years, moving with particular urgency when it

believed that Snapchat might have had other well-financed suitors that could have bolstered its competitive position.

74.     Facebook has also made a point of attempting to detect and evaluate competitive threats early, in order to neutralize them before they have a chance to grow fully.  Reflecting this policy, in October 2013, Facebook acquired the user surveillance company Onavo.  Onavo marketed itself to users as providing secure virtual private networking services, but—unknown to many users—it also tracked users' online activity.

75.     By acquiring Onavo, Facebook obtained control of data that it used to track the growth and popularity of other apps, with an eye towards identifying competitive threats for acquisition or for targeting under its anticompetitive platform policies.  As a December 2013 internal slide deck noted:  "With our acquisition of Onavo, we now have insight into the most popular apps.  We should use that to also help us make strategic acquisitions."  Facebook also used Onavo data to generate internal "Early Bird" reports for Facebook executives, which focused on "apps that are gaining prominence in the mobile eco-system in a rate or manner which makes them stand out."  Facebook shut down Onavo in 2019 following public scrutiny; however, it continues to track and evaluate potential competitive threats using other data.

76.     Today, Facebook's monopolization is ongoing.  Facebook continues to hold and operate Instagram and WhatsApp, which neutralizes their direct competitive threats to Facebook, and continues to keep them positioned to provide a protective "moat" around its personal social networking monopoly.  Specifically, Facebook recognizes that so long as it maintains Instagram and WhatsApp operating at scale, it will be harder for new firms to enter and build scale around their respective mechanics.  Thus, Facebook benefits from precisely the dynamic that Mr. Zuckerberg emphasized when explaining the value of the Instagram acquisition:  "new products

won't get much traction since we'll already have their mechanics deployed at scale."  Facebook continues to look for other competitive threats, and will seek to acquire them unless enjoined from doing so.

77.     Likewise, Facebook's imposition of anticompetitive conditions on APIs—punishing and suppressing some promising threats (e.g., Path, Circle, and various messaging apps) and preventing and deterring others from even becoming threats in the first place—continued until recently suspended in the glare of attention from governments and regulators around the globe. Facebook will resume those policies or equivalent measures unless enjoined from doing so.

## B.  Facebook Acquired Instagram to Neutralize a Competitor

78.     Beginning around 2010, the widespread adoption of smartphones marked a significant change in the way that people consumed digital services, with people shifting from desktop computers to mobile devices.  With respect to personal social networking services, because smartphones are portable and offer integrated digital cameras, social networking with family and friends through taking, sharing, and commenting on photographs via a mobile app optimized for that activity became increasingly popular.

79.     But Facebook Blue was struggling to provide a strong user experience for this kind of personal social networking activity.  It was built and optimized for desktop use, not smartphones, and its performance for working with and sharing photos on mobile devices was weak.  Facebook feared that its personal social networking monopoly would be toppled by a mobile-first, photo-based competitor emerging and gaining traction.

80.     It was soon clear that Instagram was just that competitor.  Following its launch in October 2010 for iOS devices, Instagram quickly gained popularity for users seeking a product that facilitated photo-based social interactions with friends and family.

81.     Instagram's growth was stellar.  It gained 25,000 users on its first day; 100,000 users in a week; 1 million users in less than three months; and 10 million users in less than a year—all while available only on Apple's iOS devices and before launching on Android devices.

82.     Facebook watched Instagram's emergence with mounting anxiety.  In February 2011, Mr. Zuckerberg wrote to colleagues:  "In 4 months they're up to 2m users and 300k daily photo uploads.  That's a lot.  We need to track this closely."

83.     Facebook initially tried to compete on the merits with mobile photo-sharing capabilities, dedicating significant resources to developing its own camera app, code-named "Snap."  But despite relentless pressure from senior management, these efforts met with limited success.  In July 2011, one executive demanded: "[W]hy is mobile photos app development moving so slowly?  We still are getting our ass kicked by Instagram."  And by September 2011, Mr. Zuckerberg was railing:  "In the time it has taken us to get ou[r] act together on this[,] Instagram has become a large and viable competitor to us on mobile photos, which will increasingly be the future of photos."

84.     In that same September 2011 email, Mr. Zuckerberg warned that Instagram was a major threat:

> One theme in many of the products we're about to launch -- *News Feed, Timeline, Open Graph -- is that people love nice big photos.*  A lot of the time people don't even understand how the new News Feed or Timeline work, but they love those products because of the bigger and richer photos.  While this is nice in the short term, *I view this as a big strategic risk for us if we don't completely own the photos space.  If Instagram continues to kick ass on mobile or if Google buys them, then over the next few years they could easily add pieces of their service that copy what we're doing now, and if they have a growing number of people's photos then that's a real issue for us.*
>
> They're growing extremely quickly right now.  It seems like they double every couple of months or so, and their base is already -5-10m users.  As soon as we launch a compelling product a lot of people will use ours more and future Instagram users will find no reason to use them.  But at the current rate, *literally every couple*

*of months that we waste translates to a double in their growth and a harder position
for us to work our way out of.*  (Emphasis added.)

85.     Facebook employees scrambled to meet Mr. Zuckerberg's demands.  In an internal
email dated September 13, 2011, Facebook's Director of Engineering reminded her team:  "Zuck
is anxious for the [Facebook] snap app (mainly motivated by a desire to slow down Instagram's
growth)."

86.     Facebook's leadership feared not only an independent Instagram, but also an
Instagram in the hands of another purchaser, such as Google (mentioned by Mr. Zuckerberg in the
September 2011 email above), Apple, or Twitter.  In April 2012, a Facebook engineer warned Mr.
Zuckerberg of "the potential for someone like Apple to use [Instagram] as a foothold."  And an
investor in Instagram and former Facebook executive underscored the threat of Twitter:  "if twitter
and instragram [sic] became one company it would make life more difficult for facebook."

87.     As Instagram soared, Facebook's leaders began to focus on the prospect of
acquiring Instagram rather than competing with it.  For example, in January 2012, the head of
Facebook's internal M&A group wrote to Mr. Zuckerberg to suggest "m&a" as a solution to this
problem, in order to increase users' switching costs, retain engagement, and lock them into
Facebook Blue:

> *[I] think photos in general and certainly in conjunction with mobile is a weak spot
> for us, yet represents a large part of many users['] engagement on fb.  i view this
> as both a significant threat (google/picasa/android, instagram, etc.) and
> opportunity. . . .* imo, photos (along with comprehensive/smart contacts and unified
> messaging) is perhaps one of the most important ways we can make switching costs
> very high for users - if we are where all users' photos reside because the upoading
> [sic] (mobile and web), editing, organizing, and sharing features are best in class,
> will be very tough for a user to switch if they can't take those photos and associated
> data/comments with them.  i think this area should be a priority for us organically
> *and through m&a especially given competitive dynamics.*  (Emphasis added.)

88.     By February 2012, Mr. Zuckerberg predicted that an independent Instagram could

soon achieve massive scale, and suggested that Facebook should move to acquire it:

> *If [my analytical] framework holds true, then we should expect apps like Instagram
> to be able to grow quite large.* If it has 15m users now, it might be able to reach
> 100-200m in the next 1-2 years.  (Intuitively this is not crazy because in the next
> year alone iOS should double and it should spread to Android, so even without
> further increase in market share it should grow by at least 4x this year.)  If those
> assumptions hold true, then *we should perhaps be more open to buying these
> companies than we currently seem to be.*  (Emphasis added.)

89.     Throughout this period, Mr. Zuckerberg repeatedly explained the case for

acquisition in terms of Instagram's threat as a personal social networking competitor.  In February

2012, he wrote:

> *I wonder if we should consider buying Instagram,* even if it costs ~$500m. . . . For
> the network piece, *one concerning trend is that a huge number of people are using
> Instagram every day -- including everyone ranging from non-technical high school
> friends to even FB employees -- and they're only uploading some of their photos to
> FB.*  This creates a huge hole for us and one that I'm [sic] sure anything we're going
> to do on platform or with social dynamics will completely solve. *Sometimes you
> don't want to bug all your FB friends with a lot of photos so you put them in the
> photo-posting place instead.*  With [Facebook] Snap, our basic thesis is that what
> people need is a good way to post a bunch of photos on FB.  We're doing some
> work on filters but not a ton, and the team is approaching this more as a nice feature
> and somewhat of a gimmick.  Instagram, on the other hand, is approaching this
> problem from the perspective of how to help people take beautiful photos.  *I think
> it's quite possible that our initial thesis was wrong and that theirs is right -- that
> what people want is more to take the best photos than to put them on FB.  If so,
> [Facebook] Snap might be a good first step but we'd be very behind in both
> functionality and brand on how one of the core use cases of Facebook will evolve
> in the mobile world, which is really scary and why we might want to consider
> paying a lot of money for this.*  (Emphasis added.)

90.     Later that month, Mr. Zuckerberg wrote in similar terms to Mr. Ebersman:

> One business questions [sic] I've been thinking about recently is how much we
> should be willing to pay to acquire *mobile app companies like Instagram and Path
> that are building networks that are competitive with our own.*  These companies
> have the properties where they have millions of users (up to about 20m at the
> moment for Instagram), fast growth, a small team (10-25 employees) and no
> revenue.  The businesses are nascent *but the networks are established, the brands
> are already meaningful and if they grow to a large scale they could be very*

26

*disruptive to us.*  These entrepreneurs don't want to sell (largely inspired [by] our success), but at a high enough price -- like $500m or $1b -- they'd have to consider it.  Given that we think our own valuation is fairly aggressive right now and that *we're vulnerable in mobile,* I'm curious if we should consider going after one or two of them.  What do you think about this?  (Emphasis added.)

91.     Mr. Ebersman cautioned that acquiring a nascent competitor was a poor reason for an acquisition since "someone else will spring up immediately in their place" and "[w]e will always have upstarts nipping at our heels."  But, as Mr. Zuckerberg explained, Mr. Ebersman was wrong:

> *It's a combination of (1) [i.e., neutralizing a potential competitor] and (3) [integrating acquired products into Facebook].*  The basic plan would be to buy these companies and leave their products running while over time incorporating the social dynamics they've invented into our core products.  *One thing that may make [neutralizing a potential competitor] more reasonable here is that there are network effects around social products and a finite number of different social mechanics to invent.  Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different.  It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product.  [Integrating acquired products into FB] is also a factor but in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway.*  The integration plan involves building their mechanics into our products rather than directly integrating their products if that makes sense. By a combination of (1) and (3), one way of looking at this is that what we're really buying is time.  *Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again.  Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.*  (Emphasis added.)

92.     On March 9, 2012, Mr. Zuckerberg emailed Facebook's Vice President of Engineering (and later Chief Technology Officer) Mike Schroepfer to let him know that "Kevin [Systrom] from Instagram called me yesterday to talk about selling his [company] to us.  He said he thinks he'll either raise money or sell at $500m."  Mr. Schroepfer replied that *"not losing strategic position in photos is worth a lot of money."*

93.     Similarly, on April 4, 2012, Ms. Sandberg and other senior managers received an email report that compared usage of Instagram and Facebook Blue on the iPhone, which flagged that "Facebook is not that far ahead [of Instagram] on iPhone."  Ms. Sandberg forwarded the email to Mr. Zuckerberg, noting:  "This makes me want instagram more[.]"

94.     Meanwhile, Facebook employees continued their efforts to compete with Instagram by developing a standalone photo-sharing app for the Facebook Blue network.  For example, in an email dated April 3, 2012, Mr. Schroepfer reminded a Facebook engineer, with respect to Facebook's own photo app:  "[W]e need to get into ship mode asap.  Not sure if you saw the recent instgram [sic] numbers but we just don't have much time."  The engineer responded a couple of hours later:  "Yeah, Instagram stats are scary and we need to ship asap.  I'll communicate to the team that we need to enter into launch mode."

95.     On April 9, 2012, Facebook announced that it had reached an agreement to acquire Instagram for $1 billion, Facebook's most expensive acquisition as of that date.  Facebook paid a premium for Instagram, reflecting the significant threat that Instagram posed to Facebook's monopoly.

96.     Meanwhile, Facebook employees celebrated the acquisition of an existential threat. For example, on April 10, 2012—two days after the announcement—the head of Facebook's internal M&A group wrote to Mr. Ebersman emphasizing that Instagram had "done a great job in one of the main tenets of social networking as we know it today (photos), but where social networking is clearly headed (mobile)."  He noted that "their growth trajectory is pretty incredible, mark asked them yesterday during their visit when they will reach 100m users and they said their projections are for end of this year."

97.     Other close observers of Facebook recognized that Facebook had neutralized a significant competitive threat by buying Instagram.  For example, in an email dated April 12, 2012, a major Facebook shareholder and former Facebook executive wrote to Instagram co-founder Kevin Systrom:

> I have been prodding various FB folks, including Zuck, for at least 6 months to do this, do it quickly, and do it at any cost.  From my perspective the risk of not buying you guys (and someone like Google snapping you up) was beginning to make me, and a lot of other major shareholders, extremely uncomfortable. . . . [I]n the last few years [Facebook] allowed [its] core photos product (and its mobile offering) to languish.  As a result the photos product never realized its ultimate potential, and worse, it ran the risk of the unthinkable happening - being eclipsed by another network with a "parallel graph".  As you know, photos is the lifeblood of Facebook, propping up the whole network through the usage, interaction, and positive feedback loops it generates, and time on site is directly linked to photo browsing.  Going back to 2005, shortly after I launched photos it was generating ~50% of all Facebook page views, a stat which remained fairly steady until the introduction of games on platform.  (Emphasis added.)

98.     Less than two weeks after the acquisition was announced, Mr. Zuckerberg suggested canceling or scaling back investment in Facebook's own mobile photo app as a direct result of the Instagram deal, writing in an email dated April 22, 2012:  "Examples of things we could scale back or cancel: . . . Mobile photos app (since we're acquiring Instagram)."  And Facebook did indeed allow it to die, making only two updates to it before discontinuing it entirely in 2014.

99.     In the wake of the Instagram acquisition, Facebook employees felt that they no longer needed to fear that a personal social networking competitor would emerge using mobile photo-sharing.  For example, in an email dated April 23, 2012, a Facebook business development manager wrote to colleagues that he was unconcerned about the apps Camera+ and Hipstamatic because, among other things, "Instagram is clear winner on iOS and would [be] difficult to compete with at this point[.]"  In an October 2012 document, a Facebook product director

29

recognized that its ownership of Instagram meant it "effectively dominate[d] photo sharing," and would not be "require[d] to do much work to maintain or extend" that dominance.

100.    Facebook's acquisition of Instagram neutralized a singularly threatening personal social networking competitor and an increasingly serious threat to Facebook Blue's monopoly. An investor slide deck dated May 31, 2011, underscored Instagram's founders' plan "to develop a complete social networking service."  Mr. Systrom emphasized the breadth of this vision to Mr. Zuckerberg in private correspondence shortly before the acquisition:

> [My vision for Instagram] means *not limiting the scope of Instagram to just photos - but to explore other mediums as well which support the original vision* of Burbn [Instagram's original name] *being to improve the way we communicate and share in the real world. . . . Is it a next-generation photos app or is it a next-generation communication app?*  I don't mean to get overly philosophical, *but the limits of our ambitions have really yet to be tested, and I want to see that through at least for now.  The desire to have an effect at the scale of FB is real and tangible,* and one that is actually quite hard to balance in our minds.  (Emphasis added.)

101.    Instagram also planned and expected to be an important advertising competitor.  An investor slide deck dated May 31, 2011, records Instagram's plan to earn revenues through mobile advertising.  Likewise, in a January 2012 email, Mr. Systrom explained to an external partner: "[W]e believe in the long run brands will pay to either be featured, have their content featured, or run targeted 'instagrams' to people as advertisements.  Right now we raised enough money that we can work on building a product people love before going to try to sell to advertisers.  We want an audience first[.]"

102.    By acquiring Instagram, Facebook neutralized Instagram as an independent competitor to Facebook Blue.  Since the acquisition, Facebook has taken actions to reduce the impact of Instagram on Facebook Blue, confirming that Instagram is a significant threat to Facebook's personal social networking monopoly.  For instance, after the acquisition Facebook limited promotions of Instagram that would have otherwise drawn users away from Facebook

Blue.  This disappointed Mr. Systrom, who complained in a November 2012 email: "you keep mentioning how you can't promote Instagram until you understand it's [sic] effect on FB engagement.  Who decided this?"

103.    Facebook's Vice President of Growth responded: "Chris [Cox, Vice President of Product,] voiced the concern (which btw I agree with) about instagram's feed cannibalizing our own / training users to check multiple feeds—which is why we want to first measure the impact of instagram's usage on our engagement / wire things up to make sure it is all accretive. . . . I am not sure growing Instagram blindly through promotions without understanding the impact on FB's engagement makes sense[.]"

104.    Nevertheless, despite Facebook's efforts to minimize Instagram's impact on Facebook Blue, Facebook Blue continues to lose ground to Instagram.  For example, a ████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████

105.    In sum, Facebook's acquisition and control of Instagram represents the neutralization of a significant threat to Facebook Blue's personal social networking monopoly, and the unlawful maintenance of that monopoly by means other than merits competition.  This conduct deprives users of the benefits of competition from an independent Instagram (either on its own or acquired by a third party), including, among other things:  the presence of an additional locus of competitive decision-making and innovation; a check on Facebook Blue's treatment of and level of service offered to users; an alternative provider of personal social networking for users untethered from Facebook's control; and a spur for Facebook to compete on the merits in response.

Facebook's ownership and control of Instagram also maintains a protective "moat" that deters and hinders competition and entry in personal social networking.

106.     Facebook cannot substantiate merger-specific efficiencies or other procompetitive benefits sufficient to justify the Instagram acquisition.

## C.  Facebook Acquired WhatsApp to Neutralize a Competitive Threat to its Personal Social Networking Monopoly

107.     Beginning around 2010, as another consequence of the increased popularity of smartphones, consumers began using mobile messaging services to communicate with one another.  Mobile messaging includes (1) text messaging via short-message-service or multimedia-message-service protocols ("SMS"), and (2) text messaging via internet-based, over-the-top mobile messaging apps ("OTT mobile messaging services").  Traditionally, OTT mobile messaging services have not charged a per-message fee, and have provided improvements over SMS, like enhanced features for sharing content (e.g., photos, videos, sound clips, and GIFs) and the option to create persistent groups of users.  Since 2011, when the messaging volume of SMS peaked, the messaging volume of OTT messaging services has grown astronomically.

108.     Facebook's leadership soon realized that the explosion of OTT mobile messaging services presented a significant competitive threat to Facebook Blue's personal social networking monopoly.  In particular, they realized that a mobile messaging app that reached sufficient scale could, by adding additional features and functionalities, enter the personal social networking market at competitive scale and undermine or displace Facebook Blue's personal social networking monopoly.

109.     Facebook's leadership feared that mobile messaging would serve as a path for a serious competitive threat to enter the personal social networking market.  For example, in an April 2012 email, a Facebook data scientist noted:  "[W]hile these [mobile messaging] apps began as

32

alternatives to SMS, they are increasingly expanding into domains that more closely resemble traditional social-networking services."  A couple of weeks later, he wrote again to colleagues: "We're continuing to focus on mobile messenger apps.  Two takeaways:  several of these apps are trying to expand into more full-fledged social networking; and a number are working on international expansion but with varying degrees of success."  Likewise, in an August 2013 email, the head of Facebook's internal M&A group warned that "the scary part, of course, is that this kind of mobile messaging is a wedge into broader social activity / sharing on mobile we have historically led in web."

110.    Facebook executives and employees saw this as a serious strategic threat.  For example, in an email dated October 4, 2012, Facebook's Director of Product Management wrote to colleagues on the subject of competition from mobile messaging services:  "[T]his is the biggest threat to our product that I've ever seen in my 5 years here at Facebook; it's bigger than G+, and we're all terrified.  These guys actually have a credible strategy:  start with the most intimate social graph (I.e. [sic] the ones you message on mobile), and build from there."

111.    Similarly, notes included with a February 2013 Facebook board presentation titled "Mobile Messaging" warned that mobile messaging services were "a threat to our core businesses: both [with respect to] graph and content sharing.  [T]hey are building gaming platforms, profiles, and news feeds. [T]hese competitors have all the ingredients for building a mobile-first social network. . . . At its current rate, WhatsApp will be near SMS levels of messaging in 1 year[.]"

112.    Mr. Zuckerberg also recognized the strategic value of mobile messaging services as popular and important services in their own right.  For example, in April 2012, he wrote: "I actually think that messaging is the single most important app on anyone's phone.  It may not be the biggest business, but it is almost certainly by far the most used app, and therefore it's a

critical strategic point for us."  He continued:  "Since we bought Instagram (and extended the close date!), I now feel like we're ahead in photos but falling increasingly behind in messages."

113.    Facebook's fears soon focused on WhatsApp, the leading OTT mobile messaging services provider and a significant competitive threat to Facebook Blue's personal social networking monopoly.   Launched in November 2009, WhatsApp's distinctively strong user experience and top-grade privacy protection had fueled stellar growth.   By February 2014, WhatsApp had approximately 450 million monthly active users worldwide and was gaining users at a rate of one million per day, placing it "on a path to connect 1 billion people."

114.    Unlike other mobile messaging apps that had built a large user base in parts of Asia but had not made inroads in the West, WhatsApp had not only achieved vast scale in Asia and Europe, but was also building share in the United States.   Unlike Apple's iMessage app, which is confined to the iOS operating system on Apple devices, WhatsApp was available on all the major smartphone operating systems, positioning it as a credible threat to achieve significant cross-platform scale.   And unlike traditional SMS, WhatsApp offered a rich content-sharing ability akin to a social network and increased encryption for privacy-conscious users.   As a result, WhatsApp threatened a move or spin-off into the personal social networking market.

115.    Facebook launched Facebook Messenger, an app that offered OTT mobile messaging services, in the fall of 2011, in a direct effort to prevent WhatsApp from gaining scale.  On the date of its global launch, the product director of Facebook Messenger wrote to his team that:  "We have a great shot of competing with Whatsapp on being the app for serious mobile messaging users worldwide. . . . Whatsapp has 15 million (registered?) users.  Let's see how quickly can we get to 10 million daily actives."

116.    But Facebook soon realized that it was far behind WhatsApp.  To improve its performance and usage, Facebook would have had to spend considerable resources to catch up. As Mr. Zuckerberg put it in April 2012:

> [R]ight now, aside from Facebook integration, WhatsApp is legitimately a better product for mobile messaging than even our standalone Messenger app.  It's more reliable and faster for sending messages.  You get better signal and feedback via read receipts and last seen times.  You can even reach most people easily via the contacts integration. . . . [W]hatsApp sends more mobile messages per day than we do by more than 2x, and they're growing about 3x faster week-over-week.  This is a big deal. . . . [U]nfortunately for us, I don't think there's any way to directly minimize the advantage which is their momentum and growth rate.  Their growth comes from the product and network they've built, so the best things that we can do is build out our product and network as well and as quickly as we can.

117.    Facebook executives saw clearly that WhatsApp credibly threatened to increase its scale in mobile messaging in the United States as it had already done in Europe and elsewhere. One executive wrote to Mr. Zuckerberg on August 8, 2013:  "[I] am really worried . . . these guys [WhatsApp] are the real deal!"  He continued:  "With the window of opportunity to solve the messaging situation shrinking there are a couple of things we might want to add to messenger 3.0 . . . . I will run it by you offline briefly to get your thoughts / see if we should double down now (it might be now or never given how fast these guys keep growing / the ambitions they are signaling)[.]"  Mr. Zuckerberg responded:  "[I]f they build substantive features beyond just making SMS free, that could be enough for them to tip markets like the US where SMS is still the primarily [sic] platform."

118.    Facebook executives and employees repeatedly identified WhatsApp internally as a unique threat to Facebook Blue that it would not be able to forestall through competition via Facebook Messenger.  For example:

   a.    In May 2013, a Facebook director of product growth commented of WhatsApp's
         CEO, Jan Koum, that he is "our biggest competitor/threat today[.]"

35

    b.   In July 2013, a director of engineering wrote: "'If we don't build the thing that kills Facebook, someone else will,' and that's WhatsApp (see below).  I personally think companies like WhatsApp are Facebook's biggest threat . . . [.]"

    c.   In August 2013, the Vice President of Growth noted: "We are definitely not playing in the same field as whatsapp does . . . . [W]e might be already too late as of today for a 'start from scratch strategy' . . . [.]"

    d.   In September 2013, the Vice President of Growth wrote further that if WhatsApp became a platform "in a way that makes the user experience better / fuels growth -> we are f.ed / this cements them as leader[.]"

119.    Facebook feared not only what WhatsApp would do independently; it also feared what WhatsApp would do in the hands of another purchaser.  As Facebook's Vice President of Growth wrote in October 2012, the "[b]iggest problem would be if it lands in the wrong hands…[.]"  Facebook particularly feared an acquisition of WhatsApp by Google.  As a manager of engineering and co-founder of a messaging app that Facebook acquired in 2011 warned colleagues in October 2012: "[T]he case for Google acquiring WhatsApp has only gotten stronger in the past 6 months. . . . [I]f [WhatsApp] is acquirable at all, the risks of us not being the acquirer have grown."  Facebook's Vice President of Growth agreed: "[T]hat is definitely what I would do if I was them…[.]"

120.    As with Instagram, Facebook decided to acquire WhatsApp rather than compete with it, in an effort to neutralize a significant competitive threat to its personal social networking monopoly.  In April 2012, Mr. Zuckerberg wrote: "[I]'m the most worried about messaging. WhatsApp is already ahead of us in messaging in the same way Instagram was 'ahead' of us in photos."  He added:  "I'd pay $1b for them if we could get them."

121.    Facebook first reached out to WhatsApp about a potential acquisition in November 2012; and it reached out again in February 2014, this time with more success.  On February 19, 2014, Facebook announced an agreement to buy WhatsApp for $19 billion.  This valuation reflected the seriousness of the threat that WhatsApp posed to Facebook's personal social networking monopoly.

122.    For the second time in two years, Facebook employees celebrated the neutralization of an existential competitive threat.  In an instant message dated February 19, 2014, a Facebook manager noted approvingly:  "[W]orth it.  Their numbers are through the roof, everyone uses them, especially abroad it [sic].  *Prevents probably the only company which could have grown into the next FB purely on mobile[.]* . . . [1]0% of our market cap is worth that[.]"  (Emphasis added.)

123.    A few days later, a Facebook executive wrote to colleagues summarizing the WhatsApp acquisition as a "land grab"—a significant response to a limited period of competitive vulnerability, rather than something that would have to be repeated regularly in the future:

> A big concern expressed is that we are going to spend 5-10% of our market cap every couple years to shore up our position.  I like David's answer that we think this is a "point in time" where change is coming to the mobile landscape.  I hate the word "land grab" but I think that is the best convincing argument and we should own that.

124.    Outside Facebook, industry analysts also understood that the WhatsApp acquisition had neutralized a significant competitive threat to Facebook.  The investment bank SunTrust Robinson Humphrey laid out the case for the deal with remarkable clarity:

> [W]e feel it is easy to see why WhatsApp was more than just a "messaging" threat. Much like how the acquisition of Instagram by Facebook was both an offensive and defensive move, we think this acquisition not only expands the company's [total addressable market] and capabilities but also covers it's [sic] flank from the fast growing "messaging companies".  At first glance, one may assume that WhatsApp is "merely a texting app".  However WhatsApp is much more, sharing 600m photos, 100m videos, 200m voice messages, and 19B messages per day.  Moreover, users can also share locations, places, and communicate 1-to-1 or 1-to-many.  Given this

functionality by WhatsApp and the focus of Facebook on communication and linking the world's population, we think WhatsApp and Facebook were likely to more closely resemble each other over time, potentially creating noteworthy competition, which can now be avoided.

125.    Another firm, Bernstein Research, noted of the deal:

The "distance" between the WhatsApp mobile stream and Facebook's mobile Newsfeed is not great and one could see the emergence of another 1 billion user service that could, over time, become a competitor to Facebook for user engagement.  As an independent company or as part of another business such as Google, Twitter, or eBay, WhatsApp graph could be extended and used to create a feasible competitor to Facebook.

126.    By acquiring WhatsApp, Facebook has suppressed the competitive threat that WhatsApp poses to Facebook's personal social networking monopoly.  Facebook has kept WhatsApp cabined to providing mobile messaging services rather than allowing WhatsApp to become a competing personal social networking provider, and has limited promotion of WhatsApp in the United States.  For example ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

127.    In sum, Facebook's acquisition and control of WhatsApp represents the neutralization of a significant threat to Facebook Blue's personal social networking monopoly, and the unlawful maintenance of that monopoly by means other than merits competition.  This conduct deprives users of the benefits of competition from an independent WhatsApp (either on its own or acquired by a third party), which would have the ability and incentive to enter the U.S. personal social networking market.  Moreover, WhatsApp's strong focus on the protection of user privacy would offer a distinctively valuable option for many users, and would provide an important form of product differentiation for WhatsApp as an independent competitive threat in personal social

networking.  Facebook's ownership and control of WhatsApp also maintains a protective "moat" that deters and hinders other mobile messaging apps that could credibly threaten to enter the personal social networking market.

128.     Facebook cannot substantiate merger-specific efficiencies or other procompetitive benefits sufficient to justify the WhatsApp acquisition.

### D. Facebook Maintained and Enforced Anticompetitive Conditions for Platform Access to Deter Competitive Threats to its Personal Social Networking Monopoly

129.     Facebook launched "Facebook Platform" in 2007 with the goal of becoming the infrastructure for social interactions on the internet.  Facebook Platform encouraged software developers to build an entire ecosystem of apps and tools—ranging from games and page design tools to video-sharing tools and e-marketing apps—that interoperate with Facebook Blue, with the aim of turning Facebook Blue into a dominant platform for apps.  As Mr. Zuckerberg put it in June 2009, the "platform strategy" was an effort to "enable us to be the de facto open graph/identity database that everyone uses in all their applications."

130.     Since its launch, Facebook Platform has undergone a variety of adjustments and added functionalities, such as APIs that allowed third-party apps access to Facebook user data.  In 2010, Facebook provided third-party apps with access to critical APIs, including the Find Friends API and other APIs used to access user content from Facebook Blue.  The Find Friends API, in particular, was a valuable growth tool for third-party apps because it enabled users of such apps to find their Facebook Blue friends who also used the third-party app and to invite those friends who did not.

131.     Also in 2010, Facebook added the Open Graph API to Facebook Platform, which enabled third-party apps and websites to add plug-ins, such as the Facebook "Like" button, to their own services.  Using the Like button, Facebook Blue users could like and share their interest in

the third-party app.  Third-party apps were motivated to install the Like button and encourage its use, as a "Like" would be shared on the user's news feed and profile on Facebook Blue, which could attract additional users to the third-party app.

132.    Usage of Open Graph grew rapidly.  One week after the introduction of Open Graph, over 50,000 websites had installed Open Graph plug-ins.  Those sites realized the immediate benefits of a massive new distribution channel.  By July 2012, Open Graph was being used to share nearly one billion pieces of social data each day to Facebook Blue, giving Facebook substantially greater and richer information about its users and their online activities.

133.    This strategy not only integrated users' online lives and activities more fully into Facebook Blue; it also drove profits for Facebook.  As a Facebook executive summarized it in a May 2012 email to Facebook COO Sheryl Sandberg:  "Because we have this critical mass of people, that attracts new people to sign up, it attracts developers who want to find customers for their apps and websites, and it attracts advertisers [who] want to reach the audience" and Facebook had "[r]eached a size now where you can imagine as a developer that most of your current and future users/customers are on Facebook[,]" noting that "[7] of the top 10 apps in the Apple App store are Facebook enabled[.]"

134.    Further, third-party apps helped Facebook grow and provided other forms of value to Facebook by promoting Facebook around the internet, via the Facebook plug-ins and by directing social data, such as "Likes," back to Facebook Blue.  Since launching its Facebook Platform and Open Graph initiatives, Facebook has grown significantly, adding at least 150 million monthly users each year and serving over 2.7 billion monthly users worldwide today.

135.    With the success of Facebook Platform, Facebook became important infrastructure for third-party apps and obtained immense power over apps' developmental trajectories, competitive decision-making, and investment strategies.

136.    Facebook uses this power to deter and suppress competitive threats to its personal social networking monopoly.  In particular, to protect its personal social networking monopoly, Facebook adopted conditional dealing policies that limited how third-party apps could use Facebook Platform.  Specifically, between 2011 and 2018, Facebook made Facebook Platform, including certain commercially significant APIs, available to developers *only* on the condition that their apps neither competed with Facebook (including, at relevant times, by "replicating core functionality" of Facebook Blue or Facebook Messenger), nor promoted competitors.  Facebook punished apps that violated these conditions by cutting off their use of commercially significant APIs, hindering their ability to develop into stronger competitive threats to Facebook Blue.

137.    These actions, individually and in the aggregate, have suppressed the ability and incentive of apps in the Facebook ecosystem to become competitive threats to Facebook—and its personal social networking monopoly—in at least two ways.  First, the public announcement and enforcement of the policies changed the incentives of software developers, deterring them from developing features and functionalities that would present a competitive threat to Facebook, or from working with other platforms that compete with Facebook.  Second, enforcement of the policies—i.e., the actual termination of API access for competitive threats that attracted Facebook's attention—hindered the ability of individual businesses to threaten Facebook's personal social networking monopoly.

41

### 1. *Facebook's Anticompetitive Conditions on Platform Access Required Developers Not to Work with Competitors*

138.    From July 2011 until December 2018, Facebook publicly announced and imposed a set of anticompetitive conditions governing access to Facebook Platform.

139.    On July 27, 2011, Facebook introduced a new policy that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform."

140.    This policy was intended to harm the prospects for—and deter the emergence of—competition, including personal social networking competitors.  Indeed, the immediate impetus for the policy was Google's launch of the Google+ personal social network.  In a July 27, 2011, email, a Facebook manager explained:  "[W]e debated this one a lot.  In the absence of knowing what and how google was going to launch, it was hard to get very specific, so we tended towards something broad with the option to tighten up as approach and magnitude of the threat became clear."  Later that same day, another Facebook employee protested the anticompetitive move to colleagues:  "I think its [sic] both anti user and sends a message to the world (and probably more importantly to our employees) that we're scared that we can't compete on our own merits."

141.    Following that, Facebook imposed several other policies restricting app developers' use of Facebook Platform, including Facebook APIs.  Through these policies, Facebook used its control over APIs to deter and suppress competition.

142.    September 2012:  no exporting data to competitor social networks.  On September 12, 2012, Facebook introduced a new policy:  "Competing social networks:  You [developers] may not use Facebook Platform to export user data into a competing social network without our permission[.]"

143.   <u>January 2013:  no promotion / data export to any app that "replicates a core</u>
<u>Facebook product or service."</u>  On January 25, 2013, Facebook added a new condition to prevent developers from "replicating core functionality" (i.e., competing with Facebook), or assisting others who might do so:

> Reciprocity and Replicating core functionality:  (a) Reciprocity:  Facebook Platform enables developers to build personalized, social experiences via the Graph API and related APIs.  If you use any Facebook APIs to build personalized or social experiences, you must also enable people to easily share their experiences back with people on Facebook.  (b) Replicating core functionality:  *You may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission.*  (Emphasis added.)

144.   Facebook continued to evaluate further restrictions that would target competitors. Again, the proposal to further restrict competitors' access to Facebook Platform fueled internal dissent, as well as repeated explicit recognition of the importance of API access to the growth and success of apps and businesses in the Facebook Platform ecosystem.  In an email from December 2013, a Facebook software engineer wrote:

> [S]o we are literally going to group apps into buckets based on how scared we are of them and give them different APIs?  How do we ever hope to document this? Put a link at the top of the page that says "Going to be building a messenger app? Click here to filter out the APIs we won't let you use!"  And what if an app adds a feature that moves them from 2 to 1?  Shit just breaks?  And a messaging app can't use Facebook login?  So the message is, "if you're going to compete with us at all, make sure you don't integrate with us at all."?  I am just dumbfounded.

145.   Facebook's Head of Developer Products responded, noting that Facebook already targeted competitors for access restrictions:  "[Y]eah, not great, but this already happens to some degree - e.g. Path isn't allowed to use certain things. . . . [T]he absolute numbers in terms of who is considered a competitor are pretty small."  Another Facebook engineer agreed:  "[m]ore than complicated, it's sort of unethical[,]" while an engineering manager noted:  "[w]ell, I agree it is bad[.]"  The Head of Developer Products replied:  "[S]o, I agree this sucks but you are reading this

too absolutely. . . . [R]ealistically only the top 5 messaging apps will ever raise an eyebrow." But the software developer was unsatisfied: "[T]hat feels unethical somehow, but I'm having difficulty explaining how. It just makes me feel like a bad person." The Head of Developer Products replied: "[T]his is kind a [sic] political safety net internally that allows Platform to escape-hatch situations that the rest of the company isn't happy about."

146.    May 2014: Platform 3.0 launches.    A new approach—dubbed Platform 3.0—launched on May 2, 2014. At that time, Facebook terminated all apps' access to certain APIs, which included restricting third-party apps from accessing information about their users' friends who were not already using that third-party app.

147.    An internal Facebook slide deck from August 21, 2014, summed up the fear of competition that motivated Facebook to restrict access to its Facebook Platform ecosystem: "Concern:   App may use Facebook for growth, switch functionality to become [a] direct competitor[.]"

148.    December 2018:   removal of explicit anticompetitive conditioning policy.   On December 4, 2018, Facebook removed its "core functionality" restrictions. The following day, a Member of the U.K. Parliament published a cache of documents, obtained from litigation between Facebook and the app Six4Three, highlighting Facebook's anticompetitive conduct towards app developers.

149.    Facebook's suspension of the explicit anticompetitive conditioning policy in December 2018 was driven by anticipated public scrutiny from the release of the documents, and did not represent a disavowal by Facebook of the underlying anticompetitive conduct. Having suspended its anticompetitive platform policies in response to anticipated public scrutiny, Facebook is likely to reinstitute such policies if such scrutiny passes.

150.    Because access to the relevant APIs is valuable to app developers, Facebook policy conditions changed the incentives of app developers, and deterred them from developing competing functionalities or supporting competing social networks.

151.    Moreover, Facebook knew and expected that API access was sufficiently important to affect the incentives of developers and the developmental trajectories of their apps.  Developers were incentivized to make decisions that would not jeopardize their access to Facebook's APIs. An internal Facebook slide deck dated January 2014 dealing with Facebook Platform policies directly acknowledged the importance of API access, asking whether Facebook was "[c]omfortable altering / killing prospects of many startups[.]"

### 2.  *Facebook's Enforcement of its Anticompetitive Conditions Deterred Emerging Threats*

152.    Facebook's actions to enforce these policies by cutting off API access were generally directed against apps in three groups.

153.    First, Facebook targeted promising apps that provided personal social networking. For example, Facebook took actions against a personal social networking competitor, Path, which was founded by a former Facebook manager.  In or around April 2013, Facebook terminated Path's access to Facebook's APIs, and Path's growth subsequently slowed significantly.

154.    The second group of targets were promising apps with some social functionality. For example, Circle was an app that was attempting to build a local social network that came to Facebook's attention in December 2013.  In proposing to cut off Circle's API access, a Facebook manager emphasized Circle's competitive promise:  "Circle positions itself as the 'local social network' and has seen some strong growth over the last four days (+800K downloads yesterday, +600K FB logins yesterday, #1 in the App Store in the UK)."  While Facebook claimed externally that the termination was because Circle had "spammed" users, internal correspondence after Circle

had resolved the spam problems revealed the real reason was because Circle posed a threat: "They are duplicating the [social] graph - and doing a rather excellent job if [sic] it. . . . They are also very directly creating a competing social network on top of that graph." Indeed, Facebook continued to withhold access to its APIs after Circle remedied concerns that Facebook had flagged, with a Facebook manager stating: "While I appreciate that Circle has done all of the items below (or agrees to do them), we ultimately still have the replicating core functionality piece, which can't be 'fixed'." Over the following weeks, Circle's daily new users dropped from six hundred thousand per day to nearly zero.

155. Similarly, in January 2013, Facebook's Director of Platform Partnerships and Operations wrote to colleagues: "[T]witter launched Vine today which lets you shoot multiple short video segments to make one single, 6-second video. As part of their NUX [new user experience], you can find friends via FB. Unless anyone raises objections, we will shut down their friends API access today. [W]e've prepared reactive PR, and I will let Jana know our decision." Mr. Zuckerberg replied: "[Y]up, go for it." By cutting off Vine, Facebook prevented it from accessing APIs that would have helped it grow.

156. The third group of targets were promising apps that offered mobile messaging services, that were existing competitors of Facebook Messenger, and that ultimately threatened to develop into competitive threats to Facebook Blue. Throughout 2013, Facebook blocked mobile messaging apps from using commercially significant APIs. For example, in August 2013, Facebook undertook an enforcement strike against a number of messaging apps simultaneously, with the Head of Developer Enforcement directing colleagues to restrict them from "accessing any read APIs beyond basic info[,]" instructing that "we will not be communicating with the [developers] in any way about these restrictions."

46

157.    Thus, Facebook's enforcement of the conditional platform policies hindered the ability of individual businesses to grow and threaten Facebook's personal social networking monopoly.

158.    Facebook's enforcement actions also alerted other apps that they would lose access to Facebook's APIs if they, too, posed a threat to Facebook's personal social networking monopoly.  For instance, one third-party app contacted Facebook about its platform practices soon after Facebook cut off Vine.  A Facebook manager reported internally about the third-party app: "They're super concerned about the viability of relying on our platform moving forward when there's this lingering chance that we can shut them down under grounds like this."

159.    Collectively, Facebook's announcement and enforcement of its anticompetitive conditions have served to hinder, suppress, and deter the emergence of promising competitive threats to its U.S. personal social networking monopoly.  Accordingly, this conduct has contributed to the maintenance of Facebook's U.S. personal social networking monopoly.

160.    Facebook cannot substantiate procompetitive benefits sufficient to justify the anticompetitive conditioning of access to Facebook Platform.

## VIII.  HARM TO COMPETITION

161.    Through the conduct described above, Facebook has hindered, suppressed, and deterred the emergence and growth of rival personal social networking providers, and unlawfully maintained its monopoly in the U.S. personal social networking market, other than through merits competition.

162.    The conduct described above harmed, and continues to harm, competition by limiting and suppressing competition that Facebook otherwise would have to face in the provision

47

of personal social networking.  As a result, users of personal social networking in the United States have been deprived of the benefits of additional competition for personal social networking.

163.    The benefits to users of additional competition include some or all of the following: additional innovation (such as the development and introduction of new attractive features, functionalities, and business models to attract and retain users); quality improvements (such as improved features, functionalities, integrity measures, and user experiences to attract and retain users); and/or consumer choice (such as enabling users to select a personal social networking provider that more closely suits their preferences, including, but not limited to, preferences regarding the amount and nature of advertising, and the availability, quality, and variety of data protection privacy options for users, including, but not limited to, options regarding data gathering and data usage practices).

164.    In addition, by monopolizing the U.S. market for personal social networking, Facebook also harmed, and continues to harm, competition for the sale of advertising in the United States.  In particular, because personal social networking providers typically monetize through the sale of advertising, Facebook's suppression of competing personal social networking providers also has enabled Facebook to avoid close competition in the supply of advertising services.

165.    Competing personal social networking providers would have been close competitors of Facebook Blue in the supply of advertising.  This is because they would have been able to offer the distinctive advertising features described above that distinguish social advertising from other forms of display advertising, search advertising, and "offline" advertising.  Instagram and WhatsApp, in particular, were each well-situated to develop into meaningful competitive constraints on Facebook Blue in the sale of advertising.  Instagram's founders explicitly planned to develop advertising offerings to monetize the Instagram personal social network.  And an

independent WhatsApp that developed a personal social networking offering would have had incentives to monetize it by offering advertising. Competing social networks may also have explored and developed alternative advertising models that consumers and advertisers preferred.

166.    Facebook's anticompetitive conduct to maintain its personal social networking monopoly therefore also has neutralized, suppressed, and deterred competition for the sale of advertising, and deprived advertisers of the benefits of additional competition.

167.    The benefits to advertisers of additional competition include some or all of the following: additional users to advertise to (as a result of increased innovation and improved quality of personal social networking for users); lower advertising prices (as additional advertising competition would incentivize reductions in advertising prices); additional innovation (as additional advertising competition would incentivize the development and introduction of additional attractive features, functionalities, and business models in order to attract advertisers); quality improvements (as additional advertising competition would incentivize quality improvement, such as with respect to transparency, integrity, authentication of ad views, customer service, accuracy in reporting performance and other metrics, and brand safety measures such as sensitivity to neighboring content); and/or choice (as additional advertising competition would enable advertisers to select a personal social networking provider that more closely suits their preferences, including, but not limited to, preferences regarding different forms of advertising and/or different options for users).

168.    Facebook cannot establish business justifications or procompetitive benefits in any relevant market to justify its unlawful and anticompetitive conduct to maintain its personal social networking monopoly.

## IX.  VIOLATION OF LAW

**Monopolization of Personal Social Networking Arising Under Section 2 of the Sherman Act**

169.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-167 above.

170.    At least since 2011, Facebook has had monopoly power in the United States with respect to personal social networking.

171.    Facebook has willfully maintained its monopoly power through its course of anticompetitive conduct, including though anticompetitive acquisitions and anticompetitive conditioning of access to interconnections.  Through its course of conduct, Facebook has excluded competition and willfully maintained its monopoly in personal social networking through means other than competing on the merits.

172.    Facebook's course of conduct is ongoing.  Facebook continues to hold and integrate the competitive threats it acquired in Instagram and WhatsApp.  Facebook recognizes that its continued ownership and operation of Instagram and WhatsApp both neutralizes their direct competitive threats, and creates and maintains a "moat" that protects Facebook from entry into personal social networking by another firm via mobile photo-sharing and mobile messaging. Facebook continues to monitor the industry for competitive threats, and likely would seek to acquire any companies that constitute, or could be repositioned to constitute, threats to its personal social networking monopoly.  Further, having suspended its anticompetitive platform policies in response to anticipated public scrutiny, Facebook is likely to reinstitute such policies or equivalent measures when such scrutiny passes.

173.    There is no procompetitive justification for Facebook's exclusionary conduct in maintaining its personal social networking monopoly.

174.    Facebook's anticompetitive acts violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitute unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IX.  POWER TO GRANT RELIEF

175.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act and, in the exercise of its equitable jurisdiction, to order equitable relief to remedy the injury caused by Facebook's violations.

## X.  PRAYER FOR RELIEF

WHEREFORE, the FTC requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and pursuant to its own equitable powers, enter final judgment against Facebook, declaring, ordering, and adjudging:

A.  that Facebook's course of conduct, as alleged herein, violates Section 2 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

B.  divestiture of assets, divestiture or reconstruction of businesses (including, but not limited to, Instagram and/or WhatsApp), and such other relief sufficient to restore the competition that would exist absent the conduct alleged in the Complaint, including, to the extent reasonably necessary, the provision of ongoing support or services from Facebook to one or more viable and independent business(es);

C.  any other equitable relief necessary to restore competition and remedy the harm to competition caused by Facebook's anticompetitive conduct described above;

D.  a prior notice and prior approval obligation for future mergers and acquisitions;

51

E.  that Facebook is permanently enjoined from imposing anticompetitive conditions on access to APIs and data;

F.  that Facebook is permanently enjoined from engaging in the unlawful conduct described herein;

G.  that Facebook is permanently enjoined from engaging in similar or related conduct in the future;

H.  a requirement to file periodic compliance reports with the FTC, and to submit to such reporting and monitoring obligations as may be reasonable and appropriate; and

I.  any other equitable relief, including, but not limited to, divestiture or restructuring, as the Court finds necessary to redress and prevent recurrence of Facebook's violations of law, as alleged herein.

Dated:  December 9, 2020

Respectfully submitted,

IAN R. CONNER (D.C. Bar 979696)
Director
Bureau of Competition

DANIEL J. MATHESON (D.C. Bar 502490)
Lead Counsel
600 Pennsylvania Avenue N.W.
Washington, DC 20580
202-326-2075
dmatheson@ftc.gov

DANIEL FRANCIS (D.C. Bar 1004918)
Deputy Director
Bureau of Competition

GAIL F. LEVINE (D.C. Bar 454727)
Deputy Director
Bureau of Competition

ROBERT ZUVER (D.C. Bar 987216)
MARIA DIMOSCATO (D.C. Bar 489743)
DANIEL BRADLEY
MARY CASALE (D.C. Bar 1044264)
ERIC COCHRAN (D.C. Bar 981148)
HENRY HAUSER (D.C. Bar 1614882)
BURKE KAPPLER (D.C. Bar 471936)
MITCHELL LONDON (D.C. Bar 1029408)
OWEN MASTERS (D.C. Bar 242139)
MICHAEL MIKAWA
NOEL MILLER (D.C. Bar 1026068)
DAVID OWYANG
MARK SILVIA
MICHAEL SMITH (D.C. Bar 996738)
REBECCA WEINSTEIN
SYLVIA ZHANG

TARA KOSLOV (D.C. Bar 448147)
Deputy Director
Bureau of Competition

HEATHER JOHNSON (D.C. Bar 503465)
Senior Counsel to the Director

PATRICIA GALVAN
Assistant Director

KRISHA CERILLI (D.C. Bar 983281)
Deputy Assistant Director

*Attorneys for Plaintiff*
*Federal Trade Commission*