# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

FACEBOOK, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

# MEMORANDUM IN SUPPORT OF
# FACEBOOK, INC.'S MOTION TO DISMISS FTC'S COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 6

    A.     Facebook's Innovative Free Products Deliver Value To Millions Of U.S. Consumers ...................................................................................... 6

    B.     Facebook's 2012 Instagram Acquisition ................................................... 7

    C.     Facebook's 2014 WhatsApp Acquisition ................................................. 8

    D.     Facebook's Former Platform Policies ....................................................... 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.     THE SECTION 2 CLAIM FAILS BECAUSE THE FTC HAS NOT PLEADED FACTS ESTABLISHING A PLAUSIBLE RELEVANT ANTITRUST MARKET ................................................................................ 10

    A.     The FTC's Alleged Market Definition Is Inadequate For Lack Of Facts Showing Cross-Elasticity Of Demand ............................................. 11

    B.     The FTC's Attempt To Define A Market By Reasonable Interchangeability Is Insufficiently Pleaded And Implausible .................. 12

II.     THE FTC DOES NOT ALLEGE FACTS ESTABLISHING MONOPOLY POWER ................................................................................... 20

    A.     The FTC Does Not Allege Direct Proof Of Monopoly Power ............... 20

    B.     The FTC Does Not Allege Facts Sufficient To Plausibly Establish Indirect Proof Of Monopoly Power .......................................................... 21

III.     THE FTC DOES NOT ALLEGE ACTIONABLE EXCLUSIONARY CONDUCT ......................................................................................................... 23

    A.     The Instagram And WhatsApp Acquisitions Were Not Unlawful Exclusionary Conduct ............................................................................... 26

          1.     The FTC Cannot Belatedly Challenge Mergers Cleared After HSR Review As Unlawful Exclusionary Conduct Absent Allegations That Agency Review Was Compromised ...................................................................... 26

2.      The FTC Fails To Allege Facts Establishing A Plausible
        Claim That Facebook's Acquisitions Were Unlawful
        Exclusionary Conduct .................................................................30

        a)      The FTC alleges no facts establishing a plausible
                claim that the Instagram acquisition harmed
                competition and consumers ...........................................30

        b)      The FTC fails to allege that Facebook's acquisition
                of non-competitor WhatsApp was exclusionary ...........................34

B.      The FTC's Claim That Facebook's 2011-2018 Policies Harmed
        Competition By Preventing Competitors From Making
        Unrestricted Use Of Its Proprietary Platform Fails As A Matter Of
        Law .................................................................................36

IV.     THE FTC LACKS AUTHORITY TO MAINTAIN THIS SUIT ....................................39

A.      Congress Authorized The FTC To Sue In Federal Court Only To
        Halt Imminent Or Ongoing Violations Of Law ...................................40

B.      The FTC Alleges Only Past Conduct Not Cognizable Under
        Section 13(b) ..................................................................42

CONCLUSION ............................................................................44

# TABLE OF AUTHORITIES[*]

Page

CASES

*Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097 (D. Kan. 1999) ...............................................11, 19

*Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012)...............................................................................15

*Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) .......................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................6, 9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)...................................37

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) ...................20, 23

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988
  (N.D. Cal. 2015)................................................................................................................16

*Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569 (S.D.N.Y. 2011) ...................14

* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................9, 12, 21, 25, 31, 43

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ...............................................33

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........................33

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................................................28

*Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626 (S.D. Tex. 1999) ....................................................11

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 WL 3457177
  (C.D. Cal. May 11, 2016) .................................................................................................43

*Compliance Mktg., Inc. v. Drugtest, Inc.*, 2010 WL 1416823
  (D. Colo. Apr. 7, 2010).....................................................................................................18

*Concord Assocs., L.P. v. Entm't Props. Tr.*:

  2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46
    (2d Cir. 2016)...............................................................................................................10

  817 F.3d 46 (2d Cir. 2016).................................................................................................18

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)....................................43

---

[*] Authorities principally relied upon are marked with an asterisk.

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553
(11th Cir. 1983) .................................................................................................38

*CREW v. Pompeo*, 2020 WL 5748105 (D.D.C. Sept. 25, 2020) ....................................9

*Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004) ........14, 19

*Democracy Forward Found. v. White House Office of Am. Innovation*,
356 F. Supp. 3d 61 (D.D.C. 2019) ....................................................................39

*Dresses for Less, Inc. v. CIT Grp./Commercial Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002) .............................................................................31, 32

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26,
2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018) .........................................28, 31

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. July 20,
2010) ..................................................................................................................38

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) ..........................34

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ........................................................40

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ......................................11

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) ...................................40

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) .......................................................27, 41

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ............................................30

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ............................................40

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) .................................................40

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) .........................................11

\* *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) ........................41, 42, 43

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) .......................................35

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) .............................................41

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ............13

*Gross v. Wright*, 185 F. Supp. 3d 39 (D.D.C. 2016) ...................................................10

*Herron v. Fannie Mae*, 2012 WL 13042852 (D.D.C. Mar. 28, 2012) ...........................7

\* *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) .............................10, 11, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*, --- F.3d ---, 2020 WL 5408210
    (N.D. Cal. Sept. 9, 2020) ........................................................37

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ....................................2, 19

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010).........................................12, 13

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).......................................................38, 39

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23
    (2d Cir. 2015)................................................................. 12-13

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) .......................................37

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)................................42

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004)...........................38

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016) ...................21

*Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73 (D.D.C. 2013) ...................................33

*NCAA v. Bd. of Regents*, 468 U.S. 85 (1984) .................................................................5

\* *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...................................26, 32, 37

*NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019).....................12

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...............................................................10, 13

\* *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) .................................4, 25, 36

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071
    (C.D. Cal. 2017)................................................................15

*Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198 (D.C. Cir. 2015)...................................27

*Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014) .............................................7

\* *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................11

\* *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)..............................................................4, 24

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)..........................................20, 22

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ...................................................................5

\* *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981
(N.D. Cal. 2020)............................................................................4, 38, 39, 42

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210
(D.C. Cir. 1986) ......................................................................................28

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994).............25

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ....................................................................31

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012) .........4, 38, 39

*Sky Angel, LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88 (D.D.C. 2013) ...............11, 14

*Smith & Johnson, Inc. v. Hedaya Home Fashions Inc.*, 1996 WL 737194
(S.D.N.Y. Dec. 26, 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997).........................11

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ...................................................28

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ....................................................................15

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) .............................................9

*U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*, 804 F. Supp. 2d 588
(N.D. Ohio 2011)....................................................................................20

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .....................................34

*United States v. Am. Can Co.*, 230 F. 859 (D. Md. 1916) .........................................32

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911).............................................32

\* *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).............................27

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).........................................20, 23

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ...........................34

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)................................20, 24, 25, 38

*United States v. Paramount Pictures, Inc.*, 2020 WL 4573069
(S.D.N.Y. Aug. 7, 2020).........................................................................26

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) .....................................29

\* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................4, 23, 24, 26, 29, 30, 36

*Yamaha Motor Co. v. FTC*, 657 F.2d 971 (8th Cir. 1981) ............................................35

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) ...................................43


ADMINISTRATIVE DECISIONS

Op. of the Comm'n, *In re Chicago Bridge & Iron Co.*, Dkt. No. 9300
    (FTC Jan. 6, 2005) ...............................................................................................28


STATUTES AND RULES

All Writs Act, 28 U.S.C. § 1651 ......................................................................................41

Clayton Act, 15 U.S.C. § 12 *et seq.* ...............................................................................27

    § 7, 15 U.S.C. § 18..............................................................27, 28, 34, 35, 36

    § 7A, 15 U.S.C. § 18a .........................................................................................26

    § 7A(a)(2)(A), 15 U.S.C. § 18a(a)(2)(A).........................................................7, 8

    § 7A(a)-(e), 15 U.S.C. § 18a(a)-(e).......................................................................8

    § 7A(e), 15 U.S.C. § 18a(e) ..................................................................................8

    § 7A(d)(1), 15 U.S.C. § 18a(d)(1) ...................................................................3, 27

    § 7A(i)(1), 15 U.S.C. § 18a(i)(1) ........................................................................30

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ...............................................4, 39

    § 5(b), 15 U.S.C. § 45(b) .....................................................................................39

    § 13(b), 15 U.S.C. § 53(b) ..............................................4, 5, 39, 40, 41, 42, 44

Hart-Scott-Rodino Antitrust Improvements Act of 1976,
    Pub. L. No. 94-435, 90 Stat. 1383 ................................3, 7, 8, 24, 26, 27, 28, 30

Sherman Act, 15 U.S.C. § 1 *et seq.* ...................................................1, 4, 27, 28, 29

    § 2, 15 U.S.C. § 2.........................................................1, 4, 10, 20, 24, 26, 29,

    30, 31, 32, 33, 34, 36, 42, 44

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56..........................36

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 4

LEGISLATIVE MATERIALS

119 Cong. Rec. 36,610 (1973) ............................................................................42

S. Rep. No. 93-151 (1973) ..................................................................................42


ADMINISTRATIVE MATERIALS

Compl., *In re Automatic Data Processing, Inc.*, Dkt. No. 9282 (FTC Nov. 14,
1996) ..............................................................................................................28

Fed. Trade Comm'n:

> *FTC Closes Its Investigation Into Facebook's Proposed Acquisition of
> Instagram Photo Sharing Program* (Aug. 22, 2012),
> https://www.ftc.gov/news-events/press-releases/2012/08/ftc-closes-its-
> investigation-facebooks-proposed-acquisition ...........................................8, 30

> *Model Request for Additional Information and Documentary Material*
> (rev. June 2010), https://www.ftc.gov/sites/default/files/attachments/
> premerger-introductory-guides/guide3.pdf..................................................8

Premerger Notification; Reporting and Waiting Period Requirements,
60 Fed. Reg. 38,930 (July 28, 1995).............................................................27

Premerger Notification: Reporting and Waiting Period Requirements,
64 Fed. Reg. 34,804 (June 29, 1999) ............................................................27

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*
(2010)........................................................................................................21, 31


OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

> (1998)..........................................................................................................31

> (4th ed. 2020)..........................................................................................27, 32

Brief of the FTC, *FTC v. Shire ViroPharma Inc.*, 917 F.3d 147 (3d Cir. June 19,
2018) (No. 18-1807), 2018 WL 3101438 .......................................................41

Compl., *FTC v. Hearst Tr.*, No. 01-cv-00734 (D.D.C. Apr. 5, 2001) ..........................28

David L. Meyer, *Section 2 Standards and Consumer Welfare:  Some Lessons from the World of Merger Enforcement*, 2007 Colum. Bus. L. Rev. 371 ...............................29

Richard A. Posner, *Antitrust Policy and the Supreme Court:  An Analysis of the Restricted Distribution Horizontal Merger and Potential Competition Decisions*, 75 Colum. L. Rev. 282 (1975) ......................................................................34

## INTRODUCTION

No government lawsuit similar to this one has been brought in the 130-year history of the Sherman Act, and for good reason:  The Federal Trade Commission ("FTC") has not alleged facts amounting to a plausible antitrust case.  By a one-vote margin, in the fraught environment of relentless criticism of Facebook for matters entirely unrelated to antitrust concerns, the agency decided to bring a case against Facebook that ignores its own prior decisions, controlling precedent, and the limits of its statutory authority.  It should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

The FTC's one-count monopolization case against Facebook utterly ignores the reality of the dynamic, intensely competitive high-tech industry in which Facebook operates.  To state a claim under Section 2 of the Sherman Act, the FTC must allege *facts* that, accepted as true, plausibly establish:  (1) a relevant antitrust market that includes all products that are acceptable substitutes for Facebook; (2) that Facebook has monopoly power in that market, that is, the power to harm competition and consumers, typically by raising prices or restricting output; and (3) that Facebook has maintained monopoly power through anticompetitive actions that harmed competition and consumers.  The complaint fails because the FTC has not pleaded facts sufficient to satisfy *any* of the three required elements of a claim under Section 2.  In addition, the agency has no authority to bring a lawsuit in federal district court predicated on Facebook's long-past actions.

***The FTC Has Not Alleged A Plausible Relevant Market.***  It is the FTC's burden to allege facts establishing a market that includes all products that consumers consider acceptable substitutes.  Virtually ignoring the relentlessly competitive business that provides Facebook with substantially all of its revenues (advertising), the FTC purports instead to define a free "personal social networking" user market with only the vaguest of limits.  Compl. ¶¶ 52-55, ECF No. 51.

No court has ever held that such a free goods market exists for antitrust purposes, and the FTC does not allege that one exists here.  The FTC does not allege any facts that would permit the Court to discern which products (or even which features of Facebook) are in the alleged market and which are not.  It does not and cannot define the market using the standard analysis of cross-elasticity of demand, *i.e.*, the effect a change in price for one product would have on demand for another.  Nor does it offer any plausible alternative to that rigorous analysis, much less one that could reliably define such a market for the first time in an antitrust case.  The FTC's novel market definition is even contradicted by its own allegations:  the "personal social networking" description seemingly excludes apps with "some social functionality" and mobile messaging apps that the *FTC* says were feared competitors that caused Facebook to restrict access to its proprietary Platform.  *Id.* ¶¶ 154-156.  Ultimately, the FTC's efforts to structure a crabbed "use" market for a free service in which it can claim a large Facebook "share" are artificial and incoherent.  "No party" – not even the government – "can expect to gerrymander its way to an antitrust victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  *See infra* Part I.

> **The FTC Has Not Plausibly Alleged Monopoly Power.**  The FTC also fails to plausibly allege that Facebook has monopoly power.  The FTC cannot establish that Facebook has increased prices or restricted output because the agency acknowledges that Facebook's products are offered for free and in unlimited quantities.  *See* Compl. ¶ 42.  While the FTC makes the bare, conclusory allegation that Facebook has a market share "in excess of 60%," *id*. ¶ 64, that allegation must be disregarded because it is not supported by any facts.  The FTC does not explain how it made this calculation or even which metrics were used or could be used to make such a calculation of relative free "use" by consumers.  And its own factual allegations of easy

entry by firms outside the "personal social networking" market undermine its conclusory claims that "entry barriers" prevent such other firms from competing.  *See id.* ¶¶ 81, 88, 96, 108-109, 122.  *See infra* Part II.

**The FTC Has Not Plausibly Alleged Unlawful Exclusionary Conduct.**  The FTC asserts that Facebook took three "anticompetitive" actions to maintain the monopoly it allegedly (and lawfully) acquired by 2011.  *See* Compl. ¶ 71.  *First*, Facebook acquired a small photo-sharing service in 2012, Instagram, *see id.*, after that acquisition was reviewed and *cleared by the FTC in a unanimous 5-0 vote*.  *Second*, Facebook acquired a messaging-only service in 2014, WhatsApp, after that acquisition was reviewed and *summarily allowed to proceed by the FTC* given the evident absence of any effect on competition in the United States.  *See id.*  *Third*, Facebook instituted policies after 2011 that limited competitors' ability to free-ride on Facebook's proprietary Platform.  *See id.* ¶¶ 152-158.

The FTC does not plausibly allege that Facebook's acquisitions of Instagram and WhatsApp were anticompetitive.  The FTC reviewed both acquisitions before consummation – as it was obligated to do pursuant to the expansive merger-review regime established by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR").  Under HSR review, the agency's job was to "determine" whether those acquisitions would, "if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1).  It made that required determination and allowed both mergers to close.  The agency offers no basis for disregarding its own contemporaneous conclusions that the acquisitions would *not* violate the antitrust laws; remarkably, it does not even mention them.  The agency has not alleged that it was misled or otherwise lacked access to the relevant information.  It just ignores its own decisions, failing to offer any valid explanation for its about-face – making implausible any claim of reasonably likely harm in 2012 and 2014.

*See infra* Part III.A.1.  Nor has the FTC provided facts sufficient to support its theory that

Facebook's acquisitions of marginal or potential competitors amounted to exclusionary conduct

under Section 2 of the Sherman Act, even if the FTC's theory were valid as a matter of law

(a proposition never accepted by any court).  *See infra* Part III.A.2.

 The FTC's claim that Facebook was required to share its facilities with rivals is precluded

by controlling Supreme Court precedent.  Facebook had no antitrust duty to allow anyone to use

its proprietary Platform, and it cannot incur antitrust liability for refusing access to firms that

sought to use its technology to take users away from Facebook.  *See Pac. Bell Tel. Co. v.

linkLine Commc'ns, Inc.*, 555 U.S. 438, 450-51 (2009); *Verizon Commc'ns Inc. v. Law Offices of

Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004); *Reveal Chat Holdco, LLC v. Facebook,

Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (dismissing similar Platform-based claim of

refusal to deal with rivals under Rule 12(b)(6)); *Sambreel Holdings LLC v. Facebook, Inc.*, 906

F. Supp. 2d 1070, 1075 (S.D. Cal. 2012) (same).  *See infra* Part III.B.

 Moreover, none of the challenged conduct is plausibly alleged to have harmed

competition and consumers in any measurable way.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 463

(D.C. Cir. 2008) (exclusionary conduct is conduct that harms competition and consumers).

Prices were not raised (or charged at all), and output was not reduced.  None of the harms

typically alleged in antitrust actions is alleged here.  The FTC's allegation that consumers might

have had even better products in a "but-for world" is conclusory, speculative, and entirely

insufficient to meet its pleading obligations.

 ***The FTC Lacks Statutory Authority To Maintain This Suit.***  Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), is the sole source of the FTC's

claimed authority here.  It authorizes the FTC to proceed in federal district court *only* to stop

ongoing or imminent violations of law.  It does *not* authorize actions to remedy past conduct.
All of the conduct the FTC challenges occurred in 2012 (Instagram acquisition), 2014
(WhatsApp acquisition), and 2011-2018 (Platform policies); indeed, the complaint cites to no
enforcement of the policies after 2013.  The FTC's contention that the continued operation of the
unified Facebook after 2014 is an imminent or ongoing violation of the antitrust laws, because
the FTC decided belatedly to challenge the acquisitions, is contrary to authority:  the courts have
rejected claims that completed acquisitions amount to ongoing violations.  The FTC's attempt to
challenge past conduct here is incompatible with the plain text of Section 13(b), flouts the
decisions of many courts, and should be rejected.  *See infra* Part IV.

***

"Congress designed the Sherman Act as a *consumer welfare prescription.*"  *NCAA v. Bd.
of Regents*, 468 U.S. 85, 107 (1984) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343
(1979)) (emphasis added).  The FTC itself acknowledges that Facebook, from its founding in
2004, has grown to provide free and unlimited access to its ever-improving products that "enrich
. . . social lives" for billions of people around the world, including millions of monthly users in
the United States.  Compl. ¶¶ 1-3, 42.  These are the very benefits the antitrust laws were enacted
to promote and protect – low prices, growing output, and product innovation.  The FTC's ill-
conceived attack on an extraordinary consumer welfare success story should be dismissed.

## BACKGROUND[1]

### A.     Facebook's Innovative Free Products Deliver Value To Millions Of U.S. Consumers

The FTC alleges that Facebook offers innovative products that billions of consumers worldwide enjoy every day.  Compl. ¶¶ 38-42.  Facebook offers these products to users for free, *id*. ¶ 42, making money by "selling advertising that is displayed to users," *id*. ¶ 43.  Because Facebook's business is advertising, its success depends on user "engagement."  *Id.* ¶ 42.  The "value of [Facebook's] service" to advertisers is "a function of usage" of Facebook products by users.  *Id*. ¶ 67.  Facebook has therefore identified "decreases in user engagement, including time spent on [its] products," as one of the principal risks to its business.  *See id*. ¶ 50 (incorporating by reference Facebook's fiscal year 2019 10-K, Declaration of Mark C. Hansen ("Hansen Decl.") Ex. A).

Facebook allows consumers to engage, connect, share, and consume different content, including "personal updates, interests, photos, news, and videos."  *Id.* ¶ 54.  Other apps and websites also offer opportunities to engage, connect, share, and consume similar content, such as YouTube, iMessage, Google, Snapchat, Twitter, Spotify, Netflix, Hulu, LinkedIn, and Strava. *See id*. ¶¶ 19, 58-60, 73, 86.  Each of the particular functions available on Facebook is also available on other apps and websites.  For example, consumers can view and post "videos" on Facebook, *see id*. ¶ 54, as well as on "online video or audio consumption-focused services such as YouTube," *id*. ¶ 59.  Similarly, consumers can share text, photo, video, and other content using Apple's iMessage app, *see id*. ¶¶ 19, 114, among many other services.

---

[1] The factual allegations described below are taken from the FTC's complaint and materials incorporated by reference therein, and are taken as true solely for purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Facebook competes to keep users engaged by constantly innovating and adding new features – spending billions of dollars annually on research and development.  *See* Hansen Decl. Ex. A (incorporated by reference in Compl. ¶ 50).  These efforts are critical to Facebook's survival; incumbents like Myspace, *see* Compl. ¶ 5, and services backed with virtually limitless resources like Google+, *see id.* ¶ 140, failed when they could not keep users engaged. Technology can "transition" rapidly and unpredictably; "competitive threats to a dominant" firm "can emerge" and "gain scale despite the network effects enjoyed by the incumbent" in a span of just months.  *Id.* ¶ 7.  The complaint alleges that "the most significant competitive threats" Facebook faces are not "clones of Facebook," but "differentiated products that offer users a distinctive way of interacting."  *Id.* ¶ 69.

**B.      Facebook's 2012 Instagram Acquisition**

On April 9, 2012, Facebook announced an agreement to acquire Instagram.  *See* Compl. ¶ 95.  Instagram was a startup that "facilitated photo-based social interactions" on mobile devices.  *Id.* ¶ 80.  It had no revenue, *id.* ¶¶ 90, 101, and was available only on a single mobile operating system (Apple's iOS) until days before the acquisition was announced, *id.* ¶ 81.

The transaction fell within the reporting requirements under HSR, *see id.* ¶ 95; 15 U.S.C. § 18a(a)(2)(A) (applying to transactions "in excess of $200,000,000," subject to annual adjustment), triggering an HSR filing and FTC review.  The FTC omits reference to its review of the proposed merger, but the FTC's actions and public statements are subject to judicial notice and can be considered on this motion.  *See Herron v. Fannie Mae*, 2012 WL 13042852, at *1 (D.D.C. Mar. 28, 2012) (court can take judicial notice of agency actions); *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33-34 (D.D.C. 2014) (taking judicial notice of statements on agency website).  After reviewing an initial submission,

the FTC issued a "second request" for additional information and documents.  *See* 15 U.S.C.

§ 18a(a)-(e).  Following its review of all this information, by a unanimous 5-0 vote, the FTC

issued a "no action" statement allowing Facebook to acquire what the agency described as a

"photo sharing program" without any challenge or conditions.  *See* Fed. Trade Comm'n, *FTC*

*Closes Its Investigation Into Facebook's Proposed Acquisition of Instagram Photo Sharing*

*Program* (Aug. 22, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/ftc-closes-

its-investigation-facebooks-proposed-acquisition (Hansen Decl. Ex. B).  Since Facebook

acquired Instagram in 2012, the number of users has grown substantially in the United States and

globally.  *See* Compl. ¶¶ 16, 104.

**C.      Facebook's 2014 WhatsApp Acquisition**

         On February 19, 2014, Facebook announced an agreement to acquire WhatsApp, a

messaging app that enables consumers to connect and share by sending messages and other

content over the internet.  *See* Compl. ¶ 121.  This transaction also fell within the HSR reporting

requirements.  *See id.*; 15 U.S.C. § 18a(a)(2)(A).  Again, the agency reviewed the transaction and

cleared it (and omits that critical fact from the complaint).  *See* 15 U.S.C. § 18a(e).  The FTC did

not issue a second request for "additional information and documentary materials."  *See* Fed.

Trade Comm'n, *Model Request for Additional Information and Documentary Material* at 2 (rev.

June 2010), https://www.ftc.gov/sites/default/files/attachments/premerger-introductory-

guides/guide3.pdf (Hansen Decl. Ex. C).

**D.      Facebook's Former Platform Policies**

         In 2007, Facebook launched "Platform," a set of tools designed to allow third-party app

developers to interact with Facebook's users on Facebook's then-desktop-only website.  *See*

Compl. ¶¶ 129-130.  This was intended to provide different ways for Facebook's users to

connect and share.  *See id.*  Facebook users could authorize third-party app developers on

Platform to access their Facebook data through application programming interfaces ("APIs").

This was intended to enhance and personalize the user experience on Facebook.  *See id.* ¶ 130.

Over time, Facebook updated and changed the terms governing developers' use of its

Platform.  *See id.* ¶¶ 138-139, 141.  Facebook adopted written policies prohibiting third parties

from "export[ing] user data" from Facebook "into a competing social network."  *Id.* ¶ 142.

Other iterations of this rule prohibited developers from using Platform to export data to "a

product or service that replicates a core Facebook product or service without . . . permission."

*Id.* ¶ 143.  The FTC identifies Path (¶ 153), Circle (¶ 154), Vine (¶ 155), and unidentified

"mobile messaging apps" (¶ 156) as apps that were denied unrestricted access to "commercially

significant APIs" pursuant to this policy.  The only alleged enforcement of these policies

occurred in 2013.  *Id.* ¶¶ 153-156.  Facebook removed these policies in 2018.  *Id.* ¶ 148.

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a

claim to relief that is plausible on its face," *Iqbal*, 556 U.S. at 678 (citation omitted), and that

rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The

Court should not accept as true "'a legal conclusion couched as a factual allegation,' [or] an

inference unsupported by the facts set forth in the Complaint."  *CREW v. Pompeo*, 2020 WL

5748105, at *4 (D.D.C. Sept. 25, 2020) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir.

2006)).

**ARGUMENT**

**I.    THE SECTION 2 CLAIM FAILS BECAUSE THE FTC HAS NOT PLEADED
FACTS ESTABLISHING A PLAUSIBLE RELEVANT ANTITRUST MARKET**

"[I]t is difficult or impossible to determine the plausibility of an antitrust claim if the

relevant market is untenably defined." *Gross v. Wright*, 185 F. Supp. 3d 39, 49 (D.D.C. 2016)

(citation omitted); *see also*, *e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120, 1123-24 (9th

Cir. 2018) (affirming dismissal of "antitrust claims for failure to state a relevant market" where

the plaintiff's proposed market was "facially unsustainable" because it failed to include "many

reasonably interchangeable products") (internal quotation marks, citation, and alterations

omitted).  That is because a properly defined market identifies the "market participants and

competitive pressures that restrain an individual firm's ability to raise prices or restrict output."

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 2014 WL 1396524, at *13 (S.D.N.Y. Apr. 9, 2014)

(citation omitted), *aff'd*, 817 F.3d 46 (2d Cir. 2016).  Without "an accurate definition of the

relevant market" that outlines "the area of effective competition" for the defendant's product and

"reflects commercial realities," there is "no way to measure" whether the defendant has any

"ability to lessen or destroy competition" and harm the consumers the antitrust laws are designed

to protect.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).

The FTC's market definition is no more than a description of part of what Facebook

provides; the allegations do not provide a basis for determining which of the many products

vying for user time and attention are in or out of the supposed market.  The FTC does not make

any factual allegations regarding "cross-elasticity of demand" or consumer switching in response

to price increases – a failure that reflects the agency's unprecedented attempt to define a market

for a product provided to users for free and in unlimited quantities.  Furthermore, the FTC's

alleged "personal social networking" test does not exclude other alternatives that consumers could

10

substitute for the same purpose ("reasonable interchangeability").  Both failures are fatal as a

matter of law to the FTC's attempt to define a plausible antitrust market.  *See Hicks*, 897 F.3d

at 1121 (affirming dismissal when product markets "omit[ted] many economic substitutes");

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997) ("the

relevant market is legally insufficient" where plaintiff "fails to define" it "with reference to the

rule of reasonable interchangeability and cross-elasticity of demand"; collecting cases holding

same).[2]

### A.    The FTC's Alleged Market Definition Is Inadequate For Lack Of Facts Showing Cross-Elasticity Of Demand

The standard tool for pleading and proving the contours of a relevant antitrust product

market is "cross elasticity of demand" – "in other words," the degree to which "the rise in the

price of a good within a relevant product market would tend to create a greater demand for other

like goods in that market."  *Queen City*, 124 F.3d at 437-38 (citation omitted); *see FTC v. RAG-

Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) (using cross-elasticity to establish product

market); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 (D.D.C. 2004) (same).  Facebook's

apps are free and unlimited (as are those of its competitors).  The FTC does not and cannot rely

---

[2] *See also*, *e.g.*, *Sky Angel, LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013) (granting motion to dismiss because, without adequate allegations regarding "lack of interchangeability," complaint lacked "rational relation to the methodology courts prescribe to define a market"); *Smith & Johnson, Inc. v. Hedaya Home Fashions Inc.*, 1996 WL 737194, at *6 (S.D.N.Y. Dec. 26, 1996) (dismissing complaint for failure to "present specific and concrete factual allegations which, if proved, would demonstrate that" alleged "market is truly unique and separate from the markets for similar goods, and that consumers would not substitute other products for more expensive" products in the alleged market), *aff'd*, 125 F.3d 844 (2d Cir. 1997); *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 642 (S.D. Tex. 1999) (dismissing antitrust claims where complaint "ma[de] no reference to cross-elasticity of demand" and instead alleged "consumers may prefer" defendant's product); *Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1103 (D. Kan. 1999) (dismissing antitrust claims where complaint "fail[ed] to define the relevant market in terms of interchangeability and cross-elasticity of demand" and instead alleged that unique characteristics made certain advertising better than alternatives).

on any alleged effect of a change in price to establish the boundaries of the supposed market for "personal social networking."

Nor has the FTC alleged any facts from which an alternative to price could be used to establish cross-elasticity of demand.  The complaint alludes to the competitive pressures that drive innovation and quality and acknowledges that Facebook perceived a plethora of competitors as threats.  *See*, *e.g.*, Compl. ¶¶ 7-8, 69-70, 73, 75, 77.  But the FTC does not account for those same competitive dynamics in its allegations concerning the scope of the relevant market.  For example, the FTC does not identify the products to which consumers would switch if Facebook stopped innovating and improving the quality of its products.  Facebook and the Court are left guessing as to how to determine which firms may capture consumption or demand and on what non-price basis they might do so.  *See NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims for improper market definition where the plaintiff "fail[ed] to identify the economic substitutes for the product markets" and did not "plead any facts regarding the cross-elasticity of demand"); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal of complaint as implausible under *Twombly* where it "provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity").

**B.    The FTC's Attempt To Define A Market By Reasonable Interchangeability Is Insufficiently Pleaded And Implausible**

The FTC likewise fails to define the contours of the market by reference to "reasonable interchangeability."  The question is what products consumers consider acceptable substitutes for Facebook's products; no two products are exactly alike, but some are close enough to provide alternatives for consumers and thereby prevent a dominant firm from exploiting those consumers through, for example, supracompetitive prices.  *See Madison 92nd St. Assocs., LLC v. Courtyard*

*Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) ("The relevant market must be defined 'as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.' ") (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)).

The FTC asserts (¶¶ 52-55) that there are "[t]hree key elements" that "distinguish personal social networking services from other forms of online services":  (1) a "social graph" of "connections between users" and "personal connections"; (2) "features that many users regularly employ to interact . . . and share . . . in a shared social space"; and (3) "features that allow users to find and connect with other users."  The FTC then asserts (¶¶ 58-60) that certain products are not "reasonably interchangeable" because either (1) they involve "a narrow and highly specialized set of users"; (2) they are not "primarily" used to communicate with personal connections; or (3) they "do not feature a shared social space" or "a social graph that supports users in making connections."

This "element"-based attempt to define the market departs from the purpose of defining a relevant market and provides no way to "measure" Facebook's "ability to lessen or destroy competition" and thereby exploit consumers.  *Am. Express*, 138 S. Ct. at 2285.  Rather, it appears to be a description of one aspect of Facebook's products; it fails to provide a plausible basis for identifying which firms provide products that consumers consider acceptable substitutes and which do not.  *See Hicks*, 897 F.3d at 1120-21 (properly alleged market "encompasses the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business") (internal quotation marks and citation omitted); *Jacobs*, 626 F.3d at 1338 (stating that, even at pleading stage, a plaintiff "still must present enough information in

[its] complaint to plausibly suggest the contours of the relevant geographic and product markets").

*First*, the complaint does not say whether services that are mentioned in the complaint, like Twitter and Snapchat (*see* ¶ 73), and other well-known services that are not, like TikTok and Pinterest (among many others), are included in or excluded from the market.  Based on the FTC's vague, three-element test, Facebook is improperly left to guess whether each is in or out of the alleged market.  *See Sky Angel*, 947 F. Supp. 2d at 103 (dismissing antitrust complaint where plaintiff failed to provide sufficient "detail about lack of interchangeability" to support its exclusion of certain firms from its purported market) (citation omitted); *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) ("Although [plaintiff] need not address every conceivable, far-fetched alternative . . . , it must allege sufficient facts about other [products] to make its proposed product market plausible."); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (dismissing antitrust claims because "Plaintiff offered no allegation of which hair care product brands are interchangeable with Defendants' products" and because, "[f]rom the face of the complaint, it is clear that many brands and suppliers of hair care products exist").

The complaint is not just impermissibly vague:  it is nonsensical.  The FTC's market allegations apparently attempt to circumscribe an artificially narrow competitive set by reference to arbitrary features and equally arbitrary exclusions based on competitors' allegedly "primary" functions.  But the agency's Platform allegations posit that Facebook harmed competition within this narrow market – whatever its boundaries – by denying a broader set of alleged competitors, including Path, Circle, Vine, and "various messaging apps," unrestricted access to its Platform.  *See*, *e.g.*, Compl. ¶¶ 77, 153, 154, 155, 156.  The FTC describes Path as a "personal

14

social networking competitor" to Facebook, *id*. ¶ 153, Circle as a "local social network" that was "replicating" Facebook's "core functionality," *id*. ¶ 154, Vine as a service that allowed users to share short video segments, *id*. ¶ 155, messaging apps as "services . . . that ultimately threatened to develop into competitive threats to Facebook Blue," *id*. ¶ 156, and all of these services as "threats" to Facebook, *id*. ¶ 77.  The FTC does not state which of these many products are within its three-element market.  But it is implausible – and contradictory – for the FTC to allege that all of them were serious competitive threats to support the Platform allegations without accounting for them in its market definition or, at the very least, pleading facts establishing why some did or did not compete in the claimed relevant market.

*Second*, the complaint does not allege which product features offered by the unidentified "personal social networking services" are within the claimed market.  The FTC alleges (¶¶ 54-55) that "personal social networking services" "include" certain features but does not specify whether *other* features offered by those same firms – for example, "interest-based . . . connections" (¶ 58), "passive consumption" of video (¶ 59), or "mobile messaging" (¶ 17), all of which are offered by Facebook – are in or out of the relevant market.  It is therefore impossible to discern whether all (or even most) of Facebook itself is in or out.  *See Agnew v. NCAA*, 683 F.3d 328, 346 (7th Cir. 2012) (affirming dismissal based on insufficient "notice of the relevant market" where the "confines of [the alleged product] market are far too unclear"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (affirming dismissal where court could not "determine the boundaries of the relevant product market" because complaint lacked explanation of "other insurance companies involved, and their products and services," and "other companies with whom [the parties] compete"); *see also Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017)

15

(granting motion to dismiss where alleged market definition left "unclear what products this might encompass," because such "ambiguities make Plaintiff's market definition unsustainable on its face"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015) ("Although detailed factual findings at the pleading stage are not required, Plaintiff must provide enough facts [about the relevant market] to enable the opposing party to defend itself effectively.") (internal quotation mark omitted) (alteration in original); *Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786, at *3-4 (S.D.N.Y. Apr. 14, 2011) (plaintiff's complaint fell "well below the threshold to allege a relevant product market" where "the Court [was] left to speculate" whether certain products were included in the purported market).

For example, a user viewing the post of an influencer or celebrity on Instagram may or may not be using a "personal social network." That same lack of clarity applies to, for example, a Facebook user watching a comedy routine or reading a news article or sending a direct message to a friend. And, given what the FTC has alleged with respect to "interest-based" connections, it is impossible to tell whether a Facebook user viewing posts by members of groups made up of college alumni or D.C. area kayakers or Lego enthusiasts would be using a "personal social network" either. Some people might often or always use Facebook only (or "primarily," Compl. ¶ 59) for the above purposes. The lack of required clarity in the FTC's market definition makes it impossible to know what is in or out, in these and many other respects.

This improper opacity leads to two mutually exclusive conclusions – either of which requires dismissal of the complaint. If the FTC is purporting to allege that *only* time spent by consumers engaging in "personal social networking" activities that involve all three elements of the FTC's definition is within the market, then much of what Facebook offers is outside of the market altogether, which the complaint ignores. It provides no basis to assess, much less

quantify, use of "personal social networking" – as distinct from other features – on Facebook or on any other service in any reliable way.

If, on the other hand, the FTC is purporting to allege that any feature – such as "passive" video consumption – offered by a "personal social network" is within the market *so long as* the feature is provided alongside something that satisfies the three elements of "personal social networking," then the proposed definition collapses because the FTC does not allege facts to plausibly explain why only firms offering "personal social networking" are substitutes for all of the "non-personal social networking" features offered by Facebook and many other firms.

For example, if "passive consumption" of video is in the market to the extent Facebook offers that feature, the FTC does not and cannot allege that other online services offering supposedly passive consumption of video (the FTC names YouTube, Netflix, and Hulu (¶ 59)) do not offer adequate substitutes for consuming video on Facebook.  Nowhere does the FTC allege that YouTube, Netflix, and Hulu do not compete with Facebook for users seeking to "passive[ly] consum[e]" video on Facebook.  And, if mobile messaging is in the market when Facebook offers that feature, the FTC does not and cannot allege that other mobile messaging services (the FTC names Apple's iMessage, LINE, Kakao, and WeChat (¶ 19)) are not substitutes for Facebook mobile messaging.  But, if those products are within the market, Facebook's competitive position is dramatically limited.  Facebook and the Court should not have to guess at what the FTC includes within or excludes from its claimed market.  The FTC's failure to allege facts that establish what is included within and excluded from its market definition requires dismissal.  *See supra* pp. 14-15.

*Third*, the FTC's articulation (¶¶ 52-55) of "[t]hree key elements" does not offer a plausible basis for excluding from the relevant market products that lack one or more of those

elements.  For example, the FTC identifies (¶ 55) "features that allow users to find and connect with other users" as a *sine qua non* of personal social networks.  *See also id.* ¶ 60 (citing this as the basis for excluding messaging services like iMessage from the alleged market).  But the FTC does not allege any facts that would suggest that a product that (1) is built on a "social graph" and (2) allows users to interact and share, but that (3) lacks a "connection-finder," would not be considered interchangeable *by users* for the purpose of "interact[ing] with personal connections and shar[ing] their personal experiences."  *Id.* ¶ 54.  It is obvious that people "connect and share with family and friends" on mobile devices via many technologies, with email, messaging, photo-sharing, and video-chats being just a few examples.  *E.g.*, *id.* ¶ 107 ("mobile messaging services" have "features for sharing content (e.g., photos, videos, sound clips, and GIFs)").  The FTC's conclusory assertion (¶ 52) that consumers look only to products meeting its three-part test is legally insufficient and factually implausible.

More generally, the FTC alleges no facts to plausibly establish that the combination of these three particular elements (and not others) is what sets Facebook apart from the myriad online services referenced in the complaint (LinkedIn, Strava, YouTube, Spotify, Netflix, and Hulu (¶¶ 58-60); iMessage, LINE, Kakao, and WeChat (¶ 19)) – not to mention the services the FTC either declines to characterize, such as Snapchat and Twitter, or ignores entirely, such as TikTok and Pinterest – and makes these competitors unacceptable substitutes for Facebook in the eyes of consumers.  *See Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016) (dismissing antitrust claims where alleged market "[c]onveniently" excluded "well-known and accessible" competitors because plaintiffs' definition "fail[ed] to present a plausible basis for explaining why" the distinction "makes the difference" to consumers); *Compliance Mktg., Inc. v. Drugtest, Inc.*, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (dismissing antitrust claims

because "references to the uniqueness" were insufficient to establish the products "differ[ed] in any material way" and "fail[ed] to address the interchangeability" of products outside alleged market); *Adidas Am.*, 64 F. Supp. 2d at 1103 (allegations that "NCAA promotional rights are excellent advertising vehicles" were insufficient to allege relevant antitrust market because other alternatives could "satisfy Adidas' [advertising] goals").

*Finally*, the FTC alleges (¶¶ 58-60) that some products are excluded from the market because they are "primarily" used for other purposes, but that does not plausibly allege that these competitors cannot *also* be substitutes for "personal social networking." *See Cupp*, 310 F. Supp. 2d at 970 ("reasonable interchangeability" is a question of "whether the substitute products or services *can* perform the same function") (emphasis added). Notably, the FTC does not allege these products lack *any* of the three "key" elements of a "personal social network" or cannot perform the same function or functions, but it has nonetheless excluded them from its market definition because of its conclusory and legally indefensible assertion that products used "primarily" for other purposes cannot be acceptable substitutes for consumers seeking "personal social networking," as the FTC defines it.

***

The FTC's market definition is conclusory, opaque as to what it includes and excludes, contradicted by its other allegations, and ultimately implausible. "No party" – not even the federal government – should be allowed to sustain an antitrust claim by pleading a contrived market that is "plainly designed to bolster" the party's claims "by artificially exaggerating [the defendant's] market power." *It's My Party*, 811 F.3d at 681, 683.

## II.     THE FTC DOES NOT ALLEGE FACTS ESTABLISHING MONOPOLY POWER

The FTC fails to allege facts sufficient to establish that Facebook possesses "the power to control prices or exclude competition," *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966), a "necessary element of a monopolization charge," *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).  To satisfy this element of its Section 2 claim, the FTC must plead facts establishing direct effects of monopoly power or, alternatively, a high share of a properly defined, relevant antitrust market protected from competitive entry by high barriers.  *See id.*  But, because Facebook is free and unlimited, the FTC cannot allege that Facebook has " 'the ability to cut back the market's total output and so raise price.' "  *Id.* (quoting *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986)).  The FTC also fails to allege that Facebook possesses a substantial share of a properly defined, relevant market and that entry barriers prevent "new rivals" from responding to monopolistic behavior.  *Id.*  The Section 2 claim accordingly fails on the pleadings.  *See U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*, 804 F. Supp. 2d 588, 596-97 (N.D. Ohio 2011).

### A.     The FTC Does Not Allege Direct Proof Of Monopoly Power

The FTC does not and cannot allege that Facebook "restricted output" or charged "supracompetitive prices."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  The FTC's speculation (¶ 163) that "additional competition" could bring about "additional innovation," "quality improvements," "and/or consumer choice" is not a factual allegation that supports a plausible inference of monopoly power.  Those allegations are true of *every* market.  Moreover, the FTC does not allege that Facebook's quality has become somehow worse than it would be in some but-for world in which it lacked supposed market power.  And unlike objective quality measures – metrics that an expert could identify as desirable to all consumers, *e.g.*, an app's speed, a mobile phone's battery life, or the energy efficiency of an air

conditioner – the FTC's suggested quality dimensions involve inherently subjective preferences regarding customized ads and data usage.  *See* Compl. ¶ 163.  No court has ever accepted such conclusory speculation about the possibly delayed pace of hypothetical and subjective quality improvements as direct proof of monopoly power.  *See Twombly*, 550 U.S. at 556 (conclusions disregarded on motion to dismiss).

> **B.**     **The FTC Does Not Allege Facts Sufficient To Plausibly Establish Indirect Proof Of Monopoly Power**

The FTC likewise fails to allege facts to establish that Facebook has a share greater than 60% of a properly defined, relevant market and "that there [are] barriers to entry into the market" sufficient to protect that market share.  *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016).

As to market share, the FTC offers only the naked assertion that Facebook controls "in excess of 60%" of the market – and has for the last decade.  Compl. ¶ 64.  Even leaving aside the FTC's failure to allege a proper relevant market, this check-the-box effort – on a matter that is indispensable to the government's entire apparent theory – does not satisfy minimal pleading standards.  The FTC itself says that, "[i]n most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (2010) ("Merger Guidelines").  The FTC cannot have used that method to calculate its 60% figure because Facebook's products are free for users.  But the FTC does not allege what alternative method it used.  It does not even allege what it is measuring:  Is the allegation that Facebook has 60% of users, 60% of revenue, 60% of time spent on so-called "personal social networks," or something else?  The FTC cannot plausibly allege Facebook's "market share" without alleging such facts.  Users can (and do) "multi-home," or use multiple substitutable services at once (thus multiple

services can attract 60% of users); revenue is not a proxy for share because the FTC's market definition says nothing about monetization; and time spent on "personal social networks" begs the question of how the FTC measures time spent on such services, *e.g.*, does it include time spent passively watching video or reading public content?  The FTC's inability to specify what it put in the denominator when it came up with its 60% figure (the "unit of output") underscores that it has not pleaded any facts that could establish that Facebook has the power to "restrict marketwide output" that is the hallmark of monopoly power.  *Rebel Oil*, 51 F.3d at 1434.

As to entry barriers, the FTC's own factual allegations undermine the plausibility of its apparent theory.  The FTC alleges (¶ 69) that Facebook "clones" face entry barriers because they are hampered by "network effects":  personal social networks are "more valuable" to users as "more users join the service," and consumers would incur costs by "switching to another personal social networking provider," "los[ing]" their "history of posts."  Compl. ¶¶ 65-66.  But the FTC itself also alleges (¶ 7) that products outside the alleged market with a "differentiated" social mechanic can "gain scale despite the network effects enjoyed by the incumbent" and then pivot into the market for personal social networking – bypassing network effects and switching costs.

Indeed, the agency asserts that Instagram and WhatsApp were threats capable of disciplining Facebook's exercise of power at the time of the acquisitions precisely because network and switching costs do *not* protect Facebook from losing users and engagement.  *See id.* ¶¶ 81, 88, 96 (new entrant Instagram had gained "10 million users in less than a year," was capable of achieving "massive scale," and posed "an existential threat" that prompted Facebook to compete by launching its own photo app); *see also id.* ¶¶ 108-109, 122 (alleging similar facts for WhatsApp, including that it prompted Facebook to compete by launching its own messaging app).

The agency likewise alleges (¶ 159) that Facebook's pre-2018 Platform policies were a response to "the emergence of promising competitive threats to its U.S. personal social networking monopoly" – an assertion that hinges on the vulnerability of Facebook's market position to new competitors of various kinds (including messaging products such as Apple's iMessage).  Yet there is no allegation that *other* firms – including those for which the FTC expressly identifies a differentiated mechanic, *e.g.*, YouTube (video), *id.* ¶ 59, and for those as to which the FTC is silent, *e.g.*, ephemeral content, short-form content, and more – are not equally capable of pivoting and expanding just as the FTC claims WhatsApp was poised to do.  And the FTC has not alleged (and could not allege) that Facebook has any way to hamper these competitors' ability to challenge Facebook other than to compete on the merits.

In short, the FTC alleges that Facebook's greatest threats exist outside the purported "personal social networking" "market," such that the threat of entry from the market's edges prevents any exercise of power.  *See id.* ¶¶ 114, 116 (WhatsApp able to pivot and successfully challenge Facebook).  That is fatal to any claim of barriers to entry, and thus fatal to the claim of monopoly power.  *See Ball Mem'l Hosp.*, 784 F.2d at 1336 (no monopoly power where the market definition did "not capture the possibility of new entry and expanded sales by rivals").

## III.   THE FTC DOES NOT ALLEGE ACTIONABLE EXCLUSIONARY CONDUCT

The FTC fails to allege facts establishing a plausible claim that Facebook maintained its alleged market position through "anticompetitive conduct," *Trinko*, 540 U.S. at 407, and not "as a consequence of a superior product" or "business acumen," *Grinnell*, 384 U.S. at 571.

The "mere possession" of a commanding market position – even if the FTC had adequately alleged one for Facebook – is "an important element of the free-market system" because it "attracts 'business acumen' in the first place" and "induces risk taking that produces innovation."  *Trinko*, 540 U.S. at 407.  The antitrust laws prohibit maintenance of such a position

only through "anticompetitive conduct."  *Id.*  Such conduct must have "anticompetitive effect," that is, "it must harm the competitive *process* and thereby harm consumers."  *Rambus*, 522 F.3d at 463 (alleged deception did not harm competitive process where it was not the but-for cause of adoption of allegedly anticompetitive patent standard).  Conduct that disadvantages or even eliminates rivals is not "exclusionary"; all vigorous competition can have that effect.  *Microsoft*, 253 F.3d at 58 (harm to competitors is not itself exclusionary under Section 2).  Exclusionary conduct has the effect of preventing competition on the merits and thereby harms consumers.  *Id.* at 58, 79 (preventing distribution of rival browsers on third-party PCs prevented competition on the merits in the PC operating system market).

The complaint is notably narrow, stale, and limited in what it alleges.  There are three instances of alleged exclusionary conduct:  Facebook's acquisition of Instagram in 2012; Facebook's acquisition of WhatsApp in 2014; and Facebook's circa-2011 policies limiting competitor access to its proprietary Platform.

But not one of the three claimed instances is plausibly alleged as exclusionary, *i.e.*, causing harm to competition and consumers.  The acquisition claims are extraordinary, first of all, because the FTC reviewed and cleared both acquisitions, satisfying its duties under HSR to prevent harmful acquisitions in their incipiency.  At a bare minimum, the FTC should be required to allege facts establishing that those contemporaneous clearances were compromised.  The unexplained (and curiously omitted) regulatory processes that were instituted by the agency and complied with by Facebook, to protect against the very harm now alleged, make the FTC's belated and contradictory challenges here implausible and, therefore, subject to dismissal.  In addition, clearances aside, the FTC's claim that acquisitions of marginal and potential competitors constitute exclusionary conduct under Section 2 is without legal support, and there

are no facts alleged that would support creating such law here for the first time.  *See infra* Part III.A.  Facebook's alleged Platform policies were not exclusionary either; they fall within the well-established rule that all firms, no matter their size or significance, may choose "with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *linkLine*, 555 U.S. at 448.  *See infra* Part III.B.

Overarching these specific defects:  none of the three instances of supposedly exclusionary conduct is supported by any facts establishing a legally cognizable or plausible claim of consumer harm.  The FTC alleges only that, in the absence of Facebook's challenged conduct, the products available to consumers might have been even better in some unspecified respects.  *See* Compl. ¶¶ 161-168.  But that is both conclusory and speculative, and thus doubly insufficient.  *See Twombly*, 550 U.S. at 555 (conclusions must be disregarded); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough.").  The absence of any concrete harm to consumers, even though the alleged monopoly maintenance began a decade ago, reflects the absence of any harm to competition.

Lacking facts to establish *either* unlawful conduct *or* harm to consumers, the FTC attempts to bolster its claims with a grab-bag of selectively quoted internal emails and messages from Facebook executives, which are offered to show that Facebook was concerned about competitive threats from Instagram and WhatsApp – but also many, many other firms.  *See*, *e.g.*, Compl. ¶¶ 12-15, 18-20, 69, 73, 82-94, 96-103, 109-112, 116-120.  These quotes provide virtually the entire undergirding of the FTC's allegations.  But the focus of the antitrust inquiry is properly placed on "the effect of [the alleged] conduct, not upon the intent behind it."  *Microsoft*, 253 F.3d at 59.  The FTC cannot overcome its failure to allege facts establishing a plausible

claim of consumer harm by quoting emails reflecting management perception or intent.  *Cf.*

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) (Gorsuch, J.) (expressions

of intent to "'hurt' or 'destroy'" rivals is exactly what one would expect in a competitive

marketplace).  The FTC conflates such sound bites with pertinent facts plausibly establishing the

elements of its case.  But conclusory rhetoric and selective quotations reflecting Facebook's

intense focus on addressing all manner of competitive threats are all the FTC has.

### A. The Instagram And WhatsApp Acquisitions Were Not Unlawful Exclusionary Conduct

#### 1. The FTC Cannot Belatedly Challenge Mergers Cleared After HSR Review As Unlawful Exclusionary Conduct Absent Allegations That Agency Review Was Compromised

Remarkably, while alleging that the Instagram and WhatsApp acquisitions violate

Section 2, the FTC omits any mention of the fact that it carefully reviewed and cleared both

acquisitions in 2012 and 2014.  The Court should dismiss these claims of exclusionary conduct

because the FTC fails to allege any basis to disregard its own contemporaneous determinations –

made as part of its own detailed HSR regulatory authority – that the acquisitions did *not* pose a

threat of substantial harm to competition.  Facebook is aware of no comparable, much less

successful, challenge by the FTC to a long-completed acquisition that the FTC itself cleared.

Supreme Court precedent counsels caution in accepting the FTC's invitation to make new law.

*First*, as the Supreme Court has explained, a "factor of particular importance" in

evaluating the plausibility of an antitrust claim is "the existence of a regulatory structure

designed to deter and remedy anticompetitive harm."  *Trinko*, 540 U.S. at 412.  Here, the HSR

transaction-control statute, 15 U.S.C. § 18a, supplies such a structure.  *See United States v.*

*Paramount Pictures, Inc.*, 2020 WL 4573069, at *7 (S.D.N.Y. Aug. 7, 2020) (noting that "the

HSR Act[] provide[s] federal antitrust agencies with notice and the opportunity to evaluate the

competitive significance of any major transaction . . . , which suggests a low likelihood of potential future violation").  It is designed to detect and prevent anticompetitive acquisitions before their consummation, after which it is typically impossible to "unscramble merged assets." *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966); *see also* Premerger Notification; Reporting and Waiting Period Requirements, 60 Fed. Reg. 38,930, 38,930 (July 28, 1995) (FTC notice, explaining the purpose of HSR).

The statute imposes "notification and waiting requirements for large acquisitions" to "facilitate Government identification of mergers and acquisitions likely to violate federal antitrust laws."  *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 199 (D.C. Cir. 2015). And the FTC has promulgated an expansive regulatory regime for the express purpose of "enabl[ing]" the agency "to determine whether [an] acquisition may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1); *see also* Premerger Notification: Reporting and Waiting Period Requirements, 64 Fed. Reg. 34,804, 34,805 (June 29, 1999) (FTC notice of formal interpretation) (noting "possibility of an effective remedy for violations, prior to consummation").

That is precisely the assessment the FTC made when it reviewed and cleared the Instagram and WhatsApp acquisitions.  It expressly discharged its statutory and regulatory obligations and determined that there was no basis for challenging either acquisition.  This necessarily reflects the agency's contemporaneous determinations that it was not reasonably foreseeable that the acquisitions were "likely to substantially lessen competition" under Section 7 of the Clayton Act.  *United States v. Baker Hughes Inc.*, 908 F.2d 981, 989 (D.C. Cir. 1990); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1205a (4th ed. 2020) ("Areeda") (assessing the legality of a merger must be done "on the basis of evidence of the situation existing at the time of the acquisition").  Acquisitions that do not threaten harm to competition

27

under Section 7 cannot plausibly be claimed as exclusionary under the Sherman Act. *Cf.*

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1986)

(Section 7 enacted to apply specifically to potentially harmful acquisitions, unlike the more

general provisions of the Sherman Act).

The FTC is seeking to make new law. But the agency already has regulatory tools

designed to address acquisitions likely to harm competition before closing, while they are still in

their "incipiency." *Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962) (citation

omitted). Here, the agency made use of those regulatory tools.

The FTC's failure to address – let alone explain – its prior reviews belies the plausibility

of an allegation that the Instagram and WhatsApp acquisitions were unlawful. *Cf. Texaco Inc. v.*

*Dagher*, 547 U.S. 1, 6 n.1 (2006) ("presum[ing]" that a joint venture was "lawful," including

because it was "approved by federal and state regulators, and there is no contention here that it is

a sham"); *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26,

2016) (prior FTC clearance "weigh[ed] against the conclusion" that acquisition could be

"plausibly characterized as an unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556

(9th Cir. 2018). No court has ever held that the FTC can, years after the fact, undo an HSR-

reportable transaction that the FTC itself investigated, without facts indicating, for example, that

the parties failed to comply with HSR, withheld key documents, or closed the transaction while

an investigation was ongoing. The FTC alleges no such facts here. *Compare* Compl. ¶¶ 4, 6-7,

*In re Automatic Data Processing, Inc.*, Dkt. No. 9282 (FTC Nov. 14, 1996) (acquiring company

failed to produce documents); Compl. ¶ 7, *FTC v. Hearst Tr.*, No. 01-cv-00734 (D.D.C. Apr. 5,

2001) (same); Op. of the Comm'n at 1, *In re Chicago Bridge & Iron Co.*, Dkt. No. 9300 (FTC

Jan. 6, 2005) (parties closed "in the midst of the Commission's investigation of the acquisition").

*Second*, where the "benefits" of authorizing additional "antitrust intervention" are "slight," a court "must weigh a realistic assessment of its costs." *Trinko*, 540 U.S. at 414. Allowing the FTC's about-face without any alleged basis for disregarding the outcomes of the prior reviews presents a substantial risk of "chill[ing] the very conduct the antitrust laws are designed to protect." *Id.*; *see also United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990) ("For competitors in a free market to fear buying each other out lest they be hit with the expense and misery of an antitrust enforcement action amounts to a burden only slightly less palpable than a direct governmental prohibition against such a purchase.").  "Many deals would not close, or would not be proposed in the first place, if parties faced significant lingering doubt about whether antitrust enforcers or private plaintiffs might challenge them in the future."[3] Moreover, unlike a contemporaneous review, a challenge brought years after the fact invites "[m]istaken inferences," *Trinko*, 540 U.S. at 414, based on hindsight, rather than on what was reasonably foreseeable at the time.

The FTC wants a do-over.  But just as the complaint in *Trinko* was dismissed at the pleading stage – in part because the existing legal structure addressed the very duty to deal that the plaintiffs sought to impose under the Sherman Act – the FTC's claims that the mergers were "exclusionary" under Section 2 should be dismissed for a similar reason:  they, contemporaneously, underwent searching antitrust scrutiny, making it implausible that they were unlawful at the time.  *See id.* at 412 ("Where such a structure exists, . . . it will be less plausible that the antitrust laws contemplate such additional scrutiny.").

---

[3] David L. Meyer, *Section 2 Standards and Consumer Welfare:  Some Lessons from the World of Merger Enforcement*, 2007 Colum. Bus. L. Rev. 371, 386 (then-Deputy Assistant Attorney General for Civil Enforcement, Antitrust Division, U.S. Department of Justice).

Facebook does not argue that the FTC is statutorily barred from merger re-review.  *See* 15 U.S.C. § 18a(i)(1) (savings clause providing that HSR "shall not bar" other actions).  But the agency should be required to allege facts justifying re-review, as it has done in other post-closing challenges.  *See*, *e.g.*, *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989) (permitting challenge to merger that closed before HSR review was complete, after the parties restructured the transaction "[t]o avoid having to file a premerger notification").  Here, the FTC alleges no facts to support any claim that the agency's contemporaneous determinations in 2012 and 2014 were compromised in any way – rendering implausible the agency's claim now that the conduct it deemed lawful at the time was actually unlawful.  Such a novel claim should be dismissed.  *Cf.* *Trinko*, 540 U.S. at 407 (savings clause "does not create new claims that go beyond existing antitrust standards").

### 2. The FTC Fails To Allege Facts Establishing A Plausible Claim That Facebook's Acquisitions Were Unlawful Exclusionary Conduct

#### a) The FTC alleges no facts establishing a plausible claim that the Instagram acquisition harmed competition and consumers

Putting aside its own review and clearance of the two acquisitions at issue here, the FTC fails to allege that these long-ago acquisitions were "exclusionary" under Section 2.

The agency alleges that small photo-sharing app Instagram was an actual competitor in the "personal social networking" market, without any factual allegations as to how an app that the FTC publicly described at the time as a "photo sharing program"[4] satisfied the three purportedly defining elements of a "personal social networking" competitor.  It then speculates

---

[4] *See* Fed. Trade Comm'n, *FTC Closes Its Investigation Into Facebook's Proposed Acquisition of Instagram Photo Sharing Program* (Aug. 22, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/ftc-closes-its-investigation-facebooks-proposed-acquisition (Hansen Decl. Ex. B).

that Instagram, which it now characterizes as "the most significant personal social networking competitor to emerge since Facebook Blue," Compl. ¶ 10, could have become, on its own, a meaningful competitor to Facebook, *and* that this hypothetical additional competition might have provided unspecified "quality" or "choice" benefits to consumers, *id*. ¶ 163.  Such speculation about what might have been is insufficient as a matter of law.  *See Twombly*, 550 U.S. at 557.

No court has ever held that allegations similar to the FTC's amount to a plausible claim of actionable exclusionary conduct under Section 2.  Acquisitions, including acquisitions of competitors, support no presumption of anticompetitive effect because they often increase competition and benefit consumers.  *See Eastman*, 2016 WL 1640465, at *9 ("plaintiffs cannot rely on the fact of the acquisitions alone"); *Dresses for Less, Inc. v. CIT Grp./Commercial Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("[T]he mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality.") (quoting Areeda ¶ 901a (1998)).

This is particularly true when an established firm acquires a fledgling competitor:  there are obvious opportunities for benefits not only to the acquiring company, but also to consumers.  If the acquirer can, through investment and application of expertise, promote the development and distribution of a new technology (for example), that technology may become available sooner and more widely than if the competitor had remained independent.  *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 789 (9th Cir. 2015) ("a primary benefit of mergers to the economy is their potential to generate significant efficiencies . . . which may result in lower prices, improved quality, enhanced service, or new products") (quoting Merger Guidelines § 10); *Dresses for Less*, 2002 WL 31164482, at *12 ("horizontal mergers are much more likely to be procompetitive than anticompetitive"); Areeda ¶ 901a

31

(competitors may merge "to achieve synergies in the production or distribution of complementary goods, to put inefficiently run assets into the hands of superior management").

Only in rare circumstances not alleged here have acquisitions of competitors been held to be exclusionary under Section 2. For example, in the historic *American Tobacco* case, the Supreme Court condemned the defendant's serial acquisition of rivals' assets solely to shut them down and make them unavailable for competition. *See United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (Section 2 violation where defendant spent "millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade"); *see also United States v. Am. Can Co.*, 230 F. 859, 875 (D. Md. 1916) (Section 2 violation where monopolist shut down two-thirds of the plants it acquired within two years of their purchase). Buying multiple competitors for no purpose other than to shut them down "do[es] not benefit consumers at all." Areeda ¶ 651a. And the only benefit to the acquirer from such conduct is the suppression of a competitive threat; its actions are "irrational but for [their] anticompetitive effect." *Novell*, 731 F.3d at 1075.

The FTC has not made such allegations here, nor could it. Indeed, it has alleged the opposite: Facebook acquired Instagram because its photo-sharing features were better than Facebook's own photo-sharing features. *See* Compl. ¶ 89. By purchasing Instagram, Facebook saw an opportunity to "incorporat[e] the social dynamics [Instagram had] invented into [its] core products" and to "deploy[]" them "at scale." *Id.* ¶ 91. Following the acquisition, Facebook grew the Instagram product massively to the benefit of consumers worldwide. *Id.* ¶¶ 16, 104.

The FTC posits that an independent Instagram could have done even better and brought more benefits to consumers on its own, but the FTC alleges no facts to support that claim. While the FTC speculates that an independent Instagram would have provided more "consumer choice"

by limiting ads, no facts support that implausible contention.  Instagram had no revenues when it was acquired, and it had no way to support its free-to-consumer product without advertising.  *See id.* ¶¶ 90, 101.  The FTC's suggestion that Instagram would have grown to billions of users by showing them fewer or better ads is fantasy.  The "prospective harm to competition" alleged here is self-evidently "speculative," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007), and therefore does not state a claim, *see Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73, 87 (D.D.C. 2013) (plaintiffs' allegation that, absent challenged conduct, lower fees and savings would be passed on to consumers was "speculation" that "depends on a huge number of assumptions"; complaint dismissed).

Furthermore, even crediting the FTC's conclusory allegation that Instagram was in the relevant market in 2012, the FTC does not allege facts to support any claim that Instagram – a nascent competitor at best – was the only such competitor.  On the contrary, the FTC alleges that Facebook faced plenty of other, equally threatening competitors when it acquired Instagram.  *See* Compl. ¶¶ 73 (Twitter, Snapchat), 87 (Google), 90 (Path), 91 (Foursquare).  And mere days after Facebook announced its Instagram acquisition, the CEO described *messaging* as "the single most important app on anyone's phone" and lamented that Facebook was "falling increasingly behind."  *Id.* ¶ 112.

The claim that an acquisition has resulted in one fewer competitor – which is all the FTC actually alleges when speculation is put aside – has never been held to make out a plausible claim of exclusionary conduct under Section 2.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for the protection of *competition*, not *competitors*.") (internal quotation marks omitted); *see also infra* pp. 34-36 (explaining legal insufficiency of FTC's "potential competitor" claim).

> **b)** **The FTC fails to allege that Facebook's acquisition of non-competitor WhatsApp was exclusionary**

The FTC does not even purport to allege that the acquisition of WhatsApp, a messaging service that competes with Apple's iMessage, among many others, eliminated a competitor. Indeed, the agency alleges that WhatsApp was *not* a competitor to Facebook before its 2014 acquisition. *See* Compl. ¶¶ 60, 113. The FTC alleges only that WhatsApp was a "competitive threat," *id.* ¶ 113, that *could have* entered the "personal social networking" market, "either by adding personal social networking features or by launching a spinoff personal social networking app," *id.* ¶ 17, thereby benefiting users in the future in some ill-defined way, *id.* ¶ 127.

Putting aside the purely speculative nature of the FTC's claim, no court has ever accepted the "potential competitor" theory the FTC advances here under Section 2, and for good reason: it is impossible to predict, with any degree of certainty, whether or how a firm *not* competing in a particular alleged market will actually enter that market, let alone identify future successes. *See* Richard A. Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution Horizontal Merger and Potential Competition Decisions*, 75 Colum. L. Rev. 282, 323-24 (1975) ("There is no judicially workable method of ranking, even crudely, the potential competitors in a market for the purpose of identifying a set of most likely or most feared entrants."); *cf. Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002) (noting that "there is no possible way to predict just what would happen" had a challenged transaction not occurred).

The Supreme Court has expressly refused to endorse anything like the FTC's theory, even under Section 7 – the statute that expressly addresses anticompetitive acquisitions. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) ("Whether actual potential competition is a viable

theory of section 7 liability has not been answered by the Supreme Court.").[5]  The claim relating

to WhatsApp should be denied on that ground alone.

As we explain in our motion to dismiss the Section 7 claims brought by the State

Attorneys General, the FTC's belated challenge to the WhatsApp acquisition does not even

satisfy the standards it has advocated for purposes of challenging "potential competitor"

acquisitions under Section 7.  *See* Memorandum in Support of Facebook's Motion To Dismiss

States' *Parens Patriae* Complaint at 18-20, Case No. 1:20-cv-03589-JEB (D.D.C. Mar. 10,

2021).  Under the FTC's own view, that theory requires not only facts establishing that the

potential entrant "'probably' would have entered the market," but also that the acquired firm was

one of "few . . . firms that can enter effectively."  *FTC v. Steris Corp.*, 133 F. Supp. 3d 962, 966

(N.D. Ohio 2015) (citing the FTC's briefs without endorsing the FTC's potential-competition

theory and denying the FTC's motion for a preliminary injunction because the agency could not

show the target would "probably" enter the acquirer's market but for the transaction).  But the

FTC alleges no facts as to any WhatsApp intention of competing as a "personal social network,"

much less facts establishing that its entry was probable.  Nor does it allege that WhatsApp was

one of only a few potentially effective entrants.

Rather, the FTC alleges that Facebook faced *many* potential entrants – at minimum, it

faced the apps and companies subject to the alleged enforcement of Facebook's Platform policy,

which the FTC characterizes (¶ 159) as "promising competitive threats."  The FTC does not and

---

[5] One appellate court 40 years ago applied a different "potential competition" theory in
the context of a Section 7 claim, but that case involved unusual facts not present here, and it has
not been followed by any other federal court.  *See Yamaha Motor Co. v. FTC*, 657 F.2d 971, 977
(8th Cir. 1981) (affirming injunction against joint venture deal that kept a competitor that was
already "selling substantial numbers" of the product at issue "in every developed market in the
world, *except* the United States," out of a highly concentrated market) (emphasis added).

cannot assert that WhatsApp posed a unique threat to Facebook when, as the FTC alleges, many

other, similar "threats" existed – including other mobile messaging services, *see* Compl. ¶¶ 153-

156.  Any claim that WhatsApp was uniquely threatening, while Apple's iMessage was not, is

implausible on its face.  Where the FTC cannot even pass its own Section 7 test, it necessarily

follows that the allegations are insufficient to state a claim of exclusionary conduct under

Section 2.  *See supra* pp. 27-28.

> **B.**     **The FTC's Claim That Facebook's 2011-2018 Policies Harmed Competition By Preventing Competitors From Making Unrestricted Use Of Its Proprietary Platform Fails As A Matter Of Law**

Although the FTC claims (¶¶ 64-66) that Facebook had little or no competition in its

"personal social networking" market, it later claims (¶¶ 77, 136) that the company harmed

competition by providing less than full access to its proprietary Platform to many competitors

that sought to use that free resource to take users away from Facebook.  But Facebook had *no*

*duty* to make its Platform available to any other app.  *See supra* pp. 23-25 (citing *linkLine*, 555

U.S. at 448; *Trinko*, 540 U.S. at 411).

In *Trinko*, plaintiffs, local phone customers, alleged that undisputed monopolists in

their respective local service areas had refused to make their facilities available to rivals

notwithstanding a statutory duty to do so imposed by Congress in the Telecommunications Act

of 1996.  The Supreme Court held that the defendant had *no antitrust duty* to deal on any terms

with its rivals, even though the rivals needed access to compete.  *See Trinko*, 540 U.S. at 409-11.

*Trinko* thus establishes a clear, general no-duty-to-deal rule; any possible exception to

that rule is narrow, and the FTC has not alleged that any exception could apply here.  Some

courts have suggested that Section 2 liability may still exist when a firm with (1) monopoly

control over a necessary input (2) terminates a "profitable course of dealing" with a downstream

rival, (3) refusing to provide to competitors a product "already sold in a retail market to other

customers." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)).  Furthermore, the plaintiff must plausibly allege that the challenged conduct is "irrational but for its anticompetitive effect."  *Novell*, 731 F.3d at 1075.  The FTC alleges no facts stating a plausible claim under any such theory.

*First*, the FTC has not even attempted to plead that Facebook has power over an input that developers *need* to reach users.  The *only* product market that the FTC has attempted to allege is on the user side; it has not alleged anything about a market in which developers obtain inputs that Facebook supplies.  Without any allegations about the nature of the market in which developers deal with Facebook, the FTC's refusal-to-deal claim cannot even get off the ground.

*Second*, the agency does not allege that Facebook ever *profited* from allowing competitors, for free, to use Facebook's Platform and related information to take consumers away from Facebook to their competing products, nor would such an allegation be plausible. While the FTC claims (¶¶ 132-134) that user data is generally valuable to Facebook, and that developers generally provided data when they came onto Platform, the FTC does not allege that data it received from *competitors* made it "profitable" for Facebook to let those competitors use their free access to take customers away from Facebook.  *Cf. hiQ Labs, Inc. v. LinkedIn Corp.*, --- F.3d ---, 2020 WL 5408210, at *9 (N.D. Cal. Sept. 9, 2020) (allegation that competitor's use of LinkedIn network "help[ed] prove LinkedIn's value proposition" to customers failed to plead profitable course of dealing under *Aspen Skiing*).  *Third*, there is no allegation that Facebook ever sold access in a retail market.  Rather, Platform was allegedly a project designed to increase users' engagement with Facebook – not a product sold to customers at all.

*Finally*, it was plainly reasonable and not irrational for Facebook to impose restrictions on competitors that sought to use their free access to Facebook's own proprietary Platform to

divert customers *away* from Facebook.  *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d

1288, 1295-96 (11th Cir. 2004) (rejecting claim because preventing free-riding is legitimate

business practice); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1559,

1562 (11th Cir. 1983) (same).

Two courts have resolved motions to dismiss similar refusal-to-deal claims based on the

Facebook Platform policies at issue here.  Both rejected those claims, holding that "Facebook has

a right to control its own product, and to establish the terms with which . . . application

developers . . . must comply in order to utilize this product."  *Sambreel Holdings*, 906 F. Supp.

2d at 1075; *see Reveal Chat*, 471 F. Supp. 3d at 1002-03 (granting motion to dismiss Platform

claims); *see also Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal.

July 20, 2010) (dismissing claims based on prior Platform policies).  This Court should reach the

same conclusion.

The FTC cannot evade the limitations on duty-to-deal claims by asserting that the

"conditions" Facebook placed on access to its Platform APIs somehow unreasonably harmed

competition (as opposed to particular competitors) by limiting app developers from competing

with Facebook generally, and not just while they were using Facebook property.  *See* Compl.

¶¶ 23, 136.  The FTC cannot begin to make out such a claim without alleging facts plausibly

establishing both that Facebook had monopoly power over developers in some properly defined

antitrust market and that Facebook conditioned developers' access to that monopoly on their

agreement not to deal with Facebook's rivals.  *See Lorain Journal Co. v. United States*, 342 U.S.

143, 154 n.8 (1951) (monopolist newspaper required advertisers not to advertise on radio);

*Microsoft*, 253 F.3d at 70 (Microsoft had distribution monopoly and impaired other web

browser's distribution opportunities through exclusive-dealing agreements).

But the FTC has not pleaded facts supporting either requirement.  As noted above, the

FTC alleges nothing about the nature of the market that included Platform, much less that

Facebook had monopoly power vis-à-vis developers.  And the FTC cannot allege that Facebook

required developers seeking access to its Platform to refrain from dealing with Facebook's rivals.

That is clear from the policies themselves.  *See Democracy Forward Found. v. White House*

*Office of Am. Innovation*, 356 F. Supp. 3d 61, 70 n.8 (D.D.C. 2019) (taking judicial notice of

document incorporated by reference in complaint).  The policies do not impose any condition

that interfered with any company's freedom to compete independently, including by cooperating

with third parties.  *See* Compl. ¶ 143 (quoting actual policy); *see also* Hansen Decl. Ex. D (full

text of cited policy).  Nor did Facebook's Platform policies impose any restrictions on what a

developer did with its own data.  *See* Compl. ¶ 143.  The policies simply made less *Facebook*

data available to rivals seeking to use that data to compete with Facebook.

The FTC's claim thus lies far afield from *Lorain Journal* or any other "anticompetitive

conditions" case.  Facebook's alleged conditions of dealing lie in the heartland of the general

rule that a firm may choose its terms of dealing – including terms to prevent rivals from free-

riding on the firm's assets.  *See Reveal Chat*, 471 F. Supp. 3d at 1002; *Sambreel Holdings*,

906 F. Supp. 2d at 1075.

## IV.   THE FTC LACKS AUTHORITY TO MAINTAIN THIS SUIT

The FTC acknowledges that it can maintain its suit in federal district court only if

Facebook "is violating or is about to violate" the antitrust laws under Section 13(b) of the FTC

Act, 15 U.S.C. § 53(b).  Compl. ¶ 36.  Section 13(b) supplements the FTC's ability to pursue

enforcement in its own administrative forum, where it regularly pursues claims related to past

conduct under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b).  This supplemental authority

allows the agency to seek temporary or, in appropriate cases, permanent injunctive relief to halt

imminent or ongoing violations of federal law that would inflict irreparable harm during the
pendency of an administrative proceeding.

But the FTC has not properly invoked Section 13(b) because it has alleged no imminent
or ongoing antitrust violation, only conduct that took place years ago.  The Instagram acquisition
closed in 2012, *see* Compl. ¶ 95, the WhatsApp acquisition closed in 2014, *see id*. ¶ 121, and the
Platform policies were last in effect in 2018, *see id*. ¶ 148; and all incidents of enforcement of the
Platform policies cited in the complaint took place no later than 2013, *see id* ¶¶ 153-156.  The
FTC therefore has not alleged that Facebook "is violating, or is about to violate," the antitrust
laws and thus lacks authority to proceed in this Court.

### A.   Congress Authorized The FTC To Sue In Federal Court Only To Halt Imminent Or Ongoing Violations Of Law

Section 13(b) allows the FTC to "bring suit in a district court of the United States" only
where "any person, partnership, or corporation is violating, or is about to violate, any provision
of law enforced by the [FTC] . . . to enjoin any such act or practice."  15 U.S.C. § 53(b).  By its
plain terms, this allows the FTC to proceed in federal district court only where there is an
ongoing ("is violating") or imminent ("is about to violate") violation.  The FTC cannot invoke
Section 13(b) "to remedy a past violation."  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th
Cir. 1985); *see also*, *e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 376 (3d Cir. 2020) ("[I]n order to
sue, the FTC must have reason to believe an antitrust violation is imminent or ongoing."); *FTC v.
Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020) (holding that allegedly unlawful agreements
that "terminated . . . in 2015 – two years before the FTC filed its action" – did "not warrant the
issuance of an injunction" under Section 13(b)); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764,
772, 774 (7th Cir. 2019) (stating that "Section 13(b) serves a . . . forward-facing role:  enjoining
ongoing and imminent future violations" and includes a "requirement that the defendant must be

'violating' or 'about to violate' the law" that "matches the forward-facing nature of injunctions").  The FTC concedes this limitation.  *See* Compl. ¶ 36; *see also* Brief of the FTC at 23 n.8, *FTC v. Shire ViroPharma Inc.*, 917 F.3d 147 (3d Cir. June 19, 2018) (No. 18-1807), 2018 WL 3101438 ("The 'about to violate' language applies both where the violation has not yet occurred (*e.g.*, when the FTC seeks a preliminary injunction to block a proposed merger) and . . . where violations have already occurred and are likely to recur absent an injunction.").

Where, as here, the FTC attempts to use Section 13(b) to address past conduct, it oversteps its authority, and the complaint must be dismissed.  For example, in *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), the Third Circuit held that Section 13(b)'s "unambiguous" and "clear text" "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."  *Id.* at 147, 150, 156.  Because the FTC alleged only "a violation in the distant past and a vague and generalized likelihood of recurrent conduct," the FTC had "fail[ed] to state a claim upon which relief can be granted" and its complaint was properly dismissed.  *Id*. at 159, 161.

*Shire* gives proper effect to Section 13(b)'s plain language and purpose.  Before Congress enacted Section 13(b), the FTC had no authority to initiate a proceeding in federal district court. The FTC could bring suit only in its administrative forum, where it could be "virtually impossible" to obtain relief pending a final decision, such as when two parties closed a merger and scrambled assets.  *Dean Foods*, 384 U.S. at 605, 606 n.5 (reversing order denying preliminary relief under the All Writs Act during the pendency of an FTC Part 3 proceeding); *see also FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 217 (D.D.C. 2018) (granting preliminary relief to FTC because "divestitures are really hard to do"; FTC study found that it was "particularly difficult to restore the pre-merger state of competition if the merging parties have commingled").

Congress's "purpose" in enacting Section 13(b) was to "permit the Commission to bring an immediate halt to unfair or deceptive acts or practices" that would otherwise "continue for several years until agency action is completed."  S. Rep. No. 93-151, at 30 (1973); *see also* 119 Cong. Rec. 36,610 (1973) ("[I]t is essential that the Commission have authority to prevent the aggregation of serious public harm during the period required for the Commission to complete [administrative proceedings].").  Congress's determination that the agency may seek "a permanent injunction" in "proper cases" was "not designed to address hypothetical conduct or the mere suspicion that such conduct may yet occur," "[n]or was it meant to duplicate Section 5 [15 U.S.C. § 45], which *already prohibits past conduct*."  *Shire*, 917 F.3d at 156 (citing S. Rep. No. 93-151, at 30) (emphasis added).

### B.     The FTC Alleges Only Past Conduct Not Cognizable Under Section 13(b)

**1.**     *Facebook's long-closed acquisitions are past conduct.*  The FTC attempts to recast Facebook's 2012 acquisition of Instagram and its 2014 acquisition of WhatsApp, *see* Compl. ¶¶ 95, 121, as "ongoing" conduct, *see id*. ¶¶ 76, 105, 127, 172.  But the combination of formerly separate companies into a unitary company is a "discrete act" that is completed upon closing and "not an ongoing scheme"; "[o]nce the merger is completed, the plan to merge is completed."  *Reveal Chat*, 471 F. Supp. 3d at 995 (rejecting claim that past acquisitions amount to ongoing antitrust violation) (quoting *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004)).  For this common-sense reason, another federal court has already decided that Facebook's acquisitions of Instagram and WhatsApp are not "ongoing" antitrust violations.  *See Reveal Chat*, 471 F. Supp. 3d at 995 (Section 2 claims relating to Instagram and WhatsApp are not ongoing violations).

Federal courts have consistently held, in rejecting attempts to evade statutes of limitations, that the continued operation of a company formed by an allegedly illegal acquisition

is *not* an "ongoing" or "continuing" violation of the antitrust laws. *See*, *e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599, 604 (6th Cir. 2014) (collecting cases that continuing operation of unitary company formed by merger is not itself an ongoing violation, and noting that a "cause of action challenging an acquisition accrues at the time of the merger or acquisition"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000) (same, reasoning that the "holding or use of assets is by its nature an unabated inertial consequence of the initial acquisition") (internal quotation marks and alteration omitted); *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016) (closed merger not a "continuing violation").

**2.** *Facebook's "removed" Platform policies are past conduct.* The FTC acknowledges that the challenged Facebook Platform policies ended prior to even the FTC's investigation of Facebook and have not been in effect since 2018. *See* Compl. ¶¶ 148-149. In fact, the agency does not allege any specific enforcement of those policies after *2013*. *See id.* ¶¶ 153-156. The FTC's speculation that Facebook "is likely to reinstitute such policies" if the public loses interest in scrutinizing Facebook, *id.* ¶¶ 149, 172, is patently inadequate. *See Shire*, 917 F.3d at 160 ("vague allegations" of restarting terminated conduct do not plausibly support finding that a defendant is "about to" restart that conduct). It is also entirely conclusory. *See Twombly*, 550 U.S. at 557 ("a naked assertion . . . without some further factual enhancement . . . stops short of the line between possibility and plausibility"). The FTC does not allege that Facebook has taken any steps or made any plans to reinstate the challenged policies.

***

The FTC's arguments for bringing this case in federal court have no limit: every alleged monopolist that took actions in the distant past to maintain its position is engaged in an

"ongoing" violation of the law, and, accordingly, the FTC can bring all Section 2 cases in federal district court.  That is manifestly *not* what Congress intended in granting limited supplementation to the FTC's powers in Section 13(b).  The only appropriate cure for the agency's overreaching here is dismissal of this action.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and dismiss the FTC's complaint in its entirety.

Respectfully submitted,

March 10, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
L. Vivian Dong (D.C. Bar No. 1722506)*
Alex A. Parkinson (D.C. Bar No. 166695)*
Ana Nikolic Paul (D.C. Bar No. 1531904)*
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*

* Applications for Admission to the
Bar of the U.S. District Court for the
District of Columbia Pending