# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**,

                                Plaintiff,

          v.

**FACEBOOK, INC.**

                              Defendant.

Civil Action No. 1:20-cv-03589 (JEB)

## PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS

# Table of Contents

Table of Authorities ........................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A.   Instagram Acquisition .......................................................................................... 3

    B.   WhatsApp Acquisition ........................................................................................ 4

    C.   Facebook Platform .............................................................................................. 5

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT .................................................................................................................... 6

I.     THE FTC'S COMPLAINT STATES A CLAIM OF MONOPOLIZATION ........................ 6

    A.   The Complaint's Allegations Establish that Facebook Possesses Monopoly Power in PSN Services in the United States ...................................................................... 7

        1.   The Complaint's Allegations Establish that PSN Services in the United States Constitute a Relevant Market .......................................................................... 8

        2.   Facebook's Criticisms of the Complaint's Relevant Market Allegations Fail ............... 10

            a)   Facebook's Assertion that It Provides PSN Services "Free and In Unlimited Quantities" Provides No Basis for Dismissal ...................................................... 11

            b)   The FTC's Complaint Is Not Required to Plead a Method of Quantifying Cross-Elasticity of Demand ...................................................................................... 12

            c)   Facebook's Claim that PSN Services Are Reasonably Interchangeable with Other Services Disputes the Complaint's Factual Allegations .................................... 13

            d)   Facebook's Remaining Arguments Fail to Undermine the Relevant Market ........... 15

        3.   The Complaint's Allegations Establish Facebook Possesses a Dominant Share of the Relevant Market that Is Protected by Entry Barriers ................................................ 17

    B.   The Complaint Details How Facebook Has Maintained Its Monopoly Position Through an Anticompetitive Course of Conduct ................................................................... 20

        1.   The Complaint Alleges that Facebook Maintained Its Monopoly Through the Acquisitions of Instagram and WhatsApp .......................................................... 21

            a)   Facebook's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct ...................................................................................................... 21

            b)   The Complaint Provides Detailed Allegations that Facebook's Acquisitions of Instagram and WhatsApp Caused Anticompetitive Effects .................................. 23

            c)   Prior HSR Review Does Not Bar this Action or Create a Heightened Pleading Standard ..................................................................................................... 27

d)   Section 2 Provides an Independent Basis for Challenging the Acquisitions of a Monopolist ....................................................................................................... 29

2.   The Complaint Alleges that Facebook Maintained Its Monopoly Through Its Platform Policies............................................................................................................................ 31

a)   Facebook's Platform Policies Constitute Unlawful Conditional Dealing ................. 31

b)   Facebook's Platform Conduct Is Also Actionable Under *Trinko* and *Aspen* ............. 34

c)   Facebook Inaccurately Claims that Courts Have Ruled on Its Platform Conduct ..... 37

II.   THE COMPLAINT ESTABLISHES THE FTC'S AUTHORITY TO FILE THIS SUIT ... 38

A.   Section 13(b) Empowers the FTC to Sue in Federal Court When the Commission "Has Reason to Believe" a Defendant Is Violating the Law.............................................................. 39

B.   The Complaint Alleges an Ongoing Monopolization Offense ......................................... 41

CONCLUSION............................................................................................................................. 45

## Table of Authorities

CASES

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126

    (D.D.C. 2018) ................................................................................................17, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ......34, 35, 36, 37

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F. 2d 1325 (7th Cir. 1986) ........19, 34

*Behrend v. Comcast Corp.*, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) ........................30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................6, 13

*Bd. of Trade v. CFTC*, 605 F.2d 1016 (7th Cir. 1979) ....................................................40

*Boise Cascade Corp. v. FTC*, 498 F. Supp. 772, 779 (D. Del. 1980) ...............................40

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606

    (W.D. La. 2016) ...........................................................................................26, 30

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ...................................25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ..............26

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...........................................8, 9, 12

*Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114 (D.D.C. 2019) ...........................................13

*California v. Am. Stores Co.,* 495 U.S. 271 (1990) ...........................................................43

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) ...........................20

*Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995) ...............12

*CollegeNet, Inc. v. Common Application, Inc.,* 355 F. Supp. 3d 926 (D. Or. 2018) .........10

*Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039 (8th Cir. 2000) .......................44

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553

    (11th Cir. 1983) ...................................................................................................37

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .......................21

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)..............31, 32, 33

*Dresses for Less, Inc. v. CIT Grp./Commercial Services, Inc.*, 2002 WL 31164482

    (S.D.N.Y. Sept. 30, 2002) ...................................................................................25

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),

    724 Fed. App'x 556 (9th Cir. 2018) ................................................................26, 28

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750

    (N.D. Cal. July 20, 2010) .....................................................................................38

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d. Cir. 2020)...........................................................17

*FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009)...................................................45

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)................................................................24, 33

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ...........................................14

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) .......................................10

*FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019)........39

*FTC v. Nat'l Urological Grp., Inc.*, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) .............40

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ...............................18

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020).......................................................41

*FTC v. RAG Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020)................................................14

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)....................................40, 41

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .................................................16

*FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2020)....................................25, 41

*FTC v. Vyera Pharm., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ........................39, 41, 45

*FTC v. W.Meat Co.*, 272 U.S. 554 (1926) ........................................................43

*Gottesman v. Gen. Motors Corp.*, 414 F.2d 956 (2d Cir. 1969) ..........................................43

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ....................................................15

*Hughes v. Abell*, 634 F. Supp. 2d 110 (D.D.C. 2009) ..........................................................6

*In re Sanctuary Belize*, 482 F. Supp. 3d 373 (D. Md. 2020) ..............................................45

*In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217

   (D.N.J. Oct. 29, 2015) ..........................................................................................34, 36

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010) ..................................15

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114 (10th Cir. 2014) ......19

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ................................................20, 22, 24

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ....................................... passim

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23

   (2d Cir. 2015) ........................................................................................................14, 15

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ......................................................25

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) ..................37

*Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73 (D.D.C. 2013) ........................26

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 7 F. Supp. 3d 955 (N.D. Cal. 2014) ...........11

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F. Supp. 3d 1049 (9th Cir. 2015) ........11

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ............................................................14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir. 1997) .................14

*RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215 (C.D. Cal. 2012) ................10, 13

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir 1995) ......................................18

*Reveal Chat Holdco LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981 (N.D. Cal. 2020)..38, 44

*Rochester Drug Co-op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308

(D. Del. 2010)............................................................................................20

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210

(D.C. Cir. 1986)........................................................................................29

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070

(S.D. Cal. 2012)........................................................................................38

*Search v. Uber Techs., Inc.,* 128 F. Supp. 3d 222 (D.D.C. 2015*)* ....................................11

*Standard Oil Co. v. FTC*, 449 U.S. 232 (1980) ...................................40

*Standard Oil Co. v. FTC*, 596 F.2d 1381 (9th Cir. 1979)...................................40

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ...........................................1, 22, 23

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)...........................28

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*,

311 F. Supp. 3d 468 (D.R.I. 2018) ............................................................37

*Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 713 F.2d 428 (8th Cir. 1983)..........22

*Texaco Inc. v. Dagher,* 547 U.S. 1 (2006) ........................................28

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ....................................10, 15

*United States v. Aetna*, 240 F. Supp. 3d 1(D.D.C. 2017) ...................................14

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ...................................18

*United States v. Anthem, Inc.,* No. 1:16-cv-1493 (D.D.C. Sept. 30, 2016) ................15, 16

*United States v. Anthem, Inc.,* Order Adopting R. & R. No. 4 (ECF No. 189),

No. 1:16-cv-1493 (D.D.C. Oct. 14, 2016)................................................16

*United States v. Anthem, Inc.,* R. & R. No. 4 of the Special Master (ECF No. 172),

    No. 1:16-cv-1493 (D.D.C. Sept. 30, 2016) ............................................................... 15

*United States v. Dentsply*, 399 F.3d 181 (3d Cir. 2005) ..................................................... 24

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) ............................. 7

*United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586 (1957) .......................... 43

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................ passim

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .............. 8, 11, 13, 14

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975) ........................... 43, 44

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ................................... 23

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .............................. passim

*United States v. Schine*, 260 F.2d 552 (2d Cir. 1958) ........................................................ 43

*United States v. Village Voice Media, LLC*, No. Civ.A. 1:03 CV 0164, 2003 WL 21659092

    (N.D. Ohio Feb. 12, 2003) ........................................................................................ 12

*U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986 (11th Cir. 1993) ......................................... 12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP,*

    540 U.S. 398 (2004) .......................................................................................... passim

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ................................ 36, 37

*Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594 (6th Cir. 2014) ..................................... 44

## STATUTES AND RULES

7 U.S.C. § 12a(9) ............................................................................................................... 40

Clayton Act

§7, 15 U.S.C. §18.................................................................................25, 43

§7A(f), 15 U.S.C. § 18a(f)..............................................................27

§7A(i)(1), 15 U.S.C. § 18a(i)(1) ....................................................2, 27, 28

Federal Trade Commission Act

§5(a), 15 U.S.C. § 45(a)..................................................................1, 38

§5(b), 15 U.S.C. § 45(b) .................................................................40

§13(b), 15 U.S.C. § 53(b) ...............................................................2, 38, 39, 40, 41

Hart-Scott-Rodino Antitrust Improvements Act of 1976,

   Pub. L. No. 94-435, 90 Stat. 1383 ...............................................27, 28, 29

Sherman Act §2, 15 U.S.C. § 2........................................................ passim

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56............................29


COURT FILINGS

Complaint, *FTC v. Cardinal Health, Inc.*, No. 15-cv-3031

   (S.D.N.Y. Apr. 20, 2015)...........................................................28

Complaint, *United States v. Parker-Hannifin Corp.*, No. 1:17-cv-01354-UNA

   (D. Del. Sept. 26, 2017) ............................................................28


ADMINISTRATIVE MATERIALS

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*

   (2010) .......................................................................................7, 18, 26

LEGISLATIVE MATERIALS

S. Rep. No. 81-1775 (1950) ................................................................29

OTHER MATERIALS

C. Scott Hemphill & Tim Wu, *Nascent Competitors*,

    168 U. Pa. L. Rev. 1879 (2020) ...............................................................30

Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet*,

    161 U. Pa. L. Rev. 1663 (2013) ...............................................................7

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles

    And Their Application* (4th ed. 2020) .........................................21, 24, 26

## INTRODUCTION

The Court should deny Facebook's Motion to Dismiss because the Federal Trade Commission's Complaint states a claim that Facebook holds monopoly power over personal social networking ("PSN") services in the United States, and is violating the antitrust laws by maintaining its monopoly through means other than competition on the merits.  The Complaint describes in detail Facebook's unlawful course of conduct, which includes acquiring competitive threats and deterring or hindering the emergence of rivals by imposing anticompetitive conditions on its trading partners.  This conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Facebook is one of the largest and most profitable companies in the history of the world. Facebook reaps massive profits from its PSN monopoly, not by offering a superior or more innovative product but because it has, for nearly a decade, taken anticompetitive actions to neutralize, hinder, or deter would-be competitors.  For more than a century, courts have condemned monopolists under Section 2 of the Sherman Act for resorting to similar anticompetitive practices to maintain their dominance.  *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (anticompetitive practices included acquiring rivals); *Standard Oil Co. v. United States*, 221 U.S. 1 (1911) (same); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (refusal to deal with trading partners who dealt with monopolist's rival); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (contractual conditions on trading partners to eliminate risk that nascent threats might erode entry barrier).

Disregarding such plain precedents, Facebook claims that this case should be dismissed before it even begins.  It asserts that the FTC has failed to adequately allege that Facebook has

maintained monopoly power and harms consumers, or alternatively that the FTC should bring this action through an administrative proceeding rather than in this forum.  Neither argument has merit.  Facebook's first argument fails because the Complaint's factual allegations establish that PSN services in the United States are not reasonably interchangeable with other services and thus constitute a relevant antitrust market, *see infra* § I.A.1-2; that Facebook controls a dominant share of this market and is protected by significant entry barriers, *see infra* § I.A.3; and that it has maintained its dominant position through anticompetitive means, *see infra* § I.B.  These allegations must be credited, and Facebook cannot prevail by disputing their veracity, nor by demanding that the FTC identify in its Complaint the specific evidence that the FTC will use at trial to prove its claims.

Facebook's argument that the FTC lacks authority to bring this suit likewise fails. Section 13(b) of the FTC Act provides the FTC with statutory authority to bring suit in this Court because the Complaint's allegations establish that the FTC has determined that it "has reason to believe" that Facebook "is violating" the antitrust laws.  15 U.S.C. § 53(b); *see infra* § II. Facebook's suggestion to the contrary disregards the language of Section 13(b) and ignores clear authority interpreting the statute.  *See infra* § II.

Facebook's unavailing arguments are in no way enhanced by its repeated observation that the FTC could have challenged its acquisitions of Instagram and WhatsApp at an earlier juncture.  Congress has explicitly provided that the FTC need not challenge an acquisition at its first opportunity to do so; instead, the FTC can challenge an acquisition "at any time" under any "provision of law."  15 U.S.C. § 18a(i)(1).  Moreover, the FTC challenges an ongoing course of monopoly maintenance that includes not only Facebook's elimination of competitive threats through acquisition, but also the anticompetitive conditions that hindered other potential rivals.

## BACKGROUND

PSN services enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space. Compl. ¶ 52. After first launching on college campuses in 2004, Facebook expanded to the general public within a few years, and attained a dominant market share in PSN services in the United States no later than 2011, which it has maintained ever since. *Id.* ¶¶ 3, 41, 62, 64.

Facebook's dominant market position in PSN services is protected by formidable barriers to entry. Facebook benefits from substantial direct network effects: because a core purpose of PSN services is connecting and engaging with personal connections, it is very difficult for a new entrant to displace an established PSN service in which users' friends and family already participate. *Id.* ¶ 65. Facebook's position is also protected by switching costs, because of the time and effort that users invest in developing a history and connections on the service. *Id.* ¶ 66.

Since achieving monopoly power, Facebook has defended its position through years of anticompetitive conduct. *Id.* ¶¶ 5, 9, 71. With its monopoly position at risk as users shifted their online behavior from desktop PCs to mobile phones, Facebook navigated this period of transition—and has maintained its PSN services monopoly ever since—not by competing on the merits, but rather through a course of anticompetitive conduct that includes acquiring Instagram and WhatsApp, and imposing and enforcing anticompetitive conditions on access to Facebook's valuable platform interconnections. *Id.*

### A.    **Instagram Acquisition**

Shortly after Instagram—a mobile-first, photo-centric PSN provider—launched in October 2010, Facebook executives identified the service as a key competitive threat. Compl. ¶¶ 81-82. By September 2011, Facebook founder and CEO Mark Zuckerberg described Instagram

3

as "a large and viable competitor" presenting "a big strategic risk for us." *Id.* ¶¶ 83-84.  In February 2012, Mr. Zuckerberg worried that "a huge number" of users were moving their engagement away from Facebook to Instagram, and that Instagram was building a social network that was competitive with Facebook's.  *Id.* ¶¶ 89-90.  In explaining his rationale for pursuing Instagram as an acquisition target, Mr. Zuckerberg explained to CFO David Ebersman that "there are network effects around social products and a finite number of different social mechanics to invent.  Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different." *Id.* ¶ 91.

Facebook announced its agreement to acquire Instagram in April 2012.  By acquiring Instagram, Facebook neutralized a singularly threatening PSN competitor, thereby depriving users of the benefits of competition between the two companies, *see, e.g., id.* ¶¶ 98-99, and making it harder for another firm to enter into PSN services.  *Id.* ¶¶ 100-05.

### B.      WhatsApp Acquisition

Following the Instagram acquisition, Facebook turned to what it considered "the next biggest consumer risk" to its PSN services monopoly: the possibility that an app offering mobile messaging services would enter the PSN services market.  Compl. ¶¶ 17, 107.  In particular, Facebook executives identified a serious strategic threat in the form of mobile messaging apps launching a spinoff PSN service or adding PSN features.  *Id.* ¶¶ 18, 108-11.

Facebook identified WhatsApp as the clear "category leader" in mobile messaging and as the most significant threat in this regard.  *Id.* ¶¶ 17, 19.  Facebook's own messaging app, Facebook Messenger, was launched in 2011, but was already too far behind WhatsApp to prevent WhatsApp from gaining scale.  *Id.* ¶ 115-16.  With Facebook's "window of opportunity to solve the messaging situation shrinking," Facebook once again decided it was "better to buy

than compete." *Id.* ¶¶ 20, 117.  In 2014, Facebook acquired WhatsApp for $19 billion.  *Id.* ¶¶ 120-21.  The acquisition neutralized WhatsApp as a nascent threat and thereby deprived, and continues to deprive, users of the benefits of competition from an independent WhatsApp.  *Id.* ¶¶ 21, 126-27.  As Facebook recognized, an independent WhatsApp (on its own or acquired by a third party) would have the ability and incentive to enter the U.S. PSN services market, but under Facebook's control that competitive threat no longer exists.  *Id.*  Moreover, the acquisition makes it harder for other mobile messaging apps to acquire scale and threaten to enter PSN services.  *Id.*

### C.  **Facebook Platform**

In 2007, Facebook launched "Facebook Platform," a service allowing third-party apps to interoperate and exchange certain information with Facebook, including via application programming interfaces ("APIs").  Compl. ¶¶ 23, 129.  Facebook Platform has proved highly valuable to Facebook—with at times nearly one billion pieces of social data channeled back to Facebook Blue each day.  *Id.* ¶¶ 132-34.  Facebook Platform also became an important distribution channel for third-party apps, with features like the Find Friends API serving as a valuable growth tool.  *Id.* ¶¶ 130, 132, 135.

Between 2011 and 2018, Facebook made Facebook Platform available to developers only on the condition that their apps neither competed with Facebook nor promoted its competitors.  *Id.* ¶ 136.  Facebook punished apps that violated these conditions by terminating their access to the Find Friends API and other APIs.  *Id.* ¶¶ 136, 152.  Facebook's terminations were directed against promising competitive threats, including PSN apps, apps with some social functionality, and mobile messaging services.  *Id.* ¶¶ 153-54, 156.  Facebook's imposition and enforcement of its anticompetitive conditions have served to hinder, suppress, and deter the emergence of threats to its U.S. PSN services monopoly.  *Id.* ¶ 159.

Facebook's illegal monopolization persists today.  Facebook continues to hold and operate Instagram and WhatsApp, which neutralizes them as direct competitive threats to Facebook, and maintains a protective "moat" around its PSN services monopoly.  *Id.* ¶ 76. Facebook recognizes that so long as it maintains Instagram and WhatsApp operating at scale, it will be harder for new firms to enter and build scale around their respective mechanics.  *Id.*

## LEGAL STANDARD

A motion to dismiss can be granted only if the FTC's Complaint does not allege facts that, if accepted as true, state a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  The Court does not need to determine whether the facts alleged are true to deny a motion to dismiss.  *See id.*, at 556 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.") (internal citation omitted). Instead, the Court "should assume the[] veracity" of the Complaint's factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), which "should be liberally construed in [the FTC's] favor." *Hughes v. Abell*, 634 F. Supp. 2d 110, 113 (D.D.C. 2009).

## ARGUMENT

### I.     THE FTC'S COMPLAINT STATES A CLAIM OF MONOPOLIZATION

The Complaint's allegations establish that for nearly a decade Facebook has engaged in a course of anticompetitive conduct to maintain a monopoly in PSN services in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  *See* Compl. ¶¶ 169-74.  "The offense of monopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or

historic accident.'"  *Microsoft*, 253 F.3d at 50 (quoting *Grinnell*, 384 U.S. at 570-71).  The Complaint's factual allegations establish both elements, and therefore state a claim.

A.    **The Complaint's Allegations Establish that Facebook Possesses Monopoly Power in PSN Services in the United States**

The Complaint provides detailed allegations that Facebook possesses monopoly power in the relevant market for PSN services in the United States.  *See* Compl. ¶¶ 38-42, 51-67.  Monopoly power consists of "the power to control prices or exclude competition."  *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956).

While courts commonly find that "a firm is a monopolist if it can profitably raise prices substantially above the competitive level," *Microsoft*, 253 F.3d at 51, monopoly power can also manifest in reduced non-price benefits—such as reduced product quality—that customers would enjoy in a competitive market.  *See NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 2020 WL 7233105, at *2 (9th Cir. Dec. 8, 2020) (defendant's conduct "could, as alleged, diminish the quality of services for the public and thus fall under the type of protection the antitrust laws were intended to afford"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, § 1 (Aug. 19, 2010) [hereinafter, Horizontal Merger Guidelines] ("Enhanced market power can also be manifested in non-price terms and conditions . . . including reduced product quality, reduced product variety, reduced service, or diminished innovation."); Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet*, 161 U. Pa. L. Rev. 1663, 1687 (2013) ("[A]nticompetitive conduct or transactions could enable platforms to exercise market power to give customers less of the good things—improved service, innovative products, and good privacy and data security policies[.]").  In other words, a firm is a monopolist if—paralleling the language of *Microsoft*—it can profitably *reduce* non-price consumer benefits *below* the competitive level.  *Cf. Microsoft*, 253 F.3d at 51.

The FTC has alleged facts establishing that Facebook possesses monopoly power. Because "direct proof" that a defendant has monopoly power is "only rarely available," *Microsoft*, 253 F.3d at 51, monopoly power is more commonly established through indirect proof—namely, it is "inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.* Here, the Complaint includes allegations directly describing Facebook's ability to profitably reduce non-price benefits offered to users. *See* Compl. ¶¶ 27, 98, 163. As discussed below, the Complaint also alleges, and provides detailed facts, defining PSN services in the United States as a relevant antitrust market, *see id.* ¶¶ 51-60, and establishing that Facebook possesses a dominant share in that market that is protected by significant entry barriers. *See id.* ¶¶ 61-66.

1.      **The Complaint's Allegations Establish that PSN Services in the United States Constitute a Relevant Market**

Facebook's assertions that the Complaint does not adequately plead a relevant market are unfounded. A relevant antitrust market has both a product and a geographic dimension. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). A relevant product market is "a term of art in antitrust analysis" that defines a set of products over which a firm could profitably exercise monopoly power. *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 50-51 (D.D.C. 2011) (internal citation omitted). The outer boundaries of a relevant product market "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see also Microsoft*, 253 F.3d at 51-52 (relevant product market consists of products that are "reasonably interchangeable by consumers for the same purposes").

The Complaint alleges that PSN services are not "reasonably interchangeable" with other services, which is supported by specific factual allegations regarding the distinct "characteristics

and uses" of PSN services.  *Brown Shoe*, 370 U.S. at 323.  PSN services are "online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space."  Compl. ¶ 52.

The Complaint provides detailed factual allegations regarding the distinct "uses" of PSN services.  In particular, the Complaint describes how PSN services "enable[] people to stay up to date and share personal content with friends and family" and provide "a distinct and richer way for people to maintain personal connections" compared to alternative forms of communication. Compl. ¶ 39.  The Complaint likewise provides detailed allegations describing key "characteristics" that enable the distinct "uses" for which people employ PSN services: (1) a social graph that maps connections between users and their friends, family, and other personal connections, *see id.* ¶ 53; (2) features that facilitate interaction among a user's personal connections and the sharing of personal experiences in a shared social space, *see id.* ¶ 54; and (3) features that leverage the social graph to help users to find other users with whom they may have a personal connection, *see id.* ¶ 55.

Finally, the Complaint identifies certain online services that are not suitable for the same "uses" as PSN services, and explains why each "is distinct from, and not reasonably interchangeable with," PSN services.  Compl. ¶ 57; *see id.* ¶ 58 (distinguishing professional networking services such as LinkedIn); *see id.* (specialized, interest-based services); *see id.* ¶ 59 (video or audio consumption-focused services); *see id.* ¶ 60 (mobile messaging services).

Contrary to Facebook's characterizations, *see* Mem. in Supp. of Facebook, Inc.'s Mot. to Dismiss FTC's Compl., 18-19, ECF No. 56-1 [hereinafter Mem.], these allegations are not conclusory, but instead are concrete factual allegations that plainly identify a relevant product market.  *See Brown Shoe*, 370 U.S. at 325 ("reasonabl[e] interchangeability of use," inferred

from evidence including "peculiar characteristics and uses," defines a relevant market); *Microsoft*, 253 F.3d at 52 (upholding market definition after trial because purported alternatives had fewer features, cost more, or "fell far short of performing all of the functions" of the plaintiff's proposed relevant product market).  Courts routinely deny motions to dismiss complaints that provide such allegations.  *See, e.g., RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1224-25 (C.D. Cal. 2012) (motion to dismiss denied where complaint distinguished "multiple conceivably interchangeable substitutes"); *CollegeNet, Inc. v. Common Application, Inc.,* 355 F. Supp. 3d 926, 958 (D. Or. 2018) (complaint "adequately considers and rejects alternatives"); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200-01 (2d Cir. 2001) (collecting cases and noting that market definition "is a deeply fact-intensive inquiry" rarely amenable to resolution on a motion to dismiss).

The geographic component of a relevant market identifies the "geographic area in which the defendants compete in marketing their products or services."  *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009).  Facebook does not dispute the sufficiency of the allegations that the relevant geographic market is the United States.  *See* Compl. ¶ 56.

### 2. Facebook's Criticisms of the Complaint's Relevant Market Allegations Fail

Facebook attempts to attack the relevant market allegations by disputing the accuracy of the allegations, injecting Facebook's own factual assertions, inaccurately suggesting that antitrust laws do not reach non-price harms, and demanding specific analyses that should await complete fact discovery or expert opinion testimony.  None of Facebook's arguments have merit or provide a basis for dismissing the Complaint.

### a) Facebook's Assertion that It Provides PSN Services "Free and In Unlimited Quantities" Provides No Basis for Dismissal

Facebook's assertion that it offers its product "free and in unlimited quantities," Mem. 2, 5, provides no basis for dismissing the Complaint. First, Facebook cannot prevail on this motion by injecting its own factual assertions. *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 228 (D.D.C. 2015) ("A motion to dismiss under Rule 12(b)(6) must rely solely on facts within the four corners of the Complaint[.]"). The Complaint describes how PSN providers "have refrained from charging a monetary price," Compl. ¶ 42, but the FTC disputes, and the Complaint does not indicate, that Facebook offers its services to users in "unlimited quantities" or for "free." Facebook offers PSN services to users with a nominal price of zero, but with non-price terms and conditions that include the ability to monetize user data and engagement through advertising. *Id.*

Second, the presence of a nominal price of "zero" in no way undermines the relevant market allegations. Facebook's assertion ignores the fact that sellers routinely compete to offer attractive non-price terms and conditions, in addition to whatever price they charge. *See supra* at 7. Here, the Complaint alleges that PSN providers compete to offer attractive non-price terms, *see* Compl. ¶ 42, and that Facebook's monopolization harmed this competition. *See, e.g.*, *id.* ¶¶ 27, 28, 163, 167. It also ignores the fact that a nominal price of "zero" is still a price, and could represent an "overcharge" compared with a competitive marketplace. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 972 (N.D. Cal. 2014), *vacated in part on other grounds,* 802 F.3d 1049 (9th Cir. 2015) (price-fixing by defendants resulted in a zero-dollar price for plaintiff student-athletes' services, whereas the competitive price would have been higher).

Antitrust laws reach non-price harm, *see supra* at 7, and relevant markets can be defined, regardless of whether some or all of the products in the market are offered at a nominal price of zero. *See H&R Block*, 833 F. Supp. 2d at 53 (market for "digital do-it-yourself" tax software

included products offered to consumers "in some instances free"); *United States v. Village Voice Media, LLC*, 2003 WL 21659092, at *16 (N.D. Ohio Feb. 12, 2003) (merger of zero-price alternative weekly newspapers harmed competition that previously provided readers with "better editorial coverage" and "higher quality service"); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1153 n.8, 1170 (W.D. Ark. 1995) (recognizing market for local newspapers based on evidence that the newspapers competed mostly on quality rather than price).

### b)  The FTC's Complaint Is Not Required to Plead a Method of Quantifying Cross-Elasticity of Demand

Facebook's critique that the FTC fails to plead "'cross-elasticity of demand' or consumer switching in response to price increases" finds no support under the law.  Mem. 10.  Despite Facebook's focus on price, Mem. 10-11, cross-elasticity of demand refers to the extent to which customers switch between products in response to changes in prices *or* non-price terms, such as quality changes.  *Cmty. Publishers, Inc.*, 892 F. Supp. at 1153 n.7 (cross-elasticity measures effect of changes in "price or quality").

More fundamentally, a plaintiff does not need to quantify cross-elasticity to plead or prove a relevant market.  *See Brown Shoe*, 370 U.S. at 325 (relevant market boundaries delineated by "reasonable interchangeability of use *or* the cross-elasticity of demand between the product itself and substitutes for it") (emphasis added); *Microsoft*, 253 F.3d at 52-53 (market upheld after trial based on qualitative evidence of which products were "reasonably interchangeable by consumers for the same purposes").  Indeed, *even after trial*, courts routinely define relevant markets without quantifications of cross-elasticities of demand.  Courts recognize that cross-elasticity "is nearly impossible to measure numerically in all cases."  *Cmty. Publishers, Inc.*, 892 F. Supp. at 1161; *accord U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995 (11th Cir. 1993) ("[I]t is ordinarily quite difficult to measure cross-elasticities of supply and

demand accurately.  Therefore, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data."); *H&R Block*, 833 F. Supp. 2d at 62 (relevant market established after trial despite "no direct, reliable data on diversion" existing).

Here, the FTC may proffer expert testimony at trial demonstrating that a quantitative cross-elasticity analysis supports the relevant market alleged in the Complaint.  But at the pleading stage, the FTC is not required to quantify cross-elasticities or to describe the methods such expert testimony might employ, as "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

### c)  Facebook's Claim that PSN Services Are Reasonably Interchangeable with Other Services Disputes the Complaint's Factual Allegations

Facebook's assertions that other services are substitutes for PSN services dispute the Complaint's factual allegations and are not a basis for dismissing the Complaint.  Mem. 13.  In particular, Facebook asserts that the Complaint fails to provide sufficient allegations that "exclude other alternatives" to PSN services, and asserts that PSN service features are "arbitrary" and that "myriad online services" are not set apart enough from PSN services to be "unacceptable substitutes."  Mem. 10-11, 14, 18-19.  Yet these assertions are merely attempts to dispute the accuracy of the Complaint's factual allegations that consumers do not view these "online services" as reasonable substitutes because PSN services provide distinct functionality and characteristics.  *See supra* § I.A.1.  Accordingly, they are inappropriate for a motion to dismiss.  *See Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 126 (D.D.C. 2019) ("A defendant cannot ignore, or contradict, a complaint's factual allegations in a bid to seek its dismissal[.]"); *RealPage*, 852 F. Supp. 2d at 1225 (defendant's claims that additional firms should be included

in the relevant market "turn on issues of fact inappropriate for resolution at this stage of the litigation").

Further, even if one accepted, *arguendo*, Facebook's assertions that other services provide some functionality similar to PSN services, this would not undermine the Complaint's relevant market.  Relevant markets routinely exclude products that have some functional similarity to the products in the relevant market, because not all products with some functional similarity are "reasonably interchangeable."  *See, e.g., U.S. v. Aetna*, 240 F. Supp. 3d 1, 41-42 (D.D.C. 2017) (relevant market for Medicare Advantage plans did not include Original Medicare); *H&R Block*, 833 F. Supp. 2d at 58-59 (market for digital do-it-yourself tax return software did not include alternative ways to complete a tax return, such as "pen and paper" and assisted tax preparation).  The Complaint here provides specific allegations—including statements from Facebook's own executives—distinguishing other services and describing PSN services as a distinct way to remain in touch with friends and family.  *See* Compl. ¶¶ 39, 60, 62.  This distinct value proposition delineates a relevant market.

The cases Facebook cites are also readily distinguished.  Many do not involve the pleading standard at all.  *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (ruling after full discovery and trial); *FTC v. RAG Stiftung*, 436 F. Supp. 3d 278, 289-90 (D.D.C. 2020) (after full discovery and preliminary injunction hearing); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 114 (D.D.C. 2004) (same).  Of the cases that *were* decided at the pleading stage, several involve complaints that were dismissed because plaintiffs pleaded single-firm or single-brand markets without providing factual allegations that distinguished the brands from alternatives. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997) (rejecting single-brand market for Domino's Pizza franchises); *Madison 92nd St. Assocs., LLC v.*

14

*Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28-29 (2d Cir. 2015) (rejecting single-brand market for Marriott hotels); *cf. Todd*, 275 F.3d at 200 n.3 (collecting cases).  Here, the Complaint does not allege that PSN is a single-brand market limited to Facebook.  *See* Compl. ¶¶ 3, 38, 41-42, 63-64, 153.

And none of Facebook's cited cases involved detailed allegations, like senior executive statements, *see* Compl. ¶¶ 60, 62, describing the relevant product's distinguishing characteristics and uses, and differentiating potential alternatives.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018) (complaint alleged a narrow market of advertising on golf caddie bibs without pleading specific facts distinguishing other forms of advertising); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (dismissing complaint due to "skimpy allegations" asserting, "without elaboration, that '[v]isco-elastic foam mattresses comprise a relevant product market . . . separate and distinct from the market for mattresses generally'").

### d)  Facebook's Remaining Arguments Fail to Undermine the Relevant Market

Facebook makes several other arguments in passing, which likewise provide no basis for dismissing the Complaint.  First, Facebook protests that the Complaint does not individually address whether a variety of online service providers, such as Pinterest and TikTok, provide PSN services.  Mem. 14.  In fact, the Complaint identifies other providers of PSN services.  *See* Compl. ¶¶ 38, 41, 63, 153.  In demanding more, Facebook conflates notice pleading with later phases of litigation.  Antitrust plaintiffs need not provide precise market boundaries and market shares even *during* fact discovery, as such specificity typically requires expert opinion testimony provided *after* fact discovery.  *See, e.g.*, R. & R. No. 4 of the Special Master at 13-14, *U.S. v. Anthem, Inc.,* No. 1:16-cv-1493 (D.D.C. Sept. 30, 2016), ECF No. 172 (recommending denial of motion to compel revelation of "market share calculations and the methodology used to reach

those calculations" prior to expert report); Order Adopting R. & R. No. 4, *id.* (D.D.C. Oct. 14, 2016), ECF No. 189 (denying motion in relevant part).

Second, Facebook suggests the Complaint "leads to two mutually exclusive conclusions" because Facebook offers services other than PSN services. Mem. 16-17. As an initial matter, relevant markets are routinely defined to include less than everything a defendant sells. *See Microsoft*, 253 F.3d at 52, 87-88 (defining a relevant market of operating systems despite Microsoft also offering word processing software and browser); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 122-27 (D.D.C. 2016) (defining relevant market for office supplies that excluded printer ink, toner, and other products that the defendants also sold). In those instances, providers of services outside the relevant market are not treated as competitors for the relevant product, even though the defendant also offers those out-of-market services. *See Staples*, 190 F. Supp. 3d at 122-23 (ink and toner providers not in the relevant market).

Facebook suggests that there may be complications in assessing or quantifying "use of [PSN] – as distinct from other features – on Facebook." Mem. 16-17. In doing so, Facebook implies that the FTC must specify a method for quantifying how people allocate their usage of Facebook and other PSN providers. Facebook's arguments about how the FTC might handle certain usage metrics at trial, which will be the subject of both fact and expert discovery, are not a basis for a motion to dismiss. *See supra* (discussing *Anthem* discovery orders) & *infra* § I.A.3.

Finally, Facebook asserts that the FTC's market definition is "contradicted by its own allegations" because some of the apps that Facebook targeted with its anticompetitive conduct were not PSN providers. Mem. 2, 14-15. As *Microsoft* held, however, "[n]othing in § 2 of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes." 253 F.3d at 54 (internal citation omitted). So

too here.  There is nothing contradictory about the Complaint alleging PSN services as a relevant

market, while also pleading that Facebook maintained its monopoly by targeting out-of-market

firms to deter or hinder entry into PSN services.

### 3. The Complaint's Allegations Establish Facebook Possesses a Dominant Share of the Relevant Market that Is Protected by Entry Barriers

Contrary to Facebook's contention, Mem. 21-23, the Complaint's factual allegations

establish, as the second step in providing indirect proof of monopoly power, that Facebook

possesses a dominant share in the U.S. PSN services market that is protected by significant entry

barriers.

*First*, the Complaint provides specific factual allegations establishing Facebook's

dominant share, including that it has held a market share in excess of 60% since at least 2011,

Compl. ¶ 64; that "no other social network of comparable scale exists in the United States," *id.* ¶

3; that it has millions of users in the United States, *id.*; and that it has been "the number one

provider of personal social networking in the United States" since 2009, *id.* ¶ 41.  Facebook does

not dispute that a market share "in excess of 60%" is high enough to allege monopoly power—

nor could it, as numerous courts have held that such a share, or even a lower share, is sufficient

for monopoly power.  *See, e.g., FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (shares

above 60%); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140

(D.D.C. 2018) (shares as low as 54%).

Instead, Facebook's only criticism is that the Complaint does not "specify" how the FTC

arrived at the "in excess of 60%" market share figure, which Facebook suggests is problematic

because market shares for PSN services cannot be based on revenue.  Mem. 21-22.  As an initial

matter, plaintiffs and courts routinely measure market shares using metrics other than revenue,

such as the quantity of the product produced or consumed, when that is a better measure of

competitive significance in a particular market.  *See, e.g., 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140 (D.D.C. 2018) (shares based on number of movie theaters operated by each provider); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 207-12 (D.D.C. 2017) (number of customers insured); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1078 (N.D. Ill. 2012) (number of patient admissions and patient-days spent in hospital); Horizontal Merger Guidelines § 5.2 (market shares may be based on quantity (unit sales), capacity, and reserves, depending on the factual circumstances).

The Complaint identifies a number of usage-related measures of PSN services, including daily users and monthly users, Compl. ¶ 3, and time spent using the services, *id.* ¶ 97 (referencing "time on site").  *See also id.* ¶ 16 ("Facebook Blue has lost users and engagement to Instagram[.]").  Facebook offers no legal authority for its suggestion that a complaint needs to specify which of these or other metrics provides the best indication of a firm's market share, and Facebook's demand for details on the "method" used to calculate Facebook's share, Mem. 21-22, is inappropriate in advance of expert discovery.  *See supra* at 15-16 (citing *U.S. v. Anthem, Inc.*, discovery orders).

***Second***, the Complaint provides concrete factual allegations that the market for PSN services in the United States is protected by "significant entry barriers" in the form of network effects and switching costs.  Compl. ¶¶ 65-66, 68-69.  Entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).

Here, the Complaint describes in detail how network effects and switching costs make entry into PSN services difficult.  *See* Compl. ¶¶ 6-8, 65-66, 68-69.  It further alleges that Facebook has had a sustained dominant share for nearly a decade, which itself suggests the

difficulty of entry.  *See id.* ¶¶ 1, 3, 41, 64.  And the Complaint contains specific commentary from Facebook's CEO describing the strength of network effects.  *id.* ¶¶ 14, 69, 76, 91.

Facebook provides no authority suggesting that a motion to dismiss can succeed in the face of such allegations.  Indeed, Facebook's argument finds no support from *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, the only case it cites, which concluded after "extensive findings of fact" that defendant's high market share did not indicate market power due to low entry barriers.  784 F. 2d 1325, 1331-35 (7th Cir. 1986).

Further, Facebook inaccurately asserts that the Complaint's conduct allegations are inconsistent with the existence of entry barriers.  Mem. 22.  To the contrary, as the Complaint describes, Instagram emerged as a PSN competitor during a specific period of technological transition, *see* Compl. ¶¶ 6-8, 11, 78-79, and its emergence during that period does not undermine the existence of entry barriers.  *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1125 (10th Cir. 2014) ("A single competitor's breakthrough does not preclude a finding of significant barriers to entry.").  Likewise, the fact that Facebook targeted threats outside of the relevant market—including WhatsApp and firms targeted by its Platform conduct—does not undermine the Complaint's allegations of entry barriers, any more than it undermines the Complaint's market definition.  *See supra* § I.A.2.d; *Microsoft*, 253 F. 3d at 51-56 (finding both that Microsoft's dominant position was "protected by a substantial entry barrier" and that its anticompetitive conduct targeted out-of-market threats).

*****

In sum, the Complaint does more than is required to define a PSN services market and allege that Facebook has monopoly power in it.  Facebook evidently wants to allege its own

facts, quibble with the facts alleged in the Complaint, or get a preview of expert opinions, but that is no basis for dismissing the Complaint.

    **B.**    **The Complaint Details How Facebook Has Maintained Its Monopoly Position Through an Anticompetitive Course of Conduct**

The Complaint also pleads in detail how Facebook has maintained its monopoly position through anticompetitive conduct.  Section 2 of the Sherman Act is the "provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists." *LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003).  It condemns monopoly power maintained through "exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *Grinnell*, 384 U.S. at 571).

Rather than compete on the merits, Facebook has engaged in a nearly decade-long effort to maintain its monopoly by acquiring actual or potential competitors, or suppressing and deterring them by imposing and enforcing anticompetitive conditions on access to its Platform. *See* Compl. ¶¶ 9, 16, 21, 24-26, 70, 73-77, 102, 105, 126-27, 136-37, 159.  Facebook's ongoing course of anticompetitive conduct has three main elements—acquiring Instagram, acquiring WhatsApp, and conditioning developers' access to its Platform.  *See id.* ¶¶ 9, 171.

While each element is anticompetitive on its own, and this brief discusses each in turn, Facebook's conduct should not be compartmentalized; instead, the overall combined anticompetitive effect of Facebook's course of conduct must be considered.  *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *Rochester Drug Co-op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 319 (D. Del. 2010) ("[Courts] need not . . . analyze whether each facet of this scheme constitutes a

separate antitrust violation."); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370

U.S. 690, 699 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly

compartmentalizing the various factual components and wiping the slate clean after scrutiny of

each.").

>1.     **The Complaint Alleges that Facebook Maintained Its Monopoly Through the Acquisitions of Instagram and WhatsApp**

As the Complaint details, Facebook responded to the competitive threats posed by

Instagram and WhatsApp by acquiring them, rather than competing on the merits.  As discussed

below, those acquisitions constitute anticompetitive conduct under Section 2.  Facebook's

arguments to the contrary, including that prior FTC review creates a higher pleading standard

and that Section 2 does not provide a basis for challenging acquisitions, are meritless.

>a)   **Facebook's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct**

Contrary to Facebook's assertion, *see* Mem. 23-26, Facebook's acquisitions of Instagram

and WhatsApp are anticompetitive conduct under Section 2.  Indeed, a monopolist's acquisition

of a firm that poses a competitive threat to its monopoly is a core concern of Section 2, and is

exclusionary or anticompetitive conduct under Section 2.  "[W]hatever the original source of a

monopoly, a monopolist's acquisition of the productive assets or stock of an actual or likely

potential competitor is properly classified as anticompetitive, for it tends to augment or reinforce

the monopoly by means other than competition on the merits."  Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* ¶ 701a

(4th ed. 2020) [hereinafter, Areeda & Hovenkamp] ("Historically and today, merging viable

competitors to create a monopoly is a clear §2 offense . . . ."); *see also Grinnell*, 384 U.S. at 576

(monopolist's acquisition of three competitors were exclusionary conduct under Section 2);

*Standard Oil*, 221 U.S. at 79 (monopolist's acquisitions violated Section 1 and Section 2); *Sun Newspapers, Inc. v. Omaha World-Herald Co.*, 713 F.2d 428, 429 (8th Cir. 1983) (upholding preliminary injunction against dominant newspaper because its acquisition of potential competitors in advertising circulars likely violated Section 2).

Moreover, the threat eliminated by a monopolist's acquisition need not be fully developed or even in the same relevant market.  As the Court of Appeals held in *Microsoft*, "[n]othing in §2 of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes."  253 F.3d at 54; *see also LePage's*, 324 F.3d at 159.  The *Microsoft* court explained that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will[.]"  253 F.3d at 79.

The Complaint pleads in detail how Facebook targeted Instagram and WhatsApp for acquisition because of the threats they posed to Facebook's dominant position in PSN services. *See* Compl. ¶¶ 79-81, 113-14.  It also describes, with reference to numerous business records and other specific factual allegations, why each was a threat: Instagram as an upstart PSN competitor, *see id.* ¶¶ 84, 87, 89-93, and WhatsApp as a potential entrant into PSN services, *see id.* ¶¶ 108-14, 118.  And it details the harm to the competitive process that the acquisitions entail, and the resulting loss of competitive benefits to users of PSN services.  *See id.* ¶¶ 16, 20-21, 27, 105, 127, 161-63.  Contrary to Facebook's claims, these allegations neither posit a novel theory of Section 2 liability, nor suggest that Facebook is a monopolist on account of "a superior product." Mem. 23, 31.  Instead, these allegations allege conduct at the core of Section 2's concern: that a monopolist will eliminate competitive threats to its position by means other than competing with

them on the merits.  *See Microsoft*, 253 F.3d at 62, 65 (conduct is "anticompetitive" when it

hinders competitive threats through "means other than competition on the merits").

Facebook inaccurately suggests, without citation to authority, that Section 2 might

require the FTC to prove the threats extinguished by the Instagram and WhatsApp acquisitions

were unique.  *See* Mem. 33, 36.  Such a novel rule would contradict *Microsoft*, in which the

Court of Appeals found multiple acts by Microsoft directed at Netscape's Navigator and Sun's

Java to be unlawful, *see* 253 F.3d at 62, 76, despite the clear record below that they were not the

only middleware providers.  *U.S. v. Microsoft Corp.*, 84 F. Supp. 2d 9, 28 (D.D.C. 1999)

("Microsoft was concerned with middleware as a category of software . . . .  Microsoft focused

its antipathy on two incarnations of middleware . . . .").

Nor, contrary to Facebook's suggestion, have courts said that a monopolist must shut

down an acquired firm's assets for an acquisition to be "anticompetitive" under Section 2.  Mem.

32.  Numerous monopolists have violated Section 2 by acquiring rivals and continuing to operate

the assets.  *See e.g., Grinnell*, 384 U.S. at 566-67, 576 (referencing continued operation of

acquired firms); *Standard Oil*, 221 U.S. at 33, 72-77 (defendant continued to operate some of the

acquired oil refineries).

### b)  The Complaint Provides Detailed Allegations that Facebook's Acquisitions of Instagram and WhatsApp Caused Anticompetitive Effects

Facebook inaccurately suggests that the Complaint does not adequately allege

"anticompetitive effect[s]," Mem. 24, or a "cognizable or plausible claim of consumer harm,"

Mem. 25.  It also posits that a monopolist's acquisition of a "fledgling competitor" may provide

"obvious" benefits to consumers.  Mem. 31.  These assertions are without merit.

As Facebook acknowledges, conduct has an "anticompetitive effect" when it "harm[s] the

competitive process."  Mem. 24.  As the Court of Appeals and other courts have held, a

monopolist's conduct harms the competitive process, and has an anticompetitive effect, when the conduct eliminates or disrupts the emergence of competitors on the basis of something other than merits competition. *See Microsoft*, 253 F.3d at 65; *LePage's*, 324 F.3d at 167. As described above, the Complaint details how Facebook disrupted the competitive process by acquiring threats to its monopoly position (Instagram and WhatsApp), rather than outcompeting them or providing a better service. *See supra* § I.B.1.a; *see also Grinnell*, 384 U.S. at 568-71; Areeda & Hovenkamp ¶ 701a; *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("Prevent[ing] the risk of competition . . . constitutes the relevant anticompetitive harm.").

Contrary to Facebook's suggestion, *see* Mem. 4, 25, Section 2 does not require a plaintiff to further show a change in price or output, or other specific change in consumer benefits, flowing from the conduct, particularly when the dominant firm targets nascent threats. Consumer harm flows inherently from a monopolist's maintenance of its position through conduct that is not merits competition. *See Microsoft*, 253 F.3d at 58 (defining exclusionary conduct as conduct that has an "anticompetitive effect," meaning it "harm[s] the competitive *process* and **thereby** harm[s] consumers") (italics in original, bolded emphasis added). In *Microsoft*, for example, the Court of Appeals did not separately consider consumer harm or changes in market outcomes after determining that Microsoft's conduct impaired the ability of significant competitive threats (Netscape's Navigator and Sun's Java) to compete with it. *See Microsoft*, 253 F.3d at 65, 67; *see also United States v. Dentsply*, 399 F.3d 181, 191-96 (3d Cir. 2005) (anticompetitive effect of monopolist's conduct was blocking growth of smaller rivals); *LePage's*, 324 F.3d at 158-63 (anticompetitive effect of monopolist's conduct was foreclosing ability of rival to compete, "which harmed competition itself").

As courts have recognized, the very nature of a monopoly maintenance claim is that the monopolist has *prevented* competition from emerging, which means the conduct is often not amenable to a showing of specific changes in market outcomes. *See McWane, Inc. v. FTC*, 783 F.3d 814, 839 (11th Cir. 2015) (upholding monopoly maintenance ruling and noting that a dominant firm's continued position of monopoly—rather than a showing of price increases—is consistent with a showing of unlawful anticompetitive conduct); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 103 (D.D.C. 2020) ("Regardless of Surescripts's specific above-market fees or below-market incentives, the central question is whether the FTC alleged that Surescripts engaged in exclusionary conduct that 'harmed competition, not just a competitor,' *by blocking entrants into the market.*") (internal citations omitted and emphasis added).  For the same reason, the *Microsoft* court held that a plaintiff need not prove "that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct," as "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the exclusionary conduct . . . the defendant is made to suffer the uncertain consequences of its own undesirable conduct." *Microsoft*, 253 F.3d at 79 (quotation marks omitted).

None of Facebook's cited cases are to the contrary.  *See* Mem. 4, 31, 33-34.  Most of Facebook's supporting cases involve Section 7 of the Clayton Act, 15 U.S.C. § 18, not Section 2 of the Sherman Act, and as discussed below, Section 2 and Section 7 create distinct causes of action.  *See infra* § I.B.2.d.  Those cases that do analyze Section 2 standards merely indicate that a plaintiff must allege harm to competition, which the Complaint does.  Plaintiffs have prevailed where they explained how defendants suppressed competition, *see Dresses for Less, Inc. v. CIT Grp./Commercial Services, Inc.*, 2002 WL 31164482, at \*12-13 (S.D.N.Y. Sept. 30, 2002); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317-18 (3d Cir. 2007), and lost where they did

not, *see Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016), *aff'd* 724 Fed. App'x 556 (9th Cir. 2018); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73, 87 (D.D.C. 2013).

Regardless, the Complaint details the harm to consumers stemming from Facebook's neutralization of the competitive threats posed by Instagram and WhatsApp, including the loss of alternative suppliers, the loss of a competitive check on Facebook, and the loss of additional sources of innovation and competitive decision-making. *See* Compl. ¶¶ 27, 105, 127, 163. And it details the seriousness of the threat posed by each, and therefore their associated role in contributing to the maintenance of Facebook's monopoly. *See id.* ¶¶ 79-80, 84, 87, 89-93, 108-14, 118, 126. This robustly states a claim. *See Microsoft*, 253 F.3d at 79 (causal connection to monopoly established if conduct "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power"); Areeda & Hovenkamp ¶ 701c (explaining that a monopolist's acquisition of even a "minor" rival is important).

Finally, if Facebook is attempting to posit that the acquisitions were justified despite the serious harm to the competitive process reflected in a monopolist acquiring competitive threats, this is a factual argument that is not cognizable on a motion to dismiss. *See BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 624-25 (W.D. La. 2016) (rejecting plaintiff's justification defense as "better suited for a summary judgment motion"). Any such claimed justification would face significant hurdles in any event. Horizontal Merger Guidelines § 10 ("Efficiencies almost never justify a merger to monopoly or near-monopoly."); Areeda & Hovenkamp ¶ 701h ("[A]n efficiency defense cannot be allowed in monopoly cases in the

absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms.").

### c) Prior HSR Review Does Not Bar this Action or Create a Heightened Pleading Standard

As Facebook concedes, the FTC has statutory authority to challenge acquisitions that it previously reviewed pursuant to the HSR Act, 15 U.S.C. § 18a(i)(1).  *See* Mem. 30 (acknowledging "savings clause providing that HSR 'shall not bar' other actions").  This concession is dispositive.  Facebook cites no legal authority indicating that prior HSR reviews of Instagram and WhatsApp preclude the current action, or that prior HSR review imposes a heightened pleading standard or requires allegations that the prior review was compromised.  *See* Mem. 28.  Moreover, creating such novel rules would plainly frustrate Congress's intent: the HSR regime altered neither the Sherman Act nor the Clayton Act; it merely established reporting requirements for acquisitions over a certain size to facilitate challenges to acquisitions that threaten to violate those statutes.  *See* 15 U.S.C. § 18a(f).

Facebook suggests that, by not previously challenging the acquisitions, the FTC determined it "was not reasonably foreseeable that the acquisitions were likely to substantially lessen competition" in violation of Section 7 of the Clayton Act.  Mem. 27.  Beyond misstating the standard for Section 7 liability, this is inaccurate because, as Facebook knows,[1] FTC review under the HSR Act does not constitute approval of a transaction under the Clayton Act, nor does

---

[1] Indeed, Facebook was specifically advised by the FTC after the closing of the Instagram investigation that "[t]his action is not to be construed as a determination that a violation may not have occurred" and the "Commission reserves the right to take such further action as the public interest may require."  *See* Letter from FTC to Facebook Counsel (Aug. 22, 2012), https://www.ftc.gov/sites/default/files/documents/closing_letters/facebook-inc./instagram-inc./120822barnettfacebookcltr.pdf, Declaration of Daniel J. Matheson, Ex. A.

it limit the FTC's ability to challenge a previously reviewed acquisition "at any time" under any "provision of law."  15 U.S.C. § 18a(i)(1).

Thus, an agency decision not to challenge an acquisition has no probative value as to its lawfulness.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (upholding the district court's exclusion of evidence that the Department of Justice had twice investigated the merger without challenging it because "many factors may motivate such a decision, including the Department's limited resources") (citation omitted).  Indeed, there are numerous examples of the FTC or Department of Justice challenging consummated acquisitions that were subject to the HSR Act.  *See, e.g.*, Complaint, *FTC v. Cardinal Health, Inc.*, No. 15-cv-3031 (S.D.N.Y. Apr. 20, 2015) (Section 2 claim challenging, inter alia, two consummated acquisitions more than 10 years after HSR Act notifications); Complaint, *United States v. Parker-Hannifin Corp.*, No. 1:17-cv-01354-UNA (D. Del. Sept. 26, 2017) (challenging a consummated merger despite prior notification under the HSR Act).

In arguing for novel treatment in this case, Facebook mischaracterizes the case law.  *See* Mem. 28-29.  For example, *Eastman v. Quest Diagnostics Inc.* does not stand for the proposition that "prior FTC clearance weigh[s] against the conclusion that [an] acquisition could be plausibly characterized as an unreasonable restriction on competition," as the FTC did not clear the acquisition in question, but required a divestiture to remedy competitive concerns.  2016 WL 1640465, at *9.  Nor does *Texaco Inc. v. Dagher* stand for the proposition that prior FTC review of an acquisition establishes a presumption that the acquisition is lawful.  Mem. 28.  In *Texaco*, plaintiffs did not challenge the formation of a joint venture, and the court only presumed it was lawful for purposes of focusing its review on plaintiffs' price-fixing claim.  547 U.S. 1, 6 n.1 (2006).

Facebook's reliance on *Trinko* is also inapposite.  *See* Mem. 29.  *Trinko* assessed whether access requirements imposed by the Telecommunications Act of 1996 ("Telecommunications Act"), an extensive regulatory scheme overseen by a different federal agency, created a *new* antitrust duty for telecommunication firms to provide access to rivals.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP,* 540 U.S. 398, 412-15 (2004).  But the Court never suggested that the Telecommunications Act precluded enforcement of the antitrust laws.  And further, it would be perverse to construe the HSR Act—a statute designed to enhance enforcement of the antitrust laws—to *preclude* enforcement of those laws.

### d) Section 2 Provides an Independent Basis for Challenging the Acquisitions of a Monopolist

Facebook also makes an unsupported assertion that acquisitions that do not violate Section 7 of the Clayton Act cannot be "exclusionary under the Sherman Act."  Mem. 27-28, 35 (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1986)). This argument is contrary to the plain language of the Clayton Act, which creates a distinct cause of action and does not circumscribe Section 2 in any way.  Indeed, Congress expressly recognized Section 2's applicability to acquisitions in amending Clayton Act Section 7 in 1950. S. Rep. No. 81-1775, at 5 (1950) ("Under the Sherman Act, an acquisition is unlawful if it creates a monopoly or constitutes an attempt to monopolize.").  No authority restricts the application of Section 2 as it relates to acquisitions.  Facebook's cite to *Rothery* is inapposite as that case merely discusses an analysis under Section 7; it says nothing about Section 2 or its applicability to acquisitions.  792 F.2d at 220.

As detailed above, Section 2's application to acquisitions by monopolists is well established, and Section 2 has its own elements—distinct from Section 7—that the Complaint pleads in detail.  *See supra* § I.B.1.a.  Indeed, Section 2's prohibition on unlawful acquisitions by

monopolists has continued even after passage of the Clayton Act in 1914, and subsequent amendments to Section 7 in 1950.  *See, e.g.*, *Grinnell*, 384 U.S. at 576 (finding Section 2 violation involving acquisitions in 1966); *BRFHH*, 176 F. Supp. 3d at 622 (rejecting defendant's argument that an acquisition, without other anticompetitive conduct, does not violate Section 2); *Behrend v. Comcast Corp.*, 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012) ("In *Grinnell*, the Court held that acquiring competitors in order to perfect a monopoly is predatory conduct [in violation of Section 2].").

Accordingly, Facebook errs in claiming that the FTC must allege facts meeting the elements of the potential competition doctrine in Section 7 cases to challenge Facebook's acquisition of WhatsApp under Section 2.  *See* Mem. 34-35.  The potential competition doctrine provides one framework to assess whether a merger violates Section 7, but it is not the only way to establish a merger is unlawful under the antitrust laws.  *See* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. Pa. L. Rev. 1879, 1896-901 (2020).  As noted above, *Microsoft* explained that Section 2 reaches conduct directed at competitive threats even if they do not participate in the relevant market.  *See supra* at 22.  The Court of Appeals did not assess those threats (Netscape's Navigator and Sun's Java) under the Section 7 standard or make any finding that those threats were imminently about to enter the relevant market or displace Microsoft's dominant position (as Facebook suggests is necessary here).  *See Microsoft*, 253 F.3d at 54 ("Nor is middleware likely to overtake the operating system as the primary platform for software development any time in the near future.").  In any event, while no such showing is necessary to support the FTC's Complaint, the Plaintiff States explain how Facebook's acquisitions of Instagram and WhatsApp also raise claims for relief under Section 7.  *See* States' Mem. in Opp.

to Facebook's Mot. to Dismiss, *New York v. Facebook, Inc.,* No. 1:20-cv-03589-JEB, at § IV

(D.D.C. Apr. 7, 2021).

### 2. The Complaint Alleges that Facebook Maintained Its Monopoly Through Its Platform Policies

As alleged in the Complaint, Facebook's anticompetitive efforts to maintain its monopoly

position include announcing and enforcing anticompetitive conditions on access to its valuable

Platform interconnections in order to deter the emergence of competitive threats. *See* Compl. ¶¶

22-26, 129-30. Facebook incorrectly maintains that this conduct is immune and cannot be

challenged "as a matter of law." Mem. 36.

#### a) Facebook's Platform Policies Constitute Unlawful Conditional Dealing

Facebook starts by suggesting that its Platform conduct is controlled by a "clear, general

no-duty-to-deal rule" established in *Trinko*. Mem. 36. This assertion, however, overlooks that

the Complaint does not simply allege that Facebook refused to provide competitors with access

to its Platform, but rather that Facebook *conditioned* access to its Platform on trading partners

not competing with it or assisting competitors. *See* Compl. ¶¶ 142-43.

Conditional dealing by a monopolist—which was not at issue in *Trinko*—violates Section

2 when it has an anticompetitive effect or tendency and contributes to the maintenance of

monopoly power. *See Lorain Journal*, 342 U.S. at 152-53; *Covad Commc'ns Co. v. Bell Atl.*

*Corp.*, 398 F.3d 666, 675-76 (D.C. Cir. 2005). Conditional dealing encompasses a monopolist's

inducement of trading partners or other firms not to compete with it or do business with its rivals,

by conditioning access to some resource of the monopolist. *See Lorain Journal,* 342 U.S. at 152-

53.

In *Lorain Journal*, for example, the Supreme Court held that a monopolist newspaper

engaged in anticompetitive conduct by conditioning the sale of its newspaper advertising on

customers' agreements not to purchase advertising from a local radio station.  The Court found

that the newspaper "use[d] its monopoly to destroy threatened competition" by inducing

advertisers not to deal with the radio station.  *Id.* at 152-54.  Likewise, in *Covad*, the Court of

Appeals held that a monopolist could violate Section 2 by refusing to sell internet service to

would-be customers who had placed orders for internet service with the monopolist's rival.  398

F.3d at 675-76 (reversing motion to dismiss).

Here, Facebook worked to deter the emergence of competitive threats by granting third

parties full access to its Platform only on the condition that they not threaten its monopoly by:

(1) providing PSN services, (2) providing mobile messaging functions, (3) providing promising

social functionality, or (4) connecting with or promoting other PSN providers.  *See* Compl. ¶¶

136, 153-56.  Given the value of Facebook's Platform interconnections, *see id.* ¶¶ 130-32, 158,

Facebook's denial of access to its Platform on these conditions was a meaningful inducement to

app developers to avoid competing with Facebook or aiding its competitors.  *Cf. Lorain Journal*,

342 U.S at 183-84 (newspaper's inducement effective because of its advertising reach).

Facebook disputes that this conduct "unreasonably harmed competition."  Mem. 38-39.

That factual dispute is not appropriately resolved on a motion to dismiss.  Moreover, it ignores

the specific factual allegations in the Complaint that Facebook's own employees recognized that

Facebook introduced these policies to suppress competition.  *See* Compl. ¶ 140.  The Complaint

also details how Facebook enforced these conditions to throttle the growth of specific "promising

apps" that provided PSN services, *id.* ¶ 153 (discussing Path) or some social functionality, *see id.*

¶¶ 154-55 (discussing Circle and Vine), as well as mobile messaging apps, *see id.* ¶ 156.  By

enforcing its policies, Facebook reinforced the impact of the conditions it imposed on app

developers.  *Cf. Lorain Journal*, 342 U.S. at 149 (noting that the defendant's "bold, relentless,

and predatory commercial behavior" included its termination of advertising contracts with those advertisers who violated its conditions).

Further, the Complaint explains how the Platform conditions deter app developers from entering the PSN service market, *see* Compl. ¶ 137, from providing mobile messaging services, which can provide a springboard for future entry into the PSN services market, *see id.*, and from providing valuable information to other PSN services providers. *See id.* ¶ 140. The foregoing readily articulates anticompetitive conduct, just as in *Lorain Journal* and *Covad*. *See Microsoft*, 253 F.3d at 62, 65 (conduct is anticompetitive under Section 2 when it impedes the growth of rivals on the basis of something other than competing on the merits).

Facebook's other arguments lack merit as well. First, Facebook's bald assertion that its conduct was "plainly reasonable and not irrational" conflicts with *Lorain Journal* and *Covad*, and is an attempt to dispute the facts as alleged. Second, Facebook invents a requirement that conditional dealing by a monopolist is only actionable if the monopolist had "monopoly power" over the impacted trading partners (here, developers). Mem. 38. No such requirement appears in *Lorain Journal* or *Covad*, and the logic of the cases does not support imposing one. A monopolist's use of anything of value to induce trading partners not to compete with it is anticompetitive. *Cf. FTC v. Actavis, Inc.*, 570 U.S. 136, 157-58 (2013) (payments from prescription drug manufacturers to generic drug manufacturers to induce the generics to delay entry deemed actionable anticompetitive conduct that seeks to "prevent the risk of competition"). And the Complaint details how Facebook Platform was a valuable inducement to developers. *See* Compl. ¶¶ 130-32, 158.

### b)  Facebook's Platform Conduct Is Also Actionable Under *Trinko* and *Aspen*

As explained, Facebook's conditioning of access to its Platform is unlawful under *Lorain Journal*.  That alone is enough to sustain the Platform conduct allegations, particularly given that they are part of an overall course of anticompetitive conduct and not a standalone claim.  *See supra* § I.B (case law discussing need to avoid compartmentalizing conduct).  In any event, even if treated as an unconditional refusal to deal, Facebook's Platform conduct is actionable under that framework, pursuant to the two leading cases, *Trinko* and *Aspen*.

Contrary to Facebook's suggestion, Mem. 36, "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."  *Trinko*, 540 U.S. at 408; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) ("The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.").  A refusal to deal is "exclusionary" when it tends to "impair the opportunities of rivals" and "either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing*, 472 U.S. at 605 & n.32.

The Supreme Court in *Trinko* and *Aspen* considered evidence of anticompetitive motive, and the lack of a legitimate business justification, in assessing whether defendants' conduct constituted an unlawful refusal to deal.  Specifically, in those cases, the Court considered whether defendants engaged in a prior, voluntary course of dealing, and whether they forwent benefits or other goodwill, as proxies for assessing the defendants' "anti-competitive motivation, along with its lack of legitimate business purpose for doing so."  *In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015); *see also Ball Mem'l Hosp.*, 784 F. 2d at 1339 (intent indicates "whether the large firm seeks to exclude competition on a 'basis other than efficiency'") (quoting *Aspen Skiing*, 472 U.S. at 605).

In *Aspen*, the defendant terminated a joint ski ticket, which provided skiers with an all-access pass to the plaintiff's and the defendant's ski slopes, and subsequently frustrated the plaintiff's efforts to re-create the joint ski ticket by refusing to sell it tickets. *See* 472 U.S. at 593-94. In affirming that the defendant's conduct was unlawful, the Court highlighted the defendant's refusal to sell tickets to the plaintiff even though doing so "would have provided it with immediate benefits, and would have satisfied its potential customers." *Id.* at 610. As a result, the Court found the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610-11.

*Trinko* applied this same approach, but found that the monopolist telecommunication firm's refusal to provide interconnection services to its rival was not actionable. *Trinko*, 540 U.S. at 415-16. The Court noted that, unlike in *Aspen*, there was no indication that the defendant was motivated by "anticompetitive malice," as it refused a request to provide an interconnection service that it had a regulatory obligation to provide at a cost-based rate, but that it had never provided voluntarily. *Id.* at 409.

No proxies for anticompetitive motive are needed here, as Facebook's anticompetitive intent, and lack of business justifications, are plain from the fact that Facebook refused to provide Platform access only to those app developers that competed with Facebook, threatened to compete with Facebook, or aided Facebook's competitors. *See* Compl. ¶¶ 136, 152-56. Likewise, Facebook's contemporaneous documents expressly evidence its anticompetitive motive. *See id.* ¶ 140 (internal company document stating policy is "anti user" and sends message Facebook "can't compete on our own merits"); *see also id.* ¶¶ 144-45. These allegations, alone, distinguish Facebook's conduct from *Trinko*, and, consistent with *Aspen*,

show that Facebook's practices are actionable anticompetitive conduct. *See Thalomid*, 2015 WL 9589217, at *15 ("Both [*Aspen* and *Trinko*] indicate that motivation is central.").

In any event, the *Aspen* proxies for anticompetitive motive are also present here. Facebook's voluntary provision of Platform access to all app developers before later revoking the access of only those app developers who competed with or threatened Facebook, or aided firms that competed with Facebook, *see* Compl. ¶¶ 130, 136-38, establishes a voluntary course of dealing. *See Trinko*, 540 U.S. at 409. Further, as in *Aspen*, Facebook sacrificed "short-run benefits and consumer goodwill." 472 U.S. at 610-11. Facebook benefited by providing Platform access to app developers, *see* Compl. ¶¶ 133-34, and its decision to forgo those benefits to harm competition elucidates its anticompetitive intent. *Compare Aspen Skiing*, 472 U.S. at 608 ("The jury may well have concluded that Ski Co. elected to forgo these short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor."), *with Trinko*, 540 U.S. at 409 (reluctance to interconnect under regulatory mandate "tells us nothing about dreams of monopoly").

Facebook misconstrues controlling precedent by asserting that conduct cannot constitute an anticompetitive refusal to deal unless the defendant is a monopoly provider of an input sold at retail with a prior profitable course of dealing, or where the refusal is irrational but for its anticompetitive effect. Mem. 36-37. As indicated above, *Trinko* and *Aspen* treated circumstances like prior dealing and sacrifice of short-run benefits as proxies for anticompetitive motive, but they did not indicate that those circumstances (which in any event are present here) were always necessary, nor did they announce an "irrationality" test. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462-64 & n.13 (7th Cir. 2020) (stating the termination of a prior, profitable course of dealing "is neither necessary nor sufficient for conduct to be exclusionary"

and doubting the need to show the refusal "was irrational but for its anticompetitive effect");

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F. Supp. 3d

468, 483 (D.R.I. 2018) (stating that "confusion" over *Aspen* and *Trinko* can result from

"misread[ing] or deliberately extend[ing]" their holdings, including "construing them in a rigid

fashion to require, for example, an explicit prior course of dealing").  Further, with respect to

Facebook's claims about defining an "input" market, Mem. 36-37, Facebook's Platform—which

serves as a valuable "distribution channel" and "growth tool" for third-party apps, Compl. ¶¶

130, 132—directly parallels the valuable joint ski ticket in *Aspen*.

Finally, Facebook's asserted justifications are conclusory and premature.  *See* Mem. 37-

38.  Facebook cannot prevail on a motion to dismiss by making an unsubstantiated claim that it

imposed its policies or terminated Platform access to prevent freeriding.  *Viamedia*, 951 F.3d at

460 ("[B]alancing anticompetitive effects against hypothesized justifications depends on

evidence and is not amenable to resolution on the pleadings[.]").  In fact, both cases cited by

Facebook involved motions for summary judgment, not motions to dismiss.  *Morris Commc'ns*

*Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004) (noting defendant had burden of

establishing its business justification was valid); *Consultants & Designers, Inc. v. Butler Serv.*

*Grp., Inc.*, 720 F.2d 1553, 1559, 1562 (11th Cir. 1983) (assessing defendants' restrictive

covenant based on the specific facts of the case).

### c)  Facebook Inaccurately Claims that Courts Have Ruled on Its Platform Conduct

As a final salvo, Facebook asserts that courts in California have already ruled on the

FTC's allegations related to Facebook's Platform policies, and dismissed "similar refusal-to-deal

claims" on grounds that Facebook has "a right to control its own product."  Mem. 38.  Facebook,

however, misconstrues these cases: no court has ruled that the Platform policies at issue here are not actionable anticompetitive conduct as conditional dealing or as a refusal to deal.

Indeed, only one of the cases that Facebook cites even discusses whether a claim is an unlawful refusal to deal.  In *Reveal Chat*, the court dismissed the complaint because it was time-barred and because the plaintiffs failed to allege antitrust injury, not because Facebook's conduct could not, as a matter of law, constitute an unlawful refusal to deal.  *Reveal Chat Holdco LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 996, 998 (N.D. Cal. 2020).  The court addressed the plaintiffs' refusal-to-deal claim only in dicta, stating that it did so "briefly" in order "to provide Plaintiffs with guidance for their amended complaint."  *Id.* at 998.  The court did not address whether the conduct at issue constituted conditional dealing.

The other cases Facebook references do not apply conditional dealing or refusal-to-deal frameworks, and do not involve the Platform policies at issue here.  *See Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080-82 (S.D. Cal. 2012) (assessing group boycott and tying claims); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13-14 (N.D. Cal. July 20, 2010) (dismissing counterclaim for failure to show how prohibitions against users logging in through third parties and retrieving their data via automated means was anticompetitive).  Thus, these cases do not suggest that the FTC's Complaint is deficient.

## II.      THE COMPLAINT ESTABLISHES THE FTC'S AUTHORITY TO FILE THIS SUIT

Congress empowered the FTC to seek a preliminary or permanent injunction in federal court when the Commission "has reason to believe" that (1) a defendant "is violating, or is about to violate" any provision of law enforced by the FTC, and (2) such an injunction "would be in the interest of the public."  15 U.S.C. § 53(b) (hereinafter, "Section 13(b)" of the FTC Act).  Facebook inaccurately asserts that the Complaint fails to satisfy the first of these requirements,

Mem. 39-44, ignoring the Complaint's factual allegations that Facebook "is violating" Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by monopolizing PSN services.

Facebook's attack on the Commission's authority to bring this suit fails for two reasons. First, the FTC Act vests the Commission with the discretion to decide it "has reason to believe" that Facebook is violating or about to violate the law. Second, the Complaint plainly alleges facts supporting the Commission's reason to believe that Facebook is violating Section 2 of the Sherman Act via an ongoing course of anticompetitive conduct.

### A.    Section 13(b) Empowers the FTC to Sue in Federal Court When the Commission "Has Reason to Believe" a Defendant Is Violating the Law

The plain language of the FTC Act invests the Commission, not federal courts, with discretion to determine it "has reason to believe" a defendant is violating or about to violate the antitrust laws. *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1222-23 (N.D. Ga. 2019); *FTC v. Vyera Pharm., LLC*, 479 F. Supp. 3d 31, 43-44 (S.D.N.Y. 2020). In *Hornbeam*, the FTC alleged that a violation had ceased but was likely to recur, and the defendant filed a motion to dismiss on Section 13(b) grounds. 391 F. Supp. 3d at 1222-23. The court denied the defendant's motion, holding that Section 13(b) conferred discretion on the FTC and that the FTC's "reason to believe" determination could not be reviewed. *Id.* (describing "the FTC's internal standard argument" as "persuasive."). As such, the court concluded that the complaint did not warrant dismissal on Section 13(b) grounds where it "set[] forth at least some facts to support a reasonable *inference*" that the defendant was about to violate the law. *Id.* (emphasis added). Similarly, in *Vyera*, the court denied a motion to dismiss on Section 13(b) grounds, noting that "the FTC does contend that the defendants are currently engaged in violations of federal antitrust laws, or, at the very least, that it has sufficient 'reason to believe' that the defendants are engaging in violations of federal antitrust laws." 479 F. Supp. 3d at 44.

The *Hornbeam* and *Vyera* courts' holdings that the "reason to believe" language of Section 13(b) vests discretion in the FTC duplicates the rule that courts apply to identical language in a different section of the FTC Act.  In *Standard Oil Co. v. FTC*, 596 F.2d 1381, 1383 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232 (1980), the court addressed Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), which authorizes the FTC to issue an administrative complaint "[w]henever the Commission shall have reason to believe" that a defendant "has been or is using any unfair method of competition or unfair or deceptive act or practice."  *Id.* at 1383, n.1.  The court held that "what constitutes 'reason to believe' is unreviewable because the 'reason to believe' determination is committed to the FTC's discretion."  *Id*.

Courts considering Administrative Procedure Act challenges have likewise held that the FTC has discretion to determine that it "has reason to believe" a violation is or is about to occur under Section 13(b), or that a defendant "has been or is using" an unfair method of competition in violation of Section 5(b).  *FTC v. Nat'l Urological Grp., Inc.*, 2006 WL 8431977, at *3 (N.D. Ga. Jan. 9, 2006) (holding that Section 13(b)'s language "do[es] not furnish the court with a meaningful standard by which to measure the lawfulness" of FTC's determination to file suit); *Boise Cascade Corp. v. FTC*, 498 F. Supp. 772, 779, n.3 (D. Del. 1980) (FTC's determination that it has "reason to believe" under Section 5(b) is "not reviewable."); *cf. Board of Trade v. CFTC*, 605 F.2d 1016 (7th Cir. 1979) (statute authorizing the Commodities Futures Trading Commission to take certain actions "whenever it has reason to believe that an emergency exists" conferred unreviewable discretion on the agency) (quoting 7 U.S.C. § 12a(9)).

Facebook relies heavily on *FTC v. Shire ViroPharma, Inc*., 917 F.3d 147 (3d Cir. 2019), but that case neither undermines the authority discussed above, nor supports Facebook's effort to dismiss the FTC's Complaint.  It does not undermine the above-cited authority because the *Shire*

40

court expressly declined to consider whether Section 13(b)'s "reason to believe" language confers discretion on the agency, as the FTC had not raised the issue before the district court. *See id.* at 159 n.17.  And *Shire* does not support Facebook's argument here, because the *Shire* defendant had sold off the assets that were the subject of the alleged conduct prior to the filing of the suit, and thus there was "*no* evidence" that might provide a reason for the FTC to believe the defendant "is violating" the law.  *Id.* at 159 n.17 (emphasis added).  Indeed, in *Shire*, the FTC candidly admitted that it did *not* have a reason to believe Shire "is violating" the law, and that the only question was whether Shire was likely to do so in the future.  *Id.* at 150.  In this case, by contrast, "the FTC does contend that the defendants are currently engaged in violations of federal antitrust laws."  *Vyera*, 479 F. Supp. 3d at 44.

## B.     The Complaint Alleges an Ongoing Monopolization Offense

The monopoly that Facebook's anticompetitive conduct has maintained persists to this day.  *See* Compl. ¶¶ 2, 64, 170.  To the FTC's knowledge, no court has ever dismissed on Section 13(b) grounds a complaint that seeks to enjoin an ongoing monopoly that the FTC alleges "is violating" the law.  *Cf. Surescripts*, 424 F. Supp. 3d at 100 (FTC "sufficiently pleads a 'proper' case for a permanent injunction under Section 13(b)").  Facebook relies in part on dicta from *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), Mem. 40, but that case is inapposite. In *Qualcomm*, after a full trial, the Ninth Circuit held that certain exclusive dealing arrangements had not "substantially foreclose[d] competition," noting that, regardless, the agreements were terminated, and thus would not require injunction because they posed no "current or future threat of anticompetitive harm."  969 F.3d at 1004-05.

Further, Facebook's course of anticompetitive conduct is ongoing and persists to this day. From the moment the Instagram and WhatsApp acquisitions were consummated, through today,

Facebook's control of these companies has prevented them from challenging Facebook Blue's dominance, or from being acquired by third parties that might have done so. *See* Compl. ¶¶ 71-72, 102, 105, 126-27. Furthermore, because of the network effects barrier to entry, Facebook's control of Instagram and WhatsApp "maintains a protective 'moat'" that deters and hinders competition and entry in PSN services. *Id.* ¶¶ 105, 127. Indeed, as the Complaint alleges, every day, Facebook makes choices about how Instagram and WhatsApp will operate to foreclose competition and protect its monopoly position, including by managing them to limit adverse impact on, and to insulate, Facebook Blue. *See id.* ¶¶ 102-03, 126.

Facebook's course of conduct also includes its anticompetitive conditioning of access to its Platform. *See* Compl. ¶¶ 129-60. Facebook "suspended" enforcement of these conditions in December 2018 in the face of heightened public scrutiny of its anticompetitive treatment of developers. *Id.* ¶¶ 148-49. But it has not terminated or disavowed the relevant policies, and can cut off any application's access to valuable Platform interconnections at any time. The Complaint alleges that, unless enjoined, Facebook is likely to resume enforcing its anticompetitive conditions once the current scrutiny has passed. *See id.* ¶¶ 29, 149, 172. Finally, the Complaint alleges that Facebook "continues to monitor the industry for competitive threats, and likely would seek to acquire" such threats. *Id.* ¶ 172.

Facebook ignores that the Complaint alleges a course of conduct, attempting instead to treat each alleged element of the course of conduct as a discrete occurrence disconnected from all of the others. As discussed above, this is inappropriate. *See supra* § I.B. But Facebook's arguments with respect to each element also fail. Facebook argues that the Complaint alleges only "past conduct" with respect to Instagram and WhatsApp, rather than ongoing antitrust violations. Mem. 42. This argument fails because there is ample authority that continued

possession of a firm or assets that were acquired in violation of the antitrust laws represents a continuing violation of the antitrust laws.

For example, in *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975), the government alleged that defendant ITT, a baking-goods company, acquired assets in several rival bakeries in violation of an FTC consent order prohibiting such acquisitions. *See id.* at 228. The government sought daily penalties based on ITT's continued holding of the acquired assets. *See id*. at 229. The defendant resisted the imposition of ongoing penalties by arguing, as Facebook does here, that an acquisition consists only of the initial act of purchase, not the ongoing holding of the acquired assets. *See id.* at 233. The Supreme Court rejected this argument and held that ITT's *continued holding* of a competing bakery was an ongoing violation of the order at issue. Relying on Section 7 of the Clayton Act, which prohibits anticompetitive acquisitions, 15 U.S.C. § 18, the Court held that an acquisition "means holding as well as obtaining assets." *ITT Continental Baking Co.*, 420 U.S. at 240.

The Supreme Court and at least one court of appeals have reached similar conclusions in other cases. *See du Pont*, 353 U.S. at 597 ("[T]he Government may proceed at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce."); *FTC v. Western Meat Co.*, 272 U.S. 554, 559 (1926) ("Further violations of the act through continued ownership could be effectively prevented only by requiring the owner wholly to divest itself of the stock and thus render possible once more free play of the competition which had been wrongfully suppressed."), *cited in California v. American Stores*, 495 U.S. 271, 285 n.11 (1990); *Gottesman v. General Motors Corp.*, 414 F.2d 956, 965 (2d Cir. 1969) ("[T]he very acquisition and position of potential control which was found violative of the Clayton Act as of 1949 [in *du Pont*]

43

continued through 1961."); *United States v. Schine*, 260 F.2d 552, 556 (2d Cir. 1958) ("[I]t is the maintenance of conditions in violation of the decree [prohibiting acquisitions, among other things] which is the charge against the respondents."). The reasoning in *ITT Continental* and these other cases is just as applicable to acquisitions that violate the Sherman Act as it is to those that violate the Clayton Act.

Facebook seeks to counter this well-supported and common-sense interpretation by pointing to several cases, none of which is applicable here. Unlike *ITT Continental* and the other cases discussed above, the cases Facebook cites did not involve the scope of a federal government enforcer's authorization to bring suit in federal court. Rather, Facebook's cases considered a fundamentally different question: whether suits brought by private plaintiffs were timely under the statute of limitations, which does not apply to the federal government. Mem. 42-43 (citing *Reveal Chat*, *Z Techs.*, and *Concord Boat*). The answer to that question has no bearing on the Section 13(b) question. Indeed, the very fact that the FTC is not subject to the Sherman Act's statute of limitations shows that Congress intended for a different standard to apply to the FTC than to private plaintiffs. Furthermore, unlike in the cases Facebook cites, the Complaint here alleges far more than the mere continued ownership of Instagram and WhatsApp. As discussed above, the Complaint details Facebook's continued active control over Instagram and WhatsApp and how that control hinders competition in PSN services today.

Finally, Facebook argues that its anticompetitive conditioning of API access is "past conduct" because "the challenged Facebook Platform policies . . . have not been in effect since 2018." Mem. 43. This argument ignores the Complaint's allegations that the current suspension of Facebook's conditioning activities occurred on the eve of public release of certain inculpatory documents and is merely a temporary pause while Facebook waits for the furor around its

anticompetitive activity to die down, and for this case to go away.  *See* Compl. ¶¶ 29, 148-49.

The law is clear that courts need not conclude that a defendant's illegal behavior is over simply

because it has stopped for a time, particularly when the defendant retains the ability and

incentive to resume the conduct.  *See, e.g.*, *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1202 (10th

Cir. 2009) (approving injunctive action where the defendant "had the capacity to engage in

similar unfair acts or practices in the future") (citation omitted); *In re Sanctuary Belize*, 482 F.

Supp. 3d 373, 467 (D. Md. 2020) (granting permanent injunction under Section 13(b) after

considering, among other things, "whether defendant is positioned to commit future violations,"

"defendant's recognition of culpability," and "the sincerity of defendant's assurances against

future violations") (citation omitted).  Facebook cites no law that contradicts this point.

Contrary to Facebook's characterizations, the FTC does not argue that it "can bring all

Section 2 cases in federal district court."  Mem. 44.  The FTC acknowledges that Section 13(b)

does not authorize suit in federal court when the Commission lacks reason to believe that a

defendant's violation is ongoing or about to occur.  But that simply is not the case here, where

the Complaint plainly reflects the Commission's reason to believe that Facebook is violating the

law.  The fact that Facebook's illegal conduct *began* many years ago does not undermine the

Commission's reason to believe that Facebook's violation is ongoing.  *See Vyera,* 479 F. Supp.

3d at 44 ("The FTC is not required to bring suit at the exact moment contractual negotiations

ripen into executed contracts.  It is the extant scheme that provides the basis for the lawsuit.").

## CONCLUSION

Facebook's Motion to Dismiss should be denied for the reasons set forth above.

Dated: April 7, 2021

Respectfully submitted,

/s/ Daniel Matheson
Daniel Matheson, Esq. (D.C. Bar 502490)
Patricia Galvan
Krisha Cerilli (D.C. Bar 983281)
Robert Zuver (D.C. Bar 987216)
Maria Dimoscato (D.C. Bar 489743)
Eric Cochran (D.C. Bar 981148)
Henry Hauser (D.C. Bar 1614882)
Mitchell London (D.C. Bar 1029408)
Owen Masters (D.C. Bar 242139)
Michael Mikawa
Noel Miller (D.C. Bar 1026068)
David Owyang
Mark Silvia
Michael Smith (D.C. Bar 996738)
Rebecca Weinstein
Sylvia Zhang

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*