**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

        Plaintiff,

      v.

FACEBOOK, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

---

**REPLY BRIEF IN SUPPORT OF
FACEBOOK, INC.'S MOTION TO DISMISS FTC'S COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.     THE SECTION 2 CLAIM FAILS BECAUSE THE FTC HAS NOT
       PLEADED FACTS ESTABLISHING A PLAUSIBLE RELEVANT
       ANTITRUST MARKET ........................................................................................... 4

II.    THE FTC DOES NOT ALLEGE FACTS ESTABLISHING
       MONOPOLY POWER ............................................................................................. 8

III.   THE FTC HAS NOT PLEADED ANTICOMPETITIVE CONDUCT ........................... 11

       A.     The Instagram And WhatsApp Acquisitions Were Not Unlawful
              Exclusionary Conduct ................................................................................. 11

              1.     The FTC Cannot Plausibly Ignore Its Own Prior Reviews
                     And Clearances ................................................................................. 11

              2.     The FTC Fails To Allege Facts Establishing A Plausible
                     Claim That Facebook's Acquisitions Were Unlawful
                     Exclusionary Conduct ...................................................................... 13

                     a)     The FTC alleges no facts establishing a plausible
                            claim that the Instagram acquisition harmed
                            competition and consumers ..................................................... 14

                     b)     The FTC fails to allege that Facebook's acquisition
                            of alleged non-competitor WhatsApp was
                            exclusionary .......................................................................... 16

       B.     The FTC's Claim That Facebook's 2011-2018 Policies Harmed
              Competition By Preventing Competitors From Making
              Unrestricted Use Of Its Proprietary Platform Fails As A Matter
              Of Law .......................................................................................................... 17

              1.     The Absence Of A Developer Market Monopoly Precludes
                     Both FTC Theories ........................................................................... 17

              2.     There Can Be No Valid Refusal-To-Deal Claim ............................... 18

              3.     The Absence Of Interference With Rivals Precludes
                     Any Conditional-Dealing Claim ....................................................... 20

IV.     THE FTC LACKS AUTHORITY TO MAINTAIN THIS SUIT......................................22

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES[*]

Page

CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir. 1989) ....................18

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
(9th Cir. 2010)....................................................................................................................13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).............................. 17-18

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................... 2, 4-5, 12, 14, 24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)........................22

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730
(E.D. Pa. Nov. 18, 2003).....................................................................................................7

*Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009) .........................19

*CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926 (D. Or. 2018) .....................5

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ........................................7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ....................................11

\* *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)................................17, 21

*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018)....................................14

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754
(S.D.N.Y. 2020)..............................................................................................................5, 8

*Eastman v. Quest Diagnostics Inc.*:

2015 WL 7566805 (N.D. Cal. Nov. 25, 2015) .....................................................13

2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556
(9th Cir. 2018)........................................................................................................12

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d 705
(S.D.N.Y. 2011)................................................................................................................11

*Endsley v. City of Chicago*, 230 F.3d 276 (7th Cir. 2000)...........................................................10

---

[*] Authorities principally relied upon are marked with an asterisk.

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*,
2019 WL 3503240 (N.D. Tex. Aug. 1, 2019) ...................................................................9

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750
(N.D. Cal. July 20, 2010) .............................................................................................20

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)...............................................25

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ....................................................................21

* *FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ..............22

* *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019)...................23

*FTC v. Nat'l Urological Grp., Inc.*, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) .........23

* *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)............................22, 24, 25

*FTC v. Vyera Pharm., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020)................................23

*FTC v. W. Meat Co.*, 272 U.S. 554 (1926) ....................................................................24

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701
(S.D.N.Y. 1997)..............................................................................................................8

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..................20

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010)...............................6

*Korea Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834
(N.D. Cal. Mar. 11, 2008)...............................................................................................9

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114
(10th Cir. 2014).............................................................................................................10

* *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).....................................17, 21

*Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486 (S.D.N.Y. 2014) ...........................7

* *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) .....................18, 19, 20

* *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ..............11, 18, 22

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505
(8th Cir. 2018)................................................................................................................7

*RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215 (C.D. Cal. 2012)....................5

* *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).............19, 20

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) ....................................11

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012) ...................20

*Sanctuary Belize Litig., In re*, 482 F. Supp. 3d 373 (D. Md. 2020)..............................................25

*SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782 (N.D. Cal. 2020).......................11

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016) ........................................9

*SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780
    (9th Cir. 1996)...........................................................................................................................19

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ............................................................21

*Standard Oil Co. v. FTC*, 596 F.2d 1381 (9th Cir. 1979), *rev'd*, 449 U.S. 232
    (1980).................................................................................................................................. 22-23

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ...................................................................14

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)........................................12

*Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ......................10

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ...................................................................................21

*TKO Energy Servs., LLC v. M-I L.L.C.*, 2013 WL 789458 (N.D. Okla. Mar. 4,
    2013), *aff'd*, 539 F. App'x 866 (10th Cir. 2013).......................................................................7

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .......................................................................5

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........................................24

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)...................................................................14

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975).......................................................24

* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).....................................10, 13, 15,
    16, 17, 18, 21, 23

* *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ................................................10, 24

* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...................................................................2, 11, 18, 19, 20, 22, 23

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), *petition for cert.
    pending*, No. 20-319 (U.S. Sept. 4, 2020) ..........................................................................17

*Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792 (S.D. Ohio 2010)..........................................8

STATUTES AND RULES

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ...................................................................22

Clayton Act, 15 U.S.C. § 12 *et seq.*:

    § 7, 15 U.S.C. § 18...........................................................................................12, 14

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

    § 13(b), 15 U.S.C. § 53(b) ...........................................................1, 3, 22, 24, 25

Sherman Act, 15 U.S.C. § 1 *et seq.* ................................................................................13

    § 2, 15 U.S.C. § 2...........................................................1, 2, 3, 4, 8, 10, 11,
    16, 17, 19, 20, 21, 23

Fed. R. Evid. 403 ..........................................................................................................12

LEGISLATIVE MATERIALS

*Reviving Competition, Part 3:  Strengthening the Laws to Address Monopoly
    Power:  Hearing Before the Subcomm. on Antitrust, Commercial,
    and Admin. Law of the H. Comm. on Judiciary*, 117th Cong.,
    Prepared Statement of Rebecca Kelly Slaughter (Mar. 18, 2021),
    https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4453 .........................1, 22

*Strengthening the Federal Trade Commission's Authority to Protect Consumers:
    Hearing Before the S. Comm. on Commerce, Science, and Transportation*,
    117th Cong., Prepared Statement of the Federal Trade Commission (Apr.
    20, 2021), https://www.commerce.senate.gov/services/files/C08E5761-
    8058-423B-9876-40F17B56A58B .................................................................................1

ADMINISTRATIVE MATERIALS

Complaint, *In re J.M. Smucker Co.*, FTC Dkt. No. 9381 (Mar. 5, 2018)........................................5

Complaint, *In re Tronox Ltd.*, FTC Dkt. No. 9377 (Dec. 5, 2017)..................................................5

OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2008)........................................18

Brief for Appellant, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690
    (4th Cir. 2021) (No. 19-1397) (June 10, 2019), 2019 WL 2462724.................................12

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated
    Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper
    Series, No. 20-14 (May 2020)..........................................................................................16

Robert Pitofsky, *Proposals for Revised United States Merger Enforcement in a
    Global Economy*, 81 Geo. L.J. 195 (1992) .....................................................................25

## INTRODUCTION

In the face of decades of governing antitrust precedent that precludes the FTC's claim, the agency seeks expansion of antitrust authority to overcome that settled law. Even as the agency argues here that Section 13(b) authorizes this lawsuit, it seeks a legislative fix to remedy its lack of Section 13(b) authority, citing this very case. *See* Hearing Statement[1] at 8-9 (judicial decisions "limit[] the Commission's ability to obtain relief for consumers"). And it seeks legislative help to overcome other current-law obstacles to its overreaching Section 2 claims. *See*, *e.g.*, *id.* at 9 (advocating legislation that would "minimize the need . . . to both measure and balance harm" to consumers). The FTC seeks new legislation because, for the reasons stated in Facebook's motion to dismiss, it cannot plead a valid monopolization claim under current law.

This Court is not the place for the FTC to attempt to undo governing law or to seek retroactive condemnation of competitive activity that was reviewed and cleared long ago – by the very agency that now seeks to drop a veil over those inconvenient facts. It is not the place to shunt aside consumer welfare concerns – and modern antitrust law's focus on price and output – in favor of a new theory about the subjective preferences of people who use Facebook's free products. It is not the place to establish an unprecedented *per se* bar on all acquisitions by an alleged monopolist, even beneficial acquisitions, based on untethered speculation about what

---

[1] *Reviving Competition, Part 3: Strengthening the Laws to Address Monopoly Power: Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on Judiciary*, 117th Cong., Prepared Statement of Rebecca Kelly Slaughter (Mar. 18, 2021) ("Hearing Statement"); *see also Strengthening the Federal Trade Commission's Authority to Protect Consumers: Hearing Before the S. Comm. on Commerce, Science, and Transportation*, 117th Cong., Prepared Statement of the Federal Trade Commission at 12-13 (Apr. 20, 2021) (urging Congress to "act promptly" in part because judicial decisions that "Facebook has cited" in its motion prohibit the FTC from using Section 13(b) to challenge "conduct that occurred entirely in the past").

might have been.  And it is certainly not the place to revisit the Supreme Court's *Trinko* and *Twombly* decisions, which the agency either ignores or misconstrues.

The FTC's response to the fatal defects Facebook identified in its opening submission is to seek cover for its new legal theories in very old cases that do not, on close inspection, provide support.  As to facts, the agency's response is largely "we'll get to that later" or "we don't have to provide such facts at this stage."  But the agency is wrong.  After *Twombly*, it must both have a valid legal theory under current law *and* allege enough facts as to every necessary element of such valid legal claim to make it plausible.  Here, the FTC has not come close to doing so.

*First*, the FTC has not pleaded the foundational element of its Section 2 case:  a relevant product market.  It cites no legal authority to support its attempt to construct a "free goods market" and no facts establishing which products are in or out.  The many cases Facebook has cited make clear that, at the pleading stage, a plaintiff must allege *facts* – particularly facts about which products consumers consider acceptable substitutes and where they turn in response to price increases.  The agency's repeated insistence that it need not satisfy these basic requirements (FTC Opp'n 12-13, 15-16, ECF No. 59) is incorrect.

*Second*, the FTC has not pleaded facts establishing monopoly power in any relevant product market.  It seemingly admits (at 8) that it cannot allege any *direct* evidence of such power, but it asserts that its conclusory allegations of "in excess of 60%" share and "high barriers to entry" must be taken on faith at this stage.  That, too, is wrong.  The FTC does not even try to defend its lack of factual allegations supporting its share calculation, saying only that all will be revealed in time.  And the facts it does plead indicate that barriers do *not* prevent entry.  The FTC's conclusory allegations fail to clear the plausibility hurdle.

*Third*, the FTC has not pleaded facts establishing that Facebook maintained its lawfully acquired market position through "exclusionary conduct."  No modern court has adopted the

FTC's theory that every acquisition of a potential rival by a large market participant, no matter how small or how limited the target's current presence in the claimed market, constitutes presumptively exclusionary conduct punishable under Section 2.  The agency has only its supposition that Instagram and WhatsApp *might* have emerged as "personal social network" competitors, *might* have ended Facebook's supposed monopoly, and *might* have offered some vague and unspecified product differentiation that amounted to better products for consumers. But no court has ever found such obviously speculative (and factually empty) assertions sufficient to state a claim of monopoly maintenance.  And the argument that Facebook harmed competition by not permitting all competitors unlimited free access to its proprietary APIs, which the FTC strains to support with inapt authority and mischaracterization of the written policies it attacks, flies in the face of preclusive Supreme Court precedent.  The two acquisitions and limited access to Facebook's Platform – the universe of claimed exclusionary conduct – do not amount to plausible claims of exclusionary conduct at all.

*Finally*, the agency engages in doublespeak with regard to its authority to bring this case. Even as it urges Congress to expand Section 13(b), the FTC argues here that it has unreviewable discretion to proceed whenever it says it has "reason to believe" there is an ongoing problem (whether or not it alleges facts to show that there is one) and that the conduct at issue is "ongoing" because Facebook exists and operates its business as a successful, integrated firm. On this reasoning, the agency has authority to bring federal court cases whenever it pleases, and conduct – no matter how ancient – becomes "ongoing" whenever the agency decides to sue. Neither Congress nor any court has ever granted the FTC such expansive powers.

**ARGUMENT**

## I.   THE SECTION 2 CLAIM FAILS BECAUSE THE FTC HAS NOT PLEADED FACTS ESTABLISHING A PLAUSIBLE RELEVANT ANTITRUST MARKET

The FTC ignores Facebook's actual, revenue-generating business – ad sales – to construct an unprecedented product market based on the free and unlimited distribution of apps to all comers. Price is not charged, much less raised above competitive levels; output is not restricted. The antitrust laws simply do not contemplate such an artificial construct because there is no way to establish that consumers can be objectively harmed in such a market; the FTC has not even tried to plead facts making out a plausible case of such harm. No court has ever relied on vague and undefined assertions that quality could be better, like the FTC's here, as the sole basis for an antitrust prosecution similar to the one here.

But even if the law could be stretched to accommodate its novel theory, the FTC cannot proceed without clear factual allegations defining the product market that was allegedly monopolized. The FTC's claimed "personal social networking services" market is nothing but a label. No allegations establish consumers' alternatives, identify which firms can properly be considered part of the alleged market, or provide a basis for making such determinations. More specifically, there are no facts alleged to account for the products that would experience increased demand if Facebook raised prices or for the products consumers view as reasonably interchangeable with Facebook. Those are the bare minimum facts that courts require of plaintiffs, and this is the stage at which such facts must be set forth to state a plausible claim.

The FTC's opposition (at 10, 13, 15) largely ducks the issue. It belabors the "fact-intensive" nature of proving a relevant market and urges the Court to kick that can down the road. But the FTC must satisfy its *pleading*-stage "obligation to provide the grounds of [its] entitlement to relief" with "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (internal quotation marks, brackets omitted), to state a claim.  The FTC

has an obligation, right now and not later, to plead these facts.  *See, e.g.*, *Downtown Music Publ'g*

*LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 (S.D.N.Y. 2020) ("motion to dismiss

may be granted" where plaintiff fails "to define its proposed relevant market with reference to

the rule of reasonable interchangeability and cross-elasticity of demand" and alleges "a proposed

relevant market that clearly does not encompass all interchangeable substitute products").

The FTC's cited cases involve complaints that *satisfied* this pleading standard.  *See, e.g.*,

*Todd v. Exxon Corp.*, 275 F.3d 191, 200-01 (2d Cir. 2001) ("[A]n alleged product market must

bear a rational relation to . . . analysis of the interchangeability of use or the cross-elasticity of

demand, and it must be plausible.") (citation omitted); *CollegeNet, Inc. v. Common Application,*

*Inc.*, 355 F. Supp. 3d 926, 943 (D. Or. 2018) (citing complaint listing *which* suppliers and

competitors were alleged to be in each market); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp.

2d 1215, 1219 (C.D. Cal. 2012) (citing allegation that plaintiff and defendant were the only

market participants).  As the numerous decisions granting dismissal in similar cases demonstrate,

Facebook has raised not just factual disputes (as the FTC asserts (at 13-14)), but deficiencies in

the FTC's pleading.  As any number of recent cases illustrate, the FTC knows how to plead a

relevant market when it has the facts to do so.  *See, e.g.*, Complaint, *In re Tronox Ltd.*, FTC Dkt.

No. 9377 (Dec. 5, 2017); Complaint, *In re J.M. Smucker Co.*, FTC Dkt. No. 9381 (Mar. 5, 2018).

The FTC admits (at 12-13) that it has ignored cross-elasticity of demand and has not

provided any basis for evaluating economic substitutes, arguing that it has no obligation to do so.

It claims (at 12) that both price and non-price terms can be used to determine consumer

switching patterns.  But that assertion is irrelevant here, because the FTC has not pleaded any

facts – about price or non-price terms – regarding those switching patterns or what they say

about substitution.  The FTC must at least make factual allegations regarding the effect of

*non-price* changes that are as concrete as those the law requires as to prices.  But the FTC does

not identify a *single* product that would experience increased demand if price or quality changed.

That is insufficient as a matter of law.  *See* FB FTC Br. 11-12, ECF No. 56-1.

As to reasonable interchangeability, the FTC focuses on three supposedly "key elements"

to "distinguish personal social networking services."  Compl. ¶¶ 52-55; FTC Opp'n 8-9.  But the

mere recitation of that gerrymandered formula does not "present enough information . . . to

plausibly suggest the contours of the relevant geographic and product markets."  *Jacobs v.*

*Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010); *see* FB FTC Br. 15-16 (collecting

cases dismissing complaints for insufficiently alleging contours of the market, *none* of which the

FTC addresses in its brief).  It is impossible for the Court or Facebook to discern which products

– *e.g.*, Snapchat, Twitter, TikTok, and Pinterest – are and are not in the asserted market.  The

FTC points out (at 9) that it has identified a few online services that (it claims) are *not* substitutes

for Facebook.  Those few examples do not answer the question, nor does the FTC seriously

maintain that it does; it just says it need not provide that information at this stage.

The FTC also argues that it has identified a list of other providers of personal social

networking services.  *See* FTC Opp'n 15 (citing Compl. ¶¶ 38, 41, 63, 153).  But those

companies are all defunct (Friendster (¶ 38), Myspace (¶ 41), Path (¶ 153)) or part of Facebook

(Instagram (¶ 63)) and therefore unilluminating as to the supposed contours of the current alleged

market.  The FTC provides no information about which firms make up the other 40% of the

FTC's claimed market.  The FTC effectively concedes (at 14-15) that "a single-brand market

limited to Facebook" would be legally deficient but fails to allege *any* current substitutes for Facebook.  This leaves the agency's claim on untenable footing and subject to dismissal.[2]

The FTC cannot save its deficient pleading with vague arguments (at 8-10, 14-15) that the complaint's articulation of the "characteristics and uses" of personal social networking services provides sufficient basis for determining which products are substitutes from the consumer's point of view.  An individual sharing a recent life event – a grandchild's birth or a high school graduation – can share with family and friends via, *e.g.*, email, iMessage, Twitter, TikTok, Snap, Facebook, and myriad other channels of communication.  The complaint is devoid of any facts alleging that only the combination of all three supposedly key elements will suffice for consumers and that users do not switch to products that lack one (or more) of them.  As numerous cases explain, "[m]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market."  *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016); *see* FB FTC Br. 18-19 (collecting cases dismissing complaints for excluding competitors based on artificial and immaterial distinctions, *none* of which the FTC

_____

[2] *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (affirming dismissal where alleged market was "too narrowly defined," defendant was "not the only [service] available to consumers," and complaint "fail[ed] to include all interchangeable" services); *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 499 (S.D.N.Y. 2014) (granting dismissal because "the complaint does not allege any substitutes for [the relevant product]"); *TKO Energy Servs., LLC v. M-I L.L.C.*, 2013 WL 789458, at *5 (N.D. Okla. Mar. 4, 2013) (dismissing antitrust claim where plaintiff did "not plead who [defendant's] competitors are, what market share they control, or how [defendant] could eliminate competition with those competitors"), *aff'd*, 539 F. App'x 866 (10th Cir. 2013); *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730, at *5 (E.D. Pa. Nov. 18, 2003) (granting dismissal where plaintiffs "allege[d] a proposed market which d[id] not encompass any interchangeable substitute products and d[id] not allege that there are no substitute products").

addresses in its brief).[3]  Rather, a plaintiff must plead facts plausibly establishing that other products are so different that they cannot be substitutes.

Statements from Facebook executives that different services have different features (*see* FTC Opp'n 14-15) say nothing about substitution and cannot support a plausible claim that other products, particularly products that enable sharing, are not *also* acceptable substitutes for connecting with friends and family.  The fatal flaws leading to dismissal in the cases cited in Facebook's briefs are indistinguishable from the defects in the FTC's case here.

## II.   THE FTC DOES NOT ALLEGE FACTS ESTABLISHING MONOPOLY POWER

Monopoly power is the power to raise price, restrict output, or measurably reduce price-adjusted quality.  *See* FB FTC Br. 20.  But the FTC's theory is only that the marketplace might have been better in ill-defined ways.  *See* FTC Opp'n 8 (citing Compl. ¶¶ 27 ("increased choice"), 163 ("additional innovation," "quality improvements")).  The FTC cites no case accepting such a theory as the sole basis for Section 2 enforcement and all but concedes that it has not alleged facts providing direct evidence of monopoly power.  *See id.* ("direct proof . . . is only rarely available") (internal quotation marks omitted).

---

[3] *See also Downtown Music*, 436 F. Supp. 3d at 766 (granting dismissal where counterclaimant "does not explain why" alternatives "cannot substitute" for product); *Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 803-04 (S.D. Ohio 2010) (dismissing antitrust claim because allegation that product has unique "characteristics" or "combinations of characteristics" and purchasers "have personal preferences as to certain brands" "does not suggest why other [alternatives] could not be reasonably interchangeable"); *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (granting dismissal, recognizing that "[a] consumer might prefer . . . Pepsi because she prefers the taste, or NBC because she prefers 'Friends,'" and that "[a] consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network").

Instead, the FTC relies on the assertion that it has pleaded a large market share ("in excess of 60%") and "significant entry barriers."  Compl. ¶¶ 64-65.  But the FTC does not properly allege that Facebook has a dominant share of any defined market.  *See Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 484 (S.D.N.Y. 2016) (no plausible allegation of indirect proof of monopoly power where plaintiffs failed to allege defendant's "share of [the alleged] market").  Merely reciting a percentage without alleging to what it refers – let alone how it was or could be calculated – is conclusory and insufficient.  *See EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (dismissing claim, noting plaintiff had not alleged "the total number of Airbus helicopters or other facts from which the Court could deduce Defendants' market share," "aside from the conclusory statement that Defendants have 'a market share of over 50 percent'"); *Korea Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (similar).

Here, the claim is particularly implausible, as the metrics suggested by the FTC (at 18) – daily and monthly users (¶ 3) and time spent on Facebook (¶ 97) – are not alleged to be the basis of the market-share calculation.  Whether these metrics underlie what the FTC purports to measure affects the plausibility of its claim.  Alleging that Facebook has many users will not do: the same user can log on to multiple online products in a day or month.  And the complaint makes no reference to time spent on what the FTC calls "personal social networking," *e.g.*, the time devoted to the limited slice of on-Facebook activity that qualifies as "personal social networking" (as opposed to the many other things people do on Facebook, like watching videos). *See* FTC Opp'n 9.  In each case the FTC cites (at 18), it was clear how the plaintiffs had measured market share, and the calculation was plausible:  "number of movie theaters operated," "number of customers," and "number of patient admissions and patient-days spent."  All the FTC offers is a percentage, unconnected to any pleaded facts to establish the numerator or the

denominator.  This is not enough.  *See Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at

*11 (E.D. Pa. Sept. 28, 2012) (granting motion to dismiss where plaintiff only "randomly asserts

. . . 'over 50% market share,'" without "any indication of market share" in the market alleged).

The FTC resorts to yet another conclusory label when it claims to have pleaded a barrier

formed by "network effects."  It highlights (at 19) "commentary from Facebook's CEO" but

disregards its own allegation (¶ 88) that Facebook's CEO also "predicted" – a prediction

inconsistent with network effects blocking entry or expansion – that multiple "apps like

Instagram" would in just "1-2 years" "grow quite large," by more than an order of magnitude,

from "15m users" at the time to "100-200m."  Where a "dominant" firm does not believe in the

strength of entry barriers but instead "acts consistent with a competitive market – out of fear

perhaps that potential competitors are ready and able to step in – the purpose of the antitrust laws

is amply served."  *United States v. Syufy Enters.*, 903 F.2d 659, 668-69 (9th Cir. 1990).  This is

nothing like *Microsoft*, where the defendant had more than 95% of a properly defined product

market – personal computer operating systems – that was protected by a "structural" barrier

preventing other firms from gaining a foothold.  *United States v. Microsoft Corp.*, 253 F.3d 34,

54-55 (D.C. Cir. 2001) (en banc) (per curiam); *see also Lenox MacLaren Surgical Corp. v.

Medtronic, Inc.*, 762 F.3d 1114, 1125-26 (10th Cir. 2014) (entry possible for only a "single"

entrant with "an existing distribution network, credibility among institutional buyers, and a vast

supply of capital to invest in a market generating limited revenues").

These are not quibbles over facts, unripe for resolution now.  *See* FTC Opp'n 17-19.

They are glaring defects in pleading an essential element of the Section 2 claim, which should

therefore be dismissed.  *See Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000)

(affirming dismissal "where plaintiffs fail to identify any facts from which the court can infer

that defendants had sufficient market power") (internal quotation marks omitted); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (same); *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 792-94 (N.D. Cal. 2020) (granting motion to dismiss).

## III.   THE FTC HAS NOT PLEADED ANTICOMPETITIVE CONDUCT

The FTC betrays a telling lack of conviction by arguing (at 34) that the Court should not focus on the particular instances of supposedly unlawful conduct (two acquisitions, and policies limiting competitor access to Facebook's Platform from 2011-2018) but rather should lump them into "an overall course of anticompetitive conduct and not a standalone claim."  But theories of liability that are meritless individually cannot be "alchemize[d] . . . into a new form of antitrust liability."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).  Consumers benefit when monopolists compete lawfully; conduct that is not anticompetitive cannot be the basis for condemnation under Section 2.  The FTC cites *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), but that is a case about evaluating the total effect of a *conspiracy*.  As the court explained in *Eatoni Ergonomics, Inc. v. Research In Motion Corp.*, 826 F. Supp. 2d 705 (S.D.N.Y. 2011):  "*Continental Ore* does not stand for the unworkable proposition that business conduct that does not offend the antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct."  *Id.* at 710 ("the sum of zero and zero is zero").  Taken separately, as they must be, none of the FTC's three claimed instances of exclusionary conduct stands up to scrutiny.

### A.   The Instagram And WhatsApp Acquisitions Were Not Unlawful Exclusionary Conduct

#### 1.   The FTC Cannot Plausibly Ignore Its Own Prior Clearances

The FTC was required by law to review the Instagram and WhatsApp transactions for risk of harm to competition, did so, and cleared the transactions.  Its current contradictory claim

is implausible without facts to establish that its contemporaneous reviews were compromised or deficient.  *See*, *e.g.*, *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) ("the FTC's decision to clear Quest's acquisition of Unilab . . . does weigh against the conclusion that Quest's acquisition of Unilab can be plausibly characterized as an unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).  The agency simply ignores these difficult facts.

The FTC insists (at 27, 29) that prior HSR review does not create a "bar" or "heightened pleading standard" or "preclude[] enforcement," but Facebook does not argue for such a bar. Rather, *Twombly* and *Trinko* require the FTC to plead facts as to why it allowed the Instagram and WhatsApp acquisitions to proceed – but has now changed its mind – in order to plead a plausible claim.  Armed with full information, the agency determined that the transactions posed no threat of competitive harm, even under Section 7's more restrictive standards; absent further allegations supported by facts, those judicially noticeable facts render its current claim implausible.  The FTC does not dispute that no court has credited a claim like this, *see* FB FTC Br. 28 (collecting cases); instead, it cites complaints – not decisions – filed in cases that settled before they were litigated.  *See* FTC Opp'n 28 (citing *Cardinal Health* and *Parker-Hannifin*). The FTC does not make law through allegations that are never litigated.

Nor does *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021), help the agency.  The court there affirmed, under Federal Rule of Evidence 403's discretionary balancing test, a ruling concerning the admissibility, in a jury trial, of the government's prior investigation of a challenged merger.  *Id.* at 713-14.  The court's concern was jury prejudice, because the government was not there to explain its conduct.  *See* Brief for Appellant at 67, No. 19-1397, 2019 WL 2462724 (4th Cir. June 10, 2019) (quoting evidentiary ruling).  No such concerns are

present here, as only the FTC can (but chooses not to) explain the facts.  In these circumstances, the FTC's contemporaneous decisions that the transactions posed no threat of significant harm should be credited as valid and on-point, rendering its current contrary claim implausible.

> **2.** **The FTC Fails To Allege Facts Establishing A Plausible Claim That Facebook's Acquisitions Were Unlawful Exclusionary Conduct**

The FTC contends (at 21-22) that a monopolist's acquisition of any "firm that poses a competitive threat" – no matter how small or remote from the alleged product market – "is exclusionary or anticompetitive conduct under Section 2."  No court has adopted such a sweeping and dangerous theory, and this Court should not be the first.  *See, e.g.*, *Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805, at *13 n.12 (N.D. Cal. Nov. 25, 2015) ("[a]cquisitions are not per se illegal under section 2" but are condemned only if they "unreasonably restrict[] competition") (citation omitted).

Conduct can be condemned as exclusionary under the Sherman Act only if it harms the competitive process resulting in harm to consumers.  *See Microsoft*, 253 F.3d at 58.  The facts alleged support no such conclusion.  Facebook did not "'squash'" Instagram (FTC Opp'n 22) or any other firm.  The FTC itself acknowledges that both Instagram and WhatsApp have grown significantly since Facebook acquired them, *see* Compl. ¶¶ 103-104, 126, which reflects how Facebook *improved* both products.  The FTC cites no case in which a court found an acquisition leading to such product improvements to be exclusionary conduct – for good reason.  *Cf. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) ("There is no room in this analysis for balancing the benefits or worth of a product improvement against its anticompetitive effects.  If a monopolist's design change is an improvement, it is 'necessarily tolerated by the antitrust laws'. . . .") (citation omitted).  The FTC's cavalier demand

for a legal presumption of illegality for all acquisitions by large firms is indicative of how far from the moorings of antitrust law the agency seeks to sail.

a)     **The FTC alleges no facts establishing a plausible claim that the Instagram acquisition harmed competition and consumers**

The FTC alleges (¶¶ 11, 16, 104) and acknowledges that Instagram was and continues to be a great product enjoyed by growing numbers of consumers (for free).  Its theory is that, absent acquisition by Facebook, Instagram not only would have enjoyed comparable success but also would have done some unspecified thing for consumers that is in some unexplained way better than what they have now.  Such speculation is not a plausible, factual basis for alleging exclusionary conduct, *cf. DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (merger challenge under Section 7 properly dismissed where "complaint offers only speculation" about how a firm "will do business"), and therefore fails to state a claim, *see Twombly*, 550 U.S. at 555.

The FTC, ignoring the last 50 years of antitrust law, reaches into the mists of time to mis-cite several old chestnuts, none of which supports its claim here.  In *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966), the focus of the government's case was a series of "restrictive agreements that pre-empted for each company a segment of the market where it was free of competition [from] the others"; the "acquisitions" that were challenged were specifically designed to preserve that market allocation and led to higher prices.  In *Standard Oil Co. v. United States*, 221 U.S. 1, 32-33 (1911), the acquisitions at issue (of competing refineries) were likewise part of a classic horizontal trust; the defendant "dismantled" some of the acquired facilities "to limit production" – thus raising prices and harming consumers.  In neither case was the fact of an acquisition alone sufficient to plead exclusionary conduct.

14

In contending otherwise, the FTC grossly misreads (at 24-25) *Microsoft*.  *Microsoft* did not involve acquisitions at all, and certainly not the acquisition of a single nascent competitor that left other firms in the market free to compete.  Rather, Microsoft exploited its power as a 95% market share monopolist to coerce computer equipment manufacturers and others across the market to deny distribution to rivals, which prevented *any* competitor from competing efficiently.  An acquisition of a single competitor among many, nascent or otherwise, does not have that effect.  *See* FB FTC Br. 31-32.  The FTC thus tries to lower its burden, reading *Microsoft* to say exclusionary conduct is any conduct that "'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'"  FTC Opp'n 26 (quoting *Microsoft*, 253 F.3d at 79) (alterations in *Microsoft*).  That self-evidently is not the law: better prices can help maintain a monopoly, as can improved products.  The law nonetheless encourages both.

The quoted language addresses only the standard for assessing *causation* where conduct has *already* been shown to be anticompetitive.  In upholding the district court's liability finding, the D.C. Circuit reaffirmed that "the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct *indeed has the requisite anticompetitive effect*."  *Microsoft*, 253 F.3d at 58 (emphasis added; citations omitted).  Having overcome that hurdle – by showing that Microsoft eliminated distribution of competing "middleware" products through nakedly anticompetitive agreements with computer manufacturers, among other exclusionary conduct – the government bore no demanding, *additional* burden of proving that Netscape's Navigator "would actually have developed into [a] viable platform substitute[]."  *Id.* at 78-79.

The government's stark over-reading – anything that *could* help maintain a monopoly necessarily *does* constitute exclusionary conduct – shows that it seeks to expand antitrust law

beyond its recognized limits, as one of *Microsoft*'s judges, former Chief Judge Ginsburg, has taken pains to point out. *See* Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper Series, No. 20-14, at 2 (May 2020) (in *Microsoft*, "[o]nly after finding that each type of conduct indeed had an anticompetitive effect did the court turn to the separate and distinct question of causation").

Other than its misreading of *Microsoft* and its speculation that Instagram might, on its own, have done some unspecified thing beyond the great things it is already doing, for free, for consumers, the FTC has nothing to support its claim here.

> **b)    The FTC fails to allege that Facebook's acquisition of alleged non-competitor WhatsApp was exclusionary**

The FTC goes even further into uncharted territory with its claim that the acquisition of WhatsApp in 2014 was a Section 2 violation. Facebook's acquisition of a subscription-model messaging app, which is not alleged to have had any plan to become a "personal social network," can be painted as an antitrust problem only by piling speculation upon speculation: it *might* have pivoted to become more like Facebook; it *might* have succeeded in offering a "personal social networking" product; and its hypothesized success *might* have led to the introduction of new or better products for consumers (but with no sense of what those products would have been). No court has ever accepted anything similar as grounds for a legal challenge. *See* FB FTC Br. 34-36; FB States Br. 15-18 (No. 1:20-cv-3589-JEB, ECF No. 114-1).

The agency again tries to deploy its all-purpose tool, *Microsoft*, claiming that any conduct that amounts to "'actions taken against threats'" can be condemned under Section 2. FTC Opp'n 22 (quoting *Microsoft*, 253 F.3d at 54). But, of course, all competition consists of actions taken against threats, including cutting prices and improving quality. Acquisitions can be procompetitive, and nothing in *Microsoft* addresses that. It is no accident that the FTC does not

cite a single Section 2 case finding the acquisition of an alleged potential entrant into the allegedly monopolized market to be exclusionary conduct; it has not remotely justified making this the first.

**B.     The FTC's Claim That Facebook's 2011-2018 Policies Harmed Competition By Preventing Competitors From Making Unrestricted Use Of Its Proprietary Platform Fails As A Matter Of Law**

The FTC has two theories (at 31, 34) for why Facebook could not lawfully restrict access to its own facilities:  "refusal to deal" and "unlawful conditional dealing."  Both are precluded by Supreme Court precedent.

**1.     The Absence Of A Developer Market Monopoly Precludes Both FTC Theories**

Both theories fail at the outset because the FTC has not alleged that access to Facebook's Platform was necessary for developers to create competing products.  Absent a Facebook "monopoly" over something that was necessary for competition, rivals had alternative ways to compete.  Because the FTC makes no allegation that developers could not distribute their products through other channels, Facebook's Platform policies cannot have harmed competition.  *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 (7th Cir. 2020) ("[a] firm's market power is important because, without it, a firm will have little to no ability to distort or harm competition, no matter how great its desire to do so"), *petition for cert. pending*, No. 20-319 (U.S. Sept. 4, 2020).  Contrary to the FTC's argument (at 33), the defendant must have power *in the market* where it either refused to deal or set conditional terms; without such power, there can be no viable Section 2 claim under either FTC theory.  *See Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951) (defendant was monopolist *in* market where it set exclusive terms); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 675-76 (D.C. Cir. 2005) (same); *Microsoft*, 253 F.3d at 70 (same); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

585, 600-01 (1985) (defendant was monopolist *in* market where it refused to deal); *Viamedia*,

951 F.3d at 444-45, 452 (same); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 807,

at 443 (3d ed. 2008) ("[T]hreatened refusals to deal . . . can be effective only on the assumption

that the defendant controls a significant market share.").  The FTC cites no contrary authority and

pleads no Facebook market power as to developers.

### 2. There Can Be No Valid Refusal-To-Deal Claim

Facebook has no antitrust duty to help rivals compete.  *See Novell, Inc. v. Microsoft

Corp.*, 731 F.3d 1064, 1072-73 (10th Cir. 2013) (Gorsuch, J.) (forcing firms "to help one

another" by "sharing their property" runs contrary to antitrust values).  But declining to help

rivals is all the FTC alleges:  the only "opportunity" the FTC plausibly claims Facebook closed

off was the chance to use Facebook's Platform for free.

**a.** The FTC's primary argument (at 34-36) is that, because it brands Facebook's

motives as "anticompetitive," it need not plead the rare and restricted circumstances to which

any potential refusal-to-deal claims are confined (*e.g.*, that conduct would be an *irrational*

sacrifice of profit, *see* FB FTC Br. 36-37).  The FTC cites no authority and is incorrect.  The

antitrust inquiry turns on "the effect of [the alleged] conduct, not upon the intent behind it,"

*Microsoft*, 253 F.3d at 59, because "a desire to extinguish one's rivals is entirely consistent with,

often is the motive behind, competition" itself, *A.A. Poultry Farms, Inc. v. Rose Acre Farms,

Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989).  The leading case, *Trinko*, featured an obvious and

similar motive:  the incumbent Bell companies allegedly denied would-be rivals access to their

networks because they wanted to frustrate competitive entry.  The Supreme Court could not have

been clearer in holding that the companies had no antitrust duty to make those facilities

available, and motive was irrelevant.  The FTC's argument here amounts to an admission that it

cannot wedge its claim into any narrow crack *Trinko* and *linkLine* leave open.

18

**b.**      The FTC's alternative argument (at 36-37) that it can satisfy *Trinko* disregards the

Supreme Court's holding.  The FTC claims (at 36) that, because Facebook allowed competitors

to use its Platform for a certain period, the company's decision in 2011 to halt that free-riding

betrays profit-sacrifice.  But there is no legal presumption (and no allegation) that the earlier

policy was profitable for Facebook as to every firm that took advantage of it.  No facts are

pleaded to support the notion that Facebook made money from letting rivals exploit access to

its Platform to attract users away from Facebook, let alone that Facebook would earn less by

retaining that traffic for itself.  Indeed, as then-Judge Gorsuch explained in *Novell* (which the

FTC tellingly fails even to cite), a platform's denial of access to proprietary APIs does not

suggest profit sacrifice because such restrictions, which prevent free-riding, are consistent with

increasing both short-term *and* long-term profits.  *See* 731 F.3d at 1075-77.

The FTC also fails to allege that the Platform policy was irrational other than as an attack

on competitors.  *See id.* at 1075 ("conduct must be irrational but for its anticompetitive effect").

Prohibition of free-riding is manifestly a rational business practice.  *See SmileCare Dental Grp. v.

Delta Dental Plan of California, Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (affirming dismissal of

complaint because the legitimacy of policies to prevent free-riding "is a foregone conclusion

requiring no further analysis"); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d

1188, 1197 (10th Cir. 2009) (affirming dismissal because the "Sherman Act does not force [a

defendant] to assist a competitor in eating away its own customer base").  The FTC does not and

cannot allege that Facebook acted irrationally but argues (at 36-37, without supporting authority)

that it should not have to do so.  Here again, the FTC is asking this Court to ignore existing law.

**c.**      The FTC's attempt (at 37-38) to distinguish on-point decisions of federal courts in

similar Section 2 challenges is unpersuasive.  *Reveal Chat* determined that the same Platform

policies at issue here fall within the now-settled rule that there is no antitrust duty to aid competitors.  *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002-03 (N.D. Cal. 2020) (granting motion to dismiss Platform claims).  The fact that the complaint had additional infirmities (*see* FTC Opp'n 38) does not undermine that statement.  And *Sambreel* and *Power Ventures* reached the same conclusion regarding analogous Facebook Platform restrictions.  *See Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075, 1082 (S.D. Cal. 2012) ("Facebook has a right to control its own product, and to establish the terms with which . . . application developers . . . must comply in order to utilize this product."); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13-14 (N.D. Cal. July 20, 2010) ("Facebook has the right to manage access to and use of its website").  Other courts have done the same in similar contexts.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1141-42, 1151 (N.D. Cal. 2020) (dismissing Section 2 claim based on denial of access to alleged competitors).

### 3.  The Absence Of Interference With Rivals Precludes Any Conditional-Dealing Claim

The FTC's alternative conditional-dealing theory fails for the additional reason that the FTC does not allege any *interference* in dealings between rivals and others.  All the FTC pleads is that Facebook declined to *help* rivals.  *See Novell*, 731 F.3d at 1072 (distinguishing between refusal-to-deal claims subject to *Trinko* and claims involving other "section 2 misconduct" such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)").  Facebook's Platform policies, incorporated by reference, never imposed any restriction on independent cooperation between third parties or required developers using Platform to refrain from dealing with Facebook's rivals.  *See* FB FTC Br. 39 (citing Hansen Decl. Ex. D, ECF No. 56-6).  The FTC does not argue to the contrary or claim that these policies were enforced other than as

20

written.  More broadly, the FTC simply fails to allege that Facebook foreclosed would-be rivals' opportunities to compete, including by cooperating with third parties.  *See also supra* pp. 17-18.

The FTC's claimed authority (*Lorain Journal*, *Covad*, and *Microsoft*) illustrates what is missing from the FTC's allegations:  all cases involved circumstances where the monopolist coerced customers into accepting terms that *interfered* with dealings between those customers and third-party rivals.  *See* FB FTC Br. 38.  Microsoft bullied equipment makers into contracts that prohibited distribution of rival products.  *See* 253 F.3d at 70-71.  Lorain Journal demanded agreements that its *customers* not deal with a new radio rival.  *See* 342 U.S. at 149.  And, in *Covad*, the defendant would not sell its DSL service to customers who had orders pending with a rival.  *See* 398 F.3d at 675.  The problem in these cases was abuse of monopoly power to prevent dealings between competitors and third parties, not merely the refusal to make facilities available to competitors.  The FTC does not claim to have alleged any such interference here.

The FTC asserts (at 33) that "[a] monopolist's use of anything of value to induce trading partners not to compete with it is anticompetitive," but the FTC cites nothing to support this purported standard, which is contrary to Section 2 precedent.  Were it so, no company with an arguable monopoly in some line of business could enter into a procompetitive joint venture.  *But cf. Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006).  The FTC cites *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), but that is not a Section 2 case at all; it instead addresses agreements between competitors not to compete – "the supreme evil of antitrust," *id*. at 152 (citation omitted); *see Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("[S]ingle-firm activity is unlike concerted activity covered by § 1, which inherently is fraught with anticompetitive risk.") (internal quotation marks omitted).  The FTC's expansive standard cannot be reconciled with the clear lines the Supreme Court has drawn to protect unilateral conduct, like Facebook's, that does

not *interfere* with rivals but merely declines to help them.  The FTC thus asks this Court to disregard *Trinko*, *linkLine*, and *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993), among other cases.

## IV.   THE FTC LACKS AUTHORITY TO MAINTAIN THIS SUIT

The FTC lacks authority under Section 13(b) to sue in federal court (as opposed to its own administrative forum) because it has not alleged that Facebook "is violating, or is about to violate," federal antitrust law.  15 U.S.C. § 53(b).  Calls for Congress to "swiftly" amend Section 13(b) because of this very limitation, recognized in a "series" of cases, are hardly consistent with the FTC's present claim to virtually unlimited statutory authority.  *See* Hearing Statement at 8-9 (discussing this motion in seeking expanded authority from Congress).

**A.**      The FTC first argues (at 39-41) that the Court cannot scrutinize the plausibility of its allegations because Section 13(b) permits the FTC to assert that it has "reason to believe" a violation is ongoing.  15 U.S.C. § 53(b).  That clearly conflicts with federal pleading standards and *Twombly*.  *See FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968, at *3 (E.D. Tex. Nov. 16, 2020) (granting motion to dismiss after rejecting identical "reason to believe" argument); *see also FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159 n.17 (3d Cir. 2019) (affirming dismissal and rejecting as "unpersuasive" the "unreviewable discretion" argument where there was "no evidence to support the FTC's 'reason to believe' Shire is violating or is about to violate the law").  The Administrative Procedure Act cases the FTC cites (at 40) support only the proposition that an agency's decision to commence a proceeding is subject to the agency's reasonable discretion – they do not support the FTC's claim to uncabined authority under Section 13(b) on its own say-so.  *See Standard Oil Co. v. FTC*, 596 F.2d 1381, 1385 (9th Cir. 1979) (limiting judicial review of the FTC's decision to initiate an administrative proceeding), *rev'd on*

*other grounds*, 449 U.S. 232 (1980); *FTC v. Nat'l Urological Grp., Inc.*, 2006 WL 8431977, at

*2-3 (N.D. Ga. Jan. 9, 2006) (rejecting arbitrary-and-capricious challenge).

The FTC's cases reveal the limits of its position.  In *FTC v. Hornbeam Special Situations,*

*LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019), the court did not hold "that the FTC's 'reason to

believe' determination could not be reviewed," as the FTC asserts (at 39).  It instead held that

"the FTC ha[d] pled at least some facts to show that it had 'reason to believe' that Defendants

were 'about to violate' the law."  *Hornbeam*, 391 F. Supp. 3d at 1223.  The court also warned

that "the FTC would clearly lack a 'reason to believe' and dismissal would be proper" if, as here,

"the Complaint did not contain any factual allegations from which to infer the law was about to

be violated."  *Id.*  Likewise, in *FTC v. Vyera Pharmaceuticals, LLC*, 479 F. Supp. 3d 31, 44

(S.D.N.Y. 2020), the FTC alleged that the defendants were "engaging in violations of federal

antitrust laws" because the "anticompetitive contracts" the FTC challenged were "still in effect."

**B.**      The FTC's argument (at 41) that Facebook "is violating" Section 2 because it

*possesses* a monopoly is simply wrong.  Section 2 prohibits only "anticompetitive conduct" – the

"mere possession" of a monopoly is not "unlawful."  *Verizon Commc'ns Inc. v. Law Offices of*

*Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see Microsoft*, 253 F.3d at 51 ("merely

possessing monopoly power is not itself an antitrust violation").  The FTC can challenge unlawful

conduct, but it cannot transform a long-closed acquisition into a current violation by arguing

(at 41-42) that the combined firm operates as a "moat" obstructing competition.  *See* FB FTC

Br. 42-43.  The FTC does not allege that Facebook's operation of Instagram and WhatsApp

unlawfully impedes the independent competitive effort of any rival or constitutes a barrier that

prevents entry.  Nor could it:  "effectiveness as a competitor" is not a "barrier to entry, rendering

illicit [Facebook's] acquisition" – it is the essence of competition.  *Syufy*, 903 F.2d at 668; *see id.* at 667-68 (explaining that "aggressive competition is [not] itself a structural barrier to entry").

The agency supports its position with inapposite authority.  In *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 603-05 (1957), the Department of Justice – not subject to Section 13(b) – alleged ongoing wrongful conduct involving the use of a non-controlling stock interest to obtain supply contracts, foreclosing a substantial share of the market.  In *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 225-26 (1975), the Court upheld a fine for ongoing violation of a consent decree – not federal antitrust law – because the consent order covered "both the initial transaction and the maintaining of the rights" acquired in that transaction.  What these cases and the cases that follow them make clear is that ongoing violations require ongoing wrongful conduct.  *FTC v. Western Meat Co.*, 272 U.S. 554, 559 (1926) – in which the FTC proceeded in its administrative forum, where it can challenge past conduct – has no bearing on the agency's Section 13(b) authority in federal court and supports only the uncontroversial proposition that the FTC can take administrative action against a stock acquisition that has not yet ripened (but might soon) into a total acquisition of a competitor's "plant and other property."

C.     The FTC alleges no facts to support the claim that Facebook may reimpose inoperative Platform policies.  The agency alleges no specific enforcement of those policies since 2013.  *See* Compl. ¶¶ 153-156.  Its assertion (¶¶ 149, 172) that Facebook "is likely to reinstitute such policies" is both speculative and conclusory.  *See Twombly*, 550 U.S. at 555-57.  The speculation is made no more plausible by the agency's empty theorizing that at some undefined point Facebook might face less public scrutiny and that it then may wish to reinstate the policies. The Third Circuit properly rejected similar pleading as "woefully inadequate to state a claim under Section 13(b)."  *Shire*, 917 F.3d at 160.  The agency does not even meet its own standard

for showing imminence.  *Cf. FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) ("the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and . . . the character of the past violations") (citation omitted); *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 467 (D. Md. 2020) (listing six factors relevant to finding a "cognizable danger of recurring violation").  Instead, the FTC asserts (at 42) that Facebook has not "disavowed the relevant policies," while also acknowledging that Facebook publicly "suspended" those policies, which are no longer "continued" (¶ 77) – the FTC does not cite any case that would (or could consistent with the statutory text) require more.

The allegation (¶ 172) that Facebook "continues to monitor the industry for competitive threats, and likely would seek to acquire" such competitors, adds nothing.  Monitoring "the industry for competitive threats" is not a violation of federal antitrust law; it is legitimate competition.  And the FTC's "would seek to acquire" assertion is speculation not anchored to any facts.  If the FTC can use Section 13(b) to challenge concededly past conduct by alleging that a firm "can" violate the law in the future (*see* FTC Opp'n 42) – with no facts showing the violation to be imminent – then there is no limit to the FTC's authority.  That is plainly not what Congress intended.  *See Shire*, 917 F.3d at 159.

## CONCLUSION

The immense power of government enforcers comes with limits.  Firms must be able to rely on existing law when they organize their affairs and cannot fairly be subjected to new legal standards for long-past transactions.  *See*, *e.g.*, Robert Pitofsky, *Proposals for Revised United States Merger Enforcement in a Global Economy*, 81 Geo. L.J. 195, 223-24 (1992) (it would be "anathema" to antitrust law to hold companies liable for developments that "would have been unpredictable at the time the transaction was entered into").  The Court should grant the motion and dismiss the FTC's complaint in its entirety.

Respectfully submitted,

April 21, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
L. Vivian Dong (D.C. Bar No. 1722506)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*