**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

FACEBOOK, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

**MEMORANDUM IN SUPPORT OF
FACEBOOK, INC.'S MOTION TO DISMISS
THE FTC'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 6

I.     THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY
       ESTABLISHING MONOPOLY POWER ........................................................... 6

       A.     The FTC Fails To Cure the Fatal Deficiency the Court Identified
              Because the Agency Alleges No Facts Plausibly Supporting Any
              PSNS Market Share ................................................................................. 6

       B.     The FTC's Alleged Facts Undermine Its Claim of Barriers to Entry ... 13

       C.     The FTC Still Has No Facts To Support Its "Rare" Direct-
              Evidence Theory .................................................................................... 16

II.    THE FTC HAS NOT PLAUSIBLY ALLEGED LEGALLY
       COGNIZABLE EXCLUSIONARY CONDUCT .............................................. 20

       A.     The FTC Fails To Allege a Plausible Section 2 Acquisition
              Challenge ............................................................................................... 20

       B.     The FTC's Attempt To Revive Dismissed and Defective Platform
              Allegations Fails as a Matter of Law .................................................... 33

III.   THE FTC'S VOTE PURPORTING TO AUTHORIZE THE AC WAS
       INVALID; THE COURT SHOULD ACCORDINGLY DISMISS THE
       AC .................................................................................................................... 38

       A.     Chair Khan's Prejudgment of Facebook's Liability Required Her
              Recusal ................................................................................................... 40

       B.     In the Absence of a Valid Commission Vote, the AC Must Be
              Dismissed ............................................................................................... 44

       C.     In the Alternative, the Court Should Stay the Case and Remand to
              the FTC To Resolve the Recusal Issue Now .......................................... 45

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES[*]

Page

CASES

* *Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011).......................................................39, 45

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ................................30

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235
    (3d Cir. 1987)......................................................................................................................31

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
    (9th Cir. 2010)......................................................................................................................4

* *Am. Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966)...........................................................41

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021) .............................................................36

*Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962)..........................................................45

* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................6, 12, 22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)...................................36

*Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577
    (D.C. Cir. 1984) ..................................................................................................................30

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)............................................................................................................11

*BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116 (3d Cir. 2021).......................................................17

* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................1, 3, 6, 10, 11, 13,
    15, 22, 26, 27, 28, 29

* *Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26 (D.D.C. 2017), *aff'd*,
    720 F. App'x 1 (D.C. Cir. 2018)...................................................................................33, 34

*Bigio v. Coca-Cola Co.*, 2010 WL 3377503 (S.D.N.Y. Aug. 23, 2010), *aff'd*,
    675 F.3d 163 (2d Cir. 2012)...............................................................................................34

*Blackbook Cap., Inc. v. Fin. Indus. Reg. Auth., Inc.*, 2021 WL 1827268
    (D.N.J. May 5, 2021) .........................................................................................................34

[*] Authorities principally relied upon are marked with an asterisk.

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406
(7th Cir. 1995)..................................................................................20

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612
(S.D.N.Y. 2013)...............................................................................10

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606
(W.D. La. 2016)................................................................................25

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................21

* *Cinderella Career Coll. & Finishing Schs., Inc. v. FTC*, 425 F.2d 583
(D.C. Cir. 1970) ...........................................................................40, 44

*Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) ..........................39

*Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562 (S.D.N.Y. 2021) .......................40

*CREW v. Pompeo*, 2020 WL 5748105 (D.D.C. Sept. 25, 2020) ...................................6

*Cummings v. City of New York*, 2021 WL 1163654 (S.D.N.Y. Mar. 26, 2021),
*appeal pending*, No. 21-1380 (2d Cir.)...............................................34

* *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018).............................23, 27

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002) .............................................................22, 29

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
*aff'd*, 724 F. App'x 556 (9th Cir. 2018) .........................................21, 26

*Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925
(N.D. Cal. Sept. 10, 2021), *appeal pending*, No. 21-16506 (9th Cir.)..............................17

*Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910 (9th Cir. 2003)............................14

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. July 20,
2010) .............................................................................................38

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ........................39

*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015).........................28

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) .........................27

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 2015 WL 4036319
(D. Colo. July 1, 2015)....................................................................34

*FTC v. Guignon*, 390 F.2d 323 (8th Cir. 1968) ..............................44

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................................................23

\* *FTC v. Libbey, Inc.*:

    211 F. Supp. 2d 34 (D.D.C. 2002) ....................................................................................44

    No. 1:02-cv-00060-RBW, ECF No. 76 (D.D.C. Apr. 3, 2002) ........................................39

\* *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)............................................32, 36, 37

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ..................................................24, 25

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir. 2016) ...............................44

*ICC v. S. Ry. Co.*, 543 F.2d 534 (5th Cir. 1976) ........................................................................44

*Indep. Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155 (C.D. Cal. 2002), *aff'd in part, rev'd in part, and remanded sub nom. Indep. Ink, Inc. v. Ill. Tool Works, Inc.*, 396 F.3d 1342 (Fed. Cir. 2005), *vacated and remanded*, 547 U.S. 28 (2006) .................................................................................................... 11-12

*Jones v. Shea*, 532 A.2d 571 (Vt. 1987) .....................................................................................43

\* *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) ..............................................................9

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996)..................................................................33

*Lowry v. Soc. Sec. Admin.*, 2000 WL 730412 (D. Or. June 7, 2000) ...........................................39

*Marchese v. Cablevision Sys. Corp.*, 2011 WL 3022529 (D.N.J. July 21, 2011) ...........................9

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002)...............................8

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422 (9th Cir. 2020)..........................8

\* *New York v. Facebook*, --- F. Supp. 3d ---, 2021 WL 2643724 (D.D.C. June 28, 2021), *appeal pending*, No. 21-7078 (D.C. Cir.)......................................................35, 36

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)...................................................................16

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) .......................................... 16-17

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020)..................38

\* *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ........................8, 10

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .................11

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012) ...................38

*Set-Top Cable Television Box Antitrust Litig., In re*, 2011 WL 1432036
   (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016)..................................................................................8

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016) .........................9

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479 (6th Cir. 2021)...............35

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ....................................................32

*State v. Gonzales*, 119 P.3d 151 (N.M. 2005)..................................................................43

*State v. Hohman*, 420 A.2d 852 (Vt. 1980) .....................................................................43

*State v. King*, 956 So. 2d 562 (La. 2007)..........................................................................43

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)...........................23

*Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 763 F. Supp. 2d 1341
   (S.D. Fla. 2011), *aff'd*, 711 F.3d 1264 (11th Cir. 2013)..........................................31

*Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) .........9

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .......................................................................21

* *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ..............................19

*Top Rank, Inc. v. Haymon*, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015).......................9

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ...............................................................6

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ......................................27

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911)................................................25

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C.), *aff'd*, 855 F.3d 345
   (D.C. Cir. 2017) .....................................................................................................23

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*,
   916 F.3d 1029 (D.C. Cir. 2019)...............................................................................16

* *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).....................15, 21

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) .........................25

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)....................................................25

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .........................23

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ............................................27

*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) ..............................29

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ..........................................3, 16, 17

\* *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..................................................14, 31

*Vasser v. McDonald*, 228 F. Supp. 3d 1 (D.D.C. 2016) ..........................................................40

\* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)..............................................................................................................................20, 22

*Wilcox v. Georgetown Univ.*, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ...................................39

\* *Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984) ......................................................38, 41, 43

CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const. art. III .......................................................................................................................42

Clayton Act, 15 U.S.C. § 12 *et seq.* ................................................................................. 3-4, 21, 29

    § 7, 15 U.S.C. § 18...............................................................................................3, 4, 21, 23, 27, 29

    § 7A(i)(1), 15 U.S.C. § 18a(i)(1) ...........................................................................................21

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ....................................................32, 36, 42

    § 13(b), 15 U.S.C. § 53(b) .........................................................................32, 36, 37, 39, 44

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 .................................................................................................................22

Sherman Act, 15 U.S.C. § 1 *et seq.* ..........................................................................................3, 20

    § 2, 15 U.S.C. § 2...........................................................................3, 4, 5, 6, 9, 13, 20, 21, 25, 26, 30, 31, 32, 35, 37, 40

5 C.F.R. § 2635.501(a).................................................................................................................43

16 C.F.R. § 1.61 ...........................................................................................................................44

Fed. R. Evid. 201 .........................................................................................................................39

LEGISLATIVE MATERIALS

Majority Staff of Subcomm. on Antitrust, Com. & Admin. Law of the H. Comm. on
the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets:
Majority Staff Report and Recommendations* (Oct. 2020),
https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf..........40-41

ADMINISTRATIVE MATERIALS

Fed. Trade Comm'n:

Compl., *In re Snapchat, Inc.*, File No. 132 3078 (FTC May 8, 2014)..............................18

Dissenting Statement of Commissioner Christine S. Wilson, *Facebook,
Inc.*, Matter No. 1910134 (Aug. 19, 2021), https://www.ftc.gov/system/
files/documents/public_statements/1594737/facebook_-_dissenting_
statement_-_first_amended_complaint_-_final.pdf................................................22, 39, 42

Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey M.
Klineberg re:  Recusal Petition (Aug. 19, 2021).........................................................39, 42

Facebook, Inc. Pet. for Recusal, *In re Petition for Recusal of Chair Lina
M. Khan from Involvement in the Pending Antitrust Case Against
Facebook, Inc.* (July 14, 2021) .................................................................38, 39, 40, 42, 45

Mem. in Support of Plaintiff FTC's Mot. for Temp. Restraining Order and
Prelim. Inj., *FTC v. Steris Corp.*, No. 15-cv-01080-DAP, ECF No. 21
(N.D. Ohio June 4, 2015)...............................................................................................23, 24

Press Release, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury
Scheme to Crush Competition After String of Failed Attempts to Innovate,
FTC (Aug. 19, 2021), https://www.ftc.gov/news-events/press-
releases/2021/08/ftc-alleges-facebook-resorted-illegal-buy-or-bury-
scheme-crush......................................................................................................................42

Reorganization Plan No. 8 of 1950, 15 Fed. Reg. 3175 (May 25, 1950) .........................43

Statement of Commissioner Christine S. Wilson Regarding the
Announcement of Pre-Consummation Warning Letters (Aug. 9, 2021),
https://www.ftc. gov/system/files/documents/public_statements/
1593969/pre-consummation_warning_letters_statement_v11.pdf....................................22

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ...........22, 23

OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

    Vol. IV (2d ed. 1998) ..........................................................................................29

    Vol. IVA (4th ed. 2020) .....................................................................................32

    Vol. V (4th ed. 2020) .........................................................................................27

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3
    (1940) ................................................................................................................43

Lina Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active)
    [https://perma.cc/9GB5-F78G (visited Oct. 4, 2021)] ......................................40

Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973
    (2019) ................................................................................................................41

Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*,
    133 Harv. L. Rev. 497 (2019) ...........................................................................41

N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 683 (June 7, 1996),
    https://nysba.org/app/uploads/1996/06/Opn683.pdf..........................................43

*New York v. Facebook, Inc.*, No. 1:20-cv-3589-JEB (D.D.C.):

    Mem. in Support of Facebook, Inc.'s Mot. To Dismiss States' *Parens
    Patriae* Compl., ECF No. 114-1 (Mar. 10, 2021) .............................................37

    Reply Br. in Support of Facebook, Inc.'s Mot. To Dismiss States' *Parens
    Patriae* Compl., ECF No. 123 (Apr. 21, 2021)................................................37

    States' Mem. in Opp. to Facebook's Mot. To Dismiss, ECF No. 121
    (Apr. 7, 2021)....................................................................................................37

Irving Scher, *Antitrust Adviser* (4th ed. 2001) ............................................................29

## INTRODUCTION

The Federal Trade Commission ("FTC") alleged no plausible factual basis for branding Facebook an unlawful monopolist.  *See FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, No. 20-3590, ECF No. 73, at 27 (D.D.C. June 28, 2021) ("Op.").  This Court gave the agency a second chance to make a valid claim.  But the same deficiency that was fatal to the FTC's initial complaint remains:  the Amended Complaint, ECF No. 82 ("AC"), still pleads no facts plausibly establishing that Facebook has, and at all relevant times had, monopoly power – the power to raise price or restrict output – in what the Court characterized as the "idiosyncratically drawn" "Personal Social Networking Services" ("PSNS") market.  Op. 27.  The FTC's initial complaint asserted the unsupported conclusion that Facebook had "in excess of 60%" of that alleged market.  Compl. ¶ 64, ECF No. 51.  The agency provided no facts to support either the numerator (Facebook's portion of the PSNS market) or the denominator (the total alleged PSNS market), and it offered no plausible means of calculating any market share.  The AC repeats previously rejected arguments, but adds no factual allegations supporting the claim of a 60%-plus market share; it merely ratchets up its groundless projection to 70% or even 80%, replacing unsupported assertion with "arguendo" assumption.  The agency has to take this tack because no reliable data exists for its contorted PSNS market, which is a litigation-driven fiction at odds with the commercial reality of intense competition with surging rivals like TikTok and scores of other attractive options for consumers.  The AC rests on guesswork rather than facts and fails the *Twombly* test for multiple reasons.

***The FTC Still Has No Valid Factual Basis for Alleging Monopoly Power.***  The FTC has again failed to allege a plausible factual basis for the necessary claim that Facebook has and had a dominant share of the alleged PSNS market.  The Court dismissed for this reason, but granted leave to amend so that the agency could try to supply the necessary factual allegations.

It has not come close to doing so.  To support its new, supercharged market-share numbers, the FTC relies on commercial data regarding total usage of only three cherry-picked apps: Facebook, Instagram, and Snapchat.  The vendor of this data disclaims any responsibility for its accuracy or completeness.  But the FTC uses it nonetheless to calculate PSNS market share – *even though the data does not even purport to measure PSNS usage*.  Rather, it measures overall usage – including non-PSNS usage.  Admitting this mismatch, the agency asks the Court to *assume* "arguendo" that data from a different market can establish share in the alleged market, without any facts to support that assumption.  This is legally insufficient; as the Court has already warned, aggregate (*i.e.*, non-PSNS) metrics cannot show PSNS market share.  *See* Op. 29-30.  Courts routinely dismiss antitrust claims that rely on data that does not correspond to the market actually alleged.  Our research has disclosed no decision in which a court has permitted a case to proceed based on such admittedly inapposite data paired with conceded guesswork.  The absence of any data, from any source, for a "PSNS" market makes clear that the proposed market reflects the FTC's litigation imperatives – not commercial realities.

The FTC's effort to allege market power through dominant share fails for an additional reason:  the agency still has not alleged any facts plausibly establishing that Facebook's market position was protected by "barriers to entry" that prevented competition.  *See* Op. 18 ("market power is meaningful only if it is durable") (brackets omitted).  Instead, the FTC's factual allegations taken as true establish the opposite:  entry not only was possible, but in fact occurred, including by startups like Instagram and Snapchat.  And the FTC alleges nothing that would prevent services with established networks – the agency names several, including YouTube (Google), iMessage (Apple), Twitter, and TikTok (ByteDance) – from becoming PSNS rivals.  That is exactly what the FTC claims WhatsApp would have done – indeed, that is the sole basis for its challenge to Facebook's acquisition of that company.

The FTC hedges its bets by returning to claims the Court already rejected, without invitation to replead.  It recycles the claim that direct evidence proves Facebook's monopoly power.  But the FTC again fails to allege facts sufficient to support a "rare" case of such direct evidence – that is, facts plausibly establishing that Facebook actually limited output to "'profitably raise prices above the competitive level.'"  *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam)).  The agency effectively acknowledged before that it could not make that case.  *See* FTC Opp'n 8, ECF No. 59 (acknowledging that such proof is "only rarely available").  And for good reason:  Facebook has never charged users any price and has never restricted output – not before it allegedly became a monopolist and never since.  The FTC also reasserts that Facebook's quality is somehow lower and that Facebook's total revenues from advertising somehow indicate monopoly power in a market for free PSNS products.  These assertions differ little from those the Court already found inadequate and do not come close to establishing a plausible, fact-based claim of monopoly power.

***The FTC Still Has No Valid Factual Basis for Claiming That Facebook Maintained Monopoly Power Through Unlawful Exclusionary Conduct.***  To satisfy *Twombly*, the agency must also plead *facts* establishing a plausible claim that Facebook maintained a PSNS monopoly through unlawful "exclusionary conduct."  But, as before, the AC fails to allege facts showing that either Facebook's *cleared* acquisitions or its *lawful* Platform policies violated antitrust law.

As to the acquisitions, the agency offers only *its* speculation that consumers might have better products if Instagram and WhatsApp had remained independent, based on the theory that each might have someday grown into a unique Facebook rival, and *Facebook's* speculation that these firms might become rivals.  Such speculation has *never* been a valid basis for condemning acquisitions as "exclusionary" under Section 2 of the Sherman Act.  Tellingly, the agency itself reviewed and cleared the Instagram and WhatsApp transactions under Section 7 of the Clayton

Act, which Congress passed to block acquisitions that could not amount to violations of Section 2. No such cleared acquisition has *ever* been found years later to violate Section 2.

What the agency is doing here is patent:  it seeks to upend settled law.  Indeed, it seeks to do so twice over, asking the Court both to condemn under Section 2 acquisitions that the FTC cleared under Section 7, and to do so based on a novel "nascent competitor" theory that conflicts with decades of settled antitrust precedent.  The FTC falls back on arguing that acquisitions can be unlawful merely because they "neutralize" independent firms.  But that cannot be the law because it would condemn every acquisition of an actual or potential competitor.

Taking the allegations in the AC as true, the FTC actually establishes the legality of Facebook's acquisitions when it alleges that Facebook used Instagram and WhatsApp to broaden its competitive "moat" by operating both acquisitions "at scale" and introducing superior services and features – making them more popular with consumers.  Those allegations demonstrate that the transactions were procompetitive success stories.  Every firm, including an alleged monopolist, is legally privileged to improve its product and service offerings for the benefit of consumers.  *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010).  That is the essence of competition that the antitrust laws protect, not exclusionary conduct that the antitrust laws forbid.

Regarding the Platform allegations, the FTC simply ignores the Court's prior, controlling, and correct decision.  The AC reiterates rejected allegations and adds rhetoric but no material facts.  As this Court explained after review of the Platform policies themselves, those policies were lawful, and the agency lacks authority to litigate long-past applications of the policies.  *See* Op. 39.  And, once again, the agency has no facts whatsoever to establish a plausible claim that policies ended in 2018 and last enforced even earlier are "imminently" to be restored, much less

that such policies will imminently be enforced in a manner that will somehow squeeze through any "narrow-eyed needle" that may still be open for such claims.  Op. 36.

***The AC Was Not Approved by Valid FTC Vote; the Chair Should Have Been Recused.***
The FTC's vote to authorize the AC was invalid, and the AC should be dismissed for that reason. The new Chair cast the decisive vote in a split 3-2 decision.  As Facebook demonstrated in its Petition to recuse the Chair from participation in this proceeding, the Chair's authorship of a House Judiciary Subcommittee report asserting that Facebook has violated Section 2 – among other ad hominem public charges – at the very least creates the appearance that the Chair has prejudged the facts and cannot be unbiased or impartial.  *See* Hansen Decl. Exs. A, B.  The Chair's participation in the proceeding violates both basic due process safeguards and federal ethics rules.  The FTC refused even to consider the Petition on the merits.  It instead took the remarkable position that due process and federal ethics rules *do not apply* except when the Commissioners are engaged in rulemaking or sitting as judges in an administrative proceeding. That is not the law.

* * *

It is now clear that the agency had no basis for its naked allegation that Facebook has or had a monopoly PSNS market share and no facts to support a claim that barriers to entry prevented the vigorous competition and output expansion that have, in fact, occurred.  The FTC challenges acquisitions that the agency cleared after its own contemporaneous review and that resulted not in harm but product improvements, price cuts, and dramatic output expansion to the benefit of many millions of U.S. consumers (all for free, in unlimited quantities).  And the agency relitigates claims concerning Platform policies and long-past applications of those policies that this Court already properly dismissed.  The case is entirely without legal or factual support. This is as true now as it was before.  The case was refiled, on a 3-2 vote, by an agency that seeks

unapologetically to expand antitrust law beyond its settled and appropriate bounds.  The Court

should now dismiss the FTC's case with prejudice.

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a

claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

omitted), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007).  The Court should not accept as true "'a legal conclusion couched as a factual

allegation,' [or] an inference unsupported by the facts set forth in the Complaint."  *CREW v.*

*Pompeo*, 2020 WL 5748105, at *4 (D.D.C. Sept. 25, 2020) (quoting *Trudeau v. FTC*, 456 F.3d

178, 193 (D.C. Cir. 2006)).

## ARGUMENT

## I.    THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY ESTABLISHING MONOPOLY POWER

### A.    The FTC Fails To Cure the Fatal Deficiency the Court Identified Because the Agency Alleges No Facts Plausibly Supporting Any PSNS Market Share

The Court correctly held that an essential element of any Section 2 claim is the power

to raise price substantially above and restrict output substantially below competitive levels.

*See* Op. 18.  The Court also correctly held that the FTC had not provided *any facts* supporting

a plausible case of monopoly power in the "idiosyncratically drawn" PSNS market it defined.

Op. 27.  Rejecting the agency's half-hearted assertion that it could offer direct proof of

Facebook's power, *see* Op. 19, the Court directed the FTC to plead facts, if it could, to support

its opening assertion that Facebook had, at all relevant times, a PSNS market share "in excess of

60%," Compl. ¶ 64.  This was the specific task set for the agency.  *See* Op. 32 (directing FTC to

"cure *these* deficiencies") (emphasis added) (cleaned up).

But given nearly two months to supplement its deficient allegations, which followed a year and a half of exhaustive investigation, the agency has returned with no facts plausibly supporting its claim that Facebook had and has a greater than 60% share – now upped to 70% or 80% – of the alleged PSNS market.  It is now evident that the FTC's monopoly-power allegation was "naked" all along.  Op. 2.

1.    ***The FTC's avowedly inapt Comscore data measuring non-PSNS usage provides no plausible basis for an allegation of PSNS market share.***  The Court's initial ruling was expressly tied to its recognition that "some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC."  Op. 29-30.  To strategically exclude many of the obvious rivals that compete with Facebook for user time and attention online, the FTC claims that a service is in the alleged market only if it offers a peculiarly defined, three-element feature; and then only if consumers "primarily" use that feature instead of all other features the service offers; and then only if consumers use that primary feature for the specific purpose of sharing content with friends and family.  AC ¶¶ 166-168; 172-176.  Because of "the uncertainty left open by the Complaint as to exactly which features of Facebook, Instagram, *et al.* do and do not constitute part of their PSN services," the FTC assumed the burden of alleging Facebook's share of this "idiosyncratically drawn" market for PSNS use – not the market for all time spent on apps that have PSNS features.  Op. 27, 30.

But that is exactly what the FTC has failed to do, ignoring the Court's warning that "time spent 'on Facebook' or 'on Instagram' bears an uncertain relationship to the actual metric that would be relevant:  time spent using their PSN services in particular."  Op. 30.  The agency relies on a commercial data source (Comscore) that does not track PSNS usage; it instead tracks users of online services and total time spent on those services (PSNS and non-PSNS alike).  Comscore itself warns against reliance on this data, disclaiming responsibility for its "accuracy or

completeness." AC ¶ 182 n.1.  But, apart from that fatal flaw, the Comscore data does not even purport to measure PSNS usage.  The FTC does not claim otherwise, alleging in the AC only that Facebook's "share of the time spent by users of apps *providing* [PSNS]" has exceeded certain thresholds. *Id.* ¶ 199 (underlining removed; emphasis added).  That measures the wrong thing: *not* PSNS usage, but overall time spent using all of an app's features, including, *e.g.*, interest-based broadcast or discovery (*id.* ¶ 174), "video or audio consumption" (*id.* ¶ 175), "content broadcasting and consumption" (*id.* ¶ 176), and the many other things Facebook and Instagram offer other than "friends and family" PSNS sharing.

The Court's skepticism of data measuring all time spent on Facebook and Instagram was well-founded:  estimates of overall usage are legally insufficient to support a plausible allegation of market share in the specific PSNS market the FTC defined.  *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (affirming order granting motion to dismiss antitrust claim where plaintiff sought to "infer" power in the alleged market from "statistics indicating" that defendant was "an important player" in a different market); *see also Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423-24 (9th Cir. 2020) (affirming dismissal where market-share statistics did not match the alleged market).  "It would be as if [the FTC] had adequately alleged a product market consisting of orange juice, but relied on the defendant's position in the overall beverage industry as evidence of market power."  *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011) (granting motion to dismiss), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016).  Accordingly, data showing "a defendant's market share in a market other than the alleged relevant market is irrelevant."  *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1212 (11th Cir. 2002) (affirming order directing verdict in favor of antitrust defendant

because, "as a matter of law," the asserted "market share could not be imputed to the alleged

relevant market" based on data from a "separate market").

Courts, therefore, routinely dismiss antitrust claims where there is a mismatch between

statistics used to claim monopoly power and the market actually alleged.  *See Kaufman*, 836 F.3d

at 147-48 (affirming order granting motion to dismiss because plaintiffs "cannot plausibly derive

Time Warner's market power over Premium Cable Services from broad allegations about the

nationwide market for basic cable"); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462,

483-84 (S.D.N.Y. 2016) (rejecting "vague generalities about the [alleged] market . . . combined

with evidence about trading in specific spread contracts"); *Top Rank, Inc. v. Haymon*, 2015 WL

9948936, at *8 (C.D. Cal. Oct. 16, 2015) (granting motion to dismiss Section 2 claim where

market-power allegations were "disconnected from the relevant market definition"); *Marchese v.

Cablevision Sys. Corp.*, 2011 WL 3022529, at *4 (D.N.J. July 21, 2011) (dismissing antitrust

claims where market-share allegations "conflate[d]" different product markets).  Indeed, the

FTC's present effort to allege power in a market by reference to share in another is "[e]ven more

problematic" than the agency's initial attempt to allege power by "randomly" asserting a market

share (*see* Compl. ¶ 64) because it confirms the absence of any facts as to "market share in th[e]

particular product market" actually alleged.  *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL

4473228, at *11 (E.D. Pa. Sept. 28, 2012) (granting motion to dismiss antitrust counterclaims

with prejudice).

The FTC asks the Court to accept a square peg pounded, futilely, into a round hole.

The agency includes in the numerator of its market-share calculation time spent using features

of Facebook and Instagram that are outside its alleged market and for which Facebook faces

competitors like YouTube, TikTok, LinkedIn, Twitter, and others (*i.e.*, non-PSNS time spent on

Facebook and Instagram).  At the same time, the FTC omits from the denominator all time spent

on PSNS using apps that the FTC asserts are not "primarily" PSN services (*e.g.*, YouTube, TikTok, LinkedIn, Twitter, and others), regardless of whether users spend PSNS time on those services. *See Rick-Mik*, 532 F.3d at 973 (rejecting share statistics that "do not distinguish between [in-market] sales and other potential types of sales"). This mix-and-match predictably inflates the FTC's market-share figure while providing no coherent basis to infer anything about how competition works in the real world. This "self-undermining" attempt to infer PSNS market share from an amalgamation of total time spent in concededly "distinct" markets cannot support a "reasonabl[e] infer[ence]" of power in the market actually alleged. *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (granting motion to dismiss). Like the FTC's initial complaint, the AC says "nothing concrete on the key question of how much power Facebook actually had, and still has," in the alleged market. Op. 31.

2.    ***The FTC cannot overcome this pleading defect by speculating as to PSNS time spent.*** The FTC alleges no facts regarding how much time spent on Facebook "was not in fact spent using personal social networking services." AC ¶ 202. That should foreclose its claim. Indeed, the fulcrum of its allegation is hypothesis: the FTC expressly asks the Court to "assume" various possibilities, including the chance "that half of the[] time" spent on Facebook is PSNS time. *Id.* The FTC alleges no more basis for a 50% assumption than a 20% assumption or an 80% assumption (or its earlier 60% market-share assertion). Alleging what is "conceivable" does not make an assertion "plausible" – this is precisely the conclusory approach the Supreme Court has prohibited. *See Twombly*, 550 U.S. at 570. *Twombly* simply does not countenance assuming "arguendo" that just enough time spent on Facebook qualifies as time in the alleged market sufficient to establish power; this is rank "speculati[on]" that invites the Court to reach the agency's desired "legal conclusion." *Id.* at 555. The Supreme Court has instructed that "[i]t is not . . . proper to assume that the [antitrust plaintiff] can prove facts that it has not alleged."

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526

(1983); *see id.* at 545 (holding allegations "insufficient as a matter of law" to state a claim).

Worse, the FTC's proffered assumptions have no factual support.  The FTC alleges

(at ¶ 202) that it "indicate[d]" how Facebook is "predominantly used" and that this "indicat[ion]"

somehow supports its pleading-by-assumption approach.  But the AC is devoid of actual relevant

facts alleging market power or share.  *See Twombly*, 550 U.S. at 556 (requiring "factual matter").

Indeed, what few facts the FTC pleads (at ¶ 178) do nothing to ground its numerical claims:

- Facebook's recognition that friends and family sharing is one important part of its multi-feature service cannot overcome the lack of any facts supporting allegations of PSNS share or time spent.

- Stray comments from Mark Zuckerberg and Sheryl Sandberg that Facebook is "about real connections to actual friends" and documents stating that Facebook is "focused" on connecting "friends and family" say nothing about what percentage of time spent on Facebook is PSNS.

- A snapshot 2018 poll finding that consumers use Facebook to follow "people [they] care about" – which could, of course, include celebrities, influencers, athletes, friends, or family – likewise says nothing about how much time this activity takes relative to others, let alone what PSNS usage was like in 2012 or what it is like today.

Circuit precedent forecloses the FTC's reliance on these vague, unquantified, and

conclusory observations, which – on their face – provide no support for the math the FTC asks

the Court to assume.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219

(D.C. Cir. 1986) ("[G]eneral comments were not evidence of anything, and, in particular, they

were certainly not evidence that the industry recognized some specific submarket as a 'separate

economic entity.'").  Such "non-economic, qualitative descriptions of market success are

insufficient to establish that an antitrust defendant exercises market power," particularly where –

as here – the descriptions make no mention of the "relevant product market" actually alleged.

*Indep. Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155, 1172 (C.D. Cal. 2002), *aff'd in part,*

*rev'd in part on other grounds, and remanded sub nom. Indep. Ink, Inc. v. Ill. Tool Works, Inc.*,

396 F.3d 1342 (Fed. Cir. 2005), *vacated and remanded*, 547 U.S. 28 (2006).  If there were

actually a recognized market for PSNS, there would be data that could be used to calculate

shares; there is no such data, and thus, all the agency can do is ask the Court to accept

unsupported assumptions in lieu of plausible facts.

3.     ***The FTC's total MAU and DAU figures cannot plausibly support any PSNS***

***market share.***  The FTC gets no further using its Comscore data to assert that Facebook has

more than 70% of "daily active users" ("DAUs") and 65% of "monthly active users" ("MAUs")

of the under-inclusive set of apps the agency asserts "predominantly" offer PSN services.

AC ¶¶ 200-202.  MAUs and DAUs cannot plausibly be used to calculate relative market share,

both because the same individuals may (and often do) use more than one service and, more

fundamentally, because the mere fact that an individual uses a service says nothing about how

much time (if any) that person spends consuming PSNS on that service.  *Cf. Iqbal*, 556 U.S.

at 679 (claims must be plausible in light of "judicial experience and common sense").  The FTC

even acknowledges some of these shortcomings.  *See* AC ¶ 204 ("DAUs and MAUs do not

reflect a person's intensity of use").  The Court rightly foreclosed reliance on such inapt metrics,

finding that they "might significantly overstate or understate any one firm's market share

depending on the various proportions of users who have accounts on multiple services, not to

mention how often users visit each service and for how long."  Op. 29.  The FTC alleges nothing

new here, and nothing showing that the Court's analysis was wrong before.

* * *

These defects strike at the heart of the claim's plausibility.  The FTC cannot cite any

relevant data because the PSNS construct is a litigation-driven fiction.  After a year-and-a-half

investigation, tens of millions of pages of documents, dozens of investigative hearings, and

review by a staff of economists, the agency fails to cite any data on and does not even have

a single reference – not one – to "personal social networking service" usage.  The FTC's allegations are at most "conceivable," albeit only if one makes the right "assum[ptions]" (AC ¶ 202), but not supported by facts and thus not plausible.  *See Twombly*, 550 U.S. at 570.  The FTC defined a market for which there is no data (none; zero) measuring any firm's share, and the only basis for alleging market shares is admitted guesswork using disclaimed data inconsistent with the market the FTC actually alleges.  No court has ever allowed such a Section 2 claim to proceed.

**B.**     **The FTC's Alleged Facts Undermine Its Claim of Barriers to Entry**

The Court did not need to "address the issue of whether the FTC ha[d] sufficiently alleged entry barriers" in its prior decision.  Op. 27.  But the agency did not allege and still has not alleged such facts.  On the contrary, taking the FTC's allegations as true, the agency has pleaded itself out of court:  its conclusory labels (*e.g.*, "network effects" and "switching costs") are undone by its allegations that other service providers with substantial networks could add PSNS offerings along with other services.  Simply put, the FTC's entire basis for challenging Facebook's alleged conduct is squarely inconsistent with the assertion that entry barriers protect the alleged PSNS market.  *See* AC ¶¶ 108-109 (alleging that a firm can build a network outside the PSNS market, where Facebook has no power, and then add "additional features and functionalities" to build a PSNS offering).

As the Court explained, "a plaintiff proceeding by the indirect method of providing a relevant market and share thereof must also show that there are 'barriers to entry' into that market."  Op. 18.  The FTC asserts the pure conclusion (at ¶¶ 212-213) that network effects and switching costs impede building a PSNS from scratch.  But its theory of the case is that "differentiated" firms can "gain[] scale" outside of the PSNS market and then – once the non-PSNS network is established – begin "adding additional features and functionalities" to "enter

13

the personal social networking market at competitive scale." AC ¶¶ 9, 66, 108.  Without those

allegations, the FTC has no theory of exclusionary conduct.  It alleges Facebook bought

Instagram and WhatsApp to prevent them from developing a non-PSNS "mechanic" to gain

scale and then adding PSNS features.  *See id.* ¶¶ 212-217.  Its allegation concerning acquisitions

is that the targets might grow into significant threats.  *See id.* ¶¶ 66, 68-69, 71, 74.  And its

(already dismissed) Platform allegations are similarly directed at Facebook's supposed efforts

to discourage competitors from offering competitive PSNS features.  *See id.* ¶¶ 130, 157-158.

As to network effects, the agency alleges that non-PSNS firms are able to grow to

massive scale outside the PSNS market; WhatsApp, for example, "had more than 450 million

monthly active users worldwide and was gaining users at a rate of one million per day."  *Id.*

¶ 113.  Yet the FTC itself identifies at least a half dozen other networks that achieved huge scale.

*See id.* ¶ 114 (Apple's iMessage), ¶ 175 (Google's YouTube), ¶ 176 (ByteDance's TikTok),

¶ 185 (Snapchat), ¶ 174 (Twitter and Pinterest), ¶ 173 (LinkedIn and Strava).  Such service

providers are not prevented from entering the (supposed) PSNS market by any "direct network

effects" (AC ¶ 212) because they already have huge networks (including many of the same

people who use Facebook).  *See* Op. 29.  And such networks are not deterred by switching costs,

because a user can multihome, building and enriching connections on one network as they

migrate their usage to the PSNS they prefer.  *See id.* (noting that "users . . . have accounts on

multiple services").  "Network effects" are not the issue for competitors; the stiff competition

provided by Facebook is.  And the FTC cannot support a claim of "entry barriers" merely by

alleging that users prefer Facebook's products to those offered by competitors.  *See United States

v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990) (holding that, as a matter of law, product

efficiency and quality are not and cannot be "a structural barrier to entry"); *cf. Epicenter

Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910, 911-12 (9th Cir. 2003) (holding that a firm's

"good reputation" for high-quality service is not "itself an entry barrier" where customers can "switch to different or additional vendors at will").

This is no mere tension, but a glaring contradiction at the heart of the FTC's case, which depends on the theory that Facebook was genuinely threatened in its (supposed) PSNS monopoly by *any* service provider that attained a network of significant scale.  The AC offers no plausible way to square two of its core allegations:  that (1) Instagram and WhatsApp had the ability to leverage a growing network by "adding additional features and functionalities" to become a PSNS, AC ¶ 108; but (2) at the same time massive firms like Google, Apple, Twitter, Snapchat, Microsoft, and ByteDance could not do the same, *see id.* ¶ 90 (alleging Instagram was a "small team" with "10-25 employees").  That forecloses the FTC's claim.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 988 (D.C. Cir. 1990) (Thomas, J.) (noting that it is sufficient to preclude a merger challenge if "the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs," and that defendants "need not show that any firm *will* enter the relevant market").

The FTC has asserted, and will surely say again, that Instagram and WhatsApp were different – and that Facebook clairvoyantly acquired the only two companies worth worrying about.  But where, as here, the agency *alleges facts* showing that entry barriers were no obstacle for some firms, more must be pleaded than the naked assertion that those firms were special. *See Twombly*, 550 U.S. at 555 (requiring facts, "more than labels and conclusions," "to raise a right to relief above the speculative level").  The conclusory allegations (at ¶¶ 66-67, 184) that Instagram (photos), WhatsApp (messaging), and Snapchat (ephemeral content) developed unique "social mechanics" that "differentiated" them from Facebook – allowing each to build massive networks and then pivot into the PSNS market – do not plausibly explain why other firms, with other social mechanics, were and are not similarly free to differentiate, enter, and compete.

The FTC does not allege, nor could it plausibly assert, that there are only three (or four or forty) "mechanics" for engaging with content online; this universe, which the FTC does not allege Facebook hinders, is limited only by human ingenuity and imagination.  The FTC even alleges (AC ¶ 151) that the next "technological transition" – "use of artificial intelligence" or the "metaverse" – is looming and will impose "acute competitive pressures" on Facebook. *Cf. United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018) (explaining that emerging technological "revolution" with a "transforming" effect on how consumers use products dramatically undermines the likelihood of anticompetitive effects), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

### C.      The FTC Still Has No Facts To Support Its "Rare" Direct-Evidence Theory

Hedging its bets, the agency returns with a theory that it need not cure its market-share fiction, because it can directly allege monopoly power.  The Court correctly determined before that the FTC failed to state a claim of monopoly power based on supposed "direct proof." Op. 19.  Indeed, in opposition to Facebook's first motion to dismiss, the agency admitted that "'direct proof' that a defendant has monopoly power is 'only rarely available.'"  FTC Opp'n 8 (quoting *Microsoft*, 253 F.3d at 51).  The Court did not invite the agency to try again on this theory.  But the FTC has tried again anyway, still – as before – without alleging any facts establishing that this is one of those "rare" cases.

The "ability to profitably restrict output and set supracompetitive prices is the *sine qua non* of monopoly power."  *Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008).  The FTC alleges neither.  Price is still zero and output has exploded, and not only for Facebook.  For instance, Snapchat, an alleged PSNS provider that did not exist before 2011 (when Facebook supposedly achieved dominance), has grown to "about 75 million" monthly users who spend hundreds of millions of minutes on the app each day.  AC ¶ 185.  *See Rebel Oil Co. v. Atl.*

*Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (stating that "undisputed evidence indicat[ed] that competitors have expanded output" and that this can warrant "summary disposition" because "expansion by competitors would suggest that the defendant . . . lacked the market power to control marketwide output in the first place"). And Facebook is a price cutter, having made WhatsApp free after the acquisition. *Cf.* AC ¶¶ 60, 127, 226. These allegations foreclose a finding of direct evidence of power. *See Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925, at *95 (N.D. Cal. Sept. 10, 2021) (expanding output forecloses finding of "direct evidence of monopoly power," even if – unlike here – prices are "higher"), *appeal pending*, No. 21-16506 (9th Cir.).

       1.     ***Past privacy concerns cannot establish monopoly power.*** The FTC alleges (at ¶ 207) that the Court can infer market power from the fact that the *agency* itself complained about Facebook's "user privacy" practices and that Facebook settled those allegations. No court has ever endorsed the theory the FTC espouses here: that the amount of "privacy" on a service can demonstrate monopoly power. To even articulate a theory based on service quality, the agency would need facts plausibly establishing that Facebook's *overall* PSNS quality was *substantially* below a competitive level. But the FTC has not alleged that Facebook's overall PSNS quality – of which "privacy" could be one aspect – has diminished at all, let alone substantially below a competitive level. And just as price increases cannot be alleged as direct evidence of power in the absence of facts showing that the increase is above a competitive baseline, so too a quality decrease would need to be shown to be substantially below the competitive level. *See*, *e.g.*, *Microsoft*, 253 F.3d at 51 (actionable exercise of power must drive quality "substantially" below the "competitive level"); *cf. BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021) ("[P]rice increases, without more, do not constitute

supracompetitive pricing."). The FTC makes no attempt to allege a competitive baseline of "privacy" or even of PSNS quality generally.

There is no logical or legal connection between the FTC's privacy-related suits and monopoly power: the FTC charges *many* firms – including those that the FTC alleges in this case have no market power – with similar defects. *See* Compl., *In re Snapchat, Inc.*, File No. 132 3078 (FTC May 8, 2014); *see also* Op. 9 ("[T]he Court may take judicial notice of . . . public agency action."). Furthermore, beyond the mere conclusion, the agency has alleged no facts showing that any privacy-related aspect of quality has declined at all: it alleges *nothing* about Facebook's privacy features today, let alone net PSNS quality of which "privacy" could be one dimension. For example, the FTC itself alleges (at ¶¶ 46, 49-50) that Facebook collects data to improve "rich ad targeting," which is a benefit both to Facebook's advertisers – which get a better advertising product – *and* to its users, who get a free service supported by relevant and "interactive ads" of such high quality that they "can be similar in appearance to" and "resemble 'native' content" the user chooses to view. In any event, there is not even a conclusory allegation that "privacy" or total quality on Facebook can be measured objectively, much less measured as below a competitive level at any point in time.

The agency's theory is also illogical on its face. As the FTC acknowledges (at ¶ 202), PSNS accounts for only *part* of the time users spend on Facebook. *See also* Op. 29-30. Using its "arguendo" assumption that 50% of time spent on Facebook is outside the supposedly monopolized market, any claimed reduction in quality across the entire Facebook service would logically – were the agency's allegations plausible – nudge time spent away from Facebook, at least as to features that other services admittedly offer. But while the agency claims that Facebook degraded user privacy with respect to *all* features that Facebook offers – not just PSNS, *see* AC ¶¶ 205-207 – it also alleges Facebook has maintained overall growth despite

18

competition from, among many others, YouTube and TikTok for "video . . . consumption" (*id.* ¶¶ 175-176), Twitter for "topics that interest" users (*id.* ¶ 174), and iMessage for messaging (*id.* ¶¶ 114, 172).  The FTC does not (and could not) plausibly allege that the fallout from Cambridge Analytica (*id.* ¶ 206) or the reaction to Facebook's settlement with the FTC (*id.* ¶ 207) somehow affected only Facebook's PSN services, *i.e.*, the only market in which the FTC alleges that Facebook has power.  Facebook has succeeded overall – not only in the supposedly monopolized market, but also in markets where it faces vigorous competition.  If the FTC's theory were plausible, and Facebook had deliberately reduced the quality of its entire product, that could not have occurred.

       **2.**    ***Total Facebook revenues cannot establish PSNS power.***  The FTC's allegation (at ¶¶ 208-209) that the Court can infer Facebook's market power from the revenues its *advertising* business earns ignores the Court's conclusion that "[t]he overall revenues earned by PSN services cannot be the right metric for measuring market share here, as those revenues are all earned in a separate market."  Op. 29.  This is consistent with established antitrust principles the Supreme Court decided long ago.  *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 610 (1953) (antitrust plaintiff must prove the alleged monopolist's "dominant position" in the market alleged, even if defendant "is a dual trader in separate though interdependent markets").

       The FTC compounds this fatal flaw by relying (at ¶ 208) on *all* of Facebook's advertising revenue – not revenue attributed to ads that Facebook shows to users engaging in PSNS specifically.  And, on its own mistaken terms, the allegation misses the mark:  the AC is devoid of any facts that could establish that Facebook's advertising prices are above a competitive level; the AC therefore cannot support a claim of power in some unalleged advertising market, much less in the PSNS market actually alleged.  In any event, "there is not even a good economic

theory that associates monopoly power with a high rate of return" because "competitive firms

may be highly profitable merely by virtue of having low costs as a result of superior efficiency"

or "because it is offering better service." *Blue Cross & Blue Shield United of Wis. v. Marshfield

Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995).

## II.   THE FTC HAS NOT PLAUSIBLY ALLEGED LEGALLY COGNIZABLE EXCLUSIONARY CONDUCT

The FTC's two counts of monopoly maintenance under Section 2 of the Sherman Act fail

for the additional reason that, as before, the FTC fails to allege that Facebook engaged in any

unlawful exclusionary conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,

LLP*, 540 U.S. 398, 407 (2004) (antitrust violation requires facts establishing plausible claim of

"anticompetitive *conduct*").[1]

### A.   The FTC Fails To Allege a Plausible Section 2 Acquisition Challenge

The agency seeks to enjoin, almost a decade after the fact, two acquisitions based on a

novel legal theory without precedent:  that cleared acquisitions of "nascent" competitors, or even

non-competitors, can be condemned under Section 2 based on speculation that these firms might

have become powerful rivals, delivering unknowable benefits to consumers at some future date.

The agency has neither law nor factual allegations supporting such a claim here.

**1.   *The FTC's prior clearance renders its belated Instagram and WhatsApp

challenges implausible.*** The FTC's claim that the Instagram and WhatsApp acquisitions were

"anticompetitive" collides with the judicially noticeable fact that the FTC itself cleared both

transactions in 2012 and 2014. *See* Op. 9.  The AC – like the initial complaint – "conveniently

---

[1] Count 1 is based entirely on Facebook's allegedly "anticompetitive acquisitions" – the 2012 acquisition of Instagram and the 2014 acquisition of WhatsApp, with other smaller acquisitions alluded to but briefly; Count 2 adds to that mix Facebook's Platform policies, which the Court previously dismissed from the case.

omits any mention of this review." *Id.* The FTC thus fails to explain why the agency's prior

clearances should not be taken as a strong indication – if not a decisive one – that neither

transaction can support a plausible claim of unlawful or anticompetitive conduct. *See Texaco*

*Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006) ("presum[ing]" that a joint venture was "lawful,"

including because it was "approved by federal and state regulators"); *Eastman v. Quest*

*Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (prior FTC clearance

"weigh[ed] against the conclusion" that acquisition could "be plausibly characterized as an

unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).

The FTC unconditionally cleared both acquisitions under Section 7 of the Clayton Act,

which Congress enacted to address incipient threats to competition that Section 2 *would not*

condemn. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962). This supports

the inference that the agency did not believe (or did not believe it could prove) that a substantial

lessening of competition and resultant consumer harm was likely when Facebook took the risk

of investing in Instagram and WhatsApp. And while the agency can bring post-clearance

challenges, *see* 15 U.S.C. § 18a(i)(1), the FTC's about-face begs for an explanation that is

consistent with the requirement that it plead facts plausibly establishing that anticompetitive

effects were likely at the time of the transactions. *See Baker Hughes*, 908 F.2d at 989. Relieving

the FTC of that burden – particularly where the FTC alleges that Instagram and WhatsApp have

grown and thrived as part of Facebook – risks undermining certainty in the procompetitive

investments that antitrust laws encourage.

Facebook is unaware of any case condemning an FTC-cleared acquisition under

Section 2 years after the fact, and the FTC's unprecedented effort to plow new ground here is

contrary to the purposes of antitrust law. FTC Commissioner Wilson emphasized this in her

dissent from the Commission's 3-2 decision to file the AC: the decision to bring this case

21

"undermine[s] the integrity of the premerger notification process established by Congress and the repose that it provides to merging parties that have faithfully complied with its requirements." Hansen Decl. Ex. C at 1 (Dissenting Statement of Commissioner Christine S. Wilson (Aug. 19, 2021) ("Wilson Dissent")); *see also Trinko*, 540 U.S. at 412 (explaining that "the existence of a regulatory structure designed to deter and remedy anticompetitive harm" – which the Hart-Scott-Rodino Act's clearance provisions supplied here – makes it "less plausible that the antitrust laws contemplate such additional scrutiny"). At the very least, the plausibility of the FTC's allegations must be evaluated against the judicially noticed backdrop of the FTC's prior contemporaneous judgments, which were untainted by hindsight. After *Twombly*, claims must be plausible in light of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The FTC's belated challenges to acquisitions it cleared nearly a decade ago are not.

> **2.**     ***The FTC fails to allege facts to support any claim that the Instagram and WhatsApp acquisitions were unlawful exclusionary conduct.***

**a.**     Acquisitions, even by large or dominant firms, are not presumptively unlawful; most are "benign or beneficial." Hansen Decl. Ex. D at 4 (Statement of Commissioner Christine S. Wilson Regarding the Announcement of Pre-Consummation Warning Letters (Aug. 9, 2021)) ("roughly 95 percent of deals are viewed as benign or beneficial"); *see also Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("horizontal mergers are much more likely to be procompetitive than anticompetitive"). Accordingly, enforcement agencies and courts have developed (and refined) objective standards, grounded in knowable market facts, to identify those transactions that pose an unacceptable risk of harm. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (2010). Successful modern challenges to horizontal mergers have almost invariably rested on factual allegations, and proof supporting those allegations, that the mergers would result in aggregations

of market shares exceeding prescribed numerical thresholds.  *See*, *e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc*., 988 F.3d 690, 703-04 (4th Cir. 2021).

But the FTC alleges no increase in market concentration:  if Instagram had a PSNS market share in 2012, it has not been calculated or alleged; and WhatsApp concededly had no such share in 2014 because the FTC alleges it was outside the PSNS market.  *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763-64 (9th Cir. 2018) (affirming order granting motion to dismiss Section 7 claim where plaintiff failed to allege acquisition increased the acquirer's market share).  An agency applying the *Horizontal Merger Guidelines* in 2012 or 2014 – as the FTC presumably did – could have relied on the absence of any such increase in market concentration to give those proposed mergers clean bills of health.  Courts have relied on these guidelines and have made them part of modern antitrust law.  *See*, *e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 209 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 71-72 (D.D.C. 2011).  They reflect a practical, objective way to discern what is otherwise difficult to predict:  which acquisitions may be likely to result in consumer harm.

The law governing acquisitions has developed largely under Section 7, which Congress enacted to address anticompetitive transactions.  Yet there is no successful Section 7 challenge remotely similar to the agency's claim here.  Indeed, the FTC cannot even satisfy the legal standard that the agency itself previously proposed for potential-competitor acquisitions under Section 7 (a legal standard itself that no court has ever adopted).  *See* Hansen Decl. Ex. E at 6 (Mem. of FTC, *FTC v. Steris Corp.*, No. 15-cv-01080-DAP, ECF No. 21 (N.D. Ohio June 4, 2015)) ("The acquisition of an actual potential competitor violates Section 7 if . . . the competitor 'probably' would have entered the market . . . [and] there are few other firms that can enter effectively.").

23

The FTC has alleged no facts concerning the "objective" likelihood that WhatsApp would be a significant PSNS rival.  *See id.* at 10-11 (stating that assessing the probability of entry requires both "subjective evidence" of intent and "objective evidence" including "financial capabilities" and "management and marketing expertise" relevant to the alleged market); *see also FTC v. Steris Corp.*, 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015) (reciting without accepting the FTC's legal theory, and denying the FTC's motion for a preliminary injunction to halt an acquisition because the FTC could not show the acquiree "probably" would enter the alleged market).  There are no allegations that, before the acquisition, WhatsApp planned or took any concrete preparatory steps to enter the alleged PSNS market, much less facts making a plausible case that such entry was *probable*.

And, although the FTC *asserts* that Instagram was a competitor, the AC alleges that there was little actual overlap between Instagram – then a mobile-only photo-sharing app – and Facebook, which "had grown dominant in the desktop age" and was attempting (allegedly without success) to develop such an app.  AC ¶¶ 6, 83.  The FTC's own allegations suggest that the perceived "major threat" posed by Instagram would come, from Facebook's perspective, "over the next few years," *if* Instagram were able to "copy what we're doing now."  *Id.* ¶ 84. The allegations regarding Instagram, no less than those regarding WhatsApp, depend on speculation that Instagram would develop into an unusually significant PSNS rival to Facebook down the road.

Instead of alleging that "there [we]re few other firms that c[ould] enter effectively" the PSNS market, *Steris*, 133 F. Supp. 3d at 966, the AC alleges the opposite:  Facebook feared entry from multiple "apps that [we]re gaining prominence in the mobile eco-system," each "a potential rival" that could "gain scale" in the alleged market.  AC ¶¶ 71-72.  The FTC even alleges that there was a "global *trend*" of "messaging apps" – plural – threatening "to build more general

24

mobile social networks." *Id.* ¶ 108 (emphasis added).  Multiple such apps directly "threatened to develop into competitive threats to Facebook." *Id.* ¶ 158.

The AC's passing dismissal of other obvious entrants is implausible on its face.  If WhatsApp was a potential PSNS entrant, then there is no straight-face argument that Apple's iMessage is not.  The allegation that the latter is "confined to the iOS operating system" says nothing about the significance of that universe of consumers.  *Id.* ¶ 114.  Indeed, the FTC's central theory is that effective entry into PSNS can come from many and varied sources:  "the most significant competitive threats to Facebook . . . may arise from a differentiated product that is able to gain scale quickly by offering users a superior 'mechanic' " – that is, an undefined and unlimited set of potential entrants.  *Id.* ¶ 66 (TikTok, for example).  These examples unmask the FTC's speculative and inconsistent theorizing and show that it cannot even satisfy its own test.  *See Steris*, 133 F. Supp. 3d at 966.

The only acquisitions that courts have held exclusionary under Section 2 bear no similarity whatsoever to the acquisitions at issue here.  Successful acquisition challenges under that provision involve, *e.g.*, the shuttering of significant and established rivals or of providers of key inputs needed for competition – all to restrict output (and thereby increase prices).  *See United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (acquirer used acquisitions to maintain market-allocation agreement between former competitors to limit output); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 603-05 (1957) (acquirer used non-controlling stock interest to steer supply contracts to itself, foreclosing a substantial share of the market); *United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (acquirer bought up multiple competing plants in order to shut them down); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 621-22 (W.D. La. 2016) (similar).  The agency again alleges the opposite here:  Facebook did not shut down Instagram or WhatsApp, but instead kept (and keeps) both

25

apps "operating at scale" to the indisputable benefit of the increasing numbers of consumers who enjoy these products.  AC ¶ 129; *see also id.* ¶ 21.

**b.**      The FTC's challenges to the acquisitions rest on three legally invalid and factually implausible constructs:  (1) that Instagram and WhatsApp would have given rise to even better products if left on their own; (2) that acquisitions are inherently suspect because they necessarily eliminate independent entities; and (3) that the acquisitions were so successful in providing additional consumer benefits that they made it hard for Facebook's rivals to compete.  Each novel theory fails under established antitrust law.  *Cf. Eastman*, 2016 WL 1640465, at *9 (granting motion to dismiss Section 2 acquisition claim because "plaintiffs cannot rely on the fact of the acquisitions alone," but instead "must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition").

**i.**      *First*, speculation is not a valid basis for condemnation.  The agency asserts that, in the "but for" world without the two challenged acquisitions, consumers would have better PSNS products today.  But the agency alleges no facts substantiating that claim; the theory is instead admitted speculation.  *See*, *e.g.*, AC ¶ 221 (asserting that additional competition could result in "some or all" of undefined "new features" or "improved features," among other undefined "quality improvements"); *id.* ¶ 226 (alleging "social networks *may* also have explored . . . models that consumers . . . *could* have preferred") (emphases added).  There are no facts establishing what those new products would be, how they would come about, or why they would be offered when they are not being offered now.  The law is clear:  the agency *cannot* rely on speculation that Instagram and WhatsApp might have grown and developed into substantial PSNS competitors with even better and even more widely adopted services than those they offer today.  *See Twombly*, 550 U.S. at 555.

Courts have regularly warned against just such speculation.  As the First Circuit has noted, "there is no possible way to predict just what would happen" had a challenged transaction not occurred.  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002).  Accordingly, courts have not embraced such untethered "potential competition" theorizing, even under Section 7.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974) (expressly declining to recognize this legal theory); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) ("Whether actual potential competition is a viable theory of *section 7 liability* has not been answered by the Supreme Court.") (emphasis added).  Rather, courts have rejected as implausible such claims where allegations about "competitive effects would be entirely speculative."  *DeHoog*, 899 F.3d at 764-65.  "The bottom line is that the complaint offers only speculation as to how" Instagram and WhatsApp might have sought to "do business" but for the acquisitions, which is "a classic speculative conclusion" that "'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* at 765 (quoting *Twombly*, 550 U.S. at 557).

Speculation about the possible competitive trajectory of Instagram and WhatsApp is the only thing the AC alleges to support the claim that the acquisitions were *likely* to harm consumers at the time the transactions closed.  *See* V Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1205a (4th ed. 2020) ("Areeda") (legality must be assessed "on the basis of evidence of the situation existing at the time of the acquisition").  The FTC seeks to bolster its own speculation with speculation it cherry-picked from internal Facebook and Instagram documents, *e.g.*, that Facebook executives mused about the possibility that Instagram might develop more features and become more like Facebook and that, in the course of trying to raise money, Instagram suggested that it might one day become a "complete social networking service" or an advertising competitor.  AC ¶¶ 87, 89, 100-101.  But speculation is only that – speculation – no

matter its source.  According to the very documents cited by the FTC, Facebook speculated similarly about a host of possible rivals, some of which thrived while others failed despite early success.  *See*, *e.g.*, *id.* ¶ 90.  And there is no factual allegation that Instagram was actually competing beyond its limited photo-sharing app or that WhatsApp had plans to add PSNS elements – such as allowing users to find strangers' contact information – to its "privacy-focused" service.  *Id.* ¶ 127; *see Twombly*, 550 U.S. at 555-56 (requiring facts, not speculation).

The FTC cannot allege that consumer harm was *likely* at the time of the acquisitions because it cannot even allege (years later) that consumers *were* harmed – the defining characteristic of an unlawful transaction.  It speculates instead that things could have been even better.  This pie in the sky bears no resemblance to fact-based reality.  No alleged facts support the agency's intimation that Instagram and WhatsApp would have achieved the same growth in a better (undefined) way for consumers, if those services were not part of Facebook. *Cf. Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) ("Plaintiffs' allegations of hypothetical loss of consumer choice and innovation are entirely too conclusory and speculative.").  Similarly, no alleged facts support the speculation that, but for the acquisitions, Facebook or any other PSNS provider might have a different "ad load and level of privacy." AC ¶ 105.  The FTC tellingly alleges nothing about "ad load and level of privacy" on Snapchat today, for instance.  There is only agency speculation about unspecified, unsupported "additional innovation," "quality improvements," and "consumer choice."  *Id.* ¶ 221.  There is not a single fact as to what any of these vague buzzwords actually would entail, much less facts establishing that it was likely these things would have occurred but for the acquisitions.  *See Twombly*, 550 U.S. at 555 ("formulaic recitation" without facts is not enough).

The same fanciful claims could be made in *any* challenge to *any* transaction; it can always be hypothesized that Jack's magic beans were destined to grow to the sky.  But the

law demands more than fairy tales to unwind highly successful business transactions that have produced indisputable and substantial value for consumers and shareholders alike.

      **ii.**    *Second*, the FTC asserts that "neutralization" of an "independent" firm via acquisition is itself anticompetitive.  AC ¶ 105.  This theory proves far too much:  every acquisition entails the elimination of an independent firm and an actual or potential competitor.  Unsurprisingly, there is no such dramatic theory of strict liability for acquisitions.  *See Dresses for Less*, 2002 WL 31164482, at *12 ("'the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality'" because "horizontal mergers are much more likely to be procompetitive than anticompetitive") (quoting IV Areeda ¶ 901a (2d ed. 1998), and citing Irving Scher, *Antitrust Adviser* § 3.61, at 3-167 (4th ed. 2001)); *United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 930 (S.D.N.Y. 1965) ("Necessarily, such a merger combines the shares of the constituent parties and eliminates one firm from the market.  It thereby automatically creates a firm with an increased share and increases concentration of the number of firms in the market.  Yet, Congress, in enacting Clayton Act § 7, did not forbid all horizontal mergers but only those which may lessen competition substantially or tend to create a monopoly.").  Instead, and before embarking on "a potentially massive factual controversy," *Twombly*, 550 U.S. at 558, the FTC must allege facts to plausibly support the conclusory and speculative assertion that consumers would be better off had Facebook not turned Instagram and WhatsApp into the services that consumers enjoy for free today.  But the FTC has alleged nothing close.

      **iii.**    *Third*, the FTC claims that Facebook's *successful* development and operation of Instagram and WhatsApp unlawfully "maintains a protective 'moat' that deters and hinders competition."  AC ¶¶ 105, 127.  This gives the game away entirely.  In essence, the FTC seeks to punish Facebook for delivering ever-greater value to consumers.  *See id.* ¶ 21 (alleging that

output expansion – *i.e.*, enlarging PSNS activity – "increases" "the value of the service to individual consumers").  Instead of shuttering Instagram or WhatsApp, Facebook has made them thrive.  The FTC expressly alleged that Facebook has been able to "win" in photo-sharing and messaging "mechanics," which makes it "difficult" for a competitor "to supplant [Facebook] without *doing something different*."  *Id.* ¶ 66 (emphasis added).  According to the FTC, once Facebook (or any firm) "wins" a mechanic, a competitor cannot "get much traction" with the *same* mechanic so long as Facebook keeps its winning "mechanics deployed *at scale*."  *Id.* ¶¶ 66-67 (emphases omitted in part).

    In other words, when Facebook competes successfully by expanding output and providing consumers experiences they value, it makes life harder for copycat rivals that do not innovate by developing new "mechanics" to attract consumers.  It is remarkable that the FTC seeks to condemn this as a Section 2 violation, when it is the very competition that the antitrust laws encourage.  *See Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 586 n.15 (D.C. Cir. 1984) (per curiam) ("[O]nly use of monopoly power to restrict output or exclude competitors, as opposed to promoting the efficiency of production, is unlawful."); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) (antitrust laws encourage and "do not stand as an obstacle" to even a dominant firm that "sustains a level of efficiency or innovation such that its rivals cannot effectively compete").

    No court has ever adopted the FTC's theory that acquiring a firm and winning by operating the acquired company successfully and "at scale" is unlawful.  On the contrary, that theory has been summarily rejected:  "[W]hen a producer deters competitors by . . . operat[ing] his business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served, even if no actual competitors see fit to enter the market at a particular time," for, "[w]hile the successful competitor should not be raised above the law, neither should

he be held down by law." *Syufy*, 903 F.2d at 668 (rejecting as a matter of law a Section 2 acquisition challenge claiming that, after the acquisitions, the monopolist's "effectiveness as a competitor creates a structural barrier to entry, rendering illicit [the defendants'] acquisition of its competitors' [assets]").

  **3.**  ***The FTC's other acquisition allegations are without substance.*** The AC borrows vague snippets from the dismissed States' complaint, to wit that Facebook's acquisitions of non-PSNS firms Onavo (AC ¶ 70), tbh (AC ¶ 72), Octazen (AC ¶ 74), Glancee (AC ¶ 75), and EyeGroove (AC ¶ 76) were exclusionary.  But little is alleged about these transactions, and there are no facts supporting any claim that, singly or jointly, these non-PSNS acquisitions are even relevant to the Section 2 claims.

  **a.**  The FTC alleges (at ¶ 74) that Facebook acquired Onavo to monitor "potential threats," but it is procompetitive to improve one's own products by monitoring how competitors are successfully meeting consumers' needs.  *See Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 763 F. Supp. 2d 1341, 1351-52 (S.D. Fla. 2011) (improved market-intelligence product is procompetitive innovation, not exclusionary conduct), *aff'd*, 711 F.3d 1264 (11th Cir. 2013).  The FTC does not even suggest that Onavo was an essential input necessary for competition or the only firm providing market research.  *See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("Clearly, de minimis foreclosure of a market is not an antitrust dereliction in itself.").  Nor could it:  the FTC bases its entire theory of monopoly power on data from Comscore, a "commercially-available data source" and Onavo competitor that "track[s] users' activity online."  *Compare* AC ¶ 69 *with id.* ¶ 182.

  As to Octazen (AC ¶ 74), a "contact importing" service, the acquisition took place in 2008 – years before Facebook is alleged to have had power in any market – and the FTC does not allege (because it cannot) that contact importing was necessary for competition or that

Octazen was the only commercially available contact-importing service. *Cf. Standard Oil Co.
v. United States*, 221 U.S. 1, 32-33 (1911) (Section 2 violation where monopolist bought every
competing refinery and thereafter "limit[ed] production" to drive up oil prices). The FTC just
cites (at ¶ 74) internal speculation that the acquisition "could" at most "slow some competitors
down for a quarter or so" – far from the "monopolistic proportions" of foreclosure required to
state a Section 2 claim. *See* IVA Areeda ¶ 1001.

Even less is said about the other apps – tbh (AC ¶ 72), Glancee (AC ¶ 75), and
EyeGroove (AC ¶ 76). The FTC does not allege that they were significant PSNS competitors
or potential competitors, that they were essential inputs to competition, or that they had any
competitive significance at all. Nor does the FTC allege why Facebook shut down these
supposedly promising apps rather than use them, as it did with Instagram and WhatsApp, to
broaden Facebook's supposed "moat." The agency makes no serious effort to allege plausible
claims about any of them.

**b.** The agency cannot challenge any of these transactions before the Court in any
event. The agency proceeds under Section 13(b) of the Federal Trade Commission Act ("FTC
Act"), *see* AC ¶ 17, meaning it can challenge only conduct that "is violating" or "is about to
violate" federal law, 15 U.S.C. § 53(b). But Facebook allegedly shut down all five apps years
before the agency filed its suit. That deprives the FTC of "statutory authority to seek an
injunction 'based on [such] long-past conduct.'" Op. 3 (quoting *FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147, 156 (3d Cir. 2019)) (brackets in Op.). Accordingly, the allegation that Facebook
shut down these apps years ago renders "an injunction under Section 13(b) unavailable as a
matter of law." Op. 17.

**B.     The FTC's Attempt To Revive Dismissed and Defective Platform Allegations Fails as a Matter of Law**

The Court found, after review of the actual Platform policies incorporated by reference in the FTC's initial complaint, that these policies were lawful.  And the Court reached the "conclusion[ ] of law" that the FTC's "challenge to Facebook's <u>policy</u> of refusing interoperability permissions with competing apps fails to state a claim for injunctive relief" because "there is nothing unlawful about having such a policy in general."  Op. 2-3.  The Court likewise held that particular applications of those policies were "long-past conduct" for which "the FTC lacks statutory authority to seek an injunction" (the only remedy available to the agency in federal court, as it lacks statutory authority to pursue damages) and that the only "actionable violation" would need to be "ongoing or about to occur."  Op. 3, 42.

The Court did not suggest that the FTC could replead these legally invalid Platform claims, which the Court dismissed as a matter of law.  Op. 3.  The FTC nonetheless returns with the same allegations as before, with only cosmetic changes.  But the agency's claim is barred by the law-of-the-case doctrine:  "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  In any event, now as before, the allegations have no merit:  Facebook's policies were indeed lawful, as the Court correctly held; and the long-past instances of application cannot, as a matter of law, support a future injunction, as the Court also correctly ruled.

**1.     *The FTC's attempt to revive its Platform claims is barred by the law of the case.***

The attempt to reinject discredited Platform claims into this case is barred by the law of the case because the Court already decided that indistinguishable allegations failed to state a claim.  *See LaShawn*, 87 F.3d at 1393; *see also Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26, 35-36 (D.D.C. 2017) (applying law-of-the-case doctrine to dismiss claims in amended complaint

already rejected in initial complaint), *aff'd*, 720 F. App'x 1 (D.C. Cir. 2018) (per curiam);

*Blackbook Cap., Inc. v. Fin. Indus. Reg. Auth., Inc.*, 2021 WL 1827268, at *2-3 (D.N.J. May 5,

2021) (same); *Cummings v. City of New York*, 2021 WL 1163654, at *7 (S.D.N.Y. Mar. 26,

2021) (same), *appeal pending*, No. 21-1380 (2d Cir.); *Friedman v. Dollar Thrifty Auto. Grp.,*

*Inc.*, 2015 WL 4036319, at *8 (D. Colo. July 1, 2015) (similar); *Bigio v. Coca-Cola Co.*,

2010 WL 3377503, at *2 (S.D.N.Y. Aug. 23, 2010) (same), *aff'd*, 675 F.3d 163 (2d Cir. 2012).

The AC's allegations regarding Facebook's Platform policies and their application raise the

exact same issues that this Court addressed before.  Judicial economy requires parties to accept

court rulings and not treat them as occasion for repetitive reargument; the "previous judicial

determination" controls.  *Berryman-Turner*, 233 F. Supp. 3d at 35.

        **a.**      ***No new facts or law justify revisiting the Court's holding that the Platform***

***policies were lawful.***  Because the Platform policies were incorporated by reference in the initial

complaint, the Court appropriately reviewed those policies – and not just the FTC's gloss on them.

*See* Op. 49-50.  The Court correctly held that the policies were neither an unlawful "refusal to

deal" nor "conditional dealing."  Op. 39-40, 50.  As the Court already held, "[r]egardless of

whether the FTC can amend its Complaint to plausibly allege market power . . . , the conduct

it has alleged regarding Facebook's interoperability policies cannot form the basis for Section 2

liability."  Op. 3.

        The agency continues pressing both points.  It claims (at ¶¶ 79, 132, 238) that the same

policies were "conditional dealing."  But the Court has already explained why that is unfounded:

Facebook's announcement and enforcement of its terms for developers to access proprietary

Facebook APIs did not "in fact interfere[ ] . . . with the ability of competing social-networking

services to deal with app developers."  Op. 48-49.  The Court went on to explain that, in the

absence of any alleged interference between rivals and third parties, the FTC had failed to state

a Section 2 claim for unlawful "conditional dealing."  *Id.*  The AC still alleges no interference

with rivals, and in fact continues to challenge only API "restrictions [that] limited the types of

activities developers could engage in *using the platform.*"  AC ¶ 133 (emphasis added).

      The FTC also reasserts that the policies were unlawful refusals to deal, ignoring the

preclusive effect of *Trinko*, its progeny, and this Court's holding.  As the Court explained, the

"central teaching" of refusal-to-deal law, as relevant here, "is that Facebook had no antitrust

duty to avoid creating [the] deterrent" to competitor entry that the FTC said Facebook created.

Op. 39.  Moreover, "Facebook's general policy of withholding API access from competitors . . .

was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course

of dealing."  Op. 40.  And any violation would require facts establishing that Facebook was

acting irrationally, sacrificing short-term profits solely to harm the firms with which it had

previously and voluntarily dealt.  *See* Op. 38-39.

      The AC continues to rely on the discredited "core argument" (Op. 39) that Facebook's

alleged Platform policies unlawfully "changed the incentives of app developers and deterred

them from developing competing functionalities or supporting competing personal social

networks."  AC ¶ 148; *see* Op. 39 (rejecting same theory).  The FTC points to the same policies

the Court already considered, and it cannot cite any intervening change in law that could justify a

departure from this Court's prior decision.  The only new ruling of relevance supports Facebook:

the Sixth Circuit recently *adopted* this Court's legal standard for a refusal-to-deal claim in

*St. Luke's Hospital v. ProMedica Health System, Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (citing

*New York v. Facebook, Inc.*, --- F. Supp. 3d ---, 2021 WL 2643724, at *11 (D.D.C. June 28,

2021), *appeal pending*, No. 21-7078 (D.C. Cir.)).

      **b.**    ***There is no valid basis for reconsideration of the Court's decision that the past***

***instances of enforcement of a terminated policy cannot support injunctive relief.***  The Court

also ruled that the FTC's allegations concerning Facebook's pre-2018 *implementation* of its policies fail to state a claim.  This Court correctly reasoned that Section 13(b) of the FTC Act "'is prospective, not retrospective,'" and authorizes suit only when a defendant "'is violating' or 'is about to violate'" the antitrust laws.  Op. 42 (quoting *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021)); *see also* 15 U.S.C. § 53(b).  Accordingly, the FTC could not bring suit in federal court challenging alleged refusals to deal that were long past.  *See* Op. 41-42.

The FTC had not shown any likelihood of recurrence because it did not plead facts showing that Facebook would "not only . . . imminently reinstate its policies" but also "imminently take the kind of further action that might come within *Aspen Skiing* [*Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)]:  target its competitors with which it had a previous, voluntary course of dealing for API revocation in a manner that suggests predatory, short-term-profit-sacrificing behavior."  Op. 44; *see also Shire*, 917 F.3d at 160 ("vague allegations" of restarting terminated conduct do not plausibly support imminence "when the alleged misconduct ceased almost five years before filing of the complaint").

The AC recycles the same, stale "they might do it again" rhetoric that the Court correctly rejected last time.  The FTC now mentions one additional developer that was allegedly subject to API restrictions – five years ago.  *See* AC ¶ 158.  But whether five or eight years ago, such past enforcement of discarded policies cannot support the necessary element of a claim:  an imminent likelihood of Facebook imposing an unlawful restriction and then enforcing it in a manner that threads the "narrow-eyed needle" of *Aspen Skiing*'s strict and demanding standard.  Op. 36; *see also Facebook*, 2021 WL 2643724, at *12, *14 (holding that no injunction could redress alleged refusals to deal from 2015; also noting *Aspen Skiing* requirements that the agency had not even attempted to satisfy).

The AC adds a few sentences of new speculation about conditions that the agency thinks *could* one day drive Facebook to revive the Platform policies.  But none of these allegations (at ¶ 151) about unknown "competitive pressures" from some future "period of technological transition" – much less the FTC's unsupported and vague claim that Facebook in some respect "continues to screen developers" – comes close to facts plausibly showing that Facebook will "imminently reinstate its policies," much less that it will "imminently" grant and then restrict the API access of unspecified competitors in a way that suggests otherwise irrational predatory profit sacrifice in violation of Section 2.  *See* Op. 44.  And the FTC's allegations (at ¶¶ 152-153) regarding Facebook's interactions with regulators have nothing to do with whether Facebook "is about to violate" Section 2 through an unlawful and otherwise-irrational course of dealing with developers.  15 U.S.C. § 53(b).  As the Court correctly held, the FTC's speculation about a future problem cannot make the requisite showing, and the agency has given the Court no valid reason to reconsider its decision.  *See* Op. 43 (explaining that "conditional and conclusory allegation[s]" would be "insufficient" to establish imminence); *see also Shire*, 917 F.3d at 156.

**2.      *The past Platform policies cannot support any valid claim of antitrust violation as a matter of law*.**  Even if the Court were writing on a blank slate and considering these issues for the first time, the FTC's allegations regarding policies that have not been in effect since 2018 simply cannot be litigated by the agency under its Section 13(b) authority.  The parties briefed these issues extensively in the last round.  *See* FB FTC Br. 36-39, ECF No. 56-1; FTC Opp'n 31-38; FB FTC Reply 17-22, ECF No. 62; *see also* FB States Br. 28, No. 1:20-cv-3589-JEB, ECF No. 114-1; States Opp'n 34-42, No. 1:20-cv-3589-JEB, ECF No. 121; FB States Reply 24-25, No. 1:20-cv-3589-JEB, ECF No. 123.  The agency has not materially changed its factual allegations – adding only an additional 2016 Platform policy application that still falls outside the reach of Section 13(b) and more speculation about why Facebook might want to reinstate the

policies.  *See* AC ¶¶ 151, 158.  The Court's prior decision was correct, and there is no valid basis for a different result this time.

Every court to address similar refusal-to-deal claims based on Facebook's Platform policies has upheld Facebook's conduct on the merits.  *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002-03 (N.D. Cal. 2020) (granting motion to dismiss interoperability claims); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075 (S.D. Cal. 2012) ("Facebook has a right to control its own product, and to establish the terms with which . . . application developers . . . must comply in order to utilize this product."); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) (dismissing claims based on prior Platform policies).  Facebook's Platform policies lie in the heartland of the general rule that a firm may choose its terms of dealing – including terms to prevent rivals from free-riding on the firm's assets.  *See* AC ¶ 146.

## III.   THE FTC'S VOTE PURPORTING TO AUTHORIZE THE AC WAS INVALID; THE COURT SHOULD ACCORDINGLY DISMISS THE AC

Chair Khan's participation in the decision to file the AC violates due process and federal ethics rules.  Facebook submitted a Petition to the agency explaining that due process and the federal ethics rules require Chair Khan to be recused from this case because any disinterested observer would conclude that Chair Khan came to the FTC having already made up her mind that Facebook has violated the antitrust laws and with an "axe to grind" against the company.  *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.); *see* Hansen Decl. Exs. A, B (Facebook's Petition for Recusal ("Recusal Petition") and supporting expert declaration of Professor Daniel B. Rodriguez ("Rodriguez Decl.")).

Yet the new Chair, who controls the FTC's agenda, refused to address Facebook's Recusal Petition on the merits or allow the full Commission to do so before pressing forward with a vote

38

on the AC.  That failure violates due process and federal ethics rules and invalidates the

Commission's 3-2 vote on the AC.  *See* Hansen Decl. Ex. F at 2 (Order, *FTC v. Libbey, Inc.*,

No. 1:02-cv-00060-RBW, ECF No. 76 (D.D.C. Apr. 3, 2002)) (Commission vote required

under § 13(b) to authorize filing of amended complaint).

As Commissioner Wilson wrote in her dissent, Facebook's Recusal Petition raised

serious issues worthy of careful consideration.  Wilson Dissent at 1.  The only excuse the agency

gave for not taking up the Petition was that the agency simply has no mechanism to consider the

serious issues raised by Facebook's Petition as they apply to Commissioners except for when

Commissioners are engaged in rulemaking or sitting as judges in administrative proceedings.

*See* Hansen Decl. Ex. G (Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey

M. Klineberg (Aug. 19, 2021) ("Tabor Email")).  That makes no sense.  A federal agency is

obligated "to comport its actions to the standards required by the Constitution," and, "[i]f

promulgating new regulations is the only manner in which the [agency] can properly conform

its conduct, then the [agency] must do so."  *Lowry v. Soc. Sec. Admin.*, 2000 WL 730412, at *14

(D. Or. June 7, 2000) (denying Social Security Administration's motion to dismiss claims

challenging adequacy of the agency's disqualification procedures); *see also Aera Energy LLC

v. Salazar*, 642 F.3d 212, 223 (D.C. Cir. 2011) (explaining that agencies may need "to adapt

established internal procedures" to ensure that their decisions are "untainted").[2]

---

[2] The Court may take judicial notice of Facebook's Recusal Petition and supporting
Rodriguez declaration, the public statements quoted in the Petition (as well as the underlying
news articles, publications, and tweets), and the agency's response to the Petition.  *See* Fed. R.
Evid. 201; *see also*, *e.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (courts may
take judicial notice of public "articles" and "publications"); *Wilcox v. Georgetown Univ.*, 2019
WL 132281, at *4 n.5 (D.D.C. Jan. 8, 2019) (courts may take judicial notice of facts "generally
known because of newspaper articles"); *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp.
3d 279, 306 n.23 (D.D.C. 2018) (courts may take judicial notice of "correspondence" from

The Court should dismiss the AC because it was not properly authorized by the Commission.  In the alternative, it should direct the FTC to address on the merits the serious issues presented in the Recusal Petition:  whether Chair Khan's participation comported with federal law.

### A.     Chair Khan's Prejudgment of Facebook's Liability Required Her Recusal

1.     Chair Khan's prior statements make clear to a disinterested observer that, before she became an FTC Commissioner, she had prejudged Facebook's Section 2 liability and was biased against the company.  *See* Recusal Petition at 11-13 (collecting statements).  Binding D.C. Circuit precedent requires an FTC Commissioner's recusal where "a disinterested observer" would "conclude that [she] has in some measure adjudged the facts as well as the law of a particular case in advance."  *Cinderella Career Coll. & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970); *see* Recusal Petition at 17-20 (collecting authorities); Rodriguez Decl. at 3-6 (same).

Less than a year ago, Chair Khan, by her own admission, "*led* the congressional investigation into digital markets [by the House Antitrust Subcommittee] and the publication of" a report that purported to conclude that Facebook engaged in conduct that meets all the elements of a Section 2 violation.  *See* Lina Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active) [https://perma.cc/9GB5-F78G (visited Oct. 4, 2021)] (emphasis added).  The report purported to make factual and legal findings that Facebook has "monopoly power" in a relevant antitrust market, maintained that monopoly power through anticompetitive means, and harmed consumers.  *See* Majority Staff of Subcomm. on Antitrust, Com. & Admin. Law of the H. Comm.

---

agency); *Vasser v. McDonald*, 228 F. Supp. 3d 1, 10-11 (D.D.C. 2016) (courts may take judicial notice of materials filed with an agency); *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 581 n.5 (S.D.N.Y. 2021) (courts may take judicial notice of websites).

on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets:  Majority Staff Report and Recommendations* 132-73 (Oct. 2020).  Having completed this report just months before her nomination and confirmation to the FTC, Chair Khan cannot plausibly be expected to set those conclusions aside and conduct a fresh, impartial review of the evidence.

The Sixth Circuit addressed a similar situation in *American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), holding that then-Chair Paul Rand Dixon's participation in a case "amounted . . . to a denial of due process" where he had "played an 'active role' in an [antitrust] investigation by [a congressional] Subcommittee of many of the same facts and issues and of the same parties as are involved in this [FTC] proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties." *Id.* at 763, 767 (ellipsis in original).  The court explained that it was sufficient that then-Chair Dixon's conduct created an *appearance* of prejudgment and the "reasonable suspicion of unfairness" because "[i]t is fundamental that both unfairness and the appearance of unfairness should be avoided." *Id.* at 767.

Chair Khan's participation is even more concerning because her public statements regarding Facebook go well beyond the congressional report and reveal that Chair Khan has an "axe to grind" against the company.  *Wright*, 732 F.2d at 1056.  She has accused Facebook of being responsible for "a host of social ills," including "genocide," Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 526-27 (2019), and of having "appropriated [competitors'] business information and functionality," Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 1001 (2019).  Such hyperbolic animus is incompatible with the requirement of both the fact and the appearance of unbiased exercise of the FTC's prosecutorial power.

41

**2.**      Chair Khan, purportedly upon advice from the FTC's General Counsel, bypassed

the serious issues raised by Facebook's Recusal Petition.  *See* Hansen Decl. Ex. H at 2 (Press

Release, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury Scheme to Crush Competition

After String of Failed Attempts to Innovate (Aug. 19, 2021) ("Press Release")) (stating that the

Recusal Petition had been "dismissed" by the Office of the Secretary).  In particular, the full

Commission was not given the chance to address the merits of the Petition.  In dissenting from

the decision to authorize the AC, Commissioner Wilson explained that, "[i]f the Commission

were to review Facebook's recusal petition, [she] would evaluate the petition carefully, applying

the relevant law, including Constitutional due process considerations, to the applicable facts."

Wilson Dissent at 1 (footnote omitted).

The FTC's explanation for not even considering these issues was both sweeping and

unsupported:  the agency asserted that it simply had no mechanism to evaluate the application of

due process rules to Commissioners in the exercise of their authority under the FTC Act except

in specific and limited circumstances.  *See* Tabor Email (stating that the "recusal petition and the

supporting declaration ha[ve] been procedurally reviewed" but that, "[a]s there are currently

no adjudicative or rulemaking proceedings before the Commission in which Facebook . . . is

a subject, target, or defendant/respondent, this petition is premature").  The agency likewise

maintains that federal-court jurisdiction is all the process to which a defendant is entitled and that

a defendant has no right to an unbiased agency decision when it will ultimately have its case

decided by an Article III judge.  *See* Press Release at 2 (stating that, because "the case will be

prosecuted before a federal judge, the appropriate constitutional due process protections will

be provided to the company").

That position cannot be squared with federal law.  The fact that Chair Khan was not

acting as a formal adjudicator did not remove her obligation to avoid the appearance of

prejudgment or bias.  The Chair of the FTC exercises extraordinary power within the agency:

the entire FTC staff is an extension of the Chair.  *See* Reorganization Plan No. 8 of 1950,

15 Fed. Reg. 3175 (May 25, 1950).  As the head of a powerful agency entrusted with making

enforcement decisions, Chair Khan has an obligation to approach decisions to bring the power

of the agency to bear with an open mind through a process that gives fair consideration to all

parties.  *See* Rodriguez Decl. at 3-8; *see also* 5 C.F.R. § 2635.501(a).

Indeed, all prosecutors – not just those subject to the heightened expectations of

neutrality that apply to commissioners of independent administrative agencies – are subject to

disqualification when they have an "axe to grind" against the defendant or are not otherwise

impartial.  *Wright*, 732 F.2d at 1056; *see also* Rodriguez Decl. at 8-16 (collecting authorities).

Prosecutors are expected to engage in "fair play," Robert H. Jackson, *The Federal Prosecutor*,

31 J. Crim. L. & Criminology 3, 4 (1940), and to exercise their discretion to bring cases in a

"disinterested, nonpartisan fashion," N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 683,

at 4 (June 7, 1996).[3]  While prosecutors do not make the ultimate decision of guilt or innocence,

they still have "quasi-judicial" responsibilities because they are charged with important decisions

about whether and how to bring claims.  *See* Rodriguez Decl. at 11 (collecting authorities).

The cavalier assertion that the Constitution and federal ethics rules place *no* limits on the Chair's

ability to exercise her considerable power against a defendant, no matter how apparent her bias

and prejudice are to any disinterested observer, is both breathtaking and incorrect.

---

[3] *See also*, *e.g.*, *State v. King*, 956 So. 2d 562, 563 (La. 2007) (disqualifying prosecutor who had "strong personal feelings of animosity" toward defendant); *State v. Gonzales*, 119 P.3d 151, 162 (N.M. 2005) (disqualifying prosecutor who had previously made "expressions of animosity" toward defendant); *State v. Hohman*, 420 A.2d 852, 854-55 (Vt. 1980) (finding error in trial court's denial of motion to disqualify state's attorney because he formerly pledged to prosecute the defendant in a campaign advertisement), *overruled on other grounds by Jones v. Shea*, 532 A.2d 571 (Vt. 1987).

**B.       In the Absence of a Valid Commission Vote, the AC Must Be Dismissed**

For the reasons explained above, the AC has not been properly authorized, and the

agency has failed to satisfy the requirements of Section 13(b), which provides that "the

Commission" must make the decision to "bring suit in a district court of the United States."

15 U.S.C. § 53(b).  That plain language requires a valid vote of the Commission itself.  *See FTC

v. Libbey, Inc.*, 211 F. Supp. 2d 34, 42 n.19 (D.D.C. 2002); 16 C.F.R. § 1.61.  In the absence of a

valid vote, the agency's staff lacks authority to file a complaint, and any complaint they do file

is not "properly before" the Court.  *Libbey*, 211 F. Supp. 2d at 42 n.19; *see also*, *e.g.*, *Hooks v.*

*Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 554-55 & n.2 (9th Cir. 2016) (dismissing

National Labor Relations Board petition for injunctive relief that lacked "valid authorization");

*ICC v. S. Ry. Co.*, 543 F.2d 534, 535 (5th Cir. 1976) (dismissing case where Interstate Commerce

Commission lacked the necessary authorization to "bring suit to enforce its orders in the federal

district courts"); *FTC v. Guignon*, 390 F.2d 323, 329-30 (8th Cir. 1968) (dismissing FTC

subpoena enforcement action where FTC lacked statutory authorization to bring the action).

Even if Chair Khan's vote had not been decisive – which it was – her participation would

invalidate the FTC's vote.  For example, in *Cinderella*, the D.C. Circuit held that then-Chair

Dixon's failure to recuse himself from a vote after giving a speech that gave "the appearance that

the case ha[d] been prejudged" invalidated the entirety of the Commission's unanimous vote

because there was "no way" to measure "the influence of [then-Chair Dixon] upon the others."

425 F.2d at 590, 592.  The taint on the FTC's action is even more apparent here, because the

Chair cast the deciding vote for the FTC's action.[4]  Dismissal of the AC is therefore required.

---

[4] Given the Chair's authority to direct the actions of the FTC's staff, Chair Khan's failure
to recuse herself is also an ongoing due process violation that will taint all of the agency's
litigation choices.

C.       **In the Alternative, the Court Should Stay the Case and Remand to the FTC To Resolve the Recusal Issue Now**

Whether Chair Khan's participation comported with due process and federal ethics rules is an issue that this Court should resolve before this case proceeds.  As an alternative to this Court deciding the recusal issue, the Court could also stay this case and order the agency to act on Facebook's Recusal Petition.  *See Aera Energy*, 642 F.3d at 220 (the preferred remedy in cases involving allegations that "political considerations have tainted agency action" has been to give "the agency an opportunity to issue a new, untainted decision"); *Amos Treat & Co. v. SEC*, 306 F.2d 260, 267-68 (D.C. Cir. 1962) (requiring Securities and Exchange Commission to "determin[e] upon a complete record whether or not any Commissioner should have been disqualified" or end the case).  That action may bring the case to an end; at a minimum, it would provide a basis for this Court to evaluate the legal and factual grounds for any ruling by the Commission that Chair Khan's recusal is not required.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and dismiss the FTC's case.

Respectfully submitted,

October 4, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
Jared M. Beim (D.C. Bar No. 1723465)*
Hannah D. Carlin (D.C. Bar No. 1719743)*
L. Vivian Dong (D.C. Bar No. 1722506)
Kimberly V. Hamlett (D.C. Bar No. 1722207)*
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*

* Applications for Admission to the Bar of the U.S.
District Court for the District of Columbia Pending