# Exhibit A

to the Declaration of Mark C. Hansen in Support of Facebook, Inc.'s Motion to Dismiss the
FTC's Amended Complaint in *Federal Trade Commission v. Facebook, Inc.*
Case No. 1:20-cv-03590-JEB (D.D.C.)

**FEDERAL TRADE COMMISSION**

IN RE PETITION FOR RECUSAL OF
CHAIR LINA M. KHAN FROM
INVOLVEMENT IN THE PENDING
ANTITRUST CASE AGAINST
FACEBOOK, INC.

**PETITION FOR RECUSAL**

Facebook, Inc. respectfully petitions Chair Lina M. Khan and the Federal Trade

Commission ("FTC" or "Commission") to recuse Chair Khan from participating in any decisions

concerning whether and how to continue the FTC's antitrust case against the company.[1]

**INTRODUCTION AND SUMMARY**

Due process entitles any targeted individual or company to fair consideration of its

factual and legal defenses by unbiased Commissioners who, before joining the Commission,

have not already made up their minds about the target's legal culpability.  When a new

Commissioner has already drawn factual and legal conclusions and deemed the target a

lawbreaker, due process requires that individual to recuse herself from related matters when

acting in the capacity of an FTC Commissioner.  For example – and of particular relevance here

– the D.C. Circuit deemed it an "appalling" violation of due process when a prior FTC Chair

---

[1] *See FTC v. Facebook, Inc.*, No. 1:20-cv-03590-JEB, Dkt. No. 72 (D.D.C. June 28, 2021) (order dismissing the FTC's complaint).  This petition addresses the agency's pending antitrust case against Facebook, including any decision to file a revised complaint in federal court or in a Part 3 administrative proceeding based on the same or similar allegations.  The recusal question presented is particularly urgent, given the Commission's 30-day deadline for filing any amended complaint in federal court.  Facebook reserves the right to seek Chair Khan's recusal from any additional matters presenting similar prejudgment concerns.

participated in a matter against a specific defendant because he "had investigated and developed many of the[] same facts" regarding that defendant as a congressional staffer.[2]  That precedent, as well as the federal ethics rules, compel Chair Khan's recusal from any decisions regarding the pending antitrust case against Facebook.[3]  Chair Khan has consistently made public statements not only accusing Facebook of conduct that merits disapproval but specifically expressing her belief that the conduct *meets the elements of an antitrust offense* under Section 2 of the Sherman Act, thereby constituting an unfair method of competition in violation of Section 5(a) of the FTC Act.  Indeed, she has led an organization lobbying the Commission to impose particular remedies against Facebook and, more recently, commented publicly as to her personal beliefs on the merits of the very complaint filed by the Commission last December, the dismissal of which must be addressed in some fashion by the Commission in the coming weeks.

These statements – which Facebook vigorously disputes as unsupported and contrary to law – convey to any disinterested observer that Chair Khan, well before becoming a Commissioner, had already decided the material facts relevant to Facebook's liability in the Commission's pending antitrust lawsuit and already reached legal conclusions that Facebook

---

[2] *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quoting *Am. Cyanamid Co. v. FTC*, 363 F.2d 757, 767 (6th Cir. 1966)).

[3] Amazon.com, Inc. has filed a petition with the Commission asking that Chair Khan be recused from certain matters based on her prior statements regarding Amazon.  Recusal Pet. by Amazon.com, Inc. at 1, *Motion To Recuse Chair Lina M. Khan from Involvement in Certain Antitrust Matters Involving Amazon.com, Inc.* (June 30, 2021).  Facebook agrees with Amazon's arguments concerning the circumstances where a Commissioner's prior statements require recusal and incorporates those legal arguments, as well as the ethics analysis offered by Amazon's expert Professor Thomas D. Morgan.  *See* Expert Decl. of Prof. Thomas D. Morgan in Supp. of Recusal Pet. by Amazon.com, Inc. (June 29, 2021) (Ex. A).

was liable under the antitrust laws.  She made these public and repeated statements in multiple

roles over the course of the last decade:

- ***In Her Work for the Open Markets Institute.***  At various times between 2011 and 2018, Chair Khan worked for the Open Markets Institute, a political advocacy group, and she authored numerous articles opining on Facebook's allegedly unlawful antitrust conduct.[4] While Chair Khan was the Legal Director at Open Markets, the organization advocated for the Commission to "[r]everse the approvals for Facebook [*sic*] purchases of WhatsApp and Instagram, and reestablish these as competing social networks."[5]

- ***In Her Academic Writing.***  Chair Khan published academic articles discussing her belief that Facebook violated the antitrust laws.  She has already concluded that Facebook "has both foreclosed competitors from its platform and appropriated their business information and functionality" and that, "[d]espite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course—perhaps because it no longer faced serious competition in the social network market."[6]

- ***As Leader of the House Antitrust Investigation and Report.***  From March 2019 to October 2020, Chair Khan was Majority Counsel for the U.S. House Committee on the Judiciary – Subcommittee on Antitrust, Commercial, and Administrative Law.[7]  In her own words, she "led the congressional investigation into digital markets and the publication of [the] final report"[8] by the Subcommittee that purported to make *specific factual findings* and reach *legal conclusions* about the challenged acquisitions at issue in the FTC's district court complaint against Facebook.  The Report concluded that Facebook "acquired Instagram to neutralize a nascent competitive threat" that "was growing significantly at the time of the transaction" and that "Facebook's support of

---

[4] Lina M. Khan, Resume, https://www.commerce.senate.gov/services/files/AB3EF7E3-1D58-4EB4-9646-3FBB5ADD144F, at 20-21 (Ex. B).

[5] Press Release, Open Markets Inst., *Fines for Facebook Aren't Enough: The Open Markets Institute Calls on FTC to Restructure Facebook to Protect Our Democracy* (Mar. 22, 2018), https://www.openmarketsinstitute.org/publications/fines-for-facebook-arent-enough-the-open-markets-institute-calls-on-ftc-to-restructure-facebook-to-protect-our-democracy (accessed July 14, 2021) [https://perma.cc/P4AU-C4CZ].

[6] *See* Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 1001, 1004 (2019).

[7] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).

[8] Lina M. Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active) [https://perma.cc/9GB5-F78G] (Ex. C).  Recently, most of Chair Khan's personal website was deleted, including the reference to her leadership role in the House Subcommittee.  Accordingly, Facebook has attached as Exhibit C a copy of the "Bio" page of that website as it existed on July 1, 2021.

Instagram's growth after acquiring it is overstated."[9]   The Report also concluded that "Facebook acquired WhatsApp to expand its dominance" and to take over "a maverick competitor."[10]

- ***In Her Public Appearances.***  In interviews and media appearances, Chair Khan has discussed her beliefs on Facebook's culpability under the antitrust laws, including in the context of discussing the Subcommittee's Report.  Last year, she told the *New York Times* that Facebook had engaged in "killer acquisition[s] . . . in several cases" and that "Facebook's acquisition strategy was basically a land grab to . . . lock up the market."[11]  In particular, she concluded that Facebook's "purchase of Instagram was an effort to really neutralize . . . competitive threats," and the FTC's decision to "allow[] [the Instagram acquisition] to go through" in 2012 was an "institutional failure" that demands "a moment of reckoning."[12]

- ***In Her Posts on Twitter.***  Hours after the Commission filed its complaint against Facebook in federal district court, Chair Khan commented on the substance of the Commission's pending litigation on Twitter, expressing her opinions on the facts and merits.  She applauded the FTC and the States for "suing Facebook for violating antitrust laws—and requesting divestitures/breakups, among other forms of relief."[13]  She also presumed that Facebook has a monopoly in "social networking" and has a "copy-acquire-kill" strategy, calling on "enforcers" to stop Facebook.[14]

Although Facebook strongly disagrees with Chair Khan's factual and legal conclusions about Facebook, it does not criticize her for having participated in the Open Markets Institute, in academic scholarship, in the Subcommittee's investigation and subsequent Report, or, more generally, for speaking on issues of public concern and seeking to vigorously enforce the

---

[9] Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations*, at 151, 154-55 (Oct. 2020) (hereinafter "Report").

[10] *Id.* at 158, 160.

[11] *See* Sway, *She's Bursting Big Tech's Bubble*, N.Y. Times (Oct. 29, 2020) (transcript), https://www.nytimes.com/2020/10/29/opinion/sway-kara-swisher-lina-khan.html?showTranscript=1 (accessed July 14, 2021).

[12] *Id.*

[13] Lina M. Khan (@linamkhan), Twitter (Dec. 9, 2020), https://web.archive.org/web/20210614143417/https://twitter.com/linamkhan/status/1336828056695136259 (Ex. D).  These tweets were recently deleted but are available through the use of archive.org (*i.e.*, the "Wayback Machine").

[14] *Id.*

antitrust laws.  But her acknowledged leadership of the investigation and authorship of the Report, as well as her repeated and consistent public claims that Facebook is culpable for antitrust violations, would lead any disinterested observer to conclude that she has prejudged Facebook's alleged antitrust liability.  Under controlling D.C. Circuit precedent, that appearance of prejudgment requires her immediate recusal from any involvement in the antitrust litigation against Facebook.

That conclusion would follow even if Chair Khan were a non-Chair Commissioner, but her elevation to Chair makes her recusal obligation particularly obvious and urgent.  If she does not recuse herself, she will inevitably play a pivotal role as Chair in any upcoming decision by the Commission about how to respond to the district court's dismissal of the Commission's antitrust complaint, including whether to attempt to abandon the court case in favor of a Part 3 administrative proceeding, in which Chair Khan would ultimately rule on Facebook's liability. Because, "[a]s counsel for the [House] Subcommittee," Chair Khan "investigated and developed many of the[] same facts" the Commission has alleged and would allege here, her participation in any decision to revive this case would reflect a fundamental "insensitivity to the requirements of due process."[15]  Any decisions made with her participation would thus be subject to dismissal on that threshold ground.[16]  Facebook respectfully requests that Chair Khan recuse herself from any decisions regarding the Commission's pending litigation against Facebook.

---

[15] *Cinderella*, 425 F.2d at 591.

[16] *Id.* at 591-92.  With this filing, Facebook also puts Chair Khan and all other Commission personnel on notice to preserve all emails, memoranda, and other documents reflecting or relevant to her participation in this or any other Facebook matter, both before and after she joined the Commission.

# BACKGROUND

For the entirety of her professional career, Chair Khan has consistently and very publicly concluded that Facebook is guilty of violating the antitrust laws.  She has built her career, in large part, by singling out Facebook as a professed antitrust violator in her work at the Open Markets Institute, in academic writings, as leader of a congressional investigation and drafting of a final report, in public appearances and speeches, and on Twitter.

## I.      Chair Khan Has Prejudged Facebook's Antitrust Culpability

### A.      Chair Khan's Work On Behalf Of The Open Markets Institute

In 2011, Chair Khan started working at what would become the Open Markets Institute.[17]  This political advocacy organization claims to have "pioneered analysis of how Google, Amazon, and Facebook wield [monopoly] power in ways that threaten democracy and individual liberty."[18]  Chair Khan was a Policy Analyst and Reporter at Open Markets until 2014 and later became the Legal Director of the Institute in 2017.[19]  She held that role throughout 2018,[20]

---

[17] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).  The Open Markets Institute "[l]aunched as an independent organization in September 2017."  Open Markets Inst., *About, Our Mission*, https://www.openmarketsinstitute.org/our-mission (accessed July 14, 2021) [https://perma.cc/TTU4-RS96].  Before 2017, "the Open Markets Team spent eight years studying, speaking, and writing about the problem of market concentration as the Open Markets Program at New America."  *Id.*

[18] Open Markets Inst., *Programs*, *Technology & Power*, https://www.openmarkets institute.org/technology-power (accessed July 14, 2021) [https://perma.cc/9ABQ-5Y3N].

[19] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).  As of December 12, 2017, Open Markets' website listed Chair Khan as the "Director of Legal Policy."  Open Markets Inst., *About Open Markets* (Dec. 12, 2017), https://web.archive.org/web/20171212181705/http:/openmarkets institute.org/meet-our-team.

[20] Chair Khan's resume does not specify when in 2018 she stopped working at the Open Markets Institute, although she spoke on behalf of the organization at a conference on October 17, 2018.  *See* Open Markets Inst., *Testimony by Open Markets Senior Fellow Lina Khan at the FTC's Hearing #3: Competition and Consumer Protection in the 21st Century* (Oct. 17, 2018), https://www.openmarketsinstitute.org/publications/testimony-open-markets-senior-fellow-lina-

during which time "Open Markets' grassroots arm, Citizens Against Monopoly," started a
campaign called "Freedom from Facebook"[21] that Open Markets "spearheaded."[22]  The Freedom
from Facebook movement described itself as "a diverse coalition of organizations asking the
FTC to break up Facebook's monopoly on American social media," in part by "[s]pinning off
WhatsApp, Instagram, and [Facebook] Messenger to establish greater competition and support
market-based accountability[.]"[23]  Freedom from Facebook announced on its website that "five
members of the Federal Trade Commission . . . can make Facebook safe for our democracy by
breaking it up," and stated, "[t]ogether, we will make sure that they do."[24]

---

khan-ftcs-hearing-3-competition-consumer-protection-21st-century (accessed July 14, 2021).
[https://perma.cc/CDW9-VJUW]. In July 2018, Commissioner Rohit Chopra hired Chair Khan
as a Legal Fellow in his office.  *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B); Nancy Scola,
*FTC Democrat hires tech industry critic who's taken aim at Amazon*, POLITICO (July 9, 2018),
https://www.politico.com/story/2018/07/09/prominent-tech-critic-joins-dem-ftc-office-674511
(accessed July 14, 2021).

[21] Open Markets Inst., *The Corner Newsletter, May 31, 2018: Warren Buffet's Monopoly
Win – Corporate Buyers Contribute to Wage Stagnation – Growing Support for Single-Price
Health Care* (May 31, 2018), https://www.openmarketsinstitute.org/publications/corner-
newsletter-may-31-2018-warren-buffetts-monopoly-win-corporate-buyers-contribute-wage-
stagnation-growing-support-single-price-health-care (accessed July 14, 2021) [https://perma.cc
/G2YG-99V5].

[22] Open Markets Inst., *Freedom From Facebook's Comment to the FTC's "Competition
and Consumer Protection in the 21st Century" Hearing* (Aug. 20, 2018),
https://www.openmarketsinstitute.org/publications/freedom-facebooks-comment-ftcs-
competition-consumer-protection-21st-century-hearing (accessed July 14, 2021) [https://perma.
cc/2CLY-E4VP].

[23] Comment from Freedom from Facebook to FTC on "Competition and Consumer
Protection in the 21st Century Hearing, Project Number P181201" (Aug. 20, 2018),
https://static1.squarespace.com/static/5e449c8c3ef68d752f3e70dc/t/5ebf5afb915c861317ea5d1b/
1589598972273/FFF-FTC-Comment.pdf (accessed July 14, 2021) [https://perma.cc/EKE9-9F
6H].

[24] Freedom from Facebook, Home Page (Apr. 16, 2019), https://web.archive.org/web/
20190416162812/https:/freedomfromfb.com/.

Not only did Open Markets "spearhead" this anti-Facebook group while Chair Khan was the Director of Legal Policy, Open Markets also submitted a letter to the Commission in November 2017 on "Facebook's dominance in social networking and online advertising."[25] Chair Khan personally signed the letter, asking the agency to "assess the hazards that this dominance poses to commerce and competition, basic democratic institutions, and national security."[26]  The letter alleged "facts" positioning Facebook as a so-called "top-tier platform monopolist[ ]," claiming, among other things, that "Facebook has 77% of mobile social networking traffic in the United States" and that Facebook had "captured" 38% of "the growth in online advertising last year."[27]  Chair Khan and her organization claimed that "[t]he most obvious immediate step to address Facebook's current power is to prohibit mergers between Facebook [*sic*] other potentially competitive social networks or other new and promising products and services."[28]

While Chair Khan was Director of Legal Policy at the Open Markets Institute, the organization also advocated for the Commission to:

- "Spin off Facebook's ad network[.]"[29]

- "Reverse the approvals for Facebook [*sic*] purchases of WhatsApp and Instagram, and reestablish these as competing social networks."[30]

---

[25] Press Release, Open Markets Inst., *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions* (Nov. 1, 2017), https://www.openmarketsinstitute.org/publications/open-markets-institute-calls-on-the-ftc-to-block-all-facebook-acquisitions (accessed July 14, 2021) [https://perma.cc/DT2Y-D9XM].

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Press Release, *supra* note 5.

[30] *Id.*

- "Prohibit all future acquisitions by Facebook for at least five years."[31]

- "Threaten to bring further legal action against Facebook unless top executives immediately agree to work with the FTC to restructure their corporation to ensure the safety and stability of our government and economy."[32]

### B.      Chair Khan's Academic Writings

In the fall of 2018, Chair Khan became an Academic Fellow at Columbia Law School, where she authored law review articles that reiterated her belief that Facebook has violated the antitrust laws.[33]  Before the Commission informed Facebook that it had opened an antitrust investigation and before the House Subcommittee ever began its antitrust investigation, Chair Khan criticized Facebook at length in an article published in 2019, beginning a five-page section of the article with the claim that "Facebook is a dominant social network."[34]  The article further claimed:

- Facebook "has both foreclosed competitors from its platform and appropriated their business information and functionality."[35]

- "In addition to blocking apps that it deemed competitive threats, Facebook has also systematically copied them."[36]

- "Facebook has established a systemic informational advantage (gleaned from competitors) that it can reap to thwart rivals and strengthen its own position, either through introducing replica products or buying out nascent competitors."[37]

---

[31] *Id.*

[32] *Id.*

[33] News Release, Columbia Law School, *Antitrust Scholar Lina Khan Joins Faculty* (Dec. 2, 2020), https://www.law.columbia.edu/news/archive/antitrust-scholar-lina-khan-joins-faculty (accessed July 14, 2021) [https://perma.cc/LQ5K-VT5F].

[34] *See* Khan, *supra* note 6, at 1001-05.

[35] *Id.* at 1001.

[36] *Id.* at 1002.

[37] *Id.* at 1003.

- "Despite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course—perhaps because it no longer faced serious competition in the social network market."[38]

In another article published in 2019, Chair Khan (and a co-author) again criticized Facebook, presenting various legal conclusions about Facebook's allegedly anticompetitive conduct.[39]  The article also accused Facebook of using data in ways "that threaten the users' best interests, from allowing predatory advertising and enabling discrimination to inducing addiction and sharing sensitive details with third parties."[40]

### C.    Chair Khan's Leadership Of The House Majority's Investigation And Report

After a few months as an Academic Fellow, Chair Khan went on leave from Columbia Law School in March 2019 to join the U.S. House Committee on the Judiciary – Subcommittee on Antitrust, Commercial, and Administrative Law as Majority Counsel.[41]  According to her website, Chair Khan "*led* the congressional investigation into digital markets and the publication of [the] final report" of the Subcommittee's Majority Staff.[42]  That document is explicitly styled as a report, not of the Subcommittee itself, but of the Subcommittee's "Majority Staff," on which Chair Khan served as "Counsel."

A 42-page section of that Report, entitled "Facebook," includes numerous purported factual findings that ostensibly support the Report's core legal conclusions – that Facebook has

---

[38] *Id.* at 1004.

[39] *See* Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497 (2019).

[40] *Id.* at 498.

[41] Lina M. Khan, Resume, *supra* note 4 (Ex. B); News Release, *supra* note 33.

[42] Lina M. Khan, Bio, *supra* note 8 (Ex. C) (emphasis added).

"monopoly power" in a relevant antitrust market, that it both obtained and maintained that monopoly power through anticompetitive means, and that its conduct harmed consumers.

Especially relevant here, the Report's "Facebook" section specifically purports to find that Facebook "acquired Instagram to neutralize a nascent competitive threat" that "was growing significantly at the time of the transaction" and that "Facebook's support of Instagram's growth after acquiring it is overstated."[43]  As for Facebook's acquisition of WhatsApp, the Report purports to find that "Facebook acquired WhatsApp to expand its dominance" and to takeover "a maverick competitor."[44]

The remainder of the Report's "Facebook" section appears calculated to support, with purported legal and factual findings, the essential elements of a Section 2 offense.

*First*, the Report concludes that "social networking" is a relevant antitrust market.[45]  The Report defines this market as separate from the market for "social media," based on the Subcommittee's "review[ ] [of] relevant market data and documents provided during the investigation."[46]  The Report further describes the "social networking" market as having "high entry barriers . . . that discourage direct competition by other firms."[47]

---

[43] Report, *supra* note 9, at 151, 154-55.

[44] *Id.* at 158, 160.

[45] *Id.* at 11 (identifying the market for "social networking" as one of "[s]everal markets investigated by the Subcommittee"); *id.* at 90 (distinguishing "between social networking and social media markets"); *id.* at 12 (claiming that Facebook operates "in the market for social networking"); *id.* at 13 (same); *id.* at 133 (same); *id.* at 134 (same); *id.* at 136 (same); *id.* at 138 (same); *id.* at 144 (same); *id.* at 147 (same); *id.* at 149 (same); *id.* at 160 (same); *id.* at 170 (same); *id.* at 172 (same).

[46] *Id.* at 139.

[47] *Id.* at 133.

*Second*, the Report concludes that Facebook has "monopoly power" in that supposed market.[48]  It purports to find that "Facebook and its family of products—Facebook, Instagram, Messenger, and WhatsApp—control a significant share of users and high reach in the social networking market,"[49] and this "demonstrates its monopoly power."[50]

*Third*, the Report concludes that Facebook illegally acquired and maintained its supposed monopoly power through anticompetitive means.[51]  It purports to find that "the company acquired firms it viewed as competitive threats to protect and expand its dominance in the social networking market,"[52] including Instagram and WhatsApp.  For example, the Report asserts that "the purpose of acquiring nascent competitors like Instagram was to neutralize competitive threats"[53] and that Facebook acquired WhatsApp because it "viewed WhatsApp as a potential threat to Facebook Messenger."[54]  The Report concludes that these "serial acquisitions reflect the

---

[48] *Id.* at 12 ("Facebook has monopoly power in the market for social networking."); *id.* at 133 (same); *id.* at 136 (same); *id.* at 13 ("Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms."); *id.* at 137 ("Facebook's maintenance of these high market shares over a long time period demonstrates its monopoly power."); *id.* at 147 ("Facebook has a significant data advantage [that] . . . reinforc[es] Facebook's monopoly power."); *id.* at 170 ("Facebook has monopoly power in online advertising in the social networking market.").

[49] *Id.* at 136.

[50] *Id.* at 137.

[51] *Id.* at 12 ("Facebook acquired its competitive threats to maintain and expand its dominance."); *id.* at 149 (same); *id.* at 14 ("The company used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms."); *id.* at 160 (same); *id.* at 166 ("Facebook [w]eaponized [a]ccess to its [p]latform.").

[52] *Id.* 149.

[53] *Id.* at 149-50.

[54] *Id.* at 150.

company's interest in purchasing firms that had the potential to develop into rivals before they could fully mature into strong competitive threats."[55]

*Finally*, the Report concludes that Facebook's conduct has caused cognizable consumer harm.  It claims, "[i]n the absence of competition, Facebook's quality has deteriorated over time, resulting in worse privacy protections for its users and a dramatic rise in misinformation on its platform."[56]

Chair Khan's personal involvement in both the investigation and the Report was extensive, including personally participating in calls, emails, and an in-person meeting with Facebook's outside counsel.  In these communications, Chair Khan regularly spoke on behalf of the Committee, describing the scope of the investigation and her beliefs on the sufficiency of Facebook's responses.

### D.    Chair Khan's Public Appearances

Before and after she led the congressional investigation into Facebook, Chair Khan publicly shared her beliefs about Facebook's allegedly anticompetitive conduct.  For example, in 2018, Chair Khan said, "to make sure Facebook isn't acquiring further power . . . , if Facebook tomorrow announces it is acquiring another company, I would hope that the FTC would look at that very closely *and block it*," both presuming that Facebook has too much "power" and proposing that the government block *any* future acquisition.[57]

---

[55] *Id.*

[56] *Id.* at 14.

[57] *The Bernie Sanders Show* (May 15, 2018) (starting at 20:29), https://www.youtube.com/watch?v=wuCAy10hlHI&t=1229s (emphasis added).

Two years later, shortly after the Report was issued in October 2020, Chair Khan reaffirmed her belief in its purported conclusions about Facebook in a transcribed interview for the *New York Times*.[58]  She expressed satisfaction that "more of [Facebook's] predatory practices are coming to account," such as "near-perfect market intelligence it can use . . . to cut off any competitor, to buy up that competitor, to introduce replica services."[59]  She claimed that Facebook had engaged in "killer acquisition[s] . . . in several cases," in that it "acquire[d] a company for the purpose of shutting it down, for the purpose of killing it because [Facebook] recognize[d] that a product could be a threat to them."[60]  She reaffirmed her personal belief in the Report's conclusions that "Facebook's acquisition strategy was basically a land grab to . . . lock up the market" and, in particular, that its "purchase of Instagram was an effort to really neutralize . . . competitive threats."[61]  And she claimed that the FTC's decision to "allow[] [the Instagram acquisition] to go through" in 2012 was an "institutional failure" that demands "a moment of reckoning."[62]

In addition, Chair Khan publicly stated that Facebook and others "control the infrastructure on which digital commerce and communications take place," noting that "[t]hey've used their gatekeeper power both to *extort* and to *exploit* the individuals and entities that rely on

---

[58] *See* Sway, *supra* note 11.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

their technologies.  They've maintained and extended their power through serial acquisitions and through *coercive* and *predatory* tactics."[63]

### E.      Chair Khan's Statements On Twitter

On December 9, 2020, the same day that the Commission and States filed their complaints against Facebook in federal district court, Chair Khan reaffirmed her prior conclusions about Facebook's antitrust culpability in a series of tweets that are no longer visible on her Twitter profile but are available through the use of archive.org (*i.e.*, the "Wayback Machine").[64]  In those tweets, she applauded the FTC and state attorneys general for "suing Facebook for violating antitrust laws—and requesting divestitures/breakups, among other forms of relief."[65]  She described the "States' complaint [as] especially impressive" in that it "fully showcas[ed] how Instagram & WhatsApp acquisitions were part of [a] broader monopoly maintenance strategy."[66]  She further presumed that Facebook has a monopoly in "social networking" and has long used a "copy-acquire-kill" strategy to preserve its dominance, calling on "enforcers" to stop Facebook from continuing this strategy.[67]  She also criticized Facebook for making "another acquisition" just "two days before being sued by the federal government & 48 AGs for a series of illegal acquisitions."[68]

---

[63] Andy Fitch, *Concentrated Control: Talking to Lina Khan*, L.A. Rev. of Books (Dec. 19, 2020), https://blog.lareviewofbooks.org/interviews/concentrated-control-talking-lina-khan/ (accessed July 14, 2021) [https://perma.cc/B3XZ-J25G ] (emphases added).

[64] Lina M. Khan, Twitter, *supra* note 13 (Ex. D).

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

## II.     Chair Khan's Prejudgment Of Facebook's Broader Conduct

Chair Khan has also made numerous statements that would demonstrate to a disinterested observer that she has a broadly negative view of the company.  For instance, in one of her academic articles, Chair Khan and a co-author analogized Facebook to a doctor, named "Marta Zuckerberg," who "has planted surveillance devices all around your neighborhood as well as her office" and whose "main source of income is enabling third parties to market you goods and services."[69]  The emphasis of the comparison was that, "unlike doctors, Facebook does not come close to putting its customers first in any serious sense—notwithstanding Zuckerberg's protestations to the contrary."[70]  The article also described how Facebook "serves (or disserves) its users, characterizing the relationship as "an elaborate system of social control whose terms are more imposed than chosen."[71]

Going further, Chair Khan alleged that Facebook is "associated with a host of social ills," including "serving as a tool for the incitement of genocide in Myanmar" and "amplifying the influence of 'fake news,' conspiracy theories, bot-generated propaganda, and inflammatory and divisive content more broadly."[72]  Again, consistent with the Open Markets Institute's Freedom from Facebook mission, Chair Khan supported "antitrust lawsuits reversing key acquisitions and penalizing forms of monopoly leveraging" and suggested that "Facebook and Google have achieved their dominance through anticompetitive means."[73]

* * *

---

[69] Khan & Pozen, *supra* note 39, at 514.

[70] *Id.* at 514 n.81.

[71] *Id.* at 520.

[72] *Id.* at 526-27 (footnote omitted).

[73] *Id.* at 538-39.

Facebook reiterates that it is not seeking Chair Khan's recusal because she has generally criticized "Big Tech" or expressed an eagerness to vigorously enforce the antitrust laws.  Rather, recusal is appropriate because she has consistently and repeatedly concluded that Facebook in particular has engaged in conduct that satisfies the elements of an antitrust offense under existing law.  For the reasons discussed below, Chair Khan's public prior statements would lead any disinterested observer to conclude that her participation in this matter would deny Facebook due process.

## ARGUMENT

I.   **Commissioners Must Be Recused When Their Prior Congressional Work Or Public Statements Convey An Appearance That They Have Prejudged The Liability Of A Particular Defendant**

Cases from the D.C. Circuit and other courts are directly on point and unequivocal in their holdings.  The relevant court cases clearly invalidated FTC decisions tainted by the participation of a Commissioner whose prior investigatory work or public statements would lead "a disinterested observer [to] conclude" that she "has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."[74]  The Sixth Circuit's holding in *American Cyanamid* – which the D.C. Circuit reaffirmed in *Cinderella* – is particularly relevant because the due process violation in that case is nearly identical to the due process violation the Commission would commit here in the absence of Chair Khan's recusal.

_____

[74] *Cinderella*, 425 F.2d at 591 (internal citation omitted); *see also Am. Cyanamid*, 363 F.2d at 757; *Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *vacated and remanded on other grounds*, 381 U.S. 739 (1965); *see also Inova Health Sys. Found.*, 2008 WL 2307161, at *3 (F.T.C. May 29, 2008) (citing *Cinderella*, 425 F.2d at 591, and explaining that disqualification is appropriate "if there [is] a demonstration of bias, prejudgment or apparent unfairness on the part of the decision-maker be he an ALJ or a Commissioner").

In *American Cyanamid*, FTC Chair Paul Rand Dixon refused to recuse himself from an antitrust case, even though, as counsel to a Senate Subcommittee, he had "played an 'active role' in an [antitrust] investigation by that Subcommittee of many of the same facts and issues and of the same parties as are involved in this [FTC] proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties."[75]  The Sixth Circuit was "not impressed with the Commission's argument that the proceedings before the Senate Subcommittee had no relationship to the proceedings before the Commission because the former were 'legislative' and 'investigative' in nature."[76]  And it concluded that Chair Dixon's participation in the FTC's case against the same defendants for the same conduct "amounted to a denial of due process which invalidated the order under review."[77]  The court added:  "It is fundamental that both unfairness and the appearance of unfairness should be avoided.  Wherever there may be reasonable suspicion of unfairness, it is best to disqualify."[78]

The D.C. Circuit reaffirmed that holding in *Cinderella* several years later.  There, the court vacated a different FTC order on the ground that Chair Dixon had given a speech that, in one passage, appeared to prejudge the defendants' legal culpability.  The court held that FTC Commissioners may not "make speeches which give the appearance that [a] case has been prejudged" because doing so "may have the effect of entrenching a Commissioner in a position

---

[75] *Am. Cyanamid*, 363 F.2d at 763, 767.

[76] *Id.* at 767.

[77] *Id.* (quoting *Texaco*, 336 F.2d at 760) (ellipsis omitted).

[78] *Id.*

which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record."[79]

The D.C. Circuit then pointedly criticized Chair Dixon for his participation in the earlier FTC matter at issue in *American Cyanamid*. The court agreed with the Sixth Circuit that Chair Dixon had displayed an "appalling . . . insensitivity to the requirements of due process" when – "[i]ncredible though it may seem" – he participated in an FTC case against particular defendants even though he "had investigated and developed many of the[ ] same facts" asserted against those defendants as a congressional staffer.[80]

For recusal purposes, Chair Khan stands in an even worse position than Chair Dixon. Like Chair Dixon, she "played an 'active role' in an investigation by [a congressional] Subcommittee of many of the same facts and issues" that would be asserted in any new FTC complaint or appeal involving Facebook, and she "participated in the preparation of the report of the Subcommittee on the same facts [and] issues."[81] And, like Chair Dixon in *Cinderella*, she has made additional public statements against Facebook that "may have the effect of entrenching [her] in a position" regarding Facebook, "making it difficult, if not impossible, for h[er] to reach a different conclusion in the event [s]he deems it necessary to do so after consideration of the record."[82] Her participation in the congressional investigation and Report, as well as her repeated public condemnations of Facebook, independently require her recusal from

---

[79] *Cinderella*, 425 F.2d at 590; *see also Texaco*, 336 F.2d at 760 (finding a due process violation because of a different speech by Chair Dixon).

[80] *Cinderella*, 425 F.2d at 591.

[81] *Am. Cyanamid*, 363 F.2d at 763, 767.

[82] *Cinderella*, 425 F.2d at 590.

participating in any decisions by the Commission regarding the future of its antitrust case against Facebook.

Specifically, as set forth above, *see supra* pages 10-13, the Report contains purported factual findings and legal conclusions to the effect that Facebook has violated Section 2 of the Sherman Act.  For instance, the Report finds that Facebook obtained monopoly power in a "social networking" market, acquired Instagram in 2012 "to maintain Facebook's position," and that Facebook acquired WhatsApp in 2014 "to further entrench Facebook's dominance," all to consumers' supposed detriment. [83]  All of these "findings" and "conclusions" are attributable to Chair Khan, who avowedly "led the congressional investigation into digital markets and the publication of [the] final report" before joining the Commission.[84]  Again, settled precedent requires recusal of any FTC Commissioner from an antitrust case if, in a prior job, she "played an 'active role' in [a congressional antitrust] investigation . . . of many of the same facts and issues and of the same parties as are involved in" the FTC case and "participated in the preparation of the report of the Subcommittee on the same facts, issues and parties."[85]  That is plainly the case here.

Chair Khan has also made a variety of public statements before joining the Commission that would leave any disinterested observer with the impression that she has already concluded that Facebook is liable for violating the antitrust laws.  As explained in greater detail above, Chair Khan has reached definitive conclusions about essential elements of Facebook's alleged Section 2 liability, including market definition, monopoly power, and the nature and

---

[83] Report, *supra* note 9, at 150.

[84] Lina M. Khan, Bio, *supra* note 8 (Ex. C).

[85] *Am. Cyanamid*, 363 F.2d at 763, 767; *see also Cinderella*, 425 F.2d at 591-92.

consequences of Facebook's acquisitions and Platform policies.  She has reaffirmed these conclusions in multiple academic articles, in public appearances, and on Twitter, and has done so in the context of the very antitrust case that she might now direct or rule on in her role as Chair.

In sum, these public statements confirm Chair Khan's deeply-held commitment to the conclusions that she drew about Facebook in the Report, independently warranting her recusal. Like the Report, her statements in law review articles, public interviews, and tweets promote her conclusions that Facebook has monopoly power in a defined antitrust market, that it acquired and maintained that monopoly power through unlawful and anticompetitive means, including specifically by acquiring Instagram and WhatsApp, and that it should now face "divestitures/breakups, among other forms of relief."[86]  Indeed, her statements about Facebook are far more numerous and explicit than Chair Dixon's statements at issue in *Cinderella* that the D.C. Circuit found sufficient to vacate the FTC orders tainted by his participation.[87]

## II.   Chair Khan's Recusal Is Required Now, Before The Commission Decides How To Proceed

Chair Khan should not be permitted to participate in deciding whether and, if so, how the FTC's case against Facebook should proceed.  Due process requires a Commissioner who appears to have prejudged a case on the basis of her prior work or public statements to recuse herself from participating in that case, and a Commissioner recused on this basis cannot lawfully participate in developing the Commission's strategy for how to proceed going forward.[88]  Chair Khan does not come to this juncture in the agency's decisionmaking regarding Facebook with views formed by the FTC's investigation but rather with beliefs formed and expressed on social

---

[86] Lina M. Khan, Twitter, *supra* note 13 (Ex. D).

[87] *See Cinderella*, 425 F.2d at 591; *Texaco*, 336 F.2d at 760.

[88] *See Cinderella*, 425 F.2d at 591.

media, in academic writings, and in the Report before she joined the Commission.  What she brings to any decision regarding Facebook is thus not objective weighing of the evidence gathered in the course of the agency's investigation, but prejudgment of those very same issues from her activities outside the agency, many of which predated even the beginning of the FTC's investigation.

Moreover, with respect to the FTC's Part 3 procedures, there is little distinction between Chair Khan's role as a "prosecutor" and her role as an "adjudicator."  For one thing, as a matter of historical practice, the "FTC has not lost a single case [in its administrative proceedings] in the past quarter-century"[89] because it reaches its own conclusions regardless of those of its Administrative Law Judges.  Accordingly, if Chair Khan participates in authorizing a Part 3 complaint against Facebook, such authorization effectively guarantees that the Commission would ultimately find liability, and thus her participation in authorizing the Part 3 complaint is functionally an adjudication on the merits.  Furthermore, Chair Khan's participation in the decision as to *whether* the Commission should proceed would violate Facebook's due process rights because of her "prejudice concerning specific controverted factual issues" and her conclusions on "the ultimate issue of liability."[90]  But, more than that, Chair Khan's powers go beyond merely voting, as her role as Chair of the FTC vests her with tremendous powers to use her discretion to direct the Commission.

---

[89] *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021).

[90] *Kellogg Co.*, 92 F.T.C. 877, 1978 WL 206540, at *1 (F.T.C. Nov. 30, 1978).

No matter her role or the decision that the Commission reaches, every "government lawyer in a civil action or administrative proceeding" owes a minimal "duty of neutrality."[91] When, as here, she "has a personal interest in the litigation," or even the mere appearance of a personal interest, "the neutrality so essential to the system is violated."[92]  Indeed, an interested prosecutor violates the "fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion."[93]  As Professor Thomas D. Morgan of The George Washington University opined, "it is reasonable to conclude that an FTC Chair whose impartiality could reasonably be questioned by an objective observer must step aside rather than personally participate in those decisions."[94]

Here, Chair Khan cannot meet any standard for neutrality that would permit her to participate in any decisionmaking regarding the FTC's pending antitrust litigation.  Her numerous statements throughout her career that reflect her belief in Facebook's culpability under

---

[91] *People ex rel. Clancy v. Superior Ct.*, 705 P.2d 347, 350-51 (Cal. 1985); *see, e.g.*, Charlie Savage, *Biden Administration Punts on Due Process Rights for Guantánamo Detainees*, N.Y. Times (July 9, 2021), https://www.nytimes.com/2021/07/09/us/politics/guantanamo-detainees-due-process.html (accessed July 14, 2021) (noting that U.S. Attorney General Merrick B. Garland "recused himself from playing any role in the litigation" before the D.C. Circuit on "whether Guantánamo detainees have any due process rights").

[92] *Clancy*, 705 P.2d at 351; *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) (due process imposes enforceable "limits on the partisanship of administrative prosecutors").

[93] *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987); *see also United States ex rel. SEC v. Carter*, 907 F.2d 484, 488 (5th Cir. 1990) (disqualifying SEC attorneys from leading criminal contempt prosecutions arising out of underlying SEC enforcement case); *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.) (prosecutor must be disqualified if she is not "disinterested" or has "an axe to grind against the defendant"); Am. Bar Ass'n, Model Rules of Prof'l Conduct R. 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

[94] *See* Expert Decl. of Prof. Thomas D. Morgan, *supra* note 3, at 17-18 (Ex. A).

the antitrust laws, as well as her "active role" in the investigation of "many of the same facts and issues and of the same part[y]" as counsel to the House Antitrust Subcommittee's Majority Staff, create the appearance that she has prejudged the merits of the FTC's case against Facebook and thus require her recusal.[95]  Moreover, her comments that "Facebook does not come close to putting its customers first in any serious sense"[96] and that Facebook is "associated with a host of social ills"[97] suggest that Chair Khan has "an axe to grind against" Facebook.[98]  Her negative statements about Facebook even predate her attending law school.[99]

A disinterested observer would conclude that she could not revisit her conclusions about Facebook with an open mind now that she is the FTC Chair, even in the face of contrary evidence.  It has only been about 9 months since she led preparation of the House Antitrust Report, with its conclusions that Facebook has violated the antitrust laws.  Not long before this, she was personally involved in lobbying the FTC "to address Facebook's current power" by "prohibit[ing] mergers between Facebook [*sic*] other potentially competitive social networks or other new and promising products and services."[100]  And during this same time, her organization "spearheaded" the "Freedom From Facebook coalition"[101] and advocated for, among other things, the FTC to "[r]everse the approvals for Facebook [*sic*] purchases of WhatsApp and

---

[95] *Am. Cyanamid*, 363 F.2d at 763.

[96] Khan & Pozen, *supra* note 39, at 514 n.81.

[97] *Id.* at 526.

[98] *Wright*, 732 F.2d at 1056.

[99] *See*, *e.g.*, Zephyr Teachout & Lina Khan, *Market Structure and Political Law: A Taxonomy of Power*, 9 Duke J. Const. L. & Pub. Pol'y 37, 55 (2014) (written on Aug. 15, 2014).

[100] Press Release, *supra* note 25.

[101] Public Comment, *supra* note 22.

Instagram, and reestablish these as competing social networks."[102]  Even more than the speech at

issue in *Cinderella*, Chair Khan's public authorship of the Report and advocacy as part of the

Open Markets Institute "ha[d] the effect of entrenching [her] in a position which [s]he has

publicly stated, making it difficult, if not impossible, for h[er] to reach a different conclusion in

the event [s]he deems it necessary to do so after consideration of the record."[103]

Finally, for many of the same reasons, Chair Khan's participation in the Facebook

antitrust litigation would violate not only due process but also her obligations of impartiality

under the federal ethics rules.  Those rules require any federal official to "avoid an appearance of

loss of impartiality in the performance of [her] official duties."[104]  The Office of Government

Ethics has specifically noted that an official's "political . . . association[s] . . . may raise an

appearance question" requiring recusal even if they do not give rise to a "covered

relationship."[105] Chair Khan's leadership of the Subcommittee's investigation and Majority Staff

Report illustrates exactly the type of "political association" that warrants recusal.

## CONCLUSION

Facebook respectfully requests that Chair Khan be recused from participating in any

decisions regarding whether and how to continue the Commission's antitrust case against

---

[102] Press Release, *supra* note 5.

[103] *Cinderella*, 425 F.2d at 590.

[104] 5 C.F.R. § 2635.501(a); *see also* Ethics Orientation for New FTC Employees, at 10-11 (rev. June 2019), https://www.ftc.gov/system/files/attachments/office-general-counsel/ieo_for_new_ftc_employees.pdf (accessed July 14, 2021) (noting that the FTC itself requires "every employee" to "act impartially and not give preferential treatment to any private organization or individual").

[105] Mem. to Designated Agency Ethics Officials Regarding Recusal Obligation and Screening Arrangements, OGE Informal Advisory Mem. 99 X 8, 1999 WL 33308429, at *2 (Apr. 26, 1999).

Facebook.  Chair Khan's statements – which are unsupported and contrary to law – convey to any disinterested observer that she has already decided the material facts relevant to the Commission's pending antitrust lawsuit against Facebook, well before becoming a Commissioner.  Chair Khan has also already concluded that Facebook was liable under the antitrust laws.  Thus, Chair Khan's recusal is necessary in order to protect the fairness and impartiality of the proceedings.

Respectfully submitted,

Dated:  July 14, 2021

/s/  *Geoffrey M. Klineberg*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
gklineberg@kelloghansen.com

*Counsel for Defendant Facebook, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2021, I sent via electronic mail Facebook, Inc.'s foregoing Petition for Recusal to the following:

**Lina Khan**
Chair of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
lkhan@ftc.gov

**Noah Joshua Phillips**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
nphillips@ftc.gov

**Rohit Chopra**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
rchopra@ftc.gov

**Rebecca Kelly Slaughter**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
rslaughter@ftc.gov

**Christine S. Wilson**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
cwilson3@ftc.gov

**April J. Tabor**
Secretary of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
atabor@ftc.gov

/s/ *Geoffrey M. Klineberg*
Geoffrey M. Klineberg

# Exhibits to Facebook, Inc.'s Petition for Recusal (July 14, 2021)

# Exhibit A

**BEFORE THE FEDERAL TRADE COMMISSION**

_____

                                                )

**In re Motion to Recuse**                             )

**Chair Lina M. Khan**                              )

**from Involvement in Certain Antitrust Matters**   )

**Involving Amazon.com, Inc.**                   )

_____)_____

**EXPERT DECLARATION OF PROFESSOR THOMAS D. MORGAN**

---

**1.**       **Professional Experience and Background**

       I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois.  I am S. Chesterfield Oppenheim Professor Emeritus of Antitrust and Trade Regulation Law at The George Washington University Law School where I was on the faculty from 1989 to 1998 and from 2000 to 2013.  From 1998 to 2000, I was the first Rex E. Lee Professor of Law at the J. Reuben Clark Law School, Brigham Young University.  From 1980 to 1985, I was Dean of the Emory University School of Law, and from 1985 to 1989, I was a professor at Emory.  From 1966 to 1980, less time for military service, I was a professor at the College of Law, University of Illinois.

       I have taught both antitrust law and administrative law during my career, and my law school casebook, _Modern Antitrust Law and Its Origins_ (5th ed. 2014), was published by West Academic. However, most of my teaching and scholarly research has been in the field of legal and judicial ethics.  I taught courses in both subjects one or more times each year for the forty years from 1974

through my retirement in 2013.  I continue to co-author a law school casebook covering both legal and judicial ethics, *Professional Responsibility: Problems and Materials* (13th ed. 2018), published by Foundation Press.

I served as one of two Associate Reporters for the American Law Institute (ALI) project that produced the comprehensive *Restatement of the Law (Third): The Law Governing Lawyers* (2000).  I then served as one of the two Associate Reporters for the American Bar Association's (ABA) Commission on Revision of the Model Rules of Professional Conduct—the Ethics 2000 Commission—whose work led to extensive revision of the ABA Model Rules in 2002.  I currently serve as an Advisor to the ALI project on Principles of Government Ethics.  I have received two awards for lifetime contributions to legal ethics scholarship—the American Bar Foundation's Keck Award in 2000 and the New York State Bar Association's Sanford D. Levy Award in 2008.[1] My curriculum vitae listing my publications, presentations and professional activities is attached to this report.

## 2.    My Engagement

Outside counsel for Amazon.com, Inc. (Amazon) has retained me as an expert to consider whether it would be appropriate to conclude that judgments about Amazon expressed by FTC Chair Lina M. Khan prior to her confirmation as a Commissioner at the Federal Trade Commission (FTC) compel Chair Khan to recuse herself from all antitrust cases involving Amazon that consider factual issues she purports to have determined in her academic articles, her public advocacy publications, and her leadership role in preparation of a recent Majority Staff Report of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law.  I have previously rendered expert opinions on questions concerning obligations of lawyers and judges in

---

[1] Organizations named above are for identification only.  None is responsible for the content of this Declaration.

2

affidavits, depositions, and testimony in approximately one hundred cases, and my declarations, affidavits, and testimony as an expert have been admitted in state and federal courts all over the country.  I am being compensated by counsel at my current regular rate for time spent preparing this report and any time later required.  No part of the compensation I receive is dependent on the conclusions I reach or the result in any matter in which this Declaration might be introduced.

## 3.    The Factual Record Relevant to My Opinions

Lina M. Khan graduated from college in 2010.  In 2011, she went to work in the Open Markets Program at the New America Foundation, a think-tank advocating about what it sees as issues relating to the exercise of corporate power.  She maintained an affiliation with that organization and its successor, the Open Markets Institute, in various roles through 2018.  She was a Policy Analyst (2011-14), a Fellow (2014-17), and Legal Director (2017-18).  Ms. Khan then served as Counsel to the Majority Staff of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, and as an Associate Professor of Law at Columbia Law School.

Professor Khan was confirmed by the Senate and sworn in as a Commissioner of the Federal Trade Commission (FTC) on June 15, 2021.  That same day, President Biden named Commissioner Khan the FTC Chair.  In her new role, Chair Khan has all "the executive and administrative functions of the Commission, including functions of the Commission with respect to (1) the appointment and supervision of personnel employed under the Commission, (2) the distribution of business among such personnel and among administrative units of the Commission, and (3) the use and expenditure of funds."[2]  In short, Chair Khan is in a position today to direct

---

[2] 15 U.S.C. § 41, implementing the Reorganization Act of 1949 pursuant to Reorganization Plan No. 8 of 1950 and Reorganization Plan No. 4 of 1961.

Federal Trade Commission staff to take action that affects particular companies. Whether the law permits her to so act in antitrust matters involving Amazon is the subject of this Declaration.

Beginning in 2014, the year she became a student at Yale Law School, Chair Khan began to write prolifically. She did some of her work at Yale, and later, some at Columbia. Some of Chair Khan's articles are written at a high level of generality and are not the subject of this Declaration. My focus will be on a series of other articles, begun at Open Markets/New America, in which Chair Khan has been aggressive in her condemnation of Amazon by name and in which she makes numerous specific assertions that Amazon has engaged in illegal practices that are within the jurisdiction of the FTC. I summarize each article briefly here to provide the context for my later opinions.

*A Remedy for the Amazon-Hachette Fight?* (2014) was an article for CNN about a dispute in which Amazon allegedly raised prices of books sold on the Amazon website that were published by Hachette, a major French publisher. Chair Khan said Amazon then offered to lower the prices to consumers (and thereby increase Hachette's sales) only if Hachette would lower prices at which it sold the books to Amazon. Chair Khan proposed invoking the Robinson-Patman Act against Amazon, saying that the Act "prohibits a retailer from wielding its mere size to bully suppliers for discounts." Amazon might be willing to sell books to consumers at lower prices than traditional publishers, she asserted, but the purpose of the Robinson-Patman Act is to "give smaller entities a fair chance at competing." "It's worth remembering," she concluded, "that [Amazon's] tactic— holding the publisher hostage unless it concedes to better terms—flouts the principles of anti-price-discrimination laws."

*What Everyone's Getting Wrong About Amazon*, QZ [Quartz] (Oct. 17, 2014), continued Chair Khan's attack on Amazon by name for charging low prices. Responding to articles

4

defending Amazon's growth, she contended that a "major way Amazon has secured its dominance is through steeply discounting products and using books as 'loss-leaders' to sell its other wares." She dismissed suggestions that Amazon faced serious competition in retail sales.  "First off, approximating Amazon's command as a percent of *everything sold* (minus gas, food & drinks, building supplies) in America is insane.  It dissolves the dominance Amazon enjoys in specific sectors—like books, but also in electronics like televisions and in industrial goods like valves." Amazon, she declared, "has a monopoly in books.  It has also attained a dominant position in our economy unlike anything we've seen in the last 50 years.  That alone should alarm us."

*How to Reboot the FTC*, POLITICO (Apr. 13, 2016), was Chair Khan's call for antitrust enforcement action against Amazon as a platform company.  She argued that a reinvigorated Federal Trade Commission should "take seriously the threats to competition posed by online platform monopolies," and included Amazon in her list of supposed threats.  While acknowledging that platforms often provide "great ease and convenience for consumers," Chair Khan complained that the companies "can also use their market power to squeeze or disadvantage the sellers and suppliers that depend on them."

*Amazon's Antitrust Paradox*, 126 YALE L.J. 710 (2017), a student note, assembled many of the charges Chair Khan previously made against Amazon into an integrated series of findings indicting Amazon for its alleged "structural dominance" and alleged "anticompetitive" activity.

> "In addition to using below-cost pricing to establish a dominant position in e-books, Amazon has also used this practice to put pressure on and ultimately acquire a chief rival. * * * In 2008, Quidsi was one of the world's fastest growing e-commerce companies.  It oversaw several subsidiaries: Diapers.com (focused on baby care), Soap.com (focused on household essentials), and BeautyBar.com (focused on beauty products).  Amazon expressed interest in acquiring Quidsi in 2009, but the company's founders declined Amazon's offer.  Shortly after Quidsi rejected Amazon's overture, Amazon cut its prices for diapers and other baby products by up to 30%. * * * Struggling to keep up with Amazon's pricing war, Quidsi's owners began talks with Walmart about potentially selling

5

the business. Amazon intervened and made an aggressive counteroffer.  * * * After completing its buy-up of a key rival—and seemingly losing hundreds of millions of dollars in the process—Amazon went on to raise prices**.**"

*Id.* at 768-70.

Chair Khan asserted as established fact that:

"As its history with Quidsi shows, Amazon's willingness to sustain losses has allowed it to engage in below-cost pricing in order to establish dominance as an online retailer.  Amazon has translated its dominance as an online retailer into significant bargaining power in the delivery sector, using it to secure favorable conditions from third-party delivery companies.  This in turn has enabled Amazon to extend its dominance over other retailers by creating the Fulfillment-by-Amazon service and establishing its own physical delivery capacity.  This illustrates how a company can leverage its dominant platform to successfully integrate into other sectors, creating anticompetitive dynamics."

*Id.* at 774.

Chair Khan outlined the future antitrust significance of her findings:

"Amazon is positioned to use its dominance across online retail and delivery in ways that involve tying, are exclusionary, and create entry barriers.  That is, Amazon's distortion of the delivery sector in turn creates anticompetitive challenges in the retail sector.  For example, sellers who use [Fulfillment-by-Amazon] have a better chance of being listed higher in Amazon search results than those who do not, which means Amazon is tying the outcomes it generates for sellers using its retail platform to whether they also use its delivery business."

*Id.* at 778.

Chair Khan summed up her conclusions about Amazon's likely antitrust liability:

"Amazon has responded to popular third-party products by producing them itself. * * * The anticompetitive implications here seem clear:  Amazon is exploiting the fact that some of its customers are also its rivals. The source of [Amazon's market] power is:  (1) its dominance as a platform, which effectively necessitates that independent merchants use its site; (2) its vertical integration—namely, the fact that it both sells goods as a retailer and hosts sales by others as a marketplace; and (3) its ability to amass swaths of data, by virtue of being an internet company.  Notably, it is this last factor—its control over data—that heightens the anticompetitive potential of the first two."

6

*Id.* at 782-83.

In *Amazon Bites Off Even More Monopoly Power*, NEW YORK TIMES (June 21, 2017), Chair Khan protested Amazon's plan to acquire Whole Foods.

> "Amazon on Friday announced plans to acquire Whole Foods, the high-end grocer. * * * Amazon will argue to federal authorities, most likely the Federal Trade Commission, that the deal should be blessed because the combined entity's share of the American grocery market will be less than 5 percent.  But antitrust officials would be naïve to view this deal as simply about groceries.  Buying Whole Foods will enable Amazon to leverage and amplify the extraordinary power it enjoys in online markets and delivery, making an even greater share of commerce part of its fief."

Chair Khan called Amazon a "vast empire" that "self-deal[s] with great finesse" and "dictates terms and prices to those dependent on" its services.

*Stop Amazon From Selling Books—or Anything Else—Below Cost* is a portion of *6 Ideas to Rein in Silicon Valley, Open Up the Internet, and Make Tech Work for Everyone*, NEW YORK MAGAZINE (Dec. 11, 2017), and another article in which Chair Khan asserts the factual truth of her premises for deeming Amazon's practices unlawful:

> "In 2009, Amazon executives realized that another company was winning the diapers market, Diapers.com—a subsidiary of Quidsi—offered young parents a range of baby products, and soon became one of the fastest-growing online retailers in the country.  When the founders declined an offer by Amazon to buy up the company, Amazon settled on another tactic to tame its rival: drive it into the ground.  Amazon began slashing prices on baby products, pricing goods below the cost of production.  Over the course of months, Amazon lost millions.  While Quidsi initially tried to keep up, the relative newcomer lacked Amazon's almost endless ability to absorb losses.  Soon, Quidsi's investors began to panic, and when Amazon then made another bid, the start-up's founders conceded.  Once it had Quidsi in its grip, Amazon first jacked prices back up and scaled back loyalty programs.  Then it shut down the operation completely."

Predatory pricing "is a standard trick from the monopolist's playbook," Chair Khan asserted, as she called for prosecution of Amazon for allegedly engaging in it.

*Sources of Tech Platform Power*, 2 GEO. L. TECH. REV. 325 (2018), continued Chair

Khan's attack on "dominant platforms," a group in which she includes Amazon.

> "Platforms can use their gatekeeper power to extort and extract better terms from
> the business users that depend on their infrastructure.  For example, Amazon has disabled
> the 'buy-buttons' for book publishers in order to extract better terms; executives have
> also described how the company tweaks algorithms during negotiations to remind firms
> of its power to sink their sales, through demoting their rank below where users usually
> look when making purchases.  Recently, the company has started offloading costs onto
> suppliers by subsidizing shipping costs through increased fees for the companies that
> sell through its platform.  Merchants attempting to negotiate with Amazon risk seeing
> their accounts suspended, and getting kicked off its platform often means not just seeing
> lower revenue, but having to lay off employees."

*Id.* at 327.

Platforms also can allegedly engage in "information exploitation" to enhance their own

profits and penalize others. Chair Khan accuses Amazon, for example, of collecting

> "swaths of information on the merchants selling through its Marketplace.  It routinely uses
> this data to inform its own sales and products, exploiting insights generated by third-party
> retailers and producers to go head-to-head with them, rolling out replica products that it
> can rank higher in search results or price below-cost.  In this way Amazon's platform
> functions as a petri dish, where independent firms undertake the initial risks of bringing
> products to market and Amazon gets to reap from their insights, often at their expense.
> Notably, it is the other forms of power—the fact that Amazon is a gatekeeper and integrated
> across lines of business—that enable it to exploit information in this way; those two forms
> of power enhance its ability to leverage the third."

*Id.* at 327.

*The Separation of Platforms and Commerce*, 119 COLUM. L. REV. 973 (2019), again

makes Amazon a target on the basis of Chair Khan's purported specific factual findings.

> "Amazon * * * is the dominant online marketplace, the world's largest cloud
> computing service, a massive shipping and logistics network, a media producer and
> distributor, a grocer, a small-business lender, a live video-gaming streaming platform, a
> digital home assistant, a designer of apparel, and an online pharmacy," she reports.  "Two
> areas where it both serves as a bottleneck facility and competes with those reliant on its
> bottleneck include online retail and digital home-assistant systems."

8

*Id.* at 985.  The core allegation of the article is that firms such as Amazon are "gatekeepers" for access to customers in Internet commerce.  Platform companies like Amazon, Chair Khan asserts, should not also be able to sell their own products over their platforms in competition with third-party sellers.

Recently, Chair Khan served as Counsel to the Majority Staff of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, a role in which she says that she "led the congressional investigation into digital markets and the publication of its final report." http://www.linamkhan.com/bio-1.  The final report contains an 83-page section detailing Amazon conduct that allegedly violated the antitrust laws.  Staff of H. Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations* (2020) [hereafter Majority Staff Report].  The report, also critical of Alphabet/Google, Apple and Facebook, extends Chair Khan's earlier articles into a call for use of the antitrust laws against Amazon and others.  The Majority Staff Report begins:

> "Amazon has significant and durable market power in the U.S. online retail market. * * * Although Amazon is frequently described as controlling about 40% of U.S. online retail sales, this market share is likely understated, and estimates of about 50% or higher are more credible."

Majority Staff Report at 15.

The Report continues:

> "Amazon achieved its current dominant position, in part, through acquiring its competitors * * *.  It has also acquired companies that operate in adjacent markets, adding customer data to its stockpile and further shoring up its competitive moats.  This strategy has entrenched and expanded Amazon's market power in e-commerce, as well as in other markets.  The company's control over and reach across its many business lines enable it to self-preference and disadvantage competitors in ways that undermine free and fair competition.  As a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success.

9

"Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers.  Publicly, Amazon describes third-party sellers as 'partners.'  But internal documents show that, behind closed doors, the company refers to them as 'internal competitors."  Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.  This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct. * * * The company's early leadership in this market is leading to the collection of highly sensitive consumer data, which Amazon can use to promote its other business, including e-commerce and Prime Video."

Majority Staff Report at 16.

In a later discussion of barriers to entry in e-commerce, the Majority Staff Report asserts:

"If current trends continue, no company is likely to pose a threat to Amazon's dominance in the near or distant future. * * * While some of [the] barriers to entry are inherent to e-commerce—such as economies of scale and network effects—others result from Amazon's anticompetitive conduct.  As discussed elsewhere in the Report, Amazon's acquisition strategy and many of its business practices were successfully designed to protect and expand its market power."

Majority Staff Report at 87.

Chair Khan is now clearly in a position to order Federal Trade Commission staff to investigate whether to pursue Amazon based on some or all of the issues on which the Majority Staff Report makes findings.

4.      **My Opinions**

a.      **Parties in Matters Before the FTC Have a Right to Neutral Decisionmakers**

When the work of the Federal Trade Commission becomes focused on individual citizens and companies, targets have the right to be investigated, prosecuted, and judged by impartial Commissioners and an impartial Chair.  For example, the law prohibits an FTC Commissioner from voting in a case when the Commissioner has a direct financial interest in the outcome.  18 U.S.C. § 208 and 5 C.F.R. §§ 2635.501-.502, "Impartiality in Performing Official Duties."  Such

a vote would violate a defendant's right to due process of law, *e.g., Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986), and any Commissioner in a position to cast such a vote would clearly be obliged to recuse herself.

In my opinion, the same principles that underlie disqualification in financial conflict cases would extend to a Commissioner's non-financial interests as well.  FTC Commissioners are as subject as any other government officers to the principle that those who are judged or prosecuted are entitled to have those decisions made by "impartial" persons who can hear all sides fairly.  How that principle applies to someone in the position of Chair Khan is the key issue presented in deciding whether she must recuse herself from participation in future matters that involve Amazon.

### b.     The Appropriate Standards By Which to Judge Impartiality

Three cases involving former FTC Chairman Paul Rand Dixon are particularly helpful in understanding the legal standards that are relevant here.  *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), was a case of alleged deceptive advertising.  While the case was pending before the Commission, Chairman Dixon gave a speech before the National Newspaper Association that suggested he believed the advertisement in question was deceptive. The court found that the Chairman's speech required reversal of the Commission's later cease and desist order.

> "[The law] does not give individual Commissioners license to prejudge cases or to make speeches which give the appearance that the case has been prejudged.  Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record."

425 F.2d at 590.

The court concluded:

> "The test for disqualification has been succinctly stated as being whether 'a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 489 (2d Cir.), cert. denied, 361 U.S. 896 * * * (1959).'"

425 F.2d at 591.

*American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), involved alleged fraud in obtaining pharmaceutical patents.   During several years when the matter was under FTC investigation, Paul Rand Dixon was Chief Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee.   The Report of the Senate Committee expressed conclusions about many of the same issues and evidence that were before the FTC when Mr. Dixon became Chairman of the Commission.   The 6th Circuit vacated the FTC cease and desist order and remanded for de novo consideration of the record without involvement of Chairman Dixon, saying:

> "It is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify. See Prejudice and the Administrative Process, 59 Nw. U. L. Rev. 216, 231 (1964); Disqualification of Administrative Officials for Bias, 13 Vand. L. Rev. 713, 727 (1960).

> "It is to be emphasized that the Commission is a fact-finding body.  As Chairman, Mr. Dixon sat with the other members as triers of the facts and joined in making the factual determination upon which the order of the Commission is based.  As counsel for the Senate Subcommittee, he had investigated and developed many of these same facts.

> "The result of the participation of Chairman Dixon in the decision of the Commission is not altered by the fact that his vote was not necessary for a majority. 'Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.' *Berkshire Employees Association of Berkshire Knitting Mills v. N.L.R.B.*, 121 F.2d 235, 239 (C.A.3 [1941])."

363 F.2d at 767-768.

Earlier still, *Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *rev'd on other grounds*, 381 U.S. 739 (1965), was a case against Texaco and several tire companies. While the case was pending before an FTC hearing examiner, then newly-appointed Chairman Dixon gave a speech before the National Congress of Petroleum Retailers.  In it, he said:

> "We at the Commission are well aware of the practices which plague you and we have challenged their legality in many important cases.  You know the practices—price fixing, price discrimination, and overriding commissions on TBA. You know the companies—Atlantic, Texas * * * Goodyear, Goodrich, and Firestone.

> * * *

> "You may be sure that the Commission will continue and, to the extent that increased funds and efficiency permit, will increase its efforts to promote fair competition in your industry."

336 F.2d at 759.

The D.C. Circuit's reaction was concise and definitive:

> "In this case, a disinterested reader of Chairman Dixon's speech could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the Act. * * * We conclude that Chairman Dixon's participation in the hearing amounted in the circumstances to a denial of due process which invalidated the order under review."

*Id.* at 760.

In my opinion, it is fair to conclude that Chair Khan's published views about Amazon were even more definitive and critical than those of Chair Dixon that required reversal in the Commission cases just noted.  Interestingly, the principle running through all the cases is closely analogous to the statutory standard for recusal of a federal judge.  Judicial recusal is required when the judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a), while 5 C.F.R. §§ 2635.501(a) & .502(a), "Impartiality in Performing Official Duties," use the same "question regarding * * * impartiality" test to describe when federal ethics regulations presumptively require

disqualification of any federal official, including an FTC Commissioner, in any "particular matter involving specific parties." In short, a person's fundamental right to an impartial adjudicator is essentially the same whether a judge or a Commissioner is involved and whether a lack of impartiality is asserted under the Due Process clause or under federal ethics standards.[3]

The 28 U.S.C. § 455(a) judicial standard is given further specificity in three circumstances that are also relevant to situations in which FTC Commissioners might find themselves. The section requires that a judge disqualify himself or herself:

"(1)   Where he [or she] has a personal bias or prejudice concerning a party, or [2] personal knowledge of disputed evidentiary facts concerning the proceeding; * * * [or]

"(3)   Where he [or she] has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

28 U.S.C. § 455(b).

In my opinion, one key point of both the judicial and the general federal ethics requirements is that disqualification turns on the prior formation of opinions about questions of fact rather than policy judgments. The principles outlined in § 455(a) do not make it a violation of due process "for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law." *FTC v. Cement Inst.*, 333 U.S. 683, 702-03 (1948). A judge also ordinarily may hear a matter in which he or she learned particular facts in earlier proceedings in the matter. *Liteky v. United States*, 510 U.S. 540 (1994).

---

[3] 5 C.F.R. § 2635.502(d) provides that an "agency designee" may authorize a federal official to continue acting in a matter in spite of a lack of impartiality if the designee determines "that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's programs and operations." It seems unlikely that an agency designee could make that determination in this situation, but even if the designee did, in my opinion, the action might negate the official's liability under the ethics regulations, but it could not negate the government's due process obligation to persons affected by agency action.

A second key point of both requirements is that the standards are objective, not subjective. As applied to the FTC, they ask whether a reasonable person who knew all the facts and circumstances would decide that the Commissioner's impartiality is reasonably in doubt, not that future improper conduct is a certainty.[4]  Fellow Commissioners can apply such an objective standard in reviewing each other's recusal decisions without casting aspersions on their colleague's personal integrity.  Congress and reviewing courts can apply the standard in the same spirit.  The standard neither requires nor permits proof about whether one Commissioner will act fairly while another will not, primarily because such judgments are personally awkward and often impossible to make in advance.

The specific examples of required recusal found in 28 U.S.C. § 455(b) are also informative here.  It is beyond question that Chair Khan has published a great deal of independent research that she purports gives her what § 455(b) calls "personal knowledge of disputed evidentiary facts."  Amazon, like any other defendant, will have the right to try to convince her and the other Commissioners that she has gotten the facts and inferences wrong, but the effect of taking such definitive public positions cannot help but "entrench[]" Chair Khan in her positions and make "it difficult, if not impossible * * * to reach a different conclusion in the event [s]he deems it necessary to do so after consideration of the record."  *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d at 590.

In addition, like Chair Dixon, Chair Khan comes to the FTC after service as a leading staff member of a Congressional Committee studying issues that may later come before the Federal Trade Commission.  There is good reason that 28 U.S.C. § 455(b) makes prior government service

---

[4] The relevant provision of the current Code of Conduct for United States Judges, Commentary on Canon 2A, uses the term "appearance of impropriety" to describe the inquiry that underlies this objective test: "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's *** impartiality *** is impaired."

as counsel in a matter that comes before the same person as judge a specific circumstance mandating recusal.  The Majority Staff Report in which Chair Khan played a large part in effect asserts that Amazon is guilty of violating the law.  In my opinion, in any future matter tried before the FTC, Amazon is entitled to decision makers who have a more open mind about those issues than Chair Khan would appear to a reasonable observer to have.

      **c.**      **Standards Affecting the Propriety of a Commissioner Voting to Investigate or to Bring an Action in Federal Court**

Of course, each of the cases just discussed involved matters being tried before the FTC.  That situation makes the judicial ethics analogy easy to see.  It is at least possible that the matter facing Amazon might be a prolonged FTC investigation or the filing of an action in federal court.  Such choices would not make the issue of Chair Khan's recusal go away.  In my opinion, the fact or appearance of a Chair's lack of impartiality in the decision to investigate a firm or to file a judicial proceeding would most likely violate both the agency's due process obligations and the Chair's ethical duties to named respondents and to the public.

To be sure, a prosecutor who initiates proceedings plays a different role in our justice system than a judge does.  A prosecutor presents the case that a defendant has violated the law.  Prosecutors

> "need not be entirely 'neutral and detached.' * * * [T]hey are necessarily permitted to be zealous in their enforcement of the law. * * * [T]he strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-50 (1980).

But acknowledging the differences between judges and prosecutors is only the start of the relevant analysis.  The Supreme Court made equally clear in *Jerrico* that the decision to prosecute a private party is also subject to due process standards.

> "We do not suggest * * * that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors.  Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States*, 295 U.S. 78, 88 (1935). * * * Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication.  Cf. 2 K. Davis, Administrative Law Treatise 215-256 (2d ed. 1979). A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."

*Id.*

In my opinion, the Court in *Jerrico* was making the point that, while the impartiality of judges and prosecutors may take different forms, an FTC Chair who votes to have her agency initiate a matter may not simply act as if she were only a partisan.  American Bar Association Model Rules of Professional Conduct, Rule 3.8, Comment 1, offers this often-heard insight about the role of a prosecutor:

> "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons."

A decision to prosecute involves choices of which firms to charge, what charges are appropriate, and how many of an agency's limited resources should be committed to one matter rather than another.  That is as true at the FTC as in any prosecutor's office around the country.  In my opinion, it is reasonable to conclude that an FTC Chair whose impartiality could reasonably

be questioned by an objective observer must step aside rather than personally participate in those decisions.

Cases prohibiting government agencies from delegating prosecution of enforcement cases to affected private parties help make the point.  In *People ex rel. Clancy v. Superior Court*, 705 P.2d 347 (Cal. 1985), a California city passed an ordinance defining stores that principally sell "obscene publications" as a public nuisance.  The city declared a local book store such a nuisance and retained a local attorney to go to court to abate it.  The attorney's fee would be $60 per hour, but if the city were to lose the case, the fee would drop to $30 per hour.

The court found that having a personal interest in a government victory was "antithetical to the standard of neutrality that an attorney representing the government must meet * * *."  *Id.* at 353.  It justified the neutrality requirement particularly well, saying:

> "[A] prosecutor's duty of neutrality is born of two fundamental aspects of his employment.  First, he is a representative of the sovereign; he must act with the impartiality required of those who govern.  Second, he has the vast power of the government available to him' he must refrain from abusing that power by failing to act evenhandedly.  These duties are not limited to criminal prosecutors: 'A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results.'" (quoting ABA Code of Professional Responsibility, EC 7-14).

*Id.* at 350.  For that reason, the court said, "prosecutors and other government attorneys can be disqualified for having an interest in the case extraneous to their official function." *Id.* at 351.[5]

---

[5] The most prominent federal case establishing the same principle is *Young v. United States ex rel. Vuitton et fils, S.A.*, 481 U.S. 787 (1987), in which the Supreme Court held that counsel for private parties who had settled a trademark case could not later be appointed as the special prosecutors in an action charging criminal contempt to enforce the injunction they had obtained.  Instead, the lawyer must ask the U.S. Attorney to file the contempt action, and if that office appoints someone else the contempt, it must be someone not connected with the underlying matter.

The focus on financial incentives in many cases has led to a series of cases testing whether private counsel compensated by contingent fee are *per se* barred from representing public entities in civil cases.  Several of the cases involve qui tam actions under the False Claims Act, 31 U.S.C. § 3730(b), under which a private party may file suit in

Explaining what it means to have "an interest in the case extraneous to [the prosecutor's] official function," the court in *Clancy* cited *People v. Superior Court (Greer)*, 561 P.3d 1164 (Cal. 1977), where the mother of a victim of violent crime was a non-lawyer employee in the office of the prosecutor. The employee was to be a material witness for the prosecution and, if the defendant were convicted, she might gain custody of her grandchild. The prosecutor had no personal financial interest in the case, but the court recognized that a reasonable judge could conclude that the interest of the prosecutor's employee might unduly influence the prosecutor. Constitutional guarantees of a fair trial, the court said

> "would seem better served when judges have discretion to prevent even the possibility of their violation. Individual instances of unfairness, although they may not separately achieve constitutional dimensions, might well cumulate and render the entire proceeding constitutionally invalid. The trial judge need not delay until the last straw of prejudice is added, by which time it might be too late to avert a mistrial or a reversal."

*Id.* at 1170.

That principle seems to describe Amazon's situation as well. Chair Khan has built a large portion of her professional reputation by articulating her own factual conclusions and legal opinions about Amazon's alleged guilt under the antitrust laws. Amazon will have the legal right to put on a defense, but in the words used by the D.C. Circuit about Chair Dixon: "[A] disinterested observer may conclude that [Chair Khan] has in some measure adjudged the facts as well as the

---

the name of the Government and then be awarded a percentage of any sums recovered. That statutory scheme has been upheld in cases such as *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), in part because the statute lets disinterested Government lawyers take a case over from private counsel. Indeed, government counsel may even dismiss the case if the court approves, *e.g.*, *United States ex rel. Cimznhca, LLC v. UCB, Inc.*, 970 F.3d 835 (7th Cir. 2020). *American Bankers Management Company, Inc. v. Heryford*, 885 F.3d 629 (9th Cir. 2018), extended the qui tam precedents to uphold a contingent fee in a suit to collect civil penalties under the California unfair competition law. In my opinion, such cases have been decided under the particular statutory schemes involved and, in spite of sometimes broad dicta, they do not undercut the principle that disinterested FTC officials must make key investigatory and prosecutorial decisions, not simply the final decisions, in agency matters.

law of a particular case in advance of hearing it," *Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission*, 425 F.2d 583, 591 (D.C. Cir. 1970). And in the words of 5 C.F.R. § 2635.502(a), "the circumstances would cause a reasonable person with knowledge of the facts to question [her] impartiality in the matter." *Cf.* 28 U.S.C. § 455(a).

Relying on the published statements cited earlier in this Declaration, in my opinion it would be reasonable to conclude that Chair Khan may not ethically participate in FTC antitrust matters involving Amazon and may not supervise FTC investigations into Amazon relating to practices about which Chair Khan has previously opined.

**5.      Conclusion**

I have never met Chair Khan. I have no personal animus toward her; indeed, I have genuine respect for her energy and scholarly output. I presume that she can be expected to use her position as Chair to assess the conduct of most potential FTC respondents in a fair and impartial manner.

Chair Khan is clearly a person with strong opinions about how the U.S. economy should be structured and about industry practices that she believes too readily lead to industry concentration. Nothing in this Declaration is meant to say that an FTC Commissioner is biased merely because she brings her own sense of desirable public policy to the Commission's work. Nor do I believe that having written scholarly articles about subjects a Commissioner or Chair will face should disqualify an academic from service on a regulatory agency. The nation would be denied many fine public servants if that were the applicable standard.

The point of this Declaration is that when a Commissioner is in a position to sit in judgment on, or assume the function of an investigator or prosecutor against, a particular defendant after having built a great deal of her professional reputation asserting conclusions about the guilt of that defendant, in my opinion, it is reasonable to conclude that the Commissioner is required by federal

law and regulations to step aside and permit others who have not yet formed their opinion make those decisions.

In my opinion, it would be appropriate for Chair Khan to announce that she will recuse herself in all cases against Amazon that consider factual issues she purports to have determined in her academic articles, her public advocacy publications, or the Majority Staff Report.  If she does not recuse herself voluntarily, in my opinion it would be appropriate for her fellow Commissioners to direct her to do so.

_____June 29, 2021_____
Date

_____*Thomas D. Morgan*_____
Thomas D. Morgan

21

**Attachment**

**Curriculum Vitae**
**THOMAS D. MORGAN**

**Personal Data:**

    Born:  February 8, 1942, in Peoria, Illinois

    Home Office: 4251 Gulf Shore Blvd. N., Apt. 11D, Naples, FL 34103     (239) 263-7353

    E-mail: tmorgan@law.gwu.edu

    Bar Membership:  Illinois, since 1965

**Undergraduate Education:**

    Northwestern University, Evanston, Illinois, 1959-62
        B.A. degree, highest distinction   Member, Phi Beta Kappa

**Legal Education:**

    University of Chicago Law School, Chicago, Illinois, 1962-65
        J.D. degree with honors; Member, Order of the Coif
        Comment Editor, Volume 32, University of Chicago Law Review

**Professional Experience:**

    Oppenheim Professor of Antitrust and Trade Regulation Law, George Washington
        University, 1989-1998; 2000-2013; Emeritus, since 2014

    Rex E. Lee Professor of Law, Brigham Young University, 1998-2000

    Dean, Emory University School of Law, 1980-85
        Distinguished Professor of Law 1985-89

    Professor of Law, University of Illinois, 1974-80
        Associate Professor, Illinois, 1970-74; Assistant Professor, Illinois, 1966-67

    Visiting Professor, Brigham Young University, Fall 1994
        Monash University (Australia), Spring 1988
        Cornell University, Winter 1974

    Special Assistant to Assistant Secretary of Defense, 1969-70
        Attorney, Office of Air Force General Counsel, 1967-69

    Bigelow Teaching Fellow, University of Chicago Law School, 1965-66

**Publications:**

**A.**      **In the Field of Professional Responsibility**

THE VANISHING AMERICAN LAWYER (Oxford University Press 2010)

PROFESSIONAL RESPONSIBILITY: PROBLEMS AND MATERIALS (Foundation
Press 1976); 2nd Edition 1981; 3rd Edition 1984; 4th Edition 1987; 5th Edition
1991; 6th Edition 1995, 7th Edition 2000, 8th Edition 2003, 9th Edition 2006, 10th
Edition 2008 (co-authored with R. Rotunda); 11th Edition 2011; 12th Edition 2014,
13th Edition 2018 (co-authored with R. Rotunda and J. Dzienkowski); all with
Teachers' Manuals.

SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (1981-2018),
(co-authored with R. Rotunda); (2019 – 2021), published alone.

AMERICAN LAW INSTITUTE, RESTATEMENT OF THE LAW (THIRD): THE
LAW GOVERNING LAWYERS (2000) (with C. Wolfram & J. Leubsdorf)

LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL
CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW
GOVERNING LAWYERS (2005)

LEGAL ETHICS (Gilbert Law Summaries) (9th Edition 2017)

"Where Do We Go From Here with Fee Schedules?" 59 A.B.A.J. 1403 (1973)

"The Evolving Concept of Professional Responsibility," 90 Harvard L. Rev. 702 (1977)

"Appropriate Limits on Participation by a Former Agency Official in Matters Before an
Agency," 1980 Duke L.J. 1

"Conflicts of Interest and the Former Client in the Model Rules of Professional Conduct,"
1980 American Bar Foundation Res. J. 993

"The Fall and Rise of Professionalism," 19 U. Richmond L. Rev. 451 (1985)

"Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem," 10
Univ. Arkansas (Little Rock) L. J. 37 (1987-88)

"An Introduction to the Debate over Fee Forfeitures," 36 Emory L. J. 755 (1987)

"Public Financial Disclosure by Federal Officials: A Functional Approach," 3
Georgetown J. Legal Ethics 217 (1989).

"The Quest for Equality in Regulating the Behavior of Government Officials:  The Case of Extrajudicial Compensation," 58 George Washington L. Rev. 490 (1990)

"Thinking About Lawyers as Counselors," 42 Florida L. Rev. 439 (1990)

"Vintage Freedman in a New Bottle," Review of Freedman, Understanding Lawyers' Ethics, 4 Georgetown J. Legal Ethics 847 (1991)

"Heroes for Our Time: Going Beyond Ethical Codes," Clark Memorandum (Brigham Young University), Fall 1992, p. 23

"Economic Reality Facing 21st Century Lawyers," 69 Washington L. Rev. 625 (1994)

"Sanctions and Remedies for Attorney Misconduct," 19 S. Illinois U. L. Rev. 343 (1995)

"Legal Representation in a Pluralist Society," 63 George Washington L. Rev. 984 (1995) (co-authored with Robert W. Tuttle)

"American Perspectives on the Duty of Loyalty: Conflicts of Interest and Other Issues of Particular Concern to the International Practitioner," in Mary C. Daly & Roger J. Goebel, Eds., Rights, Liability, and Ethics in International Law Practice (1995)

"Law Faculty as Role Models," in ABA Section of Legal Education, Teaching and Learning Professionalism: Symposium Proceedings (1996)

"Suing a Present Client," 9 Georgetown J. Legal Ethics 1157 (1996), reprinted in 1 Journal of Institute for Study of Legal Ethics 87 (1996)

"Conflicts of Interest in the *Restatement*: Comments on Professor Moore's paper," 10 Georgetown J. Legal Ethics 575 (1997)

"Whose Lawyer Are You Anyway?," 23 William Mitchell L. Rev. 11 (1997)

"Use of the Problem Method for Teaching Legal Ethics," 39 William & Mary L. Rev. 409 (1998)

"Conflicts of Interest and the New Forms of Professional Associations," 39 S. Texas L. Rev. 215 (1998)

"What Insurance Scholars Should Know About Professional Responsibility," 4 Conn. Insurance L. J. 1 (1997-98)

"Interview with Professor Thomas Morgan on Professional Responsibility," 13 Antitrust 4 (Fall 1998).

"The Impact of Antitrust Law on the Legal Profession," 67 Fordham L. Rev. 415 (1998)

"Toward a New Perspective on Legal Ethics," Am Bar Foun, Researching the Law (2000)

"Real World Pressures on Professionalism," 23 U. Ark. (Little Rock) L. J. 409 (2001)

"Practicing Law in the Interests of Justice in the Twenty-First Century," 70 Fordham L. Rev. 1793 (2002)

"Toward Abandoning Organized Professionalism," 30 Hofstra L. Rev. 947 (2002)

"Creating a Life as a Lawyer," 38 Valparaiso L. Rev. 37 (2003)

"Sarbanes-Oxley: A Complication, Not a Contribution in the Effort to Improve Corporate Lawyers' Professional Conduct," 17 Georgetown J. Legal Ethics 1 (2003)

"The Client(s) of a Corporate Lawyer," 33 Capital U. L. Rev. 17 (2004)

"Educating Lawyers for the Future Legal Profession," 30 Okla City U. L. Rev. 537 (2005)

"The Corporate Lawyer and the Perjury Trilemma," 34 Hofstra L. Rev. 965 (2006)

"It's Not Perfect, But the ABA Does a Key Job in State-Based Regulation of Lawyers," 11 Tex. Rev. of L. & Politics 381 (2007)

"Comment on Lawyers as Gatekeepers," 57 Case Western Res. L. Rev. 375 (2007)

"Professional Malpractice in a World of Amateurs," 40 St. Mary's L. J. 892 (2009).

"It's Not Your Parents' Profession Anymore: The Changing Course of Legal Careers," GW Law School Alumni Magazine, Summer 2010, p. 18.

"Should the Public Be Able to Buy Stock in Law Firms?" 11 Engage 111 (Sept. 2010).

"Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements," 79 George Washington L. Rev. 734 (2011).

"Realistic Questions About Modern Lawyer Regulation," part of an on-line symposium at http://truthonthemarket.com/2011/09/19/thomas-morgan-on-realistic-questions-about-modern-lawyer-regulation.

"Calling Law a 'Profession' Only Confuses Thinking about the Challenges Lawyers Face," 9 U. St. Thomas L.J. 542 (2011).

"On the Declining Importance of Legal Institutions," 2012 Mich. St. L. Rev. 255.

"The Rise of Institutional Law Practice," 40 Hofstra L. Rev. 1005 (2012).

"*The Lost Lawyer*: An Important Outline of Symptoms, But a Flawed Diagnosis," 2014 J. Professional Lawyer 83.

"The Shift to Institutional Law Practice," in Paul A. Haskins, ed., THE RELEVANT LAWYER: IMAGINING THE FUTURE OF THE LEGAL PROFESSION (2015).

"The Challenge of Writing Rules to Regulate Lawyer Conduct," 49 Creighton L. Rev. 807 (2016).

"Inverted Thinking about Law as a Profession or Business," 2016 J. Prof. Lawyer 115.

"Roger C. Cramton & the Delivery of Legal Services," 103 Cornell L. Rev. 1337 (2018).

**B.    In the Fields of Economic Regulation and Administrative Law**

MODERN ANTITRUST LAW AND ITS ORIGINS: CASES AND MATERIALS (West Publishing Co. 1994; 2nd Ed. 2001; 3rd Ed. 2005; 4th Ed. 2009; 5th Ed. 2014)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (West Publishing Co. 1976)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (2nd Edition 1985) (co-authored with J. Harrison & P. Verkuil)

REGULATION AND DEREGULATION: CASES AND MATERIALS (West Publishing Co. 1997; 2nd Edition 2004) (co-authored with Harrison and Verkuil)

"The General Accounting Office: One Hope for Congress to Regain Parity of Power with the President," 51 N. Carolina L. Rev. 1279 (1973)

Review of "Inner City Housing and Private Enterprise," 1972 U Ill. L Forum 833 (1973)

"Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained Administrative Process," 1974 Wisconsin L. Rev. 301

"Toward a Revised Strategy for Ratemaking," 1978 U. Illinois L. Forum 21

"Procedural Impediments to Optimal Rate Making," in W. Sichel, Ed., Public Utility Rate Making in an Energy-Conscious Environment (Westview Press 1979)

"Federal Chartering of Corporations" and "Shareholder Remedies in Corporations" in M.B. Johnson, Ed., The Attack on Corporate America: The Corporate Issues Sourcebook (McGraw-Hill 1978)

26

Review of "Economic Analysis and Antitrust Law," 33 Vanderbilt L. Rev. 1523 (1980)

"The Deregulation Bandwagon: Too Far, Too Fast?," 2 J. Law & Commerce 1 (1982)

Review of "Antitrust Stories," Antitrust Source, www.antitrustsource.com (Aug 2008)

"Antitrust Implications of Accreditation Standards That Limit Law School Enrollment," 101 Antitrust & Trade Regulation Report 2508 (BNA, July 15, 2011).

## C.     In the Field of Legal Education

"Computer-Based Legal Education at the University of Illinois:  A Report of Two Years' Experience," 27 J. Legal Education 138 (1975) (with P. Maggs)

"Teaching Students for the 21st Century," 36 J. Legal Education 285 (1986)

"Thinking About Bar Examining: The Challenge of Protecting the Public," 55 Bar Examiner 27 (Nov.1986)

"President's Address", 90-1 AALS Newsletter 1 (Feb. 1990)

"Should We Oppose Ranking of Law Schools?, 90-2 AALS Newsletter 1 (Apr. 1990)

"Legal Education Organizations in Business," 90-3 AALS Newsletter 1 (Aug. 1990)

"The Challenge to Maintain Diversity in Legal Education," 90-4 AALS Newsletter 1 (Nov. 1990)

"A Defense of Legal Education in the 1990s," 48 Wash. & Lee L. Rev. 1 (1991)

"Admission of George Mason to Membership in the Association of American Law Schools," 50 Case Western Reserve L. Rev. 445 (1999)

"Training Law Students For the Future: On Train Wrecks, Leadership and Choices," 6 St. Thomas L. Rev. 297 (2009).

"The Changing Face of Legal Education: Its Impact on What it Means to Be a Lawyer," 45 Akron L. Rev. 811 (2012).

**Participation in Public Programs:**

**A.  Endowed Lectures Given**

Mellon Lecture, University of Pittsburgh - 1981
Altheimer Lecture, University of Arkansas (Little Rock) - 1987
Dunwody Lecture, University of Florida - 1990
Lane Foundation Lecture, Creighton University - 1990 & 2010
Tucker Lecture, Washington & Lee University - 1990
Pirsig Lecture, Wm. Mitchell Law School - 1996
Van Arsdell Lecture, University of Illinois - 1997
Keck Award Lecture, American Bar Foundation - 2000
Tabor Lecture, Valparaiso University - 2003
Sullivan Lecture, Capital University - 2004
Miller-Becker Lecture, University of Akron - 2011
Lichtenstein Lecture, Hofstra Law School - 2012
Payne Lecture, Mississippi College – 2012
TePoel Lecture, Creighton University -- 2016

**B.  Representative Programs on Which Served as Speaker or Panelist**

Let's Make a Deal (the Ethics of Negotiation) - ABA Conference on Professional
   Responsibility (Palm Beach) - June 1992

Reporting a Client's Continuing Crime or Fraud - ABA Conference on Professional
   Responsibility (Chicago) - May 1993

Ethical Issues in Representing Older Clients - Fordham University School of Law
   (New York) - December 1993

Problem of Representing a Regulated Client, Eleventh Circuit Judicial Conference
   (Orlando) - May 1994

Ethical Issues in Products Liability Cases - Products Liability Committee of the ABA
   Litigation Section (Tucson) - February 1995

Ethical Issues Arising in the O.J. Simpson Case - University of Washington School of
   Law (Seattle) - May 1995

Competition Policy for the New South Africa (Pretoria) - November 1995

Ethical Issues in Representing Children - Fordham University School of Law (New York)
   - December 1995

Are We a Cartel? The ABA/DOJ Consent Decree - AALS Annual Meeting (San Antonio) - January 1996

Professional Responsibilities of the Law Teacher - AALS (Washington) - July 1996

Ethical Issues for Mediators and Advocates - ABA Annual Meeting (Orlando) - August 1996

Legal Issues in Cyberspace - ABA Annual Meeting (Orlando) - August 1996

Teaching Legal Ethics by the Problem Method - College of William & Mary--Keck Foundation Conference (Williamsburg) - March 1997

Litigators Under Fire: Handling Professional Dilemmas In and Out of Litigation - televised ALI/ABA CLE program (Washington) - April 1997

Conflicts of Interest in the New Forms of Law Practice - South Texas Law School Symposium (Houston) - September 1997

Fiduciary Obligations in Dismissal of a Law Firm Partner - Washington & Lee Law School Symposium (Lexington, VA) - April 1998

Impact of Disciplinary Action on Lawyer's Status as Certified Specialist - ABA Committee on Specialization National Roundtable (Washington) - May 1998

Conflicts of Interest in the Restatement of the Law Governing Lawyers - National Organization of Bar Counsel (Toronto) - July 1998

The Ethics of Teaching Legal Ethics - Association of American Law Schools (Washington) - October 1998

The New Restatement of the Law Governing Lawyers: What Is It & How Does It Affect Your Practice? - Assn of Bar of City of New York (New York) - November 1998

Imputation, Screens & Personal Conflicts - ABA Conference on Professional Responsibility (La Jolla) - June 1999

The Future of Legal Education - Dedication of Sullivan Hall, the new Seattle University Law Building (Seattle) - October 1999

Legal Ethics in the New Millennium - J. Reuben Clark Soc. (Dallas) - November 1999

Unauthorized Practice of Law and Ethical Risks to Lawyers from Multistate Practice -
ALAS Telephone Seminar (Chicago) - December 1999

Ethics 2000: Rewriting the Standards for Lawyer Conduct - American Intellectual
Property Law Association (La Quinta, CA) - January 2000

Real World Pressures on Professionalism - University of Arkansas at Little Rock Law
School (Little Rock, AR) - February 2000

Professional Responsibility Issues Arising Out of Electronic Commerce - ABA Section
of Public Contract Law (Annapolis, MD) - March 2000

Multidisciplinary Practice: Curse, Cure or Tempest in a Teapot - American Intellectual
Property Law Association (Pittsburgh, PA) - May 2000

Ethics 2000: Proposed Changes in the Law Governing Lawyers - Conference of Chief
Justices (Rapid City, SD) - July 2000

Attorney Standards in Federal Courts and Developments in the Multidisciplinary Practice
Controversy - Conference of Chief Justices (Baltimore) - January 2001

Multijurisdictional Practice - Turner Seminar (Memphis) - February 2001

Ethical Issues in Large Firms – Ass'n of Legal Administrators (Baltimore) - May 2001

Law Firm Ancillary Services - ALAS Annual Meeting (Bermuda) - June 2001

New Rule 1.6 on Disclosure of Confidential Client Information - ABA Civil Justice
Roundtable (Washington) - March 2002

Ethics for Corporate In-House Counsel - American College of Investment Counsel
(Chicago) - April 2002

Treading Water: A Young Lawyer's Guide to Ethics in Varying Practice Environments -
ABA Tax Section Young Lawyers Committee (Washington) - May 2002

Shifting Ethical Sands: Ethics 2000 and Beyond - Federal Communications Bar Ass=n
(Washington) - June 2002

Multijurisdictional Practice - ABA Forum on Franchising (Phoenix) - October 2002

The Sarbanes-Oxley Act of 2002 and the ABA Task Force on Corporate Responsibility
Report (ALAS Telephone Seminar) - October 2002

30

At the Bar and in the Boardroom: The Ethics of Corporate Lawyering - Federalist Society (Washington) - Nov. 2002

Law Firm Risk Management: Post-Enron Challenges - Hildebrandt Conference (New York) - Nov. 2002

Future Regulation of Securities Lawyers - ABA Section of Business Law, Committee on Federal Securities Regulation (Washington) - Nov. 2002

What Lawyers Need to Know to Comply with the New SEC Professional Conduct Rules - ABA Section of Business Law Televised Forum (Washington) - Feb 2003

Ethics in Representing Organizational Clients After Sarbanes-Oxley - ABA Section of Business Law Spring Meeting (Los Angeles) - April 2003

Corruption in the Executive Suite: The Nation Responds - National Teleconference from ABA Public Utility Section Spring Meeting (Washington) - April 2003

Sarbanes-Oxley Revolution in Disclosure and Corporate Governance: Complying with the New Requirements - ABA National Institute (Washington) - May 2003

Client Confidentiality, Corporate Representation and Sarbanes-Oxley - ABA National Conference on Professional Responsibility (Chicago) - May 2003

Friend or Foe: The Restatement of Law Governing Lawyers - ABA National Legal Malpractice Conference (La Jolla) - September 2003

Where Were the Lawyers in Enron? - Cato Institute (Washington) - October 2003

Testified before the House Subcommittee on Capital Markets' Hearing on the Role of Attorneys in Corporate Governance (Washington) - February 2004

The Lawyer-Lobbyist "on the Frontier": What Legal and Ethical Rules Apply? - ABA Mid-Year Meeting (San Antonio) - February 2004

The Client(s) of a Corporate Lawyer - Capital U. Law School (Columbus) - March 2004

Ethical Issues Facing Public Interest Law Firms - Heritage Foundation (Washington) - October 2004

Drafting an Ethical Code for a Diverse Legal Profession - Univ. of Memphis Law School (Memphis) - October 2004

31

Ethical Issues in International Trade Cases - International Trade Trial Lawyers
Association (Washington) - November 2004

Professional Regulation of Business Lawyers Isn't Going to Get Any Easier - ABA
Section of Business Law (Washington) - November 2004

Problems for Corporate Lawyers in Complying with the Sarbanes-Oxley Act - New
Jersey Corporate Counsel Association (Livingston, NJ) - January 2005

Avoiding Conflicts in Business Law Practice: Seven Deadly Sins - ABA Section of
Business Law (Nashville) - April 2005

Fireside Chat on Legal and Accounting Ethics - SEC Historical Society (Washington) -
November 2005

When Good Clients Go Bad - ALAS Annual Meeting (Toronto) - June 2006

Lawyers Face the Future - St. Thomas Univ. Law School (Minneapolis) - August 2006

Regulating Corporate Morality - George Washington Corporate & Business Law Society
(Washington) - September 2006

Comments on Noisy Withdrawal - Case Law School Leet Symposium (Cleveland) -
October 2006

The ABA Role in Law School Accreditation - Federalist Society Lawyers' Convention
(Washington) - November 2006

Investigative Techniques: Legal, Ethical and Other Limits - ABA Section of Antitrust
Law (National) - December 2006

Ethics Issues in Corporate Internal Investigations - Georgia Bar (Atlanta) - March 2007

Are Regulatory Lawyers' Ethical Obligations Changing? - ABA Section of Public Utility
Law (Washington) - April 2007

Antitrust Litigation Ethics From Soup to Nuts - ABA Section of Antitrust Law
(Washington) - April 2007

How to Survive in Today's Competitive Environment and Comply With the Rules of
Professional Conduct - Wisconsin State Bar (Milwaukee) - May 2007

32

Audit Response Letters: Will There Be Peace Under the Treaty? - ABA National
Conference on Professional Responsibility (Chicago) - May 2007

The Buried Bodies Case: Alive and Well After Thirty Years - ABA National Conference
on Professional Responsibility (Chicago) - May 2007

Organization and Discipline for an Independent Legal Profession - Visit of Leaders of the
Iraqi and Kurdistan Bar Associations (Washington) - November 2007

Feeling Conflicted? The Experts Opine and Prescribe - Tennessee Bar Foundation
(Nashville) - January 2008

Ethics Issues in Qui Tam Litigation - ABA National Institute on Civil False Claims
(Washington) - June 2008.

Ethics and the Lawyer-Lobbyist - ABA Administrative Law Conference (Washington) -
October 2008

Ethics in the Early Going - ABA Tort & Insurance Practice Section, Aviation & Space
Law Committee Litigation National Program (Washington) - October 2008

Professional Malpractice in a World of Amateurs - St. Mary's Law School Symposium
on Legal Malpractice (San Antonio) - February 2009

The World Economic Crisis and the Legal Profession - Order of Advocates of Brazil
(Brazilian counterpart of the ABA) - (Rio de Janeiro) - May 2009

Principles of United States Antitrust Law - Commissioners and Staff of the CADE
(Brazilian counterpart of the FTC) - (Brazilia) - May 2009

The World Economic Crisis, Antitrust Law and the Lawyer - Institute of Advocates of
Brazil (Brazilian counterpart of the ALI) - (Rio de Janeiro) - May 2009

The World Economic Crisis and Antitrust Law - American Chamber of Commerce -
(Bela Horizonte, Brazil) - May 2009

Antitrust Law: The Real U.S. Policies - Seminar celebrating the retirement of Prof. Joao
Bosco Leopoldino da Fonseca of the Federal University of Minas Gerais (Bela
Horizonte) - May 2009

Where Does It End? Duties to Former Clients - American Bar Association Center for
Professional Responsibility (Chicago) - May 2009

The Last Days of the American Lawyer - Creighton Law School (Omaha) - Oct. 2009

Ethics Challenges for National Security Lawyers In and Out of Government - ABA
      Standing Committee on Law and National Security (Washington) - Nov. 2009

The Transformative Effect of International Initiatives on Lawyer Practice and Regulation:
      The Financial Action Task Force Guidelines - Association of American Law
      Schools Annual Meeting (New Orleans) - Jan. 2010

Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in
      Aggregate Settlements - Humphreys Complex Litigation Center Conference on
      Aggregate Litigation: Critical Perspectives (Washington) - March 2010

Abandoning Homogeneity in Legal Education - Georgetown Center for Study of
      the Legal Profession Program on Law Firm Evolution: Brave New World or
      Business as Usual? (Washington) - March 2010

Ethics Issues in Housing - ABA Forum on Affordable Housing (Washington) - May 2010

The Vanishing American Lawyer - Conference on Regulating and Deregulating Lawyers
      - Institute for Advanced Legal Studies (London) - June 2010

The Vanishing American Lawyer - Federalist Society Podcast - Sept. 2010.

Developments in Ethics 2010 - ABA Teleconference - Jan. 2011

A Transforming Legal Profession: The Challenges for Bar Associations - National
      Conference of Bar Presidents (Atlanta) - Feb. 2011

A Transforming Profession: The Challenges for Lawyers Starting Out - ABA Law
      Student Division (Washington) - Feb. 2011

A Transforming Profession: A Look Back Forty Years and the Challenges Ahead -
      Alabama Bar Annual Meeting (Point Clear) - July 2011
      Florida Bar Board of Governors (Palm Beach) - July 2011

On the Declining Importance of Legal Institutions - Conference at Michigan State Law
      School (East Lansing) - Sept. 2011

Calling Law a Profession Only Confuses Thinking About Challenges Lawyers Face -
      Conference at University of St. Thomas Law School (Minneapolis) - Sept. 2011

The Changing Face of Legal Education: Its Impact on What It Means to be a Lawyer - Miller-Becker Lecture at University of Akron Law School (Akron) - Oct. 2011

Law School Accreditation - Federalist Society (Washington) - Nov. 2011

Aggregate Litigation: Don't Let Your End Game Blow-Up - ALM Litigation Summit (Washington) - Nov. 2011

So Someone Objects to Your New Client - ABA Administrative Law & Regulatory Practice Section Fall Conference (Washington) - Nov. 2011

Ethical Dilemmas Facing Lawyers Practicing National Security Law - ABA Standing Committee on Law and National Security (Washington) - Dec. 2011

Needed Law Schools' Response to Changes in the Legal Profession - AALS Annual Meeting (Washington) - Jan. 2012

The Rise of Institutional Law Practice - Lichtenstein Lecture at Hofstra Law School (Hempstead, NY) - Feb. 2012

Blazing New Pathways Through the Legal World - Washington Area Legal Recruitment Administrators Association (Washington) - Mar. 2012

Ethics in Privacy and Social Media - ABA Antitrust Section (Washington) - Mar. 2012

Ethical Issues in Alternative Litigation Funding – Humphries Center at GW Law (Washington) – May 2012

The Vanishing American Lawyer: The Road Ahead - Utah Bar (Sun Valley, ID) - July 2012

The Vanishing American Lawyer: The Changing Legal Profession -- Federal Bar Ass'n (Memphis, TN) -- Oct. 2012

The Professional World Facing New American Lawyers – 2012 Georgia Convocation on Professionalism (Atlanta) -- Nov. 2012

Testimony -- ABA Task Force on the Future of Legal Education (Dallas) - Feb. 2013

Public Ownership of Stock in Law Firms -- Federalist Society Teleforum - Apr. 2013

The ABA's 2012 Changes in Ethics Rules -- ABA Antitrust Section Spring Meeting (Washington) -- Apr. 2013

Proposals for Training Required for Bar Admission – AALS Annual Meeting (New York) – Jan. 2014

Law Professors of the Future: A New Balance of Teaching, Scholarship and Service? – AALS Annual Meeting (New York) – Jan. 2014

Are Lawyers Vanishing? – Transport. Lawyers' Ass'n (St. Petersburg, FL) – May 2014

Higher Education: Run for the Benefit of Students, Faculty or Administrators? -- Federalist Society (Washington) – Nov. 2014

The Challenge of Writing Rules to Regulate Lawyer Conduct – Creighton Law School Symposium on the Kutak Commission – March 2016

Inverted Thinking About Law as a Profession or Business – International Legal Ethics Conference VII – Fordham Law School – July 2016

Who Wants To Be An Ethics Millionaire? – ABA Antitrust Law Section Spring Meeting (Washington) – March 2017

Ethical Issues for Antitrust Lawyers – ABA Antitrust Law Section Spring Meeting (Washington) – April 2018

Ronald D. Rotunda Memorial Lecture – Federalist Society Podcast – March 2019

Duty to Whom? Ethics Dilemmas Confronted by Government Lawyers – American Law Institute Annual Meeting (Washington) – May 2019

Covid-19 and Coming Changes in Lawyer Regulation – Georgetown Roundtable for Law Firm Counsel (virtual) – June 2020

Lawyer Discipline and Executive Branch Lawyers – Cardozo Law School (virtual) – Oct. 2020

**Major Civic and Professional Activities:**

**A.  In the Field of Professional Responsibility**

Associate Reporter, American Law Institute Restatement of the Law (Third), The Law Governing Lawyers, 1986-2000

Associate Reporter, American Bar Association Ethics 2000 Commission, 1998-99

Reporter, American Bar Association Commission on Professionalism, 1985-86
Adviser, American Law Institute Principles of the Law, Government Ethics, since 2009.

Member, Advisory Board, ABA/BNA Lawyers' Manual on Professional Conduct, since
    1984; Chair 1986-87 & 1992-93

Member, Advisory Council, Project on a Digital Archive of the Birth of the Dot Com
    Era: The Brobeck Papers, Library of Congress and Univ. of Maryland, 2005-2009

Chair, Federalist Society Practice Group on Professional Responsibility and Legal
    Education 2005-2007; Member since 2001

Member, Drafting Committee, Multistate Professional Responsibility Examination,
    National Conference of Bar Examiners, 1986-89

Member, Committee on Professional Ethics, Illinois State Bar Association, 1974-1980;
    Vice Chair 1979-80

**B.**   **In the Fields of Economic Regulation and Administrative Law**

Vice Chair, ABA Section of Administrative Law & Regulatory Practice, 2001-2002;
    Council Member, 1983-86

Consultant, Administrative Conference of the U.S., 1975-1979 & 1985-1989

Chair, Section on Law and Economics, Ass'n of American Law Schools, 1979-1980

**C.**   **In the Field of Legal Education**

President, Association of American Law Schools, 1990

Member, AALS Executive Committee, 1986-1991

Chair, AALS Special Committee on ABA Accreditation Standards, 2010

Chair, AALS Nominating Committee for President-Elect and Members of the Executive
    Committee, 2010 (Member 2008 & 2011)

AALS Delegate to the ABA House of Delegates, 2011-2013

Chair, AALS Long Range Planning Committee, 1988-1989

Member, Planning Committee for Workshop on Tomorrow's Law Schools: Economics, Governance and Justice, 2013

Member, AALS Special Committee on Faculty Recruitment Practices, 2005-2007

Member, AALS Committee on the Ethical and Professional Responsibilities of Law Professors, 1988-1989

**Special Honors Received:**

Illinois State Bar Foundation, Honorary Fellow (1988) (for contributions to study of lawyer professionalism)

American Bar Foundation, Keck Foundation Award (2000) (for distinguished scholarship in legal ethics and professional responsibility)

New York State Bar Association, Sanford D. Levy Professional Ethics Award (2008) (for lifetime contributions to legal ethics scholarship)

**Legal Consulting:**

Testified in twenty-seven contested trials or hearings involving issues such as lawyer discipline, disqualification, right to fees and malpractice.

Gave depositions in thirty cases resolved prior to trial.

Submitted declarations or affidavits in forty-three other cases, typically in connection with motions for summary judgment, disciplinary investigations or motions to disqualify.

**Organization Memberships:**

American Bar Association
American Law Institute (Life Member)
American Bar Foundation (Life Fellow)
Illinois State Bar Association
Illinois Bar Foundation (Honorary Fellow)
ABA Center for Professional Responsibility
Association of Professional Responsibility Lawyers
The Federalist Society

**Current as of June 2021**

# Exhibit B

# LINA M. KHAN

435 West 116th Street, New York, NY 10027
lkhan@law.columbia.edu

## EMPLOYMENT

**Columbia Law School**                                                      Fall 2020-present
*Associate Professor of Law*

**U.S. House Committee on the Judiciary—Subcommittee on Antitrust,**          Mar. 2019-Oct. 2020
**Commercial, and Administrative Law**
*Majority Counsel*

**Columbia Law School**                                                       2018-2019
*Academic Fellow*

**Federal Trade Commission**                                                  2018
*Legal Fellow in the Office of Commissioner Rohit Chopra*

**Open Markets Institute**, Washington, DC                                    2017-2018
*Legal Director*

**Consumer Financial Protection Bureau**                                      Summer 2016
*Legal Intern—Enforcement Division*

**Cohen Milstein Sellers & Toll PLLC,**                                       Summer 2016
*Summer Associate*

**Gupta Wessler PLLC**                                                        Summer 2015
*Summer Associate*

**New America, Open Markets Program**                                         2011- 2014
*Policy Analyst & Reporter*

## EDUCATION

**Yale Law School**, J.D., 2017
*Honors*:   Israel H. Peres Prize for best student Note or Comment appearing in the *Yale Law Journal*
            Michael Egger Prize for best student *Yale Law Journal* Note on current social problems
            Reinhardt Fellow 2016-2017, scholarship for demonstrated commitment to public interest law
*Activities*: Mortgage Foreclosure Litigation Clinic, Student Co-Director
            Information Society Project, Student Fellow
            *Yale Law Journal*, Editor, Vol. 126

**Williams College**, B.A. *magna cum laude* with highest honors in political theory, 2010
*Honors*:   Phi Beta Kappa
            Arthur B. Graves Essay Prize for best essay in Political Science
*Thesis*: "Rethinking (In)action: World Alienation in the Thought of Hannah Arendt"
*Activities*: Editor-in-Chief of *The Williams Record*, the independent student newspaper

Lina M. Khan

---

## ACADEMIC PUBLICATIONS

---

*Digital Platforms, Democracy, and the Antimonopoly Tradition*, in DEMOCRACY & THE AMERICAN ANTIMONOPOLY TRADITION (eds. Daniel A. Crane & William J. Novak) (forthcoming 2022)

*The End of Antitrust History Revisited*, 133 HARVARD LAW REVIEW 1655 (2020)

*The Case for "Unfair Methods of Competition" Rulemaking*, 87 UNIVERSITY OF CHICAGO LAW REVIEW 357 (2020) (with Rohit Chopra)
- Received 2020 Antitrust Writing Award for "Best General Antitrust Academic Article"

*A Skeptical View of Information Fiduciaries*, 133 HARVARD LAW REVIEW 497 (2019) (with David E. Pozen)

*The Separation of Platforms and Commerce*, 119 COLUMBIA LAW REVIEW 973 (2019)
- Received Jerry S. Cohen Memorial Fund Writing Award for "Best Antitrust Article of 2019 on Remedies"

*The Ideological Roots of America's Market Power Problem*, 127 YALE LAW JOURNAL FORUM 960 (2018)

*Sources of Tech Platform Power*, 2 GEORGETOWN LAW & TECHNOLOGY REVIEW 325 (2018)

*The New Brandeis Movement: America's Antimonopoly Debate*, 9 JOURNAL OF EUROPEAN COMPETITION LAW & POLICY 3 (Mar. 2018)

*Amazon's Antitrust Paradox*, 126 YALE LAW JOURNAL 710 (2017)
- Received 2018 Antitrust Writing Award for "Best Academic Unilateral Conduct Article"
- Cited in *Erie Insurance Co. v. Amazon.com*, 925 F.3d 135, 144 (4th Cir. 2019) (Motz, J., concurring)
- Published as chapter in DIGITAL DOMINANCE (Oxford University Press, 2018)
- Featured in: Steven Pearlstein, *Is Amazon Getting Too Big?*, WASH. POST (July 30, 2017); Robinson Meyer, *How to Fight Amazon (Before You Turn 29)*, ATLANTIC MAG. (July 2018); David Streitfeld, *Amazon's Antitrust Antagonist Has a Breakthrough Idea*, N.Y. TIMES (Sept. 9, 2018); Rana Foroohar, *'This isn't just about antitrust. It's about values,'* FINANCIAL TIMES (Mar. 19, 2019).

*Market Power and Inequality*, 11 HARVARD LAW & POLICY REVIEW 234 (2017) (with Sandeep Vaheesan)

*Arbitration as Wealth Transfer*, 35 YALE LAW & POLICY REVIEW 101 (2017) (with Deepak Gupta)

*Market Structure and Political Law: A Taxonomy of Power*, 9 DUKE JOURNAL OF CONSTITUTIONAL LAW & PUBLIC POLICY 37 (2014) (with Zephyr Teachout)

---

## HONORS

---

POLITICO 50 (2018); FOREIGN POLICY "Global Thinkers" (2018); THE PROSPECT "Top 50 Thinkers" (2019); WIRED25 (2019); TIME MAGAZINE "Next Generation Leader" (2019); NATIONAL JOURNAL 50 (2019); WASHINGTONIAN 40 Under 40 (2020); TIME MAGAZINE 100 Next (2021)

---

## BAR ADMISSION

---

New York

# Exhibit C

**Perma.cc record**

Captured July 1, 2021 4:53 pm     See the Capture View (/9GB5-F78G)     What is Perma.cc? (/about)

(http://www.linamkhan.com/bio-1)

Show record details                    View the live page

# LINA KHAN

ABOUT     BIO     WRITINGS     PRESENTATIONS     PHOTOS     CONTACT



LEXEY SWALL / NYT

Lina Khan is an associate professor of law at Columbia Law School, where she teaches and writes on antitrust law, infrastructure industries law, and the antimonopoly tradition. Her recent scholarship has focused on how the current antitrust regime is unequipped to capture the power of dominant digital platforms. Prior to joining Columbia, Khan served as counsel to the U.S. House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, where she led the congressional investigation into digital markets and the publication of its final report.

Khan's scholarship has been published by the *Harvard Law Review*, *University of Chicago Law Review*, *Columbia Law Review*, and *Yale Law Journal*. The New York Times has described her work as having

"reframed decades of monopoly law," and _Politico_ has called her "a leader of a new school of antitrust thought." Her article "Amazon's Antitrust Paradox" was awarded the 2018 Antitrust Writing Award for "Best Academic Unilateral Conduct Article," the Yale Law School's Israel H. Peres Prize, and the Yale Law Journal's Michael Egger Prize; her article "The Separation of Platforms and Commerce" won the 2019 Jerry S. Cohen Memorial Fund's Best Antitrust Article on Remedies; and her co-authored article "The Case for 'Unfair Methods of Competition' Rulemaking" received the 2020 Antitrust Writing Award for "Best General Antitrust Academic Article." She has presented her work before the Department of Justice's Antitrust Division, the Federal Trade Commission, the House Judiciary Committee, and the European Commission.

Khan's work has been profiled in the _Atlantic_, _Boston Globe_, _Financial Times_, _New York Times_, _Washington Monthly_, _Washington Post_, _Yahoo Finance_, _Le Figaro_, _El Pais_, _and_ _Manager Magazin_, as well as widely discussed in both U.S. and international press, including by _Bloomberg_, the _Economist_, and the _Wall Street Journal_. She has appeared on CNBC, C-SPAN, Fox Business News, and BBC and been featured on Planet Money, 1A, Current Affairs, Vergecast, and The Bernie Sanders Show. Khan was recently named to the Politico 50, Foreign Policy Magazine's "Global Thinkers," The Prospect's "Top 50 Thinkers," the WIRED25, the National Journal 50, and TIME Magazine's "Next Generation Leaders."

Khan previously served as a legal advisor in the office of Commissioner Rohit Chopra at the Federal Trade Commission and as legal director at the Open Markets Institute. During law school she litigated on behalf of homeowners through Yale's Mortgage Foreclosure Litigation Clinic and spent summers at Gupta Wessler, Cohen Milstein, and the Consumer Financial Protection Bureau. Khan is a graduate of Williams College and Yale Law School, where was awarded the Reinhardt Fellowship for public interest law.

Powered by Squarespace

# Exhibit D

7/11/2021    Lina Khan on Twitter: "1. Solid complaints from FTC & 48 AGs suing Facebook for violating antitrust laws -- and requesting divestitures/br…

Case 1:20-cv-03590-JEB   Document 23-3   Filed 10/04/21   Page 76 of 78

By using Twitter'
analytics, person

Home   Ab



**Lina Khan**
@linamkhan

Antitrust and anti
Professor of Law
Formerly at @Ho
Subcommittee an

🔗 law.columbia
📅 Joined Febru



---



**Lina Khan** ✔   🔘 Follow   ⌄
@linamkhan

## 1. Solid complaints from FTC & 48 AGs suing Facebook for violating antitrust laws -- and requesting divestitures/breakups, among other forms of relief. Hopeful that it marks yet another step forward in the growing efforts to rehabilitate antitrust laws & recover antimonopoly.

4:20 PM · 9 Dec 2020

**298** Retweets   **1,111** Likes



💬 26    🔁 298    ♡ 1.1K

---

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020    ⌄

2. States' complaint is especially impressive. Tight narrative, compelling facts, told in a way where the full force of the story really lands. It's a persuasive document, fully showcasing how Instagram & WhatsApp acquisitions were part of broader monopoly maintenance strategy.

💬 1    🔁 23    ♡ 169

---

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020    ⌄

3. States' complaint also reveals a sophisticated understanding of harms. It notes FB entered market by competing on privacy, but degraded privacy once it had eliminated rivals & secured a safe monopoly position -- an echo of @DinaSrinivasan's excellent work.

💬 1    🔁 46    ♡ 226

---

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020    ⌄

4. States also note that when seeking approval for WhatsApp acquisition, FB told enforcers (including FTC) that it wouldn't combine data sets or use WhatsApp data for ads. A few years later it did so anyway. European Commission fined FB $122M for the deception. FTC did nothing.

> 176. While Facebook did not evince any genuine desire to expand WhatsApp's feature set and user base, it did take active steps to utilize WhatsApp data in efforts to promote its core platform, despite disavowing any such plans at the time of the acquisition. ==In the course of negotiating and securing regulatory approval for the acquisition of WhatsApp, Facebook had represented to the U.S. Federal Trade Commission, European regulators, the WhatsApp founders, and WhatsApp users that Facebook would not combine user data across the services, that it would not change the way WhatsApp used customer data, and that WhatsApp data would not be useful to Facebook's ad-targeting business.==
>
> 177. But once free from the competitive threat WhatsApp presented, in August 2016, ==Facebook changed WhatsApp's terms of service and privacy policy and eroded the pre-acquisition promises it had made.== It combined user data across the services by linking WhatsApp user phone numbers with accounts on Facebook Blue, enabling WhatsApp user data to be used across all Facebook products. Thus, Facebook Blue users who had declined to give their phone numbers to Facebook suddenly found their phone numbers connected to their Facebook Blue accounts anyway. Facebook was able to use that additional data in its

💬 1    🔁 59    ♡ 273




By using Twitter'
analytics, person...

Home  Ab...


Log in ▾
ng for
✕

Lina Khan
@linamkhan

Antitrust and ant...
Professor of Law
Formerly at @H...
Subcommittee a...

🔗 law.columbia...
📅 Joined Febru...



**Lina Khan** ✔ @linamkhan · 9 Dec 2020
(5. At the time of the deal @EPICprivacy & @DigitalDemoc raised alarms with FTC, prompting FTC to tell FB that reneging on WhatsApp's privacy commitments could violate law and/or a preexisting FTC order. This whole episode is absent from FTC complaint
epic.org/2016/08/facebo… )

> WhatsApp's privacy policy clearly states, among other things, that users' information will not be used for advertising purposes or sold to a third party for commercial or marketing use without the users' consent. Facebook's purchase of WhatsApp would not nullify these promises and WhatsApp and Facebook would continue to be bound by them. Further, Facebook has recently promised consumers that it would not change the way WhatsApp uses customer information. Therefore, any use of WhatsApp's subscriber information that violates these privacy promises, by either WhatsApp or Facebook, could constitute a deceptive or unfair practice under the FTC Act. Moreover, such an action could violate the FTC's order against Facebook. Among other things, the Order enjoins Facebook and its subsidiaries from misrepresenting the extent to which they maintain the privacy or security of consumers' personal information and requires Facebook and its subsidiaries to obtain consumers' affirmative express consent before sharing their nonpublic information in a manner that materially exceeds any privacy setting.

💬 2      🔁 18      ♡ 127

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020
6. Also very glad to see states connect FB's monopolization to all around quality degradation, including increase in ad load, proliferation of fake accounts, and inaccurate performance & other metrics for advertisers (see, e.g.,
wsj.com/articles/faceb…).

💬 3      🔁 30      ♡ 180

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020
7. States also describe how acquiring Onavo (& the surveillance of rivals it enabled) was key to FB's strategy for identifying competitive threats at the earliest stages. They note FB foreclosed other firms from having access to Onavo data.

> 142.    By July 2013, it became apparent to Zuckerberg and his team that ==Onavo could make an even greater contribution to their overriding goal of maintaining Facebook's monopoly if Onavo were owned and controlled—not merely licensed—by Facebook.== Such an acquisition would enable Facebook to gain exclusive control over what could be a key component to an early warning system for detecting competitive threats, allowing it to identify and eliminate or debilitate those threats in their nascency. Acquiring Onavo also allowed Facebook to terminate the access of rivals and potential rivals to Onavo's valuable tools.

💬 1      🔁 17      ♡ 118

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020
8. States discuss several other competitive threats FB acquired or cut off from APIs. Complaint marshals full set of facts in a very effective way. Net effect is clear picture of how FB's conduct was systemic, exactly what you want for Sec 2 (though states also sued under Sec 7).

💬 2      🔁 10      ♡ 106

**Lina Khan** ✔ @linamkhan · 9 Dec 2020
9. Interestingly FTC sued only under Sec 2, not Sec 7. Also notable that many of the docs cited to show Instagram & WhatsApp purchases were illegal were available at the time FTC reviewed the deals (though FTC investigated only Instagram ($1bn) in depth, not WhatsApp ($19bn)).

💬 1      🔁 8      ♡ 107

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

10. Many of the Instagram docs cited build on the material the House Antitrust Subcommittee made public through its investigation. In July @JerryNadler confronted Zuckerberg with some of this evidence c-span.org/video/?c492945…

💬 1          ⟲ 8          ♡ 91

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

11. Finally, both FTC's and states' request for relief includes requirements that would implicate future acquisitions. FTC requests "a prior notice and prior approval obligation for future mergers and acquisitions."

💬 2          ⟲ 7          ♡ 92

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

12. States request FB be prohibited from deals valued at or > $10million without first informing the states, & that FB submit deal-related disclosures it'd make to FTC/DOJ. This is potentially very significant. 48 AGs would have chance to review these deals, not just FTC/DOJ.

💬 1          ⟲ 9          ♡ 108

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

13. Notably, during the course of the investigation FB acquired Giphy, which FB could use to deprive rivals of access and/or to collect significant data. FB didn't report the deal to enforcers, presumably bc it was structured to avoid reporting thresholds.

💬 2          ⟲ 15          ♡ 111

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

14. And just this week Facebook purchased Kustomer, a business software company, reportedly for ~$1 billion. So two days before being sued by the federal government & 48 AGs for a series of illegal acquisitions, Facebook made another acquisition.

💬 3          ⟲ 17          ♡ 111

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

15. FB is now following this playbook in the virtual reality space. Quoting @PramilaJayapal & House report, Bloomberg notes FB is using same "copy-acquire-kill" strategy it used to monopolize social networking. Key task for enforcers is to prevent a repeat

💬 5          ⟲ 19          ♡ 82

**Loading seems to be taking a while.**

Twitter may be over capacity or experiencing a momentary hiccup. Try again or visit Twitter Status for more information.