# Exhibit B

to the Declaration of Mark C. Hansen in Support of Facebook, Inc.'s Motion to Dismiss the
FTC's Amended Complaint in *Federal Trade Commission v. Facebook, Inc.*
Case No. 1:20-cv-03590-JEB (D.D.C.)

**BEFORE THE FEDERAL TRADE COMMISSION**

---

**IN RE PETITION FOR RECUSAL OF CHAIR LINA M. KHAN FROM INVOLVEMENT IN THE PENDING ANTITRUST CASE AGAINST FACEBOOK, INC.**

---

**EXPERT DECLARATION OF PROFESSOR DANIEL B. RODRIGUEZ**

---

## I.      Professional Background

I am the Harold Washington Professor at Northwestern University Pritzker School of Law. I have been on that faculty since 2012, and, from 2012 to 2018, I served as the dean of the Law School.  I previously served as the Minerva Drysdale Regents Chair in Law at the University of Texas Law School, the dean and Warren Distinguished Professor at the University of San Diego Law School, and a professor of law at the University of California, Berkeley School of Law.  In addition to these full-time positions, I have been a visiting professor at the law schools at Harvard, Stanford, Columbia, Virginia, and the University of Southern California.  I am an honors graduate of Harvard Law School, where I served as Supreme Court editor of the Harvard Law Review and as a research assistant to various faculty members.

For three decades, I have taught administrative law and have written widely in this area. In addition to my scholarly work, I have consulted on various matters concerning governmental decisionmaking.  I previously served on the executive council of the American Bar Association ("ABA") Section on Administrative Law and Regulatory Practice.  On matters of governmental ethics in particular, I currently serve as an advisor to the American Law Institute ("ALI")'s restatement project on Principles of Government Ethics.

I have held many leadership roles in the profession and the academy, including the president of the Association of American Law Schools, Council Member of the ALI, member of the Board of Directors of the American Bar Foundation, chair of the ABA Center for Innovation, member of the ABA Commission on the Future of Legal Services, and member of other professional organizations.

I have authored scholarship relevant to the subject of this declaration, most recently a monograph-length article entitled *Whither the Neutral Agency?  Rethinking Bias in Regulatory Administration*, 69 Buff. L. Rev. 375 (2021).  I have included a copy of my current curriculum vitae as Exhibit A to this declaration.

## II.      Terms of Engagement on This Matter

The law firm of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. has retained me to give this declaration in support of Facebook's July 14, 2021 petition for recusal as an expert in administrative law and process and governmental ethics and consider whether the Chair of the Federal Trade Commission ("FTC"), Professor Lina Khan (hereinafter referred to as Chair Khan), should recuse herself – or be recused – from the pending antitrust matter against Facebook.  My role is to address the ethical standards that apply to someone in Chair Khan's role and the statements Chair Khan has made about Facebook.

I am being compensated by counsel at my hourly rate for the time spent preparing this report and any time later required.  No part of the compensation I receive is dependent on the conclusions I reach or the result in any matter in which this declaration might be introduced.

## III.     My Opinions Relevant to Chair Khan's Recusal

My central opinion, the basis of which I will explain in this declaration, is that Chair Khan should be disqualified from any participation in the agency's decision about how to proceed with the pending antitrust matter against Facebook.  I first support this opinion by explaining why the

2

law requires her recusal:  The federal ethics rules require an FTC Commissioner to avoid the mere "appearance of loss of impartiality in the performance of [her] official duties," 5 C.F.R. § 2635.501(a), and due process requires an FTC Commissioner to recuse herself when she has already drawn factual and legal conclusions and deemed the target of an antitrust investigation a violator of the federal antitrust laws.  Next, I explain why the requirement of an impartial decisionmaker is important to the FTC's functioning as an independent agency.  Finally, I highlight the overwhelming evidence in support of Chair Khan's recusal, showing that she has expressed clear and unequivocal views about the exact matters at issue in this dispute and cannot avoid appearing biased against Facebook.

A. <u>**Agency Proceedings Require a Neutral Decisionmaker**</u>

The ethical rules for federal agency officials, including the Chair of the FTC, are clear in requiring that agency decisionmakers be and appear impartial.  *See* 5 C.F.R. § 2635.501(a) (requiring any federal official to "avoid an appearance of loss of impartiality in the performance of [her] official duties").  This consistent requirement of impartiality is necessary to guarantee fundamental fairness to all parties who are involved in matters involving alleged unfair trade practices, including both internal FTC adjudications and proceedings in federal court.

The requirement of a neutral, impartial decisionmaker has been a central component of due process and fair administrative procedure from the earliest days of the regulatory administration. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35 (1975); *Gibson v. Berryhill*, 411 U.S. 564 (1973); *FTC v. Cement Inst.*, 333 U.S. 683 (1948); *see generally* KRISTIN HICKMAN & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 7.7 *et seq.* (6th ed. 2018).  "The law on bias in regulatory administration starts with the core principle that a fair, rational procedure requires agency officials who approach their tasks with an open-mind."  Rodriguez, *Neutral Agency*, 69 Buff. L. Rev. at 381.

This requirement of impartiality, and the facts that bear on whether or not the requirement has or has not been satisfied, has been considered in numerous cases. Some of the most prominent cases in contemporary administrative law have involved the FTC and, in particular, the conduct of then-Chair Paul Dixon. In *Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *vacated and remanded on other grounds*, 381 U.S. 739 (1965), the D.C. Circuit held that prior statements by Chair Dixon tainted the proceeding, for "a disinterested reader of Chairman Dixon's speech could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the [FTC] Act." *Id.* at 760. In *American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), the court noted, critically, the "active role" that Chair Dixon had taken in the investigation of a company when he was Chief Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Judiciary Committee. Despite the fact that Chair Dixon did not cast the deciding vote in the proceeding against the same company, the court held that his conduct violated both the Administrative Procedure Act and the Constitution's Due Process Clause, for "[i]t is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify." *Id*. at 767.

Chair Dixon's comments in advance of proceedings involving the beauty industry were found by the D.C. Circuit to be improper two separate times, in *FTC v. Cinderella Career & Finishing Schools, Inc*., 404 F.2d 1308 (D.C. Cir. 1968), and in *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970). The fundamental right of the defendants to an open-minded decisionmaker was undermined by FTC Chair statements that suggested to any reasonable observer that "the ultimate determination of the merits will move in predestined grooves." *Cinderella Finishing*, 425 F.2d at 590. In these cases, the court acknowledged that agency officials are, as the U.S. Supreme Court had put it in *Withrow*, entitled to a "presumption

of honesty and integrity," 421 U.S. at 47, yet reached the conclusion that "the statements of [Chair Dixon] that spoke . . . to the merits of the dispute and to the bad conduct of the defendant crossed the line," Rodriguez, *Neutral Agency*, 69 Buff. L. Rev. at 393.

"The test for disqualification," the court said in the second *Cinderella Finishing* case, is "whether 'a disinterested observer may conclude that [the agency official] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " 425 F.2d at 591 (citation omitted). Despite the absence of any evidence suggesting either that Chair Dixon would personally benefit from a decision rendered against these companies or any suggestion of some special personal animus at work, the courts were concerned in each instance with the simple fact that this administrative official – the Chair of the FTC – was approaching these matters with bias. After all, "[the law] does not give individual Commissioners license to prejudge cases or to make speeches which give the appearance that the case has been prejudged. Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." *Id*. at 590 (footnote omitted).

Because courts cannot read the minds of official decisionmakers, so as to determine whether in fact the official approached the matter with an open or closed mind, courts commonly rely on the appearance of partiality in determining whether the official's involvement in the matter is appropriate. In *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), the Supreme Court considered a case involving a state supreme court justice who had been previously involved in that case as a district attorney. In ruling that the failure to recuse was a constitutional defect, the Court wrote:

> An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice

are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself.

*Id.* at 1909.  The appearance of impropriety is part of the standard in cases involving administrative decisionmaking, as well.  *See Cinderella Finishing*, 425 F.2d at 590 (FTC Commissioners should avoid statements "which give the appearance that the case has been prejudged."); *American Cyanamid*, 363 F.2d at 767 ("[B]oth unfairness and the appearance of unfairness should be avoided.").  The standard is an objective one and was summarized well by the Eighth Circuit in *Antoniu v. SEC*, 877 F.2d 721 (8th Cir. 1989):  The test is "whether 'a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'"  *Id.* at 725 (alterations in original) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959)).  The risk that the parties and the public would view the process as fundamentally unfair does counsel a close watch on the behavior and statements of the decisionmaker.  "[O]ur system of law," the Court said in *In re Murchison*, 349 U.S. 133, 136 (1955), "has always endeavored to prevent even the probability of unfairness."  *See also Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").

**B.  Impartiality is Required Regardless of the Source of, and Reasons for, the Prejudice**

Bias comes in various forms.  The inquiry here is whether there is a risk of partiality that emerges from the facts of this specific matter, considering in particular the statements made before deciding whether to pursue this antitrust case.

Some of the leading cases involve official bias in situations where the official, be it a judge or an administrator, had a financial self-interest in the outcome of the proceeding.  *See, e.g., Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); *Tumey v. Ohio*, 273 U.S. 510 (1927).  Other cases have involved instances of external influence by those with a preferred outcome in a dispute.  *See, e.g., D.C. Fed'n of Civic Ass'ns v.*

6

*Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) (considering whether "extraneous pressure intruded into the *calculus of considerations* on which the Secretary's decision was based") (emphasis added).  It is clear to me from these and other cases that the courts look with special disfavor at agency decisions where the decisionmaker has a personal interest in the outcome of the case or has become compromised in some serious way because of external political influence.  *See* Rodriguez, *Neutral Agency*, 69 Buff. L. Rev. at 383-401 (sorting bias cases into the categories of interest, prejudice, and influence and discussing how courts have criticized the bias arising from each cluster of cases).  These cases illuminate the general principle that an agency official should not be seen to be serving two masters – the rule of law and her own or anyone else's individual interest.

While there is no allegation that Chair Khan has any pecuniary interest in the outcome of the agency's actions against Facebook, this principle is nonetheless relevant here because the circumstances of self-interest and external influence do not exhaust the area in which the requirement of neutral decisionmaking is imposed by courts.  Administrator neutrality covers not only where the official has been or might be compromised by financial pressures but also circumstances in which, as here, a government official comes to the matter with her mind made up and so cannot be viewed by a reasonable observer as in any way objective*.  See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 537-38 (2004) (holding that defendant was denied due process because he was given no meaningful opportunity to contest the factual basis for his detention before a neutral decisionmaker); *NLRB v. Pittsburgh S.S. Co*., 337 U.S. 656, 659-60 (1949) (finding undue bias where hearing examiner found all of one side's witnesses trustworthy and all from the other side untrustworthy).

Requiring impartiality in decisionmaking regardless of the reasons for bias makes good sense from the perspective of fair procedure and administrative justice, for the risks of unfairness

exist whenever the official has made up his or her mind in advance.  Parties to a dispute – here, a company that is being charged with violations of federal statutes – have a right to have their cause considered throughout the process by officials who can be trusted to evaluate the evidence fairly, without preconceived biases, and without any "axe to grind."  *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.).  Why is biased decisionmaking so objectionable?  As I have written recently in an article that looks comprehensively at administrative agency bias, "objective judgment by a neutral decisionmaker . . . emerges from the deeper commitment to blind justice, that is, to decisionmaking based upon the quality of the arguments made and the proof established, and without attention to the characteristics of the disputants."  Rodriguez, *Neutral Agency*, 69 Buff. L. Rev. at 420.

While it is tempting to see the concept of neutrality as inextricably tied to the principle of governmental ethics – and therefore, to see anti-bias requirements as merely intended to root out and eradicate public corruption – my opinion as a teacher and scholar of administrative law is that the essential purpose of requiring impartiality in administrative agency decisionmaking is to ensure a fair and rational administrative process.  Importantly, that process must also appear to be so.  As I will discuss in more detail below, the awesome power of regulatory agencies, such as the FTC, requires scrupulous commitment to a fair, transparent process, and such a process means, at the very least, neutral decisionmakers who can be trusted to consider the parties, arguments, and the evidence presented in an objective, open-minded way.

C.  **This Requirement Applies as Well to the Functions of an Agency Administrator that are Analogous to a Prosecutor**

To be sure, an agency official acting as an adjudicator carries special responsibilities for impartiality.  Because that role is analogous to a federal or state judge, the law governing adjudicatory decisionmakers has incorporated the high standards we expect from judges.  *See*

*Gibson*, 411 U.S. at 578 (affirming district court's determination that State Board of Optometry was too biased to constitutionally conduct hearings on appellees' licensing); *Ward*, 409 U.S. at 60 (requiring disqualification of mayor who adjudicated disputes in a town where much of his income came from fines and fees imposed by him in the so-called mayor's court).

By contrast, there is limited judicial precedent addressing the amount of impartiality expected of agency leaders who have multiple roles or assume a role similar to that of a prosecutor. While I have addressed agency decisionmaking in various places in this declaration, this decisionmaking can take different forms, especially at the FTC. Commissioners act in multiple roles because they investigate cases and decide whether and how to bring charges. Depending on which forum the Commissioners choose, they act in roles analogous to judges, when adjudicating a dispute, and to prosecutors, when bringing a case in federal court. It follows from the logic, rationale, and explication of the fundamental requirement of impartiality in administrative decisionmaking that this principle applies regardless of the specific role an administrator plays.

I start with an important observation about the state of the law: The principle of public official impartiality in the case law has never been limited only to those functioning in an adjudicatory role. Nor should it be. Prosecutors must be impartial because they are exercising the great power of the government, the power that enables them to bring both criminal and civil matters to appropriate courts and to urge that defendants be punished or penalized in some way for their conduct. This is not to say that prosecutors do not have a large amount of discretion to investigate and charge and, in exercising that discretion, to bring their opinions and judgment to bear on decisions about how best to allocate their limited resources. Adjudicators and prosecutors occupy different roles in the justice system, and nothing I say should be read as suggesting that the same strict anti-bias rules apply to prosecutors and judges. However, "[p]rosecutors . . . have a duty to

'do justice,'" and such justice requires impartiality and neutrality. Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of Interest*, 58 B.C. L. Rev. 463, 471 (2017).

This impartiality means that prosecutors should come to all matters with an open mind and free from both political influence and ideological bias. *Cf.* Standards for Criminal Justice: Prosecution Function, 3-1.3 cmt. (Am. Bar Ass'n 3d ed. 1993) ("a prosecutor should not allow . . . ideological or political beliefs to interfere with the professional performance of official duties"); D.C. Bar Legal Ethics Op. 371 (2016) (the Rules of Professional Conduct "prohibit[] statements by prosecutors that heighten condemnation of the accused and do not serve a legitimate law enforcement purpose"); N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 683 (1996) (maintaining that a prosecutor must "exercise [his or her] discretion in a disinterested, nonpartisan fashion" and, therefore, may not exercise prosecutorial discretion "to advance his or her own political interests or those of another").

The great Justice Robert Jackson spoke of this as a prosecutor's obligation of "fair play." Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 4 (1940). This special duty emerges from a prosecutor's tremendous discretion, from the fact that he "has more control over life, liberty, and reputation than any other person in America." *Id.* at 3. Shrewdly, Justice Jackson notes that it is precisely because these positions are of "such independence and importance" that these prosecutors can "afford to be just." *Id.* at 4. Because prosecutors must necessarily determine which cases among the many possibilities ought to be investigated and eventually brought to court, it is essential that the prosecutor have "a detached and impartial view of all groups in his community." *Id.* at 5. This requirement of impartiality, as a prominent criminal procedure scholar said nearly four decades later, ensures not only "insulation from narrow interest groups and corrupt influences" but also an understanding, "as an affirmative matter, that

independent-minded prosecutors are well-placed to divine the public interest."   Daniel C. Richman, Old Chief v. United States: *Stipulating Away Prosecutorial Accountability?*, 83 Va. L. Rev. 939, 959 (1997).

While the ultimate resolution of the dispute may not rest with prosecutors, the charging decision does reflect judgments reached by prosecutors based upon their investigation and conclusions about the conduct of those investigated.   And so prosecutors are properly viewed as decisionmakers with critical functions to play in the resolution of disputes.   Judge Gerard Lynch put the matter well when he wrote:   "Justice is much better served when prosecutors . . . see themselves as quasi-judicial decision-makers, obligated to reach the fairest possible results, rather than as partisan negotiators."   Gerard E. Lynch, *Our Administrative System of Criminal Justice*, 66 Fordham L. Rev. 2117, 2136 (1998); *see also* Stanley Z. Fisher, *In Search of the Virtuous Prosecutor:  A Conceptual Framework*, 15 Am. J. Crim. L. 197, 215-27 (1988) (observing that "in her *quasi-judicial role* the prosecutor acts 'impartially' and judge-like; her orientation to the factual contest is neutral"); *cf. State v. Tate*, 171 So. 108, 112 (La. 1936) ("The district attorney is a quasi judicial officer.   He represents the State, and the State demands no victims.   It seeks justice only, equal and impartial justice . . .").

This view of prosecutors need not be in tension with the traditional idea that prosecutors maintain a great amount of discretion in their decisions to investigate and pursue justice.   The prosecutor's essential role is as the "arbiter of the accusation."   H. Richard Uviller, *The Neutral Prosecutor:  The Obligation of Dispassion in a Passionate Pursuit*, 68 Fordham L. Rev. 1695, 1701 (2000).   And, therefore, as Professor Uviller puts it:

> Discharge of this major obligation, the wise exercise of virtually unilateral discretion in the matter, demands neutrality, the suspension of the partisan outlook, and at least until the case passes to the adversarial stage, dedication to interests that may prove antithetical to her ultimate position. . . . [T]horough investigation by a

detached and dedicated investigator is the best assurance of a conclusion that comports with historical truth. . . . So long as the prosecutor is primarily an advocate, sees himself, armor-clad, prepared to do battle for what is right, detachment falters.

*Id.* at 1701-02.

Although the U.S. Supreme Court has never ruled specifically in a case involving a challenge that a prosecutor must be recused, it has made clear that prosecutorial neutrality is a requirement of procedural due process under the Constitution.  In *Berger v. United States*, 295 U.S. 78 (1935), the Court declared that "[t]he [state's attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all."  *Id.* at 88.  And in *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), even though the Court recognized that "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges," *id.* at 250, it indicated that due process applies to decisions involving so-called administrative prosecutors:  "We do not suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors. Prosecutors are also public officials; they too must serve the public interest. . . . Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication."  *Id.* at 249.

A number of state courts have ruled that defendants' fair trial rights were violated by prosecutors taking public positions on matters that would be subject to litigation at trial.  In *State v. Hohman*, 420 A.2d 852 (Vt. 1980), *overruled on other grounds by Jones v. Shea*, 532 A.2d 571 (Vt. 1987), the Vermont Supreme Court considered whether the defendant's fair trial rights were violated where the state's attorney had put out an advertisement before trial promising to convict an infamous defendant.  The court held in favor of the defendant, ruling that the prosecutor had evidenced improper bias.  The court quoted from the U.S. Supreme Court's 1935 decision in

*Berger*, which emphasized how prosecutors "may prosecute with earnestness and vigor . . . [,] [b]ut, while he may strike hard blows, he is not at liberty to strike foul ones." 295 U.S. at 88.

In *State v. Snyder*, 237 So. 2d 392 (La. 1970), the Louisiana Supreme Court considered the defendant's objection that the district attorney had demonstrated "personal animosity" toward the defendant, arising from a bitterly fought mayoral election. *Id.* at 395. The court reversed the conviction on the grounds of impermissible bias because the district attorney's behavior "might, even though unconsciously, have impaired his power to conduct [the defendant's] trial fairly and impartially." *Id*.

In 1981, again in Vermont, the court struck down a conviction where the district attorney had announced an opinion before a legislative committee about the facts specifically relevant to the case. *See In re J.S.*, 436 A.2d 772 (Vt. 1981). The court reiterated that the law requires the prosecutor "to act with impartiality and with the objective of doing justice without regard to his personal feelings. If he cannot so act, his responsibility to his position and profession requires him to disqualify himself." *Id*. at 773.

In *People ex rel. Clancy v. Superior Court*, 705 P.2d 347 (Cal. 1985), the court returned to an old issue that had once been prominent in cases involving bias, and that is the self-interest attendant to a prosecutor being compensated specially for bringing cases. In invalidating this arrangement for bias, the court noted that "a prosecutor's duty of neutrality is born of two fundamental aspects of his employment. First, he is a representative of the sovereign; he must act with the impartiality required of those who govern. Second, he has the vast power of the government available to him; he must refrain from abusing that power by failing to act evenhandedly." *Id*. at 350; *see also State v. Gonzales*, 119 P.3d 151 (N.M. 2005) (finding bias

where defendant worked in office of the prosecutor and there was a history of the prosecutor's animus toward defendant).

These state cases involve local and state prosecutors in criminal cases, not a chair of a federal administrative agency. The functions and responsibilities of the latter are obviously distinct from a district attorney or a state attorney general. For example, local prosecutors are often elected officials, and the fact that they express views about certain matters that are likely to come into their orbit as prosecutors is understandable. Agency officials, while by no means empty vessels with respect to either policy issues or private parties, are still expected to conduct themselves comparatively above the ideological fray and approach individual matters with an open mind. So far as the matter of impartiality in governmental decisionmaking is concerned, the basic obligations to behave neutrally and with a scrupulously open mind are essentially the same. As the California Supreme Court put it in *Clancy*, "[t]hese duties [of neutrality] are not limited to criminal prosecutors: A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice." 705 P.2d at 350 (internal quotation marks omitted). At bottom, the courts are deeply protective of the integrity of the process and the rights of the defendant to a fair trial, and there are good reasons to protect these fundamental principles in the context of a civil lawsuit where the awesome power of a major federal agency is being brought against a private company and seeking substantial relief.

The fair process basis of this principle of prosecutorial impartiality is reflected in rules of professional ethics for federal officials. The old ABA Code of Professional Responsibility provided that "[a] government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or

results." EC 7-14.  The Model Rules of Professional Conduct make this requirement most explicit in criminal cases:

> A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons.

Rule 3.8, cmt. 1.  The National District Attorneys Association National Prosecution Standards (3d ed. 2009) provide that "[t]he prosecutor is an independent administrator of justice," § 1-1.1, and "[a] prosecutor should put the rights and interests of society in a paramount position in exercising prosecutorial discretion in individual cases," *id.* § 1-1.2.

These longstanding ethical principles are designed to ensure that the general public trusts prosecutors, in administrative proceedings as elsewhere, to bring objectivity to the task of investigating conduct and charging defendants.  In contrasting the prosecutor's role in this pre-trial phase with advocacy at trial, Professor Uviller notes that "[i]nvestigation and adjudication call for neutrality, while the trial mode of the advocate demands full partisan commitment.  Passion and dispassion are not cut from the same mentality.  Dedicated detachment is a precious quality in a public prosecutor, difficult to cultivate and best developed at some remove from the adversary zeal that characterizes the trial phase."  Uviller, *The Neutral Prosecutor*, 68 Fordham L. Rev. at 1718.  The failure to ensure such detachment is a fundamental error demanding correction.  As Justice Brennan put it:  "An error is fundamental if it undermines confidence in the integrity of the criminal proceeding.  The appointment of an interested prosecutor raises such doubts."  *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987) (plurality) (citations omitted); *see also Gonzales*, 119 P.3d at 161 ("Bias is a ground upon which a prosecutor may be disqualified.").

It is important to acknowledge that these cases and ethical rules offered by the ABA and other organizations are in some tension with the enduring principle of prosecutorial discretion. Chair Khan as prosecutor has discretion not dissimilar in content or rationale to the discretion vested in all prosecutors; and this discretion includes a wide berth to decide whether to bring complaints.  I have described in some detail cases that remind us that this prosecutorial discretion is not unlimited and that we want our officials who exercise this extraordinary public power to adhere to the rule of law and standards of fairness, a desire that fuels attention by courts to guarding against biased prosecutorial decisionmaking.  And of course the responsibility to ensure a fair process is held in the first instance by the prosecutor him or herself, which is why the recusal petition is directed toward the prosecutor, here Chair Khan.

The tension persists nonetheless and the challenge of reconciling a strong mandate of impartiality with broad prosecutorial discretion is a difficult one.  The law remains an inexact, and somewhat inchoate, guidepost.  However, I believe we can derive standards of fair process and administrative justice, standards that support an impartiality requirement for administrative prosecutors by looking to the nature and structure of regulatory agencies and the contours of administrative law.  This is the focus of the next section of my declaration.

**D.  <u>A Scrupulous Requirement of Impartial Decisionmaking is a Principle Important to the FTC's Function as an Independent Agency in Our Constitutional Scheme of Regulatory Administration</u>**

In my view, the ethical and due process concerns detailed up to this point are sufficient to support Chair Khan's recusal.  But, I want to highlight an additional argument for recusal that turns on Chair Khan's function in this particular administrative agency context.  I offer this opinion as an expert in administrative law and someone who has taught and written widely about the origins, history, and constitutional functions of regulatory agencies in American government.

16

The function and role of the FTC should be considered in light of the important expectations established by Congress in creating this agency and in the persistent choices of Congress and the President in maintaining these familiar and important schemes of administrative justice.  *See, e.g.*, JAMES M. LANDIS, THE ADMINISTRATIVE PROCESS 111 (1938) (explaining that independent regulatory commissions "evolved from the very concept of administrative power"); Cass R. Sunstein, *Constitutionalism After the New Deal*, 101 Harv. L. Rev. 421 (1987) (describing the modern emergence of administrative constitutionalism and the consistent acceptance by courts of broad administrative power under critical checks and balances).

In creating these so-called independent regulatory agencies, beginning with the Interstate Commerce Commission ("ICC") in 1887, continuing with the FTC in 1914, and reaching its zenith in the New Deal, Congress understood that these statutory creations represented new models of regulatory governance.  *See generally* Sophia Z. Lee, *Our Administered Constitution: Administrative Constitutionalism from the Founding to the Present*, 167 U. Pa. L. Rev. 1699, 1729-44 (2019) (describing origins of regulatory commissions, including the FTC, from the Progressive Era through the New Deal).  The agencies were authorized to exercise important administrative powers and, while they acted on behalf of Congress as the creator of these schemes, they were decidedly not Congress.  Therefore, as the Supreme Court made clear in key cases from the 1930s and 1940s, Congress must create in the agency's organic statute "intelligible principles" to guide adequately agency conduct, *Panama Refining Co. v. Ryan*, 293 U.S. 388, 429-30 (1935); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); they must provide a mechanism for judicial control over agency decisionmaking, especially with respect to the finding of so-called jurisdictional facts, *see Crowell v. Benson*, 285 U.S. 22 (1932); and, significantly for the purposes of this matter, they must function in accordance with transparent procedures, which

would ensure all who came before the agency that matters would be handled fairly,[1] *see, e.g.*, *Morgan v. United States*, 304 U.S. 1, 18 (1938) (parties must have "a reasonable opportunity to know the claims of the opposing party and to meet them").

It is a mistake to suppose that the only obligations imposed on agencies exercising their powers are found in the Constitution's procedural Due Process Clause. It is likewise a mistake to see the Administrative Procedure Act of 1946 ("APA") as the sole source of restrictions on agency actions. Rather, the requirements of fair process – including a neutral and impartial decisionmaker – emerge from what I have called in my scholarship a political accommodation among Congress, courts, and agencies and, more to the point, a constitutional understanding that agencies could exercise awesome power only if they turned very square corners in their decisionmaking – all decisionmaking, including matters of enforcement and implementation, in addition to adjudication. *See* Daniel B. Rodriguez & Barry R. Weingast, *Engineering the Modern Administrative State: Political Accommodation and Legal Strategy in the New Deal Era*, 46 BYU L. Rev. 147, 202-05 (2020). "The principal concern," as Professor Cass Sunstein has written, "of administrative law since the New Deal, in short, has been to develop surrogate safeguards for the original protection afforded by separation of powers and electoral accountability." Cass R. Sunstein, *Participation, Public Law, and Venue Reform*, 49 U. Chi. L. Rev. 976, 987 (1982).

---

[1] FTC Commissioner Wilson recently recognized in testimony that the lack of transparency in the agency risks leading to "agency overreach," expressing concern about "more power without appropriate guardrails." *Hearing on "Transforming the FTC: Legislation to Modernize Consumer Protection" Before the Subcomm. on Consumer Protection & Commerce of the* H. Comm. on Energy & Commerce, 117th Cong. (July 28, 2021) (1:00:40 to 1:00:52), https://www.youtube.com/watch?v=AwnW2IwgITY&t=3700s (testimony of Commissioner Christine S. Wilson); *see also* Oral Statement of Commissioner Christine S. Wilson, FTC, at 3 (July 28, 2021), https://www.ftc.gov/system/files/documents/public_statements/1592954/2021-07-28_commr_wilson_house_ec_opening_statement_final.pdf.

Not only is the FTC obliged to respect this constitutional *quid pro quo* – *i.e.*, it may exercise power but only in a manner consistent with scrupulously fair procedures – but there are reasons why it must be especially vigilant.  This stems from the statutory fact that the Commission has the power to bring disputes to the federal courts where an Article III judge will make a determination based, in part, upon evidence presented by the FTC as a party to the dispute or, alternatively, to bring matters before the agency to decide in a so-called Part 3 administrative proceeding.  It is unlikely that Congress would have created this arrangement without an expectation that the agency members who would wear these two hats would carry out their dual function with careful attention to the need to be impartial.  After all, the prosecutor in the first instance could well become the adjudicator, and the FTC lacks any mechanism to substitute a new set of officials to make adjudicatory determinations after it has proceeded – or, perhaps more realistically, considered whether to proceed – with a suit in federal court.  Judge Richard Posner summarized well the expectations and obligations of the FTC when he wrote:

> On the procedural or institutional side, it was believed that the establishment of a continuing body with specialized responsibility and broad powers to deal with trade restraints would promote the sound, certain, and expeditious implementation of antitrust policy.  Also, Commission enforcement would be outside of politics, and this would promote both effectiveness and impartiality.

Richard A. Posner, *The Federal Trade Commission*, 37 U. Chi. L. Rev. 47, 49 (1969).

Also worth mentioning is the fact that the FTC was created in the twin images of bureaucratic decisionmaking – this growing out of the foundations of both the Interstate Commerce Commission and the Federal Reserve Board (created just one year before the FTC in 1913) – and also of the courts in their adjudicatory role.  And so, when the commissioners were tasked with investigation and building a case for charging businesses with unfair trade practices, if the facts warranted such a case, they had in mind these commissioners functioning as prosecutors and

judges, rather than as lawmakers.  It stands to reason that these functions would be performed in ways that would be oriented toward fairness and that impartiality would, therefore, be scrupulously observed.  *See generally* GEORGE C. HENDERSON, THE FEDERAL TRADE COMMISSION: A STUDY IN ADMINISTRATIVE LAW AND PROCEDURE (1924) (describing the judge-like powers of federal trade commissioners).

Maintaining fair procedures consistent with this court-like structure was important for Congress from the very beginning.  Indeed, one journalist in 1937, as New Deal battles waged about whether these independent regulatory agencies should be subject to more top-down political control, proclaimed that "the country has come to look up to agencies [like the ICC and FTC] largely because of their independence and their fairness" in policymaking.  HIROSHI OKAYAMA, JUDICIALIZING THE ADMINISTRATIVE STATE: THE RISE OF THE INDEPENDENT REGULATORY COMMISSIONS IN THE UNITED STATES, 1883-1937, at 138 (2019) (quoting Wash. Evening Star, Jan. 15, 1937)).  The most prominent administrative scholars across the century-long time frame from the creation of the FTC to the present have emphasized the critical role of fair process in maintaining the democratic legitimacy of administrative agencies and their functions.  *See, e.g.*, CASS R. SUNSTEIN & ADRIAN VERMEULE, LAW & LEVIATHAN:  REDEEMING THE ADMINISTRATIVE STATE 16, 104 (2020) (connecting rule of law "virtue" of administrative justice with notions of morality central to administrative law and to the legitimacy of agencies in constitutional government); JERRY L. MASHAW, BUREAUCRATIC JUSTICE:  MANAGING SOCIAL SECURITY DISABILITY CLAIMS 29 (1983) (noting the "moral judgment" model of administrative justice as one central theme of regulatory administration); KENNETH CULP DAVIS, DISCRETIONARY JUSTICE: A PRELIMINARY INQUIRY (1969) (stressing the necessity of administrative procedures and standards in order to limit the scope of agency discretion).

The picture of administrative agency functioning and its tether to fair process articulated above has a long history and is connected to the idea that fair process often requires a clear separation of functions. The idea that there should be a clear separation of functions in administrative agencies is, as Justice White put it in *Withrow*, "substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons." 421 U.S. at 51. The APA provides for a separation of functions in certain contexts in which agencies undertake prosecutorial and, later, adjudicatory proceedings. *See* 5 U.S.C. § 554(d). These rules are designed, as the Court put it in *Butz v. Economou*, 438 U.S. 478 (1978), "to guarantee the independence of hearing examiners," *id*. at 514.[2]

The reference to the separation of functions under the APA illustrates the importance the framers of the modern administrative state put on ensuring independence and transparency.[3] Indeed, administrative law has evolved since the 1930s and 1940s in a direction that reinforces the imperative of fairness in agency procedures, from the beginning of the process to the end.[4] This

---

[2] As Professor Barkow has observed:

> The drafters of the APA expected this provision to cover those instances where an agency sought to impose a penalty or withdraw benefits because an individual violated a statute or regulation. The concern was that those individuals at the agency conducting the investigation and bringing the prosecution would have a tendency to "develop the zeal of advocates" and lack "the proper state of mind for providing neutral and dispassionate advice to decisionmakers." The concern was heightened in accusatory proceedings where "there is a greater feeling of right and wrong, of a desire to punish a particular person and of doing justice."

Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 Stan. L. Rev. 869, 890 (2009) (citations and footnotes omitted).

[3] This is illustrated also by the APA's prohibition against *ex parte* contacts, in Section 557(d).

[4] In one interesting case from the Ninth Circuit, the court interpreted Section 554(d) to disqualify an administrative law judge who previously participated, as an attorney-advisor, in the

is true not only with respect to "conflicting private claims to a valuable privilege," *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221, 224 (D.C. Cir. 1959), but in myriad administrative proceedings, where the courts insist on "some kind of hearing," *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974), or at least a process that enables a reviewing court to "examine[e] the decisionmakers" in order to ensure that the decision does not reflect "bad faith or improper behavior," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

The development of hearing requirements in so-called informal adjudications, where the APA is silent and where the agency process is not especially trial-like and therefore does not lend itself to traditional due process analysis, illustrates the lengths to which federal courts have gone in creating modern administrative law to ensure that agencies are turning square corners and that they are acting as neutral and impartial decisionmakers. *See generally* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1279-80 (1975) (discussing the relationship between the prominence of the agency in issuing decisions and the requirement of an unbiased decisionmaker). It is for the protection of the values of administrative process and of maintaining the careful equilibrium that Congress established when creating these remarkably powerful agencies that prohibitions against prejudiced decisionmakers are required. "The importance of a neutral decision maker, so central to the courts and notions of due process, was therefore thought to be equally important in the context of agencies." Barkow, 61 Stan. L. Rev. at 890 (citation omitted). Ultimately, "[b]ias law rests on a skeptical view of agency performance in the shadow of broad administrative discretion." Rodriguez, *Neutral Agency*, 69 Buff. L. Rev. at 419.

---

discussions concerning whether to bring a complaint. *See Grolier Inc. v. FTC*, 615 F.2d 1215 (9th Cir. 1980). Obviously, this is not the posture of this matter, but this case illustrates the lines that the APA's separation of functions provision draws between decisionmaking and advocacy.

All of this bears on the matter of the Chair Khan recusal in the following sense:  In a circumstance, as here, where reasonable observers could question whether the member of the agency – and not just any member, but the Commission's chair – would be impartial in making the decision to undertake a thorough investigation under the relevant antitrust laws, then casting a vote upon whether a lawsuit is warranted, and then holding in her pocket the option of undertaking a Part 3 proceeding in which that very same Commission would make a decision on liability, there is a compelling case for humility and caution.  This takes the practical form of a recusal, not as a badge of dishonor for previous views articulated or an acknowledgment of some sort of corruption, but simply as a reflection of the fundamental idea that government officials should be beyond reproach.  Moreover, they should be wary of actions that could upset this balance established by congressional action a century ago in creating these agencies and approved by courts looking at the questions of how to accommodate these independent agencies into our constitutional architecture.

In a context not unrelated to the larger questions posed by administrative constitutionalism, James Madison wrote in Federalist No. 51 of the need for "auxiliary precautions" to protect We the People against risks to our Republic by official action.  THE FEDERALIST NO. 51 (James Madison).  The guarantee of impartiality in regulatory decisionmaking, including in the role of prosecutor, is one such auxiliary precaution.

**E.  Chair Lina Khan Comes to This Matter with an Appearance of Bias and Therefore Fails in Her Responsibility for Impartiality Under the Law**

There is no question that Chair Khan is entitled to develop and communicate her own informed views about the legal matters involved in this dispute, including views on the application of antitrust and other statutes to the conduct of Facebook.  Consistent with her expertise, she has written a number of influential articles, has given speeches and interviews, and has also deployed

her expertise in her role for the House Judiciary Subcommittee.  These efforts are well within the boundaries of academic and professional work.

The problem is that Chair Khan now comes to her position as chair of the federal administrative agency responsible for implementing and enforcing antitrust and other laws with her mind already made up about Facebook's conduct.  A plethora of information publicly available, including scholarly writings, governmental and non-governmental reports, media interviews, and even tweets, evince Chair Khan's pattern of arguing that Facebook's conduct has violated the antitrust laws and warrants moral reproach.  I have included the most relevant excerpts from her prior writings as Exhibit B to this declaration.

It is not necessary to read Chair Khan's mind to evaluate whether she should recuse herself in light of these statements from the vantage point of governmental ethics and administrative law. As explained above, due process requires both impartiality and the appearance of impartiality to a disinterested observer.

I have read a substantial amount of Chair Khan's scholarship, reports, and other statements. For instance, in a 2017 article in the Yale Law Journal, Chair Khan laid out an extensive case for scrutinizing and ultimately breaking up large information-centered technology companies. Despite the article's highlighting of Amazon, Inc. in the title, part of the article was devoted to the conduct of Facebook.  *See* Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L. J. 710, 793 (2017).  She suggests that Facebook was violating antitrust laws in its consolidation and acquisition strategies.  "[T]he current antitrust regime," she writes, "has yet to reckon with the fact that firms with concentrated control over data can systematically tilt a market in their favor, dramatically reshaping the sector."  *Id.* at 783.  In a footnote, she continues:  "European antitrust authorities do investigate how concentrated control over data may have anticompetitive effects, and—unlike U.S.

antitrust authorities—investigated the Facebook/WhatsApp merger for this reason.  Complaints from companies that their rivals are acquiring an unfair competitive advantage through acquiring a firm with huge troves of data may also prompt U.S. authorities to take the exclusionary potential of data more seriously."  *Id.* at 783 n.376.  She continues in a similar vein:  "Data that gave a player deep and direct insight into a competitor's business operations, for example, might trigger review.  Under this regime, Facebook's purchases of WhatsApp and Instagram, for instance, would have received greater scrutiny from the antitrust agencies, in recognition of how acquiring data can deeply implicate competition."  *Id.* at 793 (footnote omitted).

Chair Khan has expressed prejudgment about Facebook and its business strategies in fora beyond her scholarly work, including her work on behalf of the U.S. House Committee on the Judiciary—Subcommittee on Antitrust, Commercial, and Administrative Law, where she served as majority counsel from March 2019 to October 2020.

During her tenure, Chair Khan was the principal author of a major report, the Digital Markets Report (hereinafter, "Report"). [5]  In it, she lays out the case for significant legal intervention to combat what she views as the negative effects of Facebook's business practices.  In the Report, she comes squarely to the conclusion that Facebook is a monopoly in the social networking market.  "[T]he strong network effects associated with Facebook has tipped the market toward monopoly such that Facebook competes more vigorously among its own products— Facebook, Instagram, WhatsApp, and Messenger—than with actual competitors."  Report at 11-

---

[5] *See* Investigation of Competition in Digital Markets:  Majority Staff Report and Recommendations, Subcomm. on Antitrust, Commercial, and Administrative Law of the H. Comm. on the Judiciary, 116th Cong. (2020), https://judiciary.house.gov/uploadedfiles/ competition_in_digital_markets.pdf?utm_campaign=4493-519.

12, 133.  The Report also concludes that Facebook's monopoly power "is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms."  *Id.* at 13.

Chair Khan goes into extensive detail in the Report about how Facebook has allegedly created and maintained this monopoly, laying out a litany of harms that she associates with this purported absence of competition resulting from Facebook's actions.  I will not belabor the arguments here.

The Report also specifically seeks to rebut Facebook's claims that the presence of other digital platform companies, including Twitter, Snapchat, Pinterest, and TikTok, demonstrates that it lacks monopoly power, writing that "Facebook's position that it lacks monopoly power and competes in a dynamic market is not supported by the documents it produced to the Committee during the investigation."  *Id.* at 136.  According to the Report, Facebook's "most significant competitive pressure" comes "from within its own family of products—Facebook, Instagram, Messenger, and WhatsApp."  *Id.* at 384.

A reasonable observer could see from this Report that, before coming to the Commission, Chair Khan prejudged Facebook's liability under Section 2 of the Sherman Act as well as the actions the FTC should take to address Facebook's conduct.  (The Report refers to the FTC throughout its pages.)  While I offer no opinion on the merits of this analysis, there is no doubt that it reaches strong conclusions about Facebook's actions, the reasons for these actions, liability under federal antitrust law, and the remedies appropriate for these purported legal violations.

But Chair Khan's prior statements evince more than mere prejudgment.  In another academic article, *see* Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973 (2019), she brings her critique of Facebook even more to the fore, for example, citing with approval a BuzzFeed essay by a leading "Big Tech" critic, characterizing Facebook as one of

the "'*sinister new centers of unaccountable power*.'"  *Id.* at 976 n.4 (emphasis added).  She goes

on to write:  "Facebook, equipped with technology that lets it detect which rival apps are

succeeding, would often give companies a choice:  Be acquired by Facebook, or watch it roll out

a direct replica.  Competing with one of these giants on the giant's own turf is rife with hazards."

*Id.* at 977-78 (footnote omitted).  Venture capitalists, she argues in this "Platform" article, will

make investment decisions in light of these hazards.  They "now factor this risk [of firms coming

too close to Facebook, Google, or Amazon] into their investment decisions" and "now discuss a

'kill-zone' around digital giants—'areas not worth operating or investing in, since defeat is

guaranteed.'"  *Id*. at 978-79; *see also id*. at 1009 ("[A] survey of more than two dozen Silicon

Valley investors revealed that Facebook's willingness to appropriate information from and mimic

the functionality of apps has created 'a strong disincentive for investors' to fund services that

Facebook might copy.").

The "Platforms" article is an extensive exegesis on the perceived deficiencies of modern

antitrust law when applied to large digital platform companies.  And Chair Khan applies her

analysis to Facebook in particular and at length.  Here is a good summary of her essential position

as applied to Facebook (with some of the detail omitted):

> Facebook is a dominant social network. . . . Facebook has used its dominant
> position to appropriate from rivals. . . . [Facebook] has both foreclosed competitors
> from its platform and appropriated their business information and functionality. . . .
> Facebook has established a systemic informational advantage (gleaned from
> competitors) that it can reap to thwart rivals and strengthen its own position, either
> through introducing replica products or buying out nascent competitors.

*Id.* at 1001, 1003.

Khan makes clear that she does not regard Facebook's market dominance as some sort of

unintended consequence of complex strategic decisions.  She says this about Facebook's motives

and actions:

> Despite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course—perhaps because it no longer faced serious competition in the social network market. . . . It is reasonable to consider this policy change a bait and switch.  Facebook induced websites to install Facebook plug-ins by representing that the company would not use this installed code to channel user data to its advertising business.

*Id.* at 1004-05.

She reaches her ultimate conclusion late in the article, declaring that "Google and Facebook's role as dominant portals of news and media, meanwhile, may undermine the health and diversity of the media ecosystem." *Id.* at 1071-72.

The threat posed by Facebook continues as a theme in her other scholarly work, including a 2019 co-authored article in the Harvard Law Review.  *See* Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 526-27 (2019).  First, Chair Khan and her co-author describe the threat posed by these companies:  "Digital businesses such as Facebook, Google, and Twitter collect an enormous amount of data about their users.  Sometimes they do things with this data that threaten the users' best interests, from allowing predatory advertising and enabling discrimination to inducing addiction and sharing sensitive details with third parties." *Id.* at 498.  Next, they call upon government to address these ills through appropriate legal strategies:  "Just as the law imposes special duties of care, confidentiality, and loyalty on doctors, lawyers, accountants, and estate managers vis-à-vis their patients and clients, so too should it impose such duties on Facebook, Google, Microsoft, Twitter, and Uber vis-à-vis their end users." *Id.* at 500.  Focusing on Facebook in particular, they say, it "offer[s] a particularly stark case study in the inadequacies of the information-fiduciary framework." *Id.* at 502 n.14.

To illustrate their central point, Khan and Pozen go through an extended hypothetical to illustrate what they see as the core of Facebook's bad behavior:

> To appreciate just how odd it is to think that a behavioral-advertising company could be a fiduciary for its users, imagine visiting a doctor—let's call her Marta Zuckerberg—whose main source of income is enabling third parties to market you goods and services. Instead of requesting monetary payment for services rendered, Dr. Zuckerberg floods you (and her two billion other patients) with ads for all manner of pills and procedures from the second you set foot in her office, and she gets paid every time you try to learn more about one of these ads or even look in their direction. In fact, this is just about the only way she gets paid—as her financial backers are apt to remind her. The ads themselves, moreover, are tightly tailored to your economic, demographic, and psychological profile and to any consumer frailties you exhibit. They are also continually updated in light of information Dr. Zuckerberg collects on you; to be sure she does not miss anything, she has planted surveillance devices all around your neighborhood as well as her office.

*Id.* at 514 (footnote omitted). In a footnote, the authors continue: "Your data, accordingly, *is* the payment you make to Dr. Zuckerberg," approvingly using the following parenthetical after including a source: "Users [of Facebook] are not customers. . . . They are merely free sources of raw material." *Id.* at 514 n.80 (alterations in original). And they insist that no one should be misled into thinking that this is a bug, rather than a feature: "Facebook does not come close to putting its customers first in any serious sense—notwithstanding Zuckerberg's protestations to the contrary." *Id.* at 514 n.81.

Khan and Pozen criticize at length other efforts by a diverse range of scholars to ameliorate the negative effects of Facebook's practices. In criticizing an approach they call the information fiduciary theory, they say:

> To be clear, we do not believe that addressing the market clout of companies like Facebook will remedy the full panoply of harms associated with them. . . . [T]hese other theories at least focus attention on the most constitutionally salient feature of companies like Google and Facebook: not that their end users must be able to trust and depend on them, but that they are extraordinarily powerful actors with the potential to do great harm to (as well as good for) the freedoms of speech, assembly, and the press. . . . The reason a company like Facebook can and should be regulated in a special way, it tells us, is that Facebook has (or should have) a special relationship of trust and dependency with each of its users. Not only does this argument ignore how Facebook generates dependency, but it also recasts what ought to be questions of the public interest . . . . By the same token, the information-fiduciary proposal implicitly acquiesces in the legal decisions that enabled certain

29

online platforms to become so dominant.  It takes current market structures as a given.

*Id.* at 528, 534-36.

While the focus of these articles is principally on the alleged anti-competitive practices of Facebook, along with some other tech companies, and how the law ought to remedy these ills through the antitrust laws and other regulatory tools, Chair Khan takes flight toward a view of these companies as terrifyingly destructive to democracy and human rights.  Khan and Pozen write:

> [B]eyond the issues of privacy and data security . . . , *the dominant online platforms have been credibly associated with a host of social ills*, from facilitating interference in U.S. elections; to serving as a tool for the incitement of genocide in Myanmar; to decreasing users' mental and physical health; to enabling discrimination and harassment against women and racial minorities; to amplifying the influence of "fake news," conspiracy theories, bot-generated propaganda, and inflammatory and divisive content more broadly.

*Id.* at 526-27 (emphasis added; footnotes omitted).

Chair Khan's belief of the great peril Facebook presents to our American way of life is also a common theme in her writings and speeches.  In an interview published on December 19, 2020, with Andy Fitch of the Los Angeles Review of Books, Chair Khan said this:

> Google, Amazon, Facebook, and Apple control the infrastructure on which digital commerce and communications take place.  They function as gatekeepers.  They've used their gatekeeper power both to extort and to exploit the individuals and entities that rely on their technologies.  They've maintained and extended their power through serial acquisitions and through coercive and predatory tactics.  Meanwhile, the targeted ad-based business models of Facebook and Google incentivize maximal surveillance and invasive data collection.  *Each of these dynamics imperils the health of our economy and democracy*.[6]

In 2017, while working with the Open Markets Institute, Chair Khan wrote a letter to the agency she now leads, requesting the FTC to take decisive action against Facebook in particular.  She wrote:  "Our request comes amid growing evidence that Facebook is using its increasing

---

[6] The interview is available here:  https://blog.lareviewofbooks.org/interviews/concentrated-control-talking-lina-khan/ (emphasis added).

market power in ways that stifle innovation, undermine privacy, and divert readers and advertising revenue away from trustworthy sources of news and information." Press Release, Open Markets Inst., *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions* (Nov. 1, 2017), https://www.openmarketsinstitute.org/publications/open-markets-institute-calls-on-the-ftc-to-block-all-facebook-acquisitions. She reiterated this suggestion a year later in an interview on Senator Bernie Sanders's show: "I think one of the first steps is to make sure Facebook isn't acquiring further power. So if Facebook tomorrow announces it is acquiring another company I would hope that the FTC would look at that very closely and block it." *The Bernie Sanders Show: The Greatest Threat to Our Democracy?* (May 15, 2018) (starting at 20:29), https://www.youtube.com/watch?v=wuCAy10hlHI&t=1229s.

According to Chair Khan, remedying this terrible state of affairs requires a major effort to regulate and maybe even break up Facebook. *See, e.g.*, Khan & Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. at 536 n.195 (quoting approvingly from Tim Wu, The Curse of Bigness: Antitrust in the New Gilded Age 133 (2018) ("The simplest way to break the power of Facebook is breaking up Facebook.")). In a review essay on Professor Wu's book, *see* Lina M. Khan, *The End of Antitrust History Revisited*, 133 Harv. L. Rev. 1655 (2020), Chair Khan summarizes her recommended course of action under the relevant antitrust laws: "Given current challenges—including the dominance of a small number of technology platforms, certain aspects of which seem to exhibit natural monopoly features . . . —recognizing competition as one among several mechanisms for checking concentrated private power is especially critical." *Id.* at 1664. To support this assertion, she cites one of her own articles (*i.e.*, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973 (2019)) and includes the following parenthetical:

"identifying how Amazon, Google, Facebook, and Apple serve as dominant intermediaries in digital markets."  133 Harv. L. Rev. at 1664 n.35.

Chair Khan's writings, taken as a whole, show that she has strong policy views on actions that the FTC, the Department of Justice, and other authorities at the national and state level should take to combat what she views as threats to individual privacy, democracy, and other goals in modern society.  I have no opinion as to the merits of Chair Khan's policy views, and nothing in this declaration should be read as expressing an opinion on the merits of those policy prescriptions.  However, Chair Khan's public statements indicate that she concluded, before joining the Commission, that Facebook's conduct has violated the antitrust laws and is worthy of moral reproach.  Chair Khan has been clear about what she thinks of Facebook's conduct and what she believes should be done to address it.  Such prejudgment creates, at the very least, the appearance of partiality.

I will add as one last piece of relevant information that bears on my opinion: the matter of Chair Khan's tweets.  Chair Khan had been, until the time of her nomination, a prolific user of Twitter, and on that platform she commonly expressed her critique of Facebook and other platforms, spelling out in the more cursory form that befits that platform, that Facebook was a monopoly and that the government needed to step in and address these serious problems with legal interventions.  On December 9, 2020, the day the FTC and States filed their complaints against Facebook in federal court, she pointed to the "[s]olid complaints" of the FTC and the state attorneys general.  "Hopeful," Chair Khan said in a tweet since deleted from that platform but available as a screenshot, "that it marks yet another step forward in the growing efforts to rehabilitate antitrust laws & recover antimonopoly."  Lina M. Khan (@linamkhan), Twitter (Dec. 9, 2020),   https://web.archive.org/web/20210614143417/https://twitter.com/linamkhan/status/

1336828056695136259.[7]  She referenced in a longer tweet thread the complaints brought by the FTC and the states.  The "[n]et effect" of the complaints' depiction of Facebook and its practices, she tweeted on December 9, 2020, "is [a] clear picture of how FB's conduct was systemic, exactly what you want for Sec 2."  *Id.*  She went on in the very next tweet to raise the question of why the FTC had not alleged a Section 7 violation.  In this thread of 15 separate tweets, she expresses enthusiasm for the FTC's and States' complaints, and raises further questions beyond the four corners of the complaints about Facebook practices.

While I have no opinion on the merits of Chair Khan's academic writings or public policy views, her previous public commentary evidences a commitment to a specific position on the central matters of this dispute – Facebook's antitrust liability.  Chair Khan – like Chair Dixon before her – may believe that, notwithstanding all of her prior public statements, she can fairly undertake her duties as Chair of the Commission and bring an open mind to Facebook's case.  But, as explained above, what is important from the perspective of governmental ethics, due process, and administrative law is whether a reasonable, third-party observer would expect that she would come to this matter dispassionately, with an open mind as to Facebook's liability.  Decisions involving one's individual rights should not be made by a government official who is perceived as having made up her mind in advance.

In my opinion, a reasonable observer could not conclude that Chair Khan is likely to bring an open mind and impartial attitude to Facebook's case in light of her previous public statements, scholarship, and congressional work.  Such an observer is much more likely to conclude that Chair Khan has an axe to grind against Facebook.  For this reason, fundamental fairness and "fair play,"

---

[7] Although Chair Khan has deleted these tweets, there is an archive record in the Wayback Machine, and this has been recognized as sufficient for judicial notice.  *See Cosgrove v. Oregon Chai, Inc.*, 2021 WL 706227, at *12 n.5 (S.D.N.Y. Feb. 21, 2021).

as Justice Jackson put it, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology at 4, would become sacrificed if Chair Khan does not recuse herself from the decision whether to proceed with a complaint in federal court.   Therefore, it is my opinion that Chair Khan has a sufficient appearance of partiality and bias to warrant a recusal from any further consideration of this matter involving Facebook, including a vote as the Chair of the FTC on whether to bring a complaint in federal court on behalf of the agency.

August 17, 2021
Date

Daniel B. Rodriguez

34

# Exhibit A

# Daniel B. Rodriguez

Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL  60611-3069


## *Professional Positions*

Harold Washington Professor
Northwestern University School of Law
  September 2018--present

Dean and Harold Washington Professor
Northwestern University School of Law
  January 2012-August 2018

Research Associate
  Institute for Policy Research
  Northwestern University
  2013-present

Chair, ABA Center for Innovation
  2018-2020

Minerva House Drysdale Regents Chair in Law
  University of Texas-Austin School of Law
    July 2007- December 2011
Professor of Government (by courtesy), 2009-11

Research Fellow
  Baker Institute for Public Policy
  Rice University
  July 2008-2011

July 2005-June 2007
  Warren Distinguished Professor of Law
  University of San Diego School of Law

July, 1998–June 2005
  Dean and Professor of Law, University of San Diego School of Law

July 1988-June, 1998
 Professor of Law, Boalt Hall School of Law, University of California,
   Berkeley, 1988-98 (tenured in 1994)

Judicial law clerk, The Hon. Alex Kozinski, United States Court of
  Appeals, Ninth Circuit, 1987-88


**Visiting Positions:**

University of Arizona Law School (February 2020) (visiting professor of Techlaw)
Harvard Law School (Spring 2019) (Louis Brandeis Visiting Professor)
Stanford Law School (Fall 2018)
Columbia Law School (Spring 2011)
University of Southern California Law School (Fall 2005)
University of Illinois Law School (November 2005)
Hoover Institution (summers, 2002-06)
UCSD-Scripps Institute on Oceanography (Fall and Winter, 2002-03)
University of Virginia Law School (Spring 1993) (John M. Olin Fellow)
Free University of Amsterdam (Summer 1991 & 1992)


<u>Areas of teaching and academic specialty</u>: administrative law, local government law, property, state constitutional law, statutory interpretation, law & positive political theory


*<u>Endowed/Keynote Lectures</u>*

Johnson Lecture, Vanderbilt Law School, March 2021: *"A General Theory of the State Police Power"*

Keynote Lecture, University of Hong Kong, October 2019: *"Global
  Legal Education: Trends and Strategies"*

Keynote Lecture, University of Arizona School of Law Law-Tech Conference,
  September 2018: *"Law-Tech and Law School Curricula"*

Commencement Address, BYU Law School Graduation, April 2018

Hartman Hotz Lecture, University of Arkansas Fayetteville Law School, February
  2018: *"Federalism During and After Trump"*

APEA Lecture, ITAM Law School, Mexico City, November 2016: *"Challenges in the Legal Profession"*

Distinguished Lecture, Renmin Law School, Beijing, China, June 2016: *"The New Global Lawyer"*

Thomas Jefferson Memorial Lecture, University of California, Berkeley, April 2015: *"Federalism, Localism, and the Shape of Constitutional Conflict"*

Inaugural Dean's Lecture on Legal Education, Florida International University School of Law, February 2014: *"Perspectives on Legal Education and its Trajectory"*

20th State Constitutional Law Lecture, Rutgers-Camden Law School, February 2012: *"The Political Question Doctrine in State Constitutional Law"*

William J. Brennan Lecture, Oklahoma City University School of Law, October 2010: *"Are State Constitutions Fundamentally Progressive Documents (and Why Should we Care"?*

23rd Nathaniel Nathanson Lecture, University of San Diego School of Law, April 2007: *"State Constitutionalism and Modern Governance: What's the Big Idea?"*

Kobe University (Japan) Lecture: *"The Concept of Expertise in American Administrative Law,"* October 1990


## *Research & Publications*

**Good Governing and Constitutional Construction: The Police Power in the American States** (Cambridge University Press, forthcoming 2022)

**Losing Ground: A Nation on Edge,"** (co-edited with John Nolon, Pace University School of Law) (Environmental Law Institute Press, 2007)


*works in progress:*

**Law Schools in the World: Comparative Perspectives on Legal Innovation** (book ms.)

**What Statutes Mean: Legislation and Interpretation in a Positive Political Theory Framework** (book ms.) (with Mathew McCubbins, Duke Political Science & Law)

"Our Bar Federalism"

"Is Administrative Law Inevitable?" (with Barry Weingast, Stanford Political Science)

"Constitutional Monarchy" (with Weingast & Tom Ginsburg, U Chicago)

*Publications:*

"Motivation and Purpose in the Elysian Framework," 36 <u>Constitutional Commentary</u> – (forthcoming 2021)

"Road Wary: Law and the Problem of Escape," 106 <u>Iowa L. Rev</u>. 2397 (2021)

"Whither the Neutral Agency? Rethinking Bias in Regulatory Administration," 69 <u>Buffalo L. Rev</u>. 375 (2021)

"Engineering the Administrative State: Political Accommodation and Legal Strategy in the New Deal Era," 46 <u>BYU Law Review</u> 147 (2020) (with Barry Weingast, Stanford Political Science)

"Public Health Emergencies and State Constitutional Quality,"72 <u>Rutgers L.J.</u> 1223 (2020)

"A Public Health Perspective on COVID-19 Business Liability," <u>J. L. & Bio. Sciences</u> (2020) (with Daniel Hemel, U Chicago Law School)

"The Puzzle of Entrenchment in State Constitutional Law," 33 <u>Notre Dame Journal of Law, Ethics, & Public Policy</u> 399 (2019) (symposium issue)

"Financing Local Governments in Times of Recession: Financial and Legal Innovation in the Face of the 2008 Crisis," in <u>Global Perspectives in Urban Law: The Legal Power of Cities</u> (N. Davidson & G. Tewari eds. 2019) (with Nadav Shoked, Northwestern Law).

"The Reformation of American Administrative Law Revisited" (with Weingast), 31 <u>Journal of Law, Economics, & Organization</u> 782 (2016)

"Executive Opportunism, Presidential Signing Statements, and the Separation of Powers," (with Weingast, Jed Stiglitz, Cornell Political Science), 8 <u>Journal of Legal Analysis</u> 95 (2016)

"The Inscrutable (yet Irrepressible) State Police Power," 9 <u>NYU Journal of Law & Liberty</u> 662 (2015) (symposium)

"Comparative Local Government Law in Motion: How Different Local Government Law Regimes Affect Global Cities' Bike Share Plans," XLII <u>Fordham Urban Law Journal</u> 123 (2014) (with Shoked)

"The Political Question Doctrine in State Constitutional Law," 43 <u>Rutgers Law Journal</u> 573 (2013)

"The Location Market," 19 <u>Geo. Mason L. Rev</u>. 637 (2012) (symposium issue) (with David Schleicher, Yale Law School)

"Change that Matters: An Essay on State Constitutional Development," 115 <u>Penn St. Law Review</u> 1073 (2011) (symposium issue)

"State Constitutional Failure," 2011 <u>U. Illinois Law Review</u> 1243

"Statutory Meanings: Deriving Interpretive Principles from a Theory of Communication and Legislation," Brooklyn Law Review (symposium issue) (2011) (with McCubbins)

"Super Statutory Entrenchment: A Positive and Normative Interrogatory," Yale On-Line Law Journal (symposium issue) (with McCubbins)

"State Constitutionalism and the Scope of Judicial Review," in <u>New Frontiers of State Constitutional Law</u> (Jim Gardner & Jim Rossi eds., Oxford Press (2011)

"The Rule of Law Unplugged," 59 <u>Emory Law Journal</u> 1455 (2010) (with McCubbins & Weingast)

"Opting In or Opting Out: The Conditions for Developing Consensus," 7 <u>J. Empirical Legal Studies</u> 868 (2010) (with McCubbins, Cheryl Boudreau, UC Davis Dep't of Political Science, Nick Weller, USC Dep't of Political Science)

"Constitutional Home Rule and Judicial Scrutiny," 86 <u>Denver Law Review</u> 1337 (2009) (symposium issue) (with Lynn Baker, U. Texas Law)

"Administrative Law," in <u>Oxford Handbook on Law & Politics</u> 340 (Keith Whittington ed., Oxford Press, 2008)

"The Market for Deans," 17 Journal of Contemporary Legal Issues 121 (2008)

"Administrative Law Agonistes," 108 Columbia Law Review Sidebar (2008) (with McCubbins, Roger Noll, Stanford Economics, & Weingast)

"What Statutes Mean: Interpretive Lessons from Positive Theories of Communication and Legislation," 44 San Diego Law Review 957 (2007) (with McCubbins, Cheryl Boudreau, UC-Davis Poli Sci Dep't & Arthur Lupia, U. Michigan Poli Sci)

"Institutions Matter: Some Remarks on Disaster Mitigation and the Comparative Competence Debate," in Losing Ground 245 (Nolon & Rodriguez eds. 2007)

"The Paradox of Expansionist Statutory Constructions" (with Weingast), 101 Northwestern Law Review 1207 (2007)

"Positive Political Theory and the Role of Law," Oxford Handbook on Political Economy (with McCubbins) (Barry Weingast & Donald Wittman eds., Oxford Press, 2006)

"When Does Deliberation Improve Democratic Decisionmaking" (with McCubbins), 15 Journal of Contemporary Legal Issues 9 (2006)

"Delegation, Risk Diversification, and the Properly Political Project of Administrative Law," Harvard Law Review On-Line Forum (2006)

"The Intentional(ist) Stance," (with Boudreau & McCubbins), 38 Loyola L.A. Law Review 2131 (2005) (symposium issue on "theories of statutory interpretation")

"Canonical Construction and Statutory Revisionism: The Strange Case of the Appropriations Canon of Statutory Interpretation," (with McCubbins), 14 Journal of Contemporary Legal Issues 669 (2005)

"What's New in the New Statutory Interpretation? Introduction to Journal of Contemporary Legal Issues Symposium," (with McCubbins), 14 Journal of Contemporary Legal Issues 535 (2005)

"Of Gift Horses and Great Expectations: Remands without Vacatur in Administrative Law," 36 Arizona State Law Journal 599 (2004)

"The Positive Political Theory of Legislative History: New Perspectives on the 1964 Civil Rights Act," 151 University of Pennsylvania Law Review 1417 (2003) (with Weingast)

"Foreword: Public Interest Lawyering and Law School Pedagogy," 40 San Diego Law Review 1 (2003)

"Straw Polls," 12 <u>Journal of Contemporary Legal Issues</u> 791 (2002)

"Localism and Lawmaking," 32 <u>Rutgers Law Journal</u> 627 (2001)

"Regulatory Incrementalism and Moral Choices: A Comment on Adlerian Welfarism," 28 <u>Florida State University Law Review</u> 375 (2001)

"Administrative Law and the Case Method," 38 <u>Brandeis Law Journal at the University of Louisville</u> 303 (2000)

"State Constitutionalism and the Domain of Normative Theory," 37 <u>San Diego Law Review</u> 523 (2000)

"Legal Process," In <u>The Encyclopedia of the American Constitution II</u> (L. Levy, et al. 2 ed. (2000)

"Legislative Intent," <u>The New Palgrave Dictionary on Economics and the Law</u> (Peter Newman ed.) (Macmillan Press, 1998)

"State Constitutional Theory and its Prospects," 28 <u>New Mexico Law Review</u> 271 (1998) (symposium issue)

"The Role of Legal Innovation in Ecosystem Management: Perspectives from American Local Government Law," 24 <u>Ecology Law Quarterly</u> 745 (1997)

"Jaffe's Law: An Essay on the Intellectual Underpinnings of Modern Administrative Law Theory," 72 <u>Chicago-Kent Law Review</u> (1997)

"Turning Federalism Inside Out: The Intrastate Aspects of Interstate Regulatory Competition," 14 <u>Yale Journal of Law & Public Policy/Yale Journal on Regulation</u> 149 (symposium issue) (1996)

"State Supremacy, Local Sovereignty: Reconstructing State/Local Relations Under the California Constitution," in <u>Constitutional Reform in California</u> (Roger Noll & Bruce Cain eds. 1995)

Review of "The Federal Courts, Politics, and the Rule of Law," <u>Political Science Quarterly</u> (Winter, 1995)

"Management, Control, and the Dilemmas of Presidential Leadership in the Modern Administrative State," 43 <u>Duke Law Journal</u> 1180 (1994)

7

"The Positive Political Dimensions of Regulatory Reform," 72 <u>Washington University Law Quarterly</u> 1 (1994)

"Earl Warren: An Interpretive Essay," in <u>Biographical Dictionary of U.S. Supreme Court Justices</u> (Melvin Urofsky ed. 1994)

"The Constitutionality of Legislative Term Limits," <u>California Lawyer</u> (February, 1993)

"Statutory Interpretation and Political Advantage," 11 <u>International J. Law & Economics</u> 217 (1992)

"Administrative Government and the Original Understanding: Comments on Eskridge & Ferejohn," 8 <u>J. Law, Economics & Organization</u> 197 (1992)

"The Presumption of Reviewability: A Study in Canonical Construction and its Consequences," 45 <u>Vanderbilt Law Review</u> 743 (1992)

"Preface to Symposium on Civil Rights Legislation in the 1990's," 79 <u>California Law Review</u> 591 (May, 1991) (symposium organized by author)

"Civil Rights Politics as Interest Group Politics," 14 <u>Harvard J. Law & Public Policy</u> 1 (Winter, 1991)

"Official Notice and the Administrative Process," 10 <u>J. National Association of Administrative Law Judges</u> 47 (Spring, 1990)

"The Substance of the New Legal Process," 77 <u>California Law Review</u> 919 (May, 1989)

"Free Speech: In Search of a Pattern," <u>American Bar Association Journal</u> (October, 1989)
"Note: Collateral Estoppel and Nonacquiescence: Precluding Government Relitigation in the Pursuit of Litigant Equality," 99 <u>Harvard Law Review</u> 847 (1986)


## *Selected Academic Presentations*

*"Our Bar Federalism,"* University of Oregon Law School, March 2021, Florida State U. Law School, December 2020, American Bar Foundation Workshop, December 2020

*"Is Administrative Law Inevitable?,"* BYU Law School, March 2021, UC Hastings Law School, February 2021

*"Legal Technology, Regulation and Access:  Equality and Process Norms,"* Conference on Law
  Law & Computation,  Northwestern Journal of Intellectual Property, February 2021

*"Constitutional Monarchy,"* (with Weingast & Ginsburg, U Chicago Law School,
  June 2021; Constitutional Law & Economics Workshop, January 2021

*"State of Emergencies, Executive Orders, and Separation of Powers,"* Association of
  American Law Schools Annual Meeting, January 2021

*"Police Powers and the Pandemic,"* Federalist Society Annual Meeting, January 2021

*"Law, Economics, and the Pandemic,"* Section on Law & Economics, AALS Annual
  Meeting, January 2021

*"Developments in Law, Public Health, and COVID-19,"* Northwestern University
  Pritzker School of Law Faculty Workshop, December 2020

*Symposium on Legacy of John Hart Ely*, U. Illinois Law School, October 2020

*"Instrumental Statutory Interpretation,"* Duke Law School, April 2020

*"Road Wary: Law and the Problem of Escape,"* Iowa Law Review Symposium on Law
  and Transportation, Iowa Law School, October 2020

*"A Public Health Framework for COVID-19 Business Liability,"* U. Chicago Law
  School Faculty Workshop, July 2020

*"Innovation in Legal Education,"* United Arab Emirates Law School, Dubai, UAE,
  December 2019

*"Engineering the Administrative State,"* Cornell Law School, September 2019; Stanford
  Law School, October 2018; Northwestern Law School, September 2018

*"Bias in Regulatory Administration,"* U. Pennsylvania Law School & Harvard Law
  School Faculty Workshops, April 2019

*"Innovations in Law-Tech,"* Northeastern School of Law, April 2019

*"The Puzzle of Entrenchment in State Constitutional Law,"* State Constitutional Law
  Symposium," Notre Dame Journal of Law, Ethics, & Public Policy, Notre Dame Law

School, March 2019

*"Courts in Times of Crisis,"* William & Mary Law Review Symposium, William & Mary Law School, February 2019

*"New Perspectives on Legal Education and Legal Technology"*, Michigan State Law-Tech Conference, April 2018

*"The Ethics of Legal Education,"* Ass'n of American Law Schools Annual Meeting, San Diego, CA, January 2018

*"The Role of the AALS in Legal Scholarship,"* AALS Annual Meeting, San Diego, CA, January 2018

*"Prospects, Programs, and the Innovation Premium in Modern Legal Education,"* Suffolk Law School, October 2017

*"The Future of Legal Scholarship,"* Northwestern Law School, June 2017

*"Bias in American Law,"* Duke Law School, May 2017

*"Debt, Austerity, and the Fiscal Predicament of Modern Urbanism,"* 3rd Annual International & Comparative Urban Law Conference, Hong Kong, June 2016

*"The Law of Major Cities,"* 2nd Annual International and Comparative Urban Law Conference, Sorbonne, Paris, France, June 2015

*"The Inscrutable (and Irrepressible) State Police Power,"* Symposium on Economic Rights in State Constitutional Law, New York University School of Law, April 2015

*"Executive Opportunism and Presidential Signing Statements,"* University of California, Berkeley School of Law, March 2015

*"The Law-Business-Technology Interface and its Impact on Professional Education,"* Chapman Law School Dialogue Series, January 2015

*"Trends in Legal Education and its Regulation,"* Touro Law School, December 2014

*"Law and Positive Political Theory,"* Universidad Panamericana Law School, Mexico City, Mexico, October 2014

*"Law Schools and Legal Innovation,"* 3rd Annual Meeting of the Law School Global

League, Koc University, Istanbul, Turkey, July 2014

*"State Action and Freedom of Expression in State Constitutional Law,"* Northwestern-Brown Roundtable, Brown University, June 2014

*"Law-Business-Technology and the New Legal Education,"* Tel Aviv University School of Law, March 2014

*"Comparative Local Government Law,"* Association of American Law Schools (AALS) Annual Meeting, New York City, NY, January 2014

*"Constitutional Borrowing and Democracy,"* Brown University Lecture, Political Theory Project, February 2013

*"The Location Market,"* State and Local Government Panel, AALS Annual Meeting, San Francisco, January 2012

*"A Positive Political Theory of the Reformation of American Administrative Law,"* University of Texas School of Law Workshop, October 2011

Symposium Panel on *"A Republic of Statutes,"* Yale Law School, December 2010

*"The Positive Political Foundations of Administrative Law,"* 25th Anniversary Conference on Positive Political Theory" Northwestern University School of Law & University of Texas School of Law, October 2010 (co-convenor and presenter)

*"Revision, Amendment, and the Dynamics of Constitutional Change,"* Penn St. Law School Conference on "State Constitutionalism in the 21st Century, September 2010

*"State Constitutional Failure,"* Faculty workshops at Columbia Law School (March 2011), St. John's Law School (March 2011), UC Davis School of Law (September 2010), and University of Texas School of Law (September 2010)

*"Measuring the Rule of Law,"* Conference at University of Texas School of Law, March 2010 (co-convenor and presenter)

*"State Constitutional Failure: Perspectives from California,"* Conference on California Constitutional Reform, USC, February 2010

*"Constitutional Home Rule,"* AALS Annual Meeting, New Orleans, January 2010

4th Annual Conference on Empirical Legal Studies," USC School of Law (presented two peer reviewed papers), November 2009

*"Defining the Rule of Law,"* Conference at USC-Caltech Center for the Study of Law & Politics, March 2009 (co-convenor and presenter)

*"Home Rule and the New American Constitutionalism,"* Conference at University of Colorado, Byron White Center for Constitutional Law, January 2009

*"Same Sex-Marriage and State Constitutional Law,"* AALS Annual Meeting, San Diego, January 2009

*"Is Administrative Law Inevitable?"* Faculty workshops at Northwestern University School of Law, February 2009; University of Virginia Administrative Law Conference, November 2008, Emory University Department of Political Science, October 2008; Vanderbilt Law School, March 2007

*"Criminal Justice Meets Democracy and Bureaucracy: Revisiting the Puzzle of Prosecutorial Discretion,"* University of Texas drawing board workshop, September 2008

*"Textual Analysis and the Law,"* Emory University Conference, February 2008

*"State Constitutionalism and the Scope of Judicial Review,"* Faculty Workshops at University of Pennsylvania Law School, October 2009, Ohio State Law School, February 2007; Florida State College of Law, October 2007, American U. School of Law, October 2007

*"When Does Deliberating Improve Decisionmaking?,"* Faculty Workshops at Duke, Florida State, Georgetown, Ohio State, and University of San Diego Law Schools, UCLA and USC Departments of Political Science, September 2005—May 2006, and at the First Annual Conference on Empirical Legal Studies, University of Texas-Austin School of Law, October 2006

*"The Paradox of Expansionist Statutory Interpretations,"* Faculty Workshops at USC Law School, December 2005, Duke Law School, October 2005, and Vanderbilt Law School, September 2005

Participant, Conference on Constitutional Law and Economics, Boalt Hall School of Law, UC Berkeley, August 2005

*"A Fly on the Wall: Lessons for Statutory Interpretation from the Positive Political Theory of Legislation,"* Faculty Workshop at the University of Chicago Law School and at Northwestern University Law School Conference on "Positive Political Theory," April 2005

Panelist, *Localism and the Federal System: Comparative Institutional Competence,"*

Yale University Conference on Disaster Mitigation and Public Policy, April 2005

*"Rethinking the Appropriations Canon of Statutory Interpretation,"* Faculty Workshops at University of Texas-Austin School of Law, March 2005 and at University of California, Berkeley (Boalt Hall School of Law), April 2004

Discussant, Conference on Direct Democracy, UC Irvine/USC/Caltech, January 2005

Convenor and Panelist, Section on Legislation, Association of American Law Schools Annual Meeting, San Francisco, January 2005

Panelist, AALS Panel on Future of the Solomon Amendment, AALS Annual Meeting, San Francisco, January 2005

Co-organizer and Panelist, Conference on *Administrative Procedure in the U.S. and Abroad,* USD School of Law, UCSD Department of Political Science, and UCSD School of International Relations and Pacific Studies, San Diego, January 2005

Invited Participant and Host, Third Annual Administrative Law Discussion Forum, USD School of Law, May 2004

Paper presenter, University of San Diego Institute for Law & Philosophy Conference on *"What is Legal Interpretation?,"* San Diego, April 2004

Commentator, Conference on the Legacy of the Earl Warren Court, UC Berkeley School of Law, February 2004

*"Remands without Vacatur in Administrative Law,"* Arizona State Law Journal Symposium on Remands in American Law, Phoenix, February 2004

Panelist, American Association of Law Schools Joint Workshop on Administrative Law and Legislation Sections, *"New Perspectives on Congressional Oversight,"* Atlanta, January 2004

Panelist, AALS Panel on Plagiarism, Section on Student Services, Atlanta, January, 2004
Paper presenter, Conference on Dual Enforcement of Constitutional Norms, William & Mary School of Law, Williamsburg, November 2003

Panelist, *"Procedural Due Process and Fair Hearings,"* Conference on "Demystifying Due Process," UC Hastings School of Law, October 2003

*"New Perspectives on the Civil Rights Act of 1964,"* Paper presented (with Barry Weingast) at American Political Science Association Annual Meeting, Philadelphia, August 2003

*"State Constitutions as Documents of Limit/National Constitution as a Document of Grant: Reconsidering the Police Power,"* USC/Caltech Conference on <u>Modeling the Constitution</u>, May 2003

Moderator, Panel on Agencies and Economic Justice, Institute for Law and Economic Policy/Duke Law School Conference, April 2003

*"The Positive Political Theory of Legislative History,"* Faculty workshops at Washington University at St. Louis School of Law and University of California-Berkeley, Department of Political Science, October 2002

Panel organizer and paper presenter, Public Choice Society Annual Meeting, San Diego, March 2002

Panel organizer and moderator, *"The Administrative States,"* ABA Mid-year meeting, Section on Administrative Law, Philadelphia, February 2002

Keynote Address: *"Political Theory and Public Law through the Lens of Socio-Economics,"* AALS Annual Meeting, New Orleans, January 2002

Participant in Second Annual Workshop on Administrative Law, University of Louisville School of Law, November 2001

*"Rethinking Statutory Interpretation and the Appropriations Process,"* International Association of New Institutional Economics Annual Meeting, University of California, Berkeley, September 2001

Colloquium on Statutory Interpretation and Appropriations, USD School of Law, July 2001

Workshop on the New Federalism Jurisprudence, Arizona State College of Law, April 2001

Panel on *"Finding the Source of State Sovereign Immunity,"* Stanford Law Review Symposium, February 2001

*"Straw Polls: Thoughts on Community and Coercion,"* Journal on Contemporary Legal Issues Conference on "Illiberal Communities," University of San Diego School of Law, February 2001

Presentation on *"Finding Moral Resources in the Law,"* Conference on Conscience, Law, and Personal Integrity, University of San Diego School of Law, January 2001

Panel Presentation on *"Theories of Lawmaking,"* Section on Law and Interpretation, AALS

Annual Meeting, Washington DC, January 2001

Panel Presentation on *"Transforming Boundaries: Federalism,"* Joint Program of Sections on Constitutional Law, Family Law, and Federal Courts, AALS Annual Meeting, Washington DC, January 2001

*"Home Rule, Municipal Finance, and State Prerogatives,"* National Tax Association Annual Meeting, Santa Fe, New Mexico, November 2000

Participant in Conference on Welfarism, Institute on Law and Philosophy, University of San San Diego School of Law, October 2000

*"Localism and Lawmaking,"* Faculty Workshop Presentation, Seton Hall University School of Law, September 2000

Discussant, National Association of Scholars of Color Annual Conference, Honolulu, Hawaii, May 2000

Participant/paper presenter in a Ford Foundation conference on *"The State of State Constitutions,"* Center for State Constitutional Studies, Rutgers-Camden Law School, New Jersey, May 2000

Panel participant and panel co-convenor in AALS Workshop on *"Emerging Themes in Administrative Law,"* Washington, DC, March 2000

Participant in Roundtable on Teaching Administrative Law, University of Louisville School of Law, November 1999

Panel on *"Deans of Color Speak Out,"* National People of Color in the Law Conference, John Marshall School of Law, Chicago, Illinois, March 1999

Berkeley Business School Conference on *"Positive Political Theory and Business Strategy,"* Marconi Conference Center, Marin, California, October 1998

Presentation at Conference on *"Constitutional Aspects of Impeachment,"* UC Berkeley Institute for Governmental Studies, October 1998

*"Positive Political Theory and Law,"* Law & Economics Workshop, University of Pennsylvania School of Law, March 1998

*"The Constitutional Construction of State and Local Fiscal Policy,"* Conference on State Constitutional Law, University of New Mexico School of Law, Albuquerque, New Mexico, November 1997

Commentator, Conference: *"Cities on the Cutting Edge,"* Hastings Law School, San Francisco, California, September 1997

*"Jaffe's Law: Perspectives on the Intellectual Underpinnings of Modern Administrative Law Theory,"* Symposium on <u>Administrative Law</u>, Chicago-Kent College of Law, April 1997

Discussant, Conference on *"Judicial Strategy and Judicial Politics*," Washington University, St Louis, November 1996
*"Reconsidering Section 5 of the Fourteenth Amendment,"* Cardozo School of Law, Yeshiva University, September 1996

Paper, *"New Theoretical Paradigms of Federalism,"* Conference on <u>Constructing a New Federalism: Jurisdictional Competition and Competence</u>, Yale Law School, March 1996

Commentator, Conference on *"Major Issues in Federalism*," University of Arizona College of Law, March 1996

Convenor and Participant, Conference on Federalism, UC Berkeley, December 1995

Panel Presentation on *"The Anti-federalist Revival in American Constitutional Law,"* American Association of Law Schools Annual Meeting, San Antonio, Texas, January 1996

*"Legislative Rhetoric, Statutory Interpretation, and the Civil Rights Act,"* American Political Science Association Annual Meeting, Chicago, Illinois, September 1995

Co-convenor and presenter, short-course on *"Public Law, Public Choice, and Positive Political Theory,"* APSA Annual Meeting in Chicago, September 1995

*"State Supremacy and Local Sovereignty,"* Conference on <u>Constitutional Reform in California</u>, UC Berkeley-Stanford University, June 1995

*"The Constitutional Status of Federalism,"* Conference on <u>Revitalizing Federalism</u>, Hoover Institution, Stanford University, May 1995

*"Legislative Rhetoric, Statutory Interpretation, and the Civil Rights Act,"* Conference on <u>Law and Positive Political Theory</u>, University of Southern California Law Center and California Institute of Technology, May, 1995 and Faculty Workshop, Stanford University School of Law, December 1993

*"Presidential Leadership in the Modern Administrative State,"* Duke
 Law Journal Annual <u>Conference on Administrative Law</u>, January 1994

*"The Positive Political Dimensions of Regulatory Reform,"*
 Conference on <u>Positive Political Theory and the Rule of Law</u>, University of Rochester,
 October, 1993; Faculty Workshops, Emory University School of Law, March 1993 &
 University of Virginia School of Law, April 1993

Discussant, Law & Contemporary Problems Symposium on <u>The Political Economy of
 Administrative Procedures and Regulatory Instruments</u>, Duke University, November
 1992

*"The History of the Civil Rights Act,"* Public Choice Society Annual Meeting,
 New Orleans, Louisiana, March 1992

Presenter, Panel on *"Administrative Law and the New Public Law,"* American
 Association of Law Schools Annual Meeting, San Antonio, January 1992

Discussant, Conference on <u>Administrative Adjudication</u>, UCLA Law School, November
 1991

*"The Presumption of Reviewability: A Study in Canonical Construction,"*
 Symposium on <u>The Canons of Statutory Construction</u>, Vanderbilt University Law
 School, November 1991 and Faculty Workshop, USC Law Center, March 1992

Discussant, Conference on *"The Economics of Administrative Law,"* University of Illinois,
 Champaign-Urbana, May 1991

*"Statutory Interpretation and Political Advantage,"* Conference on <u>Constitutional
 Law and Economics</u>, Stanford University, October 1990 and Faculty Workshop, University
 of Washington School of Law, March 1991.

Panelist, Conference on *"The New Public Law,"* University of Michigan School of Law,
 March 1991

Panelist, Federalist Society National Student Conference on Civil Rights, Stanford
 Law School, March 1990

*"Presidential Signing Statements,"* Western Political Science Association Annual
 Meeting, Salt Lake City, Utah, April 1989 (won <u>Pi</u> <u>Sigma</u> <u>Alpha</u> award for Best
 Paper presented at the meeting)

*Other presentations:*

*"Frontiers of Legal Technology,"* Bucerius Law School, August 2020; Hungary Law-Tech Entrepreneurs, May 2020

*"Executive Power and the Pandemic,"* Federalist Society Annual Meeting, June 2020

*"The Pandemic and the Law,"* American Constitution Society National Meeting, June 2020

*"The Present and Future of Legal Technology,"* Knowledge Institute Conference, Lisbon, Portugal, October 2019

"Frontiers of Law-Tech," Northwestern Law Alumni Ass'n presentations, Boston April 2019; San Francisco, October 2018

*"Preparing a Diverse Profession for a Diverse World,"* AALS Annual Meeting, San Francisco, January 2017

Panel on Legal Education, Nat'l Ass'n of Law Placement, New York City, December 2014

*"Same Sex Marriage: Anatomy of a Legal Controversy,"* Rice Alumni Association Presentations, New York City, March 2011; Palo Alto, California, November 2010

Presentation on *Christian Legal Society v. Martinez*, University of Texas Legal Counsel Annual Meeting, Austin, Texas, November 2010

*"Governing Arizona,"* Conference presentation to political leaders and journalists, Phoenix, Arizona, November 2009

Presentation on *"Canons of Statutory Interpretation"* to Texas Bill of Rights Annual Symposium, May 2008

Luncheon speaker, ABA Section on State & Local Government Law Spring Meeting, San Diego, March 2006

Moderator, Panel on Doing Business in China, sponsored by Procopio, Cory law firm and USD School of Law, San Diego July, 2004

Discussant, Keynote Address by Anthony Lewis on *Brown v. Board of Education*, San Diego, May 2004

Panelist, California League of Cities Spring Meeting, *"Procedural Due Process Developments*

*in California,"* San Diego, May 2004

Panelist, ABA Deans' Workshop, Seattle, February 2003

Presentation on *"Foreign Narcotics Kingpin Act,"* ABA Fall Administrative Law Conference, Washington, DC, October 2000

Testimony before U.S. Congress Judicial Review Commission on "Foreign Narcotics Kingpin Act," Washington, DC, September 2000

Participant/Consultant, GTZ Conference on Reform of Budget Law in the People's Republic of China, Beijing, China, June 2000

Federal Judicial Center Program on *"Reviewing Administrative Decisions in a Post-Chevron Environment,"* Stanford Law School, April 1999

*"Zealot's Advocacy,"* Foothill County Bar Ass'n, El Cajon, California, January 1999

*"Dimensions of Local Governance,"* St. Thomas More Society, San Diego, California, August 1998

Panel presentation on *"Opportunities for Minorities in the Legal Profession,"* American Bar Ass'n Annual Meeting, Toronto, Canada, August 1998

Lecture on *"Official Notice and the Administrative Process,"* Annual Meeting of the National Ass'n of Administrative Law Judges, New Orleans, Louisiana, October 1989

*Education*

J.D.   Harvard Law School, with honors, 1987

Supreme Court Editor, *Harvard Law Review*
Research assistant, Visiting Prof. Cass Sunstein
Legal Methods Instructor

B.A.   California State University, Long Beach, 1984

Outstanding graduate in the Department of Political Science and in the School of Social & Behavioral Sciences

Distinguished Alumnus of the Year, College of Liberal Arts, 2000

*Honors*

Fellow, American Bar Foundation

Council, American Law Institute

Distinguished Alumnus of the Year -- 2000, College of Liberal Arts, California State University
 at Long Beach

Honorary member, San Diego County Bar Association

Honorary member, Phi Alpha Delta Law Fraternity, McCormick Chapter

Honorary member, American Inns of Court, Louis Welsh Chapter

Selected as John M. Olin Fellow in Law & Economics for 1993, University
 of Virginia School of Law

Pi Sigma Alpha Award (for best paper at annual meeting), Western Political Science Ass'n, 1990

Research grant (co-recipient), Smith-Richardson Foundation, awarded for
 research on civil rights law and policy, 1992-93

Research grants, 1989, 1990-91, and 1994-95, UC Berkeley Committee on
 Research

*University Service*

**Northwestern University**

Member, Deans Council

Member, Task Force on Global Strategy

Member, Advisory Committee for the Office of Change Management

Member, Search Committee for Associate Vice President of Marketing

**University of Texas**

Chair, Laterals Subcommittee, Faculty Appointments Committee, 2009-10

Chair, Hamilton Book Prize Committee (campus-wide), 2009

Chair, Dual Degree Committee, 2008-09

Member, Laterals Subcommittee, Faculty Appointments Committee, 2008-09

Chair, Entry-Level Subcommittee, Faculty Appointments Committee, 2007-08

Coordinator, UT Law/LBJ School of Public Affairs Joint Degree Program

**University of San Diego**

Member, President's Advisory Committee, USD Cabinet, and University Senate

Member, Provost Search Committee

Member, Planning Committee, Joan B. Kroc School of Peace Studies

Member, Council of Deans

Chair, Chief Information Officer Search Committee

Member,  Nursing School Dean Search Committee

Member, Committee on University Professorships

Member, Task Force on Implementing Faculty/Administrator Diversity (Irvine II Grant)

**UC Berkeley**

Campus:

Committee on the Protection of Human Subjects, 1995-97

Advisory Board, Berkeley-Washington, D.C. Center, 1995-98

Committee on Positive Financial Disclosure, 1994-95

Selection Committee, John Gardner Public Service Fellowship, 1993-present

Ad Hoc Review Committee, Berkeley Center for Law & Society, 1992-93

Committee on Academic Freedom, 1990-92

     Law School:

Chair, Faculty Appointments Committee, 1996-98

Chair, Committee on Academic Placement, Judicial Clerkships, and Fellowships, 1995-96

Committee on Faculty Appointments, 1991-92, 1994-98

Chair, Subcommittee on Diversity, Committee on Faculty Appointments, 1991-92, 1994-95

Chair, Committee on the Academic Support Program, 1993-94

Committee on Law School Admissions, 1993-95

Task Force on Student-Faculty Relations, 1989-91

Advisory Board, <u>Ecology Law Quarterly</u>

Advisory Board, Environmental Law Program at Boalt Hall


Dissertation Advisor/Graduate Committee:

  Lydia Tiede, UCSD (assistant professor-designate, University of Houston, Department of Political Science)
  Nathan Monroe, UCSD (currently an assistant professor, Michigan State University, Department of Political Science)
  Emerson Tiller, UC Berkeley Graduate School of Business (currently on the faculty at Northwestern University School of Law)

Selection Committee, Harmon Environmental Law Writing Competition, 1995, 1996

Citation awarded by the Boalt Hall Moot Court Board for help in advising students in intramural and extramural moot court competitions, 1995

*Academic/Public Service*

Board member, American Bar Foundation, 2021—

Board member, Responsive Law, 2020—

Board member, Institute for the Future of Legal Practice, 2019-20

Chair, ABA Center on Innovation, 2018-20

Chair, AALS Deans Steering Committee, 2015-17

President, Association of American Law Schools, 2014; President-elect, AALS, 2013

Member, American Bar Association Commission on the Future of Legal Services, 2014--16

Member, American Law Institute Council, 2012--

Executive Committee, AALS, 2009-2011

Member, AALS Committee on Curriculum, 2007-09

Chair, AALS Section on Legislation, 2004-05

Chair, Consultant's Committee, ABA Project on Administrative Law in the European Union, Transparency Section, 2004-06

Affiliated Scholar, Center for the Study of Law & Politics, USC School of Law, 2004-2007

Academic Board of Advisors, Initiative and Referendum Institute, 2004--2007

Executive Council, American Bar Association Section on Administrative Law and Regulatory Practice, 1999-2002

Executive Committee, American Law Deans Association, 1999–2005

Committee, AALS Section on Libraries and Information Technology, 2003-06

Executive Committee, Section on Local Government Law, American Association of Law Schools, 1997–2002

ABA Mid-Year Administrative Law Meeting Program Chair, 2001

ABA/AALS Site Inspection Teams:
> University of Puerto Rico, April, 2002 (Team Chair)
> Seton Hall University School of Law, March, 2001
> University of Richmond School of Law, April, 2000
> Detroit College of Law–Michigan State University, October, 1998

Teacher, Legal Opportunity Program (CLEO), Boalt Hall, Summer, 1992

Television and radio commentator on various topics, including appearances on the O'Reilly
Factor, February, 2004, McNeil- Lehrer News Hour, September, 1991 and San Diego and San
Francisco TV and radio programs, 1991-present

Subcommittee, Uniform Rules of Agency Procedure and Practice, American Bar
Association, 1988-90

Reviewer,
> Cambridge University Press
> Foundation Press
> Oxford University Press
> Little, Brown & Co. Press
> Journal of Law, Economics & Organization
> American Journal on Political Science
> Western Political Science Quarterly (now Political Research Quarterly)
> Law school appointment/tenure evaluations:  Harvard, Chicago, Stanford, UC Berkeley,
> Cornell, Florida State, Illinois, Minnesota, North Carolina, Northwestern, Toledo, Vanderbilt,
> USC, & Georgetown

### *Professional Service*

Amicus brief, Petition for Certiorari, *Council Tree Investors, Inc. et al v. FCC et al* (Supreme
Court of the United States)

Amicus brief in *Christian Legal Society v. Hastings College of Law* (Supreme Court of the
United States)

Expert witness:  *Root v. Thomas Jefferson School of Law*

Consultant:
Educational Testing Service (2020-present); University of Pennsylvania (June 2021--) ROSS
Intelligence, Inc. (2018-19); Travis County Grand Jury (separation of powers), City of San Diego

(pension fund litigation); City of Los Angeles (charter dispute); City of Los Angeles, Office of Controller (development of new Fraud, Waste, & Abuse Unit); Simon Properties & the City of Austin (land use and scope of local authority); assorted pro bono work

# Exhibit B

**BEFORE THE FEDERAL TRADE COMMISSION**

IN RE PETITION FOR RECUSAL OF
CHAIR LINA M. KHAN FROM
INVOLVEMENT IN THE PENDING
ANTITRUST CASE AGAINST
FACEBOOK, INC.

**APPENDIX OF STATEMENTS BY CHAIR LINA M. KHAN**

I. **Chair Khan's Academic Articles**

1. **Lina M. Khan, *Amazon's Trust Paradox*, 126 Yale L. Rev. 710 (2017)**
   a. Khan at 783 and n.376: "[T]he current antitrust regime has yet to reckon with the fact that firms with concentrated control over data can systematically tilt a market in their favor, dramatically reshaping the sector." In a footnote, she continues: "European antitrust authorities do investigate how concentrated control over data may have anticompetitive effects, and-unlike U.S. antitrust authorities – investigated the Facebook/WhatsApp merger for this reason. Complaints from companies that their rivals are acquiring an unfair competitive advantage through acquiring a firm with huge troves of data may also prompt U.S. authorities to take the exclusionary potential of data more seriously."
   b. Khan at 793: "Data that gave a player deep and direct insight into a competitor's business operations, for example, might trigger review. Under this regime, Facebook's purchases of WhatsApp and Instagram, for instance, would have received greater scrutiny from the antitrust agencies, in recognition of how acquiring data can deeply implicate competition."

2. **Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973 (2019)**
   a. Khan (at 976 n.4) approvingly cites Jonathan Taplin's book "Move Fast and Break Things: How Facebook, Google, and Amazon Cornered Culture and Undermined Democracy 21 (2017), including by quoting this line: "Facebook has a 77 percent market share in mobile social media."
   b. Khan (at 976 n.4) approvingly cites Ben Smith's opinion article in BuzzFeed News, characterizing it as "describing an increasingly prevalent critique of the major American tech firms-Facebook, Amazon, Google, and Apple-as 'sinister new centers of unaccountable power.'"
   c. Khan at 977-78: "Facebook, equipped with technology that lets it detect which rival apps are succeeding, would often give companies a choice: Be acquired by

Facebook, or watch it roll out a direct replica. Competing with one of these giants on the giant's own turf is rife with hazards." She cites (at 978 n.10) Elizabeth Dwoskin, *Facebook's Willingness to Copy Rivals' Apps Seen as Hurting Innovation*, Wash. Post (Aug. 10, 2017), with the following parenthetical: "describing Facebook's 'aggressive strategy' for attempting to break into fields beyond social networking by 'mimic[king] the most successful features of rival companies' apps.'" Khan also writes in the footnote: "Faced with criticism that it was using Onavo in potentially anticompetitive ways, Facebook announced in 2019 that it was no longer using the technology to collect data on rivals."

d. Khan at 978: "Venture capitalists now factor this risk [of firms coming too close to Facebook, Google, or Amazon] into their investment decisions." She includes the following citation and parenthetical (at 978 n.11): Asher Schechter, Google and Facebook's "Kill Zone": "We've Taken the Focus Off of Rewarding Genius and Innovation to Rewarding Capital and Scale," ProMarket (May 25, 2018) ("The scale of these companies and their impact on what can be funded, and what can succeed, is massive." (internal quotation marks omitted) (quoting Albert Wenger, Managing Partner, Union Square Ventures)).

e. Khan at 978-79: "Venture capitalists now discuss a 'kill-zone' around digital giants—'areas not worth operating or investing in, since defeat is guaranteed.'"

f. Khan (at 984 n.31) approvingly cites Australian Competition & Consumer Comm'n, Digital Platform Inquiry: Preliminary Report 4-5 (2018), including the following parenthetical: "providing an overview of the 'substantial market power' that Facebook and Google have in the Australian social media and online search markets, respectively"; and approvingly citing Digital, Culture, Media & Sport Comm., House of Commons, Disinformation and 'Fake News': Final Report 36 (2019), including the following parenthetical: "discussing how Facebook acquired immense amount of app-usage data from its customers and utilized this information to acquire companies that appeared profitable 'or shut down those they judged to be a threat.'"

g. Khan (at 1001-05) writes an entire subsection about Facebook, reproduced only in part here. "Facebook is a dominant social network. . . . Facebook has used its dominant position to appropriate from rivals. . . . [Facebook] has both foreclosed competitors from its platform and appropriated their business information and functionality. . . . The firms that saw their API access revoked by Facebook all ended up either exiting the market or shutting down entirely. In addition to blocking apps that it deemed competitive threats, Facebook has also systematically copied them. . . . Reports capture how the tool [Onavo] has helped Facebook either imitate rivals or seek to buy them out. . . . Facebook has established a systemic informational advantage (gleaned from competitors) that it can reap to thwart rivals and strengthen its own position, either through introducing replica products or buying out nascent competitors. Strikingly, one of Facebook's more recent acquisition—the burgeoning social network tbh—had achieved limited market penetration by the time Facebook purchased it. . . . If Facebook were able to surveil a publisher's readers, it could sell access to those readers at a fraction of the publisher's price-undercutting the publisher's pricing

power in the ad market.  For Facebook, meanwhile, access to this data would enable it to more precisely target Facebook users when selling ads, increasing ad revenue. . . . Despite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course-perhaps because it no longer faced serious competition in the social network market. . . . It is reasonable to consider this policy change a bait and switch. Facebook induced websites to install Facebook plug-ins by representing that the company would not use this installed code to channel user data to its advertising business. Thirty percent of the top million most-visited websites-including major news publishers-added Facebook's plug-ins, becoming dependent on Facebook's network for greater distribution. . . . Facebook's appropriation of publishers' business information is not a feature of Facebook being vertically integrated. Instead, it derives from the fact that Facebook is both a major communications network and a major advertiser, and the price it charges publishers for using its platform as a distribution network is the right to surveil publishers' users-information that it uses to enrich its advertising business. In other words, collecting publishers' business information is not a functional necessity of allowing publishers to use Facebook; it is instead the condition Facebook has set. . . . Through Facebook Instant Articles, for example, Facebook has vertically integrated into publishing media content on its own platform.  Reports suggest that Facebook has used its integrated structure to preference its own offerings."

h.  Khan at 1009:  "[A] survey of more than two dozen Silicon Valley investors revealed that Facebook's willingness to appropriate information from and mimic the functionality of apps has created "a strong disincentive for investor" to "fund services that Facebook might copy."

i.  Khan at 1012:  "Investors acknowledge unequivocally that the dominance of digital platforms deters investment in certain markets, and data suggest that firms looking to compete with a core functionality of Google, Facebook, or Amazon have seen funding dry up."
Khan (at 1027 n.291) approvingly cites Sally Hubbard, *The Case for Why Big Tech Is Violating Antitrust Laws*, CNN (Jan. 2, 2019) with the following parenthetical:  "The nearly 20-year-old case of *US v. Microsoft* illustrates how today's tech giants are breaking the law . . . Google, Amazon and Facebook are following the same playbook."

j.  Khan at 1071-72:  "Google and Facebook's role as dominant portals of news and media, meanwhile, may undermine the health and diversity of the media ecosystem. . . . Facebook's emphasis on video content, for example, spurred publishers to fire hundreds of journalists in favor of video producers-only to learn that Facebook had inflated its video numbers. . . . In recent years, questions about news bias by Facebook and the black-box nature of Google search rankings have prompted a larger discussion about whether permitting two firms to capture control over digital information mediation undermines the integrity of our news ecosystems."

k.  Khan at 1072:  "This algorithm-chasing dynamic is primarily a feature of Google and Facebook's horizontal dominance.  But Facebook and Google also vertically

3

compete with the news publishers that depend on their platforms for greater exposure to readers.  This dual role they play-as a competitor in the sale of digital ads and as an intermediary in the distribution of information-diverts advertising revenue from publishers to the dominant platforms, helping them maintain their duopoly in the digital advertising market.  The news industry, meanwhile, is on life support:  Hundreds of local and regional newspapers have been rolled up or shuttered, such that two thirds of counties in America now have no daily newspaper and 1,300 communities have lost all local coverage. . . . Insofar as this dual role played by Facebook and Google deprives publishers of digital advertising revenue, structurally separating the communications networks these firms operate from their ad businesses could potentially be justified on the basis of protecting the news media. Rather than separating platforms from commerce, such a separation would target a particular business model in order to promote media diversity and protect journalism."

l.   Khan (at 1072 n.582) includes a parenthetical that describes Foer's argument that "Google, Facebook, and Amazon are 'indifferent to democracy' and yet 'have acquired an outside role in it.'"  She also cites Frank Pasquale, The Black Box Society 71 (2015) and includes the following parenthetical:  "describing how the vast array of content provided by Facebook's 'News Feed' may favor the interests of advertisers and Facebook itself over the news-consuming public."

m.  Khan (at 1090 n.683) includes the following parenthetical:  "providing findings from the French Competition Authority on the dominance that Facebook and Google possess in the market for online advertising."

3.  **Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497 (2019)**

a.  Khan and Pozen at 498:  "Digital businesses such as Facebook, Google, and Twitter collect an enormous amount of data about their users.  Sometimes they do things with this data that threaten the users' best interests, from allowing predatory advertising and enabling discrimination to inducing addiction and sharing sensitive details with third parties."

b.  Khan and Pozen at 500:  "Just as the law imposes special duties of care, confidentiality, and loyalty on doctors, lawyers, accountants, and estate managers vis-a-vis their patients and clients, so too should it impose such duties on Facebook, Google, Microsoft, Twitter, and Uber vis-a-vis their end users — although Balkin concedes that the duties would be 'more limited' in the digital context."

c.  Khan and Pozen at 502 n.14:  "[W]e focus above all on Facebook, both because Facebook is Balkin's main example of a digital information fiduciary and because it is the company whose practices have most galvanized privacy reformers in recent years. Facebook also happens to offer a particularly stark case study in the inadequacies of the information-fiduciary framework."

d.  Khan and Pozen at 505:  "Facebook therefore has a strong economic incentive to maximize the amount of time users spend on the site and to collect and commodify as much user data as possible.  By and large, addictive user behavior

4

is good for business.  Divisive and inflammatory content is good for business.  Deterioration of privacy and confidentiality norms is good for business.  Reforms to make the site less addictive, to deemphasize sensationalistic material, and to enhance personal privacy would arguably be in the best interests of users. Yet each of these reforms would also pose a threat to Facebook's bottom line and therefore to the interests of shareholders."

e.  Khan and Pozen at 508:  "Delaware law broadly permits, and on some accounts even requires, directors to take a long-run perspective.  The fact that corporations like Facebook have persistently declined to self-regulate along such lines, however, suggests that their boards do not see these reforms as likely to enhance firm value or shareholder wealth either in the short term or in the long term."  For this, the authors cite Dig., Culture, Media & Sport Comm., U.K. House of Commons, Disinformation and "Fake News": Final Report 20-42 (2019), including the following parenthetical (at 508 n.52):  "detailing how Facebook has repeatedly taken actions that increased revenue at the expense of users' privacy and data security."

f.  Khan and Pozen at 511 n.66:  "Facebook denies that it sells user data to third parties. But as Professor Michal Kosinski has pointed out, any time a user clicks on an advertisement, Facebook automatically reveals facets of the user's identity to the advertiser by virtue of the fact that the advertiser has paid Facebook to target specific types of individuals. . . . And as Professor Chris Hoofnagle has observed, Facebook also grants developers access to user data, a form of exchange that he argues should also be considered a 'sale.'"

g.  Khan and Pozen at 514:  "To appreciate just how odd it is to think that a behavioral-advertising company could be a fiduciary for its users, imagine visiting a doctor let's call her Marta Zuckerberg — whose main source of income is enabling third parties to market you goods and services.  Instead of requesting monetary payment for services rendered, Dr. Zuckerberg floods you (and her two billion other patients) with ads for all manner of pills and procedures from the second you set foot in her office, and she gets paid every time you try to learn more about one of these ads or even look in their direction.  In fact, this is just about the only way she gets paid as her financial backers are apt to remind her. The ads themselves, moreover, are tightly tailored to your economic, demographic, and psychological profile and to any consumer frailties you exhibit.  They are also continually updated in light of information Dr. Zuckerberg collects on you; to be sure she does not miss anything, she has planted surveillance devices all around your neighborhood as well as her office."  In a footnote, the authors continue:  "Your data, accordingly, is the payment you make to Dr. Zuckerberg," approvingly using the following parenthetical (at 514 n.80) after including a source:  "Users [of Facebook] are not customers. . . . They are merely free sources of raw material."

h.  Khan and Pozen at 514 n.81:  "Our point is simply that unlike doctors, Facebook does not come close to putting its customers first in any serious sense notwithstanding Zuckerberg's protestations to the contrary . . ."

5

**i.**   Khan and Pozen at 515-16:  "Balkin never discusses the advertisers or content producers who rely on social media companies such as Facebook. Nor does he discuss the millions of nonusers whose data is systematically swept up by Facebook through user uploads of phone and email contacts and through 'sites that use Facebook's advertising pixel or other social APIs linking back to Facebook.'  Like Facebook's end users, these parties surrender to Facebook certain forms of information that they have an interest in keeping private. Facebook, however, has an economic incentive to monetize this information as well. . . . Many advertisers and content producers are just as captive to Facebook as its end users are, or even more so. Insofar as the purpose of the information-fiduciary proposal is to rebalance the relationship between dominant online intermediaries and those who depend on them, it is unclear why its protections should cover only one set of dependents."

**j.**   Khan and Pozen at 517-18:  "The loss of privacy and control experienced by Facebook users therefore does not stem, organically, 'from the structure and nature of the fiduciary relation' . . . It stems from Facebook's deliberate efforts to create such vulnerabilities.  Facebook's dominant market position supports this strategy.  To the extent that users feel beholden to Facebook, it is not because the company offers them especially skillful services or judgments so much as because of a lack of viable alternatives.  By virtue of owning four of the top five social media applications, Facebook makes it difficult to escape the company's ecosystem.  As legal scholars and German antitrust authorities have concluded, this market position enables Facebook to extract more data from its users — who often feel they have nowhere else to go — and thereby compounds their vulnerability."

**k.**   Khan and Pozen (at 518 n.96) approvingly cite Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*, 16 Berkeley Bus. L.J. 39, 40 (2019), including the following parenthetical:  "arguing that Facebook's ability to extract so much data from users 'is merely this titan's form of monopoly rents.'"

**l.**   Khan and Pozen at 520:  "As a rule, it appears that Facebook users tend to be deeply ignorant of the ways the company serves (or disserves) them, and deeply unnerved when they find out.  This is not just an unusually stark asymmetry of information. It is an elaborate system of social control whose terms are more imposed than chosen."

**m.**   Khan and Pozen at 526-27:  "If it is unclear which problems Balkin's proposal would solve, it seems quite clear that the information-fiduciary model would leave many profound problems untouched.  This is not the place to offer a detailed inventory, but beyond the issues of privacy and data security that Balkin foregrounds, the dominant online platforms have been credibly associated with a host of social ills, from facilitating interference in U.S. elections; to serving as a tool for the incitement of genocide in Myanmar; to decreasing users' mental and physical health; to enabling discrimination and harassment against women and racial minorities; to amplifying the influence of 'fake news,' conspiracy theories, bot-generated propaganda, and inflammatory and divisive content more broadly."

6

**n.**   Khan and Pozen at 527:  "[I]n recent years Google and Facebook together have captured roughly three-quarters of all digital advertising sales in the United States and an even higher percentage of growth.  Their control over digital advertising networks appears to be an important factor behind the past decade's consolidation within the publishing industry and tens of thousands of layoffs at newspapers and magazines."

**o.**   Khan and Pozen at 528:  "To be clear, we do not believe that addressing the market clout of companies like Facebook will remedy the full panoply of harms associated with them."

**p.**   Khan and Pozen at 534:  "[T]hese other theories at least focus attention on the most constitutionally salient feature of companies like Google and Facebook: not that their end users must be able to trust and depend on them, but that they are extraordinarily powerful actors with the potential to do great harm to (as well as good for) the freedoms of speech, assembly, and the press."

**q.**   Khan and Pozen at 534:  "[A] fiduciary framework paints a false portrait of the digital world. It characterizes Facebook, Google, Twitter, and other online platforms as fundamentally trustworthy actors who put their users' interests first. As we tried to show in Part II, this is not a plausible depiction of what most of these companies . . ."

**r.**   Khan and Pozen at 535-36:  "The reason a company like Facebook can and should be regulated in a special way, it tells us, is that Facebook has (or should have) a special relationship of trust and dependency with each of its users.  Not only does this argument ignore how Facebook generates dependency, but it also recasts what ought to be questions of the  public interest . . . By the same token, the information-fiduciary proposal implicitly acquiesces in the legal decisions that enabled certain online platforms to become so dominant. It takes current market structures as a given."

**s.**   Khan and Pozen (at 536 n.195) approvingly cite (among other similar articles) Tim Wu, THE CURSE OF BIGNESS:  ANTITRUST IN THE NEW GILDED AGE 133 (2018) and include the following quoted parenthetical:  "The simplest way to break the power of Facebook is breaking up Facebook."

**t.**   Khan and Pozen at 537:  "Elsewhere, he suggested that a fiduciary approach might 'nudge' companies like Facebook to 'do the right thing,' 'without outright requiring it.'  The details were fuzzy but the message was clear.  A fiduciary approach would promote users' interests without necessarily causing too much trouble for the online platforms or their business models, thereby allowing Balkin and Zittrain to win wide support while sidestepping contentious questions like whether to restructure or break up Facebook, a step for which a number of commentators have called.  The basic selling point of the fiduciary approach was that it would be flexible, light-touch, un-'heavyhanded' — in contrast to and in lieu of structural reforms."

**u.**   Khan and Pozen at 538: "First, in the case of Facebook, Google, and other large online platforms, we might draw an analogy to 'offline' providers of social and economic infrastructure.  To the degree that these platforms serve as key channels

7

of communication, commerce, and information flow, they can be recognized as controlling the terms of access to essential services."

**4.** **Zephyr Teachout & Lina M. Khan,** *Market Structure and Political Law: A Taxonomy of Power***, 9 Duke J. Const. L. & Pub. Pol'y 37 (2014)**

    **a.** Teachout and Khan at 55: "[P]olicies set by Facebook regulate the online privacy of over 1.2 billion users worldwide."

**5.** **Lina M. Khan,** *The End of Antitrust History Revisited***, 133 Harv. L. Rev. 1655 (2020) (book review)**

    **a.** Khan at 1664 and 1664 n.35: "Given current challenges — including the dominance of a small number of technology platforms, certain aspects of which seem to exhibit natural monopoly features, and the revival of antitrust as an antiworker tool — recognizing competition as one among several mechanisms for checking concentrated private power is especially critical."  To support this sentence, she cites one of her own articles (*i.e.*, The Separation of Platforms and Commerce) and includes the following parenthetical:  "identifying how Amazon, Google, Facebook, and Apple serve as dominant intermediaries in digital markets."

## II. Chair Khan's Nomination Hearing Highlights

**1.** In her opening statement, Chair Khan highlighted her work with House Judiciary Subcommittee, where she co-led the 16-month investigation into the competitive practices of large technology companies that resulted in the Digital Markets Report, and signaled a desire for more aggressive enforcement referring to "missed opportunities" for enforcement actions under the prior Administration.  *See* Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations, (Oct. 2020) (hereinafter, "the Report").

**2.** Sen. Mike Lee (R-UT) noted in *American Cyanmid Co. v. FTC*, 363 F.2d 757 (1996) that the Sixth Circuit had previously held that former FTC Commissioner Paul Rand Dixon had to recuse himself in a matter because he had conducted an investigation as a staff member on the Senate Antitrust Subcommittee before taking the role as Commissioner.  He asked if Ms. Khan would be "bound" by that precedent and recuse herself from investigating Facebook, Apple, or Google due to her work on the Digital Markets Report.  She replied that she has "none of the financial conflicts or personal ties that are the basis of recusal under federal ethics laws" and would follow the evidence on any relevant cases.  Sen. Lee asked if this would create the appearance of impropriety.  Ms. Khan responded that recusals are resolved on a case-by-case basis, and indicated that she need not categorically recuse herself and would consult with federal ethics lawyers to determine her ethics obligations.  Sen. Lee noted that the Sixth Circuit case he had referenced did not involve any personal financial connections, but rather the individual's work on the Senate Antitrust Subcommittee.

**3.** Sen. Amy Klobuchar (D-MN) stated that Facebook and Google "tried to hold a whole country hostage" by prohibiting news dissemination in Australia. She asked if Ms. Khan was aware of her proposed legislation, which has garnered bipartisan support, allowing news organizations to collectively negotiate for content rates. Ms. Khan responded affirmatively, and noted that this type of legislation has historically been used to ameliorate "deep asymmetries" in bargaining power, citing antitrust exemptions for worker collective bargaining and ad co-ops. She stated that this type of legislation should be applicable here and would be "one step forward" in addressing this issue.

## III. The House Judiciary Subcommittee's Findings about Facebook[1]

The Report prepared by the House Judiciary Subcommittee describes how Facebook, along with Amazon, Apple, and Google, has been subject to little regulatory enforcement. For example, although Facebook had nearly 100 acquisitions, the FTC only extensively investigated Facebook's purchase of Instagram in 2012. *Id.* at 11; *see also id.* at 151-156 (describing Facebook's acquisition of Instagram); *id.* at 156-161 (describing Facebook's acquisition of WhatsApp); *id.* at 423-29 (listing Facebook's acquisitions from 2007 to 2020). Nonetheless, the Report points out that state and federal antitrust authorities are currently investigating Facebook for potential violations of antitrust laws. *Id.* at 133.

The Report considers Facebook, the largest social networking platform, to be a monopoly: "The strong network effects associated with Facebook has tipped the market toward monopoly such that Facebook competes more vigorously among its own products–Facebook, Instagram, WhatsApp, and Messenger–than with actual competitors." *Id.* at 11-12, 133. Specifically, the Report identifies Facebook's monopoly power as being in "the market for social *networking*." *Id.* at 12 (emphasis added). So although consumers might spend time on both YouTube and Facebook, the Report considers the two to be in separate markets, with YouTube considered a social *media* platform and Facebook a social *network*. *Id.* at 92; *see also id.* at 140 (discussing the differences between Facebook and YouTube).

Facebook's monopoly power is "firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms." *Id.* at 13. The Report identifies this monopoly power to be "in online advertising in the social networking market." *Id.* at 170. It cites the following as evidence of the monopoly:

- A comment from a Facebook senior executive that Facebook's acquisition strategy is a "land grab" to "shore up" Facebook's position. *Id.* at 12; *see also id.* at 378 ("Facebook used its platform tools to identify and then acquire fast-growing third-party apps, thwarting competitive threats at key moments.").

---

[1] Chair Khan's personal webpage states that, as counsel to the House Antitrust Subcommittee, she "led the congressional investigation into digital markets and the publication of its final report," presumably including the portions condemning Facebook. Lina M. Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active) [https://perma.cc/9GB5-F78G].

9

- Mark Zuckerberg's statements that Facebook "can likely always just buy any competitive startups" and that Instagram was a threat to Facebook. *Id.* at 12-13; *see also id.* at 143 (Zuckerberg "stressed the competitive significance of having a first-mover advantage in terms of network effects prior to acquiring WhatsApp.").
- Facebook's description of its network effects as a "flywheel." *Id.* at 13.
- An October 2018 memo by Thomas Cunningham, a senior data scientist and economist at Facebook, which, *inter alia*, called Facebook's network effects and family of products "very strong." *Id.* at 13; *see also id.* at 142 (describing the Cunningham memo in more detail).
- A "series of anticompetitive business practices" where Facebook "used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms." *Id.* at 14; *see, e.g., id.* at 163 (In March 2012, Mark Zuckerberg wrote an email to Facebook executives, stating that "cloning other aps could help Facebook move faster by building out more of the social use cases ourselves and prevent our competitors from getting footholds") (internal citations omitted).
- Facebook's maintenance of "high market shares over a long period of time." *Id.* at 137.

The Report also classifies Facebook, along with Amazon, Apple, and Google, as a "gatekeeper[]." *Id.* at 39; *see id.* at 71 (calling Facebook a "gateway[] to online news media for many consumers"). As such, Facebook can control the fates of other businesses by excluding other firms' access to Facebook users' data and can get concessions from third parties that would not be seen in a competitive market. *Id.* at 39, 149.

In addition, the Report details Facebook's strong network effects, which have made it prone to monopolization, and it cites Mark Zuckerberg's explanation to David Ebersman, then-CFO, about the benefits that would come from Facebook's acquisition of Instagram. *Id.* at 41. The Report also identifies Facebook's high switching costs, which is another barrier of entry for potential market participants, *id.* at 41-42, as well as Facebook's benefits from increasing returns to scale. As for the latter, the Report notes that Facebook was able to build its platform with a large upfront investment and has since grown "exponentially with relatively little increase in costs." *Id.* at 45. And it is this increasing returns to scale that has allowed Facebook "to get more out of consumers than consumers get out of platforms," since the social data gathered through Facebook may be greater than the economic value to consumers. *Id.* at 45-46.

The Report identifies other costs that have resulted from this absence of competition:
- Worse privacy protections for Facebook users. *Id.* at 14; *see also id.* at 48 ("To the extent that a firm successfully offers a service to give people tools to control their privacy, Google or Facebook are going to want to pull that back as fast as they possibly can.") (internal citations omitted).
- A "dramatic rise" in misinformation on Facebook's platform. *Id.* at 14; *see also id.* at 67 (providing an example of when misinformation on Facebook about COVID received almost 20 million views and over 100,000 comments before Facebook could take it down).

10

- Reduced venture capital investment of startups. *Id.* at 49.
- Decline of trustworthy news sources. *Id.* at 57; *see also id.* at 63-64 (describing how new organizations were negatively impacted when Facebook adjusted its News Feed algorithm in January 2018).
- Increased barriers to entry generated by Facebook's control over its platform's application programming interfaces ("API's"), which new entrants might choose to rely on. *Id.* at 90.
- Less options for advertisers and publishers to buy and sell online ad space due, in part, to the increased barriers to entry. *Id.* at 130-32.
- High switching costs, meaning high costs for users to switch from Facebook to other social networks. *Id.* at 145.

With respect to privacy, the Report explains how a platform's maintenance of a strong network and little user privacy can be considered the same as a monopoly's decision to raise prices or reduce product quality. *Id.* at 52.  The Report cites as support for this proposition a law review article written by Dina Srinivasan, which calls Facebook a monopolist. *Id.* at 52 n.208.

Regarding the rise in misinformation, the Report raises a concern that Facebook faces little financial consequence when misinformation is circulated online. *Id.* at 67.  The Report notes that Mark Zuckerberg told Facebook employees at an internal meeting that Facebook was "'not gonna change our policies or approach on anything because of a threat to a small percent of our revenue, or to any percent of our revenue.'" *Id.* at 68.

Finally, regarding the increased barriers to entry, the Report explains that, because of Facebook's dominance in the social media market, the main way for new companies to enter the market is by attracting a subgroup or a niche. *Id.* at 90.

The Report notes that the United States is not alone in its effort to examine Facebook's business practices.  For example, the United Kingdom's Competition and Markets Authority found that Facebook is dominant in the social networking and digital display ad markets. *Id.* at 135.

Despite these concerns, Facebook itself has concluded that it lacks monopoly power, citing Twitter, Snapchat, Pintrest, and TikTok as examples of its competition. *Id.* at 134-35.  But the HJC states in its Report that it is not convinced: "Facebook's position that it lacks monopoly power and competes in a dynamic market is not supported by the documents it produced to the Committee during the investigation." *Id.* at 136.  According to the Report, Facebook's "most significant competitive pressure" comes "from within its own family of products—Facebook, Instagram, Messenger, and WhatsApp." *Id.* at 384.

11

**IV.  Excerpts of Chair Khan's Social Media Posts**

Lina Khan (@linamkhan), Twitter (Jan. 7, 2021, 12:39 PM) (citing Epic.org, *Facebook to Collect WhatsApp User Data, Violating FTC Order and Privacy Premises*, Electronic Privacy Info. Ctr. (Aug. 25, 2016)).



Lina Khan
@linamkhan                                  Folgen ⌄

This episode has been especially
embarrassing for the FTC, which had
expressly told Facebook that reneging on
these privacy commitments could violate the
law and/or a preexisting order. But when
Facebook first reneged in 2016, FTC did
absolutely nothing. epic.org/2016/08/facebo
...

> Dina Srinivasan @DinaSrinivasan
> One of the things we need to change:
>
> Enforce the darn promises that CEOs make during merger...

09:39 - 7. Jan. 2021

**6** Retweets  **20** „Gefällt mir"-Angaben

💬 1     ↻ 6     ♡ 20

Lina Khan (@linamkhan), Twitter (Dec. 9, 2020, beginning at 7:20 PM).



**Lina Khan** ✔
@linamkhan

`Follow`  ⌄

1. Solid complaints from FTC & 48 AGs suing Facebook for violating antitrust laws -- and requesting divestitures/breakups, among other forms of relief. Hopeful that it marks yet another step forward in the growing efforts to rehabilitate antitrust laws & recover antimonopoly.

4:20 PM - 9 Dec 2020

298 Retweets  1,111 Likes

○ 26    ⟲ 298    ♡ 1.1K

**Lina Khan** ✔ @linamkhan · 9 Dec 2020  ⌄
2. States' complaint is especially impressive. Tight narrative, compelling facts, told in a way where the full force of the story really lands. It's a persuasive document, fully showcasing how Instagram & WhatsApp acquisitions were part of broader monopoly maintenance strategy.

○ 1    ⟲ 23    ♡ 169

**Lina Khan** ✔ @linamkhan · 9 Dec 2020  ⌄
3. States' complaint also reveals a sophisticated understanding of harms. It notes FB entered market by competing on privacy, but degraded privacy once it had eliminated rivals & secured a safe monopoly position -- an echo of @DinaSrinivasan's excellent work.

○ 1    ⟲ 46    ♡ 226

13



**Lina Khan** ✓ @linamkhan · 9 Dec 2020

4. States also note that when seeking approval for WhatsApp acquisition, FB told enforcers (including FTC) that it wouldn't combine data sets or use WhatsApp data for ads. A few years later it did so anyway. European Commission fined FB $122M for the deception. FTC did nothing.

> 176.    While Facebook did not evince any genuine desire to expand WhatsApp's feature set and user base, it did take active steps to utilize WhatsApp data in efforts to promote its core platform, despite disavowing any such plans at the time of the acquisition. In the course of negotiating and securing regulatory approval for the acquisition of WhatsApp, Facebook had represented to the U.S. Federal Trade Commission, European regulators, the WhatsApp founders, and WhatsApp users that Facebook would not combine user data across the services, that it would not change the way WhatsApp used customer data, and that WhatsApp data would not be useful to Facebook's ad-targeting business.
>
> 177.    But once free from the competitive threat WhatsApp presented, in August 2016, Facebook changed WhatsApp's terms of service and privacy policy and eroded the pre-acquisition promises it had made. It combined user data across the services by linking WhatsApp user phone numbers with accounts on Facebook Blue, enabling WhatsApp user data to be used across all Facebook products. Thus, Facebook Blue users who had declined to give their phone numbers to Facebook suddenly found their phone numbers connected to their Facebook Blue accounts anyway. Facebook was able to use that additional data in its

○ 1          ⟲ 59          ♡ 273



**Lina Khan** ✓ @linamkhan · 9 Dec 2020

(5. At the time of the deal @EPICprivacy & @DigitalDemoc raised alarms with FTC, prompting FTC to tell FB that reneging on WhatsApp's privacy commitments could violate law and/or a preexisting FTC order. This whole episode is absent from FTC complaint
epic.org/2016/08/facebo... )

> WhatsApp's privacy policy clearly states, among other things, that users' information will not be used for advertising purposes or sold to a third party for commercial or marketing use without the users' consent. Facebook's purchase of WhatsApp would not nullify these promises and WhatsApp and Facebook would continue to be bound by them. Further, Facebook has recently promised consumers that it would not change the way WhatsApp uses customer information. Therefore, any use of WhatsApp's subscriber information that violates these privacy promises, by either WhatsApp or Facebook, could constitute a deceptive or unfair practice under the FTC Act. Moreover, such an action could violate the FTC's order against Facebook. Among other things, the Order enjoins Facebook and its subsidiaries from misrepresenting the extent to which they maintain the privacy or security of consumers' personal information and requires Facebook and its subsidiaries to obtain consumers' affirmative express consent before sharing their nonpublic information in a manner that materially exceeds any privacy setting.

○ 2          ⟲ 18          ♡ 127

14



**Lina Khan** ✓ @linamkhan · 9 Dec 2020

6. Also very glad to see states connect FB's monopolization to all around quality degradation, including increase in ad load, proliferation of fake accounts, and inaccurate performance & other metrics for advertisers (see, e.g., wsj.com/articles/faceb...).

○ 3      ⟲ 30      ♡ 180

**Lina Khan** ✓ @linamkhan · 9 Dec 2020

7. States also describe how acquiring Onavo (& the surveillance of rivals it enabled) was key to FB's strategy for identifying competitive threats at the earliest stages. They note FB foreclosed other firms from having access to Onavo data.

○ 1      ⟲ 17      ♡ 118

15



**Lina Khan** ✔ @linamkhan · 9 Dec 2020

8. States discuss several other competitive threats FB acquired or cut off from APIs. Complaint marshals full set of facts in a very effective way. Net effect is clear picture of how FB's conduct was systemic, exactly what you want for Sec 2 (though states also sued under Sec 7).

○ 2          ↻ 10          ♡ 106

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

9. Interestingly FTC sued only under Sec 2, not Sec 7. Also notable that many of the docs cited to show Instagram & WhatsApp purchases were illegal were available at the time FTC reviewed the deals (though FTC investigated only Instagram ($1bn) in depth, not WhatsApp ($19bn)).

○ 1          ↻ 8          ♡ 107

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

10. Many of the Instagram docs cited build on the material the House Antitrust Subcommittee made public through its investigation. In July @JerryNadler confronted Zuckerberg with some of this evidence c-span.org/video/?c492945
...

○ 1          ↻ 8          ♡ 91

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

11. Finally, both FTC's and states' request for relief includes requirements that would implicate future acquisitions. FTC requests "a prior notice and prior approval obligation for future mergers and acquisitions."

○ 2          ↻ 7          ♡ 92

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

12. States request FB be prohibited from deals valued at or > $10million without first informing the states, & that FB submit deal-related disclosures it'd make to FTC/DOJ. This is potentially very significant. 48 AGs would have chance to review these deals, not just FTC/DOJ.

○ 1          ↻ 9          ♡ 108

**Lina Khan** ✔ @linamkhan · 9 Dec 2020

13. Notably, during the course of the investigation FB acquired Giphy, which FB could use to deprive rivals of access and/or to collect significant data. FB didn't report the deal to enforcers, presumably bc it was structured to avoid reporting thresholds.

16

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020                              ⌄

14. And just this week Facebook purchased Kustomer, a business software
company, reportedly for ~$1 billion. So two days before being sued by the
federal government & 48 AGs for a series of illegal acquisitions, Facebook made
another acquisition.

◯ 3          ⇄ 17          ♡ 111

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020                              ⌄

15. FB is now following this playbook in the virtual reality space. Quoting
@PramilaJayapal & House report, Bloomberg notes FB is using same "copy-
acquire-kill" strategy it used to monopolize social networking. Key task for
enforcers is to prevent a repeat

17

## V.   Excerpts of Chair Khan's Appearances and Writings

- Chair Khan: "I think one of the first steps is to make sure Facebook is not acquiring further power, right? So if Facebook tomorrow announces that it's acquiring another company I would hope that the FTC would look at that very closely and block it." (*The Bernie Sanders Show: The Greatest Threat to Our Democracy?* (YouTube streamed live May 15, 2018)).



- Chair Khan was interviewed by Andy Fitch from the Los Angeles Review of Books, and this interview was published on December 19, 2020.  The interview was on "Concentrated Control" and is available online here.  Below is an excerpt of some of the interview questions and Chair Khan's answers.

**ANDY FITCH: First, why should we see the core business models (and longstanding business practices) of Google, Amazon, Facebook, and Apple not just as sometimes operating to the detriment of individual consumers, but as systemically harming a much broader range of workers, entrepreneurs, independent businesses, open markets, and public spheres? In what ways do the stakes here extend to the foundational health of our economy and of our democracy?**

**LINA KHAN:** Google, Amazon, Facebook, and Apple control the infrastructure on which digital commerce and communications take place. They function as gatekeepers. They've used their gatekeeper power both to extort and to exploit the individuals and entities that rely on their technologies. They've maintained and extended their power through serial acquisitions and through coercive and predatory tactics. Meanwhile, the targeted ad-based business models of Facebook and Google incentivize maximal surveillance and invasive data collection. Each of these dynamics imperils the health of our economy and democracy. A few facets in particular stand out.

\* \* \* \*

**ANDY FITCH: Along those lines, with dominant platforms offering so much "for free" (and sometimes experiencing extraordinary growth before generating profits), why does a late-20th-century antitrust focus on consumer-pricing metrics seem inadequate? How might we need to redefine the personal and the collective "price" paid for such services and products? And/or which economic measurements might better help us to assess monopoly dominance?**

LINA KHAN: Relying exclusively on price-centric models blinds us to the many coercive and predatory ways that dominant firms use their economic power – ways that, in some instances, existing antitrust laws already prohibit. Recent lawsuits filed against Facebook and Google note that these firms have abused their monopoly power in ways that harm user privacy. These lawsuits offer a small but important step forward for antitrust enforcers. More broadly, antitrust law should rely more on presumptions and bright-line rules that outright ban certain business practices by dominant firms. The current approach (which, in many cases, requires proving the "anticompetitive effects" of a business practice, and sometimes even requires weighing these effects against potential "benefits") has created a much more permissive regime. Lastly, we need to broaden the range of disciplines and methodologies that carry weight in antitrust analysis. We need to incorporate learning from financial analysts, accountants, technologists, and business historians.

\* \* \* \*

**ANDY FITCH: Now for individual firms, could we start with Facebook's acute dominance within social-networking spheres – with this platform today mostly just "competing" against its own adjacent corporate holdings? How might Facebook's history of purchasing potential rivals, its tacit establishment of innovation kill zones, its impeding of American entrepreneurship, epitomize the need for presumptive prohibition on digital mergers and acquisitions? And why should Facebook's near-perfect market knowledge (far beyond that of regulators) in various domains call forth a proactive incipiency standard protecting nascent competitors, and preventing vertical consolidation?**

LINA KHAN: Facebook offers a case study in permissive merger enforcement. As noted in both the House report and the recent complaints filed by 48 state attorneys general and the Federal Trade Commission, Facebook maintained its monopoly through serially acquiring rivals. One business that it purchased, Onavo, even enabled Facebook to identify and closely monitor rival apps diverting attention from Facebook – positioning it to swoop in and buy up a competitor before others (including antitrust enforcers) fully understood what was going on. Collectively, Amazon, Apple, Facebook, and Google have purchased over 500 companies, and not a single one of these acquisitions was blocked by antitrust enforcers.

Antitrust enforcers can begin to remedy this multi-decade institutional failure by revising merger guidelines, and by taking a much more assertive and forward-looking approach. Lawmakers should consider a presumptive ban on acquisitions by these dominant firms. Antitrust law

19

reflects a preference for growth through internal expansion and investment, rather than through acquisition. Legislating a presumptive ban would reassert this preference. It could be especially impactful amid the COVID-19 recovery, given that the dominant platforms have only grown richer during the crisis, and are sitting on huge sums of cash that they could use to go on a buying spree.

- Lina Khan, *How to reboot the FTC*, Politico (Apr. 13, 2016) ("[T]he FTC should take seriously the threats to competition posed by online platform monopolies. Firms like Amazon, Facebook, Google and Uber have emerged as the railroads of the Internet economy, connecting buyers and sellers in a central marketplace. While often providing great ease and convenience for consumers, these companies can also use their market power to squeeze or disadvantage the sellers and suppliers that depend on them—much as the railroads of yore used their power over manufacturers and farmers to pick winners and losers.").

## VI.    Chair Khan's Letter to the FTC

- Press Release, Open Markets Inst., *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions* (Nov. 1, 2017) (accessed Aug. 16, 2021) (also available here) ("Our request comes amid growing evidence that Facebook is using its increasing market power in ways that stifle innovation, undermine privacy, and divert readers and advertising revenue away from trustworthy sources of news and information.").