# Exhibit E

to the Declaration of Mark C. Hansen in Support of Facebook, Inc.'s Motion to Dismiss the FTC's Amended Complaint in *Federal Trade Commission v. Facebook, Inc.*
Case No. 1:20-cv-03590-JEB (D.D.C.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. _____-cv-_____ |
| | ) | |
| STERIS CORPORATION | ) | **FILED UNDER SEAL** |
| | ) | |
| and | ) | |
| | ) | |
| SYNERGY HEALTH PLC | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF
FEDERAL TRADE COMMISSION'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

STATEMENT OF FACTS ............................................................................................................... 3

ARGUMENT.................................................................................................................................... 5

   I.     The FTC is Likely to Succeed on the Merits of Its Section 7 Challenge............................ 5

       A.    The Contract Radiation Sterilization Market is Highly Concentrated ........................ 7

       B.    Synergy is an Actual Potential Entrant and its Entry Would Have Resulted in
           Substantial Deconcentration and Procompetitive Benefits........................................ 10

       C.    Expansion by Other Firms is Unlikely to be Timely, Likely, or Sufficient............. 14

       D.    Defendants' Efficiencies Claims are Unverified and Not Merger-Specific............... 14

   II.    The Equities Weigh Heavily in Favor of Preliminary Relief ........................................... 15

CONCLUSION................................................................................................................................ 16

Case 2:15-cv-01080-DAP Doc #: 21 Filed: 06/04/15 9 of 21. PageID #: 291

## TABLE OF AUTHORITIES

### STATUTES

FTC Act § 5, 15 U.S.C. § 45 ................................................................................................................ 2

*FTC Act § 13(b), 15 U.S.C. § 53(b) ............................................................................................. 2, 5

*Clayton Act § 7, 15 U.S.C. § 18 (2006) ............................................................................... *passim*

### CASES

*Brown Shoe, Co. v. United States*, 370 U.S. 294 (1962) ........................................... *passim*

*FTC. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ........................................... 7

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) ................................................. 10

*\*FTC v. Bass Bros.*, No. C84-1304, 1984 WL 355 (N.D. Ohio June 6, 1984) .................... *passim*

*FTC v. Cardinal Health*, 12 F. Supp. 2d 34 (D.D.C. 1998) .................................................. 8, 14

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ...................................... 5, 14

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ................................................................. 15

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ................................................ 6

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976) ..................................... 5

*\*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................................. *passim*

*\*FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281
(N.D. Ohio March 29, 2011) ....................................................................................... 5, 6, 15

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) .............................................. 5, 7, 9

*FTC v. University Health*, 938 F.2d 1206 (11th Cir. 1991) ........................................... 15

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) ......................................... 15

*\*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .......................... 5, 8, 12, 15

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ........................................ 12

\*Authorities principally relied upon are denoted with an asterisk.

ii

*Mercantile Tex. Corp. v. Bd. of Governors of the Fed. Reserve Sys.*, 638 F.2d 1255
(5th Cir. 1981)........................................................................................................ 10

*\*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ..................................... 6, 7, 10

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005)............................... 8

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ........................................ 9

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982)..................................................... 10

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ................................. 8

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) ............................................ 9

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ........................................ 6, 11, 12

*United States v. H&R Block*, 833 F. Supp. 2d 36 (2011)...................................... 7, 8, 14

*United States v. Marine Bancorp.*, 418 U.S. 602 (1974)........................................... 6, 9, 10

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ......................................... 6, 13

*United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973) ..................... *passim*

*United States v. Siemens*, 621 F.2d 499 (2d Cir. 1980) .......................................... 12

*U.S. Steel Corp. v. FTC*, 426 F.2d 592 (6th Cir. 1970) .......................................... 6, 9

*\*Yamaha Motor Co. v. FTC*, 657 F.2d 971 (8th Cir. 1981)........................................ *passim*

## OTHER AUTHORITIES

*\*U.S. Dep't of Justice & FTC Horizontal Merger Guidelines (2010)................................. *passim*

Areeda & Hovenkamp, Antitrust Law IV ¶1121b (3d ed. 2006)................................................. 7

*Authorities principally relied upon are denoted with an asterisk.

**INTRODUCTION**

The Federal Trade Commission ("FTC") asks this Court to grant a temporary restraining order ("TRO") and preliminary injunction ("injunction") to prevent STERIS Corporation ("Steris"), a major U.S. sterilization company, from acquiring its competitor, Synergy Health plc ("Synergy"). Without court-imposed relief, Steris will eliminate a major threat and maintain its position as one of two dominant radiation sterilization providers in the United States. Consummation of the acquisition would deny customers the benefits of increased competition before the FTC has had the opportunity to exercise its statutory duty to hold an administrative proceeding on the merits and determine whether the proposed merger is illegal.

At the time the acquisition was announced, Synergy, a U.K. company, was poised to enter the United States with ███████████████████████████, x-ray sterilization, that could be used to sterilize medical devices and other healthcare products that currently rely on gamma sterilization. Sterilization is a critical part of the manufacturing process, particularly for medical devices and other similar products, and provides the last line of defense against contamination before products are distributed to end-users. Currently, there are only two U.S. suppliers of gamma sterilization services: Steris and Sterigenics International, Inc. ("Sterigenics"). These two firms, through their respective gamma businesses, are dominant— they account for at least ████ of all U.S. contract radiation sterilization services. Synergy's goal was to ███████████████████████████████████████████████████████

███████ ██████████████ ██████████[1] and █████ ███ ████████████████████

███████████████[2] As a direct substitute for gamma, Synergy viewed x-ray as a ███████████

---

[1] PX 112-037.
[2] PX 544-004.
[3] PX 275-003.

1

████ and predicted that its entry would provoke a ██████████████ █████
█████████████ ████████ But Synergy's plans ██████████████████
████████ were cut short when Steris offered to acquire Synergy.[7] Absent a TRO and injunction, gamma sterilization customers will be denied the lower prices, improved quality, and increased choice that would have resulted from Synergy's entry with x-ray.

Having found reason to believe that the proposed acquisition violates Section 7 of the Clayton Act and Section 5 of the FTC Act, the Commission seeks a preliminary injunction in this Court under Section 13(b) of the FTC Act.[8] Administrative proceedings are already under way to determine whether this merger violates Section 7, which prohibits mergers "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly."[9] Preliminary relief will preserve the status quo and stave off consumer harm, pending the full administrative proceeding on the merits, which is scheduled to begin on October 28, 2015. Section 13(b) authorizes this Court to grant preliminary relief if, after considering the Commission's likelihood of success on the merits and weighing the equities, the Court determines that such relief would serve the public interest.[10] These criteria are amply satisfied here: Synergy's documents, as well as testimony from customers and other market participants show that, if the acquisition proceeds, customers will lose the substantial benefits that x-ray sterilization would have brought to the United States.

---

[4] PX 95-002.
[5] PX 194-011.
[6] PX 275-014; PX 819-054.
[7] *See* PX 1. Steris proposes to acquire Synergy for $1.9 billion.
[8] 15 U.S.C. § 18; 15 U.S.C. § 45; 15 U.S.C. § 53(b).
[9] 15 U.S.C. § 18; 15 U.S.C. § 45.
[10] 15 U.S.C. § 53(b).

2

## STATEMENT OF FACTS

Many manufacturers, including those that make medical devices and other healthcare products, require sterilization to kill microorganisms living on or within their products.[11] Only a small number sterilize any portion of their products themselves; the bulk of sterilization is contracted to suppliers like Steris and Synergy.[12] Three primary methods of sterilization are used in the United States today: gamma radiation, electron-beam ("e-beam") radiation, and ethylene oxide ("EO") gas.[13] Customers choose sterilization methods based on their products' physical characteristics and packaging, the volume requiring sterilization, and the capabilities of each method.[14] Gamma sterilization is the most effective and economical option for many products because of its penetration capabilities. It is the only viable option for many dense products, such as implantable medical devices, and products with heterogeneous density, such as those packaged in large quantities.[15] Other methods are not viable alternatives for these products. Although e-beam sterilization has been available for over thirty years, it still represents only ▮▮▮ of all contract radiation sterilization sales because gamma is the best option for the vast majority of products.[16] EO sterilization, which relies on toxic gas, is not a meaningful alternative for many types of products and packaging.[17]

Steris, with twelve gamma facilities across the country, is one of only two U.S. providers of contract gamma sterilization services.[18] Sterigenics, the other gamma provider, operates

---

[11] *See, e.g.*, PX 601 ¶3; PX 605 ¶3; PX 609 ¶¶4-5; PX 610 ¶3; PX 611 ¶3; PX 617 ¶3.
[12] PX 607 ¶19; PX 601 ¶¶14-15; PX 614 ¶14; PX 617 ¶10; PX 710 at 175-180; PX 860-001; PX 366-013.
[13] *See* PX 607 ¶3; PX 614 ¶6; PX 617 ¶4; PX 601 ¶¶4-5; PX 819-004.
[14] *See, e.g.*, PX 890-024; PX 601 ¶4; PX 607 ¶3; PX 615 ¶8.
[15] *See, e.g.*, PX 601 ¶6; PX 610 ¶5; PX 614 ¶7; PX 617 ¶7; PX 91-003; PX 713 at 49.
[16] PX 902-002; PX 854-007; PX 716 at 50; PX 709 at 129-130.
[17] PX 902-002; PX 115; PX 614 ¶13; PX 605 ¶12; PX 607 ¶¶4-6; PX 601 ¶12; PX 617 ¶6; PX 713 at 47-48; PX 711 at 65-67.
[18] PX 854-003. Steris does not currently offer any e-beam services, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

fourteen U.S. gamma facilities and two U.S. e-beam facilities.[19] Synergy is ▓▓▓▓ provider of e-beam services in the United States, and the ▓▓▓▓▓▓ sterilization provider in the world with almost three dozen gamma plants outside the United States.[20]

X-ray is a close competitive alternative to gamma because it has comparable, and possibly superior, depth of penetration and turnaround times.[21] These are the very attributes that led Synergy's founder and CEO, Richard Steeves, to ▓▓▓▓▓▓▓▓▓▓▓.[22] Synergy operates an x-ray facility in Däniken, Switzerland[23] and ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The expansion ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ By early October 2014, Synergy's Senior Executive Board

("SEB") had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Synergy had also

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[27] and negotiated a ▓▓▓▓▓▓▓ agreement

with ▓▓▓▓ From October 7-9, Synergy held a ▓▓▓▓▓▓▓▓▓▓▓▓

---

[19] PX 607 ¶1. Sterigenics is the second-largest U.S. e-beam supplier.
[20] PX 895-004, 009; *see also* PX 819-004.
[21] *See* PX 391-028-029; PX 131-009; PX 155-016; PX 275-007, 055; PX 819-017-018; PX 603 ¶9; PX 601 ¶16; PX 709 at 76-78; PX 716 at 90-96.
[22] PX 102-001-002; PX 95-002.
[23] PX 708 at 22-23; *see also* PX 423-003.
[24] PX 819-006; *see also* PX 194-003.
[25] PX 94-038.
[26] PX 221-001; PX 574-002, 010; PX 194-002, 005; PX-0819-020-021; PX 715 at 129-130; PX 859.▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. PX 704 at 32-36.
[27] *See, e.g.*, PX 880; PX 923; PX 328-002; PX 134-004; PX 128; PX 153-002; PX 571-005; PX 110-001.
[28] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* PX 859; PX 580-004; PX 603 ¶16.

4

███████████████████████████████████.[29] Just one week later, Steris announced its

agreement to purchase Synergy.[30]

## ARGUMENT

Absent judicial intervention, the acquisition will eliminate the procompetitive benefits

that would have resulted from Synergy's independent U.S. x-ray entry, leaving sterilization

customers without an effective alternative to the current gamma duopoly. Section 13(b) of the

FTC Act authorizes this Court to enjoin a potentially anticompetitive merger "[u]pon a proper

showing that, weighing the equities and considering the [FTC's] likelihood of ultimate success,

such action would be in the public interest."[31]

## I.   The FTC is Likely to Succeed on the Merits of Its Section 7 Challenge

The proposed merger likely violates Section 7 of the Clayton Act and Section 5 of the

FTC Act. In this proceeding, the FTC "is not required to *establish* that the proposed merger

would in fact violate Section 7"[32] nor is it the district court's task "to determine whether the

antitrust laws have been or are about to be violated."[33] Rather, this Court is required only to

"measure the probability that, after an administrative hearing . . . the Commission will succeed in

proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or to

tend to create a monopoly' in violation of section 7."[34] As the language suggests, Congress chose

"the words '*may* be substantially to lessen competition' . . . to indicate that its concern was with

---

[29] *See* PX 400-001; PX 195; PX 544.

[30] PX 1.

[31] 15 U.S.C. § 53(b).

[32] *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (citing *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976)) (emphasis in original).

[33] *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) (quoting *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1042 (D.C. Cir. 2008) (Tatel, J., concurring)); *accord*, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1071 (D.D.C. 1997); *FTC v. Bass Bros.*, No. C84-1304, 1984 WL 355, at *22 (N.D. Ohio June 6, 1984).

[34] *Heinz*, 246 F.3d at 714 (quoting 15 U.S.C. § 18); *see also FTC v. ProMedica Health Sys., Inc.*, No. 311 CV 47, 2011 WL 1219281, at *53 (N.D. Ohio March 29, 2011) (quoting *Food Town Stores*, 539 F.2d at 1342); *Bass Bros.*, 1984 WL 355, at *23.

probabilities, not certainties."[35] The Court's inquiry involves an assessment of both the immediate impact of the acquisition as well as a "prediction of its impact upon competitive conditions in the future," as Section 7 is "intended to arrest anticompetitive tendencies in their 'incipiency.'"[36] Thus, "certainty, even a high probability, need not be shown," and any "doubts are to be resolved against the transaction."[37] Courts typically assess whether a merger violates Section 7 by determining the relevant product market, the relevant geographic market, and the merger's probable effect on competition in those relevant markets.[38]

Absent the acquisition, Synergy's imminent entry with x-ray would have resulted in substantial procompetitive benefits. The "actual potential entrant" doctrine specifically addresses this type of situation: where a potential entrant merges with a firm already competing in the market and the effect lessens future competition.[39] Here, Synergy is a current e-beam provider in the United States and, absent the acquisition, it would have entered the U.S. with x-ray to compete directly with gamma. The acquisition of an actual potential competitor violates Section 7 if: (1) the relevant market is highly concentrated; (2) the competitor "probably" would have entered the market; (3) its entry would have had pro-competitive effects; and (4) there are few other firms that can enter effectively.[40]

---

[35] *ProMedica Health Sys.*, 2011 WL 1219281, at *52 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) (emphasis in original)).

[36] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (citing *Brown Shoe*, 370 U.S. at 317, 322).

[37] *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989); *see also Brown Shoe*, 370 U.S. at 323.

[38] *See United States v. Marine Bancorp.*, 418 U.S. 602, 618-23 (1974); *see also U.S. Steel Corp. v. FTC*, 426 F.2d 592, 595-96 (6th Cir. 1970). Courts often rely on the Merger Guidelines framework to assess how acquisitions impact competition. PX 901 (*U.S. Dep't of Justice & FTC Horizontal Merger Guidelines* (2010) (*Merger Guidelines*)); *see, e.g.*, *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014); *Bass Bros.*, 1984 WL 355, at *24.

[39] *See Marine Bancorp.*, 418 U.S. at 624-26; *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 56-61 (1973); *Yamaha Motor Co. v. FTC*, 657 F.2d 971, 977 (8th Cir. 1981); *United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226, 1232-34 (C.D. Cal. 1973). Synergy's current small presence in the U.S. radiation sterilization market understates its future competitive significance because it is one of the largest sterilization providers in the world and an actual potential entrant into the United States with x-ray.

[40] *See* Areeda & Hovenkamp, Antitrust Law IV ¶1121b (3d ed. 2006); *Yamaha*, 657 F.2d at 977; *Phillips Petroleum*, 367 F. Supp. at 1239.

A.    **The Contract Radiation Sterilization Market is Highly Concentrated**

The Supreme Court has explained that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[41] That is, courts look at "whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other."[42] The Supreme Court has set forth a series of factors, or "practical indicia," to determine the contours of the relevant product market.[43] Courts also rely on the "hypothetical monopolist test" to define a relevant product market.[44] Based on these criteria, the relevant product market is no broader than contract radiation sterilization services; this includes contract gamma, x-ray, and e-beam sterilization services because other forms of sterilization, including EO, are not functional substitutes for radiation sterilization.[45] In-house radiation sterilization is also not a viable substitute for contract sterilization because most customers do not have the production volumes required to justify investing in sterilization facilities.[46]

Gamma is the predominant method of radiation sterilization because it is more effective than e-beam for most products.[47] Consequently, the ███████████████████████ ████████████████████████████████████████████████████

---

[41] *Brown Shoe*, 370 U.S. at 325.

[42] *ProMedica*, 749 F.3d at 565 (quoting *FTC. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004)); *United States v. H&R Block*, 833 F. Supp. 2d 36, 50-51 (2011) (citation omitted); *see also Staples*, 970 F. Supp. at 1074.

[43] *Brown Shoe*, 370 U.S. at 325 (such factors include "industry or public recognition of a submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors").

[44] *H&R Block*, 833 F. Supp. 2d at 51-52; *see also* PX 901-011-015 (*Merger Guidelines*) §§ 4.1.1-4.1.3.

[45] PX 902-002; PX 91-003; PX 390-006; PX 854-003; PX 607 ¶¶4-6; PX 601 ¶12; PX 603 ¶¶3-4; PX 709 at 49-51; PX 705 at 88-95; PX 703 at 60-61; PX 710 at 101, 104-105; PX 711 at 82-83; PX 702 at 78-79.

[46] PX 895-004; PX 860-001; PX 366-013; PX 607 ¶19; PX 601 ¶¶14-15; PX 614 ¶¶14-15; PX 605 ¶11; PX 702 at 96-99.

[47] The "outer boundaries" of the product market include all three forms of radiation sterilization because questions surrounding the long-term pricing and availability of gamma may make e-beam a more viable future alternative for some products currently sterilized with gamma. Steris, for example, believes it is uniquely positioned to ███████ *See* PX 854-007.

7



▮▮▮▮▮▮▮▮▮▮ Contract x-ray sterilization services—which Synergy ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮—are likely the only competitive alternative for most customers

who currently use contract gamma services. This is consistent with Synergy's "ordinary course"

documents,[49] which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[51] Overall, Synergy's strategy was to

present x-ray ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Many U.S. customers could not switch from gamma to e-beam under any reasonable economic

conditions, but Synergy expected they ▮▮▮▮▮▮▮▮.[53] Thus, this Court could analyze

the effects of the merger in a narrower market—the sale of contract gamma and x-ray

sterilization services to targeted customers.[54] However, whether the merger is evaluated in the

radiation market or just that consisting of targeted customers, the result is the same: the merger

will cause substantial competitive harm.

  The relevant geographic markets—the areas affected by the acquisition—are each of the

---

[48] PX 683-001-003; PX 682-001-009; PX 722-038-040; PX 72-001; PX 358; PX 607 ¶20; PX 712 at 123-128; PX 707 at 61-64; PX 710 at 158-165; PX 708 at 218.

[49] When defining the relevant market, "courts often pay close attention to the defendants' ordinary course of business documents." *H&R Block*, 833 F. Supp. 2d at 52; *see also Whole Foods*, 548 F.3d at 1045 (Tatel, J., concurring).

[50] PX 194-003; PX 102-001; PX 96-005; PX 114-003; PX 101-012-013; PX 893-001; PX 110-001; PX 109-001; PX 919-003-004, 041; PX 275-007, 061-064; PX 819-006-007; PX 112-037; PX 95-002; PX 891-005. Synergy already has an existing network of e-beam facilities in the United States, but it determined that it ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ PX 819-004.

[51] PX 159; PX 164; PX 541-002; PX 163-001; PX 197-001; PX 73-001; PX 709 at 129-130; PX 708 at 218.

[52] PX 220-002; *see also* PX 163-001; PX 275-032. *See H&R Block*, 833 F. Supp. 2d at 53 (developing "pricing and business strateg[ies] with [a particular] market and those competitors in mind" is "strong evidence" of a market).

[53] PX 614 ¶¶ 10, 17; PX 610 ¶¶ 6, 8; PX 601 ¶¶9, 17-19; PX 614 ¶17; PX 605 ¶10, 14-15; PX 606 ¶11; *see also* PX 902-002.

[54] *See* PX 901-009-010 (*Merger Guidelines*) §3 ("A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away."); *accord Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) (relevant product markets "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn"); *Brown Shoe*, 370 U.S. at 325 ("submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005); *H&R Block*, 833 F. Supp. 2d at 51-54; *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 47 (D.D.C. 1998).

 regions where Synergy planned to build an x-ray sterilization facility between ▮▮ and
▮▮. The test for assessing the bounds of the geographic market is the region in which
"consumers can practically turn for alternative sources of the product and in which the antitrust
defendant faces competition."[55] The Supreme Court has stated that the relevant geographic
market must "correspond to the commercial realities of the industry" as determined by a
"pragmatic, factual approach."[56] Because transportation costs are a significant portion of the
overall price of sterilization, contract radiation sterilization providers compete for customers
located within approximately ▮▮ miles of their plants.[57] Synergy planned to locate its ▮▮
facility in the ▮▮▮▮▮ ▮▮▮ in ▮▮▮▮▮
▮▮▮▮▮ and its ▮▮ plant in ▮▮▮▮▮▮▮ It then
planned to open ▮▮ additional facilities in ▮▮▮▮▮▮
▮▮▮▮ ▮▮

Each of the ▮▮ Synergy plants would have competed with Steris ▮▮ facilities, and
each market is highly concentrated under both the Merger Guidelines and the case law.[59] A
market is considered to be "highly concentrated" under the Merger Guidelines when the HHI is

---

[55] *Staples*, 970 F. Supp. at 1073. *See* PX 901-016-018 (*Merger Guidelines*) § 4.2. The relevant geographic markets "need not . . . be defined with scientific precision," *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974), or by precise "metes and bounds." *U.S. Steel Corp.*, 426 F.2d at 596 (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 331 (1961)).

[56] *Brown Shoe*, 370 U.S. at 336.

[57] *See* PX 604 ¶6; PX 702 at 195-196; PX 709 at 57-58; PX 705 at 148-150; PX 275-022, 033.

[58] PX 275-004-005. Synergy's ▮▮ facility in the ▮▮ would compete with Steris's ▮▮▮ and ▮▮ facilities. PX 819-047; PX 253; PX 124-008; PX 275-022; PX 703 at 87-88. The ▮▮ facility would compete directly with Sterigenics's ▮▮ facility, and it would also compete significantly with Steris's ▮▮ facility. PX 819-049; PX 124-008. In ▮▮, Synergy's other ▮▮ facilities in ▮▮▮▮▮ would compete with Steris's ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

[59] These markets are far more concentrated than what is required for the actual potential competition doctrine to apply. *See Marine Bancorp*, 418 U.S. at 631 (a high degree of concentration establishes "a *prima facie* case that the . . . market [is] a candidate for the potential competition doctrine"); *Yamaha*, 657 F.2d at 974 (top four firms accounted for 99% and top two for 85%); *Phillips Petroleum*, 367 F. Supp. at 1253 (top four accounted for 58%).

9

above 2500.[60] The  market for contract radiation sterilization services currently has an HHI of over ███, while the other ███ markets—█████████████████████—are also highly concentrated with HHIs ranging from at least ███ to more than ███ points.[61] Similarly, each relevant market for contract gamma and x-ray sterilization services sold to targeted customers is also highly concentrated: in the █████ contract gamma sterilization market in the █████ the current HHI level is approximately ████, and concentration levels in each of the other ██ geographic markets are even higher.

### B. Synergy is an Actual Potential Entrant and its Entry Would Have Resulted in Substantial Deconcentration and Procompetitive Benefits

The Supreme Court has held that a firm is an actual potential entrant if: (1) it has an "available feasible means" for entering the relevant market; and (2) those means created "a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects."[62] Courts evaluate the likelihood of entry based on whether the competitor "probably" would have entered, since the question under Section 7 is whether competition "'may be' lessened substantially."[63] To determine a firm's feasible means of entry, courts analyze the intent, capability, and incentive of that firm with respect to the relevant market. Intent is assessed on the basis of subjective evidence (such as whether the firm seriously

---

[60] Market concentration is measured by the HHI, or Herfindahl-Hirschman Index. PX 901-021-022 (*Merger Guidelines*) § 5.3; *ProMedica*, 749 F.3d at 568.

[61] *See* PX 275-004, 022, 028.

[62] *Marine Bancorp.*, 418 U.S. at 633; *accord Yamaha*, 657 F.2d at 977-78 (quoting *Marine Bancorp.*, 418 U.S. at 633); *Phillips Petroleum*, 367 F. Supp. at 1232.

[63] *Yamaha*, 657 F.2d at 977. This standard varies between circuits. Most adhere to the statutory standard under Section 7 and evaluate whether the effect of the merger "may be" to eliminate a potential competitor. *See Yamaha*, 657 F.2d at 977-79 ("probably"); *Tenneco, Inc. v. FTC*, 689 F.2d 346, 352 (2d Cir. 1982) ("would likely"); *Mercantile Tex. Corp. v. Bd. of Governors of the Fed. Reserve Sys.*, 638 F.2d 1255, 1268-69 (5th Cir. 1981) ("reasonable probability"). The Fourth Circuit, in a case that preceded *Tenneco, Yamaha,* and *Mercantile Tex.* applied a higher standard. *See FTC v. Atl. Richfield Co.*, 549 F.2d 289, 294-95 (4th Cir. 1977) ("clear proof"). The Sixth Circuit has not addressed the issue. Here, evidence of Synergy's plans satisfies all of these standards.

studied or considered entry, its awareness of the need to diversify, and presentations made to the Board of Directors), while capability and incentive are assessed on the basis of objective evidence (size, financial capabilities, and management and marketing expertise).[64]

It is clear throughout Synergy's "ordinary course" documents that, prior to the acquisition, it ███████████████████████████████████████████ ██████. Since ██████, Synergy's founder and CEO, Dr. Richard Steeves, has been working on ████ ██████████    ████████████████████████    █████████████████████████ ████████████████████████████████████▟ Dr. Steeves was ███████████████████ ███████████████▟ because███████████    ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████▟ By September of 2014, the SEB had ██████████████████    ███████████    █████████████████████████ ████████████████████████████▟    ███████, Synergy ████████████████ ████████████████    ████████████    ████████████████████ █████████████████████████████████████████████████ ███████.[70] Synergy had also █████████████████████████████████ █████████████████████; after only a few months, Synergy had ████████████████ ██ ████████████,[71] and █████████████████████████████████████.[72] After the merger

[64] See Falstaff, 410 U.S. at 532-34; Yamaha, 657 F.2d at 978; Phillips Petroleum, 367 F. Supp. at 1242.
[65] PX 94-038.
[66] PX 92-035-036; see also PX 96-005.
[67] PX 95-002.
[68] PX 93-001; see also PX 92-010, 016; PX 891-005; PX 704 at 167-168; PX 922-001 ████████████████████████
[69] PX 400-001; PX 191-001, 004; PX 221-001; PX 101-013; PX 574-010; PX 95-002.
[70] PX 602 ¶¶10, 13; PX 194-008, 012; PX 95-002; PX 544.
[71] See PX 407-018; PX 826-002; PX 134-004; PX 328-002; PX 128-001; PX 923; PX 615 ¶¶19-20; PX 602 ¶12; PX 601 ¶21; PX 614 ¶¶18-19; PX 706 at 75-76.

11

announcement, Synergy pivoted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ But Synergy also believed that ▮▮▮▮▮▮▮▮▮▮▮▮: as Synergy's CEO

told his Steris counterpart, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Only after

the FTC began investigating did Synergy ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For Synergy, x-ray was its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As the largest sterilization provider outside

of the United States, and as the only company in the world with more than ▮▮ years' experience

operating a commercial x-ray facility and the ability to offer potential customers x-ray testing,

Synergy was particularly well-positioned to introduce x-ray.[77] Synergy's agreement with ▮▮▮

also gave it the technical prerequisite to make a substantial impact in the United States.[78]

Synergy's x-ray entry—derailed by the acquisition—would have provided U.S. radiation

sterilization customers with the gamma alternative that they need, and Synergy's rollout would

have resulted in significant deconcentration and procompetitive effects throughout the United

---

[72] PX 610 ¶6; PX 614 ¶19; PX 163-001; PX 172-001. Johnson & Johnson's subsidiary, Ethicon, received the first FDA approval for x-ray sterilization with a Class III medical device. *See* PX 835-001; PX 836-002; PX 852-002. Other manufacturers would also like to validate their Class III products at Däniken. *See* PX 714 at 87.
[73] PX 248-001; PX 410-001; PX 407-019-21, 025; PX 112-037; PX 403-002.
[74] PX 109-001.
[75] By January 2015, Synergy was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At a February 19 meeting with FTC staff, Andrew McLean

▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 202 ¶20.

▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. PX 863. Courts are rightly
skeptical of such post-acquisition evidence precisely because it is subject to manipulation, as appears to have occurred here. *See Falstaff*, 410 U.S. at 563-70 (Marshall, J. concurring) (noting that such claims should be discounted as "inherently self-serving" and "viewed with skepticism"); *United States v. Siemens*, 621 F.2d 499, 508 (2d Cir. 1980); *Whole Foods*, 548 F.3d at 1047 (Tatel, J., concurring) (finding such post-acquisition evidence to be "all-but-meaningless"); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986).
[76] *Yamaha*, 657 F.2d at 978. *See* PX 704 at 109 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[77] *See* PX 895-014; PX 819-036; PX 714 at 71-73; PX 603 ¶¶16-17.
[78] *See* PX 607 ¶15; PX 711 at 141-142; *see also* PX 819-005. Additionally, Synergy's ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." PX 92-034; PX 819-034-036.

12

States.[79] "The crux of the entry effect is that if the company which enters the market by acquisition had entered unilaterally (de novo or by toehold acquisition), it would have supplied an additional competitive force."[80] Synergy expected to win ███ of the contract gamma sterilization business of ███████████████ in the United States.[81] Thus, its entry would have dramatically decreased concentration in the overall contract radiation sterilization market, resulting in a drop in HHI of at least ███ points, which far exceeds the 200-point threshold required to create a presumption of competitive harm under the Merger Guidelines.[82] For contract gamma sterilization, Synergy's x-ray entry would have reduced concentration ███



███████ ███ ███.[83] Moreover, Synergy planned to ██████████████████

████████████████████████████████████

██████████ ██████████████████████ Expecting ███

███████ ███ ████████████████████

██████████████████████████ Customers, including

████████████████████████, share ████████████ the importance

of x-ray and have expressed concern that they will lose the benefits of lower prices, better quality

---

[79] Like the defendant in *Yamaha*, Synergy is a "well-established international firm with considerable financial strength," as well as "considerable marketing experience in the United States," thus Synergy's entry "would have had an *obvious* procompetitive effect" in the U.S. market. *Yamaha*, 657 F.2d at 979 (emphasis added).

[80] *Phillips Petroleum*, 367 F. Supp. at 1232.

[81] *See* PX 275-003; PX 544-004; *see also* PX 215-001 (the x-ray business case was ████████████████████

[82] The significant deconcentration across the country is illustrative of, and consistent with, the effect in each of the relevant geographic markets. In the overall contract radiation sterilization market in the ████████, Synergy's entry would have reduced HHI by more than ███ points.

[83] In the narrower contract gamma and x-ray sterilization services market in the ████████, the HHI would have decreased by at least ███ points. PX 901-021-022 (*Merger Guidelines*) § 5.3. *See Bass Bros.*, 1984 WL 355 at *24 ("where 'concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great.'") (quoting *Phila. Nat'l Bank*, 374 U.S. at 321, 365 n.42).

[84] PX 709 at 129-130; PX 714 at 90-91.

[85] PX 275-014; *see also* PX 607 ¶22.

[86] PX 221-001; PX 707 at 126.

[87] PX 194-011; *see also* PX 721-003; PX 919-040; PX 708 at 214-216, 220; PX 703 at 55-56.

services, and a better technology if the merger proceeds.[88]

### C.   Expansion by Other Firms is Unlikely to be Timely, Likely, or Sufficient

Entry by other firms will not be timely, likely, or sufficient to prevent the anticompetitive effects of the acquisition.[89] Entry into contract gamma sterilization is highly unlikely due to the high capital costs required, the uncertain future availability and pricing of Cobalt 60,[90] and the existence of high regulatory barriers.[91] There are few firms likely to enter, and no potential entrant can replicate the competition that Synergy would have provided.[92] Synergy has enormous entry advantages over other possible x-ray entrants as it ███████ ███████ ████████ ████████████████████████████.[93] Similarly, e-beam entry is unlikely—facilities are costly and difficult to build, and most gamma customers would not switch to e-beam.[94]

### D.   Defendants' Efficiencies Claims are Unverified and Not Merger-Specific

Courts apply strict requirements to claims that merger efficiencies outweigh anticompetitive effects, including that efficiencies are verifiable, credible, reliable, and not attainable without the anticompetitive effects of the transaction.[95] When a merger raises significant competitive concerns, as it does here, courts have expressly required "proof of extraordinary efficiencies."[96] Defendants' claimed efficiencies fall well short of what is required.

---

[88] *See* PX 601 ¶22; PX 617 ¶18; PX 610 ¶¶17-18; PX 614 ¶¶17, 22; PX 605 ¶¶14-15, 17; PX 609 ¶21, 23, 25; PX 615 ¶17; PX 606 ¶15; PX 611 ¶17; PX 618 ¶11; PX 544-005; PX 99-012-013.
[89] PX 901-030-032 (*Merger Guidelines*) § 9. *See also H&R Block*, 833 F. Supp. 2d at 73; *CCC Holdings*, 605 F. Supp. 2d at 47; *Cardinal Health*, 12 F. Supp. 2d at 55; *Bass Bros.*, 1984 WL 355, at *25.
[90] Cobalt 60 is a significant gamma input.
[91] *See* PX 360-013; PX 725-023; PX 895-007; PX 703 at 122-123.
[92] ███████████████████████████████ *See* PX 613 ¶2, 12, 16; PX 612 ¶¶2, 10; PX 608 ¶12, 12; PX 604 ¶8; PX 619 ¶6.
[93] *See supra* Section B; *see also* PX 275; PX 819-006, 025-027; PX 571-003; PX 897-002; PX 893-001; PX 580-004; PX 202 ¶2; PX 895-007.
[94] *See* PX 360-013; PX 903-001; PX 619 ¶6; PX 612 ¶12. The most likely e-beam entrant is ███████ which only exacerbates the anticompetitive effects of this transaction. *See* PX 854-007.
[95] *Heinz*, 246 F.3d at 720; *see also CCC Holdings*, 605 F. Supp. 2d at 73; PX00901-032-034 (*Merger Guidelines*) § 10; *H&R Block*, 833 F. Supp. 2d at 89.
[96] *Heinz*, 246 F.3d at 720.

14

In a $1.9 billion transaction, Defendants have claimed only ▆▆▆▆▆ in efficiencies, of which the vast majority are non-merger-specific overhead and other non-cognizable savings.[97] Much of the remaining savings accrues in markets other than those at issue here, and Defendants have not provided evidence that even those efficiencies would be passed on to consumers.[98]

## II.    The Equities Weigh Heavily in Favor of Preliminary Relief

Courts value the "public interest in effective enforcement of the antitrust laws."[99] Benefits to firms deserve "little weight, lest [the Court] undermine section 13(b)'s purpose of protecting the public-at-large, rather than the individual private competitors."[100] Allowing this merger to close before the completion of the administrative proceeding would cause irreparable harm by allowing the combined firm to begin altering Synergy's operations and business plans, accessing Synergy's sensitive business information, eliminating key Synergy personnel, and stalling Synergy's U.S. x-ray rollout efforts.[101] As a result, consumers would be denied the benefits of free and open competition, and later remedies would be inadequate to undo the harm if the transaction is subsequently found to be illegal in the FTC proceeding. Defendants' likely concern that "the transaction will not occur at all" is "a private consideration that cannot alone defeat [a] preliminary injunction."[102]

---

[97] PX 17-012, 024-043; *see also* PX 701 at 48-56.

[98] PX 17-012, 047-048; PX 701 at 49.

[99] *ProMedica*, 2011 WL 1219281, at *60 (citing *Heinz*, 246 F.3d at 726).

[100] *Heinz*, 246 F.3d at 727 n.25 (citing *FTC v. University Health*, 938 F.2d 1206, 1225 (11th Cir. 1991) (quotation omitted)); *Bass Bros.*, 1984 WL 355, at *22 (private equities are not to be considered in determining whether to enjoin a merger) (citing *FTC v. Weyerhaeuser*, 655 F.2d 1072, 1083 (D.C. Cir. 1981).

[101] *See FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n. 5 (1966); *Bass Bros.*, 1984 WL 355, at *23; *Weyerhaeuser*, 665 F.2d at 1085-86 n.31 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆ *See* PX 863; PX 811-001; PX 899; PX 248-001.

[102] *Whole Foods*, 548 F.3d at 1041; *see also Heinz*, 246 F.3d at 726-27.

## CONCLUSION

For these reasons, the FTC respectfully requests that this Court grant a temporary

restraining order and preliminary injunction to prevent Steris from consummating its acquisition

of Synergy pending the outcome of the FTC's administrative proceeding.

Dated:   May 29, 2015

Of Counsel:

JAMES WEISS
Deputy Assistant Director

AMY S. POSNER
JORDAN S. ANDREW
MICHAEL R. BARNETTT
MEGHAN E. IORIANNI
LYNDA LAO
STEVEN C. LAVENDER
JOSEPH R. NEELY
CHRISTINA PEREZ
NOAH PINEGAR
JONATHAN W. RIPA
MARK SILVIA
CHRISTINE TASSO

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers I Division

Respectfully Submitted,

MICHAEL MOISEYEV
DANIEL K. ZACH
TARA REINHART
PETER COLWELL
Attorneys
Federal Trade Commission
Bureau of Competition
400 7th St., SW
Washington, DC 20024
Telephone: 202-326-3106
Facsimile: 202-326-2655
Email: mmoiseyev@ftc.gov

DEBORAH L. FEINSTEIN
Director

STEPHEN WEISSMAN
Deputy Director
Bureau of Competition

JONATHAN NUECHTERLEIN
General Counsel

*Attorneys for Plaintiff Federal Trade
Commission*

## CERTIFICATE OF SERVICE

I hereby **CERTIFY** that, on the 29th day of May, 2015, I filed the foregoing Memorandum in

Support of a Motion for Preliminary Injunction with the Clerk of the Court.

Peter Colwell
FEDERAL TRADE COMMISSION
Bureau of Competition
400 7th Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-3362
Email: pcolwell@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

I hereby **CERTIFY** that, on the 29th day of May, 2015, I served the foregoing Motion for a

Preliminary Injunction on the following counsel for Defendants via electronic mail:

| Nelson Fitts | Paolo Morante |
|---|---|
| WACHTELL, LIPTON, ROSEN & KATZ | DLA PIPER LLP |
| 51 West 52nd Street | 1251 Avenue of the Americas |
| New York, New York 10019 | New York, New York 10020-1104 |
| Telephone: 212-403-1361 | Telephone: 212-335-4813 |
| Email: nofitts@wlrk.com | Email: paolo.morante@dlapiper.com |
| *Counsel for Defendant, STERIS Corporation* | *Counsel for Defendant, Synergy Health plc* |

Tara Reinhart
Chief Trial Counsel
FEDERAL TRADE COMMISSION
Bureau of Competition
600 Pennsylvania Ave., NW
Washington, D.C. 20580
Phone: (202) 326-2638
Email: treinhart@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*