# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>       Plaintiff,<br><br>  v.<br><br>**FACEBOOK, INC.**<br><br>       Defendant. | Civil Action No. 1:20-cv-03590 (JEB)<br><br>**<u>PUBLIC REDACTED VERSION OF<br>DOCUMENT FILED UNDER SEAL</u>** |

## PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I. THE AC ADEQUATELY ALLEGES FACEBOOK'S MONOPOLY POWER IN PSN
   SERVICES ............................................................................................................. 3

  A.  The AC Adequately Alleges "Indirect" Evidence of Facebook's Monopoly Power .......... 4

    1.  The AC Alleges that Facebook Has a Dominant Share of the U.S. PSN Services
      Market as Measured by Three Key Measures of Output ............................................. 4

    2.  Facebook's Attacks on the AC's Market Share Allegations Are Unfounded ............. 6

    3.  The AC Alleges Significant Barriers to Entry in the PSN Services Market ............... 9

  B.  The AC Also Pleads Facebook's Monopoly Power via Direct Evidence ........................ 12

II. THE COMPLAINT DETAILS HOW FACEBOOK HAS MAINTAINED ITS
   MONOPOLY POSITION THROUGH AN ANTICOMPETITIVE COURSE OF
   CONDUCT ........................................................................................................... 15

  A.  Count 1 States a Claim that Facebook Maintained Its Monopoly Through the
    Acquisitions of Instagram and WhatsApp ....................................................................... 16

    1.  The AC Pleads Facts Establishing that Facebook's Acquisitions of Instagram and
      WhatsApp Constitute Anticompetitive Conduct ..................................................... 16

    2.  Facebook's Rehashed Arguments Are Unavailing .................................................. 17

    3.  The AC's Allegations Regarding "Other Acquisitions" Provide Supporting Factual
      Context .................................................................................................................. 21

  B.  Count 2 Alleges an Ongoing Monopoly Maintenance Offense Comprising
    Anticompetitive Acquisitions and Anticompetitive Platform Conduct ........................... 22

    1.  The FTC's Allegations Regarding Facebook's Agreements with Developers Support
      a Claim for Monopoly Maintenance ....................................................................... 22

    2.  Facebook's Agreements with Developers Are Not Unilateral Refusals to Deal ........ 28

    3.  The FTC's Allegations Meet Even the Standards Applicable to Unilateral Refusals to
      Deal ...................................................................................................................... 31

    4.  Count 2 Is Not Barred by the Law of the Case ...................................................... 35

III. SECTION 13(B) DOES NOT PROVIDE A BASIS TO DISMISS COUNT 1 OR
    COUNT 2 ........................................................................................................... 36

  A.  Section 13(b) Authorizes the FTC to Obtain Injunctive Relief to Remedy Facebook's
    Ongoing Violation of the FTC Act ................................................................................. 37

  B.  Section 13(b) Authorizes Both Count 1 and Count 2, and the Allegations Supporting
    Each Cause of Action Must be Considered as a Whole .................................................. 38

i

C.  The AC Plausibly Pleads that Facebook's Illegal Platform Conduct Is Likely to Recur . 40

**IV. CHAIR KHAN PROPERLY PARTICIPATED IN THE VOTE ON THE AMENDED COMPLAINT ........................................................................................................ 42**

A.  Relevant Background ......................................................................................... 42

B.  Prejudgment Is Not a Basis for Recusal from Commission Votes Authorizing Federal Court Litigation ................................................................................................. 43

C.  The Court Cannot "Remand" to the Commission ............................................... 45

**CONCLUSION ............................................................................................................ 45**

# TABLE OF AUTHORITIES

## Cases

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018) . 4, 5

*Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011) ....................................................... 45

*Am. Cyanamid Co. v. FTC,* 363 F.2d 757 (6th Cir. 1966) ....................................................... 43, 44

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021). ............................................................. 37

*Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962) ........................................................... 45

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................. 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................ 21, 32, 34, 35

*Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979) ................................... 43

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................... 3

*Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26 (D.D.C. 2017) ............................... 36

*Bouchet v. Nat'l Urban League*, 730 F.2d 799 (D.C. Cir. 1984) ................................................. 35

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.,*  176 F. Supp. 3d 606 (W.D. La. 2016) ................................................................................................................................................... 5,18

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................................... 14

*Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir. 1979) ....................................................... 12

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998) ........... 22

*Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970) .............. 43, 44

*CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926 (D. Or. 2018) ................. 4, 8

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................................... 16

*Covad Commc'ns. Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ................................... 32

*Dist. No. 1 v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327 (D.D.C. 2014) ........................................ 36

*Dist. No. 1, P. Coast Dist., Marine Engineers' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp* 815 F.3d 834 (D.C. Cir. 2016). ..................................................................................................... 36

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .................................. 10, 28

*Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ........................ 31

*EuroTec Vertical Flight Sols. LLC.  v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240
   (N.D. Tex. Aug. 1, 2019) ............................................................................................................ 9

*Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166 (D.D.C. 2018).............................................. 35

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................................. 37

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) ......................................... 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................ 41

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020)........................................................................... 4

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)............................................................. 39

*\*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)............................................................. 13, 23, 29

*FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019).................. 40

*FTC v. Neora LLC*, 2021 WL 3398153 (N.D. Tex. Aug. 2, 2021) ............................................. 38

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)...................................................... 42

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ................................ 40

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) ........................................................ 40

*FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ................................. 32, 37, 38

*FTC v. Warner Chilcott Holdings Co. III*, 2007 WL 158746 (D.D.C. Jan. 22, 2007) ................ 39

*Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484 (1st Cir. 1952)............... 25

*General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) .................... 23

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004).......................... 29

*Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021) ....................................................... 16, 17

*In re Murchison*, 349 U.S. 133 (1955)......................................................................................... 43

*In re Sanctuary Belize*, 482 F. Supp. 3d 373 (D. Md. 2020) ...................................................... 41

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959).......................................... 5

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016)................................................................. 7

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................................................................ 22

*LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ............................................ 36

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ............................................ 23

*Maris Distributing Co. v Anheuser-Busch Inc.*, 302 F.3d 1207 (11th Cir. 2002) .......................... 7

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ............................................................ 43

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422 (9th Cir. 2020) ...................... 7

*Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F. Supp. 2d 1133 (D. Minn. 2011) ................................................................................................................ 13

*Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994) .................................................... 5

*N. Sec. Co. v. United States*, 193 U.S. 197 (1904) ........................................................ 37

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) .................................... 23, 24, 27

*Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013) ................... 14

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .................................................. 45

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...................................... 29

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) ................... 33

*\*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ........................................ 23

*Post v. Pearson*, 108 U.S. 418 (1883) ........................................................................ 35

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) ............................ 35

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir. 1990) .............. 10

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ...................................... 10

*Rick-Mik Enters. Inc v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008) ........................ 7

*Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200 (D.D.C. 2020) ............................ 36

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ........................................ 19, 37, 39

*Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011) ........ 7

*Texaco v. Dagher*, 547 U.S. 1 (2006) ........................................................................ 21

*Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ..................... 32

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430

   (6th Cir. 2008)......................................................................................................... 9

*Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637 (1947)........................... 30

*United States v. Anthem, Inc*., 2016 WL 11755535 (D.D.C. Sept. 30, 2016)................................ 8

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) ................................. 1, 23

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ........................................ 9, 11

*\*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)................. passim

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ............................................................ 28, 29

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ........................................................ 20

*\*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ....................................... 13, 24

*United States v. Gen. Elec. Co.*, 80 F. Supp. 989 (S.D.N.Y. 1948)............................................. 30

*United States v. Griffith*, 334 U.S. 100 (1948)............................................................................... 3

*\*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)........................................................ passim

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................................ 9

*United States v. ITT Continental Baking Co*., 420 U.S. 223 (1975)............................................. 20

*United States v. Loew's*, 371 U.S. 38 (1962) ................................................................................ 29

*United States v. Microsoft Corp.,* 1:98-cv-01232, 1998 WL 35241886 (D.D.C., May 18, 1998)..9

*United States v. Microsoft Corp*, 84 F. Supp. 2d 9 (D.D.C. 1999). ................................. 13, 14, 18

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)........................................ passim

*United States v. MyLife.com, Inc.,* 499 F. Supp. 3d 757 (C.D. Cal. 2020) ................................. 41

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ................................. 37

*United States v. SBC Commc'ns, Inc.*, 1999 WL 1211458 (D.D.C. Aug. 2, 1999)....................... 9

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950)............................................................... 40

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)................................................................ 39

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004) ........ passim

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ..................................... 22, 30, 34

*Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984) ......................................... 44, 45

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ............................................ 24, 25

## Statutes and Rules

15 U.S.C. § 4 ......................................................................................................... 39

15 U.S.C. § 45(b) ................................................................................................. 42

16 C.F.R. § 4.17. ................................................................................................. 43

18 U.S.C. § 208 ................................................................................................... 44

5 C.F.R. § 2635.402 ............................................................................................. 44

5 U.S.C. § 554(a)(1) ............................................................................................. 44

5 U.S.C. § 556(b) ................................................................................................. 44

Fed. R. Civ. P. 12(f) ............................................................................................ 40

Fed. R. Civ. P.12(b)(6) ........................................................................................ 40

Federal Trade Commission Act,

    § 5, 15 U.S.C. § 45(a) ................................................................................... 1

    § 13(b), 15 U.S.C. § 53(b) ........................................................................ passim

Sherman Act

    § 2, 15 U.S.C. § 2 ..................................................................................... passim

## Other Authorities

Herbert Hovenkamp, *Digital Cluster Markets*, COL. BUS. L. REV. (forthcoming 2021), available
    at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3820062 .................................... 12,13

Herbert Hovenkamp, *FRAND and Antitrust*, 105 CORNELL L. REV. (2020)). ............................. 30

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles
     And Their Application (4th ed. 2020)*;* ........................................................................... passim

## INTRODUCTION

For at least a decade, Facebook has wielded enormous power, impacting the lives of millions of Americans.  Facebook has maintained this power not by outcompeting its potential rivals, but by hobbling or eliminating them in anticompetitive ways.  Left unimpeded, the competitive process would have rewarded the firms best able to innovate and adapt to technological change.  But Facebook has interfered with the competitive process by targeting nascent threats through exclusionary conduct in a successful effort to protect its monopoly power over personal social networking ("PSN") services in the United States.

Facebook has eliminated some threats entirely by acquiring them; others it has targeted by conditioning valuable growth tools on agreements to refrain from competing with Facebook or assisting its competitors—and enforcing these agreements when necessary to deny potential competitors scale.  As explained below, these anticompetitive actions violate Section 2 of the Sherman Act and thus Section 5 of the FTC Act.  *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (monopolist's acquisitions unlawful where they "eliminated any possibility of an outbreak of competition that might have occurred"); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (monopolist preserved entry barriers by preventing nascent threats from gaining scale); *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 160-65 (D.D.C. 1982) (monopolist's policies, *inter alia*, "deterred potential competitors from entering").

The Court has already determined, correctly, that the FTC has adequately pleaded that Facebook participates in a relevant antitrust market for PSN services in the United States.  ECF No. 73 ("Op.") 23-26.  The FTC's Amended Complaint ("AC," ECF No. 82) alleges, in two separate and independently sufficient ways, that Facebook is a monopolist in this market.  First, the AC provides reliable metrics establishing that Facebook controls a dominant share of the market and detailed allegations describing the significant entry barriers that protect Facebook's

1

position.  *Infra* § I.A.  In addition to this "indirect" proof of market power, Op. 18-19, the AC alleges "direct" evidence that Facebook is a monopolist with the power to profitably reduce quality (which is equivalent to a price increase) and exclude competition.  *Infra* § I.B.  These well-supported allegations establish that Facebook holds monopoly power in the U.S. PSN services market.  Facebook's arguments to the contrary are unavailing.

Further, the AC alleges that Facebook has maintained its monopoly power unlawfully through a decade-long course of exclusionary conduct.  Count 1 alleges that Facebook maintained its monopoly position in the U.S. PSN services market through its acquisitions of Instagram and WhatsApp, and pleads ample facts demonstrating that these acquisitions harmed the competitive process by eliminating nascent threats.  *Infra* § II.A.

Count 2 alleges that Facebook's course of monopoly maintenance includes not only the acquisitions of Instagram and WhatsApp, but also its adoption and enforcement of agreements with developers that deterred competition and impeded potential rivals' ability to distribute and promote their apps.  *Infra* § II.B.1.  Facebook's agreements with developers, and enforcement thereof, do not constitute unilateral refusals to deal, and in any event violate the antitrust laws even if branded as unilateral refusals to deal.  *Infra* §§ II.B.2-3.  Contrary to Facebook's claims, Count 2 is barred neither by law of the case (*infra* § II.B.4) nor by Section 13(b) of the FTC Act, which empowers the FTC to obtain injunctive relief to remedy Facebook's ongoing violation of Section 2.  *Infra* §§ III.A-B.  Moreover, the AC plausibly alleges that Facebook's exclusionary platform conduct is likely to recur.  *Infra* § III.C.

Finally, Facebook's recusal argument fails because in this case the Commission is acting as a plaintiff or prosecutor rather than performing a judicial or quasi-judicial function, and Facebook identifies no factors that would require recusal in such circumstances.  *Infra* § IV.

**ARGUMENT**

As the Court has already recognized, Op. 17, Section 2 of the Sherman Act has two elements: the possession of monopoly power and the maintenance of that power through conduct that tends "'to destroy competition itself' via 'means other than competition on the merits.'"  Op. 52 (quoting *Microsoft*, 253 F.3d at 58, 62); *see also United States v. Griffith*, 334 U.S. 100, 107 (1948) ("The anti-trust laws are as much violated by the prevention of competition as by its destruction. . . . [T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.").  The AC plausibly alleges Facebook's monopoly power, *infra* § I, and amply alleges facts sufficient to show that Facebook engaged in anticompetitive conduct to maintain that power, *infra* § II.  The AC thus states a claim for relief that is plausible on its face, and Facebook's motion to dismiss should be denied.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

I.      **The AC Adequately Alleges Facebook's Monopoly Power in PSN Services**

The Court has already determined, correctly, that the FTC has adequately pleaded a relevant antitrust market for PSN services in the United States.  Op. 23-26.  The Court held, however, that the FTC's original Complaint failed to provide enough facts supporting its allegation that Facebook holds monopoly power within that relevant market.  *Id.* at 27.  As detailed below, the AC addresses the Court's concern by alleging both indirect and direct evidence of Facebook's monopoly power.  *Microsoft,* 253 F.3d at 51 (describing methods of proving monopoly power).  The bolstered AC robustly pleads monopoly power through detailed factual allegations describing: Facebook's market share (AC ¶¶ 199-201); other firms' limited ability to constrain Facebook's market power (*id.* ¶¶ 184-89); the significant entry barriers that protect Facebook's position (*id.* ¶¶ 187-88, 212-17); Facebook's history of degrading the user

3

experience with minimal loss of user engagement (*id.* ¶¶ 206-09); and Facebook's ability to exclude firms that could emerge as or aid competitive threats (*id.* ¶¶ 210-11).

**A.  The AC Adequately Alleges "Indirect" Evidence of Facebook's Monopoly Power**

**1.  The AC Alleges that Facebook Has a Dominant Share of the U.S. PSN Services Market as Measured by Three Key Measures of Output**

The AC pleads the first prong of an indirect showing of monopoly power by alleging that Facebook has had at all relevant times a dominant share of the U.S. PSN services market as measured by three key metrics: time spent using the services, Daily Active Users ("DAUs"), and Monthly Active Users ("MAUs").  AC ¶¶ 190-204.  The AC identifies both current and defunct participants in the relevant market, AC ¶¶ 184-89, describes their size compared to Facebook, and calculates current and historical market shares across all three metrics.  AC ¶¶ 199-201 (Facebook's market share and combined shares of other PSN service providers); *see also* AC ¶¶ 194-97 (reliance on these metrics by Facebook and other services); AC ¶¶ 182-83 (number of U.S. users visiting Facebook Blue and Instagram in 2020 and aggregate time spent); AC ¶¶ 184-86 (similar metrics for Snapchat and MeWe).  These allegations address the concerns identified in the Court's prior ruling.  Op. 28-30.

The AC alleges that for nearly a decade, Facebook's share of time spent for U.S. PSN services has exceeded 80%; that its share of DAUs has exceeded 70%; and that its share of MAUs has exceeded 65%.  AC ¶¶ 199-201.  These market share figures exceed the levels that courts have found sufficient to establish monopoly power.  *See, e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (shares above 60%); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140 (D.D.C. 2018) (shares as low as 54%); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 959 (D. Or. 2018) (shares above 60%).

Further, the AC explains that the three proffered market share metrics accurately indicate

4

the competitive significance of a PSN service provider because a PSN service's competitive significance "is related to its number of users and how intensively its users engage with the service."  AC ¶ 192.  Taken together, time spent, DAUs, and MAUs provide an indication of both number of users and intensity of use: indeed, Facebook implicitly concedes the utility of these metrics—arguing that Snapchat's time spent and MAU figures support Facebook's claim that "output has exploded."  ECF No. 83-1 ("Mem.") 16.

Courts regularly rely on output- or consumption-based metrics as indications of competitive significance when evaluating market power because "[o]utput is the usual measure of a market and of the shares within it."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles And Their Application ¶ 535 (4th ed. 2020)*; see also, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249 (1959) (market share measured by number of boxing events promoted and staged); *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 n.3 (8th Cir. 1994) (number of cardiac surgery patients); *2301 M Cinema LLC,* 342 F. Supp. 3d at 140 (movie screens controlled); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 611 (W.D. La. 2016) (hospital admissions).

Here, the utility of the output metrics identified in the AC is confirmed by the fact that Facebook and other participants in the PSN services market, including Snapchat and Google+, rely on them for competitive benchmarking.  AC ¶¶ 194-95; *cf. United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32-*33 (N.D. Cal. Jan. 8, 2014) (relying on market share metrics used by defendant and other industry participants).  All three metrics indicating output and consumption confirm one another and provide a compelling indication of Facebook's market power.  *See, e.g.*, *id.* at *32 (expert "analyzed the market shares using several different metrics, each of which confirmed the commanding position occupied by [defendants]").

### 2.   Facebook's Attacks on the AC's Market Share Allegations Are Unfounded

Facebook levies several attacks on the bolstered AC allegations.  Each is groundless.

***First***, Facebook claims, wrongly, that the market share figures only include Facebook, Instagram, and Snapchat.  Mem. 2.  To the contrary, as alleged, the market shares account for multiple current and former PSN service providers, including Google+, Myspace, Path, and MeWe—and still, Facebook's position is dominant.  AC ¶¶ 199(a), 200(a), 201(a).

***Second***, Facebook faults the AC's reliance on Comscore data because, Facebook claims, the data "does not track PSNS usage."  Mem. 2, 7.  This misses the mark because it ignores the AC's allegation that Facebook Blue and Instagram are "predominantly used" as PSN services. AC ¶ 202.  This allegation is corroborated by Facebook's executives and internal analysis indicating that Facebook both understands the distinction between PSN services and other services (AC ¶ 177) and recognizes that PSN services are the predominant use of Facebook Blue and Instagram.  AC ¶¶ 178-79.  Thus, in measuring use of Facebook Blue and Instagram, the Comscore data are measuring PSN services usage.  Even if the data capture some non-PSN usage of Facebook Blue and Instagram, this would not undermine the AC's allegation that Facebook has a dominant share in PSN services.  *Bazaarvoice*, 2014 WL 203966 at *32 (market share figures need not exclude minor revenues attributable to "other offerings that complement" the relevant product).  Indeed, the AC explicitly accounts for the possibility of non-PSN use by pointing out that even in an alternative scenario—one where users spent only *half* of their time on Facebook Blue and Instagram using PSN services, but *all* of their time on other services such as Snapchat and Google+ using PSN services—Facebook's market shares would still be enormous, averaging 85% since September 2012 and never falling below around 70% for time spent.  AC ¶ 202.  The AC therefore alleges facts establishing that Facebook's share of PSN

services output exceeds the level that indicates monopoly power, AC ¶¶ 190-201, and bolsters this allegation by making the point that this would be true, *even assuming, arguendo, a set of facts more favorable to Facebook than the facts alleged in the AC*.  AC ¶ 202.

Facebook's overwhelming share of the time spent, DAU, and MAU figures provided in the AC therefore establishes its dominant share of *PSN services* output.  This contrasts sharply with the inapposite cases relied on by Facebook in which plaintiffs attempted to use a defendant's share of *some other market* to indicate dominance in the relevant market.  Mem. 8-10; *see, e.g.*, *Rick-Mik Enters. Inc v. Equilon Enters. LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (defendant's dominant position as a seller in one market did not indicate dominant position as a buyer in a different market); *Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423-24 (9th Cir. 2020) (share in wholesale market did not suggest share in retail market); *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) (dominant position in broad market did not indicate dominant position in smaller submarket); *Maris Distributing Co. v. Anheuser-Busch Inc.*, 302 F.3d 1207, 1214 (11th Cir. 2002) (rejecting attempt to infer market power in the relevant market from defendant's dominant position in another market).

*Third*, Facebook attacks MAUs and DAUs because they do not reflect a person's *intensity* of use "within a day (for DAUs) or within a month (for MAUs)."  AC ¶ 204; Mem. 12. But this is immaterial because the FTC has also provided allegations regarding time spent: each metric is a somewhat different way of measuring PSN services usage by consumers, and thus output by PSN service providers.  Notably, Facebook's share generally *increases* as one moves from less granular metrics to more granular ones (that is, from MAUs to DAUs to time spent). AC ¶¶ 199-201, 204.  This suggests that MAUs and DAUs are *conservative* indicators of

Facebook's competitive significance in the PSN services market.  AC ¶ 204.

*Fourth*, Facebook assails MAUs and DAUs because "the same individuals may (and often do) use more than one service[.]"  Mem. 12.  That assertion is not an obstacle to calculating market shares in this case or any other: a person's consumption of a product from multiple providers is reflected in the denominator used to calculate market shares.  Here, if a user were to visit Facebook Blue and Snapchat in the same day, both visits would be included in the denominator used to calculate all PSN service providers' market shares.

*Finally*, equally unavailing is Facebook's suggestion that Comscore's *data* is unreliable because of an unremarkable disclaimer that Comscore did not review the FTC's *analysis* of its data.  AC p. 81 n.1; Mem. 7-8.  This merely reflects the reality that Comscore sells data, not antitrust analysis.  Comscore data is relied on by marketplace participants, as well as by other competition enforcers (AC ¶¶ 196-97, 203), and unquestionably provides an appropriate input for the FTC's analysis.  *See, e.g.*, *Bazaarvoice*, 2014 WL 203966, at *32.

In any event, the question at this stage is not whether the AC identifies the perfect source of data, but instead whether the AC's allegations, taken as true, state a claim.  Any disputes over the methodology or data employed by the FTC in calculating shares are properly addressed in expert reports and at trial, on a full record, not at the pleading stage.  *See, e.g.*, *CollegeNet*, 355 F. Supp 3d at 959 (disputes about complaint's market share calculations not appropriate at the pleading stage); *U.S. v. Anthem, Inc.*, 2016 WL 11755535, at *7-*8 (D.D.C. Sept. 30, 2016) (recommending denial of motion to compel revelation of "market share calculations and the methodology used to reach those calculations" prior to expert report), *R & R adopted*, 2016 WL 11755527 (D.D.C. Oct. 14, 2016) (denying motion in relevant part).

Indeed, courts do not require perfect market share data even at trial.  *See, e.g., United*

*States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("While economic measures play a role in antitrust analysis, plaintiffs need not present market shares . . . with the precision of a NASA scientist.  The closest available approximation often will do.") (internal quotations omitted); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) ("A reliable, reasonable, close approximation of relevant market share data is sufficient . . . ."); *United States v. SBC Commc'ns, Inc.*, 1999 WL 1211458, at *15 (D.D.C. Aug. 2, 1999) (approving use of "subscriber data [] to estimate market shares because those data are more readily available," even though "other measures of market share may provide a more precise indication of market concentration or a firm's competitive significance"); *Bazaarvoice*, 2014 WL 203966, at *32 ("The data that exist regarding this market are imperfect, in part because the market is relatively new.  But that does not mean that one should ignore the existing data or the market realities.").

Here, the AC's market share allegations, AC ¶¶ 181-204, far exceed the level of detail provided in other successful, fully litigated, antitrust complaints.  *See, e.g.*, Complaint, *United States v. Microsoft Corp.*, 1:98-cv-01232, 1998 WL 35241886 (D.D.C., May 18, 1998) ¶ 58. And they far surpass the meager allegations that have led to dismissal in other cases.  Op. 28, 31 (citing, *inter alia*, *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (complaint identified no other market participants) and *EuroTec Vertical Flight Sols. LLC.  v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (complaint did not allege market shares beyond "the conclusory statement that defendants have 'a market share over 50 percent'")).

### 3. The AC Alleges Significant Barriers to Entry in the PSN Services Market

The AC also adequately pleads the second prong of an indirect showing of monopoly power by alleging facts that describe the significant entry barriers that protect Facebook's

dominant position.  AC ¶¶ 212-17; *cf. Microsoft*, 253 F.3d at 51.  Entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1439 (9th Cir. 1995) (citations omitted).

The AC alleges in detail that Facebook's position is insulated by entry barriers in the form of direct network effects and switching costs, AC ¶¶ 212-13, which are well established in case law and economic literature as factors that create barriers to entry.  *See, e.g.*, *Microsoft*, 253 F.3d at 56 (finding that network effects impose a barrier to entry in Intel-compatible PC operating systems); *Bazaarvoice*, 2014 WL 203966, at *50 (defendant benefited from "a network effect that is a significant and durable competitive advantage for [defendant]"); Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. Chi. L. Rev. 1, 9 (2001) ("[C]onsumers can become 'locked in' to a particular network. . . .  This lock-in effect, in turn, makes entry or expansion by rivals more difficult because they cannot attain a critical mass of customers."); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473, 476-77 (1992) (holding that consumers' switching costs were a primary factor supporting defendant's market power).

The AC also describes how multiple well-financed firms have tried and failed to enter the U.S. PSN services market, and how the remaining market participants, such as Snapchat and MeWe, have not dented Facebook's dominant share.  AC ¶¶ 185-89.  *Cf. Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 971 (10th Cir. 1990) (finding substantial entry barriers where "no other entrant remotely approached [defendant's] domination of the market"); *Rebel Oil Co.*, 51 F.3d at 1440 ("Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals.").

Facebook's critiques of the AC's entry barrier allegations are unpersuasive.  Facebook

first repeats the logically flawed assertion that entry barriers must be low because the AC alleges

that excluded firms posed nascent threats to Facebook's monopoly power.  Mem. 13-15.  This

tension would exist in any Section 2 case: for example, in *Microsoft* the Court of Appeals found

no tension between the structural "applications barrier to entry" and the existence of nascent

threats that might "erode" the barrier absent Microsoft's anticompetitive conduct.  253 F.3d at

53-56.  In any event, any supposed tension provides no basis for a motion to dismiss, because it

cannot erase the AC's specific factual allegations that network effects form a barrier to entry

(e.g., AC ¶¶ 4, 21, 65), that Facebook itself recognizes high entry barriers (AC ¶¶ 66, 212-13,

216) and that many entrants have failed (AC ¶¶ 185-89).

     Facebook's other arguments likewise attempt to dispute or contradict the AC's specific

factual allegations.  Facebook points to the growth or size of firms outside the relevant market,

Mem. 14, but that does not contradict the presence of entry barriers for PSN services.  Facebook

also suggests that there are an infinite number of possible social mechanics that a new entrant

could invent "limited only by human ingenuity and imagination."  Mem. 16.  But that factual

assertion contradicts the words of Facebook's own CEO, who wrote that "there are network

effects around social products and a finite number of different social mechanics to invent."  AC ¶

66.  Facebook's attempt to dispute its own CEO's analysis is entitled to little weight even on a

full record, and certainly cannot provide the basis for dismissal on the pleadings.  *See, e.g.*,

*Anthem, Inc.*, 236 F. Supp. 3d at 198 ("defendants' own ordinary course of business operations"

provide "real world evidence").

     Finally, Facebook argues that entry barriers do not exist because there might be a

technological transition in the future that puts new competitive pressure on the company.  Mem.

16.  That possibility has no bearing on the AC's allegations that Facebook has been a monopolist

for a decade and remains one today, underscoring the significant barriers to entry.

### B.   The AC Also Pleads Facebook's Monopoly Power via Direct Evidence

The AC pleads facts indicating, through direct evidence, that Facebook possesses monopoly power over U.S. PSN services.  These facts provide an alternative to, and further confirmation for, the indirect showing of monopoly power described above.

"Monopoly power is the power to control prices or exclude competition," *Microsoft*, 253 F.3d at 51, and it is well established that market power can manifest in reduced quality and service, in addition to higher prices.  FTC Brief in Opposition ("BIO," ECF No. 59) 7; *see also* Herbert Hovenkamp, *Digital Cluster Markets*, COL. BUS. L. REV. at 25 (forthcoming 2021) ("quality operates as a surrogate for price" for market power purposes).  Here, the AC pleads facts indicating both Facebook's ability to control "price" and quality for PSN services, and to exclude competition.  First, the AC alleges that Facebook, lacking a PSN services competitor of significance, has been able to cause significant user dissatisfaction, without losing significant user business.  AC ¶ 206-207 (describing multiple public revelations of Facebook's abuse of user data and privacy).  As the AC explains, "the ability to withstand significant user dissatisfaction while experienc[ing] a minimal loss of user engagement" is an indicator of market power.  AC ¶¶ 206; *see also Byars v. Bluff City News Co.*, 609 F.2d 843, 853 n.26 (6th Cir. 1979) (finding "strong support to plaintiff's contention that [defendant] possesses monopoly power" in evidence that monopolist provided "inferior service at greater cost which the small retailers were forced to bear since they had nowhere else to turn").

Second, the AC pleads facts indicating Facebook's ability to exclude competitors and impede competition.  In particular, the AC alleges that Facebook's commanding position as a PSN service provider allows it to shape the success or failure of other applications through API access decisions, and thus gives Facebook the power to impose restrictive agreements on

developers to deter them from competing.  AC ¶¶ 130-63, 210; *see also id.* ¶ 155 (Facebook's termination of Path's "access to key API functionality" slowed Path's growth "significantly"), *id.* ¶ 156 (Circle's "daily new users dropped from six hundred thousand per day to nearly zero"). These factual allegations indicate Facebook's ability to induce other firms not to compete with it, and to impede the growth of actual and potential rivals, and thus support a direct inference of monopoly power.  Hovenkamp, *Digital Cluster Markets* at 25 (noting that the FTC's Amended Complaint alleges exclusionary contracts that "would not have been able to succeed in the absence of market power" and "[t]hat claim, if factually supportable, also succeeds"); *see also, e.g.*, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005) (finding direct evidence from history of excluding competitors); *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 110 (D.D.C. 1999) (Microsoft "greatly imped[ed] Java's progress . . . with a series of actions whose sole purpose and effect were to do precisely that"); *Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F. Supp. 2d 1133, 1145 (D. Minn. 2011) (allegations of exclusion of competitors sufficient to allege market power).

Further, the AC alleges that Facebook has for years achieved sustained high profit margins, which dwarf the profit margins of its nearest rival (which has never even turned a profit), and far exceed the margins earned by the average firm in the S&P 500 information technology sector.  AC ¶¶ 208-09.  While Facebook does not charge users a nominal price for using its PSN services, Facebook does serve them advertisements, and generates nearly all of its revenue and profits by doing so.  AC ¶¶ 46, 52.  Thus, as alleged, "Facebook's durable monopoly power over users is a significant driver of" its enormous profits.  AC ¶ 208.  Sustained high profits can indicate monopoly power.  *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("[H]igher-than-competitive profits [are] a strong indication of market power[.]").

13

The foregoing factual allegations, individually and taken together, indicate monopoly power.  *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007) (indirect and direct evidence of monopoly power, including ability to extract supra-competitive pricing); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (allegations of high profit margins and setting supra-competitive prices).

Facebook's contrary arguments are unpersuasive.  To start, Facebook repeats the spurious arguments that it cannot have market power because the price of its product is nominally "zero," Mem. 16, and that it is purportedly novel for market power to present in the form of reduced quality, including abuse of user data and privacy.  Mem. 17-19.  As explained previously, these assertions are bad law and bad economics, because the exercise of market power can manifest in ways other than increases in nominal prices charged to consumers.  BIO 7-8.

Next, Facebook invents a requirement that stating a claim of monopoly power requires a complaint to specify a competitive baseline—such as a specific level of privacy—that would prevail absent monopoly power.  Mem. 17-18.  To the contrary, courts have found direct evidence of monopoly power without defining a competitive baseline even on a full trial record. *Microsoft*, 253 F.3d at 57; *see also Microsoft*, 84 F. Supp. 2d at 28 (citing Microsoft's conduct as direct evidence of monopoly power).

Further, Facebook ignores the specific factual allegations that underscore that the PSN services market is not competitive.  As detailed in the AC, Facebook is aware that other services are not substitutes for PSN services.  AC ¶ 177 (YouTube not cannibalizing Facebook, and YouTube and Facebook serve "disjoint use cases"); *id.* (TikTok services a "very different job" and is "not directly competing in the core areas of focus for our business").  And Facebook is aware that it has a commanding position as a provider of PSN services that deters entry and gives

it power over users.  AC ¶ 212 ("Why are we hard to compete with.  Your friends are here."); *id.*

¶¶ 212-13, 216 (users face significant switching costs and Facebook's comprehensive directory

of people confers "a huge structural advantage").

Moreover, the AC specifically alleges that users suffer due to a lack of PSN services

competition, AC ¶¶ 9, 98, 206-07, 222, bolstered by Facebook's own recognition that if it faced

"real competition" and consumers had "real choice" for PSN services, it would be forced to

provide better quality and service to users.  AC ¶ 187 (Facebook executives feared the successful

entry of Google+ as a PSN alternative would "have the same impact on us as competition has in

every industry—we will have to be better to win [and] our margins may go down").  Facebook

cannot prevail on a motion to dismiss simply by ignoring these allegations, or by offering

contrary assertions that the market is competitive.  Mem. 16-17 (injecting purported facts that

Facebook is a "price cutter" and that output has "exploded").

Finally, Facebook claims that sustained high profits do not indicate market power, Mem.

19, but in doing so, once again contradicts its own executives' statements, AC ¶ 187 (COO

feared that competition in PSN services would mean "our margins may go down"), and ignores

the allegations that Facebook's monopoly power over users drives its profits.  AC ¶¶ 46, 52, 187.

## II.    The Complaint Details How Facebook Has Maintained Its Monopoly Position Through an Anticompetitive Course of Conduct

The AC alleges that Facebook has maintained its monopoly power through a nearly

decade-long effort to suppress and deter competitive threats through strategies other than

competition on the merits.  Specifically, Count 1 alleges that Facebook has engaged in

anticompetitive conduct by acquiring Instagram and WhatsApp, which were competitive threats

to its dominance.  Count 2 alleges that Facebook's acquisitions of Instagram and WhatsApp,

along with its agreements and practices related to Facebook Platform, constitute a course of

anticompetitive conduct.  Both counts state claim Section 2 claims.  And when assessing each

count, the overall anticompetitive effect of Facebook's course of conduct must be considered.

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); BIO 20-21.

### A.  Count 1 States a Claim that Facebook Maintained Its Monopoly Through the Acquisitions of Instagram and WhatsApp

#### 1.  The AC Pleads Facts Establishing that Facebook's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct

It is "well established" law, Op. 52 (citing *Grinnell*), that a monopolist's acquisition of

any "actual or likely potential competitor is properly classified as anticompetitive" conduct that

represents a core concern of Section 2, "for it tends to augment or reinforce the monopoly by

means other than competition on the merits."  Areeda & Hovenkamp ¶ 701a; *see also id.* ¶ 701c

(a monopolist's "[a]cquisition of any firm with nontrivial potential as a substantial rival serves to

maintain monopoly power"); *id.* (a monopolist's "acquisition of any firm that has the economic

capabilities for entry and is a more-than-fanciful possible entrant is presumably anticompetitive,

unless the acquired firm is no different in these respects from many other firms"); BIO 21-23.

Here, the AC provides detailed factual allegations that Facebook engaged in such

anticompetitive conduct by acquiring an actual rival (Instagram) and a threatening potential rival

(WhatsApp) rather than outcompeting them.  AC ¶¶ 80-85, 93-94, 112, 115-118, 120.  Further,

the claim that Instagram and WhatsApp posed competitive threats to Facebook is supported by

detailed factual allegations from Facebook's records and other evidence, *see, e.g.*, AC ¶¶ 80-100;

107-125, and thus is far from speculative.  Mem. 26-28.  Such allegations therefore comfortably

plead that Facebook's acquisitions of Instagram and WhatsApp satisfy the anticompetitive

conduct element of a Section 2 claim by neutralizing actual and potential competitive threats.

*See, e.g.*, *Grinnell*, 384 U.S. at 576 (acquisitions "eliminated any possibility of an outbreak of

competition that might have occurred"); *cf. Impax Labs., Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir.

2021) ("Eliminating potential competition is, by definition, anticompetitive.").  In addition, the AC details the resulting harm to users from this disruption of the competitive process.  AC ¶¶ 105, 127, 220-21 (loss of alternative suppliers, loss of a competitive check on Facebook, and loss of sources of innovation and competitive decision-making); *cf.* Areeda & Hovenkamp ¶ 701c (identifying each of these as harms from a monopolist's acquisition of even a "minor" rival).

### 2.     Facebook's Rehashed Arguments Are Unavailing

Facebook's arguments that the Court must nonetheless dismiss Count 1 are largely rehashed from its prior briefing, *see generally* BIO 23-30, and lack merit, as explained below.

***First***, Facebook again erroneously suggests, in various forms, that a Section 2 plaintiff must establish a change in price or output, or other specific change in consumers benefits, flowing from a monopolist's anticompetitive conduct.  Mem. 26-28 (asserting that the AC must allege that "but for" the Instagram and WhatsApp acquisitions "consumers would have better PSNS products today," or that "Instagram and WhatsApp would have achieved the same growth in a better . . . way for consumers").

Section 2 imposes no such burden of pleading or proof; it requires only that the monopolist harm the "competitive *process*."  *Microsoft*, 253 F.3d at 58-59; *see also* BIO 23-26. As described above, the AC alleges that Facebook harmed the competitive process by acquiring the nascent threats it identified in Instagram and WhatsApp, after it failed in its efforts to compete against them.  BIO 21-24 (citing cases); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (monopolist's conduct foreclosed ability of rival to compete, "which harmed competition itself").  Consumer harm flows inherently from a monopolist's maintenance of its position through conduct that is not merits competition, and a plaintiff is not required to show a specific change in market outcomes.  BIO 24-25 (citing cases); *see also Impax*, 994 F.3d at 495 ("The fact that generic competition was possible, and that [the defendant] was willing to pay a

large amount to prevent that risk, is enough to infer anticompetitive effect.").

Relatedly, Facebook suggests that the AC is deficient because "there is no possible way to predict just what would happen" absent Facebook's anticompetitive acquisitions. Mem. 27 (quoting *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002)). But this flatly contradicts binding precedent: where a monopolist eliminates nascent threats "*the defendant* is made to suffer the uncertain consequences of its own undesirable conduct." *Microsoft*, 253 F.3d at 79 (emphasis added) (where nascent threats are eliminated, "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the exclusionary conduct," and as a result a plaintiff need not prove "that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct"). Indeed, in *Microsoft*, the Court of Appeals upheld liability even though the factual findings conclusively established a *lack* of evidence that the nascent threats targeted by Microsoft would have "ignited genuine competition" in the relevant market absent Microsoft's conduct. *Id.* at 78-79 (quoting ¶ 411 of the district court's factual findings, 84 F. Supp. 2d 9, 111-12 (D.D.C. 1999)).

Further, if Facebook means to posit that the acquisitions were justified, this factual argument is not cognizable on a motion to dismiss. *See BRFHH Shreveport, LLC*, 176 F. Supp. 3d at 624-25 (denying motion to dismiss and rejecting defendant's justification defense because it raised factual issues). Indeed, any such claimed justification faces significant hurdles, in light of the serious harm to the competitive process when a monopolist acquires a potential threat. Areeda & Hovenkamp ¶ 701h ("[A]n efficiency defense cannot be allowed in monopoly cases in the absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms.").

**Second**, Facebook repeats its claim that Section 2 condemns only acquisitions that result

18

in "shuttering" assets or some other special circumstance.  Mem. 25-26.  This is wrong: the core of a Section 2 claim is not the shuttering of assets, but the exclusion of potential constraints on monopoly power—and prior cases did not involve a closing of assets.  BIO 23 (citing *Grinnell* (where monopolist continued to operate acquired firms) and *Standard Oil* (where monopolist continued to operate some acquired oil refineries)).

Facebook is also wrong in suggesting that the AC seeks to "punish" it for offering products to consumers.  Mem. 29-30.  The AC does not claim that Facebook is violating the law by currently offering products branded "Instagram" and "WhatsApp."  Rather, the AC alleges Facebook has engaged in anticompetitive conduct by acquiring Instagram and WhatsApp, and that Facebook's acquisition strategy not only neutralized both firms as innovative rivals and direct threats but also maintains the network effects entry barrier that insulates Facebook's monopoly power, just as Facebook intended.  *See, e.g.*, AC ¶¶ 66, 67.

***Third***, there is no merit to Facebook's argument that a Section 2 complaint must allege that a challenged acquisition combined firms with market shares that "exceed[] prescribed numerical thresholds."  Mem. 22-23.  To the contrary, as described above, the AC alleges the core of a Section 2 acquisition claim—that Facebook targeted actual (Instagram) and potential (WhatsApp) competitors for acquisition.  *Supra* § II.A.1.  A monopolist can violate Section 2 through anticompetitive conduct—including an acquisition—that eliminates a nascent threat that does not even participate in the relevant monopolized market: for example, in *Microsoft*, the eliminated middleware threats did not participate in the relevant market for operating systems. *Microsoft*, 253 F.3d at 54 ("Nothing in § 2 of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes."); *see also* Areeda & Hovenkamp ¶ 701a, d (acquisitions of potential competitors by dominant

firms actionable under Section 2).  Indeed, allegations of "prescribed numerical thresholds" are

not required even in a Section 7 case.  *Cf. United States v. Continental Can Co.*, 378 U.S. 441,

458 (1964) ("Market shares are the primary indicia of market power but a judgment under § 7 is

not to be made by any single qualitative or quantitative test.").

 **Fourth**, Facebook also errs in repeating the suggestion that a Section 2 claim must allege

facts that might satisfy Section 7's potential competition doctrine.  Mem. 23-24; *id.* 27.  Here, as

set forth above, the AC explains in detail that Facebook's acquisition of Instagram and

WhatsApp eliminated nontrivial threats to Facebook's monopoly power.  *Supra* § II.A.1.  It is

"well established" law, Op. 52, that such acquisitions constitute anticompetitive conduct, and no

authority suggests that a monopolist's anticompetitive conduct violates Section 2 only if it

eliminates threats that might satisfy the potential competition doctrine.  BIO 29-30 (discussing

authorities indicating that Section 2 and Section 7 set out distinct violations and detailing how

*Microsoft* condemned conduct directed at nascent threats, without finding that those threats were

imminently about to enter the relevant market or displace Microsoft's dominant position).

 Relatedly, Facebook misstates the law in claiming that Section 2 condemns a

monopolist's elimination of a nontrivial threat only if the acquisition was "likely to harm

consumers at the time the transactions closed."  Mem. 27 (citing Areeda & Hovenkamp ¶ 1205a,

which analyzes acquisitions under Section 7).  This requirement does not appear in any Section 2

cases, and even in the Section 7 context Supreme Court precedent states otherwise.  *United*

*States v. ITT Continental Baking Co.*, 420 U.S. 223, 242 (1975) ("[T]here can be a violation [of

Section 7] at some time later even if there was clearly no violation—no realistic threat of

restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition.").

 **Fifth**, Facebook recycles its already-rebutted argument that the FTC's prior HSR review

20

should increase the FTC's burden of pleading or proof.  Mem. 20-22.  HSR filings do not result

in acquisitions being approved or blessed by the FTC or DOJ.  BIO 27-29.  Rather, the HSR Act

merely established reporting requirements for acquisitions over a certain size, while providing

explicitly that the FTC or DOJ can proceed at any time under any provision of law to challenge

any acquisition—whether it is HSR-reportable or not.  None of Facebook's cited authority

suggests the contrary.  BIO 28-29 (distinguishing *Eastman*, *Texaco*, and *Trinko*).

    ***Finally***, Facebook inaccurately suggests that the AC posits "strict liability for

acquisitions."  Mem. 29.  The AC alleges that a monopolist eliminated a rival (Instagram) and a

meaningful potential entrant (WhatsApp), and thereby extinguished specific nascent threats to its

dominant position.  These allegations do not imply that every acquisition is unlawful.

### 3. The AC's Allegations Regarding "Other Acquisitions" Provide Supporting Factual Context

    Facebook also takes issue with the AC's allegations regarding acquisitions other than

Instagram and WhatsApp.  The AC alleges a course of conduct, and it is inappropriate to parse

each factual allegation to determine whether it is sufficient to state a claim.  In any event, the AC

does not allege that the acquisitions of Onavo (AC ¶ 70), tbh (AC ¶ 72), Octazen (AC ¶ 74),

Glancee (AC ¶ 75), and EyeGroove (AC ¶ 76) each *standing alone,* violated the antitrust laws.

Instead, the allegations provide factual context for Facebook's anticompetitive course of

conduct: they establish that Facebook identified potential threats in order to acquire them (using

Onavo), deprived rivals of a key technology to "slow some competitors down" (Octazen), and

made it a practice to spend millions to purchase—and shutter—innovative firms to squelch

potential rivals (Glancee, EyeGroove, tbh).  These factual allegations provide relevant evidence

that the intent of Facebook's course of conduct was to interfere with rivals through means other

than competition on the merits.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

585, 602 (1985) ("Intent is . . . relevant to the question of whether the challenged conduct is fairly characterized as exclusionary or anticompetitive."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230-31 (S.D.N.Y. 2019) (denying motion to dismiss product design claims and noting that overall course of conduct and intent evidence rendered claims plausible).

### B. Count 2 Alleges an Ongoing Monopoly Maintenance Offense Comprising Anticompetitive Acquisitions and Anticompetitive Platform Conduct

Count 2 alleges that Facebook maintained its monopoly power through a course of conduct that, as in *Grinnell*, involved both acquisitions and exclusionary conduct—here, anticompetitive agreements and practices related to Facebook Platform. *See Grinnell*, 384 U.S. 563, 576 (monopolization course of conduct comprising "restrictive agreements," "pricing practices," and "acquisitions"). These agreements and practices are exclusionary under principles articulated in *Microsoft* and other cases and lack a procompetitive justification. *Infra* § II.B.1. Such conduct is not governed by *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, (2004) (hereinafter *Trinko*), but even if collapsed into a formalistic unilateral refusal to deal framework, it is still actionable. *Infra* §§ II.B.2., II.B.3.

### 1. The FTC's Allegations Regarding Facebook's Agreements with Developers Support a Claim for Monopoly Maintenance

Monopolists have "myriad" "means of illicit exclusion." *Microsoft*, 253 F.3d at 58. Anticompetitive conduct "can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). "Although 'the standard for a § 2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (citing Areeda & Hovenkamp ¶ 777a).

Nonetheless, several key principles serve as a common thread in assessing a monopolist's challenged conduct.  ***First***, conduct is anticompetitive or exclusionary if a monopolist acts "through something other than competition on the merits" to "significantly reduc[e] usage of rivals' products."  *Microsoft,* 253 F.3d at 65; *see also New York v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).  Such conduct includes a monopolist's use of agreements, threats, or other arrangements to prevent third parties from dealing with potential rivals.  *See, e.g., Microsoft*, 253 F.3d at 60-61 (Microsoft's licenses with OEMs "prevent[ed] many OEMs from distributing [rival] browsers"); *see also Lorain Journal Co. v. United States*, 342 U.S. 143, 148 (1951); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802-803 (8th Cir. 1987).  Such conduct also includes inducing or coercing a potential rival to forgo competition.  *See, e.g., FTC v. Actavis*, 570 U.S. at 157-58 (agreements with potential rivals to "prevent the risk of competition"); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("agreements not to compete" violate Section 2); *AT&T*, 552 F. Supp. at 160-62 (monopolist's practices "deterred" competition).

***Second,*** in evaluating whether a monopolist's conduct is impermissibly exclusionary, courts look to its effects.  Courts broadly recognize that a monopolist violates Section 2 when its "exclusionary acts . . . prevent[] the effective distribution and use of products that might threaten that monopoly," including when it enters agreements that "help keep usage of" such products "below the critical level necessary for [that firm] or any other rival to pose a real threat to [its] monopoly."  *Microsoft*, 253 F.3d at 58, 71.  Where otherwise neutral conduct produces such an effect, it "may be impermissibly exclusionary when practiced by a monopolist."  *Dentsply*, 399 F.3d at 187; *see also Microsoft*, 253 F.3d at 70.  Further, "as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a

23

defendant's continued monopoly power," because "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft,* 253 F.3d at 79.

*Third*, a monopolist's anticompetitive conduct is condemned where it cannot be justified by procompetitive considerations. *See New York v. Actavis*, 787 F.3d at 652 (citing *Microsoft*, 253 F.3d at 58-59).

Applying these principles, the AC plausibly alleges that Facebook violated Section 2 by entering agreements with and imposing conditions upon developers that prevented the developers from emerging as threats to Facebook, and also interfered with those developers' dealings with Facebook's potential rivals.

*First*, the AC alleges that Facebook engaged in "something other than competition on the merits" *Microsoft,* 253 F.3d at 65, when it "required that developers seeking to use Facebook Platform and access commercially significant APIs" agree to and abide by anticompetitive contract terms. AC ¶ 133. Developers agreed "that their apps would not compete with Facebook," AC ¶ 133; *see also id.* ¶ 141, and that they "would not promote competitors" through delineated actions. AC ¶ 133; *see also id.* ¶¶ 137, 140, 141. Just as the OEMs in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282-83 (3d Cir. 2012), agreed to remain loyal to the monopolist Eaton (in exchange for rebates), and the Internet Access Providers in *Microsoft* agreed not to "promote" non-Microsoft browsers (in exchange for favorable icon placement), *Microsoft*, 253 F.3d at 68, the AC alleges that many developers agreed to and did refrain from enabling, promoting, or becoming rivals to Facebook in exchange for valuable platform interconnections. AC ¶¶ 8, 148, 154.

These developers' loyalty, whether coaxed or forced, was further cemented by "Facebook's decision to aggressively enforce these provisions," sending "the message" that "competing with Facebook would come at a serious cost."  AC ¶ 154; *see also id.* ¶ 160.  Just as Microsoft's threats to Intel and Eaton's coercive terms in *ZF Meritor* worked to ensure third parties' loyalty to those monopolists, Facebook struck forcefully to ensure developers' acquiescence.  Specifically, certain developers' failure to comply with Facebook's conditions resulted in them losing "access to those interconnections, forcing some out of business."  AC ¶ 8. Facebook "terminated API access of several third-party developers because their apps allowed users to move their Facebook contacts into Google+ or another social network."  AC ¶ 138. Further, when Facebook worried that app developers themselves might emerge as competitive threats, it cut off API functionality access to threatening apps.  AC ¶¶ 142-43, 155-58.  These actions thwarted the ability of these app developers to work or interconnect with Facebook rivals and impeded their ability to emerge as rivals themselves.  *See Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484, 488 (1st Cir. 1952) (exclusion of competitor by prohibiting him from "hawking his wares beside them any longer at the very moment of his affiliation with a potentially lower priced outsider . . . establishes a prima facie case of the purpose to monopolize").

**Second**, the AC alleges that Facebook's conduct and agreements in fact harmed competition, as Facebook successfully coaxed, pressured, or induced developers to remain loyal and not compete directly or promote competition from rivals.  AC ¶¶ 136-137, 146, 148, 154. The allegation that Facebook harmed competition is buttressed by factual allegations that: APIs provided developers with a valuable tool for growth and distribution, AC ¶¶ 35-39; Facebook's agreements sent a "message" to developers to avoid competing or helping competitors or else

lose access to this valuable tool, AC ¶ 144; specific apps did in fact make changes to their products to maintain access to relevant APIs, AC ¶ 143; and a developer that became aware of Facebook's enforcement recognized the implication of non-compliance and was "super concerned." AC ¶ 160. And Facebook's agreements broadly prohibited replication of Facebook's functionality, inducing apps to refrain completely from competing with Facebook in order to retain access to valuable APIs. AC ¶¶ 141-49, 160.

Further, Facebook's Platform agreements and practices produced the additional anticompetitive effect of "exclud[ing] potential competitors from effective distribution channels and thus den[ying] these firms the scale needed to emerge as meaningful competitors." AC ¶ 219. This allegation is bolstered by the AC's concrete allegations that Facebook's termination of API access frustrated the growth of specific potential competitive threats. AC ¶¶ 155 (Path); 156 (Circle); 157 (slowing Vine's growth); 158(a)-(b) (Voxer and MessageMe "shut down"). As such, Facebook's anticompetitive agreements and practices directly "hindered the ability of individual businesses to threaten" its monopoly. AC ¶ 162.

The allegations of harm are further bolstered by the AC's allegations that Facebook intended and expected that this conduct would "harm the prospects for—and deter the emergence of—competition." AC ¶ 137; *see also id.* ¶ 146. Anticompetitive effect can be shown through proof of a monopolist's internal understanding that conduct will have the desired effect. *See Microsoft*, 253 F.3d at 34, 77 (internal documents and testimony confirmed "anticompetitive effect and intent" of Microsoft's threats to Intel). Here, the AC alleges "the immediate impetus for" Facebook's policies was competition from Google+, "the real reason for the discriminatory denial of access was ██████████████████████████████████████ ████ and ████████████████████████ and Facebook knew that enforcement would likely

26

have the effect of "altering / killing prospects of many startups[.]"  AC ¶¶ 137, 146, 149; *see also id.* ¶¶ 145-46 (enforcement targeted at "top 5 messaging apps," apps that *added* relevant functionality, or were particularly threatening based on "'significant volumes of users and/or a high growth rate.'").  Such specific allegations regarding Facebook's anticompetitive motivations are highly probative of "the likely effect of the monopolist's conduct," *Microsoft*, 253 F.3d at 59, and strongly support the inference that Facebook's conduct was intentionally designed to—and did—harm competition and limit consumer choice.

The foregoing detailed factual allegations sufficiently allege that Facebook's conduct "in fact," Op. 48, harmed competition, both by deterring and preventing direct competition from app developers and by interfering with app developers' ability to work with competing PSN providers.  Further, the AC's allegations are not undermined by the theoretical possibility that some non-competing apps, such as a chess app, could have created two separate versions, one connected to Facebook and one not.  Op. 48-49.  The AC provides no basis for concluding that "app splitting" would be efficient or desirable from apps' point of view, nor that nascent PSN threats, which benefit from a unified social graph, AC ¶ 167, would have been able to bifurcate their products in this way.  To the contrary, the AC's allegations about Facebook's aims and expectations in adopting its policies, *supra*, are inconsistent with the conclusion that apps could easily have found a workaround.

*Third*, while it is not a plaintiff's burden to rebut procompetitive justifications on the pleadings, the AC alleges that Facebook has no procompetitive justification sufficient to justify its anticompetitive Platform conduct.  AC ¶ 163; *see Microsoft*, 253 F.3d at 59; *New York v. Actavis*, 787 F.3d at 652.  The AC supports this allegation with further concrete factual allegations that: (1) Facebook's anticompetitive restrictions for developers were not an essential

27

part of Facebook Platform but rather were a change that the company implemented only once it feared the emergence of competitive threats, AC ¶¶ 131-32, 134, 137; and (2) the purpose and intent of Facebook's Platform related conduct was to "harm the prospects for—and deter the emergence of—competition, including personal social networking competitors."  AC ¶ 137.

### 2. Facebook's Agreements with Developers Are Not Unilateral Refusals to Deal

Facebook repeats the argument that the FTC has alleged a unilateral refusal to deal governed by *Trinko*, Mem. 35, ignoring detailed allegations that Facebook provided valuable API access to developers on the condition that developers *agree* to refrain from competing with Facebook.  *See, e.g.*, AC ¶¶ 8, 79, 132-33, 136, 140-41, 147-48, 154, 161-62, 238, 240.  This distinction is critical because over a century of Supreme Court precedent establishes that "antitrust law is far more tolerant of unilateral behavior," Op. 47, than it is of concerted action.

While the Sherman Act does not restrict the "right of [a] trader or manufacturer" "to exercise his own independent discretion as to parties with whom he will deal," *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), the Supreme Court has clearly distinguished this "right" from actions to restrain counterparties from dealing with a monopolist's rivals, *see, e.g., Microsoft*, 253 F.3d at 62, or from competing with a monopolist.  *See, e.g., Otter Tail*, 410 U.S. at 377 ("agreements not to compete, with the aim of preserving or extending a monopoly" violate Section 2).  For example, in *Eastman Kodak*, the Court rejected Kodak's argument that Kodak's policy of selling replacement parts to third parties "only if they agreed not to buy service from [Independent Service Operators]," was equivalent to "a unilateral refusal to deal."  504 U.S. at 463 & n.8.  As the Court explained, "[a]ssuming, arguendo, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not."  *Id.*  Likewise,

in *Trinko*, the Court explained that specific standards apply to Section 2 challenges to unilateral refusals to deal because of "the difficulty of identifying and remedying anticompetitive conduct *by a single firm*." 540 U.S. at 408 (emphasis added).

Put simply, the right described in *Colgate* and *Trinko* does not extend to restraining the dealings of *other* firms. The specific legal standard that applies to Section 2 claims that seek to impose on a monopolist a generalized duty to deal correspondingly does not apply to claims challenging agreements that contain restrictive conditions. *See generally Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013). Rather, courts apply traditional antitrust standards to such claims.

These traditional standards apply to a monopolist's use of agreements with others that are challenged as exclusionary conduct under Section 2. *See, e.g., Microsoft*, 253 F.3d at 70 (monopolization claim based on exclusive contracts that impeded competitor); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 501 (2d Cir. 2004) (monopolization claim based on exclusive supply agreement); *Otter Tail*, 410 U.S. at 377 ("agreements not to compete" state a monopolization claim); *FTC v. Actavis*, 570 U.S. at 157-58 (agreements with potential rivals to "prevent the risk of competition . . . constitutes the relevant anticompetitive harm"). As in *Microsoft*, these agreements may involve terms that altered the way a counterparty operates, at a cost to the counterparty. *See Microsoft*, 253 F.3d at 62 (discussing license agreements with OEMs that "impose[d] significant costs upon the OEMs"); *see generally United States v. Loew's*, 371 U.S. 38, 49 (1962) (licensees agreed to undesired licenses insisted on by distributors).

Applying these standards, courts have made clear that monopolists open themselves up to Section 2 scrutiny by dealing conditionally even if they would not face liability if they refused to deal entirely. For example, a conditional patent license may violate Section 2 if it preserves

monopoly power—even though a patent holder is under no obligation to grant a license at all.

*See, e.g., Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 648 (1947); *see also United States v. Gen. Elec. Co.*, 80 F. Supp. 989, 1005-1006 (S.D.N.Y. 1948); Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property § 5.6 (2017). Similarly, in *Microsoft*, the Court of Appeals held that a copyright holder's statutory right to exclude another entirely from use of its copyrighted work does not encompass a privilege to *condition* the use of a copyrighted work on anticompetitive terms.  *Microsoft*, 253 F.3d at 63.

The AC amply alleges that Facebook acted to restrain the dealings of others, rather than merely acting unilaterally, by conditioning access to its APIs on the acceptance of anticompetitive terms.  Specifically, "developers could only access Facebook's platform if they agreed (i) not to compete with Facebook's core services and (ii) not to facilitate the growth of potential rivals to Facebook."  AC ¶ 8; *see also id.* ¶¶ 132-33.  And the complaint amply alleges that developers' dealings were restrained by these agreements.  AC ¶¶ 8, 148, 154, 159, 161.

Addressing the FTC's prior allegations, the Court suggested that Facebook's conduct should be analyzed as a unilateral refusal to deal, because Facebook's conduct "'conditioned [access] on a firm's status that cannot readily be changed.'"  Op. 46 (quoting Herbert Hovenkamp, *FRAND and Antitrust*, 105 CORNELL L. REV. 1683, 1697 (2020)).  But the quoted source further explains that a firm's conditioning access on another firm's acceptance of certain terms—such as, here, an agreement not to compete—is *not* an unconditional refusal to deal.  *Id.*; *see also Viamedia*, 951 F.3d at 453 (citing same article and stating that "[a] simple refusal to deal is conduct where one firm refuses to deal no matter what," while conditional dealing exists where "one firm will refuse to deal with another firm unless some condition is met.") (quotations omitted).

Moreover, the "considerations of antitrust policy" that counsel a permissive review of a monopolist's unilateral refusal to deal, Op. 35-36, are inapplicable to the agreements described in the AC.  First, the AC's factual allegations contradict any suggestion that Facebook's conditions were necessary to provide the incentive to invest in "economically beneficial facilities."  Op. 35 (cleaned up).  The AC alleges that *prior* to introducing the anticompetitive conditions, Facebook unconditionally provided access to important APIs and assured all developers that "competing applications" would compete "on a level playing field with applications built by Facebook."  AC ¶ 26; *see also id.* ¶¶ 136-151.  Second, nothing in the AC suggests that this Court will have to act as a "central planner."  Op. 35 (cleaned up).  While appropriate equitable relief is a question for a later stage, no allegations in the AC suggest that in order to fashion a remedy the Court will need to grapple with detailed questions regarding competitors' access to facilities, such as would have been required in *Trinko*—instead, courts commonly fashion orders prohibiting conditional dealing.  *See, e.g., Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *120 (N.D. Cal. Sept. 10, 2021) (injunction prohibiting Apple from imposing conditions on developers).  Third, the AC does not suggest that any opportunity for collusion would result from a prohibition of Facebook inducing developers not to compete with it; to the contrary, such a remedy would prohibit anticompetitive concerted action.

### 3.   The FTC's Allegations Meet Even the Standards Applicable to Unilateral Refusals to Deal

Even if analyzed under the standards applicable to unilateral refusals to deal, the AC provides sufficient factual allegations to support the conclusion that Facebook's conditions on access to its platform are actionable.  Given the "myriad" "means of illicit exclusion," *Microsoft*, 253 F.3d at 58, no universal standard governs all refusal-to-deal claims.  Instead, the question is "whether the allegations of [the plaintiff's] complaint fit within existing exceptions" to the

31

general right to refuse to deal "or provide a basis, under traditional antitrust principles, for

recognizing a new one." *Trinko*, 540 U.S. at 408.  A key consideration is whether a monopolist's

conduct is motivated "by competitive zeal" or "by anticompetitive malice."  *Id.* at 409; *see also*

*In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015)

(proxies for assessing the defendant's "anti-competitive motivation" and "lack of legitimate

business justification[.]").  As this Court has noted, Op. 38, evidentiary proxies for

anticompetitive motivation include a defendant's willingness to forgo short-run profits.  *See*

*Aspen Skiing*, 472 U.S. at 608; *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 673, 675

(D.C. Cir. 2005) (applying *Trinko*).

      Here, the evidentiary proxy is unnecessary because the AC alleges, based on Facebook's

own internal documents, that Facebook's conditions on API access were driven by

anticompetitive motivations and lacked a legitimate business justification.  Facebook's goal was

to "restrict[] access to competitors," with successful apps particularly targeted.  AC ¶ 146; *see*

*also id.* ¶¶ 161-62.  As an employee recognized, the restrictions were "anti user" and a reflection

of not "compet[ing] on our own merits."  *Id.* ¶ 137.  Such evidence strongly supports the AC's

contention that Facebook's conduct violates the antitrust laws—a monopolist's right to refuse to

deal with rivals "does not permit action taken for the purpose of creating or maintaining

monopoly power."  *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 49 (S.D.N.Y. 2020)

(rejecting defendants' argument that "they have no duty to transact business with a competitor").

      In any event, the AC also contains allegations that satisfy the "short-term economic loss"

proxy.  Specifically, the AC concretely alleges that Facebook benefitted from developers' access

to valuable APIs through increased "user engagement with Facebook, which in turn helped to

fuel Facebook's massive advertising profits," AC ¶¶ 8, 25, 147, and made a "deliberate decision

to sacrifice the benefits that cut-off apps would otherwise bring to Facebook, including ad spend" in order to "extinguish[] potential competitive threats and maintain[] monopoly power." AC ¶ 134.  Thus, even if "predatory motivation" could be proven only through profit sacrifice, Op. 39, the AC's allegations are sufficient.

Facebook's general course of dealing with developers further indicates that it sacrificed short-term economic benefits to preserve its monopoly position.  First, the AC alleges that Facebook continued to provide API access on its standard terms to developers that it did not view as competitive threats, while cutting off developers that threatened its monopoly position. AC ¶¶ 8, 144 ("[S]o we are literally going to group apps into buckets based on how scared we are of them and give them different APIs?"), 145-47.  This parallels the behavior condemned in *Otter Tail*, where the defendant power company violated Section 2 when it provided transmission services to non-competing customers but denied access to municipal services that sought to compete with it.  410 U.S. at 370-71, 377-78; *see also Trinko*, 540 U.S. at 410 (leaving *Otter Tail* undisturbed); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (citing *Otter Tail* and stating: "The monopoly supplier who retaliates against customers who have the temerity to compete with him, by cutting such customers off, is severing a collateral relationship in order to discourage competition.").  And this case therefore differs from *Trinko*, which involved a monopolist that refused to provide interconnections when each interconnection provided to a rival *necessarily* cost the monopolist a customer it otherwise would have served at a higher (retail) rate of compensation.  *Trinko*, 540 U.S. at 409 (refusal to provide interconnections at cost-based rate "tells us nothing about dreams of monopoly").[1]

---

[1] The AC's allegations that Facebook sacrificed immediate benefits in order to increase barriers to entry are sufficient: no authority binding on this court suggests that a refusal to deal is actionable only if "predatory motivation" is its "only conceivable rationale or purpose."  Op. 39.

Second, the AC alleges that Facebook voluntarily engaged in prior dealings with developers, in particular, during a sustained period in which it invited developers—including nascent threats—to interconnect with Facebook Platform.  AC ¶¶ 26, 29-40.  Such a prior voluntary course of dealing further indicates that the monopolist sacrificed profits by changing course, which has supported liability in previous refusal-to-deal cases.  *See, e.g., Aspen Skiing*, 472 U.S. at 608; *Viamedia*, 951 F.3d at 463.

Notably, prior case law does not indicate that the economic-loss or prior-dealing proxies must be judged with respect to each specific firm with whom the defendant refused to deal.  To the contrary, in *Otter Tail*, the Supreme Court's decision did not focus on a prior course of dealing between the monopolist and a *specific* potential threat to its power.  410 U.S. at 377-78.  Instead, the Court focused on the monopolist's dealings with other customers, which demonstrated that it would have been in the monopolist's interest to deal with the potential entrants if not for the monopolist's aversion to the competition that might result.  *See also Covad*, 398 F.3d at 673 (affirming dismissal of "refusal to cooperate" claim that alleged neither that defendant "had at one time voluntarily dealt with [plaintiff] *nor that it would ever have been in [the monopolist's] interest to have done so*") (citing *Trinko*) (emphasis added).

Further, the AC contains additional allegations underscoring the problematic nature of Facebook's conduct.  In particular, Facebook advanced an "open-first, closed-later" API access scheme through which Facebook induced developers to help it grow, before reversing course by cutting off access.  AC ¶¶ 5, 8, 24-42, 142.  *Trinko* suggested a reluctance to make dominant firms share "the source of their advantage" and the fruits of their investment, 540 U.S. at 408, 414, but here Facebook grew partly on the back of third-party investment.  *Cf. Microsoft*, 253 F.3d at 55 (developers benefited monopolist by writing numerous applications).  Facebook's

34

changed course also provides a further reason that its actions with respect to API access had anticompetitive consequences. *Cf. PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820-21 (6th Cir. 1997) (discussing *Kodak* and describing change in policy after lock-in).

Where all the above-described indications of anticompetitive consequences—direct evidence of anticompetitive purpose, profit sacrifice, prior dealing, and changed course of conduct—are present, Section 2 jurisprudence is not so narrow and rigid as to require dismissal of a claim that a monopolist unjustifiably harmed competition by refusing to deal. To the contrary, the Supreme Court has recognized that a flexible inquiry is instead required. *Cf. Trinko* 540 U.S. at 408 (declining to treat the *Aspen Skiing* fact pattern as the exclusive avenue for stating a claim); *see also Viamedia*, 951 F.3d at 457 ("*Aspen Skiing* factors help case-by-case assessments of whether a challenged refusal to deal is indeed anticompetitive, even though no factor is always decisive by itself."). And, contrary to Facebook's claim, Mem. 38, other courts have not held that its agreements with developers *cannot* violate the antitrust laws. BIO 37-38.

### 4. Count 2 Is Not Barred by the Law of the Case

Facebook contends that the AC's platform allegations are "barred by the law-of-the-case doctrine." Mem. 33-34. That is incorrect for several reasons. First, that doctrine only applies to aspects of a court's decision that are "essential to its holding." *Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166, 177 (D.D.C. 2018); *see also Bouchet v. Nat'l Urban League*, 730 F.2d 799, 806 (D.C. Cir. 1984). Here, the Court dismissed the FTC's initial complaint for insufficient allegations of monopoly power, Op. 2, and the Court's further guidance regarding the platform allegations, *id.* at 3, was not essential to that holding.

Second, courts are not barred by the law-of-the-case doctrine from "entertaining[] the same question of law upon a fuller development of the facts." *Post v. Pearson*, 108 U.S. 418,

422 (1883).  Here, the AC furnishes additional factual allegations that warrant a new assessment, including allegations describing Facebook's anticompetitive agreements (AC ¶¶ 8, 136-41), the value Facebook gained from Platform (AC ¶¶ 24-25, 27-28, 32), and the benefits Facebook sacrificed when it cut off access to third-party apps (AC ¶ 134).

Third, Facebook faces no prejudice if the Platform conduct allegations are considered anew.  *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 235 (D.D.C. 2020) (Boasberg, J.) (declining to apply law of the case when defendant did not rely on nor would be prejudiced by reconsideration of an issue); *see also Dist. No. 1 v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327, 350 (D.D.C. 2014) (same), *aff'd*, 815 F.3d 834 (D.C. Cir. 2016).

Finally, Facebook's cited authorities are inapposite.  *See, e.g., LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (when multiple appeals are taken, decisions on the first appeal should not be revisited on later appeals); *Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26, 35-36 (D.D.C. 2017) (amended complaint did not make "any effort" to address deficiency identified in court's original holding).

## III.    Section 13(b) Does Not Provide a Basis to Dismiss Count 1 or Count 2

The Court has already determined that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to bring Count 1 of the AC, Op. 50-52, as Facebook appears to concede. Section 13(b) likewise authorizes the FTC to bring Count 2, for three reasons.  **First**, Facebook is violating the Sherman Act by continuing to wield unlawfully maintained monopoly power. **Second**, the Instagram and WhatsApp acquisitions form the basis for Count 2 as well as Count 1, and Section 13(b) requires analysis of the FTC's cause of action, not each individual allegation therein.  **Third**, even if the platform conduct allegations are inappropriately evaluated in isolation, the AC alleges Facebook's platform conduct is likely to recur.

### A.  Section 13(b) Authorizes the FTC to Obtain Injunctive Relief to Remedy Facebook's Ongoing Violation of the FTC Act

Section 13(b) of the FTC Act empowers the FTC to seek an injunction in federal court when the Commission "has reason to believe" that a defendant "is violating, or is about to violate" any provision of law enforced by the FTC.  15 U.S.C. § 53(b).  The AC alleges that Facebook's course of conduct is an ongoing act of monopolization and that Facebook thereby "is violating" Section 2.  The Court should deny the motion to dismiss Count 2 on this ground alone. *See, e.g., Vyera*, 479 F. Supp. 3d at 44 (defendants "continued to execute" unlawful scheme, "which continued to have an anticompetitive impact").

Section 2 is directed not merely at discrete acts; rather, a monopolist *is violating* the statute while the "monopolizing effects" of anticompetitive conduct persist: i.e., as long as the monopolist continues to wield unlawfully maintained monopoly power.  As the Court of Appeals has observed, "[t]he condition of monopolization is itself a violation of the Sherman Act" that constitutes a "continuing violation" subject to "remedies to cure the monopolizing effects of the forbidden anticompetitive combination or acquisition."  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1148 (D.C. Cir. 2009) (internal citations omitted); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 574 n.9 (1972) (quoting *N. Sec. Co. v. United States*, 193 U.S. 197, 357 (1904)); *Standard Oil Co. v. United States*, 221 U.S. 1, 74 (1911) (monopolist's elimination of competition brought about "a perennial violation of [Section 2 of the Sherman Act]").

By willfully continuing to hold and exercise monopoly power maintained through anticompetitive conduct, as alleged in both counts of the AC, Facebook *is violating* the Sherman Act's prohibition on monopolization today, as it has for a decade.  The FTC therefore may seek an injunction, consistent with the statutory text and purpose of Section 13(b), which is to make available prospective relief to address ongoing or likely-to-reoccur violations.  *AMG Cap.*

*Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021).

### B. Section 13(b) Authorizes Both Count 1 and Count 2, and the Allegations Supporting Each Cause of Action Must be Considered as a Whole

Section 13(b) authorizes the Commission to "bring suit in a district court of the United States." 15 U.S.C. § 53(b). Because Section 13(b) authorizes *suits*, the question at the pleading stage is whether the complaint states a viable *cause of action*. Here, the Court correctly concluded that the allegations about Instagram and WhatsApp provide a basis for injunctive relief. Op. 50-52. Those allegations are reiterated in the AC and are incorporated into both Count 1 and Count 2. Accordingly, the FTC's suit, and both causes of action stated therein, "*do[] contend* that the defendant[] [is] currently engaged in violations of federal antitrust laws," and the 13(b) inquiry ends there. *Vyera*, 479 F. Supp. 3d at 44 (emphasis added).

Facebook suggests a contrary and unprecedented result, asking the Court to ignore Section 13(b)'s focus on causes of action and instead to parse the AC to determine whether each factual allegation independently satisfies the "is violating, or is about to violate" requirement. Facebook does not cite any case, and the FTC is aware of none, in which a court has applied its proposed piecemeal approach to Section 13(b), blessing some allegations while tossing out others, to dismiss parts of a complaint that alleged maintenance of an ongoing monopoly. That is because courts consider Section 13(b) challenges at the *complaint and cause of action* level, not the allegation level. For example, in *FTC v. Neora LLC*, 2021 WL 3398153 (N.D. Tex. Aug. 2, 2021), the court denied in relevant part, without striking any allegations, defendant's motion to dismiss a complaint that contained allegations both of "long past" completed conduct and of conduct that was ongoing or likely to reoccur. The same result is appropriate here, where the AC alleges a series of related anticompetitive acts, some completed and some ongoing.

Facebook's approach to Section 13(b) would mean that the FTC could not

comprehensively address in federal court an ongoing monopolization offense that comprises multiple acts, some completed and others ongoing.  Instead, if Facebook's proposed approach were adopted—with allegations about certain acts "dismissed"—courts would be forced to assess Section 2 liability (and craft a remedy) without accounting for the entire monopolization scheme. This approach is at odds with the established antitrust principle that a course of conduct should be assessed in aggregate.  BIO 44.

Moreover, this approach would also treat the availability of injunctive relief in a monopolization case differently depending on whether the case were brought by the FTC or instead by the FTC's sister agency, the Department of Justice ("DOJ").  DOJ can clearly state a claim for equitable relief to remedy ongoing monopolization, even where some of the acts took place in the past.  *See, e.g., Standard Oil*, 221 U.S. at 82 (Section 2 claim, based in part on conduct dating back 32 years).  Similar to the FTC, DOJ has statutory authority to "institute proceedings in equity to prevent and restrain," 15 U.S.C. § 4, violations of Section 2 of the Sherman Act, and courts have repeatedly held that DOJ and FTC are subject to the same standard to establish entitlement to injunctive relief.  *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (propriety of injunctive relief sought by FTC determined by *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), which also governs injunctive relief sought by DOJ); *FTC v. Warner Chilcott Holdings Co. III*, 2007 WL 158746, at *9 (D.D.C. Jan. 22, 2007) (same). Yet the FTC is aware of no monopolization case brought by DOJ in which a court has parsed a complaint to "dismiss" allegations related to past conduct that maintained an ongoing monopoly. And neither authority nor reasoned argument suggests that a monopolist's course of conduct should violate the antitrust laws if DOJ brings suit, but not if the FTC brings suit.

Further, Count 2's platform allegations are relevant to appropriate remedies.  If the FTC

demonstrates at trial that any of the alleged conduct is a violation of the antitrust laws, the Court will have to decide what remedy is necessary and appropriate to restore competition.  *Grinnell*, 384 U.S. at 577; *Ford Motor*, 405 U.S. at 573 (adequate relief must "restore competition").  Facebook's use of interoperability and API access to stymie competition, and the effects of that conduct on the ability of rivals to compete, will be highly relevant to crafting a remedy.  *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950) (injunctive relief for monopolization "is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal").

In any event, if Facebook wanted the Court to excise *allegations* from the AC, the appropriate instrument for that request would have been a motion to strike the allegations under Rule 12(f), not a motion to dismiss under Rule 12(b)(6).  But Facebook made no such motion, and it could not support one, because the Platform-related allegations supporting Count 2 plainly are not "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

### C.  The AC Plausibly Pleads that Facebook's Illegal Platform Conduct Is Likely to Recur

Even if the Platform conduct allegations are parsed out separately from the rest of the AC—which they should not be, *supra* § III.B—the AC's allegations are sufficient "to support a reasonable inference that [Facebook's] behavior will reoccur."  *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019); *accord FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011).

To plead a likelihood of recurrence, a plaintiff must plausibly allege that the defendant retains the ability and incentive to resume the illegal conduct.  *See, e.g., Accusearch,* 570 F.3d at 1202.  "Once a violation is demonstrated, all that need be shown is that there is some reasonable likelihood of future violations, and past unlawful conduct is highly suggestive of the likelihood

40

of future violations." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000) (internal quotation omitted). Prospective injunctive relief is appropriate unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation omitted). The AC alleges that Facebook engaged in illegal conduct relating to Platform through at least December 2018, stopped the conduct due to government scrutiny, and retains the ability to engage in the same or similar practices at any time. AC ¶¶ 150-51, 240. The AC further alleges that Facebook's suspension of its anticompetitive policies is a temporary measure that Facebook is likely to reverse once antitrust scrutiny—which includes this lawsuit— has passed or it again faces acute threats to its dominant position. AC ¶¶ 151, 240. "[C]ourts have repeatedly held that defendants' cessation of violations as a direct result of government intervention is treated as if the violations never stopped—or, at a minimum, are imminently about to recur." *United States v. MyLife.com, Inc.,* 499 F. Supp. 3d 757, 767 (C.D. Cal. 2020). Facebook may dispute these allegations, but that is a question for trial, not a motion to dismiss.

Courts also find a likelihood of recurrence where the defendant failed to acknowledge culpability or make sincere assurances that it will not commit future violations. *See, e.g., In re Sanctuary Belize*, 482 F. Supp. 3d 373, 466-72 (D. Md. 2020); *Think Achievement*, 144 F. Supp. 2d at 1017. Here, Facebook has not acknowledged culpability: to the contrary, it defends its conduct as "lawful." Mem. 3. Furthermore, the AC alleges no assurances by Facebook that it will not reinstitute the Platform conduct, and any assurances would merit little weight in any event, for Facebook has made "meaningless" representations to enforcers "on multiple occasions," and paid enormous fines for misleading European regulators and "stunning" violations of its commitments to the FTC. AC ¶¶ 152-53. Taken together, the AC's allegations

readily clear the bar for pleading a likelihood of recurrence.

Facebook cites to *FTC v. Shire ViroPharma, Inc*., 917 F.3d 147 (3d Cir. 2019), but that case is simply inapposite.  In *Shire*, the Third Circuit held that Section 13(b) did not authorize a suit where the FTC conceded that the defendant no longer controlled the product it once monopolized.  Thus, in *Shire* there was concededly no ongoing violation of the antitrust laws, the defendant was no longer a monopolist, and recurrence of the conduct to maintain the monopoly in the future was therefore *impossible*.  *Id.* at 150.  The AC, by contrast, alleges an extant monopoly, *supra* § I, an ongoing violation of the antitrust laws, *supra* §§ III.A-B, and, as just explained, facts that meet the standard to establish a likelihood of recurrence.

## IV.     Chair Khan Properly Participated in the Vote on the Amended Complaint

Facebook argues that the AC should be dismissed or "remanded" because Chair Lina M. Khan allegedly "prejudged" the facts and should have been recused from the Commission vote. Its argument fails because any prohibition on prejudgment applies to officials acting in a judicial or quasi-judicial capacity, and Chair Khan and the Commission are not acting as judges here.

### A.  Relevant Background

The Commission enforces the laws under its purview through two pathways: administrative proceedings where the Commission acts as an adjudicatory body, 15 U.S.C. § 45(b), and actions (like this one) in federal court seeking injunctive relief, *id.* § 53(b).  In the former, the Commission finds facts and makes legal rulings, but in a federal court action, the Commission acts as a litigation plaintiff—the court finds the facts and determines the law.

The Commission voted to file this lawsuit in 2020 under Chairman Joseph J. Simons. After Chairman Simons stepped down, President Biden nominated Professor Khan to fill the vacancy and, following her Senate confirmation, designated her as Chair.  Prior to her confirmation, Chair Khan wrote extensively about competition issues in digital markets as a law

professor and antitrust scholar.  She also participated in a Congressional investigation that issued

a report on the activities of four major technology companies, including Facebook.  President

Biden presumably chose Chair Khan to lead the Commission in part because of her experience.

Following the dismissal of the original complaint, Facebook sought to file a petition to

recuse Chair Khan from participating in "any decisions concerning whether and how to continue

the FTC's antitrust case against the company," on the grounds that she had prejudged the issues.

Hansen Decl. Ex. A.  The Commission's rules, however, allow recusal petitions only in

adjudicative or rulemaking proceedings.  16 C.F.R. § 4.17.  Since no such proceeding involving

Facebook was pending, the Secretary of the Commission rejected Facebook's petition.  Hansen

Decl. Ex. G.  The Commission thereafter voted, 3-2, to authorize the AC.

### B.  Prejudgment Is Not a Basis for Recusal from Commission Votes Authorizing Federal Court Litigation

Facebook's argument that Chair Khan was required to recuse herself rests primarily on

two cases involving a former FTC Chairman's participation in *administrative proceedings* where

a disinterested observer could conclude that he had prejudged the issues.  *See Am. Cyanamid Co.*

*v. FTC,* 363 F.2d 757, 763-68 (6th Cir. 1966); *Cinderella Career & Finishing Schs., Inc. v. FTC*,

425 F.2d 583, 589-92 (D.C. Cir. 1970).  These cases are rooted in the rule that "[a] fair trial in a

fair *tribunal* is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136 (1955)

(emphasis added).  But the Supreme Court has held that "[t]he rigid requirements . . . designed

for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a

prosecutorial or plaintiff-like capacity."  *Marshall v. Jerrico, Inc*., 446 U.S. 238, 248 (1980).

Prosecutors "need not be entirely neutral and detached," and "are necessarily permitted to be

zealous in their enforcement of the law."  *Id.* (internal quotation omitted); *see also Ass'n of Nat'l*

*Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979) ("We must not impose judicial

43

roles upon administrators when they perform functions very different from those of judges.").

Unlike in *American Cyanamid* and *Cinderella*, in this case the Commission is acting as a plaintiff or prosecutor, and the Court will make the factual findings and legal rulings and determine the appropriate remedy. The case law regarding prejudgment in administrative proceedings is thus inapplicable. Indeed, the Administrative Procedure Act expressly provides that the rules governing adjudications, 5 U.S.C. § 556(b), do not apply to "a matter subject to a subsequent trial of the law and the facts de novo in a court." *Id.* § 554(a)(1).

That does not mean there are no circumstances in which a Commissioner may be recused from voting on the filing of a federal court complaint. For example, federal law and ethics regulations bar Executive Branch officers and employees from participating in matters where they have a financial interest. 18 U.S.C. § 208; 5 C.F.R. § 2635.402. But Facebook does not and cannot claim that Chair Khan has any such interest. Tellingly, although Facebook repeatedly asserts that Chair Khan has violated "federal ethics rules," its brief does not cite any such rule. Facebook simply argues that Chair Khan has expressed views that are adverse to it, which is not a basis for disqualification of an agency official acting in a prosecutorial capacity.

*Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984), is inapposite. In that case, the AUSA who obtained an indictment was married to a political opponent of the defendant, and "almost certainly harbored personal animosity" against him. *Id.* at 1055. Facebook does not and cannot allege that Chair Khan is motivated by any such personal animosity, and the Commission initiated this lawsuit before she even arrived. Furthermore, *Wright* held that even if the AUSA's participation was "ill advised," it did not "deprive[] [the defendant] of due process of law"; at most it "deprived him of the chance that, with another prosecutor, he might undeservedly have escaped indictment and consequent conviction for crimes of which he was properly found to be

guilty." *Id.* at 1058.

## C. The Court Cannot "Remand" to the Commission

Facebook's alternative argument that the Court should "remand" to the Commission and order it to act on the company's recusal petition is equally meritless. First, as shown above, Facebook has identified no facts that would warrant Chair Khan's recusal. Second, the Commission's rules provide only for disqualification motions in connection with an adjudicative or rulemaking proceeding—*i.e.*, where the Commission acts as a decisionmaker. Third, the Commission has not conducted an administrative adjudication, much less issued a final order, so there is nothing to "remand." Finally, if Facebook contends the Commission failed to take required action, the proper remedy is to file a suit for mandamus to compel agency action under 5 U.S.C. § 706(1). *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-65 (2004).

Facebook's cases are not remotely on point. *Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011), involved a review of final agency action under the APA where the initial agency decision was tainted by improper political pressure. Here, the Commission has not taken any final action, the Court is not conducting APA review, and there is no allegation that Chair Khan was influenced by improper political pressure. *Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962), involved an administrative proceeding; the court directed issuance of an injunction barring the SEC from continuing the proceeding because one of its Commissioners had previously been in charge of investigating and prosecuting the matter. But as shown above, the requirements that apply to agency officials acting as adjudicators do not apply where the agency is acting as a prosecutor or plaintiff in court. *Marshall*, 446 U.S. at 248.

## CONCLUSION

Facebook's Motion to Dismiss should be denied for the reasons set forth above. The FTC respectfully requests oral argument, pursuant to Local Rule 7(f).

Dated: November 17, 2021                   Respectfully submitted,

                                           /s/ Daniel Matheson
                                           Daniel Matheson (D.C. Bar 502490)
                                           Krisha Cerilli (D.C. Bar 983281)
                                           Patricia Galvan
                                           Robert Zuver (D.C. Bar 987216)
                                           Maria Dimoscato (D.C. Bar 489743)
                                           Eric Cochran (D.C. Bar 981148)
                                           Mitchell London (D.C. Bar 1029408)
                                           Owen Masters (D.C. Bar 242139)
                                           Michael Mikawa
                                           Noel Miller (D.C. Bar 1026068)
                                           David Owyang
                                           Mark Silvia
                                           Michael Smith (D.C. Bar 996738)
                                           Rebecca Weinstein
                                           Sylvia Zhang

                                           Federal Trade Commission
                                           Bureau of Competition
                                           400 Seventh Street, S.W.
                                           Washington, D.C. 20024
                                           Telephone: (202) 326-2075
                                           Email: dmatheson@ftc.gov

                                           *Attorneys for Plaintiff*
                                           *Federal Trade Commission*