**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

FACEBOOK, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

---

**REPLY BRIEF IN SUPPORT OF
FACEBOOK, INC.'S MOTION TO DISMISS
THE FTC'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................3

I. THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY
ESTABLISHING MONOPOLY POWER ........................................................................3

  A. The Agency Still Alleges No Facts Plausibly Supporting *Any*
PSNS Share ........................................................................................................4

  B. The FTC's Allegations Undermine Its Claim of Barriers to Entry ..........................9

  C. The FTC Still Has No Facts To Support Its "Rare" Direct-Evidence
Theory ..............................................................................................................12

II. THE FTC HAS NOT PLAUSIBLY ALLEGED EXCLUSIONARY
CONDUCT .................................................................................................................14

  A. The FTC Fails To Allege Facts Stating a Plausible Acquisition
Claim ...............................................................................................................14

  B. The FTC's Attempt To Revive Dismissed and Defective Platform
Allegations Fails as a Matter of Law .................................................................19

III. THE FTC'S DEFECTIVE VOTE PURPORTING TO AUTHORIZE THE
AC ALSO REQUIRES DISMISSAL .............................................................................22

CONCLUSION ..........................................................................................................................25

# TABLE OF AUTHORITIES[*]

Page

CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
(9th Cir. 2010)................................................................................................16

*Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979) ...................23

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) ..........10

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................2, 3, 6-7, 17

\* *Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26 (D.D.C. 2017),
*aff'd*, 720 F. App'x 1 (D.C. Cir. 2018)..............................................................21

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606
(W.D. La. 2016) ..............................................................................................5

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ..........................12, 14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...........16

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................18

*Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir. 1979)........................................12

*CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926 (D. Or. 2018) .......5

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005)......................19

*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018)....................19

*Dominick v. Collectors Universe, Inc.*, 2012 WL 6618616 (C.D. Cal. Dec. 18, 2012)....11

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002)................................................................................16

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
*aff'd*, 724 F. App'x 556 (9th Cir. 2018) ......................................................16-17

*Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925 (N.D. Cal.
Sept. 10, 2021), *appeals pending*, Nos. 21-16506 & 21-16695 (9th Cir.).........12

*Ervin Equip. Inc. v. Wabash Nat'l Corp.*, 2017 WL 416304 (N.D. Ind. Jan. 31,
2017) ..............................................................................................................11

---

[*] Authorities principally relied upon are marked with an asterisk.

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 2838
   (2021) ...................................................................................................................4-5, 20

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ...................................................................14

\* *FTC v. Libbey, Inc.*, No. 1:02-cv-00060-RBW, ECF No. 76 (D.D.C. Apr. 3, 2002) ...................25

*FTC v. Vyera Pharm., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ................................20

*Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967) ..........................................................23

*Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021), *petition for cert. pending*,
   No. 21-406 (U.S. Sept. 10, 2021) ...........................................................................15

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) ...........................5

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996)....................................................21

*Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir. 1981)....................................15

*Marchese v. Cablevision Sys. Corp.*, 2011 WL 3022529 (D.N.J. July 21, 2011) ...........6

*Minn. Made Hockey, Inc. v. Minn. Hockey, Inc.*, 789 F. Supp. 2d 1133
   (D. Minn. 2011) .....................................................................................................13

*Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994)....................................................5

*New Jersey v. Imperiale*, 773 F. Supp. 747 (D.N.J. 1991) ...........................................23

\* *New York v. Facebook, Inc.*, --- F. Supp. 3d ---, 2021 WL 2643724
   (D.D.C. June 28, 2021), *appeal pending*, No. 21-7078 (D.C. Cir.).............................20, 21

*Nexium (Esomeprazole) Antitrust Litig., In re*, 968 F. Supp. 2d 367
   (D. Mass. 2013)..................................................................................................12, 14

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)......................................................16

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)..........................................22

*PNY Techs., Inc. v. SanDisk Corp.*, 2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) .................10

\* *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ....................................................16

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951 (10th Cir. 1990).......................11

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)................................11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).................15

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ............................6

*Set-Top Cable Television Box Antitrust Litig.*, *In re*, 2011 WL 1432036
　　(S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*,
　　836 F.3d 137 (2d Cir. 2016)........................................................................................6

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016) ......................................6

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ..................................................................15

*Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ......................6

*Top Rank, Inc. v. Haymon*, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)....................................6

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126
　　(D.D.C. 2018) ..............................................................................................................5

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C.), *aff'd*, 855 F.3d 345
　　(D.C. Cir. 2017) ...........................................................................................................8

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019)....................................................18

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)...........................................18

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)...........................6

*United States v. Columbia Steel Co.*, 334 U.S. 495 (1948) ........................................................15

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .............................................13

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................................................................14

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .......................................8

*United States v. Microsoft Corp.*:

　　84 F. Supp. 2d 9 (D.D.C. 1999) .................................................................................13

　　* 253 F.3d 34 (D.C. Cir. 2001) .....................................2, 11, 12, 13, 14, 16, 17, 18

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .................................20

* *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..............................................10, 15

* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　　540 U.S. 398 (2004)......................................................................................2, 20, 21, 22

* *Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984) ..............................................................24

## STATUTES AND REGULATIONS

Clayton Act, 15 U.S.C. § 12 *et seq.* ............................................................18

 § 7, 15 U.S.C. § 18 ...............................................................................18, 19

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

 § 13(b), 15 U.S.C. § 53(b) ...............................................................2, 20, 25

Sherman Act, 15 U.S.C. § 1 *et seq.* .......................................................11, 18

 § 2, 15 U.S.C. § 2 ............................................1, 11, 12, 14, 15, 17, 18, 21

 § 4, 15 U.S.C. § 4 .......................................................................................20

5 C.F.R.:

 § 2635.101 ...................................................................................................24

 § 2635.501(a) ..............................................................................................24

16 C.F.R. § 5.1 ..................................................................................................24

## ADMINISTRATIVE MATERIALS

Fed. Trade Comm'n:

 Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey M.
 Klineberg re: Recusal Petition (Aug. 19, 2021) .............................................25

 Facebook, Inc. Pet. for Recusal, *In re Petition for Recusal of Chair Lina
 M. Khan from Involvement in the Pending Antitrust Case Against
 Facebook, Inc.* (July 14, 2021) .....................................................3, 22, 24, 25

 Statement of Commissioner Christine S. Wilson Regarding the
 Announcement of Pre-Consummation Warning Letters (Aug. 9, 2021),
 https://www.ftc.gov/system/files/documents/public_statements/
 1593969/pre-consummation_warning_letters_statement_v11.pdf ...................15

## OTHER MATERIALS

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated
 Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper
 Series, No. 20-14 (May 2020) ..........................................................................18

**INTRODUCTION**

After two complaints and two rounds of briefing, the Federal Trade Commission ("FTC") *still* cannot point to pleaded facts that plausibly establish the essential elements of its Section 2 claims.  The Amended Complaint ("AC") has not cured the central deficiency identified by the Court:  rather than plead facts that could show monopoly power, it relies on inapposite statistics and admitted assumptions to dress up conclusory speculation.  The agency claims that two FTC-cleared acquisitions were "exclusionary conduct" despite the agency's inability to make any factual allegation that the transactions harmed consumers.  It reargues the same points the Court already correctly rejected in dismissing the agency's Platform claims.  And it defends its tainted 3-2 vote by claiming that, when authorizing enforcement actions, Commissioners are essentially unconstrained by due process and federal ethics rules.  The FTC did not state a valid claim before; it still has not stated a valid claim.  Its case should now be dismissed with prejudice.

*First*, the FTC still has no plausible factual support for its core claim that Facebook[1] had or has the power to raise price or restrict output in the artificial, never-before-recognized "Personal Social Networking Services" ("PSNS") market.  After an exhaustive pre-filing investigation, and examination of commercial data sources, the FTC has no measure of or means of measuring how much time people spend on Facebook or any other service in activities that constitute PSNS, which neither Facebook nor any other industry participant recognizes, uses, or tracks.

The agency resorts to cherry-picked data that purport to measure *total* time spent using *all* of the features of selected online services, which the Court rejected as a measure of share in the claimed PSNS market.  Because the FTC provides no facts supporting any breakdown of time

---

[1] On October 28, 2021, Facebook, Inc. changed its name to Meta Platforms, Inc.

spent on Facebook or Instagram or any other service, the only support for its essential allegation is an arguendo *assumption*, based on no facts, as to time spent on the narrowly defined activity that, according to the agency, constitutes PSNS:  sharing with family and personal contacts, in a social space, using a social graph, based on a recommendation function, and only on services for which this activity is the primary feature.  Such guesswork is exactly what *Twombly* forbids.

*Second*, the FTC still has not pleaded facts that could plausibly establish that Facebook maintained a monopoly through unlawful, anticompetitive conduct.  Under settled antitrust law, this requires facts showing harm to consumers.  But with regard to Facebook's acquisitions, the agency seeks to *change* the law, arguing that every acquisition of a potential competitor by an alleged monopolist constitutes exclusionary conduct *without* showing harm to consumers.  That hoped-for rule – a strict-liability standard for which the FTC cannot cite a single decision – conflicts with governing Circuit precedent, including *Microsoft*.  As the D.C. Circuit has instructed, harm to consumers is a *sine qua non* of exclusionary conduct.  No such harm is alleged here.

In attempting to revive its Platform claims, the agency relitigates arguments the Court correctly rejected.  Those claims are barred by Section 13(b), which does not permit the FTC to pursue claims based on an expressly abandoned policy or long-past enforcements of that policy, and by *Trinko*, which holds that even a monopolist has no antitrust duty to aid its rivals.  The FTC's restated arguments – and sweeping contention that the Court lacks power to dismiss even invalid parts of claims asserted within a single count – provide no reason for the Court to overturn its prior rulings.

*Third*, the FTC vote to authorize the AC was invalid – tainted by the participation of a Chair who should have been recused because she prejudged Facebook's antitrust liability, something the FTC does not contest.  Even ordinary prosecutors have a duty to evaluate potential

cases impartially, and the Chair of the FTC is no ordinary prosecutor.  The broad powers granted

to the Chair of this independent regulatory agency heighten the obligation of the Chair to avoid

even an appearance of bias.  The opposite happened here:  Chair Khan has accused the company

of responsibility for a litany of social harms, even "genocide."  The FTC's concession that a

Commissioner's personal animus would be a valid basis for recusal confirms that the FTC had an

obligation to reach the merits of Facebook's Recusal Petition.  It did not do so because, it claims,

it had no procedure in place.  This was improper as a matter of both due process and federal

ethics rules.

## ARGUMENT

### I.  THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY ESTABLISHING MONOPOLY POWER

The Court dismissed the FTC's initial complaint for failure to allege facts plausibly

establishing market power in the "idiosyncratically drawn" PSNS market.  Op. 27.  It expressly

granted leave to cure only that defect: *facts* to establish PSNS market shares for Facebook and

other PSN services.  *See* Op. 32.  The FTC has come forward with no such facts, offering only

inapposite statistics and an admitted *assumption* about how those statistics relate to the alleged

relevant market.  No court has ever accepted such sleight of hand, even before *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544 (2007), emphatically closed the door on such unsupported

speculation (Point A).  Equally flawed is the conclusory allegation that entry barriers protect

Facebook's PSNS share, which the AC contradicts (Point B).  And the FTC's renewed assertion

that "direct evidence" proves power provides nothing close to the "rare" facts that could support

such a claim (Point C).

### A.      The Agency Still Alleges No Facts Plausibly Supporting *Any* PSNS Share

By pleading a curiously narrow market definition – limited to a three-element PSNS feature-set on some few services that primarily offer those features – the agency set for itself a difficult challenge:  to come forward with *facts* sufficient to make a plausible case that Facebook had and has a monopoly share of that specific market.  *See* FB Br. 6-13, ECF No. 83-1. Compounding the challenge, the FTC still has not identified a single commercial actor, anywhere, that recognizes a PSNS market as defined, much less tracks PSNS usage in a way that might permit assessment of market shares.  Indeed, in the 80-page AC, there is not a single reference to Facebook or anyone else considering PSNS market share or even recognizing the existence of this supposed market.

1.      The FTC initially asked the Court to take its word for the unsupported assertion that Facebook had "in excess of 60%" of the PSNS market.  Compl. ¶ 64, ECF No. 51.  The Court rejected that gambit.  *See* Op. 27-32.  The FTC has returned, not with facts to support its earlier claim, but with bare *assumption* disguised behind a facade of data that concededly include unquantified amounts of "non-PSN usage" and PSNS usage, with no way to distinguish between the two.  Opp'n 6, ECF No. 85.  The Court cautioned against this, warning that overall time spent on a service "bears an uncertain relationship to the actual metric that would be relevant: time spent using [a service's] PSN services *in particular*."  Op. 30 (emphasis added).

The Comscore data do not even purport to measure PSNS and thus do not qualify as "underlying facts that might substantiate" the FTC's assertion (at 4-5) that Facebook's market share exceeded 70% or 80%.  Op. 29.  The FTC identifies no case accepting any similar effort to bootstrap share from such inapt data.  Each case the agency cites (at 4) involved share allegations based on conventional measurements of the alleged relevant product market, not some broader and undefined market.  *See*, *e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 372-73 (3d Cir. 2020)

(measuring share of pharmaceutical market by pharmaceutical sales), *cert. denied*, 141 S. Ct.

2838 (2021); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 130,

140 (D.D.C. 2018) (measuring share of market for specialty-film exhibition by number of screens

showing specialty films); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926,

959 (D. Or. 2018) (measuring share of market for online college application services by number

of college applications processed online).

The FTC gets nowhere by invoking (at 5) the truism that "output- or consumption-based

metrics" can measure market share. Of course they can, *if* the metrics measure output in the

relevant market. *Cf. Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 244, 249

(1959) (measuring share of market for boxing contests by number of boxing contests);

*Morgenstern v. Wilson*, 29 F.3d 1291, 1296 & n.3 (8th Cir. 1994) (measuring share of market

for cardiac surgery by number of cardiac surgery patients); *BRFHH Shreveport, LLC v. Willis*

*Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 611-12 (W.D. La. 2016) (measuring share of market

for area hospitals by hospital admissions). But the FTC does not (and cannot) allege any facts

amounting to a plausible measure of *PSNS* output or consumption, making the cases it cites (at 5)

irrelevant; each shows only what the FTC lacks.

The FTC observes (at 5, 8) that market participants use Comscore data, but Comscore

itself disclaims the "accuracy or completeness" of the data "used in association with [the FTC's]

analysis." AC ¶ 182 n.1. It demonstrably *cannot* be used to measure PSNS usage or relative

PSNS usage. There is not one pleaded fact regarding market participants' assessment of PSNS

usage, any data supposedly tracking such usage, or any facts suggesting a plausible way to

measure that usage.

Accordingly, data reflecting overall time spent (as well as the previously rejected DAU

and MAU figures, *see* Op. 29) simply do not help the agency. Courts have repeatedly rejected

the use of data from a concededly broader market (here, overall time spent online) to establish share in a subsumed alleged relevant market (PSN services). *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (rejecting use of data from the "petroleum industry" to allege power in the "gasoline franchise market"); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 483-84 (S.D.N.Y. 2016) (rejecting use of data from the "spread market as a whole" to allege power in the lesser-included "silver futures spread market"); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) (rejecting use of data calculating management of "*all* boxers" to allege power in the market for management of "Championship-Caliber Boxers"); *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (rejecting use of data from the "Orthopedic Trauma space" to allege power in the "subset" orthopedic-device market); *Marchese v. Cablevision Sys. Corp.*, 2011 WL 3022529, at *4 (D.N.J. July 21, 2011) (rejecting use of data calculating share of "packages that include – but are not limited to – the relevant product").

The FTC relies (at 5-6) on *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32-33 (N.D. Cal. Jan. 8, 2014), which found only that an industry publication's reporting of consumers' adoption of "ratings and reviews platforms" could provide a basis for asserting share in *that* "ratings and reviews platform" market. Here, it is "as if [the FTC] had adequately alleged a product market consisting of orange juice, but relied on the defendant's position in the overall beverage industry as evidence of market power." *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011) (granting motion to dismiss), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016).

   **2.**     Lacking facts, the FTC argues (at 6-7) that the Court can *assume* that at least 50% of time spent on Facebook is PSNS usage because "sharing with friends and family" is important to Facebook. AC ¶ 177; *see also id.* ¶ 202. No facts support this conclusory leap. *See Twombly*,

6

550 U.S. at 555.  The FTC directs the Court (at 6) to paragraph 178, which alleges only that Facebook is "about real connections to actual friends" and "focused on . . . helping you connect" with friends and family.  AC ¶ 178; *cf. id.* ¶ 177 (alleging nothing about PSNS usage on Facebook).  These unquantified comments say *nothing* about PSNS or how consumers use Facebook, let alone how much time on Facebook is PSNS time.  *See* FB Br. 11-12.  As to Instagram, the AC is entirely silent with respect to the supposed primacy of PSNS usage. *Cf.* AC ¶ 179 (alleging no facts – *none* – regarding how consumers use Instagram).

The only AC allegation (at ¶ 178) about user behavior is a snapshot 2018 survey that includes among the "top uses" of Facebook following "people I care about" – a category both potentially broader than friends and family (*e.g.*, celebrities and professional acquaintances, *see* AC ¶¶ 173, 175 (excluding such connections from PSNS)) and potentially narrower than friends and family that qualify as PSNS connections (*e.g.*, immediate family members the user did not need Facebook to "find," *see id.* ¶¶ 169, 172 (explaining that this is not PSNS)).  Thus, "people I care about" does not map to PSNS at all.  And identifying one activity as a "top use" in 2018 does not permit *any* quantification, much less a plausible inference that time spent on that activity constituted 50% of the total (or any other figure) in 2018 or at any other time.

The FTC is therefore left with a naked and admitted assumption that at least "half" of all Facebook and Instagram time is PSNS, which is supposedly "favorable to Facebook" because the agency could have guessed higher.  Opp'n 6-7 (emphases omitted).  Labeling this assumption a concession in Facebook's favor is a head-scratcher:  the AC provides no plausible basis for predicting *any* PSNS share – 50% or otherwise.  Assuming the conclusion the agency wants to reach about consumer usage – that enough Facebook and Instagram time is PSNS to reach the necessary share threshold – is no better than nakedly asserting that Facebook's market share is "in excess of 60%."  Op. 28.

The FTC's admitted ignorance about the usage underlying the Comscore time-spent figures is likewise fatal to its insistence that, for the denominator of its share calculation, only Facebook, Instagram, and Snapchat matter. *Cf.* Opp'n 6 (seeking credit for MeWe and defunct services). There is no dispute that many other services offer PSNS; the FTC's only basis for excluding them is the assertion that PSNS usage is not "primary" on those services. *See* AC ¶¶ 172-176 (asserting that other services are not "primarily" PSNS, not that they lack PSNS features). But without any way to measure PSNS usage on *any* service, the FTC has no factual basis for excluding PSNS usage on other services from the denominator of its share calculation. Its market-share numbers do no more than put a patina of spurious precision on market-share assertions that are as circular and conclusory as those of the initial complaint.

**3.**     The FTC's dodge (at 8) that "[a]ny disputes" over its share allegations are not "properly addressed" on the pleadings, but are for "expert reports" and "trial," flouts the agency's pleading burden and misstates the law – as this Court and many others have recognized. *See* Op. 27-32. The FTC's "unusual, nonintuitive product market," Op. 32 – born of litigation imperatives, not commercial realities – cannot proceed without "robust" and plausible "market-share showings," Op. 27. This is not, as the FTC asserts (at 8-9), a demand for "perfect" market-share data or more than the "close approximation" some cases require. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 256-57 (D.D.C.) (cited by FTC; "approximate" number of insured enrollees provided basis for share of alleged market for health insurance), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (cited by FTC; permitting number of digital do-it-yourself federal tax filings to "approximate[]" share of alleged market for digital do-it-yourself tax software). It is a demand for *facts* making out a plausible claim that Facebook has a monopoly share in the alleged PSNS market.

The problem is of the FTC's own making.  Having alleged a "market" that defies commercial reality and excludes obvious competitors, the FTC cannot allege market shares because people's activities – sharing video content with family with whom a user is also connected on iMessage; discussing plans for a weekend jog with a group of area runners; posting an article of professional interest; and much more – cannot objectively be slotted into PSNS market-share calculations or excluded from other categories (*e.g.*, messaging or interest-based sharing).  *See* AC ¶¶ 172-175.  Nor can the FTC parse out time spent on feeds, when, in one session on News Feed, a user might scroll past a picture of a family friend (possibly PSNS), read a news story (perhaps interest sharing), see an influencer's short video (allegedly content broadcasting), and watch a clip from a comedy special (what the FTC calls passive video).  *See* Op. 30.  Assumptions *cannot* be credited on a motion to dismiss.  *See* FB Br. 10-11.  But even if they could, it is implausible here to assume "arguendo" high levels of PSNS usage as a sufficient basis for the FTC's predetermined conclusion that Facebook must be a monopolist.

This is not nitpicking or contesting the alleged facts.  Whether Facebook has monopoly power to raise price or restrict output – or faces fierce competition for everything people can do on its services – lies at the core of this case.  *See* Op. 31-32.  The agency had ample opportunity over the course of a long investigation to develop the facts, aided by access to millions of Facebook's documents, dozens of depositions, and an untold amount of third-party data.  The Court told the agency, if it could, to come back with those facts to support a claim that Facebook had and has a monopoly-level share of the alleged PSNS market.  *See* Op. 29-32.  The agency has not done so because it cannot do so.

### B.    The FTC's Allegations Undermine Its Claim of Barriers to Entry

**1.**    A high share is not enough to demonstrate power – "barriers to entry" must also protect the alleged monopolist.  *See* Op. 18.  But as Facebook showed (at 13-16), the FTC

alleged two facts central to its liability theory that preclude any claim of entry barriers:  first,

non-PSN services can and do build networks of tens or even hundreds of millions of users,

*see* AC ¶¶ 113-114, 173-176; and, second, these non-PSNS networks are Facebook's "most

significant competitive threats" because a non-PSNS can add PSNS features after establishing

a network outside the PSNS market, *see id.* ¶¶ 66, 108, 113.

The FTC's reliance (at ¶¶ 212-216) on labels like "network effects" hardly suffices

because the AC expressly alleges that firms *can* contest Facebook's alleged market position by

establishing large networks outside the alleged PSNS market and then adding PSNS features.

That claim underlies the FTC's pleaded theories of exclusionary conduct.  *See id.* ¶¶ 66, 68-69,

71, 74 (acquisitions); *see also id.* ¶¶ 130, 157-158 (Platform).  The FTC's argument (at 10) that

some "well-financed firms" have not succeeded in PSNS proves only that those firms were not

successful starting with PSNS features; it says nothing about any supposed "barriers" that

prevent non-PSN services from competing by adding those features to an established network

with millions of users who are already using that service.

Other firms could and did succeed in this way.  The FTC alleges (at ¶¶ 184-185) that

Snapchat developed a differentiated social mechanic – "ephemeral" messaging – after which it

"added" PSNS features and built a network of "about 75 million people."  *See United States v.

Syufy Enters.*, 903 F.2d 659, 671 n.21 (9th Cir. 1990) ("the government cannot prevail on its

claim of monopolization under Section 2" where there has been actual entry); *Ball Mem'l

Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335-36 (7th Cir. 1986) (similar); *PNY

Techs., Inc. v. SanDisk Corp.*, 2012 WL 1380271, at *10 (N.D. Cal. Apr. 20, 2012) (dismissing

monopolization claim because "the evidentiary facts, which are pled – that existing competitors

increased output in the short run in response to a price increase – contradict [plaintiff's]

conclusion"); *see also* FB Br. 14-15 (discussing allegations regarding Instagram and WhatsApp).

The pleaded facts about Snapchat are vastly different from the agency's examples (at 10) where there was no significant entry. *Cf. Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440-41 (9th Cir. 1995) (concerning "*de minimis*" entry of "two gasoline stations" compared to the defendant's 53, yet still finding no market power for Sherman Act claim because "competitors have expanded output"); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 971-72 (10th Cir. 1990) (insurer protected by "unique" right, which small rivals lacked, "to contract directly with hospitals").  Though the FTC argues (at 11) and the AC alleges (at ¶ 91) that there are "finite" social mechanics, it does not allege whether "finite" means 5, 50, or 500.  The FTC's theory of the case is that this kind of entry was possible (AC ¶ 107), was the biggest threat to Facebook (*id.* ¶ 66), spurred it to compete (*id.* ¶¶ 108-111), and in fact occurred (*id.* ¶¶ 184-185).

The agency has pleaded itself out of court:  there are no alleged barriers impeding the mode of entry the FTC claims matters most to competition.  *See Dominick v. Collectors Universe, Inc.*, 2012 WL 6618616, at *5-6 (C.D. Cal. Dec. 18, 2012) (dismissing Section 2 claim because alleged barriers were "not relevant to entry" and plaintiffs "fail[ed] to explain" why existing firm "could not begin [competing] with relative ease"); *see also Ervin Equip. Inc. v. Wabash Nat'l Corp.*, 2017 WL 416304, at *5 (N.D. Ind. Jan. 31, 2017) (granting motion to dismiss).

**2.** Contrary to the FTC's argument (at 11), *Microsoft* does not support its claim that barriers exist here.  The government there showed that the dearth of applications running on competing operating systems – referred to as the "applications barrier to entry" – protected Microsoft's Windows monopoly.  *United States v. Microsoft Corp.*, 253 F.3d 34, 55-56 (D.C. Cir. 2001) (en banc) (per curiam).  Elimination of middleware mattered not because independent middleware firms were actual (or even potential) operating systems, but because middleware, by creating a bridge between different operating systems and the applications running on them, could lower the applications barrier to entry.  *See id.* at 55.  Microsoft, as a 95% operating

system monopolist, had (and exercised) the ability to prevent middleware firms from becoming established and building that bridge.  *See id.* at 56; *see also id.* at 60-62.  The FTC makes no comparable allegations that Facebook had or has the power to impede potential entrants.  It cannot make such an allegation because, if there were actually "entry barriers" preventing established non-PSNS networks from adding PSNS features, that would undermine the FTC's theory of exclusionary conduct, *e.g.*, WhatsApp could not have been a nascent threat eliminated by acquisition if it was unable to add PSNS features and become a significant PSNS competitor.

C.    **The FTC Still Has No Facts To Support Its "Rare" Direct-Evidence Theory**

1.    Facebook makes its services available in unlimited quantities and at no cost; the price is not "nominally" zero, Opp'n 14, it *is* zero – the services are free.  Even by the FTC's own flawed measures, output has exploded since 2011.  Those allegations foreclose a finding of "direct evidence" of monopoly power.  *See Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925, at *95 (N.D. Cal. Sept. 10, 2021) (rejecting Section 2 claim where "output has increased"), *appeals pending*, Nos. 21-16506 & 21-16695 (9th Cir.).

The FTC's theory (at 12) that unquantified claims of "reduced quality" can establish direct evidence of power finds no support in law:  every case the FTC cites (at 12, 14) entailed a price increase above competitive levels.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007) ("supracompetitive prices"); *Byars v. Bluff City News Co.*, 609 F.2d 843, 853 n.26 (6th Cir. 1979) ("inferior service at greater cost"); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) ("supracompetitive prices").  Nor does the FTC support this theory with any plausible factual allegation that Facebook reduced *net* PSNS quality, of which privacy is perhaps one but certainly not the only part.  *See* FB Br. 17-18.

The FTC (at 14) misstates the legal standard:  a direct-evidence claim requires facts showing price increases above or output restricted below "*the competitive level*."  *Microsoft*,

253 F.3d at 51 (emphasis added).  The FTC cites no court that has ever accepted supposed quality

declines, standing alone, as direct evidence of monopoly power – but were a court to entertain

such a claim, it would necessarily have to hold that claim to the same competitive benchmarking.

Changes in price, output, or quality, untethered from an established competitive baseline, prove

nothing about power because such changes can and do occur in fully competitive markets.

2. The FTC's argument (at 12-13) that Facebook's supposed ability to impede

competitors supports a claim of monopoly power relies on inapposite cases in which large-

share firms forced consumers, dealers, or manufacturers to refrain from using competitive

alternatives.  *Cf. United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188, 190 (3d Cir. 2005)

(defendant had share of "between 75% and 80% on a revenue basis" and "required" dealers to

carry only monopoly manufacturer's product); *United States v. Microsoft Corp.*, 84 F. Supp. 2d

9, 19 (D.D.C. 1999) (defendant had 95% share and imposed restrictions on OEMs' and app

developers' dealings with competitors); *Minn. Made Hockey, Inc. v. Minn. Hockey, Inc.*, 789 F.

Supp. 2d 1133, 1146 (D. Minn. 2011) ("the rule explicitly states that players may not play in

outside leagues").  The AC alleges nothing similar.  The FTC instead acknowledges (at 8) that

Facebook users are free to use and do use other services.  Any supposed leverage that Facebook

had over developers is irrelevant as the FTC does not allege any developer-side market.  And,

as this Court recognized in dismissing the FTC's Platform claims before, *see* Op. 49-50, the

FTC cannot allege that Facebook required any developer to forgo dealing with other distribution

platforms as a condition of access to Facebook's Platform.  *See also infra* pp. 21-22.

3. The FTC again argues (at 13, 15) that Facebook's revenues from its advertising

business show power, but this Court already correctly rejected this argument:  advertising

revenues "cannot be the right metric . . . , as those revenues are all earned in a separate market."

Op. 29.  In any event, the FTC does not even allege that Facebook's profits in this different

13

market exceed competitive levels, as was true in the cases the FTC cites (at 13-14).  *Cf. FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("higher-than-competitive profits"); *Broadcom*, 501 F.3d at 307 ("direct evidence" only where there was a showing of "supracompetitive prices and restricted output"); *Nexium*, 968 F. Supp. 2d at 389 (same).

## II.    THE FTC HAS NOT PLAUSIBLY ALLEGED EXCLUSIONARY CONDUCT

### A.    The FTC Fails To Allege Facts Stating a Plausible Acquisition Claim

It is not unlawful to be a monopolist; it is unlawful to *maintain* a monopoly through anticompetitive "exclusionary conduct."  The FTC's primary claim is that two prior acquisitions it reviewed and cleared were exclusionary.  The sum total of the allegations supporting the agency's unprecedented and belated challenge is that the transactions eliminated one "nascent" competitor (of many) and one potential competitor (of many more).  The agency argues that no more need be alleged for its monopoly-maintenance claim.  But no court has ever accepted the sweeping proposition that all horizontal acquisitions by an alleged monopolist – much less acquisitions of potential competitors – are unlawful under Section 2; many courts have rejected claims that such acquisitions are inherently exclusionary.  What is missing from the AC is what *every* Section 2 claimant must allege to state a claim:  factual allegations amounting to a plausible claim that the transactions harmed consumers.  *See Microsoft*, 253 F.3d at 58.  The AC is silent on that indispensable element.

**1.**    To support its argument that any acquisition of a competitor or potential competitor by an alleged monopolist necessarily constitutes unlawful monopolization, the agency cites (at 16, 19) only two hoary Section 2 cases involving acquisitions – neither of which provides any support.  In *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966), the defendant engaged in a coordinated scheme involving not only acquisitions but also restrictive agreements and pricing practices to maintain a market-allocation conspiracy and thereby impose

14

higher prices, harming consumers.  And in *Standard Oil Co. v. United States*, 221 U.S. 1, 32-33 (1911), the defendant bought every competing refinery and shut down several to "limit production" and drive up prices, harming consumers.  The FTC's marquee modern authority, *Impax Laboratories, Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021), *petition for cert. pending*, No. 21-406 (U.S. Sept. 10, 2021), has nothing to do with acquisitions.  The case involved a reverse-payment settlement that kept generic drug competition off the market, which allowed Impax to continue selling its branded drug at "supracompetitive prices" – "the very anticompetitive consequence that underlies the claim of antitrust unlawfulness."  *Id.* at 496 (internal quotation marks omitted).

No case supports a blanket rule of illegality for horizontal acquisitions by an alleged monopolist.  As one FTC Commissioner has acknowledged, the overwhelming majority of acquisitions present no competitive concern because many are *beneficial* and procompetitive. *See* Hansen Decl. Ex. D at 4, ECF No. 83-6 (Statement of Commissioner Wilson).  In the absence of facts plausibly showing that the acquisition harmed consumers, courts have rejected claims of exclusionary conduct under Section 2.  *See Syufy*, 903 F.2d at 668-69 (rejecting Section 2 acquisition challenge as a matter of law); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271-72 (7th Cir. 1981) (acquisitions "are not generally considered predatory and are therefore rarely condemned"); *see also United States v. Columbia Steel Co.*, 334 U.S. 495, 527-29 (1948) (rejecting Section 2 acquisition challenge that failed to show harm to consumers); *cf. Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002-03 (N.D. Cal. 2020) (dismissing Section 2 challenge to the Instagram and WhatsApp acquisitions).

**2.**     Without case support, the FTC relies on three arguments; each contradicts governing Circuit precedent.

*First*, the agency cobbles together generic statements about acquisitions to assert (at 16-17) that, whenever a monopolist eliminates an independent rival by acquisition, it is necessarily

exclusionary conduct, even in the absence of consumer harm.  But that ignores the settled law applicable to every claim of exclusionary conduct.  "'[T]o be condemned as exclusionary, a monopolist's act must have "*anticompetitive effect*."'"  *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (quoting *Microsoft*, 253 F.3d at 58) (emphasis added).  The italicized phrase has a specific meaning:  conduct cannot be condemned as anticompetitive unless it "'*thereby* harm[s] consumers.'"  *Id.* (quoting *Microsoft*, 253 F.3d at 58) (emphasis added).  The effect on rivals is not what matters, because – as is well understood – much conduct that benefits consumers is hardest on competitors.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010).  Harm to consumers is what distinguishes anticompetitive conduct from conduct that lawfully challenges competitors to do better.

Rather than allege the acquisitions here harmed consumers, the FTC contends (at 17) that the "loss of alternative suppliers" meant a "loss of a competitive check" and "loss of sources of innovation and competitive decision-making" – but this is mere tautology.  Any horizontal acquisition reduces the number of competitors, but that does not mean that every horizontal acquisition harms consumers.  The FTC must do more than speculate that such a reduction might someday cause harm.  *See Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("[T]he mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality.") (citation omitted).  "[P]laintiffs cannot rely on the fact of the acquisitions alone"; they "must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition." *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26,

2016) (granting motion to dismiss Section 2 acquisition challenge where plaintiffs failed "to plausibly allege any specific anticompetitive effects"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).

But, instead, the AC affirmatively acknowledges that consumers *benefited* from a massive increase in output.  The AC depends on the allegation that Facebook's expansion of both Instagram and WhatsApp created a "protective 'moat'" (AC ¶ 105) that made it harder for rivals to compete *because* Facebook operated these services at "scale" and made them attractive to consumers post-acquisition.  *See* FB Br. 29-31.  The FTC does not allege facts that, left on their own, Instagram and WhatsApp would be less expensive (both are free; Facebook *made* WhatsApp free); or that output would have been greater (their dramatic expansion at "scale" is the linchpin of the FTC's "moat" theory); or that the products would be better in any specific way.  After *Twombly*, speculation is not enough.  *See id.* at 26-29.  And the FTC does not even contend that it has so speculated.  It argues instead (at 18) that it need not allege the requisite facts (or even speculate) and that Facebook is prematurely contesting efficiencies.  That is mere deflection:  the FTC's failure to allege facts supporting a plausible claim that the acquisitions harmed consumers is a fatal pleading defect that compels dismissal as a matter of law.

*Second*, the agency misreads *Microsoft* (at 18-20) – a case that says nothing about acquisitions.  Microsoft's undisputed operating systems monopoly gave it the power to foreclose rivals' access to equipment manufacturers and other forms of distribution, which it used to exclude middleware threats.  *See Microsoft*, 253 F.3d at 79.  This conduct decreased output and eliminated the threat that the district court found middleware posed.  *See id*.  The government acknowledged and carried its "burden of pro[ving] . . . that the monopolist's conduct" was "undesirable" – *i.e.*, that it "ha[d] the requisite anticompetitive effect."  *Id.* at 58-59, 79.  Only after the government had borne that burden did the court apply a less exacting standard of causation as to whether middleware would have led to the development of full-fledged operating

17

system competitors.  *See* Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper Series, No. 20-14, at 2 (May 2020) (in *Microsoft*, "[o]nly after finding that each type of conduct indeed had an anticompetitive effect did the court turn to the separate and distinct question of causation"). The FTC cannot leapfrog its burden by pointing to the less exacting standard for causation that is available only *after* establishing exclusionary conduct.  *Microsoft* thus forecloses, rather than supports, the FTC's claim that it need not plead facts showing that the challenged acquisitions, like the exclusionary conduct in *Microsoft*, harmed consumers.

 *Third*, the agency seeks to change the law by arguing (at 20) that the Court should – for the first time – create a lower standard of illegality for acquisitions under Section 2 of the Sherman Act than the standard Congress specifically enacted in Section 7 of the Clayton Act, the statute under which both transactions here were cleared.  But Congress designed Section 7 as a prophylactic – a *lower* bar to address acquisitions that *could not* be condemned under Section 2. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 989-90 (D.C. Cir. 1990) (Thomas, J.).  That is why the FTC's own prior review weighs so heavily against the plausibility of the FTC's claims now:  if the acquisitions had posed a threat of harm to consumers, the agency would not have voted 5-0 to clear the Instagram transaction or allowed the WhatsApp acquisition to proceed.  *See* FB Br. 20-22.

 The agency has a theory that it would *like* to enshrine in law:  a "potential competitor" standard that would, if accepted, proscribe acquisitions of firms that *might* become significant competitors – without any showing of harm.  *See* Opp'n 19-20.  The FTC cites no authority that supports this theory.  Moreover, as Facebook showed (at 23-25), the agency cannot even allege facts that would satisfy the formulation of its own theory (which it previously offered only under

Section 7).  *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763-64 (9th Cir. 2018) (affirming grant of motion to dismiss "speculative" Section 7 claim).  Although the FTC denies (at 21) that it is proposing a "strict liability" standard, it offers no limiting principle:  if the acquisition of WhatsApp – a messaging app not even alleged to have been considering PSNS features (*see* FB Br. 24) – is unlawful exclusionary conduct, then virtually every acquisition by an alleged monopolist must also be unlawful.

> **3.**     As to Facebook's "other acquisitions," Facebook argued (at 31-32) that the FTC had not alleged that any were anticompetitive, and the agency concedes (at 21-22) the point.

> **B.    The FTC's Attempt To Revive Dismissed and Defective Platform Allegations Fails as a Matter of Law**

This Court held that (1) Facebook's terminated Platform policies were lawful; (2) allegations regarding implementation of those policies years ago could not support injunctive relief; and (3) the FTC's attempt to salvage its Platform allegations by calling them "conditional dealing" violations failed to state a claim.  *See* Op. 32-50.  The FTC's opposition largely repeats rejected arguments, hardly bothering to address this Court's prior decision.

> **1.**     Facebook's long-past API restrictions "cannot be the basis for an injunction under Section 13(b)."  Op. 50.  The FTC ignores this determination and argues (at 36-40) that the Court may not narrow the case because Facebook allegedly still possesses a monopoly (even if it is not doing anything unlawful to maintain it) or alternatively because *other* alleged conduct (the acquisitions of Instagram and WhatsApp) might still be actionable.  That makes no sense and is supported by no authority.  Courts are not obligated to allow parties to pursue claims that fail as a matter of law in whole or part; they routinely narrow cases at the pleading stage as this Court did.  *See* Op. 50; *see also*, *e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672, 677-78 (D.C. Cir. 2005) (affirming dismissal of all but one theory of liability) (cited at Opp'n 32, 34);

*AbbVie*, 976 F.3d at 374 (affirming dismissal of sham-litigation theory but reversing dismissal of unlawful reverse-payments theory, where both allegedly supported single "course of anticompetitive conduct" claim under Section 13(b)).

The cases the FTC cites (at 37-38) do not permit invalid claims, either where the defendant is an alleged monopolist or where *other* conduct might be actionable.  The proposition the FTC quotes (at 37) from *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1148 (D.C. Cir. 2009) – that "[t]he condition of monopolization is itself" a "continuing violation" – is stray dicta from a RICO case that refers to DOJ's Section 4 enforcement authority, not the FTC's Section 13(b) authority.  Furthermore, the FTC's reading of that case contradicts clear Supreme Court law.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power . . . is not only not unlawful; it is an important element of the free-market system.").  In *FTC v. Vyera Pharmaceuticals, LLC*, 479 F. Supp. 3d 31, 44 (S.D.N.Y. 2020), the court permitted an exclusive-dealing claim brought under Section 13(b) where the contested contracts remained in effect – and therefore could be enjoined – at the time of suit.  This Court correctly rejected the FTC's inapposite argument (at 38-40) that a lawful and past refusal to deal becomes actionable just because the plaintiff says it should be "[c]onsidered as a [w]hole" with other conduct.  *See* Op. 40-41; *New York v. Facebook, Inc.*, --- F. Supp. 3d ---, 2021 WL 2643724, at *27-28 (D.D.C. June 28, 2021), *appeal pending*, No. 21-7078 (D.C. Cir.).

The FTC alternatively argues (at 40-42) that Facebook's challenged API restrictions are likely to recur – the same argument this Court rejected before.  Nothing in the AC comes close to alleging the facts necessary to support the claim, *i.e.*, that Facebook will imminently establish a profitable course of dealing with a rival, involving a product that Facebook already sells to retail customers, and then scuttle that arrangement in a manner that shows irrational and predatory

profit sacrifice.  *See* Op. 38-39; *see also New York*, 2021 WL 2643724, at \*12, \*14.  Contrary to

the FTC's assertion (at 41), it is irrelevant whether Facebook has "acknowledged culpability" or

made "sincere assurances" as to concededly past conduct.  The AC acknowledges (at ¶ 150) that

Facebook ended these (lawful) policies, and, after an extensive investigation, the FTC has made

no allegation that Facebook has contemplated reviving them, much less plotted to engage in

conduct that might actually violate the law.

> **2.**      The Court gave careful consideration to the FTC's arguments about the Platform

policies and rejected them.  The FTC claims (at 35-36) that the law-of-the-case doctrine does

not bar relitigation because the Court's express rejection was mere dicta.  But the FTC offers no

substantive reason to depart from the commonsense principle that the doctrine embodies:  that the

same issue presented in the same case should lead to the same result.  *See LaShawn A. v. Barry*,

87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc); *Berryman-Turner v. Dist. of Columbia*, 233 F.

Supp. 3d 26, 35-36 (D.D.C. 2017), *aff'd*, 720 F. App'x 1 (D.C. Cir. 2018) (per curiam).  The

AC has no new factual allegations that satisfy the standards this Court set out for refusal-to-deal

or conditional-dealing claims, and the FTC's gesture (at 35-36) towards rephrased factual

allegations makes no attempt to explain why any new allegations move the needle.

> Law of the case aside, the FTC's lengthy overview (at 22-31) of Section 2 law never

confronts this Court's prior decisions or the doctrines that actually control.  Once again, the FTC

cites only irrelevant tying, exclusive-dealing, and Section 1 cases.  As *Trinko* and this Court

held, "overriding considerations of antitrust policy" allow even dominant firms to decline to help

rivals and to set terms of dealing, short of interfering with rivals' independent dealings with third

parties.  Op. 35; *see also* Op. 46.  The FTC's renewed attempt (at 28-31) to reframe Facebook's

API policies as "agreements" rather than refusals to deal runs squarely into this Court's sound

conclusion that "such refusals can always be reframed as offers to deal only on the condition that

the third party refrains from competing."  Op. 46.  This Court correctly determined that refusal-to-deal law applies – and precludes the FTC's API-restriction theory – because Facebook's alleged conduct did *not* limit opportunities for rivals to deal with third parties, but rather limited only what rivals could do with Facebook's proprietary APIs.  *See* Op. 49-50.  The FTC does not argue that the Court misapprehended any of its allegations in ruling against it before.

Finally, the FTC recycles (at 31-35) rejected arguments that its allegations satisfy refusal-to-deal standards.  Again the FTC asserts (at 32) that evidence of "anticompetitive motivation" alone is sufficient.  It is not.  *See* Op. 37.  Again it argues (at 33 & n.1) that Facebook generally "sacrificed" some "benefits" when it restricted API access, but it never argues (and indeed claims it need not show) that any particular API restriction caused "short-term profit loss" where predatory sacrifice was the sole "conceivable rationale."  Op. 41.  The FTC's attempts (at 33-34) to distinguish *Trinko* and invoke *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), are unavailing in light of *Trinko*'s rule that refusals to aid rivals are permissible even when driven "by a desire 'to limit entry.'"  Op. 39 (quoting *Trinko*, 540 U.S. at 407).  While the FTC asserts (at 34-35) that Facebook's conduct is "problematic," it does not seriously contend that the AC meets the standards this Court articulated for an antitrust claim premised on a refusal to deal.

## III.   THE FTC'S DEFECTIVE VOTE PURPORTING TO AUTHORIZE THE AC ALSO REQUIRES DISMISSAL

The FTC does not dispute that (1) the AC is not properly before this Court unless its filing was authorized by a valid Commission vote, (2) this Court has the power to dismiss the AC if the vote was tainted, and (3) before its vote, the FTC did not consider the merits of Facebook's Recusal Petition or address the requirements of due process and federal ethics rules despite evidence of the Chair's prejudgment.  Dismissal is thus required.

1.      The FTC conspicuously declines to contest that Chair Khan prejudged this case. Its contention (at 43-44) that there are virtually no constitutional limits on a Commissioner's partiality when acting as a prosecutor fails for two reasons.  *First*, Commissioners – especially the Chair – are not ordinary prosecutors.  The structure of the FTC, which is unique among federal agencies, requires Commissioners to play the roles of policymaker, investigator, prosecutor, and judge, and gives them the power to decide whether to bring enforcement actions administratively or in federal court.  Those simultaneous and overlapping roles heighten their obligation to appear impartial and recuse themselves where a disinterested observer would conclude they have prejudged a specific case.  *See* Rodriguez Decl. 17-22, ECF No. 83-4; FB Br. 43.  The D.C. Circuit has recognized, in a case on which the FTC relies (at 43-44), that, even in the context of a rulemaking – where the FTC engages in "pure policy" and any fact-finding is "ordinarily general, without reference to specific parties" – Commissioners can be "disqualified" for prejudgment when there is "clear and convincing" evidence that an "agency member has an unalterably closed mind on matters critical to the disposition of the [rulemaking] proceeding."  *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1154, 1161-62, 1170 (D.C. Cir. 1979).  Here, of course, the evidence of prejudgment is so clear and convincing that the FTC has chosen not even to contest it.

*Second*, *all* prosecutors have an obligation to approach their work in an "impartial and disinterested" manner.  *New Jersey v. Imperiale*, 773 F. Supp. 747, 750 (D.N.J. 1991); *see* FB Br. 43 & n.3 (collecting authority); Rodriguez Decl. 9-16 (same).  Due process demands a "fair minded exercise of the prosecutor's discretion" in deciding whether to bring a case, *Ganger v. Peyton*, 379 F.2d 709, 712 (4th Cir. 1967), and a prosecutor who has no "personal interest or stake in the [proceeding's] outcome," *Imperiale*, 773 F. Supp. at 750.  Chair Khan's authorship of a congressional report condemning Facebook as an antitrust violator and her numerous public

statements disparaging Facebook, *see* Rodriguez Decl. at Ex. B, indicate a reputational stake in the outcome and a lack of fairmindedness inconsistent with due process.

*Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984), does not support the FTC.  The Second Circuit explained that prosecutors have an obligation to be "disinterested" and must not have "an axe to grind against the defendant" or other interests that create a "reasonable potential for prejudice." *Id*. at 1056 (citation omitted).  While the bias in *Wright* did not justify granting post-conviction relief, the court underscored that dismissal of the indictment might well have been required had the issue been raised earlier.  *See id*. at 1056 & n.8.  This is because "the degree of prosecutorial misconduct of the sort here in question and the degree of prejudice to the defendant necessary to justify action by a reviewing court steadily increase as the case goes forward, with the least being required on a motion to disqualify" at the outset.  *Id*.  Facebook filed its Recusal Petition well in advance of the Commission's vote.

**2.**      The FTC admits (at 44) that a Commissioner should be recused from voting on the filing of a federal court complaint if required by "federal law and ethics" or if the Commissioner "harbored personal animosity" against the defendant.  Yet the FTC has a policy of rejecting *any* petition seeking a Commissioner's recusal from a vote on a federal court complaint, and it does not even consider federal law, ethics, or a Commissioner's "personal animosity" in that context.  The FTC's claim (at 44) that Facebook never raised these grounds for recusal ignores Facebook's showing that Chair Khan's participation violated specific ethics rules, including 5 C.F.R. § 2635.501(a), which requires Commissioners "to avoid an appearance of loss of impartiality in the performance of [their] official duties."  *See* FB Br. 43; Recusal Petition 25, ECF No. 83-3; Rodriguez Decl. 3, 10; *see also* 5 C.F.R. § 2635.101; 16 C.F.R. § 5.1.  It also ignores Facebook's showing that the Chair has made inflammatory statements that demonstrate her "broadly negative view of the company," including statements that Facebook is responsible for "a host of social

ills," such as "genocide in Myanmar" and "decreasing users' mental and physical health." *See* FB Br. 41; Recusal Petition 16; Rodriguez Decl. 30. The federal ethics rules and the Chair's incontestably negative view of the company are, therefore, independent bases for her recusal.

3.      The FTC argues (at 45) that the Court is powerless to require the FTC to address the merits of Facebook's Recusal Petition in the first instance. But the FTC cites no case so holding and makes no attempt to distinguish Judge Walton's decision in *Libbey*. *See* FB Br. 39, 44. The FTC's suggestion (at 45) that Facebook's exclusive remedy is to file a separate action for mandamus makes no sense; the agency notified Facebook that it had "rejected" the Recusal Petition roughly four hours *after* it filed the AC. *See* Hansen Decl. Ex. G, ECF No. 83-9. Facebook had no opportunity to challenge the Commission's vote via mandamus. In any case, even if mandamus had been available, it does not follow that this Court lacks power to require the agency to establish that it has satisfied the threshold requirements of Section 13(b) before allowing this case to proceed.

The constitutional and ethical violations do not end with the vote: as Facebook explained (at 44 n.4), given the Chair's authority to direct the actions of the FTC's staff, Chair Khan's failure to recuse herself is also an ongoing violation that will taint all of the agency's litigation choices in the event the case proceeds (as it should not).

## CONCLUSION

The Court should grant the motion and dismiss the FTC's case with prejudice.

Respectfully submitted,

December 1, 2021

/s/  Mark C. Hansen
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
Jared M. Beim (D.C. Bar No. 1723465)
Hannah D. Carlin (D.C. Bar No. 1719743)*
L. Vivian Dong (D.C. Bar No. 1722506)
Kimberly V. Hamlett (D.C. Bar No. 1722207)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kelloghansen.com

*Counsel for Defendant Facebook, Inc.*

* Application for Admission to the Bar of the U.S.
District Court for the District of Columbia Pending

26