## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

       v.

**FACEBOOK, INC.,**

    **Defendant.**

</td><td>

**Civil Action No. 20-3590 (JEB)**

</td></tr>
</table>

### MEMORANDUM OPINION

Second time lucky?  The Federal Trade Commission's first antitrust suit against Facebook, Inc. stumbled out of the starting blocks, as this Court dismissed the Complaint last June.  In doing so, the Court concluded that the Commission had failed to plausibly allege "that Facebook has monopoly power in the market for Personal Social Networking (PSN) services." FTC v. Facebook, Inc., 2021 WL 2643627, at *1–2 (D.D.C. June 28, 2021).  Because that "defect could conceivably be overcome by re-pleading," however, the Court left the door ajar for the agency to amend the Complaint and reinstate its suit.  Id. at *1.

Eagerly accepting such invitation, the FTC has filed an Amended Complaint containing significant additions and revisions aimed at addressing the shortcomings identified in the Court's prior Opinion.  The core theory of the lawsuit remains essentially unchanged.  The Commission continues to allege that Facebook has long had a monopoly in the market for PSN services and that it has unlawfully maintained that monopoly via two types of actions: first, by acquiring competitors and potential competitors — most notably, Instagram and WhatsApp — that it believed were well situated to eat into its monopoly; and second, by implementing and enforcing

1

policies that prevented interoperability between Facebook and other apps that it viewed as nascent threats.  The facts alleged this time around to fortify those theories, however, are far more robust and detailed than before, particularly in regard to the contours of Defendant's alleged monopoly.

Facebook nonetheless moves to dismiss once again, contending that the FTC's latest effort is akin to rearranging the deck chairs on the Titanic.  Although the agency may well face a tall task down the road in proving its allegations, the Court believes that it has now cleared the pleading bar and may proceed to discovery.  That holding flows from several conclusions.  First, the FTC has now alleged enough facts to plausibly establish that Facebook exercises monopoly power in the market for PSN services.  Second, it has adequately alleged that the company's dominant market share is protected by barriers to entry into that market.  Third, the agency has also explained that Facebook not only possesses monopoly power, but that it has willfully maintained that power through anticompetitive conduct — specifically, the acquisitions of Instagram and WhatsApp.  The Court will not, however, allow the allegations surrounding Facebook's interoperability policies (also known as the Platform policies) to move forward; they founder for the same fundamental reasons as explained before: Facebook abandoned the policies in 2018, and its last alleged enforcement was even further in the past.

Last, the company lets fly a new arrow this time around, urging dismissal on the independent basis that the FTC's vote authorizing the Amended Complaint was invalid because Chair Lina Khan's alleged prejudgment of Facebook's antitrust liability required her recusal. The Court believes that such contention misses its target, as Khan was acting in a prosecutorial capacity, as opposed to in a judicial role, in connection with the vote.

Ultimately, whether the FTC will be able to prove its case and prevail at summary judgment and trial is anyone's guess.  The Court declines to engage in such speculation and simply concludes that at this motion-to-dismiss stage, where the FTC's allegations are treated as true, the agency has stated a plausible claim for relief under Section 2 of the Sherman Act.  The Court, consequently, will deny Facebook's Motion.

## Table of Contents

I.    Background ................................................................................................................. 5

II.   Legal Standard ............................................................................................................ 7

III.  Analysis ...................................................................................................................... 8

  A.   Monopoly Power ....................................................................................................... 8

    1.    Market Definition ............................................................................................ 10

    2.    Market Share ................................................................................................... 13

    3.    Barriers to Entry ............................................................................................. 20

  B.   Anticompetitive Conduct ........................................................................................ 24

    1.    Count I ............................................................................................................ 25

      a.    Legal Framework ........................................................................................ 25

      b.    Application .................................................................................................. 26

      c.    Facebook's Counterarguments ................................................................... 30

    2.    Count II .......................................................................................................... 34

  C.   Recusal of Chair Khan ............................................................................................ 41

    1.    Chair Khan's Role .......................................................................................... 43

    2.    Other Ethical Issues ....................................................................................... 47

IV.   Conclusion ................................................................................................................ 48

## I.      Background

In its prior Opinions in this case and in a parallel antitrust suit filed by a number of

States, the Court described in detail the background of social networking, Facebook Blue — *i.e.*,

the product that "its millions of users think of when they think of 'Facebook,'" — the company's

acquisitions of Instagram and WhatsApp, and the history of Facebook Platform and the

company's interoperability policies.  See Facebook, 2021 WL 2643627, at *2–6; New York v.

Facebook, Inc. (New York), No. 20-3589, 2021 WL 2643724, at *2–6 (D.D.C. June 28, 2021).

The Court will spare the reader another factual recitation here and will instead confine this brief

background section to the case's procedural history.  As the critical question in this Motion is

whether the FTC's new allegations have filled the holes in its previous Complaint, that will be

the focus of the Court's analysis below.

The FTC filed this action on December 9, 2020, asserting one count of monopoly

maintenance under Section 2 of the Sherman Act.  See ECF No. 3 (Redacted Complaint),

¶¶ 169–74.  The suit was filed after three of the FTC's five Commissioners voted to authorize it.

See FTC, FTC Sues Facebook for Illegal Monopolization (Dec. 9, 2020), https://bit.ly/30Q3I8Y.

Chair Khan was not yet a Commissioner at the time.  Id.  As noted in the Court's previous

Opinions, although this FTC suit was initially assigned to Judge Christopher R. Cooper of this

district, he reassigned it to this Court, which was handling the earlier-filed and related State case.

See Facebook, 2021 WL 2643627, at *7; see also No. 20-3590, Minute Order of Jan. 12, 2021.

Facebook subsequently moved to dismiss both cases.  While the Court granted the dismissal of

the States' entire case, New York, 2021 WL 2643724, at *29, here it dismissed only the

Complaint, "leaving the agency the chance to replead if it believes it can successfully remedy the

infirmities described" in the Court's Opinion.  Facebook, 2021 WL 2643627, at *7.

Despite a change in leadership since the lawsuit was initially filed, the FTC took the Court up on its offer, filing an Amended Complaint in August 2021.  See ECF No. 76 (Amended Complaint filed under seal); ECF No. 82 (Redacted Am. Compl.).  (In this Opinion, the Court cites a copy of the Amended Complaint that has minor redactions to protect confidential business information.)  As with the initial Complaint, three of the five Commissioners voted to authorize the updated filing.  See FTC, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury Scheme to Crush Competition After String of Failed Attempts to Innovate (Aug. 19, 2021), https://bit.ly/3q8Ku76.  This time around, however, Chair Khan — who was appointed earlier in 2021 — was one of those three.  Id.; see also ECF No. 83-1 (Motion to Dismiss) at 5.

The Amended Complaint again alleges unlawful monopoly maintenance under Section 2 of the Sherman Act, although it now lists two counts.  See Redacted Am. Compl., ¶¶ 230–42. The allegations in the second count incorporate those in the first, while also alleging additional conduct.  Specifically, Count I alleges that "Facebook has willfully maintained its monopoly power through its course of anticompetitive conduct consisting of its anticompetitive acquisitions."  Id., ¶ 232.  Count II, meanwhile, alleges that "Facebook has willfully maintained its monopoly power through its course of conduct that includes both anticompetitive acquisitions and . . . maintaining and enforcing anticompetitive agreements relating to Facebook Platform to deter competitive threats to its personal social networking monopoly."  Id., ¶ 238 (emphasis added).  Plaintiff again invokes Section 13(b) of the FTC Act, id., ¶ 243, which authorizes the agency to seek an injunction against an entity that "is violating" or "is about to violate" the antitrust laws.  See 15 U.S.C. § 53(b).  The Government hopes to procure an injunction aimed at preventing the allegedly unlawful conduct in the future, as well as an order mandating "divestiture of assets, divestiture or reconstruction of businesses (including, but not limited to,

Instagram and/or WhatsApp), and such other relief sufficient to restore the competition that would exist absent the conduct alleged in the Complaint."  Redacted Am. Compl. at 79.

Believing the FTC's recent effort as flawed as its predecessor, Facebook has now moved to dismiss the Amended Complaint.

## II.    Legal Standard

Facebook relies on Federal Rule of Civil Procedure 12(b)(6), which permits dismissal of a complaint where it fails to state a claim upon which relief can be granted.  See MTD at 6.  In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  The court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint."  Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice."

Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.   Analysis

As set forth in the Court's prior Opinion, the offense of monopoly maintenance under Section 2 of the Sherman Act "has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (*en banc*) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)); see Facebook, 2021 WL 2643627, at *7. Facebook seeks dismissal on the ground that the FTC has not adequately pleaded either of those prerequisites.  Specifically, Defendant contends that, as before, the Commission has not alleged facts plausibly establishing monopoly power, see MTD at 6–20, and that the agency has also not adequately alleged legally cognizable exclusionary conduct. Id. at 20–38.  Separately, Facebook also urges the Court to conclude that the FTC's vote purporting to authorize the Amended Complaint was invalid because of Chair Khan's biased participation.  Id. at 38–45.  The Court examines each of those arguments in turn.

### A.   Monopoly Power

Consider first the threshold inquiry of a monopoly-maintenance claim: has the FTC plausibly alleged that Facebook has monopoly power in a relevant market?  "The Supreme Court defines monopoly power as 'the power to control prices or exclude competition.'" Microsoft, 253 F.3d at 51 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)).  In other words, "a firm is a monopolist if it can profitably raise prices substantially above the competitive level." Id. (citations omitted).  If a plaintiff can supply direct proof that a

"firm has in fact profitably done so, the existence of monopoly power is clear."  Id. (citations

omitted).  Because such "direct proof" is "rarely available," however, plaintiffs and courts "more

typically examine market structure in search of circumstantial evidence of monopoly power."  Id.

In such a case, courts may infer monopoly power from "a firm's possession of a dominant share

of a relevant market."  Id.; see Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000)

(market power can be proven "through direct evidence of anticompetitive effects" or, "more

conventional[ly]," "by proving relevant product and geographic markets and by showing that the

defendant's share exceeds [some] threshold"); S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,

740 F.2d 980, 1000 (D.C. Cir. 1984) ("[C]ourts frequently approach the problem of measuring

market power by defining the relevant product and geographic market and computing the

defendant's market share.  Monopoly power is then ordinarily inferred from a predominant share

of the market.").

Because "[m]arket power is meaningful only if it is durable," a plaintiff proceeding by

the indirect method must also show that the firm's dominant share of the relevant market is

protected by "barriers to entry" into the market.  See Lenox MacLaren Surgical Corp. v.

Medtronic, Inc., 762 F.3d 1114, 1123–25 (10th Cir. 2014); Microsoft, 253 F.3d at 51.  "'Entry

barriers' are factors . . . that prevent new rivals from timely responding to an increase in price

above the competitive level."  Microsoft, 253 F.3d at 51; see S. Pac. Commc'ns Co., 740 F.2d at

1001–02.

In its Opposition, the FTC contends that it has alleged both indirect and direct evidence

of Facebook's monopoly power, although it devotes far more attention to the indirect-proof

argument.  See ECF No. 85 (Redacted FTC Opposition) at 4–15.  Because the Court concludes

that the FTC has adequately alleged indirect evidence of such monopoly power, it need not

separately address whether this is the rare case in which the agency has also pleaded direct evidence.  The indirect framework first requires the plaintiff to "establish[] the relevant market" in which the defendant firm allegedly has monopoly power.  See Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 947 F. Supp. 2d 88, 102 (D.D.C. 2013) (quoting Neumann v. Reinforced Earth Co., 786 F.2d 424, 429 (D.C. Cir. 1986)).  If the plaintiff succeeds at that stage, it must then adequately allege that the defendant has a dominant share of that market, and that its dominance is protected by barriers to entry.  Id.; see, e.g., FTC v. AbbVie Inc., 976 F.3d 327, 373–74 (3d Cir. 2020) (above 60% market share sufficient); Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").

### 1.  Market Definition

As the Court explained in its previous Opinion, even though the definition of a relevant antitrust market is typically a "factual" rather than a "legal" inquiry, certain "legal principles" nevertheless govern.  Newcal Indus., Inc. v. Ikon Off. Sol., 513 F.3d 1038, 1045 (9th Cir. 2008); see Facebook, 2021 WL 2643627, at *9.  It is well established, for instance, that an antitrust market includes "two components: the product market and the geographic market."  Sky Angel, 947 F. Supp. 2d at 102.  "A 'relevant product market' is a term of art in antitrust analysis," United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 50 (D.D.C. 2011), and the Circuit has defined it as including "all products reasonably interchangeable by consumers for the same purposes."  Microsoft, 253 F.3d at 52 (internal quotation marks and citation omitted).  "Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level," id. at 51 (internal citation omitted), the analysis of market power uses as its denominator all products "roughly equivalent to another for the use to which [they are] put."

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997) (citation omitted).  "In other words, courts look at whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other."  H & R Block, 833 F. Supp. 2d at 51 (internal quotation marks and citation omitted).

The Court found in its prior Opinion that the FTC had plausibly established a relevant antitrust market.  Facebook, 2021 WL 2643627, at *9–11.  The FTC alleges the same market in its Amended Complaint, and Defendant does not object to that market definition here.  See Redacted Am. Compl., ¶¶ 165–80; Redacted FTC Opp. at 3 ("The Court has already determined, correctly, that the FTC has adequately pleaded a relevant antitrust market for PSN services in the United States."); MTD at 6–13 (noting Court's prior market definition without objection, while arguing that FTC still has not alleged dominant share of that market).  The Court will briefly recount the relevant findings of its previous Opinion on market definition, as that will help frame the question of whether the FTC has sufficiently alleged that Facebook has a dominant share of such market.

Unlike a relatively obvious market for, say, tires or doughnuts, the relevant market here is considerably more nuanced.  The Court previously endorsed the agency's definition of the market for PSN services in the United States as consisting of "online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space."  Facebook, 2021 WL 2643627, at *10 (quoting Redacted Compl., ¶ 52).  Such PSN services are "defined, and distinguished from other services, by their having '[t]hree key elements.'"  Id. (quoting Redacted Compl., ¶ 52).  "First, [they] are built on a social graph that maps the connections between users and their friends, family, and other personal connections."  Redacted Compl., ¶ 53.  "Second, [they] include

features that many users regularly employ to interact with personal connections and share their personal experiences in a shared [virtual] social space, including in a one-to-many 'broadcast' format." Id., ¶ 54. And "'[t]hird, [they] include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections. The social graph also supports this feature by informing [the user] which [new] connections' might be available based on her existing network." Facebook, 2021 WL 2643627, at *10 (quoting Redacted Compl., ¶ 55). Here, the Amended Complaint provides an essentially identical definition of PSN services. See Redacted Am. Compl., ¶¶ 166–69.

Having approved the FTC's definition of PSN services, the Court's previous Opinion then turned to the agency's allegation that certain other well-known "types of internet services" are not "adequate substitutes." Facebook, 2021 WL 2643627, at *10 (quoting Redacted Compl., ¶ 57). The Commission put forth a number of reasons why other technology services — such as LinkedIn, YouTube, Spotify, and Netflix — do not qualify. For instance, it alleged that "'specialized social networking services' that 'focus on professional . . . connections' (e.g., LinkedIn) are not substitutes because they are designed for and used primarily by professionals for sharing professional content," as opposed to PSN's design and primary use of "maintain[ing] personal relationships and shar[ing] experiences with friends, family, and other personal connections." Id. (quoting Redacted Compl., ¶¶ 52, 58). The Amended Complaint provides substantially similar allegations here, while acknowledging other players in the PSN market, "including Snapchat, Google+, Myspace, Path, MeWe, Orkut, and Friendster." Redacted Am. Compl., ¶¶ 171–77, 200.

In its first Opinion, the Court concluded that "[w]hile there are certainly bones that one could pick with the FTC's market-definition allegations, the Court does not find them fatally

devoid of meat." Facebook, 2021 WL 2643627, at *10.  It rejected, for example, Facebook's contentions that the market definition "contains an internal contradiction," and that the FTC "neglected to allege any facts regarding the cross-elasticity of demand between [PSN services] and [potential] substitutes for it."  Id. at *10–11 (internal quotation marks and citations omitted). Notably, the Court parried Defendant's argument "that the Complaint impermissibly distinguishes PSN services from other possible substitutes based on their primar[y] uses." Id. at *11 (internal quotation marks and citations omitted).  As the Court explained, the question of appropriate substitutes "looks to both 'whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other.'" Id. (quoting H & R Block, 833 F. Supp. 2d at 51) (emphasis added); see also United States v. Aetna Inc., 240 F. Supp. 3d 1, 19 (D.D.C. 2017).  In sum, although "the agency certainly could have provided more on that front, the fact that other services are not primarily used for the sort of personal sharing that is the hallmark of a PSN service seems a plausible reason why little switching would occur." Id.

Given that the Amended Complaint provides an essentially identical definition of the relevant market, see Redacted Am. Compl., ¶¶ 166–69, and that Facebook lodges no objection to the Court's prior finding, the Court sees no reason to revisit its earlier analysis and conclusion. See MTD at 6–13; Redacted FTC Opp. at 3.  The Amended Complaint's allegations thus do enough to make out a plausible market for PSN services.  See Redacted Am. Compl., ¶¶ 165–80.

2. *Market Share*

With the market defined, the Court now addresses what has thus far been the FTC's Achilles' heel: sufficiently alleging Facebook's market dominance.  In the last go-round, the Commission alleged "only that Facebook has 'maintained a dominant share of the U.S. personal

social networking market (in excess of 60%)' since 2011, and that 'no other social network of comparable scale exists in the United States.'" Facebook, 2021 WL 2643627, at *12 (quoting Redacted Compl., ¶¶ 3, 64).  The Court concluded that such bare allegations — "which do not even provide an estimated actual figure or range for Facebook's market share at any point over the past ten years — ultimately fall short of plausibly establishing that Facebook holds market power."  Id.  Because it was conceivable "that the agency may be able to 'cure [these] deficiencies' by repleading," however, the Court dismissed the Complaint without prejudice, leaving Plaintiff "free to amend [its] pleading and continue the litigation."  Id. at *14 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962); Ciralsky v. CIA, 355 F.3d 661, 666 (D.C. Cir. 2004)).

        The FTC has now done precisely that, adding substantial new allegations about the contours of Facebook's market share.  Most notably, the Amended Complaint alleges far more detailed facts to support its claim that "Facebook has today, and has maintained since 2011, a dominant share of the relevant market for U.S. personal social networking services."  Redacted Am. Compl., ¶ 190.  Specifically, the Amended Complaint includes allegations regarding Facebook's market share of daily average users (DAUs) and monthly average users (MAUs) of PSN services in the United States, as well as its share of users' average time spent on PSN services.  Id.  For instance, the FTC alleges that, "[b]ased on an analysis of data maintained by Comscore, a commercially-available data source," "Facebook's share of DAUs of apps providing personal social networking services in the United States has exceeded 70% since 2016 and was at least as high in 2011."  Redacted Am. Compl., ¶¶ 182, 200.  Indeed, the Amended Complaint alleges that, from "September 2016 through December 2020, Facebook's share of DAUs among apps providing personal social networking services in the United States averaged

80% per month for smartphones, 86% per month in tablets, and 98% per month for desktop computers, and that Facebook's share of DAUs has not dropped below 70% in any month on any device-type." Id., ¶ 200(a). "The combined shares of other [PSN] providers," meanwhile — which the FTC identifies as "including Snapchat, Google+, Myspace, Path, MeWe, Orkut, and Friendster" — "did not exceed 30% on any device type during any month in this period." Id.

The agency's allegations concerning MAUs tell the same story. Again relying on Comscore data, the FTC alleges that "Facebook's share of MAUs of apps providing personal social networking services in the United States has exceeded 65% since 2012 and was at least as high in 2011." Id., ¶ 201. Similarly, the "combined shares of other providers . . . did not exceed 32% on either device type, mobile or desktop, in any month during" the period of September 2012 to December 2020. Id., ¶ 201(a). Plaintiff's allegations concerning "Facebook's share of the time spent by users of apps providing personal social networking services in the United States" are also in accord with the DAU and MAU data. In fact, the FTC alleges that Facebook's share of users' time spent on such services "has exceeded 80% since 2012 and was at least as high in 2011." Id., ¶ 199.

The Amended Complaint also adequately alleges that the three metrics offered to measure market share — DAUs, MAUs, and time spent — are appropriate indicators. The FTC explains, consistent with common sense, that "a personal social networking service's attractiveness to users, and therefore its competitive significance, is related to its number of users and to how intensively its users engage the service." Id., ¶ 192. Significantly, the Amended Complaint alleges that Facebook itself uses these metrics to assess its performance, as well as that of rival PSN services. Indeed, "in the ordinary course of business, Facebook's executives and investors, rival personal social networking providers, and industry observers have assessed

the performance of Facebook Blue, Instagram, and other personal social networking providers using measures of active user base and how much people use the services—with DAUs, MAUs, and the amount time spent by users on the service being common units of measure." Id., ¶ 193. For instance, "Facebook's internal presentations assessing the performance of Facebook Blue and Instagram focus on time spent per month, MAUs, and DAUs," and the company "relies on these same metrics to assess its rivals' competitive significance." Id., ¶ 194.

The FTC similarly alleges that other firms offering PSN services cite these metrics. Snapchat, for example, regularly compares its performance with that of "Instagram by observing the firms' MAUs, DAUs, and time spent" metrics. Id., ¶ 195. Relatedly, the FTC also alleges that "[c]ommercial data sources track the usage of online services within the United States" using metrics such as "MAUs, DAUs, and time spent." Id., ¶ 196.

Considering these new allegations and granting Plaintiff "the benefit of all inferences that can be derived from the facts alleged," Sparrow, 216 F.3d at 1113 (internal citation omitted), means that the Amended Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). In stark contrast with its predecessor, this Complaint provides reinforcing, specific allegations that all point toward the same conclusion: Facebook has maintained a dominant market share during the relevant time period. Accepting the market definition (which Defendant does) and the truth of Plaintiff's market-share allegations (which the Court must at this stage), Facebook's market share comfortably exceeds the levels that courts ordinarily find sufficient to establish monopoly power. See, e.g., AbbVie Inc., 976 F.3d at 373 (above 60% market share sufficient); Eastman Kodak Co., 125 F.3d at 1206 ("Courts generally require a 65%

market share to establish a prima facie case of market power."); 2301 M Cinema LLC v. Silver Cinemas Acquisition Co., 342 F. Supp. 3d 126, 140 (D.D.C. 2018).

Not prepared to throw in the towel, Defendant offers several rejoinders, none of which is persuasive at this stage. First, it contends that the Comscore data on which the FTC relies "itself warns against reliance on this data, disclaiming responsibility for its 'accuracy or completeness.'" MTD at 7–8 (quoting Redacted Am. Compl., ¶ 182 n.1). Such an attack on the reliability of the underlying data, however, is inapposite at the motion-to-dismiss stage. Facebook will be given ample opportunity to advance such arguments down the line, perhaps in a potential "battle of the experts." At this juncture, however, the Court "must treat the complaint's factual allegations as true." Sparrow, 216 F.3d at 1113 (internal quotation marks and citation omitted). It thus has no basis now to scrutinize the reliability of the data relied on by the FTC.

Second, Defendant also assails the significance of data concerning time spent on PSN services. Specifically, it contends that such data "does not track PSNS usage; it instead tracks users of online services and total time spent on those services (PSNS and non-PSNS alike)." MTD at 7. Here, Facebook gains more traction, though its argument does not ultimately carry the day. It is correct, as the Court previously acknowledged, that data measuring the amount of time users spend on Facebook (and on other PSN service providers) likely captures time not spent engaging with a PSN service — e.g., watching a movie trailer embedded on the official page of the movie — given how the FTC defined the market. Facebook, 2021 WL 2643627, at *13 ("[A]t least some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC; time spent on those apps or websites, accordingly, is not necessarily time spent on a PSN service."). But that

does not mean that the metric tells the Court <u>nothing</u> about Facebook's market share, as the company suggests.  <u>See</u> MTD at 7–10.  The Amended Complaint alleges, for instance, that Facebook Blue and Instagram "are predominantly used as personal social networking services." Redacted Am. Compl., ¶ 202.  Indeed, the FTC states that Facebook itself recognizes that Facebook Blue provides "personal social networking services, <u>and</u> that personal social networking services are the predominant value and use of Facebook Blue to users."  <u>Id.</u>, ¶ 178 (emphasis added).  Numerous statements from Facebook CEO Mark Zuckerberg fortify the premise that the company understands Facebook Blue and Instagram to be focused on delivering PSN services.  <u>See, e.g.</u>, <u>id.</u>, ¶¶ 177–79, 202.

While Defendant is correct that data capturing time spent on platforms providing PSN services includes more than time spent just using such services, that imperfection is not fatal at this stage.  As courts in this district have recognized, "[P]laintiffs 'need not present market shares . . . estimates with the precision of a NASA scientist.  The closest available approximation often will do.'"  <u>United States v. Anthem, Inc.</u>, 236 F. Supp. 3d 171, 207 (D.D.C. 2017) (quoting <u>FTC v. Sysco Corp.</u>, 113 F. Supp. 3d 1, 54 (D.D.C. 2015)) (internal quotation marks and citation omitted); <u>see</u> <u>H & R Block, Inc.</u>, 833 F. Supp. 2d at 72 (citation omitted) ("A reliable, reasonable, close approximation of relevant market share data is sufficient.").  Here, moreover, Plaintiff is not relying solely on the time-spent data — which indicates a market share well over the necessary threshold — but instead supports that allegation with MAU and DAU metrics that reinforce the same conclusion.  <u>See</u> <u>Twombly</u>, 550 U.S. at 563 ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").  In light of those allegations, it would be improper to dismiss the FTC's Amended Complaint just because it does not have perfect data (which may not exist) about precisely what

percentage of users' time spent on Facebook Blue and Instagram includes interacting with friends, family, and other personal contacts, as opposed to engaging in activity — such as passively viewing a music video — that falls outside of the market definition.  See, e.g., United States v. Bazaarvoice, Inc., No. 13-133, 2014 WL 203966, at *32 (N.D. Cal. Jan. 8, 2014) ("The data that exist regarding this market are imperfect, in part because the market is relatively new. But that does not mean that one should ignore the existing data or the market realities.  For example, there is no real dispute that the overwhelming majority of [Defendant's] business came from [Ratings and Reviews platforms (R & R)], so to complain that [the Government's expert] did not distinguish between revenue from R & R and other [of] the parties' other offerings that complement R & R is unconvincing.").

Facebook's third central counterargument focuses on the FTC's use of MAU and DAU figures.  See MTD at 12.  Defendant posits that those metrics "cannot plausibly be used to calculate relative market share, both because the same individuals may (and often do) use more than one service and, more fundamentally, because the mere fact that an individual uses a service says nothing about how much time (if any) that person spends consuming PSNS on that service." Id.  Not so.  With regard to the first point, the FTC indicates that a single user's consumption of services from multiple providers is reflected in the MAU and DAU metrics.  See Redacted FTC Opp. at 8.  In other words, if one person used both Instagram and Snapchat on the same day, both uses would be included in the denominator to determine the total shares in the market for PSN services.  Id.  As for Facebook's contention that MAU and DAU figures do not account for intensity of use of PSN services, that argument merely underscores the utility of looking to time-spent data as well and considering the three metrics holistically.  Indeed, while each metric captures consumption of PSN services on somewhat different terms, that reality may in fact

strengthen the FTC's case because each measurement paints the same picture: Facebook has maintained a dominant market share during the relevant time period.  In any event, to the extent that DAUs and MAUs do not fully capture consumers' intensity of use, the Amended Complaint alleges that Facebook's share of the relevant market actually increases when one looks to time-spent data, which accounts for intensity of use within a day or month.  See Redacted Am. Compl., ¶¶ 199–201.

    In short, the FTC has done its homework this time around and has put forth detailed factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  Twombly, 550 U.S. at 555 (citations omitted).  To allege market dominance, the agency used multiple metrics designed to capture output or consumption — "the usual measure of a market and of the shares within it."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, vol. IIB, ¶ 535, at 308 (5th ed. 2021).  Each of those metrics buttresses one another and demonstrates a market share that courts typically find significant enough to infer monopoly power.  And the Amended Complaint extensively alleges that the metrics are regularly used by Facebook, its competitors, and relevant data collectors to assess market power.  While Defendant may ultimately be able to disprove these allegations as litigation continues, that issue is not before the Court today.  Rather, it suffices to conclude that the FTC has plausibly alleged that Facebook maintained a dominant share of the U.S. personal-social-networking market since 2011.

    3.  *Barriers to Entry*

    As the prior Opinion in this case concluded that the Commission had fallen short on its market-share allegations, the Court did not "address the issue of whether the FTC has

sufficiently alleged entry barriers." <u>Facebook</u>, 2021 WL 2643627, at *12.  Because the agency

has now plausibly alleged such a market share, the Court must take on the issue.

As explained above, a plaintiff proceeding under the indirect method of proof who has

alleged a dominant market share must also allege that the defendant's "possession of a dominant

share of a relevant market [] is protected by entry barriers." <u>Microsoft</u>, 253 F.3d at 51.  "Because

market share is just a way of estimating market power, which is the ultimate consideration, easy

entry and the absence of barriers matter even though the defendant has a large market share."

Areeda & Hovenkamp, ¶ 420, at 78 (internal quotation marks and citations omitted).  "For

antitrust purposes, a barrier to entry is best defined as any factor that permits firms already in the

market to earn returns above the competitive level while deterring outsiders from entering." <u>Id.</u>,

¶ 420, at 77; <u>see</u> <u>Microsoft</u>, 253 F.3d at 51 ("'Entry barriers' are factors . . . that prevent new

rivals from timely responding to an increase in price above the competitive level.").

The FTC alleges that "Facebook's dominant position in the U.S. personal social

networking market is durable due to significant entry barriers, including direct network effects

and high switching costs."  Redacted Am. Compl., ¶ 212.  The Court concludes that such

allegations, set forth in more detail below, are sufficient at this stage.

Start with network effects.  A leading antitrust treatise explains, "For purposes of

analyzing barriers to entry, a network effect is a feature that makes a network more valuable as

the number of users increases."  Areeda & Hovenkamp, ¶ 421h, at 95.  A telephone system, for

example, is traditionally "more valuable as it has more subscribers, thus enabling more people to

communicate with one another." <u>Id.</u>  Here, the FTC advances a modern variation on that well-

established barrier to entry.  It alleges that "because a core purpose of personal social networking

is to connect and engage with personal connections, it is very difficult for a new entrant to

displace an established personal social network in which users' friends and family already participate." Redacted Am. Compl., ¶ 212. In other words, why would new users go to a social space that does not include their important contacts?

The Amended Complaint also alleges that "[i]n addition to facing these network effects, a potential entrant in personal social networking services would also have to overcome the high switching costs faced by users." Id., ¶ 213. It explains: "Over time, users of Facebook's and other personal social networks build more connections and develop a history of posts and shared experiences, which they cannot easily transfer to another personal social networking provider." Id. Indeed, these "switching costs can increase over time" as a "user's collection of content and connections, and investment of effort in building each, continually builds with use of the service." Id.

It is at least plausible that these twin doctrines pose barriers to entry in the market for PSN services. Off the bat, there can be little doubt that network effects and switching costs are commonly recognized types of barriers to entry — a proposition that Facebook does not meaningfully contest. See ECF No. 87 (Reply) at 9–12; see also, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 476–77 (1992) (discussing switching costs); Microsoft, 253 F.3d at 55–56 (discussing network effects); Areeda & Hovenkamp, ¶ 421h. Against that backdrop, the FTC has supported its claims with ample allegations in the Amended Complaint. For example, that Defendant itself "recognized the significant advantage Facebook enjoyed due to these structural barriers." Redacted Am. Compl., ¶ 212. Indeed, a Facebook executive expressed the sentiment as follows: "Why are we hard to compete with[?] Your friends are here. You have made a big investment in your Facebook network and identity." Id. Zuckerberg, furthermore, stated about the company's network effects, "Perhaps the most valuable thing about

Facebook is that it is by far the world's most comprehensive directory of people and their connections[, which is] a huge structural advantage."  Id.

The Amended Complaint also alleges the same with regard to switching costs.  It states that Facebook executives recognized that "one of the most important ways we can make switching costs very high for users - if we are where all users' photos reside[, it] will be very tough for a user to switch if they can't take those photos and associated data/comments with them."  Id., ¶ 216.  The FTC also notes that "these switching costs can increase over time — a 'ratchet effect' — as each user's collection of content and connections, and investment of effort in building each, continually builds with use of the service."  Id., ¶ 213.  Finally, it alleges that Facebook was also well aware of this dynamic, with "a Facebook ordinary course document not[ing] that there are 'many lines of evidence for a substantial ratchet effect' and that ratchet effects 'can confer [a] permanent advantage.'"  Id.

Taken together, those allegations are sufficient at this early stage in the ligation.  While this case involves a novel market, it is at least plausible that Facebook's network effects and the high cost of switching away prevent new rivals from entering that market.  In short, the Amended Complaint's allegations concerning barriers to entry are "enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

Facebook resists this conclusion, insisting that the FTC has "pleaded itself out of court" by alleging that "other service providers with substantial networks could add PSNS offerings along with other services."  MTD at 13.  In other words, Defendant contends that there cannot be significant entry barriers because a "non-PSNS can add PSNS features after establishing a network outside the PSNS market."  Reply at 10.  But the FTC's allegation about the growth of non-PSN services does not necessarily contradict the existence of entry barriers into the market

for PSN services.  Indeed, the Amended Complaint describes how "well-known, sophisticated, and well-financed firms" such as Google "also tried but failed to successfully enter the U.S. personal social networking market" and how Facebook's market power has nonetheless endured for years.  See Redacted Am. Compl., ¶ 187.  The Amended Complaint further alleges that Zuckerberg himself recognized, "[T]here are network effects around social products and a finite number of different social mechanics to invent."  Redacted Am. Compl., ¶ 66.  In addition, while Defendant's prediction about non-PSN services' ability to grow before eventually adding PSN services may ultimately be vindicated, at this stage the Court is required to "grant [P]laintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow, 216 F.3d at 1113 (quoting Schuler, 617 F.2d at 608).  To accept Facebook's theory about barriers to entry would require the Court to do the inverse and all but ignore the FTC's well-pleaded allegations about network effects and switching costs.  The Court declines Defendant's invitation, while noting that Facebook is of course free to pursue the theory as the litigation progresses.

    B.  Anticompetitive Conduct

Possessing monopoly power in the relevant market is not enough, however.  The Court now turns to the second element of a Section 2 claim: has the FTC sufficiently alleged the "willful . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident"?  Microsoft, 253 F.3d at 50 (quoting Grinnell, 384 U.S. at 570–71).  Count I alleges that Facebook engaged in anticompetitive conduct by acquiring firms such as Instagram and WhatsApp.  Count II, meanwhile, alleges that those acquisitions, together with Defendant's agreements and practices related to Facebook Platform — i.e., the company's "set of tools that allowed software developers to create interoperability between their products and Facebook Blue," Facebook,

2021 WL 2643627, at *5 — constitute a course of anticompetitive conduct.  The Court thus considers whether the FTC has satisfied the second element of its monopoly-maintenance claim with respect to each of the two counts.

        1.   *Count I*

            a.   Legal Framework

"[H]aving a monopoly does not by itself violate § 2."  <u>Microsoft</u>, 253 F.3d at 58.  The Supreme Court has explained that the "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system . . . .  To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive <u>conduct</u>." <u>Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004). "Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition," however, "can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad."  <u>Microsoft</u>, 253 F.3d at 58.  "The challenge for an antitrust court," therefore, "lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it."  <u>Id.</u>

    Addressing that challenge, the D.C. Circuit has articulated several principles that "emerge" from "a century of case law on monopolization under § 2."  <u>Id.</u>  "First, to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'  That is, it must harm the competitive <u>process</u> and thereby harm consumers."  <u>Id.</u>  "Second, the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect."  <u>Id.</u> at 58–59 (internal citations omitted).  "Third, if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating

anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." Id. at 59. "Fourth, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Id. Finally, "in considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, [a court's] focus is upon the effect of that conduct, not upon the intent behind it. Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct." Id.

> b.   Application

With those principles in mind, the Court examines whether Count I in the Amended Complaint — which focuses on Facebook's acquisitions of Instagram and WhatsApp — plausibly alleges legally cognizable anticompetitive conduct.

As its last Opinion recognized, "It is well established that mergers may constitute one such 'means'" that tend to "'destroy competition itself' via 'means other than competition on the merits.'" Facebook, 2021 WL 2643627, at *22 (quoting Microsoft, 253 F.3d at 58, 62). Indeed, there is no shortage of authorities observing that "[h]istorically and today, merging viable competitors to create a monopoly is a clear § 2 offense." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, vol. III, ¶ 701a, at 200 (4th ed. 2015). Further, a monopolist's acquisition of "an actual or likely potential competitor is properly classified as anticompetitive, for it tends to augment or reinforce the monopoly by means other than competition on the merits." Id.; see also, e.g., Grinnell, 384 U.S. at 576 (finding Section 2 violation based in part on acquisitions of competitors); BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr., 176 F. Supp. 3d 606, 622 (W.D. La. 2016) ("[A]cquisitions of viable competitors alone may establish

the anticompetitive conduct element of a section 2 claim."); Behrend v. Comcast Corp., No. 03-6604, 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012) (same).

Against that backdrop, the key question is whether the FTC has plausibly alleged that Facebook engaged in such anticompetitive conduct by acquiring actual or potential competitors, harming the competitive process, and thereby harming consumers. Before delving into that question, it is worth noting preliminarily that while the Amended Complaint references Facebook's acquisitions of companies other than Instagram and WhatsApp, the agency concedes that it does not allege that those acquisitions "each standing alone[] violated the antitrust laws. Instead, the allegations provide factual context for Facebook's anticompetitive course of conduct." Redacted FTC Opp. at 21 (emphasis omitted). The Court therefore focuses on the allegations with regard to the acquisitions of Instagram and WhatsApp.

Start with Instagram. The FTC alleges that it was long "a serious threat to Facebook's dominance," which led Defendant to "initially tr[y] to compete on the merits with mobile photo-sharing capabilities." Redacted Am. Compl., ¶¶ 80, 83. "As Instagram soared," however, "Facebook's leaders began to focus on the prospect of acquiring Instagram rather than competing with it." Id., ¶ 87. Indeed, Zuckerberg internally "repeatedly explained the case for acquisition in terms of Instagram's threat as a personal social networking competitor." Id., ¶ 89; see id., ¶¶ 87–92. According to the Amended Complaint, that sentiment was consistent with the "deeply rooted view within Facebook that, as Mr. Zuckerberg put it in a June 2008 internal email, 'it is better to buy than compete.'" Id., ¶ 64. Eventually in April 2012, Facebook announced that it had reached an agreement to acquire Instagram for $1 billion, the company's most expensive acquisition to date. Id., ¶ 95. The Amended Complaint also alleges that both internally and externally, commentators viewed the purchase as designed to neutralize a competitor. See, e.g.,

id., ¶¶ 95–104.  "Less than two weeks after the acquisition was announced," moreover, "Zuckerberg suggested canceling or scaling back investment in Facebook's own mobile photo app as a direct result of the Instagram deal," which Facebook went on to do in the ensuing years. Id., ¶ 98.

The story is much the same with regard to WhatsApp.  The Amended Complaint alleges that "[a]fter neutralizing the threat from Instagram, Facebook turned to what it considered 'the next biggest consumer risk' for Facebook Blue": WhatsApp, "the popular and widely used mobile message app."  Id., ¶ 107.  Although WhatsApp was not yet active in the personal-social-networking market, Facebook feared that once the app reached sufficient scale, it "could, by adding additional features and functionalities, enter the personal social networking market at competitive scale and undermine or displace Facebook Blue's personal social networking monopoly."  Id., ¶ 108.  In other words, Facebook viewed WhatsApp as a likely potential competitor.  Id., ¶ 118 ("Facebook executives and employees repeatedly identified WhatsApp internally as a unique threat to Facebook Blue.").  Once again, Facebook briefly attempted to compete with WhatsApp before "decid[ing] to acquire WhatsApp rather than compete with it, in an effort to neutralize a significant competitive threat to its personal social networking monopoly."  Id., ¶ 120.  Indeed, Zuckerberg wrote in 2012, "[I]'m the most worried about messaging.  WhatsApp is already ahead of us in messaging in the same way Instagram was 'ahead' of us in photos . . . .  I'd pay $1b for them if we could get them."  Id.  Ultimately, in February 2014, Facebook announced an agreement to buy WhatsApp for $19 billion.  Id., ¶ 121.

Those facts sufficiently allege that Facebook acquired Instagram and WhatsApp in order to neutralize actual and likely future competitors.  Although Defendant briefly contends that the FTC has not alleged the "objective likelihood that WhatsApp would be a significant PSNS rival"

and that there may in fact have been "little actual overlap" between Instagram and Facebook Blue, see MTD at 24, the question at this stage is merely whether the agency has plausibly alleged that Instagram and WhatsApp were actual or potential competitors.  See Areeda & Hovenkamp, ¶ 701a, at 200 (4th ed. 2015).  The Amended Complaint has plainly done so, as evidenced by the above allegations, as well as by numerous others put forth by the FTC and not expressly recited above.  See Redacted Am. Compl., ¶¶ 80–129.  In fact, Facebook drops this argument in its Reply, see Reply at 14–19, implying a lack of faith.  See, e.g., Wal-Mart Stores, Inc. v Sec'y of Labor, 406 F.3d 731, 736 n.* (D.C. Cir. 2005) (construing moving party's "silence in reply" brief as indication that party had "abandoned [its initial] argument"); Hunter v. D.C. Child & Family Servs. Agency, 710 F. Supp. 2d 152, 157 (D.D.C. 2010).

Defendant finds slightly surer footing, however, in its contention that the FTC must allege some anticompetitive effect — that is, that the acquisitions "harm the competitive process and thereby harm consumers."  Microsoft, 253 F.3d at 58.  Facebook is correct inasmuch as the agency must allege harm to competition and consumers; "harm to one or more competitors will not suffice."  Id.  It is right, moreover, that the FTC has not, and could not, allege harm in the archetypal form of increased consumer prices, given that Facebook Blue, Instagram, and WhatsApp are all provided free of charge.  See Reply at 17; see also Microsoft, 253 F.3d at 51 ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level.").  Notwithstanding that unusual aspect of this antitrust suit, the FTC contends — and the Court ultimately agrees — that the Amended Complaint sufficiently alleges "harm to the competitive process and thereby harm [to] consumers."  Microsoft, 253 F.3d at 58.

Setting aside price increases, the FTC does identify a host of other harms to the competitive process and to consumers of PSN services from the acquisitions.  Namely, Plaintiff

alleges a decrease in service quality, lack of innovation, decreased privacy and data protection, excessive advertisements and decreased choice and control with regard to ads, and a general lack of consumer choice in the market for such services. See Redacted Am. Compl., ¶¶ 218–24. Indeed, the FTC specifically alleges that the lack of "meaningful competition" has allowed Facebook to "provide lower levels of service quality on privacy and data protection than it would have to provide in a competitive market." Id., ¶ 222. Elsewhere the Amended Complaint alleges that, after acquiring Instagram and WhatsApp, Facebook halted development of its own competing services and slowed innovation and promotion of the newly acquired products. Id., ¶¶ 98–105; 126–27. And the agency further contends that, in a competitive market, "[c]ompeting social networks may also have explored and developed alternative advertising models that consumers . . . could have preferred." Id., ¶ 226. In short, the FTC alleges that even though Facebook's acquisitions of Instagram and WhatsApp did not lead to higher prices, they did lead to poorer services and less choice for consumers.

### c.   Facebook's Counterarguments

Defendant resists the above conclusion, maintaining that the FTC is merely speculating about the harm to competition and consumers. At this stage, however, the Court inquires merely into whether Plaintiff's allegations, taken as true, state a plausible claim for relief. Here, they do, as the FTC has alleged that consumers had access to inferior products and less choice in the market for PSN services than they would have had in the absence of Facebook's acquisitions.

The Amended Complaint alleges, for example, that while WhatsApp "embraced privacy-focused offerings and design" before its acquisition, Facebook has provided lesser privacy and data protections since, which it could not have done in a competitive market. Id., ¶¶ 127, 221. It is certainly plausible, moreover, as the Amended Complaint alleges, that consumers would prefer

services that offered fewer ads or different ad frameworks.  Indeed, the advent of federal

legislation addressing various privacy and advertising concerns related to consumer technology

is consistent with the intuitive notion that consumers care about these issues and may prefer

stronger protections in their PSN services.  See, e.g., 15 U.S.C. § 6101 et seq. (Telemarketing

and Consumer Fraud and Abuse Prevention Act); 15 U.S.C. § 7701 et seq. (Controlling the

Assault of Non-Solicited Pornography and Marketing Act); 47 U.S.C. § 227 (Telephone

Consumer Protection Act).  As for harm to consumer choice, Plaintiff's allegations that

Facebook scaled down and eventually shuttered its own mobile-sharing app after acquiring

Instagram is consistent with the assertion that consumers would have a better and broader market

of services to choose from had the acquisition never occurred.  See Redacted Am. Compl., ¶¶ 98,

102–04.

        While the FTC has not yet proven the requisite anticompetitive effect, it is not required to

do so at this stage.  The Commission has alleged that the acquisitions at issue harmed

competition and that "[w]ithout meaningful competition, Facebook has been able to provide

lower levels of service quality . . . than it would have to provide in a competitive market."

Redacted Am. Compl., ¶ 222.  The agency will need to substantiate these allegations at later

stages in the litigation — likely with expert testimony or statistical analysis — but lack of proof

at this juncture does not equate to impermissible speculation, as Defendant contends.  Relatedly,

Facebook insists that there is no way to know how the market for PSN services would have

developed but for its acquisitions.  Yet that is also not a reason to draw the negative inference

that Plaintiff's allegations must be false; rather, it reinforces the notion that the FTC down the

road will have to prove its allegations about how the acquisitions affected market conditions and

competition.  Cf. Microsoft, 253 F.3d at 79 ("[N]either plaintiffs nor the court can confidently

reconstruct a product's hypothetical technological development in a world absent the defendant's

exclusionary conduct.  To some degree, the defendant is made to suffer the uncertain

consequences of its own undesirable conduct.") (internal quotation marks and citation omitted).

Facebook's final critique on this issue involves the FTC's review of the acquisitions prior

to their closing.  As the Court's previous Opinion in this case explained:

> As required by the Hart-Scott-Rodino Act, 15 U.S.C. § 18a, the FTC
> reviewed the acquisition [of Instagram] prior to closing to assess
> whether it posed anticompetitive concerns.  Whereas most mergers
> are cleared quickly, in this instance the review took over four
> months. During that scrutiny, the agency took the rare step of
> "requir[ing] the submission [by the parties] of additional
> information or documentary material relevant to the proposed
> acquisition."  15 U.S.C. § 18a(e)(1)(A).  Eventually, however,
> Facebook and Instagram satisfied the agency's concerns, and in
> August (over four months after the merger was announced), the
> Commission voted 5-0 to allow it to proceed without any challenge
> or conditions.  See FTC, FTC Closes its Investigation into
> Facebook's Proposed Acquisition of Instagram Photo Sharing
> Program (Aug. 22, 2012), https://bit.ly/3bDa2mp.

Facebook, 2021 WL 2643627, at *4.  Facebook's acquisition of WhatsApp was "also subject to

Hart-Scott-Rodino Act pre-merger review, but the FTC, once again, did not block it."  Id.

(citation omitted).  "Although the FTC [again] conveniently omits any mention of this review in

its Complaint, the Court may take judicial notice of that public agency action."  Id. (citations

omitted).

Facebook thus argues that because the FTC "unconditionally cleared both acquisitions

under Section 7 of the Clayton Act, which Congress enacted to address incipient threats to

competition that Section 2 would not condemn," it is hypocritical for the agency to now claim

that the acquisitions run afoul of Section 2.  See MTD at 21.  The FTC, for its part, counters that

"HSR filings do not result in acquisitions being approved or blessed by the FTC or DOJ," that

the HSR Act "merely established reporting requirements for acquisitions over a certain size," and that the prior HSR reviews are simply beside the point here.  See Redacted FTC Opp. at 21.

 The FTC has the better argument, at least insofar as its HSR reviews at the time of the acquisitions do not bear significantly on the issue now before the Court.  The HSR Act does not require the FTC to reach a formal determination as to whether the acquisition under review violates the antitrust laws.  On the contrary, it merely obliges the parties to the merger to report certain information to the agency and to wait to consummate the deal until the expiration of the statutory waiting period, which the FTC may extend while it gathers additional information.  See 15 U.S.C. § 18a(a), (b), (e).  Indeed, while the FTC conducted an investigation of the challenged acquisitions here and eventually voted to close the investigation, its closing letter to Facebook expressly stated, "This action is not to be construed as a determination that a violation may not have occurred, just as the pendency of an investigation should not be construed as a determination that a violation has occurred.  The Commission reserves the right to take such further action as the public interest may require."  FTC, Closing Letter Regarding Proposed Acquisition of Instagram, Inc., by Facebook, Inc. (Aug. 22, 2012), https://bit.ly/3p1UMGF.  That letter is in keeping with the Act's explicit language making clear that the FTC can bring post-review challenges, notwithstanding the previous closing of HSR review without an antitrust-violation determination: "Any action taken by the Federal Trade Commission or the Assistant Attorney General or any failure of the Federal Trade Commission or the Assistant Attorney General to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law."  15 U.S.C. § 18a(i)(1).

In light of that reality, the FTC's decisions to close the investigations into Facebook's acquisitions do not provide a basis to grant the company's Motion. The Commission could have decided to close the investigations for many reasons, and it would be improper to draw a merits conclusion about the legality of the mergers on the basis of those decisions, especially at the motion-to-dismiss stage. Cf. Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 713–14 (4th Cir. 2021) (affirming district court's exclusion of evidence relating to Department of Justice's investigation of merger without challenging it and holding that Department's "decision not to pursue the matter isn't probative as to the merger's legality because many factors may motivate such a decision, including the Department's limited resources").

In sum, the Court concludes that Count I of the Amended Complaint adequately alleges both elements of the offense of unlawful monopoly maintenance under Section 2 of the Sherman Act: (1) Facebook's monopoly power in the market for PSN services; and (2) the company's willful maintenance of that power via anticompetitive acquisitions. See Microsoft, 253 F.3d at 50.

            2.   *Count II*

That leaves Count II, which alleges that Facebook "has willfully maintained its monopoly power through its course of conduct that includes both anticompetitive acquisitions and its anticompetitive conditional dealing practices, and maintaining and enforcing anticompetitive agreements relating to Facebook Platform to deter competitive threats to its personal social networking monopoly." Redacted Am. Compl., ¶ 238 (emphases added). Primarily relying on the Court's first Opinion, Defendant urges dismissal of this count.

Because the prior Opinion's lengthy discussion of Plaintiff's challenges to the Platform policies forms the backdrop for the instant dispute, it is worth briefly reviewing the key points of that decision.  In its initial Complaint, the FTC alleged the following:

> Facebook adopted and enforced a number of anticompetitive policies governing the use of its [application programming interfaces].  Most prominently, in 2013 it announced a policy of refusing to allow third-party, freestanding apps . . . to access those APIs if they replicate[d] [Facebook's] core functionality — *i.e.*, if they competed with Facebook Blue.  Facebook then enforced that policy against a number of freestanding apps, revoking API permissions after having previously offering them access.

Facebook, 2021 WL 2643627, at *14 (internal quotation marks and citations omitted).  The Court sided with the company, however, and explained that these allegations did not provide "a viable basis for an injunction under Section 13(b) of the FTC Act."  Id.  That holding was buttressed by three conclusions: (1) "Facebook's general policy of refusing to provide API access to its competitors does not itself violate Section 2"; (2) "although specific instances in which Facebook revoked a competitor's API permissions (after previously providing it access) might have violated Section 2, the last alleged instance occurred in 2013, so there is no way in which Facebook 'is violating' or 'is about to violate' the antitrust laws, which is a necessary condition for an injunction under Section 13(b)"; and (3) "Plaintiff has failed to plead facts to support a 'conditional dealing' theory."  Id. (citation omitted).

In response to the FTC's Amended Complaint, Facebook suggests that the Court should not even engage with the new allegations surrounding the Platform policies because Plaintiff was not invited to replead on that issue.  See MTD at 33.  Such a position is not without support.  See Facebook, 2021 WL 2643627, at *2 ("Regardless of whether the FTC can amend its Complaint to plausibly allege market power and advance this litigation, then, the conduct it has alleged regarding Facebook's interoperability policies cannot form the basis for Section 2 liability.").

The Court need not decide whether the FTC was allowed to replead these allegations, however, because in any event it has failed to successfully do so.  Similarly, while the parties further dispute whether the Platform-related allegations are barred by the law of the case, the Court can sidestep any analysis of the technical elements of that doctrine.  Regardless of whether the law of the case formally applies, the FTC has supplied no persuasive justification for departing from the sensible ethos that the doctrine embodies — *viz.*, for reaching a different result on the ultimate question of whether there is a "viable basis for an injunction under Section 13(b)."  Facebook, 2021 WL 2643627, at *14; see LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("[T]he same issue presented a second time in the same case in the same court should lead to the same result.") (emphasis omitted).

In other words, the Court concludes that even if the Amended Complaint's new allegations satisfied the exacting requirements previously set forth for showing that a Section 2 violation occurred at some point in the past, that would not be enough under Section 13(b).  This is because, as the Court previously explained, "While it is possible that Facebook's implementation of th[ose] polic[ies] as to certain specific competitor apps may have violated Section 2, such finding would not change the outcome here: all such revocations of access occurred in 2013, seven years before this suit was filed, and the FTC lacks statutory authority to seek an injunction 'based on [such] long-past conduct.'"  Id. at *2 (quoting FTC v. Shire ViroPharma, Inc., 917 F.3d 147, 156 (3d Cir. 2019)).  Put differently, the Court held that "to the extent that Facebook's Platform-related conduct is actionable, it occurred nearly eight years ago, rendering an injunction under Section 13(b) unavailable as a matter of law."  Id. at *8.

Plaintiff has not put forth material new allegations requiring the Court to change tack on its Section 13(b) conclusion.  As discussed at length in the prior Opinion, Section 13(b) allows

the FTC to "bring suit in a district court of the United States to enjoin" allegedly unlawful conduct only where it has "reason to believe . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC]."  15 U.S.C. § 53(b). Section 13(b) therefore contemplates only "relief that is prospective, not retrospective."  AMG Cap. Mgmt., LLC v. FTC, 141 S. Ct. 1341, 1348 (2021); see FTC v. Credit Bureau Ctr., LLC, 937 F.3d 764, 774 (7th Cir. 2019) ("Section 13(b) serves a . . . forward-facing role: enjoining ongoing and imminent future violations.").  It "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."  Shire ViroPharma, Inc., 917 F.3d at 156.

Here, as before, "the FTC cannot use 13(b) to challenge Facebook's Platform-related conduct because it has not pleaded that any actual Section 2 violation is ongoing or about to occur."  Facebook, 2021 WL 2643627, at *18.  The closest the agency comes is its allegation that, "[h]aving suspended its anticompetitive platform policies [in December 2018] in response to anticipated public scrutiny, Facebook is likely to reinstitute such policies if such scrutiny passes."  Redacted Am. Compl., ¶ 151.  Astute readers will recognize that allegation as identical, word-for-word, to the one that the Court already deemed insufficient for purposes of Section 13(b).  Facebook, 2021 WL 2643627, at *18 (quoting Redacted Compl., ¶ 149).  To be sure, the FTC now mentions an additional developer that was allegedly subject to the API restrictions in 2016, whereas the last such instance alleged in the initial Complaint was in 2013.  Compare Redacted Am. Compl., ¶ 158(d), with Redacted Compl., ¶¶ 152–56.  But that in no way affects the Court's previous conclusion that the FTC has not alleged that Facebook's enforcement of the Platform policies "is violating, or is about to violate, any provision of law enforced by the [FTC]."  15 U.S.C. § 53(b).  Once again, the temporal gap between the complained-of conduct

and this lawsuit is "fatal to the agency's claim for injunctive relief under Section 13(b) here . . . because it means that no actionable violation is either ongoing or about to occur." Facebook, 2021 WL 2643627, at *18.

*       *       *

This conclusion requires resolution of one remaining issue with respect to Count II. As mentioned above, the count is not limited to Facebook's Platform policies; rather, the FTC combines its challenge to those policies with its allegations concerning the contested acquisitions. See Redacted Am. Compl., ¶¶ 238–40. (Count I, conversely, deals with only the acquisitions.) The agency contends that the Court thus may not dismiss Count II because "the Instagram and WhatsApp acquisitions form the basis for Count 2 as well as Count 1." Redacted FTC Opp. at 36. In other words, where a claim contains valid and invalid components, dismissal is not appropriate. It is certainly true that the acquisitions could be subject to Section 13(b); indeed, the Court previously held that "an injunction under Section 13(b) is a theoretically available remedy in a Section 2 challenge to long-ago mergers so long as the defendant still holds the purchased assets or stock, as is the case here," Facebook, 2021 WL 2643627, at *23 — a proposition the company does not contest this time around. Compare MTD at 37–38 (arguing that Platform policies cannot be challenged under Section 13(b)), with id. at 20–33 (no mention of similar challenge to the acquisitions). The question therefore is what to do with Count II: should the Court dismiss the portion that encompasses challenges to the Platform policies, or must it allow the count to remain given its incorporation of the acquisitions?

The Court concludes that the latter is the better course, with an important caveat. Although the D.C. Circuit does not appear to have weighed in on the issue, a chorus of other courts has held that a "motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal

dismissals of parts of claims."  BBL, Inc. v. City of Angola, 809 F.3d 317, 325 (7th Cir. 2015)

(citation omitted).  Rather, "the question at this stage is simply whether the complaint includes

factual allegations that state a plausible claim for relief."  Id.; see also, e.g., FTC v. Nudge, LLC,

430 F. Supp. 3d 1230, 1246 (D. Utah 2019) ("As many courts have recognized, parties may not

use rule 12(b)(6) to dismiss only parts of a claim . . . .  And because Defendants' asserted

defenses do not dispose of the Division's claims in their entirety, those claims cannot be

dismissed at this stage."); Redwind v. W. Union, LLC, No. 18-2094, 2019 WL 3069864, at *4

(D. Or. June 21, 2019) (same and collecting cases).  That conclusion flows from the plain

language of Rule 12(b)(6), which permits a party to seek dismissal for "failure to state a claim

upon which relief can be granted."  See, e.g., Charles v. Front Royal Volunteer Fire and Rescue

Dep't, Inc., 21 F. Supp. 3d 620, 629 (W.D. Va. 2014) ("A plain reading of Rule 12(b)(6)

indicates that the rule may be used only to dismiss a 'claim' in its entirety.") (internal quotation

marks and citation omitted); Doe v. Napa Valley Unified Sch. Dist., No. 17-3753, 2018 WL

4859978, at *2 (N.D. Cal. Apr. 24, 2018) ("By its own terms, there does not appear to be any

way to grant partial dismissal of a claim under Fed. R. Civ. P. 12(b)(6).") (internal quotation

marks and citation omitted).

        In sum, at the motion-to-dismiss stage, once a court determines that a claim states a

viable basis for relief, it cannot further parse out whether other portions of the claim would

suffice on their own.  Since the allegations relating to Facebook's acquisitions state a plausible

claim for relief, even though the Platform-policy ones do not, Count II should not be dismissed.

        Of course, "[s]ummary judgment is different."  BBL, Inc., 809 F.3d at 325.  In stark

contrast to Rule 12(b)(6), Rule 56 "explicitly allow[s] for '[p]artial [s]ummary [j]udgment' and

require[s] parties to 'identif[y] each claim or defense—or the part of each claim or defense—on

which summary judgment is sought.'"  Id. (quoting Fed. R. Civ. P. 56(a)).  "At the summary-judgment stage, the court can properly narrow the individual factual issues for trial by identifying the material disputes of fact that continue to exist."  Id. (emphasis omitted); see Nudge, 430 F. Supp. 3d at 1246 ("[I]f Defendants wish to challenge only parts of Plaintiffs' claims, such a challenge would be appropriate at summary judgment.").  The Platform portion of Count II can thus be sliced out at summary judgment.

In the meantime, the Court will not award the FTC a discovery windfall for using Count II as a Trojan horse to smuggle in the Platform policies.  Instead, it will not permit what would certainly be time-consuming and costly discovery on such policies.  "A trial court enjoys considerable discretion over discovery matters."  TIG Ins. Co. v. Firemen's Ins. Co. of Washington, D.C., 718 F. Supp. 2d 90, 95 (D.D.C. 2010) (citing Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)).  Here, in light of the Court's conclusion that the Platform-related allegations are legally infirm, there is no reason "that discovery should be allowed of information that has no conceivable bearing on the case."  Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (quoting 8 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2008 (1994)).  Even if discovery fully corroborated Plaintiff's allegations about the Platform policies, there still would be no basis for a trial on that portion of Count II.  While Facebook may argue that this is why dismissal is appropriate now, the Court does not read Rule 12(b)(6) to permit such a result.  In any event, the discovery bar means that Facebook is not prejudiced by the Court's ruling.  Such a determination is one that best balances judicial economy and the parties' time with fidelity to the Federal Rules of Civil Procedure.

C.  Recusal of Chair Khan

Rebuffed on its frontal assault on the updated allegations, Facebook last assays a flanking maneuver.  It requests that this Court either dismiss the Amended Complaint as "not properly authorized by the Commission" or require that the FTC address the merits of a petition that Defendant filed with the agency seeking the recusal of Chair Khan.  See MTD at 40.  The company contends that Khan's participation in the vote to authorize the Amended Complaint violated federal law given her extensive past work on antitrust issues involving major technology platforms, including "purported factual findings and legal conclusions to the effect that Facebook has violated Section 2 of the Sherman Act" in a Report of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law.  See ECF No. 83-3 (Petition for Recusal) at 20.

Khan served as counsel to the Subcommittee and "led the congressional investigation into digital markets and the publication of [the] final report." Id. (citing to Lina M. Khan, Bio (link no longer active)).  Among the report's conclusions were that Facebook had "monopoly power" in the "social networking market" and had acquired both Instagram and WhatsApp to further that market dominance.  Id. at 11–12 (citing Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations, at 12, 13, 151, 154–55 (Oct. 2020)).  Khan's academic and other writing prior to joining the FTC also addressed at length the question of whether certain platforms, including Facebook, are anticompetitive.  These include tweets about the initial filing of this case.  See, e.g., ECF No. 83-4 at 63–82 (Expert Declaration of Professor Daniel B. Rodriguez (Appendix of Statements by Chair Lina M. Khan)); Petition for Recusal, Exh. D at 76–78.  The Court takes judicial notice of these publications, Defendant's

41

Petition for Recusal, and statements of the agency relating to the Petition.  See Washington Post v. Robinson, 935 F.2d 282, 291 (D.C. Cir. 1991) ("[C]ourt may take judicial notice of the existence of newspaper articles"); Connecticut v. Dep't of the Interior, 344 F. Supp. 3d 279, 306 n.23 (D.D.C. 2018) (court can "take judicial notice of . . . correspondence from the Department").

The FTC did not address the Petition's merits, but instead dismissed it as improperly filed since the Commission has no process for addressing the "disqualification or recusal of a Commissioner" other than when she is involved in either a rulemaking or an adjudication.  See ECF No. 83-9 (Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey M. Klineberg (Aug. 19, 2021)); see also Redacted FTC Opp. at 43.  Because Khan was not recused, Facebook believes that the FTC did not properly make the decision through a vote of the Commission to "bring suit in a district court of the United States."  15 U.S.C. § 53(b).  The FTC rejoins that the decision to dismiss the Petition was proper and that there was no need for Khan's recusal.  The Court concurs.

Before addressing the specific legal arguments that the parties raise, the Court notes that Khan's vote to authorize the Amended Complaint hardly occurred on a blank slate.  The FTC originally filed its Complaint in this case in December 2020, well before she joined the Commission in June 2021.  See Redacted Compl.; FTC, Lina M. Khan Sworn in as Chair of the FTC, https://bit.ly/3JDleyK (June 15, 2021).  When this Court dismissed the Complaint in June 2020, its Opinion expressly recognized that the FTC might well refile.  Facebook, 2021 WL 2643627, at *8 ("[t]o promote clarity and efficiency going forward in the event Plaintiff amends its Complaint"); id. at *14 ("Whether and how the agency chooses to [replead] is up to it.").  It was hardly surprising when the FTC did in fact replead, moving to file an Amended Complaint

in August 2021.  See ECF No. 76-2 (Unredacted Amended Complaint).  Like the original

Complaint, the FTC's authorization of the Amended Complaint came down to a 3-2 vote among

the five Commissioners, this time with Khan among the three who voted to authorize.  See FTC

Alleges Facebook Resorted to Illegal Buy-or-Bury Scheme to Crush Competition After String of

Failed Attempts to Innovate, https://bit.ly/3q8Ku76.  Although the Court recognizes the

importance of her vote, it is an exaggeration to treat Kahn as the sole instigator of the current

case.

   The Court also notes the unique circumstances in which the FTC operates as an agency

that may bring suit, conduct rulemaking, and act as an adjudicator.  In selecting a chair for a

Commission with these diverse responsibilities — as with choosing the head of any agency — it

is natural that the President will select a candidate based on her past experiences and views,

including on topics that are likely to come before the Commission during her tenure, and how

that administrator will implement the Administration's priorities.  Ass'n of Nat. Advertisers, Inc.

v. FTC, 627 F.2d 1151, 1174 (D.C. Cir. 1979) ("An administrator's presence within an agency

reflects the political judgment of the President and Senate.").  Courts must tread carefully when

reviewing cases in this area lest we "eviscerate the proper evolution of policymaking were we to

disqualify every administrator who has opinions on the correct course of his agency's future

action."  Id.

   1. *Chair Khan's Role*

   Turning to the specific legal arguments, Facebook gets off on the wrong foot by asserting

that "[b]inding D.C. Circuit precedent requires an FTC Commissioner's recusal where 'a

disinterested observer' would 'conclude that [she] has in some measure adjudged the facts as

well as the law of a particular case in advance.'"  MTD at 40 (quoting Cinderella Career Coll. &

Finishing Schs., Inc. v. FTC, 425 F.2d 583, 591 (D.C. Cir. 1970)).  What Defendant fails to note is that both Cinderella Career Colleges and a similar out-of-Circuit case, American Cyanamid Co. v. FTC, 363 F.2d 757, 763 (6th Cir. 1966), deal with an agency official adjudicating the merits of a case, not authorizing the filing of one.  See Redacted FTC Opp. at 42.

 In American Cyanamid Co., then-FTC Chair Paul Rand Dixon had conducted work similar to Khan's because he had "played an 'active role' in an investigation by [a Senate] Subcommittee of many of the same facts and issues and of the same parties as are involved in this [FTC] proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties."  363 F.2d at 763, 767.  That case — unlike this one — involved "[t]he question of when a judicial officer is disqualified to sit in judgment in a particular case," id. at 763 (emphasis added), not whether Dixon could have voted to authorize a suit filed in district court.  Similarly, in Cinderella Career Colleges, then-Chair Dixon took part in the Commission's review and reversal of the decision of a hearing examiner.  See 425 F.2d at 589.  Adjudication has its own unique ethical requirements; as a result, our Circuit has held that "the Cinderella standard is not applicable" to non-adjudicatory proceedings, and that courts "must not impose judicial roles upon administrators when they perform functions very different from those of judges."  Ass'n of Nat. Advertisers, 627 F.2d at 1154, 1168.  The FTC thus has the better of the argument that these cases are not relevant because it was not acting there as an adjudicatory body as provided under 15 U.S.C. § 45(b), but instead simply filing a case in federal court.  Id. at § 53(b); see Redacted FTC Opp. at 42.

 To be sure, even when not acting as an adjudicator, an FTC Commissioner is not absolved of all ethical constraints.  For instance, when a Commissioner is engaged in the rulemaking process, she should be disqualified when "there has been a clear and convincing

showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding."  Ass'n of Nat. Advertisers, 627 F.2d at 1170; see also Reply at 23.  When considering potential prejudgment in the context of a rulemaking, however, courts have not generally objected to statements made "prior to the initiation of agency action" and have recognized that "[a]dministrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding."  Ass'n of Nat. Advertisers, 627 F.2d at 1173–74. Although Khan has expressed views on Facebook's monopoly status and even on this specific case before she joined the FTC, she "remained free, both in theory and in reality, to change h[er] mind upon consideration of" the suit given her new role and other factors.  Id. at 1172; see also Consumers Union of U.S., Inc. v. FTC, 801 F.2d 417, 427 (D.C. Cir. 1986) (rejecting challenge to FTC Chairman's impartiality, as articulation of his "own considered position" "gives no indication of a mind that has been closed to the evidence in the past or that would disregard any significant new material subsequently introduced").  In any event, it is not clear that the same rulemaking standard would necessarily apply to an administrator's vote to authorize the filing of a lawsuit in federal court.

So what role does provide the best analogy for analyzing Chair Khan's actions in voting to file this case?  The Court concludes it is that of a prosecutor.  "[T]he standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers. . . . [, and they] may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists."  Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 810–11 (1987).  In particular, given prosecutors' duties, they "are necessarily permitted to be zealous in their enforcement of the law."  Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980). Of course, this does not waive prosecutors' ethical obligations, as they "too must serve the public

interest," and their behavior is not "immunize[d] from judicial scrutiny in cases in which the

enforcement decisions of an administrator were motivated by improper factors or were otherwise

contrary to law." Id. at 249.  Facebook maintains that this is just such a case, in that Khan has

"an 'axe to grind' against the defendant or [is] not otherwise impartial" given the views

articulated in her past work.  See MTD at 43 (quoting Wright v. United States, 732 F.2d 1048,

1056 (2d Cir. 1984)).

Although Khan has undoubtedly expressed views about Facebook's monopoly power,

these views do not suggest the type of "axe to grind" based on personal animosity or financial

conflict of interest that has disqualified prosecutors in the past.  See, e.g., Wright, 732 F.2d at

1055 ("appearance of impropriety" found because prosecutor's wife was both "a political

opponent of [the defendant's]" and had, among other actions, brought multiple "complaints to

federal authorities [about the defendant] that could have resulted in criminal charges against him

. . . and who almost certainly harbored personal animosity against [the defendant]"); State v.

Snyder, 256 La. 601, 605 (1970) (requiring recusal of district attorney who expressed views in

mayoral campaign that "relator was guilty of criminal offenses"); State v. Hohman, 138 Vt. 502,

505 (1980), overruled on other grounds by Jones v. Shea, 148 Vt. 307 (1987) (defendant

prejudiced at plea-bargaining stage as state's attorney's advertisement during campaign stated

that he would "vigorously prosecute [defendant] and obtain a second conviction" because past

conviction improperly overturned).  Here, there is no allegation that Khan has a personal

animosity against Facebook beyond her own views about antitrust law, nor does she have a

financial conflict of interest.  Rather, her situation is more analogous — although not a perfect fit

— to one in which an individual has "simultaneous involvement in investigative and

prosecutorial aspects of federal enforcement proceedings."  In re Perlin, 589 F.2d 260, 265 (7th

Cir. 1978) (quoting <u>United States v. Dondich</u>, 460 F. Supp. 849, 856 (N.D. Cal. 1978)).  This has not been found "to present the kind of conflict of interest" from which prosecutors are barred. <u>Id.</u>

The very caselaw on which Defendant relies makes clear that, "[o]f course, a prosecutor need not be disinterested on the issue [of] whether a prospective defendant has committed the crime with which he is charged. . . . True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury — not the prosecutor."  <u>Wright</u>, 732 F.2d at 1056.  There is no indication that Chair Khan's decision to seek reinstatement of the FTC's suit against Facebook was based on anything other than her belief in the validity of the allegations.  Such behavior does not necessitate recusal.

2. *Other Ethical Issues*

Facebook also contends that Khan's behavior independently violated federal ethics rules — namely, 5 C.F.R. § 2635.501(a), which instructs a federal employee "to avoid an appearance of loss of impartiality in the performance of [her] official duties" by not participating in "a particular matter involving specific parties which [s]he knows is likely to affect the financial interests of a member of h[er] household, or in which [s]he knows a person with whom [s]he has a covered relationship is or represents a party, if [s]he determines that a reasonable person with knowledge of the relevant facts would question [her] impartiality in the matter."  <u>Id.</u>; <u>see also</u> 5 C.F.R. § 2635.101(b)(14) ("Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part."); Reply at 24.

Here, there is no indication that this case would affect "the financial interests of a member of [Khan's] household" or that an individual with whom she has a covered relationship

is involved in the case.  To the extent that Facebook is making an appearance-of-impropriety argument, the Court believes that its above discussion lays that to rest.  Although Khan has worked extensively on matters relating to antitrust and technology, including expressing views about Facebook's market dominance, nothing the company presents suggests that her views on these matters stemmed from impermissible factors.  Indeed, she was presumably chosen to lead the FTC in no small part because of her published views.  The Court thus concludes that Khan's participating in the FTC's vote did not violate ethical rules; as a result, the Amended Complaint was properly authorized.

IV.   **Conclusion**

For the foregoing reasons, the Court will deny Facebook's Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  January 11, 2022