美国哥伦比亚特区地方法院

| | |
|---|---|
| 联邦贸易委员会,<br><br>　　　　　　原告,<br><br>　　　诉<br><br>META PLATFORMS, INC.,<br><br>　　　　　　被告。 | 案件编号：1:20-cv-03590-JEB |

**根据 1970 年 3 月 18 日《关于从国外调取民事或商事证据的海牙公约》<br>发送的国际司法协助请求函**

美国哥伦比亚特区地方法院向中华人民共和国司法部致意，请求其协助调取证据，供本法院在民事诉讼程序中使用。

本法院根据 1970 年 3 月 18 日《关于从国外调取民事或商事证据的公约》（下称《海牙取证公约》，美国和中华人民共和国均为该公约的缔约国）的第一章和第二章提出此请求。

具体而言，本地方法院请求贵方协助从非当事方北京字节跳动科技有限公司（ByteDance Ltd.（"ByteDance Ltd."，一家位于中国北京市的中国实体）调取证据。

**SECTION I**

**1.　发件人：**

　　James E. Boasberg 法官
　　美国哥伦比亚特区地方法院
　　333 Constitution Avenue, N.W.
　　Washington, D.C. 20001
　　United States of America

1

**2.      被请求国的中央主管机构：**

中华人民共和国司法部
国际司法协助交流中心 (ILCC)
中华人民共和国
北京市西城区
平安里西大街 33 号，邮编：100035
电话：+86 (10) 5560 4537
传真：+86 (10) 5560 4538

**3.      执行请求书后寄回至：**

James E. Boasberg 法官
美国哥伦比亚特区地方法院
333 Constitution Avenue, N.W.
Washington, D.C. 20001
United States of America

*抄送给当事方的法定代理人：*

Daniel Matheson 律师
联邦贸易委员会
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580
电话：202-326-2075
电子邮箱：dmatheson@ftc.gov

Mark C. Hansen 律师
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
电话：202-326-7900
电子邮箱：mhansen@kellogghansen.com

**4.      具体说明请求方机构要求的收到请求函答复的日期：**

请求方机构衷心期盼贵方尽快对协助请求作出回复，以确保及时收到文件，从而供

下文所述的民事诉讼使用。

## SECTION II

根据公约第 3 条，以下签字的申请人谨就此紧急请求提交下列资料：

5.　　**(a)　　请求方司法机构（第 3(a) 条）：**

James E. Boasberg 法官
美国哥伦比亚特区地方法院
333 Constitution Avenue, N.W.
Washington, D.C. 20001
United States of America

　　　**(b)　　致以下国家/地区的主管机构（第 3(a) 条）：**

中华人民共和国

　　　**(c)　　案件名称及识别编号：**

*联邦贸易委员会诉 Meta Platforms, Inc.*，案件编号：1:20-cv-03590-JEB，美国华盛顿特区的美国哥伦比亚特区地方法院

6.　　**当事方的名称、地址及代表（第 3(b) 条）：**

　　　**(a)　　原告：**

联邦贸易委员会
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580

代表：

Daniel Matheson 律师
联邦贸易委员会
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580
电话：202-326-2075
电子邮箱：dmatheson@ftc.gov

　　　**(b)　　被告：**

Meta Platforms, Inc.
1601 Willow Road
Menlo Park, CA 94025

代表：

Mark C. Hansen 律师
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
电话：202-326-7900
电子邮箱：mhansen@kellogghansen.com

**7.    诉讼的性质和目的以及事实摘要（第 3(c) 条）：**

**(a)    诉讼的性质：**

本次诉讼的性质为美国联邦贸易委员会（"FTC"）根据 2021 年 8 月 19 日提交的修订后诉状提起的民事案件。尽管联邦贸易委员会是政府机构，但正如其提起本诉讼那样，其可以作为民事原告在民事法院提起诉讼。本案被立案的美国地方法院指定为民事案件。本案并非行政诉讼。

联邦贸易委员会指控被告 Meta Platforms, Inc.（下称"Meta"，前身为"Facebook Inc."，提供 Facebook、Instagram、Messenger、WhatsApp 等应用程序）违反了《联邦贸易委员会法》第 5(a)条（《美国法典》第 15 编第 45(a) 条），该条款禁止采取不公平的竞争方式。联邦贸易委员会指控 Meta 在所谓的"个人社交网络服务"市场中非法维持垄断地位，从而违反了此法律。作为救济，联邦贸易委员会要求裁定：Meta 的行为违反了相关法律；将 Instagram 和 WhatsApp 从 Meta 剥离；以及额外的衡平法下的救济。

**(b)    诉状摘要：**

在相关部分，联邦贸易委员会指控，自 2011 年以来，Meta 在"个人社交网络服务"市场中非法维持垄断地位。Meta 将所述服务定义为"旨在使人们能够在共享的社交空间中与朋友、家人及其他个人维系人际关系并分享体验的线上服务"。联邦贸易委员会进一步称，Meta 目前占据了该市场 70% 到 80% 的份额，其中最主要的市场参与者是

"Facebook、Instagram 和 Snapchat"。联邦贸易委员会在其修订后诉状中称，Meta 开展业务经营的市场与 TikTok 的不同，因为 TikTok 不提供"供用户与朋友和熟人进行个人分享的共享社交空间"。因此，据联邦贸易委员会称，TikTok 的用户"主要是查看、创建视频内容，并将其分享给发布者不认识的受众，而不是与朋友和家人联系和互动，"并且"用户使用 TikTok 的目的，以及该平台上的主要互动形式，并不受用户想与朋友和家人进行网络互动的愿望驱使。"

联邦贸易委员会还指控，Meta 的市场地位受到网络效应和切换成本等高而持久的壁垒保护，当用户的"朋友和家人成为某一社交网络的成员"时，这些壁垒就会产生，而"随着用户在个人社交网络服务上投入更多时间、发布更多内容"，这些壁垒也会随之增加。

联邦贸易委员会还指控，Meta 通过实施几种类型的反竞争行为维持其在"个人社交网络"市场的垄断地位。具体而言，联邦贸易委员会指控，Meta 收购 Instagram 和 WhatsApp 是为了消除其在照片分享和短信领域的竞争威胁。

联邦贸易委员会指控，Meta 的市场地位伤害了消费者，"[剥夺了]个人社交网络竞争为[消费者]带来的益处"，而这可能包括"消费者选择更符合其喜好的个人社交网络提供商"的机会。联邦贸易委员会还指控，Meta 的市场地位损害了广告销售业的竞争，如果不是 Meta 的反竞争行为，"个人社交网络服务的竞争提供商"本会参与该竞争。

本案修订后诉状的副本作为附件 A 随附。

**(c)    抗辩摘要：**

出于许多原因，Meta 否认联邦贸易委员会诉状中的指控。本请求函旨在获取与以下抗辩（并未详细列出 Meta 在本诉讼中所作抗辩）相关的信息：联邦贸易委员会所定义

的市场并不合理；行业和公众并不认可所谓的"个人社交网络服务"市场；Meta 并未像

被指控的那样在该市场中占有巨大市场份额；竞争和消费者都不可能因所谓的向所有用户

免费发放产品的市场的垄断而受到损害；Meta 在任何合理定义的市场中一直面临竞争。

**8.    需要获取的证据或需要实施的其他司法行为（第 3(d) 条）：**

**(a)    需要获取的证据：**

向中华人民共和国请求的协助包括调取北京字节跳动科技有限公司持有的文件副本，

这些文件可以从北京字节跳动科技有限公司用于维护指标的系统和数据库中合理调取。

**(b)    寻求证据的目的：**

本请求函中所寻求的证据与上述指控和抗辩有关，仅供用于所述案件的法律诉讼。

证据受附件 B 规定的严格保密令约束。该保密令可确保 Meta 不会以除本诉讼目的外的任

何方式使用在本案中出示的文件。保密令规定，诸如字节跳动等文件出示方可将其文件标

记为"机密"或"高度机密"；如果作此标记，则除了两到四名内部律师外，Meta 的任

何其他人员均无法查阅这些文件，且这些律师在收到文件后两年内不得参与 Meta 的竞争

决策。

为公正起见，本请求函中所寻求的信息对于 Meta 就联邦贸易委员会提出的指控为

自身进行公正抗辩是必要的。特别是，北京字节跳动科技有限公司是 TikTok 的所有者；

TikTok 是一款非常受欢迎且著名的移动应用程序，用户视其为 Meta 产品的竞争性替代品。

从字节跳动寻求的证据对 Meta 的抗辩至关重要，这些证据包括 TikTok 运营所在市场、

其在该市场的份额、其与 Meta 在用户投入时间和关注度方面的竞争等，原因是 TikTok

等其他数字平台公司的存在可证明 Meta 在任何市场都不具备垄断力。

Meta 寻求关于这两方面的文件：字节跳动如何看待 TikTok 与 Meta 之间的竞争（第 1 号文件请求），以及 TikTok 的服务是否符合联邦贸易委员会对个人社交网络服务的定义（第 2 号文件请求）。Meta 还寻求与字节跳动收购 Musical.ly 有关的文件，Musical.ly 曾有助于促进 TikTok 形成知名度，成为与 Meta 竞争的社交网络（第 3 号文件请求）。为了抗辩联邦贸易委员会就市场支配力提出的指控，Meta 请求就字节跳动是否认为其隐私政策和做法——联邦贸易委员会声称的一大质量衡量标准——对 TikTok 用户满意度或参与度产生了影响提供有关文件（第 4 号文件请求）。最后，就联邦贸易委员会对市场份额和市场定义的指控，Meta 提出两项有限的数据请求，请求就用户在 TikTok 上投入的时间和日活跃用户人数提供相关信息（第 5 号和第 6 号文件请求）。Meta 认为，这些信息对于反驳联邦贸易委员会关于 Meta 在任何可认知的市场上具备垄断力的指控至关重要。Meta 仅请求提供与联邦贸易委员会声称的常用用户指标（即花费时间、活跃用户和日活跃用户）相关的数据。第 5 号请求仅限于寻求可能影响 TikTok 和 Meta 产品用户活动的事件发生的具体时间段的数据。在第 6 号请求中，为帮助回应联邦贸易委员会就 Meta 具备任何类型的持久垄断力提出的指控，Meta 请求提供可追溯至 2016 年的数据。

## SECTION III

9. **需要检查的文件或其他财产（第 3(g) 条）：**

附件 C 是需要从北京字节跳动科技有限公司获取的文件清单。

10. **应遵循的特殊方法或程序（第 3(i) 条和第 9 条）：**

在中国适用法律允许的范围内，我方恳请中国有关司法机关要求对所请求的文件进行适当标识，以供识别之用，并以电子和/或纸质形式将具有此类标识的文件出示给以下人员：

Mark C. Hansen 律师
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
电话：202-326-7900
电子邮箱：mhansen@kellogghansen.com

此外，在中国法律允许的范围内，我方还恳请中国有关司法机关在出示文件时附上经授权的字节跳动代理人的誓词，证明出示的文件包括本请求函所述的全部文件（或以其他方式说明未出示哪些文件以及未出示的原因），且为本请求函所述文件的真实和准确的副本。

**11.    请求通知执行请求的时间和地点以及任何通知接收方的身份和地址（第 7 条）：**

本法院请求向上文第 6 款所列当事方代表提供执行请求的通知。

**12.    申请请求方机构的司法人员出席或参与请求函的执行工作（第 8 条）：**

无。

**13.    任命专员的机构，待司法部批准：**

美国哥伦比亚特区地方法院。

**14.    对根据原籍国法律的规定拒绝提供证据的特权或责任的说明（第 11(b) 条）：**

除了中国法律规定的适用特权外，北京字节跳动科技有限公司无需披露构成其与律师之间就寻求或提供法律意见而进行的保密通信的文件和电子记录。但是，如果此类通信已披露给第三方，则可放弃此项特权。

**15.    根据《公约》第 14 条第 2 款或第 26 条可予报销的费用和成本将由以下当事方承担：**

本《海牙取证公约》程序的费用，包括专员的费用，由 Meta Platforms, Inc. 承担，并由其上述律师转交。各当事方负责其各自的律师就本《海牙取证公约》程序所产生的任何诉讼有关的费用和支出（如有）。

## SECTION IV

本地方法院对中华人民共和国当局根据《海牙公约》的条款提供协助和礼遇表示感谢。

请求方机构签字盖章：

日期：

_____
James E. Boasberg 法官阁下
美国地方法院法官

**附件 A**

美国地区法院
哥伦比亚地区

联邦贸易委员会

600 Pennsylvania Avenue, N.W.
Washington, DC 20580

原告，

诉

**FACEBOOK, INC.**
1601 Willow Road
Menlo Park, CA 94025

被告。

**案件编号：1:20-cv-03590-JEB**

**密封存档文件的公开编辑后版本**

## 请求禁令和其他衡平救济的替代修订后诉状

原告联邦贸易委员会（"FTC"）通过其指定律师根据《联邦贸易委员会法案》（"FTC 法案"）第 13(b) 条（《美国法典》第 15 编第 53(b) 条）请求法院针对被告 Facebook, Inc.（"Facebook"）发布永久禁令和其他衡平救济，以纠正和防止其违反 FTC 法案第 5(a) 条（《美国法典》第 15 编第 45(a) 条）的反竞争行为和不公平竞争方式。

## 一、 案件性质

1.  Facebook 是全球占据主导地位的在线社交网络，据称拥有 30 多亿固定用户。Facebook 主要通过实施首席执行官 Mark Zuckerberg 于 2008 年提出的"*收购胜于竞争*"战略来维持其垄断地位。正如这句话所说的那样，Facebook 一直在系统性追踪潜在竞争对手，并收购其认为构成严重竞争威胁的公司。Facebook 将反竞争的有条件交易政策作为

这种反竞争收购策略的补充，旨在建立或维持准入壁垒，消除发现的竞争威胁。

2.    Facebook 在美国的个人社交网络服务（"个人社交网络"或"个人社交网络服务"）市场占据垄断地位，主要原因是其控制着世界上最大和最赚钱的两个社交网络，即 Facebook 和 Instagram。Facebook 社交网络在 Facebook 内部被称为"Facebook Blue"，在美国每月拥有超过[已编辑]名用户。Instagram 每月吸引的用户超过[已编辑]人。在美国，没有任何一家个人社交网络提供商能够达到 Facebook 的规模。Snapchat 是第二大个人社交网络服务提供商，但其用户数量相形见绌：与 Facebook Blue 或 Instagram 相比，Snapchat 每月的用户数量少了数千万。

3.    Facebook 的主导地位为其带来了惊人的利润。Facebook 主要通过销售基于监视的广告，利用其个人社交网络垄断取得收入。Facebook 在其平台和互联网上收集用户数据，并利用用户活动、兴趣和关系的数据来销售行为广告。仅去年一年，Facebook 的收入就超过 850 亿美元，利润超过 290 亿美元。

4.    正如 Facebook 早就认识到的那样，其个人社交网络垄断地位受到高准入壁垒的保护，包括强大的网络效应。特别是在用户的很多朋友和家人已经加入的情况下，个人社交网络对用户来说更有价值，所以新进入企业难以吸引足够的用户群来与 Facebook 竞争。Facebook 的内部文件证实，对于占据主导地位规模的公司使用的特定社交"机制"（即与他人联系和互动的特定方式，如照片分享），围绕这种机制构建的社交网络产品很难赢得用户。通常情况下，即使是产品质量突出的进入企业也无法成功对抗现有个人社交网络所享有的压倒性网络效应。

5.    在出现颠覆性或创新性的技术，为用户开辟新的联系方式之前，强大的网络效应可以使占据主导地位的个人社交网络提供商不受竞争威胁。在竞争性环境中，Facebook 的成功需要依赖于其通过开发创新工具为公司的社交网络创造价值来预测和适应技术转型时期的能力。但在经历了几次代价高昂的失败后，Facebook 的领导层在自身

从小型初创企业向商业巨头转型的过程中意识到，Facebook 缺乏在不断变化的环境中保持主导地位所需的商业人才。由于无法通过公平竞争来维持其垄断地位，公司的高管们通过收购新创新力量来解决生存威胁，而这些创新者在 Facebook 铩羽之处取得了成功。公司以先开放后封闭的策略作为这种反竞争收购狂潮的补充，通过进一步挫败新生的竞争对手，巩固自己的垄断地位。

6.　　2010 年代智能手机和移动互联网的出现，是互联网历史和 Facebook 历史上的一个关键转型期。这些技术的出现从根本上颠覆了数字经济，让人们可以在移动中连接。随着用户越来越多地将在线活动转移到移动互联网，创新的新兴公司出现了挑战 Facebook 和其他在桌面时代占据主导地位的巨头的机会。风险投资和其他资金流向了 Instagram 和 WhatsApp 等初创公司，Instagram 让用户通过照片分享进行联系，而 WhatsApp 则提供即时通讯服务。这些新贵迅速走红。

7.　　Facebook 认识到，向移动通信的转型带来了生存挑战，而 Facebook 有一个短暂的时间窗口来阻挡新移动威胁的脚步。Facebook 首席执行官 Zuckerberg 先生将这一时期描述为"非常危险的平台转型期，我们非常脆弱"，并承认"从历史上看，许多公司都未能实现这一飞跃。"尽管在商业人才方面竞争失败，Facebook 制定了一项计划，通过收购可能构成或加剧竞争威胁的公司来保持其领先地位。通过收购，Facebook 消除了竞争对手借助移动互联网的力量挑战 Facebook 统治地位的可能性。

8.　　Facebook 通过实施和执行一系列反竞争的有条件交易政策来支持其收购策略，这些政策会使具有竞争威胁的公司陷入困境。对于在 Facebook 平台上运行或接入 Facebook 平台的第三方软件应用程序，Facebook 将这些政策写入与这些应用程序的开发者签订的协议中。从 2007 年开始，Facebook 积极邀请应用程序开发者加入其平台，向他们授予访问关键应用程序编程接口（"API"）和与 Facebook 互连所需的工具的权限。这一开放权限政策推动了开发者和用户与 Facebook 之间的互动，进而又帮助提升了 Facebook

的巨额广告利润。但随着开发者开发出越来越多受欢迎的产品，Facebook 开始将它们视为威胁，认为有些开发者可能会帮助新兴的竞争对手，甚至直接挑战 Facebook。作为回应，Facebook 转而将其 API 政策作为反竞争武器：只有在同意以下条件的情况下，开发者才能访问 Facebook 的平台：(i) 不与 Facebook 的核心服务竞争，(ii) 不促进 Facebook 潜在竞争对手的增长。遵守这些条件、对 Facebook 效忠的应用程序开发者或网站可以访问价值巨大的 Facebook 平台。相比之下，与 Facebook 的潜在竞争威胁合作或自身成为 Facebook 潜在竞争威胁的应用程序开发者则失去了这些访问权限，一些人被迫退出市场。如果不是由于 Facebook 的反竞争有条件交易政策施加的限制，开发者可能会对 Facebook 的竞争威胁提供助力，或者自己成为威胁。通过阻止他们，Facebook 减少了出现新威胁的机会。换言之，Facebook 击败竞争对手不是通过改进自己的产品，而是通过对开发者施加反竞争限制。这种行为的反竞争程度不亚于 Facebook 收购这些新的竞争威胁来停止竞争。

9.　　通过这些行动，Facebook 实施了一项反竞争计划，阻止差异化的创新公司扩大规模，从而使 Facebook 得以保持主导地位。Facebook 的行为消除了新生的竞争对手，使得这些竞争对手的独立存在无法让其他互联网平台克服保护 Facebook 垄断地位的实质性准入壁垒。通过这一系列措施，Facebook 剥夺了美国个人社交网络用户从竞争中获益的机会，包括更多的选择、质量和创新。

10.　　通过扼杀个人社交网络竞争对手的出现和发展，Facebook 也打压了广告销售的切实竞争。众多个人社交网络提供商通过销售广告为平台创造收入；因此，个人社交网络出现更多竞争也可能意味着销售广告出现更多竞争。通过垄断个人社交网络，Facebook 也因此剥夺了广告客户从竞争中获益的机会，例如降低广告价格和增加与广告相关的选择、质量和创新。

11. Facebook 为巩固其垄断地位而采取的非法行为至今仍在继续，必须予以禁止。Facebook 继续持有和运营其非法收购的资产，并确保这些资产的有利位置，为其个人社交网络垄断修建保护性的"护城河"。此外，除非加以禁止，Facebook 仍在继续监控竞争威胁，并寻求收购或打压这些威胁。

## 二、 司法管辖权和审判地

### A. 司法管辖权

12. 根据 FTC 法案第 5(a) 条和第 13(b) 条、《美国法典》第 15 编第 45(a) 条和第 53(b) 条以及《美国法典》第 28 编第 1331、1137(a) 条和第 1345 条，本法院对此诉讼拥有对事管辖权。此诉讼是根据国会保护贸易和商业不受限制和垄断的法案提起的民事诉讼，由国会法案授权提起诉讼的美国机构提起。

13. 本法院对 Facebook 拥有对人管辖权，因为根据《美国法典》第 15 编第 53(b) 条，Facebook 与美利坚合众国具有必要的宪法联系。

14. 根据 FTC 法案第 5 条（《美国法典》第 15 编第 45 条）的规定，Facebook 的一般商业行为以及本诉状指控的不公平竞争方式属于"商业行为或影响商业行为"。

15. 根据 FTC 法案第 4 条（《美国法典》第 15 编第 44 条）对"公司"一词的定义，Facebook 在所有相关时期都是一家公司。

### B. 审判地

16. 根据《美国法典》第 15 编第 22 条、第 28 编第 1391(b)(1) 条和第 15 编第 53(b) 条，本地区是适当的审判地。Facebook 成立于且位于本地区，在当地开展业务。

## 三、 当事人

17.    原告 FTC 是美国政府的行政机构，根据 FTC 法案（《美国法典》第 15 编第 41 条及*后续条款*）成立、组织和存续，主要办事处位于哥伦比亚特区。除其他事项外，委员会被赋予执行 FTC 法案第 5 条（《美国法典》第 15 编第 45 条）的权力和责任，并根据 FTC 法案第 13(b) 条（《美国法典》第 15 编第 53(b) 条）的授权，提起法院程序，禁止违反 FTC 执行的任何法律，并寻求衡平救济。

18.    FTC 有权向联邦法院提起本诉讼，因为其有理由相信被告 Facebook 正在违反或即将违反 FTC 执行的法律规定，并且本案是请求 FTC 法案第 13(b) 条（《美国法典》第 15 编第 53(b) 意义上的永久禁令救济的适当案件。

19.    被告 Facebook 是一家公开上市的盈利性公司，在特拉华州注册成立，其主要营业地点位于 1601 Willow Road, Menlo Park, CA 94025。Facebook 的主营业务是推动数字互动和通信技术，包括提供个人社交网络的 Facebook Blue；提供个人社交网络的 Instagram；提供移动消息服务的 Facebook Messenger；以及提供移动通讯服务的 WhatsApp。

## 四、 行业背景

### A. 个人社交网络的兴起和 Facebook 的诞生

20.    21 世纪初，个人电脑和互联网的广泛使用催生了一种与人联系和交流的新方式：与朋友和家人的在线社交网络。与电子邮件和短信的有限功能相比，个人社交网络为人们提供一种独特的方式来保持个人联系，从而广受欢迎。个人社交网络使人们能够了解最新动态，并与朋友和家人分享个人内容。如今，它已成为数百万美国人日常生活中不可或缺的一部分。

21.    通过个人社交网络上的帐户，人们可以发布自己生活和感兴趣的内容，并查

看个人联系人发布的内容。许多人使用个人社交网络与其他人保持联系，因此特定个人社交网络上关键多数的人的存在既能够吸引新用户，又能够留住现有用户。在这个意义上，社交网络具有电话、操作系统和其他服务的特征，具有强大的网络效应：服务对个人消费者的价值随着使用服务的其他消费者数量的增加而增加。Facebook 内部投资者电话会议谈话要点清晰地描述了这一现象："我们的网络效应是巨大的，你的朋友都在这里。"

22.    2002 年 3 月推出的 Friendster 是最早获得巨大人气的个人社交网络之一，Myspace 在第二年也随之而来。

23.    随后在 2004 年 2 月，Zuckerberg 先生和他的大学同学推出了 Facebook（当时名为"TheFacebook"）。他们首先在自己的校园里推出了这款产品，然后迅速推广到其他大学校园。随着 Facebook 在大学中的迅速普及，2006 年，公众也可以广泛使用 Facebook。Facebook 最初的快速增长为公司带来了大量私人投资，这进而又推动了更大的增长。

**B. Facebook 推出 Facebook 平台，并提供了访问关键接口的权限，引导应用程序开发者与 Facebook Blue 进行互操作**

24.    Facebook 用户群的早期快速增长对公司至关重要。Facebook 需要迅速增加用户，这不仅是为了向投资者推销自己，也是为了获得足够数量的用户，使其能够建立网络效应并从中受益：随着越来越多的用户积极、定期使用 Facebook 的服务，用户会更有可能留在 Facebook，并吸引更多的用户，而潜在的竞争对手几乎没有回旋余地。因此，Facebook 寻求迅速扩大向用户提供的服务。

25.    为了实现这一目标，Facebook 于 2007 年推出了"Facebook 平台"。该平台计划利用 Facebook 对其迅速扩大的用户群的掌控，鼓励软件开发者建立完整的应用程序和工具生态系统—从游戏和页面设计工具到视频分享工具和电子营销应用程序—并与 Facebook Blue 进行互操作。Facebook 的目的是将 Facebook Blue 变为主导的应用程序平台：

如果 Facebook 能够引导开发者使用 Facebook Blue 来推广和发布吸引用户的创新应用程序，那么 Facebook 将从用户参与度提高中获益，从而获取关于其用户及其在线活动的更多、更精细的数据，并巩固网络效应，免受竞争影响。

26.　　在推出平台时，Facebook 明确表示"欢迎拥有竞争应用程序的开发者"在平台上进行开发，这表明它"设计 Facebook 平台的目的是使第三方开发者的应用程序与 Facebook 开发的应用程序处于处于同一个竞技场中"。

27.　　Facebook 的平台计划使其能够节约自己的资源，并利用第三方的创造力，以确保 Facebook 的持续参与度。如果没有平台，Facebook 自身就不得不开发增加其网络价值的应用程序—这意味着 Facebook 将不得不尝试预测用户想要什么应用程序；设计、编码并在其用户群和网络中推广这些应用程序；并承担猜错、出错和资源流失的风险。

28.　　平台使得 Facebook 避免了这些风险和成本，并从第三方应用程序开发者的努力中获益。Facebook 不需要投入大量资源来开发新的应用程序或测试新的商业模式—第三方会去做这些。Facebook 只需要等待平台开发的应用程序获得广泛采用，然后要么开发一个与之竞争的应用程序，要么从流行应用程序的用户参与中获益，包括为 Facebook 提供有价值的新社交数据。从这些开发者的工作中攫取利润的潜力—包括从这些开发者开发的应用程序和他们吸引的用户中获取利润——促使 Facebook 积极寻找并邀请开发者在平台上开发应用程序。

29.　　Facebook 推出 Facebook 平台的目的是为*所有*应用程序开发者提供设计应用程序的自由。Facebook 推出 Facebook 平台时，Zuckerberg 先生说："直到现在，社交网络一直是封闭的平台。今天，我们要结束这一切。随着 Facebook 平台的发展，世界各地的任何开发者都可以在 Facebook 内部的社交图谱上构建完整的社交应用程序。"

30.　Facebook 将 Facebook 平台作为为所有应用程序开发者赋能的途径进行营销，因为它认识到这样做对其业务至关重要。在 2007 年的一份新闻稿中，Zuckerberg 先生表

示："[Facebook 平台]对我们有利，因为如果开发者开发出优秀的应用程序，那么他们就是在为我们的用户提供服务，并加强社交图谱。这是一个巨大的机会。我们提供集成和传播，开发者提供应用程序。我们帮助用户分享更多信息，实现双赢。"

31.    Zuckerberg 先生和 Facebook 一再重申，Facebook 受益于"开放的"Facebook 平台，允许任何社交应用程序开发者进行互操作。2008 年，Zuckerberg 先生表示："平台是我们战略的关键，因为我们相信会有很多不同的社交应用……我们认为只靠我们自己不可能将它们全都开发出来。"2012 年初，Facebook 的一份首次公开募股文件指出："我们平台开发者的成功和我们平台生态系统的活力是提高 [Facebook Blue] 用户参与度的关键。我们将继续投资工具和 API，增强平台开发者交付更具社交性和个性化的产品的能力，并更好地吸引 Facebook [Blue]、整个网络和移动设备上的用户。"

32.    Facebook 的开放平台不仅是为了吸引新的开发者，也是为了 (1) 吸引被与 Facebook 平台互操作的开发者所吸引的新 Facebook 用户；(2) 提升现有 Facebook 用户的参与度，因为他们喜欢平台上的新功能。无论哪种情况，Facebook 的平台都是为了创造和利用网络效应，从而扩大用户群，提高参与度。两者相互推动：更多的用户意味着更多的开发者，更多的开发者意味着更多的用户。两者都对 Facebook 有利。

33.    继 2007 年推出平台之后，Facebook 经常增加新的工具供开发者使用，通常是在其半年一次的"F8"开发者大会上。例如，2008 年，Facebook 推出了 Facebook Connect，该工具支持开发者让其用户使用他们的 Facebook 凭证登录开发者的网站或应用程序，"将他们的 Facebook 帐户信息、好友和隐私"带入开发者的服务中，并将内容分享到 Facebook。开发者使用 Facebook Connect 令 Facebook 受益，因为它增加了 Facebook Blue 上有吸引力的内容的数量，并使 Facebook 在互联网上更加无处不在。

34.    Facebook 继续向平台添加功能，包括允许第三方应用程序访问 Facebook 用户数据的 API。API 是不同软件相互通信和共享数据或功能的一种结构化方式。API 广泛

用于在线促进企业和其他实体之间的通信、产品和服务之间的集成或互操作，以及在其他产品的功能或数据"之上"构建开发新产品。

35.　　通过提供 API，企业可以允许第三方开发者以编程方式与来自 API 提供商的某些数据或功能进行交互。对于希望开发与自己的产品互补或接近的产品，而不是自己构建这些产品的企业来说，这是一种常见的模式。在这些情况下，API 提供者向第三方开发者提供与提供者互操作所需的数据和功能。通过提供关键的互操作能力，许多 API 可以有效地作为数字市场中第三方开发者的传播手段。

36.　　Facebook 平台包含众多不同 API 的访问权限，并且随着时间的推移，许多 API 已经发生了变化。2010 年推出的 Graph API 是 Facebook 平台的核心 API 之一。尽管多年来它也发生了变化，但其总体目的是促进 Facebook 的社交图谱和其他应用程序（包括 Facebook 和第三方产品）之间多种不同类型的信息和数据的交换。在 Facebook 向第三方开发者授予访问 Graph API 特定端点的权限后，该开发者可以使用 Graph API 在 Facebook 的社交图谱中检索和/或创建特定类型的信息。例如，Graph API 可用于检索用户上传到 Facebook Blue 的照片，或将视频发布到用户的 Facebook Blue 时间线。通过 Graph API 提供的数据可以为开发者提供实现传播和扩大其用户群的重要途径。

37.　　2010 年，Facebook 通过 Graph API 为第三方应用程序提供访问关键 API 的权限，包括 Find Friends API（提供有关用户的 Facebook 好友的信息）和其他用于从 Facebook Blue 访问用户内容的 API。特别是 Find Friends API，对于第三方应用程序来说，它是一个极具价值的增长工具，因为通过该工具，应用程序用户能找到同样使用第三方应用程序的 Facebook Blue 好友，并邀请没有使用第三方应用程序的好友。

38.　　2010 年，Facebook 还在 Facebook 平台上添加了 Open Graph 和社交插件，使第三方应用程序和网站能够在自己的服务中添加 Facebook"点赞"按钮等功能。使用"点赞"按钮，Facebook Blue 用户可以点赞并分享他们对第三方应用程序的兴趣。第三方应用

程序则有动力安装和使用"点赞"按钮，因为"点赞"可以在用户的新闻推送和 Facebook Blue 上的个人资料中分享，从而吸引更多用户使用第三方应用程序。

39. 从 Facebook 推出之时起，Facebook 平台的开放访问权限对开发者来说就具有重要意义，主要原因至少有三个。首先，Facebook 平台为开发者的产品和服务提供了一个独特的传播渠道，承诺允许开发者利用 Facebook 庞大的社交图谱来"促进大规模传播"。其次，Graph API、社交插件和 Open Graph 等工具使开发者能通过个性化体验吸引用户："例如，如果你喜欢 Pandora [音乐服务]上的一支乐队，该信息可以成为图谱的一部分，这样，如果你以后访问音乐会网站，该网站就可以推荐你喜欢的乐队何时会来到你所在的地区。"第三，Facebook 平台使开发者能为他们的产品做广告并进行应用内交易。有了这些好处，加上公司的积极推动，开发者开始依赖 Facebook 的开放访问权限政策，并投入开发兼容产品。

40. Open Graph 的使用量迅速增长。Open Graph 推出一周后，超过 5 万个网站即已安装了 Open Graph 插件。这些网站尝到了大规模新传播渠道的直接甜头。到 2008 年 7 月，也就是 Facebook 推出一年后，已经有超过 40 万开发者在使用 Facebook 平台。到 2010 年 4 月，超过 100 万开发者在使用 Facebook 平台。到 2012 年 7 月，Open Graph 每天被用于向 Facebook Blue 分享近 10 亿条社交数据，为 Facebook 提供了有关其用户及其在线活动的更多、更详细的信息。

41. 这一策略不仅将用户的在线活动更充分地整合到 Facebook Blue 中，还为 Facebook 带来了利润。正如 Facebook 一位高管在 2012 年 5 月给 Facebook 首席运营官 Sheryl Sandberg 的电子邮件中总结的那样："因为我们拥有大量用户，这会吸引新用户注册，吸引想要为他们的应用程序和网站寻找客户的开发者，吸引想要接触受众的广告客户。"这位高管解释说，Facebook"现在已经达到了一定规模，你可以想象，作为一名开发者，你现在和未来的大多数用户/客户都在 Facebook 上"，并指出"Apple App 排前 10 的

应用中有 [7] 款支持 Facebook。"

42.　　此外，第三方应用程序通过 Facebook 插件并将社交数据（如"点赞"）引流至 Facebook Blue 来促进 Facebook 发展。这些互动还为 Facebook 提供了有关用户与第三方应用程序互动程度的重要信息，使 Facebook 能密切跟踪和识别其初期的使用趋势。

**C. Facebook 超越早期竞争对手，成为社交网络霸主**

43.　　在 2006 年在学校崭露头角到推广至普通大众后，Facebook 发展迅速。根据正常的业务文件披露，在 2007 年 5 月至 2008 年 5 月期间，Facebook 的月活跃用户增长了 34%，而其主要竞争对手 Myspace 的月活跃用户同期仅增长了 7%。到 2009 年，Facebook 已经超越 MySpace，成为美国乃至全球最受欢迎的个人社交网络提供商。2011 年 10 月，根据内部流传的数据，Facebook 在美国拥有 1.56 亿独立用户，平均每位访问者使用服务的时间为 441 分钟。与此同时，Myspace 在美国只有 2700 万用户，平均每个访问者的使用时间只有 10 分钟。到 2011 年，Facebook 向广告客户吹捧"Facebook 现在占据了美国社交媒体的 95%"。

44.　　Facebook 的平台政策助推其增长。在推出 Facebook 平台和 Open Graph 计划后，Facebook 增长显著，从 2010 年到 2018 年，平均每年在美国增加超过一千万的月活跃用户。

**D. Facebook 的商业模式：根据详细的用户数据销售广告**

45.　　虽然有多种方式通过个人社交网络创造收入，但 Facebook 选择的是通过挖掘用户的个人数据和销售行为广告。

46.　　这种做法为 Facebook 带来了丰厚的利润。为了向特定的 Facebook Blue 和 Instagram 用户展示的广告，广告客户现在需要支付数十亿美元—到 2020 年，该金额约为 840 亿美元。Facebook 使用专有算法来分析该公司收集的大量用户数据，从而为这些"受众"提供服务。这使得广告客户可以将不同的活动和消息针对不同的用户群。Facebook 显

示的广告与用户生成的内容穿插在一起，并且可能具有相似的外观。

47.　　Facebook 认识到，个人社交网络可以提供的广告（"社交广告"）具有独特特征。例如，在财报电话会议上，Facebook 首席运营官 Sheryl Sandberg 将 Facebook Blue 描述为"世界上第一个让营销者以前所未有的规模实现信息个性化的全球平台"，并称 Facebook Blue 和 Instagram 是世界上"两个最重要的移动广告平台"。

48.　　社交广告不同于其他形式的广告，包括其他形式的展示广告、搜索广告和"线下"广告（例如，电视、广播和印刷品）。

49.　　社交广告是展示广告的一种独特形式。展示广告是指当用户访问或使用网站或应用程序时，在网站或应用程序上以图像、文本或视频的形式展示广告。展示广告不同于"线下"广告，如电视、广播和印刷广告，因为展示广告具有在消费者在线活动期间（包括在消费者使用智能手机和平板电脑等移动设备期间）接触消费者的能力，支持互动广告，并通过在线活动生成和收集的个人数据向用户推送丰富的广告。展示广告也不同于搜索广告，后者是一种数字广告形式，当用户在在线搜索引擎（如 Google 或 Bing）中输入特定搜索词时，就会显示给用户。广告客户购买搜索广告是为了瞄准那些主动查询特定类型的产品或服务的消费者。与之相对，展示广告瞄准的是不主动查询搜索引擎的消费者，包括可能进一步做出特定购买决定的消费者。

50.　　社交广告是展示广告的一种，但其与非个人社交网络的网站和应用程序上的非社交展示广告存在多处差异。例如，部分原因是用户必须以唯一的用户凭证登录到个人社交网络，社交广告使得广告客户能够基于用户的个人联系、活动、身份、人口统计、兴趣和爱好的个性化数据来确定目标用户。此外，与其他网站和应用程序上的展示广告相比，社交广告利用用户的高参与度和与他们的频繁联系，以及将广告直接整合到用户的个人联系生成的内容（包括类似于"原生"内容和增强内容的广告）。此外，社交广告拓宽了广告的参与形式，这是其他形式的展示广告所不具备的，例如允许用户与个人联系共享广告，

或者"点赞"或关注广告客户的页面。这些特征使得社交广告提供商能够向高度参与的用户的目标"受众"个人推销广告客户，并触及不主动搜索—甚至不知道—广告产品或服务的用户。

51.　　正如 Sandberg 女士在 2012 年财报电话会议上强调的那样："关于广告客户在哪里的问题，正如我之前所说的，我们是第三类机构。我们不是电视，也不是搜索。我们是社交广告。"尤其是 Facebook，由于其规模、高用户参与度以及跟踪 Facebook 内外用户评估广告效果的能力，Facebook 具有卓越的广告定位能力。

52.　　得益于 Facebook 收集的大量用户数据，Facebook 的社交广告业务利润异常丰厚。根据其公开的收益报告，Facebook"几乎所有收入都来自于向营销者出售广告投放"。

**E.　　移动互联网出现给 Facebook 带来的威胁**

53.　　从 2010 年左右开始，智能手机的广泛使用标志着美国人消费数字服务的方式发生了重大变化，用户从台式电脑转向移动设备。2009 年第四季度，美国只有 21% 的移动用户使用智能手机，只有 30% 的客户曾在近期购买新手机。到 2012 年第二季度，美国 55% 的移动用户使用智能手机，占新购买手机的 67%。据估计，从 2011 年到 2012 年，移动数据流量增长了 62%，到 2012 年，移动数据流量大约是 2007 年美国移动数据流量的 73 倍。

54.　　向智能手机的转变为新企业带来了机遇。除了其他功能之外，智能手机具有便携性，并内置数码相机。随着 Instagram 联合创始人 Kevin Systrom 所说的手机"最与众不同的功能"—在移动中拍摄和分享照片的功能—的优势得到充分利用，通过一款专为拍摄、分享和评论照片而优化的移动应用程序，与家人和朋友建立社交网络变得越来越流行。

55.　　想要在移动浪潮中乘风破浪—或者利用它来挑战树大根深的桌面竞争对手的企业—必须迅速采取行动。正如 Systrom 先生所说，"人们不再继续在桌面上计算……而

是转向手机进行移动计算。在短短的一瞬间，计算方式发生了转变，但为计算创建的服务并没有充分转移到移动设备上。Systrom 说，"如果你成立一家移动公司，2009 年、2010 年和 2011 年有一个时间窗口，有很多机会可以重现人们过去在桌面上的体验，而现在他们将在移动设备上拥有这些体验，因为这些桌面公司没有足够快地做出转变。"到 2012 年，Systrom 说："很明显，那些利用了移动技术的公司已经走在了前面，占据了优势，而那些落后的公司迫切需要找到迎头赶上的方法。"

56.　　智能手机也促进了移动消息的爆炸式增长，比如 (1) 通过短信消息服务或多媒体消息服务协议（"SMS"）发送文本消息；(2) 通过基于互联网的 OTT 移动消息应用程序（"OTT 移动消息服务"）发送文本消息。自 2011 年短信消息量达到顶峰以来，OTT 移动消息服务的消息量呈现了天文数字的增长。到 2012 年 4 月，Zuckerberg 先生认为"消息是所有人手机上最重要的应用程序"。

57.　WhatsApp 联合创始人 Jan Koum 也看到了人们使用设备方式的"根本性转变"，并选择专注于移动通讯。支持智能手机的 OTT 移动消息服务，如 WhatsApp，对 Facebook Blue 构成了威胁。OTT 移动消息服务通常不是按照每条消息收费，并且实现了对 SMS 的改进，例如用于共享内容（例如，照片、视频、声音剪辑和 GIF）的增强功能以及创建长期用户组的功能。

58.　Facebook 在移动设备上推出了 Facebook Blue，以应对移动智能手机的兴起，但 Facebook Blue 在移动设备上的表现最初并不出色。Facebook 于 2007 年 1 月推出首个 Facebook Blue 移动网站，2008 年 7 月推出首款原生 Facebook Blue iPhone 应用程序，2009 年 9 月推出首款原生 Facebook Blue Android 应用程序。在一篇关于发布 iPhone 版 Facebook Blue 的帖子中，负责该应用程序的工程师写道，"为 iPhone 打造的应用程序比网站能接触到更多的技术。例如，使用此款原生应用程序，你可以使用 iPhone 的摄像头拍摄照片并立即上传。"但到了 2010 年，Facebook 决定用 HTML 重写其原生应用程序。

HTML 是一种用于在网络浏览器中查看页面的语言。这个被称为 Faceweb 的项目未能改善 Facebook 的移动产品。到 2011 年 6 月，iPhone 版 Facebook Blue 的评价已经降到了历史平均最低的两星。Zuckerberg 先生后来称，使用 HTML 的决策是"我们作为一家公司所犯的最大错误"。

59. 到 2011 年底，Zuckerberg 先生和其他高管意识到，Facebook Blue 为移动用户提供的体验相对较差，这使得 Facebook 的垄断地位比以往任何时候都更加脆弱。此外，Facebook 也努力将其社交广告模式转移到移动设备上。向移动设备的转型要求 Facebook 改变其广告的展示方式：正如 Zuckerberg 先生所说，"广告的运作方式必须彻底改变。"

60. 鉴于这些接踵而至的失败，Facebook 有理由担心其个人社交网络垄断地位及其巨大的广告利润会受到移动优先的竞争对手的威胁，而这样的竞争对手正在崛起，并通过以创新方式连接用户和利用手机的照片或消息功能打造吸引力。这样的进入者可能会严重威胁 Facebook 的广告利润。能够推出受欢迎产品的竞争对手可以获取有关移动用户行为的丰富数据集，而 Facebook 由于其移动表现不具吸引力而无法获得这些数据。Facebook 迫切需要获取这些数据，因为它越来越多地寻求根据个人用户的详细信息（包括他们的身份、行为和位置）来投放广告。为了通过用户群创造收入，Facebook 需要将广告投放给最容易接受的个人。如果没有关于用户活动的大量数据，Facebook 就无法确定哪些用户最容易接受哪些广告。或者，竞争对手可以提供一种无广告的商业模式，这可能会削弱 Facebook 利用用户注意力赚钱的能力。特别是，WhatsApp 是一款快速增长的 OTT 移动消息应用，推行的是无广告的商业模式（在被 Facebook 收购之前）。

61. 为了确保在移动表现欠佳的情况下继续占据主导地位，Facebook 承担了一项"重大技术风险"—"花费多年时间，从零开始重写所有适合移动应用的代码"。但 Facebook 无法接受这样的可能性：在 Facebook 改进其表现不佳的移动产品所需的时间内，竞争对手可能会威胁其垄断地位及其巨大的广告利润。Facebook 意识到自己无法依靠自身产品

的优势来维持垄断地位，于是试图通过反竞争行动来"消除"向移动转型的风险，以维护其主导地位。

### F. 多年来，Facebook 一直专注于收购潜在竞争对手和可能帮助潜在竞争对手的企业

62.     2010-2014 年期间，智能手机的普及和向移动互联网的过渡改变了用户使用社交网络和其他数字服务的方式。这一关键但转瞬即逝的过渡期带来了一种风险，即新生但灵活的初创公司可能比 Facebook 更适合迅速利用技术和用户行为的这些变化。

63.     应对这一威胁的一种方法是，收购任何可能在这个机会窗口期内威胁 Facebook 主导地位的初创公司。在变动期间（例如向移动互联网过渡），收购引入创新机制的竞争威胁对占据主导地位的企业尤其具有吸引力。这一取向对于 Facebook 而言尤其正确，因为公司试图将自己的产品向新环境转变的尝试以失败告终。

64.     通过收购维持垄断地位是 Facebook 的自然选择。长期以来，公司一直寻求通过收购而不是竞争来实现并保持主导地位，这反映了 Facebook 内部根深蒂固的观点，正如 Zuckerberg 先生在 2008 年 6 月的一封内部电子邮件中所说，"收购胜于竞争。"Facebook 的收购往往侧重于阻止潜在竞争对手的增长：例如，在 2008 年 Facebook 试图收购 Twitter 失败后，Zuckerberg 先生写道："我期待着能有更多的时间，让我们的产品有条不紊地发展。"多年来，Facebook 也多次提出收购 Snapchat。在认为 Snapchat 可能有其他资金充足的追求者可以增强竞争地位时，Facebook 迅速采取了行动。

65.     个人社交网络服务的特点是强大的网络效应：使用服务的用户的朋友和家人越多，提供商的服务通常对用户越有价值。一旦个人社交网络服务达到主导规模，这些效应就会使竞争和进入变得更加困难，即使是用户认为提供的产品质量更高的竞争对手也是如此。

66.     因此，正如 Facebook 所理解的那样，Facebook Blue 面临的最大竞争威胁可能来自一款差异化产品，该产品能够通过为用户提供卓越的"机制"（即与朋友和家人互动

的独特方式，如分享照片）来迅速扩大规模。Facebook 阻止创新进入者扩大规模并从网络效应中获益的策略包括收购创新者，并在可能的情况下将其产品转变为公司竞争"护城河"的组成部分。Zuckerberg 先生在 2012 年 2 月的一封提议收购 Instagram 的电子邮件中清楚地解释了这一策略："社交产品存在网络效应，可以创造的不同社交机制数量有限。一旦有人在某个特定的机制上获胜，其他人就很难在没有差异化的情况下取代他们。有可能有人通过构建更好的产品来击败 Instagram，从而获得网络迁移，*但只要 Instagram 继续作为一款产品运行，难度会更大。*"（强调后加。）

67.　　正如 Zuckerberg 先生所认识到的那样，通过收购有能力扩大规模的公司，Facebook 可以弥补其在创新和预防未来威胁方面的失败："看待这个问题的一种方式是，我们真正收购的是时间。即使出现某些新的竞争对手，现在收购 Instagram、Path、Foursquare 等公司也会给我们一年或更长的时间来整合他们，之后才可能会有公司再次接近他们的规模。在这段时间里，如果我们把他们使用的社交机制融会贯通，*这些新产品就不会有太大的吸引力，因为我们已经大规模部署了他们的机制。*"（强调后加。）

68.　　长期以来，Facebook 一直专注于在早期阶段发现潜在威胁，以便在它们有机会自行发展或助推 Facebook 的其他潜在竞争对手发展之前消除这些威胁。

69.　　2013 年，Facebook 收购了 Onavo，该公司自称是"移动行业最全面的市场情报服务机构"，这说明了 Facebook 对早期发现威胁的关注。Onavo 向用户宣传自己提供安全的虚拟专用网络服务，但许多用户不知道的是，它还跟踪用户的在线活动。Facebook 明白，监视用户可以帮助他们识别快速增长并可能将用户从 Facebook 带走的服务，从而使 Onavo"成为识别收购目标的有力工具"。

70.　　2013 年 10 月，Facebook 以 1.4 亿美元收购了 Onavo，几天之内，Onavo 的商业客户就被告知，Onavo 将在 6 天后停止服务。此举挫败了 Facebook 的潜在竞争对手，这些竞争对手可能会利用 Onavo 的服务来识别他们可能合作或收购的公司，以便与

Facebook 竞争。被停止服务的 Onavo 客户表达了他们的沮丧。

71.　　通过收购 Onavo，Facebook 掌握了其用于跟踪其他应用程序的增长和受欢迎程度的数据，并拒绝其潜在竞争对手访问这些数据。正如 2013 年 12 月的内部幻灯片所说："通过收购 Onavo，我们现在可以深入了解最受欢迎的应用程序。我们应该利用这一点来帮助我们实施战略收购。"Facebook 使用 Onavo 数据为 Facebook 高管编制了一系列内部"早鸟"报告，该报告关注"在移动生态系统中以突出的速度或方式获得突出地位的应用程序"。

72.　　Facebook 利用 Onavo 数据识别包括 WhatsApp 在内的收购目标，以执行 Zuckerberg 先生在收购 Instagram 时确定的策略：收购潜在竞争对手，并部署竞争对手的机制，以挫败其他公司利用类似机制扩大规模的努力。例如，有报道称，Facebook 使用 Onavo 数据识别了收购目标"tbh"，这是一款投票应用程序，在推出后仅九周内就获得了 250 万日活跃用户。在 2017 年收购时，tbh 在青少年中颇受欢迎，并且增长迅速。尽管 Facebook 最初宣布计划将 tbh 作为独立品牌保留，但最终还是将其关闭。

73.　　在公众监督下，Facebook 于 2019 年关闭了 Onavo。但其仍在继续使用其他数据来跟踪和评估潜在的竞争威胁。

74.　　虽然 Onavo 的移动数据增强了 Facebook 识别和消除潜在威胁的能力，但在收购 Onavo 之前，Facebook 多年来一直在执行相同的基本策略。例如，2008 年，Facebook 从一家名为 Octazen 的公司取得了联系人导入服务授权。联系人导入服务可以从用户的数字地址簿中无缝提取联系人并将其导入应用程序中使用，可以推动联系人网络快速增长，这对直接网络效应至关重要。Facebook 很快意识到，收购 Octazen 将使竞争对手和潜在对手失去这一增长和参与的"关键"资源。正如一位高管所说："通过[收购 Octazen]，我们将：……让行业中的其他人没有联系人导入数据库提供商。" 在讨论此次收购时，Facebook 高管关注的不是 Octazen 将为 Facebook 带来什么，而是这次收购会如何让

Facebook 剥夺竞争对手增加用户互动和产生网络效应的技术关键。在谈到这一情况时，另一位高管解释说，*如果我们能用几百万美元让一些竞争对手放慢一个季度左右的速度，那么收购 Octazen 可能会很有趣……*"在 2010 年 2 月完成收购后，Facebook 立即终止了所有第三方访问 Octazen 的权限。

75.　　同样，在 2012 年，Facebook 了解到 Google 正在"积极争取"一款新的"社交发现"应用，这款应用可能推动了 Google 新推出的 Google+ 个人社交网络服务的增长。这款名为 Glancee 的应用程序使用地理定位服务来帮助用户结识新朋友。Facebook 随后收购了 Glancee 并将其关闭，不再向 Glancee 的 3 万名用户提供服务。两年后，Facebook 在 Facebook Blue 上推出了一项基于位置的功能，该功能利用了 Glancee 的技术，但规模缩小了，用户只能知道他们当前 Facebook 好友何时在附近。

76.　　同样，在得知 Snapchat 和其他公司对 EyeGroove（一款允许用户创建和分享具有增强现实效果的音乐视频的应用）感兴趣后，Facebook 决定在 2016 年迅速收购该应用，然后将其关闭。

## 五、　Facebook 的反竞争行为

77.　　Facebook 努力"消除"向移动转型风险的核心是其收购或扼杀创新者的战略，而这些创新者可能会在新的移动环境中击败 Facebook。

78.　　Facebook 的反竞争行为包括收购并继续控制 Instagram，这使得一家重要的独立个人社交网络提供商消失；收购并继续控制 WhatsApp，化解了对 Facebook 个人社交网络服务垄断的重大竞争威胁。收购这些竞争威胁使 Facebook 得以维持其主导地位—损害了竞争和用户—靠的不是实力竞争，而是避免竞争。

79.　　Facebook 的行为还包括有条件的交易政策，这些政策被写入与其平台互操作的公司签订的协议中，而 Facebook 引入这些政策是为了将平台访问权限作为一项武器。Facebook 实施了这些协议，并在必要时强制执行，其目的是消除其他潜在威胁，防止竞

争对手侵蚀其垄断地位。

**A. Facebook 实施反竞争收购以保护其主导地位，包括收购 Instagram 和 WhatsApp**

**1. Facebook 收购 Instagram 是为了消除削弱竞争对手**

80.    Instagram 提供移动服务，对 Facebook 的主导地位构成了严重威胁。自 2010 年 10 月在 iOS 设备上推出后，Instagram 迅速受到用户的青睐，因为他们希望获得一款方便与朋友和家人进行照片社交互动的产品。

81.    Instagram 增长极为迅速。它在第一天就获得了 2.5 万用户，一周 10 万用户；不到三个月就有 100 万用户；在不到一年的时间里就有 1000 万用户—而这只是在 Apple 的 iOS 设备上，在安卓设备上推出之前。

82.    Facebook 对 Instagram 的崛起愈加焦虑。2011 年 2 月，Zuckerberg 先生在给同事的信中写道："在 4 个月内，他们即已达到 200 万用户，每天上传 30 万张照片。这太多了。我们需要密切追踪这件事。"

83.    Facebook 最初尝试在移动照片分享功能方面竞争，投入大量资源开发自己的相机应用程序，代号为"Snap"。但是，尽管高级管理层不断施压，这些努力还是收效甚微。2011 年 7 月，一位高管要求："为什么移动照片应用程序开发进展如此缓慢？我们仍然被 Instagram 打得一败涂地。"到了 2011 年 9 月，Zuckerberg 先生抱怨称："在这段时间里，我们让大家一起行动起来，Instagram 已经成为我们在移动照片领域的强大竞争对手，而移动照片将成为照片的未来。"

84.    在 2011 年 9 月的同一封电子邮件中，Zuckerberg 先生意识到照片是 Facebook Blue 许多功能受欢迎不可或缺的一部分，因此也是 Facebook Blue 整体受欢迎的一部分，他提醒 Instagram 是一个主要威胁：

> 我们即将推出的许多产品—News Feed、Timeline、Open Graph—都有一个主题，那就是人们喜欢漂亮的大照片。*很多时候，人们甚至不了解新的 News Feed 或 Timeline 如何工作，但他们喜欢这些产品，因为有更大、更丰富的照片。虽然这在短期内是好事*，但我认为，如果我们不完全占据照片领域，这对我们来说是一个巨

大的战略风险。如果 Instagram 继续在移动设备上表现出色，或者 Google 收购了他们，那么在接下来的几年里，他们可以轻易加入一些复制我们现在所做的事情的服务，如果他们拥有越来越多的人的照片，那就会给我们带来真正的问题。

他们现在成长非常迅速。他们似乎每隔几个月就会翻一番，而他们的用户基数已经达到了 500 万到 1000 万。*一旦我们推出一款引人注目的产品，很多人就会更多地使用我们的产品，而未来的 Instagram 用户将找不到使用它们的理由。但以目前的速度，毫不夸张地说，我们每浪费几个月，他们的成长就会加倍，我们也更难摆脱困境。（强调后加。）*

85.　Facebook 员工忙着满足 Zuckerberg 先生的要求。在一封 2011 年 9 月 13 日的内部邮件中，Facebook 的工程总监提醒她的团队："Zuck 对 [Facebook Snap] 应用感到焦虑（主要是希望减缓 Instagram 的增长）。"

86.　Facebook 的领导层不仅担心独立的 Instagram，还担心 Instagram 落入其他买家手中，比如 Google（Zuckerberg 先生在 2011 年 9 月的电子邮件中曾提到）、Apple 或 Twitter。2012 年 4 月，Facebook 的一名工程师提醒 Zuckerberg 先生，"像 Apple 这样的公司可能会利用 [Instagram] 作为切入点。" 一位 Instagram 投资者和前任 Facebook 高管强调了 Twitter 的威胁："如果 Twitter 和 Instragram 合并，Facebook 的日子会更加难过。"

87.　随着 Instagram 的飞速发展，Facebook 的领导人开始关注收购 Instagram 的前景，而不是与之竞争。例如，2012 年 1 月，Facebook 内部兼并收购（"并购"）团队的负责人写信给 Zuckerberg 先生，建议通过"并购"解决问题，以增加用户的转换成本，保持参与度，并将用户锁定在 Facebook Blue：

> *我认为照片总体上是我们的一个弱点，当然与移动设备的结合也是如此，但它代表了 Facebook 许多用户参与的很大一部分。我认为这既是一个重大威胁（Google /Picasa/Android、Instagram 等），也是一个机会……在我看来，照片（以及全面/智能联系人和统一消息）可能是我们大幅度提高用户转换成本的最重要方式之一——如果我们是所有存放户照片的目的地，因为上传（移动和网络）、编辑、组织和共享功能是同类产品中最好的，而如果用户不能拍摄这些照片并获取相关数据/评论，他们将很难转换。我认为这一领域应该是我们的优先事项，通过并购，特别是考虑到竞争的态势。*（强调后加。）

88.　到 2012 年 2 月，Zuckerberg 先生预测，独立的 Instagram 可能很快成长到巨

大规模，并表示 Facebook 应当采取行动收购它：

> *如果我的分析框架正确，那么我们可以预计，像 Instagram 这样的应用程序能够发展得相当大。如果它现在有 1500 万用户，那么在未来 1-2 年内，可能会达到 1-2 亿用户。（直觉上，这并不疯狂，因为仅明年一年，iOS 的市场份额就会翻一番，而且 Android 也会扩大市场份额，所以即使市场份额没有进一步增长，今年也至少会增长 4 倍。）* 如果这些假设成立，那么*我们或许应该展现出比现在更开放的态度，收购这些公司。*（强调后加。）

89.　在此期间，Zuckerberg 先生反复从 Instagram 作为个人社交网络竞争对手的威胁角度解释收购理由。2012 年 2 月，他写道：

> *我想知道我们是否应该考虑收购 Instagram*，即使它的价格高达约 5 亿美元…… 对于网络而言，*一个令人担忧的趋势是，每天都有大量的人在使用 Instagram—包括来自非技术高中的好友到 Facebook 员工的所有人—他们只将自己的部分照片上传到 Facebook*。这为我们带来了一个巨大的漏洞，我确信我们在平台上或社交动态上所做的任何事情都会彻底解决这个问题。*有时你不想用大量照片打扰你所有的 FB 好友，所以会把照片放到专门用于上传照片的地方*。对于 Facebook Snap，我们的基本论点是，人们需要的是一种在 Facebook 上发布照片的好方式。我们在过滤器上做了一些工作，但不是很多，团队更多的是把它作为一个很好的功能和一个噱头。而 Instagram 则从如何帮助人们拍出漂亮照片的角度来解决这个问题。*我认为我们最初的论点很有可能是错误的，而他们的论点是正确的—人们更想要的是拍出最好的照片，而不是把它们放在 Facebook 上。如果是这样的话，[Facebook] Snap 可能是一个很好起步，但我们在功能和品牌方面都非常落后，Facebook 的核心使用实例之一将如何在移动世界中发展，这真的很可怕，也是我们为什么可能要考虑为此付出很多钱的原因。*（强调后加。）

90.　当月晚些时候，Zuckerberg 先生给 Facebook 时任首席财务官 David Ebersman 写了一封措辞类似的信：

> 我最近一直在思考的一个商业问题是，我们应该愿意花多少钱来*收购像 Instagram 和 Path 这样的移动应用程序公司，他们正在建立与我们竞争的网络*。这些公司拥有数百万用户（目前 Instagram 的用户高达约 2000 万）、快速增长、团队规模小（10-25 名员工）且没有收入。这些公司刚刚起步，*但网络已经建立，品牌已经很有影响，如果它们发展到很大规模，可能会对我们造成很大的破坏*。这些老板不想出售（很大程度上是受到我们成功的启发），但如果出价足够高—比如 5 亿美元或 10 亿美元—他们肯定会考虑。鉴于我们认为我们自己当前的估值相当激进，而且*我们在移动领域很脆弱*，我很好奇我们是否应该考虑收购他们中的一个？你对此有何看法？（强调后加。）

91.　　Ebersman 先生提醒说，收购新生的竞争对手是糟糕的收购理由，因为"其他人会立即填补他们的空白"，而且"我们始终会有后起之秀紧紧跟随"。但是，正如 Zuckerberg 先生解释的那样，Ebersman 先生错了：

> *这样做一举两得：(1) [即消除潜在的竞争对手]，以及 (3) [将收购的产品整合到 Facebook]。我们的基本计划是收购这些公司，让他们的产品继续运行，同时随着时间的推移，将他们发明的社交动态功能融入到我们的核心产品中。有一个原因可能会让[消除潜在竞争者]变得更加合理，那就是围绕社交产品的网络效应和尚未发明的差异化社交机制数量有限。一旦有人在某个特定的机制上获胜，其他人就很难再在没有差异化的情况下取代他们。有可能有人通过构建更好的产品来击败 Instagram，从而获得网络迁移，但只要 Instagram 继续作为一款产品运行，难度会更大。[将收购的产品整合到 Facebook] 也是一个因素，但实际上我们已经知道这些公司的社会动态功能，并会在未来 12-24 个月内整合它们。整合计划包括将他们的机制融入我们的产品中，而不是直接整合他们的产品，如果这样做有意义的话。综合考虑 (1) 和 (3)，看待这个问题的一种方式是，我们真正收购的是时间。即使出现某些新的竞争对手，现在收购 Instagram、Path、Foursquare 等公司也会给我们一年或更长的时间来整合他们，之后才可能会有公司再次接近他们的规模。在这段时间里，如果我们把他们使用的社交机制融会贯通，这些新产品就不会有太大的吸引力，因为我们已经大规模部署了它们的机制。*（强调后加。）

92.　　2012 年 3 月 9 日，Zuckerberg 先生给 Facebook 工程副总裁（后任首席技术官）Mike Schroepfer 发了一封电子邮件，告诉他称："Instagram 的 Kevin Systrom 昨天打电话给我，说要把他的公司卖给我们。他说，他在考虑要么融资，要么以 5 亿美元的价格出售。" Schroepfer 先生回复称：*"想要不失去在照片领域的战略地位是值得花很多钱的。"*

93.　　同样，2012 年 4 月 4 日，Sandberg 女士和其他高级经理收到了一封电子邮件报告，该报告比较了 iPhone 上 Instagram 和 Facebook Blue 的使用情况，指出"Facebook 在 iPhone 上并没有远远领先 Instagram"。Sandberg 女士将这封邮件转发给了 Zuckerberg 先生，并写道："这让我更想收购 Instagram。"

94.　　与此同时，Facebook 员工继续努力与 Instagram 竞争，为 Facebook Blue 网络开发了一款独立的照片分享应用。在 2012 年 4 月 3 日的一封电子邮件中，Schroepfer 先生就 Facebook 自己的照片应用提醒一位 Facebook 工程师："我们需要尽快交付。不确

定你是否看到了最近的 Instgram 数字，但我们时间不多了。"工程师回复道："是的，Instagram 的统计数据很吓人，我们需要尽快交付。我会通知团队我们需要准备好发布。"

95. 2012 年 4 月 9 日，Facebook 宣布已达成协议，将以 10 亿美元收购 Instagram，这是 Facebook 截至当时手笔最大的一项收购。Facebook 为 Instagram 支付了溢价，反映出 Instagram 对 Facebook 的垄断地位构成了重大威胁。就在同一天，Zuckerberg 先生私下写信给一位同事，庆祝自己清除了这个威胁："我记得你在内部帖子中说我们的威胁是 Instagram，而不是 Google+。你基本正确。不过，关于初创公司有一件事，那就是你可以收购它们。"

96. 与此同时，Facebook 员工也在庆祝收购了一家构成威胁的公司。例如，2012 年 4 月 10 日，也就是声明发布两天后，Facebook 内部并购团队的负责人写信给 Ebersman 先生，强调 Instagram"在我们今天所知的社交网络的主要领域之一（照片）上做得很好，但社交网络的发展方向显然是（移动）"。他指出，"他们的增长轨迹相当令人难以置信，Mark 昨天在参观期间问他们何时会达到 1 亿用户，他们说他们的预测是今年年底。"

97. Facebook 的其他密切观察人士认为，Facebook 通过收购 Instagram 化解了一个重大的竞争威胁。例如，在 2012 年 4 月 12 日的一封电子邮件中，一位 Facebook 大股东、前任 Facebook 高管对 Instagram 联合创始人 Kevin Systrom 说：

*至少有 6 个月，我一直在敦促 Facebook 的相关人员，包括 Zuck，实施这件事，要尽快实施，不惜任何代价。从我的角度来看，不收购你们（以及像 Google 这样的公司收购你们）的风险开始让我和其他许多大股东感到非常不自在……在过去几年里，Facebook 任由其核心照片产品（及其移动产品）萎靡不振。因此，照片产品从未兑现其最终潜力，更糟糕的是，它面临着不可想象的风险—被另一个拥有"平行图谱"的网络相形见绌。如你所知，照片是 Facebook 的生命线，通过它产生的使用、互动和积极的反馈循环来支撑整个网络，在网站上停留的时间与照片浏览直接相关。回顾 2005 年，在我推出照片后不久，它就产生了 Facebook 约 50% 的页面浏览量，这一数据一直相当稳定，直到平台上推出游戏。（强调后加。）*

98. 收购消息公布后不到两周，Zuckerberg 先生就建议取消或缩减对 Facebook

自有移动照片应用的投入，这是收购 Instagram 交易的直接结果。他在 2012 年 4 月 22 日的一封电子邮件中写道："我们可以缩减或取消投入的领域包括：……移动照片应用程序（因为我们正在收购 Instagram）。" Facebook 确实关闭了这款应用程序，在 2014 年完全关闭之前，只进行了两次更新。

99. 在收购 Instagram 之后，Facebook 的员工觉得他们不再需要担心会出现以移动照片分享作为主打的个人社交网络竞争对手。例如，在 2012 年 4 月 23 日的一封电子邮件中，一位 Facebook 业务开发经理在给同事的信中写道，他对 Camera+ 和 Hipstamatic 这两款应用程序并不担心，因为"Instagram 在 iOS 上显然是赢家，目前很难与之竞争。"在 2012 年 10 月的一份文件中，一位 Facebook 产品总监承认，拥有 Instagram 意味着 Facebook "有效主导了照片分享"，并且不"需要做很多工作来维持或扩大"这种主导地位。

100. Facebook 对 Instagram 的收购消除了一个极具威胁性的个人社交网络竞争对手，以及对 Facebook Blue 垄断地位日益严重的威胁。一张 2011 年 5 月 31 日的投资者幻灯片强调了 Instagram 创始人"建立完整的社交网络服务"的计划。Systrom 先生在收购前不久的私人通信中向 Zuckerberg 先生强调了这一愿景的广度：

> [我对 Instagram 的愿景]*不会将 Instagram 的范围限制在照片上，还要探索其他媒介，以支持 Burbn [Instagram 原名] 最初的愿景，即改进我们在现实世界中交流和分享的方式……它是下一代照片应用程序还是下一代通信应用程序？*我并不想过于哲学化，*但我们雄心的极限确实还有待考验，至少现在我现在的眼光不止于此。以 Facebook 的规模产生影响的愿望是真实具体的，而这一点实际上在我们的头脑中很难抑制。*（强调后加。）

101. Instagram 也计划并期望成为重要的广告竞争对手。一张 2011 年 5 月 31 日的投资者幻灯片记录了 Instagram 通过移动广告取得收入的计划。同样，在 2012 年 1 月的一封电子邮件中，Systrom 先生向外部合作伙伴解释道："我们相信，从长远来看，品牌商将会付费，要么展示自己，要么展示他们的内容，或者定向"Instagram"作为广告投放给人们。现在，我们筹集了足够的资金，我们可以在尝试向广告客户销售之前，努力打造人

们喜爱的产品。我们首先要有受众。"

102. 通过收购 Instagram，Facebook 使 Instagram 不再是 Facebook Blue 的独立竞争对手。自收购以来，Facebook 已采取措施减少 Instagram 对 Facebook Blue 的影响，这证明了 Instagram 对 Facebook 的个人社交网络垄断构成了重大威胁。例如，收购后，Facebook 限制了 Instagram 的推广活动，而这些活动会吸引用户离开 Facebook Blue。这让 Systrom 先生大失所望，他在 2012 年 11 月的一封电子邮件中抱怨道：你一直在说你不能推广 Instagram，除非你明白它对 Facebook 参与度的影响。是谁做出了这个决定？"

103. Facebook 增长副总裁回应道："[产品副总裁] Chris Cox 表达了他的担忧（顺便说一句，我也同意他的看法），他担心 Instagram 的订阅源会蚕食我们自己的订阅源，或者培养用户查看多个订阅源—这就是我们希望首先衡量使用 Instagram 对我们的参与度产生的影响并采取措施确保增值的原因…… 我不确定在不了解对 Facebook 参与度的影响的情况下，通过推广盲目发展 Instagram 是否有意义。"

104. 然而，尽管 Facebook 努力降低 Instagram 对 Facebook Blue 的影响，但 Facebook Blue 仍然不敌 Instagram。例如，2017 年 9 月的一份文件指出："用户内的动态变化表明，用户持续转向 Instagram，这在一定程度上是以 Facebook 为代价的。"另一组内部幻灯片开门见山地说："对于 Friends+Feed 应用程序而言，Facebook 和 Instagram 似乎是非此即彼。"

105. 总之，Facebook 对 Instagram 的收购和控制代表清除了 Facebook Blue 个人社交网络垄断面临的重大威胁，以及通过竞争以外的手段非法维持这种垄断。这种行为剥夺了用户从独立的 Instagram（无论是独立还是被第三方收购）竞争中获得的利益，包括额外的竞争性决策和创新场所；评估 Facebook Blue 为用户提供的服务的待遇和水平，包括广告量和隐私水平；为不受 Facebook 控制的用户提供个人社交网络的替代提供商；以及刺激 Facebook 开展竞争的推手。Facebook 拥有和控制 Instagram 也维持了一条"护城河"，

阻止和阻碍了个人社交网络的竞争和进入。

106. Facebook 无法证明并购能够提高效率或带来其他对竞争有利的好处，因而无法证明收购 Instagram 的合理性。

***2. Facebook 收购 WhatsApp 是为了消除对其个人社交网络垄断地位的竞争威胁***

107. 消除了来自 Instagram 的威胁后，Facebook 转向了在其看来是 Facebook Blue 面临的"下一个最大的消费者风险"：提供移动消息服务的应用程序进入个人社交网络市场的风险，无论是增加个人社交网络功能，还是推出衍生的个人社交网络应用程序。Facebook 认为，广受欢迎且广泛使用的移动通讯应用 WhatsApp 是这方面的最大威胁。Facebook 再一次通过收购 WhatsApp 来应对竞争威胁，而不是通过投资和创新来击败 WhatsApp。

108. Facebook 的领导层很快意识到，达到一定规模的移动消息应用程序可以通过添加额外的特性和功能，以具备竞争力的规模进入个人社交网络市场，并削弱或取代 Facebook Blue 的个人社交网络垄断地位。到 2012 年初，一款可在多个移动操作系统上使用的成功移动消息应用程序可能会闯入个人社交网络，这一风险已成为 Facebook 领导层的战略重点。例如，在 2012 年 4 月的一封电子邮件中，Zuckerberg 先生指出了一种令人不安的全球趋势，即"消息应用程序将消息作为跳板，建立更通用的移动社交网络"。到 2012 年 10 月，这一威胁在 Facebook 内部得到了广泛认可，一位 Facebook 业务增长总监在内部预测："这可能是我们公司所面临的最大威胁。"

109. Facebook 的领导层担心，移动通讯将成为进入个人社交网络市场的严重竞争威胁。例如，在 2012 年 4 月的一封电子邮件中，一位 Facebook 数据科学家指出："虽然这些[移动消息]应用程序最初是作为短信的替代品，但它们正日益扩展，进入与传统社交网络服务更相似的领域。"几周后，他再次写信给同事："我们将继续关注移动消息应用程序。两点需要关注：这些应用程序中有几个正试图进入更成熟的社交网络；还有一些公

司正在进行国际扩张，并取得了不同程度的成功。"同样，在 2013 年 8 月的一封电子邮件中，Facebook 内部并购团队的负责人警告称，"当然，令人担心的是这种移动消息应用是打入我们在互联网上一直领先的更广泛的移动社交活动/分享的楔子。"

110.    Facebook 高管和员工认为这是一个严重的战略威胁。例如，在 2012 年 10 月 4 日的一封电子邮件中，Facebook 的产品管理总监就来自移动消息服务的竞争向同事们写信："这是我在 Facebook 工作 5 年来所见过的对我们产品的最大威胁。它的威胁程度 G+ 还大，我们都很害怕。这些家伙实际上拥有可靠的策略：从最亲密的社交图谱（你在手机上发送消息的那些）开始，然后从那里入手。"

111.    同样，2013 年 2 月 Facebook 董事会一份题为"移动消息"演示文稿的备注中也警告称，移动消息服务"对我们的核心业务构成了威胁：无论是在图谱还是内容共享方面。他们正在构建游戏平台、个人资料和新闻源。这些竞争对手具备打造移动优先社交网络的所有要素……按照目前的速度，WhatsApp 将在一年内接近短信水平。"

112.    Zuckerberg 先生还认识到，移动消息服务本身作为受欢迎的重要服务，也具有重大战略价值。例如，2012 年 4 月，他写道："事实上，我认为消息应用是所有人手机上最重要的应用程序。它可能不是最大的业务，但几乎可以肯定它是迄今为止使用最多的应用程序，因此对我们来说是一个关键战略点。"他继续说："自从我们收购 Instagram （并延长了关闭日期！），我现在觉得我们在照片方面领先，但在消息方面越来越落后。"

113.    Facebook 的担忧很快就集中到了 WhatsApp 身上。WhatsApp 是领先的 OTT 移动消息服务提供商，对 Facebook Blue 的个人社交网络垄断构成了重大竞争威胁。WhatsApp 于 2009 年 11 月推出，其独特而强大的用户体验和顶级的隐私保护推动了强劲的增长。截至 2014 年 2 月，WhatsApp 在全球拥有超过 4.5 亿月活跃用户，并以每天 100 万用户的速度增长，使其"踏上了连接 10 亿人的道路"。

114.    其他移动消息应用在亚洲部分地区建立了庞大的用户基础，但在西方却没有取得进展，而与此不同，WhatsApp 不仅在亚洲和欧洲取得了巨大规模，而且还在美国赢

得了市场份额。不像 Apple 的 iMessage 应用程序只能在 Apple 设备的 iOS 操作系统中运行，WhatsApp 可以在所有主流智能手机操作系统上使用，从而成为可以实现大规模跨平台增长的切实威胁。与传统短信不同的是，WhatsApp 提供了类似于社交网络的丰富内容共享功能，并为注重隐私的用户增加了加密功能。因此，到 2014 年，WhatsApp 显然已成为移动消息领域的"品类领导者"，并有可能进军或剥离个人社交网络市场。

115. 为了直接阻止 WhatsApp 扩大规模，Facebook 在 2011 年秋季推出了 Facebook Messenger，这是一款提供 OTT 移动消息服务的应用程序。在全球发布当天，Facebook Messenger 产品总监在给团队写的信中说道："我们有很大的机会与 WhatsApp 竞争，成为大量全球移动消息用户首选的应用程序…… WhatsApp 有 1500 万（注册？）用户。让我们看看多快能达到 1000 万的日活跃人数。"

116. 但 Facebook 很快意识到，它远远落后于 WhatsApp。为了提高性能和使用率，Facebook 必须投入大量资源才能迎头赶上。正如 Zuckerberg 先生在 2012 年 4 月所说：

> 目前，除了 Facebook 整合之外，WhatsApp 是一款比我们的独立 Messenger 应用更好的移动消息产品。它更可靠，发消息更快。通过阅读回执和最近登录时间，用户可以获得更好的信号和反馈。用户甚至可以通过联系人集成轻松联系大多数人…… WhatsApp 每天发送的移动消息数量是我们的 2 倍多，而且每周的增长速度是我们的 3 倍。这是一个大问题…… 不幸的是，我认为我们没有任何办法可以直接降低他们的势头和增长率。他们的增长来自于他们建立的产品和网络，所以我们的首选方案就是尽快建立我们的产品和网络。

117. Facebook 高管们清楚地看到，WhatsApp 确实有可能扩大其在美国的移动消息规模，就像在欧洲和其他地方所做的那样。一位高管在 2013 年 8 月 8 日写信给 Zuckerberg 先生："我很担心…… 他们 [WhatsApp] 是个大麻烦！"他继续说："解决消息应用程序麻烦的机会窗口不断缩小，我们可能需要在 Messenger 3.0 中添加某些功能……我会让你在线下简单运行一下，了解你的看法/看看我们现在是否应当加倍下注（考虑到他们的增长速度/他们发出的野心信号，现在不采取措施，可能就永远没有机会

了）。"Zuckerberg 先生回复："如果除了让短信免费之外，他们还能开发出实质性的功能，那就足以让他们倾覆美国这样的市场，因为在美国，短信仍然是主要平台。"

118. Facebook 高管和员工一再在内部表示，WhatsApp 对 Facebook Blue 构成了独特的威胁，无法通过 Facebook Messenger 的竞争来阻止。例如：

   a. 2013 年 5 月，Facebook 一位产品增长总监评价 WhatsApp 的首席执行官 Jan Koum 说，他是"我们当前最大的竞争对手/威胁"。

   b. 2013 年 7 月，一位工程总监写道："如果我们不打造能打败 Facebook 的产品，其他人会这么做，那就是 WhatsApp（见下文）。我个人认为，像 WhatsApp 这样的公司是 Facebook 最大的威胁……"

   c. 2013 年 8 月，增长副总裁指出："我们和 WhatsApp 绝对不在同一个赛道…… 对于"从零开始的战略"而言，我们现在可能已经太迟了……"

   d. 2013 年 9 月，增长副总裁进一步写道，如果 WhatsApp 成为一个平台，"让用户体验更好/推动增长->我们就会完蛋/这会巩固他们的领导地位。"

119. Facebook 不仅担心独立的 WhatsApp 会做什么，还担心 WhatsApp 在被其他买家收购后会做什么。正如 Facebook 增长副总裁在 2012 年 10 月所写的那样，"最大的问题是，如果它落入错误的人手中……"Facebook 尤其担心 Google 收购 WhatsApp。2012 年 10 月，Facebook 在 2011 年收购的一款即时消息应用的联合创始人兼工程经理警告大家："Google 收购 WhatsApp 的理由在过去 6 个月里变得更加充分…… 如果可以收购 [WhatsApp]，我们不能成为收购者的风险在增加。" Facebook 增长副总裁表示同意："如果我是他们，我肯定会这么做……"

120. 与 Instagram 一样，为了消除对其个人社交网络垄断地位的重大竞争威胁，Facebook 决定收购 WhatsApp，而不是与之竞争。2012 年 4 月，Zuckerberg 先生写道："[我]最担心的是消息业务。WhatsApp 在即时消息方面已经领先于我们，就像 Instagram 在照片方面"领先"我们一样。" 他补充道："如果能够收购他们，我愿意支付 10 亿美元。"

121.　2012 年 11 月，Facebook 首次就潜在收购与 WhatsApp 接触，并于 2014 年 2 月再次接触，这一次取得了成功。2014 年 2 月 19 日，Facebook 宣布达成协议，以 190 亿美元收购 WhatsApp。这一估值反映了 WhatsApp 对 Facebook 个人社交网络垄断威胁的严重性。

122.　两年来，Facebook 员工第二次庆祝消除了一个生死攸关的竞争威胁。在 2014 年 2 月 19 日的一条即时消息中，Facebook 一名经理赞许地写道："值了。他们的数量达到了顶峰，每个人都在使用他们，尤其是在国外。*这可能是唯一一家可以在移动设备上成长为下一个 Facebook 的公司……* 它值得我们市值的 10%。"（强调后加。）

123.　几天后，Facebook 一位高管写信给同事，将收购 WhatsApp 称为"抢地盘"—这只是在有限的竞争脆弱期做出的重大回应，未来不会经常出现：

> 令人担心的是，我们每隔几年就要投入 5-10% 的市值来巩固我们的地位。我喜欢 David 的答案：我们认为这是移动领域即将发生变化的"时间点"。我讨厌"抢地盘"这个词，但我认为这是最有说服力的论据，我们应该承认这一点。

124.　在 Facebook 之外，行业分析师也认为，收购 WhatsApp 消除了对 Facebook 的重大竞争威胁。投资银行 SunTrust Robinson Humphrey 清晰阐述了这笔交易的理由：

> 我们觉得很容易理解为什么 WhatsApp 不仅仅是一个"消息"威胁。就像 Facebook 收购 Instagram 既是进攻也是防御一样，我们认为此次收购不仅扩大了公司的整体目标市场和能力，而且还覆盖了快速增长的"消息公司"的侧翼。乍一看，人们可能会认为 WhatsApp"只是一款短信应用"。但 WhatsApp 远不止于此：每天分享 6 亿张照片、1 亿个视频、2 亿条语音信息和 190 亿条信息。此外，用户还可以共享位置、地点，并进行 1 对 1 或 1 对多通信。鉴于 WhatsApp 的这些功能，以及 Facebook 对沟通和连接世界人口的关注，我们认为随着时间的推移，WhatsApp 和 Facebook 可能会更加相似，可能会产生激烈竞争，而现在可以避免这种竞争。

125.　另一家公司 Bernstein Research 在谈到这笔交易时表示：

> WhatsApp 的移动数据流和 Facebook 的移动新闻源之间的"距离"并不大，人们可能会看到另一款 10 亿用户服务的出现，随着时间的推移，它可能会成为 Facebook 用户参与度的竞争对手。作为一家独立公司，或者作为 Google、Twitter 或 eBay 等其他公司的旗下业务，WhatsApp 图谱可以扩展并打造成 Facebook 的竞争对手。

126. 通过收购 WhatsApp，Facebook 压制了 WhatsApp 对 Facebook 个人社交网络垄断的竞争威胁。Facebook 一直限制 WhatsApp 只提供移动消息服务，而不是让 WhatsApp 成为与之竞争的个人社交网络提供商，并限制 WhatsApp 在美国的推广。例如，2019 年 2 月，Cox 先生告诉 Zuckerberg 先生，他拒绝对 WhatsApp 进行某些形式的推广，并指出尽管 Facebook 拒绝在美国积极推广 WhatsApp，但它在美国还是取得了成功："在美国，WhatsApp 是 Messenger 信息量的 2/3，而我们几乎没有尝试推广它。"

127. 总之，Facebook 对 WhatsApp 的收购和控制代表清除了 Facebook Blue 个人社交网络垄断面临的重大威胁，以及通过竞争以外的手段非法维持这种垄断。这种行为剥夺了用户从独立的 WhatsApp（无论是自己还是被第三方收购）竞争中获得的利益，而 WhatsApp 有能力和动机进入美国个人社交网络市场。此外，WhatsApp 采用注重隐私的产品和设计，包括"尽可能少了解你"的原则和无广告订阅模式。对于许多用户来说，这些极具价值的功能将为 WhatsApp 提供重要的产品差异化形式，使其成为个人社交网络领域的独立竞争威胁。Facebook 拥有和控制 WhatsApp 也建立了一条"护城河"，阻止和阻碍其他可能进入个人社交网络市场的移动消息应用。

128. Facebook 无法证明并购能够提高效率或带来其他对竞争有利的好处，因而无法证明收购 WhatsApp 的合理性。

129. Facebook 通过收购实现垄断今天仍在发生。Facebook 继续持有并运营 Instagram 和 WhatsApp，这消除了它们对 Facebook 的直接竞争威胁，并继续将它们定位成为其个人社交网络垄断提供保护的"护城河"。具体来说，Facebook 认识到，只要它保持 Instagram 和 WhatsApp 的大规模运营，新公司就很难进入并围绕各自的机制扩大规模。因此，Facebook 恰恰受益于 Zuckerberg 先生在解释收购 Instagram 的价值时所强调的动力："新产品不会有太大的吸引力，因为我们已经大规模部署了它们的机制。" 除非加以禁止，

Facebook 仍在继续寻找其他竞争威胁，并寻求收购它们。

## B. Facebook 维持并强制执行平台访问权限的反竞争条件，以阻止对其个人社交网络垄断的竞争威胁

130. 即使像 Facebook 这样的大公司也无法通过收购消除所有的竞争威胁。因此，作为收购活动的补充，Facebook 还实施一系列反竞争行动，旨在通过限制和拒绝可能对其垄断构成威胁的公司或帮助其他公司这样做的公司扩大规模，保护 Facebook 的个人社交网络垄断地位。

131. 如上文所述，Facebook 提供平台的公开访问权限为应用程序和网络开发者、用户以及 Facebook 带来了巨大的利益。随着 Facebook 平台的广泛采用，Facebook 成为第三方应用程序的重要基础设施，并在应用程序的发展轨迹、竞争决策和投资策略方面获得了巨大的权力。

132. Facebook 利用这一权力来阻止和压制其个人社交网络垄断的竞争威胁。为了保护其垄断地位，Facebook 采用并要求开发者同意有条件的交易政策，限制第三方应用程序与 Facebook 竞争对手接触或自身发展成为竞争对手的能力。

133. 具体而言，Facebook 要求希望使用 Facebook 平台和访问重要的商业 API 的开发者同意 Facebook 施加的合同限制，包括 Facebook 不断施加的任何新的或更改的限制或政策。这些限制制约了开发者可以使用该平台进行的活动类型。如下所述，随着时间的推移，这些限制发生了变化，但在不同的时间点，其内容包括要求开发者同意其应用程序不会与 Facebook 竞争（包括在相关时间，通过"复制 Facebook 产品提供的核心功能"），也不会推广竞争对手。Facebook 惩罚了违反这些条件的应用程序，禁止他们使用重要的商业 API 功能，包括 Find Friends API（这些功能可以帮助应用程序扩大运营规模），并阻碍了它们发展成为对 Facebook Blue 构成更有力竞争威胁的能力。简而言之，Facebook 签订了协议，通过这些协议，Facebook 使用对关键 API 的宝贵访问权限换取这些公司承

诺不与 Facebook 竞争。

134. 在剥夺开发者访问关键 API 的权限时，Facebook 做出了一个深思熟虑的决定，放弃了被剥夺权限的应用程序原本会给 Facebook 带来的收益，包括广告支出。这一放弃是为了实现 Facebook 的长期目标：消除潜在的竞争威胁，保持垄断地位。

***1. Facebook 的反竞争平台政策体现在与开发者的协议中，消除了来自应用开发者的竞争威胁***

135. Facebook 在其 2012 年年报中披露，"平台合作伙伴可能会使用我们的用户通过 Facebook 平台共享的信息来开发与我们竞争的产品或功能，这是运营的一个重大风险因素……因此，我们的竞争对手可能会以牺牲我们用户群的增长或参与度为代价来获取和吸引用户，这可能会对我们的业务和财务业绩产生负面影响。"

136. 为了应对这一风险，从 2011 年 7 月到 2018 年 12 月，Facebook 推出并实施了一系列反竞争政策，并将其写入与应用程序开发者签订的管理开发者访问 Facebook 平台的协议中。

137. 2011 年 6 月，Google 推出了名为 Google+ 的个人社交网络。2011 年 7 月 27 日，Facebook 作出回应，推出了一项关于访问 Facebook 平台的应用程序可以做出的行为的新政策："Facebook 上的应用程序不得集成、链接、推广、传播或重定向到任何其他竞争社交平台上的任何应用程序。" 这一政策旨在破坏竞争的可能性，并阻止竞争的出现，包括个人社交网络竞争对手。事实上，该政策的直接推手是 Google 推出的 Google+ 个人社交网络。在 2011 年 7 月 27 日的一封电子邮件中，Facebook 一位经理解释说："我们争论了很久。在不知道 Google 会推出什么和如何推出的情况下，很难具体讨论，所以我们讨论的比较宽泛，随着威胁的方式和程度变得清晰，我们可以选择收紧。当天晚些时候，另一名 Facebook 员工向同事抗议这一反竞争的举动："我认为这既是反用户的，也向世界（可能更重要的是向我们的员工）传递了一个信息，即我们害怕不能靠自己的实力竞争。"

138.　2011 年 7 月和 8 月，Facebook 终止了几个第三方开发者访问 API 的权限，因为他们的应用程序允许用户将他们的 Facebook 联系人导入 Google+ 或其他社交网络。

139.　在此之后，Facebook 实施了其他几项政策，限制应用程序开发者使用 Facebook 平台，包括 Facebook API。通过这些政策，Facebook 利用其对 API 的控制来阻止和压制开发者在 Facebook 平台上构成的威胁。

140.　<u>2012 年 9 月：不得向竞争对手的社交网络导出数据。</u>2012 年 9 月 12 日，Facebook 提出了一项新的条件，要求开发者同意："竞争社交网络：未经我们许可，您的[开发者]不得使用 Facebook 平台将用户数据导出到竞争对手的社交网络。"

141.　<u>2013 年 1 月：不得推广/将数据导出到任何复制 Facebook 核心产品或服务的应用程序。"</u>2013 年 1 月 25 日，Facebook 进一步修订了其与应用程序开发者的标准协议，增加了一项新的条件，以防止开发者"复制核心功能"（即与 Facebook 竞争），或协助其他可能这样做的人：

> 复制核心功能：未经我们许可，您不得使用 Facebook 平台推广或将用户数据导出到复制 Facebook 核心产品或服务的产品或服务。

142.　随着这些反竞争政策的实施，那些依赖 Facebook 开放态度的开发者突然发现自己被 Facebook 盯上了。例如，个人社交网络应用程序 Path 的开发者在 2010 年开始开发工作，当时 Facebook 正在鼓吹平台的开放性，甚至邀请竞争对手的应用程序接入。同样，本地社交网络 Circle 也于 2010 年开始开发。有一段时间，这些开发者能够接入 Facebook 并访问平台 API，传播他们的产品。

143.　2013 年，Facebook 切断了这两个应用程序对关键 API 功能的访问权限，声称它们违反了新的平台政策。两位开发者都对他们的应用程序进行了修改，试图平息 Facebook 的怒气，从而重新获得对关键 API 的访问权限，但都遭到了拒绝。关于 Circle，Facebook 一位高管向另一位高管解释说，即使 Circle 已采取措施打消 Facebook 的疑虑，其访问权限也不会恢复，因为 Circle 是一个本地社交网络，最终可能会成为竞争威胁：

"虽然我很欣赏 Circle 已经完成了下面的所有项目（或同意这样做），但最终仍然存在复制的核心功能部分，这是无法'纠正'的。"

144. Facebook 继续评估对可能构成竞争威胁的公司施加进一步的平台限制，引发了内部异议，并一再明确承认 API 访问权限对 Facebook 平台生态系统中应用程序和业务的增长和成功的重要性。在 2013 年 12 月的一封电子邮件中，一位 Facebook 软件工程师写道：

> 那么，我们是根据我们对应用程序的恐惧程度将它们分类，并为它们提供不同的 API 吗？ 在书面文件中应该怎么写？ 在页面顶部放一个链接，说"向打造一款消息应用程序？ 单击此处筛选出我们不允许您使用的 API！" 如果一个应用程序添加了一项从 2 转到 1 的功能，那该怎么办？ 就这样降低待遇？ 消息应用程序不能使用 Facebook 登录？ 那么，我们要传达的信息是，"如果你要与我们竞争，那就完全不要接入我们。" 我表示无语。

145. Facebook 的开发者产品负责人对此做出了回应，指出 Facebook 已经针对竞争威胁进行了访问限制："是的，这样不太好，但这已经在某种程度上发生了—例如，不允许 Path 使用某些东西…… 关于哪些人被定为竞争对手，绝对数字相当小。" 另一位 Facebook 工程师表示赞同："这不仅很复杂，而且有点不道德，"而一位工程经理则表示："好吧，我同意这不太好。"开发者产品负责人回答："我同意这不太好，但你解读得太绝对了…… 实际上，只有排名前 5 的消息应用程序才会吸引我们的注意。" 但软件开发者并不满意："这感觉有点不道德，但我很难做出解释。这让我觉得自己是个坏人。" 开发者产品负责人回答："这是一种内部的政治安全网，让平台可以规避公司其他部门不愿意看到的情况。"

146. Facebook 高管在后来的内部电子邮件讨论中显示，虽然 Facebook 声称拒绝具有消息或新闻源功能的应用程序访问特别重要的 API 功能的理由是[已编辑]，但歧视性拒绝访问的真正原因是[已编辑]，Facebook 的目标和实施该政策的方式让人毫不怀疑其真正目的是阻止竞争威胁：[已编辑]

147.    总之，Facebook 一再将开发者同意接受禁止与 Facebook 竞争的条款作为允许他们访问重要商业 API 功能的条件。一般来说，开发者接入可以为 Facebook 带来巨大好处，包括增加用户参与度和由此带来的经济回报，但 Facebook 只向那些不会对 Facebook 构成竞争威胁的应用程序开发者提供完全的访问权限。

148.    Facebook 的政策要求和开发者协议条款改变了应用开发者的主动性，阻止他们开发竞争性功能或支持竞争性个人社交网络。

149.    此外，Facebook 知道 API 访问权限非常重要，足以影响开发者的主动性及其应用程序的开发轨迹。Facebook 在推动开发者做出不会损害他们访问 Facebook API 权限的决定。2014 年 1 月一张关于 Facebook 平台政策的内部幻灯片中，直接承认了 API 访问权限的重要性，并提出一个问题：Facebook"对改变/扼杀许多初创公司的前景是否感到心安"。

150.    <u>2018 年 12 月：取消明示的反竞争条件政策。</u> 2018 年 12 月 4 日，Facebook 取消了"核心功能"限制。第二天，英国议会一名议员公布了一批文件，这些文件来自 Facebook 与应用程序 Six4Three 之间的诉讼，展示了 Facebook 对应用程序开发者实施的反竞争行为。

151.    Facebook 在 2018 年 12 月暂停执行明示的反竞争条件政策，背后的原因是文件发布后引发的公众监督，并不代表 Facebook 否认潜在的反竞争行为。在 Facebook 预计这些文件公开的当天，Sandberg 女士给 Facebook 董事会写了一封信，称："预计 Six4Three 文件会被公开，我们需要将第 4.1 条从开发者平台政策中删除。该条款禁止开发者使用我们的 API 来"复制 Facebook 已经提供的核心功能"。……我们认为在 Six4Three 文件公开之前发布此项变更非常重要。" 为了应对预计会出现的公众监督，Facebook 暂停了其反竞争平台政策，而如果能够顺利度过监督，Facebook 可能会重新制定此类政策。事实上，直到今天，Facebook 仍在继续筛选开发者，并将 API 访问权限作为武器，以巩

固其主导地位。此外，下一次面临技术转型期带来的激烈竞争压力时，Facebook 可能会卷土重来，实施限制或其他类似的反竞争做法。这种压力可能会出现。举例而言，人工智能的更广泛使用，或者 Facebook 自己认为未来占据主导地位的科技公司将为用户提供引人注目的"元宇宙"（一个在数字空间中托管用户的虚拟环境），而 Zuckerberg 先生最近说，元宇宙将是"移动互联网的继任者"。

152. 没有任何政府制裁阻止 Facebook 恢复执行其政策，而 Facebook 自己的陈述也多次被证明毫无意义。事实上，自 2012 年以来，Facebook 已经因向用户和监管机构提供虚假陈述而遭到重罚。例如，2011 年，FTC 在一项包含八项指控的诉状中，称 Facebook 在如何分享和保护用户数据方面向用户做出了欺骗性陈述。为了解决这些指控，Facebook 接受了一项同意令，限制其对用户隐私做出某些不实陈述，并要求其制定新的隐私程序。该决定和命令于 2012 年 8 月最终生效。但仅在 2012 年签署同意令几个月后，Facebook 就重蹈覆辙，导致 FTC 再次采取执法行动。在随后的调查中，FTC 提起第二次诉讼，称 Facebook 持续未能保护用户隐私及其一系列虚假陈述违反了 FTC 法案和 2012 年的同意令。为了解决新的指控，Facebook 同意和解并支付创纪录的 50 亿美元罚款，并在决定和命令的修订中实施新的禁令条款，包括采用新的公司结构，增加隐私合规渠道和监督层。法官 Timothy Kelly 在批准接受和解并签署规定命令的动议时写道，Facebook 涉嫌违反"法律和行政命令的行为令人震惊"。*United States 诉 Facebook, Inc.*, 456 F. Supp. 3d 105, 117 (D.D.C. 2020)。

153. Facebook 此前也曾向其他主管部门做出虚假陈述。2014 年，作为 Facebook 获得欧盟委员会批准收购 WhatsApp 所做工作的一部分，Facebook 曾两次做出陈述，其无法在 Facebook Blue 用户帐户和 WhatsApp 用户帐户之间建立可靠的自动匹配。但大约两年后，Facebook 更新了 WhatsApp 的服务条款和隐私政策，允许其将 WhatsApp 用户的电话号码与 Facebook 用户的身份联系起来。在对 Facebook 的虚假陈述进行调查后，欧盟委

员会认定，在 Facebook 做出虚假陈述时，在技术上已经可以匹配 Facebook Blue 和
WhatsApp 用户身份，而且 Facebook 员工知道这些功能。欧盟委员会认定，Facebook 的
多次虚假陈述使得欧盟委员会无法获取评估收购所需的相关信息。结果，欧盟委员会对
Facebook 罚款 1.1 亿欧元。

### 2. *Facebook 依靠实施其反竞争条款阻止了新出现的威胁*

154.    Facebook 与应用程序开发者的协议条款，包括随着时间的推移 Facebook 政
策更新而进行的修订，本身就影响了应用程序开发者的意愿和竞争能力。应用程序开发者
通常必须同意接受这些条款才能使用 Facebook 平台。Facebook 加入这些限制性合同条款，
改变了开发者的意愿和竞争能力。Facebook 决定积极执行这些条款，这进一步确保了向
开发者传达明确的信息：与 Facebook 竞争将付出沉重的代价。Facebook 通过切断对具有
重大商业价值的 API 功能的访问权限来执行这些协议，通常针对三类应用程序。

155.    首先，Facebook 瞄准的是提供个人社交网络、前景看好的应用程序。例如，
Facebook 对个人社交网络竞争对手 Path 采取措施，后者是由一名前 Facebook 经理创建。
2013 年 4 月左右，Facebook 终止 Path 访问关键 API 功能的权限，随后 Path 的增长明显
放缓。

156.    第二类目标是具有一些社交功能、前景看好的应用程序。例如，Circle 是一
款旨在建立本地社交网络的应用程序，它在 2013 年 12 月引起了 Facebook 的注意。在提
议切断 Circle 对关键 API 功能的访问权限时，Facebook 一位经理强调称 Circle 竞争前景
广阔："Circle 将自己定位为'本地社交网络'，在过去四天里增长强劲（昨天的下载量超过
80 万次，昨天的 Facebook 登录量超过 60 万次，在英国 App Store 中排名第一）。"虽然
Facebook 对外声称剥夺权限是因为 Circle 向用户"发送垃圾邮件"，但在 Circle 解决垃圾邮
件问题后的内部通信显示，真正的原因是 Circle 构成了威胁："他们正在复制[社交]图谱，
而且做得相当出色…… 他们还非常直接地在图谱上创建了一个充满竞争力的社交网络。"

事实上，在 Circle 纠正了 Facebook 指出的问题后，Facebook 仍然继续拒绝授予访问 API 功能的权限，一名 Facebook 经理表示：“虽然我很欣赏 Circle 已经完成了下面的所有项目（或同意这样做），但最终仍然存在复制的核心功能部分，这是无法'纠正'的。” 接下来数周，Circle 的每日新用户从每天 60 万下降到几乎为零。

157.    同样，2013 年 1 月，Facebook 平台合作与运营总监在给同事的信中写道：“Twitter 今天推出了 Vine，允许用户拍摄多个短视频片段来制作 6 秒的视频。作为他们的新用户体验的一部分，用户可以通过 Facebook 找到朋友。除非有人提出不同意见，否则我们今天就会关闭他们对 Friends API 的访问权限。我们已经做好了公关准备，我会把我们的决定告知 Jana。” Zuckerberg 先生回复称：“好，去做吧。” 通过切断 Vine 的访问权限，Facebook 阻止了其访问重要的 API 功能，而这些功能本可以帮助它成长。

158.    第三类目标是提供移动消息服务、前景看好的应用程序，这些应用程序是 Facebook Messenger 的现有竞争对手，或者有可能发展成为 Facebook Blue 的竞争威胁。2013 年及以后，Facebook 禁止移动消息、视频和照片应用程序使用重要的商业 API 功能：

  a. 2013 年 1 月，在 Facebook Messenger 推出与之竞争的语音功能后不久，Facebook 切断了 Voxer 访问关键 API 的权限。Voxer 是一款具有语音通信功能的移动消息应用程序。切断之后，Voxer 从面向消费者的移动消息服务转向一键通业务通信。

  b. 2013 年 2 月，消息应用 MessageMe 人气飙升，在发布一周内就获得了近百万用户。但在 MessageMe 用户达到 100 万后不久，Facebook 就关闭了对关键 API 的访问权限。关闭后，MessageMe 停滞不前并最终关闭。

  c. 2013 年 8 月，Facebook 同时对多款消息应用实施打击，开发者执行负责人指示同事限制这些应用“访问基本信息以外的任何读取 API”，并指示称“我们不会以任何方式与[开发者]就这些限制进行沟通”。

  d. 2016 年 10 月，Facebook 切断了 Tribe 的某些 API 功能。Tribe 是一款视频消息应用，在当时引起了轰动。

159.    Facebook 实施限制对平台访问权限的反竞争条件阻碍了各家公司取得发展、威胁 Facebook 个人社交网络垄断地位的能力。

160. Facebook 的行动还向其他应用程序发出了信号，如果它们也对 Facebook 的个人社交网络垄断构成威胁，它们将失去对对商业具有重要影响的 Facebook API 的访问权限。例如，在 Facebook 切断 Vine 的访问权限后不久，一款第三方应用程序就 Facebook 平台的做法联系了 Facebook。Facebook 一位经理在内部报告中提及了这款第三方应用："他们非常担心依靠我们的平台继续发展的可行性，因为我们有可能在这样的情况下关闭他们的权限。"

161. 总体而言，Facebook 公布并实施其反竞争协议，阻碍、压制和阻止了挑战其美国个人社交网络垄断地位的潜在竞争威胁的出现。因此，这种排斥性行为有助于维持 Facebook 在美国的个人社交网络垄断地位。通过阻止其他应用程序的进入，并将那些可能与之竞争的应用程序的开发者排除在外，Facebook 巩固了保护其不受竞争的网络效应—这种效应一直持续到今天。

162. Facebook 的行为，无论是单独还是作为整体，都至少在两个方面抑制了在 Facebook 平台上运行的应用程序成为 Facebook 及其个人社交网络垄断的竞争威胁的能力和意愿。首先，应用程序开发者为访问 Facebook 的 API 而必须签署的 Facebook 强制协议的条款改变了开发者的意愿，阻止他们开发可能对 Facebook 构成竞争威胁的特性和功能，或阻止他们与可能与 Facebook 竞争的其他平台合作。其次，协议的执行—即实际终止作为潜在竞争威胁引起 Facebook 注意的应用程序的 API 访问权限—阻碍了各家公司威胁 Facebook 个人社交网络垄断地位的能力。

163. 没有任何促进竞争的好处足以证明访问 Facebook 平台设置的反竞争条件是正当的。

## 六、 **Facebook 的垄断权力**

164. Facebook 在美国提供个人社交网络方面拥有垄断权力，并且至少自 2011 年以来一直拥有这种权力。多个来源的证据表明，Facebook 在美国个人社交网络服务方面

拥有垄断权力。首先，从 2011 年至今，Facebook 一直在美国个人社交网络的相关市场中占据主导地位。其次，有直接证据表明，Facebook 在美国个人社交网络服务方面拥有垄断权力。再次，由于巨大的准入壁垒，包括直接的网络效应和高昂的转换成本，Facebook 的垄断权力长期存在。

**A. 美国的个人社交网络是一个相关市场**

165.　在美国提供个人社交网络服务是一个相关市场。

166.　个人社交网络服务是一个相关的产品市场。个人社交网络服务由在线服务组成，这些在线服务使人们能够在共享的社交空间中维护个人关系，并与朋友、家人和其他个人联系人分享体验。个人社交网络服务是一种独特的在线服务类型。三个关键要素将个人社交网络服务与提供给用户的其他形式的在线服务区分开来。

167. 首先，个人社交网络服务建立在社交图谱上，该社交图谱映射用户与其朋友、家人和其他个人联系人之间的联系。社交图谱形成了用户与他们的个人联系人连接和通信的基础，并且可以反映友谊、在线对话、查看某人最新状态的愿望、对地点的访问以及与个人兴趣和活动（包括小组、位置、公司、艺术家和爱好）的其他共享连接。个人社交网络络提供商使用社交图谱作为他们向用户提供的功能的主干，包括下文讨论的个人社交网络的另外两个关键要素。

168.　其次，个人社交网络服务包括许多用户经常用来与个人联系进行交互并在共享社交空间中分享他们的个人体验的功能，包括一对多"广播"格式。在这个共享的社交空间（可能包括新闻推送或其他类似功能）中，用户与其个人联系人共享内容（如个人更新、兴趣、照片、新闻和视频）。个人社交网络提供商可以使用社交图谱了解在共享社交空间中向用户显示什么内容以及何时显示。这通常适用于个人社交网络服务上的所有形式的内容，包括用户创建的内容（如用户"新闻推送"帖子）、发布者创建的内容（如新闻文章）

和广告。

169.　第三，个人社交网络服务包括允许用户查找并与其他用户联系的功能，每个用户可以更容易建立和扩展其个人联系人的范围。社交图谱还通过提供关于向用户推荐哪些联系人或可以与哪些人联系来支持此功能。在美国，使用最广泛的个人社交网络服务是 Facebook Blue、Instagram 和 Snapchat。

170.　相关的地理市场是美国。美国是个人社交网络服务的相关地理市场，这由几个因素促成，包括宽带接入和在国家层面上存在差异的社会规范。此外，用户网络效应通常在同一国家的用户之间更强，因为对于大多数用户来说，绝大多数相关的朋友、家人和其他个人联系人与用户居住在同一国家。因此，美国的用户主要与美国的其他用户共享内容。对于美国的用户，在美国不流行的个人社交网络服务，即使其在另一个国家流行，也不能与在美国流行的个人社交网络服务合理互换。Facebook 和其他行业参与者认识到这些区别，并按国家分别跟踪他们和竞争对手的表现。

171.　如下所述，在美国提供的促进内容的共享或消费的其他类型的基于互联网的服务不足以替代个人社交网络服务。

172.　个人社交网络与移动消息服务不同，也不能与其合理互换。移动消息服务的特征不是用户可以进行交互的共享社交空间，也不依赖于支持用户与朋友和家人建立联系和分享体验的社交图谱。实际上，移动消息服务的用户通常不会，也不能查询移动消息服务来查找他们尚未拥有的联系人信息，也不能通过查询该服务来查找与对他们重要的人、地点、事物和兴趣有关的其他用户。相反，移动消息服务的用户使用这种服务主要是为了将信息发送给一小群离散的人，而这些人通常只是每个用户的联系人。Zuckerberg 先生在 2019 年的一篇文章中描述了这一区别，称 Facebook Blue 等个人社交网络提供商是"城市广场的数字版"，并称 WhatsApp 这样的移动消息应用程序提供的私人通信是"客厅的数字版"。

173. 个人社交网络与专门的社交网络服务不同，并且不能合理互换。专门的社交网络服务是为用户设计的，并且用户使用它们主要是为了与一组范围小且高度专业化的用户共享一组范围小且高度专业化的内容。因此，用户使用这些服务主要是为了维持或与一组独特或范围小的联系人进行交流—比如参与职业网络—而不是与朋友和家人联系并分享他们个人日常生活的体验。例如，专注于职场（如 LinkedIn）或基于兴趣（如 Strava）联系人的网络。用户认为适合于与一组范围小的联系人进行有限共享的服务的其他示例包括一些在线约会服务和 Nextdoor。Nextdoor 是一种专注于促进仅在物理上彼此接近的用户之间进行共享的服务。

174. 个人社交网络与在线服务不同，并且不能合理互换。在线服务专注于基于用户的兴趣而不是他们的个人联系人来广播或发现内容。突出的例子包括 Twitter、Reddit 和 Pinterest。这些服务并不专注于联系朋友和家人：Twitter 专注于让用户随时了解他们感兴趣的话题，而 Reddit 则推动围绕参与者感兴趣的话题进行对话。因此，用户使用这些服务主要是为了了解和讨论与其兴趣相关的事件（如 Twitter），或与分享特定兴趣的匿名社区参与者进行对话（如 Reddit），而不是与朋友、家人和其他个人联系。因此，这类服务不是个人社交网络服务的合理替代品。类似地，Pinterest 允许用户根据自己的兴趣进行搜索来浏览内容，并允许基于这些兴趣建立联系，但并不专注于将用户与朋友和家人联系起来，因此不足以替代提供这些服务的个人社交网络。

175. 个人社交网络与专注于视频或音频消费的在线服务（如 YouTube、Spotify、Netflix 和 Hulu）不同，也不能合理互换。用户使用这种服务主要是为了被动消费面向通常未知用户的广大观众的特定媒体内容（例如，视频或音乐）。这些服务的主要用途不是与朋友、家人和其他个人联系人进行通信，因此不足以替代提供这些服务的个人社交网络。

176. 抖音是内容广播和消费服务的一个突出例子，它不是个人社交网络服务的可接受替代品。抖音用户主要查看、创建视频内容，并将其分享给发帖者不认识的受众，而

不是与朋友和家人联系和互动。用户使用抖音的目的，以及平台上主要的交互形式，主要不是用户与朋友和家人网络互动。

177. Facebook 自己的声明和内部文件表明，它理解个人社交网络服务和其他服务之间的区别。在 2009 年 7 月给 Apple 的一封电子邮件中，Facebook 移动业务负责人向 Apple 代表解释说："在 YouTube 上发布视频就是在一个大型视频网站上发布视频，但你的朋友都不知道你刚刚发布了视频，而且他们中的大多数人永远也不会看到它。如果人们能够看到，在 YouTube 上发布视频是一件有趣的事，对陌生人来说，对整个地球来说都是一件好事。" 2015 年 2 月，Facebook 一位高管向 Zuckerberg 先生报告称，她的团队分析了 YouTube 在 Onavo 上的使用情况，发现"似乎没有任何迹象表明[Facebook 和 YouTube 之间]正在相互蚕食"，而且"TouTube 和 Facebook 在视频消费方面提供了几乎不相关的使用场景"。类似地，2019 年 1 月，Facebook 内部评估称，"人们使用抖音的目的与 Instagram 显著不同，他们并没有与我们业务的核心领域展开直接竞争"，并进一步表示"使用抖音不是为了与朋友和家人分享"。

178. Facebook 自己的声明和内部文件也表明，它认识到 Facebook Blue 提供的是个人社交网络服务，个人社交网络服务是 Facebook Blue 对用户的主要价值和用途。例如，从一开始，Zuckerberg 先生就将 Facebook Blue 描述为"与真实朋友的真实联系，所以收到这些故事的人会感兴趣，因为这些故事对创建它们的人来说很重要。" 最近，在 2020 年 8 月，Zuckerberg 先生称，"随着时间的推移，我们最关注的使用场景是帮助你与你的朋友和家人联系。" 类似地，Sandberg 女士在 2020 年 9 月说，Facebook Blue 为用户提供的价值是"帮助你与朋友和家人保持联系，帮助你以一种非常有效的方式了解他们的情况。" 此外，Facebook 在 2018 年进行的一项内部用户调查证实，Facebook Blue 的主要用途是"查看我关心的人的日常休闲时刻或他们在做什么"，以及"在我关心的人有特殊时刻时与他们保持联系"。类似地，2014 年和 2015 年的内部文件显示，Facebook 专注于优化

Facebook Blue，将"好友分享"的优先度提高到平台其他类型的活动之上。

179. Facebook 收购 Instagram 时，后者提供的是个人社交网络。Instagram 的创始人着手建立一个"移动社交网络"，并取得了成功。自成立以来，Instagram 提供了个人社交网络的典型功能，包括维护具有个人联系人的社交图谱，使用户能够与其个人联系人互动，并通过共享社交空间（包括一对多"广播"格式）分享其个人体验，并提供允许每个用户找到并与其他用户联系的功能，以建立个人联系网络。此外，最近的内部文件显示，Facebook 对 Instagram 进行了优化，将"好友分享"的优先度提高到其他类型的互动之上。

180. 个人社交网络提供商通常出售他们向用户展示的广告位。个人社交网络提供商向用户提供的服务与其向广告客户销售的广告之间的任何积极的间接网络效应（即，一种服务的价值随着另一种服务的使用量而增加）只有一个方向：用户要么对个人社交网络提供商显示的广告量漠不关心，要么更喜欢较少的广告或没有广告。

**B. Facebook 在美国个人社交网络市场的主导地位**

181. Facebook 通过其 Facebook Blue 和 Instagram 服务向用户提供个人社交网络，并且至少自 2011 年以来一直是此类服务的主要提供商。此外，Facebook Blue 和 Instagram 是美国最大的两款个人社交网络服务。

182. 至少自 2011 年以来，Facebook Blue 一直是美国占据主导地位的最大个人社交网络服务。根据商用数据源 Comscore[1] 的数据分析，去年每个月，美国都有超过 2 亿人访问 Facebook Blue，美国用户平均每天在该服务上花费的总时间超过 40 亿分钟。此外，在 2020 年，平均每个月超过 80% 的美国互联网用户使用 Facebook Blue。

183. 自 2012 年收购以来，Facebook 还控制了 Instagram。根据对 Comscore 数据的分析，去年美国每月有超过 1.38 亿人使用 Instagram，美国用户平均每天在该服务上花费的总时间超过 15 亿分钟。此外，在 2020 年，平均每个月大约 54% 的美国互联网用户

使用 Instagram。

184. 在 Facebook 之后，Snapchat 目前是美国第二大个人社交网络服务提供商。Snapchat 于 2011 年推出，致力于将自己与移动消息服务区分开来，特别是为用户提供向联系人发送"短暂"消息的功能，这些消息只能在很短的时间内读取，之后就无法访问。随着时间的推移，Snapchat 增加了一些功能。现在，与专注于消费的服务（如抖音）和典型的个人社交网络服务不同，Snapchat 提供了一个共享的社交空间，用户可以使用该空间与朋友和熟人进行个人分享。

185. Snapchat 的用户基数和参与度只是 Facebook Blue 和 Instagram 的一小部分。根据对 Comscore 数据的分析，去年美国平均每月约有 7500 万人使用 Snapchat，平均每天在该服务上花费的总时间约为 6 亿分钟。相比之下，这只占用户在 Facebook Blue 上花费时间的 15%。此外，在 2020 年，平均每个月只有 28% 的美国互联网用户使用 Snapchat。

186. 其他规模较小的个人社交网络服务也不时在美国推出，但并没有吸引大量用户，与 Facebook 相比规模也相形见绌。例如，MeWe 于 2016 年推出，口号是"无广告。无跟踪。无废话。" MeWe 提供无广告的个人社交网络服务，但向用户收取额外存储和高级功能的费用。根据对 Comscore 数据的分析，去年美国平均每月只有 140 万人访问 MeWe，平均每天在该服务上花费的总时间不到 550 万分钟。相比之下，这只占用户在 Facebook Blue 上花费时间的不到 0.15%。此外，在 2020 年，平均每个月只有不到 1% 的美国互联网用户使用 MeWe。

187. 多家公司—甚至包括知名、成熟、资金充足的公司—也曾尝试进入美国个人社交网络市场，但均以失败告终，这凸显了巨大的准入壁垒。例如，2011 年 6 月，Google 推出了个人社交网络服务 Google+。Google+ 进入美国个人社交网络市场最初引发了 Facebook 的强烈反应，由此可以窥见非垄断相关市场的潜在利益。例如，Sandberg 女士在 Google+ 推出后的几周内就在内部表示："第一次，我们遇到了真正的竞争，消费者

有了真正的选择……我认为这将对我们产生影响，就像每个行业的竞争一样—我们必须做得更好才能获胜，我们的利润率可能会随着时间的推移而下降，我们不能再像以往犯那么多错误还能留住我们的核心用户。"如出一辙，Facebook 高管们争先恐后地对 Google+ 做出反应—动员力量提高用户对 Facebook Blue 的满意度，包括推出新功能，提高用户对自己信息的控制权。

188.　但是，尽管 Facebook 很早就开始担心，但 Google+ 在推出后并没有吸引大量用户。2011 年 12 月，Facebook 就似乎阻碍 Google+ 发展的准入壁垒发表了内部评论："G+ 的忠实粉丝很难说服他们的朋友参与进来，原因有二：一是与 Facebook 相比没有显著区别，二是由于 Facebook 上的朋友密度，转换成本会很高。" 因此，Facebook 最初对 Google+ 的担忧和反应在 Google+ 推出后的几个月内消失了。Google+ 继续运营，但没有吸引大量用户，最终在 2019 年被 Google 关闭。

189.　Google+ 等其他提供商也退出了美国个人社交网络服务市场。已经关闭的提供商包括 Friendster、Myspace、Orkut（由 Google 拥有和运营）和 Path。Friendster 和 Myspace 在 2000 年代中期 Facebook 推出和崛起之前即已在美国流行，但在 2009 年初被 Facebook 超越。Orkut 和 Path 是在 Facebook 之后推出，与 Google+ 一样，未能吸引足够多的用户来维持产品。这两款产品均已于 2018 年底关闭。

190.　Facebook 目前在美国个人社交网络服务的相关市场中占据主导地位，并且自 2011 年以来一直保持着这一地位，多个指标均是如此：花费的时间、日活跃用户量和月活跃用户量。无论是单独还是整体，这些指标都提供了重要的证据，证明 Facebook 至少自 2011 年以来在个人社交网络服务领域的持久垄断权力。

191.　个人社交网络服务的活跃用户基数和用户使用该服务的程度是衡量个人社交网络服务的市场份额和市场力量的适当标准。有几个原因支持这一说法。

192.　首先，个人社交网络服务对用户的吸引力及其竞争影响与其用户数量及其用

户参与该服务的密集程度有关。如果某项个人社交网络服务提供了与大量朋友和家人分享和参与的机会，消费者更有可能使用和参与该服务，而不太可能离开该服务。Facebook 在正常业务文件中承认网络的独特价值，它促进了朋友和家人之间的联系和沟通。个人社交网络提供商提供这种机会的能力由其用户数量以及其用户参与该服务的密集程度来表示。

193. 其次，在正常业务过程中，Facebook 的高管和投资者、竞争对手个人社交网络提供商以及行业观察人士对 Facebook Blue、Instagram 和其他个人社交网络提供商的表现进行了评估，使用的衡量标准是活跃用户基数和人们使用服务的程度，而日活跃用户量、月活跃用户量和用户在服务上花费的时间是常见的衡量标准。

194. 例如，Facebook 评估 Facebook Blue 和 Instagram 表现的内部演示文稿关注的是每月花费的时间、日活跃用户量和月活跃用户量。Facebook 同样依靠这些指标来评估其竞争对手的竞争影响。例如，Zuckerberg 先生在 2014 年 12 月要求对 Snapchat 进行评估时，就得到了这样的指标，他问他的两位高管："你们现在是不是比夏天更担心他们 [Snapchat] 了？"作为回应，Zuckerberg 先生的助手向他提供了一份 Snapchat 在不同地理区域（包括美国）的分析报告，分析的依据包括"月活跃用户量"和"花费时间占比"，以及 Snapchat 的"覆盖范围"，即特定月份在特定地理区域内使用该产品的互联网用户的百分比。

195. 其他提供或曾经提供个人社交网络服务的公司，包括 Snapchat 和 Google，也使用月活跃用户量、日活跃用户量和花费的时间来衡量自己的增长和其他公司的表现。例如，Snapchat 最近的正常业务文件通过观察公司的月活跃用户量、日活跃用户量和花费的时间等指标，比较了 Snapchat 和 Instagram 的表现。类似地，Google 使用月活跃用户量、日活跃用户量和花费的时间来跟踪 Orkut 和 Google+ 的表现。在评估对个人社交网络提供商的潜在收购时，Google 也评估了目标公司的月活跃用户量、日活跃用户量和花费的时间。

196. 商业数据源跟踪美国境内在线服务的使用情况，包括月活跃用户量、日活跃

用户量和花费的时间等指标。例如，Comscore 是一家商业数据提供商，它直接观察大量分组互联网用户的在线行为，以及他们在标记网站和应用程序上每月数万亿次的互动，并根据分组行为和标记流量推断行业统计数据。行业参与者和观察者（包括 Facebook）依赖 Comscore 的数据来评估美国和其他地方的在线服务使用情况。

197.　　Facebook 本身也依靠这样的商业数据源来追踪 Facebook Blue 和 Instagram 的表现。例如，Facebook 多份内部演示文稿都引用 Comscore 作为花费的时间等指标的来源，而且 Facebook 一直依靠 Comscore 的统计数据，为 Zuckerberg 先生准备重要的材料。

198.　　对跟踪美国在线服务的商业数据的分析表明，自 2011 年以来，Facebook（通过 Facebook Blue 和 Instagram）在美国个人社交网络服务的相关市场中占据了主导地位，无论是按照花费的时间、月活跃用户量还是日活跃用户量来衡量。

199.　　具体而言，自 2012 年以来，Facebook 在美国提供个人社交网络服务的应用程序的用户花费的时间中所占比例超过 80%，2011 年至少也有这么高。具体而言：

　　a.　分析 Comscore 的数据可以发现，从 2012 年 9 月到 2020 年 12 月，Facebook 在美国提供个人社交网络服务的应用程序的用户花费的时间比例平均为每月 92%，没有任何一个月低于 82%。在此期间，包括 Snapchat、Google+、Myspace、Path、MeWe、Orkut 和 Friendster 在内的其他提供商的总比例在任何一个月都没有超过 18%。在这些公司中，只有 Snapchat 的比例超过了 10%。

　　b.　Facebook 文件中保留的从 2011 年起的 Comscore 数据表明，Facebook 在提供个人社交网络服务的应用程序的用户花费的时间中所占比例至少与上述 2012 年后期至 2020 年期间同样高。

200.　　自 2016 年以来，Facebook 在美国提供个人社交网络服务的应用程序的日活跃用户量中所占比例超过 70%，2011 年至少也有这么高。具体而言：

　　a.　Comscore 分别收集每款智能手机、平板电脑和台式电脑的每日访问者数据。分析 Comscore 的数据可以发现，从 2016 年 9 月到 2020 年 12 月，Facebook 在美国提供个人社交网络服务的应用程序的日活跃用户量中所占比例平均为每月 80%（智能手机）、86%（平板电脑）和 98%（台式电脑）。在任何设备类型上，Facebook 的日活跃用户量比例在任何一个月均未低于 70%。在此期间的任何一

个月中，包括 Snapchat、Google+、Myspace、Path、MeWe、Orkut 和 Friendster 在内的其他提供商的总比例在任何设备类型上均未超过 30%。只有 Snapchat 在任何设备类型上的比例曾超过 10%。

b. Facebook 文件中保留的从 2011 年起的 Comscore 数据定期截图表明，Facebook 在提供个人社交网络服务的应用程序的日活跃用户量中所占比例至少与上述 2016 年后期至 2020 年期间同样高。

201.  自 2012 年以来，Facebook 在美国提供个人社交网络服务的应用程序的<u>日活跃用户量</u>中所占比例超过 65%，2011 年至少也有这么高。具体而言：

a. Comscore 为移动设备（包括智能手机和平板电脑）和台式电脑分别维护每月访问者数据。分析 Comscore 的数据可以发现，从 2012 年 9 月到 2020 年 12 月，在美国提供个人社交网络服务的应用程序中，Facebook 的月活跃用户量比例在移动设备上平均为每月 76%，在桌面上平均为每月 90%。在此期间，Facebook 的月活跃用户量比例在任何一个月都没有低于 68%（移动端）或 77%（桌面端）。在此期间的任何一个月中，包括 Snapchat、Google+、Myspace、MeWe、Path、Orkut 和 Friendster 在内的其他提供商的总比例在任何一种设备类型、移动设备或桌面设备上均未超过 32%。

b. Facebook 文件中保留的从 2011 年起的 Comscore 数据表明，Facebook 在提供个人社交网络服务的应用程序的月活跃用户量中所占比例至少与上述 2012 年后期至 2020 年期间同样高。

202.  如上文所述，Facebook 知道 Facebook Blue 和 Instagram 主要用作个人社交网络服务。与此相对的是，即使*假设*美国用户在 Facebook Blue 和 Instagram 上花费的一半时间实际上不是在使用个人社交网络服务，Facebook 仍会保持在美国个人社交网络市场的主导地位。具体来说，分析 Comscore 的花费的时间数据可以发现，自 2012 年 9 月以来，即使假设美国用户在 Facebook Blue 和 Instagram 上使用个人社交网络服务的时间只有一半—而美国用户将花在 Snapchat、MeWe、Path、Orkut、Google+、Myspace 和 Friendster 上的所有时间都使用个人社交网络服务—Facebook 每月在美国个人社交网络服务上花费的时间中所占比例平均仍为 85%，最低时约为 70%。

203.  其他反垄断机构也使用花费的时间、月活跃用户量、日活跃用户量或这些指标的组合来评估 Facebook 在其国家或地区的竞争影响，并得出结论，Facebook 在其国家或地区提供用户服务方面具有市场影响力。例如：

a. 2020 年，英国竞争与市场管理局（"CMA"）得出结论，"Facebook 在英国社交

媒体领域拥有重要且持久的市场影响力"。CMA 认为 Facebook 拥有强大市场影响力的结论部分基于 Comscore 提供的商用数据，表明用户在 Facebook 服务上花费的时间以及 Facebook 在英国互联网用户中的覆盖范围。CMA 认定，截至 2020 年 2 月，包括 WhatsApp 在内的 Facebook 占 13 岁及以上英国用户在社交媒体平台上花费时间的 70% 以上，并且多年来占社交媒体花费时间的"约 75%"。CMA 还观察到，超过 85% 的英国互联网用户使用 Facebook 应用程序。

b. 2019 年，德国联邦卡特尔局（"BKartA"）认定，Facebook 的数据服务条款构成"滥用私人用户社交网络市场的支配地位"。在认定 Facebook 在德国社交网络服务中占据主导地位时，BKartA 部分依赖于对 Facebook 和德国其他公司的日活跃用户量和月活跃用户量的评估。BKartA 得出结论，从 2012 年到 2018 年，对于德国国内的社交网络提供商，Facebook 占有超过 90% 的日活跃用户量比例和超过 70% 的月活跃用户量比例。

c. 2019 年，澳大利亚竞争和消费者委员会（"ACCC"）公布了其数字平台调查的结果，其中评估了 Facebook 在澳大利亚的"市场影响力"，该调查基于（除其他因素外）澳大利亚境内社交媒体服务的每月用户量和用户使用服务的时间。具体而言，ACCC 进行了一项调查，评估每天使用各种数字平台的用户的百分比，以及关于 Facebook 每月受众和花费时间的商用信息。ACCC 的结论是，"由于进入和扩张壁垒、范围优势及其收购战略，Facebook 隔绝了动态竞争。"在与准入壁垒相关的其他因素中，ACCC 认定，Facebook 的受众规模是 Snapchat（最接近 Facebook 平台的竞争对手）的三倍以上。这种网络效应对进入和扩张造成了巨大的障碍。

204.     日活跃用户量和月活跃用户量并不反映一个人在一天内或一个月内使用两种不同的个人社交网络服务的强度。如本诉状所述，日活跃用户量和月活跃用户量仍然是 Facebook 以及其他行业参与者和观察者用来评估 Facebook 和其他个人社交网络提供商的竞争表现的度量标准。此外，Facebook 在整个相关期间的花费时间中占据主导地位，这也决定了人们对 Facebook 的使用强度更大。因此，日活跃用户量和月活跃用户量测量中反映的关于使用强度的不精确之处都*低估*了 Facebook 的竞争影响。即便如此，Facebook 在相关时期的日活跃用户量和月活跃用户量中仍然占据主导地位。

**C. 包括历史事件和市场现实在内的直接证据证实，Facebook 拥有市场影响力**

205.     来自多个来源的其他证据表明并证实，Facebook 在美国提供个人社交网络服务方面拥有巨大的市场影响力。

206.　首先，历史事件表明，即使 Facebook 的行为引起了用户的严重不满，Facebook 也不会因竞争对手而失去大量用户或参与度。这是市场影响力的一个指标。例如，在 2018 年传出 Facebook 用户数据被一家名为 Cambridge Analytica 的公司秘密收集的消息后，Facebook 经历了一次前所未有的快速[已编辑]。尽管用户对 Facebook 感到不满，但这一事件[已编辑]并没有阻止 Facebook[已编辑]。Facebook 的一项内部分析同样对 Facebook Blue 进行了[已编辑]，并得出了[已编辑]的结论。Facebook 能够承受巨大的用户不满，同时只损失极少的 Facebook Blue 用户参与度，这表明需求和市场影响力缺乏弹性。

207.　更普遍的是，Facebook 还从事了其他降低用户体验的活动，包括滥用或错误处理用户数据。例如，FTC 指控 Facebook 在 2012 年和 2019 年实施了一系列严重的用户隐私和相关滥用行为，而 Facebook 两次都接受了同意令（并在 2019 年支付了 50 亿美元罚款）。Facebook 有能力通过降低产品质量来损害用户，但不会失去大量用户，这表明 Facebook 拥有市场影响力。

208.　其次，尽管引起了客户的极大不满，但 Facebook 在很长一段时间内都享受着巨额利润，这表明它拥有垄断权力，其个人社交网络竞争对手也无法克服准入壁垒并挑战其主导地位。自 2011 年以来，Facebook 一直保持着高利润和高市值。例如，2020 年，Facebook 是全球市值第六大上市公司，在全球创造了 290 亿美元的利润，收入约为 850 亿美元，其中 420 亿美元的收入来自美国和加拿大。2020 年第四季度，Facebook 报称在美国和加拿大的每用户平均收入（"ARPU"）为 53.56 美元。2013 年是 Facebook 成为上市公司的第一个完整年度，自那时起，Facebook 的利润率大大超过了标准普尔 500 指数成分股公司的平均水平，也超过了标准普尔 500 指数信息技术板块公司的平均水平。Facebook 对用户的持久垄断权力是这些利润的重要驱动力。投资者似乎认为，Facebook 的垄断权力将持续下去：其非凡的市值预示着未来多年的预期高利润流。

209.　Facebook 的利润远超美国的个人社交网络竞争对手。例如，Snapchat 从未盈

利。2020 年，Snapchat 报告整体净亏损 9.448 亿美元，收入约 25 亿美元。其中约 16 亿美元的收入来自美国境内的用户。2020 年第四季度，Snapchat 在北美的报告 ARPU 为 7.19 美元。

210. Facebook 的垄断权力还体现在其有能力通过执行限制性政策，阻止潜在竞争威胁进入 Facebook 庞大的个人社交网络用户群，从而摧毁应用程序者的前景。如上文所述，Facebook 采取了一系列措施防止其视为竞争威胁的应用程序接入 Facebook 平台。结果，应用程序无法对 Facebook 的垄断权力构成实质性竞争约束，有些甚至彻底倒闭。Facebook 能够将那些可能构成竞争威胁的公司排除在外，这是其垄断权力的直接证据。

211. Facebook 损害应用程序开发者前景的能力来源于，同时也证明了其在个人社交网络服务中的主导地位，正如 Facebook 一位高管在 2012 年 5 月给 Facebook 首席运营官 Sheryl Sandberg 的一封电子邮件中总结的那样："我们拥有关键数量的用户，这吸引了新用户注册，吸引了想要为他们的应用程序和网站寻找客户的开发者，也吸引了想要接触受众的广告客户。" 根据这位高管的说法，早在 2012 年，Facebook 就已经"达到了一定的规模，作为一名开发者，你可以想象你现在和未来的大多数用户/客户都在 Facebook 上"，并指出"Apple 应用商店排名前 10 的应用中有 7 款支持 Facebook。"

### D. Facebook 的主导地位受到准入壁垒的保护

212. Facebook 在美国个人社交网络市场的主导地位是长期的，因为其建立了巨大的准入壁垒，包括直接的网络效应和高昂的转换成本。直接网络效应是指随着更多用户加入服务，使个人社交网络价值更高的用户对用户效应。直接网络效应是进入个人社交网络的重要障碍。具体而言，因为个人社交网络的核心目的是连接和参与个人联系，所以新进入企业很难取代用户的朋友和家人已经参与和建立的个人社交网络。正如 Facebook 一位高管在 2012 年 5 月言简意赅地表示："为什么别人很难与我们竞争？ 你的朋友都在这里。你已经为 Facebook 网络和身份投入了很多精力。" Zuckerberg 先生本人也承认，由于这些

结构性障碍，Facebook 享有显著优势，他在 2012 年 4 月写道："Facebook 最有价值的一点或许是它是迄今为止世界上最全面的人员及其联系人目录，这是一个巨大的结构性优势。"

213. 除了面对这些网络效应，个人社交网络服务的潜在进入者还必须克服用户面临的高转换成本。随着时间的推移，Facebook 和其他个人社交网络的用户建立了更多的联系，并形成了帖子和共享体验的历史，他们无法轻易将这些转移到其他个人社交网络提供商。此外，这些转换成本可能会随着时间的推移而增加（"棘轮效应"），因为每个用户的内容和联系集合以及构建每个内容和联系的投入都会随着服务的使用而不断增加。事实上，Facebook 在一份正常业务文件中指出，有"许多证据表明存在实质性的'棘轮'效应"，而且棘轮效应"可以带来永久的优势"。

214. Facebook 在美国个人社交网络提供商中的时间花费、日活跃用户量和月活跃用户量方面的主导地位表明，它受益于强大的直接网络效应，巩固了其主导地位，并使潜在竞争对手更难进入。

215. 此外，Facebook 内部数据证实，其也从随着时间的推移而加强的棘轮效应获益。一个迹象是，美国每个月活跃的 Facebook Blue 用户的 Facebook 好友数量（每月第一天测量）从 2009 年 1 月的[已编辑]增加到 2019 年 10 月的[已编辑]。

216. Facebook 早就认识到，随着用户在个人社交网络服务上投入更多时间并发布更多内容，用户的转换成本也会增加。例如，2012 年 1 月，Facebook 一位高管在给 Zuckerberg 先生的信中写道："我们可以让用户的转换成本非常高，最重要的一种方法是如果所有用户都把照片放在我们这里……而用户不能带走这些照片和相关数据/评论，他们就很难转换。" 因此，每个 Facebook 用户照片和视频内容的增加展示了另一个迹象，表明保护 Facebook 垄断权力的转换成本仍然很高。从 2012 年到 2018 年，Facebook 平均每个月活跃用户发布的照片数量增加了[已编辑]，平均每个月活跃用户发布的视频数量增

加了[已编辑]。

217. Facebook 的反竞争行为进一步强化了准入壁垒。Facebook 收购 Instagram 和 WhatsApp 建立了一条"护城河",保护 Facebook,防止其他公司通过移动照片分享或移动消息进入个人社交网络。Facebook 针对应用程序开发者访问 Facebook 平台设置的条件为潜在竞争对手设置了障碍,而这些竞争对手本可能成为竞争威胁。

### 七、 Facebook 的行为对竞争和消费者造成的伤害

218. 通过上述行为,Facebook 阻碍、压制和阻止了竞争个人社交网络提供商的出现和发展,并通过竞争以外的手段非法维持其在美国个人社交网络市场的垄断地位。

219. 通过上述行为,Facebook 将潜在竞争对手排除在有效的传播渠道之外,从而使得这些公司无法发展获得在美国个人社交网络市场成为实质性竞争对手所需的规模。

220. 上述行为通过限制和压制 Facebook 在提供个人社交网络时必须面对的竞争,损害了并在继续损害竞争。因此,美国个人社交网络用户被剥夺了从个人社交网络竞争中获益的机会。

221. 竞争在以下某些或所有方面使用户受益:额外的创新(如开发和引入新的特性、功能和商业模式以吸引和留住用户);质量改进(如改进特性、功能、完整性措施和用户体验,以吸引和留住用户);以及消费者选择(例如使用户能够选择更适合他们的偏好的个人社交网络提供商,包括但不限于关于广告的数量和性质的偏好,以及用户的数据保护隐私选项的可用性、质量和多样性,包括但不限于关于数据收集和数据使用方式的选项)。

222. 由于 Facebook 缺乏足够的竞争约束,使得 Facebook 能够行使其垄断权力,消费者受到了伤害。在没有实质性竞争的情况下,Facebook 在隐私和数据保护方面提供的服务质量水平低于其在竞争市场中必须提供的服务质量水平。

223.　鉴于 Facebook 的非法垄断是由强大的网络效应支撑的，其持续的非法垄断权力以及由此对消费者造成的伤害尤其棘手。只有通过专门针对这些效应的禁令，才能恢复竞争。

224. Facebook 的行为对消费者造成的伤害尤其严重，因为在技术转型的关键时期，Facebook 增加了准入壁垒，排除了竞争，而在这一时期，新生竞争对手本可以有效挑战 Facebook 的垄断权力。Facebook 的反竞争行为阻碍了创新和新产品的开发，而这些创新和新产品本可以在这一转型时期打破 Facebook 的垄断。

225.　通过垄断美国的个人社交网络市场，Facebook 也损害了并将继续损害美国的广告销售竞争。特别是，由于个人社交网络提供商通常通过销售广告来为平台创造收入，Facebook 对与其竞争的个人社交网络提供商的压制也使 Facebook 避免了在广告服务提供方面的激烈竞争。这对 Facebook 给广告客户带来的价值产生了可预见的结果：例如，Facebook 因其不透明且有时不可靠的广告报告指标以及其平台上普遍存在的虚假帐号而一再受到批评，这削弱了广告客户评估其广告效果的能力。

226.　在提供广告方面，竞争的个人社交网络提供商也会是 Facebook Blue 的竞争对手。这是因为他们本来就有能力提供上述将社交广告与其他形式的展示广告、搜索广告和"线下"广告区分开来的独特广告特征。尤其是 Instagram 和 WhatsApp，它们都处于有利地位，可以在广告销售方面对 Facebook Blue 形成实质性竞争约束。Instagram 的创始人计划开发广告服务，从而通过 Instagram 个人社交网络创造收入。如果独立的 WhatsApp 开发了个人社交网络服务，就会有动力通过提供广告或寻求替代模式来创造收入。相互竞争的社交网络也可能已经探索和开发出消费者和广告客户可能更喜欢的替代广告模式。

227.　因此，Facebook 为维持其个人社交网络垄断地位而采取的反竞争行为，也消除、压制和遏制了广告销售的竞争，并剥夺了广告客户从更多竞争中获益的机会。

228.　　更多的竞争对广告客户的好处包括以下部分或全部：更多的广告用户（由于用户的个人社交网络的创新和质量的提高）；较低的广告价格（因为额外的广告竞争将刺激广告价格的降低）；额外的创新（因为额外的广告竞争将激励开发和引入额外的特性、功能和商业模式，以吸引广告客户）；质量改进（因为额外的广告竞争将推动质量改进，例如在透明度、完整性、广告观看次数的认证、客户服务、报告业绩和其他度量的准确性以及品牌安全措施（例如对邻近内容的敏感性）方面）；以及选择（因为更多的广告竞争将使广告客户能够选择更适合他们的偏好的个人社交网络提供商，包括但不限于关于不同形式的广告和/或用户的不同选项的偏好）。

229.　　Facebook 不能用所谓的效率、促进竞争的好处或通过其他方式无法实现的商业理由来证明这种对竞争的实质性损害。

## 八、　罪项 1—通过反竞争收购维持垄断

230.　　FTC 再次提出指控，并通过引用纳入上文第 1-229 段中所述指控。

231.　　至少自 2011 年以来，Facebook 在美国的个人社交网络领域一直处于垄断地位。

232.　　Facebook 通过其反竞争收购等反竞争行为，蓄意维持其垄断地位。通过其行为，Facebook 排除了竞争，并通过其他手段，而不是利用优势展开竞争，蓄意维持其在个人社交网络中的垄断地位。

233.　　Facebook 的行为是持续的。Facebook 继续持有并整合其收购的竞争威胁，包括 Instagram 和 WhatsApp。Facebook 继续拥有和运营 Instagram 和 WhatsApp 化解了它们带来的直接竞争威胁，并创建和维护了一条"护城河"，保护 Facebook，防止其他公司通过移动照片共享和移动消息进入个人社交网络。Facebook 继续关注该行业的竞争威胁，并可能寻求收购任何对其个人社交网络垄断构成威胁或可能在调整后构成威胁的公司。

234. Facebook 在维持其个人社交网络垄断方面的排他行为没有任何促进竞争的理由。

235. Facebook 的反竞争行为构成非法垄断，违反了《谢尔曼法》第 2 条（《美国法典》第 15 编 第 2 条），并因此是不公平的竞争方式，违反了 FTC 法案第 5(a) 条（《美国法典》第 15 编第 45(a) 条）。

### 九、 罪项 2—通过非法行为维持垄断，包括反竞争收购和写入与开发者签订的 Facebook 平台访问协议中的反竞争有条件交易政策

236. FTC 再次提出指控，并通过引用纳入上文第 1-229 段中所述指控。

237. 至少自 2011 年以来，Facebook 在美国的个人社交网络领域一直处于垄断地位。

238. Facebook 通过其行为蓄意维持其垄断权力，包括反竞争收购和反竞争有条件交易做法，以及维持和执行与 Facebook 平台有关的反竞争协议，以阻止对其个人社交网络垄断的竞争威胁。如上文所述，Facebook 通过反竞争收购，通过为换取第三方应用程序访问 Facebook 平台的权限而签订的协议中包含的有条件交易政策，以及通过切断应用程序访问关键 API 的权限执行其反竞争协议，维持了其个人社交网络垄断地位。

239. 通过其行为，Facebook 排除了竞争，并通过其他手段，而不是利用优势展开竞争，蓄意维持其在个人社交网络中的垄断地位。

240. Facebook 的行为是持续的。Facebook 继续持有并整合其收购的竞争威胁，包括 Instagram 和 WhatsApp。Facebook 承认，继续拥有和运营 Instagram 和 WhatsApp 化解了它们带来的直接竞争威胁，并创建和维护了一条"护城河"，保护 Facebook，防止其他公司通过移动照片共享和移动消息进入个人社交网络。Facebook 继续关注该行业的竞争威胁，并可能寻求收购任何对其个人社交网络垄断构成威胁或可能在调整后构成威胁的公司。Facebook 还继续筛选开发者，并可以以任何理由允许或拒绝他们访问 API。

Facebook 一直与开发者签署限制性协议。2018 年 12 月，公众对 Facebook 与应用程序开发者相关的政策进行监督，迫使其声称不会执行协议中包含的政策，而如果这种监督停止或其他条件发生变化，Facebook 很可能会重新制定此类政策。

241. Facebook 在维持其个人社交网络垄断方面的排他行为没有任何促进竞争的理由。

242. Facebook 的反竞争行为构成非法垄断，违反了《谢尔曼法》第 2 条（《美国法典》第 15 编 第 2 条），并因此是不公平的竞争方式，违反了 FTC 法案第 5(a) 条（《美国法典》第 15 编第 45(a) 条）。

## 十. 给予救济的权力

243. FTC 法案第 13(b) 条（《美国法典》第 15 编第 53(b) 条）授权本法院对违反 FTC 法案的行为发布永久禁令，并在行使其衡平法管辖权时，发布衡平救济命令，以补救 Facebook 违法行为所造成的损害。

## 十一、 救济请求

因此，FTC 请求法院根据 FTC 法案第 13(b) 条（《美国法典》第 15 编第 53(b) 条）的授权，并根据其自身的衡平法权力，对 Facebook 作出最终判决，宣告、命令并判决：

A. 如本诉状所述，Facebook 的行为违反了《谢尔曼法》第 2 条，因此构成了违反 FTC 法案第 5(a) 条（《美国法典》第 15 编第 45(a) 条）的不公平竞争方式；

B. 剥离资产、剥离或重组业务（包括但不限于 Instagram 和/或 WhatsApp），以及其他足以恢复竞争（即如果不存在本诉状中指控的行为本应当出现的竞争）的救济，包括在合理必要的范围内，Facebook 向一个或多个有望成功的独立公司提供持续支持或服务；

C. 任何其他衡平救济，以恢复竞争和补救上述 Facebook 反竞争行为对竞争造成的损害；

D. 对未来兼并和收购有事先通知和事先批准的义务；

E. 永久禁止 Facebook 订立反竞争协议，约束或对开发者访问 API 和数据施加反竞争条件；

F. 永久禁止 Facebook 从事本诉状所述的非法行为；

G. 永久禁止 Facebook 在未来从事类似或相关行为；

H. 要求定期向 FTC 提交合规报告，并履行合理和适当的报告和监督义务；以及

I. 任何其他衡平救济，包括但不限于法院认为必要的资产剥离、重组或互操作性要求，以纠正和防止 Facebook 的违法行为再次发生。

日期：2021 年 9 月 8 日

敬呈，

[签名]

HOLLY VEDOVA
代理局长
竞争局

DANIEL J. MATHESON（哥伦比亚特区律师协会编号：502490）
首席律师
600 Pennsylvania Avenue N.W.
Washington, DC 20580
202-326-2075
dmatheson@ftc.gov

MARK WOODWARD（哥伦比亚特区律师协会编号：479537）
代理副局长
竞争局

TARA KOSLOV（哥伦比亚特区律师协会编号：448147）
副局长
竞争局

HEATHER JOHNSON（哥伦比亚特区律师协会编号：503465）
代理副局长
竞争局

PATRICIA GALVAN
局长助理

KRISHA CERILLI（哥伦比亚特区律师协会编号：983281）
副局长助理

ROBERT ZUVER（哥伦比亚特区律师协会编号：987216）
MARIA DIMOSCATO（哥伦比亚特区律师协会编号：489743）
ERIC COCHRAN（哥伦比亚特区律师协会编号：981148）
HENRY HAUSER（哥伦比亚特区律师协会编号：1614882）
MITCHELL LONDON（哥伦比亚特区律师协会编号：1029408）
OWEN MASTERS（哥伦比亚特区律师协会编号：242139）
MICHAEL MIKAWA
NOEL MILLER（哥伦比亚特区律师协会编号：1026068）
DAVID OWYANG
MARK SILVIA
MICHAEL SMITH（哥伦比亚特区律师协会编号：996738）
REBECCA WEINSTEIN
SYLVIA ZHANG

原告律师
联邦贸易委员会

---

[1] 引用的 Comscore 数据分析基于针对 2 岁及以上的美国桌面用户和 18 岁及以上的美国移动用户收集的数据。Comscore 数据受 Comscore, Inc. 的免责声明约束："由于本分析的保密性质，Comscore, Inc. 不得查看其内容，因此对任何第三方依赖本文件包含的任何信息不承担任何责任。Comscore, Inc. 对于与本分析相关的任何 Comscore 数据的准确性或完整性不承担任何责任。"

**附件 B**

**美国哥伦比亚特区地方法院**

<table>
<tr>
<td>

**联邦贸易委员会，**

原告，

诉

**META PLATFORMS, INC.**

被告。

</td>
<td>

民事诉讼案号 1:20-cv-03590 (JEB)

</td>
</tr>
</table>

**保护令**

为 (i) 确保本诉讼高效、快速结案；(ii) 促进本诉讼各方进行披露；以及 (iii) 保护机密信息免遭不当披露或使用，本法院依据已呈充分理由以及《联邦民事诉讼规则》 第 26(c)(1) 条的规定，命令如下：

**A. 定义**

1. 在本诉讼中：

   (a) "诉讼"系指标题所述待本法院判决的诉讼，包括任何相关披露、预审、审判、审后或上诉程序。

   (b) "机密信息"系指任何商业秘密或其他机密研究、开发或商业信息（与《联邦民事诉讼规则》第 26(c)(1)(G) 条中所使用的术语含义相同）或包含此类信息但尚未公布或公开的任何文件、文字本或其他材料。此外，指定方可将违反法院保密令公开提供但指定方认为本应加以保密处理的任何信息或项目指定为机密信息。此类信息包括 (i) 从机密信息中复制或提取、总结或汇编的信息；以及 (ii)

可能泄露机密信息的证词、对话或演示文稿。

(c) "竞争性决策"系指与竞争对手、潜在竞争对手、客户或分销合作伙伴相关的决策，包括有关合同、营销、定价、产品或服务开发或设计、产品或服务提供、研发、并购，或知识产权的许可、收购或执行的决策。

(d) "被告"系指 Meta Platforms, Inc. 及其前身、部门、子公司、关联公司、合伙企业、继任者和合资企业，以及前述各方的所有董事、高级职员、员工、代理人（包括律师）和代表，包括但不限于 Instagram 和 WhatsApp。

(e) "已披露"系指已展示、泄露、揭示、出示、描述、传输或以其他方式传达全部或部分内容。

(f) "文件"系指任何文件或电子存储信息（与《联邦民事诉讼规则》 第 34(a) 条中定义的文件具有相同含义）。

(g) 此处定义的"高度机密信息"应仅包括一旦披露可能会给受保护人员造成实质性重大伤害的机密信息。

高度机密信息包括商业秘密（其中包含算法和源代码）；非公开的、商业敏感型客户名单；非公开财务、营销或战略业务规划信息；当前或未来关于价格、成本或利润的非公开信息；当前或未来规划产品研究、开发、测试或计划相关信息；受保护人员产品的优势和劣势评估，包括非公开定价和成本信息；与被告或其竞争对手有关的机密合同条款、拟定合同条款或谈判立场（包括对谈判立场的内部审议）；尚未向公众公开的未决或已放弃专利申请的相关信息；人事档案；敏感型个人身份信息；敏感型健康信息；以及披露任何高度机密信息

的通信。高度机密信息还包括非当事人认为如果向被告披露会导致非当事人或其关联的新企业面临潜在报复或伤害的信息。如果受保护人员 (i) 已出具调查材料；或 (ii) 依照传票或法院命令要求，出具可能对其造成重大实质性竞争或商业损害的信息，但该信息不在本款所列信息类别之列，则受保护人员，在出具令人信服的证据证明的情况下，可以向法院寻求命令，命令该信息为高度机密信息，不得透露给内部律师，但下文 D(1)(d) 款规定的例外情况除外。如果根据本款提出动议且动议与调查材料相关，则动议必须与 B(2)(a) 中指定的高度机密同步提交。如果根据本款提出动议且动议与传票或法院命令相关，则必须在传票或法院命令应答到期日前提交动议。如果受保护人员根据本款向本法院寻求额外保护，则在本法院作出裁决之前，不得将寻求额外保护的材料提供给外部律师以外的其他人员。

(h) "内部律师"系指受被告聘请提供法律服务的律师，以及受被告聘请、为被告聘请的提供法律服务的律师提供协助的律师助理、秘书、文书和行政人员。

(i) "调查"系指原告就被告的潜在反竞争行为进行的诉前调查，标记为美国联邦贸易委员会第 191-0134 号文件。

(j) "调查材料"系指 (i) 任何非当事人自愿或根据强制程序，向美国联邦贸易委员会提供的与调查有关的非特许机密文件、证词或其他材料；(ii) 构成美国联邦贸易委员会和任何非当事人之间关于调查以及在调查期间进行的任何沟通的非特许机密文件、证词或其他材料；或 (iii) 被告、关联个人或实体向美国联邦贸易委员会提供的与调查有关的非特许机密文件、证词或其他材料。

(k) "诉讼材料"系指 (i) 任何非当事人自愿或通过强制程序，向任何当事人提供的与本诉讼有关的任何非特许机密文件、证词或其他材料，以及本诉讼未决期间，任何非当事人自愿或通过强制程序，向任何当事人提供的任何非特许机密文件、证词或其他材料；(ii) 构成任何一方与任何非当事人就本诉讼进行的以及在本诉讼未决期间进行的任何沟通的任何非特许机密文件、证词或其他材料；(iii) 被告向原告提供的与本诉讼有关的非特许机密文件、证词或其他材料，以及本诉讼未决期间，被告向原告提供的非特许机密文件、证词或其他材料；和/或 (iv) 原告向被告提供的与本诉讼有关的非特许机密文件、证词或其他材料，以及本诉讼未决期间，原告向被告提供的非特许机密文件、证词或其他材料。

(l) "非当事人"系指未被指定为本诉讼一方当事人的任何人。

(m) "外部备案律师"系指受外部律师事务所聘请，在本诉讼中代表被告的律师及律师支持人员。

(n) "一方当事人"系指本诉讼中的原告或被告。"双方当事人"系指本诉讼中原告和被告的统称。

(o) "原告"系指美国联邦贸易委员会及其所有员工、代理人和代表。

(p) "人"系指任何自然人、公司实体、商业实体、合伙企业、协会、合资企业、政府实体、信托或其他法律实体。

(q) "受保护人员"系指任何自愿或根据强制程序，已提供或提供如下内容的任何人（包括一方当事人或非当事人）：(i) 与调查有关的调查材料；或 (ii) 诉讼材料。

**B. 高度机密信息和机密信息的指定**

1. 原告应在本法院签发本命令后 5 个工作日内，通过电子邮件、传真或隔夜快递，将本命令副本发送给向美国联邦贸易委员会提供调查材料的各受保护非当事人（或者如果由律师代表，则发送给各受保护非当事人的律师)。

2. 受保护人员将调查材料指定为高度机密。受保护人员可根据以下程序，将其提供的任何调查材料指定为高度机密材料：

    (a) 被告无需将调查材料再指定为机密或高度机密材料：被告提供的所有调查材料均应推定视为高度机密，但须遵守下文 C 节所述的质疑程序，以及法院对在本诉讼中指定和使用被告提供的调查材料所采取的任何其他相关命令或程序（例如，将审判证据指定为高度机密的程序）。

    (b) 各受保护人员（被告除外）在收到本命令副本后，有 60 天的期限("指定期限")将己方诚信确定包含高度机密信息、且保护受保护人员利益有必要指定为高度机密信息的任何调查材料指定为高度机密信息。如果此类调查材料尚未被指定，可通过以下方式进行指定：通过隔夜邮件或电子邮件向接收调查材料的一方发送书面通知，并重新提供调查材料，内含载有"高度机密"字样的调查材料副本，字样标记方式不得影响调查材料的可读性（包括页码编号）或可听性。如果非当事人因证明责任无法重新提供调查材料，则可以改为通过隔夜邮件或电子邮件向接收调查材料的一方发送书面通知，其中列明包含高度机密信息的各文件的详细指定。

    包含高度机密信息的任何文件，均可以全部指定为高度机密信息。

    (c) 指定期限到期前，所有调查材料全部视为高度机密信息。

指定期限结束时，未指定为高度机密的调查材料（被告提供的调查材料除外）、披露任何高度机密信息或从受本命令约束文件衍生所得机密信息的实质内容的信息，以及从该等材料任何部分获取的任何信息，都应依照《反托拉斯民事诉讼法》(Antitrust Civil Process Act)、任何其他联邦或州级法令或法规，或解释此类法令或法规的任何联邦或州级法院判例，视为本命令的机密信息。

就本命令而言，提交此类高度机密信息或机密信息的非当事人的身份，也应视为高度机密信息或机密信息；除非或直到非当事人通知一方当事人不需要将其身份视为高度机密信息或机密信息为止。

3. 如果受保护的非当事人认为本命令未充分保护其高度机密信息或机密信息，则该受保护的非当事人可在收到本命令副本后 10 日内，就其高度机密信息或机密信息向本法院申请额外保护。如果受保护非当事人向本法院申请额外保护，则在本法院作出裁决之前，不得将寻求额外保护的调查材料提供给外部律师以外的其他人员。

4. 任何未指定为机密或高度机密信息的证据文件或证词的出示，如果后来被指定为机密或高度机密信息，则不会被视为放弃未来对该等信息的机密要求。在本诉讼审理之前的任何时候，如果受保护人员意识到，应将其先前在本诉讼披露阶段提供的任何调查材料或诉讼材料指定为高度机密信息或机密信息，则其可以通过书面形式通知双方当事人，并向已经接收调查材料或诉讼材料的一方，重新提供调查材料或诉讼材料，以这种方式将证据文件、证词或其他材料指定为高度机密信息或机密信息，并在重新提供的该等材料中载明"高度机密"或"机密"字样，字样标记方式不得影响

调查材料或诉讼材料的可读性（包括页码编号）或可听性。此后，双方当事人应按照受保护人员在本命令下的新指定处理调查材料或诉讼材料。然而，披露任何在披露之时适合披露的信息未有不妥，即使此后此类信息指定为机密也未有不妥。

5. 如果一方当事人获悉，由于疏忽或其他原因，其在未经本命令授权的任何情况下披露了受保护人员的机密或高度机密信息，则该方必须立即 (i) 以书面形式通知受保护人员此类未经授权的披露；(ii) 尽最大努力取回所有未经授权披露材料的副本；(iii) 告知接收未经授权披露人员本命令的条款；以及 (iv) 要求该等人员承认并同意受附录 A 的约束。

6. 受保护人员将诉讼材料指定为高度机密或者机密。以下程序规定了受保护人员在本命令签发后，将其在本诉讼中披露的任何信息指定为高度机密或机密的程序（受保护人员真诚地相信，此类材料符合本命令条款下的指定条件），包括但不限于应《联邦民事诉讼规则》第 30、31、33、36 和 45 条的要求提供的信息以及应《联邦民事诉讼规则》第 33(d)、34(b)(2) 和 (c) 或 45 条规定披露的任何文件：

(a) 证词。 本命令签发后，本诉讼采信的所有证言的文字本，在向宣誓人（或宣誓人的律师，如适用）提供完整和最终副本之日后的 30 天内，将全部视为高度机密信息。收到最终文字本五 (5) 个工作日内，见证证词的一方当事人应向宣誓人提供最终文字本。收到最终文字本后 30 日内，宣誓人可以将证词文字本的任何部分（按页数和行），以及宣誓人或宣誓人雇主提供的任何证词指定为高度机密信息。为使其生效，此类指定必须以书面形式提供给原告和被告的律师。未根据本文第 6(a) 款指定的文字本或证据的任何部分均应视为机密信息，应受

下文 C 节所述质疑程序的约束。

当一方当事人有权根据本命令就另一受保护人员指定为高度机密或机密的文件或信息向宣誓人提出质疑时，提出质疑的一方应将文字本中与此类高度机密或机密文件或信息相关的部分指定为高度机密或机密。

(b) 文件。任何受保护人员，如果将其在本诉讼中出示的任何文件指定为高度机密信息，则必须在包含所述信息的每份文件上，加盖印章或以其他方式标记"高度机密"字样，标记方式应不得影响该等文件的可读性（包括页码编号）或可听性。任何受保护人员，如果将其在本诉讼中出示的任何文件指定为机密信息，则必须在包含所述信息的每份文件上，加盖印章或以其他方式标记"机密"字样，标记方式方式应不得影响该等文件的可读性（包括页码编号）或可听性。

包含机密信息的任何文件，均可以全部指定为机密信息。包含高度机密信息的任何文件，均可以全部指定为高度机密信息。

(c) 电子文件及数据。如果受保护人员以原始电子格式出示电子文件和文档，则受保护人员应根据本命令，指定此类电子文件和文档为受保护文件和文档，指定方法是在文件名或指示符后，附加表明文件是否包含高度机密信息或机密信息的信息，或以任何其他合理方法适当地指定以电子格式制作的该等资料，包括在文件可合理访问的元数据中进行此类指定。如果通过只包含机密信息的磁盘或其他介质提供高度机密信息或机密信息，则可以在磁盘或其他介质上标记"高度机密"或"机密"字样。

将原始形式的电子文件或文档打印输出，用于取证、法庭诉讼或以打印形式提供给 D(2)(g) 款所述的任何人时，打印电子文件或文档的一方当事人，应在打印

文档上标记"高度机密"或"机密"字样，同时标记与原始文件关联的证据编号和命名。

包含机密信息的任何电子文件或文档，均可以全部指定为机密信息。包含高度机密信息的任何电子文件或文档，均可以全部指定为高度机密信息。

7. 非当事人诉讼材料的指定。如果一方当事人在本诉讼中收到披露请求，要求提供其拥有的非当事人的高度机密信息或机密信息，则该方应：

   (a) 立即以书面形式通知请求高度机密信息或机密信息的一方当事人，其要求的信息部分或全部受与非当事人签订的保密协议的约束；

   (b) 立即通知非当事人其高度机密信息或机密信息被要求提供，并提供信息的合理具体说明或准备好要求提供的信息供非当事人检查；以及

   (c) 立即向非当事人提供本诉讼中规定的保护令副本和相关披露请求。

8. 如果非当事人收到通知和随附信息后，14 日内未向本法院申请保护令，则可以提供非当事人高度机密信息或机密信息中与披露请求相对应的信息。如果非当事人及时寻求保护令，则在本法院作出决定之前，不得提供其受保密协议约束的高度机密信息或机密信息。[1]

9. 本命令的条款适用于非当事人在本诉讼中提供的且被指定为高度机密信息或机密信息的信息。非当事人提供的与本诉讼有关的此类信息受本命令准许的救济和补救措施保护。这些规定中的任何内容都不应解读为禁止非当事人寻求额外保护。

## C. 质疑指定的高度机密信息或机密信息

---

[1] 本条的目的是提醒有关当事人注意非当事人的机密权利，并为非当事人提供在本法院保护其机密利益的机会。

1. 对机密信息指定提出异议的任何一方（"反对方"）可随时向作出该指定的受保护人员（"指定方"）以及本诉讼的所有各方提供书面通知，详细说明反对的理由。对机密信息指定的异议可以针对指定为机密或高度机密的文件的任何部分，包括文件中包含的任何特定声明或信息。争议解决之前，列入异议范围之内的材料，继续视为机密信息或高度机密信息。反对方发出书面通知后 10 日内，反对方和指定方均应尝试协商讨论各自的立场。如果反对方和指定方在反对方书面通知送达后 14 日内（或反对方和指定方同意的另一截止日期），未能就异议达成一致意见，则反对方可依照适用规则，向本法院提出信函动议和/或动议，解决争议。如果本法院发现存在争议的文件或声明的任何部分不构成高度机密信息或机密信息，则就该文件或该声明的该部分而言，被质疑的指定应被视为已撤销。

**D. 高度机密信息或机密信息的披露**

1. 高度机密信息只能披露给以下人员：

   (a) 本法院以及协助本法院办理本诉讼的所有人员，包括法官助理、法院书记官和速记或文书人员；

   (b) 美国联邦贸易委员会的律师、律师助理和其他专业人员（包括支持和 IT 人员），以及原告聘请协助办理本诉讼、且其职能需要访问此类信息的代理人或独立承包商；

   (c) 被告的外部备案律师，包括任何律师（但不包括被告的内部律师，但第 D(1)(d) 款规定并符合 E 节程序指定的内部律师除外）、律师助理以及外部律师为本诉讼指派且其职能需要访问该信息（但不包括被告的任何员工）的其他专业人员

（包括支持和 IT 人员）；

(d) 被告两名负责本诉讼的内部律师，签署附录 B 格式的内部律师保密协议之时以及自最后一次获得高度机密信息披露起为期两 (2) 年的时间内，不得 (a) 参与被告的竞争性决策或为其竞争性决策提供建议，而无论他们仍受雇于被告还是受雇于其他雇主；(b) 受雇于任何雇主时，对于已在本诉讼中访问其高度机密信息的受保护人员，不参与此类受保护人员的竞争性决策，也不为此类受保护人员的竞争性决策提供建议；或者 (c) 在受保护人员为真正不利利益方（即不只名义上具有不利利益，应答受保护人员的传票时及标明不利利益，且内部律师在本诉讼过程中接触到其高度机密信息）的诉讼或其他法律诉讼（因本诉讼诉状中的指控引起的或与之相关的诉讼除外）中，不参与也不提供建议；欲根据本小节规定获得访问权限，内部诉讼律师应先签署附录 B 格式的机密性内部律师协议（外部律师应为相关被告保存该协议的签署版，在法院、任何一方当事人或任何受保护非当事人要求时以供查阅），并且只能亲自在被告外部备案律师办公室访问高度机密信息，或使用个人登录账号和密码，通过安全的电子数据室或文件审查平台亲自访问高度机密信息。

被告应立即向本法院和原告报告任何已确认或涉嫌未经授权使用或披露高度机密信息的情形。受本小节规定约束的任何律师，如果不再为被告工作，进入与被告的竞争性决策无关的行业工作，那么应被视为不受本规定的离职后限制制约，原告或任何相关受保护人员，无须证明此人曾参与竞争性决策；

(e) 一方当事人为协助己方进行诉讼而聘请的外部供应商或服务提供商（如复印服务提供商、电子文件披露供应商和类似服务提供商、为证言而聘请的外部法院书记官以及文件管理顾问），但前提是他们应先签署一份附录 A 格式的机密性协议；

(f) 各方在本诉讼中聘用的或本法院指定的任何调解员、仲裁员或特别事务员；

(g) 高度机密信息本身表明，或接收方有充分理由相信是该文件作者、收件人、接收人、保管人或来源的人员，但前提条件是他们以前曾合法接触过已披露或将披露的文件；此外，在证言取证或审判期间，可能会向现在或者以前曾为一方当事人雇员的证人出示该方出具的、声称引用、叙述或总结所述员工陈述或通信的文件的任何部分（为避免疑义，必要时可以向现或前雇员出示文件的其他部分，从而确定该雇员关于相关陈述的证言或庭审证词）；

(h) 一方当事人聘请在本诉讼中担任作证专家或咨询专家的任何人员，包括专家或顾问关联公司的雇员，或在本诉讼中协助专家工作的独立承包商，但前提是他们应先签署一份附录 A 格式的机密性协议；以及

(i) 外部审判顾问（包括但不限于图形顾问），但前提是他们应先签署一份附录 A 格式的机密性协议。

2. 机密信息只能披露给以下人员：

(a) 本法院以及协助本法院办理本诉讼的所有人员，包括法官助理、法院书记官和速记或文书人员；

(b) 美国联邦贸易委员会的律师、律师助理和其他专业人员（包括支持和 IT 人员），以及原告聘请协助办理本诉讼、且其职能需要访问此类信息的代理人或独立承包商；

(c) 被告的外部备案律师，包括任何律师（但不包括被告的内部律师，但第 D(2)(d) 款规定并符合 E 节程序指定的内部律师除外）、律师助理以及外部律师为本诉讼指派且其职能需要访问该信息（但不包括被告的任何员工）的其他专业人员（包括支持和 IT 人员）；

(d) 被告四名负责本诉讼的内部律师，目前以及自最后一次获得机密信息披露起为期两 (2) 年的时间内，不得 (a) 参与被告的竞争性决策或为其竞争性决策提供建议，而无论他们仍受雇于该被告还是受雇于其他雇主；(b) 受雇于任何雇主时，对于已在本诉讼中访问其机密信息的受保护人员，不参与此类受保护人员的竞争性决策，也不为此类受保护人员的竞争性决策提供建议；或者 (c) 在受保护人员为真正不利利益方（即不只名义上具有不利利益，应答受保护人员的传票时及标明不利利益，且内部律师在本诉讼过程中接触到其机密信息）的诉讼或其他法律诉讼（因本诉讼诉状中的指控引起的或与之相关的诉讼除外）中，不参与也不提供建议；欲根据本小节规定获得访问权限，内部诉讼律师应先签署附录 B 格式的机密性内部律师协议（外部律师应为相关被告保存该协议的签署版，在法院、任何一方当事人或任何受保护非当事人要求时以供查阅），并且只能亲自在被告外部备案律师办公室访问机密信息，或使用个人登录账号和密

码，通过安全的电子数据室或文件审查平台亲自访问机密信息。

被告应立即向本法院和原告报告任何已确认或涉嫌未经授权使用或披露机密信息的情形。受本小节规定约束的任何律师，如果不再为被告工作，进入与被告的竞争性决策无关的行业工作，那么应被视为不受本规定的离职后限制制约，原告或任何相关受保护人员，无须证明此人曾参与竞争性决策；

(e) 一方当事人为协助己方进行诉讼而聘请的外部供应商或服务提供商（如复印服务提供商、电子文件披露供应商和类似服务提供商、为证言而聘请的外部法院书记官以及文件管理顾问），但前提是他们应先签署一份附录 A 格式的机密性协议；

(f) 各方在本诉讼中聘用的或本法院指定的任何调解员、仲裁员或特别事务员；

(g) 机密信息本身表明，或接收方有充分理由相信是该文件作者、收件人、接收人、保管人或来源的人员，但前提条件是他们以前曾合法接触过已披露或将披露的文件；其陈述或通讯信息曾在一方当事人文件中引用、叙述或总结的该方任何现任或前任雇员；或原告或被告律师善意地认为以前曾收到或接触过该文件的人员，但该人员指出其未接触过该文件的情形除外；

(h) 一方当事人聘请在本诉讼中担任作证专家或咨询专家的任何人员，包括专家或顾问关联公司的雇员，或在本诉讼中协助专家工作的独立承包商，但前提是他们应先签署一份附录 A 格式的机密性协议；以及

(i) 外部审判顾问（包括但不限于图形顾问），但前提是他们应先签署一份附录 A

格式的机密性协议。

3. 披露方的律师必须在本诉讼最终解决后至少一 (1) 年内保留附录 A 有关机密性的协议的原件。

4. 本命令 D (1) 和 D (2) 款所述接收高度机密信息或机密信息披露的个人,不得将高度机密信息或机密信息披露给任何其他个人,但本命令另有规定的情形除外。

5. 本命令中的任何规定均不阻止原告 (i) 在美国联邦贸易委员会作为一方当事人的任何其他法律诉讼中;(ii) 为确保遵守本诉讼的最终判决;或 (iii) 出于执法目的,披露指定为高度机密信息或机密信息的信息,但前提是须采取适当措施保护此类信息的机密性。此类披露应仅限于美国联邦贸易委员会进行的披露。

6. 本命令中的任何内容均不:

(a) 限制受保护人员使用或披露己方指定为高度机密信息或机密信息的信息;

(b) 在获得指定材料为机密的受保护人员同意的情况下,阻止披露高度机密信息或机密信息;

(c) 阻止一方披露以下高度机密信息或机密信息:(i) 非因该方过错,当前或者已为公众所知的信息;(ii) 该方合法获得或知晓的信息,与调查期间或本诉讼中发现的信息无关;(iii) 之前在没有保密义务的情况下且非因疏忽或错误制作、披露和/或提供给该方的信息;或者 (iv) 根据法院命令披露的信息;或者 (v) 法规可能要求的信息;或者

(d) 阻止美国联邦贸易委员会,在本诉讼之外,在管理此类诉前披露的适用法律或者法规(包括《哈特-斯科特-罗迪诺反垄断改进法案》(Hart-Scott-Rodino

Act)(15 U.S.C. 18a) 和《反托拉斯民事诉讼法》(15 U.S.C. 1311-14)）允许的范围内，或出于执法目的，或根据法律、法院命令或法规的要求，保留、使用或披露调查材料。任何此类披露应限于适用法律或法规允许披露的范围，包括根据《反托拉斯民事诉讼法》 15 U.S.C. 1313(d) 获得的材料。原告不得向任何非当事人披露仅在本诉讼未决期间出具的任何诉讼材料，除非法院命令或法规要求，并提前七 (7) 天书面通知被告或相关受保护人员。如果某州的公共信息法案或同等法律要求披露调查材料或诉讼材料，则本命令禁止在该州公共信息法案或同等法律规定的法院命令保护的信息披露的例外情况范围内披露信息。如果一方收到其他诉讼程序发来的强制披露任何机密信息或高度机密信息的传票或法院命令，则该方应立即通知指定方，指定方应承担向该法院寻求保护的责任和费用。

(e) 允许在另一诉讼中披露高度机密信息或机密信息。

**E. 质疑内部律师**

1. 除非法院另有命令或经受保护人员书面同意，否则向被告指定的内部律师披露指定为高度机密信息或机密信息的任何信息七 (7) 日前，被告必须以书面形式向原告和受保护人员提交一份书面声明，(i) 列出指定内部律师的全名及其所居城市和州；(ii) 充分详细地描述内部律师当前及可合理预见的未来的主要工作职责，以便确定该内部律师是否参与或可能参与任何竞争性决策；以及 (iii) 列出内部律师参与或代表被告或任何其他雇主提出建议的诉讼或其他法律诉讼。

2. 被告根据上述第 E(1) 款规定向原告或任何受保护人员提交书面声明后，除非被告

在 10 日内收到原告或任何受保护人员的书面反对意见，否则被告可以向其指定的内部律师披露高度机密信息和/或机密信息。任何此类反对意见都必须详细说明依据的理由。

3. 如果被告及时收到书面反对意见，则被告必须与原告或任何受保护人员会面并协商，以尝试在书面反对意见发出后七 (7) 日内通过协议解决问题。如果未达成一致意见，则原告和/或任何受保护人员可在七 (7) 日内向本法院提交动议，反对向指定的内部律师披露。争议未决之前，被告不会向其内部律师披露任何高度机密信息或机密信息。如果法院认为指定的内部律师符合 D(1)(d) 或 D(2)(d) 的规定，则被告可以根据 D(1)(d) 或 D(2)(d) 的规定，向其指定的内部律师披露高度机密信息或机密信息，视情况而定。

**F. 在本诉讼中使用指定为高度机密或机密的信息**

1. 如果已向本法院提交或将向本法院提交的任何诉状、动议、证据或其他文件中包含任何高度机密信息或机密信息，根据《当地规则》5.1(h) 的规定，向本法院提交此类文件的一方应告知本法院其中含有高度机密信息或机密信息，且此类文件应封装提交。本命令特此允许双方当事人及任何受保护非当事人，封装提交此类适当指定的高度机密信息或机密信息。文件中包含的高度机密信息和机密信息须继续封装保存，直至法院下达进一步命令，但前提是此类文件可提供给根据 D(1) 和 D(2) 款规定可接收高度机密信息或机密信息的个人或实体。提交包含高度机密信息或机密信息的任何文件之时或之后，提交方或受保护非当事人，应在备案材料中提交一份不泄露高度机密信息或机密信息的文件的复本。此外，如果对任何此类材料的保护期

满，一方当事人或受保护非当事人，可以在备案材料中提交一份复本，其中也包含

先前受保护的材料。本命令中的任何内容均不应限制各方或任何有利害关系的公众

成员，质疑封装提交的任何高度机密信息或机密信息的归档。

2. 如果各方合理预期证词、听证会或其他程序中包括高度机密信息或机密信息，应通

知其他方，以便其他方可以确保只有经授权的个人出席这些程序。作证时用作证据

的文件，不妨碍将其指定为高度机密信息或机密信息。

**G. 高度机密信息或机密信息在审判中的使用**

1. 在任何审判或证据听证会上披露指定为高度机密信息或机密信息的任何文件、证词

或其他材料时，须受单独的法院命令管辖。在提出关于在审判或任何证据听证会上

披露高度机密信息或机密信息的拟议命令之前，双方应向其高度机密信息或机密信

息预计将在审判或任何证据听证会上使用的第三方提供关于该命令的通知。

2. 除非本命令另有规定，否则一方当事人或非当事人作为本诉讼的一部分而提供的所

有高度机密信息和机密信息均应仅用于本诉讼，不得用于任何商业、商务、竞争、

个人或其他目的。

**H. 诉讼终止后程序**

1. 除非本法院另有命令，否则本命令规定的义务在本诉讼最终结案后仍然有效，本法

院应保留解决本命令引起的任何争议的管辖权。终止本诉讼的命令、判决或裁定的

上诉期限届满后 90 日内，所有收到指定为高度机密信息或机密信息的人员必须真

诚地努力将此类材料及其所有副本归还给提供此类材料的受保护人员（或如果由律

师代表，则归还给受保护人员的律师），或以书面形式向该方或受保护人员证明，己方已销毁或删除所有此类高度机密信息或机密信息。

2. 各方律师有权保留法庭文件和证据、证词文字本和证据、审判文字本和证据以及工作成果，但前提是各方及其律师不得向任何人披露任何法庭文件和证据、证词文字本和证据、审判文字本和证据或包含指定为高度机密信息或机密信息的工作成果，但是根据法院命令进行披露，或者与出具高度机密信息或机密信息的受保护人员达成一致意见或本命令另有许可进行披露的情形除外。法院返还给各方或其律师的所有高度机密信息和机密信息必须按照本款规定进行处理。然而，本款的任何内容均不限制各方在本命令 D (5) 或 D (6) 款下的权利。

**I. 寻求修改的权利**

1. 本命令中的任何内容均不限制任何人、当事方或受保护人员寻求 (i) 对其任何材料的进一步或额外保护；或 (ii) 依照符合本法院规定正式提出的动议，要求修改本命令，包括但不限于禁止出具某些材料的命令，或某些材料在本诉讼或任何其他程序中不能作为证据的命令。

**J. 隐私法**

1. 本法院要求出示任何文件、信息或证词记录的任何命令，构成《隐私法》5 U.S.C.§ 552a(b)(11) 所指的法院命令。

**K. 受本命令约束的人员**

1. 本命令对本诉讼各方、其律师、继任者、个人代表、管理人、受让人、母公司、子公司、部门、关联公司、员工、代理人、聘任的顾问和专家以及其直接控制的任何

个人或组织均具有约束力。本命令对签署附录 A 或附录 B 的所有人员也具有约束力。

2. 提醒受本命令约束的所有人：本庭可行使藐视法庭的全部刑事和民事权利执行本命令。

下达如上命令。


日期：  [手写：] 2022 年 3 月 25 日                [签字]
                                          _____
                                          James E. Boasberg 法官阁下
                                          美国地方法院法官

### 附录 A

### 美国哥伦比亚特区地方法院

| |
|---|
| **联邦贸易委员会,** |
| 原告, |
| 诉 |
| **META PLATFORMS, INC.** |
| 被告。 |

民事诉讼案号 1:20-cv-03590 (JEB)

### 保密协议

本人 _____,受聘于 _____,担任 _____一职。

本人特此证明:

1. 本人已阅读上述诉讼中的保护令,并理解其条款。

2. 本人同意接受上述诉讼中的保护令条款的约束。本人同意仅按照本保护令的明确规定使用提供给本人的信息。

3. 本人明白,未遵守上述诉讼中的保护令条款,将导致本人面临藐视法庭应承担的民事、刑事和其他处罚。

4. 本人服从美国哥伦比亚特区地方法院对执行上述诉讼中的保护令条款的唯一管辖权,并自愿、知情放弃本人拥有的反对上述法院管辖权的任何权利。

_____ 签字

_____ 日期

附录 B

### 美国哥伦比亚特区地方法院

<table>
<tr><td>

**联邦贸易委员会，**

原告，

诉

**META PLATFORMS, INC.**

被告。

</td><td>

民事诉讼案号 1:20-cv-03590 (JEB)

</td></tr>
</table>

### 内部诉讼律师保密性协议

本人_____，受聘于 _____，担任 _____一职。

本人特此证明：

1. 本人已阅读上述诉讼中的保护令，并理解其条款。

2. 本人同意接受标题所述诉讼保护令条款的约束，同意在担任上述被告公司的内部诉讼律师时，符合本保护令 D(2)(d) 款的要求，且仅按照本保护令的明确规定使用提供给本人的信息。

3. 本人明白，未遵守上述诉讼中的保护令条款，将导致本人面临藐视法庭应承担的民事、刑事和其他处罚。

4. 本人服从美国哥伦比亚特区地方法院对执行标题所述诉讼保护令条款的唯一管辖权，并自愿、知情放弃本人拥有的反对上述法院管辖权的任何权利。

_____ 签字

_____ 日期

### 附件 C

### 定义与说明

1.　　　在回答每项请求时，贵方应按照命令提供所有由贵方持有、保管或控制的文件，不论贵方通过何种方式持有或获取此类文件——包括但不限于贵方的高管、董事、员工、承包商、律师、审计师、保险公司、调查员、顾问、代理人或其他代表贵方行事的代表合法、实际、推定和实际持有、保管或控制的文件，或保存在贵方档案中的文件，包括但不限于在本诉讼或任何其他诉讼中通过证据开示获取的文件。为免存疑，并未命令贵方提供由贵方设于美国的任何子公司所持有或保管的文件。

2.　　　"字节跳动"、"公司"或"贵方"或"贵方的"是指北京字节跳动科技有限公司、其全资或非全资子公司、母公司、非法人部门、合资公司、合伙企业、别称经营、前身、关联公司、投资工具，所有董事、高管、合伙人、员工、代理人、律师、顾问，以及任何其他在这些请求所涉期间的任何时候为前述任何一方工作或代表其工作的个人或实体，但不包括任何在美国注册的子公司。

3.　　　"日活跃用户"是指每天保持账户活跃或每天至少使用一次产品的用户。

4.　　　"高管"是指贵方的首席执行官、首席财务官、首席运营官、首席产品官、首席技术官或首席营销官。

5.　　　"TikTok"是指公开称为"TikTok"的应用程序，其最初于 2016 年 9 月发布。

## 需要出示的文件

**第．号出示请求：**

从 2016 年 9 月 1 日至今向董事会或高管提交的报告或备忘录，其讨论或分析了 TikTok 与 Facebook、Instagram 或 WhatsApp 之间的竞争。

**第．号出示请求：**

从 2016 年 9 月 1 日至今向高管或董事会提交的报告或备忘录，其说明了 TikTok 是否或在多大程度上被用户用于维持个人关系并与朋友、家人和其他个人分享经历。

**第．号出示请求：**

从 2016 年 1 月 1 日至 2018 年 9 月 1 日期间就公司创建或收到的与字节跳动收购 Musical.ly 相关的任何估值、尽职调查或分析向高管或董事会提交的报告或备忘录，其中提及了市场份额、Facebook、Instagram、WhatsApp、Snap、YouTube、"社交媒体"、"社交网络"或"个人社交网络"等内容。

**第．号出示请求：**

从 2016 年 9 月 1 日至今向高管或董事会提交的报告或备忘录，其讨论或分析了隐私政策或隐私做法对用户满意度或参与度的影响。

**第．号出示请求：**

以下证明文件或数据：从 2020 年 7 月 24 日至 2020 年 8 月 21 日期间，从 2020 年 9 月 14 日至 2020 年 10 月 1 日期间，以及从 2021 年 9 月 27 日至 2021 年 10 月 18 日期间，在提供 TikTok 的每个国家/地区，按每小时和每天统计的活跃用户数、用户的总使用时间，以及平均每位用户使用 TikTok 的时间。

**第．号出示请求：**

以下证明文件或数据：从 2016 年 9 月 1 日至今，在提供 TikTok 的每个国家/地区，按每周、每月或每年统计生成或获取的 TikTok 的日活跃用户数，以及平均每位日活跃用户使用 TikTok 的时间。



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Jacqueline Yorke, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided English into Simplified Chinese translation(s) of the source document(s) listed below are true and accurate:

- ByteDance Ltd. Letter of Request (for Transperfect)
- Tencent Letter of Request (for Transperfect)

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____
Jacqueline Yorke, Project Manager

Sworn to before me this
Monday, June 13, 2022

_____
Signature, Notary Public



_____
Stamp, Notary Public