# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

META PLATFORMS, INC.,

     Defendant.

Case No. 1:20-cv-03590-JEB

**MEMORANDUM IN SUPPORT OF
META PLATFORMS, INC.'S MOTION TO COMPEL
ANSWER TO INTERROGATORY NO. 10 REGARDING
THE FTC'S MARKET DEFINITION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................1

I.      Background and Procedural History ...........................................................2

        A.      The FTC Conducts Extensive Discovery Prior To Filing Its
                Complaint ...........................................................................................2

        B.      The FTC Files A Complaint Advancing A "PSNS" Market
                Definition ...........................................................................................3

        C.      The FTC Refuses To Answer Meta's Interrogatory on PSNS...............6

                1.      The FTC Delays Its Response for Months.................................6

                2.      The FTC's Supplemental Response to Meta's Interrogatory
                        Continues To Ignore the Issue and Provides Evasive
                        Answers...................................................................................8

II.     Argument ..................................................................................................9

        A.      The Interrogatory Seeks Critical Information Known Only to
                the FTC ...............................................................................................9

        B.      The FTC Has Refused To Answer Interrogatory No. 10 .....................11

        C.      The FTC Must Provide This Information *Now* So That Meta Can
                Conduct Fact Discovery...................................................................14

        D.      The FTC Knows What Is Included Within Its PSNS Construct...........17

CONCLUSION...................................................................................................19

# TABLE OF AUTHORITIES

Page

## CASES

*Cleo Wrap Corp. v. Elsner Eng'g Works, Inc.*, 59 F.R.D. 386 (M.D. Pa. 1972)...........................17

*Digital Envoy, Inc. v. Google, Inc.*, 2005 WL 8162580
    (N.D. Cal. June 23, 2005) ...................................................................................................17

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................10

*FTC v. Facebook, Inc.*:

    560 F. Supp. 3d 1 (D.D.C. 2021)............................................................3, 4, 5, 9, 10, 11, 13

    --- F. Supp. 3d ---, 2022 WL 103308 (D.D.C. Jan. 11, 2022) ...................................1, 6, 13

*Image Tech. Servs. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ............................9

*King v. E.F. Hutton & Co.*, 117 F.R.D. 2 (D.D.C. 1987) ...............................................................16

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........................................................................10

*Procaps S.A. v. Patheon, Inc.*, 2015 WL 1608807 (S.D. Fla. Apr. 10, 2015) ...............................10

*Rusty Jones, Inc. v. Beatrice Co.*, 1990 WL 139145 (N.D. Ill. Sept. 14, 1990) ...........................17

*SEC v. Blackwell*, 2004 WL 6829614 (S.D. Ohio Jan. 15, 2004)...................................................17

*United States v. AT&T Inc.*, 2011 WL 5347178 (D.D.C. Nov. 6, 2011)........................................11

*United States ex rel. Dougherty v. Guild Mortg. Co.*, 2020 WL 3542391
    (S.D. Cal. June 30, 2020)...................................................................................................17

*Williams v. Johanns*, 235 F.R.D. 116 (D.D.C. 2006) .....................................................................7

## OTHER AUTHORITIES

Alphabet, Inc., Annual Report (Form 10-K) (Feb. 2, 2021),
    https://bit.ly/39UAHh2 .......................................................................................................15

CrowdGather Inc., Annual Report (Form 10-K) (July 24, 2014),
    https://bit.ly/3OtwNdUii.....................................................................................................15

eBay Inc., Annual Report (Form 10-K) (Feb. 4, 2021), https://bit.ly/3A95uRE...........................15

IAC/Interactivecorp, Annual Report (Form 10-K) (Feb. 17, 2021),
   https://bit.ly/3QQEBYK ...............................................................................15

LiveXLive Media, Inc., Annual Report (Form 10-K) (June 21, 2019),
   https://bit.ly/3Nqw9MT ...............................................................................15

The New York Times Co., Annual Report (Form 10-K) (Feb. 27, 2018),
   https://bit.ly/3y2JpSk ...................................................................................15

PayPal Holdings, Inc., Annual Report (Form 10-K) (Feb. 11, 2016),
   https://bit.ly/3a180Pq ...................................................................................15

PeerStream, Inc., Annual Report (Form 10-K) (Mar. 24, 2020),
   https://bit.ly/3AbdGkA .................................................................................15

Shutterfly, Inc., Annual Report (Form 10-K) (Feb. 28, 2019),
   https://bit.ly/39XJ1fV ...................................................................................15

Spark Networks, Inc., Annual Report (Form 10-K) (Mar. 13, 2015),
   https://bit.ly/3HXKxei ..................................................................................15

Staffing 360 Solutions, Inc., Annual Report (Form 10-K) (Feb. 28, 2019),
   https://bit.ly/39XSDat ...................................................................................15

Twitter, Inc., Annual Report (Form 10-K) (Mar. 2, 2015),
   https://bit.ly/3u7IrD0 ....................................................................................15

Virgin Media, Inc., Annual Report (Form 10-K) (Feb. 7, 2013),
   https://bit.ly/3bAotdR ...................................................................................15

## INTRODUCTION

The threshold issue in this unprecedented monopolization lawsuit is whether Meta

Platforms, Inc. ("Meta") had in 2012 and 2014 and continues to have a monopoly in a relevant

antitrust market.  The Court has observed that the FTC's alleged market begged the question of

which features of Meta's services are within the market and which are not.  *See*, *e.g.*, *FTC v.*

*Facebook, Inc.*, --- F. Supp. 3d ---, 2022 WL 103308, at *7 (D.D.C. Jan. 11, 2022) ("*Facebook*

*II*") (acknowledging that "measuring the amount of time users spend on Facebook . . . likely

captures time not spent engaging with a PSN service").  Meta *asked* that question in its

interrogatories and the FTC essentially refused to answer, taking refuge in generalities and

evasions.  The alleged "personal social networking services" ("PSNS") market does not include

*all* of what people do when using Meta's services (the Facebook, Instagram, Messenger, and

WhatsApp applications) and competing services.  *See*, *e.g.*, Pl. FTC's Mem. Law Opp'n Def.

Facebook, Inc.'s Mot. Dismiss Am. Compl. at 6-7 (Nov. 17, 2021), ECF No. 85 ("Opp'n to Mot.

To Dismiss Am. Compl.") ("Facebook Blue and Instagram are 'predominately used' as PSN

services.").  Rather, only some subset of the scores of available activities are included – *but the*

*FTC refuses to tell Meta which things count and which things do not count* as PSNS.

PSNS is an FTC creation, which neither Meta nor others in the industry recognize.

Because PSNS is the FTC's creation, and only the FTC knows what it means, Meta served a

straightforward interrogatory almost three months ago asking the FTC to identify which features

or activities available to users on Facebook, Instagram, Messenger, or WhatsApp are – and

which are not – within the FTC's definition of PSNS.  But the FTC refuses to tell Meta which

activities count and which activities do not.  Stated simply, the FTC won't tell Meta what *it*

considers the relevant antitrust market to include.  That critical information is essential for Meta to prepare its defense and alone may be dispositive of the FTC's claims.  (Point II-A).

The FTC says that such basic information about its case – known only by the FTC – is unnecessary now and can be provided after all fact discovery is completed, when experts provide their reports.  That is wrong:  Meta cannot fairly defend itself unless it can conduct *fact* discovery based on the alleged market it is accused of monopolizing.  The FTC has constructed an artificial "market," and only it knows how it has defined that market.  This fundamental issue requires development of *facts* and cannot simply be left to experts to sort out, as the FTC has suggested.  (Point II-B).

The FTC expressly alleged that, based on time spent, Meta had and has more than 60% of the PSNS market (Complaint), and then more than 70% of that market (Amended Complaint).  (Because Facebook, Instagram, Messenger, and WhatsApp are provided for free to people who use them, the FTC cannot measure market share based on revenue.)  Ergo, the FTC necessarily knows what its own creation encompasses, and what time spent counts as PSNS time spent.  The FTC investigated Meta for almost two years before bringing this case:  it has extensively investigated Meta's services and how they work.  It should be ordered now to provide the critical information about what is included in its market definition so that Meta can conduct effective fact discovery to demonstrate that this claimed market is invalid.  (Point II-C).

## I.     Background and Procedural History

### A.     The FTC Conducts Extensive Discovery Prior To Filing Its Complaint

On June 18, 2019, the FTC notified Meta that it was conducting an investigation of Meta's compliance with federal antitrust law.  Over the course of the next 18 months, the FTC conducted extensive discovery, collecting more than 12 million pages of documents from Meta, 150 hours of testimony from 18 senior Meta employees, extensive narrative responses, thousands

of documents from non-parties, interviews with as many as 85 non-parties, and 7 additional investigative hearings of non-parties.  This investigation was in addition to the FTC's previous investigations of Meta's acquisitions of Instagram and WhatsApp in 2012 and 2014, which included the collection of thousands of documents as well as numerous interviews.

### B.    The FTC Files A Complaint Advancing A "PSNS" Market Definition

On December 9, 2020, the FTC filed a complaint alleging that Meta has been a monopolist in the provision of "personal social networking" services since at least 2011, with a market share "in excess of 60%" since that time.  Compl. at ¶ 64, ECF No. 3.  The FTC alleges that PSN services do not include the entirety of the Facebook app or any other app; they are instead some undefined subset of the services representing "online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space." *Id.* ¶ 52.  Services that obviously provide this, such as apps that allow messaging, as well as YouTube, TikTok, LinkedIn, Twitter, and Reddit are inexplicably excluded in their entirety because users allegedly do not predominantly use PSNS on these services.  *See* Substitute Am. Compl. (Sept. 8, 2021) at ¶¶ 170-176, ECF No. 82 ("Am. Compl."); *see also* Compl. ¶¶ 58-60.

On March 10, 2021, Meta moved to dismiss the complaint on several grounds, including the FTC's failure to allege a plausible antitrust market, and its failure to allege facts sufficient to plausibly establish monopoly power.  The FTC argued that it need not provide more details about how it calculated Meta's PSNS market share because such inquiry is "inappropriate in advance of expert discovery."  Pl. FTC's Mem. Law Opp'n Def. Facebook, Inc.'s Mot. Dismiss at 18, ECF No. 59 ("Opp'n to Mot. To Dismiss").  The Court disagreed, granting Meta's motion to dismiss on June 28, 2021, based on the FTC's failure to plausibly allege market power.  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 14 (D.D.C. 2021) ("*Facebook I*").

3

The FTC did not seriously defend its complaint on the ground that it had alleged "direct proof" of market power, noting that "direct proof . . . is only rarely available."  Opp'n to Mot. To Dismiss at 8 (internal quotation marks omitted).  It relied instead on its claim of indirect market power – an allegedly high share of a properly defined relevant antitrust market, protected by significant barriers to entry.  Thus, it claimed that Meta had more than a 60% share of the alleged PSNS market and that entry barriers protected that share.  *Id.* at 17-19.

In granting Meta's motion to dismiss, the Court explained that the FTC could not rely on a naked assertion that Meta holds a market share in excess of 60% in the FTC's "idiosyncratically drawn" PSNS market.  *Facebook I*, 560 F. Supp. 3d at 17.  The naked assertion was particularly problematic, the Court explained, in light of the inability to measure market share for a free service with typical metrics such as revenue, and the lack of clarity in the PSNS definition, which leaves open "*exactly which features of Facebook, Instagram,* et al. *do and do not constitute part of their PSN services*."  *Id.* at 19 (emphasis added); *see also id.* at 4 ("PSN services are free to use, and the exact metes and bounds of what even constitutes a PSN service — *i.e.*, which features of a company's mobile app or website are included in that definition and which are excluded — are hardly crystal clear.").  The Court correctly identified the quandary created for Meta by that lack of clarity.  For example, the Court asked, "[t]o the extent that, say, Instagram users spend their time on the site or app watching a comedy routine posted by the official page of a famous comedian, are they spending time on a PSN service" as "the Complaint suggests is the case"?  *Id.* at 19.  Similarly, although it is "perhaps counterintuitive[] to Facebook users" given that the FTC "expressly alleges that social-networking services based on 'interest-based . . . connections' . . . are not, by its definition, PSN

services," the "time a user spends engaging with specific interest-based Facebook pages or groups may not qualify as time spent on a PSN service." *Id.* (second alteration in original).

The Court further explained that, in light of this unusual market definition, the FTC's potential use of "time spent" generally on Meta's apps may be "of limited utility" to allege market power because "time spent 'on Facebook' or 'on Instagram' bears an uncertain relationship to the actual metric that would be relevant:  time spent using their PSN services in particular." *Id.*  As the Court correctly recognized, the "actual metric" that is relevant here is necessarily "time spent using . . . PSN services in particular." *Id.*

The Court granted the FTC leave to replead to supply facts, if it could, to support its assertion that Meta had, at all relevant times, a PSNS market share "in excess of 60%." *See id.* at 18, 32.  On September 8, 2021, the FTC filed an Amended Complaint, claiming that it had additional time-spent data that supported its claim of high market share:  Meta had "a dominant share of the U.S. [PSNS] market . . . [with] a share of time spent . . . [of] 70% at its lowest." Am. Compl. ¶ 202.  To rationalize its reliance on data that did not purport to measure time spent using PSNS, the FTC alleged that the Court must accept that more than "half of the time that U.S. users spend on Facebook . . . and Instagram" is spent "using [PSNS]." *Id.*  In opposing Meta's motion to dismiss, the FTC emphasized that the Court could not dismiss the Amended Complaint because these allegations had to be taken as true, and if true, they "state[d] a claim." Opp'n to Mot. To Dismiss Am. Compl. at 6-8.

On January 11, 2022, the Court denied Meta's motion to dismiss the Amended Complaint.  The Court acknowledged that the time spent data the FTC relied on did not specifically reflect the "percentage of users' time spent on Facebook Blue and Instagram . . . interacting with friends, family, and other personal contacts, as opposed to engaging in activity

— such as passively viewing a music video — that falls outside of the market definition." *Facebook II*, 2022 WL 103308, at *8.  However, the Court reasoned that this "imperfection is not fatal at this stage" because it must accept the FTC's allegation that at least 50% of time spent on Facebook and Instagram is on PSNS.  *Id.* at *7-8 (crediting the FTC's allegation that "Facebook Blue and Instagram 'are predominantly used as personal social networking services'") (citing Am. Compl. ¶ 202).

At the scheduling conference on February 28, 2022, the Court indicated that interrogatories of this nature are "important . . . particularly in this case where the definition of the market and Meta's alleged monopoly power therein . . . is pretty significant."  Tr. of Telephonic Sched. Conf. at 36, ECF No. 109.

### C.    The FTC Refuses To Answer Meta's Interrogatory on PSNS

On March 30, 2022, in its first set of interrogatories, Meta asked the FTC a straightforward question:  "For each feature or activity available to users on Facebook, Instagram, WhatsApp, or Facebook Messenger, specify whether the feature or activity is or is not within the definition of 'personal social networking.'"  Meta's Interrog. No. 10 (quoting Am. Compl. ¶ 164).  What is included?  What is not?  What time spent counts toward the determination of whether Meta has a possibly monopoly level (more than 60%) share of the alleged PSNS "market"?  Meta did *not* ask the FTC to calculate a specific market share; it simply asked what features or activities fall within the FTC's definition of PSNS and what do not, so that discovery can be focused on the relevant features of the services of Meta and the scores of non-parties who have been subpoenaed to provide information to the parties.

### 1.    The FTC Delays Its Response For Months

On April 29, 2022, the FTC responded to Meta's Interrogatory, lodging boilerplate objections, contending that the request was vague and premature, and providing a one-paragraph

response that exclusively parroted the allegations in paragraphs 166-179 of the Amended

Complaint.  *See* FTC's Resp. to Meta's Interrog. No. 10 at 2 (reproduced pursuant to Local Civil

Rules 5.2(b) and 26.2(d) in Exhibit A (attached)). The response did not identify a *single* activity

on any of Meta's services that did or did not qualify as time spent using PSNS.

On May 6, 2022, the parties met and conferred, and Meta explained to the FTC why its

response was obviously inadequate.  The FTC initially feigned confusion, stating that it did not

understand the Interrogatory because "personal social networking service" is a noun, and Meta's

Interrogatory sought information about users engaging in "personal social networking," which is

a verb.  Meta noted that the FTC's position was sophistry; the FTC itself had used the term

PSNS as a verb.  *See* Letter from K. Huff to D. Matheson at 5 (May 10, 2022) ("Exhibit B")

(attached) (citing Compl. ¶ 11 ("Instagram — a mobile-first app that enables users to engage in

personal social networking with family and friends through taking, editing, sharing, and

commenting on photographs[.]")).  In any event, Meta explained, a plain reading of the

Interrogatory made clear that Meta sought information about which activities counted as time

spent using PSNS and which did not.  *See id.*  Meta also pointed out that regurgitating the

allegations in the Amended Complaint is legally insufficient.  *See id.* at 2; *see also Williams v.

Johanns*, 235 F.R.D. 116, 122-23 (D.D.C. 2006).  In that call, and in a following letter on May

10, Meta posed a series of specific questions to make clear to the FTC what information it was

seeking.  Meta asked the FTC:

- Is "viewing content on your Facebook Feed that was not posted by one of your Facebook friends" PSNS?

- Is "viewing content on Instagram posted by a celebrity that the user follows" PSNS?

- Is "viewing a video on Instagram Reels posted by an individual that the user does not follow" PSNS?

- Is "watching a movie trailer embedded on the official page of a movie" PSNS?

Ex. B at 4.  Meta explained that the answer to these questions, and additional questions the Court

had raised (described above), were "uniquely in the possession of the FTC" and crucial for the

FTC to clarify at the outset of the case.  *See id.* at 3-4.

Meta requested that the FTC supplement its response to the Interrogatory and raised this

issue in the parties' May 31 joint status report.

### 2. The FTC's Supplemental Response to Meta's Interrogatory Continues To Ignore the Issue and Provides Evasive Answers

On June 14, 2022, the FTC served its supplemental response to the Interrogatory.  As

described in more detail below, the FTC's supplementation still did not give a straight answer.

The response principally reiterates the Amended Complaint's bare allegations that PSNS

involves three vague elements.  "[P]ersonal social networking services . . . (i) are 'built on a

social graph that maps the connections between users and their friends, family, and other

personal connections,' (ii) have 'features that many users regularly employ to interact with

personal connections and share their personal experiences in a shared social space, including in a

one-to-many "broadcast" format,' and (iii) have 'features that allow users to find and connect

with other users, to make it easier for each user to build and expand their set of personal

connections.' " Ex. A at 4 (quoting Am. Compl. ¶¶ 167-169).  The response lists nine activities

that supposedly qualify as use of PSNS.  And it notes that Meta purportedly emphasizes "friends

and family" sharing more for certain "display surfaces," such as Facebook Feed or Stories.  Ex.

A at 5-6.  But tellingly, it does not indicate when a user is using PSNS on those "display

surfaces" and when they are not.

The FTC did not even purport to provide information about whether the vast majority of

activities on Facebook and Instagram are PSNS.  Even where it, grudgingly, admitted that a few

specific activities might *not* be PSNS (e.g., dating, shopping), it refused to actually say so –

claiming instead that "it is still exploring whether and the extent to which" these features "foster and/or provide personal social networking services." *Id.* at 8-10.

## II.     Argument

### A.     The Interrogatory Seeks Critical Information Known Only to the FTC

The Court has stated that a monopoly requires a share of a properly defined market at least in excess of 60%.  *See Facebook I*, 560 F. Supp. 3d at 13; *see also Image Tech. Servs. Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").  Here, Meta provides its apps to users for free – its revenue comes almost entirely from advertising and the FTC makes no claim that Meta commands a 60%+ share of any relevant advertising market.  *See Facebook I*, 560 F. Supp. 3d at 19.  There are accordingly no dollars or units sold to use to allege market power here. *See id.* at 2.  Instead, the FTC advances an untested theory that Meta has a monopoly in providing users free services that the FTC calls "personal social networking services."  *See* Am. Compl. ¶¶ 164, 179.  But Meta does not know what "PSNS" means, because the FTC manufactured this term for litigation, and neither Meta nor others in the industry use it.  As the Court has recognized, PSNS is an "unusual" and "nonintuitive" market.  *Facebook I*, 560 F. Supp. 3d at 20.

So what counts as PSNS, or time spent on PSNS?  The FTC alleges that Facebook and Instagram are "predominantly" used for PSNS.  It bases its allegations of market power on "time spent," but only time spent on activities that fall within the definition of PSNS.  *See* Am. Compl. ¶ 202.  But as the Court observed, the FTC "[leaves] open . . . exactly which features of Facebook, Instagram, *et al*. do and do not constitute part of their PSN services."  *Facebook I*, 560 F. Supp. 3d at 19.  What time counts?  There are scores of activities users can engage in on Facebook.  Which of those represent time spent on PSNS?  How is Meta to know which aspects

of the services that competitors provide count as time spent using PSNS for purposes of a market-share calculation if it does not even know what portions of its own services allegedly count?  Without this information Meta cannot fairly defend this case; it is entitled to know the parameters of the FTC's alleged market, so that it can develop facts that refute the FTC's artificial construct.

Without "an accurate definition of the relevant market" that outlines "the area of effective competition" for Meta's services and "reflects commercial realities," there is "no way to measure" whether Meta has any "ability to lessen or destroy competition" and harm consumers. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).  Determining what activities are included or excluded is particularly necessary in this case, because, as the Court has observed, "unlike familiar consumer goods like tobacco or office supplies, there is no obvious or universally agreed-upon definition of just what a personal social networking service is." *Facebook I*, 560 F. Supp. 3d at 14.  Meta does not use the term, nor is there any indication that any industry participant anywhere ever has in any public statement or any business record.  It is the creation of the FTC.

The scope of the FTC's claimed market is a threshold issue that "many cases hinge on." *Id.* (alteration omitted); *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1014 (N.D. Cal. 2021) ("A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'").  For that reason, "vague, incomplete and/or confusing" responses to interrogatories relating to the issue of the relevant antitrust market must be supplemented because the plaintiff "cannot be hopscotching around a case with ever-changing legal theories."  *Procaps S.A. v. Patheon, Inc.*, 2015 WL 1608807, at *1, *3, *6 (S.D. Fla. Apr. 10, 2015) (magistrate order).

Here, the problem is two-fold:  not only has the FTC failed to identify which features or activities offered by other companies are or are not within the alleged PSNS market, it also has refused to tell Meta which features and user activities on Meta's services count as PSN services.  And even for features or activities that *may* be within PSNS, is it all the time spent on those things?  Some of it?  The definition of the PSNS market is a black box known only to the FTC.  Meta is left to guess at threshold issues that are essential to preparing Meta's defense and may be dispositive of the FTC's claims.

Meta needs to develop in fact discovery the evidence it will use to rebut the FTC's claim that it has, based on time spent, a monopoly share of a PSNS market.  The denominator for that calculation is the total universe of time spent on all PSN services.  *See*, *e.g.*, *Facebook I*, 560 F. Supp. 3d at 14 ("[The] analysis of market power . . . must use, as its denominator, all products roughly equivalent to another for the use to which [they are] put" and "many case[s] hing[e] on this fight over what is included in this denominator") (internal quotation marks omitted); *United States v. AT&T Inc.*, 2011 WL 5347178, at *4, *7 (D.D.C. Nov. 6, 2011) (compelling non-party competitor, Sprint, to produce documents regarding its revenue, which were necessary to reflect "Sprint's relevant market share").  The numerator, obviously, is the time spent by Meta users on qualifying PSNS activities.  Without a straight answer to Interrogatory No. 10, Meta cannot even understand what the above calculation would involve.  Meta cannot be expected to defend against an alleged market definition that cannot be pinned down or a market share allegation that cannot properly be quantified.

## B.    The FTC Has Refused To Answer Interrogatory No. 10

The FTC has refused to give a straightforward answer to this straightforward Interrogatory.  It fails to identify whether the *vast majority* of activities that people can do on Facebook and Instagram qualify as use of PSNS, and it does not identify a single activity that it

says, unequivocally, does *not* qualify as use of PSNS, while in almost the same breath it posits

that not everything on these services is within its definition.

      **1.**      The FTC gives only a handful of illustrative examples – a mere nine activities –

that it identifies as within PSNS.  According to the FTC, people may be engaging in PSNS

activities when:

    (1) sharing "personal updates, interests, photos, news, and videos" with their friends, family, and other personal connections they have "'friended' on Facebook Blue," or "follow[ed]" on Instagram, Ex. A at 4, 8;

    (2) viewing a friend's posts, *id.* at 4;

    (3) engaging in some undefined activity on Facebook and Instagram Feed and Stories, *id.* at 6, 9;

    (4) viewing and editing their Facebook or Instagram profile, *id.* at 7, 9;

    (5) viewing their friends' profiles on Facebook or Instagram, *id.* at 7, 9;

    (6) viewing their own posts on Facebook or Instagram, *id.* at 7, 9;

    (7) viewing a timeline or other collection of posts from a users' friends, family, and other personal connections on Facebook or Instagram, *id.* at 7, 9;

    (8) using the search function to find friends, family, and other personal connections and content from such personal connections, *id.* at 7-9; and

    (9) using the "People You May Know" or "Discover" tools to find and connect with friends, family, and other personal connections, *id.* at 8, 9.

      This limited information is far from sufficient to answer the question.

      *First*, these activities account for only nine of the scores of things a user can do on

Facebook and Instagram.  The FTC has said nothing about many commonly used activities on

Facebook and Instagram, including viewing or sharing content on Instagram Reels or Facebook

Reels, Facebook Groups, Facebook Watch, and much more.  On its face, the response is

woefully incomplete and provides no information about the vast majority of the activities that

people choose to spend time on; if the FTC's position is that those activities are *not* in the PSNS

market, it should be required to make that clear now.

*Second*, even though the FTC suggests that Meta positions certain "display surfaces" for PSNS, such as Facebook Feed or Instagram Feed, it says nothing about whether all of the time spent on those surfaces constitutes PSNS time.  While *some* time spent viewing content on Facebook Feed or Instagram Feed may qualify as use of PSNS, the FTC has refused to say whether *all* time spent on those surfaces qualifies as use of PSNS, or how to determine which does and which doesn't.  Many activities on Facebook Feed and Instagram Feed do not involve viewing content posted by a friend, family member, or personal connection.  For example, users view posts from celebrities and businesses.  Users also view posts served by algorithm, based on user interests, from accounts they have not followed.  These types of activities that do not qualify as "friends and family sharing" constitute a substantial part of the time spent on both Feeds.  Do these non-friends and family activities count or not?  The FTC refuses to say, even for the miniscule percentage of "display surfaces" it addresses.  *See id.* at 7 (depicting a chart with over a dozen things on Facebook the FTC describes as "surfaces," but only addressing Feed, Stories, Timeline, Dating, and Marketplace).

*Third*, surprisingly, the FTC's answer simply ignores the questions framed by the Court about the scope of PSNS, including whether the "time a user spends engaging with specific interest-based Facebook pages or groups" qualifies as use of PSNS; or whether "passive[ly] consum[ing] online video" constitutes using PSNS; or whether "watching a movie trailer embedded on the official page of the movie" counts as using PSNS.  *See Facebook I*, 560 F. Supp. 3d at 19; *Facebook II*, 2022 WL 103308, at *7.  Meta's Interrogatory in substance tracks those questions.  The FTC has simply chosen to avoid them.

**2.**     While the FTC's answers do not provide a straightforward response to the question of what is included within PSNS on Meta services, neither does it answer as to which of

the many activities on Facebook and Instagram do *not* constitute using PSNS.  It says only, again by way of illustration, that purchasing items from strangers on Facebook Marketplace or Instagram Shops, or using dating services on Facebook Dating, "*appear* to be offering different services than personal social networking services."  Ex. A at 8, 10 (emphasis added).  But even then, the FTC equivocates and takes back any clear answer, stating that it is still "exploring" whether Facebook Dating, Facebook Marketplace and Instagram Shops provide PSNS.  *Id*. at 8, 10.

      **3.**     The FTC's answer therefore is entirely a non-answer – it refuses to exclude *anything* from the PSNS "market" while also refusing to *address the vast majority* of activities that people engage with when on Facebook and Instagram.

      **C.**     **The FTC Must Provide This Information *Now* So That Meta Can Conduct Fact Discovery**

      The FTC cannot dispute and has not disputed its obligation to come forward with straight answers to the questions posed by Meta – and indeed by the Court, in its opinions on motions to dismiss.  But it wishes to defer answering until expert discovery, when it claims all will be revealed.  Put another way, the FTC's position is that Meta should conduct a year of fact discovery – involving over a hundred subpoenas to non-parties seeking information about market issues – without a basic understanding of the PSNS-market allegations that Meta must contest, while the FTC builds its case for the gerrymandered market it contrived and presumably understands.  That is simply unfair, inappropriate, and unworkable.

      Meta needs this information *now.*  In order to determine how to ensure it collects the information Meta needs from non-parties, Meta needs to know what the FTC claims counts as time spent on PSNS and what does not, which is information the FTC will presumably utilize when conducting its own nonparty discovery.  If, for example, viewing content posted by an

influencer or celebrity counts as PSNS time, then that might increase the importance of an entire

area of internet activity for fact discovery, in order for Meta to identify and demonstrate the wide

range of acceptable substitutes that disprove the FTC's monopolization claims.

This matters because, contrary to the FTC's crabbed market allegation, there is a

multitude of companies that compete with Meta.  For example, many of the companies identified

in Meta's initial disclosures have indicated in their Annual Reports filed with the Securities and

Exchange Commission that they compete with Meta.  This includes all types of companies,

including ones the FTC specifically alleges do *not* compete with Meta, such as Alphabet,

Twitter, and many others, such as (a) streaming video services, (b) streaming audio services, (c)

dating services, (d) e-commerce services, (e) community forum services, (f) job-searching

services, (g) news and other media services, (h) photo editing and sharing services, (i) video-

chatting services, (j) telephone services, and (k) payment services.  *See* Alphabet, Inc., Annual

Report at 7 (Form 10-K) (Feb. 2, 2021); Twitter, Inc., Annual Report at 13 (Form 10-K) (Mar. 2,

2015); IAC/Interactivecorp ("Vimeo"), Annual Report at 7 (Form 10-K) (Feb. 17, 2021);

LiveXLive Media, Inc., Annual Report at 9 (Form 10-K) (June 21, 2019); Spark Networks, Inc.,

Annual Report at 12 (Form 10-K) (Mar. 13, 2015); eBay Inc., Annual Report at 13 (Form 10-K)

(Feb. 4, 2021); CrowdGather Inc., Annual Report at 11 (Form 10-K) (July 24, 2014); Staffing

360 Solutions, Inc., Annual Report at 4 (Form 10-K) (Feb. 28, 2019); The New York Times Co.,

Annual Report at 4 (Form 10-K) (Feb. 27, 2018); Shutterfly, Inc., Annual Report at 11 (Form 10-

K) (Feb. 28, 2019); PeerStream, Inc., Annual Report at 4 (Form 10-K) (Mar. 24, 2020); Virgin

Media, Inc., Annual Report at 13 (Form 10-K) (Feb. 7, 2013); PayPal Holdings, Inc., Annual

Report at 12 (Form 10-K) (Feb. 11, 2016).  Meta needs an answer to this Interrogatory, so it can

effectively collect evidence from these and other non-parties demonstrating that the FTC's market definition does not comport with industry reality.

Meta also needs this information now for its experts, who cannot fairly provide expert analysis as to the alleged relevant antitrust market without knowing what is supposedly included in that market – even for Meta's own services.  That expert analysis may require substantial lead time, and cannot be left to the short window of time provided in the Scheduling Order for responses to the FTC's experts (two months).  If Meta has to wait until it reads the FTC's expert reports, it may simply be unable to conduct the kind of empirical work that will assist the Court in understanding the actual dynamics of competition, and why the FTC's experts are wrong.

The FTC must know what it considers to be within PSNS, given its most recent assertion of Meta's supposedly 70%+ share of that market, and its representation that the Court must accept that more than half of the time spent on Facebook and Instagram is spent on what it considers to be PSNS.  *See* Am. Compl. ¶ 202.  The FTC therefore can work with its experts now to shape discovery, collect relevant data, and conduct analyses.  But Meta and its experts are in the dark, unaware of what they will have to confront and with only limited time after receipt of the FTC's reports to confront it.  Playing the waiting game is simply unfair here.  *See King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 5 (D.D.C. 1987) (granting motion to compel plaintiffs to answer interrogatory and rejecting plaintiffs' argument that they needed to wait "to consult with an expert to determine their losses").

The purpose of interrogatories is frustrated when parties refuse to provide information that will narrow the issues in dispute and facilitate efficient discovery and resolution.  Prompt and complete responses to interrogatories are especially appropriate here, where they "will narrow the issues" in dispute.  *Digital Envoy, Inc. v. Google, Inc.*, 2005 WL 8162580, at *2

(N.D. Cal. June 23, 2005) (citation omitted) (compelling plaintiff to supplement responses "because they fail to illuminate [its] positions on any of the four contentions addressed in the interrogatories"); *see also Cleo Wrap Corp. v. Elsner Eng'g Works, Inc.*, 59 F.R.D. 386, 391 (M.D. Pa. 1972) (compelling plaintiff to respond to interrogatory identifying which portions of defendant's product were implicated by plaintiff's claims, since it "certainly will narrow the issues and expedite the law suit").

### D.     The FTC Knows What Is Included Within Its PSNS Construct

The FTC cannot plausibly claim that it is *unable* to answer Meta's entirely fair question at this point in the case.  The FTC had 18 months of investigation, with more than 12 million pages of Meta documents and 18 senior Meta witness depositions, before it filed this case.  It constructed its case, including its PSNS market definition, based on that extensive pre-complaint discovery.  "The Commission is . . . not in the same position as an ordinary civil litigant that has yet to commence discovery . . . [as] it has the benefit of having conducted a lengthy investigation," and there is no reason to delay a response to the Interrogatory because "[it] should have, in fact [was] required to have, adequate information to support the contentions in its Complaint."  *SEC v. Blackwell*, 2004 WL 6829614, at *3 (S.D. Ohio Jan. 15, 2004); *see also United States ex rel. Dougherty v. Guild Mortg. Co.*, 2020 WL 3542391, at *5 (S.D. Cal. June 30, 2020) (ordering government plaintiff to respond to interrogatory prior to the conclusion of fact discovery, and explaining that the "Government's two-year statutory investigation should have enabled it to identify the specific allegations . . . as soon as discovery commenced"); *Rusty Jones, Inc. v. Beatrice Co.*, 1990 WL 139145, at *2 (N.D. Ill. Sept. 14, 1990) (ordering plaintiff

to promptly respond to interrogatories where it had access to thousands of pages of documents prior to initiating complaint).

Indeed, the FTC told the Court that it was in a position to assert an actual, numerical time-spent-based market share for Meta.  It did so both in the original (more than 60%) and the Amended Complaint (more than 70%).  *See* Compl. ¶ 64; Am. Compl. ¶ 202.  Therefore, the FTC must know now what activities *it* contends qualify as PSNS and which ones do not.

Yet the FTC has not adequately done so because it finds itself between a Scylla and Charybdis of market definitions.  If, on one hand, it admits that *all* or substantially all of the time spent on Facebook and Instagram counts as PSNS, then it has undoubtedly opened the floodgates of competition provided by YouTube, TikTok, Twitter, Apple, and a host of other successful digital rivals, and has fatally undermined its claim of monopoly.  If, on the other hand, the only time that counts is time spent in active use of the three supposedly defining features of PSNS (social graph, social space, and tools for finding people) then the alleged market shrinks to insignificance and probably can't even be measured – much less be used as a platform for some imagined consumer exploitation in the form of "reduced quality."  If the FTC believes there is a betwixt and between, then it must, with specificity, tell Meta which activities count and which activities do not.

This is a problem of the FTC's own creation, the natural result of the artificial construct it seeks to employ here.  The FTC provides no reason whatsoever for relieving itself of its burden to answer an interrogatory that fairly calls for the most fundamental, threshold information necessary for the defense of this unprecedented case.

## CONCLUSION

The Court should order the FTC to promptly provide a complete answer to Interrogatory No. 10, and state unequivocally which activities available to users on Meta's services count as time spent on using PSNS and which do not.

Dated: July 1, 2022

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Kevin B. Huff (D.C. Bar No. 462043)
Kevin J. Miller (D.C. Bar No. 478154)
Kevin D. Horvitz (D.C. Bar No. 1521032)*
Hannah D. Carlin (D.C. Bar No. 1719743)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900

*Counsel for Defendant Meta Platforms, Inc.*

* Application for Admission to the Bar of the
  U.S. District Court for the District of
  Columbia Pending