**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-03590-JEB |
| **META PLATFORMS, INC.** | |
| Defendant. | |

**Plaintiff Federal Trade Commission's Memorandum of Law in Opposition**
**to Defendant Meta Platforms, Inc.'s Motion to Compel Answer to Interrogatory No. 10**
**Regarding the FTC's Market Definition**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 4

ARGUMENT ................................................................................................................. 6

I.  The FTC Responded Fully and Sufficiently to Interrogatory No. 10 Based on the
Discovery and Analysis it has Conducted to Date ...................................................... 7

   A.  The FTC Answered Meta's Interrogatory Fully and Directly .......................... 8

   B.  Meta's Objections to the FTC's Response are Without Merit .......................... 9

II.  Meta's Motion Also Fails Because It Moves to Compel Information and Analysis the FTC
Does Not Possess ......................................................................................................... 13

III.  Meta Does Not Need Additional Information Now to Conduct Discovery .................. 16

CONCLUSION .............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*B. Braun Med., Inc. v. Abbott Labs.*, 155 F.R.D. 525 (E.D. Pa. 1994) ............................... 7, 13, 17

*Barnes v. D.C.*, 281 F.R.D. 53 (D.D.C. 2012) ..................................................... 7, 13, 17

*Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29 (D.D.C. 2007) ........................................... 7

*Everett v. USAir Grp., Inc.*, 165 F.R.D. 1 (D.D.C. 1995) ................................................. 6

*FTC v. Shkreli, 2022 WL 135026* (S.D.N.Y. Jan. 14, 2022) ........................................... 12

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................. 14

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .................................................. 12

*In re Domestic Airline Travel Antitrust Litig.*, 326 F.R.D. 43 (D.D.C. 2018) ............................. 15

*In re Domestic Airline Travel Antitrust Litig.*, No. 15-1404, 2018 WL 4381070
   (D.D.C. June 15, 2018) ........................................................................ 15

*Lohrenz v. Donnelly*, 187 F.R.D. 1 (D.D.C. 1999) ...................................................... 9

*Procaps S.A. v. Patheon, Inc.*, No. 12-24356, 2015 WL 1608807 (S.D. Fl. Apr. 10, 2015) ....... 18

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................ 12

*United States v. Anthem, Inc.*, No. 16-1493, 2016 WL 11755527
   (D.D.C. Sept. 30, 2016) ................................................................... 7, 14, 18

*United States v. Anthem, Inc.*, No. 16-1493, 2016 WL 11755535
   (D.D.C. Oct. 14, 2016) .................................................................... 7, 14, 18

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) ............................................ 12

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ........................................... 12

**Statutes**

Fed. R. Civ. P. 26(b)(1) .............................................................................. 7

Fed. R. Civ. P. 33(b)(3) .............................................................................. 7

**INTRODUCTION**

Meta seeks to compel the FTC to supplement its already lengthy response to Meta's contention Interrogatory No. 10, by forcing the FTC to engage in an unduly burdensome process of creating a list of *every* "feature" or "activity" that a person can engage in on Meta's applications. Meta's request goes on to ask the FTC to prematurely conduct analysis (including likely expert analysis) necessary to "state unequivocally" whether each feature or activity does or does not constitute personal social networking, and to do so now, early in fact discovery, while the FTC is still seeking evidence from Meta that may help inform such analysis or render it moot altogether. Meta's motion should be denied.

The FTC has already responded fully and sufficiently based on the discovery and analysis it has conducted to date. Specifically, the FTC identified core aspects of the Facebook Blue and Instagram applications directed at providing personal social networking services and enumerated specific activities within each of the applications that constitute use of personal social networking services. The FTC also identified aspects of these apps that appear, at this early stage of discovery, to be offering different services than personal social networking services, and further explained that its investigation of those and other features remains ongoing in light of (among other things) Meta's integration of various features. That is, the FTC answered the interrogatory fully and directly by stating its current understanding of what is "in," what at this early stage appears different, and what remains subject to further investigation. This detailed response is more than sufficient.

Meta objects to two aspects of the FTC's response. Meta first complains that the FTC's response did not address *every* activity that can take place on Meta's applications. But the FTC identified various common *types* of activities that users engage in on the apps, and this approach

is entirely reasonable and proportionate based on the analysis the FTC has conducted at this stage of the litigation.  The FTC's response tracks Meta's own ordinary course documents—which recognize Meta's personal social networking core "use case" without exhaustively enumerating activities that comprise that use case.  Meta's demand that the FTC parse and enumerate "scores" of individual activities is unduly burdensome.  Indeed, Meta itself has responded in kind to various FTC interrogatories by addressing "types" and "examples" of the requested information.

Meta additionally complains that the FTC is unwilling to "state unequivocally" that certain activities are "out" of the relevant market.  But such definitive categorizing is premature; and it may ultimately prove impractical and unnecessary.  While Meta seems insistent on parsing individual user "activities" and "features" within the Facebook Blue and Instagram applications, the FTC has alleged that personal social networking services is an integrated service, which entails a rich experience that facilitates personal connections.  Substitute Amended Complaint ("SAC") ¶ 168, ECF No. 81 (describing how personal social networking services allow people to share a variety of content—"personal updates, interests, photos, news, and videos"—with their personal connections).  The social context matters: video content on a user's Facebook Feed is not necessarily "just a video"—akin to passively and solitarily watching a program on YouTube.  Rather, it can play a role in an interaction in which a user may connect, share, discuss, and experience the video content with their friends, family, and personal connections.  The FTC is still investigating whether, and to what extent, additional data and analysis may indicate that various activities play a part in the personal sharing that typifies personal social networking services.  Meta's demand that the FTC make an "unequivocal" commitment that particular activities are irrelevant to market definition and Meta's monopoly power is therefore at best premature.

2

Further, as the FTC explained in its interrogatory response, while Meta has added surfaces to Facebook Blue and Instagram that (at first blush) appear to be different than allowing people to connect with people they know—like a "shopping" and "dating" section—the FTC has seen evidence that Meta attempts to integrate those services with its core use case (personal social networking), including integrating them with its "core social assets" (e.g., its social graph built with friends and family connections).  That has implications for assessing Meta's monopoly power in personal social networking services.  First, the FTC is—quite reasonably—still investigating those aspects of the applications.  Through pending discovery requests to Meta, the FTC is pursuing data, documents, and interrogatory responses about how users engage with Meta's products, how Meta integrates various aspects of its apps with its core use case (personal social networking services), and the implications of that information for establishing the boundaries of the relevant market and Meta's monopoly power.  The FTC is also continuing to collect evidence about how users and third parties perceive services on various applications.  Second, as the FTC also explained, even if seemingly different services (like dating or shopping) are ultimately "out" of the relevant market, they may still bolster entry barriers that protect Meta's position in personal social networking services.  Third, the FTC (and this Court) can conclude, through a full body of evidence, that Meta has monopoly power over users with respect to personal social networking services, without ever precisely delineating the outer bounds of the relevant market, as indeed multiple international antitrust enforcers have concluded.

Meta's motion therefore—arbitrarily and in a manner that loses the forest for the trees—attempts to "force the issue" on questions that are rightly the subject of ongoing fact gathering by the FTC, and ultimately expert analysis of the competitive implications of the factual record.  But

the FTC is only required to provide information it possesses.  The FTC need not, and cannot, provide information and analysis it does not have.

Finally, contrary to Meta's arguments, Meta does not need the information it seeks to conduct discovery.  As explained in greater detail below, Meta's claims that it is struggling to understand the FTC's monopoly power and market definition allegations are based on a false premise that those allegations are "unprecedented" and "contrived."  Further, Meta's brief underscores that Meta is currently attempting to advance its own arguments in this litigation regarding what it calls "industry reality" and "the actual dynamics of competition."  Memorandum in Support of Meta Platforms, Inc.'s Motion to Compel Answer to Interrogatory No. 10 Regarding the FTC's Market Definition ("Mem.") 16, ECF No. 151-1.  Meta does not need to hear more from the FTC to pursue fact discovery and develop its own expert analysis *now* supporting whatever Meta claims about competitive dynamics.

In sum, Meta's motion attempts to force the FTC to conduct an unduly burdensome and potentially unnecessary analysis, in order to draw "unequivocal" conclusions early in fact discovery and well in advance of expert discovery, and without the benefit of pending discovery responses from Meta.  Meta's motion should be rejected.

## **BACKGROUND**

Meta served its First Set of Interrogatories on the FTC on March 30, 2022.  Matheson Decl. (Exhibit A) ¶ 4.  This included Interrogatory No. 10, a contention interrogatory, which asked "[f]or each feature or activity available to users on Facebook, Instagram, WhatsApp, or Facebook Messenger, specify whether the feature or activity is or is not within the definition of 'personal social networking' (*see* Amended Complaint ¶ 164)."  Meta Platforms, Inc.'s First Set of Interrogatories (Exhibit B) at 10.  This expansive request contained at least four separate

interrogatories relating to Facebook Blue, Instagram, WhatsApp, and Facebook Messenger; and it contained a potentially unlimited number of subparts, as Meta failed to identify or provide any limit on how granular it wanted the FTC to assess any "feature or activity available" on any of the apps.  Despite the extensive nature of Meta's request, the FTC timely responded on April 29, 2022, to the interrogatory as written.  Ex. A ¶ 5.

Meta clarified in a subsequent May 6, 2022 meet and confer that it was actually focused on identifying whether each "activity" in which a Meta user might engage constitutes "use of PSNS" as referenced in the SAC ¶ 202.  Ex. A ¶ 6.  With Meta's necessary clarification, the FTC supplemented its response to Interrogatory No. 10 with nine additional pages of information providing detail separately for Facebook Blue, Instagram, Facebook Messenger, and WhatsApp regarding activities that constitute personal social networking services.  Plaintiff Federal Trade Commission's Supplemental Objections and Responses to Defendant Meta's First Set of Interrogatories (Exhibit C) at 4-13 ("Supplemental Response").  As explained in the FTC's Supplemental Response, Interrogatory No. 10 "seeks information and evidence subject to ongoing factual discovery."  Ex. C at 2.  Indeed, the FTC has outstanding discovery requests to Meta—for data, documents, and interrogatory responses—that seek information about the extent to which Meta's various features and activities are intertwined with its core use case, personal social networking services.  Ex. A ¶ 8.

The FTC's Supplemental Response provided its present understanding of how users interact with Meta's apps.  With respect to Facebook Blue and Instagram, the FTC: (a) identified ordinary course evidence establishing that each service provides a core "use case"; (b) identified "surfaces" focused on Meta's core use case that act as focal points for activities that constitute use of personal social networking services; (c) identified specific activities on each surface that

constitute use of personal social networking services, but explained that it was still investigating and was "not yet aware of Meta documents or testimony that exhaustively list every activity" captured in that core use case; (d) identified surfaces and activities that "appear to be offering different services than personal social networking services"; and (e) identified issues that the FTC is exploring through ongoing discovery. Ex. C at 5-11. With respect to Facebook Messenger and WhatsApp, the FTC explained that these applications provide mobile messaging services, which are distinct from personal social networking services. Ex. C at 11-12. Thus, for each app identified in Meta's request, the FTC answered the interrogatory squarely and without evasion.

In short, the FTC provided a complete response through pages of truthful, explicit, responsive, and candid information, with direct citation to Meta documents and testimony. Meta remained unsatisfied and declined to meaningfully meet and confer after receiving the Supplemental Response. Instead, largely ignoring the FTC's extensive supplementation, Meta simply asserted that even the Supplemental Response "continues to be insufficient for the same reasons" as the FTC's initial response. June 20, 2022 email from K. Huff to D. Matheson (Exhibit D).

Meta now moves this Court to compel the FTC to identify each "activity" in which a Meta user might engage on Meta's applications and specify whether that "activity" is "in" the market versus "out" of the market. *See* Mem. 1.

## ARGUMENT

As a threshold matter, Meta's request is properly considered a contention interrogatory. *See Everett v. USAir Grp., Inc.*, 165 F.R.D. 1, 3 (D.D.C. 1995) ("Contention interrogatories generally ask a party: to state what it contends, . . . or to state all the facts upon which it bases a contention.") (internal citations omitted). Here, while Meta does not use the word "contend" in

Interrogatory No. 10, its motion clarifies that Meta seeks to understand "what activities [the FTC] contends qualify as PSNS and which ones do not."  Mem. 18.  Because of the burden imposed by early contention interrogatories, courts routinely defer responses until the responding party has had an adequate opportunity to conduct discovery (including expert discovery).  *See United States v. Anthem, Inc.*, No. 16-1493, 2016 WL 11755527, at *9 (D.D.C. Sept. 30, 2016) (noting "[t]here is considerable support for deferring contention interrogatories until the end of the discovery period" and recommending denial of motion to compel) (citing cases), *R. & R. adopted*,  No. 16-1493, 2016 WL 11755535 (D.D.C. Oct. 14, 2016).

As with any discovery request, the scope and timing of contention interrogatories must be "proportional to the needs of the case," taking into account "the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  To succeed on its motion, Meta also bears the burden to show that requiring an early response to a contention interrogatory "assists the goals of discovery."  *B. Braun Med., Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994).  Finally, a party is only required to provide information it possesses and, as a general matter, is not required to "create documents to answer the [Defendant's] interrogatories."  *Barnes v. D.C.*, 281 F.R.D. 53, 57 (D.D.C. 2012).

I.    **The FTC Responded Fully and Sufficiently to Interrogatory No. 10 Based on the Discovery and Analysis it Has Conducted to Date**

The FTC answered Interrogatory No. 10 fully and sufficiently as required by the Federal Rules.  *See* Fed. R. Civ. P. 33(b)(3).  Rule 33(b)(3) is satisfied when an interrogatory response is "true, explicit, responsive, complete, and candid."  *Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007).  The FTC's Supplemental Response readily meets that standard.

A.   <u>The FTC Answered Meta's Interrogatory Fully and Directly</u>

Meta's interrogatory asks the FTC to identify each "feature" and "activity" a Meta user might engage in on four Meta apps (Facebook Blue, Instagram, WhatsApp, and Messenger), and to state whether each such "feature" and "activity" constitutes use of personal social networking services. The FTC responded fully and appropriately to this request based on the discovery and analysis it has conducted to date.

In particular, the FTC's Supplemental Response separately addressed each of the four apps requested by Meta with a detailed narrative, supported by citations to testimony and ordinary course documents. Beginning with Facebook Blue and Instagram, the FTC identified aspects of these apps that provide personal social networking services (including Facebook and Instagram "Feed," "Stories," and other features), Ex. C at 5-11, and identified specific activities within each application that constitute use of personal social networking services (including viewing a friend's "Timeline" or using the "People You May Know" tool to connect with other users), Ex. C at 8-11. The FTC also identified specific aspects of these apps that appear to offer different services (e.g., Facebook Marketplace, Facebook Dating, and Instagram Shops). Ex. C at 9, 11. The FTC further explained that it continues to investigate whether these and other aspects of the apps are properly considered part of personal social networking services, and relatedly, whether they impact barriers to entry into personal social networking services—preserving Meta's monopoly power—even if not a part of personal social networking services. Ex. C at 8-9, 11.

For WhatsApp and Facebook Messenger, the FTC explained that these apps are directed at providing mobile messaging services, which are distinct from personal social networking services. Ex. C at 11-13. However, the FTC noted that because these apps have been integrated with Meta's

personal social networking services, the FTC is still investigating whether users consume personal social networking services through these apps.  Ex. C at 11-13.

The FTC's Supplemental Response did not specifically address certain other scenarios that Meta now presses in its motion to compel—for example, whether "viewing content on your Facebook Feed that was not posted by one of your Facebook friends" constitutes use of personal social networking services.  Mem. 7.  Setting aside that these incomplete hypotheticals do not appear in Meta's interrogatory, the FTC nonetheless described how the Facebook "Feed" and other surfaces within Facebook Blue and Instagram are focal points for activities that constitute use of personal social networking services, with reference to ordinary course evidence.  Ex. C at 5-11. Put simply, the FTC provided the analysis and detail that it currently possesses, rendering its response complete for this stage of the proceeding.  Taken together, the FTC has more than adequately responded to Meta's interrogatory.  *See Lohrenz v. Donnelly*, 187 F.R.D. 1, 6 (D.D.C. 1999) (denying a motion to compel where the plaintiff "answered to the best of her ability" at the time the interrogatory was propounded).

B.  Meta's Objections to the FTC's Response Are Without Merit

Meta principally objects to two aspects of the FTC's response.  First, Meta complains that the FTC's response did not address *every* activity that can take place on the applications.  *See* Mem. 11-13.  Second, Meta complains that the FTC is unwilling to "state unequivocally" that certain activities are "out" of the relevant market.  *See* Mem. 11-12, 19.  Both complaints are without merit.

Regarding Meta's first complaint, the FTC responded by addressing various common *types* of activities that users engage in on the apps, and this approach is entirely proportional.  Ex. C at 6-13.  This conveys the concept of personal social networking services and tracks Meta's ordinary

9

course documents, which recognize a core "use case," personal social networking, without exhaustively enumerating activities that comprise the use case.  Ex. C at 6-8.  Meta's contrary suggestion that the FTC should parse and enumerate "scores" of individual activities, Mem. 9, is inefficient, impractical, unnecessary, and unduly burdensome.  Indeed, in response to an FTC interrogatory, Meta itself has refused to enumerate the "types of content and/or functionality available to the user" on its applications, and has instead provided only a "non-exhaustive list of examples" claiming an exhaustive list was "unduly burdensome."  Defendant Meta Platforms, Inc.'s Objections and Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories (Exhibit E) at 16-23.

Turning to Meta's second objection, Meta complains that the FTC is unwilling to "state unequivocally" that certain activities are "out" of the relevant market.  Mem. 13, 19.  But there are good reasons why such unequivocal conclusions are inappropriate, particularly at this early stage of discovery.  Meta's insistence on parsing individual "activities" overlooks that the FTC has alleged that personal social networking is an *integrated* service that allows people to connect and share a variety of content and experiences with people they know.  *See, e.g.*, SAC ¶ 168.  This is borne out by the ordinary course documents cited in the FTC's Supplemental Response, which repeatedly discuss Facebook Blue and Instagram facilitating friends and family sharing as a distinct service, but without parsing every individual activity that entails.  Ex. C at 6-13.  The FTC is not obligated to construct from scratch an unilluminating and unduly burdensome analysis that lacks a foundation in the evidence available to the FTC.

Meta's request for an "unequivocal statement" at this stage is also not consistent with the basic purpose of interrogatories, which is to narrow or refine issues in a litigation—not to force an adversary to conduct a premature and burdensome analysis and stake positions on issues that are

under active discovery.  Here, as explained in the FTC's Supplemental Response, the FTC is still collecting and evaluating the evidence that even seemingly different aspects of Facebook Blue and Instagram leverage Meta's "core social assets" (e.g., its friends and family social graph) and Meta integrates that functionality across its apps. Ex. C at 6-13.  Taking one of Meta's incomplete hypotheticals as an example, Mem. at 7, even content in a person's feed that was not posted by a "Facebook friend" may have a connection to sharing and interactions with friends and family— e.g., the content may have been suggested in the feed based on that person's personal connections and may facilitate further interaction with those connections.  The FTC is still exploring these issues, and requiring the FTC to conclude at this stage that activities taken in isolation within Facebook Blue and Instagram are not a part of Meta's personal social networking offering is premature and inappropriate.

It is reasonable and appropriate for the FTC to dig deeper into those aspects of the applications in assessing Meta's monopoly power, through ongoing discovery.  Among other things, the FTC is currently seeking information from Meta through discovery requests for data, documents, and interrogatory responses about how users engage with its products and the extent to which Meta's various features and activities are intertwined with its core use case of personal social networking.  *Infra* § II.  The FTC is also pursuing other relevant information on how users perceive Meta's applications and available alternatives, including from third parties.

Meta's myopic focus on tallying up which specific activities and features are "in" and "out" is also misdirected in more fundamental ways.  As the FTC has explained, even seemingly different services within Facebook Blue and Instagram (like dating or shopping) may bolster entry barriers in personal social networking services—and thus may play a part in preserving Meta's monopoly power.  Ex. C at 9, 11-13.

Further, this Court can conclude, through a full body of evidence, that Meta has monopoly power over users, without ever precisely delineating relevant market boundaries.  To start, the FTC may prove that Meta possesses monopoly power through direct proof, which does not turn on establishing a relevant market.  *See United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001); *FTC v. Shkreli*, 2022 WL 135026, at \*32, 34 (S.D.N.Y. Jan. 14, 2022) (stating that "[a] plaintiff can establish a defendant's monopoly power either 'directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market'"); SAC ¶¶ 205-211.  Nor does even the indirect method of proving monopoly power—defining a relevant market and assessing market shares—turn on precise delineation.  *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds.").

Here, a granular activity-by-activity exegesis of what "counts" as personal social networking is unnecessary to conclude that Meta possesses monopoly power or that personal social networking services, as alleged in the SAC, is a properly defined relevant market.  The FTC has enumerated multiple types of activities that comprise personal social networking services, Ex. C at 5-11—including with reference to ordinary course documents in which Meta recognizes a "core use case" of personal social networking as distinct from other services.  The provision of services enabling that core use case may represent a properly defined relevant market, regardless of the precise description of its outer bounds.  *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 54 (D.D.C. 2015) ("The FTC need not present market shares . . . with the precision of a NASA scientist."); *cf. United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) (market definition "does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground").  Among other things, ordinary course documents and user surveys may indicate

12

the basic contours of the service without precisely enumerating or articulating every activity that comprises use of the service—and indeed, that is what the evidence collected to date suggests here. Ex. C at 5-11. In that scenario, the exhaustive delineation Meta demands may be unnecessary or even misleading—as the focus on piecemeal activities overlooks the integrated service being offered. And, with similar and other evidence, one may also observe Meta's dominant position (and the lack of competition) as to that service, regardless of the presence (or absence) of *other* potential services on Meta's apps.

To this point, an international enforcer recently concluded just that about Meta's social networking service offering for users. *See* Meta (formerly Facebook): Paramount Significance for Competition Across Markets Formally Determined at 3-4, Bundeskartellamt (May 2, 2022), https://bit.ly/3yBYdre (finding that Meta "holds a dominant position on the platform and network market for social networks for private users in Germany with its core service Facebook," despite also finding "blurred market boundaries").

## II. Meta's Motion Also Fails Because It Moves to Compel Information and Analysis the FTC Does Not Possess

Meta's request for an exhaustive accounting of every possible feature and activity on all of Meta's apps, and an "unequivocal" statement of whether each constitutes using personal social networking services or not, also fails because it improperly requests information and expert analysis that the FTC does not currently possess. *Barnes*, 281 F.R.D. at 57 (explaining that, where a plaintiff's expert has not performed "the analysis that would be responsive to" a defendant's interrogatories, courts generally would not require that plaintiff "to create documents to answer the [defendant's] interrogatories"); *see also B. Braun Med., Inc.*, 155 F.R.D. at 527 (recognizing that to require a premature answer may force a party "to articulate theories of their case not yet fully developed").

As described above, the FTC has not—with good reason—gone through the burdensome process of somehow listing every "feature" and "activity" that a person can engage in on Facebook Blue, Instagram, Facebook Messenger, and WhatsApp, nor has the FTC conducted the analysis (likely including expert analysis) necessary to "state unequivocally" whether each such activity does or does not constitute personal social networking. As further described, the FTC is, quite fairly and appropriately, collecting additional information and evaluating whether it would inform these issues, and multiple relevant discovery requests to Meta remain pending. In addition to the FTC interrogatory to Meta discussed above, *see supra* § I.B, the FTC also has multiple pending data and document RFPs issued to Meta seeking information relevant to assessing activities users engage in on Meta's applications.

To date, Meta has produced barely any documents and data in this litigation, and (as described above) provided an incomplete response to a related FTC interrogatory about application features and functionalities. Compelling a further response from the FTC is unwarranted when Meta has yet to furnish relevant information in response to directly related discovery requests. *See, e.g.*, *United States v. Anthem*, No. 16-1493, 2016 WL 11755527, at *9 (D.D.C. Sept. 30, 2016) (recommending that Anthem's motion to compel be denied because the government answered "to the best of its ability at this time" and where the government "asserts that it is still gathering facts at this time, including possibly facts that may tend to" support its allegations), *R. & R. adopted*, No. 16-1493, 2016 WL 11755535 (D.D.C. Oct. 14, 2016).

Even after the FTC receives additional documents, data, and other information from Meta, an assessment of that information and its connection to market definition and market power will be the subject of expert analysis and reports. *See, e.g.*, *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 128 (D.D.C. 2016) (discussing expert analysis of data collected during discovery to estimate

market share); *see also* Memorandum Opinion at 17, ECF No. 90 (explaining that arguments around the reliability of the data may be an appropriate part of a potential "battles of the experts"). Meta's contention interrogatory is thus particularly inappropriate and untimely given it seeks a response that "may well be impacted by future discovery and will likely require expert opinion and testimony." *See In re Domestic Airline Travel Antitrust Litig.*, No. 15-1404, 2018 WL 4381070, at *4 (D.D.C. June 15, 2018), *R. & R. adopted*, 326 F.R.D. 43 (D.D.C. 2018).

The FTC's opening expert reports in this matter are not due until July 3, 2023. Scheduling Order at 1, ECF No. 103 (providing a deadline for expert discovery of January 5, 2024). With the FTC (and its expert(s)) still awaiting factual discovery from Meta, and with the FTC's expert(s) yet to conduct related analyses, the FTC cannot be required to perform analyses to answer Meta's questions based on information it does not possess. Rather, the FTC will produce one or more expert reports analyzing Meta's monopoly power and explaining the relevance or lack thereof of any particular features or activities when provided for by the Scheduling Order.

Notwithstanding the foregoing, Meta contends that the FTC must be withholding information that is currently in its possession. Specifically, Meta contends that the FTC must know which activities it considers personal social networking services and which it does not, citing allegations in the FTC's complaints about how Facebook's share of time spent on U.S. personal social networking services is at least 70%. Mem. 18 (citing SAC ¶ 202). Meta need only read the full paragraph it cites to understand how the FTC calculated this approximation. Ordinary course documents show that Meta recognizes that Facebook Blue and Instagram are "predominantly used" as personal social networking services. SAC ¶ 202. To be conservative, though, the FTC assumed, for the sake of argument, that only half of users' time spent on Facebook Blue and Instagram is using personal social networking services. *Id.* And to be even more conservative,

the FTC assumed that for all other providers, 100% of users' time spent is using personal social networking services. *Id*. Even applying such conservative assumptions, Meta's share of U.S. personal social networking services based on user time spent was "approximately 70% at its lowest." *Id*. Meta undoubtedly disagrees with and disputes this approach. But that does not mean the FTC is withholding information. It simply indicates that the granular calculation Meta demands is not necessary to calculate market shares that illuminate Meta's monopoly power. Moreover, as the Court recognized, the FTC is not relying solely on time spent to measure Meta's monopoly power—instead, relying on time spent, Daily Active Users, and Monthly Active users, "those metrics buttresses one another" to "reinforce the same conclusion." Memorandum Opinion at 16, 18, 20, ECF No. 90 (noting that the FTC's metrics "all point toward the same conclusion," that Meta "maintained a dominant market share during the relevant time period").

Meta also cites several cases for the proposition that, because the FTC conducted an investigation, it is in a different position than an ordinary litigant and cannot delay responding to contention interrogatories. Mem. 17-18. With the benefit of its investigation, the FTC was able to include in its complaint direct quotes from Meta's ordinary course documents and testimony from Meta executives to support the relevant market allegations and granular analysis of Comscore data to provide market share calculations. But that does not mean that the FTC's pre-complaint investigation gave the FTC access to all of the information called for in Meta's Interrogatory No. 10, and indeed, there is an additional, robust post-complaint discovery period underway in which (as described above) the FTC continues to collect relevant evidence.

## III.   Meta Does Not Need Additional Information Now to Conduct Discovery

Contrary to Meta's arguments, Meta does not need the information it seeks to conduct discovery. *See* Mem. 14-17. Thus, Meta has not and cannot meet its additional burden to show why the information it seeks to compel is important enough to justify requiring the FTC to create

16

an early response to Meta's contention interrogatory, nearly a year before the close of fact discovery and well before expert discovery even begins.  *See Barnes*, 281 F.R.D. at 57; *B. Braun Med., Inc.*, 155 F.R.D. at 527.

To start, Meta's claims that it cannot understand the FTC's monopoly power and market definition allegations, because they are "unprecedented" and "contrived," rest on a false premise. *See* Mem. 14, 18.  Far from being unprecedented, multiple international antitrust enforcers have found Meta to have market power in user services that hew closely to the alleged personal social networking services market.[1]  Additionally, the FTC's alleged personal social networking services market directly tracks Meta's own repeated recognition of its "core use case" for Facebook Blue and Instagram, as detailed in the FTC's SAC, *see* SAC ¶¶ 177-79, and its Supplemental Response, Ex. C at 5-11.  Meta's claims that it does not understand the FTC's allegations therefore ring hollow.

Further, Meta has what it needs to conduct discovery now.  The FTC has already described personal social networking services, articulated its "key elements," identified the market participants, and provided Meta's approximate market shares based on multiple metrics, as well as explained why other companies and services are outside the market.  SAC ¶¶ 166-69, 172-76, 181-89, 198-202.  The FTC has also enumerated types of activities that comprise personal social networking services, with citations to ordinary course documents recognizing this "core use case"

---

[1] *See, e.g.*, Digital Platforms Inquiry Final Report, Australian Competition & Consumer Commission (June 2019) at 77-78, https://bit.ly/2MoXeUS (determining that Meta holds "substantial market power in supplying social media services in Australia"); Meta (formerly Facebook): Paramount Significance for Competition Across Markets Formally Determined, Bundeskartellamt (May 2, 2022) at 3, https://bit.ly/3yBYdre (finding that Meta "holds a dominant position on the platform and network market for social networks for private users in Germany"); Online Platforms and Digital Advertising Market Study Final Report, Competition & Markets Authority (July 1, 2020) at 146, https://bit.ly/3PnK2Ng (finding that "Facebook has significant and enduring market power in social media").

as a distinct service.  Ex. C at 5-11.  The FTC's transparent and detailed disclosure of its case

theory is a dramatic contrast to the *Procaps* case that Meta cites, Mem. 10, in which the plaintiff

was admonished for "hopscotching around a case with ever-changing legal theories."  *See Procaps*

*S.A. v. Patheon, Inc.*, No. 12-24356, 2015 WL 1608807, at *3 (S.D. Fl. Apr. 10, 2015) (describing

an antitrust plaintiff who, even after summary judgment, had still not identified "current or future

competitors" or "present and future market shares"); *cf. United States v. Anthem, Inc.*, No. 16-

1493, 2016 WL 11164045, at *5 (D.D.C. Oct. 10, 2016), *R. & R. adopted*, No. 16-1493, 2016 WL

11164029 (D.D.C. Oct. 14, 2016) (recommending denial of Anthem's motion to compel the United

States to identify the 20 markets in which it alleged the proposed merger would be presumptively

unlawful, noting that Anthem had "not provided any evidence" that its experts were limited in

being able to conduct their analysis and also that Anthem would receive the requested details "as

discovery proceeds and Plaintiffs' experts share their reports").  And while the FTC is actively

seeking discovery from Meta about how users engage with its applications, Meta concedes it is

already able to parse how users spend time.  *See* Mem. 13 (claiming that "activities that do not

qualify as 'friends and family sharing' constitute a substantial part of the time spent on both

Feeds").

Meta's brief also makes clear that Meta is advancing its own purported claims about what

it calls "industry reality" and "actual competitive dynamics."  Mem. 16.  Meta thus does not need

anything more from the FTC to seek discovery from third parties and develop its own expert

testimony today in support of Meta's claims about competition.  Stated differently, *regardless* of

whether the FTC declared today that certain activities within the Facebook Blue and Instagram

apps are definitively out of the relevant market, Meta would be advancing the same arguments

about purported "actual competitive dynamics."  Thus, it is a false premise that any (different or

18

additional) response the FTC provided to Interrogatory No. 10 would change the type of discovery and expert analysis that Meta is conducting.

This is true both overall, and with respect to Meta's effort to rebut the FTC's market share allegations.  *Cf.* Mem. 11 (complaining about a lack of understanding of how to calculate market shares).  Meta is advancing the argument that there are a "multitude of companies that compete with Meta"—and presumably in Meta's view, those companies should be included in the relevant market and market shares.  Mem. 15; *but see* SAC ¶¶ 171-76 (explaining why various companies have been excluded from the alleged relevant market and market shares).  Meta therefore does not need to hear more from the FTC to advance its own arguments about how market shares should be calculated.

Indeed, Meta's defensive efforts are already well underway: Meta has subpoenaed approximately 130 non-parties, Joint Status Report at 1, ECF No. 146, and its motion to compel reveals that Meta is already developing evidence it believes will prove useful in challenging the FTC's case-in-chief, Mem. 15.

## <u>CONCLUSION</u>

Meta's motion should be denied for the reasons above.

Dated: July 14, 2022

Respectfully submitted,

/s/ Daniel Matheson
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Patricia Galvan
Michael Smith (D.C. Bar 996738)
Maria Dimoscato (D.C. Bar 489743)
Susan Musser (D.C. Bar 1531486)
Nathan Brenner
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of July 2022, I served the foregoing on the following counsel via ECF:

Mark C. Hansen
Kevin B. Huff
Kenneth M. Fetterman
Geoffrey M. Klineberg
Kevin J. Miller
Aaron M. Panner
Alex A. Parkinson
Ana Nikolic Paul
Aaseesh P. Polavarapu
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, DC 20036
Tel: 202-326-7900
mhansen@kellogghansen.com
khuff@kellogghansen.com
kfetterman@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com
apaul@kellogghansen.com
apolavarapu@kellogghansen.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: 650-858-6000
sonal.mehta@wilmerhale.com

David Gringer
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-230-8800
david.gringer@wilmerhale.com
James P. Rouhandeh
Michael Scheinkman

Davis Polk & Wardwell LLP
450 Lexington Avenue

New York, NY 10017
Tel: 212-450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

/s/ Daniel Matheson
Daniel Matheson (D.C. Bar 502490)
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*

22