# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

                Plaintiff,

      v.

META PLATFORMS, INC.

Defendant.

Civil Action No. 1:20-cv-03590-JEB

**Plaintiff Federal Trade Commission's Memorandum of Law in Opposition
to Defendant Meta Platforms, Inc.'s Motion to Compel Production of 2012 and 2014 FTC
Memoranda**

**Table of Contents**

BACKGROUND ............................................................................................................ 2

I.    Recommendation Packages Relating to the 2012 Instagram Acquisition ......................... 3

    A.    May 2012 Recommendation Package to the Commission Regarding Compulsory
        Process (Entries 1a Through 1e) .................................................................. 3

    B.    August 2012 Recommendation Package to the Commission Regarding Closing
        the Investigation (Entries 2a, 2b, and 2e) ..................................................... 4

II.    Notes Relating to the FTC's 2014 WhatsApp Review (Entries 3 and 4) ......................... 5

ARGUMENT ............................................................................................................... 6

I.    The Deliberative Process Privilege Protects from Discovery FTC Recommendation
    Memoranda (Entries 1a-e, 2a, 2b, and 2e) and Attorneys' Notes (Entries 3 and 4)........... 6

    A.    The Deliberative Process Privilege Applies Because the Recommendation
        Memoranda and Attorney Notes Are Predecisional and Deliberative .......................... 6

    B.    FTC Regulations Provide for a Twenty-Five-Year Application of the Deliberative
        Process Privilege, Not Ten Years as Meta Argues ...................................................... 8

    C.    Any Factual Material in the Documents Is "Inextricably Interwoven" with Staff's
        Analysis and Recommendations .............................................................................. 8

    D.    The Court Should Reject Meta's *Ipse Dixit* Claim that the FTC's 2012 and 2014
        "Decision-making Process Is Directly at Issue" ..................................................... 10

    E.    Meta's Argument that the FTC Has Waived the Deliberative Process Privilege by
        Initiating a Lawsuit Is Contrary to Binding Precedent ............................................... 12

II.    The Documents at Issue Are Protected Work Product .................................................. 13

    A.    Meta Does Not Contest the FTC's Work Product Claim Regarding Entries
        1a, 1b, 1c, 1e, 2a, 2b, 3 and 4.............................................................................. 13

    B.    Entries 1d and 2e Are Protected Work Product Prepared by BE Economists ........... 14

    C.    The Documents Are "Virtually Undiscoverable" Opinion Work Product ................. 15

III.    The FTC Did Not Waive its Privileges by Providing the Documents to Congress .......... 17

    A.    The FTC Responded to an Official Request from Congress, Consistent with
        Long-Standing Policy .......................................................................................... 17

    B.    The FTC Did Not Waive Privileges by Providing Information to Congress.............. 18

IV.    The Court Should Reject Meta's Alternative Argument That It Has Overcome the
    Deliberative Process Privilege and Work Product Protection .......................................... 21

    A.    Meta Exaggerates the Factual Information in the Recommendation Memorandum
        and Notes at Issue, and Ignores the Information It Already Has ................................. 21

        1.    The FTC Did Not Collect Any Documents in Its 2014 WhatsApp Review,

and Sought to Interview Only Sixteen Third Parties that Are Equally Available to Meta ............................................................................................................... 22

2.   The FTC Has Already Produced to Meta All of the Documents in Its Possession Collected in the 2012 Instagram Investigation, and Meta Has Equal or Superior Access to All Witnesses ........................................................... 23

B.   Meta Inaccurately Claims that Staff's Statements Are FTC's "Admissions" ............ 24

C.   Meta's Concession that It Seeks "Admissions" Proves that Its Motion Should Be Denied to Avoid Chilling Candid Communication Among FTC Staff ..................... 25

D.   Meta's Assertion that the FTC's 2012 and 2014 Investigations May Be "Dispositive" Misstates Antitrust Principles, and Ignores the Investigations' Limited Scope ............................................................................................................ 26

E.   Meta's Complaints About "Unfairness" Do Not Establish an Extraordinary Need for the FTC's Privileged Documents ............................................................... 28

V.   Attorney-Client and Investigatory File Privileges Also Apply ......................................... 29

CONCLUSION ........................................................................................................................... 30

**Table of Authorities**

## Cases

*A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138 (2d Cir. 1994) ........................................ 7

*Ashland Oil, Inc. v. FTC*, 548 F.2d 977 (D.C. Cir. 1976) .......................................... 18

*Aspin v. Dep't of Def.*, 491 F.2d 24 (D.C. Cir. 1973) ............................................... 30

*Brock v. Weiser*, 1987 WL 12686 (N.D. Ill. June 15, 1987) ................................... 11, 12

*Chisler v. Johnston*, 796 F. Supp. 2d 632 (W.D. Pa. 2011) ..................................... 29

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ..................... 2, 7, 8

*\* Dir., Off. of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304
(D.C. Cir. 1997) ............................................................................... 9, 16, 21

*Doe 2 v. Esper*, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) ...................................... 11

*\* Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1 (D.C. Cir. 2014) ...................... 6, 9, 10, 26

*Elec. Frontier Foundation v. Dep't of Just.*, 890 F. Supp. 2d (D.D.C. 2012) ..................... 17

*EPA v. Mink*, 410 U.S. 73 (1973) ......................................................... 6, 8, 19, 26

*Exxon Corp. v. FTC*, 466 F. Supp. 1088 (D.D.C. 1978) ........................................... 14

*Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978) .......................................... 18, 20

*First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312 (2000) ............................. 20, 29

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1 (D.D.C. 2018) ....... 30

*FTC v. Bass Bros. Enterprises, Inc.*, 1984 U.S. Dist. LEXIS 16889
(N.D. Ohio May 8, 1984) ....................................................................... 15

*FTC v. Grolier, Inc.*, 462 U.S. 19 (1983) ................................................... 29, 30

*FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980) ........................ 18, 20

*FTC v. Staples, Inc.*, 2016 WL 259642 (D.D.C. Jan. 21, 2016) ................................... 22

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .................................. 1, 6

*Heggestad v. Dep't of Just.*, 182 F. Supp. 2d 1 (D.D.C. 2000) ................................ 7, 20

*Hickman v. Taylor*, 329 U.S. 495 (1947) ...................................................... 29

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 274 F.R.D. 106
(S.D.N.Y. 2011) ............................................................................ 12, 28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) ............. 27

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ........................................ *passim*

_____

\* Authorities principally relied upon are marked with an asterisk.

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982) ........................................................ 16

*In re Subpoena Duces Tecum Served on OCC,* 145 F.3d 1422 (D.C. Cir. 1998) ........................ 11

*In re Subpoena Duces Tecum Served on OCC*, 156 F.3d 1279 (D.C. Cir. 1998) (*on rh'g*) ......... 11

*Jud. Watch, Inc. v. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142 (D.D.C. 2012) ...................... 17

*Jud. Watch, Inc. v. U.S. Dep't of State,* 2019 WL 2452325 (D.D.C. June 12, 2019) .................. 16

* *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) ....................................................... 10, 11, 13

* *Lone Star Industries, Inc. v. FTC*, 1984 U.S. Dist. LEXIS 18242 (D.D.C. Mar. 26, 1984) 14, 30

*Lundy v. Interfirst Corp.*, 105 F.R.D. 499 (D.D.C. 1985) ............................................... 12, 13

*MacNamara v. City of New York*, 249 F.R.D. 70 (S.D.N.Y. 2008) .............................................. 29

*Murphy v. Dep't of Army*, 613 F.2d 1151 (D.C. Cir. 1979) ......................................... 18, 19, 20

*New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021) ................................................ 12

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ...................................................... 8

*Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds*,
   724 F.2d 201 (D.C. Cir. 1984) .......................................................................... 7

*Parker v. United States DOJ Exec. Office for U.S. Attys*., 78 F. Supp. 3d 238 (D.D.C. 2015) .... 14

* *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598 (D.C. Cir. 2001) ................. 18, 19, 21

* *SafeCard Svces., Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ........................................ 14, 15

*Safeway Stores Inc. v. FTC*, 428 F. Supp. 346 (D.D.C. 1977) ............................................. 19, 26

*Swartwood v. County of San Diego*, 2013 WL 6670545 (S.D. Cal. Dec. 18, 2013) .................. 29

*Tax'n with Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981) ................................... 7

*Tuite v. Henry*, 181 F.R.D. 175 (D.D.C. 1998) .......................................................... 30

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021) ...................................... 25

*United States v. AT&T Co.,* 498 F. Supp. 353 (D.D.C. 1980) .................................................. 24

*United States v. AT&T*, 642 F.2d 1285 (D.C. Cir. 1980) ...................................................... 19

*United States v. Baker Hughes, Inc.,* 908 F.2d 981 (D.C. Cir. 1990) ......................................... 27

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) .................................................. 26

*United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010) ................................................ 17

*United States v. Gates*, 35 F.R.D. 524 (D. Colo. 1964) ....................................................... 13

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975) ........................................... 28

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ................................................ 30

*United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) ......................................................... 24

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1 (D.D.C. 2013) ................. 12

*United States v. Phillip Morris Inc.,* 212 F.R.D. 421 (D.D.C. 2002) ........................................ 20

*United States v. Warren,* 42 F.3d 647 (D.C. Cir. 1994) ................................................ 24

\* *United States v. Weber Aircraft Corp.*, 465 U.S. 792 (1984) ................................ 7, 19

*Upjohn Co. v. United States,* 449 U.S. 383 (1981) .................................................. 16

*Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768 (D.C. Cir. 1988) (*en banc*) .................. 9

*Worldnetdaily.com, Inc. v. DOJ*, 215 F. Supp. 3d 81 (D.D.C. 2016) ........................ 7, 9

**Statutes**

15 U.S.C. § 18a(i)(1) ................................................................................ 12, 27

15 U.S.C. § 53(b) ......................................................................................... 2

15 U.S.C. § 57b-2(b)(3)(C) ........................................................................... 17

15 U.S.C. § 57b-2(d)(1)(A) ........................................................................... 17

16 C.F.R. § 0.1 ............................................................................................. 2

16 C.F.R. § 0.18 .................................................................................... 14, 15

16 C.F.R. § 3.54 ........................................................................................... 2

16 C.F.R. § 4.10(a)(3) .................................................................................. 8

16 C.F.R. § 4.11(b) ..................................................................................... 17

16 C.F.R. §§ 3.1-3.83 ................................................................................... 2

Fed. R. Civ. P. 26(b)(3)(ii) ......................................................................... 21

**Other Authorities**

5 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. Supp. 2022) .......................................................... 28

The Court should deny Meta's motion to compel production of FTC staff's internal recommendations and advice relating to Meta's acquisitions of Instagram and WhatsApp.  ECF No. 152 (hereinafter "Mem.").  The FTC has properly asserted deliberative process protection over each of the documents at issue, and Meta's non-credible arguments to the contrary flout or ignore precedent.  *Infra* Section I.  Moreover, Meta does not even contest the FTC's assertion of work product protection over the documents at issue, except with respect to two recommendation memos prepared by the FTC's Bureau of Economics staff.  *Infra* Section II.  Meta's work-product arguments regarding these two documents are unavailing, and in any event the two Bureau of Economics recommendation memos are unquestionably protected by deliberative process privilege.  *See FTC v. Warner Commc'ns Inc*., 742 F.2d 1156, 1160-62 (9th Cir. 1984). Further, the attorney-client privilege and investigative file privileges apply.  *Infra* Section V.

Meta fails to advance any precedent suggesting that these privileges were waived when the FTC produced the documents in response to a formal Congressional request, expressly noting the privileges implicated and requesting confidential treatment (which Congress has provided). *Infra* Section III.  Nor does Meta address the policy concern that animates D.C. Circuit authority holding that such productions do not waive privilege: a finding of waiver would chill Congress's future ability to obtain information from the FTC and other federal agencies.

Finally, Meta's hyperbolic accusations of a "cover up" do not justify abrogating the FTC's privileges.  *Infra* Section IV.  Contrary to Meta's overblown claims, the documents at issue do not contain "findings" of the FTC, "evidence" that is unavailable to Meta, or "admissions" that Meta can use in this case.  Instead, the documents express the analyses and advice of individual staff members, which are core work product, and an essential part of "the give-and-take of the consultative process."  *Coastal States Gas Corp. v. Dep't of Energy*, 617

1

F.2d 854, 866 (D.C. Cir. 1980).  Staff members' advice, based on the necessarily limited inquiry undertaken at the time of the Instagram and WhatsApp acquisitions, is not dispositive of – or even particularly informative about – any issues in this matter.  Despite Meta's overheated rhetoric, the disclosure of the FTC's privileged documents is not necessary to illuminate the real issue in this case, which is Meta's unlawful maintenance of monopoly power, and not (as Meta would pretend) the particulars of FTC staff members' 2012 and 2014 analyses.

## BACKGROUND

The FTC's Bureau of Competition ("BC") investigates potential antitrust violations, recommends further actions to the Commission, and prosecutes any enforcement actions the Commission authorizes.  Declaration of BC Director Holly Vedova, Ex. A ¶ 6.  (Hereinafter, all references to "Ex.," unless otherwise identified, refer to exhibits to the Declaration of Daniel Matheson ("Matheson Decl.").)  The FTC's Bureau of Economics ("BE") advises the Commission on economic aspects of its functions and provides "economic and statistical assistance to the enforcement Bureaus in the investigation and trial of cases."  16 C.F.R. § 0.1; *see* Ex. A ¶¶ 6, 24.  During investigations, BC attorneys and BE economists work closely together to conduct and coordinate investigations.  Ex. A ¶ 24.

The Commission neither "clears" nor "approves" transactions; instead, it may only take action to challenge a transaction, which it does by voting to initiate an administrative proceeding or file suit in federal court.  *See* 15 U.S.C. § 53(b) (authorizing FTC to seek injunctive relief in federal court); 16 C.F.R. §§ 3.1-3.83 (FTC rules of practice for administrative proceedings).  The only time the Commission passes judgment on a transaction is when the Commission itself formally decides on a transaction's legality as part of an administrative proceeding.  *See, e.g.*, 16 C.F.R. § 3.54.  The Commission does not otherwise make "findings" or come to "conclusions"

about a transaction's legality, or any predicate issues.  Meta's assertions that the documents it

seeks include the FTC's "findings," "determinations," or "views" are incorrect: the documents

are pre-decisional in nature, and do not constitute agency findings or decisions.

Meta's motion failed to identify the specific documents at issue or the privilege

descriptions provided by the FTC, instead lumping the relevant documents into eight generally

described buckets.  *See* ECF No. 152-1 at 7.  In an effort to provide clarity, the FTC below

identifies the documents at issue and the relevant privilege entries.  *See* Ex. B (Privilege Log).

## I.   Recommendation Packages Relating to the 2012 Instagram Acquisition

BC staff and BC Front Office attorneys communicate opinions, advice, strategies, and

recommendations to the Commission by transmitting recommendation packages.  Ex. A ¶¶ 9, 11.

These packages contain pertinent documents including recommendation memoranda.  *See id.*

Two recommendation packages contain all Instagram-related documents Meta seeks in its

Motion; as described below, these are Entries 1a-1e, and Entries 2a, 2b, and 2e.

### A.   May 2012 Recommendation Package to the Commission Regarding Compulsory Process (Entries 1a Through 1e)

Entry 1a is a cover memo from the BC Front Office to the Commission regarding

compulsory process; Entry 1b is a memo from BC staff to the Commission.  *See* Ex. B; Mem. 7

(Arabic numeral (1)).  Both recommendation memos represent an integral part of how the FTC

makes decisions about enforcing the antitrust laws; candor and open debate in such memoranda

are vital to the Commission's exercise of prosecutorial discretion and its case selection process.

*See* Ex. A ¶¶ 20-21.  These documents are drafted for law enforcement purposes.  *Id.* ¶ 23.  FTC

staff analyze each case understanding that the Commission could ultimately vote to initiate legal

action as a result of the investigation.  *Id.* ¶ 25.

Entries 1c and 1d are BC and BE memos "to the Merger Screening Committee, later

provided to the Commission as an attachment to the compulsory process memorandum." *See* Mem. 7 (Arabic numerals (2) and (3)); *see also* Ex. B.  As Director Vedova's Declaration describes, pursuant to the FTC's procedures, based on information gathered in a preliminary review, in May 2012 BC and BE staff drafted separate recommendation memoranda to the FTC's Merger Screening Committee regarding whether to seek additional information from Facebook and Instagram.  Ex. A ¶ 14.  The Merger Screening Committee is typically composed of managers from the BC Front Office, BE Front Office, and representatives of the FTC Chair. *Id.* ¶ 10.  The May 2012 memos to the Merger Screening Committee comprised staff's opinions, analyses, and mental impressions about information gathered to that point from Facebook and Instagram, and opinions and advice regarding strategy for further investigation.  *Id.* ¶ 14.

Meta characterizes Entry 1e as a "resolution authorizing the use of compulsory process." *See* Mem. 7 (Arabic numeral (6)).  As described in the FTC's privilege log, it is a draft resolution from staff and therefore pre-decisional.  *See* Ex. B.

Following standard agency practice, all of these documents were compiled into a single recommendation package to inform the Commission's 2012 vote regarding compulsory process. Ex. A ¶ 17; *see* Ex. B, Entries 1-1e.  These documents communicate the authors' analyses, theories, opinions, advice, and recommendations to the Commission.  Ex. A ¶ 17.  To the extent that these memoranda include or reference factual material, such material either is inextricably interwoven with the authors' own evaluations, analyses, and recommendations, or discloses the mental impressions of FTC staff.  *Id.*

### B. August 2012 Recommendation Package to the Commission Regarding Closing the Investigation (Entries 2a, 2b, and 2e)

Entries 2a, 2b, and 2e are each a memorandum to the Commission "with respect to closing the investigation": 2a is from the BC Front Office, 2b is from BC staff, and 2e is from

BE staff.  *See* Mem. 7 (Arabic numerals (4) and (5)).  Each of these documents was prepared

prior to, and provided information and analysis to inform, the Commission's decision in 2012 to

close the Instagram investigation.  Ex. A ¶ 17.  These documents communicate the authors'

analyses, advice, and recommendations.  *Id.* ¶¶ 14, 17; *see* Ex. B, Entries 2-2g.  To the extent

that these memoranda include or reference factual material, such material either is inextricably

interwoven with the authors' own analyses and recommendations or discloses the mental

impressions of FTC staff.  Ex. A ¶ 17.

After deliberating on these recommendations, the Commission voted to close the

Instagram investigation on August 22, 2012.  Given that the Commission did not adjudicate the

legality of the acquisition in an administrative proceeding, *see supra* at 2-3, the Commission did

not make any "findings," conclusions, or determinations about the legality of Facebook's

acquisition of Instagram or any predicate issues such as market power or the competitive effects

of the transaction.  Accordingly, the FTC informed Meta that while the Commission took no

further action at that time, "[t]his action is not to be construed as a determination that a violation

may not have occurred . . . . The Commission reserves the right to take such further action as the

public interest may require."  *See* Ex. C (A. Tabor Ltr. To T. Barnett).

## II.   Notes Relating to the FTC's 2014 WhatsApp Review (Entries 3 and 4)

In 2014, BC staff reviewed HSR filings and interviewed third parties in connection with

Meta's proposed acquisition of WhatsApp.  Ex. A ¶ 15.  The two documents at issue, Entries 3

and 4, are BC staff notes containing analyses, legal theories, opinions, and strategy as part of the

staff's deliberations regarding what investigational steps to take.  *Id.* ¶¶ 15, 18; Ex. B, Entries 3,

4; *see also* Mem. 7 (discussing WhatsApp documents at issue).  Any factual material referenced

in these documents is inextricably interwoven with the authors' own evaluations, analyses, and

recommendations or discloses the mental impressions of FTC staff.  Ex. A ¶ 18.

**ARGUMENT**

The deliberative process privilege, work-product doctrine, attorney-client privilege, and investigatory file privilege protect the documents at issue. The FTC did not waive privileges by producing the documents to Congress, and Meta's fervent desire for the documents cannot overcome the applicable privileges.

**I.     The Deliberative Process Privilege Protects from Discovery FTC Recommendation Memoranda (Entries 1a-e, 2a, 2b, and 2e) and Attorneys' Notes (Entries 3 and 4)**

Meta is simply not credible when it asserts that "The Deliberative Process Privilege Does Not Apply to the Instagram Memoranda" – that is, to Entries 1a-e, 2a, 2b, and 2e. *See* Mem. 12. Meta itself concedes that precedent establishes that FTC recommendation memoranda are protected by the deliberative process privilege. *See* Mem. 20 (citing *Warner Commc'ns, Inc.*, 742 F.2d at 1161, which held that two FTC BE recommendation memoranda were protected by the deliberative process privilege). Meta does not cite a single instance in which any merger-related FTC recommendation memo has ever been produced, and counsel for the FTC is aware of none. Entries 3 and 4 are equally subject to the deliberative process privilege.

**A.     The Deliberative Process Privilege Applies Because the Recommendation Memoranda and Attorney Notes Are Predecisional and Deliberative**

"The deliberative process privilege protects agencies from being 'forced to operate in a fishbowl.'" *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) [hereinafter *EFF*"] (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)). The privilege protects "documents that are 'predecisional' and 'deliberative,' meaning they reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, or the personal opinions of the writer prior to the agency's adoption of a policy." *EFF,* 739 F.3d at 7 (cleaned up). "To show that a document is predecisional, the agency need not identify a specific final agency decision; it is sufficient to establish 'what deliberative process

6

is involved, and the role played by the documents at issue in the course of that process.'" *Heggestad v. Dep't of Just.*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States*, 617 F.2d at 868). Materials are "deliberative" if they reflect "the give-and-take of the consultative process" by which a decision is made. *See Coastal States*, 617 F.2d at 866.

This privilege applies especially to law enforcement recommendation memoranda. "[T]he information-gathering and deliberative process that produces" "a decision as to whether or not to prosecute someone" "is precisely the type of material" that the deliberative process privilege protects. *Paisley v. CIA*, 712 F.2d 686, 699 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984). *Heggestad* held that the privilege applied to law enforcement recommendation memoranda, including those declining to prosecute, and that "allowing release of these memoranda would violate the intent of the deliberative process privilege." 182 F. Supp. 2d at 10. Likewise, *Worldnetdaily.com, Inc. v. DOJ*, 215 F. Supp. 3d 81, 84 (D.D.C. 2016), held that the privilege protected a memorandum laying out "the evidence and analysis" underlying a recommendation to supervisors about whether to prosecute. *See also A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 147 (2d Cir. 1994) (the privilege protected a memorandum from FTC staff to the Director of the FTC's Bureau of Consumer Protection containing a recommendation regarding disposition of an investigation). Whether these decisions arise under FOIA or in the context of civil discovery is irrelevant because the analysis is the same. *See, e.g.*, *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799-800 (1984); *Tax'n with Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981) (FOIA construed "to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context," including deliberative process); *contra* Mem. 16 (FOIA cases are inapplicable because this case does not involve a FOIA request); *see also id.* at 29-30.

Here, the documents Meta seeks communicated FTC staff's advice, recommendations, and opinions to the Commission about whether and how to investigate Meta's acquisitions of Instagram and WhatsApp and possible antitrust violations. Meta does not dispute that the documents are predecisional. Nor can Meta dispute that the documents are deliberative, as they constitute "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975); *see also Coastal States*, 617 F.2d at 866 (same).

### B. FTC Regulations Provide for a Twenty-Five-Year Application of the Deliberative Process Privilege, Not Ten Years as Meta Argues

Meta incorrectly asserts that deliberative process protection does not apply to FTC memoranda that are over ten years old, Mem. 12-13, relying only on the FTC's 2016 Open Government Plan, which is a non-binding announcement to the public about open government goals. Meta ignores FTC regulations providing that the deliberative process privilege applies for twenty-five years after a document is created. 16 C.F.R. § 4.10(a)(3). The twenty-five-year period provided by the actual regulations controls. Decl. of Elizabeth Tucci ¶ 19; *compare id.* (FTC regulations adopted twenty-five-year period on December 22, 2016), *with* Mem. 13 (FTC Open Government Plan announced on September 15, 2016).

### C. Any Factual Material in the Documents Is "Inextricably Interwoven" with Staff's Analysis and Recommendations

Contrary to Meta's representation, the Supreme Court in *Mink* did not simply say that "purely factual" material must be disclosed. *See* Mem. 13-14 (citing *Mink*, 410 U.S. at 87-88). Rather, the Court observed that only "purely factual material contained in deliberative memoranda *and severable from its context* would generally be available for discovery." *Mink*, 410 U.S. at 88 (emphasis added). Accordingly, the D.C. Circuit has eschewed an artificial "fact/opinion distinction" and extended deliberative process protection to "material that could be

characterized as 'factual'" when its disclosure would "expose the deliberative process."  *See EFF*, 739 F.3d at 12-13 (quoting *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (*en banc*)).  The privilege shields factual material that "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations."  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see also Wolfe*, 839 F.2d at 774; *Worldnetdaily.com*, 215 F. Supp. 3d at 84 (protecting "evidence" in law enforcement memorandum from disclosure).

Here, Director Vedova has explained that any factual material contained in each of the disputed documents are "inextricably interwoven" with staff's analyses and recommendations. *See* Ex. A ¶ 17 (Entries 1a-1e, 2a, 2b, and 2e), ¶ 18 (Entries 3, 4).  The disclosure Meta seeks would thus force the disclosure of the deliberative process prohibited by the D.C. Circuit: indeed, Meta trumpets its hope that the memoranda will reveal (1) "the relevant market or markets" that FTC staff assessed in 2012 and 2014; (2) the "other entities" that FTC staff viewed as competitors in those markets; and (3) the FTC's assessment of "the likelihood of harm to consumers."  *See* Mem. 8.  Tellingly, none of these are <u>facts</u>.  The disclosure of "material that could be characterized as 'factual'" related to these issues would inevitably expose staff's analyses, advice, and recommendations.  *See EFF*, 739 F.3d at 13.  And Meta's motion concedes that this is what Meta truly wants – Meta repeatedly concedes that it seeks "the FTC's analyses and reasons," Mem. 2, "analyses," *id.* at 3, and "conclusions," *id.* at 3, 10, 11, 14, 24, 30.  Meta fares no better when it thinly disguises its goal as an effort to seek "the *material* facts that" on which FTC staff focused.  Mem. 13 (emphasis added).  Disclosing staff's determination of which facts are "material" is tantamount to disclosing staff's opinions and recommendations.  *Cf. Dir., Off. of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997)

("*OTS*") ("At some point . . . a lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case.").

The Court should reject Meta's effort to invade the FTC's deliberative process under the guise of seeking "facts" just as other courts in this district have done in analogous circumstances. In *EFF*, the D.C. Circuit held that "[b]ased on the declarations provided by the Government, the District Court correctly concluded that [portions of the document that could be characterized as factual] could not be released without harming the deliberative processes of the government by chilling the candid and frank communications necessary for effective governmental decision-making." *EFF*, 739 F.3d at 13 (quotation marks omitted). The Court should reach the same conclusion here: Director Vedova has explained that any facts contained in the disputed documents are "inextricably interwoven" with staff's deliberative process, Ex. A ¶¶ 17, 18, that disclosure would "chill free and frank analysis and discussion and impede the Commission's" operations, *id.* ¶¶ 20, 21, and that the recommendation memos at issue contain "legal advice" provided to the Commission, *id.* ¶¶ 27, 28. *See EFF*, 739 F.3d at 12 (facts not segregable where agency declarant explained that the documents "reflect other factual as well as confidential legal communications provided . . . for the purpose of obtaining legal advice") (quotation omitted).

> **D.     The Court Should Reject Meta's *Ipse Dixit* Claim that the FTC's 2012 and 2014 "Decision-making Process Is Directly at Issue"**

According to Meta, its equitable defenses of laches, estoppel, and waiver "put squarely at issue the FTC's intent and decision-making processes in 2012 and 2014." Mem. 15. This argument fails, as the D.C. Circuit has held that deliberative process privilege is not overcome unless a defendant advances "credible claims that improper factors motivated" the enforcement action at issue. *See Landry v. FDIC*, 204 F.3d 1125, 1136 (D.C. Cir. 2000) ("Because an ordinary enforcement action in no way implicates the [agency's] subjective motion, and

[defendant] makes no credible claims that improper factors motivated this enforcement action, there is no waiver."). This binding precedent defeats Meta's arguments. Here, Meta insinuates that in 2012 and 2014 FTC staff *correctly* analyzed the acquisitions at issue, and thus that the FTC's *current* challenge is somehow flawed. This does not advance any "credible claims that improper factors motivated," *id.*, the FTC's current action (or FTC staff's decisions in 2012 and 2014). The D.C. Circuit has expressly held that deliberative process privilege is unavailable only in "those circumstances in which the cause of action is directed at the agency's subjective motivation." *In re Subpoena Duces Tecum Served on OCC*, 156 F.3d 1279, 1280 (D.C. Cir. 1998) (*on rh'g*) [hereinafter, "*OCC*"] (in its opinion on rehearing, the D.C. Circuit held that deliberative process is not waived when a defendant simply complains of "arbitrary and capricious" decision-making, for example under the Administrative Procedure Act).

Meta's reliance on *OCC* is thus inapposite: the D.C. Circuit explained that an agency's subjective motivation is at issue when a "plaintiff's cause of action is directed at the government's intent," such as cases involving "a Title VII action or [a] constitutional claim for discrimination." *See OCC*, 145 F.3d 1422, 1424-25 (D.C. Cir. 1998) (cited in Mem. 14). In those instances, "Congress creates a cause of action that deliberately exposes government decisionmaking to the light." *Id.* at 1424. No such cause of action is at issue here, and Meta thus finds no support in *Doe 2 v. Esper*, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) (cited in Mem. 15), in which the government itself put its subjective motivation at issue when it argued that a policy related to transgender troops was a product of "reasoned military judgment." *Id.* at *6.

*Landry* and *OCC* contradict Meta's suggestion that the Court should find "instructive" a distinguishable, unpublished out-of-circuit case, *Brock v. Weiser*, 1987 WL 12686 (N.D. Ill. June 15, 1987) (discussed in Mem. 15). In that case, an agency investigated transactions and issued

11

"no-action letters"; the defendant relied on the letters in engaging in similar transactions; the agency then brought an enforcement action; and the defendant argued for estoppel based on its reliance on the agency's non-action. *See id*. at *3. Even if *Brock* were at all persuasive in light of binding D.C. Circuit authority, Meta does not explain how the documents at issue here might support estoppel given the clear statutory command that "any failure" of the FTC to take "any action" during an HSR merger review "shall not bar any proceeding or any action with respect to such acquisition at any time under . . . any other provision of law." 15 U.S.C. § 18a(i)(1). Moreover, estoppel requires that the government engaged in affirmative misconduct. *See United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 12-13 (D.D.C. 2013) (cited in Mem. 11) (explaining that estoppel's application to the government must be "rigid and sparing").

The plain language of the HSR statute, and the FTC's 2012 express reservation of its rights to take future action, *see* Ex. C, render Meta's affirmative defenses especially farfetched excuses to pierce the FTC's privilege. Laches does not apply against the federal government when enforcing antitrust laws. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 14 (D.D.C. 2021). And Meta never explains how the documents at issue might support waiver, which "should not lightly be inferred." *See In re Sealed Case*, 121 F.3d at 741 (quotation omitted).

### E. Meta's Argument that the FTC Has Waived the Deliberative Process Privilege by Initiating a Lawsuit Is Contrary to Binding Precedent

Meta claims that the FTC must provide the same discovery as any plaintiff, *see* Mem. 18, but cites no persuasive authority suggesting that this requires abrogation of the deliberative process privilege. Meta cites dicta from *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.* (Mem. 18), but that case *upheld* the government agency's assertion of deliberative process privilege. 274 F.R.D. 106, 115 (S.D.N.Y. 2011). Meta likewise over-reads dicta from *Lundy v. Interfirst Corp.*, 105 F.R.D. 499, 50 (D.D.C. 1985) in suggesting that the privilege is less

12

important "where government is a party."  Mem. 18.  In *Lundy*, the documents were related to

the government's *scienter* in proving a fraud that defendants claimed could "be attributed to the

government" (i.e., it related to the government's "subjective intent" – *see supra* Section I.D) and

the court conducted an *in camera* review of the disputed documents where the government's

"manner of invoking [its] privileges . . . was entirely inadequate and defective."  *Id.* at 505.  The

sole relevant case that Meta advances, *United States v. Gates*, 35 F.R.D. 524 (D. Colo. 1964)

(quoted in Mem. 18), predates the Supreme Court's leading deliberative process cases and

contradicts binding precedent in this Circuit.  In *Gates*, the court determined that the government

waives executive privileges when it brings suit, *id*. at 529, a conclusion that was expressly

rejected by the D.C. Circuit in *Landry*.  *See* 204 F.3d at 1136 (rejecting the argument that an

agency "waived its privileges by initiating" an "ordinary enforcement action").

     Thus, Meta cites no persuasive authority suggesting that initiating a lawsuit precludes the

FTC from claiming available privileges, or vitiates its privileges.  In any event, the FTC agrees

that both parties should play by the same rules: as Meta has withheld or clawed back on privilege

grounds thousands of documents that could reveal its own analyses of its market power,

competitive positioning, and other antitrust topics (*see infra* Section IV.E), Meta should not be

allowed to create an asymmetrical side show by probing FTC staff's years-old analysis.

## II.    The Documents at Issue Are Protected Work Product

### A.    Meta Does Not Contest the FTC's Work Product Claim Regarding Entries 1a, 1b, 1c, 1e, 2a, 2b, 3 and 4

Each of the documents at issue were prepared by FTC attorneys and those acting at their

direction with a specific possible legal violation in mind.  Ex. A ¶¶ 24-26.  Each document thus

falls squarely within the scope of work product protection.  As the D.C. Circuit has explained,

where an attorney for a law enforcement agency "prepares a document in the course of an active

investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product." *SafeCard Svces., Inc. v. SEC*, 926 F.2d 1197, 1203 (D.C. Cir. 1991); *see also Parker v. United States DOJ Exec. Office for U.S. Attys.*, 78 F. Supp. 3d 238, 244 (D.D.C. 2015).

Presumably for this reason, with the exception of two memos prepared by economists, Meta does not contest the FTC's claim that the memoranda and notes at issue constitute work product. *See* Mem. 20-21. Thus, Meta concedes that Entries 1a, 1b, 1c, 1e, 2a, 2b, 3, and 4 constitute work product, and contests only 1d and 2e, which were prepared by BE staff.

### B. Entries 1d and 2e Are Protected Work Product Prepared by BE Economists

FTC lawyers routinely work with economists on analyses that courts have acknowledged as work product. *See, e.g., Exxon Corp. v. FTC*, 466 F. Supp. 1088, 1090, 1099 (D.D.C. 1978) (economic report represents attorney work product where prepared by economists at the direction of and for the guidance of FTC lawyers, while discussing evaluation of a case and further areas of inquiry). BE staff work in close coordination and at the direction of BC staff during the course of investigations; they work at least as closely with BC attorneys as the retained economists at issue in *Exxon*. 16 C.F.R. § 0.18; *see also* Ex. A ¶¶ 6-13, 24. Where, as here, BE economists' memoranda and analyses bear a nexus to litigation, they are protected pursuant to work product as well as deliberative process privilege. In *Lone Star Industries, Inc. v. FTC*, 1984 U.S. Dist. LEXIS 18242, at *5-10, 21-22 (D.D.C. Mar. 26, 1984), the court denied a motion to compel BE memoranda (without *in camera* review), holding that the memos could be privileged as work product, but electing to analyze under deliberative process privilege absent evidence memos were prepared "in relation to any discrete FTC litigation." *Id.* at n. 2. Here, the BE memos are related to discrete litigation, as they were prepared "in the course of an

investigation that was undertaken with litigation in mind." *SafeCard Svces.*, 926 F.2d 1197,

1202; Ex. A ¶ 25.  In *FTC v. Bass Bros. Enterprises, Inc.*, 1984 U.S. Dist. LEXIS 16889, at *1-4

(N.D. Ohio May 8, 1984), the court denied a motion to compel an internal BE report that was

"instrumental in [the Commission's] deliberation of whether or not to bring an enforcement

action," relying on deliberative process privilege but suggesting that the report could also be

protected work product where it was prepared while "working in cooperation with, and under the

direction of, the Commission's attorney in investigating the proposed acquisition in question."

     Meta's sole support for its contention that BE recommendation memoranda are not work

product, Mem. 21, is a generic statement in Mr. Royall's declaration that BE "operates

independently from" BC and "staff economists do not act at the direction of attorneys."  *See*

Mem. at Ex. B ¶ 5.  While it is true that BE "operates independently from" BC in some respects

(for example, in hiring and personnel decisions), Mr. Royall's statement does not establish that

BE economists operate independently from BC attorneys when providing "economic and

statistical assistance to" BC in "the investigation and trial of cases."  16 C.F.R. § 0.18.  Director

Vedova's Declaration, on the other hand, directly addresses BE economists' work in the context

of investigations, and establishes that BE economists "work closely together with" BC attorneys,

and "at FTC lawyers' direction."  Ex. A ¶¶ 6-13, 24.  These BE recommendation memoranda are

thus work product; moreover they were provided to the Commission as a part of BC attorneys'

recommendation packages providing legal advice, Ex. A ¶¶ 27-30, and are thus also protected by

the attorney-client and the investigatory file privileges.  *See infra* Section V.

    **C.**    **The Documents Are "Virtually Undiscoverable" Opinion Work Product**

     The Instagram recommendation memoranda (Entries 1a-1e, 2a, 2b, and 2e) and

WhatsApp documents (Entries 3, 4) are evaluative in nature and center around staff's thoughts,

opinions, and recommendations regarding information gathered in the investigation.  Ex. A ¶¶

27-30.  The relevant documents thus firmly qualify as opinion work product, which is "virtually undiscoverable."  *OTS*, 124 F.3d at 1307.

Meta cannot overcome the FTC's privilege by simply asserting (incorrectly, and without citation or foundation) that the memoranda contain "a compendium of facts from key market participants" (Mem. 9) or "contain the facts – from documents and witness accounts" (Mem. 17).  Any factual material contained in the documents is "inextricably interwoven" with staffs' analyses and recommendations.  Ex. A ¶¶ 17-19.  Where witnesses' statements contained in notes and memoranda are inextricably interwoven with the author's analyses and judgments, disclosure of the documents would necessarily "reveal the attorneys' mental processes in evaluating the communications. . . . [S]uch work product ***cannot*** be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship."  *Upjohn Co. v. United States,* 449 U.S. 383, 401 (1981) (emphasis added).  *See also In re Sealed Case*, 676 F.2d 793, 809-811 (D.C. Cir. 1982) (to the extent that work product reveals counsel's opinions, judgments, and thought processes, it receives "more absolute" protection, and a party seeking discovery must show "extraordinary justification"); *OTS*, 124 F.3d at 1307-08.  As discussed below in Section IV, Meta is unable to advance any extraordinary justifications here.

Meta cites *Jud. Watch, Inc. v. U.S. Dep't of State,* 2019 WL 2452325 (D.D.C. June 12, 2019), again arguing that the FTC's opinion work product is "fact" work product (Mem. 22, 24), but that case is inapposite.  In that case, involving whether Secretary Clinton could use private email to avoid FOIA obligations, the court made clear that it faced a "rare" case where "the government's response…smacks of outrageous misconduct" and "merit[s] additional discovery into the government's motives."  *Id.* at *2.  No similar facts or circumstances exist here.

Nor can Meta transform the recommendation memoranda into "fact" work product based

solely on Mr. Royall's assertion that such memoranda "typically contain" a recitation of facts.
*See* Mem. 5 (citing Mem. at Ex. B ¶ 8).  Mr. Royall, of course, has not seen the documents, and
has not worked at the FTC since 2003 – at least nine years before the documents were created.
Mem. at Ex. B ¶ 3.  Director Vedova, in contrast, has personally reviewed the documents at
issue, and avers that any factual material in each of the disputed documents is "inextricably
interwoven" with staff's analyses and recommendations.  Ex. A ¶¶ 17, 18.

### III.    The FTC Did Not Waive its Privileges by Providing the Documents to Congress

Meta cannot carry its burden to demonstrate that the FTC waived its privileges by
providing the documents in response to an official request from the House Judiciary Committee
("HJC").  Waivers of privilege "should not be lightly inferred."  *In re Sealed Case*, 121 F.3d at
741.  With respect to work product, "the party seeking to pierce the privilege must show that the
holder of the privilege disclosed work product to a third party under circumstances 'inconsistent
with the maintenance of secrecy from the disclosing party's adversary.'"  *Jud. Watch, Inc. v.
Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 158 (D.D.C. 2012) (quoting *United States v.
Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010)).  Meta has not made this showing; nor has it
met its burden with respect to deliberative process privilege, which requires Meta to show the
FTC "voluntarily disclosed to unnecessary third parties."  *Elec. Frontier Foundation v. Dep't of
Just.*, 890 F. Supp. 2d at 47 (D.D.C. 2012) (quotation marks omitted).

### A.    The FTC Responded to an Official Request from Congress, Consistent with Long-Standing Policy

For fifty years, the FTC's policy has been to comply with official Congressional requests,
Tucci Decl. at ¶ 9, and its policy is supported by both statutes and case law.  *See* Tucci Decl. at
¶¶ 8-10 (citing 15 U.S.C. § 57b-2(b)(3)(C) (discussing Congressional "request[s] for
information"); 15 U.S.C. § 57b-2(d)(1)(A) (same); 16 C.F.R. § 4.11(b)).  The FTC's policy is

consistent with the D.C. Circuit's instruction "that the Commission may not deny Congress access to confidential documents, including those that contain trade secrets." *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) (citations omitted). The D.C. Circuit also has explained that a formal request from a committee chairman, such as the HJC's request to the FTC here, may have the same effect as a subpoena. *See, e.g., Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 979-81 (D.C. Cir. 1976) (FTC could disclose the trade secrets "pursuant either to subpoena or formal request" from Congress); *Exxon Corp. v. FTC*, 589 F.2d 582, 592-594 (D.C. Cir. 1978) (referring to "a proper request or subpoena" from Congress).

Here, the FTC responded to official requests for information from the HJC. Tucci Decl. ¶¶ 11-14 and Exs. 1, 3. These official requests served a valid legislative purpose, was written on committee letterhead, and was signed by the committee chairman and other committee members. *Id.*; *see Exxon,* 589 F.2d at 593-594 (indicia of a "formal request" from Congress include official stationery, signed by the subcommittee's chairman, pursuant to an authorized investigation). In responding to the HJC's official request for information, the FTC explicitly stated that the production included internal staff analyses and recommendations to which the deliberative process and work product protections applied, and requested that the HJC maintain confidentiality. Tucci Decl. ¶¶ 13-14, 17-18 and Exs. 2 and 4.

### B.   The FTC Did Not Waive Privileges by Providing Information to Congress

Meta's argument that the FTC waived privilege when it responded to the HJC's formal request is meritless. The D.C. Circuit has held that an agency does not waive the deliberative process privilege when it transmits to Congress "memoranda and correspondence created as part of [the agency's] deliberative processes." *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 604 (D.C. Cir. 2001). *See also Murphy v. Dep't of Army*, 613 F.2d 1151, 1155-1159 (D.C. Cir. 1979) (agency did not waive the privilege by transmitting an internal legal memorandum to

an individual congressman); *Safeway Stores Inc. v. FTC*, 428 F. Supp. 346, 347 (D.D.C. 1977) (FTC did not waive the privilege when it transmitted an FTC staff investigative report to a congressional committee).  Meta proposes a result that would flout these precedents and produce precisely the result that the D.C. Circuit condemned: "every disclosure to Congress would be tantamount to a waiver of all privileges and exemptions, executive agencies would inevitably become more cautious in furnishing sensitive information to the legislative branch—a development at odds with public policy which encourages broad congressional access to government information." *Rockwell*, 235 F.3d at 604 (quoting *Murphy*, 613 F.2d at 1156).

Meta suggests that the Court should disregard *Rockwell* because it involved a FOIA request rather than civil discovery, Mem. 29-30, but this is unpersuasive because the Supreme Court has long held (many years prior to *Rockwell*) that the FOIA "simply incorporates civil discovery privileges," and that under FOIA the "public is entitled to all . . . memoranda or letters that a private party could discover in litigation with the agency." *Weber Aircraft Corp.*, 465 U.S. at 799-800 (quoting *Mink*, 410 U.S. at 86).  Accordingly, the *Rockwell* Court did not rely on § 552(d) of the FOIA statute, as Meta suggests (*see* Mem. 29), for its conclusion that work product protection was not waived by disclosure to Congress.  Instead, the *Rockwell* Court relied on cases involving ordinary civil discovery disputes, which establish that work product protection applies unless Meta can establish that the "disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary."  235 F.3d at 605 (quoting and relying on *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

Here, the FTC maintained secrecy by expressly requesting confidential treatment.  Tucci Decl. ¶¶ 13-14, 17-18 and Exs. 2 and 4.  Meta derogates or disregards this request, and also ignores binding precedent, when it suggests that it was necessary for the FTC to "obtain[]

*enforceable* confidentiality protection" from Congress.  Mem. 28-29 (emphasis added).  Indeed, *Murphy* "explicitly held that a document otherwise covered by the deliberative process privilege does not lose this status merely because it was disclosed to a member of Congress without an explicit warning of its confidential status." *Heggestad*, 182 F. Supp. 2d at 13 (citing *Murphy*, 613 F.2d at 1159).  *Exxon* likewise explicitly rejected arguments that the FTC must obtain assurances from Congress.  589 F.2d at 590 ("any such requirement would clearly involve an unacceptable judicial intrusion into the internal operations of Congress").  *See generally Owens-Corning*, 626 F.2d at 970 ("[C]ourts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.").  And, contrary to Meta's insinuations, Mem. 1-2, the HJC Report does not reproduce or reference FTC staff's internal recommendations or analysis in any way, and instead only mentions publicly available facts regarding the investigations and the Committee's formal request for information.

   For these reasons, the circumstances of the FTC's disclosure, and Congress's treatment of the privileged disclosures, are consistent with the maintenance of secrecy from Meta, unlike the cases Meta cites in which proponents of a privilege failed to take reasonable steps to protect it. *See* Mem. 28.  Meta likewise cites only inapposite cases when it asserts that sharing information pursuant to a formal request from a Congressional committee "is not different from sharing with any other third party."  Mem. 29.  *United States v. Phillip Morris Inc.* (cited in Mem. 29), involved private parties' attempt to claim privilege over documents that had already been *publicly disclosed*, which were sent to Congress without "reasonable measures to safeguard" the privilege.  212 F.R.D. 421, 426 (D.D.C. 2002).  *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 319 (2000) (cited in Mem. 29), found waiver when an agency submitted privileged materials to Congress "in the form of attachments to public reports."

Here, the FTC and the HJC have both maintained the confidentiality of the FTC's privileged documents.  Finding waiver in such circumstances is unsupported by precedent and would significantly undermine Congressional access to government agency information and strongly disincentivize federal agency participation in Congress's nonpublic investigations and briefings, to the detriment of Congress's decision-making.  *See Rockwell*, 235 F.3d at 604.

## IV.   The Court Should Reject Meta's Alternative Argument That It Has Overcome the Deliberative Process Privilege and Work Product Protection

The Court should reject Meta's last-ditch alternative argument that the documents should be disclosed even though the FTC has properly asserted, and has not waived, its privileges. Mem. 15-20, 22-26.  Here, Meta seeks virtually undiscoverable opinion work product that is also protected by the deliberative process privilege.  Meta's request runs counter to the bedrock principles of both privileges, and Meta cannot meet its burden to demonstrate the extraordinary "showing of need" necessary to overcome them.  *See In re Sealed Case*, 121 F.3d at 737-38 (deliberative process privilege); *OTS*, 124 F.3d at 1307-08 (work product privilege); Fed. R. Civ. P. 26(b)(3)(ii) (discovery of any work product requires a showing of "substantial need," "undue hardship," and inability to obtain material by other means).  Meta's suggestion that it can show a sufficient "need" ignores the information already in Meta's possession, significantly misstates evidentiary principles, and distorts basic antitrust principles.

### A.   Meta Exaggerates the Factual Information in the Recommendation Memorandum and Notes at Issue, and Ignores the Information It Already Has

Meta insinuates that the FTC has access to "documents" and "the memories of witnesses," and claims that it would be "unfair" to "[a]llow[] only the FTC to have access to this contemporaneous evidence."  Mem. 1.  This is misleading: as explained below, Meta *already has* all of the documents that are available to the FTC, and the FTC has identified to Meta all of the

witnesses the FTC interviewed (or sought to interview) in 2012 and 2014.  As such, the FTC

does not have any unproduced "evidence" from such witnesses, and Meta is at least as well

positioned as the FTC to develop evidence from third party witnesses, and better positioned with

respect to witnesses that are current or former Meta employees.  Meta's overblown claim that it

"needs" access to purportedly factual material in the memoranda and notes at issue should be

rejected, as it disregards the limited scope of the FTC's 2012 and 2014 investigations;

exaggerates the "evidence" available to the FTC; ignores the factual information already

available to Meta; and ignores that the disputed documents contain recommendations, opinions,

and analysis, not distinct factual content (as described above).

      **1.   The FTC Did Not Collect Any Documents in Its 2014 WhatsApp Review,
and Sought to Interview Only Sixteen Third Parties that Are Equally
Available to Meta**

The FTC's 2014 WhatsApp review was based on a review of "the filings that the parties

made pursuant to the HSR Act" and unsworn interviews with third parties.  *See* Ex. A ¶ 15.

Entries 3 and 4 thus cannot contain factual material from *any* documents unavailable to Meta—

the FTC did not collect any documents apart from the HSR filings submitted by Meta and

WhatsApp (which Meta already possesses).

The FTC sought to interview only 16 third parties in its 2014 WhatsApp review, and it

has already identified to Meta all of these third parties.  *See* Matheson Decl. ¶ 6.  Meta is at least

as well positioned as the FTC to pursue discovery from these third parties.  *See FTC v. Staples,

Inc.*, 2016 WL 259642, at *4-5 (D.D.C. Jan. 21, 2016) (denying defendants' motion to compel

notes and interview memoranda from the FTC's prior and current investigations, rejecting claim

that movants sought facts that could be segregated and disclosed).  Meta implies that any factual

material in Entries 3 and 4 that might be associated with these third parties is "evidence," Mem.

17, that the FTC might use in this case, but this is obviously untrue.  Even if these Entries

contained attorney descriptions of interviews, Meta never explains how either party might be able to use attorneys' non-verbatim notes and analyses of an interview as "evidence" in this matter; FTC counsel cannot conceive of a way in which to use Entries 3 and 4 as "evidence" of anything other than mental impressions FTC attorneys formed at the time.  Nor does Meta explain how either the FTC or Meta could use attorneys' privileged mental impressions as "impeachment material."  *See* Mem. 17.

The Court should thus reject Meta's request to obtain Entries 3 and 4 based on the thin excuse that Meta seeks "facts – from documents and witness accounts."  Mem. 17.  Entries 3 and 4 are not attorneys' accounts of witness interviews.  *See* Ex. B.  Instead, they represent "FTC staff analysis of facts and the legal issues arising in the [WhatsApp] review as well as opinions, recommendations, and strategy relating to further investigation."  Ex. A ¶ 18.

### 2.  The FTC Has Already Produced to Meta All of the Documents in Its Possession Collected in the 2012 Instagram Investigation, and Meta Has Equal or Superior Access to All Witnesses

The FTC's 2012 Instagram investigation involved three document productions: approximately 10,000 documents from each of Meta and Instagram, *see* Mem. 4, and a single third-party production made in response to a third-party subpoena.  Matheson Decl. ¶ 10.  Meta already has the entirety of the first two productions—*i.e.*, the documents produced by Meta and Instagram.  With respect to the single third-party production, the FTC has already produced to Meta the relevant third-party subpoena and all documents that the FTC currently possesses that were produced in response.  *Id.*  While some documents produced by the third party no longer exist, the FTC does not "have access to this contemporaneous evidence," as Meta asserts.  Mem. 1.  The FTC is unable to use privileged summaries of factual information from no-longer-existing-documents as "evidence" — to the extent that any such documents reference factual material, the descriptions are "inextricably interwoven" with attorneys' mental impressions, Ex.

A ¶ 17, and provide "evidence" of nothing other than staff members' mental impressions.

In 2012, FTC staff interviewed (or sought to interview) 29 third parties, and has identified to Meta all of those third parties.  *See* Matheson Decl. ¶ 7.  As previously discussed, any factual information regarding such witnesses described in the FTC's recommendation memoranda are neither "evidence" available to the FTC nor "impeachment material."

Finally, in 2012, FTC staff conducted unsworn informal interviews with party executives. *See* Mem. 4.  As noted, the FTC's recommendation memoranda can hardly be used as "impeachment material" for these witnesses, and to the extent that those executives need to be reminded of the information they provided, Meta's attorneys surely created their own work product (to which Meta has access) both in preparation for and following such interviews.

### B.      Meta Inaccurately Claims that Staff's Statements Are FTC's "Admissions"

Meta repetitively claims that it seeks FTC "admissions," or "admissions of a party opponent."  Mem. 2, 9-11, 26.  Meta's claim is off base, as FTC staff's recommendations and notes are not "statements" or "admissions" of the agency.  Ex. A ¶¶ 17-22.  Further, to the extent Meta seeks statements from the FTC's employees pursuant to Fed. R. Evid. 801(d)(2)(D), *see* Mem. 9-10, it is noteworthy that the relevant employees at issue are staffers confidentially advising the Commission, offering commentary as part of the give-and-take of the deliberative process.  Unsurprisingly, Meta cites no authority endorsing the probing of government employees' privileged communications to hunt for imagined adverse statements.  Meta's cases are not on point.  *See* Mem. 9.  *United States v. AT&T Co.*, dealt with the government's statements in briefs and proposed findings of fact docketed with, and a high-level official's formal "[t]estimony" submitted to, the FCC.  *See* 498 F. Supp. 353, 356 at n. 6 (D.D.C. 1980). *United States v. Warren* dealt with a police officer's sworn statement of facts submitted to a federal magistrate.  42 F.3d 647, 655 (D.C. Cir. 1994).  *United States v. Kattar*, 840 F.2d 118,

24

130-31 (1st Cir. 1988) dealt with assertions made by the government in a formal prosecution.

### C.    Meta's Concession that It Seeks "Admissions" Proves that Its Motion Should Be Denied to Avoid Chilling Candid Communication Among FTC Staff

While Meta's pursuit of "admissions" misstates evidentiary principles, its argument is nonetheless revealing: Meta admits it wants discovery of the FTC's internal deliberations not to discover "facts," but instead so that it can hunt for "admissions" and "conclusions" it can use against the FTC in this litigation.  *See, e.g.*, Mem. 2, 9, 10, 26.  For example, Meta explicitly admits it seeks to discover FTC staff's deliberations and mental impressions in seeking "admissions from the agency *as to the import of* . . . facts" learned during the past investigations. Mem. 9 (emphasis added).  Meta's concession is remarkable for two reasons.

First, Meta has repeatedly emphasized the robustness of the FTC investigation that led to this case.  *See, e.g.*, Joint Civil Rule 16.3 Report to the Court at 11-12, ECF No. 100.  And Meta and the FTC are currently pursuing discovery from well over 100 third parties.  *See* Joint Status Report at 1, ECF No. 146.  Yet Meta now insists that this significant body of evidence (and the discovery Meta has not yet provided in this matter) will be rendered moot if Meta is provided with access to FTC staff's analyses in 2012 and 2014.  *See* Mem. 26 (accusing the FTC of concealing "potentially dispositive admissions").  This starkly indicates the stakes at issue in this motion: Meta openly admits its hope that the actual evidence of its monopoly power may be obscured by a side-show surrounding the FTC's limited 2012 and 2014 investigations, which were based on a miniscule fraction of the evidence at the FTC's disposal now.

Second, abrogating the FTC's privileges to provide Meta with "admissions" is contrary to the deliberative process privilege's "root[s] in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quotation omitted).  If

Meta's motion were granted, FTC staff would henceforth fear that their individual opinions and ideas may be litigation fodder. This would unquestionably lead to the "possibility of future timidity by government employees." *In re Sealed Case*, 121 F.3d at 738 (quotation omitted).

Nothing in the protective order, *see* Mem. 19, can ameliorate the strong "possibility of future timidity" if the FTC's privileges are abrogated. The protective order does not prevent individual staff members' recommendations (made based on limited investigation) from being presented to the finder of fact in this matter, which would create the "fishbowl" effect condemned by the Supreme Court and the D.C. Circuit. *EFF*, 739 F.3d at 7 (quoting *Mink*, 410 U.S. at 87). For the same reason, the Court should decline Meta's repetitive requests to review the disputed materials *in camera*. While the Court possesses the discretion to do so, the Court should consider that the possibility of a fact-finder's *in camera* access to internal deliberations chills candid internal debate and open communication. Here, such review is unnecessary because the Vedova Declaration and the FTC's privilege log provide a sufficient basis for the Court to reach its decision. *See, e.g. EFF*, 739 F.3d at 13 (district court concluded that agency declaration rendered *in camera* inspection unnecessary); *Safeway Stores*, 428 F. Supp. at 347 (no *in camera* inspection needed where "documents are thoroughly indexed").

### D.   Meta's Assertion that the FTC's 2012 and 2014 Investigations May Be "Dispositive" Misstates Antitrust Principles, and Ignores the Investigations' Limited Scope

Meta repeatedly posits that FTC staff's analysis in 2012 and 2014 might be "dispositive" regarding the relevant market at issue in this case. Mem. 1, 25, 26. This ignores basic antitrust principles that most products can be viewed as existing within multiple "relevant markets," even though Meta elsewhere appears to concede this reality. *See* Mem. 8 (referring to "the relevant market *or markets*…") (emphasis added); *see generally United States v. Continental Can Co.*, 378 U.S. 441, 457-58 (1964) ("a broader product market . . . does not necessarily negative the

existence of submarkets….which, in themselves, constitute product markets for antitrust purposes") (internal citation and quotation omitted).  Meta provides no basis for its suggestion that "the relevant market or markets" assessed in FTC staff's Instagram recommendation memoranda or WhatsApp notes were – or would be expected to be – identical to the personal social networking services (PSNS) market at issue in this litigation.  Even if the PSNS market were not mentioned in the documents, it would not establish that staff concluded no such market existed.  The documents at issue are not, and do not purport to be, an exhaustive catalog of every issue considered by FTC staff, and "absence of evidence is not evidence of absence."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254 (D.C. Cir. 2013).

The market(s) staff chose to analyze in 2012 and 2014 are of no relevance to whether Meta's acquisitions of Instagram and WhatsApp contributed to Meta's monopoly power in the PSNS market.  A contrary conclusion would limit the FTC's future ability to enforce the antitrust laws using commentary of individual staffers, and would be inconsistent with the HSR statutory scheme – which provides that the FTC may challenge an acquisition "at any time," under "any provision of law."  15 U.S.C. § 18a(i)(1).  It would also effectively, and contrary to law, apply laches to the federal government's antitrust enforcement efforts.  *See supra,* Section I.D.

Finally, even if FTC staff *did* analyze the transactions' likely effect on Meta's monopoly power in a PSNS market in 2012 and 2014, there is still no basis for allowing Meta to fish for purported "admissions."  As discussed above, the recommendations of FTC staff members do not constitute agency "findings" regarding relevant markets or any other issue.  Meta suggests that staff's predictions regarding likely effects of the acquisitions "at the time of the acquisition[s]" is the dispositive issue in this litigation, Mem. 8, but it provides no relevant authorities in support of its proposed rule.  *Baker-Hughes* and the treatise section cited address

Clayton Act § 7 cases, and even in that context the Hovenkamp treatise clarifies that "[p]ost-acquisition evidence available at the time of trial might be probative of the true situation that existed at the time of the merger."  5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1205a (4th ed. Supp. 2022).  *See also United States v. ITT Continental Baking Co.*, 420 U.S. 223, 242 (1975) ("[T]here can be a violation [of Section 7] at some time later even if there was clearly no violation—no realistic threat of restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition.").  Thus, even assuming, for the sake of argument, that FTC staff members in 2012 and 2014 analyzed a PSNS market and failed to anticipate the transactions' anticompetitive effects, Meta has no "extraordinary need" for the documents.  The revelation of individual attorneys' or economists' analysis and opinions would accomplish nothing other than creating a side show (as Meta seems to intend), subjecting individual staffers to unproductive scrutiny or turning FTC staff into purported witnesses.

### E.   Meta's Complaints About "Unfairness" Do Not Establish an Extraordinary Need for the FTC's Privileged Documents

Meta complains that it is "unfair" for the FTC to assert its privileges, claiming that the FTC is attempting to "possess and use" evidence that is not available to Meta.  Mem. 23; *see also* Mem. 1.  But contrary to Meta's claims, as explained above the FTC is not attempting to "use" any "evidence" contained in the disputed recommendation memoranda and attorney notes.  *See supra*, § IV.A.  Thus, the FTC is not seeking to "evade discovery of materials that a private plaintiff would have to turn over."  Mem. 18 (quoting *In re Methyl*, 274 F.R.D. at 114).

Meta's claim that it is "unfair" to deny it access to internal FTC analysis is also meritless.  Mem. 1, 14-15, 25.  Notably, Meta itself is withholding hundreds of thousands of documents from the FTC allegedly involving its attorneys and economists, with many documents involving topics of interest.  Matheson Decl. ¶¶ 8-9.  Under Meta's rendering of "fairness" and "need," the

FTC has at least as strong a claim to access Meta's privileged communications to search for statements and analysis that would bolster the FTC's case—which if revealed might render Meta's market power and anticompetitive conduct clearer.  The only "unfair" outcome here would be Meta's proposed asymmetrical hunt for "admissions" based on disclosure of only the FTC's privileged communications.

Of course, every litigant would find it valuable to peek at its adversary's work product, but this is not the law.  *FTC v. Grolier, Inc.*, 462 U.S. 19, 30-31 (1983) (Brennan, J., concurring) (quoting *Hickman v. Taylor*, 329 U.S. 495, 516 (1947)).  Meta cites no cases that support piercing a privilege because doing so would benefit an adversary, apart from inapposite cases in which privilege claims were vitiated because the discovery would establish the intent, motivations, or bad faith of a government agency.  *Cf. First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000) (Mem. 16) (internal communications were relevant parole evidence in a contract case where the government's good faith was at issue).  For the same reason, Meta's claims of "extraordinary need" find no support in *Chisler v. Johnston*, 796 F. Supp. 2d 632, 641 (W.D. Pa. 2011) (Mem. 17), *MacNamara v. City of New York*, 249 F.R.D. 70, 82 (S.D.N.Y. 2008) (Mem. 17), or *Swartwood v. County of San Diego*, 2013 WL 6670545, at *6 (S.D. Cal. Dec. 18, 2013) (Mem. 16).  In those § 1983 cases, the government's conduct, intent, or policies were at issue, and the reports at issue were the only source of evidence bearing on the agency's liability for alleged civil rights violations.

## V.   Attorney-Client and Investigatory File Privileges Also Apply

The FTC has focused above on deliberative process and work-product privileges in order to address Meta's principal arguments.  However, the FTC has likewise properly asserted the attorney-client and investigatory file privileges, *see* Ex. B, which Meta barely addresses.

"Unless applicable law provides otherwise, the Government may invoke the attorney-

client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 8 (D.D.C. 2018) (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 170 (2011)).  Meta's primary contention regarding the claim of attorney-client privilege is that the FTC has not identified confidential information "belonging to the agency."  Mem. 26-27. Meta ignores that FTC staff's investigative processes and analyses are themselves confidential information; that the materials at issue communicated FTC staff's confidential recommendations and analyses; and that any factual material obtained from third parties is "inextricably interwoven" with such analyses.  Ex. A ¶¶ 17-19.  The documents contain legal advice based on such confidential information, *id.* ¶¶ 27-30, and the attorney-client privileges applies.

As for the investigatory file privilege (also known as the law enforcement privilege), Meta is wrong that either the passage of time or the completion of an investigation suffices to eliminate the privilege.  *See, e.g.*, *Tuite v. Henry*, 181 F.R.D. 175, 181 (D.D.C. 1998) (finding that the investigatory privilege continues after investigation is complete), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999); *Aspin v. Dep't of Def.*, 491 F.2d 24, 30 (D.C. Cir. 1973) (same).  The privilege prevents disclosure of law enforcement material to "preserve the integrity of law enforcement techniques."  *Tuite*, 181 F.R.D. at 176.  Disclosure of documents "related to prior litigation can cause significant harm to the interests of agencies . . . .  It would be of substantial benefit to an opposing party [in a later case] if the party could . . . gain insight into the agency's general strategic and technical approach."  *Lone Star*, 1984 U.S. Dist. LEXIS 18242, at * 8-9 (quotation omitted); *see also FTC v. Grolier, Inc.*, 462 U.S. at 30-31.  Here, disclosure would provide a repeat adversary with the FTC's internal analyses and impede its future law enforcement efforts.

## CONCLUSION

For the reasons above, Meta's Motion to Compel should be denied.

Dated: July 19, 2022

Respectfully submitted,

/s/ Daniel Matheson
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Jessica Moy
James H. Weingarten (D.C. Bar 985070)
Maria DiMoscato (D.C. Bar 489743)
Owen Masters (D.C. Bar 242139)
Timothy J. Slattery (D.C. Bar 1023445)
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of July 2022, I served the foregoing on the following counsel via ECF:

Mark C. Hansen
Kevin B. Huff
Kenneth M. Fetterman
Geoffrey M. Klineberg
Kevin J. Miller
Aaron M. Panner
Alex A. Parkinson
Ana Nikolic Paul
Aaseesh P. Polavarapu
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, DC 20036
Tel: 202-326-7900
mhansen@kellogghansen.com
khuff@kellogghansen.com
kfetterman@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com
apaul@kellogghansen.com
apolavarapu@kellogghansen.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: 650-858-6000
sonal.mehta@wilmerhale.com

David Gringer
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-230-8800
david.gringer@wilmerhale.com
James P. Rouhandeh
Michael Scheinkman

Davis Polk & Wardwell LLP
450 Lexington Avenue

New York, NY 10017
Tel: 212-450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com


/s/ Daniel Matheson
Daniel Matheson (D.C. Bar 502490)
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*