# EXHIBIT A

# SUBPOENAED DOCUMENTS FROM FEDERAL TRADE COMMISSIONER TERRY CALVANI

# HEARING

### BEFORE THE

## SUBCOMMITTEE ON
## OVERSIGHT AND INVESTIGATIONS

#### OF THE

## COMMITTEE ON
## ENERGY AND COMMERCE
## HOUSE OF REPRESENTATIVES

### ONE HUNDREDTH CONGRESS

### SECOND SESSION

FEBRUARY 24, 1988

## Serial No. 100–82

Printed for the use of the Committee on Energy and Commerce



**U.S. GOVERNMENT PRINTING OFFICE**

84149 ±±                    WASHINGTON : 1988

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

H361-50

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

| | |
|---|---|
| JAMES H. SCHEUER, New York | NORMAN F. LENT, New York |
| HENRY A. WAXMAN, California | EDWARD R. MADIGAN, Illinois |
| PHILIP R. SHARP, Indiana | CARLOS J. MOORHEAD, California |
| JAMES J. FLORIO, New Jersey | MATTHEW J. RINALDO, New Jersey |
| EDWARD J. MARKEY, Massachusetts | WILLIAM E. DANNEMEYER, California |
| THOMAS A. LUKEN, Ohio | BOB WHITTAKER, Kansas |
| DOUG WALGREN, Pennsylvania | THOMAS J. TAUKE, Iowa |
| AL SWIFT, Washington | DON RITTER, Pennsylvania |
| MICKEY LELAND, Texas | DAN COATS, Indiana |
| CARDISS COLLINS, Illinois | THOMAS J. BLILEY, JR., Virginia |
| MIKE SYNAR, Oklahoma | JACK FIELDS, Texas |
| W.J. "BILLY" TAUZIN, Louisiana | MICHAEL G. OXLEY, Ohio |
| RON WYDEN, Oregon | HOWARD C. NIELSON, Utah |
| RALPH M. HALL, Texas | MICHAEL BILIRAKIS, Florida |
| DENNIS E. ECKART, Ohio | DAN SCHAEFER, Colorado |
| WAYNE DOWDY, Mississippi | JOE BARTON, Texas |
| BILL RICHARDSON, New Mexico | SONNY CALLAHAN, Alabama |
| JIM SLATTERY, Kansas | |
| GERRY SIKORSKI, Minnesota | |
| JOHN BRYANT, Texas | |
| JIM BATES, California | |
| RICK BOUCHER, Virginia | |
| JIM COOPER, Tennessee | |
| TERRY L. BRUCE, Illinois | |

WM. MICHAEL KITZMILLER, *Staff Director*
PAUL C. SMITH, *Minority Chief Counsel/Staff Director*

---

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

JOHN D. DINGELL, Michigan, *Chairman*

| | |
|---|---|
| RON WYDEN, Oregon | THOMAS J. BLILEY, JR., Virginia |
| DENNIS E. ECKART, Ohio | NORMAN F. LENT, New York |
| JIM SLATTERY, Kansas | DAN COATS, Indiana |
| GERRY SIKORSKI, Minnesota | MICHAEL G. OXLEY, Ohio |
| RICK BOUCHER, Virginia | MICHAEL BILIRAKIS, Florida |
| JIM COOPER, Tennessee | DAN SCHAEFER, Colorado |
| THOMAS A. LUKEN, Ohio | |
| DOUG WALGREN, Pennsylvania | |

MICHAEL F. BARRETT, JR., *Chief Counsel/Staff Director*
PATRICK M. McLAIN, *Counsel*
RICHARD A. FRANDSEN, *Counsel*
RUSSELL L. SMITH, *Minority Counsel*
ROBERT ALAN BERGMAN, *Minority Counsel*

(II)

# CONTENTS

————————

|  | Page |
|---|---|
| Testimony of Terry Calvani, Commissioner, Federal Trade Commission | 11 |
| Material submitted for the record by: | |
|    Clerk of the House of Representatives: Memorandum to Chairman Dingell from Steven R. Ross and Charles Tiefer, attorneys, dated Feb. 1, 1988 | 51 |
|    Congressional Research Service, American Law Division: Memorandum to Oversight and Investigations Subcommittee dated Feb. 3, 1988 | 59 |
|    Oversight and Investigations Subcommittee: | |
|       Chronology regarding subcommittee efforts to require the production of documents from the Federal Trade Commission | 49 |
|       Letters from Chairman Dingell to the Federal Trade Commission, and responses | 16 |
|       Subpoena with attachments to summon Terry Calvani and provide certain documents to the subcommittee | 13 |

(III)

# SUBPOENAED DOCUMENTS FROM FEDERAL TRADE COMMISSIONER TERRY CALVANI

---

## WEDNESDAY, FEBRUARY 24, 1988

House of Representatives,
Committee on Energy and Commerce,
Subcommittee on Oversight and Investigations,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2123, Rayburn House Office Building, Hon. John D. Dingell (chairman) presiding.

Mr. DINGELL. The subcommittee will come to order.

The Chair notes that a sufficient number of members are here to constitute a quorum for purposes of doing business and the record of the committee will so indicate.

This morning the Subcommittee on Oversight and Investigations meets to receive documents responsive to subpoenas authorized by the subcommittee on February 4, 1988, directing Federal Trade Commissioner Terry Calvani to appear and bring with him documents originally requested by the subcommittee through a letter of October 5, 1987, from me, to the Chairman of the Federal Trade Commission.

The Chair would like to review in some detail the background of this matter, the jurisdiction of the subcommittee in this area, and the subcommittee's need for the documents which have been subpoenaed.

In my letter of October 5, 1987, the Chair requested information on behalf of the subcommittee regarding a letter which the Federal Trade Commission addressed to the National Association of Attorneys General, and an accompanying press release relating to the proposed State guidelines for the airline industry.

At the time of the Commission's letter to the National Association of Attorneys General and the accompanying press release, the House of Representatives was scheduled only days later to consider legislation to reauthorize the Federal Trade Commission and to revoke an exemption currently enjoyed by the airline industry from Section 5 of the Federal Trade Commission Act relating to unfair and deceptive acts and practices. That relevance was heightened when a material inconsistency between the FTC letter to the National Association of Attorneys General and the press release allegedly quoting from that letter was revealed.

The inconsistency involved a sentence in the FTC press release purporting to quote from the National Association of Attorneys General's letter which states, "We are unaware of any evidence in-

dicating that airline fare advertising, frequent flyer programs or overbooking compensation policies are generally unfair or deceptive."

That was the principal quote contained in an article on the subject appearing in the Washington Post on October 3, 1987. In fact, the letter to NAAG said "Unless the task force has evidence indicating that the airline fare advertising, frequent flyer programs or overbooking compensation policies are generally unfair or deceptive, the legal and factual basis for the draft guidelines are not clear."

The sentence in the press release was in a draft of the letter to NAAG but was removed at the insistence of one Commissioner because it gave a false impression that the FTC had conducted an investigation of airline practices which in fact it had not conducted.

Obviously, if the FTC had conducted an investigation and came to the conclusion as stated in the press release and the Washington Post story, this fact could have significant bearing on congressional consideration of whether to give the FTC responsibilities in this area. Indeed, the quote from the Washington Post article was cited during the debate on the Floor of the House on the legislation in question.

The subcommittee's letter of October 5, 1987 sought to elicit documents necessary to fully examine the facts surrounding the development of the Commission's letter to NAAG, including the extent of any FTC study of airline practices, as well as the inconsistency between the letter and the press release accompanying it.

The Commission responded by letter of October 19, 1987, which supplied only some of the documents requested, but failed to provide documents that reflect communications between the Commissioners and their personal advisors. The subcommittee wrote again on October 29, directing the Commission to supply all documents originally requested by the subcommittee or to supply valid legal justification for further refusal to produce the documents as requested.

By letter of November 6, 1987, Chairman Oliver transmitted another document that was not included in the October 19, 1987 submittal but was responsive to the subcommittee's original request. That document is a draft of a memorandum which explains the facts surrounding the Commission's letter to NAAG and the inconsistency in the accompanying press release. Subsequently, the subcommittee learned of an allegation that the document was not supplied originally to the subcommittee because its author was specifically directed by her superior not to provide the document either to the Federal Trade Commission general counsel or to the subcommittee.

The staff began to examine this allegation which if true, could involve potential violations of Federal criminal statutes and agency standards of conduct. On November 17, 1987, the subcommittee requested copies of all documents relating to the Commission's compliance with the October 5 request, including documents relating to the failure of the Commission and members of the Commission to supply the draft memorandum and the allegation that it was withheld on the direction of an employee of the FTC.

3

In response to that request, the Commission by letter of November 24, 1987, supplied certain documents, but again failed to supply documents which reflect communications between individual Commissioners for their own use and notes prepared by personal advisors for their own use.

On December 2, 1987, the Chair again wrote Chairman Oliver reiterating the subcommittee's requests contained in the letters of October 5 and November 17, including the request for all documents in the offices of individual Commissioners, that might be responsive to these requests. In that letter, the Chair suggested that in the alternative, the subcommittee would not require the production of these documents at the time, if those documents were made available for review by the committee staff in the offices of the individual Commissioners. This proposal had been previously made by the subcommittee staff.

The Commission responded on December 10, 1987. According to that letter, two Commissioners, Commissioner Oliver and Commissioner Bailey, possessed no documents responsive to the subcommittee's requests that had not already been supplied and two Commissioners, Azcuenaga and Strenio, possessed documents that were responsive and they agreed to permit inspection of these documents in their personal offices. The subcommittee accepted that arrangement and the subcommittee staff has reviewed those documents. That letter also indicated that Commissioner Calvani possessed documents which were responsive to the subcommittee's requests and that he declined to provide those documents or to allow the subcommittee staff to examine the documents in his office.

On December 18, 1987, the Chair communicated directly to Commissioner Calvani restating the background of the matter, describing the subcommittee's jurisdiction in the area, explaining the subcommittee's needs for the documents in his possession and restating the subcommittee's requests for the documents. Commissioner Calvani responded in letters to the subcommittee dated January 8, 1988 and February 2, 1988. While not stating a legal basis for his continued refusal to supply documents requested by the subcommittee, Commissioner Calvani once again cited the confidential nature of the documents in question and also questioned the legal basis for the subcommittee's request. On February 4, 1988, the subcommittee met and voted unanimously to authorize the issuance of a subpoena, which the subcommittee is considering today.

The investigative authority of the Congress is well founded in law and practice and extends many centuries back through and to the practices of the British Parliament. The Supreme Court of the United States has spoken repeatedly on this matter and has firmly established that the investigative power of Congress is so essential to the legislative function as to be implied from the general vesting in the Constitution of legislative power in the Congress of the United States. In the landmark case of *Watkins* v. *United States,* 354 U.S. 178 (1957), the Court stated:

The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possible needed statutes. It includes surveys of the defects of our social, economic, or political system for the purpose of ena-

4

bling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. (354 U.S. at 187).

The foundation of this investigative and oversight function of Congress has been well articulated by the Supreme Court in other decisions prior to and subsequent to the *Watkins* case. These decisions are discussed in greater detail in memoranda prepared for the subcommittee by the General Counsel to the Clerk of the House of Representatives and the American Law Division of the Congressional Research Service addressing the matter before the subcommittee today.

The Court in *Wilkinson* v. *United States,* 365 U.S. 399 (1961), articulated the standards to be applied in determining whether the congressional investigatory power has been properly asserted. These are, (1) the committee's investigation of the broad subject matter area must be authorized by the Congress; (2), the investigation must be pursuant to a valid legislative purpose; and (3) the specific inquiries must be pertinent to the broad subject matter areas which have been authorized to the Congress and the subject of the inquiry must be apprised of that pertinency.

With regard to whether the subject matter of the current inquiry was authorized by the Congress, we will now examine the Rules of the House of Representatives. The Committee on Energy and Commerce is established by Rule X of those Rules. The Rules give this committee jurisdiction over interstate and foreign commerce generally; consumer affairs and consumer protection and travel and tourism.

The Subcommittee on Oversight and Investigations is the investigative arm of the Energy and Commerce Committee with jurisdiction concurrent with that of the full committee. The subcommittee's oversight responsibilities are also set forth in Rule X of the House of Representatives as follows:

Each standing committee shall review and study, on a continuing basis, the application, administration, execution and effectiveness of those laws, or parts of laws, the subject matter of which is within the jurisdiction of that committee, and the organization and operation of the Federal agencies and entities having responsibilities in or for the administration and execution thereof, in order to determine whether such laws and the programs thereunder are being implemented and carried out in accordance with the intent of the Congress and whether such programs should be continued, curtailed, or eliminated. In addition, each such committee shall review and study any conditions or circumstances which may indicate the necessity or desirability of enacting new or additional legislation within the jurisdiction of that committee (whether or not any bill or resolution has been introduced with respect thereto), and shall on a continuing basis undertake future research and forecasting on matters within the jurisdiction of that committee. Each such committee having more than 20 members shall establish an oversight subcommittee, or require its subcommittees, if any, to conduct oversight in the area of their respective jurisdiction, to assist in carrying out its responsibilities under this subparagraph.

Included among the laws that the subcommittee is charged with overseeing is the Federal Trade Commission Act and among the Federal agencies that the subcommittee is charged with overseeing is the Federal Trade Commission with regard to both organization and operation.

As to the requirement of a valid legislative purpose, the Supreme Court has made it clear, contrary to the assertions of Commissioner Calvani, that the Congress does not have to state explicitly what it intends to do as a result of an investigation. The record should re-

flect, however, that there are a number of areas in which there exists a valid legislative purpose associated with the subcommittee's current inquiry.

As the Chair has indicated earlier, at the time of the subcommittee's initial request for information on this matter, the House was to consider a provision in the FTC's reauthorization bill specifically addressing the subject of the FTC's letter to the National Association of Attorneys General, namely the issue of unfair and deceptive acts and practices in the airline industry. While the House decided not to enact that particular provision at that particular time, Congress at some future time may decide to revisit the question.

Also included in the FTC reauthorization bill, which was passed by the House on October 7, is a provision that addresses the manner in which the Federal Trade Commission carries out what has come to be known as the "intervention program." There is a similar provision contained in the FTC reauthorization bill which passed the United States Senate. These bills now pend in an awaiting House/Senate conference which will be addressed in the future by the two bodies. Further, by letter of January 29, 1988, the subcommittee through a letter to the Federal Trade Commission, initiated a broad inquiry regarding the conduct of FTC's intervention program. In this regard, the subject matter of the subcommittee's request for documents to Commissioner Calvani, the FTC's letter to the National Association of Attorneys General, is in fact an intervention within the Commission's intervention program.

With regard to the standard of pertinency of inquiries to the subject matter under investigation, the Courts have required only that the specific inquiries be reasonably related to the subject matter area under investigation. Commissioner Calvani has indicated to the subcommittee that the documents which he possesses are responsive to the subcommittee's request, include two pages of handwritten notes prepared by his attorney advisor to assist in briefing him on the FTC's letter to NAAG plus copies of the draft of the NAAG guidelines and three successive drafts of the Commission's letter to NAAG, each containing his attorney advisor's handwritten notations generated in connection with the discussions of what position the Commission should take and how they should be expressed. Although the subcommittee is unaware of the contents of these documents, clearly they relate to the circumstances surrounding the FTC's letter to NAAG and to the content of that letter. Further, these documents relate to and are pertinent to the Federal Trade Commission's intervention program and the operation of that program, a matter under the subcommittee's jurisdiction and investigation and a matter in which the subcommittee's staff is now inquiring. There exists a number of outstanding issues and questions regarding the FTC's letter to the National Association of Attorneys General as well as a number of questions regarding the conduct of the FTC's intervention program.

Commissioner Calvani has been apprised of the pertinency of the subcommittee's request to the subject matter of the investigation in numerous items of correspondence and is now being advised again in this statement. There have also been communications by the staff of the subcommittee to the FTC and to Mr. Calvani.

6

The subcommittee cannot thoroughly and properly carry out its responsibilities under the Constitution and the Rules of the House of Representatives to perform legislative oversight without an examination of all information relevant to particular subjects of inquiry.

With regard to the subcommittee's current inquiry, Commissioner Calvani possesses the documents and has so indicated in his responses to the committee. Through requests to the FTC and to Commissioner Calvani, the subcommittee has repeatedly sought the production of these documents. This has been unavailing.

This morning we meet to receive Commissioner Calvani's appearance and to receive the documents requested which are the subject of a duly authorized subpoena of this subcommittee compelling the production of these documents.

The Chair now recognizes the ranking minority member, Mr. Bliley.

Mr. BLILEY. Thank you, Mr. Chairman.

The question before us today relates to the production of certain documents in the possession of Commissioner Terry Calvani, which the subcommittee needs for purposes of an ongoing investigation into airline practices and the role of the Federal Trade Commission in regulating those practices. In our view, Commissioner Calvani has not asserted a legitimate legal base for his continued refusal to submit the documents in question. His position is based on what he claims has been an inaccurate articulation by the subcommittee of the subject matter of the investigation and the pertinence of the documents in question to that investigation.

I believe that this claim is specious. In fact, the subject matter of the investigation and the pertinence of the documents have been fully explained in a series of letters from the subcommittee to the Commission and to Mr. Calvani, most recently in a letter of February 19.

I would request that this letter be placed in the record at this time, Mr. Chairman. [See p. 13.]

Mr. DINGELL. Without objection, so ordered.

Mr. BLILEY. I will go over that ground again in order to make clear both the subject matter of the investigation and the pertinence of the particular documents.

I would first like to state for the record that Mr. Calvani's concern for maintaining the confidentiality of these documents has been recognized by the subcommittee. The subcommittee offered to view the disputed documents in the offices of individual Commissioners rather than requiring their production. While this offer was not legally required, it was made by the subcommittee in the interest of furthering its investigation while ensuring that the confidentiality of the documents would be preserved. Mr. Calvani has not accepted this offer.

Last year the subcommittee began an investigation of unfair and deceptive acts and practices by the airlines and Government regulation of those acts and practices. The Federal Trade Commission Act prohibits unfair and deceptive acts or practices in commerce and the Federal Trade Commission enforces this prohibition. The airline industry is specifically exempted from FTC authority under this law.

7

Under Rule X, Clause 1(h)(14) of the Rules of the House of Representatives, the Committee on Energy and Commerce has jurisdiction over "consumer affairs and consumer protection." This includes jurisdiction over the Federal Trade Commission.

The purpose of the investigation begun by the subcommittee was to determine whether the current exemption enjoyed by the airlines from the Federal Trade Commission Act is warranted. During the course of that investigation, the Energy and Commerce Committee determined that existing law should be amended to increase the oversight responsibility of the FTC in this area.

The committee reported to the House, the Federal Trade Commission Authorization Act of 1987, containing such an amendment. This investigation is an ongoing investigation and the issue of the appropriate level of FTC oversight of airline practices continues to be of concern to the subcommittee.

While the FTC authorization bill was pending in the House, the FTC expressed a position on the issue of Government regulation of unfair or deceptive practices by the airlines. This position was stated in a letter to the National Association of Attorneys General in response to proposed guidelines for State regulation of airline practices. This letter, an accompanying press release, and a subsequent clarification of the press release represented the major FTC statement of its position on the question under investigation by the subcommittee.

In order to fully understand the Commission's position and the appropriateness of conferring greater responsibility on the FTC over airline practices, it is necessary for the subcommittee to review all documents which were a part of the formulation of the FTC position in this matter. These documents including those in Mr. Calvani's possession, bear directly on the FTC's view of Government oversight of airline advertising and other practices and of the FTC's current role in that oversight, as well as on the possibility of the Congress expanding that role.

The need of the subcommittee to view these documents is, if anything, enhanced by the circumstances surrounding the press release accompanying the FTC letter of October 2, 1987, and the subsequent clarification of that press release. The press release of October 2 contained a quotation of a sentence that had been included in drafts of the letter but had been changed in the final letter because it misstated the FTC's position. The clarification of the press release included the correct quotation but a misleading view of the Commission's position had already been disseminated and significant questions were therefore raised about the manner in which the FTC's position had been formulated.

The subcommittee is also examining the facts surrounding the FTC's compliance with the original request for documents of October 5, 1987. One document was submitted after the initial submission of documents by the FTC, and there is some question about whether an employee was directed to withhold the document.

The subcommittee's requests have been directed, therefore, to documents relating to the matters that I have discussed. One, the FTC's letter to the National Association of Attorneys General relating to the proposed enforcement guidelines on airlines. Two, the accompanying press release of October 2, 1987 and the clarification

of that press release and three, the FTC's compliance with the initial request for documents. These are all legitimate areas of inquiry for the subcommittee and the documents in Mr. Calvani's possession are important to the inquiry.

The documents in Commissioner Calvani's possession also specifically relate to the investigation of the subcommittee into the intervention program at the FTC. This investigation was initiated on January 29, 1988, in order to determine the manner in which interventions are carried out. This is an issue that has been of great concern to the members of this committee, as reflected in a provision in the FTC reauthorization bill adopted by the House on October 7, 1987.

The subject matter of the subcommittee's request to Commissioner Calvani, the FTC's letter to the National Association of Attorneys General, is an intervention within this program. The documents the subcommittee seeks are pertinent to the manner in which this intervention was carried out, and without these documents the subcommittee cannot obtain a full understanding of the intervention program and how it is conducted.

I believe that the subcommittee has described the basis for its request for these documents in great detail and that the legal sufficiency of the request is clear. Commissioner Calvani has not asserted a legitimate legal basis for his refusal to submit the documents that he has withheld and therefore, he is compelled to produce these documents.

I hope that with this meeting, this dispute can be resolved so that we can continue with our investigation.

Thank you, Mr. Chairman.

Mr. DINGELL. The Chair thanks the distinguished gentleman from Virginia. The Chair recognizes the gentleman from Oregon, Mr. Wyden.

Mr. WYDEN. Thank you, Mr. Chairman.

Mr. Chairman, I believe you have very clearly and effectively articulated the purpose for the subcommittee's hearing this morning. I have totally supported the subcommittee's inquiries concerning the adequacy of existing laws to address unfair and deceptive practices of the airline industry and the subcommittee's inquiry regarding the operations of the Federal Trade Commission in the conduct of its intervention program.

I also supported and voted for the issuance of a subpoena to Commissioner Calvani and believe that the subcommittee properly conducts its hearing this morning. I also believe it is most regrettable. I believe it is regrettable because of the position Commissioner Calvani has established in this matter.

The documents which Commissioner Calvani withholds from the subcommittee could shed light on a number of issues and questions which are of legitimate concern to the subcommittee's inquiry. The documents are pertinent to questions involving the process by which the FTC decides the matters in which it wants to intervene. They are pertinent to questions involving the operation of the FTC and the process by which the FTC formulates its interventions, particularly with regard to questions concerning the level of review by the Commissioners themselves in any given intervention and

the nature of any input which the Commissioners may have in the intervention.

With regard to the specific intervention with the National Association of Attorneys General, concerning proposed State guidelines for the airline industry, the documents which the subcommittee has been seeking from Commissioner Calvani could also shed light on outstanding questions and issues. The documents may provide information to assist the subcommittee in learning more about the nature and scope of the FTC's staff investigation underlying the Commission's letter to NAAG as well as the level of review and input by the Commissioners themselves into the letter to the National Association of Attorneys General.

The documents may provide information concerning specific questions such as why the major conclusory statement in the draft of the letter to the National Association of Attorneys General was changed in the final version, and how it was that the conclusory statement which was in the draft letter was not removed from the accompanying press release. The documents which the subcommittee seeks may give insight into the question of the timing of the letter to the National Association of Attorneys General and also whether the timing of that letter was related in any way to the House's consideration of the FTC reauthorization bill that was scheduled for the following week.

These are among the many issues and questions that remain to be considered by the subcommittee in this inquiry and to which the documents subpoenaed from Commissioner Calvani may be pertinent.

Mr. Chairman, in closing, I do regret the necessity of our having to meet this morning. It is necessary, however, because the subcommittee has a tradition of faithfully and effectively discharging its oversight responsibilities inherent in the Constitution. These responsibilities are broad. They are the same responsibilities that in 1741, former Prime Minister William Pitt, referred to as the "Grand Inquest of the Nation."

I believe the record will show clearly that the subcommittee has carried out these responsibilities in a thorough and responsible manner in seeking to compel the production of documents from Commissioner Calvani.

I believe the record will show that the subcommittee has been sensitive to his and other FTC Commissioners' concerns regarding the sensitive nature of the documents the subcommittee has been seeking.

Through the subcommittee's offer to examine documents in the possession of the individual Commissioners in their offices, those concerns have been accommodated with regard to the other Commissioners. I believe that Commissioner Calvani's position on this matter to date has been wrong as a matter of law and policy.

It is my sincere hope he will provide the documents subpoenaed by the subcommittee and we may all avoid having to take necessary action that would be necessary as a consequence of his continued refusal.

Thank you, Mr. Chairman.

Mr. DINGELL. The Chair thanks the gentleman. The Chair recognizes the distinguished gentleman from Florida, Mr. Bilirakis.

Mr. BILIRAKIS. Thank you, Mr. Chairman.

Mr. Chairman, I don't have a prepared statement. I will very quickly, just off the top of my head, I might say for the benefit of Mr. Calvani and everyone else. When I introduced the amendment to the reauthorization of the Federal Trade Commission, I was trying to do a job. This committee was not trying to take jurisdiction from another committee or from another department, it was trying to do a job on the basis of facts that had been made available as a result of hearings regarding unfair practices.

I don't know what happened completely. I don't know why it happened. That is the reason for this hearing. I commend you, Mr. Chairman. I do know my amendment which was intended to benefit the consumers of this country was greatly thwarted and I might say probably the—no probably to it, I suppose, the misleading view that was reflected by the FTC in its original press release was quoted on the Floor. It certainly was a very large factor in the defeat of my amendment. If I had been sitting there without having had the benefit of the hearing and the facts and heard something like the FTC press release that being quoted, I would have said hey, why fix something that isn't broken, leave it alone, and would have voted against the amendment, which is of course what the majority of the members of the House did.

It is significant, Mr. Chairman, that we find out what if anything was behind the incorrect press release and I do commend you, sir, for following it up. Thank you.

Mr. DINGELL. The Chair thanks the gentleman. The Chair recognizes the distinguished gentleman from Ohio, Mr. Luken.

Mr. LUKEN. Thank you, Mr. Chairman.

I would like to associate myself with the opening statement of the chairman and the remarks of the other members of the subcommittee on this issue.

As Chairman of the subcommittee with oversight of the Federal Trade Commission, I am acutely interested in the precedents that might be set in this matter and the precedents which are being discussed in the legal arguments that are flowing back and forth. I might add that the level of review by the Commission and the Chairman of the Commission of the Commission's staff is a question which is presently before our subcommittee, our Hart/Scott/Rodino hearings. This makes us especially aware in the other subcommittee, the Transportation Subcommittee, and interested in the proper resolution of this matter.

I support the chairman's position and this action which is being taken. I yield back the balance of my time.

Mr. DINGELL. The Chair thanks the gentleman. The Chair recognizes the gentleman from New York, Mr. Lent.

Mr. LENT. Mr. Chairman, I would like to take just a moment to concur in the views expressed by the chairman and the ranking Republican member of the subcommittee. The jurisdiction of the subcommittee over this matter, the FTC letter to the National Association of Attorneys General concerning airline advertising, and the importance of the documents in Mr. Calvani's possession to the investigation have been stated repeatedly in letters and is being restated today.

Mr. Calvani has not, in my humble opinion, stated a legal basis on which the withholding of these documents can be justified. The record has been established. I believe that the documents requested should be made available to the subcommittee so that we may proceed with our investigation. I consider Mr. Calvani a friend and I would hope that he would sometime in the not too distant future see his way clear to provide these documents so we can avoid an unnecessary confrontation.

Thank you, Mr. Chairman.

Mr. DINGELL. The Chair thanks the gentleman.

Mr. Calvani, before the Chair commences with the proceedings this morning, the Chair would advise you that it is the practice of this committee going back to the day it was created by Sam Rayburn and had its first chairman, Mr. Oren Harris, to swear all witnesses who appear before the committee.

Mr. Calvani, do you object to appearing here under oath this morning?

Mr. CALVANI. No, Mr. Chairman.

Mr. DINGELL. Very well. Mr. Calvani, for your information, to inform you of your rights as a witness appearing before the committee and also to inform you of the limits on the power of the subcommittee, you will note there are two documents there before you, a red booklet and a buff colored booklet at the table, which are the Rules of the Committee, the subcommittee, and the Rules of the House of Representatives.

Mr. Calvani, the Chair requires now, do you desire to be represented by counsel?

Mr. CALVANI. Yes, Mr. Chairman. Mr. Stanley M. Brand has been retained as a consultant by the Office of General Counsel and will counsel me this morning.

Mr. DINGELL. Mr. Brand, the Chair knows you from a long acquaintance. We know you clearly understand the duties and responsibilities of counsel to witnesses appearing before this committee, to which we know you will most faithfully adhere. The Chair knows you are keenly aware of the difference between advising and testifying. The Chair is equally aware that you understand you will advise your client upon his request.

Mr. Calvani, if you have no objections, if you will please rise and the Chair will administer the oath.

[Witness sworn.]

Mr. DINGELL. Mr. Calvani, you may consider yourself under oath. The Chair has a series of questions before the Chair recognizes you for any statement.

Commissioner Calvani, do you have available to you the pertinent rules of the House of Representatives and the Committee on Energy and Commerce which were just made available to you by the Chair?

## TESTIMONY OF TERRY CALVANI, COMMISSIONER, FEDERAL TRADE COMMISSION, ACCOMPANIED BY STANLEY M. BRAND, COUNSEL.

Mr. CALVANI. Yes, Mr. Chairman; I do.

12

Mr. DINGELL. Mr. Calvani, did you hear my opening statement in which I summarized the jurisdiction of the subcommittee and the legislative purpose underlying the subcommittee's inquiry into this subject matter?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Mr. Calvani, did you receive a copy of the subcommittee's subpoena dated February 8, 1988?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Mr. Calvani, did you receive my letter to the Chairman of the Federal Trade Commission dated October 5, 1987?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Did you receive the copies of my letter to the Federal Trade Commission dated October 20, 1987?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Did you receive copies of my letter to the Chairman of the Federal Trade Commission dated November 17, 1987?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Did you receive copies of my letter to the Chairman of the Federal Trade Commission dated December 2, 1987?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Mr. Calvani, did you receive my letter to you dated December 18, 1987 and the letter from me and my colleague, the ranking minority member of this subcommittee, Mr. Bliley, dated February 19, 1988?

Mr. CALVANI. Yes, Mr. Chairman; I did.

Mr. DINGELL. Mr. Calvani, do you appear before the subcommittee this morning in response to a subpoena dated February 8, 1988 and served upon you that same day?

Mr. CALVANI. Yes, Mr. Chairman. I appear pursuant to that subpoena.

Mr. DINGELL. Without objection at this particular time, all copies of the documents referred to will be inserted in the record.

[Testimony resumes on p. 46.]

[The documents and letters with responses thereto follow:]

13

100-2-1

ORIGINAL

# BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Patrick M. McLain and/or Richard A. Frandsen

You are hereby commanded to summon Terry Calvani, Commissioner,

Federal Trade Commission

to be and appear before the Subcommittee on Oversight and Investigations, Energy and
Commerce
Committee of the House of Representatives of the United States, of which the Hon.

John D. Dingell is chairman, and to bring with him

the documents described in the attachment appended hereto (personal appearance

is excused if documents described in the attachment are received in the

Subcommittee offices (Room 2323 Rayburn House Office Building) by 10:00 a.m.
on Thursday, February 18, 1988)
in their chamber in the city of Washington, on Wednesday, February 24, 1988, in

Room 2123 Rayburn Office Building , at the hour of 10:00 a.m.

then and there to testify touching matters of inquiry committed to said Committee; and he is

not to depart without leave of said Committee.

Herein fail not, and make return of this summons.

Witness my hand and the seal of the House of Representatives

of the United States, at the city of Washington, this

8th day of February , 19 88

*Chairman.*

Attest:

*Clerk.*

14

ORIGINAL

Subpena for Terry Calvani

Commissioner, Federal Trade

Commission, Washington, D. C.

before the Committee on the Energy and

Commerce, Subcommittee on Oversight

and Investigations

Served:

Serve By: Richard A. Zineda   11:47 AM. Feb. 8, 1988
11:47am Feb 8, 1988

House of Representatives

U.S. GOVERNMENT PRINTING OFFICE : 1984 — 37-760

15

100-2-1

## ATTACHMENT

Copies of all books, records, correspondence, memoranda, papers, and other documents in your possession or control relating to the Federal Trade Commission's letter of October 1, 1987, to the National Association of Attorneys General regarding the proposed enforcement guidelines on the air travel industry, and the Federal Trade Commission's press release of October 2, 1987, on the same subject.

ONE HUNDREDTH CONGRESS

JOHN D. DINGELL, MICHIGAN, CHAIRMAN

RON WYDEN, OREGON                    THOMAS J. BLILEY, JR., VIRGINIA
DENNIS E. ECKART, OHIO               NORMAN F. LENT, NEW YORK
JIM SLATTERY, KANSAS                 DAN COATS, INDIANA
GERRY SIKORSKI, MINNESOTA            MICHAEL G. OXLEY, OHIO
RICK BOUCHER, VIRGINIA               MICHAEL BILIRAKIS, FLORIDA
JIM COOPER, TENNESSEE                DAN SCHAEFER, COLORADO
THOMAS A. LUKEN, OHIO
DOUG WALGREN, PENNSYLVANIA

           MICHAEL F. BARRETT, JR.
       CHIEF COUNSEL/STAFF DIRECTOR

ROOM 2323
RAYBURN HOUSE OFFICE BUILDING
PHONE (202) 225-4441

U.S. House of Representatives
Subcommittee on Oversight and Investigations
of the
Committee on Energy and Commerce
Washington, DC 20515

February 19, 1988


The Honorable Terry Calvani
Commissioner
Federal Trade Commission
Pennsylvania Avenue at Sixth Street, N. W.
Washington, D. C.  20580

Dear Commissioner Calvani:

Under the terms of a subpoena issued by this Subcommittee,
you are required to appear before the Subcommittee and to provide
certain documents to the Subcommittee on February 24, 1988.  The
Subcommittee is aware of certain concerns you have raised in
connection with the Subcommittee's request for these documents.
As has been made clear in prior correspondence with you, no basis
exists in law for your withholding these documents from the
Subcommittee.  In the absence of a legitimate legal basis for
your continued refusal, failure to provide the documents subjects
you to the charge of criminal contempt of Congress.

This is a serious charge, and the Subcommittee is seeking
not to pursue such a charge, but to pursue its investigation.
However, in order to pursue that investigation, the Subcommittee
requires the production of pertinent documents in your
possession.  Your concern with an explicit exposition of how
those documents are pertinent is not well-founded.  The
Subcommittee has made clear to you that it has a legitimate
legislative purpose for its investigation, and we will repeat
that purpose.  Under Rule X 1.(h)(14) of the Rules of the U. S.
House of Representatives, the Committee has jurisdiction over
"consumer affairs and consumer protection."  This includes
jurisdiction over the activities of the Federal Trade Commission.

Pursuant to that jurisdiction, the Subcommittee has
undertaken an inquiry into the role of the FTC in overseeing
advertising for consumers of commercial aviation.  During the
course of that investigation, which is continuing, Members of the

17

Subcommittee and the full Energy and Commerce Committee
determined that current law should be amended to increase the
oversight responsibility of the FTC in this area.  At the time
the Subcommittee's investigation was proceeding, and such an
amendment was pending on the Floor of the House, the FTC
expressed a position on the question of general government
oversight of airline advertising in the form of a letter
commenting on possible State regulation in that area.

That letter, an accompanying press release, and a later
clarification, represent the major FTC expression of position on
the question under investigation by the Subcommittee.  Therefore,
in connection with its investigation of FTC oversight of airline
advertising, the Subcommittee needs to review all documents which
were a part of the formulation of the FTC position on this
matter, as expressed in the above-mentioned letter, press
release, and clarification.  These documents, including those in
your possession, bear directly on the question of the FTC's
current oversight activities, or lack thereof, and its view of
whether it should have greater oversight responsibilities in the
future.

Included in the FTC reauthorization bill, which was passed
by the House on October 7, is a provision that addresses the
manner in which the Federal Trade Commission carries out what has
come to be known as the "intervention program."  There is a
similar provision which is contained in the FTC reauthorization
bill which has passed the United States Senate.  These bills are
now awaiting a House-Senate conference.  Further, by letter of
January 29, 1988, the Subcommittee, through a letter to the
Federal Trade Commission, initiated a broad inquiry regarding the
conduct of the FTC's intervention program.  It is important to
note, in this regard, that the subject matter of the
Subcommittee's request to Commissioner Calvani is the FTC's
letter to the National Association of Attorneys General which is,
in fact, an intervention within the Commission's intervention
program.  The documents the Subcommittee seeks are pertinent to
the manner in which this intervention was carried out.  Without
the documents you are obligated to provide, the Subcommittee
cannot obtain a full understanding of the FTC position on these
issues.  Therefore, the documents requested relate specifically
to the subject matters of the Subcommittee's inquiry.

Again, we emphasize that the Subcommittee is not seeking to
pursue the issue of criminal contempt in this case.  However, as
this and prior letters make absolutely clear, you have a legal
obligation to provide the Subcommittee with the requested
documents, and the Subcommittee intends to assure that that
obligation is met, despite the difficult personal circumstances
that may create for you should you continue to refuse to provide
the documents.  We assure you that a full explication and
accounting of the legal basis for your position will be required
of you when you appear before the Subcommittee on February 24.

Sincerely,

John D. Dingell
Chairman
Subcommittee on
Oversight and Investigations

Thomas J. Bliley
Ranking Minority Member
Subcommittee on
Oversight and Investigations

18

**FEDERAL TRADE COMMISSION**
WASHINGTON. D. C. 20580

OFFICE OF THE COMMISSIONER


RECEIVED
FEB 2 - 1988
Subcommittee on Oversight
and Investigations

February 2, 1988

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D. C.  20515

Dear Mr. Chairman:

I wrote to you on January 8 to explain the serious legal concerns that led me to decline to produce voluntarily the confidential documents requested in your letter of December 18, 1987.  I remain willing to cooperate with any legitimate demands from the Congress, and I respect its Constitutional authority to conduct oversight of federal agencies.  But before the Subcommittee takes the unusual step of subpoenaing my documents, I want to be sure that you and your colleagues understand my position.

My January 8 letter asked for a clearer articulation of the subject of the Subcommittee's inquiry and of how the documents you requested would be pertinent to that inquiry. My request asked only that the Subcommittee provide what is required by the statute, 2 U.S.C. §192, and by the Due Process Clause of the Constitution.  <u>Watkins v. United States</u>, 354 U.S. 178, 209, 215 (1957).  Rather than provide the legally-required clear explanation, your letter had cited only to the very broad and loosely worded delegations of authority in House Rules X and XI.  In a legal action founded on failure to comply with a Congressional subpoena, the government has the burden to plead and prove pertinency. <u>Sinclair v. United States</u>, 279 U.S. 263, 296-97 (1929). Vague and general citation of authority will not carry that burden.

I have received no response to my request.

Because of the very strong public interest in maintaining the confidentiality of the working relationships in my immediate office, <u>cf.</u> <u>Nixon v. Sirica</u>, 487 F.2d 700, 717 (D. C. Cir. 1973), it is most important that the Subcommittee demonstrate an adequate legal basis for a request or subpoena that would breach it.  But to justify your request, you have

19

The Honorable John D. Dingell                    February 2, 1988
                                                 Page 2

offered only general descriptions of the Subcommittee's
interests that are both vague and troubling.

I do not question Congress' authority to inquire about
"the administration of existing laws as well as proposed or
possibly needed statutes . . .," Watkins, 354 U.S. at 187.
But your letter does not state what existing law you are
reviewing.  The reference to "the necessity or desirability
of enacting new or additional legislation" is meaninglessly
vague and conclusory.  The only particular "new or addition-
al" legislation involved in the whole matter is something the
House has already recently acted on.

I also gather that the Subcommittee might be interested
in the accuracy of press accounts of the Commission's ac-
tions.  One of my concerns is Constitutional: any probe into
this subject must be careful not to abridge First Amendment
rights.  Another concern arises under the statutory require-
ment of pertinency.  I would understand if the Subcommittee
inquiry was into how the Commission's press office uses its
appropriated funds (assuming the inquiry observes Constitu-
tional and statutory limits).  But I do not understand how
internal communications within my own office could be pert-
inent to that inquiry.

Finally, I am concerned by the suggestion that the
Subcommittee might be inquiring into whether Federal criminal
statutes were violated.  Such an inquiry is assigned by the
Constitution to the executive and judicial branches, not the
legislature.  Quinn v. United States, 349 U.S. 155, 166
(1955).

I remain mindful of my duty to comply with Congress's
legitimate oversight inquiries, when its demands are within
delegated authority and meet applicable legal requirements.
But I cannot submit the confidential documents generated by
my personal staff if the Subcommittee has not demonstrated
the specific matter under inquiry and the pertinency of these
documents to that inquiry, as required by the statute govern-
ing the issuance of Congressional subpoenas and by the Due
Process Clause of the Constitution.

                                Sincerely,

                                Terry Calvani

cc: Members of the Subcommittee

20

FEDERAL TRADE COMMISSION
WASHINGTON. D. C. 20580

OFFICE OF THE COMMISSIONER

RECEIVED
JAN 1 1 1988
Subcommittee on Overs
and Investigations
To: 7167
MK
RA

January 8, 1988

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D. C.  20515

Dear Mr. Chairman:

This is in response to your December 18, 1987 letter to
me, the latest installment in the correspondence that began
in October between the Subcommittee and the Commission. Your
letter repeats requests made in the Subcommittee's letters of
October 5 and November 17, asking again for documents that
would have been responsive to those letters and would have
been provided but for the claim of confidentiality.  Should I
decline again to comply with your request, you have requested
a statement of the legal justification for doing so and a
list and description of the documents that would be respons-
ive to your request.

There is a threshold issue that must be addressed.  You
have asked for an explanation of the legal basis for declin-
ing to provide documents generated by personal, confidential
attorney-advisors to a commissioner, and used entirely within
the office of the individual commissioner, in response to a
letter from a committee of the Congress requesting their
disclosure.  In its previous correspondence, the Commission
has explained the strong public policy interest in maintain-
ing the confidentiality of communications within the offices
of individual commissioners.  I do not dissent from any of
the positions the Commission has taken on this policy issue
in its previous letters to you, and I will not repeat here
points made adequately in those letters.  This policy of
confidential treatment is consistent with the policies behind
several well-established legal justifications for withholding
evidence or discovery.  See Nixon v. Sirica, 487 F.2d 700,
717 (D. C. Cir. 1973), explaining how one of these recognized
justifications, executive privilege, is analogous to "that
between a congressman and his aides under the Speech and
Debate Clause; to that among judges, and between judges and
their law clerks; and similar to that contained in the fifth
exemption to the Freedom of Information Act."  These es-
tablished legal justifications provide clear guidance for the
present situation.  But before that issue is even reached,

21

The Honorable John D. Dingell                    **Page 2**
January 8, 1988

the legal basis for the Subcommittee's request must be es-
tablished.

The Subcommittee has a duty to point to "specific
legislative decisions that cannot responsibly be made without
access to materials uniquely contained" in the requested
documents.  <u>Senate Select Committee on Presidential Campaign
Activities v. Nixon</u>, 498 F.2d 725, 733 (D.C.Cir. 1974)(en
banc).  In the terms of the relevant statute, the Subcommit-
tee must demonstrate that the material sought is pertinent to
the question under inquiry.  2 U.S.C. §192.

Thus, a necessary predicate to the Subcommittee lawfully
requiring these documents is a clear and precise explication
of the subject of the Subcommittee's inquiry.  Once the
Subcommittee has identified the subject matter of its inquiry
with sufficient particularity, it must then demonstrate how
the documents sought are pertinent to that inquiry, and make
the demonstration with the degree of explicitness and clarity
required by the Due Process clause.  <u>Watkins v. United
States</u>, 354 U.S. 178, 209 (1957).  While your letter states
your Subcommittee's jurisdiction in its broadest terms, it
neither identifies the precise subject matter under inquiry
nor describes the "connective reasoning," <u>Watkins</u>, <u>supra</u>, at
215, relating the documents sought to that subject matter.
Indeed, your letter seems to suggest that the documents are
thought to be pertinent, not to a matter pending before your
Subcommittee, but to the consideration by the full House of a
measure that was debated and decided in the last session.

As you know, the subject matter of the inquiry and the
pertinency to that inquiry must be shown with "undisputable
clarity," <u>Watkins</u>, <u>supra</u>, at 214, so that it can be determ-
ined whether the parent body has in fact delegated the sub-
ject matter to the committee, and the committee to the sub-
committee.  It is difficult to make that determination where,
as here, you have described the full House's deliberations
and limited your explanation of the Subcommittee's inquiry to
a recital of its general jurisdiction.  As you also are no
doubt aware, "broadly worded and loosely drafted" authoriza-
tions, <u>Watkins</u>, <u>supra</u>, at 201, like those contained in House
Rules X and XI, which you cite, do not provide a witness with
the particularity needed.  "[T]he more vague the committee's
charter is, the greater becomes the possibility that the
committee's specific actions are not in conformity with the
will of the parent House of Congress."  <u>Id</u>.

In explaining the circumstances that led you to request
these documents, your letter cites press releases and a story
in <u>The Washington Post</u>.  Of course, the Commission and in-
dividual commissioners cannot take any responsibility for the

22

stories in the press nor for the accuracy or authenticity of
statements that those stories attribute to the Commission.
Without suggesting that those stories are inaccurate, none-
theless I do not understand how such extrinsic statements in
the press can buttress the Subcommittee's legal obligation to
establish the source of its authority.  I think you will
agree that, where First Amendment interests may be impli-
cated, as they are in discussing issues of public importance
like those forming the subject of the FTC's press release,
care must be taken to avoid unnecessarily confronting con-
stitutional issues.  Since "[c]learly, an investigation is
subject to the command that the Congress shall make no law
abridging freedom of speech . . .", Watkins, 354 U.S. at 197,
it becomes all the more important to assure that the Subcom-
mittee's requests are firmly grounded.  United States v.
Rumely, 345 U.S. 41, 43-44 (1953).

     Finally, I am concerned by your suggestion that the
Subcommittee might be inquiring into whether Federal criminal
statutes were violated.  Whatever the Subcommittee's basis
for inquiry, the law is clear that "[t]he [congressional]
power to investigate must not be confused with any of the
powers of law enforcement.  Those powers are assigned under
our Constitution to the Executive and the Judiciary."  Quinn
v. United States, 349 U.S. 155, 166 (1955).  The combination
of an at best vague showing of possible pertinency with an
explicit reference to non-legislative law enforcement inter-
ests raises obvious concerns, and makes a "clear and certain"
demonstration of the Subcommittee's authority, Gojack v.
United States, 384 U.S. 702, 715 (1966) all the more impor-
tant.

     As Attorney General Smith observed, in connection with
an assertion of executive privilege involving a request you
made to another agency, "the congressional oversight interest
will support a demand for predecisional, deliberative docu-
ments . . . only in the most unusual circumstances," since
oversight is only a means of facilitating legislation.
Letter, October 13, 1981.  The courts have also recognized
that legislative inquiry normally does not require detailed
examination of past acts:

          There is a clear difference between Cong-
          ress's legislative tasks and the respons-
          ibilities of a grand jury, or any in-
          stitution engaged in like functions.
          While fact-finding by a legislative
          committee is undeniably a part of its
          task, legislative judgments normally
          depend more on the predicted consequences
          of proposed legislative actions and their

The Honorable John D. Dingell                          Page 4
January 8, 1988

        political acceptability, than on precise
        reconstruction of past events;  Congress
        frequently  legislates  on  the  basis  of
        conflicting information provided in its
        hearings.   [By  contrast,  a  grand  jury
        needs detailed evidence to make judgments
        about, for example, perjury.]  We see no
        comparable need in the legislative proc-
        ess . . . .

<u>Senate Select Committee v. Nixon</u>, 498 F. 2d at 732.

    A description of the documents that you have requested
shows that they are unlikely to add much, if anything, to
your inquiry -- no matter what the subject of that inquiry
turns out to be.  They consist of two pages of handwritten
notes, prepared by my attorney-advisor to assist in briefing
me on the matter, plus copies of a draft of the NAAG Guide-
lines and of three successive drafts of the Commission's
letter to NAAG, each containing my attorney-advisor's hand-
written annotations generated in connection with our discus-
sions about what positions the Commission should take and how
they should be expressed.  These documents were generated as
part of the process by which I reached my conclusions.

    I would be happy to discuss with you both my conclusions
about the regulation of airline advertising and my reasoning
in support of them.  (I would also like to note, putting to
one side the issues raised in our current disagreement about
access to documents from my office, that I supported the bill
that would have transferred jurisdiction over the subject to
your Committee.)   But because of the policy concerns for
confidentiality mentioned above and set forth in the Commis-
sion's previous letters, I am most reluctant to submit the
documents generated by my personal staff in the course of
reaching those conclusions, in the absence of a clearer
explanation of the Subcommittee's inquiry and of how those
materials that you have requested would be pertinent to that
inquiry.  I remain as always willing to cooperate with the
Subcommittee, but the interests at stake are important enough
that I feel I must be assured that the statutory prerequi-
sites have been met.

                 Sincerely,

                 Terry Calvani

ONE HUNDREDTH CONGRESS

JOHN D. DINGELL, MICHIGAN, CHAIRMAN

RON WYDEN, OREGON
DENNIS E. ECKART, OHIO
JIM SLATTERY, KANSAS
GERRY SIKORSKI, MINNESOTA
RICK BOUCHER, VIRGINIA
JIM COOPER, TENNESSEE
THOMAS A. LUKEN, OHIO
DOUG WALGREN, PENNSYLVANIA

THOMAS J. TAUKE, IOWA
NORMAN F. LENT, NEW YORK
DAN COATS, INDIANA
MICHAEL G. OXLEY, OHIO
MICHAEL BILIRAKIS, FLORIDA
DAN SCHAEFER, COLORADO

MICHAEL F. BARRETT, JR.
CHIEF COUNSEL/STAFF DIRECTOR

ROOM 2323
RAYBURN HOUSE OFFICE BUILDING
PHONE (202) 225-4441

**U.S. House of Representatives**

**Subcommittee on Oversight and Investigations
of the
Committee on Energy and Commerce**

**Washington, DC 20515**

December 18, 1987

The Honorable Terry Calvani
Commissioner
Federal Trade Commission
Washington, D. C.  20580

Dear Commissioner Calvani:

On October 5, 1987, I wrote the Chairman of the Federal
Trade Commission requesting information on behalf of the
Subcommittee on Oversight and Investigations regarding a letter
which the Commission addressed to the National Association of
Attorneys General (NAAG) and accompanying press release relating
to the proposed State guidelines for the airline industry.
This was a matter of particular interest to the Subcommittee and,
undeniably, a matter within the Committee's jurisdiction.  The
Committee on Energy and Commerce has jurisdiction over the
regulation of commercial practices, consumer protection in
general, and over the Federal Trade Commission Act and the
Federal Trade Commission, in particular.  The Subcommittee on
Oversight and Investigations has the responsibility to review and
study the application, administration, execution, and
effectiveness of those laws within the jurisdiction of the
Committee, including the necessity or desirability of enacting
new or additional legislation, and the organization and operation
of the Federal agencies responsible in or for the administration
of those laws.

At the time of the Commission's letter to NAAG and
accompanying press release, the House of Representatives was
scheduled only days later to consider legislation to reauthorize
the Federal Trade Commission and to revoke an exemption currently
enjoyed by the airline industry from Section 5 of the Federal
Trade Commission Act relating to unfair and deceptive acts and
practices.  The NAAG letter was particularly relevant to the
consideraton of this matter by the U.S. House of Representatives.
That revelance was heightened when a material inconsistency
between the FTC letter to NAAG and the press release allegedly
quoting from that letter was revealed.

25

The Honorable Terry Calvani
December 18, 1987
Page 2

The inconsistency involved a sentence in the FTC press
release purporting to quote from the NAAG letter which states "We
are unaware of any evidence indicating that airline fare
advertising, frequent flyer programs or overbooking compensation
policies are generally unfair or deceptive". That was the
principal quote contained in an article on the subject appearing
in The Washington Post on October 3, 1987. In fact, the letter
to NAAG said "Unless the task force has evidence indicating that
airline fare advertising frequent flyer programs or overbooking
compensation policies are generally unfair or deceptive, the
legal and factual basis for the draft guidelines are not clear."
The sentence in the press release was in a draft of the letter to
NAAG but was removed on the insistence of one Commissioner
because it gave the false impression that the FTC had conducted
an investigation of airline practices, which it had not.
Obviously, if the FTC had conducted an investigation and come to
the conclusion as stated in the press release and The Washington
Post story, this fact could have significant bearing on
Congressional consideration of whether to give the FTC
responsibilities in this area. Indeed, The Washington Post
article was cited during the Floor debate on the legislation.

The Subcommittee's letter of October 5, 1987, sought to
elicit documents necessary to examine fully the facts surrounding
the development of the Commission's letter to NAAG. including the
extent of any FTC study of airline practices, as well as the
inconsistency between the letter and the press release
accompanying it. The Commission responded by letter of October
19, 1987, which supplied some of the documents requested but
failed to provide documents that reflect communications between
Commissioners and their personal advisors. The Subcommittee
wrote again on October 29, directing the Commission to supply all
documents originally requested by the Subcommittee, or to supply
a valid legal justification for its further refusal.

By letter of November 6, 1987, Chairman Oliver transmitted
another document that was not included in the October 19, 1987,
submittal. but was responsive to the Subcommittee's original
request. That document is a draft of a memorandum which explains
the facts surrounding the Commission's letter to NAAG and the
inconsistency in the accompanying press release. Subsequently,
the Subcommittee learned of an allegation that the document was
not supplied originally to the Subcommittee because its author
was specifically directed by her superior not to provide the
document to either the Federal Trade Commission General Counsel
or to the Subcommittee. The staff began to examine this
allegation which, if true, could involve potential violations of
Federal criminal statutes and agency standards of conduct. On

November 17, 1987, the Subcommittee requested copies of all
documents relating to the Commission's compliance with the
October 5 request, including documents relating to the failure to
supply the draft memorandum and the allegation that it was
withheld on the direction of an FTC employee.  In response to
that request, the Commission, by letter of November 24, 1987,
supplied certain documents but failed to supply documents which
reflect communications between individual Commissioners and their
personal advisors, notes prepared by Commissioners for their own
use, and notes prepared by personal advisors for their own use.

On December 2, 1987, I wrote Chairman Oliver reiterating the
Subcommittee's requests contained in the letters of October 5 and
November 17, including the request for all documents in the
offices of indiviudal Commissioners that may be responsive to
those requests.  In that letter, I suggested that in the
alternative, the Subcommittee would not require the reproduction
of those documents at that time if those documents were provided
for the review of the Subcommittee staff in the offices of the
individual Commissioners.  This proposal had been made previously
by the Subcommittee staff.  The Commission responded on December
10, 1987.  According to that letter, two Commissioners, Oliver
and Bailey, possess no documents responsive to the Subcommittee's
requests that had not already been supplied and two
Commissioners, Azcuenaga and Strenio, possess documents that are
responsive and they agree to permit inspection of those documents
in their personal offices.  The Subcommittee has accepted that
agreement and the Subcommittee staff has reviewed those
documents.  That letter also indicates that you possess documents
which are responsive to the Subcommittee's requests and that you
decline to provide those documents or to allow the Subcommittee
staff to examine those documents in your office.

The Subcommittee finds no legal justification for your
refusal to supply documents pursuant to a legitimate
Congressional request.  Pursuant to Rules X and XI of the Rules
of the U. S. House of Representatives, the Subcommittee requests
that you supply copies of all books, records, correspondence,
memoranda, paper, and other documents relating to the Federal
Trade Commission's press release of October 2, 1987, or the
Commission's letter to the National Association of Attorneys
General relating to the proposed enforcement guidelines on the
air travel industry.  Additionally, we request that you supply
copies of all similar documents relating to the Federal Trade
Commission's compliance with the Subcommittee's request of
October 5, 1987, including, but not limited to, any documents
which describe or relate to the circumstances surrounding the
failure to provide the document provided to the Subcommittee on
November 6, 1987, in the FTC's original submission of October 19,
1987.  In the alternative, the Subcommittee will not require the
production of these documents at this time if those documents are
provided for the review by the Subcommittee staff in your office.

Should you continue to refuse to comply with the repeated
request of the Subcommittee, we will appreciate a statement of
your legal justification for your refusal and a list and
description of those documents which are responsive to this
request.  We will appreciate your response to this matter no
later than Friday, January 8, 1988.  Should you have questions
concerning this request, please contact Subcommittee Counsel
Patrick McLain at 225-4441.

Sincerely,

John D. Dingell
Chairman
Subcommittee on
Oversight and Investigations

JDD:PMMdes

27



**OFFICE OF**
**THE COMMISSIONER**

UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

*To: NHC*
*BMM*
*XAY*

December 10, 1987

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
   of the Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C.  20515

RECEIVED

DEC 1 1 198..

Subcommittee on Oversight
and Investigations

*hand delivered*

Dear Mr. Chairman:

I am responding individually to your letter of December 2,
1987, concerning prior Subcommittee requests for documents
relating to the Commission's letter to the National Association
of Attorneys General regarding proposed state guidelines for the
air travel industry and the related Commission press release.  In
that letter, you requested that the Commission produce, or that
individual Commissioners make available for inspection, documents
in the offices of individual Commissioners that have not been
forwarded to the Subcommittee for reasons stated in the
Commission's letters dated October 19, 1987, November 24, 1987
(two letters), and December 10, 1987.

Some of the documents referred to in the previous Commission
letters are located in my office.  The materials in my office
concerning your first access letter, dated October 5, 1987,
consist of two documents prepared by my economic advisor for my
personal use.  The materials concerning your second access
letter, dated November 17, 1987, consist of memoranda and
handwritten notes reflecting private communications between me
and my economic advisor and between me and one of my attorney
advisors, handwritten notes prepared by me for my personal use,
and handwritten notes prepared by one of my attorney advisors for
use in briefing me in this matter.  None of these documents have
been disclosed to anyone outside my office.

As stated in the Commission's letter to you dated
December 10, 1987, there is a serious question as to whether a
sound legal basis exists for concluding that the full Commission
has sufficient control over internal deliberative documents to
direct their production or inspection.  I agree that the
Commission does not have such authority and that it is the
responsibility of each Commissioner to determine individually
whether to release the documents.

The Honorable John D. Dingell                              -2-

   Further, for reasons stated in the previous Commission
letters to you, I consider the internal deliberative documents
held in my office to be confidential and highly sensitive.  It is
my view that making these documents available to the other
Commissioners or even to the Subcommittee will harm important
interests essential to the effective functioning of the agency.
Indeed, similar interests underlie the protection accorded the
relationships between attorney and client, doctor and patient,
judge and law clerk, and Member of Congress and personal aide.

   Nonetheless, I have decided to waive such privileges as may
attach to the above-described documents held in my office and
will permit inspection of those documents in my office, as your
letter dated December 2, 1987 proposes.  Please have a member of
your staff contact my staff to make the necessary arrangements.
In agreeing to permit inspection, I must emphasize that I am not
thereby waiving with respect to future requests any privileges
that would ordinarily attach to the documents in question and
others of the same kind.

   My decision to permit inspection of my documents should
fully and satisfactorily respond to your letters.  I trust that
this action will thereby hasten the day when the Subcommittee and
the Commission can concentrate our undivided attention on issues
affecting consumers and competition.

                              Sincerely yours,

                              Andrew J. Strenio, Jr.

                              Andrew J. Strenio, Jr.
                              Commissioner

29





UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

OFFICE OF THE SECRETARY

December 10, 1987

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
  of the Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C.  20515



Dear Mr. Chairman:

    This responds to your letter of December 2, 1987, concerning
prior Subcommittee requests for documents concerning the
Commission's letter to the National Association of Attorneys
General regarding proposed State enforcement guidelines for the
air travel industry and the related Commission press release.  In
the December 2 letter, you requested that the Commission produce,
or that individual Commissioners make available for inspection,
documents in the offices of individual Commissioners, referred to
in a Commission letter to you dated October 19, 1987 and in two
Commission letters to you dated November 24, 1987.

    The Commission's consistent policy has been, and remains, to
comply to the fullest extent possible with requests for
information Congressional committees and subcommittees believe is
needed to fulfill their legislative and oversight functions.  In
the context of the present matter the Commission appreciates the
Subcommittee's recognition of the sensitivity of documents
within individual commissioners' offices and the need to protect
"collegiality among the Commissioners and the independence of
each Commissioner."  The Commission, however, believes that
inspection of these materials by Subcommittee staff, like
production of the materials to the Subcommittee, would seriously
harm those interests.

    The autonomy of the individual Commissioners' offices,
discussed in our November 24 response to your letter of October
20, raises a serious question whether the full Commission has
sufficient control over documents internal to those offices to
direct their production or inspection.  For the Commission to
direct that documents be made available, it must have effective
control over them, and we question the existence of a sound legal
basis for the Commission as a body to assert control over these
documents of individual Commissioners.  We also think it sound
policy that the Commission refrain from examining or acting to
disseminate memoranda reflecting private communications between
an individual Commissioner and his or her own advisors, or other
materials prepared by and for the use of individual Commissioners
and advisors.

30

The Honorable John D. Dingell                                    2

In summary, the Commission believes that production or
examination of materials generated within and for the use of
individual Commissioners' offices would seriously harm the
important interests we have articulated in our earlier
correspondence with you, interests to which your letter of
December 2 demonstrates sensitivity and concern.  The Commission
also does not believe that it has authority to direct production
or examination of the materials at issue here, which are within
the custody of individual Commissioners' offices, and believes
that it is the responsibility of each Commissioner to determine
individually whether to release such documents.

Notwithstanding the foregoing observations, Commissioner
Strenio has determined, in an effort to resolve this matter, that
he is willing in the circumstances of this case to waive such
privileges as attach to the documents and permit inspection of
documents in his office responsive to your request by a member of
your Subcommittee staff, as your letter proposes.  By separate
letter, Commissioner Strenio asks that your staff contact him to
arrange for such inspection.  In agreeing to permit inspection,
Commissioner Strenio notes that he does not thereby waive with
respect to future requests any privileges that would ordinarily
attach to the documents in question and others of the same kind.

Commissioner Azcuenaga has three pages of personal notes
responsive to your letter of November 17.  Notwithstanding the
foregoing policy observations, Commissioner Azcuenaga has
determined, in an effort to resolve this matter, that she is
willing in the circumstances of this case to waive such
privileges as attach to these notes and to permit inspection of
them in her office by a member of your Subcommittee staff, as
your letter proposes.  Commissioner Azcuenaga will contact your
staff to arrange for such inspection.  In agreeing to permit
inspection, Commissioner Azcuenaga notes that she does not
thereby waive with respect to future requests any privileges that
would ordinarily attach to the documents in question and others
of the same kind.  If Commissioner Azcuenaga had written
communications from her personal advisors responsive to your
requests, she would join Commissioner Calvani in declining,
respectfully, to produce them.

In light of the foregoing considerations Commissioner
Calvani, the other Commissioner with responsive documents, finds
it necessary to respectfully decline to submit the requested
documents.  The other Commissioners fully support that position.

By direction of the Commission.

Emily Rock
Emily Rock
Secretary

31

ONE HUNDREDTH CONGRESS

JOHN D. DINGELL, MICHIGAN, CHAIRMAN

RON WYDEN, OREGON
DENNIS E. ECKART, OHIO
JIM SLATTERY, KANSAS
GERRY SIKORSKI, MINNESOTA
BILL RICHARDSON, NEW MEXICO
JIM COOPER, TENNESSEE
THOMAS A. LUKEN, OHIO
DOUG WALGREN, PENNSYLVANIA

THOMAS J. BLILEY, JR., VIRGINIA
NORMAN F. LENT, NEW YORK
DAN COATS, INDIANA
MICHAEL G. OXLEY, OHIO
MICHAEL BILIRAKIS, FLORIDA
DAN SCHAEFER, COLORADO

MICHAEL F. BARRETT, JR.
CHIEF COUNSEL/STAFF DIRECTOR

ROOM 2323
RAYBURN HOUSE OFFICE BUILD
PHONE (202) 225-4441

**U.S. House of Representatives**

Subcommittee on Oversight and Investigations
of the
Committee on Energy and Commerce
Washington, DC 20515

December 2, 1987


The Honorable Daniel Oliver
Chairman
Federal Trade Commission
Washington, D. C.  20580

Dear Chairman Oliver:

        This responds to two letters from the Federal Trade
Commission (FTC) dated November 24, 1987, relating to prior
Subcommittee requests for documents concerning the Commission's
letter to the National Association of Attorneys General regarding
proposed State enforcement guidelines for the air travel industry
and the related Commission press release.

        The Subcommittee's letters of October 5, 1987, and November
17, 1987, called for the production of certain documents,
including notes and memoranda from the offices of individual
commissioners.  While the Commission has provided a number of
documents responsive to the Subcommittee's previous requests,
your letters of November 24, 1987, indicate, once again, your
refusal to supply documents which reflect communications between
commissioners and their personal advisers, notes prepared by
Commissioners for their own use, and notes prepared by personal
advisers for their own use.  By letter of October 20, 1987, the
Subcommittee indicated to you that in the absence of a statement
of legal authority to withhold the documents previously
requested, the Subcommittee would require their production.

        Subsequent to the Subcommittee's letter of October 20, the
Subcommittee staff met, at the Commission's request, with a
representative of the Commission to discuss the Subcommittee's
request, the Commission's concerns, and a possible resolution of
this matter.  At that time, the Subcommittee staff indicated
their concern for the sensitivity of documents within individual
commissioners' offices necessary to protect the collegiality
among the commissioners and the independence of each
commissioner.  Consequently, the Subcommittee staff suggested
that those notes and memoranda from the offices of individual
commissioners would not be required to be produced at this time,

32

The Honorable Daniel Oliver
November 30, 1987
Page 2

but would be examined by Subcommittee staff in the offices of the
individual commissioners.  I appreciate the concern that the
individual commissioners have for documents which reflect
communications between themselves and their personal advisers.
The Subcommittee has no desire to compromise the collegiality of
the Commission's process, nor the independence of any individual
commissioner.  I believe the proposal of the Subcommittee staff
to examine those documents in the offices of the individual
commissioners and not to require their production at this time
evidences the Subcommittee's concern for the sensitivity of these
documents and fully protects the FTC processes and the
independence of the commissioners.

    While we appreciate the Commission's offer to have each
commissioner respond to questions regarding any responsive
documents, that questioning could not productively take place in
the absence of examining those documents and after-the-fact
interviews of individuals are never a substitute for
contemporaneous documentation.  To accept anything less than the
review of the documents themselves, would be to shirk the
Subcommittee's oversight responsibilities.  I cannot agree to do
that.

    The Subcommittee reiterates its requests contained in the
letters of October 5, 1987, and November 17, 1987, including all
documents in the offices of individual commissioners that may be
responsive to those requests.  In the alternative, the
Subcommittee will not require the production of those documents
at this time if those documents are provided for the review by
the Subcommittee staff in the offices of the individual
commissioners.  The Subcommittee requests your response to this
matter no later than Tuesday, December 8, 1987.  Should you have
questions, please contact Subcommittee Counsel Patrick McLain at
225-4441.  Your cooperation is appreciated.

                            Sincerely,



                            John D. Dingell
                            Chairman
                            Subcommittee on
                        Oversight and Investigations


JDD:PMMdes



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

OFFICE OF THE SECRETARY



November 24, 1987

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C.  20515

Dear Mr. Chairman:

 This responds to your letter of November 17, 1987, requesting information and documents that describe or relate to the Commission's compliance with your earlier request of October 5, 1987.  You specifically identify as an example of responsive materials any documents concerning the circumstances surrounding the omission of a draft document dated October 6, 1987 in our response of October 19, 1987.  (We provided the document in question to you on November 6, 1987).  Your earlier request of October 5 had asked for information and documents concerning a Commission letter to the National Association of Attorneys General regarding proposed state enforcement guidelines for the air travel industry, and the related Commission press release.

 The General Counsel has requested that each office and bureau at headquarters produce any materials concerning the efforts of the Commission and its staff to search for, locate, or produce documents in compliance with your October 5 request, or concerning any actions taken in withholding any document or documents responsive to that request.  The General Counsel asked for all materials dated, written, or prepared on or before November 17, the date of your current request.  We are providing to you all responsive materials that were provided to the General Counsel.[1]

---

 [1] With two exceptions, the documents that we are providing to you contain no redactions.  First, certain references to agency matters entirely unrelated to your prior request have been deleted from the weekly work reports prepared by the staff in the Office of the General Counsel.  Second, certain references to business and personal matters, also unrelated to your prior request, have been deleted from the daily personal planning lists of the Assistant General Counsel for Legal Counsel.

Honorable John D. Dingell                                    2

    The Commission is providing access to these nonpublic
materials because this is an official request of a Congressional
Subcommittee. 5 U.S.C. § 552(d), as amended. These nonpublic
documents consist of Commission circulations, internal memoranda,
drafts of memoranda and Commission minutes, notes, and records of
telephone communications. These documents reflect internal
deliberations and they contain predecisional analyses, advice,
and recommendations. As such, they are exempt from mandatory
public disclosure under FOIA Exemption 5 as predecisional,
deliberative materials. NLRB v. Sears, Roebuck & Co., 421 U.S.
132 (1975); see also, Russell v. Department of the Air Force,
682 F.2d 1045 (D.C. Cir. 1982). In addition, disclosure of
certain documents may constitute a "clearly unwarranted invasion"
of the privacy of certain Commission employees, and such files
are exempt under FOIA Exemption 6. See Rural Housing Alliance v.
U.S. Department of Agriculture, 498 F.2d 73, 76-78 (D.C. Cir.
1974); see also Department of the Air Force v. Rose, 425 U.S.
352, 374 (1976).

    Even though some of the documents you requested are exempt
under the FOIA, the Commission recognizes that the FOIA is not
authority to withhold documents from the Congress. 5 U.S.C.
§ 552(d), as amended. The Commission has, therefore, authorized
release of these materials to the Subcommittee. Because the
nonpublic information would not be available to the public under
the FOIA or otherwise, the Commission requests that the
Subcommittee maintain the confidentiality of this information.

    As suggested in your letter of November 17, we have
contacted Subcommittee Counsel Patrick McLain to discuss
questions concerning the request. In accordance with
Mr. McLain's discussions of November 19 with Craig Brightup, the
Director of the Commission's Office of Congressional Relations,
and Anna Davis, his deputy, we are not providing to the
Subcommittee notes that Commission staff made during interviews
conducted by representatives of the Subcommittee. At the
Subcommittee staff's request, the Commission employees who made
these notes were present as personal representatives of the
employees who were interviewed.

    Additionally, it is our understanding, based on the
discussions with Mr. McLain, that we may view this request as
separate from the Subcommittee's earlier request, dated
October 20, 1987, for a statement of the Commission's position
regarding the communications to individual Commissioners from
their personal advisors that were not included as part of the
October 19 submission. Therefore, consistent with this approach,

35

Honorable John D. Dingell                                3

we are not including here materials relating to the issue of
personal advisor/Commissioner communications.

Finally, we have not produced material responsive to your
November 17 request that consists of communications between
Commissioners and their personal advisors, notes prepared by
Commissioners for their own use, and notes prepared by personal
advisors for their own use. We understand that these notes
include personal notes taken at meetings, and reports of
telephone conversations between Commissioners' personal advisors
and Commission employees outside the Commissioners' offices. We
respectfully request that the Subcommittee advise us whether it
believes it needs these materials at this time. The rationale
underlying this request is explained in part in our separate
letter to you, forwarded to you earlier today, relating to
documents responsive to your request of October 5. We would
appreciate an opportunity to discuss this matter further with you
or your staff should you decide production of these categories of
materials is necessary to complete your inquiry.

We appreciate your consent to a brief delay in responding to
this request.

By direction of the Commission,

Emily H. Rock
Secretary


Enclosures *to PMM only*

36



**OFFICE OF
THE CHAIRMAN**

UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON. D.C. 20580

*To: MJB
Amm
RAF
PCL*

November 24, 1987 *Hand delivered 11:ₐ*
*a*

NOV 2   1987

Subcommittee on Oversight
and Investigations

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigation
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C.  20215

Dear Mr. Chairman:

By letter of October 5, 1987, you requested documents
relating to the Commission's comment of October 1, in response to
the invitation of the National Association of Attorneys General
("NAAG") concerning its proposed guidelines on the air travel
industry as well as the Commission's press release on that
comment.  By letter of October 19, the Commission provided you
with documents responsive to your request.  In keeping with past
practice, however, we did not forward notes and memoranda from
the offices of individual Commissioners.  Your response of
October 20 calls for a further explanation of the Commission's
reasons for not forwarding these documents.

We recognize, of course, the legitimate and broad authority
of the Congress to conduct oversight, and we assure you that we
intended to cooperate fully with the Subcommittee's inquiry.  Our
response followed our usual practice in providing information to
your Subcommittee and others, who have long respected the
peculiar sensitivity of personal advisor communications and the
confidential relationships they reflect.  We hoped that, in light
of the other materials being provided, you would consider
exempting these documents from the scope of your request -- a
procedure that we believe you have found acceptable in the past.

When the Commissioners perform policy, investigative,
prosecutorial, judicial and other functions, they do so as
members of a collegial body that can act only by majority vote.
In preparing for their collective actions, individual
Commissioners rely on their confidential relationship with their
personal advisors.  Personal advisors provide their Commissioners
not only with analyses of legal and economic issues, but also
with frank, and perhaps harsh, assessments of the recommendations

The Honorable John D. Dingell -- Page 2

of other Commissioners and staff, and with practical advice about
how best to work with the other members of the Commission to
secure a desired result.  Personal advisors, unlike the rest of
the Commission's staff who work for the entire Commission, work
only for their individual Commissioners.  They analyze matters
presented for Commission action solely for the benefit of the
individual Commission member.  This function is particularly
important if that member is in the minority on the matter under
consideration.

     Even assuming our authority to do so, we are concerned that
if we, as a Commission, were to examine personal advisor
communications, we would undermine both the collegiality among
the Commissioners and the independence of each Commissioner that
are so essential to the effective functioning of the agency.  For
the Commission, as a body, to provide such communications would
have the equally deleterious effect of inhibiting the candid
sharing of views between each Commissioner and his or her
advisors.

     The highly sensitive nature of this confidential
relationship is recognized by Reorganization Plan No. 8 of 1950,
64 Stat. 1264, which exempted the personal staffs of
Commissioners, alone among Commission employees, from the
administrative direction of the Chairman.  The relationship is
recognized by the Commissioners themselves, who respect the
confidential nature of deliberations within individual
Commissioners' offices.  It is for this reason that neither the
Commission as a whole, nor the General Counsel, has examined the
materials at issue here.

     Similar considerations underlie the protection accorded the
relationships between attorney and client, doctor and patient,
judge and law clerk, and member of Congress and personal aide.
We urge the Subcommittee for like reasons to respect the
confidential relationship between individual members of the
Commission and their personal advisors to preserve the
uninhibited flow of frank advice and comment within the offices
of individual members of the Commission.*

_____

     *  Congress too has recognized the importance of protecting
the confidentiality of internal deliberations within the
government, as evidenced by its enactment of Exemption 5 to the
public disclosure requirements of the Freedom of Information Act,
5 U.S.C. § 552(b)(5), and the courts have upheld this principle
on numerous occasions.  See, e.g., Senate Select Committee on
Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C.
Cir. 1974); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40
F.R.D. 318, 324-26 (D.D.C. 1966), aff'd on opinion below, 384

The Honorable John D. Dingell -- Page 3

We are mindful of the legitimacy of Congressional oversight, and we are committed to resolving this matter in a way that will be consistent with our continuing desire to foster a productive working relationship with the Subcommittee and its staff.

In determining what information the Subcommittee needs to complete its inquiry, each of us asks that you consider that each Commissioner having any of the responsive documents is prepared to meet with you to answer questions about the circumstances surrounding the preparation of the Commission's letter to NAAG and about his participation in that process. The rest of the Commissioners are, of course, also willing to discuss any aspect of your inquiry at your convenience, although they have not been privy to the documents. In addition, each member of the Commission is prepared to assure the Subcommittee that none of the documents from his or her office referred to in our letter of October 19 contains any information suggesting any connection between the comment to NAAG and Congressional consideration of legislation about airline regulatory authority. Finally, none of these personal advisor communications was circulated outside the office of the Commissioner in which it was produced.

We appreciate your interest and the time you have taken to help accommodate us in this matter. We are hopeful that the approaches suggested here will lead to a satisfactory resolution

_____

F.2d 979 (D.C. Cir.), cert. denied, 389 U.S. 952 (1967); Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939 (Ct. Cl. 1958); see also, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975); EPA v. Mink, 410 U.S. 73 (1973); United States v. Morgan, 313 U.S. 409 (1941).

39

The Honorable John D. Dingell -- Page 4


of this matter.  Please let us know if you would like to discuss
this with any or all of us at your convenience.

Sincerely,


_____
Daniel Oliver, Chairman

_____
Mary L. Azcuenaga,
Commissioner

_____
Patricia P. Bailey, Commissioner

_____
Andrew J. Strenio, Jr.
Commissioner

_____
Terry Calvani, Commissioner

40

ONE HUNDREDTH CONGRESS

JOHN D. DINGELL, MICHIGAN, CHAIRMAN

RON WYDEN, OREGON
DENNIS E. ECKART, OHIO
JIM SLATTERY, KANSAS
GERRY SIKORSKI, MINNESOTA
RICK BOUCHER, VIRGINIA
JIM COOPER, TENNESSEE
THOMAS A. LUKEN, OHIO
DOUG WALGREN, PENNSYLVANIA

THOMAS J. BLILEY, JR. VIRGINIA
NORMAN F. LENT, NEW YORK
DAN COATS, INDIANA
MICHAEL G. OXLEY, OHIO
MICHAEL BILIRAKIS, FLORIDA
DAN SCHAEFER, COLORADO

MICHAEL F. LOMETT, JR.
CHIEF COUNSEL/STAFF DIRECTOR

ROOM 2323
RAYBURN HOUSE OFFICE BUILDING
PHONE (202) 225-4441

**U.S. House of Representatives**

**Subcommittee on Oversight and Investigations**
**of the**
**Committee on Energy and Commerce**
**Washington, DC 20515**

November 17, 1987

The Honorable Daniel Oliver
Chairman
Federal Trade Commission
Washington, D. C. 20580

Dear Chairman Oliver:

You will recall that on October 5, 1987, the Subcommittee
requested certain information and documents regarding the Federal
Trade Commission's letter to the National Association of
Attorneys General (NAAG) relating to the proposed state
enforcement guidelines for the air travel industry. On
October 19, 1987, the Commission supplied certain documents
responsive to the Subcommittee's original request. On
November 6, 1987, you transmitted another document that was not
included in your original submission but would be responsive to
the Subcommittee's original request. You may be aware that the
Subcommittee staff has been interviewing individuals at the
Federal Trade Commission concerning the circumstances surrounding
the failure of the FTC to supply the document which you
transmitted on November 6, 1987.

Pursuant to Rules X and XI of the Rules of the House of
Representatives, the Subcommittee requests that you supply copies
of all books, records, correspondence, memoranda, papers, and
other documents relating to the Federal Trade Commission's
compliance with the Subcommittee's request of October 5, 1987,
including but not limited to, any documents which describe or
relate to the circumstances surrounding the failure to provide
the document provided on November 6, 1987, in the FTC's original
submittal of October 19, 1987. This includes, but is not limited
to, notes of meetings, memoranda prepared by the General Counsel,
and all materials provided by Ms. Ellison to Mr. Paul.

41

The Honorable Daniel Oliver
November 17, 1987
Page 2

Should you have any questions concerning this request,
please contact Subcommittee Counsel Patrick McLain at 225-4441.
The Subcommittee will appreciate your supplying the documents
requested herein no later than Friday, November 20, 1987.

Sincerely,

John D. Dingell
Chairman
Subcommittee on
Oversight and Investigations

JDD:PMMdes

42

**U.S. House of Representatives**

Subcommittee on Oversight and Investigations
of the
Committee on Energy and Commerce
Washington, DC 20515

October 20, 1987

The Honorable Daniel Oliver
Chairman
Federal Trade Commission
Washington, D. C.  20580

Dear Chairman Oliver:

I have reviewed of your letter of October 19, 1987, responding
to the Subcommittee's October 6 request for information and
documents concerning the Federal Trade Commission's letter to the
National Association of Attorneys General (NAAG) relating to the
proposed state enforcement guidelines for the air travel industry.
While your letter transmits many of the documents requested by the
Subcommittee, you also indicate that a number of documents exist
which you are failing to provide the Subcommittee.

The documents which you have failed to provide the
Subcommittee apparently represent communications between
Commissioners and their advisors.  These documents clearly fall
within the October 6 request of the Subcommittee and are relevant
to the Subcommittee's inquiry.  While you indicate that "the
Commission believes that the voluminous materials it is releasing
will reveal the process by which the Commission's position on the
NAAG proposal was developed", I feel compelled to remind you that
the Subcommittee, and not the Federal Trade Commission, will
determine what documents are responsive and material to the
Subcommittee's inquiry.

You have provided no legal justification for your refusing to
supply all documents requested by the Subcommittee.  Absent a
statement of a valid legal justification for your refusal to supply
documents requested pursuant to a legitimate legislative inquiry, I
request that the documents originally requested by the Subcommittee
in its letter of October 6 be supplied forthwith.  Should you have
questions concerning this matter, please contact Subcommittee
Counsel Patrick McLain at 225-4441.

Sincerely,

John D. Dingell
Chairman
Subcommittee on
Oversight and Investigations

43

*do: NEO*
*PMM*



**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

THE CHAIRMAN

October 19, 1987

The Honorable John D. Dingell
Chairman
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
Washington D.C. 20515

*hand delivered 11:a*
[stamp: OCT 19 1987]
Subcommittee on Oversight
and Investigations

Dear Mr. Chairman:

This is in response to your letter of October 6, 1987, requesting information and documents concerning the Federal Trade Commission's letter of October 2, 1987, to the National Association of Attorneys General (NAAG) relating to the proposed state enforcement guidelines for the air travel industry. The Commission's October 2, 1987, letter responded to NAAG's letters of September 10, 1987, to the Commissioners requesting comment on NAAG's draft guidelines by September 30, 1987. In your letter, you requested that the Commission provide the Subcommittee with documents relating to its letter to NAAG, as well as the Commission's press release of October 2, 1987, concerning the letter. In addition, you requested that the Commission provide to the Subcommittee drafts of the Commission's letter and press release. You also requested that Commission personnel be available for interviews by the Subcommittee's staff regarding this matter. As explained below, the Commission is granting your request with certain exceptions. The Commission has directed its staff to respond to inquiries from the Subcommittee staff.

The documents you have requested consist of publicly available documents and nonpublic documents. The publicly available materials are not exempt from public disclosure under the Freedom of Information Act (FOIA), and the Commission is releasing these public documents to you with no request that the Subcommittee keep them confidential. The Commission is providing access to nonpublic materials because this is an official request of a Congressional Subcommittee. 5 U.S.C. § 552(d), as amended.

The confidential materials include internal memoranda, draft memoranda, drafts of the Commission's letter to NAAG, and drafts of the related October 2, 1987, press release. These documents reflect communications between Commission staff and the Commission and they reflect analyses, advice, and recommendations. As such, they are exempt from mandatory public disclosure under FOIA Exemption 5 as predecisional, deliberative materials. NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975); see also, Russell v. Department of the Air Force, 682 F.2d 1045 (D.C.Cir. 1982).

*N.D. Exes to PMM only.*

44

The Honorable John D. Dingell -- Page 2

Even though some of the documents you have requested are exempt under the FOIA, the Commission recognizes that the FOIA is not authority to withhold information from the Congress.  5 U.S.C. § 552(d), as amended.  The Commission has, therefore, authorized release of these materials to the Subcommittee. Because this nonpublic information would not be available to the public under the FOIA or otherwise, the Commission requests that the Subcommittee maintain the confidentiality of this information.  The documents discussed above are enclosed.

Included among the nonpublic documents you have requested are fewer than a dozen documents that reflect confidential communications between Commissioners and their personal advisors. The Commission is concerned that release to Congress of communications between Commissioners and their immediate advisors would have a chilling effect on the advisors' willingness to provide uninhibited advice.  Attorney and economic advisors to individual Commissioners play an essential and highly sensitive role in the agency's deliberative process, and the Commission has traditionally treated these communications as highly confidential.  The Commission believes that the voluminous materials it is releasing will reveal the process by which the Commission's position on the NAAG proposal was developed.  It is for these reasons that the documents described in this paragraph have not been disclosed.

By direction of the Commission,

Daniel Oliver
Chairman

Enclosures

45

**U.S. House of Representatives**

Subcommittee on Oversight and Investigations
of the
Committee on Energy and Commerce
Washington, DC 20515

October 5, 1987

The Honorable Daniel Oliver
Chairman
Federal Trade Commission
Washington, D. C.  20580

Dear Chairman Oliver:

As you know, the House will soon consider H.R. 2897, the
Federal Trade Commission Act Amendments of 1987.  Title II of
that bill revokes an exemption currently enjoyed by the airline
industry from Section 5 of the Federal Trade Commission Act
relating to unfair and deceptive acts and practices.
Consequently, the Subcommittee takes particular interest in your
recent letter to the National Association of Attorneys General
and press release relating to proposed State guidelines for the
airline industry.

Pursuant to Rules X and XI of the Rules of the House of
Representatives, the Subcommittee requests that you supply copies
of all books, records, correspondence, memoranda, papers, and
other documents relating to the Commission's press release of
October 2, 1987, or the Commission's letter to the National
Association of Attorneys General relating to the proposed
enforcement guidelines on the air travel industry.  This request
shall include, but is not limited to, drafts of the press release
and the Commission's letter.  Additionally, we request that all
Commission personnel respond completely to all interviews that
may be conducted by Subcommittee staff regarding this matter.

Should you have any questions concerning the Subcommittee's
request, please contact Patrick McLain at 225-4441.  We request
that the documents be supplied to the Subcommittee no later than
Friday, October 16, 1987.

Sincerely,

John D. Dingell
Chairman
Subcommittee on
Oversight and Investigations

Mr. DINGELL. Commissioner Calvani, have you brought with you the documents called for in that subpoena and the attachment to that subpoena?

Mr. CALVANI. Yes, Mr. Chairman; I have.

Mr. DINGELL. Are you prepared to supply those documents to the subcommittee at this time?

Mr. CALVANI. Mr. Chairman, in your letter to me, you asked for a complete and thorough exposition to my answer to that question and I would propose to do that at this time.

Mr. DINGELL. I beg your pardon?

Mr. CALVANI. In your letter to me, you asked for a complete and full exposition of whether I was going to submit or not going to submit the documents and I would propose to do that at this time.

Mr. DINGELL. Mr. Calvani, the Chair has a series of questions which the Chair is directing to you. The Chair assures you that you will be afforded full and appropriate opportunity to make such statements in response either to the matters that the committee is inquiring into here or other matters which are relevant to that.

The Chair would appreciate if you would respond, however, at this particular time, to the questions. The Chair will therefore present you with the question again.

Mr. Calvani, are you prepared to supply the documents requested to the subcommittee at this time?

Mr. CALVANI. Yes, Mr. Chairman, I am.

Mr. DINGELL. Very well. If the Clerk of the Committee will come forward and she will receive the documents at this time.

[Documents proffered to the chairman.]

Mr. DINGELL. Mr. Calvani, the chairman thanks you for these documents. These documents are all of the documents requested in the subpoena served upon you and the communications between yourself and the Chair; is that correct?

Mr. CALVANI. They are the only documents I have, Mr. Chairman.

Mr. DINGELL. Very well, Mr. Calvani. That is appreciated.

Mr. Calvani, the Chair will now recognize you for such statement that you choose to give the committee at this time.

Mr. CALVANI. Thank you, Mr. Chairman. I will be brief.

This Committee's insistence upon obtaining confidential material, memoranda reflecting communications from my attorneys to me, represents a very poor development in the exercise of this subcommittee's oversight responsibilities over the Federal Trade Commission. Moreover, up until the 11th hour, this subcommittee failed to satisfy the legal requirements to compel production of those materials. I think both the law and the policy merit some discussion.

First, violation of the confidence between a Commissioner and his or her personal attorney advisors makes Government less, not more, but less efficient. I tell the men and women that serve in my office that I want their wholly candid assessment and unvarnished recommendations about the matters currently before me. Their work will be for my eyes alone and they need not fear that another Commissioner, the Chairman or the parties before us will learn of their recommendations. The concern is real and shared by many.

Just not long ago, former FTC Chairman Michael Pertschuk, told me he would have refused to provide similar documents in re-

47

sponse to a request from the Senate Commerce Committee some years ago.

Our Commission, Mr. Chairman, is not often of one mind but it is unanimous on this policy. All Commissioners, without regard to the President that appointed them, objected to providing this type of information in response to your letter request.

While I am willing to assume the bona fides of this particular body with reference to confidential information, that assumption is not always safe. Just last week another subcommittee released material obtained from a non-public Hart/Scott/Rodino investigation to the press. An employee of our agency that had released that material would have gone to jail. As a result of that development, I anticipate that the Agency will have some substantial difficulty obtaining compliance with our requests for information. Indeed, our very ability to enforce compliance in the courts may have been compromised.

The courts have held that fear of release by the Congress is not grounds for a company to refuse to produce to the FTC, since Congress is entitled to a presumption that it will respect that confidentiality.

Query, Mr. Chairman, whether the Court of Appeals will reach the same result when confronted with this issue the next time.

Second, the subcommittee's actions suggest a curious change in this subcommittee's attitude toward the independence of the agencies. Today's scenario obviously plays into the hands of those who would argue that the agencies are not really independent, but rather agents of the Congress and thus violate the separation of powers doctrine.

I call to your attention articles and speeches by former Assistant Attorney General Ted Olson and Attorney General Ed Meese on this same subject.

Events such as this today underscore the waterboy status of the Agency vis-a-vis congressional committees of this chamber. Perhaps I, too, need to rethink our agency's position on this important issue.

For these policy reasons, I decided not to comply with the subcommittee's request for confidential attorney advisor documents unless legally compelled to do so. I have doubtless made many mistakes during my tenure in office but I do not recall intentionally doing something that I knew was wrong. If this subcommittee is going to compel me to do something that is wrong, then I must insist that it do so properly and that it adhere to the requirements of law, and I will do so again and again, and we will repeat this series of events as necessary.

Until last Friday, only two business days before this hearing, it was quite clear that this subcommittee had failed to satisfy the requirements of law. Had the House cited me for contempt, no court would have sustained the chamber. We have explained the legal deficiencies of the subcommittee's request in writing and I see no need to repeat what we have said in our correspondence but I do ask that correspondence be made a part of the record of these proceedings. [See p. 13.]

Counsel now advises me, as a result of developments late Friday afternoon, that this subcommittee has arguably cured the defective

48

requests. The absence of any mechanism to test the legal sufficiency of a demand such as this without placing one's liberty in jeopardy compels me to give this subcommittee the benefit of the doubt. As you are doubtless aware, one can only test the legal sufficiency of this subcommittee's process if one is willing to stand criminal trial.

To my knowledge, this Kafka-esque mode of operation is unique in our system of government. The legality of other kinds of processes in our legal system, including the process issued by some of the other committees of this Congress, can be tested before jeopardy attaches.

Now that the subcommittee has insisted on access, I must change my method of operation within my own office and my own expectations. My counsel must now write under a different set of assumptions. This morning I have instructed my staff that henceforth they should not commit their work to paper. Although that may make us less efficient, I can still assure myself their recommendations to me will not be shared with a larger audience.

Since the subcommittee arguably has cured its defective subpoena last Friday, since I frankly would have to risk jail to test the legal sufficiency, I am complying with the subcommittee's request. Thank you, Mr. Chairman.

Mr. DINGELL. Thank you, Mr. Calvani. The Chair thanks you for complying with the process of the committee.

Are there further questions or comments from my colleagues at this time?

Mr. LUKEN. Mr. Chairman, just one comment. Commissioner Calvani has brought into the record the matter before the Transportation Subcommittee with reference to Hart/Scott/Rodino. I'm sure the chairman does not want us to ventilate this matter before this forum and I do not intend to. I would simply say, without agreeing at all to the accuracy of what Mr. Calvani has stated, that the matter will be taken up on March 17 and Mr. Calvani will be there; so we can consider it further at that time.

Mr. DINGELL. The Chair thanks the gentleman.

Mr. CALVANI. Mr. Chairman, during these proceedings this morning, there has been some assumption that something may have taken place in my office in an attempt to scuttle the legislation that was sponsored out of this committee. Just to set the record clear, I am the only Commissioner that I know of, and there may have been others, that supported this legislation.

Mr. DINGELL. Mr. Calvani, the committee will note that for the record. We thank you for your presence this morning and your assistance to the committee.

If there is no further business to come before the committee, the Chair will advise that you will remain under the subpoena of the committee with regard to production of papers and records until they have been reviewed by the staff and we assume you will consider yourself as remaining under oath and available to appear before us should it be necessary to have your further assistance.

The committee stands adjourned at this time.

[Whereupon, at 11 a.m. the subcommittee was adjourned.]

[The following documents were submitted for the record:]

49

**CHRONOLOGY REGARDING SUBCOMMITTEE EFFORTS TO REQUIRE THE
PRODUCTION OF DOCUMENTS FROM THE FEDERAL TRADE COMMISSION**

| | |
|---|---|
| October 3, 1987 | Washington Post article reporting on FTC letter to National Association of Attorneys General regarding proposed State guidelines for the airline industry. Story quotes FTC letter stating, "We are unaware of any evidence indicating that airline fare advertising, frequent flyer programs or overbooking compensation policies are generally unfair or deceptive." |
| October 5, 1987 | Subcommittee staff interviews FTC staff responsible for FTC intervention with NAAG. |
| October 5, 1987 | Subcommittee letter to FTC requesting all documents relating to FTC letter to NAAG and accompanying press release. |
| October 7, 1987 | House considers FTC reauthorization bill revoking an exemption currently enjoyed by the airline industry relating to unfair and deceptive acts and practices. |
| October 19, 1987 | FTC letter to Subcommittee supplying some of the documents requested but failing to provide documents that reflect communications between Commissioners and their personal advisors. |
| October 29, 1987 | Subcommittee letter to FTC requesting, once again, documents first requested on October 5 or a valid legal justification for further refusal. |
| November 6, 1987 | FTC letter to Subcommittee transmitting a document that was not included in the October 19, 1987 submittal. Subcommittee staff learns of allegation that this document was withheld by its author on the specific directive of the author's supervisor. |
| November 17, 1987 | Subcommittee letter to FTC requesting copies of all documents relating to the FTC's compliance with the October 5 request. |

50

| | |
|---|---|
| November 24, 1987 | Two letters from the FTC to the Subcommittee. One, supplying certain documents responsive to the Subcommittee's request of November 17, but failing to supply documents in the offices of Commissioners.  In another letter of November 24, FTC continues to refuse to supply documents responsive to letter of October 5 because of their "sensitive nature." |
| December 2, 1987 | Subcommittee letter to FTC reiterating requests of October 5 and November 17 including request for documents in offices of individual Commissioners.  Offer made by Subcommittee to examine those documents in the Commissioner's offices. |
| December 10, 1987 | FTC letter to Subcommittee responding to letter of December 2, 1987.  Two Commissioners possess no responsive documents, two Commissioners possess responsive documents, and agreed to allow Subcommittee staff to review them, and Commissioner Calvani continued to refuse to supply documents or allow inspection in his office. |
| December 11, 1987 | Subcommittee staff reviews documents in Commissioner Azcuenaga's office. |
| December 14, 1987 | Subcommittee staff reviews documents, including attorney advisor notes, in Commissioner Strenio's office. |
| December 14, 1987 | Subcommittee staff and minority staff meet with Commissioner Calvani to make sure he understands the Subcommittee inquiry and process.  He indicated that he does and asked no questions. |
| December 18, 1987 | Subcommittee letter to Commissioner Calvani reiterating previous requests for documents in his possession or to allow for their review in his office. |
| January 8, 1988 | Commissioner Calvani letter to Subcommittee refusing to supply requested documents citing confidentiality of documents and questioning legal basis for the Subcommittee's request. |
| January 25, 1988 | Committee minority counsel meets with Commissioner Calvani with no resolution. |
| February 2, 1988 | Commissioner Calvani letter to Subcommittee restating position expressed in letter of January 8. |
| February 4, 1988 | Subcommittee authorizes the issuance of a subpoena to Commissioner Calvani. |
| February 8, 1988 | Commissioner Calvani is served with subpoena. |
| February 19, 1988 | Chairman Dingell and Ranking Minority Member, Congressman Bliley, wrote Commissioner Calvani reiterating the obligations of the Subcommittee. |

51

Donald K. Anderson
Clerk

Steven R. Ross
General Counsel

**Office of the Clerk**
**U.S. House of Representatives**
**Washington, DC 20515-6601**

February 1, 1988

MEMORANDUM

TO:       The Honorable John D. Dingell
          Chairman
          Subcommittee on Oversight and Investigations
          Committee on Energy and Commerce

FROM:     Steven R. Ross $SRR$
          General Counsel to the Clerk

          Charles Tiefer $CT$
          Deputy General Counsel to the Clerk

SUBJECT:  Obligation of Federal Trade Commission to Provide
          Information to Congress

You have requested an analysis of the legal obligation of a Commissioner on the Federal Trade Commission ("FTC") to provide your Subcommittee with information in his possession bearing on the question of revoking an exemption currently enjoyed by the airline industry from the Federal Trade Commission Act's prohibition of unfair and deceptive acts and practices. Your Subcommittee has pressed the FTC to produce records and to justify any refusal to do so in letters of October 5, October 20, November 17, December 2, and December 18. An FTC Commissioner, Terry Calvani, continues to withhold records.

Commissioner Calvani's letter of January 8, 1988 ("Calvani Letter"), sets forth two grounds for withholding. Principally, he challenges "the legal basis for the Subcommittee's request,"

52

The Honorable John D. Dingell
February 1, 1988
Page 2

including the "subject matter of [the Subcommittee's] inquiry and the pertinency to that inquiry," Calvani Letter at 2, of the documents sought, and questioning the Subcommittee's "inquiring into whether Federal criminal statutes were violated," id. at 3. With far less discussion, almost as an afterthought, the letter raises a privilege like "executive privilege," Calvani Letter at 1, and relies on the Nixon claim of executive privilege as precedent, Nixon v. Sirica, 487 F.2d 700 (D.C. Cir. 1973).

Both of the arguments in the Calvani Letter are without merit. Congress in general, and this Subcommittee in particular, have clear authority to pursue these inquiries; the Subcommittee may follow the trail wherever it leads, including into a Commissioner's office and into whether crimes occurred.  The claim of executive privilege here simply fails to meet even a minimal standard for such a claim.

1.      The Subcommittee has Clear Authority to Pursue These Inquiries Wherever The Trail Leads.

The Calvani Letter asks for the Subcommittee to explain the "legal basis" for its investigation, the "precise subject matter under inquiry" and the "connective reasoning" between that inquiry and "the documents sought." Calvani Letter at 2.

This Subcommittee has more than amply established the firm basis for its investigation.  Congress' oversight constitutes a necessary duty and responsibility, inherent in Article I, and

53

The Honorable John D. Dingell
February 1, 1988
Page 3

long recognized by the Supreme Court.  See e.g., Watkins v.
United States, 354 U.S. 178, 187 (1957) ("The power of Congress .
. . encompasses inquiries concerning the administration of
existing laws"); Barenblatt v. United States, 360 U.S. 109, 111
(1959).  Specifically, this Committee, and its Subcommittee on
Oversight and Investigations, have oversight jurisdiction over
"Consumer affairs and consumer protection," Rule X, cl. 1(h)(14),
which encompasses questions about whether to continue an airline
industry exemption from the FTC Act's requirements for consumer
protection.

From the outset, the Subcommittee has made clear, in its
communications to the FTC, the subject matter of its inquiry:
"the Subcommittee takes particular interest in [the FTC
Chairman's] recent letter to the National Association of
Attorneys General and press release relating to proposed State
guidelines for the airline industry."  Letter from John D.
Dingell to Daniel Oliver, October 5, 1987.  Such a statement by
the Subcommittee Chairman amply satisfies the requirements for a
statement of the subject matter of the inquiry, for it
"sufficiently apprised [the witness] of 'the topic under
inquiry.'"  Barenblatt v. United States, 360 U.S. 109, 124
(1959).1/

---

1/  In Barenblatt, the Supreme Court upheld as a sufficient
explanation of the subject matter of an inquiry that it was "in
(footnote continued)

54

The Honorable John D. Dingell
February 1, 1988
Page 4

More recently, the Subcommittee elaborated the connective
reasoning between that subject matter and the documents being
sought. "The Subcommittee's letter of October 5, 1987, sought to
elicit documents necessary to examine fully the facts surrounding
the development of the Commission's letter to NAAG, including the
extent of any FTC study of airline practices." Letter from John
D. Dingell to Terry Calvani, December 18, 1987, at 2. As the
Subcommittee explained, apparent inconsistencies between the
aforementioned press release and letter raise questions about
whether "the FTC had conducted an investigation [of airline
practices] and come to the conclusion as stated in the press
release. . . . . [which] could have have significant bearing on
Congressional consideration of whether to give the FTC
responsibilities in this area." Id. at 2. That amply
articulates the connection between the documents sought and the
subject of the inquiry.

Commissioner Calvani also states that he is "concerned by
your suggestion that the Subcommittee might be inquiring into
whether Federal criminal statutes were violated." Calvani Letter
at 3. Such concerns are specious. Congressional investigations

---

the main communism in education and the experiences and
background in the party by Francis X. T. Crowley." 360 U.S. at
124. That statement of the subject matter, although upheld by
the Supreme Court, was far less concrete and narrow than the
statement of the subject matter here -- a specific press release
and letter.

55

The Honorable John D. Dingell
February 1, 1988
Page 5

have long probed areas where criminal laws may have been
violated, as reflected in a number of the most historic
Congressional investigations.  See, e.g., United States v.
Mitchell, 397 F. Supp. 166, 179-80 (D.D.C. 1974)(Watergate
Investigation), aff'd sub nom, United States v. Haldeman, 559
F.2d 31 (D.C. Cir. 1976), cert. denied, 431 U.S. 933 (1977);
Hutcheson v. United States, 369 U.S. 599 (1962)(McClellan Labor
Racketeering Investigation); Sinclair v. United States, 279 U.S.
263, 295 (1929)(Teapot Dome Investigation).

   Any witness would quickly learn that this particular
Subcommittee has its own firm record regarding its investigative
authority.  A mere three years ago, this Circuit upheld a
conviction for perjury before this same Subcommittee.  United
States v. Lavelle, 751 F.2d 1266 (D.C. Cir. 1985)(perjury by EPA
official); see id. at 1271 & n.4 (describing conviction on the
count of perjury before another Subcommittee, including that
count's requirement of the defendant "having taken an oath before
a competent tribunal").  See 129 Cong. Rec. H3053 (daily ed. May
18, 1983)(describing Subcommittee's authority and legislative
purpose at that time).  Only this past year, the District Court
tried and convicted another perjurer before this same
Subcommittee, United States v. Michael K. Deaver, Crim. No. 87-
97, rejecting the defendant's challenge to the Subcommittee's
jurisdiction.2/   In short, twice in the past three years, the

**56**

The Honorable John D. Dingell
February 1, 1988
Page 6

courts have meted out justice to those who may have thought they could find refuge from full and frank disclosure in claiming doubts about the Subcommittee's investigative power.

2.    Vague Claims of Executive Privilege for Information
      Have Been Consistently Rejected.

Almost as an afterthought, aside from raising questions about the authority of the Subcommittee, the Calvani Letter adds a brief assertion that the Commissioner's communications with his attorney-adviser fall under a "policy of confidential treatment" that is "consistent" with "executive privilege." Calvani Letter at 1. These arguments amount to a vague claim of executive privilege of a kind which has been consistently rejected. Most recently, in the matter of EPA and Anne Gorsuch, the President himself claimed privilege for EPA enforcement-related documents. The Congress rejected the claim of privilege, voting out a contempt citation for Anne Gorsuch.

The Executive claim in that matter soon crumbled. First, this office described in detail the lack of legal authority for such withholding. See Memorandum from General Counsel to the Clerk, Re: Attorney General's Letter Concerning Subpoena for Documents to Administrator of Environmental Protection Agency,

──────────────────────────────

2/  The challenge was put forth in a motion to dismiss counts one and two of the indictment for lack of materiality, filed December 4, 1987.

57

The Honorable John D. Dingell
February 1, 1988
Page 7

December 8, 1982, printed in <u>Contempt of Congress</u>:  H.R. Rep. No.
968, 97th Cong., 2d Sess. 58-64 (1982).  The House then adopted a
contempt resolution for the EPA Administrator, Anne Gorsuch, for
having withheld the documents sought by the House
investigation.  When the Executive attempted to block the
contempt by a lawsuit, the courts rejected the effort.  <u>United</u>
<u>States v. House of Representatives</u>, 556 F. Supp. 150 (D.D.C.
1983).  The Executive was unable to sustain its claim, and it
provided the demanded documents.  A subsequent investigation has
revealed the nature of the underlying cover-up that lay behind
that blanket claim of privilege.  <u>Report on Investigation of the</u>
<u>Role of the Department of Justice in the Withholding of</u>
<u>Environmental Protection Agency Documents From Congress in 1982-</u>
<u>83</u>:  H.R. Rep. No. 435, 99th Cong., 1st Sess. (1985)(Volumes I -
IV).

     Considering that the executive privilege claim was rejected
in that instance even when the President himself made it, it has
almost no weight whatsoever when made by a mere FTC Commissioner
in these circumstances.  The fact is that if agencies could cover
up an embarrassing matter merely by saying that withholding
served "the strong public policy interest in maintaining the
confidentiality of communications," Calvani Letter at 1, they
could frustrate virtually all Congressional oversight.  The
recent Iran-Contra investigation provided a plain example of

58

The Honorable John D. Dingell
February 1, 1988
Page 8

oversight probing even the private communications of Cabinet
Members and top White House assistants with the President.  In
any dispute over the matter, the courts presume, as the Executive
must, "that the committees of Congress will exercise their powers
responsibly and with due regard for the rights of affected
parties."  FTC v. Owens-Corning Fiberglass Corp., 626 F.2d 966,
970 (D.C. Cir. 1980).


## CONCLUSION

No valid justification for withholding documents has been
presented by Commissioner Calvani's letter.  The Commissioner
states, "I feel I must be assured that the statutory
prerequisites have been met" for him to produce documents.  Those
prerequisites clearly have been met, and the documents should be
produced.


CTL:kjb



**Congressional Research Service**
**The Library of Congress**

Washington, D.C.  20540

February 3, 1988

TO        :  Subcommittee on Oversight and Investigations, House Energy and
             Commerce Committee
             Attention:  Patrick Mc Lain

FROM      :  American Law Division

SUBJECT :  Validity of Committee Request for Documents Reflecting
           Communications Between a FTC Commissioner and a Staff Attorney-
           Advisor


On October 5, 1987, the Subcommittee requested information and documents
concerning the Federal Trade Commission's letter of October 2, 1987 to the
National Association of Attorneys General (NAAG) relating to proposed state
enforcement guidelines for the air travel industry and a Commission press
release on that matter issued on that same date.  The request included, but was
not limited to, drafts of the Commission's letter and press release.  The
Subcommittee noted the pendency of a vote on the floor of the House on H.R.
2897, the Federal Trade Commission Act Amendments of 1987 (Title II of which
dealt with the revocation of an exemption to the FTC Act enjoyed by the airline
industry) and cited its jurisdictional authority for the request under Rules X
and XI of the Rules of the House of Representatives.

On October 19, Chairman Oliver responded by releasing a number of
documents concerning the agency's development of its position with respect to
the NAAG proposal but withholding documents "that reflect confidential
communications between commissioners and their personal advisors" on the
ground that the release of such documents "would have a chilling effect on the
advisors willingness to provide uninhibited advice" and thereby disrupt the

agency's deliberative process.

An accommodation was ultimately reached with all commissioners except one. On January 8, 1988, Commissioner Terry Calvani, by letter to Chairman Dingell, refused to release the requested documents, which he identified as consisting "of two pages of handwritten notes, prepared by my attorney-advisor to assist in briefing me on the matter, plus copies of a draft of the NAAG Guidelines and of three successive drafts of the Commission's letter to NAAG, each containing my attorney-advisor's handwritten annotations generated in connection with our discussions about what positions the Commission should take and how they should be expressed." As justification for the withholding Commissioner Calvani reiterated the agency's previously stated policy of maintaining the confidentiality of communications within the offices of individual commissioners, analogizing that policy to the recognized justifications underlying refusals to provide evidence or discovery pursuant to a claim of executive privilege for communications between the President and his close aides; Speech and Debate Clause immunity for a Member of Congress and his aides; the immunity afforded communications between judges and between judges and their law clerks; and deliberative process protection afforded by exemption 5 of the Freedom of Information Act (FOIA). Commissioner Calvani also appears to claim that the Subcommittee has not established a legal basis for its request. It is his position that the Subcommittee has the burden of first demonstrating that "'Specific legislative decisions...cannot responsibly be made without access to materials uniquely contained' in the requested documents" before he is obliged to release them. This burden can only be met, he argues, by "a clear and precise explication of the subject of the Subcommittee's inquiry", and by a demonstration as to "how the documents are

pertinent to that .nquiry." Further, that demonstration must be made "with the degree of explicitness and clarity required by the Due Process Clause." The Commissioner asserts that if newspaper accounts are a source of its inquiry, "such extrinsic statements...can[not] buttress the Subcommittee's legal obligation to establish the source of its authority." Finally, Commissioner Calvani argues that where a congressional inquiry may involve violations of federal criminal laws, a committee's burden of justification is at its highest.

You have inquired whether, under the present circumstances, Commissioner Calvani's refusal to release the identified documents has a substantial basis in law.  We conclude that the Commissioner's stated reasons for nondisclosure in his January 8, 1988 letter appears to misapprehend the nature and scope of the congressional oversight prerogatives applicable in this situation.

As a general proposition it may be stated that if information within the broad subject matter of its authorized purview is sought by your Subcommittee, and it is in aid of a legitimate function and is pertinent to the area of concern, the Subcommittee's authority and power to obtain such information and to subsequently disseminate it is extremely broad.  Thus, in the absence of a countervailing constitutional privilege or a self-imposed statutory restriction upon its authority, the Congress (and its committees) has plenary power to compel information needed to discharge its legislative function from executive agencies, private persons, and organizations, and, within certain constraints, the information so obtained may be made public.  The fact that an agency has determined for its own internal purposes that a particular item should not generally be disclosed does not prevent either House of Congress, or its committees and subcommittees, from obtaining and publishing information that it

considers essential for the proper performance of its functions.

More particularly, although there is no express provision of the
Constitution which specifically authorizes the Congress to conduct
investigations and take testimony for the purpose of performing its legitimate
functions, the practice of the British Parliament and numerous decisions of the
Supreme Court of the United States have firmly established that the
investigatory power of Congress is so essential to the legislative function as
to be implied from the general vesting of legislative power in Congress.
McGrain v. Daugherty, 273 U.S. 135 (1927); Watkins v. United States, 354 U.S.
178 (1957); Barenblatt v. United States, 360 U.S. 109 (1959); Eastland v.
United States Servicemen's Fund, 421 U.S. 491 (1975); Nixon v. Administrator of
General Services, 433 U.S. 425 (1977); see also, United States v. A.T.T., 551
F.2d 384 (D.C. Cir. 1976) and 567 F.2d 1212 (D.C. Cir. 1977).  Chief Justice
Warren speaking for the Court in Watkins described the power as follows:

> We start with several basic premises on which there is general
> agreement.  The power of the Congress to conduct investigations is
> inherent in the legislative process.  That power is broad.  It
> encompasses inquiries concerning the administration of existing laws
> as well as proposed or possible needed statutes.  It includes surveys
> of defects in our social, economic, or political system for the
> purpose of enabling the Congress to remedy them.  It comprehends
> probes into departments of the Federal Government to expose
> corruption, inefficiency or waste.  But broad as is this power of
> inquiry, it is not unlimited.  There is no general authority to
> expose the private affairs of individuals without justification in
> terms of the functions of the Congress...Nor is the Congress a law
> enforcement or trial agency.  These are functions of the executive
> and judicial departments of government.  No inquiry is an end in
> itself; it must be related to, and in furtherance of, a legitimate
> task of the Congress.  354 U.S. at 187.

Legitimate legislative tasks encompassing the power have been defined as
activities that are "an integral part of the deliberative and communicative
processes by which Members participate in committee and House proceedings with
respect to the consideration and passage or rejection of proposed legislation

63

or with respect to other matters which the Constitution places within the jurisdiction of either House." <u>Gravel v. United States</u>, 408 U.S. 606, 625 (1973).

In the <u>Eastland</u> case the Court reiterated its view that the power of effective congressional inquiry is an integral part of the legislative process:

> The power to investigate and to do so through compulsory process plainly falls within...[the <u>Gravel</u> definition of legitimate legislative tasks]. This Court has often noted that the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.' <u>McGrain v. Daugherty</u>, 273 U.S. 125 175 (1927)...Issuance of subpoenas such as the one in question here has long been held to be a legitimate use by Congress of its power to investigate...

> "[W]here the legislative body does not itself possess the requisite information - which not infrequently is true - recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete, as some means of compulsion are essential to obtain what is needed." <u>McGrain v. Daugherty</u>, <u>supra</u>, 273 U.S. at 175.

> It has also been held that the subpoena power may be exercised by a committee acting, as here, on behalf of one House...Without such power the Subcommittee may not be able to do the task assigned to it by Congress. (<u>Eastland v. U.S. Servicemen's Fund</u>, 421 U.S. at 504-505.)

In applying these broad principles of investigatory authority to congressional requests for confidential agency documents the courts have explicitly held that agencies may not deny Congress access to such documents, even in situations where the inquiry may result in the exposure of criminal corruption or maladministration of agency officials. As the Supreme Court has noted, "But surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding...or when crime or wrongdoing is exposed." <u>Hutcheson v. United</u>

64

_States_, 369 U.S. 599, 617 (1962).  Nor does the actual pendency of litigation
disable Congress from investigating facts which have a bearing on that
litigation, where the information sought is needed to determine what, if any,
legislation should be enacted to prevent further ills.  _Sinclair v. United
States_, 279 U.S. 263, 294 (1929).

The standard to be applied in determining whether the congressional
investigatory power has been properly asserted was art. ulated in _Wilkinson v.
United States_, 365 U.S. 399, 408-09 (1961):  (1) the committee's investigation
of the broad subject matter area must be authorized by Congress; (2) the
investigation must be pursuant to "a valid legislative purpose"; and (3) the
specific inquires must be pertinent to the broad subject matter areas which
have been authorized by the Congress.

With respect to subject matter authorization, there can be little doubt
Rule X of th    les of the House of Representatives (100th Cong.) and its
practice thereunder, gives the House Committee on Energy and Commerce
jurisdiction over the subject matter of the instant inquiry.  That Rule
provides the Committee with jurisdiction over, _inter alia_, "interstate and
foreign commerce generally" and "consumer affairs and consumer protection".
House Rule X, sec. (h)(1) and (14).  The Committee has extensive oversight
responsibilities including the duty to review and study on a continuing basis
the "application, administration, execution, and effectiveness" of existing
legislation and "any conditions or circumstances which may indicate the
necessity or desirability of enacting new or additional legislation" within the
jurisdiction of the Committee.  House Rule X, sec. 2 (b); see also 2 U.S.C.
190 d (1982).  Pursuant to its legislative authorization, the Committee
originally reported the airline industry exemption to section 5 of the FTC Act

65

and, more recently, the proposal to repeal that exemption.  See Title II of
H.R. 2897, 100th Cong., 1st Sess. (1987).  Thus, the Committee's legislative
and oversight jurisdiction are apparent on its face.  See, generally, Ashland
Oil, Inc. v. FTC, 409 F. Supp. 297 (D.D.C. 1976), aff'd 548 F.2d 966 (D.C. Cir.
1976), detailing the broad jurisdiction and authority of the Committee under
House Rules X and XI.

As to the requirement of a "valid legislative purpose," the Supreme Court
has made it clear, contrary to Commissioner Calvani's assertion, that Congress
does not have to state explicitly what it intends to do as a result of an
investigation.  In In re Chapman, 166 U.S. 661 (1897), the Court upheld the
validity of a resolution authorizing an inquiry into charges of corruption
against certain Senators despite the fact that it was silent as to what might
be done when the investigation was completed.  The Court stated:

> The questions were undoubtedly pertinent to the subject matter
> of the inquiry.  The resolutions directed the committee to inquire
> "whether any Senator has been, or is, speculating in what are known
> as sugar stocks during the consideration of the tariff bill now
> before the Senate.  What the Senate might or might not do upon the
> facts when ascertained, we cannot say, nor are we called upon to
> inquire whether such ventures might be defensible, as contended in
> argument, but it is plain that negative answers would have cleared
> that body of what the Senate regarded as offensive imputations, while
> affirmative answers might have led to further action on the part of
> the Senate within its constitutional powers.
> Nor will it do to hold that the Senate had no jurisdiction to
> pursue the particular inquiry because the preamble and resolutions
> did not specify that the proceedings were taken for the purpose of
> censure or expulsion, if certain facts were disclosed by the
> investigation.  The matter was within the range of the constitutional
> powers of the Senate.  The resolutions adequately indicated that the
> transactions referred to were deemed by the Senate reprehensible and
> deserving of condemnation and punishment.  The right to expel extends
> to all cases where the offence is such as in the judgment of the
> Senate is inconsistent with the trust and duty of a member.
>                    . . . . .
>
> We cannot assume on this record that the action of the Senate
> was without a legitimate object, and so encroach upon the province of
> that body.  Indeed, we think it affirmatively appears that the Senate

was acting within its right, and it was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded.  (166 U.S. at 669).

In McGrain v. Daugherty, 273 U.S. 135 (1927), the original resolution that authorized the Senate investigation made no mention of a legislative purpose. A subsequent resolution for the attachment of a contumacious witness declared that his testimony was sought for the purpose of obtaining "information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper."  The Court found that the investigation was ordered for a legitimate object.  It wrote:

> The only legitimate object the Senate could have in ordering the investigation was to aid it in legislating; and we think the subject-matter was such that the presumption should be indulged that this was the real object.  An express avowal of the object would have been better; but in view of the particular subject-matter was not indispensable....
>
> The second resolution--the one directing the witness be attached--declares that his testimony is sought with the purpose of obtaining "information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper."  This avowal of contemplated legislation is in accord with what we think is the right interpretation of the earlier resolution directing the investigation.  The suggested possibility of "other action" if deemed "necessary or proper" is of course open to criticism in that there is no other action in the matter which would be within the power of the Senate.  But we do not assent to the view that this indefinite and untenable suggestion invalidates the entire proceeding.  The right view in our opinion is that it takes nothing from the lawful object avowed in the same resolution and rightly inferable from the earlier one.  It is not as if an inadmissible or unlawful object were affirmatively and definitely avowed.

Moreover, when the purpose asserted is supported by reference to specific problems which in the past have been, or in the future may be, the subject of appropriate legislation, it has been held that a court cannot say that a committee of the Congress exceeds its power when it seeks information in such areas.  Shelton v. United States, 404 F.2d 1292, 1297 (D.C. Cir. 1968), cert.

67

denied, 393 U.S. 1024 (1919).  In the past, the types of legislative activity
which have justified the exercise of the power to investigate have included:
the primary functions of legislating and appropriating, Barenblatt v. United
States, 360 U.S. 109 (1959); the function of deciding whether or not
legislation is appropriate, Quinn v. United States, 349 U.S. 155, 161 (1955);
oversight of the administration of the laws by the executive branch, McGrain v.
Daugherty, supra, 279 U.S. at 295; and the essential congressional function of
informing itself in matters of national concern, United States v. Rumely, 345
U.S. 41, 43, 45 (1953); Watkins v. United States, supra, 354 U.S. at 200 n. 3.

Finally, in determining general questions of the pertinency of inquiries
to the subject matter under investigation, the courts have required only that
the specific inquiries be reasonably related to the subject matter area under
investigation.  Sinclair v. United States, supra, 279 U.S. at 299; Ashland Oil,
Inc. v. FTC, 409 F. Supp. at 305.  Commissioner Calvani's argument that
pertinence must be shown "with the degree of explicitness and clarity required
by the Due Process Clause" confuses the standard applicable in those rare cases
when the constitutional rights of individuals are implicated by congressional
investigations with the far more common situation, apparently obtaining here,
of the exercise of legislative oversight over the administration of the law
which does not involve an individual constitutional right or prerogative.  It,
is of course, well established that the courts will intervene to protect
constitutional rights from infringement by Congress, including its Committees
and members.  See, e.g., Yellin v. United States, 374 U.S. 109, 143, 144

68

(1963); <u>Watkins v. United States</u>, <u>supra</u>; <u>United States v. Ballin</u>, 144 U.S. 1, 5 (1892).  But "[w]here constitutional rights are not violated, there is no warrant to interfere with the internal procedures of Congress."  <u>Exxon Corporation v. FTC</u>, 589 F.2d 582, 590 (D.C. Cir. 1978).

There appears to be no recognized or applicable constitutional right or privilege implicated by the Subcommittee's request.  Commission members cannot claim the executive privilege recognized in <u>United States v. Nixon</u>, 418 U.S. 683 (1974), which is assertable only by the President himself.  <u>See</u>, Ehlke, Congressional Access to Information From The Executive:  A Legal Analysis (CRS, Rept. No. 86-50A, March 10, 1986) at p. 36 note 77.  Nor is the constitutionally based Speech and Debate privilege, which protects legislator-aide communications, a proper analogy to the statutorily created commissioners and their advisors.  Whatever protection their confidential communications may have must be statutorily based and must explicitly contain a congressional self-limitation.  See, <u>e.g.</u>, <u>FTC v. Owens-Corning Fiberglass Corp.</u>, 626 F.2d 966, 970 (D.C. Cir. 1980); <u>Exxon v. FTC</u>, 589 F.2d 582, 585-86 (D.C. Cir. 1978), <u>cert. denied</u>, 441 U.S. 943 (1979); <u>Ashland Oil, Inc. v. FTC</u>, 548 F.2d 977, 979 (D.C. Cir. 1976).

For similar reasons, Commissioner Calvani's analogy to the exemption 5 of the FOIA, protecting documents reflecting an agency's pre-decisional deliberative process from public disclosure, is also inapt.  The FOIA provides at 5 U.S.C.A. 552(d) (1987 Suppl.) (formerly subsection (c)) that the Act "is not authority to withhold information from Congress."  The House Report on the FOIA explains that this provision "restates the fact that a law controlling

69

public access to information has absolutely no effect on congressional access
to information.  Members of Congress have all the rights of access guaranteed
to 'any person' by [the FOIA], and the Congress has additional rights of access
to all Government information which it deems necessary to carry out its
functions."  H. Rept. No. 1497, 89th Cong. 2d Sess. 11-12 (1960), U.S. Code and
Cong. and Admin. News 1966, p. 2429.  The Senate Report indicates that the
provision refers "only to the public's right to know" and cannot "be
backhandedly construed as authorizing the withholding of information from the
Congress, the collective representative of the public."  S. Rep. 813, 89th
Cong., 1st Sess. 10 (1965).  This understanding of the FOIA has been uniformly
adapted by the courts, see, e.g., Ashland Oil, Inc. v. FTC, supra, and by the
Department of Justice.  See U.S. Department of Justice, Office of Information
and Privacy, 5 FOIA Update No. 1 at 3-4 (Winter 1984).  This would, therefore,
appear to be the clearest evidence of Congress'refusal to abdicate its
prerogative to know about all aspects of agency operations.

Further, the Commissioner's repeated reference to the fact that the aide
with whom he communicated is an attorney adds no weight to his claim of
confidentiality.  The attorney-client privilege in the legislative context
rests on no judicially recognized constitutional underpinnings and historical
congressional practice has established that the acceptance of a claim of
attorney-client privilege rests in the discretion of a congressional committee
regardless of whether a court would uphold the claim in the context of an
adversary proceeding.  See "Proceedings Against Ralph Bernstein and Joseph
Bernstein", H.R. Report No. 99-462, 99th Cong. 2d Sess. (1986) at 13 and notes

12-14; 132 Cong. Rec. 666-670 (daily ed. February 27, 1986); House Subcomm. on Oversight and Investigations, Comm. on Energy and Commerce, "Attorney-Client Privilege, Memorandum Opinions of the American Law Division, Library of Congress, 22-24 (Comm. Print 1983). The rare instances of the exercise of the discretion to entertain claims of privilege have been consistent in their rejection of the applicability of the privilege. No court has ever questioned the assertion of the prerogative, and both Houses of Congress have rejected opportunities to impose the attorney-client privilege as binding rules for committee investigations. Id. See also Senate Report No. 2, 84 Cong., 1st Sess. 27-28 (1954). Contemporary congressional practice has, in fact, evolved a delicate balancing test to ensure its fair application. Thus the exercise of committee discretion has been held to turn on a "weighing [of] the legislative need against any possible injury" to one asserting the privilege and the application of this test has involved painstaking examinations of potential detriment and relevant judicial precedents. Id.

Finally, with respect to the Commissioner's claim that disclosure of his confidential communications will implicate his "First Amendment interests", it may be noted that an analogous claim was rejected by the Supreme Court in Nixon v. Administrator, General Services Administration, 433 U.S. 425, 465-468 (1977), where the Court found no merit in the argument that "the statutory scheme for custody and archival screening of the [presidential] materials necessarily inhibits [the] freedom of political activity [for future Presidents] and thereby reduces the 'quantum and diversity' of the political speech and association the Nation will be receiving from its leaders'" The Court concluded that "the First Amendment claim is clearly outweighed by the important governmental interests promoted by the Act." 433 U.S. at 467-68.

**71**

In sum, then, it appears that under the present circumstances that your Subcommittee's oversight mandate, which includes the matters now the subject investigation and possible legislative action, entitles it to exercise plenary information gathering authority unless some other self-limiting statutory restriction or constitutional privilege not cited or raised in the Commissioner's January 8, 1988 letter limits that power.

Morton Rosenberg
Legislative Attorney
American Law Division