<div align="center">

コロンビア州特別区
合衆国連邦地方裁判所

</div>

連邦取引委員会

<div align="center">原告</div>

<div align="center">対</div>

META PLATFORMS, INC.

<div align="center">被告</div>

訴訟番号：1:20-cv-03590-JEB

<div align="center">

証拠開示命令および嘱託書の
発行を求める被告の通知

</div>

　被告 Meta Platforms, Inc.（「Meta」）は、本裁判所に対し、(1)添付の証拠開示命令に捺印および署名し、民事または商事に関する裁判上および裁判外文書の外国への送達に関するハーグ条約（「ハーグ送達条約」）により日本に所在する非当事者に伝送する、添付の証拠開示命令を発すること、および(2)日本の適切な司法当局に支援を乞う添付の嘱託書をその署名と捺印により発行すること、を謹んで要請する。証拠開示命令および嘱託書は、以下の 2 つの海外事業体から文書および/または証言を求める。

　　　LINE 株式会社
　　　日本国 160-0004
　　　東京都新宿区四谷一丁目 6 番 1 号 四谷タワー23 階

　　　楽天グループ株式会社
　　　日本国 158-0094
　　　世田谷区玉川一丁目 14 番 1 号楽天クリムゾンハウス

　添付の覚書に詳述されている理由により、Meta は、この申立てを認めることを裁判所に謹んで要請する。

<div align="center">1</div>

　　ワシントン特別区地域の現地規則 7(m)に従い、Meta は本書により、この申立てについて米国連邦取引委員会(「FTC」)と協議したこと、FTC は申立てに反対しないが、米国国務省および米国外国訴訟司法局から通知された FTC は、ハーグ送達条約を通じて証拠要請の送達を行うことは日本の非当事者からの証拠要請の不適切な方法であるという考えを表明する。 代わりに、FTC は、嘱託書プロセスを使用するべきであると信じており、また LINE 株式会社への嘱託書の送達を行うため、裁判所に支援を求めるつもりであると述べた。

　日付： <u>2022 年 8 月 17 日</u>　　　　　　　ここに謹んで提出する。

　　　　　　　　　　　　　　　　　　　署名： <u>*/署名/* Mark C. Hansen</u>
　　　　　　　　　　　　　　　　　　　　　　 Mark C. Hansen(ワシントン特別区弁護士番号425930)
　　　　　　　　　　　　　　　　　　　　　　 KELLOGG, HANSEN, TODD,
　　　　　　　　　　　　　　　　　　　　　　 FIGEL & FREDERICK, P.L.L.C.
　　　　　　　　　　　　　　　　　　　　　　 1615 M Street, N.W., Suite 400
　　　　　　　　　　　　　　　　　　　　　　 Washington, D.C. 20036
　　　　　　　　　　　　　　　　　　　　　　 Tel: +1(202) 326-7900
　　　　　　　　　　　　　　　　　　　　　　 mhansen@kelloghansen.com

　　　　　　　　　　　　　　　　　　　　　　 *被告 Meta Platforms, Inc.の弁護士*

コロンビア州特別区
合衆国連邦地方裁判所

連邦取引委員会

　　　　　　原告

　　　　　対

META PLATFORMS, INC.

　　　　　　被告

訴訟番号：1:20-cv-03590-JEB

## 証拠開示命令および嘱託書
### の発行を求める被告の申立てを裏付ける覚書

被告 Meta Platforms, Inc.（Meta）は、楽天グループ株式会社（「楽天」）と LINE 株式会社（「LINE」）による証拠開示のための証拠開示命令と嘱託書の発行についての被告の申立ての根拠となる覚書を謹んで提出する。

### はじめに

Meta はこの申立てを、米国外に本社を置く日本国内の 2 つの非当事者である楽天と LINE から証拠開示を受けるために提起する。Meta は、これらの非当事者である両社が、市場の定義、市場支配力、および異議を申し立てられている Meta の行為の影響に関連する問題など、本訴訟における Meta の防御に不可欠な情報を所有または管理していると考える。Meta は楽天および LINE の米国内子会社にサービスを提供してきたが、米国内子会社が保管または管理する対応文書は限られていると Meta が考える理由があり、Meta は、米国内子会社の所有または管理下にない情報に限り、楽天および LINE に情報を求める。

　Meta は、楽天と LINE の文書および証言が、他の多くの事業体と共に、Meta と競合していること、および米国連邦取引委員会（「FTC」）の修正訴状における主張に反し、「パーソナルソーシャルネットワーキングサービス」の製品市場に対する「業界または一般の認識」が存在しないことを証明することを期待している。*Brown Shoe Co.v United States*、370 U.S. 294, 325 (1962)を参照。また Meta は、文書および証言により、Meta による Instagram および WhatsApp の買収に反競争的な影響がないことが証明されることを期待している。

　したがって、Meta はこの 2 つの事業体から限定的な文書および証言を得るための本申立てを認めることを裁判所に謹んで要請する。各文書および証言は、第 I 条*以下に*詳述されている。具体的には Meta は、裁判所に対し、各事業体について(1)発行後、Meta が民事又は商事に関する裁判上及び裁判外の文書の外国における送達に関するハーグ条約（「ハーグ送達条約」）により日本の事業体に伝送する、証拠書類および証言の収集に関する証拠開示命令（証拠物件[A]および[B]）を発行すること、および(2)嘱託書と米国国務省からの要請書内に記載され、嘱託書を受け取り、執行後返送する日本の裁判所宛に送信される証言の収集についての嘱託書（証拠書類[C]および[D]）を米国国務省に提出することを、謹んで要請する。

　証言の収集に関しては、Meta は、証拠開示命令と嘱託状の両方の発行を求める。なぜなら、それぞれが外国の証拠開示のために日本において証言録取をする代替方法であるためである。楽天または LINE がいずれかの方法を遵守する場合、Meta は、その非当事者に関しもう一方の代替方法を取り消す。また Meta は、LINE からの文書および証言に関する嘱託書の発行について FTC から近々行われると予想される申立てに参加する予定であることを裁判所に通知する。

主張

**I.      裁判所は、要求された証拠開示命令および嘱託書を発行する権限を有する。**

　議会は本裁判所に対し、米国で係属中の訴訟で使用するために、日本に所在する非当事者から文書および証言の提示を求める証拠開示命令および嘱託状を発行する権限を与えた。*参照：*合衆国法典第 28 編第 1781 条(a)(2)、(b)(2)（米国国務省に対し、「米国内の裁判所により発行された嘱託書または作成された要請書を受け取り、それらを同書の宛先となっている外国または国際的な裁判所、役人または機関に送付する」権限を付与し、また、「嘱託書または要請書の米国内の裁判所からそれらの文書の宛先となっている外国のまたは国際的な裁判所、役人、または機関への直接送付、および同様の方法による返送を」を許可する）、合衆国法典第 28 編第 1651 条（「議会制定法により設立されたすべての裁判所は、それぞれの法域を補助し、法律の使用および原則に合致する、必要または適切なすべての令状を発行することができる」）、日本司法共助情報 [2]：*任意証人の宣誓供述書の作成*（「さまざまな行政機関は日本で証言録取するために米国全令状法、合衆国法典第 28 編第 1651 条に基づき、米国裁判所から裁判所命令を取得することができる。」）本裁判所は、全令状法に基づき、日本と米国が調印している、ハーグ送達条約を介して送信される証拠開示命令を発行する権限を有する。[1]

**II.      Meta の要請は関連性があり重要証拠につながる可能性がある。**

---

[1] *国際私法に関するハーグ会議、1965 年 11 月 15 日付の民事または商事問題における裁判上および裁判外文書の外国への送達に関するステータス表*、https://www.hcch.net/en/instruments/conventions/status-table/?cid=17（最終閲覧日：2022 年 8 月 12 日）*を参照*。

外国に所在する情報の提出について嘱託状または命令を発行するか否かを決定する際、米国裁判所は連邦民事訴訟規則第 26 条に含まれる証拠開示の原則を適用する。*参照：Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012); 対外関係法（第三）リステイトメント § 442 (2022)。連邦民事訴訟規則第 26 条（b）（1）は、当事者に対し、証拠能力のない資料を含め、「当事者の請求または抗弁に関連し、訴訟の必要性に見合った秘匿特権のない事項に関する証拠開示を入手する」ことを許可する。嘱託状または外国の証拠開示命令の発行の申立てを認める基準は非常に低いため、「裁判所は、嘱託状により要求された司法共助を当事者に拒否する正当な理由を規定しなければならない」。*Dist. Title v. Warren*, 2016 WL 10749155, at *4 (D.D.C. Dec. 23, 2016)（内部引用符略）。

以下に記載するとおり、Meta が楽天と LINE に求めるすべての情報は、Meta の防御に関連するためこの閾値をクリアする。特に Meta が直面する競争、小さな新興企業が圧倒的成功を達成できることで証明される参入障壁の低さ、関連する製品と地理的市場の概要、市場規模と市場シェアに関するデータ、Meta による WhatsApp と Instagram の買収による反競争的効果の不在に関連するためである。

## A.　LINE 株式会社（LINE）

LINE 株式会社は、日本の東京に本社を置く多国籍インターネットテクノロジー企業で、モバイルアプリ LINE を運営している。2011 年に発売された LINE は、メッセージ機能を持つ世界で最も人気のあるアプリの 1 つで、2020 年末時点で 1 億 6,500 万人の月間アクティブユーザー数を誇る。[2]

---

[2] NAVER COR.、*2020 年 NAVER 年次報告書(*22)、
https://www.navercorp.com/navercorp_/ir/annualReport/2022/2020AR_NAVER_ENG_220203.pdf。

Metaは、LINEがMetaと競合し、少なくとも2012年以降、Metaに対する競争上の制約となっていることを示すLINEからの証拠開示を求める。Metaは、証拠開示命令の発行を通じて、LINEがLINEとMeta間の競争をどのように見ているか(文書要請1、証言録取主題1および2)、LINEのサービスがFTCのパーソナルソーシャルネットワーキングサービスの定義を満たしているか(文書要請2)、およびLINEの市場参入の容易さ(証言録取主題3および4)に関する文書と証言を求めている。最後に、Metaは、FTCの市場シェアと市場定義の主張に関連して、LINEのユーザーの数と費やした時間という2つの限られたデータ要求を行っている(文書要請3および4)。Metaは、この情報が、Metaが認識可能な市場において独占権を有しているというFTCの主張に対抗するために重要であると考えている。Metaは、これらの要求を、FTCが一般的に使用されるユーザー指標であると主張する、平均消費時間とアクティブユーザー数に関するデータに限定した。*参照:修正訴状*¶193(ECF No. 82)。文書要請番号3は、Metaのサービスが停止した特定の期間に限定されたデータを求め、Metaのサービスからのユーザーの流入に関する情報を求める。文書要請番号4において、Metaが何らかの種類の永続的な独占力を有するというFTCの主張への対応するため、Metaは2011-2014および2021年の日付のデータを求める。Metaは、嘱託状の発行を通して、LINEが競争をどのように捉えているか、およびMetaによるInstagramとWhatsAppの買収の影響について、記載された質問に対する証言を求める。

Metaは、Naver BAND, Inc.に対し、LINEの米国関連会社が保管および管理している文書について文書要求をしているが、Metaは、LINEの本社がある日本でのみ入手可能な、ユニークで重要な文書も求めている。Metaは、米国の関連会社が所有または保管していない場合にのみ、文書を求める。

## B.　　楽天（Viber）

　　楽天は、日本の東京に本社を置く多国籍インターネットテクノロジー企業で、Viberを所有している。Viberは、すべての主要なオペレーティングシステムで利用可能なエンドツーエンドの暗号化されたメッセージングおよび音声通話アプリケーションである。[3]Viberユーザーは個人またはグループチャットに参加でき、アプリのパブリックアカウントでは、企業、ブランド、ニュースサービスがサブスクライブするユーザーへ直接メッセージを送ることができる。[4]Rakutenは、MetaがWhatsAppを買収する前に、Viberを9億ドルで購入した。[5]2016年、ViberはWhatsAppが行った後にエンドツーエンドの暗号化を追加した。2020年、ある情報源によると、Viberは世界中で11億人以上の登録ユーザーを擁していた。[6]

　　Metaは、ViberのMetaとの競合状況とWhatsApp買収の影響を示すために、楽天からの証拠開示を求めている。Metaは、証拠開示命令の発行を通じて、ViberがViberとMeta間の競争をどのように見ているか（文書要請1、証言録取主題1および2）、ViberのサービスがFTCのパーソナルソーシャルネットワーキングサービスの定義を満たしているか（文書要請2）、

---

　　　[3] RAKUTEN VIBER、*Viber について*、https://www.viber.com/en/about/（最終閲覧日：2022年8月12日）。

　　　[4]*Viber が Messenger に追随、企業およびブランドのパブリックアカウントを導入*、Ingrid Lunden 著 TECHCRUNCH（2016年11月9日）https://techcrunch.com/2016/11/09/viber-follows-messenger-with-the-launch-of-public-accounts-for-businesses-and-brands/。

　　　[5]楽天による Viber 購入に続いて *Facebook が What[s]App を買収*、Patrick Frater 著 VARIETY（2014年2月20日）、https://variety.com/2014/digital/asia/facebooks-whatapp-deal-preceded-by-rakutens-viber-buy-1201113544/。

　　　[8]Ingrid Lunden、*Viber は、メッセージング アプリのプライバシーウェーブの**増大に伴い**、エンド ツー エンドの暗号化と非表示のチャットを追加*、TechCrunch（2016年4月19日）、https://techcrunch.com/2016/04/19/viber-adds-end-to-end-encryption-hidden-chats-universal-delete-as-messaging-app-privacy-grows/。

　　　[6] S. Dixon 、*2011 年 6 月〜2020 年 3 月*、*Viber の一意なユーザーID 数*、STATISTA（2022年4月28日）、https://www.statista.com/statistics/316414/viber-messenger-registered-users/。

および Viber の申し立てられている市場への参入の容易さ(証言録取主題 3 および 4)に関する文書と証言を求めている。最後に、Meta は、FTC の市場シェアと市場定義の主張に関連して、Viber のユーザーの数と費やした時間という 2 点に限定してデータ要求を行っている(文書要請 3 および 4)。Meta は、この情報が、Meta が認識可能な市場において独占権を有しているという FTC の主張に対抗するために重要であると考えている。Meta は、これらの要求を、FTC が一般的に使用されるユーザー指標であると主張する、平均消費時間とアクティブユーザー数に関するデータに限定した。*参照:修正訴状* ¶ 193。文書要請番号 3 は、Meta のサービスが停止した特定の期間に限定されたデータを求め、Meta のサービスからのユーザーの流入に関する情報を求める。文書要請番号 4 において、Meta が何らかの種類の永続的な独占力を有するという FTC の主張への対応するため、Meta は 2011〜2014 年および 2021 年のデータを求める。嘱託書の発行を通じて、Meta は、Viber が Meta との競争をどのように捉えているか、および Meta が WhatsApp を買収したことの影響について記載された質問に対する証言を求める。

　　　Meta は、Rakuten USA, Inc.に対して、Rakuten の米国子会社が保管および管理している文書について文書要請を行っているが、Meta は、楽天の本社がある日本でのみ入手できると考えられる独自の重要な文書も求めている。Meta は、米国子会社が所有または保管していない場合に限り、文書を求める。

### III.　　国際礼譲の観点からこれらの証拠開示命令および嘱託書の発行が望ましい。

　　　国際証拠開示を承認するかどうかを検討する際、裁判所は国際礼譲に関する懸念も考慮する必要がある。*参照:Jaguar Land Rover Ltd. v. DR. ING. H.C. F. Porsche AG*、2021 WL 3075698, at *1（D.D.C. 2021 年 6 月 22 日）（要求書の発行を求める申し立てにより提起された

国際礼譲問題の考察）。裁判所は一般に、国際証拠開示要請を認めるか否かを判断するために、以下の国際礼譲要因を適用する。(1)訴訟における要求された文書の重要性、(2)要請の具体性の程度、(3)情報が米国に由来するか否か、(4)情報を取得するための代替手段の利用可能性、(5)要請への非遵守が米国の重要な利益を損う程度、または要請の遵守が情報が所在する州の重要な利益を損う可能性。*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987)。

　　ここでは、以下の要因が要請状の発行を支持する。*第1*に、上記のとおり、文書および証言録取の要請は、この重要な訴訟における Meta の弁護にとって極めて重要である。*第2*に、各事業体に対する狭い要求は具体的であり、限定的な一連の証拠のみを求め、かつ本件の問題に直接関連する。嘱託書に関し Meta は、日本の裁判所に逐語的に質問するよう求める正確な質問を列挙している。*第3* および *第4* の要因は、文書が海外で作成された可能性がある場合でも、Meta は、米国で発見される可能性が低い文書のみを求めており、これは海外に由来する文書の場合は逆となり、開示が優先される。*参照:Lantheus*, 841 F. Supp. 2d at 793; *Jaguar*, 2021 WL 3075698, at *2（第 3 の要因が、要請書の発行に不利に働いても、第 4 の[要因]は（中略）第 3 の要因に「優先する」と判示（*Arcelik A.S. v. E.I. Dupont de Nemours & Co.*, 2021 WL 2010816, at *7 を引用（3d Cir. 2021））。*最後に*、「裁判所が[ハーグ]条約またはその他の国際司法共助手段に依拠して命令を発する場合、同裁判所は、当該要請の遵守が当該情報が所在する国の重大な利益を損なうかどうかという問題を、その国の裁判所もしくはその他の当局に委ねる。」対外関連法（第 3）リステイトメント§ 473 報告者による注釈 5（*Jaguar*, 2021 WL 3075698, *2 に引用）。これが真実であれば、「裁判所は第 5 の要因を評価しない。」

*Jaguar*、2021 WL 3075698、at *2。したがって国際礼譲の観点からこれらの証拠開示命令および嘱託書の発行が望ましい。

<div align="center">**結論**</div>

上記の理由により、Meta は、裁判所にこの申立てを認め、添付の証拠開示命令に署名し、添付の嘱託書を米国国務省に提出し、同書が宛先とする日本の法廷に送付するよう謹んで要請する。

日付： <u>2022 年 8 月 17 日</u>　　　　　　ここに謹んで提出する。

署名：　<u>/署名/ Mark C. Hansen</u>
Mark C. Hansen（ワシントン特別区弁護士番号425930）
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: +1（202）326-7900
mhansen@kellogghansen.com

*被告 Meta Platforms, Inc. の弁護士*

<div align="center">

コロンビア州特別区
合衆国連邦地方裁判所

</div>

連邦取引委員会

原告

対

META PLATFORMS, INC.

被告

訴訟番号：1:20-cv-03590-JEB

<div align="center">

国際司法共助の要請書（嘱託書）

</div>

　　　　コロンビア地区米国地方裁判所は、日本の外務省に対し、本裁判所における上記表題の民事訴訟において使用する証拠を得るための国際司法共助を謹んで要請する。

　　　　本裁判所は、正義の名において必要となる本書記載の司法共助を要請する。要請する支援は、日本の適切な司法当局が、以下に指名する個人の出廷を強制して証拠を提出させることである。

　　　　日本国籍者、舛田淳
　　　　取締役兼最高戦略・マーケティング責任者
　　　　LINE 株式会社
　　　　日本国 160-0004
　　　　東京都新宿区四谷一丁目 6 番 1 号 四谷タワー23 階

**I.　　事実**

　　　　本訴訟の性質は、米国政府機関である米国連邦取引委員会（FTC）が 2021 年 9 月 8 日に提出した修正訴状により提起した民事訴訟である。本件の修正訴状の写しを別紙 A として添付する。FTC は政府機関だが、本訴訟のように民事訴訟の原告として民事裁判所で訴訟

<div align="center">

**Error! Unknown document property name.**

</div>

を起こすことができる。本件は、提起した米国地方裁判所により民事訴訟として指定される。本件は行政手続ではない。

　FTCは、被告であるMeta Platforms, Inc.（「Meta」は以前「Facebook Inc.」として知られ、Facebook、Instagram、Messenger、WhatsAppなどのアプリを提供する親会社である）は、不公正競争を禁止する、連邦取引委員会法第5条(a)、合衆国法典第15編第45条(a)に違反している。FTCは、FTCが主張するところの「パーソナルソーシャルネットワーキングサービス」の市場において独占権を違法に取得し維持することで、Metaが同法に違反したと主張する。救済策として、FTCは、Metaの一連の行動が関連法に違反しているとの判決、Metaによる InstagramとWhatsAppの売却、および追加の衡平法上の救済を求めている。

　関連部分においてFTCは、Metaは2011年以来、「パーソナルソーシャルネットワーキングサービス」市場を独占する地位を不法に維持していると主張している。FTCは「パーソナルソーシャルネットワーキングサービス」を、「人々が共有ソーシャルスペースで友人、家族、その他の個人的な知り合いとの個人的な関係を維持し、体験を共有することを可能にし、そのために利用されるオンラインサービス」と定義している。FTCはさらに、主張によるところの市場の最大70%または80%を現在Metaが保有していると主張しており、その市場における大手プレーヤーはFacebook、Instagram、およびSnapchatであるとしている。これは、「パーソナルソーシャルネットワーキングサービスを提供するアプリにユーザーが費やした時間」におけるMetaのシェアと、「パーソナルソーシャルネットワーキングサービスを提供するアプリの〔毎日および毎月の平均ユーザー〕におけるMetaのシェア」によって測定しているとされる。

FTCはさらに、Metaの市場における立場は、ユーザーの友人や家族がすでに特定のソーシャルネットワークのメンバーである場合に「ユーザーがパーソナルソーシャルネットワーキングサービスにより多くの時間を費やし、より多くのコンテンツを投稿するようになる」ために生じるネットワーク効果や切り替えコストなど、参入に対する高く永続的な障壁によって保護されていると主張している。

FTCは、Metaが数種類の反競争的行為を通じて「パーソナルソーシャルネットワーキングサービス」市場の主張されているところの独占を違法に取得し維持していると主張している。特にFTCは、Metaはそれぞれ写真共有とメッセージング分野における競争上の脅威を無力化するために、InstagramとWhatsAppを買収したと主張している。LINE株式会社に特に関係する点として、2014年当時WhatsAppは、アジアで人気があった同様のモバイルメッセージングサービスとは異なり、米国で「パーソナルソーシャルネットワーキングサービス」として成功する独特の能力を有していたとFTCは主張する。

FTCは、Metaの市場における立場は、「パーソナルソーシャルネットワーキングの競争による利益を奪うことにより」消費者に損害を与えると主張している。これには「自分の好みにより適したパーソナルソーシャルネットワーキングプロバイダーを選択する」機会を奪うことが含まれる可能性がある。FTCはまた、Metaの市場ポジションが広告販売の競争を阻害していると主張している。FTCは、Metaの反競争的行為がなければ、「競合するパーソナルソーシャルネットワーキングプロバイダー」が参画していたであろうと主張している。

多くの理由から、MetaはFTCの修正訴状の主張を否定している。本嘱託書は、以下の抗弁に特に関連する情報を取得することを意図している（本訴訟におけるMetaの抗弁の網羅

的リストではない)。FTC の定義による市場は信じがたいものであり、業界や一般の人は「パーソ

ナルソーシャルネットワーキングサービス」市場などというものを認識していない。Meta は、主張

されている市場において要件とされる市場シェアを有していない。すべてのユーザーに無料で

提供される製品について主張されているところの市場独占は、競合他社や消費者に損害を与

えることはできない。Meta による Instagram および WhatsApp の買収は、反競争的な効果を持

たない。Meta は適切に定義された市場で常に競争に直面している。

**II.　要請されている証拠開示**

　　　本要請書で求められる証拠は、上述の申立ておよび抗弁に関するものであり、記載さ

れた問題の法的手続きにおいてのみ使用される。証拠は、別紙 B に定める厳格な秘密保持命

令の対象となる。

　　　LINE 株式会社に対し、取締役兼最高戦略・マーケティング責任者である舛田淳に、別

紙 C に記載された質問に関する証言を提供するよう命じることを日本の司法当局に謹んで要

請する。さらに、すべての証言は、日本法の適用手順に従って宣誓の上提出し、証言は資格を

有する法廷速記者が聞き取り書き起こすよう要請する。

　　　実行可能な限り早く署名された嘱託書のコピーを以下に特定する個人へ渡し、実行可

能な限り早く証人尋問の時間と場所を通知することを謹んで要請する。

<div style="margin-left:2em">

Mark C. Hansen 弁護士
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.弁護士事務所
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
電話：+1-202-326-7900
電子メール：mhansen@kellogghansen.com

</div>

**III.　司法共助**

コロンビア地区米国地方裁判所は、日本の裁判所に、同様の助力を提供する用意がある。

**IV.   費用の弁済**

料金および費用は、以下が負担する。

Meta Platforms, Inc.
Mark C. Hansen 弁護士気付
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.弁護士事務所
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
電話:+1-202-326-7900
電子メール:mhansen@kellogghansen.com


要請当局の署名および印:


日付:                              _____

                                   James E. Boasberg
                                   合衆国連邦地方裁判所判事

別紙 **A**

<div align="center">

米国地方裁判所
コロンビア地区

</div>

| | |
|---|---|
| **連邦取引委員会**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC 20580<br><br>**原告**<br><br>**対**<br><br>**FACEBOOK, INC.**<br>1601 Willow Road<br>Menlo Park, CA 94025<br><br>**被告** | **訴訟番号：1:20-cv-03590-JEB**<br><br>**署名された文書の公開編集版** |

<div align="center">

## 差止命令およびその他の衡平法上の救済を目的とした代替修正訴状

</div>

原告である連邦取引委員会（「FTC」）は、その指名された弁護士によって、連邦取引委員会法（「FTC 法」）第 13 条(b)（合衆国法典第 15 編第 53 条(b)）に従い、被告 Facebook，Inc.（「Facebook」）に対して、Facebook による FTC 法第 5 条(a)（合衆国法典第 15 編第 45 条(a)）に違反した商業目的でのまたは商業に影響を及ぼす形での反競争的行為および不公正な競争方法を是正し、防止するための恒久的差止命令およびその他の衡平法上の救済を本裁判所に申し立てる。

<div align="center">

### I. 訴訟の性質

</div>

1. Facebook は、30 億人以上の定期ユーザーを擁するとされる、世界でも有数のオンラインソーシャルネットワークである。Facebook は、最高経営責任者（「CEO」）の Mark Zuckerberg の戦略を追求することで、重要な部分での独占地位を維持している。その戦略とは、2008 年に発表された*競争よりも購入する方が良い*である。Facebook は、この格言に従い、潜在的なライバル企業や、深刻な競争上の脅威と見なす買収企業を体系的に追跡してきた。Facebook は、この反競争的買収戦略を、参入障壁を構築または

維持し、認識されている競争上の脅威を無力化するように設計された反競争的な条件付き取引ポリシーで補完した。

2.　　Facebook は、主に、世界最大かつ最も収益性の高いソーシャルネットワークである Facebook と Instagram の 2 つを支配していることから、米国のパーソナルソーシャルネットワーキングサービス（「パーソナルソーシャルネットワーキング」または「パーソナルソーシャルネットワーキングサービス」）の市場において独占力を有している。Facebook のソーシャルネットワークは、Facebook の社内では「Facebook Blue」として知られており、米国内の月間ユーザー数は[省略]人を超えている。Instagram には、毎月[省略]人以上のユーザーが集まっている。米国には、わずかでも Facebook の規模に迫るパーソナルソーシャルネットワーキングプロバイダーは他にない。Snapchat は、Facebook に次ぐパーソナルソーシャルネットワーキングサービスプロバイダーだが、そのユーザーベースは Facebook と比較して次のように劣っている。Snapchat の月間ユーザー数は、Facebook Blue や Instagram よりも数千万人少ない。

3.　　Facebook の支配的地位は、驚異的な利益をもたらす。Facebook は、主に監視ベースの広告を販売することにより、パーソナルソーシャルネットワーキングの独占で収益を得ている。Facebook は、プラットフォーム上およびインターネット上のユーザーに関するデータを収集し、ユーザーの活動、関心、所属に関するこの膨大なデータを利用して行動広告を販売している。昨年だけでも、Facebook は 850 億ドル以上の収益と 290 億ドル以上の利益を生み出した。

4.　　Facebook が長年認識してきたように、パーソナルソーシャルネットワーキングの独占は、強力なネットワーク効果を含む、参入に対する高い障壁によって保護されている。特に、パーソナルソーシャルネットワークは、ユーザーのより多くの友人や家族がすでにメンバーである場合にそのユーザーにとっての価値が高まるため、新規参入しようとすると、Facebook と競合するのに十分なユーザーベースを引き付ける上で大きな困難に直面することになる。Facebook の社内文書では、支配的規模を有する既存企業がすでに使用している特定のソーシャル「メカニクス」（つまり、写真共有など、他者とつながり、交流する特定の方法）を中心に構築されたソーシャルネットワーキング製品でユーザーを勝ち取ることは非常に困難であることが確認されている。多くの場合、優れた製品を持つ参入者でも、既存のパーソナルソーシャルネットワークが享受する圧倒的なネットワーク効果に対抗することはできない。

5.    強力なネットワーク効果は、ユーザー同士がつながる新しい方法を開発するための破壊的技術または革新的技術が登場するまで、支配的なパーソナルソーシャルネットワーキングプロバイダーを競争上の脅威から守ることができる。競争の激しい環境では、Facebook の成功は、企業のソーシャルネットワークに価値をもたらす革新的なツールを開発することにより、技術移行の期間を予測し、それに適応する能力にかかっている。しかし、小規模のスタートアップ企業から巨大企業への自らの移行を進める中で、Facebook の指導者は、（大きな失敗をいくつか経験した後、）変化する状況の中で支配的地位を維持するために必要なビジネス人材が不足していることに気づきました。Facebook は公正な競争によって独占状態を維持できず、幹部は、Facebook が失敗した分野で成功を収めていた新しいイノベーターを買収することで、存続にかかわる脅威に対処した。同社はこの反競争的な消費景気を、「opened-first-closed-later」のスキームで補完し、新興のライバルをさらに阻止することで独占を固めることができた。

6.    インターネットの歴史、そして Facebook の歴史における重要な移行期は、2010 年代にスマートフォンとモバイルインターネットが台頭したことにあった。これらのテクノロジーの出現により、外出先でも人々がつながることができるようになり、デジタル経済は根本的に破壊された。ユーザーがオンライン活動をモバイルインターネットへと次第にシフトするにつれて、革新的な新興企業が Facebook やデスクトップ時代に支配的存在となったその他の巨大企業に挑戦する機会が生まれた。ベンチャーキャピタルやその他の資金は、Instagram などのスタートアップ企業に流れた。Instagram では写真共有を通じてユーザー同士がつながり、WhatsApp ではメッセージングサービスを提供した。これらの新興企業はすぐに人気を博することとなった。

7.　　Facebook は、モバイルへの移行は実存的な課題をもたらしており、新たなモバイル脅威の台頭を阻止するための猶予はあまりないということを認識していた。Facebook の CEO である Zuckerberg 氏は、この時期を「我が社の脆弱性がかなり高い、非常に危険なプラットフォームの移行」と表現しており、「歴史的には多くの企業がその飛躍を成し遂げられてこなかった」と認識していた。Facebook は、ビジネス人材での競争に失敗し、競争上の脅威として出現する、または競争上の脅威を支援する可能性のある企業を買収することで、支配的な地位を維持する計画を立てた。これらの企業を買収することで、Facebook は、ライバル企業がモバイルインターネットの力を利用して Facebook の独占に対抗しようとする可能性を排除した。

8.　　Facebook は、競争上の脅威と認識される企業への援助を突然打ち切る一連の反競争的な条件付き取引ポリシーを導入し、施行することで、買収戦略を強化した。Facebook は、Facebook のプラットフォーム上で実行または接続されたソフトウェアアプリのサードパーティ開発者との契約にこれらのポリシーを含めた。2007 年より、Facebook はアプリ開発者をプラットフォームに積極的に招待し、Facebook との相互接続に必要な重要なアプリケーションプログラミングインターフェイス（「API」）とツールへのオープンアクセスを許可した。このオープンアクセスポリシーは、開発者とユーザーの Facebook とのエンゲージメントを推進し、Facebook の広告利益の大幅な促進に貢献する結果となった。しかし、開発者が人気のある製品を拡大するにつれ、Facebook はその一部が新興のライバルを助けたり、Facebook に直接対抗したりする可能性もあることを認識し、それらを脅威と見なすようになった。これに対して、Facebook は API ポリシーを反競争的な武器に変えた。開発者が Facebook のプラットフォームにアクセスできるケースは、(i) Facebook のコアサービスと競合しないこと、および (ii) Facebook の潜在的なライバルの成長を促進させないことに同意した場合に限られるようになったのだ。これらの条件を順守することで Facebook に忠実であったアプリ開発者またはウェブサイトは、貴重な Facebook プラットフォーム相互接続へのアクセス権を与えられた。対照的に、Facebook の競合上の潜在的な脅威と連携したアプリ開発者、または自らが競合上の潜在的な脅威とされたアプリ開発者は、これらの相互接続へのアクセスを失い、一部は廃業に追いやられた。Facebook の反競争的な条件付き取引ポリシーによって課される制限がなければ、開発者は Facebook への競争上の脅威を助長したり、自らが脅威となったりする可能性もある。Facebook は、このような行為を阻止すること

で、初期の脅威にさらされる機会を減らした。言い換えれば、Facebook は自社製品の改良ではなく、開発者に反競争的な制限を課すことによって競合他社より優位に立っているのだ。この行為は、Facebook が競争をやめるためにこうした競争上の脅威を買収した場合に劣らず反競争的である。

9.    これらの行動を通じて、Facebook は、差別化された革新的な企業が規模を拡大することを防ぐ反競争的なスキームを導入し、Facebook が支配的地位を維持できるようにした。Facebook の一連の行動は、新興のライバルを排除し、そのようなライバルの独立した存在により、他のインターネットプラットフォームが、Facebook の独占的地位を保護する参入の大きな障壁を克服できる可能性を消滅させた。そうすることで、Facebook は、選択肢の拡大、品質やイノベーションの向上といった競争のメリットを米国のパーソナルソーシャルネットワーキングユーザーから奪っているのである。

10.    パーソナルソーシャルネットワーキングのライバルの出現と成長を妨害することで、Facebook は広告販売のための有意義な競争も抑制する。多くのパーソナルソーシャルネットワーキングプロバイダーは、広告の販売を通じてプラットフォームを収益化する。したがって、パーソナルソーシャルネットワーキングにおける競争が激化すると、広告の提供における競争も激化する可能性が高い。パーソナルソーシャルネットワーキングを独占することで、Facebook はさらに、広告価格の低下や広告に関する選択肢の拡大、品質やイノベーションの向上など、競合のメリットを広告主から奪うのである。

11.　自らの独占を維持するための Facebook による違法行為は今日も継続しており、禁止する必要がある。Facebook は、違法に取得した資産を保有・運用し続けており、パーソナルソーシャルネットワーキングの独占を保護するための「堀」を備え、そうした資産を維持し続けている。さらに、Facebook は引き続き競争上の脅威を監視しており、禁止されない限り、これらの脅威を買収または封じ込めようとしている。

## II.　裁判管轄および裁判地

### A. 管轄区

12.　本裁判所は、FTC 法の第 5 条(a)および第 13 条(b)（合衆国法典第 15 編第 45 条(a)および第 53 条(b)）、ならびに合衆国法典第 28 編第 1331 条、第 1137 条(a)および第 1345 条に従い、本訴訟に関する事物管轄権を有する。これは、貿易および通商を拘束および独占から保護する議会制定法に基づき生じる民事訴訟であり、議会制定法によってこの訴訟を提起することが認可された米国の機関により提起される。

13.　本裁判所は、Facebook が合衆国法典第 15 編第 53 条(b)に従い、必須である米国との憲法上の接触者を有するため、Facebook に対して対人管轄権を有する。

14.　Facebook の一般的な商慣行および本書で主張される不公正な競争方法は、FTC 法第 5 条（合衆国法典第 15 編第 45 条）の意味の範囲内で、「商業目的または商業に影響を及ぼす形」のものである。

15.　「法人」という用語は FTC 法の第 4 条（合衆国法典第 15 編第 44 条）に定義されているとおりであり、それに従い Facebook は法人であり、関連するすべての時点で法人であり続けている。

### B. 裁判地

16.　この管轄区の裁判地は合衆国法典第 15 編第 22 条、合衆国法典第 28 編第 1391 条(b)(1)、合衆国法典第 15 編第 53 条(b)に基づき適切である。Facebook は、この管轄区に所在し、事業を営み、存在する。

17.　　原告 FTC は、FTC 法（合衆国法典第 15 編第 41 条 *以降*）に従い設立され、組織され、存続する米国政府の行政機関であり、その主たる事務所をコロンビア特別区に置く。委員会は、とりわけ、FTC 法第 5 条（合衆国法典第 15 編第 45 条）を執行する権限と責任を与えられ、FTC 法第 13 条(b)（合衆国法典第 15 編第 53 条(b)）に基づき、FTC が執行する法律の違反を禁止し、衡平法上の救済を求めるための裁判所手続きを開始する権限を与えられている。

18.　　FTC は、被告 Facebook が FTC により執行される法の規定に違反している、または違反しようとしていると信じるに足る理由があるため、本訴訟を連邦裁判所に提起する権限を有しており、これは FTC 法の第 13 条(b)（合衆国法典第 15 編第 53 条(b)）の意味の範囲内で恒久的差止救済の適切な訴訟である。

19.　　被告 Facebook は、デラウェア州で設立された上場営利企業であり、その主たる事業所を 1601 Willow Road, Menlo Park, CA 94025 に置く。Facebook の主な事業は、デジタルインタラクションとコミュニケーションを促進するテクノロジーである。これには、パーソナルソーシャルネットワーキングを提供する Facebook Blue、パーソナルソーシャルネットワーキングを提供する Instagram、モバイルメッセージングサービスを提供する Facebook Messenger、モバイルメッセージングサービスを提供する WhatsApp が含まれる。

### Ⅳ．業界背景

#### A．パーソナルソーシャルネットワーキングの台頭と Facebook の始まり

20.　　2000 年代初頭、パソコンやインターネット接続が普及したことで、友人や家族とのオンラインソーシャルネットワーキングという新しいコミュニケーション手段が生まれた。E メールやテキストメッセージの機能が限られているのとは対照的に、パーソナルソーシャルネットワーキングは、人々が個人的なつながりを維持できる明確な方法を提供することで人気を博した。パーソナルソーシャルネットワーキングにより、人々は最新の情報を把握し、個人的なコンテンツを友人や家族と共有することができる。現在では、何百万人もの米国人の日常生活に不可欠な存在となっている。

21.　　パーソナルソーシャルネットワーク上のアカウントを通じて、自分の生活や興味に関するコ

ンテンツを投稿したり、個人的なつながりを持つ人物が投稿したコンテンツを閲覧したりすることができる。多くの人がパーソナルソーシャルネットワーキングを使用して、個人的なつながりを持つ人々と交流するため、特定のパーソナルソーシャルネットワーク上に非常に多くの人がいると、新しいユーザーを惹きつけ、既存のユーザーをネットワーク上に維持することができる。この意味で、ソーシャルネットワークは電話システム、オペレーティングシステム、および強力なネットワーク効果を特徴とするその他のサービスの機能を共有する。つまり、個々の消費者に対するサービスの価値は、サービスを使用する他の消費者の数とともに上昇する。Facebook の内部投資家の会議では、この現象について次のようにはっきりと述べている。「我々のネットワーク効果は広範で、友達は皆見つけられます。」

22.　　2002 年 3 月に立ち上げられた Friendster は、多大な人気を博した最初のパーソナルソーシャルネットワークの 1 つであり、翌年には Myspace が続いた。

23.　　その後、2004 年 2 月、Zuckerberg 氏と大学のクラスメートは Facebook（当時の名称は TheFacebook）を立ち上げた。彼らはまず自らの大学のキャンパスでこの製品の提供を開始し、その後すぐに他の大学のキャンパスへと拡大させた。Facebook は急速に大学生の間で浸透し、その後 2006 年に一般の人々にも広く普及した。Facebook の急速な初期成長は、同社への実質的な民間投資につながり、その結果、さらなる成長が促進されることとなった。

## B. Facebook が Facebook プラットフォームを立ち上げ、重要なインターフェイスへのアクセスを提供したことで、アプリ開発者に Facebook Blue との連携を促した

24.　　Facebook のユーザーベースの初期の急速な成長は、同社にとって極めて重要なものであった。Facebook は、投資家に自社を売り込むためだけでなく、ネットワーク効果を確立し、その恩恵を受けることを可能にするのに十分な非常に多くのユーザー数を達成するためにも、ユーザーを迅速に増やす必要があった。Facebook のサービスをより多くのユーザーが積極的かつ定期的に使用するようになるにつれ、ユーザーは Facebook から離れなくなり、さらに多くのユーザーを引き付け、潜在的な競合企業が入る余地をなくしている。そのため、Facebook はユーザーへのサービスの提供を迅速に拡大しようとした。

25.　　この目標を推進するため、Facebook は 2007 年に「Facebook プラットフォーム」を立ち上げた。プラットフォームイニシアチブは、急速に拡大するユーザーベースに対する Facebook のコントロールを活用して、ソフトウェア開発者に、ゲームやページデザインツールからビデオ共有ツール、e マーケティング

アプリまで、Facebook Blue と相互運用するアプリやツールのエコシステム全体を構築するよう促した。

Facebook は、Facebook Blue をアプリの支配的なプラットフォームに変えることを目指した。Facebook が開発者に対し、Facebook Blue を使用して、ユーザーを魅了する革新的なアプリのプロモーションと配信を行うよう誘導できれば、Facebook はユーザーエンゲージメントの向上、ユーザーとそのオンライン活動に関するより多くのより詳細なデータの生成、およびネットワーク効果の強化による恩恵を受け、競争相手を大きく離すことができる。

26.　　　プラットフォームの立ち上げ時、Facebook は明示的に、プラットフォームを増強するために「競合するアプリケーションを持つ開発者を歓迎」しており、これは、Facebook が、サードパーティ開発者からのアプリケーションと、Facebook によって構築されたアプリケーションが公平な競争の場にあるように Facebook プラットフォームを設計した」ことを表している。

27.　　　Facebook のプラットフォームイニシアチブにより、独自のリソースを保護し、第三者の創造性を活用して、Facebook でエンゲージメントを継続できるようにした。プラットフォームがなければ、Facebook 自体がネットワークの価値を高めるアプリを構築する必要があるだろう。つまり、Facebook は、ユーザーが望むアプリの予測を試み、ユーザーベースとネットワーク全体でこれらのアプリを設計、コード、拡張し、間違った推測やミスによるリスク負担とリソースの枯渇に耐えなければならないのだ。

28. プラットフォームにより、Facebook はこれらのリスクとコストを回避し、サードパーティのアプリ開発者の努力から得られるメリットを享受できるようになった。Facebook は、新しいアプリの開発や新しいビジネスモデルのテストに多大なリソースを費やす必要がなくなり、代わりにサードパーティがそれを行う。Facebook は、プラットフォーム向けに構築されたアプリが広く採用されるのを待っているだけで、競合アプリを構築するか、Facebook 向けの貴重な新しいソーシャルデータを含む、その人気アプリのユーザーエンゲージメントのメリットを享受することができるようになる。これらの開発者が構築したアプリや、彼らが引き寄せたユーザーなど、これらの開発者の仕事による利益を引き出す可能性は、Facebook が積極的に開発者を探し求め、プラットフォーム上でアプリを構築するよう招待するきっかけとなった。

29. Facebook は、すべてのアプリ開発者にアプリを設計する自由を提供するプログラムとして Facebook プラットフォームを展開した。Facebook が Facebook プラットフォームを導入した際、Zuckerberg 氏は「現在に至るまでソーシャルネットワークはクローズドプラットフォームであったが、今日でその時代は終わることとなる。この Facebook プラットフォームの進化により、世界中の開発者が、Facebook 内のソーシャルグラフの上に完全なソーシャルアプリケーションを構築できるようになる」と述べた。

30. Facebook は、すべてのアプリ開発者に力を与える方法として Facebook プラットフォームを販売した。これは、Facebook プラットフォームを販売することが自社のビジネスにとって重要であることを認識していたためである。2007 年のプレスリリースで、Zuckerberg 氏は、次のように述べている。「[Facebook プラットフォーム]が我々にとって良いのは、開発者が優れたアプリケーションを構築すれば、ユーザーにサービスを提供してソーシャルグラフを強化することになるからです。これは大きなチャンスです。我々が提供するのは統合と流通で、開発者が提供するのはアプリケーションです。ユーザーがより多くの情報を共有し、共に利益を得られるよう、我々がサポートします。」

31. Zuckerberg 氏と Facebook は、Facebook がソーシャルアプリ開発者の相互運用を可能にする「オープン」な Facebook プラットフォームから利益を得たというメッセージを繰り返した。2008 年に Zuckerberg 氏は、次のように捉えていた。「プラットフォームは我々の戦略の鍵です。なぜなら、今後さまざまなソーシャルアプリケーションが多数台頭してくるでしょう ... これらすべてを我々自身で開発することはできないと考えています。」2012 年初頭、Facebook の初回公募文書には、次のように記載された。「当社の

プラットフォーム開発者の成功と当社のプラットフォームエコシステムの活気が、[Facebook Blue における]

ユーザーエンゲージメントを向上させる鍵です。当社は、プラットフォーム開発者が、より社会的でパーソナ

ライズされた製品を提供し、Facebook [Blue]、ウェブ全体、およびモバイルデバイスでユーザーをより良く関

与させる能力を強化するツールと API に引き続き投資しています。」

32.　　　Facebook のオープンプラットフォームは、新しい開発者だけでなく、(i) Facebook のプラット

フォームと相互運用している開発者に魅了された新しい Facebook ユーザーをも引き付け、また (ii) プラット

フォームの新機能を享受した既存の Facebook ユーザーからのエンゲージメントを高めるように設計されて

いる。いずれの場合も、Facebook のプラットフォームは、ユーザーベースとエンゲージメントの増加に伴うネ

ットワーク効果を生み出し、活用するように設計されている。そして、お互いがお互いの原動力となった。ユ

ーザーの増加は開発者の増加を意味し、また開発者の増加がユーザーの増加を意味することとなった。ど

ちらも Facebook にとって良い結果をもたらした。

33.　　　2007 年のプラットフォームの立ち上げ後、Facebook は、通常半年ごとの「f8」開発者会議に

おいて、開発者が使用する新しいツールを頻繁に追加した。例えば、Facebook は 2008 年に Facebook

Connect を立ち上げた。Facebook Connect とは、開発者によって、ユーザーが Facebook の認証情報を使用

して開発者のウェブサイトやアプリにログインし、開発者のサービスに「Facebook のアカウント情報、友人、

プライバシーを持ち込み」、Facebook にコンテンツを共有することを可能にするツールである。開発者によ

る Facebook Connect の利用は、Facebook Blue の魅力的なコンテンツの量を増やし、インターネット全体で

Facebook をよりユビキタスにすることで、Facebook に利益をもたらした。

34.　　　Facebook は、サードパーティのアプリが Facebook のユーザーデータにアクセスできるよう

にする API を含め、プラットフォームに機能を追加し続けた。API は、異なるソフトウェアがデータや機能を

相互に通信し、共有する構造化された方法である。API は、企業とその他の事業体間のコミュニケーショ

ン、製品およびサービスの統合または相互運用、および他者の機能やデータの「上に」構築された新製品

の開発を促進するために、広くオンラインで使用されている。

35.　　　API を提供することで、サードパーティ開発者は API プロバイダーからの特定のデータや

機能をプログラムで操作することができる。これは、自社製品に補完的または隣接した製品の開発を自社

18

で構築することなく実現したい企業にとって一般的なパターンである。このような状況では、API プロバイダーは、プロバイダーとの相互運用に必要なデータと機能をサードパーティ開発者に提供することになる。重要な相互運用性を提供することで、多くの API は、デジタル市場のサードパーティ開発者にとっての配信手段として効果的に機能している。

36.　　　Facebook プラットフォームは多くの異なる API へのアクセスで構成されており、多くの API は時間の経過とともに変化していく。2010 年に発売された Graph API は、Facebook プラットフォームのコア API の 1 つである。これも長年にわたって変化してきたが、その一般的な目的は、Facebook のソーシャルグラフと、Facebook とサードパーティ製品の両方を含む他のアプリとの間で、さまざまな種類の情報とデータの交換を促進することにある。Facebook がサードパーティ開発者に Graph API の特定のエンドポイントへのアクセスを許可した後、その開発者は Graph API を使用して、Facebook のソーシャルグラフ内の特定のタイプの情報を取得および／または作成できるようになる。例えば、Graph API を使用して、ユーザーが Facebook Blue にアップロードした写真を取得したり、ユーザーの Facebook Blue タイムラインにビデオを公開したりといったことが可能になる。Graph API を通じて利用可能なデータは、配信を達成し、ユーザーベースを拡大するための重要な手段を開発者に提供することができるのである。

37.　　2010 年、Facebook は、Find Friends API（ユーザーの Facebook の友達に関する情報を提供するもの）や、Facebook Blue からユーザーコンテンツにアクセスするために使用するその他の API を含む、Graph API を通じて重要な API へのアクセスをサードパーティアプリに提供した。Find Friends API は特に、サードパーティアプリのユーザーが、かかるアプリを同様に使用していた Facebook Blue の友人を見つけたり、そのアプリを使用していなかった友人を招待したりすることを可能にしたため、サードパーティアプリにとって貴重な成長ツールであった。

38.　　2010 年、Facebook は Facebook プラットフォームに Open Graph と Social Plugins も追加した。これにより、サードパーティのアプリやウェブサイトで、Facebook の「いいね」ボタンなどの機能を自社のサービスに追加できるようになった。いいねボタンを使用すると、Facebook Blue ユーザーはサードパーティアプリで好意を表したり、シェアしたりすることができる。Facebook Blue のユーザーのニュースフィードやプロフィールで「いいね」が共有されるため、サードパーティアプリがいいねボタンをインストールし、それを使用するように促す動機となり、これがサードパーティアプリにさらなるユーザーを惹きつけることとなった。

39.　　Facebook がプラットフォームを導入した当時から、Facebook プラットフォームへのオープンアクセスは、少なくとも 3 つの主な理由で開発者にとって重要であった。第一に、Facebook プラットフォームは、開発者に自社の製品とサービスの独自の流通チャネルを提供し、開発者が Facebook の巨大なソーシャルグラフを利用して「大量流通を促進」することを可能にすることを約束したのだ。第二に、Graph API、Social Plugins、Open Graph などのツールにより、開発者は個人個人の行動からパーソナライズした情報を通じてユーザーに働きかけることができる。「例えば、[音楽サービスの]Pandora であるバンドにいいねをすると、その情報がグラフの一部となる。それによりその後でコンサートサイトにアクセスすると、いいねをしたバンドがいつ自分のエリアに来るかが表示されるようになっている。」第三に、Facebook プラットフォームにより、開発者は自社製品を宣伝したり、アプリ内トランザクションを実行したりすることを許可された。これらの提示されたメリットと会社の積極的な奨励により、開発者は Facebook のオープンアクセスポリシーに頼るようになり、互換性のある製品の開発へ投資するようになった。

40.　　Open Graph の利用が急増した。Open Graph の導入から 1 週間後、5 万を超えるウェブサイトが Open Graph プラグインをインストールした。これらのサイトは、大規模な新しい流通チャネルからすぐ

に得られるメリットを認識していた。発売から1年後の2008年7月までには、40万人以上の開発者がすでに Facebook プラットフォームを使用していた。2010年4月までに、その数は100万人以上に増加した。2012年7月には、Open Graph を使用して毎日10億近くのソーシャルデータが Facebook Blue と共有され、Facebook のユーザーとそのユーザーによるオンライン活動に関するより多大な量のより詳細な情報が Facebook に提供されるようになった。

41.　　この戦略は、ユーザーのオンライン活動をより完全に Facebook Blue に統合しただけでなく、Facebook の利益の成長も促進した。Facebook の幹部は、Facebook の最高執行責任者（「COO」）である Sheryl Sandberg に宛てた2012年5月のEメールで次のようにまとめた。「当社には、新規ユーザーをサインアップへと誘導するこの重要な人々が多数おり、アプリやウェブサイトの顧客を探している開発者を引き付け、またオーディエンスにリーチしたいと望んでいる広告主も引き付けている[。]」幹部は、Facebook について「現在および将来のユーザー／顧客のほとんどが Facebook 上に存在していることを開発者として想像できるほどの規模に到達した」と説明し、「Apple App Store の上位10アプリのうち[7]アプリが Facebook に対応している[。]」と述べた。

42.　　さらに、サードパーティのアプリは、Facebook プラグインを通じて、また「いいね数」などのソーシャルデータを Facebook Blue に送り返すことで Facebook の成長を支援した。また、これらのやり取りは、ユーザーがサードパーティのアプリとやり取りした程度に関する重要な情報を Facebook に提供し、初期の使用状況の傾向を綿密に追跡して特定することを可能にした。

### C. Facebook は、初期の競合他社を大幅に上回ることで主要なソーシャルネットワークとなった

43.　　Facebook は、2006年に学校の枠を超えて一般の人々に浸透した後、急速に成長した。通常業務文書によると、2007年5月から2008年5月にかけて、Facebook の月間アクティブユーザーは34%増加したが、主要な競合企業である Myspace のユーザーは同時期にわずか7%増加にとどまった。2009年には、Facebook は Myspace を凌駕し、米国と世界でもっとも人気のあるパーソナルソーシャルネットワーキングプロバイダーとして地位を確立していた。2011年10月、社内で回覧された数字によると、Facebook は米国で1億5,600万人のユニークユーザーを抱えており、このサービスの訪問者1人当たりの平均は441分であった。同時期の Myspace の米国ユーザー数は2,700万人にとどまっており、訪問者1人当たり

平均 10 分に過ぎない。2011 年には、Facebook は広告クライアントに対し、「Facebook は今や米国における

ソーシャルメディア全体の 95%を占めている」と売り込んでいた。

44.　　　Facebook の成長はそのプラットフォームポリシーによって、促進された。Facebook プラット

フォームと Open Graph イニシアチブの立ち上げ後、Facebook は大幅に成長し、2010 年から 2018 年にか

けて、米国で毎月平均 1,000 万人以上のアクティブユーザーを毎年増やしていった。

**D. Facebook のビジネスモデル：詳細なユーザーデータに基づく販売広告**

45.　　　パーソナルソーシャルネットワーキングを収益化する方法はいくつかあるが、Facebook は

ユーザーの個人データを引き出し、行動広告を販売することで、自社製品を収益化することを選択した。

46.　　　この慣行は、Facebook にとって非常に収益性の高いものである。広告主は現在、

Facebook Blue や Instagram の特定のユーザーに広告を表示するために、数十万ドル（2020 年には約 840

億ドル）を支払っている。Facebook は、企業がユーザーに関して収集する膨大な量のデータを分析する独

自のアルゴリズムを使用して、これらの「オーディエンス」にサービスを提供している。これにより、広告主は

さまざまなキャンペーンやメッセージを多様なユーザーグループをターゲットにして送ることができる。

Facebook が表示する広告は、ユーザー生成コンテンツと混ざっており、ぱっと見ただけではユーザー生成

コンテンツと見分けがつかない。

47.　　　Facebook は、パーソナルソーシャルネットワークが提供できる広告独自の特徴を把握して

いる（「ソーシャル広告」）。例えば、決算報告では、Facebook COO の Sheryl Sandberg は、Facebook Blue

を「マーケターがかつてない規模でメッセージをパーソナライズできる世界初のグローバルプラットフォー

ム」とし、Facebook Blue と Instagram を世界で「最も重要な 2 つのモバイル広告プラットフォーム」と呼んだ。

48.　　ソーシャル広告は、他の形態のディスプレイ広告、検索広告、および「オフライン」広告（テレビ、ラジオ、印刷物など）といった他の形態の広告とは区別される。

49.　　ソーシャル広告は、れっきとしたディスプレイ広告の形態である。ディスプレイ広告とは、ユーザーがウェブサイトやアプリを訪問または利用する際に、そのウェブサイトやアプリ上で画像、テキスト、動画などの形で広告を表示することである。ディスプレイ広告は、テレビ、ラジオ、印刷広告などの「オフライン」広告とは異なる。なぜなら、ディスプレイ広告は、消費者のオンライン活動中（スマートフォンやタブレットなどのモバイルデバイスの使用中を含む）に消費者にリーチする機会を提供し、インタラクティブな広告を実現し、オンライン活動を通じて生成および収集された個人データを使用してユーザーをターゲットにしたリッチ広告を可能にするからである。また、ディスプレイ広告は、Google や Bing などのオンライン検索エンジンに特定の検索用語を入力すると表示されるデジタル広告の一種である検索広告とも異なる。広告主は、特定の種類の製品やサービスについて積極的に問い合わせを行っている消費者をターゲットにする事を目的として検索広告を購入する。対照的に、ディスプレイ広告は、検索エンジンに積極的に問い合わせていない消費者に届く。この場合の消費者とは、何か特別商品を購入しようという意思を持たない消費者も含まれる。

50.　　ソーシャル広告はディスプレイ広告の一種ですが、パーソナルソーシャルネットワークではないウェブサイトやアプリで見られる非ソーシャルディスプレイ広告とは、いくつか異なる点がある。例えば、ユーザーが固有のユーザー認証情報を使用してパーソナルソーシャルネットワークにログインする必要があることも一因となり、ソーシャル広告により、広告主はユーザーの個人的なつながり、活動、アイデンティティ、人口統計、関心、趣味に関するパーソナライズされたデータに基づいてユーザーをターゲットにすることができる。また、他のウェブサイトやアプリ上のディスプレイ広告とは対照的に、ソーシャル広告は、ユーザーとの高いエンゲージメントと頻繁な接触、および個人的なつながりによって生成されたコンテンツのユーザーフィードへの広告の直接統合（「ネイティブ」コンテンツやブーストされたコンテンツに似た広告を含む）を活用する。さらに、ソーシャル広告は、ユーザーが個人的なつながりを持つ人と広告を共有したり、広告主のページをいいねしたり、フォローしたりすることを可能にするなど、他の形態のディスプレイ広告では利用できない、広告とのエンゲージメント形態を促進します。とりわけ、前述の特徴により、ソーシャル広告

23

プロバイダーは、エンゲージメントの高いユーザーの個人をターゲットとする「オーディエンス」へのアクセスを広告主に販売し、宣伝された製品またはサービスを積極的に検索する必要のない、または認識してないユーザーにリーチすることができる。

51.   Sandberg 氏は 2012 年の決算報告で次のように強調した。「広告主がどこに位置するのかという質問では、先ほど申し上げたように、私たちは 3 番目です。私たちはテレビでもなく、検索エンジンでもありません。私たちはソーシャル広告です。」特に Facebook は、その規模、高いレベルのユーザーエンゲージメント、Facebook のプロパティ内外のユーザーを追跡して成果を測定する能力により、広告でユーザーをターゲットにする機能に優れている。

52.   Facebook がユーザーから収集する膨大なデータを活用することで、Facebook のソーシャル広告事業は極めて高い収益を上げている。公開収益報告書によると、Facebook は、「広告プレースメントをマーケターに販売することで実質上すべての収益」を得ているとのことである。

### E.   モバイルインターネットの出現による Facebook への脅威

53.   2010 年頃から、スマートフォンの普及により、ユーザーはデスクトップコンピュータからモバイルデバイスへと移行し、米国の人々がデジタルサービスを利用する方法は大きく変わった。2009 年第 4 四半期のスマートフォン使用率は、米国の全モバイル加入者のわずか 21%、最近新しい携帯電話を購入した顧客のわずか 30%であった。2012 年第 2 四半期までに、米国の全モバイル加入者の 55%がスマートフォンを使用し、新規携帯電話購入の 67%を占めるようになっていた。2011 年から 2012 年にかけて、モバイルデータトラフィックは 62%増加し、2012 年までには 2007 年の米国のモバイルデータトラフィックの約 73 倍に増加したと推定されている。

54.　スマートフォンへの移行により、新規ビジネスの機会が開かれた。数ある機能の中でもとりわけ、スマートフォンはポータブルで、デジタルカメラが内蔵されている点が特徴である。写真の撮影、シェア、コメントをするアクティビティに最適化したモバイルアプリを通じて、家族や友人とのソーシャルネットワーキングがますます普及している。Instagram の共同創設者である Kevin Systrom は、写真を外出先で撮影しシェアする機能は、携帯電話の「最も差別化された機能」と言及しており、その機能の活用が試みられた。

55.　モバイルの波に乗ろうとした企業、またはモバイルの波を利用してデスクトップに縛られた競合企業に対抗しようとした企業は、迅速に行動を起こす必要があった。Systrom 氏が説明したように、「人々はデスクトップに縛られず．．．外出先でもスマートフォンでコンピューティングできるようになりつつありました。そして、コンピューティングがシフトした瞬間ときっかけがありましたが、コンピューティング用に作成されたサービスはモバイルに十分にシフトしませんでした。」Systrom 氏によると、「モバイル会社を設立したとしたら．．．2009 年、2010 年、2011 年には、デスクトップで行っていたことを再現する機会がたくさんありました。今はそれらのことはモバイルで行われるようになっています。デスクトップ企業が十分な速さで変化を起こさなかったためです」とのことである。2012 年までに、Systrom 氏は、「モバイルを利用していた企業が先手を打って優位に立ち、後れを取っていた企業が、追いつく方法を見つける必要に迫られるようになったことは明らかだ」と説明した。

56.　　　また、スマートフォンはモバイルメッセージングの爆発的な増加を促進した。これには、(i) ショートメッセージサービスまたはマルチメディアメッセージサービスプロトコル（「SMS」）を介したテキストメッセージ、および (ii) インターネットベースのオーバーザトップモバイルメッセージングアプリ（「OTT モバイルメッセージングサービス」）を介したテキストメッセージが含まれる。2011 年以来、SMS のメッセージングボリュームがピークを迎え、OTT モバイルメッセージングサービスのメッセージングボリュームは天文学的に増加している。2012 年 4 月までに、Zuckerberg 氏は、「メッセージは誰の電話でも最も重要なアプリだ」と信じていた。

57.　　　WhatsApp の共同創設者である Jan Koum 氏は、人々がデバイスをどのように使用しているかという「基本的な変化」も目の当たりにし、モバイルメッセージングに焦点を当てることを選択した。WhatsApp などのスマートフォン対応の OTT モバイルメッセージングサービスは、Facebook Blue に脅威をもたらした。OTT モバイルメッセージングサービスは、一般にメッセージごとの料金を請求しておらず、コンテンツ（写真、ビデオ、サウンドクリップ、GIF など）をシェアするための拡張機能や、永続的なユーザーグループを作成するオプションなど、SMS よりも優れている。

58.　　　Facebook は、モバイルスマートフォンの台頭に対処するために、モバイルデバイスで Facebook Blue を提供したが、当初、モバイルデバイスでの Facebook Blue のパフォーマンスは低調であった。Facebook は、2007 年 1 月に初の Facebook Blue モバイルウェブサイト、2008 年 7 月に初のネイティブ Facebook Blue iPhone アプリ、2009 年 9 月に初のネイティブ Facebook Blue Android アプリの提供を開始した。Facebook Blue for iPhone を発表する投稿で、アプリの責任者であるエンジニアは、「iPhone 用に構築されたアプリケーションはウェブサイトよりも多くのテクノロジーにアクセスできる。例えば、ネイティブアプリケーションを使用すると、iPhone のカメラで写真を撮り、瞬時にアップロードすることができる」と述べている。しかし 2010 年までに、Facebook はネイティブアプリケーションを HTML に書き直すことにした。HTML は、ウェブブラウザで閲覧するように設計されたページに使用される言語である。Faceweb と呼ばれるこの取り組みは、Facebook のモバイルサービスの改善に失敗し、2011 年 6 月までに Facebook Blue for iPhone のレビューは、過去最低の 2 つ星にとどまることとなった。Zuckerberg 氏は後に、HTML で記述すると決定したことを「会社として犯した最大の過ち」とした。

59.　　　2011 年後半までに、Zuckerberg 氏と他の幹部は、Facebook Blue がモバイルユーザーにとって比較的品質の劣った体験を提供し、これにより Facebook の独占ポジションが今までないほどに脅かされたことを認識した。さらに、Facebook はソーシャル広告モデルをモバイルデバイスへと変換するのに苦労した。モバイルへの移行により、Facebook は広告の表示方法を変える必要があった。Zuckerberg 氏は「広告の仕組みを完全に変更する必要があった」と説明した。

60.　　　このような大きな失敗が連続していることを考えると、Facebook は明らかに、パーソナルソーシャルネットワーキングの独占と膨大な広告利益が、モバイルファーストの競合他社が台頭し、革新的な方法でユーザーを結びつけ、携帯電話の写真やメッセージング機能を活用することで、牽引力を得るという脅威にさらされることを恐れていた。そのような参入者は、Facebook の広告利益を著しく脅かす可能性がある。人気のある製品を発売できる競合他社は、モバイルユーザーの行動に関する豊富なデータを取得することができる。これは、Facebook ではモバイルパフォーマンスに長けていないため利用できなかった。Facebook は、このようなデータに対する切実なニーズを抱え、アイデンティティ、行動、場所などの個々のユーザーに関する詳細な情報に基づいて広告のターゲットを絞ろうとますます試みていた。ユーザーベースを収益化するために、Facebook は最も受容性の高い個人を広告のターゲットにする必要があった。また、Facebook は、ユーザーの活動に関する重要な大量のデータなしに、どのユーザーがどの広告を最も受け入れるかを決定することができなかった。あるいは、競合他社が広告のないビジネスモデルを提供することで、Facebook がユーザーの関心を収益化する能力が弱体化させられる可能性があった。特に WhatsApp は、（Facebook が買収する前の）広告のないビジネスモデルを追求する急成長中の OTT モバイルメッセージングアプリとして登場した。

61.　　　モバイルのパフォーマンスが標準以下であるにもかかわらず、Facebook は引き続き優位に立つように、「モバイルでも使える．．．ように、何年にもわたってすべてのコードを一から書き換える」という「重大な技術的リスク」を背負うことを選んだ。しかし、Facebook は、自社の質の劣るモバイルサービスを改善することに時間を費やしている間に、その独占的な地位と広告による莫大な利益を競合企業が脅かす可能性があるということを受け入れられなかった。Facebook は、自社製品のメリットに基づいて独占状態を維持できないことに気づき、その独占的地位を守るために反競争的な行動を通じてモバイルへの移行を「リスク低減」しようと努めた。

**F.　Facebook は長年にわたり、潜在的なライバル企業や潜在的なライバル企業を支援する企業の買収に注力してきた**

62.　　　スマートフォンの普及と 2010-2014 年のモバイルインターネットへの移行により、ユーザーはソーシャルネットワーキングやその他のデジタルサービスを利用するようになった。重要でありながら短期間であったこの移行期間に、これらのテクノロジーやユーザーの行動の変化を迅速に利用するために、新しい機敏なスタートアップ企業が Facebook よりも適任になるリスクが生まれた。

63.　　　この脅威に対処する方法の 1 つは、この機会のさなかに Facebook の支配を脅かす可能性のあるスタートアップ企業を買収することであった。革新的なメカニズムを導入する競争上の脅威を買収することは、モバイルインターネットへの移行などの混乱の時期に支配的地位にあるものにとって特に魅力的である。この考えは、Facebook の事例に特に当てはまった。これは、同社が自社の製品をこの新しい環境に移行しようと試みなかったことによる。

64.　　　買収を通じて独占を維持することは、Facebook にとって自然な選択であった。同社は長年にわたり、競争ではなく買収を通じて優位性を達成し維持しようと努めてきた。これは、Zuckerberg 氏が 2008 年 6 月の社内メールに記載しているように、「競争よりも購入する方が良い」という Facebook の根強い見解を反映したものである。Facebook の買収は、しばしば潜在的なライバルの成長を阻止することに焦点を当てている。例えば、Facebook が 2008 年に Twitter を買収しようと試み、これが失敗した際、Zuckerberg 氏は次のように述べている。「製品を軌道に乗せるためにさらに使うことになったであろう時間を楽しみにしていました。」Facebook はまた、長年にわたり Snapchat を買収するために複数の予備交渉を

行い、Snapchat の競争力をさらに強化する資金豊富な候補企業が他にいるに違いないと感じた時、迅速に行動に移した。

65. パーソナルソーシャルネットワーキングサービスは、強力なネットワーク効果を特徴としている。一般に、ユーザーのより多くの友人や家族があるプロバイダーのサービスを使用している場合、そのサービスはそのユーザーにとってより価値がある。パーソナルソーシャルネットワーキングサービスが独占的な規模に達すると、これらの効果により、ユーザーがより高品質の製品を提供していると認識するライバルですら、競争と参入が難しくなる。

66. その結果、Facebook がよく理解しているように、Facebook Blue に対する競争上の最大の脅威は、ユーザーに対し優れた「メカニクス」（つまり、写真のシェアなど、友人や家族との独自のやり取りの方法）を提供することで、迅速に規模を拡大できる差別化された製品から生じる可能性がある。革新的な参入企業が規模を拡大し、ネットワーク効果の恩恵を受けるのを防ぐという Facebook の戦略は、イノベーターを獲得し、可能な場合にはその製品を会社の競争上の「堀」の不可欠な部分に変えることで構成されている。Zuckerberg 氏は、Instagram の買収を提唱する 2012 年 2 月の E メールで、この戦略を明確に説明した。「ここには、ソーシャルプロダクトと発明すべき有限の異なるソーシャルメカニクスに関するネットワーク効果がある。特定のメカニクスで誰かが勝つと、他の人は同じことをしていてもその勝者に取って代わることはなかなかできない。誰かが、ネットワークを移行させるほど優れたものを構築することにより Instagram に勝つことは可能だが、*Instagram が製品として動作し続けている限り、これはより難しくなる*」（強調は筆者）。

67. Zuckerberg 氏が認識していたように、規模を拡大できる企業を単に買収するだけで、Facebook はイノベーションの失敗を埋め合わせ、将来の脅威を予測することができる。「1 つの見方では、我々が実際に購入しているのは時間である。新しい競合企業が[]立ち上がったとしても、今我が社が Instagram、Path、Foursquare 等を買収することにより、誰かが再びこの規模に近づく前に、1 年以上かけてそれらのダイナミクスを統合することができる。その間に、我々が彼らの使っているソーシャルメカニクスを取り入れると、すでにそのメカニクスを大規模に展開しているため、*これらの新製品にはそれほどの牽引力がなくなる*」（強調は筆者）。

68. Facebook は長年にわたり、潜在的な脅威を早期に検知することに重点を置いてきた。これは、それらが単独で成長したり、他の潜在的な Facebook のライバルの成長を促進したりする機会を得る前に、無力化するためである。

69. Facebook が脅威を早期に検知することに注力していることは、「モバイル業界で最も包括的なマーケットインテリジェンスサービス」として名を連ねる企業である Onavo を 2013 年に買収したことで示されている。Onavo は、安全な仮想プライベートネットワーキングサービスを提供する会社としてユーザーに対し自主販売を行ったが、多くのユーザーには知られていないことながら、オンライン上でユーザーの活動の追跡もしていた。Facebook は、ユーザーを監視することによって、Facebook からユーザーを迂回させる可能性のある急速な成長を遂げているサービスを特定できるようになることを理解しており、そのため Onavo は「買収対象を特定するのに本当に優れていた」。

70. 2013 年 10 月、Facebook は Onavo を 1 億 4,000 万ドルで買収し、そこから数日のうちに、Onavo のビジネス顧客は、Onavo のサービスへのアクセスが 6 日後に終了すると知らされた。この動きは、Facebook と競合することを目的として、提携または買収する可能性のある企業を特定するために Onavo のサービスを使用していた可能性のある Facebook の潜在的なライバルを妨害することとなった。切り捨てられた Onavo の顧客は不満を表明した。

30

71.　Onavoを買収することで、Facebookは他のアプリの成長と人気を追跡するために使用したデータを管理でき、かつライバル企業によるそのデータへのアクセスを拒否できるようになった。2013年12月の社内スライド資料には、次のように記されている。「Onavoの買収により、最も人気のあるアプリについてのインサイトを得ました。戦略的買収にも活用すべきです。」Facebookは、Onavoのデータを使用して、Facebookの幹部向けの社内「Early Bird」レポートを生成した。このレポートでは、「モバイルエコシステムで卓越した速度や方法で注目を集めているアプリ」に焦点を当てている。

72.　Facebookは、Onavoのデータを使用して、WhatsAppを含む買収ターゲットを特定し、Zuckerberg氏がInstagramの購入に関連して特定したプレイブックを実行した。つまり、潜在的なライバルを買収し、ライバルのメカニクス展開を維持することで、同様のメカニクスを使用して規模を拡大する他者の取り組みを妨げたのである。例えば、FacebookはOnavoを使用して、公開からわずか9週間以内に1日のアクティブユーザー数250万人を達成した投票アプリである買収ターゲット「tbh」を特定したと報告されている。2017年の買収当時、tbhは10代の若者の間で人気があり、急速に成長していた。Facebookは当初、tbhを独自のブランドとして維持する計画を発表していたが、最終的にはそれを閉鎖することになった。

73.　Facebookは2019年に世間の厳しい目にさらされOnavoを閉鎖したが、他のデータを使用して潜在的な競争上の脅威の追跡と評価を続けている。

74.　Onavoのモバイルデータにより、潜在的な脅威を特定して排除するFacebookの能力が高まったが、FacebookはOnavoの買収以前から同じ基本戦略を何年も実行していた。例えば、2008年にFacebookは、Octazenという会社によるコンタクトインポートサービスを認可した。コンタクトインポートサービスは、ユーザーのデジタルアドレス帳からコンタクト情報をシームレスに引き出し、アプリで使用するようにインポートすることで、直接的なネットワーク効果に不可欠なコンタクト情報のネットワークの急速な成長を促進している。Facebookはすぐに、Octazenの買収によって、成長とエンゲージメントのためのこの「主要」なリソースをライバルと潜在的なライバルから奪うことになると気がついた。ある幹部によると、「[Octazenの買収]によって、．．．業界の他のすべての人がコンタクトインポーターライブラリのプロバイダー持たずにいることになる」とのことである。買収についての議論で、Facebookの幹部は、OctazenがFacebookに何を追加するかではなく、買収によって、ライバル企業がユーザーインタラクションを増やし、ネ

31

ットワーク効果を生み出すためのテクノロジーの鍵を獲得するのを、Facebook がいかに拒否するかに焦点を当てた。このダイナミクスについて、別の幹部は、Octazen の「買収は、*数百万人* で、*競合他社の一部を4分の1 程度減速させる*ことができれば、面白いかもしれない...」と説明した。2010 年 2 月に買収が完了した直後に、Facebook は Octazen へのすべての第三者アクセスを終了した。

75.　同様に 2012 年、Facebook は、Google が Google による新しいパーソナルソーシャルネットワーキングサービスの Google+の成長を促進する可能性がある新しい「ソーシャルディスカバリー」アプリの「獲得を積極的に試みている」ことを知った。Glancee という名のこのアプリは、ユーザーが新しい人々と出会うのを支援するためにジオロケーションサービスを利用していた。その後、Facebook は Glancee を買収し、同時にアプリを閉鎖し、Glancee の 3 万人のユーザーへのサービスを終了した。2 年後、Facebook は、Facebook Blue 上で、Glancee の技術を利用した位置情報ベースの機能を立ち上げたが、既存の Facebook の友人が近くにいる時だけユーザーが知ることができるよう、規模を縮小して展開した。

76.　同様に、拡張現実効果でユーザーがミュージックビデオを作成およびシェアできるアプリ、EyeGroove に Snapchat や他の企業が関心を持っていたことを知った後、Facebook は 2016 年、すぐにそのアプリの買収を決め、その後アプリを閉鎖した。

## V.　FACEBOOK の反競争的行為

77.　モバイルへの移行の「リスクを回避する」という Facebook の取り組みの中心にあるのは、新しいモバイル環境で Facebook を凌ぐ恐れのあるイノベーターを買収または封じ込める戦略であった。

78. Facebook の反競争的な行動には、重要な独立したパーソナルソーシャルネットワーキングプロバイダーを無力化した Instagram の買収と継続的な管理、Facebook のパーソナルソーシャルネットワーキングサービスの独占に対する重要な競争上の脅威を無力化した WhatsApp の買収と継続的な管理が含まれる。こうした競争上の脅威を買収することで、Facebook は、メリットにおいて競うのではなく、競争を避けることにより、競争やユーザーに損失を与えるまでに、競争上の優位性を維持することが可能となった。

79. Facebook の行動方針には、プラットフォームと相互運用する企業との契約に具体化された条件付き取引ポリシーも含まれ、これは Facebook がプラットフォームへのアクセスを武器として使用する方法として導入した。Facebook は、他の潜在的な脅威を封じ込め、ライバルが Facebook の独占力を損なうのを防ぐために、これらの合意を実行し、必要に応じてこれを強制執行した。

## A. Facebook は、Instagram や WhatsApp の買収を含み、独占的地位を守るために反競争的買収を実行した

### 1. Facebook、競合他社を無力化するために Instagram を買収

80. Instagram のモバイル向け製品を考えると、Instagram は Facebook の独占的地位にとって深刻な脅威であった。Instagram は、2010 年 10 月に iOS デバイス向けに提供開始された後、友人や家族との写真ベースのソーシャルインタラクションを促進する製品を求めるユーザーの間で急速に人気を博していた。

81. Instagram の成長は目覚ましいものであった。初日には 25,000 人のユーザー、1 週間後には 100,000 人のユーザー、3 か月足らずで 100 万人のユーザー、1 年足らずで 1,000 万人のユーザーを獲得した。これはいずれも Android デバイスでのサービス提供開始前のことであり、Apple の iOS デバイスでのみ利用可能であった時点の数である。

82. Facebook は、Instagram の出現を不安感を高めながら目の当たりにしていた。2011 年 2月、Zuckerberg 氏は同僚に次のように書いている。「4 か月で 200 万人に至るユーザーが利用し、1 日 30万枚の写真をアップロードできるようになっている。これはすごいことだ。綿密に追跡していかなければならない。」

83.　　　Facebook は当初、モバイル写真共有機能のメリットで競争しようと試み、独自のカメラアプリであるコード名「Snap」の開発に多大なリソースを投入した。しかし、上級管理職からの絶え間ないプレッシャーにもかかわらず、これらの努力により達成された成功は限定的であった。2011 年 7 月、ある幹部は次のように要求した。「なぜ、モバイル写真アプリの開発がこんなにも遅れているのか？ いまだに Instagram に引けを取っている。」2011 年 9 月までに Zuckerberg 氏は憤慨し次のように述べている。「このことに関して一丸となって行動するのに時間をかけている間にも、Instagram はモバイル写真において当社にとって大規模で実行可能な競合企業となっており、ますます写真の将来像となっていくだろう。」

84.　　　写真は Facebook Blue の多くの機能の人気に不可欠であり、そのため Facebook Blue の全体的な普及率にも不可欠であることを認識し、2011 年 9 月の同 E メールにおいて、Zuckerberg 氏は Instagram が大きな脅威であると警告した。

> *ニュースフィード、タイムライン、Open Graph など、これからリリースする多くの製品の 1 つのテーマは、綺麗で大きな写真が好まれるということである。多くの場合、新しいニュースフィードやタイムラインがどのように機能するかさえ人々には理解されていないが、大きめでより鮮やかな写真のおかげで、これらの製品に人気がある。これは短期的には良いことだが、写真スペースがまったくない場合、これは当社にとって大きな戦略的リスクであると考えている。Instagram がモバイルで覇権を握り続ける場合や、Google が買収する場合、今後数年で、今我々が行っていることをコピーしたサービスの一部が彼らにより簡単に追加されてしまい、人々の写真の数が増えれば、それは我々にとって大きな問題となる。*

> *現在、彼らは非常に急速に成長している。数か月ごとに 2 倍になっていると見られ、すでに 500 万人から 1,000 万人のユーザーを抱えている。魅力的な製品を発売すればすぐに、多くの人々が当社の製品の方をより使用し、将来の Instagram ユーザーはもはや Instagram を使用しなくなるだろう。しかし、現在のペースでは、文字通り、私たちが無駄にしている数か月ごとに、彼らの成長が 2 倍になり、我々に勝ち目がなくなってしまう。（強調は筆者。）*

85.　　　Facebook の従業員は、Zuckerberg 氏の要望に応えるために奮闘した。2011 年 9 月 13 日付けの社内メールにおいて、Facebook のエンジニアリング担当ディレクターはチームに次のように念押しした。「ザックは、（主に Instagram の成長を遅らせたいという願望が動機となり）[Facebook]スナップアプリに不安を抱いている。」

86.　　Facebook の幹部は、独立した Instagram だけでなく、Google（上記の 2011 年 9 月の E メールで Zuckerberg 氏が言及）、Apple、Twitter などの別の買収者の手に Instagram が渡ることについても恐れていた。2012 年 4 月、Facebook のエンジニアは Zuckerberg 氏に「Apple のような誰かが[Instagram]を足掛かりとして使う可能性」について警告した。また、Instagram の投資家と元 Facebook の幹部が、Twitter の脅威を強調している。「twitter と instragram[原文ママ]が 1 つの企業になったら、Facebook にとってより困難な状況になる」とのことである。

87.　　Instagram が急成長するにつれ、Facebook のリーダーは、競合するのではなく、Instagram の買収の見込みに焦点を当て始めた。例えば、2012 年 1 月、Facebook の社内合併・買収（「M&A」）グループの責任者は Zuckerberg 氏に、ユーザーの切替コストを増やし、エンゲージメントを維持し、ユーザーを Facebook Blue に固定するために、この問題の解決策として「m&a」を提案した。

> 写真は一般的に、そしてモバイルとの組み合わせにおいて私たちの弱点だと[私は]思っているが、多くのユーザー[の]fb へのエンゲージメントの大きな部分を占めている。私は、これは重大な脅威（google/picasa/android、instagram など）であり、かつ機会でもあると考えている. . . imo[原文ママ]、写真（包括的／スマートな連絡先やユニファイドメッセージングとともに）は、ユーザーの切替コストを非常に高める最も重要な方法の 1 つであるだろう。（モバイルとウェブ）でのアップロード[原文：upoading]や編集、整理、シェアの機能がクラス最高なためにすべてのユーザーの写真が格納されている場所にいた場合、これらの写真や関連するデータ／コメントを持ち込めないと、ユーザーにとって切り替えるのは非常に困難となる。この分野は、特に競争力学を考慮すると m&a を通じてそして組織的に優先すべきだと考える。（強調は筆者。）

88.　　2012 年 2 月までに、Zuckerberg 氏は、独立した Instagram が間もなく圧倒的な規模に達すると予測し、Facebook が買収を進めるべきだと提案した。

> [私の分析]フレームワークが真実であれば、Instagram のようなアプリはかなり大幅に成長できると期待すべきだろう。現在 1,500 万人のユーザーがいる場合、今後 1～2 年間で 1～2 億人に達する可能性がある。（iOS は来年だけで 2 倍になり、Android に普及するはずであり、そのため市場シェアがそれ以上増えていなくても今年は 4 倍以上に成長するはずなので、直感的には常軌を逸してはいない。）これらの前提が成立すれば、現在よりもこれらの企業を買収することに前向きであるべきだろう。（強調は筆者。）

89.　　　この期間を通して、Zuckerberg 氏は、パーソナルソーシャルネットワーキングの競合企業としての Instagram の脅威の観点から、買収のケースについて繰り返し説明していた。2012 年 2 月、彼は次のように書いている。

> *Instagram の買収を検討すべきか考えている。5 億ドルに及ぶとしても . . . ネットワーク部分について、懸念される傾向は、技術系でない高校生から FB 社員まで、毎日多くの人が Instagram を利用しているということである。そして、彼らはその写真のごく一部しか FB にアップロードしていないのだ。*これにより、私たちにとって大きな穴が生まれ、私が確信している、プラットフォーム上でまたはソーシャルダイナミクスで我々がやろうとしていることは、すべて解決されるだろう。大量の写真をアップロードすることで FB の友人を困らせたくないような場合には、写真を投稿する場所に代わりに投稿することがある。[Facebook] Snap での我々の基本的なテーマは、人々が必要としているのは多くの写真を FB に投稿するための良い方法である、ということである。フィルターについては取り組んでいるが、その取り組みは多くあるわけではない。チームは、これをより素晴らしい特徴として、またはギミックとしてアプローチしている。一方、Instagram では、美しい写真を撮る手助けという視点からこの問題にアプローチしている。*我々の最初の定説が間違っていて、彼らの定説が正しいと言う可能性は十分にある。人々が望むのは、FB に投稿するよりも、最高の写真を撮ることにある、という定説だ。*もしそうなら、*[Facebook] Snap は良い最初のステップであるかもしれないが、Facebook のコアユースケースの 1 つがモバイル世界でどのように進化するか、どちらをより恐れるべきか、そしてなぜこのために多額のお金を払うことを検討することを希望するかについて、機能性とブランドの両方において非常に後れを取っている。*（強調は筆者。）

90.　　　その月の後半、Zuckerberg 氏は Facebook の最高財務責任者（「CFO」）である David Ebersman 氏に似たような言葉で次のように書いている。

> ビジネス上の 1 つの質問として最近、*当社の製品と競合するネットワークを構築する Instagram や Path などのモバイルアプリ会社を買収するために、いくら払えるのかということを考えている。*これらの企業には、何百万人ものユーザー（Instagram では現時点で最大約 2,000 万人）がいて、急成長しており、小規模チーム（従業員 10〜25 人）で、収益を上げていない。ビジネスは初期段階だが、*ネットワークが確立されており、ブランドはすでに有意義で、それらが大規模に成長すれば、我々に非常に破壊的な影響を及ぼす恐れがある。*これらの起業家は、（大体は当社の成功[に]インスピレーションを受けて）販売しようとしないが、5 億ドルや 10 億ドルなど、十分な価格を提示すれば販売を検討するのではないか。今のところ、当社のバリュエーションはかなりアグレッシブであり、モバイルでは脆弱だと考えているため、これらの企業の 1 つか 2 つについて買収を持ちかけるべきかどうかに興味がある。これについて意見を聞かせてほしい。（強調は筆者。）

91.　　　Ebersman 氏は、「またすぐ同じような存在が出てくる」こと、そして「我々は常に追い上げられる立場にある」ことから、新興の競合他社を買収することは買収の理由としては不十分であると警告した。しかし、Zuckerberg 氏が説明したように、Ebersman 氏は次の点で間違っていた。

> これは (1)[つまり潜在的な競合企業を無力化すること]と (3)[買収した製品を Facebook に統合すること]の組み合わせである。基本計画は、これらの企業を買収し、その製品を稼働させ続ける―

方で、その企業が発明したニ―ソーシャルメカニクスを時間をかけて当社のコア製品に組み込むことである。ここで[潜在的な競合他社を無力化させること]の妥当性を高める1つの点は、ソーシャルプロダクトと、発明すべき有限の異なるソーシャルメカニクスに関するネットワーク効果があるということである。特定のメカニクスで誰かが勝つと、他の人は同じことをしていてもその勝者に取って代わることはなかなかできない。誰かが、ネットワークを移行させるほど優れたものを構築することによりInstagramに勝つことは可能ですが、Instagramが製品として動作し続けている限り、これはより難しくなる。[買収した製品をFBに統合すること]も要因であるが、実際には、これらの企業のソーシャルダイナミクスはすでに把握しており、今後12～24か月にわたって統合する予定である。統合計画には、理にかなった製品を直接統合するのではなく、当社の製品にそのメカニズムを組み込むことが含まれる。(1)と(3)を組み合わせることで、1つの見方では、我々が実際に購入しているのは時間である。新しい競合企業が[]立ち上がったとしても、今我が社がInstagram、Path、Foursquare等を買収することにより、誰かが再びこの規模に近づく前に、1年以上かけてそれらのダイナミクスを統合することができる。その間に、我々が彼らの使っているソーシャルメカニクスを取り入れると、すでにそのメカニクスを大規模に展開しているため、これらの新製品にはそれほどの牽引力がなくなる」(強調は筆者。)

92.     2012年3月9日、Zuckerberg氏はFacebookのエンジニアリング担当バイスプレジデント

(および後の最高技術責任者である)Mike SchroepferにEメールを送った。そのEメールは以下について

知らせるものだった。「昨日、InstagramのKevin [Systrom]が私に電話をかけてきて、彼の[会社]を我が社

に売却することについて話した。資金を調達するか、5億ドルで売却するつもりとのことだ。」Schroepfer氏

は、「写真における戦略的地位を失わないことは、多額の金銭に値する」と答えた。

93.     同様に、2012年4月4日、Sandberg氏とその他の上級管理職は、iPhoneでのInstagram

とFacebook Blueの使用を比較したEメールレポートを受け取った。このレポートには、「iPhoneでの

Facebookは[Instagramより]それほど先を行くものではない」というフラグが付けられている。Sandberg氏

は、Zuckerberg氏にEメールを転送し、次のように述べた。「instagramを買収したい気持ちが高まった[。]」

94.     一方、Facebookの従業員は、Facebook Blueネットワーク用のスタンドアロンの写真共有ア

プリを開発することで、Instagramと競合する取り組みを続けた。2012年4月3日付のEメールにおいて、

Schroepfer氏はFacebookの写真アプリに関してFacebookエンジニアに念押しした。「出荷モードに至急入

る必要がある。最近のinstgram [原文ママ]の数字をあなたが見たかどうかはわからないが、我々には時間

がない。」エンジニアは次のように答えた。「はい、Instagramの統計は恐ろしいもので、できるだけ早く出荷

する必要があります。リリースモードに入る必要があることをチームに伝えます。」

95.     2012年4月9日、Facebookは、Instagramを10億ドルで買収する合意に達したと発表し

た。これは、その日現在、Facebookの最も高価な買収であった。FacebookがInstagramに高額を支払った

ことは、Instagram が Facebook の独占に与えた大きな脅威を反映している。同日、Zuckerberg 氏は脅威の抑制を祝して個人的に同僚に対して以下のように書いている。「当社の脅威は Google+ではなく、Instagram であるというあなたの社内投稿を覚えている。基本的にはその通りであった。ただしスタートアップ企業について 1 つ言えるのは、多くの場合、その企業を買収できるということである。」

96.        一方、Facebook の従業員は、存続にかかわる脅威の買収を喜んでいた。例えば、発表から 2 日後の 2012 年 4 月 10 日、Facebook の社内 M&A グループの責任者は、Ebersman 氏に、Instagram は、「現在私たちが知っているソーシャルネットワーキングの主な信条の 1 つ（写真）で、ただしソーシャルネットワーキングが明らかに目指している場所（モバイル）で素晴らしい仕事を遂行した」と強調した。彼は「彼らの成長軌跡はかなり驚くべきものだ。マークは昨日訪問中にいつ 1 億ユーザーに達するかと尋ねたが、彼らは今年の終わりを見込んでいると言っていた」と述べた。

97.        Facebook の忠実な他のオブザーバーは、Facebook が Instagram を買収することで競争上の重大な脅威を無力化したことを認識していた。例えば、2012 年 4 月 12 日付けの E メールにおいて、Facebook の主要株主であり元 Facebook 幹部のある人は、Instagram の共同創業者である Kevin Systrom に次のように書いている。

>   私は、Zuck を含むさまざまな FB 関係者に対して、少なくとも 6 か月間、迅速にこれを実行するよう、そしてどんなことをしてもこれを実行するよう促してきました。私の視点では、あなた方を買収しない（そして例えば Google 等が貴社を買収する）というリスクに対し、私や他の大株主の多くは非常にやきもきするようになっていました...ここ数年の[Facebook]は、[その]コアの写真製品（およびそのモバイル製品）を停滞させていました。その結果、写真製品はその最高の潜在力を実現できず、さらに悪いことに、思いがけない事態が発生するリスク、つまり「並列グラフ」を持つ別のネットワークによって失墜させられるリスクに陥りました。ご存知のように、写真は Facebook の生命線であり、利用状況、やり取り、Facebook が生成するポジティブなフィードバックループを通じてネットワーク全体を下支えしており、サイトにいる時間は写真閲覧に直接結びついています。2005 年にさかのぼると、私が写真を立ち上げた直後、写真は Facebook のページビュー全体の約 50%に上っており、この統計はプラットフォームにゲームが導入されるまでかなり安定していました。（強調は筆者。）

98.        Zuckerberg 氏は、買収が発表されてから 2 週間足らずで、Instagram 取引の直接的な結果として、Facebook 独自のモバイル写真アプリへの投資をキャンセルまたは縮小することを提案し、2012 年 4 月 22 日付の E メールに次のように記載している。「縮小またはキャンセルできるものの例：.... モバイル写真アプリ（Instagram を買収中のため）」。そして、Facebook は実際に停止を実現させ、2014 年に完全に

中止する前に 2 つの更新のみを行った。

99. Instagram の買収を受けて、Facebook の従業員は、モバイル写真共有を使用するパーソナルソーシャルネットワーキングの競合他社が登場することを恐れる必要がなくなったと感じた。例えば、2012 年 4 月 23 日付けの E メールにおいて、Facebook のビジネス開発マネージャーは同僚に、特に「Instagram は iOS において明らかに勝者であり、この時点では競争するのが困難である[。]」という理由で、Camera+と Hipstamatic のアプリについて心配していないと書いている。2012 年 10 月の文書において、ある Facebook の製品ディレクターは、Instagram の所有権が「写真共有を効果的に支配する」ことを意味し、その支配を「維持または拡大するために多くの作業を行う必要」はないと認識した。

100. Facebook による Instagram の買収は、強力な脅威であるパーソナルソーシャルネットワーキングの競合企業および Facebook Blue の独占に対する深刻な脅威を無力化させた。2011 年 5 月 31 日付けの投資家向けスライド資料では、Instagram の創業者による「完全なソーシャルネットワーキングサービスを開発する」計画を明確に示している。Systrom 氏は、買収の直前の私信において、Zuckerberg 氏にこのビジョンの幅広さを強調した。

*私の Instagram に対するビジョンとは、ただ単に機能の範囲を写真だけから拡大するのではなく、実際の世界でのコミュニケーションや共有方法を改善するという、Burbn [Instagram の元の名称] の当初のビジョンを支える他のメディアを探ることです。次世代の写真アプリとなるか、それとも次世代のコミュニケーションアプリとなるか。過度に哲学的なものになるわけではありませんが、私たちの野心の限界はまだまだ試されていないので、少なくとも今のところはそれを見たいと思っています。FB の規模で効果を出したいという願望は実物であり、実は私たちの心の中でバランスを取るのが非常に難しいものなのです。(強調は筆者。)*

101.    Instagram はまた重要な広告の競合企業になることを計画し、期待している。2011 年 5 月 31 日付けの投資家スライド資料には、モバイル広告を通じて収益を得る Instagram の計画が記録されている。同様に、Systrom 氏は 2012 年 1 月の E メールで、外部パートナーに次のように説明した。「長期的に見て、ブランドは、注目される、コンテンツが注目される、またはターゲットを絞った『instagram』を人々に広告として実行することのいずれかにお金を払うだろうと信じています。広告主へ売ろうとする前に、人々が好む製品の構築に取り組むのに十分な資金を集めることができた段階にいます。まずオーディエンスを獲得したいのです[。]」

102.    Facebook は Instagram を買収することで、Facebook Blue の独立した競合企業としての Instagram を無力化した。買収以来、Facebook は Instagram の Facebook Blue への影響を減らすための措置を講じており、Instagram が Facebook のパーソナルソーシャルネットワーキング独占に対する重大な脅威であることが確認されている。例えば、買収後、Facebook は、ユーザーを Facebook Blue から引き離す可能性のあった Instagram のプロモーションを制限した。これについて Systrom 氏は失望し、2012 年 11 月の E メールで苦情を申し立てた。「FB のエンゲージメントへの影響を理解するまで、Instagram を宣伝できないことについてあなたは言及し続けていますが、誰の決定ですか?」

103.    Facebook の成長担当バイスプレジデントは次のように答えている。「[製品担当バイスプレジデントの] Chris [Cox] は、instagram のフィードが複数のフィードをチェックするために、当社自身の／トレーニングユーザーを引き抜くことに関する懸念を表明しました(私も同意しています)。そのため、まず、我々のエンゲージメント上での instagram の使用の影響を測定して、それがすべて増加していることを確認する必要があります. . . . FB のエンゲージメントへの影響を理解しないまま、プロモーションを通じて Instagram を盲目的に成長させるのが理にかなっているのか確信が持てません[。]」

104.    しかし、Facebook Blue に対する Instagram の影響を最小限に抑えるという Facebook の取

り組みにもかかわらず、Facebook Blue は引き続き Instagram よりも不利なままとなっている。例えば、2017 年 9 月の文書には次のように記載されている。「ユーザー間のダイナミクスは、一部は Facebook の費用負担で、Instagram への継続的な転換を示唆しています。」また別の内部スライド資料では簡潔に次のようにまとめている。「FB と IG は、友人向け＋フィードアプリのようだ。」

105.　要約すると、Facebook による Instagram の買収と管理は、Facebook Blue のパーソナルソーシャルネットワーキングの独占に対する重大な脅威の無力化と、メリットに関する競争以外の手段によるその独占の違法な維持を意味している。この行為は、独立した Instagram からの競争の利益をユーザーから奪うものであり（単独またはサードパーティからの獲得による）、これにはとりわけ以下を含む。競争力のある意思決定とイノベーションのさらなる場所の存在；広告の負荷とプライバシーのレベルを含む、Facebook Blue のユーザーに対する扱いとサービスレベルの確認；Facebook の管理下にないユーザーのためのパーソナルソーシャルネットワーキングの代替プロバイダー；それに対しメリットで競争することについての Facebook への働きかけ。Facebook が有する Instagram の所有権と支配権はまた、パーソナルソーシャルネットワーキングの競争や参入を抑止し、妨げる保護的な「堀」を維持している。

106.　Facebook は、Instagram の買収を正当化するのに十分な、合併固有の効率性またはその他の競争促進的な利益を実証することができない。

**2. Facebook は WhatsApp を買収し、パーソナルソーシャルネットワーキング独占に対する競争上の脅威を無力化**

107.　Instagram からの脅威を無力化した後、Facebook は、Facebook Blue にとって「次に大きな消費者リスク」であると考えたものに注目した。つまり、モバイルメッセージングサービスを提供するアプリが、パーソナルソーシャルネットワーキング機能を追加するか、派生したパーソナルソーシャルネットワーキングアプリを立ち上げることで、パーソナルソーシャルネットワーキング市場に参入するリスクである。Facebook は、人気があり広く使用されているモバイルメッセージングアプリである WhatsApp を、この点で最も重要な脅威として特定した。しかし、ここでも、Facebook は、WhatsApp を打ち負かすために投資し革新するのではなく、それを買収することで競争上の脅威に対応した。

108.　Facebook の幹部はすぐに、十分な規模に達したモバイルメッセージングアプリが、さらなる機能や特徴を追加することで、パーソナルソーシャルネットワーキング市場に競争力のある規模で参入し、Facebook Blue のパーソナルソーシャルネットワーキングの独占を弱体化または置き換えることができることに気が付いた。2012 年初頭までに、複数のモバイルオペレーティングシステムで利用可能な成功したモバイルメッセージングアプリがパーソナルソーシャルネットワーキングに侵入するリスクは、会社の経営陣にとって戦略的焦点となった。例えば、2012 年 4 月の E メールで、Zuckerberg 氏は、以下の問題のあるグローバルトレンドを特定した。「メッセージングアプリは... より一般的なモバイルソーシャルネットワークを構築するために、メッセージを出発点として使用している。」そして 2012 年 10 月までに、この脅威は Facebook 内で広く認識され、Facebook のビジネス成長ディレクターは、「これは企業としてこれまで私たちが直面した中で最大の脅威かもしれない」と社内で予測するようになっていた。

109.　Facebook の幹部は、モバイルメッセージングがパーソナルソーシャルネットワーキング市場に参入する深刻な競争上の脅威の道筋となるのではないかと恐れていた。例えば、2012 年 4 月の E メールで、Facebook のデータサイエンティストは次のように指摘している。「これらの[モバイルメッセージング]アプリは、SMS の代替として開始され、従来のソーシャルネットワーキングサービスによく似たドメインにますます拡大しています。」数週間後、彼は再び同僚に次のように書いている。「モバイルメッセンジャーアプリに引き続き注目しています。次の 2 つのポイントがあります。これらのアプリのいくつかは、より本格的なソーシャルネットワーキングに拡大しようとしており、多くのアプリは、国際的な拡大に取り組んでいますが、成功度はさまざまです。」同様に、2013 年 8 月の E メールで、Facebook の社内 M&A グループの責任者

は、「恐ろしいことは、言うまでもなく、この種のモバイルメッセージングは、当社がこれまでウェブでリードしてきたモバイルでのより広範な社会活動／共有に対して不和を生じさせるものだということです」と警告した。

110.　Facebook の幹部と従業員は、これを深刻な戦略的脅威と見なした。例えば、2012 年 10 月 4 日付の E メールにおいて、Facebook の製品管理担当ディレクターは、モバイルメッセージングサービスの競争の対象について同僚に次のように書いている。「これは私が Facebook で働いてきた 5 年間で目の当たりにした中で最も大きな製品への脅威です。G+を凌駕するほどで、全員が恐怖を感じています。これらの人々には、最も親密なソーシャルグラフ（つまり、モバイルでメッセージを送る相手）から始めて、そこから構築するという、信頼できる戦略があります。

111.　同様に、2013 年 2 月の Facebook 取締役会プレゼンテーションで取り上げられた「モバイルメッセージング」というメモでは、以下のように警告している。モバイルメッセージングサービスが、「グラフとコンテンツ共有の両方という当社の中核事業にとっての脅威である。それらはゲームプラットフォーム、プロフィール、ニュースフィードを構築している。競合他社には、モバイルファーストのソーシャルネットワークを構築するためのすべての要素が備わっている. . . . 今のペースでは、WhatsApp は 1 年後に SMS レベルのメッセージングに近づくだろう[。]」

112.　Zuckerberg 氏はまた、モバイルメッセージングサービスの戦略的価値を、それ自体が人気のある重要なサービスであると認識している。例えば、2012 年 4 月、彼は次のように述べている。「実際には、メッセージは誰の電話でも最も重要なアプリだと思います。最大のビジネスではないかもしれませんが、ほぼ間違いなく最も使用されているアプリであるため、当社にとって重要な戦略的ポイントです。」次のように続けました。「Instagram を買収（そして期限を延長！）して以来、今では写真では一歩先を行きつつも、メッセージでますます遅れをとっているように感じています。」

113. Facebook は間もなく、大手 OTT モバイルメッセージングサービスプロバイダーであり、Facebook Blue のパーソナルソーシャルネットワーキング独占に対する競争上の大きな脅威である WhatsApp に恐れの焦点を向けた。2009 年 11 月に発売された WhatsApp は、非常に強力なユーザーエクスペリエンスと最高レベルのプライバシー保護により、驚異的な成長を遂げた。2014 年 2 月には、WhatsApp は世界中で 4 億 5,000 万人以上の月間アクティブユーザーを擁し、1 日当たり 100 万人のユーザーを獲得し、「10 億人の人々をつないで」きていた。

114. アジアの一部で大規模なユーザーベースを構築したが、欧米には参入しなかった他のモバイルメッセージングアプリとは異なり、WhatsApp はアジアとヨーロッパで巨大な規模を達成しただけでなく、米国でもシェアを拡大していた。Apple のデバイス上の iOS オペレーティングシステムに限定されている Apple の iMessage アプリとは異なり、WhatsApp はすべての主要なスマートフォンオペレーティングシステムで利用可能であり、プラットフォーム間の大規模なスケールを達成するための信頼できる脅威として位置付けられていた。そして従来の SMS とは異なり、WhatsApp はソーシャルネットワークのようなリッチなコンテンツ共有機能を提供し、プライバシー意識の高いユーザー向けに暗号化を強化したのだ。その結果、2014 年までに WhatsApp はモバイルメッセージングにおける明確な「カテゴリーリーダー」となり、パーソナルソーシャルネットワーキング市場への移行や派生を脅かすこととなった。

115. WhatsApp の規模拡大を防ぐための直接的な取り組みとして、2011 年秋、Facebook は OTT モバイルメッセージングサービスを提供するアプリ、Facebook Messenger を立ち上げた。世界的な発売日に、Facebook Messenger の製品ディレクターはチームに次のように書いている。「世界中の真剣なモバイルメッセージングユーザー向けのアプリとして、Whatsapp と競合した素晴らしい写真があります . . . . Whatsapp には 1,500 万人（登録済み？）のユーザーがいます。1 日のアクティブユーザー1,000 万人にどれだけ早く到達できるか見てみましょう。」

116.    しかし、Facebook はすぐに WhatsApp よりもはるかに遅れていることに気がついた。パフォーマンスと利用率を改善するには、Facebook は大量のリソースを費やして追いつく必要があった。Zuckerberg 氏が 2012 年 4 月に次のように発表した。

> 現在、Facebook の統合は別として、WhatsApp はスタンドアロンの Messenger アプリよりもモバイルメッセージングに適した製品です。メッセージの送信は、より信頼性が高く高速です。開封確認と最後に見た時刻によって、より良い信号とフィードバックが得られます。連絡先の統合により、ほとんど誰にでも簡単に連絡できます。[W]hatsApp は、1 日当たりのモバイルメッセージを当社と比べて 2 倍以上多く送信し、週ごとに約 3 倍速く成長しています。これは大きな問題です... 残念ながら、彼らの勢いと成長率という利点を直接最小限に抑える方法はないと思います。彼らの成長は、彼らが構築した製品とネットワークからもたらされます。ですから、私たちができる最善のことは、製品とネットワークをできるだけ迅速に構築することです。

117.    Facebook の幹部は、WhatsApp が、ヨーロッパやその他の場所ですでに実行していたように、米国でモバイルメッセージングの規模を拡大する脅威が、間違いなくあるとはっきり理解した。ある幹部は 2013 年 8 月 8 日に Zuckerberg 氏に次のように書いている。「本当に心配です・・・[WhatsApp]は本気です！」そして次のように続けた。「メッセージングの状況を解決する機会が減る中、messenger 3.0 に追加したいことがいくつかあります。オフラインで簡単に相談して、お考えを把握し、今強化すべきかどうか確認します（WhatsApp が成長し続けるスピードや野心を鑑みて、やるなら今でしょう）[。]」Zuckerberg 氏は次のように答えた。「SMS を無料にするだけでなく、実質的な機能を構築すれば、SMS がまだ主要なプラットフォームである米国のような市場を開拓するのに十分かもしれません。」

118.    Facebook の幹部と従業員は、Facebook Messenger を介して競争を通じて未然に防ぐことができない、Facebook Blue にとっての独自の脅威として、WhatsApp を社内で繰り返し指摘した。例：

a.   2013 年 5 月、Facebook の製品成長担当ディレクターは、WhatsApp の CEO である Jan Koum に、彼が「今日の最大の競合／脅威である」とコメントした。

2013 年 7 月、エンジニアリングディレクターは次のように述べている。「Facebook を倒せるものを我々が構築しなければ、他の人にやられてしまうでしょう。そしてそれが WhatsApp です（以下を参照）。個人的には、WhatsApp のような企業は Facebook の最大の脅威だと思っています . . . [。]」

   c.　2013 年 8 月、成長担当バイスプレジデントは次のように述べている。「私たちは決して、whatsapp と同じ土俵でプレーしているわけではありません...『最初から戦略を練る』には、今日の時点ですでに遅すぎるかもしれません . . . [。]」

   d.　2013 年 9 月、成長担当バイスプレジデントはさらに、WhatsApp が「ユーザーエクスペリエンスを向上させる／成長を促進する方法で」プラットフォームになったら、最悪であり、これにより彼らのリーダーとしての地位が固まると述べた。

119.　Facebook は、WhatsApp が単独で行うことについて恐れただけでなく、別の買収者の手に渡って WhatsApp が行うことについても恐れた。Facebook の成長担当バイスプレジデントが 2012 年 10 月に書いたように、「最も大きな問題は、それが間違った相手に渡ったらどうなるか...」ということであった。Facebook は特に WhatsApp の Google による買収を恐れていた。Facebook が 2011 年に買収したメッセージングアプリのエンジニアリングマネージャー兼共同創設者は、2012 年 10 月に同僚に以下のように警告した。「Google が WhatsApp を買収する傾向は、過去 6 か月で強くなりました. . . . [WhatsApp]は、とにかく取得可能であるため、我々が買収者でなくなるリスクは増大しています。」Facebook の成長担当バイスプレジデントは次のように同意した。「私が彼らだったら、間違いなくそうするでしょう。」

120.　Instagram と同様に、Facebook は、パーソナルソーシャルネットワーキング独占に対する競争上の大きな脅威を無力化するため、WhatsApp と競合するのではなく、WhatsApp を買収することにした。2012 年 4 月、Zuckerberg 氏は次のように述べている。「最も心配なのはメッセージです。WhatsApp はすでに、Instagram が写真で私たちの[先]にいたのと同じ方法で、メッセージで私たちの先を行っています。」彼は次のように付け加えた。「もし獲得できるのであれば、10 億ドルを支払います。」

121.　Facebook は、2012 年 11 月に買収の可能性について最初に WhatsApp に連絡を取った。そして 2014 年 2 月に再度連絡を取り、そのときにさらなる成功を収めた。2014 年 2 月 19 日、Facebook は WhatsApp を 190 億ドルで買収する契約を発表した。この評価は、WhatsApp が Facebook のパーソナルソーシャルネットワーキング独占に与えた脅威の深刻さを反映している。

122.　Facebook の従業員が、存続にかかわる競争における脅威の無力化を喜んだのは、2 年の

うちで2回目であった。2014年2月19日付けのインスタントメッセージで、Facebookのマネージャーは次のように承認した。「よくやりました。その数は天井知らずで、特に海外では誰もが使っています。おそらく、*モバイルだけで次のFBに成長できた唯一の企業でしょう[。]...* 当社の時価総額の[1]0%はそのの価値があります」（強調は筆者追加。）

123.　　数日後、Facebookの幹部は同僚にWhatsAppの買収を「土地の争奪」として要約して書いている。これは、将来定期的に繰り返す必要があるものではなく、限られた期間の競争上の脆弱性に対する重要な対応である。

> 大きな懸念は、時価総額の5〜10%を数年ごとに投資して、ポジションを強化することです。私は、これがモバイル環境の変化が始まる「時点」だと思っているというDavidの答えを気に入っています。「土地の争奪」という言葉は嫌いですが、それが最も説得力のある論拠だと思います。私たちはそれを所有すべきです。

124.　　Facebook以外では、業界アナリストもWhatsAppの買収がFacebookに対する競争上の大きな脅威を無力化したと理解していた。投資銀行のSunTrust Robinson Humphreyは、この取引について次のように明確に述べている。

> なぜWhatsAppが単なる「メッセージング」以上の脅威だったのかは簡単に分かると思います。Facebookによる Instagramの買収が攻撃的かつ防御的なものであったように、この買収は、同社の[総市場規模]と能力を拡大するだけでなく、急速に成長している「メッセージ発信会社」の側にあるものだと考えています。一見すると、WhatsAppは「単なるテキストアプリにすぎない」と想定されるかもしれません。しかし、WhatsAppは、それをはるかに上回るものであり、1日当たり6億枚の写真、1億件のビデオ、2億件のボイスメッセージ、190億件のメッセージを共有しています。さらに、ユーザーは住所や場所を共有し、1対1または1対多でコミュニケーションを取ることもできます。WhatsAppのこの機能と、コミュニケーションと世界の人口とのつながりに関するFacebookの焦点を考慮すると、WhatsAppとFacebookは時間の経過とともに互いによりよく似通い、注目に値する競争を生み出す可能性があると当社は考えています。そして今やこれを回避できるでしょう。

125.　　別の企業であるBernstein Researchは、この取引について次のように述べている。

WhatsApp モバイルネットワークと Facebook のプロフィールモデルが完全に[距離は内容を]わけ
ではなく、時間の経過とともにユーザーエンゲージメントの面で Facebook の競合企業となり得る 10
億のユーザーサービスの出現が見られるかもしれません。独立した企業として、または Google、
Twitter、eBay などの別のビジネスの一部として、WhatsApp グラフを拡張し、Facebook に対して実
行可能な競合相手を作成するために使用することができます。

126.　　WhatsApp を買収することで、Facebook は、WhatsApp が Facebook のパーソナルソーシャ
ルネットワーキングの独占にもたらす競争上の脅威を抑制した。Facebook は、WhatsApp が競合するパー
ソナルソーシャルネットワーキングプロバイダーとなるのを許すのではなく、モバイルメッセージングサービ
スの提供を続けるようにしており、米国での WhatsApp のプロモーションは限られている。例えば、2019 年
2 月、Cox 氏は Zuckerberg 氏に、特定の形態の WhatsApp プロモーションの許可を拒否したことを伝え、ま
た Facebook が積極的にプロモーションを拒否したにもかかわらず、米国で WhatsApp が成功したことを指
摘した。「[W]A は、米国における Messenger のメッセージ量の 2/3 であり、私たちはほとんど宣伝しようとし
ていません。」

127.　　要約すると、Facebook による WhatsApp の買収と管理は、Facebook Blue のパーソナルソ
ーシャルネットワーキングの独占に対する重大な脅威の無力化と、メリットに関する競争以外の手段によ
るその独占の違法な維持を意味している。この行為は、米国のパーソナルソーシャルネットワーキング市
場に参入する能力とインセンティブを持つ、独立した WhatsApp（単独で、または第三者が取得）による競争
の利益をユーザーから奪っている。さらに、WhatsApp は、「お客様のことをできるだけ把握しない」という原
則や、広告のない購読モデルなど、プライバシーを重視したサービスとデザインを採用した。多くのユーザ
ーにとって、このような際立った価値のあるオプションは、パーソナルソーシャルネットワーキングにおける
独立した競争上の脅威として、WhatsApp の重要な製品差別化の一形態となるであろう。また、Facebook
の WhatsApp の所有権と支配権は、パーソナルソーシャルネットワーキング市場を確実に脅かす可能性の
ある他のモバイルメッセージングアプリを抑止し、妨害する保護的な「堀」も維持している。

128.　　Facebook は、WhatsApp の買収を正当化するのに十分な合併固有の効率性またはその他の競争促進的な利益を実証することができない。

129.　　買収による Facebook の独占は現在も続いている。Facebook は、Facebook に対する直接的な競争上の脅威を無力化する Instagram と WhatsApp を保有・運営し続けており、パーソナルソーシャルネットワーキングの独占を保護するための保護的な「堀」を備え、それらを維持し続けている。具体的には、Facebook は、Instagram と WhatsApp が大規模に運営されている限り、新しい企業が参入し、それぞれのメカニクスの規模を構築するのは難しいと認識している。このように、Facebook は、Instagram の買収の価値を説明する際に Zuckerberg 氏が強調したダイナミクス、つまり「新製品は、すでにそのメカニクスを大規模に展開しているため、それほどの牽引力がなくなる」ことから恩恵を受けている。Facebook は、他の競争上の脅威を引き続き探し続けており、それを禁止されない限り、それらの脅威を買収しようとする。

## B.　Facebook は、パーソナルソーシャルネットワーキング独占に対する競争的脅威を阻止するためのプラットフォームアクセスに関する反競争的条件を維持および強制した

130.　　Facebook のような規模の企業でも、買収によって競争上の脅威をすべて排除することはできない。したがって、Facebook は、その独占に対する脅威に発展する可能性のある企業や、そうすることができる他の企業を支援する可能性のある企業が拡大するのを妨害し拒否することで、Facebook のパーソナルソーシャルネットワーキングの独占を保護することを目的とした、一連の反競争的行為を行って、買収キャンペーンを補完した。

131.　　上述のように、プラットフォームへのオープンな相互接続を許可するという Facebook の決定は、アプリやウェブの開発者やユーザー、そして Facebook に大きな利益をもたらした。Facebook プラットフォームが広く採用されたことで、Facebook はサードパーティアプリの重要なインフラストラクチャとなり、アプリの開発軌道、競争上の意思決定、投資戦略に対して大きな力を獲得した。

132.　Facebook はこの力を利用して、パーソナルソーシャルネットワーキング独占に対する競争における脅威を阻止し、抑制している。Facebook は、独占を保護するために、サードパーティアプリが Facebook のライバル企業と関わりを持つ、またはライバル企業自体に発展する能力を制限する条件付き取引ポリシーを採用したうえで、それに合意することを開発者に求めた。

133.　具体的には、Facebook は、Facebook プラットフォームの使用および商業的に重要な API へのアクセスを求める開発者に対し、Facebook が経時的に課す新たなまたは変更された制限または方針を含む、Facebook が課す契約上の制限に同意することを要求したのである。これらの制限により、開発者がプラットフォームを使用して従事できる活動の種類が制限された。以下に詳述するように、これらの制限は時間の経過とともに変化したが、さまざまな点で、開発者はアプリが Facebook と競合しないこと（関連する時期には、Facebook 製品が提供する「コア機能を複製すること」を含む）や競合他社を宣伝しないことに合意するという要件が含まれていた。Facebook は、これらの条件に違反したアプリを罰し、Find Friends API を含む商業的に重要な API 機能の使用を遮断した。これにより、Facebook は運用を拡張し、Facebook Blue に対する競争における脅威をより強力に発展させる能力を妨げた。要するに、Facebook は、Facebook との競争を控えるというこれらの企業によるコミットメントと引き換えに、主要な API への貴重なアクセスを犠牲にする契約を結んだのである。

134.　開発者を主要な API から切り離す際、Facebook は、広告支出を含め、遮断されたアプリがそのままであれば Facebook にもたらしたであろうメリットを犠牲にするという慎重な決断を下した。この犠牲は、競争上の潜在的な脅威を消滅させ、独占力を維持するという Facebook の長期的な目標を達成するために払われた。

135.    Facebook は、2012 年の年次報告書において、「当社と競合する製品または機能を開発するために、プラットフォームパートナーが Facebook プラットフォームを通じて当社ユーザーによって共有された情報を使用できる」可能性を、その運営に対する重大なリスク要因として開示した。「その結果、当社の競合他社は、当社のユーザーベースの成長または関与を犠牲にしてユーザーを獲得し、関与させる可能性があり、当社の事業および財務結果に悪影響を与える可能性がある。」

136.    このリスクに対処するため、Facebook は、2011 年 7 月から 2018 年 12 月まで、Facebook プラットフォームへの開発者のアクセスを管理するアプリ開発者との契約に具体化された一連の反競争的ポリシーを導入し、維持した。

137.    2011 年 6 月、Google は Google+ というパーソナルソーシャルネットワークを立ち上げた。2011 年 7 月 27 日、Facebook は、Facebook プラットフォームにアクセスするアプリが行える行動に関する新しいポリシーを導入することでこれに応えた。「Facebook 上のアプリは、他の競合するソーシャルプラットフォーム上のアプリに統合、リンク、販売促進、配布、またはリダイレクトすることはできません。」というものである。このポリシーは、パーソナルソーシャルネットワーキングの競合他社を含む、競争の見込みのある企業にダメージを与え、競争の発生を阻止することを意図していた。実際、このポリシーの直接的な推進力は Google が Google+ パーソナルソーシャルネットワークを立ち上げたことであった。2011 年 7 月 27 日の E メールで、Facebook のマネージャーは次のように説明した。「これについては、よく議論しました。Google が何をどのように立ち上げるかがわからなかったため、具体的に把握することは非常に困難でした。そのため、脅威のアプローチと規模が明らかになったため、厳しく運用するという選択肢で、より広い範囲に向けました。」その後、同日に、別の Facebook 従業員が同僚に対し反競争的な動きについて次のように抗議した。「反ユーザーであり、また（おそらく従業員にとってより重要なことに、）我々が自分たちの実力で競争できないことを恐れているというメッセージを世界に発信していると私は考えています。」

138.　2011 年 7 月および 8 月、Facebook は、いくつかのサードパーティ開発者の API アクセスを終了した。これはそれらのアプリが、ユーザーが Facebook の連絡先を Google+または他のソーシャルネットワークに移動することを可能にしていたためである。

139.　その後、Facebook はアプリ開発者による Facebook API を含む Facebook プラットフォームの使用を制限するその他のポリシーをいくつか課した。これらのポリシーを通じて、Facebook は API の制御を使用して、Facebook プラットフォーム上の開発者による脅威を抑止および抑制した。

140.　<u>2012 年 9 月：いかなるデータも競合他社のソーシャルネットワークにエクスポートしないこと。</u>2012 年 9 月 12 日、Facebook は開発者が同意しなければならない次のような新しい条件を導入した。「競合するソーシャルネットワーク：お客様[開発者]は、Facebook プラットフォームを使用して、当社の許可なく、競合するソーシャルネットワークにユーザーデータをエクスポートすることはできません[。]」

141.　<u>2013 年 1 月：「Facebook のコア製品やサービスを複製する」いかなるアプリへもプロモーション／データエクスポートは行わないこと。</u>2013 年 1 月 25 日、Facebook はアプリ開発者との標準契約をさらに改訂し、開発者が「コア機能を複製する」（Facebook と競合する）ことまたはそうする可能性のある他者を支援するのを妨げる新しい条件を追加した。

コア機能の複製：お客様は、Facebook プラットフォームを使用して、当社の許可なく、Facebook のコア製品またはサービスを複製する製品またはサービスを宣伝したり、ユーザーにデータをエクスポートしたりすることはできません。

142.　これらの反競争ポリシーの導入により、Facebook のオープン性表現に頼った開発者は、突然 Facebook の標的にされたことに気がついた。例えば、パーソナルソーシャルネットワーキングアプリの Path の開発者は、Facebook がプラットフォームのオープン性を称え、競合アプリを相互接続に招待するようになった 2010 年に開発を開始した。同様に、ローカルソーシャルネットワークである Circle も 2010 年に開発を開始した。しばらくの間、これらの開発者は Facebook と相互接続し、プラットフォーム API にアクセスして製品を配布することができていた。

143.　2013 年、Facebook は、両アプリが新しいプラットフォームポリシーに違反していたとする理由により、これらのアプリの主要な API 機能へのアクセスを遮断した。両開発者は、Facebook をなだめることで、重要な API へのアクセスを取り戻そうとしてアプリに変更を加えたが、両アプリは拒絶された。Circle の場合、ある Facebook の幹部は、Circle が Facebook の懸念に対処する手段を講じたとしても、アクセスは回復されないことを別の幹部に説明した。Circle は最終的に競争における脅威として浮上する可能性があるローカルソーシャルネットワークだったためである。「Circle が以下の項目をすべて実行した（または実行に同意した）ことは理解していますが、最終的には、『修正』できないコア機能の要素を複製しています。」

144.　Facebook は引き続き、競争における脅威をもたらす可能性のある企業に対するプラットフォームのさらなる制限を評価し、内部の反対意見を高め、Facebook プラットフォームのエコシステムにおけるアプリとビジネスの成長と成功への API アクセスの重要性について、繰り返し明示的な認識を繰り返した。2013 年 12 月の E メールで、Facebook のソフトウェアエンジニアは次のように書いている。

> ですから、私たちはそれらに対する恐怖感に基づいて、文字通りにアプリをバケツにグループ化し、さまざまな API を提供しますか？ どのように文書化したいですか？「メッセンジャーアプリを構築しようとしていますか？こちらをクリックして使用を許可していない API をフィルターをかけて除外してください］と書かれたリンクをページの上部に貼りましょう。また、アプリが 2 から 1 に移動する機能を追加するとどうなりますか？ どうにもならないのでしょうか？ また、メッセージングアプリは Facebook ログインを使用できませんか？ メッセージは「競合するなら統合するな」というものでしょうか？ ただただ呆れるばかりです。

145.　Facebook の開発者向け製品責任者は、Facebook がすでにアクセス制限の競争上の脅威を標的にしていると指摘している。「そうですね、いいことではありませんが、これはすでにある程度起こっています。例えば、Path は特定のものを使用することは許されていません. . . . 誰が競合他社と見なされるかというと、絶対数はかなり小さいです。別の Facebook のエンジニアは、次のように同意している。「複雑というよりは非倫理的である。」別のエンジニアリングマネージャーは次のように述べている。「悪いことだと同意します。」開発者向け製品の責任者は次のように回答している。「確かに良くないことであることには同意しますが、あなたも確実にこれを読んではいますね. . . . 現実的には、けげんな顔をするのはトップ 5 のメッセージングアプリだけです。」しかし、ソフトウェア開発者は不満を抱え次のように述べた。「非倫理的に感じるが、どういうことか説明しづらい。悪者だと感じさせられるばかりだ。」開発者向け製品の責任者は次のように回答した。「このプラットフォームは、社内の他のメンバーが満足できないような状況を回避するた

めの、政治的なセーフティネットのようなものなのです。」

146. Facebook の幹部が後ほど行った社内メールの議論では、Facebook が特に重要な API 機能へのアクセスを拒否する論拠を述べたのは、メッセージング機能やフィード機能を持つアプリへのアクセスを拒否する[省略]の本当の理由であったが、差別的なアクセス拒否は、[省略]Facebook の目標であり、ポリシーの実装方法は、競争上の脅威を阻止するその真の目的についてほとんど疑念を抱かなかった。

[省略]

147. 要約すると、Facebook は、Facebook との競争を禁止する条件に開発者が同意することを条件として、商業的に重要な API 機能へのアクセスを繰り返し条件付けている。一般的な問題として、開発者との相互接続は、ユーザーエンゲージメントの増加やそこから得られる金銭的な報酬など、Facebook に大きなメリットをもたらすが、Facebook は、競合的に Facebook を脅かす行為を行わないアプリ開発者にのみ完全な相互接続アクセスを提供した。

148. Facebook のポリシー条件と開発者契約条件は、アプリ開発者のインセンティブを変え、競合する機能の開発や競合するパーソナルソーシャルネットワークのサポートを阻止した。

149. さらに、Facebook は、API アクセスが開発者のインセンティブやアプリの開発軌道に影響を与えるのに十分重要であることを認識しており、そのように期待していた。開発者は、Facebook の API へのアクセスを危険にさらさないような意思決定を行うよう奨励された。2014 年 1 月付けで Facebook プラットフォームのポリシーを扱う Facebook 社内スライド資料は、Facebook が「多くの新興企業の潜在顧客を置き換える／ないものにすることが平気でできる」かどうかについて尋ね、API アクセスの重要性を直接認識した。

150.　<u>2018 年 12 月：明示的な反競争的条件の付いたポリシーを削除。</u>2018 年 12 月 4 日、

Facebook は「コア機能」の制限を解除した。翌日、英国議会議員は Facebook とアプリ Six4Three との間の

訴訟から入手した文書を公表し、アプリ開発者に対する Facebook の反競争的行為を強調した。

151.　2018 年 12 月に Facebook が明示的な反競争的条件付け政策を停止したのは、文書の公

開から予想される国民の監視の目によって引き起こされたものであり、Facebook が根底にある反競争的行

為を否定するものではなかった。Facebook が文書が公開されると予想した日に、Sandberg 氏は Facebook

の取締役会に次のように書いた。「Six4Three 文書が公開されることを予想して、開発者プラットフォームポ

リシーから第 4.1 項を削除することになりました。この規約は、開発者が当社の API を使用して、

『Facebook がすでに提供しているコア機能を複製』することを禁止しています。. . . . Six4Three 文書が公開

される前に、この変更を公開することが重要だと感じました。」予想される世間の詮索への対応として反競

争的プラットフォームポリシーを停止した Facebook は、そこを乗り越えられれば、かかるポリシーを再開す

る可能性が高い。実際、現在まで Facebook は開発者のスクリーニングを続けており、API アクセスを武器

として独占的地位を強固にすることができる。さらに、Facebook は、技術移行の時期から激しい競争圧力

に直面した場合に、その条件付けまたはその他の類似の反競争的慣行を再開する可能性が高い。このよ

うなプレッシャーは、例えば、人工知能の使用の増加や、将来の優勢なテクノロジー企業がユーザーに説

得力のある「メタバース」、デジタル空間でユーザーをホストする仮想環境を提供し、Zuckerberg 氏が最近

述べたように「モバイルインターネットの後継者」になるという Facebook 自身の見解によって生じる可能性

がある。

152.　Facebook がポリシーを復活させることを禁止する政府の制裁措置はなく、Facebook 自身の表明は複数回にわたって無意味であることが証明されている。事実、Facebook は 2012 年以降、ユーザーと規制当局の両方に対し、虚偽表示に関する厳しい罰金を支払った。例えば、2011 年の FTC は、8 つの訴因の訴状で、Facebook がデータの共有と保護についてユーザーに対して虚偽の表明を行ったと主張した。申し立てを解決するために、Facebook は、ユーザーのプライバシーに関する特定の虚偽表示を行うことを制限し、新しいプライバシープログラムを作成することを義務付ける同意判決に同意した。判決および命令は 2012 年 8 月に最終決定された。しかし、2012 年の同意判決に署名してからわずか数か月後、Facebook は FTC に再び執行措置を取らせるような行為を行った。その後の調査の後、FTC は、Facebook がユーザーのプライバシーの保護を継続的に怠っていること、およびその一連の不実表示が FTC 法および 2012 年同意判決に違反していることについて述べた 2 回目の訴訟を提起した。新たな告発を解決するために、Facebook は、記録的な 50 億ドルの罰金を支払うことを求める、そして追加のプライバシーコンプライアンスチャネルと監視層を備えた新しい企業構造を含む、判決と命令の修正に定められた新しい差止条項を課す和解に合意した。和解を受諾し、規定の命令を実行する申立てを認めるにあたり、Timothy Kelly 判事は、Facebook の申し立てられた「法律と行政命令の両方の違反は驚異的である」と書いた。*合衆国対 Facebook, Inc.*、456 F. Supp. 3d 105, 117（D.D.C. 2020）。

153.　また、Facebook は以前、他の当局に情報を偽って伝えていた。2014 年、欧州委員会から WhatsApp の買収許可を受けるという Facebook の取り組みの一環として、Facebook は 2 回、Facebook Blue ユーザーのアカウントと WhatsApp ユーザーのアカウントの間に信頼性の高い自動マッチングを確立できないと表明した。しかし、約 2 年後、Facebook は WhatsApp の利用規約とプライバシーポリシーを更新し、WhatsApp ユーザーの電話番号と Facebook ユーザーの ID を結び付けることを許可した。Facebook の不実表示に関する調査の結果、欧州委員会は、Facebook Blue と WhatsApp ユーザーの身元を一致させる技術的実現可能性は、Facebook の不実表示の時点ですでに存在しており、Facebook のスタッフがこれらの機能を認識していたことを確認した。欧州委員会は、Facebook の繰り返しの不実表示が、買収の評価に必要な関連情報を欧州委員会から奪ったことを理解した。結果として、欧州委員会は Facebook に 1 億 1,000 万ユーロの罰金を科した。

### *2. Facebook による反競争的条件の執行は新たな脅威を抑止*

154.　　Facebook のポリシー更新によって経時的に変更されたものを含め、アプリ開発者との Facebook の合意条件は、アプリ開発者のインセンティブと競争能力に影響を与えた。アプリ開発者は通常、Facebook プラットフォームを利用するために条件に同意する必要があった。Facebook がこれらの制限的な契約条項を含めることで、開発者のインセンティブと競争能力が一変した。また、これらの条項を積極的に執行するという Facebook の決定は、開発者へのメッセージが極めて明確であることをさらに保証した。Facebook との競争には深刻なコストがかかることになる。商業的に価値のある API 機能へのアクセスを遮断することによってこれらの契約を執行する Facebook の行動は、一般的に 3 つのグループのアプリに対して向けられた。

155.　　まず、Facebook はパーソナルソーシャルネットワーキングを提供する有望なアプリをターゲットにした。例えば、Facebook は、元 Facebook マネージャーによって設立されたパーソナルソーシャルネットワーキングの競合他社である Path に対して行動を起こした。2013 年 4 月頃、Facebook は Path の主要な API 機能へのアクセスを終了し、Path の成長はその後大幅に減速することとなった。

156.　　2つ目のターゲットグループは、いくつかのソーシャル機能を備えた有望なアプリであった。

例えば、Circle は 2013 年 12 月に Facebook が注目したローカルソーシャルネットワークを構築しようとして

いるアプリであった。Circle の主要な API 機能へのアクセスの遮断の提案にあたり、Facebook のマネージ

ャーは Circle の競争における有望さを次のように強調した。「Circle は、自らを『ローカルソーシャルネットワ

ーク』として位置付け、過去 4 日間で堅調な成長を見せています（昨日は+80 万件のダウンロードおよび

+60 万件の FB ログイン、英国の App Store では No.1）。」Facebook は対外的に、提供停止は Circle がユ

ーザーに「スパムを送った」ためであると主張した一方で、Circle がスパムの問題を解決した後の内部文書

により、本当の理由は Circle が脅威となったことであることが明らかにされている。「彼らは[ソーシャル]グ

ラフを複製し、．．．なのであれば、かなり素晴らしい業績を収めています。また、そのグラフの上に競合する

ソーシャルネットワークを非常に直接的に作り上げています。」実際、Facebook は、Facebook が指摘した懸

念を Circle が是正した後も、API 機能へのアクセスを引き続き保留した。Facebook のマネージャーは次の

ように述べている。「Circle が以下の項目をすべて実行した（または実行に同意した）ことは理解しています

が、最終的には、『修正』できないコア機能の要素を複製しています。」その後数週間にわたり、Circle の新

規ユーザーは 1 日当たり 60 万人からほぼゼロに減少した。

157.　　同様に、2013 年 1 月、Facebook のプラットフォームパートナーシップおよびオペレーション

担当ディレクターは同僚に次のように書いている。「本日、[T]witter は Vine を立ち上げました。これにより、

複数の短いビデオセグメントを撮影し、1 つの 6 秒間のビデオを作成できます。NUX[新しいユーザーエク

スペリエンス]の一環として、FB から友人を探すことができます。異議が唱えられない限り、Vine のフレンド

API アクセスを本日停止します。反応性 PR を準備しました。Jana にこの決定を知らせます。」Zuckerberg 氏

は次のように答えた。「了解。」Facebook は Vine を遮断することで、成長に役立つ重要な API 機能にアク

セスできないようにしたのである。

158. 3つ目のターゲットグループは、モバイルメッセージングサービスを提供した有望なアプリ、Facebook Messenger の既存の競合他社のアプリ、または Facebook Blue に対する競争上の脅威に発展する恐れのあるアプリであった。2013 年以降、Facebook はモバイルメッセージング、ビデオ、写真アプリが商業的に重要な API 機能を使用することを阻止した。

    a. Facebook Messenger が競合する音声機能の提供を開始した直後の 2013 年 1 月、Facebook は音声通信機能を備えたモバイルメッセージングアプリ、Voxer への主要な API アクセスを遮断した。遮断後、Voxer は消費者向けモバイルメッセージングから離れ、プッシュツートークのビジネスコミュニケーションへと移行した。

    b. 2013 年 2 月、メッセージングアプリの MessageMe の人気が高まり、リリースから 1 週間以内に 100 万人近くのユーザーを達成していた。しかし、MessageMe が 100 万人のユーザーに到達してまもなく、Facebook は主要な API アクセスを遮断した。遮断後、MessageMe は停滞し、最終的に停止した。

    c. 2013 年 8 月、Facebook は複数のメッセージングアプリに対して同時に強制ストライキを実施し、開発者執行責任者は同僚に対し、「基本情報以外の読み取り API へのアクセス」を制限するよう指示し、「これらの制限について、当社はいかなる方法でも[開発者]と連絡を取ることはない」と指示した。

    d. 2016 年 10 月、Facebook はその頃に話題になったビデオメッセージングアプリである Tribe に対して特定の API 機能を遮断した。

159. Facebook のプラットフォームへのアクセスに対する反競争的条件の執行により、個々の企業が Facebook のパーソナルソーシャルネットワーキング独占を拡大し、脅かす能力が阻害された。

160. また、Facebook の強制措置は、その他のアプリに対しても、Facebook のパーソナルソーシャルネットワーキング独占に脅威を及ぼすようであれば、商業的に重要な Facebook API へのアクセスが失われることになるという警告となった。例えば、あるサードパーティアプリは、Facebook が Vine を遮断した直後に、Facebook にプラットフォームの慣行について問い合わせた。Facebook のマネージャーが、このサードパーティのアプリについて社内で次のように報告を行った。「彼らは、このような理由で遮断される可能性が残っているのに、今後、私たちのプラットフォームに依存していていいものか、とても心配しているのです。」

161.　全体として、Facebook の反競争的協定の発表と執行は、米国のパーソナルソーシャルネットワーキング独占に対する有望な競争上の脅威の発生を阻止、抑制、抑止する役目を果たした。したがって、この排他的な行為は、Facebook の米国のパーソナルソーシャルネットワーキング独占の維持に貢献してる。Facebook は、他のアプリの侵入を阻止し、競合する恐れがあるアプリの開発者を除外することで、競合から自社を保護するネットワーク効果、つまり現在まで続く効果を固めた。

162.　Facebook の行動は、個別および全体として、Facebook のプラットフォーム上で運用されているアプリが、Facebook およびそのパーソナルソーシャルネットワーキング独占に対する競争上の脅威となる能力とインセンティブを、少なくとも 2 つの方法で抑制している。第一に、アプリ開発者が Facebook の API にアクセスするために締結することを義務付けられた Facebook の契約の条件は、開発者のインセンティブを変え、Facebook に競争上の脅威をもたらす特性や機能の開発、または Facebook と競合する可能性のある他のプラットフォームとの協働を阻止した。第二に、協定の執行、すなわち、潜在的な競争上の脅威として Facebook の注目を集めたアプリに対する API アクセスの実際の提供終了は、個々の企業が Facebook のパーソナルソーシャルネットワーキング独占を脅かす能力を妨げた。

163.　Facebook プラットフォームへのアクセスの反競争的条件を正当化するのに十分な競争促進的な利益はない。

## VI.　FACEBOOK の独占力

164.　Facebook は、米国におけるパーソナルソーシャルネットワーキングの提供において独占力を有しており、少なくとも 2011 年以来、そのような権力を継続的に保持している。複数の証拠ソースは、Facebook が米国のパーソナルソーシャルネットワーキングサービスに関して独占力を有していることを示している。第一に、Facebook は、2011 年から現在まで、米国のパーソナルソーシャルネットワーキング関連市場の支配的シェアを維持している。第二に、直接的な証拠は、Facebook が米国のパーソナルソーシャルネットワーキングサービスに関して独占力を有していることを示している。さらに、Facebook の独占力は、直接的なネットワーク効果や高い切替コストなど、参入障壁が大きいため、耐久性がある。

### A.　米国におけるパーソナルソーシャルネットワーキングは関連市場である

165.　米国におけるパーソナルソーシャルネットワーキングサービス提供は関連市場である。

166.　パーソナルソーシャルネットワーキングサービスは、関連製品市場である。パーソナルソーシャルネットワーキングサービスは、人々が個人的な関係を維持し、共有ソーシャルスペースで友人、家族、その他の個人的なつながりと体験を共有するために利用できるようにするオンラインサービスで構成されている。パーソナルソーシャルネットワーキングサービスは、ユニークで明確なタイプのオンラインサービスである。3つの重要な要素は、パーソナルソーシャルネットワーキングサービスを、ユーザーに提供される他のオンラインサービスと区別している。

167.　まず、パーソナルソーシャルネットワーキングサービスは、ユーザーとその友人、家族、その他の個人的なつながりをマッピングするソーシャルグラフ上に構築される。ソーシャルグラフは、ユーザーが個人的なつながりを結びつけ、コミュニケーションを取るための基盤を形成し、友情、オンラインの会話、誰かの最新情報を見たいという願望、場所への訪問のほか、グループ、場所、ビジネス、アーティスト、趣味などの個人的な関心や活動へのその他の共有のつながりを反映することができる。パーソナルソーシャルネットワーキングプロバイダーは、ソーシャルグラフをユーザーに提供する機能のバックボーンとして使用する。これには、以下で説明するパーソナルソーシャルネットワーキングのその他の2つの重要な要素が含まれる。

168.　第二に、パーソナルソーシャルネットワーキングサービスには、1 対多の「ブロードキャスト」形式など、多くのユーザーが個人的なつながりを持つ人々と交流し、共有ソーシャルスペースで個人の体験を共有するために定期的に使用する機能が含まれている。この共有ソーシャルスペースには、ニュースフィードやその他の同様の機能が含まれる場合があるが、ここでユーザーは個人的な最新情報、興味、写真、ニュース、ビデオなどのコンテンツを個人的なつながりを持つ人々と共有する。パーソナルソーシャルネットワーキングプロバイダーは、ソーシャルグラフを使用して、共有ソーシャルスペースでどのコンテンツをいつユーザーに表示するかを通知することができる。これは一般に、ユーザーによる「ニュースフィード」投稿などのユーザー作成コンテンツ、ニュース記事などのパブリッシャーが作成したコンテンツ、広告を含む、パーソナルソーシャルネットワーキングサービス上のあらゆる形式のコンテンツに適用される。

169.　第三に、パーソナルソーシャルネットワーキングサービスには、ユーザーが他のユーザーを見つけて接続できるようにし、各ユーザーが個人的なつながりのセットを簡単に構築して拡張できるようにする機能が含まれている。ソーシャルグラフはまた、どの接続がユーザーに提案されるか、またはユーザーがどの接続を使用できるかを通知することで、この機能をサポートしている。米国内で最も広く利用されているパーソナルソーシャルネットワーキングサービスは、Facebook Blue、Instagram、Snapchat である。

170.　関連地域市場は米国である。米国は、ブロードバンドアクセスや国によって異なる社会規範の違いなど、いくつかの要因により、パーソナルソーシャルネットワーキングサービスの関連地域市場である。さらに、ユーザー間のネットワーク効果は、一般的に同じ国のユーザー間でより強くなる。これは、ほとんどのユーザーにとって、関連する友人、家族、およびその他の個人的なつながりの大部分は、ユーザーと同じ国に存在するためである。したがって、米国のユーザーは、主に米国の他のユーザーとコンテンツを共有している。したがって、米国のユーザーにとって、米国で人気のないパーソナルソーシャルネットワーキングサービスは、たとえそれが他の国で人気があったとしても、米国で人気のあるパーソナルソーシャルネットワーキングサービスとは合理的に互換性を持たない。Facebook やその他の業界の参加者は、国ごとに、これらの違いを認識し、彼らのパフォーマンスや競合他社のパフォーマンスを追跡する。

171.　以下に説明するように、コンテンツの共有または消費を促進する、米国で利用可能なその他のタイプのインターネットベースのサービスは、パーソナルソーシャルネットワーキングサービスの十分な代替とはいえない。

172.　パーソナルソーシャルネットワーキングは、モバイルメッセージングサービスと異なり、合理的な互換性をもたない。モバイルメッセージングサービスは、ユーザーが交流できる共有ソーシャルスペースを特色としておらず、ユーザーが友人や家族とつながり、体験を共有できるようサポートするソーシャルグラフに依存していない。実際、モバイルメッセージングサービスのユーザーは、通常、モバイルメッセージングサービスに問い合わせて、まだ所有していない連絡先情報を見つけることはせず、かつそれは不可能であり、サービスに問い合わせて、自分にとって重要な人、場所、物、関心事につながっている他のユーザーを見つけることもできない。その代わりに、モバイルメッセージングサービスのユーザーは、主に、各ユーザーが入力した一連の連絡先に一般的に限定された、小規模で個別の人々に通信を送信するために、このようなサービスを使用している。Zuckerberg 氏は 2019 年の投稿でこの違いについて、Facebook Blue のようなパーソナルソーシャルネットワーキングプロバイダーを「タウンスクエアのデジタル相当[]」と呼び、WhatsApp のようなモバイルメッセージングアプリが提供するプライベートコミュニケーションを「リビングルームのデジタル相当」として対比させて説明した。

173.　パーソナルソーシャルネットワーキングは、狭く勝つ独特な目的で、狭く非常に特殊なユーザーに、狭く非常に特殊なカテゴリのコンテンツを共有するために設計され、ユーザーが主に利用している特殊なソーシャルネットワーキングサービスとは区別され、合理的に互換性をもたない。その結果、ユーザーはこれらのサービスを主に、プロフェッショナルなネットワーキングを行うなど、明確または狭いつながりを維持またはそれらのつながりとやり取りするために利用し、友人や家族とつながり、個人的な日常生活の経験を共有するためには利用しない。例としては、プロフェッショナル（LinkedIn など）または興味・関心に基づく（Strava など）つながりに焦点を当てたネットワークが挙げられる。狭いつながりとの限定的な共有に適切であるとユーザーが見なすサービスのその他の例には、オンラインデートサービスや Nextdoor などがある。Nextdoor は、物理的に互いに近接したユーザー間でのみ共有を促進することに焦点を当てたサービスである。

174.　パーソナルソーシャルネットワーキングは、ユーザーの個人的なつながりではなく、ユーザーの関心に基づくコンテンツのブロードキャストまたは発見に焦点を当てたオンラインサービスとは区別され、合理的な互換性をもたない。主な例は、Twitter、Reddit、Pinterest である。これらのサービスは、友人と家族をつなぐことに重点を置いていない。Twitter はユーザーが興味のあるトピックについて常に情報を得られるようにすることに重点を置いている。一方、Reddit は参加者にとって関心のあるトピックを中心とした会話を促進している。その結果、ユーザーはこれらのサービスを、友人、家族、その他の個人的なつながりとつながるためではなく、主に、自分の関心事に関連するイベントについて常に情報を得て議論するため（Twitter など）、または特定の関心事を共有するほとんどの場合匿名の人々のコミュニティとの会話を行うため（Reddit など）に利用している。したがって、このようなサービスは、パーソナルソーシャルネットワーキングサービスの妥当な代用とはならない。同様に、Pinterest では、ユーザーが自分の興味に基づいて検索を行うことでコンテンツを閲覧できるようにし、そのような興味に基づいてつながることを可能にするが、ユーザーと友人や家族を結びつけることに重点を置いていないため、そのようなことを行うパーソナルソーシャルネットワーキングサービスの適切な代替手段ではない。

175.　パーソナルソーシャルネットワーキングは、YouTube、Spotify、Netflix、Hulu などのビデオまたはオーディオの消費に重点を置いたオンラインサービスとは異なり、合理的な互換性を持たない。ユーザーは、このようなサービスを主に、一般に未知のユーザーの幅広いオーディエンスとの間で特定のメディアコンテンツ（ビデオや音楽など）を受動的に消費するために利用する。これらのサービスは、主に友人、家族、その他の個人的なつながりとの通信には使用されないため、そのようなパーソナルソーシャルネットワーキングサービスの代用として適切とはいえない。

176.　TikTok は、パーソナルソーシャルネットワーキングサービスの代替として認められないコンテンツのブロードキャストおよび消費サービスの顕著な例である。TikTok のユーザーは主に、友人や家族とつながり、個人的に関わり合うのではなく、投稿者が個人的に知らない視聴者にビデオコンテンツを表示、作成、共有するものである。ユーザーが TikTok を採用する目的、およびプラットフォーム上での交流の主流は、友人や家族のネットワークと交流したいというユーザーの願望によって決まるものではない。

177.　Facebook の声明と社内文書は、パーソナルソーシャルネットワーキングサービスとその他のサービスの違いを理解していることを示している。2009 年 7 月の Apple への E メールにおいて、Facebook のモバイル事業責任者は Apple の担当者に次のように説明した。「youtube に投稿するということは、大規模なビデオウェブサイトに投稿するということですが、友人の誰もあなたがビデオを投稿したことを知らないため、ほとんどの友人にビデオを見られることはありません。youtube に投稿することは、そのビデオを見つけることができれば、いい楽しみの手段となりますし、見知らぬ人にとっても、世界中にいる人に見せるという意味でも良いことです。」2015 年 2 月、ある Facebook の幹部は Zuckerberg 氏に、彼女のチームが Onavo で YouTube の利用状況を分析し、「[Facebook と Youtube 間で]カニバリゼーションが発生していることを示すものはないようだ」ということ、そして「YT と Facebook はビデオの消費に関してほとんど異なるユースケースを提供している」ということが判明したと報告した。同様に、2019 年 1 月、Facebook は社内で、「人々は TikTok を Instagram とはまったく異なる方法で利用しており、当社のビジネスの中心的な領域で直接競合していない」と評価し、さらに「TikTok は友人や家族と共有するために使われていない」と評価した。

178.　Facebook による声明および社内文書はまた、Facebook Blue がパーソナルソーシャルネットワーキングサービスを提供していること、およびパーソナルソーシャルネットワーキングサービスがユーザーにとって Facebook Blue の主な価値であり、それを利用していることを認識していることも示している。例えば、Zuckerberg 氏は、最初から Facebook Blue を「実際の友人との真のつながりを大切にしており、それにより、実際に出てくるストーリーは、それらを作成する人にとって重要なものであるため、受け取る人にとって興味深いものとなる」と説明してきた。最近では、2020 年 8 月、Zuckerberg 氏は、「私たちが時間をかけて最も重視してきたユースケースは、あなたが 友人や家族とつながる助けになる．．．」と証言している。同

様に、Sandberg 氏は 2020 年 9 月に、Facebook Blue がユーザーに提供する価値は、「友人や家族と連絡を取り合うのを手助けし、また彼らに何が起きているのかを非常に効率的な方法で知るのを助けている」と証言した。さらに、2018 年に Facebook が実施したユーザーの社内調査では、Facebook Blue の主な用途は、「大切にしている人々の日常の気軽な瞬間や、彼らが何をしているかを知る」ことと、「特別な瞬間に、自分が大切にしている人々と最新情報を共有する」ことであることが確認された。同様に、2014 年と 2015 年の社内文書によると、Facebook は Facebook Blue を最適化し、プラットフォーム上の他のタイプのアクティビティよりも「友人との共有」を優先させることに重点を置いている。

179.　Instagram は、Facebook に買収された時点で、パーソナルソーシャルネットワーキングを提供した。Instagram の創業者たちは、「モバイルソーシャルネットワーク」の構築に着手し、成功した。Instagram は創業以来、個人的なつながりを持つ人々とのソーシャルグラフを維持し、1 対多の「ブロードキャスト」形式を含む共有ソーシャルスペースを介してユーザーが個人的なつながりを持つ人々と交流し、個人的な体験を共有できるようにし、そして各ユーザーが個人的なつながりのネットワークを構築するために他のユーザーを見つけて接続できるようにする機能を提供するなど、パーソナルソーシャルネットワーキングの決定的な機能を提供してきた。さらに、最近の社内文書では、Facebook が他のタイプのやり取りよりも「友人との共有」を優先するように Instagram を最適化していることを示している。

180.　パーソナルソーシャルネットワーキングのプロバイダーは、通常、ユーザーに表示する広告スポットを販売している。パーソナルソーシャルネットワーキングプロバイダーのユーザーへのサービスとその広告の広告主への販売の間の、あらゆるプラスの間接的なネットワーク効果（すなわち、あるサービスの価値が別のサービスに応じて増大すること）は、一方向でのみ動作するものである。ユーザーは、パーソナルソーシャルネットワーキングプロバイダーが表示する広告の量に無関心であるか、または広告の数が少ないほうを好むか、または広告を望まないのいずれかである。

**B.　米国のパーソナルソーシャルネットワーキング市場における Facebook の独占的シェア**

181.　Facebook は、Facebook Blue および Instagram サービスを通じてユーザーにパーソナルソーシャルネットワーキングを提供しており、少なくとも 2011 年以来、そのようなサービスの支配的プロバイダーとなっている。さらに、Facebook Blue と Instagram は、米国における最大規模のパーソナルソーシャルネットワーキングサービスの 2 社である。

182.　Facebook Blue は、少なくとも 2011 年以来、米国で有力かつ最大のパーソナルソーシャルネットワーキングサービスである。Comscore が保持するデータの分析によると[1]、昨年、市販のデータソースである、米国の 2 億人以上が毎月 Facebook Blue にアクセスし、米国のユーザーは 1 日当たり平均 40 億分以上をサービスに費やしている。さらに、2020 年には、米国のインターネットユーザーのうち、毎月の平均で 80％以上が Facebook Blue を利用している。

183.　2012 年の買収以来、Facebook は Instagram も管理している。Comscore データの分析によると、昨年、毎月米国の 1 億 3,800 万人以上が Instagram を使用し、米国のユーザーは平均で 1 日当たり計 15 億分以上の時間をサービスに費やしている。さらに、2020 年には、毎月平均で米国のインターネットユーザーの約 54％が Instagram を利用している。

184.　Facebook に次いで、Snapchat は現在、米国で 2 番目に大きなパーソナルソーシャルネットワーキングサービスプロバイダーである。2011 年に立ち上げられた Snapchat は、モバイルメッセージングサービスとしての差別化に取り組んだ。特に、短い時間だけ利用でき、その後はアクセス不能になる、「一時的」メッセージを連絡先に送信する機能をユーザーに提供した。Snapchat は徐々に機能を追加し、現在では消費重視のサービス（TikTok など）と異なり、パーソナルソーシャルネットワーキングサービスの典型的な例として、Snapchat は、ユーザーが友人や知人との個人的な共有に利用する共有ソーシャルスペースを提供している。

185.　Snapchat のユーザーベースとエンゲージメントレベルは、Facebook Blue や Instagram の規模と比べてほんの一部にすぎない。Comscore データの分析によると、昨年は平均で 1 か月あたり約 7,500 万人が米国で Snapchat を使用し、合計で 1 日あたり約 6 億分をサービスに費やしていた。比較すると、これはユーザーが Facebook Blue に費やした時間の約 15%に過ぎない。さらに、2020 年に Snapchat を使用した米国のインターネットユーザーは、平均して毎月約 28%に過ぎない。

186.　その他の小規模なパーソナルソーシャルネットワーキングサービスが、米国で随時導入されてきたが、Facebook と比較して大きな牽引力や規模を持つには至らなかった。例えば、2016 年に「広告なし。トラッキングなし。BS なし。」というタグラインで MeWe が発表された。MeWe は、広告なしでパーソナルソーシャルネットワーキングサービスを提供しているが、追加のストレージとプレミアム機能についてはユーザーに請求する。Comscore データの分析によると、昨年米国で MeWe を使用したのは平均で 1 か月あたり約 140 万人のみで、1 日あたりのサービスに費やされた時間は合計で 550 万分に満たなかった。比較すると、これはユーザーが Facebook Blue に費やす時間の 0.15%にも満たない。さらに、2020 年に MeWe を利用しているのは、平均して、毎月米国のインターネットユーザーの 1%未満である。

187.　　参入の大きな障壁を明確に示すと、よく知られた、洗練された、資金の豊富な企業を含む複数の企業が、米国のパーソナルソーシャルネットワーキング市場への参入を試みてきたものの、成功しなかった。例えば、2011 年 6 月、Google はパーソナルソーシャルネットワーキング製品である Google+を立ち上げた。Google+が米国のパーソナルソーシャルネットワーキング市場に参入したことで、当初は Facebook から大きな反応が寄せられ、非独占の関連市場が持つ潜在的なメリットについてのインサイトが得られた。例えば、Sandberg 氏は Google+の発売から数週間以内に社内で次のように述べている。「初めて、本当の意味での競争相手が台頭し、消費者には本当の選択肢が与えられています....これは、あらゆる業界において競争が私たちにもたらす影響と同じです。勝つためには、より良いものが必要であり、マージンは時間の経過とともに減少する可能性があり、これ以上多くの間違いを犯すことは許されず、コアユーザーを掌握する必要があります。」これと一致して、Facebook の幹部は Google+への対応に悩まされ、Facebook Blue のユーザー満足度を向上させるための取り組みを動員した。これには、ユーザーが自分の情報をより適切に制御できるようにする機能の導入が含まれる。

188.　　しかし、Facebook の初期の懸念にもかかわらず、Google+は発売後に大きな牽引力を獲得できなかった。Facebook は 2011 年 12 月に Google+の成長を阻害していると思われる参入障壁について社内でコメントした。「G+の熱烈なファンは、友人に参加を説得するのに困難を強いられています。第一に Facebook との有意義な差別化要因がまだなく、第二に Facebook の友人密度が原因で切替コストが高くなることが理由です。」そのため、Google+に対する Facebook の最初の懸念と反応は、発売から数か月以内に消散した。Google+は運営を継続したが、大きな牽引力はなく、最終的には 2019 年に Google によって閉鎖された。

189.　　Google+と同様に他のプロバイダーも、米国のパーソナルソーシャルネットワーキングサービス市場から撤退した。現存しないプロバイダーには、Friendster、Myspace、Orkut（Google が所有・運営する会社）、Path などが含まれる。Friendster と Myspace は、Facebook が 2000 年代半ばに発売される前に米国で人気を博したが、2009 年初頭には Facebook に追い越された。Orkut と Path は Facebook の後に発売され、Google+と同様、製品を持続させるのに十分な数のユーザーを集めることができなかった。両製品は 2018 年末までに提供中止となった。

190.     Facebook は 2011 年以来、現在に至るまで米国のパーソナルソーシャルネットワーキング

サービスの関連市場で支配的なシェアを維持している。このシェアは、費やした時間、毎日のアクティブユー

ザー（「DAU」）、毎月のアクティブユーザー（「MAU」）という複数の指標で測定されている。これらの指標

は、個別および集合的に、少なくとも 2011 年以来、パーソナルソーシャルネットワーキングサービスにおけ

る Facebook の持続的な独占力の有意な証拠を提供している。

191.     パーソナルソーシャルネットワーキングサービスのアクティブユーザーベースと、そのサー

ビスを使用するユーザー数の測定は、パーソナルソーシャルネットワーキングサービスの市場シェアと市場

支配力の適切な測定である。これはいくつかの理由で適切であるといえる。

192.     第一に、パーソナルソーシャルネットワーキングサービスがユーザーにとって魅力的である

こと、そしてそのためその競争上の意義は、そのユーザー数と、そのユーザーがサービスにどの程度集中

的に関与しているかに関係している。消費者は、パーソナルソーシャルネットワーキングサービスを利用

し、それに関与する可能性が高く、また、より多くの友人や家族と交流する機会を提供するパーソナルソー

シャルネットワーキングサービスから切り替える可能性が低くなる。Facebook の通常業務文書において、友

人や家族とのつながりやコミュニケーションを促進するネットワークのユニークな価値が認識されている。こ

の機会を提供するパーソナルソーシャルネットワーキングプロバイダーの能力は、そのユーザー数と、その

ユーザーがサービスにどの程度集中的に従事しているかによって示される。

193.     第二に、通常の業務過程において、Facebook の役員および投資家、競合するパーソナル

ソーシャルネットワーキングプロバイダー、および業界のオブザーバーは、Facebook Blue、Instagram、およ

びその他のパーソナルソーシャルネットワーキングプロバイダーのパフォーマンスを、アクティブユーザーベ

ースの測定値と、DAU、MAU、およびユーザーがサービスに費やす時間を一般的な測定単位として、サー

ビスを使用する人数を使用して評価した。

194.　例えば、Facebook Blue と Instagram のパフォーマンスを評価する Facebook の内部プレゼンテーションでは、1 か月に費やす時間、MAU、DAU に重点を置いている。また Facebook は、競合他社の競争上の重要性を評価するために、これらの同じ指標に依拠している。例えば、Zuckerberg 氏は、2014 年 12 月に Snapchat の評価を求めた際にこのような指標を提供されたが、2 人の最高幹部に次のような質問をしている。「彼ら[Snapchat]について、夏ごろよりも懸念していますか？」これに対して、Zuckerberg 氏の補佐役は、MAU や費やした時間の割合、および特定の地域内で特定の月に製品を使用したインターネットユーザーの割合（「リーチ」）などの指標に基づいて、米国を含むさまざまな地域における Snapchat の分析を彼に提供した。

195.　Snapchat や Google など、パーソナルソーシャルネットワーキングサービスを提供している、または提供してきた他の企業も、MAU、DAU、および自分の成長と他者のパフォーマンスを測定するために費やした時間を利用している。例えば、Snapchat の最近の通常業務文書では、企業の MAU、DAU、費やした時間などの指標を観察することにより、Snapchat と Instagram のパフォーマンスを比較する。同様に、Google は MAU、DAU、および費やした時間を使用して、Orkut と Google+ の両方のパフォーマンスを追跡した。パーソナルソーシャルネットワーキングプロバイダーの買収の可能性を評価する際にも、Google は対象企業の MAU、DAU、および費やした時間を評価した。

196.　商用データソースは、MAU、DAU、費やした時間などの指標を含む、米国内のオンラインサービスの使用状況を追跡する。例えば、Comscore は、インターネットユーザーの大規模なパネルのオンライン行動や、タグ付けされたウェブサイトやアプリでの毎月の何兆ものやり取りを直接観察し、パネル行動やタグ付けされたトラフィックに基づいて業界統計を推定する商用データプロバイダーである。Comscore データは、米国およびその他の地域におけるオンラインサービスの利用状況を評価するために、Facebook を含む業界の参加者およびオブザーバーによって信頼されている。

197.　　Facebook 自体は、Facebook Blue と Instagram のパフォーマンスを追跡するために、このような商用データソースに依拠している。例えば、複数の Facebook 社内プレゼンテーションでは、Comscore が費やした時間などの指標のソースであると指摘されており、Facebook は、Zuckerberg 氏にとって重要な資料を準備するためのインプットとして Comscore の統計に依拠している。

198.　　米国における商業データ追跡オンラインサービスの分析によると、Facebook（Facebook Blue および Instagram 経由）は、費やした時間、MAU、DAU を使用して測定されたかどうかにかかわらず、2011 年以降、米国におけるパーソナルソーシャルネットワーキングサービスの関連市場において支配的なシェアを占めている。

199.　　具体的には、米国でパーソナルソーシャルネットワーキングサービスを提供するアプリのユーザーが費やした時間に対する Facebook のシェアは、2012 年以降 80%を超えており、2011 年には少なくとも同程度に高かった。以下を特筆する。

    a.　Comscore が保持するデータの分析によると、2012 年 9 月から 2020 年 12 月までの間に、米国でパーソナルソーシャルネットワーキングサービスを提供するアプリのユーザーが費やした時間のうち Facebook が占める割合は、平均して 1 か月あたり 92%であり、82%を下回る月はなかった。この期間中、Snapchat、Google+、Myspace、Path、MeWe、Orkut、Friendster などの他のプロバイダーの合計シェアで、18%を超える月はなかった。これらの企業のうち、10%以上のシェアを達成したのは Snapchat のみであった。

    b.　2011 年から Facebook のファイルに保持されている Comscore のデータによると、パーソナルソーシャルネットワーキングサービスを提供するアプリのユーザーが費やす時間のうち、Facebook が占める割合は、少なくとも上記の 2012 年後半から 2020 年にかけてのものと同程度に高かった。

200.　　米国でパーソナルソーシャルネットワーキングサービスを提供するアプリの Facebook による DAU シェアは、2016 年以降 70%を超えており、2011 年には少なくとも同程度に高かった。以下を特筆する。

Comscore は、スマートフォン、タブレット、デスクトップコンピュータごとに、訪問者データを毎日別々に管理する。Comscore が保持するデータの分析によると、2016 年 9 月から 2020 年 12 月までの間に、米国でパーソナルソーシャルネットワーキングサービスを提供するアプリのFacebook による DAU シェアは、平均して 1 か月あたりスマートフォンで 80%、タブレットで86%、デスクトップコンピュータで 98%であった。Facebook の DAU シェアは、どのデバイスタイプでも、70%を下回った月はない。Snapchat、Google+、Myspace、Path、MeWe、Orkut、Friendster を含む他のプロバイダーの合計シェアは、この期間中のどの月においても、どのデバイスタイプでも 30%を超えなかった。どのデバイスタイプでも 10%を超えるシェアを達成したのは Snapchat のみであった。

b. 2011 年から Facebook のファイルに保持されている Comscore からのデータの定期的なスナップショットは、パーソナルソーシャルネットワーキングサービスを提供するアプリにおけるFacebook の DAU のシェアが、少なくとも上述の 2016 年後半から 2020 年にかけてのものと同じくらい高かったことを示している。

201.　米国でパーソナルソーシャルネットワーキングサービスを提供するアプリの Facebook による MAU シェアは、2012 年以降 65%を超えており、2011 年には少なくとも同程度に高かった。以下を特筆する。

a. Comscore は、モバイルデバイス（スマートフォンやタブレットを含む）とデスクトップコンピュータの月間訪問者データを別々に管理している。Comscore が保持するデータの分析によると、2012 年 9 月から 2020 年 12 月までの間に、米国でパーソナルソーシャルネットワーキングサービスを提供するアプリの Facebook による MAU シェアは、平均して 1 か月あたりモバイルデバイスで 76%、デスクトップコンピュータで 90%であった。この期間中のどの月も、Facebook のMAU シェアは、モバイルでは 68%、デスクトップでは 77%を下回らなかった。この期間中、Snapchat、Google+、Myspace、MeWe、Path、Orkut、Friendster などの他のプロバイダーの合計シェアは、モバイルまたはデスクトップのいずれのデバイスタイプでも 32%を超える月がなかった。

b. 2011 年から Facebook のファイルに保持されている Comscore のデータによると、パーソナルソーシャルネットワーキングサービスを提供するアプリにおける Facebook による MAU のシェアは、少なくとも上記の 2012 年後半から 2020 年にかけてのシェアと同程度に高かった。

202.　上述のように、Facebook は、Facebook Blue と Instagram が主にパーソナルソーシャルネットワーキングサービスとして使用されていることを認識している。これに反して、仮に米国のユーザーがFacebook Blue や Instagram に費やす時間の半分が実際にはパーソナルソーシャルネットワーキングサービスの利用に費やされていないと仮定しても、Facebook は米国のパーソナルソーシャルネットワーキング市場で圧倒的なシェアを維持していたことになる。具体的には、Comscore の費やされた時間のデータ分析では、米国のユーザーがパーソナルソーシャルネットワーキングサービスを利用する半分の時間しかFacebook Blue や Instagram に費やしていないと仮定したとしても（米国のユーザーがパーソナルソーシャルネットワーキングサービスを利用するすべての時間を Snapchat、MeWe、Path、Orkut、Google+、

73

Myspace、Friendster に費やしている一方、パーソナルソーシャルネットワーキングサービスに費やされた時間の Facebook の各月のシェアは 2012 年の 9 月以降平均して 85%で、最低でも平均 70%であることを示している。

203.　　　他の反トラスト当局も、自国における Facebook の競争上の重要性を評価するために、費やされた時間、MAU、DAU、またはこれらの指標の組み合わせを使用しており、Facebook が自国でのユーザーサービスの提供に関して市場支配力を有していると結論付けている。例：

a.　2020 年、英国の競争・市場庁（「CMA」）は、「Facebook は、英国内でソーシャルメディアにおいて、重要かつ永続的な市場支配力を有している」と結論付けた。Facebook が大きな市場支配力を持っているという CMA の結論は、Comscore からの市販データに一部基づいており、これは、ユーザーが Facebook サービスに費やした時間と、英国のインターネットユーザー間の Facebook のリーチを示している。CMA は、WhatsApp を含め、Facebook が、2020 年 2 月時点で 13 歳以上の英国のユーザーがソーシャルメディアプラットフォームに費やした時間の 70%以上を占め、「約 75%」の時間がソーシャルメディアに何年も費やされたと判断した。CMA はまた、Facebook アプリが英国のインターネットユーザーの 85%以上に行き届いたことも確認した。

b.　2019 年、ドイツの連邦カルテル庁（Bundeskartellamt：「BKartA」）は、Facebook のデータ利用規約が「プライベートユーザー向けのソーシャルネットワーク市場での支配的地位の濫用」を構成すると判断した。BKartA は、ドイツ国内で Facebook がソーシャルネットワーキングサービスの支配的地位を占めているという決定に至る際、Facebook およびドイツ国内のその他の企業の DAU および MAU の評価に一部依拠した。BKartA は、2012-2018 年から、ドイツ国内のソーシャルネットワーキングプロバイダーについては、Facebook は DAU シェアが 90%以上、MAU シェアが 70%以上であったと結論付けた。

c.　2019 年、オーストラリア競争消費者委員会（「ACCC」）はデジタルプラットフォーム調査の結果を発表した。この調査は、とりわけ、オーストラリア国内のソーシャルメディアサービスの毎月のユーザー数とユーザーがサービスに費やす時間などの要因に基づいて、オーストラリア国内の Facebook の「市場支配力」を評価したものである。具体的には、ACCC は、毎日さまざまなプラットフォームを使用したデジタルプラットフォームユーザーの割合、および Facebook の月間オーディエンスと費やした時間に関する市販の情報を評価するために調査を実施した。ACCC は、特に、「Facebook は参入と拡大の障壁、範囲の利点、その買収戦略によって、ダイナミックな競争から隔離されている」と結論付けた。参入障壁に関連する他の要因の中でも、ACCC は「Facebook のオーディエンスの規模は、Snapchat のオーディエンスの規模（Facebook プラットフォームに最も近い競合他社）の 3 倍以上である。このネットワーク効果は、参入と拡大の大きな障壁となる」ことを見出した。

204.　　DAU と MAU は、1 日（DAU の場合）または 1 か月（MAU の場合）に、2 つの異なるパーソナルソーシャルネットワーキングサービスを使用する個人の使用度を反映していない。それにもかかわらず、本書に記載されるように、DAU および MAU は、Facebook およびその他のパーソナルソーシャルネットワーキングプロバイダーの競合的パフォーマンスを評価するために、Facebook、およびその他の業界の参加者およびオブザーバーによって使用される尺度である。さらに、Facebook の使用度の高さは、関連する期間を通して費やされた時間の大部分によって確立される。そのため、DAU および MAU の測定に反映された使用度の不正確さは、Facebook の競争上の重要性を*過小評価*している。それでも、Facebook は関連期間中、DAU と MAU の支配的なシェアを占めている。

### C.　過去の出来事や市場の現実を含む直接的な証拠により、Facebook が市場支配力を持っていることを確認

205.　　その他の証拠の複数の情報源は、Facebook が米国におけるパーソナルソーシャルネットワーキングサービスの提供に関して大きな市場支配力を有していることを示し、それを確認している。

206.　　第一に、過去の出来事は、Facebook の行為がユーザーの大きな不満を引き起こしたときでも、Facebook が重要なユーザーや競合他社との関わりを失うことはないことを示している。これは市場支配力の指標である。例えば、2018 年に Facebook のユーザーデータが Cambridge Analytica と呼ばれる企業によって秘密裏に収集されていたというニュースが報道された後、Facebook は比類のない高速な[省略]を体験した。ユーザーは Facebook に不満を抱いていたが、このインシデントは[省略]であり、Facebook を[省略]にすることはなかった。Facebook Blue に関する Facebook の社内分析も同様に[省略]であり、[省略]があったと結論付けた。Facebook Blue でユーザーエンゲージメントの損失を最小限に抑えながら、ユーザーの大きな不満に耐えられる Facebook の能力は、非弾力的な需要と市場支配力を示している。

207. より一般的には、Facebook は、ユーザーデータの悪用や取り扱いの誤りなど、ユーザーエクスペリエンスを低下させるその他の活動にもかかわっている。例えば、FTC は、2012 年と 2019 年にさまざまな深刻なユーザープライバシーおよび関連する不正使用に関与したとして Facebook を起訴し、Facebook は 2 回とも同意判決に同意した（そして 2019 年には 50 億ドルの罰金を支払うことになった）。ユーザーエンゲージメントを著しく損なうことなく製品品質を低下させることでユーザーに損害を与える Facebook の能力は、Facebook が市場支配力を持っていることを示している。

208. 第二に、Facebook は、顧客の大きな不満を引き起こしているにもかかわらず、長期間にわたって莫大な利益を得ており、このことは、Facebook が独占力を有し、かつパーソナルソーシャルネットワーキングのライバルが参入障壁を乗り越えてその支配に対抗することはできないということを示唆している。2011 年以来、Facebook は高い利益と時価総額を維持している。例えば、2020 年、Facebook は時価総額で世界第 6 位の上場企業であり、世界全体で約 850 億ドルの収益で 290 億ドルの利益を生み出した。そのうち 420 億ドルの収益は米国とカナダで生み出された。2020 年第 4 四半期に、Facebook は米国とカナダにおけるユーザー 1 人当たりの平均収益（「ARPU」）は 53.56 ドルであると報告した。公開会社として初めて通年を迎えた 2013 年以来、Facebook の利益率は、S&P 500 を構成する企業の平均と、S&P 500 情報技術セクターの企業の平均を大幅に上回っている。Facebook のユーザーに対する持続的な独占力は、これらの利益の大きな推進力である。そして投資家は、Facebook の独占力は今後も続くと信じているようである。その卓越した時価総額は、今後何年にもわたって高利益が見込まれることを示している。

209.　　Facebook の利益は、米国のパーソナルソーシャルネットワーキングのライバル企業による相当の数字を大幅に上回った。例えば、Snapchat は利益を計上したことがない。2020 年、Snapchat は約 25 億ドルの収益で 9 億 4,480 万ドルの純損失を報告した。この収益の約 16 億ドルは、米国内のユーザーから生み出された。2020 年第 4 四半期の Snapchat の報告によると、北米の ARPU は 7.19 ドルであった。

210.　　Facebook の独占力は、Facebook の膨大なパーソナルソーシャルネットワーキングユーザーベースへのアクセスを潜在的な競争上の脅威から拒否する制限的なポリシーを施行することで、アプリケーション開発者の潜在能力を打ち破る能力によってさらに実証されている。上記で詳述したように、Facebook は、競合の脅威と見なされているアプリが Facebook のプラットフォームと相互接続するのを防ぐために、一連の措置を講じた。その結果、アプリは Facebook の独占力に対する有意義な競争上の制約として浮上することができず、場合によっては完全に停止する。競争上の脅威として浮上する、または競争上の脅威を支援する可能性のある企業を除外する Facebook の能力は、その独占力の直接的な証拠である。

211.　　アプリ開発者の見込み客に損害を与えうる Facebook の力は、パーソナルソーシャルネットワーキングサービスの支配的地位から派生し、またそれを示している。このことは Facebook の幹部が Facebook の COO である Sheryl Sandberg に送った 2012 年 5 月の E メールに次のように要約されている。「当社には、新規にサインアップするよう導かれる非常に多くの人々が集まっているため、アプリやウェブサイトの顧客を見つけたい開発者や、オーディエンスにリーチしたい広告主も集まっています。」幹部によると、早ければ 2012 年の時点で、Facebook は「現在および将来のユーザー／顧客のほとんどが Facebook 上にあると開発者として想像できる規模を現在も提供しており」、「Apple App Store の上位 10 アプリのうち 7 アプリは Facebook で有効になっている」と指摘している。

212. 米国のパーソナルソーシャルネットワーキング市場におけるFacebookの支配的地位は、直接的なネットワーク効果や高い切替コストなど、参入障壁が大きいため、長続きしている。直接ネットワーク効果とは、より多くのユーザーがサービスに参加するにつれて、パーソナルソーシャルネットワークの価値を高めるユーザー間効果を指す。直接的なネットワーク効果は、パーソナルソーシャルネットワーキングへの参入の大きな障壁である。具体的には、パーソナルソーシャルネットワーキングの中核的な目的は、個人的なつながりを結びつけ、関わり合うことであるため、新規参入者が、ユーザーの友人や家族がすでに参加している確立されたパーソナルソーシャルネットワークを置き換えることは非常に困難である。Facebookの幹部は、2012年5月に次のように簡潔に述べている。「なぜ我々は競争が困難な相手なのか。あなたのお友達がここにいます。あなたはFacebookのネットワークとアイデンティティに多大な投資をしてきたのです。」Zuckerberg氏自身も、Facebookが2012年4月に、これらの構造的障壁のために享受した大きな利点を次のように認識している。「おそらく、Facebookについて最も価値のあることは、それが世界で群を抜いて包括的な、人とそのつながりのディレクトリであるということであり[、これは]構造的な大きな利点である。」

213. これらのネットワーク効果に直面するだけでなく、パーソナルソーシャルネットワーキングサービスに参入する可能性のある人は、ユーザーが直面する高い切替コストを克服する必要もある。時間の経過とともに、Facebookやその他のパーソナルソーシャルネットワークのユーザーは、より多くのつながりを築き、投稿や共有体験の履歴を発展させており、これは他のパーソナルソーシャルネットワーキングプロバイダーに簡単に転送することはできない。さらに、これらの切替コストは、各ユーザーのコンテンツと接続のコレクション、および各構築への労力の投資が、サービスの使用とともに継続的に構築されるため、時間の経過とともに増加する可能性（「ラチェット効果」）がある。実際、Facebookの通常業務文書には、「実質的な『ラチェット』効果の証拠が多数」あること、およびラチェット効果は「永続的な利点を与えることができる」ことが記載されている。

214.　Facebook は、米国のパーソナルソーシャルネットワーキングプロバイダーの間で、費やした時間、DAU、MAU の支配的地位を占めており、これは、強力な直接ネットワーク効果の恩恵を受け、その支配的地位を強化し、潜在的なライバルの参入をより困難にしていることを示唆している。

215.　さらに、Facebook の内部データは、時間が経つにつれて強化されるラチェット効果の恩恵を受けていることを裏付けている。1 つの兆候として、米国の Facebook Blue の月間アクティブユーザー（毎月 1 日に測定）当たりの Facebook の友達数は、2009 年 1 月の[省略]から 2019 年 10 月の[省略]に増加した。

216.　Facebook は、ユーザーがパーソナルソーシャルネットワーキングサービスにより多くの時間を費やし、より多くのコンテンツを投稿するにつれて、ユーザーの切替コストが増加することを長年認識してきた。例えば、2012 年 1 月、Facebook の幹部は Zuckerberg 氏に次のように書いている。「Facebook がすべてのユーザーの写真が存在する場所であれば、ユーザーにとって切替コストを非常に高める最も重要な方法の 1 つとなります... ユーザーがこれらの写真や関連データ／コメントを一緒に持ち込めないと、切り替えるのは非常に困難になります。」したがって、ユーザー1 人当たりの写真およびビデオコンテンツの Facebook での増加は、Facebook の独占力を保護する切替コストが依然として大きいことを示す別の指標を提供する。2012 年から 2018 年にかけて、Facebook の MAU 当たりの平均投稿画像数は[省略]以上増加し、MAU 当たりの平均投稿動画数は[省略]以上増加した。

217.　Facebook の反競争的行為は、参入障壁をさらに強化しています。Facebook が Instagram と WhatsApp を買収したことで、モバイル写真共有やモバイルメッセージングを介して、別の企業のパーソナルソーシャルネットワーキングへの参入から Facebook を守る「堀」が生み出された。また、アプリ開発者の Facebook プラットフォームへのアクセスを管理する Facebook の条件は、競争上の脅威として浮上した可能性のある潜在的なライバルに対する障害を生み出した。

218.　　上記の行為を通じて、Facebook は、ライバルのパーソナルソーシャルネットワーキングプロバイダーの出現と成長を阻害、抑制、抑止し、メリットにおける競争以外の手段によって、米国のパーソナルソーシャルネットワーキング市場での独占を違法に維持してきた。

219.　　上記の行為を通じて、Facebook は効果的な販売チャネルから潜在的な競合企業を除外したため、これらの企業が米国のパーソナルソーシャルネットワーキング市場で意味のある競合企業として出現するために必要な規模を否定した。

220.　　上記の行為は、パーソナルソーシャルネットワーキングの提供において Facebook が直面するであろう競争を制限し抑制することによって、競争に損害を与え、今でも損害を与え続けている。その結果、米国のパーソナルソーシャルネットワーキングのユーザーは、パーソナルソーシャルネットワーキングの競争による恩恵を奪われている。

221.　　競争は、以下の方法のいずれかまたはすべてにおいてユーザーに利益をもたらすものである。さらなるイノベーション（ユーザーを惹きつけ、維持するための新機能、特徴、ビジネスモデルの開発や導入など）。品質の改善（ユーザーを惹きつけ、維持するための機能、特徴、統合尺度、およびユーザーエクスペリエンスの改善）。消費者の選択（ユーザーが自分の好みにより適したパーソナルソーシャルネットワーキングプロバイダーを選択できるようにすること。広告の量と性質に関する好み、データ収集およびデータ使用慣行に関するオプションなどユーザー向けのデータ保護のプライバシーオプションの可用性や品質、種類を含むがこれに限定されない）。

222.　　消費者は、Facebook に十分な競争上の制約がないことによって被害を受けており、これにより Facebook は独占権を行使することができた。有意義な競争がないことにより、Facebook は、プライバシーとデータ保護に関して、競争の激しい市場で提供しなければならないものよりも、低いレベルのサービス品質を提供することができた。

223.　　Facebook の不法な独占力の継続とそれによる消費者への被害は、その不法な独占が強力なネットワーク効果に支えられていることを考えると、特に不愉快である。競争は、これらの影響に対抗するように調整された差止命令によってのみ回復することができる。

224.　　Facebook の行為による消費者への損害は特に深刻である。なぜなら、Facebook は参入障壁を高め、新興の競合他社が Facebook の独占力に効果的に異議を唱えた可能性がある重要な技術移行の時期に競争を排除したためである。Facebook の反競争的な行為は、この移行期間中に Facebook の独占を妨害する可能性のあるイノベーションと新製品の開発を阻害した。

225.　　パーソナルソーシャルネットワーキングのために米国市場を独占することで、Facebook は米国での広告販売の競争にも損害を与え、引き続き損害を与えている。特に、パーソナルソーシャルネットワーキングプロバイダーは通常、広告の販売を通じてプラットフォームを収益化するため、競合するパーソナルソーシャルネットワーキングプロバイダーを Facebook が抑制することで、Facebook は広告サービスの提供において密接な競争を避けることができた。これは、Facebook が広告主に提供する価値に関して予測可能な結果をもたらしてる。例えば、Facebook は、その不透明で、時には信頼性の低い広告報告指標、およびプラットフォーム上の偽アカウント普及について繰り返し批判されており、これにより広告主が広告の有効性を評価する能力が損なわれている。

226.　　競合するパーソナルソーシャルネットワーキングプロバイダーは、広告の提供において Facebook Blue の密接な競合相手であったと考えられる。これは、ソーシャル広告を他の形態のディスプレイ広告、検索広告、および「オフライン」広告と区別する、上述の特徴的な広告機能を提供できるためである。特に、Instagram と WhatsApp はそれぞれ、広告の販売において Facebook Blue で有意義な競争上の制約に発展させるのに適していた。Instagram の創設者は、Instagram のパーソナルソーシャルネットワークを収益化するための広告サービスの開発を計画した。そして、パーソナルソーシャルネットワーキング製品を開発した独立した WhatsApp は、広告をオファーするか、代替モデルを追求することで、その製品を収益化するインセンティブがあったはずである。競合するソーシャルネットワークはまた、消費者や広告主が好む可能性のある代替広告モデルを探索し、開発していたかもしれない。

227.　　したがって、パーソナルソーシャルネットワーキング独占を維持するための Facebook の反

競争的行為は、広告販売の競争を中立、抑制、抑止し、広告主から追加の競争の利益を奪っている。

228.　さらなる競争がもたらす広告主にとっての利点には、以下の一部またはすべてが含まれる。宣伝対象となる追加のユーザー（イノベーションの向上とユーザー向けのパーソナルソーシャルネットワークの質の向上の結果）、広告価格の低下（広告競争が拡大すると広告価格の低下を促すため）、追加のイノベーション（追加の広告競争は、広告主を惹きつけるための追加機能、特徴、ビジネスモデルの開発と導入を促すため）、品質改善（広告競争が激化することで、透明性、誠実さ、広告ビューの認証、カスタマーサービス、パフォーマンスとその他の指標のレポートの精度および近隣のコンテンツに対する感度などのブランド安全対策に関する品質改善が促進されるため）、選択肢（広告の競争が増えることで、設定広告主は、異なる形式の広告および／またはユーザー向けの異なるオプションに関する好みを含め、自分の好みにより適したパーソナルソーシャルネットワーキングプロバイダーを選択できるようになるため）。

229.　Facebook は、他の手段では達成できなかった、主張された効率性、競争促進的利益、または ビジネス上の正当性によって、競争に対するこの重大な損害を正当化することはできない。

## VIII.　訴因 1 – 反競争的買収による独占維持

230.　FTC は、上記第 1 項〜第 229 項の申し立てを再主張し、参照により組み込む。

231.　少なくとも 2011 年以降、Facebook は、パーソナルソーシャルネットワーキングに関して米 国で独占力を有している。

232.　Facebook は、その反競争的買収から成る反競争的行為の過程を通じて、意図的に独占力 を維持している。Facebook は、その行為を通じて競争を排除し、パーソナルソーシャルネットワーキングに おいて、そのメリットを競う以外の手段で意図的に独占を維持している。

233.　Facebook の行動方針は継続中である。Facebook は、Instagram や WhatsApp など、取得し た競争上の脅威を保持し、統合し続けている。Facebook の Instagram と WhatsApp の継続的な所有と運営 は、直接的な競争上の脅威を無力化し、モバイル写真共有とモバイルメッセージングを介して別の企業に よるパーソナルソーシャルネットワーキングへの参入から Facebook を保護する「堀」を作成・維持する。 Facebook は、競争上の脅威について業界を引き続き監視しており、パーソナルソーシャルネットワーキング の独占に対する脅威を構成する、または脅威を構成する可能性がある企業を買収しようと試みる可能性が 高い。

234. パーソナルソーシャルネットワーキングの独占を維持することにおいて、Facebook の排他的行為に競争促進的な根拠はない。

235. Facebook の反競争的行為は、シャーマン法第 2 条（合衆国法典第 15 編第 2 条）に違反して違法な独占を構成するため、FTC 法第 5 条(a)（合衆国法典第 15 編第 45 条(a)）に違反する不公正な競争方法である。

## IX.　訴因 2 – 反競争的買収や、開発者による FACEBOOK プラットフォームへのアクセスを管理する契約に盛り込まれた反競争的な条件付き取引ポリシーを含む、違法な行動方針による独占維持

236. FTC は、上記第 1 項〜第 229 項の申し立てを再主張し、参照により組み込む。

237. 少なくとも 2011 年以降、Facebook は、パーソナルソーシャルネットワーキングに関して米国で独占力を有している。

238. Facebook は、反競争的買収およびその反競争的な条件付き取引慣行の両方を含む一連の行動を通じて、また、パーソナルソーシャルネットワーキング独占に対する競争上の脅威を阻止するために Facebook プラットフォームに関連する反競争的協定を維持および実施することにより、意図的に独占力を維持している。上述のように、Facebook は、反競争的買収、サードパーティアプリの Facebook プラットフォームへのアクセスと引き換えに抽出された契約に具体化された条件付き取引ポリシー、および重要な API へのアプリのアクセスを遮断することで反競争的契約を執行することにより、パーソナルソーシャルネットワーキングの独占を維持している。

239. Facebook は、その一連の行為を通じて競争を排除し、パーソナルソーシャルネットワーキングにおいて、そのメリットを競う以外の手段で意図的に独占を維持している。

240.　　Facebook の行動方針は継続中である。Facebook は、Instagram や WhatsApp など、取得した競争上の脅威を保持し、統合し続けている。Facebook の Instagram と WhatsApp の継続的な所有と運営は、直接的な競争上の脅威を無力化し、モバイル写真共有とモバイルメッセージングを介して別の企業によるパーソナルソーシャルネットワーキングへの侵入から Facebook を保護する「堀」を作成・維持していることを認識している。Facebook は、競争上の脅威について業界を引き続き監視しており、パーソナルソーシャルネットワーキングの独占に対する脅威を構成する、またはそのように再配置される可能性のある企業を買収しようとする可能性が高い。Facebook は開発者のスクリーニングも継続しており、選択した理由を問わず API アクセスを許可または拒否することができる。Facebook は 2018 年 12 月まで、開発者との制限的合意を維持していた。アプリ開発者に関連するポリシーに対する世間の厳しい目にさらされ、契約に盛り込まれたポリシーを強制しないことを主張せざるを得なくなり、かかる批判が落ち着いた後、またはその他の条件が変わった場合、Facebook はかかるポリシーを再開する可能性がある。

241.　　パーソナルソーシャルネットワーキングの独占を維持するうえで、Facebook の排他的行為に競争促進的な根拠はない。

242.　　Facebook の反競争的行為は、シャーマン法第 2 条（合衆国法典第 15 編第 2 条）に違反して違法な独占を構成するため、FTC 法第 5 条(a)（合衆国法典第 15 編第 45 条(a)）に違反した不公正な競争方法である。

## X.　　救済を与える権限

243.　　FTC 法の第 13 条(b)（合衆国法典第 15 編第 53 条(b)）は、本裁判所が FTC 法の違反に対して恒久的差止命令を出し、その衡平法上の管轄権の行使において、Facebook の違反により生じた損害を救済するための衡平法上の救済を命じる権限を与えている。

よって、FTC は、本裁判所に対し、FTC 法第 13 条(b)項（合衆国法典第 15 編第 53 条(b)）により承認され、かつ自らの衡平法上の権限に従い、Facebook に対して以下の事項を宣言、命令、および裁定する最終判決を下すことを要求する。

A. Facebook の一連の行動は、本書で主張されるように、シャーマン法第 2 条に違反し、したがって、FTC 法第 5 条(a)（合衆国法典第 15 編第 45 条(a)）に違反した不公正な競争方法を構成する。

B. 資産の売却、事業（Instagram および／または WhatsApp を含むが、これらに限定されない）の売却または再建、および訴状で主張される行為がなければ存在するであろう競争を回復させるのに十分なその他の救済（合理的に必要な範囲において、Facebook から 1 つ以上の実行可能かつ独立した事業への継続的なサポートまたはサービスの提供を含む）

C. 競争を回復し、上記の Facebook の反競争的行為によって生じる競争への損害を是正するために必要なその他の衡平法上の救済

D. 将来の合併および買収に関する事前の通知および事前の承認義務

E. Facebook が、開発者による API およびデータへのアクセスを支配する、または反競争的条件を課す反競争的合意に達することを恒久的に禁止されること

F. Facebook が本書に記載されている違法行為に関与することを恒久的に禁止されていること

G. Facebook が将来、同様の行為または関連する行為を行うことを恒久的に禁止されること

H. FTC に定期的なコンプライアンス報告書を提出し、合理的かつ適切な報告義務および監視義務に従う要件

I. 本訴状で主張される Facebook の法律違反の是正および再発防止に必要であると裁判所が判断する、売却、再編、または相互運用性の要件を含むがこれらに限定されない、その他の衡平法上の救済。

[署名]

| | |
|---|---|
| HOLLY VEDOVA | DANIEL J. MATHESON (D.C. Bar 502490) |
| 取締役代理 | 主任弁護士 |
| 競争局 | 600 Pennsylvania Avenue N.W. |
| | Washington, DC 20580 |
| | 202-326-2075 |
| MARK WOODWARD (D.C. Bar 479537) | dmatheson@ftc.gov |
| 副局長代理 | |
| 競争局 | ROBERT ZUVER (D.C. Bar 987216) |
| | MARIA DIMOSCATO (D.C. Bar 489743) |
| | ERIC COCHRAN (D.C. Bar 981148) |
| TARA KOSLOV (D.C. Bar 448147) | HENRY HAUSER (D.C. Bar 1614882) |
| 副部長 | MITCHELL LONDON (D.C. Bar 1029408) |
| 競争局 | |
| | OWEN MASTERS (D.C. Bar 242139) |
| | MICHAEL MIKAWA |
| HEATHER JOHNSON (D.C. Bar 503465) | NOEL MILLER (D.C. Bar 1026068) |
| 副局長代理 | DAVID OWYANG |
| 競争局 | MARK SILVIA |
| | MICHAEL SMITH (D.C. Bar 996738) |
| | REBECCA WEINSTEIN |
| PATRICIA GALVAN | SYLVIA ZHANG |
| 取締役補佐 | |
| | *原告側弁護士* |
| KRISHA CERILLI (D.C. Bar 983281) | *連邦取引委員会* |
| 副次長 | |

---

[1]Comscore データの分析への参照は、2 歳以上の米国のデスクトップユーザーおよび 18 歳以上の米国の
モバイルユーザーについて収集されたデータに基づいている。次の Comscore データは、Comscore, Inc.の
免責事項の対象となる。「本分析は機密情報であるため、COMSCORE, INC.はその内容を確認することが
許可されておらず、ここに含まれるいかなる情報に第三者が依拠することに対しても、一切の責任を負いま
せん。COMSCORE, INC.は、本分析に関連して使用された COMSCORE データの正確性または完全性に
関して一切の責任を負わないものとします。」



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Jacqueline Yorke, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided English into Japanese translation(s) of the source document(s) listed below are true and accurate:

- Rakuten Requests (for Transperfect)
- Line Requests (for Transperfect)

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Jacqueline Yorke, Project Manager

Sworn to before me this
Wednesday, May 25, 2022

Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
.01PO6356754.
MY COMMISSION EXPIRES 04-03-2025

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

115

別紙 **B**

<div align="center">

コロンビア特別区連邦地方裁判所

</div>

| | |
|---|---|
| **連邦取引委員会**<br><br>原告<br><br>対<br><br>**META PLATFORMS, INC.**<br><br>被告 | 民事訴訟番号 1:20-cv-03590（JEB） |

<div align="center">

**[案] 保護命令**

</div>

　（ⅰ）本訴訟を効率的かつ迅速に解決し、（ⅱ）本訴訟を提起する両当事者による証拠開示を促進し、さらに（ⅲ）機密情報を不適切な開示または使用から保護するため、本裁判所は、提示された正当な理由に基づき、また Fed. R. Civ. P. 26(c)(1)に従い、以下のとおり命じる。

**SECTION I 定義**

1. 本書類で使用される場合、

    (a) 本訴訟とは、関連する証拠開示手続、裁判前手続、公判手続、公判後手続、上訴手続を含む、本裁判所で係属中の上記の訴訟を意味する。

    (b) 「機密情報」とは、営業秘密またはその他の秘密の研究、開発または商業的情報（これらの用語は、Fed. R. Civ. P. 26(c)(1)(G)で使用されている）、または当該情報を含む文書、謄本もしくはその他の資料のうち、公表されていないもの、またはその他一般に公開されていないものを意味する。さらに、指定当事者は、裁判所の

命令に違反して公開された情報または品目のうち、指定当事者が機密扱いを受けるべきと考えるものを機密として指定することができる。これには、(i)機密情報からコピーまたは抽出、要約、編集された情報、および(ii)機密情報を明らかにする可能性のある証言、会話、プレゼンテーションが含まれる。

(c) 「競争上の意思決定」とは、契約、マーケティング、価格設定、製品またはサービスの開発または設計、製品またはサービスの提供、研究開発、合併および買収、または知的財産権のライセンス供与、取得、または執行に関する意思決定を含む、競合他社、潜在的な競合他社、顧客、または販売パートナーに関連する意思決定を意味する。

(d) 「被告」とは、Meta Platforms, Inc.、その前身、部門、子会社、関連会社、パートナーシップ、後継者、合弁会社、ならびに Instagram および WhatsApp を含むがこれらに限定されない、前述のすべての取締役、役員、従業員、代理人（弁護士を含む）および代表者を意味する。

(e) 「開示」とは、全体または一部の表示、漏洩、開示、作成、説明、送信、またはその他の方法で伝達されることを意味する。

(f) 「文書」とは、あらゆる文書または電子的に保存された情報（この用語は、Fed. R. Civ.P. 34(a)で使用されている）を意味する。★ ★

(g) 本書で定義される「極秘情報」には、開示された場合、保護対象者に重大かつ重大な損害を与える可能性がある機密情報のみが含まれるものとする。

極秘情報には、アルゴリズムとソースコードを含む企業秘密、非公開の営業上機密性の高い顧客リスト、非公開の財務およびマーケティングまたは戦略的事業計画情報、価格やコスト、またはマージンに関する現在または将来の非公開情報、

研究、開発、テストまたは既存もしくは提案された将来の製品の計画に関する情報、非公開の価格設定およびコスト情報を含む保護対象者の製品提供の強靭性と脆弱性の評価、機密契約条件、提案された契約条件、または被告または被告の競合他社に関する交渉の立場（交渉の立場に関する社内協議を含む）、未決または放棄された特許出願に関する情報で一般に公開されていないもの、人事ファイル、個人を特定できる機微情報、機微健康情報、ならびにあらゆる極秘情報を開示する通信が含まれるものとする。また、極秘情報には、被告に開示された場合に、非当事者が、自社または自社と関連する新規事業が潜在的な報復または損害にさらされると考える情報も含まれる。保護対象者が、(i)調査資料を作成した場合、または(ii)召喚状もしくは裁判所命令により、重大かつ著しい競争上または商業上の損害を生じさせることのある情報を作成するよう求められた場合で、当該情報が、本条項に記載の情報のカテゴリのいずれにも該当しないことが明らかであるときは、説得力のある証拠をもって、当該情報が極秘情報であり、社内弁護士による提出を差し控えるための保護命令を求めることができる。ただし、下記第 D (1)(d)項の例外に従う。本項に従って申立てが行われ、調査資料に関連する場合、B(2)(a)項に基づくその極秘指定と同時に提出されなければならない。本項に従って申し立てが行われ、召喚状または裁判所命令に関連する場合、召喚状または裁判所命令に応答するには、期日までに提出する必要がある。保護対象者が本項に従って裁判所から追加の保護を求める場合、追加の保護を求めた資料は、裁判所が判決を下すまで、外部弁護士を除き、何人にも提供されない。

(h) 「社内弁護士」とは、法律サービスを提供する目的で被告が雇用する弁護士、ならびに法律サービスを提供する目的で被告が雇用する弁護士を支援する目的で被

告が雇用するパラリーガル、秘書、事務および管理職員を意味する。

(i) 「調査」とは、被告による反競争的行為の可能性に関して、連邦取引委員会ファイル番号 191-0134 としてマークされた原告による苦情前の照会を意味する。

(j) 「調査資料」とは、非特権文書、証言またはその他の資料で、次のものを意味する。(i) あらゆる非当事者が、調査に関連して、任意または強制的な手続きにより連邦取引委員会に提供したもの。(ii) 調査に関連して、および調査中に、連邦取引委員会とあらゆる非当事者との間の通信を構成するもの。(iii) 被告、または関連人物もしくは事業体が、調査に関連して、連邦取引委員会に提供したもの。

(k) 「訴訟資料」とは、秘匿特権のない文書、証言、その他の資料で、次のものを意味する。(i) 本訴訟に関連して、および本訴訟の係属中自主的または強制的なプロセスで非当事者が当事者に提供するもの。(ii) 本訴訟の係属中および係属中に、いずれかの当事者と非当事者との間の通信を構成するもの。(iii) 本訴訟に関連して、また本訴訟の係属中に、被告が原告に提供するもの。(iv) 本訴訟に関連して、および本訴訟の係属中に原告が被告に提供するもの。

(l) 「非当事者」とは、本訴訟の当事者として指名されていない者を意味する。

(m)「外部弁護士」とは、本訴訟において被告を代表する社外法律事務所が雇用する弁護士および弁護士支援スタッフを意味する。

(n) 「当事者」とは、本訴訟における原告または被告を意味する。「当事者ら」とは、本訴訟における原告と被告の総称である。

(o) 「原告」とは、米国連邦取引委員会およびその従業員、代理人、代表者全員を意味する。

(p) 「個人」とは、自然人、法人、事業体、パートナーシップ、協会、合弁事業、政府機

関、信託、またはその他の法人を意味する。

(q)「保護対象者」とは、任意または強制的なプロセスのいずれかで、(i) 調査に関連する調査資料、または (ii) 訴訟資料を提供または提供した者（当事者または非当事者を含む）を意味する。

**SECTION II極秘情報および機密情報の指定**

1. 本裁判所が本命令を締結してから 5 営業日以内に、原告は、本命令の写しを、調査資料を連邦取引委員会に提供した各非当事者保護対象人（または、弁護士が代理する場合は、非当事者保護対象人の弁護士）に、電子メール、ファクシミリ、または翌日配達で送付するものとする。

2. 保護対象者による調査資料の極秘指定。保護対象者は、以下の手順に従って、自身が作成した調査資料を極秘として指定することができる。

(a) 被告は、以下の場合、調査資料を機密または極秘として再指定するよう求められない。被告が作成したすべての調査資料は、セクション C で後述する異議申し立て手順および被告が作成した本調査資料訴訟における指定および使用に適用される裁判所が採択するその他の関連する命令または手続（例：公判証拠物件を極秘として指定することに適用される手順）に従うことを条件に、極秘として扱われるものとする。

(b) 被告を除き、各保護対象者は、本命令の写しを受領してから 60 日以内に（「指定期間」）、保護対象者が誠実に、調査資料に極秘情報が含まれ、かかる指定が保護対象者の利益を保護するために必要であると判断する範囲で、調査資料を極秘情報として指定するものとする。かかる調査資料は、まだ指定されていない場合、書面通知を翌日配達郵便または電子メールにより提供し、ページ番号付けま

た、は可聴性を含め、判読性を妨げない方法で、「極秘情報」の文言を付した調査資料の写しを含む代替資料を、調査資料が作成された当事者に提示することにより、そのように指定することができる。非当事者が、負担のために代替の制作物を提出できない場合、代わりに、極秘情報を含むすべての文書の詳細な指定を含む調査資料が作成された当事者に、翌日配達郵便または電子メールで書面による通知を提供することができる。

極秘情報を含む文書は、その全体を極秘情報として指定することができるものとする。

(c) 本指定期間の満了まで、すべての調査資料は、その全体が極秘情報として扱われる。


被告が作成した調査資料を除き、この指定期間の満了までに極秘に指定されていない調査資料ならびにかかる法律または規制を解釈するもの、また、極秘情報または本命令の対象となる文書から派生した機密情報の内容を開示する情報、およびかかる資料の任意の部分から取得した情報は、本命令の目的上、反トラスト民事訴訟法その他の連邦または州の法令または規制 または連邦裁判所または州裁判所の判例に従い、機密情報として取り扱われるものとする。

かかる極秘情報または機密情報を提出する非当事者の身元も、非当事者から当該取り扱いが不要であるとの通知がある場合を除き、または当該通知があるまで、本命令の目的上、極秘情報または機密情報として扱われるものとする。

3. 非当事者の保護対象者が、本命令がその極秘情報または機密情報を適切に保護していないと考える場合、本命令の写しの受領後 10 日以内に、当事者外保護対象者の

95

極秘情報または機密情報について裁判所にさらなる保護を求めることができる。非当

事者の保護対象者が裁判所から追加の保護を求める場合、追加の保護を求めた調

査資料は、裁判所が判決を下すまで、外部弁護士以外の他の者に提供されない。

4. 機密情報または極秘情報として指定されていない文書または証言のいかなる提出も、

後に機密情報または極秘情報として指定される場合、かかる情報に関する将来の機

密保持請求の権利放棄とはみなされない。本訴訟の公判前であればいつでも、保護

対象者は、本訴訟の証拠開示中に以前に提出した調査資料または訴訟資料を極秘

性または機密性に指定すべきであることに気付いた場合、当該文書、証言、およびそ

のような資料を指定することができる。その際、当事者らに書面で通知し、ページ番号

を含む判読性または可聴性を妨げない方法で「極秘情報」または「機密情報」の文言

を付した調査資料または訴訟資料の複製物を含む代替資料を提供することにより行

う。その後、当事者らは、本命令の条件に基づき、保護対象者の新しい指定に従って

調査資料または訴訟資料を取り扱うものとする。ただし、開示が適切な情報の開示

は、その後の機密保持の指定にかかわらず、不適切とはみなされない。

5. 当事者が、不注意またはその他の理由により、本命令で許可されていない状況で、保

護対象者の機密情報または極秘情報を開示した場合、当事者は、直ちに次のことを

行う必要がある。(i)保護対象者に書面で不正開示を通知すること。(ii)開示資料の

不正な写しをすべて取得するために最善の努力を払うこと。(iii)本命令の条件を不正

に開示された人物に通知すること。および(iv)かかる人物に、付録 A に拘束されるこ

とを承認し、同意するよう要請すること。

6. 訴訟資料の保護対象者による極秘または機密としての指定 以下の手続きは、保護対

象者が本命令が締結された後に本訴訟において開示する情報を極秘または極秘とし

て指定するためのプロセスを規定するものであり、かかる資料が本命令の条件に基づきその指定に適格であるという誠実な信念に基づいている。これには、Fed. R. Civ.の 30 頁、31 頁、33 頁、36 頁、45 頁および Fed. R. Civ.の 33 頁(d)、34 頁(b)(2)および (c)、45 頁に対して開示された文書に基づく要請に対応する情報が含まれるが、これらに限定されない。

(a) 証言。本命令の締結後に本訴訟において行われた供述録取のすべての記録は、記録の完全かつ最終的な写しが供述録取者(または該当する場合は、供述録取者の弁護士)に提供された日から 30 日間、その全体が極秘情報として扱われる。証言録取に気付いた当事者は、最終記録を受領してから五(5)営業日以内に、最終記録を証言録取者に提供するものとする。最終記録の受領後 30 日以内に、証言録取者は、証言録取記録の任意の部分を、ページ(複数可)および行(複数可)、ならびに証言録取者または証言録取者の雇用主が提供した証言録取の証拠物件により、極秘情報として指定することができる。かかる指定が有効となるには、原告および被告の弁護士に書面で通知しなければならない。

本第 6(a)項に従って指定されていない転写物または証拠物件のいかなる部分も、セクション C で後述する異議申し立ての手続きに従い、機密情報として扱われるものとする。

当事者が本命令に基づき、別の保護対象者によって極秘または機密と指定された文書または情報について証人に質問する権利を有する場合、かかる質問を行った当事者は、極秘または機密の文書または情報に関する記録の部分を極秘または機密として指定するものとする。

(b) 文書。本訴訟において作成する文書を極秘情報として指定する保護対象者は、当

該情報を含む各文書に、ページ番号付けや可読性を含め、判読性を妨げない方法で「極秘文書」の文言を付すか、またはその他の方法で表示しなければならない。

本件訴訟において作成する文書を機密情報として指定する保護対象者は、当該情報を含む各文書に、ページ番号付けや可読性を含め、判読性を妨げない方法で、「機密情報」の文言を付すか、またはその他の方法で表示しなければならない。

機密情報を含む文書は、その全体を機密情報として指定することができるものとする。極秘情報を含む文書は、その全体を極秘情報として指定することができるものとする。

(c) 電子文書およびデータ。保護対象者がネイティブの電子形式で電子ファイルおよび文書を作成する場合、かかる電子ファイルおよび文書は、ファイルには極秘情報または機密情報が含まれるかどうかを示すファイル名または指定者情報を追加することにより、または電子形式で作成された当該情報を適切に指定するためのその他の合理的な方法により、本命令に基づく保護のために保護対象者によって指定されるものとする。これには、ファイルに関連する合理的にアクセス可能なメタデータでかかる指定を行うことが含まれる。極秘情報または機密情報が、排他的な機密情報を含むディスクまたはその他の媒体上で電子形式で生成される場合、「極秘情報」または「機密情報」の指定は、ディスクまたはその他の媒体上に行うことができる。

電子ファイルまたは文書が、証言録取、裁判所手続、または印刷形式で第 D(2)(g)項に記載される人物に提供するためにネイティブ形式で印刷される場合、電子ファイルまたは文書を印刷する当事者は、印刷された文書に、「極秘情報」または「機密情報」の文言を付し、ネイティブファイルに関連する製造番号および指定を含

めるものとする

機密情報を含む電子ファイルまたは文書は、その全体を機密情報として指定することができるものとする。極秘情報を含む電子ファイルまたは文書は、その全体を極秘情報として指定することができるものとする。

7. 非当事者からの訴訟資料の指定。当事者が、非当事者の極秘情報または自らが保有する機密情報を生成するために、本訴訟において証拠開示要請を受けた場合、当事者は、

   (a) 極秘情報または機密情報を求める当事者に、要請された情報の一部または全部が非当事者との機密保持契約の対象であることを書面で速やかに通知する。

   (b) 当事者の極秘情報または機密情報が要求されていることを非当事者に速やかに通知し、当該情報について合理的に具体的な説明を提供するか、または当該非当事者による調査のために要請された情報を利用できるようにする。

   (c) 本訴訟における規定保護命令および関連する証拠開示請求（複数可）の写しを非当事者に速やかに提供する。

8. 非当事者が、通知および付随する情報を受領してから 14 日以内に本裁判所に保護命令を求めない場合、非当事者の極秘情報または証拠開示要請に対応する機密情報が提出される場合がある。非当事者が適時に保護命令を求める場合、機密保持契約の対象となるその極秘情報または機密情報は、裁判所による決定の前に作成してはならないものとする。[1]

9. 本命令の条件は、本訴訟において非当事者が作成し、極秘情報または機密情報とし

---

[1] 本条項の目的は、非当事者の機密保持権の存在を利害関係者に警告し、非当事者に本裁判所におけるその機密保持権を保護する機会を提供することである。

て指定された情報に適用される。本訴訟に関連して非当事者が作成したかかる情報は、本命令により提供される救済により保護される。これらの条項のいかなる規定も、非当事者が追加の保護を求めることを禁止するものと解釈されるべきではない。

**SECTION III** 極秘または機密指定への異議申し立て

1. 機密保持の指定に異議を唱える当事者（「異議申立当事者」）は、かかる指定を行った保護対象者（「指定当事者」）および本訴訟の全当事者に、異議申立の理由を具体的に述べる書面通知をいつでも提供することができる。機密または極秘と指定された文書の一部には、文書に含まれる特定の記述または情報を含め、機密指定に対する異議を申し立てることができる。異議申立の対象となるすべての資料は、紛争の解決まで引き続き機密情報または極秘情報として扱われるものとする。異議申立当事者の書面による通知から 10 日以内に、異議申立当事者および指定当事者は、それぞれの立場について協議するよう試みるものとする。異議申立当事者および指定当事者が、異議申立当事者の書面による通知サービス（または異議申立当事者および指定当事者が合意した別の期限）から 14 日以内に異議申立について合意に達することができない場合、異議申立当事者は、適用される規則に従って書簡による申立および/または申立を行うことにより、本裁判所に紛争を提起することができる。裁判所が、問題となっている文書または陳述書のいずれかの部分が極秘情報または機密情報を構成していないと判断した場合、異議を申し立てられた指定は、文書または陳述書の当該部分に関して撤回されたものとみなされるものとする。

**SECTION IV** 極秘情報または機密情報の開示

1. 極秘情報は、以下の者に対してのみ開示することができる。

   (a) 裁判所、および法律書記官、法廷記者、および速記者または事務職員を含む、本

(b) 米国連邦取引委員会の弁護士、パラリーガルおよびその他の専門職員（サポート
および IT スタッフを含む）、ならびに本訴訟を支援するために原告が雇用する代
理人または独立請負業者であって、その職務上情報へのアクセスを必要とする
者。

(c) 被告の社外弁護士（D(1)(d)項に定める場合を除き、被告の社内弁護士ではなく、
セクション E の手順に従う）、パラリーガル、および当該社外弁護士が情報へのア
クセスを必要とする機能を有するその他の専門家（サポートおよび IT スタッフを含
む）を含む（ただし被告の従業員ではないこと）。

(d) 本訴訟を担当する被告の社内弁護士で、付録 B の形式にて機密性に関する社内
弁護士契約を締結する時点で、また極秘情報が当該社内弁護士に開示された最
後の時点後 2 年間、(a) 当該社内弁護士が現在も被告により雇用されているか、
別の雇用主により雇用されているかを問わず、被告における競争的意思決定に参
加しておらず、これにつき助言していない者、(b) いずれの雇用主においても、本
訴訟の過程で入手した極秘情報を所有する保護対象者が関与する競争的意思決
定に参加しておらず、これにつき助言していない者、または (c)（本訴訟の訴状の
申し立てに起因または関連する訴訟とは別に）被告、もしくは保護対象者が実際に
相手方（すなわち、単なる名目上の相手方以上に、保護対象者の召喚状に応じる
ことによる相手方）であり、指定された社内弁護士が本訴訟の過程で入手した極
秘情報の所有者である他の雇用主に代わり、訴訟その他の法的措置に参加して
おらず、これにつき助言していない者 2 名。このサブパートに基づくアクセスの資

格を得るために、社内訴訟弁護士はまず添付の付録Aの形式で機密性に関する社内弁護士契約を締結し（この締結版は関連する被告の社外弁護士が維持し、裁判所、いずれかの当事者、または非当事者の保護対象者の要求に応じて閲覧できるものとする）、被告の社外記録弁護士のオフィスで直接、または個人のログインIDとパスワードを使用して安全な電子データルームまたは文書レビュープラットフォームを使ってのみ極秘情報へアクセスするものとする。

被告は、極秘情報の不正使用または開示が確認された場合、またはその疑いがある場合は、速やかに裁判所および原告に報告するものとする。本項の対象となる弁護士のうち、被告の競争的意思決定に関連する決定とは無関係な業界で働くために被告を退職する者は、かかる人物が競争的意思決定に従事したことを原告または利害関係のある被保護者から示されない限り、本条項の雇用後の制限が免除されると想定されるものとする。

(e) 当事者が本訴訟において当該当事者を支援するために雇用する外部ベンダーまたはサービスプロバイダー（コピーサービスプロバイダー、eDiscovery ベンダーおよび類似のサービスプロバイダー、証言録取のために雇用される外部法廷速記者、および文書管理コンサルタントなど）。ただし、当該当事者は、本契約に添付される付録 A の形式で、機密保持に関する契約を締結することを条件とする。

(f) 当事者らが本訴訟に従事する、または本裁判所が任命する調停人、仲裁人、または特別マスター。

(g) 極秘情報自体が示す、または受領当事者が誠意を持って文書の作成者、宛先、受領者、保管者、または出所であると信じるに足る人物で、開示または開示される

文書に合法的にアクセスしたことがある者。さらに証言または裁判の間、当事者の現または元従業員である証人は、当事者によって作成された文書のうち、当該従業員の発言または通信を引用、再集計、または要約するとされる部分を示すことができる（疑義を避けるため、文書の他の部分は、当該従業員の当該発言に関する証言または裁判での証言を方向付けるために必要な場合には、現または元従業員に示すことができる）。

(h) 当事者が、本訴訟において証言またはコンサルティングの専門家として雇用する者。これには、専門家またはコンサルタントが関係する会社の従業員、または本訴訟において専門家の作業を支援する独立請負業者が含まれる。ただし、当該人物は、本契約に添付される付録 A の形式で機密保持に関する契約を締結することを条件とする。

(i) 社外の裁判コンサルタント（グラフィックコンサルタントを含むが、これに限定されない）。ただし、当該コンサルタントは、本契約に添付される付録 A の形式で機密保持に関する契約を締結することを条件とする。

2. 機密情報は、以下の者に対してのみ開示することができる。

(a) 裁判所、および法律書記官、法廷記者、および速記者または事務職員を含む、本訴訟において裁判所を支援するすべての者。

(b) 米国連邦取引委員会の弁護士、パラリーガルおよびその他の専門職員（サポートおよび IT スタッフを含む）、ならびに本訴訟を支援するために原告が雇用する代理人または独立請負業者であって、その職務上情報へのアクセスを必要とする者。

被告の社外弁護士（D(2)(d)項に定める場合を除き、被告の社内弁護士ではなく、セクションEの手順に従う）、パラリーガル、および当該社外弁護士が情報へのアクセスを必要とする機能を有するその他の専門家（サポートおよびITスタッフを含む）を含む（ただし被告の従業員ではないこと）。

(d) 本訴訟を担当する被告の社内弁護士で、現在、および機密情報が当該社内弁護士に開示された最後の時点後2年間、(a)当該社内弁護士が現在も被告により雇用されているか、別の雇用主により雇用されているかを問わず、被告における競争的意思決定に参加しておらず、これにつき助言していない者、(b)いずれの雇用主においても、本訴訟の過程で入手した機密情報を所有する保護対象者が関与する競争的意思決定に参加しておらず、これにつき助言していない者、または(c)（本訴訟の訴状の申し立てに起因または関連する訴訟とは別に）被告、もしくは保護対象者が実際に相手方（すなわち、単なる名目上の相手方以上に、保護対象者の召喚状に応じることによる相手方）であり、指定された社内弁護士が本訴訟の過程で入手した機密情報の所有者である他の雇用主に代わり、訴訟その他の法的措置に参加しておらず、これにつき助言していない者4名。このサブパートに基づくアクセスの資格を得るために、社内訴訟弁護士はまず添付の付録Bの形式で機密性に関する社内弁護士契約を締結し（この締結版は関連する被告の社外弁護士が維持し、裁判所、いずれかの当事者、または非当事者の保護対象者の要求に応じて閲覧できるものとする）、被告の社外記録弁護士のオフィスで直接、または個人のログインIDとパスワードを使用して安全な電子データルームまたは文書レビュープラットフォームを使ってのみ機密情報へアクセスするものとする。

被告は、機密情報の不正使用または開示が確認された場合、またはその疑いがある場合は、速やかに裁判所および原告に報告するものとする。本項の対象となる弁護士のうち、競争的意思決定に関連する決定とは無関係な業界で働くために被告を退職する者は、かかる人物が競争的意思決定に従事したことを原告または利害関係のある被保護者から示されない限り、本条項の雇用後の制限が免除されると想定されるものとする。

(e) 当事者が本訴訟において当該当事者を支援するために雇用する外部ベンダーまたはサービスプロバイダー（コピーサービスプロバイダー、eDiscovery ベンダーおよび類似のサービスプロバイダー、証言録取のために雇用される外部法廷速記者、および文書管理コンサルタントなど）。ただし、当該当事者は、本契約に添付される付録 A の形式で、機密保持に関する契約を締結することを条件とする。

(f) 当事者らが本訴訟に従事する、または本裁判所が任命する調停人、仲裁人、または特別マスター。

(g) 機密情報自体が示す、または受領当事者が誠実に信じるに足る根拠を有する者が、開示されたまたは開示されるべき文書に過去に合法的にアクセスした範囲において、当該文書の作成者、受取人、受領者、保管者、または出所である者。当事者の現在または過去の従業員で、その発言または通信が当該当事者の文書に引用、再録、または要約されている者、または原告または被告の弁護士が善意で以前に文書を受領またはアクセスしたと信じる者（ただし、その者が文書にアクセスしなかったことを示す場合はこの限りではない）。

(h) 当事者が、本訴訟において証言またはコンサルティングの専門家として雇用する

者。これには、専門家またはコンサルタントが関係する会社の従業員、または本訴訟において専門家の作業を支援する独立請負業者が含まれる。ただし、当該人物は、本契約に添付される付録 A の形式で機密保持に関する契約を締結することを条件とする。

(i) 社外の裁判コンサルタント（グラフィックコンサルタントを含むが、これに限定されない）。ただし、当該コンサルタントは、本契約に添付される付録 A の形式で機密保持に関する契約を締結することを条件とする。

3. 開示を行う当事者の弁護士は、本訴訟の最終解決後少なくとも一（1）年間、本契約に添付される付録 A の形式の機密保持に関する契約書の原本を保持しなければならない。

4. 本命令の D(1)項および D(2)項に記載された各個人のうち、極秘情報または機密情報として指定された情報が開示される者は、本命令に定められている場合を除き、当該極秘情報または機密情報を他の個人に開示してはならない。

5. 本命令のいかなる内容も、かかる情報の機密性を保持するための適切な措置を取ることを条件として、原告が、(i) 米国連邦取引委員会が当事者であるその他の法的手続きの過程で、(ii) 本訴訟の最終判決の遵守を確保する目的で、または (iii) 法執行目的で、極秘情報または機密情報として指定された情報を開示することを妨げるものではない。かかる開示は、米国連邦取引委員会による開示に限定されるものとする。

6. 本命令のいかなる内容も、

(a) 保護対象者による、極秘情報または機密情報として指定された自身の情報の使用または開示を制限しない。

(b) 極秘情報または極秘情報を機密として指定した保護対象者の同意を得て開示することを妨げない。

(c) 一方の当事者による次の極秘情報または機密情報の開示を妨げない。(i) 当該当事者の過失によらずして公知であるか公知となったもの。(ii) 調査中または本訴訟における証拠開示において、受領とは無関係に、当該当事者により合法的に取得された、または当該当事者が知るもの。(iii) 以前に作成された機密保持義務を負わず、不注意または誤りによってではなく、当該当事者に開示および/または提供された情報。または (iv) 裁判所の命令に基づくもの。または (v) 規制により要求されるもの。または

(d) ハート・スコット・ロディーノ法、合衆国法典第 15 編第 18a 条、および反トラスト民事訴訟法、合衆国法典第 15 編第 1311-14 条を含む、かかる苦情前の証拠開示に適用される適用法規により許可される範囲において、または法執行の目的で、または法律、裁判所命令、もしくは規制により要求される範囲で、米国連邦取引委員会による本訴訟の文脈外での調査資料の保持、使用、または開示を妨げない。かかる開示は、反トラスト民事訴訟法 15 U.S.C. § 1313 (d) に基づき取得された資料を含む、適用される法律または規制により許可されるものに限定されるものとする。原告は、本訴訟の係属中にのみ作成された訴訟資料を非当事者に開示しない。ただし、裁判所により命令された場合、または規制により義務付けられる場合、および被告または利害関係のある被保護人に対する七 (7) 日間の書面による通知がある場合はこの限りではない。調査資料または訴訟資料が、州の公開情報法または同等の法律に基づき開示を要求された場合、本命令は、州の公開情報法または同等の法律が裁判所命令により保護される情報の開示の例外を提供

する範囲で、開示を禁止する。一方の当事者が、機密情報または極秘情報の開示を強制するその他の訴訟において発出された召喚状または裁判所命令を送達された場合、当該当事者は指定当事者に速やかに通知し、指定当事者は当該裁判所で保護を求める責任および費用を負担するものとする。

(e) 他の行為における極秘情報または機密情報の開示を許可しない。

**SECTION V社内弁護士に対する異議申し立て**

1. 裁判所から別途命令されない限り、または保護対象者が書面で同意しない限り、極秘情報または機密情報として指定された情報を被告の指定社内弁護士に開示する七（7）日前に、被告は、原告および保護対象者に対し、次の書面による声明を提出しなければならない。(i)指定社内弁護士の氏名、ならびに被告の居住地の市および州を記載したもの(ii)競争上の意思決定において、社内弁護士が関与しているか、または関与する可能性があるかどうかを判断するために、社内弁護士の、過去の、現在の、および合理的に予見可能な将来の主要な職務および責任について十分に詳細に説明したもの。(iii)社内弁護士が被告またはその他の雇用主に代わり参加または助言する訴訟またはその他の法的措置を列挙するもの。

2. 被告は、上記 E(1)項に基づく被告の書面による陳述書を受領してから 10 日以内に、原告または保護対象者から書面による異議を受領しない限り、その指定された社内弁護士に極秘情報および／または機密情報を開示することができる。かかる異議申し立ては、その根拠を詳細に記載する必要がある。

3. 被告は、適時の書面による異議を受領した場合、合意により、書面による異議から七（7）日以内に問題を解決するよう試みるために、原告または保護対象者と会合し、協議しなければならない。合意に至らなかった場合、原告および/または保護対象者は、指定された社内弁護士に異議を唱え、七（7）日間、裁判所に申立てを行う。被告は、

紛争の解決まで、その社内弁護士に極秘情報または機密情報を開示しない。指定された社内弁護士が D(1)(d)項または D(2)(d)項の条項に基づき適格であると裁判所が判断した場合、被告は、D(1)(d)項または D(2)(d)項に従い、指定された社内弁護士に、適宜、極秘情報または機密情報を開示することができる。

**SECTION VI** 本訴訟における極秘または機密と指定された情報の使用

1. 極秘情報または機密情報が、裁判所に提出された、または提出される申立書、申請書、証拠書類、またはその他の書類に含まれている場合、裁判所は、かかる書類を提出する当事者からそのように通知されるものとし、かかる書類は、現地規則 5.1(h)に従い、封印して提出されるものとする。本命令は、本契約により、両当事者および非当事者の保護対象者に対し、かかる適切に指定された極秘情報または機密情報を押印して提出する許可を与える。本書類に含まれる極秘情報および機密情報は、裁判所のさらなる命令があるまで引き続き封印されるものとする。ただし、かかる書類は、第 D(1)項および第 D(2)項に従い極秘情報または機密情報を受領する可能性のある個人または事業体に提供することができる。極秘情報または機密情報を含む書類の提出時または提出後、提出当事者または非当事者の保護対象者は、極秘情報または機密情報を開示しない紙の写しを公記録に保管するものとする。さらに、かかる資料の保護が失効した場合、当事者または非当事者の保護対象者は、以前保護されていた資料も含まれる複製の写しを公記録に保管することができる。本命令のいかなる定めも、両当事者または関心のある一般の人が、封印された極秘情報または機密情報の提出に異議を唱えることを制限しないものとする。

2. 両当事者は、証言録取、聴聞、またはその他の訴訟手続きに極秘情報または機密情報を含めることが合理的に予想される場合、他方当事者に通知を送付し、他方当事者

がかかる訴訟手続きに許可された個人のみが出席できるようにするものとする。宣誓

供述書の証拠物件として文書を使用することは、いかなる形であれ、その文書が極秘

情報または機密情報として指定されることに影響を与えないものとする。

## SECTION VII 公判における極秘情報または機密情報の使用

1. 極秘情報または機密情報として指定された文書、証言、またはその他の資料の裁判

   または証拠審理での開示は、別の裁判所命令に従って管理されるものとする。両当事

   者は、公判または証拠審理での極秘情報または機密情報の開示に適用される命令

   案を提出する前に、公判または証拠審理で極秘情報または機密情報が使用されるこ

   とが予想される第三者に対し、かかる命令について通知するものとする。

2. 本命令に別段の定めがない限り、本手続の一環として当事者または非当事者により

   生成されたすべての極秘情報および機密情報は、本訴訟の実施のみを目的として使

   用するものとし、いかなる事業、商業、競争、個人的またはその他の目的にも使用して

   はならない。

## SECTION VIII 本訴訟の終了時の手続き

1. 本命令により課される義務は、本命令に起因する紛争を解決する管轄権を保持する

   裁判所が別途命令しない限り、本訴訟の最終処分後も存続する。命令、判決、または

   この訴訟の終結の布告に対する申し立て期限の満了後 90 日以内に、極秘情報また

   は機密情報として指定された情報を受け取ったすべての人物は、かかる資料およびそ

   のすべての写しを、それを生成した保護対象者（または弁護士が代理する場合は保

   護対象者の弁護士）に返却するために誠実な努力を払う必要がある。または、当事

   者または保護対象者に対して、かかる極秘情報または機密情報をすべて破棄または

削除したことを証明すること。

2. 当事者らの弁護士は、裁判所文書及び証拠書類、供述録取書及び証拠書類、裁判記録及び証拠書類並びに作業成果物を保持する権利を有するが、当事者ら及びその弁護士は、裁判所の命令又は極秘情報もしくは機密情報を作成した保護対象者との合意に従って、又は本契約において別途許可される場合を除いて、極秘情報又は機密情報として指定された情報を含む裁判所文書及び証拠書類の部分を何人にも開示しないことが条件となる。裁判所から当事者らまたはその弁護士に返却されたすべての極秘情報および機密情報も同様に、本項に従って処分しなければならない。ただし、本項のいかなる定めも、本命令の D(5)または D(6)に基づく当事者らの権利を制限するものではない。

**SECTION IX修正を求める権利**

1. 本命令のいかなる規定も、いかなる人、当事者、または保護対象者に対しても、(i) その資料のさらなる保護または追加の保護、または (ii) 本裁判所の規則に従って正式に行われた申立による本命令の修正を求めることを制限するものではない。これには、本訴訟またはその他の手続きにおいて、特定の資料が全く作成されないか、証拠として認められないという命令が含まれるが、これらに限定されない。

**SECTION Xプライバシー法**

1. 文書、情報、または証言録取書の提出を要求する本裁判所の命令は、プライバシー法、5 U.S.C.§ 552a(b)(11)の意味の範囲内で裁判所命令を構成する。

**SECTION XI本命令に拘束される者**

1. 本命令は、本訴訟の当事者、その弁護士、およびそれらの承継人、個人代表者、管理者、譲受人、親会社、子会社、部門、関連会社、従業員、代理人、雇用コンサルタント

および専門家、ならびにそれらが直接支配する人物または組織を拘束するものとする。本命令はまた、付録 A または付録 B に署名するすべての者を拘束するものとする。

2. 本命令の対象となるすべての人は、本命令は、裁判所の刑事上および民事上の侮辱の完全な権限によって執行され得ることを再認識する。

以上の通り命令する。

日付: ［hw:］2022 年 3
　　　月 25 日

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　［署名］

　　　　　　　　　　　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　　　　　　　　　　**James E. Boasberg**
　　　　　　　　　　　　　　　　　　　　　　　　　　　米国地方裁判所判事

## 付録 A

### コロンビア特別区連邦地方裁判所

|  |  |
|---|---|
| **連邦取引委員会**<br><br>原告<br><br>対<br><br>**META PLATFORMS, INC.**<br><br>被告 | 民事訴訟番号 1:20-cv-03590（JEB） |

### 機密保持に関する合意

私_____は_____として_____に雇用されています。

私はここに、以下を証明します。

1. 私は、上記の訴訟に記された保護命令を読み、その条件を理解しました。

2. 私は、上記の訴訟に記された保護命令の条件に拘束されることに同意します。私は、私に提供された情報を、本保護命令に明示的に規定されている場合にのみ使用することに同意します。

3. 私は、上記の訴訟で出された保護命令の条件に従わなかった場合、裁判所の侮辱に対する民事および刑事罰の対象となることを了解します。

4. 私は、上記の訴訟で出された保護命令の条項を執行する目的に限り、コロンビア特別区連邦地方裁判所の管轄権に服し、当該裁判所の管轄権に異議を唱える権利を自由かつ意図的に放棄します。

_____ 署名

_____ 日付

**付録 B**

**コロンビア特別区連邦地方裁判所**

| | |
|---|---|
| **連邦取引委員会**<br><br>原告<br><br>対<br><br>**META PLATFORMS, INC.**<br><br>被告 | 民事訴訟番号 1：20-cv-03590（JEB） |

**機密保持に関する社内訴訟弁護士契約**

私、＿＿＿＿＿＿＿＿ は、＿＿＿＿＿＿＿＿＿＿＿＿＿＿として＿＿＿＿＿＿＿に雇用されています。

私はここに、以下を証明します。

1.  私は、上記の訴訟に記された保護命令を読み、その条件を理解しました。

2.  私は、上記の訴訟で出された保護命令の条件に拘束されることに同意し、上記の被告会社の社内訴訟弁護士としての私の役割において本保護命令の D(2)(d) 項の要件を満たし、本保護命令に明示的に規定されている場合にのみ、私に提供された情報を使用することに同意します。

3.  私は、上記の訴訟で出された保護命令の条件に従わなかった場合、裁判所の侮辱に対する民事および刑事罰の対象となることを了解します。

4.  私は、上記の訴訟で出された保護命令の条項を執行する目的に限り、コロンビア特別区連邦地方裁判所の管轄権に服し、当該裁判所の管轄権に異議を唱える権利を自由かつ意図的に放棄します。

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿ 署名

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿ 日付

114



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Jacqueline Yorke, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided English into Japanese translation(s) of the source document(s) listed below are true and accurate:

- Rakuten Requests (for Transperfect)
- Line Requests (for Transperfect)

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____
Jacqueline Yorke, Project Manager

Sworn to before me this
Wednesday, May 25, 2022

_____
Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

### 別紙 C

裁判所の証人に対する質問事項

1. 2010 年 12 月から現在までのいずれかの期間に、LINE 株式会社(「LINE」)が LINE ア
   プリと比較したときのパフォーマンスを(ユーザー、費やした時間、または収益のいずれ
   により測定したかに関わらず)追跡したアプリケーションは、次のうちどれですか。LINE
   が特定のアプリケーションを追跡したかどうかわからない場合は、そのように記入してく
   ださい。

   a. Facebook
   b. Instagram
   c. Facebook Messenger
   d. Snapchat
   e. WhatsApp
   f. iMessage
   g. Telegram
   h. Signal
   i. Viber
   j. KakaoTalk
   k. Google Messenger
   l. WeChat

2. LINE が広告収益に関する LINE アプリの競合と見なしたアプリケーションは、次のうち
   どれですか。LINE が特定のアプリケーションを広告収入に関する LINE アプリの競合と
   みなしたか否かわからない場合は、そのように記入してください。

   a. Facebook
   b. Instagram
   c. Facebook Messenger
   d. Snapchat
   e. WhatsApp
   f. Telegram
   g. Signal
   h. Viber
   i. KakaoTalk
   j. WeChat

3. LINE アプリに以下の各機能が含まれているかどうか、また含まれている場合は、その機
   能を最初に搭載した時期を記載してください。

a. ユーザーと友人、家族、その他の個人的なつながりを持つ人を結び付けるソーシャルグラフ

b. ユーザーが、プロフィールページなどの 1 つの共有スペースで、個人的な最新情報、興味、写真、動画などのコンテンツを共有できる機能

c. ユーザーが別の LINE ユーザーを検索し見つけることのできる機能

d. ユーザーが写真を複数のユーザーと同時に共有できる機能

4. LINE アプリが使用されている最も人気のあるアクティビティを 5 つ挙げてください。

5. Meta が Instagram を買収しその所有を継続したことの（一部または全部の）結果として、LINE が LINE アプリの改善または変更を拒否した事例を挙げて説明してください。

6. Meta が WhatApp を買収しその所有を継続したことの（一部または全部の）結果として、LINE が LINE アプリの改善または変更を拒否した事例を挙げて説明してください。

7. 2010 年から 2014 年の間に LINE アプリが米国市場に参入し成功する上での最大の障壁を列挙し、説明してください。

 TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):                     REDLINE (Solo) Line letter rogatory

Source Language(s):          English

Target Language(s):          Japanese (Japan)

Authorized Signature:                              Signature, Notary Public:

Name:     Shayna Himelfarb

Title:       Project Assistant

Date:       August 16, 2022



*Stamp: Notary Public*

Reason for signature: I approve the accuracy of this document content as written