```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
        --------------------------X

          FEDERAL TRADE COMMISSION,

                       Plaintiff

                            v.              Civil Action 20-3590 (JEB)

        META PLATFORMS, INC.,

                       Defendant

        ----------------------------X
                                              Washington, D.C
                                       Monday, October 31, 2022
                                              11:00 a.m.

                  TRANSCRIPT OF A VIDEO STATUS CONFERENCE
                 BEFORE THE HONORABLE JAMES E. BOASBERG
                      UNITED STATES DISTRICT JUDGE
        APPEARANCES:

        For the Plaintiff:  Robert E. Zuver, Jr.
                            Nathan Brenner, Esq.
                            FEDERAL TRADE COMMISSION
                            Constitution Center
                            400 7th Street SW
                            Washington, DC 20024
                            (202) 326-3134

        For Snap, Inc.:     Justina Sessions, Esq.
        Non-Party Petitioner WILSON SONSINI GOODRICH &
                              ROSATI
                             One Market Plaza
                             Spear Tower, Suite 3300
                             San Francisco, CA 94105
                             (415) 947-2000




        Court Reporter:     Lisa Walker Griffith, RPR
                            U.S. District Courthouse, Room 6507
                            Washington, D.C.  20001
                            (202) 354-3247
```

```
APPEARANCES:  (Cont'd.)

For the Defendant:   Ana Paul, Esq.
                     Geoffrey M. Klineberg, Esq.
                     KELLOGG, HANSEN, TODD,
                       FIGEL & FREDERICK, PLLC
                     1615 M Street, NW, Suite 400
                     Washington, DC 20036
                     (202) 326-7904
```

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  We're here for a status

3    hearing in 20-3590, Federal Trade Commission versus Meta

4    Platforms Inc.

5          Beginning with counsel for the plaintiff, please

6    states your name for the record.

7          MR. ZUVER:  This is Robert Zuver for the FTC,

8    joined by my colleague, Nathan Brenner.

9          THE COURT:  Okay.  Good morning.

10         MR. KLINEBERG:  Good morning, Your Honor.  This is

11   Geoffrey Klineberg from Kellogg Hansen on behalf of Meta

12   Platforms, Inc.   I'm joined this morning by my colleague,

13   Ana Paul, who will be addressing the substance of the matter

14   this morning.

15         THE COURT:  Okay, welcome to both of you.

16         MS. SESSIONS:  Good morning, Your Honor.  This is

17   Justina Sessions, Wilson Sonsini Goodrich and Rosati, for

18   non-party Snap, Inc.

19         THE COURT:  Welcome everybody.  Thank you for your

20   submissions.

21         So let me tell you how I want to proceed today.

22   So on the first issue, the confidentiality issue, I'm just

23   not prepared to modify my protective order and to go into

24   that again.

25         I think, Ms. Sessions, I think your colleague -- I

1     guess you were representing Clubhouse in the prior discovery

2     dispute.  And my views from that hearing that I believe that

3     the protective order is sufficiently protective, that I

4     don't plan to revisit that issue on confidentiality.

5             Second, I'm also adhering to my prior ruling on

6     cost-shifting, which is I don't intend to rule on it now.

7     As we said last time, I think that before electronic

8     searching is done, the parties should agree on a vendor and

9     agree on pricing and rates for the vendor service.  And

10    then, if you can't agree on the percentages of cost-sharing

11    at the end, you can bring it back to me.

12            As I said last time, Meta's risk is that the more

13    intrusive and burdensome their requests are, then the more

14    likelihood I'm going to have them pay a greater percentage.

15    But I don't, I just don't think it is worth my time to

16    address the specific share of that now.  You folks can

17    generally agree.  If you can't, I'll resolve it when it's

18    over.  So I am sticking with the prior rulings on those two.

19            On specific topics, here is what I would like to

20    do.  I want to talk about each of the topics generally and

21    I'll give you my general thoughts on them.  And I hope that

22    that will lead everyone to agreement with those in mind.  If

23    it doesn't, if I don't deal with an issue with enough

24    specificity, then you folks can submit one document which

25    will include the request that Meta is making that you can't

1    agree on and what Snap proposes to do in response to each of

2    those requests.  In other words, what they consent to give

3    or what their position is on each request.

4         Then I will -- but I don't want any argument and

5    I'll just decide.  A baseball arbitration type of ruling,

6    not of the ongoing world series.  In other words, I'm not

7    going to split the baby.  Meta, you will give me your

8    request.  And Snap will give me what they think is a

9    reasonable response.  And I'll just rule so it will be to

10   each side's advantage to make a reasonable proposal.

11        Okay.  Questions on any of that before I go

12   through these specific categories, Ms. Paul?

13        MS. PAUL:  No questions for me, thanks.

14        THE COURT:  Ms. Sessions?

15        MS. SESSIONS:  Your Honor, not a question.  I

16   recognize and appreciate Your Honor's statement, that you

17   are not inclined to revisit the confidentiality order issue.

18   With the Court's indulgence, I would like to be heard

19   briefly on that issue because I think Snap is situated

20   differently from Clubhouse and the scope of the requests.

21   And demands are different.

22        THE COURT:  Okay, okay, go ahead.

23        MS. SESSIONS:  So Snap in particular needs

24   additional protection because Snap is the one company that I

25   guess both sides agree does actually compete with Meta.  And

1    the documents that are being requested include Snap's most

2    current and ongoing product plans and competitive analysis.

3    And these are some of the most sensitive materials at the

4    company.  And materials that would be devastating, the

5    consequences of an inadvertent disclosure would be

6    absolutely devastating.  So I think the fact that Meta is

7    demanding the very specific, for instance, product plans of,

8    who everybody agrees is their closest competitor, sets Snap

9    apart.

10          The other reason that I think Snap is differently

11   situated and that we're asking for some limited additional

12   protection, again has do with the scope of some of these

13   requests.  And some of these requests ask for documents that

14   would reveal, for instance, Snap's confidential interactions

15   with regulators, the potential to reveal ongoing regulatory

16   investigations or lobbying activity and things like that,

17   that the in-house counsel that Meta has designated may be

18   involved in.  So some of these materials may actually

19   directly impact the activities of the in-house counsel.

20          And what we're asking for here, Your Honor, is not

21   the ability to designate every document that we produce as

22   "outside counsel's eyes only."  In fact, we've produced

23   many documents without that designation.  We are asking for

24   the opportunity to restrict Meta's in-house lawyers from

25   reviewing just the most current and the most sensitive

1    materials.  And we've said in our submission, we're happy to

2    provide examples of the documents that would merit such

3    protection to Your Honor to the extent that would be

4    helpful.  But we're asking for a very limited exception.

5          THE COURT:  Where am I drawing the lines there?

6          MS. SESSIONS:  Well, Your Honor, I think we're not

7    asking you to draw a particular line, although we could say,

8    we would be happy to say something like materials from the

9    last year or that describe ongoing, but not yet

10    publicly-implemented, plans or confidential non-public

11    regulatory investigations would be the types of materials

12    that would merit this sort of protection.

13          THE COURT:  Ms. Paul, do you want to respond?

14          MS. PAUL:  Of course.  Our position is that the

15    P.O. is adequately protective as drafted and there is no

16    need to revisit it.  The two Meta in-house counsel

17    authorized to review information as you may recall are

18    litigators.  They submitted affidavits.  They do not

19    participate in competitive decision-making.  They have

20    signed confidentiality agreements and agreed not to use the

21    information for competitive purposes.  They also cannot use

22    it to advise on legal actions involving Snap.

23          And the law is clear and this is the law you

24    considered when rejecting the exact same relief Snap seeks

25    now, that the risk of inadvertent disclosure in these

1  situations is low, does not warrant limiting in-house

2  counsel's ability to participate in the defense in this

3  action.

4          And our position is that, while Snap might be the

5  only alleged significant competitor in the complaint, this

6  proposal is likelihood to wreak administrative havoc more

7  generally on the protective order as other parties are

8  likely to wind up seeking the same modifications that Snap

9  is seeking now that will create additional administrative

10  burden in dealing with discovery in this case.  So we--

11          THE COURT:  I'm sorry, I didn't mean to--

12          MS. PAUL:  No, I was going to say we believe the

13  protective order is ample.

14          THE COURT:  As do I, Ms. Sessions, again, we spent

15  a lot of time early on creating the protective order and

16  thinking about this.  And I believe that it is appropriate.

17  Again, we could talk as we get into some of these categories

18  about regulatory, although I'm not sure that Meta should be

19  able to get all the regulatory ones concerned about.

20          So again, you make reasonable points,

21  Ms. Sessions, indeed.  But this is something that I did

22  think about in some detail when we created the protective

23  order.  So I am going to retain it.

24          Let's move to categories, Ms. Paul, I will be

25  wanting to know in particular on some of these why Snap's

1   proposal along with the FTC's priority categories aren't

2   sufficient.  In addition, it seems to me in many of these

3   circumstances, that limiting searches to C-Suite employees

4   is sufficient.  I'm not sure why on some of these that you

5   so desperately need the files of the lower ranking employees

6   if what they're thinking never filtered up to the C-Suite.

7            So let's start with competition.  Ms. Paul, why

8   aren't C-Suite searches for Snap's used on competition

9   enough?

10           MS. PAUL:  I want to clarify that Snap is not

11  doing custodial searches of C-Suite employees' mail boxes,

12  they are hand-selecting the documents that they believe are

13  responsive to these requests and providing them to us.  So

14  we think broader custodial searches, including collection of

15  e-mails, is necessary in order to get a complete picture of

16  the competitive landscape.

17           These searches are common in antitrust cases.

18  Other parties are doing that in this case, and citing

19  examples from the Google case where Microsoft is searching

20  45 custodians, and Apple is searching 19 custodians.  Snap

21  is not proposing to do any of this sort of custodial

22  searching.

23           THE COURT:  Let me stop you for a second.  When we

24  talk about custodial searches, would it be sufficient for

25  them to do C-Suite custodial searches?

1          MS. PAUL:  I think we have to consider the list of

2   employees that they provide us.  It is likely that would be

3   sufficient in many instances but we have not had

4   negotiations about specific employees and their positions

5   but we would be interested in individuals who make decisions

6   about the competitive issues involved in this case.  And

7   that might be only C-Suite people, but without having talked

8   with Snap about the org chart and who the right people are

9   that would be involved --

10          THE COURT:  All right.  Let me stop.  Thank you.

11   Again, no disrespect intended to everybody but I am going

12   to, there may be times when I cut you off as we go back and

13   forth.

14          So Ms. Sessions, what about if I limited it to

15   C-Suite custodial searches, why isn't that okay?

16          MS. SESSIONS:  So Your Honor, what we offered to

17   do, and what we have been doing is searching for documents

18   that were presented to the Executive Suite or to the Board

19   Directors regarding competition.  So those are the documents

20   on which these decisions are based.  And so we think that

21   that is more than sufficient to provide Meta with a picture

22   of who Snap views as competitors and what considerations are

23   relevant when considering competition and also the decisions

24   and action that Snap has taken in response to competition.

25   They seem to--

1          THE COURT:  I'm sorry.  So you are doing that.

2     But why aren't you doing it via custodial service searches

3     or is your point we don't need to?  There aren't so many

4     that we can't just do it by hand.

5          MS. SESSIONS:  So Your Honor, what we're doing is

6     going to the central repository of documents where those

7     presentations would be stored.  It seems to me that the

8     argument that we're having is whether which needs to also

9     search Jewel's e-mail for certain key words.  And that adds

10    to the burden very significantly because the volume of

11    documents that we have to collect and then process and then

12    run search terms over balloons exponential when you get

13    e-mailed involved.

14          And the incremental relevance of any sort of stray

15    e-mail would be quite, quite low given that we're already

16    collecting and producing, as I said the documents that are

17    presented to the decision-makers in order for them to

18    make their decisions.

19          THE COURT:  Got it.

20          Ms. Paul, why isn't that enough?

21          MS. PAUL:  So the presentations are important but

22    they don't give insight into how they were created, who

23    created them, why they were created, the underlying analysis

24    and considerations that went into those presentations.  And

25    those sorts of discussions are necessary, not just to give

1    meaning to the documents but also to conduct depositions and

2    get answers to questions in the case.  I can imagine putting

3    one of these debts in front of a C-Suite employee during a

4    deposition, and them saying I didn't prepare this debt, I

5    don't know why this analysis was included.  I don't know why

6    we sent this or any sort of, you know, considerations were

7    made in drafting it.

8              So, the e-mails will give that context, but

9    they're also likely to give more candid assessments of

10   competition than presentations that don't necessarily

11   reflect real time developments like features on market

12   shifts as they're happening.  And they might not reflect

13   regularly occurring updates that people get.  For example,

14   if there is a weekly e-mail sent around about competition

15   with TikTok and the features being developed by Facebook,

16   those presentations aren't going to capture those e-mails.

17   It would be excluded from the types of searches that Snap is

18   proposing here.

19             THE COURT:  Okay.  So my general thought on this

20   then is that you should not get custodial searches below the

21   C-Suite, but that I believe that some custodial searches,

22   again with barely-targeted terms so we're not obtaining the

23   stray e-mail that Ms. Sessions appropriately said is not

24   appropriate.  But I think that something beyond the

25   presentations that may be in the file is sufficient.

1        So I'm hoping you folks can agree on a middle

2   ground there, which again, with my parameters of not below

3   the C-Suite and not searching every search term you can

4   think of, but central search terms for custodial searches in

5   the C-Suite.

6        And in addition, I know that one of the points

7   that Meta brought up was advertising competition.  But in

8   this case, the FTC isn't proceeding on a theory that Meta

9   has monopolized the market for internet advertising, for

10  example on PS -- on Personal Social Networking Services or

11  that Meta's rates are predatorily low.  So why do you need

12  advertising competition information, Ms. Paul?

13       MS. PAUL:  The FTC's complaint includes an entire

14  section making allegations regarding competition for the

15  sale of advertising, putting to the--

16       THE COURT:  But haven't I found that to be not

17  terribly persuasive, the section that the idea that the

18  victims here are not advertisers, that the alleged victims

19  are users.

20       MS. PAUL:  Sure, we would agree that there is no

21  specific claim relating to advertising, but the FTC alleges

22  that one of the anti-competitive effects of Meta's

23  acquisition of Instagram and WhatsApp was decreased

24  competition for advertising, and that only Snap and Meta

25  compete in this social advertising market.

1          So our position is that we need discovery to

2     defend against these allegations, and the FTC's complaint of

3     the advertising market, and advertisers have somehow

4     suffered harm from having less choice as a result of the

5     acquisition.

6          THE COURT:  I would allow the production of some

7     advertising data, but Ms. Sessions you can be reasonable

8     (inaudible).

9          Competition was certainly the section that you

10    folks talked about the most.

11         Ms. Paul, do you feel you have sufficient guidance

12    on this category or is there another specific sub area of

13    this category that you want some guidance on?

14         MS. PAUL:  I think we have sufficient guidance

15    here to continue our discussions with Ms. Sessions.

16         THE COURT:  Okay, great.

17         Ms. Sessions, do you agree?

18         MS. SESSIONS:  Yes, Your Honor, thank you.

19         THE COURT:  Okay.  Number two is acquisitions.

20    Again, I guess I would be in the same place on acquisitions.

21    Again, this is documents related to Meta's proposed

22    acquisition of Snap and I would think that no searches are

23    necessary below the C-Suite level, again, using central

24    terms there.

25         So why do you need, why do you think you need more

1    than that, Ms. Paul?

2            MS. PAUL:  I just want to make clear.  This might

3    have been a drafting error given the shortness, but we're

4    also interested in documents about Meta's acquisition of

5    Instagram and WhatsApp in this category as well, which Snap

6    has refused to produce any documents related to.

7            THE COURT:  I didn't see that.  It's not in your

8    brief.  I'll agree that I've kept these very short.  I'm

9    sure there are proposed drafting challenges for everyone,

10   but in the spirit of efficiency I think still unwarranted.

11           So Ms. Sessions, tell me where you stand then if

12   essentially my same ruling as to category A competition

13   applied to the acquisitions.

14           MS. SESSIONS:  Well Your Honor, I think that

15   provides sufficient guidance with two caveats.  I will say I

16   think the discussion about, just any discussions about

17   Meta's acquisitions of Instagram or WhatsApp are I think

18   fairly covered by the competition category as well.  So I

19   don't think we need to separately retread that ground and

20   understand Your Honor's guidance regarding Meta's offer to

21   apply to Snap.

22           There is a request in this category, however, that

23   goes well beyond those two types of requests.  And that is a

24   demand that Meta has for all documents relating to

25   investment in Snap, unrelated to Meta's acquisition offer

1   and unrelated to Meta's acquisition of these other

2   companies.  And that is unbelievably invasive and minimally

3   relevant.

4          THE COURT:  I'm sorry, let me make sure I

5   understand what you're saying.  So these are requests for

6   documents that relate to investments in Snap by outside

7   investors for other companies?

8          MS. SESSIONS:  Correct, including Snap's IPO and

9   any other significant investment in Snap.

10         THE COURT:  How is that relevant, Ms. Paul?

11         MS. PAUL:  So according to the FTC's complaint,

12  competitors like Snap weren't able to effectively compete

13  because of Meta's monopoly.  And we believe documents from

14  outside investors considering investing in Snap would

15  demonstrate that that theory is incorrect.  Otherwise, they

16  wouldn't make such an investment.  So that potential

17  acquisition offers from folks other than Meta that Snap

18  turned down can demonstrate that Snap believed that it was

19  able to effectively compete in this market,  and that Meta

20  was not a hindrance to competition.

21         THE COURT:  Ms. Sessions, again, looking at my

22  notes, that one issue I think may have been involved was

23  investments by Snap, which again seems to me likely not to

24  be terribly relevant.  But why isn't Ms. Paul right that

25  investments by people who wish to invest in Snap and how

1    they look to value the company be relevant to Snap's ability

2    to compete with Meta--

3         MS. SESSIONS:  Your Honor, Snap's ability to

4    compete with Meta will be demonstrated in Snap's assessments

5    of the market and all the competitive documents that we've

6    just discussed searching for, as well as the actual data and

7    metrics that show Snap's performance in the market.

8         So this additional search is unbelievably invasive

9    for diligence documents, all kinds of valuation documents,

10   that are again, extremely sensitive to Snap and of marginal

11   and speculative additional relevance, if all they want is to

12   find some document that says, Gee, someone believed that

13   Snap could compete, aren't the actual facts on the ground

14   and the other documents that we're producing or discussing

15   far more probative of that issue than allowing Meta to go

16   routing around in a lot of unrelated documents or documents

17   related to our IPO that have nothing to do with investments

18   due to Snap's ability to compete.

19        THE COURT:  I am going to reserve on that one and

20   think about it and I'll let you folks know.  Some of these I

21   want to think about a little more, I'll just follow up with

22   a ruling on it.  So thank you for letting me know.

23        Moving to C, which is product quality and pricing.

24   My issue here, Ms. Sessions, is that Snap's offer to Meta

25   says in bullets three and four, documents sufficient to show

1  Snap's privacy policies and changes thereto, and documents

2  sufficient to show how Snap sets pricing and any payment for

3  posting content.

4          The devil is in the details a little bit here

5  about what does that mean.  So you want to tell me a little

6  bit about what "documents sufficient to show means?"

7          And then Ms. Paul, you can tell me why they aren't

8  sufficient.

9          MS. SESSIONS:  Yes, Your Honor.  Documents

10 sufficient to show Snap's privacy policies and changes

11 thereto, our privacy policies are in fact public and so it's

12 reasonably easy to compile those privacy policies and to

13 show how those privacy policies have changed over time.

14          Additionally, documents sufficient to show how

15 pricing is set and then payment for posting and content is a

16 relatively limited set of materials.  Snap does provide some

17 payment for posting on content.  And we've agreed to provide

18 documents that would explain how that pricing mechanism,

19 what that pricing mechanism is and how it was set.

20 Otherwise, Snap is generally free to use.  So there is not

21 much to explain there.

22          Then again, Your Honor, these requests need to be

23 considered also in the context of the competitive documents

24 that we've been talking about.  So as I understand it, part

25 of the reason that Meta claims to need these documents is to

1    understand what if any changes have been made in response to

2    competition, either with Meta or with anybody else.

3           And that it seems would be covered by the

4    production of competitive documents and competitive analysis

5    and competitive decision-making that we've talked about.

6    The additional materials that I understand them to be asking

7    for would be changes that were made for other, for reasons

8    other than because of competition or because of pressure in

9    the market place.  And that is again a very marginal, if any

10   relevance, it's a burden of searching for and producing a

11   whole swath of documents on every change that Snap has ever

12   made when not in response to competition is a burden that we

13   shouldn't be required to do.

14           THE COURT:  Okay.

15           Ms. Paul.

16           MS. PAUL:  The FTC alleges that it can prove

17   Meta's market power through alleged product quality

18   degradation.  And it highlights things like privacy policies

19   as well as ad load and spam as areas that Meta's quality

20   degraded as a result of its alleged monopoly.  So the

21   privacy policies are part of that.

22           But as Ms. Sessions notes, those are public and

23   tell us nothing about the effect of those changes on users

24   and whether Snap believes it competes based on these sorts

25   of privacy practices and whether Meta's privacy practices

1    are below so-called competitive level, how users react to

2    changes in privacy policies and how --

3            THE COURT:  Again, apologies for interrupting.

4    Why couldn't we do something along the lines of what I did

5    in regard to one of the FTC's interrogatories.  I think it

6    was interrogatory 10.  So here, Meta would identify a

7    reasonable number of specific changes that Snap made and

8    then Snap would provide C-Suite documents relating to each

9    change.

10           In other words, so it's not a question of you go

11   figure out what all the changes are, some of which are

12   incredibly unimportant but that you, Meta, identify the

13   specific changes and then Snap will respond.

14           Ms. Paul, how is that?

15           MS. PAUL:  Well, I assume that not all of these

16   changes are publically available or information that Meta is

17   able to access, for example, that Snap somehow changed its

18   ad load policy.  That's not something that would likely be

19   public information.  So if we're allowed to include things

20   on the list like changes to ad load more generally, I think

21   that would suffice.  But a specific incident, whether it's

22   change in ad load, if it's something that we're going to

23   have the information to provide to Snap--

24           THE COURT:  All right.

25           So Ms. Sessions, what is your response?

1          MS. SESSIONS:  Your Honor, ad load on Snap's

2    platform is publicly observable.  So I don't think it is

3    right to say that none of that is public.  So I think Your

4    Honor's suggestion that they identify specific changes that

5    they are interested in, and then we can go investigate those

6    particular changes, sounds like a reasonable path forward.

7    And it does not put the burden on us to identify every

8    change we make to any of our products.

9          THE COURT:  Great.  Okay.  That's what we'll do.

10          MS. PAUL:  Could I just be heard on that?

11          THE COURT:  Sure.

12          MS. PAUL:  Part of the issue is that some of the

13    information we're seeking here relates to allegations of

14    things that occurred in 2012 and 2014.  So, while we could

15    observe what the ad load maybe is today by being on Snapchat

16    and playing with it, that's not particularly helpful to

17    identify changes in ad load that might have occurred in

18    prior years.  So I just reiterate the request that we be

19    able to identify sort of more broad categories of changes

20    we're interested in rather than specific instances of

21    changes in ad load that we wouldn't be able to gather from.

22          THE COURT:  But I think to say changes in ad load

23    policies made in 2012 are in the window following Meta's

24    acquisition of WhatApp.  Something like that I would think

25    would be reasonable.  But again, I think you folks are close

1    enough.

2              The next one is data.  So what we talked about in

3    my earlier, actual the most recent opinion denying the

4    motion to dismiss the amended complaint, was that the

5    metrics we looked at were daily active users and monthly

6    active users.  Then perhaps the difference between U.S. data

7    and overseas data or non-U.S. data I should say.

8              So why then, Ms. Paul, if they produce these

9    metrics, isn't that good enough?

10             MS. PAUL:  So I think we're not that far apart on

11   the data.  The additional request that we have is a refresh

12   of all of the data that we currently have from Snap.  I'm

13   not sure if Snap is okay with me discussing all those

14   categories publicly.  I would defer to them.  But there are

15   some other categories of data we have that were not included

16   in their refresh offer that we would like updated to the

17   present as well.

18             Then the other two categories that are not

19   included in Snap's offer, one of them is engagement metrics

20   for the type of contents on Snap such as the amount of

21   messages sent or the time spent engaging in different

22   content.  And this is relevant because, as you are aware,

23   the FTC alleges that certain activities on Facebook and

24   presumably on Snap are not PSNS time.  So we're looking for

25   a little more regular breakdown on how time is spent on Snap

1   by features or how ever Snap measures its time to better

2   assess the FTC's market definition claims here.

3         THE COURT:  I agree with you that down the road

4   that MAUs and DAUs may not be the parameters of the full

5   field that we're playing on, that if there are better

6   metrics, more accurate metrics or different metrics, I

7   certainly don't want to prevent either of you or the FTC

8   from relying on them.

9         But so Ms. Sessions, do you agree-- I guess the

10  first issue is the refreshing question.  Do you think you

11  are close on that one?

12        MS. SESSIONS:  Your Honor, I think we're probably

13  reasonably close.  The devil is in the details on a lot of

14  this data because there are certain ways that Meta has asked

15  us to slice data, certain metrics that are not kept in the

16  ordinary course of business; and therefore, we would need to

17  do a lot of processing and joining of data sets to even

18  provide, if even possible.

19        THE COURT:  I don't think that I would be

20  requiring you to create information that you don't keep in

21  the ordinary course of business because, if you don't keep

22  it, then it is not a metric you can use.

23        MS. SESSIONS:  So I think, Your Honor, if it is

24  limited to metrics that we maintain in the ordinary course

25  of business, I think we're probably reasonably close and can

1    hopefully work this out among ourselves.

2              THE COURT:  Okay.  I would say, as Ms. Paul said,

3    that if there are other specific metrics you use beyond the

4    DAUs and MAUs that you do use in the course of this, that I

5    wouldn't say that the request should be limited to just DAUs

6    and MAUs.

7              MS. SESSIONS:  Understood, Your Honor.

8              MS. PAUL:  There is one other aspect of the data

9    request we haven't talked about is that, Meta has requested

10   more granular hourly and daily data for a one month period

11   from September 27, 2021 to October 18, 2021, which is during

12   the period that there was an outage on Meta for several

13   hours.  And we're interested in that data to see where users

14   turned to during the time period of that outage.

15             THE COURT:  Ms. Sessions?

16             MS. SESSIONS:  Your Honor, I don't have all of the

17   details of data retention in front of me.  So I'm actually

18   not able to respond to that particular request.  But I will

19   say, to the extent that it is kept and relatively easy to

20   do, we'll talk about it.  If there is significant burden

21   then we're going to need to discuss it.

22             THE COURT:  Fair enough.

23             All right.  So category five is infrastructure.

24   I'll admit, Ms. Paul, I know by this time you are complying

25   to two sentences or three sentences.  I'm not sure exactly

1    what you are looking for in this category.

2            MS. PAUL:  Sure.  This category of documents is

3    designed to test or -- for one of the Meta's defenses that

4    one of the pro-competitive benefits of the Instagram and

5    WhatApp acquisition was that they were able to transition to

6    Meta's infrastructure which allows them to grow faster than

7    they would have from third party available alternatives.

8            NAF is one of the parties that uses such third

9    party providers currently and we would like to understand

10   challenges Snap has had scaling on these platforms.  Snap

11   has made certain public statements regarding the lack of

12   alternatives to what is publicly available, to sort of

13   demonstrate and compare Snap's experience to what Instagram

14   and WhatsApp would have looked like, but for the acquisition

15   here.

16           So we've asked for certain information relating to

17   challenges that Snap has had growing its computer storage

18   and database infrastructure, as well as a recent decision it

19   made to move its infrastructure model to a new system.  And

20   then like I said, this public statement they made regarding

21   lack of alternatives to Google competing structure.  So

22   that's the sort of thesis of these requests.

23           THE COURT:  So Ms. Sessions, again, if you use the

24   same parameters that we used earlier in our discussion

25   namely C-Suite documents, custodial searches of a limited

1   number with barely-targeted scope, C-Suite data, is that

2   going to be, do you think you can resolve this?

3        MS. SESSIONS:  Your Honor, we already agreed to

4   provide C-Suite level documents regarding the specific

5   change to Snap's cloud infrastructure that Meta had

6   identified.  And I think that's, we think that was a very

7   reasonable offer in response to this broad request.

8        It seems that they want to go beyond specific

9   changes to fish around for any potential scaling problem

10  that the company might have had at any time.  And that's

11  unbelievably broad and vague and unlikely to result in much

12  that is actually useful but could potentially turn over

13  large swaths of documents that really have nothing to do

14  with any particular infrastructure challenges or comparisons

15  that could be made between some pre-acquisition Instagram

16  and WhatsApp architecture and Snap, in particular Snap's

17  current infrastructure and scaling needs.  So while we were

18  happy to provide documents on the specific change that they

19  had identified, I think it should be limited to that

20  particular change.

21        THE COURT:  So Ms. Paul, do you want to respond to

22  that?

23        MS. PAUL:  Sure.  That particular change occurred

24  in 2018.  And because the Instagram and WhatsApp

25  acquisitions occurred in 2012 and 2014, we need documents

1   from a broader time period than just that one particular

2   change here, and so we don't think there is a -- and they

3   cabin that offer on presentations if any exists on this

4   infrastructure change.  So assuming they do exist, we don't

5   think they're sufficient to cover the time period or the

6   content that we're looking for.

7           But I'll also note that Meta had proposed for this

8   category that Snap work with, it has a head of engineering

9   to identify responsive documents.  We don't think custodial

10  searches are necessary for this one.  I believe their head

11  of engineering should be able to identify documents that

12  already exist regarding scaling challenges and

13  infrastructure limitations that Snap has experienced that

14  are likely stored in some central repository from the

15  engineering department.  So that's how we had proposed going

16  about this search to minimize the burden on Snap and to

17  ensure that only responsive documents are captured here.

18          THE COURT:  Ms. Sessions.

19          MS. SESSIONS:  Your Honor, it's no help to say go

20  to the engineering department and ask them to identify every

21  document that says something about a scale challenge or

22  infrastructure challenge that the company may have had since

23  2012.  That is potentially a huge number of issues and a

24  huge number of documents because I imagine that scaling and

25  infrastructure challenges happen all the time at a company,

1    at an internet based company.

2         So without some more specific guidance, I think

3    we're talking about a potentially huge swath of documents.

4    To say just go talk to the engineering department doesn't

5    really help.  It puts the burden on the engineering

6    department to go and identify all these.

7         So Your Honor, we stand by our offer to provide

8    documents relating to the specific infrastructure change

9    that they identified.  If they want to also say, if you give

10   us documents from 2012 or 2014, to the extent they do have

11   them, that is another limit.  We can potentially work with

12   those but to go through the entire history of the company to

13   look for any IT-related challenges that we have is just

14   immensely overbroad.

15        THE COURT:  I think Ms. Sessions has a more

16   reasonable position on this one, as she most recently

17   articulated it.  But if you disagree, Ms. Paul, you can

18   submit a specific request that you think they should have to

19   respond to.  And Ms. Sessions, you can respond by telling me

20   what you are doing and what you are not doing.  Okay.

21        So all right.  Last Project Voldemart.  I'm sure

22   people enjoyed coming up with that title.  I'm glad we're

23   discussing it on Halloween.

24        So Snap is saying that they are going to produce

25   Project Voldemart documents.  So Ms. Paul, what do you want

1   beyond what they say they're going to do?

2          MS. PAUL:  This is one of the categories where we

3   think that Snap hand-picking the documents without

4   conducting custodial searches is insufficient because--

5          THE COURT:  I'll stop you right there.

6          So Ms. Sessions, the prior ruling regarding

7   custodial searches of C-Suite with barely-targeted terms, do

8   you think given those parameters that you can resolve this?

9          MS. SESSIONS:  Your Honor, I think we have gone

10  down the road of doing some, of collecting some e-mail

11  already for the C-Suite.  And Meta wants to add the term

12  Voldemart to the list of search terms that we run.  I think

13  we can discuss that with Meta and talk about what

14  incremental burden that creates, without hit counts, I can't

15  really comment on it.  But if that's a suggestion, I think

16  we can probably resolve this with Meta.

17         THE COURT:  Okay.  So here is where we stand.

18  What I would like you folks to do -- and again, if this

19  isn't reasonable, we can pick another date.  But within two

20  weeks, so that's November 14th, to provide me the document

21  on which, that sets forth the areas on which there is not

22  agreement.

23         Again, this isn't a brief.  This will be simply

24  what remains of Meta's requests and then what Snap proposes

25  to do and not do.  I'll either say that's good enough or

1    you've got to do more.  So it seems also that we've narrowed

2    this down a substantial amount unless you folks are just

3    humoring me today.

4         So does two weeks give you enough time to resolve,

5    just figure out where there is resolution and then to submit

6    to me where there isn't, Ms. Paul, do you think?

7         MS. PAUL:  I think so.  I just want clarity.

8    There is obviously some requests that we didn't specifically

9    touch on today in much detail.  Are you okay with us

10   including those in this submission?

11        THE COURT:  Yes.  I mean, the idea today was to

12   give you, to give you a reasonably high level but not

13   significantly utterly unhelpful.

14        Ms. Sessions, does that sound okay with you?

15        MS. SESSIONS:  Your Honor, I think that generally

16   sounds okay, with the caveat that, to the extent that we are

17   fighting about individual search terms and hit counts and

18   things like that, that may take a little bit longer

19   depending on --

20        THE COURT:  Again, I want to keep this moving but

21   I also don't want to impose unreasonable deadlines.  If you

22   think adding another week would make it much more doable, I

23   can do that.

24        MS. SESSIONS:  I think potentially giving us three

25   weeks would help, just help us get things processed.

 1              THE COURT:  Okay.  Fair enough.  I will do that.

 2    Then I also need to rule on the investment.  But I'm going

 3    to have you include that in that 11-21 document.  But I know

 4    that's the one area I haven't given you any guidance on

 5    which is investments in Snap.

 6              If you folks can reach an agreement, great.  If

 7    you can't, I'll give you my ruling.  My plan would be to

 8    rule pretty quickly on what you provide me.  Just say,

 9    you've got to do the search, Snap, or what you are proposing

10    is good enough.  Okay.

11              So any, Mr. Zuver, I know you have enjoyed the

12    show.  Any questions or anything you want to add?

13              MR. ZUVER:  Nothing further, Your Honor.  Thank

14    you.

15              THE COURT:  Ms. Paul, anything else today?

16              MS. PAUL:  Yes, I would just like to raise one

17    issue to make sure we're all on the same page regarding the

18    custodial search issue.  And whether you are okay with us

19    interpreting C-Suite as a Class C leadership team and heads

20    of relevant teams.  For example, Snap has a head of

21    competition.  I don't know that they're formally categorized

22    as a C-Suite executive under Snap's corporate bylaws, but

23    that would obviously be the type of position that would be a

24    key decision-maker in the company on issues related to

25    competition.  So I just want to clarify that when you say

```
 1   C-Suite, maybe it means C-Suite/executives that we could

 2   then negotiate with Snap to make sure we have the right

 3   group of individuals that are likely to capture the topic.

 4               THE COURT:  Okay.  Ms. Session?

 5               MS. SESSIONS:  I think Your Honor has provided

 6   guidance of sort of the magnitude and scope of the custodial

 7   searches that Your Honor has in mind.  I think we can

 8   discuss with Meta who the most appropriate people might be.

 9   So for example the head of competition might be a more

10   appropriate custodian than some executives--

11               THE COURT:  Certainly, it would be more

12   appropriate on the competition categories as opposed to

13   others.

14               MS. SESSIONS:  Yes, yes.

15               THE COURT:  Okay, right.  I think the answer is

16   that you both bring up good points.  That perhaps the cast

17   of characteristics shifts somewhat depending on what

18   category of documents you are seeking.

19               MS. SESSIONS:  As long as the cast of categories

20   does not continue to expand.

21               THE COURT:  Okay.  All right.  And then,

22   Ms. Sessions, anything else you want to raise?

23               MS. SESSIONS:  No, thank you, Your Honor.

24               THE COURT:  Mr. Klineberg, anything else in an

25   umbrella capacity?
```

1          MR. KLINEBERG:  No, Your Honor, thank you.

2          THE COURT:  Thank you.  I look forward to your

3    submissions next week.

4          (Whereupon, at 10:55 a.m., the hearing concluded.)

5

6                              oo0oo

7

8                     CERTIFICATE OF REPORTER

9                    I, Lisa Walker Griffith, certify that

10   the foregoing is a correct transcript from the record of

11   the remotely reported proceedings in the above-entitled

12   matter, and is subject to the technological limitations of

13   court reporting remotely, including signal interference and

14   other restrictions.

15

16

17

18   _____   11-1-2022
     Lisa Walker Griffith, RPR                  Date
19

20

21

22

23

24

25