## 미국 컬럼비아 특별구 지방법원

|  |  |
|---|---|
| 연방거래위원회(FEDERAL TRADE COMMISSION),<br><br>　　　　　원고,<br><br>　　　　　대<br><br>META PLATFORMS, INC.,<br><br>　　　　　피고. | 사건번호: 1:20-cv-03590-JEB |

### 민사 또는 상사의 해외 증거 조사에 관한 1970 년 3 월 18 일자 헤이그 협약에 따른 국제 사법 공조 요청서

미국 컬럼비아 특별구 지방법원은 대한민국의 법원 행정처의 무궁한 발전을

기원하면서 본 법원 앞으로 제기된 상기 언급된 민사 소송에 사용될 증언 증거를 입수하는 데

있어 공조를 요청합니다. 구체적으로, 본 지방법원은 대한민국에 소재하는 비당사자인

주식회사 카카오("카카오")의 현직 및 전직 직원으로부터 구두 증언을 입수하는 데 있어

공조를 요청합니다. 본 요청서는 미국과 대한민국이 모두 당사자인 민사 또는 상사의 해외

증거 조사에 관한 1970 년 3 월 18 일 자 협약(이하 "헤이그 증거 협약")의 제 1 장에 따라

작성되었습니다.

### 섹션 I

1.　　　발신자:

　　　　James E. Boasberg 판사
　　　　미국 컬럼비아 특별구 지방법원
　　　　333 Constitution Avenue, N.W.

Washington, D.C. 20001
미국

**2.**   **요청받은 국가의 중앙 당국:**

법원 행정처
수신자: 국제심의관
대한민국
서울특별시
서초구
서초대로 219 (우: 06590)

**3.**   **수행된 요청을 반환 받을 대상:**

James E. Boasberg 판사
미국 컬럼비아 특별구 지방법원
333 Constitution Avenue, N.W.
Washington, D.C. 20001
미국

*당사자들의 법정 대리인에게 사본 제공:*

Daniel Matheson 귀하
연방거래위원회
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580
전화: 202-326-2075
이메일: dmatheson@ftc.gov

Mark C. Hansen 귀하
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
전화: 202-326-7900
이메일: mhansen@kellogghansen.com

**4.**     **요청 사법 당국이 요청서에 대한 답변을 수령해야 하는 일자 명시:**

아래에 기술된 민사 소송을 위해 요청 사법 당국이 해당 증거를 적시에 수령할 수

있도록 가능한 한 조속히, 4 개월 이내에, 국제 사법 공조 요청에 답변해 주시면 대단히

감사하겠습니다.

**섹션 II**

헤이그 증거 협약 제 3 조에 따라, 아래에 서명한 신청자는 조속한 요청에 관하여

다음과 같은 정보를 제출합니다.

**5.**     **(a)**     **요청 사법 당국(제 3(a)조):**

James E. Boasberg 판사
미국 컬럼비아 특별구 지방법원
333 Constitution Avenue, N.W.
Washington, D.C. 20001
미국

**(b)**     **관할 당국(제 3(a)조) :**

법원 행정처
수신자: 국제심의관
대한민국
서울특별시
서초구
서초대로 219 (우: 06590)

**(c)**     **사건명 및 식별 번호:**

*연방거래위원회 대 Meta Platforms, Inc.*, 사건번호 1:20-cv-03590-JEB, 미국 워싱턴
D.C.에 소재한 컬럼비아 특별구 지방법원

**6.**     **당사자들 및 그 대리인의 성명 및 주소(제 3(b)조):**

**(a)**     **원고:**

연방거래위원회
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580

대리인:

Daniel Matheson 귀하
연방거래위원회
600 Pennsylvania Avenue N.W.
Washington, D.C. 20580
전화: 202-326-2075
이메일: dmatheson@ftc.gov

**(b)**　　**피고:**

Meta Platforms, Inc.
1601 Willow Road
Menlo Park, CA 94025

대리인:

Mark C. Hansen 귀하
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
전화: 202-326-7900
이메일: mhansen@kellogghansen.com

**7.**　　**소송 절차의 성격, 목적 및 사건 개요(제 3(c)조):**

**(a)**　　**소송 절차의 성격:**

상기 소송은 미국 연방거래위원회("FTC")가 Meta Platforms, Inc.(페이스북,

인스타그램, 페이스북 메신저 및 왓츠앱 등의 앱을 제공하는 "Facebook Inc."로 알려진

"메타")(총칭하여, "당사자들")을 상대로 2021 년 9 월 8 일에 수정된 대체 소장을 제출해

제기한 민사 소송입니다. 미국 법률에 따라, 연방거래위원회는 민사상 원고로서 민사 법원에

소송을 제기할 권한이 있습니다. 15 U.S.C. § 53(b)를 *참조하십시오.* 연방거래위원회는 이

권한에 따라 상기 소송을 제기했으며, 동 소송은 제출된 미국 지방법원에 의해 민사 소송으로 지정되었습니다. 본 사건은 행정 절차가 아닙니다.

연방거래위원회는 메타가 경쟁 제한적 행위 및 불공정한 경쟁 방식을 금지하는 연방거래위원회법 15 U.S.C. § 45(a)의 섹션 5(a)를 위반했다고 주장합니다. 연방거래위원회는 메타가 "개인 소셜 네트워크 서비스(SNS)"로 알려진 시장에서 불법적으로 독점적 지위를 유지함으로써(인스타그램 및 왓츠앱을 경쟁 제한적으로 인수했다는 혐의 포함) 본 법률을 위반했다고 주장합니다. 연방거래위원회는 구제책으로서 메타의 일련의 행위가 관련 법률을 위반했다는 판결, 혐의를 받는 경쟁 제한적 행위가 없었다면 유지되었을 경쟁을 회복하는 데 충분한 구제 조치(메타에서 인스타그램 및/또는 왓츠앱을 매각하는 조치를 포함하되 이에 국한하지 않음) 및 추가적인 형평법상의 구제 조치를 구합니다.

**(b)      소장의 개요:**

수정된 대체 소장은 2011 년 이후 메타가 인스타그램과 왓츠앱의 인수를 포함한 경쟁 제한적 행위 과정을 통해 미국에서 "개인 소셜 네트워크 서비스" 시장에서 불법적으로 독점적 지위를 유지했다고 주장합니다. 수정된 대체 소장은 개인 소셜 네트워크 서비스를 "공유된 사회적 공간에서 개인 관계를 유지하고 친구, 가족 및 기타 지인들과 경험을 공유할 수 있도록 사람들이 사용하는 온라인 서비스"라고 정의하면서, 개인 소셜 네트워크 서비스는 모바일 메시지 서비스, 전문 소셜 네트워크 서비스(예: 링크드인), 비디오 소비 서비스(예: 유튜브)와 같은 다른 유형의 인터넷 기반 서비스와 구별된다고 주장합니다.

수정된 대체 소장은 "개인 소셜 네트워크 서비스를 제공하는 앱의 사용자들이 소요한 시간"에서 차지하는 메타의 점유율로 측정한 바에 따르면 메타가 현재 혐의를 받는 시장 점유율의 최소 80%를 보유하고 있으며, "개인 소셜 네트워크 서비스를 제공하는 앱의 [일별 및 월별 평균 사용자]"로 측정한 바에 따르면 메타가 혐의를 받는 시장 점유율의 최소 70%를 보유한다고 주장합니다.

나아가 수정된 대체 소장은 메타의 시장 지위가 사용자의 "친구와 가족이 이미 특정 소셜 네트워크의 회원"일 때 발생하고 "사용자가 개인 소셜 네트워크 서비스(SNS)에 더 많은 시간을 투자하고 더 많은 콘텐츠를 게시할 때" 증가하는 강력한 네트워크 효과 및 높은 전환 비용을 포함하여 높고 지속적인 진입 장벽에 의해 보호된다고 주장합니다.

수정된 대체 소장은 메타가 여러 유형의 경쟁 제한적 행위에 관여함으로써 미국의 "개인 소셜 네트워크 서비스" 시장에서 독점적 지위를 유지했다고 주장합니다. 특히, 수정된 대체 소장은 메타가 인스타그램을 인수하여 관련 시장에서 주목할 만한 독립적인 경쟁사를 무력화하고, 왓츠앱을 인수하여 상당한 경쟁 위협을 무력화하며 모바일 메신저를 통해 관련 시장에 진입하려 했다고 주장합니다. 또한, 수정된 대체 소장은 왓츠앱이 다른 "아시아 일부 지역에 대규모 사용자 기반을 구축했지만 서방으로 진출하지 않은 모바일 메신저 앱"보다 메타에 더 큰 위협을 지녔다고 주장합니다. 나아가 수정된 대체 소장은 메타가 인스타그램과 왓츠앱을 규모 있게 지속적으로 통제하고 운영한 것이 다른 모바일 사진 공유 및 모바일

메신저 앱이 개인 소셜 네트워크 시장에 진입하지 못하게 막는 "해자" 역할을 한다고

주장합니다.

수정된 대체 소장은 개인 소셜 네트워크의 독점을 증진하기 위한 메타의 경쟁 제한적

행위가 "개인 소셜 네트워크에 있어 경쟁의 이점을 [박탈]함으로써" 소비자에게 해를

끼친다고 주장하며, 여기에는 시장에서의 혁신, 품질 개선 및 "소비자의 선호도에 더 근접한

개인 소셜 네트워크 제공업체를 선정할" 기회가 포함될 수 있습니다. 또한 수정된 대체 소장은

혐의를 받는 메타의 개인 소셜 네트워크 서비스의 독점이 광고 판매 경쟁을 저해하였고,

메타의 경쟁 제한적 행위가 없었다면 "개인 소셜 네트워크 제공업체들이" 이러한 광고 판매

경쟁에 참여했을 것이라고 주장합니다.

본 사건의 수정된 대체 소장 사본은 부록 A 로 첨부했습니다.

**(c)     항변의 개요:**

메타는 연방거래위원회의 수정된 대체 소장에 있는 혐의를 부인합니다. 메타는 다음

항변과 특별히 관련이 있다고 생각하는 정보를 입수하기 위해 본 요청서를 제출합니다(메타는

이것이 본 소송 절차에서 메타 측 항변에 관한 완전한 목록이 아니라고 진술함):

연방거래위원회가 정의한 시장은 실현 가능하지 않습니다. 업계와 대중은 "개인 소셜

네트워크 서비스(SNS)"로 추정되는 시장을 인식하지 못하고 있고, 메타는 이렇게 추정된

시장의 필수 시장 점유율을 보유하고 있지 않으며, 경쟁사와 소비자는 모든 사용자에게

무료로 배포된 상품의 시장 독점 혐의로 인해 피해를 입을 수 없고, 메타는 적절하게 정의된 시장에서 늘 경쟁에 직면해 왔습니다.

**8.   취득할 증거 또는 수행할 기타 사법 활동(제 3(d)조):**

   **(a)   취득할 증거:**

대한민국에 요청한 공조는 각각 현재 대한민국에 거주하고 근무하는 주식회사 카카오의 전직 및 현직 직원인 박창희와 정현주로부터 구두 증언을 받으려는 것입니다. 당사자들은 부록 C 에 포함된 질문 및 관련 질문에 대해 박창희로부터 증언을 얻고자 합니다. 당사자들은 부록 D 에 포함된 질문 및 관련 질문에 대해 정현주로부터 증언을 얻고자 합니다.

   **(b)   요청한 증언의 목적:**

본 요청서에서 요구하는 증언은 위에 기술한 혐의 및 항변과 관련이 있으며, 기술된 본 사건의 법적 절차에서만 사용되어야 합니다. 증언은 엄격한 비밀 유지 명령이 적용되며, 그 사본이 부록 B 로 첨부되어 있습니다. 비밀 유지 명령은 본 사건에서 주어진 증언이 소송 목적 이외에는 어떤 방식으로도 당사자들에 의해 사용되지 않도록 보장합니다. 비밀 유지 명령은 증언 당사자가 적절한 경우 자신의 증언을 극비로 표시할 수 있고 극비로 표시되지 않은 모든 증언은 우선 기밀로 취급할 것임을 규정합니다. 극비 및 기밀 증언은 공개될 수 없으며 해당 문서를 수령한 후 2 년 동안 메타에서 경쟁에 관한 의사 결정에 관여할 수 없는 제한된 수의 사내 변호사를 제외하고 메타의 어느 누구도 증언을 볼 수 없습니다.

본 요청서에서 요구하는 정보는 당사자들이 공정하게 그들의 주장 및 항변을 하는 데 필요합니다. 카카오는 카카오톡, 카카오스토리, 패스(Path) 앱을 소유하고 있습니다.

카카오톡은 메시지 및 영상 통화 앱입니다. 카카오스토리는 사용자가 "스토리", 사진, 동영상을 서로 공유할 수 있는 앱입니다. 패스는 사용자가 앱에서 "친구"와 멀티미디어 게시물 및 업데이트를 생성하고 공유할 수 있게 해주는 앱이었습니다. 카카오는 2015 년부터 2018 년 중단할 때까지 패스를 매수하여 운영했습니다.

카카오톡의 수석 개발자, 카카오톡 최고제품책임자, 그리고 약 2010 년부터 2016 년까지 카카오톡과 카카오스토리를 감독하는 고위 임원이었던 박창희는 특히 카카오톡과 카카오스토리의 성장, 개발, 전략적 방향의 역사, 카카오톡의 출시 및 운영, 카카오스토리의 출시 및 운영, 오랜 기간에 걸친 카카오톡과 카카오스토리의 기능과 사용, 오랜 기간에 걸친 카카오톡 및 카카오스토리의 규모 및 지리적 초점, 소장에 주장하는 시장의 경쟁 범위, 주장하는 시장에 진입하는 데 있어 장애물에 관한 정보를 보유하고 있습니다.

2013 년부터 주식회사 카카오의 부사장이었던 정현주는 특히 카카오톡과 카카오스토리의 성장, 개발, 전략적 방향의 역사, 카카오톡의 출시 및 운영, 카카오스토리의 출시 및 운영, 패스의 폐쇄 결정, 오랜 기간에 걸친 카카오톡과 카카오스토리의 기능과 사용, 오랜 기간에 걸친 카카오톡 및 카카오스토리의 규모 및 지리적 초점, 소장에 주장하는 시장의 경쟁 범위, 주장하는 시장에 진입하는 데 있어 장애물에 관한 정보를 보유하고 있습니다.

따라서, 당사자들은 특히 메타가 인스타그램 및 왓츠앱을 인수하는 시점에 카카오톡, 카카오스토리 및 패스가 메타의 유의미한 경쟁자였는지 여부를 더 잘 이해하고, 카카오스토리의 출시, 패스 서비스의 인수 및 최종 종료, 카카오톡 및 카카오스토리의 기능,

사용, 규모 및 지리적 초점, 그리고 카카오가 미국에서 성공적으로 운영될 수 있는 능력을 더

잘 이해하기 위해 박창희 및 정현주로부터 증언을 구하고자 합니다.

## 섹션 III

**9.** **신문 받을 자의 신원 및 주소(제 3(e)조):**

> **박창희**
> 수신자: 카카오톡 최고제품책임자 박창희(전직)
> 주식회사 카카오
> 대한민국
> 경기도 성남시
> 분당구 판교로 235, 3 층
> (우: 13494)

> **정현주**
> 수신자: 정현주 부사장
> 주식회사 카카오
> 대한민국 제주특별자치도
> 제주시 첨단로 242(우: 63309)

**10.** **신문 받을 자에게 해야 할 질문 또는 신문할 주제 사안에 대한 진술(제 3(f)조):**

박창희와 정현주에게 할 질문은 증인의 지식 및 역량에 대한 사전적 질의사항과

관련된 질문 외에 위 8(b)항에 기술된 주제 사안과 관련이 있습니다. 당사자들이 각각

박창희에게 제기하고자 하는 구체적인 질문은 부록 C 로 본 요청서에 첨부되어 있습니다.

당사자들이 각각 정현주에게 제기하고자 하는 구체적인 질문은 부록 D 로 본 요청서에

첨부되어 있습니다. 당사자들은 또한 적절한 경우 박창희와 정현주에게 관련 질문을 할 수

있는 권한을 요청합니다.

**11.** **증거에 대한 구두 또는 확인서 및 사용할 특정 양식에 대한 요건(제 3(h)조):**

법원 행정처가 동의하는 경우, 다음과 같이 요청합니다.

a.      박창희와 정현주의 구두 증언은 대한민국 법률에 따라 대한민국의 적절한

사법관리 앞에서 서약 또는 확인 하에 이루어지도록 요청합니다.

b.      연방거래위원회는 로펌 WeAdvise Law 가 대한민국에서 본 요청서를 작성하는

데 있어 자신의 이익을 대변하고 변호인 역할을 하도록 승인했습니다. 본 요청서에 관한 질문

및 통지는 WeAdvise Law 파트너 국태준에게 연락하십시오. 본 요청서를 작성하도록

지명해야 할 법원에 국태준이 증인 신문 및 문서 제출과 관련하여 취하고 심리하는 절차, 심리

및 신청과 관련하여 연방거래위원회를 대표한다는 사실을 통지하여 주십시오. 국태준의

연락처는 다음과 같습니다.

> 국태준, 파트너
> WeAdvise Law
> 전화: +82 02-518-0005
> 팩스: +82 02-518-3100
> tjkook@weadvise.co.kr

c.      Meta Platforms, Inc.는 로펌 Kim & Chang 이 대한민국에서 본 요청서를

작성하는 데 있어 자신의 이익을 대변하고 변호인 역할을 하도록 승인했습니다. 본 요청서에

관한 질문 및 통지는 Kim & Chang 변호사 정영진에게 연락하십시오. 본 요청서를 작성하도록

지명해야 할 법원에 정영진이 증인 신문 및 문서 제출과 관련하여 취하고 심리하는 절차, 심리

및 신청과 관련하여 Meta Platforms, Inc.를 대표한다는 사실을 통지하여 주십시오. 정영진의

연락처는 다음과 같습니다.

정영진, 변호사
Kim & Chang
전화: +82-2-3703-1776
팩스: +82-2-737-9091/9092
Youngjin.jung@KimChang.com

d.      연방거래위원회가 요청한 구두 증언은 대한민국 내의 연방거래위원회의

변호인인 WeAdvise 파트너 국태준 또는 그 피지명인의 질문을 통해 입수하며, Meta 의

변호인인 정영진 또는 그 피지명인이 연방거래위원회의 질문에 의해 제기된 주제에 대해 각

증인에게 질문(교차 신문)할 수 있는 기회가 주어집니다.

e.      Meta 가 요청한 구두 증언은 대한민국 내의 Meta 의 변호인인 정영진 또는 그

피지명인의 질문을 통해 입수하며, 연방거래위원회의 변호인인 국태준 또는 그 피지명인이

Meta 의 질문에 의해 제기된 주제에 대해 각 증인에게 질문(교차 신문)할 수 있는 기회가

주어집니다.

f.      연방거래위원회의 변호인과 Meta 의 변호인에게 법적 절차 시간과 장소를

사전에 통지하고, 변호사들이 직접 참석하거나, 직접 참석할 수 없는 사람들이 있는 경우 화상

또는 음성회의를 통해 참석할 수 있도록 요청합니다. 국태준은 직접 참석하거나 화상 또는

음성 회의에 참석하는 데 필요한 조치를 포함하여 법적 절차에서 따라야 할 절차를 이메일(본

사안에서 당사자들이 이전에 합의한 대로)로 Meta 의 변호인에게 알려야 합니다.

g.      또한 확인서와 구두 신문은 속기 녹취록으로 작성되어야 하고 그 녹취록을 다음

당사자들에게 제공하도록 요청합니다.

James E. Boasberg 판사

미국 컬럼비아 특별구 지방법원

333 Constitution Avenue, N.W.

Washington, D.C. 20001

미국

*당사자들의 법정 대리인에게 사본 제공:*

Daniel Matheson 귀하

연방거래위원회

600 Pennsylvania Avenue N.W.

Washington, D.C. 20580

전화: 202-326-2075

이메일: dmatheson@ftc.gov

Mark C. Hansen 귀하

Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.

1615 M Street, N.W., Suite 400

Washington, D.C. 20036

전화: 202-326-7900

이메일: mhansen@kellogghansen.com

     h.         또한, 본 요청서의 어느 부분이 대한민국 법률에 따라 허용 불가능한 것으로 간주되는 경우, 연방거래위원회의 변호인인 국태준 및 Meta 의 변호인인 정영진에게 해당 사실을 알리고 결정에 앞서 실질적으로 답변하도록 허용하며 법원 행정처는 가능한 한 많은 요청을 따라줄 것을 요청합니다.

**12.      준수할 특별한 방법 또는 절차(제 3(i)조 및 제 9 조):**

      위의 11 항을 참조하십시오.

**13.      요청 수행 일시 및 장소에 대한 통지 요청 및 통지받는 자의 신원 및 주소(제 7 조):**

      상기 제 6 항 및 제 11 항에 열거된 당사자들의 대리인들에게 요청 수행에 대한 통지를 제공할 것을 요청합니다.

14.     요청서 작성 시 요청 당국의 법원 직원의 출석 또는 참여 요청(제 8 조):

      없음.

15.     목적지국의 법률에 따른 문서 제공 거부에 관한 특권 또는 의무의 명시(제 11(b)조):

      당사자들은 대한민국 법률에 따라 적용되는 변호사-의뢰인 특권 또는 특권에 의해

보호되는 정보의 공개를 유도하기 위해 박창희 또는 정현주로부터 증언을 이끌어내려고 하지

않습니다. 그러나 해당 연락이 제 3 자에게 공개된 경우에는 이러한 변호사-의뢰인 특권이

철회될 수 있습니다.

16.     **헤이그 협약 제 14 조 두 번째 단락 또는 제 26 조에 따라 상환받을 수 있는 발생
수수료와 비용은 다음 당사자들이 부담합니다.**

      본 법원은 본 요청서 작성 시 발생하는 특정 수수료 및 비용이 헤이그 증거 협약

제 14 조 두 번째 단락 또는 제 26 조에 따라 상환될 수 있음을 감안합니다.  본 헤이그 증거

협약 과정의 수수료와 비용은 연방거래위원회와 Meta Platforms, Inc.가 균등하게 부담합니다.

연방거래위원회 및 Meta Platforms, Inc. 각각은 본 헤이그 증거 협약 과정으로 인해 발생하는

일체의 소송과 관련하여, 해당하는 경우, 자신의 변호사 수수료와 경비를 부담합니다. 헤이그

증거 협약 제 14 조 또는 제 26 조에 따라 일체의 비용이 발생하기 전, 연방거래위원회의

변호인인 국태준과 메타의 변호인인 정영진에게 통지해야 합니다.

## 섹션 IV

      본 지방법원은 헤이그 증거 협약 조건에 따른 공조와 호의에 대해 대한민국 당국에

감사를 표합니다.

요청 사법 당국의 서명 및 날인:

날짜: _____

_____

James E. Boasberg
미국 지방법원 판사

<u>**부록 A**</u>
**미국 콜롬비아 특별구**
**연방지방법원**

---

**연방거래위원회(FEDERAL TRADE COMMISSION)**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

**원고,**

**대**

**FACEBOOK, INC.**
1601 Willow Road
Menlo Park, CA 94025

**피고.**

**사건번호: 1:20-cv-03590-JEB**

**봉인 제출된 문서의 대외공개용 편집본**

---

**<u>금지명령 및 기타 형평법상의 구제조치를 위한 대체 보정소장</u>**

원고인 연방거래위원회(Federal Trade Commission, "FTC")는 위임된 변호사들을 통해 연방거래위원회법(Federal Trade Commission Act, "FTC 법") 제 13(b)조, 미국법전 제 15 편 제 53(b)조에 따라 피고인 Facebook, Inc.("Facebook")에 의한 FTC 법 제 5(a)조, 미국법전 제 15 편 제 45(a)조에 저촉되는 상거래상의, 또는 상거래에 영향을 미치는 경쟁제한 행위 및 불공정한 경쟁 방식을 시정하고 방지하기 위해 피고에 대한 영구 금지명령 및 기타 형평법상의 구제조치를 신청한다.

## I.    사건의 성격

1.      Facebook 은 글로벌 시장 1 위의 온라인 소셜 네트워크로, 약 30 억 명 이상의 정기적 사용자를 보유하고 있다. Facebook 은 마크 저커버그(Mark Zuckerberg) 최고경영자(Chief Executive Officer, "CEO")가 2008 년에 발표한 "*경쟁하는 대신 경쟁사를 구매하자(it is better to buy than compete)*"라는 전략에 따라 주력 부분에서 독점적 지위를 유지해 왔다. 이러한 방침에 충실하게, Facebook 은 위협적인 경쟁 대상으로 간주되는 잠재적 경쟁사들을 체계적으로 추적한 다음 인수를 진행하였다. Facebook 은 이러한 경쟁제한적 인수 전략을 보완하기 위하여, 진입 장벽을 세우거나 유지하고 위협적인 경쟁사를 무력화하기 위해 설계된 경쟁제한적 형태의 조건부 거래 정책을 마련하였다.

2.      세계에서 가장 크고 수익성이 높은 양대 소셜 네트워크인 Facebook 과 Instagram 을 산하에 두고 있는 Facebook 은 이에 힘입어 미국 내 개인용 소셜 네트워킹 서비스(personal Social Networking Services, "개인용 SNS") 시장에서 독점적 지위를 확보하고 있다. Facebook 소셜 네트워크는 Facebook 내부에서는 "Facebook Blue"로 지칭하며, 미국 내 월간 이용자 수는 [편집처리]명 이상이다. Instagram 의 월간 이용자 수는 [편집처리]명 이상이다. 미국 내 다른 개인용 SNS 업체들의 규모는 Facebook 에 전혀 미치지 못하는 수준이다. 개인용 SNS 분야에서 2 위 규모인 Snapchat 의 경우, 월간 이용자 수가 Facebook Blue 나 Instagram 보다 수천만 명 적은 수준에 불과해 비교가 무색할 정도이다.

3.      Facebook 의 시장지배적 지위는 엄청난 규모의 수익을 안겨준다. Facebook 이 개인용 SNS 시장의 독점을 수익화하는 주된 방식은 감시 기반 광고의 판매이다. Facebook 은 자사 플랫폼은 물론 인터넷 전반에서 수집한 사용자의 활동, 관심사 및 가입정보 등의 심층 데이터를 활용하여 행동기반 맞춤형 광고를 판매한다. Facebook 이 벌어들인 매출액은 작년에만 미화 850 억 달러 이상이며, 그 수익금은 미화 290 억 달러 이상에 달한다.

4.      Facebook 도 오랫동안 인정해 왔듯이, 개인용 SNS 시장에서 Facebook 이

누리는 독점은 강력한 네트워크 효과(network effect)를 비롯한 높은 진입 장벽에 의해 보호를 받고 있다. 특히 개인용 소셜 네트워크의 가치는 해당 사용자의 친구와 가족 중 더 많은 사람이 이미 회원일 경우 더욱 높아지기 때문에, 신규 시장진입자는 Facebook 과 경쟁하는 과정에서 충분한 사용자 기반을 유치하는 데 상당한 어려움을 겪을 수밖에 없다. 이미 기존 업체가 지배적 규모를 차지하고 있는 소셜 "작동기제(mechanic)"(즉, 사진 공유 기능와 같이 다른 회원과 연결하고 상호작용하는 특정 방법)를 중심으로 구축된 소셜 네트워킹 제품으로 사용자를 유치하기가 매우 어렵다는 점은 Facebook 의 내부 문서에도 확인된다. 우수한 제품을 가진 시장진입자조차도 기존 개인용 소셜 네트워크가 누리고 있는 압도적인 네트워크 효과에 맞서 성공을 거둘 수 없는 경우가 많다.

5.      강력한 네트워크 효과는 새로운 방식으로 사용자들을 연결시키는 파괴적이거나 혁신적인 신기술이 등장할 때까지는 지배적인 개인용 SNS 업체를 경쟁 위협으로부터 보호해줄 수 있다. Facebook 이 경쟁 환경에 처해 있었다면, 성공을 위해 자사의 소셜 네트워크를 위한 가치를 창출하는 혁신적인 툴을 개발하는 등 기술 전환 시기에 대비하고 이에 적응하는 능력을 갖추어야 했을 것이다. 그러나 Facebook 의 경영진은 소규모 스타트업에서 업계의 거인으로 전환하는 과정에서 여러 번의 값비싼 실패를 경험했고, 자신들에게는 변화하는 환경에서 지배력을 유지하는 데 필요한 비즈니스 역량이 부족하다는 사실을 깨닫게 되었다. 공정한 경쟁을 통해서는 독점적 지위를 유지할 수 없다고 판단한 Facebook 의 경영진은 운영상의 위기를 해결하기 위해 자신들이 실패한 영역에서 성공을 거두고 있는 새로운 혁신 기업들을 사들이기로 하였다. Facebook 은 이러한 경쟁제한적 형태의 기업인수 행보에 더해 신생 경쟁사를 더욱 좌절시킴으로써 시장 독점을 공고화할 목적으로 '선 개방 후 폐쇄(opened-first-closed-later)'와 같은 조치를 동원하기도 하였다.

6.      스마트폰의 출현에 이은 2010 년대의 모바일 인터넷의 태동은 인터넷의 역사에 있어서도 Facebook 이라는 기업 차원에서도 중요한 전환의 계기가 되었다. 이러한 기술의

출현은 사람들이 이동 중에도 연결할 수 있게 함으로써 디지털 경제를 근본적으로 뒤바꿔 놓았다. 사용자들의 온라인 활동이 점점 더 모바일 인터넷으로 이동함에 따라, 혁신적인 스타트업 기업들은 데스크톱 시대에 시장지배적 거인으로 성장한 Facebook 등의 대기업들에 도전해볼 기회를 갖게 되었다. 사진 공유를 통해 사용자들을 연결시키는 Instagram, 메시지 서비스를 내세운 WhatsApp 등의 스타트업에 벤처 캐피털을 비롯한 투자금이 유입되었다. 이러한 신생 업체들은 빠르게 인기를 얻었다.

7.    Facebook 은 모바일로의 전환이 경영상의 위기를 야기한다는 점과, 모바일 환경이라는 새로운 위협을 견제할 수 있는 기간이 얼마 없다는 것을 인식하였다. Facebook 의 CEO 인 저커버그는 이 시기를 "회사의 입지를 취약하게 만드는 아주 위태로운 플랫폼 전환 과정"이라고 묘사했으며, "과거의 많은 회사들이 이에 대응한 도약에 실패한 바 있다"는 점을 언급하였다. 비즈니스 역량에서 경쟁이 되지 않았던 Facebook 은 위협적인 경쟁자로 부상하거나 이에 조력할 수 있는 회사들을 인수함으로써 자신들의 시장지배적 지위를 유지하겠다는 계획을 고안하였다. 이러한 회사들을 사들인 Facebook 은 이로써 경쟁자들이 모바일 인터넷의 힘을 활용하여 Facebook 의 우월적 지위에 도전해올 가능성을 제거할 수 있었다.

8.    Facebook 은 위협적인 경쟁자로 인식되는 기업들의 사업 기반을 약화시키는 일련의 경쟁제한적 조건부 거래 정책을 시행하고 집행함으로써 이러한 인수 전략을 한층 보강하였다. Facebook 은 Facebook 상에서 실행되거나 자사의 플랫폼과 연동되는 소프트웨어 앱을 제작하는 타사 개발자와의 계약에 이러한 정책을 포함하였다. Facebook 은 2007 년 무렵부터 자사 플랫폼에 앱 개발자들을 적극적으로 유치하는 한편, Facebook 과 상호 연동하는 데 필요한 핵심 애플리케이션 프로그래밍 인터페이스(application programming access, "API") 및 툴을 이 개발자들에게 개방하였다. Facebook 의 이러한 개방 정책은 더 많은 개발자 및 사용자 참여를 유도했으며, 이는 결과적으로 Facebook 의 막대한 광고 수익을

견인하는 데 도움이 되었다. 그러나 개발자들이 인기 제품의 확대 개발에 나서면서 Facebook 은 이를 위협으로서 인식하기 시작했고, 그 중 일부는 새로운 경쟁자를 돕거나 Facebook 에 직접적인 위협이 될 수 있다고 보았다. 이에 대응하여 Facebook 은 회사의 API 정책을 경쟁제한적 무기로 전환하였다. 즉, 오직 (i) Facebook 의 핵심 서비스와 경쟁하지 않고 (ii) Facebook 의 잠재적 경쟁사의 성장에 기여하지 않기로 동의한 개발자에게만 Facebook 플랫폼을 이용할 수 있었다. 그 결과 이러한 조건들을 준수함으로써 Facebook 에 충실했던 앱 개발자나 웹 사이트만이 Facebook 플랫폼과의 상호 연동 기능을 이용할 수 있었고, 그와는 반대로 Facebook 의 잠재적 경쟁사와 협력했거나 그 자체로 위협적인 경쟁자로 부상한 앱 개발자의 경우, 이러한 상호 연동 기능을 활용할 수 없게 됨에 따라 일부는 폐업으로까지 이어졌다. 그러나 Facebook 의 경쟁제한적 형태의 조건부 거래 정책에 따른 제한에 반발하는 개발자가 Facebook 을 상대로 경쟁 위협을 조장하거나 스스로 위협으로 자리매김할 수도 있었다. Facebook 은 이를 방지함으로써 신생 경쟁사가 가질 수 있는 기회를 축소시켰다. 다시 말해, Facebook 은 자사 제품의 개선에 나서기보다 개발자에게 경쟁제한적인 제약을 부과함으로써 경쟁에서 앞서갔다. 이러한 제한 조치는 Facebook 이 경쟁자를 단념시키기 위해 신생 경쟁사에 보상을 지급한 행위 못지않게 경쟁제한적이다.

9.　　　Facebook 은 이러한 여러 조치를 통해 차별성 있고 혁신적인 기업이 규모 확장에 나설 수 없게 만드는 경쟁제한 수법을 완성하였고, 이는 Facebook 의 우월적 지위를 유지해 주었다. Facebook 의 행동 방침은 신생 경쟁사를 제거하는 효과 및, 그러한 경쟁사가 독립적으로 존재함으로 인해 다른 인터넷 플랫폼이 Facebook 의 독점적 지위를 둘러싼 진입 장벽을 극복할 수 있는 가능성을 근본적으로 차단하는 효과를 거두었다. 이를 통해 Facebook 은 미국 내 개인용 SNS 사용자를 위한 더 많은 선택권, 품질 향상 및 혁신 촉진 등 기업 경쟁으로 인한 혜택을 박탈하고 있다.

10.　　　Facebook 은 또한 개인용 SNS 업계에서의 경쟁사 출현과 성장을 방해함으로써

광고 판매와 관련한 실질적인 경쟁도 억제하고 있다. 개인용 SNS 업체가 자사의 플랫폼에서 수익을 창출하는 수단은 광고 판매인 경우가 많으며, 따라서 개인용 SNS 업체 간의 더 많은 경쟁은 광고 제공과 관련한 경쟁 역시 심화됨을 의미한다. 개인용 SNS 시장을 독점하겠다는 Facebook 의 전략은 광고 단가 하락, 광고와 관련된 더 많은 선택권, 품질 향상 및 혁신 촉진을 비롯한 기업 경쟁으로 인한 광고주의 혜택 역시 박탈하고 있다.

11.     시장 독점을 유지하기 위한 Facebook 의 불법적인 행동 방침은 지금껏 지속되고 있으며, 이는 금지되어야 한다. Facebook 은 자신들이 불법적으로 취득한 자산을 계속해서 보유 및 운영 중이고, 이는 개인용 SNS 시장에서의 Facebook 의 독점적 지위를 보호해주는 '해자(moat)' 역할을 지속적으로 수행하고 있다. 또한 Facebook 은 경쟁 위협을 지속적으로 모니터링하고 있으며, 금지 조치가 없는 한 이들을 인수하거나 좌절시키는 수법을 계속 사용할 것이다.

## II.   관할권 및 재판지

### A. 관할권

12.     본 법원은 FTC 법 제 5(a)조 및 제 13(b)조, 미국법전 제 15 편 제 45(a)조 및 제 53(b)조, 미국법전 제 28 편 제 1331 조, 제 1137(a)조 및 제 1345 조에 의거하여 본 소송에 대한 주제 관할권을 갖는다. 본 소송은 무역 및 상거래를 제한 및 독점 행위로부터 보호하는 국회제정법(Acts of Congress)에 의거하여 제기된 민사 소송이며, 제기 당사자는 본 소송을 제기할 수 있도록 국회제정법이 승인하고 있는 미국의 정부기관이다.

13.     Facebook 이 미국법전 제 15 편 제 53(b)조에 따른 미국과의 헌법상의 필수 접촉 기준에 부합하기 때문에, 본 법원은 Facebook 에 대한 대인 관할권을 갖는다.

14.     Facebook 의 일반적인 사업 관행과 본 소에서 주장하는 불공정한 경쟁 방식은 FTC 법 제 5 조, 미국법전 제 15 편 제 45 조가 의미하는 "상거래상의, 또는 상거래에 영향을

미치는" 경우에 해당한다.

15.     Facebook 은 현재 및 과거의 모든 관련 기간에 FTC 법 제 4 조, 미국법전 제 15 편 제 44 조에 정의된 "법인"이라는 용어에 부합하는 기업에 해당한다.

**B. 재판지**

16.     본 관할구의 재판지는 미국법전 제 15 편 제 22 조, 미국법전 제 28 편 제 1391(b)(1)조 및 미국법전 제 15 편 제 53(b)조에 따라 적절하다. Facebook 은 본 관할구에 소재하고, 이곳에서 사업을 영위하고 있다.

## III. 양 당사자

17.     원고인 FTC 는 미국 정부의 행정 기관으로, FTC 법, 미국법전 제 15 편 제 41 조 이하에 따라 설립 및 조직되어 존재하며, 컬럼비아 특별구에 주 사무소를 두고 있다. 해당 위원회는 무엇보다도 FTC 법 제 5 조, 미국법전 제 15 편 제 45 조를 집행할 권한과 책임을 부여받았으며, FTC 법 제 13(b)조, 미국법전 제 15 편 제 53(b)조에 따라 FTC 가 집행하는 일체의 법률에 대한 위반 행위를 금지하고 공평한 구제조치를 구하기 위한 법원 절차를 개시할 수 있는 권한이 있다.

18.     FTC 는 피고 Facebook 이 FTC 가 집행하는 법률 조항을 위반하고 있거나 위반하려 한다고 믿을 만한 근거를 확보하였으므로 이 사건을 연방 법원에 제기할 권한이 있으며, 이는 FTC 법 제 13(b)조, 미국법전 제 15 편 제 53(b)조가 의미하는 영구 금지명령 구제조치를 요청할 수 있는 사건에 해당한다.

19.     피고 Facebook 은 델라웨어에서 설립되어 1601 Willow Road, Menlo Park, CA 94025 에 주요 사업장을 둔 상장된 영리 기업이다. 개인용 SNS 를 제공하는 Facebook Blue, 개인용 SNS 를 제공하는 Instagram, 모바일 메시지 서비스를 제공하는 Facebook Messenger,

모바일 메시지 서비스를 제공하는 WhatsApp 을 비롯한 Facebook 의 주요 사업들은 디지털 상호작용과 커뮤니케이션을 촉진하는 기술 분야에 속해 있다.

## IV.  업계 배경

### A.  개인용 SNS 의 등장과 Facebook 의 시작

20.     2000 년대 초에 개인용 컴퓨터와 인터넷 연결의 사용이 보편화됨에 따라, 다른 사람들과 연결하고 소통하는 전혀 새로운 방법, 즉 친구 및 가족과의 온라인 소셜 네트워킹과 같은 기능이 가능해졌다. 이메일과 문자 메시지가 기능 면에서 제한적인 것과는 대조적으로, 개인용 SNS 는 사람들이 개인적인 연락을 유지할 수 있는 차별화된 방법을 제공함으로써 인기를 얻었다. 사람들은 개인용 SNS 를 통해 최신 정보를 얻거나 친구 및 가족과 개인적인 콘텐츠를 공유할 수 있으며, 이는 이제 수백만 미국인들의 일상 생활에 필수적인 부분으로 자리잡았다.

21.     사람들은 개인용 SNS 의 계정을 통해 자신의 삶과 관심사에 대한 콘텐츠를 게시할 수 있고, 자신의 지인들이 게시한 콘텐츠를 볼 수도 있다. 개인용 소셜 네트워킹을 통해 사적인 관계를 맺는 사람이 많기 때문에, 특정 개인용 SNS 상에 이미 임계점을 넘는 사용자층이 존재하고 있다면 신규 사용자를 유치하고 기존 사용자를 유지하는 데 있어 유리하다. 해당 서비스를 사용하는 다른 소비자의 수가 늘어날수록 개별 소비자가 느끼는 서비스의 가치도 함께 올라간다는 면에서, 소셜 네트워크는 강력한 네트워크 효과를 특징으로 하는 전화 시스템, 운영체제 등의 서비스와 유사한 기능을 제공한다고 할 수 있다. Facebook 은 내부에서 실시한 투자자 회의(investor call)에 등장한 다음 문장은 이러한 현상을 명확하게 표현하고 있다. "당사의 네트워크 효과는 상당합니다. 친구들이 모두 여기에 있으니까요."

22.     2002 년 3 월에 출시된 Friendster 는 대중적 인기를 구가한 최초의 개인용 SNS

중 하나였으며, 이듬해에는 Myspace 가 그 뒤를 이었다.

23.      그 이후 2004 년 2 월에는 저커버그와 그의 대학교 친구들이 Facebook (당시의 표기로는 "TheFacebook")를 출시하였다. 이들은 먼저 모교 캠퍼스 내에서 제품을 출시한 다음, 다른 대학 캠퍼스들로 빠르게 서비스를 확장하였다. 대학교 환경에서 사용자 수가 빠르게 증가하자, Facebook 은 2006 년에 일반 대중에게도 전면 서비스되었다. Facebook 의 빠른 초기 성장은 회사에 대한 상당한 민간 투자로 이어졌고, 이는 결과적으로 더 많은 성장을 촉진하였다.

**B. 앱 개발자들의 Facebook Blue 와의 상호 운용을 유도하기 위해 Facebook Platform 을 출시하고 핵심 인터페이스에 대한 이용 권한을 제공한 Facebook**

24.      Facebook 의 사용자 기반이 초반부터 빠르게 성장한 것은 회사에 매우 중요한 의미를 가졌다. Facebook 은 매력적인 투자 대상으로 다가가는 것뿐 아니라 네트워크 효과를 발생시켜 그 이점을 활용할 수 있게 되는 임계 사용자 수를 달성하기 위해서라도 사용자를 빠르게 추가해야 하였다. 더 많은 사용자가 Facebook 의 서비스에 적극적이고 정기적으로 참여하게 될수록 이들이 Facebook 에 머무르면서 추가 사용자를 유치할 가능성이 더 높아지고, 잠재적인 경쟁사가 이에 대응할 여지는 대폭 줄어들게 된다. 따라서 Facebook 은 자사 제품의 사용자 기반을 신속하게 확대하고자 하였다.

25.      이 목표를 달성하기 위해 Facebook 은 2007 년에 "Facebook Platform"을 출시하였다. Platform 이니셔티브는 Facebook 이 빠르게 확대 중인 자사의 사용자 기반을 제어할 수 있다는 점을 활용하여, 소프트웨어 개발자들이 Facebook Blue 와 상호 운용되는 게임과 페이지 디자인 툴부터 비디오 공유 툴 및 e-마케팅 앱까지도 망라하는 앱과 툴의 생태계를 구축하도록 장려하였다. Facebook 의 목표는 Facebook Blue 를 앱의 지배적인 플랫폼으로서 자리매김하는 것이었다. 개발자들이 Facebook Blue 를 활용하여 사용자가 선호할 만한 혁신적인 앱을 홍보하고 배포하도록 유도할 수만 있다면, Facebook 은 사용자

참여도를 높이고 사용자 정보와 그들의 온라인 활동에 대한 한층 세분화된 데이터를 더 많이 확보하는 한편 경쟁자들을 따돌릴 수 있는 네트워크 효과를 강화할 수도 있게 된다.

26.     Facebook 은 Platform 을 출시할 당시에 자신들이 "타사 개발자의 애플리케이션이 Facebook 의 자체 개발 애플리케이션과 함께 평등한 경쟁의 장에서 공존할 수 있도록 Facebook Platform 을 설계하였다"면서, "각종 경쟁 애플리케이션의 개발자들을 환영"한다는 입장을 명시적으로 밝혔다.

27.     Platform 이니셔티브는 Facebook 이 자체적인 자원은 보존하면서도 타사의 창의성을 활용하여 Facebook 상에서의 참여를 지속시킬 수 있게 해주었다. Platform 이 없었다면 Facebook 은 자사 네트워크의 가치를 높여주는 앱들을 스스로 구축해야만 했을 것이다. 그러한 경우, Facebook 은 사용자가 원하는 앱을 예측한 다음, 자사의 사용자 기반과 네트워크 전반에서 이러한 앱들을 설계, 코딩 및 확장하고, 잘못된 예측과 실수에 따른 위험과 리소스 소모를 자체적으로 감수해야만 한다.

28.     Facebook 은 Platform 을 통해 이러한 위험과 비용을 회피하는 한편, 타사 앱 개발자들의 노력으로 창출된 편익 역시 향유할 수 있었다. 이로써 새로운 앱을 개발하거나 새로운 비즈니스 모델을 테스트하는 과정에서 상당한 자원을 소비할 필요가 없어졌고, 타사 개발자들이 그 역할을 대신했다. Facebook 은 단지 Platform 용으로 개발된 앱이 널리 채택되기를 기다린 다음, 경쟁 앱을 구축하거나 해당 인기 앱의 사용자 기반에서 Facebook 을 위한 값진 신규 소셜 데이터 등의 편익을 향유하기만 하면 되었다. 타사 개발자가 구축한 앱과 그들이 유치한 사용자를 포함하여 이러한 개발자들의 노력의 결과로부터 수익을 창출할 수 있는 잠재력은 Facebook 이 Platform 상에서 앱을 구축할 개발자를 적극적으로 모색 및 초대하게 되는 동기로 작용하였다.

29.     Facebook 은 Facebook Platform 출시 당시에 이를 *모든* 앱 개발자에게 앱 디자인의 자유를 제공하는 프로그램으로 소개하였다. Facebook Platform 이 공개되었을 때,

저커버그는 "지금까지 소셜 네트워크는 폐쇄형의 플랫폼이었습니다. 하지만 오늘부터는 아닙니다. 이러한 Facebook Platform 의 발전 덕분에, 이제는 전 세계 어떤 개발자라도 Facebook 내부의 소셜 그래프(Social graph)에 기반한 완전한 소셜 앱을 구축할 수 있게 되었습니다"라고 발언하였다.

30. Facebook 은 Facebook Platform 을 모든 앱 개발자의 역량을 지원하는 수단으로 마케팅하였다. 그렇게 하는 것이 사업에 중요하다는 것을 인식했기 때문이다. 저커버그는 2007 년의 보도 자료에서 "개발자들이 훌륭한 애플리케이션을 구축한다면 이는 우리 사용자에게 서비스가 제공되고 소셜 그래프도 강화된다는 것을 의미하므로, [Facebook Platform 은] 우리에게도 이롭습니다. 이것은 큰 기회입니다. Facebook 이 연동 및 배포를 담당하고, 개발자는 애플리케이션을 제공합니다. 둘의 노력으로 사용자들은 더 많은 정보를 공유할 수 있으며, 이익은 함께 나누게 됩니다"라고 언급하였다.

31. 저커버그와 Facebook 은 모든 소셜 앱 개발자에게 상호 운용의 가능성을 열어준 '개방형' Facebook Platform 의 혜택이 자신들에게도 돌아온다는 메시지를 계속해서 반복하였다. 2008 년, 저커버그는 "다양한 소셜 앱들이 많이 등장할 거라고 믿고 있는 만큼, Platform 은 우리 전략의 핵심이라고 할 수 있습니다. . . Facebook 스스로 이 모든 것을 개발할 수는 없었을 겁니다"라고 밝혔다. 2012 년 초의 Facebook 의 기업공개 관련 문서에는 "Platform 개발자의 성공과 Platform 생태계의 활기가 [Facebook Blue 에서의] 사용자 참여를 높이는 데 있어서 핵심적인 역할을 합니다. 당사는 Platform 의 개발자가 보다 사회적이고 개인 맞춤형이면서 Facebook [Blue]와 웹 전반, 그리고 모바일 기기에서도 사용자 참여를 개선하는 제품을 제공할 수 있도록 개발 역량을 강화해주는 각종 툴과 API 에 지속적으로 투자하고 있습니다"라고 명시되어 있다.

32. Facebook 이 개방형 플랫폼을 설계한 이유는 신규 개발자를 유치하려는 목적뿐만 아니라 (i) Facebook Platform 과 상호 운용하는 개발자가 끌어들이는 신규 Facebook

사용자를 유치하고, (ii) Platform 상에서 새로운 기능을 즐길 수 있게 함으로써 기존 Facebook 사용자의 참여도를 높이기 위함이었다. 각각의 경우, Facebook Platform 은 사용자 기반과 참여도의 증가에 따른 네트워크 효과의 창출 및 활용을 염두에 두고 설계되었다. 그리고 더 많은 사용자가 더 많은 개발자를, 더 많은 개발자가 더 많은 사용자를 끌어들임으로써 각각은 서로를 견인하였다. 양쪽 모두 Facebook 에 이익이 된 것이다.

33.    2007 년의 Platform 출시 이후 Facebook 은 개발자가 사용할 수 있는 새로운 툴을 자주 추가했으며, 이는 보통 반기별 'f8' 개발자 컨퍼런스에서 이루어졌다. 2008 년의 경우를 예로 들면, Facebook 은 사용자가 자신의 Facebook 자격증명을 입력하여 개발자의 웹사이트 또는 앱에 로그인할 수 있도록 하고 이로써 "사용자의 Facebook 계정 정보, 친구 및 개인 정보"를 개발자의 서비스로 가져와 콘텐츠를 Facebook 에 다시 공유할 수 있도록 해주는 툴인 Facebook Connect 를 출시하였다. 개발자들이 Facebook Connect 를 사용함으로써, Facebook Blue 의 매력적인 콘텐츠가 늘어나고 Facebook 의 인터넷 점유율이 더욱 높아지는 등 Facebook 또한 그 이익을 누리게 되었다.

34.    Facebook 은 타사 앱에 Facebook 사용자 데이터 이용을 허용해주는 API 를 비롯한 여러 기능들을 Platform 에 계속 추가하였다. API 는 상이한 소프트웨어들이 각각의 데이터나 기능을 서로 통신하고 공유할 수 있는 구조화된 방법을 의미한다. API 는 온라인 상에서 기업과 다른 주체 간의 커뮤니케이션, 제품과 서비스 간의 통합 또는 상호 운용, 그리고 다른 업체의 기능이나 데이터를 '기반으로' 구축되는 신제품의 개발을 촉진하는 데 널리 사용되고 있다.

35.    기업은 API 를 제공함으로써 타사 개발자가 API 제공자의 특정 데이터 또는 기능과 프로그래밍 환경에서 상호작용하도록 허용할 수 있다. 이는 제품을 자체 개발하지 않고도 자사의 기존 제품과 상호 보완적이거나 인접한 제품을 개발하고자 하는 기업들의 공통적인 패턴이다. 이러한 경우, API 제공자는 타사 개발자에게 해당 제공자와의 상호

운용에 필요한 데이터와 기능을 제공하게 된다. 많은 API 들은 중요한 상호운용성을 제공함으로써 타사 개발자를 위한 디지털 시장에서의 배포 수단으로서 기능한다.

36.     Facebook Platform 은 다양한 API 에 대한 이용 권한을 내용으로 하며, 많은 API 가 시간이 지남에 따라 변경되었다. 2010 년에 출시된 그래프 API 는 Facebook Platform 의 핵심 API 중 하나이다. 이 또한 수년에 걸쳐 변경되었지만, 그 일반적인 목적은 Facebook 의 소셜 그래프와 Facebook 및 타사 제품을 비롯한 다른 앱들 사이에서 일어나는 다양한 유형의 정보와 데이터 교환을 촉진하는 것이었다. Facebook 이 타사 개발자에게 그래프 API 의 특정 엔드포인트에 대한 이용 권한을 부여하면, 해당 개발자는 그래프 API 를 사용하여 Facebook 의 소셜 그래프 내에서 특정 유형의 정보를 검색 및/또는 생성할 수 있게 된다. 예를 들어, 그래프 API 를 이용하면 사용자가 Facebook Blue 에 업로드한 사진을 검색하거나 사용자의 Facebook Blue 타임라인에 비디오를 게시하는 등의 작업이 가능하다. 그래프 API 를 통해 획득된 데이터는 개발자가 배포를 완료하고 사용자 기반을 확장하는 데 있어 중요한 수단이 되어줄 수 있다.

37.     2010 년에 Facebook 은 Find Friends API(사용자의 Facebook 친구에 대한 정보 제공)와 Facebook Blue 에서 사용자 콘텐츠를 이용하는 데 사용되는 기타 API 를 비롯한 중요 API 에 대한 이용 권한을 그래프 API 를 통해 타사 앱에 제공하였다. 특히 Find Friends API 의 경우, 타사 앱의 사용자들이 똑같은 타사 앱을 사용 중인 Facebook Blue 친구를 찾고 현재 사용 중이 아닌 친구를 초대할 수 있게 해주었기 때문에, 타사 앱에게는 귀중한 성장 수단이었다.

38.     또한 Facebook 은 2010 년에 타사 앱 및 웹사이트가 Facebook 의 '좋아요' 버튼과 같은 기능을 자체 서비스에 추가할 수 있도록 해주는 Open Graph 및 소셜 플러그인을 Facebook 플랫폼에 추가하였다. Facebook Blue 사용자는 좋아요 버튼을 사용하여 특정 타사 앱에 대한 관심을 표현하고 공유할 수 있다. '좋아요'를 누르면 Facebook Blue 사용자의 뉴스피드와 프로필에 그러한 내용이 공유되어 해당 타사 앱에 추가 사용자가 유입될 수 있기

때문에, 타사 앱들에게는 좋아요 버튼을 설치하고 그 사용을 장려할 만한 동기가 있었다.

39.     개발자들은 다음과 같은 세 가지 이유로 플랫폼의 최초 도입 시점부터 Facebook Platform 개방을 중요하게 생각하였다. 첫째, Facebook Platform 은 개발자의 제품과 서비스를 위한 고유한 유통 채널을 제공했으며, 개발자가 Facebook 의 방대한 소셜 그래프를 활용하여 "대량 유통을 촉진"할 수 있다고 홍보하였다. 둘째, 그래프 API, Social Plugins, Open Graph 와 같은 툴은 다음과 같이 개인 맞춤형 경험을 통해 사용자를 참여시킬 수 있는 기능을 개발자에게 제공하였다. "예를 들어, 제가 [음원 서비스인] Pandora 에서 특정 밴드에 좋아요를 눌렀다면, 해당 사이트의 정보는 그래프의 일부가 되어 나중에 제가 콘서트장을 방문했을 때 좋아하는 밴드가 현장에 도착한 시점 등을 알려줄 수 있습니다." 셋째, Facebook Platform 은 개발자가 자사 제품을 광고하고 앱 내 구입을 처리할 수 있게 해주었다. 이런 식으로 제공된 혜택과 회사의 적극적인 홍보를 통해 개발자들은 Facebook 의 개방 정책에 의존하도록 유도되었고, 호환 가능한 제품을 개발하기 위해 역량을 투입하였다.

40.     Open Graph 의 사용은 빠르게 확대되었다. Open Graph 가 공개된 후 1 주일 만에 50,000 개 이상의 웹 사이트가 Open Graph 플러그인을 설치하였다. 이러한 사이트들은 대규모 신규 유통 채널의 이점을 즉시 누릴 수 있게 되었다. 출시 후 1 년이 지난 2008 년 7 월경에는 400,000 명 이상의 개발자가 이미 Facebook Platform 을 사용 중이었다. 2010 년 4 월경에는 Facebook Platform 을 사용 중인 개발자의 수가 100 만 명 이상으로 늘어났다. 2012 년 7 월이 되자, Open Graph 는 Facebook Blue 에 매일 약 10 억 건의 소셜 데이터를 공유하는 수준이 되었고, Facebook 은 이로써 사용자 정보와 그들의 온라인 활동에 대한 한층 세분화된 데이터를 더 많이 확보할 수 있었다.

41.     이러한 전략은 사용자들의 온라인 활동을 Facebook Blue 에 더 완벽하게 통합했을 뿐만 아니라, Facebook 의 수익 증대에도 일조하였다. Facebook 의 한 임원은 2012 년 5 월에 Facebook 의 최고운영책임자(Chief Operating Officer, "COO")인 셰릴

샌드버그(Sheryl Sandberg)에게 보낸 이메일에서 다음과 같이 전했다. "우리가 신규 사용자의 가입을 유도하는 임계 사용자 수를 이미 확보하고 있기 때문에, 이는 자사의 앱과 웹사이트를 고객에게 알리고 싶은 개발자를 끌어들이게 되고, [이는 다시] 소비자에게 다가가고자 하는 광고주를 끌어들이게 [됩니다.]" 해당 임원은 Facebook 이 "이제는 개발자의 입장에서 현재와 미래의 사용자/고객 대부분이 Facebook 회원일 것이라고 생각해도 되는 규모에 [이르렀습니다]"라고 설명하면서, "Apple App Store 의 상위 10 개 앱 중 [7]개는 Facebook 과 [연동됩니다]"라고 덧붙였다.

42.    또한 타사 앱은 Facebook 플러그인을 통해, 그리고 '좋아요'와 같은 소셜 데이터를 Facebook Blue 로 재전송하면서 Facebook 의 성장에 기여하였다. 이러한 상호작용은 사용자가 각종 타사 앱들과 상호작용한 정도와 관련한 중요한 정보 역시 Facebook 에 제공했으며, Facebook 은 이를 통해 신규 앱의 사용 추세를 면밀히 추적하고 식별할 수 있었다.

**C. 초반의 경쟁사들을 뛰어넘어 시장지배적 소셜 네트워크가 된 Facebook**

43.    Facebook 은 대학교를 넘어 일반 대중으로 사용자층을 확대한 2006 년 이후 빠르게 성장하였다. 운영현황 자료에 따르면, 2007 년 5 월부터 2008 년 5 월 사이에 Facebook 의 월간 실사용자 규모는 34% 성장한 반면, 주요 경쟁사인 Myspace 의 실사용자는 같은 기간 동안 7%만 성장하였다. 2009 년 무렵 Facebook 은 Myspace 를 넘어서게 되었으며, 이때부터 미국과 전세계에서 가장 인기 있는 개인용 SNS 업체로 자리매김하였다. 2011 년 10 월에 내부적으로 회람된 수치에 따르면, Facebook 은 미국에서 1 억 5 천 6 백만 명의 고유한 사용자들을 보유했으며, 서비스 방문자당 평균 이용 시간은 441 분에 달한다. 같은 시기 Myspace 는 미국에서 2 천 7 백만 명의 사용자를 보유했으며, 방문자당 평균 이용 시간은 10 분에 불과하다. 2011 년에 이르러 Facebook 은 자사의 광고 고객들에게 "Facebook 은 현재 미국 내 모든 소셜 미디어의 95%를 차지합니다"라고 자랑할 정도가 되었다.

44.    Facebook 의 플랫폼 정책은 회사의 성장을 촉진하는 데 도움이 되었다.

Facebook 플랫폼 및 Open Graph 이니셔티브가 공개된 이후 Facebook 은 크게 성장하여, 2010 년부터 2018 년까지 미국에서 매년 평균 1,000 만 명 이상의 월간 실사용자가 새로 가입하였다.

**D. Facebook 의 비즈니스 모델: 세부 사용자 데이터에 기반한 광고의 판매**

45.    개인용 SNS 를 수익화할 수 있는 방법은 여러 가지이지만, Facebook 은 자사 사용자의 개인 데이터를 채굴하고 행동 타겟팅 광고를 판매함으로써 제품을 수익화하기로 결정하였다.

46.    이러한 방식은 Facebook 에 막대한 수익을 안겨준다. 광고주들은 현재 Facebook Blue 및 Instagram 의 특정 사용자층에 자사 광고를 노출시키기 위해 수십억 달러(2020 년에는 약 미화 840 억 달러)를 지불하고 있다. Facebook 은 자사 사용자를 대상으로 수집된 방대한 양의 데이터를 분석하는 독점 알고리즘을 활용하여 이러한 '청중'에게 서비스를 제공한다. 광고주는 이를 통해 다양한 사용자 집단을 타겟팅하여 다양한 캠페인을 실시하고 메시지를 전달할 수 있다. Facebook 이 표시하는 광고는 사용자가 생성한 콘텐츠와 섞여서 노출되며, 이 둘은 외견상 유사할 수 있다.

47.    Facebook 은 개인용 SNS 가 제공할 수 있는 광고("소셜 광고")의 고유한 특성을 활용한다. 예를 들어, Facebook 의 COO 인 셰릴 샌드버그는 실적발표(earning call)에서 Facebook Blue 를 일컬어 "마케터가 전례 없는 규모로 메시지를 개인 맞춤화할 수 있게 해주는 세계 최초의 글로벌 플랫폼"이라고 설명했으며, Facebook Blue 와 Instagram 을 세계에서 "가장 중요한 양대 모바일 광고 플랫폼"이라고 지칭하였다.

48.    소셜 광고는 디스플레이 광고, 검색 광고 및 "오프라인" 광고(예: 텔레비전, 라디오 및 인쇄물)를 비롯한 다른 형태의 광고들과는 구별되는 특징이 있다.

49.    소셜 광고는 디스플레이 광고의 독특한 한 형태이다. 디스플레이 광고란 사용자가 웹사이트나 앱을 방문 또는 사용할 때 이미지, 텍스트 또는 비디오의 형태로 광고를

표시하는 것을 의미한다. 디스플레이 광고는 소비자가 온라인에 머무는 동안(스마트폰이나 태블릿과 같은 모바일 기기의 사용시간 등)에 소비자에게 다가갈 수 있는 기능을 제공하고, 대화형 광고가 가능하며, 온라인 상에서 생성되고 수집된 개인 데이터를 활용하여 사용자에게 풍부한 광고를 타겟팅할 수 있기 때문에, 텔레비전, 라디오 및 인쇄 광고와 같은 "오프라인" 광고와는 뚜렷이 구별된다. 디스플레이 광고는 사용자가 Google 이나 Bing 과 같은 온라인 검색 엔진에서 특정 키워드를 입력했을 때 화면에 표시되는 디지털 광고의 일종인 검색 광고와도 다르다. 광고주들은 특정 유형의 제품 또는 서비스에 대해 적극적으로 알아보고 있는 소비자를 타겟팅하기 위해 검색 광고를 구매한다. 이와는 대조적으로, 디스플레이 광고는 아직은 구체적 구매 의사가 없는 소비자를 포함하여, 검색 엔진에서 적극적으로 검색하고 있지 않은 사용자에게 노출된다.

50.      소셜 광고는 디스플레이 광고의 일종이지만, 개인용 SNS 가 아닌 여러 웹사이트와 앱에서 흔히 볼 수 있는 비 소셜 디스플레이 광고와는 여러 가지 면에서 구별된다. 예를 들어, 사용자가 고유한 사용자 인증 정보로 개인용 SNS 에 로그인해야 한다는 소셜 광고의 특성 덕분에, 광고주는 사용자의 개인적 관계, 활동, 신원, 인구통계, 관심사 및 취미와 관련한 개인 맞춤화된 데이터를 기반으로 사용자를 타겟팅할 수 있게 된다. 또한 소셜 광고는 높은 사용자 참여도와 접촉 빈도뿐만 아니라 각자의 인맥에 의해 생성된 사용자 콘텐츠 에 직접 통합된 형태의 광고('네이티브' 콘텐츠나 부스트 게시물 및 유사한 형태의 광고 포함)를 활용한다는 면에서 다른 웹사이트나 앱에 광고를 표시하는 경우와는 차별화된다. 나아가 소셜 광고는 사용자가 개인적인 관계를 이용하여 광고를 공유하거나 광고주의 페이지에 '좋아요'를 누르거나 팔로우하는 등, 다른 형태의 디스플레이 광고에서는 불가능한 형태의 광고 참여를 촉진할 수도 있다. 무엇보다도, 전술한 특징 덕분에 소셜 광고 업체는 선별적으로 타겟팅된 참여도 높은 '사용자층'에 대한 이용 권한을 광고주에게 판매하고, 광고된 제품이나 서비스를 적극적으로 검색하거나 별도로 인식할 필요조차 없는 사용자에게 다가갈 수 있다.

51.     샌드버그는 2012 년 실적발표에서 다음과 같이 강조하였다. "광고주를 찾는 문제에 대하여 말씀드리자면, 전에도 말씀드렸듯, Facebook 은 제 3 의 채널입니다. 우리는 TV 가 아니며, 검색 서비스도 아닙니다. 우리는 소셜 광고입니다." 특히 Facebook 은 그 규모, 높은 수준의 사용자 참여도, Facebook 자산의 안팎에서 사용자를 추적하여 결과를 측정할 수 있는 각종 기능을 활용하여 차별화된 방식으로 광고를 타겟팅할 수 있다.

52.     Facebook 이 사용자를 대상으로 수집하는 방대한 데이터 덕분에, Facebook 의 소셜 광고 비즈니스는 수익성이 유달리 높다. Facebook 의 공개 수익 보고서에 따르면, Facebook 은 "사실상 모든 수익이 마케터에게 광고를 판매함으로써 발생한다."

**E.     모바일 인터넷의 등장이 Facebook 에게 가져온 위협**

53.     2010 년부터 광범위하게 이루어진 스마트폰의 보급으로 인해 사용자의 기반이 데스크톱 컴퓨터에서 모바일 기기로 옮겨가는 등, 미국 내 소비자들이 디지털 서비스를 소비하는 방식에 상당한 변화가 일어났다. 2009 년 4 분기에는 미국 내 모든 이동통신 가입자의 21%만이 스마트폰을 사용하고 있었으며, 최근에 새로 휴대폰을 구입했던 고객의 30%만이 스마트폰을 선택하였다. 2012 년 2 분기가 되자, 미국 내 모든 이동통신 가입자의 55%가 스마트폰을 사용하고 있었으며, 새로 구매한 휴대폰 중 67%가 스마트폰이었다. 추산에 따르면 모바일 데이터 트래픽은 2011 년부터 2012 년까지 62% 증가했으며, 2012 년 무렵의 미국 내 모바일 데이터 트래픽 규모는 2007 년의 모바일 데이터 트래픽보다 약 73 배 더 커졌다.

54.     스마트폰으로의 전환은 새로운 비즈니스 기회를 열어주었다. 스마트폰은 무엇보다도 휴대가 간편하며 디지털 카메라가 내장되어 있다. Instagram 의 공동 창업자인 케빈 시스트롬(Kevin Systrom)이 스마트폰의 "가장 차별화된 특징"이라고 정의했던 기능, 즉 이동 중에도 사진을 찍고 공유할 수 있는 기능을 활용하려는 서비스들이 늘어나면서, 사진을

찍고, 공유하고, 댓글을 다는 일에 최적화된 모바일 앱을 통해 가족 및 친구들과 함께하는 온라인 네트워킹은 점점 더 인기를 끌게 되었다.

55.     모바일 시대에 편승하거나 이를 이용하여 데스크톱 기반의 기성 경쟁사에 도전하려는 기업은 즉시 행동에 나서야 하였다. 시스트롬이 설명했듯, "사람들은 데스크톱 환경에서의 컴퓨팅을 뒤로 하고 어디에서나 가능한 휴대폰 컴퓨팅으로 기꺼이 이동했습니다. 컴퓨팅 환경이 급속히 변화한 순간 짧은 기회가 찾아왔지만, 컴퓨팅을 위해 만들어진 서비스들은 충분한 규모로 모바일 환경에 대응하지 못했습니다." 시스트롬은 또한 다음과 같이 발언했다. "2009, 2010, 2011 년 무렵에는 모바일 회사를 창업할 경우 데스크톱 환경이 제공하는 사용자 경험을 모바일로 고스란히 옮길 수 있는 과도기적 기회가 많았습니다. 기존의 데스크톱 기반의 회사들이 충분히 빠르게 전환을 이루어내지 못했기 때문입니다." 2012 년에 시스트롬은 "모바일의 이점을 충분히 활용한 회사들이 앞서나가기 시작했고, 이에 뒤처진 회사들은 따라잡을 방법을 찾는 데 필사적이라는 점이 분명해졌다"고 설명하기도 하였다.

56.     스마트폰은 또한 (i) 단문 메시지 서비스 또는 멀티미디어 메시지 서비스 프로토콜(short-message-service or multimedia-message-service protocol, "SMS")을 통한 문자메시지, (ii) 인터넷 기반의 OTT (Over The Top) 모바일 메신저 앱을 통한 문자메시지("OTT 모바일 메시지 서비스") 등 모바일 메신저 시장의 폭발적인 성장을 불러왔다. SMS 의 데이터 전송량이 최고조에 달했던 2011 년부터 OTT 모바일 메시지 서비스의 데이터 규모는 천문학적인 성장세를 보였다. 2012 년 4 월에 이르면, 저커버그는 "메신저 앱은 사용자의 휴대폰에서 가장 중요한 앱"이라고 생각하게 되었다.

57.     WhatsApp 의 공동 창업자인 얀 쿰(Jan Koum) 역시 사람들이 전자기기를 사용하는 방식의 "근본적인 변화"를 목격하고 모바일 메신저에 초점을 맞추기로 하였다. WhatsApp 과 같은 스마트폰 기반의 OTT 모바일 메시지 서비스는 Facebook Blue 의 아성을

위협했다. OTT 모바일 메시지 서비스는 일반적으로 메시지당 수수료를 부과하지 않았으며, SMS 에 비해 강화된 콘텐츠 공유 기능(예: 사진, 비디오, 오디오 클립, GIF)과 고정 사용자 그룹을 생성할 수 있는 옵션 등의 여러 개선사항을 제공하였다.

58.      Facebook 은 스마트폰이 가져온 모바일 환경에 대응하기 위해 모바일 기기에서도 Facebook Blue 를 제공했지만, 모바일 기기 상에서의 Facebook Blue 의 초반 성능은 부족하였다. Facebook 은 2007 년 1 월에 최초의 Facebook Blue 모바일 웹사이트를, 2008 년 7 월에 최초의 Facebook Blue iPhone 네이티브 앱을, 2009 년 9 월에 최초의 Facebook Blue Android 네이티브 앱을 출시하였다. iPhone 용 Facebook Blue 의 발표 소식이 담긴 게시물에서 해당 앱의 담당 엔지니어는 "iPhone 용으로 구축된 애플리케이션은 웹사이트용보다 더 많은 기술을 이용할 수 있습니다. 예를 들어, 네이티브 애플리케이션을 사용하면 iPhone 의 카메라로 사진을 찍어 바로 업로드할 수 있습니다"라고 강조하였다. 그러나 2010 년이 되자 Facebook 은 웹 브라우저용으로 설계된 페이지에 사용되는 언어인 HTML 로 네이티브 애플리케이션을 재작성하기로 결정하였다. Facebook 이 Faceweb 이라고 불렀던 이러한 노력은 Facebook 의 모바일 버전을 개선하지 못했으며, 2011 년 6 월 기준 iPhone 용 Facebook Blue 에 대한 사용자 평점은 역대 가장 낮은 수준인 별 2 개에 불과하였다. 저커버그는 훗날 HTML 로 코드를 작성하기로 한 결정이 "회사로서 우리가 저지른 가장 큰 실수"였다고 털어놓았다.

59.      2011 년 말, 저커버그와 다른 임원들은 Facebook Blue 가 모바일 사용자에게는 상대적으로 좋지 못한 경험을 제공했으며, 이로 인해 Facebook 의 독점적 지위가 그 어느 때보다 취약해졌다는 것을 깨달았다. 여기에 더해 Facebook 은 기존의 소셜 광고 모델을 모바일 환경으로 이식하는 데 어려움을 겪고 있었다. 모바일로의 전환으로 인해 Facebook 은 화면에 광고가 표시되는 형태를 바꿔야 했고, 저커버그는 이를 "광고가 작동하는 방식을 전면 개편해야 했습니다"라는 말로 설명하였다.

60.     이러한 연속적인 실패를 감안할 때, Facebook 은 혁신적인 방식으로 사용자들을 연결하고 휴대폰의 사진이나 메시지 기능을 적극 활용하는 모바일 우선 전략의 경쟁사들이 새로 등장하여 주목을 받고 있는 상황 때문에 자신들의 개인용 SNS 시장에서의 독점적 지위와 엄청난 광고 수익이 위협받게 된다는 점을 충분히 두려워할 만하였다. 그러한 시장진입자는 Facebook 의 광고 수익의 상당 부분을 가져갈 수 있었다. 인기 제품을 출시할 수 있는 역량을 갖춘 경쟁사라면 모바일 사용자의 풍부한 행동 데이터를 확보할 수 있을 것이며, 이는 모바일 성능으로 고전 중인 Facebook 은 시도할 수 없는 일인 것이다. 사용자의 신원, 행동, 위치 등 개별 사용자에 대한 세분화된 정보를 기반으로 광고를 타겟팅하려는 노력을 확대하고 있었던 Facebook 에게는 이러한 종류의 데이터가 절실히 필요한 상황이었다. Facebook 이 자신들의 사용자 기반에서 수익을 창출하려면 가장 광고 효과가 높은 개인을 타겟팅해야 하였다. 또한 Facebook 은 사용자 활동에 관한 임계 분량 이상의 데이터 없이는 어떤 사용자에게 어떤 광고가 가장 효과적일지를 판단할 수 없었다. 게다가 경쟁사가 광고 없는 비즈니스 모델을 제공할 가능성도 있었으며, 이는 Facebook 이 사용자의 관심을 이용해 수익을 창출할 여지를 약화시킬 수 있다. 특히 WhatsApp 의 경우, 무광고 비즈니스 모델을 기반을 고속 성장 중인 OTT 모바일 메신저 앱으로 떠올랐다(Facebook 이 인수하기 전).

61.     Facebook 은 평균을 밑도는 모바일 성능에도 불구하고 시장 지배력을 이어나가기 위해, "커다란 기술적 위험"을 떠안고 "모바일에서의 성능을 위해 [앱의] 모든 코드를 처음부터 새로 작성하는 수년간의 프로젝트"에 착수하였다. 그러나 Facebook 은 자체적으로 부족한 모바일 성능을 개선하는 데 걸리는 기간 동안에 경쟁자가 나타나 자신들의 시장지배적 지위와 막대한 광고 수익을 위협할 수도 있다는 가능성을 용납할 수 없었다. 자사 제품의 장점을 바탕으로는 독점을 유지할 수 없다는 것을 깨달은 Facebook 은 자신들의 시장지배적 지위를 방어하기 위해 경쟁제한 조치를 동원하여 모바일로의 전환과 관련한 '위험 제거(derisk)'를 시도하게 되었다.

**F. 장기간에 걸쳐 잠재적 경쟁사와 잠재적 경쟁사의 조력자들을 인수하는 데 집중해온**

    **Facebook**

62.      2010 년~2014 년에 걸쳐 진행된 스마트폰의 보급과 모바일 인터넷으로의 전환은 사용자가 소셜 네트워킹 등의 디지털 서비스를 소비하는 방식을 근본적으로 변화시켰다. 이렇게 급변하는 과도기에는 새롭고 민첩한 스타트업이 기술과 사용자 행동의 이 같은 변화들을 신속하게 활용하는 데 있어 Facebook 보다 유리한 위치를 점할 수 있다는 위험이 상존한다.

63.      이러한 위협에 대처하는 한 가지 방법은 과도기 동안에 Facebook 의 우월적 지위를 위협할 수 있는 스타트업을 모두 인수하는 것이다. 혁신적인 작동기제를 선보이는 위협적인 경쟁사를 사들이는 것은, 지배적인 지위에 있으나 모바일 인터넷으로의 전환과 같은 혼란기를 겪고 있는 기성 업체에게 특히 매력적인 방안이다. 자사의 제품을 새로운 모바일 환경으로 전환하려는 과정에서 실패를 거듭했던 Facebook 의 경우 이러한 측면에 더욱 부합하였다.

64.      Facebook 에게는 기업인수를 통해 시장독점력을 유지하는 것이 자연스러운 선택이었다. Facebook 에는 저커버그의 2008 년 6 월 내부 이메일의 표현대로 "경쟁하는 대신 경쟁사를 구매하자"라는 뿌리깊은 기조가 있었으며, 회사는 이러한 견해를 반영하여 경쟁보다는 인수를 통해 지배력을 달성하고 유지하기 위해 오랫동안 노력해 왔다. Facebook 의 인수 전략은 잠재적 경쟁사의 성장을 막는 데 초점을 맞추는 경우가 많았다. 예를 들어, Facebook 이 2008 년에 Twitter 인수에 실패했을 때 저커버그는 다음과 같이 밝혔다. "저는 우리 제품의 재정비에 나설 수 있는 추가적인 시간이 주어지기를 바라고 있었습니다." 또한 Snapchat 이 회사의 경쟁력을 강화할 수 있는 자금력이 풍부한 다른 인수자를 만나게 될 가능성이 있다고 판단한 Facebook 은 발 빠르게 움직이면서 수년간 여러 번에 걸쳐 Snapchat 에 인수를 제안해 왔다.

65.    개인용 SNS 의 주된 특징은 강력한 네트워크 효과이다. 사용자들은 일반적으로 자신의 친구와 가족 중 더 많은 사람이 해당 서비스를 사용 중일 때 특정 SNS 업체의 서비스를 더욱 가치 있게 여긴다. 어떤 개인용 SNS 가 일단 지배적인 규모를 달성하고 나면 이러한 효과는 경쟁과 시장진입을 더 어렵게 만들며, 이는 사용자들이 경쟁사 제품의 품질을 더 높게 평가하고 있는 경우에도 마찬가지이다.

66.    따라서, Facebook Blue 에 가장 큰 경쟁상의 위협은 사용자에게 우수한 "작동기제(mechanic)"(즉, 사진 공유와 같이 친구 및 가족과 상호작용하는 특색 있는 방식)를 제공함으로써 사용자 기반을 빠르게 확대할 수 있는 차별화된 제품에서 나올 가능성이 높았으며, Facebook 도 이를 잘 알고 있었다. 혁신적인 시장진입자의 사용자 기반 확대에 이은 네트워크 효과 실현을 막기 위한 Facebook 의 전략은 혁신 기업을 인수하는 작업, 그리고 가능한 경우 그들의 제품을 자사의 경쟁력과 관련한 '해자(moat)'의 중요한 일부로서 변모시키는 작업으로 구성된다. 저커버그는 Instagram 인수를 지지하는 2012 년 2 월의 이메일에서 이러한 전략을 명확하게 설명한 바 있다. "소셜 제품에는 네트워크 효과가 적용되며, 고안 가능한 소셜 작동기제의 종류에는 한계가 존재합니다. 누군가가 특정 작동기제로 성공을 거두었다면 새로운 무언가 없이 다른 업체들이 이를 대체하기는 어렵습니다. 네트워크 이주가 발생할 정도로 더 뛰어난 무언가를 만들어냄으로써 Instagram 을 능가하는 업체가 나올 수는 있겠지만, *Instagram 이 하나의 제품으로서 계속 서비스되는 한 이는 쉽지 않은 일입니다.*" (강조표시 추가됨.)

67.    다음과 같은 저커버그의 인식대로, Facebook 은 단지 확장성이 유망한 회사를 인수함으로써 자사의 혁신 실패를 벌충하고 미래의 위협에 미리 손쓸 수 있었다. "우리가 실제로 구매하는 것은 시간이라고 볼 수도 있습니다. 몇몇 새로운 경쟁사들이 생겨나더라도, Instagram, Path, Foursquare 등을 지금 사들일 경우 누군가가 다시 그 정도 규모에 가까워지기 전에 이들의 혁신을 흡수할 시간을 1 년 이상 벌 수 있게 되죠. 우리가 이 기간 안에 그들이

사용하던 소셜 작동기제를 내재화할 경우, *Facebook 이 이미 해당 작동기제를 대규모로 구현해놓은 상태가 되므로 이러한 신제품들의 매력은 크게 떨어지게 됩니다.*" (강조표시 추가됨.)

68.    Facebook 은 잠재적 경쟁사가 스스로 성장하거나 다른 Facebook 경쟁사의 탄생을 돕기 전에 경쟁 위협을 선제적으로 제거할 목적으로 이러한 업체들을 조기에 발견하기 위해 오랫동안 노력해 왔다.

69.    스스로 "모바일 업계에서 가장 종합적인 시장 인텔리전스 서비스"임을 내세웠던 Onavo 를 Facebook 이 2013 년에 인수한 것은 위협을 조기에 발견하려는 Facebook 의 노력을 잘 보여주는 사례이다. Onavo 는 안전한 가상 사설 네트워킹 서비스를 제공한다고 홍보했지만, 이는 사용자들 모르게 그들의 온라인 활동을 추적하는 기능을 포함했다. Facebook 은 빠른 성장세로 Facebook 에서 사용자를 빼갈 가능성이 있는 서비스를 식별하는 데 사용자 감시가 유용함을 깨달았고, 따라서 Onavo 는 "인수 대상 기업 식별 용도로 꼭 알맞은" 업체였다.

70.    Facebook 은 2013 년 10 월에 Onavo 를 미화 1 억 4 천만 달러에 인수했으며, 그로부터 며칠 후 Onavo 의 비즈니스 고객들은 기존 서비스에 대한 이용 권한이 6 일 후에 종료된다는 통보를 받았다. 이로써 Facebook 의 잠재적 경쟁사들이 Onavo 의 서비스를 통해 Facebook 에 맞서 함께 파트너십을 맺거나 인수를 진행할 수 있는 대상 기업을 찾아낼 가능성은 좌절되었다. 서비스 이용이 막힌 Onavo 고객들은 불만을 표시하였다.

71.    Facebook 은 Onavo 를 인수함으로써 다른 앱의 성장세와 인기를 측정하는 데 유용한 데이터에 대한 통제권을 확보하는 동시에 잠재적 경쟁사의 그 이용을 막았다. 2013 년 12 월의 Facebook 내부 슬라이드에는 다음과 같이 나와 있다. "우리는 Onavo 를 인수하면서 인기 앱들에 대한 인사이트를 얻게 되었음. 앞으로의 전략적 인수 작업을 위해서도 이를 적극 활용해야 함." Facebook 은 Onavo 의 데이터를 활용하여 Facebook 경영진을 위한 내부용

'조기 대응(Early Bird)' 보고서를 작성했으며, 이는 "모바일 에코시스템에서 눈에 띄는 속도나 방식으로 두각을 나타내고 있는 앱"에 초점을 맞추었다.

72.     Facebook 은 Onavo 의 데이터를 활용하여 WhatsApp 을 비롯한 인수 대상 기업들을 식별했고, 저커버그가 Instagram 인수와 관련하여 언급했던 기조, 즉 유사한 작동기제로 성장을 꾀하려는 타사의 시도를 좌절시키기 위해 잠재적 경쟁사를 사들여서 해당 작동기제를 선제적으로 배포하는 전략을 실행에 옮겼다. 일례로 Facebook 은 출시 후 단 9 주만에 250 만 명의 일일 실사용자를 확보한 설문조사 앱인 'tbh'를 인수 대상으로 파악하는 과정에서 Onavo 를 활용한 것으로 알려졌다. 2017 년 인수 당시 tbh 는 십대들에게 선풍적인 인기를 끌었고 빠르게 성장 중이었다. Facebook 은 처음에는 tbh 를 별도의 브랜드로 유지할 계획을 발표했지만, 결국에는 서비스를 중단했다.

73.     Facebook 은 2019 년의 대외적 논란 이후로 Onavo 를 운영 중단했지만, 다른 종류의 데이터를 활용하여 여전히 잠재적인 경쟁 위협을 추적 및 평가하고 있다.

74.     Onavo 의 모바일 데이터가 잠재적 위협을 식별하고 제거하는 Facebook 의 능력에 날개를 달아주기는 했지만, Facebook 은 Onavo 인수 이전에도 오랫동안 동일한 기본 전략을 실행해 왔다. 예를 들어, 2008 년에 Facebook 은 Octazen 이라는 회사로부터 연락처 가져오기 서비스의 라이선스를 획득하였다. 연락처 가져오기 서비스는 사용자의 디지털 주소록에서 연락처를 쉽게 가져와 앱에서 활용할 수 있게 함으로써 직접적인 네트워크 효과 발생 시 꼭 필요한 연락처 네트워크의 빠른 확장을 촉진해주는 역할을 한다. 머지않아 Facebook 은 Octazen 을 인수하면 사용자 기반 확대와 참여에 '핵심'인 이 기능에 대한 경쟁사들의 사용을 차단할 수 있음을 깨달았다. Facebook 의 한 임원은 이를 두고 "[Octazen 인수를] 통해 우리는 . . . 업계의 다른 누구도 연락처 가져오기 라이브러리를 활용할 수 없게 만들 [원문표기] 수 있다"라고 언급하였다. 인수 논의 과정에서 Facebook 의 임원들이 초점을 맞춘 부분은 Octazen 이 Facebook 에 가져다 줄 이점이 아니라, 기업인수를 통해 사용자

상호작용 증대와 네트워크 효과 창출에 필수적인 기능을 경쟁사로부터 박탈하는 것이었다. Facebook 의 또 다른 임원은 이러한 역학을 두고 Octazen “인수 시 *단 몇 백만 달러로 경쟁사들의 성장을 한두 분기 동안 저지할 수 있다*는 점에서 흥미롭다. . .”고 표현한 바 있다. 2010 년 2 월에 인수 작업을 완료한 직후 Facebook 은 Octazen 에 대한 타사의 이용을 전부 차단하였다.

75.    비슷한 예로, 2012 년에 Facebook 은 Google 이 자사가 새롭게 선보인 Google+ 개인용 SNS 의 성장을 견인해줄 수 있는 특정 신개발 ‘소셜 디스커버리(social discovery)’ 앱을 놓고 “적극적인 구애”를 하고 있음을 알게 되었다. Glancee 라는 이 앱은 사용자의 위치정보를 활용하여 새로운 사람들과의 만남을 도와주었다. 이때도 Facebook 은 Glancee 를 인수한 즉시 운영 중단하고 30,000 명의 Glancee 사용자에게 서비스 중지를 통보하였다. 그로부터 2 년 후 Facebook 은 Glancee 의 기술을 활용한 Facebook Blue 용 위치 기반 기능을 출시했지만, 이는 오직 사용자의 기존 Facebook 친구가 근처에 있을 때만 알림을 제공하는 축소된 형태로 서비스되었다.

76.    또 다른 예로, Facebook 은 증강현실 효과로 뮤직비디오를 제작하여 공유할 수 있게 해주는 앱인 EyeGroove 에 Snapchat 등의 경쟁사가 관심을 보였음을 알게 되자 2016 년에 이를 재빨리 인수한 다음 운영 중단하기로 결정하였다.

## V.   Facebook 의 경쟁제한 행위

77.    모바일 전환 과정에서의 ‘위험 제거’를 위한 Facebook 의 노력은 새로운 모바일 환경에서 Facebook 을 뛰어넘을 수 있는 위협적인 혁신 기업을 인수하거나 폐업시킨다는 전략을 중심으로 이루어졌다.

78.    Facebook 이 개인용 SNS 업계에서 나름의 존재감을 구축한 Instagram 을 인수하여 지속적인 통제 하에 둠으로써 무력화한 것, WhatsApp 을 인수하여 지속적인 통제

하에 둠으로써 Facebook 의 개인용 SNS 시장 독점에 대한 주요 경쟁 위협을 제거한 것 등은 Facebook 의 경쟁제한적 행동 방침의 결과였다. 이런 식으로 위협적인 경쟁사들을 사들인 Facebook 은 능률경쟁이 아닌 경쟁의 회피를 통해 자신들의 우월적 지위를 유지함으로써 경쟁 환경과 사용자들에게 피해를 입혔다.

79.     자사의 플랫폼과 상호 운용하는 회사와의 계약에 조건부 거래 정책을 포함시킨 것 역시 Facebook 의 행동 방침의 결과이며, Facebook 은 이러한 조건들을 앞세워 플랫폼에 대한 이용 권한을 무기화하였다. Facebook 은 조건부 계약의 효력을 발생시킨 다음, 각종 잠재적 위협을 잠재우고 경쟁사에 의한 시장독점력 약화를 막기 위해 필요할 때마다 동 조건을 집행하였다.

**A. Instagram 및 WhatsApp 의 인수를 포함하여, 시장지배적 지위의 방어를 위해 경쟁제한적 기업인수를 일삼은 Facebook**

*1. 경쟁사의 무력화가 목적이었던 Facebook 의 Instagram 인수*

80.     모바일 환경에 특화된 Instagram 은 Facebook 의 우월적 지위에 심각한 위협이 되고 있었다. 2010 년 10 월에 iOS 용 버전이 출시된 이후, Instagram 은 친구 및 가족과의 사진 공유 위주의 간편한 소셜 상호작용 서비스를 원했던 사용자층을 대상으로 빠르게 인기를 얻었다.

81.     Instagram 의 성장세는 눈부셨다. 첫날에만 25,000 명의 사용자가 몰려들었으며, 일주일 만에 10 만 명, 3 개월 안에는 100 만 명, 1 년 안에는 1,000 만 명의 사용자를 확보했다. 이 당시에 Instagram 은 아직 Android 용 버전이 출시되지도 않은 Apple 의 iOS 기기 전용인 상황이었다.

82.     Instagram 의 부상을 바라보는 Facebook 의 불안감은 가중되었다. 2011 년 2 월, 저커버그는 동료들에게 다음과 같이 전달하였다. "이들은 4 개월 만에 2 백만 명의 사용자와 30 만 건의 일일 사진 업로드를 기록했습니다. 엄청난 수치죠. 우리는 이를 면밀히 추적해야 합니다."

83.     처음에는 Facebook 도 자체적인 카메라 앱(코드명 "Snap")의 개발에 상당한

자원을 투입하는 등 모바일 사진 공유 기능을 보강하면서 능률경쟁을 시도하였다. 그러나 고위 경영진의 끊임없는 압박에도 불구하고 이러한 노력의 성과는 제한적이었다. 2011 년 7 월, 한 임원은 다음과 같이 다그쳤다. "모바일용 사진 앱 개발의 진척이 왜 이렇게 더딥니까? Instagram 은 지금도 치고 올라오고 있습니다." 2011 년 9 월이 되자 저커버그는 이렇게 한탄하기도 하였다. "우리가 이에 대응하려 애쓰느라 허비한 시간 동안 Instagram 은 이미 모바일 사진 기능에서 우리의 막강한 경쟁자로 떠올랐으며, 점점 더 사진 기능 분야를 주도해가고 있습니다."

    84.    사진이 Facebook Blue 의 각종 기능들의 인기에 있어 핵심 요소라는 점과 Facebook Blue 의 전반적인 점유율 역시 결국은 이에 좌우될 것임을 인식한 저커버그는 2011 년 9 월의 이메일에서 Instagram 이 제기한 위협의 심각성을 다음과 같이 경고하기도 하였다.

> *News Feed, Timeline, Open Graph 등 우리가 곧 출시할 많은 제품들을 관통하는 한 가지 테마는 사람들이 큼직한 사진을 좋아한다는 것입니다.* 새로운 News Feed 나 Timeline 의 작동 방식에는 전혀 관심이 없는 경우도 많지만, 사람들은 더 크고 풍부한 사진들을 볼 수 있어서 이러한 제품들을 좋아합니다. 이는 단기적으로는 도움이 되지만, *저는 우리가 사진 기능을 완전히 주도하지 못한다면 이로 인한 전략적 위험 역시 아주 크다고 생각합니다. Instagram 이 모바일에서 계속 치고 올라오거나 Google 에 인수될 경우, 그들은 향후 몇 년에 걸쳐 우리가 지금 하고 있는 것들을 모방한 각종 서비스를 쉽게 추가할 수 있으며, 사람들의 사진 업로드 건수가 늘어날수록 이는 우리에게 정말 문제가 됩니다.*
>
> *그들은 현재 무서운 속도로 성장하고 있습니다. 거의 한두 달마다 두 배씩 커지고 있는 수준이고, 사용자 기반이 이미 500~1,000 만 명에 달합니다.* 우리가 매력적인 제품을 빠르게 출시한다면 많은 사람들이 우리 제품을 더 선호할 것이고, Instagram 을 사용할 만한 이유는 갈수록 줄어들 것입니다. 그러나 현재의 추세를 놓고 보면, *말 그대로 우리가 한두 달을 허비할 때마다 Instagram 의 성장은 두 배가 되고 있고, 우리가 이를 헤쳐나갈 수 있는 여지는 점점 줄어들고 있습니다.* (강조표시 추가됨.)

    85.    Facebook 직원들은 저커버그의 요구에 맞추기 위해 서둘러야 했다. 2011 년 9 월

13 일자 내부 이메일에서 Facebook 의 엔지니어링 담당이사는 자신의 팀원들에게 다음과 같이 상기시켰다. "저커버그 대표님이 (주로 Instagram 의 성장세를 꺾고자 하는 욕구로 말미암아) [Facebook] Snap 앱 때문에 불안해 하십니다."

86.     Facebook 의 경영진은 Instagram 이 독립적으로 운영되는 경우뿐만 아니라, Google (상기 2011 년 9 월 이메일에서 저커버그가 이를 언급함), Apple 또는 Twitter 와 같은 다른 인수기업의 통제 하에서 운영되는 경우 역시 두려워하였다. 2012 년 4 월, Facebook 의 한 엔지니어는 저커버그에게 "Apple 과 같은 누군가가 [Instagram]을 도약의 발판으로 삼을 가능성"에 대해 경고하였다. 또한 Instagram 의 투자자이면서 Facebook 의 전직 임원으로서 "Twitter 와 Instagram 이 [원문표기] 하나의 회사가 된다면 Facebook 의 어려움은 가중될 것"이라며 Twitter 로부터의 위협을 강조한 사람도 있었다.

87.     Instagram 의 인기가 치솟자 Facebook 의 경영진은 이들과 경쟁하기보다는 차라리 인수해버리는 방안에 집중하기 시작하였다. 예를 들어, 2012 년 1 월에 Facebook 내부의 인수 및 합병("인수합병") 팀 책임자는 사용자의 전환 비용을 늘리고, 참여율을 유지하며, 사용자를 Facebook Blue 에 붙잡아두기 위해서는 "인수합병"이 하나의 해결책일 수 있다는 다음과 같은 의견을 저커버그에게 전달하였다.

> [제가] 생각할 때 특히 모바일과 연동된 사진 기능은 우리의 약점에 해당하지만, 이는 많은 Facebook 사용자의 주된 참여 방식이기도 합니다. 그래서 이는 심각한 위협(Google/Picasa/Android, Instagram 등)인 동시에 중요한 기회일 수도 있습니다. . . . 사진 기능(종합/스마트 연락처 및 통합형 메신저와 결합된)이야말로 사용자의 전환 비용을 현저히 높일 수 있는 가장 중요한 방법일 거라고 말씀드리고 싶습니다. 만약 Facebook 이 업계 최강의 업로드 [원문표기](모바일 및 웹), 편집, 정리, 공유 기능을 제공하고 있어서 사용자가 자신의 모든 사진을 이곳에 저장해 두었다면, 그러한 사진들과 관련 데이터/댓글까지 옮길 수 없는 상황에서는 전환을 결심하기가 매우 어려울 것입니다. 저는 특히 현재의 경쟁 역학을 고려할 때 우리가 인수합병 등의 방법으로 조직 차원에서 이 분야에 집중해야 한다고 생각합니다. (강조표시 추가됨.)

88.     2012 년 2 월, 저커버그는 독립 운영되는 Instagram 이 머지않아 대규모 사용자

기반을 확보하게 될 것이라고 예상하면서 Facebook 이 인수에 나서야 한다고 다음과 같이
제안하였다.

> 만약 [저의 분석] 프레임워크가 정확하다면, Instagram 과 같은 앱이 상당한 규모까지
> 성장할 수 있을 것으로 봐야 합니다. 현재 그 사용자 수가 1,500 만 명이라면, 향후
> 1~2 년 이내에는 1 억~2 억 명에 도달하게 되겠죠. (이는 무리한 예측이 아닌 것이, 향후
> 1 년간 iOS 버전이 2 배 커지고 이는 Android 버전에서도 똑같을 것이므로,
> 시장점유율이 추가로 늘어나지 않더라도 올해에는 최소한 4 배의 성장이 예상됩니다.)
> 이러한 가정이 실현될 경우, 우리는 아마도 이러한 회사들을 인수하는 방안을 지금보다
> 긍정적으로 고려해야 할 것입니다. (강조표시 추가됨.)

89.     이 기간 동안 저커버그는 Instagram 이 개인용 SNS 시장의 경쟁사로서 제기하는
위협과 관련하여 기업인수의 정당성을 반복적으로 설명하였다. 2012 년 2 월, 그는 다음과
같이 썼다.

> Instagram 인수 비용이 5 억 달러에 육박한다고 해도 인수에 나서야 할지 고민입니다. . .
> 네트워크 부문의 경우, 기술 문외한인 고등학교 친구들로부터 Facebook 직원까지도
> 포괄하는 엄청난 수의 사용자가 매일 Instagram 을 사용하고 있다는 것, 그리고 이들이
> Facebook 에 업로드하는 사진은 일부에 불과하다는 추세가 우려됩니다. 이는
> Facebook 에 큰 문제를 야기하며, 이 문제는 우리가 플랫폼이나 소셜 역학을 통해
> 아무리 노력한다 한들 완전히 해소될 것 같지는 않습니다.[원문표기] 한꺼번에 많은
> 사진을 올려서 Facebook 의 친구들을 성가시게 하고 싶지 않아서 사진 게시용 장소에
> 대신 올려두는 사람들이 많습니다. 우리가 [Facebook] Snap 을 만든 것은 Facebook 에
> 대량의 사진을 게시할 수 있는 좋은 방법을 모두가 원한다는 생각에서였습니다. 현재는
> 필터 기능을 손보고 있지만 대단한 작업은 아니며, 개발팀은 이를 그저 있으면 좋거나
> 간단한 추가 기능 정도로 여기고 있습니다. 반면에 Instagram 은 어떻게 하면 누구나
> 아름다운 사진을 찍게 될 수 있을지 고민하는 관점에서 이 문제에 접근합니다. 저는
> 우리의 전제가 틀렸고 Instagram 의 접근법이 맞을 가능성이 높다고 생각합니다. 즉,
> 사람들이 바라는 것은 최고의 사진을 찍는 일이지, Facebook 에 올릴 걱정은
> 나중이라는 것이죠. 제 생각이 맞다면, [Facebook] Snap 이 좋은 출발점일 수는
> 있더라도 우리는 Facebook 의 핵심 활용법이 모바일 환경에서 어떻게 진화할 것인지와
> 관련하여 기능과 브랜드 측면 모두에서 매우 뒤처지게 될 것입니다. 이는 정말 무서운
> 일이며, 우리는 그래서 이 문제의 해결에 막대한 지출을 검토하고 있습니다. (강조표시
> 추가됨.)

90.     같은 달 말, 저커버그는 당시 Facebook 의 최고재무책임자(Chief Financial Officer, "CFO")였던 데이비드 에버스만(David Ebersman)에게 다음과 같이 비슷한 취지를 전하였다.

최근에 제가 고민 중인 비즈니스 질문 중 하나는 [원문표기] *우리 제품과 경쟁 관계에 있는 네트워크를 구축 중인 Instagram 이나 Path 와 같은 모바일 앱 회사*를 인수하는 데 얼마를 지불하는 것이 적절한지입니다. 이러한 회사들의 공통된 특징은 수백만 명의 사용자(Instagram 의 경우 현재 최대 약 2 천만 명)가 있고, 성장세가 빠르며, 조직 규모가 작고(직원 10~25 명) 아직은 수익이 전무하다는 것입니다. 아직은 신생 회사들이지만 *네트워크는 확보되어 있고, 브랜드 가치도 이미 유의미한 수준이며, 회사 규모를 크게 확장하기만 하면 우리에게 매우 큰 지장을 줄 수 있습니다.* 이 기업가들은 현재 판매 의사가 없지만(우리의 성공 [사례를] 참고하여), 5 억에서 10 억 달러 수준의 높은 가격을 제시하면 판매를 고려할 것입니다. 현재 Facebook 의 밸류에이션이 상당히 높은 수준이고 *우리가 모바일에 취약하다는 점*을 감안할 때, 두 회사 모두 또는 하나만 인수를 검토하는 것이 좋을지 궁금합니다. 이에 대해 어떻게 생각하십니까? (강조표시 추가됨.)

91.     에버스만은 "다른 누군가가 즉시 그 자리를 대체할 것"이며 "발목을 잡으려는 도전자는 항상 있게 마련"이라는 점을 들면서 신생 경쟁사를 인수할 만한 이유가 충분치 않다고 경고하였다. 그러나 저커버그의 다음과 같이 에버스만의 생각에 동의하지 않았다.

이는 결국 (1) [*요컨대, 잠재적 경쟁사의 무력화*] 와 (3) [*인수한 제품의 Facebook 과의 통합*] 의 조합에 관한 문제입니다. 이러한 회사들을 인수한 다음에는 일단은 서비스를 한동안 유지하면서 그들이 구축한 소셜 역학을 우리 핵심 제품에 통합해 나간다는 것이 기본적인 계획입니다. 여기서 [*잠재적 경쟁사의 무력화*] 가 더욱 합리적으로 다가오는 한 가지 이유를 들자면, 소셜 제품에는 네트워크 효과가 적용되며, 우리가 고안할 수 있는 소셜 작동기제의 종류에는 한계가 존재합니다. 누군가가 특정 작동기제로 성공을 거두었다면 새로운 무언가 없이 다른 업체들이 이를 대체하기는 어렵습니다. 네트워크 이주가 발생할 정도로 더 뛰어난 무언가를 만들어냄으로써 Instagram 을 능가하는 업체가 나올 수는 있겠지만, Instagram 이 하나의 제품으로서 계속 서비스되는 한 이는 쉽지 않은 일입니다. [*인수한 제품의 Facebook 과의 통합*] 도 한 가지 고려 요소이지만, 실은 우리도 이러한 기업들의 소셜 역학을 이미 파악하고 있으며 향후 12~24 개월에 걸쳐 어차피 이를 통합할 예정입니다. 통합 계획에는 가능한 경우 그들의 제품을 직접적으로 통합하기보다 그 작동기제를 우리 제품에 내재화하는 과정이 포함됩니다.

(1)과 (3)의 조합을 통해 우리가 실제로 구매하는 것은 시간이라고 볼 수도 있습니다. *몇몇 새로운 경쟁사들이 생겨나더라도, Instagram, Path, Foursquare 등을 지금 사들일 경우 누군가가 다시 그 정도 규모에 가까워지기 전에 이들의 혁신을 흡수할 시간을 1 년 이상 벌 수 있게 되죠. 우리가 이 기간 안에 그들이 사용하던 소셜 작동기제를 내재화할 경우, Facebook 이 이미 해당 작동기제를 대규모로 구현해놓은 상태가 되므로 이러한 신제품들의 매력은 크게 떨어지게 됩니다.* (강조표시 추가됨.)

92.      2012 년 3 월 9 일, 저커버그는 Facebook 의 엔지니어링 상무(이후 최고기술책임자로 승진)인 마이크 슈뢰퍼(Mike Schroepfer)에게 이메일을 보내 "어제 Instagram 의 케빈 [시스트롬]의 연락을 받고 그의 [회사]를 우리에게 판매하는 것에 대해 논의했습니다. 5 억 달러 또는 그 이상을 생각하고 있다고 말했습니다"라고 알렸다. 슈뢰퍼는 "사진 기능에서의 전략적 지위 보장은 많은 돈을 들일 가치가" 있다고 대답하였다.

93.      비슷한 예로, 2012 년 4 월 4 일에 샌드버그와 다른 고위 관리자들은 Instagram 과 Facebook Blue 의 iPhone 에서의 사용량을 비교한 이메일 보고서를 받았는데, 여기에는 "Facebook 이 iPhone 상에서 [Instagram 보다] 그다지 앞서고 있지 않다"고 강조되어 있었다. 샌드버그는 다음 메시지와 함께 저커버그에게 해당 이메일을 전달하였다. "이를 보니 Instagram 을 더 원하게 [되었습니다.]"

94.      한편, Facebook 의 직원들은 Facebook Blue 네트워크를 위한 독립형 사진 공유 앱을 개발하여 Instagram 과 경쟁하기 위한 노력을 이어갔다. 2012 년 4 월 3 일자 이메일에서 슈뢰퍼는 Facebook 의 한 엔지니어에게 자체 사진 앱과 관련하여 다음과 같은 점을 상기시켰다. "우리는 당장 배포 모드로 전환해야 합니다. [Instagram]의 최근 수치들을 보셨는지 모르겠지만, 우리에게는 시간이 많지 않습니다." 해당 엔지니어는 다음과 같이 답하였다. "네, 무시무시한 수치더군요. 하루빨리 전환해야 하겠습니다. 출시 모드에 들어갈 거라고 팀원들에게 알리겠습니다."

95.      2012 년 4 월 9 일, Facebook 은 Instagram 을 미화 10 억 달러에 인수하기로 합의했다고 발표하였다. 이는 당시 기준으로 Facebook 의 최고액 인수건에 해당하였다.

Facebook 은 Instagram 이 자신들의 독점적인 지위에 제기했던 위협을 감안하여 Instagram 에 프리미엄을 지불하였다. 같은 날, 저커버그는 위협이 억제된 것을 축하하면서 동료에게 다음과 같이 사적으로 털어놓았다. "우리를 위협하는 대상은 Google+가 아닌 Instagram 이라고 내부 게시물에서 주장하셨던 기억이 납니다. 그 말씀이 옳았습니다. 그러나 인수가 가능한 경우가 많다는 것이 스타트업의 특징이기도 하죠."

96.     한편, Facebook 직원들도 인수를 통한 회사의 위기 극복을 축하하였다. 예를 들어, 발표 이틀 후인 2012 년 4 월 10 일에 Facebook 의 내부 인수합병 팀 책임자는 에버스만에게 보낸 이메일에서 Instagram 이 "현 시대 소셜 네트워킹의 주요 원칙에 해당하는 분야(사진)뿐만 아니라 소셜 네트워킹의 미래가 향하는 곳(모바일)에서도 훌륭한 성과를 거두었습니다"라고 강조하였다. 그는 "이들의 성장세는 꽤 놀랍습니다. 마크가 어제의 방문 도중에 1 억 명의 사용자에 언제 도달하느냐고 물었더니 올해 말쯤으로 예상하고 있다고 답했다는군요"라고 언급하였다.

97.     Facebook 의 다른 긴밀한 관계자들 역시 Facebook 이 Instagram 을 구매함으로써 상당한 경쟁 위협을 제거했다고 판단하였다. 예를 들어, Facebook 의 주요 주주이자 전직 Facebook 임원이었던 한 사람은 Instagram 의 공동 창업자인 케빈 시스트롬에게 다음과 같이 전하였다.

*저는 최소 6 개월간 저커버그 대표를 비롯한 Facebook 사람들에게 하루라도 빨리 얼마를 지불해서든 일을 성사시키라고 재촉해 왔습니다. 저의 관점에서는, Instagram 인수 실패와 관련한 위험(또는 Google 등이 여러분의 회사를 선제 인수할 가능성)이 저를 포함한 많은 주주들을 매우 불안하게 만들었습니다. . . . 지난 몇 년 동안 [Facebook]은 [자사의] 핵심 사진 제품(및 관련 모바일 제품)의 경쟁력을 약화시켰습니다. 그 결과, 사진 제품은 궁극적인 잠재력을 전혀 실현하지 못했고, 더 나쁜 점은 다른 네트워크 업체와 '평행선'을 그리며 지금의 지위를 서서히 내어주게 될 위험이 있다는 부분이었죠. 아시다시피 사진 기능은 Facebook 의 생명선에 해당하며, 관련한 사용, 상호작용 및 긍정적인 피드백 루프를 통해 전체 네트워크를 뒷받침합니다. 사진 브라우징과 사용자가 사이트에 머무는 시간이 정비례한다고도*

*하죠. 제가 사진 기능을 출시한 직후였던*2005 년 무렵에는 *사진이 모든Facebook 페이지 뷰의 약50%를 생성하고 있었으며,* 이러한 수치는 플랫폼에 게임이 도입되기 전까지 상당히 안정적으로 유지되었다. (강조표시 추가됨.)

98.     인수 발표 후 2 주도 되지 않은 시점인 2012 년 4 월 22 일, 저커버그는 Instagram 매매거래의 직접적인 결과로서 Facebook 의 자체 모바일 사진 앱에 대한 투자를 취소하거나 축소할 것을 다음과 같이 제안하는 이메일을 발송하였다. "우리가 축소하거나 취소할 수 있는 부분들의 예를 들자면 . . . . 모바일 사진 앱(Instagram 을 인수했으므로) 등이 있습니다." 이에 따라 Facebook 은 2014 년에 서비스를 완전히 중단하기 전에 단 두 번만 업데이트하는 등 실제로 지원을 줄였다.

99.     Instagram 이 인수되었으므로, Facebook 의 직원들은 이제는 모바일 사진 공유 기능을 내세운 개인용 SNS 업계 경쟁자의 부상을 걱정할 필요가 없다고 느꼈다. 예를 들어, Facebook 의 한 비즈니스 개발팀 관리자는 동료들에게 보낸 2012 년 4 월 23 일자 이메일에서 "Instagram 은 iOS 시장의 확실한 승자이며, 현 시점에서는 경쟁자를 찾기가 [어렵다]"는 점을 들면서, Camera+와 Hipstamatic 앱에 대해서는 걱정이 되지 않는다고 썼다. 2012 년 10 월의 문서에는 Facebook 의 한 제품 디렉터가 Instagram 인수는 Facebook 이 "사실상 사진 공유 분야를 지배"하게 되었다는 의미이며, 그러한 시장독점력을 "유지하거나 확대하기 위해 많은 노력을 기울일 필요[가]" 사라졌다고 밝히는 내용도 있다.

100.     Facebook 의 Instagram 인수를 통해 개인용 SNS 업계에서 두각을 나타내며 Facebook Blue 의 시장독점력에 점점 더 심각한 위협이 되어가고 있던 경쟁사는 무력화되었다. 2011 년 5 월 31 일자 투자자용 슬라이드에는 Instagram 설립자들의 "완벽한 소셜 네트워킹 서비스 개발" 계획이 강조 표시되어 있다. 시스트롬은 인수 직전에 저커버그와 주고 받은 사적인 서신에서 이 비전의 장대함을 다음과 같이 설파하였다.

[Instagram 에 대한 저의 비전]은 *Instagram 의 사진 기능으로만 국한되지 않습니다. 저의 목표는 현실 세계에서의 소통과 공유 방식을 개선하고자 했던*Burbn [Instagram 의

원래 이름]의 *원래 비전을 실현할 수 있는 다른 분야들도 탐색하는 것입니다. . . . 그 분야는 차세대 사진 앱일 수도, 차세대 커뮤니케이션 앱일 수도 있습니다. 지나치게 철학적으로 들릴 수도 있겠지만, 우리의 목표는 아직도 한계에 부닥쳐보지 않았으며, 적어도 지금은 끝까지 한번 가보고 싶습니다. Facebook 만큼의 규모로 영향력을 확대하고자 하는 열망의 실현이 눈앞에 있지만, 심리적 균형을 유지하기가 쉽지 않은 것도 사실입니다. (강조표시 추가됨.)*

101.     Instagram 또한 광고 업계의 중요 경쟁자가 될 계획이었으며, 이는 충분히 가능했다. 2011 년 5 월 31 일자 투자자용 슬라이드에는 모바일 광고를 통해 수익을 창출하겠다는 Instagram 의 계획이 기록되어 있다. 비슷한 맥락에서, 시스트롬은 2012 년 1 월의 이메일에서 외부 파트너에게 다음과 같이 설명하였다. "저희는 브랜드들이 언젠가는 광고를 싣거나, 자사 콘텐츠를 소개하거나, 사용자층에 광고형 'Instagram 포스팅'을 타겟팅하기 위해 비용을 지불할 것이라고 확신합니다. 하지만 저희는 광고주에게 판매를 시작하기에 앞서 사람들이 좋아하는 제품을 완성하는 데 필요한 자금을 먼저 확보해둔 상태입니다. 우선은 사용자층에 주력하려고 [합니다.]"

102.     Facebook 이 Instagram 을 인수함으로써 Facebook Blue 의 독자적인 경쟁사로서의 Instagram 은 사라지게 되었다. 인수가 완료된 시점부터 Instagram 이 Facebook Blue 에 끼쳤던 악영향을 완화하기 위한 조치들이 취해졌으며, 이는 Instagram 이 Facebook 의 개인용 SNS 시장 독점에 상당한 위협이었음을 확인해주는 사례이다. 예를 들어, 인수 이후 Facebook 은 Instagram 의 홍보 활동을 제한했는데, 그렇지 않았다면 많은 사용자가 Facebook Blue 에서 빠져나갔을 것이다. 이 조치에 실망한 시스트롬은 2012 년 11 월의 이메일에서 "Facebook 의 참여도에 어떤 [원문표기] 영향이 있을지 파악될 때까지는 Instagram 을 홍보할 수 없다고 자꾸 말씀하시는데, 이건 누구의 결정인가요?"라고 불만을 표현하기도 하였다.

103.     Facebook 의 성장 담당 상무는 다음과 같이 설명하였다. "크리스[Chris Cox, 제품 담당 상무]도 Instagram 피드가 우리 것과 중복되는 상황에 대해 우려했습니다(참고로 저도 동의합니다). 사용자들은 여러 곳에서 피드를 확인하는 데 익숙해지고 있어요. 먼저

Instagram 의 이용률이 우리 쪽 참여도에 미치는 영향을 파악하여 자연스럽게 함께 성장하는 상황을 만들어야 하는 이유가 바로 이것입니다. . . . 저는 Facebook 의 참여도에 어떤 영향을 줄지 모르는 상태에서 덮어놓고 Instagram 을 홍보하여 성장시키는 것이 올바른 길인지 [의문입니다.]"

104.    하지만, Instagram 이 Facebook Blue 에 끼치는 악영향을 최소화하기 위한 노력에도 불구하고, Facebook Blue 는 여전히 Instagram 에 시장을 내어주고 있었다. 예를 들어, 2017 년 9 월의 문서에는 "사용자층 전반의 역학에서 Instagram 으로의 꾸준한 전환세가 나타나며, 상당수는 Facebook 사용자들이다"라는 대목이 나온다. 또 다른 내부 슬라이드는 이를 "Facebook 과 Instagram 의 친구/피드 앱은 양자택일의 관계로 보인다"라고 한마디로 표현하였다.

105.    결론적으로, Facebook 에 의한 Instagram 의 인수 및 통제는 Facebook Blue 의 개인용 SNS 시장 독점에 제기된 심각한 위협의 제거, 그리고 능률경쟁 이외의 방법을 동원한 불법적인 형태의 시장독점력 방어 행위를 의미한다. 이러한 행위는 무엇보다도 (자체적으로 또는 타사에 인수된 형태로) 독립 운영되는 Instagram 이 시장에 가져왔을 경쟁의 혜택, 즉 경쟁력 있는 의사결정 및 혁신이 일어나는 추가적인 기점의 존재, 광고 분량이나 개인정보보호 수준 등과 관련하여 Facebook Blue 가 사용자를 대하는 자세 및 서비스 품질에 대한 감시, Facebook 의 통제 하에 있지 않은 대안적인 개인용 SNS 업체, Facebook 이 이에 대응하여 능률경쟁에 나서야 할 유인 등의 요소를 사용자로부터 박탈하는 결과를 낳는다. 또한 Instagram 에 대한 Facebook 의 소유권과 통제권은 개인용 SNS 업계의 경쟁과 시장진입을 저지 및 방해하는 일종의 방어적 '해자(moat)'를 형성한다.

106.    Facebook 은 Instagram 인수를 정당화할 수 있을 만큼의 합병 효과나 기타 경쟁촉진적인 이점을 구체적으로 입증해내지 못한다.

**2.   *자사의 개인용 SNS 시장 독점에 제기된 경쟁 위험을 무력화하기 위해 WhatsApp 을***

### 인수한 *Facebook*

107.    Instagram 에 의한 위협을 제거한 이후, Facebook 은 스스로 "소비자 관련 두 번째로 큰 위험"이라고 간주했던 위협, 즉 모바일 메시지 서비스를 제공하던 앱이 어느 날 개인용 SNS 기능을 추가하거나 별도의 개인용 파생 SNS 앱을 출시함으로써 개인용 SNS 시장에 *진입*하게 될 가능성에 눈을 돌렸다. Facebook 은 광범위한 인기를 구가하고 있던 모바일 메시저 앱인 WhatsApp 을 이러한 경우에 해당하는 가장 커다란 위협으로 지목하였다. 하지만 이 경우에서도 Facebook 은 WhatsApp 을 능가하기 위한 혁신 노력에 투자하기보다는 그저 경쟁사를 사들이는 방식으로 위협에 대응하였다.

108.    Facebook 의 경영진은 충분한 규모에 도달한 모바일 메신저 앱이라면 추가적인 작동요소와 기능들을 도입함으로써 언제든 개인용 SNS 시장에 경쟁력 있는 규모로 진입하여 Facebook Blue 의 개인용 SNS 시장 독점을 약화시키거나 대체할 수 있다는 점을 곧 깨닫게 되었다. 2012 년 초가 되자, 복수의 모바일 운영체제에서 성공리에 서비스 중인 모바일 메신저 앱이 개인용 SNS 시장에 갑자기 진입할 가능성이 회사 경영진의 전략적 관심사로 떠오르게 되었다. 예를 들어, 저커버그는 2012 년 4 월의 이메일에서 현재 전 세계의 "메신저 앱들이. . . 메시지 기능을 발판 삼아 더 일반적인 형태의 모바일 소셜 네트워크 구축을 시도 중"이라며 우려를 표현하였다. 2012 년 10 월 무렵에는 그러한 인식이 회사 내부에 널리 퍼졌으며, Facebook 의 한 사업성장 담당 이사는 "어쩌면 이는 우리 회사가 여태 직면한 가장 큰 위협일 수 있다"는 예측을 내부적으로 내놓기도 하였다.

109.    Facebook 의 경영진은 모바일 메시저가 심각한 경쟁 위협의 개인용 SNS 시장 진입을 도와주는 징검다리 역할을 하게 될 가능성을 두려워하였다. 예를 들어, Facebook 의 한 데이터 사이언티스트는 2012 년 4 월의 이메일에서 "이러한 [모바일 메신저] 앱들은 SMS 의 대안으로서 출발했지만, 이제는 기존의 소셜 네트워킹 서비스와 거의 흡사한 영역까지도 경계를 확장해가고 있다"라고 지적하였다. 몇 주 뒤, 그는 동료들에게 "우리는 계속해서

모바일 메신저 앱에 집중하고 있습니다. 두 가지를 말씀드리자면, 이 앱들 가운데 몇몇은 보다 완전한 형태의 SNS 로 확장을 시도 중이며, 일부는 현재 글로벌 시장의 문을 두드리고 있지만 성공 여부는 들쭉날쭉합니다"라고 재차 강조하였다. 비슷한 예로, Facebook 의 내부 인수합병 팀 책임자는 2013 년 8 월의 이메일에서 "가장 무서운 부분은 당연히, 이러한 유형의 모바일 메신저가 Facebook 이 전통적인 웹에서 주도해 온 소셜 활동/공유의 모바일 버전으로 밀고 들어온다는 점"이라고 경고하였다.

110.    Facebook 의 경영진과 직원들은 이를 심각한 전략적 위협으로 보았다. 예를 들어, Facebook 의 제품관리 담당이사는 2012 년 10 월 4 일자 이메일에서 모바일 메시지 서비스와의 경쟁과 관련하여 동료들에게 다음과 같이 전하였다. "이것이야말로 제가 Facebook 에서 일한 5 년 동안 접해본 최대의 위협입니다. Google+ 때보다 심각하며, 모두 두려워하고 있습니다. 이들은 가장 친숙한 소셜 그래프(즉, 모바일에서 가장 흔한 메신저들[원문표기])를 거점으로 삼고 영향력을 구축해 나가는 치밀한 전략을 지니고 있습니다."

111.    비슷한 예로, "모바일 메시징(Mobile Messaging)"이라는 제목의 2013 년 2 월의 Facebook 이사회용 프레젠테이션에는 모바일 메시지 서비스가 제기하는 위협을 경고하는 다음과 같은 문구가 담겨 있었다. "우리의 핵심 비즈니스에 대한 위협: 모두 그래프 및 콘텐츠 공유 [관련]. 이들은 현재 게임 플랫폼, 프로필, 뉴스피드 등을 구축하고 있음. 이러한 경쟁자들은 모바일 우선 소셜 네트워크 구축에 필요한 모든 요소를 갖추고 있음. . . . 현 추세대로라면, WhatsApp 은 메신저 분야에서 1 년 안에 SMS 수준에 도달할 [전망임.]"

112.    저커버그 역시 나름의 인기와 중요성을 인정받고 있는 모바일 메시지 서비스의 전략적 가치를 인식하였다. 예를 들어, 그는 2012 년 4 월에 "저는 메신저 앱은 사용자의 휴대폰에서 가장 중요한 앱이라고 실제로 믿고 있습니다. 비즈니스 규모 면에서는 작더라도 훨씬 많이 사용되는 앱이라는 점은 분명하므로, 이는 우리에게도 중요한 전략적 관심사입니다"라고 지적하면서, "우리가 Instagram 을 구매했기 때문에(그래서 마감일이

38

연장되었기 때문에!) 사진 기능에서는 앞서가게 되었지만, 메신저 기능에서는 점점 뒤처지고 있는 듯합니다"라고 덧붙였다.

113.    머지않아 Facebook 의 관심은 업계 선두의 OTT 모바일 메시지 서비스 제공업체로서 Facebook Blue 의 개인용 SNS 시장 독점에 상당한 위협이 되고 있는 WhatsApp 에게 집중되었다. WhatsApp 만의 독특하고 뛰어난 사용자 경험과 최고 수준의 개인정보보호 기능은 2009 년 11 월에 처음 출시된 이후 WhatsApp 의 눈부신 성장을 이끌었다. 2014 년 2 월 기준, WhatsApp 은 전 세계적으로 4 억 5 천만 명 이상의 월간 실사용자를 보유하고 있었으며, 매일 1 백만 명의 사용자를 추가하는 등 "사용자 수 10 억 명 달성을 목전에 두고" 있었다.

114.    아시아 일부 지역에서 대규모 사용자 기반을 구축했지만 서구권에는 진출하지 않았던 다른 모바일 메신저 앱들과는 다르게, WhatsApp 은 아시아와 유럽에서 대규모로 성장했을 뿐만 아니라 미국에서도 점유율을 높여가고 있었다. WhatsApp 은 Apple 기기의 iOS 운영체제에 한정된 Apple 의 iMessage 앱과 달리 모든 주요 스마트폰 운영체제에서 사용이 가능했기 때문에, 유의미한 규모를 크로스플랫폼에서 달성할 수 있는 확실한 위협으로서 다가오게 되었다. 또는 WhatsApp 은 소셜 네트워크와 유사한 풍부한 콘텐츠 공유 기능과 개인정보보호에 민감한 사용자를 위한 향상된 암호화 기능을 제공한다는 면에서 전통적인 SMS 와 차별화되었다. 그 결과, 2014 년 무렵 WhatsApp 은 모바일 메신저 분야에서 확실한 "선두주자"로 자리매김했으며, 개인용 SNS 시장으로의 진출이나 파생 출시도 예고되었다.

115.    Facebook 은 WhatsApp 의 사용자 기반 확대를 저지하기 위한 직접적인 노력의 일환으로 2011 년 가을에 OTT 모바일 메시지 서비스를 제공하는 Facebook Messenger 라는 앱을 출시하였다. 해당 글로벌 출시일에 Facebook Messenger 의 제품 담당 이사는 팀원들에게 다음과 같은 포부를 밝혔다. "우리는 이제 전 세계의 모바일 메신저 사용자가 선택한 앱의 자리를 놓고 WhatsApp 과 멋진 경쟁을 펼치게 되었습니다. . . . WhatsApp 에는 1,500 만 명의

(등록된?) 사용자가 있습니다. 우리가 얼마나 빨리 일일 실사용자 1,000 만 명에 도달할 수 있을지 지켜봅시다.”

116.    하지만 Facebook 은 WhatsApp 과의 커다란 격차를 곧 깨닫게 되었다. 실적과 이용률을 끌어올리려면 Facebook 은 상당한 자원을 투입하여 상대를 따라잡아야만 하였다. 2012 년 4 월, 저커버그는 이와 관련하여 다음과 같이 언급하였다.

> Facebook 통합은 차치하고, 현재 WhatsApp 은 우리의 독립형 Messenger 앱보다도 모든 면에서 앞서 있는 모바일 메신저 제품입니다. 더욱 안정적이고 빠르게 메시지를 보낼 수 있으며, 수신 확인과 마지막으로 확인한 시간 기능은 더 나은 알림과 피드백을 제공해줍니다. 연락처 통합 기능으로 대부분의 사람들에게 쉽게 연락을 취하는 일도 얼마든지 가능하죠. . . . WhatsApp 으로 하루에 전송되는 모바일 메시지는 우리의 2 배 이상이며, 우리보다 약 3 배 더 빠른 성장세를 꾸준히 유지하고 있습니다. 이는 큰 문제입니다. . . . 안타깝게도, 지금의 우리에게는 모멘텀과 성장률이라는 그들의 강점을 최소화할 만한 직접적인 방법이 없는 것 같습니다. 그러한 성장의 비결은 WhatsApp 이 구축한 제품과 네트워크에 있으며, 따라서 지금 할 수 있는 최선은 우리 자신의 제품과 네트워크를 최대한 빨리 구축하는 것입니다.

117.    Facebook 의 경영진은 유럽과 기타 지역에서의 성공 경험을 바탕으로 미국에서도 모바일 메시지의 규모를 늘려나가려는 WhatsApp 의 공격적인 행보를 분명히 인식하였다. 한 임원은 2013 년 8 월 8 일에 저커버그에게 “[저는] 정말 걱정됩니다. . . . 이 친구들[WhatsApp]이야말로 진짜입니다!”라고 언급하면서, 다음과 같은 말도 덧붙였다. “메신저 관련 상황을 타개할 수 있는 여지가 없어지고 있는 지금, 메신저 3.0 에 추가되면 좋을 몇 가지 사항이 있습니다. . . . 오프라인으로 잠깐 만나서 말씀을 드려볼까 하는데, 지금이 계속 밀어붙일 적기인지 확인받고 싶습니다(그들의 지속적인 고속 성장과 공공연한 야심을 감안하면 어쩌면 지금이 마지막 기회일 수 있습니다)[.]” 이에 저커버그는 다음과 같이 대답하였다. “만약 그들이 공짜 SMS 이상의 의미를 가진 기능들을 구축해낸다면, SMS 가 여전히 주요 [원문표기] 플랫폼인 미국 같은 시장에서는 그것만으로도 판세가 바뀔 수 있습니다.”

118.    Facebook 의 임직원 사이에서는 WhatsApp 이 Facebook Messenger 의 경쟁력만으로는 손쓸 수 없는 Facebook Blue 에 대한 유례 없는 위협이라고 거듭 경고하는 내부적 분위기가 있었다. 그 예는 다음과 같다.

a.   2013 년 5 월, Facebook 의 한 제품성장 담당 이사는 WhatsApp 의 얀 쿰(Jan Koum) CEO 를 일컬어 "오늘날 우리에게 가장 큰 경쟁사/위협"이라고 언급하였다.

b.   2013 년 7 월, 한 엔지니어링 담당 이사는 다음과 같이 지적하였다. "'Facebook 을 뛰어넘는 제품을 우리가 만들어내지 못하면 다른 누군가가 만들 것'이며, 그게 바로 WhatsApp 입니다(아래 참조). 개인적으로는 WhatsApp 과 같은 회사야말로 Facebook 에 진정한 위협이 된다고 생각합니다. . . [.]"

c.   2013 년 8 월, Facebook 의 성장 담당 상무는 다음과 같이 언급하였다. "현 시점의 WhatsApp 은 우리와는 확실히 체급부터 다릅니다 . . . . 지금 우리가 '처음부터 갈아엎기 전략(start from scratch strategy)'을 쓰기에는 이미 너무 늦었을 수 있어요. . . [.]"

d.   2013 년 9 월, Facebook 의 성장 담당 상무는 만약 WhatsApp 이 "사용자 경험을 개선하고 성장을 촉진하는 방식의" 플랫폼화에 성공할 경우, 단박에 업계 선두로 올라설 것이고, 우리는 큰일난 것"이라고도 언급하였다.

119.    Facebook 은 WhatsApp 이 독립적으로 무엇을 할지 두려웠을 뿐만 아니라, 다른 누군가에게 인수되었을 경우에 무엇을 할지도 두려웠다. Facebook 의 성장 담당 상무가 2012 년 10 월에 지적했듯, "가장 큰 문제는 그것이 적대 기업의 손에 들어갔을... [경우이다.]" Facebook 은 특히 Google 이 WhatsApp 을 인수하는 것을 두려워하였다. Facebook 이 2011 년에 인수한 메신저 앱의 공동창업자이기도 한 어떤 엔지니어링 관리자는 2012 년 10 월에 동료들에게 다음과 같이 경고하였다. "Google 이 WhatsApp 을 인수했을 시의 시나리오는 지난 6 개월간 계속 악화되었습니다. . . . WhatsApp 의 인수가 실제로 가능하다면, 우리가 인수하지 않았을 경우의 위험이 더 커졌습니다." Facebook 의 성장 담당 상무는 다음과 같이 동의하였다. "제가 그들이었다면 틀림없이 이렇게 했을 것입니다...[.]"

120.    Instagram 의 경우에서처럼, Facebook 은 자신들의 개인용 SNS 시장 독점을 위협하는 경쟁사를 무력화하기 위해 WhatsApp 과의 경쟁인 아닌 기업인수를 선택하였다. 2012 년 4 월, 저커버그는 "[제가] 가장 걱정되는 분야는 메신저입니다. WhatsApp 은 마치 Instagram 이 사진 기능에서 우리를 '앞섰던' 것처럼 메시지 기능에서 이미 우리보다 앞서 있습니다"라고 지적하며, 다음과 같이 덧붙였다. "인수가 가능하다면 10 억 달러를 지불할 용의가 있습니다."

121.    Facebook 은 2012 년 11 월에 처음으로 WhatsApp 에 인수 가능성을 타진했으며, 2014 년 2 월에 다시 한번 접촉한 결과 일정한 진전을 이루었다. 2014 년 2 월 19 일, Facebook 은 WhatsApp 을 미화 190 억 달러에 구매하기로 합의하였다고 발표하였다. 이만큼의 가치평가는 WhatsApp 이 Facebook 의 개인용 SNS 시장 독점에 제기했던 위협의 심각성을 보여주는 수치다.

122.    2 년 만에 두 번째로, Facebook 의 직원들은 운영상의 위기를 야기한 경쟁 위협의 제거를 축하하였다. 2014 년 2 월 19 일, Facebook 의 한 관리자는 인스턴트 메시지로 다음과 같이 만족감을 드러냈다. "잘 샀습니다. 천문학적인 가격을 지불해야 했지만, 누구나 이 앱을 사용 중이며, 특히 해외에서 [원문표기] 높습니다. *순전히 모바일만으로 차세대 Facebook 으로 성장할 가능성이 있었던 거의 유일한 회사를 막아낸 [ 겁니다.]* . . . 우리 시가총액의 [1]0%를 지불할 [만하죠.]" (강조표시 추가됨.)

123.    며칠 후, Facebook 의 한 임원은 WhatsApp 인수거래가 한마디로 '토지수탈(land grab),' 즉 미래에 정기적으로 반복할 만한 조치가 아니라 얼마간의 경쟁력 약화에 대한 과도한 대응에 가깝다는 다음과 같은 내용의 메일을 동료들에게 보냈다.

우리가 지금의 시장 지위를 굳히기 위해 회사 시가총액의 5~10%를 한두 해마다 지출하게 될까 봐 우려의 목소리가 높습니다. 저는 지금이 모바일 환경의 지각변동이 일어나는 '특정 시기'라고 생각한다는 데이빗의 답변이 마음에 듭니다. '토지 수탈'이라는 단어까지 쓰고 싶지는 않지만, 여기에 가장 들어맞는 표현이며, 우리는

그런 말을 들을 만합니다.

124.    Facebook 외부의 업계 분석가들 역시 WhatsApp 의 인수로 Facebook 에 대한 상당한 경쟁 위협이 무력화되었다고 파악하였다. 투자은행인 SunTrust Robinson Humphrey 는 이 거래의 속성을 다음과 같이 명확하게 설명하였다.

> WhatsApp 이 단지 "메신저" 분야의 위협만이 아니었던 이유를 누구나 쉽게 알아차릴 수 있을 것이다. Facebook 의 Instagram 인수가 공격 전술인 동시에 방어 전술이기도 했던 것처럼, 우리는 이번 인수거래가 회사의 [전체시장(total addressable market)]과 역량을 확대해줄 뿐만 아니라 회사의 [원문표기] 측면을 빠르게 성장하는 '메신저 회사'의 위협으로부터 지켜줄 것으로 보고 있다. 언뜻 보면 WhatsApp 은 '단순한 문자 앱'으로만 생각될 수 있다. 하지만 WhatsApp 은 매일 6 억 장의 사진, 1 억 개의 비디오, 2 억 건의 음성메시지와 190 억 건의 문자메시지가 공유되는 거대한 서비스다. 사용자는 이를 통해 자신의 위치 및 장소를 공유하거나 일대일 또는 일대다 통신을 수행할 수도 있다. 이렇게 다양한 WhatsApp 의 기능들과 전 세계 인구를 연결하는 커뮤니케이션에 특화된 Facebook 의 특성을 고려할 때, 우리는 WhatsApp 과 Facebook 이 시간이 지날수록 서로 닮아가면서 뚜렷한 경쟁 구도를 형성할 가능성이 높았다고 보지만, 지금은 이러한 구도를 피할 수 있게 되었다.

125.    Bernstein Research 와 같은 회사도 이 인수거래에 대해 다음과 같이 언급하였다.

> WhatsApp 모바일 스트림과 Facebook 의 모바일 뉴스피드 사이의 '거리'는 그리 크지 않으며, 사용자 참여도 측면에서 갈수록 Facebook 의 경쟁자로 떠오르게 될 또 하나의 사용자 10 억 명짜리 서비스의 등장을 누구나 쉽게 떠올릴 수 있다. WhatsApp 그래프는 독립된 회사로서, 또는 Google, Twitter, eBay 와 같은 다른 기업의 일부로서 확장되어 Facebook 의 적수를 만들어내는 데 언제든 활용이 가능하다.

126.    Facebook 은 WhatsApp 을 인수함으로써 WhatsApp 이 Facebook 의 개인용 SNS 시장 독점에 제기했던 경쟁 위협을 제거할 수 있었다. Facebook 은 WhatsApp 이 경쟁력 있는 개인용 SNS 업체로 성장하도록 내버려두지 않고 모바일 메시지 서비스를 제공하는 역할로만 가두어 놓았으며, 미국 내에서의 WhatsApp 홍보를 제한하였다. 예를 들어, 2019 년 2 월에 콕스 상무는 저커버그에게 특정 형태의 WhatsApp 관련 홍보를 불허했다고 보고했으며, Facebook 이 적극적으로 홍보 지원을 거부했음에도 *불구하고* WhatsApp 이 미국에서 거두고

있는 성공에 대해 다음과 같이 언급하였다. "홍보를 거의 하지도 않았는데, WhatsApp 의

메시지 볼륨은 미국 내 메신저 서비스 전체의 2/3 에 달하고 있습니다."

127.    요약하자면, Facebook 에 의한 WhatsApp 의 인수 및 통제는 Facebook Blue 의

개인용 SNS 시장 독점에 제기된 심각한 위협의 제거, 그리고 능률경쟁 이외의 방법을 동원한

불법적인 형태의 시장독점력 방어 행위를 의미한다. 이러한 행위는 미국 내 개인용 SNS

시장에 진입할 수 있는 역량과 인센티브를 갖추고 (자체적으로 또는 타사에 인수된 형태로)

독립 운영되는 WhatsApp 이 시장에 가져왔을 경쟁의 이점을 사용자로부터 박탈하는 결과를

낳는다. 또한 WhatsApp 은 "가급적 최소한의 개인정보만을 수집"한다는 원칙과 광고 없는

구독 모델을 포함하여 개인정보보호를 중시하는 상품과 디자인을 지향하고 있었다. 많은

사용자에게 가치를 제공하는 이러한 판매 전략은 개인용 SNS 업계의 독립적인 경쟁

위협으로서의 WhatsApp 에게 중요한 형태의 제품 차별화 요소가 되어주었을 것이다. 또한

WhatsApp 에 대한 Facebook 의 소유권과 통제권은 개인용 SNS 시장 진입을 통해 경쟁사로

부상할 역량을 갖춘 다른 모바일 메신저 앱들을 저지 및 방해하는 일종의 방어적

'해자(moat)'를 형성한다.

128.    Facebook 은 WhatsApp 인수를 정당화할 수 있을 만큼의 합병 효과나 기타

친경쟁적인 혜택을 구체적으로 입증해내지 못한다.

129.    Facebook 이 사용하는 인수를 통한 시장독점화 전략은 현재진행형이다.

Facebook 은 Instagram 과 WhatsApp 을 계속 보유하고 운영하면서 Facebook 에 대한 직접적인

경쟁 위협을 무력화하고 있으며, 지금까지도 이들이 개인용 SNS 시장에서의 Facebook 의

시장독점력을 방어해주는 '해자'로 기능하도록 하고 있다. 특히, Facebook 은 자신들이

Instagram 과 WhatsApp 의 운영을 대규모로 계속하기만 하면 새로운 회사들이 나름의

작동기제를 내세워 시장에 진입하고 규모를 키워가기가 어려워질 것임을 잘 알고 있다. 즉,

Facebook 은 저커버그가 Instagram 인수의 가치를 설명할 당시 "Facebook 이 이미 해당 작동기제를 대규모로 구현해놓은 상태가 되므로 이러한 신제품들의 매력은 크게 떨어지게 됩니다"라면서 강조했던 바로 그 역학으로부터 혜택을 보고 있다. Facebook 은 다른 경쟁 위협들을 계속해서 주시하고 있으며, 금지 조치가 없는 한 경쟁사의 인수를 시도할 것이다.

**B. 자신들의 개인용 SNS 시장 독점에 제기된 경쟁 위협을 저지하기 위해 플랫폼 이용 권한과 관련한 경쟁제한 조건을 유지 및 시행하고 있는 Facebook**

130.    Facebook 과 같은 대기업조차도 기업인수를 통해 모든 경쟁 위협을 제거하는 것은 불가능하다. 따라서 Facebook 은 기존의 기업인수 전략을 보완하기 위하여, 자신들의 시장지배적 지위를 위협하는 경쟁사로 스스로 성장하거나 이를 도와줄 수 있는 다른 회사들의 손발을 묶고 확장을 억제함으로써 개인용 SNS 시장에서의 지배력을 방어할 수 있도록 고안된 일련의 경쟁제한 조치를 마련하였다.

131.    위에서 설명한 바와 같이, 자사의 플랫폼에 대한 개방형 상호 연동을 허용하기로 한 Facebook 의 결정은 앱 및 웹 개발자와 사용자는 물론, Facebook 에게도 상당한 이점을 가져왔다. Facebook 플랫폼이 광범위하게 채택됨에 따라 Facebook 은 타사 앱들의 중요한 인프라가 되었으며, 앱의 개발 궤도, 경쟁 관련 의사결정 및 투자 전략에 대한 엄청난 권한을 손에 넣게 되었다.

132.    Facebook 은 이러한 권한을 활용하여 자신들의 개인용 SNS 시장 독점에 대한 경쟁 위협을 저지하고 억제하였다. 현재의 시장독점력을 방어할 목적으로, Facebook 은 타사 앱이 경쟁사와 관계를 맺거나 스스로 경쟁사로 성장할 수 있는 여지를 제한하는 조건부 거래 정책을 채택하고 개발자들이 이에 동의하도록 요구하였다.

133.    구체적으로, Facebook 은 Facebook 플랫폼을 사용하고 상업적으로 중요한 API 에 이용하고자 하는 개발자들을 대상으로 장기간에 걸쳐 수시로 도입된 새롭거나 변경된

제한사항 또는 정책을 포함하여 Facebook 이 부과해놓은 계약상의 제한사항에 동의할 것을 요구하였다. 이러한 제한사항은 개발자가 플랫폼 사용 시 참여할 수 있는 활동의 유형을 제한하였다. 아래에서 자세히 설명하는 바와 같이, 이러한 제한사항은 시간이 지남에 따라 변경되었으며, 개발자의 앱이 Facebook 과 경쟁(관련 시점에 Facebook 이 제공하는 제품의 "핵심 기능을 모방"하는 행위 포함)하지 않고 경쟁사를 돕지 않을 것이라는 서약 요건이 여러 차례에 걸쳐 포함되었다. 이러한 조건을 위반한 앱이 있을 경우, Facebook 은 운영 기반을 확대할 때 필요한 Find Friends API 와 같이 상업적으로 중요한 API 기능들의 사용을 차단하고 Facebook Blue 를 위협하는 보다 강력한 경쟁자로 발전할 가능성을 억누르는 등의 처벌을 가하였다. 간단히 말해서, Facebook 은 필수 API 에 대한 귀중한 이용 권한을 제공하고, 그 대신 해당 업체로부터 Facebook 과의 경쟁을 삼가겠다는 서약을 얻는 형태의 계약을 체결하였다.

134.    Facebook 은 개발자의 필수 API 사용을 차단하는 과정에서 차단된 앱이 Facebook 에게 원래 가져다 줄 수 있었던 광고비 등의 이익을 희생하기로 의도적으로 결정하였다. 이러한 희생은 Facebook 의 장기적인 목표 달성, 즉 잠재적인 경쟁 위협을 제거하고 시장독점력을 유지하는 것을 목적으로 이루어졌다.

### 1. 개발자와의 계약에 경쟁제한 플랫폼 정책을 포함시켜 앱 개발자로부터의 경쟁 위협을 제거한 Facebook

135.    2012 년도 연례 보고서에서 Facebook 은 "Platform 파트너가 당사와 경쟁하는 제품 또는 기능을 개발하기 위해 Facebook 사용자들이 공유하는 정보를 Facebook Platform 을 통해 활용하고. . . . 그 결과로서 경쟁사들이 당사 사용자 기반의 확대 또는 참여를 희생하는 방식으로 사용자를 확보하고 참여시킴으로써 당사의 사업 및 재무 성과에 부정적인 영향을 끼치게 되는 것"과 관련한 가능성을 회사 운영에 대한 심각한 위험 요인으로 지목하였다.

136.    이러한 위험을 해소하기 위해 Facebook 은 2011 년 7 월부터 2018 년 12 월까지

일련의 경쟁제한적 정책을 도입하여 유지했으며, 이는 개발자의 Facebook 플랫폼 이용을 규율하는 앱 개발자와의 계약서에 구체화되어 있다.

137.    2011 년 6 월, Google 은 Google+라는 개인용 SNS 를 출시하였다. 2011 년 7 월 27 일, Facebook 은 이에 대응하고자 Facebook Platform 을 이용하려는 앱에게 허용되는 행동과 관련하여 "Facebook 에 등록된 앱은 다른 경쟁 소셜 플랫폼의 앱과 통합하거나 이에 링크, 홍보, 배포 또는 리디렉션을 제공할 수 없다"라는 정책을 새로 도입하였다. 이 정책은 개인용 SNS 업계의 경쟁사를 비롯한 잠재적 경쟁 대상에게 피해를 주고 그 출현을 막기 위한 조치였다. 실제로, 이 정책을 즉각 추진한 배경에는 Google 의 Google+ 개인용 SNS 출시라는 사건이 있었다. Facebook 의 한 관리자는 2011 년 7 월 27 일자 이메일에서 다음과 같이 설명하였다. "이에 대한 많은 토론이 있었습니다. Google 이 무엇을 어떻게 출시할지에 대한 정보가 없었기 때문에 구체화하기가 어려웠고, 그래서 우리는 일단 방향만 설정한 다음 해당 위협의 접근법과 규모가 차츰 드러남에 따라 추후에 조치를 강화하기로 했습니다." 같은 날 오후, 또 다른 Facebook 직원은 회사의 경쟁제한적 전략에 반대하며 동료들에게 다음과 같이 밝혔다. "제가 볼 때 [원문표기] 둘 다 사용자의 이익에 반하고, 우리의 장점을 바탕으로는 경쟁에 나설 용기가 없다는 것을 전 세계에(그리고 더 중요하게는 우리 직원들에게) 광고하는 꼴입니다."

138.    Facebook 은 2011 년 7 월과 8 월에 해당 앱이 사용자의 Facebook 연락처를 Google+ 또는 다른 소셜 네트워크로 이동하는 것을 허용했다는 사유를 들어 몇몇 타사 개발자의 API 이용을 차단하였다.

139.    그 후, Facebook 은 앱 개발자에 의한 Facebook API 를 포함한 Facebook 플랫폼의 사용을 제한하는 몇 가지 다른 정책들도 도입하였다. 이러한 정책을 무기 삼아, Facebook 은 자사 API 에 대한 통제 권한을 활용하여 Facebook 플랫폼 상에서 개발자들이 제기하는 위협을 저지하고 억제하였다.

140.    2012 년 9 월: 경쟁사 소셜 네트워크로의 데이터 내보내기 금지. 2012 년 9 월 12 일, Facebook 은 개발자가 필수적으로 동의해야 하는 다음과 같은 새로운 조건을 내걸었다. "경쟁사 소셜 네트워크: 귀하[개발자]는 당사의 허가 없이 Facebook Platform 을 사용하여 경쟁사 소셜 네트워크로 사용자 데이터를 내보낼 수 [없습니다.]"

141.    2013 년 1 월: "핵심 Facebook 제품 또는 서비스를 모방한" 앱에 대한 홍보/데이터 내보내기 금지. 2013 년 1 월 25 일, Facebook 은 앱 개발자와의 표준 계약을 추가로 개정해, 개발자가 "핵심 기능을 모방"(즉, Facebook 과 경쟁)하거나 타사의 그러한 행위에 조력하는 것을 금지하는 다음과 같은 새로운 조건을 추가하였다.

> 핵심 기능 모방: 귀하는 당사의 허가 없이는 Facebook Platform 을 사용하여
> Facebook 의 핵심 제품 또는 서비스를 모방하는 제품 또는 서비스를 홍보하거나 이에
> 사용자 데이터를 내보낼 수 없습니다.

142.    이렇게 경쟁제한적 정책이 시행되자, 그동안 Facebook 이 내세웠던 개방성에 의존하고 있던 개발자들은 갑자기 Facebook 의 표적이 되었다. 예를 들어, Path 라는 개인용 SNS 앱의 개발자는 Facebook 이 Platform 의 개방성을 대대적으로 홍보하면서 경쟁 앱들조차 상호 연동이 가능하도록 초대하던 2010 년 무렵부터 개발을 시작하였다. 마찬가지로, 지역용 소셜 네트워크인 Circle 도 2010 년에 개발을 시작하였다. 이러한 개발자들은 한동안은 Facebook 과 상호 연동이 가능했고 Platform API 에 접근하여 자사 제품을 배포할 수 있었다.

143.    2013 년이 되자, Facebook 은 이들이 새로운 Platform 정책을 위반했다고 하면서 두 앱 모두의 필수 API 기능 이용을 차단하였다. 두 개발자 모두 Facebook 측을 누그러뜨리면 필수 API 에 대한 이용 권한이 회복될지도 모른다는 생각에 자사 앱을 변경했지만, 둘 다 결국 퇴출되고 말았다. Circle 의 경우, Facebook 의 한 임원은 다른 임원과의 대화에서 Circle 이 언젠가는 경쟁사로서 맞붙게 될 수도 있는 지역용 소셜 네트워크에 해당했기 때문에 비록 Facebook 이 우려하는 사항을 시정하기 위한 조치를 취했음에도 불구하고 이용 권한이 회복되지는 않을 것이라고 다음과 같이 설명하였다. "Circle 이 아래의 모든 항목을 이행(또는

이행을 약속)했다는 점은 높이 사지만, 우리는 결국에는 핵심 기능 모방이라는 '시정'이 불가능한 사유를 제시할 수밖에 없습니다."

144.   Facebook 은 경쟁 위협을 제기할 수 있는 기업들에 대한 추가적인 Platform 사용제한 조치를 계속해서 검토하면서 내부적 반발을 불러일으켰고, Facebook Platform 생태계 안에서 앱이 성장하고 사업이 성공을 거두는 데 API 이용이 얼마나 중요한 요소인지에 대한 자신들의 인식을 거듭 명시적으로 드러냈다. Facebook 의 한 소프트웨어 엔지니어는 2013 년 12 월의 이메일에서 다음과 같이 의문을 제기하였다.

> 그러니까 이제부터 말 그대로 우리에게 얼마나 위험해 보이는지를 기준으로 앱들을 줄세운 다음 등급별로 API 를 제공할 거라는 말인가요? 이를 도대체 어떻게 문서화할 수 있을까요? 페이지 상단에다가 "귀사는 메신저 앱을 구축할 예정입니까? 당사가 사용을 불허할 API 를 필터링하려면 여기를 클릭하세요!"라는 링크를 걸어둘 셈입니까? 만약 특정 앱이 2 등급에서 1 등급으로 올라갈 만한 기능을 추가하면 어떻게 되나요? 그냥 치워버리면 그만입니까? 그 메신저 앱은 이제부터 Facebook 로그인을 사용할 수 없고요? 그러니까, "우리와 조금이라도 경쟁할 예정이라면 먼저 우리와의 연동부터 완전히 포기하십시오"라는 메시지인 거죠? 저는 정말이지 할 말을 잃었습니다.

145.   Facebook 의 개발자용 제품 책임자는 Facebook 이 이미 경쟁 위협을 표적으로 이용 제한 조치를 취한 바 있음을 언급하며 다음과 같이 답변하였다. "네, 훌륭한 그림은 아니죠. 하지만 이미 어느 정도는 일어나고 있는 일입니다. 몇몇 기능을 차단당한 Path 도 그런 예였죠. . . . 경쟁사로 실제로 분류되는 절대적인 숫자는 매우 적은 편입니다." 또 다른 Facebook 엔지니어는 "애매한 게 아니라 비윤리적인 것에 가깝다"면서 맞장구쳤고, 한 엔지니어링 관리자는 "뭐, 나쁜 일인 건 맞죠"라고 말하였다. 이에 개발자용 제품 책임자는 다음과 같이 반박하였다. "저도 별로인 상황이라고 생각하지만, 너무 문자 그대로 해석하지는 마시죠. . . . 실제로는 상위 5 개 정도의 메신저 앱만이 경계의 대상이 될 겁니다." 하지만 소프트웨어 개발자는 여전히 다음과 같이 토로하였다. "비윤리적이라는 느낌이긴 한데,

49

왜인지 정확히 설명하기는 어렵습니다. 그저 제가 나쁜 사람이 된 것만 같아요." 개발자용 제품 책임자는 다음과 같이 대답하였다. "이는 플랫폼을 통해 회사의 나머지 다수가 불만족해 하는 상황을 피할 수 있게 되기 위한 일종의 [원문표기] 정치적 안전망입니다."

146.    이후에 있었던 Facebook 경영진 간의 내부 이메일 논의 내용을 보면 이러한 점이 드러나는데, 메시지 또는 피드 기능을 갖춘 앱에게는 특히 중요한 API 기능 이용을 차단했던 Facebook 의 표면적인 명분은 [편집처리] 그런 식의 차별적인 이용 거부 조치의 실제 이유는 [편집처리] 애초에 Facebook 의 목표가 무엇이었는지, 그리고 해당 정책이 어떤 식으로 시행되었는지를 살펴보면 실제 목적은 경쟁 위협의 저지였다는 점에는 다음과 같이 의심의 여지가 없다. [편집처리]

147.    결론적으로, Facebook 은 자신들과의 경쟁을 금지하는 조항에 대한 개발자의 동의 여부를 놓고 상업적으로 중요한 API 기능의 이용에 반복적으로 조건을 부가하였다. 일반적으로는 Facebook 역시 개발자와의 상호 연동으로 사용자 참여 증가와 이로 인한 금전적 보상을 비롯하여 상당한 이점을 얻을 수 있게 되지만, Facebook 은 오직 자신들을 위협할 만큼의 경쟁력을 확보할 의사가 없는 앱 개발자에게만 상호 연동 기능에 대한 온전한 이용 권한을 제공하였다.

148.    Facebook 의 정책 조건 및 개발자용 계약 조건은 앱 개발자들의 인센티브를 바꿔버렸고, 이들이 경쟁 기능을 개발하거나 경쟁 관계의 개인용 SNS 를 지원하지 못하도록 단념시켰다.

149.    그뿐 아니라, Facebook 은 API 이용 권한이 개발자들의 인센티브와 앱의 개발 궤도를 좌우할 만큼 충분히 중요하다는 점을 잘 알았으며, 예견하고 있었다. 개발자들은 Facebook API 에 대한 자사의 이용 권한을 위태롭게 하지 않는 방향으로 결정을 내리도록 장려되었다. Facebook 플랫폼 정책과 관련한 2014 년 1 월의 한 Facebook 내부용 슬라이드에는 Facebook 스스로 "많은 스타트업의 장래성을 제거/파괴하는 것이 적절"하다고

느끼는지 질문하는 등 API 이용의 중요성을 직접적으로 인정하는 대목이 나온다.

150.    <u>2018 년 12 월: 명시적 형태의 경쟁제한적 조건 부여 정책을 삭제.</u> 2018 년 12 월 4 일, Facebook 은 기존의 "핵심 기능" 관련 제한사항을 삭제하였다. 그 다음 날, 영국 의회의 한 의원은 Facebook 과 Six4Three 앱 간의 소송과 관련한 비공개 자료를 공개하면서 앱 개발자에 대한 Facebook 의 경쟁제한적 행태를 문제 삼았다.

151.    Facebook 이 2018 년 12 월에 명시적 형태의 경쟁제한적 조건 부여 정책을 중단시킨 것은 문서가 공개됨에 따라 예상되는 공적 조사를 의식한 조치이며, Facebook 이 그동안 경쟁제한적 행위를 수행해 왔음을 부인하기 위함은 아니었다. Facebook 이 해당 문서의 공개가 이루어질 것으로 예상한 날짜에 샌드버그는 Facebook 이사회에 다음과 같이 밝혔다. "Six4Three 관련 문서가 공개될 것으로 보이므로, 우리의 [원문표기] 우리는 개발자용 플랫폼 정책 제 4.1 조를 삭제하기로 했습니다. 해당 조항은 개발자가 당사의 API 를 사용하여 'Facebook 이 이미 제공 중인 핵심 기능을 모방'하는 것을 금지하는 내용입니다. . . . 우리는 Six4Three 문서가 보도되기 전에 이러한 변경사항을 적용해두는 것이 중요하다고 판단했습니다." Facebook 이 경쟁제한적 플랫폼 정책을 중단시킨 것은 예상되는 공적 조사에 대한 반응이었으므로, 그러한 조사가 마무리되고 나면 해당 정책은 재도입될 가능성이 높다. 실제로 Facebook 은 오늘날까지도 여전히 개발자를 심사하고 있으며, 언제든 자신들의 우월적 지위를 공고화하는 방향으로 API 이용 권한을 무기화할 수 있다. 그뿐 아니라, Facebook 은 앞으로도 기술 전환기가 불러온 경쟁 압박에 갑자기 직면할 경우에는 이 같은 조건을 비롯한 경쟁제한적 관행을 다시 도입할 가능성이 높다. 예를 들어, 이러한 경쟁 압박은 인공지능 활용의 증가로 인한 것일 수 있고, 또는 미래의 지배적 기술 회사들이 강력한 "메타버스", 즉 디지털 공간에서 사용자를 호스팅하는 가상 환경으로서 저커버그도 "모바일 인터넷의 후속 혁신"이 될 것이라고 최근 언급한 바 있는 기능을 출시할 것이라는 Facebook 의 자체적 판단에 따른 것일 수도 있다.

152.    Facebook 이 이 같은 정책을 재도입하지 못하도록 금지하는 정부 규제는 전무하며, 이와 관련한 Facebook 측의 발언들은 여러 번 신뢰를 잃었다. 실제로 Facebook 은 2012 년부터 사용자와 규제 당국 모두에 대한 허위 진술과 관련하여 막대한 벌금을 납부해 왔다. 예를 들어, 2011 년에 FTC 는 8 건의 소송을 통해 Facebook 이 자사가 개인 데이터를 공유하고 보호하는 방법에 대해 사용자를 기만하는 진술을 하였다고 주장한 바 있다. 이러한 혐의를 해소하기 위해 Facebook 은 사용자 개인정보보호에 대한 특정 허위 진술을 금하고 새로운 개인정보보호 프로그램을 마련하도록 의무화하는 법원의 동의명령에 동의하였다. 해당 판결 및 법원명령은 2012 년 8 월에 최종 확정되었다. 그러나 Facebook 은 2012 년의 동의명령에 서명한 후 불과 몇 달 만에 FTC 가 다시금 법적인 조치를 진행할 수밖에 없는 기존의 행태를 되풀이하였다. FTC 는 후속 조사를 수행한 데 이어 Facebook 이 여전히 사용자 개인정보보호에 소홀하고 있고 일련의 허위 진술을 통해 FTC 법과 2012 년의 동의명령을 위반하였다는 혐의를 들어 두 번째 소송을 제기하였다. 새로운 혐의를 해소하기 위해, Facebook 은 미화 50 억 달러라는 기록적인 벌금, 그리고 추가적인 개인정보보호 준수 채널과 감독 체계를 갖춘 기업구조 개편을 포함하여 기존 판결 및 법원명령을 개정증보하는 새로운 금지명령 조건이 부과된다는 합의안에 동의하였다. 티모시 켈리(Timothy Kelly) 판사는 합의안의 수락 및 합의된 조건의 발효와 관련한 명령 신청을 승인하면서 "법률과 행정명령 모두에 대한 [Facebook 의 위반 혐의는] 충격적"이라고 서술하였다. *미합중국 대 Facebook, Inc.*, 연방지방법원 판례집 제 3 편 제 456 권 제 105 면, 제 117 면(컬럼비아특별구 지방법원, 2020 년).

153.    Facebook 은 이전에 다른 당국을 대상으로도 허위 정보를 진술한 바 있다. 2014 년, Facebook 은 유럽집행위원회(European Commission)로부터 WhatsApp 인수 허가를 받기 위해 노력하는 과정에서 Facebook Blue 사용자들의 계정과 WhatsApp 사용자들의 계정 간에는 안정적인 자동 매칭을 설정하기가 어렵다고 두 번에 걸쳐 진술하였다. 그러나 약 2 년

후 Facebook 은 WhatsApp 사용자의 전화번호와 Facebook 사용자의 ID 가 서로 연동이
가능하도록 WhatsApp 의 서비스 약관 및 개인정보 보호정책을 업데이트하였다. Facebook 의
허위 진술 여부에 대한 조사를 실시한 후, 유럽집행위원회는 Facebook Blue 와 WhatsApp
사용자 간의 신원을 매칭할 수 있는 기술적 기반이 Facebook 의 허위 진술 당시에도 이미
존재하고 있었으며 Facebook 직원도 이러한 부분을 인지한 상태였다고 판단하였다.
유럽집행위원회는 Facebook 의 반복적인 허위 진술로 인해 위원회가 해당 인수거래를
평가하는 데 필요한 관련 정보를 검토할 수 없게 되었다고 결론내렸다. 그 결과,
유럽집행위원회는 Facebook 에 1 억 1 천만 유로의 벌금을 부과하였다.

## 2. *경쟁제한적 조건을 시행함으로써 경쟁사의 출현을 저지한 Facebook*

154.    Facebook 이 추후 수시로 업데이트한 부분을 포함한 앱 개발자용 계약서의 약관
자체도 앱 개발자들의 인센티브와 경쟁 능력에 영향을 미쳤다. 일반적으로 앱 개발자가
Facebook 플랫폼을 사용할 수 있으려면 약관에 동의해야 하였다. Facebook 이 이러한
제한적인 계약 조항을 포함시키자 개발자의 인센티브와 경쟁 의지에 변화가 일어났다. 또한
Facebook 은 이러한 조항들을 적극적으로 집행하기로 결정함으로써 개발자들에게
'Facebook 과 경쟁하면 큰 대가가 따를 것'이라는 메시지를 명확히 전달하였다. Facebook 이
상업적으로 가치 있는 API 기능에 대한 이용을 차단함으로써 이러한 계약 조건을 실제로
집행했던 앱들은 일반적으로 세 부류로 나뉜다.

155.    Facebook 이 표적으로 삼은 첫 번째 부류는 개인용 SNS 를 제공하는 유망한
앱들이었다. 예를 들어, Facebook 은 전직 Facebook 관리자가 설립한 개인용 SNS 경쟁사인
Path 를 상대로 이러한 조치를 취하였다. 2013 년 4 월경 Facebook 은 필수 API 기능에 대한
Path 의 이용 권한을 정지시켰으며, 이후 Path 의 성장은 크게 둔화되었다.

156.    두 번째 부류는 소셜 기능을 부분적으로만 갖춘 유망한 앱들이었다. 예를 들어,
Facebook 은 지역용 소셜 네트워크를 구축하려고 시도했던 Circle 이라는 앱을 2013 년
12 월부터 주시하였다. Facebook 의 한 관리자는 필수 API 기능에 대한 Circle 의 이용을

차단할 것을 제안하면서 Circle 의 경쟁력을 다음과 같이 강조하였다. "Circle 은 '지역용 소셜

네트워크'라고 스스로 홍보하고 있으며, 지난 4 일 동안 꽤 견조한 성장세를 보였습니다(어제

기준으로 800,000 건 이상의 다운로드, 600,000 회 이상의 Facebook 로그인, 영국 앱스토어

1 위를 기록함)." Facebook 이 대외적으로 내세운 차단 사유는 Circle 에서 '스팸(spam)'

사용자가 활동했다는 것이었지만, Circle 이 스팸 문제를 해결한 이후의 Facebook 내부

서신에서는 Circle 이 위협이 되었기 때문이라는 그 실제 사유가 다음과 같이 언급되고 있다.

"이들은 [소셜] 그래프를 모방하고 있으며, 그러한 시도는 [원문표기]이거나 꽤

성공적이다. . . . 게다가 이제는 해당 그래프를 토대로 우리와 직접적으로 경쟁하는 소셜

네트워크를 만들고 있다." 실제로, Facebook 은 Circle 이 Facebook 의 우려사항들을 해결한

이후에도 API 기능에 대한 이용 허용을 계속 보류했으며, 이와 관련하여 Facebook 의 한

관리자는 다음과 같이 말하였다. "Circle 이 아래의 모든 항목을 이행(또는 이행을 약속)했다는

점은 높이 사지만, 우리는 결국에는 핵심 기능 모방이라는 '시정'이 불가능한 사유를 제시할

수밖에 없습니다." 그 후 몇 주 동안 Circle 의 일일 신규 사용자는 하루 6 만 명 수준에서 0 명

가까이로 떨어지게 되었다.

157. 비슷한 예로, Facebook 의 플랫폼 파트너십 및 운영 담당 이사는 2013 년 1 월에

동료들에게 다음과 같은 메일을 보냈다. "Twitter 가 짧막한 여러 개의 동영상을 이어붙여

6 초짜리 동영상을 제작하는 형태인 Vine 이라는 앱을 오늘 출시했습니다. 해당 NUX[새로운

사용자 경험]에는 Facebook 을 통한 친구찾기 기능이 포함되어 있습니다. 별도의 이의제기가

없는 한, 우리는 오늘 친구찾기 API 에 대한 해당 앱의 이용을 차단할 예정입니다. 대응 성격의

홍보 문구가 준비되었으니, 야나(Jana)에게 이 결정을 알리도록 하겠습니다." 저커버그는

다음과 같이 대답하였다. "좋습니다. 그렇게 하시죠." Facebook 은 Vine 을 차단함으로써

이들이 앱 성장에 도움이 되었을 중요한 API 기능을 이용하지 못하도록 하였다.

158. 세 번째 부류는 모바일 메시지 서비스를 제공 중이거나, Facebook Messenger 의

기존 경쟁사이거나, Facebook Blue 에 대한 경쟁 위협으로 발전할 여지가 있는 경우에
해당하는 유망한 앱들이었다. Facebook 은 2013 년과 그 이후에도 다음과 같이 여러 모바일
메신저, 비디오 및 사진 앱들의 상업적으로 중요한 API 기능 이용을 차단하였다.

a. 2013 년 1 월에 Facebook Messenger 가 경쟁 관계에 있는 음성통화 기능을 출시한
직후, Facebook 은 음성통화 기능을 갖춘 모바일 메신저 앱인 Voxer 의 필수 API
이용을 차단하였다. 해당 차단 조치 이후, Voxer 는 소비자 대상의 모바일
메신저에서 벗어나 무전기형(Push To Talk) 비즈니스 커뮤니케이션 앱으로
전환하였다.

b. 2013 년 2 월, MessageMe 라는 메신저 앱이 인기를 끌면서 출시 1 주일 만에 거의
100 만 명의 사용자를 달성하였다. 그러나 MessageMe 의 사용자 수가 100 만에
도달한 직후 Facebook 은 필수 API 이용을 차단하였다. 해당 차단 조치 이후
MessageMe 는 지지부진하다가 결국 폐업하였다.

c. 2013 년 8 월, Facebook 은 복수의 메신저 앱을 동시에 차단하는 조치를 감행했으며,
개발자 집행팀 책임자는 직원들에게 해당 앱들의 "모든 읽기 API 에 대한 기본 정보
이상의 이용"을 제한하도록 지시하면서, "이러한 제한 조치와 관련하여 해당
[개발자들]과 어떤 식의 소통도 하지 말 것"을 주문하기도 하였다.

d. 2016 년 10 월, Facebook 은 특정 API 기능에 대한 Tribe 의 이용을 차단하였다.
Tribe 는 그 당시에 유행하고 있던 비디오 메신저 앱이었다.

159.    Facebook 이 Platform 이용과 관련하여 집행했던 경쟁제한적 조건들은 개별
기업이 나름의 성장을 거쳐 Facebook 의 개인용 SNS 시장 독점을 위협할 수 있게 될만한
여지를 억눌렀다.

160.    Facebook 의 이러한 집행 조치는 다른 앱들도 Facebook 의 개인용 SNS 시장
독점에 위협이 된다면 상업적으로 중요한 Facebook API 에 대한 이용 권한을 잃게 될 것임을
경고하는 효과가 있었다. 예를 들어, 한 타사 앱은 Facebook 이 Vine 을 차단한 직후에 자사의
플랫폼 사용 관행과 관련하여 Facebook 에게 문의하기도 하였다. Facebook 의 한 관리자는
해당 타사 앱에 대해 다음과 같이 내부적으로 보고하였다. "그들은 우리가 이런 사유를 들어
플랫폼 이용을 차단할 수 있는 가능성이 상존하는 상황에서 앞으로도 우리 플랫폼에 계속
의존해도 될지에 대해 매우 우려하고 있었다."

161.    Facebook 이 이렇게 경쟁제한 형태의 계약을 발표하여 집행한 것은 종합적으로 자신들의 미국 내 개인용 SNS 시장 독점을 위협하는 유망한 경쟁사의 출현을 방해, 억제 및 저지하는 효과를 발생시켰다. 따라서, 이런 방식의 배제 행위는 미국 내 개인용 SNS 시장에 대한 Facebook 의 지배력 유지에 기여하였다. Facebook 은 타사 앱들의 시장진입을 저지하고 경쟁 위협으로 떠오를 위험이 있는 개발자들의 앱을 퇴출시킴으로써 자신들을 경쟁으로부터 보호해주는 네트워크 효과를 공고화하였고, 이 효과는 오늘날까지 지속되고 있다.

162.    개별 건으로서든 집합적으로든, Facebook 의 조치는 Facebook 플랫폼 상에서 운영되는 앱들이 Facebook 자체와 그들의 개인용 SNS 시장 독점에 대한 경쟁 위협으로서 발돋움할 만한 여지와 인센티브를 최소한 두 가지 방식으로 억제하였다. 첫째, Facebook 의 API 를 이용하려는 앱 개발자가 반드시 체결해야 했던 Facebook 이 의무화한 계약의 조건들은 개발자의 인센티브를 변화시킴으로써 개발자들이 Facebook 에 경쟁 위협이 될 수 있는 작동요소 및 기능을 개발하거나 Facebook 과의 경쟁 가능성이 있는 다른 플랫폼과 협력하는 것을 단념시켰다. 둘째, 해당 계약의 집행, 즉 잠재적인 경쟁 위협으로서 Facebook 의 이목을 끌었던 앱에 의한 API 이용을 실제로 정지시킨 조치는 개별 기업이 Facebook 의 개인용 SNS 시장 독점을 위협할 수 있게 될만한 여지를 억눌렀다.

163.    Facebook Platform 이용 조건 부과라는 경쟁제한적 조치를 정당화하기에 충분한 친경쟁적 혜택은 존재하지 않는다.

## VI. **Facebook 의 시장독점력**

164.    Facebook 은 미국 시장에 개인용 SNS 를 제공함에 있어 독점적 지위를 확보하고 있으며, 최소 2011 년부터 이러한 지위를 지속적으로 유지하고 있다. Facebook 이 미국 내 개인용 SNS 시장에서 독점력을 발휘하고 있음을 입증하는 다양한 출처의 증거들이 존재한다. 첫째, Facebook 은 2011 년부터 현재까지 미국 내 개인용 SNS 관련 시장에서 압도적인

점유율을 차지하고 있다. 둘째, Facebook 이 미국 내 개인용 SNS 시장에서 독점력을 발휘하고 있음을 보여주는 직접적인 증거가 존재한다. 셋째, Facebook 의 시장독점력은 직접적인 네트워크 효과와 높은 전환 비용을 포함한 상당한 진입 장벽으로 인해 영속성이 있다.

## A. 미국 내 개인용 SNS 시장의 관련성

165.   미국 내에서 이루어지는 개인용 소셜 네트워킹 서비스(SNS)의 제공은 관련성 있는 시장에 해당한다.

166.   개인용 SNS 는 관련성 있는 제품 시장에 해당한다. 개인용 SNS 는 사람들이 공동의 소셜 공간 안에서 개인적 관계를 유지하면서 친구, 가족 및 기타 지인들과 각자의 경험을 공유할 수 있게 해주고 또 그러한 목적으로 사람들에게 이용되고 있는 각종 온라인 서비스들로 구성된다. 개인용 SNS 는 고유하고 차별화된 유형의 온라인 서비스이다. 개인용 SNS 를 사용자를 대상으로 한 다른 형태의 온라인 서비스와 구분지을 수 있게 해주는 세 가지 핵심 요소가 존재한다.

167.   첫째, 개인용 SNS 는 사용자가 자신의 친구, 가족 및 기타 지인들과 맺고 있는 관계를 파악하는 소셜 그래프(social graph)를 기반으로 구축된다. 소셜 그래프는 사용자와 그 개인적 인맥 사이에서의 연결과 소통이 이루어지는 토대를 형성하며, 이는 우정, 온라인 대화, 누군가의 최신 소식을 확인하고 싶은 욕구, 장소 방문, 그리고 그룹, 장소, 사업체, 아티스트, 취미 등의 개인적 관심사 및 활동과 관련한 기타 형태의 공유된 인맥을 반영하여 나타낼 수 있다. 개인용 SNS 업체가 사용자에게 제공하는 각종 기능의 근간에는 소셜 그래프가 있으며, 여기에는 아래에서 다루어진 개인용 SNS 의 나머지 두 가지 핵심 요소도 포함된다.

168.   둘째, 개인용 SNS 에는 자신의 인맥과 상호작용하고 일대다 형식의 '방송' 등을 통해 각자의 경험을 공동의 소셜 공간 안에 공유하기 위해서 많은 사용자가 정기적으로 활용하는 여러 작동요소들이 포함된다. 뉴스피드나 기타 유사한 작동요소를 포함하고 있는 이

공동의 소셜 공간 안에서 사용자는 개인적 소식, 관심사, 사진, 뉴스, 비디오와 같은 콘텐츠를

자신의 인맥과 함께 공유한다. 개인용 SNS 업체는 소셜 그래프를 활용하여 공동의 소셜

공간에 머물고 있는 사용자에게 어떤 콘텐츠를 언제 표시해야 할지 알 수 있게 된다.

일반적으로 이러한 원리는 사용자의 '뉴스피드' 게시물과 같은 사용자 생성 콘텐츠, 뉴스

기사와 같은 퍼블리셔 생성 콘텐츠, 광고 등, 개인용 SNS 상에 표시되는 모든 형태의 콘텐츠에

적용된다.

169.    셋째, 개인용 SNS 에는 사용자 스스로 다른 사용자를 찾아 연결할 수 있는

기능이 포함되어 있으므로, 개별 사용자는 각자의 인맥을 쉽게 구축하고 확장할 수 있다. 또한

소셜 그래프는 사용자에게 인맥을 제안하거나 연결이 가능한 대상을 보여줌으로써 이 기능을

보조한다. 미국 내에서 가장 널리 사용되고 있는 개인용 SNS 는 Facebook Blue, Instagram,

Snapchat 이다.

170.    관련성 있는 지리적 시장은 미국이다. 미국은 초고속 인터넷 접근성의 격차와

국가별로 차이가 큰 사회적 규범을 포함한 여러 요인들로 인해 개인용 SNS 와의 관련성이 큰

지리적 시장이다. 또한, 거의 모든 사용자들의 경우 관련성 있는 대다수의 친구, 가족 및 기타

지인이 사용자와 동일한 국가에 거주하고 있기 때문에, 사용자들 간의 네트워크 효과는

일반적으로 동일한 국가의 사용자들 사이에서 더 강하게 형성되는 편이다. 이에 따라, 미국의

사용자들은 주로 미국 내의 다른 사용자들과 콘텐츠를 공유하게 된다. 그러므로 미국 내

사용자들에게는, 미국에서 인기가 없는 개인용 SNS 는 설령 다른 국가에서는 인기가 높더라도

미국 내에서 인기를 끌고 있는 개인용 SNS 와 합리적으로 상호 대체할 수 있는 관계가 아니다.

Facebook 과 다른 업계 참여자들은 이러한 차이를 인식하고 있으며, 그들 자신의 성과와

경쟁사들의 성과를 국가별로 구분하여 추적한다.

171.    아래에 설명된 바와 같이, 콘텐츠의 공유 또는 소비의 편리함을 위해 만들어진

미국 내에서 이용 가능한 다른 유형의 인터넷 기반 서비스는 개인용 SNS 를 대체하기에

적합하지 않다.

172.    개인용 SNS 는 모바일 메시지 서비스와는 구별되며, 합리적으로 상호 대체할 수 있는 관계가 아니다. 모바일 메시지 서비스는 사용자가 머물면서 상호작용할 수 있는 공동의 소셜 공간을 제공하지 않고, 사용자가 친구 및 가족과 관계를 맺고 경험을 공유하는 과정을 뒷받침하기 위해 소셜 그래프에 의존하지도 않는다. 실제로, 모바일 메시지 서비스 사용자는 일반적으로 기존에 저장된 것이 아닌 연락처 정보를 찾는 용도로는 모바일 메시지 서비스를 이용할 수 없고 그렇게 이용하지도 않는다. 또한 자신에게 중요한 사람, 장소, 사물 및 관심사와 연결된 다른 사용자를 찾는 용도로 서비스를 이용할 수도 없다. 모바일 메시지 서비스의 사용자는 그 대신 이러한 서비스를 일반적으로 각 사용자가 직접 입력한 일련의 연락처로만 제한되는 소규모의 개별 집단에 속한 사람들에게 통신을 전송하는 용도로 주로 사용한다. 저커버그는 자신의 2019 년 게시물에서 Facebook Blue 와 같은 개인용 SNS 업체를 "시내 광장의 디지털 등가물"로 지칭하는 한편 WhatsApp 과 같은 모바일 메신저 앱에서의 개인 간 커뮤니케이션은 "거실의 디지털 등가물"로 대조적으로 지칭하면서 이러한 차별점을 설명한 바 있다.

173.    개인용 SNS 는 고도로 전문화된 좁은 범주의 콘텐츠를 고도로 전문화된 좁은 집합의 사용자들과 좁은 범위로 특화된 목적에서 공유하기 위해 설계되어 주로 그러한 방식으로 사용자에게 활용되고 있는 전문화된 소셜 네트워킹 서비스와는 구별되며, 합리적으로 상호 대체할 수 있는 관계가 아니다. 따라서 사용자들은 이러한 서비스를 주로 전문가 네트워크 참여 등에서와 같이 소수이거나 좁은 인맥을 유지하거나 이들과 소통하는 용도로 활용할 뿐, 자신의 친구 및 가족과 연결하거나 일상적인 사생활 속 경험을 공유하는 용도로는 활용하지 않는다. 직업적 연결(예: LinkedIn)이나 관심 기반 연결(예: Strava)에 초점을 맞춘 네트워크들이 그러한 예에 해당한다. 사용자들이 좁은 범주의 인맥과 제한적 주제를 공유하는 용도로 알맞다고 여기는 서비스의 다른 예로는 일부 온라인 데이팅 서비스,

그리고 물리적으로 서로 가까운 지역에 위치한 사용자들 사이에서의 공유에만 특화되어 있는 서비스인 Nextdoor 등이 있다.

174.    개인용 SNS 는 사용자의 개인적 인맥이 아닌 사용자의 관심사에 기반한 콘텐츠의 유포 또는 탐색에 초점을 맞춘 온라인 서비스와는 구별되며, 합리적으로 상호 대체할 수 있는 관계가 아니다. 대표적인 예로는 Twitter, Reddit 및 Pinterest 가 있다. 이러한 서비스들은 친구와 가족을 연결하는 데 특화되어 있지 않다. Twitter 는 사용자가 관심을 가진 주제에 대한 정보를 계속 얻을 수 있도록 하는 데 중점을 두며, Reddit 은 참가자들의 관심 주제를 중심으로 이루어지는 대화를 촉진한다. 따라서 사용자들은 이러한 서비스를 주로 자신의 관심사와 관련된 사건에 대한 정보를 얻고 이에 대해 논의하는 용도(예: Twitter), 또는 대부분 특정 관심사를 공유하고 있는 익명의 회원들로 구성된 커뮤니티에서의 대화에 참여하는 용도(예: Reddit)로 활용할 뿐, 자신의 친구, 가족 및 기타 개인적 인맥과 연결하는 용도로는 활용하지 않는다. 따라서 이러한 서비스들은 개인용 SNS 를 합리적으로 대체할 수 없다. 이들과 유사한 형태인 Pinterest 는 사용자가 자신의 관심사에 맞는 콘텐츠를 검색하여 탐색할 수 있도록 해주고 그러한 관심사에 기반한 인맥 형성을 지원하지만, 사용자를 친구 및 가족과 연결하는 데는 초점을 맞추지 않으므로, 해당 서비스를 제공하는 개인용 SNS 를 충분히 대체할 수 없다.

175.    개인용 SNS 는 YouTube, Spotify, Netflix 및 Hulu 등과 같이 비디오 또는 오디오 소비에 초점을 맞춘 온라인 서비스와는 구별되며, 합리적으로 상호 대체할 수 있는 관계가 아니다. 사용자들은 그러한 서비스를 대부분 친분이 없는 사람들로 구성된 광범위한 사용자층을 대상으로 한 특정 미디어 콘텐츠(예: 비디오 또는 음악)를 제공하거나 수동적으로 소비하는 용도로 활용한다. 이러한 서비스의 주된 이용 목적은 친구, 가족 및 기타 개인적 인맥과 소통하는 것이 아니므로, 해당 서비스를 제공하는 개인용 SNS 를 충분히 대체할 수 없다.

176.    TikTok 은 개인용 SNS 의 충분한 대체물이 아닌 콘텐츠 유포 및 소비 관련 서비스의 대표적인 예이다. TikTok 사용자의 주된 활동은 친구 및 가족과 연결하고 개인적으로 교류하는 것이 아니라, 개인적 친분이 없는 게시자의 비디오 콘텐츠를 시청하고, 이를 스스로 제작하여 공유하는 것이다. 사용자들이 TikTok 을 이용하는 목적과 플랫폼에서 일어나는 주된 상호작용의 형태는 자신의 친구 및 가족으로 구성된 네트워크와 상호작용하고자 하는 욕구에 의한 것이 아니다.

177.    Facebook 의 자체 진술 및 내부 문서만 봐도 이들이 개인용 SNS 와 기타 서비스 간의 차이점을 잘 이해하고 있음을 알 수 있다. Facebook 의 모바일 사업부 책임자는 2009 년 7 월에 Apple 에 보낸 이메일에서 Apple 담당자에게 다음과 같이 설명하였다. "YouTube 에 무언가를 게시하는 것은 대규모 비디오 웹사이트에 올려두는 것이지만, 친구 중 누구도 내가 방금 비디오를 게시했다는 사실을 알지 못하며, 대부분의 친구들은 이를 시청하지도 않을 것입니다. 사람들이 이를 발견할 수 있다는 전제 하에, 유튜브에 영상을 올리는 것은 낯선 사람들과 전 세계에 보여줄 있는 재미있고 좋은 방법입니다." 2015 년 2 월, Facebook 의 한 임원은 팀원들을 통해 Onavo 상에서의 YouTube 사용률을 분석했더니 "[Facebook 과 YouTube 간에] 시장 잠식이 일어나고 있음을 확인해주는 근거는 발견되지 않았다"는 점과 "YouTube 와 Facebook 은 비디오 소비와 관련하여 거의 교집합이 없는 활용 사례를 서비스한다"는 점을 발견했다고 저커버그에게 보고하였다. 비슷한 맥락으로, Facebook 은 2019 년 1 월에 "사람들이 TikTok 을 이용하는 목적과 방식은 Instagram 의 그것과는 매우 다르며, 둘 다 우리 사업의 핵심적인 관심 분야에서 직접적인 경쟁 관계에 있지 않다"고 내부적으로 평가하면서, "TikTok 의 이용 목적과 방식은 친구 및 가족과의 공유가 아니다"라고 부연하였다.

178.    또한 Facebook 의 자체 진술 및 내부 문서에 따르면, 이들은 Facebook Blue 가 제공하는 서비스가 개인용 SNS 라는 점, 그리고 사용자가 느끼는 Facebook Blue 의 주된

가치이자 용도 역시 개인용 SNS 임을 이미 인식하고 있는 것으로 보인다. 예를 들어, 저커버그는 처음부터 Facebook Blue 를 두고서 이는 "현실 친구들과의 실제 관계에 관한 서비스이며, 따라서 이곳의 이야기는 그 수신자가 해당 이야기의 생산 주체와 가까운 사이일 것이므로 흥미롭게 다가올 수밖에 없다"라고 묘사하고는 하였다. 보다 최근인 2020 년 8 월에는 저커버그가 "저희가 오랜 기간 가장 주력해 온 활용 사례는 사용자와 그 친구 및 가족들을. . . 서로 연결해주는 것이었습니다"라고 증언하기도 하였다. 비슷한 예로, 샌드버그는 2020 년 9 월의 증언을 통해 Facebook Blue 가 사용자에게 제공하는 가치는 "사용자가 친구 및 가족들과 연락을 유지하고 그들에게 현재 일어나고 있는 소식을 매우 효율적인 방식으로 알 수 있도록 돕는 것"이라고 밝히기도 하였다. 또한, Facebook 이 2018 년에 내부적으로 실시한 사용자 설문조사에서는 Facebook Blue 의 가장 큰 용도가 "내가 관심을 갖는 사람들의 일상적인 순간이나 생각들을 관찰"하고 "내가 관심을 갖는 사람들이 특별한 순간을 맞이했을 때 최신 소식을 받아보는 것"임이 확인되었다. 마찬가지로, 2014 년과 2015 년의 내부 문서에 따르면 Facebook 은 플랫폼 상의 다른 유형의 활동보다 "친구 공유"를 우선시하는 방향으로 Facebook Blue 를 최적화하는 데 집중한 것으로 보인다.

179.    Instagram 은 Facebook 에 인수될 당시에 개인용 SNS 기능을 이미 제공하고 있었다. Instagram 의 설립자들은 '모바일 소셜 네트워크'를 구축하는 작업에 착수했고 이는 성공적이었다. Instagram 은 창립 이래로 개인적 인맥을 통한 소셜 그래프의 유지, 사용자가 자신의 인맥과 상호작용하고 공동의 소셜 공간 안에서 일대다 형식의 '방송' 등을 통해 각자의 개인적 경험을 공유할 수 있는 기능, 개인적 인맥 네트워크를 구축하려는 개별 사용자가 다른 사용자들을 찾고 관계를 맺을 수 있도록 지원하는 기능을 비롯한 개인용 SNS 의 주된 특징들을 제공해 왔다. 또한 최근의 내부 문서에 따르면 Facebook 은 다른 유형의 상호작용보다 '친구 공유'를 우선시하는 방향으로 Instagram 을 최적화한 것으로 보인다.

180.    개인용 SNS 업체의 일반적인 수익원은 사용자에게 표시되는 광고란의

판매이다. 개인용 SNS 업체가 사용자를 대상으로 제공하는 각종 서비스들과 광고주를 위한 광고 판매 사이에서 생성되는 모든 긍정적인 네트워크 효과(예: 다른 서비스 이용 시 필수적으로 사용되는 특정 서비스의 가치 증가)는 오직 한 가지 방향, 즉 사용자가 개인용 SNS 업체가 표시하는 광고 분량에 개의치 않게 되거나 또는 광고가 줄어들거나 아예 없는 서비스를 선호하게 되는 식으로만 작용한다.

**B. Facebook 의 미국 내 개인용 SNS 시장에서 유지 중인 압도적 시장점유율**

181.    Facebook 은 Facebook Blue 와 Instagram 의 각종 서비스를 통해 사용자에게 개인용 SNS 를 제공하며, 적어도 2011 년부터 이러한 각종 서비스와 관련한 업계 1 위 제공업체로 자리매김해 왔다. 또한 Facebook Blue 와 Instagram 은 각각 미국 내 최대 규모를 자랑하는 양대 개인용 SNS 이다.

182.    Facebook Blue 는 최소 2011 년부터 지금까지 미국에서 가장 사용자가 많은 업계 1 위의 개인용 SNS 이다. 상업적으로 이용 가능한 데이터 제공기관인 Comscore 가 유지해 온 데이터 [1]를 분석한 결과에 따르면, 작년 한 해 동안 미국에서 매달 2 억 명 이상이 Facebook Blue 를 방문했으며, 해당 서비스에 대한 미국 사용자들의 하루 평균 이용 시간은 도합 40 억 분 이상이었다. 또한, 2020 년에는 매달 미국 내 모든 인터넷 사용자 중 평균 80% 이상이 Facebook Blue 를 이용하였다.

183.    Facebook 은 2012 년의 인수거래 이래로 Instagram 도 통제하고 있다. Comscore 데이터를 분석한 결과, 지난 해 미국에서 매달 1 억 3 천 8 백만 명 이상이 Instagram 을 이용했으며 해당 서비스에 대한 미국 사용자들의 하루 평균 이용 시간은 도합 15 억 분 이상인 것으로 나타났다. 또한, 2020 년에는 매달 미국 내 모든 인터넷 사용자 중 평균 54% 가량이 Instagram 을 이용하였다.

184.    Snapchat 은 현재 미국에서 Facebook 에 이어 업계 2 위에 올라 있는 개인용 SNS

업체이다. 2011 년에 출시된 Snapchat 은 특히 자동 삭제되기 전에 단시간 동안만 열람이
가능한 '휘발성' 메시지를 친구들에게 전송할 수 있는 기능을 제공함으로써 모바일 메시지
서비스로서의 차별화를 꾀하였다. 갈수록 많은 기능들을 추가해 나간 Snapchat 은, 다른 소비
중심 서비스(예: TikTok)들과는 달리 사용자가 친구 및 지인들과 콘텐츠를 공유하는 데
활용되는 공동의 소셜 공간을 제공하는 등, 이제는 전형적인 개인용 SNS 의 모습을 하고 있다.

185.   Snapchat 의 사용자 기반과 참여도는 규모 면에서 Facebook Blue 와 Instagram 에
한참 못 미친다. Comscore 데이터를 분석한 결과, 지난 해 미국에서 매달 평균 7,500 만 명
가량이 Snapchat 을 이용했으며 해당 서비스에 대한 미국 사용자들의 하루 평균 이용 시간은
도합 6 억 분 안팎인 것으로 나타났다. 이를 사용자들의 Facebook Blue 방문 시 체류 시간과
비교하면 약 15%에 불과하다. 또한, 2020 년에는 매달 미국 내 모든 인터넷 사용자의 약
28%만이 Snapchat 을 이용하였다.

186.   소규모의 다른 개인용 SNS 들도 수시로 미국 시장에 출시되었지만 큰 주목을
받지는 못했으며, Facebook 와의 비교가 무색한 수준이다. 예를 들어, 2016 년에는 "광고 제로.
사용자 추적 제로. 스트레스 제로"라는 문구를 내세운 MeWe 라는 앱이 출시되었다. MeWe 는
광고가 없는 개인용 SNS 를 제공하지만, 추가 스토리지 및 프리미엄 기능을 원하는
사용자에게는 비용을 청구한다. Comscore 데이터를 분석한 결과, 지난 해 미국에서 매달 평균
140 만 명 정도만이 MeWe 를 방문했으며 해당 서비스에 대한 미국 사용자들의 하루 평균 이용
시간은 도합 550 만 분 미만인 것으로 나타났다. 이를 사용자들의 Facebook Blue 방문 시 체류
시간과 비교하면 0.15% 미만에 불과하다. 또한, 2020 년에는 매달 미국 내 모든 인터넷
사용자의 1% 미만이 MeWe 를 이용하였다.

187.   인지도가 높고 자금력이 풍부한 거대 기업들도 포함된 다수의 회사들이 미국 내
개인용 SNS 시장에 의욕적으로 진입을 시도했지만 실패로 그쳤다는 사실은 해당 시장의 진입
장벽이 얼마나 높은지를 여실히 보여준다. 예를 들어, Google 은 2011 년 6 월에 개인용 SNS

제품인 Google+를 출시하였다. Google+가 미국 내 개인용 SNS 시장에 진입함에 따라, 처음에는 Facebook 도 크게 동요하며 반응하였다. 이는 비독점화된 관련 시장이 어떤 이점을 제공해줄지 짐작할 수 있게 해주는 부분이다. 예를 들어, 샌드버그는 Google+가 출시된 몇 주 뒤에 내부적으로 다음과 같이 언급하였다. "처음으로 우리는 진정한 경쟁자를 만났고, 소비자들의 선택을 기다리게 되었습니다... 저는 이것이 경쟁이 치열한 다른 모든 산업에서와 마찬가지의 효과를 불러올 것이라고 봅니다. 더 나은 기업만이 승리하게 되고, 수익은 시간이 갈수록 감소할 것이며, 지금까지처럼 마음껏 실수를 저지른 다음 핵심 사용자한테 기댈 수 없게 되겠죠." 이러한 분위기를 반영하듯, Facebook 경영진은 사용자 개인정보 설정의 폭을 넓혀주는 각종 기능을 도입하기로 하고 Facebook Blue 의 사용자 만족도 개선에 착수하는 등, Google+에 대응하기 위해 서둘러 나섰다.

188.    그러나 초반에 Facebook 이 우려한 것과는 달리 Google+는 출시 후에도 별다른 관심을 끌지 못하였다. 2011 년 12 월, Facebook 은 Google+의 성장을 막은 요인으로 보이는 진입 장벽과 관련하여 내부적으로 다음과 같이 언급하였다. "Google+의 열성 팬들조차 1/ 아직은 Facebook 과 뚜렷이 차별화되는 요소가 없고 2/ 많은 친구들이 Facebook 에 몰려 있어 전환 비용이 높다는 점 때문에 자신의 친구들을 끌어들이는 데 어려움을 겪고 있습니다." 따라서 Google+에 대해 Facebook 이 초반에 보였던 우려와 반응은 출시 후 수개월이 지나자 사라지게 되었다. Google+는 계속 운영되었지만 의미 있는 영향력을 발휘하지는 못하였고, Google 은 2019 년에 결국 서비스를 중지하였다.

189.    다른 업체들도 Google+와 마찬가지로 미국 내 개인용 SNS 시장에서 철수하였다. 완전히 철수한 업체에는 Friendster, Myspace, (Google 이 소유 및 운영했던) Orkut 및 Path 등이 있다. Friendster 와 Myspace 는 2000 년대 중반에 Facebook 이 출시되어 유행하기 전까지는 미국에서 인기를 끌었지만, 2009 년 초반에는 그 자리를 Facebook 에게 내어주고 말았다. Orkut 와 Path 는 Facebook 보다 나중에 출시되었으며, Google+와 마찬가지로

서비스를 지속하기에 충분한 규모의 사용자를 유치하지 못하였다. 두 제품 모두 2018 년 말에
서비스가 중지되었다.

190.    사용자가 체류한 시간, 일일 실사용자(daily active users, "DAU") 및 월간
실사용자(monthly active users, "MAU")와 같은 여러 지표를 사용하여 미국 내 개인용 SNS
관련 시장을 살펴보았을 때, Facebook 은 현 시점에도, 그리고 2011 년부터 내도록 압도적인
시장점유율을 유지하여 왔다. 개별적으로든 집합적으로든, 이러한 지표는 Facebook 이 개인용
SNS 업계에서 적어도 2011 년부터 유지해 온 시장독점력의 견고함에 대해 유력한 증거를
제공한다.

191.    개인용 SNS 의 실사용자 규모와 사람들이 해당 서비스를 이용하는 시간을
측정하는 것은 개인용 SNS 업계에서의 시장점유율 및 시장지배력을 측정하는 데 적절한
지표에 해당한다. 이것이 참인 이유는 여러 가지이다.

192.    첫째, 사용자들이 특정 개인용 SNS 에 대해 느끼는 매력도와 그에 따라
발생하게 되는 경쟁력은 사용자 수와 이용 시 서비스 참여 집중도와 관련이 있다. 소비자는 더
많은 수의 친구 및 가족과 공유하고 교류할 수 있는 기회를 제공하는 개인용 SNS 를 사용하고
이에 참여할 가능성이 더 높으며, 이 경우 다른 서비스를 찾아 나설 가능성은 더 낮다.
Facebook 의 운영현황 자료를 보면 친구 및 가족들 간의 연결과 커뮤니케이션을 촉진할 수
있는 네트워크만의 고유한 가치가 언급되어 있다. 개인용 SNS 업체가 이러한 기회를 얼마나
제공할 수 있는지는 보유 사용자 규모와 그들의 서비스 참여 집중도를 통해 나타나게 된다.

193.    둘째, 운영현황 자료에 따르면 Facebook 의 임원과 투자자, 개인용 SNS 업계의
경쟁사, 업계 관찰자들은 그동안 Facebook Blue, Instagram 및 기타 개인용 SNS 업체들의
성과를 평가하기 위해 실사용자 규모, 그리고 일반적으로 DAU, MAU 및 사용자가 서비스
이용 시 체류한 시간을 기준으로 측정되는 서비스 이용 수준을 주된 척도로 사용해 왔다.

194.    예를 들어, Facebook Blue 와 Instagram 의 성과를 평가하는 Facebook 의 내부

프레젠테이션은 월별 이용 시간, MAU 및 DAU 를 기준으로 하고 있다. 또한 Facebook 은

경쟁사의 경쟁력을 평가하는 작업에서도 이와 동일한 지표에 의존한다. 예를 들어,

저커버그가 2014 년 12 월에 요청한 Snapchat 에 대한 평가 자료에는 이러한 지표가

사용되었고, 이를 받아본 저커버그는 고위급 임원 2 명에게 "여러분은 그들[Snapchat]이 지난

여름보다 지금 더 위협적이라고 보시나요?"라고 물었던 바 있다. 저커버그의 참모들은 이에

답변하는 과정에서 MAU 및 체류 시간 비중을 포함한 지표와 그 '도달률(reach)', 또는 특정

지리적 구역 내에서 특정 달에 해당 제품을 사용한 인터넷 사용자의 백분율을 사용하여

미국을 포함한 다양한 지역을 기준으로 분석된 Snapchat 이용 현황 자료를 제시하였다.

195.    Snapchat 과 Google 처럼 개인용 SNS 를 제공 중이거나 제공했던 다른 회사들도

자사의 성장 현황과 타사의 성과 수준을 측정하기 위해 MAU, DAU 및 체류 시간을 지표로

사용하였다. 예를 들어, Snapchat 의 최신 운영현황 자료에는 다른 지표 중에서도 회사의

MAU, DAU 및 체류 시간 위주로 파악된 Snapchat 과 Instagram 의 성과를 비교한 수치가 나와

있다. 마찬가지로, Google 은 MAU, DAU 및 체류 시간을 지표로 사용하여 Orkut 과 Google+

모두의 성과를 추적하였다. Google 역시 인수 여부를 놓고 개인용 SNS 업체를 평가함에 있어

대상 회사의 MAU, DAU 및 체류 시간을 기준으로 삼았던 바 있다.

196.    상업용 데이터 제공업체는 MAU, DAU 및 체류 시간 등의 지표를 사용하여 각종

온라인 서비스의 미국 내 이용률을 추적한다. 예를 들어, Comscore 와 같은 상용 데이터

제공업체는 대규모 인터넷 사용자 패널 집단의 온라인 행동, 그리고 태그 지정된 웹사이트와

앱 상에서 이루어지는 수조 건의 월간 상호작용을 직접 관찰한 다음, 패널 행동 및 태그 지정

트래픽을 기준으로 업계 통계치를 추정한다. Comscore 데이터는 Facebook 을 포함한 업계

참여자와 관찰자들이 미국 및 기타 지역에서의 온라인 서비스 이용률을 평가할 때 자주

인용된다.

197.    Facebook 은 Facebook Blue 와 Instagram 의 성과를 자체적으로 추적할 때도

이러한 상업적 데이터 제공업체에 의존한다. 예를 들어, 복수의 Facebook 내부 프레젠테이션을 살펴보면 체류 시간과 같은 각종 지표의 출처로 Comscore 가 기재되어 있으며, Facebook 은 저커버그에게 보고할 중요 자료를 준비하는 과정에서 Comscore 통계에 의존하였다.

198.    미국 내 온라인 서비스 이용률을 추적한 상업적 데이터의 분석 결과에 따르면, Facebook 은 체류 시간, MAU 또는 DAU 를 사용한 측정치 모두에서 2011 년부터 지금까지 미국 내 개인용 SNS 관련 시장에서 (Facebook Blue 및 Instagram 을 통해) 지배적인 시장점유율을 차지하고 있는 것으로 나타났다.

199.    특히, 미국 시장에서 개인용 SNS 를 제공 중인 각종 앱과 관련한 사용자의 <u>체류 시간</u>에서 Facebook 이 차지하는 비중은 2012 년 이후로 80%를 넘어선 상태이며, 2011 년에도 적어도 그만큼 높았다. 구체적으로 살펴보면,

   a. Comscore 가 유지해 온 데이터를 분석한 결과, 2012 년 9 월부터 2020 년 12 월까지 미국 시장에서 개인용 SNS 를 제공 중인 각종 앱과 관련한 사용자의 체류 시간에서 Facebook 이 차지하는 비중은 매월 평균 92%를 기록했으며, 어느 달에도 82% 미만으로는 감소하지 않았던 것으로 나타났다. 같은 기간 동안 Snapchat, Google+, Myspace, Path, MeWe, Orkut 및 Friendster 를 포함한 다른 모든 업체가 기록한 비중을 모두 합쳐도 18%를 초과했던 달은 없었다. 이들 회사 중 10% 이상의 점유율을 달성한 것은 오직 Snapchat 뿐이었다.

   b. Facebook 을 대상으로 Comscore 이 2011 년부터 유지해 온 데이터를 살펴봐도, 개인용 SNS 를 제공 중인 각종 앱과 관련한 사용자의 체류 시간에서 Facebook 이 차지하는 비중이 적어도 위에서 설명한 2012 년 후반부터 2020 년까지의 기간만큼 높게 나타나 있다.

200.    미국 시장에서 개인용 SNS 를 제공 중인 각종 앱의 <u>DAU</u> 에서 Facebook 이 차지하는 비중은 2016 년 이후로 70%를 넘어섰으며, 2011 년에도 적어도 그만큼 높았다. 구체적으로 살펴보면,

   a. Comscore 는 스마트폰, 태블릿 및 데스크톱 컴퓨터 각각에 대한 일일 방문자

데이터를 구분하여 유지한다. Comscore 가 유지해 온 데이터를 분석한 결과, 2016 년 9 월부터 2020 년 12 월까지 미국 시장에서 개인용 SNS 를 제공 중인 각종 앱의 DAU 에서 Facebook 이 차지하는 비중은 스마트폰의 경우 매월 평균 80%, 태블릿의 경우 매월 평균 86%, 데스크톱 컴퓨터의 경우 매월 평균 98%를 기록했던 것으로 나타났다. Facebook 의 DAU 점유율은 어떤 기기 유형에서도 어느 달에도 70% 미만으로는 감소하지 않았던 것으로 나타났다. 같은 기간 동안 Snapchat, Google+, Myspace, Path, MeWe, Orkut 및 Friendster 를 포함한 다른 업체들이 기록한 비중을 모두 합쳐도, 어떤 기기 유형에서도 30%를 초과했던 달은 없었다. 오직 Snapchat 만이 모든 기기 유형에서 10%를 상회하는 점유율을 달성하였다.

b. Facebook 을 대상으로 Comscore 이 2011 년부터 유지해 온 정기 스냅샷 데이터를 살펴봐도, 개인용 SNS 를 제공 중인 각종 앱의 DAU 에서 Facebook 이 차지하는 비중이 적어도 위에서 설명한 2016 년 후반부터 2020 년까지의 기간만큼 높게 나타나 있다.

201.   미국 시장에서 개인용 SNS 를 제공 중인 각종 앱의 <u>MAU</u> 에서 Facebook 이 차지하는 비중은 2012 년 이후로 65%를 넘어선 상태이며, 2011 년에도 적어도 그만큼 높았다. 구체적으로 살펴보면,

a. Comscore 는 모바일 기기(스마트폰 및 태블릿 포함) 및 데스크톱 컴퓨터에 대한 월간 방문자 데이터를 구분하여 유지한다. Comscore 가 유지해 온 데이터를 분석한 결과, 2012 년 9 월부터 2020 년 12 월까지 미국 시장에서 개인용 SNS 를 제공 중인 각종 앱의 MAU 에서 Facebook 이 차지하는 비중은 모바일 기기의 경우 매월 평균 76%, 데스크톱의 경우 매월 평균 90%를 기록했던 것으로 나타났다. 이 기간 동안 Facebook 의 MAU 점유율은 모바일의 경우 68%, 데스크톱의 경우 77% 미만으로는 감소하지 않았던 것으로 나타났다. 같은 기간 동안 Snapchat, Google+, Myspace, Path, MeWe, Orkut 및 Friendster 를 포함한 다른 업체들이 기록한 비중을 모두 합쳐도, 모바일에서든 데스크톱에서든 32%를 초과했던 달은 없었다.

b. Facebook 을 대상으로 Comscore 이 2011 년부터 유지해 온 데이터를 살펴봐도, 개인용 SNS 를 제공 중인 각종 앱의 MAU 에서 Facebook 이 차지하는 비중이 적어도 위에서 설명한 2012 년 후반부터 2020 년까지의 기간만큼 높게 나타나 있다.

202.   위에서도 알 수 있듯, Facebook 은 Facebook Blue 와 Instagram 이 주로 개인용 SNS 로서 이용되고 있음을 인식하고 있었다. *논의 진행을 위해* 이와 달리 미국 사용자들이 Facebook Blue 와 Instagram 에 체류했던 시간의 절반 정도가 실제로는 개인용 SNS 로서

이용된 것이 아니라고 가정하더라도, Facebook 은 여전히 미국 내 개인용 SNS 업계에서 지배적인 시장점유율을 유지했을 것이다. 구체적으로, Comscore 의 체류 시간 데이터를 분석해보면, 미국 사용자들이 Facebook Blue 와 Instagram 에 체류했던 시간 중 개인용 SNS 이용을 위한 시간이 절반에 불과하고 Snapchat, MeWe, Path, Orkut, Google+, Myspace, 및 Friendster 의 경우에는 모든 체류 시간을 개인용 SNS 이용에 할애했다고 가정하더라도, 미국 내 개인용 SNS 와 관련한 체류 시간에서 Facebook 이 차지하는 비중은 2012 년 9 월 이후로 매월 평균 85에 달했을 것이며, 최저치를 기록한 달은 약 70였을 것이다.

203.    다른 독점규제 당국들 역시 Facebook 의 해당 국가 내 경쟁력을 평가하기 위해 체류 시간, MAU, DAU 또는 이들의 조합을 지표로서 사용했으며, Facebook 이 해당 국가에서 사용자 서비스를 제공하는 것과 관련하여 시장지배력을 확보한 상태라고 결론지었다. 예를 들어,

a. 2020 년에 영국의 경쟁시장청(Competition and Markets Authority, "CMA")은 "Facebook 은 영국 내 소셜 미디어 업계에서 압도적이고 견고한 시장지배력을 유지하고 있다"는 결론을 내렸다. Facebook 이 압도적인 시장지배력을 유지하고 있다는 CMA 의 결론은 부분적으로는 사용자가 Facebook 서비스에 체류한 시간과 Facebook 이 영국의 인터넷 사용자들에게 가진 도달률을 수치로 나타낸 Comscore 의 상업적으로 이용 가능한 데이터를 기반으로 도출되었다. CMA 는 2020 년 2 월 기준 영국 내 만 13 세 이상의 사용자가 소셜 미디어 플랫폼에 체류한 시간 중 Facebook 과 WhatsApp 이 차지하는 비중은 총 70 이상이었으며, 소셜 미디어 관련 체류 시간의 경우 "약 75" 수준인 것으로 판단하였다. 또한 CMA 는 영국 내 인터넷 사용자의 85 이상이 Facebook 앱을 설치한 상태라고 밝혔다.

b. 2019 년에 독일 연방카르텔사무소(Bundeskartellamt, "BKartA")는 Facebook 의 데이터 서비스 약관이 "개인 사용자를 위한 소셜 네트워크 시장에서의 지배적 지위 남용"에 해당한다고 판단하였다. BKartA 는 Facebook 이 독일 내 SNS 시장에서 지배적 지위를 확보했다는 결론에 도달하는 과정에서 부분적으로는 Facebook 과 다른 회사들이 독일 내에서 기록한 DAU 및 MAU 수치에 의존하였다. BKartA 는 2012 년부터 2018 년 사이에 독일 내에서 운영된 SNS 업체 가운데 Facebook 의 DAU 점유율이 90를 넘어섰고, MAU 점유율은 70를 넘는다고 결론지었다.

c. 2019 년에 호주 경쟁 및 소비자 위원회(Australian Competition and Consumer Commission, "ACCC")는 주로 호주 내 SNS 의 월간 사용자 수와 관련 서비스 참여

시의 체류 시간을 기준으로 Facebook 이 호주 시장에서 확보한 '시장지배력' 등을 평가한 디지털 플랫폼 조사보고서를 발행하였다. 구체적으로, ACCC 는 다양한 디지털 플랫폼과 관련한 일일 플랫폼 사용자 비율과 Facebook 의 월간 사용자층 및 체류 시간에 관한 상업적으로 이용 가능한 정보를 평가하기 위해 설문조사를 실시하였다. ACCC 는 그 중에서도 특히 "Facebook 은 확장을 막는 진입 장벽, 도달 범위의 이점, 특유의 인수 전략을 통해 역동적인 시장 경쟁으로부터 보호받고 있다"고 결론지었다. ACCC 는 진입 장벽과 관련된 여러 요인들 가운데 "Facebook 의 사용자층 규모는 Snapchat 의 사용자층 규모(Facebook 플랫폼에 가장 근접한 경쟁자)보다 3 배 이상 크다. 이러한 네트워크 효과는 시장진입과 확장에 상당한 장벽으로 작용한다"는 점을 지적하였다.

204.    DAU 와 MAU 는 개별 사용자가 하루(DAU 의 경우) 또는 한 달(MAU 의 경우) 이내에 두 가지의 서로 다른 개인용 SNS 를 얼마나 집중적으로 이용했는지는 반영하지 않는다. 본 문서에서 설명한 바와 같이, Facebook 및 기타 업계 참가자와 관찰자는 그럼에도 불구하고 Facebook 및 기타 개인용 SNS 업체의 경쟁력과 성과를 평가하기 위해 DAU 및 MAU 와 같은 척도를 사용하고 있다. 또한, Facebook 의 이용 집중도가 월등한 것은 관련 기간 전반에서의 체류 시간과 관련한 점유율이 압도적인 덕분이다. 따라서, DAU 및 MAU 측정 시 이용 집중도가 부정확하게 반영될 경우 Facebook 의 경쟁력을 *과소평가*하는 결과가 발생한다. 설령 그렇다 하더라도, Facebook 은 해당 기간 동안 압도적인 DAU 및 MAU 점유율을 보이고 있다.

**C. 역사적 사례 및 시장 현실 등의 직접적인 증거로 확인된 Facebook 의 시장지배력**

205.    다양한 출처의 다른 증거들을 통해서도 Facebook 이 미국에서 개인용 SNS 를 제공함에 있어 압도적인 시장지배력을 발휘하고 있음을 확인할 수 있다.

206.    첫째, 역사적 사례에 따르면, Facebook 의 행위가 사용자들에게 상당한 불만족을 야기했을 때조차 Facebook 이 보유한 사용자나 그들의 참여를 경쟁사에 빼앗기게 되는 일은 일어나지 않는다. 이는 시장지배력을 보여주는 단면이다. 예를 들어, Facebook 의 사용자 데이터가 Cambridge Analytica 라는 회사에 의해 비밀리에 수집되었다는 뉴스가

2018 년에 보도된 후, Facebook 은 이전과는 비교할 수 없이 신속한 [편집처리] 경험하게 되었다. 비록 사용자들은 Facebook 에 불만족했지만, 이 사고는 [편집처리]였고 Facebook 이 [편집처리]를 단념하도록 만들지 않았다. Facebook 이 자체적으로 실시한 Facebook Blue 에 대한 분석 역시 [편집처리]했고, [편집처리]하다는 결론을 내렸다. Facebook 이 Facebook Blue 에서의 사용자 참여 손실을 최소화하면서도 상당한 수준의 사용자 불만을 버텨낼 수 있다는 사실은 비탄력적인 수요와 시장지배력이 작동 중임을 의미한다.

207.   더 넓게 보면, Facebook 은 그동안 사용자 데이터를 오용하거나 부주의하게 취급하는 등, 사용자 경험을 저하시키는 다른 여러 활동들에도 관여해왔다. 예를 들어, FTC 는 Facebook 이 여러 심각한 사용자 개인정보 남용 및 보호의무 위반에 관여했다는 혐의를 2012 년과 2019 년에 제기했으며, Facebook 은 두 번 모두 동의명령(Consent Order)에 승복(또한 2019 년에는 미화 50 억 달러의 벌금도 지불)하였다. Facebook 이 제품의 품질을 떨어뜨려 사용자에게 피해를 주고 있음에도 사용자 참여가 크게 줄어들지 않는다는 사실은 Facebook 이 시장지배력을 가지고 있음을 나타낸다.

208.   둘째, Facebook 은 상당한 고객 불만족을 야기했음에도 불구하고 장기간에 걸쳐 엄청난 수익을 벌어들일 수 있었으며, 이는 Facebook 이 시장독점력을 가지고 있다는 점과 개인용 SNS 업계의 경쟁자들이 진입 장벽을 극복하고 그 지위에 도전할 수 없다는 것을 시사하는 부분이다. Facebook 은 2011 년부터 높은 수익과 시가총액을 유지해 왔다. 2020 년을 예로 들면, Facebook 은 시가총액 기준 세계 6 위의 상장 기업으로, 전 세계적으로 약 미화 850 억 달러의 매출 가운데 290 억 달러의 수익을 창출했으며, 이 중 420 억 달러의 매출은 미국과 캐나다에서 발생하였다. 2020 년 4 분기에 Facebook 은 미국과 캐나다에서 53.56 달러의 사용자당 평균 매출(Average Revenue Per Paying User, "ARPU")을 기록했다고 보고하였다. 2013 년, 즉 기업 상장으로부터 만 1 년이 지난 시점부터 Facebook 의 이익 마진은 치솟기 시작하여 S&P 500 에 들어가는 회사들의 평균과 S&P 500 정보기술 부문 회사들의

평균을 크게 넘어서게 되었다. 이렇게 막대한 이익을 견인하는 요소는 Facebook 이

사용자에게 발휘하는 견고한 시장독점력이다. 또한 보기 드물게 높은 Facebook 의 시가총액은

향후 수년간의 높은 수익 흐름에 대한 기대치를 반영한 것이므로, 투자자들은 이들의

시장독점력이 지속될 것으로 보고 있다고 할 수 있다.

209.    Facebook 의 수익은 미국 내 개인용 SNS 경쟁사들의 관련 수치보다 월등히 높은

수준이다. 예를 들어, Snapchat 은 수익을 기록한 적이 없다. 2020 년에 Snapchat 은 약 미화

25 억 달러의 매출 가운데 9 억 4,480 만 달러의 전체 순손실을 기록했다고 보고하였다. 이

매출에서 약 미화 16 억 달러는 미국 내 사용자에게서 발생하였다. 2020 년 4 분기에

Snapchat 이 북미에서 기록했다고 보고한 ARPU 는 미화 7.19 달러였다.

210.    Facebook 의 시장독점력을 극명히 보여주는 또 다른 요소는 잠재적인 경쟁사가

Facebook 의 방대한 개인용 SNS 사용자 기반에 접근할 수 없게 만드는 제한적인 정책을

시행함으로써 앱 개발자들의 장래성을 무너뜨릴 수 있는 이들의 통제권이다. 위에서 설명한

바와 같이, Facebook 은 스스로 경쟁 위협이라고 간주한 앱이 Facebook 의 플랫폼과 상호

연동되는 것을 막기 위해 일련의 조치를 취하였다. 그 결과, 많은 앱들이 Facebook 의

시장독점력을 견제하는 의미 있는 경쟁자로 부상하지 못하게 되었고, 몇몇 경우에는 서비스가

완전히 중지되고 말았다. Facebook 이 위협적인 경쟁자로 부상하거나 이에 조력할 수 있는

회사들을 퇴출시킬 수 있다는 사실은 시장독점력의 직접적인 증거에 해당한다.

211.    Facebook 이 앱 개발자의 잠재성을 해칠 수 있는 것은 개인용 SNS 시장에서의

지배력 덕분이며, 이는 Facebook 의 한 임원이 2012 년 5 월에 Facebook 의 COO 인 셰릴

샌드버그에게 보낸 다음과 같은 이메일에도 압축적으로 드러나 있다. "우리가 신규 사용자의

가입을 유도하는 임계 사용자 수를 이미 확보하고 있기 때문에, 이는 자사의 앱과 웹사이트를

고객에게 알리고 싶은 개발자를 끌어들이게 되고, [이는 다시] 소비자에게 다가가고자 하는

광고주를 끌어들이게 됩니다." 해당 임원은 Facebook 이 2012 년 초부터 이미 "이제는

개발자의 입장에서 현재와 미래의 사용자/고객 대부분이 Facebook 회원일 것이라고 생각해도 되는 규모에 [이르렀다]"고 설명하면서, "Apple 앱스토어의 상위 10 개 앱 중 [7]개는 Facebook 과 [연동됩니다]"라고 덧붙였다.

**D.  진입 장벽에 의해 보호되고 있는 Facebook 의 지배적 지위**

212.    Facebook 이 미국 내 개인용 SNS 시장에서 차지하고 있는 지배적 지위는 직접적인 네트워크 효과와 높은 전환 비용을 포함한 상당한 진입 장벽으로 인해 영속성이 있다. 직접적인 네트워크 효과란 더 많은 사용자가 서비스에 참여할수록 해당 개인용 SNS 의 가치를 더욱 올려주게 되는 사용자 대 사용자 효과를 의미한다. 직접적인 네트워크 효과는 개인용 SNS 시장으로의 진입을 가로막는 중요한 장벽이다. 특히, 개인용 SNS 의 핵심 목적은 개인적인 인맥과의 연결하고 교류하는 것이기 때문에, 신규 시장진입자가 사용자의 친구와 가족이 이미 참여하고 있는 기성의 개인용 SNS 를 대신하는 것은 매우 어렵다. Facebook 의 한 임원은 2012 년 5 월에 이렇게 한마디로 표현하였다. "우리가 까다로운 경쟁 상대인 이유는 뭘까요? 친구들이 여기 있기 때문입니다. 사용자들은 Facebook 네트워크와 ID 에 이미 많은 투자를 한 상태입니다." 저커버그 본인도 2012 년 4 월의 메일에서 "아마도 Facebook 에서 가장 가치 있는 요소는 현 시점에 세계에서 가장 포괄적인 주소록 및 관계도라는 점일 것이며, 이는 엄청난 구조적 [이점입니다]"라고 하는 등, Facebook 이 이러한 구조적 장벽으로 인해 누리고 있는 상당한 이점을 인식하였다.

213.    개인용 SNS 시장의 잠재적 진입자는 스스로 이러한 네트워크 효과에 직면하는 것 외에도, 사용자가 맞닥뜨리게 되는 높은 전환 비용도 극복해야 한다. Facebook 및 기타 개인용 SNS 의 사용자들은 시간이 지날수록 더 많은 사용자들과 연결되고, 각종 게시물과 공유된 경험의 기록을 쌓아가게 되며, 이는 다른 개인용 SNS 업체로 간단히 이전할 수 없는 성질의 것들이다. 또한, 각 사용자가 수집해온 콘텐츠와 인맥, 그리고 각각을 구축하는 데

투입된 노력이 서비스 이용이 계속될수록 점점 누적되는 '관성효과(ratchet effect)' 때문에, 이러한 전환 비용은 시간이 지남에 따라 불어날 수 있다. 실제로, Facebook 의 운영현황 자료에는 "실제적인 '관성' 효과에 대한 수많은 증거들"의 존재가 언급되어 있으며, 관성효과 덕분에 "영구적인 이점이 주어질 수 있다"고 되어 있다.

214.    Facebook 은 미국 내 개인용 SNS 업체들 가운데 체류 시간, DAU 및 MAU 면에서 압도적이며, 이는 Facebook 이 시장지배력을 강화하고 잠재적인 경쟁사의 시장진입을 더 어렵게 만들어주는 강력하고 직접적인 네트워크 효과의 수혜자라는 점을 시사한다.

215.    또한 Facebook 의 내부 데이터는 자신들이 시간이 갈수록 강화되어 온 관성효과의 혜택을 입었음을 확인해주고 있다. 한 가지 예로, Facebook Blue 의 미국 내 월간 실사용자(매월 첫째 날 기준으로 측정)당 Facebook 친구 수는 2009 년 1 월의 [편집처리]에서 2019 년 10 월에는 [편집처리]으로 증가하였다.

216.    Facebook 은 사용자가 개인용 SNS 에 더 많은 시간을 투자하고 더 많은 콘텐츠를 게시하게 될수록 전환 비용도 증가한다는 것을 오래 전부터 인식하고 있었다. 예를 들어, Facebook 의 한 임원은 2012 년 1 월에 저커버그에게 "사용자의 전환 비용을 현저히 높일 수 있는 가장 중요한 방법일 거라고 말씀드리고 싶습니다. 만약 사용자가 자신의 모든 사진을 이곳에 저장해 두었다면. . . 그러한 사진들과 관련 데이터/댓글까지 옮길 수 없는 상황에서는 전환을 결심하기가 매우 어려울 것입니다"라는 메일을 보내기도 하였다. 따라서 각 Facebook 사용자당 사진과 비디오 콘텐츠 분량이 늘어난 것은 높은 전환 비용이 Facebook 의 시장독점력을 보호해주는 효과가 여전히 상당한 수준임을 보여주는 또 다른 사례다. 2012 년부터 2018 년까지 Facebook 의 MAU 당 게시된 평균 이미지 수는 [편집처리] 이상 증가했으며 MAU 당 게시된 평균 비디오 수는 [편집처리]만큼 증가하였다.

217.    Facebook 의 경쟁제한 행위는 진입 장벽을 더욱 강화하였다. Facebook 이 Instagram 과 WhatsApp 을 인수한 결과, 다른 회사가 모바일 사진 공유나 모바일 메시지

기능을 통해 개인용 SNS 시장에 진입하는 것을 막아주는 "해자"가 Facebook 주위에 형성되었다. 또한 앱 개발자의 Facebook Platform 이용을 통제하는 Facebook 측의 조건은 원래는 경쟁 위협으로 부상할 수도 있었을 잠재적 경쟁자를 가로막는 장애물로 작용하였다.

### VII.   Facebook 의 행위가 시장경쟁 및 소비자에게 끼치는 피해

218.    Facebook 은 위에서 설명한 행동을 통해 개인용 SNS 업계 경쟁사의 출현과 성장을 방해, 억제 및 저지하였고, 능률경쟁 이외의 수단을 동원하여 미국 내 개인용 SNS 시장에서의 지배력을 불법적인 형태로 유지하였다.

219.    Facebook 은 위에서 설명한 행동을 통해 잠재적 경쟁사들을 효과적인 유통 채널에서 배제시켰으며, 이로써 이러한 회사들이 미국 내 개인용 SNS 시장에서 의미 있는 경쟁사로 부상하는 데 필요한 규모 확장을 막았다.

220.    위에서 설명한 행위는 Facebook 이 원래는 개인용 SNS 를 제공하는 과정에서 직면하여야 했을 시장경쟁을 제한하고 억제함으로써 시장경쟁을 저해하는 결과를 낳았고, 이는 지금도 계속되고 있다. 그 결과, 미국 내 개인용 SNS 사용자들은 개인용 SNS 업계와 관련한 시장경쟁의 혜택을 박탈당하였다.

221.    시장경쟁은 추가 혁신(예: 사용자를 유치하고 유지하기 위한 새로운 작동요소, 기능, 비즈니스 모델의 개발 및 도입), 품질 개선(예: 사용자를 유치하고 유지하기 위한 개선된 작동요소, 기능, 기업윤리 실천 및 사용자 경험), 소비자 선택권(예: 표시되는 광고의 분량과 유형에 관한 개인 설정, 그리고 데이터 수집 및 사용 관행에 관한 옵션을 포함하되 이에 국한되지 않는 각종 사용자 데이터 및 개인정보 보호 옵션의 가용성과 품질 및 다양성을 포함하되 이에 국한되지 않는 요소들과 관련하여 사용자 자신이 더 선호하는 개인용 SNS 업체를 선택할 수 있는 권리를 보장하는 것) 가운데 일부 또는 전부에 해당하는 방식으로 사용자들에게 편익을 제공한다.

222.    Facebook 을 견제할 수 있는 경쟁자가 실종되어 이들이 시장독점력을 행사할 수 있게 됨으로써 소비자들은 피해를 입고 있다. 의미 있는 경쟁이 결여된 덕분에, Facebook 은 경쟁이 치열한 시장이라면 제공되어야 했을 수준보다 낮은 품질로 개인정보보호 및 데이터 보호를 제공하는 것이 가능하였다.

223.    Facebook 이 유지하는 불법적인 시장독점력과 그로부터 발생하는 소비자 피해는 그들의 부당한 독점적 지위를 강화해주는 강력한 네트워크 효과로 인해 특히 시정이 까다롭다. 경쟁은 오직 이러한 효과에 대응할 수 있도록 맞춤화된 금지명령을 통해서만 회복이 가능하다.

224.    Facebook 의 행위로 인한 소비자 피해는 진입 장벽을 높이는 한편 신생 경쟁사로서 Facebook 의 시장독점력에 효과적으로 도전해볼 수 있었을 중요한 기술 전환기에 있는 경쟁자들을 제거했던 Facebook 의 행태로 인해 특히 심각하다 할 수 있다. Facebook 의 이러한 기술 전환기를 이용하여 Facebook 의 독점적 지위를 위협할 수도 있었던 혁신적 신제품의 개발을 저해하는 경쟁제한적 행위를 일삼았다.

225.    Facebook 은 미국 내 개인용 SNS 시장을 독점함으로써 미국에서의 광고 판매와 관련된 시장경쟁 역시 해쳤으며, 이는 지금도 계속되고 있다. 특히, 개인용 SNS 업체는 일반적으로 광고 판매를 통해 자사 플랫폼에서 수익을 창출하기 때문에, Facebook 이 개인용 SNS 업계의 경쟁사들을 억누른 것은 광고 서비스 업계에서의 치열한 경쟁 역시 피할 수 있게 해주는 결과를 가져다 주었다. 이는 Facebook 이 광고주에게 제공하는 가치와 관련하여 예측 가능한 결과를 불러왔다. 예를 들어, Facebook 은 불투명하고 때로는 신뢰성이 떨어지는 광고효과 지표, 그리고 광고주의 광고효과 평가를 어렵게 만드는 플랫폼상의 가짜 계정 범람과 관련하여 반복적으로 비난을 받아 왔다.

226.    개인용 SNS 업계의 경쟁사들은 광고 제공 분야에서 Facebook Blue 와 치열한

77

경쟁을 벌일 수 있었을 것이다. 소셜 광고를 다른 형태의 디스플레이 광고, 검색 광고 및 '오프라인' 광고와 차별화 하는 상술한 독특한 광고 기능을 경쟁사들이 제공할 수 있었을 것이기 때문이다. 특히 Instagram 과 WhatsApp 은 광고 판매와 관련한 Facebook Blue 의 입지를 견제할 수 있는 유의미한 경쟁자로 발돋움할 수 있는 유리한 위치에 있었다. Instagram 설립자들은 Instagram 의 개인용 SNS 를 통해 수익을 창출할 수 있는 광고 상품들을 개발할 계획이었다. 그리고 개인용 SNS 제품을 독자 개발한 WhatsApp 역시 광고를 판매하거나 대안적 모델을 추구함으로써 수익을 창출하고자 하는 인센티브를 가지고 있었을 것이다. 경쟁 관계의 소셜 네트워크들이 소비자와 광고주가 더 선호하는 대안적 광고 모델의 탐색 및 개발에 성공했을 가능성은 충분하다.

227.    따라서, 개인용 SNS 시장에서의 독점적 지위를 유지하기 위한 Facebook 의 경쟁제한적 행위는 광고 판매와 관련한 경쟁 역시 무력화, 억제 및 저지하면서 광고주에게 돌아갈 추가적인 시장경쟁의 이점을 박탈하는 결과를 낳았다.

228.    광고주에게 돌아갈 추가적인 시장경쟁의 이점에는, 광고 대상 사용자의 증가(사용자를 고려한 개인용 SNS 의 혁신 및 품질 향상에 따른), 광고 단가 인하(광고시장 내 추가 경쟁이 광고 가격의 하락을 유도할 수 있으므로), 더 많은 혁신(광고시장 내 추가 경쟁은 개발자들이 광고주 유치를 목적으로 각종 작동요소, 기능, 비즈니스 모델을 추가할 만한 유인이 되므로), 품질 개선(광고시장 내 추가 경쟁이 투명성, 준법성, 광고노출 인증, 고객 서비스, 성과 및 기타 지표 보고의 정확성, 인접 콘텐츠에 대한 민감성과 같은 브랜드 보호 수단 등과 관련한 광고 품질 개선에 나설 만한 유인이 되므로), 선택권(광고시장 내 추가 경쟁 덕분에 광고주가 광고 형태의 다양성 및/또는 다양한 사용자용 개인 설정과 관련한 선호도를 포함하되 이에 국한되지 않는 자신의 선호도에 더 부합하는 개인용 SNS 업체를 선택할 수 있게 되므로) 가운데 일부 또는 전부가 포함된다.

229.    Facebook 이 다른 수단을 통해서는 달성이 불가능하다고 주장하는 효율성, 친경쟁적 혜택 또는 사업적 정당성의 논리로는 시장경쟁에 가해진 심각한 피해를 정당화할 수 없다.

## VIII.    제 1 소인 – 경쟁제한 인수를 통한 시장독점의 유지

230.    FTC 는 상기 제 1~229 항의 주장을 재차 주장하며 본 언급에 의하여 해당 주장을 본 항에 통합한다.

231.    Facebook 은 미국 내 개인용 SNS 와 관련하여 적어도 2011 년부터 시장독점력을 확보하고 있었다.

232.    Facebook 은 일련의 경쟁제한적 인수거래로 구성된 경쟁제한적 행동 방침을 통해 적극적으로 자신들의 시장독점력을 유지하여 왔다. Facebook 은 그러한 행위를 통해 경쟁자를 배제하였고, 능률경쟁 이외의 수단을 동원하여 개인용 SNS 시장에서의 독점적 지위를 적극적으로 유지하였다.

233.    Facebook 의 행동 방침은 지금도 유효하다. Facebook 은 Instagram 및 WhatsApp 을 비롯하여 인수에 성공한 경쟁 위협을 지속적으로 보유 및 흡수하고 있다. Facebook 은 Instagram 과 WhatsApp 를 계속 소유하며 운영을 이어감으로써 직접적인 경쟁 위협을 무력화하는 한편, 모바일 사진 공유 및 모바일 메시지 기능을 앞세운 다른 회사들이 개인용 SNS 시장에 진입하지 못하도록 막아주는 '해자(moat)'를 형성 및 유지하고 있다. Facebook 은 경쟁 위협을 발견하기 위해 업계를 지속적으로 모니터링하고 있으며, 앞으로도 개인용 SNS 시장에서의 독점적 지위에 대한 위협에 해당하거나 그러한 형태로 변신이 가능한 회사를 인수하려고 시도할 가능성이 높다.

234.    Facebook 이 개인용 SNS 시장 독점을 유지하는 과정에서 일삼는 배제적 행위를 정당화할 수 있는 친경쟁적인 사유는 존재하지 아니한다.

235.   Facebook 의 경쟁제한적 행위는 셔먼법(Sherman Act) 제 2 조, 미국법전 제 15 편 제 2 조를 위반한 불법적인 시장독점에 해당하며, 따라서 이는 FTC 법 제 5(a)조, 미국법전 제 15 편 제 45(a)조를 위반한 불공정한 경쟁 방식에 해당한다.

**IX.   제 2 소인 – 경쟁제한적 인수거래 그리고 개발자의 Facebook Platform 이용을 규율하는 계약에 포함시킨 경쟁제한 형태의 조건부 거래 정책 등의 위법한 행동 방침을 동원한 시장독점 유지**

236.   FTC 는 상기 제 1~229 항의 주장을 재차 주장하며 본 언급에 의하여 해당 주장을 본 항에 통합한다.

237.   Facebook 은 미국 내 개인용 SNS 와 관련하여 적어도 2011 년부터 시장독점력을 확보하고 있었다.

238.   Facebook 은 경쟁제한적 인수거래와 경쟁제한 형태의 조건부 거래 관행을 모두 포함하는 경쟁제한적 행동 방침을 통해, 그리고 자신들의 개인용 SNS 시장 독점에 경쟁 위협이 제기되는 것을 저지할 목적으로 Facebook 플랫폼과 관련된 경쟁제한적 계약을 유지하고 집행함으로써 적극적으로 기존의 시장독점력을 유지하여 왔다. 위에서 설명한 바와 같이, Facebook 은 경쟁제한적 인수거래를 수행하는 한편, 조건부 거래 정책이 포함된 계약을 놓고 Facebook 플랫폼에 접근할 수 있는 권리를 대가로 타사 앱들의 동의를 얻어내고 앱들에 의한 필수 API 이용을 차단하는 방식으로 그러한 경쟁제한적 형태의 계약을 집행함으로써 자신들의 개인용 SNS 시장 독점을 유지하여 왔다.

239.   Facebook 은 자신들의 행동 방침을 통해 경쟁자를 배제하였고, 능률경쟁 이외의 수단을 동원하여 개인용 SNS 시장에서의 독점적 지위를 적극적으로 유지하였다.

240.   Facebook 의 행동 방침은 지금도 유효하다. Facebook 은 인수에 성공한 Instagram 및 WhatsApp 과 같은 경쟁 위협을 지속적으로 보유 및 흡수하고 있다. Facebook 은 자신들이 Instagram 과 WhatsApp 를 계속 소유하며 운영을 이어감으로써 직접적인 경쟁

위협을 무력화하는 한편, 모바일 사진 공유 및 모바일 메시지 기능을 앞세운 다른 회사들이 개인용 SNS 시장에 진입하지 못하도록 막아주는 '해자(moat)'를 형성 및 유지할 수도 있음을 인지하고 있다. Facebook 은 경쟁 위협을 발견하기 위해 업계를 지속적으로 모니터링하고 있으며, 앞으로도 개인용 SNS 시장에서의 독점적 지위에 대한 위협에 해당하거나 그러한 형태로 변신이 가능한 회사를 인수하려고 시도할 가능성이 높다. Facebook 은 또한 지속적으로 개발자를 심사하고 있으며, 자의적인 사유를 들어 언제든 API 이용을 허용하거나 거부할 수 있다. Facebook 은 자신들의 앱 개발자 관련 정책에 대한 공적 조사가 진행됨에 따라 해당 계약들에 포함된 정책을 집행할 계획이 없다는 주장을 펼칠 수밖에 없었던 2018 년 12 월 직전까지도 개발자들과 제한적인 형태의 기존 계약을 유지했으며, Facebook 은 그러한 조사가 종료되거나 상황이 달리 바뀌는 경우에는 해당 정책을 재도입할 가능성이 높다.

241.    Facebook 이 개인용 SNS 시장 독점을 유지하는 과정에서 일삼는 배제적 행위를 정당화할 수 있는 친경쟁적인 사유는 존재하지 아니한다.

242.    Facebook 의 경쟁제한적 행위는 셔먼법(Sherman Act) 제 2 조, 미국법전 제 15 편 제 2 조를 위반한 불법적인 시장독점에 해당하며, 따라서 이는 FTC 법 제 5(a)조, 미국법전 제 15 편 제 45(a)조를 위반한 불공정한 경쟁 방식에 해당한다.

## X.  구제조치 승인 권한

243.    FTC 법 제 13(b)조, 미국법전 제 15 편 제 53(b)조는 본 법원에게 FTC 법 위반 사례에 대해 영구 금지명령을 내리고, 형평법상의 관할권 행사를 통해 Facebook 의 위반 행위로 인한 피해의 치유를 위한 형평법상의 구제조치를 명령할 권한을 부여한다.

## XI. 구제 소원

이에 따라, FTC 는 본 법원이 FTC 법 제 13(b)조, 미국법전 제 15 편 제 53(b)조에 의해 승인된 대로, 그리고 형평법상 부여받은 권한에 따라, Facebook 을 상대로 다음을 인정, 명령, 판정하는 최종 판결 및 명령을 선고할 것을 청구한다.

A. Facebook 의 행동 방침이 본 소장에서 주장된 바와 같이 셔먼법(Sherman Act) 제 2 조를 위반하였고, 따라서 이는 FTC 법 제 5(a)조, 미국법전 제 15 편 제 45(a)조에 반하는 불공정한 경쟁 방식에 해당한다는 사실

B. 자산의 분할, 사업부의 분할 또는 재편(Instagram 및/또는 WhatsApp 을 포함하되 이에 국한되지 않음), 그리고 독립적 생존이 가능한 하나 이상의 기업(들)에게 Facebook 으로부터 합리적으로 필요한 범위에 한하여 제공되는 지속적인 지원 또는 서비스를 포함하여, 본 소장에서 주장된 행위가 아니었다면 정상적으로 이루어졌을 시장경쟁을 회복하기에 충분한 기타 구제조치

C. 시장경쟁을 회복하고 위에서 설명한 Facebook 의 경쟁제한 행위로 인해 야기된 시장경쟁의 훼손을 치유하는 데 필요한 기타 모든 형평법상의 구제조치

D. 향후의 인수합병에 대한 사전 통지 및 사전 승인 의무

E. Facebook 이 개발자의 API 및 데이터 이용을 규율하거나 이와 관련한 경쟁제한 조건을 부과하는 경쟁제한적 형태의 계약을 동원하는 것에 대한 영구적 금지

F. Facebook 이 본 소장에 기술된 불법 행위에 관여하는 것에 대한 영구적 금지

G. Facebook 이 향후에 유사하거나 관련된 행위에 관여하는 것에 대한 영구적 금지

H. FTC 에 정기 준수 보고서를 제출하고, 합리적이고 적절한 보고 및 모니터링 의무에 따라야 한다는 요건

I. 본 소장에서 주장된 Facebook 의 법률 위반을 시정하고 재발을 방지하기 위해 법원이 필요하다고 판단하는 기업분할, 구조조정 또는 상호운용성 요건을 포함하되 이에 국한되지 않는 기타 모든 형평법상의 구제조치

날짜: 2021 년 9 월 8 일                          삼가 제출함,


                                                  [서명]

                                   _____

홀리 브도바 (HOLLY VEDOVA)       다니엘 J. 매시슨 (DANIEL J. MATHESON)

                                   (D.C. 바 제 502490 호)

국장 직무대리                             선임 변호사


경쟁국                              600 Pennsylvania Avenue N.W.

                                   Washington, DC 20580

                                   202-326-2075

MARK WOODWARD (마크               dmatheson@ftc.gov

우드워드) (D.C. 바 제 479537 호)

                                   로버트 주버 (ROBERT ZUVER)

부국장 직무대리

                                   (D.C. 바 제 987216 호)

경쟁국

                                   마리아 디모스카토 (MARIA

타라 코슬로브 (TARA KOSLOV)        DIMOSCATO) (D.C. 바 제 489743 호)

(D.C. 바 제 448147 호)              에릭 코크란 (ERIC COCHRAN)

부국장                             (D.C. 바 제 981148 호)

경쟁국

헤더 존슨 (HEATHER JOHNSON) (D.C. 바 제 503465 호)

부국장 직무대리

경쟁국

패트리샤 갈반 (PATRICIA GALVAN)

담당관

크리샤 세릴리 (KRISHA CERILLI) (D.C. 바 제 983281 호)

부담당관

헨리 하우저 (HENRY HAUSER) (D.C. 바 제 1614882 호)

미츠웰 런던 (MITCHELL LONDON) (D.C. 바 제 1029408 호)

오웬 마스터스 (OWEN MASTERS) (D.C. 바 제 242139 호)

마이클 미카와 (MICHAEL MIKAWA)

노엘 밀러 (NOEL MILLER) (D.C. 바 제 1026068 호)

다비드 오양 (DAVID OWYANG)

마크 실비아 (MARK SILVIA)

마이클 스미스 (MICHAEL SMITH) (D.C. 바 제 996738 호)

레베카 와인슈타인 (REBECCA WEINSTEIN)

실비아 장 (SYLVIA ZHANG)

*원고측 변호사*

*연방거래위원회(FEDERAL TRADE*

*COMMISSION)*

---

[1] Comscore 데이터 분석 자료에 대한 참조는 2 세 이상의 미국 내 데스크톱 사용자 및 18 세 이상의 미국 내 모바일 사용자를 대상으로 수집된 데이터에 기반함. Comscore 데이터에는 다음과 같은 Comscore, Inc.의 면책조항이 적용됨. "기밀을 요하는 본 분석 자료의 성격상, COMSCORE, INC.는 그 내용을 검토하는 것이 허용되지 않았으므로, 당사는 여하한 제 3 자가 여기에 포함된 일체의 정보에 의존하는 것과 관련하여 어떠한 책임도 지지 않습니다. COMSCORE, INC.는 이 분석 자료와 연관되어 사용된 여하한 COMSCORE 데이터의 정확성이나 완전성에 관한 모든 종류의 책임을 부인합니다."

**부록 B**

미국 콜롬비아 특별구 연방지방법원

| |
|---|
| 연방거래위원회(FEDERAL TRADE COMMISSION), |
| 원고, |
| 대 |
| META PLATFORMS, INC., |
| 피고. |

민사소송번호 1:20-cv-03590 (JEB)

**[제안서] 문서보호 명령**

법원은 정당한 사유가 제시되는 경우 (i) 본 소송의 효율적이고 신속한 해결을

보장하고 (ii) 본 소송에 임하는 양 당사자의 순조로운 증거개시 절차를 도우며 (iii) 기밀정보를

부적절한 공개 또는 사용으로부터 보호하기 위해 연방민사소송규칙 제 26 조(c)(1)에 따라

다음과 같이 명령한다.

**정의**

1. 본 명령상의 용어는 다음과 같이 정의한다.

    (a) "소송"이란 관련된 여하한 증거개시, 재판전, 재판, 재판후 또는 항소심 절차를

        포함하여 본 법원에 계류 중인 상기 명시된 소송을 의미한다.

    (b) "기밀정보"란 연방민사소송규칙 제 26 조(c)(1)(G)에서 사용된 바와 같은 모든

        영업비밀이나 기타 기밀연구 정보, 개발 정보, 상업 정보, 또는 그러한 정보를

포함하고 있는 모든 문서, 사본이나 기타 자료로서 아직 공표 등의 방식으로 공개가

이루어지지 않은 경우를 의미한다. 또한 지정 당사자는 기밀로 취급되어야 한다고

간주하는 여하한 정보나 항목이 법원 명령에 반하여 공개가 이루어진 경우, 그러한

정보의 기밀성을 유지하기 위해 여하한 정보나 항목을 기밀정보로 지정할 수 있다.

여기에는 (i) 기밀정보로부터 복사나 발췌, 요약 또는 재구성된 정보 및 (ii)

기밀정보를 노출할 가능성이 있는 증언, 대화 또는 프레젠테이션도 포함된다.

(c) "경쟁 관련 의사결정"이란 계약, 마케팅, 가격책정, 제품이나 서비스의 개발 또는

설계, 제품이나 서비스의 제공, 연구 및 개발, 인수 및 합병에 관한 결정, 또는

지적재산권의 라이선싱, 취득, 집행에 관한 결정을 비롯하여 경쟁자, 잠재적

경쟁자, 고객, 유통 파트너와 관련하여 이루어지는 의사결정을 의미한다.

(d) "피고"란 Meta Platforms, Inc., 그리고 Instagram 과 WhatsApp 을 포함하나 이에

국한되지 않는 그 전신, 사업부, 자회사, 계열사, 협력사, 승계인 및 합작투자 회사와

상기 회사들의 모든 이사, 임원, 직원, 대리인(변호사 포함), 대표자를 의미한다.

(e) "공개"란 정보의 전체 또는 일부가 표시, 누설, 공개, 제출, 설명, 전송 등의

방식으로 전달이 이루어진 경우를 의미한다.

(f) "문서"란 연방민사소송규칙 제 34 조(a)에서 사용된 바와 같이 모든 문서나

전자적으로 저장된 정보를 의미한다.

2

(g) 본 명령에서 정의하는 "극비정보"는, 오직 공개 시 보호대상자에게 실질적이고

중대한 피해를 야기할 가능성이 높은 기밀정보만을 포함한다.

극비정보에는 알고리즘 및 소스코드, 상업적으로 민감한 비공개 고객 목록, 재무나

마케팅이나 전략적 사업계획과 관련된 비공개 정보, 가격이나 비용이나 마진에

관한 현재 또는 미래의 비공개 정보, 기존 또는 향후 예정된 제품의 연구, 개발,

테스트 또는 계획에 관한 정보, 비공개 가격책정 및 비용 정보 등 보호대상자 측

제품의 강점 및 취약점에 관한 평가자료, 피고 또는 피고의 경쟁자와 관련한 기밀

계약조건이나 제안된 계약조건의 내용 또는 협상력 정보(협상력에 관한 내부 전략

포함), 보류 중이거나 포기된 특허 출원건과 관련하여 아직 일반에 공개되지 않은

정보, 인사 파일, 민감한 개인 식별 정보, 민감한 건강 정보, 여하한 기밀정보가

언급된 대화 내용을 비롯한 각종 영업비밀이 포함된다. 극비정보에는 비당사자의

입장에서 해당 정보가 피고 측에 공개될 경우 자신 또는 자신과 관련된 신규 개척

사업에 잠재적인 보복이나 피해가 있을 것으로 간주할 만한 정보도 포함된다. 만약

보호대상자가 (i) 이미 조사자료를 제출했거나 (ii) 자신에게 실질적이고 중대한

경쟁 관련 피해나 상업적 피해를 야기할 수 있는 정보를 제출하라는 소환장 또는

법원 명령을 받았으나 해당 정보는 본 조항에 열거된 정보 범주 중 하나에 명확히

부합하지 않는 경우, 보호대상자는 관련 내용을 설득력 있게 입증한 다음 해당

정보를 극비정보로 취급하고 아래 제 D 조(1)(d)에 따른 예외가 아닌 이상

사내변호사에게 공개하지 않도록 하는 법원 명령을 구할 수 있다. 본 조항에

의거하여 조사자료와 관련한 신청을 제기할 경우에는 제 B 조(2)(a)에 해당되는

극비정보도 반드시 함께 제출하여야 한다. 본 조항에 의거하여 소환장 또는

법원명령과 관련한 명령을 신청할 경우에는 반드시 해당 소환장 또는 법원명령에

대한 답변 기한 이전에 제출하여야 한다. 보호대상자가 본 조항에 따른 추가 보호를

법원에 요청할 경우, 추가 보호의 대상이 된 해당 자료는 법원 판결 시점까지

외부변호사 이외의 타인에게 제공할 수 없다.

(h) "사내변호사"란 피고가 법률 서비스 제공을 목적으로 고용한 변호사, 그리고 법률

서비스 제공을 목적으로 고용된 피고 측 변호사를 지원할 목적으로 피고가 고용한

법무보조원, 비서, 사무 및 행정 직원을 의미한다.

(i) "조사"란 원고가 피고의 잠재적 경쟁제한적 행위에 대해 수행했으며

연방거래위원회 제출자료 제 191-0134 호로 표기된 고소전 조사 절차를 의미한다.

(j) "조사자료"란 면책특권이 부여되지 않은 문서, 증언 또는 기타 자료로서 다음에

해당하는 경우를 의미한다. (i) 여하한 비당사자가 조사와 관련하여 임의로 또는

강제절차에 따라 연방거래위원회에 제출한 경우, (ii) 조사 진행 과정에서 조사와

관련하여 연방거래위원회와 비당사자 사이에서 이루어진 여하한 정보전달에

해당하는 경우, 또는 (iii) 피고나 관련 개인/법인이 조사와 관련하여

연방거래위원회에 제출한 경우

(k) "소송자료"란 면책특권이 부여되지 않은 문서, 증언 또는 기타 자료로서 다음에

해당하는 경우를 의미한다. (i) 여하한 비당사자가 소송 계류 중에 본 소송과

관련하여 임의로 또는 강제절차에 따라 여하한 당사자에게 제시한 경우, (ii) 소송

계류 중에 본 소송과 관련하여 여하한 당사자와 비당사자 사이에서 이루어진

여하한 정보전달을 구성하는 경우, (iii) 피고가 소송 계류 중에 본 소송과 관련하여

원고 측에 제시한 경우, 및/또는 (iv) 원고가 소송 계류 중에 본 소송과 관련하여

피고 측에 제시한 경우

(l) "비당사자"란 본 소송의 당사자로 지목되지 않은 모든 사람을 의미한다.

(m) "기록상 외부변호사"란 본 소송 절차에서 피고를 대리하는 외부 법무법인에 소속된

변호사와 변호사 지원을 담당하는 직원을 의미한다.

(n) "당사자"란 본 소송의 원고 또는 피고를 의미한다. "양 당사자"란 본 소송의 원고

또는 피고 양측을 의미한다.

(o) "원고"란 미국 연방거래위원회(U.S. Federal Trade Commission)와 그 직원, 대리인

및 대표자를 의미한다.

(p) "사람"이란 모든 자연인, 법인, 사업체, 협력사, 협회, 합작투자 회사, 정부 기관,

5

신탁 또는 기타 법인을 의미한다.

(q) "보호대상자"란 임의로 또는 강제절차에 따라 다음을 제공했거나 제공하는 모든

사람(당사자나 비당사자 모두 포함)을 의미한다. (i) 조사와 관련된 조사자료 또는

(ii) 소송자료

## 극비정보 및 기밀정보의 지정

1. 원고는 연방무역위원회에 조사자료를 제공했던 각각의 비당사자인 보호대상자(또는

   법무대리인이 있는 경우 비당사자인 보호대상자의 변호사)에게 본 명령서의 사본을

   법원이 본 명령을 개시한 후 영업일 기준 5 일 이내에 이메일, 팩스 또는 익일 송달로

   발송하여야 한다.

2. 보호대상자에 의한 조사자료의 극비정보 지정. 보호대상자는 다음과 같은 절차에 따라

   자신이 제출한 여하한 조사자료를 극비정보로 지정할 수 있다.

   (a) 피고가 제출하는 모든 조사자료는, 아래 제 C 조에 설명된 이의제기 절차, 그리고

       법원이 피고가 제출한 조사자료의 보호등급 지정 및 본 소송에서의 사용을

       규율하기 위해 추가적으로 채택하는 모든 관련 명령이나 절차(예: 재판 증거물의

       극비정보 지정을 규율하는 절차)의 적용을 전제로 극비정보로 추정 및 취급되므로,

       피고는 조사자료를 기밀정보나 극비정보로 재지정할 의무가 없다.

   (b) 피고를 제외한 각 보호대상자는, 해당 조사자료에 극비정보가 포함되어 있고

보호대상자의 이익을 보호하는 데 그러한 지정이 필요하다고 선의로 판단하는

범위 내에서, 본 명령의 사본을 수령한 후 60 일("지정가능 기간") 이내에 여하한

조사자료를 극비정보로 지정할 수 있다. 그러한 조사자료의 극비정보 지정은, 이미

지정이 이루어진 경우가 아니라면, 서면 통지를 익일우편 또는 이메일로 제공하고,

해당 조사자료를 제출받았던 당사자 측에 "극비정보(HIGHLY

CONFIDENTIAL)"라는 문구가 페이지 번호 구분이나 가청도를 비롯한 가독성이

저해되지 않는 형태로 인쇄되어 있는 조사자료 사본을 포함한 대체 제출 문서를

전달하는 방법으로 수행할 수 있다. 비당사자가 사정상 대체 제출 문서를 전달하기

어려운 경우, 해당 조사자료를 제출받았던 당사자 측에 극비정보를 수록한 각

문서에 대한 상세 지정 내용이 포함된 서면 통지를 익일 우편 또는 이메일로

제공함으로써 이를 갈음할 수 있다.

극비정보를 수록한 모든 문서의 경우 그 전체 내용을 극비정보로 지정할 수 있다.

(c)  이 지정가능 기간이 만료될 때까지는 모든 조사자료의 전체 내용이 극비정보로

취급된다.


피고 측이 제출한 조사자료가 아니면서 이 지정가능 기간이 만료될 때까지

극비정보로 지정되지 않은 조사자료는, 본 명령과 관련하여,

독점금지민사소송법(Antitrust Civil Process Act) 등의 연방 또는 주 법령이나

규정에 의거하여, 또는 그러한 법령이나 규정을 해석하는 여하한 연방 또는 주 법원

판례에 따라 기밀정보로 취급한다. 또한 본 명령의 적용을 받는 문서로부터 파생된

여하한 극비정보나 기밀정보의 내용을 드러내는 모든 정보, 그리고 동 자료의

여하한 부분에서 발췌한 모든 정보 또한 본 명령과 관련하여 기밀정보로 취급한다.

본 명령과 관련하여, 그러한 취급이 불필요하다고 해당 비당사자가 당사자에게

통지하지 않는 한, 또는 통지할 때까지는, 그러한 극비정보나 기밀정보를 제출하는

비당사자의 신원 역시 극비정보나 기밀정보로 취급한다.

3. 본 명령이 비당사자인 보호대상자의 극비정보나 기밀정보를 적절하게 보호하지

못한다고 생각되는 경우, 비당사자인 해당 보호대상자는 본 명령서 사본의

수령일로부터 10 일 이내에 자신의 극비정보나 기밀정보에 대한 추가 보호를 법원에

요청할 수 있다. 비당사자인 보호대상자가 추가 보호를 법원에 요청할 경우, 추가

보호의 대상이 된 해당 조사자료는 법원 판결 시점까지 외부변호사 이외의 다른

사람에게 제공할 수 없다.

4. 기밀정보나 극비정보로 지정되지 않은 문서 또는 증언을 제출하더라도 해당 정보가

추후 기밀정보나 극비정보로 지정되었을 시의 해당 정보와 관련한 앞으로의 기밀 주장

가능성을 포기한 것으로 간주되지 아니한다. 보호대상자가 앞선 본 소송의 증거개시

과정에서 본인이 제출했던 여하한 조사자료나 소송자료를 극비정보나 기밀정보로

지정했어야 함을 본 소송의 재판이 시작되기 전 언제라도 깨닫게 될 경우, 해당

보호대상자는 해당 당사자에게 서면으로 통지하고 그러한 조사자료나 소송자료를

제출받았던 당사자 측에 "극비정보(HIGHLY CONFIDENTIAL)" 또는

"기밀정보(CONFIDENTIAL)"라는 문구가 페이지 번호 구분이나 가청도를 비롯한

가독성이 저해되지 않는 형태로 인쇄되어 있는 조사자료나 소송자료 사본을 포함한

대체 제출 문서를 전달함으로써 그러한 문서나 증언 등의 자료를 극비정보나

기밀정보로 지정할 수 있다. 그 이후 양 당사자는 해당 조사자료나 소송자료를

보호대상자가 본 명령의 조건에 따라 새로이 지정한 바에 따라 취급하여야 한다.

그러나 공개 당시의 시점에 적절히 진행되었던 여하한 정보의 공개는 그러한 후속 기밀

지정 여부와는 상관없이 부적절한 것으로 간주되지 아니한다.

5.  당사자가 본 명령에 따라 승인된 것이 아닌 상황에서 부주의 등으로 인해 자신이

보호대상자의 기밀정보나 극비정보를 공개했음을 알게 된 경우, 해당 당사자는 즉시

다음 조치를 취해야 한다. (i) 해당 보호대상자에게 그러한 무단 공개 사실을 서면으로

통지한다. (ii) 무단 공개된 자료의 모든 사본을 회수하기 위해 최선의 노력을 다한다.

(iii) 무단 공개가 이루어진 대상자나 대상자들에게 본 명령상의 조건을 안내한다. (iv)

그러한 대상자나 대상자들이 부록 A 를 확인하고 이에 구속될 것에 동의하도록

요청한다.

6. 보호대상자에 의한 소송자료의 극비정보 또는 기밀정보 지정. 다음 절차는

   보호대상자가 본인이 본 명령의 개시 이후 본 소송에서 공개하는 정보로서

   연방민사소송규칙 제 30, 31, 33, 36 조 및 제 45 조의 요청에 따라 제출된 정보와

   연방민사소송규칙 제 33 조(d), 제 34 조(b)(2), (c) 또는 제 45 조에 따라 공개된 문서를

   포함하되 이에 국한되지 않는 여하한 정보와 관련하여, 그러한 자료가 본 명령의

   조건에 따른 극비정보 또는 기밀정보 지정에 대한 적격성이 있다는 선의의 믿음에

   기초하여 이를 극비정보나 기밀정보로 지정하는 과정을 규율한다.

   (a) 증언. 본 명령의 개시 이후 본 소송에서 취득된 모든 선서증언의 녹취록은 해당

      녹취록의 완전한 최종본이 피고(또는 해당 시 피고 측 변호사)에게 제공된

      날짜로부터 30 일 동안 그 전체 내용을 기밀정보로 취급한다. 해당 선서증언을

      기록한 당사자는 최종 녹취록을 수령한 후 영업일 기준 오(5)일 이내에 이를 해당

      증언인에게 제공하여야 한다. 해당 증언인은 최종 녹취록을 수령한 후 30 일 이내에

      선서증언 녹취록의 여하한 대목을 페이지 및 행별로 극비정보로 지정할 수 있고,

      증언인이나 증언인의 고용주가 제공한 여하한 선서증언 증거물도 극비정보로

      지정할 수 있다. 그러한 보호등급 지정은 원고와 피고 측 변호사에게 서면으로

      통지해야 유효하다.

본 6(a)항에 따른 지정이 이루어지지 않은 녹취록 또는 증거물의 여하한 대목은

아래 제 C 조에 설명된 이의제기 절차에 의거하여 기밀정보로 취급된다.

다른 보호대상자가 극비정보나 기밀정보로 지정한 문서 또는 정보와 관련하여

증언인에게 질문할 수 있는 자격이 본 명령에 의거하여 당사자에게 주어지는 경우,

그러한 질문을 한 당사자는 해당 극비 또는 기밀 문서나 정보와 관련되어 있는

녹취록의 대목을 극비정보나 기밀정보 중 하나로 지정하여야 한다.

(b) 문서. 본인이 본 소송에서 제출하는 여하한 문서를 극비정보로 지정하려는

보호대상자는 그러한 정보를 수록한 각각의 문서에 "극비정보(HIGHLY

CONFIDENTIAL)"라는 문구를 페이지 번호 구분이나 가청도를 비롯한 가독성을

방해하지 않는 형태의 인쇄 등의 방식으로 표기하여야 한다.

본인이 본 소송에서 제출하는 여하한 문서를 기밀정보로 지정하려는 보호대상자는

그러한 정보를 담고 있는 각각의 문서에 "기밀정보(CONFIDENTIAL)"라는 문구를

페이지 번호 구분이나 가청도를 비롯한 가독성을 방해하지 않는 형태의 인쇄 등의

방식으로 표기하여야 한다.

기밀정보를 수록한 모든 문서의 경우 그 전체 내용을 기밀정보로 지정할 수 있다.

극비정보를 수록한 모든 문서의 경우 그 전체 내용을 극비정보로 지정할 수 있다.

(c) 전자 문서 및 데이터. 보호대상자가 전자 파일 및 문서를 원본(native) 전자 문서

형식으로 제출하는 경우, 보호대상자는 해당 파일에 극비정보나 기밀정보가

11

포함되어 있는지 여부를 나타내는 정보를 파일 이름 또는 지정자에 추가함으로써,

또는 해당 파일의 합리적으로 접근 가능한 메타데이터에 그러한 지정을 추가하는

등 전자 형식으로 제출된 그러한 정보의 보호등급을 적절하게 지정할 수 있는 기타

합리적인 방법을 통해 해당 전자 파일 및 문서에 대한 본 명령에 따른 보호등급을

지정하여야 한다. 극비정보나 기밀정보를 기밀정보만을 위한 별도의 디스크 등의

매체에 저장하여 전자 형식으로 제출하는 경우, "극비정보(HIGHLY

CONFIDENTIAL)" 또는 "기밀정보(CONFIDENTIAL)"라는 지정 문구는 디스크

등의 해당 매체 겉면에 표시할 수 있다.

선서증언 및 재판 절차에서 사용하기 위해, 또는 제 D 조(2)(g)에 명시된 대상에게

인쇄물 형식으로 제공하기 위해 원본 형식의 전자 파일 또는 문서를 출력하는 경우,

해당 전자 파일 또는 문서를 출력하는 당사자는 출력된 문서의 표지에

"극비정보(HIGHLY CONFIDENTIAL)" 또는 "기밀정보(CONFIDENTIAL)"라는

문구를 표기하고 원본 파일과 관련된 제출 번호 및 지정을 추가하여야 한다.

기밀정보를 수록한 모든 전자 파일이나 문서의 경우 그 전체 내용을 기밀정보로

지정할 수 있다. 극비정보를 수록한 모든 전자 파일이나 문서의 경우 그 전체 내용을

극비정보로 지정할 수 있다.

7.   비당사자의 소송자료 보호등급 지정. 당사자가 본 소송의 증거개시 절차에서 자신이

현재 보유 중인 비당사자의 극비정보나 기밀정보에 대한 제출 요청을 받는 경우, 해당

당사자는 다음을 수행하여야 한다.

(a) 요청된 정보의 일부 또는 전체가 비당사자와의 비밀유지 계약의 적용을 받는다는

사실을 극비정보나 기밀정보를 구하는 당사자에게 즉시 서면으로 통지

(b) 해당 비당사자의 극비정보나 기밀정보가 요청된 사실을 즉시 비당사자 본인에게

알리고, 요청된 정보에 대한 합리적으로 구체적인 설명을 제공하거나 비당사자

본인이 요청된 해당 정보를 열람할 수 있도록 조치

(c) 본 소송의 문서보호 명령 합의서 사본과 관련 증거개시 요청서를 해당

비당사자에게 즉시 제공

8. 비당사자가 그러한 통지 및 수반되는 정보를 수신한 후 14 일 이내에 본 법원에

문서보호 명령을 구하지 않는 경우, 증거개시와 관련하여 요청된 비당사자의

극비정보나 기밀정보를 제출할 수 있다. 비당사자가 적시에 문서보호 명령을 구하는

경우, 비밀유지 계약의 적용을 받는 해당 극비정보나 기밀정보는 법원의 판단이 있기

전에는 제출되지 아니한다.[1]

9. 본 명령의 조건은 비당사자가 본 소송 절차에서 제출하는 극비정보나 기밀정보로

지정된 정보에 적용된다. 비당사자가 본 소송과 관련하여 제출한 그러한 정보는 본

명령이 규정하는 시정책 및 구제책에 의한 보호를 받는다. 본 조항의 어떠한 내용도

---

[1] 이 조항의 목적은 비당사자에게는 비밀유지 권리가 있음을 이해당사자에게 알리고 해당 비당사자가 본 법원에서 자신의 정보 기밀을 보호할 수 있도록 기회를 제공하는 데 있다.

비당사자가 추가 보호를 추구하는 것을 금지하는 내용으로 해석될 수 없다.

극비정보 또는 기밀정보 지정에 대한 이의제기

1. 여하한 보호등급 지정에 반대하는 당사자("이의당사자")는 그러한 지정을 수행한

   보호대상자("지정당사자")와 본 소송의 모든 당사자에게 이의 근거가 구체적으로

   명시된 서면 통지를 언제든지 전달할 수 있다. 보호등급 지정에 대한 이의는 문서에

   수록된 특정 진술이나 정보를 비롯하여 극비정보나 기밀정보로 지정된 문서의 모든

   대목에 대해 제기될 수 있다. 이의가 제기된 모든 자료는 해당 분쟁이 해결될 때까지는

   계속해서 기밀정보나 극비정보로 취급된다. 이의당사자와 지정당사자는 해당

   이의당사자의 서면 통지 후 10일 이내에 각자의 입장을 논의하기 위한 협의를

   진행하여야 한다. 이의당사자와 지정당사자가 해당 이의당사자의 서면 통지가 송달된

   후 14일(또는 이의당사자와 지정당사자가 합의한 다른 기한) 이내에 이의건에 대한

   합의에 도달하지 못하는 경우, 이의당사자는 관련 규칙에 따른 신청서신 제출 및/또는

   신청을 통해 해당 분쟁을 본 법원에 회부할 수 있다. 법원이 문제가 되는 문서 또는

   진술의 여하한 대목이 극비정보나 기밀정보에 해당하지 않는다고 판단하는 경우,

   이의가 제기된 문서 또는 진술의 해당 대목은 보호등급 지정이 취소된 것으로

   간주된다.

극비정보 또는 기밀정보의 공개

1. 극비정보는 오직 다음에 해당하는 사람에게만 공개될 수 있다.

   (a) 재판연구원, 법원서기, 속기사 또는 사무직원 등 법원 및 본 소송에서 법원을

       보조하는 모든 사람

   (b) 미국 연방거래위원회 소속 변호사, 법무보조원 및 기타 전문 인력(지원 및 IT 부서

       직원 포함), 그리고 원고가 본 소송의 지원을 위해 고용한 자로서 직무상 해당

       정보에 접근해야 하는 대리인 또는 독립 계약자

   (c) 피고 측의 기록상 외부변호사, 여하한 변호사(제 D 조(1)(d)에 규정된 자로서

       제 E 조의 절차가 적용되는 경우가 아닌 피고 측 사내변호사는 제외), 법무보조원,

       그리고 그러한 외부변호사가 본 소송을 위해 선임한 기타 전문 인력(지원 및 IT

       부서 직원 포함)으로서 직무상 해당 정보에 접근해야 하는 경우(단, 피고 측 직원은

       제외)

   (d) 본 소송건의 업무를 담당하는 피고 측 사내변호사로서 부록 B 양식의

       사내변호사용 비밀유지 동의서에 서명하는 시점에, 그리고 해당 사내변호사에게

       극비정보가 공개된 가장 최근의 시점으로부터 이(2)년 동안에 다음 행위를

       수행하지 않는 2 인의 사내변호사. (a) 해당 사내변호사가 피고에게 고용된

       상태인지 다른 고용주를 위해 일하는지 여부와 무관하게 피고의 경쟁 관련

의사결정에 참여하거나 조언 제공 (b) 자신이 여하한 고용주에 소속되어 본 소송을

진행하는 과정에서 자신이 열람한 극비정보의 주체인 특정 보호대상자가 관여하는

경쟁 관련 의사결정에 참여하거나 조언 제공 (c) 지정 사내변호사가 본 소송

과정에서 열람한 극비정보의 주체인 보호대상자가 실질적 상대방 당사자(즉,

피보호 당사자 측의 소환장에 응하는 등, 단순 명목상의 상대방 이상에 해당하는

이익 당사자)인 소송 기타 법적 절차(본 소송의 고소장에 나와 있는 주장으로 인해

발생하거나 이와 관련된 소송은 제외)에서 피고측 또는 여하한 고용주의

대리인으로 참여하거나 조언을 제공. 사내 소송변호사가 본 하위 조항에 따른 열람

자격을 얻으려면 먼저 본 명령에 첨부된 부록 B 양식의 사내변호사용 비밀유지

동의서에 서명하여야 하고(서명된 동의서는 관련 피고 측 외부변호사가 보관하고

법원, 여하한 당사자, 또는 비당사자인 여하한 보호대상자의 열람 요청 시

제공되어야 함), 극비정보를 열람할 때는 오직 피고 측 기록상 외부변호사의

사무실에서 직접 열람하거나, 개인별 로그인 ID 과 비밀번호로 전자자료

보안열람실 또는 전용 열람 플랫폼을 이용 열람할 수 있다.

피고는 극비정보의 무단사용이나 무단공개로 확인되거나 의심되는 모든 사례를

법원과 원고에게 즉시 보고하여야 한다. 본 항의 적용을 받는 여하한 변호사로서

16

피고의 경쟁 관련 의사결정 내용과는 무관한 업계에서 일하기 위해 피고의

피고용인 신분을 벗어난 경우, 원고 또는 이해관계에 있는 여하한 보호대상자가

그러한 사람이 경쟁 관련 의사결정에 참여했음을 별도로 입증하지 않는 한 본

조항의 사후 고용 제한이 면제된 것으로 간주된다.

(e) 본 소송의 당사자를 지원하기 위해 해당 당사자가 고용한 외부 공급업체 또는

서비스 제공업체(예: 복사 서비스 업체, 전자증거개시 업체 및 유사한 형태의

서비스 업체, 선서증언을 위해 고용된 외부 법원서기 및 문서관리 컨설턴트)로서 본

명령에 첨부된 부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을

충족하는 경우

(f) 본 소송의 양 당사자가 참여시키거나 본 법원이 임명하는 여하한 중재관, 중재인

또는 특별보조재판관(special master)

(g) 공개되었거나 공개가 예정된 문서에 대한 합법적 접근 권한이 기존에 있었던

경우에 한하여, 해당 극비정보의 본문에서 지목된 사람, 또는 수령 당사자가 신뢰성

있는 근거에 의해 해당 문서의 작성자, 청자, 수령인, 보관자 또는 출처였다고

간주할 만한 사람. 또한, 선서증언이나 재판 과정에서 당사자 측 현직 또는 전직

직원인 증인은 해당 당사자가 제출한 문서 중 동 직원의 진술이나 대화내용을 인용,

상술 또는 요약하는 것으로 주장된 여하한 대목을 열람할 수 있다(의심의 여지를 없애기 위해, 문서의 나머지 분량은 관련 진술에 있어 해당 직원의 선서증언 또는 법정증언이 나오는 대목을 지시하는 데 필요한 경우 현직 또는 전직 직원에게 제시될 수 있음).

(h) 해당 전문가나 컨설턴트가 소속되어 있는 법인의 직원 또는 본 소송에서 그러한 전문가의 업무를 지원하는 독립 계약자를 포함하여, 당사자가 본 소송과 관련한 전문가 증언 또는 자문을 목적으로 고용한 여하한 사람으로서 본 명령에 첨부된 부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을 충족하는 경우

(i) 외부 재판 컨설턴트(그래픽 컨설턴트를 포함하되 이에 국한되지 않음)로서 본 명령에 첨부된 부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을 충족하는 경우

2. 기밀정보는 오직 다음에 해당하는 사람에게만 공개될 수 있다.

(a) 재판연구원, 법원서기, 속기사 또는 사무직원 등 법원 및 본 소송에서 법원을 보조하는 모든 사람

(b) 미국 연방거래위원회 소속 변호사, 법무보조원 및 기타 전문 인력(지원 및 IT 부서 직원 포함), 그리고 원고가 본 소송의 지원을 위해 고용한 자로서 직무상 해당

정보에 접근해야 하는 대리인 또는 독립 계약자

(c) 피고 측의 기록상 외부변호사, 여하한 변호사(제 D 조(2)(d)에 규정된 자로서

제 E 조의 절차가 적용되는 경우가 아닌 피고 측 사내변호사는 제외), 법무보조원,

그리고 그러한 외부변호사가 본 소송을 위해 선임한 기타 전문 인력(지원 및 IT

부서 직원 포함)으로서 직무상 해당 정보에 접근해야 하는 경우(단, 피고 측 직원은

제외)

(d) 본 소송건의 업무를 담당하는 피고 측 사내변호사로서 현재, 그리고 해당

사내변호사에게 기밀정보가 공개된 가장 최근의 시점으로부터 이(2)년 동안에

다음 행위를 수행하지 않는 4 인의 사내변호사. (a) 해당 사내변호사가 피고에게

고용된 상태인지 다른 고용주를 위해 일하는지 여부와 무관하게 피고의 경쟁 관련

의사결정에 참여하거나 조언 제공 (b) 자신이 여하한 고용주에 소속되어 본 소송을

진행하는 과정에서 열람한 기밀정보의 주체인 특정 보호대상자가 관여하는 경쟁

관련 의사결정에 참여하거나 조언 제공 (c) 지정 사내변호사가 본 소송 과정에서

열람한 기밀정보의 주체인 보호대상자가 실질적 상대방 당사자(즉, 피보호 당사자

측의 소환장에 응하는 등, 단순 명목상의 상대방 이상에 해당하는 이익 당사자)인

소송 기타 법적 절차(본 소송의 고소장에 나와 있는 주장으로 인해 발생하거나 이와

관련된 소송은 제외)에서 피고측 또는 여하한 고용주의 대리인으로 참여하거나

조언을 제공. 사내 소송변호사가 본 하위 조항에 따른 열람 자격을 얻으려면 먼저

본 명령에 첨부된 부록 B 양식의 사내변호사용 비밀유지 동의서에 서명하여야

하고(서명된 동의서는 관련 피고 측 외부변호사가 보관하고 법원, 여하한 당사자,

또는 비당사자인 여하한 보호대상자의 열람 요청 시 제공되어야 함), 극비정보를

열람할 때는 오직 피고 측 기록상 외부변호사의 사무실에서 직접 열람하거나,

개인별 로그인 ID 와 비밀번호로 전자자료 보안열람실 또는 전용 열람 플랫폼을

이용 열람할 수 있다.

피고는 기밀정보의 무단사용이나 무단공개로 확인되거나 의심되는 모든 사례를

법원과 원고에게 즉시 보고하여야 한다. 본 항의 적용을 받는 여하한 변호사로서

피고의 경쟁 관련 의사결정 내용과는 무관한 업계에서 일하기 위해 피고의

피고용인 신분을 벗어난 경우, 원고 또는 이해관계에 있는 여하한 보호대상자가

그러한 사람이 경쟁 관련 의사결정에 참여했음을 별도로 입증하지 않는 한 본

조항의 사후 고용 제한이 면제된 것으로 간주된다.

(e) 본 소송의 당사자를 지원하기 위해 해당 당사자가 고용한 외부 공급업체 또는

서비스 제공업체(예: 복사 서비스 업체, 전자증거개시 업체 및 유사한 형태의

서비스 업체, 선서증언을 위해 고용된 외부 법원서기 및 문서관리 컨설턴트)로서 본

명령에 첨부된 부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을

충족하는 경우

(f) 본 소송의 양 당사자가 참여시키거나 본 법원이 임명하는 여하한 중재관, 중재인

또는 특별보조재판관(special master)

(g) 공개되었거나 공개가 예정된 문서에 대한 합법적 접근 권한이 기존에 있었던

경우에 한하여, 해당 기밀정보의 본문에서 지목된 사람, 또는 수령 당사자가 신뢰성

있는 근거에 의해 해당 문서의 작성자, 청자, 수령인, 보관자 또는 출처였다고

간주할 만한 사람, 그리고 당사자 측 현직 또는 전직 직원으로서 관련한 진술이나

대화내용이 해당 당사자 측 문서상에 인용, 상술 또는 요약되어 있는 경우, 또는

해당 문서를 수령한 사실 또는 기존 접근 권한이 있었다고 원고 또는 피고 측

변호사가 간주할 만한 근거가 있는 사람(그러한 사람이 본인에게는 해당 문서에

대한 접근 권한이 없었음을 확인해준 경우는 제외)

(h) 해당 전문가나 컨설턴트가 소속되어 있는 법인의 직원 또는 본 소송에서 그러한

전문가의 업무를 지원하는 독립 계약자를 포함하여, 당사자가 본 소송과 관련한

전문가 증언 또는 자문을 목적으로 고용한 여하한 사람으로서 본 명령에 첨부된

부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을 충족하는 경우

(i) 외부 재판 컨설턴트(그래픽 컨설턴트를 포함하되 이에 국한되지 않음)로서 본

명령에 첨부된 부록 A 양식의 비밀유지 동의서에 먼저 서명해야 한다는 조건을

충족하는 경우

3. 정보를 공개하는 당사자 측 변호사는 본 명령에 첨부된 부록 A 양식의 비밀유지

동의서 원본을 본 소송의 판결 선고일로부터 최소 일(1)년 동안 보관하여야 한다.

4. 본 명령 제 D 조(1) 및 제 D 조(2)의 규정에 따라 극비정보나 기밀정보로 지정된 내용을

열람하게 된 각 개인은 본 명령에 명시된 경우를 제외하고는 그러한 극비정보나

기밀정보를 다른 누구에게도 공개할 수 없다.

5. 그러한 정보의 기밀 유지를 위해 적절한 조치를 취한다는 조건으로, 본 명령의 어떠한

내용도 원고가 극비정보나 기밀정보로 지정된 정보를 (i) 미국 연방거래위원회가

당사자인 여타의 법적 절차에서 (ii) 본 소송의 최종 판결에 대한 준수를 보장하기 위해,

또는 (iii) 법 집행을 목적으로 공개하는 것을 금지하지 아니한다. 이러한 경우, 공개의

주체는 미국 연방거래위원회만으로 제한된다.

6. 본 명령의 어떠한 내용도 다음과 같이 해석되지 아니한다.

(a) 보호대상자가 극비정보나 기밀정보로 지정된 본인의 정보를 사용 또는 공개하는

것을 제한

(b) 해당 자료를 기밀로 지정한 보호대상자의 동의 하에 극비정보나 기밀정보를

공개하는 것을 금지

(c) (i) 당사자의 귀책에 의하지 않고 공개 상태이거나 공개되는 경우, (ii) 본 소송과

관련한 조사나 증거개시 과정에서의 수령과는 별개로 해당 당사자가 합법적으로

취득했거나 알게 된 경우, (iii) 비밀유지 의무가 없었던 이전 상황에서 부주의나

실수가 아닌 형태로 해당 당사자에게 제출, 공개 및/또는 제공된 경우, 또는 (iv)

법원의 명령에 따른 경우 (v) 규정상 요구되는 경우에 해당하는 극비정보나

기밀정보의 당사자가 이를 공개하는 것을 금지

(d) 미국 연방거래위원회가 HSR 반독점증진법(Hart-Scott-Rodino Act), 미국법전

제 15 편 제 18 조(a)와 독점금지민사소송법(Antitrust Civil Process Act), 미국법전

제 15 편 제 1311-14 조 등 그러한 고소전 증거개시 절차를 규율하는 관련 법령 또는

규정에서 허용된 범위 내에서, 또는 법 집행을 목적으로, 또는 법령이나

법원명령이나 규정상 요구되는 상황에서 본 소송과 무관하게 조사자료를 보유,

사용 또는 공개하는 것을 금지. 그러한 공개는 독점금지민사소송법, 미국법전

제 15 편 제 1313 조(d)에 의거하여 취득한 자료인 경우를 비롯하여 해당 법령 또는

규정에서 허용하고 있는 경우만으로 제한된다. 법원 명령이 있거나 규정상의

요구에 따라 피고 또는 관련 보호대상자에게 칠(7)일 전에 서면으로 통지한 경우를

제외하고, 원고는 본 소송이 계류 중인 동안에 한정하여 제출된 어떠한 소송자료도

여하한 비당사자에게 공개할 수 없다. 특정 주의 공공정보법 또는 이에 상응하는

조항에 의거하여 조사자료나 소송자료의 공개가 요청되는 경우, 본 명령은 해당

주의 공공정보법 또는 이에 상응하는 조항이 법원 명령에 의해 보호되는 정보의

공개에 대한 예외를 규정하고 있는 범위 내에서 공개를 금지한다. 극비정보나

기밀정보의 공개를 지시하는 다른 소송건에서 발부된 소환장 또는 법원명령이

당사자에게 송달된 경우, 해당 당사자는 즉시 지정당사자에게 통지하여야 하고,

해당 지정당사자는 해당 법원의 보호를 구하는 부담과 비용을 감수하여야 한다.

   (e) 다른 소송에서 극비정보나 기밀정보를 공개하는 것을 허용

사내변호사 관련 이의제기

1. 법원에서 달리 명령하거나 보호대상자가 서면으로 동의하지 않는 한, 피고는 극비정보

   또는 기밀정보로 지정된 여하한 정보를 피고 측 지정 사내변호사에게 공개하기 칠(7)일

   전에 (i) 지정 사내변호사의 전체 이름과 현재 거주 중인 도시 및 주가 명시되어 있고,

   (ii) 해당 사내변호사의 과거, 현재 및 합리적으로 예측 가능한 미래의 주요 업무 및

   책임이 사내변호사가 일체의 경쟁 관련 의사결정에 관여했거나 추후 관여할 여지가

   있는지 여부를 판단할 수 있을 만큼 충분히 자세히 설명되어 있으며, (iii) 해당

   사내변호사가 피고 또는 여하한 다른 고용주의 대리인으로서 참여 또는 자문을 제공

중인 소송건들이나 기타 법적 조치들이 나열되어 있는 진술서를 작성하여 원고와

보호대상자에게 서면으로 제출하여야 한다.

2. 피고는 원고 또는 여하한 보호대상자가 상기 제 E 조(1)에 따른 피고의 진술서를

수령한 날로부터 10 일 이내에 반대서면을 회신하지 않는 한 피고 측 지정

사내변호사에게 극비정보 및/또는 기밀정보를 공개할 수 있다. 그러한 반대서면에는

그 근거가 되는 내용이 자세히 설명되어 있어야 한다.

3. 피고가 적시에 반대서면을 수령하는 경우, 피고는 반대서면 수령일로부터 칠(7)일

이내에 원고 또는 여하한 보호대상자와 만나서 합의에 따른 문제 해결을 위한 협의를

진행하여야 한다. 합의에 도달하지 못한 경우, 원고 및/또는 여하한 보호대상자는 지정

사내변호사와 관련한 이의를 제기하는 내용의 신청을 칠(7)일 이내에 법원에

제기하여야 한다. 피고는 법원의 판결이 계류 중인 동안에는 어떠한 극비정보나

기밀정보도 자신의 사내변호사에게 공개할 수 없다. 해당 지정 사내변호사가

제 D 조(1)(d) 또는 제 D 조(2)(d)상의 규정에 부합한다는 법원의 판단이 있을 경우,

피고는 제 D 조(1)(d) 또는 제 D 조(2)(d)에 따라 적절한 지정 사내변호사에게

극비정보나 기밀정보를 공개할 수 있다.

<u>본 소송에서 극비정보 또는 기밀정보로 지정된 정보의 사용</u>

1. 법원에 제출되었거나 제출 예정인 여하한 변론서면, 신청서면, 증거물 등의 서류에

여하한 극비정보나 기밀정보가 포함되어 있는 경우, 그러한 서류를 제출하는 당사자는

관련 내용을 법원에 통지해야 하며, 해당 서류는 현지규정 제 5.1 조(h)에 따라 봉인된

상태로 제출되어야 한다. 적절하게 지정된 극비정보나 기밀정보를 봉인된 상태로

제출할 수 있는 권한을 본 명령에 따라 양 당사자 및 비당사자인 여하한

보호대상자에게 부여한다. 서류에 포함된 극비정보와 기밀정보는 법원의 추가 명령이

있을 때까지는 계속 봉인 상태로 보관되어야 한다. 단, 그러한 서류는 제 D 조(1) 및

제 D 조(2)에 따라 극비정보나 기밀정보를 수신할 권한이 있는 개인 또는 단체에게

제공할 수 있다. 극비정보나 기밀정보를 포함하는 여하한 서류를 제출한 후, 제출

당사자 또는 비당사자인 보호대상자는 극비정보나 기밀정보가 드러나 있지 않은 해당

서류의 사본을 공개 기록용으로 제출하여야 한다. 또한, 그러한 여하한 자료에 대한

보호기간이 만료되는 경우, 당사자 또는 비당사자인 보호대상자는 기존에 보호등급이

지정된 자료도 포함된 사본을 공개 기록용으로 제출하여야 한다. 본 명령의 어떠한

내용도 양 당사자 또는 관심 있는 일반인이 여하한 극비정보나 기밀정보의 봉인 제출에

이의를 제기할 수 있는 권리를 제한하지 아니한다.

2.  양 당사자는 선서증언 및 심리 등의 절차에 극비정보나 기밀정보가 포함될 것으로

    합리적으로 예상되는 경우라면 이를 상대방에게 미리 통지함으로써 해당 상대방이

    오직 승인된 개인만을 그러한 절차에 참석시킬 수 있도록 하여야 한다. 문서를

선서증언 시 증거물로 사용하는 것은 해당 문서를 극비정보나 기밀정보로 지정함에

있어 어떠한 영향도 미치지 아니한다.

재판에서의 극비정보 또는 기밀정보 사용

1. 모든 문서, 증언, 또는 극비정보나 기밀정보로 지정된 기타 자료에 대한 재판 또는

   여하한 증거심리에서의 공개 여부는 별도의 법원 명령에 따라 결정된다. 당사자는 재판

   또는 여하한 증거심리에서의 극비정보나 기밀정보 공개 여부를 결정하는 명령의

   제안서를 제출하기에 앞서 재판 또는 여하한 증거심리에서 관련 극비정보나

   기밀정보가 사용될 것으로 예상되는 제 3 자에게 그러한 명령에 대한 통지를

   제공하여야 한다.

2. 본 명령에서 달리 규정하지 않는 한, 당사자 또는 비당사자가 본 소송 절차에서 제출한

   모든 극비정보나 기밀정보는 오직 본 소송의 진행을 위해서만 사용하여야 하며, 일체의

   사업적, 상업적, 경쟁적, 개인적 또는 기타 목적으로는 사용할 수 없다.

본 소송 종료 시의 절차

1. 본 명령에 의해 부과된 의무는 본 명령으로 인해 발생하는 여하한 분쟁 해결에 대한

   관할권을 지닌 본 법원이 달리 명령하지 않는 한 본 소송의 최종 처분 이후로도

   존속한다. 극비정보나 기밀정보로 지정된 정보를 수령했던 모든 사람은 본 소송건을

종결짓는 명령, 판단 또는 판결에 대한 항소 기간이 만료된 후 90 일 이내에 그러한

자료와 모든 관련 사본을 제출자인 보호대상자(또는 법무대리인이 있는 경우

보호대상자의 변호사)에게 반환하기 위해 성실한 노력을 기울이거나, 또는 그러한

극비정보나 기밀정보 전체를 파기하거나 삭제한 사실을 해당 당사자나

보호대상자에게 서면으로 증명하여야 한다.

2. 양 당사자와 그 변호사들이 극비정보나 기밀정보로 지정된 정보가 포함된 법원 서류 및

증거물, 선서증언 녹취록 및 증거물, 재판 기록 및 증거물과 소송 준비 자료의 일부를

법원 명령 또는 해당 극비정보나 기밀정보를 제출했던 보호대상자의 동의에 따른

경우나 본 명령이 달리 허용하고 있는 경우가 아닌 이상 그 누구에게도 공개하지

않는다는 조건 하에, 양 당사자 측 변호사는 그러한 법원 서류 및 증거물, 선서증언

녹취록 및 증거물, 재판 기록 및 증거물과 소송 준비 자료를 계속 보유할 수 있다.

법원이 양 당사자 또는 그 변호사에게 반환한 모든 극비정보나 기밀정보 역시 본

조항에 따라 처리되어야 한다. 그러나 본 조항의 어떠한 내용도 본 명령 제 D 조(5) 또는

제 D 조(6)에 의거한 양 당사자의 권리를 제한하지 아니한다.

<u>수정을 요청할 권리</u>

1. 본 명령의 어떠한 내용도 여하한 사람, 당사자 또는 보호대상자가 (i) 본인의 여하한

자료에 대한 확대 보호나 추가 보호, 또는 (ii) 특정 자료는 전혀 제출하지 못하게

막거나 본 소송이나 여하한 기타 절차에서 증거로 허용되지 않도록 수정하는 명령을

비롯한(이에 국한되지 않음) 본 명령의 수정을 본 법원 규칙에 따라 정당하게 이루어진

신청에 따라 추구할 수 있는 권리를 제한하지 아니한다

개인정보보호법

1.  여하한 문서, 정보 또는 증언 녹취록의 제출을 요구하는 본 법원의 모든 명령은

    개인정보보호법(Privacy Act), 미국법전 제 5 편 제 552 조 a(b)(11)에서 정한

    의미에서의 법원 명령에 해당한다.

본 명령에 구속되는 사람

1.  본 소송의 양 당사자, 그들의 변호사 및 상기인들의 승계인, 개인대리인, 관리자,

    양수인, 모회사, 자회사, 사업부, 계열사, 직원, 대리인, 상근 컨설턴트 및 전문가,

    그리고 이들의 직접적인 통제를 받는 모든 개인 또는 조직은 본 명령에 구속된다. 또한

    본 명령은 부록 A 또는 부록 B 에 서명하는 모든 사람에게도 구속력을 가진다.

2.  본 법원은 민형사상의 법정모독죄와 관련한 법원의 전적인 재량에 따라 본 명령의

    적용을 받는 모든 사람을 대상으로 본 명령을 집행할 수 있다.

이와 같이 명령한다.

날짜:   [필기체:] *22-3-25*

[서명]

**James E. Boasberg**
미국 지방법원 판사

## 부록 C

### 연방거래위원회를 대신하여
### 박창희에 제시할 질문

**오늘 참석해 주셔서 감사합니다.**

1.   기록상 법적 성명을 말하고 적어 주십시오. 영어 이름, 기타 이름 또는 별명을 사용하는 경우, 해당 이름을 기록할 수 있도록 말하고 철자를 알려 주십시오.

2.   현재 고용주와 직책을 말하고 직무 책임을 기술하십시오.

3.   그 역할을 맡은 지 얼마나 되었습니까?

4.   주식회사 카카오에서 귀하가 역임한 직책, 해당 직책에 대한 귀하의 책임, 해당 직책을 역임한 날짜를 포함하여 주식회사 카카오에서 근무한 이력을 기술해 주십시오.

5.   주식회사 카카오의 임원으로서 기업 전략에 대한 논의에 관여하였습니까? 이러한 논의에 언제부터 관여하기 시작했습니까?

6.   카카오스토리라는 제품에 대해 잘 알고 계십니까?

7.   카카오톡이란 무엇인가요?

8.   카카오톡은 언제 출시되었나요?

9.   카카오톡은 아직도 운영 중인가요?

   **2013년부터 2016년까지 카카오톡에 대해 구체적으로 몇 가지 질문을 하겠습니다. 이 기간 동안 제가 카카오톡에서 벗어난 주제로 바꿀 것임을 명시할 때까지 이러한 연도와 관련된 각 질문에 답변해야 합니다. 이러한 연도에 이러한 질문에 대한 귀하의 답변이 개별적으로 상당히 다를 경우, 귀하의 답변에서 이를 명확히 해 주십시오.**

10.   카카오톡은 사용자에게 모바일 메시징 기능을 제공했습니까?

11.   모바일 메시징 기능이 카카오톡을 채택한 사용자들의 주된 용도였습니까?

   a.      그렇지 않은 경우, 사용자가 주로 카카오톡을 사용한 용도는 무엇입니까?

12.   사용자가 카카오톡을 채택한 주된 용도라고 말씀하신 근거는 무엇입니까?

13.    카카오톡은 SMS 가 아닌 인터넷으로 운영되었나요?

14.    카카오톡 사용자는 서로 메시지를 보내기 위해 어떻게 서로를 찾았습니까?

15.    카카오톡의 사용자가 다른 카카오톡 사용자에게 메시지를 보내려면 어떤 정보가
       필요하였나요?

16.    카카오톡을 통해 사용자가 다른 사용자에게 일대일로 직접 메시지를 보낼 수
       있었습니까?

17.    카카오톡은 사용자가 그룹 메시지에서 여러 사용자에게 메시지를 보낼 수 있도록
       허용했습니까?

18.    카카오톡은 (1) 사용자가 새로운 게시물이 생성됨에 따라 업데이트되는 커넥션에서
       일련의 게시물을 보고 의견을 제시할 수 있도록 하고, (2) 사용자가 모든 커넥션에서 한
       번에 보고 의견을 제시할 수 있는 게시물을 공유할 수 있도록 하는 "뉴스 피드" 또는
       "스토리 피드"를 가지고 있었습니까?

19.    카카오톡의 사용자들이 특정 국가에 집중되어 있었습니까? 그렇다면, 어느
       국가입니까?

20.    주식회사 카카오는 다른 애플리케이션과 비교하여 카카오톡의 성공을 측정하기 위해
       어떤 지표를 사용했습니까?

21.    이 기간 동안 대한민국에 거주하는 카카오톡 총 사용자의 비율은 몇 퍼센트로
       추정됩니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

22.    이 기간 동안 미국에 거주하는 카카오톡 총 사용자의 비율은 몇 퍼센트로 추정됩니까?
       가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

23.    이 기간 동안 카카오톡이 전 세계, 대한민국, 미국에서 보유한 사용자는 각각 대략 몇
       명이었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해
       주십시오.

24.    카카오톡이 수익을 창출했습니까? 그렇다면, 카카오톡은 언제부터 수익을 창출하기
       시작했으며, 어떻게 그렇게 했습니까?

25.    카카오톡이 독립형 애플리케이션으로 수익성이 있었습니까?

26.     만약 카카오톡이 독립형 애플리케이션으로 수익성이 없는 시점이 있었다면, 언제 카카오톡이 독립형 운영으로 수익성이 없었고, 그 기간 동안 주식회사 카카오가 계속 운영한 이유는 무엇입니까?

27.     귀하가 알고 있는 한, 주식회사 카카오는 미국에서 카카오톡의 사용을 늘리려고 시도한 적이 있습니까?

    a.     만약 그렇다면, 미국에서 카카오톡의 사용을 늘리기 위해 주식회사 카카오가 취한 조치와 언제 카카오톡이 이를 수행했는지 기술해 주시기 바랍니다.

    b.     기술한 조치로 어떤 결과가 나왔습니까?

    c.     주식회사 카카오는 미국에서 카카오톡 사용 목표가 있었습니까? 만약 그렇다면, 귀하가 기술한 조치의 결과가 주식회사 카카오의 목표를 충족시켰습니까? 왜 또는 왜 그렇지 않습니까?

28.     주식회사 카카오가 카카오톡의 미국 내 사용을 늘리기 위한 조치를 취하지 <u>않았다면</u>, 그렇게 하지 않은 이유는 무엇입니까?

**이제 카카오스토리에 대해 몇 가지 질문을 드리겠습니다.**

29.     카카오스토리라는 제품에 대해 잘 알고 계십니까?

30.     카카오스토리란 어떤 것입니까?

31.     카카오스토리가 언제 출시되었나요?

32.     주식회사 카카오가 카카오스토리를 출시한 이유는 무엇인가요?

33.     카카오에서 근무하는 동안 카카오스토리가 카카오톡과 별도의 앱이었습니까?

34.     주식회사 카카오가 카카오톡에서 카카오스토리를 별도의 앱으로 만든 이유는 무엇인가요?

35.     주식회사 카카오에서 근무하는 동안 카카오스토리가 사용자에게 제공한 기능은 무엇이었습니까?

36.     이러한 기능이 카카오톡이 제공하는 기능과 어떻게 달랐습니까?

37.     사용자의 경험 측면에서 주식회사 카카오에서 근무하는 동안 카카오스토리가 카카오톡과 어떻게 달랐습니까?

38.   카카오스토리를 출시하려면 어떤 새로운 자원이 필요했습니까?

39.   주식회사 카카오는 카카오톡 이용자에 대한 정보를 이용하여 카카오스토리를
      출시하였습니까? 그렇다면, 어떤 정보입니까?

40.   주식회사 카카오는 카카오톡의 자원을 활용하여 카카오스토리를 출시했습니까?
      그렇다면, 어떤 자원이었습니까?

41.   주식회사 카카오가 카카오스토리를 출시했을 때 카카오스토리를 카카오톡의 기존
      사용자층에게 홍보하려고 했습니까? 카카오에서 근무하는 기간 동안 다른 때는
      어떠하였습니까?

42.   기존 카카오톡 사용자 기반이 카카오스토리의 성장에 영향을 주었습니까? 그렇다면,
      카카오스토리의 성장에 대한 기존 카카오톡 사용자 기반의 영향은 무엇이었습니까?

43.   카카오스토리가 출시되었을 때, 카카오톡을 통해 연결된 사람들이
      카카오스토리에서도 서로 연결되도록 초대할 수 있었습니까?

44.   그렇다면, 카카오스토리에서의 카카오톡 연결 기능이 카카오스토리 성장에 도움이
      되었습니까? 그렇다면 어떻게 가능했습니까?

45.   카카오스토리 출시 당시 카카오톡은 몇 명의 사용자를 보유하고 있었습니까? 가능한
      경우 일일 실제 사용자와 월간 실제 사용자 수를 추정해 주십시오.

46.   카카오스토리가 처음 한 달 동안 보유한 사용자는 몇 명이었습니까? 가능한 경우
      카카오스토리를 다운로드한 사람들의 수, 일일 실제 사용자와 월간 실제 사용자 수를
      추정해 주십시오.

47.   운영 첫 달에 카카오스토리의 사용자 중 몇 명이 이미 카카오톡 사용자였습니까?
      가능한 경우 카카오톡의 일일 실제 사용자와 월간 실제 사용자를 바탕으로 추정해
      주십시오.

48.   운영 첫 달에 카카오스토리의 사용자 중 카카오톡 사용자는 대략 몇 퍼센트였습니까?
      가능한 경우 카카오톡의 일일 실제 사용자와 월간 실제 사용자를 바탕으로 추정해
      주십시오.

49.   주식회사 카카오에서 근무하는 동안 카카오스토리가 수익을 창출했습니까? 그렇다면,
      카카오스토리가 언제 수익을 창출하기 시작했는지, 카카오스토리가 어떻게 그렇게
      했는지, 그리고 카카오스토리의 수익 창출에 대한 접근 방식이 시간이 지남에 따라

변했는지 설명해 주십시오. 그렇지 않은 경우, 카카오스토리가 수익성이 없는 경우 카카오스토리를 계속 운영하는 이유에 대해 설명해 주십시오.

**시간을 내주셔서 대단히 감사합니다.**

<u>**META PLATFORMS 를 대신하여**</u>
박창희에 제시할 질문

1. 2011 년 1 월부터 2018 년 사이에 패스가 사업의 일환으로 다음 중 어느 애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를 추적했는지 표시하십시오. 패스가 특정 애플리케이션을 추적했는지 확실하지 않은 경우 다음에서 나타내 주십시오.

   a. 페이스북
   b. 인스타그램
   c. 페이스북 메신저
   d. 왓츠앱
   e. 힙스타매틱
   f. 플리커
   g. 아이메시지
   h. 핀터레스트
   i. 카메라+
   j. 빈티지 카메라
   k. 스냅
   l. DMD 파노라마
   m. 틱톡
   n. 트위터
   o. 유튜브
   p. 링크드인
   q. 스트라바
   r. 레딧

2. 2011 년 1 월부터 2018 년 사이에 다음 중 주식회사 카카오가 광고 수익에 있어 패스의 경쟁업체로 간주한 애플리케이션을 표시하십시오. 카카오가 특정 애플리케이션을 광고 수익에 있어 패스의 경쟁업체로 간주했는지 확실하지 않은 경우, 다음에서 나타내 주십시오.

a. 페이스북
b. 인스타그램
c. 페이스북 메신저
d. 왓츠앱
e. 힙스타매틱
f. 플리커
g. 아이메시지
h. 핀터레스트
i. 카메라+
j. 빈티지 카메라
k. 스냅
l. DMD 파노라마
m. 틱톡
n. 트위터
o. 유튜브
p. 링크드인
q. 스트라바
r. 레딧

3. 2011 년 1 월부터 현재까지 카카오톡이 사업의 일환으로 다음 중 어느 애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를 추적했는지 표시하십시오. 카카오톡이 특정 애플리케이션을 추적했는지 확실하지 않은 경우 다음에서 나타내 주십시오.

a. 페이스북
b. 인스타그램
c. 페이스북 메신저
d. 스냅챗
e. 왓츠앱
f. 아이메시지
g. 텔레그램
h. 시그널
i. 라인
j. 바이버
k. 구글 메신저
l. 위챗

4. 2011년 1월부터 현재까지 다음 중 주식회사 카카오가 광고 수익에 있어 카카오톡의
   경쟁업체로 간주한 애플리케이션을 표시하십시오. 카카오가 특정 애플리케이션을
   광고 수익에 있어 카카오톡의 경쟁업체로 간주했는지 확실하지 않은 경우, 다음에서
   나타내 주십시오.

   a. 페이스북
   b. 인스타그램
   c. 페이스북 메신저
   d. 스냅챗
   e. 왓츠앱
   f. 아이메시지
   g. 텔레그램
   h. 시그널
   i. 라인
   j. 바이버
   k. 구글 메신저
   l. 위챗

5. 2011년 1월부터 현재까지 카카오스토리가 사업의 일환으로 다음 중 어느
   애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를
   추적했는지 표시하십시오. 카카오스토리가 특정 애플리케이션을 추적했는지 확실하지
   않은 경우 다음에서 나타내 주십시오.

   a. 페이스북
   b. 인스타그램
   c. 페이스북 메신저
   d. 스냅챗
   e. 왓츠앱
   f. 아이메시지
   g. 텔레그램
   h. 시그널
   i. 라인
   j. 바이버
   k. 구글 메신저
   l. 위챗

6. 2011 년 1 월부터 현재까지 다음 중 주식회사 카카오가 서비스 이용 시 사용자에게
   광고를 보여주려고 하는 회사에 있어 카카오스토리의 경쟁업체로 간주한
   애플리케이션을 표시하십시오. 카카오스토리가 서비스 이용 시 사용자에게 광고를
   보여주려고 하는 회사에 있어 특정 애플리케이션을 경쟁업체로 간주했는지 확실하지
   않은 경우, 다음에서 나타내 주십시오.

   a. 페이스북
   b. 인스타그램
   c. 페이스북 메신저
   d. 스냅챗
   e. 왓츠앱
   f. 아이메시지
   g. 텔레그램
   h. 시그널
   i. 라인
   j. 바이버
   k. 구글 메신저
   l. 위챗

7. 카카오톡에 다음 기능이 포함되어 있는지 표시하십시오.

   a. 사용자를 친구, 가족 및 기타 지인과 연결하는 소셜 그래프.
   b. 사용자가 개인적 소식, 관심사, 사진 및 비디오를 포함한 콘텐츠를 프로필 페이지와
      같은 하나의 공용 공간에서 공유할 수 있는 기능.
   c. 사용자가 다른 카카오톡 사용자를 검색하고 찾을 수 있는 기능.
   d. 사용자가 동시에 여러 사용자에게 사진을 공유할 수 있는 기능.

8. 카카오스토리에 다음 기능이 포함되어 있는지 표시하십시오.

   a. 사용자를 친구, 가족 및 기타 지인과 연결하는 소셜 그래프.
   b. 사용자가 개인적 소식, 관심사, 사진 및 비디오를 포함한 콘텐츠를 프로필 페이지와
      같은 하나의 공용 공간에서 공유할 수 있는 기능.
   c. 사용자가 다른 카카오스토리 사용자를 검색하고 찾을 수 있는 기능.
   d. 사용자가 동시에 여러 사용자에게 사진을 공유할 수 있는 기능.

9. 패스에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

8

10. 카카오톡에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

11. 카카오스토리에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

12. 주식회사 카카오가 패스를 인수하기로 결정한 이유를 열거하고 설명하십시오.

13. 주식회사 카카오가 패스 서비스를 중단하기로 결정한 이유를 열거하고 설명하십시오.

14. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 패스를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

15. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 패스를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

16. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오톡을 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

17. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오톡을 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

18. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오스토리를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

19. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오스토리를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

## 부록 D

### 연방거래위원회를 대신하여
### 정현주에 제시할 질문

**오늘 참석해 주셔서 감사합니다.**

1. 기록상 법적 성명을 말하고 적어 주십시오. 영어 이름, 기타 이름 또는 별명을 사용하는 경우, 해당 이름을 기록할 수 있도록 말하고 철자를 알려 주십시오.

2. 현재 고용주와 직책을 말하고 직무 책임을 기술하십시오.

3. 이 역할을 맡은 지 얼마나 되었습니까?

4. 주식회사 카카오에서 귀하가 역임한 직책, 귀하의 책임, 해당 직책을 역임한 날짜를 포함하여 주식회사 카카오에서 근무한 이력을 기술해 주십시오.

5. 주식회사 카카오의 임원으로서 기업 전략에 대한 논의에 관여합니까? 이러한 논의에 언제부터 관여하기 시작했습니까?

6. 카카오스토리라는 제품에 대해 잘 알고 계십니까? 카카오톡이란 무엇인가요?

7. 카카오톡은 언제 출시되었나요? 카카오톡은 아직도 운영 중인가요?

8. 카카오톡은 현재 사용자에게 모바일 메시징 기능을 제공하고 있습니까? 2012 년부터 2015 년까지 이러한 기능을 제공했습니까?

9. 모바일 메시징 기능이 현재 카카오톡을 채택한 사용자들의 주요 용도입니까? 2012 년부터 2015 년까지 모바일 메시징 기능이 카카오톡을 채택한 사용자들의 주요 용도였습니까?

   a. 모바일 메시징 기능이 현재 카카오톡을 채택한 사용자들의 주요 용도가 아닌 경우, 사용자들은 카카오톡을 주로 무슨 목적으로 사용합니까? 모바일 메시징 기능이 2012 년부터 2015 년까지 카카오톡의 주요 용도가 아니었다면, 그 기간 동안 사용자가 카카오톡을 사용한 주요 목적은 무엇이었습니까?

10. 카카오톡은 현재 SMS 가 아닌 인터넷을 사용하여 운영되고 있습니까? 2012 년에서 2015 년까지는 어떠했나요?

11.    현재, 카카오톡 사용자는 서로 메시지를 보내기 위해 어떻게 서로를 찾습니까?
       2012 년에서 2015 년까지는 어떠했나요?

12.    현재, 카카오톡의 사용자가 다른 카카오톡 사용자에게 메시지를 보내려면 어떤 정보가
       필요하나요? 2012 년에서 2015 년까지는 어떠했나요?

13.    현재, 카카오톡을 통해 사용자가 다른 사용자에게 일대일로 직접 메시지를 보낼 수
       있습니까? 2012 년부터 2015 년까지 카카오톡을 통해 사용자가 다른 사용자에게
       일대일로 직접 메시지를 보낼 수 있었습니까?

14.    현재, 카카오톡을 이용해 사용자가 그룹 메시지에서 여러 사용자에게 메시지를 보낼
       수 있습니까? 2012 년부터 2015 년까지 카카오톡을 이용해 사용자가 그룹 메시지에서
       여러 사용자에게 메시지를 보낼 수 있었습니까?

15.    현재, 카카오톡은 (1) 사용자가 새로운 게시물이 생성됨에 따라 업데이트되는
       커넥션에서 일련의 게시물을 보고 의견을 제시할 수 있도록 하고, (2) 사용자가 모든
       커넥션에서 한 번에 보고 의견을 제시할 수 있는 게시물을 공유할 수 있도록 하는
       "뉴스 피드", "스토리 피드", 또는 "월(wall)"을 가지고 있습니까? 2012 년에서
       2015 년까지는 어떠했나요?

16.    현재, 카카오톡의 사용자들이 특정 국가에 집중되어 있습니까? 그렇다면, 어느
       국가입니까? 2012 년부터 2015 년까지 카카오톡의 사용자들은 특정 국가에 집중되어
       있었습니까? 그렇다면, 어느 국가였습니까?

17.    현재, 카카오는 다른 애플리케이션과 비교하여 카카오톡의 성공을 측정하기 위해 어떤
       지표를 사용합니까? 2012 년에서 2015 년까지는 어떠했나요?

18.    귀하가 알고 있는 한, 주식회사 카카오는 미국에서 카카오톡의 사용을 늘리려고
       시도한 적이 있습니까? 만약 그렇다면, 미국에서 카카오톡의 사용을 늘리기 위해
       카카오가 취한 조치와 언제 카카오톡이 이를 수행했는지 기술해 주시기 바랍니다.

19.    주식회사 카카오는 미국에서 카카오톡 사용 목표가 있었습니까? 그렇다면 주식회사
       카카오가 그 목표를 달성했습니까? 왜 또는 왜 그렇지 않습니까?

20.    주식회사 카카오가 카카오톡의 미국 내 사용을 늘리기 위한 조치를 취하지 않았다면,
       그렇게 하지 않은 이유는 무엇이었습니까?

21.    카카오톡은 수익을 창출하고 있습니까?

2

a.　그렇다면, 카카오톡의 수익 창출의 원천은 무엇이며, 각 수익 창출은 언제 시작되었습니까? 2013 년, 2014 년, 2015 년, 2016 년, 2021 년에 카카오톡이 창출한 총 수익은 각각 얼마였습니까?

b.　이 기간 동안 각 수익원에 의해 창출된 총 카카오톡 수익의 백분율을 가장 잘 추정한다면 어떻게 됩니까?

22.　카카오톡이 독립형 애플리케이션으로 수익성이 있습니까? 그렇지 않다면 주식회사 카카오가 이를 계속 운영하는 이유는 무엇입니까?

**카카오톡이 현재도 존재하므로 몇 가지 질문을 드리겠습니다.**

23.　카카오톡이 현재 한국의 다른 메시징 앱보다 더 많은 사용자를 보유하고 있는 것이 맞습니까? 카카오톡은 언제부터 대한민국의 다른 메시징 앱보다 더 많은 사용자를 보유하고 있었나요?

24.　대한민국에 거주하는 카카오톡 총 사용자의 백분율은 어떻게 됩니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

25.　미국에 거주하는 카카오톡 총 사용자의 백분율은 어떻게 됩니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

26.　2022 년에 카카오톡이 전 세계, 대한민국, 미국에서 보유한 사용자는 각각 대략 몇 명이었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

27.　카카오가 카카오톡을 통해 전송된 메시지 수를 추적하는 범위 내에서, 이 기간 동안 전 세계, 대한민국, 미국에서 카카오톡을 통해 전송된 메시지 수는 각각 몇 개였습니까? 가능하면 월별로 그리고 연도별로 알려 주십시오.

**2012 년부터 2015 년까지 카카오톡에 대해 몇 가지 질문을 하겠습니다.**

28.　이 기간 동안 대한민국에 거주하는 카카오톡 총 사용자의 백분율은 얼마였습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

29.　이 기간 동안 미국에 거주하는 카카오톡 총 사용자의 백분율은 얼마였습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

30.　이 기간 동안 카카오톡이 전 세계, 대한민국, 미국에서 보유한 사용자는 각각 대략 몇 명이었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해

주십시오.

31.   카카오가 카카오톡을 통해 전송된 메시지 수를 추적하는 범위 내에서, 이 기간 동안 전 세계, 대한민국, 미국에서 카카오톡을 통해 전송된 메시지 수는 각각 몇 개였습니까? 가능하면 월별로 그리고 연도별로 알려 주십시오.

**이제 카카오스토리에 대해 질문하겠습니다.**

32.   카카오스토리라는 제품에 대해 잘 알고 계십니까? 카카오스토리란 어떤 것입니까?

33.   카카오스토리가 언제 출시되었나요? 카카오스토리는 아직도 운영 중인가요?

34.   현재, 카카오스토리가 애플리케이션에서 사용자의 커넥션을 해당 사용자의 "친구"로 언급하고 있습니까? 카카오스토리가 2012~2015 년 기간 동안 그렇게 했습니까?

35.   현재, 카카오스토리를 통해 사용자가 모든 카카오스토리 커넥션 또는 "친구"가 한 번에 볼 수 있는 게시물을 만들 수 있습니까? 카카오스토리가 2012~2015 년 기간 동안 그렇게 했습니까?

36.   현재, 카카오스토리를 통해 사용자가 자신의 "친구"가 작성한 게시물에 댓글을 달거나 다른 방식으로 반응할 수 있습니까? 그렇다면 게시물에 대한 이러한 의견이나 반응을 누가 볼 수 있습니까? 2012~2015 년 기간 동안 카카오스토리를 통해 사용자가 자신의 "친구"가 작성한 게시물에 댓글을 달거나 다른 방식으로 반응할 수 있었습니까? 그렇다면 게시물에 대한 이러한 의견이나 반응을 누가 볼 수 있습니까?

37.   카카오스토리에는 현재 "뉴스피드", "스토리 피드" 또는 "월" 기능이 있습니까? 그렇다면, 기능에 대해 기술해 주십시오. 카카오스토리가 2012 년부터 2015 년까지 이러한 기능을 가지고 있었습니까? 었다면, 기술하여 주시기 바랍니다.

38.   현재, "피드" 또는 "월"을 통해 사용자가 한 곳에서 여러 "친구"의 업데이트를 스크롤할 수 있습니까? 2012 년에서 2015 년 사이에 그렇게 했습니까?

39.   현재, 카카오스토리를 통해 사용자가 자신의 "피드" 또는 "월"에 게시하여 친구 및 가족과 생활 업데이트를 공유할 수 있습니까? 2012 년에서 2015 년 사이에 그렇게 했습니까?

40.   현재, 카카오스토리를 통해 사용자가 자신의 "피드" 또는 "월"에 게시하여 친구 및 가족과 개인 사진을 공유할 수 있습니까? 2012 년에서 2015 년 사이에 그렇게 했습니까?

41.     현재, 카카오스토리 사용자들은 어떻게 다른 사용자들을 찾고 연결합니까?
        2012 년에서 2015 년 사이에 어떻게 그렇게 했습니까?

42.     현재, 카카오톡의 사용자들이 특정 국가에 집중되어 있습니까? 그렇다면, 어느
        국가입니까? 2012 년부터 2015 년까지 카카오스토리의 사용자들은 특정 국가에
        집중되어 있었습니까? 그렇다면, 어느 국가였습니까?

43.     현재, 카카오는 다른 애플리케이션과 비교하여 카카오스토리의 성공을 측정하기 위해
        어떤 지표를 사용합니까? 2012~2015 년 동안에 카카오는 다른 애플리케이션과
        비교하여 카카오스토리의 성공을 평가하기 위해 어떤 지표를 사용했습니까?

**카카오스토리가 현재도 존재하므로 몇 가지 질문을 드리겠습니다.**

44.     대한민국에 거주하는 카카오스토리 총 사용자의 백분율은 어떻게 됩니까? 가능한 경우
        일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

45.     미국에 거주하는 카카오스토리 총 사용자의 백분율은 어떻게 됩니까? 가능한 경우
        일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

46.     2022 년에 카카오스토리가 전 세계, 대한민국, 미국에서 보유한 사용자는 각각 대략 몇
        명이었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해
        주십시오.

47.     2022 년에 사용자가 각각 전 세계, 대한민국, 미국에서 카카오스토리를 사용한 총
        시간은 분 단위로 월간 대략 얼마였습니까?

**2012 년부터 2015 년까지 카카오스토리에 대해 몇 가지 질문을 하겠습니다.**

48.     이 기간 동안 대한민국에 거주하는 카카오스토리 총 사용자의 백분율은 어떻게
        됩니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

49.     이 기간 동안 미국에 거주하는 카카오스토리 총 사용자의 백분율은 얼마였습니까?
        가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해 주십시오.

50.     이 기간 동안 카카오스토리가 전 세계, 대한민국, 미국에서 보유한 사용자는 각각 대략
        몇 명이었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자에 대해 말해
        주십시오.

51.     이 기간 동안 사용자가 각각 전 세계, 대한민국, 미국에서 카카오스토리를 사용한 총
        시간은 분 단위로 월간 대략 얼마였습니까?

**이제 카카오스토리에 대해 좀 더 일반적인 질문을 드리겠습니다.**

52. 주식회사 카카오가 카카오스토리를 출시한 이유는 무엇이었습니까?

53. 카카오스토리가 카카오톡과 별개의 앱인게 맞나요? 카카오스토리가 항상 카카오톡과는 별도의 앱이었나요?

54. 주식회사 카카오가 카카오톡에서 카카오스토리를 별도의 앱으로 만든 이유는 무엇이었나요?

55. 카카오스토리가 출범 시 운영에 주력한 국가를 나열하고 카카오스토리가 그러한 국가에 주력한 이유를 설명하십시오. 카카오스토리가 미국에 집중하지 않았다면 그 이유를 설명해 주십시오.

56. 사용자 경험 측면에서 카카오스토리와 카카오톡은 어떻게 다릅니까?

57. 주식회사 카카오는 카카오톡 이용자에 대한 정보를 이용하여 카카오스토리를 출시하였습니까? 그렇다면, 어떤 정보입니까?

58. 주식회사 카카오는 카카오톡의 자원을 활용하여 카카오스토리를 출시했습니까? 그렇다면, 어떤 자원이었습니까?

59. 카카오스토리를 출시하려면 어떤 새로운 자원이 필요했습니까?

60. 주식회사 카카오가 카카오스토리를 출시했을 때 카카오스토리를 카카오톡의 기존 사용자층에게 홍보하려고 했습니까? 출시 이래로 어떠하였습니까?

61. 기존 카카오톡 사용자 기반이 카카오스토리의 성장에 영향을 주었습니까? 그렇다면, 카카오스토리의 성장에 대한 기존 카카오톡 사용자 기반의 영향은 무엇이었습니까?

62. 카카오스토리가 출시되었을 때, 카카오톡을 통해 연결된 사람들이 카카오스토리에서도 서로 연결되도록 초대할 수 있었습니까?

    a. 그렇다면, 카카오스토리에서의 카카오톡 연결 기능이 카카오스토리 성장에 도움이 되었습니까? 그렇다면 어떻게 가능했습니까?

63. 카카오스토리 출시 당시 카카오톡은 몇 명의 사용자를 보유하고 있었습니까? 가능한 경우 일일 실제 사용자와 월간 실제 사용자를 추정해 주십시오.

64. 카카오스토리가 처음 한 달 동안 보유한 사용자는 몇 명이었습니까? 가능한 경우

카카오스토리를 다운로드한 사람들의 수, 일일 실제 사용자와 월간 실제 사용자 수를 추정해 주십시오.

65.   운영 첫 달에 카카오스토리의 사용자 중 몇 명이 이미 카카오톡 사용자였습니까? 가능한 경우 카카오톡의 일일 실제 사용자와 월간 실제 사용자를 바탕으로 추정해 주십시오.

66.   운영 첫 달에 카카오스토리의 사용자 중 카카오톡 사용자는 대략 몇 퍼센트였습니까? 가능한 경우 카카오톡의 일일 실제 사용자와 월간 실제 사용자를 바탕으로 추정해 주십시오.

67.   카카오스토리가 출시 8 일 후 1,000 만 명의 사용자와 2012 년 11 월까지 2,600 만 명의 일일 실제 사용자를 보유했던 것이 맞습니까? 그렇다면, 이러한 성장의 원인은 무엇이라고 생각하십니까?

68.   귀하가 알고 있는 한, 주식회사 카카오는 미국에서 카카오스토리의 사용을 늘리려고 시도한 적이 있습니까?

   a.   만약 그렇다면, 미국에서 카카오스토리의 사용을 늘리기 위해 주식회사 카카오가 취한 조치와 언제 카카오가 이를 수행했는지 기술해 주시기 바랍니다.

   b.   주식회사 카카오는 미국에서 카카오스토리 사용 목표가 있었습니까? 그렇다면 주식회사 카카오가 그 목표를 달성했습니까? 왜 또는 왜 그렇지 않습니까?

69.   주식회사 카카오가 카카오스토리의 미국 내 사용을 늘리기 위한 조치를 취하지 않았다면, 그렇게 하지 않은 이유는 무엇입니까?

70.   카카오스토리가 수익을 창출하고 있습니까?

   a.   그렇다면, 카카오스토리의 수익 창출의 원천은 무엇이며, 각 수익 창출은 언제 시작되었습니까? 2012 년, 2013 년, 2014 년, 2015 년, 2021 년에 카카오스토리가 창출한 총 수익은 각각 얼마였습니까?

   b.   카카오스토리의 수익 창출의 원천이 카카오톡의 수익 창출의 원천과 달랐습니까? 그렇다면, 이러한 출처는 무엇이었으며 언제 제공되었습니까?

   c.   이 기간 동안 각 수익원에 의해 창출된 총 카카오스토리 수익의 백분율을 가장 잘 추정한다면 어떻게 됩니까?

71.   카카오스토리가 독립형 애플리케이션으로 수익성이 있습니까? 그렇다면, 독립형

애플리케이션으로서 항상 수익성이 있었습니까?

72. 만약 카카오스토리가 독립형 애플리케이션으로 수익성이 없는 시점이 있었다면, 언제 카카오스토리가 독립형 애플리케이션으로 수익성이 없었고, 그 기간 동안 주식회사 카카오가 계속 운영한 이유는 무엇입니까?

73. 카카오스토리가 대한민국에서 페이스북 앱보다 일일 실제 사용자나 월간 실제 사용자가 더 많은 때가 있었나요? 그렇다면 언제입니까? 카카오스토리가 더 많이 보유한 사용자 유형(예: 일일 실사용자, 월간 실사용자)은 무엇입니까?

**이제 패스에 대해 몇 가지 질문을 드리겠습니다.**

74. 2015 년 주식회사 카카오에서 인수한 패스라는 앱을 알고 계십니까?

75. 비즈니스를 책임지는 동안 패스에 익숙해졌습니까?

76. 비즈니스를 책임지는 동안 패스에 어떻게 익숙해졌습니까?

77. 비즈니스를 책임지는 동안 패스에 언제 익숙해졌습니까?

78. 귀하가 알기에 주식회사 카카오가 패스를 인수한 이유는 무엇이었습니까?

79. 주식회사 카카오에서 궁극적으로 패스를 종료하였습니까?

    a. 카카오가 궁극적으로 패스를 종료한 이유에 대해 어떻게 이해하고 계십니까?

**시간을 내주셔서 대단히 감사합니다.**

**META PLATFORMS, INC.를 대신하여**
**정현주에 제시할 질문**

1. 2011 년 1 월부터 2018 년 사이에 패스가 사업의 일환으로 다음 중 어느 애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를 추적했는지 표시하십시오. 패스가 특정 애플리케이션을 추적했는지 확실하지 않은 경우 다음에서 나타내 주십시오.

    s. 페이스북
    t. 인스타그램
    u. 페이스북 메신저
    v. 왓츠앱

  w. 힙스타매틱

  x. 플리커

  y. 아이메시지

  z. 핀터레스트

  aa. 카메라+

  bb. 빈티지 카메라

  cc. 스냅

  dd. DMD 파노라마

  ee. 틱톡

  ff. 트위터

  gg. 유튜브

  hh. 링크드인

  ii. 스트라바

  jj. 레딧

2. 2011 년 1 월부터 2018 년 사이에 다음 중 주식회사 카카오가 광고 수익에 있어 패스의 경쟁업체로 간주한 애플리케이션을 표시하십시오. 카카오가 특정 애플리케이션을 광고 수익에 있어 패스의 경쟁업체로 간주했는지 확실하지 않은 경우, 다음에서 나타내 주십시오.

  s. 페이스북

  t. 인스타그램

  u. 페이스북 메신저

  v. 왓츠앱

  w. 힙스타매틱

  x. 플리커

  y. 아이메시지

  z. 핀터레스트

  aa. 카메라+

  bb. 빈티지 카메라

  cc. 스냅

  dd. DMD 파노라마

  ee. 틱톡

  ff. 트위터

  gg. 유튜브

  hh. 링크드인

  ii. 스트라바

  jj. 레딧

3. 2011 년 1 월부터 현재까지 카카오톡이 사업의 일환으로 다음 중 어느 애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를 추적했는지 표시하십시오. 카카오톡이 특정 애플리케이션을 추적했는지 확실하지 않은 경우 다음에서 나타내 주십시오.

  m. 페이스북

  n. 인스타그램

  o. 페이스북 메신저

  p. 스냅챗

  q. 왓츠앱

  r. 아이메시지

  s. 텔레그램

  t. 시그널

  u. 라인

  v. 바이버

  w. 구글 메신저

  x. 위챗

4. 2011 년 1 월부터 현재까지 다음 중 주식회사 카카오가 광고 수익에 있어 카카오톡의 경쟁업체로 간주한 애플리케이션을 표시하십시오. 카카오가 특정 애플리케이션을 광고 수익에 있어 카카오톡의 경쟁업체로 간주했는지 확실하지 않은 경우, 다음에서 나타내 주십시오.

  m. 페이스북

  n. 인스타그램

  o. 페이스북 메신저

  p. 스냅챗

  q. 왓츠앱

  r. 아이메시지

  s. 텔레그램

  t. 시그널

  u. 라인

  v. 바이버

  w. 구글 메신저

    x. 위챗

5. 2011 년 1 월부터 현재까지 카카오스토리가 사업의 일환으로 다음 중 어느 애플리케이션에서 (사용자 측면 혹은 매출 측면에서 측정한 것과 상관없이) 성과를 추적했는지 표시하십시오. 카카오스토리가 특정 애플리케이션을 추적했는지 확실하지 않은 경우 다음에서 나타내 주십시오.

    m. 페이스북
    n. 인스타그램
    o. 페이스북 메신저
    p. 스냅챗
    q. 왓츠앱
    r. 아이메시지
    s. 텔레그램
    t. 시그널
    u. 라인
    v. 바이버
    w. 구글 메신저
    x. 위챗

6. 2011 년 1 월부터 현재까지 다음 중 주식회사 카카오가 서비스 이용 시 사용자에게 광고를 보여주려고 하는 회사에 있어 카카오스토리의 경쟁업체로 간주한 애플리케이션을 표시하십시오. 카카오스토리가 서비스 이용 시 사용자에게 광고를 보여주려고 하는 회사에 있어 특정 애플리케이션을 경쟁업체로 간주했는지 확실하지 않은 경우, 다음에서 나타내 주십시오.

    m. 페이스북
    n. 인스타그램
    o. 페이스북 메신저
    p. 스냅챗
    q. 왓츠앱
    r. 아이메시지
    s. 텔레그램
    t. 시그널
    u. 라인
    v. 바이버
    w. 구글 메신저

x. 위챗

7. 카카오톡에 다음 기능이 포함되어 있는지 표시하십시오.

   e. 사용자를 친구, 가족 및 기타 지인과 연결하는 소셜 그래프.
   f. 사용자가 개인적 소식, 관심사, 사진 및 비디오를 포함한 콘텐츠를 프로필 페이지와 같은 하나의 공용 공간에서 공유할 수 있는 기능.
   g. 사용자가 다른 카카오톡 사용자를 검색하고 찾을 수 있는 기능.
   h. 사용자가 동시에 여러 사용자에게 사진을 공유할 수 있는 기능.

8. 카카오스토리에 다음 기능이 포함되어 있는지 표시하십시오.

   e. 사용자를 친구, 가족 및 기타 지인과 연결하는 소셜 그래프.
   f. 사용자가 개인적 소식, 관심사, 사진 및 비디오를 포함한 콘텐츠를 프로필 페이지와 같은 하나의 공용 공간에서 공유할 수 있는 기능.
   g. 사용자가 다른 카카오스토리 사용자를 검색하고 찾을 수 있는 기능.
   h. 사용자가 동시에 여러 사용자에게 사진을 공유할 수 있는 기능.

9. 패스에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

10. 카카오톡에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

11. 카카오스토리에서 가장 흔하게 이용되는 다섯 가지 활동을 열거하십시오.

12. 주식회사 카카오가 패스를 인수하기로 결정한 이유를 열거하고 설명하십시오.

13. 주식회사 카카오가 패스 서비스를 중단하기로 결정한 이유를 열거하고 설명하십시오.

14. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 패스를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

15. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 패스를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

16. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오톡을 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

17. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오톡을 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

18. 메타가 인스타그램을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오스토리를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.

19. 메타가 왓츠앱을 (전체 또는 일부를) 인수하여 지속적으로 소유한 결과, 주식회사 카카오가 카카오스토리를 개선하거나 수정하기를 거부한 각 사례를 열거하고 설명하십시오.



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Jacqueline Yorke, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided English into Korean translation(s) of the source document(s) listed below are true and accurate:

- *Letter of Request to Kakao (Testimony)*

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).



Jacqueline Yorke, Project Manager

Sworn to before me this
Thursday, November 03, 2022

Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
.01PO6356754
MY COMMISSION EXPIRES 04-03-20__

Stamp, Notary Public