**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

**JOINT STATUS REPORT**

Pursuant to the Court's Minute Order of September 30, 2022, the parties submit the following Joint Status Report summarizing the state of discovery, identifying any issues between the parties, and summarizing the parties' respective positions.

**I.      The FTC's Statement on the Status of Discovery**

Meta represents that it has now substantially completed production of documents responsive to the FTC's first set of requests for production ("RFPs"), although this was not the case on December 7, 2022, when Meta – for the second time – failed to meet the Court's deadline to complete its production of documents responsive to the FTC's first set of requests for production. *See* Aug. 10, 2022 Minute Order (instructing Meta to substantially complete production by November 16, 2022); Nov. 9, 2022 Minute Order (extending deadline to December 7, 2022). Based on Meta's current representations, the parties' only dispute involving Meta's production is whether Meta should prioritize production of relevant "de-privileged" documents in advance of depositions, as described below.

Further, as described below, the FTC respectfully asks the Court to instruct Meta to provide a sufficient response to the FTC's Interrogatory No. 4.

Pursuant to guidance from the Court on December 9, the Parties have agreed to a Remote Deposition Protocol, attached here as Ex. 1 (Stipulation and [Proposed] Order Regarding Remote Depositions).

A.     **The FTC's Position Regarding Its Discovery to Meta**

    1.     **Requests for Production**

While Meta claims it has now substantially complied with the FTC's First RFPs, this was not true on December 7, which required postponing a previously-agreed deposition:

- On Saturday, December 10, Meta postponed a deposition that the parties had agreed to conduct on Tuesday, December 13, explaining that Meta had not yet produced "a number of additional documents" relevant to the witness;

- At 11:22 p.m. on December 13 (less than five hours before the first fact witness deposition in this case), Meta unexpectedly announced the production of 998,000 pages of documents "responsive to the FTC's Requests for Production."  Meta has suggested that these were produced in the *Klein* litigation, but has provided no reason it waited until after the Court's deadline to produce them to the FTC.

To avoid further interference with depositions, the FTC has asked Meta how many documents in its December 13 production relate to the postponed deposition, and to other witnesses whose depositions will occur shortly.  Had Meta informed the FTC that it would produce nearly one million pages of documents after the Court's deadline, the parties could have discussed prioritizing a timely production of documents related to particular custodians – an approach Meta has repeatedly rejected, despite Meta's previous representation to the Court that it would cooperate with the FTC on such prioritization efforts.  *See* ECF No. 164 (July 29, 2022 Joint Status Report), at 2.

Regardless of Meta's failure to comply with the December 7 deadline to respond to the FTC's first set of RFPs, the parties have agreed that Meta will produce its associated privilege log, and any corresponding documents, by January 23, 2023, which is 45 days after Meta should have substantially complied with the FTC's first set of RFPs.  *See* ECF No. 103 (Joint Scheduling Order), ¶ 17.

The FTC has issued four additional sets of RFPs, and the parties continue to negotiate Meta's compliance with the FTC's remaining RFPs.

## 2.   **Deposition Scheduling**

The FTC served Meta with deposition notices pursuant to Fed. R. Civ. P. 30(b)(6), on June 28, 2022 and July 22, 2022.  The FTC has conducted two depositions relating to a subset of the topics described in these notices.  At Meta's request, the FTC agreed to accept a written response in lieu of deposition testimony on certain additional topics.  Meta has provided some written responses and has committed to complete its written responses by December 20, 2022.

The FTC noticed 22 depositions of current or former Meta employees on November 3, 2022, and an additional 25 on November 23.  Meta has confirmed that it represents 40 of these 47 witnesses.  Of the 40 witnesses represented by Meta: the FTC has conducted one deposition, the parties have agreed to dates for 37 additional witnesses, and the parties have agreed to hold 2 deposition notices in abeyance.

For each of the aforementioned depositions involving current or former Meta employees, the FTC respectfully asks the Court to instruct Meta to use best efforts to: (i) complete its assessment of any documents that Meta has identified as potentially privileged that involve a deposition witness in advance of the deposition; and (ii) produce any non-privileged documents relevant to a deposition witness no fewer than 10 days in advance of the deposition.  Meta has

demonstrated its ability to identify documents related to a particular witness that are not actually privileged and produce them in advance of depositions.  For example, the first fact witness deposition in this case began at 4:00 a.m. Eastern time on December 14, 2022.  Approximately 6.5 hours before the deposition began, Meta provided a set of documents from its "review of potentially privilege [sic] documents," "on which [the deponent] was listed or appears in the text of the document."  *Dec. 13, 2022 Email from K. Fetterman to FTC Counsel* (sent at 9:29 p.m.). The FTC asks that the Court instruct Meta to engage in the same process for each currently scheduled deposition and produce non-privileged documents in a useful timeframe – i.e., no fewer than 10 days in advance of the relevant deposition.

### 3.     The Court's November 28 Minute Order regarding Meta's Privilege Log

As instructed by the Court on November 28, 2022, the FTC provided Meta on December 1, 2022 with a sample of 2500 privilege entries, split into two batches of 1250 entries to correspond to Meta's responsibility to respond on December 30, 2022 and January 31, 2023.  *See* Nov. 28, 2022 Minute Order.

Separately, on September 20, 2022 the FTC identified to Meta approximately 1300 entries.  On November 23, Meta reversed privilege claims for more than 1100 of these entries. For approximately 100 additional entries, Meta appears not to have provided any response at all (that is, the FTC does not know whether Meta is standing on its original assertion of privilege). Thus, Meta's reversal rate appears to exceed 80% for the entries the FTC identified on September 20.  The parties will meet and confer to discuss next steps in light of Meta's continued high reversal rate.

### 4.     Interrogatories

The FTC issued interrogatories Nos. 1-8 on May 26, 2022.  The parties currently have a

dispute regarding Meta's response to FTC Interrogatory No. 4.  Interrogatory No. 4 asks Meta to "[d]escribe, and state the basis for, the Company's valuation of WhatsApp prior to Meta's acquisition of WhatsApp, including, but not limited to, identifying any valuation estimates developed by Meta or on Meta's behalf, the reasoning or assumptions underlying the valuation estimates, and any sources of data or modeling Meta relied upon in developing valuation estimates for WhatsApp."  Meta has refused to provide a narrative description and has instead pointed to certain documents as examples of the requested information, pursuant to Federal Rule of Civil Procedure 33(d).  Throughout an extended negotiation process, the FTC identified to Meta significant shortcomings in the documents listed in Meta's response: first, concerns regarding the completeness of Meta's response; second, Meta's failure to provide the "reasoning or assumptions" of Meta's valuation of WhatsApp.  As such, the FTC asked Meta to supplement its response by identifying *all* valuation estimates as well as documents sufficient to show its reasonings or assumptions of those documents.  *Oct. 11, 2022 Ltr. From S. Musser to K. Fetterman.*  In response, Meta supplemented its response by identifying a handful of additional documents.  *Defendant Meta Platforms, Inc.'s Supplemental Objections and Responses to Plaintiff Federal Trade Commission's Interrogatory Nos. 4, 5, and 7* (November 30, 2022), at 4. Meta's supplemental response, however, suffers from the same fundamental deficiencies as its initial response.  Namely, Meta still has yet to confirm it has identified all valuations made by Meta or made on Meta's behalf prior to the closing of the WhatsApp acquisition, nor has Meta identified documents sufficient to show the underlying reasoning or assumptions.

Responding to an interrogatory request by identifying documents under Federal Rule of Civil Procedure 33(d) cannot be used as an excuse to avoid providing a complete answer to an interrogatory.  In the event that Meta is either unwilling or unable to provide a set of documents

that provides a complete and fulsome response to these interrogatories, it must provide a narrative response that does so.  As such, the FTC asks this Court to compel Meta to provide a complete response to Interrogatory No. 4 no later than December 30, 2022 by either identifying documents sufficient to answer the question or, if such documents are unavailable, by providing a complete narrative response.

      **B.**      **<u>The FTC's Position Regarding Non-Party Discovery</u>**

            **1.**        **Non-Party Document Subpoenas**

Meta has served document subpoenas on 133 non-parties.  The FTC has served cross-notices on 129 of those non-parties and has served document subpoenas on 23 additional non-parties.  The FTC has achieved substantial compliance with approximately 56 of the non-party subpoenas it has issued, setting aside any issues that might arise as a result of Meta's efforts to collect documents pursuant to its own subpoenas.  Thus, the FTC is well positioned to move forward with any necessary depositions of individuals associated with these non-parties.

Pursuant to the Court's instructions, the parties have undertaken or will undertake to bring to this Court any disputes regarding non-party compliance with Rule 45 subpoenas.  To date, the FTC does not have any ripe disputes with non-parties regarding subpoena compliance, although one non-party, Hipstamatic LLC, has stopped responding to the FTC's communications after initially accepting service of a Rule 45 subpoena and engaging in subpoena compliance discussions.  The FTC anticipates that it may need to seek the Court's assistance in securing Hipstamatic's compliance with the subpoena.

The parties are exchanging notices of modifications, extensions, or postponements to the subpoenas and cross-notices served on non-parties.  The parties are also exchanging non-party productions on a rolling basis.

### 2.      Depositions of Individuals Associated with Non-Parties

The FTC provided Initial Disclosures on February 22, 2022, and updated its disclosures on October 3, 2022; November 3, 2022; November 23, 2022; and December 9, 2022.  The FTC's disclosures currently identify 30 individuals who are associated with non-parties.

The FTC has served, or is the process of serving, 9 deposition subpoenas on individuals associated with non-parties, including some former Meta employees that are not represented by Meta.  Deposition dates have not been finalized for any of these witnesses.  The FTC and counsel for the witness have provided deposition dates for two of these witnesses, but Meta has not yet confirmed those dates.   No non-party depositions have yet been conducted.

Meta's February 2022 initial disclosures failed to identify any individuals associated with non-parties; Meta instead identified approximately 290 third-party entities and stated that it might rely on evidence from any "Corporate Representative or employee(s)" of each entity. Meta supplemented its disclosures on December 12, and identified 6 individuals associated with non-parties that had not already been identified in the FTC's disclosures.  In addition, Meta's disclosures removed certain non-parties, and added a smaller number of non-parties.  At this point, it appears likely that Meta will not disclose the witnesses it intends to depose or call at trial until very little time remains before the close of fact discovery.  The parties do not yet have a ripe dispute regarding Meta's disclosures or non-party deposition scheduling, but the FTC may be forced to seek the Court's assistance in the event that Meta's belated identification of individuals likely to possess relevant information prejudices the FTC's efforts to comply with the fact discovery cutoff.

### 3.      Proposal for a January Omnibus Discovery Proceeding

The FTC believes that efficiency is likely to be increased by an omnibus hearing in

January at which both parties would attempt, in good faith, to identify and resolve any disputes

with third parties.  Meta sets forth below, in its portion of the Joint Statement, further support for

such a hearing.  The FTC agrees that such a hearing should not prejudice a party's (or a non-

party's) ability to seek relief at a future time and should take place at the Court's convenience.

### C.   The FTC's Position Regarding Meta's Discovery to the FTC

#### 1.   The FTC's Responses to Meta Interrogatories 13 and 14

The parties do not presently have a dispute regarding the substance of the FTC's

responses to Meta interrogatories 13 and 14.  The FTC is engaged in ongoing factual discovery

and expert analysis that may inform the FTC's views regarding the appropriate treatment of any

particular feature/activity offered by Meta or by another online service.  For this reason, Meta's

demand for precise details regarding the FTC's granular understanding of features/activities

offered by 19 online service providers – twelve of which are outside the relevant market – is

premature, particularly because these interrogatories failed to identify any specific "features or

activities" offered by online service providers that are supposedly "similar" to the features or

activities offered by Meta.  Ex. 3 (*Defendant Meta's Second Set of Interrogatories* (October 17,

2022)).    Nonetheless, in the interests of avoiding needless disputes, the FTC has agreed to

undertake the burdensome exercise of assessing 100 specific features/activities that Meta will

identify.  Once Meta identifies the features/activities, the FTC will provide within three weeks a

further elaboration of its position.  Further, within five weeks, for each of the 100 specific

features/activities, the FTC will as requested by interrogatories 13 and 14, "state whether use of

that feature or activity or similar feature or activity counts as time spent using a 'personal social

networking service'" and "explain why or why not."  Ex. 3 (*Defendant Meta's Second Set of

Interrogatories to the Federal Trade Commission* (October 17, 2022)).  In addition, to avoid a

dispute on the issue, the FTC has agreed to identify relevant facts, despite the fact that the

interrogatories at issue do not purport to even request the FTC to list relevant facts.

Given the lack of a live dispute, it is unclear to the FTC why Meta has chosen to spill considerable ink on this issue, unless it is simply to inaccurately accuse the FTC of "shifting" its position regarding market definition.  In truth, the FTC's position has been consistent and clear: when a user spends time using an online service that is <u>not</u> a personal social networking service, the user is not using a personal social networking service – regardless of the feature or activity at issue.  Meta calls this a tautology, but it is in fact a basic principle of market definition.  Meta appears to suggest that because other online services may offer discrete features/activities that resemble certain features/activities offered by Meta's products, this necessarily means that time spent using each such feature/activity must be counted as time spent using a personal social networking service – presumably because Meta wants to argue that at least some time spent by users on non-PSNS products should be counted as "time spent" in the denominator when assessing Meta's market share.  But this is obviously wrong.

Market share calculations take into account firms that offer products "reasonably interchangeable by consumers for the same purposes," because the purpose of defining a relevant market in a Section 2 case is to determine whether competition from "other suppliers restrains a firm from raising prices above the competitive level."  *United States v. Microsoft Corp.*, 253 F.3d 34, 51–52 (D.C. Cir. 2001) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) and *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986)).  Here, the FTC has alleged that personal social networking is an integrated service that allows people to connect and share a variety of content and experiences with people they know.  *See, e.g.*, Second Amended Complaint ("SAC"), ¶ 168.  A firm that offers a discrete feature does not thereby offer a service that is interchangeable by users for the same purpose that

consumers use an integrated service.  Meta's attempt to parse out individual features/activities, and its insistence that each feature must be considered separately is therefore misguided: in analogous circumstances courts regularly reject the argument that all providers of individual products necessarily compete within the same antitrust market as a firm that offers a set of products in a distinctive format.  *E.g.*, *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."); *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1073-74 (D.D.C. 1997) (relevant market consisted of "the sale of consumable office supplies through office supply superstores," despite the fact that "[t]he consumable office products at issue here are identical whether they are sold by Staples or Office Depot [the superstores at issue] or another seller of office supplies").  Nor is it the case that the appearance of individual features or activities in two offerings makes the offerings the same product or part of the same relevant antitrust market.  For instance, a country club and a cruise ship may both offer swimming pools, but they are not the same product and likely do not belong in the same antitrust market.  And when calculating market shares, sales made by firms that do not participate in the relevant antitrust market are not taken into account.

Here, non-PSNS products are not reasonably interchangeable by consumers for the same purposes for which consumers use PSNS products.  This is because the user experiences offered by non-PSNS products are dedicated to different purposes than Meta's PSNS products, which are used by consumers to "maintain[] a network of friends, family, and personal connections and shar[e] experiences with them in a shared social space."  *Plaintiff Federal Trade Commission's Objections and Responses to Defendant Meta's Second Set of Interrogatories* (November 16, 2022), at 14-19.  It thus rings hollow for Meta to claim that it is unable to understand "why

viewing content posted in a Group User joined [on Facebook] based on User's interests. . .
qualifies as using PSNS . . . but viewing similar content posted in a similar community joined on
Reddit does not qualify as use of PSNS." *Infra*. The FTC has already explained why: "[w]ith
the exception of Facebook Dating, the evidence presently available to the FTC suggests that the
various features/activities identified by Meta for Facebook and Instagram are experienced and
perceived by users, and/or are presented to users, as aspects of personal social networking, and
users are engaging with that content along with their networks of friends, family, and personal
connections, built and maintained within the respective applications, and using Facebook's and
Instagram's integrated and personalized social experiences." *Plaintiff Federal Trade
Commission's Response to Meta Platforms, Inc.'s List of Features or Activities* (September 12,
2022), at 3. In contrast, "the FTC's present impression is that the features/activities provided on
Reddit are outside the definition of personal social networking because Reddit presents a user
experience dedicated to the broadcast or discovery of content based on users' interests, rather
than maintaining a network of friends, family, and personal connections and sharing experiences
with them in a shared social space." *Plaintiff Federal Trade Commission's Objections and
Responses to Defendant Meta's Second Set of Interrogatories* (November 16, 2022), at 17.

The FTC could not be more clear: Meta offers PSNS, and Reddit does not, because
Reddit is not reasonably interchangeable by consumers for the same purposes of "maintaining a
network of friends, family, and personal connections and sharing experiences with them in a
shared social space." *Id.* The fact that Reddit may offer a discrete feature/activity that resembles
a feature/activity offered by Meta is thus irrelevant because, as the FTC has explained to Meta:

> [t]he FTC's classifications [of the features and activities offered by Meta] have no
> implication for whether any specific feature or activity offered by a different
> product is or is not within the definition of personal social networking. For
> example, the FTC currently classifies "Posting Original photo(s)" on Facebook's

Feed as within the definition of "personal social networking" in significant part because users engaged in that activity are doing so with their network of friends, family, and personal connections, built and maintained within Facebook, and using Facebook's integrated and personalized social experience. Such classification has no bearing on whether posting photos on any other website or product is within or outside the definition of "personal social networking."" Id.

Repetitively, Meta asserts it is unable to understand why "[v]iewing Reel(s) [on Instagram] posted by a celebrity qualifies as using PSNS, but viewing the same type of videos posted by a celebrity on TikTok does not qualify as using PSNS." *Infra.* Again, the FTC has explained why: the social context matters, and viewing videos on Meta's PSNS products "can play a role in an interaction in which a user may connect, share, discuss, and experience the video content with their friends, family, and personal connections." ECF No. 157 (FTC Opposition to Meta Motion to Compel), at 2. In contrast, "the FTC's present impression is that the features/activities provided on TikTok are outside the definition of personal social networking because TikTok presents a user experience dedicated to entertainment through viewing short form video content from creators a user does not personally know, as well as creating and sharing short form video content to an audience that the poster does not personally know, rather than maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space." *Plaintiff Federal Trade Commission's Objections and Responses to Defendant Meta's Second Set of Interrogatories* (November 16, 2022), at 19. Meta's own internal documents, and the statements of its executives, demonstrate that Meta understands this reality. *See, e.g.*, SAC ¶ 177 (in January 2019, Facebook assessed internally that "people are hiring TikTok for very different jobs to Instagram and they are not directly competing in the core areas of focus for our business," and further that "TikTok is not hired for sharing with friends and family").

In short, the FTC has already explained its allegations to Meta, and the FTC has provided the information and the basic market definition principles that underlie the FTC's allegations. *See generally*, *Plaintiff Federal Trade Commission's Objections and Responses to Defendant Meta's Second Set of Interrogatories* (November 16, 2022).  Meta clearly disputes the FTC's relevant market, and classification of various apps, but Meta does not need to hear more from the FTC to build its own evidence and arguments to support its insistence that other applications belong in the relevant market.  The FTC will provide Meta with further detail based on Meta's forthcoming list of 100 features/activities, and if the parties have a dispute based on the FTC's response, the parties should seek the Court's assistance if necessary.

### 2.    The FTC's Responses to Meta Interrogatory 15

Meta has far exceeded the Court's allotment of 30 total interrogatories, including discrete subparts, and thus the FTC should not be required to respond to Meta interrogatory 15, or any subsequently served interrogatories.  The FTC has lodged repeated objections as Meta attempted to squeeze together facially distinct interrogatories.  In response to Meta's First Set of Interrogatories, the FTC identified at least three interrogatories that are more fairly treated as several and distinct requests:

- **Interrogatory No. 1** requested that the FTC identify all persons that any employee of the FTC communicated with in connection to five temporally—and in part substantively—distinct matters: (1) the 2012 Instagram investigation; (2) the 2014 WhatsApp investigation; (3) the pre-Complaint investigation related to the instant matter; (4) the original Complaint in the instant matter; and (5) the Substitute Amended Complaint in the instant matter.   These five matters span a decade, and the FTC employees involved at each stage have turned over multiple times in the intervening time.  To compile its answer, the FTC had to make inquiries of distinct sets of case teams and scour distinct case files.  Accordingly, "Interrogatory No. 1" in fact constitutes five distinct interrogatories. Ex. 2 at 8 (*Defendant Meta's First Set of Interrogatories* (March 30, 2022), at 9-11).

- **Interrogatory No. 2** presents similar issues.  Meta requested that the FTC identify all *communications*, rather than *persons*, between any employee of the FTC and any other

person in connection with the same five distinct matters listed above.  Again, the FTC had to compile records from distinct sets of case teams and pull distinct case files.  Accordingly, "Interrogatory No. 2" in fact constitutes five distinct interrogatories. Ex. 2, at 8 (*Defendant Meta's First Set of Interrogatories* (March 30, 2022)).

- **Interrogatory No. 10** requested that the FTC first identify every feature or activity available to users on four distinct Meta applications: (1) Facebook; (2) Instagram; (3) WhatsApp; and (4) Facebook Messenger.  Then "Interrogatory No. 10" separately asked the FTC to categorize every feature or activity offered on each application as either within or outside the definition of personal social networking services.  With the Court's assistance, Meta eventually narrowed its request by providing the FTC with a set of 322 features and activities to assess.  But Meta's request still demanded a distinct assessment of the same four separate applications.  Accordingly, "Interrogatory No. 10" in fact constitutes four distinct interrogatories. Ex. 2, at 10 (*Defendant Meta's First Set of Interrogatories* (March 30, 2022)).

At the time Meta served its Second Set of Interrogatories, by its own estimate Meta had already served 12 interrogatories.  Accounting for Meta's improper grouping together of unrelated requests, though, Meta had propounded at least 23 interrogatories.  Thus, the FTC attempted to respond as required to Meta's Second Set of Interrogatories.  But this set, also, warranted objections on the basis that Meta again attempted to circumvent the Court's limit on interrogatories by grouping unconnected and highly burdensome requests into single interrogatories.

- **Interrogatory No. 13** requested that the FTC make a granular and burdensome assessment of seven different applications: (1) Snapchat; (2) Google+; (3) MeWe; (4) Path; (5) Friendster; (6) Myspace; and (7) and Orkut.  Further, "Interrogatory No. 13" on its face asks the FTC to (a) exhaustively catalogue every feature/activity available on these seven nonparty applications; (b) make hundreds of individualized determinations of whether, and to what extent, each such feature or activity bears some similarity, if any, to one or more of the 270 features or activities on Meta's applications that the FTC identified as being within the definition of personal social networking services in response to Meta's Interrogatory No. 10; (c) individually assess and classify some yet undetermined number of features or activities on each of these seven nonparty applications as part of or not part of personal social networking services; and then (d), explain why the FTC made such a classification.  Accordingly, "Interrogatory No. 13" in fact constitutes at least seven distinct interrogatories because it requires a distinct assessment of seven different applications.   Ex. 3, at 7-8 (*Defendant Meta's Second Set of Interrogatories* (October 17, 2022)).   This brings Meta's total to 30.

14

- **Interrogatory No. 14** presents similar issues.  Meta requested that the FTC make the same granular and burdensome assessment for 12 additional applications: (1) Strava; (2) LinkedIn; (3) iMessage; (4) Twitter; (5) Reddit; (6) Pinterest; (7) YouTube; (8) Spotify; (9) Nextdoor; (10) Netflix; (11) Hulu; and (12) TikTok.  Accordingly, "Interrogatory No. 14" in fact constitutes at least twelve distinct interrogatories because it requires a distinct assessment of twelve different applications.   Ex. 3, at 8 (*Defendant Meta's Second Set of Interrogatories* (October 17, 2022)).  This brings Meta's total to 42.

Meta has now gone too far, with Interrogatory No. 15 representing at least its 43rd interrogatory.  A line must be drawn eventually, and if the FTC did not hold its ground with this objection Meta would likely have served another 15 unreasonably compound interrogatories.  The FTC continues to work in good faith to respond to Meta's discovery, including as described above the FTC's agreement to supplement its responses to Interrogatories No. 13 and 14.  But Meta has exceeded its court-ordered limit on interrogatories, even by the most conservative assessment.  Thus, respectfully, the FTC requests the Court's assistance in halting Meta's effort to burden the FTC through its use of interrogatories.

## II.  Meta's Statement On The Status Of Discovery

### A.   Meta's Statement on the Status of Discovery to the FTC

#### 1.   The Parties Are Attempting To Resolve an Ongoing Dispute in Relation to the FTC's Shifting Market Definition

A threshold question in this case is the proper market definition.  The FTC alleges a market that it calls "personal social networking services" ("PSNS").  *See* Am. Compl. ¶ 2 (Sept. 7, 2021), ECF No. 82.  Because the meaning of PSNS is "nonintuitive," *see FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 20 (D.D.C. 2021), Meta has spent roughly two years attempting to get details regarding the contours of the alleged market from the FTC.

At the motion to dismiss stage, the FTC persuaded the Court that it had alleged a plausible market, with a definition of PSNS that included some, but not all, activities that occur

on Facebook, Instagram, and other PSNS providers.[1]  The FTC eventually reaffirmed that

position in response to Meta's Interrogatory on the topic, identifying nine narrow activities on

Facebook and Instagram that it contended qualify as PSNS, and representing to the Court that

those nine activities on Facebook and Instagram "fully and directly" reflected "its current

understanding of what is 'in'" the alleged PSNS market.  FTC's Opp. at 1, ECF No. 157.

On September 12, 2022, the FTC changed horses entirely, stating that there is no need to

parse between PSNS and non-PSNS activities on Instagram and Facebook because *every activity*

on Instagram and Facebook, with the potential exception of activities on Facebook Dating

(which was introduced in 2019), qualifies as PSNS.  *See* FTC's Resp. to Meta's List of Features

or Activities (Sept. 12, 2022) (Joint Status Report Ex. 2 (Oct. 31, 2022), ECF No. 206-2).

In light of the FTC's material change in position, Meta served Interrogatories on October

17, 2022 aimed to elicit whether the FTC classifies as PSNS the same or similar features or

activities when they occur on applications other than Facebook and Instagram, such as Snapchat,

Twitter, YouTube, and TikTok.  *See* Meta's 2d Set of Interrogs. to FTC Nos. 13-14, at 7-8 (Oct.

17, 2022).  On November 16, 2022, the FTC responded to Meta's Interrogatories with a

tautology.  According to the FTC's new theory, if the activity occurs on applications that

allegedly offer some PSNS (like, allegedly, Snapchat), it "likely" counts as PSNS because of the

---

[1] *See, e.g.*, *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48 (D.D.C. 2022) ("It is correct, as the Court previously acknowledged, that data measuring the amount of time users spend on Facebook (*and on other PSN service providers*) likely captures time not spent engaging with a PSN service – *e.g.*, watching a movie trailer embedded on the official page of the movie – *given how the FTC defined the market*." (emphases added)); *id.* at 49 ("[P]assively viewing a music video [on Facebook or Instagram] . . . falls outside of the market definition."); *FTC v. Facebook*, 560 F. Supp. 3d at 19 ("[A]t least some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC; time spent on those apps or websites, accordingly, is not necessarily time spent on a PSN service."); FTC's Opp. to Meta's Mot. To Compel Answer to Interrog. No. 10 Regarding the FTC's Market Definition at 15 (July 14, 2022), ECF No. 157 (emphasizing that the Amended Complaint alleged that Facebook and Instagram are "predominately used" as PSNS (citation omitted)).

likely connection between the feature/activity and users' ability to share and experience each of the various features and activities with their social networks of friends, family, and personal connections in a shared social space."  FTC's Resp. to Meta's 2d Set of Interrogs. No. 13, at 11-13 (Nov. 16, 2022).  But similar features and activities are not PSNS when they occur on other applications, because those applications "present[] a user experience dedicated to [something other than] maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space."  *Id.* Interrog. No. 14, at 17-19.

Meta has explained in several letters and meet-and-confers that the FTC's response is deficient because it merely parrots conclusory allegations about the scope of the market, without providing any actual explanation.  *See Williams v. Johanns*, 235 F.R.D. 116, 122-23 (D.D.C. 2006).  For example, Meta has asked the FTC to explain why "[v]iewing Reel(s) [on Instagram] posted by a celebrity" qualifies as using PSNS, but viewing the same type of videos posted by a celebrity on TikTok does not qualify as using PSNS.  *See* FTC's Resp. to Meta's List of Features or Activities at 17.  And it has asked why viewing content posted "in a Group User joined [on Facebook] based on User's interests, such as the 'Slow Cooker/Instant Pot Recipes' Group" qualifies as using PSNS, *see id.* at 6, but viewing similar content posted in a virtually identical community joined on Reddit does not.

In the interest of compromise, the parties have agreed that the FTC will supplement its responses to Interrogatory Nos. 13 and 14.  Under this agreement, Meta will provide the FTC with a list of 100 features or activities on specific non-Meta products that are similar to the features and activities that the FTC classified as PSNS when they occur on Facebook or Instagram.  The FTC, in turn, will respond within three weeks by providing further elaboration of its position, and then within five weeks by explaining why those features or activities do—or do

not—qualify as PSNS when they occur on non-Meta products.  The FTC has also agreed that it

will identify any relevant facts supporting its explanation.

     To ensure that the FTC's answers are useful, Meta's list of 100 features or activities on

the other applications will identify similar features or activities on Meta's products that the FTC

has classified as PSNS.  The FTC has confirmed that its explanation will include details and any

relevant facts on why the FTC classifies the two activities similarly or differently.  If the FTC

merely parrots conclusory statements that are not tied to the specific examples like it does here,

Meta anticipates it will need to seek relief from the Court, because the parties will be no closer to

answering the threshold questions about the FTC's market than they were when the Court posed

them in dismissing the FTC's initial Complaint.  *See FTC v. Facebook*, *Inc.*, 560 F. Supp. 3d at

19 (posing questions about the FTC's market and noting that "specific interest-based Facebook

pages or groups" are among the list of features that are "seemingly, [not part] of [Facebook's]

PSN-services offerings"); Joint Status Report at 11-12 (stating that engaging with an interest-

based Facebook group does not compete with engaging with an interest-based Reddit group

because the Facebook group is "built and maintained within Facebook"); *id.* at 12 (incorrectly

representing that Meta's internal documents from January 2019 state that Instagram Reels does

not compete with TikTok even though Instagram Reels was not launched in the United States

until August 2020).

        **2.**    **The Court Should Compel the FTC To Respond to Interrogatory No.
15**

     Interrogatory No. 15 asks the FTC to "[i]dentify each industry participant, including any

companies identified in the FTC's initial disclosures, that has recognized a distinct market for

personal social networking services, as defined by the FTC and consisting of the specific entities

the FTC has identified as providers of personal social networking services, in ordinary course

business documents or otherwise." Meta's 2d Set of Interrogs. No. 15, at 8. The FTC has refused to respond at all, standing on its objection that Meta has "exceed[ed] the number of interrogatories permitted under the Court's Scheduling Order." FTC's Resp. to Meta's 2d Set of Interrogs. No. 15, at 19-20. The FTC's objection is unfounded and a misguided attempt to avoid having to admit that it has not yet identified *any* industry participant in its 18-month investigation or 10 months of fact discovery that recognizes its alleged market.

The requested information is highly relevant. The FTC itself recognizes that the market views of third parties, with detailed knowledge of the relevant product and competition, are pivotal in antitrust cases. *See* U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 2.2.3 (2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf ("Information from firms that are rivals to the merging parties can help illuminate how the market operates."); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 32-33 (D.D.C. 2015) (citing testimony from an "industry's [various] players regarding the boundaries of the product market"). Such information could help show the viability or lack of viability of the alleged market. And, to the extent the FTC does not have industry recognition of the non-intuitive market concerning a free good, that alone could be case dispositive.

The FTC's numerosity objection is unfounded. To date, Meta has propounded fifteen Interrogatories. *Cf.* Scheduling Order ¶ 11 (Mar. 3, 2022), ECF No. 103 (permitting thirty interrogatories per side). But, without citing any authority for its counting methodology, the FTC insists that Interrogatory No. 15 is "at least the forty-fourth interrogatory served by Meta." FTC's Resp. to Meta's 2d. Set of Interrogs. No. 15, at 19-20; *see* Joint Status Report at 13-15. The FTC's theory is flawed. When determining whether an interrogatory counts as more than one question, "courts apply a pragmatic approach" and examine whether the interrogatory

"threaten[s] the purpose of [Rule 33] by putting together in a single question distinct areas of inquiry that should be kept separate." *Ramirez v. U.S. Immigr. & Customs Enf't*, 2019 WL 11623990, at *2 (D.D.C. June 4, 2019) (citation omitted).  None of the Interrogatories identified by the FTC "introduce a separate line of inquiry." *Id.*  Instead, they are each designed to "elicit[] details concerning a common theme." *Id.* (holding that an interrogatory "directed at eliciting details concerning a common theme" is "considered a single question," even when it contains subparts (citation omitted)).

For example, Interrogatory No. 3 asks the FTC to "[i]dentify all Products that have offered 'personal social networking services' in the United States (*see* Amended Complaint ¶ 164), and the time periods during which those Products offered personal social networking services."  Meta 1st Set of Interrogs. To FTC No. 3, at 8 (Mar. 30, 2022).  The FTC contends that Interrogatory counts as two subparts, because it uses the word "and" for clarity, instead of asking the FTC to just identify the "time periods during which Providers offered personal social networking services," which would necessarily include the identity of the Products as well.  Rule 33 does not require such a draconian reading of multiple clauses that go to the same theme.  *See Ramirez*, 2019 WL 11623990, at *2 (rejecting argument that an interrogatory seeking "every released age-out's name, date of birth, and A-number, in addition to the date of release and form of release" should qualify as multiple subparts because, although it does "contain[] a few subparts . . . those subparts all relate to the common theme"); *see also id.* ("[T]he fact that the interrogatory 'request[s] information as to a number of individuals does not equate to subparts." (second alteration in original; citation omitted)); *cf. Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 10-11 (D.D.C. 2004) (rejecting as "unfair" the "draconian approach of counting every subdivision of an interrogatory as a separate question").

The FTC's challenges to Interrogatory Nos. 1, 2, 10, 13, and 14 fail on similar grounds. For example, Interrogatory No. 1 asks the FTC to identify the individuals the FTC has communicated with in connection with the subject matter of this action.  The FTC claims this should count as five discrete interrogatories because the FTC has investigated the conduct at issue in this action multiple times, and because "the matters span a decade, and the FTC employees involved at each stage have turned over multiple times in the intervening time."  Joint Status Report at 13.  But the Interrogatory is focused on a single issue, and the FTC's own delay in bringing this lawsuit does not provide any support for the notion that Meta's single Interrogatory concerning this action should count as multiple interrogatories. *See Ramirez*, 2019 WL 11623990, at *2 ("[T]he fact that the interrogatory requests information as to a number of individuals does not equate to subparts." (cleaned up)).  The FTC's challenge to Interrogatory No. 2 fails for the identical reason.

 The FTC's attack on Interrogatory No. 10 fails for the additional reason that the Court ordered Meta to generate the list of features and activities that the FTC responded to in relation to that Interrogatory.  The FTC's attack on Interrogatory Nos. 13 and 14 fails for the additional reason that the parties reached agreement on the scope of the FTC's response to those Interrogatories.  Moreover, the fact that Interrogatory Nos. 13 and 14 identify the applications that the FTC identified in its Amended Complaint for clarity, rather than asking the FTC to explain the contours of its market in relation to the applications discussed in the Amended Complaint, does nothing to transform the straightforward Interrogatories into 19 distinct interrogatories.  Therefore, Meta has not exceeded the thirty-interrogatory limit provided in the Scheduling Order.

Meta requests that the Court order the FTC to respond to Interrogatory No. 15 based on

information presently in the FTC's possession, as required under the Federal Rules of Civil Procedure.  If the FTC knows of an industry participant that has recognized the PSNS market, the FTC must disclose that information.  Similarly, if the FTC does not possess any information in response to this Interrogatory, it must so state.

        **B.**      **<u>Meta's Statement on the Status of Nonparty Discovery</u>**

Meta has issued 139 nonparty document subpoenas, and has received documents from many nonparties.  Although many nonparties have completed productions, and Meta is concluding the review of their documents, negotiations with many others have drawn out for many months and a number of nonparties have yet to complete productions.  With limited exceptions, Meta has requested that all nonparties that Meta served with subpoenas in February 2022 complete their productions by December 31, 2022.  To the extent productions are not complete by that date, Meta will likely need to seek Court intervention, given how much time has passed since Meta served the subpoenas, and given the discovery deadline in May 2023.  To facilitate prompt resolution of those disputes, and to ease the administrative burden on the Court, if disputes remain outstanding, and the Court would find it useful, Meta believes that setting an omnibus hearing for a date certain in January to resolve any outstanding nonparty disputes would be beneficial.[2]  Placing the date on the calendar with a schedule for written submissions would likely serve as a helpful catalyst to encourage nonparties to reach resolution over substantive disputes and to commit to producing documents in a timely fashion. This procedure has recently been employed with success in other large antitrust cases.  *See* Google LLC's Stmt. Regarding Disputes Involving Compliance with Subpoenas Issued to Third Parties, *United States v. Google LLC*, No. 1:20-cv-03010-AMP at 2 (D.D.C. July 9, 2021), ECF No. 157 ("The Court's setting of

---

[2] Under this approach, the parties and non-parties would not be foreclosed from seeking relief from the Court at a later time should a dispute arise requiring Court intervention.

firm dates for briefing and argument for disputes jump-started negotiations with various third parties and has led to sufficient progress such that Google does not have any issues to raise at this time . . . .").

Meta has served, or is the process of serving, deposition notices to nonparties, with deposition dates noticed in January 2023.  Meta intends to notice many more deposition subpoenas to nonparties in the coming months.

On December 12, Meta supplemented its initial disclosures.  It will continue to do so in accordance with the Federal Rules of Civil Procedure.  As the FTC notes (at 7), the parties do not have "a ripe dispute regarding Meta's disclosures or non-party deposition scheduling."  The FTC's suggestion (at 7) that Meta's disclosures relating to nonparties could somehow "prejudice[] the FTC's efforts to comply with the fact discovery cutoff" is unfounded.  As Meta indicated in its last status report, Meta has been conducting nonparty discovery with urgency, serving close to one hundred subpoenas *months* before the FTC issued its first handful of subpoenas.  For months, nonparties routinely delayed productions and delayed engaging in any substantive discussions about Meta's subpoenas because they were still waiting to receive a subpoena from the FTC.

The FTC, on the other hand, notes that it has achieved substantial compliance with only about 37% of the document subpoenas it has issued, and thus is unprepared to take depositions of the vast majority of its subpoena targets.  Meta's initial disclosures do not prejudice the FTC's ability to conduct effective discovery.  It has identified 11 individuals who are associated with non-parties; and it will continue to supplement its disclosures as it identifies more potential witnesses based on its review of the documents produced by non-parties.  Moreover, the fact that Meta has indicated it may rely on evidence from a "Corporate Representative or employee(s)"

from many nonparties – similar to what the FTC has done for most nonparties on its disclosures – does not "fail to provide the FTC with sufficient information" to determine who "the FTC should depose." Meta has started to serve the FTC with notices of 30(b)(6) depositions, and intends to serve notice of many more. Meta does not know which individuals those non-parties will designate as 30(b)(6) deponents, and the FTC is free to notice depositions of any of the entities that have been on Meta's disclosures since the start of discovery.

## C.   Meta's Statement on the Status of the FTC's Discovery to Meta

### 1.   Depositions

a.   **Fact Depositions.**  Meta has worked constructively with the FTC to schedule depositions for dozens of Meta current and former employees, promptly providing the availability of witnesses that the FTC seeks to depose.  The FTC has requested dates as early as December for some of the depositions and as late as April for others.  Meta has confirmed or offered dates for all 40 of the noticed depositions of current or former employees represented by Meta's counsel.

The Court should reject the FTC's request for an order that Meta produce "de-privileged" documents associated with upcoming depositions at least ten days before the deposition.  That proposal is contrary to the Scheduling Order.  The Scheduling Order provides Meta until January 23 (45 days after the substantial completion deadline, December 7) to complete its privilege log for documents responsive to the FTC's First Set of Requests for Production ("First RFPs").  *See* ECF No. 103 ¶ 17.  As part of that process, Meta may produce additional documents that Meta ultimately determines are not privileged or may be produced with redactions.  *See, e.g.*, ECF No. 164 at 3 ("The FTC does not object to the production of a privilege log, and any documents that are 'de-privileged' or redacted during the preparation of that log, 45 days after Meta completes its document production.").  The FTC, by choice, nonetheless insisted on scheduling 14

depositions (nearly 30% of all noticed depositions for Meta current or former employees) on or before January 23, even after Meta weeks ago notified the FTC that it may produce downgraded documents after those early depositions occurred.  Indeed, Meta informed the FTC, on November 14, that because the FTC was insisting on depositions while document discovery (and Meta's privilege review in particular) are in process, Meta would oppose any effort thereafter to seek second depositions of the same witnesses on the ground that any discovery materials were produced after the deposition.  In response, the FTC decided to proceed with early depositions anyways and then noticed two more for before January 23.

Meta is entitled to the 45 days that the Court granted for its privilege review—over the FTC's objection at the Rule 26(f) Conference.  *See* Rule 26(f) Conf. Hr'g Tr. at 27:23-28:1 (Feb. 28, 2022), ECF No. 109 (ruling that the "privilege log will be due 45 days after completion of production for each set").  It would be unfair and impractical to now shorten the time Meta expected to have for its privilege review for the First RFPs, simply because the FTC unnecessarily insisted that some depositions occur before Meta's privilege review deadline, which was previously set by the Court.  To be sure, in the spirit of cooperation, Meta has tried to complete its review of potentially privileged documents relating to the FTC's early depositions before those depositions occur.  But because the FTC has chosen to schedule fourteen depositions during December and January amidst the winter holidays, it is not feasible to review all potentially privileged documents for all of the FTC's early-noticed deponents in advance of their depositions, and the Court should not order Meta to do so.

  **b.**  **Rule 30(b)(6) Depositions.**  The FTC served Meta with deposition notices pursuant to Federal Rule of Civil Procedure 30(b)(6), on June 28, 2022 and July 22, 2022.  The FTC has conducted two depositions relating to some of the topics described in these notices and

has agreed to accept a written response in lieu of deposition testimony on certain other topics. Meta has already provided written responses regarding two of those topics and has told the FTC that it expects to serve its written responses to three others, which pertain to studies of Meta users, by December 20, 2022 as agreed by the parties.

The parties continue to negotiate the scope of Meta's written responses to two of the FTC's data 30(b)(6) topics.  As agreed by the parties, Meta provided a proposal to the FTC regarding the scope of Meta's written responses to those topics on November 4, 2022.  The FTC waited until December 2 to seek certain clarifications of Meta's proposal.  The parties are negotiating to resolve those points.  Once both sides are aligned on the scope of the proposed responses to those topics, Meta will provide a date certain for completing its responses.

### 2.    Remote Deposition Protocol

The parties briefed disputes about the parties' Remote Deposition Protocol on December 8, and the Court held argument on those disputes on December 9.  Consistent with the Court's guidance, the parties now have agreed to a Remote Deposition Protocol and request that the Court enter it.

### 3.    Document Productions

a.    Meta believes that it has substantially completed its production of documents in response to the FTC's First RFPs.  Consistent with its obligations under the Federal Rules of Civil Procedure, Meta will continue to review this production with the goal of ensuring that all responsive and non-privileged documents have been produced.  If Meta identifies any additional documents that should be produced, it will, of course, supplement its production as appropriate.

To date, Meta has made substantial document productions in response to the FTC's First RFPs and its other expansive document discovery requests.  The FTC has served five sets of

Requests for Production ("RFPs") on Meta.  For the FTC's First RFPs, as of December 7, 2022

(the Court-ordered deadline for substantial completion), Meta produced over 1.6 million

documents, comprising over 8.3 million Bates numbers.  As Meta has explained to the FTC, one

of these RFPs seeks reproduction of all documents produced in *Klein v. Meta Platforms, Inc.*

("*Klein*"), No. 3:20-cv-08570-JD (N.D. Cal.).  As productions are still ongoing in that case, Meta

anticipates making additional *Klein* reproductions in this matter beyond the substantial

completion deadline.  Moreover, as noted above, Meta is preparing its privilege log, due on

January 23 for the First RFPs, and may produce additional documents that Meta ultimately

determines are not privileged in whole or in part.  *See* ECF No. 103 ¶ 17.  Additionally, for the

FTC's Second Set of RFPs, Meta is in the process of producing substantial amounts of data—and

this week will complete a fourth data production that is responsive to more than half a dozen

requests.  Meta also has produced, and continues to produce, more documents in response to the

FTC's Third, Fourth, and Fifth Sets of RFPs.  These productions are in addition to the more than

3 million documents (comprising over 12 million pages) that Meta produced to the FTC during

its pre-complaint investigation.

The FTC's complaints that Meta did not substantially complete production in response to

the First RFPs are unfounded.  First, the FTC's complaint that Meta produced approximately

998,000 pages the night before a deposition on December 14 is misleading and inaccurate.  Meta

made four separate productions on December 13.  One production, of approximately 192,000

documents comprising about 998,000 pages, was entirely a reproduction of documents produced

in *Klein*, which as noted above, is a case where fact discovery is ongoing.  Meta accordingly has

been reproducing productions from *Klein* on a rolling basis, and the latest reproduction on

December 13 updated the *Klein* reproductions through December 4.  Meta has repeatedly

explained to the FTC that because the First RFPs seek reproduction of documents produced in *Klein*, a case where document production is still ongoing, Meta's reproduction of documents from *Klein* in this case likewise necessarily will be ongoing. The second production exclusively included 82 documents related to the deponent. Meta expressly notified the FTC that these documents concerned the deponent, and explained that it downgraded these documents over a month early as it prepares its privilege log, due on January 23, in an effort to provide these documents to the FTC before the deposition occurred. *See* ECF No. 103 ¶ 17. The third production consisted of only 10 documents from Meta's pre-complaint investigation privilege log that Meta determined, after starting its re-review pursuant to the Court's November 28 Minute Order, are not privileged. Only one document in that production concerned the deponent, and when Meta made the production, Meta notified the FTC of the specific Bates number for the document. Meta produced this document well before the Court's initial December 30 deadline for the investigation privilege log re-review. *See* Min. Order (Nov. 28, 2022). The fourth production provided replacements for 28 documents over which Meta asserted privilege, in part or in full, and clawed back.

Second, the FTC is incorrect that Meta failed to substantially complete production of documents for the First RFPs merely because Meta expects to produce additional documents associated with a witness whose deposition was originally scheduled for December 13. Meta explained to the FTC that, for this witness, Meta anticipates producing additional documents downgraded as Meta prepares its privilege log for this litigation due in over a month and conducts the Court-ordered re-review of certain entries from its pre-complaint investigation privilege log, as well as WhatsApp chats that Meta determined are potentially responsive to the First RFPs.

**b.**     The FTC belatedly insisted that Meta's re-review of large numbers of privilege log entries from Meta's pre-complaint investigation privilege log, which is now over two years old and contains many entries irrelevant to this action.

**i.**     On September 20, the FTC demanded that Meta re-review approximately 1,300 entries on Meta's pre-complaint investigation privilege log.  There is no ripe dispute between the parties about that re-review.  Indeed, Meta complied with, and did more than, what the FTC asked.  In two months, the timeline agreed by the parties, *see* ECF No. 206 at 14, Meta diligently re-reviewed the approximately 1,300 entries specifically identified by the FTC, which included Platform-related documents that this Court ruled may not be the subject of discovery.  Meta also voluntarily identified and re-reviewed duplicate or near duplicate versions of documents and email threads that also appeared on the Log.  As a result of that re-review, Meta produced approximately 2,800 documents to the FTC.

The FTC admits that the privilege downgrade statistics it cites about those productions, based on the FTC's selection of entries, are tentative.  The FTC's downgrade statistics are also misleading because they omit important context.  The productions consisted of a significant number of duplicate versions of documents and e-mail threads and little incremental substantive content, versions of documents that had already been produced to the FTC, and documents with little or no relevance to the issues in the litigation, including documents discussing global policy developments, foreign laws and regulations, and drafts of documents subsequently made public.

**ii.**     Pursuant to the Court's November 28 Minute Order, the FTC identified, on December 1, two sets of 1,250 additional Log entries for Meta to re-review.  Meta is in the process of reviewing the first set of 1,250 pre-complaint investigation privilege log entries, and it intends to complete that review by the Court's deadline of December 30, 2022.  In the meantime,

Meta has asked the FTC to provide it with information about how it selected those entries for re-review, including confirmation that the FTC selected entries consistent with the methodology it described to the Court during the November 28 hearing.  The FTC has not yet provided all of the information that Meta requested or that the FTC informed the Court that it would provide in a declaration.  The parties continue to meet and confer on this issue.

### 4.    The FTC's Interrogatories

Meta has timely responded to the FTC's Interrogatories to Meta.  The FTC takes issue only with Meta's response to the FTC's Interrogatory No. 4.  The FTC's complaints are unfounded and should be rejected.

The FTC's Interrogatory No. 4 asks Meta to "[d]escribe, and state the basis for, the Company's valuation of WhatsApp prior to Meta's acquisition of WhatsApp."  That is what Meta has done.  In its initial response and two supplements, Meta, pursuant to Federal Rule of Civil Procedure 33(d), cited documents concerning the valuation that Meta prepared and considered before acquiring WhatsApp for $19 billion, including the estimates, reasoning, data, and assumptions underlying that valuation.

The FTC now takes the position that, when requesting a description of Meta's "valuation of WhatsApp prior to Meta's acquisition of WhatsApp," the FTC meant to request a description of "all valuations . . . made by Meta or made on Meta's behalf prior to the closing of the WhatsApp acquisition."  The notion that Meta is required to explain or describe any valuation unrelated to the purchase price prior to the acquisition is inconsistent with the FTC's own request and is not proportional.  Meta is "entitled to rely on the plain meaning of the interrogatory," which seeks Meta's pre-purchase valuation of WhatsApp and the basis for it.  *In re Greenwood Air Crash*, 161 F.R.D. 387, 391 (S.D. Ind. 1995).  If the FTC desires other valuations, such as

those after Meta's valuation of WhatsApp but before the deal closed, it may review those that Meta has produced in response to document requests but which are not responsive to this Interrogatory.  And so far as the FTC insists that Meta give a best-and-final answer to its Interrogatory, that position is inconsistent with the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 26(e).  Meta already has supplemented twice with additional responsive documents and will continue to supplement, including with any responsive documents from Meta's December 7 production, if necessary to complete its response.

The FTC demands in the alternative that Meta summarize, in a narrative response, the import of the documents Meta has identified in response to the FTC's Interrogatory.  Rule 33(d) requires no such narrative response.  Fed. R. Civ. P. 33(d)(2); *see also Covad Commc'ns. Co. v. Revonet, Inc.*, 258 F.R.D. 17, 20 (D.D.C. 2009) ("[Rule 33(d)] gives the [responding] party an option to make the records available and *place the burden of research on the party who seeks the information*." (emphasis added; citation omitted)).  Now that Meta has identified by Bates number 35 specific responsive records—from C-suite explanations of Meta's valuation, to granular data about WhatsApp's user base, monetization prospects, and competitors—it is the FTC's burden to analyze them.  The Court should reject the FTC's effort to belatedly alter its interrogatory and to require Meta—"through interrogatory response—to do [the FTC's] document review."  *United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22, 29 (D.D.C. 2012).

Dated: December 15, 2022　　　　　　　Respectfully submitted,

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*


*/s/ Mark Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Kevin J. Miller (D.C. Bar No. 478154)
Kenneth M. Fetterman (D.C. Bar No. 474220)
KELLOGG, HANSEN, TODD,
　FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

James P. Rouhandeh (NY0390)
Michael Scheinkman (NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*