**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 1:20-cv-03590-JEB

---

## JOINT STATUS REPORT

Pursuant to the Court's Minute Order of September 30, 2022, the parties submit the following Joint Status Report summarizing the state of discovery, identifying any issues between the parties, and summarizing the parties' respective positions.

### I.      The FTC's Statement on the Status of Discovery

The FTC may need to seek the Court's permission to file a supplemental statement, as Meta did not provide the FTC with a meaningful opportunity to address the arguments Meta makes in its portion of the joint statement, or to examine the material Meta cites.  At 10:43 p.m. on January 30, Meta provided the FTC with Meta's portion of the Joint status report containing 8,037 words.  The most inclusive previous draft Meta provided to the FTC contained 4,705 words.  While the FTC has not had an opportunity to assess all of Meta's additions and changes, it appears that Meta has introduced mis-statements that the FTC may wish to correct.  Meta also purports to cite documents and authority that it never previously identified, and the FTC has not had an opportunity to rebut or consider.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

For the reasons described below, the FTC respectfully asks the Court to order the following:

1. For evidentiary and trial purposes, an investigational hearing ("IH") of a Meta current or former employee shall be treated in the same manner as a deposition conducted pursuant to Federal Rule of Civil Procedure 30, provided that the current or former employee was represented by Meta's counsel during the IH.

2. The stipulated remote deposition protocol, ECF No. 227-1, shall be entered as a stipulated Order on the public docket.

3. Meta shall, no later than February 28, 2023, provide a complete response to Interrogatory No. 8 and provide a complete, narrative response to Interrogatory No. 9 in accordance with Fed. R. Civ. P. 33(b).

4. Both parties shall use best efforts to achieve, no later than March 15, 2023, substantial compliance with all document production requests served on non-parties.

5. To facilitate deposition scheduling, both parties shall use best efforts to serve all deposition subpoenas they intend to serve in this litigation as quickly as possible, and no later than February 28, 2023 absent good cause or agreement of the parties.

### A.     The FTC's Position Regarding Its Discovery to Meta

#### 1.     Depositions of Current or Former Meta Employees

The FTC has conducted the depositions of 16 current or former Meta employees. These depositions have proceeded efficiently averaging approximately 4.6 hours on the record per deposition. Of the 840 hours of deposition time allotted to the FTC by the Joint Scheduling Order, the FTC has taken approximately 74 hours of live testimony from Meta's current or former employees.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

The parties have reached agreement on deposition dates for 24 of the remaining 29 current or former Meta employees who have been noticed by the FTC and are represented by Meta's counsel.[1]  The FTC has noticed and scheduled an additional 4 depositions of former Meta employees who are not represented by Meta's counsel.

> a.    **The FTC respectfully asks the Court to instruct that investigational hearing testimony be treated in the same manner as a deposition conducted pursuant to Fed. R. Civ. P. 30.**

To facilitate the efficient resolution of depositions, the FTC asks the Court to instruct that, for evidentiary and trial purposes, the IH of a Meta current or former employee shall be treated in the same manner as a deposition conducted pursuant to Federal Rule of Civil Procedure 30, provided that the current or former employee was represented by Meta's counsel during the IH.  In the FTC's substantial experience, this is how courts routinely deal with the FTC's IH testimony.  This proposal makes sense because it will allow the FTC to rely on the IH transcript rather than re-establish at the deposition propositions that were sufficiently established during the IH.  And it is important to resolve the FTC's request now, even though it relates to trial presentation, to enable the FTC to decide which depositions it must notice, and which questions it must ask at depositions that have already been noticed.

Here, to avoid burdening the Court, the FTC proposed to Meta that the parties stipulate to this result.  However, unlike defendants in previous FTC litigations, Meta has refused to agree to the FTC's sensible proposal, unless the FTC submits to unreasonable conditions that the Court has already rejected.  Specifically, Meta has attempted to condition its acceptance on the

---

[1]     This does not include three deposition notices that the parties have agreed to hold in abeyance, and the FTC hopes to be able to withdraw entirely.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

requirement that the FTC "not use these depositions to re-examine witnesses with respect to the same topics and documents that were covered in those investigational hearings."  G. Klineberg Ltr. to S. Musser (Jan. 18, 2023).  The FTC agrees with the general principle that its deposition questions should avoid unnecessarily wasting time and has assured Meta that the FTC does not have any intention of conducting depositions in order to needlessly or harassingly duplicate testimony given during an IH.  As the FTC has given that assurance, Meta's additional requested caveats are overly restrictive and unreasonable, and indeed, have already been rejected by the Court.

The Court has already expressly rejected Meta's request that the FTC avoid during depositions "the same topics" covered during investigational hearings.  *See* Hearing Transcript, Feb. 28, 2022 ("I agree with the FTC that current employees should not have depositions limited to prior topics. They can depose them as they wish."); ECF No. 100, at 30 (rejecting Meta's request that the FTC "limit any deposition of Meta employees to new areas not covered in prior sworn testimony").  The Court should reject Meta's attempt to extract the same result the Court has already rejected as the price of agreeing to the FTC's efficiency-enhancing proposal.  First, Meta's proposal is highly likely to lead to unproductive disputes over whether a line of inquiry deals with "the same topics" covered during an IH.  Second, while the FTC has no intention of needlessly wasting its deposition hours, there is no doubt that investigational hearings and depositions serve different purposes.  Investigational hearings help the FTC determine whether a target has violated or is about to violate the antitrust laws, while depositions seek testimony to prove specific elements in court.  *See generally Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 201 (1946) (Agency investigations are intended "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

judgment, the facts thus discovered should justify doing so."); *S.E.C. v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) (noting "there is no authority which suggests that it is appropriate to limit the SEC's right to take discovery based upon the extent of its previous investigation into the facts underlying its case" (quoting *SEC v. Saul*, 133 F.R.D. 115, 118 (N.D. Ill. 1990))); *see also United States v. GAF Corp.*, 596 F.2d 10, 14 (2d Cir. 1979) ("It is important to remember that the [Justice] Department's objective at the pre-complaint stage of the investigation is not to 'prove' its case but rather to make an informed decision on whether or not to file a complaint." (quoting H. R. REP. 94-1343 at 26, Hart-Scott-Rodino Antitrust Improvements Act of 1976)). Moreover, the FTC now has considerably more documents at its disposal than it did during the investigation, including but not limited to thousands of documents Meta wrongfully withheld under spurious claims of privilege. The FTC may thus be able to more effectively explore during depositions "the same topics" that might have been addressed during IHs.

Meta's effort to prohibit the FTC from asking a witness about the same "document" addressed in an IH is likewise unreasonable. A single document can be used to generate numerous different admissions and can be used to explore many different lines of inquiry. Moreover, as noted above, the FTC's focus at a deposition is simply different than in an IH.

> **b.    The FTC respectfully asks the Court to enter the Joint Stipulated Remote Deposition Protocol, ECF No. 227, Exhibit 1.**

The parties have adhered to the remote deposition protocol previously submitted to the Court, *see* ECF No. 227-1, and depositions have proceeded efficiently. However, communications with third parties regarding depositions would be facilitated if the protocol were available on the public docket as a stipulated Order, and the FTC therefore respectfully asks the Court to enter the protocol as a stipulated Order on the public docket.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

2.      **Status of Meta's Compliance with the FTC's Requests for Production**

a.      **The FTC has agreed to a compromise to address the alarming rate of unjustified privilege assertions on Meta's September 2020 privilege log.**

As instructed by the Court, the FTC provided to Meta on December 1, 2022 a sample of 2,500 privilege entries, split into two batches of 1,250 entries to correspond to Meta's responsibility to respond on December 30, 2022 and January 31, 2023.  *See* Nov. 28, 2022 Minute Order.  As the FTC committed to the Court, each sample was generated using a random number generator to select privilege entries from the files of important custodians that fell within categories of concern.  Meta's reversal rate for the first sample was as appalling as the rates the FTC has previously brought to the Court's attention: based on the FTC's calculations, Meta has conceded that its privilege assertions in the first sample of 1,250 entries were erroneous more than 70% of the time.

These results – based on a random sample – suggest that the 336,000+ entries of Meta's September 2020 privilege log wrongfully conceal many tens of thousands of responsive documents that were withheld under baseless claims of privilege.  The FTC believes that a complete re-review would be necessary to ensure that Meta produces the responsive documents it should have provided years ago, and that such a complete re-review might help ensure that future litigants do not assume that baseless assertions of privilege during FTC investigations will successfully prevent large numbers of responsive documents from ever coming to light.  However, in light of the compelling need to move this litigation forward expeditiously, the FTC has nonetheless acceded to the following compromise:

- Meta will re-review entries that involve already-noticed deponents in this litigation and fall into four categories of entries that have been previously

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

described to the Court.  *See* ECF No. 221.  Meta reports that this represents

approximately 96,000 entries.

- In addition, Meta will conduct a reasonable search of its investigation privilege

  log for, and re-review, (i) entries that involve a relevant deponent and a non-law

  firm third party; and (ii) all entries, regardless of whether the entry falls into a

  specific category of concern, involving the custodial documents or documents

  to/from/cc/bcc Mark Zuckerberg, Sheryl Sandberg, Javier Olivan, Kevin Systrom,

  Mike Krieger, Brian Acton, Jan Koum, Adam Mosseri, Fidji Simo, Alex Schultz,

  Andrew Bosworth, and the Facebook Board.

- Meta will endeavor to complete its re-review by March 6, 2023, to conduct its re-

  review on a rolling basis, and to prioritize upcoming deponents to the extent

  possible.

In exchange for the above commitments from Meta, the FTC has agreed that it will not

seek further categorical re-review of entries on Meta's investigational log, although the FTC

reserves the right to request re-evaluation of particular documents on an ad hoc basis.  The FTC

hopes that this result will avoid further burdening the Court regarding Meta's investigational

privilege log.

> **b.    The FTC is assessing Meta's Litigation Privilege Log,**
> **produced on January 24, 2023.**

On January 24, 2023, Meta produced its initial litigation privilege log.  While the FTC is

continuing to assess Meta's January 24 privilege log, a preliminary assessment suggests that it

suffers from some similar deficiencies that the FTC identified in Meta's September 2020

privilege log related to the Investigation.  The FTC will meet and confer with Meta regarding

these issues and will seek the Court's assistance if the parties are unable to resolve any similar

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

deficiencies in a timely fashion.

> **c.  The FTC has agreed to withdraw its request for access to certain data sets pursuant to Fed. R. Civ. P. 34(a)(1).**

For months, the FTC has sought discovery into Meta's surveys of its users, including user surveys relating to user sentiment, advertising, spam, and privacy.  In February 2022, and again in July 2022, the FTC propounded requests for production ("RFPs") seeking the data underlying these surveys.  *See, e.g.*, RFP 24 (documents and data relating to Meta's surveys), RFP 55 (data showing measures of user satisfaction or sentiment).  While Meta's counsel failed, for months, to identify efficient sources of responsive information, a 30(b)(6) witness ultimately identified a key resource ██████████████████████████████████████████████

███████████  Meta's 30(b)(6) witness testified ████████████████████████████████

███████████████████████████████████████████████  Aug. 25, 2022

30(b)(6) Dep. Tr. (C. Cobb) at 189.  Shortly after the relevant 30(b)(6) deposition, the FTC specifically asked Meta to produce the survey data underlying ████████  and Meta agreed.

Nearly four months later, Meta began to express reservations that the data "is much, much larger than expected," and that producing it "may take months and would impose massive burdens."  Email from M. Reade to A. Teng (Jan. 18, 2023).  In response to these belated and surprising assertions, the FTC proposed inspection of the data under Rule 34(a)(1).  Fed. R. Civ. P. 34(a)(1) ("permit the requesting party or its representative to inspect, copy, test, or sample" the relevant "electronically stored information" and "data or data compilations.").  Rather than permit inspection, Meta instead withdrew its claims of burden, and now asserts that it can produce the agreed-upon survey data on a rolling basis, to be completed by March 9, 2023. Letter from S. Strikis to A. Teng (Jan. 25, 2023).  Assuming that Meta adheres to its commitment, there is no current dispute before the court.  However, in the event that Meta

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

refuses to produce this data or other data sets on claims of burden, or, if after reviewing the data, the FTC determines it requires production of or access to ███████████, the FTC may renew its request for a Fed. R. Civ. P. 34(a)(1) inspection.

**d.    Meta has agreed to produce all requested data on an agreed-
upon schedule to be completed by April 30, 2023.**

The FTC served Meta the vast majority of its data-related RFPs over six months ago on July 12, 2022 (and nearly a year ago in the case of RFPs 18-19).  Since October, the parties have conducted over nine meet and confers regarding the scope and timing of data production and exchanged nearly a dozen letters.  Throughout the process, the FTC has made itself available to discuss its requests and endeavored to answer promptly any questions posed by Meta.  Despite that, over six months after the RFPs were issued, Meta has only completed production for seven data RFPs and subparts of four other data RFPs – a small subset of the forty-five data-related RFPs issued.  Concerned with Meta's slow pace of data production, the FTC asked Meta to commit to a data-production schedule as well as the scope of its planned production.  *See* Letter from P. Taylor to C. Masterman (Dec. 28, 2022).  After much negotiation, Meta has agreed to a production schedule, committing to produce certain priority data by the end of February and to substantially complete production of the remaining data on a rolling basis by the end of April. Meta has also committed to clarify the scope of its forthcoming productions on February 3: specifically, it has agreed to inform the FTC whether it is refusing to produce certain data due to burden issues and to tell the FTC whether any requested data is unavailable. *See* Letter from L. Smith to P. Taylor (Jan. 13, 2023).

While there is no ripe dispute at this time we anticipate that the parties may have additional disputes regarding the scope of Meta's remaining data productions once the FTC receives Meta's production schedule on February 3, 2023.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

  e.  **Meta has not provided a time frame by which it will substantially complete its production in response to the FTC's first set of requests for production.**

As the Court has previously been informed, Meta notified the FTC on December 30, 2022 that Meta failed to review 270,000 potentially responsive documents. The FTC has requested that Meta provide an estimate for when this review and production will be completed, but Meta has not provided one. Meta has stated that in February it may begin production of responsive documents located among this set of 270,000 documents.

Meta continues to produce documents responsive to the FTC's first set of requests for production, after the Court's discovery deadline of December 7, 2022 and more than two months after the original date for substantial compliance of November 16, 2022. Meta claims that the largest of these productions (nearly 1,000,000 pages in December and nearly 500,000 additional pages in January) were produced in the *Klein* litigation but has provided no reason it waited until after the Court's deadline to produce them to the FTC.

The FTC has issued five additional sets of RFPs, and the parties continue to negotiate Meta's compliance with the FTC's remaining RFPs.

  **3.**  **Meta's Compliance with the FTC's Interrogatories**

The FTC issued Interrogatories Nos. 1-8 on May 26, 2022. Meta has not yet fully responded to Interrogatory No. 8 and instead only pointed to a handful of documents that, on their face, fail to even superficially respond to the Interrogatory. In December, the FTC also issued Interrogatory No. 9 asking for additional information related to Meta's alleged pro-competitive justifications. Meta has yet to respond to Interrogatory No. 9 and instead pointed to its facially-deficient response to Interrogatory No. 8 in an attempt side-step its obligations. To address these deficiencies, the FTC respectfully asks the Court to instruct Meta to supplement

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

and certify its response to Interrogatory No. 8 and to provide a narrative response to

Interrogatory No. 9.

> a.  **The FTC respectfully asks the Court to instruct Meta to certify its response to Interrogatory No. 8.**

The FTC served its initial interrogatories eight months ago.  Yet Meta still has not

provided a complete response to the FTC's straightforward Interrogatory No. 8 which asks Meta

to:

> Identify and describe any product, software, or service offered by any Person
> other than the Company that the Company has used to detect, deter, measure,
> quantify, assess or remove Objectionable Content on Facebook Blue, Instagram,
> and WhatsApp, including, but not limited to, the dates of use and cost of each, all
> metrics used to measure, quantify, or assess the prevalence of Objectionable
> Content or the amount of Objectionable Content deterred or removed, and any
> limitations of any such product, software, service, or metric in detecting,
> deterring, removing, measuring, quantifying, or assessing the prevalence of
> Objectionable Content.

The information requested is directly relevant to Meta's claims that its acquisitions of

Instagram and WhatsApp were necessary to introduce meaningful efficiencies related to content

moderation on Instagram and WhatsApp.  The FTC disputes these claims.  For example, public

reports show that Meta in fact performs content moderation largely by paying hundreds of

millions of dollars to consulting firms, staffing firms, and other subcontractors who do the actual

work.  *See, e.g.*, Adam Satariano & Mike Isaac, *The Silent Partner Cleaning Up Facebook for*

*$500 Million a Year*, New York Times (Aug. 31, 2021) ("[B]ehind the scenes, Facebook has

quietly paid others to take on much of the responsibility.  Since 2012, the company has hired at

least 10 consulting and staffing firms globally to sift through its posts, along with a wider web of

subcontractors, according to interviews and public records.").  This undermines Meta's claims

that its acquisitions of Instagram and WhatsApp were essential to introduce meaningful

efficiencies related to content moderation, as Instagram and WhatsApp could have remained

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

independent and simply hired the same consulting firms and subcontractors that Meta relies on today.

Unfortunately, Meta has failed to provide a meaningful response to Interrogatory 8. Since receiving Meta's initial Responses and Objections in which Meta declined to respond, the FTC has asked Meta on multiple occasions to "identify each third party with whom it has contracted or licensed software or other services for the purpose of identifying, detecting, reviewing, tagging, or removing . . . objectionable content. . . and describe the dates when it contracted with the third party and identify the costs of obtaining or licensing the third party's software or services."  Letter to K. Fetterman (Aug. 12, 2022); Letter to K. Fetterman (Oct. 11, 2022).  Alternatively, the FTC proposed "Meta may identify Bates numbers of documents containing this information."  Letter to K. Fetterman (Aug. 12, 2022); Letter to K. Fetterman (Oct. 11, 2022).  After months of unwarranted delay, Meta supplemented its Responses and Objections on October 20 and (at the FTC's urging) again on December 5.  To date, Meta has identified five third parties that it works with to identify objectionable content and produced a handful of business records responsive to Interrogatory No. 8, specifically licensing agreements with third-party services related to Meta's efforts to detect and deter objectionable content. Despite its sparse production, Meta has nonetheless cited a forthcoming production of business records in response to Interrogatory No. 8 to resist responding to related discovery requests such as RFP No. 98 and Interrogatory No. 9.

Meta now claims that it will be producing "hundreds of contracts" in the upcoming weeks claiming, for the first time, that it is unduly burdensome to do more.  In the first instance, the FTC has been asking Meta to engage on its deficient response since August 2022.  Despite multiple requests from the FTC, Meta did not articulate any specific claims of burden nor did it

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

provide a counter proposal.  Meta's proposed response of dumping hundreds of documents on the FTC that may or may not completely respond to the Interrogatory is insufficient and improperly shifts the burden of responding to the Interrogatory from Meta to the FTC.  Meta's delay has already prevented the FTC from being able to question at least a dozen of Meta's witnesses regarding the details of their alleged procompetitive benefits – details that are solely available to Meta.  As such, the FTC respectfully asks the Court to order Meta to provide any further supplementation no later than February 28, 2023, and to certify that Meta's response to Interrogatory 8 represents a complete response to the Interrogatory.

To the extent that Meta attempts to rely on producing contracts to satisfy its obligations, the FTC has serious doubts that this production will allow the FTC to ascertain information sought by the Interrogatory No. 8, such as "the costs for obtaining or licensing the third party's software of services" as the FTC has been requesting since August 12, 2022.  Letterfrom S. Musser to K. Fetterman (Aug. 12, 2022).  As such, we ask this Court to order that Meta must provide a narrative response supplementing any information missing from the documents by February 28, 2023 in addition to their planned document production.  Finally, the FTC respectfully asks that the Court instruct Meta to provide its certification pursuant to Fed. R. Civ. P. 33(b).  *See* Fed. R. Civ. P. 33(b)(3), (b)(5) ("[t]he person who makes the answers must sign them," and interrogatories must be answered "under oath.").

### b. The FTC respectfully asks the Court to order Meta to provide a narrative response to Interrogatory No. 9.

Due to Meta's excessive delay and the FTC's serious doubts that Meta's promised production under Interrogatory No. 8 will provide an adequate response, the FTC concluded that it would have to take additional steps to facilitate timely discovery, as testing Meta's assertion that the not-yet-provided contracts provide a sufficient response will require the FTC to analyze

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

the contracts and will likely require the FTC to depose the individual who actually makes and signs the interrogatory response.  *See* Fed. R. Civ. P. 33(b)(3), (5).  Thus, the FTC propounded an interrogatory that clearly cannot be answered by producing contracts: on December 16, 2022, the FTC served Interrogatory No. 9, which requires Meta to:

> For each quarter, from January 1, 2009 to the present: identify each Contractor the Company has used to identify, review, classify, tag, measure, quantify, assess, or remove Objectional Content on the Facebook Family of Apps, and the amount that Meta paid each such Contractor to identify, review, classify, tag, measure, quantify, assess, or remove Objectional Content on the Facebook Family of Apps.

Interrogatory No. 9 cannot be satisfied by the contracts that Meta will provide to satisfy Interrogatory No. 8, as Interrogatory No. 9 requires Meta to identify the contractors that the Company actually used in each quarter for the services described, not merely those it had the contractual right to use.  Moreover, a list of contracts cannot provide the amount actually paid to each contractor for the services described.

The FTC thus requests that the Court instruct Meta to provide a complete response to Interrogatory No. 9, no later than February 16, 2023 (two months after the interrogatory was served).  The FTC's request is proportional to the needs of the case, as the information sought is centrally relevant to Meta's assertions regarding efficiencies and to Meta's affirmative defenses.  Moreover, the information should be readily available to Meta.  Meta's half-hearted objection to the interrogatory on the basis that a "Contractor" could include a natural person employed by a contracting agency is unavailing.  As the FTC has explained to Meta, where Meta contracted with a Person, and that Person in turn sub-contracted with or employed other Persons to perform the services, the FTC agrees that it is sufficient for Meta provide the requested information with respect to the Person with which Meta directly contracted.

**B.  <u>The FTC's Position Regarding Non-Party Discovery</u>**

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

1.      **Non-Party Document Subpoenas**

The FTC has served approximately 160 document subpoenas on non-parties: 131 of these are cross-notices on non-parties subpoenaed by Meta.  The FTC has achieved substantial compliance with approximately 90% of its document subpoenas and does not anticipate document-related disputes with these non-parties.  The FTC anticipates that it will be able to achieve compliance with most or all of the remaining approximately 10% of its document subpoenas without the Court's assistance.  The only disputes that appear probable at the present time involve three key non-parties.  The FTC continues to make progress in achieving these three non-parties' compliance but may need to seek this Court's intervention at a later date.

The Court's recent action in calendaring a hearing for January 26 to address any disputes between the parties and non-parties was, in the FTC's experience, very helpful in crystallizing discussions with non-parties and bringing them to a more rapid conclusion.  The FTC believes that another, similar deadline could be equally helpful in concluding outstanding negotiations and facilitating the orderly completion of fact discovery.  The FTC therefore suggests that any document production-related dispute between a party and a non-party that has not been resolved by February 21, 2023, should be brought to the Court's attention at that time, in a manner convenient for the Court.  The FTC does not intend that this date would prejudice any party's or non-party's right to seek the Court's assistance prior to February 21, 2023.

The FTC also respectfully asks the Court to instruct both parties to use best efforts to achieve no later than March 15, 2023 substantial compliance with all document production requests served on non-parties (excluding data-related requests that are intended to facilitate expert discovery).  In the FTC's view, if non-party document productions remain substantially incomplete by the latter part of March, orderly completion of depositions may be difficult to

15

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

achieve.

### 2. Non-Party Data Subpoenas

The FTC continues to negotiate with a number of non-parties regarding its separate subpoenas seeking data, and at this time has no ripe data-related disputes with non-parties.

### 3. Depositions of Non-Parties

The FTC has served deposition subpoenas on the substantial majority of individuals that it will seek to depose in this litigation, except for cross-notices that may be necessary as a result of deposition subpoenas subsequently served by Meta. The FTC has served 21 deposition subpoenas on individuals who are associated with non-parties. In addition, the FTC has cross-noticed or will soon cross-notice 20 30(b)(6) depositions that have been noticed by Meta. The table below summarizes the notices and cross-notices served by each party, and the approximate deposition hours consumed to date by each party.

| DEPOSITION SUBPOENAS | | | | | |
|---|---|---|---|---|---|
| | Noticed | Noticed & Completed | Scheduled, not Complete | Cross-Noticed | Hours Used |
| FTC (Meta employees) | 49 | 16 | 28 | N/A | 91[2] |
| FTC (non-party) | 22 | 3 | 2 | 5 | 8 |
| Meta (non-party) | 20 | 0 | 1 | 8 | 1 |

As the table above makes plain, Meta has used virtually none of the deposition time it

---

[2]    At Meta's request, the FTC agreed to accept written responses from Meta in lieu of live testimony from a 30(b)(6) witness. The FTC has agreed to count Meta's written 30b6 responses as 9 hours of testimony, in addition to the ~74 hours of live testimony taken from Meta's current or former employees.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

has been allotted by the Joint Scheduling Order.  The FTC has made more progress, but still has used only a fraction of its allotted deposition hours.

Less than four months of fact discovery remain.  The only Meta-noticed deposition that has actually been scheduled will take place on February 24.  For Meta to use the hours that it so strenuously advocated for in the scheduling order, if it started depositions in earnest on February 24, Meta would have to take nearly 14 hours of testimony every day for each business day remaining in fact discovery – and, obviously, this does not account for any deposition hours the FTC requires.  Meta's delay in scheduling depositions has already compressed the period in which non-party depositions must occur, and Meta's practice of noticing 30(b)(6) depositions in lieu of 30(b)(1) deposition imposes yet another stressor.  While Meta is certainly entitled to issue Rule 30(b)(6) notices if it chooses to do so, in the FTC's experience 30(b)(6) depositions of non-parties generally take far longer to schedule than Rule 30(b)(1) depositions of specific individuals.

To minimize the possibility that deposition scheduling challenges interfere with the parties' orderly compliance with the fact discovery deadline, the FTC respectfully asks the Court to instruct both parties to use best efforts to serve all deposition subpoenas they will serve in this litigation as quickly as possible, and no later than February 28, 2023, absent good cause or agreement of the parties.  This deadline will ensure that depositions are conducted in an orderly and efficient manner that minimizes logistical challenges and the negative impact to both third parties and the parties.  As Meta itself admits, it has achieved substantial compliance with most of its third-party document subpoenas: as such, it should have all the information it needs to expeditiously notice any remaining depositions.

**B.**     **The FTC's Position Regarding Meta's Discovery to the FTC**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

The Court should deny Meta's request for a further supplemental response to Interrogatories No. 13 and 14. The FTC has already provided the information Meta demanded through an entirely adequate initial response and two burdensome and unnecessary supplemental responses, which the FTC provided to avoid disputes. *See* FTC's Supplemental Responses and Objections to Meta's Second Set of Interrogatories, Exhibit A (Jan. 24, 2023). At this point, based on evidence collected to date, the FTC has specified which applications (and which features and activities) are part of the relevant market the FTC has alleged and which are not; provided an explanation for its classifications; and identified supporting evidence—all notwithstanding that fact discovery is still ongoing and expert disclosures are months away.

Meta simply ignores the FTC's clear explanations when it claims that Meta does not understand why certain "excluded" features or activities of various applications are not reasonable substitutes for products within the FTC's relevant market. For example, Meta claims that it cannot understand why features of TikTok do not provide a substitute for the personal social networking experience Meta's applications provide to consumers, but the FTC has cited



supports the explanation that the FTC provided in its Complaint. *See* Substitute Amended Complaint ¶ 174, ECF No. 81.

Likewise, Meta claims that it cannot understand why Reddit does not provide consumers

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

with an alternative personal social networking service (PSNS).  But the FTC has cited to Meta's

own documents, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████.  The FTC explained in its Complaint why Reddit and

other "online services that focus on the broadcast or discovery of content based on users'

interests rather than their personal connections," are not substitutes for PSNS: users employ

Reddit to "engage in conversations with communities of mostly anonymous people who share a

particular interest . . . rather than to connect with friends, family, and other personal

connections."  Substitute Amended Complaint ¶ 174, ECF No. 81.

The FTC has thus already provided a complete response to Meta's request to explain why

certain "excluded" features or activities of various applications do not fall within the relevant

market: "when a user spends time using an online service that is not a personal social networking

service, the user is not using a personal social networking service – regardless of the feature or

activity at issue."  Joint Status Report at 9, ECF No. 227 (Dec. 15, 2022); *see also id.* at 9-10

("Meta's attempt to parse out individual features/activities, and its insistence that each feature

must be considered separately is therefore misguided: in analogous circumstances courts

regularly reject the argument that all providers of individual products necessarily compete within

the same antitrust market as a firm that offers a set of products in a distinctive format.") (citing

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008); *FTC v. Staples, Inc.*, 970

F. Supp. 1066, 1073-74 (D.D.C. 1997)).

The unsurprising fact that Meta's counsel disagrees with the FTC's well-supported

approach to market definition does not provide a basis for Meta to re-write its interrogatories and

require the FTC to provide further responses.  The FTC looks forward to compiling additional

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

factual evidence to support its allegations through the remainder of fact discovery, and to ultimately submitting expert testimony and analysis to prove its case at trial. Nothing more, however, can be productively accomplished through further engagement on Interrogatories No. 13 and 14. Indeed, the FTC has already gone further than the actual text of the interrogatories, and has allowed Meta to shift the goalposts multiple times, to avoid disputes and provide a response that parallels (and in fact already exceeds) what the Court deemed an appropriate approach to Meta's Interrogatory No. 10. *See, e.g.*, Order, ECF No. 165 (Aug. 8, 2022) (ordering that the FTC need only "inform Meta whether each such feature or activity is or is not within" the definition of personal social networking services).

If, however, the Court is inclined to grant Meta's request for a supplemental response, the FTC respectfully requests an opportunity to brief this issue further. In particular, to the extent that the Court will entertain Meta's request, it is imperative that Meta be directed to precisely define what is deficient in the FTC's responses and what Meta is requesting the FTC be directed to answer—as Meta has repeatedly shifted its question presented and demands for further explanation throughout this process. Indeed, Meta notified the FTC only on Friday, January 27, 2023, of its intention to "move to compel in the Joint Status Report," leaving the FTC to prepare its counterstatement over the weekend. Email from K. Horvitz (Jan. 29, 2023). Moreover, while the FTC has directed its response at its best sense of what Meta considers deficient about the FTC's responses—and believes the Court should deny Meta's request for the reasons above—if the court is inclined to entertain Meta's request, both the FTC and the Court would benefit if Meta actually explains with specificity what Meta claims it is "moving to compel."

A.    Relevant Background

This dispute is best understood within the context of Meta's Interrogatory No. 10, in

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

which Meta asked the FTC to first catalogue and then classify all features and activities available

on Meta's applications as either included in or excluded from the FTC's definition of PSNS.

With the Court's assistance, Meta identified 322 features/activities on Facebook, Instagram,

Facebook Messenger, and WhatsApp for classification, and the FTC responded that 268 of those

features/activities are part of Facebook's and Instagram's PSNS offerings largely because of the

"connection between the feature/activity and users' ability to share and experience each of the

various features and activities with their social networks of friends, family, and personal

connections in a shared social space . . . ."  FTC's Response to Meta Platforms, Inc.'s List of

Features or Activities, Exhibit B at 2 (Sept. 12, 2022).  In particular, the FTC classified all listed

features/activities on Facebook and Instagram as part of Meta's PSNS offerings, except

Facebook Dating, where evidence suggests Meta has affirmatively cordoned off its dating

service from Facebook's social networking service.  *See id.* at 3.  For Messenger and WhatsApp,

the FTC classified all features/activities as outside the definition of PSNS, with the sole

exception of Stories on Messenger "because it appears to be fully linked with Facebook's

personal social networking services (e.g., users automatically cross-post Stories between

Facebook and Messenger)."  *Id.* at 3-4.

      With Interrogatories No. 13 and 14, Meta requested that, for each of the 270

features/activities the FTC included as within PSNS on Meta's applications, the FTC now "state

whether use of that feature or activity or similar feature or activity" likewise qualifies as PSNS

when the feature or activity "is used or performed" on 19 nonparty applications.  The FTC

objected to the indeterminate breadth of Meta's interrogatories: Meta did not identify which

features/activities on the 19 nonparty applications it wanted assessed, and Meta provided no

evidence to support that any features/activities on those other applications are fairly

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

characterized as "similar" to features/activities offered by Meta. Nonetheless, on November 16, 2022, the FTC classified the 19 nonparty applications and explained why each qualified or did not qualify as offering PSNS. For those offering PSNS, the FTC explained it is likely that features/activities available on the application are part of that application's PSNS offering. Ex. A at 2-8. The FTC further explained that other applications, and their features/activities, are not providing PSNS. *Id.* at 8-13.

Unsatisfied, Meta requested that the FTC classify 100 specific features/activities on the 19 nonparty applications, with an explanation of why each of the features/activities "do—or do not—qualify as PSNS" along with relevant facts supporting that assessment. Joint Status Report at 17-18, ECF No. 227 (Dec. 15, 2022). Meta's request stretched the proper scope of fact discovery. It is one thing to seek details about how the alleged market is defined and who are its market participants (i.e., who is in the market and why). The FTC has answered those questions several times over. It is another thing for a plaintiff to be required to explain to the defendant's satisfaction, in the middle of fact discovery, the evidence that demonstrates why every single out-of-market application (and an extensive list of feature/activities on those applications) is not a reasonable substitute for the applications within the alleged market definition.

Despite concerns that Meta was not actually seeking explanation—and instead was merely disputing the FTC's allegations—the FTC agreed to address Meta's list of features/activities to avoid needless disputes. The FTC agreed to not only provide an assessment and classification like what the Court ordered in connection with Meta's Interrogatory No. 10, but also to explain its assessment and identify evidence relevant to the FTC's classifications. *See* Joint Status Report at 8, ECF No. 227 (Dec. 15, 2022). The FTC also agreed to provide a further explanation of its position that assessing Meta's monopoly power and the relevant market in this

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

case do not require feature-by-feature, or activity-by-activity, assessments.  *Id.*  On January 10, 2023, the FTC provided the further explanation of its position on feature-by-feature and activity-by-activity assessments.  Ex. A at 14-17.  And on January 24, 2023, the FTC responded with an additional 50 pages of explanation, including over 50 citations to ordinary course records, sworn testimony, and public reporting, all explaining why the FTC has classified the various applications (and their accompanying features/activities) as it has.  *Id.* at 17-67.

> B. The Court Should Reject Meta's Request for a Further Response.

Despite receiving multiple robust responses, Meta now complains, again, that the FTC has failed to sufficiently explain why certain applications (or features/activities on certain applications) are not providing PSNS.  *See infra* II.A.1.a.  Meta's claims are unfounded.  In truth, the FTC has fully addressed Meta's initial request and provided explanations for why the identified applications, and certain features/activities purportedly provided by those applications, do or do not provide PSNS.  In light of the FTC's comprehensive response, Meta's continuing objections amount to nothing more than disputing the FTC's explanations and evidence; moreover, Meta's position appears to reject logic and relevant caselaw indicating that two products need not be included in the same antitrust market simply because they both offer some seemingly similar features.

As described above, despite ongoing fact discovery and without the benefit of expert testimony, the FTC has proffered dozens of pages of explanation detailing which applications are in its alleged market, which applications are not, and why it has drawn the market's boundaries as it has.  In particular, the FTC has explained why, based on evidence collected to date, it believes that the following set of applications provide or provided PSNS: Friendster, Google+, MeWe, Myspace, Orkut, Path, Snapchat.  Ex. A at 21-36.  With citations to various forms of

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

evidence, the FTC has explained that each of these applications present or presented a user experience dedicated to maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space. *See, e.g.*, *id.* at 24 (████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ).

The FTC has also explained, by contrast, why it believes that the following set of applications do not provide PSNS: Hulu, iMessage, LinkedIn, Netflix, Nextdoor, Pinterest, Reddit, Spotify, Strava, TikTok, Twitter, and YouTube. *Id.* at 37-67. With citations to various forms of evidence, the FTC has explained that each of these applications present a user experience dedicated to some other online service (e.g., mobile messaging, professional networking, etc.) rather than maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

Additionally, the FTC has explained its position that "it is not necessary to perform a highly granular and burdensome, feature/activity-by-feature/activity analysis of some indeterminate number of features/activities on Meta's applications in order to define a relevant market and show monopoly power" in this case. *See id.* at 14-15. Among other reasons, the FTC believes this is unnecessary because "Meta's own ordinary course documents recognize Facebook and Instagram provide personal social networking services without exhaustively enumerating features/activities that comprise that service," and "ordinary course documents,

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

testimony, and other evidence" can allow an assessment "of the basic contours of the services offered" on various applications without a feature-by-feature comparison.  *See id.* at 16.  This approach is wholly consistent with the case law, since antitrust markets do not require rigid, precise boundaries.  *See United States v. Anthem*, 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("Plaintiffs need not present market share estimates with the precision of a NASA scientist. The closest available approximation often will do."); *see also Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds.").

Thus, Meta is not lacking in explanation from the FTC.  Instead, Meta simply disagrees with the FTC's explanations.  But the unsurprising fact that Meta does not agree with the FTC does not change the fact that the FTC has provided Meta with what it requested in its December Joint Status Report formulation of the interrogatories.  *See* Joint Status Report at 17-18, ECF No. 227 (Dec. 15, 2022).  The FTC has explained, with citations to ordinary course evidence, why seven of the nonparty applications appear to offer PSNS, and also that the identified features/activities appear to be part of that PSNS offering.  The FTC likewise explained, with citations to ordinary course evidence, why 12 of the nonparty applications appear to not offer PSNS, and that the identified features/activities accordingly are not part of a PSNS offering.

By continuing to insist that the FTC has failed to explain why certain applications are not reasonable substitutes, *see infra* II.A.1.a., Meta ignores both the proffered evidence and case law indicating that such ordinary course evidence is sufficient to sustain a relevant market.  *See, e.g.*, *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("[P]ractical indicia as industry or public recognition of . . . . market boundaries may be viewed as evidentiary proxies for proof of substitutability and cross-elasticities of supply and demand.").  But Meta's refusal to

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

acknowledge the FTC's evidence and explanations does not make the FTC's responses deficient.

In addition to simply ignoring evidence, Meta's insistence that the FTC's responses are deficient also rests on the fundamentally mistaken idea that an application provides a substitute for Facebook or Instagram, or must belong in the same antitrust market, if the application makes available a purportedly similar individual feature or activity.  The FTC has already explained why Meta's claim is wrong, as a matter of both logic and law.  *See* Joint Status Report at 9-10, ECF No. 227 (Dec. 15, 2022).  As a matter of logic, numerous examples underscore the point that the presence of the same "feature" or "activity" on two offerings does not make them the same product or worthy of inclusion in the same antitrust market.  For instance, the Girl Scouts website, the Windows desktop operating system, and YouTube all have a "search" feature, but that does not mean they are the same product or belong in the same relevant antitrust market.  Likewise, people listen to the radio in their car and also at home, but that does not mean that a car and a house are the same product or worthy of inclusion in the same antitrust market.

As a matter of law, numerous cases have excluded products from a relevant antitrust market despite the appearance of individual features or items from the "excluded" products that were similar or even exactly like the included products.  *See, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040, 1049 (D.C. Cir. 2008) (finding a premium natural and organic supermarket-only market even though customers purchased the same categories of grocery products from different outlets); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 30 (D.D.C. 2015) (finding a broadline-only market even though "competitors of all stripes offer[] fungible goods through different but overlapping distribution channels"); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46-49 (D.D.C. 1998) (finding a wholesale prescription drug market even though other firms sold the same drugs through different distribution channels); *FTC v. Staples, Inc.*,

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

970 F. Supp. 1066, 1075 (D.D.C. 1997) (finding an office supply superstore-only market even though many other outlets sold consumable office supplies, which "are undeniably the same no matter who sells them"); *see also* Joint Status Report at 8-13, ECF No. 227 (Dec. 15, 2022). Those cases did so based on, among other things, ordinary course evidence—which the FTC has already proffered in its interrogatory responses showing a PSNS-only market—and expert testimony, which the FTC plans to proffer when it becomes due.

At bottom, Meta's continuing objections effectively boil down to insisting that the FTC explain to Meta's satisfaction that certain applications are not reasonable substitutes. But that is not what the interrogatory provisions of the Federal Rules of Civil Procedure are for, and indeed that is an impossible standard, given that Meta—through trial and beyond—is unlikely ever to concede to the FTC's explanations and evidence. At this point, Meta's insistence that the FTC respond with further explanation exceeds the bounds of even a contention interrogatory and inappropriately seeks early expert discovery far beyond what similarly situated plaintiffs have been compelled to produce. *See, e.g.*, Transcript of Status Conference at 38-41, Exhibit C, *Klein v. Meta Platforms, Inc.*, No. C 20-08570 JD (Jan. 19, 2023) (denying Meta's motion to compel a similar interrogatory response on the grounds that it prematurely seeks "expert testimony"); *Barnes v. District of Columbia*, 281 F.R.D. 53, 57 (D.D.C. 2012) (explaining that, where a plaintiff's expert has not performed "the analysis that would be responsive to" a defendant's interrogatories, courts generally would not require that plaintiff "to create documents to answer the [defendant's] interrogatories"). Indeed, Meta's insistence on a further explanation now is especially upside down in that Meta's persistent questioning rests on unstated contentions by Meta—unsupported by evidence or analysis proffered by Meta or its expert(s)—that various applications are similar or are reasonable substitutes for Meta's products. The FTC cannot

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

"rebut" an argument that has not been proffered or supported in the first place.

To the extent that Meta needs to hear more from the FTC on this topic, the FTC attempts here to explain again: the FTC does not believe that an application (be it TikTok, Reddit, or another) is offering personal social networking services or is a reasonable substitute warranting inclusion in the alleged PSNS relevant market on account of individual purportedly similar "features" or "activities." The FTC will ultimately be offering additional factual evidence to support its position, but of course fact discovery is ongoing. And the FTC, like countless antitrust plaintiffs prior, will offer expert testimony to explain and support its relevant market allegations despite any purported "similarity" of excluded applications. Further, the FTC's expert(s) will respond in due course via rebuttal report(s) to whatever arguments Meta's expert(s) proffer about purported competitive alternatives. But the FTC has said more than enough in its interrogatory responses.

*   *   *   *   *

The foregoing reasons are cause enough for the Court to reject outright Meta's request for a further response from the FTC. Additionally, Meta has materially altered its interrogatory requests since they were originally propounded, repeatedly shifting the goalposts as the FTC attempts to respond in good faith. In brief, Meta has reformulated its request in the following ways, among others:

- "[S]tate whether use of [each of the 100 features/activities] count[] as time spent using a 'personal social networking service . . . and explain why or why not." Meta's Second Set of Interrogatories at 7-8 (Oct. 17, 2022).

- "[I]s it the FTC's position that some PSNS activities compete with activities offered by non-PSNS providers?" Ltr. from K. Huff to D. Matheson at 2 (Nov. 23, 2023).

- "[E]xplain[] why those [100] features or activities do—or do not—qualify as PSNS." Joint Status Report at 17-18, ECF No. 227 (Dec. 15, 2022).

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

- Explain why IG Reels is not a substitute for TikTok.  Meet and Confer (Jan. 26, 2023).

- "[E]xplain with relevant facts why [viewing content on Reddit and viewing different content within Facebook Groups] are not substitutes. . . .  [I]s the FTC's theory that interest-based groups on Facebook are not substitutable with interest based groups on another application because users only spend time in interest groups on Facebook when they accidentally click on one, or because they incorrectly think some of their Facebook friends may be in the group?  Or is it some other reason?"  Email from K. Horvitz (Jan. 27, 2023).

As described in detail above, the FTC has plainly responded to Meta's interrogatories as propounded.  The shifting sands of Meta's demands multiply the number of interrogatory questions Meta has effectively propounded and underscore why any further engagement would be unproductive.  But if the Court is inclined to grant Meta any relief, the FTC requests that Meta be directed to precisely define what is deficient in the FTC's responses and what the FTC is now being asked to answer, and that the FTC be allowed briefing in response.

**II.**  <u>**Meta's Statement on the Status of Discovery**</u>

    **A.**  **Meta's Statement on the Status of Discovery to the FTC**

        **1.**  **Interrogatories**

            **a.**  **The Court Should Compel the FTC to Respond to Meta's Interrogatory Nos. 13 and 14 As the FTC Had Agreed**

As explained in the parties' December Joint Status Report, ECF No. 227, the FTC agreed to supplement its response to Meta's Interrogatory Nos. 13 and 14 by explaining why a list of 100 features or activities on non-Meta products that are similar to the features and activities that the FTC classified as PSNS when they occur on Facebook or Instagram do or do not qualify as PSNS.  Joint Status Report (Dec. 15, 2022), ECF No. 227 at 17-18; *see* Meta's List of Features or Activities for Explanation by the FTC (Dec. 20, 2022) ("Exhibit D") (attached).  In particular, the FTC "confirmed that its explanations [would] include details and any relevant facts on why the FTC classifies two activities similarly or differently."  *See* Joint Status Report, ECF No. 227

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

at 18.  Yet in its Supplemental Response, the FTC expressly refuses to provide that information, stating (20 times) that "the FTC has not presently conducted such an analysis comparing the individual features available on [the identified app] and those currently available on Facebook Blue and Instagram."  *See* FTC's Suppl. Objs. & Resps. to Meta's 2d Set of Interrogs. (Jan. 24, 2023) ("Exhibit A") (attached).  The FTC instead contends, in broad strokes, that any features on the products it alleges are PSNS are, by definition, PSNS (with the exception of Facebook Dating), and any features on the products it alleges are not PSNS are, by definition, not PSNS. *See* FTC's Resp. to Meta's List of Features or Activities at 13 (Sept. 12, 2022) (Joint Status Report Ex. 2 (Oct. 31, 2022), ECF No. 206-2).

For example, Meta asked the FTC to classify six features on Reddit and to explain their classification.  *See* Ex. D, Nos. 11, 13, 37, 39-40, 57.  Although the FTC delayed the parties' dispute over this Interrogatory in the last Joint Status Report by committing to respond with respect to each of those features, the FTC's Supplemental Response merely combines all of the features into one "Reddit" category and asserts that the features are not PSNS because "[t]he FTC's present understanding is that Reddit does not provide personal social networking services."  Ex. A, at 51.  Even though Meta specifically highlighted Reddit communities in the last Joint Status Report submission, the FTC makes no attempt to explain why "Viewing content posted in a Community User joined on Reddit based on User's interests, such as the 'Instant Pot' Community," is not PSNS, while "Viewing content posted in a [Facebook] Group User joined based on User's interests, such as the 'Slow Cooker/Instant Pot Recipes' Group," qualifies as PSNS.  *Compare Id.* at 50-51 *with* FTC's Resp. to Meta's List of Features or Activities, at 11 (Sept. 12, 2022) (Joint Status Report Ex. 2 (Oct. 31, 2022), ECF No. 206-2).  To respond adequately to that Interrogatory, the FTC needs to explain with relevant facts why those

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

competitive offerings are not substitutes.  For example, the FTC needs to explain with relevant facts its position that interest-based groups on Facebook are not substitutable with interest-based groups on Reddit.  Perhaps the FTC's theory is that users only accidentally click on interest-based groups on Facebook or that they mistakenly think that some of their Facebook friends are in the group.  Meta does not know.  *Cf. FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 19 (D.D.C. 2021) (posing questions about the FTC's market and noting that "specific interest-based Facebook pages or groups" are among the list of features that are "seemingly, [not part] of [Facebook's] PSN-services offerings").   And if the FTC does not have any factual basis for its position after one year of discovery, an 18-month investigation, and multiple complaints, it must so state.

Although Meta did not intend to submit such extensive briefing, the FTC sent Meta a 12 page insert on the day of this filing to which Meta wishes to respond.  The FTC argues (at 27-28) that Meta's request is unsupported by evidence and "that the goalposts have shifted."   But it is the FTC that has moved the goalposts with its ever-shifting market definition theories, and the FTC bears the burden of proving a relevant market.  The FTC's claimed confusion in response to Meta's persistent inquiries over the last year only underscores that the FTC has provided no factual basis or coherent explanation as to this threshold question no matter how it is phrased. Indeed, its response first reiterates the Amended Complaint.  *See* Jan. 30 JSR at 18 (stating that "the FTC explained in its Complaint why Reddit and other 'online services that focus on . . . user's interests'  . . . are not substitutes for PSNS").  But that does not address the inquiry, as the FTC has previously conceded it made those allegations before the FTC had even determined if Facebook Groups was allegedly part of Facebook's PSNS offering.  *See* FTC's Suppl. Objs. & Resps. to Meta's First Set of Interrogs. at 6-8 (June 14, 2022) (indicating that it was still

exploring the extent to which PSNS is offered outside of Facebook Feed, Stories, and Timeline).

The FTC then represents that "[o]rdinary course records and evidence support the FTC's

understanding."  See Ex. A, at 51.  But the only Meta document that the FTC cites ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  The FTC does not cite anything from Reddit indicating

otherwise, and ordinary course evidence from ██████ and ██████ allegedly "interest based"

apps uniformly recognize their fierce competition with Meta.  *See*, *e.g.*, ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████; Pinterest, Inc., Annual Report (Form 10-K) at 12 (Feb. 5, 2021),

https://investor.pinterestinc.com/financial-results/sec-filings/sec-filings-

details/default.aspx?FilingId=14673485 (Pinterest indicating that it competes with companies

"such as Amazon, Facebook (including Instagram), Google (including YouTube), Snap, TikTok

and Twitter, which provide their users with a variety of online Products, services, content

(including video) and advertising offerings.";  ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████; Nextdoor Holdings, Inc., Annual Report (Form 10-K) at

11 (March 15, 2022), https://investors.nextdoor.com/financials/annual-reports/default.aspx

(Nextdoor explaining that it "compete[s] . . . with companies that provide a variety of internet

products, . . . including Meta (including Facebook and Instagram), Alphabet (including Google),

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Pinterest, Snap, and Twitter . . . to attract, engage, and retain users"); ████

████████████████████████████████████████████████████████████████

████████████████████████  Thus, Meta does not object to the FTC's response because Meta "disagree[s] with the FTC's explanation" or because it is "ignoring evidence" (as the FTC posits at 24-26); Meta objects because it is entitled to the FTC's explanation of and factual support for its position beyond conclusory statements that do not address or even encompass the identified features.

As another example, in relation to the FTC's response to the sixteen distinct features listed on TikTok, the FTC merely states that "TikTok does not provide personal social networking services and the [sixteen TikTok features identified by Meta] are therefore not part of the personal social networking offering."  Ex. A, at 58-59; *see* Ex. D Nos. 5-7, 9, 44, 60, 62, 64, 67, 69, 72, 76, 78, 86, 96, 98.  It does not attempt to explain, for example, why "[v]iewing Reel(s) [on Instagram] posted by a celebrity" qualifies as using PSNS, but viewing the same type of videos "posted by a celebrity" on TikTok does not qualify as using PSNS, nor does it point to any documents that would purport to explain that distinction.  *See* Joint Status Report, ECF No. 227 at 17-18 (explaining why the FTC's initial response to the Interrogatory No. 14 was deficient for failing to address this example, among others).  Indeed, just as it did in its last Joint Status Report submission, the FTC's response relies solely on soundbites from documents that could not conceivably address the issue, since they were created before Instagram Reels was even launched in the United States (in August 2020).   As the FTC knows, Meta views TikTok as a significant competitor, and its ordinary course documents consistently emphasize this reality.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████         The FTC's repetition of allegations from the Amended Complaint and citation

to documents that do not analyze the features identified in the Interrogatory do not reflect a

factual dispute, they reflect the FTC's plain repudiation of its previous commitment to address

the listed features and a continued failure to explain its market definition.

Finally, even though the FTC committed to engage in the feature-by-feature analysis, it

contends that it need not engage in that inquiry because it is conceivable that Facebook and

Instagram could have some features that are similar to other offerings, without those other

applications being in the same antitrust market. *See* Jan. 30 JSR at 25 (asserting that YouTube

and a Girls Scouts website should not be in the same antitrust market even though they each have

a search function).  Although it is certainly true as an abstract proposition that similar features on

different products may not be reasonably interchangeable, that does not excuse the FTC's failure

to engage in the underlying assessment with the relevant facts in its possession.  The FTC alleges

that Meta possesses monopoly power in the market for PSNS based on time spent on PSNS.  If

the FTC cannot explain why users do not view the time they spend on the underlying PSNS

features as reasonably interchangeable with time they spend on even the most facially similar

features on other applications that are likewise free to use and only a touch of a button away on

the same device, Meta cannot adequately develop facts to defend itself against the FTC's ever-

changing theories.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

In the previous Joint Status Report, Meta made clear that it would seek relief from the Court if the FTC "merely parrot[ed] conclusory statements that are not tied to the specific examples." Joint Status Report, ECF No. 227 at 18. That is what the FTC has done. Its repeated assertion that Facebook offers PSNS and other apps do not does not address the reality that users do many different things on Facebook, Instagram, and competing applications, nor does it provide Meta with a coherent theory that Meta can defend against. The FTC's failure to address any of the listed examples in its Supplemental Interrogatory Response renders the response plainly insufficient.

Meta requests that the Court order the FTC to supplement its response to Interrogatory Nos. 13-14 in ten days with the information it agreed to provide over a month ago, as set forth in Meta's section of the December 15, 2022 joint status report. Meta is entitled to the information in the FTC's possession on these critical threshold issues, so it can adequately develop facts to defend itself.

### b.   The FTC Has Committed to Respond to Meta's Interrogatory No. 15 By February 4

On January 5, 2023, the Court ordered the FTC to answer Meta's Interrogatory No. 15, which asks the FTC to "[i]dentify each industry participant, including any companies identified in the FTC's initial disclosures, that has recognized a distinct market for personal social networking services, as defined by the FTC and consisting of the specific entities the FTC has identified as providers of personal social networking services, in ordinary course business documents or otherwise." Meta's 2d Set of Interrogs. to FTC, at 8 (Oct. 17, 2022) (Joint Status

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Report Ex. 3 (Dec. 15, 2022), ECF No. 227-3); *see* Min. Order (Jan. 5, 2023).  The FTC has

committed to providing its response by February 4, 2023.

> **2.    The Parties Are Continuing to Negotiate Over Meta's Second Set of Requests for Production**

On December 5, 2022, Meta served the FTC with its Second Set of Requests for

Production, seeking documents relating to the FTC's own use of services it refers to as "Social

Media," including Twitter, Facebook, LinkedIn, YouTube, and Reddit, to engage with the

public.  *See* Federal Trade Commission, Social Media, https://perma.cc/78M5-BGXL (last

visited Nov. 2, 2022).  On January 25, 2023, the FTC committed to producing documents

responsive to this Set of Requests and stated that it anticipates it will complete its production by

the end of February.  The parties are continuing to meet and confer on the scope of the search the

FTC will conduct.

> **B.     Meta's Statement on the Status of Non-Party Discovery**

The Court should reject the FTC's requests for a non-party document discovery deadline

and a deadline for serving non-party deposition subpoenas.  In addition, although the Court does

not need to set an additional non-party discovery hearing at this time, Meta does not object to the

FTC's request that it do so.

> **1.    The Court has already rejected the FTC's previous requests to impose new fact**

discovery deadlines on non-party discovery.  *See* Hr'g Tr. (Feb. 28, 2022) at 4:19-21, ECF No.

109 (rejecting the FTC's requests to impose a deadline to complete production of non-party

documents and data and to file motions to compel against non-parties, and explaining "I'm not

going to have deadlines about third parties because I think that's part of general discovery and

there is a lot of third party discovery that needs to take place"); *see also id.* at 15:11-18 (rejecting

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

the FTC's proposal to require the parties to serve document requests on a non-party within a certain number of days of the opposing party serving a document request on that non-party).

As the filings with this Court have made clear, Meta is proceeding with non-party discovery with urgency, serving close to one hundred subpoenas *months* before the FTC issued its first handful of subpoenas, and exchanging thousands of communications with those non-parties to obtain compliance with its subpoenas. More than one hundred non-parties have produced documents in response to Meta's subpoenas, with production sizes ranging up to more than 100,000 documents. Many of those non-parties have completed their productions. Meta is currently reviewing the sufficiency of productions it has received and expects to have follow-up inquiries for certain non-parties. Meta is also continuing to issue a small number of document subpoenas to additional non-parties as discovery continues to unfold. Meta has already achieved substantial compliance with most of its subpoenas and is aiming to secure discovery as efficiently and effectively as possible. It expects that the overwhelming majority of non-parties will substantially complete their productions by March 15 or well before then. However, as the Court has repeatedly explained, that is no basis to impose a new deadline on Meta that is different from the existing fact discovery deadline. *See* Hr'g Tr. (Nov. 9, 2022) at 17:6-20, ECF No. 219 (rejecting the FTC's similar request to impose a deadline for Meta to identify the non-parties from which it intends to seek documents, or a declaration, or a deposition, or trial testimony, and explaining "I just don't think that this is consistent with the rules and appropriate for me to do at this juncture"). While Meta has been expeditiously pursuing non-party discovery, it has relied on that fact discovery deadline, and cutting short the timeline for non-party discovery would significantly prejudice Meta's ability to get the discovery it needs to defend against the FTC's ever-changing theories. Meta needs the flexibility to continue to

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

collect and review responsive documents and to issue additional document subpoenas to collect evidence in support of its defenses.

**2.**      The Court should similarly reject the FTC's request to order Meta to serve all non-party deposition subpoenas by no later than February 28, 2023.  As discovery progresses, Meta has been reviewing the productions it has received from non-parties to determine which non-parties to notice for depositions.  To date, Meta has served 28 deposition subpoenas on non-parties and plans to issue additional deposition subpoenas over the next few months.  Meta has noticed many depositions to occur throughout February, and it can take multiple depositions of different non-parties on the same day, just as the FTC has done in deposing Meta's employees with the dozens of FTC attorneys working on this case.  Meta should not be artificially limited by a requirement to serve all deposition subpoenas on a specific day of the FTC's choosing, almost three months prior to the close of fact discovery.  The FTC's proposal for a deadline to notice depositions – which comes *before* its requested deadline for substantial completion of document productions – would require Meta to decide whom to depose before it has even reviewed all non-party document productions.  The FTC's request would also improperly restrain Meta from issuing new deposition subpoenas as a result of facts learned during depositions conducted after the FTC's artificial deadline.  The FTC benefited from 18 months of non-party discovery during its pre-complaint investigation; Meta had no similar opportunity. The Court should reject the FTC's repeated attempts to cut Meta's discovery efforts short. Moreover, imposing this deadline would require Meta to send out more deposition notices than it will ultimately take in order to preserve optionality and flexibility based on Meta's document review and how other depositions progress, which would be inefficient and cause unnecessary burdens on non-parties.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

**3.**     Finally, Meta does not dispute that the Court's setting of the January 26 omnibus discovery dispute hearing was helpful in crystalizing and resolving disputes with non-parties. But given the current status of discovery and the commitments that Meta has received from non-parties, Meta does not believe that setting an additional hearing is necessary at this time. However, Meta has no objection to the setting of such a hearing.

### C.     Meta's Statement on the Status of the FTC's Discovery Requests

#### 1.     Absent Meta's Consent, the FTC's Investigational Hearings from Its Pre-Complaint Investigation Cannot Be Deemed Rule 30 Depositions

The Court should reject the FTC's request for an order that "[f]or evidentiary and trial purposes, an investigational hearing ('IH') of a Meta current or former employee shall be treated in the same manner as a deposition conducted pursuant to Federal Rule of Civil Procedure 30, provided that the current or former employee was represented by Meta's counsel during the IH." Jan. 30 JSR at 1.

The FTC has conceded that the IHs it conducted during its pre-complaint investigation were not Rule 30 depositions, and it does not cite any support for the proposition that federal courts may deem IHs the same as Rule 30 depositions absent a stipulation between the parties. *See Florida v. United States*, 2012 WL 13218793, at *2 (D.D.C. Feb. 16, 2012) (Garland, J., three-judge panel) (denying motion to compel a deposition after a party failed to comply with Rule 30's notice requirements because "although courts have broad discretion to manage discovery, they are not free to ignore basic rules of procedure" (citation omitted)); *United States v. Gavilan Joint Cmty. Coll. Dist.*, 849 F.2d 1246, 1251 (9th Cir. 1988) ("The Government acknowledges that it must follow the Federal Rules of Civil Procedure when litigating civil matters in the federal courts."). The FTC is free to argue that these IHs are admissible under the Rules of Evidence, but they are neither depositions under Federal Rule of Civil Procedure 30 nor

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

admissible under Federal Rule of Civil Procedure 32. *See* Fed. R. Civ. P. 32 (discussing when, "[a]t a hearing or trial, all or part of a deposition may be used against a party"). Rule 30 limits depositions to no more than 7 hours and affords Meta an opportunity to conduct a redirect examination – with knowledge of the FTC's allegations in the case – at the close of the FTC's questioning. *See* Fed. R. Civ. P. 30(d)(1); Fed. R. Civ. P. 30(c)(1). The FTC does not dispute that its IHs lacked these basic procedural safeguards. Most of the FTC's IHs of Meta's employees lasted longer than seven hours. And Meta's opportunity to conduct a redirect examination of the witnesses was a matter solely within the FTC's discretion and limited to questions that would merely "clarify" answers. *See* 16 C.F.R. § 2.9(b)(4) ("[T]he witness or his or her counsel may on the hearing record request that the hearing official permit the witness to clarify any answers."). The FTC's IHs simply did not comply with Rule 30.

The FTC's stated reasons for its requested relief do not warrant a contrary conclusion. The FTC first argues that it needs an order deeming IHs of Meta employees to be the same as Rule 30 depositions because it otherwise cannot "rely on the IH transcript" and must "re-establish at the deposition propositions that were sufficiently established during the IH." Jan. 30 JSR at 3. The FTC's preference to use evidence on which it cannot rely is no basis to grant the FTC's request.

The FTC next asserts that it needs to know how IH testimony will be treated for evidentiary and trial purposes now so that it can know which depositions "it must notice." *Id.* That explanation rings hollow. The FTC has issued deposition notices to 16 of the 18 Meta employees who were questioned during the FTC's IHs. The FTC thus has already decided that it must notice depositions of nearly all of the Meta employees who previously sat for IHs, regardless of when or how the Court rules.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Finally, the FTC unfairly complains that Meta did not stipulate to the FTC's requested relief.  Meta had no obligation to so stipulate.  *See* Fed. R. Civ. P. 29(a) (providing that parties "may" stipulate around deposition procedures); *Keira v. Berry*, 2013 WL 5416900, at *2 (S.D. Fla. Sept. 26, 2013) ("Rule 29(a) is permissive; it does not require a party to enter into any stipulation."); *see also Truong v. Metro-N. R.R.*, 1999 WL 225539, at *1 (S.D.N.Y. Apr. 16, 1999) (declining to issue an order directing a party to stipulate to admissibility of exhibits because "the process of stipulating to admissibility" is "a voluntary one").  Nonetheless, Meta negotiated with the FTC about the contemplated stipulation in good faith.  During the parties' negotiations, Meta asked if the FTC would be willing to agree, in writing, that it would neither waste the witnesses' time nor ask them questions previously asked during these witnesses' IHs. Courts routinely impose such limitations on re-depositions of witnesses.  *See, e.g.*, *Smith v. Café Asia*, 2009 WL 10692462, at *2 (D.D.C. Aug. 25, 2009) (Facciola, M.J.) (limiting scope of re-deposition to "issues that were not and could not have been addressed at . . . initial deposition"); *United States v. Philip Morris USA Inc.*, 2004 WL 5643766, at *1 n.1 (D.D.C. July 22, 2004) (Kessler, J.) (prohibiting re-deposition of "any matters which could have been addressed at the time of his deposition").

Rather than provide those straightforward assurances, the FTC asserts that it may ask witnesses about the same documents that it already covered in IHs and that it is entitled to retread ground that it already explored in IHs.  *See* Jan. 30 JSR at 3-5; *see also id.* at 3 (vaguely stating the FTC does not have "any intention of conducting depositions in order to needlessly or harassingly duplicate testimony given during an IH").  Indeed, the Court has declined to impose limitations on the scope of questions that the FTC may ask Meta's witnesses who previously sat for IHs.  Hr'g Tr. (Feb. 28, 2022) at 22:9-11, ECF No. 109.  Meta would gain nothing from

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

agreeing that more than 150 hours of testimony from the FTC's pre-complaint investigation can be treated as Rule 30 testimony; it would be inappropriate to order the FTC's requested relief over Meta's objection.  The parties accordingly have not reached an agreement, and Meta will not enter into a stipulation from which it derives no benefit.

There is no basis under the Federal Rules to deem that IHs of Meta employees be treated as if they were depositions under Rule 30.  The FTC's request should be rejected.

### 2.    The FTC's Interrogatories

#### a.    With Respect to Interrogatory No. 8, There Is No Issue for the Court to Resolve; Meta Has Committed to Responding to Interrogatory No. 8 by February 28, 2023, and the FTC Previously Agreed that Meta Could Respond By Identifying Bates-Stamped Documents

The FTC prematurely requests an order that Meta must finish supplementing Interrogatory No. 8 by February 28, 2023 with a narrative response.  The Court should reject this request.  Meta has informed the FTC that it is endeavoring in good faith to substantially complete production of documents responsive to FTC Interrogatory No. 8, on a rolling basis, by February 28, 2023, and the FTC accepted that timeline.  The FTC's request for an order that Meta also supplement its response with a narrative – which the FTC is raising one month before the date by which the FTC agreed that Meta could substantially complete production of documents for this Interrogatory – is patently premature.

FTC Interrogatory No. 8 seeks information about Meta's use of third-party products, software, or services to combat what the FTC defines as "Objectionable Content."  The Interrogatory seeks information that is plainly irrelevant to the case.  The FTC explains that this information is somehow necessary to refute the argument that Meta's acquisition of Instagram and WhatsApp improved their respective abilities to address certain types of objectionable

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

content.  But the fact that Meta has deployed third-party products, software, or services for at least some of this work says nothing about the internal resources and efforts that Meta has expended to address these issues.  In addition, the FTC has never explained why Meta's efforts to combat all of the content that the FTC has defined as "Objectionable Content" have any bearing on this case; yet the FTC nevertheless asks this Court to require a company-wide search to find every third-party product, software, or service that Meta has used to combat "Objectionable Content."

The FTC incorrectly asserts that Meta has never explained until recently that responding to Interrogatory No. 8 is unduly burdensome.  Meta's timely initial objections, and its supplemental responses and objections, all made exactly that point.  *See* Meta's Objs. & Resps. to FTC's Interrog. No. 8 (June 27, 2022) (objecting to Interrogatory No. 8 as "unduly burdensome"), as supplemented on Oct. 20, 2022 and Dec. 5, 2022 (objecting to Interrogatory No. 8 as "unduly burdensome because it seeks to require Meta to provide information relating to a broad array of disparate content, ranging from spam and fake accounts to fraud to pornography to violent content to hate speech to election interference to bullying").  Indeed, providing an answer to the FTC's request for this irrelevant information is an enormous task.  For that reason, Meta has explained to the FTC repeatedly, in writing and on numerous meet and confers, that the process of identifying and collecting responsive information for this Interrogatory is necessarily manual and labor intensive.  *See, e.g.*, Email from S. Strikis to S. Musser (Nov. 23, 2022) ("[T]he identification of and production of contracts related to such third parties imposes a significant burden on Meta . . . .").  Countless teams across Meta's various products combat "Objectionable Content," as defined by the FTC's Interrogatory No. 8, in some manner.  This diversity of sources, coupled with the fact that the FTC seeks production of information dating back over a

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

dozen years, means that considerable research is required to answer this Interrogatory. There is neither a central repository where this information is stored nor an automated approach by which this information can be extracted. Consequently, because Meta's investigation and efforts to identify responsive information from 2009 to the present remains ongoing, Meta is not yet in a position to certify that its "response to Interrogatory 8 represents a complete response to the Interrogatory," as requested by the FTC. *See* Jan. 30 JSR at 12.

Notwithstanding its objections and concerns that Meta has consistently communicated to the FTC, Meta has undertaken an exhaustive and good faith search for responsive documents. After conferring with the FTC, Meta began responding to this Interrogatory on October 20, 2022 and supplemented it recently on December 5, 2022. Meta also informed the FTC on January 27, 2023, that it will work in good faith to continue producing responsive documents for this Interrogatory on a rolling basis and endeavor to substantially complete production by February 28, 2023. *See* Ltr. from G. Klineberg to S. Musser (Jan. 27, 2023). The FTC agreed to that timeline.

The FTC, for the first time on the evening of January 27 (the last business day before this submission was due), inserted a request in its portion of this submission for an order that Meta respond to Interrogatory No. 8 with a narrative response "supplementing any information missing from the documents" that Meta produces. Jan. 30 JSR at 13. The FTC's request for supplementation with a narrative, before Meta finishes substantially completing its response to this Interrogatory by the date to which the parties agreed, is simply premature. Moreover, the FTC's attempt to dictate the way in which Meta responds is contrary to the Federal Rules of Civil Procedure, as this Court explained at the last status conference. *See* Fed. R. Civ. P. 33(d) (allowing "option to produce business records"); Hr'g Tr. (Jan. 5, 2023) at 8:19-21, ECF No. 234

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

(ruling, for FTC Interrogatory No. 4, that although the FTC was "looking for more of a narrative," Meta "certainly is entitled under 33(d)" to point the FTC to documents).  And the FTC's new insistence on a supplemental narrative response contravenes its prior repeated assurances that it had no objection to Meta responding to this Interrogatory by simply identifying the Bates numbers of documents containing responsive information.  *See* Ltr. from S. Musser to K. Fetterman (Aug. 12, 2022) ("Meta may identify Bates numbers of documents containing this information."); Ltr. from S. Musser to K. Fetterman (Oct. 11, 2022) ("Meta may identify Bates numbers of documents containing this information.").  The FTC's attempt to reverse course now and insist on a supplemental narrative response, in contravention of the Federal Rules and the parties' prior understanding, should be rejected.

> **b.     The FTC's Request for a Response to Interrogatory No. 9 By February 16, 2023 Is Premature**

The Court should reject as premature the FTC's request that Meta respond, by February 16, 2023, to the FTC's Interrogatory No. 9, which asks:

> For each quarter, from January 1, 2009 to the present: identify each Contractor the Company has used to identify, review, classify, tag, measure, quantify, assess, or remove Objectional Content [sic] on the Facebook Family of Apps, and the amount that Meta paid each such Contractor to identify, review, classify, tag, measure, quantify, assess, or remove Objectional Content [sic] on the Facebook Family of Apps.

FTC's 2d Set of Interrogs to Meta No. 9 (Dec. 16, 2022).  This request, which like FTC Interrogatory No. 8 concerns the sweeping topic of "Objectionable Content," is ambiguous, overbroad, and appears designed to create a discovery dispute, rather than to provide the FTC with information relevant to the case.

Because the parties are still negotiating over this Interrogatory, the Court should reject the FTC's request for Meta to respond in narrative form to the Interrogatory by February 16.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

The FTC waited until December 16, 2022 – more than 10 months into fact discovery – to serve this Interrogatory.  Meta timely served its initial objections and responses to this Interrogatory on January 17, 2023.  Two days later, the parties met and conferred.  The FTC refused to explain the purpose of this Interrogatory, suggest any narrowing of it, or clarify the meaning of any particular words used in the Interrogatory.  The FTC instead demanded that Meta propose how it intends to respond.  The next day, Meta proposed that if the FTC could agree to "a construction of 'Contractor' in Interrogatory No. 9 that is limited to entities or businesses with whom Meta has contracted to address Objectionable Content, Meta could agree to provide a substantive response."  Ltr. from G. Klineberg to D. Matheson (Jan. 20, 2023).  The FTC replied three days later, appearing to accept Meta's proposed construction.  The FTC has now confirmed that understanding in its portion of the Joint Status Report.  So the scope of the Interrogatory has only just now been resolved.  Meta thus explained to the FTC, on January 27, 2023, that Meta will be in a position, by February 14, 2023, to inform the FTC whether and when it can provide a substantive response to this Interrogatory.  *See* Ltr. from G. Klineberg to S. Musser (Jan. 27, 2023).  If Meta determines that it can and will respond to Interrogatory No. 9 with the production of documents, Meta is entitled to do so under Rule 33(d).  *See* Hr'g Tr. (Jan. 5, 2023) at 8:19-21, ECF No. 234 (rejecting FTC's request for narrative response to FTC Interrogatory No. 4 because Meta is entitled to rely on Rule 33(d)).

In light of this ongoing back and forth, and the FTC's own delay in serving the Interrogatory until last month, the FTC's demand that Meta urgently submit a complete narrative response by February 16 is premature, inappropriate, inconsistent with the FTC's own discovery conduct, and contrary to the Federal Rules.  The parties first met and conferred on this issue on January 19, just two days after Meta's objections were due.  Meta's investigation regarding

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

whether the requested information (as modified by the FTC in recent negotiations) even exists for the period at issue thus remains ongoing.

### 3.    The Parties Jointly Request Entry of Their Stipulated Remote Deposition Protocol

The parties briefed disputes about the parties' Remote Deposition Protocol on December 8, and the Court held argument on those disputes on December 9.  Consistent with the Court's guidance, the parties agreed to a Remote Deposition Protocol, *see* ECF No. 227-1, and jointly request that the Court enter it as a stipulated order.

### 4.    There Is No Dispute About the FTC's Request for ███████ Data



There is no dispute about Meta's production of data from its ████████████████ ████████████████████████████████████. Meta is disappointed that the FTC has mischaracterized Meta's cooperative efforts to produce responsive ███████ data, forcing Meta to respond and burden the Court with discussion of this non-issue.

In late June 2022, the FTC served an extraordinarily broad Rule 30(b)(6) deposition notice regarding user surveys at Meta.  Despite the objectionable nature and scope of the deposition notice, Meta negotiated the notice in good faith and, in August 2022, the FTC took a Rule 30(b)(6) deposition regarding certain user surveys in partial satisfaction of the notice.  After the deposition, the FTC issued its Fourth Set of Requests for Production of Documents ("Fourth RFPs") in September 2022, seeking documents and data relating to one survey that was referenced during the Rule 30(b)(6) deposition.  Meta timely objected to the Fourth RFPs in October 2022.

The parties conferred about production of that data.  The data for the survey mentioned in the Rule 30(b)(6) deposition is so voluminous that the parties agreed that it would not be productive for Meta to produce *all* of the data █████████████████, and the FTC

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

informed Meta which data from that survey it wanted most.  *See* Email from A. Teng to S. Strikis (Nov. 21, 2022).  The FTC also asked Meta to confirm whether the same data was available for one other survey ████████████.  *Id.*  Then, on December 21, the FTC for the first time requested the same categories of data for 17 other surveys.  *See* Email from A. Teng to S. Strikis (Dec. 21, 2022).

When Meta indicated to the FTC in January that the data that the FTC had requested could still be very voluminous, the FTC responded with a purported Rule 34(a) request demanding to inspect Meta's ████████████ and underlying survey data using Meta's internal systems.  *See* Ltr. from A. Teng to S. Strikis (Jan. 19, 2023).  The FTC, however, expressly agreed, during meet and confers on January 23 and 26, and again in correspondence on January 27, that it would withdraw its Rule 34(a) inspection request and remove this issue from its portion of this Joint Status Report, if Meta provided a schedule for production of the requested data.  *See* Email from A. Teng to S. Strikis (Jan. 27, 2023) ("The FTC agrees to withdraw its request for a Rule 34(a) inspection and remove the ██████ dispute from the JSR . . . .").  The parties agreed on that production schedule and, in fact, Meta has already produced some data faster than agreed.

Despite the FTC's representation three times that it would remove discussion from this submission of its now-withdrawn putative request to inspect ████████ the FTC kept the issue in its portion of the joint status report only to state that it "may"  seek  such an inspection in the future.  Should the FTC actually make a Rule 34(a) inspection request, Meta will respond more fully.  For now, Meta notes that inspections related to information that has been produced are extremely disfavored.  *See, e.g.*, *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003) (requiring a district court to vacate its order granting a Rule 34(a) inspection because such a

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

remedy was inappropriate absent a finding that the defendant failed "to comply properly with" a

discovery request).

5.    **There Is No Dispute About the FTC's Requests for Production of Data**

The FTC's discussion of its Second Set of Requests for Production – which seek an

immense volume of data from Meta – is gratuitous given that there is no ripe dispute regarding

those requests, and is misleading about the work Meta has already done – and has agreed it will

continue to do – to respond to those requests.

*First*, the FTC fails to acknowledge the enormous burden posed by these Requests, which

include more than 300 requests for data in the guise of forty-five RFPs.  Those requests ask Meta

to produce complex and voluminous data spanning more than a decade and covering, variously,

Facebook Blue, Instagram, WhatsApp, Messenger, and Audience Network.  The majority of the

requests ask for the data broken down into multiple time intervals – sometimes seeking huge

quantities of data broken out by month, week, day or even hour – and cut by numerous user

attributes and surfaces (which the FTC defines as the medium on an app through which a user

interacts with content), including mutually exclusive combinations of those attributes and

surfaces.

Responding to these hundreds of requests is incredibly burdensome not only to produce

but also to investigate for the purpose of identifying potentially responsive data.  The vast

majority of the requests require Meta to aggregate data and join multiple data tables that Meta

does not aggregate or join in the ordinary course of business.  The requests require Meta to

identify and consult with subject-matter experts to understand what data exists, where it is

located, and how it can be retrieved; to write the code (in many cases, thousands of lines)

necessary to run complex queries; to run those queries over millions to up to hundreds of billions

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

or even trillions of rows of data, depending on the RFP, and to check those queries for errors; and, finally, to load and transmit the data to the FTC.  Moreover, running these queries uses vast amounts of computing power and storage, requiring Meta's data scientists to devote considerable time to monitoring the process to make sure it runs correctly and to correct any problems that occur along the way.  The lengths of time for which the FTC has requested data often require retrieving data from archival storage, which further increases the burden and time associated with producing them.  To date, Meta estimates that its data scientists devoted to this matter have spent well in excess of a thousand hours responding to these requests, and members of its product teams have spent many additional hours supporting that effort.  Meta expects to have to dedicate thousands more hours of employee time to finish responding to the FTC's data requests.

*Second*, the FTC's complaint about "Meta's slow pace of data production" is disingenuous.  Jan. 30 JSR at 9.  Although the FTC correctly states that it served its Second Set of Requests for Production on July 12, 2022, the FTC then failed to meet and confer with Meta about the scope of those Requests until October, contrary to this Court's Joint Scheduling Order. *See* Ltr. from K. Fetterman to S. Musser (Sept. 19, 2022); Joint Scheduling Order ¶ 10, ECF No. 103.  Since the FTC finally began engaging with Meta about the Requests, Meta has worked diligently to respond to them, and has met and conferred with the FTC at least nine times to provide updates on the status of that work and to answer the FTC's questions.  Meta has already produced data responsive to approximately a dozen of the FTC's requests and is working to substantially complete its production on the schedule to which Meta and the FTC have agreed. The fact that Meta has not produced data as quickly as the FTC would like is due to the vast scope of the FTC's requests and the FTC's numerous follow-up questions and supplemental requests, and not to any lack of effort on Meta's part.

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

6.     **There Is No Dispute About Meta's Production of Documents
Responsive to the FTC's First RFPs**

There are no disputes about Meta's production of documents in connection with the

FTC's First Set of Requests for Production of Documents ("First RFPs").  As Meta previously

explained to the FTC and the Court, consistent with its obligations under the Federal Rules of

Civil Procedure, Meta will continue to review its production of documents in response to the

First RFPs, with the goal of ensuring that all responsive and non-privileged documents have been

produced.  If Meta identifies any additional documents that should be produced, it will, of

course, supplement its production as appropriate.

On December 30, 2022, Meta informed the FTC that its vendor inadvertently omitted

from Meta's standard review process documents that were previously collected for

responsiveness and privilege review in connection with the FTC's First RFPs.  Meta notified the

Court of this inadvertent vendor error at the last status conference on January 5, 2023.  The FTC

misrepresents that Meta has not provided the FTC with an "estimate for when this review and

production will be completed."  Jan. 30 JSR at 9.  Meta provided the FTC with that estimate on

January 25, nearly a week ago.  Meta anticipates substantially completing production of

responsive, non-privileged documents from this set by February 15, 2023.  Meta anticipates

providing an updated privilege log by March 1, 2023.

The FTC for the second time unfairly complains that Meta continues to reproduce

documents that Meta produced in *Klein v. Meta Platforms, Inc.* ("*Klein*"), No. 3:20-cv-08570-JD

(N.D. Cal.), after the December 7 substantial completion deadline for the First RFPs.  *See* Joint

Status Report at 27, ECF No. 227 (Dec. 15, 2022) (Meta's response to the FTC's identical

complaint about Meta's December *Klein* reproductions).  As Meta previously explained to the

FTC, one of the RFPs that the FTC chose to issue seeks reproduction of documents produced in

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

*Klein*.  Because productions are still ongoing in *Klein*, Meta has continued in January to make additional *Klein* reproductions in this matter.

      **7.**    **There Is No Dispute About Meta's Pre-Complaint Investigation Privilege Log**

The parties have reached an agreement about a path forward regarding Meta's re-review of certain entries on Meta's privilege log ("Log"), dated September 26, 2020, from the FTC's pre-complaint investigation.  Accordingly, there is no dispute for the Court to resolve as to this issue.

Just as Meta began re-reviewing the two samples of entries drawn by the FTC, pursuant to the Court's November 28, 2022 Minute Order, Meta asked the FTC on December 6, 2022 to disclose what entries were in the total population from which the FTC drew the samples.  The FTC refused.  It claimed that providing the information was unnecessary at that time, and that the FTC was "occupied with numerous other issues at the moment, including deposition scheduling and preparation, preparing the December 15 status report, and reviewing Meta's document production."  Email from D. Matheson (Dec. 7, 2022).  On December 23, 2022, Meta reiterated its request that the FTC disclose the total population of entries from which the FTC drew its samples.  The FTC never provided that information.  *See* Ltr. from M. Scheinkman to J. Moy (Dec. 23, 2022).

To avoid disruption of the fact discovery schedule and burdening the Court, and to make forward progress on resolving the parties' dispute, Meta afterward offered to re-review certain Log entries.  Based on the limited information that the FTC has provided about its samples, Meta believes that the set of entries it has agreed to re-review includes not only the total population of entries from which the FTC drew the Court-ordered samples but also far exceeds that population.  Indeed, Meta is re-reviewing entries related to deponents noticed by the FTC as of January 17,

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

not just entries related to "key witnesses" that the FTC used for its samples, *see* FTC's Statement at 2, ECF No. 221 (Nov. 23, 2023), as well as categories of entries that the FTC requested in the parties' recent negotiations but never briefed or included in its samples.

Specifically, notwithstanding that many of the entries from the Log are irrelevant, or cumulative of information that the FTC already has from the more than 20 million pages that Meta produced in this case and during the FTC's pre-complaint investigation, Meta agreed to re-review, based on a reasonable search, entries that (a) fall into one of the categories that the FTC identified in its November 23 brief on this issue, *see id.* at 1-2, or involve a non-law firm third party, and (b) also relate to a witness who was noticed for a deposition by the FTC as of January 17 (based on Meta's search methodology disclosed to the FTC).  Meta also agreed to the FTC's request that Meta re-review, based on a reasonable search, entries "involving the custodial documents or documents to/from/cc/bcc Mark Zuckerberg, Sheryl Sandberg, Javier Olivan, Kevin Systrom, Mike Krieger, Brian Acton, Jan Koum, Adam Mosseri, Fidji Simo, Alex Schultz, Andrew Bosworth, and the Facebook Board," regardless of whether those entries fall into a category of concern to the FTC.  *See* Ltr. from G. Klineberg to J. Moy (Jan. 17, 2023).

In exchange, the FTC agreed that it would not seek re-review of the entire Log of approximately 330,000 entries, and that it will no longer seek re-review of any additional category of entries from the Log.  Meta also informed the FTC that this agreement is conditional on Meta's understanding that if the FTC makes any one-off re-review requests, Meta will only consider those requests if they are limited in quantity, they include a detailed, entry-specific justification for each one-off request, and Meta is given a reasonable amount of time to respond to each one-off request.  *See* Email from A. Polavarapu to J. Moy (Jan. 23, 2023).

### 8.    There Is No Dispute About Meta's Privilege Log for This Litigation

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

The FTC has not raised any dispute about the initial privilege log for this litigation, which Meta served last week.

9.       **There Is No Dispute About Depositions of Current or Former Meta Employees**

There is no dispute about depositions of current or former Meta employees.  The FTC has noticed 54 depositions of current and former Meta employees, and it has issued three Rule 30(b)(6) deposition notices.  Meta has worked diligently to provide deposition dates that accommodate both the FTC's and the witnesses' schedules and expects the parties to continue working cooperatively regarding deposition scheduling.

Dated: January 30, 2023                    Respectfully submitted,

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

*/s/ Mark C. Hansen*

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Mark C. Hansen (D.C. Bar No. 425930)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Kevin J. Miller (D.C. Bar No. 478154)
Kenneth M. Fetterman (D.C. Bar No. 474220)
Kevin D. Horvitz (D.C. Bar No. 1521032)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
kfetterman@kellogghansen.com
khorvitz@kellogghansen.com
apolavarapu@kellogghansen.com

James P. Rouhandeh (D.D.C. Bar No. NY0390)
Michael Scheinkman (D.D.C. Bar No. NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*