**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

       Plaintiff,

       v.

META PLATFORMS, INC.,

       Defendant.

Case No. 1:20-cv-03590-JEB

**MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL ANSWERS TO
INTERROGATORY NOS. 13 AND 14 REGARDING
THE FTC'S MARKET DEFINITION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

I.    Background and Procedural History ............................................................................ 3

    A.    The FTC Claims PSNS Is Some But Not All of Facebook and Instagram ................ 3

    B.    The FTC Shifts Its Theory and Defines (Nearly) Everything as PSNS ..................... 4

    C.    Meta Seeks the Basis of the FTC's Change in Position ............................................. 5

II.    Argument ..................................................................................................................... 7

    A.    The FTC Must Provide Facts, If Any, To Support The Allegation That Enumerated
Features on "Non-PSNS" Apps Are Not Substitutes For Similar Features On Meta's
"PSNS" Apps ................................................................................................................ 8

    B.    The FTC Has No Valid Legal Basis For Refusing To Provide The Factual Basis For
Its Market Definition Allegations ............................................................................... 13

    C.    The FTC's Failure To Provide The Factual Basis For Its Market Definition
Allegations Is Prejudicial ............................................................................................ 15

CONCLUSION ....................................................................................................................... 17

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*FTC v. Cardinal Health, Inc.*,
 12 F. Supp. 2d 34 (D.D.C. 1998) ................................................................................. 14, 15

*FTC v. Facebook, Inc.*,
 560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................................... 3, 9

*FTC v. Facebook, Inc.*,
 581 F. Supp. 3d 34 (D.D.C. 2022) ............................................................................... 4, 8, 9

*FTC v. Staples, Inc.*,
 970 F. Supp. 1066 (D.D.C. 1997) ............................................................................... 14, 15

*FTC v. Sysco Corp.*,
 113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................................ 14, 15

*FTC v. Whole Foods Mkt., Inc.*,
 548 F.3d 1028 (D.C. Cir. 2008) .................................................................................. 14, 15

*King v. E.F. Hutton & Co.*,
 117 F.R.D. 2 (D.D.C. 1987) .............................................................................................. 16

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
 624 F. App'x 23 (2d Cir. 2015) ....................................................................................... 8-9

*Rail Freight Fuel Surcharge Antitrust Litig., In re*,
 281 F.R.D. 1 (D.D.C. 2011) ............................................................................................. 15

*Rusty Jones, Inc. v. Beatrice Co.*,
 1990 WL 139145 (N.D. Ill. Sept. 14, 1990) ..................................................................... 16

*SEC v. Blackwell*,
 2004 WL 6829614 (S.D. Ohio Jan. 15, 2004) .................................................................. 16

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
 875 F.2d 1369 (9th Cir. 1989) .......................................................................................... 14

*United States ex rel. Dougherty v. Guild Mortg. Co.*,
 2020 WL 3542391 (S.D. Cal. June 30, 2020) ................................................................... 16

*United States v. Marine Bancorporation, Inc.*,
 418 U.S. 602 (1974) ........................................................................................................... 7

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) .............................................................................................. 8

**INTRODUCTION**

The FTC came to this Court with a market definition for "personal social networking services" (or "PSNS") that does not include such commonly known competitors as Twitter, YouTube, and Tiktok, but rests instead on three particular elements, one or more of which nearly all other online services supposedly lack.  Finding that market definition both "idiosyncratic" and "non-intuitive," the Court dismissed the complaint with leave to amend because the complaint lacked even the most basic information as to how market power could be alleged, much less proved.

Back came the FTC, this time with the allegation that Meta had and has a monopoly share of an alleged market that includes some, but not all, features of Facebook and Instagram (and some but not all of the features on Snapchat and MeWe as well).  On renewed motion to dismiss, the Court found this allegation of market power "plausible" – if only barely.

The FTC, in response to Meta's interrogatories, has again changed its position:  it now claims that *every* feature offered on Facebook and Instagram is encompassed within PSNS (Facebook Dating, introduced in 2019, is the sole possible exception).  But *no* features on other existing services (other than Snapchat and MeWe) – even features that are functionally identical to those offered by Facebook and Instagram – are within the alleged PSNS market.  This is a dramatic change from the pleading that survived dismissal, which the FTC has refused to support with facts.  It simply asserts that, for example, watching short form videos on Facebook and Instagram is different from watching the same short form videos on TikTok, YouTube, and other services, such that there is no competition between these functionally identical features on different services.  But as a matter of common sense, there is indeed broad and vibrant feature-

by-feature competition across the array of online offerings, as well over 100 companies have attested in their public filings or other public statements.

In Interrogatory No. 14, Meta asked the FTC to explain the factual bases, if any, for its new assertion. Why, for example, do *none* of the features on Facebook and Instagram compete with *any* of the features on TikTok, YouTube, Twitter, iMessage and Reddit – no matter how similar those features are? And in Interrogatory No. 13, Meta asked the FTC to explain the factual bases, if any, for indicating that the similar or identical features on the other alleged PSNS providers *are* PSNS. Why, for example, is posting a video to Snapchat Spotlight a reasonable substitute for doing the same thing on Facebook or Instagram (while doing the same thing on TikTok or YouTube is not)?

The FTC after much negotiation agreed to provide that explanation, supported by relevant facts, for 100 specific features on Facebook, Instagram, Snapchat, and the other apps. *See* Joint Status Report, ECF No. 227 at 17-18 (Dec. 15, 2022). After making that commitment, in writing, the FTC reneged, stating twenty times in its Supplemental Responses (in relation to all listed features) that "*the FTC has not presently conducted such an analysis comparing the individual features available on [the identified competitor app] and those currently available on Facebook Blue and Instagram*" – failing to provide further meaningful response. *See* FTC's Suppl. Objs. & Resps. to Meta's 2d Set of Interrogs. (Jan. 24, 2023) ("Exh. A") (attached) (emphasis added). In substance, the FTC has staked its case on the dissimilarity of similar features and has flatly refused to provide an answer to Meta's reasonable request that it explain why, with any supporting facts it may have.

Meta asks that the Court order the FTC to fulfill its previous commitment: the FTC should explain with any relevant facts in its possession why the enumerated features on

Facebook and Instagram are or are not reasonable substitutes for similar – if not identical –

features on other applications.  The FTC should identify its factual basis for asserting, for

example, that interest-based groups on Reddit are not reasonable substitutes for interest-based

groups on Facebook, that viewing short-form videos on TikTok is not a reasonable substitute for

viewing short-form videos on Instagram Reels, and so forth.  And the FTC should explain with

relevant facts in its possession why the enumerated features on alleged PSNS providers like

Snapchat *are* reasonable substitutes for the similar activities (or other PSNS activities) on

Facebook or Instagram.  As the parties head into an intense period of non-party discovery in the

remaining 12 weeks provided for that discovery, it is essential for Meta to know what the FTC is

actually contending, so that it can frame appropriate discovery from the dozens of non-parties

whose depositions have been noticed or likely will be noticed.  This information is pivotal to the

development of Meta's defenses.  And if the FTC still has no factual basis for its shifting sands

market allegations, then this case should not proceed.

## I.    Background and Procedural History

### A.    The FTC Claims PSNS Is Some But Not All of Facebook and Instagram

The FTC's original complaint alleged that Meta has had "in excess of 60%" of the market

for "personal social networking" services since at least 2011.  Compl. ¶ 64, ECF No. 3.  The

Court granted Meta's motion to dismiss, based on the FTC's failure to plausibly allege power in

this contrived "market."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 14 (D.D.C. 2021)

("*Facebook I*").  The FTC thereafter filed an Amended Complaint, in which the FTC expressly

distinguished "personal social networking" from "other types of activities" provided by

Facebook and Instagram, and argued that Meta nevertheless had monopoly power in PSNS.  Am.

Compl. ¶ 178, ECF No. 82; *see id.* ¶ 179; *see also*, *e.g.*, *id.* ¶ 202 (assuming "*arguendo*, that half

of the time that U.S. users spend on Facebook Blue and Instagram was not in fact spent using personal social networking services").  The Court held that the FTC had plausibly alleged that Meta possesses monopoly power in the PSNS market, while noting that time spent on Facebook and Instagram includes non-PSNS usage, as the FTC had itself indicated.  *See*, *e.g.*, *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48 (D.D.C. 2022) ("*Facebook II*") ("It is correct, as the Court previously acknowledged, that data measuring the amount of time users spend on Facebook (and on other PSN service providers) *likely captures time not spent engaging with a PSN service – e.g.*, watching a movie trailer embedded on the official page of the movie – given how the FTC defined the market." (emphasis added)); *id.* at 49 ("[P]assively viewing a music video [on Facebook or Instagram] . . . falls outside of the market definition.").  Thus, the Court relied on the Amended Complaint's allegations that not all of the time spent, or features enjoyed on Facebook and Instagram, falls within the alleged relevant antitrust market.

**B.**     **The FTC Shifts Its Theory and Defines (Nearly) Everything as PSNS**

In response to discovery, the FTC initially stuck to its position that only a few features or activities on Facebook and Instagram are PSNS.  Its Supplemental Response to Meta's Interrogatory No. 10 identified nine features on Facebook and Instagram – such as viewing a friend's profile on Facebook – that "fully and directly" reflected "its current understanding of what is 'in'" the alleged PSNS market on Facebook and Instagram.  FTC's Opp. to Mot. to Compel at 1, ECF No. 157.  The list did not include most of what users do on Facebook and Instagram, including any activities on Facebook Groups, Facebook Watch, Facebook Reels, Instagram Reels, Facebook Marketplace, Instagram Shops, Facebook Dating, or most of the activities now at issue.  The FTC, however, refused to state which of these activities do *not* count as PSNS.

Meta accordingly moved to compel a further response to Interrogatory No. 10, and this Court granted that motion over the FTC's strenuous objections that such inquiry was "premature" and best left for expert analysis.  The Court directed the FTC to categorize features or activities (which Meta would enumerate) "as included or excluded from the definition of 'personal social networking.'"  ECF No. 165, at 2; *see also* ECF No. 206-1 (Meta Platforms, Inc.'s List of Features or Activities for Classification by the Federal Trade Commission).

The FTC's response to Meta's list produced a dramatic shift.  The FTC now asserted that *all* activities on Instagram and Facebook (with the *possible* exception of Facebook Dating) – are within the PSNS market.  *See* FTC's Resp. to Meta's List of Features or Activities at 2 (Sept. 12, 2022) (Exh. B) (attached).  The FTC also asserted that no activities on WhatsApp or Facebook Messenger are PSNS other than viewing and posting stories on Facebook Messenger.  *See, e.g.*, *id.* at 14-15, 35-39, 41-42 (indicating that sending a message to one other user or to a group of "200 or more other users" using Instagram Direct or Facebook Chat is PSNS, but those same activities on WhatsApp and Facebook Messenger are not PSNS, and that posting and viewing stories on Facebook Messenger is PSNS, but posting or viewing statuses on WhatsApp is not).

C. **Meta Seeks the Basis of the FTC's Change in Position**

Meta promptly served two Interrogatories (Nos. 13 and 14) requiring the FTC to state, as to each feature of a Meta product that allegedly constitutes "personal social networking," "whether use of that feature or activity or similar feature or activity counts as time spent using a 'personal social networking service' when the feature or activity is used or performed on" the other apps identified in the Amended Complaint (Strava, LinkedIn, iMessage, Twitter, Reddit, Pinterest, YouTube, Spotify, Nextdoor, Netflix, Hulu, TikTok, Snapchat, Google+, MeWe, Path,

Friendster, Myspace, or Orkut), "and explain why or why not." Meta's 2d Set of Interrogs. to FTC No. 14, at 7-8 (Oct. 17, 2022) (Exh. C) (attached).

As explained in the parties' December 15, 2022 joint status report, the FTC agreed it would supplement its responses to Interrogatory Nos. 13 and 14 with specific facts relating to specific features or activities that Meta would identify. Under this agreement, Meta was to provide the FTC with a list of 100 features or activities on specific non-Meta apps that are similar to the features and activities that the FTC classified as PSNS when they occur on Facebook or Instagram. For example, Meta asked the FTC to explain, with relevant facts, why "[v]iewing Reel(s) [on Instagram] posted by a celebrity" qualifies as using PSNS, when viewing the same type of videos posted by a celebrity on TikTok does not. And Meta asked why viewing a video on Snapchat Spotlight posted "by an account that User does not follow" (such as a celebrity) *does* qualify as PSNS, as does the similar activity on Instagram Reels. Meta's List of Features or Activities for Explanation by the FTC, at 14 (Dec. 20, 2022) (Exh. D) (attached). The FTC agreed that its responsive "explanations [would] include details and any relevant facts on why the FTC classifies the two activities similarly or differently." Joint Status Report, ECF No. 227 at 18; *see also id.* at 8. Because the FTC had agreed to provide responsive information, Meta did not seek relief from the Court.

But five weeks later, when the FTC provided its supplemental responses, it provided *none* of the information it had promised. It simply asserted that it had no answer to give: stating (twenty times) that it "has not presently conducted such an analysis comparing the individual features available on [the identified competitor app] and those currently available on Facebook Blue and Instagram." *See* Exh. A. Taken at face value, this amounts to the striking admission that the FTC has no basis whatsoever for the critical distinctions on which its new market

definition rests.  Merely stating that any features on the products it alleges are PSNS are, by definition, PSNS while any identical or similar features on the products it alleges are *not* PSNS are, by definition, not PSNS, is no answer at all.  The FTC has not addressed, in any way, the relevant features or their substitutability.  If the Emperor has clothes, it has been adamantly unwilling to display them.

After Meta raised this deficiency in the parties' January 30, 2023 Joint Status Report, the Court ordered the parties to provide written support for their positions.

## II.    Argument

There can be no antitrust case without a properly defined relevant antitrust market. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974).  Yet the FTC here has tied itself in knots to try to define one.  It first asserted that only activities resting on "[t]hree key elements distinguish personal social networking services from other forms of online services." Compl. ¶ 166; *see also id.* ¶¶ 167-169 (alleging that PSNS are "built on a social graph"; "include features" used to "interact with personal connections and share . . . personal experiences in a shared social space"; and "include features that allow users to find and connect with other users").  Although Meta believes that this definition is contrived and that Meta faces fierce competition for all of its services, logically, things that do *not* employ these supposedly distinctive hallmarks must fall outside PSNS.  From the outset Meta has contended that many if not most of the features on Facebook and Instagram are distinct from the three supposedly defining characteristics, and face vigorous competition from many firms the FTC excludes from its definition.  The FTC at first agreed – and on this basis argued in effect that whether or not YouTube competes with Facebook Watch, YouTube does not compete with Facebook's PSNS features; whether or not Reddit competes with Facebook Groups, Reddit does not compete with

Facebook's PSNS features; whether or not TikTok competes with Instagram Reels, TikTok does not compete with Facebook's PSNS features – and so on.  *See, e.g.*, FTC's Opp. to Mot. to Dismiss at 26, ECF No. 59 (arguing that such exclusion does not matter because "relevant markets are routinely defined to include less than everything a defendant sells"); *see, e.g.*, FTC's Opp. to Mot. to Compel at 1, 8, ECF No. 157 (stating that the nine activities the FTC identified on Feed, Timeline, Stories, and People You May Know or Discover "fully and directly" reflected "its current understanding of what is 'in'" the alleged PSNS market on Facebook and Instagram).

The FTC has since abandoned that argument.  It now insists that Facebook Watch, and Facebook Groups, and Instagram Reels – and every other feature on every other alleged PSNS application – are integral parts of PSNS, while the same or similar features of other services are not.  *Why* that is so, and any facts that support the distinction, is what the FTC is assiduously seeking to obscure – first by promising to answer and then not answering at all; and now by resisting the instant motion.

A.    **The FTC Must Provide Facts, If Any, To Support The Allegation That Enumerated Features on "Non-PSNS" Apps Are Not Substitutes For Similar Features On "PSNS" Apps**

This Court should order the FTC to explain why and provide any facts it may have that support its assertion that analogous features offered by competing apps are not in the same relevant product market.  To establish its claim under Section 2 of the Sherman Act, the FTC must prove that Meta "has monopoly power in a relevant market."  *Facebook II*, 581 F. Supp. 3d at 43.  The alleged market "must include all products 'reasonably interchangeable by consumers for the same purposes,'" *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001), "because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level," *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F.

App'x 23, 28 (2d Cir. 2015).  Identifying such competitive constraints is critical here as users can do many different things on Facebook and Instagram, ranging from "engaging with specific interest-based Facebook pages or groups," to "passive[ly] consum[ing] online video," *Facebook I*, 560 F. Supp. 3d at 19 (first alteration in original), to "watching a movie trailer embedded on the official page of the movie," *Facebook II*, 581 F. Supp. 3d at 48.

The FTC has refused to explain (or apparently even to consider) why features on alleged non-PSNS applications are not reasonable substitutes for similar or identical features on alleged PSNS applications.  *See* Exh. A.  Rather than disclosing this critical information or providing *any* facts to address it – as it agreed to do – the FTC simply restates the *allegation* from the Amended Complaint that the entire app at issue is not PSNS, without reference to any particular feature. The FTC then states that "[o]rdinary course records and other evidence support the FTC's understanding," *id*. at 22, citing a few documents that do not address the features in question or their substitutability.  In many cases, the documents say nothing about competition at all, and include a generalized description of one feature that may be offered on the application.  In other cases, the documents include a generalized statement about competition between the companies, but not the feature identified.  They provide no answer at all to Interrogatory No. 14.

For example, Meta asked the FTC to explain why "[P]osting content in a [Facebook] Group User joined based on the User's interests, such as the 'Slow Cooker/Instant Pot Recipes' Group," is not a reasonable substitute for "Posting content in a Community on Reddit User joined based on the User's interests, such as the 'Instant Pot' Community."  The FTC's response states in full:

> Reddit presents a user experience dedicated to the broadcast or discovery of content based on users' interests, rather than maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space.  *See,*

> *e.g.*, SAC ¶ 174 (distinguishing personal social networking services from online services focused on the broadcast or discovery of content based on users' interests rather than their personal connections, such as Reddit).  Ordinary course records and other evidence support the FTC's understanding.



Exh. A at 51.

Neither the FTC's brief description nor the cited documents provide any explanation for why the two features *are not reasonable substitutes*.  The narrative does not distinguish an interest-based Group on Facebook – which includes individuals with no pre-existing relationship or connection – and similar interest-based communities on Reddit.  The first cited document observes only that Reddit offers "█████████" content, saying nothing about whether such content is a reasonable substitute for the interest-based content on Facebook Groups.  On the contrary, the cited document ███████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████  The second cited document quotes ██████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██

The FTC's response thus provides *no* factual basis or explanation as to why the identified Reddit feature is or is not a reasonable substitute for viewing interest-based content on Facebook Groups.  And Meta cannot begin to speculate as to the FTC's rationale or factual basis, because ▆▆▆▆▆ and Meta's understanding and other competitors' understanding – as reflected in ordinary course documents – is that the two features fiercely compete.  *See*, *e.g.*,

All of the FTC's responses relating to alleged non-PSNS apps (Interrogatory No. 14) are similarly deficient.  For example, Meta asked the FTC to address multiple features on TikTok, such as "[v]iewing videos posted on TikTok by a celebrity User follows" compared to "viewing [videos on Instagram Reels] posted by a celebrity . . . User follows."  Exh. D at 2.  The FTC responded with a conclusory statement about TikTok generally and citations to three documents unrelated to Reels, created before Reels even launched in the United States (in some cases by close to two years).  The response does not address the features identified nor their

11

substitutability.  Again, Meta does not understand the FTC's basis for asserting that the features
are not reasonable substitutes, as both Meta and ▮▮▮▮▮ understand that the opposite is true.  *See,*
*e.g.,* 

*see also* ▮▮▮▮▮

        The FTC's responses relating to features Meta identified on other alleged PSNS apps
(Interrogatory No. 13) are equally deficient.  For example, Meta asked the FTC to explain why
"[v]iewing video(s) on Snapchat Spotlight posted by an account that User does not follow, and
that does not follow User" is PSNS similar to "[v]iewing Reel(s) [on Instagram Reels] posted by
an account that User does not follow, and that does not follow User."  Exh. D. at 14.  The FTC
responded with a conclusory statement about Snapchat generally and citations to testimony
describing Snapchat shortly after 2012, and two documents created in 2014 and 2017, over six
years and three years before the listed feature on Snapchat was even created.  The FTC then
stated it "continues to examine the extent to which users view and experience Snapchat as a
mobile messaging or other type of application, as opposed to or in addition to a personal social
networking service," with related citations to documents and an article from 2016 describing
how teen users switch away from iMessage to message friends over Snapchat.  Exh. A at 34-36.
But this response does not address the features identified nor explain why the listed feature on

Snapchat is PSNS.  And Meta does not understand the FTC's basis for the classification because, Snapchat has represented to investors that it "certainly compete[s]" not just with Instagram but also with alleged non-PSNS providers including, "TikTok" and "YouTube for video entertainment," Snap Inc., Q4 2021 Earnings Call Tr. (Feb. 3, 2022), http://bit.ly/3ITvdll, and it is widely understood (and reported) that ███████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████

Other representative examples of the FTC's deficient responses are set forth in Appendix A.

### B.      The FTC Has No Valid Legal Basis For Refusing To Provide The Factual Basis For Its Market Definition Allegations

The FTC cannot avoid providing the requested factual basis for its market definition allegations by citing to prior cases in which courts found evidence to support a market definition that apparently included multiple products.  Even if those cases were apposite – and they are not – they stand for the proposition that such a market definition is potentially cognizable *where supported by evidence*.  If the FTC is asserting a similar type of market in this case – and so far the FTC has not said, one way or another – that simply underscores the need for the FTC to disclose the basis for any such claim and any facts that support the claim.

In any event, the cases the FTC has cited do not support its approach here.  In the latest Joint Status Report, the FTC cited four cases as support for excluding from the relevant market such features "that were similar or even exactly like the included products."  Joint Status Report, ECF No. 237 at 26 (Jan. 31, 2023).  Each is inapposite as – unlike here – they all involved an

alleged market for the distribution of products, rather than the products themselves. *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039-41 (D.C. Cir. 2008) (distribution of natural and organic groceries at retail); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27-30 (D.D.C. 2015) (distribution of food and related supplies at wholesale by broadline distributors); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46-49 (D.D.C. 1998) (distribution of prescription drugs at wholesale); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1080 (D.D.C. 1997) (distribution of consumable office supplies at retail).  No one would dispute that an apple is the same no matter where it is purchased.  But that does not mean that distribution of an apple from a broadline distributor like Sysco is a reasonable substitute for distribution of an apple from a clubstore like Costco.  That question turns on whether the pricing of apples at Costco constrains the pricing of apples offered by a broadline distributor, which is an *empirical* question – a matter of factual evidence, not mere assertion.

All of these cases turn on their facts – not the FTC's sweeping proposition that it can simply assert without explanation or evidence.  For example, the FTC prevailed in *Sysco* by explaining its theory – that the "product breadth," and multitude of service options, including "next-day delivery," and the ability to save costs by "aggregat[ing] a substantial portion of their purchases with one distributor," that were uniquely offered by broadline distributors allowed them to price at levels above those charged by club stores, because those unique services were "crucial" to meeting their customers' business needs.  *Sysco*, 113 F. Supp. 3d at 16, 27-30; *cf. Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) (the fact that home centers were perceived as distinguishable from other retailers based on the fact they offer "one-stop shopping," which was important to customers, was "wholly inadequate" to exclude other retailers from the market, since it does not support a finding that those other

14

retailers "selling house paint are unable through price reductions or other marketing strategies to lure significant numbers of do-it-yourself builders into buying paint at a specialty store even if they purchase all their other supplies at a home center").

Here, the FTC asserts that the relevant market includes product features on Facebook and Instagram but not the same or similar features that are available on other apps.  And they are available without cost or inconvenience:  a user can instantly and costlessly access a plethora of apps merely by clicking on a phone screen.  If the FTC has a theory that makes this case similar to *Sysco* or *Staples* or *Whole Foods or Cardinal Health*, it should be required to explain it *and* support it with any facts it now knows.  In no case cited by the FTC, or found by Meta, has a government plaintiff been allowed to obfuscate a critical aspect of its case until after the close of fact discovery.

### C.     The FTC's Failure To Provide The Factual Basis For Its Market Definition Allegations Is Prejudicial

The FTC's failure to explain its theory (beyond saying "it's different on Facebook and Instagram") and disclose the facts that it may use to support it is prejudicial to Meta's ability to defend itself, and specifically its ability to pursue relevant non-party discovery and expert testimony.  That discovery and expert work will necessarily be targeted to the claims asserted by the FTC.  Because we now do *not know* what the FTC's theory is for distinguishing, say, Tiktok videos from Instagram Reels, we are left to guess what evidence we might need to develop to undermine it.  And because we do *not know* what facts the FTC has to support any theory that distinguishes identical or similar features, we cannot challenge those facts or develop other facts that put them in a different light.  In short, we are left to shadow box, which is highly unfair.  This cannot be left to the expert phase of the case, which will occur only after fact discovery has been completed.  *See King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 5 (D.D.C. 1987) (a party is not

excused from fully responding to an interrogatory with the information in its possession based on its asserted need "to consult with an expert" before answering interrogatories). Courts routinely reject attempts to disguise non-answers with flurries of tangential information. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 281 F.R.D. 1, 3, 7 (D.D.C. 2011) (ordering response to an Interrogatory and explaining, "[i]f the question is how fast were you going when you hit the other car, a narrative answer that speaks of the accident but does not mention how fast the person answering was driving would not comply [with] that person's obligation to answer the question").

The FTC began investigating this case roughly four years ago. It has analyzed tens of millions of pages, taken hundreds of hours of testimony, interviewed roughly 175 individuals across its three investigations, and has subpoenaed approximately 160 companies. The FTC should have settled on its theory as to the relevant antitrust market, and the factual support for that theory, before it ever filed this case. *See SEC v. Blackwell*, 2004 WL 6829614, at *3 (S.D. Ohio Jan. 15, 2004) ("The Commission is . . . not in the same position as an ordinary civil litigant that has yet to commence discovery . . . [as] it has the benefit of having conducted a lengthy investigation," and there is no reason to delay a response to the Interrogatory because "[it] should have, in fact [was] required to have, adequate information to support the contentions in its Complaint."); *see also United States ex rel. Dougherty v. Guild Mortg. Co.*, 2020 WL 3542391, at *5 (S.D. Cal. June 30, 2020) (ordering government plaintiff to respond to interrogatory prior to the conclusion of fact discovery, and explaining that the "Government's two-year statutory investigation should have enabled it to identify the specific allegations . . . as soon as discovery commenced"); *Rusty Jones, Inc. v. Beatrice Co.*, 1990 WL 139145, at *2 (N.D. Ill. Sept. 14, 1990) (ordering plaintiff to promptly respond to interrogatories where it had

access to thousands of pages of documents prior to initiating complaint). After multiple, inconsistent stabs at the dispositive issue of market definition, and now in the waning days of fact discovery, the FTC should not be permitted to further evade its responsibility to provide the critically important, reasonable, and non-burdensome information Meta seeks. If it is the FTC's position that Instagram Reels is not a substitute for TikTok – or that Facebook Groups is not a substitute for Reddit; or that Facebook Watch is not a substitute for YouTube; and so forth – the time has come for the FTC to explain why and show its factual cards, if it has any.

## CONCLUSION

Meta respectfully requests that the Court order the FTC to (1) promptly provide a complete answer to Interrogatory No. 13, that provides relevant facts as to why identical or similar features of alleged PSNS apps are both in the alleged PSNS market; and (2) promptly provide a complete answer to Interrogatory No. 14, that provides relevant facts as to why identical or similar features of alleged non-PSNS apps are not reasonable substitutes for the identified identical or similar features on Facebook and Instagram.

Dated: February 24, 2023

/s/ *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Kevin D. Horvitz (D.C. Bar No. 1521032)
Alex A. Parkinson (D.C. Bar No. 166695)
Hilary M. Weaver*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900

*Counsel for Defendant Meta Platforms, Inc.*

*Application to D.C. Bar Pending

17

| Appendix A | | |
|---|---|---|
| **Product Offering Comparison** | **FTC Citations** | **Reason Response is Deficient** |
| (1) Viewing . . . content in a Facebook Group focused on a . . . neighborhood" (FTC classification: PSNS)<br><br>(2) "view[ing] content in User's immediate neighborhood" on Nextdoor (FTC classification: Not PSNS) | ███████████████ ███████████████ Nextdoor, www.nextdoor.com ("The only way to instantly connect to the people, businesses, and happenings near your home."). | The FTC's documents say nothing about the features at issue.  Documents that do address them ███████████████ ███████████████ Nextdoor Holdings, Inc. Annual 10-K for Report for fiscal year 2022 (describing competition with Facebook and Instagram); ███████████████ ███████████████ |
| (1) Viewing content on Shops for You on Instagram Shops (FTC classification: PSNS)<br><br>(2) Viewing Product Pins on Pinterest's Shop Tab (FTC classification: not PSNS) | ███████████████ ███████████████ What is Pinterest?, https://help.pinterest.com/en/guide/all-about-pinterest ("Pinterest is a visual discovery engine for finding ideas like | The FTC's narrative response and cited documents do not purport to address the features or their substitutability.  The three excerpts are a generalized statement in an email that notes that ███████████████ a website tagline that Pinterest is a "visual discovery engine," and a ████████.<br><br>Documents that do address listed features indicate that ███████████████ *See, e.g.,* ██████ |

| | | |
|---|---|---|
| | recipes, home and style inspiration, and more."). |  |
| (1) Viewing Reel(s) [on Instagram Reels] posted by a celebrity . . . User follows that does not follow User. (FTC classification: PSNS)<br><br>(2) Viewing YouTube Shorts posted by a celebrity User subscribes to who does not subscribe to User. (FTC classification: not PSNS) | | The FTC's documents say nothing about the features at issue.  They were all created before the listed feature (YouTube Shorts) was even launched in the United States.<br><br>Documents that do address the listed features recognize                                   *See, e.g.,* |