## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**META PLATFORMS, INC.**

Defendant.

Civil Action No. 1:20-cv-03590-JEB

**Plaintiff Federal Trade Commission's Memorandum of Law in Opposition
to Defendant Meta Platforms, Inc.'s Motion to Compel Answers to Interrogatory Nos. 13
and 14 Regarding the FTC's Market Definition**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

I.  Meta's Motion Rests on a Misguided Understanding of Antitrust Principles ..................... 4

II.  The FTC Responded in Full to the Propounded Interrogatories, and Explained with Supporting Evidence, that PSNS are a Distinct Product Offering and Qualify as a Relevant Market. ...................................................................................... 7

    A.  The FTC's Responses Are Comprehensive and Fully Responsive .......................... 7

    B.  Individual Feature Substitution is Not Relevant to the FTC's Contentions ........... 11

III.  Meta Has All the Information It Needs to Conduct Discovery ......................................... 15

IV.  The FTC Has Not Changed its Position or Reneged on Past Commitments ..................... 16

# TABLE OF AUTHORITIES

## Cases

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................ 4, 5, 6

*Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451 (1992) ........................................ 6

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ........................................... 6, 13

*FTC v. Meta Platforms, Inc.*, No. 22-4325 (N.D. Cal. Feb. 3, 2023) ........................................ 5

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .......................................................... 5

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ........................................................ 5, 13

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000).................................................... 6

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)...................................................... 5, 6, 13

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) .................................. 6, 11, 12

*Klein v. Meta Platforms, Inc.*, No. 20-8570 (N.D. Cal. Jan. 19, 2023) ........................................ 4

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)................................................ 5

*United States v. Bertelsmann SE & Co. KGaA*, No. 21-02886, 2022 WL 16949715
   (D.D.C. Nov. 15, 2022)........................................................................................................ 4

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 26 (D.D.C. 2011) ................................... 4, 11

## Other Authorities

P. Areeda & L. Kaplow, Antitrust Analysis (4th ed. 1988)........................................................ 6

Richard Posner, Antitrust Law: An Economic Perspective (1976) .............................................. 6

**INTRODUCTION**

The Court should not require the FTC to provide any further response to Meta's interrogatories, because the FTC's multiple detailed responses have fully explained its contentions and identified evidence that supports them.  For the sake of transparency, the FTC will explain again.  The FTC alleges a market for personal social networking services ("PSNS") that "consist[s] of online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space."  SAC ¶ 166, ECF No. 81.  The FTC further alleges that Meta provides PSNS through Facebook and Instagram, and that PSNS reflect integrated services centered on friends and family, and not, as Meta suggests, a balkanized set of individual activities and features.  *See* SAC ¶¶ 178-79; FTC's Suppl. Resps. & Objs. to Meta's Second Set of Interrogs. (Ex. A) at 16 (citing various other occasions in which the FTC explained the same).

The market definition question in this case is whether consumers lack sufficient alternatives to the PSNS offered by Meta.  The FTC has provided comprehensive interrogatory responses, citing to dozens of ordinary course documents and other evidence, supporting the existence of such a service on Facebook, Instagram, and seven other (now mostly defunct) applications, and the absence of such a service on twelve applications.  *See* Ex. A; FTC's Resp. to List of Features or Activities (Ex. B); FTC's Suppl. Objs. & Resps. to First Interrogs. (Ex. C); FTC's Suppl. Objs. & Resps. to Interrog. 15 (Ex. D).

Meta's motion seeks to disregard the FTC's prior explanations and exhaustive responses based on a misunderstanding (real or pretend) of what the FTC contends.  Meta asks the FTC to "explain with any relevant facts in its possession why the enumerated features on Facebook and Instagram are or are not reasonable substitutes for similar—if not identical—features on other

applications."  Meta's Mem. in Supp. of Mot. to Compel ("Mot.") at 2-3, ECF No. 244-2.  But Meta's preoccupation with purported substitutability between individual features fails to illuminate the market definition question at hand.  Meta complains that the documents on which the FTC's interrogatory responses rely fail to discuss purportedly similar individual features and their substitutability.  *See* Mot. at 9-12.  Far from being irrelevant, those documents underscore the point: they establish a distinct consumer demand for a friends and family social networking service, without regard for purportedly similar specific features on other applications.  Numerous precedents recognize that such evidence supports recognizing a relevant market for personal social networking services.  *See infra* §§ I and II.A.

Meta nonetheless presses on, asking about competition for individual features and activities viewed in isolation and without regard to the relevant market at issue in this case.  To take one example, Meta asks about the substitutability of posting about "Instant Pot" recipes on Reddit and in a Facebook Group.  *See* Mot. at 9.  The relevant question, though, is whether Reddit provides a reasonable substitute for Meta's PSNS.  The answer to that question is "no," as the FTC has explained and supported with ordinary course evidence.  Facebook offers people the "ability to share and experience each of the various features and activities with their social networks of friends, family, and personal connections in a shared social space," including (possibly) discussing "Slow Cooker/Instant Pot Recipes."  *See* Ex. B at 2, 6.  Reddit, by contrast, is an interest-based discussion service ████████████████████████████████████████ ████████████████████████████████████. *See* ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████ Thus, Reddit does

not offer consumers seeking PSNS an alternative to Meta, in general and even as to the action of

discussing "slow cookers."

Even if one were to assume for the sake of argument that a consumer views a Facebook

Group as interchangeable with a Reddit discussion group under certain circumstances for the

purpose of posting about slow cookers, this would show only that the consumer may be able to

turn to Facebook Groups rather than Reddit (or vice versa) when desiring to discuss slow cooker

recipes.  It would not show that the consumer could turn to Reddit rather than Facebook to meet

their demand for PSNS—i.e., their demand for a social networking experience centered around

friends and family.  Thus, Meta is pressing on a question not at issue in the litigation—whether

Facebook Groups and Reddit compete in a market for online discussion spaces.  That question is

not relevant to this case because the FTC has not alleged a separate market for such online

discussion spaces, and that question is not relevant to the PSNS market definition or to Meta's

monopoly power over PSNS.  Meta has no basis to demand that the FTC "explain" to Meta's

satisfaction the answer to an irrelevant contention the FTC is not making.  *See infra* § II.B.

Meta's misleading claims that the FTC has shifted its position are baseless.  The FTC's

position has been consistent, *see infra* § IV, even as it allowed Meta to amend its interrogatories

multiple times to avoid unnecessary disputes.  Notably, Meta cites no cases where a court

ordered plaintiffs to explain further why they excluded firms, let alone individual features, from

an alleged relevant market, particularly after already providing over a hundred pages of detailed

explanation and evidentiary citations.  Indeed, the FTC's efforts go far beyond what Judge

Donato required in the *Klein* action: in that case, the court rejected the same interrogatories from

Meta, holding that the plaintiffs need not provide any response in advance of expert discovery.

*See* Tr. of Status Conference at 38-41 (Ex. E), *Klein v. Meta Platforms, Inc.*, No. 20-8570 (N.D. Cal. Jan. 19, 2023).  This Court should reach the same conclusion.  If Meta's request is entertained at all, the FTC should not be required to respond further until its expert reports are completed: not only is the FTC entitled to complete its assessment of the discovery record before providing further elaboration on its already-complete response to Interrogatory Nos. 13 and 14, but it would be disproportionate to divert the FTC's resources by requiring further burdensome and repetitive explanations that Meta will never accept in any event.

## I.   Meta's Motion Rests on a Misguided Understanding of Antitrust Principles

Meta's motion is based on a misunderstanding of antitrust law and basic principles of market definition.  Market definition "is not an end unto itself," but rather "an analytical tool used to ascertain the 'locus of competition.'"  *United States v. Bertelsmann SE & Co. KGaA*, No. 21-02886, 2022 WL 16949715, at *11 (D.D.C. Nov. 15, 2022) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320-21 (1962)); *see also Bertelsmann*, 2022 WL 16949715, at *18 ("[I]t is critical to remember that the goal of the [market definition] exercise is to enable and facilitate the examination of competitive effects.").  A product market's outer boundaries "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325.  Market definition analysis considers "*both* 'whether two products can be used for the same purpose, *and*, if so, whether and to what extent purchasers are willing to substitute one for the other."  Memorandum Opinion I ("Mem. Op. I") at 26, ECF No. 73 (emphasis in original) (quoting *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 26, 51 (D.D.C. 2011)).

Here, the FTC alleges that Meta has illegally maintained monopoly power over PSNS through its acquisitions of Instagram and WhatsApp.  As to the monopoly power element, the

4

question is whether Meta has monopoly power in its provision of PSNS.  The relevant market analysis of that inquiry involves assessing reasonable substitution for the proposed relevant product when offered under competitive conditions, including whether PSNS are a distinct object of consumer demand over which a firm could exercise market power.

To assess such reasonable interchangeability, courts routinely rely on ordinary course evidence of industry or public recognition and distinct product characteristics.  *See Brown Shoe*, 370 U.S. at 325; *see also, e.g.*, *FTC v. Meta Platforms, Inc.*, No. 22-4325 at 19-21 (N.D. Cal. Feb. 3, 2023) (finding that "[i]ndustry companies' internal communications showing frequent distinctions between various categories of applications is 'strong[] support' of a distinct submarket" and noting that marketing for VR dedicated fitness apps "are often characterized by their fitness-specific features"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 119 (D.D.C. 2016) ("[T]he industry recognizes large B-to-B customers as a separate economic entity.").  The FTC's interrogatory responses identify copious ordinary course evidence, revealing that both Meta and nonparties recognize the peculiar characteristics and uses of PSNS.

Meta's motion wrongly implies that competition and substitutability represent a binary "yes or no" proposition.  But a firm may operate in a relevant market and possess monopoly power even while being constrained to some degree by "outside" options.  The Supreme Court has cautioned that "[f]or every product, substitutes exist.  But a relevant market cannot meaningfully encompass that infinite range."  *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).  Thus, it is well-worn that "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."  *See e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) and

citing *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 47 (D.D.C. 1998)).

Courts regularly find relevant markets within a broader field.  *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008) ("A broad market may also contain relevant submarkets which themselves 'constitute product markets for antitrust purposes.'") (quoting *Brown Shoe*, 370 U.S. at 325).  This is true both when a product offering has alternatives, *see, e.g.*, *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-65 (D.D.C. 2000) (finding a relevant market for loose leaf chewing tobacco even though the court found "some degree of competition between, and overlapping consumer usage of, moist snuff and loose leaf tobacco"), and when individual portions of a product offering have alternatives, *see e.g., Sysco Corp.*, 113 F. Supp. 3d at 30-31 ("[T]he fact that Defendants sometimes compete against other channels of distribution in the larger marketplace does not mean that those alternative channels belong in the relevant product market for purposes of merger analysis.").

Relatedly, it is not a Section 2 plaintiff's burden to establish that the defendant is totally free of competitive constraints, and indeed, expecting such a showing falls prey to the so-called "cellophane fallacy" that was rejected by the Supreme Court more than thirty years ago.  *See Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451, 470-71 (1992) (quoting P. Areeda & L. Kaplow, Antitrust Analysis ¶ 340(b) (4th ed. 1988)) ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power." (emphasis in original)); *see also* Richard Posner, Antitrust Law: An Economic Perspective 127-28 (1976) ("At a high enough price even poor substitutes look good to the consumer. . . . Reasonable interchangeability at the current price but not at a competitive price level, far from demonstrating absence of monopoly power, might well be a symptom of that power[.]").

6

II.     **The FTC Responded in Full to the Propounded Interrogatories, and Explained with Supporting Evidence, that PSNS are a Distinct Product Offering and Qualify as a Relevant Market**

Having corrected Meta's improper framing of market definition, the FTC's responses to Meta's interrogatories are plainly sufficient.  The FTC has already provided the information requested in Meta's interrogatories on multiple occasions.  In response to Meta's Interrogatory Nos. 10, 13, 14, and 15, which all press on the same market definition issues, the FTC has provided 170 pages of explanation and cited more than 80 ordinary course documents, public statements, and sworn testimony showing evidence of a distinct user demand for an online offering through which people can maintain a network of friends and family, and connect and share their daily lives and other experiences with them in a communal setting.  If an application does not provide such an offering, it is neither necessary nor relevant to assess and determine claimed feature-by-feature substitutability between that application and Meta's applications.

**A.  The FTC's Responses Are Comprehensive and Fully Responsive**

The FTC has devoted countless hours and hundreds of pages to explaining its analytical approach to market definition and identifying supportive evidence.  *See generally* Joint Status Report ("Jan. JSR") at 17-28 (Jan. 30, 2023), ECF No. 236-1.  Those responses provide Meta with all the information it demanded in Interrogatory Nos. 13 and 14: (a) identifying which applications (and which features/activities) are part of the relevant market and which are not; (b) explaining how the FTC made its classifications; and (c) identifying supporting evidence.

Months ago, in response to Meta's Interrogatory No. 10, the FTC considered 322 individual features/activities identified by Meta and thoroughly explained its current understanding that many features and activities available on Facebook and Instagram are integrated with both applications' PSNS offerings.  *See* Ex. B at 3 (explaining that "the evidence

presently available to the FTC suggests that the various features/activities identified by Meta for Facebook and Instagram are experienced and perceived by users, and/or are presented to users, as aspects of personal social networking, and users are engaging with that content along with their network of friends, family, and personal connections, built and maintained within the respective applications, and using Facebook's and Instagram's integrated and personalized social experiences").  Thus, the FTC has already explained why it currently views features such as Facebook Watch, Facebook Groups, and Instagram Reels as part of Meta's PSNS offerings, notwithstanding Meta's claimed failure to understand.  *Compare* Mot. at 8 *with* Ex. B at 3 (explaining that each of these features are connected with Meta's PSNS offering).  Likewise, the FTC explained that Facebook Dating appears independent from Meta's integrated PSNS offering because it has been intentionally cordoned off.  Ex. B at 3 (citing and quoting www.facebook.com/dating, which describes Facebook Dating as: "A space just for Dating.  Your Facebook Dating profile and conversations won't be shared with anyone outside of Dating.").

Where Meta's Interrogatory No. 10 asked only for a classification of features and activities as in or out of the market, Interrogatory Nos. 13 and 14 demanded (and the FTC agreed to provide) even more: (1) a classification of features/activities; (2) an explanation of those classifications; and (3) identification of evidence in support of those classifications.  The FTC provided it all, believing it was avoiding disputes and addressing Meta's burdensome requests: i.e., a comprehensive explanation of why various nonparty applications, and specific features and activities purportedly offered by those applications, "do—or do not—qualify as PSNS."  Ex. A at 17 (quoting Meta's portion of the December, 15 2022 Joint Status Report).

Yet despite over 170 pages of explanation and analysis and scores of citations to ordinary-course evidence, Meta claims it does not understand the FTC's alleged market.  This

complaint cannot be taken seriously.  For example, Meta claims that it cannot understand why features of TikTok do not provide a substitute for the personal social networking experience Meta's applications provide to consumers, Mot. at 11-12, but the FTC cited ███████████ ████████ that explain why:

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  This evidence ███████████████████ ████████ supports the FTC's alleged relevant market.  *See* SAC ¶ 174.

Just as it did for TikTok, the FTC examined each of the twelve applications identified in Meta's Interrogatory No. 14, and concluded, with explanation and citation to ordinary course evidence, that each offers users some other service instead of PSNS; that is, these twelve applications do not offer online services that enable and are used by people to maintain personal relationships and share with friends, family, and other personal connections in a shared social space.  Ex. A at 18-19, 37-67 (discussing Hulu, iMessage, LinkedIn, Netflix, Nextdoor, Pinterest, Reddit, Spotify, Strava, TikTok, Twitter, and YouTube).

This is so, even though atomized features on Facebook or Instagram may appear superficially similar to those offered by non-PSNS applications.  This is neither a tautology nor, in light of the evidence the FTC cites, a conclusory assertion.  As the Court has already recognized, "[w]hether due to network effects or the norms around what sort of content is generally posted on different platforms, it is not a stretch to imagine that users are reluctant to share a highly personal milestone on LinkedIn or post a video of their child's first steps to

9

YouTube."  Mem. Op. I at 26.  This is exactly what the evidence cited by the FTC shows.  *See, e.g.*, Ex. A at 42 

The FTC has provided an equally detailed—and consistent—examination and explanation of why each of seven applications Meta identified in its Interrogatory No. 13 do constitute PSNS.  The FTC examined each, and explained that, based on discovery conducted to date, the FTC believes that each enable and are used by people to connect and share with friends, family, and personal connections in a shared social space, and that the identified features and activities all appear to be integrated with that core PSNS offering.  Ex. A at 18, 21-36 (discussing Friendster, Google+, MeWe, Myspace, Orkut, Path, and Snapchat).  The FTC also identified ordinary course evidence supporting its current understanding, and explained that with respect to Snapchat, the FTC continues to examine the extent to which users view and experience the application as a mobile messaging or other type of application, as opposed to or in addition to a personal social networking service.  Ex. A at 35-36.  Even so, to be conservative, the SAC included all of Snapchat in the PSNS market.

The ordinary course records cited above are only a fraction of the evidence summarized in the FTC's interrogatory responses.  *See generally* Ex. A; Ex. B; Ex. C; Ex. D.  Meta ignores or fails to appreciate the legal significance of such evidence, arguing that the cited documents are

not illuminating because they do not expressly explain why various "features are not reasonable substitutes." Mot. at 10. Critically, this misses the point. This evidence is instructive *because* it demonstrates that Meta and other firms recognize a distinct offering for social networking with friends and family, rather than balkanized consumer demand for individual features. In other words, the evidence indicates recognition of a distinct consumer demand for personal social networking services. Such ordinary course evidence, which courts regularly rely on to identify relevant markets, provides persuasive proof that PSNS are a distinct service offering and relevant market. *See, e.g.*, *H&R Block*, 833 F. Supp. 2d at 52 ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."); *see also Whole Foods*, 548 F.3d at 1045 (describing evidence of "industry or public recognition" as "one of the 'practical indicia' the Supreme Court has said can be used to determine the boundaries of a distinct market").

### B. Individual Feature Substitution is Not Relevant to the FTC's Contentions

The FTC alleges a relevant market for PSNS, i.e., an integrated friends and family social networking service. *See* Memorandum Opinion II ("Mem. Op. II") at 10-13, ECF No. 90. As such, the important question is which other products offer reasonable substitutes for the PSNS applications that Meta offers: if users wanted to leave Facebook and Instagram, to what other applications would they turn to maintain a network of friends and family, connecting and sharing with them in a communal space? As the FTC has explained (for example): not YouTube, Reddit, or LinkedIn. Ex. A at 41-42 (LinkedIn), 50-51 (Reddit), 64-67 (YouTube).

Meta refuses to grapple with the FTC's clearly explained contentions and the facts that support them. Meta instead attempts to focus on individual features/activities available on Facebook or Instagram, and insists that the important question is the existence or non-existence

11

of "reasonable substitutability" between those features and other non-PSNS applications.  *See e.g.*, Mot. at 9-10, 19 (asking about posting about slow cookers on Reddit or watching celebrity videos on YouTube).  In effect, Meta is asking whether there may exist distinct relevant markets for community groups—or video consumption or e-commerce—in which Meta and Reddit, or Meta and YouTube, or Meta and an e-commerce application, may compete.  But this is neither a relevant question, nor what Meta's interrogatories request.

That Meta may compete with Reddit in a separate market for online discussion spaces, or with YouTube in a separate market for video consumption, does not negate a relevant market for PSNS or Meta's monopoly power in PSNS.  As described *supra* § II.A, evidence shows that PSNS are a distinct object of consumer demand, regardless of individual features.  Further, even if Meta's PSNS offerings provide some features and activities that others also provide, that does not negate its monopoly power in PSNS.

*First*, as already described, *supra* § II.A, the record is replete with evidence showing that there is a distinct product offering and distinct consumer demand for PSNS, notwithstanding the presence of individual features or activities elsewhere.  Thus, even if non-PSNS applications compete with specific features available on Facebook or Instagram, such competition would not warrant their inclusion in the relevant market.  Indeed, courts have repeatedly rejected Meta's mistaken view of market definition, and have instead excluded products from relevant antitrust markets even when the appearance of individual features or items from the "excluded" products were similar or even exactly like the included products.  *See generally* Jan. JSR at 26-27.  In *FTC v. Whole Foods*, the D.C. Circuit found a premium natural and organic supermarket-only market even though customers purchased the same categories of grocery products from different outlets.  548 F.3d at 1040, 1049.  Judge Brown explained that even though "a customer might

12

buy a stick of gum at a supermarket or at a convenience store does not mean there is no defensible groceries market."  And in *FTC v. Sysco Corp.*, the court found a broadline-only market even though "competitors of all stripes offer[] fungible goods through different but overlapping channels."  113 F. Supp. 3d at 30; *see also Cardinal Health, Inc.*, 12 F. Supp. 2d at 45-49 (finding a wholesale prescription drug market even though other firms sold the same drugs through different distribution channels); *Staples, Inc.*, 970 F. Supp. at 1074-75 (finding an office supply superstore-only market even though many other outlets sold consumable office supplies, which "are undeniably the same no matter who sells them").

Meta suggests that each of these cases is fact-specific, but ignores the key point that each case focuses the market definition inquiry on whether there is a substitute for the total service provided, rather than any individual component therein.  These courts' consistent approach to market definition is illuminating because, just as in these precedents, in this case the FTC has cited evidence that there is a distinct offering and demand for social networking with friends and family, influenced by factors such as the context in which individual features/activities are made available.  *See* Ex. C at 5-11.  This directly parallels the cited cases.  *See, e.g.*, *Sysco Corp.*, 113 F. Supp. 3d at 26 ("[F]ruit can be bought from both a grocery store and a fruit stand, but no one would reasonably assert that buying all of one's groceries from a fruit stand is a reasonable substitute for buying from a grocery store.").

In addition to overlooking the holistic service, Meta's focus on individual features and activities is especially misguided in that it directs attention away from what non-PSNS applications lack: an online offering for connecting and sharing with friends and family in a shared environment.  This misdirects attention from Meta's enduring monopoly power over PSNS, a service that millions of Americans value and which has been enormously lucrative for

Meta.  *See generally* Ex. C at 5-11; *see also id.* at 6 (quoting Meta executive testimony that "the use cases that we've focused on the most over time are helping you connect . . . with your friends and family" and that the value Facebook provides its users is "helping you stay in touch with friends and family and helping you know what's going on with them in a very efficient way"); SAC ¶¶ 2-3, 20 (Facebook and Instagram used by millions in U.S., earning billions in profits); ¶ 212 (Internal Meta document: "Why are we hard to compete with.  Your friends are here.").

*Second*, that Meta has added features (e.g., a video player, a marketplace) over time does not diminish its monopoly power in the relevant market for PSNS, and it does not transform applications such as YouTube and Craigslist into reasonable substitutes for personal social networking.  Imagine, for example, a car company with complete monopoly power in a market for cars decides to add stereos to its vehicles.  The addition of a stereo would not somehow reduce the company's monopoly power, nor would it introduce standalone stereo manufacturers as competitive constraints.  That is, whether car stereos integrated into a car compete with standalone stereos in a separate stereo market is not relevant to an assessment of whether this company has a monopoly over cars.  Meta's products should be viewed similarly.  Individual features or activities may be woven into its integrated services, much like a stereo system may be woven into a car.  But Meta's decisions to integrate new features have not transformed firms that do not provide PSNS into substitutes for PSNS.

This case is about Meta's monopoly power over PSNS, and its maintenance of that power by anticompetitive means.  Accordingly, the FTC has not analyzed whether individual features/activities are reasonable substitutes in other markets apart from PSNS.  The FTC has not, for example, assessed whether Facebook Watch also competes in a market for online video consumption with firms like YouTube, nor has it assessed whether YouTube is a reasonable

substitute for Facebook Watch in such a market.  Meta's demand that the FTC conduct such an

assessment is disproportionate, as that assessment is irrelevant for the reasons discussed above,

and it would require the FTC to gather and analyze information that is not in its possession and

instead resides with nonparties and/or with Meta itself.  This is plainly inappropriate—indeed,

Meta has itself taken the position that ██████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

What the FTC has done, however, is adhere to foundational market definition principles

to assess whether YouTube provides PSNS.  The answer to that question—supported by

overwhelming ordinary course evidence—is a resounding no.  There may be distinct antitrust

markets involving the applications cited by Meta, which in another case, involving different

conduct, might be an area of focus.  Those hypothesized markets are not relevant here, though.

### III.   <u>Meta Has All the Information It Needs to Conduct Discovery</u>

As outlined above, the FTC has described and supported its relevant market allegations in

painstaking detail, including explaining why purportedly similar features do not constrain Meta's

monopoly power in PSNS.  *See also* Jan. JSR at 18-23.  The FTC also explained in great detail

which firms are in the relevant market, which are out, and the reasons why.  There is nothing

more for the FTC to say at this stage, and Meta's claim that it needs more is inaccurate and

unavailing.

Though it strains credulity, if Meta sincerely still does not understand the FTC's market,

then its interrogatories have long since passed the point of uselessness.  The FTC is not

withholding responsive information.  If Meta cannot grasp the FTC's detailed and repeated

explanations, then the forthcoming exchange of expert reports, and deposition(s) of the FTC's

expert(s), will be the proper forum for prodding at the FTC's alleged market.

More likely, Meta simply disagrees with the FTC, and posits that the FTC has failed to

account for other PSNS providers besides those identified in the SAC, or that feature-by-feature

substitution to non-PSNS applications might constrain Meta's monopoly power in the provision

of PSNS.  Meta does not need more information from the FTC to attempt to develop and proffer

facts that might support such arguments.  The FTC has given Meta all that these interrogatories

asked for, and well beyond what is necessary to support an alleged market.  If Meta continues to

quibble with troves of ordinary course evidence and foundational market definition principles,

those questions are more appropriately addressed at summary judgment or trial.

## IV.    The FTC Has Not Changed its Position or Reneged on Past Commitments

Meta's motion should also be denied for the additional reason that it is premised on

multiple mischaracterizations of the FTC's positions.  *See* Mot. at 3-8.

*First*, contrary to Meta's assertions, the FTC's response to Interrogatory No. 10 did not

"dramatic[ally] shift" or "abandon[]" the FTC's relevant market allegations.  Mot. at 5, 8.  The

FTC's complaint alleged that "personal social networking services are the predominant value and

use of Facebook Blue to users."  SAC ¶ 178; *see also* SAC ¶ 179 (describing the same as to

Instagram).  The FTC's response to Interrogatory No. 10 shifted nothing, "dramatically" or

otherwise; it merely elaborated on these allegations with the added benefit of ongoing fact

discovery.  While noting that fact discovery was in its early stages and expert reports are not due

for several more months, the FTC explained in its Interrogatory No. 10 response that it had

classified nearly all of the Facebook and Instagram features/activities identified by Meta as part

of Meta's personal social networking offering largely based on "the connection between the feature/activity and users' ability to share and experience each of the various features and activities with their social networks of friends, family, and personal connections in a shared social space." Ex. B at 2. Meta complains about this explanation based on SAC ¶ 202, which assumed, "arguendo," that only half of the time spent on Facebook and Instagram was in fact time spent using PSNS. *See* Mot. at 3-5. The FTC offered such an assumption, "arguendo," to illustrate just how dominant Facebook and Instagram have been in the last decade; the FTC did not allege that half of time spent on Facebook and Instagram is time spent consuming something other than PSNS.

*Second*, Meta advances the particularly pernicious claim that the FTC "first asserted that only *activities* resting on '[t]hree key elements distinguish personal social networking services from other forms of online services.'" Mot. at 7 (emphasis added). Here, Meta's distortion relies on a deliberate change to a key word in the FTC's complaint. The FTC did not allege that each *activity* must have all three elements. Rather, the complaint alleged that personal social networking *services*, taken as a whole, are characterized by these three elements. SAC ¶¶ 166-69 (alleging that personal social networking services are: (1) built on a social graph; (2) include features used to interact and share with personal connections in a shared social space; and (3) include features that allow users to find and connect with other users). Unsurprisingly, a variety of activities that are central to personal social networking will not involve all three elements at a given time. For example, sharing with friends involves the first element (social graph) and second element (shared social space), but not the third element (tools to find and connect with other users). The FTC explained this to Meta almost nine months ago in another interrogatory response. Ex. C at 19 ("A user may be using personal social networking services even if, in a

17

particular instance, the user is not utilizing each of the three elements of personal social networking services discussed in paragraphs 166-169 of the SAC.").

*Third*, Meta suggests, incorrectly, that the FTC reneged on its agreement to provide the irrelevant analysis Meta now moves to compel. Mot. at 6-7. Yet again, not true. In truth, at Meta's request the FTC agreed to: (i) assess and classify 100 features and activities; (ii) explain and identify evidence relevant to those classifications; and (iii) explain its position that assessing Meta's monopoly power and the relevant market in this case do not require feature-by-feature, or activity-by-activity, assessments. *See generally* Jan. JSR at 20-23. The FTC did exactly as it was asked. Because evidence shows that there is distinct consumer demand for a social networking offering for friends and family, the FTC began its assessment of each feature or activity with a threshold question: whether the application even offers personal social networking services at all. If the answer was "yes," then the FTC considered whether the listed features or activities appear to have been integrated with the application's PSNS offering. If the answer was "no," then the inquiry concluded; without offering a personal social networking service at all, any given feature or activity could not be part of a PSNS.

*Fourth*, Meta claims that the FTC has abandoned its previously held view that "whether or not YouTube competes with Facebook Watch, YouTube does not compete with Facebook's PSNS features." Mot. at 7-8. Again, Meta is wrong. The FTC's position is that it does not matter whether Facebook Watch competes with YouTube in, say, a separate market for online video consumption. The key point is that YouTube is not a constraint on Meta's monopoly over PSNS because users do not regard YouTube's offering as a close substitute for a service whereby users maintain a network of their friends and family, connecting and sharing personal experiences with them in a shared social space. The FTC explained this in its initial response to

Meta's Interrogatory No. 14.  Ex. A at 12 ("[T]he features/activities provided on YouTube are outside the definition of personal social networking because YouTube presents a user experience dedicated to video consumption, rather than maintaining a network of friends, family, and personal connections and sharing experiences with them in a shared social space.").  In its Supplemental Response to Interrogatory No. 14, the FTC provided this same explanation with extensive evidentiary support.  Ex. A at 64-67 (stating that "[t]he FTC's present understanding is that YouTube does not provide personal social networking services and the features/activities identified above are therefore not part of a personal social networking offering" and citing evidence in support).  The FTC reaffirmed its position again as recently as the parties' January Joint Status Report.  *See* Jan. JSR at 28 ("To the extent that Meta needs to hear more from the FTC on this topic, the FTC attempts here to explain again: the FTC does not believe that an application (be it TikTok, Reddit, or another) is offering personal social networking services or is a reasonable substitute warranting inclusion in the alleged PSNS relevant market on account of individual purportedly similar 'features' or 'activities.'").  Thus, rather than "abandon" this argument as Meta alleges, the FTC has repeatedly re-affirmed it.

*Finally*, Meta misleadingly implies that the FTC has ignored the Court's prior statement that "measuring the amount of time users spend on Facebook (and on other PSN service providers) likely captures time not spent engaging with a PSN service."  Mot. at 4.  Meta is conflating the question of, on one hand, which providers are in the market and, on the other, how market shares should be calculated.  The FTC's position is unchanged.  To be in the relevant market, an application must provide PSNS.  That is, it must provide online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space.  SAC ¶ 166.  If an online

application does not provide such services, then it is out of the market because such applications are not regarded by users as a close substitute for PSNS services.

There is a separate question about how market shares should be calculated among those market participants that provide PSNS.  The Court noted that "time spent" may be "imperfect[]" as a measure of PSNS market share, and that data may not exist to calculate what portion of a users' time spent is spent actively consuming PSNS.  Mem. Op. II at 17-19.  To the extent that there is any concern that counting all time spent on Facebook and Instagram overstates their significance as personal social networking providers, the FTC expects at trial (as it did in its complaint) to provide multiple market share metrics (not only time spent) establishing Meta's dominant share of PSNS.  As to time spent, the FTC anticipates its expert(s) will consider whether imperfections in the data likely affect the bottom-line conclusion that Meta's share of PSNS is indicative of monopoly power or whether, as to a metric based on time spent, any type of adjustment is warranted.  *See, e.g.*, Ex. A at 35 ("The FTC continues to examine the extent to which users view and experience Snapchat as a mobile messaging or other type of application, as opposed to or in addition to a personal social networking service"); *see also* Mem. Op. II at 18 (noting that the FTC "is not relying solely on the time-spent data . . . but instead supports [its market share allegations] with MAU and DAU metrics that reinforce the same conclusion").  But these are all issues for expert discovery and remain subject to ongoing investigation.

* * * * * *

Meta has used this discovery fight for months to divert the resource-constrained FTC from preparing its case.  At each turn, just as the FTC believes it has satisfied Meta, Meta moves the goalposts.  Now, after innumerable hours devoted to this discovery dispute, and hundreds of pages of explanation, Meta's requests have been satisfied.  Meta's motion should be denied.

Dated: March 7, 2023                          Respectfully submitted,

                                              */s/ Daniel Matheson*
                                              Daniel Matheson (D.C. Bar 502490)
                                              Krisha Cerilli (D.C. Bar 983281)
                                              Patricia Galvan
                                              Maria Dimoscato (D.C. Bar 489743)
                                              Susan Musser (D.C. Bar 1531486)
                                              Nathan Brenner
                                              Michael Smith (D.C. Bar 996738)
                                              Albert Teng (D.C. Bar 1021115)
                                              Federal Trade Commission
                                              Bureau of Competition
                                              400 Seventh Street, S.W.
                                              Washington, DC 20024
                                              Telephone: (202) 326-2075
                                              Email: dmatheson@ftc.gov

                                              *Attorneys for Plaintiff*
                                              *Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of March 2023, I served the foregoing on the following counsel via ECF:

Mark C. Hansen
Kevin B. Huff
Kenneth M. Fetterman
Geoffrey M. Klineberg
Kevin J. Miller
Aaron M. Panner
Alex A. Parkinson
Ana Nikolic Paul
Aaseesh P. Polavarapu
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, DC 20036
Tel: 202-326-7900
mhansen@kellogghansen.com
khuff@kellogghansen.com
kfetterman@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
apanner@kellogghansen.com
aparkinson@kellogghansen.com
apaul@kellogghansen.com
apolavarapu@kellogghansen.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: 650-858-6000
sonal.mehta@wilmerhale.com

David Gringer
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-230-8800
david.gringer@wilmerhale.com
James P. Rouhandeh
Michael Scheinkman

Davis Polk & Wardwell LLP
450 Lexington Avenue

New York, NY 10017
Tel: 212-450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

*/s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*