# EXHIBIT E

Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

MAXIMILIAN KLEIN and SARAH          )
GRABERT, individually and on        )
behalf of all others similarly      )
situated,                           )
                                    )
            Plaintiffs,             )
                                    )
  VS.                               )   **NO. C 20-08570 JD**
                                    )
META PLATFORMS, INC.,               )
                                    )
            Defendant.              )
_____)


                        San Francisco, California
                        Thursday, January 19, 2023

                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Consumer Class Plaintiffs:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        865 South Figueroa Street, 10th Floor
                        Los Angeles, California 90017
                **BY: KEVIN Y. TERUYA, ATTORNEY AT LAW**
                     **BRANTLEY I. PEPPERMAN, ATTORNEY AT LAW**

                        LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                        100 Washington Avenue South, Suite 2200
                        Minneapolis, Minnesota 55401-2159
                **BY:  BRIAN D. CLARK, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official U.S. Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Consumer Class Plaintiffs:

3                       HAGENS BERMAN SOBOL SHAPIRO LLP
                        715 Hearst Avenue, Suite 300
                        Berkeley, California 94710
4               BY:  **SHANA E. SCARLETT, ATTORNEY AT LAW**

5

6    For Advertiser Class Plaintiffs:

7                       BATHAEE DUNNE LLP
                        3420 Bristol Street, Suite 600
                        Costa Mesa, California 92626
8               BY:  **BRIAN J. DUNNE, ATTORNEY AT LAW**

9                       BATHAEE DUNNE LLP
                        445 Park Avenue, Ninth Floor
10                      New York, New York 10022
                BY:  **YAVAR BATHAEE, ATTORNEY AT LAW**

11

12                      BATHAEE DUNNE LLP
                        901 South MoPac Expressway
                        Barton Oaks Plaza I, Suite 300
13                      Austin, Texas 78746
                BY:  **EDWARD M. GRAUMAN, ATTORNEY AT LAW**

14

15                      SCOTT & SCOTT ATTORNEYS AT LAW LLP
                        156 South Main Street
                        Post Office Box 192
16                      Colchester, Connecticut 06415
                BY:  **AMANDA LAWRENCE, ATTORNEY AT LAW**

17

18   For Defendant:

19                      WILMER CUTLER PICKERING HALE & DORR LLP
                        2600 El Camino Real, Suite 400
                        Palo Alto, California 94306
20              BY:  **SONAL M. MEHTA, ATTORNEY AT LAW**

21                      WILMER CUTLER PICKERING HALE & DORR LLP
                        7 World Trade Center
22                      New York, New York 10007
                BY:  **DAVID Z. GRINGER, ATTORNEY AT LAW**

23

24            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

```
 1   APPEARANCES:  (CONTINUED)
     For Defendant:
 2                           KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
                             Sumner Square
 3                           1615 M Street, N.W., Suite 400
                             Washington, D.C. 20036
 4                 BY:  KEVIN D. HORVITZ, ATTORNEY AT LAW

 5

     For Third-Party Apple Inc.:
 6                           SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP
 7                           One Manhattan West
                             New York, New York 10001-8602
 8                 BY:  KAREN M. LENT, ATTORNEY AT LAW

 9

10

11   Also Present:          Eric Meiring, In-House Counsel
                            Meta Platforms, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Thursday - January 19, 2023**</u>                           <u>**10:45 a.m.**</u>

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Calling Civil 20-8570, Klein, et al. vs.
Meta Platforms, Inc.

Counsel, state your appearances.

**MS. SCARLETT:**  Good morning, Your Honor.  Shana Scarlett
from Hagens Berman for the consumer class.

**MR. CLARK:**  Good morning, Your Honor.  Brian Clark,
Lockridge Grindal Nauen, for the consumer class.

**MR. TERUYA:**  Good morning, Your Honor.  Kevin Teruya from
Quinn Emanuel for the consumer class.

**MR. DUNNE:**  Good morning, Your Honor.  Brian Dunne of
Bathaee Dunne for the advertiser class.  I'll be speaking on
advertiser-specific issues today.  And I'm joined by
colleagues.

**MS. LAWRENCE:**  Good morning, Your Honor.  Amanda Lawrence,
Scott & Scott, on behalf of the advertiser class.

**MR. BATHAEE:**  Good morning, Your Honor.  Yavar Bathaee,
Bathaee Dunne LLP, on behalf of the advertiser class.

**MR. GRAUMAN:**  Good morning, Your Honor.  Edward Grauman of
Bathaee Dunne on behalf of the advertiser class.

**MR. PEPPERMAN:**  Good morning, Your Honor.  Brantley
Pepperman from Quinn Emanuel for the consumer class.

**MS. MEHTA:**  Good morning, Your Honor.  Sonal Mehta from

1  WilmerHale on behalf of Meta Platforms Inc.  I'm joined by my

2  colleague David Gringer, also from WilmerHale.

3       We have with us today Kevin Horvitz from the Kellogg

4  Hansen firm, who will be handling the issues relating to Apple,

5  and in-house counsel at Meta Platforms, Eric Meiring.

6       **THE COURT:**  Who's Karen Lent?

7       **MS. MEHTA:**  I believe that's Apple's counsel, Your Honor.

8       **THE COURT:**  Oh, okay.  So Horvitz and Lent for Apple?

9       **MS. MEHTA:**  Mr. Horvitz is going to be representing

10  Meta Platforms with respect to the Apple issues, and then

11  Apple's counsel is also here.

12       **THE CLERK:**  Counsel, please state your appearance for the

13  record.

14       **THE COURT:**  You're not --

15       **MS. LENT:**  Good morning, Your Honor.

16       **THE COURT:**  Wait just one second.

17       **MS. LENT:**  I'm Karen Lent.  I represent Apple.

18       **THE COURT:**  You represent -- Ms. Mehta represents Meta.

19       **MS. LENT:**  Yes.

20       **MS. MEHTA:**  Yes.

21       **THE COURT:**  But not for Apple?

22       **MS. MEHTA:**  Correct.

23       **THE COURT:**  An entirely new firm coming in for that?

24       **MS. MEHTA:**  That's right.  Apple's a non-party, and

25  they're represented by Ms. Lent.

1      **THE COURT:**  I know, but Meta is a party.  And Meta is

2  bringing in an entirely new lawyer to handle the Apple thing?

3      **MS. MEHTA:**  The Kellogg Hansen firm has been our

4  co-counsel on the case, and they are --

5      **THE COURT:**  Oh, okay.

6      **MS. MEHTA:**  -- also representing --

7      **THE COURT:**  So they've already been in the case?

8      **MS. MEHTA:**  That's right.

9      **THE COURT:**  Okay.  Now, you are -- who just made --

10  somebody just -- yeah.

11      **MS. LENT:**  Good morning, Your Honor.  I'm Karen Lent, and

12  I represent Apple, the non-party.

13      **THE COURT:**  Apple.  Okay.  All right.

14      Okay.  Well, let's see.  Everybody can sit down.

15      Who's going to take the lead on the consumer side?

16      **MS. SCARLETT:**  I will, Your Honor.  Shana Scarlett from

17  Hagens Berman.

18      **THE COURT:**  All right.

19      **MS. SCARLETT:**  To be precise --

20      **THE COURT:**  Well, it should probably be someone from Quinn

21  Emanuel.

22      **MS. SCARLETT:**  Sorry.  I'll be addressing the case

23  management conference issues.  The Apple --

24      **THE COURT:**  Yeah, but this whole --

25      **MS. SCARLETT:**  -- motion to compel --

1       **THE COURT:**  -- counsel thing --

2       **MS. SCARLETT:**  The leadership issue?

3       **THE COURT:**  Yes, the leadership issue.

4       Okay.  I have to say, I got this from a former colleague.

5  And I don't do all these committees and things.  I just don't

6  do it.  I have a high degree of skepticism, based on experience

7  and evidence, that it is not always -- it is not in the class's

8  best interest in most cases to have these kinds of structures.

9  And I also think that it engenders problems, and the discovery

10  things that we're going to be spending time on may be an

11  indicator of that here.

12       Now, so who is it that is leaving?  Is that Swedlow?

13  Mr. Swedlow?

14       **MR. TERUYA:**  Yes, Your Honor.

15       **THE COURT:**  From Quinn Emanuel?

16       **MR. TERUYA:**  My name is Kevin Teruya from Quinn Emanuel.

17       **THE COURT:**  All right.  So -- and, by the way, I also

18  appoint individuals.  I don't appoint firms because I don't

19  think there's enough accountability when class counsel -- a

20  firm gets it, because then you get exactly what's happening or

21  hear that it's improperly, in my view, considered a firm asset

22  as opposed to an individual case assignment, and the firm

23  simply can just shuffle people in and out, regardless of

24  the Court's view of who is best situated to represent the

25  class, which is an obligation that I have to ensure, or the

1   putative classes, as the case may be.

2       So put it more simply, we don't just do a tag team.

3   People don't tap out of the ring and then tag in their

4   successor.

5       Now, having said all that, I just didn't understand all

6   this stuff that your colleagues were saying about inability to

7   work with women and -- what's going on with that?

8       **MR. TERUYA:**  So, Your Honor, on the first point,

9   Mr. Swedlow left our firm to become a judge.  So we're not just

10  substituting myself for him in terms of staffing.  He left the

11  firm.

12      **THE COURT:**  No.  That was the tapping out.  He's out of

13  the ring.  I get it.  It doesn't matter to me why.  He's tapped

14  out.  But you can't just tap in.

15      But what is all this working with women thing that I --

16  who said that?  Hagens Berman?

17      **MR. TERUYA:**  Yes, Your Honor.

18      **THE COURT:**  All right.  Go ahead.

19      **MR. TERUYA:**  Yes.  Your Honor, those statements or

20  suggestions are not correct.  We have worked very hard to be

21  cooperative with all counsel on the case, including female

22  counsel.  We've often, very often agreed with Hagens Berman's

23  lead counsel.  On our team, we have several female counsel who

24  we respect and listen to.  The name -- one of our name partners

25  at our firm is a female counsel.  We are very committed to

 1   listening to and respecting the voices of female counsel.

 2        And I think what is happening here is, sometimes there's

 3   disagreement among counsel.  I think that's appropriate

 4   whenever there's leadership or multiple lawyers on a team or

 5   representing a class.  You know, the idea is to have

 6   discussion, and not everybody's going to always agree.  But

 7   just because you disagree with someone doesn't make it about

 8   their race or their gender.  It's just disagreement.  And

 9   I think disagreement is okay under the existing process.  We

10   talk about things when we don't agree and come to a consensus

11   and --

12        **THE COURT:**  Well, it sounds like it's been more than just

13   honest differences of opinion.  But I don't know.  I'm not

14   making any findings.  I just -- it's quite surprising to me

15   that this would be coming up.

16        All right.  Who's the sponsoring party?  Is that

17   Hagens Berman?

18        Okay.  All right.  So what's the concern?

19        **MS. SCARLETT:**  Your Honor, this is a difficult position

20   for us to be in and not one that my firm brought lightly.

21        This has been a difficult case and a challenging dynamic

22   for us.  I'm one of the few female --

23        **THE COURT:**  You mean in the leadership team?

24        **MS. SCARLETT:**  In the leadership team.

25        **THE COURT:**  I don't like using that word, but I'm saddled

 1   with it.  But, okay.  In the leadership team.

 2        All right.  Go ahead.

 3        **MS. SCARLETT:**  I'm one of the few females who lead cases

 4   in the antitrust area on the plaintiff's bar.  I feel that I've

 5   done a lot in the 20 years that I've practiced law.

 6        This case has presented a set of circumstances where I

 7   feel that my voice has not been equally heard.

 8        What I've done in the papers is ask the Court to elevate

 9   another firm to be of equal co-lead status to try and break up

10   some of the gridlock that exists and to help break through for

11   the next six months, to get through the rest of fact discovery.

12        **THE COURT:**  Well, here's what I want to figure out.

13        And, by the way, I'm not doing that either.  Nobody's

14   tapping out and tapping in by designation.  That's just not

15   going to happen.  And I'll tell you how I think I'm going to

16   resolve this in a moment for us to discuss.

17        But what is it that's the plus factor?  You're not

18   expected to all have the same view on tactics, on strategy, on

19   settlement, on evaluation of the evidence, on trial.  I mean,

20   you know that.  So what is it that is making this so unbearable

21   for you?

22        **MS. SCARLETT:**  Your Honor, it's difficult when there's

23   voices that -- it's difficult when my vote counts for less than

24   someone else's vote and, from my perspective, it's because of

25   my gender.  That has been the difficulty that we've faced in

1    this case.

2        I have difficulties at time agreeing with Quinn Emanuel.

3    They're defense counsel actively in four of my cases.  It makes

4    it difficult to entirely share the playbook that a trial

5    attorney would have, preparing for depositions, getting ready

6    for argument.  So there are a lot of tensions that exist there.

7        And at times, it does appear to me that the only reason

8    that my voice is not being listened to, when others on the same

9    team, male voices are being listened to, to me there feels like

10   there's a gender dynamic.

11       **THE COURT:**  Are you the only woman in this structure?

12       **MS. SCARLETT:**  We have a female counsel on the advertiser

13   side.

14       **THE COURT:**  This is just the consumer side; right?

15       **MS. SCARLETT:**  On the consumer side.

16       **THE COURT:**  You're the only woman on the case?

17       **MS. SCARLETT:**  I'm certainly not the only woman on the

18   case.

19       **THE COURT:**  On the case management side?

20       **MS. SCARLETT:**  Yes, Your Honor.

21       **THE COURT:**  You're the only one.  Okay.

22       All right.  Well, at this point, I think we should just

23   start over and do it my way.  I don't like this structure.  I

24   sort of took it because it came as a package.  But, I mean, as

25   I said earlier, I have significant experience-based qualms

1   about these multiheaded, you know, plaintiff-side structures.

2   You don't need them.

3       I've had plaintiffs get phenomenal success in my cases:

4   $650 million from Facebook for privacy violations; $650 million

5   from antitrust defendants in my price-fixing Capacitors MDL.  I

6   appoint -- I personally appointed an almost all-female

7   leadership group in my Google antitrust MDL.  Okay?

8       So none of those people have all these committees and

9   co-counsels and everything else, and they're killing it.  Okay?

10  They're killing it.  Not necessarily Google.  That's still

11  underway.  The other two are basically on the books.

12      All right.  So we're just going to rebid.

13      This doesn't affect the ads; right?  You all are good on

14  the ad side?

15      Okay.  This just affects the consumer putative class.

16  Okay?  So make your applications, and I'll take a look at it.

17      Now, your application should take into account what I've

18  said today about how to structure things.  And also, look at

19  my -- I'll put them in my minutes, but I have some guidance on

20  evaluation of diversity and other factors in selection of class

21  counsel and MDL counsel.  I'll put the cites in, and I will

22  expect you to be responsive to those.

23      So how long do you want for this?  Three weeks?  Two

24  weeks?

25      **MS. SCARLETT:**  Two weeks.

1      **THE COURT:**  Is that okay with everybody?

2      Quinn Emanuel, okay with that?

3      **MR. TERUYA:**  Yes.

4      **THE COURT:**  Who's this third person, Keller Lenkner?

5      **MS. SCARLETT:**  Keller Lenkner has been recused -- I mean,

6      sorry -- was disqualified from the case.

7      **THE COURT:**  Oh, they're out.  Oh, that's the -- okay.

8      **MS. SCARLETT:**  Lockridge --

9      **THE COURT:**  Yeah, I was wondering about that.  What

10     happened to them?

11     **MS. MEHTA:**  They were disqualified by Judge Koh,

12     Your Honor.

13     **THE COURT:**  After she put them on the team?

14     **MS. MEHTA:**  Yes.  There was a motion to disqualify based

15     on a lateral attorney move from the Kellogg Hansen firm to the

16     Keller Lenkner firm.

17     **THE COURT:**  Okay.

18     **MS. MEHTA:**  And she considered that motion, and they were

19     disqualified.

20     **THE COURT:**  Maybe I got the wrong firm.  I thought Ms. --

21     **MR. CLARK:**  Your Honor, I think you're referring to

22     Lockridge --

23     (Official Reporter interrupts for clarification of the record.)

24     **MR. CLARK:**  Brian Clark, Lockridge Grindal Nauen.

25     **THE COURT:**  Ms. Scarlett, is that --

 1      I'm talking to Ms. Scarlett.

 2      I thought, Ms. Scarlett, you said that you had somebody in

 3  mind.

 4      **MS. SCARLETT:**  Lockridge is acting on this --

 5      **THE COURT:**  Okay.  Well, Lockridge can put its application

 6  in too.  Okay?  So it's open.  It's a clean slate.  It's a new

 7  day.  We're going to just rebid it.  "Bid" is not the right

 8  word, but that's often what's used.  So we're just going to

 9  rebid it.  Okay?  All right.  Now, that takes care of that.

10      Okay.  I have page after page after page of discovery

11  disputes.

12      **MS. SCARLETT:**  Your Honor?

13      **THE COURT:**  Yes.

14      **MS. SCARLETT:**  I'll try to simplify this for you.

15      **THE COURT:**  What's that?

16      **MS. SCARLETT:**  Can I try to help simplify the 35-page --

17      **THE COURT:**  Did you get some things --

18      **MS. SCARLETT:**  -- case management conference --

19      **THE COURT:**  Did you get it solved?

20      **MS. SCARLETT:**  Okay.

21      **THE COURT:**  All right.  Give me some good news.

22      **MS. SCARLETT:**  There are four issues that we can distill

23  this down to.  Let's take them one by one.  And I think there's

24  a lot of common ground and just --

25      **THE COURT:**  All of this is just four issues?

1    **MS. SCARLETT:**  I think so, Your Honor.

2    **THE COURT:**  All right.

3    **MS. SCARLETT:**  Transcripts from related proceedings.

4  Plaintiffs have identified six separate pieces of related

5  litigation.  There's been a lot of back and forth over the

6  transcripts.  Depositions start in three weeks.

7        This is our proposed solution.  On Friday, the two groups

8  of plaintiffs will give our list of target witnesses in this

9  case.  We only have 200 hours.  We're pretty sure on who those

10  witnesses are going to be.  It's going to be in good faith.

11  Some of those people might not get deposed; some might get

12  deposed.  Sometimes you don't really know if you have the guy

13  until he's sitting in the chair and you hear his answers, and

14  you might need another guy or that guy's boss.  But on Friday,

15  we'll give Facebook a list of all of our target witnesses in

16  good faith.

17        The week after, we'd like them to give us anyone from

18  those six identified pieces of litigation that has a transcript

19  under oath or an interview.  We'd like those transcripts

20  produced to us so we can start getting ready for these

21  depositions that are beginning on February 2nd.

22    **THE COURT:**  Seems reasonable.

23    **MS. MEHTA:**  Your Honor, I --

24    **THE COURT:**  Have you heard about this before?

25    **MS. MEHTA:**  No, we have not heard this before.

1      **THE COURT:**  Okay.  So next time -- we're going to get it

2  done today.

3      Let Ms. Mehta know before you -- okay.

4      **MS. SCARLETT:**  All right.

5      **MS. MEHTA:**  In fact, we were on the phone yesterday and

6  this didn't come up, but I'm glad we're making progress.

7      So with respect to the witnesses that they identify that

8  are going to testify in this case, we've already told them that

9  if those witnesses are testifying in the FTC action, we'll

10  provide rough transcripts for those witnesses as soon as the

11  rough transcripts are available, and we're all working to try

12  to coordinate those depositions where we can.

13      The litigations they're now asking about are all across

14  the world, different subject matters.  They're saying,

15  basically, if someone testified in, for example, a privacy case

16  about sponsored stories, that that person's depo transcript

17  from that other litigation should be provided to them in this

18  case.  If they testified in an antitrust regulatory matter

19  internationally, they want that transcript.

20      That is far, far afield of the deposition testimony in

21  this case.  If it is a witness testifying in this case --

22      **THE COURT:**  Okay.  It's perfectly fine to, if you're going

23  to depose a witness, ask for any prior sworn statements.

24      I'll tell you what, though.  You have 200 witnesses or 200

25  hours?

```
 1        MS. SCARLETT:  200 hours.

 2        THE COURT:  How many witnesses, just roughly?  I'm not

 3   tying your hands.

 4        MS. SCARLETT:  I'd give you an estimate --

 5        THE COURT:  Friday is tomorrow.  How many are going to be

 6   on that list?

 7        MS. SCARLETT:  I'd give you, the list is probably 50 to

 8   60, my best guess as I sit here.

 9        THE COURT:  50 to 60.  Okay.

10        MS. MEHTA:  And, Your Honor, just one point.  It is

11   burdensome because we don't have a central repository of

12   transcripts to go to.  So we have to go to outside counsel for

13   all of these different matters and figure out whether these 50

14   or 60 people were testifying in some foreign regulatory

15   matter --

16        THE COURT:  Okay.

17        MS. MEHTA:  -- and get the transcript.

18        THE COURT:  I get it.

19        So here's what we're going to do.  If they've testified in

20   the last -- when was this case filed?

21        MS. MEHTA:  It was filed December 2020, Your Honor.

22        THE COURT:  All right.  If they've testified in the last

23   five years.  Okay?  So that's going to be the limit.

24        So you're going to give them the witness list.  If they've

25   had testimony under oath in the last five years, Meta will give
```

```
 1   you -- I can't guarantee I'm going to keep saying "Meta"
 2   because I may say "Facebook," but you know who I'm talking
 3   about -- Meta will give you the transcript.
 4        Now, the only thing I have a little concern about, why do
 5   you need to go abroad?  Germany, Australia.  First of all,
 6   their method of deposition is not necessarily going to be
 7   acceptable in this court.  So what's the point of all that?
 8        MS. SCARLETT:  I'm going to defer to my colleagues on
 9   the --
10        THE COURT:  Sure.
11        MS. SCARLETT:  -- advertiser case.
12        THE COURT:  You have to have a thing, yeah.
13        MR. DUNNE:  Brian Dunne for the advertiser class.
14        Your Honor, the foreign investigations are on our behest,
15   and that is because the specific investigations in England and
16   in Australia are into monopolization of the advertising market
17   by Meta and also --
18        THE COURT:  Was it the same market?
19        MR. DUNNE:  Well, we would like to --
20        THE COURT:  I don't know that it is.
21        MS. MEHTA:  It's not, Your Honor.
22        MR. DUNNE:  And the other thing is --
23        THE COURT:  It would seem to me that --
24        MR. DUNNE:  Right.  So --
25        THE COURT:  -- it's not the same market.
```

1   **MR. DUNNE:**  And there's testimony about an agreement with

2 Google in at least one of those cases.  But if Your Honor --

3   **THE COURT:**  You've got to keep your voice -- I have no

4 idea what you just said.  Something about "Brr-brr-brr Google."

5 What did you say?

6   **MR. DUNNE:**  Oh, my apologies.

7   **THE COURT:**  Keep it up, yeah.

8   **MR. DUNNE:**  So in at least one of those cases --

9   **THE COURT:**  Why is Google coming into this?

10   **MR. DUNNE:**  Well, because we have -- there's an allegation

11 of an agreement with Google being investigated in one of those

12 cases.  The so-called network bidding agreement, which is --

13   **THE COURT:**  All right.  It's just going to be

14 United States for now.  You can make an offer at some point for

15 later, but just United States in the last five years.

16   **MS. MEHTA:**  Your Honor, can I address timing?

17   There's no way that we can do that within one week of

18 getting these names tomorrow.

19   **THE COURT:**  No, no.  You've got to work it out.

20   **MS. MEHTA:**  Thank you.

21   **THE COURT:**  I mean, you said you had 40 or 50 people,

22 roughly, for depositions?

23   **MS. SCARLETT:**  Yes, Your Honor.  But with that

24 limitation --

25   **THE COURT:**  It's going to be months and months, right, of

1  scheduling?

2      **MS. MEHTA:**  That's right, Your Honor.  There's a couple of

3  depositions that are starting in early February, but we're

4  scheduling out till March, April, and May.

5      **THE COURT:**  So the way to do it -- I'm not going to

6  micromanage this.  I don't have the time and I certainly don't

7  have the desire.

8      But just get it a week before the depo.  Make your

9  structure.  Don't do it the day before, and you don't have to

10  do it eight months before.  Just be reasonable.

11      **MS. MEHTA:**  I was going to suggest a week before the

12  deposition, and I think that's accomplishable.

13      **THE COURT:**  A week, ten days.  Look, if it's a seven- --

14  if it's War and Peace size, it may be more than a week.  If

15  it's somebody taking the Fifth Amendment, maybe it's less than

16  a week.  I don't know.  But just be smart.  Work it out.  I

17  have full confidence in your good judgment.

18      Okay.  That resolves that.  That's great.  So Category 1

19  is done.

20      What's Category 2?

21      **MS. SCARLETT:**  Issue 2, the tutorial before Your Honor on

22  February 28.

23      **THE COURT:**  The tutorial, yes.

24      **MS. SCARLETT:**  I think we have agreement between the

25  parties now.  We'll be submitting six pages from each plaintiff

1    class, 12 pages from Meta, seven court days before the

2    tutorial.

3        THE COURT:  Remember, this is not argument.  This is --

4        MS. SCARLETT:  I understand.

5        THE COURT:  -- tutorial:  Teach the judge.

6        MS. SCARLETT:  This is a teachable --

7        THE COURT:  Don't argue to the judge.  Teach the judge.

8    Yeah, okay.

9        MS. SCARLETT:  We are hoping --

10       THE COURT:  Do you need to divide it that way?

11       MS. SCARLETT:  We went off of your tutorial guidelines.

12       THE COURT:  No, no, I know.  Do you need to divide the

13   six pages on your side that way?

14       MS. SCARLETT:  We did that in fairness.

15       THE COURT:  Same technology, same markets.  I mean, isn't

16   it?

17       MS. SCARLETT:  Different markets.  Different allegations.

18       THE COURT:  All right.  That's fine.

19       MS. SCARLETT:  I think it will be helpful for you to have

20   it six and six.

21       THE COURT:  All right.  That's fine.  I'll leave it up to

22   you.

23       MS. SCARLETT:  Meta will be filing 12.

24       We've proposed to exchange demonstratives 48 hours in

25   advance.

1          Here's the one point of disagreement, Your Honor.   We've

2     asked to exchange names.   Meta has declined.

3          **THE COURT:**  Names of?

4          **MS. SCARLETT:**   The names of who will be testifying so that

5     we can help understand what businesspeople Meta has coming, to

6     make sure that our witnesses are as responsive as possible.

7          **THE COURT:**  Well, you don't have any, do you?   I mean --

8          **MS. SCARLETT:**   We will be bringing a professor to come and

9     testify.

10         **THE COURT:**  An expert?

11         **MS. SCARLETT:**   She's an expert, that's correct.

12         **THE COURT:**  Okay.   Who's the expert?

13         **MS. SCARLETT:**   Her name is Professor Ellison.   She's an

14    expert in social media, social networks.

15         **THE COURT:**  An economist?

16         **MS. SCARLETT:**   She's from School of Information at

17    University of Michigan.   She's a social scientist.

18         **THE COURT:**  Okay.   Has she testified before?

19         **MS. SCARLETT:**   She's certainly very well qualified,

20    Your Honor.

21         **THE COURT:**  She's been qualified as an expert before?

22         **MS. SCARLETT:**   I wouldn't want to say that I know she's

23    been qualified as an expert, but I certainly know she has a lot

24    of expertise in this area.

25         **THE COURT:**   In an antitrust market area?

1      **MS. SCARLETT:**  Your Honor, we did not understand that you

2    wanted economists coming to testify about antitrust --

3      **THE COURT:**  No, I don't.  But I want people who are

4    actually qualified to help me understand the markets.  And

5    that's an antitrust market; right?  It's not a social media

6    market for privacy or something.  It's an antitrust market --

7      **MS. SCARLETT:**  Correct.

8      **THE COURT:**  -- subject to all the antitrust market issues.

9      **MS. SCARLETT:**  So we did not understand --

10     **THE COURT:**  What's the relevant market?  What's the

11   geographic market?

12     **MS. SCARLETT:**  Absolutely.

13     **THE COURT:**  Who are the players?  What's interchangeable?

14   What's substitutable?  You know, all that kind of stuff.

15     **MS. SCARLETT:**  So if this is what -- if you want this to

16   be a market tutorial with our economist, I'm happy --

17     **THE COURT:**  Oh, no.

18     **MS. SCARLETT:**  -- we're having this conversation so we can

19   bring our economist.

20     **THE COURT:**  I don't remember what I told you, but I'm

21   pretty sure that I said I wanted a tutorial on the markets.

22     **MS. SCARLETT:**  Okay.

23     **THE COURT:**  I leave it up to you, but -- if you're happy

24   with your person, that's fine.  But it's a tutorial; it's not

25   summary judgment or anything else.  But I just want to maximize

```
 1    my comprehension.
 2         So if you think you've got the right person, I'm not --
 3    you know better than I do at this point.  I'm not going to
 4    gainsay it.  Okay?
 5         MS. SCARLETT:  Understood.
 6         THE COURT:  Don't let me sew doubts.  All right.
 7         Okay.  So you have that person.  And then who else?
 8         MS. SCARLETT:  So we named our names, and we're hoping
 9    that --
10         THE COURT:  All right.  So who --
11         MS. SCARLETT:  -- Meta would name names.
12         THE COURT:  Meta, who do you have?  Who's going to be
13    here?
14         MS. MEHTA:  Your Honor, what we've told them is that we're
15    able to give them the name a week in advance.  We're still
16    finalizing who it is that we're going to use; so I don't have a
17    name now.
18         THE COURT:  That's not long enough.  Do it by -- give it
19    to them by next Friday, a week from Friday.
20         MS. MEHTA:  Okay.
21         THE COURT:  Okay?
22         MS. MEHTA:  Thank you, Your Honor.
23         THE COURT:  Now, who's it going to be?  Are you going to
24    have --
25         MS. MEHTA:  It's going to be a businessperson.  We're
```

```
 1    still trying to figure out who --

 2           THE COURT:  In-house?

 3           MS. MEHTA:  An internal Meta businessperson, yes.

 4           THE COURT:  Just one?

 5           MS. MEHTA:  I expect it'll just be one.  That's what we're

 6    aiming for.

 7           THE COURT:  Okay.  So do that a week from tomorrow.

 8           All right.  That's Category 2.  Is that it?

 9           Okay.  What's Category 3?

10           MS. SCARLETT:  Issue 3 is protocol on non-party

11    depositions.  We are in agreement --

12           THE COURT:  Non-party depositions.  Oh, is that Apple?

13           MS. SCARLETT:  Apple would be included on that list,

14    certainly.

15           THE COURT:  Let's save Apple -- it's more than Apple?

16           MS. SCARLETT:  It will be more than Apple.

17           THE COURT:  Let's just leave Apple out for a moment.  But

18    for the other non-parties, what's the idea?

19           MS. SCARLETT:  Okay.  So the two sides agree on 175 hours

20    for non-party depositions.  Meta has also --

21           THE COURT:  On top of the 200 hours for witnesses?

22           MS. SCARLETT:  For non-party witnesses.  This includes

23    former employees of Facebook, Your Honor.

24           THE COURT:  You're going to take 375 hours of depositions?

25           MS. SCARLETT:  Yes, Your Honor.
```

1      **THE COURT:**  Really?

2      **MS. MEHTA:**  Your Honor, we did not think 200 hours of

3  party witnesses is appropriate.  And if Your Honor is willing

4  to revisit that, we'd like to revisit that.

5      **THE COURT:**  I thought it was 200 for everything.

6      **MS. MEHTA:**  No.  The limit -- this was disputed, and they

7  were able to get 200 hours just for party witnesses.

8      And then we're talking about hours on top of that which

9  would cover former employees as well as non-parties like Apple

10  and others that both sides might want to depose.

11      **THE COURT:**  That seems like a lot of time, Ms. Scarlett.

12      **MS. SCARLETT:**  Your Honor, from our experience on this

13  side and having only done antitrust cases for over a decade,

14  that's actually not a lot of time at all.  For us that seems

15  like a short amount of time.

16      **THE COURT:**  I don't agree with that, and I've done

17  antitrust cases for several decades.  Probably longer than you,

18  I'm guessing.  So I'm not buying that.  Why do you need

19  175 hours just for non-parties?

20      **MS. SCARLETT:**  Because they also include the non- -- the

21  former Facebook witnesses, of whom there are many.

22      **THE COURT:**  Former employees?

23      **MS. SCARLETT:**  Former employees of Facebook.

24      **THE COURT:**  They're not considered party-affiliated

25  witnesses?

1      **MS. SCARLETT:**  They are not, Your Honor.

2      **THE COURT:**  You're not going to defend them, Ms. Mehta?

3      **MS. MEHTA:**  Your Honor, we are going to be defending a

4  number of them.

5      This is the issue, Your Honor.  We both need to be able to

6  take depositions from true non-parties, like Apple and Amazon

7  and Twitter, et cetera.

8      **THE COURT:**  That's fine.  I don't have a problem with

9  that.

10     **MS. MEHTA:**  And the 175 is intended to address that.

11     The problem is that's on top of the 200, which was limited

12  just to current employees.

13     Our position that we took earlier -- and I think it still

14  makes a lot of sense -- is that the 200 should cover current

15  and former employees, and then we can have some number for true

16  non-parties.  That, to me, makes more sense.  I mean, frankly,

17  200 still seems high for current and former employees.  But I

18  don't think that we should have 200 for current employees and

19  then 175 hours for former employees and true non-parties.

20  That's crazy.

21     **THE COURT:**  I'm baffled.  I mean, okay, so you take a

22  30(b)(6) of ten companies on their advertising issues.  What

23  more do you need?

24     **MR. BATHAEE:**  Your Honor, if I may.

25     **THE COURT:**  You're not going to take seven Amazon

1 witnesses.  You're just going to send a 30(b)(6) to Amazon.

2 They're a third party.  They're not really required to give you

3 the time of day, but they do have some duties.  They'll prep a

4 person.  And you'll be done.

5     What else are you going to be doing with 175 hours' worth

6 of time?

7     **MR. BATHAEE:**  Your Honor, Yavar Bathaee for the

8 advertisers.

9     I just want to make the point that our witness lists are

10 not entirely coextensive because we have a different set of

11 issues, different set of exclusionary acts.  So parts of the

12 business at Facebook are not going to be a complete

13 conjunction, that we're going to be -- the people that we're

14 going to be deposing.

15     **THE COURT:**  What percentage does not overlap?

16     **MR. BATHAEE:**  A good amount.  I think more than 50 percent

17 isn't overlapping from our -- maybe at least -- over a third.

18 Between 30 and 50 percent aren't overlapping.

19     We have other witnesses that don't have anything to do

20 with their case, for example, on the Netflix issue --

21     **THE COURT:**  More than --

22     **MR. BATHAEE:**  -- on the eBay --

23     **THE COURT:**  -- 50 percent of your case does not overlap

24 with the consumer class?

25     **MR. BATHAEE:**  It's -- that's right, Your Honor.  The

1    exclusionary acts are -- do overlap, but not very much.  So,

2    you know, we have four or five exclusionary acts; and save the

3    Onavo issues, a lot of it's disjoint.

4         So we may be deposing someone that we care very much about

5    that really is addressed to, say, a Netflix agreement that

6    doesn't even concern the consumer case.

7         So the 300 hours sounds like --

8         **THE COURT:**  Let me just pause here for a moment.

9    Thank you.

10        Do you agree with that, Ms. Mehta, that --

11        **MS. MEHTA:**  So, Your Honor --

12        **THE COURT:**  -- less than half of the case overlaps between

13   the two proposed classes?

14        **MS. MEHTA:**  I can't break down their witnesses and how

15   they're thinking about which witnesses are relevant to which

16   cases.  I do agree that their asserted markets are different

17   and that some of the exclusionary -- the alleged exclusionary

18   conduct is different.  So there are certainly differences

19   between the classes.

20        On the other hand, if what they're saying is they need

21   375 hours of depositions of current and former employees or

22   maybe 300 of those are for current and former employees, that

23   seems extreme, even for non-overlapping classes.

24        My suggestion would be that what we do is take the 200 --

25   you know, honestly, I would actually reduce that.  But let's

1    say we take the 200 and make that current and former employees;

2    and then we can reach a separate number of hours -- and I do

3    want to talk about an actual number cap on those depositions --

4    for the true non-parties.  And that could be 125 hours or

5    something.  That's still over 300 hours of depositions for this

6    case, which is a lot.

7         But right now, my concern is that we're going to have

8    60 --

9         **THE COURT:**  I just want to -- are the ad people -- look,

10   I'm getting this -- I'm coming to the party at 10:00 p.m.  You

11   all started at 5:30.

12        Are you fully consolidated in one complaint?

13        **MS. SCARLETT:**  No, Your Honor.  There are two separate

14   complaints.

15        **THE COURT:**  Are you consolidated just for discovery

16   purposes?

17        **MS. SCARLETT:**  I think that's fair to say, yes.

18        **THE COURT:**  Maybe that doesn't even make sense.  I'm not

19   sure.

20        **MS. MEHTA:**  I will say, Your Honor, I think at this point

21   we're sort of pretty far down the line in terms of coordinating

22   these depositions.  They've given us a joint list of people

23   they want to depose.  We're working already to schedule them.

24   We're coordinating them with the FTC.

25        I do --

1       **THE COURT:**  These are going to be separate trials, then;

2  right?

3       **MS. MEHTA:**  I think we have to see what's left of the case

4  and figure out exactly -- we're still getting sort of changes

5  in their theory of the case.  Just yesterday the users dropped

6  one of their markets.  And so things are very dynamic.  Let me

7  put it that way.

8       I don't know that we can decide at this moment exactly

9  what the trial structure would look like.  I do think

10  coordination is important because we're pretty far down that

11  line; and for witness efficiency, especially for --

12       **THE COURT:**  You're not.  You've got 375 unused deposition

13  hours.

14       **MS. MEHTA:**  We've started scheduling a lot of them.

15       **THE COURT:**  You haven't even started.

16       **MS. MEHTA:**  We've started scheduling a lot of them.

17       **THE COURT:**  This is the time to fix it, not the time to

18  give up hope.

19       **MS. MEHTA:**  I completely agree this is the time to fix it,

20  but I think disconnecting the discovery process and then having

21  dueling notices for potentially overlapping witnesses is going

22  to make things a lot worse and not easier.

23       What I think we need to do is bring some order to this

24  process in terms of limiting the number of depositions.

25  60 depositions of current and former employees is a lot, even

1   for two classes that are partially non-overlapping.

2      **THE COURT:**  Let me ask you this:  So, for the plaintiffs,

3   if there is less than 50 percent overlap, you all aren't going

4   to go to every deposition; right?

5      **MS. SCARLETT:**  That's correct, Your Honor.  We can't

6   imagine that we would go to every -- certainly not question at

7   every deposition.  Whether or not we might send someone, one

8   attorney from our class to simply monitor the deposition to

9   make sure that there weren't any questions asked that impact

10  our class, we might do that as a precautionary measure.

11     **THE COURT:**  I just -- okay.  But when it comes to fee

12  time, if you get there, I'm not going to give you money for

13  that in all likelihood.

14     **MS. SCARLETT:**  Understood.

15     **THE COURT:**  I'm being told here that these cases are more

16  different than alike.  And if that's true, I'm not going to

17  take money out of class members' pockets for each of you to sit

18  in on each and every deposition.  You're not going to get paid

19  for that.  I mean, I'm making that a tentative, but you should

20  take that to heart.  So --

21     **MS. SCARLETT:**  Understood, Your Honor.

22     **THE COURT:**  -- that seems extremely unwise to me.

23     **MS. SCARLETT:**  Can we just focus back in on the non-party

24  depositions?  I would just like to give the Court some context.

25     Meta alone has subpoenaed 49 non-parties across the

1   country in this litigation.  It's not that Meta doesn't believe

2   that a number of non-parties are not relevant to this case.

3   Plaintiffs' intention is certainly not to depose 49

4   non-parties, but we also do have to wrestle with defining two

5   markets.  And so the 175 hours would include the non-parties

6   that have pertinent information to the markets, but also the

7   former Facebook employees.

8        And we think that we can get it done efficiently.  We

9   certainly wouldn't intend to take every last hour if we don't

10  need to.  I personally take pride in ending depositions long

11  before seven hours.

12       But these were the contours that the parties negotiated

13  and agreed to at this point in time with all the information

14  they have about two very separate classes and Meta having

15  subpoenaed such a large number of non-parties for documents.

16       **THE COURT:**  Who are the -- Ms. Mehta, who are the 49

17  non-parties you subpoenaed?

18       **MS. MEHTA:**  So, Your Honor, first of all, those were

19  document subpoenas.  Our deposition subpoenas are going to be a

20  lot more targeted than that.  I think your estimate of 10 to 15

21  is a lot more realistic, and that's very much in line with what

22  we're expecting to do for depositions.

23       **THE COURT:**  10 to 15.  Okay.  Well --

24       **MS. MEHTA:**  And I think part of the problem is that what

25  they're asking for is to take this non-party time and

1  essentially include all of the former employees on that on top

2  of the 200 hours they want to get with respect to current

3  employees.

4      That's a lot, and it's extremely burdensome on the former

5  employees.

6      **THE COURT:**  You're going to represent them all, aren't

7  you?

8      **MS. MEHTA:**  We're not representing all of them, but we're

9  going to represent some of them.

10     **THE COURT:**  Okay.

11     **MS. MEHTA:**  My suggestion, again, would be to think about

12 one number for current and former employees and then one number

13 for true third parties.

14     **THE COURT:**  Well, here is what you're going to do.  You

15 all are going to have to meet and confer about this.  Okay?

16     So I consider this quantity of deposition time to be

17 extreme on both sides.  Okay?  I don't even know why you would

18 send out 49 document requests.  This case isn't that

19 complicated.  All right?  And it is not heading in the right

20 direction in terms of efficient and effective management and

21 the interests of justice.

22     So you all are going to meet and confer and come up with a

23 plan for that.  You've got two weeks from today to submit your

24 plan.  And do not submit to me "We can't agree.  Here are our

25 mutual proposals."  I won't take it.  Okay?

1        **MS. MEHTA:**  Understood, Your Honor.

2        **THE COURT:**  I will freelance, and you will not like that,

3   either one of you.  Okay?  So don't -- if you cannot agree, you

4   just file one line and say, "We have failed."  I will take it

5   from there.  I do not want to hear your proposals.  So this is

6   your last chance.

7        **MS. MEHTA:**  Understood, Your Honor.

8        **THE COURT:**  Come to an agreement.

9        It defies experience, logic, and intuition that you can't

10  do it.  Okay?  So if you cannot do it, you just literally file

11  one thing saying, "We were not able to reach an agreement," and

12  I will unilaterally issue your discovery schedule.

13       What's the fourth category?

14       **MS. SCARLETT:**  The fourth category is no disagreement at

15  all.  We just want to confirm the exchange schedule on case

16  management statements.  There has been some troubles in the

17  past, late filings, 35-page statements that --

18       **THE COURT:**  Late filings?

19       **MS. SCARLETT:**  -- I know that you did not want to see.

20       So Meta has proposed a schedule that was first proposed by

21  plaintiffs.  We just want to say in open court we agree;

22  exchange schedules for case management conference statements

23  are as written in that statement.  We will follow that in the

24  future, and there won't be any problems.

25       **MS. MEHTA:**  Your Honor, there is a fifth issue, which is

1    all of the moot --

2          **THE COURT:**  Wait.  Are we talking about the --

3          **MS. MEHTA:**  -- motions we raised.

4          **THE COURT:**  -- 5 o'clock, 9 o'clock, 12 o'clock thing, or

5    are we talking about something --

6          **MS. SCARLETT:**  Yes.

7          **THE COURT:**  -- else?

8          That's all we're talking about?

9          **MS. SCARLETT:**  That's all we're talking about.

10         **THE COURT:**  So what's the idea?  You want to --

11         **MS. SCARLETT:**  Going forward, we're just going to have the

12   two real exchanges.  One's going to happen three business days

13   before.  They'll be one 9:00 a.m. the morning of the filing,

14   and then there's going to be --

15         **THE COURT:**  This is just for the case management

16   statements?

17         **MS. SCARLETT:**  Yes, Your Honor.

18         **MS. MEHTA:**  They're just agreeing to our proposal for how

19   we get the drafts exchanged to get to a final.

20         **THE COURT:**  You all can't even get this to work?

21         **MS. MEHTA:**  It looks like we finally can.  So we're glad

22   to have the agreement from Ms. Scarlett today.

23         **THE COURT:**  Fine with me.

24         **MS. SCARLETT:**  Great.

25         **THE COURT:**  Okay?

1      **MS. SCARLETT:**  So --

2      **THE COURT:**  That's a bad indicator for both of you, you

3   can't get these little, tiny things done.

4      **MS. MEHTA:**  I apologize, Your Honor.  We tried multiple

5   times to get to a resolution on a schedule.  I'm glad we got

6   here today, but I hope we'll be able to get there before it

7   gets to your desk in the future.

8      **THE COURT:**  You're going to have to start because I'm not

9   going to have you in like this much more.  I've got other

10   things to do.  I've got 400 cases, and I'm not going to sit

11   here and listen to disputes about whether a case management

12   draft should be filed at 9:00 a.m. or noon.  That is an abuse

13   of scarce federal judicial resources.  Okay?  If you cannot

14   agree, I will do it for you.  That's the default.  I'm not

15   going to burn any more time on these things.

16      All right.  What's the last thing?

17      **MS. MEHTA:**  Your Honor, the last thing is, we have moved

18   to compel or filed a discovery letter brief with respect to the

19   users' responses to certain interrogatories and the

20   advertisers' responses to certain interrogatories.

21      The core issue underlying that is we are having trouble

22   getting from the plaintiffs basic information about the scope

23   of the case and what their contentions are with respect to

24   fundamental things like market definition in the case of the

25   users --

1       **THE COURT:**  Let me just pause here.

2       All right.  So I'm going to terminate all these letters

3   because we've now solved them all.  Right?  That was the four

4   categories.

5       **MS. MEHTA:**  No.  These were in the case management

6   conference statement.  Ms. Scarlett just omitted them from her

7   four categories.

8       **MR. TERUYA:**  Yeah.  Your Honor, there's also a discovery

9   dispute letter that we raised that is on the agenda as well.

10      **THE COURT:**  All right.  What is the Meta one?  Is it

11  Docket 365?

12      **MS. MEHTA:**  Yes, Your Honor, there's Docket 365.  Exactly.

13      **THE COURT:**  That's denied.  That's the subject of expert

14  testimony.  You can get it later, but not now.  So that's for

15  Interrogatory Number 5.  That's expert testimony.  That will

16  come out in due course.  They'll have to answer it, but not

17  right now.  It's for experts.

18      **MS. MEHTA:**  Your Honor, I just want to clarify --

19      **THE COURT:**  For 13 and 14, I don't really understand.

20  This looks like expert testimony to me as well.

21      But what is it you want for 13 and 14?

22      **MS. MEHTA:**  Yes, Your Honor.  So for 13 and 14, we're not

23  asking for their expert opinions, but we are asking for the

24  underlying factual basis.

25      So if they're saying, as a matter of fact, that something

1   is part of their network or not part of the alleged market,

2   then we'd like that information.

3       We're not -- in none of these contention interrogatories

4   are we asking for the expert piece of this.  Obviously, that

5   will come at the appropriate time.  But they are required to

6   provide us with the factual basis for their contentions in this

7   case.  The case has been going on for two years.

8       **THE COURT:**  I don't need -- I know discovery.  I want the

9   specifics.

10      **MS. MEHTA:**  Yes, Your Honor.

11      **THE COURT:**  What is it are you asking for in 13 and 14?

12      **MS. MEHTA:**  So --

13      **THE COURT:**  I don't understand what you're asking for.

14      **MS. MEHTA:**  Yes, Your Honor.  So they have alleged a

15  social network market, and we're asking them to say whether the

16  features or activities that Meta puts out in its products fall

17  within the alleged social network market or not.

18      They said they couldn't answer that because they didn't

19  know what the features or activities are.  We gave them a list

20  and said:  Okay, great.  Take this list, and could you at least

21  tell us whether that falls within the market or not so that we

22  can proceed with fact discovery understanding what the contours

23  are.

24      That's what we're asking for.  Yes or no for the features

25  that we've given them.

1      **MR. TERUYA:**  Your Honor, as to that interrogatory, those

2   interrogatories --

3      **THE COURT:**  This is just 13 and 14.

4      **MR. TERUYA:**  Yes, as to 13 and 14.

5      If it's helpful to the Court, we could hand up the list

6   that Ms. Mehta referred to just now that expands the

7   interrogatory and makes it even more complicated.

8      They sent us a list of the features they'd like us to say

9   that are in or out of the market.  There's 320 of them.

10  They're very granular things that --

11     **THE COURT:**  What are they?  What are some examples?

12     **MR. TERUYA:**  Like oEmbed; comments plug-in; embedded

13  videos plug-in; conversions; API; app events via Facebook SDK.

14  And the list goes on.

15     So there's 320 of those that they had given in a different

16  case, and then they added 25 more on.  This is after all the

17  briefing is completed.

18     This is, as I think the Court's earlier questions reflect,

19  very technical and complicated.  I think it's -- we don't

20  really understand what's the legal relevance of the question as

21  it's articulated.  It's hard to understand.

22     But regardless, this is certainly expert and contention

23  discovery.  I mean, it requires a definition of the market,

24  first, and then figuring out what products are in it and then,

25  beyond that, what features are in it.  We don't think that

1   makes a lot of sense.

2       **THE COURT:**  I agree with that.  Same ruling for 5, 13, and

3   14.  I will defer --

4       **MS. MEHTA:**  And 14 is mooted, Your Honor, because they've

5   withdrawn their social media -- their alleged social media

6   market.  So 14 is --

7       **THE COURT:**  Okay.  I'm just going to use what I have.  You

8   all work out the nuances.

9       **MS. MEHTA:**  Understood.

10      **THE COURT:**  Okay?

11      All right.  Interrogatories 9 and 12.  The first one, with

12  respect to which firms would have entered or been more

13  competitive in each alleged market, that's perfectly fair in an

14  exclusionary conduct case.

15      I don't get the rest of them.

16      **MS. MEHTA:**  Your Honor, with respect to 12, one of their

17  theories is that the way that Meta acquired the alleged

18  monopoly was through material misstatements or omissions with

19  respect to privacy.  That's their theory.

20      So we'd like to understand their theory, and that's what

21  Interrogatory Number 12 is asking for, the factual basis for

22  their contentions.

23      **MR. TERUYA:**  Your Honor, 9 through 12 are very similar in

24  structure.  They're basically asking about the but-for world,

25  what would have happened in a world where certain conduct were

1   different.

2       We think that's quintessential contention and expert

3   discovery in the sense that it's not asking questions about

4   facts that happened in the real world; it's asking about what

5   would have happened.  You know, that's going to be the subject

6   of expert testimony.  Your Honor I'm sure is very familiar with

7   the kinds of expert testimony that will go to that.  And trying

8   to put that together now is very premature.

9       **THE COURT:**  When is your expert report going to be --

10      **MR. TERUYA:**  Sorry?

11      **THE COURT:**  What is the expert deadline?

12      **MS. MEHTA:**  Yes, Your Honor.  So merits expert disclosures

13  are in January of 2024, and fact discovery closes this June.

14      **MR. TERUYA:**  And there's an expert report in connection

15  with class certification.

16      **THE COURT:**  Oh, there's class in between.  Okay.

17      **MS. MEHTA:**  But even that happens after the close of fact

18  discovery.

19      **THE COURT:**  Not "even"; always in my courtroom.

20      But I forgot.  I was wondering why it was January, but we

21  have the class thing in between.

22      Okay.  Those are all expert testimonies also.  Those are

23  all denied pending expert testimony.

24      Okay.  Is there anything else?

25      **MR. TERUYA:**  Yes, Your Honor.  There's Docket Number 377,

1    which --

2        **THE COURT:**  Oh, yes.  Didn't we just work that one out?

3    You're going to identify witnesses.  Doesn't that take care of

4    this one?

5        **MR. TERUYA:**  No, Your Honor, in the sense that there were

6    two transcripts that we had identified.  So these are 30(b)(6)

7    transcripts.

8        Per the Court's instruction last time, we understood Meta

9    was going to provide us with a list of the depositions that had

10   occurred or were going to occur in the FTC action and that we

11   would be able to look at that, identify a curated, select set

12   of relevant transcripts, ask them for it, and they would

13   provide those promptly, the videos -- sorry -- the transcripts,

14   exhibits, and videos.

15       And so we had two transcripts that we identified, one

16   30(b)(6) deposition about user surveys and another 30(b)(6)

17   deposition about user data.  We discussed those with the Court

18   in the October status conference.

19       We thought those were highly relevant.  Meta does not

20   disagree with that.  For one of them, they acknowledged --

21       **THE COURT:**  What is the dispute?

22       **MS. MEHTA:**  Your Honor --

23       **THE COURT:**  The way it was presented to me is that Meta

24   said:  Okay, but we're going to deduct 21 hours off your

25   deposition clock.

1      I thought that was the dispute.

2      **MS. MEHTA:**  Your Honor, it does relate to hours.  And the

3  question is whether -- if they're going to get these

4  transcripts through another means, whether that should affect

5  the hours.

6      My suggestion would be that we build this into the

7  meet-and-confer that we're doing on deposition hours totally

8  and see if we can try to reach a resolution of that as part of

9  thinking about how we're going to allocate hours.

10     **THE COURT:**  That makes sense to me.  Okay.  You can do

11 that.

12     Okay.  That's it.  Now we just get to Apple; right?

13     **MR. TERUYA:**   Your Honor, there's one more pressing issue,

14 which is, for the depositions that are coming up, that we've

15 scheduled close in time to the date of the FTC depositions

16 pursuant to Meta's request, those are ones where the last time

17 we were here, we asked the Court could we attend the

18 depositions because we thought that was important, and

19 the Court said that you saw no reason to do so.

20     We think there is a reason to do so now for this limited

21 set of depositions that we're taking close in time in our case

22 to the depositions in the FTC case, because we're not going to

23 be able to -- or potentially not going to be able to get the

24 transcripts and exhibits in time.  They're often within one to

25 two --

1        **THE COURT:**  Get them overnight.

2        **MR. TERUYA:**  Pardon me?

3        **THE COURT:**  You can get them overnight.  Just have an

4    expedited transcript.

5        **MS. MEHTA:**  And we've agreed to provide them rough

6    transcripts as soon as we get them from the agency, which

7    presumably will be within hours of the conclusion of the

8    deposition.

9        **THE COURT:**  So the answer is no.

10       Okay.  Now can we get to Apple?

11       **MS. MEHTA:**  Yes, Your Honor.

12       **THE COURT:**  Thank you.

13       **MR. DUNNE:**  Your Honor, there's a letter brief against the

14   advertisers --

15       **THE COURT:**  Oh.

16       **MR. DUNNE:**  Sorry.  Brian Dunne for the advertisers.

17       **THE COURT:**  Which number is that?

18       **MR. DUNNE:**  I just want to make sure we get everything

19   from --

20       **THE COURT:**  Which one is that?

21       **MR. DUNNE:**  That is Docket 409.

22       **MS. MEHTA:**  And, actually, Your Honor, with respect to

23   that one, we got a very lengthy supplemental interrogatory

24   response yesterday that we're evaluating.  So I think what we

25   should do is terminate that one, if Your Honor agrees, and

1    we'll evaluate their response.  And if there's anything to come

2    back to you on at some point in the future, we'll come back to

3    you on it.

4          But I think at this point, I'd like to look at their

5    response and see if they've, in fact, mooted their issues.

6          **THE COURT:**  All right.  So you supplemented your response?

7          **MR. DUNNE:**  Yeah.

8          **THE COURT:**  Okay.  I'm going to terminate 409, then.

9          **MS. MEHTA:**  Thank you, Your Honor.

10         **THE COURT:**  Okay.  Now Apple.

11         All right.  So ATT, Apple app tracking transparency didn't

12   come into being till April 2021.  It's awfully late for your

13   case.

14         **MS. SCARLETT:**  Correct, Your Honor, but it's the type of

15   event that economists, in particular, are looking at as a kind

16   of natural experiment about what happens when consumers are

17   given the ability to choose how someone uses their data.  The

18   impact on it -- on Facebook of this event was enormous.  And

19   so, yes, it postdates the class period; but, of course, you

20   couldn't have a natural experiment like this and perhaps have

21   the class continue on, given the enormous impact it had.

22         What we're looking for are documents for the experts that

23   help explain how this came about and what the impact was in

24   terms of what Apple saw on their side of the line.  These are

25   things that we simply can't get from Facebook.

1      **THE COURT:**  I didn't understand why not.

2      You want the dollar value of data.  Facebook has that or

3  Meta has that; right?

4      **MS. SCARLETT:**  So for the ATT, for the app tracking

5  transparency feature --

6      **THE COURT:**  That's what I'm talking about.

7      **MS. SCARLETT:**  -- we're seeking --

8      **THE COURT:**  I just said ATT.

9      **MS. SCARLETT:**  Sure.

10     **THE COURT:**  So you can get that from Meta.  Why are you

11  trying to get it out of Apple?  You may not believe Meta, but

12  that's not what you do with third parties.  They do not owe you

13  the time of day.  Okay?  They just don't.  So you can get that

14  from Meta.  So that one's denied.

15     I have doubts about this whole thing generally because

16  it's so late in the day, April 2021; but that, you get from

17  Meta.

18     I did think, to the extent that you want documents about

19  the origins, intent, purpose, motivations, and strategy of

20  AT&T -- ATT, not AT&T -- ATT, Apple tracking transparency, to

21  the extent Apple mentions Facebook directly, that seems

22  reasonable.  If there's anything in the records that say Apple

23  is doing this because something about Facebook, that seems

24  fine; that seems relevant.

25     So how about that?  Just put "Facebook" in as an

1  electronic search term, and if it says "Facebook" and "ATT,"

2  you can hand it over.

3      **MS. LENT:**  Thank you, Your Honor.  Karen Lent for Apple.

4      This is confidential commercial information that the

5  plaintiffs have to show --

6      **THE COURT:**  It all is.  That's why we have protective

7  orders.  Okay?  You can do "Outside Counsel Only," whatever you

8  want to do.

9      **MS. LENT:**  I understand, Your Honor.  There are a number

10  of cases that --

11      **THE COURT:**  That's not going to be a basis for denying

12  production.

13      **MS. LENT:**  My understanding of the law in this Circuit is

14  that the plaintiffs -- or the parties need to show a

15  substantial need for the information that is highly

16  confidential to get that from a non-party.

17      **THE COURT:**  Just run "Facebook" on the ATT -- any

18  documents that reference the origin strategies of ATT and

19  Facebook, you can produce.

20      **MS. LENT:**  Your Honor --

21      **THE COURT:**  Yes.

22      **MS. LENT:**  -- when you say to run those, plaintiffs have

23  proposed 13 custodians who go all the way up to the CEO of the

24  company.

25      We think that is unreasonable and unnecessary in this

1    circumstance.  So --

2         **THE COURT:**  I don't have that here.  I don't have a

3    custodian dispute.  So you all can work that out.  Okay?

4    I think Tim Cook might be a little much, but --

5         **MS. LENT:**  Thank you, Your Honor.

6         **THE COURT:**  -- you can work it out, okay, in the first

7    instance.

8         If you can't, you can come back to me.  Okay?

9         13 is a little much.  It's a third party.  Okay?  I'm not

10   being glib when I say they don't owe you the time of day.  They

11   are not here for you.  They're here for them.  So you're

12   getting a little something, but it's got to be tight and well

13   defined.

14        2019 fight between Tim Cook and Mark Zuckerberg in

15   Sun Valley, that's denied.

16        Apple's evaluation and discussion of Facebook data

17   collection used, that's also denied.

18        And is that it for Apple?

19        Oh, Meta programs that compensate -- Meta's programs that

20   compensate users for their data.

21        I mean, you should get that from Meta.  Why do you need

22   that from Apple?

23        **MS. SCARLETT:**  Your Honor, Apple does have some unique

24   perspective on this, and under the *Brown Shoe* practical

25   indicia, the perspective --

1     **THE COURT:**  Apple has what?

2     **MS. SCARLETT:**  A unique perspective on this.

3     **THE COURT:**  Who cares -- I'm sorry.  Who cares about

4  Apple's unique perspective?  All you're looking for is evidence

5  relevant, meaning to this case, okay, defined by the claims in

6  this case.

7     I'm sure Apple has a unique perspective on a billion

8  things.  You just don't get to go and get it.  It costs them

9  money; it costs them time; it invades their business.  You

10 don't just get to ask for it.

11    So you get it from Meta.  If you cannot get it from Meta,

12 then you can come back and tell me "There's only one shop in

13 the world that I can get this from and that's Apple."  Then

14 I'll take a look at it.  But in the meantime, that's all

15 denied.

16    So the only thing that Apple is going to do is produce

17 those documents that reference Facebook and the ATT program.

18 You understand what I'm saying?  You know better than I do.

19 But is this a response to Facebook?  Are we worried about

20 Facebook?  You know, that kind of thing.

21    **MS. LENT:**  Understood, Your Honor.

22    **MR. HORVITZ:**  Your Honor, Meta also has --

23 (Official Reporter interrupts for clarification of the record.)

24    **MR. HORVITZ:**  My name is Kevin Horvitz on behalf of

25 Meta Platforms.

1        I just wanted to indicate that Meta also has an

2   independent motion against Apple.

3        **THE COURT:**  Oh, yes.  Okay.  Now, what's the Meta one?

4        **MR. HORVITZ:**  So Meta is seeking documents and data from

5   Apple that are going to --

6        **THE COURT:**  406.  Docket 406; right?

7        **MR. HORVITZ:**  Yes, Your Honor.

8        **THE COURT:**  Meta's request to non-party Apple.  Meta would

9   like -- let me just jump in.

10        Meta wants Apple to produce documents regarding the impact

11   of Apple's ATT feature on Apple's own advertising business.

12        You know, the answer is no.  So I just shut down most of

13   the plaintiffs' request on that grounds.  That's also shut

14   down.  That's denied.

15        **MR. HORVITZ:**  Your Honor, may I be heard for one moment on

16   that?

17        **THE COURT:**  I have your letter.  If you're just going to

18   regurgitate what's in the letter, the answer is no.  Okay?

19        All right.  Thank you.

20        Anything else for today, plaintiffs?

21        **MS. SCARLETT:**  No, Your Honor, nothing from consumers.

22        **THE COURT:**  Anything else from the defendants?

23        **MS. MEHTA:**  No, Your Honor.  Thank you.

24        **THE COURT:**  All right.  Now, wait.  We left a

25   meet-and-confer dangling.  It will be in person.

```
 1        Are you all next to each other geographically?

 2        MR. CLARK:  No, Your Honor.

 3        THE COURT:  Let me start with Ms. Scarlett.

 4        How far are you away from Ms. Mehta?

 5        MS. SCARLETT:  We are probably 50 miles away.

 6        THE COURT:  50?

 7        MS. SCARLETT:  She's in the Bay Area.  I'm in the

 8   Bay Area, yeah.

 9        THE COURT:  Okay.  You two are going to meet in person.

10        MS. SCARLETT:  Okay.

11        THE COURT:  Okay?  You can have colleagues join remotely,

12   I guess.

13        MS. SCARLETT:  Okay.

14        THE COURT:  All right?  When do you want to do this

15   meet-and-confer?

16        MS. MEHTA:  Your Honor, this is the meet-and-confer

17   relating to all the scheduling issues we talked about, depo --

18        THE COURT:  Depositions and, yeah, all these other things.

19        MS. MEHTA:  Your Honor, I'm out of town all next week, but

20   I'm available the week after.

21        THE COURT:  No.  I'm just asking, like, two weeks? three

22   weeks? four weeks?  I'm not setting a date.  I just want to

23   know --

24        MS. MEHTA:  I see.

25        THE COURT:  -- how much time do you want.
```

1    **MS. SCARLETT:**  Oh, good.  This is for the deposition

2   numbers and hours?  Given the depositions are starting

3   February 2nd, we'd like to get this done in two weeks.

4    **THE COURT:**  You can start.  You're going to get some time.

5   There's no reason -- don't delay the depositions.  You can

6   start.  You're going to have plenty of time.  So don't derail

7   anything.  You're just rounding it out on the back end.

8    So you want three weeks?  Three weeks.  How about three

9   weeks?  Three weeks from Monday?

10    **MS. MEHTA:**  That works, Your Honor.  Thank you.

11    **THE COURT:**  All right.  So you two are going to be in

12   person.

13    Now, the advertisers need to be there too.  So who's going

14   to be in person -- where are you located?

15    **MR. BATHAEE:**  I'm in New York, Your Honor, and my

16   colleague's in Austin, Texas.

17    **MS. LAWRENCE:**  I'm in Connecticut, Your Honor.

18    **THE COURT:**  Connecticut?

19    **MS. MEHTA:**  Your Honor, we do have -- actually, one of my

20   colleagues is in New York.  So what we could do is have some

21   people meet in person in New York, some people meet in person

22   in California, and we can videoconference together.  We've done

23   that before, and it's worked reasonable well.

24    **MS. LAWRENCE:**  Advertisers are willing to offer

25   Scott & Scott's offices in New York City for in-person as well.

1      **THE COURT:**  Location.  You'll meet in New York.  Ad people

2  will meet in New York same time frame.  Okay.

3      And then I don't really need to see it.  You just work

4  something out.  Okay?  I mean, I don't normally get involved

5  unless you want me to.  I'd be happy to do it.  But you just

6  work it out.  And write it down, so if you have a problem, I

7  can look at it later.  But you don't have to wait on me.  If

8  you want me to do it as an order, I'll be happy to do it, but

9  you don't necessarily have to do it that way.

10     **MS. MEHTA:**  Would it be okay, Your Honor, if -- I'm very

11  hopeful we'll reach some sort of agreement.  We'll memorialize

12  that in a stipulation just so that we can show that to

13  non-parties if they ask.  And then if we can't reach an

14  agreement, we'll do what you said, which is one line.

15  Hopefully, that won't be necessary.

16     **THE COURT:**  Okay.  Now, wasn't there something else that

17  you -- oh, yes.  Then the rebids are going to be -- did we set

18  a deadline for that?

19     **MS. SCARLETT:**  Two weeks.

20     **THE COURT:**  Two weeks from Monday.

21     Okay.  And what else?

22     **MS. MEHTA:**  Your Honor, just want to clarify one thing.

23  On the report from the meet-and-confer, three weeks from today

24  is when you'd like us to file that?

25     **THE COURT:**  Well, I'm saying if you work everything out, I

 1  don't necessarily --

 2       **MS. MEHTA:**  You don't care.

 3       **THE COURT:**  -- need to see it; but if you want me to do it

 4  as an order, I'm happy to do it.

 5       **MS. MEHTA:**  Thank you.

 6       **THE COURT:**  Okay?  If you haven't worked it out, you need

 7  to tell me.  That's the only thing.  You can do an order if you

 8  want; happy to do it.  If you failed, just let me know and I

 9  will do it myself.  And if you reach a deal and you don't want

10  an order, that's okay.  I don't need to be involved.

11       I want you two -- this is your case.  You manage it.  I

12  should not be managing this the way that I am.  You manage it.

13  I'm trying to get you to do it.  Okay?

14       **MS. MEHTA:**  Understood, Your Honor.

15       I think the last thing is to set another status

16  conference.  Hopefully, the agenda for that will be a lot

17  slimmer.

18       **THE COURT:**  That's fine.  Just pick a date in late

19  February or whatever you'd like, but at least 30 days out.  At

20  least 30 days out.  Okay?

21       **MS. MEHTA:**  Should we meet and confer on that and just

22  propose a date to the Court, or do you want to do that right

23  now?

24       **THE COURT:**  No.  You pick them.  Just pick a date.

25       **MS. MEHTA:**  Okay.  We'll just pick a date.  Thank you.

1      **THE COURT:**  I'm trying to get you to internalize this.  I

2  don't feel like the message -- you pick the date.  I don't want

3  to be involved.  This is your case.  You pick it.  Okay?

4      Now, I am going to start putting caps on these letters.

5  I'm getting way too many.  Okay?  So if between now and our

6  next conference I get anything like the volume of letters I've

7  gotten, there's going to be some prefiling restrictions.  So

8  just be aware of that.  Okay?

9      All right.  Is that it?

10     **MS. SCARLETT:**  That's it.  Thank you very much,

11  Your Honor.

12     **THE COURT:**  Good?  Okay.  Thanks a lot.

13     **THE CLERK:**  All rise.  Court's in recess.

14        (Proceedings adjourned at 11:40 a.m.)

15             ---o0o---

16         **CERTIFICATE OF REPORTER**

17      I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  DATE:  Monday, January 23, 2023

21

22             *Ana Dub*

23  _____

24     Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
           Official United States Reporter

25