**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

**JOINT STATUS REPORT**

Pursuant to the Court's Minute Order of September 30, 2022, the parties submit the following Joint Status Report summarizing the state of discovery, identifying any issues between the parties, and summarizing the parties' respective positions.

## I.    The FTC's Statement on the Status of Discovery

For the reasons described below, the FTC respectfully asks the Court to order the following:

1.  Meta shall, no later than April 14, 2023, produce performance evaluations in response to FTC's Request for Production No. 101.

2.  The parties shall submit briefing, in accordance with the FTC's requested briefing schedule described below, regarding the FTC's motion to compel Meta's complete response to FTC's Interrogatory Nos. 10-12.

3.  Meta shall conduct a complete re-review of its March 2 litigation privilege log and produce, no later than April 28, 2023, a final amended litigation privilege log.

**A.**     <u>The FTC's Position Regarding Its Discovery to Meta</u>

     **1.**     **The FTC Respectfully Requests this Court to Compel Meta to Produce Performance Evaluations**

The FTC served its Seventh Set of Requests for Production ("RFPs") on February 1, 2023, including a request for performance evaluations of Meta's current and former employees subpoenaed for a deposition in this matter, as well as any performance evaluations those individuals authored or approved. FTC's Seventh Set of Requests for Production to Meta, Exhibit A. Meta objected, and during a March 7 meet and confer claimed *inter alia* that performance evaluations are irrelevant and thus not discoverable. On March 10, Meta subsequently asked, without formally offering, that the FTC consider a potential compromise to limit its request to performance evaluations of deponents only, excluding performance evaluations authored or approved by deponents. In the spirit of compromise and hoping to avoid an unnecessary dispute, the FTC agreed to so limit the scope of its request. *See* Email from N. Brenner to S. Strikis (Mar. 13, 2023) ("During Friday's meet and confer, Meta asked whether the FTC would be willing to accept deponents' performance evaluations in response to RFP No. 101. In the interest of compromise, if Meta agrees to produce performance evaluations from the relevant period for all of the deponents who are current or former Meta employees, then the FTC will remove this dispute from the JSR."). But Meta then rejected the very compromise it had initially introduced, and now insists that it will not produce any performance evaluations. The FTC thus requests that the Court instruct Meta to comply with the FTC's Request for Production as originally propounded: Meta should produce performance evaluations of Meta's current and former employees subpoenaed for a deposition in this matter, as well as any performance evaluations those individuals authored or approved.

Performance evaluations typically reflect a contemporaneous catalog of employees' roles,

responsibilities, accomplishments, and actions, which shed light on an employee's knowledge of certain subject matters and success in achieving company goals. Thus, they can serve as important barometers for the credibility of employees' testimony. *See, e.g.*, *U.S. ex rel Krahling v. Merck & Co.*, 2016 WL 7042203, at *3 (E.D. Pa. Feb 5. 2016) (noting performance reviews were relevant to assess the credibility of a witness's testimony). Accordingly, performance evaluations are commonly produced and used in antitrust litigations. *See, e.g.*, Joint Status Report at 7-8, *United States v. Google*, No. 20-cv-03010, ECF No. 189 (Aug. 27, 2021) (citing *United States v. Am. Exp. Co.*, No. 10-cv-4496 (E.D.N.Y. 2014), Trial Tr. 742:22–746:10, 1994:7–1998:19, 2068:21–2070:23, 2133:22–2144:25, 5611:19–5618:17; *United States v. Aetna Inc.*, No. 16-cv-1494 (D.D.C. 2016), Trial Tr. 298:10–24; *United States v. Sabre Corp.*, No. 19-cv-1548 (D. Del. 2020), Trial Tr. 812:6–813:13). Indeed, after reviewing a sample selected by the Department of Justice, Judge Mehta recently compelled production of Google's performance evaluations in response to a similar RFP. Hr'g Tr. at 29, *United States v. Google*, No. 20-cv-03010, ECF No. 151 (June 29, 2021) (finding that the requested performance evaluations "provide sort of an interesting insight and window into the thinking of the assessor in terms of reflecting on the work that they've done and how they think that benefited the company"); *see also* Hr'g Tr. at 33-35, *United States v. Google*, No. 20-cv-03010, ECF No. 142 (May 28, 2021) (describing the process by which Judge Mehta planned to review a sample of performance evaluations).

Given their routine production in similar lawsuits, the FTC was surprised to learn that Meta neglected to collect and produce such documents in response to the FTC's First Set of RFPs—the parties spent months negotiating custodial search terms, and yet Meta never indicated that it planned to categorically exclude from its custodial review any employee's performance evaluations. Meta now uses its unilateral and undisclosed decision to withhold such documents as

an attempted justification for rejecting the FTC's latest RFP, claiming that production at this stage of fact discovery would be unhelpful because depositions are already underway.  Meta's reasoning is both circular and myopic: though performance evaluations might have been helpful during already-completed depositions, they will also be useful for expert discovery, dispositive motions practice, and trial—in addition to being useful in remaining depositions.

Meta cannot reasonably assert that the FTC's request does not meet the low bar for relevance.  *Food Lion, Inc. v. United Food & Com. Workers Intern. Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) ("Generally speaking, 'relevance for discovery purposes is broadly construed.'").  The FTC's request is not a fishing expedition; the performance evaluations the FTC seeks will provide important information regarding Meta's competitive strategies and business goals, as well as shed light on the responsibilities, competence, knowledge, and credibility of deponents.  Such issues are central to any antitrust case.  And the FTC has good reason to suspect that Meta's records would be highly relevant, too.  At least one performance evaluation slipped through the cracks of Meta's document review protocol and was produced.  *See* PX10504, Exhibit B.  The document shows █████████████████████████████████
████████████████████████████████████████████████████
*See id.*; █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

In support of its refusal to produce performance evaluations, Meta cites two cases, but

neither support its unreasonable position that the requested documents are irrelevant.  In *Lurensky v. Wellinghoff*, 271 F.R.D. 345 (D.D.C. 2010), the court addressed a number of document requests, two of which Meta muddles together: (1) seeking performance evaluations for every employee over a ten year period, *id.* at 348; and (2) seeking the entire personnel file for thirteen employees listed on defendant's initial disclosures, *id*. at 349.  On the first request, the court understandably found that a request for "every performance evaluation for every employee" over a ten-year period was disproportionate.  *Id*. at 348; *see also id.* at 355 (noting that the defendant had 200 employees).  Here, the FTC is not seeking every performance evaluation for every Meta employee; instead, the FTC is only seeking performance evaluations relating to deponents.

On the second document request, the *Lurensky* court concluded that simply including an individual on defendant's initial disclosures did not compel the production "of their entire personnel file irrespective of any connection between the information they may have and their personnel files."  *Id.* at 349.  Here, the FTC's request is informed by specific evidence, some of which is set out above, that Meta's performance evaluations will likely contain relevant facts.  Moreover, the FTC is not seeking anyone's "entire personnel file," only performance evaluations.  And the request is narrowly targeted to Meta employees the FTC has already or will soon depose, the FTC is not seeking the files of employees whose link to the case is merely speculative.  Meta's reliance on *Slate v. Am. Broad. Cos. Inc.*, 274 F.R.D. 350 (D.D.C. 2011) is unpersuasive for the same reasons.  In *Slate*, the court reached the uncontroversial conclusion that entire personnel files need not be discoverable when they have only a tenuous connection to the case.  *Id.* at 352 ("The simple fact that [defendant's] employees interacted with plaintiff in the course of their employment does not provide a basis for allowing the plaintiff to explore these employees' personnel files, let alone forcing the defendants to produce them.").  As noted above, the FTC's request here is not

seeking entire personnel files, and its request is supported by strong indications that the evaluations the FTC seeks will contain or shed light on relevant facts.

The FTC's need for these documents is acute here, since Meta deponents have repeatedly sought to minimize the quality or significance of past work, or in some cases to disclaim their involvement in the work altogether.   For example, ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████.   In another instance, ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████.

In both examples, access to the deponents' performance evaluations could help contextualize or otherwise inform the credibility of the witness's testimony.   Meta further claims that the FTC has no need for these performance evaluations because the information and facts contained within are readily obtainable during deposition, a claim which overstates the ability of Meta's current and former employees to recall information as simple as the names of previous supervisors or direct reports.   ████████████████████████████████ ███████.   Even if these performance evaluations were of uncertain relevance at the outset of this

litigation, the behavior of Meta's current and former employees during depositions—both forgetful and brazen—confirms their significance.

Further, Meta has yet to articulate any burden the FTC's request might impose: presumably, as a large and sophisticated corporation, Meta maintains personnel files such that discrete sets of performance evaluations can be collected and produced easily. The burden of producing such information would be "slight." *Telecom Tech. Servs. Inc. v. Rolm Co.*, 1997 WL 34636705, at *2 (N.D. Ga. Dec. 30, 1997). Last, any concerns Meta may have about sensitive information contained within these documents can be allayed by the existing protective order. *See* Protective Order, ECF No. 134 at 2-3 (protecting personnel files and sensitive personal information as Highly Confidential); *see also Moya v. City of Clovis*, 2019 WL 4193427, at *3 (D.N.M. Sept. 3, 2019) (recognizing the appropriate remedy to protect sensitive information in personnel files is a protective order, not barring access to the information within the files). And if Meta believes it has good cause to redact acutely sensitive or irrelevant personal information such as information related to individuals' health conditions or personal circumstances, Meta should make such a proposal rather than use the mere possibility to foreclose appropriate discovery into relevant topics.

Meta has no justification for refusing the FTC's request for a limited set of performance evaluations. Meta's position—that the FTC is entitled to zero performance evaluations relating to deponents, and that Meta is unwilling to even discuss scope or reasonable limitations—is as untenable as it is unsupported. Meta should not be rewarded for unilaterally choosing to carve out these documents from its response to the FTC's First Set of RFPs, nor for refusing to engage in negotiations over a possible compromise that would have obviated the need for this dispute. Accordingly, the FTC respectfully asks the Court to order Meta to produce all performance evaluations of Meta's current and former employees already or subsequently subpoenaed for a

deposition in this matter, as well as any performance evaluations those individuals authored or approved.

### 2. The Court Should Set a Briefing Schedule for the FTC's Motion to Compel a Complete Response to 10, 11, and 12.

As explained below, the FTC respectfully asks this Court to set the FTC's requested briefing schedule for the FTC's motion to compel a complete response to Interrogatories No. 10 through 12. Without the additional specificity requested by Interrogatory Nos 10-12 – which only Meta is able to provide – the FTC cannot understand Meta's assertions that its acquisitions of Instagram and WhatsApp produced procompetitive benefits, and the FTC certainly cannot engage in effective discovery regarding Meta's allegations. The FTC needs additional information to engage in discovery and avoid being blindsided by belated disclosure of facts in Meta's sole control.

### a. Background

The FTC issued Interrogatory Nos. 1-8 on May 26, 2022. This set of Interrogatories included Interrogatory Nos. 5 and 6 which asked Meta in part to "[i]dentify and describe each procompetitive justification that the Company contends supports its Fourth and Fifth Affirmative Defenses in Meta's Answer" and to "identify and describe each improvement." FTC's First Set of Interrogatories to Meta, Exhibit H; Meta's Fourth and Fifth Affirmative Defenses, ECF No. 94 (January 25, 2022). Meta responded by providing only a high-level overview of its allegations that provided no meaningful details or specificity regarding Meta's supposed procompetitive benefits. For example, Meta's response provided only general information about changes in WhatsApp and Instagram's infrastructure but did not provide details regarding what changes Meta made to particular components of the hardware, software, or servers of WhatsApp and Instagram, how those changes resulted in procompetitive benefits, or the extent of those alleged benefits.

Meta Supplemental Responses & Objections to Interrogatory No. 6 (Sept. 22, 2022), Exhibit I.

As Meta refused to supply specificity, the FTC then issued a set of Request for Admissions asking Meta to admit that Meta could not identify which of Meta's resources contributed to specific alleged improvements: Meta denied each. Meta's Responses and Objections to the FTC's First Set of RFAs, Exhibit J. Accordingly, since Meta insists that it ***can*** identify which of its resources contributed to specific supposed improvements, the FTC issued Interrogatory Nos. 10-12 to Meta on January 30, 2023 to obtain the details missing from Meta's response to Interrogatory Nos. 5 and 6 and to ask Meta to provide the basis for its denial of the FTC's Request for Admissions Nos 4-10. FTC's Third Set of Interrogatories, Exhibit K. Meta responded on March 1, 2023, refusing to answer Interrogatory No. 11 and providing a deficient response to Interrogatories Nos. 10 and 12.

The FTC identified specific deficiencies in Meta's response to Interrogatories 10 and 12 in a March 7 letter and invited Meta to submit a counter proposal to address those deficiencies in its response. Mar. 7, 2023 Ltr. from S. Musser to G. Block, Exhibit L. Meta declined to do so and indicated that they were unwilling to supplement their response. To date, Meta's responses to Interrogatories Nos. 10 and 12 are vague, conclusory, and omit key information requested. Regarding Interrogatory No. 11, at Meta's urging, the FTC offered to substantially narrow its request to include only an explanation regarding the tools or programs Meta employs to address objectionable content. The FTC confirmed that it was not seeking every action or instance that Meta has taken to address objectionable content but only sought a high-level understanding of Meta's programs. Meta rejected the FTC's proposal and has not offered a counterproposal.

> **b.   The FTC Respectfully Request this Court to set a Briefing Scheduling for the FTC's Motion to Compel a Complete Response to Interrogatories Nos. 10, 11, and 12**

In its Answer, Meta injected certain procompetitive justifications into this litigation by asserting that its acquisitions of Instagram and WhatsApp are "procompetitive."   Meta's Fourth and Fifth Affirmative Defenses, ECF No. 94 (January 25, 2022).   Specifically, Meta appears to be alleging that its acquisitions produced procompetitive benefits for users due to changes to Instagram and WhatsApp's infrastructure (i.e., the compilation of hardware, software, and servers used to run each application), integrity programs (i.e., tools, systems, and methods used to identify spam and other undesirable content), features, and personnel.  Meta Supplemental Responses & Objections to Interrogatory No. 6 (Sept. 22, 2022), Exhibit I.  Under D.C. Circuit law, Meta must do more than simply declare that its conduct—here its acquisitions of Instagram and WhatsApp— are procompetitive.  Instead, a monopolist that has engaged in exclusionary conduct bears a heavy burden of proving a substantial "procompetitive justification – a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  *United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001); *see also* Areeda & Hovenkamp ¶ 701h ("[A]n efficiency defense cannot be allowed in monopoly cases in the absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms.").  To probe Meta's allegations, the FTC Interrogatories No. 10 through 12 seek detailed, factual information regarding the basis for Meta's contentions regarding procompetitive benefits.  FTC's Third Set of Interrogatories, Exhibit K.

Meta's vague responses recite certain benefits supposedly produced by its acquisition of Instagram and WhatsApp, but fail to provide any detail regarding what changes or actions Meta took in order to accomplish those alleged procompetitive benefits, the costs associated with those actions, metrics by which Meta measures or measured those alleged procompetitive benefits, or

the degree to which Instagram and WhatsApp changed post-acquisition.  Meta also cited a series of internal documents, videos, and public sources.  The FTC's review of these thousands of pages of documents and hours of video show that instead of providing clarity and transparency regarding Meta's answer to Interrogatory Nos 10-12, Meta's citations raise more questions than answers.

Given the deficiency of Meta's responses and the importance of understanding and pursuing discovery regarding Meta's contentions, the FTC is given no choice but to move to compel further supplementation to Meta's answer.  The FTC respectfully asks this Court to enter the following briefing schedule, which parallels the briefing schedule adopted in the Court's Minute Order of February 9, 2023:

- FTC Motion to Compel (15 pages)

- Meta Opposition to Motion to Compel (15 pages due 11 days after the Motion to Compel)

- FTC Reply to Meta Opposition (10 pages due 5 days after Meta's Opposition to Motion to Compel).

### 3.    Meta's March 2 Litigation Privilege Log

Meta disregarded its obligation to provide a litigation privilege log by January 23, 2023, despite previously acknowledging it was required to do so by the Joint Scheduling Order.[1]  Meta provided a log on January 24, but promptly acknowledged that this log was insufficient.  Meta

---

[1] *See* ECF No. 227 (Joint Status Report Dec. 15, 2022), at 3 ("Regardless of Meta's failure to comply with the December 7 deadline to respond to the FTC's first set of RFPs, the parties have agreed that Meta will produce its associated privilege log, and any corresponding documents, by January 23, 2023, which is 45 days after Meta should have substantially complied with the FTC's first set of RFPs.") (citing ECF No. 103 (Joint Scheduling Order), ¶ 17); *id.* at 24 (Meta's portion of the Joint Statement: "[t]he Scheduling Order provides Meta until January 23 (45 days after the substantial completion deadline, December 7) to complete its privilege log for documents responsive to the FTC's First Set of Requests for Production ("First RFPs").").

then delayed for more than five weeks before providing a revised log on March 2, 2023 (the "March 2 Privilege Log") that substantially altered more than 30,000 privilege descriptions, addressed previously un-reviewed documents, and addressed other unspecified "issues" with its initial log.  *See* 2/9/23 Joint Status Conference Tr., pp. 28-29 (acknowledging "there [we]re some issues with the log that got produced" on January 24).

Unfortunately, the FTC's review of the March 2 Privilege Log reveals that Meta's privilege descriptions are insufficient to support its claims, even after its substantial revisions.  But at this point, due to Meta's delay in providing the March 2 log and the impending end of fact discovery, the FTC simply does not have the time or resources to repeat a lengthy process of identifying a sample of specific entries for Meta's review.  Thus, in light of Meta's delayed log, previously unacceptable reversal rates, and the continued presence of concerning categories of documents, the FTC requests that the Court instruct Meta to conduct a re-review of its entire March 2 Privilege Log and to provide a final amended litigation privilege log by April 28, 2023.

### a.   Meta's Litigation Log Suffers from the Same Fundamental Defects as its Investigation Log

Meta's March 2 Privilege Log dramatically changed the privilege assertions Meta advanced in its January log:  Meta appears to have abandoned privilege assertions over thousands of previously withheld documents, changed the type of privilege claimed for more than 1,800 other entries, and substantially altered more than 30,000 privilege descriptions.  In short, the litigation privilege log Meta provided in January 2023 was not an accurate representation of what now appear to be Meta's actual privilege claims.  Despite substantial these changes, Meta's March 2 Privilege Log contains tens of thousands of concerning entries that fall into the categories previously identified to the Court.

### b.   Meta's Policy and Practice to Shield Documents

Meta's pattern and practice of over-asserting privilege raises concerns not only about selected categories of documents, but also about Meta's privilege log as a whole. As this Court is aware, Meta's re-review of its investigation log revealed systematic deficiencies in Meta's privilege assertions. *See generally,* ECF No. 221 (Plaintiff's Statement In Advance Of The Parties' November 28, 2022 Teleconference With the Court Regarding Discovery Dispute), p. 1 (identifying that "Meta has reversed over 50% of privilege claims falling into four categories"); ECF No. 227 (Dec. 15 Joint Status Report), p. 4 ("Meta's reversal rate appears to exceed 80% for the entries that the FTC identified on September 20"); ECF No. 237 (Jan. 31 Joint Status Report), p. 6 (identifying Meta's alarming reversal rate of "more than 70%" related to a random sample). While these alarming rates of reversals continued to roll in, in light of the compelling need to move this litigation forward expeditiously, the FTC acceded to a compromise regarding Meta's investigation privilege log wherein Meta would re-review entries related to certain categories of documents and deponents, constituting roughly a third of its 337,000 total privilege assertions. Meta represented that it completed this re-review of its investigation log on March 7, 2023. Based on the FTC's assessment, Meta reversed privilege claims for approximately 60% of the responsive documents it reviewed. This shockingly high reversal rate indicates that Meta's investigation log likely still contains tens of thousands of responsive, non-privileged documents described by the two-thirds of entries Meta did not re-review.

These deficiencies may be the result of Meta's internal policy intended to shield documents from discovery. In holding that Meta's discovery-related conduct was sanctionable, Judge Chhabria found, "Facebook employees are taught to improperly 'privilege' documents based on their perceived sensitivity." Exhibit M (Sanctions Order at 47, ECF 1104, *In re Facebook Consumer Privacy Litig.*, 3:18-cv-2843 (N.D. Cal. Feb. 9, 2023)) ("Sanctions Order"). Identified

in that order, FB_FTC_CID_09243004 shows an employee instructing another: "Just ensure that if it's very sensitive you ask a lawyer for guidance in the quip and privilege it" and then forwarding links to company instructions on the process. *See* Exhibit N; *see also* Exhibit O (ECF 1103-22, *In re Facebook Consumer Privacy Litig.*) ("[C]an we discuss in person?  Else we need to make this a/c priv and add a lawyer in the thread.").

The FTC's independent document review revealed other examples of this policy in action and raises concerns that the practice identified by Judge Chhabria was not isolated to the documents in that case.  For instance, in FTC-META-005368715, a Meta employee asks ███ ████████████████████████████████████████ to which another replies ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ and ████████████████████ ████████████████████████████████ Exhibit P.  In FTC-META-011950427, Meta employees discuss a ████████ analysis and write ███████████████████████ ███████████████████████ and ████████████████████████████████████ ███████████████████████████████ Exhibit Q.  Such documents suggest a systematic and company-endorsed practice of gratuitously asking "a question" to a lawyer solely to conceal sensitive documents.  In light of these indications, Meta should be required to examine its privilege assertions to ensure that communications between Meta employees and counsel involve a genuine attempt to seek advice that is legal in nature, rather than just a box-checking exercise designed to conceal communications related to sensitive issues.

Given Meta's pattern and practice both in this case and as a company in over-designating documents as privileged, as well as indications that Meta litigation log suffers from the same deficiencies as it investigation log, the FTC respectfully request that the Court order Meta to

complete a re-review of its March 2 privilege log and produce a final amended litigation privilege log by April 28, 2023.

     **B.**      **The FTC's Position on Third-Party Discovery**

     The FTC currently has no ripe disputes with third parties.  However, the FTC is aware of one pending dispute between Meta and a third party.  eBay filed its Motion to Quash Meta's Subpoena in the Northern District of California.  Mot. to Quash, *Federal Trade Commission v. Meta Platforms, Inc.*, 23-mc-80074 (N.D. Cal. Mar. 13, 2023), ECF. No. 1. In its Motion, eBay explained that "[o]f course eBay does not provide PSNS.  eBay is an online platform that brings buyers and sellers together to buy and sell goods, either through auctions or traditional purchase and sale transactions." *Id.* at 1.  Accordingly, eBay contends that "Meta has violated the principles of proportionality and reason in its third-party discovery efforts in this case, on an overall level and as to eBay in particular" and moved the Court to issue a Protective Order under Federal Rule of Civil Procedure 26(c)(1) to preclude Meta and the FTC from deposing eBay or, alternatively, requests the Court quash the deposition subpoenas pursuant to Federal Rule of Civil Procedure 45(d)(3). *Id.* at 2-3.  The FTC takes no position regarding eBay's motion.

**II.**     **Meta's Statement on the Status of Discovery**

     **A.**      **Meta's Statement on the Status of the FTC's Discovery to Meta**

     Meta has provided an extraordinary amount of discovery in response to the FTC's sweeping discovery requests.  In the FTC's pre-complaint investigation and in this litigation, Meta produced approximately 5.4 million documents comprising nearly 25 million Bates numbers; hundreds of pages of written interrogatory and Rule 30(b)(6) responses and other narrative submissions; and hundreds of gigabytes of data.  Moreover, in the investigation and the litigation, Meta's current and former employees and Rule 30(b)(6) witnesses to date have given

over 300 hours of oral testimony in response to the FTC's questioning.  Meta has provided

nearly all of this information without burdening the Court to raise disputes about the FTC's

expansive discovery requests.  The FTC, by contrast, has produced to Meta approximately 8,880

documents (comprising only about 83,000 Bates numbers) and resisted providing fulsome

responses to Meta's reasonable interrogatories.  *See*, *e.g.*, Order, ECF No. 165 at 1 (Aug. 1,

2022) (granting Meta's motion to compel the FTC to answer Interrogatory No. 10 because "Meta

understandably seeks a clearer definition of what the FTC maintains is the personal-social-

networking-services market"); Meta's Mot. to Compel Answers to Interrog. Nos. 13 and 14

Regarding the FTC's Market Definition, ECF No. 243-1 (Feb. 24, 2023); Meta's Mot. to Compel

Answer to Interrog. No. 2 Regarding Facts Nonparties Provided the FTC In 2012 And 2014,

ECF No. 254-1 (Mar. 13, 2023).

Despite the extensive discovery that Meta already provided, the FTC has continued to

issue a hodgepodge of overbroad, duplicative, irrelevant, unduly burdensome, and

disproportionate discovery requests.  The Court should bring an end to the FTC's excessive

discovery demands.

### 1. The Court Should Deny the FTC's Request for Briefing on FTC Interrogatory Nos. 10-12.

The Court should reject the FTC's request to brief whether Meta should be required to

supplement its responses to Interrogatory Nos. 10 and 12 and respond to Interrogatory No. 11.

The FTC's demands for supplementation of Interrogatory Nos. 10 and 12 and for a response to

Interrogatory No. 11 – distinct issues that the FTC conflates – are on their face without merit.

The Court does not need 40 pages of briefing to reject the FTC's demands.

### A.   The Court Should Deny the FTC's Request that Meta Supplement Its Response to FTC Interrogatory No. 10.

The Court should reject the FTC's request that Meta further supplement its response to Interrogatory No. 10.  That interrogatory – which is, in fact, dozens of separate interrogatories – asks Meta to identify, among many other things, every action it has taken to improve Instagram and WhatsApp, including the "timeline, status, and costs of such actions"; "the specific tools, methods, strategies, personnel, or technologies employed" in connection with such actions; and all metrics and data quantifying such improvements.  Meta provided a detailed 22-page narrative response that describes the primary ways it has improved Instagram and WhatsApp, and for support cites 279 documents, specific portions of seven depositions, its prior responses to Interrogatory Nos. 5 and 6, and publicly available material.  In addition, Meta explained that information the FTC seeks about quantification of improvements is a matter for expert testimony, not fact discovery.

The FTC wrongly claims that Meta is required to provide more detail still.  Since Meta acquired Instagram in 2012 and WhatsApp in 2014, it has engaged in countless interrelated actions to improve these services, and the success of these two apps is inextricably tied to both the individual and collective nature of these massive efforts that continue to this day.  The FTC is mistaken that each single action that resulted in improvements can be separately identified, documented, and quantified.  Meta's response is more than sufficient, and the Court should deny the FTC's unreasonable request for additional information.

*First*, the FTC's request for a supplement ignores information the FTC already has from Meta's prior responses to the FTC's duplicative earlier interrogatives and Meta's written submissions during the FTC's pre-complaint investigation.  Last year, the FTC propounded two interrogatories that similarly sought information about the improvements Meta made to both

Instagram and WhatsApp.  Interrogatory No. 5 asked Meta to "Identify and describe each procompetitive justification that the Company contends supports its Fourth and Fifth Affirmative Defenses in Meta's Answer and Defenses to the FTC's Substitute First Amended Complaint." Interrogatory No. 6 asked Meta to "Identify and describe each improvement the Company contends it has made to Instagram and WhatsApp since acquiring each (*see generally* Submission by Facebook, Inc., Facebook's Acquisitions of Instagram and WhatsApp (Sept. 18, 2020)), including describing any monetary, technological, personnel, and other resources and investments required for the improvement."

Meta provided approximately 20 pages of substantive narrative responses to the FTC's Interrogatory Nos. 5 and 6, including a list and descriptions of the major improvements that Meta made to Instagram and WhatsApp and the benefits that resulted from those improvements.  Meta supplemented its responses to Interrogatory Nos. 5 and 6 at the FTC's request, and the FTC is not challenging those responses as deficient.  In Meta's responses, Meta also explained that it would be impossible to provide a detailed list of every single improvement made to both Instagram and WhatsApp over the past decade.  Meta has made improvements and investments to its products continually over the ten and eight years following the acquisitions.  Meta explained that it was therefore not possible as either a theoretical or practical matter to identify every specific action that resulted in a procompetitive benefit, much less the details regarding the timeline, costs, specific tools methods, strategies, personnel, and technologies employed.

Months later, on January 30, 2023, the FTC propounded Interrogatory No. 10, which largely duplicates Interrogatory Nos. 5 and 6 and adds multiple additional requests for granular detail regarding the benefits that Meta had previously described.  Notwithstanding Meta's objections and concerns that Interrogatory No. 10 is duplicative of prior discovery requests and

excessively burdensome on its face, Meta provided a substantive response and undertook a good-faith and extensive search for responsive documents.  Meta's response was more than adequate.

*Second*, the FTC's request for Meta to supplement its response disregards the information in the Interrogatory No. 10 response that Meta already provided.  During the parties' negotiations, the FTC accused Meta, incredibly, of "fail[ing] to identify *any* improvement or investment that it attributes to its acquisitions of WhatsApp and Instagram."  Ltr. from S. Musser to G. Block at 3 (Mar. 7, 2023).  But the FTC either did not review Meta's response or is choosing to mischaracterize it.  As just one example, Meta's response to Interrogatory No. 10 cited to specific pages from the deposition transcript of ████████ to support Meta's improvements to Instagram's Integrity efforts.  ███████, ████████████████ ███████████████████████████████████, testified that Meta ████████████████████████████████████████ ████████████████████ He explained that ██████████████ █████████████████████████████████████████ ████████████████████ █████████ further testified that, █████████████████████████████████████ ███████████████████████████████████████ ████████████████████

The FTC claims that "[w]ithout additional specificity – which only Meta is able to provide – the FTC cannot understand Meta's position regarding how its acquisitions of Instagram and WhatsApp are procompetitive and it certainly cannot engage in effective discovery regarding Meta's allegations."  JSR at 8.  This is disingenuous.  Meta has identified with specificity the myriad ways in which the acquisitions are procompetitive – it provided six

categories of benefits with respect to Instagram, and five with respect to WhatsApp; it provided narrative descriptions of each; and it cited documents and other evidence supporting this explanation.  Further, the FTC's depositions to date — which were cited in Meta's response — have explored these various categories in considerable depth.  The FTC's claim that it "cannot understand Meta's position" — and its related request for further briefing on this issue — is just another attempt to impose on Meta an unreasonable and unfair discovery burden.

Further briefing on this question would be a waste of time and resources.  Meta's response required considerable effort, and the additional detail the FTC seeks is neither warranted nor reasonable.

### B.      The Court Should Quash FTC Interrogatory No. 11.

The Court should reject the FTC's request that Meta respond to the FTC's Interrogatory No. 11.  That interrogatory – which is, in fact, more than a dozen separate interrogatories – asks Meta to "[i]dentify and describe in detail the specific methods, tools, or actions taken to manage or address Integrity on the Facebook Family of Apps (including Instagram and WhatsApp prior to their acquisitions by the Company) [from January 1, 2009 to the present], and include in the description the timeline and status of deploying such methods, tools, or actions, and whether the methods, tools, or actions were provided in whole or in part by the Company or any other Person."  Despite Meta's request, the FTC has refused to narrow this Interrogatory in any meaningful way.  Instead, the FTC has continued to demand that Meta describe every tool and method it deployed related to Integrity efforts on Facebook Blue, Instagram, WhatsApp, and Facebook Messenger for the last 14 years.

The FTC surely knows that Meta cannot possibly identify and describe in detail each discrete "action" the company has taken, from 2009 to the present, to "manage or address

Integrity." The FTC defines Integrity to mean "efforts to detect, deter, measure, quantify, assess, or remove Objectionable Content on Facebook Blue, Instagram, and WhatsApp." The FTC in turn defines Objectionable Content to mean "any type of content that may violate Meta's Community Standards . . . including, but not limited to, spam, fake accounts, fraud, pornography, child exploitation, sexual solicitation, violent and graphic content, hate speech, election interference, and bullying." As Meta explained in the last Joint Status Report, many teams across Meta address this broad range of issues. There is neither a central repository where the complete history of such efforts is stored nor an automated approach by which such comprehensive information can be extracted. Accordingly, to comply with the Interrogatory as written would be unduly burdensome and for no apparent purpose other than to provide the FTC with information that is at best marginally relevant (if that) and disproportionate to the needs of the case.

The FTC asks the Court to order additional briefing on this issue. But no briefing is necessary where, as here, the FTC has failed to explain what specific information it is seeking in addition to the information that Meta already has provided about its Integrity efforts, including in its pre-complaint investigation written submissions, its responses to FTC Interrogatory Nos. 5, 6, 8, 9, and 10, and Request for Production No. 93, all of which requested discovery on the same subjects. What is more, Meta has frequently reminded the FTC that significant and detailed information about Meta's Integrity efforts exists in the public domain. For example, Interrogatory No. 11 asks Meta to, among other requests, create a "timeline" of every single method, tool, or action Meta has used to address Integrity. During the parties' meet and confer on March 9, Meta reminded the FTC that Meta maintains a publicly available Integrity Timeline which provides, from 2016 to the present, "a comprehensive list of [Meta's] public

announcements regarding integrity." *See Integrity Timeline*, Meta, https://transparency.fb.com/policies/improving/timeline (last accessed Mar. 16, 2023).  This timeline "includes product improvements, policy expansions, external engagement, and transparency reports." *Id.*  Meta's robust Integrity Timeline currently consists of 515 entries; each entry links to a unique page that provides the specific Integrity-related public announcement.  Even this robust and lengthy timeline does not include all of the information the FTC seeks, which only highlights the vast overbreadth of the FTC's request.  The information Meta has published about its Integrity efforts, in conjunction with Meta's substantive responses to the FTC's prior discovery requests, provides the FTC with sufficient information about the Integrity information it seeks.  Meta should not be forced to provide anything more.

### C.  The Court Should Deny the FTC's Request that Meta Supplement Interrogatory No. 12.

The FTC also requests additional briefing to argue that Meta should supplement further its response to the FTC's Interrogatory No. 12.  The Court should reject this request.

The FTC's Interrogatory No. 12 seeks information about "the monetary, technological, or personnel resources the Company contends contributed, either separately or collectively, to the improvements referenced in the Company's denial of the FTC's Requests for Admission Number 4 through 10."  But as the FTC knows, Meta objected to those RFAs because they were vague, ambiguous, and failed to define key terms.  *See Foretich v. Chung*, 151 F.R.D. 3, 5 (D.D.C. 1993) (a "party served with a request for admission" may "object to the request."); *IPOC Int'l Growth Fund Ltd. v. Diligence, LLC*, 2007 WL 9812840, at *2 (D.D.C. Apr. 24, 2007) (RFAs that "are vague, ambiguous, [and] overly broad" are "inappropriate.") ; *cf. Long v. Howard Univ.*, 561 F. Supp. 2d 85, 94 (D.D.C. 2008) (finding plaintiff's RFAs "significantly flawed" because they "used very broad and ambiguous language").  For example, the FTC's RFA No. 4

stated: "Admit that Meta cannot identify which monetary, technological, or personnel resources contributed either separately or collectively to each specific infrastructure improvement Meta claims it has made to Instagram since its acquisition."  Meta accordingly objected because this Request was "vague and ambiguous to the extent it fails to define the terms 'identify,' 'monetary, technological, or personnel resources,' 'contributed,' 'infrastructure,' and 'improvement.'"  As Meta has already explained to the FTC, those same ambiguities necessitated Meta's denial of that RFA and the other similar ones that the FTC propounded.  And Meta also made clear in its response to Interrogatory No. 12 that its response to the FTC's duplicative Interrogatory No. 10 "provides extensive evidence of the monetary, technological, and personnel resources that contributed to" improvements.  Meta has answered the FTC's Interrogatory No. 12, and no further response is required.

> ### 2.    The Court Should Not Authorize the FTC's Request for Irrelevant Performance Evaluations.

The FTC's 101st Request for Production, as clarified during the parties' meet and confer, seeks all final performance reviews or evaluations for "the Company's employees and former employees that the FTC has already or subsequently does subpoena for a deposition in this matter," as well as "any performance review or evaluation those individuals authored or approved."  Even as narrowed from the FTC's original request for "[a]ll documents and data" relating to the performance evaluations of those employees, the FTC's request remains overbroad and seeks information irrelevant to this antitrust case.  Courts in this district do not permit plaintiffs to rummage through a defendant's performance evaluations absent a specific showing of relevance and need – and the FTC has not made that showing.  Even if the FTC's request sought relevant information (it does not), the FTC has not explained how the production of marginally relevant, duplicative documents with sensitive personnel information is

proportionate to the needs of the case.

Even in employment cases, where perhaps the strongest arguments exist for producing evaluations of a defendant's employees, this court has indicated that it will not require production of employee evaluations and other materials from a party's personnel files without a specific showing of relevance and need.  In *Lurensky v. Wellinghoff*, 271 F.R.D. 345, 349 (D.D.C. 2010), for example, the plaintiff sought information regarding the performance evaluations of 13 employees of the defendant because the defendant had listed those employees in its initial disclosures.  The plaintiff speculated that those files might "lead to admissible evidence about the inter-relationships of employees and/or evidence of favoritism in plaintiff's work environment."  *Id.*  The court denied the plaintiff's motion to compel, demanding a clearer connection between the plaintiff's claims, those files, and the information that those employees were likely to have about the plaintiff's claims.  The court also refused to compel the defendant to produce the evaluation ratings of the plaintiffs' former colleagues across a ten-year period, describing that request as "overbroad and objectionable" and pointing out that the plaintiff had not shown that any unproduced ratings would help prove her substantive claims.  *Id.* at 348.

The FTC has not demonstrated with any specificity that the materials it seeks are relevant or necessary.  The FTC asserts that the performance evaluations of current and former employees will "shed light on the responsibilities, competence, knowledge, and credibility of deponents," JSR at 4, and *might* include relevant information about "important information regarding Meta's competitive strategies," JSR at 4.  But self-serving speculation and boilerplate allusions to witness credibility do not authorize the FTC to sift through the sensitive personnel information of Meta's current and former employees nor, as the FTC now asks, through the sensitive personnel information of *every other person* those employees have reviewed during the last fourteen years.

*See Slate v. Am. Broad. Cos. Inc.*, 274 F.R.D. 350, 352 (D.D.C. 2011) (rejecting argument that personnel files were discoverable to assess "credibility" of witnesses and to "define the scope of the witnesses' knowledge," and finding that those files were irrelevant to the plaintiff's copyright claim).  If merely incanting the words "witness credibility" and "relevance" could render an opponent's performance reviews discoverable, those reviews would be produced in every case.  Yet they rarely are, as the FTC tacitly acknowledges by relying on inapposite authority from this district – and that only in passing – to support its request.

The FTC's reliance on *United States v. Google, LLC* undermines the FTC's position.  There, the government substantiated its request for deponents' performance reviews by identifying specific relevant information from a sample of those reviews – and from reviews that the defendant had already produced – that was not "likely to be found" elsewhere because of communication practices unique to Google.  Hr'g Tr. at 26:23-24, ECF No. 151, *United States v. Google, LLC*, No. 20-cv-03010-APM (D.D.C. 2021) ("*Google*"); *see also id.* at 21:1-10; *id.* at 21:15–25.  And as Judge Mehta observed, those samples discussed the matters at issue in the litigation.  *See id*. at 25:4-16 (observing that "some of these samples . . . do make reference to [the] transactions" at issue in the case, and identifying one sample that referenced the "potential for antitrust litigation").  Accordingly, Judge Mehta authorized the government's discovery—but only in part.  Judge Mehta ordered production only of the evaluations of actual, future deponents and, instead of requiring a blanket disclosure, insisted that the government specify, on a deponent-by-deponent basis, "the time period" for which it needed those materials.  *Id.* at 31:11–12.  Here, by contrast, the FTC has not demonstrated that its blanket request for fourteen years of performance evaluations, including for non-deponents and people the FTC already deposed months ago, has any likelihood of producing information relevant to its antitrust claims.  Nor has

the FTC identified any unique communications practice at Meta that suggests those evaluations are likely to contain information that the FTC cannot adduce from the nearly 25 million pages of documents that Meta already has produced, which contain some of the evaluations the FTC seeks.  But even if the FTC could show that those evaluations may contain novel and relevant information, the FTC still would not need them, because it can obtain those same basic facts far more easily from Meta's current and former employees during their depositions.

The other cases cited by the FTC fail to show the FTC's entitlement to Meta employees' sensitive records.  For example, the FTC cites *United States ex rel Krahling v. Merck & Co.,* 2016 WL 7042203 (E.D. Pa. Feb. 5, 2016) from outside this District for the proposition that employee evaluations "can serve as important barometers for the credibility of employees' testimony."  JSR at 3.  But *Krahling* was a False Claims Act case where the plaintiff, a former employee, alleged that the employer-defendant engaged in fraudulent testing, and the plaintiff's employment evaluations were probative to understanding whether the plaintiff could actually "evaluate [the defendant's] allegedly improper methodology and falsified testing."  2016 WL 7042203, at *3.  The fact that employment evaluations were probative evidence in one False Claims Act case says nothing about the FTC's need for these records here.

The FTC similarly cites *United States v. Aetna Inc.*, No. 16-cv-1494 (D.D.C. 2016) ("*Aetna*"), Trial Tr. 298:10–24, and *United States v. Sabre Corp.*, No. 19-cv-1548 (D. Del. 2020), Trial Tr. 812:6–813:13, to suggest that "[p]erformance evaluations are commonly produced and used in antitrust litigation."  JSR at 3.  Those cases do not show what the FTC alleges.  At trial in *Aetna*, the government questioned an Aetna employee about the "star rating system," which measures the quality of a Medicare advantage health plan.  To prove the importance of that system – which evaluates the plan, not the employee – the government asked

the witness, among other questions, whether "part of your annual evaluation as an employee of
Aetna depends upon how you're doing with your star scores." *Aetna*, Trial Tr. 298:19-22.  The
government did not introduce the employee's evaluation or ask the witness any questions about
its contents, and nothing in the trial transcript suggests that the employee's evaluation was, in
fact, produced.  Likewise, the FTC cites from *Sabre* a brief colloquy about the circumstances of
a witness's departure from his company, including a question whether that witness received poor
feedback during a midyear performance review; again, it appears that no evaluation was
produced and used during that discussion.

 Apparently recognizing that it must give this Court more than a naked assurance of
conceivable relevance, the FTC asserts that two depositions it has already taken demonstrate that
"performance evaluations could help contextualize or otherwise inform the credibility" of Meta
deponents.  JSR at 6.  But those examples instead underscore how unreasonable the FTC's
request is.  In one example, the FTC's lawyer examined ███████, a former product manager,
to confirm the accuracy and truthfulness of a statement that ██████ did not make.  One of ██
███ direct reports drafted the statement in question and sought ███████ authorization to
post it to a work group.  That exchange had nothing to do with either ███████ or his direct
report's job performance, and the FTC does not explain how either person's performance review
would help "contextualize" ███████ testimony about a subordinate's single email that ███
did not write.  As for Meta's former chief financial officer, David Ebersman, it is not clear,
and the FTC has not explained, how performance evaluations would be necessary to confirm the
extent of Mr. Ebersman's participation in the WhatsApp transaction—a fact that is readily
apparent from multiple documents out of the millions Meta has produced—or would "inform the
credibility" of Mr. Ebersman's testimony that, nine years after leaving Facebook, he does not

remember what someone else meant by the words "network migration" in an eleven-year-old message. The FTC also references Chris Cox's testimony during his investigational hearing three years ago that his own performance as Meta's Chief Product Officer is measured, in part, by the success of the products he oversees. The FTC cannot plausibly contend that it is unable to examine Mr. Cox about the success of Instagram or WhatsApp without access to his performance evaluations or those he authored.

Likewise, the FTC cannot credibly argue that it needs performance evaluations to effectively depose Meta's current and former employees. If that were true, the FTC would have requested those evaluations more than a year ago in its First Set of Requests for Production. Instead, the FTC waited a year, after conducting 16 depositions of Meta employees and lodging 100 requests for production, to even seek those materials. The FTC is mistaken that performance evaluations would necessarily have been responsive to its First Set of RFPs – such files do not ordinarily reside in individual custodial files – and the FTC never even suggested that it wanted such performance evaluations until recently. Most importantly, the FTC has never shown that performance evaluations of Meta's current or former employees are relevant to any issue in this case.

Along with the performance reviews *of* any deponents, the FTC seeks any reviews that those deponents "authored" or "approved" (a vague and ambiguous term) *about anyone else*. Meta asked the FTC for any case law it could find to support that request. *See* Ltr. from G. Block to N. Brenner (Mar. 13, 2023). The FTC never responded and has provided none. And in *Google*, Judge Mehta expressly rejected the government's request for the performance reviews completed *by* all *named custodians* because of "the breadth of the Government's ask." *Google*, Hr'g Tr.at 29:24–25. That ruling confirms – if there ever were any doubt – that there is no basis

for requiring Meta to produce the sensitive performance evaluations of an even broader set of employees who have no connection to the case and whom the FTC has no interest in deposing.

Finally, the FTC claims that Meta proposed – and then rejected – a compromise that would drop the FTC's request for final performance reviews that Meta's current and former employees "authored or approved."  That is contrary to the facts.  Meta made clear that it was standing on its relevancy objection during the parties' meet and confer, which the FTC recognized in its own summary of the parties' discussions.  *See* Ltr. from N. Brenner to S. Strikis (Mar. 8, 2023) ("[I]f Meta . . . plans to produce nothing based on its relevancy objection, then we plan to include this in the upcoming JSR.").  The FTC then attempted to modify its request in exchange for Meta's accession to the rest of the FTC's unsupported request.  Email from N. Brenner to S. Strikis (Mar. 13, 2023) ("In the interest of compromise, *if* Meta agrees to produce performance evaluations from the relevant period for all of the deponents who are current or former Meta employees, then the FTC will remove this dispute from the JSR.") (emphasis added).  When Meta did not accede, the FTC reintroduced its demand for final performance reviews that Meta's current and former employees "authored or approved."  The FTC's quibble aside, it is the FTC's burden to show a genuine need for the final evaluations "authored or approved" by each deponent; it has not even attempted to meet that burden here.

The FTC's request for sensitive personnel information about every current and former employee it chooses to depose, plus anyone those people reviewed in the last fourteen years, is overbroad and irrelevant to the antitrust issues here.  The Court should rule that Meta has no obligation to produce performance evaluations in response to the FTC's Request for Production No. 101.

**3.      The FTC Has No Basis for Its Request that Meta Re-Review Its Entire Litigation Log.**

The Court should reject the FTC's request that Meta re-review its entire litigation privilege log ("Litigation Log"), which Meta served in January 2023 and supplemented this month.  The Litigation Log contains approximately 98,000 privilege entries, which is roughly 4% of the approximately 2.3 million documents that Meta produced in response to the FTC's Requests for Production.  The Litigation Log provides, document-by-document, a description of the basis for the privilege claim, the email subject or file name of the document, the type of privilege asserted, the relevant attorney for purposes of the privilege claim, and information about who sent and received each document on the log where available (including the custodians for each document).  This is far more than Rule 26 requires for high-volume document productions.  *See* Fed. R. Civ. P. 26(b)(5) advisory committee's note to 1993 amendment (explaining that "[d]etails concerning time, persons, general subject matter, etc., . . . may be unduly burdensome when voluminous documents are claimed to be privileged").

The FTC's arguments for wholesale re-review of the Litigation Log have no basis.  *First*, the FTC relies on a non-sequitur, asserting that because Meta downgraded documents during re-review of its September 26, 2020, privilege log from the FTC's pre-complaint investigation ("Investigation Log"), Meta must re-review its wholly separate and distinct Litigation Log.  Meta prepared the Investigation Log 2.5 years ago as it was responding to the FTC's myriad civil investigative demands well before this litigation commenced.  The Litigation Log is a different privilege log for an entirely distinct set of documents reviewed in connection with the FTC's Requests for Production and was prepared during this litigation.  In the Litigation Log, Meta has withheld far fewer documents as a percentage of its litigation productions (roughly 4%) as compared to the percentage of documents that Meta withheld during the investigation as a

percentage of its investigation productions (about 10%). And in the Litigation Log, Meta applied targeted redactions (rather than withholding documents in full) more frequently than it did in the investigation. Indeed, roughly 23% of the Litigation Log is redaction entries, while 12% of the Investigation Log prior to re-review was redaction entries. The FTC cites no authority for the novel proposition that the statistics it has asserted about Meta's Investigation Log – even if they were not otherwise incomplete and misleading – may be used to infer anything about Meta's wholly separate Litigation Log. That is because the FTC's assertions about the Investigation Log say nothing about, and are not a representative sample of, Meta's Litigation Log. *See Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1151 (D.C. Cir. 1991) (explaining in the FOIA context that statistical samples of *Vaughn* indices must be "sufficiently representative" to be informative).

The FTC's discussion of Meta's Investigation Log is irrelevant also because disputes about the Investigation Log are moot. Before Meta finished re-reviewing the two samples of Investigation Log entries drawn by the FTC, pursuant to the Court's November 28, 2022 Minute Order, Meta proactively offered to re-review certain categories of Investigation Log entries by March 6, 2023 to avoid disruption of the fact discovery schedule, resolve the parties' dispute, and avoid burdening the Court. In exchange for this Investigation Log re-review, the FTC agreed that it would no longer seek re-review of any additional categories of Investigation Log entries. Jt. Status Rep. at 53, ECF No. 237 (Jan. 30, 2023). In any event, Meta's cooperation with the FTC, and downgrades of documents during this Investigation Log re-review, do not establish that Meta engaged in an effort to shield documents from discovery as the FTC contends. To the contrary, those facts establish Meta's good-faith cooperation in discovery. *See Am. Nat'l Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 879

(7th Cir. 2005) (a defendant "exhibited good faith" by revising "its initial log," volunteering an "amended log," and cooperating to "resolve outstanding disputes").

*Second*, the FTC attempts to justify its demand for a re-review of nearly 100,000 entries on the Litigation Log by asserting that Meta has a policy and practice of shielding documents from discovery by instructing employees to copy attorneys on emails and label them privileged and confidential.  That is a baseless allegation that Meta takes seriously and vigorously disputes. Of course, the FTC cites no such "policy," and Judge Chhabria's order in *In re Facebook Consumer Privacy Litig.*, 3:18-cv-2843 (N.D. Cal. Feb. 9, 2023), made no finding that any such policy existed.  In support of its "practice" assertions, the FTC cherry-picks three messages – out of Meta's total production of more than 5 million documents – between employees discussing attorney-client privilege.  None of those three documents mentions or reflects a "practice" of using privilege to shield documents from discovery in litigation.  These messages, which Meta produced, contradict the FTC's point: Meta has produced numerous documents in this litigation notwithstanding the fact that employees have incorrectly labeled them as privileged.  The FTC's "policy and practice" argument thus is no basis for an order requiring Meta to undertake the enormous burden of re-reviewing the entire Litigation Log.

*Third*, the FTC's joint status report submission does not even challenge examples of Litigation Log entries or undertake any effort to prove with actual evidence that certain categories of entries merit re-review.  Instead, the FTC relies on the bald assertion that the Litigation Log "suffers from the same deficiencies" as the Investigation Log.  Even if the FTC had identified any examples or categories of entries to challenge, that would be far from adequate to justify the FTC's request that Meta re-review the *entire* Litigation Log.  *Steele v. United States*, 2022 WL 2817835, at *3, *4 (D.D.C. July 19, 2022) (Lamberth, J.) (explaining

that it is improper to challenge only a handful of "exemplar" log entries, "shun[] individual analysis" of other privilege log entries, and on that basis request a "blanket" finding that an entire privilege log is deficient); *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 48 F. Supp. 3d 40, 51 (D.D.C. 2014) (Boasberg, J.) (in a FOIA case, rejecting that some errors identified by DOJ during its third review of a *Vaughn* index could "call into question" the "entire" index).

*Fourth*, the FTC's assertion that Meta improperly delayed providing the Litigation Log is incorrect.  Shortly after Meta learned that its vendor had inadvertently excluded some documents from Meta's standard review process for responsiveness and privilege, Meta informed the FTC and the Court on January 5, 2023 that while it would be serving a privilege log in January, its privilege review for the vendor error set of documents would extend past January.  Meta thus explained to the FTC and the Court in the January 30 Joint Status Report and the subsequent hearing that it planned to provide an "updated privilege log by March 1" that would include additional privilege log entries from the vendor error set and that would correct entries in the January 2023 log.  *See* Jt. Status Rep. at 51, ECF No. 237 (Jan. 30, 2023); Hr'g Tr. at 28:10-29:1 (Feb. 9, 2023).  The FTC did not object in the January Joint Status Report or at the hearing to that timing.  On February 17, Meta again informed the FTC that it planned to provide the updated privilege log on March 1.  Email from K. Fetterman to J. Moy (Feb. 17, 2023); Ltr. from A. Polavarapu to J. Moy (Feb. 17, 2023).  The FTC again did not object (or even respond).

The FTC complains that when Meta provided the March Litigation Log, it revised privilege log descriptions and downgraded documents.  But that is no basis to order re-review of the entire Litigation Log.  Indeed, updating and correcting its privilege log – as well as producing documents that had been inadvertently withheld – is precisely what this Court would expect

Meta to do.

Meta has told the FTC that it would be willing to review specific entries that the FTC identifies, and Meta is doing precisely that with respect to a few hundred entries that the FTC specifically raised in correspondence to Meta.  Meta will continue to consider any reasonable requests that the FTC may bring to its attention, but a wholesale review of the entire Litigation Log is wholly unjustified.

**B.      Meta's Position on Third Party Discovery**

Although Meta has indicated to the FTC that it should abide by the Court's preference to only hear ripe disputes in joint status report submissions, Meta responds to the FTC's statement on a pending motion filed by eBay in the Northern District of California, which seeks to quash deposition subpoenas issued by Meta *and* the FTC.  eBay's counsel currently represents the purported user class plaintiffs in a related antitrust proceeding, also in the Northern District of California, *Klein v. Meta Platforms Inc.*, Case No. 3:20-cv-08570-JD (N.D. Cal.).  Although the FTC states that it "takes no position" regarding the motion that seeks to quash both parties' subpoenas, it selectively highlights a sentence in the motion, which states that eBay "does not provide PSNS" as that term is described in the Amended Complaint, to suggest that eBay's motion provides support for the FTC's merits case.  In fact, eBay's motion directly undermines the FTC's case, and demonstrates precisely why the testimony Meta seeks from eBay is necessary.

As the Court knows, to address Meta's "understandabl[e]" interest in "a clearer definition of what the FTC maintains is the personal-social-networking-services market," the Court ordered the FTC to identify which features on Meta's products are within or "not within the definition of 'personal social networking'" alleged in the FTC's complaint.  *See* ECF No. 165.  In response,

the FTC stated unambiguously that "[p]osting content of any form" and "[v]iewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook's Friends" on Facebook Marketplace falls within the definition of Personal Social Networking.

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 6 | Marketplace | Viewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook Friends. | Yes |
| Facebook | 7 | Marketplace | Viewing content of any form (such as Items for Sale) that was posted by one of User's Facebook Friends. | Yes |
| Facebook | 8 | Marketplace | Posting content of any form. | Yes |

**Figure 1: Excerpts of FTC's Resp. to Meta's List of Features or Activities, at 5 (Sept. 12, 2022), ECF No. 243-3**

eBay disagrees with the FTC's position. On the first page of its motion, eBay states that "Facebook Marketplace" is a **distinct Meta product**," "**which has nothing to do with PSNS**" as that term is described in the FTC's Amended Complaint. Memo in Support of Mot. to Quash Subpoena or for Protective Order at 1, *FTC v. Meta Platforms, Inc.*, 3:23-mc-80074 (N.D. 2023) (emphasis added). eBay then repeatedly states that it competes with Facebook Marketplace and that its ordinary course documents prove this. *See, e.g. id.* at 3 ("eBay does compete with respect to Meta's 'Facebook Marketplace' service—a site where individuals can market goods for sale,"); *id.* at 4 ("On August 22, 2022, eBay produced nearly 2,500 pages of documents and this production proved the point; eBay discusses Facebook as a competitor in the context of e-commerce, not PSNS."). Indeed that is a key *basis* for eBay's motion: Facebook is a direct competitor and eBay wants to shield its information from that competitor.

These documents also show why the deposition testimony that Meta seeks from eBay is necessary. The FTC has the burden of proving that it has advanced a relevant market that includes all reasonable substitutes for "PSNS" – a non-intuitive term that as far as Meta's

counsel is aware, no company has ever used in the ordinary course (and notably, the FTC has not identified any ordinary course use of the term in response to Meta's Interrogatory seeking that information).  eBay's testimony, if consistent with its representations to the Court, will show that the FTC cannot meet that burden because eBay – a company that is allegedly not in the PSNS market – offers a reasonable substitute for services that the FTC includes within its definition of "PSNS."

To minimize burden on eBay, Meta has offered to agree to limit the noticed deposition to 60 minutes and to two topics, focused on eBay's competition with these services on Facebook Marketplace that eBay calls "e-commerce" and the FTC calls "PSNS."  Meta has also informed eBay of this Court's preference to hear all non-party disputes relating to the action, and indicated that this Court should resolve the dispute.  *See* Min. Order (Sept. 30, 2022).  eBay has so far not agreed to submit this dispute to this Court, but has recently indicated that it is considering whether it will agree to identify an individual to sit for a deposition relating to the narrowed scope of topics Meta has proposed.  Meta intends to file a motion to transfer eBay's dispute to this Court, pursuant to the Court's September 30, 2022 Minute Order.

Dated: March 16, 2023                    Respectfully submitted,


                                         */s/ Mark C. Hansen*
                                         Mark C. Hansen (D.C. Bar No. 425930)
                                         Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                         Kevin J. Miller (D.C. Bar No. 478154)
                                         Kenneth M. Fetterman (D.C. Bar No. 474220)
                                         Kevin D. Horvitz (D.C. Bar No. 1521032)
                                         Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
                                         KELLOGG, HANSEN, TODD,
                                           FIGEL & FREDERICK, P.L.L.C.
                                         1615 M Street, N.W., Suite 400
                                         Washington, D.C. 20036
                                         Tel: (202) 326-7900

mhansen@kellogghansen.com
gklineberg@kellogghansen.com
kmiller@kellogghansen.com
kfetterman@kellogghansen.com
khorvitz@kellogghansen.com
apolavarapu@kellogghansen.com

James P. Rouhandeh (D.D.C. Bar No. NY0390)
Michael Scheinkman (D.D.C. Bar No. NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

37

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*