```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,,
                                        Civil Action
              Plaintiff(s),             No. 20-3590 (JEB)
         v.
                                        Washington, D.C.
META PLATFORMS, INC.,
                                        March 27, 2023
              Defendant(s).

-------------------------------------------------------------

              STATUS CONFERENCE HELD VIA ZOOM
          BEFORE THE HONORABLE JAMES E. BOASBERG
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):    Daniel J. Matheson, Esquire
                         Susan Musser, Esquire
                         Federal Trade Commission
                         Bureau of Competition
                         400 Seventh Street Southwest
                         Washington, D.C. 20024


FOR THE DEFENDANT(S):    Geoffrey M. Klineberg, Esquire
                         Kellogg, Hansen, Todd, Figel
                          & Fredrick, PLLC
                         1615 M Street Northwest
                         Suite 400
                         Washington, D.C. 20036



REPORTED BY:             Tammy Nestor, RMR, CRR
                         Official Court Reporter
                         333 Constitution Avenue NW
                         Washington, D.C. 20001
                         tammy_nestor@dcd.uscourts.gov
```

1  The following proceedings began at 2:01 p.m.:
2          THE COURT:  Good afternoon, folks.
3          THE COURTROOM DEPUTY:  Good afternoon, Your Honor.
4      We are here today for a status conference in 20-3590,
5  Federal Trade Commission versus Meta Platforms, Inc.
6          Beginning with counsel for plaintiff, please state
7  your name for the record.
8          MR. MATHESON:  Good afternoon, Your Honor.  Daniel
9  Matheson for the Federal Trade Commission.  I'm joined by my
10 colleague Susan Musser.
11         THE COURT:  Good afternoon to both of you.
12         MR. MATHESON:  Thank you.
13         MR. KLINEBERG:  Good afternoon, Your Honor.  Geoffrey
14 Klineberg, from Kellogg, Hansen on behalf of Meta Platforms,
15 Inc.
16         THE COURT:  Good afternoon, Mr. Klineberg.
17         This one is on the three disputes raised in the status
18 report.  Sorry I didn't get to that more quickly.  I like to
19 get to it right away.  I had a few other things going on last
20 week.  So sorry about that.
21         So let's talk about those.  So going into what -- you
22 both submit them in slightly different orders also.
23         On the briefing, I will require further briefing on
24 the interrogatories 10 through 12.  I think that would be
25 helpful.  I think that's enough of a significant issue that I

1  think that that's worth my taking a look at.
2          So, FTC, you can -- the schedule you proposed, I
3  think, is fine, which, I guess it's 15 page limits, Meta's
4  opposition due 11 days after, and then yours due 5 days, 7
5  days?  Here it is, page 11.  Yes, 5 days.
6          What you propose on that with schedule and page limits
7  is fine with me, so I will order that.
8          Okay.  Next up is performance evaluations.  I am not
9  inclined to give anywhere close to the breadth that the FTC
10 requests performance evaluations.
11         Why shouldn't I limit it to -- and we will talk about
12 time frame next.  But why shouldn't I limit it to performance
13 evaluations that discuss the acquisitions of WhatsApp and
14 Instagram, Mr. Matheson?  First of all, I don't buy the general
15 credibility link.  That to me seems tenuous.  So why isn't it
16 appropriate limiting in scope performance evaluations that
17 discuss those acquisitions?
18         MR. MATHESON:  Because Meta's competitive initiatives
19 are relevant to the market definition questions.  And to the
20 extent that performance evaluations discuss, not just the
21 acquisitions themselves, but competitive initiatives and, more
22 importantly, infrastructure innovations and their failure or
23 success in achieving the pro-competitive benefits that they
24 continually talk about, they are very informative.
25         We do not know one way or the other if their

1  performance evaluations support or undermine the notion that
2  they successfully improved either WhatsApp or Instagram after
3  the acquisitions or if, instead, their performance evaluations
4  indicate they made no improvements.
5          Those are at least two issues that I think would be
6  readily illuminated by performance evaluations.
7          THE COURT:  So I think, you know, what I want to do, I
8  want to make this easily searchable so it's not too burdensome,
9  and so, Mr. Klineberg, your answer on that, a considerably more
10 targeted request?
11         MR. KLINEBERG:  Well, Your Honor, we certainly favor
12 the far more targeted request.  You know, one thing that may
13 not be clear from the status report is that Meta has produced
14 literally thousands of reports that senior employees at Meta
15 produce every week describing what they have done, what they
16 are working on, and how they are doing in their own estimation,
17 which contains much, if not all, of the information that
18 Mr. Matheson just described.
19         So the record already contains far more documents than
20 the FTC could even use at this point going into details about
21 what these various projects have been over the course of the
22 entire production period.
23         THE COURT:  All right.  So, Mr. Matheson, let's talk
24 again, because I'm going to give you something, but it's going
25 to be quite targeted.  So beyond acquisitions of WhatsApp and

1   Instagram, I mean, even what you said just now seemed to be too
2   broad.  So tell me more specifically and so that we can render
3   this easily searchable for Meta.
4           MR. MATHESON:  Well, Your Honor, we can propose search
5   terms.  It was, frankly, news to us they had excluded these
6   from the collection in response to the first set of requests
7   for production.
8           If you take a look at Exhibit B to the joint status
9   report, that is the performance evaluation we highlighted in
10  our complaint.  It indicates that performance evaluations are
11  emailed to employees.  So I'm not sure on what basis they
12  unilaterally and undisclosedly did not search those for the
13  relevant search terms, which would have included terms relevant
14  to competition and infrastructure improvements.
15          So we would ask for those search terms to be run,
16  performance evaluations not to be excluded.  And also, if you
17  look at the last page of Exhibit B, it references a BCC to that
18  particular employee's employment file.  It seems as if these
19  are readily locatable in some sort of employment file which
20  Meta has provided us no transparency into, and that they could
21  review --
22          THE COURT:  Stop one second.
23          Mr. Klineberg, let me ask you that.  So what's the
24  objection to running the same search terms in the performance
25  evaluations?

1        MR. KLINEBERG:  We would have no objection to running
2   the search terms through the performance evaluations, but I
3   just want to be clear about what we are talking about.
4        The original request was for, not only evaluations of
5   each --
6        THE COURT:  No, I know.  I understand.  Also authored
7   by.
8        MR. KLINEBERG:  That's right.
9        THE COURT:  But I guess, it seems to me, just the
10  easiest way to do this and to effectuate what I think is a more
11  targeted and appropriate request would be that you've just got
12  to run the same search terms through the universe of
13  performance evaluations, but that if there be aren't -- but you
14  don't have to otherwise search for performance evaluations in
15  which there are no hits from those terms.  Okay?  Go ahead.
16       MR. KLINEBERG:  If I can just clarify one thing, that
17  there are a number of evaluations that happen at Meta that are
18  done by peers and that also are done by subordinates.  If we
19  can limit this to the manager reviews, that is, the managers of
20  each of the deponents, their final performance evaluations for
21  the year, say, that would at least limit it to a universe that
22  I think we can obtain at least for some of the relevant period
23  and apply those search terms to.
24       THE COURT:  Let me ask you, in an order, when I say
25  that you should apply the search terms, should I --

```
 1   Mr. Matheson, what is a better way to -- I want to make sure
 2   there's no lack of clarity.  Is there a better way to sort of
 3   name or label search terms?
 4            MR. MATHESON:  I understand, Your Honor.  I would
 5   suggest, I think this would be clear to Mr. Klineberg, the
 6   search terms negotiated by the parties with respect to the
 7   FTC's first set of productions.  And that's a specific
 8   universe, and I think we have a meeting of the minds of what
 9   those search terms would be.
10            Just to seek one point of classifications, Your Honor.
11   When you look at their performance evaluations, and I want to
12   make sure that we are not going to miss something here, in
13   Exhibit B, it has a cover email which transmits a
14   system-generated document.  The system-generated document is
15   not what we are looking for.  That simply provides an overall
16   evaluation in relation to expectations that's on the final page
17   of Exhibit B.
18            What we are interested in is the actual feedback that
19   delineates the employees' roles, responsibilities, and success
20   in achieving particular goals.
21            So in Exhibit B, it would be actually the cover email
22   that goes from a manager to the employee, not the
23   system-generated document that informs the employee how they
24   performed overall without referencing any particular set of
25   targets and provides their compensation information.  We want
```

1   the email, not the system-generated document.
2           THE COURT:  That sounds -- any problem with that,
3   Mr. Klineberg?
4           MR. KLINEBERG:  No, Your Honor, I don't think so,
5   except that, you know, as I stand here today, I am not certain
6   what files exist and how far back they go for each of these
7   deponents.  So with that caveat, that we will search for what
8   Mr. Matheson has described, but I can't guarantee that they
9   will be found for everyone.
10          THE COURT:  All right.  And I will agree that they
11  will be, the search terms, that they will be for manager or
12  supervisor reviews.  Okay.
13          Thank you.
14          So third is the privilege log.  And I will admit I'm
15  struggling to understand exactly what the facts are on the
16  ground.  And I think part of it is I think at times, you folks
17  distinguish between the investigation privilege log and the
18  litigation privilege log, and other times you don't.  So I will
19  admit to confusion.
20          So, Mr. Klineberg, why don't I start with you to
21  explain.  So the first investigation privilege log was
22  submitted in connection with the investigation?  In other
23  words, the log that was submitted on January 24 was what?
24          MR. KLINEBERG:  That was the litigation log, Your
25  Honor.  The investigation log was submitted back in 2020 as

1    part of the production of the -- you know, under the CID that
2    the FTC was undertaking in the investigation.
3            THE COURT: And then March 2 is the revised litigation
4    privilege log?
5            MR. KLINEBERG: That is correct, Your Honor.
6            THE COURT: What we talked about in an earlier hearing
7    and what we ended up doing sampling -- you folks ended up doing
8    sampling of was the investigation log?
9            MR. KLINEBERG: Exactly, Your Honor. I had tried to
10   persuade you unsuccessfully that it was not necessary to review
11   that three-year-old log anymore. But you disagreed, and we did
12   the sampling. And then we undertook, essentially on our own,
13   to do a substantial rereview at enormous cost to try to resolve
14   the issues that the FTC had identified in that investigative
15   log.
16           So that's exactly what had happened. Now, with
17   respect to the litigation log, there has been no similar, you
18   know, discussion of categories or problematic issues. It's
19   simply based on the experience with the investigative log, the
20   FTC is now suggesting that we need to review the entire
21   litigation log.
22           THE COURT: Right. And so the litigation log contains
23   close to a hundred thousand privilege entries, correct?
24           MR. KLINEBERG: That's correct.
25           THE COURT: And how much overlap with the litigation

1  log privilege entries is there with investigation log privilege
2  entries?
3              MR. KLINEBERG:  There should be none at all, Your
4  Honor.  These are totally separate document productions.  You
5  know, it is possible that a different version of the same
6  document might have shown up in both productions, but we were
7  careful in the litigation document production to filter out any
8  documents that had already been produced or reviewed as part of
9  the investigation.  So there should be almost no overlap
10 between the two logs.
11             THE COURT:  Okay.  So then, Mr. Matheson, so your
12 argument is, look, they had a lot of problems with the
13 investigation log.  We can assume the same is true of the
14 litigation log.
15             MR. MATHESON:  I think our argument is a little better
16 supported than that, Your Honor. On March 9 -- so we did not
17 get their litigation log until March 2.  They just disregarded
18 their obligation to give us this log in January.  They gave us
19 a log in January, and then more than 30,000 entries were
20 different when they gave it to us in March.  And they
21 immediately told us we couldn't rely on the January log.
22             So we got this on March 2, and we quickly identified
23 tens of thousands of entries that look exactly the same as the
24 entries for which they reversed their privilege calls, almost
25 two out of three times, 60 percent of the times in their

1  investigation log.  That is a shocking number.  How can you be
2  wrong two times out of three?
3         These entries look exactly the same.  And we could go
4  through and identify to them those specific entries, but we
5  shouldn't bear the burden because they produced us a log in
6  March.  We are busy, and we cannot spare key staff members to
7  go through their log and correct their mistakes.  We think that
8  they should --
9         THE COURT:  Let me ask you this.  What seemed to me
10 when I generally understood what was going on to be a
11 reasonable solution is how about a sampling now.  In other
12 words, let's have Meta look at a certain number of the them
13 now, and if they are reversing them at any kind of serious
14 rate, then they are going to need to go through more, as
15 opposed to saying, we've got to look at 98,000, which is
16 obviously a substantial burden.  It may be warranted, but why
17 would we not start with a sample?
18        MR. MATHESON:  Your Honor, we just feel we are running
19 out of time to make use of these documents during fact
20 discovery.  If sampling is how Your Honor would like to
21 proceed, we can provide them with a sample.  It might take us a
22 week or so to put it together.  We just feel that if they had
23 done in this January, that would have been the correct
24 approach.  The fact that --
25        THE COURT:  Let me ask you this.  In terms of putting

1  it together, and again, I don't -- because I have not seen the
2  log, nor who I have any interest in looking at a 98,000 entry
3  log, but can you just say every -- as opposed to your going
4  through -- maybe it's worth it, maybe it isn't, because you are
5  more interested in some than others, we could also just say,
6  okay, these are the numbers you have to look at.  And so
7  there's no burden on you.  We will just pick a statistical
8  basis of sampling.
9          But if you think that's much less helpful to you than
10 picking particular ones, I'm happy to do that too.
11         MR. MATHESON:  We could use a random number generator
12 and generate a totally random sample relatively quickly.  What
13 we had done previously was a lot more labor intensive, which
14 was to identify the most problematic categories and a sample
15 within those.  That obviously just takes us a long time.  You
16 know, it takes us a while to deal with a hundred thousand
17 entries.
18         THE COURT:  Okay.  So then, Mr. Klineberg, I guess, I
19 understand what you are saying, that, look, this is a totally
20 separate log, but the problems with the investigation log are
21 pretty serious when we look at the percentage of reversal
22 rates.  So it doesn't seem crazy, particularly given that the
23 FTC is making a somewhat more refined argument, that you folks
24 should have to look at some to see if we've got the same
25 problem, right?

1         MR. KLINEBERG:  Well, but, Your Honor, just to
2    reemphasize what I had alluded to earlier, this log is
3    completely different.  It reflects a completely different
4    production process, and it's an entirely different set of
5    documents.
6         The one -- what the FTC did in the investigative log
7    was to identify some categories of what appeared to be
8    problematic entries.  And we took a look at those and corrected
9    a lot of them and did what we were supposed to do, which was to
10   review the documents and determine, if they weren't privileged,
11   that we would produce them.
12        There's no evidence that this log suffers from
13   anything like the problems that the FTC identified in the
14   investigative log.  So I think even a sampling hasn't really
15   been justified at this stage.
16        THE COURT:  But the FTC's argument is that it's the
17   same type of entries, and so, therefore, it's fair to infer
18   that there would be the same type of problems.  Why isn't that
19   right?
20        MR. KLINEBERG:  Well, they haven't really identified
21   the same type of entries.  They haven't provided us anything
22   like the level of detail that they indicated before.
23        What they did do was they identified something like
24   270 entries for which a work product doctrine claim was made,
25   and there was no associated litigation with those entries.  And

1  we took the time to go through those and corrected the log.
2  And we did it within a week of when they asked.  And that's
3  what we would propose.
4        To the extent that they have any concerns about
5  particular entries in the log, we are more than happy to take a
6  look at those.  And that's how this ought to work.  There's
7  just no reason to undertake what is essentially, you know, a
8  sampling that could be a prelude to further review when there's
9  been no indication --
10       THE COURT:  All right.  But it's only a prelude to
11 further review if there are problems, right?  In other words,
12 you would agree that if the sampling shows that there is a
13 substantial reversal rate, then you should have to do more
14 review, right?
15       MR. KLINEBERG:  Well, I guess my point is that that
16 would be true of every log that's ever created in any
17 litigation, right?
18       THE COURT:  Right, but I would think, isn't that a
19 fair way to approach any log if there are errors?
20       MR. KLINEBERG:  Well, yes, Your Honor, exactly, if
21 there are errors.  And if they can show us where there are
22 errors at that level, you know, we would consider doing the
23 sampling.  But there isn't any evidence that there's a similar
24 kind of problem with this log.  And we are just thinking that a
25 sampling without that isn't justified, is our position.

1         THE COURT:  Okay.  Here's what I am going to do.  You
2    can do one of two things, Mr. Matheson.  You can either,
3    following Mr. Klineberg's proposal, which is to point to
4    specific items that you think are problematic, or you can give
5    him 1,000 randomly generated ones, which is essentially
6    1 percent of what we got.  A thousand is not nothing, but I
7    don't think it's incredibly onerous to review for the defense.
8         And so you can do either one of those.  And if there
9    are substantial problems or reversal rates, then we will talk
10   about what Meta will have to do next.
11        MR. MATHESON:  Thank you, Your Honor.  What do you
12   think a reasonable time frame might be for a rereview of a
13   thousand, just so we can have --
14        THE COURT:  What do you think?
15        MR. MATHESON:  Ten days.
16        THE COURT:  Mr. Klineberg?
17        MR. KLINEBERG:  You know, Mr. Matheson referred to his
18   being busy.  We are also very busy.  Ten days is a very short
19   amount of time to review a thousand entries at the level of
20   detail we would need to do it, you know, three weeks.
21        THE COURT:  The problem is if it's bad, it's going to
22   need to be -- there are going to be a bunch more to review.
23        Two weeks on that.  So you've got an incentive,
24   Mr. Matheson, to get them to Mr. Klineberg.  You can just say,
25   hey, every 98th document that will get you to a thousand or

```
 1   whatever number you want.  So that will be yours.  Okay.
 2              MR. MATHESON:  Thank you, Your Honor.
 3              THE COURT:  So I think those were the three issues.  I
 4   expect to have in the next few days, there will be a short
 5   order, it's not going to be a long opinion, on Meta's motion to
 6   compel responses to 13, 14.  I know now the motion to compel
 7   response to interrogatory 2 is now fully briefed as of today.
 8   I will also try to get to that soon.
 9              And I think that covers all of our current disputes.
10   Mr. Matheson, anything else that I'm missing?
11              MR. MATHESON:  Nothing from my point of view.  Thank
12   you, Your Honor.
13              THE COURT:  Mr. Klineberg?
14              MR. KLINEBERG:  Your Honor, just one point of
15   clarification.  I know the last time you left it to us as to
16   when we would be filing our motion to compel which would then
17   trigger the response by the FTC.
18              I'm just wondering whether, you know, in light of the
19   fact that we are nearing the end of discovery and that
20   potentially one implication of the interrogatories 10 to 12 is
21   that we will have to do a substantial amount of work, I'm
22   wondering if the FTC can commit to getting the motion to compel
23   within a short time frame.
24              THE COURT:  How is one week, Mr. Matheson?
25              MR. MATHESON:  We would like until the end of next
```

1  week if that's possible, Your Honor.  That was the amount of
2  time they took last time.
3           THE COURT:  Yeah, this is your -- you've already
4  briefed it in part in this brief, so I will say by Friday.  So
5  that's March 31.  All right?  March 31 for FTC's motion to
6  compel on interrogatories 10 to 12.
7           Okay.  Anything else, Mr. Klineberg?
8           MR. KLINEBERG:  No, Your Honor.  Thank you.
9           THE COURT:  Thank you very much, everyone.  Appreciate
10 it.  I will get this minute order memorializing what I did
11 today out, and we will get the rest of the material to you
12 shortly.  Thank you.
13          MR. MATHESON:  Thank you, Your Honor.
14          (The hearing concluded at 2:24 p.m.)
15                              - - -
16                         C E R T I F I C A T E
17
18          I hereby certify that the foregoing is an
19 accurate transcription of the proceedings in the
20 above-entitled matter.
21
22 3/28/23                     s/ Tammy Nestor
                               Tammy Nestor, RMR, CRR
23                             Official Court Reporter
                               333 Constitution Avenue NW
24                             Washington, D.C. 20001
                               tammy_nestor@dcd.uscourts
25