# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**META PLATFORMS, INC.,**

Defendant.

Civil Action No. 1:20-cv-03590 (JEB)

### PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT META PLATFORMS, INC.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Federal Trade Commission ("FTC") requests that Defendant Meta Platforms, Inc. ("Meta") produce the documents requested in this First Set of Requests for Production ("Requests") for inspection, examination, and production. The documents requested herein should be sent to Daniel J. Matheson, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580, or to another designee that shall be mutually agreed upon between counsel for Meta and the FTC. The production of documents shall be in accordance with the Instructions and Definitions set forth below, Federal Rule of Civil Procedure 34, and the provisions of the Case Management Order and any other relevant orders governing the production of documents and electronic information the Court shall enter in the above-captioned action. The Requests are continuing in nature and shall be supplemented in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

### REQUESTS

1. All documents relating to competition in the sale or provision of any Relevant Product, including, but not limited to, market studies, forecasts, surveys, and all other documents relating to:

    a. the sales, market share, or competitive position of the Company or any other Person;

    b. the relative strengths or weaknesses of the Persons selling or providing each Relevant Product, or of their product or service offering;

    c. supply and demand conditions;

     d.     the ability or willingness of users to switch to (or from) the Company's products or services or from (or to) another product or service (including by making greater or lesser use of the product or service);

     e.     monitoring or collecting information about any other Person's Relevant Product;

     f.     competition to attract, gain, and retain users or increase user engagement;

     g.     competition relating to any dimension of quality, service, features, or innovation, including, but not limited to, privacy and data protection;

     h.     the ability or willingness of users to use the Company's Relevant Product while also using Relevant Products offered by other Persons;

     i.     competition between any Relevant Product and any other product or service;

     j.     comparing competition to sell or provide any Relevant Product in the United States to competition in any other country;

     k.     allegations that any Person that sells or provides any Relevant Product is not behaving in a competitive manner, including, but not limited to, user and competitor complaints; threatened, pending, or completed lawsuits; and federal and state investigations; and

     l.     any actual or potential effect on the supply, demand, cost, or price of any product or service the Company sells or provides as a result of competition from any other possible product or service.

2.     All documents discussing competition in the sale or provision of any Relevant Product in Brazil, Germany, India, Japan, the Netherlands, Poland, South Korea, or Spain, including, but not limited to, competition with Hyves, KakaoStory, KakaoTalk, Kik, LINE, Nasza Klasa, Orkut, StudiVZ, or Tuenti.

3.     All documents relating to the following anywhere in the world:

     a.     KakaoTalk, KakaoStory, the LINE messaging app, WeChat, or Kik Messenger;

     b.     the actual or contemplated addition of Personal Social Networking Services to apps that provide Mobile Messaging services; and

     c.     the actual or contemplated development or launch of a website or app that provides Personal Social Networking Services by a Person that provides Mobile Messaging services.

4.     All documents relating to the Company's decision to acquire, and acquisition of, Instagram LLC or WhatsApp LLC, including, but not limited to:

a.      all documents relating to the Company's rationale, strategies, and Plans for the acquisition;

b.      all documents relating to the financial or competitive position of Instagram LLC or WhatsApp LLC;

c.      all documents relating to the effect of the acquisition on competition for any Relevant Product or Digital Advertising Services;

d.      all communications with Instagram LLC, WhatsApp LLC, or any other Person, relating to the potential or actual acquisition of Instagram LLC or WhatsApp LLC; and

e.      all documents relating to the future of Instagram LLC or WhatsApp LLC if not acquired by the Company, including, but not limited to, documents relating to the potential acquisition of Instagram LLC or WhatsApp LLC by another Person.

5.      All documents, from January 1, 2007 to the present, relating to:

a.      the Company's processes, criteria, and rationale for identifying, evaluating, and acquiring potential acquisition targets;

b.      the Company's evaluation of, and any decisions with respect to, acquiring Onavo, Octazen, Glancee, EyeGroove, or tbh; and

c.      the Company's evaluation of, any decisions with respect to, and negotiations with any Person relating to any contemplated acquisition of Snap Inc., the Snapchat app, TikTok Inc., the TikTok app, or the Musical.ly app.

6.      All communications with Apple Inc. or Alphabet Inc. relating to each actual or contemplated feature or functionality of Instagram or WhatsApp available to users at any time since February 1, 2009, including, but not limited to, communications relating to updates or modifications to Instagram or WhatsApp.

7.      All documents sent to or from, or reviewed by, any Senior Executive of the Company discussing any actual or contemplated feature or functionality of Instagram or WhatsApp available to users in the United States, including, but not limited to, documents discussing updates or modifications to Instagram and WhatsApp.

8.      All documents (a) discussing the use of Facebook Blue or Instagram by people to share content with friends, family, and other personal connections; (b) relating to any efforts by the Company to foster such sharing, including, but not limited to, any modifications to content ranking algorithms; and (c) discussing meaningful communities or meaningful social interactions.

9.      All documents relating to financing or raising capital for Instagram LLC or WhatsApp LLC before their acquisitions by the Company, including, but not limited to:

a.     all communications with any Person relating to Instagram's or WhatsApp's product development, finances, and business Plans relating to a request for financing or capital; and

b.     all studies, analyses, or evaluations by the Company or any Person relating to performance, growth, or revenue projections.

10.    All documents relating to any actual or contemplated efforts (including changes to prior efforts) to generate revenue from Facebook Blue, Instagram, WhatsApp, or Facebook Messenger, including, but not limited to, all documents relating to revenue generated or Plans to generate revenue through features or functionalities (e.g., payment processing, e-commerce or retail features, business-to-person messaging) or business models (e.g., subscription, freemium, advertising).

11.    All documents relating to Facebook Camera, including, but not limited to:

a.     the Company's rationale for the development of Facebook Camera;

b.     decisions relating to resources devoted to or investment in Facebook Camera; and

c.     termination of Facebook Camera as a standalone app.

12.    All documents, from January 1, 2010 to December 31, 2014, relating to competition in the provision of any features or functionality relating to storing, editing, or sharing photographs or videos through a website or app, including, but not limited to:

a.     the performance of any product or service providing such features or functionality;

b.     the actual or projected usage of, and engagement with, each such product or service; and

c.     any steps the Company (including Instagram LLC) took to compete with any such product or service.

13.    All documents, from January 1, 2007 to January 1, 2015, relating to:

a.     the increased adoption and usage of mobile devices to consume digital services; and

b.     developing mobile apps for Facebook Blue, including, but not limited to, the Company's reasons for developing, modifying, or updating the mobile apps and the projected or actual benefits, costs, development time, and performance of the mobile apps.

14.    Submit all documents relating to the Company's or any other Person's Plans relating to any Relevant Product or Digital Advertising Services, including, but not limited to:

4

    a.        business Plans;

    b.        short-term and long-range strategies and objectives;

    c.        expansion or retrenchment Plans;

    d.        research and development efforts;

    e.        presentations to management committees, executive committees, and boards of directors;

    f.        budgets and financial projections; and

    g.        any Plans relating to personnel or resource allocation.

15.    All documents discussing:

    a.        whether or how to publicize, promote, or market Facebook Blue, Facebook Messenger, Facebook Camera, Instagram, or WhatsApp;

    b.        methods used to publicize, promote, or market Facebook Blue, Facebook Messenger, Facebook Camera, Instagram, or WhatsApp (e.g., cross-promotions, friend recommendations, prompts); and

    c.        the effects of any decisions to limit, terminate, or reject efforts to publicize, promote, or market Facebook Blue, Facebook Messenger, Facebook Camera, Instagram, or WhatsApp.

16.    All documents relating to the performance of any Relevant Product, including, but not limited to, the Company's or any Person's evaluation or tracking of the actual or estimated use of, or user engagement with, any Relevant Product, including specific features or functionality (e.g., measures of user acquisition, user retention, user switching, user multi-homing, user engagement (including monthly active users, daily active users, time spent)).

17.    All documents relating to the performance of any Mobile Messaging service anywhere in the world, including, but not limited to, the Company's or any Person's evaluation or tracking of the actual or estimated use of, or user engagement with, any Mobile Messaging service, including specific features or functionality (e.g., measures of user acquisition, user retention, user switching, user multi-homing, user engagement (including monthly active users, daily active users, time spent)).

18.    All data, publications, or reports prepared by any commercial or industry source relating to the use or performance of any Relevant Product or Digital Advertising Services (e.g., Comscore reports, eMarketer, App Annie).

19.    All documents discussing, analyzing, or containing Comscore data, including, but not limited to, any Comscore data residing in the Company's files.

20.   All documents relating to the Company's revenues, costs and expenses, and margins relating to the sale or provision or any Relevant Product or Digital Advertising Services, including, but not limited to, each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for the Company, including such statements and reports for the Company as a whole and business units within the Company.

21.   All documents relating to cannibalization among and between the Facebook Family of Apps.

22.   All documents relating to Google+, including, but not limited to, the launch of Google+, competition between Google+ and the Facebook Family of Apps, partnerships or software integration between Google+ and the Facebook Family of Apps, and the termination or discontinuance of Google+.

23.   All documents relating to the revelation in 2018 that Cambridge Analytica Ltd collected Facebook user data, including, but not limited to:

   a.   user reaction (including changes in user sentiment or user engagement);

   b.   advertiser reaction;

   c.   any actual or contemplated effects on the Company's revenues, margins, or share price; and

   d.   advocacy, presentations, or analyses presented to any government entity.

24.   All documents relating to the following for any Relevant Product:

   a.   surveys, studies, analyses, or experiments of user sentiment or user behavior;

   b.   how and why users use a product or service; and

   c.   user preferences relating to product or service features.

25.   All documents relating to:

   a.   the tracking and collection of information about users of any Relevant Product, including, but not limited to:

      i.   the collection of, or access to, information about user activities, attributes, or interests;

      ii.   the tracking of user activity on or off of the Company's products or services; and

      iii.   user preferences with respect to tracking and collection of user information;

6

      b.      the value of user data and information to the Company or to the provision or sale of any product or service; and

      c.      requiring users to have and be logged into an account in order to view content hosted on Facebook Blue, Instagram, or WhatsApp.

26.    All documents relating to:

      a.      each actual or contemplated privacy policy or change in privacy policy for Facebook Blue, Instagram, or WhatsApp; and

      b.      the actual or anticipated effects of any actual or contemplated privacy policy or change in privacy policy for Facebook Blue, Instagram, or WhatsApp on user privacy, data security, usage, engagement, user sentiment, revenue, profitability, or access to user data.

27.    All documents relating to:

      a.      actual or attempted entry into, or exit from, the provision or sale of any Relevant Product anywhere in the world;

      b.      requirements for entry into or expansion in the provision or sale of the Relevant Product, including, but not limited to, research and development, planning and design, production or infrastructure requirements, distribution systems, financing, access to capital, monetization strategy, service requirements, intellectual property, licenses, partnerships, sales and marketing activities, and legal or regulatory requirements;

      c.      the total costs required for entry into or expansion in the provision or sale of the Relevant Product; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the provision or sale of the Relevant Product; the methods and amount of time necessary to recover such costs; and the total Sunk Costs entailed in satisfying the requirements for entry;

      d.      barriers to entry into or expansion in the provision or sale of the Relevant Product, including, but not limited to, network effects, customer or user lock-in effects, access to user data, ability to scale, and algorithmic sophistication;

      e.      switching costs for users of the Relevant Product;

      f.      economies of scale or scope (e.g., size-related cost savings), or diseconomies of scale or scope, relating to the Relevant Product; and

      g.      the effect of any dimension of size (e.g., number of users, amount of user engagement, network size, advertising inventory, number of advertisers) on the operation, profitability, or ability to provide any Relevant Product.

28.   All documents relating to the benefits, costs, and risks anticipated or achieved as a result of the Company's acquisition of Instagram LLC or WhatsApp LLC, including, but not limited to:

    a.   any benefits the Company anticipated or achieved from acquiring Instagram LLC or WhatsApp LLC, including any improvements relating to user growth, output, infrastructure (including hardware and software), network effects, features, functionality, integrity (e.g., fake accounts, spam, pornography, misinformation, disinformation), or the provision or sale of advertising;

    b.   all cost savings, economies, or other efficiencies of any kind anticipated or achieved as a result of the acquisition of Instagram LLC or WhatsApp LLC;

    c.   all costs, diseconomies, or other inefficiencies of any kind anticipated or incurred as a result the acquisition of Instagram LLC or WhatsApp LLC; and

    d.   any methods, strategies, or Plans that the Company considered or anticipated using, or used, to achieve any benefits or cost savings.

29.   All documents, from January 1, 2011, to the present, relating to any methods, strategies, or Plans for managing the infrastructure (including hardware and software) or personnel requirements of Instagram or WhatsApp.

30.   All documents relating to the Open Compute Project, including, but not limited to, any hardware or data center designs or specifications provided by the Company to the Open Compute Project.

31.   All documents, from January 1, 2011, to the present, relating to any methods, strategies, or Plans to protect the integrity (e.g., identify fake accounts or moderate content, including spam, pornography, misinformation, or disinformation) of Instagram, WhatsApp, or Facebook Blue, including, but not limited to, all documents relating to the use of the Company's or any other Person's software, algorithms, or techniques to protect the integrity of Instagram, WhatsApp, or Facebook Blue.

32.   All documents, from January 1, 2010, to the present, relating to the Company's contemplated or actual interconnection, integration, or interoperation of Instagram or WhatsApp with each other or with Facebook Blue or Facebook Messenger, including, but not limited to, interconnections, integrations, or interoperations through:

    a.   use of APIs;

    b.   unifying the code bases, in whole or in part, of the Facebook Family of Apps; or

    c.   combining the apps' social graphs, combining or linking a user's account(s) on one app with account(s) on another app, or allowing users of one app to interact with users or features of another app.

33. All documents, from January 1, 2010 through December 31, 2015, relating to the Company's Special Partnerships relating to use of Facebook Platform and Open Graph, including, but not limited to, documents discussing:

    a.    the scope and terms of the partnership;

    b.    integrations or interconnections between the Company and the partner (including use of APIs);

    c.    the costs, benefits, and rationale of the partnership; and

    d.    the performance or growth of the Company or the partner during or as a result of the partnership.

34. All documents relating to competition in the sale or provision of Digital Advertising Services, including, but not limited to, market studies, forecasts, surveys, and all other documents relating to:

    a.    the sales, market share, or competitive position of the Company or any other Person;

    b.    the relative strengths or weaknesses of any Person selling or providing Digital Advertising Services, or of their product or service offering;

    c.    supply and demand conditions;

    d.    the ability or willingness of advertisers to switch business to (or from) the Company's products or services or from (or to) another product or service;

    e.    monitoring or collecting information about any other Person's Digital Advertising Services;

    f.    competition to attract, gain, or retain advertising customers;

    g.    actual or attempted entry or expansion in the sale or provision of Digital Advertising Services;

    h.    the effect of user engagement on advertising revenue, prices, or profitability;

    i.    competition between Digital Advertising Services and any other product or service;

    j.    allegations that any Person that sells or provides Digital Advertising Services is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints; threatened, pending, or completed lawsuits; and federal and state investigations; and

k.      any actual or potential effect on the supply, demand, cost, or price of any product or service the Company sells or provides as a result of competition from any other possible product or service.

35.     All documents relating to the Stop Hate for Profit campaign in or around 2020, or any other boycott by advertisers of the Company's or any other Person's Digital Advertising Services, including, but not limited to:

a.      any actual or potential effect on revenue, prices, or profitability;

b.      advertiser behavior during and after the boycott; and

c.      all communications with advertisers.

36.     All documents relating to:

a.      the effect of advertising on users of any Relevant Product, including, but not limited to, how the amount (including ad load), quality, or relevance of advertising displayed to users affects user activity, engagement, sentiment, growth, retention, or attrition;

b.      the effect of advertising load and advertising inventory volume on revenue, price, and profitability; and

c.      changes to product design (e.g., modifications to the dynamic advertising load algorithm) that affect the volume of advertising that users are exposed to on Facebook Blue or Instagram.

37.     All documents relating to the Company's pricing strategy, pricing practices, and pricing policies relating to Digital Advertising Services, including, but not limited to:

a.      how, and how often, the prices for Digital Advertising Services are determined;

b.      the advertising auction process; and

c.      whether, and how, customer characteristics, the presence of other competitors, or other factors are used by the Company in determining the prices for Digital Advertising Services.

38.     All documents relating to the quality or performance of the Company's or any other Person's Digital Advertising Services, including, but not limited to:

a.      the value of those services to advertisers (e.g., advertiser return on investment);

b.      the conversion rate, lead quality, click-through rate, or other metrics relating to advertisement quality or performance;

c.      the integrity, accuracy, transparency, and completeness of metrics relating to Digital Advertising Services;

     d.      allegations, concerns, or complaints from advertisers that any advertising metrics are incomplete, inaccurate, or insufficient in any way; and

     e.      the ability to target advertising in any way.

39.    All documents relating to Apple Inc.'s implementation of technical and policy changes relating to its Identifier for Advertisers, App Tracking Transparency framework, or other aspects of user tracking, including, but not limited to:

     a.      any actual or estimated effect of any such changes on the Company or any other Person or the provision or sale of any product or service;

     b.      user responses to any such changes, including the extent to which users are "opting in" or "opting out" of tracking, and any actual or contemplated efforts by the Company to affect user behavior relating to tracking; and

     c.      any assessments, strategies, or Plans relating to any such changes.

40.    All documents produced or submitted by the Company, and transcripts of any testimony provided by the Company or its employees, in the following:

     a.      Klein et al. v. Facebook, Inc., 20-CV-08570-LHK and 3:20-cv-08570-JD (N.D. Cal.);

     b.      RevealChat LLC v. Facebook, Inc., 20-CV-00363-BLF (N.D. Cal);

     c.      New York et al. v. Facebook, 1:20-cv-03589 (D.D.C.);

     d.      United States et al. v. Google, 1:20-cv-03010 (D.D.C.);

     e.      all government investigations into Facebook's acquisitions of Instagram LLC and WhatsApp LLC, and related investigations (e.g., the European Commission's investigation into misleading statements relating to the WhatsApp acquisition);

     f.      House Judiciary Committee Investigation of Competition in Digital Markets;

     g.      Israel Competition Authority investigation of Facebook's acquisitions of Redkix and Service Friend;

     h.      UK Competition and Markets Authority: Online Platforms and Digital Advertising Market Study;

     i.      Australian Competition and Consumer Commission: Digital Platforms Inquiry; and

     j.      Germany Federal Cartel Office: Abuse of Dominance Investigation/Litigation.

## DEFINITIONS

D1.   "Company" or "Meta" means Meta Platforms, Inc. (formerly Facebook, Inc.), its domestic and foreign parents, predecessors, divisions, subsidiaries (including Instagram LLC and WhatsApp LLC), affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial or total ownership or control between the Company and any other Person.

D2.   "Alphabet Inc." means Alphabet Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing.

D3.   "And" and "or" have both conjunctive and disjunctive meanings as necessary to bring within the scope of these Requests anything that might otherwise be outside its scope.

D4.   "Apple Inc." means Apple Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing.

D5.   "Communication" is used in the broadest possible sense and means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

D6.   "Digital Advertising Services" means the provision or sale of any type of online advertising, including search advertising, display advertising, social advertising, or any other form of advertising displayed online through an app or website.

D7.   "Discuss" or "discussing" mean, in whole or in part, constituting, containing, describing, or addressing the designated subject matter, regardless of the length of the treatment or detail of analysis of the subject matter, but not merely referring to the designated subject matter without elaboration.  In addition, a document that "discusses" another document includes the other document itself (e.g., a document that "discusses" an agreement or contract includes the agreement or contract itself).  Further, these terms include any operating or financial data about the designated subject matter where such data are separately set out as in a chart, listing, table, or graph.

D8.   "Document" and "documents" mean any information, on paper or in electronic format, including written, recorded, and graphic materials of every kind, in the possession, custody, or control of the Company.  The term "documents" includes, without limitation: computer files; email messages; audio files; instant messages; text messages; messages sent on any enterprise messaging system; any other form of electronic message; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that person's files; and copies of documents the originals of which are not in the possession, custody, or control of the Company.  The term "computer files" includes information stored in, or accessible through, computers or other information retrieval systems.  Thus, the Company should produce documents that

exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, mobile devices, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off Company premises.

D9.  "Each," "any," and "all" mean "each and every."

D10. "Facebook Camera" means the app named Camera that the Company introduced on or around May 24, 2012, and includes all preceding projects to create Camera or a similar app.

D11. "Facebook Family of Apps" means the Facebook Blue, Instagram, WhatsApp, and Facebook Messenger apps and websites.

D12. "Include" and "including" mean "including, but not limited to."

D13. "Instagram LLC" means Burbn, Inc., Instagram, Inc., or Instagram LLC, its domestic and foreign predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing; and includes Instagram, Inc., as an independent company and as a subsidiary of Meta.

D14. "Mobile Messaging" means messaging via short-message-service or multimedia-message-service protocols, and messaging via internet-based, over-the-top apps.

D15. "Other Online Services" means online services, other than PSNS, that enable the sharing or consumption of content, and includes Mobile Messaging services, specialized social networking services, interest-based networking services, and content consumption services.

D16. "Person" includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

D17. "Personal Social Network Services" or "PSNS" mean online services that enable and are used by people to maintain personal relationships and share experiences (e.g., personal updates, interests, photos, news, videos) with friends, family, and other personal connections in a shared social space (e.g., in a one-to-many broadcast feed).

D18. "Plans" means tentative, preliminary, or final proposals, recommendations, or considerations, whether or not authorized or adopted.

D19. "Price" or "pricing," includes price, gross price, net price, average price, unit price, effective price, dead net price, rebate, package price, bundled price, discount, credit, charge or chargeback, allowance, debit, or any other payment or receipt of anything of value incurred in whole or in part as a result of the sale or provision of the applicable product.

D20.   "Relate," "related to," and "relating to" are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, identifying, referring to, reflecting, reporting on, stating, or dealing with.

D21.   "Relevant Product" means (1) PSNS and (2) Other Online Services.  For the avoidance of doubt, "Relevant Product" includes, but is not limited to, services offered to users by Facebook Blue, Facebook Messenger, Instagram, WhatsApp, Friendster, Google+, LinkedIn, MeWe, Myspace, Nextdoor, Orkut, Path, Pinterest, Reddit, Snapchat, Strava, TikTok, Twitter, and YouTube.

D22.   "Senior Executive" means, at any time since January 1, 2009, the Company's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Technology Officer, Chief Growth Officer, Chief Product Officer, or any other Chief Officer; and any member of the M Team, the Small Group, or any similar group at the Company.  "Senior Executive" includes, but is not limited to: Andrew Bosworth, Will Cathcart, Stan Chudnovsky, Marne Levine, Adam Mosseri, Chamath Palihapitiya, Guy Rosen, and Fidji Simo.

D23.   "Snap Inc." means Snap Inc. (formerly Snapchat Inc.), its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing.

D24.   "Special Partnerships" means (a) the Company's relationships with Microsoft Corporation, Pandora Media, LLC, and Yelp Inc., referenced as "special partnerships" in the Company's April 21, 2010 blog post titled "The Next Evolution of Facebook Platform" (https://developers.facebook.com/blog/post/377/); (b) the Company's relationships with the Persons described as "partners" by the Company at the Company's 2011 f8 conference (https://www.youtube.com/watch?v=9r46UeXCzoU) (see video at 1:06:00 and 1:06:10); and (c) the Company's relationships with the Persons that constitute the "more than 60 apps" referenced in the Company's January 18, 2012 blog post titled "Open Graph now available" (https://developers.facebook.com/blog/post/634/), including, but not limited to, the Company's relationships with Path, Inc., Pinterest, Inc., Foursquare Labs, Inc., and Spotify Ltd.

D25.   "Sunk Costs" means the acquisition costs of tangible and intangible assets necessary to the provision or sale of the Relevant Product that cannot be recovered through the redeployment of these assets for other uses.

D26.   "TikTok Inc." means TikTok Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, including Musical.ly, A.me, or ByteDance Ltd.; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing.

14

D27.   "WhatsApp LLC" means WhatsApp LLC or WhatsApp Inc., its domestic and foreign predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, attorneys, consultants, agents, and representatives of the foregoing; and includes WhatsApp LLC as an independent company and as a subsidiary of Meta.

## INSTRUCTIONS

For the purposes of these Requests, the following instructions apply:

I1.     If the Company previously produced a document in the investigation styled In the Matter of Facebook, FTC File No. 191-0134, the Company need not produce another copy of the document in response to these Requests.

I2.     Unless otherwise indicated, these Requests cover any and all documents generated, prepared, created, edited, sent, or received during the period from January 1, 2009, to the present.

I3.     Unless otherwise indicated, these Requests seek information relating to the Company's business in the United States.  For the avoidance of doubt, documents containing information relating to the Company's global business, or to the Company's business in the United States and in other countries, should be treated as containing information relating to the Company's business in the United States.

I4.     Documents requested are those in actual or constructive possession, custody, or control of the Company, or its representatives, attorneys, or other agents, including without limitation consultants, accountants, lawyers, or any other persons retained, consulted by, or working on behalf of or under the direction of the Company, wherever they may be located.  This includes Documents in the Company's possession, custody, or control that were in the possession, custody, or control of Instagram LLC or WhatsApp LLC prior to acquisition by the Company.

I5.     If the Company objects to any part of a Request, set forth the basis for your objection and respond to all parts of the Request to which you do not object.  Any ground not stated in an objection will be waived.  All objections must be made with particularity and must set forth all the information upon which the Company intends to rely in response to any motion to compel.

I6.     All objections must state with particularity whether and in what manner the objection is being relied upon as a basis for limiting the scope of any search for documents or redacting or withholding any responsive Document.  If the Company withholds responsive information pursuant to any general objection, the Company should so expressly indicate.  If, in responding to any Request, the Company claims any ambiguity in interpreting either the Request or a definition or instruction applicable thereto, set forth as part of the Company's response the language deemed to be ambiguous and the interpretation used in responding to the Request, and produce all documents that are responsive to the Request as interpreted.

I7.     Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

    a.     The singular form of any word includes the plural, and the plural form includes the singular;

16

b. The past tense of a verb includes the present tense, and the present tense includes the past tense; and

c. The term "date" means the exact day, month, and year if ascertainable; if not ascertainable, then "date" means the closest approximation that can be made by means of relationship to other events, locations, or matters.

I8. Unless otherwise stated, construe each Request independently and without reference to any other for the purpose of limitation.

I9. Do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with the FTC. If any document responsive to a particular Specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

a. The term "Sensitive PII" means an individual's Social Security Number alone; or an individual's name, address, or phone number in combination with one or more of the following:

   i. date of birth

   ii. driver's license number or other state identification number, or a foreign country equivalent

   iii. passport number

   iv. financial account number

   v. credit or debit card number

b. The term "SHI" includes medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. Sensitive Health Information relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I10. Provide an English translation of all non-English documents; submit the foreign language document with the English translation.

I11. Subject to any agreement by the parties or order of the Court, the Company shall submit documents as instructed below.

a. Each production must include a transmittal letter that includes (1) the production date, (2) the Bates range of the materials included in the production, and (3) a brief description of the production, including identification of any Custodial Data Source.

b.  Bates Numbering:

  i.  All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (e.g., ten-digits and 0-padded) across the entire production; (3) contain no special characters, embedded spaces, hyphens, or underscores; (4) be sequential within a given document; and (5) identify the producing party.  To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

  ii.  If a Bates number or set of Bates numbers is skipped in a production, the Company will so note in a cover letter or production log accompanying the production.  The Company will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

c.  Email Threading.  The Company will not suppress email threads in productions, but may do so for the purposes of internal review.  This in no way prevents using email threading for purposes of internal review of documents and increasing the efficiency of such review.

d.  Redaction:

  i.  Except for information or material subject to a valid claim of privilege, submit the complete, unredacted document (including all attachments) as kept by the Company in the ordinary course of business.  Where a claim of privilege or other protection from discovery is asserted in objecting to any Request or sub-part thereof, and any document is withheld (in whole or in part) on the basis of such assertion, the Company shall provide a log ("Privilege Log") in accordance with the operative orders entered by the court or agreement by the parties.

  ii.  If any documents are redacted or withheld on a basis other than privilege, provide the information and reason for redacting or withholding that document.  The FTC does not concede the appropriateness of redacting or withholding information on a basis other than privilege and expressly reserves all rights to challenge the redacting or withholding of documents or information.

  iii.  Where ESI items need to be redacted, the Company shall produce these materials solely in TIFF format with each redaction clearly indicated.  Any non-privileged metadata fields reasonably available shall be provided.  Documents for which TIFF redactions may be impracticable may be redacted in native format by deleting the data from the document before production.

  iv.  If the items redacted and partially withheld from production are audio/visual files, the Company shall, to the extent reasonably practicable,

provide the unredacted portions of the content.  If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the Company to produce the unredacted portion of the content.

    v.   All documents containing a redaction must include a metadata field indicating that the document contains a redaction.

e.   TIFF Plus Text Productions. Except as stated otherwise below, ESI being produced by the Company shall be converted to 300 dpi, single-page TIFF images using CCITT Group IV compression.  Color images shall be produced by the Company in the form of .JPG images where color is necessary to interpret the contents of the relevant document.  Each page must be branded with a unique Bates number, which must not be an overlay of the image.  Unless otherwise agreed by the Parties, the TIFF images must be produced electronically by secure FTP or USB hard drive, accompanied by (1) an image cross reference file in OpticonTM format (.OPT) that associates each Bates number with its corresponding single-page TIFF image file and JPG image file for color images; (2) a "data load file" (.DAT) containing each of the applicable metadata and bibliographic fields described in Appendix A; (3) a comma delimited control list file (.LST) containing the Bates number and the full path to the extracted text/OCR text as it exists on the delivery media; and (4) Custodian Overlay files.  The data load file must be database/review platform (Relativity) load-ready.  Metadata fields should be provided in delimited text format using Concordance default delimiters.  There should be one line to account for each record. Nothing in this Instruction requires the Company to manually populate a metadata field (other than globally populated bibliographic fields such as MediaID, VolumeName, Company, Custodian, etc.) if such fields cannot be extracted from a Document.

f.   Load file volumes should be as large as practical but not contain more than 200,000 records each.  Each volume directory should contain four (4) subdirectories (each may contain sub-directories with no more than 10,000 files per directory): (1) Doclink to contain linked native files; (2) Fulltext to contain extracted/OCR text files; (3) Images; and (4) Loadfiles to contain the .OPT, .LST, .DAT, and Custodian Overlay files.

g.   Documents produced from hard copy files must be organized by Custodian and maintained in the order in which they appear in the files of the Custodian.

h.   Email.

    i.   If the Company redacts any part of an email before producing it, OCR text may be provided in place of extracted text.

    ii.   Email attachments must be processed and produced as though they were separate documents, and the text load file must include fields in which the Company identifies, for each email and its attachments the BegAttach and

19

EndAttach of the family range.  Where an email hyperlinks to another file or files, including material originally stored or accessed through a share drive, cloud storage, or Collaborative Work Environment, that linked-to material is also considered an email attachment for the purposes of this litigation.

i.  All hidden text (e.g., anchored URLs, track changes, hidden columns, hidden rows, hidden slides, hidden worksheets, mark-ups, notes) shall be expanded and rendered in the extracted text file.  For files that cannot be expanded to show all hidden text, native files shall be produced in addition to extracted text and images.

j.  Word, WordPerfect, PDF, and Collaborative Work Environment files.

    i.  "Collaborative Work Environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices.  Even when based on a common technology platform, Collaborative Work Environments are often configured as separate and closed environments, each one of which is open to a select group of users with layered access control rules (reader vs. author vs. editor).  Collaborative Work Environments include Facebook Workplace, Google Workspace, Microsoft Sharepoint sites, eRooms, document management systems (e.g., iManage), intranets, web content management systems (CMS) (e.g., Drupal), wikis, and blogs.

    ii.  For Word, WordPerfect, PDF, and Collaborative Work Environment files, the text load file must contain the full extracted text from the document, including all URL pathways, unless the document has been redacted during privilege review, in which case the load file may contain OCR text.

    iii.  For Word, WordPerfect, PDF, and Collaborative Work Environment files that contain comments or tracked changes that are not part of the ordinary text, the TIFF images must be generated based on how the document appears when first opened using view settings contained in the file.

k.  Microsoft PowerPoint and other presentation files ("Presentations") must be processed and produced as full color, half page, JPEG images with one slide per page.  Any presenter notes must appear below each slide.  Presentations must also be produced in Native Format in the Doclinks folder on the production media.  The text load file must contain a field that identifies the file path of the native file corresponding to each Document.  If Presentations contain privileged text that must be redacted before production, the Company will image the redacted files and provide OCR text for the files.  If a Presentation contains embedded Documents, those Documents must be processed and produced as though they were separate Documents with text load files containing BegAttach and EndAttach as described above.

l.  Microsoft Excel and other data spreadsheet files ("Spreadsheets") must also be produced in Native Format in the Doclinks folder on the production media using the same process as for producing Presentations.  If Spreadsheets contain privileged text that must be redacted before production, the Company will image the redacted spreadsheets showing all non-privileged hidden columns and provide OCR text for the files.

m.  Digital photographs must be produced as full color .JPG image files at their original resolution with Bates numbers branded onto them.

n.  Multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi) must be produced in Native Format at their original resolution with Bates numbers branded onto them.

o.  Microsoft OneNote files, and files from programs that offer similar functionality as Microsoft OneNote, may be converted to PDF files prior to processing, review, and production.  The Company need not collect or produce an entire OneNote notebook if only certain sections or pages in the notebook are responsive.

p.  With respect to any other kinds of electronic data, including data from databases, CAD drawings, GIS data, videos, online data science notebooks, dashboards, etc., the Company must produce in Native Format or initiate a meet-and-confer to determine a reasonably usable form for the production.  If the file is not one of the types described above, the Company must provide a placeholder TIFF image that shows the name of the file and has a Bates number.  If the FTC and the Company have not agreed on a production format for the ESI prior to the production, then Rule 34(b)(2)(E)(iii) shall not apply to the production.

q.  Document Families.  The Company may withhold small image files or extracted embedded files that are unresponsive or irrelevant, even if other documents in the same document family are responsive.  The Company shall not withhold documents on a claim of privilege merely because other documents in the same document family are privileged.

r.  Password-Protected, Encrypted, or Proprietary-Software Files.  With respect to any ESI items that are password-protected or encrypted within the scope of review, the Company will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate.  In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular Custodian after such reasonable efforts have been made, the Company shall advise the FTC.  ESI that cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

s.  Structured Data.  To the extent a response to these Requests requires production of discoverable ESI contained in a structured database, the Parties shall meet and

confer in an attempt to agree upon a set of queries or processes to collect discoverable information and generate a report in a reasonably usable and exportable electronic file for review by the FTC.  Upon review of the report, the FTC may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

t.   File Paths: file names, file paths, or similar information shall reflect how the document was used in the ordinary course of business.

112.   Except as stated above, the Company need not produce the same ESI in more than one form.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2022, I served the foregoing on the following counsel via electronic mail:

Mark C. Hansen, Esq. (mhansen@kellogghansen.com)

/s/ Daniel Matheson

Daniel Matheson (D.C. Bar 502490)
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov
*Attorney for Plaintiff*
*Federal Trade Commission*

23

**Appendix A**

All requested fields are to be included in the data load file whether populated or not, with the exception of fields that are blank for the entirety of a production.  A ✓ indicates the record types to which the field normally applies.  "Other ESI" includes ESI other than emails, calendars, and messages.

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| Bates Begin | The unique sequential document control number of the first page of the document. Cannot contain spaces or special characters. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bates End | The unique sequential control number of the last page of the document. Cannot contain spaces or special characters. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Beg Attach | Used for documents in a family group (e.g. an email with attachments). Populated with the document control number of the parent document. Populated for each child document as well as the parent document. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| End Attach | Used for documents in a family group (e.g. an email with attachments). Populated with the Bates End of the last child record in the family group. Populated for each child document as well as the parent document. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| Accessed By | Accessed By metadata field pulled from metadata of native file and identifying users who accessed a file. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | | ✓ | ✓ | ✓ | ✓ |
| All Custodians | All custodians who were in possession of a deduplicated document, including the person or group identified in the Custodian field. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Author | Author or created by field value pulled from the metadata of a native file. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | | | ✓ | | |
| BCC | Names of person(s) blind copied on a document or message. | Note Text | | ✓ | | ✓ | ✓ |
| CC | Names of person(s) copied on a document or message. | Note Text | | ✓ | | ✓ | ✓ |
| Conversation Index | Conversation index value for Microsoft Exchange emails. | Note Text | | ✓ | | ✓ | |
| Custodian | Name of the individual, or group/department for shared resources, from whose files the document originated. Format: Last, First or ABC | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |

A-2

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| | Dept. Use consistent naming and formatting across all productions. | | | | | | |
| Date Created | Date the document was created. | Date Format: MM/DD/YYYY | | | ✓ | ✓ | |
| Date Hardcopy | Date of hard copy documents, if coded. | Date Format: MM/DD/YYYY | ✓ | | | | |
| Date Modified | Date the file was last changed and saved. | Date Format: MM/DD/YYYY | | | ✓ | ✓ | |
| Date Received | Date a document or message was received. | Date Format: MM/DD/YYYY | | ✓ | | ✓ | ✓ |
| Date Sent | Date a document or message was sent. | Date Format: MM/DD/YYYY | | ✓ | | ✓ | ✓ |
| Delivery Receipt | Delivery receipt request notification for Email messages. | Note Text | | ✓ | | ✓ | |
| Duration | The elapsed time of the audio, video, voice message. | Time Format: HH:MM:SS AM/PM | | | ✓ | | |
| Edited By | Edited By metadata field pulled from metadata of native file and identifying users who edited a file. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | | | | | |

A-3

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| E-mail/Message Subject | Subject line of the message or document. | Note Text | | ✓ | | ✓ | ✓ |
| File Extension | File extension type (e.g., docx, xlsx, etc.). | Note Text | | ✓ | ✓ | ✓ | ✓ |
| File Path | Filepath of original document or message as it resided in its original, pre-collection environment. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| File Size | Size of document in KB. | Note Text | | ✓ | ✓ | ✓ | ✓ |
| Filename | Name of the original file, including any relevant file extension. | Note Text | ✓ | | ✓ | ✓ | |
| From | Names of person who authored the document. | Note Text | | ✓ | | ✓ | ✓ |
| Hash | Identifying value used for deduplication in MD5 format. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Importance | Indicates priority level set for message. | Note Text | | ✓ | | ✓ | ✓ |
| Last Author | Last Saved By field value pulled from metadata of a native file. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | | | ✓ | | |
| Message ID | Microsoft Outlook Message ID or similar value in other message systems. | Note Text | | ✓ | | ✓ | |

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| Organization Metadata | Company or organization field value pulled from the metadata of a native file. | Note Text | | | ✓ | | |
| Page Count | Number of pages in record. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Parent ID | Document ID or beginning Bates number of parent document. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Privilege Status | Privilege notation indicating whether document includes redaction, is withheld in its entirety, or is the family member of a privileged document. | Privilege Notations: Withheld Redacted Priv Family Member | ✓ | ✓ | ✓ | ✓ | ✓ |
| Production Link | Relative file path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Read Receipt | Read Receipt request notification for Email messages. | Note Text | | ✓ | | ✓ | |
| Sensitivity | Sensitivity field from Email messages or calendar items. | Note Text | | ✓ | | ✓ | |
| Subject Metadata | Title or Subject field value pulled from metadata from electronic file. | Note Text | | | ✓ | | |

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| Text Body | Body of text messages, instant messages, notes, or chats. Do not populate for emails or calendar items. | Note Text | | | | | ✓ |
| Text Chat Name | Name of chat room used in the communications. | Note Text | | | | | ✓ |
| Text Link | Relative path to submitted text file.<br><br>Example: \TEXT\001\FTC0003090.txt | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| Text Participants | List of participant names and/or telephone numbers. | Note Text | | | | | ✓ |
| Text Status | Indicates whether text was Sent or Read. | Note Text | | | | | ✓ |
| Text Thread Group | Populate with the Bates Begin of the first text in a conversation or chat. | Note Text | | | | | ✓ |
| Time Created | Time the document was created. | Time Format: HH:MM:SS AM/PM | | | ✓ | ✓ | ✓ |
| Time Modified | Time the document was last changed and saved. | Time Format: HH:MM:SS AM/PM | | | ✓ | ✓ | ✓ |
| Time Received | Time document or message was received. | Time Format: HH:MM:SS AM/PM | | ✓ | | ✓ | ✓ |
| Time Sent | Time document or message was sent. | HH:MM:SS AM/PM | | ✓ | | ✓ | ✓ |
| Time Zone | Native Time Zone in which the file originated. | Time Zone (*e.g.* UTC +/- XX) | ✓ | ✓ | ✓ | ✓ | ✓ |

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IMs, Texts, Chats |
|---|---|---|---|---|---|---|---|
| To | Recipient(s) of the document or message. | Note Text | | ✓ | | ✓ | ✓ |
| Version Number | Revision or version number extracted from metadata of native file. | Note Text | | | ✓ | | |
| Volume Name | Unique volume identifier assigned to the production (e.g., ABC001-001). | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |