# Exhibit 8

Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
MAXIMILIAN KLEIN, et al.,        )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )   NO. C 20-08570-JD
                                 )
META PLATFORMS, INC., formerly   )
known as Facebook, Inc.,         )
                                 )
          Defendant.             )
_____)
```

San Francisco, California
Thursday, August 11, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          BATHAEE DUNNE LLP
                         445 Park Avenue - 9th Floor
                         New York, New York 10022
                    BY:  **YAVAR BATHAEE, ATTORNEY AT LAW**

                         BATHAEE DUNNE LLP
                         901 S MoPac Expy
                         Plaza I - Suite 300
                         Austin, Texas 90071
                    BY:  **BRIAN J. DUNNE, ATTORNEY AT LAW**

                         QUINN, EMANUEL, URQUHART
                            & SULLIVAN LLP
                         865 South Figueroa Street - 10th Floor
                         Los Angeles, California 90017
                    BY:  **KEVIN Y. TERUYA, ATTORNEY AT LAW**
                         **BRANTLEY I. PEPPERMAN, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                             QUINN EMANUEL URQUHART
 3                              & SULLIVAN, LLP
                             191 N. Wacker Drive - Suite 2700
 4                           Chicago, Illinois 60606
                       BY:   STEPHEN A. SWEDLOW, ATTORNEY AT LAW
 5
                             LEVIN SEDRAN AND BERMAN LLP
 6                           510 Walnut Street - Suite 500
                             Philadelphia, Pennsylvania 19106
 7                     BY:   KEITH J. VERRIER, ATTORNEY AT LAW

 8                           SCOTT AND SCOTT, ATTORNEYS AT LAW, LLP
                             156 S. Main Street - PO Box 192
 9                           Colchester, Connecticut 06415
                       BY:   AMANDA LAWRENCE, ATTORNEY AT LAW
10
     For Defendant:
11                           WILMER, CUTLER, PICKERING, HALE
                                & DORR LLP
12                           2600 El Camino Real
                             Suite 400
13                           Palo Alto, California 94306
                       BY:   SONAL N. MEHTA, ATTORNEY AT LAW
14
                             WILMER, CUTLER, PICKERING, HALE
15                              & DORR LLP
                             7 World Trade Center
16                           250 Greenwich Street
                             New York, New York 10007
17                     BY:   DAVID Z. GRINGER, ATTORNEY AT LAW

18
     Also Present:        Eric Meiring
19

20

21

22

23

24

25
```

```
 1   Thursday - August 11, 2022                    11:50 a.m.

 2                      P R O C E E D I N G S

 3                         ---o0o---

 4                          -o0o-

 5            THE CLERK:  Calling Civil 20-8570, Klein versus Meta

 6   Platforms.

 7            THE COURT:  Okay.

 8            THE CLERK:  Counsel, please state your appearances for

 9   the record.

10                       (No response.)

11            THE CLERK:  Somebody?

12            MS. MEHTA:  Good morning, Your Honor.  Sonal Mehta on

13   behalf of the defendant Meta Platforms, Inc.  With me is my

14   colleague David Gringer, and in-house counsel from Meta, Eric

15   Meiring.

16            THE COURT:  Okay.

17            MR. SWEDLOW:  Good morning, Your Honor.  Steven

18   Swedlow on behalf of Plaintiff Klein and putative class.

19        I think I'll just let you introduce yourself, if that's

20   okay.

21            THE COURT:  Sure.

22            MR. BATHAEE:  Good afternoon, Your Honor.  Yavar

23   Bathaee of Bathaee Dunne LLP on behalf of the advertiser class.

24            THE COURT:  That's Klein; right?

25            MR. BATHAEE:  Yes, Your Honor.
```

PROCEEDINGS

1          **THE COURT:**  Okay.  All right.

2          **MR. BATHAEE:**  I'm with -- I'm sorry.

3      Go ahead, Brian.

4          **MR. DUNNE:**  Brian Dunne of Bathaee Dunne LLP on behalf

5   of the advertiser putative class in Klein as well.

6          **MR. TERUYA:**  Kevin Teruya from Quinn Emanuel for the

7   consumer class.  Good morning, Your Honor.

8          **MR. PEPPERMAN:**  Good morning, Your Honor.  Brantley

9   Pepperman from Quinn Emanuel for the putative consumer class.

10         **THE COURT:**  All right.

11         **MS. LAWRENCE:**  Amanda Lawrence from Scott & Scott in

12  the Klein matter on behalf of the advertising class, please.

13         **THE COURT:**  More?

14         **MR. VERRIER:**  Keith Verrier from Levin Sedran and

15  Berman on behalf of the advertiser class.

16         **THE COURT:**  Okay.  Good.

17      Who is going to take the lead on the plaintiffs' side for

18  the --

19         **MR. SWEDLOW:**  I was going to, but I didn't know if you

20  want to --

21      (Reporter interrupts for clarification of the record.)

22         **THE COURT:**  Well, I just had a couple of questions

23  about the motion to dismiss.  Yeah.

24         **MR. SWEDLOW:**  Okay.

25         **MR. BATHAEE:**  Good morning, Your Honor --

PROCEEDINGS

```
 1          THE COURT:  Let me ask you -- we're just talking about
 2   the advertisers here now.  The consumers are, I guess, already
 3   off to the races.
 4      What is -- I'm having trouble understanding, for the
 5   advertisers, what the relevant market is for the Section 2
 6   claims.
 7          MR. BATHAEE:  Your Honor, the relevant market is the
 8   social data market.  It's -- oh, I'm sorry.  Sorry.  Social
 9   advertising market.
10          THE COURT:  I almost fell out of my chair.  I thought
11   that was --
12          MR. BATHAEE:  I'm sorry.
13          THE COURT:  This is why I'm asking.
14          MR. BATHAEE:  I'm sorry.
15          THE COURT:  That's all right.
16          MR. BATHAEE:  It's the social advertising market and
17   there's a social data targeting barrier to entry surrounding
18   it.
19          THE COURT:  And I hear the words.  I don't understand
20   the market.
21      So who is in the social advertising market?  Who are
22   the -- who are the players?
23          MR. BATHAEE:  Your Honor, we identify LinkedIn, for
24   example; Twitter.  These are members of the submarket from the
25   general online advertising market.
```

1      **THE COURT:**  All right.  But, as I understand -- and

2 you need to jump in because your complaint is like a novel.  It

3 goes on.  I'm not necessarily criticizing it.  It is a little

4 overlong.  I am it criticizing it.

5      I just -- I'm having trouble understanding -- I know

6 Section 2 fairly well -- it's one of my favorite areas -- and

7 I'm having a hard time understanding the relevant product

8 market.  It looks to me like you're dangerously close to saying

9 the relevant product market is Facebook.

10      I'm going to say a Facebook because I'm old and I'm having

11 trouble adjusting to Meta, but you understand what I'm saying.

12      **MR. BATHAEE:**  I do.

13      **THE COURT:**  So I don't really get it.

14      And then there's the weirdness of also you come very close

15 to saying it's Facebook, that's the relevant market; which is a

16 doubtful proposition to my mind.  I'm not saying it's the end

17 of the world.  I'm just going to need some explaining.  But you

18 also make the strange -- after that premise, the strange

19 statement that Facebook has only an 83 percent share of its own

20 market.

21      So help me out.  Because this is a critical fact,

22 you know, whether you're going to go ahead or not, in order to

23 monopolize, you have to have a relevant product market.  I

24 don't care about the U.S. right now; that may come into play

25 later.  So don't worry about geography.  I'm just talking about

1   the product.

2       So I don't understand how you're defining that market.  It

3   doesn't look like a market that I've seen defined by the usual

4   standards which is, you know, interchangeable products, and

5   here are the competitors, and other factors.  So spell it out

6   for me.

7           MR. BATHAEE:  Well, Your Honor, it's not a Facebook

8   market.  We have Twitter, Snapchat, TikTok -- TikTok has

9   entered much later, since 2020.  These are all competing for a

10  special kind of advertising, and that's the kind that targets

11  advertising based on information exchanged between users, and

12  information that allows propagation of content.

13      So it's a very distinct submarket of the general

14  advertising market.  And as Judge Koh recognized in the first

15  motion to dismiss, it has been thoroughly pled, and market

16  power has been pled.

17          THE COURT:  Koh is not here anymore.  You've got me.

18          MR. BATHAEE:  I understand.

19          THE COURT:  It would be a lot better to address my

20  concerns.

21          MR. BATHAEE:  Of course, Your Honor.

22          THE COURT:  Here's where I'm getting hung up.  I mean,

23  I don't -- everybody on the online industry has been using

24  targeted ads from day one.  That's how they monetize their

25  products.  That's why people don't have to pay for anything.

**PROCEEDINGS**

1      So I just -- it's not at all clear to me how you're

2   defining the handful of people in the relevant product

3   marketing to be YouTube, Twitter, Facebook, and TikTok.

4      I'm also -- just as a side thought, I mean, it's hard to

5   see that there are any meaningful barriers of entry when TikTok

6   has come on the scene and had such a significant impact on

7   eating up Facebook's market share.  That doesn't suggest that

8   they're a particularly good monopolist if they're not able to

9   exclude competition; which is the definition of a monopolist.

10  And everybody else in the world has used this targeted

11  advertising from day one of the Internet.  That's a little bit

12  of an exaggeration, but not much.

13      So I'm not seeing it.

14      **MR. BATHAEE:**  Well, Your Honor, you're right that

15  there is targeted advertising.  But what the difference is

16  between social advertising is it uses a specific kind of data.

17  Now, I can distinguish it, I mean, by looking at Google, for

18  example.  When you enter a search -- right? -- when you talk

19  about a search, someone gives you a query and that query is

20  used to target advertising.  Social advertising is

21  context-based.  It's about people interacting with each other

22  and content propagating.  You don't have -- you don't have

23  something like a query where you know exactly what the user

24  wants.

25      And, in fact, our complaint makes this very point.

 1      You have a funnel.  Google's way close to the point of --
 2  the point of conversion, as they call it.  Facebook is not.
 3  Facebook is way up here and needs much more data and very
 4  specific data to target its advertising.
 5      Now, as for TikTok, during the most of our monopolization
 6  period -- and I think our claims pretty much stops around
 7  2020 -- there is a significant barrier to entry.  And TikTok
 8  got past it exactly how we say you need to, and that is through
 9  a critical mass of social data.
10      And if you don't have it, you're not going to get past it.
11  And TikTok is very well funded.  Extremely well funded.  And --
12      **THE COURT:**  Let me -- if I might just jump in.
13      I just don't understand why that's a market in the
14  antitrust sense.  Okay?  So Facebook has to do a little more
15  sleuthing to figure out that 10 photos of a user on a golf
16  course indicates that she likes to golf.  Okay. I get that.
17      Whereas, if you're on Google and the user types in
18  "women's golf clubs," you know right away that's the issue.
19      But why, I don't see why that's -- I mean, everybody is
20  doing it, maybe in slightly different ways, but they're still
21  an advertiser.  Your clients are still bargaining with all of
22  those entities to reach the audience.  Some have more direct,
23  like Google.  Some are more reading tea leaves, as you say,
24  from Facebook's end.  But they're all in the market.
25      And if you do that, I mean, isn't -- doesn't Facebook's

1    share of the market drop well below 50 percent?

2          **MR. BATHAEE:**  Well, Your Honor, the important point

3    for a defined market is cross-elasticity of demand; the fact

4    that products are interchangeable.  And we pled significant

5    facts that they are not interchangeable.  An advertiser that

6    advertises on Google has completely different criteria,

7    completely different expectations, completely different breadth

8    than someone who advertises, for example, on the social media

9    platform.  And that's because the level of targeting is

10   extremely different.  You can target by age, by demographic, by

11   content exchanged, by interest; and you can't do that generally

12   with Google, with a Google search.

13        And, Your Honor, the *Brown Shoe* factors, I think one of

14   them is:  Does -- do people generally consider these different?

15        And we've pled tons of facts that this is completely

16   viewed as a different kind of product.  They're not

17   interchangeable.  If -- and we plead as much because it is one

18   thing to enter something into a search term, buying a search a

19   term, targeting ads that way.  And it's another thing to pick

20   exactly the kind of people you want to see that ad with

21   specificity.  They're not interchangeable products.

22        Now, they become sort of interchangeable by 20- -- by

23   2019, when the Jedi Blue agreement kicks in.  And that's

24   exactly why they cut that deal.

25          **THE COURT:**  What happens in 2019?

1          **MR. BATHAEE:**  The Jedi Blue agreement in 2018 --

2          **THE COURT:**  Jedi, J-E-D-I?

3          **MR. BATHAEE:**  That's right, Your Honor.

4      That's an agreement between Google and Facebook --

5          **THE COURT:**  Oh, that.

6          **MR. BATHAEE:**  -- to divide markets, essentially.  And

7  that's because the markets were starting to converge.

8          **THE COURT:**  That's the Section 1 claim; right?

9          **MR. BATHAEE:**  That's also a Section 2 claim, Your

10  Honor.  It's an agreement that's --

11         **THE COURT:**  Okay.  Before we get too far down -- I

12  understand what you're saying.

13      What about TikTok?  I mean, it seems like a pretty porous

14  barrier to entry if this upstart can come out of nowhere --

15  which it literally did -- and turned out to the product that

16  everybody under the age of 25 wants to be on.

17         **MR. BATHAEE:**  Well, they traversed the barrier to

18  entry in precisely the way the complaint says, AI and

19  targeting.  That's very expensive.  That's not something you

20  can do.  For example -- and we say this in the complaint -- to

21  train a large language model, for example, you have to spend

22  tens or hundreds of millions of dollars in GPU and computing

23  time.  There are very few people that can pull that off; and

24  TikTok did in 2020 and they were heavily bankrolled to do it.

25      And there is a distinction between use an uses and ad

**PROCEEDINGS**

1    money.  And that's the important point.  It's not -- it's not

2    necessarily that TikTok, its uses may be interchangeable, but

3    it's -- sorry.  Its uses may not be interchangeable, but the ad

4    money may be.  And we're talking about product market.  So

5    TikTok, you slide through videos and it learns exactly what you

6    want and what you are interested in.  That's not -- that is not

7    what Facebook did for many years.

8         **THE COURT:**  I'm not -- listen.  I don't use social

9    media -- as a principled matter -- because I'm a federal judge;

10   but I have seen TikTok.  And I don't think -- TikTok is a lot

11   closer to Facebook than Google in terms of the information that

12   people are posting.

13        And it may have been expensive.  It may have been

14   back-breaking labor; I don't know.  The fact is, a major

15   competitor entered this market at a time when you-all are

16   saying in the complaint that Facebook had dug a moat around the

17   castle.  And I just -- it's hard to see how the barriers to

18   entry are plausible when you have these kinds of things

19   happening.

20        **MR. BATHAEE:**  Well, Your Honor, TikTok comes way later

21   than most of our allegations.  In fact, our allegations stop

22   before TikTok's entry.  It's very different than the consumer

23   case, I think, that may be all the way through.  The advertiser

24   case stops before TikTok enters because the exclusionary acts

25   stop.

1        Now, is the barrier to entry same in 2020 as it was in

2   2018 or 2019?  It's very different.  And in 2017 or 2016, for

3   example, when, for example, Google bought DeepMind, and there

4   is this AI revolution, that's a very -- that's a much more

5   powerful barrier to entry because you have feedback loops.  You

6   have network effects that are on steroids by then.  And it gets

7   worse and worse by '17, '18, '19; which is exactly why in 2018,

8   Facebook had to cut that deal with Google.

9        Google had far more sophisticated artificial intelligence

10  and machine learning.  They couldn't keep up anymore.  And so

11  the barrier to entry, by the time TikTok enters, is a very

12  heavy AI one.  And earlier, it's not heavily AI.  And it is a

13  very different barrier to entry and -- by the time TikTok

14  enters.  And by then, our exclusionary acts essentially end.

15       We're talking about -- we're talking about the four years

16  between -- before 2020, before 2019.  And there it is

17  actually -- you can -- we pled facts that no one could traverse

18  that barrier to entry and, in fact, Google+ tried.

19           **THE COURT:**  In your view, Meta's monopoly power ended

20  in 2019.

21           **MR. BATHAEE:**  Your Honor, it may well have.  We don't

22  know.  And that is a completely fact-based question.  And by

23  2020 -- by 2020, we were looking at completely different things

24  driving --

25           **THE COURT:**  What happened to Meta?

**PROCEEDINGS**

1      I want to hear from Ms. Mehta in just a moment.

2      But what -- what happened to Facebook's pricing after

3  TikTok erupted?

4      **MR. BATHAEE:**  Our complaint doesn't cover that because

5  our claims don't cover that point.

6      But we can -- we do cover, during our relevant period,

7  prices going up almost exponentially.  There's a graph in the

8  complaint showing that.  And the fact that they can raise

9  prices and no one can do a thing about it is direct evidence of

10  the barrier to entry.

11      And, in fact, Your Honor, the fact that they cut a deal

12  with Google when the markets started to converge is also

13  evidence of that barrier to entry and that submarket.  And

14  the -- these two points, Your Honor, are highly factual points,

15  and we plead them in complete detail.

16      Now, maybe Facebook comes back and says:  Look, TikTok

17  destroyed our monopoly in 2020.

18      Well, they need to prove that and they need to prove that

19  affects -- that affects the overcharge that occurred during our

20  relevant period, when there was exclusionary conduct targeting

21  the issues -- targeting our clients, the advertisers, what made

22  them pay the higher price.

23      We don't have that issue with TikTok.

24      **THE COURT:**  Just -- okay.  I mean -- just one last

25  question.

**PROCEEDINGS**

1    Look, you're probably going to be safe just because these

2  are factually intensive.  I'm just highly doubtful about a

3  number of these.  Who knows.  Maybe you're right; I need to see

4  the evidence, probably.  But how -- what was the means of

5  excluding competition during those -- what is it 2015 to 2019;

6  who did Facebook exclude from the advertisers?

7         **MR. BATHAEE:**  Well, Your Honor, there's several --

8         **THE COURT:**  They were the only show in town is

9  basically what I hear you saying.  So where else would you

10  spend your advertising dollars but Facebook?  That's not

11  exclusionary.  That's, in old-fashioned terms, a natural

12  monopoly from a first-mover in the industry.

13         **MR. BATHAEE:**  Well, Your Honor, there are several

14  exclusionary acts.  In fact, that's the centerpiece of our

15  complaint.

16    They scuttled their own platform to get rid of their

17  competition.  But that left them vulnerable, because the way

18  they were getting data to target people and ads was through

19  these people in their platform.  So someone would build an app

20  for Facebook's platform, and that would give them data.  So

21  what did they do?  They entered data-sharing agreements with

22  all of these people; and they're exclusive.  There's not -- as

23  they say, these nonexclusive agreements.  They're agreements to

24  use Facebook's APIs, or put ads, pump ads into Facebook in

25  exchange for continued access --

1          **THE COURT:**  I saw all that.  I'm just at a higher

2    level.  How did that exclude a competitor?

3          **MR. BATHAEE:**  How does Snapchat compete when it

4    doesn't have enough data to traverse that barrier to entry?

5    They can't do the same targeting as Facebook --

6          **THE COURT:**  Probably the same way TikTok did.  I mean,

7    Snapchat just chose not to do that.

8          **MR. BATHAEE:**  Snapchat didn't do that for years and

9    years.  In the same way TikTok did it, why didn't they do it?

10   There's no evidence.  TikTok came in with an elephant-like

11   amount of funding, and came into a very different market by

12   2020, one that we are not -- it's not at issue for advertisers.

13        And so if Snap could do it, it would have done it.  Snap

14   actually looked so good that Facebook cloned it.  Facebook

15   cloned it.  It was that powerful and still could not traverse

16   the data targeting barrier to entry.

17        Because it's not just data, Your Honor, it's also the

18   ability to target, and that requires machine learning and

19   requires AI.  And no one else could do it without a critical

20   mass of data and a critical mass of technology.  And all of

21   this is pleaded with detail in the complaint, including the

22   very particulars of the technology needed and the types of, as

23   we say, signal which is a particular type of social data needed

24   to power that technology.  That's not easy to get.  Snap didn't

25   have it; Twitter didn't have it; LinkedIn didn't have it.

**PROCEEDINGS**

1          And TikTok eventually pulled it off.  And they pulled it

2     off, Your Honor, maybe -- we don't know, and this is factual --

3     in a sort of innovative way; right?  In TikTok, you're able to

4     sort of -- they learn from you.  They learn from your behavior.

5     They sit there and they look at every video you liked and you

6     just keep swiping.  No one else had that.

7          So maybe they innovated into the space.  That actually

8     does happen.  It happened with Microsoft in 2000.  It doesn't

9     mean Microsoft didn't have a monopoly well before then and

10    abused it.  It doesn't mean Microsoft didn't unlawfully

11    maintain it for years.

12         We have something similar here.  TikTok enters the market

13    in 2020, well after, we argue, the exclusionary conduct ended.

14    We don't argue that TikTok, by then, has much to do with the

15    exclusionary acts of the monopoly maintenance for those prior

16    years.  And when TikTok comes in, there are heavy fact issues

17    including:  Did TikTok innovate?  Did TikTok have massive

18    amounts of funding, data, and AI to traverse the data targeting

19    barrier --

20         **THE COURT:**  It may have cost the fortune of Croesus;

21    it doesn't matter.  If you can get in, you can get in.  That

22    means that there is no monopoly power to exclude competition.

23         But, Ms. Mehta, you have been waiting patiently.  I would

24    like to hear your view on the relevant market.

25         **MS. MEHTA:**  Yes, Your Honor.  Thank you.

 1       So you won't be surprised to hear that my view is similar

 2  to your view, which is -- or at least the questions --

 3           **THE COURT:**  Let me just jump in.  I'm expressing some

 4  tentative thoughts.

 5           **MS. MEHTA:**  Fair enough.  And I agree with that.

 6       So -- but I do have some of the same questions you have,

 7  and we've presented those questions each time the social

 8  advertising market has come up.

 9       Judge Freeman had some of the same questions in the *Reveal*

10  *Chat One* opinion in which she pressed on this very issue, in

11  light of *Hicks*; right?

12       And what we are hearing today is precisely the type of

13  contriving of a market that is going to cause fundamental

14  problems in the theory.  And I think what you will see here is

15  they've contrived a market, they admit LinkedIn is in the

16  market, they admit Twitter was in the market, Snap, TikTok, and

17  many others --

18           **THE COURT:**  What about YouTube; is YouTube in the

19  market?

20           **MS. MEHTA:**  I'm sorry?

21           **THE COURT:**  Is YouTube in the market?

22           **MS. MEHTA:**  I think that's for them to tell us,

23  whether with YouTube is in the market.  But I think a large

24  number of people would say YouTube is in the market.

25       I think there is also a question as to whether they would

PROCEEDINGS

1   define the market to include Google, which does targeted

2   advertising.

3           MR. BATHAEE:  No.

4           MS. MEHTA:  The fact that we don't know, based on an

5   879-paragraph complaint, who is alleged to be in this market

6   and what lines they're drawing -- other than carving in and

7   carving out and changing over time to try to contrive a

8   market -- is a fundamental problem.  And I think, if you

9   consider the core of their theory, which is that there was some

10  sort of barrier to entry, the fact that all of these other

11  players have entered the market at different times, really, I

12  think, fundamentally undermines the notion that there's a

13  structural barrier to entry.

14          The fact that Facebook was a strong platform, and

15  performed well because it had a good product, is not

16  anticompetitive.  It doesn't mean that -- what they have is a

17  claim based on its success, which is essentially what you hear

18  Mr. Bathaee saying.  And I think that problem permeates the

19  actual challenged conduct as well.

20          So if we think about what the core of the theory is even

21  apart from what I would submit would be the failure to plead an

22  adequate market, if you listen to the core of the theory it is:

23  Well, there is a handful of nonexclusive vertical agreements

24  that they claim to be these entry and capture agreements;

25  there's other nonexclusive vertical agreements that they call

1    the data sharing agreements.

2         There's integration of WhatsApp and Instagram.  There is

3    this surveillance apparatus that they've described, Onavo.  And

4    then there is a Google agreement, which is a basis for their

5    stand-alone Section 1 claim.  But affirmatively they elected

6    not to plead a stand-alone Section 2 claim based on the Google

7    agreement.  And the reason for that is that Google agreement is

8    about off-platform advertising.  It's about off-platform

9    advertising, not --

10        **THE COURT:**  Well, I think that you -- that is clearly

11   an issue that's just going to have to be -- I don't have any

12   doubts that the Section 1 claim is going to go forward.

13        **MS. MEHTA:**  Agreed, Your Honor.

14        **THE COURT:**  And that's my own conclusion, in addition

15   to a prior court.  Look, I hear what you're saying.  But I

16   think at the end of the day, classically Section 2, relevant

17   market, barriers to entry, exclusionary conduct, or factual

18   issues -- I don't think the complaint is particularly

19   deficient, I'm not saying I have some doubts.  But seems to me

20   that it's probably enough to go forward.

21        But, you know, one thing I would like to see as we go

22   forward is, I'd like to get the relevant market issues

23   addressed early rather than later.  This is a gatekeeper; okay?

24   Because if there's no relevant market, there is no market in

25   which monopoly power could be exercised.

**PROCEEDINGS**

1          I'm also -- I'm really just a little bit at sea as to what

2     the barriers to entry are and who was excluded.  I can't figure

3     out who was kept out of the advertising game.  Who wanted to do

4     this service and who, among the plaintiffs' advertisers, wanted

5     to buy a service that they couldn't do because Facebook built a

6     brick wall?  Am I just -- I'm not seeing it.  So those are the

7     things I'd like to target earlier.

8          On the limitations issues I think there's enough to go

9     forward.

10          Is there anything you want to add on that?

11          **MS. MEHTA:**  Yes, Your Honor.

12          **THE COURT:**  I mean, it's very new events under

13     *Samsung*.  I think it's -- I mean, look, at the end of the day

14     you'll still have the opportunity to raise it as a fact issue,

15     we're still talking about 12(b)(6), but under *Samsung* it seems

16     to me that they have enough.

17          **MS. MEHTA:**  Understood, Your Honor.

18          I will respectfully submit that I think on both the merits

19     of their claims in terms of whether they've adequately pled an

20     effect in the social advertising market and an anticompetitive

21     effect in the market, and on statute of limitations, what we

22     heard today actually goes to the heart of the problem, which is

23     they're now saying their claims are about supposed monopoly and

24     anticompetitive effect 2018, 2017.  How do they then connect

25     that to a 2022 filing date, which is the filing date for this

1   complaint?

2          **THE COURT:**  They've got four-years.

3          **MS. MEHTA:**  Well, right.  But if it's 2017 and ends in

4   2018, it may fall right outside of the statue of limitations.

5          **THE COURT:**  Well, no, no.  It's the last -- within

6   four years of the last overt act.  That's typically how it's

7   construed.

8          **MS. MEHTA:**  Right.  Understood.  But that would be

9   2018, and I don't know when in 2018 they're claiming the

10  monopoly ended.

11         But the problem with all of this is really what I'm

12  getting as is they have had four opportunities -- I guess,

13  five, if we listen to them today -- to articulate a viable

14  claim, because they've had their original complaint; their

15  consolidated advertiser class action complaint; their first

16  amended complaint; their opposition to the motion to dismiss;

17  and the argument today to articulate a viable market for a

18  viable time period and a theory of exclusionary conduct that

19  would have an anticompetitive effect in that market.

20         **THE COURT:**  Just to be clear, I'm not going to cut

21  them off just on the pleadings.  This is intensely fact-based.

22  This is a complicated market.  It's going to require expert

23  testimony, in addition to a good factual record.  I'm not going

24  to turn off the spigot just on the papers.  That would be

25  unreasonable, I think.

**PROCEEDINGS**

1      Let me ask you this, though -- because I want to get into

2  discovery.  We're going to work out all your discovery

3  problems, get you back on track here.

4      I do hot-tubs.  Do you understand what those are?  I'm

5  very fond of them.

6      Now what's the -- have you talked about how you're going

7  to -- do you have your experts yet?  Do you know more or less

8  who you're going to use and have you shared that with each

9  other?

10          **MR. BATHAEE:**  We do, Your Honor.  We do.

11          **THE COURT:**  You what?

12          **MR. BATHAEE:**  We have not shared it, but we have our

13  experts, Your Honor.

14          **THE COURT:**  Okay.

15          **MS. MEHTA:**  And Your Honor has set a schedule that

16  includes the period for the hot-tubs.

17          **THE COURT:**  I really want -- can you tell me now?  Do

18  you want -- you don't want to tell -- it's okay.  If you don't

19  want to tell me now, it's all right.  But can you tell me now

20  who it might be?  Do you want to wait?

21          **MR. BATHAEE:**  I'm happy to --

22          **THE COURT:**  If it's not locked in, that's okay.

23          **MR. BATHAEE:**  Yeah.

24          **THE COURT:**  Okay.

25          **MR. BATHAEE:**  My colleague, Brian Dunne, is going to

**PROCEEDINGS**

1    address that.

2         MR. DUNNE:  Yeah.  So we have a -- Rick Warren Bolton

3    and Michael Williams is --

4         THE COURT:  Oh, Warren Bolton.  Okay.  And who else?

5         MR. DUNNE:  Yes, Warren Bolton, will be our liability

6    expert.  And then we have -- Mike Williams is our damages

7    expert.

8         THE COURT:  All right.  So Warren Bolton is liability

9    and Mr. Williams is damages.

10        MR. DUNNE:  And then we have an MLAI expert.  I forgot

11   his name.

12        THE COURT:  A what?

13        MR. DUNNE:  A machine learning AI expert to actually

14   help --

15        THE COURT:  Okay.  I'm just talking about the

16   antitrust thing.

17        MR. DUNNE:  Your Honor, that will go to the barrier to

18   entry stuff --

19        THE COURT:  And, Meta, have you all settled on your

20   experts yet?

21        MS. MEHTA:  At least some of them, Your Honor.  So we

22   will be working with Dennis Carlton, Katherine Tucker, and I

23   suspect some others depending on how the issues develop.

24        THE COURT:  Okay.  On liability issues.

25        MS. MEHTA:  Yes, on liability issues.

1      **THE COURT:**  It's likely to be Carlton and Warren

2   Bolton at the hot-tub then; right?  I'm not -- your hands

3   aren't tied.  If anything happens, it's fine.

4      I would rather do it sooner rather than later.  Here's

5   what I would like to do, I think.  In addition to my fondness

6   for hot-tubs, I am very fond, in my patent cases, of tutorials.

7   And I think a market tutorial, relevant market tutorial with

8   some thought about barriers to entry, exclusionary conduct,

9   would be useful as well.  So think about doing a tutorial day.

10      It would be off the record.  Tutorials, I do my IP

11   tutorials, patent tutorials off -- actually, I do do them on

12   the record, but you just can't cite them.

13      Just think about that.  Okay?  I think I'm probably going

14   to do to this in my Google antitrust case, although they don't

15   know it yet.  Just think about how that might work.

16      **MS. MEHTA:**  Your Honor, just one point --

17      **THE COURT:**  Do you understand what I'm saying?  This

18   would be each expert would come in and say:  Here's my

19   understanding of what the market is; here's my understanding of

20   what Meta has done; here's my understanding about why it

21   excluded people who wanted to get in, and -- or vice versa.

22   Yeah.

23      **MS. MEHTA:**  Understood, Your Honor.  And just one

24   point of clarification.  I assume you also want to do this for

25   the users, because I think some of the very same issues apply

**PROCEEDINGS**

1   to their market definition that you've raised with respect to

2   the social advertising maternal.

3            THE COURT:  Consumers?

4            MS. MEHTA:  Users, consumers, we use those therms

5   interchangeably.

6            THE COURT:  Yeah, for everybody.  Yeah.  Yeah.  I

7   mean, we haven't had -- I haven't been called upon to look at

8   that one yet so I don't --

9            MS. MEHTA:  And, Your Honor, I may have missed it, but

10  I don't know that we've heard who the users plan to use for

11  expert purposes.

12           THE COURT:  Oh.  Aren't you all using the same people?

13           MR. SWEDLOW:  No, we're not.  We're not defining the

14  same market and we don't have the same theories.  So.~.~.~

15           THE COURT:  Oh.

16           MR. SWEDLOW:  I wasn't prepared to tell you because we

17  haven't finalized who we're going to use as our experts.  But

18  since everybody else shared, can we set a very short deadline

19  and then we'll send Facebook an e-mail or letter saying here

20  are the experts we're going to use.

21           THE COURT:  I have had no occasion to look at the user

22  complaint because it wasn't -- you know, nothing came up.  So I

23  don't know anything about it, to be honest.  And I would really

24  prefer not to have overlapping plaintiffs' side experts.  So

25  just see what you can do with that.  Okay?

**PROCEEDINGS**

1      If you have Section 2 claims -- do you have Section 2

2  claims for the users?  Yes?

3          MR. SWEDLOW:  Yes.  I was just -- we're not going to

4  have overlapping experts.  We have --

5          THE COURT:  In other words, I don't want Warren Bolton

6  to be followed by someone, technically on the user side, saying

7  exactly the same thing with a few extra points.

8          MR. SWEDLOW:  We have different -- I don't want to

9  take up your entire afternoon --

10          THE COURT:  You have very different markets and

11  everything else?  How is this going to work for trial then?

12  How are we going to try this?

13          MS. MEHTA:  Your Honor, we did raise this issue with

14  Judge Koh at the initial hearing with respect to counsel

15  selection.

16      Our view is that the cases should not be consolidated in

17  the way they have been for that reason.  But Judge Koh thought

18  it made sense to consolidate them.  I think we're now pretty

19  far down the line in terms of consolidated discovery.

20          THE COURT:  I think that's okay.  I'm just talking

21  about trial.

22          MS. MEHTA:  But at trial I think we are going to have

23  some real serious conversations depending on what theories

24  survive this process.  And if we get to trial, then the

25  question will be how do we structure that.  And I think there

1   is still a lot of work to do to figure out -- I mean, from our

2   perspective, I think a lot of the theories are nonviable and

3   we're going to have to hash that out with Your Honor over the

4   next year.

5          **THE COURT:**  I am not surprised to hear you say that.

6          **MS. MEHTA:**  I know you're not.

7          **MR. SWEDLOW:**  Your Honor, I don't know what's

8   happening here, but Facebook argued that they should be

9   consolidated and included in one complaint.  We don't believe

10  they should be consolidated.  They're different classes and

11  different theories.  So I don't know why we're now saying that

12  Facebook didn't want it to be consolidated.  They did; we

13  didn't.  So I still think it shouldn't and it sounds like we're

14  in agreement that it should not be consolidated --

15         **THE COURT:**  I asked an innocent which is:  How are we

16  going to try the cases?

17     Well, apparently, there is some huge back story.  I'll

18  deal with it later.

19     Let's deal with the discovery now.

20         **MS. MEHTA:**  Your Honor, there is just one point of

21  clarification with respect to the pleadings in light of what

22  I -- where I read Your Honor to be on the motion to dismiss

23  which is:  In -- over the course of the motion to dismiss

24  briefing, the plaintiff -- the advertiser plaintiffs have

25  indicated that they're withdrawing a large number of the

1    theories and allegations from their complaint.   It is 879

2    paragraphs, as Your Honor knows.

3         What we would ask is if you are going to deny the motion

4    to dismiss, that you direct them to file an amended complaint

5    that conforms to only the theories that they have not abandoned

6    and the allegations that actually relate to those theories, not

7    hundreds of paragraphs of context.

8         The reason for that is twofold.   One, it's very burdensome

9    for us to respond to a complaint of this length.   But two --

10   and perhaps more importantly -- I don't think Your Honor wants

11   us to have discovery skirmishes based on allegations in the

12   complaint and whether things are actually relevant or no longer

13   relevant.   And so cleaning up the pleadings will allow us to

14   actually focus on the case as we go forward.

15        So that would be our request.

16        **MR. BATHAEE:**  Your Honor, if I may respond, the --

17   what she is referring to -- what my friend over here is

18   referring to is the original refusal deal claim.

19        Now, the problem, of course, the refusal deal is not in

20   this case, but the context for the exclusionary agreements is

21   the same, which is that Facebook demanded reciprocity

22   agreements, hatched the scuttling of its platform, which in

23   turn required it to enter into these exclusionary agreements.

24   They're part and parcel in that sense that we're not basing

25   liability on those facts, but those facts are extremely

1    important for the plausibility of the complaint, and even

2    potentially at trial.

3         And, Your Honor, I -- if Your Honor will permit me, I just

4    do want to make some point on limitations if you don't mind.

5    And that is --

6              **THE COURT:**  Okay.  Yeah.

7              **MR. BATHAEE:**  Ms. Mehta -- I just want to correct

8    this.  Ms. Mehta said that this starts in 2017 for the eBay and

9    Netflix agreement.  And for Netflix it's incorrect, and

10   Your Honor can look at the sealed portions of paragraphs 530

11   and 536 -- I won't read the date because it's sealed.

12             **THE COURT:**  You know, I had a question about that, but

13   go ahead.

14             **MR. BATHAEE:**  Your Honor, so there is no relation back

15   or statute of limitations issue with respect to Netflix.

16        With respect to eBay, the conduct spans from 2017, all the

17   way to 2019.  And, in fact, Your Honor, we identified -- we

18   identified a presentation in this on paragraph 469 --

19             **THE COURT:**  You know, actually, I think I'm okay on

20   all this.  My question --

21             **MR. BATHAEE:**  Okay.

22             **THE COURT:**  -- why is this complaint under seal?  I

23   mean, I didn't --

24             **MR. BATHAEE:**  Your Honor --

25             **THE COURT:**  I am really hostile to sealing documents

**PROCEEDINGS**

1  because it completely undermines who we are as a federal court,

2  which is a courtroom of the People of the United States, who

3  have a perfect right to see everything that crosses my desk and

4  that I rely upon and a jury will rely upon in making a

5  decision, particularly in a case of this magnitude.  And I'm

6  particularly doubtful that complaints should be sealed.

7      So why was this sealed?

8      **MR. BATHAEE:**  Your Honor, we took no position on the

9  sealing.  These are Facebook's redactions, essentially, that

10  they wanted.  We don't actually see reasons any of these things

11  should be sealed, but that's a question for Facebook, Your

12  Honor, and we don't oppose unsealing.

13      **THE COURT:**  I'm not just following it, Ms. Mehta.

14      **MS. MEHTA:**  Yes, Your Honor.  I understand

15  Your Honor's view on that and I understand the case law on that

16  issue.  We have proposed very, very, very limited and narrow

17  targeting of the redactions.  This is at Docket Entry

18  Number 244 --

19      **THE COURT:**  This is -- I'm holding up -- which will

20  not show up on the record -- the entire page after page after

21  page is redacted.  That is not narrow and limited.

22      **MS. MEHTA:**  That's not the set of redactions that we

23  actually asked to have sealed.

24      So they submitted a highlighted copy of the complaint

25  which was based on the confidentiality designation of the

**PROCEEDINGS**

1  documents they were citing.  Then, under the local rules, we

2  submitted a declaration from a Meta employee with targeted,

3  narrowed requests to seal only the specific things that would

4  create, under the relevant standards, undue burden to Meta's

5  business.

6      And that's the declaration at 244-1.  And it is not all of

7  the highlighting.  It is a very limited subset of that.

8          **THE COURT:**  It's not.  It's a much smaller set?

9          **MS. MEHTA:**  Yes, Your Honor.  And we have a

10 declaration --

11         **THE COURT:**  If I look at this, I would say it is a

12 fraction of what I have now?

13         **MS. MEHTA:**  Yes, Your Honor.  We narrowed

14 significantly what needs to be sealed from the highlighted

15 version of the complaint that was filed by the --

16         **THE COURT:**  All right.  I'll take a look at it, but in

17 all probability a much, much less redacted complaint will be

18 filed.  Okay?

19        **MR. BATHAEE:**  Your Honor, I just want to flag that we

20 have had multiple sealing motions.  And they often seal the

21 names of people and, you know, that sort of perplexes me, why

22 the name has to be sealed.

23     So I respectfully want to flag that for the Court.  We

24 don't see a basis to redact names off the complaint.

25         **THE COURT:**  Well, I'm not going to remember that.  So

**PROCEEDINGS**

1   you have to say it in your filings about sealing or the point

2   is going to get lost.

3         **MR. BATHAEE:**  Thank you, Your Honor.

4         **THE COURT:**  You have a mountain of discovery problems.

5   I keep my discovery, which means I'm going to figure out who's

6   an impediment and who is a problem-solver.  And problem-solvers

7   will be rewarded and people who are impediments will be

8   sanctioned.  I want to be very clear about that.

9         So let me take up -- let's see.  This looks like a joint

10  letter, Docket Number 319.  Something to do about Facebook's

11  app developer investigation documents and non-party subpoena

12  communications.

13        **MR. SWEDLOW:**  Your Honor, I think that's two disputes

14  that we put in that we combined into --

15        **THE COURT:**  Let's start with the app developer

16  investigation.

17        **MR. SWEDLOW:**  So the app developer investigation

18  documents were -- have been ruled on by two state courts and

19  one federal judge, Judge Corley.

20        The dispute, as we see it, is that the information, the

21  ADI, app developer information, was not the attorney/client

22  communication, but the underlying documents and data from that

23  investigation, is not attorney/client privilege and is not work

24  product, as Judge Corley ruled.  And what we would like is that

25  the exact same information that Facebook is required to produce

1   in the exact same form be produced here.

2          THE COURT:  All right.  Where is -- so there is a

3   bolus of AD -- what do you call it, ADI?

4          MR. SWEDLOW:  ADI.

5          THE COURT:  So there is a bolus of ADI documents

6   sitting where; what case are they on?

7          MR. SWEDLOW:  The Cambridge Analytica case which, I

8   think, Judge Corley was the magistrate judge at the time, and

9   ruled on the discovery dispute in Judge Chhabria's --

10         THE COURT:  You know what?  Please.  The name on the

11  door is "Donato."

12         MR. SWEDLOW:  Oh, I'm sorry.

13         THE COURT:  Just forget about -- you're here, okay?

14         MR. SWEDLOW:  Yes.

15         THE COURT:  You're with me now.  Don't mention anybody

16  else.

17         MR. SWEDLOW:  Got it.

18         THE COURT:  I'm asking a very simple question:  Where

19  physically are the ADI located?  In this MDL case?

20         MR. SWEDLOW:  Yes.

21         THE COURT:  All right.  What is the problem with

22  producing them, Facebook?

23         MS. MEHTA:  Yes, Your Honor.

24      So the problem is that the documents that they have

25  requested are not the nonprivileged documents relating to ADI.

1       **THE COURT:**  Nonprivileged.

2       **MS. MEHTA:**  They're not asking for nonprivileged

3  documents.  What they've asked for is a request that is focused

4  only on the documents that Judge Corley ordered to be produced

5  over Meta's objection that they are work product protected.

6       **THE COURT:**  Let me ask you this:  So have you given

7  your colleagues here, the plaintiffs side, have you given them

8  the non- -- what you consider to be the nonprivileged ADI?

9       **MS. MEHTA:**  We have proposed that to them.  And they

10  have said they don't want that.  What they want is just the

11  cloned production of what is being produced in the Cambridge --

12  and we're happy to talk to them about --

13       **THE COURT:**  Let's do this:  You produce the ADI

14  documents -- okay? -- whatever you think is nonprivileged and

15  then you're just going to do a privilege log for the other

16  ones.  And if you have a problem with the privilege log, you

17  can come and see me.  Okay?

18       A problem is not going to be "a judge in Massachusetts" or

19  "one down the hall reached a different decision."

20       That is not a problem.  You approach me and say, "This

21  document is not privileged because," as if you're the first

22  person to speak on the issue.  You got it?

23       **MR. SWEDLOW:**  Understood, yes.

24       **THE COURT:**  All right.  So just do that.

25       How long do you need for that, Ms. Mehta?

**PROCEEDINGS**

1      **MS. MEHTA:**  Your Honor, we're talking about

2   potentially hundreds of thousands of documents.  So I'm happy

3   to give you an estimate, but I don't have one off the top of my

4   head.

5      **THE COURT:**  They've already been produced; right?

6      **MS. MEHTA:**  The problem is they're intermingled with

7   other productions.  So it's not like there's no database that I

8   can go to --

9      **THE COURT:**  It's not in a little box, so to speak?

10      **MS. MEHTA:**  I wish we were talking about boxes of

11   documents, Your Honor.  We're talking about data centers.

12      We have -- I understand there's -- I'm not counsel of

13   record in the case, but I understand there is something like

14   five document production databases.  And the documents are

15   intermingled throughout, so it wouldn't be like pressing a

16   button.  It's going to take us some time.

17      **THE COURT:**  How about let's start with three weeks.

18   If you need more time -- okay?  So three weeks, you produce the

19   nonprivileged ADI and then a privilege log.  If you need more,

20   you can just tell me and work it out with -- preferably, work

21   it out.  I don't need to be involved.  You can work it out.  If

22   you can't work it out, then I'll get involved.

23      **MS. MEHTA:**  Thank you, Your Honor.

24      **THE COURT:**  All right.  So that takes care of that.

25      What's this non-party subpoena issue?

1      **MR. SWEDLOW:**  So from our perspective, there are --

2  third-party subpoenas have been issued, and what we were hoping

3  is that we could be copied on the correspondence with

4  third-party subpoenas recipients, receive the productions, and

5  be allowed to attend meet and confers so that we don't have to

6  issue subpoenas and engage in another litigation potentially.

7      **THE COURT:**  Okay.  That's a little too abstract for

8  me.  Who's issuing the subpoenas?

9      **MR. SWEDLOW:**  Facebook issued 36 non-party subpoenas

10  in this case.

11      **THE COURT:**  Okay.

12      **MR. SWEDLOW:**  We've issued a total of 11 so as far.

13      **THE COURT:**  Okay.  So 36 Facebook subpoenas and what

14  is it -- or Meta subpoenas.  What is it you want to know?

15      **MR. SWEDLOW:**  We want to be copied on the

16  correspondence with the -- counsel for those third-parties, so

17  that when they engage in a document production and narrow the

18  scope of the subpoena, we don't have to issue our own subpoena

19  to get our own documents from the same party.  The parties

20  would be companies like Google and Nielsen.

21      **THE COURT:**  Are you having a lot of conversations with

22  people about their production?

23      **MS. MEHTA:**  Yes, Your Honor, we are.

24      So here's the concern, and I've said this to them many,

25  many times over the preceding months.  We have no problem

1    producing to them our correspondence with non-parties, the

2    documents we get with non-parties; of course, they're entitled

3    to all of that.

4         The problem is, we're having phone calls with non-parties

5    to talk about what we're looking for to develop potential

6    witnesses, to talk about what evidence they may have that may

7    be relevant to our case.  Having plaintiffs' counsel on those

8    calls not only infringes on our work product and our ability to

9    develop our case, but I think, frankly, is going to really

10   derail our ability to get non-party discovery, which we're

11   already struggling with because we're already getting a lot of

12   foot-dragging from the non-parties.  And I suspect -- I hate to

13   say this, Your Honor, but there's going to be some motions to

14   compel coming your way.  We need this evidence --

15        **THE COURT:**  Oh, no, no.  Discovery letters.  No

16   motions.

17        **MS. MEHTA:**  That's what I mean, Your Honor.  I'm

18   sorry.

19        **THE COURT:**  Please, always keep that in mind; just the

20   letters, please.

21        **MS. MEHTA:**  And that having plaintiffs on every call

22   so that we're having a three-way negotiation or litigation

23   about the scope of the subpoenas is going to take this process

24   and blow it up way further.

25        **THE COURT:**  Well, strictly speaking, you shouldn't be

1   having conversations with witnesses about what they're going to

2   do.  They're supposed to be producing --

3        **MS. MEHTA:**  Not the witnesses, counsel -- about who

4   might be knowledgeable about what documents they might have

5   that might be relevant.  This is the normal negotiation process

6   with counsel for a non-party.

7        I guarantee you that if a non-party was on the phone with

8   me or one of my colleagues, and then a plaintiff's lawyer, and

9   had to listen to us argue about what's relevant and not

10  relevant and what should come in and what shouldn't come in,

11  the process is going to fundamentally break down.

12       **THE COURT:**  Well, I think they have a right to know if

13  you're skewing the evidence.  That's what he's asking.

14       **MS. MEHTA:**  But that --

15       **THE COURT:**  And I have to say I'm a little concerned.

16  I mean, these are non-parties, meaning they're witnesses, and

17  you should not be bargaining with them about what's good for

18  you and what's not good and whether they should produce it or

19  not.

20       **MS. MEHTA:**  Well, but -- Your Honor, that's not what

21  we're doing.

22       So I want to be very clear.  That's not what we're doing.

23  What we're doing is talking about the scope of the information

24  that we're asking for.  "Here is what we're interested in

25  trying to learn about.  Do you have documents about that?"  And

PROCEEDINGS

1   the non-party might say, "No, we don't keep documents about

2   that, but we have documents about this other thing."

3        That's a free-flowing conversation.

4        **THE COURT:**  No, I understand you may say that.  And

5   everybody here is entitled to trust but verify, and you are

6   taking out the "verify" part.

7        I'll just tell you as a general rule, I am not at all

8   sanguine about lawyers cutting deals with witnesses on what,

9   you know, they may have or not.  That gives me considerable

10  pause, Ms. Mehta.  So I don't know what the answer is, but --

11       **MS. MEHTA:**  Could I make a suggestion, Your Honor?

12       **THE COURT:**  -- I don't like the position you're

13  taking.

14       **MS. MEHTA:**  Could I make a suggestion, Your Honor?

15  Because I want to be very clear, we're not -- I'm sorry.

16       We're not cutting deals, but we're getting very strong

17  objections from non-parties as to the scope of the subpoena and

18  then we're doing what you do in every instance where you have a

19  negotiation:  We're making agreements to narrow in some places

20  and focus in places that are higher priority for us.

21       We have no problem sharing with the plaintiffs what we're

22  narrowing.  We will tell them -- we'll send them an e-mail and

23  say "We just narrowed the following topics, and we've told them

24  that we're not going to ask for X, Y, Z."  And if they want X,

25  Y, and Z, they can talk to those non-parties and get it.

PROCEEDINGS

1         **THE COURT:**  Well, that seems fair.  Let's do it that

2   way.  That should be enough.

3         **MR. SWEDLOW:**  If I could -- just one point here.

4      What we're hoping for is to avoid then having to, after

5   the fact, go back to Apple, Google, Twitter and say, "If you

6   had just looked for that category, then we don't have to issue

7   or enforce our subpoena."  It's not --

8         **THE COURT:**  You might have to do that.

9      So that's -- but, Ms. Mehta, you're going to send to the

10  plaintiffs every conversation and deal you strike.

11        **MS. MEHTA:**  Yes, Your Honor.

12        **THE COURT:**  This is going to be aboveboard.  This is

13  going to be discovery in the sunshine.  I'm not going to

14  have --

15        **MS. MEHTA:**  We're happy to do that.

16        **THE COURT:**  -- any backroom deals that the other

17  side -- and that goes -- both sides.  This works two ways; this

18  is bilateral.  This isn't just Ms. Mehta.  I'm just talking to

19  you too on the plaintiffs' side.  You're all going to do this

20  out in the public square, so to speak, and everyone is going to

21  see it.  So make sure that happens.

22        **MS. MEHTA:**  Your Honor, just one logistics point.

23      I would like to suggest that we agree to a weekly schedule

24  by which the parties inform each other of any adjustments or

25  narrowing of the subpoenas.

1          **THE COURT:**  Do a Friday check-in, how about that?

2          **MS. MEHTA:**  That sounds great.

3          **THE COURT:**  So a weekly Friday check-in.

4          **MS. MEHTA:**  We'll e-mail each other on Friday with

5    that --

6          **THE COURT:**  You two can work it out.

7       That resolves Docket Number 319.

8       Now, Docket Number 323-3, which is sealed again for some

9    reason, but anyway:  Hyperlinked Documents.

10      What's the hyperlinked documents issue?  Plaintiff?

11         **MR. DUNNE:**  Yes, Your Honor.  Brian Dunne for the

12   advertisers.

13      So, Your Honor, the dispute here is essentially that we

14   have this giant amount of documents where the centerpiece of

15   the conversation is missing.  And I think the real problem,

16   just going through practicalities, is that we haven't been

17   presented by -- anything by Meta that would allow us to

18   actually ensure what when we have all of these documents that

19   are saying, "Hey, look at this -- look at this -- read through

20   about what you're going to be doing," or "look at this

21   competitive analysis of Netflix," we have an ability to see

22   that.

23      And so, you know, what we would like is, an order from

24   Your Honor saying, at minimum, when -- right? -- that

25   advertisers, can send or, I guess, plaintiffs generally can

**PROCEEDINGS**

 1  send a list of hyperlinks of relevance that Meta will then --

 2       THE COURT:  All right.  You just want to pick some

 3  links here and there?  Is that what you're saying?

 4       MR. DUNNE:  What I would recommend -- which I've seen

 5  in other cases -- is, we will just send them lists on a rolling

 6  basis --

 7       THE COURT:  Okay.

 8       MR. DUNNE:  -- and they send back to us the documents.

 9       THE COURT:  My point is, though, you're going to --

10  this is a curated list.  You're not just going to say --

11       MR. DUNNE:  It's a curated list.  Yes, so it will

12  be --

13       THE COURT:  You will actually pick a subset.

14       MR. DUNNE:  Right.  So it will say, you know, my

15  colleague or whatever, Mr. -- my friend --

16       THE COURT:  All of them, every time.

17       MR. DUNNE:  Mr. Gringer -- "David, I have these lists

18  that advertisers noticed from our document review that we need

19  to find the hyperlinks from."  Right?

20       And some sort of -- right? -- reasonable time period,

21  perhaps like 10 days or so, where we're supposed to get back to

22  us.  And then we can work out -- right? -- they say that they

23  have trouble -- right? -- locating -- or doing -- doing like

24  linkages, or maybe things are missing.  Well, they can tell us

25  that when we send it to them.

1        **THE COURT:**  All right.  That seems reasonable.

2        **MR. GRINGER:**  Good afternoon, Your Honor.  David

3   Gringer for Meta.

4        I agree it seems reasonable; so reasonable we've been

5   proposing it to the advertiser plaintiffs for the last

6   six months.  So as long as it's reasonable, if that's how they

7   want to proceed --

8        **THE COURT:**  If it gets too much, you can come back and

9   tell me.  Okay?  We'll do that on that basis.

10       All right.  That resolves 323-3.

11       All right.  Now, 328.  Hot off the press, August 4th.

12  Well, not that hot.  A week ago.  Let's see.

13       Oh.  This is the hyperlink.  That's fine.  We're done.

14  Okay.  So -- all right.  The discovery problems are solved.

15       Now, I always regret asking this:  Is there anything else,

16  Ms. Mehta?

17       **MS. MEHTA:**  Your Honor, what I would suggest is that

18  we take heed of Your Honor's warning that we need to move this

19  case forward with discovery and that you're not going to abide

20  discovery impediments, and see if we can't get the parties to

21  work together on a whole host of other issues that we raised in

22  our joint case management statements.

23       I don't want to take your time with them now.  I'm hoping

24  your comments will help get us moving.

25       **THE COURT:**  Good.  I'll give you this opportunity -- I

1  do it rarely, but this may be a case where it's suitable -- I'm

2  happy to have quarterly check-ins with me, if you'd like to do

3  that.  We set it every quarter, and if you don't want to do it

4  you can just say "We don't need to," and we'll just take it off

5  calendar, that's not a problem, if you are -- if everybody is

6  happy.

7      Do you want to do that?

8          **MS. MEHTA:**  Yes, Your Honor.  You know, I know it's

9  rare for the defendant to be asking for that, but in this case,

10 I think we could actually really use that --

11         **THE COURT:**  No, defendants ask all the time.

12         **MS. MEHTA:**  We need to move this forward and we need

13 to move it forward effectively and officially, and I think that

14 would help.

15        **THE COURT:**  Why don't we schedule the first one for --

16 when would you like to schedule the first one, Ms. Mehta?

17        **MS. MEHTA:**  I think, Your Honor -- it's August right

18 now.  Maybe in October, towards the middle or end of October,

19 if Your Honor is available.

20        **THE COURT:**  All right.  You two work out a date.

21 We'll keep it quarterly, more or less.  If you don't want to do

22 it, just tell me a week ahead of time.  It's not a problem.  No

23 questions asked.  We'll cancel it.  But if there are things

24 that come up -- now, let me tell you how this has gone off the

25 tracks in other cases:  People get used to it and then they

**PROCEEDINGS**

 1   just sort of walk in and present things to me without any prior

 2   notice of what the situation is or anything else.  Let's don't

 3   do that.  Okay?  I'm happy to shoot from the hip, but you're

 4   going to regret it afterwards.  So just, if you have something

 5   for me to do, a week before, you put it in your statement.

 6        Now, look, I don't need the full this is -- whatever is on

 7   deck for that meeting, I don't need the whole joint case

 8   management thing.  So don't do that.  Give yourselves a break.

 9   Just tell me, "Here are the three issues we're having a problem

10   on," and I'll take it from there.  Okay?

11        **MS. MEHTA:**  Understood, Your Honor.  Thank you.

12        **THE COURT:**  Okay.

13        What are you doing to resolve this, informally?

14        Ms. Mehta?

15        **MS. MEHTA:**  Yes, Your Honor.  I knew you'd ask me that

16   question.

17        So the answer is:  Nothing yet.

18        But I have to say the reason for that.  We are always open

19   to talking about settlement, but this is a little bit of an

20   unusual case given the breadth of the allegations, the nature

21   of the allegations -- which are pretty novel, both with respect

22   to the users and with respect to the advertisers.  And I think,

23   you know, my assessment is, given the numbers they've said in

24   their initial disclosures for what they think is at stake,

25   given the issues in the pleadings that if we were to try to

**PROCEEDINGS**

1   engage now, it might be too early to actually have a

2   constructive discussion.

3            THE COURT:  Have you picked anybody?

4            MS. MEHTA:  We have not, and we're happy to work on

5   that with them.

6            THE COURT:  Why don't you select someone and have that

7   person ready to go.  You two know what to do, but -- I mean,

8   there are a number of national figures, you know, all sorts of

9   people who are available and may be useful.

10       To some extent, your life, I think, has been made easier,

11   Ms. Mehta, because as I understand it, the plaintiff

12   advertisers are just saying it's just 2015 to 2019; that's it,

13   more or less.  So at least you know the years.  I don't know

14   how much is within those years.

15       But anyway, why don't you get that done.  So within

16   two weeks, just file a designation of who you have selected to

17   be -- for everything, okay?  This will be the global dispute

18   mediator, settlement mediator for everybody.

19       I'm happy to consider a magistrate judge.  This is a case

20   that I think might profit from it.  But I'd leave it to you in

21   the first instance to decide.  And if you prefer to have a

22   magistrate judge, you can just file in two weeks a request for

23   that and I will get somebody lined up.  But if you want to do

24   someone else, you two talk about it first and work it out.

25   Okay?

1          **MS. MEHTA:**  Just one question about that, Your Honor.

2      In the past, where we have requested a magistrate judge --

3  and different district judges have done this in different ways,

4  so I wanted to ask your preference.  Would you like us to

5  confer on particular magistrates that we think would be well

6  suited --

7          **THE COURT:**  I always like to have a name that people

8  are comfortable with.  I want everyone to be comfortable.  So I

9  want you to pick your judge.  So if you have somebody in mind,

10  I'd be perfectly happy to consider it.  I can't guarantee it

11  for a variety of reasons, but I will do everything I can to

12  honor the request.  Sound good?

13          **MS. MEHTA:**  Thank you.

14          **MR. SWEDLOW:**  Your Honor, I just wanted to flag one

15  issue so that it doesn't just come up for the first time in

16  October.

17      We believe that the case schedule could -- we may not be

18  able to meet it as litigants unless there's some date that is

19  imposed, a substantial completion date that's imposed.

20      The *FTC* case -- which is not the same case, but is against

21  Facebook also -- recently had a substantial completion date for

22  document production.  If we don't have that date imposed upon

23  Facebook, and for the plaintiffs, then we won't be able to

24  proceed to depositions because we won't know that we have the

25  documents we need to conduct a deposition.

**PROCEEDINGS**

```
 1          THE COURT:  Well, you two can talk about that.  And if
 2   it's a problem and you don't want to wait until October, you
 3   can do a joint statement to me and I can take care of it that
 4   way.
 5          MR. SWEDLOW:  Okay.
 6          THE COURT:  All right.  Thanks for coming in.
 7          MS. MEHTA:  Thank you, Your Honor.
 8          (Proceedings adjourned at 12:44 p.m.)
 9                         ---o0o---
10                 CERTIFICATE OF REPORTER
11          I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13
14   DATE:   Sunday, August 14, 2022
15
16
17
18
19        _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
20              Official Reporter, U.S. District Court
21
22
23
24
25
```