**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

## JOINT STATUS REPORT

Pursuant to the Court's Minute Order of September 30, 2022, the parties submit the following Joint Status Report summarizing the state of discovery, identifying any issues between the parties, and summarizing the parties' respective positions.

## I.    The FTC's Statement on the Status of Discovery

For the reasons described below, the FTC respectfully asks the Court to order the following:

1. Meta shall conduct a complete re-review of its March 2 litigation privilege log and produce, no later than May 22, 2023, any documents de-privileged as a part of its review and a final litigation privilege log.  In the alternative, the FTC respectfully asks the Court to order Meta to conduct a re-review of entries within specific categories of concern and produce, no later than May 22, 2023, any documents de-privileged as a part of its review and any amended privilege log.

2. Meta shall produce, no later than May 15, 2023, documents responsive to FTC Request for Production No. 125, which seeks audited financial statements.

3. Meta shall not call as a trial witness Mr. Santosh Janardhan.

4. The FTC is granted permission to file a Consent Motion seeking two out-of-time depositions of witnesses employed by non-parties, and Meta's request to conduct an out-of-time deposition by a former employee of a non-party is denied.

5. Meta's requests to quash the FTC's Requests for Production 111, 112, 116, 117, 124, 134, and 135 are denied.

6. Meta's requests to quash the FTC's Interrogatory Nos. 16, 17, 21, 22, and 23 are denied.

7. The Court will not address at this time Meta's request to determine how much 30(b)(6) deposition time should be "credited" based on each of the FTC's Rule data requests; the parties should meet and confer and attempt to come to agreement. In the alternative, the FTC respectfully asks the Court to order that the FTC's proposal on how to "credit" 30(b)(6) deposition time shall be adopted by the parties.

**A.**    **<u>The FTC's Position Regarding Its Discovery to Meta</u>**

      **1.**    **The Court Should Order Meta to Re-Review Its Litigation Privilege Log, Or In the Alternative Re-Review Entries Within Specific Categories of Concern**

The Court is well acquainted with the parties' dispute regarding Meta's September 2020 privilege log relating to the FTC's pre-Complaint investigation ("Investigation Log"). *See* Mar. 16, 2023 Joint Status Report at 12-14, ECF No. 258. At the present time, though, the FTC is focused only on the "Litigation Log" – that is, the privilege log Meta provided (or, at least, should have provided) pursuant to this Court's Joint Scheduling Order.

Meta provided its Litigation Log on January 24, 2023, a day late and including approximately 110,000 entries. *See* ECF No. 258 at 11-12. Along with its tardy submission, Meta acknowledged that this log was insufficient and delayed providing a revision until March, almost two months after the Court's deadline. *See* ECF No. 258 at 11-12. After the FTC brought its concerns to the Court, the Court ordered Meta to re-review a portion of its Litigation Log. Meta's

Litigation Log reversal rate again indicates that it is unjustifiably withholding tens of thousands of responsive documents based on spurious claims of privilege.  Based on the FTC's calculations:

(1) Meta has already abandoned entirely more than 14,000 of the ~110,000 claims on its January Litigation Log.

(2) Meta is continuing to assert privilege over about 96,000 documents (in whole or in part) in its revised March Litigation Log.

(3) During the last Joint Status Report Conference, the Court ordered Meta to re-review 1000 entries randomly selected by the FTC (the "Sample") from Meta's March Litigation Log.  Meta disregarded the Court's instruction to provide the results of its re-review within 14 days, but eventually provided the FTC with its revised claims and produced the documents for which it reversed its privilege claims.  Having reviewed the delayed results, the FTC continues to believe Meta's March Litigation Log improperly withholds thousands of documents.

    a.  Meta's overall reversal rate within the random sample was approximately 18%, suggesting that Meta continues to withhold more than 17,000 responsive and non-privileged documents based on spurious claims of privilege.

    b.  Based on the documents within the random sample that fall within specific categories of concern, Meta's reversal rates are higher, justifying a re-review of at least all documents falling into these categories of concern.  Specifically, the FTC calculates (i) a reversal rate between 29% and 31% for non-child entries asserting attorney-client privilege but lacking an attorney[1] and (ii) a reversal

---

[1]    To provide clarity: the FTC is referring to entries (i) lacking an attorney that are (ii) not the "children" of a parent document (i.e., the FTC attempted to exclude attachments to emails). The random Sample included 386 communications asserting attorney-client privilege that are not

rate of at least 19% for entries lacking author information.[2]  Taken together, these two categories have a reversal rate of approximately 24.5%.  Among entries including a third party, the FTC cannot provide a complete assessment of the reversal rate because the FTC cannot identify all third parties, as Meta has not confirmed that every third party on the Litigation Log is identified in an appendix.  Nevertheless, the FTC has identified third parties on Meta's Litigation Log and continues to believe this category merits re-review.

For the reasons below, the FTC requests the Court order Meta to re-review its entire privilege log, or in the alternative re-review entries within the three specific categories of concern: (a) entries lacking an attorney that are not the "child" of another document, (b) entries lacking author information, and (c) entries including third parties.

### a. The Court Should Instruct Meta to Re-Review its Entire Litigation Log

Meta's re-review indicates the Litigation Log still contains thousands of responsive, non-privileged documents.  In addition to the statistics above, which indicate that after a re-review Meta would likely produce an additional ~17,000 documents from its Litigation Log that are currently being wrongfully withheld, even a cursory review of the Litigation Log reveals a host of problematic claims including entries purporting to "seek[] legal advice" of non-lawyers.  For example, one log entry asserts privilege for a document purportedly "seeking legal advice" from

---

identified as children of other files and fail to identify an attorney in the "Author," "Recipient," "CC," and "BCC" fields.  Meta's reversal rate in this category exceeded 30%.  (118 of 386).  The random Sample included 457 communications asserting attorney-client privilege that are not identified as children of other files and fail to identify an attorney in the "All participants" field. Meta reversed 131 of the 457 sampled claims in this category (29%).  The latter set (457 entries) likely includes all or nearly all of the documents in the former set (386 entries), but the FTC has not confirmed this.

[2]     The random Sample included 205 asserted privileged communications for which the log identified no author, of which 39 were reversed.

███████████████████████████████, a non-lawyer ████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████

A full re-review of the Litigation Log is warranted.  An error rate of 25% is "unacceptably high." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 48 F. Supp. 3d 40, 52 (D.D.C. 2014) (citing *Meeropol v. Meese,* 790 F.2d 942, 960 (D.C.Cir.1986)); *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1154 (D.C. Cir. 1991) (citing Meeropol's 25% error rate and noting that "if the error rate for the sample…should prove unacceptably high, the State Department must then reprocess all of the over 1,700 documents at issue…"); *Clemente v. F.B.I.*, 854 F. Supp. 2d 49, 59 (D.D.C. 2012) (same).  Here, Meta's overall Sample reversal rate (187 of 1000) approaches 25%, and is compounded by its continued delays.

The FTC has on multiple occasions documented Meta's continued discovery delays, as well as the documents indicating Meta's internal policy to artificially generate privilege claims. *See generally* ECF No. 258 at 12-14.  As noted in the prior joint status report, Meta produced this Litigation Log more than five weeks late – in March rather than January.  *See* ECF No. 258 at 11-12.  Then, in connection with the Sample review, Meta disregarded the Court's instruction to provide the results of its review within 14 days of receiving the Sample, as Meta failed to provide either its revised claims or the documents on which it reversed its privilege claims for an extra five days on top of the Court's ordered deadline: the FTC sent the Sample set on March 29; Meta sent a cursory letter listing the overall number of downgraded documents (187) on April 12, but did not provide its log and de-privileged documents until April 17.  As also highlighted in the prior joint status report, a court has already found Meta employees were instructed to "privilege" files in an attempt to shield sensitive discussions from discovery.  ECF No. 258 at 13-15.  The results of

Meta's Sample review are consistent with that pattern, as its delayed downgrades continue to produce highly salient information.

Accordingly, Meta's continued high reversal rates and repeated delays require a re-review of its Litigation Log.

### b. In the Alternative, the Court Should Instruct Meta to Review Entries That Fall Within Three Categories of Concern

The Court should, at a minimum, instruct Meta to re-review its entries asserting attorney-client privilege over (non-child) documents that lack an attorney.  In this category, Meta's reversal rate is between 29% and 31%.  *See supra* n.1.  As noted above, such reversal rates are "unacceptably high" and should be addressed.  *Citizens for Resp. & Ethics*, 48 F. Supp. 3d 40, 52; *Bonner*, 928 F.2d 1148, 1154; *Clemente*, 854 F. Supp. 2d 49, 59.  As the FTC's randomly selected Sample of 1,000 documents contained approximately 457 documents in this category, it is likely that approximately 40% or more of the entries on Meta's Litigation Log fall into this category.

In addition, the FTC believes that good cause exists to review entries lacking an author, and entries involving third parties.  Including entries lacking an author in the review, along with (non-child) documents that lack an attorney, would require Meta to re-review a set of entries with an overall error rate of approximately 24.5%, which is unacceptably high.  A re-review of entries involving third parties is likewise appropriate.  While the FTC cannot provide statistics on Meta's Litigation Log reversal rate in this category because Meta has never provided an appendix that allows the FTC to identify all third parties on the log, Meta has a history of over-asserting privilege claims involving third parties: in re-reviewing a sample of its Investigation Log, Meta reversed an estimated 75% of its privilege assertions involving third parties.  Meta's high reversal rate on its Investigation Log is troubling but predictable, as "voluntary disclosure to a third party waives the [attorney-client] privilege."  *Niskanen Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 13

(D.D.C. 2018).

### 2. Meta Refuses to Produce Audited Consolidated Financials from 2004 and 2005

The FTC's RFP No. 125 seeks audited consolidated financials that will allow the FTC to fully assess Meta's profitability over time, or in the event that audited financial statements do not exist, unaudited financial documents that will allow the FTC to make such an assessment. *See* Ex. A at 1-2 (Tenth RFPs).  The FTC is conducting a comprehensive review of the company's profitability and return on its assets and investments since inception, which may be a relevant factor when assessing Meta's monopoly power.  The requested financial information is needed to complete that analysis, and RFP No. 125 is thus reasonably calculated to uncover relevant evidence.  The information sought is proportional to the needs of the case, as the FTC is requesting a relatively straightforward production of financial statements and/or documents "sufficient to show" Meta's ordinary-course calculations of its profitability metrics (for example Meta's after-tax free cash flow), acquisitions, and income tax rate.

Meta has not provided a reason that the FTC's request is unduly burdensome or disproportionate.  While the time period 2004-2005 undoubtedly pre-dates the time period in which the FTC alleges that Meta unlawfully maintained its monopoly power, Meta's margins and profitability over time is relevant to the FTC's allegations.  And Meta likely maintains financial archives that can be efficiently accessed to satisfy the FTC's request.

The FTC respectfully requests that the Court order Meta to produce the requested documents.

### 3. The FTC Respectfully Asks the Court to Instruct Meta Not to Call as a Trial Witness Mr. Santosh Janardhan, as Meta (i) Belatedly Added the Executive to its Initial Disclosures, and (ii) Refused to Produce the Executive's Documents

The FTC respectfully requests that the Court instruct that Meta shall not call as a trial

witness Mr. Santosh Janardhan, or in the alternative instruct Meta to promptly collect and produce responsive documents from Mr. Janardhan's files, using the parties' full set of agreed-upon search terms.

Mr. Janardhan has been a Meta employee since 2009.  Mr. Janardhan was not identified by either the FTC or Meta in the parties' February 22, 2022 Initial Disclosures.  As Mr. Janardhan was not identified in Meta's Initial Disclosures, the FTC did not request him as a document custodian (and Meta did not offer him).  In June 2022 – prior to Meta's document collection in this matter – Mr. Janardhan was named Meta's Head of Global Infrastructure, Co-Head Engineering.  Meta did not supplement its initial disclosures to add Mr. Janardhan at that time, nor did Meta identify Mr. Janardhan in Supplemental Initial Disclosures Meta provided on December 12, 2022 and again on February 2, 2023.

Meta identified Mr. Janardhan for the first time as an individual Meta intends use to support its claims or defenses on February 28, 2023, more than a year after the Court's deadline for initial disclosures, and at least 8 months after Mr. Janardhan was promoted to his current role.  *See* Scheduling Order ¶ 2.  Meta indicated on February 28 that Mr. Janardhan possessed information regarding "Meta Infrastructure."  The FTC promptly noticed a deposition of Mr. Janardhan and began to review Meta's document production to prepare.  Based on an extensive review of documents, the FTC determined that Meta's production appeared materially incomplete.  The FTC asked Meta to delay Mr. Janardhan's deposition and produce documents responsive to the FTC's RFPs from Mr. Janardhan's files.  *See* Ex. B at 1-2 (4/13/2023 N. Mugure Email).  Meta refused to collect relevant documents, and also refused to delay the deposition.  *See id* at 1 (4/13/2023 A. Paul Email).

At Mr. Janardhan's April 14 deposition, ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████   The FTC was prejudiced in its ability to depose Mr. Janardhan by Meta's refusal to

conduct a reasonable search for responsive documents.

Then, on Friday, April 28, 2023 – two weeks after Mr. Janardhan's deposition, and less

than a month before the close of fact discovery – Meta again revised its Initial Disclosures.  Meta

has now suddenly expanded the subjects of information Mr. Janardhan may possess beyond

"Meta Infrastructure" to include "Instagram and WhatsApp acquisition procompetitive benefits,

efficiencies, innovation, and improvements."  *See* Ex. D at 10 (Meta's April 28, 2023

Supplemental Initial Disclosures).  Without notice, the FTC did not have reason to prepare an

examination around these just-identified topics and lacked the documents to do so in any event.

Due to Meta's belated and inexplicable revisions to its Initial Disclosures, Meta should be

precluded from calling Mr. Janardhan as a trial witness; in the alternative, the FTC requires a full

custodial production for Mr. Janardhan.

### 4.   The Court Should Deny Meta's Requests to Quash the FTC's Requests for Production

The Court should deny Meta's requests to quash the FTC's Requests for Production.

RFP No. 111: RFP No. 111, served over two months ago on February 17, 2023, seeks

documents related to Meta's Cross Check program (also referred to as "Xcheck") or any other

Whitelisting Program.  *See* Ex. E at 2 (Eighth RFPs).  These programs allow content flagged as

objectionable by Meta's integrity systems to remain available to users (for example, because the

poster is a celebrity or a prominent public figure).  These programs are highly relevant to the

Meta's claim that Instagram's and WhatsApp's access to Meta's integrity programs represent a

procompetitive benefit of the acquisitions. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ Meta's XCheck, or other Whitelisting Programs, are relevant to how Meta has

████████████████████████ and the discovery the FTC seeks will reveal information relevant

to the benefits (if any) Meta's approach provides, and the harms inflicted by Meta's approach to

such integrity issues.

In an effort to avoid disputes, the FTC has narrowed the scope of this request

significantly and identified to Meta a discrete set of documents that the FTC would accept as a

complete response to this RFP. The FTC requests: (1) a narrow set of 16 documents identified in

a 2021 SEC Whistleblower complaint related to Meta's Cross Check program; and (2) all audits

of Meta's Cross Check program or other Whitelisting program. This is a reasonable and

narrowly targeted request.

First, the 16 documents identified in the SEC Whistleblower complaint are not

burdensome for Meta to locate: the documents appear to be quoted extensively on the face of the

Whistleblower complaint itself, which is publicly available (in redacted form) and was provided

to Congress. *See, e.g.*, Ex. G at 6-7 (SEC Whistleblower complaint). Even assuming Meta has

not already collected the documents in order to respond to the SEC Whistleblower complaint, or

prepare for Congressional hearings, Meta should be able to locate the documents quite easily

through text searches or otherwise. *See id.*

Second, with respect to the FTC's request for audits of the relevant programs: Meta has

provided the FTC no reason to believe that audits of the relevant programs are numerous or

difficult to locate. Meta offered to produce a single 2019 audit of the Cross Check program, but

has provided the FTC with no information that suggests producing audits conducted in other years would be disproportionate or burdensome.  The FTC does not know how many audits are at issue, because Meta elected to short-circuit negotiations and instead attempt to quash the RFP. Meta's request to quash should be denied, and the court should instruct Meta to produce the documents identified above in response to RFP No. 111.

RFP No. 112: RFP No. 112, also served over two months ago on February 17, 2023, seeks documents related to Meta's Oversight Board, which advises Meta on what content to take down, what to leave up, and why.  *See* Ex. E at 2; https://www.oversightboard.com.  The FTC has agreed to limit the scope of RFP No. 112 to only those documents that relate to Meta's Cross Check program or any other Whitelisting Program, discussed above in connection with RFP No. 111.  Thus, RFP No. 112, as narrowed by the FTC, seeks only documents relating to Meta's Cross Check and other Whitelist programs that *also* relate to communications between Meta and the Oversight Board.

For the reasons discussed above, RFP No. 112 seeks information plainly relevant to the FTC's assessment of Meta's claimed benefits from connecting Instagram and WhatsApp to Meta's integrity systems.  The FTC's proposal to narrow RFP No. 112 is reasonable, as the FTC understands that only a small group of Meta employees are responsible for interactions with Meta's Oversight Board.  Thus, a targeted document collection from a very narrow group of employees should allow Meta to efficiently identify documents that relate to communications with the Oversight Board and also relate to the Cross Check or other Whitelist programs.  Meta has not informed the FTC of which specific employees may possess responsive documents, which is a reason that Meta's request to quash RFP No. 112 should be rejected: Meta has refused to conduct a reasonable search, and has provided no information that suggests that a reasonable

search would be burdensome.

Meta's counter-proposal to the FTC would limit RFP No. 112 to (i) only those documents actually produced to the Oversight Board, and even then (ii) only "as part of the Oversight Board's cross-check Policy Advisory Opinion process."  Both proposed limitations appear likely to disproportionately limit the discovery of relevant information.

The first proposed limitation (only documents actually provided to the Oversight Board) is disproportionate, as the public statements of the Oversight Board indicate that the documents produced by Meta to the Oversight Board were not sufficient to evaluate the Cross Check program.  *See* Ex. H at 4 (Policy Advisory Opinion on Meta's Cross-Check Program, Dec. 2022) ("Meta did not provide the Board with information showing it tracks whether its decisions through cross-check are more or less accurate than through its normal quality control mechanisms.  Without this, it is difficult to know whether the program is meeting its core objectives of producing correct content moderation decisions, or to measure whether cross-check provides an avenue for Meta to deviate from its policies."); *id.* at 27 ("In order to assess how Meta prioritizes entities within cross-check, the Board repeatedly requested that Meta share its Early Response Secondary Review list for the Board's analysis.  Meta did not provide the Board with this list."). ██████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Thus, Meta's proposal to deny the FTC the same information it denied to the Oversight Board would likely

withhold relevant discovery probative of, *inter alia*, whether Meta's Cross Check or other Whitelist programs "are more or less accurate" than its other quality control mechanisms, and the extent to which such programs provide "an avenue for Meta to deviate from its" own stated integrity policies.  Ex. H at 4.

Meta's second proposed limitation (only documents related to the "cross-check Policy Advisory Opinion process") is likewise disproportionate.  The FTC understands that Meta refers to documents provided to the Oversight Board in connection with the Oversight Board's December 2022 Report.  *See*  Ex. H Meta has not provided the FTC with any information on which, if any, other occasions Meta may have generated relevant documents that relate to its Cross Check or other Whitelist programs and also the Oversight Board.  For example, the Oversight Board could have conducted other earlier inquiries or could currently be conducting a further inquiry into a Meta Whitelist program – the FTC does not know one way or the other – and Meta could possess an easily accessible trove of responsive documents that are highly probative of the harms and benefits of such a Whitelist program (and thus, highly probative of Meta's asserted procompetitive justifications).  If the Oversight Board's December 2022 Report was the only occasion on which Meta created responsive documents, then no purpose would be served by the express restriction Meta seeks to impose.  If, on the other hand, there are other occasions of which the FTC is unaware, Meta should conduct a reasonable search for documents responsive to RFP No. 112, as narrowed by the FTC.  Meta's request to quash RFP No. 112 should be denied, and Meta should conduct such a reasonable search.

RFP Nos. 116 and 117:  From the FTC's perspective, the parties are in the process of meeting and conferring on these requests, which seek data rather than a custodial search for documents.  *See* Ex. J at 2 (Ninth RFPs).  When seeking data, it is difficult for the FTC to make a

narrowing proposal because Meta is in sole possession of information regarding burdens, and how data-related RFPs might reasonably be narrowed. That is why throughout the course of the meet and confer process on the FTC's data-related Requests for Production, the FTC has consistently solicited narrowing proposals and has repeatedly demonstrated its willingness to narrow requests when Meta has made such a proposal. The FTC has followed this course of action here: on April 24, the FTC requested a further meet and confer on the relevant RFPs, which Meta rejected because it was "still investigating the burden associated with responding to these RFPs." Ex. K (4/24/2023 C. Masterman Email). The FTC followed up on April 25, articulating the relevance of RFPs 116 and 117, and asking Meta to articulate its burden objections to these requests with greater specificity, make counter-proposals for responding to them, and further meet and confer. *See* Ex. L (4/25/2023 P. Taylor Ltr.). Meta never responded to this correspondence, nor did Meta address it in any meet and confer. Meta's request to quash RFPs 116 and 117 is premature in light of the FTC's requests to meet and confer, and Meta's refusal to provide any information regarding the burden of the requests. The FTC respectfully asks that the Court deny Meta's request, and instruct the parties to attempt to negotiate an agreement on the scope of a reasonable responsive production.

RFP No. 124: Meta is likewise prematurely moving to quash RFP No. 124. *See* Ex. J at 3. The FTC has already offered to narrow the request to analyses and data underlying commentary in a specific document indicating that ████████████████████████████ ████████████████████ On April 27, 2023, Meta offered to produce a single document (the "H2 2022 Planning Primer") in satisfaction of this RFP, but without indicating whether the document provided details about the requested analyses. Further, Meta maintained that if the FTC did not agree to accept the "H2 2022 Planning Primer" in satisfaction of the RFP, then the parties were

at impasse.  As the FTC advised Meta, the FTC is willing to consider the proposal, but cannot

meaningfully do so until Meta provides the "planning primer" so the FTC can understand Meta's

proposal.  At about noon today (May 1), Meta indicated that it would produce the planning

primer for the FTC's consideration, but did not do so until 9:30 pm ET.  The FTC could not

practically consider the document in the time remaining before filing.  The FTC respectfully asks

that the Court deny Meta's request to quash RFP No. 124, and instruct the parties to attempt to

negotiate an agreement on the scope of a reasonable responsive production.

      RFP No. 134:  RFP No. 134 seeks deposition or hearing transcripts and exhibits provided

by Meta or its employees in two litigations brought against Meta.  *See* Ex. M at 2 (Eleventh

RFPs).  As Meta admits, these lawsuits were brought by advertisers claiming there were

problems with how Meta reported advertising metrics (such as the average time users spent

watching video advertisements) to the advertisers that bought advertising slots from Meta.  Meta

argues that these litigations are irrelevant to the FTC's claims in this litigation, but ignores the

allegations in the FTC's Substitute Amended Complaint ("SAC").  The SAC alleges:

> By monopolizing the U.S. market for personal social networking, Facebook also
> harmed, and continues to harm, competition for the sale of advertising in the
> United States. . . . This has had predictable results on the value that Facebook
> provides to advertisers: for example, Facebook has repeatedly been criticized for
> its non-transparent and sometimes unreliable advertising reporting metrics, and
> for the prevalence of fake accounts on its platform, which undermines advertisers'
> ability to assess the effectiveness of their ads.

Substitute Amended Complaint ¶ 225, ECF No. 82.  This allegation directly relates to the matters

raised in the advertiser-brought lawsuits – in particular, Meta's failure to provide reliable metrics

to its advertising customers.

      Meta argues that the FTC's RFP No. 134 rests on a "boundless" request for "any

document relating to the quality of Meta's services."  This is inaccurate.  As explained above, the

FTC seeks a narrow set of materials from specific cases because they are relevant to specific

advertiser impacts alleged in the SAC.  Meta's request to quash RFP No. 134 is therefore
unjustified.

RFP No. 135: The FTC respectfully asks the Court to instruct Meta to produce
documents responsive to RFP No. 135, which seeks "[d]ocuments sufficient to show any
blacklist Meta has employed to prevent ███████████████████████████████████
Ex. M at 2.  The FTC requires such documents to show that Meta has blocked ███████████
from personal social networking service competitors on the one hand, including Google+, but
has not done the same for firms that do not provide personal social networking services,
including TikTok.  Without providing explanation, Meta states that such discovery is barred by
the Court's ruling concerning the FTC's platform allegations, but fails to address the FTC's
position that RFP No. 135 requests documents relating to PSNS competition and showing that
Meta treats non-PSNS firms differently.  While Meta's previous document productions provide
some information about Meta's practices with respect to ████████████████████████████
the FTC's limited request for documents sufficient to show any blacklists Meta maintained to
prevent competitors from ████████████████ on Facebook is a narrowly targeted and
proportionate request that will ensure the complete disclosure of blacklisted firms.

Meta argues that it has already produced information on its competitors in response to
other FTC RFPs.  But what Meta does not – and apparently cannot – do is make the
representation that it has already produced materials showing the existence (or non-existence) of
blacklists to prevent competitors from ████████████████ on Facebook.  Instead, Meta
asserts that documents responsive to RFP No. 135 are cumulative of documents already
produced, without performing any sort of reasonable search to determine if such highly relevant
documents exist.  Meta's argument – lacking any sort of support or evidence – should be rejected

and the Court should not grant Meta's request to quash RFP No. 135.

> ###### 5.   The Court Should Deny Meta's Request to Quash the FTC's Interrogatories

Interrogatory Nos. 16–17:  The FTC's Interrogatory Nos. 16 and 17 ask Meta to identify all facts supporting contentions Meta has made about advertising competition and TikTok.  *See* Ex. N at 2 (Fourth Interrogatories).  In particular, the interrogatories reference assertions by Meta that:

- "[T]he competition for advertisements to show . . . users is fierce."
- "TikTok is expanding its reach into 'friends and family' sharing[.]"

The FTC's interrogatories reference a court filing in *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454, and the FTC understands Meta to be advancing the same contentions in this litigation.

Meta has refused to respond to Interrogatory Nos. 16 and 17, arguing that the statements in made in the *Klein* filing were "off the record."  Specifically, Judge Donato apparently arranged for a "tutorial day" to explore the parties' views on competition issues.  In advance of the tutorial, Meta publicly docketed a 12-page "Tutorial Submission," submitted and apparently authored by Meta's counsel.  Meta's statements, those that serve as the basis for Interrogatory Nos. 16 and 17, were included in Meta's public filing.

Meta's objections are baseless.  As an initial matter, it is not clear whether Judge Donato intended for Meta's pre-tutorial written submission to be considered "off the record."  In each quote set out in Meta's portion of the JSR, Judge Donato speaks of statements made during the tutorial day itself being "off the record," not any written submissions.  And in fact, the tutorial day *was* off the record.  To the FTC's knowledge, there is no written transcription of that day's proceedings.  By contrast, however, Meta's written submission is publicly accessible from the

Court's docket, and so is very much a matter of public record.

Even if Judge Donato intended this written submission to be off the record in the *Klein* matter, there is no indication that he intended it to be somehow shielded in any other context. Indeed, had Judge Donato desired such a result, he could have directed the parties (or the parties could have asked) to submit the filings under seal. This does not appear to be what Judge Donato intended or instructed. Judge Donato's Standing Order regarding tutorials says that "parties may not use or rely on statements made at the tutorial *in this litigation*." (emphasis added). Similarly, in advance of Meta's tutorial day, Judge Donato again explained that statements made during the conference itself would be "off the record," meaning it "[c]an't be used against anybody . . . *can't be featured in a deposition or motion to me*." Tr. at 8, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Oct. 20, 2022), ECF No. 373 (emphasis added).

Meta should be able to either identify relevant facts supporting its contentions or it should confirm that it does not intend to make such contentions in this matter. If, for example, Meta does not plan to assert that TikTok is expanding its reach into "friends and family" sharing, then Meta should state as much in its response to Interrogatory No. 17. If, though, Meta plans to make such contentions in this litigation, it should not be permitted to hide behind tactical objections to avoid responding to the FTC's fairly propounded interrogatories. Meta's request to quash Interrogatory Nos. 16 and 17 should be denied.

Interrogatory No. 21:  The FTC's Interrogatory No. 21 seeks high-level information about Meta's financial investments in the Facebook Metaverse. *See* Ex. N at 2. The FTC has informed Meta that the FTC has narrowed this interrogatory to accept a response that, for each year since 2019, identifies and describes, in dollars, all costs and expenses that are associated

with or attributable to Reality Labs, including all "cost and expenses" reported in the "consolidated and segment results" of Meta's Annual Form 10-K filing, any capital investment costs, and any acquisition costs that are associated with or attributable to Reality Labs.

As narrowed by the FTC, Interrogatory No. 21 seeks discrete and highly relevant information.  Meta's apparent willingness to lose several billion dollars on a moonshot investment in the Metaverse may be probative of Meta's enduring market power in its core product offering, personal social networking services.  In particular, if Meta were concerned about the competitive positioning of its core products – most notably, Facebook and Instagram – we might expect to see Meta prioritizing investments in those products.

Further, the SAC expressly alleges that Meta has recognized sustained high profits driven by its PSNS monopoly.  SAC ¶ 208.  Meta should not be allowed to obscure these sustained high profits by offsetting them against its enormous losses on its Metaverse division (Reality Labs), and then refusing to reveal its losses on its Metaverse endeavors.  *See, e.g.*, Steve Kovach, *Mark Zuckerberg's 'Metaverse' Business Lost More than $10 Billion Last Year, and the Losses Keep Growing*, CNBC (Feb. 2, 2022), https://www.cnbc.com/2022/02/02/meta-reality-labs-reports-10-billion-loss.html.

Meta has categorically refused to engage in negotiations over a reasonable response, instead wrongly claiming that the parties had previously agreed that such discovery is outside the scope.  True, to minimize the burden of fact discovery and to focus on the most relevant factual issues, the FTC previously agreed to exclude from its RFPs seeking custodial documents Facebook's Oculus product and other virtual reality subject matter.  But the FTC's past willingness to focus the scope of some discovery requests does not act as a waiver of *all* discovery relating to the Facebook Metaverse.  Meta's request to quash Interrogatory No. 21

should be denied.

Interrogatory No. 22:  The FTC's Interrogatory No. 22 seeks all relevant facts supporting Meta's contention, advanced in Meta's Answer to the FTC's Complaint, that "competition and consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users."  Answer at 39, ECF No. 94; *see* Ex. N at 2.  Meta refuses to provide any response to the FTC's interrogatory, claiming that the FTC's request is "not appropriate" because it "falls within a subject matter of expert discovery."

That an interrogatory may implicate expert analysis does not justify providing no answer at all.  Indeed, the Court recently rejected Meta's nearly identical arguments in its April 26, 2023 opinion.  Mem. Op. at 3-4, ECF No. 281.  There, the Court rejected Meta's argument that the FTC's contested interrogatories requested "premature" expert discovery, explaining that the fact "that Meta intends experts to testify about procompetitive benefits of its acquisitions does not alter its Rule 33 obligation to provide complete interrogatory responses to questions asking it to state its contentions or to provide facts on which they are based."  *Id.*

Meta knows as much, propounding several interrogatories that have required the FTC to disclose facts on which its experts may rely.  Most notably, Meta's Interrogatory Nos. 10, 13, and 14 each sought facts concerning market definition boundaries that unquestionably implicate expert analysis.  And yet in each of these instances, the FTC provided detailed interrogatory responses that disclosed facts on which its experts may rely.  *See generally* FTC Opp. to Motion to Compel Answers to Interrogatory Nos. 13 and 14, ECF No. 250; FTC's Response to Meta's Interrogatory Nos. 13 & 14, ECF No. 250-1; FTC's Response to Meta's Interrogatory No. 10, ECF No. 250-2.  Here, though, Meta does not even attempt to answer the interrogatory.

If Meta is not aware of any facts that support its position that "competition and

consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users," then it should say so and the FTC's interrogatory will be satisfied. If however, facts currently known to Meta support its contention, it must make a good faith effort to identify those facts. Meta's request to quash Interrogatory No. 22 should be denied.

Interrogatory No. 23: FTC Interrogatory No. 23 requests basic information necessary to understand the scope of Meta's Cross Check and Whitelist programs ("the Programs") and the impact of such programs on the content seen by users. *See* Ex. N at 3; *see generally supra* (discussing Meta's programs in reference to RFP Nos. 111 & 112). In an effort to avoid disputes, the FTC has agreed to narrow this interrogatory by eliminating several subparts. Specifically, the FTC has already agreed to drop 23(b), (g), (h), (i) and (k) from its request. The remaining subparts are discussed below.

The FTC maintains its original request with respect to 23 (a) and (j), which seek information necessary to understand the scope of the Programs. Specifically, 23(a) seeks the "number of accounts or users covered by the Programs," by year; and 23(j) seeks the "number of accounts or users exempt from any [integrity] review under the Programs," by year. The information responsive to 23 (a) and (j) should be readily available to Meta: as the FTC understands it, Meta can identify each specific account that was covered by the Programs, and it should not be difficult to count the total number and provide the information to the FTC. Meta also has the option to identify business records pursuant to Fed. R. Civ. P. 33(d), which Meta has readily availed itself of in response to other FTC interrogatories. In the alternative, if Meta has no information on how many accounts were covered by the Programs, it should state as much.

23(c) seeks the volume of "false positives" identified by the Programs; and 23(d) seeks the number of views that the "false positives" received. As Meta asserts that the Programs were

designed to reduce the volume of false positives, this information is directly relevant to Meta's contention that it produced procompetitive benefits by making its integrity tools available to Instagram and WhatsApp.  Again, Meta should either provide a response, identify business records pursuant to Rule 33(d), or state that it does not have the information requested.

23(e) requests the "volume of content that was flagged as potentially violating Meta's Community Standards which on review were found to be violating" those Standards; and 23(f) requests the number of views of the violating content received "before it was taken down after review under the Programs."  This information is relevant because, as the FTC understands it, Meta's Programs provide that for certain accounts (e.g., prominent public figures), content that is flagged as violating Meta's Community Standards is allowed to remain posted for some period of time while Meta conducts an additional level of review.  Thus, the frequency with which content subject to one of the Programs was determined to violate Community Standards is relevant to harm those Programs caused (by allowing violative content to be visible while the additional review was performed); for the same reason, the number of views that violative content received is relevant to harm.  Where Meta has no such information, it should state so.

The stated concessions and clarifications offered by the FTC sufficiently address any objections Meta has related to any burden of responding to Interrogatory No. 23.

Meta asks the Court to quash Interrogatory No. 23, asserting that it has already produced the information requested, pointing to their responses to FTC's Rog Nos. 5, 6, 8, 9, 10, & 12 and RFP Nos. 83, 93, & 98.  First, the foregoing requests concern Meta's integrity identification tools and methods, not the Cross Check or Whitelisting programs.  In any event, if it is true that the FTC can locate the information that provides a complete response to Interrogatory No. 23 (as narrowed by the FTC) within the foregoing discovery responses, then Meta should readily be

able to provide a response that identifies where within the referenced materials that information exists.

Finally, Meta asserts that the information is publicly available via a publicly available Oversight Board Opinion and a 2021 blog post.  Again, if that is true, then Meta should provide a response to Interrogatory No. 23 that states that a complete response is provided by the referenced materials.  At present, based on the information currently available to the FTC, the FTC disagrees that the public report provides a complete response to Interrogatory No. 23. Notably, the material Meta points to is not related to the operation of these programs but generated in response to public criticism in the wake of whistleblower information on these integrity exclusion programs.  *See, e.g.*, Jeff Horwitz, *Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt*, Wall Street Journal (Sept. 13, 2021), https://www.wsj.com/articles/facebook-files-xcheck-zuckerberg-elite-rules-11631541353.  The Oversight Board Opinion gives a high-level overview of the program as it existed in 2021, without providing any data regarding the breadth, efficacy, or potential harms related to the programs.  The Oversight Board Opinion also made a recommendation which may or may not have been implemented.  Standing alone, it cannot reveal whether any changes were made since that time, or the impact of any changes that Meta made in response to the Opinion may have had on the breadth, efficacy or potential harms related to the programs.

The FTC has made significant efforts to limit the scope of this request and yet Meta has continued to refuse to engage in a meaningful dialogue about what it can produce in response to Interrogatory No. 23.  Therefore, the FTC respectfully asks that the Court to instruct Meta to respond to the 23(a), (c-f), and (j) as requested herein.

> **6.      Meta's Request Regarding Time Limits For The FTC's Data Rule 30(b)(6) Notice is Not Ripe for Resolution**

The FTC respectfully asks that the Court defer its consideration of the issue of how much "30(b)(6) deposition time" should be credited to the FTC's data-related questions until the FTC has had an opportunity to assess Meta's April 28 and April 30 data productions, and to instruct the parties to meet and confer and attempt to come to agreement.  In the alternative, the FTC respectfully asks that the Court instruct Meta to accept the most recent proposal that the FTC made to Meta, on April 30, 2023. regarding how much time should be credited.  *See* Ex. O at 4 (4/30/2023 P. Taylor Ltr.).  At the time of this filing, Meta had not responded to the FTC's proposal.

While the Court did not set a limit on the number of hours of 30(b)(6) deposition testimony the FTC could take regarding Meta's data, the parties initially agreed that 28 hours of 30(b)(6) data-related testimony should be sufficient.  Further, the parties have been proceeding with Meta providing written answers to certain of the FTC's data-related questions, with Meta's written responses being "credited" as a certain amount of deposition time.  Any allocation of time that the Court imposes that counts against a 28-hour limit could necessarily operate to limit the FTC's opportunity to obtain necessary information.

The parties' extended negotiations over "crediting" 30(b)(6) deposition hours related to data have been enormously complicated by the fact that, despite the FTC's repeated requests, Meta has not provided "data dictionaries" or other explanatory materials that might assist the FTC in understanding the data produced by Meta.  *See* Ex. O at 1 ("To be clear, the FTC is in the position of needing to ask the number and types of questions we are asking because Meta has made nearly all of its data productions without data dictionaries or similar explanatory material.").  Because Meta refused to provide necessary information, the FTC has been forced to

expend significant resources reviewing unadorned data productions—many received only within the last month—and then attempting to pose questions to adequately understand the data.

This process takes time, and Meta did not complete its data productions in response to the FTC's Second Requests for Production until April 30, 2023. This means that the FTC has not yet had an opportunity to understand what has been produced, or to formulate meaningful questions. Accordingly, the FTC asks that the Court defer its consideration of this question until the FTC has had such an opportunity. At that point, the FTC hopes that the parties will be in a position to reach an overall agreement that would obviate the need for the Court's involvement in how to "credit" Meta's responses to the FTC's data-related questions. Given the timing of Meta's final data productions, the FTC may need Meta's cooperation in responding to data questions after May 22, promptly and in advance of the FTC's opening expert reports on July 3—but this issue too is not yet ripe. The FTC will continue to work with Meta to attempt to reach agreement and obviate the need for the Court's involvement in this issue.

If, however, the Court chooses to "credit" time now, the FTC's proposal is more reasonable and should be adopted by the Court. *See* Ex. O at 4 ("[W]e propose that Meta receive 7 hours of deposition testimony credit for providing written responses to the questions that the FTC has identified as high priorities on revised Exhibit B and Exhibit C attached hereto (inclusive of the 14 questions Meta answered on April 28, 2023) and 2 hours of deposition testimony credit for providing written responses to the "negative option" questions on Exhibit D attached hereto."). As of this filing, Meta has not responded to the FTC's proposal, which would provide for significant "credit" (7 hours) for responses to high-priority questions for data produced as of March 31, 2023. The proposal would provide somewhat less credit for responding to very narrow, easily answered questions that should be answered in the ordinary

course of discovery discussions, and would not require elaborate preparation of a 30(b)(6) witness. *See* Ex. O at Exhibit D (e.g., Question 1: citing a specific Bates number and asking "Please confirm that data for the months of May and June 2018 is not available."; Question 3 asking "Please confirm that data for India for December 2016 and January 2017 are not available."; Questions 4 and 5 (asking Meta to confirm that observed changes in usage accurately reflect changes in usage, and did not result from a change in Meta's method for measuring the relevant factors)).

While the latter questions should be easily answered by Meta, they are critical to the FTC's preparation of expert reports.  The FTC's expert(s) must rely in significant part on data provided by Meta.  Thus, the FTC must be able to understand, for example, basic issues such as whether particular data was not provided by Meta because the data does not exist, or whether changes in metrics accurately indicate the behavior of users or instead result from anomalies or changes in the manner in which Meta collects data.  Likewise, the FTC should not be vulnerable to Meta or its experts later saying that it misinterpreted certain data, for want of Meta providing explanatory material or responding to the questions posed.  This information is solely within Meta's control, and Meta should be able to provide it as a complement to its data productions.

7.   **The Parties Continue to Discuss Issues Relating to Meta's Document Productions**

The parties have discussed certain issues relating to Meta's document productions.  On Friday, April 28, Meta provided the FTC with certain information regarding these issues.  The FTC is in the process of assessing that information, and will continue to meet and confer to the extent necessary.  There is no ripe dispute at this time.

B.   **The FTC Seeks the Court's Permission to File a Motion Seeking Two Out-of-Time Depositions, But Does Not Agree That the Third Out-of-Time Deposition Sought by Meta is Necessary**

To date, the FTC has conducted 52 depositions of Meta's current or former employees. The parties have conducted 28 depositions of nonparties that are not current or former Meta employees. The FTC has used approximately 338 hours of deposition time; Meta has used approximately 71 hours. Approximately 38 additional depositions are scheduled to be conducted between May 1, 2023 and the close of fact discovery on May 22, 2023. The FTC anticipates that all depositions will be completed within the fact discovery period, with three exceptions.

### 1.   The FTC Seeks the Court's Permission to File a Motion Seeking Two Out-of-Time Depositions

Pursuant to the Joint Scheduling Order, the FTC respectfully asks for the Court's permission to file a Consent Motion to conduct two depositions. *See* ECF No. 103 ¶¶ 6, 7. Meta has agreed to consent to the FTC's motion to conduct: (1) a May 23, 2023 out-of-time deposition of a witness employed by TikTok; and (2) an out-of-time deposition of a 30(b)(6) witness for Snap, Inc., which the parties anticipate will occur between May 23, 2023 and May 26, 2023. The FTC will explain in its Consent Motion why conducting the depositions out-of-time is appropriate.

Below, the FTC discusses Meta's request to conduct an out-of-time deposition of a former TikTok employee. Meta has informed the FTC that in the event that the Court does not grant Meta's request to conduct such an out-of-time deposition, Meta will ask that the Court also refuse to grant permission to conduct the two out-of-time depositions to which Meta consents. The FTC does not understand the basis for Meta's position, which appears to be retaliatory and unproductive.

### 2.   The FTC Does Not Believe That An Additional Out-of-Time Deposition of a Former TikTok Employee is Necessary

Meta seeks to conduct the deposition of an additional witness, formerly employed by TikTok, on May 26. The FTC does not believe that this deposition is necessary. The parties

have already taken, or soon will take, the depositions of three senior TikTok executives:

- On April 20, the parties conducted an approximately 6.5 hour deposition of a senior TikTok executive, who also testified on TikTok's behalf pursuant to Fed. R. Civ. P. 30(b)(6) notices issued by both Meta and the FTC.  The parties cross-noticed the deposition: Meta took approximately 3.9 hours of testimony, the FTC took approximately 2.6 hours of testimony.

- On May 11 the parties will depose TikTok's Chief Operating Officer, who is responsible for overseeing TikTok's content, operations, marketing, and product teams.  The parties have both noticed the deposition.

- As described above, with the Court's permission and upon approval of a Consent Motion, on May 23 the parties will depose TikTok's President, Global Business Solutions.  Based on public information and the FTC's review of TikTok's document production, this executive's responsibility include TikTok's advertising offerings, among other relevant topics.  The parties have both noticed the deposition.

In addition, TikTok has produced to the parties approximately 350,000 pages of documents, and a significant data production.  TikTok has informed both Meta and the FTC that TikTok is willing to provide a certification authenticating business records pursuant to Fed. R. Evid. 902(11).

In light of this discovery, the FTC does not believe an out-of-time deposition of a relatively junior former employee is necessary.  The former TikTok employee Meta seeks to depose served in a far more narrowly focused and junior role than the other TikTok witnesses, for just under three years.  Meta has never explained why Meta seeks to proceed with the

deposition – indeed, as discussed below, the parties have never met and conferred to discuss why the deposition might be desirable or efficient.

Moreover, Meta has never explained to the FTC why the deposition could not have been conducted within the fact discovery period. Meta noticed the deposition on February 15, 2023. The relevant FTC attorney responsible for TikTok witnesses, and best positioned to conduct the deposition, has been generally available throughout the fact discovery period to participate, and in fact has been responsible for only two other depositions to date, so there has not been a scheduling problem on the FTC's end. However, since May 26 is outside the fact discovery period, other responsibilities naturally arise, and that date is thus suboptimal for the FTC (although the FTC understands that TikTok is available on that date and the FTC could, if necessary, cover the deposition and thus does not argue that Meta's request should be denied solely on this basis).

In addition, Meta's request is procedurally improper. The reason that the FTC is seeking permission to file a Consent Motion seeking two out-of-time depositions is that is how the parties agreed to proceed when seeking those out-of-time depositions, pursuant to Joint the Scheduling Order. *See* ECF No. 103 ¶ 7 ("Parties may not extend any deadline by stipulation; instead, parties must seek extensions by motion. Consent motions are generally looked upon with favor by the Court."); *id.* ¶ 6 ("No discovery motions may be filed without leave of court."). However, in this case Meta attempts to proceed in a procedurally improper fashion, over the FTC's objections, without providing the FTC any opportunity to understand Meta's reasons, or to rebut or even anticipate the arguments Meta may make in support. The FTC does not have any idea why Meta believes the deposition it seeks would be valuable. Not only has Meta refused to engage in a meet-and-confer process to provide an explanation, the FTC has never

even seen a draft of Meta's portion of the Joint Status Report dealing with this issue – Meta first informed the FTC at 8:40 p.m. this evening (May 1) that it would include a request for the deposition in this filing, and did not provide a draft of Meta's portion of the filing.  That was the first time the FTC learned that Meta would ask the Court to consider the merits of Meta's request for an unimportant, unnecessary, and unexplained deposition of a former employee who likely would prefer not to be imposed upon by the parties.

The Court should deny Meta's request to conduct the relevant out-of-time deposition.  If the Court considers this request at any point, Meta should file a motion seeking the deposition. As the FTC has informed Meta, if Meta were to file such a motion the FTC can provide its response within two business days.  That would provide the FTC with the opportunity to understand Meta's reasons and address the arguments it may advance in support of its request. Alternatively, the Court could instruct the parties to meet and confer so that Meta can explain its reasons, and then file simultaneous 3-page statements dealing with the issue.

**C.     The FTC's Position on Non-Party Discovery**

The FTC has no current disputes with non-parties regarding discovery issues.  At the present time, the FTC does not anticipate that such disputes will arise between May 1, 2023 and the close of fact discovery.

Last year, the parties filed, and the Court granted, a joint motion for the issuance of a letter of request for International Judicial Assistance under the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters to a nonparty located in the Republic of Korea, Kakao Corporation.  *See* ECF No. 214, 215.  After submitting the signed order to the appropriate foreign authorities, the parties have yet to receive a response.  The parties respectfully request that the Court order that if the parties receive a response from Kakao after the May 22 deadline,

they are not precluded from using that discovery.

## II. The FTC's Position Regarding Meta's Discovery to the FTC

### A.  Meta's Second Set of Requests for Production

The parties do not appear to have a dispute regarding Meta's Second Set of RFPs.  As Meta seeks production of non-privileged responsive documents and the FTC's privilege log on May 8, and the FTC has agreed to provide those materials on May 8 (even though they are not due until May 19), the FTC does not understand why Meta has elected to devote many pages of unnecessary words to the issue, contrary to the Court's expressed preferences.  Nonetheless, to correct significant distortions in Meta's portion of its filing, the FTC will explain its perspective below.

*** 

On April 4, 2023, the FTC fulfilled its commitment to Meta to produce non-privileged documents responsive to Meta's Second Set of RFPs.  *See* Ex. P (3/15/23 J. Moy Email) ("With the understanding that we are continuing to assess the extent to which your requests implicate privileged materials, the FTC agrees to endeavor to . . . produce by April 4 . . . non-privileged responsive materials.").  Contrary to the Meta's incorrect implication, the FTC did not break its promise or fail to make a production on April 4 – it produced non-privileged documents on that date.  *See* Ex. Q (4/4/23 J. Moy Ltr. accompanying production of documents).  However, as the FTC has explained to Meta, the FTC withheld from this production weekly reports ("OPA Weekly Reports") because these reports are privileged.  *See* Ex. R (4/13/23 J. Moy Ltr.).  The Scheduling Order provides that the FTC's privilege log regarding these reports is due May 19, 2023.  ECF No. 103 ¶ 17.

The FTC has a legitimate claim that the OPA Weekly Reports at issue are protected by the deliberative process privilege. *See, e.g., Cause of Action Inst. v. Exp.-Imp. Bank of the United States*, No. CV 19-1915, 2022 WL 252028, at *12-15 (D.D.C. Jan. 27, 2022) (finding intra-agency weekly reports provided by lower level employees for the benefit of upper-level decision-makers protected by deliberative process privilege). Nonetheless, in an effort to avoid a controversy, the FTC has now elected not to advance a privilege claim over portions of the OPA Weekly Reports that are actually responsive to Meta's RFPs (these sections are called "Social Media Reports"). *See* Ex. S (4/28/2023 D. Matheson Email). The FTC will thus produce OPA Weekly Reports in redacted form, and Meta will have access to the portions of the OPA Weekly Reports that Meta actually seeks.[3] The FTC has made this choice, despite the fact that the information Meta seeks is irrelevant, duplicative, and available elsewhere, because given the information's lack of importance it does not merit a dispute that would consume the FTC's time and the Court's time.

The FTC's offer to provide its privilege log, and produce the Social Media Reports in unredacted form, by Monday, May 8, 2023 should fully resolve this dispute. The FTC's offer will ensure that Meta has access to the Social Media Reports in advance of the 30(b)(6) deposition of the FTC, which Meta has noticed for May 19. Meta agrees that May 8 is an appropriate production date. The parties thus have no dispute.

---

[3]     Meta's RFP seeks materials going back to January 1, 2011. OPA Weekly Reports have been constructed in various ways over this time period: during some periods, OPA Weekly Reports were created by attaching together various separate reports, one of which represents the Social Media Report. For those periods of time, due to the manner in which files are maintained by the FTC, the Social Media Report is available as free-standing document rather than as a portion of a combined OPA Weekly Report.

### B.   Meta's Third Set of Interrogatories and First Set of Requests for Admission

The FTC is in the process of preparing responses to Meta's recent interrogatories and requests for admission, and will provide its responses at the appropriate time.  Accordingly, the parties do not have any ripe dispute.

## II.   Meta's Statement on the Status of Discovery

### A.   Meta's Statement on the Status of Meta's Discovery to the FTC

#### 1.   Meta's Second Set of Requests for Production

Meta seeks an order compelling the FTC to produce by May 8, 2023, a limited set of documents that the FTC previously promised to produce by April 4, 2023.  The FTC's most recent change in position—saying once again that it will produce the documents—provides insufficient assurance to Meta that the documents will be produced.

On December 5, 2022, Meta served its Second Set of Requests for Production seeking information about how, why, and when the FTC uses—in the FTC's words—"social media" accounts.  *See*, *e.g.*, Meta's RFP No. 17 (seeking information on the FTC's "uses" of Facebook, LinkedIn, Reddit, Twitter, and YouTube, and the reasons for that usage).  This information is directly relevant to the FTC's alleged market definition.  The FTC claims nearly every aspect of Facebook falls within the so-called "personal social networking services" market, including Facebook Pages, on which the FTC maintains a page to disseminate news to the public (facebook.com/federaltradecommission).  At the same time, the FTC maintains a similar presence on other "social media," including LinkedIn, Reddit, Twitter, and YouTube—all of which the FTC claims are not part of the so-called "personal social networking services" market.  *See* Social Media, Federal Trade Commission, https://www.ftc.gov/news-events/stay-connected/social-media.  Meta seeks discovery of the FTC's seemingly similar uses of these

services to understand how the FTC's—and others'—use of Facebook can be "personal social networking services" while the same activity on other platforms like LinkedIn, Reddit, Twitter, and YouTube is not.

The FTC has produced just seven documents on this issue in more than five months. Meta sought to bring this issue to resolution during the parties' last Joint Status Report.  The FTC finally relented, promising that it would produce, by April 4, 2023, its so-called "Social Media Reports."  *See* Ex. 1, J. Moy Email to K. Horvitz (Mar. 15, 2023).  Meta understands these reports discuss the FTC's use of various online services.  The FTC's production of these materials by April 4 was important to Meta's ability to seek follow-up discovery.

April 4 came and went without any production.  On April 5, Meta asked why the FTC had not produced the reports as promised, but the FTC stated it was no longer willing to produce the Social Media Reports.  It claimed the reports were contained within the Office of Public Affairs ("OPA") Weekly Reports and that the OPA Weekly Reports have other "confidential" and "deliberative process privilege material"; the FTC claimed it would be "unduly burdensome" to redact the privileged material and to produce only the Social Media Reports.  *See* Ex. 2, Ltr. from J. Moy (Apr. 13, 2023); Ex. 3, Ltr. from G. Block (Apr. 19, 2023).

The FTC's rationale for refusing to produce these documents makes no sense.  Weekly reports from the FTC's public affairs personnel are not covered by the deliberative-process privilege, which is reserved for material that "makes recommendations or expresses opinions on legal or policy matters."  *See Public Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010). And even if there were limited material protected by deliberative process, the FTC can redact the privileged portions in the limited number of documents at issue (as Meta has done thousands of times in this litigation).  The FTC's claims of burden are especially confounding in the context of

this litigation, where the FTC has imposed massive burdens on Meta in terms of costs and time devoted by its senior executives, and where the FTC seeks to divest Meta of apps it has owned for many years (Instagram and WhatsApp) and that have billions of users.

On April 28—after Meta stated that it would raise this issue with the Court—the FTC once again has made an empty promise.  The FTC stated an "anticipat[ion]" that it could produce the Social Media Reports by May 8 but staked out its right to delay production "until May 19, at the earliest."  Ex. 4, Email from D. Dorris to D. Matheson (Apr. 28, 2023).  The FTC made its offer "contingent" on Meta agreeing not to seek any additional discovery from the FTC.  *See id.*

The FTC's most recent "offer" provides Meta no greater assurance than the FTC's last broken promise that the materials will be produced.  The "offer" also does not provide any assurance that the reports will be produced in a timely fashion.  Meta has noticed for May 19, 2023, a Rule 30(b)(6) deposition of the FTC concerning, among other things, the Social Media Reports.  Meta needs the reports to be produced sufficiently in advance of that deposition to prepare for the deposition and to seek follow-up discovery to cure any deficiencies with the FTC's production.  In order to guard against the FTC's running out the discovery clock without ever producing meaningful discovery on this issue, the Court should order that the FTC produce the Social Media Reports by no later than May 8.

### 2.     Meta's Third Set of Interrogatories and First Set of Requests for Admission

On April 3 and April 4, 2023, respectively, Meta served its Third Set of Interrogatories and First Set of Requests for Admission.  These discovery requests ask the FTC to state the basis of its core contentions in this case, after years of investigation and discovery.  *See* Ex. 5, Meta's Third Set of Interrogatories to FTC (Apr. 3, 2023); Ex. 6, Meta's First Set of Requests For Admission to FTC (Apr. 4, 2023).  For example, the interrogatories make the very request that

the Court acknowledged that Meta could make of the FTC—namely, to provide "all relevant facts about what makes the use of one platform/feature pair a PSNS usage while another is not." ECF No. 264, at 3. The FTC has twice (on April 20 and 26) stated orally on meet-and-confers that it will provide substantive responses to these interrogatories and requests for admission by May 3 and May 4, respectively. The FTC, however, has been unwilling to accede to Meta's requests that it make these same representations in writing. If the FTC's responses to Meta's requests are deficient, Meta intends to promptly seek relief from the Court. Although Meta recognizes that the Court generally prefers that the parties not include in the Joint Status Report issues for which no immediate relief is sought, the timing of this Joint Status Report and the imminent close of fact discovery have led Meta to respectfully make an exception here: The Court may wish to consolidate any hearing on Meta's discovery requests to the FTC with a hearing on the issues in the Joint Status Report, in the interest of efficiency.

**B.     Meta's Statement on the Status of the FTC's Discovery to Meta**

Over the last four years, from the FTC's pre-complaint investigation and this litigation, the FTC has obtained from Meta approximately 5.4 million documents comprising nearly 25 million Bates numbers from over 100 custodians, hundreds of gigabytes of data, hundreds of pages of written interrogatory and Rule 30(b)(6) responses and other narrative submissions, and more than 400 hours (and counting) of testimony from more than 65 depositions and investigative hearings of Meta current and former employees).

And the requests keep coming. In April, the FTC requested that Meta "refresh" its production from June 2022 to the present; served three new sets of requests for production (comprising 22 individual requests, not including subparts), 10 new burdensome interrogatories (not including dozens of subparts), and 2 new sets of requests for admission; and demanded two

more Rule 30(b)(6) depositions covering more than 100 topics, on which no group of employees could hope to have pre-existing knowledge. To the extent the requests are even relevant, non-duplicative, or appropriate at all (and many of them are not), these requests could and should have been made much earlier.

Meta has made enormous efforts to respond to this latest discovery on an expedited schedule—weeks before many of its responses would be due—by reasonably searching for the most relevant information in response to legitimate discovery requests that seek relevant, non-cumulative materials. (Most of the FTC's recent requests are tangentially relevant, at best, or rehash issues on which there has already been extensive discovery.) But some disputes remain. Meta requests that the Court quash the FTC's requests or narrow them to a reasonable scope, so that Meta has clarity on what information it must provide and can make best efforts to provide that information by close of fact discovery.

**1. The FTC's Eighth, Tenth & Eleventh Sets of Requests for Production**

The Court should order that Meta does not need to produce more documents in response to several requests in the FTC's Tenth and Eleventh Sets of Requests for Production ("RFPs") (served on April 5 and April 21, respectively), or to the remaining RFPs in the FTC's Eighth Set (for which the FTC modified its position and requests on April 30). There is not sufficient time for Meta to collect documents from relevant custodians, apply search terms to cull that set, and review for responsiveness and privilege. Instead, Meta has proposed doing reasonable and targeted searches for the most relevant information in response to discovery requests where possible. Where disputes remain, Meta requests that the Court quash the request, or provide certainty about what Meta must do so that Meta can immediately begin making best efforts to comply by the close of fact discovery. Those are detailed below.

RFP Nos. 111-112:  The FTC's RFP Nos. 111 and 112 seek information about Meta's Oversight Board and Cross-Check program—each of which relates to Meta's content-moderation process.  Meta asks the Court to quash those requests or to conform them to Meta's compromise proposal, which the FTC rejected out of hand and without explanation.

As an initial matter, both requests are disproportionate to the needs of the case.  Both the Cross-Check program and the Oversight Board have been matters of public record and extensive news reporting for years.  Were they relevant or important to this litigation, the FTC would not have delayed until the closing months of fact discovery and its 111th and 112th requests for production to seek documents about them.  The FTC has said that the information it seeks is relevant to assessing the integrity benefits that Meta delivered to WhatsApp and Instagram after acquiring them, but those substantial benefits do not turn on the minutiae of content-moderation decisions or how they are appealed.  Moreover, both requests seek cumulative materials.  For example, the FTC has represented that it seeks, with those requests, to understand the goals of the Cross-Check program, how Meta has tracked it over time, and the Oversight Board's review of the Cross-Check program, among other things.  But Meta's extensive public disclosures already answer those basic questions.  For example, one post on Meta's website explains that "Meta implemented the cross-check system to identify content that presents a greater risk of false positives and provide additional levels of review to mitigate that risk."  Meta, Reviewing high-impact content accurately via our cross-check system (Dec. 6, 2022), https://perma.cc/2H3X-82X9.  The same post also discusses how the Cross-Check program works today and how the program has changed over time, including by describing review criteria it currently uses and has used before.  Another post details 32 separate recommendations of the Oversight Board regarding Meta's Cross-Check program, *see* Meta, Oversight Board Selects a PAO on Meta's

Cross-Check Policies (Apr. 24, 2023), https://perma.cc/87KZ-AZ33, and the Board itself has

published a 57-page advisory opinion detailing those recommendations, *see* Oversight Board,

Public advisory opinion on Meta's cross-check program (Dec. 2022), https://perma.cc/6Y99-

AMKT.

Nonetheless, when the FTC finally provided a list of materials that it was seeking through

these requests, Meta immediately began to explore a good-faith compromise:  After investigating

the feasibility of the FTC's proposal in a matter of hours, Meta offered to produce most of the

requested materials—including a 2019 audit of the Cross-Check program and all documents that

Meta produced to the Oversight Board in connection with the Board's Policy Advisory Opinion

on the Cross-Check program—and asked the FTC to provide more information about certain

documents it had described to help Meta identify and determine if it could produce them.  But

the FTC rejected Meta's offer.  When asked for an explanation, the FTC refused to provide one,

instead alluding vaguely to discussions that long predated its eleventh-hour proposal and Meta's

response.  *See* Ex. 7, Email from N. Brenner to A. Polavarapu (May 1, 2023, 6:14 PM) ("The

FTC disagrees, for reasons already explained during the various meet and confers we have had . .

. .").

This Court should not stand for the FTC's unreasoned rejection of Meta's proposal.  Only

three weeks remain in fact discovery, and Meta needs to know now which targeted sets of

materials it will need to identify, review, and produce to comply with the Court's schedule.  This

Court should quash RFP Nos. 111 and 112 as disproportionate to the needs of the case—given

the irrelevance of the requested materials, the responsive materials already available to the FTC

from Meta's and the Oversight Board's websites, the enormous amount of discovery that Meta

has provided to date and that it still must provide in the next three weeks.   At the very most, the

Court should direct Meta to provide the documents Meta has proposed as a reasonable compromise to satisfy the FTC's RFPs.

RFP No. 125:  This request seeks "audited consolidated financials" or equivalent financial information for 2004 and 2005.  The Court should order that no further production is required because financial information from 2004 and 2005 is irrelevant.

The FTC does not allege that Meta had a monopoly until 2011, *see* Am. Compl. ¶ 190, and does not allege that Facebook (launched in a dorm room in February 2004) was even available to the "general public" until 2006, *id.* ¶ 23.  The FTC offers only speculation that this nearly 20-year-old data might "be probative of Meta's market power over time."  But Meta has already produced relevant financial information for the later time periods that actually matter (which the FTC does not contest).  Nor is it "straightforward"—as the FTC claims—to collect nearly 20-year-old financial information, which, in Meta's experience, would require identifying and interviewing several subject matter experts to determine what (if any) financial information might exist that far back, and then additional effort to obtain that data—potentially from legacy systems no longer in use.

RFP No. 134:  This request seeks "[a]ll exhibits, and all transcripts of any testimony, provided by the Company or its employees" in two unrelated cases: *Tyler Barnett PR, LLC v. Facebook*, No. 16-6232 (N.D. Cal.), and *DZ Reserve v. Meta Platforms, Inc.*, No. 18-4978 (N.D. Cal.).  The Court should order that Meta need not produce these materials because they are irrelevant.

These cases have nothing to do with the present litigation.  Neither was an antitrust case.  Both suits were brought by advertisers alleging problems with how Meta reported advertising metrics (such as the average time users spent watching video advertisements) to the advertisers

that bought advertising slots from Meta.  The FTC relies on a single stray allegation in its complaint that Meta's "monopol[y]" in "personal social networking . . . harm[s] competition for the sale of advertising in the United States."  Am. Compl. ¶ 225.  But as this Court has previously noted, "the FTC isn't proceeding on a theory that Meta has monopolized the market for internet advertising."  Hr'g Tr. at 13:8-9 (Oct. 31, 2022).  The FTC has never alleged the existence of a relevant advertising market, let alone that Meta has market power in such a market.  *See* Am. Compl. ¶¶ 164-217 (alleging a monopoly in the user-side "personal social networking services" market).  There is thus no basis for the FTC to seek discovery of purported quality deficiencies in Meta's advertising products—deficiencies that (to the extent they exist) are disciplined by competition from other advertising avenues.

Moreover, the FTC's theory of relevance is boundless.  It makes any document relating to the quality of *any* of Meta's services (that is, almost *any* Meta document) relevant, even if those services are not within the alleged relevant market.  And the FTC here does not seek a few targeted documents; it seeks *all exhibits and testimony* from two complex litigations relating to an issue with no relevance to this case.  That is hardly "limited in scope."

In any event, despite their tangential relevance to the FTC's alleged user market, Meta has already produced documents and data relating to the quality of Meta's advertising product in response to, for example, RFP No. 38, which sought "[a]ll documents relating to the quality or performance of [Meta's] . . . Digital Advertising Services," and more than a dozen RFPs seeking advertising-related data.  *See* FTC's Second Set of RFPs (propounding numerous requests for advertising data); *see also*, *e.g.*, RFP No. 35 (seeking documents relating to advertiser boycott of Meta); RFP No. 36 (seeking documents relating to the effect of advertising on users).  Further discovery on these tangential issues is not proportionate to the needs of the case.

RFP No. 135:  This request seeks "[d]ocuments sufficient to show any blacklist Meta has employed to prevent 'competitors from running app install ads on Facebook,'" and cites an already-produced document that the FTC implies is relevant to that issue.  The Court should order that Meta need not respond to the request because it seeks cumulative evidence, is burdensome, and is prohibited by this Court's ruling that it would "not permit . . . time-consuming and costly discovery on [Platform] policies" like this.  ECF No. 90, at 2, 40; *see also New York v. Meta Platforms, Inc.*, No. 21-7078, 2023 WL 3102921, at *3 (D.C. Cir. Apr. 27, 2023) (affirming dismissal of claims related to platform policies).

This request impermissibly seeks information on Meta's Platform policies for who is and is not allowed to advertise on Meta's platform.  The FTC tries to dodge this Court's ruling by claiming that RFP No. 135 seeks information on "PSNS competition."  The document cited by the FTC in support of that request calls that explanation into question.  The FTC relies on a 2013 document that identifies as "competitors" various services (WeChat, Kakao, and Line)—contradicting the FTC's allegations that such services do not compete with Facebook and Instagram, *see* Am. Compl. ¶ 172—and "Google products" that the FTC also claims do not compete with Facebook and Instagram, *see id.* ¶ 175 (excluding YouTube from the PSNS market).  The document does not state personal social networking services are excluded and directly contradicts the FTC's gerrymandered market.

In any event, the FTC has already obtained from Meta massive discovery on competition, including in response to RFP No. 1 (seeking "[a]ll documents relating to competition in the sale or provision of [any of Meta's] [p]roduct[s]," with twelve enumerated subparts seeking documents related to Meta's competition).  Moreover, Meta already produced the very document

giving rise to the FTC's discovery request and undoubtedly many others on the same issue.

There is no reason to believe further discovery would yield non-cumulative information.

The FTC has it backwards in claiming that it is Meta's burden to make a "representation"

that this discovery would not be cumulative.  If the FTC cannot articulate in the last weeks of

discovery what it believes is missing after millions of documents produced and dozens of

depositions, the only reasonable conclusion to be drawn is that further discovery would be

cumulative, especially because Meta produced documents after using agreed search terms

targeting competition and potential competitors.  Nor is the FTC's request "narrowly targeted."

The document cited in RFP No. 135 is from 2013, showing that the FTC's request seeks to

explore issues spanning at least a decade.  The effort in responding to this discovery request

(served on April 21) would be extensive and very likely not possible to complete by the close of

fact discovery on May 22.

Accordingly, this Court should order that no further discovery is necessary in response to

this request because this request is (1) an end run around the ruling barring discovery of Platform

policies, (2) cumulative with extensive discovery already provided, and (3) burdensome.

## 2.    The FTC's Fourth Set of Interrogatories

The Court should order that Meta has no obligation to respond to several interrogatories

in the FTC's Fourth Set of Interrogatories, which the FTC served on April 5, 2023.  For several

of these interrogatories, Meta has already reached—or expects to reach—agreement with the

FTC to respond with information Meta believes it can feasibly collect by the close of fact

discovery, especially in light of the FTC's many other simultaneous discovery requests.  As

explained more fully below, some of the interrogatories in the FTC's Fourth Set seek irrelevant,

non-discoverable, and cumulative information.  Meta thus seeks a ruling on each disputed

interrogatory.

Interrogatory Nos. 16-17: The FTC's Interrogatory No. 16 seeks "all relevant facts supporting Meta's contention that 'the competition for advertisements to show . . . users is fierce.' Meta Platforms, Inc.'s Relevant Markets Tutorial Submission at 8, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454." Interrogatory No. 17, meanwhile, seeks "all relevant facts supporting Meta's contention that 'TikTok is expanding its reach into "friends and family" sharing[.]'" Meta Platforms, Inc.'s Relevant Markets Tutorial Submission at 7, *Klein v. Meta Platforms*, Inc., No. 20-cv-08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454."

The Court should order that no response is required to either Interrogatory because each seeks non-discoverable and duplicative information. The FTC already has in its possession sufficient information to show that Meta competes with many companies for advertising dollars and, as explained above, the FTC has plenty of advertising-related discovery. Meta has also already produced an enormous amount of information detailing the many ways Meta competes with various competitors—including TikTok—for users' time and attention. Moreover, the FTC has many documents showing such competition from TikTok's response to the FTC's subpoena. And yet during the parties' meet and confer, the FTC did not identify any non-duplicative information that it thinks *might* be discovered through either Interrogatory. No further response is therefore necessary.

These Interrogatories are also improper because they require Meta to provide the FTC information from Meta's Relevant Markets Tutorial Submission in the *Klein* litigation. As Judge Donato repeatedly instructed the parties in that case, there was to be no substantive use of the information provided by Meta in its *Klein* Relevant Markets Tutorial Submission. For example, in a hearing regarding Meta's motion to dismiss, Judge Donato informed the parties:

I am very fond, in my patent cases, of tutorials.  And I think a market tutorial, relevant market tutorial with some thought about barriers to entry, exclusionary conduct, would be useful as well.  So think about doing a tutorial day.  It would be *off the record*.

*See* Ex. 8 at 25, *Klein* Transcript of Proceedings (Aug. 11, 2022) (emphasis added).  Two months later, Judge Donato reiterated that the tutorial "will be off the record.  It will be like a patent tutorial.  It will be off the record.  *Can't be used against anybody*."  *See* Ex. 9 at 8, *Klein* Transcript of Proceedings (Oct. 20, 2022) (emphasis added); *see also* Ex. 10, ¶ 7, Standing Order for Claim Construction In Patent Cases Before Judge James Donato (Jan. 5, 2017) ("The Court may schedule a tutorial one to two weeks prior to the claim construction hearing. . . . No argument is permitted.  The proceeding is not recorded and *parties may not use or rely on statements made at the tutorial in the litigation*.") (emphasis added).

Meta has explained to the FTC that the information it seeks violates both the letter and spirit of Judge Donato's orders.  *See* Ex. 11, Ltr. from J. Hall to N. Brenner (Apr. 25, 2023).  Yet during the parties' meet and confer on April 26, 2023, the FTC asserted that Judge Donato's orders do not apply here.  Meta disagrees.  Judge Donato's orders were clear:  the *Klein* tutorials "[c]an't be used against anybody."  Allowing the FTC to seek discovery into material that Judge Donato explicitly instructed should be off-limits would frustrate the purpose and intent of Judge Donato's tutorial, which was meant to allow the parties to provide candid and free-flowing observations regarding that case, including in the written tutorial submissions cited by the FTC. The FTC should not be permitted to seek discovery about discovery in another matter, particularly where the *Klein* plaintiffs cannot obtain the very information the FTC requests. Meta respectfully requests that the Court order that Meta does not need to respond to the FTC's Interrogatory Nos. 16-17.

Interrogatory No. 21:  This interrogatory demands that Meta "[d]escribe and identify all relevant facts relating to all investments Meta has made in the Facebook Metaverse, by quarter, including but not limited to dollars invested in developing Reality Labs."  This interrogatory seeks plainly irrelevant and unduly burdensome information, and it is not proportionate to the needs of the case.  The Court should order that no response is required to this interrogatory.

The FTC has never alleged that the Metaverse or Reality Labs—which concern Meta's virtual and augmented reality offerings—are part of, or have anything to do with, the FTC's allegations regarding a market for so-called "personal social networking services."  Indeed, when the parties negotiated over custodians for the FTC's First Set of RFPs, the FTC agreed that information regarding Oculus (the former name of Meta's virtual reality hardware brand) was irrelevant and not discoverable.  *See*, *e.g.*, Ex. 12, Ltr. from D. Matheson to K. Fetterman at 6, 8 (Apr. 27, 2022) (FTC agreeing to drop a proposed supplemental custodian because his "responsibilities are exclusively related to AI issues focused on Oculus and virtual reality"; agreeing to limit the collection of two employees' documents "to the time period prior to the date on which [their] responsibilities became exclusively directed to Oculus"); Ex. 13, Ltr. from S. Strikis to D. Matheson at 3 (May 13, 2022) (noting Meta's understanding that the FTC was "in agreement" to limit date ranges of searches for custodians' documents to exclude the time when they were involved in "a role relating to Oculus").  Given that the FTC has appropriately conceded the irrelevance of augmented and virtual reality and that the parties reached an understanding that the FTC would not seek discovery on these issues, the FTC should not be permitted to renege at the eleventh hour and now seek discovery into the Metaverse and Reality Labs.

The FTC's Interrogatory No. 21 is also overbroad and unduly burdensome. The interrogatory, as propounded, seeks "all relevant facts relating to all investments" Meta ever made in the Metaverse and Reality Labs. And in its portion of the Joint Status Report, the FTC confirms that it seeks "all costs and expenses that are associated with or attributable to Reality Labs." As Meta has repeatedly explained, however, Meta has made regular improvements to and investments in the Metaverse and Reality Labs. It is therefore not possible to identify "all relevant facts relating to all investments" Meta made to each product.

Interrogatory No. 22: This interrogatory seeks "all relevant facts supporting Meta's contention that 'competition and consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users.' Answer at 39, ECF No. 94." During the parties' April 26 meet and confer, the FTC clarified that it seeks relevant facts that would serve as the basis for expert analysis. Meta disagrees with the premise of this interrogatory that there is monopolization of this market. The facts that would serve as the basis for expert analysis are hypothetical facts of the theoretical world that the FTC's interrogatory presupposes. Meta, therefore, has nothing further to state in response to this interrogatory during fact discovery. The Court accordingly should deny the FTC's premature request that Meta respond to this interrogatory.

Interrogatory No. 23: This interrogatory—and its eleven subparts—seeks bespoke analyses about Meta's "Cross Check" program, which Meta has used to address objectionable content. Specifically, the program aids Meta in identifying content that may be incorrectly flagged as violating Meta's community standards.

The Court should order that no response is required because the interrogatory is unduly burdensome and cumulative of other information already provided to the FTC. Although the

FTC has narrowed its request by eliminating sub-parts (b), (g)-(i), and (k), this narrowing fails to reduce the burden to a proportionate and reasonable level. Meta has produced abundant materials about its integrity efforts, including in its responses to the FTC's Interrogatory Nos. 5, 6, 8, 9, 10, & 12 and Requests for Production Nos. 83, 93, & 98.

Additionally, Meta has identified a number of publicly-available documents discussing its Cross Check program. *See*, *e.g.*, Meta, *Reviewing high-impact content accurately via our cross-check system* Dec. 6, 2022), https://perma.cc/2H3X-82X9. And Meta's Oversight Board has recently published a 57-page policy-advisory opinion about the program. *See* Oversight Board, *Oversight Board publishes policy advisory opinion on Meta's cross-check program* (Dec. 2022), https://perma.cc/6Y99-AMKT.

The FTC is (allegedly) unsatisfied. It seeks, for example, in the context of the cross-check program, "[t]he volume of content that was flagged as potentially violating Meta's Community Standards which on review were found to be violating"; and "[t]he number of views of the violating content before it was taken down after review under the Programs." Meta cannot feasibly perform these bespoke analyses before the end of fact discovery—nor should it be required to do so. This interrogatory, and its six remaining subparts, seeks information which has no relevance to the claims or defenses of either party. Given Meta's immense production of information relevant to Meta's integrity efforts, no further response should be required.

### 3. The FTC's Requests Regarding Data from Meta

To date, Meta has provided an extraordinary amount of discovery in response to the FTC's sweeping data discovery requests. Before April 2023, the FTC had served more than 300 data Requests for Production (including subparts) and sought Rule 30(b)(6) deposition testimony on nine different data topics. In response to those expansive requests, Meta produced several hundred gigabytes of data, four hours of live corporate deposition testimony, and written

responses the parties agreed constitute 10 further hours of Rule 30(b)(6) data deposition

testimony against an agreed-to 28-hour Rule 30(b)(6) data deposition cap.  Meta has provided all

of these data without once burdening the Court with a dispute over these expansive data requests.

Meta and the FTC extensively negotiated the scope of Meta's production in response to

the FTC's data RFPs, meeting and conferring more than a dozen times since the FTC served its

initial data requests.  As a result of those negotiations, Meta is providing an enormous amount of

data to the FTC at substantial burden to itself.  In response to the FTC's data requests, just the

Meta data scientists supporting this matter have spent more than 2,500 hours searching for and

collecting data; creating new data sets specifically for the FTC by combining massive tables

containing, at times, hundreds of millions of rows of data per day; and preparing the responsive

data for production.

Despite the extensive data discovery Meta has already provided, the FTC recently served

a set of 30 distinct requests for yet more data (styled as 11 RFPs) and a Rule 30(b)(6) notice

identifying 106 data questions and promising to identify even more.  If the FTC had served its

new RFPs months ago, as it generally could have, then Meta could have incorporated the burden

of producing these data in its negotiations with the FTC.  However, because of the substantial

burden these recent requests pose at this late stage in fact discovery, Meta requests (as discussed

in detail below) that the Court quash the most burdensome of the FTC's new requests and limit

the burden associated with the FTC's newest Rule 30(b)(6) data deposition notice.

### a.      The FTC's Ninth Set of Requests for Production

On April 5, 2023, the FTC served its Ninth Set of Requests for Production, which include

several RFPs that are irrelevant, vague, confusing, duplicative, overly broad, individually and

cumulatively unduly burdensome, and disproportionate to the needs of the case at this time.  In

the spirit of compromise, Meta has informed the FTC that it is willing to engage in a reasonable

search, under the circumstances, for all but three of the FTC's requests.  Those three requests are

particularly onerous, and Meta respectfully asks the Court to quash these requests in light of the

tremendous burden they present:

RFP Nos. 116 and 117:  These requests seek the number of posts posted (116), and

viewed (117), sorted by "audience type," "Surface," "Type of Post," eight distinct "Selected

User Attribute[s]," and "each mutually exclusive combination" of those Selected User Attributes.

With these requests, the FTC is asking Meta to produce data showing, for example, how many

photos 30-year-old men using iPhones in Japan posted to News Feed with Custom audience

settings in June 2010.  As the FTC has defined those terms, each RFP seeks more than 1,900 cuts

of post data for every month since 2009 to present.

These granular and niche data cuts are irrelevant to the issues in this case.  Knowing how

many photos 30-year-old men posted compared to 29-year-old men, how many of those photos

were posted from an iPhone or other device, and how Japanese men posted to News Feed

compared to men in South Korea will not help the Court resolve any issues in this case.

Moreover, the FTC could have served these requests earlier in discovery and has prejudiced

Meta by waiting to do so until late in fact discovery.  As Meta has previously explained, it takes

significant time and resources to determine, among other things, whether responsive data exist,

where they are housed, what it would take to restore them, how to combine them with the other

metrics the FTC seeks, how to pull them, and how to produce them.  Meta should not have to

undertake the significant burden of producing irrelevant data responsive to the FTC's unduly

burdensome requests with less than a month left in fact discovery, especially when the FTC

could have sought these data months ago.

These data are also cumulative of data Meta has already produced in this case.  The FTC claims it wants these data to test "Meta's arguments that people use Facebook Blue for activities other than viewing content from friends and family."  Ex. 14,  Ltr. from P. Taylor to C. Masterman & L. Smith at 2 (April 25, 2023).  Meta already produced eight years of Facebook and Instagram data on how many posts are viewed by friends and reciprocal follows in response to RFP No. 49(a-b).

There is no reason for the Court to delay ruling on these RFPs as the FTC requests; the parties are at impasse.  The parties initially met and conferred regarding these RFPs on April 19, 2023, at which time Meta informed the FTC that it was likely to object to RFP Nos. 116 and 117 as irrelevant, unduly burdensome, and disproportionate to the needs of the case.  On a meet and confer on April 26, 2023, Meta confirmed its position and stated that unless the FTC withdrew these RFPs, the parties were at an impasse.  The FTC's letter restating why the FTC thinks these RFPs are relevant, which it sent later that night and which did not acknowledge Meta's articulated position, did not change Meta's position that these RFPs are overbroad, cumulative, unduly burdensome, and unfair.  Meta once again made that position clear in its written Responses and Objections to the FTC's Ninth Set of RFPs, which Meta served on April 27 (more than a week before they were due), again objecting in full to RFPs 116 and 117 on these grounds.  Meta maintains those objections here.

RFP No. 124:  This request seeks "[a]ll documents (including any underlying analyses and data) related to the actual or potential impact of TikTok on Facebook Blue or Instagram," including documents related to a single sentence in a May 11, 2022 email regarding Instagram: "We see downward pressure from TT on interest content consumption on IG but that same pressure is less evident on consumption of friend content."  Meta has already produced more

than 35,000 documents that refer to TikTok, which is unsurprising given the significant

competition between Meta and TikTok.  In addition, the May 11, 2022 email also contains a

hyperlink to an H2 2022 Planning Primer, which is a 25-slide deck that is the source of the

quoted sentence and contains related analyses.  Meta produced that hyperlinked H2 2022

Planning Primer.  Meta should not be required to go back through these thousands of documents

or scour all of the company's documents and data simply because the FTC is interested in one

sentence in an email, particularly when Meta has produced the underlying source of that one

sentence.  In light of the substantial production of discovery related to TikTok to date, Meta

should not have to undertake the significant burden of searching for and producing additional

documents and data at this late stage in discovery.

> **b.** **The FTC's Second Rule 30(b)(6) Notice Regarding Data**

On April 3, 2023, the FTC served a Rule 30(b)(6) notice seeking deposition testimony

regarding Meta's data productions to date.  The notice identified 106 questions on Meta's data

productions covering the first of three tranches of data productions, and promised an

indeterminate number of further questions "to be identified."  At 11:21 p.m. on Sunday, April 30,

2023, the FTC served a modified set of questions in which it (a) withdrew 21 questions; (b)

acknowledged that 39 questions already had been resolved; (c) identified 21 "high priority"

questions; (d) trivially reworded 25 questions to allow a "yes" or "no" response instead of a

narrative answer, but requiring the same burdensome process of researching the answers to those

questions (and still requiring a narrative response if the answer is "no"); (e) added 73 new

questions; and (f) promised to send an undetermined number of additional questions by an

unspecified date.  Although the FTC presented these modifications as a "compromise," the FTC

in fact increased significantly the burden it seeks to impose on Meta.  As a result, the FTC's Rule

30(b)(6) notice remains improper and burdensome.

As an initial matter, the FTC's notice of questions "to be identified" fails the reasonable particularity requirement of Rule 30(b)(6), because the FTC proposes to pose an unlimited number of additional questions on a rolling basis, without committing to a hard deadline for completing that process. *Buie v. District of Columbia*, 327 F.R.D. 1, 9 (D.D.C. 2018). Moreover, many of the noticed topics go far beyond simply seeking clarification about the data Meta has produced (such as what a particular column heading means), and ask substantive questions about the reasons why data changed over time, or why data differs for different countries, time periods, operating systems, and so forth. These questions are more akin to interrogatories than the type of clarifying questions parties routinely answer about document and data productions. Not only are these questions inappropriate, but answering them—across multiple different apps spanning more than a decade—would be exceptionally difficult and time-consuming. It would require identifying knowledgeable members of the relevant product teams, meeting with them, investigating the data sources they use in the ordinary course of business, and working with them to research the basis for the changes or differences the FTC has asked about. It is not reasonable to demand that Meta determine the reasons behind every change in the data the FTC may observe, particularly when the burden of researching such changes is attributable in large part to the FTC's own delay in bringing this suit.

The FTC argues that its questions are necessary because "Meta has not provided 'data dictionaries' or other explanatory materials that might assist the FTC in understanding the data produced by Meta" and has had to contend with "unadorned" data productions. The argument is disingenuous on at least two fronts. First, as Meta has informed the FTC on numerous occasions, Meta does not maintain data dictionaries in the ordinary course of business. Meta cannot, and the Federal Rules do not obligate it to, provide what it does not have. Second, to

date Meta has provided more than 130 pages of single-spaced letters to the FTC detailing the

contents of Meta's data productions in response to the FTC's Second Set of RFPs and answering

the FTC's questions about Meta's data productions, and answered FTC questions regarding

Meta's data on more than a dozen meet and confers.  This amply satisfies any obligation on

Meta's part to provide information about the data it has produced.

Given the expansive scope of the FTC's data Rule 30(b)(6) notice—including its promise

for even more, yet-to-be-identified questions—Meta asks the Court to order that each written

answer to the questions in the FTC's notice, as well as future questions the FTC identified, will

count for 10 minutes of deposition testimony against the agreed limit of 28 hours of data-related

Rule 30(b)(6) testimony.  This is appropriate because it would take the FTC at least 10 minutes

of deposition time to unobjectionably elicit testimony in response to the complicated data

questions that it has posed to Meta.  Some of the FTC's questions would take at least that long

just to ask—questions 34 and 35 in Exhibit C to the FTC's April 30, 2023 letter, for example,

take up 2.5 single spaced pages—and several others include complicated tables, charts, and

multiple sub-parts.  The FTC has implicitly conceded this point by agreeing to accept responses

in writing, and Meta should receive appropriate credit against the Rule 30(b)(6) time limits, as

the parties have done for multiple prior Rule 30(b)(6) notices.  Because the FTC has 14 hours of

data deposition time remaining, 10 minutes per question will also serve to limit the cumulative

burden of responding to the FTC's notice on Meta while still permitting the FTC to ask as many

as 84 questions about Meta's data productions.

Contrary to the FTC's argument, this issue is ripe for resolution.  Meta proposed the 10-

minute limit for written responses in its letter of April 21, 2023, and raised it again on the

parties' April 25, 2023 meet and confer.  The FTC did not respond until April 30, 2023, and has

proposed to count the equivalent of less than three minutes for each of its existing questions, and
to reserve 5 hours of deposition time for questions not yet posed (which, at three minutes per
question, would enable the FTC to ask an additional 100 new questions on top of the 180 already
posed).  Although the FTC undoubtedly will ask the Court to order the parties to continue to
meet and confer about this issue, the Court should decide it now for three interrelated reasons.
First, the FTC agreed to a cap of 28 hours for data 30(b)(6) depositions, of which it has 14 hours
remaining, so the Court's resolution of this issue will impact how many questions the FTC can
expect Meta to answer, and therefore the burden of responding to those questions by the
discovery deadline.  Second, Meta has already made considerable efforts to gather information
necessary to answer the FTC's first set of questions, and will have to devote substantial time and
resources to answer the FTC's April 30 set of additional questions, and the unknown number of
questions the FTC is yet to ask.  It is not reasonable to ask Meta to shoulder this burden without
any certainty without any certainty on the overall burden of answering by the close of fact
discovery.  Third, imposing a time limit per question will serve to narrow the FTC's questions to
those it genuinely needs to know, thereby balancing the needs of both parties.  The fact that the
FTC already has withdrawn 21 of its initial set of questions suggests that the FTC either does not
need all of the information it seeks, or that it is able to answer several of its questions without
burdening Meta.  As the Court recognized in imposing a limit on the number of linked files Meta
was required to produce, a reasonable cap on the number of questions the FTC can ask about
Meta's data will require the FTC to be "judicious" in deciding what to ask.  *See* H'rg Tr. at 6:2-
10 (Nov. 9, 2022).

       Finally, Meta does not believe that the FTC's request to either depose a witness or
receive written responses as late as June 5, 2023, is warranted.  The FTC's request is inconsistent

with the schedule the FTC itself proposed in the parties' most recent meet-and-confer on data issues, under which Meta would serve answers to the FTC's pending questions, and the FTC would propound additional questions, by April 28; the parties would do the same on May 12; and then Meta would serve its final set of answers by the close of fact discovery.  Meta largely accepted that proposal, agreeing to engage in reasonable efforts to answer questions by the deadlines the FTC proposed but reserving the right to answer questions which require more substantial investigation on a rolling basis before the close of fact discovery, due in larger part to the uncertainty over which (and how many) questions the FTC was yet to raise.  *See* Ex. 15, Ltr. from C. Masterman to P. Taylor (Apr. 21, 2023).  Not only that, in a show of good faith, Meta has already answered more than a third of the questions in the initial notice.  The FTC, on the other hand, failed to provide the additional questions it promised by its own proposed deadline of April 28 until April 30, and reversed course from its proposal to resolve these issues by the close of fact discovery.  The FTC's asserted necessity for more time is attributable to its own failure to narrow its questions and delay in serving them.  That is no basis to extend any data-related deadline beyond the close of fact discovery.

For these reasons, the Court should order that Meta be credited with 10 minutes of Rule 30(b)(6) data deposition time for each of the questions in the FTC's notice relating to Meta's data productions that Meta answers and that, given the answers Meta has already provided (to 14 questions in its April 28 response), the FTC may receive answers to 70 additional questions.  The FTC shall promulgate any new questions by no later than May 12, 2023, and Meta shall have until May 22, 2023, to respond to them.

### 4.    The FTC's Unwarranted Demand for a Custodial Production for Mr. Santosh Janardhan

The FTC's request "that the Court instruct that Meta shall not call as a trial witness Mr. Santosh Janardhan, or in the alternative instruct Meta to promptly collect and produce relevant documents from Mr. Janardhan" is unwarranted and unreasonable. The FTC's stated premise for its request—that Meta's Supplemental Initial Disclosures "suddenly expanded the subjects of information Mr. Janardhan may possess beyond 'Meta Infrastructure'"—is false. The FTC has no valid basis to name Mr. Janardhan as a first-time custodian, particularly given how long the FTC waited to make this demand after learning about Mr. Janardhan's role at Meta.

Mr. Janardhan became Meta's Head of Infrastructure in June 2022, replacing David Mortenson, who replaced Jay Parikh. Mr. Janardhan's promotion was widely publicized at the time (see, e.g., Alex Heath, *Meta names new head of engineering as current leader steps aside*, The Verge (June 8, 2022), https://perma.cc/QPZ6-ZMCU); the FTC also discussed this fact during the January 9, 2023 deposition of Nitin Gupta (one of the earliest in the case) and the March 3, 2023, deposition of Mr. Mortenson. On February 28, 2023, Mr. Mortenson's last day with Meta, Meta revised its Initial Disclosures to substitute Mr. Janardhan for Mr. Mortenson with respect to issues regarding "Meta infrastructure." On March 7, 2023, the FTC noticed Mr. Janardhan's deposition for April 14, 2023. Meta promptly agreed to that date.

On April 11, 2023, three days before Mr. Janardhan's scheduled deposition, the FTC requested to defer the deposition, claiming it did not have enough documents for Mr. Janardhan to take his deposition, and demanded that Meta either remove Mr. Janardhan from its Initial Disclosures or make a custodial production of Mr. Janardhan's documents. Meta responded that the FTC had long known about Mr. Janardhan's new role, that Mr. Janardhan was not one of the agreed custodians that the parties negotiated over for months, and that moving the deposition at the last minute would unnecessarily burden the witness and was unwarranted. Meta also

explained that it had already produced over 8,000 documents referencing Mr. Janardhan, as well as the custodial files of his two predecessors (to whom Mr. Janardhan reported).  *See* Ex. 16, Email from A. Paul to N. Mugure (Apr. 12, 2023).  Meta asked the FTC to reconsider its request while also agreeing to the FTC's request to jointly call the Court.  *See id.*  The FTC dropped its request to call the Court and proceeded to depose Mr. Janardhan on the scheduled date.

The FTC deposed Mr. Janardhan for less than four of its allotted seven hours and introduced only four documents other than Mr. Janardhan's bio.  At the end of the deposition, FTC counsel "note[d] for the record . . . an ongoing dispute with Meta regarding the completeness of its documents production related to Mr. Janardhan" and stated that the FTC "may need to call this witness at a later time to complete this deposition in light of those disputes."  Janardhan Tr. at 184:3-12.  Meta's counsel objected to the FTC's attempt to hold the deposition open and asked FTC counsel "to state for the record, if you can, if there are any specific categories or topics of information that you had hoped to address that Mr. Janardhan was unable to answer today."  *Id.* at 184:13-21.  FTC counsel replied that "your objection is noted for the record and we can discuss it at a later date."  *Id.* at 184:22-23.

On April 28, 2023, Meta supplemented its Initial Disclosures.  Among other things, Meta modified the "subject" of Mr. Janardhan's testimony from "Meta infrastructure" to "Instagram and WhatsApp acquisition procompetitive benefits, efficiencies, innovation, and improvements; Meta infrastructure."  The FTC's latest demand claims that this modification has "suddenly expanded the subjects of information Mr. Janardhan may possess beyond 'Meta Infrastructure' to include 'Instagram and WhatsApp acquisition procompetitive benefits, efficiencies, innovation, and improvements.'"  This pretextual claim fails for several reasons.

*First*, the modified description does not expand the subjects about which Mr. Janardhan may testify.  To the contrary, the added language merely describes a subset of the broad "Meta infrastructure" topic.  As the FTC is well aware, Meta's infrastructure is relevant to the litigation because of Meta's contention that migrating Instagram and WhatsApp to Meta's infrastructure resulted in significant procompetitive benefits, efficiencies, innovation, and improvements.  The FTC does not and cannot suggest otherwise.

The FTC's claim that, "[w]ithout notice, the FTC did not have reason to prepare an examination around these just-identified topics, and lacked the documents to do so in any event," does not pass the straight-face test.  Prior to the deposition, the FTC had extensive information regarding Mr. Janardhan's role in Meta since he joined the company in 2009, including thousands of internal documents referring to Mr. Janardhan, several prior depositions (including of Mr. Mortenson, Mr. Parikh, and Mr. Gupta), numerous other Meta documents on these topics, and public documents.  In addition, contrary to its claim, the FTC spent the majority of the deposition asking about how Meta's infrastructure benefited Instagram and WhatsApp.  By way of a few examples, *see* Janardhan Tr. at 30:15-31:6 (asking about how Meta Production Engineering Team helps Instagram and WhatsApp develop new features); *id.* at 34:19-44:7 (asking numerous questions about the scale and other engineering and economic efficiencies that Meta's infrastructure provides to Instagram and WhatsApp, including as compared to third party cloud services); *id.* at 47:6-49:19 (asking questions about the cost savings and greater flexibility that Meta's infrastructure provides compared to third party cloud providers); *id.* at 53:3-62:8 (asking numerous questions about Instagram infrastructure and performance before and after the acquisition and Instagration generally); *id.* at 63:4-19 (asking about Instagram's use of Meta's CDN); *id.* at 63:20-79:25 (asking numerous questions about Instagram's performance on Meta's

infrastructure before and after the acquisition); *id.* at 80:6-87:19 (asking numerous questions of the benefits for Instagram of using Meta infrastructure instead of AWS); *id.* at 88:4-98:20 (asking numerous questions about WhatsApp infrastructure and performance before and after the acquisition and integration of WhatsApp generally); *id.* at 99:6-101:12 (asking about benefits of Meta infra with respect to reliability and redundancy compared to AWS).

*Second*, with respect to the issue of how Meta's infrastructure has been used to benefit Instagram and WhatsApp, the FTC does not even attempt to show how Mr. Janardhan's custodial documents are likely to be non-duplicative of the large production Meta has already made on this topic, which is still ongoing. In the context of producing documents related to these benefits, including the custodial documents of both of Mr. Janardhan's predecessors—for whom he has worked for most of his tenure at the company—Meta produced more than 8,000 documents referencing Mr. Janardhan. The FTC used a tiny number of these at the deposition and failed to identify any subjects Mr. Janardhan was unable to address. The FTC's latest arguments likewise fail to identify any specific topics that it believes will be contained in Mr. Janardhan's custodial documents and that are not redundant of the vast amount of information that Meta has already produced.

*Third*, in addition to being unwarranted, the FTC's request is untimely. The FTC has continually changed its explanation for why it seeks access to Mr. Janardhan's custodial documents in order to cover for its own failure to request this information on a timely basis long ago in fact discovery. The parties agreed on document custodians more than a year ago, the FTC has had ample opportunities to seek this information sooner, and it is far too late to subject Meta to the burdens of an entirely new custodial search now, three weeks prior to the close of fact discovery.

*Finally*, the FTC's attempt to exclude Mr. Janardhan as a trial witness is baseless.  As described above, Meta disclosed Mr. Janardhan near in time to Mr. Mortenson's departure from Meta; it had no duty to disclose Mr. Janardhan at the start of discovery because it had not yet determined that he had "discoverable information" that Meta "may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i); *see also Edmondson v. Brennan & Clark, Ltd., LLC*, 2019 WL 1375780, at *1 (N.D. Ind. Mar. 26, 2019) ("Rule 26(a) requires disclosure of information 'reasonably available' at the time; Defendants do not need to identify every individual at the start of discovery.").  Further, Rule 26(e) did not require Meta to formally supplement its disclosures to identify Mr. Janardhan, because his identity and position were "made known to" the FTC with at least more than four months left in "the discovery process." Fed. R. Civ. P. 26(e)(1)(A); *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 192 (D.D.C. 2017) (no rule 26(e) violation where party was "'on notice' that [the witnesses at issue] could have potentially relevant and discoverable information"); Tr. of N. Gupta  at 157:19-158:13 (Jan. 9, 2023) (identifying an action taken by the "[h]ead of infrastructure for Meta, Santosh"); *see also id.* at 54:2-55:22 (in response to question about 2017 document, identifying Mr. Janardhan as having been "some part of infrastructure").  Indeed, the FTC does not claim Meta's disclosure was untimely, and for the same reasons, there is no serious argument that Meta lacked a "substantial justification" for the timing of Mr. Janardhan's disclosure.  *See* Fed. R. Civ. P. 37(c)(1).  Nor can the FTC claim prejudice.  Again, the FTC elicited testimony identifying Mr. Janardhan and his position more than four months before the end of discovery; Meta amended its initial disclosures with nearly three months left, in which it identified him as having potentially relevant information about the same subject matter as Mr. Mortenson.  Any prejudice the FTC suffered because it declined to investigate Mr. Janardhan's

knowledge until shortly before his deposition is of its own making.  *See* Fed. R. Civ. P. 37,

advisory committee's note to 1993 amendment (untimely disclosure harmless where there is an

"inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness

known to all parties").

**5.**    **The FTC's Unjustified Demand for Privilege Re-Review**

The Court should reject the FTC's demand that Meta re-review its entire litigation

privilege log ("Litigation Log") of approximately 98,000 entries.  The Litigation Log provides,

document-by-document, among other information, participant information where available

(author, recipients, cc, bcc, all participants, relevant attorney, and custodians), the document's

date, the document's subject matter (through email subject and file name fields), the type of

privilege asserted, and a description of the basis for the privilege claim.  This is far more than

Rule 26 requires for high-volume document productions.  *See* Fed. R. Civ. P. 26(b)(5) advisory

committee's note to 1993 amendment (explaining that "[d]etails concerning time, persons,

general subject matter, etc., . . . may be unduly burdensome when voluminous documents are

claimed to be privileged").

On March 29, pursuant to this Court's order, the FTC provided Meta with "1000 items on

the log for Meta to review within two weeks of receipt."  Min. Order (Mar. 27, 2023).  On April

12, Meta timely finished reviewing those entries and provided the FTC with the following

results.  Of the 1,000 documents selected by the FTC, Meta determined that 159 documents

(15.9%) were not privileged.  Meta also modified its privilege determinations (1) for 22

documents withheld in full that Meta determined could be provided in redacted form (2.2%), and

(2) for seven redacted documents that could be provided with narrower redactions (0.7%).  Meta

produced these downgraded and modified documents to the FTC on April 17.

- 62 -

1.       Meta's determination that 15.9% of the documents in the FTC-selected sample were not privileged does not warrant re-review of Meta's entire Litigation Log.  Courts routinely decline to order re-review when downgrade rates are under 25% and only after consideration of the "totality of the circumstances."  *See*, *e.g.*, *Shapiro v. Dep't of Just.*, 2020 WL 3615511, at *41 (D.D.C. July 2, 2020) (declining to order re-processing for *Vaughn* index that had a downgrade rate of 16%, because this was "less than 25%"), *aff'd in part*, 40 F.4th 609 (D.C. Cir.), *cert. denied*, 143 S. Ct. 526 (2022); *see also id.* at *14 ("[T]he Circuit suggested that . . . an error rate of just over 30%[] may be unacceptably high with or without . . . intransigence, but ultimately left that question to the district court.") (citing *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1154 (D.C. Cir. 1991)); *Meeropol v. Meese*, 790 F.2d 942, 952, 960 (D.C. Cir. 1986) (considering "error rate," as well as a party's "intransigence").  The FTC does not explain how it calculated an overall "reversal rate" of "approximately 18%," which may incorrectly include some or all of the documents for which Meta modified a document's redactions but did not reverse its determination that the document contained privileged material.  Regardless, even the FTC's inaccurate 18% "reversal" calculation does not justify a re-review of Meta's entire Litigation Log.

Nor is the FTC's inaccurate and unexplained extrapolation that there must be about "17,000" "improperly withheld" documents on the Litigation Log a reason to require re-review. To the contrary, a re-review for that quantity of documents—about 0.3% of the approximately 5.4 million documents that Meta already produced—would be unreasonable and disproportionate to the needs of the case.  *See Shapiro*, 2020 WL 3615511, at *41 (considering the "diligent processing of hundreds of thousands of pages" in declining to order re-review).  That is especially the case because the FTC seeks re-review of Meta's entire Litigation Log with three

weeks of fact discovery left, regardless of the documents' importance or relevance.  The documents the FTC seeks are in all likelihood either cumulative of the mountains of information the FTC already has or immaterial to any issue in this case.  Indeed, (a) one of the "downgrades" in the sample was a document that the FTC in effect already had; Meta removed a stray redaction of a blank space, the only redaction in the document; (b) the downgrades that the FTC claims had "highly salient" information about "WhatsApp revenue projections" are two near-duplicates of documents that Meta previously produced.

  **2.** Effectively recognizing that a complete re-review of the Litigation Log is not warranted, the FTC pivots to seek in the alternative a re-review of three specific categories of entries that it identified from the sample:  entries (a) "including third parties"; (b) "lacking author information"; or (c) "lacking an attorney that do not describe the 'child' of another document."

  The Court should reject the FTC's request for re-review of these categories for at least four distinct reasons:

  *First*, the FTC forfeited re-review of specific categories of entries a month ago when it elected one of the two options that the Court offered.  Instead of agreeing to Meta's proposal that the FTC should identify specific entries, or specific categories of entries, for Meta to reconsider, it chose to require Meta to review a sample in the hope that it would yield a downgrade rate to justify a re-review of the entire Litigation Log.  *See* Min. Order (Mar. 27, 2023) ("[T]he FTC shall identify specific items on the Meta litigation log *or* randomly generate 1000 items on the log for Meta to review within two weeks of receipt.") (emphasis added); Hr'g Tr. at 13:20-15:6 (Mar. 27, 2023) (The Court:  "You can either, following [Meta counsel's] proposal, which is to point to specific items that you think are problematic, or you can give him 1,000 randomly generated ones, which is essentially 1 percent of what we got.").  Having seen that Meta's

downgrade rate is under 16%, the FTC should not be permitted to change courses and seek a narrower—albeit burdensome and unjustified—review of specific categories.

*Second*, the FTC's categories include overlapping entries, and the FTC's category-based arguments thus double count downgraded sample documents to create the appearance of downgrade rates above 25%.  Based on Meta's best approximation of the entries the FTC intended to include in its categories, with the exception of the "third-party" category for which the FTC did not identify any entries, there are 646 documents "of concern" to the FTC in the sample.  Of those, Meta determined that 132 (20.4%) are not privileged.  The downgrade rate for these documents—even including documents that Meta determined could be provided with redactions or narrower redactions, as the FTC appears to do—remains below 25%.

*Third*, the FTC's categories are necessarily based on sample sizes of less than 1,000 documents (a fact the FTC does not dispute).  Results based on these categories of only a subset of sample documents are thus both more uncertain as a statistical matter and below the minimum 1000-document sample size that the Court required as a matter of fairness.  *See* Hr'g Tr. at 15:6-7 (Mar. 27, 2023) (The Court: "A thousand is not nothing.").

*Fourth*, the FTC-identified categories do not warrant re-review for the following category-specific reasons as well.

a.      The FTC does not attempt to calculate a downgrade rate for Litigation Log "entries including third parties," and there is nothing about this category that is inherently incorrect.  *See, e.g.*, *FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) ("[W]e can imagine no useful purpose in having a court review the business judgment of each corporate official who deemed it necessary or desirable for a particular . . . contractor to have access to a

corporate secret."). The FTC's stated "belief" that this category warrants re-review is no basis to require it.

      **b.**     The FTC's demand for re-review of entries "lacking author information" also is unwarranted. The FTC has never explained to Meta how it calculated a "reversal rate" for this category. Based on Meta's best approximation of what sample entries the FTC appears to be including, the entries in this category are the types of documents that appropriately would not include an individual author, such as collaborative files with attorneys (*e.g.*, Google documents with multiple editors shown in the Litigation Log's All Participants field), chats among multiple participants where there is no single author, and image files (*e.g.*, .gif, .png, and .jpeg) embedded in, or documents attached to, privileged parent documents with entries containing information about the individuals involved. Based on Meta's best approximation of the entries the FTC included in this "author" category, there are 205 such sample entries, and Meta determined that 37 of them are not privileged (about 18%). Even the FTC's calculation of a "reversal rate of at least 19%"—which appears incorrect—is below the threshold where courts have required re-review.

      **c.**     The FTC's final category of "non-child entries asserting attorney-client privilege but lacking an attorney" likewise does not merit re-review. The FTC includes in this category entries (1) "asserting attorney-client privilege that are not identified as children of other files" and that do not include "an attorney in the 'Author,' 'Recipient,' 'CC,' and 'BCC' fields," and (2) "asserting attorney-client privilege that are not identified as children of other files" that do not include "an attorney in the 'All participants' field." All of the entries in these subcategories have the Litigation Log's "Relevant Attorney" field populated and thus are not entries that "lack an attorney," the category the FTC attempts to quantify.

Regardless, the FTC's slicing and dicing of sample entries into two sub-categories—to create perceived "reversal rates" above 25%—is misleading because the entries in those subcategories overlap substantially and the FTC is thus double counting. That is apparent from the FTC's claims that there are 118 "reversals" in its first subcategory and 131 "reversals" in its second subcategory, for a total of 249 entries, which is more than the 188 documents that Meta downgraded or modified in the sample in total. In actuality, both categories combined contain 514 entries, and Meta determined that of those, 109 (21.2%) are not privileged.

**3.** The FTC's atmospheric arguments about Meta's privilege logs generally are inaccurate and incorrect. The FTC rehashes its arguments that Meta delayed providing the Litigation Log, and those are misleading for the reasons Meta previously explained. *See* ECF No. 257, at 33 (explaining that Meta "informed the FTC that it planned to provide the updated privilege log" in March, and the FTC did not object). The FTC likewise continues to complain about the Investigation Log, created before this litigation commenced and under a different process. Even if the Court accepts the FTC's incomplete and misleading statistics about the Investigation Log and the Litigation Log, it is apparent that the sample results for the Litigation Log as described by the FTC are drastically different than the Investigation Log statistics that the FTC asserts. The FTC has thus, by its own calculations, proven that it is not appropriate to draw inferences about the Litigation Log from the Investigation Log. And it is true that Meta endeavored in good faith to update and correct its Litigation Log between January and March (as the Court would expect Meta to do), and this resulted in a more accurate privilege log. That is a reason to decline to order re-review, not grant it. *See Meeropol*, 790 F.2d at 952-53 (explaining that "producing records when error was discovered" was "cooperation," not "bad faith").

The Court should reject the FTC's insistence that Meta re-review its Litigation Log. Meta's review of the sample confirmed that, while not perfect, its Litigation Log is well within the range of what is to be expected in a production of this size comprising multiple millions of complex documents over the course of more than a decade, with a downgrade rate that falls well below the threshold that courts have used to justify the kind of wholesale re-review that the FTC has demanded.

**C.      Meta's Position on Nonparty Discovery**

**1.      Meta's Position on Out of Time Nonparty Depositions**

████████████████████████████████████████████████████████████████

███████████████████████████████████

  Meta noticed ████████████ deposition on February 15, 2023, and made clear it was willing to work with ████████████ counsel to accommodate ████████████ schedule.  While Meta would have preferred an earlier date, the FTC had attempted to push back the deposition as late as possible in the discovery period, noticing its own deposition of ████████████ for May 16, after it could conduct virtually all of its depositions of Meta employees.  ████████████ counsel indicated that ████████████ was strictly unavailable prior to May due to his personal circumstances.  To accommodate both the nonparty and the FTC, and to avoid ████████████ having to sit for two distinct depositions, Meta agreed to a deposition date of May 12, 2023.   On April 26, 2023, ████████████ told Meta and the FTC that he could no longer sit for his deposition on May 12 and would only become available on May 26, four days after the close of fact discovery.  On the same day, TikTok's counsel—who is also ████████████ counsel—told Meta and the FTC another TikTok witness, ████████████, could no longer sit for his deposition on May 22 and would have to sit on May 23 instead.  The FTC indicated that it would move to take an out-of-time deposition of ████████████  To accommodate the nonparties, and to avoid burdening the Court with needless disputes, that same day Meta told the FTC that it would consent to the FTC's motion to depose ████████████, as well as a witness from Snap, after the May 22 discovery cut-off.

  The FTC, however, refuses to consent to Meta's motion to depose ████████████ on May 26.  The FTC's refusal to accommodate a nonparty's personal circumstances is unjustified.  It would deprive Meta of important evidence regarding the competition between TikTok and Meta, which undermines the FTC's market definition.  The FTC's refusal is also inconsistent with the

FTC's own anticipated motion to the Court to take two nonparty depositions after the close of

fact discovery that the FTC apparently believes will yield helpful evidence to the FTC—as well

as the FTC's prior communications to TikTok that nonparty depositions occurring after the close

of fact discovery would be "inevitable."  The FTC sought to take those depositions after the

close of fact discovery to accommodate personal circumstances of those two witnesses (just as

Meta seeks to do for one witness), and all three depositions would occur just days after the close

of fact discovery.  Meta has consented to the FTC's request; there is no reasonable justification

for the FTC not to do the same.  If the Court denies Meta's motion to conduct this deposition on

May 26, then Meta asks the Court to (1) order that no depositions can occur after May 22 –

including the two depositions the FTC requests occur after May 22, and (2) order ████████████

to sit for a deposition any day on or before May 22.

      The FTC opposes Meta's request to depose ████████████ on the grounds that the

Scheduling Order provides that extensions must be granted through a motion rather than through

stipulation.  *See* Joint Scheduling Order ¶ 7 (Mar. 3, 2022).  But Meta does not seek to extend

any deposition pursuant to stipulation; it hereby moves for relief from the Court in this Joint

Status Report, as the parties routinely do in joint status reports.  *See* Status Conf. Tr. 29:8-13

(Feb. 9, 2023) (expressing desire for parties "to just tee up the disputes" in status reports).

### 2.      Meta's Position on Nonparty Productions

      Certain nonparties have yet to complete their data productions in response to Meta's data

requests.  Meta is currently working with the nonparties, including those listed below, to ensure

their timely and adequate responses.  Meta requests that the Court set a hearing date to address

any disputes with any nonparty that may arise regarding Meta's discovery requests for May 17,

2023, with simultaneous three-page letter briefing due on May 15 from Meta and each nonparty

stating their positions.  Meta hopes that it will not have any disputes requiring resolution from

the Court by the hearing date, in which case Meta will inform the Court and the Court can cancel the scheduled hearing.

The status of outstanding data discovery with certain nonparties is summarized below.

### a.      TikTok

Meta has requested that TikTok produce, or confirm in writing that it does not possess, data including, but not limited to, the following categories:  (1) daily active users ("DAUs") broken down by age, gender, and surface, on a daily basis, for three periods of time and geographic locations; (2) time spent data broken down by age, gender, and surface, on a daily basis, for the same three periods and geographic locations; (3) certain user time spent and engagement data TikTok already produced, refreshed to the present day; and (4) certain data relating to TikTok's messaging and Stories functionalities.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including TikTok.  Meta expects the data to show that users use a broad range of services to connect with their friends and family, and more generally, that users have access to a similar set of features and use cases on TikTok as they do on Meta's products.

### b.      Alphabet (YouTube)

Meta has requested that Alphabet produce, or confirm in writing that it does not possess, data for YouTube including, but not limited to, the following categories:  (1) total DAUs and Monthly Active Users ("MAUs") for each country, on a monthly basis, pre-dating January 2018; (2) DAUs broken down by age, gender, country, and surface, on an hourly and daily basis, for September 27, 2021 to October 18, 2021; (3) time spent data broken down by age, gender, type of activity, country, and surface, on weekly, monthly, and yearly basis, before January 2019; (4)

certain types of engagement data for January 2010 to present day; and (5) certain data relating to amount of advertising on YouTube for January 2010 to December 2019.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including YouTube.  Of greatest concern, while Alphabet has produced DAU, MAU, and time spent data for YouTube from 2018 onwards, it has provided no such data for the years prior.  This is despite the fact YouTube launched in 2005 and the FTC alleges Meta has had a monopoly in the alleged PSNS market since 2011 and Meta's acquisitions of Instagram and WhatsApp occurred in 2012 and 2014, respectively.  Meta expects the data to show users have access to a similar set of features and use cases on YouTube as they do on Meta's products.

### c.       Twitter

Meta has requested that Twitter produce, or confirm in writing that it does not possess, data for Twitter including, but not limited to, the following categories:  (1) data showing active user counts before May 2015; (2) time spent data before September 2016; (3) total DAUs in the United States broken down by age or gender; (4) time spent data in the United States broken down by age or gender; (5) time spent data on an hourly basis; and (6) certain data relating to the amount of advertising and non-advertising impressions on Twitter prior to July 2020.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including Twitter.  Meta expects the data to show that users substitute between Twitter and Meta's products in response to changes on any of the products.

### 3.       Meta's Position on Foreign Nonparty Discovery

Last year, the parties filed, and the Court granted, a joint motion for the issuance of a letter of request for International Judicial Assistance under the Hague Convention on Taking of

Evidence Abroad in Civil or Commercial Matters to a nonparty located in the Republic of Korea, Kakao Corporation.  *See* ECF Nos. 214, 215.  After submitting the signed order to the appropriate foreign authorities, the parties have yet to receive a response.  The parties respectfully request that the Court order that if the parties receive a response from Kakao after the May 22 deadline, they are not precluded from using that discovery.

Dated: May 2, 2023

Respectfully submitted,

*/s/ Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Kenneth M. Fetterman (D.C. Bar No. 474220)
Daniel V. Dorris (D.C. Bar No. 1012305)
Kevin D. Horvitz (D.C. Bar No. 1521032)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
kfetterman@kellogghansen.com
ddorris@kellogghansen.com
khorvitz@kellogghansen.com
apolavarapu@kellogghansen.com

James P. Rouhandeh (D.D.C. Bar No. NY0390)
Michael Scheinkman (D.D.C. Bar No. NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*

- 74 -

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*