## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

### JOINT STATUS REPORT

Pursuant to the Court's Minute Order of May 8, 2023, the parties submit the following revised version of the parties' May 1 Joint Status Report identifying any issues between the parties and summarizing the parties' respective positions.

In the week since filing the May 1 Joint Status Report, the parties have been able to resolve and narrow certain disputes. Specifically, the parties have resolved entirely disputes regarding the FTC's RFP Nos. 116, 117, and 124. Additionally, on May 8, the FTC produced documents in response to Meta's Second Set of Requests for Production of Documents, and Meta is reviewing that production. This dispute has been resolved for now.

A table of contents and then the parties' positions on the remaining disputes are included below. The exhibits referenced in this filing are those docketed with the original May 1 Joint Status Report filing at ECF No. 284 (ECF Nos. 284-1 through 284-38).

# TABLE OF CONTENTS

**Page**

I.    Re-Review of Meta's Litigation Privilege Log ........................................................ 1

    A.    The FTC's Position ................................................................................ 1

    B.    Meta's Position ..................................................................................... 4

II.    Mr. Santosh Janardhan ........................................................................................ 7

    A.    The FTC's Position ................................................................................ 7

    B.    Meta's Position ..................................................................................... 9

III.    FTC RFP No. 111 .............................................................................................. 12

    A.    Meta's Position ................................................................................... 12

    B.    The FTC's Position .............................................................................. 15

IV.    FTC RFP No. 112 .............................................................................................. 17

    A.    Meta's Position ................................................................................... 17

    B.    The FTC's Position .............................................................................. 19

V.    FTC RFP No. 125 .............................................................................................. 22

    A.    The FTC's Position .............................................................................. 22

    B.    Meta's Position ................................................................................... 23

VI.    FTC RFP No. 134 .............................................................................................. 24

    A.    Meta's Position ................................................................................... 24

    B.    The FTC's Position .............................................................................. 26

VII.    FTC RFP No. 135 .............................................................................................. 27

    A.    Meta's Position ................................................................................... 27

    B.    The FTC's Position .............................................................................. 29

VIII.    FTC Interrogatory Nos. 16-17 ........................................................................... 31

    A.    Meta's Position ................................................................................... 31

B.      The FTC's Position ................................................................................. 33

IX.     FTC Interrogatory No. 21 ......................................................................... 35

        A.      Meta's Position ........................................................................... 35

        B.      The FTC's Position ..................................................................... 37

X.      FTC Interrogatory No. 22 ......................................................................... 39

        A.      Meta's Position ........................................................................... 39

        B.      The FTC's Position ..................................................................... 40

XI.     FTC Interrogatory No. 23 ......................................................................... 42

        A.      Meta's Position ........................................................................... 42

        B.      The FTC's Position ..................................................................... 45

XII.    The FTC's Data Rule 30(b)(6) Deposition Notice ................................... 48

        A.      Meta's Position ........................................................................... 48

        B.      The FTC's Position ..................................................................... 51

XIII.   Meta's Third Set of Interrogatories ......................................................... 54

XIV.    Meta's Statement Regarding Non-Party Productions ............................... 55

        A.      TikTok .......................................................................................... 55

        B.      Alphabet (YouTube) .................................................................. 56

        C.      Twitter ......................................................................................... 56

XV.     Nonparty Foreign Discovery ................................................................... 58

## I.       Re-Review of Meta's Litigation Privilege Log

### A.       The FTC's Position

This dispute concerns the currently operative version of Meta's Litigation Log, produced in March, which now contains approximately 96,000 entries.  By order of the Court, the FTC identified 1,000 Litigation Log entries at random (the "Sample").  Based on the results of Meta's re-review and Meta's pattern of delay and reversals, the FTC respectfully requests that the Court order Meta to re-review, by a date certain, portions of its Litigation Log.  Though the FTC had initially requested a complete re-review of Meta's Litigation Log, *see* May 1 Joint Status Report, ECF No. 284 at 2-7, to narrow the issues before the Court the FTC now seeks only a re-review of specific categories from the Litigation Log: (a) entries lacking an attorney that are not the "child" of another document,[1] (b) entries lacking author information, and (c) entries including third parties.

*First*, re-review of these three categories is warranted because of the worryingly high reversal rate.  In the Sample, the FTC calculates a reversal rate between 29% and 31% for category (a)—non-child entries asserting attorney-client privilege but lacking an attorney ("no attorney" entries)—and a reversal rate of at least 19% for category (b)—entries lacking author information ("no author" entries).  Taken together, these two categories yield a reversal rate of approximately 24.5% in the Sample.  Courts have found that an error rate of 25% is "unacceptably high." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 48 F. Supp. 3d 40, 52 (D.D.C. 2014)

---

[1]       The FTC is referring to entries lacking an attorney that are not the "children" of a parent document (i.e., the FTC attempted to exclude attachments to emails).  The Sample included 386 communications asserting attorney-client privilege that are not identified as children of other files and fail to identify an attorney in the "Author," "Recipient," "CC," and "BCC" fields.  Meta's reversal rate in this category exceeded 30%.  (118 of 386).  The Sample included 457 communications asserting attorney-client privilege that are not identified as children of other files and fail to identify an attorney in the "All participants" field.  Meta reversed 131 of the 457 sampled claims in this category (29%).  The latter set (457 entries) likely includes all or nearly all of the documents in the former set (386 entries).

(citing *Meeropol v. Meese,* 790 F.2d 942, 960 (D.C.Cir.1986)); *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1154 (D.C. Cir. 1991) (citing Meeropol's 25% error rate and noting that "if the error rate for the sample . . . should prove unacceptably high, the State Department must then reprocess all of the over 1,700 documents at issue . . . ."); *Clemente v. F.B.I.*, 854 F. Supp. 2d 49, 59 (D.D.C. 2012) (same).   Although Meta claims a "relevant attorney" is connected to each withheld document, the FTC is left wondering what makes this attorney so relevant to the withheld communication when they are not in any noticeable way associated with the document itself.

Category (c), third parties, is inherently suspect both as a category (i.e., most third parties waive privilege) and because Meta has a history of over-withholding documents shared with third parties.  For this category, the FTC cannot provide a complete assessment because the FTC cannot identify all third parties included on Meta's Litigation Log.  Meta declined to provide a single comprehensive appendix identifying all included third parties, and so the FTC has been left to work through a patchwork of sources to identify third parties.  Nevertheless, the FTC has identified many third parties on Meta's Litigation Log and continues to believe this category merits re-review.  Meta has a history of over-asserting privilege claims involving third parties: an estimated 75% of these claims were reversed in the samples from Meta's Investigation Log.  And this prior reversal rate remains relevant because the FTC can identify a number of the same third parties on Meta's Litigation Log.  Privilege entries containing third parties are especially concerning given that "voluntary disclosure to a third party waives the [attorney-client] privilege."  *Niskanen Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 13 (D.D.C. 2018).

*Second*, Meta's pattern of spurious privilege assertions and subsequent reversals supports the FTC's claim for re-review.  Though this dispute concerns Meta's March revision to the Litigation Log, it must be understood in the context of Meta's *already substantial* downgrades.

Since first producing its Litigation Log late in January, Meta has downgraded more than 14,000 entries.  Now, a Sampled re-review of Meta's revised March Litigation Log suggests many thousands more non-privileged documents remain improperly withheld.  As highlighted in the prior joint status report, a court has already found Meta employees were instructed to "privilege" files to shield sensitive discussions from discovery.  ECF No. 258 at 13-15.  The FTC is not aware of any evidence to suggest that this practice was limited in scope such that it would not apply to this case.  Further, the FTC identified similar examples of Meta's practice of over-designating sensitive discussions in this case.  *See* ECF No. 257 at 13-14 (Mar. 16 Joint Status Report).  Given that Meta has withheld entirely about 78% of entries on the Litigation Log, the FTC continues to believe parts of or entire privileged documents remain on the log, and that these claims will not stand up to re-review.

The FTC therefore requests the Court order Meta to re-review all Litigation Log entries in the three categories identified above by a date certain.  In the alternative, the FTC respectfully requests that the Court at least instruct Meta to re-review entries asserting attorney-client privilege over non-child documents that lack an attorney, as this category contains the highest reversal rates: between 29% and 31%.  *See supra* n.1.  As noted above, such reversal rates are "unacceptably high" and should be addressed.  *Citizens for Resp. & Ethics*, 48 F. Supp. 3d 40, 52; *Bonner*, 928 F.2d 1148, 1154; *Clemente*, 854 F. Supp. 2d 49, 59.

B.    Meta's Position

The Court should reject the FTC's demand that Meta re-review any portion of its litigation privilege log ("Litigation Log").  The Court gave the FTC the option to either "identify specific items on the Meta litigation log _or_ randomly generate 1000 items on the log for Meta to review within two weeks of receipt."  Min. Order (Mar. 27, 2023) (emphasis added).  On March 29, the FTC elected to generate 1000 items on the log.  On April 12, Meta timely finished its review of that sample from the entire Log and provided the results to the FTC.  Of the 1,000 documents selected, Meta determined that 159 documents (15.9%) were not privileged.  Meta also modified a small number of redactions (2.9%).  Meta produced these documents to the FTC on April 17.  After seeing these results, the FTC has now abandoned its demand that Meta re-review the entire Litigation Log and now, instead, seeks re-review of three categories of entries.  The FTC's demand is unwarranted.

1.    The FTC forfeited re-review of specific categories of entries over a month ago.  Rather than accepting Meta's proposal in March that the FTC would identify specific categories of entries for Meta to reconsider when there was still time in fact discovery left, the FTC chose to require Meta to review a random sample of the entire Log with the hope that it would yield a downgrade rate to justify re-review of the whole thing.  Having conceded that Meta's overall downgrade rate of under 16% does not justify re-review of the entire Log, the FTC should not be permitted to change course at the last minute and seek a narrower—albeit burdensome, untimely, and unjustified—review of a subset.

2.    The FTC's three categories each rely on sample sizes below the 1,000 entries that the Court ordered, which is unfair and creates uncertainty in the reliability of the sample.  *See* Hr'g Tr. at 15:6-7 (Mar. 27, 2023) (The Court: "A thousand is not nothing.").  The categories also include overlapping entries and thus double count downgraded sample documents to create

the appearance of downgrade rates above 25%.  Meta estimates that there are 646 entries out of

the 1,000 entry-sample that the FTC identified for its categories.  Of those, Meta determined that

132 (20.4%) are not privileged.  Even after including documents in which Meta has only

modified the redactions, the downgrade rate for the documents in the FTC's specific categories

remains below 25%.  *See Shapiro v. Dep't of Just.*, 2020 WL 3615511, at *41 (D.D.C. July 2,

2020) (declining to order re-review for downgrade rate "less than 25%").

      **3.**        The FTC's categories do not warrant re-review for category-specific reasons.

      **a.**        The FTC does not attempt to calculate a downgrade rate for Litigation Log

"entries including third parties," and there is nothing inherently incorrect about this category.

*See, e.g.*, *FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (explaining that

privileged communications involving third-party contractors may be privileged).  The FTC's

mere "belief" that this category warrants re-review is no basis to require it.

      **b.**        The FTC's demand for re-review of entries "lacking author information" also is

unwarranted.  Based on Meta's best approximation of the entries the FTC appears to be

including, this category encompasses documents that appropriately do not include an individual

author, such as collaborative files with attorneys (*e.g.*, collaborative Google documents with

multiple authors shown in other Log fields).  Based on Meta's best approximation of the entries

the FTC included in this category, there are 205 such sample entries, and Meta determined that

37 of them are not privileged (about 18%).  Even accepting the FTC's proffered "reversal rate of

at least 19%," the rate falls well below the threshold for re-review.

      **c.**        The FTC's final category of "non-child entries asserting attorney-client privilege

but lacking an attorney" also does not merit re-review.  The FTC includes in this category entries

that (1) do not include "an attorney in the 'Author,' 'Recipient,' 'CC,' and 'BCC' fields," or (2)

do not include "an attorney in the 'All participants' field."  But all of these entries have the Litigation Log's "Relevant Attorney" field populated, so none of them in fact "lack an attorney." Regardless, the downgrade rate for this category does not warrant re-review.  There are 514 such sample entries, and Meta determined that of those, 109 (21.2%) are not privileged, which is, again, under the 25% threshold.

    **4.**    The "totality of the circumstances" also favor declining re-review.  *See Shapiro*, 2020 WL 3615511, at *41.  Meta has produced approximately 5.4 million documents to the FTC, and the additional material the FTC seeks is in all likelihood cumulative or immaterial.  *See id.* (declining re-review in part because of "diligent processing of hundreds of thousands of pages"). Moreover, Meta has endeavored in good faith to update and correct its Litigation Log as needed over the course of discovery (as the Court would expect Meta to do), and this has resulted in a more accurate privilege log.  *See Meeropol v. Meese*, 790 F.2d 942, 952-53 (D.C. Cir. 1986) (explaining that "producing records when error was discovered" was "cooperation," not "bad faith").  The FTC's atmospheric arguments about Meta's privilege logs and supposed delays are unfair and incorrect.  *See, e.g.*, ECF No. 257, at 33 (explaining that Meta "informed the FTC that it planned to provide the updated privilege log" in March, and the FTC did not object).  The Court should reject the FTC's insistence that Meta re-review the specified categories of entries on its Litigation Log – an assignment that would require the review of more than 50,000 documents in the final weeks of discovery.  Meta's review of the sample confirmed that, while not perfect, its Litigation Log (and even the FTC's contrived categories) are well within the range of what is to be expected in a production of this size comprising multiple millions of complex documents over the course of more than a decade.

II.    **Mr. Santosh Janardhan**

A.      The FTC's Position

The FTC respectfully requests that the Court instruct that Meta shall not call as a trial witness Mr. Santosh Janardhan, or in the alternative instruct Meta to promptly collect and produce responsive documents from Mr. Janardhan's files, using the parties' full set of agreed-upon search terms.

Mr. Janardhan has been a Meta employee since 2009.  Mr. Janardhan was not identified by either the FTC or Meta in the parties' February 22, 2022 Initial Disclosures.  As Mr. Janardhan was not identified in Meta's Initial Disclosures, the FTC did not request him as a document custodian (and Meta did not offer him).  In June 2022 – prior to Meta's document collection in this matter – Mr. Janardhan was named Meta's Head of Global Infrastructure, Co-Head Engineering.  Meta did not supplement its initial disclosures to add Mr. Janardhan at that time, nor did Meta identify Mr. Janardhan in Supplemental Initial Disclosures Meta provided on December 12, 2022 and again on February 2, 2023.

Meta identified Mr. Janardhan for the first time as an individual Meta intends use to support its claims or defenses on February 28, 2023, more than a year after the Court's deadline for initial disclosures, and at least 8 months after Mr. Janardhan was promoted to his current role.  *See* Scheduling Order ¶ 2.  Meta indicated on February 28 that Mr. Janardhan possessed information regarding "Meta Infrastructure."  The FTC promptly noticed a deposition of Mr. Janardhan and began to review Meta's document production to prepare.  Based on an extensive review of documents, the FTC determined that Meta's production appeared materially incomplete.  The FTC asked Meta to delay Mr. Janardhan's deposition and produce documents responsive to the FTC's RFPs from Mr. Janardhan's files.  *See* Ex. B at 1-2 (4/13/2023 N. Mugure Email).  Meta refused to collect relevant documents, and also refused to delay the

7

deposition.  *See id* at 1 (4/13/2023 A. Paul Email).

At Mr. Janardhan's April 14 deposition, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████    The FTC was prejudiced in its ability to depose Mr. Janardhan by Meta's refusal to

conduct a reasonable search for responsive documents.

Then, on Friday, April 28, 2023 – two weeks after Mr. Janardhan's deposition, and less

than a month before the close of fact discovery – Meta again revised its Initial Disclosures.  Meta

has now suddenly expanded the subjects of information Mr. Janardhan may possess beyond

"Meta Infrastructure" to include "Instagram and WhatsApp acquisition procompetitive benefits,

efficiencies, innovation, and improvements."  *See* Ex. D at 10 (Meta's April 28, 2023

Supplemental Initial Disclosures).  Without notice, the FTC did not have reason to prepare an

examination around these just-identified topics and lacked the documents to do so in any event.

Due to Meta's belated and inexplicable revisions to its Initial Disclosures, Meta should be

precluded from calling Mr. Janardhan as a trial witness; in the alternative, the FTC requires a full

custodial production for Mr. Janardhan.

B.    Meta's Position

The FTC's request "that the Court instruct that Meta shall not call as a trial witness Mr.

Santosh Janardhan, or in the alternative instruct Meta to promptly collect and produce relevant

documents from Mr. Janardhan" is unwarranted and unreasonable.  Meta listed Mr. Janardhan on

its Initial Disclosures months ago; the FTC has access to thousands of documents relating to him;

and it deposed him on April 14, 2023.  The FTC's attempt to have Meta's current Head of

Infrastructure disqualified from testifying at trial is entirely inappropriate and so, too, is its

eleventh-hour demand for a full custodial production.  The Court should deny the FTC's request

for the following reasons:

*First*, Mr. Janardhan was named Meta's new Head of Infrastructure in June 2022, which

was widely publicized at the time, and discussed at one of the first depositions the FTC took in

this case (of Nitin Gupta) in January 2023.  Meta revised its Initial Disclosures to substitute Mr.

Janardhan for his predecessor as Head of Infrastructure, David Mortenson, on February 28, 2023,

indicating that he could address issues regarding "Meta infrastructure."  Once Meta determined

that Mr. Janardhan had "discoverable information" that Meta "may use to support its claims or

defenses," Meta promptly disclosed him.  Fed. R. Civ. P. 26(a)(1)(A)(i); *see also Edmondson v.*

*Brennan & Clark, Ltd., LLC*, 2019 WL 1375780, at *1 (N.D. Ind. Mar. 26, 2019) ("Rule 26(a)

requires disclosure of information 'reasonably available' at the time; Defendants do not need to

identify every individual at the start of discovery.").  Further, Rule 26(e) did not require Meta to

formally supplement its disclosures to identify Mr. Janardhan earlier, because his identity and

position were "made known to" the FTC with more than four months left in "the discovery

process."  Fed. R. Civ. P. 26(e)(1)(A); *United States ex rel. Landis v. Tailwind Sports Corp.*, 234

F. Supp. 3d 180, 192 (D.D.C. 2017) (no rule 26(e) violation where party was "'on notice' that

[the witnesses at issue] could have potentially relevant and discoverable information"); Tr. of N.

Gupta  at 157:19-158:13 (Jan. 9, 2023) (identifying an action taken by the "[h]ead of

infrastructure for Meta, Santosh [Janardhan]"); *see also id.* at 54:2-55:22 (in response to question

about 2017 document, identifying Mr. Janardhan as having been "some part of infrastructure").

Indeed, the FTC does not claim Meta's disclosure was untimely, and for the same reasons, there

is no serious argument that Meta lacked a "substantial justification" for disclosing him when it

did.  *See* Fed. R. Civ. P. 37(c)(1); *cf.* Fed. R. Civ. P. 37, advisory committee's note to 1993

amendment (untimely disclosure harmless where there is an "inadvertent omission from a Rule

26(a)(1)(A) disclosure of the name of a potential witness known to all parties").

*Second*, there is no merit to the FTC's claim that Meta's April 28, 2023, supplement to its

Initial Disclosures has "suddenly expanded the subjects of information Mr. Janardhan may

possess beyond 'Meta Infrastructure' to include 'Instagram and WhatsApp acquisition

procompetitive benefits, efficiencies, innovation, and improvements.'"  The modified description

does not expand the subjects about which Mr. Janardhan may testify.  To the contrary, the added

language merely describes a subset of the broad "Meta infrastructure" topic that is relevant to the

case.  As the FTC is well aware, Meta's infrastructure matters to this litigation because migrating

Instagram and WhatsApp to Meta's infrastructure resulted in significant procompetitive benefits,

efficiencies, innovation, and improvements.

The FTC's claim that, "[w]ithout notice, the FTC did not have reason to prepare an

examination around these just-identified topics, and lacked the documents to do so in any event,"

does not pass the straight-face test.  Prior to the deposition, the FTC had extensive information

regarding Mr. Janardhan's role in Meta since he joined the company in 2009, including more

than 8,000 internal documents referring to Mr. Janardhan, several prior depositions (including of

Mr. Mortenson, Jay Parikh (Meta's Head of Infrastructure prior to Mr. Mortenson), and Mr.

Gupta), numerous other Meta documents on these topics, and public documents. The FTC does not even attempt to show how Mr. Janardhan's custodial documents are likely to be non-duplicative of the large production Meta has already made on this topic, many of which Mr. Janardhan is on. Further, the FTC spent the majority of its deposition of Mr. Janardhan asking about how Meta's infrastructure benefited Instagram and WhatsApp, the very issues the FTC now claims to have just learned about in Meta's supplement to its Initial Disclosures. *See, e.g.*, Janardhan Tr. at 30:15-31:6, 34:19-44:7, 47:6-49:19, 53:3-62:8, 63:4-19, 63:20-79:25, 80:6-87:19, 88:4-98:20, 99:6-101:12. Meta's counsel objected to the FTC's attempt to hold the deposition open and asked FTC counsel "to state for the record, if you can, if there are any specific categories or topics of information that you had hoped to address that Mr. Janardhan was unable to answer today." *Id.* at 184:13-21. FTC counsel replied that "your objection is noted for the record and we can discuss it at a later date." *Id.* at 184:22-23. Tellingly, the FTC has made no attempt to identify any subjects on which it believes it was unable to conduct a complete examination of Mr. Janardhan.

*Finally*, the FTC's request is untimely. The FTC has continually changed its explanation for why it seeks access to Mr. Janardhan's custodial documents to cover for its own failure to request this information on a timely basis. The parties agreed on document custodians more than a year ago, the FTC has had ample opportunities to seek this information sooner, and it is far too late to subject Meta to the burdens of an entirely new custodial search now, two weeks prior to the close of fact discovery.

### III.   FTC RFP No. 111

A.   <u>Meta's Position</u>

This request seeks "All documents related to Meta's Cross Check program or any other Whitelisting Program . . . ."  Meta's Cross-Check program relates to Meta's content-moderation process.  The FTC has not specifically identified any other "whitelisting program" about which it seeks information.  Meta asks that the Court either quash this request or, in the alternative, adopt Meta's compromise proposal, which the FTC rejected without explanation.

**1.**   The Court should quash this request because it seeks irrelevant information and is disproportionate to the needs of the case.  The Cross-Check program has been a matter of public record and extensive news reporting for years.  If this were relevant or important to this litigation, the FTC would not have delayed until the closing months of fact discovery and its 111th request for production to seek documents on this topic.  The FTC has said that the information it seeks is relevant to assessing the integrity benefits that Meta delivered to WhatsApp and Instagram after acquiring them, but those substantial benefits do not turn on the minutiae of content-moderation decisions.

The FTC claims that it is seeking to understand the goals of the Cross-Check program and how Meta has tracked it over time.  But Meta's extensive public disclosures already answer those basic questions.  For example, one post on Meta's website explains that "Meta implemented the cross-check system to identify content that presents a greater risk of false positives and provide additional levels of review to mitigate that risk."  Meta, *Reviewing high-impact content accurately via our cross-check system* (Dec. 6, 2022), https://perma.cc/2H3X-82X9.  The same post also discusses how the Cross-Check program works today and how the program has changed over time, including by describing review criteria it currently uses and has used before.  Moreover, Meta has already produced documents regarding the Cross-Check

program, and the FTC has deposed Meta witnesses about it.  For all these reasons, the Court

should quash this RFP.

      **2.**      If the Court chooses not to quash this request altogether, it should at most

conform this request to Meta's compromise proposal.  During a meet-and-confer about this RFP,

the FTC stated it was interested in audits of Meta's Cross-Check program, and in particular, a

2019 audit.  In addition, the FTC identified a list of sixteen documents referenced in an

anonymous SEC whistleblower disclosure (Exhibit G) regarding Meta's Cross-Check program.

      After learning what the FTC actually wanted, Meta proposed to resolve this RFP by

providing a compromise proposal.  First, Meta offered to produce documents from the 2019 audit

that the FTC specifically identified.  Second, Meta offered to produce, out of the sixteen

documents listed by the FTC, seven that it was able to identify using the quoted material and

other information from the anonymous SEC whistleblower disclosure.  As for the remainder of

those documents, Meta offered to investigate further whether they were available, but it needed

more information from the FTC than what the anonymous whistleblower complaint provided.

Meta explained that because the document titles the FTC had provided (e.g., "Cross Check,"

"XCheck (Cross Check)") were so generic, Meta could not identify the particular documents at

issue.  For example, the generic title "XCheck (Cross Check)" appears in the SEC whistleblower

disclosure multiple times and is not associated with any particular quotation.  For another

example, the term "Cross Check" similarly appears multiple times in the whistleblower

disclosure (the subject matter of which is the Cross-Check program), and it is far from clear what

document the FTC is seeking based on the phrase "Cross Check" alone.  Meta accordingly asked

the FTC for more information, so that Meta could continue to investigate whether additional

documents were available.

But the FTC has refused to provide more detail about the SEC whistleblower disclosure documents that Meta offered to investigate.  The FTC instead would not engage further on the RFP, alluding vaguely to unspecified discussions that long predated the FTC's eleventh-hour proposal and Meta's response.  *See* Ex. 7, Email from N. Brenner to A. Polavarapu (May 1, 2023, 6:14 PM) ("The FTC disagrees, for reasons already explained during the various meet and confers we have had . . . .").

If the Court orders any production in response to this RFP (it should not), the Court should require the FTC to specify in detail which documents it is seeking.  Only two weeks remain in fact discovery.  The FTC's refusal to provide any greater specificity about the documents it seeks through this request has run out the clock.  Meta needs to know now which targeted sets of materials it will need to identify, review, and produce before fact discovery is over.

B.      The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

RFP No. 111.

RFP No. 111, served over two months ago on February 17, 2023, seeks documents

related to Meta's Cross Check program (also referred to as "Xcheck") or any other Whitelisting

Program.  *See* Ex. E at 2 (Eighth RFPs).  These programs allow content flagged as objectionable

by Meta's integrity systems to remain available to users (for example, because the poster is a

celebrity or a prominent public figure).  These programs are highly relevant to the Meta's claim

that Instagram's and WhatsApp's access to Meta's integrity programs represent a procompetitive

benefit of the acquisitions.  ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Meta's XCheck, or other Whitelisting Programs, are relevant to how Meta has ████████████

████████████████  and the discovery the FTC seeks will reveal information relevant to the

benefits (if any) Meta's approach provides, and the harms inflicted by Meta's approach to such

integrity issues.

In an effort to avoid disputes, the FTC has narrowed the scope of this request

significantly and identified to Meta a discrete set of documents that the FTC would accept as a

complete response to this RFP.  The FTC requests: (1) a narrow set of 16 documents identified in

a 2021 SEC Whistleblower complaint related to Meta's Cross Check program; and (2) all audits

of Meta's Cross Check program or other Whitelisting program.  This is a reasonable and

narrowly targeted request.

First, the 16 documents identified in the SEC Whistleblower complaint are not

burdensome for Meta to locate: the documents appear to be quoted extensively on the face of the

Whistleblower complaint itself, which is publicly available (in redacted form) and was provided to Congress. *See, e.g.*, Ex. G at 6-7 (SEC Whistleblower complaint). Even assuming Meta has not already collected the documents in order to respond to the SEC Whistleblower complaint, or prepare for Congressional hearings, Meta should be able to locate the documents quite easily through text searches or otherwise. *See id.*

Second, with respect to the FTC's request for audits of the relevant programs: Meta has provided the FTC no reason to believe that audits of the relevant programs are numerous or difficult to locate. Meta offered to produce a single 2019 audit of the Cross Check program, but has provided the FTC with no information that suggests producing audits conducted in other years would be disproportionate or burdensome. The FTC does not know how many audits are at issue, because Meta elected to short-circuit negotiations and instead attempt to quash the RFP. Meta's request to quash should be denied, and the court should instruct Meta to produce the documents identified above in response to RFP No. 111.

IV.    **FTC RFP No. 112**

A.    <u>Meta's Position</u>

This request seeks "All documents related to Meta's Oversight Board," which, like RFP No. 111, concerns Meta's content moderation process.  Meta asks the Court to quash this request or to conform it to Meta's compromise proposal, which the FTC rejected out of hand and without explanation.

1.    The Court should quash this request because it seeks irrelevant and cumulative information.  The FTC claims that the information sought is relevant to assessing the integrity benefits that Meta delivered to WhatsApp and Instagram after acquiring them.  These substantial benefits have nothing to do with how content moderation decisions are appealed to the Oversight Board.  Documents related to the Oversight Board are also cumulative of information that the FTC has already obtained in discovery through Meta's extensive document productions and through depositions of Meta employees.  Moreover, there is extensive public information about the Oversight Board.  For example, one post details 32 separate recommendations of the Oversight Board regarding Meta's Cross-Check program, *see* Meta, Oversight Board Selects a PAO on Meta's Cross-Check Policies (Apr. 24, 2023), https://perma.cc/87KZ-AZ33, and the Board itself has published a 57-page advisory opinion detailing those recommendations, *see* Oversight Board, Public advisory opinion on Meta's cross-check program (Dec. 2022), https://perma.cc/6Y99-AMKT.  The Court accordingly should quash this request.

2.    In the alternative, the Court should conform the FTC's request to Meta's proposal.  After Meta asked the FTC for months for a proposal that was narrower than "All documents related to Meta's Oversight Board," the FTC finally explained that it seeks documents relating to Meta's Cross Check and other Whitelist programs that also relate to communications between Meta and the Oversight Board.  The FTC has not identified any programs, apart from Cross-

Check, in which it is interested.  Meta accordingly attempted to resolve this RFP in good faith by providing the FTC with information it had requested:  all documents that Meta produced to the Oversight Board in connection with the Board's Policy Advisory Opinion on the Cross-Check program.  The FTC refused that offer.

Given where the parties are in the discovery process and in light of the (at best) tangential relevance of any of this material, Meta's proposal is more than sufficient to provide the FTC with documents regarding the relationship between Meta and the Oversight Board as it relates to the Cross-Check program.  A requirement to search for, collect, review, and produce all Cross Check or any other unidentified whitelisting program documents that "relate to" communications between Meta and the Oversight Board would be unreasonable and unduly burdensome, particularly at this stage of the litigation.

B.      The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

RFP No. 112.

RFP No. 112, also served over two months ago on February 17, 2023, seeks documents

related to Meta's Oversight Board, which advises Meta on what content to take down, what to

leave up, and why.  *See* Ex. E at 2; https://www.oversightboard.com.  The FTC has agreed to

limit the scope of RFP No. 112 to only those documents that relate to Meta's Cross Check

program or any other Whitelisting Program, discussed above in connection with RFP No. 111.

Thus, RFP No. 112, as narrowed by the FTC, seeks only documents relating to Meta's Cross

Check and other Whitelist programs that *also* relate to communications between Meta and the

Oversight Board.

For the reasons discussed above, RFP No. 112 seeks information plainly relevant to the

FTC's assessment of Meta's claimed benefits from connecting Instagram and WhatsApp to

Meta's integrity systems.  The FTC's proposal to narrow RFP No. 112 is reasonable, as the FTC

understands that only a small group of Meta employees are responsible for interactions with

Meta's Oversight Board.  Thus, a targeted document collection from a very narrow group of

employees should allow Meta to efficiently identify documents that relate to communications

with the Oversight Board and also relate to the Cross Check or other Whitelist programs.  Meta

has not informed the FTC of which specific employees may possess responsive documents,

which is a reason that Meta's request to quash RFP No. 112 should be rejected: Meta has refused

to conduct a reasonable search, and has provided no information that suggests that a reasonable

search would be burdensome.

Meta's counter-proposal to the FTC would limit RFP No. 112 to (i) only those documents

actually produced to the Oversight Board, and even then (ii) only "as part of the Oversight

Board's cross-check Policy Advisory Opinion process."  Both proposed limitations appear likely to disproportionately limit the discovery of relevant information.

The first proposed limitation (only documents actually provided to the Oversight Board) is disproportionate, as the public statements of the Oversight Board indicate that the documents produced by Meta to the Oversight Board were not sufficient to evaluate the Cross Check program.  *See* Ex. H at 4 (Policy Advisory Opinion on Meta's Cross-Check Program, Dec. 2022) ("Meta did not provide the Board with information showing it tracks whether its decisions through cross-check are more or less accurate than through its normal quality control mechanisms.  Without this, it is difficult to know whether the program is meeting its core objectives of producing correct content moderation decisions, or to measure whether cross-check provides an avenue for Meta to deviate from its policies."); *id.* at 27 ("In order to assess how Meta prioritizes entities within cross-check, the Board repeatedly requested that Meta share its Early Response Secondary Review list for the Board's analysis.  Meta did not provide the Board with this list.").  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████  Thus, Meta's proposal to deny the FTC the same information it denied to the Oversight Board would likely withhold relevant discovery probative of, *inter alia*, whether Meta's Cross Check or other Whitelist programs "are more or less accurate" than its other quality control mechanisms, and the extent to which such programs provide "an avenue for Meta to deviate from its" own stated

integrity policies.  Ex. H at 4.

Meta's second proposed limitation (only documents related to the "cross-check Policy Advisory Opinion process") is likewise disproportionate.  The FTC understands that Meta refers to documents provided to the Oversight Board in connection with the Oversight Board's December 2022 Report.  *See*  Ex. H Meta has not provided the FTC with any information on which, if any, other occasions Meta may have generated relevant documents that relate to its Cross Check or other Whitelist programs and also the Oversight Board.  For example, the Oversight Board could have conducted other earlier inquiries or could currently be conducting a further inquiry into a Meta Whitelist program – the FTC does not know one way or the other – and Meta could possess an easily accessible trove of responsive documents that are highly probative of the harms and benefits of such a Whitelist program (and thus, highly probative of Meta's asserted procompetitive justifications).  If the Oversight Board's December 2022 Report was the only occasion on which Meta created responsive documents, then no purpose would be served by the express restriction Meta seeks to impose.  If, on the other hand, there are other occasions of which the FTC is unaware, Meta should conduct a reasonable search for documents responsive to RFP No. 112, as narrowed by the FTC.  Meta's request to quash RFP No. 112 should be denied, and Meta should conduct such a reasonable search.

## V.     FTC RFP No. 125

### A.     The FTC's Position

The FTC respectfully requests that the Court compel Meta's response to RFP No. 125.

The FTC's RFP No. 125 seeks audited consolidated financials that will allow the FTC to fully assess Meta's profitability over time, or in the event that audited financial statements do not exist, unaudited financial documents that will allow the FTC to make such an assessment. *See* Ex. A at 1-2 (Tenth RFPs).  The FTC is conducting a comprehensive review of the company's profitability and return on its assets and investments since inception, which may be a relevant factor when assessing Meta's monopoly power.  The requested financial information is needed to complete that analysis, and RFP No. 125 is thus reasonably calculated to uncover relevant evidence.  The information sought is proportional to the needs of the case, as the FTC is requesting a relatively straightforward production of financial statements and/or documents "sufficient to show" Meta's ordinary-course calculations of its profitability metrics (for example Meta's after-tax free cash flow), acquisitions, and income tax rate.

Meta has not provided a reason that the FTC's request is unduly burdensome or disproportionate.  While the time period 2004-2005 undoubtedly pre-dates the time period in which the FTC alleges that Meta unlawfully maintained its monopoly power, Meta's margins and profitability over time is relevant to the FTC's allegations.  And Meta likely maintains financial archives that can be efficiently accessed to satisfy the FTC's request.

The FTC respectfully requests that the Court order Meta to produce the requested documents.

B.    <u>Meta's Position</u>

This request seeks "audited consolidated financials" or equivalent financial information for 2004 and 2005.  The Court should order that no further production is required because financial information from 2004 and 2005 is irrelevant.

The FTC does not allege that Meta had a monopoly until 2011, *see* Am. Compl. ¶ 190, and does not allege that Facebook (launched in a dorm room in February 2004) was even available to the "general public" until 2006, *id.* ¶ 23.  The FTC offers only speculation that this nearly 20-year-old data might "be probative of Meta's market power over time."  But Meta has already produced relevant financial information for the later time periods that actually matter (which the FTC does not contest).  Nor is it "straightforward"—as the FTC claims—to collect nearly 20-year-old financial information, which, in Meta's experience, would require identifying and interviewing several subject matter experts to determine what (if any) financial information might exist that far back, and then additional effort to obtain that data—potentially from legacy systems no longer in use.

## VI.     FTC RFP No. 134

### A.     Meta's Position

This request seeks "[a]ll exhibits, and all transcripts of any testimony, provided by the Company or its employees" in two unrelated cases: *Tyler Barnett PR, LLC v. Facebook*, No. 16-6232 (N.D. Cal.), and *DZ Reserve v. Meta Platforms, Inc.*, No. 18-4978 (N.D. Cal.).  The Court should order that Meta need not produce these materials because they are irrelevant.

These cases have nothing to do with the present litigation.  Neither was an antitrust case. Both suits were brought by advertisers alleging problems with how Meta reported advertising metrics (such as the average time users spent watching video advertisements) to the advertisers that bought advertising slots from Meta.  The FTC relies on a single stray allegation in its complaint that Meta's "monopol[y]" in "personal social networking . . . harm[s] competition for the sale of advertising in the United States."  Am. Compl. ¶ 225.  But as this Court has previously noted, "the FTC isn't proceeding on a theory that Meta has monopolized the market for internet advertising."  Hr'g Tr. at 13:8-9 (Oct. 31, 2022).  The FTC has never alleged the existence of a relevant advertising market, let alone that Meta has market power in such a market.  *See* Am. Compl. ¶¶ 164-217 (alleging a monopoly in the user-side "personal social networking services" market).  There is thus no basis for the FTC to seek discovery of purported quality deficiencies in Meta's advertising products—deficiencies that (to the extent they exist) are disciplined by competition from other advertising avenues.

Moreover, the FTC's theory of relevance is boundless.  It makes any document relating to the quality of *any* of Meta's services (that is, almost *any* Meta document) relevant, even if those services are not within the alleged relevant market.  And the FTC here does not seek a few targeted documents; it seeks *all exhibits and testimony* from two complex litigations relating to an issue with no relevance to this case.  That is hardly "limited in scope."

In any event, despite their tangential relevance to the FTC's alleged user market, Meta has already produced documents and data relating to the quality of Meta's advertising product in response to, for example, RFP No. 38, which sought "[a]ll documents relating to the quality or performance of [Meta's] . . . Digital Advertising Services," and more than a dozen RFPs seeking advertising-related data.  *See* FTC's Second Set of RFPs (propounding numerous requests for advertising data); *see also*, *e.g.*, RFP No. 35 (seeking documents relating to advertiser boycott of Meta); RFP No. 36 (seeking documents relating to the effect of advertising on users).  Further discovery on these tangential issues is not proportionate to the needs of the case.

B.   The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

RFP No. 134.

RFP No. 134 seeks deposition or hearing transcripts and exhibits provided by Meta or its

employees in two litigations brought against Meta.  *See* Ex. M at 2 (Eleventh RFPs).  As Meta

admits, these lawsuits were brought by advertisers claiming there were problems with how Meta

reported advertising metrics (such as the average time users spent watching video

advertisements) to the advertisers that bought advertising slots from Meta.  Meta argues that

these litigations are irrelevant to the FTC's claims in this litigation, but ignores the allegations in

the FTC's Substitute Amended Complaint ("SAC").  The SAC alleges:

> By monopolizing the U.S. market for personal social networking, Facebook also
> harmed, and continues to harm, competition for the sale of advertising in the United
> States. . . . This has had predictable results on the value that Facebook provides to
> advertisers: for example, Facebook has repeatedly been criticized for its non-
> transparent and sometimes unreliable advertising reporting metrics, and for the
> prevalence of fake accounts on its platform, which undermines advertisers' ability
> to assess the effectiveness of their ads.

Substitute Amended Complaint ¶ 225, ECF No. 82.  This allegation directly relates to the matters

raised in the advertiser-brought lawsuits – in particular, Meta's failure to provide reliable metrics

to its advertising customers.

Meta argues that the FTC's RFP No. 134 rests on a "boundless" request for "any

document relating to the quality of Meta's services."  This is inaccurate.  As explained above, the

FTC seeks a narrow set of materials from specific cases because they are relevant to specific

advertiser impacts alleged in the SAC.  Meta's request to quash RFP No. 134 is therefore

unjustified.

**VII.   FTC RFP No. 135**

A.   Meta's Position

This request seeks "[d]ocuments sufficient to show any blacklist Meta has employed to prevent 'competitors from running app install ads on Facebook,'" and cites an already-produced document that the FTC implies is relevant to that issue.  The Court should order that Meta need not respond to the request because it seeks cumulative evidence, is burdensome, and is prohibited by this Court's ruling that it would "not permit . . . time-consuming and costly discovery on [Platform] policies" like this.  ECF No. 90, at 2, 40; *see also New York v. Meta Platforms, Inc.*, No. 21-7078, 2023 WL 3102921, at *3 (D.C. Cir. Apr. 27, 2023) (affirming dismissal of claims related to platform policies).

This request impermissibly seeks information on Meta's Platform policies for who is and is not allowed to advertise on Meta's platform.  The FTC tries to dodge this Court's ruling by claiming that RFP No. 135 seeks information on "PSNS competition."  The document cited by the FTC in support of that request calls that explanation into question.  The FTC relies on a 2013 document that identifies as "competitors" various services (WeChat, Kakao, and Line)—contradicting the FTC's allegations that such services do not compete with Facebook and Instagram, *see* Am. Compl. ¶ 172—and "Google products" that the FTC also claims do not compete with Facebook and Instagram, *see id.* ¶ 175 (excluding YouTube from the PSNS market).  The document does not state personal social networking services are excluded and directly contradicts the FTC's gerrymandered market.

In any event, the FTC has already obtained from Meta massive discovery on competition, including in response to RFP No. 1 (seeking "[a]ll documents relating to competition in the sale or provision of [any of Meta's] [p]roduct[s]," with twelve enumerated subparts seeking documents related to Meta's competition).  Moreover, Meta already produced the very document

giving rise to the FTC's discovery request and undoubtedly many others on the same issue. There is no reason to believe further discovery would yield non-cumulative information.

The FTC has it backwards in claiming that it is Meta's burden to make a "representation" that this discovery would not be cumulative.  If the FTC cannot articulate in the last weeks of discovery what it believes is missing after millions of documents produced and dozens of depositions, the only reasonable conclusion to be drawn is that further discovery would be cumulative, especially because Meta produced documents after using agreed search terms targeting competition and potential competitors.  Nor is the FTC's request "narrowly targeted." The document cited in RFP No. 135 is from 2013, showing that the FTC's request seeks to explore issues spanning at least a decade.  The effort in responding to this discovery request (served on April 21) would be extensive and very likely not possible to complete by the close of fact discovery on May 22.

Accordingly, this Court should order that no further discovery is necessary in response to this request because this request is (1) an end run around the ruling barring discovery of Platform policies, (2) cumulative with extensive discovery already provided, and (3) burdensome.

B.      The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

RFP No. 135.

The FTC respectfully asks the Court to instruct Meta to produce documents responsive to

RFP No. 135, which seeks "[d]ocuments sufficient to show any blacklist Meta has employed to

prevent ████████████████████████████████ Ex. M at 2.  The FTC requires

such documents to show that Meta has blocked ███████ from personal social networking

service competitors on the one hand, including Google+, but has not done the same for firms that

do not provide personal social networking services, including TikTok.  Without providing

explanation, Meta states that such discovery is barred by the Court's ruling concerning the FTC's

platform allegations, but fails to address the FTC's position that RFP No. 135 requests

documents relating to PSNS competition and showing that Meta treats non-PSNS firms

differently.  While Meta's previous document productions provide some information about

Meta's practices with respect to ███████████████████, the FTC's limited

request for documents sufficient to show any blacklists Meta maintained to prevent competitors

from ████████████ on Facebook is a narrowly targeted and proportionate request that

will ensure the complete disclosure of blacklisted firms.

Meta argues that it has already produced information on its competitors in response to

other FTC RFPs.  But what Meta does not – and apparently cannot – do is make the

representation that it has already produced materials showing the existence (or non-existence) of

blacklists to prevent competitors from ████████████ on Facebook.  Instead, Meta

asserts that documents responsive to RFP No. 135 are cumulative of documents already

produced, without performing any sort of reasonable search to determine if such highly relevant

documents exist.  Meta's argument – lacking any sort of support or evidence – should be rejected

29

and the Court should not grant Meta's request to quash RFP No. 135.

## VIII.   FTC Interrogatory Nos. 16-17

A.   <u>Meta's Position</u>

The FTC's Interrogatory No. 16 seeks "all relevant facts supporting Meta's contention that 'the competition for advertisements to show . . . users is fierce.' *Meta Platforms, Inc.'s Relevant Markets Tutorial Submission* at 8, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454." Interrogatory No. 17, meanwhile, seeks "all relevant facts supporting Meta's contention that 'TikTok is expanding its reach into "friends and family" sharing[.]'" *Meta Platforms, Inc.'s Relevant Markets Tutorial Submission* at 7, *Klein v. Meta Platforms*, Inc., No. 20-cv-08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454."

The Court should order that no response is required to either Interrogatory because each seeks non-discoverable and duplicative information. The FTC already has in its possession sufficient information to show that Meta competes with many companies for advertising dollars and, as explained above, the FTC has plenty of advertising-related discovery. Meta has also already produced an enormous amount of information detailing the many ways Meta competes with various competitors—including TikTok—for users' time and attention. Moreover, the FTC has many documents showing such competition from TikTok's response to the FTC's subpoena. And yet during the parties' meet and confer, the FTC did not identify any non-duplicative information that it thinks *might* be discovered through either Interrogatory. No further response is therefore necessary.

These Interrogatories are also improper because they require Meta to provide the FTC information from Meta's Relevant Markets Tutorial Submission in the *Klein* litigation. As Judge Donato repeatedly instructed the parties in that case, there was to be no substantive use of the information provided by Meta in its *Klein* Relevant Markets Tutorial Submission. For example, in a hearing regarding Meta's motion to dismiss, Judge Donato informed the parties:

31

> I am very fond, in my patent cases, of tutorials.  And I think a market tutorial, relevant market tutorial with some thought about barriers to entry, exclusionary conduct, would be useful as well.  So think about doing a tutorial day.  It would be *off the record*.

*See* Ex. 8 at 25, *Klein* Transcript of Proceedings (Aug. 11, 2022) (emphasis added).  Two months later, Judge Donato reiterated that the tutorial "will be off the record.  It will be like a patent tutorial.  It will be off the record.  *Can't be used against anybody*."  *See* Ex. 9 at 8, *Klein* Transcript of Proceedings (Oct. 20, 2022) (emphasis added); *see also* Ex. 10, ¶ 7, Standing Order for Claim Construction In Patent Cases Before Judge James Donato (Jan. 5, 2017) ("The Court may schedule a tutorial one to two weeks prior to the claim construction hearing. . . . No argument is permitted.  The proceeding is not recorded and *parties may not use or rely on statements made at the tutorial in the litigation*.") (emphasis added).

Meta has explained to the FTC that the information it seeks violates both the letter and spirit of Judge Donato's orders.  *See* Ex. 11, Ltr. from J. Hall to N. Brenner (Apr. 25, 2023).  Yet during the parties' meet and confer on April 26, 2023, the FTC asserted that Judge Donato's orders do not apply here.  Meta disagrees.  Judge Donato's orders were clear:  the *Klein* tutorials "[c]an't be used against anybody."  Allowing the FTC to seek discovery into material that Judge Donato explicitly instructed should be off-limits would frustrate the purpose and intent of Judge Donato's tutorial, which was meant to allow the parties to provide candid and free-flowing observations regarding that case, including in the written tutorial submissions cited by the FTC.  The FTC should not be permitted to seek discovery about discovery in another matter, particularly where the *Klein* plaintiffs cannot obtain the very information the FTC requests.  Meta respectfully requests that the Court order that Meta does not need to respond to the FTC's Interrogatory Nos. 16-17.

B.     The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

Interrogatory Nos. 16 & 17.

The FTC's Interrogatory Nos. 16 and 17 ask Meta to identify all facts supporting

contentions Meta has made about advertising competition and TikTok.  *See* Ex. N at 2 (Fourth

Interrogatories).  In particular, the interrogatories reference assertions by Meta that:

- "[T]he competition for advertisements to show . . . users is fierce."

- "TikTok is expanding its reach into 'friends and family' sharing[.]"

The FTC's interrogatories reference a court filing in *Klein v. Meta Platforms, Inc.*, No. 20-cv-

08570-JD (N.D. Cal. Feb. 17, 2023), ECF No. 454, and the FTC understands Meta to be

advancing the same contentions in this litigation.

Meta has refused to respond to Interrogatory Nos. 16 and 17, arguing that the statements

in made in the *Klein* filing were "off the record."  Specifically, Judge Donato apparently

arranged for a "tutorial day" to explore the parties' views on competition issues.  In advance of

the tutorial, Meta publicly docketed a 12-page "Tutorial Submission," submitted and apparently

authored by Meta's counsel.  Meta's statements, those that serve as the basis for Interrogatory

Nos. 16 and 17, were included in Meta's public filing.

Meta's objections are baseless.  As an initial matter, it is not clear whether Judge Donato

intended for Meta's pre-tutorial written submission to be considered "off the record."  In each

quote set out in Meta's portion of the JSR, Judge Donato speaks of statements made during the

tutorial day itself being "off the record," not any written submissions.  And in fact, the tutorial

day *was* off the record.  To the FTC's knowledge, there is no written transcription of that day's

proceedings.  By contrast, however, Meta's written submission is publicly accessible from the

Court's docket, and so is very much a matter of public record.

Even if Judge Donato intended this written submission to be off the record in the *Klein* matter, there is no indication that he intended it to be somehow shielded in any other context. Indeed, had Judge Donato desired such a result, he could have directed the parties (or the parties could have asked) to submit the filings under seal. This does not appear to be what Judge Donato intended or instructed. Judge Donato's Standing Order regarding tutorials says that "parties may not use or rely on statements made at the tutorial *in this litigation*." (emphasis added). Similarly, in advance of Meta's tutorial day, Judge Donato again explained that statements made during the conference itself would be "off the record," meaning it "[c]an't be used against anybody . . . *can't be featured in a deposition or motion to me*." Tr. at 8, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Oct. 20, 2022), ECF No. 373 (emphasis added).

Meta should be able to either identify relevant facts supporting its contentions or it should confirm that it does not intend to make such contentions in this matter. If, for example, Meta does not plan to assert that TikTok is expanding its reach into "friends and family" sharing, then Meta should state as much in its response to Interrogatory No. 17. If, though, Meta plans to make such contentions in this litigation, it should not be permitted to hide behind tactical objections to avoid responding to the FTC's fairly propounded interrogatories. Meta's request to quash Interrogatory Nos. 16 and 17 should be denied.

IX.     **FTC Interrogatory No. 21**

A.     <u>Meta's Position</u>

This interrogatory demands that Meta "[d]escribe and identify all relevant facts relating to all investments Meta has made in the Facebook Metaverse, by quarter, including but not limited to dollars invested in developing Reality Labs." This interrogatory seeks plainly irrelevant and unduly burdensome information, and it is not proportionate to the needs of the case. The Court should order that no response is required to this interrogatory.

The FTC has never alleged that the Metaverse or Reality Labs—which concern Meta's virtual and augmented reality offerings—are part of, or have anything to do with, the FTC's allegations regarding a market for so-called "personal social networking services." Indeed, when the parties negotiated over custodians for the FTC's First Set of RFPs, the FTC agreed that information regarding Oculus (the former name of Meta's virtual reality hardware brand) was irrelevant and not discoverable. *See, e.g.*, Ex. 12, Ltr. from D. Matheson to K. Fetterman at 6, 8 (Apr. 27, 2022) (FTC agreeing to drop a proposed supplemental custodian because his "responsibilities are exclusively related to AI issues focused on Oculus and virtual reality"; agreeing to limit the collection of two employees' documents "to the time period prior to the date on which [their] responsibilities became exclusively directed to Oculus"); Ex. 13, Ltr. from S. Strikis to D. Matheson at 3 (May 13, 2022) (noting Meta's understanding that the FTC was "in agreement" to limit date ranges of searches for custodians' documents to exclude the time when they were involved in "a role relating to Oculus"). Given that the FTC has appropriately conceded the irrelevance of augmented and virtual reality and that the parties reached an understanding that the FTC would not seek discovery on these issues, the FTC should not be permitted to renege at the eleventh hour and now seek discovery into the Metaverse and Reality Labs.

The FTC's Interrogatory No. 21 is also overbroad and unduly burdensome.  The interrogatory, as propounded, seeks "all relevant facts relating to all investments" Meta ever made in the Metaverse and Reality Labs.  And in its portion of the Joint Status Report, the FTC confirms that it seeks "all costs and expenses that are associated with or attributable to Reality Labs."  As Meta has repeatedly explained, however, Meta has made regular improvements to and investments in the Metaverse and Reality Labs.  It is therefore not possible to identify "all relevant facts relating to all investments" Meta made to each product.

B.    The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's

Interrogatory No. 21.

The FTC's Interrogatory No. 21 seeks high-level information about Meta's financial

investments in the Facebook Metaverse.  *See* Ex. N at 2.  The FTC has informed Meta that the

FTC has narrowed this interrogatory to accept a response that, for each year since 2019,

identifies and describes, in dollars, all costs and expenses that are associated with or attributable

to Reality Labs, including all "cost and expenses" reported in the "consolidated and segment

results" of Meta's Annual Form 10-K filing, any capital investment costs, and any acquisition

costs that are associated with or attributable to Reality Labs.

As narrowed by the FTC, Interrogatory No. 21 seeks discrete and highly relevant

information.  Meta's apparent willingness to lose several billion dollars on a moonshot

investment in the Metaverse may be probative of Meta's enduring market power in its core

product offering, personal social networking services.  In particular, if Meta were concerned

about the competitive positioning of its core products – most notably, Facebook and Instagram –

we might expect to see Meta prioritizing investments in those products.

Further, the SAC expressly alleges that Meta has recognized sustained high profits driven

by its PSNS monopoly.  SAC ¶ 208.  Meta should not be allowed to obscure these sustained high

profits by offsetting them against its enormous losses on its Metaverse division (Reality Labs),

and then refusing to reveal its losses on its Metaverse endeavors.  *See, e.g.*, Steve Kovach, *Mark*

*Zuckerberg's 'Metaverse' Business Lost More than $10 Billion Last Year, and the Losses Keep*

*Growing*, CNBC (Feb. 2, 2022), https://www.cnbc.com/2022/02/02/meta-reality-labs-reports-10-

billion-loss.html.

Meta has categorically refused to engage in negotiations over a reasonable response, instead wrongly claiming that the parties had previously agreed that such discovery is outside the scope.  True, to minimize the burden of fact discovery and to focus on the most relevant factual issues, the FTC previously agreed to exclude from its RFPs seeking custodial documents Facebook's Oculus product and other virtual reality subject matter.  But the FTC's past willingness to focus the scope of some discovery requests does not act as a waiver of *all* discovery relating to the Facebook Metaverse.  Meta's request to quash Interrogatory No. 21 should be denied.

X.      **FTC Interrogatory No. 22**

A.      <u>Meta's Position</u>

This interrogatory seeks "all relevant facts supporting Meta's contention that 'competition and consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users.' Answer at 39, ECF No. 94."  Meta has already responded to this Interrogatory by explaining that Meta's contention is purely legal and thus there are no relevant facts to provide.

During the parties' April 26 meet and confer, the FTC clarified that it seeks relevant facts that would serve as the basis for expert analysis.  Meta disagrees with the premise of this interrogatory that there is monopolization of this market.  The facts that would serve as the basis for expert analysis are hypothetical facts of the theoretical world that the FTC's interrogatory presupposes.  Meta, therefore, has nothing further to state in response to this interrogatory during fact discovery.  The Court accordingly should deny the FTC's premature request that Meta respond to this interrogatory.

B.    The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's Interrogatory No. 22.

The FTC's Interrogatory No. 22 seeks all relevant facts supporting Meta's contention, advanced in Meta's Answer to the FTC's Complaint, that "competition and consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users." Answer at 39, ECF No. 94; *see* Ex. N at 2. Meta refuses to provide any response to the FTC's interrogatory, claiming that the FTC's request is "not appropriate" because it "falls within a subject matter of expert discovery."

That an interrogatory may implicate expert analysis does not justify providing no answer at all. Indeed, the Court recently rejected Meta's nearly identical arguments in its April 26, 2023 opinion. Mem. Op. at 3-4, ECF No. 281. There, the Court rejected Meta's argument that the FTC's contested interrogatories requested "premature" expert discovery, explaining that the fact "that Meta intends experts to testify about procompetitive benefits of its acquisitions does not alter its Rule 33 obligation to provide complete interrogatory responses to questions asking it to state its contentions or to provide facts on which they are based." *Id.*

Meta knows as much, propounding several interrogatories that have required the FTC to disclose facts on which its experts may rely. Most notably, Meta's Interrogatory Nos. 10, 13, and 14 each sought facts concerning market definition boundaries that unquestionably implicate expert analysis. And yet in each of these instances, the FTC provided detailed interrogatory responses that disclosed facts on which its experts may rely. *See generally* FTC Opp. to Motion to Compel Answers to Interrogatory Nos. 13 and 14, ECF No. 250; FTC's Response to Meta's Interrogatory Nos. 13 & 14, ECF No. 250-1; FTC's Response to Meta's Interrogatory No. 10, ECF No. 250-2. Here, though, Meta does not even attempt to answer the interrogatory.

If Meta is not aware of any facts that support its position that "competition and consumers cannot be harmed from alleged monopolization of a market for a product distributed free to all users," then it should say so and the FTC's interrogatory will be satisfied.  If however, facts currently known to Meta support its contention, it must make a good faith effort to identify those facts.  Meta's request to quash Interrogatory No. 22 should be denied.

XI.    **FTC Interrogatory No. 23**

A.    <u>Meta's Position</u>

This interrogatory—and its eleven subparts—seeks bespoke analyses about Meta's "Cross Check" program, which Meta has used to address objectionable content.  Specifically, the program aids Meta in identifying content that may be incorrectly flagged as violating Meta's community standards.  This interrogatory requests:

From the inception of the Cross Check Program or any Whitelisting Program (collectively, "the Programs"), state, by year:

a. The number of accounts or users covered by the Programs;

b. The total volume of content (e.g., the number of posts, comments, messages, or any other content subject to Meta's Community Standards) covered by the Programs;

c. The volume of false positives (e.g., content that was flagged as potentially violating Meta's Community Standards, but which on review were found to be non-violating) identified by the Programs;

d. The number of views of the false positives identified by the Programs;

e. The volume of content that was flagged as potentially violating Meta's Community Standards which on review were found to be violating ("the violating content");

f. The number of views of the violating content before it was taken down after review under the Programs;

g. The average and range of the number of days and hours between when the violating content was posted and when the content was taken down after review under the Programs;

h. The percentage of content covered by the Programs (e.g., the posts, comments, messages, or any other content that was flagged as potentially violating Meta's community

guidelines by accounts or users covered by the Programs) that was reviewed under the Programs;

     i. The percentage of content covered by the Programs that was never reviewed under the Programs;

     j. The number of accounts or users exempt from any review under the Programs; and

     k. The percentage of content covered by the Programs that was exempt from review under the Programs.

     The Court should order that no response is required because the interrogatory is unduly burdensome and cumulative of other information already provided to the FTC. Although the FTC has narrowed its request by eliminating sub-parts (b), (g)-(i), and (k), this narrowing fails to reduce the burden to a proportionate and reasonable level. Meta has produced abundant materials about its integrity efforts, including in its responses to the FTC's Interrogatory Nos. 5, 6, 8, 9, 10, & 12 and Requests for Production Nos. 83, 93, & 98.

     Additionally, Meta has identified a number of publicly-available documents discussing its Cross Check program. *See, e.g.*, Meta, *Reviewing high-impact content accurately via our cross-check system* Dec. 6, 2022), https://perma.cc/2H3X-82X9. And Meta's Oversight Board has recently published a 57-page policy-advisory opinion about the program. *See* Oversight Board, *Oversight Board publishes policy advisory opinion on Meta's cross-check program* (Dec. 2022), https://perma.cc/6Y99-AMKT.

     The FTC is (allegedly) unsatisfied. It seeks, for example, in the context of the cross-check program, "[t]he volume of content that was flagged as potentially violating Meta's Community Standards which on review were found to be violating"; and "[t]he number of views of the violating content before it was taken down after review under the Programs." Meta cannot

feasibly perform these bespoke analyses before the end of fact discovery—nor should it be required to do so.  This interrogatory, and its six remaining subparts, seeks information which has no relevance to the claims or defenses of either party.  Given Meta's immense production of information relevant to Meta's integrity efforts, no further response should be required.

B.     The FTC's Position

The FTC respectfully requests that the Court deny Meta's request to quash the FTC's Interrogatory No. 23.

FTC Interrogatory No. 23 requests basic information necessary to understand the scope of Meta's Cross Check and Whitelist programs ("the Programs") and the impact of such programs on the content seen by users.  *See* Ex. N at 3; *see generally supra* (discussing Meta's programs in reference to RFP Nos. 111 & 112).  In an effort to avoid disputes, the FTC has agreed to narrow this interrogatory by eliminating several subparts.  Specifically, the FTC has already agreed to drop 23(b), (g), (h), (i) and (k) from its request.  The remaining subparts are discussed below.

The FTC maintains its original request with respect to 23 (a) and (j), which seek information necessary to understand the scope of the Programs.  Specifically, 23(a) seeks the "number of accounts or users covered by the Programs," by year; and 23(j) seeks the "number of accounts or users exempt from any [integrity] review under the Programs," by year.  The information responsive to 23 (a) and (j) should be readily available to Meta: as the FTC understands it, Meta can identify each specific account that was covered by the Programs, and it should not be difficult to count the total number and provide the information to the FTC.  Meta also has the option to identify business records pursuant to Fed. R. Civ. P. 33(d), which Meta has readily availed itself of in response to other FTC interrogatories.  In the alternative, if Meta has no information on how many accounts were covered by the Programs, it should state as much.

23(c) seeks the volume of "false positives" identified by the Programs; and 23(d) seeks the number of views that the "false positives" received.  As Meta asserts that the Programs were designed to reduce the volume of false positives, this information is directly relevant to Meta's contention that it produced procompetitive benefits by making its integrity tools available to

Instagram and WhatsApp.  Again, Meta should either provide a response, identify business records pursuant to Rule 33(d), or state that it does not have the information requested.

23(e) requests the "volume of content that was flagged as potentially violating Meta's Community Standards which on review were found to be violating" those Standards; and 23(f) requests the number of views of the violating content received "before it was taken down after review under the Programs."  This information is relevant because, as the FTC understands it, Meta's Programs provide that for certain accounts (e.g., prominent public figures), content that is flagged as violating Meta's Community Standards is allowed to remain posted for some period of time while Meta conducts an additional level of review.  Thus, the frequency with which content subject to one of the Programs was determined to violate Community Standards is relevant to harm those Programs caused (by allowing violative content to be visible while the additional review was performed); for the same reason, the number of views that violative content received is relevant to harm.  Where Meta has no such information, it should state so.

The stated concessions and clarifications offered by the FTC sufficiently address any objections Meta has related to any burden of responding to Interrogatory No. 23.

Meta asks the Court to quash Interrogatory No. 23, asserting that it has already produced the information requested, pointing to their responses to FTC's Rog Nos. 5, 6, 8, 9, 10, & 12 and RFP Nos. 83, 93, & 98.  First, the foregoing requests concern Meta's integrity identification tools and methods, not the Cross Check or Whitelisting programs.  In any event, if it is true that the FTC can locate the information that provides a complete response to Interrogatory No. 23 (as narrowed by the FTC) within the foregoing discovery responses, then Meta should readily be able to provide a response that identifies where within the referenced materials that information exists.

Finally, Meta asserts that the information is publicly available via a publicly available Oversight Board Opinion and a 2021 blog post.  Again, if that is true, then Meta should provide a response to Interrogatory No. 23 that states that a complete response is provided by the referenced materials.  At present, based on the information currently available to the FTC, the FTC disagrees that the public report provides a complete response to Interrogatory No. 23.  Notably, the material Meta points to is not related to the operation of these programs but generated in response to public criticism in the wake of whistleblower information on these integrity exclusion programs.  *See, e.g.*, Jeff Horwitz, *Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt*, Wall Street Journal (Sept. 13, 2021), https://www.wsj.com/articles/facebook-files-xcheck-zuckerberg-elite-rules-11631541353.  The Oversight Board Opinion gives a high-level overview of the program as it existed in 2021, without providing any data regarding the breadth, efficacy, or potential harms related to the programs.  The Oversight Board Opinion also made a recommendation which may or may not have been implemented.  Standing alone, it cannot reveal whether any changes were made since that time, or the impact of any changes that Meta made in response to the Opinion may have had on the breadth, efficacy or potential harms related to the programs.

The FTC has made significant efforts to limit the scope of this request and yet Meta has continued to refuse to engage in a meaningful dialogue about what it can produce in response to Interrogatory No. 23.  Therefore, the FTC respectfully asks that the Court to instruct Meta to respond to the 23(a), (c-f), and (j) as requested herein.

XII.    **The FTC's Data Rule 30(b)(6) Deposition Notice**

A.    Meta's Position

On April 3, 2023, the FTC served a Rule 30(b)(6) notice regarding Meta's data

productions to date, for which it subsequently has agreed to accept written responses in lieu of

live testimony.  The notice identified an initial set of 106 questions, and promised an

indeterminate number of further questions "to be identified."  Then, in an April 30, 2023 letter,

the FTC (a) added 73 new questions; (b) withdrew 50 of its first set of questions, including 39 it

acknowledged were already resolved; (c) identified 21 "high priority" questions; (d) reworded 25

questions without reducing the burden on Meta of researching the answers; and (e) promised to

send an undetermined number of additional questions by an unspecified date.  Although the FTC

presented these modifications as a "compromise," the FTC in fact increased significantly the

burden it seeks to impose on Meta.  The FTC's Rule 30(b)(6) notice remains improper and

burdensome for at least three reasons:

*First*, the FTC's notice of questions "to be identified" fails the reasonable particularity

requirement of Rule 30(b)(6).  *Buie v. District of Columbia*, 327 F.R.D. 1, 9 (D.D.C. 2018).

*Second*, many of the noticed topics go far beyond asking Meta to confirm whether certain

data is available or to explain what a particular column heading means, which Meta has not

objected to doing, but are more akin to substantive interrogatories about *why* data changed over

time or differs for different countries, time periods, operating systems, and so forth.  Answering

these questions—across multiple different apps spanning more than a decade—would be

exceptionally difficult and time-consuming.  It would require identifying knowledgeable

members of the relevant product teams, meeting with them, investigating the data sources they

use in the ordinary course of business, and working with them to research the basis for the

changes or differences the FTC has asked about.  It is not reasonable to demand that Meta

determine the reasons behind every change in the data the FTC may observe, particularly when the FTC's own delay in bringing this suit has increased the burden of doing so.

*Third*, the FTC is not entitled (as it claims) to pose an unlimited number of substantive questions to Meta merely because "Meta has not provided 'data dictionaries' or other explanatory materials that might assist the FTC in understanding the data produced by Meta." Meta repeatedly has informed the FTC that it does not maintain data dictionaries in the ordinary course of business.  Meta cannot, and the Federal Rules do not obligate it to, provide what it does not have.  Moreover, Meta has amply explained the details of its data productions in more than 130 pages of single-spaced letters to the FTC, and more than a dozen meet and confers.  And, as explained above, many of the FTC's questions concern the reasons for patterns or changes in data, and would not be answered by data dictionaries even if they existed.

Given the scope of the FTC's data Rule 30(b)(6) notice—and the FTC's intention to keep expanding that scope on a rolling basis—Meta asks the Court to order that each written answer to the questions in the FTC's notice (as modified), as well as future questions the FTC identifies, will count for 10 minutes of deposition testimony against the agreed limit of 28 hours of data-related Rule 30(b)(6) testimony.  The parties agreed during their May 3, 2023, meet and confer that they are at impasse on this issue, so it is ripe for this Court's resolution.  Meta's proposal is reasonable because it would take the FTC at least 10 minutes of deposition time to unobjectionably elicit testimony in response to the complicated data questions that it has posed to Meta.  Indeed, some of the FTC's questions would take at least that long just to ask—questions 34 and 35 in Exhibit C to the FTC's April 30, 2023, letter, for example, take up 2.5 single spaced pages, and several others include complicated tables, charts, and multiple sub-parts.  Because the FTC has 14 hours of data deposition time remaining, 10 minutes per question will also serve to

limit the cumulative burden of responding to the FTC's notice on Meta while still permitting the FTC to ask as many as 84 questions about Meta's data productions.

The FTC's counter-proposal to count less than three minutes for each of its existing questions, and to reserve 5 hours of deposition time for an unknown number of additional questions, is not reasonable.  As the Court recognized in imposing a limit on the number of linked files Meta was required to produce, a reasonable cap on the number of questions the FTC can ask about Meta's data will require the FTC to be "judicious" in deciding what to ask.  *See* H'rg Tr. at 6:2-10 (Nov. 9, 2022).  It is not fair to ask Meta to shoulder the significant burden of answering the FTC's questions without any certainty about what that will entail.

*Finally*, the Court should not grant FTC's request to hold its notice open past the current close of discovery.  The FTC originally proposed a schedule in which Meta would serve its final set of answers by the close of fact discovery.  Meta agreed to that deadline, and also agreed to engage in reasonable efforts to answer questions by the interim deadlines the FTC proposed, notwithstanding its uncertainty over which (and how many) questions the FTC would ultimately raise.  *See* Ex. 15, Ltr. from C. Masterman to P. Taylor (Apr. 21, 2023).  Meta has already answered more than a third of the questions.  The FTC's failure to narrow its existing questions and delay in serving the remainder are no basis for extending data discovery beyond May 22.

For these reasons, the Court should order that Meta be credited with 10 minutes of Rule 30(b)(6) data deposition time for each of the questions in the FTC's notice relating to Meta's data productions that Meta answers, and that, as a result, Meta need not answer more than 84 questions in total.  The Court also should order that the FTC promulgate any new questions by no later than May 12, 2023, and that Meta shall have until May 22, 2023, to respond.

B.    The FTC's Position

The FTC respectfully asks that the Court defer its consideration of how much "30(b)(6) deposition time" should be credited to the FTC's data-related questions until the FTC has assessed Meta's April 28, April 30, and May 5 data productions, and to instruct the parties to meet and confer and attempt to come to agreement.  Alternatively, the FTC respectfully asks that the Court instruct Meta to accept the FTC's most recent proposal.  *See* Ex. O at 4 (4/30/2023 P. Taylor Ltr.).  In a meet and confer on May 3, 2023, Meta rejected the FTC's proposal, and the parties did not come to an agreement on the time credit.

Meta's requested time credit operates as a meaningful substantive cap on the FTC's ability to understand and use Meta's own data productions.  While the Court did not set a limit on the number of hours of 30(b)(6) deposition testimony the FTC could take regarding Meta's data, the parties initially agreed that 28 hours of 30(b)(6) data-related testimony should be sufficient.  Under Meta's proposal, the FTC would be able to ask only approximately 80 questions about Meta's voluminous data productions, which Meta was still making as of last week.  This approach unjustifiably limits the FTC's ability to obtain necessary information.

The parties' extended negotiations over "crediting" 30(b)(6) deposition hours related to data have been complicated by the fact that, despite the FTC's repeated requests, Meta has not provided "data dictionaries" or other explanatory materials that might assist the FTC in understanding Meta's data.  *See* Ex. O at 1.  Because Meta refused to provide necessary information, the FTC has been forced to expend significant resources reviewing unadorned data productions—many received only within the last month—and then attempting to pose questions to adequately understand the data.

This process takes time, and Meta continues to make data productions in response to the FTC's Second Requests for Production, including as recently as May 5, 2023.  The FTC has not

51

yet had an opportunity to understand what has been produced, or to formulate meaningful questions for all the data Meta has produced to date in response to the FTC's Second Requests for Production.  Accordingly, the FTC asks that the Court defer its consideration of this question until next week, by which time the FTC will have served its questions related to data produced through April 30, 2023.

If, however, the Court chooses to "credit" time now, the FTC's proposal is more reasonable and should be adopted by the Court.  *See* Ex. O at 4.  The FTC's proposal would provide for significant "credit" (7 hours) for responses to high-priority questions for data produced as of March 31, 2023.  The proposal would provide somewhat less credit for responses to narrow, easily answered questions that should be answered in the ordinary course of discovery discussions, and would not require elaborate preparation of a 30(b)(6) witness.  *See* Ex. O at Exhibit D (e.g., Questions 4 and 5 (asking Meta to confirm that observed changes in usage accurately reflect changes in usage, and did not result from a change in Meta's method for measuring the relevant factors)).

While the latter questions should be easily answered by Meta, they and the high-priority questions are critical to the FTC's preparation of expert reports.  The FTC's expert(s) must rely in significant part on data provided by Meta.  Thus, the FTC must be able to understand, for example, basic issues such as whether particular data was not provided by Meta because the data does not exist, or whether changes in metrics accurately indicate the behavior of users or instead result from anomalies or changes in the manner in which Meta collects data.  Likewise, the FTC should not be vulnerable to Meta or its experts later saying that the FTC misinterpreted certain data, for want of Meta providing explanatory material or responding to the questions posed.  This information is solely within Meta's control, and Meta should be able to provide it as a

complement to its data productions.

Finally, given the timing of Meta's final data productions, the FTC may need Meta's cooperation in responding to data questions after May 22, promptly and in advance of the FTC's opening expert reports on July 3.  Meta rejects this approach, and requests that the Court order all responses completed by May 22.  The FTC is proposing that answers continue after May 22, because Meta has implied that it could not (or would not) complete responses to all high priority questions by May 22 and because of the reality that Meta's data productions continue to roll in. Meta's suggestion that the FTC has "delay[ed] in serving" its remaining questions is relatedly unfounded, as the FTC could not conceivably propound questions about data it did not have.

The FTC is working diligently to process Meta's just-received productions, and will send questions about data produced through April 30, 2023 by the end of this week.  The FTC has no objection to Meta completing its responses by May 22, provided that Meta does not refuse to answer questions on the basis that it does not have enough time.  If Meta cannot answer the questions posed by May 22, however, the FTC respectfully requests that the Court grant the FTC leave to hold its deposition notice open for a limited time, to provide with Meta additional time to complete its answers to the FTC's high priority questions rather than cut off Meta's answers.

**XIII.   Meta's Third Set of Interrogatories**

      The Court ordered the parties to file 5-page briefs regarding the FTC's responses and objections to Meta's Third Set of Interrogatories.  *See* Min. Order (May 5, 2023).  If the Court wishes to hear argument on those issues during the scheduled May 10 hearing, the parties will be prepared to address those disputes.

**XIV.    Meta's Statement Regarding Non-Party Productions**

Certain nonparties have yet to complete their data productions in response to Meta's data requests.  Meta is currently working with the nonparties, including those listed below, to ensure their timely and adequate responses.  Meta requests that the Court set a hearing date to address any disputes with any nonparty that may arise regarding Meta's discovery requests for May 17, 2023, with simultaneous three-page letter briefing due on May 15 from Meta and each nonparty stating their positions.  Meta hopes that it will not have any disputes requiring resolution from the Court by the hearing date, in which case Meta will inform the Court and the Court can cancel the scheduled hearing.

The status of outstanding data discovery with certain nonparties is summarized below.

A.    <u>TikTok</u>

Meta has requested that TikTok produce, or confirm in writing that it does not possess, data including, but not limited to, the following categories:  (1) daily active users ("DAUs") broken down by age, gender, and surface, on a daily basis, for three periods of time and geographic locations; (2) time spent data broken down by age, gender, and surface, on a daily basis, for the same three periods and geographic locations; (3) certain user time spent and engagement data TikTok already produced, refreshed to the present day; and (4) certain data relating to TikTok's messaging and Stories functionalities.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including TikTok.  Meta expects the data to show that users use a broad range of services to connect with their friends and family, and more generally, that users have access to a similar set of features and use cases on TikTok as they do on Meta's products.

B.      Alphabet (YouTube)

Meta has requested that Alphabet produce, or confirm in writing that it does not possess, data for YouTube including, but not limited to, the following categories:  (1) total DAUs and Monthly Active Users ("MAUs") for each country, on a monthly basis, pre-dating January 2018; (2) DAUs broken down by age, gender, country, and surface, on an hourly and daily basis, for September 27, 2021 to October 18, 2021; (3) time spent data broken down by age, gender, type of activity, country, and surface, on weekly, monthly, and yearly basis, before January 2019; (4) certain types of engagement data for January 2010 to present day; and (5) certain data relating to amount of advertising on YouTube for January 2010 to December 2019.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including YouTube.  Of greatest concern, while Alphabet has produced DAU, MAU, and time spent data for YouTube from 2018 onwards, it has provided no such data for the years prior.  This is despite the fact YouTube launched in 2005 and the FTC alleges Meta has had a monopoly in the alleged PSNS market since 2011 and Meta's acquisitions of Instagram and WhatsApp occurred in 2012 and 2014, respectively.  Meta expects the data to show users have access to a similar set of features and use cases on YouTube as they do on Meta's products.

C.      Twitter

Meta has requested that Twitter produce, or confirm in writing that it does not possess, data for Twitter including, but not limited to, the following categories:  (1) data showing active user counts before May 2015; (2) time spent data before September 2016; (3) total DAUs in the United States broken down by age or gender; (4) time spent data in the United States broken down by age or gender; (5) time spent data on an hourly basis; and (6) certain data relating to the amount of advertising and non-advertising impressions on Twitter prior to July 2020.

These data, among others, are relevant to Meta's defense that it competes with a broad range of services for users' time and attention, including Twitter.  Meta expects the data to show that users substitute between Twitter and Meta's products in response to changes on any of the products.

**XV.    Nonparty Foreign Discovery**

Last year, the parties filed, and the Court granted, a joint motion for the issuance of a letter of request for International Judicial Assistance under the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters to a nonparty located in the Republic of Korea, Kakao Corporation.  *See* ECF Nos. 214, 215.  After submitting the signed order to the appropriate foreign authorities, the parties have yet to receive a response.  The parties respectfully request that the Court order that if the parties receive a response from Kakao after the May 22 deadline, they are not precluded from using that discovery.

Dated: May 9, 2023

Respectfully submitted,

/s/ Mark C. Hansen

Mark C. Hansen (D.C. Bar No. 425930)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Kenneth M. Fetterman (D.C. Bar No. 474220)
Daniel V. Dorris (D.C. Bar No. 1012305)
Kevin D. Horvitz (D.C. Bar No. 1521032)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
kfetterman@kellogghansen.com
ddorris@kellogghansen.com
khorvitz@kellogghansen.com
apolavarapu@kellogghansen.com

James P. Rouhandeh (D.D.C. Bar No. NY0390)
Michael Scheinkman (D.D.C. Bar No. NY0381)
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, New York 10017
Tel: (212) 450-4754
james.rouhandeh@davispolk.com
michael.scheinkman@davispolk.com

Sonal N. Mehta (CA SBN 222086)
Wilmer Cutler Pickering Hale & Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000
Sonal.Mehta@wilmerhale.com

David Z. Gringer (D.C. Bar No. 1001200)
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
David.gringer@wilmerhale.com

*Counsel for Defendant Meta Platforms, Inc.*

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*