## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

## JOINT STATUS REPORT

Pursuant to the Court's Order of May 10, 2023, *see* ECF No. 295, the parties submit this final Joint Status Report on fact discovery.  Part I of this report identifies disputes between the parties and summarizes the parties' respective positions.  Part II describes fact discovery that will remain after May 31, 2023.

## TABLE OF CONTENTS

I. ISSUES IN DISPUTE............................................................................................... 1

    A. Meta's Rule 30(b)(6) Deposition of the FTC ................................................... 1

        1. Meta's Position ......................................................................................... 1

        2. The FTC's Position ................................................................................ 11

    B. The FTC's Ad-Load Rule 30(b)(6) Deposition of Meta.................................. 21

        1. The FTC's Position ................................................................................ 21

        2. Meta's Position ...................................................................................... 26

    C. The FTC's RFP No. 132 ................................................................................. 31

        1. The FTC's Position ................................................................................ 31

        2. Meta's Position ...................................................................................... 34

II. FACT DISCOVERY TO BE PRODUCED AFTER MAY 31, 2023 .................................... 37

    A. The Parties' Joint Statement on Party Discovery Remaining After May 31, 2023 ......... 37

    B. The Parties' Statements on Nonparty Discovery Remaining After May 31, 2023........... 40

        1. The FTC's Statement on Nonparty Discovery.......................................... 40

        2. Meta's Statement on Nonparty Discovery ................................................ 41

I.      **ISSUES IN DISPUTE**

    A.      **Meta's Rule 30(b)(6) Deposition of the FTC**

        1.      **Meta's Position**

The Court should order the FTC to fully answer Meta's Rule 30(b)(6) deposition questions.  Meta noticed this deposition to explore the factual basis for the FTC's market definition – including why the FTC contends that (1) all time spent on Facebook or Instagram (other than Facebook dating) counts as time spent using personal social networking services and (2) that consumers are not willing to substitute doing an activity on Meta's services (like watching video) with that same activity on a competing platform that the FTC excludes from its market definition (like TikTok).  After four years of investigation and litigation, and at the close of fact discovery, the FTC should be able to quickly and easily provide this information.

Prior to the Rule 30(b)(6) deposition, Meta attempted to use contention interrogatories to understand the FTC's claims with only partial success.  The FTC had provided evasive responses that (as this Court has noted) did "little more" than repeat the "market definition" in the Amended Complaint.  ECF No. 281, at 8.  Accordingly, this Court noted that the "important information" Meta sought might be "more easily obtained" by a Rule 30(b)(6) deposition. 2/9/23 Hr'g Tr. at 22.  Courts have condoned similar uses of Rule 30(b)(6).  *See, e.g.*, *Sigmund v. Starwood Urb. Retail VI, LLC*, 236 F.R.D. 43, 46-47 (D.D.C. 2006); *see also infra* pp. 9-10.

The FTC agreed to provide a witness to testify on these issues.  But apparently because of its undisclosed "misgivings," the FTC prepared and counseled the witness to do nothing more than read the interrogatory responses into the record.  And if a question required the witness to do more, the FTC instructed the witness not to answer on grounds that the question exceeded the scope of the deposition topic, called for privileged information, or both.  The FTC had no basis for either instruction.  The noticed topic called for "[t]he facts supporting" the interrogatory

1

responses; that topic cannot be fairly read as requiring anything less than testimony on the nature and types of facts the FTC relies on.  Such information on the basis for a party's contentions is routinely the subject of discovery; none of it is privileged.  *See* Fed. R. Civ. P. 33(a)(2).

The Court should order the FTC to present a Rule 30(b)(6) witness to testify on the noticed topic or to provide "full and complete" written responses to the following questions:

1.   Does the FTC's classification of each specified feature and activity on Facebook and Instagram as personal social networking (except Facebook Dating) rely on any facts regarding the reasons why consumers use those features and activities (for example, to communicate with friends and family or not)?  And if so, explain those factual contentions and provide the factual support on which the FTC relies.

2.   Do the FTC's classifications of each specified feature and activity on Facebook and Instagram as personal social networking (except Facebook Dating) rely on any facts regarding how consumers actually use those features and activities (for example, to communicate with friends and family or not)?  And if so, explain those factual contentions and provide the factual support on which the FTC relies.

3.   Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding the (dis)similarity of the user experience for those pairs of features and activities?  And if so, explain those factual contentions and provide the factual support on which the FTC relies.

4.   Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding the circumstances under which consumers have switched (or would be willing to switch) between those pairs of features and activities).  And if so, explain those factual contentions and provide the factual support on which the FTC relies.

5.   Does the FTC's different market classifications of specified pairs of features and activities on-and-off Meta's platform (like watching short-form video on Instagram and TikTok) rely on any facts regarding whether there are impediments to consumers switching between those pairs of features and activities?  And if so, explain those factual contentions and provide the factual support on which the FTC relies.

a.   The FTC Evasively Responded to Meta's Interrogatories

Because there is no "obvious or universally agreed-upon definition of just what a personal social networking service is," *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 14 (D.D.C.

2021), Meta pursued discovery to understand the contours and factual bases of the FTC's market definition. Meta initially used contention interrogatories; when that proved less than satisfactory, it pursued the Rule 30(b)(6) deposition at issue.

At the outset of the case, the Court noted that "at least some of the features offered by a Facebook or Instagram" – such as "watching a comedy routine posted by the official page of a famous comedian" – "are not, seemingly, part of those firms' PSN-services offerings." *Id.* at 19. Thus, Meta served a contention interrogatory (No. 10) asking whether specific features and activities on Meta's services are within the FTC's market. The FTC answered that every feature or activity on Instagram and Facebook is personal social networking, except Facebook Dating. That answer begged the question whether time spent on similar activities on other apps also counts as personal social networking. Meta thus served contention interrogatories (Nos. 13 & 14) on that question. For example, the FTC contended that time spent watching short-form video on Instagram Reels was personal social networking; Meta asked whether time spent watching video on TikTok—a similar service[1] the FTC excludes from its market definition—was also time spent on personal social networking, and to explain why. *See* ECF No. 250-2, at 8, 56-59.

As this Court has noted, the FTC's subsequent response "offered little more than the core market definition of its Amended Complaint." ECF No. 281, at 8. On the one hand, the FTC contended that Facebook and Instagram fit the definition of a personal social networking service, and hence, every listed activity on them counts as time spent using a personal social networking service. *See* ECF No. 250-2, at 16. On the other hand, the FTC contended that other services (like TikTok) did not fit the definition of a personal social networking service, and hence, no

---

[1] ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

activity on them counted as time spent using a personal social networking service.  *See id.* at 56-59.  The FTC defended its definitional approach on grounds that the "market definition inquiry" should focus "on whether there is a substitute for the total service provided, rather than any individual component therein."  ECF No. 249, at 12-13 (relying on four cases).  The FTC disclaimed any reliance on a "feature-by-feature analysis comparing the individual features" on Meta and non-Meta services.  ECF No. 250-2, at 19, 58-59.

However, as the FTC itself noted, "relevant markets are routinely defined to include less than everything a defendant sells."  ECF No. 59, at 16 (citing *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 122-27 (D.D.C. 2016)); *see FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 48 (D.D.C. 2022) ("[D]ata measuring the amount of time users spend on Facebook . . . likely captures time not spent engaging with a PSN service – *e.g.*, watching a movie trailer . . . .").  The FTC's response thus begged the question why this case should be one where the market is defined with reference to apps holistically and also the question how to categorize apps holistically given their many varied features and activities.  The cases on which the FTC has relied concerning businesses that distribute or sell bundles of goods and services have each turned on their specific facts.  *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-41 (D.C. Cir. 2008) (Brown, J.) (customers for whom "only [a particular package of goods or services] will do"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25-26 (D.D.C. 2015) ("undue expense or inconvenience" in switching from "broadline distributors" to component retailers); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 39-42 (D.D.C. 1998) (wholesalers provided "efficien[cy]" unavailable from component retailers); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1078 (D.D.C. 1997) ("low cross-elasticity of demand between" office "superstores" and component retailers).

Meta thus served another contention interrogatory (No. 16) seeking the factual basis for

the FTC's position.  *See* ECF No. 289-3, at 8; ECF No. 264, at 3-4 (ruling that Interrogatory Nos.

13 & 14 did not seek the factual basis for the FTC's position).  The FTC responded by once

again disclaiming any "comparison" of the "features or activities" on Facebook or Instagram

with non-Meta apps.  ECF No. 289-3, at 9.  While the FTC cited many pieces of the discovery

record, its factual contentions were opaque.  The FTC frequently cited material without any

explanation of how or why the material supported the FTC's contentions.  *See, e.g., id.* at 31-34.

Meta believes much of the cited materials has either no relevance at all to the questions at issue,

*see*, *e.g.*, *id.* at 19 (citing FB_FTC_CID_07784244, at -256, which is a slide on Meta's (and

others') investments in video content attached as Ex. C), or actually supports the vibrant

competition that Meta faces, *see*, *e.g.*, *id.* at 20 (citing FB_FTC_CID_05981393 for the fact of

"direct competition" between Facebook Groups and Nextdoor).  However, because the FTC

certified that its response was "full and complete," Meta did not seek to compel a further

response.  *See* 5/15/23 Hr'g Tr. at 2-3.

      The FTC's opaque responses are the reason this Court should allow further discovery of

the factual basis underlying the FTC's market definition.  Meta needs to know, at a minimum,

whether the FTC is relying on any facts on the five issues identified above.  For example, Meta

seeks to understand whether the FTC contends that facts show consumers are not willing to

switch between TikTok and Instagram Reels, and if so, what those facts are.  There is no

legitimate reason for the FTC to refuse this discovery.

      The FTC's arguments in the JSR further exemplify why this discovery is necessary.

Even though the FTC previously argued to the Court that its responses to Interrogatories No. 13

& 14 addressed substitutability (albeit at the app level), *see supra* p. 4, the FTC now claims (at

18) that its answers to those interrogatories provide no "analy[sis] or . . . facts" on "consumer

substitution behavior."  And even though the FTC previously committed in writing to answer

Interrogatories No. 13 & 14 regarding whether "time spent" on other apps counts as "time spent"

using a personal social networking service, ECF No. 250-2, at 2, 8, 14, the FTC now claims

(at 16) its answers provide no "analysis of how 'time spent' on a service should be considered."

It is well past time for the FTC to be forthright about its contentions.

          b.      The FTC Obstructed the Rule 30(b)(6) Deposition

Meta served a Rule 30(b)(6) notice on the FTC regarding "[t]he facts supporting" the

FTC's responses to Meta's market-definition interrogatories.  *See* Ex. 18.  The FTC agreed to

provide a witness to testify on this topic, *see* Ex. D, and Meta reasonably expected the witness

would be able to explain in an appropriate level of detail the factual basis for the FTC's market

definition.  To be clear, Meta expected only a reasonably prepared witness – not that the witness

would be able to exhaustively recite specific evidence or know every single feature or activity.

The witness was not prepared to do the minimum that Meta expected.  The witness was

prepared and counseled to read the interrogatory responses into the record.  ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

The FTC's view that a deposition on "[t]he facts supporting" the FTC's interrogatory

responses requires only that the witness read those responses into the record is absurd.  There

would be no purpose for Meta to waste its time with such a deposition; indeed, that is why Meta

ultimately decided to cut it short.  Courts routinely reject (or sanction) such hypertechnical

readings of discovery requests.  *See EEOC v. Freeman*, 288 F.R.D. 92, 99 (D. Md. 2012) ("The

scope of the 30(b)(6) notice should not be read so narrowly so as to prevent the deposing party

from probing and scrutinizing a deponent's answers."); *In re Depuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, No. 13-cv-01071, ECF No. 314, at 10, 16-17 (N.D. Tex. Aug. 12, 2016) (ruling in response to a Rule 30(b)(6) witness that was prepared only to read from documents without additional detail: "Bottom line, you didn't comply.  Period.  I'm just going to think about how hard I'm going to sanction you.").

Even if the witness had been knowledgeable, the FTC obstructed any attempt to obtain testimony beyond the text of the interrogatory responses.  In response to virtually every question, the FTC made paragraph-long speaking objections that the questions exceeded the scope of the notice and sought privileged information. ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

The FTC's scope objections deprived Meta of any useful testimony.  The FTC instructed the witness that each objection to "scope" meant that the witness could not testify on behalf of the FTC. ███████████████████████████████████████

█████████████████████████████ And due to its absurdly narrow view of the deposition topic, the FTC objected to scope more than 30 times—even for questions that quoted verbatim the noticed topic and prior interrogatory responses. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████. Numerous courts have sanctioned

counsel for inappropriately instructing a Rule 30(b)(6) witness not to testify.  *See In re Vitamins*

*Antitrust Litig.*, 216 F.R.D. 168, 175 (D.D.C. 2003) (sanctioning party and counsel for

"repeatedly" instructing 30(b)(6) witness to "not testify regarding the factual bases for, and

accuracy of [party's] governmental submission"); *Medline Indus., Inc. v. Wypetech, LLC*, 2020

WL 6343089, at *2 (N.D. Ill. Oct. 29, 2020) (sanctioning counsel who "repeatedly instructed

Medline's corporate witnesses not to answer questions on the ground that the questions were

beyond the scope of Wypetech's Rule 30(b)(6) deposition notice"); *Mass Engineered Design,*

*Inc. v. Ergotron, Inc.*, 2008 WL 8667511, at *1 (E.D. Tex. Jan. 8, 2008) (collecting cases).

Finally, FTC counsel repeatedly instructed the witness not to testify on privilege grounds

without any legal basis.  It is black letter law that parties may discover their adversaries' factual

contentions without invading attorney work product, as both parties have done here.  *See*, *e.g.*,

ECF No. 281; ECF No. 291, at 33-34 (FTC seeking and receiving "all facts supporting" Meta's

contentions in a legal filing); Fed. R. Civ. P. 33(a)(2); *United States v. All Assets Held in Acct.*

*No. XXXXXXX*, 2019 WL 13197264, at *2 (D.D.C. June 12, 2019) (compelling government to

provide 30(b)(6) testimony because work product "may not be used as a blanket excuse to justify

the designee's failure to learn non-privileged, relevant facts"); *Vitamins Antitrust Litig.*, 216

F.R.D. at 172 (compelling party to produce a 30(b)(6) witnesses "thoroughly educated about the

noticed deposition topics with respect to any and all facts . . . regardless of whether such facts are

memorialized in work product . . . or reside in the minds of counsel"); *see infra* pp. 9-10 (cases

allowing Rule 30(b)(6) depositions on a party's contentions).  Here, Meta sought discovery to understand the facts (if any) underlying the FTC's market definition.  That is not privileged.

        c.        <u>The Court Should Order Responses to the Rule 30(b)(6) Notice</u>

The FTC errs in arguing that it is improper for Meta to seek a Rule 30(b)(6) deposition on the factual basis underlying the FTC's market definition.  Litigants may explore the factual bases for their adversaries' position by either a Rule 30(b)(6) deposition or contention interrogatories; which "is more appropriate will be a case by case factual determination."  *United States v. Taylor*, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996) (citing cases); *see, e.g.*, *Sigmund*, 236 F.R.D. at 46-47 (allowing Rule 30(b)(6) deposition on contentions "requiring the application of law to fact"); *Protective Nat'l Ins. Co. of Omaha v. Commonwealth Ins. Co.*, 137 F.R.D. 267, 282 (D. Neb. 1989) (Rule 30(b)(6) deposition may obtain "the factual basis for the contentions"); *Veolia Water N. Am. Operations Servs., LLC v. SSAB Alabama, Inc.*, 2018 WL 9597052, at *1 (N.D. Ala. July 31, 2018) (Rule 30(b)(6) appropriate where ability to "obtain explanation of an answer to a contention interrogatory . . . provides a means to obtain more complete information").

The FTC forfeited its objection to the propriety of a Rule 30(b)(6) deposition in this case.  The FTC needed to raise its "misgivings" by seeking a protective order before the deposition.  *See New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 242 F.R.D. 164, 166 (D. Mass. 2007).  The case the FTC relies on – *SEC v. Merkin*, 283 F.R.D. 689 (S.D. Fla. 2012) – confirms the FTC needed to do so (as the SEC did) and also rejects the exact arguments the FTC raises here.  *See id.* at 694-98.  But instead of seeking a protective order, the FTC agreed on April 20 to produce a witness for *all* noticed topics.  *See* Ex. D.  It was inappropriate for the FTC to wait until the deposition to engage in "self-help."  *Prosonic Corp. v. Stafford*, 2008 WL 2323528, at *4 (S.D. Ohio June 2, 2008).  By this time, it was too late for Meta to pursue alternative discovery, such as additional contention interrogatories (of which Meta had seven

9

left).  This Court should not allow the FTC's gamesmanship of promising to respond to the Rule 30(b)(6) deposition only to renege after Meta has no other recourse.

Nor could the FTC have legitimately opposed the Rule 30(b)(6) deposition in this case. This Court has already indicated that a Rule 30(b)(6) deposition would be appropriate.  The Court noted that Meta's contention interrogatories are a "difficult route" to obtain the "important information" Meta seeks on the FTC's market definition, and that such information may be "more easily obtained" by a Rule 30(b)(6) deposition.  2/9/23 Hr'g Tr. at 22.  The FTC's subsequent evasive and opaque answers to Meta's contention interrogatories provided ample basis for Meta to use a Rule 30(b)(6) deposition.  *See In re Brca1 – and Brca2 – based Hereditary Cancer Test Patent Litig.*, 2014 WL 12600708, at *1 (D. Utah Nov. 19, 2014) (Rule 30(b)(6) deposition appropriate if "unsatisfactory answers" are given to interrogatories).

Further, the reasons that some courts have disallowed Rule 30(b)(6) depositions on a party's contentions do not apply here.  Courts have reasoned that some "inquiries are better answered through contention interrogatories wherein the client can have the assistance of the attorney in answering complicated questions involving legal issues."  *Taylor*, 166 F.R.D. at 362 n.7.  The FTC, however, is an agency of antitrust experts that are capable of explaining the factual basis for its market definition.  *See FDIC v. Hays*, 1998 WL 1782547, at *1-2 (W.D. Tex. Jan. 9, 1998) (Rule 30(b)(6) deposition on issues "not otherwise apparent from the responses to . . . contention interrogatories" appropriate because FDIC had a knowledgeable "in-house investigator").  The FTC's reluctance to explain its market definition at this stage is inexplicable.

\*            \*            \*

The Court should order the FTC, by June 7, to present a Rule 30(b)(6) witness on the noticed topic or to provide "full and complete" responses to the five questions listed above.

## 2.    The FTC's Position

The Court should deny Meta's demand that the FTC provide further testimony in response to Meta's 30(b)(6) notice ("Notice").  The parties agree that the FTC has fully addressed eight of the nine topics, and Meta has no legitimate complaint regarding the testimony provided by the FTC regarding Topic 6 of the Notice, which purports to seek testimony regarding: "[t]he facts supporting Your Response to Meta's List of Features or Activities (Sept. 12, 2022) and Your responses to Meta's Interrogatory Nos. 13, 14, and 16."  Ex. 18.

The FTC had misgivings about Topic 6 from the start.  First, as explained below, courts across the country disfavor such 30(b)(6) depositions of government agencies acting in an enforcement capacity.  *Cf.* Ex. 19 (Judge Kness's Standing Rule, N.D. Ill.), ¶ 14 (collecting authority supporting rule that "[p]arties cannot take depositions under Rule 30(b)(6) of government agencies acting in their enforcement capacity without leave of Court").  Second, Meta's request for "facts supporting" the FTC's responses appeared disproportionate, as the relevant facts supporting the FTC's responses are available to Meta on the face of the hundreds of pages of responses the FTC provided, and in the documents the FTC cited.  Ex. 20; Ex. 21.

Despite its misgivings, to avoid burdening this Court by prematurely moving for a protective order, the FTC prepared ████████████ to address the Notice.  *See, e.g.*, *SEC v. Merkin*, 283 F.R.D. 689 (S.D. Fl. 2012) (denying the government's request for a protective order prior to the deposition and holding that "a party could move for a protective order if the need actually arises during a deposition.").  FTC counsel assembled for ████████ hundreds of pages of FTC policies, public statements, and interrogatory responses, and provided to ██ ████████ all of the documents cited in the FTC's responses.  ████████ spent approximately 40 hours preparing.  To address most topics, he reviewed relevant FTC policies and interviewed persons knowledgeable about such policies.  To address Topic 6, ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 22

████████████ 15:14-19; 20:5-16; 316:3-22.  Unfortunately, ████████████ efforts were

largely wasted, as Meta focused its deposition almost entirely on efforts to elicit the FTC's

privileged legal analysis and work product relating to its interrogatory responses.  Indeed, Meta

focused the first *five and a half* hours of its time on questions related to the FTC's interrogatory

responses; and then did not even use the entire seven hours available.  As explained below, the

Court should deny Meta's demand for further testimony from the FTC regarding Topic 6.

## I.   Further Response to Topic No. 6 is Unwarranted

Topic 6 was, from the outset, questionable.  Topic 6 asks the FTC to provide "*[t]he facts*"

supporting its interrogatory responses.  Ex. 18.  Unlike private parties to a litigation, the FTC is

an enforcement agency.  As such, the facts supporting the FTC's interrogatory responses are not

within the FTC's own internal records, but are instead gleaned from materials provided by Meta

or third parties, based on assessments made by the FTC's attorneys.  Thus, seeking testimony on

"the facts" that the FTC identifies in its interrogatory responses necessarily implicates legal

assessments made by the FTC's attorneys.  *Cf.* Ex. 19 (Judge Kness Standing Rule, N.D. Ill.), ¶

14 ("The government does not have first-hand knowledge of any facts when it acts in an

enforcement capacity.  Instead, the government relies on facts gathered during an investigation,

often by lawyers. A deposition under Rule 30(b)(6) under those circumstances may raise work-

product issues, among others, and may create more trouble than it is worth.").  Recognizing the

minimal value of 30(b)(6) depositions of enforcement agencies along with the high likelihood of

the deposition delving into privileged topics, courts hesitate to compel government agencies to

respond to a Rule 30(b)(6) deposition.  *See, e.g.*, *SEC v. Buntrock*, 217 F.R.D. 441, 445, 448

(N.D. Ill. 2003) (quashing a 30(b)(6) notice intended "to discover the inferences" the government

agency "believes can be drawn from that evidence"); *SEC v. Jasper*, 2009 WL 1457755, at *2-3,

9 (N.D. Cal. May 26, 2009); *SEC v. Morelli*, 143 F.R.D. 42, 47-48 (S.D.N.Y. 1992).

Notwithstanding the problematic nature of Meta's request, the FTC prepared a witness to

testify regarding Topic 6 – subject, of course, to the FTC's express objection to divulging

privileged information.  *See* Ex. 26 at 2-3.  Meta chose to ask questions that were answerable

from the interrogatory responses already provided, and ████████ patiently answered.  *See*

*e.g.,* ████████ 35:11-36:8; 42:1-43:1.  Meta also chose to ask numerous questions that

sought more than "facts," and instead sought the FTC's interpretation or analysis.  *See, e.g.,*

████████ 28:11-29:2; 155:16-20 ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████;

158:4-10.  In response to such questions, FTC counsel rightfully raised concerns that the

question seemed to call for testimony that constituted attorney work product and instructed ██

████████ to answer only to the extent he could do so without risking the work product

protections afforded to attorneys' mental impressions, ideas, and strategies.  *See, e.g.,* ████████

██ 28:16-29:2; 29:20-30:6; 33:16-19; 46:18-22; 97:9-15; 155:21-156:4; 158:11-19.   Despite the

FTC's cooperation through over five hours of questioning, Meta now seeks to compel additional

testimony.  Meta's request for a further response to Topic 6, however, impermissibly expands the

scope of Topic 6, seeks attorney work product, and is unduly burdensome.

### a. Meta Seeks to Compel Responses to Topic No. 6 Outside the Scope of the Deposition Notice

Meta's request for additional responses to Topic 6, like its flawed questions during the

deposition, targets information that was not contained within the FTC's interrogatory responses

13

and is therefore beyond the scope of Topic 6.  Topic 6 seeks "facts" underlying four discrete

FTC discovery responses, none of which Meta challenges (or could challenge) as insufficient:

- The FTC's response to Meta's List of Features or Activities (the "List") classifies over 330 specific features/activities offered by Meta's products as either constituting personal social networking services ("PSNS"), or not.  *See* Ex. 24.

- The FTC's response to Interrogatory 13 provides the same assessment for specific features/activities offered by Friendster, Google+, MeWe, Myspace, Orkut, Path, and Snapchat.  In each case, the FTC stated that the identified feature or activity constituted "personal social networking." *See* Ex. 20.

- The FTC's responses to Interrogatory 14 provides the same assessment for specific features/activities offered by Hulu, iMessage, LinkedIn, Netflix, Nextdoor, Pinterest, Reddit, Spotify, Strava, TikTok, Twitter, and YouTube.  *See* Ex. 20.  In each case, the FTC stated that the feature or activity did <u>not</u> constitute "personal social networking." *See* Ex. 20.

- The FTC's response to Interrogatory 16 identified the relevant facts, based on discovery and the FTC's assessment to date, supporting the FTC's List and the FTC's response to Interrogatory 14 (but not to Interrogatory 13).  *See* Ex. 21.

Thus, the FTC's responses classified specific features/activities as "personal social networking"

(or not) and provided relevant facts supporting this classification.  ECF No. 264 (Mar. 29, 2023).

Meta now suggests that it was entitled to ask questions that went beyond the facts

supporting the interrogatory responses that the FTC actually provided – i.e., the scope of the

Notice – because these responses were somehow "evasive," or "less than satisfactory."  This is

inappropriate because the classifications that the FTC provided in response to Meta's

interrogatories resulted from extensive negotiations between the parties, yet Meta now seeks to

set aside all of those negotiations.  Moreover, the Court has already squarely rejected Meta's

suggestion that the FTC's responses were in any way deficient: the Court has already held that

the FTC's responses to Interrogatory Nos. 13 and 14 are sufficient and denied Meta's motion to

compel a further response.  *See* ECF No. 264 (Mar. 29, 2023).  And Meta has conceded the

adequacy of the FTC's response to Interrogatory No. 16.  Ex. 23 (5/15/23 Hearing Tr. at 3)

("Your Honor, this one, thankfully, has been resolved.").  There is thus no basis for Meta to suggest that it was entitled during the deposition to ask questions that went beyond the "facts supporting" the actual responses that the FTC provided.

However, during the deposition Meta repeatedly asked the witness to provide "facts" or analysis that are well outside the scope of the classifications provided by the FTC's relevant responses.  For example, Meta asked the witness to identify "facts" relating to matters such as:



*See, e.g.,* ███████████ at 116-119, 128-142.

Such questions are all outside the Scope of Topic 6.  None of the FTC's interrogatory responses address ██████████████ or ██████████████████ a particular application or whether applications can ████████████████ for certain use cases.  Yet Meta's questions during the deposition reveal, and Meta now expressly concedes, that Meta seeks to leverage its 30(b)(6) notice to seek analyses never provided in the FTC's interrogatory responses.  *See supra* (asking for a further analysis, not sought by the Notice, regarding "the reasons why consumers use those features and activities" or "impediments to consumers switching between the paired features and activities").  Meta asserts that the FTC has argued its interrogatory responses "addressed substitutability," *see supra*, but the fact that the FTC's responses illuminate an issue does not re-write the relevant interrogatory responses, or suggest that facts specific to the issue of

"substitutability" were provided to support the FTC's responses.

Likewise, during the deposition Meta repeatedly asked the witness whether ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████  *See, e.g.,* ███████████  27:10-13; 28:12-15; 29:16-19; 30:13-16; 31:9-12.  Such

questions are outside the scope of Topic 6 and the FTC's extensively negotiated responses to

Meta's interrogatories – as noted above, the FTC's responses classify specific features or

activities as either personal social networking or not personal social networking.  The FTC did

not purport to provide an analysis of how ███████ on a service should be considered.  Yet

this is the analysis that Meta now appears to seek, demanding that the FTC re-draft or expand

upon its interrogatory responses through the inappropriate vehicle of questions outside the scope

of the Notice.  Meta's request should be denied.

### b. Meta's Impermissible Expansion of its Interrogatories also Inappropriately Seeks Attorney Work Product

Compelling disclosure of attorney work product would "contravene[] the public policy

underlying the orderly prosecution and defense of legal claims."  *Hickman v. Taylor*, 329 U.S.

495, 510 (1947).  The work product doctrine therefore "reflects the strong public policy against

invading the privacy of an attorney's course of preparation."  *In re Sealed Case*, 856 F.2d 268,

273 (D.C. Cir. 1988).  *See also* Fed. R. Civ. P. 26(b)(3)(A), (B)*; FTC v. Boehringer Ingelheim

Pharms, Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015); *United States v. AB Electrolux*, 2015 U.S.

Dist. LEXIS 162023, *14 (D.D.C. Sept. 25, 2015).  Meta's questioning of the FTC under Topic 6

contravened this public policy by repeatedly calling for the FTC's "impressions, conclusions,

[or] opinions" related to the facts available to it, and how those facts fit into the FTC's legal

theories.  *See Hickman*, 329 U.S. at 508.  Indeed, counsel for Meta admitted as such during the

deposition.  *See, e.g.*,  39:1-40:8; 44:19-45:1 ; 46:13-17 ; 185:6-9 .  Where possible, the FTC provided factual

support for its interrogatory responses.  However, given the need to protect FTC attorneys' work

product, the FTC counsel defending the deposition was often required to advise

that the question might call for protected information and instruct him that he should only

respond to the extent he could without revealing the FTC's work product.  *See, e.g.*,

29:16-30:6; 30:7-31:5; 33:6-19.  Nonetheless, on a majority of occasions, was

able to provide the FTC's factual support without revealing protected work product.

Meta has now doubled down on its inappropriate requests and asks the FTC to provide a

witness to testify regarding whether the FTC's classification of the specified features and

activities depend on certain categories of facts.  Meta admits it does not seek *additional* facts

supporting the FTC's interrogatory response but rather seeks to *understand* whether "consumers

substitute between use of Meta's services for services that the FTC has excluded from its

market."  Ex. 25 at 3.  As explained above, Meta's Interrogatory Nos. 13 and 14 did not ask the

FTC to analyze or provide facts to support consumer substitution behavior, or any other issue

beyond classifying the specific features/activities as PSNS or not-PSNS.  Moreover, the analysis

Meta seeks goes straight to the "selection and compilation of the relevant facts" that is the "heart

of the work product doctrine."  *E.E.O.C. v. HBE Corp.*, 157 F.R.D. 465, 466 (E.D. MO. 1994);

*see also Am. Nat'l Red Cross v. Travelers Indem. Co.*, 896 F. Supp. 8, 14 (D.D.C. 1995) (finding

that "[w]hen ARC's counsel requested of Yessman a description of the 'facts and documents which Travelers contends support' each affirmative defense, ARC's counsel was asking questions that intruded upon protected work product; in effect, what ARC was requesting was insight into Travelers' defense plan."); *Morelli,* 143 F.R.D. 42, 47 (defendant's notice of Rule 30(b)(6) deposition "constitute[d] an impermissible attempt to inquire into the mental processes and strategies of the SEC [because defendant's notice] was intended to ascertain how the SEC intends to marshal the facts, documents, and testimony in its possession . . . ."). There is simply no way that the FTC can respond to Meta's new inquiries without divulging attorney work product and, for this reason alone, Meta's motion to compel should be denied.

### c. Even if Meta's Questions Were Within the Scope and Did Not Seek Work Product, Meta's Request is Disproportionate

Topic 6 as interpreted by Defendants is cumulative, duplicative, and imposes an undue burden on the FTC. Rule 30(b)(6) depositions, like all discovery requests, must comply with the rule of proportionality. *Arnett v. Bank of Am., N.A.*, 2012 WL 13055461, at *3-4 (D. Or. Dec. 17, 2012). The FTC has already provided hundreds of pages of discovery in response to Interrogatory Nos. 13 and 14 and cited hundreds of documents in response to Interrogatory No. 16's request for "all facts" supporting Interrogatory No. 14. Not content, Meta now seeks an FTC witness to parse through all of these documents to analyze and categorize particular facts. Meta, however, is equally capable of reviewing and assessing the documents cited in the FTC's voluminous response. Requiring a 30(b)(6) witness to testify regarding such granularity is unduly burdensome and disproportionate considering that Meta is equally well-position to make the same assessment. *See McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275, 286-288 (N.D. Cal. 1991), *rev'd on other grounds,* 765 F. Supp. 611 (N.D. Cal. 1991) (where a Rule 30(b)(6) topic calls for testimony so granular that "no human being . . .could reliably and

completely set forth [the] material," party may be directed to seek testimony through interrogatories.); *Morelli,* 143 F.R.D. at 47-48.

## II.    The FTC Appropriately Objected During the Deposition

Meta also seems to suggest the FTC's conduct during the deposition was out of bounds. *See* Ex. 25 at 6 ("Meta also reserves its ability to seek additional relief . . . in light of the FTC's conduct at the Rule 30(b)(6) deposition.").  To the contrary, the FTC extensively prepared for the deposition, and its objections reflected a thoughtful effort to provide responsive testimony while protecting the FTC's mental impressions, opinions, and legal theories.



Multiple FTC attorneys responsible for this litigation met with ▮▮▮▮▮▮ for at least 10-15 hours in preparation for his testimony, *see* ▮▮▮▮▮▮ 16:17-19, in addition to the time spent compiling and providing him with hundreds of documents for his review. ▮▮▮▮▮▮ 20:5-16.  During the deposition, FTC counsel objected often to Meta's apparent disregard for the scope of the topics on which ▮▮▮▮▮▮ prepared as well as – and importantly – the FTC's protected analysis of the facts ▮▮▮▮▮▮ was prepared to discuss.  *See e.g.*, ▮▮▮▮▮▮ 155:16-20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  However, FTC counsel made every attempt to let the witness respond as he was able, and focused instructions not to answer on legitimate concerns about the FTC's work product.  *See, e.g.*, ▮▮▮▮▮▮ 27:14-22.  FTC counsel noted the work product concern, but permitted the witness to testify as long as he could do so without revealing protected work product.  ▮▮▮▮▮▮ 29:16-30:6; 30:7-31:5; 33:6-19.

Meta subsequently complained about the FTC's "speaking objections." Ex. 25 at 4. However, it is evident from even the examples that Meta cited that the FTC was attempting to be

clear as to its objections and any related privilege-based instructions.  Indeed, Meta's counsel sought clarity and explanation during the deposition itself.  *See, e.g.,* ██████████ 79:21-80:2; 94:20-95:5.  Additionally, some of the FTC's explanations were directly in response to Meta's counsel's long speeches on the record, *see, e.g.,* ██████████ 39:1-15, or in order to correct mischaracterizations of the FTC's interrogatory responses and negotiations with Meta.  *See, e.g.,* ██████████ 54:16-1; 79:10-18.  All of these areas of guidance are appropriate for counsel to caution a witness about, or to note for the record.  In any event, the FTC's proper objections caused Meta no prejudice, as Meta did not even use its entire seven hours on the record.

Meta appears to suggest that it might have pursued contention interrogatories had it known that during the deposition the FTC would raise proper objections regarding scope and privilege.  This is unavailing: the FTC never suggested that it would prepare a representative to testify on the FTC's behalf regarding topics outside the scope of the Notice, and never suggested that the FTC allow its representative to waive privileges.  Indeed, Meta has no basis for asserting that the FTC waived objections to the Notice, as the FTC expressly objected to the Topics to the extent that they called for the disclosure of privileged information.  *See* Ex. 26 at 2-3.

If Meta had chosen to issue interrogatories, the FTC would have responded.  Instead, Meta chose to issue its Notice, requesting a date of May 8, 2023.  In other words, Meta's proposed deposition date rendered it impossible for Meta to conduct the deposition, subsequently issue contention interrogatories, and receive responses by May 22.  The FTC proposed five dates for the deposition; Meta chose to proceed on May 22.  Meta now apparently complains that it is out of time for contention interrogatories, but further burdensome imposition on the FTC cannot be justified based on Meta's failure to understand the scope of the Topics in its own Notice, or Meta's failure to anticipate that the FTC would properly assert its fully preserved privileges.

**B.** **The FTC's Ad-Load Rule 30(b)(6) Deposition of Meta**

    **1.** **The FTC's Position**

On May 19, 2023, Meta proffered a corporate designee to testify regarding a pre-negotiated set of topics related to Meta's ad load practices.  While the FTC secured testimony on some topics during the examination, the witness was unprepared to discuss others.  This both deprived the FTC of relevant evidence and prolonged the questioning, which prevented the FTC from reaching topics specified in the parties' pre-deposition correspondence—i.e., an overview of ad load on Facebook Stories and Reels, and ad load on Instagram Feed, Stories, and Reels. *See* Silvia Dec. ¶ 6.  Accordingly, the FTC respectfully requests that the Court order Meta to provide, by no later than June 14, 2023, an additional four hours of 30(b)(6) testimony. Specifically, the FTC requests testimony from a witness prepared to address (1) limited follow-up questions regarding topics Meta's 30(b)(6) representative was unprepared to address on May 19; and (2) the topics agreed to in the parties' pre-deposition correspondence which the FTC did not reach on May 19.

  **A. The FTC's 30(b)(6) Deposition Topics Are Highly Relevant**

Meta's practices with respect to imposing ad load on users of Facebook and Instagram are highly relevant.  Meta claims that its services are offered for "free," and that it therefore cannot be exercising market power.  *See* ECF 083-1 at 16-17.  To the contrary, Meta imposes a variety of conditions on users, including, among other things, serving a heavy dose of advertisements—the level of which Meta and others call "ad load."  *See* ECF 081, SAC ¶ 105. Meta internally acknowledges that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Silvia Dec. Ex. 10; *id*. Ex. 11 at 8.  Moreover, facing limited competitive constraints, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Silvia Dec. Exhibit 12 at -859 ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮; *id.* Ex. 13 at 4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.* Ex. 15.

21

The FTC has diligently sought evidence regarding Meta's ad load practices through various discovery mechanisms, including documents and testimony from individual executives. The FTC has been unable to secure all necessary information through these vehicles, however. Meta's deposed individual executives, for instance, were not able to speak to certain material aspects of Meta's ad load practices. *See e.g.* Silvia Dec. Ex. 14, ██████████████ Tr. 38:1-10, 133:19-134:6, 136:25-138:11 ████████████████████████████ ███████████████████████████████████████████████; Ex. 16 ████████████████ Tr. 281:11-283:10 ██████████████████████████ ██████████████████████. As such, the FTC served a 30(b)(6) notice related to ad load, seeking to collect highly relevant evidence on these and other topics.

**B.  The FTC's 30(b)(6) Deposition Topics Are Narrowly Tailored**

On April 3, 2023, the FTC served a 30(b)(6) subpoena related to ad load on Meta.  Silvia Dec. Ex. 2.  The FTC subsequently narrowed its topics considerably based on negotiations, and even sent specific documents to aid Meta's preparation.  Silvia Dec. ¶¶ 5, 6.  Overall, following the parties' discussions, Meta agreed to prepare a witness to testify about specific aspects of Meta's ad load practices on Facebook Feed and Instagram Feed today, and similar core concepts at milestone points in the past.  Silvia Dec. ¶ 6.  The specific aspects included the ████ ████████████████████████████████████████████████████████████ ████████████████  Meta also agreed that the witness would be prepared to provide an overview of ad load on Facebook Stories and Reels, and Instagram Stories and Reels.  Silvia Dec. ¶ 6. Meta never replied to the FTC's final email setting out the finishing touches on the agreed-upon topics, but also never disavowed the FTC's framing.  Silvia Dec. ¶ 7.

**C.  The FTC Could Not Secure the Requested Information in Seven Hours**

Despite the extended pre-deposition discussions, Meta's corporate representative was

unable to provide information on all of the narrowed 30(b)(6) deposition topics, and the FTC was

thus forced to spend far longer than expected to obtain answers on even discrete topics, to the

extent it could secure an answer at all.  For example, the parties agreed that Meta's corporate

representative would be prepared to address Meta's practice of ███████████████████████

████████████████████████████████████████████████████████████████████

██████.  Silvia Dec. Ex. 4, at pg. 2-3 ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ citing documents the FTC identified, and

"[o]ther specific rules that the FTC identifies by May 8"); Silvia Dec. Ex. 5, at pg. 2 (identifying

████████████████████████ as a specific point on which the witness should be prepared).

The FTC provided Meta with specific documents discussing ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.  Silvia Dec. Ex. 3.

At the deposition, however, Meta's witness was unable to provide basic details about the

operation and effect of Meta's ██████████████████████████.  *See* Silvia

Dec. Ex. 9.  For instance, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████, despite the FTC citing these topics for examination.  Silvia Dec. Ex. 9

████████ Tr. at 96:5-97:13, 98:20-99:2, 103:23-104:11, 101:22-102:17; s*ee* Silvia Dec. Ex. 5 pg.

1 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.  When asked about the practical impact of ████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████ Silvia Dec. Ex. 9 ██████ Tr. at 90:7-91:18,

91:1-18.  The FTC was thus forced to expend significant time to address basic aspects of a

specific topic that was agreed upon in advance, and only after extensive questioning did the

witness acknowledge that █████████████████████████████████████████████

██████████ Silvia Dec. Ex. 9, ████████ Tr. at 99:3-100:21, 151:2-157:10.

 The witness was likewise not prepared to address certain core aspects of the current ad

load practices on Facebook and Instagram, despite current ad load systems being an agreed-upon

topic.  Silvia Dec. Ex. 4, at pg. 3-4, 5-6.  Notably, in advance of the deposition, Meta sent the

FTC a 2020 document that appears to describe ████████████████████████████

█████████████████████████ ("Ad Load Preparation" document).  Silvia Dec. Ex. 8.  The

FTC expected this to be a useful vehicle for learning about ██████████████████████

████████████████.  Yet the witness was not able to say, among other things, ████████

█████████████████████████████████████████████████████

██████████████████████████████ *See* Silvia Dec. Ex. 9 (Tr.) at 119:9-

120:3, 228:19-230:15, 238:3-13; Silvia Dec. Ex. 4 at 3-4, 5 ██████████████████████

████████████████████████████████████████████████████████

████████████.  The witness was similarly unable to provide basic detail about ████████████

███████████████████████████, instead giving unclear and conflicting answers.  *See* Silvia

Dec. Ex. 9 at 103:4-15, 139:3-141:13, 146:7-18, 215:15-216:25 ██████████████████

████████████████████████████████████████.  On these topics,

the FTC simply left the deposition without answers.

 **D.  An Additional Four Hours of Examination is Reasonable and Proportionate**

 The FTC has acted reasonably.  First, the FTC substantially narrowed and focused the

scope of testimony sought and provided materials to assist Meta's preparation as described

above.

Second, the FTC's request does not impose any burden on Meta that is not already contemplated by the Joint Scheduling Order ("JSO").  Even after the May 19 deposition, the FTC has 10.8 hours of non-data 30(b)(6) deposition time provided by the JSO that the FTC has never used.  Indeed, Meta itself was originally contemplated proffering two separate witnesses— one for ad load on Facebook and one for ad load on Instagram—and this would have afforded the FTC fourteen total deposition hours.  Silvia Ex. 4 at pg. 1.  The FTC is therefore eminently reasonable in requesting overall deposition time of eleven hours to cover both Facebook and Instagram (the seven hours taken on May 19 plus the four additional hours requested by the FTC).  Meta's insistence on providing one witness, despite the FTC's efforts to narrow its topics, elevates form over substance: if the FTC had issued two notices separately addressing Facebook ad load and Instagram ad load, the FTC would receive and the JSO would provide fourteen hours, but now Meta would restrict the FTC to only seven hours total.

Third, the FTC promptly raised concerns about the progress of the deposition during breaks in the day, in the hopes of receiving clearer and more prompt responses.  Meta notably provided additional briefing to the witness on two questions during a break and had him correct a previous answer upon return, *see* Silvia Dec. Ex. 9 at 129:8-130:12, but otherwise disputed (then and now) that its witness was not prepared.  Meta refuses additional time, and has made no alternative proposal that might provide the FTC with the information it requires.  Instead of making any alternative proposal, Meta criticizes the FTC for spending time on purported "background."  This is unavailing, as the witness's preparation was relevant, and moreover the FTC fully expected to cover all its questions at the outset of the deposition, but was thwarted by the witness's inability to promptly answer questions.

### 2. Meta's Position

The FTC seeks to extend by four hours its May 19 deposition of Meta's Rule 30(b)(6)

witness ███████████████████████████████████████████████████████

███████████████████████████████████, with responsibility for the overall

ad experience on Facebook as well as partnering with the Instagram ad team.  The deposition,

which by agreement was to focus on Meta's ad load systems, lasted seven hours on the record.

The Court should deny the FTC's request for more deposition time with ████████.

Contrary to the FTC's assertions – and in marked contrast to the FTC's own

Rule 30(b)(6) witness deposed on May 22 – ███████, who has been with Meta since 2017,

was well prepared to answer questions within the negotiated scope of the 30(b)(6) topics and

diligently and thoroughly answered every question that the FTC asked.  *See* Ex. F (5/19/23

███ Dep. Tr.).  The FTC used all of the time permitted under the Federal Rules, yet

neglected to cover some of the topics.  Failing to efficiently depose Meta's witness is not a valid

basis for requiring Meta to offer him again for several more hours.

#### a. The Scope of the Deposition

The FTC's deposition notice, issued on April 3, 2023, consisted of two overly broad

topics.  Silvia Decl. Ex. 1 (FTC's Rule 30(b)(6) Deposition Notice).  The first topic purported to

require testimony regarding Meta's 17-page supplemental response to the FTC's Interrogatory

No. 3, which provided ████████████████████████████████████████████

████████████████████.  The second topic had eight subparts regarding a variety of ad

load-related issues, including highly technical descriptions of Meta's ad load systems.  Based on

several meet and confers and correspondence, including Meta's letters of May 4 and 15, and the

FTC's letter of May 8 and email of May 16, the parties agreed on a narrower scope.  Silvia Decl.

Exs. 4 (5/4/23 N. Gillespie Letter), 6 (5/15/23 S. Strikis Letter), 5 (5/8/23 M. Silvia Letter), and 7

(5/16/23 M. Silvia Email).  Because of the complexity of Meta's ad load systems – as Meta explained to the FTC on several occasions – the negotiated scope limited the topics to *high-level* testimony about Meta's ad load systems on six surfaces:  Facebook Feed, Reels, and Stories, and Instagram Feed, Reels, and Stories.  For Facebook and Instagram Feed, Meta's witness was expected to testify at a high level regarding ad load systems as they existed before and after the introduction of the ███████████████████████████ and regarding their current operation.  For those two surfaces, Meta agreed to provide general, high level descriptions of certain "rules," including the so-called ████████████████████████████████

### b. The Deposition

During the deposition, the FTC proceeded at a slow pace.  Despite knowing that it had six surfaces to cover in seven hours, the FTC spent the first 45 minutes of the deposition going over introductory questions, with particular focus on ████████ employment history prior to joining Meta, which had nothing to do with the 30(b)(6) topics.

During the course of the deposition, the FTC asked numerous out-of-scope questions.  For example, the FTC asked ████████ about both ███████████████████████ – two topics related to the auction system that were duplicative of information in Meta's Interrogatory No. 3 responses and that the FTC had not included in the deposition scope.  Ex. F, at 50:15-16; 81:10-11 (████ Dep. Tr.); Ex. G, at 14-15 (Meta's Supplemental Response to the FTC's Interrogatory No. 3); Silvia Decl. Ex. 1 (FTC's Rule 30(b)(6) Deposition Notice) (limiting the scope to "ad load systems," and not including auction systems).  The FTC also asked about an ████████████████████████ even though the parties had agreed that the witness would not be expected to testify about formulas.  Ex. F, at 86:5-10 ████ Dep. Tr.); Silvia Decl. Ex. 4 (5/4/23 N. Gillespie Letter at 2-3) ("[T]he deponent will be prepared to provide testimony at *a thematic level* suitable for a presentation to executives about" several

██████████████ rules (emphasis added)).  The FTC also asked about how the ad load systems weigh various inputs, *see* Ex. F, at 125:21-23 (██████ Dep. Tr.); very specific techniques used to regulate ad load, including the ████████████ that the FTC now complains about not getting sufficient testimony about, *see*, *e.g.*, *id.* at 226:14-230:15; and experiments Meta conducted with respect to ad load systems, *see id.* at 247:9-23.  Those questions were outside the scope because they were too granular and/or focused on Meta's experiments.  *See*, *e.g.*, Silvia Decl. Ex. 4 (5/4/23 N. Gillespie Letter at 3) ("The deponent will be prepared to provide testimony *generally* describing the operation of Facebook Feed's current ad load system, including *a high-level overview* of the nature of major, *broadly implemented changes* to the system in the last year"; "[t]he testimony will not include a detailed technical, or engineering or code level . . . or a complete list of all factors or criteria that affect ad load and their relative weighting") (emphases added).  ████████████ answered those questions to the best of his knowledge, but, of course, they took time away from the topics that were actually within the deposition's scope.

        The FTC complains that it did not obtain sufficient testimony about what it calls the ████████████  That is inaccurate.  The FTC asserts that ████████████ did not specify when the rule was introduced, but he did explain that it ████████████████████████████ ████████████████████████████████████ Ex. F, at 94:25-95:4, 61:3-4 (██████████ Dep. Tr.).  And as the FTC knows, the "specific dates" as to when the rule "first launched or deprecated" were outside the scope.  Silvia Decl. Ex. 6 (5/15/23 S. Strikis Letter at 1); *see also* Silvia Decl. Ex. 7 (5/16/23 M. Silvia Email) ("we agree that the witness need not discuss the 'specific dates any such rules/concepts were first launched or deprecated'").  The FTC next faults ████████████ for not explaining when the rule was retired.  But ████████████████████



███████████████████████████████████████████████████████

Ex. F, at 103:7-15 (████████ Dep. Tr.).  And contrary to the FTC's assertion, ████████ did

provide ████████████████. *Id.* at 130:7-8 █████████████████████); 102:2-4.

Simply put, ████████ testimony regarding ███████████ was more than sufficient to

satisfy the scope of the notice, which called for a general description of the rule.  And the

questioning regarding ████████████ did not prevent the FTC from addressing other

deposition topics, such as Facebook and Instagram Reels, that the FTC chose not to ask

questions about.

The FTC also complains that it had to "expend significant time to address basic aspects

of a specific topic," including ███████████.  But that complaint is rooted not in any

alleged deficiencies in ██████████ testimony, but rather in the FTC's persistent

unwillingness to recognize that Meta's ad load systems and aspects thereof are highly complex

and may not necessarily fit into the FTC's preconceived expectations.  *Id.* at 266:17-267:6 (FTC

stating that █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████).  ███████████ was entirely consistent in explaining

how the ad load systems operate.

c.    The FTC's Request for More Time

████████████ answered every question the FTC posed, and he did so competently and at

an appropriate level of detail.  When it became clear that the FTC was not understanding his

responses, he provided helpful analogies to describe the issues addressed.  *See*, *e.g.*, *id.* at 135:9-

11; 136:5-16 (██████████████████████████████████████████████

████████████████████████████████████).  Similarly, when ████████████ was

asked about specific factors used or being tested for use in determining ad load, ███████

repeatedly responded that, while he may not have known about the use of a specific factor, he

described the ████████████████ that were available to the ad load system.  *Id.* at 248:13-

21; 242:15-18.  At one point, when the FTC asked for very specific information about ██

██████████████████████████████, with the FTC's approval, consulted his

colleagues at Meta during a break to obtain the details the FTC wanted.  *Id.* at 129:11-20.  *See*

*also Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 255 (D.D.C. 2018) (in circumstances where a

Rule 30(b)(6) witness "testified to some of the basics regarding [a software program], [but]

[w]hen pressed . . . struggled to answer more technical questions," relief based on a claim that a

witness was unprepared is not warranted).

       The FTC argues that it is entitled to depose █████████ for four more hours because it

did not use all of its deposition time during the discovery period, but that ignores the seven-hour

limit applicable to any witness.  The FTC's claim that Meta "insiste[d] on providing one

witness" is simply inaccurate.  The parties never had a dispute over the number of witnesses to

satisfy the notice, and Meta provided one witness because he could testify about the topics.

       ██████████ was fully prepared and cooperative in responding to all questions regarding

the operation of Meta's highly complex ad load systems.  The FTC was well aware that the

operation of those systems could not be explained by providing simple and short answers.  The

Federal Rules of Civil Procedure limit a deposition to seven hours on the record.  The FTC knew

it had seven hours to cover the topics it sought to cover.  It failed to do so because of its own

strategic choices.  The Court should deny the FTC's request for additional time.

### C.   The FTC's RFP No. 132

#### 1.   The FTC's Position

On April 21, 2023, the FTC served RFP No. 132, which seeks documents and data

related to analyses conducted or directed by Meta regarding the ████████████████

████████████████████████████████████████████████████. On April 28, 2023,

the FTC further narrowed the request to only analyses (including planned analyses) that are

referred to in the cited document: FTC-META-007049467.  Ex. 17 (4/28/23 Email from D.

Matheson to Meta's counsel).  Meta replied that it was evaluating the FTC's request and

proposal, *id.*, but did not make a counterproposal until a meet and confer on May 24,

2023.  During that meet and confer, the FTC once again narrowed its request to include only

analysis conducted in ████████████████████.

Following additional conversation, Meta has offered to produce the following materials

related to the ████████████ referenced in FTC-META-007049467: ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

The FTC agrees that Meta's offered materials are relevant and responsive, and that Meta

should produce them. The FTC also requests, however, that Meta additionally conduct a

reasonable search for internal and external documents related to the ████████████, including

internal discussions, draft analyses, and draft presentations.  Despite requests by the FTC, Meta

has not disclosed pertinent information that would help in determining a scope of search—

including, for example, which Meta employees are involved in ████████████ and how the

project files are maintained.  Notwithstanding the information disadvantage, the FTC suggests

that a reasonable scope of search would additionally include the following: ██████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████

     Meta's contrary offer to produce only studies submitted for publication, and presentations

that Meta considers "final," is insufficient because these materials necessarily focus on results

that Meta deemed favorable enough for publication or to be considered "final."  In so doing,

Meta's offer would fail to uncover and produce other highly relevant information—including,

*inter alia*, results that were not favorable to Meta (and thus not selected for publication);

commentary regarding weaknesses or vulnerabilities in (published or un-published) results or

study methodologies; and strategic decisions Meta made regarding what to address or not

address.  Such information is highly relevant because Meta maintains that it "may" rely on the

███████████████  to defend itself in this litigation.

     Meta's general claims of burden are unavailing.  In particular, in meet and confers,

Meta's counsel suggested that a search for responsive materials might involve voluminous

documents and data.  However, this claim is entirely unsupported, given that Meta has never

disclosed the number or identity of people who worked on the █████████████, nor provided

any details about how project materials are kept or their specific volumes.  Now, for the first

time with this filing, Meta selectively reveals that ███████████████████████

██████████.  Along with these delayed revelations, Meta should disclose relevant details about the scope of files that exist—including, e.g., information on which Meta employees were heavily involved and the participation of any third parties—to allow for a meaningful discussion about a representative scope of search.

Both parties agree that RFP 132 was timely served and is relevant to this litigation—and yet Meta asks the Court, without justification, to treat this request as one for expert discovery. As a result, Meta proposes to limit its production to documents and data that were shared with external parties.  This position is plainly untenable given that RFP 132 requests documents and data produced and maintained in the ordinary course of Meta's business.  The Court should order Meta to conduct a reasonable search and production of internal documents and data in response to RFP 132.

2.      **Meta's Position**

Meta has made a more than reasonable compromise offer to produce documents to the

FTC in response to RFP No. 132.  After a reasonable investigation, Meta determined that ████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *See* Meta Research,

https://research.facebook.com/economiccontribution/ (last visited May 31, 2023).  ███████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

Unwilling to accept this offer, the FTC demands all data and communications *relating to*

each of the ███████████, insisting that Meta engage in custodial searches of at least seven

Meta employees.  It argues this broad discovery is appropriate because other research and data

might exist that are "not favorable to Meta."  That is entirely speculative, and the FTC has not

offered any evidence for this theory – either in its portion of the Joint Status Report above, or

during the parties' meet and confers – that could justify imposing this significant burden on Meta

at this stage in discovery.  Indeed, when Meta asked the FTC to explain why it was seeking such

an unreasonable amount of discovery, the FTC offered only a general suspicion that Meta may

have "rigged" its data analysis.  The Court should reject this unfounded assertion and deny the

FTC's demand for more than what Meta has already offered.

Meta's offer will provide the FTC with the information it reasonably needs. 

(By way of comparison, this is far more than the FTC would receive under the default federal rules for actual expert reports, let alone academic papers that an expert might cite. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring production of "the facts or data *considered* by" an expert, while Meta is providing the data *received* by the outside academics (emphasis added)).)

The FTC's request for additional communications and data "relating to" these efforts is cumulative and disproportionate to the needs of the litigation at this late stage. The FTC and Meta negotiated search terms and custodians nearly a year ago. Those search terms and custodians resulted in the production of the document that the FTC relies on concerning the research into ██████████████ as well as countless other documents on this and other issues. Indeed, Meta has already produced approximately 332,000 documents for three of the custodians the FTC has identified ███████████████████████) – *including* FTC-META-007049467, the document that describes the ████████████ – and the FTC deposed all three of those individuals more than three months after Meta produced that document, yet did not any of them about it. Absent any evidence that undertaking additional custodial searches of these three employees (and adding four other employees as new custodians

for the first time) would result in any useful information the FTC does not already have, the Court should reject the FTC's demand.

Moreover, the FTC has already served 57 data requests, in response to which Meta has produced a massive volume of data. This additional request for yet more data is belated, speculative, and incredibly burdensome. Meta publicly discloses these research efforts on its website. *See* Meta, *Economic Impact*, https://about.fb.com/news/tag/economic-impact (last visited May 31, 2023). If the FTC had any genuine need for even more information about these efforts, it could have sought it long ago. And, in any event, Meta has proposed to produce all data the academic co-authors received; not just what they relied on.

Two points of clarification are necessary. First, Meta has never suggested that it might rely on any research or data from the ███████████ that it has not produced to the FTC. Second, Meta's claims about the burden were not "unsupported." Meta explained to the FTC with specificity that the underlying data sets for one of the two academic papers at issue comprise trillions of rows of data that also cross-reference other data tables. Meta explained that it is unlikely that Meta could even feasibly produce these data in their entirety, and that this is the reason Meta proposed to produce the subset of those data provided to the academic co-authors.

For these reasons, the Court should adopt Meta's proposal. If the Court is inclined to require Meta to go beyond that proposal, it should only require Meta to search readily accessible central repositories where additional information may be found, and not to engage in custodial searches. And, as discussed above, the Court should not order Meta to produce all data "related" to the studies because it would be virtually impossible for Meta to do so.

II.    **FACT DISCOVERY TO BE PRODUCED AFTER MAY 31, 2023**

This section describes fact discovery remaining after May 31, 2023. Part II.A includes the parties' joint statement on the party discovery that they expect to postdate May 31, 2023. Part II.B includes each party's respective statement on the nonparty discovery each party expects to postdate May 31, 2023.

A.    **The Parties' Joint Statement on Party Discovery Remaining After May 31, 2023**

This section includes the parties' joint statement on party discovery expected to postdate May 31 and the parties' proposed deadlines or, as applicable, the deadlines this Court has ordered, for such discovery.

- The FTC has issued questions to Meta regarding Meta's data productions, pursuant to the FTC's April 3, 2023, Rule 30(b)(6) Notice of Deposition. The parties propose that Meta will serve responses by June 5, 2023, to all questions the FTC has served as of May 29, 2023. In addition, the parties propose that the FTC may serve discrete follow-up questions within ten days of receiving any further data or Meta's responses, and Meta will respond to any such follow-up questions within ten days.

- As the Court previously directed, on or before June 7, 2023, the FTC will respond to Meta's Interrogatory No. 23 (regarding the facts supporting the FTC's allegation that Snapchat provides personal social networking services in the United States). *See* 5/15/23 Hr'g Tr. at 10:22-23.

- The parties propose that on or before June 9, 2023, Meta shall provide its responses to the FTC's Interrogatory Nos. 16 and 17 (regarding Meta's relevant markets tutorial submission in *Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570-JD (N.D. Cal.) ("*Klein*")), No. 19 (regarding certain standalone apps), and No. 23 (regarding the Cross-Check program). In

addition, the parties propose that on or before June 9, 2023, Meta also shall provide a supplemental response (if any) to Interrogatory No. 9 (regarding amounts paid to contractors addressing Objectionable Content).

- The parties agreed on a scope of production of videos responsive to the FTC's RFP No. 109. Meta has already produced certain videos within the agreed scope of production for this RFP. The parties propose that on or before June 9, 2023, Meta shall produce additional, available videos within the agreed scope of production (if there are any).

- The parties agreed on a scope of production of documents from the custodial files of Mr. Santosh Janardhan. The parties propose that on or before June 9, 2023, Meta shall produce these documents.

- The parties propose that by mid-June, Meta shall complete the production of certain Board documents identified in the FTC's "refresh" request.

- The parties agreed on the scope of Meta's re-review of certain entries on Meta's privilege log for this litigation. The parties propose that on or before June 26, 2023, Meta shall complete this re-review by serving any downgrades, or modified redactions, and associated privilege log entries.

- Meta is preparing a privilege log for its productions responsive to the FTC's Seventh, Eighth, Tenth, and Eleventh Sets of Requests for Production, as well as for Meta's productions of Mr. Janardhan's custodial documents and of documents responsive to the FTC's "refresh" request. Consistent with the Joint Scheduling Order (ECF No. 103, ¶ 17), Meta shall serve its privilege log for those productions on or before July 17, 2023.

- The FTC's RFP No. 40(a), from the FTC's First Set of Requests for Production, requests that Meta reproduce in this litigation documents that Meta produces in *Klein*. In *Klein*, Meta is

continuing to produce documents responsive to the *Klein* plaintiffs' requests for production and privilege downgrades.  The parties propose that Meta shall continue serving *Klein* reproductions in this case until Meta's productions in *Klein* cease.  Fact discovery in *Klein* is scheduled to close on June 23, 2023.

- The FTC's RFP No. 126 seeks Meta's 2023 long-range plan, which is not yet available.  The parties propose that Meta shall produce the 2023 long-range plan reasonably soon after it becomes available.  Meta anticipates that the 2023 long-range plan will become available later in June 2023.

- The parties propose that the FTC may use its remaining linked file requests, if any, until November 6, 2023, which is the deadline for the FTC's rebuttal expert reports under the Joint Scheduling Order.  *See* ECF No. 103, ¶ 5.

**B.**     <u>**The Parties' Statements on Nonparty Discovery Remaining After May 31,**</u>
<u>**2023**</u>

      **1.**     **The FTC's Statement on Nonparty Discovery**

- **Alphabet:** Alphabet is in the process of producing a final, small set of documents to the FTC. Alphabet's counsel has represented that Alphabet's production of relevant documents is forthcoming.

### 2.     Meta's Statement on Nonparty Discovery

During the fact discovery period, Meta worked diligently to obtain evidence from

nonparties.  To that end, Meta has received documents from approximately 140 nonparties and

conducted nearly 70 nonparty depositions.  A few nonparties, however, are still working to

finalize or correct productions and may produce limited sets of documents or data shortly after

May 31.  Amazon has stated ███████████████████████████████████.

Bessemer Venture Partners has indicated that █████████████████████████

████████████████████████████████████████████████████████

███████████.  News Corporation will make a re-production to pare back certain redactions in

documents that it has already produced to Meta (and that Meta has forwarded to the FTC).

Finally, Meta is awaiting some data from Alphabet relating to YouTube.  The Court

previously set a hearing to be held on May 17 for nonparty discovery disputes.  Meta previously

notified the Court that the hearing was unnecessary based on a representation made by Alphabet

that it would produce certain data to Meta on or before May 29.  Alphabet produced some (but

not all) of that data on May 29.  Meta and Alphabet are continuing to cooperate to ensure that

Alphabet can produce the agreed-upon data.  Meta and Alphabet will notify the Court if they are

unable to resolve this matter.

Meta also may receive a declaration or, in the alternative, a very limited document

production from Twitter on Twitter's current ad load, which Meta expects to receive no later

than June 2, 2023.  Meta also expects to receive a declaration from OfferUp concerning its

competition with Meta by June 2.  Separately, Meta expects to continue receiving from

nonparties declarations authenticating documents the nonparty has already produced.

Dated: May 31, 2023                    Respectfully submitted,

                                       _/s/ Mark C. Hansen_
                                       Mark C. Hansen (D.C. Bar No. 425930)
                                       Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                       Kenneth M. Fetterman (D.C. Bar No. 474220)
                                       Daniel V. Dorris (D.C. Bar No. 1012305)
                                       Kevin D. Horvitz (D.C. Bar No. 1521032)
                                       Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
                                       KELLOGG, HANSEN, TODD,
                                         FIGEL & FREDERICK, P.L.L.C.
                                       1615 M Street, N.W., Suite 400
                                       Washington, D.C. 20036
                                       Tel: (202) 326-7900
                                       mhansen@kellogghansen.com
                                       gklineberg@kellogghansen.com
                                       kfetterman@kellogghansen.com
                                       ddorris@kellogghansen.com
                                       khorvitz@kellogghansen.com
                                       apolavarapu@kellogghansen.com

                                       James P. Rouhandeh (D.D.C. Bar No. NY0390)
                                       Michael Scheinkman (D.D.C. Bar No. NY0381)
                                       Davis Polk & Wardwell LLP
                                       450 Lexington Ave.
                                       New York, New York 10017
                                       Tel: (212) 450-4754
                                       james.rouhandeh@davispolk.com
                                       michael.scheinkman@davispolk.com

                                       Sonal N. Mehta (CA SBN 222086)
                                       Wilmer Cutler Pickering Hale & Dorr LLP
                                       2600 El Camino Real, Suite 400
                                       Palo Alto, California 94306
                                       Tel: (650) 858-6000
                                       Sonal.Mehta@wilmerhale.com

                                       David Z. Gringer (D.C. Bar No. 1001200)
                                       Wilmer Cutler Pickering Hale & Dorr LLP
                                       7 World Trade Center
                                       250 Greenwich Street
                                       New York, New York 10007
                                       Tel: (212) 230-8800
                                       David.gringer@wilmerhale.com

                                       _Counsel for Defendant Meta Platforms, Inc._

By: */s/ Daniel Matheson*
Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Maria DiMoscato (D.C. Bar 489743)
Patricia Galvan
Owen Masters (D.C. Bar 242139)
Susan Musser (D.C. Bar 1531486)
Michael Smith (D.C. Bar 996738)
Mitchell London (D.C. Bar 1029408)
Jessica Moy
Nathan Brenner
Rebecca Weinstein

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*