# Volume 27: Exhibits 399-410

No. 1:20-CV-03590-JEB

# Exhibit 399

Help Center    General  Business                    Log in or Sign up    Pinterest home

What are Pins?   How to create Pins   Design a Pin   Tag products in your Pins   Add links to your Pins   Review before publishing   Edit or delete a Pin   ‹ ›

# Guide to creating Pins

## What are Pins?

Pins are visual bookmarks that people use to save content they love on Pinterest. People can search for Pins, save the ones they like and click on a Pin to learn more.

## How to create Pins

You can create your own Pins by uploading images or videos from your computer or mobile device. Plus, with the Pinterest camera tools available in the app, you can record videos and take new photos too.

In addition to creating Pins with your own images and videos, you can save images you find online as Pins.

## Design a Pin

Once you select the images and videos you want to include in your Pin, you have the option to add effects like text overlay, stickers, music, and more. You can find more on how to use these design tools in our article, Design a Pin.

## Tag products in your Pins

You may want to tag products in your Pins so people on Pinterest can shop for them. You can add up to five product tags per Pin. Just make sure any products you add align with our merchant guidelines and affiliate guidelines.

## Add links to your Pins

When you add a link to your Pin, you're giving your audience a clear next step. Many Pinterest creators like to send people on Pinterest to their blog, website, or another website they're affiliated with.

You'll see the option to add a link when you're adding the descriptive details to your Pin (like choosing a title, board, etc.). With a business account, you can see how often people are viewing your Pin and visiting the links you share. Learn more about how to view Pinterest Analytics.

## Review before publishing

Before publishing your Pin, be sure to take a final look to ensure it looks right and has all the correct details. This includes reviewing the overall design and any details you've added like a title, cover image, tags and link.

## Edit or delete a Pin

### Other articles

Create and edit Pins                  +

Create and edit boards                +

Organize boards                       +

Content creation overview             +

Guide to creating Pins

Create a collage

After publishing, you can edit a Pin's title, board, and a few other descriptive details. However, you cannot make changes to the image, video or audio contents of your Pin once it's been published. Learn more about how to edit or delete a Pin.

## Creation best practices

As a content creator on Pinterest, you should review the Creator Code and follow our community guidelines. If you create a Pin that violates these guidelines, you may lose the ability to create Pins. And if we notice any spam-related behaviors, your account may be temporarily blocked.

Looking for more tips? Learn how to become a Pinterest creator  and find more on the Pinterest creator site.

## Do more with your Pins

When you set up a business account, you have access to extra tools and features on Pinterest. You can:

- Access Pin analytics
- Schedule Pins in advance
- Promote your Pins as ads

And if you have a website, you can create rich Pins. Rich Pins will automatically update to reflect any edits you make to your blog posts, recipes, or another page on your website.



# Exhibit 400

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023
OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM              TO**

Commission File Number 001-40246

# Nextdoor Holdings, Inc.
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **86-1776836** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **420 Taylor Street** **San Francisco, California** | **94102** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (415) 344-0333

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Exchange on Which Registered |
|---|---|---|
| Class A common stock, par value $0.0001 per share | KIND | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant, as of June 30, 2023, the last business day of the registrant's recently completed second fiscal quarter, was approximately $692.4 million based upon the closing price reported for such date on the New York Stock Exchange.

As of February 23, 2024, there were 192,311,520 shares of the registrant's Class A common stock outstanding and 201,319,374 shares of the registrant's Class B common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Information required in responses to Part III of Form 10-K is hereby incorporated by reference to portions of the Registrant's Proxy Statement for the Annual Meeting of Stockholders to be held in 2024. The Proxy Statement will be filed by the Registrant with the Securities and Exchange Commission no later than 120 days after the end of the registrant's fiscal year ended December 31, 2023.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Special Note Regarding Forward-Looking Statements | | 2 |
| Risk Factor Summary | | 4 |
| **PART I** | | |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 41 |
| Item 1C. | Cybersecurity | 41 |
| Item 2. | Properties | 42 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Mine Safety Disclosures | 42 |
| **PART II** | | |
| Item 5. | Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. | Item 6. [Reserved] | 44 |
| Item 7. | Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 57 |
| Item 8. | Item 8. Financial Statements and Supplementary Data | 59 |
| Item 9. | Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 91 |
| Item 9A. | Item 9A. Controls and Procedures | 91 |
| Item 9B. | Item 9B. Other Information | 91 |
| Item 9C. | Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 92 |
| **PART III** | | |
| Item 10. | Item 10. Directors, Executive Officers and Corporate Governance | 92 |
| Item 11. | Item 11. Executive Compensation | 92 |
| Item 12. | Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 92 |
| Item 13. | Item 13. Certain Relationships and Related Transactions, and Director Independence | 92 |
| Item 14. | Item 14. Principal Accountant Fees and Services | 92 |
| **PART IV** | | |
| Item 15. | Item 15. Exhibits, Financial Statement Schedules | 93 |
| Item 16. | Item 16. Form 10-K Summary | 94 |
| Signatures | | 95 |

See "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" — "*Key Business Metrics*" and "*Non-GAAP Financial Measure*" for the definitions of the following terms used in this Annual Report: "WAU," "ARPU," and "Adjusted EBITDA."

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K ("Annual Report") contains forward-looking statements within the meaning of the federal securities laws. All statements contained in this Annual Report, other than statements of historical fact, including statements regarding our or our management team's expectations, hopes, beliefs, intentions, strategies, future operating results and financial position, potential growth or growth prospects, are forward-looking statements. Words such as "believes," "may," "will," "estimates," "potential," "continues," "anticipates," "intends," "expects," "could," "would," "projects," "plans," "targets," and variations of such words and similar expressions are intended to identify forward-looking statements. Forward-looking statements in this Annual Report may include, for example, statements about:

- our anticipated growth, including our ability to scale new neighbor growth, our ability to grow engagement by our existing neighbor base and our ability to increase monetization of our platform;

- our ability to scale our business and monetization efforts;

- the political, economic, and macroeconomic climate, whether in the advertising industry in general, or among specific types of advertisers or within particular geographies, including but not limited to the impacts related to actual or perceived instability in the global banking system, labor shortages, supply chain disruptions, a potential recession, uncertainty with respect to the federal budget and debt ceiling and a potential temporary federal government shutdown related thereto, inflation, and changing interest rates;

- our ability to expand our business operations abroad by opening new and expanding within existing neighborhoods outside of the United States;

- our ability to respond to general economic conditions;

- our ability to invest in, and the ultimate success of, technologies aimed at enhancing our business solutions and delivering additional value to customers on our platform;

- our ability to scale our business effectively;

- our ability to achieve and maintain profitability in the future;

- our ability to access sources of capital to finance operations and growth;

- the success of strategic relationships with third parties;

- our ability to maintain the listing of our Class A common stock on the New York Stock Exchange;

- changes in applicable laws or regulations, both within and outside of the United States;

- the impact of the regulatory environment and complexities with compliance related to such environment;

- the inability to develop and maintain effective internal controls;

- the impact on our business as a result of interruptions, delays, or failures resulting from earthquakes, fires, floods, adverse weather conditions, other natural disasters, power loss, terrorism, pandemics, geopolitical conflict (including the war in Ukraine and the Israel-Hamas war), other physical security threats, cyber-attacks, or other catastrophic events;

- our ability to raise financing in the future;

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors;

- our financial performance; and

- other factors detailed in Part I, Item 1A, "Risk Factors" in this Annual Report.

Table of Contents

We have based these forward-looking statements largely on our current expectations and projections as of the date of this filing about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in Part I, Item 1A, "Risk Factors" in this Annual Report. Readers are urged to carefully review and consider the various disclosures made in this Annual Report and in other documents we file from time to time with the Securities and Exchange Commission (the "SEC") that disclose risks and uncertainties that may affect our business. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for us to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and circumstances discussed in this Annual Report may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, performance, or achievements. In addition, the forward-looking statements in this Annual Report are made as of the date of this filing, and we do not undertake, and expressly disclaim any duty, to update such statements for any reason after the date of this Annual Report or to conform statements to actual results or revised expectations, except as required by law.

You should read this Annual Report and the documents that we reference herein and have filed with the SEC as exhibits to this Annual Report with the understanding that our actual future results, performance, and events and circumstances may be materially different from what we expect.

As used in this Annual Report, the terms "Nextdoor," "we," "us," and "our" mean Nextdoor Holdings, Inc. and its subsidiaries unless the context indicates otherwise.

Table of Contents

## RISK FACTOR SUMMARY

Our business is subject to numerous risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in this Annual Report. You should carefully consider these risks and uncertainties when investing in our Class A common stock. Some of the principal risks and uncertainties include the following:

- We have a limited operating history at the current scale of our business and are still scaling up our monetization efforts, which makes it difficult to evaluate our current business and future prospects, and there is no assurance we will be able to scale our business for future growth.

- Adverse global economic and financial conditions could harm our business and financial condition.

- We currently generate substantially all of our revenue from advertising. If advertisers reduce or eliminate their spending with us, our business, operating results, and financial condition would be adversely impacted.

- Our business is highly competitive. Competition presents an ongoing threat to the success of our business.

- Our business is dependent on our ability to maintain and scale our product offerings and technical infrastructure, and any significant disruption in the availability of our platform could damage our reputation, result in a potential loss of neighbors and engagement, and adversely affect our business, operating results, and financial condition.

- If we fail to scale our business effectively, our business, operating results, and financial condition would be adversely affected.

- If our efforts to build strong brand identity and reputation are not successful, we may not be able to attract or retain neighbors, and our business, operating results, and financial condition will be adversely affected.

- We plan to continue expanding our international operations where we have limited operating experience and may be subject to increased business, regulatory, and economic risks that could seriously harm our business, operating results, and financial condition.

- If we need additional capital in the future, it may not be available on favorable terms, if at all.

- Our business depends largely on our ability to attract, retain and assimilate talented employees, including senior management. If we lose the services of or fail to successfully assimilate highly skilled personnel, key employees or members of our senior management team, we may not be able to execute on our business strategy.

- We are dependent on third-party software and service providers, including the Google Ad Manager ("GAM") platform, for management and delivery of advertisements on the Nextdoor platform. Any failure or interruption experienced by such third-parties could result in the inability of certain businesses to advertise on our platform, and adversely impact our business, operating results, and financial condition.

- We rely on third-party software and service providers, including Amazon Web Services ("AWS"), to provide systems, storage and services for our platform. Any failure or interruption experienced by such third parties could result in the inability of neighbors and advertisers to access or utilize our platform, and adversely impact our business, operating results, and financial condition.

- Technologies have been developed that can block the display of advertisements on the Nextdoor platform, which could adversely impact our business, operating results, and financial condition.

- Security breaches, including improper access to or disclosure of our data or our neighbors' data, or other hacking and phishing attacks on our or third-party systems, could harm our reputation and adversely affect our business.

- Distribution and marketing of, and access to, our platform depends, in significant part, on a variety of third-party publishers and platforms (including mobile app stores, third-party payment providers, computer systems, and other communication systems and service providers). If these third parties limit, prohibit or otherwise interfere with or change the terms of the distribution, use or marketing of our platform in any material way, it could materially adversely affect our business, operating results, and financial condition.

- Certain of our market opportunities and key metric estimates could prove to be inaccurate, and any real or perceived inaccuracies may harm our reputation and negatively affect our business.

Table of Contents

- We have a history of net losses and may experience net losses in the future and we cannot assure you that we will achieve or sustain profitability. If we cannot achieve and sustain profitability, our business, financial condition, and operating results will be adversely affected.

- We may have greater than anticipated tax liabilities, which could harm our business, revenue and financial results.

- We cannot guarantee that our Share Repurchase Program will be fully consummated or that it will enhance long-term stockholder value. Share repurchases could also increase the volatility of the trading price of our stock and diminish our cash reserves.

- We may be liable as a result of content or information that is published or made available on our platform.

- Our business is subject to complex and evolving U.S. and foreign laws, regulations, and industry standards, many of which are subject to change and uncertain interpretations, which uncertainty could harm our business, operating results, and financial conditions.

- We could be involved in legal disputes that are expensive and time consuming, and, if resolved adversely, could harm our business, operating results, and financial condition.

- Failure to maintain effective systems of internal controls and disclosure controls could have a material adverse effect on our business, operating results, and financial condition.

- If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business, operating results, and financial condition may be adversely affected.

- Third parties may claim that our platform infringes their intellectual property rights and this may create liability for us or otherwise adversely affect our business, operating results, and financial condition.

- Our use of "open source" software could subject us to possible litigation or could prevent us from offering products that include open source software or require us to obtain licenses on unfavorable terms.

- We license technology from third parties, and our inability to maintain those licenses could harm our business.

- The price of our Class A common stock has been and may continue to be volatile.

- The dual class structure of our common stock may adversely affect the trading market for our Class A common stock.

- The dual class structure of our common stock has the effect of concentrating voting power with our management and other existing stockholders, which will limit your ability to influence the outcome of important transactions, including a change in control.

- We do not intend to pay cash dividends for the foreseeable future.

Table of Contents

# PART I

**Item 1. Business**

**Overview**

At Nextdoor, our purpose is to cultivate a kinder world where everyone has a neighborhood they can rely on. Neighbors around the world turn to Nextdoor to receive trusted information, give and get help, get things done, and build real world connections with those nearby — neighbors, businesses, and public services. By fostering these connections, both online and in the real world, Nextdoor builds stronger, more vibrant, and more resilient neighborhoods. As of December 31, 2023, Nextdoor was in more than 325,000 neighborhoods around the world and in 1 in 3 households in the United States. As of the end of the fourth quarter of 2023, Nextdoor had 88 million global Verified Neighbors.[1]

**Our Platform**

The Nextdoor platform enables neighbors and organizations to build an engaged community of trusted neighbors, businesses and public services that can be depended on to exchange valuable information, goods, and services.

Neighbors use Nextdoor to engage with and stay up to date on the communities that matter to them. They can find posts, photos, and discussions in the Feed, discover nearby neighbors, Groups, businesses, events, and items through a nativized maps surface in the Discover tab, and search for specific content and organizations through our Search feature.

Nextdoor is a high-utility platform that connects neighbors with organizations and other local resources. Neighbors can discover and interact with local businesses, leave recommendations, and follow their Faves on the platform. Neighbors can utilize a truly local marketplace, For Sale & Free, to buy, sell, or give away items, and offer services such as dog walking.

In addition, Nextdoor is where neighbors can receive critical, real-time information from trusted officials. Public agencies, including government entities and service providers, turn to Nextdoor to directly, quickly, and easily reach neighbors in their community with relevant local information and alerts.

Our unique local data set includes event information, safety reports, recommendations, reviews, and discussions, as well as demographic data, interests, and behaviors of local residents. This detailed data contribute to the formation of the unique local knowledge graph that Nextdoor owns. Businesses on Nextdoor can use our real-time local data to devise advertising strategies and ensure their messages reach the most relevant and receptive audience in their immediate locality. Other artificial intelligence ("AI") and machine learning ("ML") applications allow us to improve notifications, drive positive interactions, optimize ad delivery, drive growth of comments and replies, and analyze data.

**Our Advertising Solutions**

Nextdoor offers advertising solutions designed to generate tangible value for businesses seeking to expand their reach and drive sales with unique local context that allows advertisers of all sizes to reach the right neighbor, at the right time, with the right message.

Our platform enables advertisers to achieve measurable outcomes that help advertisers build brand awareness, drive consideration and engagement, and generate sales. Ads can be leveraged on multiple surfaces on and off the platform, including Feed, Search, For Sale & Free, Right Hand Rail, and email.

We are continually improving and building upon our library of ad formats, including sponsored posts and lead generation, which feature combinations of text (static or dynamic), images (including static and animated), and URL links, and the ways in which advertisers can purchase and deliver ads across our platform.

*Ad Auction*

Ads on the Nextdoor platform primarily compete via an auction-based system. Our auction system selects the best ad for each available ad impression based on the likelihood of a desired action occurring and how much that action is worth to advertisers. The likelihood of the action occurring depends on a variety of factors, such as ad relevance and creative quality.

*Measurement & Targeting*

---

[1] Verified Neighbors are individuals who have joined Nextdoor and completed the verification process for their account.

Table of Contents

Delivering and demonstrating value for our advertisers is a key focus for Nextdoor. We offer a variety of measurement solutions, including a Conversion API, that are mapped to advertisers' goals and objectives and validate Nextdoor's performance. Nextdoor offers both brand safety controls as well as brand safety measurement via independent third-party partners.

Utilizing our neighborhood graph, advertisers can effectively target and reach multiple high value audiences, such as homeowners, parents, and recent movers. Nextdoor's neighborhood graph is built off high quality signals shared directly by our neighbors and partners. These signals are integrated using proprietary machine learning models that undergo continuous refinement and optimization to ensure scalability and accuracy.

*Go-to-Market Approach*

Nextdoor offers diverse marketing solutions for advertisers depending on size and goals. Our go-to-market approach combines the utilization of our self-service ads platform and support of a dedicated global sales force for managed campaigns. Our sales team is strategically positioned to attract and retain advertisers across all products, and provides support through all stages of the marketing cycle, including campaign planning, optimization, and performance analytics.

**A Kind Platform**

Nextdoor is a leading innovator in creating a welcoming platform that facilitates healthy neighborhood connections and conversations. We set clear Community Guidelines and use a combination of people, including nearly 200,000[2] volunteer community moderators, and technology to encourage kind conversations and promote neighborhood vitality.

From day one, we've required neighbors to sign up with their real names and addresses to ensure neighborhoods are made up of real people, nearby, and we have improved on similar verification procedures for businesses. We require all new neighbors to accept our Neighbor Pledge upon joining, in order to introduce our Community Guidelines and provide personal accountability for interactions on the platform. Further, neighbors are alerted when a new neighbor joins so they can reach out with a message of connection and belonging and establish rapport.

As neighbors interact through the platform, we use a combination of human review and machine learning and predictive technology solutions, like our Kindness Reminder and Constructive Conversations Reminder, launched in 2022, to enforce our Community Guidelines, support civility, and cultivate kindness. In 2023, we gave neighbors the ability to use generative AI to help write posts that are more likely to drive positive community engagement, and integrated AI into the Kindness Remainder to suggest more constructive revisions for comments that may violate the Community Guidelines. These developments enable us to better analyze tone and context, and help authors rephrase posts and comments to receive a better response from their community.

We have always believed it is important to incorporate local context into moderation decisions, which is why we have incorporated volunteer community moderators into our moderation program, alongside Nextdoor operations staff. Volunteer community moderators are active neighbors who have access to specialized tools and resources they can utilize as they help enforce our Community Guidelines. While local community moderators review most types of guideline-violating content, reports of certain types of harmful content (e.g., misinformation, discrimination) are handled by Nextdoor operations staff to ensure our standards and policies are applied consistently.

**Technology**

Our investments in technology are consistently focused on creating and improving products for neighbors and organizations in the countries in which we operate around the world. We have built generative AI features that personalize the distribution of content and make posts more engaging and kind through the use of Post Assistant. We continue to use machine-learning and proprietary technology to power our product strategy of building an engaged community.

We also continue to invest in our proprietary ad platform to expand and improve our advertising solutions for businesses of all sizes. In support of our objectives of delivering advertiser value, reducing advertising effort, and enabling businesses to thrive on Nextdoor, our development roadmap is focused on unifying our self-service offerings, leveraging machine learning and AI technologies to improve ad targeting, and enhancing measurement solutions to better inform our value proposition.

**Intellectual Property**

Our intellectual property and core technological innovations are integral components of our business. To establish and protect our intellectual property, proprietary rights and brand, we rely on a combination of federal, state, and common-law rights in the United

---

[2] Nextdoor Transparency Report, 2023.

Table of Contents

States and the rights under the laws of other countries, patents, trademarks, copyrights, domain name, trade secrets, including know-how, license agreements, confidentiality procedures, non-disclosure agreements with third parties, employee disclosure, and invention assignment agreements, and other contractual rights.

We own a trademark portfolio, including registered trademarks and applications in the United States and other countries, for the marks NEXTDOOR, ⬩, and ▰. We have registered domain names that we use in or relate to our business, such as the <nextdoor.com> domain name and country code top level domain name equivalents. As of December 31, 2023, we had 10 issued patents in the United States. We cannot assure you that any of our patent applications will result in the issuance of a patent or whether the examination process will require us to narrow our claims. Additionally, our current and future patents, trademarks, and other intellectual property or other proprietary rights may be contested, circumvented or found unenforceable or invalid. We may not be able to obtain or maintain sufficient protection for or successfully enforce our intellectual property. We license content, technology, and other intellectual property from our partners, and rely on our license agreements with those partners to use the intellectual property. Third parties may assert claims related to intellectual property rights against our partners or us.

For additional information, please see the section entitled "*Risk Factors — Risks Related to Intellectual Property*."

**Human Capital**

*Our Culture and Core Values*

Community is at the heart of Nextdoor and our community of employees is our lifeblood. Our employees have a wide range of experiences and perspectives, which fuel our purpose to cultivate a kinder world where everyone has a neighborhood they can rely on.

Our company core values are:

- Earn trust everyday;
- Invest in community;
- Customer obsessed;
- Think big;
- Experiment and learn quickly; and
- Act like an owner.

We live these core values through our approach to our people practices, summarized below.

*Employees*

As of December 31, 2023, we had 594 employees in the United States and in our international locations in Canada, the United Kingdom, the Netherlands, Ireland, France and Australia.

*Diversity, Equity, Inclusion and Belonging*

The principles of Diversity, Equity, Inclusion and Belonging ("DEIB") are woven into the very fabric of our organization and guide how we recruit, retain, and develop our talent.

Our commitment to DEIB begins at the top and is underscored by the importance of making diverse perspectives a business imperative. This is reflected in the racially diverse and gendered-balanced leaders that make up our Board of Directors, management team, and employees, and who all share in our passion for contributing to and effecting change in communities globally.

We thrive on creating a dynamic, inclusive environment that aims to support and value our employees, and contributes to our award-winning company culture. We have active and engaged Employee Resource Groups ("ERG") that are aligned around dimensions of diversity, such as gender, ethnicity, religion, sexual orientation and other shared attributes, which we believe help foster a sense of community, and a diverse and inclusive workplace. We have equipped our ERG leaders with tools and training to engage in courageous conversations with their communities. This approach is designed to foster space discussions on cultural topics that support the well-being of our employees.

Table of Contents

We focus our global recruitment efforts on ensuring that teams and hiring managers have the opportunity to consider qualified people from historically excluded groups for open roles. Moreover, we distribute a bi-annual employment engagement survey to measure our employees' satisfaction at Nextdoor, including employees' perspectives on our current state of workplace inclusivity.

***Learning, Development, and Engagement***

We have a dedicated Talent Management and Development team that develops and delivers company-wide people programs and learning and development experiences to help our employees grow in their careers. The programs include performance feedback and promotion cycles and recognition through our "Nextdoor Values Awards". Our learning and development experiences focus on onboarding new hires as well as offering resources focused on skills development and compliance training.

We are committed to making Nextdoor the best place to work by engaging with, and listening to, our community of employees. We maintain ongoing connection with our team members through regular all hands meetings, our speaker series, and bi-annual engagement surveys.

***Compensation, Benefits and Perks***

We provide employees with competitive compensation packages that include base salaries, sales commissions for certain employees, and equity awards. Additional benefits programs (which vary by country and region) include a 401(k) Plan with a company match, healthcare, vision, and dental insurance benefits, health savings and flexible spending accounts, flexible paid time off, parental leave, and other benefits tailored to the specific needs of our employees such as family forming, caregiving and mental health resources. We also support and encourage our employees to give back to our communities by giving each employee "Volunteer Time Off" to dedicate to the causes that matter most to them.

## Competition

We compete in almost every aspect of our business with companies that provide a variety of internet products, services, content, and online advertising. In addition, aspects of our platform compete with other products and services, including home services, classifieds, real estate, recommendations and search engines. Of these companies, we most directly compete with social media companies that offer local products to advertisers and users, including large companies such as Meta (including through Facebook and Instagram), Alphabet (including through Google), and other companies that provide home services, classifieds, real estate, recommendations, and search engines. We compete with these companies to attract, engage, and retain users and to attract and retain advertisers. As we introduce new products, as our platform evolves, or as other companies introduce new products and services, we may become subject to additional competition in other countries.

While our industry is evolving rapidly and is becoming increasingly competitive, we believe that we compete effectively due to our singular focus on creating and strengthening our neighborhood networks, the size and engagement of our user base, our ability to provide neighbors with trusted information from a uniquely local perspective, our value proposition to advertisers including businesses and public agencies, and our powerful network effects.

Our strengths include a strong value proposition based on real people, real conversations and real achievements; Built-in community: creating instant access for new neighbors and businesses joining the neighborhood; and, Our unique ability to connect neighbors to what matters to them. For our customers key strengths also include real people, as well as a high-intent audience with an action mindset and the ability to target neighborhoods everywhere in the countries we serve. Each of these elements reinforce each other to create a strong competitive moat.

For additional information, see the section entitled "*Risk Factors — Our business is highly competitive. Competition presents an ongoing threat to the success of our business.*"

## Government Regulation

We are subject to many U.S. federal and state and foreign laws, regulations, and industry standards that involve matters central to our business, including laws and regulations that involve data privacy and data protection, intellectual property (including copyright and patent laws), content regulation, rights of publicity, advertising, marketing, health and safety, competition, protection of minors, consumer protection, taxation, anti-bribery, anti-money laundering and corruption, telecommunications, AI and machine learning, and securities. Our business may also be affected by the adoption of any new or existing laws or regulations or changes in laws or regulations that adversely affect the growth, popularity or use of the internet, or that significantly restrict or impose conditions on our ability to collect, store, augment, analyze, use and share data or increase consumer notice or consent requirements before a company can utilize cookies or other tracking technologies or that increase the liability of content platforms like us. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended, in a manner that could harm our business.

Table of Contents

We rely on a variety of statutory and common-law frameworks and defenses relevant to the content available on our service, including the Digital Millennium Copyright Act (the "DMCA"), the Communications Decency Act ("CDA") and the fair-use doctrine in the United States, and the Electronic Commerce Directive in the European Union. However, each of these statutes is subject to uncertain or evolving judicial interpretation and regulatory and legislative amendments. For example, in the United States, laws such as the CDA, which have previously been interpreted to provide substantial protection to interactive computer service providers, have seen recent Supreme Court challenges and there have been legislative efforts to curtail the CDA's protections. These efforts could expose us to lawsuits in which we could incur significant costs and could seriously harm our business. In addition, various countries around the world have adopted legislation, including the Digital Services Act (the "DSA") in the European Union, the Online Safety Act in Australia, and the Online Safety Bill in the United Kingdom, that may impose additional obligations or liability on us associated with content uploaded by users to our platform.

We receive, process, store, use, and share data, some of which contains personal information. We are therefore subject to U.S. federal, state, local, and foreign laws and regulations regarding data privacy and the collection, storage, sharing, use, processing, disclosure and protection of personal information and other data from users, employees or business partners, including the European Union's General Data Protection Regulation ("GDPR"), the United Kingdom's General Data Protection Regulation ("UK GDPR"), Canada's Personal Information Protection and Electronic Documents Act, Australia's The Privacy Act 1988 and Australian Privacy Principles, the California Consumer Privacy Act ("CCPA"), along with similar privacy laws enacted in other U.S. states. There are also a number of legislative proposals recently enacted or pending before the U.S. Congress, various state legislatures and foreign governments concerning content regulation and data protection that could affect us, These and other laws and regulations that may be enacted, or new interpretation of existing laws and regulations, may require us to modify our data processing practices and policies and to incur substantial costs in order to comply.

The costs of complying with these laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are high and likely to increase in the future, particularly as the degree of regulation increases, our business grows and our geographic scope expands. Further, the impact of these laws and regulations may disproportionately affect our business in comparison to our peers in the technology sector that have greater resources. Any failure on our part to comply with these laws and regulations may subject us to significant liabilities or penalties, or otherwise adversely affect our business, financial condition or operating results. Further, it is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely.

We communicate with lawmakers and regulators in the countries and regions in which we do business. We have a dedicated policy team that monitors legal and regulatory developments and works with policymakers and regulators around the world to help ensure that our perspective is heard in matters of importance to us.

For additional information, see the section entitled "*Risk Factors — Risks Related to Legal and Regulatory Matters*."

**Corporate Information**

We were initially a blank check or special purpose acquisition company called KVSB, incorporated in Delaware on January 29, 2021, formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities. On November 5, 2021 (the "Closing Date"), KVSB consummated the transactions contemplated by the Agreement and Plan of Merger, dated July 6, 2021, as amended on September 30, 2021 (the "Merger Agreement"), by and among KVSB, Lorelei Merger Sub Inc., a direct wholly owned subsidiary of KVSB ("Merger Sub") and Nextdoor, Inc. ("Legacy Nextdoor"), with Legacy Nextdoor surviving as a wholly owned subsidiary of KVSB (the "Merger" and the transactions contemplated thereby, the "Business Combination"). Legacy Nextdoor was incorporated in Delaware on December 4, 2007. Following the consummation of the Business Combination on the Closing Date, KVSB changed its name from Khosla Ventures Acquisition Co. II to Nextdoor Holdings, Inc.

Our principal executive offices are located at 420 Taylor Street, San Francisco, California 94102 and our telephone number is (415) 344-0333. Our website address is https://www.nextdoor.com. The information contained on, or that can be accessed through, our website is not incorporated by reference into, and is not a part of, this Annual Report. Investors should not rely on any such information in deciding whether to purchase our Class A common stock.

Nextdoor, the Nextdoor logo, and other registered or common law trade names, trademarks, or service marks of Nextdoor appearing in this Annual Report are the property of Nextdoor. This Annual Report contains additional trade names, trademarks, and service marks of other companies that are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks, or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies. Solely for convenience, our trademarks and tradenames referred to in this Annual Report appear without the ® and ™ symbols, but

Table of Contents

those references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights, or the right of the applicable licensor, to these trademarks and tradenames.

**Available Information**

Our reports filed with or furnished to the SEC pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are available, free of charge, on our Investor Relations website at https://investors.nextdoor.com/ as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. The SEC maintains a website at http://www.sec.gov that contains reports, proxy and information statements, and other information regarding us and other companies that file materials with the SEC electronically. Copies of our reports on Form 10-K, Forms 10-Q, and Forms 8-K, and amendments to those reports may also be obtained, free of charge, electronically through our Investor Relations website located at the web address appearing above as soon as reasonably practicable after we file such material with, or furnish it to, the SEC. We use our Investor Relations website as a means of disclosing material information and for complying with our disclosure obligations under Regulation FD. Accordingly, investors should monitor our Investor Relations website, in addition to following our press releases, SEC filings, and public conference calls and webcasts.

The content of our websites and information that we may post on or provide to online and social media channels and information that can be accessed through our websites or these online and social media channels are not incorporated by reference into this Annual Report or in any other report or document we file with the SEC, and any references to our websites or these online and social media channels are intended to be inactive textual references only.

Table of Contents

**Item 1A. Risk Factors**

*Investing in our Class A common stock involves risks. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Annual Report, including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, before deciding whether to purchase shares of our Class A common stock. You should also carefully consider the following risk factors in addition to the other information included in this Annual Report, including matters addressed in the above section entitled "Special Note Regarding Forward-Looking Statements." Our business, operating results, financial condition, and prospects could also be harmed by risks and uncertainties that are not presently known to us or that we currently believe are not material. If any of these risks actually occur, our business, operating results, financial condition, and prospects could be materially and adversely affected. Unless otherwise indicated, references in these risk factors to our business being harmed will include harm to our business, reputation, brand, financial condition, operating results, and prospects. In such event, the market price of our securities could decline, and you could lose all or part of your investment.*

**Risks Related to Our Business and Industry**

***We have a limited operating history at the current scale of our business and are still scaling up our monetization efforts, which makes it difficult to evaluate our current business and future prospects, and there is no assurance we will be able to scale our business for future growth.***

We commenced operating the Nextdoor platform in 2011 and began supporting the platform with advertising in 2016. Our limited operating history at the current scale of our business may make it difficult to evaluate our current business and future prospects. We have encountered, and will continue to encounter, risks and difficulties frequently experienced by growing companies in rapidly evolving industries, including challenges in accurate financial planning and forecasting, increasing competition and expenses as we effectively scale our business, and our ability to achieve market acceptance of our platform and attract, engage and retain users, who we call "neighbors" (which includes individuals) and organizations (which includes businesses and public agencies, including paying customers such as advertisers). You should consider our business and prospects in light of the risks and difficulties that we may encounter as a business with a limited operating history. We cannot ensure that we will be successful in addressing these and other challenges we may face in the future, and our business, operating results, and financial condition may be adversely affected if we do not manage these risks successfully. We may not be able to sustain or increase our current rate of growth, which is a risk characteristic often shared by companies with limited operating histories participating in rapidly evolving industries.

Additionally, we are still in the early stages of monetizing our platform. Our growth strategy depends on, among other things, increasing neighbors on the network, increasing engagement, developing new and improving existing products for neighbors and organizations, attracting more advertisers (including expanding our sales efforts to reach advertisers in additional international markets), scaling our business with existing advertisers, and delivering targeted advertisements based on neighbors' personal taste and interests. Given the current macroeconomic environment, it may be more difficult for us to capitalize on our growth strategies. There can be no assurance that we will successfully increase monetization on our platform or that we will sustain or increase the current growth rate of our revenue.

***Adverse global economic and financial conditions could harm our business and financial condition.***

Adverse global economic and financial events and the effects thereof, such as health epidemics or pandemics, the war in Ukraine and the Israel-Hamas war, inflation, changing interest rates, potential recessions, uncertainty with respect to the federal budget or debt ceiling and a potential temporary federal government shutdown related thereto, fluctuations in foreign exchange rates, actual or perceived instability in the global banking system, supply chain issues and inventory and labor shortages, have caused, and could in the future cause, disruptions and volatility in global financial markets. These conditions have in the past and may in the future translate to cost increases to us and advertisers and lead to decreased spending by our advertisers. In addition, since the majority of our revenue is derived from advertisers within the United States, economic conditions in the United States have a greater impact on us. We may not perform well in adverse macroeconomic conditions, which could adversely affect our business, financial condition and operating results.

***We currently generate substantially all of our revenue from advertising. If advertisers reduce or eliminate their spending with us, our business, operating results, and financial condition would be adversely impacted.***

Substantially all of our revenue is currently generated from the sales of advertising on our platform in the form of online display advertisements, which include sponsored posts and local deals. Our advertisers typically do not have long-term advertising spend commitments with us. Many of our advertisers spend only a relatively small portion of their overall advertising budget with us. In

addition, advertisers may view some of the features on our platform as experimental and unproven. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver advertisements in an effective manner, or if advertisers do not believe that their investment in advertising with us will generate a competitive return relative to alternatives. Our ability to attract and retain advertisers, and ultimately generate revenue, may be adversely affected by a number of factors, including but not limited to:

- decreases in neighbor or advertiser engagement on the platform;

- slower than anticipated growth in, or lack of growth or decreases in, the number of neighbors active on the platform;

- the impact of macroeconomic conditions, whether in the advertising industry in general, among specific types of advertisers or within particular geographies, including but not limited to health epidemics or pandemics, actual or perceived instability in the global banking system, labor shortages, supply chain disruptions, a potential recession, uncertainty with respect to the federal budget or debt ceiling and a potential temporary federal government shutdown related thereto, inflation and changing interest rates;

- platform changes (such as the migration to our proprietary ad server) or inventory management decisions that change the size, format, frequency, or relative prominence of advertisements displayed on the platform;

- competitors offering more attractive pricing for advertisements that we are unable or unwilling to match;

- a decrease in the quantity or quality of advertisements shown to neighbors;

- changes to laws, third-party policies or applications that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

- changes to demographics of our neighbors that make us less attractive to advertisers;

- an increase in neighbors who exercise opt-out rights under privacy laws to restrict the advertisements they receive;

- neighbors that upload content or take other actions that are deemed to be hostile, inappropriate, illicit, objectionable, illegal, or otherwise not consistent with the brand of our advertisers;

- adverse government actions or legislative, regulatory, or other legal developments;

- neighbor behavior or changes to the platform that may affect, among other things, the safety and security of other neighbors or the cultivation of a positive and inclusive online community;

- adverse media reports or other negative publicity involving us;

- implementing or enforcing policies, such as advertising policies, community guidelines, and other terms or service that are perceived negatively by advertisers;

- our ability to develop and improve our products for advertisers;

- limitations in, or reductions to, the availability, accuracy, utility, and security of analytics and measurement solutions offered by us or third parties that are intended to demonstrate the value of our advertisements to advertisers; and

- changes to our data privacy practices that affect the type or manner of advertising that we are able to provide, including as a result of changes to laws, regulations or regulatory actions, such as the GDPR, European Directive 2002/58/EC (the "ePrivacy Directive"), the UK GDPR, the UK Data Protection Act 2018, the CCPA, Nevada's Online Privacy Law, the CDPA, the VCPDA, the CPRA, and other U.S. state privacy laws, or changes to third-party policies.

From time to time, certain of these factors have adversely affected our revenue to varying degrees. The occurrence of any of these or other factors in the future could result in a reduction in demand for our advertisements, which may reduce the prices we receive for our advertisements, or cause advertisers to stop or reduce their spend with us, either of which would negatively affect our business, operating results, and financial condition. Similar occurrences in the future may impair our ability to maintain or increase the quantity or quality of advertisements shown to neighbors and adversely affect our business, operating results, and financial condition.

Table of Contents

***Our ability to attract and retain advertisers depends on our ability to collect and use data and develop products to enable us to effectively deliver and accurately measure advertisements on the Nextdoor platform.***

Most advertisers rely on tools that measure the effectiveness of their advertising campaigns in order to allocate their advertising spend among various formats and platforms. If we are unable to accurately measure the effectiveness of advertising on our platform, if at all, or if we are unable to convince advertisers that advertising on our platform should be part of a larger advertising budget, our ability to increase the demand and pricing of our advertising tools and maintain or scale our revenue may be limited or decline. Our ability to develop and offer products that accurately measure the effectiveness of a campaign on our platform is critical to our ability to attract new advertisers and retain, and increase spend from our existing advertisers.

We are continually developing and improving our products for advertisers and such efforts have and are likely to continue to require significant time and resources and additional investment, and in some cases, we have relied on, and may in the future rely on, third parties to provide data and technology needed to provide certain measurement data to our advertisers. If we cannot continue to develop and improve our products for advertisers in a timely fashion, those products are not reliable, or the measurement results are inconsistent with advertiser's expectations or goals, our revenue could be adversely affected.

In addition, web and mobile browser developers, such as Apple, Microsoft or Google, have implemented and may continue to implement changes, including requiring additional user permissions, in their browser or device operating system that impair our ability to measure and improve the effectiveness of advertising on our platform. Such changes include limiting the use of first-party and third-party cookies and related tracking technologies, such as mobile advertising identifiers, and other changes that limit our ability to collect information that allows us to attribute neighbors' actions on advertisers' websites to the effectiveness of advertising campaigns run on our platform. For example, Apple launched its Intelligent Tracking Prevention ("ITP") feature in its Safari browser. ITP blocks some or all third-party cookies by default on mobile and desktop and ITP has become increasingly restrictive over time. Apple's related Privacy-Preserving Ad Click attribution, intended to preserve some of the functionality lost with ITP, would, for example, prevent uniquely identifying individuals and devices across sites for the purpose of Ad Click attribution, prevent measurement outside a narrowly-defined attribution window, and prevent advertisement re-targeting and optimization. Further, Apple introduced an App Tracking Transparency framework that limits the ability of mobile applications to request an iOS device's advertising identifier and may also affect our ability to track neighbors' actions off our platform and connect their interactions with on-platform advertising. Similarly, Google has announced that it plans to start phasing out third-party cookies in its Google Chrome browser, beginning in the second half of 2024, and, more recently, that it intends to limit access by mobile applications to advertising identifiers on Android devices. These web and mobile browser developers have also implemented and may continue to implement changes and restrictions in browser or device functionality that limit our ability to communicate with or understand the identity of our neighbors.

These restrictions and changes make it more difficult for us to provide the most relevant advertisements to our neighbors, as well as decrease our ability to measure the effectiveness of, re-target or optimize advertising on our platform. Developers may release additional technology that further inhibits our ability to collect data that allows us to measure the effectiveness of advertising on our platform. Any other restriction, whether by law, regulation, policy (including third-party policies), user opt-outs or otherwise, on our ability to collect and share data which our advertisers find useful or that further reduce our ability to measure the effectiveness of advertising on our platform, would impede our ability to attract, grow and retain advertisers. Advertisers and other third parties who provide data that helps us deliver personalized, relevant advertising may restrict or stop sharing this data and it therefore may not be possible for us to collect this data within the platform or from another source.

We rely heavily on our ability to collect and share data and metrics for our advertisers to help new and existing advertisers understand the performance of advertising campaigns. If advertisers do not perceive our metrics to be accurate representations of our neighbors and neighbor engagement, or there are inaccuracies in our metrics, advertisers may decrease or eliminate allocations of their budgets or resources to our platform, which could harm our business, operating results, and financial condition.

***If we fail to add new neighbors or retain current neighbors, or if current neighbors engage less with the Nextdoor platform, our business, operating results, and financial condition would be adversely impacted.***

The number of neighbors that use the Nextdoor platform and their level of engagement on the platform are critical to our success. We must continue to engage and retain existing neighbors on our platform as well as attract, engage and retain new neighbors. The number of neighbors on the Nextdoor platform may not continue to grow at historical growth rates or at all, and it may even decline. In order to attract new neighbors, we must engage with neighbors in existing neighborhoods on our platform and add new neighborhoods to the Nextdoor platform, both domestically and internationally. If our neighbor growth rate slows or reverses, our financial performance will be adversely impacted unless we can increase our engagement with our existing neighbors and our monetization efforts to offset any such reduction or decrease in neighborhood growth rate.

14

Table of Contents

If current and potential neighbors do not perceive their experience with the Nextdoor platform to be useful, the content generated on the platform to be valuable or relevant or the social connections with fellow neighbors to be worthwhile, we may not be able to attract new neighbors, retain existing neighbors or maintain or increase the frequency and duration of their engagement on our platform. In addition, if our existing neighbors decrease the frequency or duration of their engagement or the growth rate of our active neighbor base slows or reverses, we may be required to incur significantly higher marketing expenses than we currently anticipate in order to acquire new neighbors or retain current neighbors.

There are many factors that could negatively impact our ability to grow, retain and engage current and prospective neighbors, including but not limited to:

- neighbors increasing their engagement with competitors' platforms, products or services instead of, or more frequently than, our platform;

- changes in the amount of time neighbors spend across all applications and platforms, including our platform;

- failing to introduce platform enhancements that neighbors find engaging or if we introduce new features, terms, policies or procedures, or make changes to our platform, that are not favorably received by current or prospective neighbors;

- technical or other problems frustrating the neighbor experience, such as problems that prevent us from delivering our service in a fast and reliable manner;

- neighbors having difficulty installing, updating or otherwise accessing the Nextdoor platform on mobile devices through the app or web browsers;

- neighbor behavior on the Nextdoor platform changing, including a decrease in the quality and frequency of content shares on the platform;

- decreases in neighbor or advertiser sentiment due to questions about the quality or usefulness of our platform, concerns about the nature of content made available on the platform, concerns related to privacy, safety, security, well-being or other factors;

- changes mandated by legislation, government and regulatory authorities, or litigation that adversely impact our platform or neighbors;

- third parties preventing their content from being displayed on the Nextdoor platform;

- changes we may make to how we promote different features on our platform;

- initiatives designed to attract and retain neighbors and engagement are unsuccessful or discontinued, whether as a result of actions by us, third parties, or otherwise;

- we, or other partners and companies in the industry are the subject of adverse media reports or other negative publicity;

- we are unable to combat spam, harassment, cyberbullying or other hostile, inappropriate, abusive or offensive content or usage on our platform; or

- we cannot preserve and enhance our brand and reputation as a trusted neighborhood networking community.

Any decrease in neighbor growth, retention or engagement could render our service less attractive to neighbors or advertisers, and could harm our business, operating results, and financial condition. In addition, neighbor verification is a critical feature of our platform because it demonstrates that neighbors are real people and businesses in the neighborhood they desire to join. If we were to change our verification methods, that may adversely impact our ability to add new neighbors or retain existing neighbors.

***Our business is highly competitive. Competition presents an ongoing threat to the success of our business.***

We compete with companies that provide a variety of internet products, services, content, and online advertising. In addition, aspects of our platform compete with other products and services, including home services, classifieds, real estate, recommendations, and search engines. Of these companies, we most directly compete with social media companies that offer local products to advertisers and users, including large companies such as Meta (including through Facebook and Instagram) and Alphabet (including through Google), and other companies that provide home services, classifieds, real estate, recommendations, and search engines. We compete with these companies to attract, engage, and retain users and to attract and retain advertisers. If we introduce or acquire new products and services or evolve our platform in a way that subjects us to additional competition or as existing competitors introduce new products

Table of Contents

and services or evolve their platforms, we may fail to engage or retain neighbors or attract new neighbors, which could harm our business, operating results, and financial condition.

Some of our current and potential competitors have substantially broader product or service offerings and leverage their relationships based on other products or services to gain additional share of advertising spend. They have large distributed sales forces and an increasing amount of control over mobile distribution channels. Many of these competitors' economies of scale allow them to have access to larger volumes of data and platforms that are used on a more frequent basis than the Nextdoor platform, which may enable them to better understand their member base and develop and deliver more targeted advertising. Such competitors may not need to rely on third-party data, including data provided by advertisers, to effectively target the campaigns of advertisers, which could make their advertising products more attractive to advertisers than our platform if such third-party data ceases to be available to us, whether because of regulatory changes, privacy or cybersecurity concerns or other reasons. If our advertisers do not believe that our value proposition is as compelling as those of our competitors, we may not be able to attract new advertisers or retain existing ones, and our business, operating results, and financial condition could be adversely impacted.

Our competitors may develop products, features, or services that are similar to our platform or that achieve greater acceptance, may undertake more far-reaching and successful product development efforts or marketing campaigns, or may adopt more aggressive pricing policies. Some competitors may gain a competitive advantage relative to us in areas where we operate, including by more effectively responding to changes to third-party products and policies or by integrating competing platforms, applications, or features into products they control such as mobile device operating systems, search engines, browsers, or e-commerce platforms. For example, Apple introduced changes starting with iOS 14.5 that limit our ability, and the ability of others in the digital advertising industry, to track individual users and devices, and target and measure advertisements effectively. Additionally, the Apple App Store guidelines require apps that support account creation to also allow users to delete their account within the app. This change has and may continue to impact our ability to retain users. Moreover, Google recently announced that it intends to limit access by mobile applications to advertising identifiers on Android devices, likely by the end of 2024. As a result, our competitors may, and in some cases will, acquire and engage neighbors or generate advertising or other revenue at the expense of our efforts, which would negatively affect our business, operating results, and financial condition. In addition, from time to time, we may take actions in response to competitive threats, but we cannot assure you that these actions will be successful or that they will not negatively affect our business, operating results, and financial condition.

We believe that our ability to compete depends upon many factors both within and beyond our control, including:

- the popularity, usefulness, ease of use, performance, and reliability of our platform compared to our competitors' products;

- the size and composition of our neighbor base;

- the engagement of neighbors with our platform and competing products;

- first- and third-party data available to us relative to our competitors;

- our ability to attract and retain advertisers who use our free or paid advertisements services;

- the timing and market acceptance of developments and enhancements to our platform or our competitors' products;

- our safety and security efforts and our ability to protect neighbor data and to provide neighbors with control over their data;

- our ability to distribute our platform to new and existing neighbors;

- our ability to effectively monetize our platform;

- the successful implementation of platform changes, such as the migration to our proprietary ad server and introduction of AI technologies into our platform;

- the frequency, size, format, quality, and relative prominence of the advertisements displayed by us or our competitors;

- customer service and support efforts;

- marketing and selling efforts, including our ability to measure the effectiveness of our advertisements and to provide advertisers with a compelling return on their investments;

- our ability to establish and maintain publisher interest in integrating their content with our platform;

Table of Contents

- changes mandated by legislation, regulatory authorities, or litigation, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry, which may result in more formidable competitors;

- our ability to attract, retain, and motivate talented employees, particularly software engineers, designers, and managers;

- our ability to cost-effectively manage and grow our operations; and

- our reputation and brand strength relative to those of our competitors.

If we are not able to compete effectively, our neighbor base and level of neighbor engagement may decrease, we may become less attractive to advertisers and our business, operating results, and financial condition may be adversely affected.

***Our business is dependent on our ability to maintain and scale our product offerings and technical infrastructure, and any significant disruption in the availability of our platform could damage our reputation, result in a potential loss of neighbors and engagement, and adversely affect our business, operating results, and financial condition.***

Our reputation and ability to attract, retain, and serve our neighbors and to scale our product offerings is dependent upon the reliable performance of our platform and our underlying technical infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our platform from time to time. Our systems may not be adequately designed or may not operate with the reliability and redundancy necessary to avoid performance delays or outages that could be harmful to our business. If our platform is unavailable when neighbors attempt to access it, or if it does not load as quickly as expected, neighbors may not use our platform as often in the future, or at all, and our ability to serve advertisements may be disrupted, any of which could adversely affect our business, operating results, and financial condition. As the amount and types of information shared on our platform continues to grow and evolve, as the usage patterns of our communities continues to evolve, and as our internal operational demands continue to grow, we will need an increasing amount of technical infrastructure, including network capacity and computing power, to continue to satisfy our needs. If we fail to continue to effectively scale and grow our technical infrastructure to accommodate these increased demands, neighbor engagement and revenue growth may be adversely impacted. Moreover, as we scale our platform and product offerings, including video and other platform features, that may place strain on our technical infrastructure, and we may also be unsuccessful in scaling our technical infrastructure to accommodate new product offerings and increased platform usage cost-effectively. In addition, our business may be subject to interruptions, delays, or failures resulting from earthquakes, fires, floods, adverse weather conditions, other natural disasters, power loss, terrorism, pandemics, geopolitical conflict (including the current war in Ukraine and the Israel-Hamas war), other physical security threats, cyber-attacks, or other catastrophic events. If such an event were to occur, neighbors may be subject to service disruptions or outages and we may not be able to recover our technical infrastructure and neighbor data in a timely manner to restart or provide our services, which may adversely affect our financial results. In addition, the substantial amount of our employees are based in our headquarters located in San Francisco, California. If there is a catastrophic failure involving our systems or major disruptive event affecting our headquarters or the San Francisco area in general, we may be unable to operate our platform.

A substantial portion of our network infrastructure is provided by third parties, including AWS. We also rely on third parties for other technology related services, including certain AI functions. Any disruption or failure in the services we receive from these providers could impact the availability of our platform and could adversely impact our business, operating results and financial condition. Any financial or other difficulties these providers face may adversely affect our business, and we exercise little control over these providers, which increases our reliance on and vulnerability to problems with the services they provide and increases in the costs of these services.

Any of these developments may result in interruptions in the availability or performance of our platform, result in neighbors ceasing to use our platform, require unfavorable changes to our platform, delay the introduction of future products, or otherwise adversely affect our reputation, business, operating results, and financial condition.

***If we fail to scale our business effectively, our business, operating results, and financial condition would be adversely affected.***

We have experienced growth in recent years and expect to continue to invest strategically across our organization to support measured growth, while also scaling back certain areas of our business in response to changing economic conditions. Although we have experienced rapid growth historically, we may not return to prior growth rates or sustain our growth rates, nor can we assure you that our investments to support our growth or to manage expenses by scaling back other areas of our business will be successful. The effective scaling of our business will require us to invest financial and operational resources and the continuous dedication of our management team.

17

Table of Contents

We plan to continue to expand our international operations into more countries in the future, which will place additional demands on our resources and operations. The growth and expansion of our business has placed, and continues to place, a significant strain on our management, operations, and financial and technical infrastructure. In the event of further growth of our business or in the number of our third-party relationships, our information technology systems or our internal controls and procedures may not be adequate to support our operations.

Further, as we have grown, our business has become increasingly complex and requires more resources. To manage any future growth effectively, we must continue to improve and expand our information technology and financial infrastructure, our operating and administrative systems and controls, and our ability to manage headcount, capital, and processes in an efficient and appropriate manner. Failure to manage growth effectively could result in increases in costs, difficulties in introducing new products and services or enhancing the platform, loss of neighbors and advertisers, or other operational difficulties, any of which could adversely affect our business, operating results, and financial condition. For example, as we expand our product offerings, including video, we may not be able to do so cost-effectively. Effectively managing our growth may also be more difficult to accomplish the longer that our employees, our advertisers, neighbors and the overall economy is impacted due to macroeconomic conditions and factors, including but not limited to the impacts related to the actual or perceived instability in the global banking system, labor shortages, supply chain disruptions, a potential recession, uncertainty with respect to the federal budget or debt ceiling and a potential temporary federal government shutdown, related thereto, changing interest rates and inflation, and the war in Ukraine and the Israel-Hamas war.

We may not be able to successfully implement or scale improvements to our systems, processes, and controls in an efficient or timely manner. Our controls, policies and procedures, including with respect to accounting, risk management, data privacy, cybersecurity, client on-boarding, transaction monitoring, and reliance on manual controls, among other compliance matters, remain under development and may not be consistently applied or fully effective to identify, monitor and manage all risks of our business as we continue to scale rapidly. In addition, our existing systems, processes, and controls may not prevent or detect all errors, omissions, or fraud. We may also experience difficulties in managing improvements to our systems, processes, and controls or in connection with third-party software licensed to help us with such improvements. Any future growth will continue to add complexity to our organization and require effective coordination throughout our organization. Failure to manage any future growth effectively could result in increased costs, cause difficulty or delays in attracting new neighbors or retaining or increasing the engagement of existing neighbors, cause difficulties in introducing new features, impact our ability to attract and retain talent or cause other operational difficulties, and any of these difficulties would adversely impact our business, operating results, and financial condition.

Additionally, from time to time, we realign our resources and talent to implement stage-appropriate business strategies, which could include furloughs, layoffs and reductions in force. For example, in November 2023, in response to changing economic conditions and in an effort to support our growth, scale and profitability objectives, reduce our operational costs and improve our organizational efficiency, we executed a restructuring plan, which included a restructuring and reduction of the current workforce by approximately 25%. The restructuring plan was substantially completed by the end of the fourth quarter of 2023. If there are unforeseen expenses associated with such realignments in our business strategies, and we incur unanticipated charges or liabilities, then we may not be able to effectively realize the expected cost savings or other benefits of such actions. Failure to manage any growth or any scaling back of our operations could have an adverse effect on our business, operating results, and financial condition.

***If we or our industry generally are unable to provide a high-quality and secure customer experience in the various locales in which we operate, our brand could suffer reputational damage and our business results could be harmed.***

Our business is largely driven by and reliant on customer trust. The reliability of our service, the security of personally identifiable and other sensitive information of our customers, and a responsive and effective customer support function are each critical elements for the maintenance of this trust. For example, any significant interruption in either our internal or our partners' systems could reduce customer confidence in our services. In addition, any breach, or reported breach, of our systems, our information security policies, or legal requirements that results in a compromise of customer data or causes customers to believe their data has been compromised could have a significant negative effect on our business. Legal claims and regulatory enforcement actions could also arise in response to these events, which would further exacerbate erosion of customer trust and potentially result in operating losses and liabilities.

***If we do not successfully anticipate market needs and develop products and services and platform enhancements that meet those needs, or if those products, services, and platform enhancements do not gain market acceptance, our business, operating results, and financial condition will be adversely impacted.***

We may not be able to anticipate future market needs or be able to improve our platform or to develop new products and services or platform enhancements to meet such needs on a timely basis, if at all. In addition, our inability to diversify beyond our current offerings could adversely affect our business. Any new products or services or platform enhancements that we introduce, including by way of acquisitions, may not achieve any significant degree of market acceptance from current or potential neighbors, which would

adversely affect our business, operating results, and financial condition. In addition, the introduction of new products or services or platform enhancements may decrease neighbor engagement with our platform, thereby offsetting the benefit of even a successful product or service introduction, any of which could adversely impact our business, operating results, and financial condition.

***We may not be successful in our AI initiatives, which could adversely affect our business, reputation, or financial results.***

We are continuing to make investments in AI initiatives, including to recommend relevant content across our products, enhance our advertising tools, and develop new product features using generative AI. Our AI initiatives may require increased investment in infrastructure and headcount. AI technologies are complex and rapidly evolving, and we face significant competition from other companies as well as an evolving regulatory landscape. These efforts, including the introduction of new products or changes to existing products, may result in new or enhanced governmental or regulatory scrutiny, litigation, ethical concerns, or other complications that could adversely affect our business, operating results and financial condition. For example, the use of datasets to develop AI models, the content generated by AI systems, or the application of AI systems may be found to be insufficient, offensive, biased, or harmful, or violate current or future laws and regulations. Moreover, AI may give rise to litigation risk, including potential intellectual property or privacy liability. In addition, market acceptance of AI technologies is uncertain, and we may be unsuccessful in our product development efforts. Moreover, our competitors may introduce AI technologies and features into their products and services that achieve greater market acceptance that ours. Any of these factors could adversely affect our business, operating results, and financial condition.

***If our efforts to build strong brand identity and reputation are not successful, we may not be able to attract or retain neighbors, and our business, operating results, and financial condition will be adversely affected.***

We believe that maintaining and enhancing the "Nextdoor" brand and reputation is critical to retaining and growing neighbors and advertisers on our platform. We anticipate that maintaining and enhancing our brand and reputation will depend largely on our continued ability to provide high-quality, relevant, reliable, trustworthy and innovative features on our platform, which may require substantial investment and may not be successful. We may need to introduce new products, services and features or updates to our platform and features that require neighbors to agree to new terms of service that our neighbors do not like, which may negatively affect our brand and reputation.

Additionally, advertisements or actions of our advertisers may affect our brand and reputation if neighbors do not think the advertisements help them accomplish their objectives, view the advertisements as intrusive or misleading or have poor experiences with our advertisers.

Our brand and reputation may also be negatively affected by the content or actions of neighbors that are deemed to be hostile or inappropriate to other neighbors, by the actions of neighbors acting under false or inauthentic identities, by the use of our platform to disseminate misleading or false information, the use of our platform for fraudulent schemes and scams, or by the use of our service for illicit, illegal or objectionable ends. We also may fail to respond expeditiously to the sharing of illegal, illicit or objectionable content on our service or objectionable practices by advertisers, or to otherwise address our neighbors' concerns, which could erode confidence in our brand and damage our reputation. We expect that our ability to identify and respond to this content in a timely manner may decrease as the number of neighbors grows, as the amount of content on the platform increases or as we expand our product and service offerings on our platform. Any governmental or regulatory inquiry, investigation or action, including based on the appearance of illegal, illicit or objectionable content on our platform or the failure to comply with laws and regulations, could damage our brand and reputation, regardless of the outcome.

We have experienced, and expect to continue to experience, media, legislative, governmental and regulatory scrutiny of our decisions. Any scrutiny regarding us, including regarding our data privacy, content moderation or other practices, platform changes, platform quality, litigation or regulatory action, or regarding the actions of our employees, neighbors, or advertisers or other issues, may harm our brand and reputation. In addition, scrutiny of other companies in our industry, including such companies' data privacy, content moderation or other practices, could also have a negative impact on our brand and reputation. These concerns, whether actual or unfounded, may also deter neighbors or advertisers from using our platform. In addition, we may fail to adequately address the needs of neighbors and advertisers which could erode confidence in our brand and damage our reputation. If we fail to promote and maintain the "Nextdoor" brand or preserve our reputation, or if we incur excessive expenses in this effort, our business, operating results, and financial condition could be adversely impacted.

***Unfavorable media coverage negatively affects our business from time to time.***

Unfavorable publicity regarding us, for example regarding our privacy or cybersecurity practices, terms of service, advertising policies, platform changes, platform quality, litigation or regulatory activity, the actions of our advertisers, the use of our platform for illicit or objectionable ends, the substance or enforcement of our community standards, the actions of our neighbors, the quality and integrity of content shared on our platform, or the actions of other companies that provide similar services to us, has in the past, and

Table of Contents

could in the future, adversely affect our reputation. For example, we have been, and may in the future be, subject to negative publicity in connection with our handling of misinformation and other illicit or objectionable uses of our platform. Any such negative publicity could have an adverse effect on the size, engagement, and loyalty of our neighbor base and advertiser demand for advertising on our platform, which could result in decreased revenue and adversely affect our business, operating results, and financial condition, and we have experienced such adverse effects to varying degrees from time to time.

***We plan to continue expanding our international operations where we have limited operating experience and may be subject to increased business, regulatory, and economic risks that could seriously harm our business, operating results, and financial condition.***

We plan to continue expanding our business operations abroad by opening new and expanding within existing neighborhoods outside of the United States. As of December 31, 2023, the Nextdoor platform was accessible in 11 countries (including the United States) and had over 325,000 neighborhoods. We plan to enter new international markets and expand in existing markets where we have limited or no experience in marketing, selling, advertising and deploying our platform or selling advertising. Any of our limited experience and infrastructure in such markets, individuals' lack of familiarity with us or our platform, the existence of alternative platforms in such jurisdictions that offer similar products and services or the lack of a critical mass of potential neighbors in such markets may make it more difficult for us to effectively monetize any increase in neighbors in those markets, and may increase our costs without a corresponding increase in revenues. If we fail to deploy or manage our operations in international markets successfully, comply with international regulations or effectively monetize our platform in international markets to the same degree as we are able to monetize our efforts within the United States, our business, operating results and financial conditions will be adversely affected. In the future, if our international operations increase, or more of our expenses are denominated in currencies other than the U.S. dollar, our operating results may be more greatly affected by fluctuations in the exchange rates of the currencies in which we do business. In addition, as our international operations and sales to advertisers continue to grow, we will be subject to a variety of risks inherent in doing business internationally, including:

- political, social and economic instability, including as a result of acts of war or terrorism, including the war in Ukraine and the Israel-Hamas war;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy and data protection, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship and requirements to provide neighbor information to local authorities;

- enhanced difficulty in reviewing content on the Nextdoor platform and enforcing community standards across different languages and countries;

- fluctuations in currency exchange rates;

- foreign exchange controls and tax and other regulations and orders that might prevent us from repatriating cash earned in countries outside the United States or otherwise limit our ability to move cash freely, and impede our ability to invest such cash efficiently;

- compliance with multiple U.S. and international tax jurisdictions and management of tax impact of global operations;

- potentially higher levels of credit risk and payment fraud;

- difficulties integrating any foreign acquisitions;

- burdens of complying with a variety of foreign laws, including laws related to taxation, content removal, data localization, data transfer, consents, payments, and regulatory oversight;

- reduced protection for intellectual property rights in some countries;

- different regulations and practices with respect to employee/employer relationships, existence of workers' councils and labor unions, increase in labor costs due to high wage inflation in certain international jurisdictions, and other challenges caused by distance, language and cultural differences, making it harder to do business in certain international jurisdictions; and

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and legal compliance costs associated with multiple international locations.

In addition, we must manage the potential conflicts between locally accepted business practices in any given jurisdiction and our obligations to comply with laws and regulations, including anti-money laundering laws, anti-corruption laws or regulations applicable to us, such as the U.S. Foreign Corrupt Practices Act, and the U.K. Bribery Act 2010. We also must manage our obligations to comply with laws and regulations related to export controls, sanctions, and embargoes, including regulations established by the U.S. Office of Foreign Assets Control. Government agencies and authorities have a broad range of civil and criminal penalties they may seek to impose against companies for violations of anti-corruption laws or regulations, export controls, and other laws, rules, sanctions, embargoes, and regulations. Any failure by us to comply with local business practices or the laws and regulations applicable to us in the markets in which we operate may adversely affect our business, operating results, and financial condition. Additionally, if we are unable to expand internationally and manage the complexity of our global operations successfully, our business, operating results, and financial condition could be adversely affected.

***If we need additional capital in the future, it may not be available on favorable terms, if at all.***

We have historically relied on outside financing to fund our operations, capital expenditures and expansion. We may require additional capital from equity or debt financing in the future to support our growth, fund our operations or to respond to competitive pressures or strategic opportunities. We may not be able to secure timely additional financing on favorable terms, if at all. The current macroeconomic environment may make it more difficult to raise additional capital on favorable terms, if at all. If we raise additional funds through further issuances of equity, convertible debt securities or other securities convertible into equity, our existing stockholders, could suffer significant dilution in their percentage ownership, and any new securities that we issue could have rights, preferences and privileges senior to those of holders of our Class A common stock. Any debt financing that we secure in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, including the ability to pay dividends. This may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. If we are unable to obtain adequate financing or financing on terms that are satisfactory to us, if and when we require financing, our ability to grow or support our business and to respond to business challenges that we may face could be significantly limited.

***We may make acquisitions, which could harm our financial condition or operating results and may adversely affect the price of our Class A common stock.***

As part of our business strategy, we have made, and may in the future make acquisitions to add specialized employees and complementary companies, products or technologies, data, and enter new geographic regions. Our previous and future acquisitions may not achieve our goals, and we may not realize benefits from acquisitions we make in the future. If we fail to successfully integrate acquisitions, or the personnel or technologies associated with those acquisitions, our business, operating results, and financial condition could be harmed. Any integration process will require significant time and resources, and we may not be able to manage the process successfully. Our acquisition strategy may change over time and any future acquisitions we complete could be viewed negatively by neighbors, advertisers, investors or other parties with whom we do business. We may not successfully evaluate or utilize the acquired technology and accurately forecast the financial impact of an acquisition, including accounting charges. We may also incur unanticipated liabilities that we assume as a result of acquiring companies. We may have to pay cash, incur debt or issue equity securities to pay for any such acquisition, each of which could affect our financial condition or the value of our securities. In the future, we may not be able to find other suitable acquisition candidates, and we may not be able to complete acquisitions on favorable terms, if at all. Our acquisition strategy could require significant management attention, disrupt our business and harm our business, operating results, and financial condition.

***Our business depends largely on our ability to attract, and retain and assimilate talented employees, including senior management. If we lose the services of or fail to successfully assimilate highly skilled personnel, key employees or members of our senior management team, we may not be able to execute on our business strategy.***

Our future success depends on our continuing ability to attract, train, assimilate, and retain highly skilled personnel, including software engineers and sales personnel. We face intense competition for qualified individuals from numerous software and other technology companies. In addition, competition for qualified personnel, particularly software engineers, is particularly intense in the San Francisco Bay Area, where our headquarters are located, and the change by companies to offer a remote or hybrid work environment may increase the competition for such employees from employers outside of our traditional office locations.

We may not be able to retain our current key employees or attract, train, assimilate, or retain other highly skilled personnel in the future. We have incurred, and may continue to incur, significant costs to attract and retain highly skilled personnel, and we may lose new employees to our competitors or other technology companies before we realize the benefit of our investment in recruiting and training them. As we move into new geographies, we will need to attract and recruit skilled personnel in those areas. Further, labor is subject to external factors that are beyond our control, including our industry's highly competitive market for skilled workers and leaders, cost inflation, and workforce participation rates. Further, in November 2023, in response to changing economic conditions and

21

Table of Contents

in an effort to reduce our operational costs and improve our organizational efficiency, we executed a restructuring plan, which included a restructuring and reduction of the current workforce by approximately 25%. The restructuring plan was substantially complete by the end of the fourth quarter of 2023. This restructuring plan could negatively impact our ability to attract, integrate, retain and motivate key employees. If we are unable to attract and retain suitably qualified individuals who are capable of meeting our growing technical, operational, and managerial requirements, on a timely basis or at all, our business, operating results, and financial condition may be adversely affected.

Our future success also depends in large part on the continued services of senior management and other key personnel. We rely on our senior management team and key employees in the areas of engineering, sales and product development, design, marketing, operations, strategy, security, and general and administrative functions. Our senior management and other key personnel are all employed on an at-will basis, which means that they could terminate their employment with us at any time, for any reason, and without notice. We do not currently maintain key-person life insurance policies on any of our officers or employees.

On February 23, 2024, we announced that Nirav Tolia, co-founder of Legacy Nextdoor, will return as Chief Executive Officer, President and Chairperson of our Board of Directors. The effective date of Mr. Tolia's position as Chief Executive Officer, President and Chairperson of the Board will be May 8, 2024 (the "Transition Date"). Mr. Tolia will initially serve as the Executive Chair of the Company, effective March 18, 2024. To support the planned orderly transition of our Chief Executive Officer, Sarah Friar will remain employed by the Company as the Chief Executive Officer, President and Chairperson of our Board of Directors until the Transition Date. If we lose the services of senior management or other key personnel, or if we are unable to attract, train, assimilate, and retain the highly skilled personnel that we need, our business, operating results, and financial condition could be adversely affected.

Volatility or lack of appreciation in our stock price may also affect our ability to attract and retain our key employees. Our employees may be more likely to leave if the shares they own or the shares underlying their vested options have significantly appreciated in value relative to the original purchase price of the shares or the exercise price of the options, or conversely, if the exercise price of the options that they hold are significantly above the market price of our Class A common stock. If we are unable to retain our employees, or if we need to increase our compensation expenses to retain our employees, our business, operating results, and financial condition could be adversely affected.

***Our core values may conflict with the short-term interests of our business.***

We consider our core values as a guide to the decisions we make, which we believe is essential to our success in increasing our neighbor growth rate and engagement and in serving the best, long-term interests of Nextdoor and our stockholders. In the past, we have forgone, and may in the future forgo, certain expansion or revenue opportunities that we do not believe are aligned with our core values, even if our decision may negatively impact our operating results in the short term. Our decisions may not result in the long-term benefits that we expect, in which case our neighbor engagement, business, operating results, and financial condition could be harmed.

### Risks Related to Security and Technology

***We are dependent on third-party software and service providers, including the GAM platform, for management and delivery of advertisements on the Nextdoor platform. Any failure or interruption experienced by such third-parties could result in the inability of certain businesses to advertise on our platform, and adversely impact our business, operating results, and financial condition.***

Currently, we are dependent on third-party software and service providers, including the GAM platform, for management and delivery of advertisements on the Nextdoor platform. As such, the continued use of third-party software and service providers, including GAM, is critical to our continued success and any service disruptions, adverse changes to the terms of use, pricing or related terms and conditions for such third-party providers' products, or difficulties with such products, including our data usage, meeting our requirements or standards could result in the inability of certain businesses to advertise on our platform, and adversely impact our business, operating results, and financial condition.

***We rely on third-party software and service providers, including AWS, to provide systems, storage and services for our platform. Any failure or interruption experienced by such third parties could result in the inability of neighbors and advertisers to access or utilize our platform, and adversely impact our business, operating results, and financial condition.***

We rely on third-party software and service providers, including AWS, to provide systems, storage and services, including neighbor login authentication, for our website. Any technical problem with, cyber-attack on or loss of access to such third parties' systems, servers, or technologies could result in the inability of neighbors to access the Nextdoor platform or result in the theft of neighbors' personal information.

Table of Contents

Because we rely on third-party technology providers in our business, we rely on the cybersecurity practices and policies adopted by these third parties. Our ability to monitor our third-party technology providers' cybersecurity practices is limited.

Any significant disruption, limitation or loss of our access to or other interference with our use of AWS, including as a result of termination by AWS of its agreement with us, would negatively impact our business, operating results, and financial condition. In addition, any transition of the cloud services currently provided by AWS to another cloud services provider would be difficult to implement and would cause us to incur significant time and expense and could disrupt or degrade our ability to deliver our products and services. The level of service provided by AWS could affect the availability or speed of our services. If neighbors or advertisers are not able to access our platform or encounter difficulties in doing so, we may lose neighbors or advertisers, which could harm our reputation, business, operating results, and financial condition.

We utilize data center hosting facilities operated by AWS, located in various facilities. We are unable to serve network traffic from back-up data center services. An unexpected disruption of services provided by these data centers could hamper our ability to handle existing or increased traffic, result in the loss of data or cause our platform to become unavailable, which may harm our reputation, business, operating results, and financial condition.

***We rely on third parties, including email providers, mobile data networks, and geolocation providers to complete the verification process for our neighbors' accounts. Any failure or interruption experienced by such third parties could result in the inability of neighbors to join our platform, resulting in harm to our reputation and an adverse impact to our business, operating results, and financial condition.***

We rely on third parties to verify our neighbors' accounts through several methods, including but not limited to email, SMS text message, phone calls, geolocation and mailed invitations. For example, we utilize email providers, mobile data networks, and geolocation providers to verify neighbors' accounts. Account verification is a critical feature of our platform because it demonstrates that neighbors actually live in the neighborhood they desire to join. Any failure, interruption, or loss of access to such third parties or their software could result in the inability of neighbors to join our platform. Our reliance on third parties makes us vulnerable to any service interruptions, whether as a result of a cyber-attack, security breach, weather or other events, or delays in their operations. Additionally, alternative email providers, mobile data networks, geolocation providers or postal providers may be more costly to use than our current providers. Any disruption in the third parties could harm our neighbor growth, which in turn could make us a less attractive advertising platform and harm our reputation, and could harm our business, operating results, and financial condition.

***Technologies have been developed that can block the display of advertisements on the Nextdoor platform, which could adversely impact our business, operating results, and financial condition.***

Technologies have been developed, and will likely continue to be developed, that can block the display of advertisements on the Nextdoor platform. We generate substantially all of our revenue from advertising, and ad-blocking technologies may prevent the display of certain advertisements appearing on our platform, which could harm our business, operating results, and financial condition. Existing ad-blocking technologies that have not been effective on our platform may become effective as we make certain platform changes, and new ad-blocking technologies may be developed in the future. More neighbors may choose to use such ad-blocking products to block or obscure the display of advertisements on our platform if we are unable to successfully balance the amount of our organic content and paid advertisements, or if neighbors' attitudes toward advertisements become more negative. Further, regardless of their effectiveness, ad-blockers may generate concern regarding the health of the digital advertising industry, which could reduce the value of digital advertising and harm our business, operating results, and financial condition.

***Security breaches, including improper access to or disclosure of our data or our neighbors' data, or other hacking and phishing attacks on our or third-party systems, could harm our reputation and adversely affect our business.***

We collect, store and otherwise process personal data relating to a number of individuals such as our neighbors, employees and partners, including, but not limited to, neighbor contact details, network details, and location data. The evolution of technology systems introduces unknown and complex security risks that can be unpredictable and difficult to defend against. Cyber-attacks continue to evolve in sophistication and volume, and inherently may be difficult to detect for long periods of time. In particular, social media companies, like us, are prone to cyber-attacks by third parties seeking unauthorized access to company or user data or to disrupt their ability to provide access to their products and services.

The trend towards working from home and using private residential networks to access the Internet may further exacerbate risks associated with cyberattacks and data security breaches, because we cannot guarantee these private work environments and electronic connections to our work environment have the same robust security measures deployed in our physical offices.

We take a variety of technical and organizational security measures and other measures to protect our data. Although we have implemented systems and processes that are designed to protect our data and our neighbors' data, prevent data loss, disable

23

Table of Contents

undesirable accounts and activities on our platform and prevent or detect security breaches, and maintain an information security policy, such measures cannot provide absolute security, and despite measures that we have or will in the future put in place, we may be unable to anticipate or prevent unauthorized access to such data. For example, computer malware, viruses, social engineering (predominantly spear phishing attacks), ransomware, and general hacking have become more prevalent in the industry, have occurred on our systems in the past, and are likely to occur on our systems in the future. In addition, we regularly encounter attempts to create false or undesirable accounts or take other actions on our platform for purposes such as spamming, spreading misinformation, or other objectionable ends. Our efforts to protect our company data or the information that we receive may also be unsuccessful due to software bugs or other technical malfunctions; employee, contractor, or vendor error or malfeasance; government surveillance; or other threats that evolve.

Some third parties, including advertisers and vendors, may store information that we share with them on their networks. If these third parties fail to implement adequate data-security practices or fail to comply with their contractual obligations and/or, where applicable, our terms and policies, neighbor data may be improperly accessed, used or disclosed. Even if these third parties take all the necessary precautions and comply with their applicable obligations, their networks may still suffer a breach, which could compromise neighbor data.

Security breaches may cause interruptions to our platform, degrade the neighbor experience, cause neighbors or advertisers to lose confidence and trust in our platform, impair our internal systems, or result in financial harm to our company.

In addition, affected neighbors, government authorities or other third parties could initiate legal or regulatory actions against us in connection with any actual or perceived security breaches or improper disclosure of data, which could cause us to incur significant expense and liability that may not be fully covered by insurance, if at all, or result in orders or consent decrees forcing us to modify our business practices. Such incidents or our efforts to remediate such incidents may also result in a decline in our active neighbor base or engagement levels and trust. In addition, such incidents could also result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position. In addition, any of these events could have a material and adverse effect on our business, operating results, financial condition, market acceptance of our products or revenues and may also divert development resources and increase service and support costs.

The landscape of laws, regulations, and industry standards related to cybersecurity is evolving globally. We may be subject to increased compliance burdens by regulators and customers with respect to our platform, as well as additional costs to oversee and monitor security risks. Many jurisdictions have enacted laws mandating companies to inform individuals, stockholders, regulatory authorities, and others of security breaches. For example, the SEC recently adopted cybersecurity risk management and disclosure rules, which require the disclosure of information pertaining to cybersecurity incidents and cybersecurity risk management, strategy, and governance. This mandatory disclosure can be costly, harm our reputation, erode customer trust, and require significant resources to mitigate issues stemming from actual or perceived security breaches.

While we maintain insurance policies, our coverage may be insufficient to compensate us for all losses caused by security breaches, and any such security breaches may result in increased costs for such insurance. We also cannot ensure that our existing cybersecurity insurance coverage will continue to be available on acceptable terms or that the insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could adversely affect our reputation and our business, financial condition, and operating results.

***A security breach of our system could trigger a breach of our agreements with partners that we rely on to deliver our services and expose us to significant loss.***

Our agreements with third parties, including without limitation significant agreements with payment processors, credit card and debit card issuers and bank partners, contain contractual commitments we are required to adhere to related to information security and data privacy compliance. If we experience an incident that triggers a breach of such contractual commitments, we could be exposed to significant liability or cancellation of service under these agreements. The damages payable to the counterparty as well as the impact to our service could be substantial and create substantial costs and loss of business.

***Distribution and marketing of, and access to, our platform depends, in significant part, on a variety of third-party publishers and platforms (including mobile app stores, third-party payment providers, computer systems, and other communication systems and service providers). If these third parties limit, prohibit or otherwise interfere with or change the terms of the distribution, use or***

24

Table of Contents

***marketing of our platform in any material way, it could materially adversely affect our business, operating results, and financial condition.***

We market and distribute our platform (including related mobile applications) through a variety of third-party publishers and distribution channels. Our ability to market our brands on any given property or channel is subject to the policies of the relevant third party. There is no guarantee that mobile platforms will continue to feature our platform, or that neighbors using mobile devices will continue to use our platform rather than competing products. We are dependent on the interoperability of our platform with mobile operating systems, networks, technologies, products, and standards that we do not control, such as the Android and iOS operating systems. Any changes, bugs, or technical issues in such systems, or changes in our relationships with mobile operating system partners, handset manufacturers, or mobile carriers, or in their terms of service or policies that degrade the functionality of our platform, reduce or eliminate our ability to update or distribute our platform, give preferential treatment to competitive products, limit our ability to deliver, target, or measure the effectiveness of advertisements, or charge fees related to the distribution of our platform or our delivery or placement of advertisements could materially adversely affect the usage of our platform on mobile devices, our business, operating results and financial condition. For example, the release of iOS 14.5 brought with it a number of new changes, including the need for neighbors using the app to opt in before their identifier for advertisers ("IDFA") can be accessed by an app (which came into effect in April 2021). Apple's IDFA is a string of numbers and letters assigned to Apple devices which advertisers use to identify app users to deliver personalized and targeted advertising. As a consequence, the ability of advertisers to accurately target and measure their advertising campaigns at the neighbor level will depend on the opt-in rate to grant IDFA access and if the opt-in rate is low, advertisers' ability to target and measure advertising campaigns on the Nextdoor platform may become significantly limited. We did not observe any directly attributable negative impact on our business, operating results or financial condition, including our revenue, revenue growth rates, and operating income (loss), related to the introduction of IDFA during the year ended December 31, 2023, though we may be impacted by such changes, or other changes to third-party policies or applications in the future, and as a result, our business, operating results and financial condition, including our revenue, revenue growth rates, and operating income (loss), could, in the future, be adversely impacted by any such changes. Further, in May 2022, Apple introduced changes for the Apple mail client available on its operating systems, which have impacted, and are expected to continue to impact our ability to track individual users and devices, and measure the effectiveness of our advertisements. Moreover, Google recently announced that it intends to limit access to mobile applications to advertising identifiers on Android devices, likely by the end of 2024. As a result, advertisers may find our products less appealing and may seek alternative platforms on which to run their advertising campaigns.

Further, certain publishers and channels have, from time to time, limited or prohibited advertisements for a variety of reasons. There is no assurance that we will not be limited or prohibited from using certain current or prospective marketing channels in the future. If this were to happen in the case of a significant marketing channel and/or for a significant period of time, our business, operating results, and financial condition could be materially adversely affected.

***Our platform and internal systems rely on software and hardware that is highly technical, and any errors, bugs, or vulnerabilities in these systems, or failures to address or mitigate technical limitations in our systems, could adversely affect our business.***

Our platform and internal systems rely on software and hardware, including software and hardware developed or maintained internally and/or by third parties, that is highly technical and complex. In addition, our platform and internal systems depend on the ability of such software and hardware to store, retrieve, process, and manage immense amounts of data. The software and hardware on which we rely has contained, and will in the future contain, errors, bugs, or vulnerabilities, and our systems are subject to certain technical limitations that may compromise our ability to meet our objectives. Some errors, bugs, or vulnerabilities inherently may be difficult to detect and may only be discovered after the code has been released for external or internal use. Errors, bugs, vulnerabilities, design defects, or technical limitations within the software and hardware on which we rely have in the past led to, and may in the future lead to, outcomes including a negative experience for neighbors and advertisers who use our platform, compromised ability of our platform to perform in a manner consistent with our terms, contracts, or policies, delayed product introductions or enhancements, targeting, measurement, or billing errors, compromised ability to protect the data of neighbors and/or our intellectual property or other data, or reductions in our ability to provide some or all of our services. For example, we make commitments to our neighbors as to how their data will be used within and across our platform, and our systems are subject to errors, bugs and technical limitations that may prevent us from fulfilling these commitments reliably. In addition, any errors, bugs, vulnerabilities, or defects in our systems or the software and hardware on which we rely, failures to properly address or mitigate the technical limitations in our systems, or associated degradations or interruptions of service or failures to fulfill our commitments to our neighbors, have in the past led to, and may in the future lead to, outcomes including damage to our reputation, loss of neighbors, loss of advertisers, loss of revenue, regulatory inquiries, litigation, or liability for fines, damages, or other remedies, any of which could adversely affect our business, operating results, and financial condition.

***Social and ethical issues may result in reputational harm and liability.***

Positions we may take (or choose not to take) on social and ethical issues may be unpopular with some of our employees, neighbors, or with our advertisers or potential advertisers, which may in the future impact our ability to attract or retain employees, neighbors or

Table of Contents

advertisers. Further, actions taken by our customers or partners, including through the use or misuse of our products, may result in reputational harm or possible liability. Any such claims could cause reputational harm to our brand or result in liability.

Our disclosures on environmental, social, and governance ("ESG") matters, and any standards we may set for ourselves or a failure to meet these standards, may influence our reputation and the value of our brand. For example, we have elected to share publicly certain information about our ESG initiatives and information, and our commitment to the recruitment, engagement and retention of a diverse board and workforce. In addition, the SEC has also proposed additional disclosure requirements regarding, among other ESG topics, the impact our business has on the environment. Moreover, California recently adopted two new climate-related bills, which require companies doing business in California that meet certain revenue thresholds to publicly disclose certain greenhouse gas emissions data and climate-related financial risk reports. California also recently enacted the Voluntary Carbon Market Disclosures Act, which requires companies that operate within the state to make certain climate-related claims and to provide enhanced disclosures around the achievement of such claims. Our business may face increased scrutiny related to these activities and our related disclosures, including from the investment community, and our failure to achieve progress in these areas on a timely basis, or at all, could adversely affect our reputation, business, and financial performance. To the extent the SEC proposals become effective for our company, we will be required to establish additional internal controls, engage additional consultants, and incur additional costs related to evaluating our environmental impact and preparing such disclosures. If we fail to implement sufficient internal controls or accurately capture and disclose, among other things, our environmental impact, our reputation, business, operating results and financial condition may be materially adversely affected.

**Risks Related to Financial and Accounting Matters**

***Our operating results may fluctuate significantly, which makes our future results difficult to predict.***

Our quarterly and annual operating results have fluctuated in the past and may fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results and subjects us to a number of uncertainties, including our ability to plan for and anticipate future growth. As a result, you should not rely upon our past quarterly and annual operating results as indicators of future performance. We have encountered, and will continue to encounter, risks and uncertainties frequently experienced by growing companies in rapidly evolving markets, such as the risks and uncertainties described herein. Our operating results in any given quarter can be influenced by numerous factors, many of which are unpredictable or are outside of our control, including, but not limited to:

- our ability to generate revenues from our platform;

- our ability to acquire, retain, and grow our neighbors and neighbor engagement on our platform;

- ability to attract and retain advertisers;

- ability to recognize revenue or collect payments from advertisers in a particular period;

- fluctuations in spending by our advertisers due to macroeconomic conditions, seasonality, episodic regional or global events, or other factors;

- changes in domestic and global business and macroeconomic conditions, including actual or perceived instability in the global banking system, potential recession, uncertainty with respect to the federal budget and debt ceiling and a potential temporary federal government shutdown related thereto, local and national elections, the continued rise of inflation, changing interest rates, and the war in Ukraine and the Israel-Hamas war;

- fluctuations in internet usage generally;

- the number, prominence, size, format, quality and relevancy of advertisements shown to neighbors;

- the success of technologies designed to block the display of advertisements;

- changes to third-party policies or applications that limit our ability to deliver, target, or measure the effectiveness of advertising, including changes by mobile operating system and browser providers such as Apple and Google;

- the pricing of our advertisements;

- the timing, cost of and mix of new and existing sales and marketing and promotional efforts;

Table of Contents

- the availability of our platform and app on mobile devices and other third-party platforms;

- changes to our platform or the development and introduction of new products or services by our competitors;

- changes in advertising industry association rules and standards that limit our ability to deliver, target or measure the effectiveness of advertising, such as the Network Advertising Initiative, and Interactive Advertising Bureau;

- neighbor behavior or platform changes that may reduce traffic to features of the platform that we monetize;

- system failures, disruptions, breaches of security or privacy, whether on our platform or on those of third parties, and the costs associated with any such breaches and remediation;

- negative publicity associated with our platform, including as a result of content on our platform, security breaches and neighbor privacy concerns that may result in advertisers reducing or eliminating their spend with us;

- health epidemics, such as the COVID-19 pandemic, influenza, and other highly communicable diseases or viruses;

- the timing of incurring additional expenses, such as increases in sales and marketing or research and development;

- adverse litigation judgments, settlements, or other litigation-related costs;

- changes in the legislative or regulatory environment, including with respect to privacy and cybersecurity, or actions by governments or regulators, including fines, orders, or consent decrees; and

- changes in U.S. generally accepted accounting principles.

The impact of one or more of the foregoing and other factors may cause our operating results to vary significantly. As such, quarter-to-quarter comparisons of our operating results may not be meaningful and should not be relied upon as an indication of future performance. If our quarterly and annual operating results fall below the expectations of investors or securities analysts, the price of our Class A common stock could decline substantially. If we fail to meet or exceed the expectations of investors or securities analysts, then the trading price of our Class A common stock could fall substantially, and we could face costly lawsuits, including securities class action suits. Furthermore, any quarterly or annual fluctuations in our operating results may, in turn, cause the price of our Class A common stock to fluctuate substantially.

In addition, we believe that our rapid historical growth may understate the potential seasonality of our business. As our revenue growth rate slows, we expect that the seasonality in our business may become more pronounced and may in the future cause our operating results to fluctuate. For example, advertising spending is traditionally seasonally strong in the fourth quarter of each year and we believe that this seasonality affects our quarterly results, which generally reflect higher sequential revenue growth from the third to fourth quarter compared to sequential revenue growth from the fourth quarter to the subsequent first quarter. In addition, global economic concerns continue to create uncertainty and unpredictability and add risk to our future outlook. An economic downturn in any particular region in which we do business or globally could result in reductions in revenue, as our advertisers reduce their advertising budgets, and other adverse effects that could harm our business, operating results, and financial condition.

***Certain of our market opportunities and key metric estimates could prove to be inaccurate, and any real or perceived inaccuracies may harm our reputation and negatively affect our business.***

The estimates discussed herein are subject to significant uncertainty and are based on assumptions that may not prove to be accurate. The key assumptions underlying our estimates include our ability to scale new neighbor growth, our ability to grow engagement by our existing neighbor base and our ability to increase monetization of our platform. These assumptions involve risks and uncertainties, including, but not limited to, those described in this "*Risk Factors*" section, which could cause actual results to differ materially from our estimates. Unfavorable changes in any of these or other assumptions, most of which are beyond our control, could materially and adversely affect our business, operating results, and financial condition and result in our estimates being materially different than actual results. Market opportunity estimates, whether obtained from third-party sources or developed internally, are subject to significant uncertainty and are based on assumptions that may not prove to be accurate. In particular, our estimates regarding our market penetration in new and existing markets are difficult to predict.

We regularly review key business and other metrics, including WAUs, Verified Neighbors and ARPU and other measures to evaluate growth trends, measure our performance, and make strategic decisions. These key metrics are calculated using internal company data derived from our analytics platform and have not been validated by an independent third party and there are inherent challenges in such measurements. For example, in 2021, Apple introduced changes for the Apple mail client available on its operating systems,

Table of Contents

which have limited, and are expected to continue to limit, our ability to track individual users and devices, and measure user engagement with our emails containing monetizable content for users that use the Apple email client. These changes have affected our ability to calculate WAUs, a key business metric. Because of the introduction of these changes, we are required to rely on estimates based on past user behavior and behavior of users engaging with our monetizable content on email clients other than the Apple email client in order to determine the portion of our WAU figure relating to users that engage solely with emails with monetizable content, which may impact the effectiveness of our analytics platform, as well as the accuracy of our WAU calculations. If we fail to maintain an effective analytics platform, our key metrics calculations may be inaccurate, and we may not be able to identify those inaccuracies. Our key business metrics may also be impacted by compliance or fraud-related bans, technical incidents, or false or spam accounts in existence on our platform. We regularly deactivate accounts that violate our terms of service, and exclude these accounts from the calculation of our key business metrics; however, we may not succeed in identifying and removing all such accounts from our platform. If our metrics are incorrect or provide incomplete information about neighbors and their behavior, we may make inaccurate conclusions about our business.

We regularly review and may adjust our processes for calculating our estimates to improve their accuracy. Our estimates may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology. If investors or analysts do not perceive our estimates to be accurate representations of our business, or if we discover material inaccuracies in our estimates, our reputation, business, operating results, and financial condition would be adversely affected.

***We have a history of net losses and may experience net losses in the future and we cannot assure you that we will achieve or sustain profitability. If we cannot achieve and sustain profitability, our business, financial condition, and operating results will be adversely affected.***

We have experienced significant net losses each year since we began operations in 2007, including net losses of $147.8 million, $137.9 million and $95.3 million for the years ended December 31, 2023, 2022 and 2021, respectively. We have an accumulated deficit of $766.0 million as of December 31, 2023. We anticipate that our operating expenses and capital expenditures will increase in the foreseeable future as we continue to invest in acquiring additional neighbors, increasing engagement on our platform, increasing monetization on our platform, expanding our platform and operations internationally, attracting and retaining team members, developing and enhancing our platform, marketing and sales, and enhancing our infrastructure. Our expansion efforts may prove more expensive than we anticipate, and we may not succeed in increasing our revenues sufficiently to offset these higher expenses. While we consistently evaluate opportunities to reduce our operating costs and optimize efficiencies, including, for example, through our workforce reduction in November 2023, we cannot guarantee that these efforts will be successful or that we will not re-accelerate operating expenditures in the future in order to capitalize on growth opportunities. Given the significant operating and capital expenditures associated with our business plan, we expect to continue to incur net losses for the foreseeable future and cannot assure you that we will be able to achieve profitability. If we do achieve profitability, it cannot be certain that we will be able to sustain or increase such profitability.

***Our ability to use our U.S. federal and state net operating losses to offset future taxable income may be subject to certain limitations which could subject our business to higher tax liability.***

As of December 31, 2023, we had gross U.S. federal net operating loss ("NOL") carryforwards of approximately $413.6 million and gross state NOL carryforwards of approximately $280.8 million, which if not utilized, will begin to expire for federal and state income tax purposes beginning in 2028. To the extent that we continue to generate taxable losses, unused losses will carry forward to offset future taxable income, if any. Under the 2017 Tax Cuts and Jobs Act, as modified by the Coronavirus Aid, Relief, and Economic Security Act, unused U.S. federal NOLs generated in tax years beginning after December 31, 2017, will not expire and may be carried forward indefinitely, but the deductibility of such federal NOLs in taxable years beginning after December 31, 2020, is limited to 80% of current year taxable income.

Under Section 382 of the Code, and corresponding provisions of state law, if a corporation that undergoes an "ownership change," which is generally defined as a greater than 50 percentage point change (by value) in its equity ownership by certain stockholders over a three-year period, the corporation's ability to utilize its pre-change NOL carryforwards to offset its post-change income or taxes may be limited. Though we recently completed a Section 382 study that supports that our use of NOLs will not be subject to limitation, it is possible that the limitation could still apply.

We may experience ownership change(s) in the future as a result of subsequent shifts in our stock ownership, some of which may be outside our control. Therefore, it is possible that such an ownership change could limit the amount of NOLs we can use to offset future taxable income. Our current NOL carryforwards, and any NOL carryforwards of companies we have acquired, may be subject to limitations, thereby increasing our overall tax liability. Our NOL carryforwards may also be impaired under similar provisions of state law. We have recorded a full valuation allowance related to our U.S. federal and state NOL carryforwards and other net deferred tax assets due to the uncertainty of the ultimate realization of the future benefits of those assets. Our NOL carryforwards may expire

28

Table of Contents

unutilized or underutilized, which could prevent us from offsetting future taxable income. Any future changes in U.S. tax laws in respect of the utilization of NOL carryforwards may further affect the limitation in future years. In addition, there may be periods during which the use of NOL carryforwards is suspended or otherwise limited at the state level, which could also impact our ability to utilize NOL carryforwards. As a result, even if we attain profitability, we may be unable to use all or a material portion of our NOLs, which could adversely affect our business, operating results, financial condition, and cash flows.

***Our financial results may be adversely affected by changes in accounting principles generally accepted in the United States and our financial estimates may be different from our financial results.***

GAAP is subject to interpretation by the Financial Accounting Standards Board, the American Institute of Certified Public Accountants, the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could harm our revenue and financial results, and could affect the reporting of transactions completed before the announcement of a change.

***If currency exchange rates fluctuate substantially in the future, our operating results, which are reported in U.S. dollars, could be adversely affected.***

As we continue to expand our international operations, we will become more exposed to the effects of fluctuations in currency exchange rates. A substantial majority of our revenues to date have been denominated in U.S. dollars and, therefore, we have not historically been subject to foreign currency risk. In addition, as we continue to expand internationally, we expect to incur increased expenses for employee compensation and other operating expenses at non-U.S. locations in the local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of such expenses being higher. This could have a negative impact on our operating results. Although we may in the future decide to undertake foreign exchange hedging transactions to cover a portion of our foreign currency exchange exposure, we currently do not hedge our exposure to foreign currency exchange risks.

***We may have greater than anticipated tax liabilities, which could harm our business, revenue and financial results.***

We operate in a number of tax jurisdictions globally, including in the United States at the federal, state and local levels, and in many foreign countries, and plan to continue to expand the scale of our operations in the future. We are subject to review and potential audit by a number of U.S. and non-U.S. tax authorities. A change in law or in our global operations could result in higher effective tax rates, reduced cash flows and lower overall profitability. In particular, our intercompany relationships are subject to complex transfer pricing regulations administered by taxing authorities in various jurisdictions. Significant judgment is required in determining our worldwide provision for income taxes and other tax liabilities.

We are subject to various indirect non-income taxes, such as payroll, sales, use, value-added and goods and services taxes in the United States and various foreign jurisdictions, and we may face indirect tax audits in various U.S. and foreign jurisdictions. In certain jurisdictions, we collect and remit indirect taxes. However, tax authorities may question, challenge or disagree with our calculation, reporting or collection of taxes and may require us to collect taxes in jurisdictions in which we do not currently do so or to remit additional taxes and interest, and could impose associated penalties and fees. A successful assertion by one or more tax authorities requiring us to collect taxes in jurisdictions in which we do not currently do so or to collect additional taxes in a jurisdiction in which we currently collect taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest, could discourage neighbors from utilizing our platform and could otherwise harm our business, operating results, and financial condition.

Although we do not currently incur significant tax costs due to our history of operating losses, our tax liabilities may increase if our profitability increases in the future. In addition, our effective tax rate may change from year to year based on changes in the mix of activities and income allocated or earned among various jurisdictions, tax laws and the applicable tax rates in these jurisdictions (including future tax laws that may become material), tax treaties between countries, our eligibility for benefits under those tax treaties and the valuation of deferred tax assets and liabilities. Such changes could result in an increase in the effective tax rate applicable to all or a portion of our income, which would negatively affect our financial results. In August 2022, President Biden signed into law the Inflation Reduction Act of 2022 ("IRA"). The IRA includes a 15% corporate alternative minimum tax for companies with modified GAAP net income in excess of $1 billion, a 1% excise tax on certain stock repurchases, and numerous environmental and green energy tax credits. Currently, we are not subject to the corporate alternative minimum tax and we do not expect the new law to have a material impact on our results of operations.

Table of Contents

***We cannot guarantee that our Share Repurchase Program will be fully consummated or that it will enhance long-term stockholder value. Share repurchases could also increase the volatility of the trading price of our stock and diminish our cash reserves.***

On May 31, 2022, our Board of Directors authorized and approved a share repurchase program (the "Share Repurchase Program") pursuant to which we may repurchase up to $100.0 million in aggregate of shares of our Class A common stock, with the authorization to expire on June 30, 2024, or such shorter period if $100.0 million in aggregate of shares of our Class A common stock have been repurchased. As of December 31, 2023, we had $22.8 million available for future share repurchases under the Share Repurchase Program. On February 21, 2024, the Company's Board of Directors authorized and approved an increase of $150.0 million to the Share Repurchase Program and extended the expiration date to March 31, 2026. Although our Board of Directors has authorized this Share Repurchase Program, the program does not obligate us to repurchase any specific dollar amount or to acquire any specific number of shares of our Class A common stock. The actual timing and amount of repurchases remain subject to a variety of factors, including stock price, trading volume, market conditions and other general business considerations, all of which may be negatively impacted by macroeconomic conditions and factors, including rising interest rates and inflation. The Share Repurchase Program may be modified, suspended, or terminated at any time, and we cannot guarantee that the Share Repurchase Program will be fully consummated or that it will enhance long-term stockholder value. The program could affect the trading price of our Class A common stock, increase volatility and diminish our cash and cash equivalents and marketable securities, and any announcement of a termination of this program may result in a decrease in the trading price of our stock.

**Risks Related to Legal and Regulatory Matters**

***We may be liable as a result of content or information that is published or made available on our platform.***

We are subject to many U.S. federal and state and foreign laws and regulations that involve matters central to our business, including laws and regulations that involve data privacy and protection, intellectual property (including copyright and patent laws), content regulation, the use of AI, rights of publicity, advertising, marketing, health and safety, competition, protection of minors, age verification, consumer protection, taxation, anti-bribery, anti-money laundering and corruption, economic or other trade prohibitions or sanctions or securities law compliance. Although content on our platform is typically generated by third parties, and not by us, we may be sued or face regulatory liability for claims relating to personal information, content or information that is made available on our service, including claims of defamation, disparagement, intellectual property infringement, breach of our privacy commitments, breach of privacy and data security laws, or other alleged damages could be asserted against us. In addition, the availability of copyright protection and other legal protections for intellectual property generated by certain new technologies, such as generative AI, is uncertain. The use of generative AI and other forms of AI may expose us to risks because the intellectual property ownership and license rights, including copyright, of generative and other AI output, has not been fully interpreted by U.S. courts or been fully addressed by U.S. federal or state regulation, as well as in foreign jurisdictions. Our systems, tools and personnel that help us to proactively detect potentially policy-violating or otherwise inappropriate content cannot identify all such content on our service, and in many cases this content will appear on the Nextdoor platform. This risk may increase as we develop and increase the use of certain features, such as video, for which identifying such content and obtaining appropriate consents is challenging. Additionally, some controversial content may not be banned on the Nextdoor platform and, even if it is not featured in advertisements to neighbors, it may still appear in the Feed or elsewhere. This risk is enhanced in certain jurisdictions outside of the United States where our protection from liability for content published on our platform by third parties may be unclear and where we may be less protected under local laws than we are in the United States. Further, if law and/or policy-violating content is found on the Nextdoor platform, or we do not give appropriate notice or obtain appropriate consents, we may be in violation of the terms of certain of our key agreements, which may result in termination of the agreement and potentially payment of damages in some cases. We could incur significant costs in investigating and defending such claims and, if we are found liable, damages. If any of these events occur, our business, operating results, and financial condition could be harmed.

While we rely on a variety of statutory and common-law frameworks and defenses, including those provided by the DMCA, the CDA, the fair-use doctrine in the United States and the Electronic Commerce Directive in the European Union, differences between statutes, limitations on immunity, requirements to maintain immunity, and moderation efforts in the many jurisdictions in which we operate may affect our ability to rely on these frameworks and defenses, or create uncertainty regarding liability for information or content uploaded by neighbors and advertisers or otherwise contributed by third-parties to our platform.

***Actions by governments that restrict access to the Nextdoor platform in their countries, or that otherwise impair our ability to sell advertising in their countries, could substantially harm our business, operating results, and financial condition.***

Governments may seek to censor content available on the Nextdoor platform or restrict access to the platform from their country entirely, or impose other restrictions that may affect the accessibility of the platform in their country for an extended period of time or indefinitely. In addition, government authorities in other countries may seek to restrict neighbors' access to the platform if they consider us to be in violation of their laws or a threat to public safety or for other reasons. It is possible that government authorities could take action that impairs our ability to sell advertising, collect, process, use, store, disclose or transfer data including in countries

30

Table of Contents

where access to our consumer-facing platform may be blocked or restricted. In the event that content shown on the Nextdoor platform is subject to censorship, access to the platform is restricted, in whole or in part, in one or more countries, or other restrictions are imposed on the platform, or our competitors are able to successfully penetrate new geographic markets or capture a greater share of existing geographic markets that we cannot access or where we face other restrictions, our ability to retain or increase our neighbor base, neighbor engagement, or the level of advertising by advertisers may be adversely affected, we may not be able to maintain or grow our revenue as anticipated, and our financial results could be adversely affected.

***Our business is subject to complex and evolving U.S. and foreign laws, regulations, and industry standards, many of which are subject to change and uncertain interpretations, which uncertainty could harm our business, operating results, and financial condition.***

We are subject to many U.S. federal and state and foreign laws, regulations and industry standards that involve matters central to our business, including laws and regulations that involve data privacy, data security, intellectual property (including copyright and patent laws), content, rights of publicity, advertising, marketing, competition, protection of minors, age verification, consumer protection, taxation, and telecommunications. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended, in a manner that could harm our business. In addition, the introduction of new products, expansion of our activities in certain jurisdictions, or other actions that we may take may subject the company to additional laws, regulations, or other government scrutiny.

We rely on a variety of statutory and common-law frameworks and defenses relevant to the content available on the Nextdoor platform, including the DMCA, the CDA and the fair-use doctrine in the United States, and the Electronic Commerce Directive in the European Union. However, each of these statutes is subject to uncertain or evolving judicial interpretation and regulatory and legislative amendments. For example, in the United States, laws such as the CDA, which have previously been interpreted to provide substantial protection to interactive computer service providers, may change and become less predictable or unfavorable by legislative action or juridical interpretation. There have been various federal and state legislative efforts to restrict the scope of the protections available to online platforms under the CDA, in particular with regards to Section 230 of the CDA, and current protections from liability for third-party content in the United States could decrease or change. Although the U.S. Supreme Court declined to narrow the scope of Section 230 in its Gonzalez v. Google decision, there are still legislative efforts to amend the CDA, which if successful could expose us to additional lawsuits and potential judgments that could seriously harm our business. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages.

The DSA, signed into law in the European Union on October 19, 2022, is a package of legislation intended to update the liability and safety rules for digital platforms, products, and services. The DSA, which started to apply to our business in February 2024, could negatively impact the scope of the limited immunity provided by the E-Commerce Directive, limit targeted advertising, and require us to expend resources to try to comply with the new regulations or incur liability. The DSA also includes significant penalties for non-compliance. On October 26, 2023, similarly, the United Kingdom's Online Safety Act became law. The Act creates requirements around monitoring and handling harmful content and will require us to expend resources to try to comply with the new regulations or incur liability. Additionally, Australia's Online Safety Act 2021, which went into effect in January 2022, and its accompanying Social Media Services Code, which went into effect in December 2023, may impose new obligations and liabilities on platforms with respect to certain types of harmful content. These new and proposed laws, together with any changes to the existing laws and regulations within the jurisdictions in which we operate could require us to expend additional resources to maintain compliance with any new or evolving regulations. As a result, we may incur additional liability, and our business, operating results, and financial condition could be harmed.

We collect, store, use, share and otherwise process data, some of which contains personal information about individuals including, but not limited to, our neighbors, employees and partners including, contact details, network details, and location data. We are therefore subject to U.S. (federal, state, local) and foreign laws and regulations regarding data privacy and security and the processing of personal information and other data from neighbors, employees or business partners. The regulatory framework for privacy, information security, data protection and processing worldwide and interpretations of existing laws and regulations is likely to continue to be uncertain and current or future legislation or regulations in the United States and other jurisdictions, or new interpretations of existing laws and regulations, could significantly restrict or impose conditions on our ability to process data and increase notice or consent requirements before we can utilize advertising technologies.

We have internal and publicly posted policies regarding our collection, processing, use, disclosure, deletion and security of information. Although we endeavor to comply with our policies and documentation, we may at times fail to do so or be accused of having failed to do so. The publication of our privacy policies and other documentation that provide commitments about data privacy

31

Table of Contents

and security can subject us to potential actions if they are found to be deceptive, unfair, or otherwise misrepresent our actual practices, which could materially and adversely affect our business, operating results, and financial condition.

In the United States, we are subject to numerous federal, state and local data privacy and security laws and regulations governing the processing of information about individuals. For example, the CCPA establishes certain transparency obligations and creates data privacy rights for users, including rights to access and delete their personal information as well as opt-out of certain sales or transfers of their personal information. The law also prohibits covered businesses from discriminating against consumers (for example, charging more for services) for exercising any of their CCPA rights. The CCPA imposes statutory damages for certain violations of the law as well as a private right of action for certain data breaches that result in the loss of personal information, which increases the likelihood of, and risks associated with, data breach litigation. Additionally, California voters approved a new privacy law, the CPRA, which became effective January 1, 2023 (with a look back to January 1, 2022). The CPRA significantly modifies the CCPA, including by expanding consumers' rights and establishing a new state agency that is vested with authority to implement and enforce the CPRA. Other states have also passed comparable legislation, with unique compliance requirements relevant to our business. For example, Virginia, Colorado, Connecticut, and Utah have all passed data privacy laws that went into effect in 2023, which may impose obligations similar to or more stringent than those we may face under other data protection laws. Additionally, the Federal Trade Commission and many state attorneys general are interpreting federal and state consumer protection laws to impose standards for the online collection, use, dissemination and security of data. Compliance with these laws and any newly enacted privacy and data security laws or regulations may be challenging and cost- and time-intensive, and may require us to modify our data processing practices and policies and to incur substantial costs and potential liability in an effort to comply with such legislation.

Outside the United States, we are subject to an increasing number of laws, regulations and industry standards that apply to data privacy and security. In Canada, we are subject to the Personal Information Protection and Electronic Documents Act, which governs the collection, use and disclosure of Canadian residents' personal information in the course of commercial activities. In Australia, we are also subject to, among other laws, Australia's "Privacy Act 1988" and Australian Privacy Principles ("APPs"), which require us to, among other things: (a) establish a governance framework for managing privacy and data protection; (b) give individuals the option of not identifying themselves or using a pseudonym (unless certain exceptions apply); (c) destroy or de-identify unsolicited personal information that was not obtained for a purpose reasonably necessary or directly related to our business activities; and (d) not transfer or disclose personal information to a party outside of Australia unless consent is obtained, the destination country has substantially similar privacy protections to Australia, or the overseas recipient contractually agrees to comply with the APPs. In the EEA, we are subject to the GDPR and in the United Kingdom, we are subject to the United Kingdom data protection regime consisting primarily of the UK GDPR and the UK Data Protection Act 2018, in each case in relation to our collection, control, processing, sharing, disclosure and other use of data relating to an identifiable living individual (personal data). The GDPR, and national implementing legislation in EEA member states and the United Kingdom, imposes a strict data protection compliance regime, grants new rights for data subjects in regard to their personal data (including the right to be "forgotten" and the right to data portability) and enhances current rights (e.g., data subject access requests).

We are also subject to European Union rules with respect to cross-border transfers of personal data out of the EEA and the United Kingdom. After years of uncertainty following the July 16, 2020 decision of the Court of Justice of the European Union invalidating the EU-U.S. Privacy Shield Framework (the "Privacy Shield"), on July 10, 2023 the European Commission adopted its adequacy decision for the new EU-U.S. Data Privacy Framework ("DPF"). The DPF creates a path forward for personal data to be transferred from the EU to the United States for U.S. entities that have self-certified with the U.S. Department of Commerce.

We are also subject to evolving EU and U.K. privacy laws on cookies and e-marketing. In the EU and the U.K., regulators are increasingly focusing on compliance with current national laws that implement the ePrivacy Directive. The ePrivacy Directive may be replaced by an EU regulation known as the ePrivacy Regulation that will significantly increase fines for non-compliance. In the EU and the U.K., informed consent is required for the placement of certain cookies or similar technologies on a user's device and for direct electronic marketing and (under the UK GDPR and the GDPR) valid consent is tightly defined, including, a prohibition on pre-checked consents and, in the context of cookies, a requirement to obtain separate consents for each type of cookie or similar technology. While the text of the ePrivacy Regulation is still under development, a December 2021 European court decision and regulators' guidance are driving increased attention to cookies and tracking technologies. If regulators start to enforce the strict approach in recent guidance, this could lead to substantial costs, require significant systems changes, limit the effectiveness of our marketing activities, divert the attention of our technology personnel, adversely affect our margins, increase costs and subject us to additional liabilities. Regulation of cookies and similar technologies, and any decline of cookies or similar online tracking technologies as a means to identify and potentially target users, may lead to broader restrictions and impairments on our marketing and personalization activities and may negatively impact our efforts to understand users. Furthermore, the EU Artificial Intelligence Act, which was proposed on April 21, 2021 by the European Commission and aims to introduce a common regulatory and legal framework for AI, is expected to pass in the coming months. The EU Artificial Intelligence Act would regulate AI providers and entities making

Table of Contents

use of AI tools in a professional capacity, and may require the implementation of additional quality assurance controls and measures to be reviewed and approved by regulatory submissions of our products.

While we have put in efforts to comply with these regulations, the uncertainty surrounding enforcement and changing privacy landscapes could change our compliance status. Similarly, there are a number of legislative proposals in the European Union, the United States, at both the federal and state level, as well as other jurisdictions that could impose new obligations or limitations in areas affecting our business.

The costs of complying with these laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are high and likely to increase in the future, particularly as the degree of regulation increases, our business grows and our geographic scope expands. The impact of these laws and regulations may disproportionately affect our business in comparison to our peers in the technology sector that have greater resources. Even though we communicate with lawmakers and regulators in countries and regions in which we conduct business, and despite having a dedicated policy team to monitor legal and regulatory developments, any failure or perceived failure of compliance on our part to comply with the laws and regulations may subject us to significant liabilities or penalties, or otherwise adversely affect our business, financial condition or operating results. Furthermore, it is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely.

***We could be involved in legal disputes that are expensive and time consuming, and, if resolved adversely, could harm our business, operating results, and financial condition.***

We are currently involved in, and may in the future be involved in, actual and threatened legal proceedings, claims, investigations and government inquiries arising in the ordinary course of our business, including intellectual property, data privacy, cybersecurity, privacy and other torts, illegal or objectionable content, consumer protection, securities, stockholder derivative claims, employment, governance, workplace culture, contractual rights, civil rights infringement, false or misleading advertising, or other legal claims relating to content or information that is provided to us or published or made available on our platform. Any proceedings, claims or inquiries involving us, whether successful or not, may be time consuming, result in costly litigation, unfavorable outcomes, increased costs of business, may require us to change our business practices or platform, require significant amount of management's time, may harm our reputation or otherwise harm our business, operating results, and financial condition.

We are currently involved in and have been subject to actual and threatened litigation with respect to third-party patents, trademarks, copyrights and other intellectual property, and may continue to be subject to intellectual property litigation and threats thereof. Companies in the internet, technology and media industries own large numbers of patents, copyrights, trademarks and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. As we face increasing competition, grow our business and platform offerings, and become increasingly high profile, the possibility of receiving a larger number of intellectual property claims against the company grows. In addition, various "non-practicing entities" that own patents and other intellectual property rights have asserted, and may in the future attempt to assert, intellectual property claims against us to extract value through licensing or other settlements.

From time to time, we receive letters from patent holders alleging that the Nextdoor platform infringes on their patent rights and from trademark holders alleging infringement of their trademark rights. We also receive letters from holders of copyrighted content alleging infringement of their intellectual property rights. Our technologies and content, including the content that neighbors upload to the platform, may not be able to withstand such third-party claims.

With respect to any intellectual property claims, we may have to seek a license to continue using technologies or engaging in practices found to be in violation of a third-party's rights, which may not be available on reasonable terms and may significantly increase our operating expenses. A license to continue such technologies or practices may not be available to us at all and we may be required to discontinue use of such technologies or practices or to develop alternative non-infringing technologies or practices. The development of alternative non-infringing technologies or practices could require significant effort and expense or may not be achievable at all. Our business, operating results, and financial condition could be harmed as a result.

***The obligations associated with operating as a public company require significant resources and management attention and have, and will continue to, cause us to incur additional expenses, which will adversely affect our profitability.***

Operating as a public company has and is expected to continue to increase our expenses as a result of the additional accounting, legal and various other additional expenses associated with operating as a public company and complying with public company disclosure obligations. We are required to comply with certain requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the listing requirements of the NYSE and other applicable securities rules and regulations. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our

Table of Contents

business and operating results with the SEC. We are also required to ensure that we have the ability to prepare financial statements that are fully compliant with all SEC reporting requirements on a timely basis. Compliance with these rules and regulations has increased, and will continue to increase, our legal and financial compliance costs, make some activities more difficult, time-consuming or costly and increase demand on our systems and resources. As a public company, we have and will continue to, among other things:

- prepare and distribute periodic public reports and other stockholder communications in compliance with our obligations under the federal securities laws;

- create or expand the roles and duties of our Board of Directors and committees of the Board of Directors;

- institute more comprehensive financial reporting and disclosure compliance functions; and

- establish new and enhance existing internal policies, including those relating to disclosure controls and procedures.

These changes, and the additional involvement of accountants and legal advisors, will require a significant commitment of additional resources. We might not be successful in complying with these obligations and the significant commitment of resources required for complying with them could have a material adverse effect on our business, financial condition, results of operations and cash flows. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, regulatory authorities may initiate legal proceedings against us, and our business may be harmed. Moreover, the cost of our directors' and officers' insurance coverage has increased as a public company. In the future, it may be more expensive or more difficult for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors would also make it more difficult for us to attract and retain qualified members of our Board of Directors and qualified executive officers.

***Failure to maintain effective systems of internal controls and disclosure controls could have a material adverse effect on our business, operating results, and financial condition.***

Effective internal and disclosure controls are necessary for us to provide reliable financial reports and effectively prevent fraud and to operate successfully as a public company. We are required by the Sarbanes-Oxley Act to design and maintain a system of internal control over financial reporting and disclosure controls and procedures. If we cannot provide reliable financial reports or prevent fraud, our reputation and operating results would be harmed.

Our current controls and any new controls we develop may become inadequate because of changes in conditions in our business. Further, weaknesses in our internal controls may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in their implementation or improvement, could harm our operating results, may result in a restatement of our financial statements for prior periods, cause us to fail to meet our reporting obligations, and could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we are required to include in the periodic reports we will file with the SEC. Our independent registered public accounting firm is required to formally attest to the effectiveness of our internal control over financial reporting. Our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that are filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the market price of our Class A common stock.

We have incurred and expect to continue to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act. As a result of the complexity involved in complying with the rules and regulations applicable to public companies, our management's attention may be diverted from other business concerns, which could harm our business, operating results, and financial condition. Although we have already hired additional employees to assist us in complying with these requirements, we may need to hire more employees in the future, or engage outside consultants, which will increase our operating expenses.

***We are obligated to maintain proper and effective internal control over financial reporting. If we identify material weaknesses in the future, or otherwise fail to maintain an effective system of internal control over financial reporting in the future, we may not be able to accurately or timely report our financial condition or operating results, which may adversely affect investor confidence in our company and, as a result, the value of our Class A common stock.***

As a public company, we are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, and the rules and regulations of the applicable listing standards of the NYSE. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on our personnel, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls, internal control over financial reporting and other procedures that are designed to ensure information required to be disclosed by us in our financial statements and in the reports that we will file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. In order to maintain and improve the effectiveness of our internal controls and procedures, we have expended, and anticipate that we will continue to expend, significant resources, including accounting related costs and significant management oversight.

If we are unable to assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion on the effectiveness of our internal control, including as a result of any identified material weakness, we could lose investor confidence in the accuracy and completeness of our financial reports, which would cause the price of our Class A common stock to decline, and we may be subject to investigation or sanctions by the SEC. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the NYSE.

### Risks Related to Intellectual Property

***If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business, operating results, and financial condition may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality, assignment, and license agreements with our employees, consultants, and third parties with whom we have relationships, as well as trademark, copyright, patent, trade secret, and domain name protection laws, to protect our proprietary rights. In the United States and internationally, we have filed various applications for protection of certain aspects of our intellectual property, and we currently hold issued patents and copyrights in the United States, issued copyrights in the United States, and multiple trademark registrations in the United States and other foreign countries. Third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark and patent applications may not be approved.

Any issued patents may be challenged, invalidated or circumvented, and any rights granted under these patents may not actually provide adequate defensive protection or competitive advantages to us. Patent applications in the United States are typically not published until at least 18 months after filing, or, in some cases, not at all. We cannot be certain that we were the first to make the inventions claimed in our pending patent applications or that we were the first to file for patent protection. Additionally, the process of obtaining patent protection is expensive and time-consuming, and we may not be able to prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. Recent changes to the patent laws in the United States may also bring into question the validity of certain software patents and may make it more difficult and costly to prosecute patent applications. Such changes may lead to uncertainties or increased costs and risks surrounding the prosecution, validity, ownership, enforcement, and defense of our issued patents and patent applications and other intellectual property, the outcome of third-party claims of infringement, misappropriation, or other violation of intellectual property brought against us and the actual or enhanced damages (including treble damages) that may be awarded in connection with any such current or future claims, and could have a material adverse effect on our business.

We rely on our trademarks, trade names, and brand names to distinguish our platform from the products of our competitors. However, third parties may have already registered identical or similar marks for products or solutions that also address the software market. Efforts by third parties to limit use of our brand names or trademarks and barriers to the registration of brand names and trademarks may restrict our ability to promote and maintain a cohesive brand throughout our key markets. There can also be no assurance that pending or future U.S. or foreign trademark applications will be approved in a timely manner or at all, or that such registrations will effectively protect our brand names and trademarks. Third parties may also oppose our trademark applications, or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our platform, which would result in loss of brand recognition and would require us to devote resources to advertising and marketing new brands.

In addition, effective intellectual property protection may not be available in every country in which we operate or intend to operate our business. In any or all of these cases, we may be required to expend significant time and expense in order to prevent infringement or to enforce our rights. Although we have generally taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business. If the protection of our

Table of Contents

proprietary rights is inadequate to prevent unauthorized use or appropriation by third parties, the value of our brands and other intangible assets may be diminished and competitors may be able to more effectively mimic the Nextdoor platform and methods of operations.

To prevent substantial unauthorized use of our intellectual property rights, it may be necessary to prosecute actions for infringement and/or misappropriation of our proprietary rights against third parties. Any such action could result in significant costs and diversion of our resources and management's attention, and we cannot assure that we will be successful in such action. Furthermore, many of our current and potential competitors have the ability to dedicate substantially greater resources to enforce their intellectual property rights (or to contest claims of infringement) than we do. Accordingly, despite our efforts, we may not be able to prevent third parties from knowingly or unknowingly infringing upon, misappropriating or circumventing our intellectual property rights. If we are unable to protect our proprietary rights (including aspects of our software and platform protected other than by patent rights), we will find ourselves at a competitive disadvantage to others who need not incur the additional expense, time and effort required to create our platform. Moreover, we may need to expend additional resources to defend our intellectual property rights in foreign countries, and our inability to do so could impair our business, results of operations and financial condition or adversely affect our business, operating results, and financial condition.

***Confidentiality agreements with employees and others may not adequately prevent disclosure of trade secrets and proprietary information.***

We have devoted substantial resources to the development of our intellectual property and proprietary rights. To protect our intellectual property and proprietary rights, we rely in part on confidentiality agreements with our employees, vendors, licensees, independent contractors and other advisors. These agreements may not effectively prevent disclosure of confidential information and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. Effective trade secret protection may also not be available in every country in which the Nextdoor platform is available or where we have employees or independent contractors. The loss of trade secret protection could make it easier for third parties to compete with the Nextdoor platform by copying functionality. In addition, any changes in, or unexpected interpretations of, the trade secret and employment laws in any country in which we operate may compromise our ability to enforce our trade secret and intellectual property rights. In addition, others may independently discover trade secrets and proprietary information and in such cases, we could not assert any trade secret rights against such parties. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights and failure to obtain or maintain trade secret protection could adversely affect our competitive business position.

***Third parties may claim that our platform infringes their intellectual property rights and this may create liability for us or otherwise adversely affect our business, operating results, and financial condition.***

Third parties may claim that the Nextdoor platform infringes their intellectual property rights, and such claims may result in legal claims against us and our technology partners and customers. These claims may damage our brand and reputation and create liability for us. We expect the number of such claims to increase as the functionality of our platform overlaps with that of other products and services, and as the volume of issued software patents and patent applications continues to increase.

Companies in the software and technology industries own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. In addition, many of these companies have the capability to dedicate substantially greater resources to enforce their intellectual property rights and to defend claims that may be brought against them. Furthermore, patent holding companies, non-practicing entities, and other adverse patent owners that are not deterred by our existing intellectual property protections may seek to assert patent claims against us. We have received, and may in the future receive, notices that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, we may face a higher risk of being the subject of intellectual property infringement claims.

We may also face exposure to third party intellectual property infringement, misappropriation, or violation actions if we engage software engineers or other personnel who were previously engaged by competitors or other third parties and those personnel inadvertently or deliberately incorporate proprietary technology of third parties into our products. In addition, we may lose valuable intellectual property rights or personnel. A loss of key personnel or their work product could hamper or prevent our ability to develop, market and support potential products or enhancements, which could severely harm our business. Any intellectual property claims, with or without merit, could be very time-consuming, could be expensive to settle or litigate, and could divert our management's attention and other resources. These claims could also subject us to significant liability for damages, potentially including treble damages if we are found to have willfully infringed patents or copyrights. These claims could also result in us having to stop using technology found to be in violation of a third party's rights. We might be required to seek a license for the intellectual property, which may not be available on reasonable terms or at all. Even if a license were available, we could be required to pay significant royalties,

Table of Contents

which would increase our operating expenses. Alternatively, we could be required to develop alternative non-infringing technology, which could require significant time, effort, and expense, and may affect the performance or features of our platform. If we cannot license or develop alternative non-infringing substitutes for any infringing technology used in any aspect of our business, we would be forced to limit use of our platform. Any of these results would adversely affect our business, operating results and financial condition.

***Our use of "open source" software could subject us to possible litigation or could prevent us from offering products that include open source software or require us to obtain licenses on unfavorable terms.***

A portion of the technologies we use incorporates "open source" software, and we may incorporate open source software in the future. Open source software is generally licensed by its authors or other third parties under open source licenses. These licenses may subject us to certain unfavorable conditions, including requirements that we offer our products that incorporate the open source software for no cost, that we make publicly available the source code for any modifications or derivative work we create based upon, incorporating or using the open source software, or that we license such modifications or derivative works under the terms of the particular open source license. From time to time, companies that use third-party open source software have also faced claims challenging the use of such open source software and their compliance with the terms of the applicable open source license. We may be subject to suits by parties claiming ownership of what we believe to be open source software, or claiming non-compliance with the applicable open source licensing terms.

In addition to using open source software, we also license to others some of our software through open source projects. Open sourcing our own software requires the company to make the source code publicly available, and therefore can affect our ability to protect our intellectual property rights with respect to that software. Additionally, if a third-party software provider has incorporated open source software into software that we license from such provider, we could be required to disclose any of our source code that incorporates or is a modification or derivative work of such licensed software. If an author or other third party that distributes open source software that we use or license were to allege that we had not complied with the conditions of the applicable license, we could be required to incur significant legal expenses defending against such allegations and could be subject to significant damages, enjoined from offering our products that contained the open source software, required to release proprietary source code, required to obtain licenses from third parties or otherwise required to comply with the unfavorable conditions unless and until we can re-engineer the product so that it complies with the open source license or does not incorporate the open source software.

The terms of many open source licenses have not been interpreted by U.S. or foreign courts, and accordingly there is a risk that those licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to commercialize our platform. In that event, we could be required to seek licenses from third parties in order to continue offering our platform, to re-develop our platform, or to release our proprietary source code under the terms of an open source license, any of which could harm our business. Enforcement activity for open source licenses can also be unpredictable. Were it determined that our use was not in compliance with a particular license, we may be required to release our proprietary source code, defend claims, pay damages for breach of contract or copyright infringement, grant licenses to our patents, re-engineer our platform, or take other remedial action that may divert resources away from our product development efforts, any of which could negatively impact our business. Open source compliance problems can also result in damage to reputation and challenges in recruitment or retention of engineering personnel. Further, given the nature of open source software, it may be more likely that third parties might assert copyright and other intellectual property infringement claims against us based on our use of these open source software programs. Litigation could be costly for us to defend, have a material adverse effect on our business, results of operations and financial condition, or require us to devote additional development resources to change our platform.

***We license technology from third parties, and our inability to maintain those licenses could harm our business.***

We currently incorporate, and will in the future continue to incorporate, technology that we license from third parties, including software, into our platform. Licensing technologies from third parties exposes us to increased risk of being the subject of intellectual property infringement due to, among other things, our lower level of visibility into the development process with respect to such technology and the care taken to safeguard against infringement risks. We cannot be certain that our licensors do not or will not infringe on the intellectual property rights of third parties or that our licensors have or will have sufficient rights to the licensed intellectual property in all jurisdictions in which we operate. Some of our agreements with our licensors may be terminated by them for convenience, or otherwise provide for a limited term. If we are unable to continue to license technology because of intellectual property infringement claims brought by third parties against our licensors or against us, or if we are unable to continue our license agreements or enter into new licenses on commercially reasonable terms, our ability to develop our platform that is dependent on that technology would be limited, and our business could be harmed. Additionally, if we are unable to license technology from third parties, we may be forced to acquire or develop alternative technology, which we may be unable to do in a commercially feasible manner or at all, and may require us to use alternative technology of lower quality or performance standards. As a result, our business, operating results and financial condition would be adversely affected.

37

Table of Contents

**Risks Related to Ownership of Our Class A Common Stock**

***The price of our Class A common stock has been and may continue to be volatile.***

The trading price of our Class A common stock has been, and is likely to continue to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. Factors that could cause fluctuations in the trading price of our Class A common stock include the following:

- actual or anticipated fluctuations in our user growth, retention, engagement, revenue, or other operating results;

- developments involving our competitors;

- variations between our actual operating results and the expectations of securities analysts, investors, and the financial community;

- actual or anticipated fluctuations in our quarterly or annual operating results;

- any forward-looking financial or operating information we may provide to the public or securities analysts, any changes in this information, or our failure to meet expectations based on this information;

- publication of research reports by securities analysts about us, our competitors or our industry;

- the public's reaction to our press releases, our other public announcements and our filings with the SEC;

- additional shares of our Class A common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, or if existing stockholders subject to a lock-up sell shares into the market when applicable "lock-up" periods end;

- additions and departures of key personnel;

- commencement of, or involvement in, litigation involving us;

- changes in our capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of our Class A common stock available for public sale;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry, including our partners and competitors;

- the impact of interest rate increases on the overall stock market and the market for technology company stocks;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- developments in new legislation and pending lawsuits or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from recessions, rising inflation, changing interest rates, local and national elections, actual or perceived instability in the global banking system, international currency fluctuations, corruption, political instability and acts of war or terrorism, such as the war in Ukraine and the Israel-Hamas war.

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business.

Table of Contents

***The dual class structure of our common stock may adversely affect the trading market for our Class A common stock.***

Certain stock index providers limit the eligibility of public companies with multiple classes of shares of common stock from inclusion in their indices. In addition, several shareholder advisory firms have announced their opposition to the use of multiple class structures. As a result, the dual class structure of our common stock may prevent the inclusion of our Class A common stock in such indices and may cause shareholder advisory firms to publish negative commentary about our corporate governance practices or otherwise seek to cause us to change our capital structure. Any such exclusion from indices could result in a less active trading market for our Class A common stock. Any actions or publications by shareholder advisory firms critical of our corporate governance practices or capital structure could also adversely affect the value of our Class A common stock.

***The dual class structure of our common stock has the effect of concentrating voting power with our management and other existing stockholders, which will limit your ability to influence the outcome of important transactions, including a change in control.***

Our Class B common stock has 10 votes per share and our Class A common stock has one vote per share. Stockholders who hold shares of our Class B common stock, including certain of our executive officers, employees, and directors and their affiliates, together hold a substantial majority of the voting power of our outstanding capital stock as of December 31, 2023. Because of the 10-to-1 voting ratio between our Class B common stock and Class A common stock, the holders of our Class B common stock collectively control a majority of the combined voting power of common stock and therefore are able to control all matters submitted to our stockholders for approval so long as the shares of Class B common stock represent at least 9.1% of all outstanding shares of our Class A common stock and Class B common stock. This concentrated control will limit or preclude your ability to influence the outcome of important corporate matters, including a change in control, for the foreseeable future.

Transfers by holders of our Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning or charitable purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term.

***We do not intend to pay cash dividends for the foreseeable future.***

We currently intend to retain our future earnings, if any, to finance the further development and expansion of our business, as well as to fund our Share Repurchase Program, and do not intend to pay cash dividends in the foreseeable future. Any future determination to pay dividends will be at the discretion of our Board of Directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in future agreements and financing instruments, business prospects and such other factors as our Board of Directors deems relevant. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases.

***If analysts do not publish research about our business or if they publish inaccurate or unfavorable research, our stock price and trading volume could decline.***

The trading market for our Class A common stock will depend in part on the research and reports that analysts publish about our business. We do not have any control over these analysts. If one or more of the analysts who cover our company downgrade our Class A common stock or publish inaccurate or unfavorable research about our business, the price of our Class A common stock would likely decline. If few analysts cover our company, demand for our Class A common stock could decrease and our Class A common stock price and trading volume may decline. Similar results may occur if one or more of these analysts stop covering us in the future or fail to publish reports on us regularly.

***We may be subject to securities litigation, which is expensive and could divert management attention.***

The market price of our Class A common stock may be volatile and, in the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert management's attention from other business concerns, which could seriously harm our business.

***Future resales of our Class A common stock may cause the market price of our securities to drop significantly, even if our business is doing well.***

Sales of a substantial number of shares of our Class A common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of our Class A common stock intend to sell shares, could reduce the market price of our Class A common stock. As of December 31, 2023, we had 186,415,075 shares of our Class A common stock outstanding.

Table of Contents

We have filed a registration statement related to the offer and sale from time to time by the selling securityholders named in the prospectus that forms a part of the registration statement of up to 206,159,498 shares of our Class A common stock, which registration statement has been declared effective by the SEC. To the extent shares are sold into the market pursuant to a registration statement that has been declared effective by the SEC, under Rule 144 or otherwise, particularly in substantial quantities, the market price of our Class A common stock could decline.

***Provisions in our charter documents and under Delaware law, including anti-takeover provisions, could make an acquisition of us, which may be beneficial to our stockholders, more difficult and may limit attempts by our stockholders to replace or remove our current management.***

Provisions in our Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and our Amended and Restated Bylaws (the "Bylaws"), including anti-takeover provisions, may have the effect of delaying or preventing a merger, acquisition or other change of control of the company that our stockholders may consider favorable. In addition, because our Board of Directors is responsible for appointing the members of our management team, these provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our Board of Directors. Among other things, our Certificate of Incorporation and Bylaws include provisions that:

- provide that our Board of Directors is classified into three classes of directors with staggered three-year terms;

- permit our Board of Directors to establish the number of directors and fill any vacancies and newly created directorships;

- require super-majority voting to amend some provisions in our Certificate of Incorporation and Bylaws;

- authorize the issuance of "blank check" preferred stock that our Board of Directors could use to implement a stockholder rights plan;

- provide that only our chairperson of the Board of Directors, our chief executive officer, the lead independent director or a majority of our Board of Directors will be authorized to call a special meeting of stockholders;

- eliminate the ability of our stockholders to call special meetings of stockholders;

- do not provide for cumulative voting;

- provide that directors may only be removed "for cause" and only with the approval of two-thirds of our stockholders;

- provide for a dual class common stock structure in which holders of our Class B common stock may have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the outstanding shares of our common stock, including the election of directors and other significant corporate transactions, such as a merger or other sale of our company or its assets;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that our Board of Directors is expressly authorized to make, alter, or repeal our Bylaws; and

- establish advance notice requirements for nominations for election to our Board of Directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Moreover, Section 203 of the Delaware General Corporation Law ("DGCL") may discourage, delay, or prevent a change in control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock.

***Our Certificate of Incorporation contains exclusive forum provisions for certain claims, which may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our Certificate of Incorporation provides that the Court of Chancery of the State of Delaware, to the fullest extent permitted by law, will be the exclusive forum for any derivative action or proceeding brought on our behalf, any action asserting a breach of fiduciary duty, any action asserting a claim against us arising pursuant to the DGCL, our Certificate of Incorporation, our Bylaws, or any action asserting a claim against us that is governed by the internal affairs doctrine.

40

Table of Contents

Moreover, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all claims brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. Our Certificate of Incorporation provides that the federal district courts of the United States will, to the fullest extent permitted by law, be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act ("Federal Forum Provision"). Our decision to adopt a Federal Forum Provision followed a decision by the Supreme Court of the State of Delaware holding that such provisions are facially valid under Delaware law. While there can be no assurance that federal or state courts will follow the holding of the Delaware Supreme Court or determine that the Federal Forum Provision should be enforced in a particular case, application of the Federal Forum Provision means that suits brought by our stockholders to enforce any duty or liability created by the Securities Act must be brought in federal court and cannot be brought in state court.

Section 27 of the Exchange Act creates exclusive federal jurisdiction over all claims brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. In addition, the Federal Forum Provision applies to suits brought to enforce any duty or liability created by the Exchange Act. Accordingly, actions by our stockholders to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder must be brought in federal court.

Our stockholders will not be deemed to have waived our compliance with the federal securities laws and the regulations promulgated thereunder.

Any person or entity purchasing or otherwise acquiring or holding any interest in any of our securities shall be deemed to have notice of and consented to our exclusive forum provisions, including the Federal Forum Provision. These provisions may limit a stockholder's ability to bring a claim in a judicial forum of their choosing for disputes with us or our directors, officers, or employees, which may discourage lawsuits against us and our directors, officers, and employees. Alternatively, if a court were to find the choice of forum provision contained in our Certificate of Incorporation and Bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, financial condition, and operating results.

## Item 1B. Unresolved Staff Comments

None.

## Item 1C. Cybersecurity

### Risk Management and Strategy

Our cybersecurity policies, standards, processes and practices are based on applicable laws and regulations and informed by industry standards and industry-recognized practices. Our strategy to assess, identify, and manage material cybersecurity risks is through a comprehensive, cross-functional approach that is focused on preserving the confidentiality, security, and availability of our information systems and data. We implement security measures and processes to identify, prevent, and mitigate cybersecurity threats and to effectively respond to cybersecurity incidents when they occur. Our cyber risk management includes: (1) enterprise risk management to identify top cybersecurity risks; (2) vulnerability management to identify software vulnerabilities and risks related to compute infrastructure; (3) vendor risk management to identify risks related to third parties and business partners, which includes pre-engagement review, use of contractual security provisions, and continued monitoring, as applicable; (4) privacy risk management to identify privacy risks in our product and platforms and ensure regulatory compliance; (5) security monitoring to analyze and assess threat activity in real time; and (6) security incident response to investigate, respond to, and mitigate cyber threats. We regularly engage third parties to identify risks in our underlying software and infrastructure, to provide threat intelligence, and to assist in triaging, identifying, and responding to cyber threats.

In 2023, we did not identify any cybersecurity threats that have materially affected or are reasonably likely to materially affect our business strategy, results of operations, or financial condition. However, despite our efforts, we cannot eliminate all risks from cybersecurity threats, or provide assurances that we have not experienced undetected cybersecurity incidents. For more information regarding cybersecurity risks that we face and potential impacts on our business related thereto, see the section entitled *"Risk Factors — Security breaches, including improper access to or disclosure of our data or our neighbors' data, or other hacking and phishing attacks on our or third-party systems, could harm our reputation and adversely affect our business."*

### Governance

Our Board of Directors maintains oversight of risks from cybersecurity threats by meeting with and receiving periodic updates from our Chief Information Security Officer ("CISO"), via our Audit & Risk Committee, which is assigned oversight of cybersecurity risks. Our Audit & Risk Committee is responsible for ensuring that management has processes in place designed to identify and evaluate

41

Table of Contents

cybersecurity risks to which the company is exposed and to implement processes and programs to manage cybersecurity risks and mitigate cybersecurity incidents.

Our CISO, has over 20 years of experience in the technology and cybersecurity, including senior leadership roles in software security, penetration testing, and incident response. Our CISO attained and maintains multiple security certifications including CISSP (Certified Information Security Professional). Prior to Nextdoor, our CISO led Software Security at the Federal Reserve's National Incident Response Team.

## Item 2. Properties

We are headquartered in San Francisco, California. As of December 31, 2023, we maintained offices in various locations in the United States and internationally, including approximately 115,770 square feet for our corporate headquarters. All of our facilities are leased. We believe that our current facilities are adequate to meet our current needs and that, should it be needed, suitable additional or alternative space will be available to accommodate our operations.

## Item 3. Legal Proceedings

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not presently a party to any legal proceedings that, if determined adversely to us, would individually or taken together have a material adverse effect on our business or financial results.

## Item 4. Mine Safety Disclosures

Not applicable.

42

Table of Contents

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information for Common Stock**

Our Class A common stock began trading on the New York Stock Exchange under the symbol "KIND" on November 8, 2021. Prior to that date, there was no public trading market for our Class A common stock.

Our Class B common stock is not listed or traded on any stock exchange.

**Holders of Record**

As of February 23, 2024, there were 72 stockholders of record of our Class A common stock and 318 stockholders of record of our Class B common stock. The actual number of holders of our Class A and Class B common stock is greater than the number of record holders and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or other nominees. The number of holders of record presented here also does not include stockholders whose shares may be held in trust by other entities.

**Dividend Policy**

We have never declared nor paid any cash dividends on our capital stock and do not expect to pay any dividends on our capital stock in the foreseeable future. Any future determination relating to our dividend policy will be at the discretion of our Board of Directors, subject to applicable laws, and will depend on our financial condition, results of operations, capital requirements, general business conditions, and other factors that our Board of Directors considers relevant. In addition, our ability to pay dividends may be limited by covenants of any future indebtedness we incur.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The information required by this item will be included in our Proxy Statement (the "Proxy Statement") for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the year ended December 31, 2023, and is incorporated herein by reference.

**Sales of Unregistered Securities**

None.

**Use of Proceeds**

On March 26, 2021, KVSB consummated its initial public offering of 40,000,000 public shares. On March 30, 2021 in connection with the underwriters' election to partially exercise their over-allotment option, KVSB sold an additional 1,634,412 public shares to cover over-allotments. The public shares were sold at a price of $10.00 per share, generating total gross proceeds of $416.3 million from the initial public offering and partial exercise of the underwriters' over-allotment option. The securities sold in the offering were registered under the Securities Act on a registration statement on Form S-1 (No. 333-253098). The registration statement became effective on March 23, 2021.

Simultaneously with the consummation of the initial public offering, KVSB consummated a private placement of 1,100,000 private placement shares, at a price of $10.00 per share, to Khosla Ventures SPAC Sponsor II LLC (the "Sponsor"), generating gross proceeds to KVSB of $11.0 million. In connection with the underwriters' partial exercise of their over-allotment option that closed on March 30, 2021, KVSB also consummated the sale of an additional 32,688 private placement shares to the Sponsor, generating gross proceeds of $0.3 million. Such securities were issued pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act.

KVSB incurred $23.6 million in offering costs for its initial public offering including $14.6 million of deferred underwriting fees, $8.3 million of underwriting discounts and commissions, and $0.7 million of other costs. Following the initial public offering, the partial exercise of the over-allotment option, and the sale of the private placement shares, a total of $416.3 million was deposited into the trust account for the purpose of effecting an initial business combination. As of November 5, 2021, the record date of the Business Combination, there was $416.4 million held in the trust account. After deducting payments to existing KVSB shareholders of $12.2 million in connection with their exercise of redemption rights, the payment of the $14.6 million of deferred underwriting fees, and $28.9 million of expenses in connection with the Business Combination paid from the trust account, the remainder of the trust account is now held on our balance sheet to fund our operations and continued growth.

**Issuer Purchases of Equity Securities**

*Share Repurchases*

On May 31, 2022, our Board of Directors authorized and approved the Share Repurchase Program to repurchase up to $100.0 million in aggregate of our Class A common stock, with the authorization to expire on June 30, 2024. We did not repurchase or retire any shares of Class A common stock during the year ended December 31, 2023. As of December 31, 2023, we had $22.8 million available for future share repurchases under the Share Repurchase Program. On February 21, 2024, the Company's Board of Directors authorized and approved an increase of $150.0 million to the Share Repurchase Program and extended the expiration date to March 31, 2026.

**Stock Performance Graph**

*This performance graph shall not be deemed "soliciting material" or to be "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any filing of Nextdoor Holdings, Inc. under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act.*

The following graph shows a comparison of the cumulative total return for our Class A common stock, the Standard & Poor's 500 Stock Index ("S&P 500 Index") and the Dow Jones Internet Composite Index ("DJ Internet Composite"). An investment of $100 and reinvestment of all dividends is assumed to have been made in our Class A common stock and in each index on November 8, 2021, the date our Class A common stock began trading on the New York Stock Exchange, and its relative performance is tracked through December 31, 2023. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis provides information which our management believes is relevant to an assessment and understanding of our consolidated results of operations and financial condition. The discussion should be read together with our consolidated financial statements and related notes that are included elsewhere in this Annual Report. This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Special Note Regarding Forward-Looking Statements" and "Risk Factors" or in other parts of this Annual Report.*

*Discussions regarding our financial condition and results of operations for the year ended December 31, 2023 compared to the year ended December 31, 2022 are presented below. Discussions regarding our financial condition and results of operations for the year ended December 31, 2022 compared to the year ended December 31, 2021 are located in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on February 28, 2023.*

**Overview**

At Nextdoor, our purpose is to cultivate a kinder world where everyone has a neighborhood they can rely on. Neighbors around the world turn to Nextdoor to receive trusted information, give and get help, get things done, and build real world connections with those nearby — neighbors, businesses, and public services. By fostering these connections, both online and in the real world, Nextdoor builds stronger, more vibrant, and more resilient neighborhoods. As of December 31, 2023, Nextdoor was in more than 325,000 neighborhoods around the world and in 1 in 3 households in the United States. As of the end of the fourth quarter of 2023, Nextdoor had 88 million global Verified Neighbors.

*Key business metrics for the three months ended December 31, 2023 are as follows:*

- Weekly active users ("WAUs") were 41.8 million, an increase of 5% compared to the three months ended December 31, 2022.

- Average revenue per weekly active user ("ARPU") was $1.33 and remained flat compared to the three months ended December 31, 2022.

*Financial Results as of and for the year ended December 31, 2023 are as follows:*

- Revenue was $218.3 million, an increase of 3% compared to 2022.

- Total costs and expenses were $390.6 million, an increase of 9% compared to 2022, including $11.1 million of restructuring charges.

- Net loss increased 7% to $147.8 million in 2023, compared to $137.9 million in 2022.

- Adjusted EBITDA loss decreased 2% to $74.1 million in 2023, compared to $75.5 million in 2022.

- Cash, cash equivalents, and marketable securities were $531.1 million.

See "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measure*" below for more information and for a reconciliation of net loss, the most directly comparable financial measure calculated and presented in accordance with U.S. generally accepted accounting principles ("GAAP"), to Adjusted EBITDA.

**Restructuring**

In the fourth quarter of 2023, we announced a cost reduction plan (the "Cost Reduction Plan") intended to right size the business and align the workforce and other expenses with our near term revenue expectations and long term business priorities. The Cost Reduction

45

Plan included a reduction of full-time employee headcount by approximately 25%. The execution of the Cost Reduction Plan was substantially complete by the end of the fourth quarter of 2023.

The following table summarizes the restructuring charges in the consolidated statements of operations for the year ended December 31, 2023 (in thousands):

| | Severance and Related Charges | Stock-Based Compensation Expense | Total |
|---|---|---|---|
| Research and development | $ 5,141 | $ 903 | $ 6,044 |
| Sales and marketing | 2,984 | 228 | 3,212 |
| General and administrative | 1,763 | 80 | 1,843 |
| Total | $ 9,888 | $ 1,211 | $ 11,099 |

Refer to Note 14 to our consolidated financial statements for further information on our restructuring charges.

**Key Business Metrics**

In addition to the measures presented in our consolidated financial statements, we use the following key business metrics to evaluate our business, measure our performance, develop financial forecasts, and make strategic decisions:

*Weekly Active Users (WAUs)*

We define a Weekly Active User ("WAU") as a Nextdoor user who opens our application, logs on to our website, or engages with an email with monetizable content at least once during a defined 7-day period.[1] We calculate average WAUs for a particular period by calculating the count of unique users, on a rolling basis for the past seven days, for each day of that period, and dividing that sum by the number of days in that period. We assess the health of our business by measuring WAUs because we believe that weekly usage best captures the cadence at which we expect a healthy user base to engage with, and derive the most utility from our platform, and by extension their neighborhood. We also present WAUs by geography because we are more advanced in engagement and monetization in the United States than internationally.

Beginning in September 2021, Apple introduced changes to the Apple email client available on its operating systems, which limit our ability to measure user engagement with emails containing monetizable content for users that use the Apple email client. The introduction of these changes impacts our ability to accurately calculate a portion of WAUs for periods following the adoption of the updated operating systems. Following this introduction, we use estimates for these user engagement numbers based on historical data sets, as well as data from users who engage with Nextdoor's monetizable content on email clients other than Apple email.

Our WAU for the three months ended December 31, 2023 and 2022 was 41.8 million and 40.0 million, respectively, which represents 5% growth period over period.

---

[1] Emails with monetizable content are emails with a primary purpose to regularly inform users about topics that are relevant to them, and are therefore appropriate for delivering ads to users. These emails comprise almost all of the emails that we send our users and include, but are not limited to, new, trending and top posts, weekly and anytime digests, welcome emails and urgent and emergency alerts. We earn revenue from delivery of ad impressions in emails with monetizable content on either a cost per thousand ("CPM") basis, a cost per click ("CPC") basis, or on a fixed-fee basis. While we have the ability to serve ads in all emails with monetizable content, we currently only do so on a portion of the total.

Table of Contents

**Quarterly Average Weekly Active Users**

*(in millions)*





*Average Revenue per Weekly Active User (ARPU)*

We generate revenue primarily from advertising. We measure monetization of our platform through our ARPU metric. We define ARPU as our total revenue in that geography during a period divided by the average of the number of WAUs in that geography during the same period. We present ARPU on a U.S. and international basis because we are more advanced in our monetization in the United States than internationally.

U.S. ARPU is higher primarily due to our decision to focus our earliest monetization efforts there, the size and maturity of our audience in the United States, as well the size of the U.S. advertising market. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on a determination of the location of the account where the revenue-generating

activities occur. Our ARPU for the years ended December 31, 2023 and 2022 was $5.25 and $5.60, respectively, with the decrease due to stronger WAU growth relative to revenue growth.

**Quarterly ARPU**





**Factors Affecting Our Performance**

*Macroeconomic Conditions.* Macroeconomic conditions, such as inflation, supply chain issues, fluctuations in foreign currency exchange rates, competition from other platforms and other risks and uncertainties have impacted, and all or some of these factors may continue to impact, advertiser demand, user growth, user engagement, and our business, operations and financial results. See "Risk Factors" and "Special Note Regarding Forward-Looking Statements" for additional details.

*Growth in and Engagement of Users.* We measure growth in, and engagement of, users by tracking WAUs. As the size and engagement of our user base grows, we believe the potential to increase our revenue grows.

Table of Contents

We may face challenges increasing the size and engagement of our user base due to a number of factors including competition, challenges in acquiring and engaging users, or changes in regulations.

*Growth in Monetization.* Monetization trends, which are reflected in our ARPU, are a key factor that affects our revenue and financial results. To increase monetization, we are focused on serving more national brands by efficiently scaling our salesforce, increasing ad agency relationships, and enhancing our self-serve tools for customers of all sizes. We are also focused on increasing our user base and engagement in the United States and internationally, which will increase the opportunities for businesses to advertise on Nextdoor.

There are many variables that impact ARPU, including the number of ad impressions shown on our platform and the price per ad, which depends on a number of factors including the engagement of our user base, the number and diversity of our customers, seasonality of advertising spend, our customers' advertising objectives, advertising performance, the effectiveness of our advertising products, our ability to measure that effectiveness for our customer, and the effect of geographic differences on each of these factors.

Due to our decision to focus our earliest monetization efforts in the United States, we have less experience monetizing international markets and therefore may experience challenges scaling and monetizing these markets. The international advertising market is also less mature than the U.S. digital advertising market.

*Investment for Growth.* We intend to continue to invest in technology that we believe will enhance user and customer experiences. We also intend to continue to invest in our advertising products, including our proprietary ad platform and first-party and third-party ad measurement tools, as well as our sales team. Our ability to grow our user base, attract new advertisers, increase our revenue, and expand our total addressable market will depend, in part, on our ability to continue innovating.

*International Expansion.* Our early proof points from launches in certain countries outside of the United States show user engagement across international markets on par with the U.S. market. We believe that increased international monetization presents an important opportunity for long-term growth, and we are working on localizing our product and expanding our operations to better serve our international user and customer base. We are still in the early stages of global expansion and will continue to evaluate expansion opportunities in our current international markets, and also in additional geographies. Over time, we believe that international WAUs can grow rapidly. We also believe that we can increase the monetization of users in international markets and that we can increase long-term ARPU for international WAUs from current levels. While we expect to grow ARPU for international WAUs, we still expect this to be lower than ARPU for U.S. WAUs. We expect that our international expansion will require significant investment. Although our investments in international expansion may adversely affect our operating results in the near term, we believe that they will contribute to our long-term growth. If our near-term investments do not lead to increased international WAUs and ARPU and expected revenue growth over time, we may not achieve or, if achieved, maintain profitability and our growth rates may slow or decline.

*Seasonality.* Industry advertising spend tends to be strongest in the fourth quarter, and we typically observe a similar pattern in our historical revenue. Periods of significant growth and changes in the macroeconomic environment have partially masked these trends in historical periods.

**Components of Results of Operations**

### Revenue

We generate substantially all of our revenue from the delivery of advertisements on our platform which includes the delivery of advertising impressions sold on a CPM basis and CPC basis, as well as on a fixed-fee basis. The majority of our revenue is generated in the United States.

### Cost of Revenue

Cost of revenue consists primarily of expenses associated with the delivery of our revenue generating activities, including the third-party cost of hosting our platform and allocated personnel-related costs, which include salaries, benefits, and stock-based compensation for employees engaged in development of our revenue generating products. Cost of revenue also includes third-party costs associated with delivering and supporting our advertising products and credit card transaction fees related to processing customer transactions.

### Research and Development

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, restructuring costs, and stock-based compensation for our employees engaged in research and development, as well as costs for consultants, contractors and third-party software. In addition, allocated overhead costs, such as facilities, information technology, and depreciation are included in research and development expenses.

Table of Contents

***Sales and Marketing***

Sales and marketing expenses consist of personnel-related and other costs which include salaries, commissions, benefits, restructuring costs, and stock-based compensation for employees engaged in sales and marketing activities as well as other costs including third-party consulting, public relations, allocated overhead costs, and amortization of acquired intangible assets. Sales and marketing expenses also include brand and performance marketing for both user and local business acquisition, and neighbor services, which includes personnel-related costs for our neighbor support team, our outsourced neighbor support function, and verification costs.

Performance marketing costs related to user acquisition largely consist of the distribution of mailed invitations and, to a lesser extent, digital advertising. Performance marketing costs related to local business acquisition largely consists of digital advertising and, to a lesser extent, direct mail campaigns. Fluctuations in our performance marketing expenses are driven by a variety of factors, including but not limited to: our target geographies, whether we are acquiring users or businesses, assessment of return on investment of marketing spend, strategic priorities, and seasonal factors.

***General and Administrative***

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, restructuring costs, and stock-based compensation for certain executives, finance, legal, information technology, human resources, and other administrative employees. In addition, general and administrative expenses include fees and costs for professional services, including consulting, third-party legal and accounting services, and allocated overhead costs.

***Interest Income***

Interest income consists of interest earned on our cash, cash equivalents, and marketable securities.

***Other Income (Expense), Net***

Other income (expense), net consists primarily of unrealized gains and losses from the re-measurement of monetary assets and liabilities denominated in non-functional currencies, and gains and losses on marketable securities and foreign currency transactions.

***Provision for Income Taxes***

The provision for income taxes consists primarily of income taxes related to foreign and state jurisdictions in which we conduct business. We maintain a full valuation allowance on our U.S. federal and state deferred tax assets as we have concluded that it is more likely than not that the deferred tax assets will not be realized.

Table of Contents

**Results of Operations**

The results of operations presented below should be reviewed in conjunction with our consolidated financial statements and related notes thereto included elsewhere in this Annual Report. The following table sets forth our consolidated results of operations for the periods presented.

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Revenue | $ 218,309 | $ 212,765 | $ 192,197 |
| Costs and expenses[1]: | | | |
| Cost of revenue | 41,613 | 38,981 | 28,813 |
| Research and development | 149,998 | 127,073 | 97,096 |
| Sales and marketing | 122,925 | 123,182 | 106,430 |
| General and administrative | 76,057 | 67,733 | 54,664 |
| Total costs and expenses | 390,593 | 356,969 | 287,003 |
| Loss from operations | (172,284) | (144,204) | (94,806) |
| Interest income | 25,780 | 9,304 | 177 |
| Other income (expense), net | (505) | (1,343) | (539) |
| Loss before income taxes | (147,009) | (136,243) | (95,168) |
| Provision for income taxes | 756 | 1,673 | 157 |
| Net loss | $ (147,765) | $ (137,916) | $ (95,325) |

_____

(1)   Includes stock-based compensation expense as follows:

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Cost of revenue | $ 3,201 | $ 2,627 | $ 1,466 |
| Research and development | 43,619 | 35,567 | 20,690 |
| Sales and marketing | 12,548 | 10,160 | 6,388 |
| General and administrative | 23,657 | 16,066 | 18,970 |
| Total | $ 83,025 | $ 64,420 | $ 47,514 |

Table of Contents

The following table sets forth the components of our consolidated statements of operations as a percentage of revenue for each of the periods presented:

| (as a percentage of total revenue) | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Revenue | 100 % | 100 % | 100 % |
| Costs and expenses: | | | |
| Cost of revenue | 19 | 18 | 15 |
| Research and development | 69 | 60 | 51 |
| Sales and marketing | 56 | 58 | 55 |
| General and administrative | 35 | 32 | 28 |
| Total costs and expenses | 179 | 168 | 149 |
| Loss from operations | (79) | (68) | (49) |
| Interest income | 12 | 4 | — |
| Other income (expense), net | — | (1) | — |
| Loss before income taxes | (67) | (64) | (50) |
| Provision for income taxes | — | 1 | — |
| Net loss | (68)% | (65)% | (50)% |

Note: Certain figures may not sum due to rounding.

**Comparison of the Years Ended December 31, 2023 and 2022**

*Revenue*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2023 | 2022 | $ | % |
| Revenue | $ 218,309 | $ 212,765 | $ 5,544 | 3 % |

Revenue increased by $5.5 million, or 3%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The increase was primarily due to an increase in advertiser demand for our product offerings, which we believe was driven by increased marketer spending as well as increased user engagement as measured by a 9% increase in 2023 WAUs. Full year ARPU decreased 6% reflecting stronger year-over-year WAU growth relative to revenue growth.

*Cost of revenue*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2023 | 2022 | $ | % |
| Cost of revenue | $ 41,613 | $ 38,981 | $ 2,632 | 7 % |

Cost of revenue increased by $2.6 million, or 7%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The increase was primarily due to a $1.3 million increase in third-party hosting costs due to rising user growth and engagement, a $0.9 million increase in allocated personnel-related costs, and a $0.4 million increase in third-party costs associated with delivering and supporting our advertising products.

*Research and development*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2023 | 2022 | $ | % |
| Research and development | $ 149,998 | $ 127,073 | $ 22,925 | 18 % |

Research and development expenses increased by $22.9 million, or 18%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The increase was primarily due to a $20.2 million increase in personnel-related costs, inclusive of restructuring costs, primarily driven by an increase in average headcount, a $2.4 million increase in third-party software costs, and a $0.5 million increase in allocated overhead costs reflecting an increase in average headcount.

Table of Contents

*Sales and marketing*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| Personnel-related and other | $ 93,056 | $ 77,718 | $ 15,338 | 20 % |
| Brand and performance marketing | 18,054 | 33,628 | (15,574) | (46)% |
| Neighbor services | 11,815 | 11,836 | (21) | — % |
| Total sales and marketing | $ 122,925 | $ 123,182 | $ (257) | — % |

Sales and marketing expenses decreased by $0.3 million for the year ended December 31, 2023 compared to the year ended December 31, 2022. The decrease was primarily due to a $14.7 million decrease in performance marketing costs for user acquisition as focus shifted to organic user acquisition channels and a $0.9 million decrease in performance marketing costs to attract local businesses, offset by a $15.3 million increase in personnel-related and other costs, inclusive of restructuring costs, which was driven by an increase in average headcount.

*General and administrative*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| General and administrative | $ 76,057 | $ 67,733 | $ 8,324 | 12 % |

General and administrative expenses increased by $8.3 million, or 12%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The increase was primarily due to a $10.5 million increase in personnel-related costs, inclusive of restructuring costs, which was driven by an increase in average headcount, partially offset by a $2.7 million decrease in insurance expenses.

*Interest income*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| Interest income | $ 25,780 | $ 9,304 | $ 16,476 | 177 % |

Interest income increased by $16.5 million, or 177%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The increase was driven by higher interest rates.

*Other income (expense), net*

| (in thousands, except percentages) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| Other income (expense), net | $ (505) | $ (1,343) | $ 838 | (62)% |

Other expense, net decreased by $0.8 million, or 62%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The decrease was primarily due to the periodic re-measurement of monetary assets and liabilities denominated in non-functional currencies.

*Provision for income taxes*

| (in thousands) | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | $ | % |
| Provision for income taxes | $ 756 | $ 1,673 | $ (917) | (55)% |

Provision for income taxes decreased by $0.9 million, or 55%, for the year ended December 31, 2023 compared to the year ended December 31, 2022. The decrease was primarily due to a decrease in foreign income tax expenses.

Table of Contents

**Liquidity and Capital Resources**

Since inception, we have generated negative cash flows from operations and have primarily financed our operations from net proceeds received from the sale of equity securities, proceeds from the Business Combination, and payments received from our customers. We currently have no debt outstanding.

We have generated losses from our operations, as reflected in our accumulated deficit of $766.0 million as of December 31, 2023. We incurred operating losses and cash outflows from operations by supporting the growth of our business. We expect these losses and operating cash outflows to continue for the foreseeable future. We also expect to incur significant research and development, sales and marketing, and general and administrative expenses over the next several years in connection with the continued development and strategic expansion of our business.

As of December 31, 2023, we had $531.1 million in cash, cash equivalents, and marketable securities. We anticipate satisfying our short-term cash requirements, including meeting our working capital and capital expenditure requirements, with our existing cash, cash equivalents, and marketable securities. In the long term, we may satisfy our cash requirements with cash, cash equivalents, and marketable securities on hand or with proceeds from any future equity or debt financings. Our ability to support our requirements and plans for cash, including working capital and capital expenditure requirements, will depend on many factors, including the rate of our revenue growth, the timing and extent of spending on research and development efforts and other business initiatives, the expansion of sales and marketing activities, the introduction of new and enhanced product offerings and features, the continuing market adoption of our platform, the number of shares repurchased under our Share Repurchase Program, and our ability to obtain equity or debt financing. Moreover, any actual or perceived instability in the U.S. or international banking systems may impact liquidity both in the short term and long term.

To the extent existing cash, cash equivalents, and marketable securities are insufficient to fund our working capital and capital expenditure requirements, or should we require additional cash for other purposes, we may attempt to raise additional capital through the sale of equity or debt securities. If we raise additional funds through the issuance of equity or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A and Class B common stock, and our stockholders may experience dilution. Any future indebtedness we incur may result in terms that could also be unfavorable to our equity investors. There can be no assurances that we will be able to raise additional capital on terms we deem acceptable, or at all. The inability to raise additional capital as and when required would have an adverse effect, which could be material, on our results of operations, financial condition, and ability to achieve our business objectives.

On May 31, 2022, our Board of Directors authorized and approved the Share Repurchase Program to repurchase up to $100.0 million in aggregate of our Class A common stock, with the authorization to expire on June 30, 2024. The timing of any repurchases will depend on market conditions and other investment opportunities, and will be made at our discretion. The Share Repurchase Program does not obligate us to repurchase any dollar amount or number of shares, and the program may be extended, modified, suspended, or discontinued at any time. During the year ended December 31, 2023, we did not repurchase or retire any shares of Class A common stock. As of December 31, 2023, we had $22.8 million available for future share repurchases under the Share Repurchase Program. On February 21, 2024, the Company's Board of Directors authorized and approved an increase of $150.0 million to the Share Repurchase Program and extended the expiration date to March 31, 2026.

*Cash Flows*

The following table summarizes our cash flows for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| *(in thousands)* | **2023** | **2022** | **2021** |
| Net cash used in operating activities | $ (59,273) | $ (60,503) | $ (51,268) |
| Net cash provided by (used in) investing activities | $ 66,490 | $ (342,448) | $ (149,522) |
| Net cash provided by (used in) financing activities | $ 8,916 | $ (64,348) | $ 637,576 |

*Operating activities*

Cash used in operating activities during the year ended December 31, 2023 was $59.3 million which resulted from a net loss of $147.8 million, adjusted for non-cash charges of $79.9 million and net cash inflows of $8.6 million from changes in operating assets and liabilities. Non-cash charges primarily consisted of $83.0 million of stock-based compensation expense and $5.8 million of depreciation and amortization expense, partially offset by $8.6 million of accretion on investments. The net cash inflows from changes in operating assets and liabilities were primarily due to a $5.3 million increase in accrued expenses and other liabilities, a $4.7 million

54

Table of Contents

decrease in operating lease right-of-use assets due to normal amortization, a $3.5 million decrease in accounts receivable, and a $3.4 million decrease in prepaid expenses and other assets. These amounts were partially offset by a $5.7 million decrease in operating lease liabilities due to lease payments and a $2.6 million decrease in accounts payable.

Cash used in operating activities during the year ended December 31, 2022 was $60.5 million which resulted from a net loss of $137.9 million, adjusted for non-cash charges of $68.0 million and net cash inflows of $9.4 million from changes in operating assets and liabilities. Non-cash charges primarily consisted of $64.4 million of stock-based compensation expense and $5.7 million of depreciation and amortization expense. The net cash inflows from changes in operating assets and liabilities were primarily due to a $7.7 million increase in accrued expenses and other liabilities, a $6.9 million decrease in operating lease right-of-use assets due to normal amortization, and a $3.8 million decrease in prepaid expenses and other assets. These amounts were partially offset by a $7.1 million decrease in operating lease liabilities due to lease payments, and a $1.6 million decrease in accounts payable.

*Investing activities*

Cash provided by investing activities for the year ended December 31, 2023 was $66.5 million, which consisted of proceeds from maturities of marketable securities of $504.4 million and proceeds from sales of marketable securities of $155.4 million. This was partially offset by purchases of marketable securities of $590.6 million and a loan to Opportunity Finance Network of $2.5 million.

Cash used in investing activities for the year ended December 31, 2022 was $342.4 million, which consisted of purchases of marketable securities of $711.9 million, a loan to Opportunity Finance Network of $5.0 million, and purchases of property and equipment of $3.2 million. This was partially offset by proceeds from maturities of marketable securities of $366.8 million and proceeds from sales of marketable securities of $10.8 million.

*Financing activities*

Cash provided by financing activities for the year ended December 31, 2023 was $8.9 million, which consisted of $7.2 million of proceeds from the exercise of stock options and $2.0 million of proceeds from the issuance of common stock under the employee stock purchase plan.

Cash used in financing activities for the year ended December 31, 2022 was $64.3 million, which consisted of repurchases of common stock of $77.2 million. This was partially offset by $12.5 million of proceeds from the exercise of stock options.

**Non-GAAP Financial Measure**

*Adjusted EBITDA*

Adjusted EBITDA is a non-GAAP financial measure that represents our net loss adjusted for depreciation and amortization, stock-based compensation, net interest income, provision for income taxes, and any restructuring charges or acquisition-related costs.

We use Adjusted EBITDA in conjunction with GAAP measures as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies and to communicate with our Board of Directors concerning our financial performance. We believe Adjusted EBITDA is also helpful to investors, analysts, and other interested parties because it can assist in providing a more consistent and comparable overview of our operations across our historical financial periods. Adjusted EBITDA has limitations as an analytical tool, however, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Because of these limitations, you should consider Adjusted EBITDA alongside other financial performance measures, including net loss and our other GAAP results. In evaluating Adjusted EBITDA, you should be aware that in the future we may incur expenses that are the same as or similar to some of the adjustments in this presentation. Our presentation of Adjusted EBITDA should not be construed to imply that our future results will be unaffected by the types of items excluded from the calculation of Adjusted EBITDA. Adjusted EBITDA is not presented in accordance with GAAP and the use of this term varies from others in our industry.

Table of Contents

The following is a reconciliation of net loss, the most comparable GAAP measure, to Adjusted EBITDA:

| (in thousands) | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2023 | | 2022 | | 2021 |
| Net loss | $ | (147,765) | $ | (137,916) | $ | (95,325) |
| Depreciation and amortization | | 5,769 | | 5,656 | | 4,172 |
| Stock-based compensation | | 83,025 | | 64,420 | | 47,514 |
| Interest income | | (25,780) | | (9,304) | | (177) |
| Provision for income taxes | | 756 | | 1,673 | | 157 |
| Restructuring charges | | 9,888 | | — | | — |
| Adjusted EBITDA | $ | (74,107) | $ | (75,471) | $ | (43,659) |

## Critical Accounting Policies and Estimates

We prepare our consolidated financial statements in accordance with GAAP. Preparing consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

The critical accounting policies requiring estimates, assumptions, and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

Refer to Note 2 to our consolidated financial statements for further information on our other significant accounting policies.

### Revenue Recognition

We generate a majority of our revenue from the delivery of advertising services. We recognize advertising revenue after satisfying our contractual performance obligation, which, for the majority of our advertising arrangements, is when an advertising impression is displayed to users. None of our arrangements contain minimum impression guarantees. We typically bill advertisers on a monthly basis and our payment terms vary by customer type and location. We have other advertising arrangements which are typically fixed-fee arrangements and revenue is recognized on a straight-line basis over the non-cancellable contractual term of the agreement, generally beginning on the date our service is made available to the customer. In certain advertising arrangements we require payment upfront from our customers. We record deferred revenue when we collect cash from customers in advance of revenue recognition.

### Leases

At the inception of our contracts we determine if the contract is or contains a lease. A contract is or contains a lease if it conveys the right to control the use of an identified asset for a period of time in exchange for consideration. Operating leases consist of real estate leases and are included in operating lease right-of-use assets and operating lease liabilities on our consolidated balance sheets at commencement date based on the present value of remaining fixed lease payments.

When the discount rate implicit in the lease cannot be readily determined, we use the applicable incremental borrowing rate at lease commencement in order to discount lease payments to present value for purposes of performing lease classification tests and measuring the lease liability. The incremental borrowing rate is a hypothetical rate based on the rate of interest we would have to pay to borrow on a collateralized basis over a similar term and amount equal to the lease payments in a similar economic environment.

### Stock-based compensation

Stock-based compensation expense for stock-based awards is measured based on the grant date fair value of the awards and recognized in the consolidated statements of operations on a straight-line basis over the requisite service period of the awards. The grant date fair value of stock options granted is estimated using the Black-Scholes option pricing model. Forfeitures are accounted for as they occur. Historically, our stock option awards and restricted stock permitted early exercise. The unvested portion of shares exercised is recorded as a liability on our consolidated balance sheets and reclassified into stockholders' equity (deficit) as vesting occurs.

Table of Contents

The Black-Scholes option-pricing model requires the use of highly subjective assumptions. These assumptions are estimated as follows:

- Fair Value of the Underlying Common Stock—Prior to the Business Combination, the Board of Directors considered numerous objective and subjective factors to determine the fair value of our common stock. After the Business Combination, the fair value of the underlying common stock is determined by the closing price, on the date of grant, of our Class A common stock, which is traded on the New York Stock Exchange.

- Expected Volatility—Expected volatility is a measure of the amount by which the stock price is expected to fluctuate. Since we do not have sufficient trading history of our common stock, we estimate the expected volatility of our stock options at their grant date by taking the weighted average historical volatility of a group of comparable publicly traded companies over a period equal to the expected term of the options;

- Expected Term—We determine the expected term based on the average period the stock options are expected to remain outstanding using the simplified method, calculated as the midpoint of the stock options' vesting term and contractual expiration period, as we do not have sufficient historical information to develop reasonable expectations about future exercise patterns and post-vesting employment termination behavior;

- Risk Free Interest Rate—We use the U.S. Treasury yield for our risk-free interest rate that corresponds with the expected term; and

- Dividend Yield—We utilize a dividend yield of zero, as we do not currently issue dividends and do not expect to in the future.

### Income Taxes

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our uncertain tax positions. We recognize a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position.

We account for income taxes using the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the consolidated financial statements or in our tax returns. Deferred income taxes are recognized for differences between financial reporting and tax bases of assets and liabilities at the enacted statutory tax rates in effect for the years in which the temporary differences are expected to reverse. We make an assessment of the likelihood that the resulting deferred tax assets will be realized. A valuation allowance is provided when it is more likely than not that some portion or all of a deferred tax asset will not be realized.

### Recently Issued Accounting Pronouncements

Refer to Note 2 to our consolidated financial statements included elsewhere in this Annual Report for more information regarding recently issued accounting pronouncements.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial condition due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of fluctuations in interest rates and foreign currency exchange rates.

### Interest Rate Risk

As of December 31, 2023, we had cash and cash equivalents of $60.2 million and marketable securities of $470.9 million. Our cash and cash equivalents consist of cash in bank accounts, demand deposits, money market funds, corporate bonds, and commercial paper. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. We do not enter into investments for trading or speculative purposes. Due to the relatively short-term nature of our investment portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

### Foreign Currency Risk

The functional currency of our international subsidiaries is generally their local currency. Our sales are typically denominated in the local currency of the country in which the sale was made. The majority of our revenue is denominated in U.S. Dollars. As such, our

Table of Contents

revenue is not currently exposed to significant foreign currency risk. Our operating expenses are generally denominated in the currency of the countries in which the operations are located, and are subject to fluctuations due to changes in foreign currency exchange rates, particularly the British Pound, the Euro, Canadian Dollar, and the Australian Dollar. Our consolidated results of operations and cash flows are, therefore, subject to fluctuations due to changes in foreign currency exchange rates and may be adversely affected in the future due to changes in foreign exchange rates. We do not believe a 10% change in the relative value of the U.S. Dollar would have materially affected our consolidated financial statements for the periods presented. To date, we have not had a formal hedging program with respect to foreign currency, but we may do so in the future if our exposure to foreign currency should become more significant.

Table of Contents

**Item 8. Financial Statements**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 60 |
| Consolidated Balance Sheets | 63 |
| Consolidated Statements of Operations | 64 |
| Consolidated Statements of Comprehensive Loss | 65 |
| Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) | 66 |
| Consolidated Statements of Cash Flows | 68 |
| Notes to the Consolidated Financial Statements | 69 |

59

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Nextdoor Holdings, Inc.

**Opinion on the Financial Statements**
We have audited the accompanying consolidated balance sheets of Nextdoor Holdings, Inc. (the Company) as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive loss, redeemable convertible preferred stock and stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 27, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

Table of Contents

**Revenue Recognition**

*Description of the Matter*

As described in Note 2 to the consolidated financial statements, the Company generates a majority of its revenues by delivering ads on the Nextdoor Holdings, Inc. website and mobile application. Revenue is recognized after transferring control of the promised goods or services to customers, which for the majority of advertising arrangements occurs when an advertising impression is displayed to users.

The Company's revenue recognition process utilizes complex proprietary systems and tools for the initiation, processing, delivery and recording of advertising transactions which includes a high volume of individually low monetary value transactions, auditing of which requires significant audit effort.

*How We Addressed the Matter in Our Audit*

To test the Company's recognition of revenue, our audit procedures included, among others, testing the completeness and accuracy of the underlying data within the Company's revenue systems, and comparing revenue recognized to accounts receivables and cash receipts. Additionally, we examined customer terms and conditions, and we selected a sample of contractual arrangements to test the timing and amount of revenue recognition.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2018.

San Mateo, California

February 27, 2024

61

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Nextdoor Holdings, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Nextdoor Holdings, Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Nextdoor Holdings, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive loss, redeemable convertible preferred stock and stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes and our report dated February 27, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's annual report on internal control over financial reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

San Mateo, California

February 27, 2024

**Nextdoor Holdings, Inc.**
**CONSOLIDATED BALANCE SHEETS**
*(in thousands, except per share data)*

| | As of December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 60,233 | $ 55,236 |
| Marketable securities | 470,868 | 528,067 |
| Accounts receivable, net of allowance of $385 and $422 as of December 31, 2023 and 2022, respectively | 26,233 | 29,770 |
| Prepaid expenses and other current assets | 9,606 | 12,185 |
| Total current assets | 566,940 | 625,258 |
| Restricted cash, non-current | 11,171 | — |
| Property and equipment, net | 8,082 | 11,818 |
| Operating lease right-of-use assets | 56,968 | 52,555 |
| Intangible assets, net | 1,301 | 3,067 |
| Goodwill | 1,211 | 1,211 |
| Other assets | 8,891 | 5,653 |
| Total assets | $ 654,564 | $ 699,562 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,895 | $ 4,535 |
| Operating lease liabilities, current | 6,208 | 7,766 |
| Accrued expenses and other current liabilities | 27,308 | 22,362 |
| Total current liabilities | 35,411 | 34,663 |
| Operating lease liabilities, non-current | 60,378 | 53,831 |
| Other liabilities, non-current | 218 | — |
| Total liabilities | 96,007 | 88,494 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; 50,000 shares authorized; no shares issued or outstanding as of December 31, 2023 and 2022 | — | — |
| Class A Common stock, $0.0001 par value; 2,500,000 shares authorized; 186,415 and 153,693 shares issued and outstanding as of December 31, 2023 and 2022, respectively | 19 | 15 |
| Class B Common stock, $0.0001 par value; 500,000 shares authorized; 201,960 and 218,029 shares issued and outstanding as of December 31, 2023 and 2022, respectively | 20 | 22 |
| Additional paid-in capital | 1,323,595 | 1,231,482 |
| Accumulated other comprehensive income (loss) | 943 | (2,196) |
| Accumulated deficit | (766,020) | (618,255) |
| Total stockholders' equity | 558,557 | 611,068 |
| Total liabilities and stockholders' equity | $ 654,564 | $ 699,562 |

The accompanying notes are an integral part of these consolidated financial statements.

63

**Nextdoor Holdings, Inc.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
*(in thousands, except per share data)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Revenue | $ 218,309 | $ 212,765 | $ 192,197 |
| Costs and expenses: | | | |
| Cost of revenue | 41,613 | 38,981 | 28,813 |
| Research and development | 149,998 | 127,073 | 97,096 |
| Sales and marketing | 122,925 | 123,182 | 106,430 |
| General and administrative | 76,057 | 67,733 | 54,664 |
| Total costs and expenses | 390,593 | 356,969 | 287,003 |
| Loss from operations | (172,284) | (144,204) | (94,806) |
| Interest income | 25,780 | 9,304 | 177 |
| Other income (expense), net | (505) | (1,343) | (539) |
| Loss before income taxes | (147,009) | (136,243) | (95,168) |
| Provision for income taxes | 756 | 1,673 | 157 |
| Net loss | $ (147,765) | $ (137,916) | $ (95,325) |
| Net loss per share attributable to Class A and Class B common stockholders, basic and diluted | $ (0.39) | $ (0.36) | $ (0.65) |
| Weighted average shares used in computing net loss per share attributable to Class A and Class B common stockholders, basic and diluted | 379,254 | 378,731 | 146,337 |

The accompanying notes are an integral part of these consolidated financial statements.

64

Table of Contents

**Nextdoor Holdings, Inc.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
*(in thousands)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Net loss | $ (147,765) | $ (137,916) | $ (95,325) |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustments | 35 | 723 | 283 |
| Change in unrealized gain (loss) on available-for-sale marketable securities | 3,104 | (2,390) | (15) |
| Total other comprehensive income (loss) | 3,139 | (1,667) | 268 |
| Comprehensive loss | $ (144,626) | $ (139,583) | $ (95,057) |

The accompanying notes are an integral part of these consolidated financial statements.

65

Table of Contents

**Nextdoor Holdings, Inc.**
**CONSOLIDATED STATEMENTS OF REDEEMABLE CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY**
*(in thousands)*

| | Redeemable Convertible Preferred Stock | | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' (Deficit) Equity |
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | 190,477 | $ 447,166 | — | $ — | 103,777 | $ 10 | $ 87,945 | $ (797) | $ (385,014) | $ (297,856) |
| Conversion of redeemable convertible preferred stock into Class B common stock in connection with the Reverse Recapitalization | (190,477) | (447,166) | — | — | 190,477 | 19 | 447,147 | — | — | 447,166 |
| Issuance of common stock upon the Reverse Recapitalization, net of issuance costs | — | — | 78,954 | 8 | — | — | 622,580 | — | — | 622,588 |
| Release of restricted stock units | — | — | — | — | 101 | — | — | — | — | — |
| Tax withholdings on release of restricted stock units | — | — | — | — | — | — | (863) | — | — | (863) |
| Issuance of common stock upon exercise of stock options, net of repurchases of unvested common stock | — | — | — | — | 10,325 | 1 | 15,333 | — | — | 15,334 |
| Issuance of common stock in connection with acquisition | — | — | — | — | 21 | — | — | — | — | — |
| Vesting of early exercised stock options | — | — | — | — | — | — | 442 | — | — | 442 |
| Vesting of restricted stock | — | — | — | — | — | — | 5,717 | — | — | 5,717 |
| Stock-based compensation | — | — | — | — | — | — | 47,514 | — | — | 47,514 |
| Other comprehensive income | — | — | — | — | — | — | — | 268 | — | 268 |
| Net loss | — | — | — | — | — | — | — | — | (95,325) | (95,325) |
| **Balances as of December 31, 2021** | — | $ — | 78,954 | $ 8 | 304,701 | $ 30 | $1,225,815 | $ (529) | $ (480,339) | $ 744,985 |
| Release of restricted stock units | — | — | 4,315 | — | 97 | — | — | — | — | — |
| Tax withholdings on release of restricted stock units | — | — | — | — | — | — | (695) | — | — | (695) |
| Repurchase of common stock | — | — | (23,252) | (2) | — | — | (77,230) | — | — | (77,232) |
| Conversion from Class B to Class A common stock | — | — | 89,376 | 9 | (89,376) | (9) | — | — | — | — |
| Issuance of common stock upon exercise of stock options | — | — | 3,748 | — | 2,434 | 1 | 12,462 | — | — | 12,463 |
| Issuance of common stock in connection with acquisition | — | — | — | — | 173 | — | — | — | — | — |
| Issuance of common stock under employee stock purchase plan | — | — | 552 | — | — | — | 1,430 | — | — | 1,430 |
| Vesting of early exercised stock options | — | — | — | — | — | — | 516 | — | — | 516 |
| Vesting of restricted stock | — | — | — | — | — | — | 4,764 | — | — | 4,764 |
| Stock-based compensation | — | — | — | — | — | — | 64,420 | — | — | 64,420 |
| Other comprehensive loss | — | — | — | — | — | — | — | (1,667) | — | (1,667) |
| Net loss | — | — | — | — | — | — | — | — | (137,916) | (137,916) |
| **Balances as of December 31, 2022** | — | $ — | 153,693 | $ 15 | 218,029 | $ 22 | $1,231,482 | $ (2,196) | $ (618,255) | $ 611,068 |

Table of Contents

| | Redeemable Convertible Preferred Stock | | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balances as of December 31, 2022** | — | $   — | 153,693 | $   15 | 218,029 | $   22 | $1,231,482 | $   (2,196) | $ (618,255) | $   611,068 |
| Release of restricted stock units | — | — | 12,101 | — | — | — | — | — | — | — |
| Tax withholdings on release of restricted stock units | — | — | — | — | — | — | (273) | — | — | (273) |
| Conversion from Class B to Class A common stock | — | — | 17,569 | 2 | (17,569) | (2) | — | — | — | — |
| Issuance of common stock upon exercise of stock options | — | — | 2,023 | 1 | 1,500 | — | 7,180 | — | — | 7,181 |
| Issuance of common stock under employee stock purchase plan | — | — | 1,029 | 1 | — | — | 2,007 | — | — | 2,008 |
| Vesting of early exercised stock options | — | — | — | — | — | — | 174 | — | — | 174 |
| Stock-based compensation | — | — | — | — | — | — | 83,025 | — | — | 83,025 |
| Other comprehensive income | — | — | — | — | — | — | — | 3,139 | — | 3,139 |
| Net loss | — | — | — | — | — | — | — | — | (147,765) | (147,765) |
| **Balances as of December 31, 2023** | — | $   — | 186,415 | $   19 | 201,960 | $   20 | $1,323,595 | $   943 | $ (766,020) | $   558,557 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**Nextdoor Holdings, Inc.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(in thousands)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (147,765) | $ (137,916) | $ (95,325) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 5,769 | 5,656 | 4,172 |
| Stock-based compensation | 83,025 | 64,420 | 47,514 |
| Bad debt expense | 46 | 71 | 317 |
| Accretion of investments | (8,607) | 151 | 340 |
| Other | (347) | (2,322) | (337) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | 3,491 | (168) | (8,172) |
| Prepaid expenses and other assets | 3,399 | 3,751 | (3,717) |
| Operating lease right-of-use assets | 4,694 | 6,867 | 6,605 |
| Accounts payable | (2,640) | (1,578) | 2,759 |
| Operating lease liabilities | (5,676) | (7,132) | (5,844) |
| Accrued expenses and other liabilities | 5,338 | 7,697 | 420 |
| Net cash used in operating activities | (59,273) | (60,503) | (51,268) |
| **Cash flows from investing activities:** | | | |
| Purchases of property and equipment | (267) | (3,161) | (8,846) |
| Purchases of marketable securities | (590,610) | (711,887) | (199,832) |
| Sales of marketable securities | 155,418 | 10,789 | 2,411 |
| Maturities of marketable securities | 504,449 | 366,811 | 56,745 |
| Loan to Opportunity Finance Network | (2,500) | (5,000) | — |
| Net cash provided by (used in) investing activities | 66,490 | (342,448) | (149,522) |
| **Cash flows from financing activities:** | | | |
| Proceeds from exercise of stock options, net of repurchases | 7,181 | 12,463 | 15,334 |
| Proceeds from issuance of common stock under employee stock purchase plan | 2,008 | 1,430 | — |
| Proceeds from the Reverse Recapitalization | — | — | 628,489 |
| Payment of transaction costs related to the Reverse Recapitalization | — | (314) | (5,384) |
| Tax withholdings on release of restricted stock units | (273) | (695) | (863) |
| Repurchase of common stock | — | (77,232) | — |
| Net cash provided by (used in) financing activities | 8,916 | (64,348) | 637,576 |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | 35 | 723 | 283 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 16,168 | (466,576) | 437,069 |
| Cash, cash equivalents, and restricted cash at beginning of period | 55,236 | 521,812 | 84,743 |
| Cash, cash equivalents, and restricted cash at end of period | $ 71,404 | $ 55,236 | $ 521,812 |
| **Reconciliation of cash, cash equivalents, and restricted cash to the consolidated balance sheets:** | | | |
| Cash and cash equivalents | $ 60,233 | $ 55,236 | $ 521,812 |
| Restricted cash | 11,171 | — | — |
| Total cash, cash equivalents, and restricted cash | $ 71,404 | $ 55,236 | $ 521,812 |
| **Supplemental cash flow disclosures:** | | | |
| Cash paid for taxes | $ 2,407 | $ 1,201 | $ 313 |
| Non-cash investing and financing activities: | | | |
| Vesting of restricted stock and early exercised stock options | $ 174 | $ 5,280 | $ 6,159 |
| Lease liabilities arising from obtaining right-of-use assets | $ 10,665 | $ — | $ 34,971 |
| Unpaid deferred transaction costs | $ — | $ — | $ 314 |
| Conversion of redeemable convertible preferred stock into Class B common stock in connection with the Reverse Recapitalization | $ — | $ — | $ 447,166 |

The accompanying notes are an integral part of these consolidated financial statements.

68

Table of Contents

**Notes to the Consolidated Financial Statements**

**Note 1. Description of Business**

Nextdoor Holdings, Inc. ("Nextdoor" or the "Company") is headquartered in San Francisco, California. Nextdoor's purpose is to cultivate a kinder world where everyone has a neighborhood they can rely on. That purpose enables the Company's mission to be the neighborhood hub for trusted connections and the exchange of helpful information, goods, and services.

On November 5, 2021 (the "Closing"), the Company consummated the transactions contemplated by the Agreement and Plan of Merger, dated July 6, 2021, as amended on September 30, 2021 (the "Merger Agreement"), by and among Khosla Ventures Acquisition Co. II ("KVSB"), a special purpose acquisition company, Lorelei Merger Sub Inc. ("Merger Sub"), and Nextdoor, Inc. ("Legacy Nextdoor"), with Legacy Nextdoor surviving as a wholly owned subsidiary of KVSB (the "Merger" and, collectively with the other transactions that occurred in connection with the Merger, including the PIPE Investment (as described in Note 3, the "Reverse Recapitalization")). In connection with the Closing, KVSB was renamed to Nextdoor Holdings, Inc. Reported results from operations included herein prior to the Reverse Recapitalization are those of Legacy Nextdoor.

See Note 3 - Reverse Recapitalization for further details.

**Note 2. Summary of Significant Accounting Policies**

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation. The Company's fiscal year ends on December 31.

The Merger was accounted for as a reverse recapitalization in accordance with GAAP. This determination was primarily based on the evaluation of the following facts and circumstances:

- Legacy Nextdoor stockholders had a relative majority of the voting power of Nextdoor;

- The Board of Directors of Nextdoor had ten members, and Legacy Nextdoor stockholders had the ability to nominate a majority of the members of the Board of Directors;

- Legacy Nextdoor's senior management comprised the senior management roles of Nextdoor and were responsible for the day-to-day operations;

- KVSB assumed the Nextdoor Holdings, Inc. name and Legacy Nextdoor's corporate headquarters; and

- The intended strategy and operations of Nextdoor continued Legacy Nextdoor's strategy and operations to leverage technology to connect millions of neighbors online and in real life to build stronger, more vibrant, and resilient neighborhoods.

Under this method of accounting, KVSB was treated as the "acquired" company for financial reporting purposes. Accordingly, the financial statements of Nextdoor represent the continuation of the financial statements of Legacy Nextdoor, with the Merger reflected as the equivalent of Nextdoor issuing common stock for the net assets of KVSB, accompanied by a recapitalization. The shares and corresponding capital amounts and all per share data related to Legacy Nextdoor's outstanding redeemable convertible preferred stock, common stock, and stock-based awards prior to the Reverse Recapitalization have been retroactively adjusted using the Exchange Ratio (as defined in Note 3). The conversion of the outstanding shares of Legacy Nextdoor redeemable convertible preferred stock into shares of Class B common stock in connection with the Reverse Recapitalization and the issuance of Class A common stock are presented as of the Closing of the Merger in the consolidated statements of redeemable convertible preferred stock and stockholders' equity (deficit). The net assets of KVSB were recognized as of the Closing at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Merger are those of Legacy Nextdoor and Legacy Nextdoor's operations are the only ongoing operations of Nextdoor.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates include, but are not limited to, valuation of financial instruments, valuation of common stock through the date of the Reverse Recapitalization, valuation of stock-based awards, revenue recognition, collectability of accounts receivable, valuation of acquired intangible assets and goodwill, useful

Table of Contents

lives of intangible assets, useful lives of property and equipment, the incremental borrowing rate applied in lease accounting, income taxes and deferred income tax assets and associated valuation allowances. The Company bases these estimates and assumptions on historical experience and various other assumptions that it considers reasonable. The actual results could differ materially from these estimates.

*Foreign Currency*

The functional currency of the Company's international subsidiaries is generally their local currency. The financial statements of these subsidiaries are translated into U.S. dollars using month-end exchange rates for assets and liabilities, historical exchange rates for equity, and average exchange rates for revenue and expenses. Translation gains and losses are recorded in accumulated other comprehensive income (loss) as a component of stockholders' equity (deficit). Unrealized foreign exchange gains and losses due to the re-measurement of monetary assets and liabilities denominated in non-functional currencies and realized foreign exchange gains and losses on foreign exchange transactions are recorded in other income (expense), net in the consolidated statements of operations.

*Cash and Cash Equivalents*

Cash and cash equivalents consist of highly liquid investments with insignificant interest rate risk and original maturities of three months or less at the time of purchase. Cash and cash equivalents include demand deposits, money market funds, corporate bonds, and commercial paper. Interest is accrued as earned. Cash and cash equivalents are recorded at cost, which approximates fair value.

*Marketable Securities*

The Company's marketable securities are comprised of certificates of deposit, commercial paper, corporate bonds, U.S. Treasury securities, U.S. agency bonds, and asset-backed securities. The Company determines the appropriate classification of its investments at the time of purchase and reevaluates such designation at each balance sheet date. The Company has classified and accounted for its investments as available-for-sale securities as the Company may sell these securities at any time for use in its current operations or for other purposes, even prior to maturity. As a result, the Company classifies its investments, including securities with stated maturities beyond 12 months, within current assets on the consolidated balance sheets.

Available-for-sale securities are recorded at fair value each reporting period. Unrealized gains and losses on these investments are reported as a separate component of accumulated other comprehensive income (loss) on the consolidated balance sheets until realized. Interest income is reported within interest income in the consolidated statements of operations. The Company periodically evaluates its marketable securities to assess whether those with unrealized loss positions are other-than-temporarily impaired. The Company considers various factors in determining whether to recognize an impairment charge, including the length of time the investment has been in a loss position, the extent to which the fair value is less than the Company's cost basis, the financial condition and near-term prospects of the investee. Realized gains and losses are determined based on the specific identification method and are reported in other income (expense), net in the consolidated statements of operations. If the Company determines that the decline in an investment's fair value is other than temporary, the difference is recognized as an impairment loss in the consolidated statements of operations. The Company did not consider any of its investments to be other-than-temporarily impaired for the years ended December 31, 2023 and 2022.

*Fair Value Measurements*

The Company accounts for certain assets and liabilities at fair value, which is the expected exchange price that would be received for an asset or an exit price paid to transfer a liability in an orderly transaction between market participants on the measurement date. Assets and liabilities measured at fair value are classified into the following categories based on the degree to which the inputs the Company uses to measure the fair values are observable in active markets. The Company uses the most observable inputs available when measuring fair value.

- Level 1: Observable inputs such as unadjusted quoted prices for identical assets or liabilities in active markets;

- Level 2: Observable inputs such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical assets or liabilities in inactive markets, or inputs that are derived principally from or corroborated by observable market data or other means; and

- Level 3: Unobservable inputs that are supported by little or no market activity and are significant to the fair value of the assets or liabilities.

Table of Contents

*Accounts Receivable and Allowance for Doubtful Accounts*

The Company records accounts receivable at the original invoiced amount. The Company maintains an allowance for doubtful accounts for any receivables it may be unable to collect and reduces the allowance when it determines that it will be unable to collect specific receivables. The Company determines the allowance based on its receivables' age, the customers' credit quality, and current economic conditions, among other factors that may affect the customers' ability to pay.

*Restricted Cash*

The Company's restricted cash balance is invested in a savings account and pledged as collateral for standby letters of credit as security deposits for the Company's office leases.

*Property and Equipment*

Property and equipment are recorded at cost, less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the assets as follows:

|  | Estimated Useful Life |
| --- | --- |
| Computer equipment and software | 3 years |
| Furniture and fixtures | 5 years |
| Leasehold improvements | Shorter of the estimated useful life of 5 years or the lease term |

Maintenance and repair costs are expensed as incurred.

*Capitalized Internal-use Software*

The Company capitalizes internal-use software costs when preliminary development efforts are successfully completed, management has authorized and committed project funding, and it is probable that the project will be completed, and the software will be used as intended. Costs related to preliminary project activities and post-implementation activities are expensed as incurred and costs related to the application development stage are capitalized. Capitalized costs are recorded as part of property and equipment, net. The capitalized costs related to internal-use software are amortized on a straight-line basis over an estimated useful life of two to three years. Management evaluates the useful lives of these assets on an annual basis and tests for impairment whenever events or changes in circumstances occur that could impact the recoverability of these assets. The Company did not capitalize any internal-use software costs for the year ended December 31, 2023. The Company capitalized $0.3 million of internal-use software costs for the year ended December 31, 2022.

*Goodwill and Other Acquired Intangible Assets*

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in connection with business combinations accounted for using the acquisition method of accounting. Goodwill is not amortized, but is tested for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. For all periods presented the Company had one reporting unit. The Company's test for goodwill impairment starts with a qualitative assessment to determine whether it is necessary to perform the quantitative goodwill impairment test. If the Company determines, based on the qualitative factors, that the fair value of the reporting unit is more likely than not to be less than the carrying amount, then a quantitative goodwill impairment test is required. There was no impairment of goodwill recorded for the periods presented.

Intangible assets consist of identifiable intangible assets, including customer relationships and developed technology, resulting from the Company's acquisitions. Acquired intangible assets are recorded at cost, net of accumulated amortization. Intangible assets are amortized on a straight-line basis over their estimated useful lives. Amortization costs are recorded in sales and marketing in the consolidated statements of operations.

*Impairment of Long-Lived Assets*

Property and equipment and other long-lived assets, such as finite-lived intangible assets, subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. Recoverability of these assets is measured by a comparison of the carrying amounts to the future undiscounted cash flows the assets are expected to generate. If impairment is indicated, an impairment loss is recognized as the amount by which the carrying amount exceeds the fair value. No impairment was recorded for long-lived assets for the periods presented.

Table of Contents

*Leases*

Results and disclosure requirements for all periods presented are presented under ASU 2016-02, Leases ("Topic 842").

The Company has various lease agreements related to real estate that are all classified as operating leases. At the inception of the Company's contracts it determines if the contract is or contains a lease. A contract is or contains a lease if it conveys the right to control the use of an identified asset for a period of time in exchange for consideration. The Company has elected not to separate the lease and non-lease components within the contract. For leases that have greater than a 12-month lease term, right-of-use ("ROU") assets and operating lease liabilities are recognized on the consolidated balance sheets at commencement date based on the present value of remaining fixed lease payments.

Certain of the Company's leases include options to extend the lease, with renewal terms that can extend the lease term from one month to five years. If the Company is reasonably certain to exercise an option to extend a lease, the extension period is included as part of the ROU asset and the operating lease liability.

When the discount rate implicit in the lease cannot be readily determined, the Company uses its incremental borrowing rate at lease commencement in order to discount lease payments to present value for purposes of performing lease classification tests and measuring the lease liability. The Company's incremental borrowing rate represents the rate of interest the Company would have to pay to borrow, on a collateralized basis, over a similar term an amount equal to the lease payments in a similar economic environment.

The operating lease ROU asset also includes accrued lease expense resulting from the straight-line accounting under prior accounting methods, which is now being amortized over the remaining life of the lease.

The Company's lease payments are largely fixed. Variable lease payments exist in circumstances such as payments for property tax, insurance, and common area maintenance. Variable lease payments are recognized in operating expense in the period in which the obligation for those payments are incurred. Certain of the Company's leases include an option to early terminate the lease. The Company's leases may contain early termination options which may result in an early termination fee. The Company has a significant lease for its headquarters in San Francisco, California, which does not include an option to early terminate.

For the Company's leases, it has elected to not apply the recognition requirements to leases of twelve months or less. These leases are expensed on a straight-line basis and no ROU asset or operating lease liability is recorded.

***Concentration of Credit and Customer Risks***

Financial instruments that are exposed to concentrations of credit risk consist principally of cash and cash equivalents, marketable securities and accounts receivable. The Company maintains cash and cash equivalents and marketable securities with domestic and foreign financial institutions and at times may exceed federally insured limits. The Company performs periodic evaluations of the relative credit standing of these institutions. The Company maintains investments in U.S. government debt and agency securities, corporate debt securities, and commercial paper that carry high credit ratings and accordingly, minimal credit risk exists with respect to these balances.

One customer accounted for 19% and 24% of the Company's accounts receivable as of December 31, 2023 and 2022, respectively. No customer accounted for 10% or more of the Company's total revenue for the years ended December 31, 2023, 2022 and 2021.

***Revenue Recognition***

The Company generates a majority of its revenue from the delivery of advertising services.
The Company determines revenue recognition through the following steps:

    (1)  Identification of the contract, or contracts, with a customer;

    (2)  Identification of the performance obligations in the contract;

    (3)  Determination of the transaction price;

    (4)  Allocation of the transaction price to the performance obligations in the contract; and

    (5)  Recognition of revenue when, or as, the Company satisfies a performance obligation.

The Company recognizes advertising revenue after satisfying its contractual performance obligation, which, for the majority of its advertising arrangements, is when an advertising impression is displayed to users. None of the Company's arrangements contain

Table of Contents

minimum impression guarantees. The Company typically bills advertisers on a monthly basis and the payment terms vary by customer type and location. The Company has other advertising arrangements which are typically fixed-fee arrangements and revenue is recognized on a straight-line basis over the non-cancellable contractual term of the agreement, generally beginning on the date its service is made available to the customer.

*Deferred Revenue*

In certain advertising arrangements the Company requires payment upfront from its customers. The Company records deferred revenue when it collects cash from customers in advance of revenue recognition. As of December 31, 2023 and 2022, deferred revenue was $8.3 million and $6.0 million, respectively, and included within accrued expenses and other current liabilities on the consolidated balance sheets. For the years ended December 31, 2023 and 2022, revenue recognized from deferred revenue at the beginning of each year was $3.0 million and $2.9 million, respectively.

*Practical Expedients and Exemptions*

The Company expenses sales commissions as incurred because the expected period of benefit is less than one year. These costs are recorded within sales and marketing expenses in the consolidated statements of operations.

The Company does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which it recognizes revenue at the amount to which it has the right to invoice for services performed.

*Cost of Revenue*

Cost of revenue consists primarily of expenses associated with the delivery of the Company's revenue generating activities, including third-party costs of hosting its platform and allocated personnel-related costs, including salaries, benefits, and stock-based compensation for employees engaged in development of its revenue generating products. Cost of revenue also includes third-party costs associated with delivering and supporting its advertising products and credit card transaction fees related to processing customer transactions.

*Research and Development*

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, restructuring costs, and stock-based compensation for its employees engaged in research and development, as well as costs for consultants, contractors and third-party software. In addition, allocated overhead costs, such as facilities, information technology, and depreciation are included in research and development expenses.

*Sales and Marketing*

Sales and marketing expenses consist primarily of personnel-related costs and other costs which include salaries, commissions, benefits, restructuring costs, and stock-based compensation for employees engaged in sales and marketing activities as well as other costs including third-party consulting, public relations, allocated overhead costs, and amortization of acquired intangible assets. Sales and marketing expenses also include brand and performance marketing for both user and local business acquisition, and neighbor services, which includes personnel-related costs for the Company's neighbor support team, its outsourced neighbor support function, and verification costs.

*General and Administrative*

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, restructuring costs, and stock-based compensation, for certain executives, finance, legal, information technology, human resources, and other administrative employees. In addition, general and administrative expenses include fees and costs for professional services, including consulting, third-party legal and accounting services, and allocated overhead costs.

*Advertising Costs*

Advertising costs which consist primarily of brand and performance marketing are expensed as incurred and are included in sales and marketing expense in the consolidated statements of operations. Total advertising costs incurred were $18.1 million, $33.6 million, and $37.5 million for the years ended December 31, 2023, 2022 and 2021, respectively.

73

Table of Contents

***Income Taxes***

The Company accounts for income taxes using the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the consolidated financial statements or in the Company's tax returns. Deferred income taxes are recognized for differences between financial reporting and tax bases of assets and liabilities at the enacted statutory tax rates in effect for the years in which the temporary differences are expected to reverse. Management makes an assessment of the likelihood that the resulting deferred tax assets will be realized. A valuation allowance is provided when it is more likely than not that some portion or all of a deferred tax asset will not be realized. Due to the Company's historical operating performance and the recorded cumulative net losses in prior fiscal periods, the U.S. net deferred tax assets have been fully offset by a valuation allowance.

The Company operates in various tax jurisdictions which are subject to audit by various tax authorities. The Company recognizes a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such positions are then measured based on the largest benefit that has a greater than 50% cumulative likelihood of being realized upon settlement. The Company recognizes interest and penalties related to unrecognized tax benefits in the income tax provision in the consolidated statements of operations.

***Net Loss Per Share Attributable to Common Stockholders***

The Company presents net loss per share attributable to common stockholders in conformity with the two-class method required for multiple classes of common stock and participating securities. Under the two-class method, net loss is attributed to common stockholders and participating securities based on their participation rights. The rights, including the liquidation and dividend rights, of the Class A common stock and Class B common stock are substantially identical, other than voting rights. Accordingly, the Class A common stock and Class B common stock share proportionately in the Company's net losses. The Company considers its redeemable convertible preferred stock (prior to the Reverse Recapitalization), early exercised stock options, and unvested restricted stock to be participating securities and contractually entitles the holders of such shares to participate in dividends but does not contractually obligate the holders of such shares to participate in the Company's losses. As such, net losses for the periods presented were not allocated to these securities.

The Company computes basic net loss per share attributable to common stockholders by dividing the net loss attributable to common stockholders by the weighted average number of shares of common stock outstanding during the period, adjusted for outstanding shares that are subject to repurchase. Diluted net loss per share attributable to common stockholders is computed by giving effect to all potentially dilutive securities outstanding for the period. For periods in which the Company reports net losses, diluted net loss per share attributable to common stockholders is the same as basic net loss per share attributable to common stockholders, because all potentially dilutive securities are anti-dilutive.

***Stock-Based Compensation***

Stock-based compensation expense for stock-based awards granted to employees and non-employees is measured based on the grant date fair value of the awards and recognized in the consolidated statements of operations on a straight-line basis over the period during which services are provided in exchange for the award, generally, the vesting period of the award. The grant date fair value of stock options granted is estimated using the Black-Scholes option pricing model. Forfeitures are accounted for as they occur.

***Segments***

The Company has one reportable and operating segment. The Company's chief operating decision maker is its Chief Executive Officer ("CEO"), who reviews financial information presented on a consolidated basis for purposes of making operating decisions, assessing financial performance, and allocating resources. See Note 13 - Geographical Information for more details on the Company's revenue and long-lived assets by jurisdiction.

***Recently Adopted Accounting Pronouncements***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses* (*Topic 326*): *Measurement of Credit Losses on Financial Instruments*, and has since issued various amendments including ASU 2018-19, ASU 2019-04, and ASU 2019-05. The guidance and related amendments modify the accounting for credit losses for most financial assets and require the use of an expected loss model, replacing the currently used incurred loss method. Under this model, entities will be required to estimate the lifetime expected credit loss on such instruments and record an allowance to offset the amortized cost basis of the financial asset, resulting in a net presentation of the amount expected to be collected on the financial asset. The Company adopted this standard as of January 1,

Table of Contents

2023, and the adoption did not have an impact on the Company's consolidated financial statements.

***Recently Issued Accounting Pronouncements Not Yet Adopted***

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*, which expands annual and interim disclosure requirements for reportable segments, primarily through enhanced disclosures about significant segment expenses. The ASU is effective for fiscal years beginning after December 15, 2023 with early adoption permitted. The Company is currently evaluating the impact of this standard on its consolidated financial statements and related disclosures.

In December 2023, the FASB issued ASU 2023-09, *Income Taxes (Topic 740): Improvements to Income Tax Disclosures*, which expands income tax disclosures primarily related to an entity's rate reconciliation and information on income taxes paid. The ASU is effective for fiscal years beginning after December 15, 2024 with early adoption permitted. The Company is currently evaluating the impact of this standard on its consolidated financial statements and related disclosures.

**Note 3. Reverse Recapitalization**

Pursuant to the Merger Agreement, as described in Note 1, Merger Sub merged with and into Legacy Nextdoor, with Legacy Nextdoor surviving the Merger. Legacy Nextdoor became a wholly owned subsidiary of KVSB and KVSB was immediately renamed Nextdoor Holdings, Inc. Upon the consummation of the Merger, the following events contemplated by the Merger Agreement occurred, based on Legacy Nextdoor's capitalization as of November 5, 2021:

- all 61,331,815 issued and outstanding shares of Legacy Nextdoor redeemable convertible preferred stock were converted into 61,331,815 shares of Legacy Nextdoor common stock at the conversion rate as calculated pursuant to Legacy Nextdoor's certificate of incorporation;

- all 97,886,321 issued and outstanding shares of Legacy Nextdoor common stock (including Legacy Nextdoor common stock resulting from the conversion of the Legacy Nextdoor redeemable convertible preferred stock) were converted into 304,003,976 shares of Nextdoor Class B common stock after giving effect to the exchange ratio of 3.1057 as calculated in accordance with the Merger Agreement ("Exchange Ratio");

- all 19,196,313 granted and outstanding unexercised Legacy Nextdoor options were converted into 59,616,898 Nextdoor options exercisable for shares of Nextdoor Class B common stock with the same terms and vesting conditions except for the number of shares exercisable and the exercise price, each of which was adjusted by the Exchange Ratio;

- all 866,687 granted and outstanding unvested Legacy Nextdoor restricted stock units ("RSUs") were converted into 2,691,577 Nextdoor RSUs for shares of Nextdoor Class B common stock with the same terms and vesting conditions except for the number of shares, which was adjusted by the Exchange Ratio; and

- the entitlement to receive 58,135 shares of Legacy Nextdoor common stock pursuant to the Pixel Labs Merger Agreement converted into the right to receive 180,549 shares of Nextdoor Class B common stock, which was adjusted by the Exchange Ratio.

There were 304,003,976 shares of Nextdoor Class B common stock issued and outstanding as of the Closing and Nextdoor options and RSUs covering 62,308,475 shares reserved for the potential future issuance of Nextdoor Class B common stock as of the Closing.

In connection with the Closing of the Merger:

- all KVSB Class B founder shares, consisting of 5,000,000 shares of KVSB Class B common stock, automatically converted into an aggregate of 7,347,249 shares of Nextdoor Class A common stock;

- all KVSB Class K founder shares, consisting of 5,000,000 shares of KVSB Class K common stock, converted into an aggregate of 3,061,354 shares of Nextdoor Class A common stock;

- all 1,132,688 private placement sponsor shares of KVSB Class A common stock converted into shares of Nextdoor Class A common stock on a one-to-one basis; and

- 40,412,372 shares of KVSB Class A common stock held by KVSB public stockholders, net of the redemption of 1,222,040 shares of KVSB Class A common stock, converted into Nextdoor Class A common stock on a one-to-one basis.

On July 6, 2021, concurrently with the execution of the Merger Agreement, KVSB entered into subscription agreements with certain investors (collectively, the "PIPE Investors"), pursuant to, and on the terms and subject to the conditions of which, the PIPE Investors subscribed for an aggregate of 27,000,000 shares of Class A common stock, which included 750,000 shares of Nextdoor Class A common stock to the KVSB sponsor and 4,500,000 shares of Nextdoor Class A common stock to certain Legacy Nextdoor stockholders, including 500,000 shares of Nextdoor Class A common stock to Nextdoor's Chief Executive Officer and President, for an aggregate purchase price of $270.0 million (the "PIPE Investment"). The PIPE Investment was consummated substantially concurrently with the Closing of the Merger.

There were 78,953,663 shares of Nextdoor Class A common stock issued and outstanding as of the Closing.

Each holder of shares of Class A common stock is entitled to one vote for each share of Class A common stock held on all matters submitted to a vote of stockholders and each holder of shares of Class B common stock is entitled to 10 votes for each share of Class B common stock held on all matters submitted to a vote of stockholders.

The following table presents the number of shares of common stock issued and outstanding immediately following the Reverse Recapitalization:

|  | Shares |
|---|---|
| KVSB Class A common stock, outstanding prior to Reverse Recapitalization | 42,767,100 |
| Less: redemption of KVSB Class A common stock | (1,222,040) |
| Conversion of KVSB Class B founder shares | 7,347,249 |
| Conversion of KVSB Class K common stock | 3,061,354 |
| Shares issued to PIPE Investors | 27,000,000 |
| Nextdoor Class A common stock | 78,953,663 |
|  |  |
| Conversion of Legacy Nextdoor common stock [1] | 113,526,555 |
| Conversion of Legacy Nextdoor redeemable convertible preferred stock [2] | 190,477,421 |
| Nextdoor Class B common stock | 304,003,976 |
|  |  |
| Total shares of common stock immediately after Reverse Recapitalization | 382,957,639 |

(1) Upon the completion of the Reverse Recapitalization, the 36,554,506 outstanding shares of Legacy Nextdoor common stock were converted into shares of Nextdoor Class B common stock using the Exchange Ratio.

(2) Upon the completion of the Reverse Recapitalization, all 61,331,815 outstanding shares of Legacy Nextdoor redeemable convertible preferred stock converted into Legacy Nextdoor common stock on a one-to-one basis, which were then converted into shares of Nextdoor Class B common stock using the Exchange Ratio.

KVSB was treated as the "acquired" company for financial reporting purposes. Accordingly, the financial statements of Nextdoor represent the continuation of the financial statements of Legacy Nextdoor, with the Merger reflected as the equivalent of Nextdoor issuing common stock for the net assets of KVSB, accompanied by a recapitalization. The net assets of KVSB were recognized as of the Closing at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Merger are those of Legacy Nextdoor and Legacy Nextdoor's operations are the only ongoing operations of Nextdoor.

In connection with the Reverse Recapitalization, the Company raised $628.5 million of proceeds, presented as cash flows from financing activities, which included the contribution of $416.4 million of funds held in KVSB's trust account, $0.2 million of cash held in KVSB's operating cash account, and $270.0 million of proceeds from the PIPE Investment, net of $12.2 million paid to redeem 1,222,040 public shares of KVSB's Class A common stock and $45.9 million in transaction costs incurred by KVSB. Legacy Nextdoor incurred $5.7 million of transaction costs, which consisted of direct incremental legal, accounting, consulting, and other fees which were recorded as deferred transaction costs and upon completion of the Reverse Recapitalization were reclassified to additional paid-in capital as a reduction of the net proceeds received.

The shares and corresponding capital amounts and all per share data related to Legacy Nextdoor's outstanding redeemable convertible preferred stock, common stock, and stock-based awards prior to the Reverse Recapitalization have been retroactively adjusted using the Exchange Ratio.

Table of Contents

**Note 4. Cash Equivalents and Marketable Securities**

The amortized costs, unrealized gains and losses, and estimated fair values of the Company's cash equivalents and marketable securities were as follows (in thousands):

| | As of December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Unrealized Loss | Estimated Fair Value |
| Cash equivalents: | | | | |
| Money market funds | $ 32,572 | $ — | $ — | $ 32,572 |
| Corporate bonds | 1,696 | — | — | 1,696 |
| Commercial paper | 5,216 | — | (3) | 5,213 |
| Total cash equivalents | 39,484 | — | (3) | 39,481 |
| Marketable securities: | | | | |
| Certificates of deposit | 38,253 | 98 | — | 38,351 |
| Commercial paper | 71,263 | 110 | (8) | 71,365 |
| Corporate bonds | 226,495 | 851 | (200) | 227,146 |
| U.S. Treasury securities | 64,952 | 15 | (263) | 64,704 |
| U.S. Agency bonds | 29,918 | — | (50) | 29,868 |
| Asset-backed securities | 39,290 | 157 | (13) | 39,434 |
| Total marketable securities | 470,171 | 1,231 | (534) | 470,868 |
| Total | $ 509,655 | $ 1,231 | $ (537) | $ 510,349 |

| | As of December 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Unrealized Loss | Estimated Fair Value |
| Cash equivalents: | | | | |
| Money market funds | $ 20,381 | $ — | $ — | $ 20,381 |
| Corporate bonds | 6,021 | 3 | — | 6,024 |
| Commercial paper | 9,394 | — | (3) | 9,391 |
| Total cash equivalents | 35,796 | 3 | (3) | 35,796 |
| Marketable securities: | | | | |
| Certificates of deposit | 44,732 | 9 | (191) | 44,550 |
| Commercial paper | 100,909 | 27 | (92) | 100,844 |
| Corporate bonds | 280,023 | 11 | (1,980) | 278,054 |
| U.S. Treasury securities | 41,646 | 3 | (123) | 41,526 |
| U.S. Agency bonds | 46,366 | 66 | (22) | 46,410 |
| Asset-backed securities | 16,798 | — | (115) | 16,683 |
| Total marketable securities | 530,474 | 116 | (2,523) | 528,067 |
| Total | $ 566,270 | $ 119 | $ (2,526) | $ 563,863 |

All marketable securities are designated as available-for-sale securities as of December 31, 2023 and 2022.

The following table summarizes the fair value and gross unrealized losses aggregated by category and the length of time that individual securities have been in a continuous unrealized loss position. No investments had been in a continuous unrealized loss position for greater than 12 months as of December 31, 2022.

77

Table of Contents

| | As of December 31, 2023 | | | | | |
| | Less than 12 Months | | 12 Months or Greater | | Total | |
| | Fair Value | Gross Unrealized Loss | Fair Value | Gross Unrealized Loss | Fair Value | Gross Unrealized Loss |
|---|---|---|---|---|---|---|
| Commercial paper | $ 23,410 | $ (11) | $ — | $ — | $ 23,410 | $ (11) |
| Corporate bonds | 46,728 | (133) | 17,763 | (67) | 64,491 | (200) |
| U.S. Treasury securities | 57,471 | (263) | — | — | 57,471 | (263) |
| U.S. Agency bonds | 26,662 | (50) | — | — | 26,662 | (50) |
| Asset-backed securities | 6,276 | (2) | 1,237 | (11) | 7,513 | (13) |
| Total | $ 160,547 | $ (459) | $ 19,000 | $ (78) | $ 179,547 | $ (537) |

The following tables present the contractual maturities of the Company's marketable securities (in thousands):

| | As of December 31, 2023 | |
| | Amortized Cost | Estimated Fair Value |
|---|---|---|
| Due within one year | $ 250,738 | $ 250,927 |
| Due after one to four years | 219,433 | 219,941 |
| Total | $ 470,171 | $ 470,868 |

| | As of December 31, 2022 | |
| | Amortized Cost | Estimated Fair Value |
|---|---|---|
| Due within one year | $ 473,133 | $ 471,378 |
| Due after one to four years | 57,341 | 56,689 |
| Total | $ 530,474 | $ 528,067 |

## Note 5. Fair Value Measurements

The Company's financial assets and liabilities measured at fair value on a recurring basis are classified by level within the fair value hierarchy. There were no financial assets or liabilities measured using Level 3 inputs as of December 31, 2023 and 2022. The following table presents information about the Company's financial assets that are measured at fair value on a recurring basis (in thousands):

| | As of December 31, 2023 | | |
| | Level 1 | Level 2 | Total |
|---|---|---|---|
| Cash equivalents: | | | |
| Money market funds | $ 32,572 | $ — | $ 32,572 |
| Corporate bonds | — | 1,696 | 1,696 |
| Commercial paper | — | 5,213 | 5,213 |
| Total cash equivalents | 32,572 | 6,909 | 39,481 |
| Marketable securities: | | | |
| Certificates of deposit | — | 38,351 | 38,351 |
| Commercial paper | — | 71,365 | 71,365 |
| Corporate bonds | — | 227,146 | 227,146 |
| U.S. Treasury securities | — | 64,704 | 64,704 |
| U.S. Agency bonds | — | 29,868 | 29,868 |
| Asset-backed securities | — | 39,434 | 39,434 |
| Total marketable securities | — | 470,868 | 470,868 |
| Total | $ 32,572 | $ 477,777 | $ 510,349 |

|  | As of December 31, 2022 | | |
|  | Level 1 | Level 2 | Total |
|---|---|---|---|
| Cash equivalents: | | | |
| Money market funds | $ 20,381 | $ — | $ 20,381 |
| Corporate bonds | — | 6,024 | 6,024 |
| Commercial paper | — | 9,391 | 9,391 |
| Total cash equivalents | 20,381 | 15,415 | 35,796 |
| Marketable securities: | | | |
| Certificates of deposit | — | 44,550 | 44,550 |
| Commercial paper | — | 100,844 | 100,844 |
| Corporate bonds | — | 278,054 | 278,054 |
| U.S. Treasury securities | — | 41,526 | 41,526 |
| U.S. Agency bonds | — | 46,410 | 46,410 |
| Asset-backed securities | — | 16,683 | 16,683 |
| Total marketable securities | — | 528,067 | 528,067 |
| Total | $ 20,381 | $ 543,482 | $ 563,863 |

The Company classifies its cash equivalents, marketable securities, and note receivable within Level 1 or Level 2 because it determines their fair values using quoted market prices or alternative pricing sources and models utilizing market observable inputs. There were no transfers between levels of the fair value hierarchy during the years ended December 31, 2023 and 2022.

***Assets and Liabilities Measured at Fair Value on a Recurring Basis***

The carrying amounts of certain financial instruments, including cash held in banks, accounts receivable, and accounts payable approximate fair value due to their short-term maturities and are excluded from the fair value table above.

***Financial Instruments, Assets, and Liabilities Not Recorded at Fair Value***

The following table presents the fair value hierarchy of assets not recorded at fair value (in thousands):

|  | As of December 31, 2023 | | | | |
|  | Carrying Amount | Level 1 | Level 2 | Level 3 | Fair Value |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Note receivable | $ 7,500 | $ — | $ — | $ 7,011 | $ 7,011 |

|  | As of December 31, 2022 | | | | |
|  | Carrying Amount | Level 1 | Level 2 | Level 3 | Fair Value |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Note receivable | $ 5,000 | $ — | $ — | $ 4,646 | $ 4,646 |

As of December 31, 2023 and 2022, there were no financial instruments or liabilities that were not recorded at fair value.

**Note 6. Other Balance Sheet Components**

*Property and Equipment, net*

Property and equipment, net consisted of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Computer equipment and software | $ 4,278 | $ 4,103 |
| Furniture and fixtures | 2,303 | 2,209 |
| Capitalized internal-use software | 2,123 | 2,123 |
| Leasehold improvements | 10,597 | 10,597 |
| Property and equipment, gross | 19,301 | 19,032 |
| Less: accumulated depreciation and amortization | (11,219) | (7,214) |
| Property and equipment, net | $ 8,082 | $ 11,818 |

Depreciation and amortization expense was $4.0 million, $3.9 million and $2.0 million for the years ended December 31, 2023, 2022 and 2021, respectively.

*Intangible Assets, net*

The Company's intangible assets consist of customer relationships and developed technology arising from acquisitions.
Intangible assets, net consisted of the following (in thousands):

| | As of December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** | **Weighted Average Remaining Life (years)** |
| Customer relationships | $ 7,068 | $ (6,381) | $ 687 | 1.5 |
| Developed technology | 4,600 | (3,986) | 614 | 0.7 |
| Total intangible assets, net | $ 11,668 | $ (10,367) | $ 1,301 | 1.1 |

| | As of December 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** | **Weighted Average Remaining Life (years)** |
| Customer relationships | $ 7,068 | $ (5,534) | $ 1,534 | 2.1 |
| Developed technology | 4,600 | (3,067) | 1,533 | 1.7 |
| Total intangible assets, net | $ 11,668 | $ (8,601) | $ 3,067 | 1.9 |

Amortization expense related to intangible assets was $1.8 million, $1.8 million and $2.2 million for the years ended December 31, 2023, 2022 and 2021, respectively.

Expected future amortization expense for intangible assets as of December 31, 2023 was as follows (in thousands):

| | |
| --- | --- |
| 2024 | $ 1,076 |
| 2025 | 225 |
| Total | $ 1,301 |

***Accrued Expenses and Other Current Liabilities***

Accrued expenses and other current liabilities consisted of the following (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Accrued compensation [1] | $ 8,873 | $ 6,022 |
| Employee stock purchase plan liability | 1,093 | 2,076 |
| Liability for early exercise of unvested stock options | — | 174 |
| Taxes payable | 1,065 | 1,425 |
| Deferred revenue | 8,294 | 6,020 |
| Other accrued and current liabilities | 7,983 | 6,645 |
| Accrued expenses and other current liabilities | $ 27,308 | $ 22,362 |

[1] Includes liabilities and remaining charges under the Cost Reduction Plan of $1.8 million as of December 31, 2023.

## Note 7. Leases

The Company has entered into various non-cancellable office facility leases in various locations with original lease periods expiring between 2020 and 2029, with its primary office location in San Francisco, California. The Company entered into a lease consisting of multiple floors for its San Francisco headquarters in 2019, with a lease term through 2029. On January 30, 2023, the Company entered into a lease amendment for its headquarters lease. The lease amendment extended the lease term through April 30, 2032, and resulted in an increase to right-of-use assets and operating lease liabilities. The Company's lease agreements generally do not contain any material residual value guarantees or material restrictive covenants.

The components of lease costs were as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Operating lease cost | $ 9,370 | $ 9,781 | $ 9,864 |
| Short-term lease cost | 1,887 | 1,417 | 525 |
| Variable lease cost | 2,553 | 1,665 | 409 |
| Total | $ 13,810 | $ 12,863 | $ 10,798 |

Other information related to the Company's operating leases was as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ 10,347 | $ 10,045 | $ 6,585 |
| ROU assets obtained in exchange for new operating lease liabilities: | $ 9,107 | $ — | $ 28,252 |

Lease terms and discount rates for operating leases were as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Weighted average remaining lease term (years) | 8.3 | 6.3 |
| Weighted average discount rate | 7.1 % | 4.5 % |

Table of Contents

As of December 31, 2023, future minimum lease payments under operating leases were as follows (in thousands):

| | |
|---|---:|
| 2024 | $ 10,657 |
| 2025 | 10,977 |
| 2026 | 10,777 |
| 2027 | 10,586 |
| 2028 | 10,936 |
| Thereafter | 33,455 |
| Total lease payments | 87,388 |
| Less: imputed interest | (20,802) |
| Present value of lease liabilities | 66,586 |
| Less: current operating lease liabilities | (6,208) |
| Long-term operating lease liabilities | $ 60,378 |

The table above does not include lease payments that were not fixed at commencement or lease modification.

**Note 8. Commitments and Contingencies**

*Commitments*

As of December 31, 2023, the Company had non-cancellable purchase commitments with certain service providers primarily related to the provision of cloud computing services as follows (in thousands):

| | |
|---|---:|
| 2024 | $ 14,599 |
| 2025 | 3,436 |
| 2026 | 1,326 |
| Thereafter | — |
| Total | $ 19,361 |

*Legal matters*

From time to time, the Company is a party to a variety of claims, lawsuits, and proceedings which arise in the ordinary course of business, including claims of alleged infringement of intellectual property rights. The Company records a liability when it believes that it is probable that a loss will be incurred and the amount of loss or range of loss can be reasonably estimated. The Company discloses potential losses when they are reasonably possible. In the Company's opinion, resolution of pending matters is not likely to have a material adverse impact on its consolidated results of operations, cash flows, or its financial position. Given the unpredictable nature of legal proceedings, the Company bases its estimate on the information available at the time of the assessment. As additional information becomes available, the Company reassesses the potential liability and may revise the estimate. There were no such material matters as of December 31, 2023 and 2022.

*Indemnification*

In the ordinary course of business, the Company often includes standard indemnification provisions in its arrangements with its customers, partners, suppliers, and vendors. Pursuant to these provisions, the Company may be obligated to indemnify such parties for losses or claims suffered or incurred in connection with its service, breach of representations or covenants, intellectual property infringement, or other claims made against such parties. These provisions may limit the time within which an indemnification claim can be made. It is not possible to determine the maximum potential amount under these indemnification obligations due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. For the years ended December 31, 2023, 2022 and 2021, the Company did not incur material costs to defend lawsuits or settle claims related to these indemnifications. The Company believes the fair value of these liabilities is not material and accordingly has no liabilities recorded for these agreements as of December 31, 2023 and 2022.

*Opportunity Finance Network Loan Agreement*

On June 29, 2022, the Company entered into a credit agreement with Opportunity Finance Network ("OFN") to lend up to an aggregate of $15.0 million, unsecured, over the course of 24 months. OFN is a national network of community development financial

Table of Contents

institutions ("CDFIs"). OFN will use the loan proceeds to make low-cost, fixed-rate loans to OFN-member CDFIs that on-lend those loan proceeds to fund affordable housing, community facilities, small businesses, nonprofit organizations, consumer finance, and other eligible financing extended by such CDFIs. OFN may borrow in increments of $2.0 million or more and may not borrow more than $7.5 million within the first 12 months immediately following the closing date of June 29, 2022. Each disbursement made by the Company will bear interest at a rate of 0.75% per annum and will be due quarterly from OFN. The outstanding principal, plus any accrued and unpaid interest, for each disbursement becomes due and payable 10 years following the disbursement date. During the year ended December 31, 2023, the Company made one loan disbursement of $2.5 million. In January 2024, the Company made an additional loan disbursement of $7.5 million.

### Note 9. Redeemable Convertible Preferred Stock, Common Stock, and Stockholders' Equity

*Legacy Nextdoor Redeemable Convertible Preferred Stock*

Upon the completion of the Reverse Recapitalization on November 5, 2021, all outstanding shares of Legacy Nextdoor redeemable convertible preferred stock converted into Legacy Nextdoor common stock on a one-to-one basis, which were then converted into 190,477,421 shares of Nextdoor Class B common stock as a result of the Reverse Recapitalization, using the Exchange Ratio of 3.1057.

*Preferred Stock*

In connection with the Reverse Recapitalization, the Company's amended and restated certificate of incorporation became effective, which authorized the issuance of 50,000,000 shares of preferred stock with a par value of $0.0001 per share with such designations, voting, and other rights and preferences as may be determined from time to time by the Company's Board of Directors. As of December 31, 2023 and 2022, there were no shares of preferred stock issued or outstanding.

*Common Stock*

The Company was authorized to issue 2,500,000,000 shares of Class A common stock and 500,000,000 shares of Class B common stock as of December 31, 2023 and 2022. The rights, including the liquidation and dividend rights, of the Class A common stock and Class B common stock are substantially identical, other than voting and conversion rights. The holder of each share of Class A common stock is entitled to one vote per share and the holder of each share of Class B common stock is entitled to ten votes per share. Shares of Class B common stock are convertible into an equivalent number of shares of Class A common stock at the option of the holder or upon certain events upon the terms and conditions described in the Company's amended and restated certificate of incorporation. Class A common stock and Class B common stock are referred to, collectively, as common stock throughout the notes to these consolidated financial statements, unless otherwise indicated. Shares of common stock reserved for future issuance on an as-converted basis were as follows (in thousands):

|  | As of December 31, | |
|---|---|---|
|  | **2023** | **2022** |
| Stock options outstanding | 47,858 | 55,388 |
| Unvested restricted stock units (RSUs) | 33,515 | 21,986 |
| Shares reserved for future award issuances | 52,297 | 50,852 |
| Total | 133,670 | 128,226 |

*Common Stock Subject to Repurchase*

Certain stock option grant agreements permit exercise prior to vesting. Upon termination of service of an employee, the Company has the right to repurchase any unvested, but issued, common stock at the original purchase price. The consideration received for an exercise of an option is accounted for as a deposit of the exercise price and is recorded as a liability. Upon vesting of the shares pursuant to the grant agreements, the shares and related liability are reclassified into stockholders' equity. As of December 31, 2023, all shares of common stock subject to repurchase were fully vested with no balance remaining. As of December 31, 2022, the Company had $0.2 million recorded in accrued expenses and other current liabilities related to 101,593 unvested shares of common stock subject to repurchase.

Table of Contents

### Equity Incentive Plans

#### 2021 Equity Incentive Plan

In November 2021, the Company's Board of Directors and stockholders approved the Company's 2021 Equity Incentive Plan (the "2021 Plan") as a successor to the 2018 Equity Incentive Plan (the "2018 Plan"), with the purpose of granting stock-based awards to employees, directors, officers, and consultants, including stock options, restricted stock awards, and RSUs.

The Company initially reserved for issuance under the 2021 Plan (a) 46,008,885 shares of Class A common stock, plus (b) shares that are subject to issuance upon exercise of options granted under the 2018 Plan prior to the Closing but which, after the Closing, cease to be subject to the option for any reason other than exercise of the option, (c) shares that are subject to awards granted under the 2018 Plan prior to the Closing that, after the Closing, are forfeited or are repurchased by the Company at the original issue price, (d) shares that are subject to awards granted under the 2018 Plan prior to the Closing that, after the Closing, otherwise terminate without such shares being issued, and (e) shares that, after the Closing, are used to pay the exercise price of a stock option issued under the 2018 Plan prior to the Closing or are withheld to satisfy the tax withholding obligations related to any award issued under the 2018 Plan prior to the Closing. The number of shares available for grant and issuance under the 2021 Plan will increase automatically on January 1 of each of 2022 through 2031 by the number of shares equal to the lesser of (i) five percent (5%) of the number of shares (rounded down to the nearest whole share) of Class A common stock and Class B common stock issued and outstanding on each December 31 immediately prior to the date of increase, or (ii) such number of shares determined by the Company's Board of Directors.

#### 2021 Employee Stock Purchase Plan

In November 2021, the Company's Board of Directors and stockholders approved the Company's 2021 Employee Stock Purchase Plan (the "2021 ESPP"). Over a series of offering periods, each of which may consist of one or more purchase periods, eligible employees will be offered the option to purchase shares of Class A common stock at 85% of the lesser of the fair market value of Class A common stock on (i) the first business day of the applicable offering period and (ii) the date of purchase. Under the 2021 ESPP, the Company initially reserved 8,901,159 shares of Class A common stock for issuance, and the aggregate number of shares reserved will increase automatically on January 1 of each of 2022 through 2031 by the number of shares equal to the lesser of (i) one percent (1%) of the total number of outstanding shares of Class A common stock and Class B common stock as of the immediately preceding December 31, or (ii) a number of shares as may be determined by the Company's Board of Directors. The aggregate number of shares issued over the term of the 2021 ESPP, subject to adjustments for stock-splits, recapitalizations, or similar events, may not exceed 89,011,590 shares. In February 2022, the Company commenced its first offering period under the 2021 ESPP. During the years ended December 31, 2023 and 2022, 1,028,778 and 551,765 shares of Class A common stock were purchased under the 2021 ESPP, respectively.

#### Share Repurchase Program

On May 31, 2022, the Company's Board of Directors authorized and approved a share repurchase program (the "Share Repurchase Program") to repurchase up to $100.0 million in aggregate of the Company's Class A common stock, with the authorization to expire on June 30, 2024. Repurchases of Class A common stock under the Share Repurchase Program may be made from time to time, on the open market, in privately negotiated transactions or by other methods, and in accordance with the limitations set forth in Rule 10b-18 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and other applicable legal requirements. The timing of any repurchases will depend on market conditions and other investment opportunities, and will be made at the Company's discretion. As of December 31, 2023 the Company anticipates that the Share Repurchase Program will extend through June 30, 2024, or such shorter period if $100.0 million in aggregate of shares of the Company's Class A common stock have been repurchased. The Share Repurchase Program does not obligate the Company to repurchase any dollar amount or number of shares, and the program may be extended, modified, suspended, or discontinued at any time.

When the Company repurchases shares under the Share Repurchase Program, it reduces the common stock component of stockholders' equity by the par value of the repurchased shares. The excess of the repurchase price over par value is recorded to additional paid-in capital. All repurchased shares are retired and become authorized and unissued shares.

During the year ended December 31, 2023, the Company did not repurchase or retire any shares of its Class A common stock. During the year ended December 31, 2022, the Company repurchased and retired 23,251,703 shares of Class A common stock at an average purchase price of $3.32 per share for an aggregate repurchase price of $77.2 million. As of December 31, 2023, the Company had $22.8 million available for future share repurchases under the Share Repurchase Program.

On February 21, 2024, the Company's Board of Directors authorized and approved an increase of $150.0 million to the Share Repurchase Program and extended the expiration date to March 31, 2026.

Table of Contents

*Stock Options and RSUs*

The Company may grant options to acquire shares of Class A common stock to employees, directors, officers, and consultants at a price not less than the fair market value of the shares at the date of grant. Options granted to a person who, at the time of the grant, owns more than 10% of the voting power of all classes of stock shall be at no less than 110% of the fair market value and expire five years from the date of grant. All other options generally have a contractual term of ten years. Options granted generally vest on a monthly basis over two to three years. RSUs granted for Class A common stock generally vest on a quarterly basis over two to three years.

A summary of the Company's stock option activity for the year ended December 31, 2023 and related information is as follows (in thousands, except per share data):

| | Number of Options | | Weighted- Average Exercise Price | Weighted Average Remaining Contractual Term (years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding at December 31, 2022 | 55,388 | $ | 2.67 | 7.5 | $ | 10,552 |
| Options granted | 4,409 | $ | 2.08 | | | |
| Options exercised | (3,523) | $ | 2.04 | | | |
| Options forfeited or expired | (8,416) | $ | 3.16 | | | |
| Outstanding at December 31, 2023 | 47,858 | $ | 2.58 | 5.2 | $ | 8,196 |
| Exercisable at December 31, 2023 | 34,698 | $ | 2.20 | 4.0 | $ | 7,903 |
| Vested or expected to vest at December 31, 2023 | 47,858 | $ | 2.58 | 5.2 | $ | 8,196 |

The intrinsic value is calculated as the difference between the exercise price of the underlying common stock option award and the fair value of the Company's common stock as of the respective balance sheet date. The weighted average grant date fair value of options granted was $1.32 per share, $2.47 per share and $3.63 per share during the years ended December 31, 2023, 2022 and 2021, respectively.

The intrinsic value of the options exercised was $2.2 million, $14.0 million and $31.9 million for the years ended December 31, 2023, 2022 and 2021, respectively.

A summary of the Company's RSU activity for the year ended December 31, 2023 and related information is as follows (in thousands, except per share data):

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2022 | 21,986 | $ | 4.25 |
| RSUs granted | 34,517 | $ | 2.13 |
| RSUs vested | (12,292) | $ | 3.39 |
| RSUs forfeited | (10,696) | $ | 3.42 |
| Unvested at December 31, 2023 | 33,515 | $ | 2.64 |

*Valuation Assumptions*

The Company's use of the Black-Scholes option-pricing model to estimate the fair value of stock options granted requires the input of highly subjective assumptions. These assumptions were estimated as follows:

*Fair value of the underlying common stock* – Prior to the Reverse Recapitalization, the Board of Directors considered numerous objective and subjective factors to determine the fair value of the Company's common stock including, but not limited to: (i) the results of contemporaneous third-party valuations of the Company's common stock; (ii) the prices, rights, preferences, and privileges of the Company's redeemable convertible preferred stock relative to those of its common stock; (iii) the lack of marketability of the Company's common stock; (iv) actual operating and financial results; (v) current business conditions and projections; (vi) the likelihood of achieving a liquidity event, such as an initial public offering, merger, or acquisition of the Company, given prevailing market conditions; (vii) transactions involving the Company's shares; (viii) the history and nature of its business, industry trends and competitive environment; and (iv) general economic outlook. After the Reverse Recapitalization, the fair value of

Table of Contents

the underlying common stock is determined by the closing price, on the date of grant, of the Company's Class A common stock, which is traded on the New York Stock Exchange.

*Expected volatility* – Expected volatility is a measure of the amount by which the stock price is expected to fluctuate. Since the Company does not have sufficient trading history of its common stock, it estimates the expected volatility of its stock options at their grant date by taking the weighted average historical volatility of a group of comparable publicly traded companies over a period equal to the expected term of the options.

*Expected term* – The Company determines the expected term based on the average period the stock options are expected to remain outstanding using the simplified method, calculated as the midpoint of the stock options' vesting term and contractual expiration period, as the Company does not have sufficient historical information to develop reasonable expectations about future exercise patterns and post-vesting employment termination behavior.

*Risk-free rate* – The Company uses the U.S. Treasury yield for its risk-free interest rate that corresponds with the expected term.

*Expected dividend yield* – The Company utilizes a dividend yield of zero, as it does not currently issue dividends and does not expect to in the future.

The following assumptions were used to calculate the fair value of stock option grants made during the following periods:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2023** | **2022** | **2021** |
| Expected volatility | 64.9%- 72.7% | 53.9% - 61.2% | 53.7% -54.5% |
| Expected term (years) | 5.0 - 6.2 | 6.1 | 6.3 |
| Risk-free interest rate | 3.4% - 4.7% | 3.1% | 1.1% |
| Expected dividend yield | — | — | — |
| Fair value of common stock per share | $1.44 - $3.31 | $1.99 - $6.06 | $4.92 - $6.83 |

### *Stock-Based Compensation*

The Company recorded stock-based compensation expense in the consolidated statements of operations as follows (in thousands):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2023** | **2022** | **2021** |
| Cost of revenue | $ 3,201 | $ 2,627 | $ 1,466 |
| Research and development | 43,619 | 35,567 | 20,690 |
| Sales and marketing | 12,548 | 10,160 | 6,388 |
| General and administrative | 23,657 | 16,066 | 18,970 |
| Total | $ 83,025 | $ 64,420 | $ 47,514 |

As of December 31, 2023, there was $105.7 million of unrecognized stock-based compensation expense, which is expected to be recognized over a weighted average period of 1.6 years.

Table of Contents

**Note 10. Net Loss Per Share Attributable to Common Stockholders**

The following table sets forth the computation of basic and diluted net loss per share attributable to common stockholders (in thousands, except per share data):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2021 | |
| | Class A | Class B | Class A | Class B | Class A | Class B |
| Net loss attributable to common stockholders | $ (65,975) | $ (81,790) | $ (46,344) | $ (91,572) | $ (8,032) | $ (87,293) |
| Weighted average shares used in computing net loss per share attributable to Class A and Class B common stockholders, basic and diluted | 169,331 | 209,923 | 127,266 | 251,465 | 12,330 | 134,007 |
| Net loss per share attributable to Class A and Class B common stockholders, basic and diluted | $ (0.39) | $ (0.39) | $ (0.36) | $ (0.36) | $ (0.65) | $ (0.65) |

The following potentially dilutive securities outstanding have been excluded from the computations of diluted net loss per share because such securities have an anti-dilutive impact due to losses reported (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Outstanding stock options | 47,858 | 55,388 | 58,278 |
| Unvested RSUs | 33,515 | 21,986 | 2,511 |
| Unvested early exercised stock options subject to repurchase | — | 102 | 422 |
| Unvested restricted stock | — | — | 3,210 |
| Shares issuable pursuant to the employee stock purchase plan | 1,828 | 2,566 | — |
| Contingently issuable shares | 7 | 7 | 181 |
| Total | 83,208 | 80,049 | 64,602 |

**Note 11. Employee Benefit Plan**

The Company has a 401(k) plan (the "401(k) Plan") covering all eligible employees in the United States. The Company is allowed to make discretionary profit sharing and qualified non-elective contributions as defined by the 401(k) Plan and as approved by the Board of Directors. The Company matches a portion of eligible participants' 401(k) contributions. The Company's match totaled $1.7 million, $1.4 million and $1.1 million for the years ended December 31, 2023, 2022 and 2021, respectively. No discretionary profit-sharing contributions have been made to date.

**Note 12. Income Taxes**

Loss before income taxes were as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Domestic | $ (147,786) | $ (138,883) | $ (94,693) |
| Foreign | 777 | 2,640 | (475) |
| Loss before income taxes | $ (147,009) | $ (136,243) | $ (95,168) |

Table of Contents

Provision for income taxes was as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| **Current:** | | | |
| Federal | $ — | $ — | $ — |
| State | 74 | 343 | 146 |
| Foreign | 1,321 | 1,560 | 11 |
| Total current provision for income taxes | 1,395 | 1,903 | 157 |
| **Deferred:** | | | |
| Federal | — | — | — |
| State | — | — | — |
| Foreign | (639) | (230) | — |
| Total deferred provision for income taxes | (639) | (230) | — |
| Total provision for income taxes | $ 756 | $ 1,673 | $ 157 |

Income tax expense (benefit) differed from the amount computed by applying the federal statutory income tax rate to pretax loss as a result of the following:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Statutory rate | (21.0)% | (21.0)% | (21.0)% |
| State tax | 0.1 | 0.2 | 0.2 |
| Permanent items | 0.8 | 0.9 | 0.7 |
| Transaction costs | — | — | (4.8) |
| Stock-based compensation | 5.8 | 5.3 | 6.6 |
| R&D credit | (3.2) | (3.2) | (4.2) |
| Other | — | 0.5 | — |
| Changes in valuation allowance | 18.0 | 18.5 | 22.8 |
| Foreign rate differential | — | — | (0.1) |
| Effective tax rate | 0.5 % | 1.2 % | 0.2 % |

Tax effects of significant items comprising the Company's deferred taxes were as follows (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| Deferred tax assets: | | |
| Net operating loss | $ 104,693 | $ 95,567 |
| Credit carryforwards | 22,382 | 18,564 |
| Stock-based compensation | 11,609 | 8,071 |
| Lease liability | 16,247 | 14,945 |
| Reserves, accruals and other | 2,833 | 1,948 |
| Capitalized R&D | 37,270 | 22,944 |
| Other | 1,646 | 1,252 |
| Total deferred tax assets | 196,680 | 163,291 |
| Valuation allowance | (181,884) | (150,294) |
| Total deferred tax assets, net | 14,796 | 12,997 |
| Deferred tax liabilities: | | |
| ROU asset basis | (13,900) | (12,752) |
| Total deferred tax liabilities | (13,900) | (12,752) |
| Net deferred tax assets | $ 896 | $ 245 |

Table of Contents

Based upon available objective evidence, management believes it is more likely than not that the U.S. net deferred tax assets will not be fully realizable. Accordingly, the Company has established a full valuation allowance for its U.S. net deferred tax assets. The valuation allowance increased by $31.6 million and $29.4 million, respectively, during 2023 and 2022.

As of December 31, 2023, the Company had federal net operating loss carryforwards of $413.6 million, which begin to expire in 2028, and state net operating loss carryforwards of $280.8 million, which begin to expire in 2029. Of the $413.6 million U.S. federal net operating losses $234.2 million is carried forward indefinitely but is limited to 80% of current year taxable income. As of December 31, 2023, the Company had federal tax credits of $26.7 million, which begin to expire in 2028, and state tax credits of $22.8 million, which do not expire. The Internal Revenue Code ("IRC") limits the amount of net operating loss carryforwards that a company may use in a given year in the event of certain cumulative changes in ownership over a three-year period as described in Section 382 of the IRC. Utilization of net operating loss carryforwards and credits may be subject to a substantial annual limitation due to the ownership change limitations provided by the IRC, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating losses and credits before utilization.

The Company accounts for uncertainty in income taxes in accordance with ASC 740 *Income Taxes*. Tax positions are evaluated in a two-step process, whereby the Company first determines whether it is more likely than not that a tax position will be sustained upon examination by the tax authority, including resolutions of any related appeals or litigation processes, based on technical merit. If a tax position meets the more-likely-than-not recognition threshold it is then measured to determine the amount of benefit to recognize in the financial statements. The tax position is measured as the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement.

A reconciliation of the beginning and ending balances of unrecognized tax benefit were as follows (in thousands):

| | Year Ended December 31, | | | | | |
| | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Gross unrecognized tax benefits - beginning of year | $ | 18,564 | $ | 13,902 | $ | 10,143 |
| Increases related to current year tax positions | | 4,408 | | 4,662 | | 3,759 |
| Increases related to prior year tax positions | | 241 | | — | | — |
| Decreases related to prior year tax positions | | (600) | | — | | — |
| Gross unrecognized tax benefits - end of year | $ | 22,613 | $ | 18,564 | $ | 13,902 |

The amount of the Company's unrecognized tax benefits that would affect the Company's effective tax rate, if recognized, is $0.2 million. The Company does not believe it is reasonably possible that its unrecognized tax benefits will significantly change in the next twelve months.

The Company has net operating losses in the United States federal and various state jurisdictions for which the tax years beginning in 2007 are open to examination by applicable taxing authorities.

### Note 13. Geographical Information

Revenue disaggregated by geography based on the customers' location was as follows (in thousands):

| | Year Ended December 31, | | | | | |
| | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| United States | $ | 206,484 | $ | 204,449 | $ | 183,724 |
| International | | 11,825 | | 8,316 | | 8,473 |
| Total | $ | 218,309 | $ | 212,765 | $ | 192,197 |

Substantially all of the Company's long-lived assets are located in the United States.

### Note 14. Restructuring

In the fourth quarter of 2023, the Company announced a cost reduction plan (the "Cost Reduction Plan") intended to right-size the business and align the workforce and other expenses with Nextdoor's near term revenue expectations and long term business

Table of Contents

priorities. The Cost Reduction Plan included a reduction of the Company's full-time employee headcount by approximately 25%. The execution of the Cost Reduction Plan was substantially complete by the end of the fourth quarter of 2023.

The following table summarizes the restructuring charges in the consolidated statements of operations for the year ended December 31, 2023 (in thousands):

| | Severance and Related Charges | | Stock-Based Compensation Expense | | Total | |
|---|---|---|---|---|---|---|
| Research and development | $ | 5,141 | $ | 903 | $ | 6,044 |
| Sales and marketing | | 2,984 | | 228 | | 3,212 |
| General and administrative | | 1,763 | | 80 | | 1,843 |
| Total | $ | 9,888 | $ | 1,211 | $ | 11,099 |

Liabilities and remaining charges under the Cost Reduction Plan were $1.8 million as of December 31, 2023, included in accrued expenses and other current liabilities on the consolidated balance sheets.

**Note 15. Subsequent Events**

On February 21, 2024, the Company's Board of Directors authorized and approved an increase of $150.0 million to the Share Repurchase Program and extended the expiration deadline to March 31, 2026.

Repurchases of Class A common stock under the Share Repurchase Program may be made from time to time, on the open market, in privately negotiated transactions or by other methods, at the Company's discretion, and in accordance with the limitations set forth in Rule 10b-18 promulgated under the Exchange Act and other applicable federal and state laws and regulations. The timing of any repurchases will depend on market conditions and will be made at the Company's discretion. The Company currently anticipates that the Share Repurchase Program will extend through March 31, 2026, or such shorter period if the approximately $172.8 million in remaining capacity under the Share Repurchase Program is used to repurchase shares of the Company's Class A common stock.

The Share Repurchase Program does not obligate the Company to repurchase any dollar amount or number of shares, and the program may be extended, modified, suspended, or discontinued at any time.

On February 23, 2024, the Company announced that Nirav Tolia, co-founder of Nextdoor, will return to the company as Chief Executive Officer, President and Chairperson of the Board, and that Sarah Friar will step down as Chief Executive Officer, President and Chairperson of the Board, with an orderly transition in the second quarter of 2024.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report, and have concluded that, based on such evaluation, our disclosure controls and procedures were effective as of December 31, 2023 at the reasonable assurance level to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

**Management's annual report on internal control over financial reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2023 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the period covered by this Annual Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on the Effectiveness of Disclosure Controls and Procedures**

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well designed and implemented, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues within a company are detected. The inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple errors or mistakes. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected.

**Item 9B. Other Information**

**None.**

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not Applicable.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the fiscal year ended December 31, 2023, and is incorporated herein by reference.

**Item 11. Executive Compensation**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the fiscal year ended December 31, 2023, and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the fiscal year ended December 31, 2023, and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the fiscal year ended December 31, 2023, and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information required by this item will be included in our Proxy Statement for the 2024 Annual Meeting of Stockholders, to be filed with the SEC within 120 days of the fiscal year ended December 31, 2023, and is incorporated herein by reference.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules.**

(a) The following documents are filed as part of this report:

1. Financial Statements

See Index to Financial Statements under Part II, Item 8 of this Annual Report.

2. Financial Statement Schedules

Schedules not listed above have been omitted because they are not required, not applicable, or the required information is otherwise included.

3. Exhibits

The exhibits listed below are filed as part of this Annual Report or are incorporated herein by reference as indicated.

| Exhibit Number | Description | Incorporated by Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date |
| 2.1† | Agreement and Plan of Merger, dated as of July 6, 2021, by and among the Khosla Ventures Acquisition Co. II, Lorelei Merger Sub Inc. and Nextdoor, Inc., as amended (included as Annex A to the registration statement on Form S-4) | S-4 | 2.1 | October 1, 2021 |
| 3.1 | Amended and Restated Certificate of Incorporation of Nextdoor Holdings, Inc. | 8-K | 3.1 | November 12, 2021 |
| 3.2 | Amended and Restated Bylaws of Nextdoor Holdings, Inc. | 8-K | 3.1 | December 1, 2022 |
| 4.1 | Specimen Class A Common Stock Certificate of Nextdoor Holdings, Inc. | 8-K | 4.1 | November 12, 2021 |
| 4.2* | Description of Registrant's Securities | | | |
| 10.1 | Form of Subscription Agreement | S-4 | 10.3 | October 1, 2021 |
| 10.2 | Amended and Restated Registration Rights Agreement, dated November 5, 2021, by and among Nextdoor Holdings, Inc. and the other parties thereto | 8-K | 10.5 | November 12, 2021 |
| 10.3+ | 2008 Equity Incentive Plan of Nextdoor, Inc. | S-4 | 10.24 | July 20, 2021 |
| 10.4+ | Form of Early Exercise Stock Option Grant under the 2008 Equity Incentive Plan | S-4 | 10.26 | July 20, 2021 |
| 10.5+ | Form of Stock Option Grant under the 2008 Equity Incentive Plan of Nextdoor, Inc. | S-4 | 10.27 | July 20, 2021 |
| 10.6+ | 2018 Equity Incentive Plan of Nextdoor, Inc. | S-4 | 10.25 | July 20, 2021 |
| 10.7+ | Form of Early Exercise Stock Option Grant under the 2018 Equity Incentive Plan of Nextdoor, Inc. | S-4 | 10.28 | July 20, 2021 |
| 10.8+ | Form of Stock Option Grant under the 2018 Equity Incentive Plan of Nextdoor, Inc. | S-4 | 10.29 | July 20, 2021 |
| 10.9+ | Form of Restricted Stock Unit Award Agreement under the 2018 Equity Incentive Plan of Nextdoor, Inc. | 8-K | 10.18 | November 12, 2021 |
| 10.10+ | Nextdoor Holdings, Inc. 2021 Equity Incentive Plan | 8-K | 10.7 | November 12, 2021 |
| 10.11+ | Form of Stock Option Agreement under Nextdoor Holdings, Inc. Equity Incentive Plan | S-4 | 10.15 | July 20, 2021 |
| 10.12+ | Form of Restricted Stock Unit Award Agreement under Nextdoor Holdings, Inc. Equity Incentive Plan | S-4 | 10.16 | July 20, 2021 |
| 10.13+ | Nextdoor Holdings, Inc. 2021 Employee Stock Purchase Plan | 8-K | 10.10 | November 12, 2021 |
| 10.14+ | Executive Offer Letter of Sarah Friar | S-4 | 10.18 | July 20, 2021 |

| 10.15+* | Executive Offer Letter of Matt Anderson | | | |
|---|---|---|---|---|
| 10.16+ | Executive Offer Letter of Heidi Andersen | S-4 | 10.20 | July 20, 2021 |
| 10.17+ | 2019 Incentive Compensation Plan of Heidi Andersen | S-4 | 10.22 | July 20, 2021 |
| 10.18+* | 2023 Incentive Compensation Plan of Heidi Andersen | | | |
| 10.19+ | Executive Offer Letter of John Orta | S-4 | 10.21 | July 20, 2021 |
| 10.20+ | Form of Indemnity Agreement | 8-K | 10.6 | November 12, 2021 |
| 10.21+ | Form of Change in Control and Severance Agreement | S-4 | 10.23 | July 20, 2021 |
| 10.22+ | Executive Offer Letter of Michael Doyle | S-4 | 10.19 | July 20, 2021 |
| 10.23* | Separation Agreement of Michael Doyle | | | |
| 21.1 | List of Subsidiaries | 8-K | 21.1 | November 12, 2021 |
| 23.1* | Consent of Ernst & Young, LLP, independent registered public accounting firm | | | |
| 24.1* | Power of Attorney (reference is made to the signature page thereto) | | | |
| 31.1* | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | |
| 31.2* | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | |
| 32.1# | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | |
| 32.2# | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | |
| 97.1* | Compensation Recovery Policy | | | |
| 101.INS* | Inline XBRL Instance Document. | | | |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document. | | | |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document. | | | |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document. | | | |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | |
| 104* | Cover Page Interactive Date File (formatted in iXBRL and contained in Exhibit 101) | | | |

---

†   Certain of the exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). We agree to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

+   Indicates a management contract or compensatory plan, contract or arrangement.

*   Filed herewith.

\#   This certification is deemed not filed for purpose of section 18 of the Exchange Act or otherwise subject to the liability of that section, nor shall it be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

## Item 16. Form 10-K Summary

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, in San Francisco, California.

**NEXTDOOR HOLDINGS, INC.**

Date:   February 27, 2024

By:   /s/ Sarah Friar

Name:   Sarah Friar

Title:   Chief Executive Officer, President and Chairperson of the Board of Directors

## POWER OF ATTORNEY

*KNOW ALL PERSONS BY THESE PRESENTS*, that each person whose signature appears below constitutes and appoints Sarah Friar and Matt Anderson, and each of them, as his or her true and lawful attorneys-in-fact, proxies and agents, each with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report and to file the same, with any exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto such attorneys-in-fact, proxies and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact, proxies and agents, or their or his or her substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Sarah Friar <br> Sarah Friar | Chief Executive Officer, President and Chairperson of the Board of Directors (Principal Executive Officer) | February 27, 2024 |
| /s/ Matt Anderson <br> Matt Anderson | Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) | February 27, 2024 |
| /s/ John Hope Bryant <br> John Hope Bryant | Director | February 27, 2024 |
| /s/ Dana Evan <br> Dana Evan | Director | February 27, 2024 |
| /s/ J. William Gurley <br> J. William Gurley | Director | February 27, 2024 |
| /s/ Mary Meeker <br> Mary Meeker | Director | February 27, 2024 |
| /s/ Jason Pressman <br> Jason Pressman | Director | February 27, 2024 |
| /s/ David Sze <br> David Sze | Director | February 27, 2024 |
| /s/ Nirav Tolia <br> Nirav Tolia | Director | February 27, 2024 |
| /s/ Chris Varelas <br> Chris Varelas | Director | February 27, 2024 |

**Exhibit 4.2**

**DESCRIPTION OF THE REGISTRANT'S CAPITAL STOCK REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

**General**

The following description of the capital stock of Nextdoor Holdings, Inc. (the "*Company*," "*we*," "*us*," and "*our*") and of certain provisions of our certificate of incorporation (the "*Certificate of Incorporation*") and bylaws (the "*Bylaws*") does not purport to be complete and is subject to our Certificate of Incorporation and our Bylaws, copies of which have been filed with the Securities and Exchange Commission, and the provisions of applicable law.

As of December 31, 2022, we had two classes of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"): Class A common stock, $0.0001 par value per share and Class B common stock, $0.0001 par value per share. Our authorized common stock consists of 2,500,000,000 shares of Class A common stock, 500,000,000 shares of Class B common stock, and 50,000,000 shares of undesignated preferred stock, $0.0001 par value per share. All shares of our common stock outstanding are fully paid and non-assessable.

**Class A Common Stock and Class B Common Stock**

*Dividend Rights*

Subject to preferences that may apply to any shares of convertible preferred stock outstanding at the time, the holders of shares of our common stock are entitled to receive dividends out of funds legally available if our Board of Directors, in its discretion, determines to issue dividends and then only at the times and in the amounts that the Board of Directors may determine.

*Voting Rights*

Each holder of shares of Class A common stock is entitled to one vote for each share of Class A common stock held on all matters submitted to a vote of stockholders and each holder of Class B common stock is entitled to 10 votes for each share of Class B common stock held on all matters submitted to a vote of stockholders. Holders of shares of Class A common stock and Class B common stock vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders, unless, otherwise required by Delaware law or the Certificate of Incorporation. Delaware law could require either holders of Class A common stock or Class B common stock to vote separately as a single class in the following circumstances:

- if the Company were to seek to amend the Certificate of Incorporation to increase or decrease the par value of a class of our common stock, then that class would be required to vote separately to approve the proposed amendment; and

- if the Company were to seek to amend the Certificate of Incorporation in a manner that alters or changes the powers, preferences, or special rights of a class of our common stock in a manner that affected its holders adversely, then that class would be required to vote separately to approve the proposed amendment.

The Company has not provided for cumulative voting for the election of directors in the Certificate of Incorporation. Accordingly, holders of a majority of the shares of our common stock are able to elect all of the Company's directors.

*No Preemptive or Similar Rights*

Our common stock is not entitled to preemptive rights, and is not subject to redemption or sinking fund provisions.

*Right to Receive Liquidation Distributions*

Upon the Company's liquidation, dissolution or winding-up, the assets legally available for distribution to the Company's stockholders would be distributable ratably among the holders of our common stock and any participating preferred stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights of and the payment of liquidation preferences, if any, on any outstanding shares of preferred stock.

*Conversion*

Each share of our Class B common stock is convertible into one share of our Class A common stock automatically, without further action by the Company immediately prior to the close of business on the earlier of (i) ten (10) years from the date of the Closing (defined below) and (ii) the date specified by an affirmative vote of the holders of Class B common stock representing not less than two-thirds (2/3) of the voting power of the outstanding shares of Class B common stock, voting separately as a single class.

**Preferred Stock**

Our Board of Directors is authorized, subject to limitations prescribed by Delaware law, to issue up to 50,000,000 shares of preferred stock in one or more series, to establish from time to time the number of shares to be included in each series, and to fix the designation, powers, preferences, and rights of the shares of each series and any of its qualifications, limitations or restrictions, in each case without further vote or action by our stockholders. Our Board of Directors can also increase or decrease the number of shares of any series of preferred stock, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. The number of authorized shares of our preferred stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting stock, without a separate vote of the holders of the preferred stock, irrespective of the provisions of Section 242(b)(2) of the DGCL, unless a separate vote of the holders of one or more series is required pursuant to the terms of any applicable certificate of designation. Our Board of Directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring, or preventing a change in the Company's control and might adversely affect the market price of our Class A common stock and the voting and other rights of the holders of our Class A common stock and Class B common stock. We do not currently plan to issue any shares of preferred stock.

**Anti-Takeover Provisions**

The provisions of the DGCL, our Certificate of Incorporation, and our Bylaws could have the effect of delaying, deferring or discouraging another person from acquiring control of the Company. These provisions, which are summarized below, are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and encourage persons seeking to acquire control of the Company to first negotiate with our Board of Directors. We believe that the benefits of increased protection of our potential ability to negotiate with an unfriendly or unsolicited acquirer outweigh the disadvantages of discouraging a proposal to acquire the Company because negotiation of these proposals could result in an improvement of their terms.

*Delaware Law*

The Company is subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the time that this stockholder becomes an interested stockholder, unless the business combination is approved in a prescribed manner. Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions:

- before the stockholder became interested, our Board of Directors approved either the business combination or the transaction, which resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction, which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans in some instances, but not the outstanding voting stock owned by the interested stockholder; or

- at or after the time the stockholder became interested, the business combination was approved by our Board of Directors and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock, which is not owned by the interested stockholder.

Section 203 defines a business combination to include:
- any merger or consolidation involving the corporation and the interested stockholder;

- any sale, transfer, lease, pledge, or other disposition involving the interested stockholder of 10% or more of the assets of the corporation;

- subject to exceptions, any transaction that results in the issuance of transfer by the corporation of any stock of the corporation to the interested stockholder;

- subject to exceptions, any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; and

- the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges, or other financial benefits provided by or through the corporation.

In general, Section 203 defines an interested stockholder as any entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by the entity or person.

### Certificate of Incorporation and Bylaws Provisions

The Certificate of Incorporation and the Bylaws include a number of provisions that may have the effect of deterring hostile takeovers, or delaying or preventing changes in control of the Company's management team or changes in our Board of Directors or the Company's governance or policy, including the following:

- **Dual Class Common Stock**. As described above in the section entitled "- *Class A Common Stock and Class B Common Stock - Voting Rights*," the Certificate of Incorporation provides for a dual class common stock structure pursuant to which holders of Class B common stock have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of outstanding Class A common stock and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of the Company or its assets. The Company's investors, executives, and employees will have the ability to exercise significant influence over those matters.

- **Board of Directors Vacancies**. The Certificate of Incorporation and the Bylaws authorize generally only our Board of Directors to fill vacant directorships resulting from any cause or created by the expansion of the Board of Directors. In addition, the number of directors constituting our Board of Directors may be set only by resolution adopted by a majority vote of the entire Board of Directors. These provisions prevent a stockholder from increasing the size of the Board of Directors and gaining control of our Board of Directors by filling the resulting vacancies with its own nominees.

- **Classified Board**. The Certificate of Incorporation and the Bylaws provide that the Board of Directors is classified into three classes of directors. The existence of a classified board of directors could delay a successful tender offeror from obtaining majority control of the Board of Directors, and the prospect of that delay might deter a potential offeror. For additional information, see the section entitled "*Management - Executive Officers and Directors - Classified Board of Directors*."

- **Directors Removed Only for Cause**. The Certificate of Incorporation provides that stockholders may remove directors only for cause and only by the affirmative vote of the holders of at least two-thirds of the voting power of the then-outstanding common stock.

- **Supermajority Requirements for Amendments of the Certificate of Incorporation and Bylaws**. The Certificate of Incorporation further provide that the affirmative vote of holders of at least two-thirds (2/3) of the voting power of all of the then outstanding shares of capital stock will be required to amend certain provisions of the Certificate of Incorporation, including provisions relating to the classified board, the size of the Board of Directors, removal of directors, special meetings, actions by written consent and designation of our preferred stock, provided that if two-thirds of the Board of Directors has approved such

amendment only the affirmative vote of a majority of the voting power of all of the then outstanding shares of capital stock shall be required to amend the Certificate of Incorporation. The affirmative vote of holders of at least two-thirds (2/3) of the voting power of all of the then outstanding shares of common stock will be required to amend or repeal the Bylaws, although the Bylaws may be amended by a simple majority vote of the Board of Directors. Additionally, in the case of any proposed adoption, amendment, or repeal of any provisions of the Bylaws that is approved by the Board of Directors and submitted to the stockholders for adoption, if two-thirds of the Board of Directors has approved such adoption, amendment, or repeal of any provisions of the Bylaws, then only the affirmative vote of a majority of the voting power of all of the then outstanding shares of common stock shall be required to adopt, amend, or repeal any provision of the Bylaws.

- ***Stockholder Action; Special Meetings of Stockholders***. The Certificate of Incorporation provides that the Company's stockholders may not take action by written consent, but may only take action at annual or special meetings of the Company's stockholders. As a result, holders of our common stock would not be able to amend the Bylaws or remove directors without holding a meeting of the Company's stockholders called in accordance with the Bylaws. The Certificate of Incorporation and the Bylaws provide that special meetings of the Company's stockholders may be called only by a majority of the Board of Directors, the chairman of the Board of Directors or the Company's chief executive officer, thus prohibiting a stockholder from calling a special meeting. These provisions might delay the ability of the Company's stockholders to force consideration of a proposal or for stockholders to take any action, including the removal of directors.

- ***Advance Notice Requirements for Stockholder Proposals and Director Nominations***. The Bylaws provide advance notice procedures for stockholders seeking to bring business before the Company's annual meeting of stockholders or to nominate candidates for election as directors at the Company's annual meeting of stockholders. The Bylaws also specify certain requirements regarding the form and content of a stockholder's notice. These provisions may preclude the Company's stockholders from bringing matters before the Company's annual meeting of stockholders or from making nominations for directors at the Company annual meeting of stockholders. We expect that these provisions might also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of the Company.

- ***No Cumulative Voting***. The DGCL provides that stockholders are not entitled to the right to cumulate votes in the election of directors unless a corporation's certificate of incorporation provides otherwise. The Certificate of Incorporation and Bylaws will not provide for cumulative voting.

- ***Issuance of Undesignated Preferred Stock***. The Board of Directors has the authority, without further action by the stockholders, to issue up to 50,000,000 shares of undesignated preferred stock with rights and preferences, including voting rights, designated from time to time by the Board of Directors. The existence of authorized but unissued shares of preferred stock enables the Board of Directors to render more difficult or to discourage an attempt to obtain control of the Company by means of a merger, tender offer, proxy contest or otherwise.

- ***Choice of Forum***. In addition, the Certificate of Incorporation provides that, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action or proceeding brought on the Company's behalf; any action asserting a breach of fiduciary duty; any action asserting a claim against the Company arising pursuant to the DGCL, the Certificate of Incorporation or the Bylaws; any action asserting a claim against the Company that is governed by the internal affairs doctrine; or any to interpret, apply, enforce, or determine the validity of the Certificate of Incorporation or Bylaws. The enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable. The Certificate of Incorporation will also provide that the federal district courts of the United States will, to the fullest extent permitted by law, be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act, or the Federal Forum Provision. While there can be no assurance that federal or state courts will follow the

holding of the Delaware Supreme Court which recently found that such provisions are facially valid under Delaware law or determine that the Federal Forum Provision should be enforced in a particular case, application of the Federal Forum Provision means that suits brought by the Company's stockholders to enforce any duty or liability created by the Securities Act must be brought in federal court and cannot be brought in state court. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all claims brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. In addition, the Federal Forum Provision applies, to the fullest extent permitted by law, to suits brought to enforce any duty or liability created by the Exchange Act. Accordingly, actions by the Company's stockholders to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder must be brought in federal court. The Company's stockholders will not be deemed to have waived the Company's compliance with the federal securities laws and the regulations promulgated thereunder. Any person or entity purchasing or otherwise acquiring or holding any interest in any of the Company's securities shall be deemed to have notice of and consented to the Company's exclusive forum provisions, including the Federal Forum Provision. These provisions may limit a stockholder's ability to bring a claim in a judicial forum of their choosing for disputes with the Company or the Company's directors, officers, or other employees, which may discourage lawsuits against the Company and the Company's directors, officers, and other employees.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock and Class B common stock is American Stock Transfer & Trust Company, LLC. The transfer agent's address is 6201 15th Avenue, Brooklyn, New York 11219.

# nextdoor

November 7, 2023

Matt Anderson
manderson@nextdoor.com

Dear Matt:

This letter agreement confirms your promotion to the role of Chief Financial Officer of Nextdoor, Inc. (the "**Company**")[1] effective November 7, 2023, and hereby amends and restates your prior offer letter, dated May 28, 2019 (the "**Prior Agreement**").

In your role as Chief Financial Officer of the Company you will report to the Company's Chief Executive Officer.

**1.** <u>**Cash Compensation**</u>. In this position, the Company will pay you an annual base salary of $475,000, subject to all applicable taxes and withholdings, payable in accordance with the Company's standard payroll schedule. Your pay will be periodically reviewed as a part of the Company's regular reviews of compensation.

**2.** <u>**Employee Benefits**</u>. You will continue to be eligible to participate in a number of Company-sponsored benefits to the extent that you comply with the eligibility requirements of each such benefit plan. The Company, in its sole discretion, may amend, suspend or terminate its employee benefits at any time, with or without notice. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

**3.** <u>**Termination Benefits**</u>. In connection with your promotion, you will be eligible to receive certain change in control and severance payments and benefits pursuant to a Change in Control and Severance Agreement (the "**Severance Agreement**") to be entered into between you and the Company at substantially the same time as the date of this offer letter, pursuant to the form attached to this offer letter as **Exhibit A**.

**4.** <u>**Confidentiality Agreement**</u>. By signing this letter agreement, you reaffirm the terms and conditions of the Employee Invention Assignment and Confidentiality Agreement by and between you and the Company.

**5.** <u>**Arbitration Agreement**</u>. By signing this letter agreement, you reaffirm the terms and conditions of the Arbitration Agreement by and between you and the Company.

**6.** <u>**No Conflicting Obligations**</u>. You understand and agree that by signing this letter agreement, you represent to the Company that your performance will not breach any other agreement to which you are a party and that you have not, and will not during the term of your employment with the Company, enter into any oral or written agreement in conflict with any of the provisions of this letter or the Company's policies. You are not to bring with you to the Company, or use or disclose to any person associated with the Company, any confidential or proprietary information belonging to any former employer or other person or entity with respect to which you owe an obligation of confidentiality under any agreement or otherwise. The Company does not need and will not use such information and we will assist you in any way possible to preserve and protect the confidentiality of proprietary information belonging to third parties. Also, we expect you to abide by any obligations to refrain from soliciting any person employed by or otherwise associated with any former employer and suggest that you refrain from having any contact with such persons until such time as any non-solicitation obligation expires.

**7.** <u>**Outside Activities**</u>. While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the

---

[1] Any reference to the Company will be understood to include any parent of the Company that employs you, including Nextdoor Holdings, Inc.

**nextdoor**

Company. In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

**8.   Equal Employment Opportunity**. The Company is an equal opportunity employer and conducts its employment practices based on business needs and in a manner that treats employees and applicants on the basis of merit and experience. The Company prohibits unlawful discrimination on the basis of race, color, religion, sex, pregnancy, national origin, citizenship, ancestry, age, physical or mental disability, veteran status, marital status, domestic partner status, sexual orientation, or any other consideration made unlawful by federal, state or local laws.

**9.   General Obligations**. As an employee, you will be expected to continue to adhere to the Company's standards of professionalism, loyalty, integrity, honesty, reliability and respect for all. You will also be expected to continue to comply with the Company's policies and procedures. The Company is an equal opportunity employer.

**10. At-Will Employment**. Your employment with the Company continues to be for no specific period of time. Your employment with the Company will continue to be on an "at will" basis, meaning that either you or the Company may terminate your employment at any time for any reason or no reason. The Company also reserves the right to modify or amend the terms of your employment at any time for any reason. Any contrary representations which may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Board of Directors.

**11. Withholdings**. All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

[Signature Page Follows]



This letter agreement supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter (other than the Severance Agreement), including, without limitation, the Prior Agreement. This letter will be governed by the laws of California, without regard to its conflict of laws provisions.

Very truly yours,

**NEXTDOOR, INC.**

/s/ Sarah Friar
By: **Sarah Friar**
**Chief Executive Officer**

**ACCEPTED AND AGREED:**

Matt Anderson

/s/ Matt Anderson
Signature

November 7, 2023
Date

[Signature Page to Amended and Restated Offer Letter]



## Exhibit A

## Change in Control and Severance Agreement

This Change in Control and Severance Agreement (the "**Agreement**") is entered into by and between Matt Anderson (the "**Executive**") and Nextdoor, Inc., a Delaware corporation (together with its parent, Nextdoor Holdings, Inc., the "**Company**"), effective as of November 7, 2023 (the "**Effective Date**").

**1.     Term of Agreement.**

This Agreement shall terminate the earlier of the third (3rd) anniversary of the Effective Date (the "**Expiration Date**") or the date the Executive's employment with the Company terminates for a reason other than a Qualifying Termination or CIC Qualifying Termination; *provided however*, if a definitive agreement relating to a Change in Control has been signed by the Company on or before the Expiration Date, then this Agreement shall remain in effect through the earlier of:

**(a)**     The date the Executive's employment with the Company terminates for a reason other than a Qualifying Termination or CIC Qualifying Termination, or

**(b)**     The date the Company has met all of its obligations under this Agreement following a termination of the Executive's employment with the Company due to a Qualifying Termination or CIC Qualifying Termination.

This Agreement shall renew automatically and continue in effect for three (3) year periods measured from the initial Expiration Date, unless the Company provides Executive notice of non-renewal at least three (3) months prior to the date on which this Agreement would otherwise renew. For the avoidance of doubt, and notwithstanding anything to the contrary in Section 2 or 3 below, the Company's non-renewal of this Agreement shall not constitute a Qualifying Termination or CIC Qualifying Termination, as applicable.

**2.     Qualifying Termination.** If the Executive is subject to a Qualifying Termination, then, subject to Sections 4, 8, and 9 below, Executive will be entitled to the following benefits:

**(a)**     **Severance Benefits.** The Company shall pay the Executive six (6) months of his/her monthly base salary (at the rate in effect immediately prior to the actions that resulted in the Qualifying Termination). The Executive will receive his or her severance payment in a cash lump-sum in accordance with the Company's standard payroll procedures, which payment will be made no later than the first regular payroll date occurring after the sixtieth (60th) day following the Separation, *provided that* the Release Conditions have been satisfied.

**(b)**     **Continued Employee Benefits.** If Executive timely elects continued coverage under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), the Company shall pay the full amount of Executive's COBRA premiums on behalf of the Executive for the Executive's continued coverage under the Company's health, dental and vision plans, including coverage for the Executive's eligible dependents, for a period of six (6) months following the Executive's Separation or, if earlier, until Executive is eligible to be covered under another substantially equivalent medical insurance plan by a subsequent employer. Notwithstanding the foregoing, the Company may elect to provide Executive, in lieu of any portion of such continued coverage, taxable installment payments equal in amount to the applicable premiums in effect as of Executive's Separation for the remainder of the COBRA continuation period; *provided that*, Executive shall have no right to an additional gross-up payment to account for the fact that such COBRA premium amounts are paid on an after-tax basis.

**3.     CIC Qualifying Termination.** If the Executive is subject to a CIC Qualifying Termination, then, subject to Sections 4, 8, and 9 below, Executive will be entitled to the following benefits:

**(a)**     **Severance Payments.** The Company or its successor shall pay the Executive twelve (12) months of his/her monthly base salary and an amount equal to his/her annual target bonus at 100% achievement of target, in each case, at the rate in effect immediately prior to the actions that resulted in the Separation. Such payment shall be paid in a cash lump sum in accordance with the Company's standard payroll procedures, which payment will be made no later than the first regular payroll date occurring after the sixtieth (60th) day following the Separation, *provided that* the Release Conditions have been satisfied. For the avoidance of doubt, in the event that a Change in Control occurs within three (3) months following a Qualifying Termination, then, provided that such Qualifying

**nextdoor**

Termination followed a Potential Change in Control, then in addition to any prior payments under Section 2(a), Executive shall receive an additional payment in order to provide the benefits described in this Section 3(a).

        **(b)**        **Equity.** Each of Executive's then outstanding Equity Awards, other than awards that vest on the satisfaction of performance criteria, shall accelerate and become vested and exercisable as to 100% of the total shares underlying such Equity Awards. As to outstanding Equity Awards that would vest only upon satisfaction of performance criteria, such awards shall accelerate and become vested and exercisable as if such awards had been achieved at the greater of (x) actual achievement (if measurable on the date of Executive's Separation) or (y) target levels; provided, however, that the Company may specify, in any individual Equity Award agreement, that the acceleration provisions of such award agreement shall specifically overwrite the acceleration provisions set forth herein. Subject to Section 4, the accelerated vesting described above shall be effective as of the Separation. For the avoidance of doubt, in order to give effect to the acceleration contemplated by this Section 3(b), each of Executive's outstanding Equity Awards shall remain outstanding and eligible for the vesting acceleration contemplated by this Section 3(b) for a period of three (3) months following a Qualifying Termination.

        **(c)**        **COBRA; Pay in Lieu of Continued Employee Benefits.** Continuation of COBRA or a cash benefit, in both cases on the same terms as set forth in Section 2(b) above, for a period of twelve (12) months following the Executive's Separation or, if earlier, until Executive is eligible to be covered under another substantially equivalent medical insurance plan by a subsequent employer.

**4.**        **General Release.** Any other provision of this Agreement notwithstanding, the benefits under Section 2 and 3 shall not apply unless the Executive (i) has executed a general release of all known and unknown claims that he or she may then have against the Company or persons affiliated with the Company and such release has become effective and (ii) has agreed not to prosecute any legal action or other proceeding based upon any of such claims. The release must be in the form prescribed by the Company, without alterations (this document effecting the foregoing, the "**Release**"). The Company will deliver the form of Release to the Executive within thirty (30) days after the Executive's Separation. The Executive must execute and return the Release within the time period specified in the form and in any event no later than sixty (60) days following the date of Executive's Separation.

**5.**        **Accrued Compensation and Benefits.** Notwithstanding anything to the contrary in Sections 2 and 3 above, in connection with any termination of employment (whether or not a Qualifying Termination or CIC Qualifying Termination), the Company shall pay Executive's earned but unpaid base salary and other vested but unpaid cash entitlements for the period through and including the termination of employment, including unreimbursed documented business expenses incurred by Executive through and including the date of termination (collectively "**Accrued Compensation and Expenses**"), as required by law and the applicable Company plan or policy. In addition, Executive shall be entitled to any other vested benefits earned by Executive for the period through and including the termination date of Executive's employment under any other employee benefit plans and arrangements maintained by the Company, in accordance with the terms of such plans and arrangements, except as modified herein (collectively "**Accrued Benefits**"). Any Accrued Compensation and Expenses to which the Executive is entitled shall be paid to the Executive in cash as soon as administratively practicable after the termination, and, in any event, no later than two and one-half (2-1/2) months after the end of the taxable year of the Executive in which the termination occurs. Any Accrued Benefits to which the Executive is entitled shall be paid to the Executive as provided in the relevant plans and arrangements.

**6.**        **Definitions.**

        **(a)**        The term "**Cause**" means the occurrence of any of the following events, as reasonably determined by the Company:

        (i)        any willful and material violation by Executive of any law or regulation applicable to the business of the Company or a parent or subsidiary of the Company;

        (ii)        Executive's conviction for, or guilty plea to, a felony or a crime involving moral turpitude or any willful perpetration by Executive of a common law fraud;

        (iii)        Executive's commission of an act of personal dishonesty which involves personal profit in connection with the Company or any other entity having a business relationship with the Company;

        (iv)        any material breach by Executive of any provision of any agreement or understanding between the Company or any parent or subsidiary of the Company and Executive regarding the terms of Executive's

service as an employee to the Company or a parent or subsidiary of the Company, or any breach of any applicable invention assignment and confidentiality agreement or similar agreement between Executive and the Company;

(v)   Executive's disregard of the policies or regulations of the Company or any parent or subsidiary of the Company so as to cause material loss, damage or injury to the property, reputation or employees of the Company or a parent or subsidiary of the Company;

(vi)   Executive's failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested Executive's assistance; or

(vii)   Executive's willful and continuing failure to perform assigned duties after receiving written notification of the failure from the Company's Chief Executive Officer.

(b)   provided that the Company shall provide Executive with a written notice of the basis for a finding of Cause once known. Upon receiving such notice, Executive shall have a period of thirty (30) days to cure such Cause (if a cure is possible) to the satisfaction of the Company.

(c)   "**Code**" means the Internal Revenue Code of 1986, as amended.

(d)   "**Change in Control**." For all purposes under this Agreement, a Change in Control shall mean a "Corporate Transaction," as such term is defined in the Plan, *provided that* the transaction (including any series of transactions) also qualifies as a change in control event under U.S. Treasury Regulation 1.409A-3(i)(5)(v) or (vii).

(e)   "**CIC Qualifying Termination**" means a Separation (A) within twelve (12) months following a Change in Control or (B) within three (3) months preceding a Change in Control (but as to part (B), only if the Separation occurs after a Potential Change in Control) resulting, in either case (A) or (B), from (i) the Company terminating the Executive's employment for any reason other than Cause or (ii) the Executive voluntarily resigning his or her employment for Good Reason. A termination or resignation due to the Executive's death or disability shall not constitute a CIC Qualifying Termination. A "**Potential Change in Control**" means the date of execution of a legally binding and definitive agreement for a corporate transaction which, if consummated, would constitute the applicable Change in Control (which for the avoidance of doubt, would include a merger agreement, but not a term sheet for a merger agreement). In the case of a termination following a Potential Change in Control and before a Change in Control, solely for purposes of benefits under this Agreement, the date of Separation will be deemed the date the Change in Control is consummated.

(f)   "**Equity Awards**" means all options to purchase shares of common stock of Nextdoor Holdings, Inc., as well as all other stock-based awards granted to the Executive, including, but not limited to, stock bonus awards, restricted stock, restricted stock units and stock appreciation rights.

(g)   "**Good Reason**" means, without the Executive's written consent and provided (a) the Company receives, within thirty (30) days following the occurrence of any of the events set forth in clauses (i) through (iii) below, written notice from Executive indicating the specific basis for Executive's belief that Executive is entitled to terminate employment for Good Reason, (b) the Company fails to cure the event constituting Good Reason within thirty (30) days after receipt of such written notice thereof, and (c) Executive terminates employment within ten (10) days following expiration of such cure period or receipt from the Company of notice that it will not seek to cure: (i) a material decrease in Executive's annual base compensation, other than in connection with a general decrease applied to similarly-ranked executives of the Company; (ii) if Executive has a principal workplace (as set forth in Executive's offer letter or employment agreement, or as otherwise subsequently agreed by the Company and Executive) (the "***Principal Location***"), receipt of notice that Executive's principal workplace will be relocated more than twenty-five (25) miles from the Principal Location; or (iii) a material diminution in Executive's authority, duties, or responsibilities (provided, however, that having a similar position, authority, duties or responsibilities after a Change in Control with respect to a division or line of business, rather than a substantially comparable position, authority, reporting structure, duties or responsibilities with respect to the Company's successor or acquiror, as a whole, shall not alone be considered such a diminution and that a mere change in title, a change in the person or office to which you report shall not constitute "Good Reason").

(h)   "**Plan**" means the Nextdoor Holdings, Inc. 2021 Equity Incentive Plan, as may be amended from time to time.

**nextdoor**

(i)       "**Release Conditions**" mean the following conditions: (i) Company has received the Executive's executed Release and (ii) any rescission period applicable to the Executive's executed Release has expired (without Executive having rescinded the executed Release).

(j)       "**Qualifying Termination**" means a Separation that is not a CIC Qualifying Termination, but which results from (i) the Company terminating the Executive's employment for any reason other than Cause or (ii) the Executive voluntarily resigning his or her employment for Good Reason. A termination or resignation due to the Executive's death or disability shall not constitute a Qualifying Termination.

(k)       "**Separation**" means a "separation from service," as defined in the regulations under Section 409A of the Code.

**7.       Successors.**

(a)       **Company's Successors.** The Company shall require any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets, by an agreement in substance and form satisfactory to the Executive, to assume this Agreement and to agree expressly to perform this Agreement in the same manner and to the same extent as the Company would be required to perform it in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets or which becomes bound by this Agreement by operation of law.

(b)       **Executive's Successors.** This Agreement and all rights of the Executive hereunder shall inure to the benefit of, and be enforceable by, the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

**8.       Golden Parachute Taxes.**

(a)       **Best After-Tax Result.** In the event that any payment or benefit received or to be received by Executive pursuant to this Agreement or otherwise ("**Payments**") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code and (ii) but for this subsection (a), be subject to the excise tax imposed by Section 4999 of the Code, any successor provisions, or any comparable federal, state, local or foreign excise tax ("**Excise Tax**"), then, subject to the provisions of this Section 8, such Payments shall be either (A) provided in full pursuant to the terms of this Agreement or any other applicable agreement, or (B) provided as to such lesser extent which would result in no portion of such Payments being subject to the Excise Tax ("**Reduced Amount**"), whichever of the foregoing amounts, taking into account the applicable federal, state, local and foreign income, employment and other taxes and the Excise Tax (including, without limitation, any interest or penalties on such taxes), results in the receipt by Executive, on an after-tax basis, of the greatest amount of payments and benefits provided for hereunder or otherwise, notwithstanding that all or some portion of such Payments may be subject to the Excise Tax. Unless the Company and Executive otherwise agree in writing, any determination required under this Section shall be made by independent tax counsel designated by the Company and reasonably acceptable to Executive ("**Independent Tax Counsel**"), whose determination shall be conclusive and binding upon Executive and the Company for all purposes. For purposes of making the calculations required under this Section, Independent Tax Counsel may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code; *provided that* Independent Tax Counsel shall assume that Executive pays all taxes at the highest marginal rate. The Company and Executive shall furnish to Independent Tax Counsel such information and documents as Independent Tax Counsel may reasonably request in order to make a determination under this Section. The Company shall bear all costs that Independent Tax Counsel may reasonably incur in connection with any calculations contemplated by this Section. In the event that Section 8(a)(ii)(B) above applies, then based on the information provided to Executive and the Company by Independent Tax Counsel, Executive may, in Executive's sole discretion and within thirty (30) days of the date on which Executive is provided with the information prepared by Independent Tax Counsel, determine which and how much of the Payments (including the accelerated vesting of equity compensation awards) to be otherwise received by Executive shall be eliminated or reduced (as long as after such determination the value (as calculated by Independent Tax Counsel in accordance with the provisions of Sections 280G and 4999 of the Code) of the amounts payable or distributable to Executive equals the Reduced Amount). If the Internal Revenue Service (the "**IRS**") determines that any Payment is subject to the Excise Tax, then Section 8(b) hereof shall apply, and the enforcement of Section 8(b) shall be the exclusive remedy to the Company.

**nextdoor**

(b)     **Adjustments.** If, notwithstanding any reduction described in Section 8(a) hereof (or in the absence of any such reduction), the IRS determines that Executive is liable for the Excise Tax as a result of the receipt of one or more Payments, then Executive shall be obligated to surrender or pay back to the Company, within one-hundred twenty (120) days after a final IRS determination, an amount of such payments or benefits equal to the "**Repayment Amount.**" The Repayment Amount with respect to such Payments shall be the smallest such amount, if any, as shall be required to be surrendered or paid to the Company so that Executive's net proceeds with respect to such Payments (after taking into account the payment of the Excise Tax imposed on such Payments) shall be maximized. Notwithstanding the foregoing, the Repayment Amount with respect to such Payments shall be zero (0) if a Repayment Amount of more than zero (0) would not eliminate the Excise Tax imposed on such Payments or if a Repayment Amount of more than zero would not maximize the net amount received by Executive from the Payments. If the Excise Tax is not eliminated pursuant to this Section 8(b), Executive shall pay the Excise Tax.

9.     **Miscellaneous Provisions.**

(a)     **Section 409A.** To the extent (i) any payments to which Executive becomes entitled under this Agreement, or any agreement or plan referenced herein, in connection with Executive's termination of employment with the Company constitute deferred compensation subject to Section 409A of the Code and (ii) Executive is deemed at the time of such termination of employment to be a "specified" employee under Section 409A of the Code, then such payment or payments shall not be made or commence until the earlier of (i) the expiration of the six (6)-month period measured from the Executive's Separation; or (ii) the date of Executive's death following such Separation; *provided, however,* that such deferral shall only be effected to the extent required to avoid adverse tax treatment to Executive, including (without limitation) the additional twenty percent (20%) tax for which Executive would otherwise be liable under Section 409A(a)(1)(B) of the Code in the absence of such deferral. Upon the expiration of the applicable deferral period, any payments which would have otherwise been made during that period (whether in a single sum or in installments) in the absence of this paragraph shall be paid to Executive or Executive's beneficiary in one lump sum (without interest). Except as otherwise expressly provided herein, to the extent any expense reimbursement or the provision of any in-kind benefit under this Agreement (or otherwise referenced herein) is determined to be subject to (and not exempt from) Section 409A of the Code, the amount of any such expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the expenses eligible for reimbursement or in kind benefits to be provided in any other calendar year, in no event shall any expenses be reimbursed after the last day of the calendar year following the calendar year in which Executive incurred such expenses, and in no event shall any right to reimbursement or the provision of any in-kind benefit be subject to liquidation or exchange for another benefit. To the extent that any provision of this Agreement is ambiguous as to its exemption or compliance with Section 409A, the provision will be read in such a manner so that all payments hereunder are exempt from Section 409A to the maximum permissible extent, and for any payments where such construction is not tenable, that those payments comply with Section 409A to the maximum permissible extent. To the extent any payment under this Agreement may be classified as a "short-term deferral" within the meaning of Section 409A, such payment shall be deemed a short-term deferral, even if it may also qualify for an exemption from Section 409A under another provision of Section 409A. Payments pursuant to this Agreement (or referenced in this Agreement) are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the regulations under Section 409A.

(b)     **Other Arrangements.** This Agreement supersedes any and all cash severance arrangements and vesting acceleration arrangements under any agreement governing Equity Awards, severance and salary continuation arrangements, programs and plans which were previously offered by the Company to the Executive, including under any employment agreement or offer letter, and Executive hereby waives Executive's rights to such other benefits except as set forth in the succeeding sentence. In no event shall any individual receive cash severance benefits under both this Agreement and any other severance pay or salary continuation program, plan or other arrangement with the Company. For the avoidance of doubt, in no event shall Executive receive payment under both Section 2 and Section 3 with respect to Executive's Separation.

(c)     **Dispute Resolution.** Executive hereby acknowledges and agrees that his or her Arbitration Agreement with the Company remains in full force and effect and that any and all disputes arising in connection with this Agreement shall be solely governed by the terms and procedures set forth in Executive's Arbitration Agreement.

(d)     **Notice.** Notices and all other communications contemplated by this Agreement shall be in writing (including via email) and shall be deemed to have been duly given when (i) personally delivered, (ii) when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid or deposited with Federal Express Corporation, with shipping charges prepaid, or (iii) when sent by email, on the date that the email is received (provided that, if the time of deemed receipt is not before 5:30PM local time on a business day, it is deemed to have

been received at the commencement of business on the next business day). In the case of the Executive, mailed notices shall be addressed to him or her at the home address or email address which he or she most recently communicated to the Company. In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its Secretary.

(e)     **Waiver.** No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by the Executive and by an authorized officer of the Company (other than the Executive). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(f)     **Withholding Taxes.** All payments made under this Agreement shall be subject to reduction to reflect taxes or other charges required to be withheld by law.

(g)     **Severability.** The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision hereof, which shall remain in full force and effect.

(h)     **No Retention Rights.** Nothing in this Agreement shall confer upon the Executive any right to continue in service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or any subsidiary of the Company or of the Executive, which rights are hereby expressly reserved by each, to terminate his or her service at any time and for any reason, with or without Cause.

(i)     **Choice of Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California (other than its choice-of-law provisions).

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

**EXECUTIVE**                                                    **NEXTDOOR, INC.**

                                                                 By: _____
_____                                          Name: _____
Matt Anderson                                                    Title: _____



**NEXTDOOR, INC.**
**2023 INCENTIVE COMPENSATION PLAN**

This Nextdoor, Inc. ("***Nextdoor" or the "Company***") 2023 Incentive Compensation Plan (the "***Plan***") has been established as part of Nextdoor's overall effort to attract and retain high quality sales people and to reward those employees for meeting and exceeding the sales-related goals and objectives set by Nextdoor.

1. **Term**. The Plan shall be effective as of January 1, 2023 and shall continue until it is amended or terminated by Nextdoor in accordance with Section 9 below (the "***Plan Period***").

2. **Compensation Plan Overview**. Employees who are eligible to earn incentive compensation under this Plan are "***Participants***." Participants will be informed of their eligibility to earn incentive compensation under this Plan in Participant's offer letter, or through written confirmation of their transfer into a Plan-eligible role, and upon receipt of this Plan and an individualized quarterly compensation Schedule ("***Schedule***") setting forth the specific details of the Participant's potential incentive compensation. Participant's total potential quarterly compensation may consist of the following components:

   2.1. **Base Salary**. Base salary is Participant's regular monthly salary, paid in accordance with Nextdoor's established local payroll policies and practices, and is not considered incentive compensation.

   2.2. **Commission**. Participants may be eligible to earn commissions on sales activity ("***Commissions***") at the rates set forth in the Participant's Schedule and under the terms outlined below and in the Schedule.

   2.3. **MBO Bonus**. Participants may be eligible to earn a quarterly performance-based reward known as a Management by Objective Bonus (a "***MBO Bonus***") at the rates set forth in the Participant's Schedule and under the terms outlined below and in the Schedule. An MBO Bonus is designed to incentivize behaviors that will drive the long-term health of Nextdoor's business. The target and potential payout amount of the MBO Bonus, if any, will be outlined in the Participant's Schedule. The management objectives for the quarter will be set forth in the Participant's Schedule, and such objectives will be evaluated by Participant's assigned manager at the end of each quarter to determine whether and to what extent the objectives were achieved. A condition of earning any quarterly MBO Bonus is that the Participant must also be employed on the applicable quarterly payout date of any MBO Bonus.

   2.4. **SPIFFs**. Short-term or one-time bonus opportunities may be offered in connection with contests or similar short-term incentive effort (each, a "***SPIFF***"). SPIFFs may be announced from time to time, at Nextdoor's discretion, and the terms will be communicated to Participants via email or similar written announcement.

This Plan, the Participant's Schedule, and any SPIFF announcements govern the potential incentive compensation for the Participant, and constitute the entire agreement between the Company and the Participant regarding incentive compensation. In the event of any conflict between the Plan (on the one hand), and a Participant's Schedule and/or SPIFF announcement (on the other hand), the terms of this Plan will govern.

3. **Eligibility Criteria for Incentive Compensation**

   3.1. To be eligible to earn any Commissions under this Plan and the Schedule, Participant must:

EXHIBIT 10.18

      3.1.1.     Within **fifteen (15)** days of receipt of the Plan and Schedule sign and return the Plan and Schedule; and

      3.1.2.     Otherwise adhere to and meet the terms and conditions of the Plan and Schedule.

3.2. In order to be eligible to earn any MBO Bonus under this Plan and the Schedule, Participant must:

      3.2.1.     Within **fifteen (15)** days of receipt of the Plan and Schedule, sign and return the Plan and Schedule;

      3.2.2.     Be an employee of Nextdoor on the day on which the MBO Bonus is paid to Participants; and

      3.2.3.     Otherwise adhere to and meet the terms and conditions of the Plan and Schedule.

3.3. In order to be eligible to earn a SPIFF, Participant need only accomplish the criteria set forth in the SPIFF announcement and be an employee of Nextdoor on the day on which the SPIFF is paid to Participants. No signature will be required to participate or be eligible to receive a SPIFF, though Participant may be required to utilize a record-keeping mechanism determined by Nextdoor in order to track completion of the SPIFF criteria.

Employees who do not sign the Plan and Schedule will not be Participants, and therefore, are not eligible to earn or be paid any incentive compensation under the Plan.

4.  **Commissions and Quotas**. Commissions are incentive compensation paid based on Participant's achievement of an individually assigned quarterly sales quota ("***Sales Quota***").

    4.1. **Earned Commissions**. To earn Commissions, Participants must fulfill all conditions to earning set forth in this Plan and in accordance with the Participant's Schedule. Commissions are earned ("***Earned Commissions***") by the Participant when the following conditions are met:

      4.1.1.     The Participant completes an Order Form (as defined below) for a customer of Nextdoor, which is signed by the customer and the Company;

      4.1.2.     There are no outstanding obligations under the Order Form;

      4.1.3.     The Company issues an Invoice (as defined below) to the customer related to the Order Form;

      4.1.4.     The Company has received full payment from the customer in accordance with the terms set forth in the applicable Order Form and Invoice, and all related contingencies are extinguished; and

      4.1.5.     The Company has recognized the revenue related to the Order Form and Invoice under Generally Accepted Accounting Principles (GAAP) (as applied by the Company).

Nextdoor reserves the right to pay Commissions in advance of the date upon which the Commissions are earned (see Section 5.1 below). Commission Advances (defined below) do not constitute Earned Commissions and are subject to adjustments and Clawbacks if the Commission is not earned (see Section 5.2 below).

For the purposes of this Plan, the term "**Order Form**" shall be defined as an insertion order, a credit card payment record, a sales agreement between Nextdoor and customer, or any other mechanism by which a sale is made by Nextdoor. For the purposes of this Plan, the term "**Invoice**" shall be defined as a demand

for payment sent by Nextdoor or by a partner on behalf of Nextdoor, to a customer. For the purposes of this Plan, the term "**customer**" describes a prospective or existing Nextdoor paying customer, which may include advertisers, agencies, or other businesses.

4.2. **Sales Quotas**. A Participant who is eligible to earn Commissions will be assigned a Sales Quota in the Participant's Schedule. A Sales Quota is an individual or team target, as applicable, and is determined for a Participant in the Company's sole discretion based on a variety of factors, which may include past performance. The Participant's Schedule will outline the type and amount of a Participant's Sales Quota along with any terms, conditions, rules, designations, and provisions that apply to that Participant. Participants receive credit towards their Sales Quota for each executed Order Form that the Participant or Participant's team (as applicable) is directly responsible for leading and obtaining as set forth in Participants' schedules, and for which an Invoice has been generated, as determined in good faith by the Company. Sale Quotas are individualized and may vary at the Company's discretion. The Company reserves the right to adjust, amend or modify Sales Quotas at any time at the Company's sole discretion. Any such adjustments will be prospective in nature, and will not cause or result in a forfeiture of Earned Commissions.

4.3. **Commission Rates**. A Participant's specific Commission rate is set forth in the Schedule. The Company reserves the right to adjust the Commission rate at any time in its sole discretion, with or without advance notice. Any such adjustment will be prospective in nature, and will not cause or result in a forfeiture of Earned Commissions.

4.4. **Payment of Commissions**. A Participant's Sales Quota achievement and achievement toward Participant's MBO Bonus are measured on a quarterly basis. Quarterly Commission payments are typically calculated within sixty (60) days following the end of each calendar quarter. As a general rule, payments of Commissions are made to Participants as either a Commission Advance or Earned Commission within sixty (60) days following the end of each calendar quarter, so long as Commissions can be reasonably calculated as of that date. The timing of payment may depend on the jurisdiction, or as otherwise required by law. To ensure timely payments, Participants must enter all appropriate information fully and accurately in accordance with procedures established by Nextdoor. All amounts paid pursuant to this Plan are subject to deduction for all applicable taxes and other required or authorized withholdings.

5. **Commission Advances and Clawback**.

5.1. **Commission Advances**. Commissions paid as an unearned advance following the end of each calendar quarter are generally made on the assumption that revenue will be collected by Nextdoor. Any payment of Commissions made to a Participant prior to the date that all requirements of Section 4.1 have been met (e.g., the Company has not yet received payment from the customer) is an advance (each, a "*Commission Advance*") against expected Commissions earnings. Any Commission Advance will be paid in accordance with Section 4.4 above, unless the Participant's employment with the Company has terminated for any reason (or the Participant has notified the Company of the Participant's intention to resign) on or before that date, in which case no Commission Advance will be paid.

5.2. **Adjustments/Clawbacks for Advanced but Unearned Commissions**. If an Order Form is subsequently canceled, full payment is not received from the customer and the Company deems the amount to be uncollectible in accordance with its internal policies and procedures and writes such amount off the books as bad debt, or if any other condition in Section 4.1 above is not achieved, any unearned Commission Advances shall be deducted from future Commission Advances or Earned Commissions of the Participant, to the fullest extent permitted by applicable law ("*Clawbacks*"), at the Company's sole discretion. In no event will any Clawback be made against a Participant's base salary. Upon termination of employment, the Participant agrees (i) to return any Commission Advances for which no offset is possible to the Company within

ten (10) days of such termination of employment; and (ii) to sign any documents necessary to deduct Commission Advances or other advances of unearned wages from the employee's final paycheck as may be requested by the Company, to the maximum extent permitted by law. Clawbacks can be applied in the Company's discretion to any unearned payments to Participants.

*For example, in Q1 a Participant has a Sales Quota of $1M, and makes sales during Q1 of $1M. Participant's Q1 sales include Customer X, whose Invoice totaled $500,000. At the end of Q1, Nextdoor received payments equal to $500,000 from sales made by Participant, but the amount attributable to Customer X ($500,000) had not yet been collected by Nextdoor. Therefore, Participant received a Commission Advance based on the Company X's Invoice of $500,000 and Earned Commission based on the remaining $500,000 of sales made and collected during Q1. After the Commission Advance is paid to Participant, Customer X fails to pay $350,000 of the $500,000 due to the Company and Company writes the amount off the books as bad debt. Therefore, in Q3, the Company will deduct the Commission Advance based on $350,000 attributable to the Company's X's Invoice from Participant's Commissions for Q3. The deduction will result in a reduced Commission to the Participant in Q3, when the Clawback is applied.*

6. **Disqualification; Business Ethics; No Side Letters**. Nextdoor is committed to maintaining the highest ethical and business standards. Any fraud, misrepresentation or other malfeasance committed or aided by a Participant in connection with an Order Form or otherwise in connection with this Plan will be considered a serious violation of the Participant's professional duties, and may render the Participant disqualified from eligibility for participation in the Plan and/or ineligible to earn any or all Commissions, MBO Bonus or SPIFF bonus that the Participant would otherwise have been eligible for with respect to such Order Form and may be considered grounds for immediate termination of employment, to the fullest extent allowed by law. Such unethical acts include but are not limited to the following:

    6.1. Proposing or entering into any unauthorized "side letter" or into any other understanding with a customer that is not reflected in a written contract signed by an authorized representative of Nextdoor and delivered to Nextdoor's legal department;

    6.2. Making false statements or claims (e.g., knowingly misrepresenting facts to Nextdoor personnel, customers, or third parties with the intent to induce action or inaction, or reliance on the deception);

    6.3. Offering or providing bribes or kickbacks;

    6.4. Misusing Nextdoor's, a customer's, or partner's confidential information;

    6.5. Falsifying records or documents; or

    6.6. Failure to follow established Nextdoor policies, including sales policies and procedures set forth in this Plan or communicated to you in writing by Nextdoor legal, human resources, sales operations, or finance departments, any approval matrix issued in writing by Nextdoor.

7. **Leaves of Absences and Transfers**. A Participant on an approved leave of absence who performed work for the Company during the Plan Period will be eligible to receive Commissions attributable to Participant's sales activity prior to the date the leave commences, which will be paid pursuant to the timing set forth in Section 4. A Participant's Sales Quota may be adjusted at the Company's discretion to reflect a leave of absence, subject to any legal requirements. Participants who are promoted or transferred into another Company position in which they are no longer a Participant under this Plan will be eligible to receive Commissions attributable to sales activity by that Participant as of the effective transfer date. An employee who remains a Participant but receives a new Schedule will be eligible to receive Commissions based on the old Schedule through the effective date of the new Schedule and will be eligible to receive Commissions based on the new Schedule from the effective date of the new Schedule.

**EXHIBIT 10.18**

8.   **Employment Relationship; Termination of Employment**.

    8.1.**No Guarantee of Employment**. Participant acknowledges and understands that this Plan does not establish employment for any definite term and does not alter the at-will nature of Participant's employment relationship.

    8.2.**Termination of Employment**. A Participant whose employment with the Company terminates (for any reason) shall only be entitled to payment of Earned Commissions that are earned per Section 4.1 above as of the date of termination. Such Earned Commissions shall be paid in accordance with Section 4.4 unless otherwise required by applicable law. Because continued employment is a condition of earning a MBO Bonus or SPIFF award, a Participant will not be eligible to earn either if their employment ends before the payout date.

    8.3.**No Additional Commissions**. Except for Participant's Base Salary, Participant shall not be entitled to any compensation of any kind relating to sales or potential sales not specifically provided for in this Plan.

9.   **Amendment or Termination of Plan**. Nextdoor reserves and retains the right to modify, rescind or terminate this Plan, in whole or in part, at its sole discretion upon not less than ten (10) days prior written notice to Participants. Further, Nextdoor does not have any obligation under this Plan or otherwise to adopt this or any other compensation plan in the future. In the event of any amendments or modifications to the Plan, and if requested by Nextdoor, a Participant must execute an additional acknowledgment of such modifications or amendments to remain a Participant.

10.  **Entire Agreement**. This Plan, the Schedule and any SPIFF announcements together contain the entire understanding between a Participant and Nextdoor concerning the terms and conditions described herein and therein. Any prior understanding, representations, plans or agreements (including the 2019 Incentive Compensation Plan), whether oral or written, are superseded and replaced by this Plan. If any of the terms of this Plan expressly conflict with mandatory provisions of applicable law, such applicable law shall supersede the conflicting terms of this Plan.

Please sign below to acknowledge your receipt, review and acceptance of this Plan document.

**Acknowledged and Agreed to by Participant:**

Signature: _____

Print Name: _____

Date: _____

Exhibit 10.23

# nextdoor

November 7, 2023

Mike Doyle

Re:    Terms of Transition and Separation

Dear Mike:

This letter confirms the agreement ("**Agreement**") between you and Nextdoor, Inc. (together with its parent, "**Company**") concerning the terms of your transition and separation from employment and offers you the separation compensation we discussed in exchange for a general release of claims and covenant not to sue now and upon the Separation Date (as defined below).

1.    <u>Separation Date</u>: December 1, 2023 will be your last day of employment with the Company (the "**Separation Date**"), subject to the at-will nature of your employment during the Transition Period (as defined below). You resign from your position as Chief Financial Officer of the Company and any other positions you have as an officer or director of the Company or any of its subsidiaries, effective November 7, 2023.

2.    <u>Separation and Transition Compensation</u>: In exchange for your agreement to the general release and waiver of claims and covenant not to sue now and upon the Separation Date (as set forth below and on Exhibit A hereto) and your other promises herein, and consistent with the terms set forth in that Change in Control and Severance Agreement between you and the Company dated October 31, 2021 (the "**CIC Severance Agreement**"), the Company agrees to provide you with the following:

a.    <u>Transitional Period</u>: During the period between November 7, 2023 and the Separation Date (the "**Transition Period**"), you will continue to carry out certain duties and responsibilities to the Company, and provide transition services as may reasonably be requested by the Company, including transition of the responsibilities, duties, and knowledge relative to your position (the "**Transition Services**"). Your continued employment during the Transition Period is expressly conditioned upon you carrying out the Transition Services in a cooperative and diligent manner.

i.    <u>Compensation and Benefits</u>: During the Transition Period, the Company will continue to pay you your current base salary and you will continue to be eligible to participate in the benefits customarily afforded to other Company employees, including participation in the Company-

sponsored health benefits plan and continued vesting of Company equity awards, to the fullest extent permitted under the governing plan documents, agreements, and/or Company policies.

b.      <u>Separation Compensation</u>: Provided that you cooperatively and diligently carry out the Transition Services, as reasonably determined by the Company in its sole discretion, then, in exchange for your agreement to the general release and waiver of claims and covenant not to sue set forth in Exhibit A (the "***Second Release***"), to be signed no earlier than the Separation Date, and your other promises herein, the Company agrees as follows:

i.      <u>Severance</u>: The Company agrees to pay you, within ten (10) business days following the effectiveness of the Second Release (as provided therein) of this Agreement, a lump sum payment in the gross amount of $237,500, less applicable state and federal payroll deductions, which equals six (6) months of your base salary.

ii.     <u>COBRA</u>: Upon your timely election to continue your existing health benefits under COBRA, and consistent with the terms of COBRA and the Company's health insurance plan, the Company will pay the insurance premiums to continue your existing health benefits for six (6) months following the Separation Date. You will remain responsible for, and must continue to pay, the portion of premiums, co-payments, etc. that you would have paid had your employment continued.

By signing below, you acknowledge that you are receiving the separation compensation outlined in this section in consideration for waiving your rights to claims referred to in this Agreement (and the Second Release, if applicable) and that you would not otherwise be entitled to the separation compensation.

3.      <u>Return of Company Property</u>: You hereby warrant to the Company that, not later than your final date of employment, you will have returned to the Company all property or data of the Company of any type whatsoever that has been in your possession or control.

4.      <u>Post-Employment Obligations</u>: You hereby acknowledge that: (a) you continue to be bound by the attached Employee Invention Assignment and Confidentiality Agreement (<u>Exhibit B</u> hereto); (b) as a result of your employment with the Company, you have had access to the Company's proprietary and/or confidential information, and you will continue to hold all such information in strictest confidence and not make use of it on behalf of anyone; and (c) you must, and by your signature below confirm that you shall, deliver to the Company, no later than the Separation Date, all documents and data of any nature containing or pertaining to such information, and not take with you, or otherwise retain in any respect, any such documents or data or any reproduction thereof.

5.      <u>Stock Options and Restricted Stock Units</u>: The Company previously granted you certain awards of stock options (collectively, the "**Options**") and restricted stock units (collectively, the "**RSUs**") under the Company's 2018 Equity Incentive Plan (the "**2018 Plan**") and the Nextdoor Holdings, Inc. 2021 Equity Incentive Plan (the "**2021 Plan**" and together with the 2018 Plan, the "**Plans**"), as set forth in <u>Exhibit C</u> hereto. <u>Exhibit C</u> sets forth the unvested, vested, and exercised shares subject to the Options as of the Separation Date, and the unvested and vested shares

subject to the RSUs as of the Separation Date. Because your employment is terminating on the Separation Date, none of the unvested shares subject to your Options or RSUs can ever vest following the Separation Date. Your rights concerning the Options and RSUs will continue to be governed by their respective Plans, Stock Option Agreements and Restricted Stock Unit Agreements (collectively, the "**Stock Plan Agreements**"). Per the Stock Option Agreements governing the Options, you will have three (3) months following the Separation Date to exercise any unexercised vested shares subject to the Options. After this date, you will no longer have a right to exercise the Options as to any shares.

6.      General Release and Waiver of Claims:

a.      The payments and promises set forth in this Agreement and the Second Release are in full satisfaction of all of your rights pursuant to your CIC Severance Agreement, as well as all accrued salary, vacation pay, bonus and commission pay, profits haring, stock, stock options or other ownership interest in the Company, termination benefits or other compensation to which you may be entitled by virtue of your employment with the Company or your separation from the Company. To the fullest extent permitted by law, you hereby release and waive any claims you may have against the Company and its owners, agents, officers, shareholders, employees, directors, attorneys, subscribers, subsidiaries, affiliates, successors and assigns (collectively "**Releasees**"), whether known or not known, including, without limitation, claims under any employment laws, including, but not limited to, claims of unlawful discharge, breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of public policy, defamation, physical injury, emotional distress, claims for additional compensation or benefits arising out of your employment or your separation of employment, claims under Title VII of the 1964 Civil Rights Act, as amended, and any other laws and/or regulations relating to employment or employment discrimination, including, without limitation, claims under the Americans with Disabilities Act. By signing this Agreement, you are not releasing or waiving any claims under either the California Fair Employment and Housing Act, the Age Discrimination in Employment Act,the and/or Older Workers Benefit Protection Act; however, for the avoidance of doubt, you will release and waive such claims once you sign the Second Release.

b.      By signing below, you expressly waive any benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

c.      You and the Company do not intend to release claims that you may not release as a matter of law, including but not limited to claims for indemnity under California Labor Code Section 2802, or any claims for enforcement of this Agreement. To the fullest extent permitted by law, any dispute regarding the scope of this general release shall be determined by an arbitrator under the procedures set forth in the arbitration clause below.

7.   <u>Covenant Not to Sue</u>:

a.   To the fullest extent permitted by law, at no time subsequent to the execution of this Agreement will you pursue, or cause or knowingly permit the prosecution, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency, or any other tribunal, of any charge, claim or action of any kind, nature and character whatsoever, known or unknown, which you may now have, have ever had, or may in the future have against Releasees, which is based in whole or in part on any matter released by this Agreement.

b.   Nothing in this section shall prohibit or impair you or the Company from complying with all applicable laws, nor shall this Agreement be construed to obligate either party to commit (or aid or abet in the commission of) any unlawful act.

8.   <u>Protected Rights</u>: You understand that nothing in this Agreement, including the General Release and Waiver of Claims, Covenant Not to Sue, and Confidentiality sections contained herein, limits, impedes or restricts: (a) your ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board (the "***NLRB***"), the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local government agency or commission ("***Government Agencies***"); or (b) if you are a non-supervisory (as defined under the National Labor Relations Act (the "***NLRA***")) Company employee, you from exercising your protected rights under Section 7 of the NLRA, including your right to file an unfair labor practice charge with the NLRB and/or assist other current or former Company employees in doing so. You further understand that this Agreement does not limit your ability to communicate with any Government Agencies or otherwise participate and/or assist in any investigation or proceeding that may be conducted by any Government Agency, including providing documents (including this Agreement) or other information, without notice to the Company. This Agreement does not limit your right to receive an award for information provided to any Government Agencies or prohibit you from providing truthful information in response to a subpoena or other legal process.

9.   <u>Arbitration</u>: Except for any claim for injunctive relief arising out of a breach of a party's obligations to protect the other's proprietary information, the parties agree to arbitrate, in San Francisco, California through JAMS, any and all disputes or claims arising out of or related to the validity, enforceability, interpretation, performance or breach of this Agreement, whether sounding in tort, contract, statutory violation or otherwise, or involving the construction or application or any of the terms, provisions, or conditions of this Agreement. Any arbitration may be initiated by a written demand to the other party. The arbitrator's decision shall be final, binding, and conclusive. The parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law. The parties expressly waive any entitlement to have such controversies decided by a court or a jury.

10.   <u>Attorneys' Fees</u>: If any action is brought to enforce the terms of this Agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees, costs and expenses from the other party, in addition to any other relief to which the prevailing party may be entitled.

11.   <u>Confidentiality</u>: Subject to the Protected Rights section above, and otherwise to the fullest extent permitted by applicable law, the contents, terms and conditions of this Agreement must be kept confidential by you and may not be disclosed except to your immediate family, accountant or attorneys or pursuant to subpoena or court order.

12.   <u>No Admission of Liability</u>: This Agreement is not and shall not be construed or contended by you to be an admission or evidence of any wrongdoing or liability on the part of Releasees, their representatives, heirs, executors, attorneys, agents, partners, officers, shareholders, directors, employees, subsidiaries, affiliates, divisions, successors or assigns. This Agreement shall be afforded the maximum protection allowable under California Evidence Code Section 1152 and/or any other state or federal provisions of similar effect.

13.   <u>Complete and Voluntary Agreement</u>: This Agreement, together with the Exhibits hereto and the Stock Plan Agreements, constitute the entire agreement between you and Releasees with respect to the subject matter hereof and supersedes all prior negotiations and agreements, whether written or oral, relating to such subject matter (including, without limitation, the CIC Severance Agreement). You acknowledge that neither Releasees nor their agents or attorneys have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this Agreement for the purpose of inducing you to execute the Agreement, and you acknowledge that you have executed this Agreement in reliance only upon such promises, representations and warranties as are contained herein, and that you are executing this Agreement voluntarily, free of any duress or coercion.

14.   <u>Severability</u>: The provisions of this Agreement, including, without limitation, the Second Release, are severable, and if any part of it is found to be invalid or unenforceable, including, without limitation, any part of the General Release, Covenant Not to Sue, and/or Confidentiality sections herein, or the Non-disparagement provision in the Second Release, the other parts shall remain fully valid and enforceable. Specifically, should a court, arbitrator, or government agency conclude that a particular claim may not be released as a matter of law, it is the intention of the parties that the general release, the waiver of unknown claims and the covenant not to sue above shall otherwise remain effective to release any and all other claims.

15.   <u>Modification; Counterparts; Electronic/PDF Signatures</u>: It is expressly agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect except by another written agreement that specifically refers to this Agreement, executed by authorized representatives of each of the parties to this Agreement. This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Execution of an electronic or PDF copy shall have the same force and effect as execution of an original, and a copy of a signature will be admissible in any legal proceeding as if an original.

16.   <u>Review of Separation Agreement; Expiration of Offer</u>: You understand that you may take up to twenty-one (21) days to consider this Agreement following the initial date that this Agreement is delivered to you (and, for the avoidance of doubt, no subsequent changes to this Agreement (regardless of the nature or extent of such changes) shall impact this twenty-one (21) day review period). The offer set forth in this Agreement, if not accepted by you on the

Separation Date, will automatically expire. By signing below, you affirm that you were advised to consult with an attorney prior to signing this Agreement. You also understand you may revoke this Agreement within seven (7) days of signing this document and that the separation compensation to be provided to you pursuant to Section 2 will be provided only after both the expiration of that seven (7) day revocation period and the effectiveness of the Second Release (as set forth therein).

17.   <u>Effective Date</u>: This Agreement is effective on the eighth (8th) day after you sign it and without revocation by you (the "***Effective Date***").

18.   <u>Governing Law</u>: This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Mike Doyle
Page 7

      If you agree to abide by the terms outlined in this Agreement, please sign and return it to me. I wish you the best in your future endeavors.

                       Sincerely,

                       Nextdoor, Inc.

                       By:     <u>/s/ John Orta         </u>
                            John Orta, Head of Legal and Corporate       Development

READ, UNDERSTOOD AND AGREED

<u>/s/ Mike Doyle      </u>    Date: <u>November 29, 2023     </u>
Mike Doyle

**EXHIBIT A**

**SECOND RELEASE**

This General Release of All Claims and Covenant Not to Sue (the "***Second Release***") is entered into between Mike Doyle ("***Employee***") and Nextdoor, Inc. (the "***Company***") (collectively, "the parties").

**WHEREAS**, Employee and the Company entered into an agreement regarding Employee's transition and separation from employment with the Company (the "***Separation Agreement***," to which this Second Release is attached as Exhibit A);

**WHEREAS**, on December 1, 2023, Employee's employment with the Company terminated (the "***Separation Date***");

**WHEREAS**, the Company has determined that Employee cooperatively and diligently provided the Transition Services (as defined in the Separation Agreement);

**WHEREAS**, this agreement serves as the Second Release, pursuant to the Separation Agreement; and

**WHEREAS**, Employee and the Company desire to mutually, amicably and finally resolve and compromise all issues and claims surrounding Employee's employment and separation from employment with the Company;

**NOW THEREFORE**, in consideration for the mutual promises and undertakings of the parties as set forth below, Employee and the Company hereby enter into this Second Release.

1.     <u>Acknowledgment of Payment of Wages</u>: By signing below, Employee acknowledges that the Company: (a) has timely paid Employee for all wages, other compensation, and reimbursable expenses due Employee from the Company and (b) does not owe Employee any other amounts, except as may become payable under the Separation Agreement and the Second Release. Employee agrees to promptly submit for reimbursement all final outstanding expenses, if any.

2.     <u>Return of Company Property</u>: Employee hereby warrants to the Company that Employee has returned to the Company all property or data of the Company of any type whatsoever that has been in Employee's possession, custody or control.

3.     <u>Consideration</u>: In exchange for Employee's agreement to this Second Release and Employee's other promises in the Separation Agreement and herein, the Company agrees to provide Employee with the consideration set forth in Section 2(b) of the Separation Agreement. By signing below, Employee acknowledges that Employee is receiving the consideration in exchange for waiving Employee's rights to claims referred to in this Second Release and Employee would not otherwise be entitled to the consideration.

4.     <u>General Release and Waiver of Claims</u>:

a.      To the fullest extent permitted by law, Employee hereby releases and waives any claims Employee may have against the Company and its owners, agents, officers, shareholders, employees, directors, attorneys, subscribers, subsidiaries, affiliates, successors and assigns (collectively "***Releasees***"), whether known or not known, including, without limitation, claims under any employment laws, including, but not limited to, claims of unlawful discharge, breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of public policy, defamation, physical injury, emotional distress, claims for additional compensation or benefits arising out of Employee's employment or separation of employment, claims under Title VII of the 1964 Civil Rights Act, as amended, the California Fair Employment and Housing Act and any other laws and/or regulations relating to employment or employment discrimination, including, without limitation, claims based on age or under the Age Discrimination in Employment Act or Older Workers Benefit Protection Act, and/or claims based on disability or under the Americans with Disabilities Act.

b.      By signing below, Employee expressly waives any benefits of Section 1542 of the Civil Code of the State of California, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

c.      Employee and the Company do not intend to release claims that Employee may not release as a matter of law, including but not limited to claims for indemnity under California Labor Code Section 2802, or any claims for enforcement of this Second Release. To the fullest extent permitted by law, any dispute regarding the scope of this general release shall be determined by an arbitrator under the procedures set forth in the arbitration clause set forth in the Separation Agreement.

5.      Covenant Not to Sue: To the fullest extent permitted by law, at no time subsequent to the execution of this Second Release will Employee pursue, or cause or knowingly permit the prosecution, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency, or any other tribunal, of any charge, claim or action of any kind, nature and character whatsoever, known or unknown, which Employee may now have, have ever had, or may in the future have against Releasees, which is based in whole or in part on any matter released by this Second Release. Nothing in this section shall prohibit or impair Employee or the Company from complying with all applicable laws, nor shall this Second Release be construed to obligate either party to commit (or aid or abet in the commission of) any unlawful act.

6.      Protected Rights: Employee understands that nothing in this Second Release, including the General Release and Waiver of Claims, Covenant Not to Sue and Non-disparagement sections contained herein, limits, impedes or restricts: (a) Employee's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board (the "***NLRB***"), the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local government agency or commission ("***Government Agencies***"); or (b) if Employee is a non-supervisory (as defined under the

National Labor Relations Act (the "***NLRA***")) Company employee, Employee from exercising Employee's protected rights under Section 7 of the NLRA, including Employee's right to file an unfair labor practice charge with the NLRB and/or assist other current or former Company employees in doing so. Employee further understands that this Second Release does not limit Employee's ability to communicate with any Government Agencies or otherwise participate and/or assist in any investigation or proceeding that may be conducted by any Government Agency, including providing documents (including this Second Release) or other information, without notice to the Company. This Second Release does not limit Employee's right to receive an award for information provided to any Government Agencies or prohibit you from providing truthful information in response to a subpoena or other legal process.

7.  <u>Non-disparagement</u>: Subject to the Protected Rights section above, and otherwise to the fullest extent permitted by applicable law, Employee agrees that Employee will not, directly or indirectly, make any disparaging oral or written statements that are disloyal or maliciously untrue (and specifically, made with knowledge of their falsity or with reckless disregard for the truth or falsity of the statements) regarding the Company and/or its products, services, directors, officers, employees and affiliated entities, including, but not limited to, any statement posted on social media (including online company review sites) or otherwise on the Internet, whether or not made anonymously or with attribution. Nothing in this Second Release prevents Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful.

8.  <u>Review of Second Release; Expiration of Offer</u>: Employee understands that Employee may take up to twenty-one (21) days to consider this Second Release (the "***Consideration Period***"). The offer set forth in this Second Release, if not accepted by Employee before the end of the Consideration Period, will automatically expire. Employee and the Company further agree that any changes to this Agreement, whether material or immaterial, do not re-start the Consideration Period. By signing below, Employee affirms that Employee was advised to consult with an attorney prior to signing this Second Release. Employee also understands that Employee may revoke this Second Release within seven (7) days of signing this document and that the consideration to be provided to Employee pursuant to Section 2(b) of the Separation Agreement will be provided only after the expiration of that seven (7) day revocation period.

9.  <u>Effective Date</u>: This Second Release is effective on the eighth (8th) day after Employee signs it, provided Employee has not revoked it as of that time (the "***Effective Date***").

10. <u>Other Terms of Separation Agreement Incorporated Herein</u>: All other terms of the Separation Agreement to the extent not inconsistent with the terms of this Second Release are hereby incorporated in this Second Release as though fully stated herein and apply with equal force to this Second Release, including, without limitation, the provisions on Arbitration, Governing Law, and Attorneys' Fees.

Dated: <u>December 1, 2023</u>      <u>/s/ John Orta</u>

                                       Name: John Orta
                                       Title: Head of Legal and Corporate Development
                                       For the Company

Dated: <u>December 4, 2023</u>      <u>/s/ Mike Doyle</u>

                                       Mike Doyle

**EXHIBIT B**

**EMPLOYEE INVENTION ASSIGNMENT AND CONFIDENTIALITY AGREEMENT**

**EXHIBIT C**

**OPTIONS AND RSUS**

EXHIBIT 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)  Registration Statement (Form S-8 No. 333-270095) pertaining to the Nextdoor Holdings, Inc. 2021 Equity Incentive Plan and the Nextdoor Holdings, Inc. 2021 Employee Stock Purchase Plan;

(2)  Registration Statement (Form S-8 No. 333-262102) pertaining to the Nextdoor Holdings, Inc. 2021 Equity Incentive Plan, the Nextdoor, Inc. 2008 Equity Incentive Plan, the Nextdoor, Inc. 2018 Equity Incentive Plan and the Nextdoor Holdings, Inc. 2021 Employee Stock Purchase Plan;

(3)  Registration Statement (Form S-3 No. 333-261252) of Nextdoor Holdings, Inc.

of our reports dated February 27, 2024, with respect to the consolidated financial statements of Nextdoor Holdings, Inc., and the effectiveness of internal control over financial reporting of Nextdoor Holdings, Inc., included in this Annual Report (Form 10-K) of Nextdoor Holdings, Inc. for the year ended December 31, 2023.

/s/ Ernst & Young LLP

San Mateo, California
February 27, 2024

EXHIBIT 31.1

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**RULE 13A-14(A) AND 15D-14(A) UNDER THE EXCHANGE ACT,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Sarah Friar, certify that:

1.  I have reviewed this report on Form 10-K for the year ended December 31, 2023 of Nextdoor Holdings, Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

**EXHIBIT 31.1**

Date:      February 27, 2024

By:   /s/ *Sarah Friar*

Sarah Friar

Chief Executive Officer, President and
Chairperson of the Board of Directors

**EXHIBIT 31.2**

### CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
### RULE 13A-14(A) AND 15D-14(A) UNDER THE EXCHANGE ACT,
### AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Matt Anderson, certify that:

1.  I have reviewed this report on Form 10-K for the year ended December 31, 2023 of Nextdoor Holdings, Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

**EXHIBIT 31.2**

Date:        February 27, 2024

By:   /s/ Matt Anderson
_____

Matt Anderson
Chief Financial Officer and Treasurer

**EXHIBIT 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Nextdoor Holdings, Inc. (the "Company") on Form 10-K for the year ended December 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        February 27, 2024

By:   /s/ Sarah Friar

Sarah Friar
Chief Executive Officer, President and
Chairperson of the Board of Directors

**EXHIBIT 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Nextdoor Holdings, Inc. (the "Company") on Form 10-K for the year ended December 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

    (1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

    (2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        February 27, 2024

By:   */s/ Matt Anderson*
Matt Anderson
Chief Financial Officer and Treasurer

**Nextdoor Holdings, Inc.**

**Compensation Recovery Policy**

*(Adopted November 2, 2023)*

The Board has determined that it is in the best interests of the Company and its stockholders to adopt this Policy enabling the Company to recover from specified current and former Company executives certain incentive-based compensation in the event of an accounting restatement resulting from material noncompliance with any financial reporting requirements under the federal securities laws. Capitalized terms are defined in Section 14.

This Policy is designed to comply with Rule 10D-1 of the Exchange Act and shall become effective on the Effective Date and shall apply to Incentive-Based Compensation Received by Covered Persons on or after the Listing Rule Effective Date.

**1.      Administration**

This Policy shall be administered by the Administrator. The Administrator is authorized to interpret and construe this Policy and to make all determinations necessary, appropriate, or advisable for the administration of this Policy. The Administrator may retain, at the Company's expense, outside legal counsel and such compensation, tax or other consultants as it may determine are advisable for the purposes of administering this Policy.

**2.      Covered Persons and Applicable Compensation**

This Policy applies to any Incentive-Based Compensation Received by a person (a) after beginning service as a Covered Person; (b) who served as a Covered Person at any time during the performance period for that Incentive-Based Compensation; and (c) was a Covered Person during the Clawback Period.

However, recovery is not required with respect to:

i.      Incentive-Based Compensation Received prior to an individual becoming a Covered Person, even if the individual served as a Covered Person during the Clawback Period.

ii.     Incentive-Based Compensation Received prior to the Listing Rule Effective Date.

iii.    Incentive-Based Compensation Received prior to the Clawback Period.

iv.     Incentive-Based Compensation Received while the Company did not have a class of listed securities on a national securities exchange or a national securities association, including the Exchange.

The Administrator will not consider the Covered Person's responsibility or fault or lack thereof in enforcing this Policy with respect to recoupment under the Final Rules.

**3.      Triggering Event**

Subject to and in accordance with the provisions of this Policy, if there is a Triggering Event, the Administrator shall require a Covered Person to reimburse or forfeit to the Company the Recoupment Amount applicable to such Covered Person. A Company's obligation to recover

the Recoupment Amount is not dependent on if or when the restated financial statements are filed.

**4.      Calculation of Recoupment Amount**

The Recoupment Amount will be calculated in accordance with the Final Rules, as provided in the Calculation Guidelines attached hereto as Exhibit B.

**5.      Method of Recoupment**

Subject to compliance with the Final Rules and applicable law, the Administrator will determine, in its sole discretion, the method for recouping the Recoupment Amount hereunder which may include, without limitation:

  i.   Requiring reimbursement or forfeiture of the pre-tax amount of cash Incentive-Based Compensation previously paid;

  ii.  Offsetting the Recoupment Amount from any compensation otherwise owed by the Company to the Covered Person, including without limitation, any prior cash incentive payments, executive retirement benefits, wages, equity grants or other amounts payable by the Company to the Covered Person in the future;

  iii. Seeking recovery of any gain realized on the vesting, exercise, settlement, cash sale, transfer, or other disposition of any equity-based awards; and/or

  iv.  Taking any other remedial and recovery action permitted by law, as determined by the Administrator.

**6.      Arbitration**

To the fullest extent permitted by law, any disputes under this Policy shall be submitted to mandatory binding arbitration (the "***Arbitrable Claims***"), governed by the Federal Arbitration Act (the "***FAA***"). Further, to the fullest extent permitted by law, no class or collective actions can be asserted in arbitration or otherwise. All claims, whether in arbitration or otherwise, must be brought solely in the Covered Person's individual capacity, and not as a plaintiff or class member in any purported class or collective proceeding.

SUBJECT TO THE ABOVE PROVISO, ANY RIGHTS THAT A COVERED PERSON MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS ARE WAIVED. ANY RIGHTS THAT A COVERED PERSON MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION PERTAINING TO ANY CLAIMS BETWEEN A COVERED PERSON AND THE COMPANY ARE WAIVED.

The Covered Person is not restricted from filing administrative claims that may be brought before any government agency where, as a matter of law, the Covered Person's ability to file such claims may not be restricted. However, to the fullest extent permitted by law, arbitration shall be the exclusive remedy for the subject matter of such administrative claims. The arbitration shall be conducted in San Francisco, California through JAMS before a single neutral arbitrator, in accordance with the JAMS Comprehensive Arbitration Rules and Procedures then in effect, provided however, that the FAA, including its procedural provisions for compelling arbitration, shall govern and apply to this Arbitration provision. The arbitrator shall issue a written decision that contains the essential findings and conclusions on which the decision is based. If, for any reason, any term of this Arbitration provision is held to be invalid or

2

unenforceable, all other valid terms and conditions herein shall be severable in nature and remain fully enforceable.

## 7.    Recovery Process; Impracticability

Actions by the Administrator to recover the Recoupment Amount will be reasonably prompt.

The Administrator must cause the Company to recover the Recoupment Amount unless the Administrator shall have previously determined that recovery is impracticable and one of the following conditions is met:

i.    The direct expense paid to a third party to assist in enforcing this Policy would exceed the amount to be recovered; before concluding that it would be impracticable to recover any amount of erroneously awarded Incentive-Based Compensation based on expense of enforcement, the Company must make a reasonable attempt to recover such erroneously awarded Incentive-Based Compensation, document such reasonable attempt(s) to recover, and provide that documentation to the Exchange;

ii.    Recovery would violate home country law where that law was adopted prior to November 28, 2022; before concluding that it would be impracticable to recover any amount of erroneously awarded Incentive-Based Compensation based on violation of home country law, the Company must obtain an opinion of home country counsel, acceptable to the Exchange, that recovery would result in such a violation, and must provide such opinion to the Exchange; or

iii.    Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and regulations thereunder.

## 8.    Non-Exclusivity

The Administrator intends that this Policy will be applied to the fullest extent of the law. Without limitation to any broader or alternate clawback authorized in any written document with a Covered Person, (i) the Administrator may require that any employment agreement, equity award agreement, or similar agreement entered into on or after the Effective Date shall, as a condition to the grant of any benefit thereunder, require a Covered Person to agree to abide by the terms of this Policy, and (ii) this Policy will nonetheless apply to Incentive-Based Compensation as required by the Final Rules, whether or not specifically referenced in those arrangements. Any right of recoupment under this Policy is in addition to, and not in lieu of, any other remedies or rights of recoupment that may be available to the Company pursuant to the terms of any other clawback policy of the Company as then in effect, or any similar policy in any employment agreement, equity award agreement, or similar agreement and any other legal remedies or regulations available or applicable to the Company (including SOX 304). If recovery is required under both SOX 304 and this Policy, any amounts recovered pursuant to SOX 304 may, in the Administrator's discretion, be credited toward the amount recovered under this Policy, or vice versa.

## 9.    No Indemnification

The Company shall not indemnify any Covered Persons against (i) the loss of erroneously awarded Incentive-Based Compensation or any adverse tax consequences associated with any incorrectly awarded Incentive-Based Compensation or any recoupment hereunder, or (ii) any claims relating to the Company enforcement of its rights under this Policy. For the avoidance of doubt, this prohibition on indemnification will also prohibit the Company from reimbursing or

paying any premium or payment of any third-party insurance policy to fund potential recovery obligations obtained by the Covered Person directly. No Covered Person will seek or retain any such prohibited indemnification or reimbursement.

Further, the Company shall not enter into any agreement that exempts any Incentive-Based Compensation from the application of this Policy or that waives the Company's right to recovery of any erroneously awarded Incentive-Based Compensation and this Policy shall supersede any such agreement (whether entered into before, on or after the Effective Date).

## 10.    Covered Person Acknowledgement and Agreement

All Covered Persons subject to this Policy must acknowledge their understanding of, and agreement to comply with, the Policy by executing the certification attached hereto as <u>Exhibit A</u>. **<u>Notwithstanding the foregoing, this Policy will apply to Covered Persons whether or not they execute such certification.</u>**

## 11.    Successors

This Policy shall be binding and enforceable against all Covered Persons and their beneficiaries, heirs, executors, administrators or other legal representatives and shall inure to the benefit of any successor to the Company.

## 12.    Interpretation of Policy

To the extent there is any ambiguity between this Policy and the Final Rules, this Policy shall be interpreted so that it complies with the Final Rules. If any provision of this Policy, or the application of such provision to any Covered Person or circumstance, shall be held invalid, the remainder of this Policy, or the application of such provision to Covered Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

In the event any provision of this Policy is inconsistent with any requirement of any Final Rules, the Administrator, in its sole discretion, shall amend and administer this Policy and bring it into compliance with such rules.

Any determination under this Policy by the Administrator shall be conclusive and binding on the applicable Covered Person. Determinations of the Administrator need not be uniform with respect to Covered Persons or from one payment or grant to another.

## 13.    Amendments; Termination

The Administrator may make any amendments to this Policy as required under applicable law, rules and regulations, or as otherwise determined by the Administrator in its sole discretion.

The Administrator may terminate this Policy at any time.

## 14.    Definitions

"***Administrator***" means the Compensation and People Development Committee of the Board, or in the absence of a committee of independent directors responsible for executive compensation decisions, a majority of the independent directors serving on the Board.

"***Board***" means the Board of Directors of the Company.

"***Clawback Measurement Date***" is the earlier to occur of:

4

    i. The date the Board, a committee of the Board, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an accounting restatement as described in this Policy; or

    ii. The date a court, regulator, or other legally authorized body directs the Company to prepare an accounting restatement as described in this Policy.

"***Clawback Period***" means the three (3) completed fiscal years immediately prior to the Clawback Measurement Date and any transition period between the last day of the Company's previous fiscal year end and the first day of its new fiscal year (that results from a change in the Company's fiscal year) within or immediately following such three (3)-year period; provided that any transition period between the last day of the Company's previous fiscal year end and the first day of its new fiscal year that comprises a period of 9 to 12 months will be deemed a completed fiscal year.

"***Company***" means Nextdoor Holdings, Inc., a Delaware corporation, or any successor corporation.

"***Covered Person***" means any Executive Officer (as defined in the Final Rules), including, but not limited to, those persons who are or have been determined to be "officers" of the Company within the meaning of Section 16 of Rule 16a-1(f) of the rules promulgated under the Exchange Act, and "executive officers" of the Company within the meaning of Item 401(b) of Regulation S-K, Rule 3b-7 promulgated under the Exchange Act, and Rule 405 promulgated under the Securities Act of 1933, as amended; provided that the Administrator may identify additional employees who shall be treated as Covered Persons for the purposes of this Policy with prospective effect, in accordance with the Final Rules.

"***Effective Date***" means November 2, 2023, the date the Policy was adopted by the Board.

"***Exchange***" means the New York Stock Exchange or any other national securities exchange or national securities association in the United States on which the Company has listed its securities for trading.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Final Rules***" means the final rules promulgated by the SEC under Section 954 of the Dodd-Frank Act, Rule 10D-1 and Exchange listing standards, as may be amended from time to time.

"***Financial Reporting Measure***" are measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures that are derived wholly or in part from such measures. Stock price and TSR are also financial reporting measures. A financial reporting measure need not be presented within the financial statements or included in a filing with the SEC.

"***Incentive-Based Compensation***" means compensation that is granted, earned or vested based wholly or in part on the attainment of any Financial Reporting Measure. [Examples of "Incentive-Based Compensation" include, but are not limited to: non-equity incentive plan awards that are earned based wholly or in part on satisfying a Financial Reporting Measure performance goal; bonuses paid from a "bonus pool," the size of which is determined based wholly or in part on satisfying a Financial Reporting Measure performance goal; other cash awards based on satisfaction of a Financial Reporting Measure performance goal; restricted stock, restricted stock units, performance share units, stock options, and SARs that are granted or become vested based wholly or in part on satisfying a Financial Reporting Measure goal; and

5

proceeds received upon the sale of shares acquired through an incentive plan that were granted or vested based wholly or in part on satisfying a Financial Reporting Measure goal. "Incentive-Based Compensation" excludes, for example, time-based awards such as stock options or restricted stock units that are granted or vest *solely* upon completion of a service period; awards based on non-financial strategic or operating metrics such as the consummation of a merger or achievement of non-financial business goals; service-based retention bonuses; discretionary compensation; and salary.]

"***Listing Rule Effective Date***" means the effective date of the listing standards of the Exchange on which the Company's securities are listed.

"***Policy***" means this Compensation Recovery Policy.

Incentive-Based Compensation is deemed "***Received***" in the Company's fiscal period during which the relevant Financial Reporting Measure specified in the Incentive-Based Compensation award is attained, irrespective of whether the payment or grant occurs on a later date or if there are additional vesting or payment requirements, such as time-based vesting or certification or approval by the Compensation and People Development Committee or Board, that have not yet been satisfied.

"***Recoupment Amount***" means the amount of Incentive-Based Compensation Received by the Covered Person based on the financial statements prior to the restatement that exceeds the amount such Covered Person would have received had the Incentive-Based Compensation been determined based on the financial restatement, computed without regard to any taxes paid (*i.e.*, gross of taxes withheld).

"***SARs***" means stock appreciation rights.

"***SEC***" means the U.S. Securities and Exchange Commission.

"***SOX 304***" means Section 304 of the Sarbanes-Oxley Act of 2002.

"***Triggering Event***" means any event in which the Company is required to prepare an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

"***TSR***" means total stockholder return.

**EXHIBIT A**

**Certification**

I certify that:

1. I have read and understand the Company's Compensation Recovery Policy (the "***Policy***"). I understand that Nextdoor Holdings, Inc. (the "***Company***") is available to answer any questions I have regarding the Policy.

2. I understand that the Policy applies to all of my existing and future compensation-related agreements with the Company, whether or not explicitly stated therein.

3. I agree that notwithstanding the Company's certificate of incorporation, bylaws, and any agreement I have with the Company, including any indemnity agreement I have with the Company, I will not be entitled to, and will not seek indemnification from the Company for, any amounts recovered or recoverable by the Company in accordance with the Policy.

4. I understand and agree that in the event of a conflict between the Policy and the foregoing agreements and understandings on the one hand, and any prior, existing or future agreement, arrangement or understanding, whether oral or written, with respect to the subject matter of the Policy and this Certification, on the other hand, the terms of the Policy and this Certification shall control, and the terms of this Certification shall supersede any provision of such an agreement, arrangement or understanding to the extent of such conflict with respect to the subject matter of the Policy and this Certification; provided that, in accordance with Section 8 of the Policy, nothing herein limits any other remedies or rights of recoupment that may be available to the Company.

5. I agree to abide by the terms of the Policy, including, without limitation, by returning any erroneously awarded Incentive-Based Compensation to the Company to the extent required by, and in a manner permitted by, the Policy.

Signature: _____

Name: _____

Title: _____

Date: _____

7

**EXHIBIT B**

**Calculation Guidelines**

For the purposes of calculating the Recoupment Amount:

i.   For cash awards not paid from bonus pools, the erroneously awarded compensation is the difference between the amount of the cash award (whether payable as a lump sum or over time) that was received and the amount that should have been received applying the restated Financial Reporting Measure.

ii.  For cash awards paid from bonus pools, the erroneously awarded compensation is the pro rata portion of any deficiency that results from the aggregate bonus pool that is reduced based on applying the restated Financial Reporting Measure.

iii. For equity awards, if the shares, options, restricted stock units, or SARs are still held at the time of recovery, the erroneously awarded compensation is the number of such securities received in excess of the number that should have been received applying the restated Financial Reporting Measure (or the value of that excess number). If the options or SARs have been exercised, but the underlying shares have not been sold, the erroneously awarded compensation is the number of shares underlying the excess options or SARs (or the value thereof). If the underlying shares have been sold, the Company may recoup proceeds received from the sale of shares.

iv.  For Incentive-Based Compensation based on stock price or TSR, where the amount of erroneously awarded compensation is not subject to mathematical recalculation directly from the information in an accounting restatement:

a.   The amount must be based on a reasonable estimate of the effect of the accounting restatement on the stock price or TSR upon which the Incentive-Based Compensation was Received; and

b.   The Company must maintain documentation of the determination of that reasonable estimate and the Company must provide such documentation to the Exchange in all cases.

8

# Exhibit 401

# Preview



Share the
journey with
friends.

🖵 🖵 **iPhone and Apple Watch Apps**



Strava makes fitness tracking social. We house your
entire active journey in one spot – and you get to share
it with friends. Here's how:

• Record everything – runs, rides, hikes, yoga and over
30 other sport types. Think of Strava as the homebase
of your movement.

• Discover anywhere – our Routes tool uses de-
identified Strava data to intelligently recommend popular
routes based on your preferences. You can also build
your own.

• Build a support network – Strava's about celebrating
movement. Here you'll find your community and cheer
each other on.

• Train smarter – get data insights to understand your
progress and see how you improve. Your Training Log is
the record of all your workouts.

• Move safer – share your real-time location with loved
ones while outdoors for an extra layer of safety.

• Sync your favorite apps and devices – Strava is
compatible with thousands of them (Apple Watch, Fitbit,
Garmin – you name it).

• Join and create challenges – join millions in monthly
challenges to chase new goals, collect digital badges
and stay accountable.



MetaFTC-Dx-15
(2-24-23)

WWW.DIGITALEVIDENCEGROUP.COM

# Exhibit 402

**Facebook, Inc. (FB)**
**Fourth Quarter 2020 Results Conference Call**
**January 27th, 2021**

**Deborah Crawford, VP, Investor Relations**

Thank you. Good afternoon and welcome to Facebook's Fourth Quarter and Full Year 2020 Earnings Conference Call. Joining me today to discuss our results are Mark Zuckerberg, CEO; Sheryl Sandberg, COO; and Dave Wehner, CFO.

Before we get started, I would like to take this opportunity to remind you that our remarks today will include forward-looking statements. Actual results may differ materially from those contemplated by these forward-looking statements.

Factors that could cause these results to differ materially are set forth in today's press release, and in our quarterly report on form 10-Q filed with the SEC. Any forward-looking statements that we make on this call are based on assumptions as of today and we undertake no obligation to update these statements as a result of new information or future events.

During this call we may present both GAAP and non-GAAP financial measures. A reconciliation of GAAP to non-GAAP measures is included in today's earnings press release. The press release and an accompanying investor presentation are available on our website at investor.fb.com.

And now, I'd like to turn the call over to Mark.

**Mark Zuckerberg, CEO**

Thanks everyone for joining us today. I hope you're all staying healthy and well.

Our community and business had a strong end of the year. As Covid continued to keep many of us apart and at home, people and businesses continued relying on our services to stay in touch and create economic opportunity. 2.6 billion people now use one or more of our apps each day and more than 200 million businesses -- mostly small businesses -- use our free tools to reach customers.

Those numbers give a sense of scale, but some of the stories we hear show the impact. Groups have formed where Covid long-haulers are helping each other through a scary experience where there's not much else to turn to. Teachers are sending class assignments to students through WhatsApp. Local bookstores and coffee shops are using Instagram to let customers know they're open for curbside pick-up. We saw people come together to raise $1.8 billion for nonprofits and personal causes through our fundraising tools last year -- including $175 million for Covid-related causes alone. I'm proud of the role our services played in helping people support each other during what has been such a hard time.

I've spent a fair amount of time on recent earnings calls talking about our election integrity efforts, so I'm not going to discuss them at length today, but I do want to call out that, according to our estimates, we easily surpassed our goal to help 4 million people register to vote as part of the largest effort to distribute authoritative voting information in recent history -- and I want to thank everyone involved in our teams and outside involved with that effort.

1

Today I'm going to focus on our product work, and specifically I'm going to focus on four themes that I'm excited about for the year ahead: communities, private messaging, commerce tools for small businesses, and building the next computing platform.

Let's start with communities. I think that helping people build communities is one of the most important things that we can do. Our social fabric is made of multiple different layers through which we get our social support. First, we have friends and family. That's the most personal layer. Then we have communities we're a part of -- where we feel a sense of purpose and belonging, explore interests, develop skills, grow as individuals, and meet new people. And then finally, there's the safety net that society and government provide. In many parts of the world, there's been an unfortunate decline in community participation over the last several decades – that's that second layer. This isn't something that we can solve alone, but I think we can help. So now that we've helped billions of people stay connected with friends and family, helping everyone find and participate in communities that are meaningful to them has been our next goal. We even updated our mission a few years ago to reflect this, making it: "give people the power to build community and bring the world closer together."

Today, more than 600 million people are now members of a group on Facebook that they consider to be meaningful in their lives. This has grown steadily over time -- and I hear all the time from people who are in parenting groups that they're a major resource as they navigate raising kids, or from people who found a group that shares the same health condition and they can lean on that community for knowledge and support, or from people who've moved to a new place and joined local groups to meet people and get situated.

Our product focus now is to develop this community infrastructure beyond feeds and message boards to help people build and run full self-sustaining community institutions. So we're building tools to help groups get things done together and provide support for people that span messaging, video chat, and even communities' own websites. And we're exploring different ways to raise funds, including donations, merchandise and membership fees, to help group leaders support their community's operations, and hire people for different roles that are needed to build sustainable communities for the long term.

As we continue to focus on this, we need to make sure the communities people connect with are healthy and positive. That's something we've been focused on for a while now. One way of course that we do this is by taking down groups that break our rules against things like violence or hate speech. In September, we shared that we had removed more than 1 million groups in the last year alone. But there are also a lot of groups that we may not want to encourage people to join, even if they don't violate our policies. For example, we stopped recommending civic and political groups in the US ahead of the elections. We're continuing to fine tune how this works, but now we plan to keep civic and political groups out of recommendations for the long term, and we plan to expand that policy globally. To be clear, this is a continuation of work we've been doing for a while to turn down the temperature and discourage divisive conversations and communities.

Along these same lines, we're also currently considering steps we could take to reduce the amount of political content in News Feed as well. We're still working through exactly the best ways to do this. And to be clear, of course we'll still enable people to engage in political groups and discussions if they want to. These can often be important and helpful. They can be ways that people organize grassroots movements, speak out against injustice, or learn from people with different perspectives. So we want these discussions to be able to keep happening. But one of the top pieces of feedback we're hearing

from our community right now is that people don't want politics and fighting to take over their experience on our services.

So one theme for this year is that we're going to continue to focus on helping millions more people participate in healthy communities and we're going to focus even more on being a force for bringing people closer together.

Next, let's talk about private messaging. As we've discussed before, while people enjoy connecting with friends and communities in the digital equivalent of a town square in apps like Facebook and Instagram, the fastest growing social experiences are about connecting privately in the digital equivalent of the living room in services like WhatsApp and Messenger. That's why we kicked off a big effort a couple of years ago to re-imagine what a modern social platform would look like if you built it from the bottom up to be privacy-first.

We identified several core principles. A private social platform should be built around the most intimate interactions that we have: and that's one-on-one conversations. The most important aspect of privacy and security is that your conversations should stay between you. That means your conversations should always be end-to-end encrypted and they should disappear when you're done with them. Safety and reducing spam matter too, and that means that we should maintain a minimum amount of metadata to build sophisticated tools to stop bad actors using these services. You should have choice over what services you use, so we should make messaging as interoperable as possible across our apps. And, finally, no matter what, we should only store people's data in countries where we know we can keep it secure -- and we should continue opposing data localization in countries with weak records on human rights or privacy.

I think these are the privacy principles that matter most to people -- first and foremost people care that their conversations stay private, but after that people also care about safety and other convenience too. And from this perspective, WhatsApp -- and the direction we're heading in with Messenger -- are the best private social apps available.

We have a lot of competitors who make claims about privacy that are often misleading. Apple recently released so-called nutrition labels which focus largely on metadata that apps collect rather than the privacy and security of people's actual messages. But iMessage stores non-end-to-end encrypted backups of your messages by default unless you disable iCloud, so Apple and governments have the ability to access most people's messages. So when it comes to what matters most -- protecting people's messages, I think that WhatsApp is clearly superior.

Since I try to use these earnings calls to discuss aspects of business strategy that I think are important for investors to understand, I do want to highlight that we increasingly see Apple as one of our biggest competitors. iMessage is a key linchpin of their ecosystem. It comes pre-installed on every iPhone and they've preferenced it with private APIs and permissions, which is why iMessage is the most used messaging service in the US. And now, we're also seeing Apple's business depend more and more on gaining share in apps and services against us and other developers. Apple has every incentive to use their dominant platform position to interfere with how our apps and other apps work, which they regularly do to preference their own. This impacts the growth of millions of businesses around the world, including with the upcoming iOS14 changes, many small businesses will no longer be able to reach their customers with targeted ads. Apple may say that they're doing this to help people, but the

moves clearly track their competitive interests. I think this dynamic is important for people to understand because we and others are going to be up against this for the foreseeable future.

Our messaging services continue growing, but it's an uphill battle and our services need to be that much better as private social platforms to succeed. To make sure we remain the best, a couple years back we kicked off a number of long-term efforts that have started shipping recently, and more of these projects around strengthening encryption, ephemerality, interoperability and offering other tools are going to be shipping throughout this year.

Now, let's talk about commerce. Our goal here is to give every individual entrepreneur and small business access to the same kinds of tools that historically only the big companies have had access to. We've always cared about this, but the pandemic has made it more urgent.

It used to be the case that only large companies could afford to have analytics or targeted advertising capacity to reach their customers. It was expensive to build these capabilities and it often required building teams and storing large amounts of data in-house, which most small businesses can't do. One of the things I'm most proud of is that we build the tools so we can offer these same capabilities to small businesses, often for free. So when you hear people say that we hold a lot of data, that's because hundreds of millions of businesses that would have otherwise had to do this individually and would have had no easy way of doing so are now using our services to help them reach customers. When you hear people say that we're connecting data from lots of sources, that's to help small businesses reach customers more efficiently. Big companies often do this themselves, but small businesses can't a lot of time, so we do this for them. When you hear people argue that we shouldn't be doing these things -- or that we should go back to the old days of untargeted television ads – I think that what they are really arguing for is a regression where only the largest companies have this capacity, small businesses are severely disadvantaged, and competition is diminished.

With our commerce tools, we've made it so that a business can set up a shop once, and then they'll have an online storefront in both Facebook and Instagram immediately, and eventually on WhatsApp and Messenger as well. We recently expanded checkout to all US businesses, making the process of buying a lot more seamless. And as the lockdowns continued, we saw more small businesses and creators also use Paid Online Events as a way to make money.

WhatsApp is also an important part of our strategy here. More than 175 million people message a WhatsApp business account every day and we're building new features to make it even easier to transact with businesses in the app. We introduced carts, which lets people browse catalogs, select multiple products, and send the order as a message to a business.

The more people that interact with businesses, the better tools we're going to need to provide for businesses to help them support their customers. Many businesses need more than a phone to manage their customer service, so we're building tools to let businesses store and manage their WhatsApp chats using our secure hosting infrastructure if they would like. We're in the process of updating WhatsApp's privacy policy and terms of service to reflect these optional experiences.

To clarify some confusion that we've seen, this update does *not* change the privacy of anyone's messages with friends and family. All of these messages are end-to-end encrypted, which means we can't see or hear what you say, and we never will unless the person you messaged chooses to share it. And business messages will only be hosted on our infrastructure if the business chooses to do so. We

4

want everyone to know the lengths that we go to to protect your private messages, so we're moving the date of this update back to give everyone time to understand what the update means.

Finally, let's discuss our work building the next computing platform. This is one of the areas that I'm most excited about our progress heading into 2021. If you look at the history of computing, every 15 years or so a new major platform emerges that integrates technology more naturally and ubiquitously into our lives -- starting with mainframes, then PCs, then browser-based computing, and then mobile. I believe that the next logical step here is an immersive computing platform that just delivers this magical sense of presence -- that you're really there with another person or in another place. Our phones can't deliver this, and neither can any other technology that has come before it. This is going to unlock the types of social experiences I've dreamed about building since I was a kid, and it's what we're building towards at Facebook Reality Labs.

We launched Quest 2 in October and it's on track to be the first mainstream virtual reality headset. We designed it so that anyone could jump in -- with the best and most immersive experience out there -- and at a price that makes it available to as many people as possible. I think that Facebook has done more than any other company to help bring virtual reality to the mainstream. It's been great to see so many people embrace this, especially this year during the pandemic. We're seeing people use it to play games with friends when they can't be together in person, to do workouts in their living room, or to meet with colleagues while working from home. There are a lot of reasons Quest 2 was one of the hot holiday gifts this year.

We're also seeing a growing ecosystem of developers building amazing new experiences for the platform. Right now, more than 60 Oculus developers are generating revenue in the millions – that's nearly twice as many as a few months ago.

In previous quarters, I've talked about our long term, future goals when it comes to virtual reality. But I think this quarter's results show that this future is here.

Augmented reality glasses are going to be a key part of this vision too. We're still working on some of the foundational technology to underpin these -- and the ultimate product is still some years away. But this year we're excited to deliver a first glimpse of what will be when we launch our first pair of smart glasses from Ray-Ban, in partnership with Luxottica.

During this pandemic, we've also seen Portal has proven to be a great way for people to stay connected -- and especially over the holiday as families had to celebrate apart. This year, we're focused on expanding the role of Portal and virtual reality presence into the workplace -- bringing more features that can improve remote presence, collaboration and productivity.

2021 has a lot of unknowns. We don't know when vaccines are going to be widely available, when our teams will be back in the office, or when our lives will start feeling normal again. But what I do know is that we're going to keep investing in and innovating on the big themes that I discussed here in order to put more power in the hands of people and small businesses. I personally believe that technology can unlock progress and opportunity -- and that the full story of the Internet has not yet been written. That's why I'm hopeful for the year ahead, and grateful that you're all on this journey with us.

And now, here's Sheryl to talk about our business.

**Sheryl Sandberg, COO**

Thanks Mark, and hi everyone. I hope everyone is safe and healthy.

This was a strong quarter for our business, as the acceleration of online commerce we've seen during the pandemic continued into the holiday season. Our total revenue for Q4 was $28.1B, which is a 33% year-over-year increase, our fastest growth rate in over two years.

After a really difficult year for so many businesses, this holiday period was important. And while many businesses are still struggling, the good news is that Q4 was stronger than expected for retail. In the U.S., the National Retail Federation reported that sales in November and December went up 8% year-over-year and online sales were up 24%. This holiday period was also longer; compared to previous years, advertisers started spending earlier and sustained that spend well beyond Black Friday and Cyber Monday. We saw robust performance across all regions, as well as an improvement in brand advertising.

The strength of our Q4 performance is the result of years of investments in free and paid tools to help businesses succeed online. Even before the pandemic, businesses were going digital. But Covid made this a necessity. Almost overnight, businesses had to create digital storefronts, figure out how to take online orders, and find new ways to reach their customers. For many small companies, these steps, or even just setting up a website or a mobile app can be difficult and expensive. Our free and paid tools help solve these problems for businesses around the world.

With so many businesses struggling when the pandemic hit, we asked our teams: what do businesses need, and how can we help?

First, they need the tools to get their business up and running online. So what can we do to make ours simpler and more effective, and can we build new ones to help them?

Second, they need the digital skills and know how to succeed. So how can we help more businesses with training and resources?

And third, they need their voices to be heard. So can we use our scale to amplify their voices and tell their stories?

We've been asking these questions throughout the last year and into Q4. On the first, we accelerated our work on tools to make it easier for people to find brands and products they love, and for businesses to manage their online presence and connect with customers. Mark talked about some of the new tools we've launched, like Shops and Paid Online Events. In the fall we also rolled out Facebook Business Suite, a new interface to help businesses manage their pages or profiles across our apps.

We also continued to invest in making our products as effective as possible, so businesses can get more value for every dollar they spend. Personalized ads are privacy safe and help businesses reach customers where they are – which has been more important than ever during the pandemic. One notable area of progress this past year was in Stories ads, which have become more effective for direct response advertisers.

One business that used Stories ads is Carlota Flower Lab, a florist in Los Reyes, Mexico. Before Covid, they made 70% of their revenue from face-to-face workshops. So when the pandemic hit, founder Paola

6

Mendoza had to get creative. She used personalized ads on Instagram to reach new audiences, and even found her first international customers with campaigns targeting California and Texas. One campaign for Día de los Muertos – the Day of the Dead – in November led to a 24x return on ad spend, helping Paola triple her annual revenue in 2020, despite Covid.

On the second, resources and training, we did some big things in 2020. We created a Business Resource Hub – a one stop shop for resources and trainings for small businesses that we've continued to build out through the end of the year. We committed to reach 1M members of the Black community and 1M members of the Latinx and Hispanic communities in the U.S. with free digital skills trainings through our Elevate program by 2023. And we reimagined our Boost with Facebook events to reach businesses virtually – with 100M people tuning in throughout the year. This included our 12-week Season of Support to help businesses across 16 countries prepare for the holidays.

On the third, a great example of how we amplified the voices of our businesses in Q4 is our #BuyBlack Friday campaign – one of my favorite campaigns ever. In the U.S., Black-owned businesses closed at twice the rate of others after the start of the pandemic, so we wanted to help people shop with them over the holidays. We created ways for people to find Black businesses in their local area, a Gift Guide featuring products from Black businesses across the U.S., and even a #BuyBlack Friday Show on Facebook Live that was seen by 15M people.

One of the small businesses we featured is a vegan skincare brand called Redoux from New York City. Its founder, Asia Grant, appeared on the #BuyBlack Friday Show – and that became one of her most successful sales days ever. The campaign gave her record revenue and web traffic, and she was even able to hire more people - something that's so important given current unemployment rates.

Business owners like Asia and Paola have worked hard to adapt and grow online. But lots of businesses will continue to struggle in 2021. So we're going to keep listening to them and building on what we did last year. That means improving our products and tools to help businesses seamlessly manage their online presence, advertise across our apps, and communicate with customers through business messaging. It means making more training available through programs like SheMeansBusiness for women and Elevate for diverse communities. And it means finding more ways to amplify their voices, whether it's sharing the stories of small businesses worried that Apple's iOS14 changes will hurt their ability to reach customers, or showcasing small businesses in gift guides and products like Businesses Nearby.

I want to close by saying how grateful I am to all of the businesses around the world who work with us. Your partnership helps us build the tools you need so you can continue to grow and hire. And, as always, I'm grateful to our incredible teams who have done so much to help businesses survive this difficult year, including coming up with great ideas like #BuyBlack Friday. I hope that 2021 is a better year for everyone.

Now, here's Dave.

**Dave Wehner, CFO**

Thanks Sheryl and good afternoon everyone.

Q4 was a strong quarter, capping off a solid year for our business as full year 2020 revenue grew 22% to $86 billion. We have been encouraged to see improved demand for our ads during the second half of the year after facing significant headwinds at the onset of the pandemic. Our results reflect the ongoing strength in the digital economy and the value we're providing to millions of businesses who use our services to reach consumers and generate sales.

Let's begin with our community metrics.

In December, we estimate that approximately 2.6 billion people used at least one of our services on a daily basis, and that approximately 3.3 billion people used at least one on a monthly basis.

Facebook daily active users reached 1.84 billion, up 11% or 188 million compared to last year. DAUs represented approximately 66% of the 2.80 billion monthly active users in December. MAUs grew 299 million or 12% compared to last year. Consistent with our outlook, US & Canada DAU declined 1 million sequentially as usage continued to normalize from peak COVID levels experienced earlier in the year.

Turning to the financials. All comparisons are on a year-over-year basis unless otherwise noted.

Q4 total revenue was $28.1 billion, up 33% or 32% on a constant currency basis. We benefited from a currency tailwind and had foreign exchange rates remained constant with Q4 of last year, total revenue would have been $339 million lower. Q4 ad revenue was $27.2 billion, up 31% or 30% on a constant currency basis.

The growth in advertising revenue was largely driven by a strong holiday shopping season for retail, which benefited from the ongoing shift to online commerce.

On a user geography basis, ad revenue was strongest in Europe which grew 35% and benefited from currency tailwinds. US & Canada grew 31%, and Asia-Pacific grew 29%. Rest of World growth improved to 25% but continues to be significantly impacted by currency headwinds.

In Q4, the total number of ad impressions served across our services increased 25% and the average price per ad increased 5%.

Impression growth was driven by both Facebook and Instagram. The increase in average price per ad was driven primarily by FB mobile feed as well as pricing improvement in Instagram Stories.

Other revenue was $885 million, up 156%, due to strong Quest 2 holiday sales. We've been encouraged by the positive reception of Quest 2 since its October launch.

Turning now to expenses.

Q4 total expenses were $15.3 billion, up 25% compared to last year. In terms of specific line items:

- Cost of revenue increased 49%, driven primarily by hardware costs related to Quest 2 sales, core infrastructure investments, and payments to partners.
- R&D increased 34%, driven primarily by hiring and investments in core products as well as our consumer hardware efforts.
- Marketing & Sales increased 8%, driven by hiring and marketing spend.
- Lastly, G&A expenses decreased 13% as we lapped charges related to the BIPA legal settlement recorded in the fourth quarter of 2019.

In the past year, we added a record 13,600 net employees and reached our goal of adding 10,000 employees in tech and product roles. We ended the year with over 58,600 full-time employees, up 30% compared to last year. We continue to be pleased with our ability to recruit, onboard, and retain talent in this environment.

Fourth quarter operating income was $12.8 billion, representing a 46% operating margin. Our tax rate was 14%. Net income was $11.2 billion or $3.88 per share.

Capital expenditures were $4.8 billion, driven by investments in data centers, servers, office facilities and network infrastructure.

Free cash flow was $9.2 billion and we ended the quarter with $62.0 billion in cash and marketable securities.

For the full year we repurchased $6.3 billion of our Class A common stock and had $8.6 billion remaining on our prior authorization as of December 31st. Today we announced a $25 billion increase in our stock repurchase authorization.

Turning now to the outlook.

We continue to face significant uncertainty as we manage through a number of cross currents in 2021.

We believe our business has benefited from two broad economic trends playing out during the pandemic. The first is the ongoing shift to online commerce. The second is the shift in consumer demand towards products and away from services. We believe these shifts provided a tailwind to our advertising business in the second half of 2020 given our strength in product verticals sold via online commerce and our lower exposure to service verticals like travel. Looking forward, a moderation or reversal in one or both of these trends could serve as a headwind to our advertising revenue growth.

At the same time, in the first half of 2021 we will be lapping a period of growth that was negatively impacted by reduced advertising demand during the early stages of the pandemic. As a result, we expect year-over-year growth rates in total revenue to remain stable or modestly accelerate sequentially in the first and second quarters of 2021. In the second half of the year we will lap periods of increasingly strong growth which will significantly pressure year-over-year growth rates.

We also expect to face more significant ad targeting headwinds in 2021. This includes the impact of platform changes, notably iOS14, as well as the evolving regulatory landscape. While the timing of the iOS14 changes remains uncertain, we would expect to see an impact beginning late in the first quarter.

There is also continuing uncertainty around the viability of transatlantic data transfers in light of recent European regulatory developments, and like other companies in our industry, we are closely monitoring the potential impact on our European operations as these developments progress.

Turning now to expenses.

We expect 2021 total expenses to be in the range of $68-73 billion, unchanged from our prior outlook. This is driven by investments in technical and product talent as well as continued growth in infrastructure costs.

We continue to expect 2021 capital expenditures to be in the range of $21-23 billion, driven by data centers, servers, network infrastructure and office facilities. Our outlook includes spend that was delayed from 2020 due to the impact of the pandemic on our construction efforts.

Turning now to tax. We continue to expect our full-year 2021 tax rate to be in the high-teens.

In closing, 2020 was a unique operating environment that introduced a number of unforeseen challenges. We've been pleased with our team's ability to adapt in order to maintain the reliability of our services, deliver new products and experiences, and support the millions of businesses who use our platforms to reach consumers.

With that, Mike, let's open up the call for questions.

| Operator: | We will now open the lines for a question and answer session. To ask a question, press star followed by the number one on your touchtone phone. Please pick up your handset before asking your question to ensure clarity. If you are streaming today's call, please mute your computer's speakers. Your first question comes from the line of Brian Nowak from Morgan Stanley. |
|---|---|
| Brian Nowak: | Thank for taking my question; I have two. The first one for either Mark or Sheryl, I appreciate the color on commerce. I was curious as for any encouraging quantifiable signposts or learnings that you've seen so far in Instagram shopping that sort of give you confidence you're making progress in building out this opportunity? |
| | And then the second one, Dave, in the -- appreciate the comment on the forward outlook and the outlook commentary. I guess the question is, you sort of talk about this shift to consumer expenditure toward products away from services and how that could potentially be a headwind in the back half as it reverses. |
| | I think last quarter you mentioned you had 10 million advertisers. So maybe talk to us about sort of some of the segments of advertisers you think that you're missing? |

And what initiatives do you have in place to sort of broaden the advertiser base to bring more services on the platform? Thanks.

Sheryl Sandberg:   I can take the first. With Instagram shopping, we launched a new shop tab on Instagram in Q4, and this is built on other shopping efforts we've had. We see this as an overall part of our commerce effort. You know, we've always been, I think, a great place for people to discover new products and services.

But we are very interested in taking people all the way down that funnel from discovery to purchase, to finding products and services to checking out as well. And our shopping efforts are part of that. We're seeing nice uptick. It's still really early days.

But we think businesses are having a good experience and people are having a good experience. And as always, with our ad products and with our commerce products, we want to make sure we provide a great experience to the end user so that they can find the things they're looking for.

David Wehner:   Brian, it's Dave. Yes, the data that we've looked at there really is that when you look at the data from the U.S. BEA, it basically showed that in Q3, while the services consumer spend was still down year-over-year, spending on goods actually surged to record levels, sort of the highest in like 15 years. We don't have the results for Q4, but we expect that sort of trend continued.

If you look at the balance of our of our business, it tends to skew more towards products relative to the overall GDP -- or the overall consumer spend in, for instance, the US. So we just think we're overall exposed a little bit more to products.

We continue to invest to improve our exposure in travel -- sorry, in service areas like travel. But our expectation would be in 2021, we'll continue to have a similar skew towards products as we've had in the past. But we'll continue to make investments to make our ad products more relevant for services as well.

Operator:   Your next question comes from the line of Doug Anmuth from JPMorgan.

11

Douglas Anmuth:     Great, thanks for taking the question. For Dave and Sheryl, we know you mentioned significant ad targeting headwinds. But has your view on IDFA changed at all over the past few months?

Just curious how you're thinking about Facebook's ability now to offset some of the impact just through things like limited log-in mode and new APIs and other conversion tools and data. And then if you could just talk a little bit more about how you're thinking about the impact across FAN and then the core products.

David Wehner:      Doug, I'll take that. So I don't think our outlook has changed in any significant way on iOS 14. We continue to believe that will be a headwind in the ads business.

It's in our view, not just limited to IDFA, but broader than that is we're going to have to be providing a prompt asking people for permission to use third-party data to deliver personalized ads.

So that's going to be true whether you're using IDFA or not. And we do expect there to be high opt out rates related to that, and that's factored into our outlook. We expect that to roll out sometime -- we expect later in Q1.

But the timing is uncertain, and Apple hasn't given clarity on that at this point. And we do expect that will have increasing impact through the year as more users adopt iOS 14 and go through those permissions.

When you think about what the mitigations might be, obviously, there's going to be mitigation of the impact on us, to some extent, just because this is a platform-wide change and so it will impact everyone.

And so that's going to mitigate it to some extent. And in addition, over time, we hope to help businesses by providing more on-site conversion opportunities through initiatives like shops, and also click to messaging ads.

As it relates to, specifically, the audience network products, obviously, that's going to have a significant impact on audience network on iOS, as we have explained in the past. But it's -- but the broader impact given the size of that business is really to our -- to the core advertising business on iOS.

Operator:          Your next question comes from the line of Eric Sheridan from UBS.

Eric Sheridan:      Maybe two, if I can. Mark, just coming back to your comments, what do you see as some of the key investments either on the hardware side or the content and application side to unlock the opportunity based on what you recently saw with the success of Oculus in the holiday period, where there was a piece of hardware, obviously, that's sold through quite well.

And how do you think about aligning investments against the opportunity in the coming years? And then maybe -- I don't know if it's for Sheryl or Dave, but maybe I could just follow up a little bit on Doug's question.

When you think out to the language you're using about the back half of the year, is there any sense you can give us quantitatively about how to think about some of the tougher comps you'll see as we move through '21 versus identifying the degree of the severity of different outcomes from some of the headwinds.

Mark Zuckerberg:      I can take the first one. So when we started working on virtual and augmented reality, we basically laid out a path where we knew that virtual reality would be practical to build first.

And we view that it's kind of all part of one continuous ecosystem for spatial, immersive, computing and presence. So, the key things that we're trying to do with VR now. I do believe that Quest 2 is the first mainstream virtual reality product that is doing quite well, and I'm really proud of what we've been able to do there.

The goal there is we keep on shipping content and titles and working with developers and shipping new capabilities to the device. Like last year, we shipped the ability to do -- now hand tracking, which no one expected to be possible yet, but the team working on that did some really great work. And it just made the device better and increased the value.

So we're continuing to work on new hardware as well. The new hardware will kind of fit the same platform. So the content that works on Quest 2 should be forward compatible. And so that way we're going to build one kind of larger installed base around the virtual reality headsets that we have.

And at the same time, we're building towards a future with some of this -- the fundamental technology investments that we're making to be able to provide augmented reality glasses that hopefully will be able to support a lot of the same

content in this ecosystem over time and take advantage of a lot of these foundational investments that we've made.

So this is -- this continues to be a long-term investment. I think it's very important both for the vision of what we want to do. Like I said in my script before -- earlier, some of the things that we're going to be able to build with VR and AR are the types of social experiences that I wanted to build since I was a kid, and I'm excited to be able to unlock that.

And I also think strategically, it's important for us to have a little more control of our own destiny in terms of the operating systems and platforms that all of our services operate on. So continue to be very focused on this and optimistic about what we're seeing.

David Wehner:   Yes. Eric, it's Dave. Just coming back to your question. I think the context is we have this -- we've had a tremendously strong quarter Q4 of this year. A number of factors we talked about driving that. A couple are pandemic related which is just the shift to online commerce as well as the ongoing -- the shift to more spend on products versus services.

In Q4, we also saw strength with sort of our full range of advertisers. We have seen sort of small and medium-sized businesses come back and start getting strength in Q2 and Q3, or Q3 specifically. And then Q4, we also saw strength from some of our largest advertisers as well.

So as you look out in 2021, I think we're just going to be facing tougher comps in the back half of the year. Some of those things related to the pandemic have the potential to revert, whether it's more consumer expenditure shifting towards services away from products. So that will make it a little bit of a tougher comp. And then you layer on top of that headwinds to growth related to privacy-related headwinds.

The biggest factor there is iOS 14. So we certainly anticipate growth, but we're just looking at tougher comps as we hit the back half of the year, given really, most importantly, the strength that we saw this year. And then on top of that, the headwinds that we're seeing from some of the privacy changes.

14

Operator:            Your next question comes from the line of Justin Post from Bank of America.

Justin Post:         Great. I guess I'll ask about regulation. I know it's a tough topic. First, Mark, in your prepared remarks, you elevated a little bit competition with Apple. Is there anything going on with iOS 14 besides IDFA that maybe puts you in more direct competition with Apple?

                     And then secondly, obviously, the FTC filed their case since the last earnings call. Maybe just open forum. Any thoughts on that, that you're able to share.

Mark Zuckerberg:     Well, in terms of the competition with Apple specifically, I laid out three or four product focus areas. And with the exception of the work that we're doing on communities, which I think is quite separate from the work that they do, the other three areas, I think, are going to have very significant competitive overlap with Apple. In messaging, certainly, iMessage is the most popular service in the U.S.

                     I think because of the fact that they pre-install it and give their app several advantages that other apps don't have. In commerce and supporting small businesses, I think there, you have some of the iOS 14 changes that we think are going to be very problematic, especially for small businesses.

                     And then longer term, as we move towards building the next computing platform, I think we would expect to see them as more of a competitor there as well. So I do think that this is sort of shaping up that -- we face many competitors, right. There are a lot of competitors in the core social app work that we do.

Operator:            This is the operator. I apologize but there will be a slight delay in today's conference. Please hold and the conference will resume shortly. Thank you for your patience.

                     (Technical Difficulties)

                     Speakers, we are now connected.

Mark Zuckerberg:   Was there another question on that last one that I was supposed to answer?

David Wehner:   Well, there's a question about the FTC. All right. Are we on now through this line?

Operator:   Yes, you are connected.

David Wehner:   OK.

Mark Zuckerberg:   All right. So where did I lose you?

David Wehner:   I think you had covered the question of the dynamics related to the competitive landscape, and then there was a follow-on question around the FTC case and any thoughts that we have on that. I don't think we have anything we necessarily are commenting on at this point.

Mark Zuckerberg:   Yes. Nothing on the case. I mean on regulation overall because I think some of the question was focused on that.

The point that I would highlight is I actually think it would be very helpful to us, and the Internet sector overall, for there to be clearer rules and expectations on some of these social issues around how content should be handled, or how elections should be handled around what privacy norms governments want to see in place because these questions all have trade-offs, right? All the content and elections content and elections questions have trade-offs between giving people free expression and a voice but some -- there's trade-offs against safety and privacy and other social equities, they're all very important.

And it's I think very difficult for a private company to balance those, and I think it would be much better to have just a clearer guidance and clearer rules for the Internet. So that's going to be something that we continue to advocate for.

16

Operator:          Your next question comes from the line of Ross Sandler from Barclays.

Ross Sandler:      A question about the price volume metrics -- can you hear me?

David Wehner:      Yes. I can hear you now.

Ross Sandler:      Yes. A question about the price versus volume metrics, Dave, that you just
                   mentioned. This is the first quarter in a long time that price, I think, was up year-on-
                   year. I know there's a lot of factors that go into that.

                   But you also mentioned that you're seeing now strong traction from DR advertisers
                   around the stories format. So maybe just a little bit more color on where we are in
                   the stories versus feed price dynamic? And what kinds of DR advertisers are seeing
                   the most traction around these stories ads.

David Wehner:      Yes, sure, Ross. So I mean, as you know, with the auction dynamic, the growth in
                   pricing is -- does really depend on impression growth. And we saw impression
                   growth slowed this quarter to 25 percent from the Q3 rate of 35 percent.

                   And some of that is just due to lapping product optimizations on Instagram during
                   Q4 of '19 as well as just the normalization of engagement trends on Facebook. And
                   so we would expect that sort of overall story to continue into Q1 with those trends.
                   And then we're also continuing to make iterative improvements that enhance the
                   performance and benefit pricing over time.

                   And the one example that we give there is Instagram Stories that, as you know, it's
                   been an area we've been focused on to try and make DR performance through
                   better ads interactivity work better on Stories, and we've been seeing some good
                   progress there.

                   So we called that out as well as being a driver of price improvement. There's still a
                   gap with Stories ads and feed ads, but we've been pleased with the progress we've
                   been making on that front.

17

Operator:              Your next question comes from the line of Colin Sebastian from Baird.

Colin Sebastian:     Great. Two quick ones for me. I guess, given the ongoing efforts in private messaging, I'm curious, ultimately, what will differentiate Messenger from WhatsApp other than branding or geography if there's an inevitable consolidation of functionality there.

And then secondly, on Reels, I know it's still early, but any update on performance or uptake as well as the road map for monetization, I think, would be helpful.

David Wehner:       Mark, do you want to take this?

Mark Zuckerberg:    Yes, I can take the first one. I mean the biggest connection for -- the biggest difference between Messenger and WhatsApp is, obviously, the connection to Facebook and the kind of same identity and graph that you use on Facebook comes with you to Messenger.

So even if you can send messages across the different apps and there's more interoperability, and we bring the same world-class privacy features to both. I think that will still make the apps feel fairly distinct.

I also think the kind of aesthetic and focus of the apps on how much different functionality they include will vary. I think WhatsApp has always had -- we've always focused a lot on making it a very utilitarian experience and place more of a premium on simplicity there.

So we'll continue adding new functionality, but we're more focused on keeping that minimal. Whereas in Messenger, we have a lot more tools and features for expression. And I would expect that we'll continue adding more there as well.

Sheryl Sandberg:    On the second, with Reels, we're really pleased with the early data on consumption, and we have a bunch of work ahead of us to make it easier for people to create and discover content. We've now rolled out the product into over 50 countries.

18

In monetization of it, we've launched branded content tags in Reels, so that helps creators share the content and monetize. We launched shopping in Reels. And we've said that we will launch ads.

The timing is to be determined. And we're going to follow the same pattern we followed on other things like Stories. We launch a consumer product. We make sure there's product market fit, and people are using it. Then we launch an ad product.

And we make sure that it's beneficial for consumers. And as David answered in I think the last question, we work very diligently quarter-by-quarter on the basis point improvements that help us scale a product.

So we will do things to make it easier for businesses to create the right ad format. We will do things to make those ads get to the person who might be looking for that product or service.

Operator:          Your next question comes from the line of Youssef Squali from Truist Securities.

Youssef Squali:    Two questions, please. Mark, I want to go back to the first theme that you discussed of communities and how you're looking to potentially deemphasize civic and political groups.

How important -- or how large is civic and political contents on the site. Is there a way to quantify it or to quantify the engagement with it to see if this is one of the headwinds that you guys talk about in terms of potentially emerging in 2021?

And second, on the regulatory headwinds, there is just increasing talk of about Section 220 protection. I know it's a thorny subject.

But from where you stand, how do you see Facebook -- and not just really Facebook, but other social media platforms dealing with it. And if it was either to be narrowed or even completely eliminated?

Mark Zuckerberg:  Sure. I can probably take both of those. Yes, I don't know if we have any stats to share on the size of civic and political content, but it's a pretty small minority of the content, right. And it's -- and all the feedback that we have from our communities suggest that the vast majority of people would like it to stay that way.

19

And I think there has been this trend, I think, across society where a lot of things have become politicized and politics has kind of had a way of creeping into everything. And I think a lot of the work that we're -- a lot of the feedback that we see from our communities that people don't want that in their experience.

And they come to our services to connect with friends and family, to connect to communities that they care about. And I think that we can potentially do a better job of those core jobs that we have and do a better job of helping to bring people together and helping to promote healthier communities if we can reduce the amount of politics on our services.

Now I mean it's -- we'll have to balance this carefully because we have a deep commitment to free expression. So I believe that if people want to be able to discuss this stuff or join groups there, they should certainly be able to do that. But I just don't think that it's serving the community particularly well to be recommending that content right now.

But one thing to mention just because you were asking about the headwinds and all that is, I don't think that this is a factor in any of that. And Wehner can jump in if there's any more that you want to add on that.

But I don't think that that, that's what he had in mind in any way there. Wehner, I'll skip a beat for you to jump in if you want before going to the next question.


David Wehner:        Yes. No, I was just going to say that exact thing, Youssef. This is not something that's factoring into our outlook. It's not a headwind that is a factor in our 2021 outlook.

And certainly, on the ads front as well, political is extremely small. It's low single-digit revenue even in an active political quarter like we had. So no, it's not factoring in on either the ad side or the engagement side in our outlook.


Mark Zuckerberg:     Yes. And now going to your 230 question, I do think -- and I testified this -- about this in Congress. I do think that Congress should update Section 230 to make sure that it's working the way that people intend, right. And it's after, I think, being in place for almost 25 years.

And the Section 230 has been very important. It's helped give rise to the Internet as we know it today. And it's given Internet platforms tools to be able to balance free expression and safety.

And I think it's also gone pretty far in terms of helping to ensure that values like free expression are built into the Internet's DNA. So I think that any changes should be thought through very carefully. And should be thought through not just from the perspective of what a larger company like Facebook or Google or Twitter could handle in terms of updating their content moderation policies, but also from the perspective of making sure that new companies can continue to emerge. I think that's very important as well.

So we've supported changes in this for a while. Back in 2018, we supported a change to prevent sex trafficking. And we'll support similar efforts to tackle harms like child exploitation imagery and material and opioids.

And we'll also support any push to make content moderation systems more transparent. The details on all this, of course, matter, but we hope to be able to work with the new Congress on this.

Operator:                   Your last question comes from the line of John Blackledge from Cowen.

John Blackledge:      Great. Two questions. Mark, on community, could you just provide further details on layering more services for Facebook groups? And expectation for uptake of those new services?

And could community evolve as a meaningful monetization driver in the coming years? And then on IDFA, maybe for Dave or Sheryl, how do you think advertisers are prepared for the changes? And will the long-tail advertisers be more impacted than the larger, more sophisticated advertisers?

Mark Zuckerberg:   I can speak to the first point. First, for the business -- and I don't think we look at communities separately from friends and family. There are both different types of content that show up in news feed that people interact with.

21

But my guess is that it's probably already a pretty meaningful driver of the business and the value that people get from the services today. So absolutely, I think as this continues to grow, it should be in the future.

The big trend that we're looking at now, and that I tried to call out in my remarks earlier, is that right now, there's a spectrum of different kinds of groups and communities on Facebook. Everything from meme groups that people find very entertaining and fun, to groups that people really turn to for support when they have kind of serious issues in their lives.

And I think that right now, though, most of these communities, they have this backbone of -- there's a feed, there are ways to message people. But when I think about the physical communities that I'm a part of, in my life, they often have more of an institutional structure.

There are subcommunities. There are people who -- it's their full-time job to basically help people engage and -- basically help people navigate them. I'm thinking about things like the synagogue that I'm a member of. I mean there are people there whose job it is to help engage the congregation and help them get basically the most out of everything that the institution has to offer. And that's a very important kind of community organization. And I would love for more institutions like that to be able to organize and build community more effectively online.

So there are lots of just different tools that I think that -- if we provide -- spanning messaging, spanning video chat, these organizations own websites and other things that they do, that if we can help in a lot of those areas, then we can make it so that groups on Facebook are not just a feed and a place where you post some content and maybe engage on a post, but that we can really help more organizations build up community institutions like that. And I think that, that could be a very big contribution and something that I'm excited about taking on.

Sheryl Sandberg:    To your second question, we think it's a really important question and one that we take very seriously. So small businesses are very reliant on personalized ads, the ability to use data in a very privacy safe way, to get the customers who are interested in their products and services. And that makes sense.

Big businesses, we can buy an ad to the whole country. We can buy an ad to a whole region. Small businesses can't. They have to find the precise audiences they want.

And I think one of the mainstays of our business is we've enabled that targeting in a very privacy safe way without giving information without permission to advertisers.

And what's happening with IDFA is that small businesses are really concerned because they're worried that they're not going to be able to buy effective advertising. If all personalized ads went away, small businesses would see a 60 percent cut in website sales.

Now we don't think Apple's contemplating going that far that quickly, but that is the general direction of what would happen. And you can see that would be very detrimental to their business.

It's also very detrimental to economic growth because so much of our job growth comes from small businesses. I think it's worth noting, it's not just about advertisers. Some of these changes also impact developers and other forms of businesses.

We are starting to hear from creators and developers who are worried that some of their free services will have to start charging or shut down, force them into subscriptions or other in payments for revenue. Now not all small businesses are aware of these challenges, but we are hearing from more and more of them, so we're very concerned.

Deborah Crawford:   Great. Thank you, everybody, for joining us today. We appreciate your time, and we look forward to speaking with you again.

Operator:   Ladies and gentlemen, this concludes today's conference call. Thank you for joining us. You may now disconnect your lines.

# Exhibit 403

**Facebook, Inc. (FB)**
**Third Quarter 2021 Results Conference Call**
**October 25th, 2021**

**Deborah Crawford, VP, Investor Relations**

Thank you. Good afternoon and welcome to Facebook's third quarter earnings conference call. Joining me today to discuss our results are Mark Zuckerberg, CEO; Sheryl Sandberg, COO; and Dave Wehner, CFO.

Before we get started, I would like to take this opportunity to remind you that our remarks today will include forward-looking statements. Actual results may differ materially from those contemplated by these forward-looking statements.

Factors that could cause these results to differ materially are set forth in today's press release, and in our quarterly report on form 10-Q filed with the SEC. Any forward-looking statements that we make on this call are based on assumptions as of today and we undertake no obligation to update these statements as a result of new information or future events.

During this call we may present both GAAP and non-GAAP financial measures. A reconciliation of GAAP to non-GAAP measures is included in today's earnings press release. The press release and an accompanying investor presentation are available on our website at investor.fb.com.

And now, I'd like to turn the call over to Mark.

**Mark Zuckerberg, CEO**

Hey everyone and thanks for joining today.

We made good progress this quarter across a number of product priorities, and our community continues to grow. There are now almost 3.6 billion people who actively use one or more of our services, and I'm excited about our roadmap to keep building great new experiences for them.

As expected, we did experience revenue headwinds this quarter, including from Apple's changes that are not only negatively affecting our business, but millions of small businesses in what is already a difficult time for them in the economy. Sheryl and Dave will talk about this more later, but the bottom line is we expect we'll be able to navigate these headwinds over time with investments that we're already making today.

Before I get to our product update, I want to discuss the recent debate around our company.

I believe large organizations should be scrutinized and I'd much rather live in a society where they are than one where they can't be. Good faith criticism helps us get better. But my view is that what we're seeing is a coordinated effort to selectively use leaked documents to paint a false picture of our company.

The reality is that we have an open culture where we encourage discussion and research about our work so we can make progress on many complex issues that are not specific to just us. We have industry-

leading programs to study the effects of our products and provide transparency into our progress because we care about getting this right.

When we make decisions, we need to balance competing social equities, like free expression with reducing harmful content, or enabling strong encrypted privacy with supporting law enforcement, or enabling research and interoperability with locking down data as much as possible. It makes a good soundbite to say that we don't solve these impossible tradeoffs because we're just focused on making money, but the reality is these questions are not primarily about our business, but about balancing different difficult social values. And I've repeatedly called for regulation to provide clarity because I don't think companies should be making so many of these decisions ourselves.

I'm proud of our record navigating the complex tradeoffs involved in operating services at global scale, and I'm proud of the research and transparency we bring to our work. Our programs are industry-leading. We have made massive investments in safety and security with more than 40,000 people and we are on track to spend more than $5 billion on safety and security in 2021. I believe that's more than any other tech company, even adjusted for scale. We set the standard for transparency with our quarterly enforcement reports and tools like our political ads archive. We established a new model for independent academic researchers to safely access data. We pioneered the Oversight Board as a model of self-regulation. And as a result, we believe that our systems are the most effective at reducing harmful content across the industry. And I think that any honest account of how we've handled these issues should include that.

I also think that any honest account should be clear that these issues aren't primarily about social media. That means that no matter what Facebook does, we're never going to solve them on our own. For example, polarization started rising in the US before I was born. At the same time, independent research shows that many countries around the world have flat or declining polarization, despite similar social media use there to in the US. We see this pattern repeat with other issues as well. The reality is, if social media is not the main driver of these issues, then it probably can't fix them by itself either.

We should want every other company in our industry to make the investments and achieve the results that we have. I worry about the incentives that we're creating for other companies to be as introspective as we have been. But I am committed to continuing this work, because I believe it will be better for our community and our business over the long term.

We can't change the underlying media dynamics, but there's a different constituency that we serve that has always been more important and that I try to keep us focused on: and that's people.

Billions of people use our services because we build the best tools to stay connected to the people you care about, to find communities that matter to you, and to grow your small business.

And the reason we've been able to succeed for almost two decades is because we keep evolving and building. Facebook started in a dorm room and grew into a global website. We invented the News Feed and a new kind of ads platform. We became a mobile-first experience. And then we grew a whole family of apps that serve billions of people.

And there is so much more to build. Even with all the tools we have today, we still can't feel like we're right there together with the people we care about when we're physically apart. We can't teleport as holograms to instantly be at the office without a commute, or at a concert with a friend, or in your

parents' living room to catch up. The creative economy and commerce tools are still nascent and there should be opportunity for millions of more people to make a living doing the work that they love.

Our three product priorities remain our focus on creators, commerce, and building the next computing platform.

A big part of our work with creators is our focus on Reels. Reels is already the primary driver of engagement growth on Instagram. It's incredibly entertaining, and I think that there's a huge amount of potential ahead. We expect this to continue growing and I am optimistic that Reels will be as important for our products as Stories is. We also expect to make significant changes to Instagram and Facebook in the next year to further lean into video and make Reels a more central part of the experience.

One aspect of this is giving all our apps the goal of being the best services for young adults, which we define as ages 18-29. Historically, young adults have been a strong base and that's important because they are the future. But over the last decade, as the audience that uses our apps has expanded so much and we've focused on serving everyone, our services have gotten dialed to be the best for the most people who use them rather than specifically for young adults. And during this period, competition has also gotten more intense, especially with Apple's iMessage growing in popularity and more recently, the rise of TikTok, which is one of the most effective competitors we have ever faced.

So we are retooling our teams to make serving young adults their north star, rather than optimizing for the larger number of older people. Like everything, this will involve tradeoffs in our products and it will likely mean that the rest of our community will grow more slowly than it otherwise would have. But it should also mean that our services become stronger for young adults. This shift will take years, not months, to fully execute, and I think it's the right approach to building our community and company for the long term.

Our next product priority is commerce. Helping people discover new products that they're interested in and reach customers inside our apps is going to unlock a lot of opportunity.

As Apple's changes make e-commerce and customer acquisition less effective on the web, solutions that allow businesses to set up shop right inside our apps will become increasingly attractive and important to them. We've built solutions like ads that can dynamically point to either a business's website or their Shop on our platforms depending on what will perform better for them, and that will help more businesses navigate this challenging environment.

Building a full-fledged commerce platform is a multi-year journey. Marketplace is already at scale and lots of people rely on it, especially now with supply chain issues that make it harder to get new products. Shops are getting more developed, and we have an exciting program planned for this holiday season where we're working closely with a number of the businesses that have invested the most in Shops to identify what works to find new customers and grow their business even faster. Our plan is to then scale those solutions even more broadly in 2022.

Beyond Reels and commerce, I also want to share some thoughts on our longer-term efforts to build the next computing platform and help bring the metaverse to life. This is a major area of investment for us and an important part of our strategy going forward.

3

I view this work as critical to our mission because delivering a sense of presence -- like you're right there with another person -- that's the holy grail of online social experiences. Over the next decade, these new platforms are going to start to unlock the kinds of experiences that I've wanted to build since even before I started Facebook. Along with those social experiences I expect a massive increase in the creator economy and amount of digital goods and commerce. If you're in the metaverse every day, then you'll need digital clothes, digital tools, and different experiences. Our goal is to help the metaverse reach a billion people and hundreds of billions of dollars of digital commerce this decade. Strategically, helping to shape the next platform should also reduce our dependence on delivering our services through competitors.

Building the foundational platforms for the metaverse will be a long road. We just released the 128GB Quest 2, replacing the 64GB model for $299. With EssilorLuxottica, we released our first smart glasses, and they're off to a strong start as well. But bringing this vision to life isn't just about building one glasses product. There's a whole ecosystem. We're building multiple generations of our VR and AR products at the same time, as well as a new operating system and development model, a digital commerce platform, content studios, and of course a social platform.

So to reflect the significance of this for our business, today we're announcing a change to our financial reporting. Starting next quarter, we'll begin disclosing financial metrics for Facebook Reality Labs separately from our Family of Apps. This will provide investors with additional visibility into the investments that we're making in augmented and virtual reality. In 2021, we expect these investments to reduce our overall operating profit by approximately $10 billion, and I expect this investment to grow even further for each of the next several years. Dave will share more about this later, but I encourage you all to tune into Connect on Thursday to hear more about our vision and our work here in more detail.

I recognize the magnitude of this bet on the future, and I am grateful for the support of our investors, the creative community, and the thousands of talented people working on this effort inside our company to bring this inspiring future to life.

And with that, here's Sheryl.

**Sheryl Sandberg, COO**

Thanks Mark, and hi everyone.

This quarter our total revenue was $29 billion, up 35% year-over-year. We saw solid revenue growth across all regions. And we continued to grow our user base.

We felt the impact of some big external factors in Q3. I want to explain some of the revenue softness we've seen, and what we're doing to mitigate the headwinds and help businesses over the crucial holiday period and beyond.

To start, let's take a step back. Over the past decade, we've seen more and more businesses shift online. When the pandemic hit, this digital transformation accelerated. We've invested in tools and products over many years to help businesses make this shift. So this acceleration drove very strong growth for us throughout the last few quarters.

4

We've been open about the fact that there were headwinds coming – and we've experienced that in Q3. The biggest is the impact of Apple's iOS14 changes, which have created headwinds for others in the industry as well, major challenges for small businesses, and advantaged Apple's own advertising business. We started to see that impact in Q2, but adoption on the consumer side ramped up by late June, so it hit critical mass in Q3. As a result, we've encountered two challenges. One is that the accuracy of our ads targeting decreased, which increased the cost of driving outcomes for our advertisers. And the other is that measuring those outcomes became more difficult.

On targeting, we're focused on improving campaign performance even with the increased limitations facing our industry. We're building commerce tools to help businesses reach more new customers and get more incremental sales. And over the longer term, we're developing Privacy Enhancing Technologies in collaboration with others across the industry to help minimize the amount of personal information we process, while still allowing us to show relevant ads. Progress in these areas will take time and will be a focus for us throughout 2022 and beyond.

On measurement, as we wrote in a recent blog post, we believe we are underreporting iOS web conversions. This means real world conversions, like sales and app installs, are higher than what's being reported for many advertisers, especially small advertisers. We're making good progress fixing this. We think we'll be able to address more than half of the underreporting by the end of this year. And we'll continue to work on this into 2022.

Another external factor is slowing e-Commerce growth. The strong e-Commerce growth in recent quarters was driven in part by the acceleration of the digital transformation that is now tapering off. I think most people see this in their own lives. There was a period of time when many people who were able to stayed at home and ordered things online much more. But now in many places things have opened up, and people are increasingly making purchases in person. That doesn't mean e-Commerce has stopped growing. Businesses are still making the shift online. But e-Commerce is no longer growing at the pace it was at the height of the pandemic.

These factors have been compounded for many advertisers by major global supply chain issues and labor shortages, which have left many consumer businesses with less inventory. This has reduced their appetite to generate demand from consumers, which has impacted advertising spend. Businesses in every region and across a range of verticals have been affected. At the same time we've also seen some impact from Covid surges around the world in places like South-East Asia.

Overall, if it wasn't for Apple's iOS14 changes, we would have seen positive quarter-over-quarter revenue growth. And while we and our advertisers will continue to feel the effect of these changes in future quarters, we will continue working hard to mitigate them.

Despite the headwinds, we remain confident about our future. We believe Facebook and Instagram are the best place for people to connect with their friends and families, build communities, and start and grow businesses. And we believe they're still the best platforms for advertisers to reach people where they are and get measurable outcomes. Our focus remains where it always has been, building products that help people connect and businesses grow.

Mark talked about video a moment ago. Not only is this a growing area for us overall, but we're also continuing to get better at monetizing it. More than 60% of video revenue now comes from mobile-first video, meaning videos that are shot vertically or are under 15 seconds. Over 2 billion people per month

now watch videos that are eligible for In-Stream ads, which are ads shown before, during or after videos. And we're expanding access to Reels ads on Instagram to more advertisers with automatic placement and new creative formats.

Another area we're seeing good progress is in lead generation. Our products help businesses generate quality leads at scale and meet customers where they are on their preferred channel of communication, whether it's messaging, forms, or calls. In April, we started rolling out a new Conversion Leads optimization goal for higher quality leads, and advertisers can also integrate their CRM with Facebook via our Conversions API. Our tests show that on average advertisers see a 20% increase in lead to sale conversion rate when they use both the optimization goal and the integration.

Q4 is the most important quarter of the year for many businesses, large and small. As always, we're focused on making the holiday season a success for them. We're working to fix the measurement issues they're experiencing, and deliver the tools and products they need to grow. And we're rolling out a range of holiday shopping experiences to help people find great deals, support small businesses and good causes, and shop with local and Black-owned businesses.

We're bringing exclusive gifts to Shops that will be available when people checkout on Facebook or Instagram, like 20% off your first purchase and free shipping. Starting next week, we'll host daily Live Shopping experiences with companies large and small – brands like Walmart, Macy's, Benefit Cosmetics and Paintbox Nails – to educate shoppers and share exclusive deals.

And we're bringing back one of my favorite campaigns ever – Buy Black Friday – to showcase Black-owned small businesses during the holidays. It includes things like Buy Black collections in the Facebook and Instagram Shop tabs, and a weekly Buy Black Friday show with Live Shopping segments from up and coming Black-owned small businesses.

I want to close by saying how grateful I am to our partners around the world. And to our incredible teams who are working so hard to help people and businesses throughout this period.

Now, here's Dave.

**Dave Wehner, CFO**

Thanks Sheryl and good afternoon everyone.

We delivered solid results in the third quarter in the face of a challenging mobile platform landscape and an evolving macroeconomic environment.

Let's begin with our community metrics.

Our global community continued to grow even as we lapped elevated user growth in the third quarter of last year related to the pandemic. We estimate that approximately 2.8 billion people used at least one of our services on a daily basis in September, and that approximately 3.6 billion people used at least one on a monthly basis.

Facebook daily active users reached 1.93 billion, up 6% or 110 million compared to last year. DAUs represented approximately 66% of the 2.91 billion monthly active users in September. MAUs grew by 170 million or 6% compared to last year.

Turning to the financials.

All comparisons are on a year-over-year basis unless otherwise noted.

Q3 total revenue was $29.0 billion, up 35% or 34% on a constant currency basis. We benefited from a currency tailwind and had foreign exchange rates remained constant with Q3 of last year, total revenue would have been $259 million lower.

Q3 ad revenue was $28.3 billion, up 33% or 32% on a constant currency basis.

On a user geography basis, year-over-year ad revenue growth was strongest in Rest of World at 50%. Europe, North America and Asia-Pacific grew 35%, 31%, and 28%, respectively. Europe, Asia-Pacific and Rest of World benefited from currency tailwinds, though to a lesser degree than in the prior quarter.

In Q3, the total number of ad impressions served across our services increased 9% and the average price per ad increased 22%.

Impression growth was driven primarily by developing markets, especially in Asia-Pacific. Pricing growth benefited from advertiser demand and lapping of Covid-related pricing weakness during the third quarter of last year. Though, as Sheryl noted, growth was hindered by three primary headwinds:

First, advertising spend was negatively impacted by performance and measurement headwinds related to Apple's ATT changes.

Second, we are seeing some macro headwinds as growth in online commerce has moderated from the elevated levels experienced earlier in the pandemic and businesses face supply chain disruptions.

Third, Covid resurgences in Southeast Asia have led to additional lockdowns and a curtailment of economic activity.

Other revenue was $734 million, up 195%, driven by strong Quest 2 sales.

Turning now to expenses.

Q3 total expenses were $18.6 billion, up 38% compared to last year. In terms of the specific line items:

Cost of revenue increased 38%, driven mostly by consumer hardware costs, core infrastructure investments, and payments to partners.

R&D increased 33%, driven primarily by hiring to support our core products and consumer hardware efforts.

Marketing & Sales increased 32%, mainly driven by marketing spend and hiring.

Lastly, G&A expenses increased 65%, driven primarily by higher legal-related costs and employee-related costs.

We added over 4,700 net new hires in Q3, primarily in technical functions. We ended the quarter with over 68,100 full-time employees, up 20% compared to last year.

Third quarter operating income was $10.4 billion, representing a 36% operating margin. Our tax rate was 13%. Net income was $9.2 billion or $3.22 per share.

Capital expenditures including finance leases were $4.5 billion, driven by investments in data centers, servers, network infrastructure and office facilities.

Free cash flow was $9.5 billion and we ended the quarter with $58.1 billion in cash and marketable securities.

We repurchased $14.4 billion of our Class A common stock in the third quarter and had $8.0 billion remaining on our prior authorization as of September 30th. Today we announced a $50 billion increase in our stock repurchase authorization.

Turning now to the outlook.

Starting with our results for the fourth quarter of 2021, we plan to break out Facebook Reality Labs, or FRL, as a separate reporting segment. As we have discussed, we are dedicating significant resources towards our augmented and virtual reality products and services, which are an important part of our work to develop the next generation of online social experiences. The new segment disclosures will provide additional information on the performance of FRL and the investments we are making.

Under this reporting structure, we will provide revenue and operating profit for two segments:

The first segment, Family of Apps, will include Facebook, Instagram, Messenger, WhatsApp and other services.

The second segment, Facebook Reality Labs, will include augmented and virtual reality related hardware, software and content. As Mark noted, we expect our investment in FRL to reduce our overall operating profit in 2021 by approximately $10 billion. We are committed to bringing this long-term vision to life and we expect to increase our investments for the next several years.

Ahead of the fourth quarter earnings call, we will share additional details about the reporting format of our segmented financials.

Turning now to the revenue outlook.

We expect fourth quarter 2021 total revenue to be in the range of $31.5 billion to $34 billion. Our outlook reflects the significant uncertainty we face in the fourth quarter in light of continued headwinds from Apple's iOS14 changes, and macroeconomic and Covid-related factors. In addition, we expect non-ads revenue to be down year-over-year in the fourth quarter as we lap the strong launch of Quest 2 during last year's holiday shopping season.

As previously noted, we also continue to monitor developments regarding the viability of transatlantic data transfers and their potential impact on our European operations.

Turning now to the expense outlook.

We expect 2021 total expenses to be in the range of $70-71 billion, updated from our prior outlook of $70-73 billion. We anticipate our full-year 2022 total expenses will be in the range of $91-97 billion, driven by investments in technical and product talent and infrastructure-related costs.

We expect 2021 capital expenditures to be approximately $19 billion, updated from our prior estimate of $19-21 billion. For 2022, we expect capital expenditures to be in the range of $29-34 billion, driven by our investments in data centers, servers, network infrastructure, and office facilities. A large factor driving the increase in capex spend is an investment in our AI and Machine Learning capabilities, which we expect to benefit our efforts in ranking and recommendations for experiences across our products, including in Feed and video, as well as improving ads performance and relevance.

We expect our Q4 2021 tax rate to be in the high-teens. Absent any changes to U.S. tax law, we would expect our full year tax rate in 2022 to be similar to the full year 2021 rate.

Please note that our outlook for 2022 expenses, capital expenditures and tax rate are preliminary estimates as we have not yet finalized our 2022 budget.

In closing, this was another solid quarter for our business despite facing some headwinds. And we believe the investments we're making in our current services, as well as new products and experiences, will enable us to remain the best place for people to connect and for businesses to advertise – both now and in the years ahead.

With that, France, let's open up the call for questions.

| | |
|---|---|
| Operator: | Thank you. We will now open the lines for a question and answer session. To ask a question, press one followed by the number four on your touchtone phone. Please pick up your handset before asking your question to ensure clarity. If you are streaming today's call, please mute your computer speakers. And your first question comes from the line of Brian Nowak with Morgan Stanley. Please go ahead. |
| Brian Nowak: | Thanks for taking my questions. I have two. The first one on Reels. It sounds like it's a pretty important part of long-term adoption. Curious to hear about anything you'll share about current user adoption, current engagement, or more color on the demographics of people who are using Reels now. |
| | Then the second one, just a little more question on Apple and the ATT changes. I appreciate the color on accuracy and measurement improvements. |
| | Any more specifics you can share about where you've made the most progress from your investment to date and sort of some of the areas where you're seeing more challenges, you need to continue to invest to really improve to navigate through this more challenging environment? Thanks. |

Dave Wehner:    Yes. Sure, Brian. On Reels, that's been a bright spot for Instagram. And currently, we're seeing good growth globally -- strength in a number of different markets, but we've been making a lot of progress on Reels and have been happy with it on Instagram.

In terms of launch on Facebook, that's earlier stage. On the monetization front, we're just starting to roll out ads in Instagram. So it's earlier on that front, and we really haven't gotten to a monetization point with Reels on Facebook. Sheryl, do you want to take the iOS 14 question?

Sheryl Sandberg:    Yes. I can take that. I mean when you start at the top of this, you really have to think about what personalized ads are. And we think they're better for people and businesses, and they're especially important to small businesses. They also can be delivered, can be done in a very privacy safe way.

There are two big challenges coming from this iOS changes. The one is targeting and one is measurement. I'm taking the second one first. On measurement, we think we can address more than half of that underreporting by the end of the year and make more progress in the years ahead.

We estimate we're underreporting iOS web conversions. We believe that real-world conversions like sales and app installs are higher. And so we have to do the work to help clients measure these properly in order for them to really understand the outcomes they're getting and improving performance. And again, we think we can get a good chunk of that done this year and more in the next year.

Targeting is a longer-term challenge. Our direct response products are built on user level conversions. And as a result of the iOS changes, we don't see the same level of conversion data coming through.

So we have to rebuild our targeting and optimization systems to work with less data. So this is a multiyear effort. We are developing privacy-enhancing technology to minimize the amount of personal information we learn and using more aggregate or anonymized data while still allowing us to show those relevant personalized ads and measure ads effectiveness.

In order for this to really work and benefit all businesses, it can require some cross-industry collaboration and more commerce tools, and those are going to be longer-term efforts.

Dave Wehner:    Operator, we can go to the next questions.

Operator:    Our next question is from Eric Sheridan with Goldman Sachs. Please go ahead.

Eric Sheridan:    Thanks so much. Maybe two, if I can. Maybe Sheryl, following up there, in terms of thinking in terms of quarters or years on both the targeting and the measurement piece, can you help us just go one level lower in terms of what you're building in terms of what's in your control to put out into the advertising ecosystem versus

what might just take time for advertisers to adopt and get comfortable with and better understand the data that drive their business outcomes and how they allocate advertising budget? That would be for you.

And then, Dave, maybe if I could follow up on OpEx and CapEx. Just how should we be thinking about the elements of core Facebook versus some of the things you're trying to build against Mark's vision for the long term with Reality Labs and how that might be a driver of permanence versus transient nature of OpEx and CapEx in the years ahead? Thanks so much.

Sheryl Sandberg:     So some of the technology we can build ourselves. We build AI. We make continued investments in AI that help us maintain or improve long-term performance data. We're building some of our own commerce tools, and those are tools we can build that we need other people to adopt.

And then some of the targeting opportunities we see have to take tools we can build or tools we can build in industry collaboration. We're really working as part of several industry collaborative groups on what those tools will look like and how those get adopted. So those obviously take more partnership and are less in our direct control.

Dave Wehner:     Hey, Eric, on the outlook on expenses in 2022, it's obviously early, but we wanted to give an initial outlook of our expected expense range since we typically do that in Q3. Mark outlined we have a lot of priorities that we're investing against across the business that includes a lot of areas in the core sort of Family of Apps.

But also in FRL, we've got a lot of priorities in advertising, AI, commerce, privacy. So when you kind of pull all these things together, we've got a pretty robust spending plan next year. The primary driver is going to be accelerating headcount growth in 2022.

So that's going to be something you'll see headcount coming in above 20%, obviously, that we had this quarter. And we also expect to have higher expenses from office operations and travel once larger parts of the workforce are returning to the office in 2022. We're not providing a specific breakdown at this point for segment expense. And France, you can go to the next question.

Operator:     Our next question from Doug Anmuth with JPMorgan. Please go ahead.

Douglas Anmuth:     Great, thank you. One for Mark and one for Dave. Mark, just given the significant investments in both P&L expenses and CapEx, and clearly, you're talking about the heavy focus on metaverse over the long term, I was just hoping you could help us recap kind of the 1-year, 3-year and then 5-year aspirations from a product perspective as you've done in the past?

And then, Dave, just on the 2022 expenses, which is about 29% to 38% growth, do you have any commentary on revenue growth in '22 to go along with that? Thanks.

11

Mark Zuckerberg:   I can talk about the metaverse and Reality Labs part of this. So for the next 1 and 3 years, especially, I think what you'll see is us putting more of the foundational pieces into place. This is not an investment that is going to be profitable for us anytime in the near future.

But we basically believe that the metaverse is going to be the successor of the mobile Internet, that it's going to enable social experiences that are the ultimate expression of what we try to build, which is allowing people to feel really present with the people they care about no matter where they actually are.

And we think it's going to unlock a massively larger creative economy of both digital and physical goods than what exists today and allow millions of people to be able to do work doing what they love and enabling a whole different economy around that, that I think is going to be another important pillar of our business, over the next decade.

So on the next 1 to 3 years, I mean, I almost -- wouldn't focus on the sort of business outcomes there quite as much as I would just -- the products and infrastructure that we're putting in place. So there's -- there are new platforms, there's hardware components.

There's the whole virtual reality product line. There's the augmented reality product line. We're kind of starting to put those pieces in place. There's the operating system and development model for all these new creative tools. There's the commerce parts of what we're doing around this and how they tie into broader commerce effort across Family of Apps.

And then there's all the social platform work that we're doing with our Horizon effort that touches a bunch of different areas of what we're doing. But I think you'll see all of those pieces start to get built out and start to mature a bit over the next few years. And then if we do a good job on this, and I would say later in this decade, is when we would sort of expect this to be more of a real business story.

But I think what we kind of think about for the near term is are we delivering the product experiences that are completely groundbreaking and that people try this, and they just think this is amazing and can see a glimpse of where this is going, and that will pave the way for the future. The sort of the business North Star that I mentioned in some of my opening remarks are, we hope that by the end of the decade that we can help a billion people use the metaverse and support hundreds of billions of dollars of digital commerce. And I think if we can do that, then this will be a good investment over the long term.

Dave Wehner:   Hey Doug, it's Dave. We're not at this point providing a specific revenue outlook for 2022. We continue to see opportunities to grow both impressions and price next year, but we're obviously coming off an incredibly strong year of revenue growth in 2021.

So we do expect deceleration in growth in 2022 from the full year 2021 rate. And this -- there's sort of uncertainty implied in our range for Q4 revenue, and I think that holds true for the 2022 outlook as well.

There's a lot of factors at play, including advertisers working their way through the impact of the Apple platform changes. We're obviously navigating a challenging macroeconomic environment.

We'll have a better sense of how these things work together as we get through the holiday season. But given the expense growth that we outlined, which is implied in the 30 -- north of 30% we don't expect revenue growth at that level. So we would expect 2022 margins to be lower than 2021. France, you can go to the next question.

Operator:                 Our next question is from Justin Post with Bank of America Merrill Lynch. Please go ahead.

Justin Post:              Great. Thank you. Maybe one for Mark and one for Dave. Getting 18- to 29-year old users is not easy. I wonder if you could maybe outline some of your strategies to kind of get some progress there. I know it's multi-quarter.

And then, Dave, in your guidance for Q4, can you help us on the IDFA impact? Is it contemplated to be about the same as 3Q, a little bit better as you work on your measurement? Or is it a little bit more of a headwind in Q4? Thank you.

Dave Wehner:         Yes, Justin, I can take the -- I can actually take both of those questions. In terms of the younger demographics, our products are obviously widely used by young adults. And we remain focused on building out those product capabilities and continuing to focus on making our products relevant for that audience. I think Reels is a big part of that strategy.

And we've now got that -- we've got that rolled out in over 100 countries since launching in August of last year, and we're continuing to invest in that experience and make ongoing product enhancements. And so that's probably one of our big focus points that I would point to. In terms of the IDFA...

Mark Zuckerberg:    Maybe I'll just add something on Reels. Yes. I think that this is going to be a very meaningful qualitative change in how people use a lot of different products across the Internet. I mean I think every once in a while, a format comes along that allows new types of content, right? So we saw this with News Feed. We saw it with Stories.

And I think Reels is -- from everything I've seen has the potential to be something of that scale where there are different flavors of it and different apps. But I think as a format, it can be very fundamental.

And I think we're still closer to the beginning of that journey than we are to its maturity in terms of just having rolled out some of the initial tests and experiences

13

and rolled it out in Facebook. And I mean you mentioned all the countries that it's in in Instagram, but it's just continuing to grow very quickly.

So I think that, that's going to be a big part of the focus here. And I think we'll -- I'm excited over the next year or two to see how that grows into something that I would bet will be like Stories in our product today. Sorry, Dave, go for it.

Dave Wehner:     Yeah, Justin, on the iOS question as it relates to Q4 versus Q3, the bulk of iOS 14 updates were completed as we entered Q3, which contributed to the step up in the impact from Q2 to Q3. Since iOS 14 is now widely adopted, we don't expect a similar step up in Q4.

But importantly, we haven't gone through a holiday season with these changes and prices are higher during the holidays, given strong demand. And so there's uncertainty how that will intersect with the challenges on targeting and measurements coming from the iOS changes. So, I think that brings some uncertainty into the Q4 outlook that's reflected in our guidance range. You can go to the next question, France.

Operator:     Our next question -- thank you. Our next question is from Youssef Squali with the Truist Securities. Please go ahead.

Youssef Squali:     Great, thank you very much. Two questions for me. Mark, it's the week of Facebook Connect, so I was hoping you can provide us an update on Horizon. This is the -- that social app where people can create games and experiences to share together.

When will that finally come out of the closed beta? I think it's been in for the last two years. It seems to us that to move Facebook into the metaverse successfully, you really need to have a VR social app that's obviously cool and successful.

And the other question is around, again, this focus on the 18 to 29. Can you maybe just speak to the current trends in engagement at both Facebook and Instagram among millennials and younger audiences? I know you're speaking about a focus on it going forward, but how has it been trending of late? Thank you.

Mark Zuckerberg:     I'll take the first, and then Dave can talk about whatever numbers you want to share. So first, let me say, I think we have -- on Thursday, at Connect, we're going to -- be going into quite a bit of detail about our vision for the metaverse and how we think we can help contribute to building this.

So I encourage all of you to tune in. Part of that, that we are going to talk about is Horizon, how that fits into this. And we've been steadily working on this and onboarding more creators and more people to it, and we're adding more worlds all the time.

I think you're right, this is going to be a critical part of at least our platform and the work that we're doing here. We released Workrooms recently. I'm really excited about how that experience has come together.

14

And I think to your point, you mentioned it's important to have a VR social experience. I actually think it's important to have an experience that goes across all of the platforms, right? I don't think what you're going to end up with is just a -- something that's like a VR social network.

I think you want to be able to have these experiences where you can feel present with people and have this immersive experience that's going to be best if you're in VR or in AR and you're a hologram, but it needs still to work everywhere, right? It needs to be able to work across our whole Family of Apps. It needs to be able to work on the web and on phones and on computers. So there's a lot to do.

And whether we call it beta or not, I think the reality is we're going to be -- this is kind of similar to the question before about where we're going to be in a year or 3 years. There's a lot of foundational infrastructure that just needs to get built up here.

And part of what we're trying to reflect in the segment reporting and all that is we're committed to doing this work. It's going to be a big investment. We want to be transparent about it. But we think it's very exciting. It's a huge opportunity for the future, and I encourage you to tune in on Thursday to hear more.

Dave Wehner:     And Youssef, just on overall, the engagement trends, our products are widely used by teens, but we are facing tough competition from the likes of TikTok particularly and Snapchat.

And we're focused on obviously continuing to innovate and roll out products like Reels and attract the younger demographics and retain the younger demographics for our products. And that's why we're continuing to build and invest in those areas.

Operator:        Our next question is from Mark Mahaney with Evercore ISI. Please go ahead. Mr. Mahaney, your line is open. Please proceed.

Mark Mahaney:   I apologize. Two questions. On the iOS changes, is it fair to say that, that's the majority -- that accounts for the majority of the headwinds that you saw in Q3 and expect to see in Q4?

And then secondly, a question for Mark. Just on the application of artificial intelligence to kind of help moderate content is the wrong word, but to try to make sure that inappropriate content is removed from Facebook and Instagram, et cetera.

Where do you think you are in terms of getting that to be where you want it to be? I know it's been a multiyear investment journey experience. Here we are several years later, is this a Sisyphean in task? Do you think you've been able to show success in using AI constructively? Thank you.

Dave Wehner:     Hey Mark, it's Dave. On the first question, yes, the Apple platform changes were the largest factor in terms of Q3 headwinds.

15

I mean it was really the first full quarter impact of those new ATT policy changes following just the increased consumer adoption ramp of the iOS updates. And if it really weren't for that, we would have expected sequential growth Q2 to Q3. So that was the largest headwind in the quarter.

Mark Zuckerberg:   Sure. I can speak a bit to AI. So my answer is, yes, I think it's made a big impact. We issue these quarterly transparency reports, which I should add we're industry-leading on this both in terms of defining this and in terms of the depth of what we outline so that people can hold us accountable and kind of see the breakdown of how we're actually doing.

But what we measure in those reports and disclose is what percent of the content that we act on is our AI or our internal systems finding rather than people having to report it.  Because we have a lot of people who use our products if they find something that's problematic and they report stuff to us.

And it used to be before the last several years that most of what we did for community integrity was just respond to incoming reports, but we decided, hey, we should really try to get in front of this and build really sophisticated systems so that we're not just relying on people to tell us when there are issues, but we can proactively go address that.

And in most of these categories and we've basically gotten to the point now where 90-plus percent of the content where we're basically -- that we act on, we're identifying largely through the AI system. It varies a bit by category. So for categories like nudity where it's relatively easier to train a computer to identify that, the numbers are very high. Some of the categories like hate speech that have been harder because, first of all, we're operating in, I think it's around, 150 languages around the world.

I also think it's -- there's a lot of cultural nuance in this where you want to be able to make sure you understand the innuendos in all those languages and that you want to make sure that people can say -- can denounce racism, right? If someone is saying something racist to encourage someone to do something hateful, that's bad. But if you -- if someone wants to basically say, hey, I saw this person doing this and people shouldn't be doing that, then you don't want to sensor people doing that.

So it is being a very challenging problem. And for the first couple of years working on this, we're still at a relatively low recall rate where our AI systems had 10%, 15% of the content that we were addressing, we were dealing with proactively. But in recent years, the AI progress has been very impressive. We're now above 90% of the content that we take an action on there, is also proactive even with hate speech.

So overall -- I mean, look, let me take this question in a slightly different direction, which is I know that there is a lot of scrutiny of our efforts. And I guess I just want to say to the team and the people who work on this that I'm really proud of the

progress that they make. I think we have the best people in the world, and we're doing the best job of this, I believe, across any company in the industry.

And I think this is an important area. There should be scrutiny on it, but I also think that any honest account of what's actually going on here should take into account that a huge amount of progress has been made and will continue to be made by a lot of talented people who are working on this.

Operator:                  Our next question is from Ross Sandler with Barclays. Please go ahead.

Ross Sandler:          Thanks. Dave, one nitpicky question on the guide and then one kind of big picture for Sheryl maybe. So since we're now all focusing on the 2-year CAGRs for the guidance for the high end of the fourth quarter revenue actually has an acceleration on the 2-year CAGR.

So I know we're talking about headwinds and IDFA and supply chains and everything like that, but the sequential growth looks normal, and then that 2-year CAGR is accelerating.

So I guess, where is the strength coming from? And would you call that a strong 4Q environment? And then, Sheryl, you talked about overhauling targeting longer term to have less focus on users or user-based targeting and more contextual and kind of other things.

I guess, high level, how do you think that will impact the overall return on ad spend compared to pre-IDFA levels? And as you look at Facebook's competitive position in the digital ad market versus some of the other large platforms, like any impact on the long term as you kind of retool the targeting? Thanks a lot.

Dave Wehner:         Hey Ross, it's Dave. We're giving sort of specific quantitative revenue guidance on Q4. I think if you look at the range, it's from a sequential growth basis on a seasonal basis Q3 to Q4, it's lower sequential growth than we've seen historically.

So I do think that reflects some of the uncertainty that we're seeing out there as it relates to how IDFA -- sorry, with the iOS 14 and ATT and IDFA impacts play into pricing during the holidays and also the macroeconomic factors like the supply chain issues. So I do think that kind of the seasonal sequential growth is lower than we've seen in the past. And with the range, I think that reflects that uncertainty.

Sheryl Sandberg:     In terms of the overall targeting, I think it's hard to sit here and decide exactly where we're going to end up at the all of this. It is going to be a multiyear effort. We've definitely seen a hit already, and we're definitely focused on tools to help advertisers.

We think we have opportunities to strengthen targeting ourselves, both by the work we do ourselves and as part of industry consortium. You're right in your question in that advertisers have to make a choice of where they advertise. So the question for us is, how good can our targeting be compared to others?

17

I think our targeting can suffer compared to others like Apple who have the direct data themselves, but I think our targeting still remains, I think, in very, very many ways, very good for advertisers. When you compare us on ROI, we've always performed well. We still do even though we've taken a hit, and we're focused on continuing to do that for businesses.

Operator:    Our next question is from John Blackledge with Cowen. Please go ahead.

John Blackledge:    Great, thanks. Two questions. First on the macro, are you already seeing supply chain issues impacting 4Q ad revenue or do you expect them -- the issues to be more impactful later in the quarter?

And then second question on Instagram. Given the rise of Reels, is it cannibalizing engagement on the other Instagram services? Thank you.

Dave Wehner:    Yes, John. I mean it's -- look, we're not the macroeconomic authority on all things. I would tell you that what we're hearing from advertisers is they are seeing supply chain issues. That was true in Q3 and had an impact there as well as we expect that to continue to carry over into Q4.

They're also -- obviously that intersects with the challenges with the targeting and measurement headwinds from iOS 14. So it's hard to parse exactly how the platform issues and the macroeconomic factors will play into Q4, but I think those are the two biggest factors driving the range of potential outcomes that we've outlined in our guidance.

In terms of Reels and other IG services, I can take a crack at that, and then if Mark and Sheryl want to add anything. Whenever we launch new experiences, this was true with Stories, it was true with Facebook Watch. It's -- you're always going to see some amount of shifting of people's time and attention to the new areas.

And we do think that, that benefits the experience overall, and we think that makes the overall experience more engaging over time. And we do think that it's -- we're able to with Reels drive incremental engagement with Instagram and Facebook. So that's why we're investing to do that. You can go to the next questions.

Operator:    From the line of Mark Shmulik with AllianceBernstein. Please go ahead.

Mark Shmulik:    Yes, hi. One for Sheryl, specifically around kind of on-platform commerce and that pivot, and I know previously you've shared kind of merchant and user adoption metrics, but any progress you could share on that front as it relates to activity? Are users embracing it?

And then the second question kind of more broadly around recruiting. I know the recent post to create kind of 10,000 jobs tied to the metaverse in Europe. Any particular kind of rationale for how you're thinking about recruiting kind of globally? Thanks.

18

Sheryl Sandberg:   So on commerce, we have a lot of commerce activity on our platform already. People are discovering lots of products through our Feed and Stories ads. This is our largest ad vertical, and COVID really accelerated it. But it's also been one of the fastest-growing verticals over a 5-year period.

We believe we drive hundreds of billions of dollars of off-site e-commerce gross merchandise volume today through our ads business. And we think commerce tools will be built and layered on top of that to help businesses reach more new customers and drive more incremental sales.

In those commerce efforts, we're focused on three areas, continuing to be the best place to advertise, making it easier to sell on the platform, and improving the customer experience. And I think we're in different places on those. In the first, in terms of continuing to be the best place to advertise, we are a great place to find customers. We think the ROI is very strong, and it continues to be competitive.

In terms of making it easier, the second, to sell on the platform, here, we're catching up to other mobile and web shopping experiences. And I think we have some work to do there. And then the third, improving the consumer experience to encourage people to shop, I think we're also making progress there, but we've got some room to grow.

Dave Wehner:   And Mark, on the recruiting front, obviously, we've got a big investment year planned in 2022. That's going to be largely driven by recruiting. We're going to have to do that globally. We're looking to build technical talent. We're going to be hiring people to do more remote work and focusing on that.

We're going to be investing in headcount outside of the Bay Area and continuing to focus on building our technical and product capabilities across the globe. Europe is an important part of that, and that's why it was outlined in that announcement.

Deborah Crawford:  Operator, we have time for one last question.

Operator:   Very good. Our last question then will be from the line of Brent Thill with Jefferies. Please go ahead.

Brent Thill:   Thanks. Dave, just on the CapEx at the midpoint over 70%, there are a lot of questions just as it relates to what the surge is related to there. Is there any more detail you can help us better understand that investment?

Dave Wehner:   Yes. Sure, Brent. I mean I mentioned in my prepared remarks, our 2022 outlook really reflects a significant increase in our planned investment in areas like AI and machine learning. And a lot of that will be dedicated to investing in areas where we can use machine learning to improve ranking and recommendations to power experiences across our products in areas like Feed and in emerging areas like Reels.

We'll also be dedicating that to ads as we work to improve ads relevance and leveraging machine learning and AI to help balance out the loss of signal that we've experienced from some of the platform changes.

So we think that we can, as part of sort of making our ads even more effective, make up for that loss with the large investments on the machine learning and AI side. And I think our position gives us a good ability to do that. So that's really part of the logic behind the big increase in the CapEx budget next year.

Deborah Crawford:   Great. Thank you again for joining us today. We appreciate your time, and we look forward to speaking with you again.

Operator:   And this concludes today's conference call. Thank you for joining us. You may now disconnect your lines.

# Exhibit 404



*Article*

# Connection strategies: social capital implications of Facebook-enabled communication practices

new media & society
XX(X) 1–20
© The Author(s) 2010
Reprints and permission: sagepub.
co.uk/journalsPermissions.nav
DOI: 10.1177/1461444810385389
http://nms.sagepub.com

⑤SAGE

## Nicole B. Ellison, Charles Steinfield, Cliff Lampe
Michigan State University, USA

## Abstract
This study assesses whether Facebook users have different 'connection strategies,' a term which describes a suite of Facebook-related relational communication activities, and explores the relationship between these connection strategies and social capital. Survey data ($N = 450$) from a random sample of undergraduate students reveal that only social information-seeking behaviors contribute to perceptions of social capital; connection strategies that focus on strangers or close friends do not. We also find that reporting more 'actual' friends on the site is predictive of social capital, but only to a point. We believe the explanation for these findings may be that the identity information in Facebook serves as a social lubricant, encouraging individuals to convert latent to weak ties and enabling them to broadcast requests for support or information.

## Key words
computer-mediated communication, Facebook, social capital, social network sites

The concept of social capital describes the benefits individuals derive from their social relationships and interactions: resources such as emotional support, exposure to diverse ideas, and access to non-redundant information. Social capital is embedded in the structure of social networks and the location of individuals within these structures (Burt, 2005). Because social network sites (SNSs) have the potential to reshape social networks and lower the costs of communicating with (and thus contributing to and extracting benefits from) this social network, SNS use may have social capital implications. This study

**Corresponding author:**
Nicole B. Ellison, 408 Communication Arts & Sciences Bldg., Michigan State University, East Lansing, MI 48824, USA.
Email: nellison@msu.edu

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016



Case 1:20-cv-03590-JEB   Document 324-31   Filed 04/05/24   Page 200 of 664

is among the first to explore the relationship between social capital and specific communication practices on the most popular SNS among US undergraduates, Facebook.

Previous scholarship has addressed issues such as the demographic characteristics of SNS users (Hargittai, 2007) and the personal information they reveal on these sites (Acquisti and Gross, 2006), but there is currently little empirical research that describes the specific communication-based relational activities that occur on these sites (who does what and with whom) and how these behaviors affect outcomes of interest. Similarly, while the literature provides a basic understanding of whether Friendships[1] on SNSs represent pre-existing offline connections or new relationships forged online (Ellison et al., 2007), measurement difficulties hamper our ability to provide a clear picture of how online and offline modes of communication replace, complement, and facilitate one another. In the research presented here, we test the proposition that Facebook users will have different 'connection strategies,' a term which describes a suite of Facebook-related relational communication activities, and explore the relationship between these connection strategies and social capital outcomes.

Previous work has established a relationship between Facebook use and social capital levels among undergraduate students (Ellison et al., 2007; Steinfield et al., 2008; Valenzuela et al., 2009). It is not clear, however, whether there are *particular uses of Facebook* that are more likely to result in positive social capital outcomes. In other contexts, scholars have argued that while the internet makes vast amounts of information available, only those who have the skills necessary to locate and evaluate this content can take full advantage of it (Hargittai, 2008). Examining SNS use more specifically, Papacharissi and Mendelson (2008) explored the relationship between motivations for using Facebook and social capital outcomes and Burke et al. (2010) found that while Facebook use overall was associated with social capital, there was a stronger association between social capital and active contributions to the site (versus passive consumption of others' information). These studies suggest that users who have the ability and inclination to engage in certain SNS activities may be more likely to reap social capital benefits.

In addition to explicating this relationship between SNS communication behaviors and social capital, this study advances our ability to measure internet-related social behaviors. Currently, SNS researchers use a variety of measures to assess SNS use, such as number of Friends (Joinson, 2008), time on site (Tong et al., 2008), or the number of completed profile fields (Lampe et al., 2007; Stecher and Counts, 2008). The Facebook Intensity (FBI) scale, developed by Ellison et al. (2007) and used in other Facebook research (e.g., Tomai et al., 2010; Valenzuela et al., 2009), uses time on site, number of Friends, and a series of Likert-scale attitudinal items such as, 'I feel out of touch when I haven't logged onto Facebook for a while.' Similar to the way in which scholarship on the digital divide has evolved from simple measures of internet access to nuanced assessments of internet activities, SNS researchers need to develop measures of specific SNS-based communication practices, not just generic usage, in order to better discern usage patterns and their effects.

An important component of measuring SNS communication practices entails accurately characterizing the kinds of social relationships that are being formed and maintained via SNSs. One question is whether SNSs are primarily used to form mixed-mode

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

relationships (which form online and then migrate offline; see Walther and Parks, 2002) or to support existing relationships. In general terms, there is evidence that SNSs are more often used to articulate previously established relationships (see boyd & Ellison, 2007, for a review). However, measurement difficulties, especially surrounding the concepts of 'offline' and 'online' interaction, point to a need to confirm and unpack this general trend.[2] An investigation into the ways SNS users manage their online and offline interactions and the outcomes of these practices is important because it has the potential to shed light on a recurring debate within the internet effects literature: whether the internet augments or displaces social relationships. For instance, Bessiere et al. (2008) found that using the internet to 'meet new people' was associated with higher depression scores seven months later; they speculated that these new connections constituted weak ties, and that interactions with people met online replaced time spent with strong ties. However, they noted that they were unable to determine 'what "meeting new people" online … really meant to [their] respondents' (p. 64). Assessing the role of SNS use in offline and online interactions will contribute to our understanding of how these tools reshape social networks and the outcomes of these practices.

## Social capital and relationship development online and offline

The concept of social capital traces its roots to the work of Bourdieu (1986) and Coleman (1988), with subsequent extension by Burt (1992), Putnam (1995), and Lin (2001). Social capital can be considered as 'the aggregate of the actual or potential resources which are linked to possession of a durable network of more or less institutionalized relationships of mutual acquaintance and recognition' (Bourdieu, 1986: 248). Social capital can be understood as a form of capital, like financial or human capital, that is embedded in the relationships between individuals, and can be measured at the individual or group level.

Putnam (2000) delineated two basic forms of social capital: bonding and bridging. Bonding social capital describes benefits from close personal relationships, which might include emotional support, physical succor, or other 'large' benefits (such as willingness to loan a substantial sum of money). Bridging social capital, the benefits derived from casual acquaintances and connections, can also lead to tangible outcomes such as novel information from distant connections and broader world-views. Empirical research confirms the practical importance of bridging social capital. In Granovetter's (1973) work on 'the strength of weak ties', weak ties in a social network were more likely to have information not possessed by the individual or by the individual's strong ties. Similarly, Boase et al. (2006) found that those with a wider range of occupations represented in their social circle were more likely to get help doing things like changing jobs or finding health information.

### Social interactions on SNSs

SNSs are bundles of technological tools that incorporate features of earlier technologies (such as personal websites) but recombine them into a new context that supports users' ability to form and maintain a wide network of social connections. Although precise

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

data regarding usage are not available, survey data suggest that upwards of 90 percent of undergraduates use Facebook (Lampe et al., 2008). After creating a profile on a SNS such as Facebook, users typically invite others into their network, thus giving one another increased access to profile information and more communication options. In Facebook, this is called 'Friending' (a verb used to describe adding someone to one's 'Friends' list), and there is a wide range of conceptions of what Friendship on an SNS signals (boyd, 2006).

Boyd and Ellison (2007) argue that the term 'social network sites' reflects actual usage patterns, in that individuals are typically using the sites to articulate and reflect offline social relationships, and are generally not trying to meet strangers on the site (as might be suggested by the term 'social *networking* sites'). The extant literature on this topic suggests that Facebook is used more for communication among acquaintances and offline contacts than it is for connecting with strangers (Ellison et al., 2007; Lampe et al., 2006) and that most Facebook 'Friend' connections represent 'in person' relationships (Mayer and Puller, 2008; Subrahmanyam et al., 2008). This represents a fundamental difference between SNSs and earlier 'online communities,' which utilized the internet as a way to bring together people based on shared interests as opposed to shared geography (Rheingold, 1993). Traditional survey measures that attempt to probe communication patterns may not be transferable to SNS contexts because they do not adequately capture the overlapping nature of online and offline interactions. For instance, consider two students who have never spoken but learn from Facebook that they share the same hometown – information that prompts a face-to-face interaction in class the following day. Although this interaction occurs face-to-face, it is predicated on online information – a nuance that would not be captured by traditional questionnaire items that ask whether they first 'met' online or offline. Conceptualizing 'online to offline' and 'offline to online' as dichotomous and mutually exclusive constructs prevents these important distinctions from emerging, stymieing our ability to describe and understand these communication processes.

In addition to supporting existing social relationships, Facebook contains many features that could be used to create new connections, although this seems to be a less common use. At the time of data collection, users could randomly browse the profiles of those in their Facebook 'network' (potentially thousands of individuals) whose privacy settings permitted access[3] and then poke, message, or try to Friend them. They could also encounter other users through shared SNS contexts, such as playing 'Farmville' or other application-based games, and Friend them in order to receive in-game benefits associated with a larger Friend network. However, these forms of indiscriminate Friending should be distinguished from the practice of 'social browsing' (Lampe et al., 2006), which refers to investigating people with whom one shares an offline connection, such as a shared class or mutual friend. In short, Facebook supports a wide spectrum of possible connections, ranging from those who share an offline connection to complete strangers who find one another through a variety of features such as Groups, networks, fan pages, social games and applications, photographs, interest-based profile fields, status updates, and Friend networks.

The concept of latent ties can help distinguish between these different Friending practices on Facebook. Haythornthwaite (2005) described the ways in which information and

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

communication technologies open up new pathways of communication between individuals who would not otherwise connect. These 'latent ties,' defined as connections that are 'technically possible but not yet activated socially' (p. 137), arise whenever a new medium is introduced that enables individuals to connect with each other (e.g., a telephone system and a telephone directory). As Ellison et al. (2007) speculated, Facebook's inclusion of a wide range of identifying information, including mutual friends and shared interests, may encourage users to activate latent ties, transforming them into the weak and bridging ties associated with positive bridging social capital outcomes. Based on this review, it is important to distinguish between uses of the site that involve initiating a relationship with a complete stranger, with no previous offline connection, and uses that essentially activate online ties among those who share an offline connection. Our use of the term 'latent tie' thus describes a relationship between two individuals which has not been socially activated. These individuals may have a passing awareness of one another (or may have even met briefly), but the affordances of the SNS serve to enhance and accelerate the relationship development process.

SNSs are also used by close friends, although little published research focuses on these uses. Close friends who connect through Facebook are likely to find it an efficient and easy way to keep in touch, and the lightweight interactions enabled by the site are likely to benefit these more developed relationships as well. In fact, 20 percent of the SNS users in research by Subrahmanyam et al. (2008) reported that their SNS use brought them closer to friends, and Ellison et al. (2007) found that intensity of Facebook use predicted bonding social capital, which is often associated with strong ties such as close friends. Facebook is unlikely to be a critical communication channel for close friends because these stronger ties typically use multiple, redundant channels to communicate, as suggested by media multiplexity (Haythornthwaite, 2005).

In summary, although research suggests that Facebook users are more likely to use the site to articulate existing relationships than they are to use the site to meet strangers, there is also some indication that users may use the site to convert latent into weak ties. We are particularly interested in distinguishing among the various uses of Facebook aimed at connecting with diverse types of others, including existing strong ties, casual acquaintances (i.e., latent ties), and strangers who share no prior or offline connection. Given the ambiguity in the literature about these specific behaviors, our first research question asks:

> RQ1: Are there distinct patterns in the online and offline communication behaviors employed by Facebook users in relation to close friends, latent ties, and strangers?

Assuming different connection strategies exist among users,[4] it is important to assess how these strategies relate to outcomes of interest, such as bridging and bonding social capital. Just as Quan-Haase and Wellman (2004: 125) point out that 'not all uses of the Internet are social', different uses of the site will result in different social capital outcomes. Connecting with latent ties may increase bridging social capital while using the site to maintain existing close friendships may encourage bonding social capital. Thus, we ask whether distinct types of communication behaviors on Facebook lead to different social capital outcomes.

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

RQ2: Which Facebook-related communication behaviors, if any, are more likely to predict bridging social capital?

RQ3: Which Facebook-related communication behaviors, if any, are more likely to predict bonding social capital?

We also explore the relationship between number of Friends and social capital. The site's affordances facilitate giving and receiving emotional support through one's Friend network; for instance, a status update complaining about an illness serves to inform one's social network and may generate supportive comments or advice. Friends may be more likely to respond to requests for social support if they see the request was posted recently (in that posting 'I'm sorry' a week after a friend complains of a bad day may seem ineffective); thus, it may be that larger Friend networks are more likely to generate social support messages because someone in the network will see the request immediately and respond. Likewise, the site supports requests for information or perspective-sharing, which can be easily shared with one's entire Friend network; responses are more likely to be useful when contributed by weak ties (Granovetter, 1973) and, therefore, the larger one's Friendship network, the more likely it is to include someone with access to the necessary information. Therefore, we expect Friend counts will be positively correlated with both types of social capital.

Related research suggests that boundary conditions may affect the positive association between number of Friends and social capital levels such that the relationship is actually curvilinear. There may be a limit to the number of stable social relationships we can maintain, according to research by Dunbar (1996) (i.e., 'Dunbar's number'). SNSs may support the maintenance of larger social networks (Donath, 2007), allowing users to track and engage with more people than they normally would. However, individuals may indiscriminately accumulate large numbers of Friends – too many to engage with meaningfully, even with the help of technological tools.

Is 'Friend collecting' productive from a social capital perspective? Tong et al. (2008) examined perceptions of social attractiveness and found that higher Friend counts were associated with higher levels of perceived social attractiveness – but only to a point. Individuals who had more than 302 Facebook Friends were rated as lower in social attractiveness, perhaps because these individuals appeared to be 'friending out of desperation' (p. 542) or otherwise inappropriately replacing face-to-face social interactions with computer-mediated ones. Likewise, Donath and boyd (2004) pointed to the pejorative term 'Friendster whores' as reflecting negative perceptions of random Friending behavior.

Some Friends may be less beneficial than others from a social capital perspective. Although Facebook enables users to broadcast requests, we suspect that information requests are less likely to be answered by Friends who are strangers (i.e., with little to no shared history) and that provisions of emotional support will be less meaningful when coming from strangers with little personal knowledge of the recipient. We expect that connection strategies that reflect use of the site to express and develop relationships rooted in some kind of offline connection (operationalized as 'actual friends') are more likely to predict social capital than will using the site to meet strangers, and that social capital is more likely to be generated from latent ties and strong tie Friends as opposed

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

to Friends who start out as complete strangers. Additionally, following Tong et al. (2008) and Donath and boyd (2004), there may be a point of diminishing returns in regards to Friend counts. Thus:

H1: The greater the number of Facebook Friends, the greater the reported bridging social capital.

H1a: This relationship will be stronger for the number of actual friends on the site than for the total number of all Facebook Friends.

H1b: The relationship between the number of actual friends and bridging social capital will be curvilinear, reaching a point where increases in the number of actual friends is no longer associated with higher social capital.

H2: The greater the number of Facebook Friends, the greater the reported bonding social capital.

H2a: This relationship will be stronger for the number of actual friends on the site than for the total number of all Facebook Friends.

H2b: The relationship between the number of actual friends and bonding social capital will be curvilinear, reaching a point where increases in the number of actual friends is no longer associated with higher social capital.

## Methods

In order to address our research questions and hypotheses about the relationship between distinct Facebook connection strategies and social capital, a survey of undergraduate students at a large Midwestern university was fielded in April 2008. A random sample of 2000 undergraduate students, provided by the university registrar, was invited to participate, yielding 450 respondents for a response rate of 22.5 percent. The survey was hosted on Zoomerang.com and subjects were entered into a raffle for 15 $40 Amazon. com gift certificates.

### Measures

*Demographics.* For descriptive and comparative purposes, we asked a series of questions about the demographics of our sample. Sixty-two percent of respondents were female, with an average age of 20.4. They were primarily white (81%), approximately evenly split between on-campus (49%) and off-campus (51%) residence, and the average year in school was 2.68 (where 1 = first year and 4 = senior). They reported using the internet for a mean of 4.01 hours a day and spent 81.4 minutes on Facebook each day; we capped the total hours of Facebook use at 8, approximately three standard deviations from the mean.

*Psychological well-being measures.* Self-esteem was found to be an important predictor in previous work exploring Facebook use and social capital (Ellison et al., 2007; Steinfield et al., 2008). Thus, we included a measure of self-esteem as a control variable in our regressions. Self-esteem was measured using seven items from the Rosenberg Self-esteem Scale (Rosenberg, 1989) as reported in Ellison et al. (2007). The mean of this

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

scale was 4.20 on a 5-point scale, with a standard deviation of 0.57, and the scale was reliable (Cronbach's $\alpha = .86$).

*Facebook use.* Respondents were first asked if they were Facebook members. Those who responded in the affirmative ($N = 436$, 96%) were then asked a series of questions related to their Facebook usage. These included when they first joined the site, how many minutes they spent using it each day in the past week, and how many total Facebook Friends they had. Although previous work in this topic has used Facebook Intensity (e.g., Ellison et al., 2007) to assess Facebook use, we wanted to assess differences between total number of Friends and perceptions of 'actual' friends, which the FBI measure would not enable us to do. Using FBI would also preclude us from doing curvilinear analyses. We control for minutes on Facebook because we want to assess outcomes of certain kinds of uses, while controlling for the fact that those who spend more time on the site might have more opportunities to develop social capital.

*Friends on Facebook.* In order to see if actual friends were more likely to be associated with social capital than the total number of Friends (including those who are not considered actual), we asked about the total number of Facebook Friends reported by participants ('Approximately how many TOTAL Facebook friends do you have at MSU or elsewhere?'), and what proportion of these Friends were considered 'actual' friends ('Approximately how many of your TOTAL friends do you consider actual friends?'). We intentionally did not specify what 'actual friends' meant in order to tap into individual understandings of friendship. The median number for total Facebook Friends was 300 and the median number of 'actual' Facebook friends was 75. Overall, the percentage of all Facebook Friends who were considered 'actual' friends was 25 percent.[5]

*Connection strategies.* We created a series of items asking respondents to indicate how likely they were to browse the Facebook profile, contact via Facebook, add as a Facebook friend, and ultimately meet face-to-face with various types of others, such as close friends or someone from their residence hall (see Table 1). We focused on three types of others reflecting distinct sets of behavior: use of the site for connecting with total strangers at the university, with latent ties representing an offline connection, and with close friends. The three relationship prompts, in order of increasing prior offline connection, were:

- *Total stranger*: 'Imagine a MSU student you've never met in real life or had a face-to-face conversation with.'
- *Someone from your residence hall (latent tie)*: 'Imagine someone at MSU who lives in your residence hall who you would recognize but have never spoken to.'
- *Close friend*: 'Think about one of your close friends.'

We further assessed respondents' connection practices with several items gauging the extent to which they used Facebook to meet new people and learn more about acquaintances, derived from items reported in Ellison et al. (2007). These were asked as a series of 5-point agree/disagree Likert scale items (see Table 1).

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

**Table 1.** Summary statistics for various Facebook connection strategies

| Items | Mean | SD |
|---|---|---|
| **Initiating Scale (Cronbach's $\alpha$ = .86)** | **1.87** | **0.88** |
| I use Facebook to meet new people.[2] | 2.13 | 1.12 |
| MSU Stranger: Browse their profile on Facebook[1] | 2.34 | 1.25 |
| MSU Stranger: Contact them using Facebook, or by using information from Facebook[1] | 1.62 | 0.97 |
| MSU Stranger: Add them as a Facebook friend[1] | 1.71 | 1.09 |
| MSU Stranger: Meet them face-to-face[1] | 1.52 | 0.92 |
| **Information-seeking (Cronbach's $\alpha$ = .77)** | **3.40** | **0.84** |
| I have used Facebook to check out someone I met socially.[2] | 3.92 | 0.91 |
| I use Facebook to learn more about other people in my classes.[2] | 3.31 | 1.08 |
| I use Facebook to learn more about other people living near me.[2] | 2.93 | 1.16 |
| Someone in Residence Hall: Browse their profile on Facebook[1] | 3.43 | 1.18 |
| **Maintaining (Cronbach's $\alpha$ = .87)** | **4.68** | **0.61** |
| Close Friend: Browse their profile on Facebook[1] | 4.62 | 0.76 |
| Close Friend: Contact them using Facebook, or by using information from Facebook[1] | 4.57 | 0.83 |
| Close Friend: Add them as a Facebook Friend[1] | 4.79 | 0.58 |
| Close Friend: Meet them face-to-face[1] | 4.73 | 0.69 |

[1] Scale ranges from 1 = not likely at all to 5 = very likely.
[2] Scale ranges from 1 = strongly disagree to 5 = strongly agree.

*Bridging social capital.* We adapted the bridging social capital measure constructed by Ellison et al. (2007), which contained five items from Williams' (2006) Bridging Social Capital subscale as well as three additional items intended to place these dimensions of bridging social capital in the specific university context. For this study, we omitted two items ('I am interested in what goes on at MSU' and 'MSU is a good place to be') from the Ellison et al. (2007) scale in order to more closely mirror Williams' original scale (*SD*). We did keep one item, 'I feel I am part of the MSU community' because it taps into a dimension of bridging social capital which Williams (2006) describes as 'a view of oneself as part of a broader group' (p. 600). Given its size (over 46,000 students) and diversity (76% White, 6% International, 8% African-American/Black, 5% Asian/Pacific Islander, and 3% Hispanic), we assume that students who report being part of the university community see themselves as part of this large, diverse, broad group. The final scale (Cronbach's $\alpha$ = .84; *M* = 3.74; *SD* = 0.61) consisted of the items: I feel I am part of the MSU community; Interacting with people at MSU makes me want to try new things; Interacting with people at MSU makes me feel like a part of a larger community; I am willing to spend time to support general MSU activities; At MSU, I come into contact with new people all the time; Interacting with people at MSU reminds me that everyone in the world is connected.

*Bonding social capital.* We used the bonding social capital measure employed by Ellison et al. (2007), comprised of five items from the bonding subscale of the internet social

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

capital scales developed and validated by Williams (2006) and adapted to the university context (Cronbach's $\alpha$ = .80; $M$ = 3.69; $SD$ = 0.75).

## Findings

RQ1 probed whether there exist distinct groupings of specific online and offline communication behaviors employed by Facebook users in relation to close friends, latent ties, and strangers. We conducted an exploratory factor analysis (available from the authors upon request) of the 12 connection strategies items and the items probing other purpose of use behaviors, using principal components analysis with varimax rotation. The initial results yielded five factors with eigenvalues greater than 1. However, these results exhibited significant cross-loading of items and several of the factors were not interpretable. After removing cross-loading items, the remaining items factored cleanly into three dimensions, each of which represents a distinct set of social behaviors:

- *Initiating*: This dimension represents the use of Facebook to meet strangers or make new friends without any prior offline connection. Items included all four of the online/offline behaviors (browsing, contacting, Friending, and meeting face-to-face) in relation to Michigan State University (MSU) strangers and one other item, 'I use Facebook to meet new people.'
- *Maintaining*: This dimension reflects using the site to maintain existing close ties. It includes all four of the online/offline behaviors in relation to close friends.
- *Social information-seeking*: This dimension reflects use of the site for learning more about people with whom the user has some offline connection. It includes three items about usage ('I have used Facebook to check out someone I met socially'; 'I use Facebook to learn more about other people in my classes'; 'I use Facebook to learn more about other people living near me') and one item probing the likelihood of browsing the profile of someone in their residence hall.

High loading items on each scale were averaged to create three separate scales representing each connection strategy. All items were measured on 5-point scales, so the connection strategy scales range from a minimum of 1 ('Strongly Disagree') to a maximum of 5 ('Strongly Agree'). Initiating connections with strangers is clearly not a typical usage of Facebook, as evidenced by the low mean ($M$ = 1.87), which was significantly lower than the other connection strategies based on matched sample $t$-tests (infoseeking vs. initiating: $t$ = 31.65, $DF$ = 413, $p$ < .0001); (maintaining vs. initiating: $t$ = 53.20, $DF$ = 413, $p$ < .0001). Nearly all respondents used Facebook to maintain ties with close friends ($M$ = 4.68), which was significantly higher than social information-seeking ($M$ = 3.40) (maintaining vs. info-seeking: $t$ = 30.64, $DF$ = 413, $p$ < .0001). Both the initiating and maintaining strategies exhibit highly skewed distributions (see Figure 1), while social information-seeking – which exhibits a modest amount of skewness (0.71) – is normally distributed.

For RQ2 and RQ3, we explored whether any of these communication patterns were predictive of respondents' reported levels of bridging and bonding social capital. We conducted a series of regression analyses predicting social capital in order to isolate the effect of the various communication patterns above and beyond the factors identified in other work (self-esteem, general internet use, and measures of Facebook use including

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016



**Figure 1.** Distributions of three Facebook connection strategies

time spent on Facebook and number of Friends). We initially included demographic variables as controls, but dropped all but year in school from our final analyses since factors such as gender and ethnicity were not significant predictors of bridging social capital in either our analyses or earlier studies (i.e., Ellison et al., 2007). Regressions included both total Friends and actual friends in order to assess H1a and H2a. In order to explore whether the effect of actual friends diminishes at a certain point, we included a squared term for actual friends.

Our first regression model, addressing RQ2 and H1, examined bridging social capital as the dependent variable; control variables, total number of Facebook Friends, actual Facebook Friends, and the squared term for actual Facebook Friends were included as independent variables (see Table 2). This model has an adjusted $R^2$ of .12. Adding social information-seeking to the model increased the adjusted $R^2$ to .16. We also ran a model using all three of the communication behaviors, but the addition of the maintaining and initiating factors did not increase the $R^2$, nor were these factors significant in the model.[6] Using the model that included social information-seeking, standardized coefficients reveal that the extent to which students engaged in social information-seeking behaviors did, in fact, contribute significantly ($\beta = .22$, $p < .0001$) to bridging social capital. Year in school ($\beta = -0.10$, $p = .0465$), number of actual friends ($\beta = .41$, $p = .0009$), and self-esteem ($\beta = .25$, $p < .0001$) were also significant predictors. The number of total Facebook Friends was not a significant predictor, thus supporting H1a, which predicted that the number of actual friends would be more predictive of bridging social capital than the number of Facebook Friends. This effect appears to diminish if the number of actual friends is too large, as evidenced by the significant, negative squared term ($\beta = -.25$, $p = .0330$), supporting H1b. Figure 2 fits the linear and squared terms to the scatterplot between actual friends and bridging social capital, illustrating the inverted U-shaped relationship between the number of actual friends and bridging social capital. The gray line represents a linear relationship between number of actual friends and bridging social

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

Case 1:20-cv-03590-JEB   Document 324-31   Filed 04/05/24   Page 210 of 664

**Table 2.** Regression predicting bridging social capital from year in school, internet use, self-esteem, social information-seeking, and Facebook use (time, Friends, actual friends)

| Variable | Model 1 | | Model 2 | |
|---|---|---|---|---|
| | Std. Beta | P | Std. Beta | P |
| Intercept | 0 | <.0001 | 0 | <.0001 |
| Year in school | −0.11 | 0.0281 | −0.10 | 0.0465 |
| Daily internet use (hours) | 0.06 | | 0.05 | |
| Self-esteem | 0.23 | <.0001 | 0.25 | <.0001 |
| Minutes on Facebook | 0.04 | | 0.01 | |
| Total Friends on Facebook | −0.00 | | −0.05 | |
| Actual friends on Facebook | 0.41 | 0.0011 | 0.41 | 0.0009 |
| Actual friends on Facebook (squared term) | −0.24 | 0.0391 | −0.25 | 0.033 |
| Social information-seeking via Facebook | | | 0.22 | <.0001 |
| | $R^2 = .14$ | | $R^2 = .18$ | |
| | Adjusted $R^2 = .12$, | | Adjusted $R^2 = .16$, | |
| | $F = 8.07, p < .0001$, | | $F = 9.86, p < .0001$, | |
| | $N = 367$ | | $N = 367$ | |



**Figure 2.** Relationship between number of actual friends on Facebook and bridging social capital

capital while the black line represents the relationship between bridging social capital and the squared number of actual friends. Social capital benefits appear to diminish after approximately 500 reported actual friends.

In order to address RQ3 and H2, we examined these same variables in a regression predicting bonding social capital (see Table 3). After first controlling for year in school, self-esteem, general internet use and Facebook use (time spent on site), as well as the number of total Friends on Facebook, actual friends on Facebook, and the square of actual friends, the extent to which students engaged in social information-seeking

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

behaviors did contribute significantly ($\beta = .15$, $p = .0056$) to bonding social capital. The overall adjusted $R^2$ increases from .07 to .09 with social information-seeking behaviors in the equation. As with bridging social capital, self-esteem ($\beta = .18$, $p = .0006$) was a significant predictor of bonding social capital. The number of actual friends ($\beta = .33$, $p = 0.009$) was significant, although the number of total Facebook Friends was not, supporting H2a. Once again, the squared term for actual friends ($\beta = -.24$, $p = .0496$) suggests a diminishing return beyond approximately 500 actual friends, supporting H2b. Figure 3 plots the relationship between actual friends and bonding social capital, again depicting diminishing social capital returns for those who report more than 500 actual friends.

## Discussion

The overarching goal of this study was to explore how undergraduates use Facebook to initiate and develop social relationships and to assess the impact of these practices on perceived social capital levels. Because Facebook is closely integrated into the daily experience of most undergraduate students in the US, we investigated whether some patterns of Facebook-enabled social interaction are more effective than others for actualizing 'the benefits of Facebook "friends' (Ellison et al., 2007). This study contributes to our understanding of SNS-enabled social capital by identifying specific communication practices (i.e., 'connection strategies') on the site, developing scales to measure them, and empirically assessing their relationship to users' social capital. Furthermore, this study identifies intriguing patterns regarding the quantity and quality of Facebook Friendships as they relate to levels of social capital.

Our first research question asked about Facebook users' communication practices. Specifically, we were interested in *who* users are interacting with and *what* they are doing

**Table 3.** Regression predicting bonding social capital from year in school, internet use, self-esteem, social information-seeking, and Facebook use (time, Friends, actual friends)

| Variable | Model 1 | | Model 2 | |
|---|---|---|---|---|
| | Std. Beta | P | Std. Beta | P |
| Intercept | 0 | <.0001 | 0 | <.0001 |
| Year in school | 0.00 | | 0.01 | |
| Daily internet use (hours) | −0.01 | | −0.02 | |
| Self-esteem | 0.17 | 0.0013 | 0.18 | 0.0006 |
| Minutes on Facebook | 0.03 | | 0.01 | |
| Total Friends on Facebook | 0.09 | | 0.06 | |
| Actual friends on Facebook | 0.33 | 0.0098 | 0.33 | 0.0093 |
| Actual friends on Facebook (squared term) | −0.24 | 0.053 | −0.24 | 0.0496 |
| Social information-seeking via Facebook | | | 0.15 | 0.0056 |
| | $R^2 = .09$ | | $R^2 = .11$ | |
| | Adjusted $R^2 = .07$, | | Adjusted $R^2 = .09$, | |
| | $F = 5.04$, $p < .0001$, | | $F = 5.46$, $p < .0001$, | |
| | $N = 367$ | | $N = 367$ | |

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016



**Figure 3.** Relationship between number of actual friends on Facebook and bonding social capital

with their interaction partners. Our findings suggest that there are three distinct modes of interaction employed by our participants. 'Initiating' describes behaviors aimed at meeting strangers through Facebook. People who scored high on this strategy were more likely to report using Facebook to 'meet new people' and to browse, contact, Friend, and meet strangers in person. This suite of behaviors was the least common. On the other end of the spectrum, 'maintaining' behaviors include engaging in all the behaviors we examined – browsing, communicating, Friending, and meeting – with one's close friends, and was by far the most common. Finally, and perhaps most interestingly, 'social information-seeking' describes a suite of behaviors that revolve around using the site to discover more information about someone with whom the user shares some kind of offline connection. Individuals scoring high on this variable were more likely to agree with statements about using the site to 'check out' someone they met socially, to learn more about peers in their classes, and to learn more about other people living near them. They were also more likely to browse the profile of someone in their residence hall.

   The social information-seeking strategy is intriguing because it encapsulates the organic interplay between offline and online communication found on many SNSs. People who report engaging in information-seeking behaviors are using the site to learn more about people around them. Although our measures do not enable us to claim with certainty what they are doing with this information or whether an offline interaction preceded the online investigation, we speculate that the identity information typically included in Facebook profiles may be used to trigger offline interactions. In this sense, Facebook use can act as a catalyst of, rather than a replacement for, offline interaction, supporting earlier research that suggested that 'highly engaged users are using Facebook to crystallize relationships that might otherwise remain ephemeral' (Ellison et al., 2007: 1162). Although early work on the subject employed 'online to offline' and 'offline to online' measures (Ellison et al., 2007), these connection strategies point to an evolved approach to describing interaction patterns which moves beyond dichotomous 'online'

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

and 'offline' social worlds and instead acknowledges these channels as deeply integrated communicative spheres.

For RQ2 and RQ3, we explored whether these strategies were significant predictors of perceptions of social capital. Social information-seeking was significant in both regressions, whereas including the other two strategies did not explain more variance, nor were they significant when included. We believe that initiating behaviors do not exploit one of the true benefits of SNSs, learning information about latent ties (Haythornthwaite, 2005) that share an offline connection or shared interest. It is also worth noting that using Facebook to connect with strangers is not the norm on the site, and thus users may be less receptive to these advances. Similarly, using Facebook to engage with close friends (maintaining) does not contribute to perceptions of social capital. Media multiplexity would predict that these strong ties are using a variety of channels for communicating (Haythornthwaite, 2005); thus, we would not expect Facebook-enabled interaction with close friends to have a large impact on either form of social capital as these social resources are available with or without Facebook.

Considering the significant influence of social information-seeking behaviors, we believe the social and technical affordances of Facebook support the conversion of latent ties to weak ties, in that the site provides identity information, enables communication between parties, and helps bring together those with shared interests. Haythornthwaite (2005) noted that technologies like the telephone, especially when combined with a directory, create latent ties. Examining how emerging adults use Facebook enables us to explicate how SNS communication practices can help transform latent ties into weak ties. Following Haythornthwaite (2005), we believe that communication technologies like the telephone can provide the *technical ability* to communicate, but this alone is often not sufficient for relationship development. Calling total strangers on the telephone is unlikely to result in the development of social relationships, because these individuals do not have access to social information that enables them to cultivate *socially relevant* interactions. However, unlike the telephone directory, Facebook also provides a rich collection of social context cues, such as mutual friends or shared interests, which can guide conversations to socially relevant topics and better enable participants to find common ground. These additional cues distinguish Facebook-enabled communication from digital 'crank calling'. We believe that the identity information in Facebook serves as a *social lubricant*, providing individuals with social information that is critical for exploiting the technical ability to connect provided by the site. Using Facebook to try to connect with 'total strangers' (initiating) did not have an impact on social capital scores, whereas using the site to 'check out' or 'learn more about' proximate latent or very weak ties (social information-seeking) did. The process by which Facebook can be used to scaffold productive social interactions is complex and is only partially illuminated by our data.

Our analyses suggest 'Friends' who are not considered 'actual' friends are unlikely to provide social capital benefits. For H1 and H2, we examined the role played by the number of total Facebook Friends and actual friends on the site. A simple quantity-centric view of social networks would assume that more Friends (regardless of tie strength) should result in higher levels of bridging social capital because more of these friends are likely to be bridging, or weak, ties and because higher numbers represent more potential sources of information and perspectives. However, this was not the case:

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

the number of Facebook Friends alone did not predict bridging social capital, but the number of actual friends did. Given the high median number of actual friends reported by our subjects (75, out of a median estimate of 300 total Friends), we surmise that not all actual friends are truly close ties or intimate friends, but are likely to be individuals with whom the user has a stronger offline connection. Our findings suggest that these perceived actual Friends are more likely to be productive from a social capital stand-point. One explanation for this stems from the ways in which individual users may be configuring their use of the site. Although Facebook users directly interact with only a small percentage of their Friends (Facebook Data Team, 2009; Golder et al., 2007), they can consume content from many others through the News Feed. Perhaps users employ their settings to 'hide' non-actual friends' activity from their News Feed (and, likewise, may have their updates, including requests for support, hidden by others), rendering them invisible within the system and thus not active contributors to social capital-building exchanges. The fact that total and 'actual' friends had different effects in our models suggests that future studies should probe self-reported total Friends, which are very highly correlated with Friend counts as extracted from server-level data (Burke et al., 2010), as well as perceptions of 'actual' friends.

Finally, our findings suggest a point of diminishing returns, even for those considered to be actual friends, in terms of the association with social capital once the number of reported actual friends exceeds the 400–500 range. At this size, it may be impossible to engage in the kinds of relationship maintenance necessary to get weak ties to provide useful information or other forms of support, as suggested by other research that examines theoretical limits on the number of stable social relationships humans can maintain (Dunbar, 1996). Alternatively, those people with such large numbers of reported actual friends may simply be improperly ascribing the moniker of 'actual' friend, and much of their network may, in fact, be comprised of very weak ties such that these individuals are no more likely than total strangers to offer any form of support. Future research, including qualitative methods, should address the mechanism behind this intriguing finding.

## Conclusion

Emerging adults such as college students, who are experimenting with various identities, may benefit from the larger, more heterogeneous network that Facebook enables. The modern-day equivalent of Granovetter's (1973) 'strength of weak ties' may be found in these larger social 'supernets' (Donath, 2007) enabled by SNSs such as Facebook. This study sheds light on the processes by which SNSs can scaffold relationship development in both online and offline contexts. Our findings suggest that communication practices on the site impact social capital outcomes and underscore the importance of examining not just whether individuals use a particular site, but what they do with it and, as our findings regarding different 'connection strategies' and their relationship to social capital suggest, who they do it with. Our analysis considers friendship practices – both the articulation of 'Friendship' as evidenced on the site and how users perceive these relationships – and finds that users do differentiate between all Facebook Friends and 'actual' friends. These individuals may not all be close friends, but, as suggested by regressions showing the number of *actual* friends (but not the number of total Friends) predicts social capital,

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

they may be useful resources for providing individuals with a window into a diverse set of perspectives and information.

Limitations to this study include the fact that we studied just one social network site, Facebook, and thus our results cannot be generalized to other sites. Research suggests there might be differences among SNSs regarding how receptive users are to meeting new people (Dwyer et al., 2007). Additionally, survey data suffer from concerns regarding self-report and social capital is notoriously hard to measure. Our measures of social capital reflect limited dimensions of the concept and should be refined in future studies.

Sharing time and space with others supports relational development in multiple ways: social information about others is readily available through identity cues such as appearance, opportunities for sustained and repeated interaction are available, and commonalities among individuals are surfaced (Kraut et al., 2002). Technological tools for interaction, such as cell phones, e-mail, and SNSs, may emulate proximity in some cases. For instance, online dating profiles provide identity information, newsgroups enable those with shared preferences or interests to come together, and the telephone enables communication between distributed users. SNSs such as Facebook are well designed to support relational development in that they perform all three of these relationship-supporting tasks. Facebook enables individuals to find those with shared interests (e.g., through Groups or searchable profile fields). It enables self-expression through the profile, which consists of multiple opportunities to share information about one's cultural tastes, friendship networks, political affiliations, and other aspects of the self. Finally, Facebook provides multiple communication opportunities, both public and private, broadcast and targeted, lightweight and more substantive. We believe these social and technical affordances play an important role in helping students maintain and develop social networks and the social capital that is embedded within them.

## Acknowledgements

The authors would like to thank Jessica Vitak and members of the Organizations & Markets Workshop at the Booth School of Business for feedback on this article.

## Funding

This research received no specific grant from any agency in the public, commercial, or not-for-profit sectors.

## Notes

1. Following boyd and Ellison (2007), we capitalize Friends to indicate SNS contacts in order to distinguish it from colloquial understandings of the term. On Facebook, individuals invite other users to be 'Friends,' a relationship visible to others on the site and which enables two users to more easily communicate with and share content with one another.
2. For instance, Ellison et al. (2007) use a weak one-item measure for the 'on to offline' pattern, interpreted as describing relationships that start online and then migrate to face-to-face or other offline settings: the extent to which respondents agreed with the statement 'I use Facebook to

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

meet new people.' It is difficult to create survey items that adequately assess the online/offline directionality of relationship development given the multiple channels employed by users, confusion among participants about the meaning of various terms (e.g., 'online,' 'offline'), and difficulties in retrospective reporting.

3. At the time of data collection, Facebook allowed users to self-select into 'networks' associated with organizations, universities, or other grouping mechanisms. By default, privacy settings enabled anyone in the same network to view network members' profile.

4. We explored the relationship between demographic attributes and these behaviors, although these analyses are not reported here due to length restrictions.

5. We use median scores here to minimize the effect of outliers (e.g., one individual reported 1500 Friends).

6. Given the highly skewed distributions and limited variance of these other connection strategy scales, this result was not surprising. We attempted to transform the scales in various ways (e.g., log transforms and standardization), but none of these efforts yielded any significant results, so we can only conclude that these types of behaviors are not associated with any concomitant increase or decrease in social capital.

## References

Acquisti A and Gross R (2006) Imagined communities: Awareness, information sharing, and privacy on the Facebook. *Lecture Notes in Computer Science* 4258: 36–58.

Bessiere K, Kiesler S, Kraut R and Boneva B (2008) Effects of Internet use and social resources on changes in depression. *Information, Communication and Society* 11: 47–70.

Boase J, Horrigan JB, Wellman B and Rainie L (2006) *The Strength of Internet Ties*. Washington, DC: Pew Internet & American Life Project.

Bourdieu P (1986) The forms of capital. In: Richardson JG (ed.) *Handbook of Theory And Research for the Sociology of Education*. New York: Greenwood, 241–258.

boyd d (2006) Friends, Friendsters, and MySpace Top 8: Writing community into being on social network sites. *First Monday* 11(12).

boyd d and Ellison N (2007) Social network sites: Definition, history, and scholarship. *Journal of Computer-mediated Communication* 13: 210–230.

Burke M, Marlow C and Lento T (2010) Social network activity and social well-being. In: *Proceedings of the 2010 ACM Conference on Human Factors in Computing Systems*. New York: ACM, 1909–1912.

Burt RS (1992) *Structural Holes: The Social Structure of Competition*. Cambridge, MA: Harvard University Press.

Burt RS (2005) *Brokerage and Closure: An Introduction to Social Capital*. Oxford: Oxford University Press.

Coleman JS (1988) Social capital in the creation of human capital. *The American Journal of Sociology* 94(Supplement): S95–S120.

Donath J (2007) Signals in social supernets. *Journal of Computer-mediated Communication* 13: 231–251.

Donath JS and boyd d (2004) Public displays of connection. *BT Technology Journal* 22(4): 71–82.

Dunbar RIM (1996) *Grooming, Gossip, and the Evolution of Language*. Cambridge, MA: Harvard University Press.

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

Dwyer C, Hiltz SR and Passerini K (2007) Trust and privacy concern within social networking sites: A comparison of Facebook and MySpace. In: *Proceedings of the Thirteenth Americas Conference on Information Systems*. Available at: http://csis.pace.edu/~dwyer/research/DwyerAMCIS2007.pdf

Ellison NB, Steinfield C and Lampe C (2007) The benefits of Facebook 'friends': Exploring the relationship between college students' use of online social networks and social capital. *Journal of Computer-mediated Communication* 12: 1143–1168.

Facebook Data Team (2009) Maintained relationships on Facebook. Available at: http://www.facebook.com/note.php?note_id=55257228858&id=8394258414&ref=nf

Golder S, Wilkinson D and Huberman B (2007) Rhythms of social interaction: Messaging within a massive online network. In: Steinfield C, Pentland BT, Ackerman M and Contractor N (eds), *Communities and Technologies 2007: Proceedings of the Third International Conference on Communities and Technologies*. London: Springer, 41–66.

Granovetter M (1973) The strength of weak ties. *American Journal of Sociology* 78: 1360–1380.

Hargittai E (2007) Whose space? Differences among users and non-users of social network sites. *Journal of Computer-mediated Communication* 13: 276–297.

Hargittai E (2008) The digital reproduction of inequality. In: Grusky D (ed.) *Social Stratification*. Boulder, CO: Westview, 936–944.

Haythornthwaite C (2005) Social networks and Internet connectivity effects. *Information, Communication & Society* 8: 125–147.

Joinson AN (2008) Looking at, looking up or keeping up with people?: Motives and use of Facebook. In: *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*. New York: ACM, 1027–1036.

Kraut R, Fussell S, Brennan S and Siegel J (2002) Understanding effects of proximity on collaboration: Implications for technologies to support remote collaborative work. In: Hinds P and Kiesler S (eds) *Distributed Work*. Cambridge, MA: MIT Press, 137–162.

Lampe C, Ellison N and Steinfield C (2006) A Face(book) in the crowd: Social searching vs. social browsing. In: *Proceedings of the 2006 20th Anniversary Conference on Computer Supported Cooperative Work*. New York: ACM, 167–170.

Lampe C, Ellison N and Steinfield C (2007) A familiar Face(book): Profile elements as signals in an online social network. In *Proceedings of the 2007 ACM Conference on Human Factors in Computing Systems*. New York: ACM, 435–444.

Lampe C, Ellison N and Steinfield C (2008) Changes in use and perception of Facebook. In *Proceedings of the 2008 Conference on Computer-supported Cooperative Work*. New York: ACM, 721–730.

Lin N (2001) Building a network theory of social capital. In: Lin N, Cook KS and Burt RS (eds) *Social Capital: Theory and Research*. New York: Aldine de Gruyter, 3–29.

Mayer A and Puller SL (2008) The old boy (and girl) network: Social network formation on university campuses. *Journal of Public Economics* 92: 329–347.

Papacharissi Z and Mendelson A (2008) Toward a new(er) sociability: Uses, gratifications, and social capital on Facebook. Paper presented at the Internet Research conference, Copenhagen, Denmark, October 2008.

Putnam R (1995) Bowling alone: America's declining social capital. *Journal of Democracy* 6: 65–78.

Putnam RD (2000) *Bowling Alone: The Collapse and Revival of American Community*. New York: Simon and Schuster.

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

Quan-Haase A and Wellman B (2004) How does the Internet affect social capital? In: Huysman M and Wulf V (eds) *Social Capital and Information Technology*. Cambridge, MA: MIT Press, 113–135.

Rheingold H (1993) *The Virtual Community: Homesteading on the Electronic Frontier.* Cambridge, MA: Perseus Books.

Rosenberg M (1989) *Society and the Adolescent Self-image* (revised ed). Middletown, CT: Wesleyan University Press.

Stecher K and Counts S (2008) Thin slices of online profile attributes. In: *Proceedings of the Second International Conference on Weblogs and Social Media* Seattle, WA: AAAI Press.

Steinfield C, Ellison NB and Lampe C (2008) Social capital, self-esteem, and use of online social network sites: A longitudinal analysis. *Journal of Applied Developmental Psychology* 29: 434–445.

Subrahmanyam K, Reich SM, Waechter N and Espinoza G (2008) Online and offline social networks: Use of social networking sites by emerging adults. *Journal of Applied Developmental Psychology* 29: 420–433.

Tomai M, Rosa V, Mebane ME, D'Acunti A, Benedetti M and Francescato D (2010) Virtual communities in schools as tools to promote social capital with high schools students. *Computers & Education* 54: 265–274.

Tong ST, Van Der Heide B, Langwell L and Walther J (2008) Too much of a good thing? The relationship between number of friends and interpersonal impressions on Facebook. *Journal of Computer-mediated Communication* 13: 531–549.

Valenzuela S, Park N and Kee KF (2009) Is there social capital in a social network site?: Facebook use and college students' life satisfaction, trust, and participation. *Journal of Computer-mediated Communication* 14: 875–901.

Walther JB and Parks MR (2002) Cues filtered out, cues filtered in: Computer-mediated communication and relationships. In: Knapp ML and Daly JA (eds) *Handbook of Interpersonal Communication* (3rd edn). Thousand Oaks, CA: Sage, 529–563.

Williams D (2006) On and off the 'net: Scales for social capital in an online era. *Journal of Computer-mediated Communication* 11: 593–628.

**Nicole B. Ellison** is an associate professor in the Department of Telecommunication, Information Studies, and Media (TISM) at Michigan State University. Her research focuses on relationship development in online contexts such as social network sites.

**Charles Steinfield** is a professor and the chairperson of TISM at Michigan State University. He studies the social and organizational impacts of information and communication technologies.

**Cliff Lampe** is an assistant professor in TISM at Michigan State University. His research interests include the social practices and architecture of large-scale online communities.

Downloaded from nms.sagepub.com at PENNSYLVANIA STATE UNIV on May 17, 2016

# Exhibit 405



MetaFTC-DX-99
7 (5-22-23)
WWW.DIGITALEVIDENCEGROUP.COM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**, | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-03590 (JEB) |
| **META PLATFORMS, INC.**, | |
| Defendant. | |

### PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO META PLATFORMS, INC.'S LIST OF FEATURES OR ACTIVITIES

Pursuant to the Court's August 1, 2022 Order, ECF No. 165, and in response to Meta's August 22, 2022 List of Features or Activities for Classification ("Meta's List"), the Federal Trade Commission ("FTC") provides below its present position on whether each of the 322 features or activities identified in Meta's List is or is not within the definition of "personal social networking" alleged in the FTC's complaint. *E.g.*, Substitute Amended Complaint ("SAC") ¶¶ 166-169, ECF No. 81.

The FTC incorporates by reference all of its General and Specific Objections in its April 29, 2022 Objections and Responses to Defendant Meta Platforms, Inc.'s First Set of Interrogatories, as well as in its June 14, 2022 Supplemental Objections and Responses to Defendant Meta Platforms, Inc.'s First Set of Interrogatories ("Supplemental Response"). Moreover, the FTC responds here to the best of its present ability after a reasonably diligent inquiry and while discovery in this matter is ongoing, and thus the FTC reserves its right to supplement, revise, or correct any of its responses pursuant to Fed. R. Civ. P. 26(e). *See also*

1

ECF No. 165 at 2 ("If, at any point in the future, the FTC takes a different position on any such feature or activity, the FTC shall so supplement its response.").

In particular, the FTC is actively seeking documents, data, and testimony from Meta that will further inform the characteristics and usage of Meta's applications.  Moreover, such questions will likely be the subject of expert analysis as provided by the Court's Scheduling Order.  Scheduling Order at 1, ECF No. 103 (providing a deadline for expert discovery of January 5, 2024).  The FTC also reserves its right to revise its response if additional evidence and analysis shows that any features or activities have materially changed such that their classification varies depending on the time period assessed.

The table below reflects the FTC's item-by-item assessment and classification for each of the 322 features/activities identified by Meta on the Facebook, Instagram, Facebook Messenger, and WhatsApp applications at this time.

In sum, all of the features/activities identified by Meta for Facebook and Instagram are part of Meta's personal social networking offering, except Facebook Dating.  The FTC's classifications are driven in large part by the connection between the feature/activity and users' ability to share and experience each of the various features and activities with their social networks of friends, family, and personal connections in a shared social space—all built and maintained within the Facebook and Instagram applications—using Facebook's and Instagram's integrated and personalized social experiences.  *Cf.* SAC ¶ 166 (alleging "personal social networking services" are "online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space"); *see also* Supplemental Response at 6-11 (describing how personal social networking is an integrated service that allows people to share personal updates and other

2

content with personal connections). With the exception of Facebook Dating, the evidence presently available to the FTC suggests that the various features/activities identified by Meta for Facebook and Instagram are experienced and perceived by users, and/or are presented to users, as aspects of personal social networking, and users are engaging with that content along with their networks of friends, family, and personal connections, built and maintained within the respective applications, and using Facebook's and Instagram's integrated and personalized social experiences. *See, e.g.*, Supplemental Response at 6-11 (discussing evidence of how Meta integrates various features of its apps, including with its "core social assets").

The FTC classifies Facebook Dating as outside of Meta's personal social networking offering because evidence suggests that Meta affirmatively cordons off Dating from Facebook's social networking service—that is, Facebook Dating is intentionally kept separate from users maintaining a personal network of friends, family, and other personal connections and sharing personal updates and other content with them. *See, e.g.*, www.facebook.com/dating (last accessed September 12, 2022) ("A space just for Dating. Your Facebook Dating profile and conversations won't be shared with anyone outside of Dating."). The FTC has, however, also found evidence suggesting that Meta does offer the opportunity for users to use Facebook Dating as an experience shared with their personal network. *See, e.g.*, FB_FTC_CID_05974730 (noting that, as of May 2019, Meta created a "Secret Crush" feature in Dating that allowed users to "create a private list of []Facebook friends that [the user] might be interested in"). This remains under evaluation and subject to further discovery by the FTC.

For Messenger and WhatsApp, by contrast, nearly all features/activities are outside the definition of personal social networking because both applications present a user experience dedicated to mobile messaging, rather than maintaining a network of friends, family, and

personal connections and sharing experiences with them in a shared social space.  Stories,

offered on Messenger, is the sole exception because it appears to be fully linked with Facebook's

personal social networking services (e.g., users automatically cross-post Stories between

Facebook and Messenger).  This, too, remains under evaluation and subject to further discovery

by the FTC.

   The FTC's classifications are limited to the features/activities identified by Meta as they

are implemented on Facebook, Instagram, WhatsApp, and Messenger.  The FTC's classifications

have no implication for whether any specific feature or activity offered by a different product is

or is not within the definition of personal social networking.  For example, the FTC currently

classifies "Posting Original photo(s)" on Facebook's Feed as within the definition of "personal

social networking" in significant part because users engaged in that activity are doing so with

their network of friends, family, and personal connections, built and maintained within

Facebook, and using Facebook's integrated and personalized social experience.  Such

classification has no bearing on whether posting photos on any other website or product is within

or outside the definition of "personal social networking."

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 1 | Watch | Viewing publicly accessible video(s) on the "For You," "Live," "Music," "Gaming," "Following," "Saved," or "Shows" Tabs posted by a Page User follows. | Yes |
| Facebook | 2 | Watch | Viewing publicly accessible video(s) on the "For You," "Live," "Music," Gaming," "Following," "Saved," or "Shows" Tabs posted by a person User follows that is not Facebook Friends with User. | Yes |
| Facebook | 3 | Watch | Viewing video(s) on the "For You," "Live," "Music," Gaming," "Following," "Saved," or "Shows" Tabs posted by an account that is Facebook Friends with User. | Yes |
| Facebook | 4 | Watch | Viewing video(s) on the "For You," "Live," "Music," Gaming," "Saved," or "Shows" Tabs posted by a Page or person User does not follow. | Yes |
| Facebook | 5 | Watch | Viewing advertisement(s). | Yes |
| Facebook | 6 | Marketplace | Viewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook Friends. | Yes |
| Facebook | 7 | Marketplace | Viewing content of any form (such as Items for Sale) that was posted by one of User's Facebook Friends. | Yes |
| Facebook | 8 | Marketplace | Posting content of any form. | Yes |
| Facebook | 9 | Reels | Viewing Reel(s) posted by a Page User follows. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 10 | Reels | Viewing Reel(s) posted by a Public Figure or other Personal Account User follows that is not Facebook Friends with User. | Yes |
| **Facebook** | 11 | Reels | Viewing Reel(s) posted by User's Facebook Friend. | Yes |
| **Facebook** | 12 | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User or a person or Page User follows. | Yes |
| **Facebook** | 13 | Reels | Viewing Reel(s) posted by User's Facebook Friend that User did not use the People You May Know ("PYMK") feature to form a friendship with on the application. | Yes |
| **Facebook** | 14 | Reels | Viewing advertisement(s). | Yes |
| **Facebook** | 15 | Reels | Posting Reel(s) to a Public Audience. | Yes |
| **Facebook** | 16 | Reels | Posting Reel(s) to an audience limited exclusively to User's Facebook Friends. | Yes |
| **Facebook** | 17 | Reels | Commenting on or reacting to Reel(s) not posted by User's Facebook Friend or a person or Page User follows. | Yes |
| **Facebook** | 18 | Reels | Commenting on or reacting to Reel(s) posted by User's Facebook Friend. | Yes |
| **Facebook** | 19 | Reels | Commenting on or reacting to Reel(s) posted by a Page User follows. | Yes |
| **Facebook** | 20 | Groups | Viewing or posting content in a Group User joined based on the User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 21 | Groups | Viewing or posting content in a Group of any size where 0-15% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 22 | Groups | Viewing or posting content in a Group of any size where 16-50% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 23 | Groups | Viewing or posting content in a Group of any size where more than 50% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 24 | Groups | Viewing or posting content in a Group that contains more than 10,000 members. | Yes |
| **Facebook** | 25 | Groups | Viewing or posting content in a Group that contains between 1,001 and 10,000 members. | Yes |
| **Facebook** | 26 | Groups | Viewing or posting content in a Group that contains between 250 and 1,000 members. | Yes |
| **Facebook** | 27 | Groups | Viewing or posting content in a Group that contains fewer than 250 members. | Yes |
| **Facebook** | 28 | Groups | Viewing or posting content in a Group of any size regarding buying, selling, trading, or giving away items. | Yes |
| **Facebook** | 29 | Groups | Viewing or posting content in a Group focused on a geographic community, such as a neighborhood or city. | Yes |
| **Facebook** | 30 | Fundraisers & Donations | Donating to or creating fundraiser(s). | Yes |

7

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 31 | Pages | Viewing or posting content on a Page. | Yes |
| Facebook | 32 | Games/Gaming | Playing game(s). | Yes |
| Facebook | 33 | Games/Gaming | Watching gaming video(s) or live stream gaming. | Yes |
| Facebook | 34 | Stories | Viewing Story(ies) posted by Facebook Friend. | Yes |
| Facebook | 35 | Stories | Viewing Sponsored Story(ies). | Yes |
| Facebook | 36 | Stories | Viewing Story(ies) posted by a Page User follows. | Yes |
| Facebook | 37 | Stories | Viewing Story(ies) posted by a Public Figure or other Personal Account User follows that is not Facebook Friends with User. | Yes |
| Facebook | 38 | Stories | Posting Story(ies). | Yes |
| Facebook | 39 | Live | Viewing Live video(s) posted by an account User follows that is not Facebook Friends with User. | Yes |
| Facebook | 40 | Live | Viewing Live video(s) posted by an account that is Facebook Friends with User. | Yes |
| Facebook | 41 | Live | Viewing Live video(s) posted by a Page or account User does not follow. | Yes |
| Facebook | 42 | Feed | Viewing advertisement(s). | Yes |
| Facebook | 43 | Feed | Posting to all of User's Facebook Friends encouraging them to attend an industry-networking event hosted by User's employer. | Yes |
| Facebook | 44 | Feed | Posting to User's Facebook Friends to promote User's small business. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 45 | Feed | Posting to a limited audience of User's Facebook Friends who are exclusively User's work colleagues. | Yes |
| Facebook | 46 | Feed | Viewing post(s) to all of poster's Facebook Friends encouraging them to attend an industry-networking event hosted by the poster's employer. | Yes |
| Facebook | 47 | Feed | Viewing content posted by User's Facebook Friend that User has never met in person, or spoken to individually. | Yes |
| Facebook | 48 | Feed | Posting content to a limited audience of five or fewer Facebook Friends whose mobile telephone number User possessed prior to joining Facebook. | Yes |
| Facebook | 49 | Feed | Viewing content that was posted to a limited audience of five or fewer Facebook Friends whose mobile telephone number the User possessed prior to joining Facebook. | Yes |
| Facebook | 50 | Feed | Viewing Original content that was posted by User's Facebook Friend that User did not use the PYMK feature to form a friendship with on the application. | Yes |
| Facebook | 51 | Feed | Posting Original content that encourages users that reside in close physical proximity to one another to attend a local social event. | Yes |
| Facebook | 52 | Feed | Viewing Original photo(s) posted by a Facebook Friend. | Yes |

9

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 53 | Feed | Posting Original photo(s). | Yes |
| Facebook | 54 | Feed | Viewing Original video(s) posted by a Facebook Friend. | Yes |
| Facebook | 55 | Feed | Posting Original video(s). | Yes |
| Facebook | 56 | Feed | Viewing comments or reactions to Original post(s) by a Facebook Friend. | Yes |
| Facebook | 57 | Feed | Viewing content (e.g., The New York Times ("NYT") article or 20 minute comedy routine from a famous comedian that was posted on YouTube) that was linked in a Facebook Friend's post. | Yes |
| Facebook | 58 | Feed | Viewing content that User's Facebook Friend reshared that was posted by a Page that Facebook Friend followed. | Yes |
| Facebook | 59 | Feed | Viewing content that User's Facebook Friend reshared that was posted in a Group that Facebook Friend joined or a Page that Facebook Friend followed. | Yes |
| Facebook | 60 | Feed | Viewing content that was posted by a Facebook Friend of one of User's Facebook Friends (who is not Facebook Friends with User) and reshared by User's Facebook Friend. | Yes |
| Facebook | 61 | Feed | Viewing content posted by a Public Figure or other Personal Account User follows or subscribes to on Facebook but is not Facebook Friends with. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 62 | Feed | Viewing content without a link posted by a Page User follows on Facebook. | Yes |
| **Facebook** | 63 | Feed | Viewing content linked in a post (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Page User follows on Facebook. | Yes |
| **Facebook** | 64 | Feed | Viewing content posted in a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |
| **Facebook** | 65 | Feed | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Yes |
| **Facebook** | 66 | Feed | Viewing content posted from a Group of any size where 0-15% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 67 | Feed | Viewing content posted from a Group of any size where 16-50% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 68 | Feed | Viewing content posted from a Group of any size where more than 50% of pairs of members of the Group are Facebook Friends. | Yes |
| **Facebook** | 69 | Feed | Viewing content posted from a Group that contains more than 10,000 members. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 70 | Feed | Viewing content posted from a Group that contains between 1,001 and 10,000 members. | Yes |
| **Facebook** | 71 | Feed | Viewing content posted from a Group that contains between 250 and 1,000 members. | Yes |
| **Facebook** | 72 | Feed | Viewing content posted from a Group that contains fewer than 250 members. | Yes |
| **Facebook** | 73 | Feed | Viewing content posted from a Group of any size regarding buying, selling, trading, or giving away items. | Yes |
| **Facebook** | 74 | Feed | Viewing content posted from a Group focused on a geographic community, such as a neighborhood or city. | Yes |
| **Facebook** | 75 | Feed | Viewing comments or reactions to post(s) by a person User follows or subscribes to on Facebook but is not Facebook Friends with. | Yes |
| **Facebook** | 76 | Feed | Viewing comments or reactions to post(s) by a Page User follows. | Yes |
| **Facebook** | 77 | Feed | Viewing comments or reactions to a post(s) from a Group User has joined. | Yes |
| **Facebook** | 78 | Feed | Viewing Recommended video content that does not originate from people or Pages User follows or Groups User has joined. | Yes |

12

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 79 | Feed | Viewing Recommended user-generated non-video content that does not originate from User's Facebook Friends, or people or Pages User follows or subscribes to or Groups User has joined. | Yes |
| Facebook | 80 | Feed | Viewing PYMK content. | Yes |
| Facebook | 81 | Memories | Viewing content posted on Memories. | Yes |
| Facebook | 82 | Dating | Posting or viewing content on Facebook Dating. | No |
| Facebook | 83 | Photos | Viewing User's own library of photos User took. | Yes |
| Facebook | 84 | Timeline/Profile/Wal1 | Viewing photos of User posted on User's Timeline/Profile/Wall. | Yes |
| Facebook | 85 | Timeline/Profile/Wall | Viewing content from a Page that User's Facebook Friend reshared. | Yes |
| Facebook | 86 | Timeline/Profile/Wall | Viewing content that User's Facebook Friend reshared that was posted in a Group that a Facebook Friend joined. | Yes |
| Facebook | 87 | Timeline/Profile/Wall | Viewing content on a Timeline/Profile/Wall of User's Facebook Friend. | Yes |
| Facebook | 88 | Timeline/Profile/Wall | Viewing content on a Timeline/Profile/Wall of an account that User is not Facebook Friends with. | Yes |
| Facebook | 89 | Notifications | Viewing Notifications based on activity from User's Facebook Friends. | Yes |
| Facebook | 90 | Notifications | Viewing Notifications based on activity from any source other than User's Facebook Friends. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Facebook** | 91 | Messaging/Facebook Chat | Sending or viewing message(s) sent to one other Facebook Friend. | Yes |
| **Facebook** | 92 | Messaging/Facebook Chat | Sending or viewing message(s) sent to one other user who is not Facebook Friends with User. | Yes |
| **Facebook** | 93 | Messaging/Facebook Chat | Sending or viewing message(s)sent to a group of 2-5 other users. | Yes |
| **Facebook** | 94 | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 6-10 other users. | Yes |
| **Facebook** | 95 | Messaging/Facebook Chat | Sending or viewing message(s)sent a group of 11-20 other users. | Yes |
| **Facebook** | 96 | Messaging/Facebook Chat | Sending or viewing message(s)sent to a group of 21-30 other users. | Yes |
| **Facebook** | 97 | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 31-50 other users. | Yes |
| **Facebook** | 98 | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 51-100 other users. | Yes |
| **Facebook** | 99 | Messaging/Facebook Chat | Sending or viewing message(s)sent to a group of 101-199 other users. | Yes |
| **Facebook** | 100 | Messaging/Facebook Chat | Sending or viewing message(s)sent to a group of 200 or more other users. | Yes |
| **Facebook** | 101 | Messaging/Facebook Chat | Sending or viewing content that was posted elsewhere on Facebook (such as on Feed) by User's Facebook Friend. | Yes |
| **Facebook** | 102 | Messaging/Facebook Chat | Sending or viewing unconnected content that was posted elsewhere on Facebook (such as on Feed or on a Page). | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 103 | Messaging/Facebook Chat | Sending or viewing message(s) to or from a contact that User connected with using PYMK. | Yes |
| Facebook | 104 | Messaging/Facebook Chat | Sending or viewing a message to or from a contact that User did not connect with using PYMK. | Yes |
| Facebook | 105 | Messaging/Facebook Chat | Sending or viewing a message containing a link (e.g., to a YouTube video or a NYT article). | Yes |
| Facebook | 106 | Messaging/Facebook Chat | Sending or viewing message(s) containing sender's Original photo(s). | Yes |
| Facebook | 107 | Messaging/Facebook Chat | Sending or viewing message(s) containing reshared photo(s). | Yes |
| Facebook | 108 | Messaging/Facebook Chat | Sending or viewing message(s) containing sender's Original video(s). | Yes |
| Facebook | 109 | Messaging/Facebook Chat | Sending or viewing message(s) containing reshared video(s). | Yes |
| Facebook | 110 | Messaging/Facebook Chat Rooms | Voice calling with one other user. | Yes |
| Facebook | 111 | Messaging/Facebook Chat Rooms | Voice calling with more than one other user. | Yes |
| Facebook | 112 | Messaging/Facebook Chat | Video calling with one other user. | Yes |
| Facebook | 113 | Messaging/Facebook Chat Rooms | Video calling with more than one other user. | Yes |
| Facebook | 114 | Pay | Paying or requesting or receiving payment from one of User's Facebook Friends. | Yes |
| Facebook | 115 | Pay | Paying or requesting or receiving payment from someone that User is not Facebook Friends with. | Yes |
| Facebook | 116 | Search | Using the Search feature to find Page(s) or Group(s) User is interested in. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Facebook | 117 | Events | Viewing event(s) not posted by one of User's Facebook Friends. | Yes |
| Facebook | 118 | Events | Viewing event(s) posted by one of User's Facebook Friends. | Yes |
| Facebook | 119 | Questions | Posting or viewing content in Questions. | Yes |
| Facebook | 120 | Feedback | Pos tin g or vie wing content in Feedback. | Yes |
| Facebook | 121 | Places | Posting or viewing content in Places. | Yes |
| Facebook | 122 | Podcasts | Listening to Podcast(s) or Live Audio Room(s). | Yes |
| Facebook | 123 | News | Viewing content in News. | Yes |
| Instagram | 1 | Reels | Viewing Reel(s) posted by an account that User follows that does not follow User. | Yes |
| Instagram | 2 | Reels | Viewing Reel(s) posted by an account for a business, non-profit, or other organization that User follows that does not follow User. | Yes |
| Instagram | 3 | Reels | Viewing Reel(s) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 4 | Reels | Viewing Reel(s) posted by any Personal Account with under 100 followers that User follows that does not follow User. | Yes |

16

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 5 | Reels | Viewing Reel(s) posted by any Personal Account with between 100 and 999 followers that User follows that does not follow User. | Yes |
| Instagram | 6 | Reels | Viewing Reel(s) posted by any Personal Account with between 1,000 and 1,999 followers that User follows that does not follow User. | Yes |
| Instagram | 7 | Reels | Viewing Reel(s) posted by any Personal Account that has between 2,000 and 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 8 | Reels | Viewing Reel(s) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 9 | Reels | Viewing Reel(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. | Yes |
| Instagram | 10 | Reels | Viewing Reel(s) posted by a celebrity or influencer that User follows that does not follow User. | Yes |
| Instagram | 11 | Reels | Viewing Reel(s) posted by any Personal Account User follows that does not follow User, where User has never met the owner of the account in person or spoken to them individually. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 12 | Reels | Viewing Reel(s) posted by an account for a business, non- profit, or other organization that User follows and that follows User. | Yes |
| Instagram | 13 | Reels | Viewing Reel(s) posted by an Instagram Creator Account that follows User and that User follows. | Yes |
| Instagram | 14 | Reels | Viewing Reel(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 15 | Reels | Viewing Reel(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 16 | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 17 | Reels | Viewing advertisement(s). | Yes |
| Instagram | 18 | Reels | Viewing branded content in Reel(s). | Yes |

18

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 19 | Reels | Posting Reel(s) to an audience limited to User's followers. | Yes |
| **Instagram** | 20 | Reels | Posting Reel(s) to a Public Audience. | Yes |
| **Instagram** | 21 | Reels | Viewing comments or reactions to Reel(s) posted by an account that User does not follow. | Yes |
| **Instagram** | 22 | Reels | Commenting on or reacting to Reel(s) posted by an account User follows that does not follow User. | Yes |
| **Instagram** | 23 | Reels | Viewing comments or reactions to Reel(s) posted by an account that User follows that does not follow User. | Yes |
| **Instagram** | 24 | Reels | Commenting on or reacting to Reel(s) posted by an account User follows and that follows User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 25 | Reels | Commenting on or reacting to Reel(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 26 | Reels | Viewing comments or reactions in response to Reel(s) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 27 | Reels | Commenting on or reacting to Reel(s) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 28 | Stories | Viewing Story(ies) posted by an account that User follows that does not follow User. | Yes |
| Instagram | 29 | Stories | Viewing Story(ies) posted by an account for a business, non- profit, or other organization that User follows that does not follow User. | Yes |
| Instagram | 30 | Stories | Viewing Story(ies) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 31 | Stories | Viewing Story(ies) by a Personal Account with under 100 followers that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 32 | Stories | Viewing Story(ies) posted by any Personal Account that has between 100 and 999 followers that User follows that does not follow User. | Yes |
| Instagram | 33 | Stories | Viewing Story(ies) posted by any Personal Account that has between 1,000 and 2,000 followers that User follows that does not follow User. | Yes |
| Instagram | 34 | Stories | Viewing Story(ies) posted by any Personal Account that has between 2,001 and 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 35 | Stories | Viewing Story(ies) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 36 | Stories | Viewing Story(ies) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. | Yes |
| Instagram | 37 | Stories | Viewing Story(ies) posted by a celebrity or influencer that User follows that does not follow User. | Yes |
| Instagram | 38 | Stories | Viewing Story(ies) posted by any Personal Account User follows that does not follow User, where User has never met the owner of the account in person or spoken to them individually. | Yes |

21

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 39 | Stories | Viewing Story(ies) posted by an account for a business, non- profit, or other organization that User follows and that follows User. | Yes |
| Instagram | 40 | Stories | Viewing Story(ies) posted by an Instagram Creator Account that follows User and that User follows. | Yes |
| Instagram | 41 | Stories | Viewing Story(ies) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 42 | Stories | Viewing Story(ies) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 43 | Stories | Viewing Story(ies) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 44 | Stories | Viewing Story(ies) posted by a celebrity or influencer that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 45 | Stories | Viewing Sponsored Story(ies). | Yes |
| **Instagram** | 46 | Stories | Reacting to or messaging in response to Story(ies) posted by an account User follows but that does not follow User. | Yes |
| **Instagram** | 47 | Stories | Reacting to or messaging in response to Story(ies) posted by an account User follows and that follows User. | Yes |
| **Instagram** | 48 | Stories | Reacting to or messaging in response to Story(ies) posted by an account that User does not follow, and that does not follow User. | Yes |
| **Instagram** | 49 | Stories | Reacting to or messaging in response to Story(ies) posted by a celebrity or influencer that User follows that does not follow User. | Yes |
| **Instagram** | 50 | Stories | Messaging in response to Sponsored Story(ies). | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 51 | Live | Viewing Live video(s) posted by an account User follows that does not follow User. | Yes |
| **Instagram** | 52 | Live | Viewing Live video(s) posted by an account that User does not follow and that does not follow User. | Yes |
| **Instagram** | 53 | Live | Viewing Live video(s) posted by an account User follows that follows User. | Yes |
| **Instagram** | 54 | Shop | Viewing content on Shops User does not follow. | Yes |
| **Instagram** | 55 | Shop | Viewing content on Shops User follows. | Yes |
| **Instagram** | 56 | Shop | Viewing content on Shops for You. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 57 | Explore/Popular | Viewing content from the Explore or Popular Page posted by an account that User does not follow. | Yes |
| **Instagram** | 58 | Explore/Popular | Viewing content on the Explore or Popular Page posted by a celebrity or influencer that the User follows. | Yes |
| **Instagram** | 59 | IGTV | Watching video(s) on IGTV. | Yes |
| **Instagram** | 60 | IGTV/Feed | Viewing preview(s) of IGTV video(s) on Feed. | Yes |
| **Instagram** | 61 | Feed | Viewing Sponsored post(s). | Yes |
| **Instagram** | 62 | Feed | Viewing content posted by an account that User follows that does not follow User. | Yes |
| **Instagram** | 63 | Feed | Posting to all of User's followers, encouraging them to attend an industry-networking event hosted by User's employer. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 64 | Feed | Viewing post(s) by an account User follows encouraging people to attend an industry-networking event hosted by the account's employer. | Yes |
| Instagram | 65 | Feed | Posting content to a limited audience of five or fewer followers whose mobile telephone number User possessed prior to joining Instagram. | Yes |
| Instagram | 66 | Feed | Viewing content that was posted to a limited audience of five or fewer followers whose mobile telephone number the User possessed prior to joining Instagram. | Yes |
| Instagram | 67 | Feed | Posting Original content that encourages Users that reside in close physical proximity to one another to attend a local social event. | Yes |
| Instagram | 68 | Feed | Viewing Original photo(s) posted by an account that User follows and that follows User, where neither follow was based on Suggested for you accounts. | Yes |
| Instagram | 69 | Feed | Viewing Original photo(s) posted by an account that User follows and that follows User, where either follow was based on Suggested for you accounts. | Yes |
| Instagram | 70 | Feed | Viewing Original photo(s) posted by an account that User does not follow, and that does not follow User. | Yes |

26

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 71 | Feed | Viewing Original photo(s) posted by an account for a business, non-profit, or other organization that User follows but does not follow User. | Yes |
| Instagram | 72 | Feed | Viewing Original photo(s) posted by an Instagram Creator Account that User follows but does not follow User. | Yes |
| Instagram | 73 | Feed | Viewing Original photo(s) posted by any Personal Account with under 25 followers that User follows that does not follow User. | Yes |
| Instagram | 74 | Feed | Viewing Original photo(s) posted by any Personal Account with 25-99 followers that User follows that does not follow User. | Yes |
| Instagram | 75 | Feed | Viewing Original photo(s) posted by any Personal Account with 100 to 999 followers that User follows that does not follow User. | Yes |
| Instagram | 76 | Feed | Viewing Original photo(s) posted by any Personal Account with 1,000 to 1,999 followers that User follows that does not follow User. | Yes |
| Instagram | 77 | Feed | Viewing Original photo(s) posted by any Personal Account that has between 2,000 and 10,000 followers that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 78 | Feed | Viewing Original photo(s) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 79 | Feed | Viewing Original photo(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. | Yes |
| Instagram | 80 | Feed | Viewing Original photo(s) posted by a celebrity or influencer that User follows but does not follow User. | Yes |
| Instagram | 81 | Feed | Viewing Original photo(s) posted by any account User follows that does not follow User, where User has never met the owner of the account in person or spoken to the owner individually. | Yes |
| Instagram | 82 | Feed | Viewing Original photo(s) posted by an account for a business, non-profit, or other organization that User follows, and that follows User. | Yes |
| Instagram | 83 | Feed | Viewing Original photo(s) posted by an Instagram Creator Account that follows User and that User follows. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 84 | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 85 | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 86 | Feed | Viewing a Paid partnership post posted by an account User follows. | Yes |
| Instagram | 87 | Feed | Viewing comments or reactions to content posted by an account User follows that does not follow User. | Yes |
| Instagram | 88 | Feed | Viewing comments or reactions to content posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 89 | Feed | Viewing comments or reactions to a post of Original photo(s) by a celebrity or influencer that User follows but does not follow User. | Yes |
| Instagram | 90 | Feed | Viewing comments or reactions to Original photo(s) by an account User follows that has more followers than 99% of all accounts on Instagram. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 91 | Feed | Commenting on or reacting to Original photo(s) posted by an account User follows that follows User. | Yes |
| Instagram | 92 | Feed | Commenting on or reacting to Original photo(s) posted by an account that User does not follow, but that follows User. | Yes |
| Instagram | 93 | Feed | Commenting on or reacting to Original photo(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 94 | Feed | Commenting on or reacting to Paid partnership post(s) posted by an account User follows. | Yes |
| Instagram | 95 | Feed | Commenting on or reacting to Original photo(s) posted by an account User follows that does not follow User. | Yes |
| Instagram | 96 | Feed | Commenting on or reacting to Original photo(s) posted by a business, non-profit, or other organization that User follows that does not follow User. | Yes |
| Instagram | 97 | Feed | Commenting on or reacting to Original photo(s) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |
| Instagram | 98 | Feed | Commenting on or reacting to Original photo(s) posted by a celebrity or influencer that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 99 | Feed | Commenting on or reacting to Original photo(s) by an account User follows that has more followers than 99% of all accounts on Instagram. | Yes |
| Instagram | 100 | Feed | Viewing Original video(s) posted by an account that User follows and that follows User, where neither follow was based on Suggested for you accounts. | Yes |
| Instagram | 101 | Feed | Viewing Original videos(s) posted by an account that User follows and that follows User, where either follow was based on Suggested for you accounts. | Yes |
| Instagram | 102 | Feed | Viewing Original video(s) posted by an account that User does not follow, and that does not follow User. | Yes |
| Instagram | 103 | Feed | Viewing Original video(s) posted by an account for a business, non-profit, or other organization that User follows that does not follow User. | Yes |
| Instagram | 104 | Feed | Viewing Original video(s) posted by an Instagram Creator Account that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 105 | Feed | Viewing Original video(s) posted by any Personal Account with under 25 followers that User follows that does not follow User. | Yes |
| Instagram | 106 | Feed | Viewing Original video(s) posted by any Personal Account with 25-99 followers that does not follow User. | Yes |
| Instagram | 107 | Feed | Viewing Original video(s) posted by any Personal Account with 100 to 999 followers that does not follow User. | Yes |
| Instagram | 108 | Feed | Viewing Original video(s) posted by any Personal Account with 1,000 to 1,999 followers that User follows that does not follow User. | Yes |
| Instagram | 109 | Feed | Viewing Original video(s) posted by any Personal Account with between 2,000 and 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 110 | Feed | Viewing Original video(s) posted by any Personal Account with over 10,000 followers that User follows that does not follow User. | Yes |
| Instagram | 111 | Feed | Viewing Original video(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 112 | Feed | Viewing Original video(s) posted by a celebrity or influencer that User follows that does not follow User. | Yes |
| Instagram | 113 | Feed | Viewing Original video(s) posted by any account User follows that does not follow User, where User has never met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 114 | Feed | Viewing Original video(s) posted by an account for a business, non-profit, or other organization that User follows and that follows User. | Yes |
| Instagram | 115 | Feed | Viewing Original video(s) posted by an Instagram Creator Account that follows User and that User follows. | Yes |
| Instagram | 116 | Feed | Viewing Original video(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. | Yes |
| Instagram | 117 | Feed | Viewing Original video(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| Instagram | 118 | Feed | Viewing Original video(s) posted by an account that User follows and that follows User. | Yes |
| Instagram | 119 | Feed | Posting Original video(s). | Yes |
| Instagram | 120 | Profile | Viewing User's own posts of Original photos. | Yes |
| Instagram | 121 | Profile | Viewing photo(s) in which User is tagged. | Yes |
| Instagram | 122 | Profile | Viewing content on a profile of a Personal Account that User follows and that follows User. | Yes |
| Instagram | 123 | Profile | Viewing content on a profile of a business, non-profit, or other organization that User follows and that follows User. | Yes |
| Instagram | 124 | Profile | Viewing content on a profile of an account that User follows but does not follow User. | Yes |
| Instagram | 125 | Profile | Viewing content on a profile of an Instagram Creator Account that User follows but does not follow User. | Yes |
| Instagram | 126 | Profile | Viewing content on a profile of any Personal Account that User follows where User has never met the owner of the account in person or spoken to the owner individually, | Yes |
| Instagram | 127 | Profile | Viewing posts on profile of account that User does not follow and that does not follow User. | Yes |

34

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 128 | Instagram Direct | Sending or viewing message(s)to or from an account User follows that does not follow User. | Yes |
| **Instagram** | 129 | Instagram Direct | Sending or viewing message(s)to or from an account User does not follow and that does not follow User. | Yes |
| **Instagram** | 130 | Instagram Direct | Sending or viewing message(s)sent to a group of 2-5 other users. | Yes |
| **Instagram** | 131 | Instagram Direct | Sending or viewing message(s)sent to a group of 6-10 other users. | Yes |
| **Instagram** | 132 | Instagram Direct | Sending or viewing message(s)sent to a group of 11-20 other users. | Yes |
| **Instagram** | 133 | Instagram Direct | Sending or viewing message(s)sent to a group of 21-30 other users. | Yes |
| **Instagram** | 134 | Instagram Direct | Sending or viewing message(s)sent to a group of 31-50 other users. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 135 | Instagram Direct | Sending or viewing message(s)sent to a group of 51-100 other users. | Yes |
| **Instagram** | 136 | Instagram Direct | Sending or viewing message(s)sent to a group of 101-199 other users. | Yes |
| **Instagram** | 137 | Instagram Direct | Sending or viewing message(s)sent to a group of 200 or more other users. | Yes |
| **Instagram** | 138 | Instagram Direct | Sending or viewing message(s) containing sender's Original photo(s). | Yes |
| **Instagram** | 139 | Instagram Direct | Sending or viewing message(s) containing sender's Original videos(s). | Yes |
| **Instagram** | 140 | Instagram Direct | Sending or viewing message(s) containing content posted by an account User does not follow on Instagram. | Yes |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Instagram** | 141 | Instagram Direct | Sending or viewing message(s) containing content posted by an account User follows that does not follow User. | Yes |
| **Instagram** | 142 | Instagram Direct | Sending or viewing disappearing message(s). | Yes |
| **Instagram** | 143 | Instagram Direct | Voice calling with one other user. | Yes |
| **Instagram** | 144 | Instagram Direct | Voice calling with more than one other user. | Yes |
| **Instagram** | 145 | Instagram Direct | Video calling with one other user. | Yes |
| **Instagram** | 146 | Instagram Direct | Video calling with more than one other user. | Yes |
| **WhatsApp** | 1 | WhatsApp | Posting or viewing Status(es). | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **WhatsApp** | 2 | WhatsApp | Posting or viewing profile photo(s). | No |
| **WhatsApp** | 3 | WhatsApp | Voice Calling with one other user. | No |
| **WhatsApp** | 4 | WhatsApp | Voice Calling with more than one other user. | No |
| **WhatsApp** | 5 | WhatsApp | Video Calling with one other user. | No |
| **WhatsApp** | 6 | WhatsApp | Video Calling with a more than other user. | No |
| **WhatsApp** | 7 | WhatsApp | Sending or viewing message(s) sent to one other user. | No |
| **WhatsApp** | 8 | WhatsApp | Sending or viewing message(s)sent to a group of 2-5 other users. | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **WhatsApp** | 9 | WhatsApp | Sending or viewing message(s)sent to a group of 6-10 other users. | No |
| **WhatsApp** | 10 | WhatsApp | Sending or viewing message(s)sent to a group of 11-20 other users. | No |
| **WhatsApp** | 11 | WhatsApp | Sending or viewing message(s)sent to a group of 21-30 other users. | No |
| **WhatsApp** | 12 | WhatsApp | Sending or viewing message(s)sent to a group of 31-50 other users. | No |
| **WhatsApp** | 13 | WhatsApp | Sending or viewing message(s)sent to a group of 51-100 other users. | No |
| **WhatsApp** | 14 | WhatsApp | Sending or viewing message(s)sent to a group of 100-199 other users. | No |
| **WhatsApp** | 15 | WhatsApp | Sending or viewing message(s)sent to a group of more than 200 other users. | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **WhatsApp** | 16 | WhatsApp | Sending or viewing message(s)sent to a group that contains 2-5 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 17 | WhatsApp | Sending or viewing message(s)sent to a group that contains 6-10 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 18 | WhatsApp | Sending or viewing message(s)sent to a group that contains 11-20 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 19 | WhatsApp | Sending or viewing message(s)sent to a group that contains 21-30 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 20 | WhatsApp | Sending or viewing message(s)sent to a group that contains 31-50 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 21 | WhatsApp | Sending or viewing message(s)sent to a group that contains 51-100 people whose contact information (number *and* name) User does not possess. | No |
| **WhatsApp** | 22 | WhatsApp | Sending or viewing message(s)sent to a group that contains 100+ people whose contact info1mation (number *and* name) User does not possess. | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **WhatsApp** | 23 | WhatsApp | Sending or viewing disappearing message(s). | No |
| **WhatsApp** | 24 | WhatsApp | Sending or viewing message(s) containing link(s) (e.g., to a YouTube video or a NYT article). | No |
| **WhatsApp** | 25 | WhatsApp | Sending or viewing message(s) containing sender's Original photo(s). | No |
| **WhatsApp** | 26 | WhatsApp | Sending or viewing message(s) containing reshared photo(s). | No |
| **WhatsApp** | 27 | WhatsApp | Sending or viewing message(s) containing sender's Original video(s). | No |
| **WhatsApp** | 28 | WhatsApp | Sending or viewing message(s) containing reshared video(s). | No |
| **Messenger** | 1 | Messenger | Posting Story(ies). | Yes |
| **Messenger** | 2 | Messenger | Voice Calling with one other user. | No |
| **Messenger** | 3 | Messenger | Voice Calling with more than one other user. | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Messenger** | 4 | Messenger | Video Calling with one other user. | No |
| **Messenger** | 5 | Messenger | Video Calling with more than one other user. | No |
| **Messenger** | 6 | Messenger | Sending or viewing message(s) sent to one other user. | No |
| **Messenger** | 7 | Messenger | Sending or viewing message(s)sent to a group of 2-5 other users. | No |
| **Messenger** | 8 | Messenger | Sending or viewing message(s)sent to a group of 6-10 other users. | No |
| **Messenger** | 9 | Messenger | Sending or viewing message(s)sent to group of 11-20 other users. | No |
| **Messenger** | 10 | Messenger | Sending or viewing message(s)sent to a group of 21-30 other users. | No |
| **Messenger** | 11 | Messenger | Sending or viewing message(s)sent to a group of 31-50 other users. | No |
| **Messenger** | 12 | Messenger | Sending or viewing message(s)sent to a group of 51-100 other users. | No |
| **Messenger** | 13 | Messenger | Sending or viewing message(s)sent to a group of 100-199 other users. | No |
| **Messenger** | 14 | Messenger | Sending or viewing message(s)sent to a group of more than 200 other users. | No |
| **Messenger** | 15 | Messenger | Viewing Stories. | Yes |
| **Messenger** | 16 | Messenger | Sending or viewing message(s)to or from a contact that User is not Facebook Friends with. | No |
| **Messenger** | 17 | Messenger | Sending or viewing message(s)to or from a contact that User connected with using PYMK. | No |

| Application | Number | Location | Feature/Activity | Included in "personal social networking"? |
|---|---|---|---|---|
| **Messenger** | 18 | Messenger | Sending or viewing a message to or from a contact that User did not connect with using PYMK. | No |
| **Messenger** | 19 | Messenger | Sending or viewing disappearing message(s). | No |
| **Messenger** | 20 | Messenger | Sending or viewing a message containing a link (e.g., to a YouTube video or a NYT article). | No |
| **Messenger** | 21 | Messenger | Sending or viewing message(s) containing sender's Original photo(s). | No |
| **Messenger** | 22 | Messenger | Sending or viewing message(s) containing reshared photo(s). | No |
| **Messenger** | 23 | Messenger | Sending or viewing message(s) containing sender's Original video(s). | No |
| **Messenger** | 24 | Messenger | Sending or viewing message(s) containing reshared video(s). | No |
| **Messenger** | 25 | Messenger | Playing games on Play Together. | No |

# Exhibit 406

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM TO**

**Commission File Number 001-38017**

# SNAP INC.

**(Exact name of registrant as specified in its charter)**

| Delaware | 45-5452795 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3000 31st Street, Santa Monica, California 90405**
**(Address of principal executive offices, including zip code)**

**(310) 399-3339**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.00001 per share | SNAP | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by checkmark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of Class A common stock on the New York Stock Exchange on June 30, 2022, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $16.7 billion.

As of January 27, 2023, the Registrant had 1,527,180,321 shares of Class A common stock, 22,521,887 shares of Class B common stock, and 231,026,943 shares of Class C common stock outstanding.

Auditor Firm Id: 42        Auditor Name: Ernst & Young LLP        Auditor Location: Los Angeles, CA, United States

# TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| Note Regarding Forward-Looking Statements |  | 1 |
| Risk Factor Summary |  | 3 |
| Note Regarding User Metrics and Other Data |  | 5 |
| **PART I** |  |  |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 50 |
| Item 2. | Properties | 50 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | Reserved | 53 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 54 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 72 |
| Item 8. | Financial Statements and Supplementary Data | 74 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 111 |
| Item 9A. | Controls and Procedures | 111 |
| Item 9B. | Other Information | 111 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 111 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 112 |
| Item 11. | Executive Compensation | 118 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 138 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 141 |
| Item 14. | Principal Accounting Fees and Services | 144 |
| **PART IV** |  |  |
| Item 15. | Exhibits, Financial Statement Schedules | 145 |
| Item 16. | Form 10-K Summary | 148 |
|  | Signatures | 149 |

Table of Contents

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, about us and our industry that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this report, including statements regarding guidance, our future results of operations or financial condition, our future stock repurchase programs or stock dividends, business strategy and plans, user growth and engagement, product initiatives, objectives of management for future operations, and advertiser and partner offerings, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "going to," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions. We caution you that the foregoing may not include all of the forward-looking statements made in this report.

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends, including our financial outlook, macroeconomic uncertainty, geo-political conflicts, and the COVID-19 pandemic, that we believe may continue to affect our business, financial condition, results of operations, and prospects. These forward-looking statements are subject to risks, uncertainties, and other factors described under "Risk Factor Summary" below, "Risk Factors" in Part I, Item 1A, and elsewhere in this Annual Report on Form 10-K, including among other things:

- our financial performance, including our revenues, cost of revenues, operating expenses, and our ability to attain and sustain profitability;

- our ability to generate and sustain positive cash flow;

- our ability to attract and retain users and partners;

- our ability to attract and retain advertisers;

- our ability to compete effectively with existing competitors and new market entrants;

- our ability to effectively manage our growth and future expenses;

- our ability to comply with modified or new laws, regulations, and executive actions applying to our business;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to successfully expand in our existing market segments and penetrate new market segments;

- our ability to attract and retain qualified team members and key personnel;

- our ability to repay outstanding debt;

- future acquisitions of or investments in complementary companies, products, services, or technologies; and

- the potential adverse impact of climate change, natural disasters, health epidemics, including the COVID-19 pandemic, macroeconomic conditions, and war or other armed conflict, including Russia's invasion of Ukraine, on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.

Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Annual Report on Form 10-K. And while we believe that information provides a reasonable basis for these statements, that information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

Table of Contents

The forward-looking statements made in this Annual Report on Form 10-K relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this report to reflect events or circumstances after the date of this report or to reflect new information or the occurrence of unanticipated events, including future developments related to geo-political conflicts, the COVID-19 pandemic, and macroeconomic conditions, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, dispositions, joint ventures, restructurings, legal settlements, or investments.

Investors and others should note that we may announce material business and financial information to our investors using our websites (including investor.snap.com), filings with the U.S. Securities and Exchange Commission, or SEC, webcasts, press releases, and conference calls. We use these mediums, including Snapchat and our website, to communicate with our members and the public about our company, our products, and other issues. It is possible that the information that we make available may be deemed to be material information. We therefore encourage investors and others interested in our company to review the information that we make available on our websites.

Table of Contents

### Risk Factor Summary

Our business is subject to significant risks and uncertainties that make an investment in us speculative and risky. Below we summarize what we believe are the principal risk factors but these risks are not the only ones we face, and you should carefully review and consider the full discussion of our risk factors in the section titled "Risk Factors", together with the other information in this Annual Report on Form 10-K.

**1.  Our Strategy and Advertising Business**

We operate in a highly competitive and rapidly changing environment so we must continually innovate our products and evolve our business model for us to succeed.

We emphasize rapid innovation and prioritize long-term user engagement over short-term financial conditions or results if we believe that it will benefit the aggregate user experience and improve our financial performance over the long term. Although we have achieved profitability in certain periods, we have a history of operating losses and, as a result of our long-term focus, we may prioritize investments and expenses we believe are necessary for our long-term growth over achieving short-term profitability. Investments in our future, including through new products or acquisitions, are inherently risky and may not pay off, which would adversely affect our ability to settle the principal and interest payments on our outstanding convertible senior notes or other indebtedness when due, and further delay or hinder our ability to sustain profitability. This in turn would hinder our ability to secure additional financing to meet our current and future financial needs on favorable terms, or at all.

We generate substantially all of our revenue from advertising. Our advertising business is most effective when our advertisers succeed. Driving their success requires continual investment in our advertising products and may be hindered by competitive challenges and various legal, regulatory, and operating system changes that make it more difficult for us to achieve and demonstrate a meaningful return for our advertisers. For example, on-going changes to privacy laws and mobile operating systems have made it more difficult for us to measure the effectiveness of advertisements on our services. Additionally, individuals are becoming increasingly resistant to the processing of personal data to deliver behavioral, interest-based, or targeted advertisements, and regulators are likewise scrutinizing such data processing activities, which could reduce the demand for our products and services and threaten our primary revenue stream. Alternative methods, to the extent we can develop such methods in light of changes to privacy laws, mobile operating system requirements, and other changes, will take time to develop and become more widely adopted by our advertisers, and may not be as effective as prior methods.

We believe that this impact on our targeting, measurement, and optimization capabilities has negatively affected and may continue to negatively affect our operating results. In addition, our advertising business is seasonal, volatile, and cyclical, which could result in fluctuations in our quarterly revenues and operating results, including the expectations of our business prospects.

Our business and operations have been, and could in the future be, adversely affected by events beyond our control, such as health epidemics, including the COVID-19 pandemic, and geo-political events, including the conflict in Ukraine. In addition, macroeconomic factors like labor shortages, supply chain disruptions, and inflation continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may also halt or decrease advertising spending, and harm our business.

**2.  Our Community and Competition**

We need to continually innovate and create new products, and enhance our existing products, to attract, retain, and grow our global community. Products that we create may fail to attract or retain users, or to generate meaningful revenue, if at all. In addition, we have and expect to continue to expand organically and through acquisitions, including in international markets, which we may not be able to effectively manage or scale. If our community does not see the value in our products or brand, or if competitors offer better alternatives, our community could easily switch to other services. Although we have experienced rapid growth in our community over the last few years, we have also experienced declines and there can be no assurance that won't happen again.

Many of our competitors have significantly more resources and larger market shares than we do, each of which gives them advantages over us that can make it more difficult for us to succeed.

Table of Contents

**3.   Our Partners**

We primarily rely on Google, Apple, and Amazon to provide their mobile operating systems and other services for our applications and other core services, including our platform. If these partners do not provide their services as we expect, terminate their services, or change or interpret the terms of their agreements, or change the functionality of their mobile operating systems in ways that are adverse to us, our service may be interrupted and our product experience could be degraded, and these may harm our reputation, increase our costs, or make it harder for us to sustain profitability. Many other parts of our business depend on partners, including content partners and advertising partners, so our success depends on our ability to attract and retain these partners.

**4.   Our Technology and Regulation**

Our business is complex and success depends on our ability to rapidly innovate, the interoperability of our service on many different smartphones and mobile operating systems, and our ability to handle sensitive user data with the care our users expect. Because our systems and our products are constantly changing, we are susceptible to data breaches, cyber attacks, security incidents, bugs, and other vulnerabilities and errors in how our products work and are measured. We may also fail to maintain effective processes that report our metrics or financial results. Given the complexity of the systems involved and the rapidly changing nature of mobile devices and operating systems, we expect to encounter issues, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable.

We are also subject to complex and evolving federal, state, local, and foreign laws and regulations regarding privacy, data protection, biometric processing, content, taxes, and other matters, which are subject to change and have uncertain interpretations. Given the nature of our business, we are particularly susceptible to changes in such laws regarding privacy and data protection, which may require us to change our products and may impact our revenue stream. Any actual or perceived failure to comply with such legal and regulatory obligations, including in connection with our consent decree with the U.S. Federal Trade Commission, may lead to costly litigation or otherwise adversely impact our business.

We also must actively protect our intellectual property. We are subject to various legal proceedings, claims, class actions, inquiries, and investigations related to our intellectual property, which may be costly or distract management. We also rely on a variety of statutory and common-law frameworks for the content we provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, and the fair-use doctrine, each of which has been subject to adverse judicial, political, and regulatory scrutiny in recent times.

**5.   Our Team and Capital Structure**

We need to attract and retain a high caliber team to maintain our competitive position. We may incur significant costs and expenses in maintaining and growing our team, and may lose valuable members of our team as we compete globally, including with our competitors, for key talent. A substantial portion of our employment costs is paid in our common stock, the price of which has been volatile, and our ability to attract and retain talent may be adversely affected if our shares decline in value.

Our two co-founders, who serve as our Chief Executive Officer and Chief Technology Officer, control over 99% of the voting power of our outstanding capital stock, which means they control substantially all outcomes submitted to stockholders. Class A common stockholders have no voting rights, unless required by Delaware law. This concentrated control may result in our co-founders voting their shares in their best interest, which might not always be in the interest of our stockholders generally.

4

### NOTE REGARDING USER METRICS AND OTHER DATA

We define a Daily Active User, or DAU, as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We define average revenue per user, or ARPU, as quarterly revenue divided by the average DAUs. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on our determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This allocation differs from our components of revenue disclosure in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer. For information concerning these metrics as measured by us, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Unless otherwise stated, statistical information regarding our users and their activities is determined by calculating the daily average of the selected activity for the most recently completed quarter included in this report.

While these metrics are determined based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who have unauthorized or multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. We have not determined the number of such multiple accounts.

Changes in our products, infrastructure, mobile operating systems, or metric tracking system, or the introduction of new products, may impact our ability to accurately determine active users or other metrics and we may not determine such inaccuracies promptly. We also believe that we don't capture all data regarding each of our active users. Technical issues may result in data not being recorded from every user's application. For example, because some Snapchat features can be used without internet connectivity, we may not count a DAU because we don't receive timely notice that a user has opened the Snapchat application. This undercounting may increase as we grow in Rest of World markets where users may have poor connectivity. We do not adjust our reported metrics to reflect this underreporting. We believe that we have adequate controls to collect user metrics, however, there is no uniform industry standard. We continually seek to identify these technical issues and improve both our accuracy and precision, including ensuring that our investors and others can understand the factors impacting our business, but these technical issues and new issues may continue in the future, including if there continues to be no uniform industry standard.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from our age demographics or estimate their ages based on a sample of the self-reported ages that we do have. If our active users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor expectations.

In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate. We count a DAU only when a user opens the application and only once per user per day. We believe this methodology more accurately measures our user engagement. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, and becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application.

If we fail to maintain an effective analytics platform, our metrics calculations may be inaccurate. We regularly review, have adjusted in the past, and are likely in the future to adjust our processes for calculating our internal metrics to improve their accuracy. As a result of such adjustments, our DAUs or other metrics may not be comparable to those in prior periods. Our measures of DAUs may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology or data used.

Table of Contents

**PART I**

**Item 1. Business.**

**Overview**

Snap Inc. is a technology company. We believe the camera presents the greatest opportunity to improve the way people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a visual messaging application that enhances your relationships with friends, family, and the world. Visual messaging is a fast, fun way to communicate with friends and family using augmented reality, video, voice, messaging, and creative tools. Snaps are deleted by default to mimic real-life conversations, so there is less pressure to look popular or perfect when creating and sending images on Snapchat. By reducing the friction typically associated with creating and sharing content, Snapchat has become one of the most used cameras in the world.

The camera is a powerful tool for communication and the entry point for augmented reality experiences. By opening directly to the camera, Snapchat empowers our community to express themselves instantly and offers millions of augmented reality Lenses for self expression, learning, and play. In the way that the flashing cursor became the starting point for most products on desktop computers, we believe the camera screen will be the starting point for most products on smartphones. This is because images created by smartphone cameras contain more context and richer information than other forms of input like text entered on a keyboard. Given the magnitude of this opportunity, we are investing and innovating to continue to deliver products and services that are differentiated and that are better able to reflect and improve our life experiences.

**Snapchat**

Snapchat is our core mobile device application and contains five distinct tabs, complemented by additional tools that function outside of the application. With a breadth of visual messaging and content experiences available within the application, Snapchatters can interact with all five, or a subset of those five tabs.

*Camera*: The Camera is a powerful tool for communication and the entry point for augmented reality experiences in Snapchat. Snapchat opens directly to the Camera, making it easy to create a Snap and send it to friends. Our augmented reality, or AR, capabilities within our Camera allow for creativity and self-expression. We offer millions of Lenses, created by both us and our community, along with creative tools and licensed music and audio clips, which make it easy for people to personalize and contextualize their Snaps. We also offer voice and scanning technology within our Camera. While Snaps are deleted by default to mimic real-life conversations, users can save their creativity through a searchable collection of Memories stored on both their Snapchat account and their mobile device. A user can also create Snaps on our wearable devices, Spectacles. Spectacles connect seamlessly with Snapchat and capture photos and video from a human perspective. Our latest version of Spectacles, designed for creators, overlays AR Lenses directly onto the world.

*Visual Messaging*: Visual Messaging is a fast, fun way to communicate with friends and family using augmented reality, video, voice, messaging and creative tools. They can also communicate with our proprietary personalized avatar tool, Bitmoji, and its associated contextual stickers and images, which integrate seamlessly into both mobile devices and desktop browsers.

*Snap Map*: Snap Map is a live and highly personalized map that allows Snapchatters to connect with friends and explore what is going on in their local area. Snap Map makes it easy to locate nearby friends who choose to share their location, view a heatmap of recent Snaps posted to Our Story by location, and locate local businesses. Places, rich profiles of local businesses that include information such as store hours and reviews, overlay specialized experiences from select partners on top of Snap Map, and allow Snapchatters to take direct actions from Snap Map, such as sharing a favorite store, ordering takeout, or making a reservation.

*Stories*: Stories are a fun way to stay connected with people you care most about. Stories feature content from a Snapchatter's friends, our community, and our content partners. Friends Stories allow our community to express themselves in narrative form through photos and videos, shown in chronological order, to their friends. The Discover section of this tab displays curated content based on a Snapchatter's subscriptions and interests, and features news and entertainment from both our creator community and publisher partners. We also offer Public Profiles, as a way for our creator community and our advertising partners to memorialize and scale their content and AR Lenses on our platform.

*Spotlight*: Spotlight showcases the best of Snapchat, helping people discover new creators and content in a personalized way. Here we surface the most entertaining Snaps from our community all in one place, which becomes tailored to each Snapchatter over time based on their preferences and favorites. The Trending page allows Snapchatters to discover and engage with popular topics and genres.

Additionally, we offer Snapchat+, our subscription product that provides subscribers access to exclusive, experimental, and pre-release features. Snapchat+ offers a variety of features from allowing Snapchatters to customize the look and feel of their app, to giving special insights into their friendships. We also offer Snapchat for Web, a browser-based product that brings Snapchat's signature calling and ephemeral messaging capabilities to the web.

## Our Partner Ecosystem

Many elements and features of Snapchat are enhanced by our expansive partner ecosystem that includes developers, creators, publishers, and advertisers, among others. We help them create and bring diverse content and experiences into Snapchat, leverage Snapchat capabilities in their own applications and websites, and use advertising to promote these and other experiences to our large, engaged, and differentiated user base. We seek to reward our partner ecosystem for their creativity, and continue to support them as they grow their audience and build their business on Snapchat.

Developers are able to integrate with Snapchat and its core technologies, like Snap's AR Camera and Bitmoji, through a variety of tools. Creative Kit gives developers and their communities a seamless sharing experience from their app directly to Snapchat. Through Camera Kit, our partners can embed Snap's AR platform directly into their application, extending the use of AR beyond self-expression and communication use cases. We also provide developers a turnkey suite of tools and services that enable them to create AR Lenses and track the performance of those through analytics. Finally, developers can bring an inclusive mode of identity and expression to their apps and games with our Bitmoji for Developers APIs and SDKs.

AR creators can use Lens Studio, our powerful desktop application designed for creators and developers, to build augmented reality experiences for Snapchatters. Spotlight creators can utilize our content creation tools to reach millions of Snapchatters and build their businesses through various monetization opportunities. Our Creator Marketplace connects both AR and Spotlight creators directly with our advertising partners. We provide monetizable opportunities through programs like the Snap Lens Network and Ghost, which provide grants to support AR product development across many industries. We also support our content creator community through a number of programs, including advertising revenue sharing on our mid-roll advertisements in Snap Stars' Stories.

Publisher partners can expand their audiences and monetize content through our Discover platform. In addition, we work with various telecommunications providers and original equipment manufacturers, particularly as we build our presence in new markets.

## Our Advertising Products

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way through AR Lenses. AR Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences, including the ability to visualize and try on products such as beauty, apparel, accessories, and footwear. AR Lenses can be memorialized on Snapchat, through Public Profiles that aggregate content and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

Table of Contents

- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: We aim to continually improve the way these ad formats are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, make a purchase, visit a local business, call or text a business, watch a story or video, download an app, or return to an app, among others. Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.

*Measuring Advertising Effectiveness*: We offer first-party measurement solutions and we support our advertising partners preferred third-party measurement solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.

## Technology

Our research and development efforts focus on product development, advertising technology, and large-scale infrastructure.

*Product Development*: We work relentlessly and invest heavily to create and improve products for our community and our partners. We develop a wide range of products related to visual messaging and storytelling that are powered by a variety of new technologies.

*Advertising Technology*: We constantly develop and expand our advertising products and technology. In an effort to provide a strong and scalable return on investment to our advertisers, our advertising technology roadmap centers around improving our delivery framework, measurement capabilities, and self-serve tools.

*Large-scale Infrastructure*: We spend considerable resources and investment on the underlying architecture that powers our products, such as optimizing the delivery of billions of videos to hundreds of millions of people around the world every day. We currently partner with third party providers to support the infrastructure for our growing needs. These partnerships have allowed us to scale quickly without upfront physical infrastructure costs, allowing us to focus our efforts on product innovation.

## Employees and Culture

We seek to be a force for good through our products, our work to strengthen our communities, our efforts to make a positive impact on the planet, and our inclusive workplace.

*Supporting Our Team*: Our values at Snap are being kind, smart, and creative, and we put those values into action through how we support our team and how our team supports one another. Council, which is a practice of active listening that promotes open-mindedness and cultivates empathy and compassion among participants, helps us build and sustain a community steeped in integrity, connection, collaboration, creativity, and kindness. Our talent development programs seek to unlock potential by helping team members advance, learn, and grow in a fair and equitable way at Snap. We focus on the health and well-being of our employees through programs and benefits that support their physical, emotional, and financial fitness. To attract and retain the best talent, we aim to offer challenging work in an environment that enables our employees

Table of Contents

to have a direct meaningful contribution to new and exciting projects. Underlying these values is our commitment to ethical conduct where we work to instill in our team that acting with integrity means being your whole self, being honest, and doing the right thing.

*Diversity, Equity, and Inclusion*: Snap has long supported a Diversity, Equity and Inclusion, or DEI, program, and we have made progress on a number of fronts, including diversifying our board of directors and executive leadership, introducing new accountability around DEI outcomes, maintaining an allyship program to inspire a more inclusive culture, and enhancing our recruiting process to continue driving diverse hiring. To aid in our mission, we publish a Diversity Annual Report that discusses our goals with respect to diversity, equity, and inclusion efforts. This report outlines our beliefs around the idea that an inclusive workplace and inclusive products are central to achieving that purpose. This report is excerpted in our broader CitizenSnap Report that details the work we're doing to support our communities, our planet, and our team, and is available on our website at www.snap.com.

*Human Capital*: As part of our human capital resource objectives, we seek to recruit, retain, and incentivize our highly talented existing and future employees. We believe that creating an inclusive environment where team members can grow, develop, and be their true selves is critical to attracting and retaining talent. Our compensation philosophies also align to that belief.

Our compensation philosophy is based around building a culture of ownership and high performance by putting both impact and our values at the center of our performance feedback process and pay outcomes. We utilize equity as part of our compensation practices to drive a long-term orientation and have committed to paying a minimum living wage for all employees globally.

As of December 31, 2022, we had approximately 5,288 full-time employees, of whom approximately 57% are in engineering roles involved in the design, development, support, and manufacture of new and existing products and processes.

*Climate Change:* We continue to deepen our commitment to help combat climate change. In 2021, we adopted science-based emissions reduction targets approved by the Science Based Targets Initiative and became historically carbon neutral from our founding in 2011 through 2020. In 2022, we remained carbon neutral by purchasing offsets to balance emissions attributable to Snap through December 31, 2021 and are committed to achieving net negative carbon emissions by 2030. We also purchased renewable energy certificates in 2022 sufficient to cover all of the electricity consumed in our global operations for the year ended December 31, 2021.

## Our Commitment to Privacy

Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.

We built Snapchat as an antidote to the context-less communication that has plagued "social media." Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. Somewhere along the way, social media—by prioritizing virality and permanence—sapped conversations of this valuable context and choice. When we began to communicate online, we lost some of what made communication great: spontaneity, emotion, honesty—the full range of human expression that makes us human in the first place.

We don't think digital communication has to be this way. That's why choice matters. We build products and services that emphasize the context of a conversation—who, when, what, and where something is being said. If you don't have the autonomy to shape the context of a conversation, the conversation will simply be shaped by the permanent feeds that homogenize online conversations.

When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication. For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understands exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy and Safety Hub where we show that context and choice are more than talking points. There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more. This is where you'll also find our Transparency Report in which we provide insight into these efforts and visibility into the nature and volume of content reported on our platform.

Table of Contents

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

**Competition**

We compete with other companies in every aspect of our business, particularly with companies that focus on mobile engagement and advertising. Many of these companies, such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Meta (including Facebook, Instagram, and WhatsApp), Pinterest, and Twitter, may have greater financial and human resources and, in some cases, larger user bases. Given the breadth of our product offerings, we also compete with companies that develop products or otherwise operate in the mobile, camera, communication, content, and advertising industries that offer, or will offer, products and services that may compete with Snapchat features or offerings. Our competitors span from internet technology companies and digital platforms, to traditional companies in print, radio, and television sectors to underlying technologies like default smartphone cameras and messaging. Additionally, our competition for engagement varies by region. For instance, we face competition from companies like Kakao, LINE, Naver (including Snow), and Tencent in Asia.

We compete to attract and retain our users' attention, both in terms of reach and engagement. Since our products and those of our competitors are typically free, we compete based on our brand and the quality and nature of our product offerings rather than on price. As such, we invest heavily in constantly improving and expanding our product lines.

We also compete with other companies to attract and retain partners and advertisers, which depends primarily on our reach and ability to deliver a strong return on investment.

Finally, we compete to attract and retain highly talented individuals, including software engineers, designers, and product managers. In addition to providing competitive compensation packages, we compete for talent by fostering a culture of working hard to create great products and experiences and allowing our employees to have a direct meaningful contribution to new and exciting projects.

**Seasonality in Our Business**

We have historically seen seasonality in our business. Overall advertising spend tends to be strongest in the fourth quarter of the calendar year, and we have observed a similar pattern in our historical revenue. We have also experienced seasonality in our user engagement, generally seeing lower engagement during summer months and higher engagement in December.

**Intellectual Property**

Our success depends in part on our ability to protect our intellectual property and proprietary technologies. To protect our proprietary rights, we rely on a combination of intellectual property rights in the United States and other jurisdictions, including patents, trademarks, copyrights, trade secret laws, license agreements, internal procedures, and contractual provisions. We also enter into confidentiality and invention assignment agreements with our employees and contractors and sign confidentiality agreements with third parties. Our internal controls are designed to restrict access to proprietary technology.

As of December 31, 2022, we had approximately 2,425 issued patents and approximately 3,247 filed patent applications in the United States and foreign countries relating to our camera platform and other technologies. Our issued patents will expire between 2023 and 2047. We may not be able to obtain protection for our intellectual property, and our existing and future patents, trademarks, and other intellectual property rights may not provide us with competitive advantages or distinguish our products and services from those of our competitors.

We license content, trademarks, technology, and other intellectual property from our partners, and rely on our license agreements with those partners to use the intellectual property. We also enter into licensing agreements with third parties to receive rights to patents and other know-how. Third parties may assert claims related to intellectual property rights against our partners or us.

Other companies and "non-practicing entities" that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights related to the mobile, camera, communication, content, internet, and other technology-related industries frequently enter into litigation based on allegations of infringement, misappropriation, and other violations of intellectual property or other rights. As our business continues to grow and competition increases, we will likely face more claims related to intellectual property and litigation matters.

## Government Regulation

We are subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, data protection, content regulation, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could harm our business. Compliance with these laws and regulations has not had, and is not expected to have, a material effect on our capital expenditures, results of operations, and competitive position as compared to prior periods, and we do not currently anticipate material capital expenditures for environmental control facilities.

In December 2014, the Federal Trade Commission resolved an investigation into some of our early practices by handing down a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year lifespan of the order, we must complete biennial independent privacy audits. In June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

Furthermore, foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. It is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely. Not all of our products are available in all locations and may not be due to such laws and regulations. Our public policy team monitors legal and regulatory developments in the United States, as well as many foreign countries, and communicates with policymakers and regulators in the United States and internationally.

## Corporate Information

We were formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. We completed our initial public offering in March 2017 and our Class A common stock is listed on the New York Stock Exchange, or NYSE, under the symbol "SNAP."

Our principal executive offices are located at 3000 31st Street, Santa Monica, California 90405, and our telephone number is (310) 399-3339. Snap Inc., "Snapchat," and our other registered and common-law trade names, trademarks, and service marks appearing in this Annual Report on Form 10-K are property of Snap Inc. or our subsidiaries.

## Information about Segment and Geographic Revenue

Information about segment and geographic revenue is set forth in Notes 1 and 2 of the notes to our consolidated financial statements included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

## Available Information

Our website address is www.snap.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to these reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are filed with the SEC. Such reports and other information filed or furnished by us with the SEC are available free of charge on our website at investor.snap.com when such reports are available on the SEC's website. We use our website, including investor.snap.com, as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

11

Information contained in, or accessible through, the websites referred to in this Annual Report on Form 10-K is not incorporated into this filing. Further, our references to website addresses are only as inactive textual references.

## Item 1A. Risk Factors

You *should carefully consider the risks and uncertainties described below, together with all the other information in this Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the related notes. If any of the following risks actually occurs (or if any of those discussed elsewhere in this Annual Report on Form 10-K occurs), our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. Unless otherwise indicated, references to our business being seriously harmed in these risk factors will include harm to our business, reputation, financial condition, results of operations, revenue, and future prospects. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business and Industry

***Our ecosystem of users, advertisers, and partners depends on the engagement of our user base. Our user base growth rate has declined in the past and it may do so again in the future. If we fail to retain current users or add new users, or if our users engage less with Snapchat, our business would be seriously harmed.***

We had 375 million daily active users, or DAUs, on average in the quarter ended December 31, 2022. We view DAUs as a critical measure of our user engagement, and adding, maintaining, and engaging DAUs have been and will continue to be necessary. Our DAUs and DAU growth rate have declined in the past and they may decline in the future due to various factors, including as the size of our active user base increases, as we achieve higher market penetration rates, as we face continued competition for our users and their time, or if there are performance issues with our service. For example, in 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. In addition, as we achieve maximum market penetration rates among younger users in developed markets, future growth in DAUs will need to come from older users in those markets, developing markets, or users with Android mobile operating systems, which may not be possible or may be more difficult or time-consuming for us to achieve. While we may experience periods when our DAUs increase due to products and services with short-term popularity, or due to a lack of other events that compete for our users' attention, we may not always be able to attract new users, retain existing users, or maintain or increase the frequency and duration of their engagement if current or potential new users do not perceive our products to be fun, engaging, and useful. In addition, because our products typically require high bandwidth data capabilities for users to benefit from all of the features and capabilities of our application, many of our users live in countries with high-end mobile device penetration and high bandwidth capacity cellular networks with large coverage areas. We therefore do not expect to experience rapid user growth or engagement in regions with either low smartphone penetration or a lack of well-established and high bandwidth capacity cellular networks. If our DAU growth rate slows or becomes stagnant, or we have a decline in DAUs, our financial performance will increasingly depend on our ability to elevate user activity or increase the monetization of our users.

Snapchat is free and easy to join, the barrier to entry for new entrants in our business is low, and the switching costs to another platform are also low. Moreover, the majority of our users are 18-34 years old. This demographic may be less brand loyal and more likely to follow trends, including viral trends, than other demographics. These factors may lead users to switch to another product, which would negatively affect our user retention, growth, and engagement. Snapchat also may not be able to penetrate other demographics in a meaningful manner. Falling user retention, growth, or engagement could make Snapchat less attractive to advertisers and partners, which may seriously harm our business. In addition, we continue to compete with other companies to attract and retain our users' attention. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average. There are many factors that could negatively affect user retention, growth, and engagement, including if:

- users engage more with competing products instead of ours;

- our competitors continue to mimic our products or improve on them;

- we fail to introduce new and exciting products and services or those we introduce or modify are poorly received;

Table of Contents

- our products fail to operate effectively or compatibly on the iOS or Android mobile operating systems;

- we are unable to continue to develop products that work with a variety of mobile operating systems, networks, and smartphones;

- we do not provide a compelling user experience because of the decisions we make regarding the type and frequency of advertisements that we display or the structure and design of our products;

- we are unable to combat spam, bad actors, or other hostile or inappropriate usage on our products;

- there are changes in user sentiment about the quality or usefulness of our products in the short-term, long-term, or both;

- there are concerns about the privacy implications, safety, or security of our products and our processing of personal data;

- our content partners do not create content that is engaging, useful, or relevant to users;

- our content partners decide not to renew agreements or devote the resources to create engaging content, or do not provide content exclusively to us;

- advertisers and partners display ads that are untrue, offensive, or otherwise fail to follow our guidelines;

- our products are subject to increased regulatory scrutiny or approvals, including from international privacy regulators (particularly in the EEA/UK), or there are changes in our products that are mandated or prompted by legislation, regulatory authorities, executive actions, or litigation, including settlements or consent decrees, that adversely affect the user experience;

- technical or other problems frustrate the user experience, including by providers that host our platforms, particularly if those problems prevent us from delivering our product experience in a fast and reliable manner;

- we fail to provide adequate service to users, advertisers, or partners;

- we do not provide a compelling user experience to entice users to use the Snapchat application on a daily basis, or our users don't have the ability to make new friends to maximize the user experience;

- we, our partners, or other companies in our industry segment are the subject of adverse media reports or other negative publicity, some of which may be inaccurate or include confidential information that we are unable to correct or retract;

- we do not maintain our brand image or our reputation is damaged; or

- our current or future products reduce user activity on Snapchat by making it easier for our users to interact directly with our partners.

Any decrease to user retention, growth, or engagement could render our products less attractive to users, advertisers, or partners, and would seriously harm our business.

***Snapchat depends on effectively operating with mobile operating systems, hardware, networks, regulations, and standards that we do not control. Changes in our products or to those mobile operating systems, hardware, networks, regulations, or standards may seriously harm our user retention, growth, and engagement.***

Because Snapchat is used primarily on mobile devices, the application must remain interoperable with popular mobile operating systems, primarily Android and iOS, application stores, and related hardware, including mobile-device cameras. The owners and operators of such mobile operating systems and application stores, primarily Google and Apple, each have approval authority over our core products and provide consumers with other products that compete with ours, and there is no guarantee that any approval will not be rescinded in the future. Additionally, mobile devices and mobile-device cameras are manufactured by a wide array of companies. Those companies have no obligation to test the interoperability of new mobile devices, mobile-device cameras, or related devices with Snapchat, and may produce new products that are incompatible with or not optimal for Snapchat. We have no control over these mobile operating systems, application stores, or hardware, and any changes may degrade our products' functionality, or give preferential treatment to competitive products. Actions by government authorities may also impact our access to these systems or hardware and could seriously harm Snapchat usage. Our competitors that control the mobile operating systems and related hardware could make interoperability of our products more difficult or display their competitive offerings more prominently than ours. Additionally, our competitors that control the standards for the application stores could make Snapchat, or certain features of Snapchat, inaccessible for a potentially significant period of time or require us to make changes to maintain

13

access. We plan to continue to introduce new products and features regularly, including some features that may only work on the latest systems and hardware, and have experienced that it takes time to optimize new products and features to function with the variety of existing mobile operating systems, hardware, and standards, impacting the popularity of such products, and we expect this trend to continue.

Moreover, our products require high-bandwidth data capabilities. If the costs of data usage increase or access to cellular networks is limited, our user retention, growth, and engagement may be seriously harmed. Additionally, to deliver high-quality video and other content over mobile cellular networks, our products must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control and which may be subject to future changes. In addition, the proposal or adoption of any laws, regulations, or initiatives that adversely affect the growth, popularity, or use of the internet, including laws governing internet neutrality, could decrease the demand for our products and increase our cost of doing business.

For example, in January 2018, the Federal Communications Commission, or FCC, issued an order that repealed the "open internet rules," which prohibit mobile providers in the United States from impeding access to most content, or otherwise unfairly discriminating against content providers like us and also prohibit mobile providers from entering into arrangements with specific content providers for faster or better access over their data networks. The FCC order repealing the open internet rules went into effect in June 2018. The core aspects of that order have been upheld by the United States Court of Appeals for the District of Columbia Circuit, but a number of states have adopted or are considering legislation or executive actions to impose state-level open internet rules, and those actions have been or can be expected to be challenged in court. More recently, U.S. President Biden issued an executive order encouraging the FCC to restore the open internet rules. We cannot predict whether the FCC order or state initiatives regulating providers will ultimately be upheld, modified, overturned, or vacated by further legal action, federal legislation, or the FCC, or the degree to which such outcomes would adversely affect our business, if at all. Similarly, the European Union requires equal access to internet content, but as part of certain initiatives and reviews (including recent modifications to the European Electronic Communications Code and proposals to expand the scope and nature of the EU Network and Information Security Directive), the European Union may impose additional obligations, including network security requirements, reporting and transparency obligations, disability access, or 911-like obligations on certain "over-the-top" services or those that qualify as "electronic communication services." If we are considered to be in the scope of such service definition, our costs of doing business could increase and our business could be seriously harmed. The European Union's highest court has also issued rulings that may limit our ability to engage in certain practices, such as "zero rating." If the FCC's repeal of the open internet rules is maintained, state initiatives are modified, overturned, or vacated, or the European Union modifies these open internet rules or limits commercial practices, mobile and internet providers may be able to limit our users' ability to access Snapchat or make Snapchat a less attractive alternative to our competitors' applications. Were that to happen, our ability to retain existing users or attract new users may be impaired, and our business would be seriously harmed.

We may not successfully cultivate relationships with key industry participants or develop products that operate effectively with these technologies, systems, networks, regulations, or standards. If it becomes more difficult for our users to access and use Snapchat, if our users choose not to access or use Snapchat, or if our users choose to use products that do not offer access to Snapchat, our business and user retention, growth, and engagement could be seriously harmed.

***We rely on Google Cloud and Amazon Web Services, or AWS, for the vast majority of our computing, storage, bandwidth, and other services. Any disruption of or interference with our use of either platform would negatively affect our operations and seriously harm our business.***

Google and Amazon provide distributed computing infrastructure platforms for business operations, commonly referred to as a "cloud" computing service. We currently run the vast majority of our computing on Google Cloud and AWS, have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google and AWS and our systems are not fully redundant on the two platforms. Any transition of the cloud services currently provided by either Google Cloud or AWS to the other platform or to another cloud provider would be difficult to implement and would cause us to incur significant time and expense. Given this, any significant disruption of or interference with Google Cloud or AWS, whether temporary, regular, or prolonged, would negatively impact our operations and our business would be seriously harmed. If our users or partners are not able to access Snapchat or specific Snapchat features, or encounter difficulties in doing so, due to issues or disruptions with Google Cloud or AWS, we may lose users, partners, or advertising revenue. The level of service provided by Google Cloud and AWS or similar providers may also impact our users', advertisers', and partners' usage of and satisfaction with Snapchat and could seriously harm our business and reputation if the level of service decreases. Hosting costs also have and will continue to increase as our

Table of Contents

user base and user engagement grows and may seriously harm our business if we are unable to grow our revenues faster than the cost of utilizing the services of Google Cloud, AWS, or similar providers.

In addition, Google or Amazon may take actions beyond our control that could seriously harm our business, including:

- discontinuing or limiting our access to its cloud platform;

- increasing pricing terms;

- terminating or seeking to terminate our contractual relationship altogether;

- establishing more favorable relationships or pricing terms with one or more of our competitors; or

- modifying or interpreting its terms of service or other policies in a manner that impacts our ability to run our business and operations.

***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm our business.***

Substantially all of our revenue is generated from third parties advertising on Snapchat. For the years ended December 31, 2022, 2021, and 2020, advertising revenue accounted for approximately 99%, 99%, and 99% of total revenue, respectively. Even though we have introduced other revenue streams, including a subscription model, we still expect this trend to continue for the foreseeable future. Although we try to establish longer-term advertising commitments with advertisers, most advertisers do not have long-term advertising commitments with us, and our efforts to establish long-term commitments may not succeed.

Our advertising customers vary from small businesses to well-known brands. Many of our customers only recently started working with our advertising solutions and spend a relatively small portion of their overall advertising budget with us, but some customers have devoted meaningful budgets that contribute to our total revenue. In addition, advertisers may view some of our advertising solutions as experimental and unproven, or prefer certain of our products over others. Advertisers, including our customers who have devoted meaningful advertising budgets to our product, will not continue to do business with us if we do not deliver advertisements in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. As our business continues to develop, there may be new or existing advertisers or resellers, or advertisers or resellers from different geographic regions that contribute more significantly to our total revenue. Any economic or political instability, whether as a result of the COVID-19 pandemic, the conflict in Ukraine, the macroeconomic climate, or otherwise, in a specific country or region may negatively impact the global or local economy, advertising ecosystem, our customers and their budgets with us, or our ability to forecast our advertising revenue, and our business would be seriously harmed.

Moreover, we rely heavily on our ability to collect and disclose data, and metrics to our advertisers so we can attract new advertisers and retain existing advertisers. Any restriction or inability, whether by law, regulation, policy, or other reason, to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers. Regulators around the world are increasingly scrutinizing and regulating the collection, use, and sharing of personal data related to advertising, which could materially impact our revenue and seriously harm our business. For example, the European Union's General Data Protection Regulation, or EU GDPR, and the United Kingdom's GDPR, or UK GDPR, expanded the rights of individuals to control how their personal data is collected and processed, and placed restrictions on the use of personal data of younger minors. The processing of personal data for personalized advertising under GDPR continues to be under increased scrutiny from European regulators, which includes ongoing regulatory action against large technology companies like ours, the outcomes of which may be uncertain and subject to appeal. The upcoming European Digital Services Act, or DSA, which will go into effect in late 2023 or early 2024, prohibits targeted advertising to minors based on the profiling of personal information in the European Union. Other European legislative proposals and present laws and regulations may also apply to our or our advertisers' activities and require significant operational changes to our business. For example, it is anticipated that the ePrivacy Regulation and national implementing laws will replace the current national laws implementing the ePrivacy Directive, which could have a material impact on the availability of data we rely on to improve and personalize our products and features. Outside of Europe, other laws further regulate behavioral, interest-based, or targeted advertising, making certain online advertising activities more difficult and subject to additional scrutiny. For example, in the United States, the California Consumer Privacy Act, or CCPA, and the California Privacy Rights Act of 2020, or CPRA (operative January 2023), place additional requirements on the handling of personal data for us, our partners, and our advertisers, such as granting California residents the right to opt-out of a

Table of Contents

company's sharing of personal data for certain advertising purposes in exchange for money or other valuable consideration. Other states are considering similar legislation. Moreover, individuals are also becoming increasingly aware of and resistant to the collection, use, and sharing of personal data in connection with advertising. Individuals are becoming more aware of options related to consent and other options to opt-out of such data processing, including through media attention about privacy and data protection. Some users have opted out of allowing Snap to join data from third party apps and websites with data from Snapchat for advertising purposes, which has negatively impacted our ability to collect certain user data and our advertising partners' ability to deliver relevant content, all of which could negatively impact our business.

Furthermore, in April 2021, Apple issued an iOS update that imposes heightened restrictions on our access and use of user data by allowing users to more easily opt-out of tracking of activity across devices. Additionally, Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Firefox, Safari, and Chrome, have or plan to make similar changes as well. These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to target advertisements and measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business. The longer-term impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. While we implement alternative solutions, we are subject to rules and standards set by the owners of such mobile operating systems which may be unclear, change, or be interpreted in a manner adverse to us and require us to halt or change our solutions, any of which could seriously harm our business. In addition, if we are unable to mitigate these and future developments, and alternative solutions do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Our advertising revenue could also be seriously harmed by many other factors, including:

- diminished or stagnant growth, or a decline, in the total and regional number of DAUs on Snapchat;

- our inability to deliver advertisements to all of our users due to hardware, software, or network limitations;

- a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Visual Messaging, Map, Stories, and Spotlight platforms;

- our inability to create new products that sustain or increase the value of our advertisements;

- changes in our user demographics that make us less attractive to advertisers;

- lack of ad creative availability by our advertising partners;

- a decline in our available content, including if our content partners do not renew agreements, devote the resources to create engaging content, or provide content exclusively to us;

- decreases in the perceived quantity, quality, usefulness, or relevance of the content provided by us, our community, or partners;

- increases in resistance by users to our collecting, using, and sharing their personal data for advertising-related purposes;

- changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content;

- competitive developments or advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat;

- product changes or advertising inventory management decisions we may make that change the type, size, or frequency of advertisements displayed on Snapchat or the method used by advertisers to purchase advertisements;

- adverse legal developments relating to advertising, including changes mandated or prompted by legislation, regulation, executive actions, or litigation regarding the collection, use, and sharing of personal data for certain advertising-related purposes;

- adverse media reports or other negative publicity involving us, our founders, our partners, or other companies in our industry segment;

- advertiser or user perception that content published by us, our users, or our partners is objectionable;

- the degree to which users skip advertisements and therefore diminish the value of those advertisements to advertisers;

- changes in the way advertising is priced or its effectiveness is measured;

- our inability, or perceived inability, to measure the effectiveness of our advertising or target the appropriate audience for advertisements;

- our inability to collect and disclose data or access a user's personal data, including identifier for advertising or similar deterministic identifiers that new and existing advertisers may find useful;

- difficulty and frustration from advertisers who may need to reformat or change their advertisements to comply with our guidelines;

- volatility in the equity markets, which may reduce our advertisers' capacity or desire for aggressive advertising spending towards growth; and

- the political, economic, and macroeconomic climate and the status of the advertising industry in general, including impacts related to labor shortages, supply chain disruptions, inflation, and as a result of war, terrorism, or armed conflict, including Russia's invasion of Ukraine.

These and other factors could reduce demand for our advertising products, which may lower the prices we receive, or cause advertisers to stop advertising with us altogether. Either of these would seriously harm our business.

***Our two co-founders have control over all stockholder decisions because they control a substantial majority of our voting stock.***

Our two co-founders, Evan Spiegel and Robert Murphy, control over 99% of the voting power of our outstanding capital stock as of December 31, 2022, and Mr. Spiegel alone can exercise voting control over a majority of our outstanding capital stock. As a result, Mr. Spiegel and Mr. Murphy, or in many instances Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO or 32,383,178 shares of Snap's common stock. Should either of our co-founders' Class C common stock be converted to Class B common stock, the remaining co-founder will be able to exercise voting control over our outstanding capital stock. Moreover, Mr. Spiegel and Mr. Murphy have entered into a proxy agreement under which each has granted to the other a voting proxy with respect to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over. The proxy would become effective on either founder's death or disability. Accordingly, on the death or incapacity of either Mr. Spiegel or Mr. Murphy, the other could individually control nearly all of the voting power of our outstanding capital stock.

In addition, in October 2016, we issued a dividend of one share of non-voting Class A common stock to all our equity holders, which will prolong our co-founders' voting control because our co-founders are able to liquidate their holdings of non-voting Class A common stock without diminishing their voting control. Furthermore, in July 2022, our board of directors approved the future declaration and payment of a special dividend of one share of Class A Common stock on each outstanding share of Snap's common stock, subject to certain triggering conditions. In the future, our board of directors may, from time to time, decide to issue additional special or regular stock dividends in the form of Class A common stock, and if we do so our co-founders' control could be further prolonged. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support. Conversely, this concentrated control could allow our co-founders to consummate such a transaction that our other stockholders do not support. In addition, our co-founders may make long-term strategic investment decisions and take risks that may not be successful and may seriously harm our business.

As our Chief Executive Officer, Mr. Spiegel has control over our day-to-day management and the implementation of major strategic investments of our company, subject to authorization and oversight by our board of directors. As board members and officers, Mr. Spiegel and Mr. Murphy owe a fiduciary duty to our stockholders and must act in good faith in

a manner they reasonably believe to be in the best interests of our stockholders. As stockholders, even controlling stockholders, Mr. Spiegel and Mr. Murphy are entitled to vote their shares, and shares over which they have voting control, in their own interests, which may not always be in the interests of our stockholders generally. We have not elected to take advantage of the "controlled company" exemption to the corporate governance rules for companies listed on the New York Stock Exchange, or NYSE.

***Macroeconomic uncertainties, including labor shortages, supply chain disruptions, inflation, recession risks, and the COVID-19 pandemic have in the past and may continue to adversely impact our business.***

Global economic and business activities continue to face widespread macroeconomic uncertainties, including labor shortages, supply chain disruptions, inflation, as well as recession risks, which may continue for an extended period, and which have adversely impacted, and may continue to adversely impact, many aspects of our business.

As some of our advertisers experienced downturns or uncertainty in their own business operations and revenue, they halted or decreased or may halt, decrease, or continue to decrease, temporarily or permanently, their advertising spending or may focus their advertising spending more on other platforms, all of which may result in decreased advertising revenue. Labor shortages, supply chain disruptions, and inflation continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may also halt or decrease advertising spending. In addition, the unpredictability of the COVID-19 pandemic and other macroeconomic uncertainties may make it difficult to forecast our advertising revenue. Any decline in advertising revenue or the collectability of our receivables could seriously harm our business.

As a result of the COVID-19 pandemic, our partners and community who provide content or services to us may experience delays or interruptions in their ability to create content or provide services, if they are able to do so at all. A decrease in the amount or quality of content available on Snapchat, or an interruption in the services provided to us, could lead to a decline in user engagement, which could seriously harm our business.

The effects of the COVID-19 pandemic on user engagement or growth are uncertain, and may lead to unpredictable results in the short-term and long-term, including shorter-term increases in user engagement or growth that may not be indicative of longer-term trends. If physical distancing requirements and shelter-in-place orders are reactivated, and if fewer in-person activities take place, we may experience short-term and long-term disruption to user behavior and our business. We may also experience inconsistent or negative engagement as user behavior on our platform changes, including changes in user activity as a result of any physical distancing requirements and shelter-in-place orders. In addition, while the impact and duration of the COVID-19 pandemic on the global economy and our business has been mitigated, there are no assurances that the COVID-19 pandemic may not in the future result in significant volatility and disruption of global financial markets, which could negatively affect our liquidity in the future.

The global impact of COVID-19 continues to evolve, and we will continue to monitor the situation closely. Although the spread of COVID-19 may eventually be contained or further mitigated, we do not yet know how businesses, advertisers, or our partners will operate in a post-COVID-19 environment. Our users may change how they use our products and services in an environment where the perceived risk of COVID-19 and regulations surrounding it have changed. There may be additional costs or impacts to our business and operations, including future plans to return to our offices and resume in-person activities, travel, and events. In addition, there is no guarantee that a future outbreak of this or any other widespread epidemic will not occur, or if or when the global economy will fully recover. The ultimate impact of the COVID-19 pandemic or a similar health epidemic on our business, operations, or the global economy as a whole remains highly uncertain.

To the extent that macroeconomic uncertainties and the COVID-19 pandemic continue to impact our business, many of the other risks described in these risk factors may be exacerbated.

***Exposure to geo-political conflicts and events, including Russia's invasion of Ukraine, could put our employees and partners at substantial risk, interrupt our operations, increase costs, create additional regulatory burdens, and have significant negative macroeconomic effects, any of which could seriously harm our business.***

Significant geo-political conflicts and events, such as Russia's invasion of Ukraine, have had, and will likely continue to have, a substantial effect on our business and operations. We have team members and their families in Ukraine who face substantial personal risk, unprecedented disruption of their lives, and uncertainty as to the future. We have been providing emergency assistance and support to these team members and their families, including helping team members to

18

safely relocate when possible. We expect to continue this support in the future. In addition, we have offices, hardware, and other assets in Ukraine that may be at risk of destruction or theft. We have incurred, and will likely continue to incur, costs to support our team members and reorganize our operations to address these ongoing challenges. In addition, our management has spent significant time and attention on these and related events. The ongoing disruptions to our team members, our management, and our operations could seriously harm our business.

We believe Snapchat remains an important communication tool for family and friends in the region. However, in March 2022, we stopped all advertising running in Russia, Belarus, and Ukraine and halted advertising sales to all Russian and Belarusian entities. Many countries have placed sanctions and other restrictions on doing business with Russian or Belarusian businesses and certain individuals. In response, Russia and Belarus have enacted restrictions and sanctions of their own. These new laws, regulations, and sanctions are rapidly evolving and may conflict with each other, leading to uncertainty and possible mistakes in compliance. Should we violate such existing or similar future sanctions or regulations, we may be subject to substantial monetary fines and other penalties that could seriously harm our business. In addition, we may be restricted from offering our products or services in these countries, and any reduction in availability or use could negatively impact our DAU, revenue, or operations.

Generally, during times of war and other major conflicts, we, the third parties on which we rely, and our partners may be vulnerable to a heightened risk of cyberattacks, including retaliatory cyberattacks, that could seriously disrupt our business. We have experienced an increase in attempted cyberattacks on our products, systems, and networks, which we believe are related to the conflict. We may also face retaliatory attacks by governments, entities, or individuals who do not agree with our public expressions of support for Ukraine and our Ukrainian team members. Any such attack could cause disruption to our platform, systems, and networks, result in security breaches or data loss, damage our brand, or reduce demand for our services or advertising products. In addition, we may face significant costs (including legal and litigation costs) to prevent, correct, or remediate any such breaches. We may also be forced to expend additional resources monitoring our platform for evidence of disinformation or misuse in connection with the ongoing conflict.

The situation in Ukraine continues to evolve and we will monitor the situation closely. It is unclear how long the conflict will last and the long-term outcome and impact. On a macroeconomic level, the conflict in Ukraine has further disrupted trade, intensified problems in the global supply chain, and contributed to inflationary pressures. All of these factors may negatively impact the demand for advertising as companies face limited product availability, restricted sales opportunities, and condensed margins. Any pause or reduction in advertising spending in connection with the conflict in Ukraine could negatively impact our revenue and harm our business.

***If we do not develop successful new products or improve existing ones, our business will suffer. We may also invest in new lines of business that could fail to attract or retain users or generate revenue.***

Our ability to engage, retain, and increase our user base and to increase our revenue will depend heavily on our ability to successfully create new products, both independently and together with third parties. We may introduce significant changes to our existing products or develop and introduce new and unproven products and services, including technologies with which we have little or no prior development or operating experience. These new products and updates may fail to increase the engagement of our users, advertisers, or partners, may subject us to increased regulatory requirements or scrutiny, and may even result in short-term or long-term decreases in such engagement by disrupting existing user, advertiser, or partner behavior or by introducing performance and quality issues. For example, beginning in 2017, we started transitioning our advertising sales to a self-serve platform, which decreased average advertising prices. In 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. In August 2022, we announced a strategic reprioritization in which we substantially reduced or eliminated, and may continue to reduce or eliminate, investments not directly connected to our top priorities of community growth, revenue growth, and augmented reality. The short- and long-term impact of any major change, like our 2018 application redesign, the rewrite of our application for Android users in 2019, and our strategic reprioritization in 2022, or even a less significant change such as a refresh of the application or a feature change, is difficult to predict. Although we believe that these decisions will benefit the aggregate user experience and improve our financial performance over the long term, we may experience disruptions or declines in our DAUs or user activity broadly or concentrated on certain portions of our application. Product innovation is inherently volatile, and if new or enhanced products fail to engage our users, advertisers, or partners, or if we fail to give our users meaningful reasons to return to our application, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, any of which may seriously harm our business in the short-term, long-term, or both.

19

Table of Contents

Because our products created new ways of communicating, they have often required users to learn new behaviors to use our products, or to use our products repeatedly to receive the most benefit. These new behaviors, such as swiping and tapping in the Snapchat application, are not always intuitive to users. This can create a lag in adoption of new products and new user additions related to new products. We believe this has not hindered our user growth or engagement, but that may be the result of a large portion of our user base being in a younger demographic and more willing to invest the time to learn to use our products most effectively. To the extent that future users, including those in older demographics, are less willing to invest the time to learn to use our products, and if we are unable to make our products easier to learn to use, our user growth or engagement could be affected, and our business could be harmed. We may also develop new products or initiatives that increase user engagement and costs without increasing revenue. For example, in 2016, we introduced Memories, our cloud storage service for Snaps, which increases our storage costs but does not currently generate revenue.

In addition, we have invested, and expect to continue to invest, in new lines of business, new products, and other initiatives to increase our user base and user activity, and attempt to monetize the platform. For example, in 2020 we launched Spotlight, a new entertainment platform for user-generated content within Snapchat, in June 2022 we launched Snapchat+, a subscription product that gives subscribers access to exclusive, experimental, and pre-release features, and in July 2022, we launched Snapchat for Web, a browser-based product that brings Snapchat's signature calling and ephemeral messaging capabilities to the web. Such new lines of business, new products, and other initiatives may be costly, difficult to operate and monetize, increase product liability and litigation risk, and divert management's attention, and there is no guarantee that they will be positively received by our community or provide positive returns on our investment. We frequently launch new products and the products that we launch may have technical issues that diminish the performance of our application. These performance issues or issues that we encounter in the future could impact our user engagement. In addition, new products or features that we launch may ultimately prove unsuccessful and may be eliminated in the future. In certain cases, new products that we develop may require regulatory approval prior to launch or may require us to comply with additional regulations or legislation, including laws that are rapidly changing. There is no guarantee that we will be able to obtain such regulatory approval, and our efforts to comply with these laws and regulations could be costly and divert management's time and effort and may still not guarantee compliance. If we do not successfully develop new approaches to monetization or meet the expectations of our users or partners, we may not be able to maintain or grow our revenue as anticipated or recover any associated development costs, and our business could be seriously harmed.

***Our business is highly competitive. We face significant competition that we anticipate will continue to intensify. If we are not able to maintain or improve our market share, our business could suffer.***

We face significant competition in almost every aspect of our business both domestically and internationally, especially because our products and services operate across a broad list of categories, including camera, visual messaging, content, and augmented reality. Our competitors range from smaller or newer companies to larger, more established companies such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Kakao, LINE, Meta (including Facebook, Instagram, and WhatsApp), Naver (including Snow), Pinterest, Tencent, and Twitter. Our competitors also include platforms that offer, or will offer, a variety of products, services, content, and online advertising offerings that compete or may compete with Snapchat features or offerings. For example, Instagram, a competing application owned by Meta, has incorporated many of our features, including a "stories" feature that largely mimics our Stories feature and may be directly competitive. Meta has introduced, and likely will continue to introduce, more private ephemeral products into its various platforms which mimic other aspects of Snapchat's core use case. We also compete for users and their time, so we may lose users or their attention not only to companies that offer products and services that specifically compete with Snapchat features or offerings, but to companies with products or services that target or otherwise appeal to certain demographics, such as Discord or Roblox. Moreover, in emerging international markets, where mobile devices often lack large storage capabilities, we may compete with other applications for the limited space available on a user's mobile device. We also face competition from traditional and online media businesses for advertising budgets. We compete broadly with the social media offerings of Alphabet, Apple, ByteDance, Meta, Pinterest, and Twitter, and with other, largely regional, social media platforms that have strong positions in particular countries. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

Many of our current and potential competitors have significantly greater resources and broader global recognition and occupy stronger competitive positions in certain market segments than we do. These factors may allow our competitors to respond to new or emerging technologies and changes in market requirements better than we can, undertake more far-reaching and successful product development efforts or marketing campaigns, or adopt more aggressive pricing policies. In addition, ongoing changes to privacy laws and mobile operating systems have made it more difficult for us to target and measure advertisements effectively, and advertisers may prioritize the solutions of larger, more established companies. As

20

Table of Contents

a result, our competitors may, and in some cases will, acquire and engage users or generate advertising or other revenue at the expense of our own efforts, which would negatively affect our business. Advertisers may use information that our users share through Snapchat to develop or work with competitors to develop products or features that compete with us. Certain competitors, including Alphabet, Apple, and Meta, could use strong or dominant positions in one or more market segments to gain competitive advantages against us in areas where we operate, including by:

- integrating competing social media platforms or features into products they control such as search engines, web browsers, advertising networks, or mobile operating systems;

- making acquisitions for similar or complementary products or services; or

- impeding Snapchat's accessibility and usability by modifying existing hardware and software on which the Snapchat application operates.

Certain acquisitions by our competitors may result in reduced functionality of our products and services, provide our competitors with valuable insight into the performance of our and our partners' businesses, and provide our competitors with a pipeline of future acquisitions to maintain a dominant position. As a result, our competitors may acquire and engage users at the expense of our user base, growth, or engagement, which may seriously harm our business.

We believe that our ability to compete effectively depends on many factors, many of which are beyond our control, including:

- the usefulness, novelty, performance, and reliability of our products compared to our competitors' products;

- the number and demographics of our DAUs;

- the timing and market acceptance of our products, including developments and enhancements of our competitors' products;

- our ability to monetize our products;

- the availability of our products to users;

- the effectiveness of our advertising and sales teams;

- the effectiveness of our advertising products;

- our ability to establish and maintain advertisers' and partners' interest in using Snapchat;

- the frequency, relative prominence, and type of advertisements displayed on our application or by our competitors;

- the effectiveness of our customer service and support efforts;

- the effectiveness of our marketing activities;

- changes as a result of actual or proposed legislation, regulation, executive actions, or litigation, including settlements and consent decrees, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry segment;

- our ability to attract, retain, and motivate talented team members, particularly engineers, designers, and sales personnel;

- our ability to successfully acquire and integrate companies and assets;

- our ability to cost-effectively manage and scale our rapidly growing operations; and

- our reputation and brand strength relative to our competitors.

If we cannot effectively compete, our user engagement may decrease, which could make us less attractive to users, advertisers, and partners and seriously harm our business.

***We have incurred operating losses in the past, and may not be able to attain and sustain profitability.***

We began commercial operations in 2011 and we have historically experienced net losses and negative cash flows from operations. As of December 31, 2022, we had an accumulated deficit of $10.2 billion and for the year ended December 31, 2022, we had a net loss of $1.4 billion. We expect our operating expenses to increase in the future as we

Table of Contents

expand our operations. We may incur significant losses in the future for many reasons, including due to the other risks and uncertainties described in this report. Additionally, we may encounter unforeseen expenses, operating delays, or other unknown factors that may result in losses in future periods. If our revenue does not grow at a greater rate than our expenses, our business may be seriously harmed and we may not be able to attain and sustain profitability.

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could seriously harm our business.***

We depend on the continued services and performance of our key personnel, including Mr. Spiegel and Mr. Murphy. Although we have entered into employment agreements with Mr. Spiegel and Mr. Murphy, the agreements are at-will, which means that they may resign or could be terminated for any reason at any time. Mr. Spiegel and Mr. Murphy are high profile individuals who have received threats in the past and are likely to continue to receive threats in the future. Mr. Spiegel, as Chief Executive Officer, has been responsible for our company's strategic vision and Mr. Murphy, as Chief Technology Officer, developed the Snapchat application's technical foundation. Should either of them stop working for us for any reason, it is unlikely that the other co-founder would be able to fulfill all of the responsibilities of the departing co-founder nor is it likely that we would be able to immediately find a suitable replacement. The loss of key personnel, including members of management and key engineering, product development, marketing, and sales personnel, could disrupt our operations, adversely impact employee retention and morale, and seriously harm our business.

As we continue to grow, we cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position. We face significant competition in hiring and attracting qualified engineers, designers, and sales personnel, and the change by companies to offer a remote or hybrid work environment may increase the competition for such employees from employers outside of our traditional office locations. In November 2022, we announced our return to office plan that still encompasses a hybrid approach, but requires greater in-office attendance. While we intend to continue offering flexible work arrangements based on the different needs of teams across our company on a case-by-case basis, we may face difficulty in hiring and retaining our workforce as a result of this shift to have greater in-office attendance. Further, labor is subject to external factors that are beyond our control, including our industry's highly competitive market for skilled workers and leaders, inflation, the COVID-19 pandemic and other macroeconomic uncertainties, and workforce participation rates. In addition, if our reputation were to be harmed, whether as a result of our strategic reprioritization in 2022, media, legislative, or regulatory scrutiny or otherwise, it could make it more difficult to attract and retain personnel that are critical to the success of our business.

As we mature, or if our stock price declines, our equity awards may not be as effective an incentive to attract, retain, and motivate team members. Stock price declines may also cause us to offer additional equity awards to our existing team members to aid in retention. Conversely, many of our current team members received substantial amounts of our capital stock, giving them a substantial amount of personal wealth, which can lead to an increase in attrition. As a result, it may be difficult for us to continue to retain and motivate these team members, and this wealth could affect their decision about whether they continue to work for us. Furthermore, if we issue significant equity to attract and retain team members, we would incur substantial additional stock-based compensation expense and the ownership of our existing stockholders would be further diluted. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively and our business could be seriously harmed.

***We have a continually evolving business model, which makes it difficult to evaluate our prospects and future financial results and increases the risk that we will not be successful.***

We began commercial operations in 2011 and began meaningfully monetizing Snapchat in 2015. We started transitioning our advertising sales to a self-serve platform in 2017. We have a continually evolving business model, based on using the camera to improve the way that people live and communicate, which makes it difficult to effectively assess our future prospects. Accordingly, we believe that investors' future perceptions and expectations, which can be idiosyncratic and vary widely, and which we do not control, will affect our stock price. For example, investors may believe our timing and path to increased monetization will be faster or more effective than our current plans or than actually takes place. You should consider our business and prospects in light of the many challenges we face, including the ones discussed in this report.

***If the security of our information technology systems or data is compromised or if our platform is subjected to attacks that frustrate or thwart our users' ability to access our products and services, our users, advertisers, and partners may cut back on or stop using our products and services altogether, which could seriously harm our business.***

In the ordinary course of business, we collect, store, use, and share personal data and other sensitive information, including proprietary and confidential business data, trade secrets, third party sensitive information, and intellectual property (collectively, sensitive information). Our efforts to protect our sensitive information, including information that our users, advertisers, and partners have shared with us, may be unsuccessful due to the actions of third parties, software bugs or other technical malfunctions, employee error or malfeasance, or other factors. We and the third parties on which we rely may be subject to a variety of evolving threats, including social-engineering attacks (for example by fraudulently inducing employees, users, or advertisers to disclose information to gain access to our sensitive information, including data or our users' or advertisers' data), malware, viruses, hacking, and other threats. While certain of these threats have occurred in the past, they have become more prevalent and sophisticated in our industry, and may occur in the future. Because of our prominence and value of our sensitive data, we believe that we are an attractive target for these sorts of attacks.

In particular, severe ransomware attacks are becoming increasingly prevalent. To alleviate the financial, operational, and reputational impact of these attacks, it may be preferable to make extortion payments, but we may be unwilling or unable to do so, including, for example, if applicable laws or regulations prohibit such payments. And, even if we make such payments, cyber threat actors may still disclose data, engage in further extortion, or otherwise harm our systems or data. Moreover, we permit a hybrid work environment, which has increased risks to our information technology systems and data, as our employees utilize network connections, computers, and devices outside our premises or network, including working at home, while in transit and in public locations.

In addition, cyber threat actors have also increased the complexity of their attempts to compromise user accounts, despite our defenses and detection mechanisms to prevent these account takeovers. User credentials may be obtained through breaches of third party platforms and services, password stealing malware, social engineering, or other tactics and techniques, and used to launch coordinated attacks. Some of these attacks may be hard to detect at scale and may result in cyber threat actors using our service to spam or abuse other users, access user personal data, further compromise additional user accounts, or to compromise employee account credentials or social engineer employees into granting further access to systems.

We may rely on third-party service providers and technologies to operate critical business systems to process sensitive information in a variety of contexts, including cloud-based infrastructure, data center facilities, encryption and authentication technology, employee email, content delivery, and other functions. We may also rely on third-party service providers to provide other products or services to operate our business. Additionally, some advertisers and partners may store sensitive information that we share with them. Our ability to monitor these third parties' information security practices is limited, and these third parties may not have adequate information security measures in place despite their contractual representations to implement such measures and our third party service provider vetting process. If these third parties fail to implement adequate data security practices or fail to comply with our terms and policies, our sensitive data may be improperly accessed or disclosed, and we may experience adverse consequences. And even if these third parties take all of these steps, their networks may still suffer a breach, which could compromise our sensitive data. While we may be entitled to damages if our third-party service providers fail to satisfy their privacy or security-related obligations to us, any award may be insufficient to cover our damages, or we may be unable to recover such award.

Moreover, supply chain attacks have increased in frequency and severity, and we cannot guarantee that third parties in our supply chain have not been compromised or that their systems or networks are free from exploitable defects or bugs that could result in a breach of or disruption to our platform, systems, and networks or the systems and networks of third parties that support us and our services. We are also reliant on third party and open source software that may contain bugs, vulnerabilities, or errors that could be exploited or disclosed before a patch or fix is available.

If any of these or similar events occur, our or our third party partners' sensitive information and information technology systems could be accessed, acquired, modified, destroyed, lost, altered, encrypted, or disclosed in an unauthorized, unlawful, accidental, or other improper manner, resulting in a security incident or other interruption.

We may expend significant resources or modify our business activities to adopt additional measures designed to protect against security incidents. Certain data privacy and security obligations may require us to implement and maintain specific security measures or industry-standard or reasonable security measures to protect our systems and sensitive information. While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective. Additionally, we may be unable to detect vulnerabilities in other parts of our systems, including in our products, because such threats and techniques change frequently, are often sophisticated in nature, and may not be detected until after a security incident has occurred.

Table of Contents

Any security incident experienced by us or our third party partners could damage our reputation and our brand, and diminish our competitive position. Applicable privacy and security obligations may require us to notify relevant stakeholders of security incidents. Such discloses are costly, and the disclosure or the failure to comply with such requirements could lead to adverse consequences. Governments and regulatory agencies may also enact new disclosure requirements for cybersecurity events. In addition, affected users or government authorities could initiate legal or regulatory action against us, including class-action claims, investigations, penalties, and audits, which could be time-consuming and cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. We could also experience loss of user or advertiser confidence in the security of our platform, additional reporting requirements or oversight, restrictions on processing sensitive information, claims by our partners or other relevant parties that we have failed to comply with contractual obligations or our policies, and indemnification obligations. We could also spend material resources to investigate or correct the incident and to prevent future incidents. Maintaining the trust of our users is important to sustain our growth, retention, and user engagement. Concerns over our privacy and security practices, whether actual or unfounded, could damage our reputation and brand and deter users, advertisers, and partners from using our products and services. Any of these occurrences could seriously harm our business.

Our contracts may not contain limitations of liability, and even where they do, there can be no assurance that limitations of liability in our contracts are sufficient to protect us from liabilities, damages, or claims related to our data privacy and security obligations. We cannot be sure that our insurance coverage will be adequate or sufficient to protect us from or to mitigate liabilities arising out of our privacy and security practices, that such coverage will continue to be available on commercially reasonable terms or at all, or that such coverage will pay future claims.

We have previously suffered the loss of sensitive information related to employee error and vendor breaches.

***Our user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review and share metrics, including our DAUs and ARPU metrics, with our investors, advertisers, and partners to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data gathered on an analytics platform that we developed and operate and our methodology has not been validated by an independent third party. While these metrics are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally that may require significant judgment and are subject to technical errors. For example, there may be individuals who have multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. Our user metrics are also affected by technology on certain mobile devices that automatically runs in the background of our Snapchat application when another phone function is used, and this activity can cause our system to miscount the user metrics associated with such account.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from age demographics or estimate their ages based on a sample of the self-reported ages we do have. If our users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor or advertiser expectations.

Errors or inaccuracies in our metrics or data could also result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of active users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies. We count a DAU when a user opens the application, but only once per user per day. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application. However, we believe that we do not capture all data regarding our active users, which may result in understated metrics. This generally occurs because of technical issues, for instance when our systems do not record data from a user's application or when a user opens the Snapchat application and contacts our servers but is not recorded as an active user. We continually seek to address these technical issues and improve our accuracy, such as comparing our active users and other metrics with data received from other pipelines, including data recorded by our servers and systems. But given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect these issues to continue, particularly if

24

Table of Contents

we continue to expand in parts of the world where mobile data systems and connections are less stable. If advertisers, partners, or investors do not perceive our user, geographic, other demographic metrics, or measurements of advertising effectiveness to be accurate, or if we discover material inaccuracies in our metrics, our reputation may be seriously harmed. Our advertisers and partners may also be less willing to allocate their budgets or resources to Snapchat, which could seriously harm our business. In addition, we calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average.

***Improper or illegal use of Snapchat could seriously harm our business and reputation.***

We cannot be certain that the technologies that we have developed to repel spamming attacks will be able to eliminate all spam messages from our products. Spammers attempt to use our products to send targeted and untargeted spam messages to users, which may embarrass or annoy users and make our products less user friendly. Our actions to combat spam may also divert significant time and focus from improving our products. As a result of spamming activities, our users may use our products less or stop using them altogether, and result in continuing operational cost to us.

Similarly, terrorists, criminals, and other bad actors may use our products to promote their goals and encourage users to engage in terror and other illegal activities discussed in our Transparency Report. We expect that as more people use our products, these bad actors will increasingly seek to misuse our products. Although we invest resources to combat these activities, including by suspending or terminating accounts we believe are violating our Terms of Service and Community Guidelines, we expect these bad actors will continue to seek ways to act inappropriately and illegally on Snapchat. Combating these bad actors requires our teams to divert significant time and focus from improving our products. In addition, we may not be able to control or stop Snapchat from becoming the preferred application of use by these bad actors, which may become public knowledge and seriously harm our reputation or lead to lawsuits or attention from regulators. If these activities increase on Snapchat, our reputation, user growth and user engagement, and operational cost structure could be seriously harmed.

***Because we store, process, and use data, some of which contains personal data, we are subject to complex and evolving federal, state, local and foreign laws, regulations, executive actions, rules, contractual obligations, policies, and other obligations regarding privacy, data protection, content, and other matters. Many of these obligations are subject to change and uncertain interpretation, and our actual or perceived failure to comply with such obligations could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, or other adverse consequences, any of which could seriously harm our business.***

In the ordinary course of business, we collect, store, use, and share personal data and other sensitive information, including proprietary and confidential business data, trade secrets, third party sensitive information, and intellectual property. Accordingly, we are subject to a variety of laws, regulations, industry standards, policies, contractual requirements, executive actions, and other obligations relating to privacy, security, and data protection. We also are or may in the future be subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation.

In Europe, the Middle East, and Africa, all of our major markets have laws, regulations, and regulatory/industry standards that govern privacy, security, online safety and data protection.

For example, in Europe, under GDPR or similar laws, companies may face temporary or definitive bans on data processing and other corrective actions, fines of up to 20 million Euros or 4% of annual global revenue, whichever is greater, or private litigation related to processing of personal data brought by classes of data subjects or consumer protection organizations authorized at law to represent their interests. Additionally, the transfer of personal data from Europe and other jurisdictions to the United States, has recently also been under increased regulatory pressure and scrutiny. In particular, the European Economic Area (EEA) and the UK have significantly limited the lawful basis on which personal data can be transferred to the United States (and other countries they believe provide inadequate privacy protections) and increased the assessments required to do so. Other jurisdictions may adopt similarly stringent interpretations of their data localization and cross-border transfer laws, or adopt similar laws. We have attempted to structure our operations in a manner designed to help us partially avoid some of these concerns (e.g., Snap Inc. receives Snapchat consumer data directly from European consumers and is directly subject to GDPR; a structure designed to seek to avoid any requirement for additional transfer protections under the GDPR in this context); however, we still transfer some data from the EEA and

Table of Contents

UK to the United States using currently legal mechanisms. Some of these mechanisms are subject to legal challenges, and there is no assurance that we can satisfy or rely on these measures to lawfully transfer personal data to the United States. If there is no lawful manner for us to transfer personal data from the EEA, the UK or other jurisdictions to the United States, or if the requirements for a legally-compliant transfer are too onerous, we could face significant adverse consequences, including the interruption or degradation of our operations, the need to relocate part of or all of our business or data processing activities to other jurisdictions at significant expense, increased exposure to regulatory actions, substantial fines and penalties, the inability to transfer data and work with partners, vendors and other third parties, and injunctions against our processing or transferring of personal data necessary to operate our business. Some European regulators have sought to restrict some companies' data processing activities, including our competitors, from transferring certain personal data out of Europe for allegedly violating the GDPR's cross-border data transfer limitations, which would materially impact such companies' operations and revenues. Additionally, companies that transfer personal data outside of the EU to other jurisdictions, particularly to the United States, are subject to increased scrutiny from regulators, individual litigants and activist groups.

Additionally, in Europe, the European Union has new legislative initiatives, such as the DSA, which requires further change to our products, policies, and procedures. We expect to be designated as one of the "providers of very large online platforms" in Spring 2023 and are therefore likely to be subject to significant compliance deadlines starting in Summer 2023. Current national laws that implement the ePrivacy Directive are likely to be replaced or updated when the ePrivacy Regulation enters into force, which will significantly increase fines for non-compliance once in effect and could also have a material impact on the availability of data we rely on to improve and personalize our products and features. Moreover, the United Kingdom's Age Appropriate Design Code, or AADC, and incoming Online Safety Bill, focuses on online safety and protection of children's privacy online. Furthermore, in Europe, there is a proposed regulation related to artificial intelligence, or AI, that, if adopted, could impose onerous obligations related to the use of AI-related systems and may require us to change our business practices to comply with such obligations. Moreover, in the EEA, the Collective Redress Directive (effective June 2023) will allow collective actions to be brought by a representative body against businesses if they breach legislation intended to protect EU consumers, including for data protection matters.

In Asia-Pacific, or APAC, our major markets are following closely behind Europe in introducing or updating their laws and regulations governing privacy, security, online safety and data protection. India's new IT Rules, introduced in 2021 requires large technology companies like ours to appropriately moderate online content and provide government agencies with access, and has ultimately led to a ban of certain platforms. India has also introduced a new comprehensive privacy and data protection law (Digital Personal Data Protection Bill) under which we will be required to meet GDPR style obligations for Indian consumer data. Australia's recent Online Safety Act and existing Assistance and Access Act have similarly placed significant focus on appropriate moderation, take down and government access. Australia is working on updates to its Privacy Act 1988 and a new Privacy Legislation Amendment (Enhancing Online Privacy and Other Measures (Bill) 2021 (Online Privacy Bill) that will impose more stringent obligations on us and other social / technology companies. Other APAC countries also have privacy laws that apply to our operations, such as South Korea's Personal Information Protection Law, Japan's Act on the Protection of Personal Information, and Singapore's Personal Data Protection Act. Other foreign legislative and regulatory bodies in the Americas have enacted or may enact similar legislation regarding the handling of personal data, or conduct additional investigations into specific companies or the industry as a whole that could alter the existing regulatory environment in a manner that would be adverse to us. For example, Canada's Personal Information Protection and Electronic Documents Act, and various related provincial laws, Canada's Anti-Spam Legislation, and Brazil's LGPD.

In the United States, federal, state, and local governments have enacted numerous privacy, security, and data protection laws, including data breach notification laws, personal data privacy laws, consumer protection laws (e.g., Section 5 of the Federal Trade Commission Act), and other similar laws. For example, the CCPA went into effect in January 2020 and the CPRA, which expands the requirements for handling personal data of California residents, went into effect in January 2023. The CCPA and CPRA also provide for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. In 2022, Virginia, Colorado, Connecticut, and Utah also passed comprehensive privacy laws that go into effect in 2023. The privacy of children's personal data collected online is also becoming increasingly scrutinized. In addition to the federal Children's Online Privacy Protection Act, or COPPA, the California's Age-Appropriate Design Code Act, which is modeled after the AADC, goes into effect in 2024. These developments may further complicate compliance efforts, and may increase legal risk and compliance costs for us and our third party partners.

Additionally, several states and localities have enacted statutes banning or restricting the collection of biometric information. For example, the Illinois Biometric Information Privacy Act, or BIPA, regulates the collection, use,

Table of Contents

safeguarding, and storage of biometric information. BIPA provides for substantial penalties and statutory damages and has generated significant class action activity. In November 2020, a putative class filed an action against us in Illinois, alleging that we violated BIPA. Other legal proceedings alleging similar claims followed. Although we maintain the position that our technologies implicated by these proceedings do not collect any biometric information, we have settled these disputes to avoid potentially costly litigation and have implemented a BIPA consent flow in Snapchat in an abundance of caution. Additionally, several states and localities have enacted measures related to the use of AI and machine learning in products and services.

In addition, privacy advocates and industry groups have proposed, and may propose in the future, standards with which we are legally or contractually obligated to comply. Moreover, we may also be bound by contractual obligations related to data privacy and security, and our efforts to comply with such obligations may not be successful. We may also publish privacy policies, marketing materials and other statements, such as compliance with certain certifications or self-regulatory principles, regarding data privacy and security. If these policies, materials, or statements are found to be deficient, lacking in transparency, deceptive, unfair, or misrepresentative of our practices, we may be subject to investigation, enforcement actions by regulators or other adverse consequences.

Many of these obligations are becoming increasingly stringent and subject to rapid change and uncertain interpretation. Preparing for and complying with these obligations requires us to devote significant resources. These obligations may necessitate changes to our services, information technologies, systems, and practices and to those of any third parties that process personal data on our behalf. In addition, these obligations may require us to change our business model. Our business model materially depends on our ability to process personal data, particularly in connection with our advertising offerings, so we are particularly exposed to the risks associated with the rapidly changing legal landscape regarding privacy, security, and data protection. For example, privacy regulators have targeted some of our competitors, including by investigating their data processing activities and issuing large fines. Such enforcement actions may cause us to revise our business plans and operations. Moreover, we believe a number of investigations into other technology companies are currently being conducted by federal, state, and foreign legislative and regulatory bodies. We therefore may be at heightened risk of regulatory scrutiny, as regulators focus their attention on data processing activities of companies like us, and any changes in the regulatory framework or enforcement actions – whether against us or our competitors – could require us to fundamentally change our business model.

We may at times fail, or be perceived to have failed, in our efforts to comply with our privacy, security, and data protection obligations. Moreover, despite our efforts, our personnel or third parties on whom we rely may fail to comply with such obligations, which could negatively impact our business operations. If we or the third parties upon which we rely fail, or are perceived to have failed, to address or comply with applicable privacy, security, or data protection obligations, we could face significant consequences, including but not limited to: government enforcement actions (such as investigations, claims, audits, penalties, etc.), litigation (including class action litigation), additional reporting requirements or oversight, bans on processing personal data, and orders to destroy or not use personal data. Any of these events could have a material adverse effect on our business, including loss of users and advertisers, inability to process personal data or operate in certain jurisdictions, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.

We have in the past been subject to enforcement actions, investigations, proceedings, orders, or various government inquiries regarding our data privacy and security practices and processing. For example, in December 2014, the U.S. Federal Trade Commission resolved an investigation into some of our early practices by issuing a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year term of the order, we must complete biennial independent privacy audits. In addition, in June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors under the age of 13 from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could seriously harm our business.

***Our financial condition and results of operations will fluctuate from quarter to quarter, which makes them difficult to predict.***

Our quarterly results of operations have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely on our past quarterly results of operations as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving market

segments. Our financial condition and results of operations in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement;

- the development and introduction of new or redesigned products or services by us or our competitors;

- the ability of our cloud service providers to scale effectively and timely provide the necessary technical infrastructure to offer our service;

- our ability to attract and retain advertisers in a particular period;

- seasonal or other fluctuations in spending by our advertisers and product usage by our users, each of which may change as our product offerings evolve or as our business grows or as a result of unpredictable events such as the COVID-19 pandemic, inflationary pressures, labor shortages, supply chain disruptions, or the conflict in Ukraine;

- restructuring or other charges and unexpected costs or other operating expenses;

- the number of advertisements shown to users;

- the pricing of our advertisements and other products;

- our ability to demonstrate to advertisers the effectiveness of our advertisements;

- the diversification and growth of revenue sources beyond current advertising;

- increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

- our ability to maintain operating margins, cash provided by operating activities, and Free Cash Flow;

- our ability to accurately forecast consumer demand for our physical products and adequately manage inventory;

- system failures or security incidents, and the costs associated with such incidents and remediations;

- inaccessibility of Snapchat, or certain features within Snapchat, due to third-party or governmental actions;

- stock-based compensation expense;

- our ability to effectively incentivize our workforce;

- adverse litigation judgments, settlements, or other litigation-related costs, or product recalls;

- changes in the legislative or regulatory environment, including with respect to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, enforcement by government regulators, including fines, orders, sanctions, or consent decrees, or the issuance of executive orders or other similar executive actions that may adversely affect our revenues or restrict our business;

- new privacy, data protection, and security laws and other obligations and increased regulatory scrutiny on our or our competitors' data processing activities and privacy and information security practices, which some of our competitors have already experienced, including through enforcement actions potentially resulting in large penalties or other severe sanctions and increased restrictions on the data processing activities and personal data transfers critical to the operation of our current business model;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and interest rates or impairments of any assets on our consolidated balance sheet;

- changes in our effective tax rate;

- announcements by competitors of significant new products, licenses, or acquisitions;

- our ability to make accurate accounting estimates and appropriately recognize revenue for our products for which there are no relevant comparable products;

- our ability to meet minimum spending commitments in agreements with our infrastructure providers;

- changes in accounting standards, policies, guidance, interpretations, or principles;

Table of Contents

- the effect of war or other armed conflict on our workforce, operations, or the global economy; and

- changes in domestic and global business or macroeconomic conditions, including as a result of the COVID-19 pandemic or the conflict in Ukraine, and resulting labor shortages, supply chain disruptions, and inflation.

***If we are unable to continue to successfully grow our user base and further monetize our products, our business will suffer.***

We have made, and are continuing to make, investments to enable users, partners, and advertisers to create compelling content and deliver advertising to our users. Existing and prospective Snapchat users and advertisers may not be successful in creating content that leads to and maintains user engagement. We are continuously seeking to balance the objectives of our users and advertisers with our desire to provide an optimal user experience. We do not seek to monetize all of our products nor do we solely focus our efforts on users with higher ARPU, and we may not be successful in achieving a balance that continues to attract and retain users and advertisers. We focus on growing engagement across our service, and from time to time our efforts may reduce user activity with certain monetizable products in favor of other products we do not currently monetize. If we are not successful in our efforts to grow or effectively and timely monetize our user base, or if we are unable to build and maintain good relations with our advertisers, our user growth and user engagement and our business may be seriously harmed. In addition, we may expend significant resources to launch new products that we are unable to monetize, which may seriously harm our business.

Additionally, we may not succeed in further monetizing Snapchat. We currently monetize Snapchat by displaying advertisements sold by us and our partners. As a result, our financial performance and ability to grow revenue could be seriously harmed if:

- we fail to increase or maintain DAUs;

- our user growth outpaces our ability to monetize our users, including if we don't attract sufficient advertisers or if our user growth occurs in markets that are not as monetizable;

- we fail to increase or maintain the amount of time spent on Snapchat, the amount of content that our users share, or the usage of our Camera, Visual Messaging, Map, Stories, and Spotlight platforms;

- partners do not create sufficient engaging content for users or renew their agreements with us;

- we fail to attract sufficient advertisers to utilize our self-serve platform to make the best use of our advertising inventory;

- advertisers do not continue to introduce engaging advertisements;

- advertisers reduce their advertising on Snapchat;

- we fail to maintain good relationships with advertisers or attract new advertisers, or demonstrate to advertisers the effectiveness of advertising on Snapchat; or

- the content on Snapchat does not maintain or gain popularity.

***We cannot assure you that we will effectively manage our growth.***

The growth and expansion of our business, headcount, and products create significant challenges for our management, including managing multiple relationships with users, advertisers, partners, and other third parties, and constrain operational and financial resources. If our operations or the number of third-party relationships continues to grow, our information-technology systems and our internal controls and procedures may not adequately support our operations. In addition, some members of our management do not have significant experience managing large global business operations, so our management may not be able to manage such growth effectively. To effectively manage our growth, we must continue to improve our operational, financial, and management processes and systems and effectively expand, train, and manage our employee base. However, the actions we take to achieve such improvements may not have the intended effect and may instead result in disruptions, employee turnover, declines in revenue, and other adverse effects.

As our organization continues to mature and we are required to implement more complex organizational management structures, we may also find it increasingly difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance and seriously harm our business.

29

Table of Contents

In August 2022, we announced a plan to reduce our global employee headcount by approximately 20%. The headcount reduction is part of a broader strategic reprioritization to focus on our top priorities, improve cost efficiencies, and drive toward profitability and positive free cash flow. As a result of the strategic reprioritization, in the year ended December 31, 2022, we incurred pre-tax charges of $188.9 million, primarily consisting of severance and related charges, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. This headcount reduction and strategic reprioritization could disrupt our operations, adversely impact employee retention and morale, adversely impact our reputation as an employer, which could make it more difficult for us to retain existing employees and hire new employees in the future, distract management, and seriously harm our business.

***Our costs may increase faster than our revenue, which could seriously harm our business or increase our losses.***

Providing our products to our users is costly, and we expect our expenses, including those related to people and hosting, to grow in the future. This expense growth will continue as we broaden our user base, as users increase the number of connections and amount of content they consume and share, as we develop and implement new product features that require more computing infrastructure, and as we grow our business. Historically, our costs have increased each year due to these factors, and we expect to continue to incur increasing costs. Our costs are based on development and release of new products and the addition of users and may not be offset by a corresponding growth in our revenue. We will continue to invest in our global infrastructure to provide our products quickly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization, if any. Our expenses may be greater than we anticipate, and our investments to make our business and our technical infrastructure more efficient may not succeed and may outpace monetization efforts. In addition, we expect to increase marketing, sales, and other operating expenses to grow and expand our operations and to remain competitive. Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.

***Our business depends on our ability to maintain and scale our technology infrastructure. Any significant disruption to our service could damage our reputation, result in a potential loss of users and decrease in user engagement, and seriously harm our business.***

Our reputation and ability to attract, retain, and serve users depends on the reliable performance of Snapchat and our underlying technology infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our products and services from time to time. Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could seriously harm our business. If Snapchat is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to Snapchat as often in the future, or at all. As our user base and the volume and types of information shared on Snapchat grow, we will need an increasing amount of technology infrastructure, including network capacity and computing power, to continue to satisfy our users' needs. It is possible that we may fail to effectively scale and grow our technology infrastructure to accommodate these increased demands. In addition, our business is subject to interruptions, delays, and failures resulting from earthquakes, other natural disasters, geo-political conflicts, terrorism, pandemics, and other catastrophic events. Global climate change could also result in natural disasters occurring more frequently or with more intense effects, which could cause business interruptions. Wars or other armed conflicts, including Russia's invasion of Ukraine, could damage or diminish our access to our technology infrastructure or regional networks, disrupting our services which could seriously harm our business and financial performance.

As discussed in these risk factors, substantially all of our network infrastructure is provided by third parties, including Google Cloud and AWS. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could seriously harm our business. Any financial or other difficulties these providers face may seriously harm our business. And because we exercise little control over these providers, we are vulnerable to problems with the services they provide.

Beginning in 2021, we implemented a new enterprise resource planning system, or ERP, and migrated our general ledger, consolidation, and planning processes onto the new system. As we periodically augment and enhance our financial systems, we may experience difficulties in managing our systems and processes, which could disrupt our operations, the management of our finances, and the reporting of our financial results, which in turn, may result in our inability to manage the growth of our business and to accurately forecast and report our results, each of which could seriously harm our business.

Table of Contents

***Our business emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes don't align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. We believe our culture fosters this goal. Our focus on innovations and quick reactions could result in unintended outcomes or decisions that are poorly received by our users, advertisers, or partners. We have made, and expect to continue to make, significant investments to develop and launch new products and services and we cannot assure you that users will purchase or use such new products and services in the future. We will also continue to attempt to find effective ways to show our community new and existing products and alert them to events, holidays, relevant content, and meaningful opportunities to connect with their friends. These methods may provide temporary increases in engagement that may ultimately fail to attract and retain users. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and improve our financial performance over the long term. For example, we monitor how advertising on Snapchat affects our users' experiences to ensure we do not deliver too many advertisements to our users, and we may decide to decrease the number of advertisements to ensure our users' satisfaction in the product. In addition, we improve Snapchat based on feedback provided by our users, advertisers, and partners. These decisions may not produce the long-term benefits that we expect, in which case our user growth and engagement on our service or on certain platforms, our relationships with advertisers and partners, and our business could be seriously harmed.

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be seriously harmed. If we need to license or acquire new intellectual property, we may incur substantial costs.***

We aim to protect our confidential proprietary information, in part, by entering into confidentiality agreements and invention assignment agreements with our employees, consultants, advisors, and third parties who access or contribute to our proprietary know-how, information, or technology. We, however, cannot assure you that these agreements will be effective in controlling access to, or preventing unauthorized distribution, use, misuse, misappropriation, reverse engineering, or disclosure of our proprietary information, know-how, and trade secrets. Further, these agreements do not prevent our competitors or partners from independently developing offerings that are substantially equivalent or superior to ours. These agreements may be breached, and we may not have adequate remedies for any such breach. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret or know-how can be difficult, expensive, and time-consuming, and the outcome can be unpredictable.

We also rely on trademark, copyright, patent, trade secret, and domain-name protection laws to protect our proprietary rights. In the United States and internationally, we have filed various applications to protect aspects of our intellectual property, and we currently hold a number of issued patents, trademarks, and copyrights in multiple jurisdictions. In the future, we may acquire additional patents or patent portfolios, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, third parties may design around our proprietary rights or independently develop competing technology, and pending and future trademark, copyright, and patent applications may not be approved. Moreover, we cannot ensure that the claims of any granted patents will be sufficiently broad to protect our technology or platform and provide us with competitive advantages. Additionally, failure to comply with applicable procedural, documentary, fee payment, and other similar requirements could result in abandonment or lapse of the affected patent, trademark, or copyright application or registration.

Moreover, a portion of our intellectual property has been acquired or licensed from one or more third parties. While we have conducted diligence with respect to such acquisitions and licenses, because we did not participate in the development or prosecution of much of the acquired intellectual property, we cannot guarantee that our diligence efforts identified and remedied all issues related to such intellectual property, including potential ownership errors, potential errors during prosecution of such intellectual property, and potential encumbrances that could limit our ability to enforce such intellectual property rights.

Further, the laws of certain foreign countries do not provide the same level of protection of corporate proprietary information and assets such as intellectual property, trade secrets, know-how, and records as the laws of the United States. For instance, the legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection. As a result, we may be exposed to material risks of theft of our proprietary information and other intellectual property, including technical data, manufacturing processes, data sets, or

Table of Contents

other sensitive information, and we may also encounter significant problems in protecting and defending our intellectual property or proprietary rights abroad. In any of these cases, we may be required to expend significant time and expense to prevent infringement or to enforce our rights. Our efforts to enforce our intellectual property rights may be met with defenses, counterclaims, and countersuits attacking the validity and enforceability of our intellectual property rights, and, if such defenses, counterclaims, and countersuits are successful, we could lose valuable intellectual property rights. Our inability to protect our proprietary technology against unauthorized copying or use, as well as any costly litigation or diversion of our management's attention and resources, could impair the functionality of our platform, delay introductions of enhancements to our platform, result in our substituting inferior or more costly technologies into our platform, or harm our reputation and brand. In addition, we may be required to license additional technology from third parties to develop and market new platform features, which may not be on commercially reasonable terms, or at all, and would adversely affect our ability to compete. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products, brands, content, or concepts that are substantially similar to ours and compete with our business. If we are unable to protect our proprietary rights or prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished, and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could seriously harm our business.

***Some of our software and systems contain open source software, which may pose particular risks to our proprietary applications.***

We use software licensed to us by third-party developers under "open source" licenses in connection with the development or deployment of our products and expect to continue to use open source software in the future. Some open source licenses contain express requirements or impose conditions, which may be triggered under certain circumstances, with respect to the exploitation of proprietary source code or other intellectual property by users of open source software. While we employ practices designed to monitor our compliance with the licenses of third-party open source software and to avoid using the open source software in a manner that would put our valuable proprietary source code at risk, there is a risk that we could have used, or may in the future use, open source software in a manner which could require us to release our proprietary source code to users of our software or to the public, require us to license our proprietary software for purposes of making modifications or derivative works, or prohibit us from charging fees for the use of our proprietary software. This could result in loss of revenue, and allow our competitors to create similar offerings with lower development costs, and ultimately could result in a loss of our competitive advantages. Furthermore, there is an increasing number of open source software license types, almost none of which have been tested in a court of law, resulting in guidance regarding the proper legal interpretation of such licenses and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our products. If we were to receive a claim of non-compliance with the terms of any of our open source licenses, we may be required to publicly release certain portions of our proprietary source code or expend substantial time and resources to re-engineer some or all of our software, which may divert resources away from our product development efforts and, as a result, adversely affect our business. In addition, we could be required to seek licenses from third parties to continue offering our products for certain uses, or cease offering the products associated with such software, which may be costly.

In addition, our use of open source software may present greater risks than use of other third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the code. To the extent that our e-commerce capabilities and other business operations depend on the successful and secure operation of open source software, any undetected errors or defects in open source software that we use could prevent the deployment or impair the functionality of our systems and injure our reputation. In addition, the public availability of such software may make it easier for others to compromise our systems. Any of these risks could be difficult to eliminate or manage and, if not addressed, could have an adverse effect on our business.

***If our users do not continue to contribute content or their contributions are not perceived as valuable to other users, we may experience a decline in user growth, retention, and engagement on Snapchat, which could result in the loss of advertisers and revenue.***

Our success depends on our ability to provide Snapchat users with engaging content, which in part depends on the content contributed by our users. If users, including influential users such as world leaders, government officials, celebrities, athletes, journalists, sports teams, media outlets, and brands, do not continue to contribute engaging content to Snapchat, our user growth, retention, and engagement may decline. That, in turn, may impair our ability to maintain good relationships with our advertisers or attract new advertisers, which may seriously harm our business.

Table of Contents

*Foreign government initiatives and restrictions could seriously harm our business.*

Foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. Foreign governments may censor Snapchat in their countries, restrict access to Snapchat from their countries entirely, impose other restrictions that may affect their citizens' ability to access Snapchat for an extended period of time or even indefinitely, require data localization, or impose other laws or regulations that we cannot comply with, would be difficult for us to comply with, or would require us to rebuild our products or the infrastructure for our products. Such restrictions may also be implemented or lifted selectively to target or benefit other companies or products, which may result in sudden or unexpected fluctuations in competition in regions where we operate. In addition, geo-political disputes, including Russia's invasion of Ukraine, may cause countries to target and restrict our operations, or to promote other companies' products in place of ours. Any restriction on access to Snapchat due to foreign government actions or initiatives, or any withdrawal by us from certain countries because of such actions or initiatives, or any increased competition due to actions and initiatives of foreign governments would adversely affect our DAUs, including by giving our competitors an opportunity to penetrate geographic markets that we cannot access or to which they previously did not have access. As a result, our user growth, retention, and engagement may be seriously harmed, and we may not be able to maintain or grow our revenue as anticipated and our business could be seriously harmed.

*Our users may increasingly engage directly with our partners and advertisers instead of through Snapchat, which may negatively affect our revenue and seriously harm our business.*

Using our products, some partners and advertisers not only can interact directly with our users but can also direct our users to content with third-party websites and products and downloads of third-party applications. In addition, our users may generate content by using Snapchat features, but then share, use, or post it on a different platform. The more our users engage with third-party websites and applications, the less engagement we may get from them, which would adversely affect the revenue we could earn from them. Although we believe that Snapchat reaps significant long-term benefits from increased user engagement with content on Snapchat provided by our partners, these benefits may not offset the possible loss of advertising revenue, in which case our business could be seriously harmed.

*If events occur that damage our brand or reputation, our business may be seriously harmed.*

We have developed a brand that we believe has contributed to our success. We also believe that maintaining and enhancing our brand is critical to expanding our user base, advertisers, and partners. Because many of our users join Snapchat on the invitation or recommendation of a friend or family member, one of our primary focuses is on ensuring that our users continue to view Snapchat and our brand favorably so that these referrals continue. Maintaining and enhancing our brand will depend largely on our ability to continue to provide useful, novel, fun, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products, make changes to existing products and services, or require our users to agree to new terms of service related to new and existing products that users do not like, which may negatively affect our brand in the short-term, long-term, or both. Additionally, our partners' actions may affect our brand if users do not appreciate what those partners do on Snapchat. We may also fail to adequately support the needs of our users, advertisers, or partners, which could erode confidence in our brand. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not be successful. If we fail to successfully promote and maintain our brand or if we incur excessive expenses in this effort, our business may be seriously harmed.

In the past, we have experienced, and we expect that we will continue to experience, media, legislative, and regulatory scrutiny. Unfavorable publicity regarding us, our privacy or security practices, product changes, product quality, illicit use of our product, litigation, employee matters, or regulatory activity, or regarding the actions of our founders, our partners, our users, or other companies in our industry, could seriously harm our reputation and brand. Negative publicity and scrutiny could also adversely affect the size, demographics, engagement, and loyalty of our user base and result in decreased revenue, fewer app installs (or increased app un-installs), or declining user base or growth rates, any of which could seriously harm our business.

*Expanding and operating in international markets requires significant resources and management attention. If we are not successful in expanding and operating our business in international markets, we may incur significant costs, damage our brand, or need to lay off team members in those markets, any of which may seriously harm our business.*

We have expanded to new international markets and are growing our operations in existing international markets, which may have very different cultures and commercial, legal, and regulatory systems than where we predominantly operate. In connection with our international expansion and growth, we have also hired new team members in many of these markets. This international expansion may:

Table of Contents

- impede our ability to continuously monitor the performance of all of our team members;

- result in hiring of team members who may not yet fully understand our business, products, and culture; or

- cause us to expand in markets that may lack the culture and infrastructure needed to adopt our products.

These issues may eventually lead to turnover or layoffs of team members in these markets and may harm our ability to grow our business in these markets. In addition, scaling our business to international markets imposes complexity on our business, and requires additional financial, legal, and management resources. We may not be able to manage growth and expansion effectively, which could damage our brand, result in significant costs, and seriously harm our business. For example, in August 2022, we announced a plan to reduce our global employee headcount by approximately 20%. The headcount reduction is part of a broader strategic reprioritization by the company to focus on our top priorities, improve cost efficiencies, and drive toward profitability and positive free cash flow. As a result of the strategic reprioritization, in the year ended December 31, 2022, we incurred pre-tax charges of $188.9 million, primarily consisting of severance and related charges, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. This headcount reduction and strategic reprioritization could disrupt our operations, adversely impact employee retention and morale, adversely impact our reputation as an employer, which could make it more difficult for us to retain existing employees and hire new employees in the future, distract management, and seriously harm our business.

Additionally, as we increase the number of our team members internationally, we are exposed to political, social, and economic instability in additional countries and regions. For example, we have team members in Ukraine, and the current conflict and instability in the region has disrupted our operations and negatively impacted our team members and our business.

***Our products are highly technical and may contain undetected software bugs or hardware errors, which could manifest in ways that could seriously harm our reputation and our business.***

Our products are highly technical and complex. Snapchat, our other products, or products we may introduce in the future, may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently disabled products. We have a practice of rapidly updating our products and some errors in our products may be discovered only after a product has been released or shipped and used by users, and may in some cases be detected only under certain circumstances or after extended use. While we maintain an application security program designed to detect bugs and vulnerabilities in our products prior to their launch and a bug bounty program to allow security researchers to assist us in identifying vulnerabilities in our products before they are exploited by malicious threat actors, there is no guarantee that we will be able to discover every vulnerability or threat to our products. We may be unable to detect bugs, vulnerabilities or threats because no testing can reveal all bugs and vulnerabilities in highly technical and complex products that are constantly evolving, cyber threat actors are developing sophisticated and often undisclosed exploit development tools and techniques, and vulnerabilities in open source and third party software that may be included in our products are disclosed daily. Any errors, bugs, or vulnerabilities discovered in our products or code after release could damage our reputation, result in a security incident (and all the attendant risks), drive away users, lower revenue, and expose us to claims or regulatory investigations, any of which could seriously harm our business.

Spectacles, as an eyewear product, is regulated by the U.S. Food and Drug Administration, or the FDA, and may malfunction in a way that results in physical harm to a user or others around the user. We offer a limited one-year warranty in the United States and a limited two-year warranty in Europe, and any such defects discovered in our products after commercial release could result in a loss of sales and users, which could seriously harm our business.

We could also face claims for product liability, tort, or breach of warranty. In addition, our product contracts with users contain provisions relating to warranty disclaimers and liability limitations, which may not be upheld. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***We have been, are currently, and may in the future be subject to regulatory inquiries, investigations, and proceedings in the future, which could cause us to incur substantial costs or require us to change our business practices in a way that could seriously harm our business.***

We have been, are currently, and may in the future be subject to inquiries, investigations, and proceedings instituted by government entities. We regularly report information about our business to federal, state, and foreign regulators in the ordinary course of operations. For example, many companies in our industry have received additional information requests from the U.S. Equal Employment Opportunity Commission, and companies with operations in California, including us, have received additional information requests and notices of cause from the California Civil Rights Department (formerly the California Department of Fair Employment and Housing) regarding employment practices, including pay equity. These actions, including any potential unfavorable outcomes, and our compliance with any associated regulatory orders, consent decrees, or settlements, may require us to change our policies or practices, subject us to substantial monetary fines or other penalties or sanctions, result in increased operating costs, divert management's attention, harm our reputation, and require us to incur significant legal and other expenses, any of which could seriously harm our business.

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property claims that are expensive and time-consuming. If resolved adversely, these lawsuits and claims could seriously harm our business.***

Companies in the mobile, camera, communication, media, internet, and other technology-related industries own large numbers of patents, copyrights, trademarks, trade secrets, and other intellectual property rights, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" and other entities that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights often attempt to aggressively assert their rights to extract value from technology companies. Furthermore, from time to time we may introduce new products or make other business changes, including in areas where we currently do not compete, which could increase our exposure to patent, copyright, trademark, trade secret, and other intellectual property rights claims from competitors and non-practicing entities. We have been subject to, and expect to continue to be subject to, claims and legal proceedings from holders of patents, trademarks, copyrights, trade secrets, and other intellectual property rights alleging that some of our products or content infringe their rights. For example, in January 2020, You Map, Inc. filed a lawsuit in the U.S. District Court for the District of Delaware against us, our subsidiary Zenly, and certain of our respective employees alleging that we misappropriated various trade secrets regarding map technology used in Snapchat's and Zenly's map products and that the Snapchat and Zenly applications infringe a You Map patent. While we believe we have meritorious defenses to these claims, an unfavorable outcome in these and other similar lawsuits could seriously harm our business. If these or other matters continue in the future or we need to enter into licensing arrangements, which may not be available to us or on terms favorable to us, it may increase our costs and decrease the value of our products, and our business could be seriously harmed. If a third party does not offer us a license to its intellectual property on commercially reasonable terms, or at all, we may be required to develop, acquire or license alternative, non-infringing technology, which could require significant time, effort, and expense, and may ultimately not be successful. Any of these events would adversely affect our business.

Moreover, we may not be aware if our platform is infringing, misappropriating, or otherwise violating third-party intellectual property rights, and third parties may bring claims alleging such infringement, misappropriation, or violation. Because patent applications can take years to issue and are often afforded confidentiality for some period of time, there may currently be pending applications, unknown to us, that later result in issued patents that could cover one or more of our products and there is also a risk that we could adopt a technology without knowledge of a pending patent application, which technology would infringe a third-party patent once that patent is issued. Moreover, the law continues to evolve and be applied and interpreted by courts in novel ways that we may not be able to adequately anticipate, and such changes may subject us to additional claims and liabilities. In a patent infringement claim against us, we may assert, as a defense, that we do not infringe the relevant patent claims, that the patent is invalid or both. The strength of our defenses will depend on the patents asserted, the interpretation of these patents and our ability to invalidate the asserted patents. However, we could be unsuccessful in advancing non-infringement or invalidity arguments in our defense. In the United States, issued patents enjoy a presumption of validity, and the party challenging the validity of a patent claim must present clear and convincing evidence of invalidity, which is a high burden of proof. Conversely, the patent owner need only prove infringement by a preponderance of the evidence, which is a lower burden of proof. Intellectual property claims, whether or not successful, could divert management time and attention away from our business and harm our reputation and financial condition. Moreover, there could be public announcements of the results of hearings, motions or other interim proceedings or developments and if securities analysts or investors perceive these results to be negative, it could have a substantial adverse effect on our business.

We rely on a variety of statutory and common-law frameworks for the content we host and provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, or CDA, and the fair-use doctrine. However, each of these statutes and doctrines is subject to uncertain judicial interpretation and regulatory and legislative

amendments. For example, the U.S. Congress amended the CDA in 2018 in ways that could expose some Internet platforms to an increased risk of litigation. In addition, the U.S. Congress and the Executive branch have proposed further changes or amendments each year since 2019 including, among other things, proposals that would narrow the CDA immunity, expand government enforcement power relating to content moderation concerns, or repeal the CDA altogether. Some U.S. states have also enacted or proposed legislation that would undercut, or conflict with, the CDA's protections. Although such state laws have been or can be expected to be challenged in court, if these laws were upheld or if additional similar laws or the changes or amendments to the CDA proposed by the U.S. Congress and the Executive branch were enacted, such changes may decrease the protections provided by the CDA and expose us to lawsuits, penalties, and additional compliance obligations. If courts begin to interpret the CDA more narrowly than they have historically done, this could expose us to additional lawsuits and potential judgments and seriously harm our business. The U.S. Supreme Court recently agreed to hear a case concerning the scope of CDA protection; an eventual ruling in that case might narrow the judicial interpretation of the statute, exposing us to additional lawsuits and potential judgments that could seriously harm our business. Moreover, some of these statutes and doctrines that we rely on provide protection only or primarily in the United States. If the rules around these doctrines change, if international jurisdictions refuse to apply similar protections, or if a court were to disagree with our application of those rules to our service, we could incur liability or be required to make significant changes to our products, business practices, or operations, and our business could be seriously harmed.

***From time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming and could seriously harm our business.***

We are involved in numerous lawsuits, including putative class-action lawsuits brought by users and investors, some of which may claim statutory damages. We anticipate that we will continue to be a target for lawsuits in the future. Because we have millions of users, class-action lawsuits against us that are purportedly filed by or on behalf of users typically claim enormous monetary damages in the aggregate even if the alleged per-user harm is small or non-existent. For example, in November 2020, a putative class filed an action against us in Illinois, alleging that we violated BIPA, which we recently settled. Other plaintiffs have chosen to pursue a strategy of joining with other plaintiffs to bring a large number of individual claims, rather than pursuing a class action. For example, a sizable number of plaintiffs have sued us and other technology companies alleging that social platforms are addictive and harmful to minor users' mental health. Other plaintiffs have argued that we should be legally responsible for fentanyl overdoses or poisoning, if communications about a drug transaction occurred on our platform.

Similarly, because we have a large number of stockholders, class-action lawsuits on securities theories typically claim enormous monetary damages in the aggregate even if the alleged loss per stockholder is small. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency, or ATT, framework would have on our business. In August 2022, we, and certain of our directors, were named as defendants in a class action lawsuit in Delaware Chancery Court purportedly brought on behalf of Class A stockholders, alleging that a transaction between the company's co-founders and the company, in which the co-founders agreed to employment agreements and we agreed to amend our certificate of incorporation and issue a stock dividend if certain conditions were met, was not advantageous to the stockholders and constituted a breach of fiduciary duty.

We believe we have meritorious defenses to these lawsuits, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business. Any litigation to which we are a party may result in an onerous or unfavorable judgment that might not be reversed on appeal, or we may decide to settle lawsuits on adverse terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and seriously harm our business. Even if the outcome of any such litigation or claim is favorable, defending them is costly and can impose a significant burden on management and employees. We may also receive unfavorable preliminary, interim, or final rulings in the course of litigation.

***We may face lawsuits, incur liability, or need to seek licenses based on information posted to our products.***

We have faced, currently face, and will continue to face claims relating to information that is published or made available on our products, including Snapchat. In particular, the nature of our business exposes us to claims related to defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. For example, we do not monitor or edit the vast majority of content that is communicated through Snapchat, and such content has, and may in the future, expose us to lawsuits. Specifically, we are currently facing several lawsuits alleging that we are liable for allowing users to communicate with each other, and that those communications sometimes result in harm. In addition, other lawsuits

allege that the design of our platform and those of our competitors is addictive and harmful to minor users' mental health. We believe we have meritorious defenses to these lawsuits, but litigation is inherently uncertain and unfavorable outcomes could seriously harm our business.

This risk is enhanced in certain jurisdictions outside the United States where our protection from liability for third-party actions may be less than the protection that exists in the United States. For example, in April 2019, the European Union passed a directive expanding online platform liability for copyright infringement and regulating certain uses of news content online, which member states were required to implement by June 2021. In addition, legislation in Germany may impose significant fines for failure to comply with certain content removal and disclosure obligations. Numerous other countries in Europe, the Middle East, Asia-Pacific, and Latin America are considering or have implemented similar legislation imposing penalties for failure to remove certain types of content or follow certain processes.

In the United States, there have been various Congressional and Executive branch efforts to remove or restrict the scope of the protections available to online platforms under Section 230 of the CDA, and some U.S. states have also enacted or proposed legislation that would undercut, or conflict with, the CDA's protections. For example, the CDA was amended in 2018, and the U.S. Congress and the Executive branch have proposed further changes or amendments each year since 2019, including among other things proposals that would narrow CDA immunity, expand government enforcement power relating to content moderation concerns, or repeal the CDA altogether. The U.S. Supreme Court recently agreed to hear a case concerning the scope of CDA protection; an eventual ruling in that case might narrow the judicial interpretation of the statute, exposing us to additional lawsuits and potential judgments that could seriously harm our business. Such changes could decrease or change our protections from liability for third-party content in the United States.

We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages, or license costs. We could also face fines or orders restricting or blocking our services in particular geographies as a result of content hosted on our services. If any of these events occur, we may incur significant costs or be required to make significant changes to our products, business practices, or operations and our business could be seriously harmed.

***We plan to continue expanding our international operations where we have limited operating experience and may be subject to increased business and economic risks that could seriously harm our business.***

We plan to continue expanding our business operations abroad and translating our products into other languages. Snapchat is currently available in more than 40 languages, and we have offices in more than 15 countries. We plan to enter new international markets and expand our operations in existing international markets, where we have limited or no experience in marketing, selling, and deploying our products and advertisements. Our limited experience and infrastructure in such markets, or the lack of a critical mass of users in such markets, may make it more difficult for us to effectively monetize any increase in DAUs in those markets, and may increase our costs without a corresponding increase in revenue. If we fail to deploy or manage our operations in international markets successfully, our business may suffer. We do not currently enter into foreign currency exchange contracts, which means our business, financial condition, and operating results may be impacted by fluctuations in the exchange rates of the currencies in which we do business. In the future, as our international operations increase, or more of our revenue agreements or operating expenses are denominated in currencies other than the U.S. dollar, these impacts may become material. In addition, as our international operations and sales continue to grow, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, and economic instability, including war and other armed conflicts;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship and requirements to provide user information to local authorities;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- complying with tax requirements of multiple jurisdictions;

- enhanced difficulties of integrating any foreign acquisitions;

Table of Contents

- complying with a variety of foreign laws, including certain employment laws requiring national collective bargaining agreements that set minimum salaries, benefits, working conditions, and termination requirements;

- reduced protection for intellectual-property rights in some countries;

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and compliance costs associated with multiple international locations;

- regulations that might add difficulties in repatriating cash earned outside the United States and otherwise preventing us from freely moving cash;

- import and export restrictions and changes in trade regulation;

- complying with statutory equity requirements;

- complying with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and similar laws in other jurisdictions; and

- export controls and economic sanctions administered by the Department of Commerce Bureau of Industry and Security, the Treasury Department's Office of Foreign Assets Control, or other similar foreign regulatory bodies.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our business could be seriously harmed.

***Exposure to United Kingdom political developments, including the effect of its withdrawal from the European Union, could be costly and difficult to comply with and could harm our business.***

We have based a significant portion of our European operations in the United Kingdom and have licensed a portion of our intellectual property to one of our United Kingdom subsidiaries. These operations continue to face risks and potential disruptions related to the withdrawal of the United Kingdom from the European Union, commonly referred to as "Brexit." Although the United Kingdom and the European Union have entered into a trade and cooperation agreement, the long-term nature of the United Kingdom's relationship with the European Union remains unclear. For example, Brexit could lead to potentially divergent laws and regulations, such as with respect to data protection and data transfer laws, that could be costly and complicate compliance efforts. While we continue to monitor these developments, the full effect of Brexit on our operations is uncertain and our business could be harmed by trade disputes or political differences between the United Kingdom and the European Union in the future.

***We plan to continue to make acquisitions and strategic investments in other companies, which could require significant management attention, disrupt our business, dilute our stockholders, and seriously harm our business.***

As part of our business strategy, we have made and intend to make acquisitions to add specialized team members and complementary companies, products, and technologies, as well as investments in public and private companies in furtherance of our strategic objectives. Our ability to acquire and successfully integrate larger or more complex companies, products, and technologies is unproven. In the future, we may not be able to find other suitable acquisition or investment candidates, and we may not be able to complete acquisitions or investments on favorable terms, if at all. Our previous and future acquisitions and investments may not achieve our goals, and any future acquisitions or investments we complete could be viewed negatively by users, advertisers, partners, or investors. In addition, if we fail to successfully close transactions, integrate new teams, or integrate the products and technologies associated with these acquisitions into our company, our business could be seriously harmed. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. For example, future or past business transactions could expose us to additional cybersecurity risks and vulnerabilities, as our systems could be negatively affected by vulnerabilities present in acquired or integrated entities' systems and technologies. We may not successfully evaluate or use the acquired products, technology, and personnel, or accurately forecast the financial impact of an acquisition or investment transaction, including accounting charges. We may also incur unanticipated liabilities and litigation exposure that we assume as a result of acquiring companies. We may have to pay cash, incur debt, or issue equity securities to pay for any acquisition or investment, any of which could seriously harm our business. Selling or issuing equity to finance or carry out any such acquisition or investment would also dilute our existing stockholders. Incurring debt would increase our fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

In addition, it generally takes several months after the closing of an acquisition to finalize the purchase price allocation. Therefore, it is possible that our valuation of an acquisition may change and result in unanticipated write-offs or

Table of Contents

charges, impairment of our goodwill, or a material change to the fair value of the assets or liabilities associated with a particular acquisition, any of which could seriously harm our business.

The strategic investments we make in public and private companies around the world range from early-stage companies still defining their strategic direction to mature companies with established revenue streams and business models. Many of the instruments in which we invest are non-marketable and illiquid at the time of our initial investment, and we are not always able to achieve a return in a timely fashion, if at all. Our ability to realize a return on our investment in a private company, if any, is typically dependent on the company participating in a liquidity event, such as a public offering or acquisition. To the extent any of the companies in which we invest are not successful, which can include failures to achieve business objectives as well as bankruptcy, we could recognize an impairment or lose all or part of our investment.

Our acquisition and investment strategy may not succeed if we are unable to remain attractive to target companies or expeditiously close transactions. For example, if we develop a reputation for being a difficult acquirer or having an unfavorable work environment, or target companies view our non-voting Class A common stock unfavorably, we may be unable to source and close acquisition targets. In addition, members of the U.S. administration and Congress have proposed new legislation that could limit, hinder, or delay the acquisition process and target opportunities. If we are unable to consummate key acquisition transactions essential to our corporate strategy, it may limit our ability to grow or compete effectively and our business may be seriously harmed.

*If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings, which could seriously harm our business.*

Under U.S. generally accepted accounting principles, or GAAP, we review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. As of December 31, 2022, we had recorded a total of $1.9 billion of goodwill and intangible assets, net related to our acquisitions. An adverse change in market conditions, particularly if such change has the effect of changing one of our critical assumptions or estimates, could result in a change to the estimation of fair value that could result in an impairment charge to our goodwill or intangible assets. Any such material charges may seriously harm our business.

*We have spent and may continue to spend substantial funds in connection with the tax liabilities on the settlement of equity awards. The manner in which we fund these tax liabilities may cause us to spend substantial funds or dilute stockholders, either of which may have an adverse effect on our financial condition.*

When our employee equity awards vest, we withhold taxes and remit them, along with any employee and employer social security contributions, to relevant taxing authorities on behalf of team members and, where applicable, their employers. To fund the withholding and remittance obligations for equity awards, we have either used our existing cash or sold a portion of vested equity awards on behalf of our team members near the applicable settlement dates in an amount that is substantially equivalent to the number of shares of common stock that we would withhold in connection with these settlements. In the future, we may also sell equity on our behalf and use the proceeds to fund the withholding and remittance obligations for equity awards. Any of these methods may have an adverse effect on our financial condition.

If we sell shares on behalf of our team members, although those newly issued shares should not be dilutive, such sales to the market could result in a decline to our stock price. If we use our existing cash, or if our cash reserves are not sufficient, we may choose to issue equity securities or borrow funds under our revolving credit facility. In such an event, we cannot assure you that we will be able to successfully match the proceeds of any such equity financing to the then applicable tax liability, and any such equity financing could result in a decline in our stock price and be dilutive to existing stockholders. If we elect to satisfy tax withholding and remittance obligations in whole or in part by drawing on our revolving credit facility, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

*There are numerous risks associated with our internal and contract manufacturing of our physical products and components. If we encounter problems with either our internal or contract manufacturing, we may not deliver our products within specifications or on time, which may seriously harm our business.*

Manufacturing processes are highly complex, require advanced and costly equipment, and must be continuously modified to improve yields and performance. We rely on suppliers and contract manufacturers in connection with the

production of our own physical products and components. We and our contract manufacturers are all vulnerable to capacity constraints and reduced component availability, and have limited control over delivery schedules, manufacturing yields, and costs, particularly when components are in short supply, or if we introduce a new product or feature. In addition, we have limited control over our suppliers' and manufacturers' quality systems and controls, and therefore must rely on them to meet our quality and performance standards and specifications. Delays, component shortages, including custom components that are manufactured for us at our direction, global trade conditions and agreements, and other manufacturing and supply problems could impair the distribution of our products and ultimately our brand. For example, the United States has threatened tougher trade terms with China and other countries, leading to the imposition, or potential future imposition, of substantially higher U.S. Section 301 tariffs on certain imports from China, which may adversely affect our products and seriously harm our business.

Furthermore, any adverse change in our suppliers' or contract manufacturers' financial or business condition or our relationship with them could disrupt our ability to supply our products. If we change our suppliers or contract manufacturers, or shift to more internal manufacturing operations, we may lose revenue, incur increased costs, and damage our reputation and brand. Qualifying and commencing operations with a new supplier or contract manufacturer is expensive and time-consuming. In addition, if we experience increased demand for our products, we may need to increase our material or component purchases, internal or contract-manufacturing capacity, and internal test and quality functions. The inability of our suppliers or contract manufacturers to provide us with adequate high-quality materials and products could delay our order fulfillment, and may require us to change the design of our products to meet this increased demand. Any redesign may require us to re-qualify our products with any applicable regulatory bodies or customers, which would be costly and time-consuming. This may lead to unsatisfied customers and users and increase costs to us, which could seriously harm our business. As we increase or acquire additional manufacturing capacity, we are subject to many complex and evolving environmental, health, and safety laws, regulations, and rules in each jurisdiction in which we operate. If we fail to comply with any such laws and regulations, then we could incur regulatory penalties, fines, and legal liabilities, suspension of production, significant compliance requirements, alteration of our manufacturing processes, or restrictions on our ability to modify or expand our facilities, any of which could seriously harm our business.

In addition, any errors or defects in any parts or technology incorporated into our products could result in product failures that could seriously harm our business. Further, any defect in manufacturing, design, or other could cause our products to fail or render them permanently inoperable. For example, the typical means by which our Spectacles product connects to mobile devices is by way of a Bluetooth transceiver located in the Spectacles product. If the Bluetooth transceiver in our Spectacles product were to fail, it would not be able to connect to a user's mobile device and Spectacles would not be able to deliver any content to the mobile device and the Snapchat application. As a result, we may have to replace these products at our sole cost and expense, face litigation, or be subject to other liabilities. Should we have a widespread problem of this kind, the reputational damage and the cost of replacing these products, or other liabilities, could seriously harm our business.

***Some of our products are in regulated industries. Clearances to market regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products.***

The FDA and other state and foreign regulatory agencies regulate Spectacles. We may develop future products that are regulated as medical devices by the FDA or regulated by other governmental agencies. Government authorities, primarily the FDA and corresponding regulatory agencies, regulate the medical device industry. Unless there is an exemption, we must obtain regulatory approval from the FDA and corresponding agencies, or other applicable governmental authorities, before we can market or sell a new regulated product or make a significant modification to an existing product. Obtaining regulatory clearances to market a medical device or other regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any products under development could prevent us from launching new products. We could seriously harm our business and the ability to sell our products if we experience any product problems requiring reporting to governmental authorities, if we fail to comply with applicable federal, state, or foreign agency regulations, or if we are subject to enforcement actions such as fines, civil penalties, injunctions, product recalls, or failure to obtain regulatory clearances or approvals.

***We have faced inventory risk with respect to our physical products.***

We have been and may in the future be exposed to inventory risks related to our physical products as a result of rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand and consumer spending

patterns, changes in consumer tastes with respect to our products, and other factors. We try to accurately predict these trends and avoid overstocking or understocking inventory. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. Failure to manage our inventory, supplier commitments, or customer expectations could seriously harm our business.

### Risks Related to Credit and Financing

***We have offered and may continue to offer credit to our partners to stay competitive, and as a result we may be exposed to credit risk of some of our partners, which may seriously harm our business.***

We engage in business with some of our partners on an open credit basis. While we attempt to monitor individual partner payment capability when we grant open credit arrangements and maintain allowances we believe are adequate to cover exposure for doubtful accounts, we cannot assure investors these programs will be effective in managing our credit risks in the future. This may be especially true as our business grows and expands, we engage with partners that have limited operating history, or we engage with partners that we may not be familiar with. If we are unable to adequately control these risks, our business could be seriously harmed.

***Operating our business requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay the Convertible Notes, and any other debt when due, which may seriously harm our business.***

Our ability to make principal or interest payments on, or to refinance, the Convertible Notes or other indebtedness depends on our future performance, which is subject to many factors beyond our control. Our business may not generate sufficient cash flow from operations in the future to service our debt and business. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt, obtaining additional debt financing, or issuing additional equity securities, any of which may be on terms that are not favorable to us or, in the case of equity securities, highly dilutive to our stockholders. Our ability to refinance the Convertible Notes or our other indebtedness will depend on various factors, including the available capital markets, our business, and our financial condition at such time. We may not be able to engage in any of these activities or on desirable terms, which could result in a default on our debt obligations. In addition, our existing and future debt agreements, including the Convertible Notes and Credit Facility, may contain restrictive covenants that may prohibit us from adopting any of these alternatives. Our failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in the acceleration of our debt, and would seriously harm our business.

In addition, holders of the Convertible Notes have the right to require us to repurchase all or a portion of the Convertible Notes on the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Convertible Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. Further, if a make-whole fundamental change as defined in each of the indentures governing the Convertible Notes, or the Indentures, occurs prior to the maturity date of the Convertible Notes, we will in some cases be required to increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such make-whole fundamental change. On the conversion of the Convertible Notes, unless we elect to deliver solely shares of our Class A common stock to settle such conversion (other than paying cash in lieu of delivering any fractional share), we will be required to make cash payments for the Convertible Notes being converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make such repurchases of the Convertible Notes surrendered or pay cash with respect to the Convertible Notes being converted.

***If we default on our credit obligations, our operations may be interrupted and our business could be seriously harmed.***

We have a Credit Facility that we may draw on to finance our operations, acquisitions, and other corporate purposes. If we default on these credit obligations, our lenders may:

- require repayment of any outstanding amounts drawn on our Credit Facility;

- terminate our Credit Facility; or

- require us to pay significant damages.

If any of these events occur, our operations may be interrupted and our ability to fund our operations or obligations, as well as our business, could be seriously harmed. In addition, our Credit Facility contains operating covenants, including customary limitations on the incurrence of certain indebtedness and liens, restrictions on certain

intercompany transactions, and limitations on the amount of dividends and stock repurchases. Our ability to comply with these covenants may be affected by events beyond our control, and breaches of these covenants could result in a default under the Credit Facility and any future financial agreements into which we may enter. If not waived, defaults could cause our outstanding indebtedness under our outstanding Convertible Notes or our Credit Facility, including any future financing agreements that we may enter into, to become immediately due and payable. For more information on our Credit Facility, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

***We cannot be certain that additional financing will be available on reasonable terms when needed, or at all, which could seriously harm our business.***

We have historically incurred net losses and negative cash flow from operations, and we may not attain and sustain profitability in future periods. As a result, we may need additional financing. Our ability to obtain additional financing, if and when required, will depend on investor demand, our operating performance, our credit rating, the condition of the capital markets, and other factors. To the extent we use available funds or draw on our Credit Facility, we may need to raise additional funds and we cannot assure investors that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-linked, or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A common stock, and our existing stockholders may experience dilution. In the event that we are unable to obtain additional financing on favorable terms, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

**Risks Related to Taxes**

***New legislation that would change U.S. or foreign taxation of business activities, including the imposition of tax based on gross revenue, could seriously harm our business, or the financial markets and the market price of our Class A common stock.***

Reforming the taxation of international businesses has been a priority for politicians at a global level, and a wide variety of changes have been proposed or enacted. Due to the large and expanding scale of our international business activities, any changes in the taxation of such activities may increase our tax expense, the amount of taxes we pay, or both, and seriously harm our business. For example, legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017, significantly reformed the U.S. Internal Revenue Code of 1986, as amended, or the Code. The Tax Cuts and Jobs Act lowered U.S. federal corporate income tax rates, changed the utilization of future net operating loss carryforwards, allowed for the expensing of certain capital expenditures, eliminated the option to currently deduct research and development expenditures and requires taxpayers to capitalize and amortize U.S.-based and non-U.S.-based research and development expenditures over five and fifteen years, respectively, and put into effect significant changes to U.S. taxation of international business activities. In August 2022, the Inflation Reduction Act, or the IRA, was enacted, the provisions of which include a minimum tax equal to 15% of the adjusted financial statement income of certain large corporations, as well as a 1% excise tax on certain share buybacks by public corporations that would be imposed on such corporations. It is possible that changes under the Tax Cuts and Jobs Act, the IRA or other tax legislation could increase our future tax liability, which could in turn adversely impact our business and future profitability.

In addition, many jurisdictions and intergovernmental organizations have been discussing or are in the process of implementing proposals that may change various aspects of the existing framework under which our tax obligations are determined in many of the jurisdictions in which we do business and in which our users are located. Some jurisdictions have enacted, and others have proposed, in each case potentially on a temporary basis pending the implementation of the "two-pillar solution" described below, taxes based on gross receipts applicable to digital services regardless of profitability. In addition, the Organisation for Economic Co-operation and Development, or the OECD, has led international efforts to devise, and to implement on a permanent basis, a two-pillar solution to address the tax challenges arising from the digitalization of the economy. Pillar One focuses on nexus and profit allocation, and Pillar Two provides for a global minimum effective corporate tax rate of 15%. Pillar One would apply to multinational enterprises with annual global revenue above 20 billion euros and profitability above 10%, with the revenue threshold potentially reduced to 10 billion euros in the future. Based on these thresholds, we currently expect to be outside the scope of the Pillar One proposals, though we anticipate that we will be subject to Pillar One in the future if our global revenue exceeds the Pillar One thresholds. In December 2021, the OECD published detailed rules that define the scope of the Pillar Two global minimum effective tax rate proposal. A number of countries, including the United Kingdom, are currently proposing to implement core elements of the Pillar Two proposal by the start of 2024, and the European Union has adopted a Council Directive which requires certain Pillar Two rules to be transposed into member states' national laws from such time. Based on our

current understanding of the minimum revenue thresholds contained in the proposed Pillar Two rules, we expect that we may be within their scope and so their implementation could impact the amount of tax we have to pay.

We continue to examine the impact these and other tax reforms may have on our business. The impact of these and other tax reforms is uncertain and one or more of these or similar measures could seriously harm our business.

***We may have exposure to greater-than-anticipated tax liabilities, which could seriously harm our business.***

Our income tax obligations are based on our corporate operating structure and third-party and intercompany arrangements, including the manner in which we develop, value, and use our intellectual property and the valuations of our intercompany transactions. The tax laws applicable to our international business activities, including the laws of the United States and other jurisdictions, are subject to change and uncertain interpretation. The taxing authorities of the jurisdictions in which we operate may challenge our methodologies for valuing developed technology, intercompany arrangements, or transfer pricing, which could increase our worldwide effective tax rate and the amount of taxes we pay and seriously harm our business. Taxing authorities may also determine that the manner in which we operate our business is not consistent with how we report our income, which could increase our effective tax rate and the amount of taxes we pay and seriously harm our business. In addition, our future income taxes could fluctuate because of earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by U.S. federal and state and foreign tax authorities. Any adverse outcome from a review or audit could seriously harm our business. In addition, determining our worldwide provision for income taxes and other tax liabilities requires significant judgment by management, and there are many transactions where the ultimate tax determination is uncertain. Although we believe that our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements for such periods and may seriously harm our business.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited, each of which could seriously harm our business.***

As of December 31, 2022, we had U.S. federal net operating loss carryforwards of approximately $7.4 billion and state net operating loss carryforwards of approximately $4.6 billion, as well as U.K. net operating loss carryforwards of approximately $3.6 billion. We also accumulated U.S. federal and state research tax credits of $691.5 million and $430.7 million, respectively, as of December 31, 2022. Under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a cumulative change in our ownership by "5% shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. In the event that we experience one or more ownership changes as a result of transactions in our stock, then we may be limited in our ability to use our net operating loss carryforwards and other tax assets to reduce taxes owed on the net taxable income that we earn.

For U.S. federal income tax purposes, net operating losses arising in tax years beginning before January 1, 2018 can be carried forward to the earlier of the next subsequent twenty tax years or until such losses are fully utilized; net operating losses arising in tax years beginning after December 31, 2017 are not subject to the twenty-year limitation. In addition, for tax years beginning after December 31, 2020, our use of net operating losses arising in tax years beginning after December 31, 2017, may not exceed 80% of such year's taxable income. In the U.K., net operating loss carryforwards can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income and may be subject to ownership change rules that restrict the use of net operating loss carryforwards.

Any limitations on the ability to use our net operating loss carryforwards and other tax assets, as well as the timing of any such use, could seriously harm our business.

***Our operating results may be negatively affected if we are required to pay additional sales and use tax, value added tax, or other transaction taxes, and we could be subject to liability with respect to all or a portion of past or future sales.***

We currently collect and remit sales and use, value added and other transaction taxes in certain of the jurisdictions where we do business based on our assessment of the amount of taxes owed by us in such jurisdictions. However, in some jurisdictions in which we do business, we do not believe that we owe such taxes, and therefore we currently do not collect

Table of Contents

and remit such taxes in those jurisdictions or record contingent tax liabilities in respect of those jurisdictions. A successful assertion that we are required to pay additional taxes in connection with sales of our products and solutions, or the imposition of new laws or regulations or the interpretation of existing laws and regulations requiring the payment of additional taxes, would result in increased costs and administrative burdens for us. If we are subject to additional taxes and determine to offset such increased costs by collecting and remitting such taxes from our customers, or otherwise passing those costs through to our customers, companies may be discouraged from purchasing our products and solutions. Any increased tax burden may decrease our ability or willingness to compete in relatively burdensome tax jurisdictions, result in substantial tax liabilities related to past or future sales or otherwise seriously harm our business.

### Risks Related to Ownership of Our Class A Common Stock

***Holders of Class A common stock have no voting rights. As a result, holders of Class A common stock will not have any ability to influence stockholder decisions.***

Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2022, Mr. Spiegel and Mr. Murphy control over 99% of the voting power of our capital stock, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval. In addition, because our Class A common stock carries no voting rights (except as required by Delaware law), the issuance of the Class A common stock in future offerings, in future stock-based acquisition transactions, or to fund employee equity incentive programs could prolong the duration of Mr. Spiegel's and Mr. Murphy's current relative ownership of our voting power and their ability to elect certain directors and to determine the outcome of all matters submitted to a vote of our stockholders. This concentrated control eliminates other stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

***We cannot predict the impact our capital structure and the concentrated control by our founders may have on our stock price or our business.***

Although other U.S.-based companies have publicly traded classes of non-voting stock, to our knowledge, we were the first company to only list non-voting stock on a U.S. stock exchange. We cannot predict whether this structure, combined with the concentrated control by Mr. Spiegel and Mr. Murphy, will result in a lower trading price or greater fluctuations in the trading price of our Class A common stock, or will result in adverse publicity or other adverse consequences. In addition, some indexes have indicated they will exclude non-voting stock, like our Class A common stock, from their membership. For example, FTSE Russell, a provider of widely followed stock indexes, requires new constituents of its indexes to have at least five percent of their voting rights in the hands of public stockholders. In addition, S&P Dow Jones, another provider of widely followed stock indexes, has stated that companies with multiple share classes will not be eligible for certain of their indexes. As a result, our Class A common stock is not eligible for these stock indexes. We cannot assure you that other stock indexes will not take a similar approach to FTSE Russell or S&P Dow Jones in the future. Exclusion from indexes could make our Class A common stock less attractive to investors and, as a result, the market price of our Class A common stock could be adversely affected. Additionally, the exclusion of our Class A common stock from these indexes may limit the types of investors who invest in our Class A common stock and could make the trading price of our Class A common stock more volatile.

***Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock.***

Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require periodic reporting of beneficial ownership by significant stockholders, including changes in that ownership. For example, we believe that Tencent Holdings Limited, together with its affiliates, holds greater than 10% of our Class A common stock based in part on Tencent Holdings Limited's public reporting. As a result of our capital structure, holders are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. Our directors and officers are required to file reports under Section 16 of the Exchange Act. Our significant stockholders, other than directors and officers, are exempt from the "short-swing" profit recovery provisions of Section 16 of the Exchange Act and related rules with respect to their purchases and sales of our securities. As such, stockholders will be unable to bring derivative claims for disgorgement of profits for trades by significant stockholders under Section 16(b) of the Exchange Act unless the significant stockholders are also directors or officers.

Since our Class A common stock is our only class of stock registered under Section 12 of the Exchange Act and that class is non-voting, we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, unless a vote of the Class A common stock is required by applicable law. Accordingly, legal causes of action and remedies under Section 14 of the Exchange Act for inadequate or misleading information in proxy statements may not be available to holders of our Class A common stock. If we do not deliver any proxy statements, information statements, annual reports, and other information and reports to the holders of our Class B common stock and Class C common stock, then we will similarly not provide any of this information to holders of our Class A common stock. Because we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, any proxy statement, information statement, or notice of our annual meeting may not include all information under Section 14 of the Exchange Act that a public company with voting securities registered under Section 12 of the Exchange Act would be required to provide to its stockholders. Most of that information, however, will be reported in other public filings. For example, any disclosures required by Part III of Form 10-K as well as disclosures required by the NYSE for the year ended December 31, 2022 that are customarily included in a proxy statement are instead included in our Annual Report. But some information required in a proxy statement or information statement is not required in any other public filing. For example, we will not be required to comply with the proxy access rules or the "pay versus performance" disclosure rules under Section 14 of the Exchange Act. If we take any action in an extraordinary meeting of stockholders where the holders of Class A common stock are not entitled to vote, we will not be required to provide the information required under Section 14 of the Exchange Act. Nor will we be required to file a preliminary proxy statement under Section 14 of the Exchange Act. Since that information is also not required in a Form 10-K, holders of Class A common stock may not receive the information required under Section 14 of the Exchange Act with respect to extraordinary meetings of stockholders. In addition, we are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Act. As a result, our stockholders do not have an opportunity to provide a non-binding vote on the compensation of our executive officers. Moreover, holders of our Class A common stock will be unable to bring matters before our annual meeting of stockholders or nominate directors at such meeting, nor can they submit stockholder proposals under Rule 14a-8 of the Exchange Act.

***The trading price of our Class A common stock has been and will likely continue to be volatile.***

The trading price of our Class A common stock has been and is likely to continue to be volatile. From January 1, 2021 to December 31, 2022, the trading price of our Class A common stock ranged from $7.33 to $83.34. Declines or volatility in our trading price, including during the current economic downturn, could make it more difficult to attract and retain talent, adversely impact employee retention and morale, and has required, and may continue to require, us to issue more equity to incentivize team members which is likely to dilute stockholders. The market price of our Class A common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our user growth, retention, engagement, revenue, or other operating results;

- variations between our actual operating results and the expectations of investors and the financial community;

- the accuracy of our financial guidance or projections;

- any forward-looking financial or operating information we may provide, any changes in this information, or our failure to meet expectations based on this information;

- actions of investors who initiate or maintain coverage of us, changes in financial estimates by any investors who follow our company, or our failure to meet these estimates or the expectations of investors;

- whether our capital structure is viewed unfavorably, particularly our non-voting Class A common stock and the significant voting control of our co-founders;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if we issue shares to satisfy equity-related tax obligations;

- stock repurchase programs undertaken by us;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry segment, including our partners and competitors;

Table of Contents

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole, the COVID-19 pandemic, inflationary pressures, war, armed conflict, including Russia's invasion of Ukraine, incidents of terrorism, or responses to these events;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits, executive actions, or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war, incidents of terrorism, pandemics, or responses to these events.

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices, including ours. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class-action litigation following periods of market volatility. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's ATT framework would have on our business. We believe we have meritorious defenses to this lawsuit, but an unfavorable outcome could seriously harm our business. Any litigation could subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business.

***We may not realize the anticipated long-term stockholder value of any stock repurchase program undertaken by us and any failure to repurchase our Class A common stock after we have announced our intention to do so may negatively impact our stock price.***

Our board of directors has in the past and may from time to time in the future authorize stock repurchase programs, pursuant to which repurchases of Class A common stock may be made either through open market transactions (including pre-set trading plans) or through other transactions in accordance with applicable securities laws. Any repurchase programs may be modified, suspended, or terminated at any time. Any failure to repurchase stock after we have announced our intention to do so may negatively impact our reputation and investor confidence in us and may negatively impact our stock price.

The existence of a stock repurchase program could cause our stock price to trade higher than it otherwise would be and could potentially reduce the market liquidity for our stock. Although stock repurchase programs are intended to enhance long-term stockholder value, there is no assurance they will do so because the market price of our Class A common stock may decline below the levels at which we repurchased shares and short-term stock price fluctuations could reduce the effectiveness of any such program.

Repurchasing our Class A common stock reduces the amount of cash we have available to fund working capital, capital expenditures, strategic acquisitions or business opportunities, and other general corporate purposes, and we may fail to realize the anticipated long-term stockholder value of any stock repurchase program.

***Conversions or exchanges of the Convertible Notes may dilute the ownership interest of our stockholders or may otherwise affect the market price of our Class A common stock.***

The conversion of some or all of the Convertible Notes may dilute the ownership interests of our stockholders. On conversion of the Convertible Notes, we have the option to pay or deliver, as the case may be, cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock. If we elect to settle our conversion obligation in shares of our Class A common stock or a combination of cash and shares of our Class A common stock, any sales in the public market of our Class A common stock issuable on such conversion could adversely affect prevailing market prices of our Class A common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the conversion of the Convertible Notes could be used to satisfy short positions, or anticipated conversion of the Convertible Notes into shares of our Class A common stock, any of which could depress the market price of our Class A common stock.

We may also engage in exchanges, repurchase, or induce conversions, of the Convertible Notes in the future. Holders of the Convertible Notes that participate in any of these exchanges, repurchases, or induced conversions may enter into or unwind various derivatives with respect to our Class A common stock or sell shares of our Class A common stock

46

in the open market to hedge their exposure in connection with these transactions. These activities could decrease (or reduce the size of any increase in) the market price of our Class A common stock or the Convertible Notes, or dilute the ownership interests of our stockholders. In addition, the market price of our Class A common stock is likely to be affected by short sales of our Class A common stock or the entry into or unwind of economically equivalent derivative transactions with respect to our Class A common stock by investors that do not participate in the exchange transactions and by the hedging activity of the counterparties to our Capped Call Transactions or their respective affiliates.

***We may still incur substantially more debt or take other actions that would diminish our ability to make payments on the Convertible Notes when due. Our ability to repay our debt depends on our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.***

We and our subsidiaries may incur substantial additional debt in the future, subject to the restrictions contained in our current and future debt instruments. We are not restricted under the terms of the Indentures governing the Convertible Notes from incurring additional debt, securing existing or future debt, repurchasing our stock, making investments, paying dividends, recapitalizing our debt, or taking a number of other actions that could have the effect of diminishing our ability to make payments on the Convertible Notes when due.

Our ability to pay our debt when due or to refinance our indebtedness, including the Convertible Notes, depends on our financial condition at such time, the condition of capital markets, and our future performance, which is subject to economic, financial, competitive, and other factors beyond our control

***The conditional conversion feature of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.***

The Convertible Notes are convertible at the option of the holder. In the event the conditions for optional conversion of the 2025 Notes, 2026 Notes, 2027 Notes, or 2028 Notes by holders are met before the close of business on the business day immediately preceding February 1, 2025, May 1, 2026, February 1, 2027, or December 1, 2027, respectively, holders of the applicable Convertible Notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their Convertible Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our Class A common stock (other than paying cash in lieu of delivering any fractional share), we may settle all or a portion of our conversion obligation in cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Convertible Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Convertible Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital and may seriously harm our business.

***We entered into certain hedging positions that may affect the value of the Convertible Notes and the volatility and value of our Class A common stock.***

In connection with the issuance of the Convertible Notes, we entered into certain hedging positions with certain financial institutions. These hedging positions are expected generally to reduce potential dilution of our Class A common stock on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount of such converted Convertible Notes, as the case may be, with such reduction or offset subject to a cap.

The counterparties to these hedging positions or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our Class A common stock or purchasing or selling our Class A common stock in secondary market transactions prior to the maturity of the Convertible Notes (and are likely to do so during any observation period related to a conversion of Convertible Notes or following any repurchase of Convertible Notes by us on any fundamental change repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our Class A common stock or the Convertible Notes. In addition, if any such hedging positions fail to become effective, the counterparties to these hedging positions or their respective affiliates may unwind their hedge positions, which could adversely affect the value of our Class A common stock.

***Delaware law and provisions in our certificate of incorporation and bylaws, as well as our Indentures, could make a merger, tender offer, or proxy contest difficult or more expensive, thereby depressing the trading price of our Class A common stock.***

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our Class A common stock by acting to discourage, delay, or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- our certificate of incorporation provides for a tri-class capital structure. As a result of this structure, Mr. Spiegel and Mr. Murphy control all stockholder decisions, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. This includes the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. This concentrated control could discourage others from initiating any potential merger, takeover, or other change-of-control transaction that other stockholders may view as beneficial. As noted above, the issuance of the Class A common stock dividend, and any future issuances of Class A common stock dividends, could have the effect of prolonging the influence of Mr. Spiegel and Mr. Murphy on the company;

- our board of directors has the right to elect directors to fill a vacancy created by the expansion of our board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect directors; and

- our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Any provision of our certificate of incorporation, bylaws, or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

Furthermore, certain provisions in the Indentures governing the Convertible Notes may make it more difficult or expensive for a third party to acquire us. For example, the Indentures require us, at the holders' election, to repurchase the Convertible Notes for cash on the occurrence of a fundamental change and, in certain circumstances, to increase the conversion rate for a holder that converts its Convertible Notes in connection with a make-whole fundamental change. A takeover of us may trigger the requirement that we repurchase the Convertible Notes or increase the conversion rate, which could make it more costly for a third party to acquire us. The Indentures also prohibit us from engaging in a merger or acquisition unless, among other things, the surviving entity assumes our obligations under the Convertible Notes and the Indentures. These and other provisions in the Indentures could deter or prevent a third party from acquiring us even when the acquisition may be favorable to holders of the Convertible Notes or our stockholders.

### Future sales of shares by existing stockholders could cause our stock price to decline.

If our existing stockholders, including employees and service providers who obtain equity, sell, or indicate an intention to sell, substantial amounts of our Class A common stock in the public market, the trading price of our Class A common stock could decline. As of December 31, 2022, we had outstanding a total of 1.3 billion shares of Class A common stock, 22.5 million shares of Class B common stock, and 231.6 million shares of Class C common stock. In addition, as of December 31, 2022, 131.1 million shares of Class A common stock and 0.6 million shares of Class B common stock were subject to outstanding stock options and RSUs. As a result of our capital structure, holders who are not required to file reports under Section 16 of the Exchange Act are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. All of our outstanding shares are eligible for sale in the public market, except approximately 368.0 million shares (including options exercisable and RSAs subject to forfeiture as of December 31, 2022) held by directors, executive officers, and other affiliates that are subject to volume limitations under Rule 144 of the Securities Act. Our employees, other service providers, and directors are subject to our quarterly trading window closures. In addition, we have reserved shares for issuance under our equity incentive plans. We may also issue shares of our Class A common stock or securities convertible into our Class A common stock from time to time in connection with a financing, acquisition, investment, or otherwise. When these shares are issued and subsequently sold, it would be dilutive to existing stockholders and the trading price of our Class A common stock could decline.

### If securities or industry analysts either do not publish research about us, or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our Class A common stock could decline.

Table of Contents

The trading market for our Class A common stock is influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market, or our competitors. If one or more of the analysts initiate research with an unfavorable rating or downgrade our Class A common stock, provide a more favorable recommendation about our competitors, or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume to decline. Since we provide only limited financial guidance, this may increase the probability that our financial results are perceived as not in line with analysts' expectations, and could cause volatility to our Class A common stock price.

***We do not intend to pay cash dividends for the foreseeable future.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any cash dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases. In addition, our Credit Facility includes restrictions on our ability to pay cash dividends.

***If we are unable to maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our Class A common stock may be seriously harmed.***

We are required to maintain adequate internal control over financial reporting, perform system and process evaluation and testing of those internal controls to allow management to report on their effectiveness, report any material weaknesses in such internal controls, and obtain an opinion from our independent registered public accounting firm regarding the effectiveness of such internal controls as required by Section 404 of the Sarbanes-Oxley Act, all of which is time-consuming, costly, and complicated. If we are unable to comply with these requirements in a timely manner, if we assert that our internal control over financial reporting is ineffective, if we identify material weaknesses in our internal control over financial reporting, or if our independent registered public accounting firm is unable to express an opinion or expresses a qualified or adverse opinion about the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected. In addition, we could become subject to investigations by the NYSE, the SEC, and other regulatory authorities, which could require additional financial and management resources.

***The requirements of being a public company may strain our resources, result in more litigation, and divert management's attention.***

We are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Complying with these rules and regulations have caused and will continue to cause us to incur additional legal and financial compliance costs, make some activities more difficult, be time-consuming or costly, and continue to increase demand on our systems and resources. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results, and that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting. Failure to comply with these rules might also make it more difficult for us to obtain certain types of insurance, including director and officer liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage.

***Our certificate of incorporation provides that the Court of Chancery of the State of Delaware and the federal district courts of the United States will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

Table of Contents

- any action asserting a claim against us arising under the Delaware General Corporation Law, our certificate of incorporation, or our bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

These exclusive forum provisions may limit a stockholder's ability to bring an action in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. While the Delaware courts have determined that such choice of forum provisions are facially valid, a stockholder may nevertheless seek to bring an action in a venue other than those designated in the exclusive forum provisions. In such an instance, we would expect to vigorously assert the validity and enforceability of our exclusive forum provisions, which may require significant additional costs associated with resolving such action in other jurisdictions, and there can be no assurance that the provisions will be enforced by a court in those other jurisdictions. If a court were to find either exclusive forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur further significant additional costs associated with resolving the dispute in other jurisdictions, all of which could seriously harm our business.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters are located in Santa Monica, California, where we occupy approximately 720,000 square feet. As of December 31, 2022, our global facilities totaled an aggregate of approximately 1.9 million square feet of leased office space. We also maintain offices in multiple locations in North America and internationally in Europe, Asia, and Australia. We may add additional offices as we expand our business to other continents and countries. We believe that our facilities are sufficient for our current needs and that, should it be needed, additional facilities will be available to accommodate the expansion of our business.

Table of Contents

**Item 3. Legal Proceedings.**

On November 11, 2021, we, and certain of our officers, were named as defendants in a federal securities class action lawsuit filed in the U.S. District Court Central District of California. The lawsuit was purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. Defendants seek monetary damages and other relief.

On August 2, 2022, we, and certain of our directors, were named as defendants in a class action lawsuit in Delaware Chancery Court purportedly brought on behalf of Class A stockholders, alleging that a transaction between our co-founders and us, in which our co-founders agreed to employment agreements and we agreed to amend our certificate of incorporation and issue a stock dividend if certain conditions were met, was not advantageous to the stockholders, constituted a breach of fiduciary duty, and should have been put to a vote of the Class A stockholders. Defendants seek monetary damages and other relief.

We believe we have meritorious defenses to these lawsuits, and continue to defend the lawsuits vigorously, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business.

We are currently involved in, and may in the future be involved in, legal proceedings, claims, inquiries, and investigations in the ordinary course of our business, including claims for infringing intellectual property rights related to our products and the content contributed by our users and partners. Although the results of these proceedings, claims, inquiries, and investigations cannot be predicted with certainty, we do not believe that the final outcome of these matters is reasonably likely to have a material adverse effect on our business, financial condition, or results of operations. Regardless of final outcomes, however, any such proceedings, claims, inquiries, and investigations may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings.

**Item 4. Mine Safety Disclosures.**

Not applicable.

51

PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information for Common Stock**

Our Class A common stock has been listed on the NYSE under the symbol "SNAP" since March 2, 2017. Our Class B common stock and Class C common stock are not listed or traded on any stock exchange.

**Holders of Record**

As of December 31, 2022, there were 967 stockholders of record of our Class A common stock. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. The closing price of our Class A common stock as of December 31, 2022 was $8.95 per share as reported on the NYSE. As of December 31, 2022, there were 75 stockholders of record of our Class B common stock and two stockholders of record of our Class C common stock.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate paying any cash dividends in the foreseeable future. The terms of our Credit Facility also restrict our ability to pay dividends, and we may also enter into credit agreements or other borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our capital stock.

We have paid a stock dividend of our Class A common stock on our capital stock in the past and from time to time in the future may pay special or regular stock dividends in the form of Class A common stock, which per the terms of our certificate of incorporation must be paid equally to all stockholders. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects, and other factors that our board of directors may deem relevant.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

The following table summarizes stock repurchase activity for the three months ended December 31, 2022 (in thousands, except per share data):

| | Total Number of Shares Purchased [1] | | Average Price Per Share [2] | Total Number of Shares Purchased as Part of Publicly Announced Program [1] | Approximate Dollar Value of Shares that May Yet be Repurchased Under the Program [1] | |
|---|---|---|---|---|---|---|
| October 1 - October 31, 2022 | 52,891 | $ | 9.27 | 52,891 | $ | — |
| November 1 - November 30, 2022 | 1,005 | | 10.03 | 1,005 | $ | — |
| December 1 - December 31, 2022 | — | | — | — | $ | — |
| Total | 53,896 | $ | 9.29 | 53,896 | $ | — |

(1)   In October 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the fourth quarter of 2022, during which we repurchased, and subsequently retired, 53.9 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases.

(2)   Average price paid per share includes costs associated with the repurchases.

**Recent Sale of Unregistered Securities and Use of Proceeds**

None.

**Stock Performance Graph**

*This performance graph shall not be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Snap Inc. under the Securities Act.*

The following graph shows a comparison from March 2, 2017 (the date our Class A common stock commenced trading on the NYSE) through December 31, 2022 of the cumulative total return for our Class A common stock, the Standard & Poor's 500 Stock Index (S&P 500 Index), and the NYSE Composite. The graph assumes that $100 was invested at the market close on March 2, 2017 in our Class A common stock, the S&P 500 Index, and the NYSE Composite, and data for the S&P 500 Index and the NYSE Composite assumes reinvestment of any dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Item 6. Reserved.**

Not required.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs that involve significant risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to those differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in "Risk Factors," "Note Regarding Forward-Looking Statements," and "Note Regarding User Metrics and Other Data."*

*The following generally discusses 2022 and 2021 items and year-to-year comparisons between 2022 and 2021. Discussion of historical items and year-to-year comparisons between 2021 and 2020 that are not included in this discussion can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC on February 4, 2022.*

**Overview of Full Year 2022 Results**

Our key user metrics and financial results for fiscal year 2022 are as follows:

*User Metrics*

- Daily Active Users, or DAUs, increased 17% year-over-year to 375 million in Q4 2022.

- Average revenue per user, or ARPU, was $3.47 in Q4 2022, compared to $4.06 in Q4 2021.

*Financial Results*

- Revenue increased 12% year-over-year to $4.6 billion in 2022.

- Total costs and expenses were $6.0 billion in 2022, compared to $4.8 billion in 2021.

- Net loss was $1.4 billion in 2022, compared to $488.0 million in 2021.

- Diluted net loss per share was $(0.89) in 2022, compared to $(0.31) in 2021.

- Adjusted EBITDA was $377.6 million in 2022, compared to $616.7 million in 2021.

- Cash provided by operating activities was $184.6 million in 2022, compared to $292.9 million in 2021.

- Free Cash Flow was $55.3 million in 2022, compared to $223.0 million in 2021.

- Cash, cash equivalents, and marketable securities were $3.9 billion as of December 31, 2022.

- In the third quarter of 2022, we initiated a strategic reprioritization plan, which included a reduction of our global employee headcount by approximately 20%. Total restructuring charges included in our consolidated statements of operations for the year ended December 31, 2022 were $188.9 million, consisting primarily of severance and related charges, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization.

**Business and Macroeconomic Conditions**

In 2022 we realigned our priorities and we expect to continue to focus on our three strategic priorities: growing our community and deepening their engagement with our products, accelerating and diversifying our revenue growth, and investing in the future of augmented reality. We believe that we can be successful in our current operating environment, with various macroeconomic factors impacting our business, by rigorously prioritizing our investments and continuing to engage our community with our products while driving success for our advertising partners. However, the impact of this strategic reprioritization is difficult to predict.

Macroeconomic factors such as labor shortages, supply chain disruptions, inflation, changes in interest and foreign currency exchange rates, and other risks and uncertainties, including the COVID-19 pandemic and the conflict in Ukraine, continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may cause our advertisers to halt or decrease advertising spending on our platform. Such macroeconomic factors may also

Table of Contents

negatively impact, in the short-term or long-term, the global economy, advertising ecosystem, our customers and their budgets with us, user engagement, other user metrics, and our business, financial condition, and results of operations.

In addition, competition for advertising dollars has increased and demand growth on our advertising platform has slowed. We expect to continue to experience increased competition, which may result in reduced advertising demand, and could adversely affect our revenue growth, pricing, business, financial condition, and results of operations.

Our revenue, particularly in North America, has further been impacted by platform policy changes and restrictions that affected our targeting, measurement, and optimization capabilities, and in turn our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced advertising revenue, especially if we are unable to mitigate these developments.

We compete with other companies in every aspect of our business. We must compete effectively for users and advertisers to grow our business and increase our revenue. These and other risks and uncertainties are further described in the sections titled "Competition" in Part I, Item 1. Business, and "Risk Factors" in Part I, Item 1A of this Annual Report on Form 10-K.

**Trends in User Metrics**

We define a DAU as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We define ARPU as quarterly revenue divided by the average DAUs. We assess the health of our business by measuring DAUs and ARPU because we believe that these metrics are important ways for both management and investors to understand engagement and monitor the performance of our platform. We also measure ARPU because we believe that this metric helps our management and investors to assess the extent to which we are monetizing our service.

*User Engagement*

We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We had 375 million DAUs on average in the fourth quarter of 2022, an increase of 56 million, or 17%, from the fourth quarter of 2021.

**Quarterly Average Daily Active Users**
**(in millions)**

**Global**



| | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 | Q1'21 | Q2'21 | Q3'21 | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAU | 218 | 229 | 238 | 249 | 265 | 280 | 293 | 306 | 319 | 332 | 347 | 363 | 375 |
| YOY growth: | 17% | 20% | 17% | 18% | 22% | 22% | 23% | 23% | 20% | 18% | 18% | 19% | 17% |

**North America** [1]          **Europe** [2]



North America:
| | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 | Q1'21 | Q2'21 | Q3'21 | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAU | 86 | 88 | 90 | 90 | 92 | 93 | 95 | 96 | 97 | 98 | 99 | 100 | 100 |
| YOY growth: | 9% | 10% | 9% | 7% | 6% | 5% | 6% | 7% | 6% | 5% | 4% | 4% | 3% |

Europe:
| | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 | Q1'21 | Q2'21 | Q3'21 | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAU | 67 | 70 | 71 | 72 | 74 | 77 | 78 | 80 | 82 | 84 | 86 | 88 | 92 |
| YOY growth: | 12% | 14% | 12% | 10% | 10% | 9% | 10% | 11% | 11% | 10% | 10% | 11% | 12% |

(1)       North America includes Mexico, the Caribbean, and Central America.

(2)       Europe includes Russia and Turkey.

**Rest of World**



| | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 | Q1'21 | Q2'21 | Q3'21 | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Value | 64 | 71 | 77 | 87 | 99 | 111 | 120 | 130 | 140 | 150 | 162 | 175 | 183 |
| YOY growth: | 36 % | 45 % | 37 % | 43 % | 55 % | 57 % | 55 % | 49 % | 41 % | 36 % | 35 % | 34 % | 31 % |

*Monetization*

In the year ended December 31, 2022, we recorded revenue of $4.6 billion compared to revenue of $4.1 billion for the year ended December 31, 2021, an increase of 12% year-over-year. We monetize our business primarily through advertising. Our advertising products include Snap Ads and AR Ads.

We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base. ARPU was $3.47 in the fourth quarter of 2022, compared to $4.06 in the fourth quarter of 2021. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on a determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This differs from the presentation of our revenue by geography in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer.

57

Table of Contents



**Quarterly Average Revenue per User**

Global

| Quarter | ARPU |
|---------|------|
| Q4'20 | $3.44 |
| Q1'21 | $2.74 |
| Q2'21 | $3.35 |
| Q3'21 | $3.49 |
| Q4'21 | $4.06 |
| Q1'22 | $3.20 |
| Q2'22 | $3.20 |
| Q3'22 | $3.11 |
| Q4'22 | $3.47 |

North America [1]

| Quarter | ARPU |
|---------|------|
| Q4'20 | $7.19 |
| Q1'21 | $5.94 |
| Q2'21 | $7.37 |
| Q3'21 | $8.20 |
| Q4'21 | $9.58 |
| Q1'22 | $7.77 |
| Q2'22 | $7.93 |
| Q3'22 | $8.13 |
| Q4'22 | $8.77 |

Europe [2]

| Quarter | ARPU |
|---------|------|
| Q4'20 | $1.91 |
| Q1'21 | $1.48 |
| Q2'21 | $1.95 |
| Q3'21 | $1.92 |
| Q4'21 | $2.54 |
| Q1'22 | $1.93 |
| Q2'22 | $1.98 |
| Q3'22 | $1.83 |
| Q4'22 | $2.38 |

(1)    North America includes Mexico, the Caribbean, and Central America.

(2)    Europe includes Russia and Turkey. Effective March 2022, we halted advertising sales to Russian and Belarusian entities.



**Results of Operations**

*Components of Results of Operations*

*Revenue*

We generate substantially all of our revenue through the sale of our advertising products, which primarily include Snap Ads and AR Ads, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of hardware products. This revenue is reported net of allowances for returns.

*Cost of Revenue*

Cost of revenue consists of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs, and payments for content, developer, and advertiser partner costs. In addition, cost of revenue includes third-party selling costs and personnel-related costs, including salaries, benefits, and stock-based compensation expenses. Cost of revenue also includes facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

*Research and Development Expenses*

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our engineers, designers, and other employees engaged in the research and development of our products. In addition, research and development expenses include facilities and other supporting overhead costs, including depreciation and amortization. Research and development costs are expensed as incurred.

*Sales and Marketing Expenses*

Sales and marketing expenses consist primarily of personnel-related costs, including salaries, benefits, commissions, and stock-based compensation expense for our employees engaged in sales and sales support, business development, media, marketing, corporate partnerships, and customer service functions. Sales and marketing expenses also include costs incurred for advertising, market research, tradeshows, branding, marketing, promotional expense, and public relations, as well as facilities and other supporting overhead costs, including depreciation and amortization.

*General and Administrative Expenses*

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our finance, legal, information technology, human resources, and other administrative teams. General and administrative expenses also include facilities and supporting overhead costs, including depreciation and amortization, and external professional services.

*Interest Income*

Interest income consists primarily of interest earned on our cash, cash equivalents, and marketable securities.

*Interest Expense*

Interest expense consists primarily of interest expense associated with convertible notes and commitment fees related to our revolving credit facility.

*Other Income (Expense), Net*

Other income (expense), net primarily consists of gains and losses on strategic investments, marketable securities, and foreign currency transactions.

*Income Tax Benefit (Expense)*

We are subject to income taxes in the United States and numerous foreign jurisdictions. These foreign jurisdictions have different statutory tax rates than the United States. Additionally, certain of our foreign earnings may also be taxable in the United States. Accordingly, our effective tax rates will vary depending on the relative proportion of foreign to domestic income, use of tax credits, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws.

*Adjusted EBITDA*

We define Adjusted EBITDA as net income (loss), excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; payroll and other tax expense related to stock-based compensation; and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We consider the exclusion of certain non-cash and non-recurring expenses in calculating Adjusted EBITDA to provide a useful measure for period-to-period comparisons of our business and for investors and others to evaluate our operating results in the same manner as does our management. See "Non-GAAP Financial Measures" for additional information and a reconciliation of net loss to Adjusted EBITDA.

Table of Contents

**Discussion of Results of Operations**

The following table sets forth our consolidated statements of operations data:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (in thousands) | | |
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | $ 4,601,847 | $ 4,117,048 | $ 2,506,626 |
| Costs and expenses[1] [2]: | | | |
| Cost of revenue | 1,815,342 | 1,750,246 | 1,182,505 |
| Research and development | 2,109,800 | 1,565,467 | 1,101,561 |
| Sales and marketing | 1,118,746 | 792,764 | 555,468 |
| General and administrative | 953,265 | 710,640 | 529,164 |
| Total costs and expenses | $ 5,997,153 | 4,819,117 | 3,368,698 |
| Operating loss | (1,395,306) | (702,069) | (862,072) |
| Interest income | 58,597 | 5,199 | 18,127 |
| Interest expense | (21,459) | (17,676) | (97,228) |
| Other income (expense), net | (42,529) | 240,175 | 14,988 |
| Loss before income taxes | (1,400,697) | (474,371) | (926,185) |
| Income tax benefit (expense) | (28,956) | (13,584) | (18,654) |
| Net loss | $ (1,429,653) | $ (487,955) | $ (944,839) |
| Adjusted EBITDA[3] | $ 377,573 | $ 616,686 | $ 45,163 |

(1)     Stock-based compensation expense included in the above line items:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (in thousands) | | |
| **Stock-based compensation expense:** | | | |
| Cost of revenue | $ 12,288 | $ 17,221 | $ 9,367 |
| Research and development | 970,746 | 740,130 | 533,272 |
| Sales and marketing | 203,092 | 164,241 | 108,270 |
| General and administrative | 201,661 | 170,543 | 119,273 |
| Total | $ 1,387,787 | $ 1,092,135 | $ 770,182 |

(2)     Depreciation and amortization expense included in the above line items:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (in thousands) | | |
| **Depreciation and amortization expense:** | | | |
| Cost of revenue | $ 24,235 | $ 19,711 | $ 22,205 |
| Research and development | 98,041 | 62,159 | 37,627 |
| Sales and marketing | 67,169 | 21,772 | 12,916 |
| General and administrative | 12,728 | 15,499 | 13,996 |
| Total | $ 202,173 | $ 119,141 | $ 86,744 |

Table of Contents

(3)     See "Non-GAAP Financial Measures" of this Annual Report on Form 10-K for more information and for a reconciliation of Adjusted EBITDA to net loss, the most directly comparable financial measure calculated and presented in accordance with GAAP.

The following table sets forth the components of our consolidated statements of operations data for each of the periods presented as a percentage of revenue:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | 100 % | 100 % | 100 % |
| Costs and expenses: | | | |
|    Cost of revenue | 39 | 43 | 47 |
|    Research and development | 46 | 38 | 44 |
|    Sales and marketing | 24 | 19 | 22 |
|    General and administrative | 21 | 17 | 21 |
| Total costs and expenses | 130 | 117 | 134 |
| Operating loss | (30) | (17) | (34) |
| Interest income | 1 | — | 1 |
| Interest expense | — | — | (4) |
| Other income (expense), net | (1) | 6 | 1 |
| Loss before income taxes | (30) | (12) | (37) |
| Income tax benefit (expense) | (1) | — | (1) |
| Net loss | (31)% | (12)% | (38)% |

### *Revenue*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Revenue | $ 4,601,847 | $ 4,117,048 | $ 2,506,626 | $ 484,799 | 12 % | $ 1,610,422 | 64 % |

#### *2022 compared to 2021*

Revenue for the year ended December 31, 2022 increased $484.8 million compared to the same period in 2021. Revenue increased due to a combination of growth in advertisers and auction-based advertising demand and optimization efficiencies.

### *Cost of Revenue*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Cost of Revenue | $ 1,815,342 | $ 1,750,246 | $ 1,182,505 | $ 65,096 | 4 % | $ 567,741 | 48 % |

#### *2022 compared to 2021*

Cost of revenue for the year ended December 31, 2022 increased $65.1 million compared to the same period in 2021. The increase in cost of revenue was primarily driven by the growth in revenue share due to the overall increase in revenue and higher mix of revenue subject to revenue share, increased infrastructure costs attributable to DAU growth, and

$20.6 million relating to restructuring charges. The increase was offset by infrastructure cost efficiencies and lower content costs.

### Research and Development Expenses

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Research and Development Expenses | $ 2,109,800 | $ 1,565,467 | $ 1,101,561 | $ 544,333 | 35 % | $ 463,906 | 42 % |

*2022 compared to 2021*

Research and development expenses for the year ended December 31, 2022 increased $544.3 million compared to the same period in 2021. The increase was primarily driven by higher personnel expenses, including increased cash- and stock-based compensation expenses, and $78.9 million relating to restructuring charges.

### Sales and Marketing Expenses

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Sales and Marketing Expenses | $ 1,118,746 | $ 792,764 | $ 555,468 | $ 325,982 | 41 % | $ 237,296 | 43 % |

*2022 compared to 2021*

Sales and marketing expenses for the year ended December 31, 2022 increased $326.0 million compared to the same period in 2021. The increase was primarily driven by higher personnel expenses, including increased cash- and stock-based compensation expense, marketing investments, and $30.8 million relating to restructuring charges. The increase was also due to higher amortization expense, which resulted from our revision of the useful lives of certain customer relationships and trademarks.

### General and Administrative Expenses

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| General and Administrative Expenses | $ 953,265 | $ 710,640 | $ 529,164 | $ 242,625 | 34 % | $ 181,476 | 34 % |

*2022 compared to 2021*

General and administrative expenses for the year ended December 31, 2022 increased $242.6 million compared to the same period in 2021. The increase was primarily driven by higher personnel expenses, higher other administrative expenses, and $58.7 million relating to restructuring charges.

*Interest Income*

| | | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | **2020** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) | | | |
| | | | | | (NM = Not Meaningful) | | | |
| *Interest Income* | $ | 58,597 | $ | 5,199 | $ | 18,127 | $ | 53,398 | NM | $ | (12,928) | (71)% |

*2022 compared to 2021*

Interest income for the year ended December 31, 2022 increased $53.4 million compared to the same period in 2021. The increase was primarily a result of higher interest rates on U.S. government-backed securities and a higher overall invested cash balance.

*Interest Expense*

| | | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | **2020** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) | | | |
| Interest Expense | $ | (21,459) | $ | (17,676) | $ | (97,228) | $ | (3,783) | 21 % | $ | 79,552 | (82)% |

*2022 compared to 2021*

Interest expense for the year ended December 31, 2022 increased $3.8 million, compared to the same period in 2021 primarily due to increases in amortization of debt issuance costs.

*Other Income (Expense), Net*

| | | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|---|
| | **2022** | | **2021** | **2020** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) | | | |
| Other Income (Expense), Net | $ | (42,529) | $ | 240,175 | $ | 14,988 | $ | (282,704) | (118)% | $ | 225,187 | 1,502 % |

*2022 compared to 2021*

Other expense, net for the year ended December 31, 2022 was $42.5 million, compared to other income, net of $240.2 million for the same period in 2021, an increase in other expense, net of $282.7 million. Other expense, net for the current year was primarily a result of $101.3 million total losses on publicly traded securities primarily classified as marketable securities, offset by $19.9 million unrealized gains and $45.9 million realized gains on strategic investments. Other income, net in the comparable period in 2021 was primarily a result of $207.7 million of unrealized gains and $27.8 million of realized gains on strategic investments, and $59.4 million of unrealized gains on publicly traded securities reclassified from strategic investments to marketable securities in the fourth quarter, partially offset by an induced conversion expense related to the Convertible Notes of $41.5 million.

*Income Tax Benefit (Expense)*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | (dollars in thousands) | | | | | | |
| Income Tax Benefit (Expense) | $ (28,956) | $ (13,584) | $ (18,654) | $ (15,372) | 113 % | $ 5,070 | (27)% |
| Effective Tax Rate | (2.1)% | (2.9)% | (2.0)% | | | | |

*2022 compared to 2021*

Income tax expense was $29.0 million for the year ended December 31, 2022, compared to $13.6 million for the same period in 2021. The increase was primarily attributable to the partial valuation allowance releases on our deferred tax assets in the prior period due to deferred tax liabilities acquired in business acquisitions, as well as the capitalization of research and development expenditures under Section 174 of the Internal Revenue Code. Beginning in 2022, the Tax Cuts and Jobs Act eliminates the option to currently deduct research and development expenditures in the period incurred and requires taxpayers to capitalize and amortize such expenditures over five or fifteen years, as applicable, pursuant to Section 174 of the Internal Revenue Code. Although this tax law change did not result in any U.S. federal tax liability due to the use of existing U.S. federal net operating loss carryforwards, it did result in incremental state tax liability and expense due to limitations on the use of existing state net operating loss carryforwards.

Our effective tax rate differs from the U.S. statutory tax rate primarily due to valuation allowances on our deferred tax assets as it is more likely than not that some or all of our deferred tax assets will not be realized.

For additional discussion, see Note 12 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

*Net Loss and Adjusted EBITDA*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| | (dollars in thousands) | | | | | | |
| Net Loss | $ (1,429,653) | $ (487,955) | $ (944,839) | $ (941,698) | (193)% | $ 456,884 | (48)% |
| Adjusted EBITDA | $ 377,573 | $ 616,686 | $ 45,163 | $ (239,113) | (39)% | $ 571,523 | 1,265 % |

*2022 compared to 2021*

Net loss for the year ended December 31, 2022 was $1,429.7 million, compared to $488.0 million for the same period in 2021. Adjusted EBITDA for the year ended December 31, 2022 was $377.6 million, compared to $616.7 million for the same period in 2021. The decrease in Adjusted EBITDA was attributable to increased cost of revenue and overall operating expenses, partially offset by increased revenues.

For a discussion of the limitations associated with using Adjusted EBITDA rather than GAAP measures and a reconciliation of this measure to net loss, see "Non-GAAP Financial Measures."

## Liquidity and Capital Resources

Cash, cash equivalents, and marketable securities were $3.9 billion as of December 31, 2022, primarily consisting of cash on deposit with banks and highly liquid investments in U.S. government and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. Our primary source of liquidity is cash generated through financing activities. Our primary uses of cash include operating costs such as personnel-related costs and the infrastructure costs of the Snapchat application, facility-related capital spending, and acquisitions and investments. There are no known material subsequent events that could have a material impact on our cash or liquidity. We may contemplate and engage in merger and acquisition activity that could materially impact our liquidity and capital resource position.

Table of Contents

In October 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the fourth quarter of 2022, during which we repurchased, and subsequently retired, 53.9 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases.

In July 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the third quarter of 2022, during which we repurchased 51.3 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases.

In May 2022, we entered into a five-year senior unsecured revolving credit facility, or Credit Facility, with certain lenders that allows us to borrow up to $1.05 billion to fund working capital and general corporate-purpose expenditures. The prior revolving credit facility entered into in July 2016 (as amended) was terminated concurrently with the entry into the Credit Facility. The prior credit facility was never drawn upon and, as of December 31, 2021, there were no amounts outstanding on the prior credit facility. On the Credit Facility, loans bear interest, at our option, at a rate equal to (i) a term secured overnight financing rate, or SOFR, plus 0.75% or the base rate, if selected by us, for loans made in U.S. dollars, (ii) the Sterling overnight index average plus 0.7826% for loans made in Sterling, and (iii) foreign indices as stated in the credit agreement plus 0.75% for loans made in other permitted foreign currencies. The base rate is defined as the greatest of (i) the Wall Street Journal prime rate, (ii) the greater of the (a) federal funds rate and (b) the overnight bank funding rate, plus 0.50%, and (iii) the applicable SOFR for a period of one month (but not less than zero) plus 1.00. The Credit Facility also contains an annual commitment fee of 0.10% on the daily undrawn balance of the facility. As of December 31, 2022, we had $40.1 million in the form of outstanding standby letters of credit, with no amounts outstanding under the Credit Facility.

In February 2022, we entered into a purchase agreement for the sale of an aggregate of $1.5 billion principal amount of convertible senior notes due in 2028, the full amount of which is outstanding as of December 31, 2022. The net proceeds from the issuance of the 2028 Notes were $1.31 billion, net of debt issuance costs and the 2028 Capped Call Transactions discussed further in Note 7. The 2028 Notes mature on March 1, 2028 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2022 and as a result, the 2028 Notes will not be eligible for optional conversion during the first quarter of 2023.

In April 2021, we entered into a purchase agreement for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027, the full amount of which is outstanding as of December 31, 2022. The net proceeds from the issuance of the 2027 Notes were $1.05 billion, net of debt issuance costs and the 2027 Capped Call Transactions discussed further in Note 7. The 2027 Notes mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2022 and as a result, the 2027 Notes will not be eligible for optional conversion during the first quarter of 2023.

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of convertible senior notes due in 2025, of which $284.1 million remains outstanding as of December 31, 2022. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and the 2025 Capped Call Transactions discussed further in Note 7. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2022 and as a result, the 2025 Notes will not be eligible for optional conversion during the first quarter of 2023.

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of convertible senior notes due in 2026, of which $838.5 million remains outstanding as of December 31, 2022. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and the 2026 Capped Call Transactions discussed further in Note 7. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2022 and as a result, the 2026 Notes will not be eligible for optional conversion during the first quarter of 2023.

We believe our existing cash balance is sufficient to fund our ongoing working capital, investing, and financing requirements for at least the next 12 months. Our future capital requirements will depend on many factors including our growth rate, headcount, sales and marketing activities, research and development efforts, the introduction of new features,

products, and acquisitions, and continued user engagement. We continually evaluate opportunities to issue or repurchase equity or debt securities, obtain, retire, or restructure credit facilities or financing arrangements, or declare dividends for strategic reasons or to further strengthen our financial position.

As of December 31, 2022, approximately 6% of our cash, cash equivalents, and marketable securities was held outside the United States. These amounts were primarily held in the United Kingdom and are utilized to fund our foreign operations. Cash held outside the United States may be repatriated, subject to certain limitations, and would be available to be used to fund our domestic operations. However, repatriation of funds may result in additional tax liabilities. We believe our existing cash balance in the United States is sufficient to fund our working capital needs.

The following table sets forth the major components of our consolidated statements of cash flows for the periods presented:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Net cash provided by (used in) operating activities | $ 184,614 | $ 292,880 | $ (167,644) |
| Net cash provided by (used in) investing activities | (1,062,275) | 90,227 | (729,864) |
| Net cash provided by (used in) financing activities | 306,714 | 1,065,073 | 922,791 |
| Change in cash, cash equivalents, and restricted cash | $ (570,947) | $ 1,448,180 | $ 25,283 |
| Free Cash Flow [1] | $ 55,308 | $ 223,005 | $ (225,476) |

(1)   For information on how we define and calculate Free Cash Flow and a reconciliation to net cash provided by (used in) operating activities to Free Cash Flow, see "Non-GAAP Financial Measures."

### Net Cash Provided By (Used In) Operating Activities

*2022 compared to 2021*

Net cash provided by operating activities was $184.6 million for the year ended December 31, 2022, compared to net cash provided by operating activities of $292.9 million for the year ended December 31, 2021, resulting primarily from our net loss, adjusted for non-cash items, including stock-based compensation expense of $1.4 billion, depreciation and amortization expense of $202.2 million, and losses on debt and equity securities, net of $36.8 million. Net cash provided by operating activities for the year ended December 31, 2022 was also impacted by an increase in the accounts receivable balance of $119.8 million due to the timing of collections.

### Net Cash Provided By (Used In) Investing Activities

*2022 compared to 2021*

Net cash used in investing activities was $1.1 billion for the year ended December 31, 2022, compared to net cash provided by investing activities of $90.2 million for the year ended December 31, 2021. Our investing activities in the year ended December 31, 2022 consisted of purchases of marketable securities of $3.5 billion, partially offset by maturities of marketable securities of $2.5 billion. Our investing activities for the year ended December 31, 2021 consisted of cash provided by the sales and maturities of marketable securities of $2.9 billion, partially offset by the purchase of marketable securities of $2.4 billion and cash paid for acquisitions of $310.9 million.

### Net Cash Provided By (Used In) Financing Activities

*2022 compared to 2021*

Net cash provided by financing activities was $306.7 million for the year ended December 31, 2022, compared to net cash provided by financing activities of $1.1 billion for the year ended December 31, 2022 and 2021, respectively. Our financing activities for the year ended December 31, 2022 consisted primarily of net proceeds of $1.5 billion from the issuance of the 2028 Notes, offset by the purchase of the 2028 Capped Call Transactions of $177.0 million and repurchases of our Class A common stock for an aggregate of $1.0 billion, representing the entire amount approved by our board of directors and including costs associated with the repurchases. Our financing activities for the year ended December 31,

Table of Contents

2021 consisted primarily of net proceeds of $1.1 billion from the issuance of the 2027 Notes, offset by the purchase of the 2027 Capped Call Transactions of $86.8 million. Net cash provided by (used in) financing activities in all periods presented includes proceeds from the exercise of stock options.

### *Free Cash Flow*

*2022 compared to 2021*

Free Cash Flow was $55.3 million for the year ended December 31, 2022 and was composed of net cash provided by operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also included purchases of property and equipment of $129.3 million for the year ended December 31, 2022. Free Cash Flow was $223.0 million for the year ended December 31, 2021 and was composed of net cash provided by operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also included purchases of property and equipment of $69.9 million for the year ended December 31, 2021. See "Non-GAAP Financial Measures."

## Non-GAAP Financial Measures

To supplement our consolidated financial statements, which are prepared and presented in accordance with GAAP, we use certain non-GAAP financial measures, as described below, to understand and evaluate our core operating performance. These non-GAAP financial measures, which may be different than similarly titled measures used by other companies, are presented to enhance investors' overall understanding of our financial performance and should not be considered a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

We use the non-GAAP financial measure of Free Cash Flow, which is defined as net cash provided by (used in) operating activities, reduced by purchases of property and equipment. We believe Free Cash Flow is an important liquidity measure of the cash that is available, after capital expenditures, for operational expenses and investment in our business and is a key financial indicator used by management. Additionally, we believe that Free Cash Flow is an important measure since we use third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue generating activities. Free Cash Flow is useful to investors as a liquidity measure because it measures our ability to generate or use cash. Once our business needs and obligations are met, cash can be used to maintain a strong balance sheet and invest in future growth.

We use the non-GAAP financial measure of Adjusted EBITDA, which is defined as net income (loss); excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; payroll and other tax expense related to stock-based compensation; and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We believe that Adjusted EBITDA helps identify underlying trends in our business that could otherwise be masked by the effect of the expenses that we exclude in Adjusted EBITDA.

We believe that both Free Cash Flow and Adjusted EBITDA provide useful information about our financial performance, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics used by our management for financial and operational decision-making. We are presenting the non-GAAP measures of Free Cash Flow and Adjusted EBITDA to assist investors in seeing our financial performance through the eyes of management, and because we believe that these measures provide an additional tool for investors to use in comparing our core financial performance over multiple periods with other companies in our industry.

These non-GAAP financial measures should not be considered in isolation from, or as substitutes for, financial information prepared in accordance with GAAP. There are a number of limitations related to the use of these non-GAAP financial measures compared to the closest comparable GAAP measure. Some of these limitations are that:

- Free Cash Flow does not reflect our future contractual commitments.

- Adjusted EBITDA excludes certain recurring, non-cash charges such as depreciation of fixed assets and amortization of acquired intangible assets and, although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future;

- Adjusted EBITDA excludes stock-based compensation expense and payroll and other tax expense related to stock-based compensation, which have been, and will continue to be for the foreseeable future, significant recurring expenses in our business and an important part of our compensation strategy; and

- Adjusted EBITDA excludes income tax benefit (expense).

The following table presents a reconciliation of Free Cash Flow to net cash provided by (used in) operating activities, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | (in thousands) | | |
| **Free Cash Flow reconciliation:** | | | |
| Net cash provided by (used in) operating activities | $ 184,614 | $ 292,880 | $ (167,644) |
| Less: | | | |
| Purchases of property and equipment | (129,306) | (69,875) | (57,832) |
| Free Cash Flow | $ 55,308 | $ 223,005 | $ (225,476) |

The following table presents a reconciliation of Adjusted EBITDA to net loss, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | (in thousands) | | |
| **Adjusted EBITDA reconciliation:** | | | |
| Net loss | $ (1,429,653) | $ (487,955) | $ (944,839) |
| Add (deduct): | | | |
| Interest income | (58,597) | (5,199) | (18,127) |
| Interest expense | 21,459 | 17,676 | 97,228 |
| Other (income) expense, net | 42,529 | (240,175) | (14,988) |
| Income tax (benefit) expense | 28,956 | 13,584 | 18,654 |
| Depreciation and amortization | 186,434 | 119,141 | 86,744 |
| Stock-based compensation expense | 1,353,283 | 1,092,135 | 770,182 |
| Payroll and other tax expense related to stock-based compensation | 44,213 | 107,479 | 50,309 |
| Restructuring charges [1] | 188,949 | — | — |
| Adjusted EBITDA | $ 377,573 | $ 616,686 | $ 45,163 |

(1)   Restructuring charges in 2022 were composed primarily of severance and related charges of $97.1 million, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. These charges are non-recurring and not reflective of underlying trends in our business. See Note 18 to our consolidated financial statements included in the "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for more information.

## Contingencies

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. We also disclose material contingencies when we believe that a loss is not probable but reasonably possible. Significant judgment is required to determine both probability and the estimated amount. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Many of these legal and tax contingencies can take years to resolve. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

Table of Contents

**Commitments**

We have non-cancelable contractual agreements primarily related to the hosting of our data processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $3.7 billion in commitments, as of December 31, 2022, primarily due within 3 years.

**Critical Accounting Policies and Estimates**

We prepare our financial statements in accordance with GAAP. Preparing these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

The critical accounting estimates, assumptions, and judgments that we believe to have the most significant impact on our consolidated financial statements are described below.

### *Revenue Recognition*

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Lenses, which allow users to interact with an advertiser's brand by enabling branded augmented reality experiences, and Sponsored Filters, which allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is served. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

### *Stock-Based Compensation*

In the year ended December 31, 2022, total stock-based compensation expense recognized was $1.4 billion. We have granted stock-based awards consisting primarily of restricted stock units, or RSUs, restricted stock awards, or RSAs, and to a lesser extent, stock options to employees, members of our board of directors, and non-employee advisors. The substantial majority of our stock-based awards have been made to employees. RSUs vest and RSAs lapse to a forfeiture condition on the satisfaction of service conditions. The service condition for RSUs granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. The service condition for RSUs and RSAs granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years.

Table of Contents

We account for stock-based employee compensation under the fair value recognition and measurement provisions, in accordance with applicable accounting standards, which requires stock-based awards to be measured based on the grant date fair value. Stock-based compensation expense is recorded net of estimated forfeitures in our consolidated statements of operations. Accordingly, stock-based compensation expense is only recorded for those potential stock-based awards that we expect to vest. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. We will re-evaluate our estimated forfeiture rate if actual forfeitures differ from our initial estimates. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

*Restricted Stock Units and Restricted Stock Awards*

As of December 31, 2022, total unrecognized compensation cost related to outstanding RSUs and RSAs was $2.0 billion and is expected to be recognized over a weighted-average period of 1.8 years.

### Business Combinations and Valuation of Goodwill and Other Acquired Intangible Assets

We estimate the fair value of assets acquired and liabilities assumed in a business combination. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed. While we use our best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, our estimates are inherently uncertain and subject to refinement.

Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from acquired technology, useful lives, and discount rates. Although we believe the assumptions and estimates we have made in the past have been reasonable and appropriate, they are based in part on historical experience and information obtained from the management of the acquired companies and are inherently uncertain. During the measurement period, which may be up to one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. On the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to our consolidated statements of operations.

### Loss Contingencies

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. When there appears to be a range of possible costs with equal likelihood, a liability is recorded based on the low-end of such range. However, the likelihood of a loss is often difficult to predict and determining a meaningful estimate of the loss or a range of loss may not be practicable based on the information available, the potential effect of future events, and decisions by third parties impacting the ultimate resolution of the contingency. It is also not uncommon for such matters to be resolved over multiple reporting periods. During this time, relevant developments and new information must be continuously evaluated to determine both the likelihood of potential loss and whether it is possible to reasonably estimate a range of potential loss. We also disclose material contingencies when we believe that a loss is reasonably possible.

Significant judgment is required to determine both probability and the estimated amounts of loss contingencies. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change, it could have a material impact on our results of operations, financial position, and cash flows.

### Income Taxes

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our uncertain tax positions.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. Although we believe that we have adequately reserved for our uncertain tax positions, we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves when facts and

circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences may affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and results of operations.

## Recent Accounting Pronouncements

See Note 1 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the date of this Annual Report on Form 10-K.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk and foreign currency risk as follows:

### *Interest Rate Risk*

We had cash and cash equivalents totaling $1.4 billion and $2.0 billion at December 31, 2022 and December 31, 2021, respectively. We had marketable securities totaling $2.5 billion and $1.7 billion at December 31, 2022 and December 31, 2021, respectively. Our cash and cash equivalents consist of cash in bank accounts and marketable securities consisting of U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. We do not enter into investments for trading or speculative purposes. Due to the relatively short-term nature of our investment portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

In February 2022, we issued the 2028 Notes with an aggregate principal amount of $1.5 billion, the full amount of which is outstanding as of December 31, 2022. We carry the 2028 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2028 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2028 Notes. The fair value of the 2028 Notes changes when the market price of our stock fluctuates or market interest rates change.

In April 2021, we issued the 2027 Notes with an aggregate principal amount of $1.15 billion, the full amount of which is outstanding as of December 31, 2022. We carry the 2027 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2027 Notes do not bear regular interest; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2027 Notes. The fair value of the 2027 Notes changes when the market price of our stock fluctuates or market interest rates change.

In April 2020, we issued the 2025 Notes with an aggregate principal amount of $1.0 billion, of which $284.1 million remains outstanding as of December 31, 2022. We carry the 2025 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2025 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2025 Notes. The fair value of the 2025 Notes changes when the market price of our stock fluctuates or market interest rates change.

In August 2019, we issued the 2026 Notes with an aggregate principal amount of $1.265 billion, of which $838.5 million remains outstanding as of December 31, 2022. We carry the 2026 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2026 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2026 Notes. The fair value of the 2026 Notes changes when the market price of our stock fluctuates or market interest rates change.

### *Foreign Currency Risk*

For all periods presented, our revenue and operating expenses were predominately denominated in U.S. dollars. We therefore have not had material foreign currency risk associated with revenue and cost-based activities. However, due to fluctuations in exchange rates resulting from the current macroeconomic environment, and in particular, a strengthening of the U.S. dollar in relation to the Euro and British Pound, we have, and may in the future experience negative impacts to

Table of Contents

our revenue and operating expenses denominated in currencies other than the U.S. dollar. The functional currency of our material operating entities is the U.S. dollar.

For all periods presented, we believe the exposure to foreign currency fluctuation from operating expenses is immaterial as the related costs do not constitute a significant portion of our total expenses. As we grow operations, our exposure to foreign currency risk will likely become more significant.

For all periods presented, we did not enter into any foreign currency exchange contracts. We may, however, enter into foreign currency exchange contracts for purposes of hedging foreign exchange rate fluctuations on our business operations in future operating periods as our exposures are deemed to be material. For additional discussion on foreign currency risk, see "Risk Factors" elsewhere in this Annual Report on Form 10-K.

73

Table of Contents

**Item 8. Financial Statements and Supplementary Data.**

**SNAP INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 75 |
| Consolidated Financial Statements: | |
| Consolidated Statements of Cash Flows | 78 |
| Consolidated Statements of Operations | 79 |
| Consolidated Statements of Comprehensive Income (Loss) | 80 |
| Consolidated Balance Sheets | 81 |
| Consolidated Statements of Stockholders' Equity | 82 |
| Notes to Consolidated Financial Statements | 83 |

74

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Snap Inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated January 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

Table of Contents

*Revenue Recognition*

*Description of the Matter*   As described in Note 2 to the consolidated financial statements, the Company generates substantially all of its revenues by offering various advertising products on Snapchat. The substantial majority of such advertising revenues is generated based upon contractual agreements with customers that are on a fixed fee basis for advertisements delivered over a period of time, or fees based on the number of advertising impressions delivered. Revenues related to fixed fee agreements are recognized ratably over the service period while revenues related to agreements based on the number of advertising impressions delivered are recognized when the advertisements are served.

The Company's revenue recognition process utilizes multiple complex, proprietary systems and tools for the initiation, processing and recording of transactions which comprise a high volume of individually low monetary value transactions. This process is dependent on the effective design and operation of multiple systems, sub-processes, data sources and controls which required significant audit effort. Also, the identification and evaluation of certain non-standard terms and conditions, which may arise through side agreements, required incremental audit effort to determine the distinct performance obligations and the timing of revenue recognition.

*How We Addressed the Matter in Our Audit*   With the support of our information technology professionals, we identified and tested the relevant systems and tools used for the determination of initiation, processing, recording and billing of revenue, which included processes and controls related to access to the relevant systems and data, changes to the relevant systems and interfaces, and configuration of the relevant systems. We obtained an understanding, evaluated the design and tested the operating effectiveness of the Company's internal controls over the identification and evaluation of revenue recognition for standard and non-standard terms and conditions.

To test the Company's recognition of revenue, our audit procedures included, among others, testing the completeness and accuracy of the underlying data within the Company's billing systems by agreeing amounts recognized to contractual terms and conditions, and testing revenue recognized to accounts receivable and cash receipts. Additionally, we examined standard customer online terms and conditions to understand the distinct performance obligations and tested the timing of revenue recognition. Further, we selected a sample of non-standard contractual arrangements to understand the performance obligations and the timing of revenue recognition. To assess completeness of non-standard terms and conditions, we obtained external confirmations of terms and conditions for a sample of customers.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.

Los Angeles, California

January 31, 2023

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Snap Inc.'s internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Snap Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and our report dated January 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California

January 31, 2023

Table of Contents

**Snap Inc.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| **Cash flows from operating activities** | | | |
| Net loss | $ (1,429,653) | $ (487,955) | $ (944,839) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 202,173 | 119,141 | 86,744 |
| Stock-based compensation | 1,387,787 | 1,092,135 | 770,182 |
| Amortization of debt discount and issuance costs | 6,865 | 4,311 | 81,401 |
| Losses (gains) on debt and equity securities, net | 36,838 | (289,052) | (10,250) |
| Induced conversion expense related to convertible notes | — | 41,538 | — |
| Other | 15,596 | 8,643 | 2,963 |
| Change in operating assets and liabilities, net of effect of acquisitions: | | | |
| Accounts receivable, net of allowance | (119,780) | (332,967) | (255,818) |
| Prepaid expenses and other current assets | (40,917) | (26,607) | (14,587) |
| Operating lease right-of-use assets | 71,441 | 47,258 | 38,940 |
| Other assets | (504) | (10,916) | (11,442) |
| Accounts payable | 46,492 | 53,579 | 20,374 |
| Accrued expenses and other current liabilities | 71,706 | 117,092 | 108,601 |
| Operating lease liabilities | (68,886) | (49,294) | (49,730) |
| Other liabilities | 5,456 | 5,974 | 9,817 |
| Net cash provided by (used in) operating activities | 184,614 | 292,880 | (167,644) |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (129,306) | (69,875) | (57,832) |
| Purchases of strategic investments | (26,346) | (41,160) | (111,586) |
| Sales of strategic investments | 63,276 | 36,777 | — |
| Cash paid for acquisitions, net of cash acquired | (67,067) | (310,915) | (168,850) |
| Purchases of marketable securities | (3,485,638) | (2,438,983) | (3,524,599) |
| Sales of marketable securities | 75,716 | 379,555 | 389,974 |
| Maturities of marketable securities | 2,525,215 | 2,536,725 | 2,737,523 |
| Other | (18,125) | (1,897) | 5,506 |
| Net cash provided by (used in) investing activities | (1,062,275) | 90,227 | (729,864) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible notes, net of issuance costs | 1,483,500 | 1,137,527 | 988,582 |
| Purchase of capped calls | (177,000) | (86,825) | (100,000) |
| Proceeds from the exercise of stock options | 4,272 | 14,671 | 34,209 |
| Payments of debt issuance costs | (3,006) | — | — |
| Repurchases of Class A non-voting common stock | (1,001,052) | — | — |
| Net cash provided by (used in) financing activities | 306,714 | 1,065,073 | 922,791 |
| Change in cash, cash equivalents, and restricted cash | (570,947) | 1,448,180 | 25,283 |
| Cash, cash equivalents, and restricted cash, beginning of period | 1,994,723 | 546,543 | 521,260 |
| Cash, cash equivalents, and restricted cash, end of period | $ 1,423,776 | $ 1,994,723 | $ 546,543 |
| **Supplemental disclosures** | | | |
| Cash paid for income taxes, net | $ 12,087 | $ 25,333 | $ 3,692 |
| Cash paid for interest | $ 8,873 | $ 10,887 | $ 12,019 |

See Notes to Consolidated Financial Statements.

Table of Contents

**Snap Inc.**
**Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | **2020** |
| Revenue | $ | 4,601,847 | $ | 4,117,048 | $ | 2,506,626 |
| Costs and expenses: | | | | | | |
| Cost of revenue | | 1,815,342 | | 1,750,246 | | 1,182,505 |
| Research and development | | 2,109,800 | | 1,565,467 | | 1,101,561 |
| Sales and marketing | | 1,118,746 | | 792,764 | | 555,468 |
| General and administrative | | 953,265 | | 710,640 | | 529,164 |
| Total costs and expenses | | 5,997,153 | | 4,819,117 | | 3,368,698 |
| Operating loss | | (1,395,306) | | (702,069) | | (862,072) |
| Interest income | | 58,597 | | 5,199 | | 18,127 |
| Interest expense | | (21,459) | | (17,676) | | (97,228) |
| Other income (expense), net | | (42,529) | | 240,175 | | 14,988 |
| Loss before income taxes | | (1,400,697) | | (474,371) | | (926,185) |
| Income tax benefit (expense) | | (28,956) | | (13,584) | | (18,654) |
| Net loss | $ | (1,429,653) | $ | (487,955) | $ | (944,839) |
| Net loss per share attributable to Class A, Class B, and Class C common stockholders (Note 3): | | | | | | |
| Basic | $ | (0.89) | $ | (0.31) | $ | (0.65) |
| Diluted | $ | (0.89) | $ | (0.31) | $ | (0.65) |
| Weighted average shares used in computation of net loss per share: | | | | | | |
| Basic | | 1,608,304 | | 1,558,997 | | 1,455,693 |
| Diluted | | 1,608,304 | | 1,558,997 | | 1,455,693 |

See Notes to Consolidated Financial Statements.

79

**Snap Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
*(in thousands)*

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | | 2022 | | 2021 | | 2020 |
| Net loss | $ | (1,429,653) | $ | (487,955) | $ | (944,839) |
| Other comprehensive income (loss), net of tax |  |  |  |  |  |  |
| Unrealized gain (loss) on marketable securities, net of tax |  | (9,307) |  | (1,735) |  | (516) |
| Foreign currency translation |  | (10,188) |  | (14,107) |  | 21,306 |
| Total other comprehensive income (loss), net of tax |  | (19,495) |  | (15,842) |  | 20,790 |
| Total comprehensive loss | $ | (1,449,148) | $ | (503,797) | $ | (924,049) |

See Notes to Consolidated Financial Statements.

80

Table of Contents

**Snap Inc.**
**Consolidated Balance Sheets**
*(in thousands, except par value)*

|  | December 31, | |
|  | 2022 | 2021 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 1,423,121 | $ 1,993,809 |
| Marketable securities | 2,516,003 | 1,699,076 |
| Accounts receivable, net of allowance | 1,183,092 | 1,068,873 |
| Prepaid expenses and other current assets | 134,431 | 92,244 |
| Total current assets | 5,256,647 | 4,854,002 |
| Property and equipment, net | 271,777 | 202,644 |
| Operating lease right-of-use assets | 370,952 | 322,252 |
| Intangible assets, net | 204,480 | 277,654 |
| Goodwill | 1,646,120 | 1,588,452 |
| Other assets | 279,562 | 291,302 |
| Total assets | $ 8,029,538 | $ 7,536,306 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 181,774 | $ 125,282 |
| Operating lease liabilities | 46,485 | 52,396 |
| Accrued expenses and other current liabilities | 987,340 | 674,108 |
| Total current liabilities | 1,215,599 | 851,786 |
| Convertible senior notes, net | 3,742,520 | 2,253,087 |
| Operating lease liabilities, noncurrent | 386,271 | 325,509 |
| Other liabilities | 104,450 | 315,756 |
| Total liabilities | 5,448,840 | 3,746,138 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity | | |
| Class A non-voting common stock, $0.00001 par value. 3,000,000 shares authorized, 1,371,242 shares issued, 1,319,930 shares outstanding at December 31, 2022 and 3,000,000 shares authorized, 1,364,887 shares issued and outstanding at December 31, 2021. | 13 | 14 |
| Class B voting common stock, $0.00001 par value. 700,000 shares authorized, 22,529 shares issued and outstanding at December 31, 2022 and 700,000 shares authorized, 22,769 shares issued and outstanding at December 31, 2021. | — | — |
| Class C voting common stock, $0.00001 par value. 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2022 and 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2021. | 2 | 2 |
| Treasury stock, at cost. 51,312 shares of Class A non-voting common stock at December 31, 2022. | (500,514) | — |
| Additional paid-in capital | 13,309,828 | 12,069,097 |
| Accumulated deficit | (10,214,657) | (8,284,466) |
| Accumulated other comprehensive income (loss) | (13,974) | 5,521 |
| Total stockholders' equity | 2,580,698 | 3,790,168 |
| Total liabilities and stockholders' equity | $ 8,029,538 | $ 7,536,306 |

See Notes to Consolidated Financial Statements.

81

**Snap Inc.**
**Consolidated Statements of Stockholders' Equity**
*(in thousands)*

| | Year Ended December 31, | | | | | |
| | 2022 | | 2021 | | 2020 | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|
| **Class A non-voting common stock** | | | | | | |
| Balance, beginning of period | 1,364,887 | $ 14 | 1,248,010 | $ 12 | 1,160,127 | $ 12 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 334 | — | 1,174 | — | 3,824 | — |
| Issuance of Class A non-voting common stock in connection with acquisitions | 1,277 | — | 6,732 | — | — | — |
| Issuance of Class A non-voting common stock for vesting of restricted stock units and restricted stock awards, net | 58,342 | — | 55,466 | 1 | 78,042 | — |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | — | — | 52,410 | 1 | — | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | 298 | — | 1,095 | — | 6,017 | — |
| Repurchases of Class A non-voting common stock | (105,208) | (1) | — | — | — | — |
| Balance, end of period | 1,319,930 | 13 | 1,364,887 | 14 | 1,248,010 | 12 |
| **Class B voting common stock** | | | | | | |
| Balance, beginning of period | 22,769 | — | 23,696 | — | 24,522 | — |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 58 | — | 168 | — | 754 | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | (298) | — | (1,095) | — | (6,017) | — |
| Conversion of Class C voting common stock to Class B voting common stock | — | — | — | — | 4,437 | — |
| Balance, end of period | 22,529 | — | 22,769 | — | 23,696 | — |
| **Class C voting common stock** | | | | | | |
| Balance, beginning of period | 231,627 | 2 | 231,627 | 2 | 231,147 | 2 |
| Conversion of Class C voting common stock to Class B voting common stock | — | — | — | — | (4,437) | — |
| Issuance of Class C voting common stock for settlement of restricted stock units, net | — | — | — | — | 4,917 | — |
| Balance, end of period | 231,627 | 2 | 231,627 | 2 | 231,627 | 2 |
| **Treasury stock** | | | | | | |
| Balance, beginning of period | — | — | — | — | — | — |
| Repurchases of Class A non-voting common stock | 105,208 | (1,001,052) | — | — | — | — |
| Retirement of Class A non-voting common stock | (53,896) | 500,538 | — | — | — | — |
| Balance, end of period | 51,312 | (500,514) | — | — | — | — |
| **Additional paid-in capital** | | | | | | |
| Balance, beginning of period | — | 12,069,097 | — | 10,200,141 | — | 9,205,256 |
| Stock-based compensation expense | — | 1,369,407 | — | 1,088,506 | — | 771,084 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | — | 4,285 | — | 14,680 | — | 34,209 |
| Cumulative-effect adjustment from accounting changes | — | — | — | (664,021) | — | — |
| Issuance of Class A non-voting common stock in connection with acquisitions and divestitures | — | 44,039 | — | 341,425 | — | 3,003 |
| Equity component of convertible senior notes, net | — | — | — | — | — | 286,589 |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | — | — | — | 1,175,191 | — | — |
| Purchase of capped calls | — | (177,000) | — | (86,825) | — | (100,000) |
| Balance, end of period | — | 13,309,828 | — | 12,069,097 | — | 10,200,141 |
| **Accumulated deficit** | | | | | | |
| Balance, beginning of period | — | (8,284,466) | — | (7,891,542) | — | (6,945,930) |
| Cumulative-effect adjustment from accounting changes | — | — | — | 95,031 | — | (773) |
| Net loss | — | (1,429,653) | — | (487,955) | — | (944,839) |
| Retirement of Class A non-voting common stock | — | (500,538) | — | — | — | — |
| Balance, end of period | — | (10,214,657) | — | (8,284,466) | — | (7,891,542) |
| **Accumulated other comprehensive income (loss)** | | | | | | |
| Balance, beginning of period | — | 5,521 | — | 21,363 | — | 573 |
| Other comprehensive income (loss), net of tax | — | (19,495) | — | (15,842) | — | 20,790 |
| Balance, end of period | — | (13,974) | — | 5,521 | — | 21,363 |
| **Total stockholders' equity** | 1,625,398 | $ 2,580,698 | 1,619,283 | $ 3,790,168 | 1,503,333 | $ 2,329,976 |

See Notes to Consolidated Financial Statements.

Table of Contents

**Snap Inc.**
**Notes to Consolidated Financial Statements**

## 1. Summary of Significant Accounting Policies

Snap Inc. is a technology company.

Snap Inc. ("we," "our," or "us") was formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. Snap Inc. is headquartered in Santa Monica, California. Our flagship product, Snapchat, is a visual messaging application that was created to help people communicate through short videos and images called "Snaps."

### Basis of Presentation

Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Our consolidated financial statements include the accounts of Snap Inc. and our wholly owned subsidiaries. All intercompany transactions and balances have been eliminated in consolidation. Our fiscal year ends on December 31. Certain reclassifications have been made in the prior periods to conform to the current year's presentation. None of these reclassifications had a material impact on our consolidated financial statements.

### Use of Estimates

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. Management's estimates are based on historical information available as of the date of the consolidated financial statements and various other assumptions that we believe are reasonable under the circumstances. Actual results could differ from those estimates.

Key estimates relate primarily to determining the fair value of assets and liabilities assumed in business combinations, evaluation of contingencies, uncertain tax positions, forfeiture rate, the fair value of stock-based awards, and the fair value of strategic investments. On an ongoing basis, management evaluates our estimates compared to historical experience and trends, which form the basis for making judgments about the carrying value of assets and liabilities.

### Concentrations of Business Risk

We currently use both Google Cloud and Amazon Web Services for our hosting requirements. A disruption or loss of service from one or both of these partners could seriously harm our ability to operate. Although we believe there are other qualified providers that can provide these services, a transition to a new provider could create a significant disruption to our business and negatively impact our consolidated financial statements.

### Concentrations of Credit Risk

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash, cash equivalents, marketable securities, and accounts receivable. We maintain cash deposits, cash equivalent balances, and marketable securities with several financial institutions. Cash and cash equivalents may be withdrawn or redeemed on demand. We believe that the financial institutions that hold our cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to these balances. We also maintain investments in U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper that carry high credit ratings and accordingly, minimal credit risk exists with respect to these balances.

We extend credit to our customers based on an evaluation of their ability to pay amounts due under contractual arrangement and generally do not obtain or require collateral.

**Revenue Recognition**

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. See Note 2 for additional information.

**Cost of Revenue**

Cost of revenue includes payments for content, developer, and advertiser partner costs. Under some of these arrangements, we pay a portion of the fees we receive from the advertisers for Snap Ads that are displayed within partner content on Snapchat. Partner arrangement costs were $681.9 million, $679.0 million, and $324.3 million for the years ended December 31, 2022, 2021, and 2020, respectively.

In addition, cost of revenue consists of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs. Cost of revenue also includes third-party selling costs, personnel-related costs, facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

**Advertising**

Advertising costs are expensed as incurred and were $42.7 million, $62.4 million, and $29.5 million for the years ended December 31, 2022, 2021, and 2020, respectively.

**Capital Structure**

We have three classes of authorized common stock – Class A common stock, Class B common stock, and Class C common stock. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer.

**Future Stock Split to be Effected in the Form of a Stock Dividend**

In July 2022, our board of directors determined that it was advisable and in our best interest to approve a stock split to be effected in the form of a special dividend of one share of Class A common stock on each outstanding share of our common stock at a future date (the "Future Stock Split"). In connection with the Future Stock Split, we entered into certain agreements (the "Co-Founder Agreements") with Evan Spiegel and Robert Murphy, our co-founders, and certain of their respective affiliates requiring them, among other things, to convert shares of Class B common stock and Class C common stock into Class A common stock under certain circumstances.

The Future Stock Split will be not be declared and paid until the later of (i) June 30, 2023 and (ii) the first business day following the date on which the average of the volume weighted average price per share of Class A common stock equals or exceeds $40 per share for 65 consecutive trading days. If this does not occur by July 21, 2032, the Future Stock Split will not be declared and paid, and the Co-Founder Agreements will terminate. No adjustments have been made to share or per share amounts for Class A common stock in the accompanying consolidated financial statements for the effects of the Future Stock Split as these triggering conditions have not been met.

**Stock-based Compensation**

We measure and recognize compensation expense for stock-based payment awards, including stock options, restricted stock units ("RSUs"), and restricted stock awards ("RSAs") granted to employees, directors, and advisors, based on the grant date fair value of the awards. The grant date fair value of stock options is estimated using a Black-Scholes option pricing model. The fair value of stock-based compensation for stock options is recognized on a straight-line basis, net of estimated forfeitures, over the period during which services are provided in exchange for the award. The grant date fair value of RSUs and RSAs is estimated based on the fair value of our underlying common stock.

RSUs and RSAs are subject to the satisfaction of service conditions. The service condition for RSUs granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30%

over the third year, and 40% over the fourth year. In limited instances, we have issued RSUs with vesting periods in excess of four years. The service condition for RSUs and RSAs granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years. For these awards, we recognize stock-based compensation expense on a straight-line basis over the requisite service period.

Stock-based compensation expense recognized for all periods presented is based on awards that are expected to vest, including an estimate of forfeitures. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

The future tax benefits on settlement of the above RSUs and RSAs is not expected to be material as currently we have established valuation allowances to reduce our net deferred tax assets to the amount that is more likely than not to be realized. The majority of the future tax benefits that arise on settlement of the above RSUs are in jurisdictions for which our net deferred tax assets have a full valuation allowance.

**Income Taxes**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the deferred tax asset or liability is expected to be realized or settled.

In evaluating our ability to recover deferred tax assets, we consider all available positive and negative evidence, including historical operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis. Based on the level of historical losses, we have established a valuation allowance to reduce our net deferred tax assets to the amount that is more likely than not to be realized.

We recognize a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in our consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized. We recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheets.

**Currency Translation and Remeasurement**

The functional currency of the majority of our foreign subsidiaries is the U.S. dollar. Monetary assets and liabilities denominated in a foreign currency are remeasured into U.S. dollars at the exchange rate on the balance sheet date. Revenue and expenses are remeasured at the average exchange rates during the period. Equity transactions and other non-monetary assets are remeasured using historical exchange rates. Foreign currency transaction gains and losses are recorded in other income (expense), net on our consolidated statement of operations. For those foreign subsidiaries where the local currency is the functional currency, adjustments to translate those statements into U.S. dollars are recorded in accumulated other comprehensive income (loss) in stockholders' equity.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of highly liquid investments with original maturities of 90 days or less from the date of purchase.

**Restricted Cash**

We are required to maintain restricted cash deposits to back letters of credit for certain property leases. These funds are restricted and have been classified in other assets on our consolidated balance sheets due to the nature of restriction. At December 31, 2022 and 2021, restricted cash balances were immaterial.

Table of Contents

**Marketable Securities**

We hold investments in marketable securities consisting of U.S. government securities, U.S. government agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. We classify marketable investments in debt securities as available-for-sale investments in our current assets because they represent investments available for current operations.

Our available-for-sale investments in debt securities are carried at fair value with any unrealized gains and losses, included in accumulated other comprehensive (loss) income in stockholders' equity. Available-for-sale debt securities with an amortized cost basis in excess of estimated fair value are assessed to determine what amount of that difference, if any, is caused by expected credit losses, with any allowance for credit losses recognized as a charge in other income (expense), net on our consolidated statements of income. We did not record any credit losses on our available-for-sale debt securities in any of the periods presented. We determine gains or losses on the sale or maturities of marketable securities using the specific identification method and these gains or losses are recorded in other income (expense), net in our consolidated statements of operations.

Publicly traded equity securities are carried at fair value with any unrealized gains and losses recorded in other income (expense), net in our consolidated statements of operations.

**Strategic Investments**

We hold strategic investments primarily in privately held companies, consisting primarily of equity securities without readily determinable fair values, and to a lesser extent, debt securities. We adjust the carrying value of these equity securities to fair value upon observable transactions for identical or similar investments of the same issuer or upon impairment. Any adjustments to carrying value of these investments are recorded in other income (expense), net in our consolidated statements of operations. Strategic investments are included within other assets on the consolidated balance sheets.

When we exercise significant influence over, but do not control the investee, such strategic investments are accounted for using the equity method. Under the equity method of accounting, we record our share of the results of the investments within other income (expense), net in our consolidated statements of operations.

**Fair Value Measurements**

Certain financial instruments are required to be recorded at fair value. Other financial instruments, including cash and cash equivalents and restricted cash, are recorded at cost, which approximates fair value. Additionally, accounts receivable, accounts payable, and accrued expenses approximate fair value because of the short-term nature of these financial instruments.

**Accounts Receivable and Allowance for Doubtful Accounts**

Accounts receivable are recorded at the invoiced amount less any allowance for doubtful accounts to reserve for potentially uncollectible receivables. To determine the amount of the allowance, we make judgments about the creditworthiness of customers based on ongoing credit evaluation and historical experience. At December 31, 2022 and 2021, the allowance for doubtful accounts was immaterial.

**Property and Equipment**

Property and equipment are stated at cost, less accumulated depreciation. We compute depreciation using the straight-line method over the estimated useful lives of the assets, which is generally three years for computer hardware, software, and equipment, five years for furniture, and over the shorter of lease term or useful life of the assets for leasehold improvements. Buildings are generally depreciated over a useful life ranging from 20 to 45 years. Maintenance and repairs are expensed as incurred.

**Leases**

We have non-cancelable lease agreements for certain of our offices with original lease terms expiring between 2023 and 2042. Leases are recorded as operating lease right-of-use assets and operating lease liabilities on the consolidated balance sheets. We account for lease and non-lease components as a single lease component and do not record leases with

86

Table of Contents

an initial term of twelve months or less on the consolidated balance sheets. We use our incremental borrowing rate based on the information available at the lease commencement date to determine the present value of lease payments over the lease term. Our lease terms may include options to extend or terminate the lease when it is reasonably certain we will exercise that option. Certain agreements have free rent periods or escalating rent payment provisions. Rent expense is recognized on a straight-line basis over the lease term.

### Software Development Costs

Software development costs include costs to develop software to be used to meet internal needs and applications used to deliver our services. We capitalize development costs related to these software applications once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended. Costs capitalized for developing such software applications were not material for the periods presented.

### Segments

Our CEO is our chief operating decision maker. We have determined that we have a single operating segment. Our CEO evaluates performance and makes operating decisions about allocating resources based on financial data presented on a consolidated basis accompanied by disaggregated information about revenue by geographic region.

### Business Combinations

We include the results of operations of the businesses that we acquire from the date of acquisition. We determine the fair value of the assets acquired and liabilities assumed based on their estimated fair values as of the respective date of acquisition. The excess purchase price over the fair values of identifiable assets and liabilities is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates including the selection of valuation methodologies, estimates of future revenue and cash flows, discount rates, and selection of comparable companies. Our estimates of fair value are based on assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, not to exceed one year from the date of acquisition, we may record adjustments to the assets acquired and liabilities assumed, with a corresponding offset to goodwill. At the conclusion of the measurement period, any subsequent adjustments are reflected in the consolidated statements of operations.

When we issue payments or grants of equity to selling stockholders in connection with an acquisition, we evaluate whether the payments or awards are compensatory. This evaluation includes whether cash payments or stock award vesting is contingent on the continued employment of the selling stockholder beyond the acquisition date. If continued employment is required for the cash to be paid or stock awards to vest, the award is treated as compensation for post-acquisition services and is recognized as compensation expense.

Transaction costs associated with business combinations are expensed as incurred, and are included in general and administrative expenses in our consolidated statements of operations.

### Goodwill

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in a business combination. We test goodwill for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. For all periods presented, we had a single operating segment and reporting unit structure. There were no impairment charges in any of the periods presented.

87

## Intangible Assets

Intangible assets are carried at cost and amortized on a straight-line basis over their estimated useful lives. We determine the appropriate useful life of our intangible assets by measuring the expected cash flows of acquired assets. The estimated useful lives of intangible assets are generally as follows:

| Intangible Asset | Estimated Useful Life |
| --- | --- |
| Domain names | 5 Years |
| Trademarks | 3 Years |
| Acquired developed technology | 3 to 7 Years |
| Customer relationships | 2 to 8 Years |
| Patents | 4 to 14 Years |

## Impairment of Long-Lived Assets

We evaluate recoverability of our property and equipment and intangible assets, excluding goodwill, when events or changes indicate the carrying amount of an asset may not be recoverable. Events and changes in circumstances considered in determining whether the carrying value of long-lived assets may not be recoverable include: significant changes in performance relative to expected operating results; significant changes in asset use; and significant negative industry or economic trends and changes in our business strategy. Recoverability of these assets is measured by comparison of their carrying amount to future undiscounted cash flows to be generated. If impairment is indicated based on a comparison of the assets' carrying values and the undiscounted cash flows, the impairment loss is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

## Legal Contingencies

For legal contingencies, we accrue a liability for an estimated loss if the potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated. Legal fees and expenses are expensed as incurred. Note 8 provides additional information regarding our legal contingencies.

## Recent Accounting Pronouncements

In June 2022, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2022-03, Fair Value Measurement (Topic 820): Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions, which clarifies the guidance when measuring the fair value of an equity security subject to contractual restrictions that prohibit the sale of an equity security and introduces new disclosure requirements for equity securities subject to contractual sale restrictions that are measured at fair value in accordance with Topic 820. The guidance is effective for annual periods beginning after December 15, 2023, with early adoption permitted. Effective April 1, 2022, we early adopted ASU 2022-03 on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In November 2021, the FASB issued ASU 2021-10, Government Assistance (Topic 832): Disclosure by Business Entities about Government Assistance, which improves the transparency of government assistance received by requiring the disclosure of: (1) the types of government assistance received; (2) the accounting for such assistance; and (3) the effect of the assistance on an entity's financial statements. The guidance is effective for annual periods beginning after December 15, 2021, with early adoption permitted. Effective January 1, 2022, we early adopted ASU 2021-10 on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. Under ASU 2021-08, an acquirer must recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with Topic 606. The guidance is effective for interim and annual periods beginning after December 15, 2022, with early adoption permitted. Effective January 1, 2022, we early adopted ASU 2021-08 on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In August 2020, the FASB issued ASU 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. Under ASU 2020-06, the embedded conversion features are no longer separated from the host contract for convertible instruments with conversion features that are not required to be accounted for as derivatives under Derivatives and Hedging (Topic 815), or that do not result in substantial premiums accounted for as paid-in capital. Consequently, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost, as long as no other features require bifurcation and recognition as derivatives. The guidance also requires the if-converted method to be applied for all convertible instruments. ASU 2020-06 is effective for fiscal years beginning after December 15, 2021, with early adoption permitted. Adoption of the standard requires using either a modified retrospective or a full retrospective approach. Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million. Interest expense recognized in periods subsequent to the adoption date will be reduced as a result of accounting for the convertible debt instrument as a single liability measured at its amortized cost.

In January 2020, the FASB issued ASU 2020-01, Investments-Equity Securities (Topic 321), Investments-Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815), which clarifies the interaction between the accounting for equity securities in Topic 321, the accounting for equity method investments in Topic 323, and the accounting for certain forward contracts and purchased options in Topic 815. The guidance is effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. Effective January 1, 2021, we adopted this standard on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

## 2. Revenue

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Lenses, which allow users to interact with an advertiser's brand by enabling branded augmented reality experiences, and Sponsored Filters, which allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is served. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

We also generate revenue from subscriptions and sales of hardware products. For the periods presented, all such revenue was not material.

The following table represents our revenue disaggregated by geography based on the billing address of the advertising customer:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
| | (in thousands) | | |
|---|---|---|---|
| Revenue: | | | |
| North America [1] [2] | $ 3,205,554 | $ 2,871,369 | $ 1,649,937 |
| Europe [3] | 712,764 | 660,473 | 425,445 |
| Rest of world | 683,529 | 585,206 | 431,244 |
| Total revenue | $ 4,601,847 | $ 4,117,048 | $ 2,506,626 |

(1)     North America includes Mexico, the Caribbean, and Central America.

(2)     United States revenue was $3.1 billion, $2.8 billion, and $1.6 billion for the years ended December 31, 2022, 2021, and 2020, respectively.

(3)     Europe includes Russia and Turkey. Effective March 2022, we halted advertising sales to Russian and Belarusian entities.

**3. Net Loss per Share**

We compute net loss per share using the two-class method required for multiple classes of common stock. We have three classes of authorized common stock for which voting rights differ by class.

Basic net loss per share is computed by dividing net loss attributable to each class of stockholders by the weighted-average number of shares of stock outstanding during the period, adjusted for RSAs for which the risk of forfeiture has not yet lapsed.

For the calculation of diluted net loss per share, net loss per share attributable to common stockholders for basic net loss per share is adjusted by the effect of dilutive securities, including awards under our equity compensation plans. Diluted net loss per share attributable to common stockholders is computed by dividing the resulting net loss attributable to common stockholders by the weighted-average number of fully diluted common shares outstanding. We use the if-converted method for calculating any potential dilutive effect of the Convertible Notes on diluted net loss per share. The Convertible Notes would have a dilutive impact on net income per share when the average market price of Class A common stock for a given period exceeds the respective conversion price of the Convertible Notes. For the periods presented, our potentially dilutive shares relating to stock options, RSUs, RSAs, and Convertible Notes were not included in the computation of diluted net loss per share as the effect of including these shares in the calculation would have been anti-dilutive.

Table of Contents

The numerators and denominators of the basic and diluted net loss per share computations for our common stock are calculated as follows for the years ended December 31, 2022, 2021, and 2020:

| | Year Ended December 31, | | | | | | | | |
| | 2022 | | | 2021 | | | 2020 | | |
| | (in thousands, except per share data) | | | | | | | | |
| | Class A | Class B | Class C | Class A | Class B | Class C | Class A | Class B | Class C |
|---|---|---|---|---|---|---|---|---|---|
| **Numerator:** | | | | | | | | | |
| Net loss | $ (1,203,614) | $ (20,141) | $ (205,898) | $ (408,118) | $ (7,339) | $ (72,498) | $ (775,801) | $ (15,577) | $ (153,461) |
| Net loss attributable to common stockholders | $ (1,203,614) | $ (20,141) | $ (205,898) | $ (408,118) | $ (7,339) | $ (72,498) | $ (775,801) | $ (15,577) | $ (153,461) |
| **Denominator:** | | | | | | | | | |
| Basic shares: | | | | | | | | | |
| Weighted-average common shares - Basic | 1,354,019 | 22,658 | 231,627 | 1,303,921 | 23,449 | 231,627 | 1,195,259 | 23,999 | 236,435 |
| Diluted shares: | | | | | | | | | |
| Weighted-average common shares - Diluted | 1,354,019 | 22,658 | 231,627 | 1,303,921 | 23,449 | 231,627 | 1,195,259 | 23,999 | 236,435 |
| Net loss per share attributable to common stockholders: | | | | | | | | | |
| Basic | $ (0.89) | $ (0.89) | $ (0.89) | $ (0.31) | $ (0.31) | $ (0.31) | $ (0.65) | $ (0.65) | $ (0.65) |
| Diluted | $ (0.89) | $ (0.89) | $ (0.89) | $ (0.31) | $ (0.31) | $ (0.31) | $ (0.65) | $ (0.65) | $ (0.65) |

The following potentially dilutive shares were excluded from the calculation of diluted net loss per share because their effect would have been anti-dilutive for the periods presented:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
| | (in thousands) | | |
|---|---|---|---|
| Stock options | 3,159 | 4,304 | 5,624 |
| Unvested RSUs and RSAs | 132,392 | 86,180 | 131,172 |
| Convertible Notes (if-converted) | 89,379 | 62,755 | 101,591 |

## 4. Stockholders' Equity

### Common Stock

As of December 31, 2022, we are authorized to issue 3,000,000,000 shares of Class A nonvoting common stock, 700,000,000 shares of Class B voting common stock, and 260,887,848 shares of Class C voting common stock, each with a par value of $0.00001 per share. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer. Any dividends paid to the holders of the Class A common stock, Class B common stock, and Class C common stock will be paid on a pro rata basis. For the year ended December 31, 2022, we did not declare any dividends. On a liquidation event, as defined in our certificate of incorporation, any distribution to common stockholders is made on a pro rata basis to the holders of the Class A common stock, Class B common stock, and Class C common stock.

As of December 31, 2022, there were 1,371,241,822 shares issued and 1,319,929,508 shares outstanding of Class A common stock, and 22,529,132 shares and 231,626,943 shares issued and outstanding of Class B common stock and Class C common stock, respectively.

### Stock-based Compensation Plans

We maintain three share-based employee compensation plans: the 2017 Equity Incentive Plan ("2017 Plan"), the 2014 Equity Incentive Plan ("2014 Plan"), and the 2012 Equity Incentive Plan ("2012 Plan", and collectively with the 2017 Plan and the 2014 Plan, the "Stock Plans"). In January 2017, our board of directors adopted the 2017 Plan, and in February

2017 our stockholders approved the 2017 Plan, effective on March 1, 2017, which serves as the successor to the 2014 Plan and 2012 Plan and provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, RSAs, RSUs, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. We do not expect to grant any additional awards under the 2014 Plan or 2012 Plan as of the effective date of the 2017 Plan, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France under the 2014 Plan. Outstanding awards under the 2014 Plan and 2012 Plan continue to be subject to the terms and conditions of the 2014 Plan and 2012 Plan, respectively. Shares available for grant under the 2014 Plan and 2012 Plan, which were reserved but not issued or subject to outstanding awards under the 2014 Plan or 2012 Plan, respectively, as of the effective date of the 2017 Plan, were added to the reserves of the 2017 Plan.

We initially reserved 87,270,108 shares of our Class A common stock for future issuance under the 2017 Plan. An additional number of shares of Class A common stock will be added to the 2017 Plan equal to (i) 96,993,064 shares of Class A common stock reserved for future issuance pursuant to outstanding stock options and unvested RSUs under the 2014 Plan, (ii) 37,228,865 shares of Class A common stock issuable on conversion of Class B common stock underlying stock options and unvested RSUs outstanding under the 2012 Plan, (iii) 17,858,235 shares of Class A common stock that were reserved for issuance under the 2014 Plan as of the date the 2017 Plan became effective, (iv) 11,004,580 shares of Class A common stock issuable on conversion of Class B common stock that were reserved for issuance under the 2012 Plan as of the date the 2017 Plan became effective, and (v) a maximum of 86,737,997 shares of Class A common stock that will be added pursuant to the following sentence. With respect to each share that returns to the 2017 Plan pursuant to (i) and (ii) of the prior sentence that was associated with an award that was outstanding under the 2014 Plan and 2012 Plan as of October 31, 2016, an additional share of Class A common stock will be added to the share reserve of the 2017 Plan, up to a maximum of 86,737,997 shares. The number of shares reserved for issuance under the 2017 Plan will increase automatically on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 5.0% of the total number of shares of our capital stock outstanding on December 31st of the immediately preceding calendar year, and (ii) a number determined by our board of directors. The maximum term for stock options granted under the 2017 Plan may not exceed ten years from the date of grant. The 2017 Plan will terminate ten years from the date our board of directors approved the plan, unless it is terminated earlier by our board of directors.

**2017 Employee Stock Purchase Plan**

In January 2017, our board of directors adopted the 2017 Employee Stock Purchase Plan ("2017 ESPP"). Our stockholders approved the 2017 ESPP in February 2017. The 2017 ESPP became effective in connection with the IPO. A total of 16,484,690 shares of Class A common stock were initially reserved for issuance under the 2017 ESPP. No shares of our Class A common stock have been issued or offered under the 2017 ESPP. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (ii) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (i) and (ii).

**Restricted Stock Units and Restricted Stock Awards**

The following table summarizes the RSU and RSA activity during the year ended December 31, 2022:

|  | Class A Number of Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
|  | (in thousands, except per share data) | | |
| Unvested at December 31, 2021 | 86,180 | $ | 26.07 |
| Granted | 134,446 | $ | 15.17 |
| Vested | (62,349) | $ | 19.36 |
| Forfeited | (25,885) | $ | 25.46 |
| Unvested at December 31, 2022 | 132,392 | $ | 18.28 |

The total fair value of RSUs and RSAs vested during the years ended December 31, 2022, 2021, and 2020 was $1.2 billion, $3.6 billion, and $1.7 billion, respectively.

Total unrecognized compensation cost related to outstanding RSUs and RSAs was $2.0 billion as of December 31, 2022 and is expected to be recognized over a weighted-average period of 1.8 years.

**Stock Options**

The following table summarizes the stock option award activity under the Stock Plans during the year ended December 31, 2022:

| | Class A Number of Shares | Class B Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value[1] |
|---|---|---|---|---|---|
| | | | (in thousands, except per share data) | | |
| Outstanding at December 31, 2021 | 3,676 | 628 | $ 10.59 | 4.19 | $ 157,374 |
| Granted | 119 | — | $ 15.03 | | |
| Exercised | (334) | (58) | $ 10.94 | | |
| Forfeited | (872) | — | $ 14.33 | | |
| Outstanding at December 31, 2022 | 2,589 | 570 | $ 9.68 | 4.05 | $ 9,669 |
| Exercisable at December 31, 2022 | 2,463 | 570 | $ 9.47 | 3.83 | $ 9,662 |
| Vested and expected to vest at December 31, 2022 | 2,587 | 570 | $ 9.68 | 4.05 | $ 9,669 |

(1)    The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying stock option awards and the closing market price of our Class A common stock as of December 31, 2022 and December 31, 2021, respectively.

The weighted-average fair value of stock options granted during the years ended December 31, 2022 and 2021 was $8.41 and $36.17 per share, respectively. The expense is estimated based on the option's fair value as calculated by the Black-Scholes option pricing model. Stock-based compensation expense for stock options was not material in the years ended December 31, 2022, 2021, and 2020.

Total unrecognized compensation cost related to unvested stock options was $0.8 million as of December 31, 2022 and is expected to be recognized over a weighted-average period of 1.2 years.

The total grant date fair value of stock options that vested in the years ended December 31, 2022, 2021, and 2020 was $3.2 million, $7.7 million, and $11.1 million, respectively. The intrinsic value of stock options exercised in the years ended December 31, 2022, 2021, and 2020 was $5.9 million, $69.4 million, and $75.5 million, respectively.

**Stock-Based Compensation Expense**

Total stock-based compensation expense by function was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| | (in thousands) | | |
| Cost of revenue | $ 12,288 | $ 17,221 | $ 9,367 |
| Research and development | 970,746 | 740,130 | 533,272 |
| Sales and marketing | 203,092 | 164,241 | 108,270 |
| General and administrative | 201,661 | 170,543 | 119,273 |
| Total | $ 1,387,787 | $ 1,092,135 | $ 770,182 |

93

**Stock Repurchases**

In October 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the fourth quarter of 2022, during which we repurchased, and subsequently retired, 53.9 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases.

In July 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the third quarter of 2022, during which we repurchased 51.3 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases. These shares are recorded as treasury stock on our consolidated balance sheets and remain available for re-issuance.

## 5. Business Acquisitions and Divestitures

### 2022 Acquisitions

In 2022, we completed acquisitions to enhance our existing platform, technology, and workforce. The aggregate purchase consideration was $120.5 million, which included $17.7 million in cash, $44.0 million in shares of our Class A common stock, and $58.8 million recorded in other liabilities on our consolidated balance sheets. Of the aggregate purchase consideration, $69.3 million was allocated to goodwill and the remainder primarily to identifiable intangible assets. The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $101.7 million is deductible for tax purposes.

### 2021 Acquisitions

*Wave Optics*

In May 2021, we acquired Wave Optics Limited ("Wave Optics"), a display technology company that supplies light engines and diffractive waveguides for augmented reality displays. The total consideration was $541.8 million, of which $510.4 million represented purchase consideration and primarily consisted of 4.7 million shares of our Class A common stock with a fair value of $252.0 million, cash of $13.7 million, and a $238.4 million payable due no later than May 2023 in either cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election. The remaining $31.4 million of total consideration transferred represented compensation for future employment services.

The allocation of the total purchase consideration for this acquisition was as follows:

|  | Total |
| --- | --- |
|  | (in thousands) |
| Trademarks | $ 20,584 |
| Technology | 77,118 |
| Customer relationships | 32,708 |
| Goodwill | 370,236 |
| Net deferred tax liability | (3,313) |
| Other assets acquired and liabilities assumed, net | 13,111 |
| Total | $ 510,444 |

The goodwill amount represents synergies expected to be realized from the business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Fit Analytics*

In March 2021, we acquired Fit Analytics GmbH ("Fit Analytics"), a sizing technology company that powers solutions for retailers and brands, to grow our e-commerce and shopping offerings. The purchase consideration for Fit Analytics was $124.4 million, which primarily represented current and future cash consideration payments.

The allocation of the total purchase consideration for this acquisition was as follows:

| | Total |
|---|---|
| | (in thousands) |
| Trademarks | $ 800 |
| Technology | 17,000 |
| Customer relationships | 17,000 |
| Goodwill | 88,132 |
| Net deferred tax liability | (5,643) |
| Other assets acquired and liabilities assumed, net | 7,160 |
| Total | $ 124,449 |

The goodwill amount represents synergies expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Other 2021 Acquisitions*

For the year ended December 31, 2021, we completed other acquisitions to enhance our existing platform, technology, and workforce. The aggregate purchase consideration was $266.1 million, which included $139.5 million in cash, $93.7 million in shares of our Class A common stock, and $32.9 million recorded in other liabilities on our consolidated balance sheets.

The aggregate allocation of purchase consideration was as follows:

| | Total |
|---|---|
| | (in thousands) |
| Technology | $ 64,150 |
| Customer relationships | 4,000 |
| Goodwill | 203,482 |
| Net deferred tax liability | (11,871) |
| Other assets acquired and liabilities assumed, net | 6,325 |
| Total | $ 266,086 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $8.2 million is deductible for tax purposes.

## 2020 Acquisitions

For the year ended December 31, 2020, we completed acquisitions to enhance our existing platform, technology, and workforce. The aggregate allocation of acquisition date fair value was as follows:

| | Total |
|---|---|
| | (in thousands) |
| Technology | $ 46,112 |
| Goodwill | 162,747 |
| Net deferred tax liability | (5,741) |
| Other assets acquired and liabilities assumed, net | 1,392 |
| Total | $ 204,510 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $49.6 million is deductible for tax purposes.

*Additional Information on 2022, 2021, and 2020 Acquisitions*

The operating results of the above acquisitions were included in the results of our operations from the acquisition date and were not material to our consolidated revenue or consolidated operating loss. In addition, unaudited pro forma results of operations assuming the above acquisitions had taken place at the beginning of each period are not provided because the historical operating results of the acquired entities were not material and pro forma results would not be materially different from reported results for the periods presented.

## 6. Goodwill and Intangible Assets

The changes in the carrying amount of goodwill for the years ended December 31, 2022 and 2021 were as follows:

|  | Goodwill |
|---|---|
|  | (in thousands) |
| Balance as of December 31, 2020 | $ 939,259 |
| Goodwill acquired | 661,850 |
| Foreign currency translation | (12,657) |
| Balance as of December 31, 2021 | $ 1,588,452 |
| Goodwill acquired | 69,291 |
| Foreign currency translation | (11,623) |
| Balance as of December 31, 2022 | $ 1,646,120 |

Intangible assets consisted of the following:

|  | December 31, 2022 | | | |
|---|---|---|---|---|
|  | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
|  | (in thousands, except years) | | | |
| Domain names | 4.0 | $ 954 | $ (690) | $ 264 |
| Trademarks | 1.2 | 800 | (478) | 322 |
| Technology | 3.1 | 340,375 | (178,427) | 161,948 |
| Customer relationships | 5.7 | 21,000 | (6,641) | 14,359 |
| Patents | 9.1 | 39,373 | (14,912) | 24,461 |
| Other | 1.0 | 6,000 | (2,874) | 3,126 |
|  |  | $ 408,502 | $ (204,022) | $ 204,480 |

96

| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
|---|---|---|---|---|
| | | | **December 31, 2021** | |
| | | (in thousands, except years) | | |
| Domain names | 4.6 | $ 967 | $ (365) | $ 602 |
| Trademarks | 4.3 | 21,384 | (2,613) | 18,771 |
| Technology | 3.6 | 343,800 | (142,588) | 201,212 |
| Customer relationships | 5.1 | 53,709 | (6,332) | 47,377 |
| Patents | 4.0 | 21,195 | (11,503) | 9,692 |
| | | $ 441,055 | $ (163,401) | $ 277,654 |

Amortization of intangible assets for the years ended December 31, 2022, 2021, and 2020 was $132.3 million, $63.2 million, and $33.5 million, respectively. In 2022, we revised the useful lives of certain customer relationships, trademarks, domain names, and technology, which resulted in a $49.3 million increase to amortization expense for the year ended December 31, 2022.

As of December 31, 2022, the estimated intangible asset amortization expense for the next five years and thereafter is as follows:

| | Estimated Amortization |
|---|---|
| | (in thousands) |
| Year ending December 31, | |
| 2023 | $ 70,126 |
| 2024 | 57,181 |
| 2025 | 41,106 |
| 2026 | 16,677 |
| 2027 | 7,297 |
| Thereafter | 12,093 |
| Total | $ 204,480 |

## 7. Long-Term Debt

### Convertible Notes

*2028 Notes*

In February 2022, we entered into a purchase agreement with certain counterparties for the sale of an aggregate of $1.50 billion principal amount of convertible senior notes due in 2028 (the "2028 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). The 2028 Notes consisted of a $1.30 billion initial placement and an over-allotment option that provided the initial purchasers of the 2028 Notes with the option to purchase an additional $200.0 million aggregate principal amount of the 2028 Notes, which was fully exercised. The 2028 Notes were issued pursuant to an indenture dated February 11, 2022.The net proceeds from the issuance of the 2028 Notes were $1.31 billion, net of debt issuance costs and cash used to purchase the capped call transactions ("2028 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2028 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on September 1, 2022 at a rate of 0.125% per year. The 2028 Notes mature on March 1, 2028 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2028 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 17.7494 shares of Class A common

stock per $1,000 principal amount of 2028 Notes, which is equivalent to an initial conversion price of approximately $56.34 per share of our Class A common stock. The conversion rate is subject to customary adjustments for certain events as described in the indenture governing the 2028 Notes.

We may redeem for cash all or any portion of the 2028 Notes, at our option, on or after March 5, 2025 if the last reported sale price of our Class A common stock has been at least 130% of the conversion price then in effect for at least 20 trading days at a redemption price equal to 100% of the principal amount of the 2028 Notes to be redeemed, plus accrued and unpaid interest, if any.

Holders of the 2028 Notes may convert all or a portion of their 2028 Notes at their option prior to December 1, 2027, in multiples of $1,000 principal amounts, only under the following circumstances:

- if the last reported sale price of our Class A common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the preceding calendar quarter is greater than or equal to 130% of the applicable conversion price of the 2028 Notes on each such trading day;
- during the five business day period after any ten consecutive trading day period in which the trading price per $1,000 principal amount of the 2028 Notes for each day of that ten consecutive trading day period was less than 98% of the product of the last reported sale price of our Class A common stock and the applicable conversion rate of the 2028 Notes on such trading day;
- on a notice of redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date, in which case we may be required to increase the conversion rate for the 2028 Notes so surrendered for conversion in connection with such redemption notice; or
- on the occurrence of specified corporate events.

On or after December 1, 2027, the 2028 Notes are convertible at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

Holders of the 2028 Notes who convert the 2028 Notes in connection with a make-whole fundamental change, as defined in the indenture governing the 2028 Notes, or in connection with a redemption are entitled to an increase in the conversion rate. Additionally, in the event of a fundamental change, holders of the 2028 Notes may require us to repurchase all or a portion of the 2028 Notes at a price equal to 100% of the principal amount of 2028 Notes, plus any accrued and unpaid interest, if any.

We accounted for the issuance of the 2028 Notes as a single liability measured at its amortized cost, as no other embedded features require bifurcation and recognition as derivatives.

*2027 Notes*

In April 2021, we entered into a purchase agreement for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027 (the "2027 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2027 Notes were $1.05 billion, net of debt issuance costs and cash used to purchase the capped call transactions (the "2027 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2027 Notes are unsecured and unsubordinated obligations which do not bear regular interest and for which the principal balance will not accrete. The 2027 Notes will mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2027 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 11.2042 shares of Class A common stock per $1,000 principal amount of 2027 Notes, which is equivalent to an initial conversion price of approximately $89.25 per share of our Class A common stock. We may redeem for cash all or portions of the 2027 Notes, at our option, on or after May 5, 2024 based on certain circumstances.

*2025 Notes*

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of convertible senior notes due in 2025 (the "2025 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt

issuance costs and cash used to purchase the capped call transactions (the "2025 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2025 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on November 1, 2020 at a rate of 0.25% per year. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2025 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 46.1233 shares of Class A common stock per $1,000 principal amount of 2025 Notes, which is equivalent to an initial conversion price of approximately $21.68 per share of our Class A common stock. We may redeem for cash all or portions of the 2025 Notes, at our option, on or after May 6, 2023 based on certain circumstances.

*2026 Notes*

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of convertible senior notes due in 2026 (the "2026 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and cash used to purchase the capped call transactions ("2026 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2026 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on February 1, 2020 at a rate of 0.75% per year. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with the terms prior to such date.

The 2026 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 43.8481 shares of Class A common stock per $1,000 principal amount of 2026 Notes, which is equivalent to an initial conversion price of approximately $22.81 per share of our Class A common stock. We may redeem for cash all or portions of the 2026 Notes, at our option, on or after August 6, 2023 based on certain circumstances.

*Exchange Transactions*

In 2021, we entered into various exchange agreements (collectively, the "Exchange Agreements") with certain holders of the 2025 Notes and the 2026 Notes pursuant to which we exchanged approximately $715.9 million principal amount of the 2025 Notes and approximately $426.5 million principal amount of the 2026 Notes for aggregate consideration of approximately 52.4 million shares of Class A common stock (the "Exchange Shares"). The Exchange Shares included an additional 0.7 million shares of our Class A common stock not provided for under the original conversion terms of the 2025 Notes and the 2026 Notes to induce the holders to agree to the exchange.

The Exchange Agreements were accounted for as an induced conversion with the fair value of 0.7 million Exchange Shares, less accrued interest, recognized as an inducement expense in other income (expense), net in our consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Inducement expense recorded for the year ended December 31, 2021 was $41.5 million. The common stock consideration issued under the original terms of the 2025 Notes and 2026 Notes was accounted for under the general conversion accounting guidance with the net carrying amount of $1,132.6 million recorded in additional paid-in-capital and as a non-cash transaction excluded from cash activities on the consolidated statements of cash flows.

The Convertible Notes consisted of the following:

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | |
| | Principal | Unamortized Debt Issuance Costs | Net Carrying Amount | Principal | Unamortized Debt Issuance Costs | Net Carrying Amount |
| | (in thousands) | | | | | |
| 2025 Notes | $ 284,105 | $ (1,521) | $ 282,584 | $ 284,105 | $ (2,168) | $ 281,937 |
| 2026 Notes | 838,482 | (4,698) | 833,784 | 838,493 | (5,982) | 832,511 |
| 2027 Notes | 1,150,000 | (9,239) | 1,140,761 | 1,150,000 | (11,361) | 1,138,639 |
| 2028 Notes | 1,500,000 | (14,609) | 1,485,391 | — | — | — |
| Total | $ 3,772,587 | $ (30,067) | $ 3,742,520 | $ 2,272,598 | $ (19,511) | $ 2,253,087 |

As of December 31, 2022, the debt issuance costs on the 2025 Notes, 2026 Notes, 2027 Notes, and 2028 Notes will be amortized over the remaining period of approximately 2.3 years, 3.6 years, 4.3 years and 5.2 years, respectively.

Interest expense related to the amortization of debt issuance costs was $6.5 million and $4.3 million for the years ended December 31, 2022 and 2021, respectively. Interest expense related to the amortization of debt discount and issuance costs was $81.4 million for the year ended December 31, 2020. Contractual interest expense was $8.7 million, $8.9 million, and $11.2 million for the years ended December 31, 2022, 2021, and 2020, respectively.

As of December 31, 2022, the if-converted value of the Convertible Notes did not exceed the principal amount. The sale price for conversion was not satisfied as of December 31, 2022 for the Convertible Notes, and as a result, the Convertible Notes will not be eligible for optional conversion during the first quarter of 2023. No sinking fund is provided for the Convertible Notes, which means that we are not required to redeem or retire them periodically.

*Capped Call Transactions*

In connection with the pricing of the 2025 Notes, the 2026 Notes, the 2027 Notes, and the 2028 Notes, we entered into the 2025 Capped Call Transactions, the 2026 Capped Call Transactions, the 2027 Capped Call Transactions, and the 2028 Capped Call Transactions (collectively, the "Capped Call Transactions"), respectively, with certain counterparties at a net cost of $100.0 million, $102.1 million, $86.8 million, and $177.0 million, respectively. The cap price of the 2025 Capped Call Transactions, the 2026 Capped Call Transactions, the 2027 Capped Call Transactions, and the 2028 Capped Call Transactions is initially $32.12, $32.58, $121.02, and $93.90 per share of our Class A common stock, respectively. All are subject to certain adjustments under the terms of the Capped Call Transactions. Conditions that cause adjustments to the initial strike price of the Capped Call Transactions mirror conditions that result in corresponding adjustments for the Convertible Notes.

The Capped Call Transactions are intended to reduce potential dilution to holders of our Class A common stock beyond the conversion prices up to the cap prices on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount, as the case may be, with such reduction or offset subject to a cap. The cost of the Capped Call Transactions was recorded as a reduction of our additional paid-in capital in our consolidated balance sheets. The Capped Call Transactions will not be remeasured as long as they continue to meet the conditions for equity classification. As of December 31, 2022, the Capped Call Transactions were out-of-the-money.

**Credit Facility**

In May 2022, we entered into a five-year senior unsecured revolving credit facility ("Credit Facility") with certain lenders that allows us to borrow up to $1.05 billion to fund working capital and general corporate-purpose expenditures. The prior revolving credit facility entered into in July 2016 (as amended) was terminated concurrently with the entry into the Credit Facility. The prior credit facility was never drawn upon and, as of December 31, 2021, there were no amounts outstanding on the prior credit facility. On the Credit Facility, loans bear interest, at our option, at a rate equal to (i) a term secured overnight financing rate ("SOFR") plus 0.75% or the base rate, if selected by us, for loans made in U.S. dollars, (ii) the Sterling overnight index average plus 0.7826% for loans made in Sterling, and (iii) foreign indices as stated in the credit agreement plus 0.75% for loans made in other permitted foreign currencies. The base rate is defined as the greatest of (i) the Wall Street Journal prime rate, (ii) the greater of the (a) federal funds rate and (b) the overnight bank funding rate,

Table of Contents

plus 0.50%, and (iii) the applicable SOFR for a period of one month (but not less than zero) plus 1.00. The Credit Facility also contains an annual commitment fee of 0.10% on the daily undrawn balance of the facility. As of December 31, 2022, we had $40.1 million in the form of outstanding standby letters of credit, with no amounts outstanding under the Credit Facility.

## 8. Commitments and Contingencies

### Commitments

We have non-cancelable contractual agreements primarily related to the hosting of our data processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $3.7 billion in commitments as of December 31, 2022, primarily due within 3 years. For additional discussion on leases, see Note 9 to our consolidated financial statements.

### Contingencies

We record a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also disclose material contingencies when we believe a loss is not probable but reasonably possible. Accounting for contingencies requires us to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. Many legal and tax contingencies can take years to be resolved.

*Pending Matters*

In November 2021, we and certain of our officers and directors, were named as defendants in a securities class actions purportedly brought on behalf of purchasers of our Class A common stock, alleging that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. Management believes these lawsuits are without merit and intends to vigorously defend them. Based on the preliminary nature of the proceedings in this case, the outcome of this matter remains uncertain.

The outcomes of our legal proceedings are inherently unpredictable, subject to significant uncertainties, and could be material to our financial condition, results of operations, and cash flows for a particular period. For the pending matters described above, it is not possible to estimate the reasonably possible loss or range of loss.

We are subject to various other legal proceedings and claims in the ordinary course of business, including certain patent, trademark, privacy, regulatory, and employment matters. Although occasional adverse decisions or settlements may occur, we do not believe that the final disposition of any of our other pending matters will seriously harm our business, financial condition, results of operations, and cash flows.

### Indemnifications

In the ordinary course of business, we may provide indemnifications of varying scope and terms to customers, vendors, lessors, investors, directors, officers, employees, and other parties with respect to certain matters. Indemnification may include losses from our breach of such agreements, services we provide, or third party intellectual property infringement claims. These indemnifications may survive termination of the underlying agreement and the maximum potential amount of future indemnification payments may not be subject to a cap. We have not incurred material costs to defend lawsuits or settle claims related to these indemnifications as of December 31, 2022. We believe the fair value of these liabilities is immaterial and accordingly have no liabilities recorded for these agreements at December 31, 2022.

**9. Leases**

The components of lease cost were as follows:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | | (in thousands) | |
| Operating lease expense | $ 109,506 | $ 69,831 | $ 60,450 |
| Sublease income | (1,086) | (2,478) | (2,815) |
| Total net lease costs | $ 108,420 | $ 67,353 | $ 57,635 |

The weighted-average remaining lease term (in years) and discount rate related to the operating leases were as follows:

| | For the Year Ended December 31, | |
| | 2022 | 2021 |
|---|---|---|
| Weighted-average remaining lease term | 6.8 | 6.6 |
| Weighted-average discount rate | 5.0 % | 5.0 % |

The maturities of our operating lease liabilities as of December 31, 2022, were as follows:

| | Operating Leases |
| | (in thousands) |
|---|---|
| Year ending December 31, | |
| 2023 | $ 66,698 |
| 2024 | 102,440 |
| 2025 | 98,524 |
| 2026 | 51,717 |
| 2027 | 36,843 |
| Thereafter | 166,883 |
| Total lease payments | $ 523,105 |
| Less: Imputed interest | (90,349) |
| Present value of lease liabilities | $ 432,756 |

As of December 31, 2022, we had additional operating leases that have not yet commenced for facilities with lease obligations of $31.2 million. These operating leases will commence in 2023 with lease terms of approximately 7 years to 11 years.

Cash payments included in the measurement of our operating lease liabilities were $94.9 million, $73.9 million, and $73.3 million for the years ended December 31, 2022, 2021, and 2020, respectively.

Lease liabilities arising from obtaining operating lease right-of-use assets were $147.4 million, $99.3 million, and $36.2 million for the years ended December 31, 2022, 2021, and 2020, respectively.

**10. Strategic Investments**

We hold strategic investments primarily in privately held companies with a carrying value of $252.3 million and $262.7 million as of December 31, 2022 and December 31, 2021, respectively, which consist primarily of equity securities, and to a lesser extent, debt securities. These strategic investments are primarily recorded at fair value on a non-recurring basis. The estimation of fair value for these privately held strategic investments requires the use of significant unobservable inputs, such as the issuance of new equity by the company, and as a result, we deem these assets as Level 3 financial instruments within the fair value measurement framework.

Table of Contents

The components of gains and losses on strategic investments were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| | (in thousands) | | |
| Unrealized gains (losses) on investments in privately held companies, net | $ 19,946 | $ 145,010 | $ 42,363 |
| Realized gains (losses) on investments in privately held companies, net | 45,935 | 27,820 | — |

Unrealized and realized gains on all strategic investments are included within other income (expense), net on the consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Strategic investments are included within other assets on the consolidated balance sheets.

All strategic investments are reviewed periodically for impairment. Impairment expense was not material for the years ended December 31, 2022 and 2021, respectively. Impairment expense for the year ended December 31, 2020 was $29.5 million.

## 11. Fair Value Measurements

Assets and liabilities measured at fair value are classified into the following categories:

- Level 1: Quoted market prices in active markets for identical assets or liabilities.

- Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

- Level 3: Unobservable inputs reflecting the reporting entity's own assumptions or external inputs from inactive markets.

We classify our cash equivalents and marketable securities within Level 1 or Level 2 because we use quoted market prices or alternative pricing sources and models utilizing market observable inputs to determine their fair value.

The following table sets forth our financial assets as of December 31, 2022 and 2021 that are measured at fair value on a recurring basis during the period:

| | December 31, 2022 | | | |
|---|---|---|---|---|
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| | (in thousands) | | | |
| Cash | $ 1,325,946 | $ — | $ — | $ 1,325,946 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,630,224 | 109 | (9,484) | 1,620,849 |
| U.S. government agency securities | 175,269 | 19 | (188) | 175,100 |
| Publicly traded equity securities [1] | 102,189 | 20,859 | (31,548) | 91,500 |
| Level 2 securities: | | | | |
| Corporate debt securities | 309,942 | 32 | (1,462) | 308,512 |
| Commercial paper | 290,589 | — | — | 290,589 |
| Certificates of deposit | 157,965 | — | (1) | 157,964 |
| Total | $ 3,992,124 | $ 21,019 | $ (42,683) | $ 3,970,460 |

(1)     During the year ended December 31, 2022, we reclassified strategic investments from Level 3 to Level 1 at their fair value using the beginning-of-period approach, following the commencement of public market trading of the investments during the quarter (a portion of which was subject to short-term lock-up restrictions as of December 31, 2022).

| | December 31, 2021 | | | |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| | | | (in thousands) | |
| Cash | $ 1,966,966 | $ — | $ — | $ 1,966,966 |
| Level 1 securities: | | | | |
| U.S. government securities | 811,092 | 1 | (1,454) | 809,639 |
| U.S. government agency securities | 77,409 | 1 | (8) | 77,402 |
| Publicly traded equity securities | 71,139 | 122,064 | — | 193,203 |
| Level 2 securities: | | | | |
| Corporate debt securities | 143,124 | — | (207) | 142,917 |
| Commercial paper | 422,328 | — | (1) | 422,327 |
| Certificates of deposit | 80,431 | — | — | 80,431 |
| Total | $ 3,572,489 | $ 122,066 | $ (1,670) | $ 3,692,885 |

We held investments in publicly traded companies with an aggregate carrying value of $91.5 million and $193.2 million as of December 31, 2022 and 2021, respectively, primarily recorded as marketable securities. We recorded total losses of $101.3 million and unrealized gains of $122.1 million related to these investments for the years ended December 31, 2022 and 2021, respectively, within other income (expense), net on our consolidated statements of operations. Unrealized losses related to publicly traded equity securities still held as of December 31, 2022 were $79.2 million for the year ended December 31, 2022.

Gross unrealized losses on marketable debt securities were not material as of December 31, 2022 and 2021, respectively. As of December 31, 2022, we considered any decreases in fair value on our marketable debt securities to be driven by factors other than credit risk, including market risk. As of December 31, 2022, $357.5 million of our total $2.5 billion in marketable debt securities have contractual maturities between one and five years. All other marketable debt securities have contractual maturities less than one year.

We carry the Convertible Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets and present the fair value for disclosure purposes only. As of December 31, 2022, the fair value of the 2025 Notes, the 2026 Notes, the 2027 Notes, and the 2028 Notes was $257.0 million, $711.9 million, $796.2 million, and $1.0 billion, respectively. As of December 31, 2021, the fair value of the 2025 Notes, the 2026 Notes, and the 2027 Notes was $650.1 million, $1.9 billion, and $1.1 billion, respectively. The estimated fair value of the Convertible Notes, which are classified as Level 2 financial instruments, was determined based on the estimated or actual bid prices of the Convertible Notes in an over-the-counter market on the last business day of the period.

## 12. Income Taxes

The domestic and foreign components of pre-tax loss were as follows:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| | | (in thousands) | |
| Domestic[1] | $ (538,311) | $ 364,989 | $ (320,757) |
| Foreign[1] | (862,386) | (839,360) | (605,428) |
| Loss before income taxes | $ (1,400,697) | $ (474,371) | $ (926,185) |

(1)   Includes the impact of intercompany charges to foreign affiliates for management fees and research and development cost sharing, inclusive of stock-based compensation.

The components of our income tax (benefit) expense were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| | (in thousands) | | |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 10,704 | 919 | 1,035 |
| Foreign | 22,404 | 22,078 | 23,945 |
| Total current income tax expense (benefit) | 33,108 | 22,997 | 24,980 |
| Deferred: | | | |
| Federal | 1,212 | (6,295) | (1,720) |
| State | 837 | (445) | (414) |
| Foreign | (6,201) | (2,673) | (4,192) |
| Total deferred income tax expense (benefit) | (4,152) | (9,413) | (6,326) |
| Income tax expense (benefit) | $ 28,956 | $ 13,584 | $ 18,654 |

The following is a reconciliation of the statutory federal income tax rate to our effective tax rate:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Tax benefit (expense) computed at the federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| State tax benefit (expense), net of federal benefit[1] | 2.9 | 31.5 | 8.3 |
| Change in valuation allowance | (32.0) | (246.3) | (58.9) |
| Differences between U.S. and foreign tax rates on foreign income | 2.5 | 3.9 | (1.4) |
| Stock-based compensation benefit | (0.1) | 119.3 | 17.8 |
| U.S. federal research & development credit benefit | 5.0 | 36.7 | 8.4 |
| U.K. corporate rate increase | — | 39.8 | 4.3 |
| Acquisitions and divestitures | (0.7) | (8.0) | (0.5) |
| Other benefits (expenses) | (0.7) | (0.8) | (1.0) |
| Total income tax benefit (expense) | (2.1)% | (2.9)% | (2.0)% |

(1)      Inclusive of state research and development credits.

105

The significant components of net deferred tax balances were as follows:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| | (in thousands) | | | |
| Deferred tax assets: | | | | |
| Accrued expenses | $ | 37,731 | $ | 30,169 |
| Intangible assets | | 177,762 | | 183,441 |
| IRC 174 Capitalized R&D[1] | | 265,485 | | — |
| Stock-based compensation | | 102,364 | | 61,885 |
| Loss carryforwards | | 2,651,812 | | 2,631,230 |
| Tax credit carryforwards | | 824,220 | | 715,844 |
| Lease liability | | 98,668 | | 93,312 |
| Other | | 20,154 | | 29,572 |
| Total deferred tax assets | $ | 4,178,196 | $ | 3,745,453 |
| Deferred tax liabilities: | | | | |
| Right-of-use asset | | (75,212) | | (75,782) |
| Investments | | (30,962) | | (66,792) |
| Other | | (17,309) | | (2,549) |
| Total deferred tax liabilities | $ | (123,483) | $ | (145,123) |
| Total net deferred tax assets before valuation allowance | | 4,054,713 | | 3,600,330 |
| Valuation allowance | | (4,060,943) | | (3,611,242) |
| Net deferred taxes | $ | (6,230) | $ | (10,912) |

(1)    An offsetting reduction is included in loss carryforwards as of December 31, 2022 as U.S. federal and state loss carryforwards were utilized to offset the increase in federal and state tax liability resulting from capitalization under Section 174 of the Internal Revenue Code.

On July 22, 2020 the U.K. Finance Act 2020 was enacted, increasing the U.K. tax rate from 17% to 19% effective April 1, 2020. On June 10, 2021, the U.K. Finance Act 2021 was enacted, further increasing the U.K. tax rate from 19% to 25% effective April 1, 2023. These changes to the U.K. tax rate resulted in an increase to our U.K. net deferred tax assets (before valuation allowance) of $188.9 million and $39.7 million for the period ending December 31, 2021 and 2020, respectively, both of which were fully offset by an increase in our valuation allowance.

As of December 31, 2022, we had an immaterial amount of unremitted earnings related to certain foreign subsidiaries. We intend to continue to reinvest these foreign earnings indefinitely and do not expect to incur any significant taxes related to such amounts.

As of December 31, 2022, we had accumulated U.S. federal and state net operating loss carryforwards of $7.4 billion and $4.6 billion, respectively. Of the $7.4 billion of federal net operating loss carryforwards, $1.2 billion was generated before January 1, 2018 and is subject to a 20-year carryforward period. The remaining $6.2 billion can be carried forward indefinitely but is subject to an 80% taxable income limitation. The pre-2018 federal and certain significant state net operating loss carryforwards will begin to expire in 2037 and 2031, respectively. As of December 31, 2022, we had $3.6 billion of U.K. net operating loss carryforwards that can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income. As of December 31, 2022, we had accumulated U.S. federal and state research tax credits of $691.5 million and $430.7 million, respectively. The U.S. federal research tax credits will begin to expire in 2032. The U.S. state research tax credits do not expire.

We recognize valuation allowances on deferred tax assets if it is more likely than not that some or all of the deferred tax assets will not be realized. We had valuation allowances against net deferred tax assets of $4.1 billion and $3.6 billion as of December 31, 2022 and 2021, respectively. In 2022, the increase in the valuation allowance was primarily attributable to a net increase in our deferred tax assets resulting from the loss from operations.

**Uncertain Tax Positions**

The following table summarizes the activity related to our gross unrecognized tax benefits during the years ended December 31, 2022 and 2021:

| | Year Ended December 31, | |
| | 2022 | 2021 |
|---|---|---|
| | (in thousands) | |
| Beginning balance of unrecognized tax benefits | $ 469,573 | $ 344,971 |
| Additions for current year tax positions | 47,366 | 119,938 |
| Additions for prior year tax positions | 115 | 180 |
| Reductions for prior year tax positions | (3,569) | (996) |
| Changes due to lapse of statute of limitations | (1,887) | (2,077) |
| Changes due to foreign currency translation adjustments | (929) | (357) |
| U.K. corporate rate increase | — | 7,914 |
| Ending balance of unrecognized tax benefits (excluding interest and penalties) | $ 510,669 | $ 469,573 |
| Interest and penalties associated with unrecognized tax benefits | 385 | 124 |
| Ending balance of unrecognized tax benefits (including interest and penalties) | $ 511,054 | $ 469,697 |

The total amount of gross unrecognized tax benefits, including related interest and penalties, was $511.1 million and $469.7 million as of December 31, 2022 and 2021, respectively.

Substantially all of the unrecognized tax benefit was recorded as a reduction in our gross deferred tax assets, offset by a corresponding reduction in our valuation allowance. We have net unrecognized tax benefits of $21.7 million and $15.9 million included in other liabilities on our consolidated balance sheet as of December 31, 2022 and 2021, respectively. Assuming there continues to be a valuation allowance against deferred tax assets in future periods when gross unrecognized tax benefits are realized, this would result in a tax benefit of $21.7 million within our income tax provision at such time.

Our policy is to recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheet. During the year ended December 31, 2022, interest expense recorded related to uncertain tax positions was not material.

The income taxes we pay are subject to review by taxing jurisdictions globally. Our estimate of the potential outcome of any uncertain tax position is subject to management's assessment of relevant risks, facts, and circumstances existing at that time. We believe that our estimate has adequately provided for these matters. However, our future results may include adjustments to estimates in the period the audits are resolved, which may impact our effective tax rate.

Tax years ending on or after December 31, 2012 are subject to examination in the U.S., and tax years ending on or after December 31, 2020 are subject to examination in the U.K. We are currently under examination by the U.S. Internal Revenue Service for the tax year ending December 31, 2018, and by the U.K. tax authorities for the tax year ending December 31, 2020.

107

Table of Contents

**13. Accumulated Other Comprehensive Income (Loss)**

The table below presents the changes in accumulated other comprehensive income (loss) ("AOCI") by component and the reclassifications out of AOCI:

| | Changes in Accumulated Other Comprehensive Income (Loss) by Component | | |
| --- | --- | --- | --- |
| | Marketable Securities | Foreign Currency Translation | Total |
| | (in thousands) | | |
| Balance at December 31, 2021 | $ (1,822) | $ 7,343 | $ 5,521 |
| OCI before reclassifications | (9,289) | (10,188) | (19,477) |
| Amounts reclassified from AOCI [1] | (18) | — | (18) |
| Net current period OCI | (9,307) | (10,188) | (19,495) |
| Balance at December 31, 2022 | $ (11,129) | $ (2,845) | $ (13,974) |

(1) Realized gains and losses on marketable securities are reclassified from AOCI into other income (expense), net in the consolidated statements of operations.

**14. Property and Equipment, Net**

Property and equipment, net, consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in thousands) | |
| Computer hardware and software | $ 62,945 | $ 51,984 |
| Buildings | 21,486 | — |
| Leasehold improvements | 225,647 | 203,124 |
| Furniture and equipment | 100,025 | 78,492 |
| Construction in progress | 80,267 | 44,304 |
| Total | 490,370 | 377,904 |
| Less: accumulated depreciation and amortization | (218,593) | (175,260) |
| Property and equipment, net | $ 271,777 | $ 202,644 |

Depreciation and amortization expense on property and equipment was $69.9 million, $55.9 million, and $53.2 million for the years ended December 31, 2022, 2021, and 2020, respectively.

Noncash property and equipment additions in accounts payable, accrued expenses and other current liabilities were $28.0 million, $14.2 million, and $7.0 million as of December 31, 2022, 2021, and 2020, respectively.

Table of Contents

The following table lists property and equipment, net by geographic area:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| | | (in thousands) | | |
| Property and equipment, net: | | | | |
| United States | $ | 214,857 | $ | 174,826 |
| United Kingdom | | 36,774 | | 15,843 |
| Rest of world [(1)] | | 20,146 | | 11,975 |
| Total property and equipment, net | $ | 271,777 | $ | 202,644 |

(1)      No individual country exceeded 10% of our total property and equipment, net for any period presented.

## 15. Balance Sheet Components

Accrued expenses and other current liabilities at December 31, 2022 and 2021 consisted of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| | | (in thousands) | | |
| Accrued compensation and related expenses | $ | 206,441 | $ | 177,659 |
| Accrued infrastructure costs | | 169,886 | | 168,942 |
| Partner revenue share liability | | 83,395 | | 86,991 |
| Acquisition liability | | 293,332 | | 49,870 |
| Other operating costs | | 75,376 | | 48,635 |
| Deferred revenue | | 50,782 | | 44,473 |
| Other | | 108,128 | | 97,538 |
| Total accrued expenses and other current liabilities | $ | 987,340 | $ | 674,108 |

Other liabilities at December 31, 2022 and 2021 consisted of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| | | (in thousands) | | |
| Acquisition liability | $ | 66,020 | $ | 280,194 |
| Other | | 38,430 | | 35,562 |
| Total other liabilities | $ | 104,450 | $ | 315,756 |

## 16. Employee Benefit Plans

We have a defined contribution 401(k) plan (the "401(k) Plan") for our U.S.-based employees. The 401(k) Plan is available for all full-time employees who meet certain eligibility requirements. Eligible employees may contribute up to 100% of their eligible compensation, but are limited to the maximum annual dollar amount allowable under the Code. We match 100% of each participant's contribution up to a maximum of 3% of the participant's eligible compensation paid during the period, and also match 50% of each participant's contribution between 3% and 5% of the participant's eligible compensation paid during the period. During the years ended December 31, 2022, 2021, and 2020, we recognized expense of $33.6 million, $25.0 million, and $18.4 million, respectively, related to matching contributions.

**17. Related Party Transactions**

In November 2020, we entered into a ground sublease with an entity that is controlled by our CEO that allows us to build and operate a hangar to support our aviation program. This entity subleases the ground to us for $0 and in exchange may utilize a specified percentage of the hangar space. If the entity needs additional space within the hangar, it will pay rent to Snap at a fair market value rate determined at the time this arrangement was entered into. Any space utilized by this entity will be space that is not required for Snap's aviation program. Subject to certain limited exceptions, neither party may terminate this sublease for at least six years. After this period, Snap or this entity may terminate the lease at any time on 24 months' prior written notice. Upon termination of the sublease, this entity will purchase the hangar from Snap at its fair market value on the termination date.

The value of these arrangements is not material to our consolidated financial statements for the current period or for the term of the agreement.

**18. Restructuring**

In the third quarter of 2022, we initiated a strategic reprioritization plan, which included a reduction of our global employee headcount by approximately 20%. We substantially completed the reprioritization plan in the fourth quarter of 2022.

The following table summarizes the restructuring charges (benefits) in our consolidated statements of operations for the year ended December 31, 2022:

| | Severance and Related Charges [1] | | Stock-Based Compensation Expense (Benefit) | | Lease Exit and Related Charges [2] | | Other [3] | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | | |
| Cost of revenue | $ | 2,291 | $ | 709 | $ | — | $ | 17,585 | $ | 20,585 |
| Research and development | | 46,994 | | 29,188 | | — | | 2,733 | | 78,915 |
| Sales and marketing | | 30,565 | | (504) | | — | | 730 | | 30,791 |
| General and administrative | | 17,211 | | 5,111 | | 31,227 | | 5,109 | | 58,658 |
| Total | $ | 97,061 | $ | 34,504 | $ | 31,227 | $ | 26,157 | $ | 188,949 |

(1)   Severance and related charges include cash severance expense and other termination benefits. The majority of cash paid for restructuring in 2022 was related to severance and benefits.

(2)   Lease exit and related charges are non-cash and presented in other cash flows from operating activities in our consolidated statements of cash flows.

(3)   Other includes impairment charges, contract termination charges, and intangible asset amortization.

The liabilities related to the reprioritization plan were immaterial as of December 31, 2022.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

### *Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2022, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in this Annual Report on Form 10-K was (a) reported within the time periods specified by SEC rules and regulations, and (b) communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding any required disclosure.

### *Changes in Internal Control*

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *Limitations on Effectiveness of Controls and Procedures*

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

### *Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2022 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

**Item 9B. Other Information.**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions That Prevent Inspections.**

Not applicable.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

The following table sets forth information for our directors and executive officers, and their ages as of December 31, 2022.

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| Evan Spiegel | 32 | Co-Founder, Chief Executive Officer, and Director |
| Robert Murphy | 34 | Co-Founder, Chief Technology Officer, and Director |
| Derek Andersen | 44 | Chief Financial Officer |
| Jerry Hunter | 58 | Chief Operating Officer |
| Rebecca Morrow | 49 | Chief Accounting Officer |
| Michael O'Sullivan | 57 | General Counsel |
| *Non-Employee Directors* | | |
| Michael Lynton(1)(2) | 63 | Director and Chairperson of the Board |
| Kelly Coffey(3) | 57 | Director |
| Joanna Coles(2) | 60 | Director |
| Liz Jenkins(3) | 45 | Director |
| Stanley Meresman(3) | 76 | Director |
| Scott D. Miller(1)(3) | 70 | Director |
| Poppy Thorpe(1)(3) | 38 | Director |
| Fidel Vargas(2) | 54 | Director |

(1)　Member of the compensation committee.

(2)　Member of the nominating and corporate governance committee.

(3)　Member of the audit committee.

**Executive Officers**

*Evan Spiegel.* Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. Mr. Spiegel has served on the board of directors of KKR & Co., Inc. since October 2021 We believe that Mr. Spiegel is qualified to serve as a member of our board based on the perspective and experience he brings as our co-founder and Chief Executive Officer.

*Robert Murphy.* Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Murphy is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Technology Officer.

*Derek Andersen.* Mr. Andersen has served as Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A from Acadia University, an M.B.A from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

*Jerry Hunter.* Mr. Hunter has served as our Chief Operating Officer since August 2022 and previously served as our Senior Vice President, Engineering from November 2017 to August 2022, and as our Vice President of Core Engineering from October 2016 to November 2017. From August 2010 to October 2016, Mr. Hunter served as Vice

President of Infrastructure at Amazon.com, Inc., and previously as Vice President of Corporate Applications at Amazon.com, Inc. from October 2007 to August 2010. Mr. Hunter holds a B.S. and M.S. in Systems Engineering from the University of Arizona.

*Rebecca Morrow.* Ms. Morrow has served as our Chief Accounting Officer since September 2019. From January 2018 to August 2019, Ms. Morrow served as Chief Accounting Officer at GoDaddy Inc., and previously served as Vice President of Finance and Head of Technical Accounting and Reporting from March 2015 to January 2018. Prior to that, Ms. Morrow served in various roles at Deloitte & Touche LLP, most recently serving as Managing Director in the Advisory Services practice from August 2013 to March 2015, and as Senior Manager in the Advisory Services practice from October 2008 to August 2013. Ms. Morrow holds a B.S. degree in Business and Accounting from the University of Idaho and a Masters of Accountancy degree from the David Eccles School of Business of the University of Utah.

*Michael O'Sullivan.* Mr. O'Sullivan has served as our General Counsel since July 2017. From 1992 to July 2017, Mr. O'Sullivan was a lawyer in private practice. He served since 1996 as a lawyer at the law firm of Munger, Tolles & Olson LLP in Los Angeles, California, where he focused his practice on advising companies, their boards of directors, and founders on corporate transactions, governance matters, and significant disputes. Mr. O'Sullivan holds a J.D. from University of Southern California's Gould School of Law and a B.A. from University of Pennsylvania.

**Non-Employee Directors**

*Michael Lynton.* Mr. Lynton has served on our board of directors since April 2013 and has been Chairperson of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton has served as a member of the board of directors of Ares Management Corp, Warner Music Group Corp., Schrodinger, Inc., and The Boston Beer Company. Mr. Lynton also served as a member of the board of directors of Pandora Media, Inc. from August 2017 until February 2019 and Pearson plc, from January 2018 to April 2021. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School. We believe that Mr. Lynton is qualified to serve as a member of our board of directors and Chairperson due to his extensive leadership experience.

*Kelly Coffey.* Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey has served as Chief Executive Officer at City National Bank, a subsidiary of the Royal Bank of Canada (RBC), since February 2019. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College. We believe that Ms. Coffey is qualified to serve as a member of our board of directors due to her extensive leadership experience.

*Joanna Coles.* Ms. Coles has served on our board of directors since December 2015. Ms. Coles served as Chairperson and Chief Executive Officer of Northern Star Acquisition Corp. since July 2020, until its merger with Bark, Inc. (formerly Barkbox Inc.) in June 2021. Ms. Coles has served as Chairperson and Chief Executive Officer of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV since November 2020. Prior to joining the Northern Star entities, Ms. Coles served as Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Bark, Inc., Sonos, Inc., and is on the board of Women Entrepreneurs New York City, an initiative to encourage female entrepreneurship, with a focus on underserved communities. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia. We believe that Ms. Coles is qualified to serve as a member of our board of directors due to her extensive experience working with content providers and advertisers.

*Liz Jenkins.* Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) since January 2021, and served as Chief Financial Officer at Hello Sunshine from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October

2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves as Chair of the board of GLAAD. Ms. Jenkins holds an MBA from The Wharton School at the University of Pennsylvania and a BA in Economics from Stanford University. We believe that Ms. Jenkins is qualified to serve as a member of our board of directors and chair of our audit committee due to her experience working with digital and technology companies and her financial and accounting expertise from her prior experience as Chief Financial Officer of Hello Sunshine.

*Stanley Meresman.* Mr. Meresman has served on our board of directors since July 2015. During the last ten years, Mr. Meresman has served on the boards of directors of various public and private companies, including service as chair of the audit committee for some of these companies. He currently serves on the board of directors and as chair of the audit committee of DoorDash, Inc. He served as a member of the board of directors and as chair of the audit committees of Palo Alto Networks, Inc. from September 2014 to December 2018, LinkedIn Corporation from October 2010 to December 2016, Zynga Inc. from June 2011 to June 2015, Medallia, Inc. from June 2015 to October 2021, Guardant Health, Inc. from May 2018 to June 2022, and Cloudflare, Inc. from December 2018 to June 2022; and on the board of directors of Meru Networks, Inc. from September 2010 to May 2013, and Riverbed Technology, Inc. from March 2005 to May 2012. He also serves on the board of trustees of the Panetta Institute of Public Policy, a non-profit organization. From January 2004 to December 2004, Mr. Meresman was a Venture Partner with Technology Crossover Ventures, a private equity firm, and was General Partner and Chief Operating Officer of Technology Crossover Ventures from November 2001 to December 2003. During the four years before joining Technology Crossover Ventures, Mr. Meresman was a private investor and board member and advisor to several technology companies. From 1989 to 1997, Mr. Meresman served as the Senior Vice President and Chief Financial Officer of Silicon Graphics, Inc. Mr. Meresman holds a B.S. in Industrial Engineering and Operations Research from the University of California, Berkeley and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Meresman is qualified to serve as a member of our board of directors due to his background as a member of the board and chair of the audit committee of other public companies and his financial and accounting expertise from his prior extensive experience as chief financial officer of two publicly traded companies.

*Scott D. Miller.* Mr. Miller has served on our board of directors since October 2016. Mr. Miller is a founder and Chief Executive Officer of Council Advisors (formerly known as G100 Companies), and is also a founder and chairman of G100 Network and SSA & Company. Before joining Council Advisors in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller served on the boards of QTS Realty Trust, Inc. from 2013 to 2021, Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago. We believe that Mr. Miller is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Poppy Thorpe.* Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe is a freelance brand consultant. Previously, Ms. Thorpe served as Chief Marketing Officer at Sesame Inc. from March 2020 to May 2021, Head of Brand Marketing at Glossier Inc., a beauty brand, from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017. Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco. We believe that Ms. Thorpe is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies and with advertisers.

*Fidel Vargas.* Mr. Vargas has served on our board of directors since July 2021. Mr. Vargas has served as Chief Executive Officer of the Hispanic Scholarship Fund since January 2013. Prior to joining the Hispanic Scholarship Fund, Mr. Vargas worked as a Partner at Centinela Capital Partners from June 2006 to December 2012, and from 1992 to 1997, Mr. Vargas served as Mayor for the City of Baldwin Park, California. Mr. Vargas serves on the President's Commission on White House Fellowships. Mr. Vargas holds an M.B.A. and an A.B. in Social Studies from Harvard University. We believe that Mr. Vargas is qualified to serve as a member of our board of directors due to his extensive leadership experience.

There are no family relationships among any of the directors or executive officers.

## Independent Chairperson

Our board of directors appointed Mr. Lynton to serve as our independent Chairperson of our board of directors in September 2016. As Chairperson of our board of directors, Mr. Lynton presides over meetings of our independent directors

without management present. Mr. Lynton also performs such additional duties as our board of directors may otherwise determine and delegate. Mr. Lynton is an independent director and satisfies the independence requirements under NYSE listing standards.

**Composition of Our Board of Directors**

Our board of directors may establish the authorized number of directors from time to time by resolution. Our board of directors currently consists of ten members.

No stockholder has any special rights regarding the election or designation of members of our board of directors. There is no contractual arrangement by which any of our directors are appointed to our board of directors. Our current directors will continue to serve as directors until our 2023 annual meeting of stockholders and until their successor is duly elected, or if sooner, until their earlier death, resignation, or removal.

So long as any shares of our Class C common stock are outstanding, we will not have a classified board of directors, and all directors will be elected for annual terms.

Following the conversion of all of our Class C common stock to Class B common stock, and subsequent conversion of all of our Class B common stock to Class A common stock, we will have a classified board of directors consisting of three classes. Each class will be approximately equal in size, with each director serving staggered three-year terms. Directors will be assigned to a class by the then-current board of directors.

When our board of directors is classified, we expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control.

Our board of directors held seven meetings during 2022. No member of our board of directors attended fewer than 75% of the aggregate of (a) the total number of meetings of the board of directors (held during the period for which he or she was a director) and (b) the total number of meetings held by all committees of the board of directors on which such director served (held during the period that such director served). Members of our board of directors are invited and encouraged to attend our annual meeting of stockholders. In 2022, nine members of our board of directors attended our annual meeting of stockholders.

**Executive Sessions of Independent Directors**

In order to promote open discussion among non-management directors, and as required under applicable NYSE rules, our board of directors conducts executive sessions of non-management directors during each regularly scheduled board meeting and at such other times if requested by a non-management director. In 2022, the non-management directors met in executive session at least once. The non-management directors provide feedback to executive management, as needed, promptly after the executive session. Neither Mr. Spiegel nor Mr. Murphy participates in such sessions. As Chairperson of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present.

**Committees of Our Board of Directors**

Our board of directors has established an audit committee, a compensation committee, and a nominating and corporate governance committee. The composition and responsibilities of each of these committees of our board of directors are described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Our board of directors may have or establish other committees as it deems necessary or appropriate from time to time.

*Audit Committee*

Our audit committee consists of Ms. Coffey, Ms. Jenkins, Mr. Meresman, Mr. Miller, and Ms. Thorpe, each of whom our board of directors has determined satisfies the independence requirements under NYSE listing standards and Rule 10A-3(b)(1) of the Exchange Act. The chair of our audit committee is Ms. Jenkins, who our board of directors has determined is an "audit committee financial expert" within the meaning of SEC regulations. Each member of our audit

Table of Contents

committee can read and understand fundamental financial statements in accordance with applicable requirements. In arriving at these determinations, the board of directors has examined each audit committee member's scope of experience and the nature of their employment in the corporate finance sector. No member of the audit committee simultaneously serves on the audit committees of more than three public companies. During 2022, the audit committee met six times. Our board of directors has adopted a written charter for the audit committee, which is available on our website at www.snap.com.

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits, and to oversee our independent registered accounting firm.

Specific responsibilities of our audit committee include:

- helping our board of directors oversee our corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related person transactions;

- reviewing cybersecurity and data privacy risks;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes our internal quality control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and

- approving, or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

### *Compensation Committee*

Our compensation committee consists of Mr. Lynton, Mr. Miller, and Ms. Thorpe. Our board of directors has determined that each of Mr. Lynton, Mr. Miller, and Ms. Thorpe is independent under NYSE listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act. The chair of our compensation committee is Mr. Lynton. During 2022, the compensation committee met five times. Our board of directors has adopted a written charter for the compensation committee, which is available on our website at www.snap.com.

The primary purpose of our compensation committee is to discharge the responsibilities of our board of directors in overseeing our compensation policies, plans, and programs for directors and employees and to review and determine the compensation to be paid to our executive officers and other senior management, as appropriate.

Specific responsibilities of our compensation committee include:

- reviewing and approving the compensation of our Chief Executive Officer, other executive officers, and senior management;

- reviewing and recommending to our board of directors the compensation paid to our directors;

- reviewing and approving the compensation arrangements with our executive officers and other senior management;

- administering our equity incentive plans and other benefit programs;

- reviewing, adopting, amending, and terminating incentive compensation and equity plans, severance agreements, profit sharing plans, bonus plans, change-of-control protections, and any other compensatory arrangements for our executive officers and other senior management;

- reviewing, evaluating, and recommending to our board of directors succession plans for our executive officers;

- reviewing and establishing general policies relating to compensation and benefits of our employees, including our overall compensation philosophy; and

- reviewing and approving polices and procedures with respect to perquisites or other personal benefits provided to executive officers, directors, and other senior management.

See the sections titled "Item 11. Executive Compensation—Compensation Discussion and Analysis" and "—Director Compensation" for a description of our processes and procedures for the consideration and determination of executive officer and director compensation.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Ms. Coles, Mr. Lynton, and Mr. Vargas. The chair of our nominating and corporate governance committee is Ms. Coles. Our board of directors has determined that each current member, and member during 2022, of the nominating and corporate governance committee is and was, respectively, independent under the NYSE listing standards, a non-employee director, and free from any relationship that would interfere with the exercise of his or her independent judgment. During 2022, the nominating and corporate governance committee met five times. Our board of directors has adopted a written charter for the nominating and corporate governance committee, which is available on our website at www.snap.com.

Specific responsibilities of our nominating and corporate governance committee include:

- identifying and evaluating candidates, including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on our board of directors;

- considering and making recommendations to our board of directors regarding the composition and chairperson of the committees of our board of directors;

- instituting plans or programs for the continuing education of our board of directors and orientation of new directors;

- developing and making recommendations to our board of directors regarding corporate governance guidelines and matters;

- overseeing periodic evaluations of the board of directors' performance, including committees of the board of directors; and

- monitoring, reviewing, and making recommendations to our board of directors regarding its succession planning.

## Code of Conduct

We have adopted a Code of Conduct that applies to all our employees, officers, and directors. This includes our principal executive officer, principal financial officer, and principal accounting officer or controller, or persons performing similar functions. The full text of our Code of Conduct is available on our website at www.snap.com. We intend to disclose on our website any future amendments of our Code of Conduct or waivers that exempt any principal executive officer, principal financial officer, principal accounting officer or controller, persons performing similar functions, or our directors from provisions in the Code of Conduct. You can request a copy of our Code of Conduct by writing to our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

Our board of directors believes that good corporate governance is important to ensure that the company is managed for the long-term benefit of our stockholders. The full text of our corporate governance guidelines is also available on our website at www.snap.com.

## Procedures by Which Stockholders May Nominate Directors

The nominating and corporate governance committee and our board of directors will review and evaluate candidates proposed by stockholders. The nominating and corporate governance committee and our board of directors will apply the same criteria, and follow substantially the same process in considering the candidates, as they do in considering other candidates. The factors generally considered by the nominating and corporate governance committee and our board of directors are set out in our Corporate Governance Guidelines, which are available on our website at www.snap.com. If a stockholder who is eligible to vote at the 2023 annual meeting of stockholders wishes to nominate a candidate to be

Table of Contents

considered for election as a director, it must comply with the procedures set forth in our bylaws and give timely notice of the nomination in writing to our Secretary. All stockholder proposals should be marked for the attention of our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

## Communications with the Board of Directors

Any stockholder, including a holder of Class A common stock, or any interested party may contact our board of directors regarding genuine issues or questions about us by sending a letter to the board of directors at: Snap Inc., c/o Secretary, 3000 31st Street, Santa Monica, CA 90405, Attention: Board of Directors. Each communication should specify the person sending the communication, the general topic of the communication, and the class and number of shares of our stock that are owned of record (if a record holder) or beneficially (if not a record holder). If any stockholder, including a holder of Class A common stock, wants to contact the independent members of the board of directors, the stockholder should address the communication to the attention of the Chairman (c/o Secretary) of the board of directors at the address above. Our legal department will review communications before forwarding them to the recipient, and will not forward a communication that is unrelated to the duties and responsibilities of the board of directors, irrelevant, primarily commercial in nature, addressed already on our website or in other filings, or is unduly hostile, threatening, illegal, or similarly unsuitable. Any communication that is not forwarded will be made available to any director on request.

## Delinquent Section 16(a) Reports

Section 16(a) of the Exchange Act requires our executive officers and directors to file initial reports of ownership and reports of changes in ownership with the SEC and to furnish us with copies of all Section 16(a) forms they file. Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Section 16 of the Exchange Act. For more information, see "Risk Factors—Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock."

To our knowledge, based solely on our review of the copies of such reports furnished to us or written representations from such persons, we believe that, with respect to the year ended December 31, 2022, such persons complied with all such filing requirements, except Mr. Hunter inadvertently filed one late Form 4 with respect to one transaction.

## Item 11. Executive Compensation.

### Compensation Discussion and Analysis

The compensation provided to our named executive officers is detailed in the Summary Compensation Table, other tables and the accompanying footnotes, and narrative following this section. This compensation discussion and analysis summarizes the material aspects of our compensation programs that we provide to our named executive officers. Our named executive officers for 2022 were:

- Evan Spiegel, Co-Founder and Chief Executive Officer;

- Derek Andersen, Chief Financial Officer;

- Jerry Hunter, Chief Operating Officer;

- Rebecca Morrow, Chief Accounting Officer;

- Michael O'Sullivan, General Counsel; and

- Jeremi Gorman, former Chief Business Officer.

Our board of directors has delegated to the compensation committee the authority and responsibility for reviewing, evaluating, and determining the compensation to be paid to executive officers, overseeing our compensation policies, and administering the compensation plans and programs for our company.

**General Compensation Philosophy and Objectives**

*Philosophy*

We seek kind, smart, and creative individuals to accomplish our business goals. Our compensation philosophy supports this objective by attracting the best people to join our company and incentivizing them to innovate, create, and drive long-term results.

Today, we compensate our executive officers mostly with equity that vests over multiple years. Our focus on equity compensation encourages executives to operate like owners, linking their interests with the interests of our stockholders. As our company grows, we will continue to evaluate our compensation philosophy and programs to ensure they continue to meet our objectives.

*Objectives*

We designed our compensation program for all employees, including our named executive officers, to support four main objectives:

- recruit and retain the most talented people in a competitive market;

- reinforce our values, which serve to motivate our employees to deliver the highest level of performance;

- reward success when both our company and the individual succeed; and

- align employee and stockholder interests to share in long-term success.

**Compensation-Setting Process**

*Compensation Committee's Role*

The compensation committee has overall responsibility for determining the compensation of our executive officers, including our Chief Executive Officer. Members of the compensation committee are appointed by our board of directors. The compensation committee consists of three members of our board of directors: Michael Lynton, Scott D. Miller, and Poppy Thorpe. No member of the compensation committee are, or were in 2022, an executive officer of Snap Inc., and each of them qualifies as an "independent director" under the NYSE rules.

*Compensation Consultant's Role*

The compensation committee has the authority to engage the services of outside consultants. The compensation committee first retained FW Cook, a national compensation consulting firm, in 2017 as its independent compensation consultant. FW Cook reports directly to the compensation committee.

In January 2023, our compensation committee reviewed FW Cook's independence under applicable SEC and NYSE rules. Our compensation committee concluded that FW Cook is independent within the meaning of such rules and that its engagement did not present any conflict of interest.

*Management's Role*

Management makes recommendations to the compensation committee regarding our compensation programs and policies, and implements the programs and policies approved by the compensation committee. Our Chief Executive Officer makes recommendations to the compensation committee with respect to compensation for our executive officers, including our named executive officers, other than himself. The compensation committee considers our Chief Executive Officer's recommendations, but ultimately has final approval of all compensation for our executive officers, including the types of award and specific amounts. All such determinations by our compensation committee are discretionary. Our co-founders, who serve as Chief Executive Officer and Chief Technology Officer, respectively, each have base salaries of $1 per year and did not receive any equity awards in 2022.

No executive officer participated directly in the final deliberations or determinations regarding his or her own compensation package or was present during such determinations.

The compensation committee meets regularly in executive session. Our Chief Executive Officer is not present during compensation committee deliberations or votes on his compensation and also recuses himself from sessions of our board of directors where they act on his compensation.

**Peer Group**

We analyze market data for executive compensation periodically using the most relevant published survey sources, information available from public filings, and input from our compensation consultants. In 2022, the compensation committee requested that FW Cook perform a detailed review of our peer group, considering appropriateness of the current peer companies and potential additions based on similarity in market capitalization size and industry. Based on those considerations and FW Cook's review, our compensation committee approved maintaining the same peer group as used in 2021. Our peer group for 2022 consisted of the following companies:

| | | |
|---|---|---|
| Activision Blizzard | Match Group | Twilio |
| Autodesk | Pinterest | Twitter |
| Block (formerly Square) | Roku | Uber |
| DocuSign | ServiceNow | Workday |
| Etsy | Shopify | Zillow Group |
| Intuit | Spotify | Zoom Video |

We use the peer group as a general reference. In addition to the peer group, we also rely on the knowledge and experience of our compensation committee members and our management in determining the appropriate compensation for our executive officers.

**Elements of Executive Compensation**

Our current compensation program generally consists of the following components:

- base salary;

- equity-based awards;

- annual incentive compensation; and

- other benefits.

We combine these elements to formulate compensation packages that provide competitive pay, reward achievement of financial, operational, and strategic objectives, and align the interests of our executive officers with those of our stockholders. The overall use and weight of each compensation element is based on our subjective determination of the importance of each element in meeting our overall objectives, including motivating executive officers with an owner's mentality.

***Base Salary***

We review the base salaries of our executive officers annually and may adjust them from time to time, if needed, to reflect changes in market conditions or other factors. Base salaries of our executive officers generally remain below the 50th percentile compared to our peer group, primarily because we compensate our executive officers mostly with equity awards.

Table of Contents

The table below sets forth information regarding the year-end base salary amounts for 2022 for our named executive officers. Other than Ms. Morrow, no base salaries were changed for any of our named executive officers in 2022.

| Name | 2022 Base Salary |
|------|-----------------:|
| Evan Spiegel | $ 1 |
| Derek Andersen | 500,000 |
| Jerry Hunter | 500,000 |
| Rebecca Morrow(1) | 431,600 |
| Michael O'Sullivan | 500,000 |
| Jeremi Gorman(2) | 500,000 |

(1) Ms. Morrow's annual base salary was increased from $415,000 to $431,600 effective March 27, 2022.

(2) Ms. Gorman served as our Chief Business Officer until September 16, 2022.

### Equity-based Awards

The majority of the total compensation for our executive officers, including our named executive officers, is provided through equity awards. By having a significant portion of our executive officers' total compensation payable in the form of equity awards that vest over a number of years and are thus subject to higher risk, our executive officers are motivated to align their long-term financial interests with those of our stockholders.

We generally issue three forms of equity awards:

*Restricted Stock Awards*. RSAs represent one share of Class A common stock for each award granted, subject to a forfeiture condition, so the value of the RSAs is tied to the performance of our Class A common stock. The forfeiture condition will typically lapse over multiple years, subject to continued service through each lapse date.

*Restricted Stock Units*. RSUs represent the right to receive one share of Class A common stock for each unit granted, subject to a continued service requirement, so the value of the RSUs is tied to the performance of our Class A common stock. RSUs typically vest over multiple years, subject to continued service through each vesting date.

RSAs and RSUs align the interests of our executive officers and other employees with those of our stockholders. Because RSAs and RSUs have value to the recipient even in the absence of stock price appreciation, these forms of equity awards help us retain and incentivize employees during periods of market volatility.

*Stock Options*. Stock options are granted with an exercise price based on the market price of Class A common stock on the date of grant (as quoted on the NYSE). The stock options will have value to our executive officers only if the fair market value of our Class A common stock increases after the date of grant, which provides a strong incentive to our executive officers to increase stockholder value. Additionally, stock options typically vest over multiple years, subject to continued service through each vesting date. We view stock options as inherently performance-based and an effective tool to motivate our executive officers to build stockholder value and reinforce our position as a growth company. Although we typically grant RSAs and RSUs to our executive officers, we have granted stock options to our executive officers in limited circumstances.

We generally grant larger, one-time new hire equity awards to our executive officers when they start employment with us or are promoted. These initial awards are intended to establish a meaningful equity stake and motivate long-term value creation. While these awards generally cover multiple years, we may also consider providing additional equity grants to our executive officers to ensure appropriate incentives are in place to promote our long-term strategic and financial objectives and help us retain key executive officers. The size of these awards is not determined based on a specific formula, but rather through the exercise of judgment after considering various factors, including compensation provided to other executives with similar responsibilities in our peer group and within our company, the current unvested equity held by such executive officer, the perceived retentive value of the proposed awards, and for new-hires, amounts forfeited when joining our company. We also consider each executive officer's individual performance, including the results and contributions delivered during the year and how they align with our short-term and long-term goals, the executive's leadership of his or her team, the cash compensation received by the executive officer, and feedback received from the executive officer's peers and team.

Table of Contents

### Annual Incentive Compensation

In February 2022, our board of directors approved the 2022 Bonus Program, which provided our named executive officers, with the exception of Ms. Morrow, and other eligible employees the opportunity to earn bonuses on the level of achievement of certain company-wide objectives and key results, or Corporate OKRs, from January 1, 2022 through December 31, 2022. A participant must remain an employee through the payment date under the 2022 Bonus Program to earn a bonus.

The Corporate OKRs are approved by the compensation committee. Each Corporate OKR category is assigned a relative weighting by the compensation committee based on recommendations by the Chief Executive Officer, reflecting its importance to the achievement of our Corporate OKRs during the year.

Each eligible participant in the 2022 Bonus Program may receive a bonus in an amount up to 100% of such participant's annual base salary earned in 2022. Bonus targets for participants will be correspondingly adjusted downward in the event certain Corporate OKRs are deemed by the compensation committee to have not been fully achieved. The compensation committee also has the right, in its sole discretion, to adjust the bonus target of any participant upward in the event of over-achievement of the Corporate OKRs.

The Corporate OKRs consisted of growing the overall business, including growing our community, growing our Snapchat application into monetizable platforms, and investing in partnerships to scale our platforms and content.

In January 2023, the compensation committee approved a 20% payment of the bonus target amount to certain of our employees, including our named executive officers, pursuant to the 2022 Bonus Program. The bonus payment amounts approved by the compensation committee were based on their respective determinations of the degree to which such Corporate OKRs were achieved.

Ms. Morrow is eligible to earn a bonus under our performance award program. These bonuses are paid out at our discretion following a review of Ms. Morrow's performance in a given year. In 2022, the amount paid to Ms. Morrow was $259,375.

### Other Benefits

Like other employees, our executive officers, including our named executive officers, are able to participate in our employee benefit and welfare plans, including life and disability insurance, medical and dental care plans, and a 401(k) plan. In 2022, we matched contributions made to our 401(k) plan by our employees up to federal limits, including the named executive officers. All of the named executive officers, other than Mr. Spiegel, participated in our 401(k) plan. Our executive officers, including our named executive officers, also receive access to an on-call medical service paid for by us. Ms. Gorman and Messrs. Hunter and O'Sullivan participated in such on-call medical services in 2022, and we paid applicable tax gross ups related to such services. We generally do not provide our executive officers with additional retirement benefits, pensions, perquisites, or other personal benefits, except as further described in the section titled "—Summary Compensation Table." In the future, we may provide perquisites or other personal benefits in limited circumstances, such as where we believe it is appropriate to assist an individual executive in the performance of his or her duties, to make our executive team more efficient and effective, and for recruitment, motivation, or retention purposes. All future practices with respect to perquisites or other personal benefits for executives will be subject to review and approval by the compensation committee.

### Executive Security Policy

Based on our overall risk assessment, including the findings of security studies, we have approved an executive security policy that currently provides security for our Chief Executive Officer and Chief Technology Officer (who is not a named executive officer). The executive security policy may apply to other executive officers as needed. We believe that the personal safety of our executive officers is crucial to our success, and based on our risk assessment, we believe that the cost of the personal security measures for executive officers is an appropriate and necessary business expense. Although we do not consider personal security measures to be a perquisite for the covered executive officer's benefit, we have included the aggregate incremental costs to us, if any, in the "All Other Compensation" column of the Summary Compensation Table, as applicable. Please see the section titled "—Summary Compensation Table" for additional detail.

Table of Contents

### Change of Control Benefits

Some employee equity awards with back-weighted vesting (i.e., 10%/20%/30%/40% vesting), including certain awards held by certain named executive officers, accelerate so that the equity award is evenly-weighted if the employee's employment is involuntarily terminated other than for cause or voluntary termination for good reason following a change of control (i.e., "double-trigger"). We ceased issuing back-weighted equity awards in early 2018. Mr. Hunter is the only named executive officer with back-weighted equity vesting in 2022 that could benefit from such a provision, but such equity award was fully vested as of December 31, 2022.

Our named executive officers are not entitled to any other change of control benefits or post-employment payments with the limited exception of equity acceleration on a termination due to death. For more detail, please see the section titled "—Potential Payments Upon Termination, Change in Control, or Death."

## Tax and Accounting Considerations

### Deductibility of Executive Compensation

Compensation paid to each of our "covered employees" under Section 162(m) of the Code that exceeds $1 million per taxable year is generally non-deductible. Although our compensation committee will continue to consider tax implications as one factor in determining executive compensation, it also considers other factors in making its decisions and retains the flexibility to provide compensation to our executive officers in a manner that can best promote our corporate objectives. Therefore, we may approve compensation that is not deductible.

### No Tax Reimbursement of Parachute Payments and Deferred Compensation

We did not provide any executive officer, including any named executive officer, with a "gross-up" or other reimbursement payment for any tax liability that he or she might owe as a result of the application of Sections 280G, 4999, or 409A of the Code during 2022, and we have not agreed and are not otherwise obligated to provide any named executive officer with such a "gross-up" or other reimbursement.

### Accounting Treatment

We account for stock-based compensation in accordance with the authoritative guidance set forth in Accounting Standards Codification Topic 718, or ASC Topic 718, which requires companies to measure and recognize the compensation expense for all share-based awards made to employees and directors, including RSAs, RSUs, and stock options, over the period during which the award recipient is required to perform services in exchange for the award.

## Compensation Policies and Practices as they Relate to Risk Management

Our management team and our compensation committee, with the assistance of our independent compensation consultants, each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices, and policies for all employees, including our named executive officers. In 2022, we reviewed our compensation plans and philosophy and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse impact on our business or our financial condition. The objective of the review was to identify any compensation plans, practices, or policies that may encourage employees to take unnecessary risk that could threaten our company. No such plans, practices, or policies were identified. The risk assessment process included, among other things, a review of our cash and equity incentive-based compensation plans to ensure that they are aligned with our company performance goals and ensure an appropriate balance between fixed and variable pay components and between short-term and long-term incentives. The base salary component of our compensation program is designed to provide income independent of our stock price performance so that employees will not focus exclusively on stock price performance to the detriment of other important business metrics. The annual bonus component is scored with discretion by the compensation committee so that short-term outcomes are not over-weighted in the final results. The equity-based component of our compensation program is primarily designed to reward employees evenly throughout their tenure, which we believe discourages employees from taking actions that focus only on specific periods. Furthermore, our executive officers typically receive a substantial portion of their equity in the form of RSAs and RSUs, which does not require our stock price to be trading at a certain price for the executive officer to realize value. Executive officer compensation is not tied to any singular performance metric. Additional controls, such as our Code of Conduct and related training, help further mitigate the risks of unethical behavior and inappropriate risk-taking.

### *Hedging and Pledging Prohibition*

Our insider trading policy prohibits all employees (including our executive officers), members of our board of directors, and consultants from engaging in derivative securities transactions, including hedging, pledging company securities as collateral, holding company securities in a margin account, or other inherently speculative transactions with respect to our capital stock.

### *Rule 10b5-1 Sales Plans*

Our executive officers and members of our board of directors may adopt written plans, known as Rule 10b5-1 plans, in which they will contract with a broker to buy or sell shares of our capital stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades under parameters established by the individual when entering into the plan, without further direction from them. The director or officer may amend a Rule 10b5-1 plan in some circumstances and may terminate a plan at any time, so long as such termination was made in good faith. The Securities and Exchange Commission recently adopted new rules, effective in late February 2023, with additional requirements for Rule 10b5-1 plans, including "cooling off" periods and limitations on the number of Rule 10b5-1 plans our executive officers and members of our board of directors may have.

## Compensation Committee Report

The compensation committee has reviewed and discussed the compensation discussion and analysis included in this Annual Report on Form 10-K with management and, based on such review and discussions, the compensation committee recommended to our board of directors that the compensation discussion and analysis be included in this Annual Report on Form 10-K.

Snap Inc. compensation committee,

Michael Lynton (Chairperson)
Scott D. Miller
Poppy Thorpe

## Summary Compensation Table

The following table presents all of the compensation awarded to, earned by, or paid to our named executive officers during the fiscal years ended December 31, 2022, 2021, and 2020.

| Name and Principal Position | Year | Salary | | Bonus | | Stock Awards(1) | | Non-Equity Incentive Plan Compensation | | All Other Compensation | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Evan Spiegel | 2022 | $ | 1 | $ | — | $ | — | $ | — | $ | 2,747,394 | (2) | $ | 2,747,395 |
| *Co-Founder and Chief* | 2021 | | 1 | | — | | — | | — | | 3,290,615 | | | 3,290,616 |
| *Executive Officer* | 2020 | | 1 | | — | | — | | — | | 2,094,431 | | | 2,094,432 |
| Derek Andersen | 2022 | | 500,000 | | — | | 7,747,984 | | 100,000 | (3) | 14,964 | (4) | | 8,362,948 |
| *Chief Financial Officer* | 2021 | | 500,000 | | — | | 5,876,814 | | 225,000 | | 14,364 | | | 6,616,178 |
| | 2020 | | 500,000 | | — | | 6,242,566 | | 400,000 | | 24,841 | | | 7,167,407 |
| Jerry Hunter(5) | 2022 | | 500,000 | | — | | 28,977,743 | | 100,000 | (3) | 22,125 | (6) | | 29,599,868 |
| *Chief Operating Officer* | 2021 | | 500,000 | | — | | 9,402,903 | | 225,000 | | 12,164 | | | 10,140,067 |
| | 2020 | | 500,000 | | — | | 24,970,262 | | 400,000 | | 20,489 | | | 25,890,751 |
| Rebecca Morrow(7) | | | | | | | | | | | | | | |
| *Chief Accounting Officer* | 2022 | | 427,131 | | 259,375 | (8) | 921,192 | | — | | 12,682 | (9) | | 1,620,380 |
| Michael O'Sullivan | 2022 | | 500,000 | | — | | 4,018,740 | | 100,000 | (3) | 22,173 | (10) | | 4,640,913 |
| *General Counsel* | 2021 | | 500,000 | | — | | 4,701,451 | | 225,000 | | 21,631 | | | 5,448,082 |
| | 2020 | | 500,000 | | — | | 6,810,086 | | 400,000 | | 17,191 | | | 7,727,277 |
| Jeremi Gorman(11) | 2022 | | 375,000 | | — | | 6,909,311 | (12) | — | | 165,662 | (13) | | 7,449,973 |
| *Former Chief Business* | 2021 | | 500,000 | | — | | 5,876,814 | | 225,000 | | 21,631 | | | 6,623,445 |
| *Officer* | 2020 | | 500,000 | | — | | 5,675,063 | | 400,000 | | 16,213 | | | 6,591,276 |

124

(1)    Amounts reported represent the aggregate grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2)    Amount reported includes (a) $2,136,341 for security for Mr. Spiegel, (b) $122,676 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot reimburse under the Federal Aviation Regulations, (c) $488,371 in incremental costs for personal flights not reimbursed by Mr. Spiegel, and (d) $6 in life insurance premiums paid by us on behalf of Mr. Spiegel.

(3)    Represents amounts earned under the 2022 Bonus Program for performance from January 1, 2022 through December 31, 2022. Amounts under the 2022 Bonus Program will be paid in March 2022. See "Elements of Executive Compensation – Annual Incentive Compensation."

(4)    Amount reported includes (a) $12,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Andersen, and (c) contributions by the Company to Mr. Andersen's health savings account. Amounts not quantified above total less than $10,000 in aggregate.

(5)    Mr. Hunter was promoted to Chief Operating Officer effective August 30, 2022.

(6)    Amount reported includes (a) $12,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Hunter, (c) $5,000 in medical on-call services paid by us on behalf of Mr. Hunter, and (d) tax "gross up" payments paid to Mr. Hunter to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(7)    Ms. Morrow was not a named executive officer in fiscal years 2021 or 2020.

(8)    Represents amount awarded under the company's performance award program.

(9)    Amount reported includes (a) $12,200 in 401(k) plan matching contributions by us, and (b) life insurance premiums paid by us on behalf of Ms. Morrow. Amounts not quantified above total less than $10,000 in aggregate.

(10)   Amount reported includes (a) $12,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, and (d) tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(11)   Ms. Gorman served as Chief Business Officer until September 16, 2022.

(12)   $2,002,360 of the amount reported is the aggregate modification date fair value of previously granted equity awards in accordance with ASC Topic 718, and does not reflect a new award or the actual economic value that may be realized by Ms. Gorman.

(13)   Amount reported includes (a) $145,833 pursuant to the August 2022 transition agreement we entered with Ms. Gorman, in which we agreed to pay Ms. Gorman her salary that she would have earned had she remained our Chief Business Officer through December 31, 2022, (b) $9,921 in 401(k) plan matching contributions by us, (c) life insurance premiums paid by us on behalf of Ms. Gorman, (d) $5,000 in medical on-call services paid by us on behalf of Ms. Gorman, and (e) tax "gross up" payments paid to Ms. Gorman to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

**Grants of Plan-Based Awards in Fiscal 2022**

The following table provides information regarding grants of incentive plan-based awards made to each of our named executive officers during 2022 under our 2017 Plan. No named executive officer was granted options in 2022.

| Name | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(1) | Grant Date Fair Value of Stock Awards(2) |
|------|-----------|----------------------------------------------|---------------------------------|
| Evan Spiegel | — | — | $ — |
| Derek Andersen | 2/2/2022 | 141,731 | 4,545,314 |
| | 5/11/2022 | 77,830 | 1,699,807 |
| | 11/28/2022 | 152,730 | 1,502,863 |
| Jerry Hunter | 2/2/2022 | 167,188 | 5,361,719 |
| | 5/11/2022 | 113,982 | 2,489,367 |
| | 8/31/2022 | 1,789,697 | 19,471,904 |
| | 11/28/2022 | 168,166 | 1,654,753 |
| Rebecca Morrow | 5/11/2022 | 33,019 | 721,135 |
| | 11/28/2022 | 20,331 | 200,057 |
| Michael O'Sullivan | 2/2/2022 | 83,594 | 2,680,860 |
| | 5/11/2022 | 56,992 | 1,244,705 |
| | 11/28/2022 | 9,469 | 93,175 |
| Jeremi Gorman | 2/2/2022 | 104,493 | 3,351,091 |
| | 5/11/2022 | 71,239 | 1,555,860 |

(1)   Except as indicated below, equity awards vest and the forfeiture condition lapses only on the satisfaction of a service-based vesting condition. If an employee dies while in service, the service-based vesting condition as to 100% of his or her shares subject to the award will be satisfied.

(2)   The dollar amounts reflect the grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, see Notes 1 and 4 of the notes to our consolidated financial statements.

**Outstanding Equity Awards as of December 31, 2022**

The following table presents information regarding outstanding equity awards held by our named executive officers as of December 31, 2022. All awards are for Class A common stock and were granted under our 2017 Plan.

| | | Stock Awards | | Option Awards | | | |
|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Shares or Units of Stock That Have Not Vested(#)(1) | Market Value of Shares or Units of Stock That Have Not Vested($)(2) | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable(1) | Option Exercise Price | Option Expiration Date |
| Evan Spiegel | — | — | $ — | — | — | $ — | — |
| Derek Andersen | 3/4/2019 | 1,266 (3) | 11,331 | — | — | — | — |
| | 5/16/2019 | 93,750 (4) | 839,062 | — | — | — | — |
| | 2/18/2020 | 297,469 (5) | 2,662,348 | — | — | — | — |
| | 2/3/2021 | 99,170 (6) | 887,572 | — | — | — | — |
| | 2/2/2022 | 125,392 (7) | 1,122,258 | — | — | — | — |
| | 5/11/2022 | 77,830 (8) | 696,579 | — | — | — | — |
| | 11/28/2022 | 99,193 (9) | 887,777 | — | — | — | — |
| Jerry Hunter | 5/16/2019 | 31,250 (10) | 279,687 | 700,000 | — | 14.72 | 12/29/2027 |
| | 2/18/2020 | 528,835 (11) | 4,733,073 | — | — | — | — |
| | 2/3/2021 | 158,672 (6) | 1,420,114 | — | — | — | — |
| | 2/2/2022 | 167,188 (12) | 1,496,333 | — | — | — | — |
| | 5/11/2022 | 113,982 (13) | 1,020,139 | — | — | — | — |
| | 8/31/2022 | 1,652,028 (14) | 14,785,651 | — | — | — | — |
| | 11/28/2022 | 140,782 (9) | 1,259,999 | — | — | — | — |
| Rebecca Morrow | 9/10/2019 | 68,750 (15) | 615,313 | — | — | — | — |
| | 5/13/2020 | 6,572 (16) | 58,819 | — | — | — | — |
| | 5/12/2021 | 19,772 (17) | 176,959 | — | — | — | — |
| | 5/11/2022 | 33,019 (18) | 295,520 | — | — | — | — |
| | 11/28/2022 | 16,265 (9) | 145,572 | — | — | — | — |
| Michael O'Sullivan | 5/16/2019 | 93,750 (10) | 839,063 | — | — | — | — |
| | 2/18/2020 | 264,418 (19) | 2,366,541 | — | — | — | — |
| | 2/3/2021 | 79,336 (6) | 710,057 | — | — | — | — |
| | 2/2/2022 | 83,594 (12) | 748,167 | — | — | — | — |
| | 5/11/2022 | 56,992 (20) | 510,078 | — | — | — | — |
| Jeremi Gorman | — | — | — | — | — | — | — |

(1) Each of our named executive officers, other than Mr. Spiegel, holds equity awards that only vest, or the forfeiture condition only lapses, on the satisfaction of a service-based condition. The service-based condition for each of our named executive officers is further described below. If an executive officer dies while in our service, the service-based condition as to 100% of his or her shares subject to the award will be satisfied.

(2) The market value is based on the closing price of our Class A common stock on December 31, 2022, which was $8.95.

(3) The service-based condition for these RSUs is satisfied in 48 equal monthly installments after each month of continuous service from February 15, 2019.

(4) The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from June 15, 2019.

(5) The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 18.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 81.8% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(6) The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA on March 15, 2024, subject to continuous service by the executive officer through such date. Thereafter, the service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA after each quarter of continuous service by such executive officer from March 15, 2024.

(7)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 10,450 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 114,942 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(8)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 41,576 of these RSUs shall vest in equal quarterly installments during the 12-month period following December 15, 2023; and 36,254 of these RSUs shall vest in equal quarterly installments during the 12-month period following December 15, 2024.

(9)    The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 12-month period following December 15, 2022.

(10)    The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from May 15, 2019.

(11)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 27.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2020; 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(12)    The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 12-month period following/from December 15, 2024.

(13)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 61,249 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 52,733 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(14)    The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 39-month period following September 15, 2022.

(15)    The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from October 15, 2019.

(16)    The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from April 15, 2020.

(17)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 25% of the RSAs on March 15, 2024; 25% of the RSAs on June 15, 2024; 25% of the RSAs on September 15, 2024; and 25% of the RSAs on December 15, 2024.

(18)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 5,528 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 27,491 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(19)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 33.3% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 66.7% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(20)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 30,625 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 26,367 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

**Option Exercises and Stock Vested**

The following table presents information regarding the vesting or lapse of the forfeiture condition during 2022 of RSUs and RSAs previously granted to the named executive officers. No named executive officer exercised options during 2022.

| | Stock Awards | |
| --- | --- | --- |
| Name | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($)(1) |
| Evan Spiegel | — | $ — |
| Derek Andersen | 455,766 | 8,561,719 |
| Jerry Hunter | 791,376 | 16,111,423 |
| Rebecca Morrow | 77,197 | 1,770,108 |
| Michael O'Sullivan | 329,178 | 7,292,405 |
| Jeremi Gorman | 799,990 | 16,791,290 |

(1)   The value realized is based on the closing price of our Class A common stock on the vesting date.

**Pension Benefits**

Other than our 401(k) plan, our named executive officers did not participate in, or otherwise receive any benefits under, any pension or retirement plan sponsored by us during the year ended December 31, 2022.

**Non-qualified Deferred Compensation**

Our named executive officers did not participate in, or earn any benefits under, a non-qualified deferred compensation plan sponsored by us during the year ended December 31, 2022.

**Employment, Severance, and Change in Control Agreements**

*Employment Agreements and Offer Letters*

We have employment agreements or offer letters with each of our executive officers. Except as otherwise described below, the employment agreements and offer letters generally provide for at-will employment and set forth the executive officer's initial base salary, eligibility for employee benefits, and confirmation of the terms of previously issued equity grants, if applicable, including in some cases severance benefits on a qualifying termination of employment. If an executive officer dies, all outstanding equity awards will be deemed to satisfy the service-based requirement. In addition, each of our named executive officers has executed our standard proprietary information and inventions agreement. The key terms of employment with our executive officers are described below.

*Evan Spiegel and Robert Murphy*

In July 2022, we entered into employment agreements with Evan Spiegel, our co-founder and Chief Executive Officer, and Robert Murphy, our co-founder and Chief Technology Officer, with respect to their continuing employment with us. The annual base salary for each of Messrs. Spiegel and Murphy as of December 31, 2022 was $1. The employment agreements are each effective as of January 1, 2022, and will have an initial term of five years, subject to automatic renewals for successive five year periods unless earlier terminated as provided in their respective employment agreements.

In July 2022, our board of directors determined that it was advisable and in our best interest to approve the Future Stock Split. In connection with the Future Stock Split, we entered into the Co-Founder Agreements with each of Messrs. Spiegel and Murphy, and certain of their respective affiliates requiring them, among other things, to convert shares of Class B common stock and Class C common stock into Class A common stock under certain circumstances.

The Future Stock Split will be not be declared and paid until the later of (i) June 30, 2023 and (ii) the first business day following the date on which the average of the volume weighted average price per share of Class A common stock

129

equals or exceeds $40 per share for 65 consecutive trading days. If this does not occur by July 21, 2032, the Future Stock Split will not be declared and paid, and the Co-Founder Agreements will terminate.

*Derek Andersen*

In May 2019, we entered into an amended and restated offer letter agreement with Derek Andersen, our Chief Financial Officer, with respect to his continuing employment with us. Mr. Andersen's annual base salary as of December 31, 2022 was $500,000.

*Jeremi Gorman*

In October 2018, we entered into an offer letter agreement with Jeremi Gorman, our former Chief Business Officer, with respect to her employment with us.

In August 2022, we entered into a transition agreement with Ms. Gorman. Under the transition agreement, following the execution of a standard release, Ms. Gorman's outstanding equity awards that were scheduled to vest pursuant to a monthly schedule through December 31, 2022, and salary had she remained our Chief Business Officer through December 31, 2022, were each accelerated.

*Jerry Hunter*

In October 2020, we entered into an amended and restated offer letter agreement with Jerry Hunter, our Chief Operating Officer, with respect to his continuing employment with us. Mr. Hunter's annual base salary as of December 31, 2022 was $500,000.

*Rebecca Morrow*

In July 2019, we entered into an offer letter agreement with Rebecca Morrow, our Chief Accounting Officer, with respect to her employment with us. Ms. Morrow's annual base salary as of December 31, 2022 was $431,600.

*Michael O'Sullivan*

In July 2017, we entered into an offer letter agreement with Michael O'Sullivan, our General Counsel, with respect to his employment with us. Mr. O'Sullivan's annual base salary as of December 31, 2022 was $500,000.

***Potential Payments upon Termination, Change in Control, or Death***

Currently, no named executive officer is entitled to any payments upon a termination of employment or a resignation, in each case, following a change of control of our company.

No named executive officer is also entitled to any payments following a resignation for good reason, other than Mr. Spiegel. If Mr. Spiegel resigns for good reason as an employee and member of our board of directors, then Mr. Spiegel is entitled to continue receiving his existing aircraft usage and security benefits provided by us, in each case, subject to the terms of his employment agreement entered into with us in July 2022.

The table below reflects amounts that would have been received by each named executive officer assuming that his or her employment was terminated due to his or her death on December 31, 2022.

| Name | Accelerated Vesting of Stock Awards(1) |
|---|---|
| Evan Spiegel | $ — |
| Derek Andersen | 7,106,927 |
| Jerry Hunter | 24,994,996 |
| Rebecca Morrow | 1,292,183 |
| Michael O'Sullivan | 5,173,906 |
| Jeremi Gorman | — |

(1)    The amount reported reflects the aggregate value, based on the closing price of our Class A common stock of $8.95 on December 31, 2022, of the unvested equity awards that would be accelerated.

**Employee Benefit Plans**

We believe that our ability to grant equity-based awards is a valuable and necessary compensation tool that aligns the long-term financial interests of our employees, consultants, and directors with the financial interests of our stockholders. In addition, we believe that our ability to grant equity-based awards helps us to attract, retain, and motivate employees, consultants, and directors, and encourages them to devote their best efforts to our business and financial success. The principal features of our equity incentive plans and our 401(k) plan are summarized below. These summaries are qualified in their entirety by reference to the actual text of the plans.

*401(k) Plan and Similar Plans*

We maintain a safe harbor 401(k) plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax advantaged basis. Eligible employees are able to defer eligible compensation up to certain Code limits, which are updated annually. We have the ability to make matching and discretionary contributions to the 401(k) plan. Currently, we match 100% of each participant's contribution up to a maximum of 3% of the participant's eligible compensation paid during the period, and also match 50% of each participant's contribution between 3% and 5% of the participant's eligible compensation paid during the period. Contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employees are immediately and fully vested in their own contributions and our contributions. The 401(k) plan is intended to be qualified under Section 401(a) of the Code, with the related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan are deductible by us when made, and contributions and earnings on those amounts are not taxable to the employees until withdrawn or distributed from the 401(k) plan.

Similar plans outside the United States, some of which are government mandated, cover employees of certain of our international subsidiaries. Several of these plans allow us to match, on a voluntary basis, a portion of the employee contributions.

*2017 Equity Incentive Plan*

Our board of directors adopted our 2017 Equity Incentive Plan, or our 2017 Plan, in January 2017, and our stockholders approved our 2017 Plan in February 2017. Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. Our 2017 Plan provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. The 2017 Plan is the successor to our 2012 Equity Incentive Plan and 2014 Equity Incentive Plan, each of which is described below, or, together, the Prior Plans.

*Authorized Shares.* The maximum number of shares of our Class A common stock that may be issued under our 2017 Plan as of December 31, 2022 is 157,768,323. The number of shares of our Class A common stock reserved for issuance under our 2017 Plan will automatically increase on January 1st of each calendar year, starting on January 1, 2018

through January 1, 2027, in an amount equal to 5.0% of the total number of shares of our capital stock outstanding on the last day of the calendar month before the date of each automatic increase, or a lesser number of shares determined by our board of directors. The maximum number of shares of our Class A common stock that may be issued on the exercise of incentive stock options under our 2017 Plan is three times the share reserve under the 2017 Plan.

Shares subject to stock awards granted under our 2017 Plan that expire or terminate without being exercised in full, or that are paid out in cash rather than in shares, do not reduce the number of shares available for issuance under our 2017 Plan. Additionally, shares become available for future grant under our 2017 Plan if they were issued under stock awards under our 2017 Plan and if we repurchase them or they are forfeited. This includes shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award.

*Corporate Transactions*. Our 2017 Plan provides that in the event of certain specified significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of more than 50% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards:

- arrange for the assumption, continuation, or substitution of a stock award by a successor corporation;
- arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation;
- accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction;
- arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us;
- cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, or no payment, as determined by the board of directors; or
- make a payment, in the form determined by our board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the awards before the transaction over any exercise price payable by the participant in connection with the exercise.

The plan administrator is not obligated to treat all stock awards or portions of stock awards, even those that are of the same type, in the same manner and is not obligated to treat all participants in the same manner.

In the event of a change in control, awards granted under the 2017 Plan will not receive automatic acceleration of vesting and exercisability, although this treatment may be provided for in an award agreement. Under the 2017 Plan, a change in control is defined to include: (1) the acquisition by any person or company of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) a sale, lease, exclusive license, or other disposition of all or substantially all of our assets other than to an entity more than 50% of the combined voting power of which is owned by our stockholders, and (4) an unapproved change in the majority of the board of directors.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2017 Plan, provided that such action does not materially impair the existing rights of any participant without such participant's written consent. Certain material amendments also require the approval of our stockholders. No incentive stock options may be granted after the tenth anniversary of the date our board of directors adopted our 2017 Plan. No stock awards may be granted under our 2017 Plan while it is suspended or after it is terminated.

### 2014 Equity Incentive Plan

Our board of directors adopted, and our stockholders approved, our 2014 Equity Incentive Plan, or our 2014 Plan, in September 2014. Our 2014 Plan was amended most recently in October 2016. Our 2014 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to employees, directors, and consultants, including employees and consultants of our affiliates.

Table of Contents

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2014 Plan following that date, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France. Any awards granted under the 2014 Plan will remain subject to the terms of our 2014 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class A common stock that may be issued under our 2014 Plan is 166,164,100, minus the number of shares of our Class B common stock issued after September 4, 2014 under our 2012 Plan. In addition to the share reserve, an additional 53,357,397 shares of Class A common stock are reserved under the 2014 Plan in connection with the distribution of shares of Class A common stock provided as a dividend to the holders of all preferred stock and common stock outstanding on October 31, 2016. The maximum number of shares of Class A common stock that may be issued on the exercise of incentive stock options under our 2014 Plan is three times such maximum number of shares. Shares subject to stock awards granted under our 2014 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2014 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2014 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2014 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2014 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2014 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2014 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2012 Equity Incentive Plan

Our board of directors adopted our 2012 Equity Incentive Plan, or our 2012 Plan, in May 2012, and our stockholders approved our 2012 Plan in August 2012. Our 2012 Plan was amended most recently in October 2016. Our 2012 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to our employees, directors, and consultants, including employees and consultants of our affiliates.

133

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2012 Plan following that date. Any awards granted under the 2012 Plan will remain subject to the terms of our 2012 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class B common stock that may be issued under our 2012 Plan is 91,292,140, minus the number of shares of our Class A common stock issued after September 4, 2014 under our 2014 Plan. In addition to the share reserve, an additional 50,022,362 shares of Class A common stock are reserved under the 2012 Plan in connection with the Class A Dividend, one share of which will be issued if and when a share from the share reserve is issued in connection with the settlement or exercise of a stock award that was outstanding as of October 31, 2016. The maximum number of shares of Class B common stock that may be issued on the exercise of incentive stock options under our 2012 Plan is such maximum number of shares. Shares subject to stock awards granted under our 2012 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2012 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2012 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2012 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation, or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2012 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2012 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2012 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2017 Employee Stock Purchase Plan

Our board of directors adopted our 2017 Employee Stock Purchase Plan, or ESPP, in January 2017 and our stockholders approved our ESPP in February 2017. Our ESPP became effective when the registration statement in connection with our initial public offering was declared effective in March 2017. The purpose of the ESPP is to secure the services of new employees, to retain the services of existing employees, and to provide incentives for such individuals to exert maximum efforts toward our success and that of our affiliates. The ESPP is intended to qualify as an "employee stock purchase plan" within the meaning of Section 423 of the Code for U.S. employees. In addition, the ESPP authorizes grants of purchase rights that do not comply with Section 423 of the Code under a separate non-423 component. In particular,

where such purchase rights are granted to employees who are foreign nationals or employed or located outside the United States, our board of directors may adopt rules that are beyond the scope of Section 423 of the Code.

*Share Reserve*. The ESPP authorizes the issuance of 16,484,690 shares of our Class A common stock under purchase rights granted to our employees or to employees of any of our designated affiliates. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (1) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (2) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (1) and (2). As of December 31, 2022, no shares of our Class A common stock have been purchased under the ESPP.

*Corporate Transactions*. In the event of certain significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding immediately before such transaction are converted or exchanged into other property by virtue of the transaction, any then-outstanding rights to purchase our stock under the ESPP may be assumed, continued, or substituted for by any surviving or acquiring entity (or its parent company). If the surviving or acquiring entity (or its parent company) elects not to assume, continue, or substitute for such purchase rights, then the participants' accumulated payroll contributions will be used to purchase shares of our common stock within ten business days before such corporate transaction, and such purchase rights will terminate immediately.

*ESPP Amendment or Termination*. Our board of directors has the authority to amend or terminate our ESPP, provided that except in certain circumstances such amendment or termination may not materially impair any outstanding purchase rights without the holder's consent. We will obtain stockholder approval of any amendment to our ESPP as required by applicable law or listing requirements.

## Limitations on Liability and Indemnification Matters

Our certificate of incorporation contains provisions that limit the liability of our current and former directors and officers for monetary damages to the fullest extent permitted by Delaware law. Delaware law provides that directors and officers of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's or officer's duty of loyalty to the corporation or its stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions; or

- any transaction from which the director derived an improper personal benefit.

Such limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission. In addition, Delaware courts could find certain of these limitations of liability in our certificate of incorporation to be inapplicable or unenforceable in an action.

Our certificate of incorporation authorizes us to indemnify our directors, officers, employees, and other agents to the fullest extent permitted by Delaware law. Our bylaws provide that we are required to indemnify our directors and officers to the fullest extent permitted by Delaware law and may indemnify our other employees and agents. Our bylaws also provide that, on satisfaction of certain conditions, we will advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee, or other agent for any liability arising out of his or her actions in that capacity regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered into, and expect to continue to enter into agreements to indemnify our directors, executive officers, and other employees as determined by the board of directors. With certain exceptions, these agreements provide for indemnification for related expenses including attorneys' fees, judgments, fines, and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these certificate of incorporation and bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain customary directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws, if permitted by applicable law, may discourage stockholders from bringing a lawsuit against our directors or officers for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for directors, executive officers, or persons controlling us, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## Director Compensation

Under our non-employee director compensation policy, our non-employee directors receive an annual retainer for service on our board of directors and an additional retainer is provided to individuals who serve as chair of a committee or the board of directors. We also currently reimburse our directors for their reasonable out-of-pocket expenses in connection with attending board of directors and committee meetings.

Our non-employee director compensation policy provides that each non-employee director receives the following compensation for board of directors and committee services:

- an annual retainer for board of director membership of $75,000, paid in cash;

- an annual retainer of $75,000 for chairing the board of directors, paid in cash;

- an annual retainer of $25,000 for chairing the audit committee, $20,000 for chairing the compensation committee, and $10,000 for chairing the nominating and corporate governance committee, each paid in cash; and

- an annual grant of equity with a fair market value as of the date of grant of $250,000, comprised of 50% in RSUs vesting after one year, and 50% in stock options vesting after one year.

All annual cash retainers will be paid quarterly in arrears. Additionally, in the event of a change to the designated chair for a committee, the annual cash retainer for chairing such committee will be prorated based on the number of days the chair held the position. The annual grants of equity described above are subject to pro-rata acceleration on a director's discontinued service on our board of directors and automatic full acceleration in the event of a change in control, as defined in the 2017 Plan.

Non-employee directors are also encouraged to accumulate stock ownership equal in value to five times the annual retainer for board of director membership within the later of five years from the effective date of the non-employee director compensation policy or each non-employee director's initial election to serve on the board of directors. Previously owned and vested stock and shares held in trust for the benefit of the non-employee director or his or her immediate family members are counted for purposes of determining stock ownership.

### *Director Compensation Table*

The following table sets forth information concerning the compensation paid to our directors who are not named executive officers during the year ended December 31, 2022. The compensation received by Mr. Spiegel as an employee of our company is presented in "Executive Compensation—Summary Compensation Table."

In 2022, we paid fees and made equity awards to our non-employee directors. We granted each non-employee director (a) RSUs for 9,114 shares of Class A common stock under our 2017 Plan and (b) options to purchase 14,864 shares of Class A common stock under our 2017 Plan. The service-based vesting condition will be fully satisfied for the RSUs and options on July 20, 2023. If a director's service ceases before July 20, 2023, vesting of the RSUs and options will be accelerated pro rata, based on the number of months of service provided by such director. In addition, in the event of a change in control, the service-based vesting condition of the RSUs and options will be deemed satisfied for 100% of the RSUs and options that have not yet satisfied the service-based vesting condition, immediately before the closing of such change in control.

Mr. Murphy did not receive compensation for his service as a director.

| Name | Fees Earned or Paid in Cash | | Stock Awards(1)(5) | | Option Awards(1)(5) | | Total | |
|---|---|---|---|---|---|---|---|---|
| Michael Lynton | $ | 198,333 | $ | 141,358 | $ | 125,006 | $ | 464,697 |
| Kelly Coffey | | 87,500 | | 141,358 | | 125,006 | | 353,864 |
| Joanna Coles | | 97,500 | | 141,358 | | 125,006 | | 363,864 |
| Liz Jenkins | | 108,333 | | 141,358 | | 125,006 | | 374,697 |
| Stanley Meresman | | 95,834 | | 141,358 | | 125,006 | | 362,198 |
| Scott D. Miller(2) | | 157,500 | | 141,358 | | 125,006 | | 423,864 |
| Robert Murphy(3) | | 524,998 | | — | | — | | 524,998 |
| Poppy Thorpe(4) | | 91,371 | | 141,358 | | 125,006 | | 357,735 |
| Fidel Vargas(4) | | 91,371 | | 141,358 | | 125,006 | | 357,735 |

(1) Amounts reported represent the aggregate grant date fair value of RSUs and stock options granted during 2022 under our 2017 Plan without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the directors. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2) Amount reported includes a $5,000 per month retainer for services on a special committee.

(3) Mr. Murphy does not receive any compensation for service as a director. Amount reported represents (a) $1 for his annual base salary as an employee, (b) $349,744 for security for Mr. Murphy, (c) $6 for life insurance premiums paid by us on behalf of Mr. Murphy, and (d) $175,247 in incremental costs for personal flights not reimbursed by Mr. Murphy.

(4) Amount reported includes $3,871 retainer for services on a special committee.

(5) As of December 31, 2022, the aggregate number of shares underlying stock awards and option awards outstanding for each of our non-employee directors was:

| Name | Aggregate Stock Awards | Aggregate Option Awards |
|---|---|---|
| Michael Lynton | 9,114 | 65,553 |
| Kelly Coffey | 9,114 | 31,896 |
| Joanna Coles | 9,114 | 65,553 |
| Liz Jenkins | 9,114 | 21,896 |
| Stanley Meresman | 9,114 | 65,553 |
| Scott D. Miller | 9,114 | 65,553 |
| Poppy Thorpe | 9,114 | 63,553 |
| Fidel Vargas | 9,114 | 18,908 |

In 2022, we also provided Mr. Lynton with an executive administrative assistant for his duties as Chairperson. The executive administrative assistant would occasionally assist Mr. Lynton with incidental personal matters, the cost of which to us is financially immaterial.

**Compensation Committee Interlocks and Insider Participation**

None of the members of the compensation committee is currently, or has been at any time, one of our officers or employees. None of our executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of our board of directors or compensation committee.

**Pay Ratio Disclosure**

As disclosed in the Summary Compensation Table, for the year ended December 31, 2022, the annual total compensation of our Chief Executive Officer was $2,747,395. The annual total compensation of our median employee,

Table of Contents

excluding our Chief Executive Officer, for the same period, using the same methodology used to calculate our Chief Executive Officer's annual total compensation, was $219,330. The ratio of these amounts is approximately 12.5 to 1. We believe such ratio is a reasonable estimate calculated in a manner consistent with Item 402 of Regulation S-K under the Exchange Act.

To determine our median employee, we used the total compensation of our employees from our company records, including salary and wages, bonuses, commissions, allowances, and grant date fair value of equity awards. We applied this measure to our global employee population as of October 1, 2022 and calculated total compensation for the 12 months prior to such date, annualizing all compensation other than equity awards for employees who did not work the full 12 months. We selected the individual who represented our median employee based on this information. For employees who were not paid in U.S. dollars, we converted their compensation to U.S. dollars using the exchange rate as of October 1, 2022.

The pay ratio above represents our reasonable estimate calculated in a manner consistent with the SEC rules, which allow for significant flexibility in how companies identify the median employee, and each company may use a different methodology and make different assumptions particular to that company. As a result, and as explained by the SEC when it adopted the pay ratio rules, the ratio was not designed to facilitate comparisons of pay ratios among different companies, even companies within the same industry, but rather to allow stockholders to better understand our compensation practices and pay ratio disclosures.

## Additional Disclosure Considerations

We are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Wall Street Reform Act, and such sections are not included in this Annual Report on Form 10-K.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

The table below sets forth information, as of December 31, 2022, with respect to the beneficial ownership of: (a) our Class A common stock, Class B common stock, and Class C common stock by each named executive officer, each of our directors, and our directors and executive officers as a group; and (b) our Class B and Class C common stock by each person or entity known by us to own beneficially more than 5% of our Class B common stock or Class C common stock (by number or by voting power).

Because our Class A common stock is non-voting, significant holders of our Class A common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require significant stockholders to publicly report their ownership, including changes in that ownership. As a result, those stockholders and we are not obligated to disclose ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of such ownership or changes in such ownership. Furthermore, significant holders of our Class A common stock may hold our stock in nominee or "street name" with various brokers, such that we will not be able to identify their ownership.

We have determined beneficial ownership in accordance with the rules and regulations of the SEC, and the information is not necessarily indicative of beneficial ownership for any other purpose. Except as indicated by the footnotes below, we believe, based on information furnished to us, that the persons and entities named in the table below have sole voting and sole investment power with respect to all shares that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 1,319,929,508 shares of Class A common stock, 22,529,132 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding as of December 31, 2022. In computing the number of shares beneficially owned by a person and the percentage ownership of such person, we deemed to be outstanding all shares subject to options and RSUs held by the person that are currently exercisable, or would become exercisable or would vest based on service-based vesting conditions within 60 days of December 31, 2022. However, except as described above, we did not deem such shares outstanding for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address for each beneficial owner listed in the table below is c/o Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

| Name of Beneficial Owner | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | % of Total Voting Power |
|---|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % | |
| **Directors and Named Executive Officers:** | | | | | | | |
| Evan Spiegel(1) | 39,963,540 | 3.0 % | 5,862,410 | 26.0 % | 123,683,019 | 53.4 % | 53.1 % |
| Robert Murphy(2) | 77,684,764 | 5.9 | 5,862,410 | 26.0 | 107,943,924 | 46.6 | 46.4 |
| Derek Andersen(3) | 807,328 | * | — | * | — | * | * |
| Jerry Hunter(4) | 2,263,072 | * | — | * | — | * | * |
| Rebecca Morrow(5) | 216,678 | * | — | * | — | * | * |
| Michael O'Sullivan(6) | 890,015 | * | — | * | — | * | * |
| Jeremi Gorman | 1,343,344 | * | — | * | — | * | * |
| Michael Lynton(7) | 1,081,416 | * | — | * | — | * | * |
| Kelly Coffey(8) | 26,282 | * | — | * | — | * | * |
| Joanna Coles(9) | 68,616 | * | — | * | — | * | * |
| Liz Jenkins(10) | 10,732 | * | — | * | — | * | * |
| Stanley Meresman(11) | 77,634 | * | — | * | — | * | * |
| Scott D. Miller(12) | 141,978 | * | — | * | — | * | * |
| Poppy Thorpe(13) | 67,359 | * | — | * | — | * | * |
| Fidel Vargas(14) | 6,189 | * | — | * | — | * | * |
| All directors and executive officers as a group (14 persons)(15) | 123,305,603 | 9.3 | 11,724,820 | 52.0 | 231,626,943 | 100.0 | 99.5 |
| **5% Stockholders:** | | | | | | | |
| FMR LLC(16) | 143,828,052 | 10.9 | — | * | — | * | * |
| T. Rowe Price Associates, Inc.(17) | 122,086,490 | 9.2 | — | * | — | * | * |
| Entities affiliated with Tencent Holdings Limited(18) | 232,655,030 | 17.6 | 10,344,970 | 45.9 | — | * | * |

\*      Represents beneficial ownership of less than 1%.

(1)      Includes 4,077,844 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Spiegel is trustee and holds voting power.

(2)      Includes 5,307,526 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Murphy is trustee and holds voting power.

(3)      Includes (a) 490,389 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2022 and (b) RSUs for 1,266 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2022.

(4)      Includes (a) 718,757 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2022, (b) 700,000 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022, and (c) 844,315 shares held in trust for which Mr. Hunter is trustee and holds dispositive power.

(5)      Includes 95,094 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2022.

(6)      Includes (a) 437,504 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2022, (b) 452,191 shares of Class A common stock held in trust for which Mr. O'Sullivan is trustee and holds dispositive power, and (c) 160 shares of Class A common stock held by members of Mr. O'Sullivan's immediate family for which Mr. O'Sullivan disclaims beneficial ownership except as to indirect pecuniary interest, if any.

(7)      Includes (a) 945,876 shares of Class A common stock held in trust for which Mr. Lynton is trustee and (b) 50,689 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(8)     Includes 17,032 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(9)     Includes 50,689 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(10)    Includes 7,032 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(11)    Includes 50,689 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(12)    Includes 50,689 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(13)    Includes 48,689 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(14)    Includes 4,044 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022.

(15)    Consists of (a) 122,324,784 shares of Class A common stock (of which 1,741,744 shares are unvested and subject to forfeiture as of December 31, 2022), 11,724,820 shares of Class B common stock, and 231,626,943 shares of Class C common stock held by our current directors and executive officers or for which they serve as trustees, (b) RSUs for 1,266 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2022, and (c) 979,553 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2022. Does not include shares held by Ms. Gorman, as she was not an executive officer as of December 31, 2022.

(16)    Based on information reported by FMR LLC on Schedule 13G filed with the SEC on October 11, 2022. FMR LLC reported as a parent holding company that certain of its subsidiaries have sole dispositive power with respect to 143,828,052 shares of Class A common stock and sole voting power with respect to 136,845,537 shares of Class A common stock. FMR LLC reported that Fidelity Management & Research Company LLC beneficially owns 5% or greater of the outstanding shares of Class A common stock. FMR LLC listed its address as 245 Summer Street, Boston, Massachusetts 02210.

(17)    Based on information reported by T. Rowe Price Associates, Inc. on Schedule 13G/A filed with the SEC on February 14, 2022. T. Rowe Price Associates, Inc. reported that it has sole dispositive power with respect to 122,086,490 shares of Class A common stock and sole voting power with respect to 50,755,018 shares of Class A common stock. T. Rowe Price Associates, Inc. listed its address as 100 E. Pratt Street, Baltimore, Maryland 21202.

(18)    Tencent Holdings Limited reported in its 2021 Interim Report that, as of June 30, 2021, it was interested in approximately 243 million shares of Snap Inc., and has not provided any update in subsequent reports. We believe, based on such reporting and our corporate and transfer agent records, that Tencent Holdings Limited and its affiliates beneficially own 10,344,970 shares of Class B Common Stock, and the balance of any remaining shares they hold are Class A Common Stock. As noted above, holders of our Class A common stock, other than our directors or officers, are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act and may hold the stock in nominee or "street name" such that we are not able to identify or confirm their ownership. Tencent Holdings Limited listed its registered address as Hutchins Drive, P.O. Box 2681, Grand Cayman KY1-1111 Cayman Islands.

**Securities Authorized for Issuance under Equity Incentive Plans**

The table set forth below provides information concerning the awards that may be issued under our 2012 Plan, 2014 Plan, and 2017 Plan as of December 31, 2022:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights(1) (a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights(2) (b) | Number of Securities Remaining Available for Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (C) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders(3) | 131,694,045 | $ | 9.68 | 157,768,323 |
| Equity compensation plans not approved by security holders | — | | — | — |
| Total | 131,694,045 | $ | 9.68 | 157,768,323 |

(1) Excludes RSAs subject to forfeiture that are already included within issued and outstanding Class A common stock as of December 31, 2022.

(2) The weighted-average exercise price does not reflect shares that will be issued in connection with the settlement of RSUs, since RSUs have no exercise price.

(3) Prior to our initial public offering, we granted awards under our 2012 Plan and our 2014 Plan. Following our initial public offering, we granted awards under our 2017 Plan, other than certain awards to our employees and consultants in France, which were granted under our 2014 Plan.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

Other than compensation arrangements for our directors and executive officers, which are described elsewhere in this Annual Report on Form 10-K, below we describe transactions since January 1, 2022 to which we were a party or will be a party, in which:

• the amounts involved exceeded or will exceed $120,000; and

• any of our directors, executive officers, or holders of more than 5% of our capital stock, or any member of the immediate family of, or person sharing the household with, the foregoing persons, had or will have a direct or indirect material interest.

**Investor Rights Agreement**

We are party to an amended and restated investor rights agreement, which provides Mr. Spiegel and Mr. Murphy with certain registration rights with respect to up to an aggregate of 339,889,877 shares of our Class A common stock (including shares issuable on conversion of Class C common stock, which are initially convertible into Class B common stock). Under this agreement, Mr. Spiegel and Mr. Murphy have the right to request that their shares be covered by a registration statement that we are otherwise filing.

**Co-Founder Agreements and Related Agreements**

We are party to a series of agreements with Mr. Spiegel and Mr. Murphy, and certain of their respective affiliates, as applicable, which include: (i) employment agreements pursuant to which each individual will continue to serve in their respective roles at Snap for an initial five-year term ending on January 1, 2027, subject to automatic renewals for successive five year periods unless earlier terminated as provided in their respective employment agreements, (ii) the Future Stock Split, which shall not be declared and paid until the later of (x) June 30, 2023 and (y) the first business day following the date on which the average of the volume weighted average price per share of Class A common stock equals or exceeds $40 per share for 65 consecutive trading days by July 21, 2032, and (iii) the Co-Founder Agreements, which include (a) the requirement under certain circumstances to convert an equal number of shares of Class B common stock or Class C common stock into Class A common stock in connection with sales by such individual of shares of Class A

141

common stock received in the special dividend, (b) conversion of such individual's remaining shares of Class C common stock into Class B common stock at such time as such Class C common stock represents in the aggregate less than 60% of such individual's Base Class C Common Stock (as such term is defined in our certification of incorporation), and (c) in the event of any sale or liquidation of Snap Inc. following the special dividend, shares of Class A common stock, Class B common stock, and Class C common stock are to be treated identically, equally, and ratably, on a per share basis, with respect to any consideration received.

### Munger, Tolles & Olson LLP

We have in the past engaged the law firm Munger, Tolles & Olson LLP, or Munger, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's father, John Spiegel, is a partner at Munger and has provided legal services to us. For the year ended December 31, 2022, total services provided by Munger were $5,921,891.

Our general counsel, Michael O'Sullivan, is a former attorney at Munger.

### Gibson, Dunn & Crutcher LLP

We have in the past engaged the law firm Gibson, Dunn & Crutcher LLP, or Gibson, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's stepmother, Debra Wong Yang, is a partner at Gibson and has provided legal services to us. For the year ended December 31, 2022, total services provided by Gibson were $354,413.

### Entities Affiliated with FMR LLC

In the ordinary course of business, FMR LLC and its affiliates, who hold 5% or more of our Class A common stock at December 31, 2022, purchased $2,653,243 of our advertising products for the year ended December 31, 2022. In addition, we use affiliates of FMR LLC for certain services related to our 401(k) plan. For the year ended December 31, 2022 total services provided by affiliates of FMR LLC were $539,356.

### Entities Affiliated with Tencent

In the ordinary course of business, Tencent Holdings Limited and its affiliates, who hold 5% or more of our Class B common stock at December 31, 2022, purchased $7,448,405 of our advertising products for the year ended December 31, 2022.

### Aviation Matters

*Airplane Leases*

In June 2018, we entered into a lease of an aircraft from an entity controlled by Mr. Spiegel on terms that are advantageous to us. Under the terms of this lease, Mr. Spiegel's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Spiegel's entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Spiegel and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality, privacy, and safety.

Mr. Spiegel may use aircraft leased by us for personal use pursuant to a time sharing agreement between us and Mr. Spiegel in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Spiegel and guests are flown by our pilots and crew members. Mr. Spiegel reimburses us for certain costs incurred by us in connection with these flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Spiegel has family or guests accompanying him on business flights, Mr. Spiegel cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations. In 2022, the amount that Mr. Spiegel could not reimburse was $122,676.

In September 2022, we entered into a lease of an aircraft from an entity controlled by Mr. Murphy on terms that are advantageous to us. Under the terms of this lease, Mr. Murphy's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Murphy's

entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Murphy and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality, privacy, and safety.

Mr. Murphy may use aircraft leased by us for personal use pursuant to a time sharing agreement between us and Mr. Murphy in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Murphy and guests are flown by our pilots and crew members. Mr. Murphy reimburses us for certain costs incurred by us in connection with these flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Murphy has family or guests accompanying him on business flights, Mr. Murphy cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations.

*Hangar Leases*

In June 2018, we entered into a sublease of approximately 10,000 square feet of a hangar from an entity that is controlled by Mr. Spiegel. Under the terms of this sublease, Mr. Spiegel's entity leased the space to us for no charge. We covered the maintenance and insurance costs associated with the space. This lease was terminated in May 2022.

In anticipation of the termination of the prior hangar lease, Mr. Spiegel's entity previously entered into a ground lease for a site on which it was required to build a new hangar. In November 2020, we and Mr. Spiegel's entity entered into a twelve-year sublease for $0 allowing us to build and operate a new hangar on that site to support our aviation program, including the storage and operation of the aircraft that we lease from Mr. Spiegel and Mr. Murphy. Construction of the new hangar was completed in 2022. Mr. Spiegel's entity is solely responsible for the ground lease rental payments, certain airport fees, and taxes. In exchange for certain construction-related costs and ground lease payments that Mr. Spiegel's entity has incurred and will continue to incur, Mr. Spiegel's entity has the right to occupy space at the hangar that Snap does not require for its aviation program at a market rate determined at the time this arrangement was entered into. As of December 31, 2022, Mr. Spiegel's entity had a credit balance of approximately $1.7 million that can be used for future rent or, to the extent not utilized by the end of the term, to purchase the hangar from Snap under the terms of the sublease. No credit balance will be paid to Mr. Spiegel in cash.

Subject to certain limited exceptions, neither party may terminate this sublease for a minimum of six years. After this period, either party may terminate the sublease on 24 months' notice to the other party. Upon termination of the sublease, Mr. Spiegel's entity will purchase the hangar from Snap at its fair market value on the termination date. The audit and compensation committees of our board of directors approved this arrangement based on their assessment that it is fair and reasonable to us.

**Employment Relationships**

Mr. Hunter's son, John Hunter, has been employed by us since May 2021. In 2022, John Hunter's base salary and discretionary bonus was $132,678, which along with other benefits he received, were commensurate with similar roles at Snap Inc. In addition, in 2022 he received 2,015 restricted stock units subject to vesting over thirty-six months, commensurate with similar roles at Snap Inc. John Hunter is not part of Mr. Hunter's household.

**Indemnification Agreements**

Our certificate of incorporation contains provisions limiting the liability of directors, and our bylaws provide that we will indemnify each of our directors and officers to the fullest extent permitted under Delaware law. Our certificate of incorporation and bylaws also provide our board of directors with discretion to indemnify our employees and other agents when determined appropriate by the board. In addition, we have entered into an indemnification agreement with each of our directors and executive officers, which requires us to indemnify them.

**Policies and Procedures for Transactions with Related Persons**

In July 2016, we entered into a policy that our executive officers, directors, nominees for election as a director, beneficial owners of more than 5% of any class of our common stock, and any members of the immediate family of any of the foregoing persons are not permitted to enter into a related person transaction with us without the approval or ratification of our board of directors or our audit committee. Any request for us to enter into a transaction with an executive officer, director, nominee for election as a director, beneficial owner of more than 5% of any class of our common stock, or any member of the immediate family of any of the foregoing persons, in which the amount involved exceeds $50,000 and such

person would have a direct or indirect interest, must be presented to our board of directors or our audit committee for review, consideration, and approval. In approving or rejecting any such proposal, our board of directors or our audit committee is to consider the material facts of the transaction, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction. There were no 2022 transactions where our policy was not followed.

**Director Independence**

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Ms. Coffey, Ms. Coles, Ms. Jenkins, Mr. Lynton, Mr. Meresman, Mr. Miller, Ms. Thorpe, and Mr. Vargas do not have relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the listing standards. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our shares by each non-employee director and the transactions described above.

**Item 14. Principal Accountant Fees and Services.**

The following table sets forth the aggregate fees for professional service provided by our independent registered public accounting firm, Ernst & Young LLP, for the years ended December 31, 2022 and 2021:

|  | Year Ended December 31, | |
|  | 2022 | 2021 |
| --- | --- | --- |
|  | (in thousands) | |
| Audit Fees(1) | $    8,766 | $    8,955 |
| Audit-Related Fees(2) | — | 99 |
| Tax Fees(3) | 1,399 | 2,287 |
| All Other Fees(4) | 593 | 461 |
| Total | $    10,758 | $    11,802 |

(1) Audit fees consist of the fees for professional services rendered for the audit of our financial statements, audit of our internal control over financial reporting, review of our quarterly financial statements, filing of our registration statements, accounting consultations, and audits provided in connection with statutory filings.

(2) Audit-related fees consist of fees for professional services rendered in connection with an internal controls review of an implementation of a new enterprise financial planning and reporting system.

(3) Tax fees consist of the fees for professional services rendered in connection with tax compliance, tax advisory, and tax planning.

(4) All other fees consist of fees for professional services other than the services reported in audit fees, audit-related fees, and tax fees.

The audit committee has adopted a pre-approval policy under which the audit committee approves in advance all audit and permissible non-audit services to be performed by the independent accountants (subject to a *de minimis* exception). These services may include audit services, audit-related services, tax services, and other non-audit services. As part of its pre-approval policy, the audit committee considers whether the provision of any proposed non-audit services is consistent with the SEC's rules on auditor independence. In accordance with its pre-approval policy, the audit committee has pre-approved certain specified audit and non-audit services to be provided by our independent auditor. If there are any additional services to be provided, a request for pre-approval must be submitted to the audit committee for its consideration under the policy. The audit committee generally pre-approves particular services or categories of services on a case-by-case basis. Finally, in accordance with the pre-approval policy, the audit committee has delegated pre-approval authority to the chair of the audit committee. The chair must report any pre-approval decisions to the audit committee at its next meeting.

All of the services of Ernst & Young LLP for 2022 and 2021 described above were in accordance with the audit committee pre-approval policy.

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules.**

We have filed the following documents as part of this Annual Report on Form 10-K:

1.      Consolidated Financial Statements

See Index to Financial Statements and Supplementary Data on page 74.

2.      Financial Statement Schedules

All schedules have been omitted because they are not required, not applicable, not present in amounts sufficient to require submission of the schedule, or the required information is otherwise included.

3.      Exhibits

The documents set forth below are filed herewith or incorporated herein by reference to the location indicated.

| Exhibit Number | Description | Incorporated by Reference | | | |
| | | Schedule Form | File Number | Exhibit | Filing Date |
| --- | --- | --- | --- | --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation of Snap Inc. | S-1 | 333-215866 | 3.2 | February 2, 2017 |
| 3.2 | Amendment No. 1 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K | 001-38017 | 3.1 | July 21, 2022 |
| 3.3 | Certificate of Correction to Amendment No. 1 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K/A | 001-38017 | 3.1 | August 8, 2022 |
| 3.4 | Amendment No. 2 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K | 001-38017 | 3.1 | August 26, 2022 |
| 3.5 | Amended and Restated Bylaws of Snap Inc. | 10-K | 001-38017 | 3.2 | February 4, 2021 |
| 4.1 | Form of Class A Common Stock Certificate | S-1 | 333-215866 | 4.1 | February 2, 2017 |
| 4.2 | Form of Class B Common Stock Certificate | S-8 | 333-216495 | 4.6 | March 7, 2017 |
| 4.3 | Form of Class C Common Stock Certificate | S-8 | 333-216495 | 4.7 | March 7, 2017 |
| 4.4 | Description of Securities | | | | |
| 4.5 | Indenture, dated August 9, 2019, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | August 9, 2019 |
| 4.6 | Form of Global Note, representing Snap Inc.'s 0.75% Convertible Senior Notes due 2026 (included as Exhibit A to the Indenture filed as Exhibit 4.5) | 8-K | 001-38017 | 4.2 | August 9, 2019 |
| 4.7 | Indenture, dated April 28, 2020, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 28, 2020 |
| 4.8 | Form of Global Note, representing Snap Inc.'s 0.25% Convertible Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.7) | 8.K | 001-38017 | 4.2 | April 28, 2020 |
| 4.9 | Indenture, dated April 30, 2021, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 30, 2021 |

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 4.10 | Form of Global Note, representing Snap Inc.'s 0% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.9) | 8-K | 001-38017 | 4.2 | April 30, 2021 |
| 4.11 | Indenture, dated February 11, 2022, by and between Snap Inc. and U.S. Bank Trust Company, National Association, as Trustee. | 8-K | 001-38017 | 4.1 | February 11, 2022 |
| 4.12 | Form of Global Note, representing Snap Inc.'s 0.125% Convertible Senior Notes due 2028 (included as Exhibit A to the Indenture filed as Exhibit 4.1) | 8-K | 001-38017 | 4.2 | February 11, 2022 |
| 10.1+ | Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.2 | February 2, 2017 |
| 10.2+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.3 | February 2, 2017 |
| 10.3+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.4 | February 2, 2017 |
| 10.4+ | Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.5 | February 2, 2017 |
| 10.5+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.6 | February 2, 2017 |
| 10.6+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.7 | February 2, 2017 |
| 10.7+ | Snap Inc. 2017 Equity Incentive Plan | S-8 | 333-216495 | 99.7 | March 7, 2017 |
| 10.8+ | Forms of global grant notice, stock option agreement and notice of exercise under the Snap Inc. 2017 Equity Incentive Plan | 10-K | 001-38017 | 10.8 | February 3, 2022 |
| 10.9+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-K | 001-38017 | 10.9 | February 3, 2022 |
| 10.10+ | Forms of restricted stock award grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-Q | 001-38017 | 10.4 | October 26, 2018 |
| 10.11+ | Snap Inc. 2017 Employee Stock Purchase Plan | S-1 | 333-215866 | 10.11 | February 2, 2017 |
| 10.12+ | Form of indemnification agreement | S-1 | 333-215866 | 10.12 | February 2, 2017 |
| 10.13 | Co-Founder's Agreement among Snap Inc., Evan Spiegel, and other Holders signatory thereto, made as of July 21, 2022 | 8-K | 001-38017 | 10.1 | July 21, 2022 |
| 10.14 | Co-Founder's Agreement among Snap Inc., Robert Murphy, and other Holders signatory thereto, made as of July 21, 2022 | 8-K | 001-38017 | 10.2 | July 21, 2022 |

| Exhibit Number | Description | Incorporated by Reference | | | |
| --- | --- | --- | --- | --- | --- |
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 10.15+ | Employment Agreement by and between Snap Inc. and Evan Spiegel, dated July 21, 2022 | 8-K | 001-38017 | 10.3 | July 21, 2022 |
| 10.16+ | Employment Agreement by and between Snap Inc. and Robert Murphy, dated July 21, 2022 | 8-K | 001-38017 | 10.4 | July 21, 2022 |
| 10.17+ | Offer Letter, by and between Snap Inc. and Michael O'Sullivan, dated July 24, 2017 | 10-Q | 001-38017 | 10.1 | November 8, 2017 |
| 10.18+ | Amended and Restated Offer Letter, by and between Snap Inc. and Jerry Hunter, dated October 7, 2020 | 10-K | 001-38017 | 10.16 | February 4, 2021 |
| 10.19+ | Transition Agreement, by and between Snap Inc. and Jeremi Gorman, dated August 30, 2022 | 8-K | 001-38017 | 10.1 | August 31, 2022 |
| 10.20+ | Offer Letter, by and between Snap Inc. and Derek Andersen, dated May 16, 2019 | 8-K | 001-38017 | 10.1 | May 20, 2019 |
| 10.21+ | Offer Letter, by and between Snap Inc. and Rebecca Morrow, dated July 12, 2019 | 10-Q | 001-38017 | 10.1 | October 23, 2019 |
| 10.22+ | Snap Inc. 2022 Bonus Program | 10-K | 001-38017 | 10.22 | February 3, 2022 |
| 10.23 | Notice of Prepayment and Termination of Commitments, dated May 5, 2022 | 10-Q | 001-38017 | 10.1 | July 21, 2022 |
| 10.24 | Revolving Credit Agreement by and among Snap Inc., the lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, dated May 6, 2022 | 10-Q | 001-38017 | 10.2 | July 21, 2022 |
| 10.25 | Snap Inc. Non-Employee Director Compensation Policy | 10-K | 001-38017 | 10.28 | February 22, 2018 |
| 10.26+ | Form of Time Share Agreement | 10-Q | 001-38017 | 10.3 | October 26, 2018 |
| 21.1 | List of Subsidiaries | | | | |
| 23.1 | Consent of Ernst & Young, LLP, independent registered public accounting firm | | | | |
| 31.1 | Certification of the Chief Executive Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934 | | | | |
| 31.2 | Certification of the Chief Financial Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934 | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer of Snap Inc. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | |
| 101.INS | Inline XBRL Instance Document. | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | |
| 101.DEF | Inline XBRL Taxonomy Definition Linkbase Document. | | | | |

| Exhibit Number | Description | Incorporated by Reference | | | |
| | | Schedule Form | File Number | Exhibit | Filing Date |
|---|---|---|---|---|---|
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document. | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | |

+   Indicates management contract or compensatory plan.
*   The certifications furnished in Exhibit 32.1 hereto are deemed to accompany this Annual Report on Form 10-K and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the Registrant specifically incorporates it by reference.

**Item 16. Form 10-K Summary.**

None.

148

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized**.**

**SNAP INC.**

Date: January 31, 2023

/s/ Derek Andersen

Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

Date: January 31, 2023

/s/ Rebecca Morrow

Rebecca Morrow
Chief Accounting Officer
*(Principal Accounting Officer)*

149

Pursuant to the requirements of the Securities Exchange Act of 1934 this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Evan Spiegel<br>Evan Spiegel | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | January 31, 2023 |
| /s/ Robert Murphy<br>Robert Murphy | Director and Chief Technology Officer | January 31, 2023 |
| /s/ Derek Andersen<br>Derek Andersen | Chief Financial Officer<br>*(Principal Financial Officer)* | January 31, 2023 |
| /s/ Rebecca Morrow<br>Rebecca Morrow | Chief Accounting Officer<br>*(Principal Accounting Officer)* | January 31, 2023 |
| /s/ Kelly Coffey<br>Kelly Coffey | Director | January 31, 2023 |
| /s/ Joanna Coles<br>Joanna Coles | Director | January 31, 2023 |
| /s/ Elizabeth Jenkins<br>Elizabeth Jenkins | Director | January 31, 2023 |
| /s/ Michael Lynton<br>Michael Lynton | Director | January 31, 2023 |
| /s/ Stanley Meresman<br>Stanley Meresman | Director | January 31, 2023 |
| /s/ Scott D. Miller<br>Scott D. Miller | Director | January 31, 2023 |
| /s/ Poppy Thorpe<br>Poppy Thorpe | Director | January 31, 2023 |
| /s/ Fidel Vargas<br>Fidel Vargas | Director | January 31, 2023 |

Exhibit 4.4

**DESCRIPTION OF THE REGISTRANT'S SECURITIES
REGISTERED PURSUANT TO SECTION 12 OF THE
SECURITIES EXCHANGE ACT OF 1934**

Snap Inc. ("we," "our," or "us") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our Class A common stock, $0.00001 par value per share. The following description of our capital stock is a summary and does not purport to be complete. It is qualified in its entirety by, and should be read in conjunction with, our certificate of incorporation, bylaws, and applicable Delaware law.

**Authorized Capital Stock**

Our authorized capital stock consists of 4,460,887,848 shares, of which:

- 3,000,000,000 shares are designated as Class A common stock, $0.00001 par value per share;
- 700,000,000 shares are designated as Class B common stock, $0.00001 par value per share;
- 260,887,848 shares are designated as Class C common stock, $0.00001 par value per share; and
- 500,000,000 shares are designated as preferred stock, $0.00001 par value per share.

**Class A Common Stock, Class B Common Stock, and Class C Common Stock**

*Voting Rights*

Our Class A common stock is non-voting and is not entitled to any votes on any matter that is submitted to a vote of our stockholders, except as required by Delaware law. Delaware law would permit holders of Class A common stock to vote, with one vote per share, on a matter if we were to:

- change the par value of the common stock; or
- amend our certificate of incorporation to alter the powers, preferences, or special rights of the common stock as a whole in a way that would adversely affect the holders of our Class A common stock.

In addition, Delaware law would permit holders of Class A common stock to vote separately, as a single class, if an amendment to our certificate of incorporation would adversely affect them by altering the powers, preferences, or special rights of the Class A common stock, but not the Class B common stock or Class C common stock. As a result, in these limited instances, the holders of a majority of the Class A common stock could defeat any amendment to our certificate of incorporation. For example, if a proposed amendment of our certificate of incorporation provided for the Class A common stock to rank junior to the Class B common stock and Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock, with each share of Class A common stock entitled to one vote per share. In this instance, the holders of a majority of Class A common stock could defeat that amendment to our certificate of incorporation. Moreover, if an amendment to our certificate of incorporation would alter the powers, preferences, or special rights of the Class A common stock and either the Class B common Stock or the Class C common stock in a way that would affect them adversely compared to the unaffected class, Delaware law would permit the holders of Class A common stock to vote with the other adversely affected class of common stock together as a single class. For example, if a proposed amendment to our certificate of incorporation provided for the Class A common stock and Class B common stock to rank junior to the Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock and Class B common stock voting together as a single class, with each share of Class A common stock and Class B common stock entitled to one vote per share. In this instance, the holders of a majority of the Class A common stock and Class B common stock, voting together as a single class, could defeat that amendment to our certificate of incorporation.

Our certificate of incorporation provides that the number of authorized shares of common stock or any class of common stock, including our Class A common stock, may be increased or decreased (but not below the number of shares of common stock then outstanding) by the affirmative vote of the holders of a majority of the Class B common stock and Class C common stock, voting together as a single class. As a result, the holders of a majority of the outstanding Class B common stock and Class C common stock can approve an increase or decrease in the number of authorized shares of Class A common stock without a separate vote of the holders of Class A common stock. This could allow us to increase and issue additional shares of Class A common stock beyond what is currently authorized in our certificate of incorporation without the consent of the holders of our Class A common stock.

Holders of our Class B common stock are entitled to one vote per share and holders of Class C common stock are entitled to ten votes per share on any matter submitted to our shareholders. Except as set forth above, holders of shares of Class B common stock and Class C common stock will vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders. In addition, each class of our common stock may have the right to vote separately in certain instances as listed below under "-Economic Rights."

On the date that all outstanding shares of Class C common stock have converted to Class B common stock, all shares of Class B common stock will convert to Class A common stock and the holders of Class A common stock will be entitled to one vote per share.

Our certificate of incorporation does not provide for cumulative voting for the election of directors.

*Founder Proxy Agreement*

Evan Spiegel and Robert Murphy, our co-founders, have entered into a proxy agreement with each other. The agreement will apply to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over.

Under the proxy agreement, Mr. Spiegel has designated Mr. Murphy as his designated proxy holder, and Mr. Murphy has designated Mr. Spiegel as his designated proxy holder. Each co-founder has the right to select from time to time an alternate proxy holder who would exercise the proxy if the primary proxy holder were unable or unwilling to serve as a proxy. Mr. Spiegel and Mr. Murphy have each appointed Michael Lynton as his alternate proxy. Mr. Spiegel and Mr. Murphy may not change the primary proxy holder without the other's consent. A proxy holder will have the right to exercise all of the voting and consent rights of our shares of Class B common stock and Class C common stock beneficially owned by the deceased or disabled co-founder or over which he has voting control on and for the nine months following the co-founder's death or during his disability. Before any proxy holder may vote or act by written consent with respect to the shares of Class B common stock and Class C common stock over which they hold a proxy, that proxy holder will meet with the independent members of our board of directors within 90 days of the co-founder's death or disability.

The proxy agreement will terminate as soon as any of the following occur: (i) nine months after the death of both Mr. Spiegel and Mr. Murphy, (ii) the liquidation, dissolution, or winding up of our business operations, (iii) the execution by us of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of our property and assets, or (iv) the date as of which Mr. Spiegel and Mr. Murphy terminate the proxy agreement by written consent of Mr. Spiegel and Mr. Murphy, with notice to us.

*Co-Founder's Agreements*

Each of Evan Spiegel and Robert Murphy has also entered into a co-founder's agreement, pursuant to which, under certain circumstances related to the Special Dividend (as defined under the heading "Economic Rights – Dividends and Distributions" below) Mr. Spiegel and Mr. Murphy must convert a share of Class B common stock or Class C common stock, as the case may be, into a share of Class A common stock.

Specifically, (i) in the event Mr. Spiegel or Mr. Murphy sells during any Conversion Period (as defined below) a share of Class A common stock received as the Special Dividend on a share of Class B common stock, he shall be required to convert such share of Class B common stock into a share of Class A common stock and (ii) in the event Mr. Spiegel or Mr. Murphy sells during any Conversion Period a share of Class A common stock received as the Special Dividend on a share of Class C common stock, he shall be required to convert such share of Class C common stock into one share of Class A common stock ((i) and (ii) collectively, the "Conversion Requirement"), unless a majority of the Independent Directors (as defined in our certificate of incorporation) waives the Conversion Requirement prior to such conversion.

"Conversion Period" shall mean either of the following periods of time: (i) beginning on June 30, 2023 and ending on January 1, 2027; or (ii) beginning on the date (if any) on which Mr. Spiegel or Mr. Murphy, as applicable, has neither been a director nor an employee for a continuous period of two (2) years (subject to certain exceptions),

and ending on the date (if any) on which Mr. Spiegel or Mr. Murphy, as applicable, resumes service with us as a director or employee; provided, that no Conversion Period shall commence prior to the declaration and payment of the Special Dividend.

The Conversion Requirement does not apply to any sale (i) that would meet the requirements of a permitted transfer or (ii) (x) that constitutes a donation of such dividend shares to a tax-exempt organization or (y) the net proceeds of which are donated to a tax-exempt organization.

Each co-founder's agreement will terminate as soon as any of the following occur: (i) Mr. Spiegel or Mr. Murphy, as applicable, along with their permitted transferees and qualified trusts and certain affiliates, ceases to own any shares of Class C common stock or Class B common stock following the payment of the Special Dividend (including as a result of the occurrence of the Final Conversion Date (as defined in our certificate of incorporation)): (ii) if the condition for the declaration of the Special Dividend has not been satisfied as of such date, the tenth (10th) anniversary of the effective date of the co-founder's agreement; or (iii) the date as of which Mr. Spiegel or Mr. Murphy, as applicable, agrees to terminate the co-founder's agreement and such termination has been approved by a majority of the Independent Directors and executed on our behalf.

*Economic Rights*

Except as otherwise expressly provided in our certificate of incorporation or required by Delaware law, all shares of Class A common stock, Class B common stock, and Class C common stock will have the same rights and privileges and rank equally, share ratably, and be identical in all respects for all matters, including those described below:

*Dividends and Distributions*. Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably, on a per share basis, with respect to any dividend or distribution of cash or property paid or distributed by us, unless different treatment of the shares of the affected class is approved by the affirmative vote of the holders of a majority of the outstanding shares of the class treated adversely voting separately as a class. Even though holders of Class A common stock are not normally entitled to a vote on matters presented to our stockholders, they would be entitled to vote separately as a class, with one vote per share, on dividends and distributions if the holders of Class A common stock were treated adversely. As a result, if the holders of Class A common stock were treated adversely in any dividend or distribution, the holders of a majority of Class A common stock could defeat that dividend or distribution. In addition, if any two classes of common stock are treated adversely relative to another class of common stock with respect to any dividend or distribution, the vote of the holders of a majority of the adversely affected classes, voting together as a single class, would be required to approve that dividend or distribution. For example, if we were to make a distribution of cash to the holders of Class C common stock but not make a cash distribution or make a distribution of stock instead of cash to the holders of Class A common stock and Class B common stock, the holders of a majority of Class A common stock and Class B common stock, voting together as a single class, would be required to approve that dividend or distribution. In that scenario, each share of Class A common stock and Class B common stock would be entitled to one vote per share.

On July 19, 2022, our board of directors, after receiving the recommendation of a special committee of the board of directors (the "Special Committee"), determined that it is advisable and in our best interests, and in the best interests of our stockholders (other than Mr. Spiegel and Mr. Murphy and certain of their respective affiliates that hold shares of our capital stock, as to whom no determination was made), to declare and pay a special dividend of one share of Class A common stock as a one-time stock dividend on each outstanding share of our common stock (the "Special Dividend"); provided, however, that the Special Dividend shall not be declared until the later of (i) June 30, 2023 and (ii) the first business day following the date on which the 65-Day VWAP (as defined below) equals or exceeds $40 per share, or, if the board of directors so determines, a date that is within five business days after the later of such two dates. "65-Day VWAP" means the average of the volume weighted average price per share of Class A common stock traded on the New York Stock Exchange, or any other national securities exchange on which the shares of Class A common stock are then traded, for each of the 65 trading days ending on, and including, the first trading day immediately preceding the date of determination of the 65-Day VWAP. If the 65-Day VWAP does not exceed $40 per share by July 21, 2032, the Special Dividend will not be declared and paid and the co-founder's agreements shall terminate and be of no further force and effect.

*Liquidation Rights*. On our liquidation, dissolution, or winding-up, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably in all assets remaining after the payment of any liabilities, liquidation preferences, and accrued or declared but unpaid dividends, if any, with respect to any outstanding preferred stock, unless a different treatment is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class. As a result, the holders of a majority of each class of common

3

stock, including the Class A common stock, could defeat a proposed distribution of any assets on our liquidation, dissolution, or winding-up if that distribution were not to be shared equally, identically, and ratably.

*Change of Control Transactions.* The holders of Class A common stock, Class B common stock, and Class C common stock will be treated equally and identically with respect to shares of Class A common stock, Class B common stock, or Class C common stock owned by them, unless different treatment of the shares of each class is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class, on (i) the closing of the sale, transfer, or other disposition of all or substantially all of our assets, (ii) the consummation of a merger, reorganization, consolidation, or share transfer which results in our voting securities outstanding immediately before the transaction (or the voting securities issued with respect to our voting securities outstanding immediately before the transaction) representing less than a majority of the combined voting power of the voting securities of the company or the surviving or acquiring entity, or (iii) the closing of the transfer (whether by merger, consolidation, or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons of securities of the company if, after closing, the transferee person or group would hold 50% or more of the outstanding voting power of the company (or the surviving or acquiring entity). However, consideration to be paid or received by a holder of common stock in connection with any such asset sale, merger, reorganization, consolidation, or share transfer under any employment, consulting, severance, or other arrangement will be disregarded for the purposes of determining whether holders of common stock are treated equally and identically. As a result, the holders of a majority of each class of common stock, including the holders Class A common stock, could defeat a change of control transaction if the holders of Class A common stock, Class B common stock, and Class C common stock were not to be treated equally and identically in such change of control transaction.

*Subdivisions and Combinations.* If we subdivide or combine in any manner outstanding shares of Class A common stock, Class B common stock, or Class C common stock, the outstanding shares of the other classes will be subdivided or combined in the same manner.

If holders of Class A common stock are treated the same as holders of Class B common stock and Class C common stock with respect to the dividends and distributions, liquidation rights, change of control transactions, and subdivisions and combinations, such holders of Class A common stock will not have the right to vote on such matters.

### No Preemptive or Similar Rights

Our Class A common stock, Class B common stock, and Class C common stock are not entitled to preemptive rights, and are not subject to conversion, redemption, or sinking fund provisions, except for the conversion provisions with respect to the Class B common stock and Class C common stock described below.

### Conversion

Each share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. Each share of Class C common stock is convertible at any time at the option of the holder into one share of Class B common stock.

On any transfer of shares of Class B common stock, whether or not for value, each such transferred share will automatically convert into one share of Class A common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder continues to hold sole voting and dispositive power with respect to the shares transferred. Any holder's shares of Class B common stock will automatically convert into Class A common stock, on a one-to-one basis, on the death of the holder.

On any transfer of shares of Class C common stock, whether or not for value, each transferred share will automatically convert into one share of Class B common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder or a qualified trustee for that holder continues to hold sole voting and dispositive power with respect to the shares transferred, and transfers between founders.

Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, on the date on which the number of outstanding shares of Class C common stock held by that holder represents less than 32,383,178 shares of Class C common stock, which represents 30% of the 107,943,924 shares of Class C common stock held by that holder on the date of the closing of our initial public offering. Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months after the death of that holder. Once there are no shares of Class C common stock outstanding, all shares of Class B common stock will convert to Class A common stock, on a one-to-one basis, and all shares of

4

Class A common stock will have one vote per share, as described in our certificate of incorporation. Either of our founders may transfer shares of Class B common stock or Class C common stock to the other founder or a founder's permitted transferee without such transferred shares converting into Class A common stock or Class B common stock, respectively. In addition, either founder may transfer shares of Class B common stock or Class C common stock to a qualified trustee without such transferred shares converting into Class A common stock or Class B common stock, respectively. A qualified trustee is a professional in the business of providing trustee services that is subject to appointment and removal solely by that founder or, following a founder's death or during the founder's disability event, by the founder's designated proxy (who may be the other founder or another person selected by the founder and approved to act in that role by the independent members of our board of directors). A qualified trustee may not have any pecuniary interest in any Class B common stock or Class C common stock held by any entity of which that person is a trustee. Shares of Class C common stock held by a founder's qualified trustee will convert to Class B common stock nine months after the death of that founder. Termination of a founder's employment or services with us does not result in conversion of Class C common stock held by such founder.

Once transferred and converted into Class A common stock, the Class B common stock may not be reissued. Once transferred and converted into Class B common stock, the Class C common stock may not be reissued.

## Preferred Stock

Our board of directors may, without further action by our stockholders, fix the rights, preferences, privileges, and restrictions of up to an aggregate of 500,000,000 shares of preferred stock in one or more series and authorize their issuance. These rights, preferences, and privileges could include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, and the number of shares constituting any series or the designation of such series, any or all of which may be greater than the rights of our Class A common stock, Class B common stock, or Class C common stock. Any issuance of our preferred stock could adversely affect the voting power of holders of our Class B common stock or Class C common stock, and the likelihood that such holders would receive dividend payments and payments on liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring, or preventing a change of control or other corporate action.

## Anti-Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws

Because our stockholders do not have cumulative voting rights, stockholders holding a majority of the voting power of our shares of common stock will be able to elect all of our directors. Our certificate of incorporation and bylaws provide for stockholder actions at a duly called meeting of stockholders or, before the date on which all shares of common stock convert into a single class, by written consent. A special meeting of stockholders may be called by a majority of the total number of authorized directors of our board of directors, the chair of our board of directors, our chief executive officer, or, before the date on which all shares of common stock convert into a single class, the holders of at least 30% of the total voting power of our Class A common stock, Class B common stock, and Class C common stock, voting together as a single class. Our bylaws include an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors.

Our certificate of incorporation further provides for a tri-class common stock structure, which provides Mr. Spiegel, our co-founder and Chief Executive Officer, and Mr. Murphy, our co-founder and Chief Technology Officer, or Mr. Spiegel alone, with control over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets.

The foregoing provisions will make it more difficult for our existing stockholders, other than Mr. Spiegel and Mr. Murphy, or Mr. Spiegel alone, to replace our board of directors as well as for another party to obtain control of us by replacing our board of directors. Since our board of directors has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management. In addition, the authorization of undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change our control.

These provisions, including the tri-class structure of our common stock, are intended to preserve our existing founder control structure, facilitate our continued product innovation and the risk-taking that it requires, permit us to continue to prioritize our long-term goals rather than short-term results, enhance the likelihood of continued stability in the composition of our board of directors and its policies, and discourage certain types of transactions that may involve an actual or threatened acquisition of us. These provisions are also designed to reduce our vulnerability to an unsolicited acquisition proposal and to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for our shares and may have the effect of deterring hostile takeovers or delaying changes in our control or management. As

a consequence, these provisions may also inhibit fluctuations in the market price of our stock that could result from actual or rumored takeover attempts.

When we have a class of voting stock that is either listed on a national securities exchange or held of record by more than 2,000 stockholders, we will be subject to Section 203 of the Delaware General Corporation Law, or the DGCL. Section 203 of the DGCL prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years after the date that such stockholder became an interested stockholder, subject to certain exceptions.

**Choice of Forum**

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware will be the exclusive forum for: (i) any derivative action or proceeding brought on our behalf; (ii) any action asserting a breach of fiduciary duty; (iii) any action asserting a claim against us arising under the DGCL, our certificate of incorporation, or our bylaws; or (iv) any action asserting a claim against us that is governed by the internal affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

**Listing**

Our Class A common stock is listed on the New York Stock Exchange under the symbol "SNAP."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company, LLC.

**Exhibit 21.1**

**Subsidiaries of the Registrant**

| Name of Subsidiary | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Snap LLC | Nevada |
| Snap Group Limited | United Kingdom |
| Snap International I Limited | United Kingdom |
| Snap International II Limited | United Kingdom |
| Snap Intermediate Inc. | Delaware |
| Snap Group SAS | France |
| Snap Aus Pty Ltd | Australia |
| Snap ULC | Canada |
| Snap Camera GmbH | Germany |

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statements (Form S-8 No. 333-216495, 333-224591, 333-229530, 333-236257, 333-252789, 333-262543) pertaining to the Snap Inc. Amended and Restated 2012 Equity Incentive Plan, Snap Inc. Amended and Restated 2014 Equity Incentive Plan, Snap Inc. 2017 Equity Incentive Plan, Snap Inc. 2017 Employee Stock Purchase Plan, and a separate Snap Inc. Restricted Stock Unit Award Agreement

(2)    Registration Statement (Form S-3 ASR No. 333-252796) of Snap Inc.

of our reports dated January 31, 2023, with respect to the consolidated financial statements of Snap Inc., and the effectiveness of internal control over financial reporting of Snap Inc., included in this Annual Report (Form 10-K) of Snap Inc. for the year ended December 31, 2022.

/s/ Ernst & Young LLP

Los Angeles, California
January 31, 2023

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Evan Spiegel, certify that:

1.  I have reviewed this annual report on Form 10-K of Snap Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 31, 2023

/s/ Evan Spiegel
Evan Spiegel
Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

### CERTIFICATION PURSUANT TO
### RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Derek Andersen, certify that:

(1)       I have reviewed this annual report on Form 10-K of Snap Inc.;

(2)       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)       The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

       (a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

       (b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

       (c)       Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

       (d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       (a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       (b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 31, 2023

/s/ Derek Andersen
_____
Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Snap Inc. (the "Company") on Form 10-K for the year ended December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: January 31, 2023                                    /s/ Evan Spiegel
                                                          Evan Spiegel
                                                          Chief Executive Officer
                                                          *(Principal Executive Officer)*

Date: January 31, 2023                                    /s/ Derek Andersen
                                                          Derek Andersen
                                                          Chief Financial Officer
                                                          *(Principal Financial Officer)*

# Exhibit 407

MetaFTC-DX-10
01 (5-22-23)
WWW.DIGITALEVIDENCEGROUP.COM

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:  **Joseph J. Simons, Chairman**
       **Noah Joshua Phillips**
       **Rohit Chopra**
       **Rebecca Kelly Slaughter**
       **Christine S. Wilson**

**FTC Matter No.**    **P205402**

## ORDER TO FILE A SPECIAL REPORT

Pursuant to a resolution of the Federal Trade Commission ("FTC" or "the Commission") dated December 11, 2020, entitled "Resolution Directing Use of Compulsory Process to Collect Information Regarding Social Media and Video Streaming Service Providers' Privacy Practices," a copy of which is enclosed, **[COMPANY NAME],** hereinafter referred to as the "Company," is ordered to file with the Commission, no later than 45 days after date of service, a Special Report containing the information and Documents specified herein.

The Commission is seeking information concerning the privacy policies, procedures, and practices of Social Media and Video Streaming Service providers, Including the method and manner in which they collect, use, store, and disclose Personal Information about consumers and their devices. The Special Report will assist the Commission in conducting a study of such policies, practices, and procedures.

The Special Report is required to be subscribed and sworn by an official of the Company who has prepared or supervised the preparation of the report from books, records, correspondence, and other data and material in Your possession. Your written report should restate each item of this Order with which the corresponding answer is Identified. If any question cannot be answered fully, give the information that is available and explain in what respects and why the answer is incomplete. The Special Report and all accompanying documentary responses must be Bates-stamped.

You are required to respond to this Order using information in Your possession, custody, or control, Including information maintained in a central data repository to which You have access. You should not seek any responsive information and data from separately incorporated subsidiaries or affiliates or from individuals (other than in their capacity as Your employee or as Your agent). However, You should provide information from separately incorporated subsidiaries or affiliates or from individuals if You already have possession, custody, or control of such information. No later than 14 days from the date of service, You should contact Commission staff and indicate whether all of the information required to respond to this Order is in Your possession, custody, or control. If certain information is not in Your possession, custody, or control, no later than 14 days from the date of service, You also must: (1) Identify, both orally and in writing, each question or sub-question that You are not able to fully answer because information is not in Your possession, custody, or control, and (2) for each, provide the

full names and addresses of all entities or individuals who have possession, custody, or control of such missing information.

Confidential or privileged commercial or financial information will be reported by the Commission on an aggregate or anonymous basis, consistent with Sections 6(f) and 21(d) of the FTC Act.  Individual submissions responsive to this Order that are marked "confidential" will not be disclosed without first giving the Company ten (10) days' notice of the Commission's intention to do so, except as provided in Sections 6(f) and 21 of the FTC Act.

## SPECIFICATIONS

Please produce the following information, Documents, and items, consistent with the definitions, instructions, and formatting requirements contained in Attachment A.

**Identification of Report Author**

1.    Identify by full name, business address, telephone number, and official capacity the individual(s) who prepared or supervised the preparation of the Company's response to this Order, and Describe in Detail the steps taken by the Company to respond to this Order.  For each Specification, Identify the individual(s) who assisted in preparation of the response.  Produce a list Identifying the individual(s) whose files were searched, and Identify the individual(s) who conducted the search.

**Company Information**

2.    State the Company's complete legal name and all other names under which it has done business, its corporate mailing address, all addresses from which it does or has done business, and the dates and states of its incorporation.

3.    Describe the Company's corporate structure, and state the names of all parents, subsidiaries, divisions, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control.  For each such entity, Describe in Detail the nature of its relationship to the Company and the date it was created, acquired, sold, or otherwise changed ownership or control.  Produce organizational charts sufficient to detail the Company's corporate structure.

4.    If the Company is not publicly traded, Identify each individual or entity having an ownership interest in the Company, as well as their individual ownership stakes and their positions and responsibilities within the Company.

**General Information Regarding Social Media and Video Streaming Services**

5.    Identify each Social Media and Video Streaming Service provided or sold by the Company from January 1, 2019 to the present in each Relevant Area, and for each such Social Media and Video Streaming Service, separately for all users in total and for each mutually exclusive Selected User Group, provide, on a monthly basis, separately for

2

desktop and mobile, the number of users and the value of each User Metric, in total and on average per monthly active user (if applicable), Including:

a) number of registered users;

b) daily active users ("DAUs");

c) monthly active users ("MAUs");

d) time spent;

e) number of sessions;

f) unique posts, separately by photos, videos, stories, or other;

g) views, separately by photos, videos, stories, or other;

h) "like" or "recommend" actions (e.g., likes, upvotes, downvotes);

i) shares, reposts, or forwards, within the Social Media and Video Streaming Service or to any other Social Media and Video Streaming Service;

j) comments;

k) messages sent, separately by text, video, and image messages;

l) status updates;

m) size of the social graph;

n) User Network Size;

o) privacy settings;

p) User Engagement on any Social Media and Video Streaming Service, or other product or service, owned by any Person other than the Company;

q) value of user to the Company (e.g., dollar value);

r) exposure to ads (e.g., ad load);

s) ad engagement;

t) ads viewed for (i) each Advertising Format and (ii) all Advertising Formats in total;

u) ads viewed for (i) each Advertising Format and (ii) all Advertising Formats in total; as a share of total posts, stories, and messages viewed; and

3

v) any other measure of user traffic, density, engagement, or activity used by the Company in the ordinary course of business.

Provide with Your response a description of each User Metric, Including a description of how each User Metric is calculated, and a data dictionary with each such metric.

Submit a list of available mutually exclusive Selected User Groups to Commission counsel before submitting a full response to Specification 5.  If the Company lacks a value (e.g., "yes," and "no," for whether a natural Person is of Hispanic, Latino or Spanish origin) for a Selected User Attribute for any user, the Company should treat "missing" as the value of that Selected User Attribute for the users who lack a value.

For the limited purpose of illustrating the concept of mutually exclusive Selected User Groups, assume that the Selected User Attributes are age, whether a natural Person is of Hispanic, Latino or Spanish origin, and country, and that the mutually exclusive values for those Selected User Attributes are 0-25 years, 26-50 years, 50+ years, and "missing" for age; yes, no and "missing" for whether a natural Person is of Hispanic, Latino or Spanish origin; and United States, Other, and "missing" for country.  The number of mutually exclusive Selected User Groups in the Company's response would be the product of the number of mutually exclusive values for each Selected User Attribute: N = (# of age values)*(# of origin values)*(# of country values).

In this example, the Company's response would Include 36 mutually exclusive Selected User Groups per month [(4 age values)*(3 origin values)*(3 country values) = 36], and the Company's response should Include the number of registered users in each such group and the value of each User Metric, on a monthly basis, in total and on average per MAU (if applicable), for each such group of users.  The spreadsheet in Appendix A illustrates this example.

6. For each Social Media and Video Streaming Service identified in response to Specification 5, provide, on a monthly basis, separately for each Relevant Area, the total number of registered users and value of each User Metric, in total and on average per MAU (if applicable), separately for the subset of users in each Selected User Group that were:

a) MAUs on such Social Media and Video Streaming Service; and

b) MAUs on such Social Media and Video Streaming Service and also active on another Social Media and Video Streaming Service provided or sold by any Person other than the Company, stated separately for each other Social Media and Video Streaming Service (and Identifying such other Social Media and Video Streaming Service).

7. For each Social Media and Video Streaming Service identified in response to Specification 5, separately for each Relevant Area, Identify and describe each metric (Including the inputs and the methodology used to calculate the metric) that the Company uses to assess the service's penetration or reach (e.g., 1-day reach, 30-day reach, installed base, or app downloads).  Provide each such metric (Including the inputs used to

4

calculate the metric) on a monthly basis, stated separately for each Social Media and Video Streaming Service in each Relevant Area.

8.  For each Social Media and Video Streaming Service identified in response to Specification 5, separately for each Relevant Area, state, on a monthly, quarterly, and annual basis:

    a) the Company's revenue, other than advertising revenue, stated in dollars, stated separately by type of revenue, Including gross and net revenue;

    b) the Company's revenue for each Digital Advertising Service on the Social Media and Video Streaming Service, stated in dollars, stated separately by type of revenue, Including gross and net revenue;

    c) the Company's costs and expenses, other than for Digital Advertising Services on the Social Media and Video Streaming Service, stated in dollars, Including, but not limited to, cost of revenue, traffic acquisition costs, and revenue guarantees;

    d) the Company's costs and expenses for each Digital Advertising Service on the Social Media and Video Streaming Service, stated in dollars, Including, but not limited to, cost of revenue, traffic acquisition costs, and revenue guarantees;

    e) the Company's prices for revenue-generating products or services other than advertising revenue; and

    f) the Company's gross margins, operating margins, and the method of computation.

9.  State whether the Company uses data professionals (e.g., a privacy engineer) in the management and operation of its Social Media and Video Streaming Service's privacy, ethics, or bias efforts, and state their roles (e.g., legal, technical, operational, design, etc.) in the Social Media and Video Streaming Service's product lifecycle, Including any privacy, bias, or ethics-focused professionals working on Algorithms or Data Analytics utilized by a Social Media and Video Streaming Service, and Describe in Detail their responsibilities.

**Data Collection, Use, Storage, Disclosure, and Deletion**

10. For each Social Media and Video Streaming Service identified in response to Specification 5, separately for each Relevant Area, Identify each User Attribute that the Company uses, tracks, estimates, or derives, Including, but not limited to, each User Attribute Related to the Company's sale of Digital Advertising Services such as User Attributes for targeted advertising.  Further, provide the following:

    a) For each such User Attribute, Identify and provide the available values for that attribute (e.g., "yes," "no" for whether the natural Person is of Hispanic, Latino, or Spanish origin) that the Company uses, tracks, estimates, or derives.

b)  For each Social Media and Video Streaming Service in each Relevant Area, Identify, on an annual basis, the top 1,000 most populous User Attribute values (excluding "missing" as a value), based on average number of MAUs of the Social Media and Video Streaming Service, and for each, provide, on an annual basis:

i)   the number of registered users;

ii)  the average number of DAUs;

iii) the average number of MAUs;

iv)  the total time spent;

v)   the average time spent per day per MAU; and

vi)  the average value of the user to the Company, Including average revenue per user.

c)  For each Social Media and Video Streaming Service in each Relevant Area, Identify, on an annual basis, the top 1,000 User Attribute values most frequently used by the Company and advertisers on the Company's Social Media and Video Streaming Service to target advertising or match advertisements to users, provide a description of the Company's criteria and method for determining the top values, and, for each top value, provide, on an annual basis:

i)   the number of registered users;

ii)  the average number of DAUs;

iii) the average number of MAUs;

iv)  the total time spent;

v)   the average time spent per day per MAU; and

vi)  the average value of the user to the Company, Including average revenue per user.

d)  Identify any metric the Company uses, tracks, estimates, or derives to assess the accuracy of its User Attribute information, and, for each such metric, provide on an annual basis, the value of each such metric.

11.  Describe in Detail the process for Identifying and reporting inaccurate User Attribute information, and the process, if any, for remedying any harms caused by these inaccuracies, Including all oversight provided by senior leadership as identified by position.  For each Social Media and Video Streaming Service in each Relevant Area, Identify, on an annual basis:

a)  the number of inaccurate User Attributes identified per quarter;

b) the top 100 types of inaccuracies (e.g., fake account, unauthorized account, bot, inaccurate information, invalid clicks or views, etc.) and their primary genesis if known;

c) the top 1,000 User Attributes with inaccuracies in rank order, starting with the attribute with the most inaccuracies;

d) the number and type of advertisements shown based on (i) inaccurate information overall, (ii) top 1,000 User Attributes with inaccuracies, and (iii) for each of the top 100 types of inaccuracies where applicable;

e) the total and average cost of advertisements placed based on (i) inaccurate information overall, (ii) top 1,000 User Attributes with inaccuracies, and (iii) for each of the top 100 types of inaccuracies where applicable;

f) the total and average revenue value, Including but not limited to revenue derived from (i) inaccuracy overall, (ii) top 1,000 User Attributes with inaccuracies, and (iii) for each of the top 100 types of inaccuracies where applicable; and

g) the total and average amount of restitution provided to third parties harmed by (i) inaccuracy overall, (ii) for the top 1,000 User Attributes with inaccuracies, and (iii) for each of the top 100 types of inaccuracies where applicable.

12. For each Social Media and Video Streaming Service identified in response to Specification 5, submit all Documents Relating to the Company's or any other Person's strategies or plans, Including, but not limited to:

a) business strategies or plans;

b) short-term and long-range strategies and objectives;

c) expansion or retrenchment strategies or plans;

d) research and development efforts;

e) sales and marketing strategies or plans, Including, but not limited to, strategies or plans to expand the Company's customer base or increase sales and marketing to particular customer segments (e.g., a user demographic);

f) strategies or plans to reduce costs, improve products or services (e.g., expanding features or functionality), or otherwise become more competitive;

g) plans to enter into or exit from the sale or provision of any Relevant Product or other product or service;

h) presentations to management committees, executive committees, and boards of directors; and

      i)    budgets and financial projections.  For regularly prepared budgets and financial projections, the Company need only submit one copy of final year-end Documents for prior years, and cumulative year-to-date Documents for the current year.

13.     For each Social Media and Video Streaming Service identified in response to Specification 5, submit all Documents Relating to the Company's or any other Person's advertising or premium subscription pricing plans, pricing strategy, pricing practices, pricing decisions, pricing Analyses, and pricing policies, Including, but not limited to, pricing Algorithms or Data Analytics, discount policies, pricing programs, and bundling strategies.

14.     Describe in Detail how the Company shares users' and non-users' Personal Information with, or obtains users' and non-users' Personal Information from, its affiliates or other Company-branded entities.  As part of Your response, (a) Identify those entities and Describe in Detail the types of Personal Information and purposes for such sharing or obtaining; and (b) Describe in Detail and provide any policies or contracts detailing sharing and use restrictions among affiliates and Company-branded entities.

15.     Describe in Detail how the Company shares users' and non-users' Personal Information with, or obtains users' and non-users' Personal Information from, third parties.  As part of Your response, (a) Identify those entities and Describe in Detail the types of Personal Information and purposes for such sharing or obtaining; and (b) Describe in Detail and provide any policies or contracts applicable to such sharing.

16.     Describe in Detail how the Company collects, assembles, purchases, or otherwise obtains information Related to a consumer's shopping behavior, Including at offline and online retail outlets (e.g., grocery stores).  Include in Your response a detailed description of how the Company uses this data, or permits this data to be used, to target individual consumers or members of a household.

17.     Submit all data deletion and retention policies the Company has in place.  If the Company does not have such data deletion and retention policies, Describe in Detail the Company's data deletion and retention practices, Including (a) any retention periods for Personal Information collected from or about users and their devices, or information inferred about users and their devices; (b) how these practices apply to Personal Information associated with canceled or abandoned accounts; and (c) the process for responding to a third party request to delete data.

18.     Describe in Detail the Company's policies and procedures Related to the minimization of Personal Information, as well as policies and procedures to ensure that the Company's employees, affiliates, and third parties with whom the Company shares such Personal Information comply with these policies and procedures.

19.     Describe in Detail any analyses the Company performed on different variations of user interfaces for users' privacy settings or ability to exercise access, correction, porting, or deletion rights.  Produce the Documents associated with and all results of such Analyses. Describe in Detail any changes to the user interfaces as a result of these processes, the

dates these changes were made, and every metric and its value pertaining to the financial, growth, or other Company outcomes associated with each change.  State, separately for each month from January 1, 2019 onward, the number of users who (a) made changes to their privacy settings; (b) requested access to their data; (c) requested correction of their data; (d) requested to port their data; or (e) requested to delete their data.  If any of these choices were not honored, Describe in Detail why.

20.     For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail how academics and researchers may request access to Personal Information or other information held by the Social Media and Video Streaming Service, and what types of Personal Information and other information such academics and researchers may access.  Produce all materially different contracts or policies that apply to academics' and researchers' use of Personal Information or other information.

**Advertising**

21.     Identify each Digital Advertising Service sold or provided by the Company from January 1, 2019 to the present in each Relevant Area, and for each such service, provide the following information:

   a)   a description of the Digital Advertising Service;

   b)   its intended user or user segment;

   c)   whether the product or service is priced by cost-per-click, cost-per-impression, revenue split, or other formula;

   d)   whether the intended focus of the product or service is for brand awareness advertising, performance advertising, product purchase, or other purposes; and

   e)   the targeting capabilities of the product or service, Including, but not limited to, a description of all data points that can be used to target (e.g., user information, mobile device type, location information, application being used, keywords), and the source of that data.

22.     For each Digital Advertising Service identified in response to Specification 21, separately for each Relevant Area, state on a monthly, quarterly, and annual basis:

   a)   the Company's revenue, other than those for advertising on any Social Media and Video Streaming Service reported in Specification 8(b), stated in dollars, Including, but not limited to, gross revenue, separated by advertising and non-advertising revenues; and

   b)   the Company's costs and expenses, other than those for advertising on any Social Media and Video Streaming Service reported in Specification 8(d), stated in dollars, Including, but not limited to, cost of revenue, traffic acquisition costs, or revenue guarantees, exclusive of the costs and expenses reported in response to Specification 8(d); and

     c)   the Company's gross margins, operating margins, and the method of computation.

23.    For each Digital Advertising Service identified in response to Specification 21 separately for each Relevant Area, Identify and describe (Including, but not limited to, describing how the Company defines each item in the ordinary course):

    a)   each Advertiser Metric, Including but not limited to, each metric for:

        i)   ad revenue;

        ii)   number of bids in auctions that resulted in an ad being shown to a user;

        iii)   number of advertisers;

        iv)   number of impressions (i.e., ads shown to a user);

        v)   number of clicks;

        vi)   click-through rate (i.e., number of clicks per impression);

        vii   measures of User Engagement (e.g., number or users or average time spent per user);

        viii) average winning advertiser bid for ads shown to a user;

        ix)   average price determined by the auction for ads shown to a user (e.g., average cost per click or cost per action);

        x)   average cost per mille (i.e., cost per thousand impressions) regardless of whether cost to advertisers was based on number of views or other user actions;

        xi)   number of ads shown to a user that resulted in the desired Advertising Objective (e.g., conversions);

        xii)   advertiser return on investment (e.g., return on ad spend); and

        xiii) the existence or absence of other advertising Publishers and their identities;

    b)   each Advertising Objective;

    c)   the pricing models available for each Advertising Objective (e.g., cost per click or cost per impression);

    d)   each Selected Advertiser Attribute, and each mutually exclusive value for each such Selected Advertiser Attribute (e.g., "small business" or "large business" for advertiser size) tracked by, derived by, estimated by, or available to the Company (with "missing" treated as a value if the Company lacks a value for the Advertiser Attribute for every advertiser);

e)   each mutually exclusive Selected Advertiser Category (i.e., each mutually exclusive group of advertisers reflecting each mutually exclusive combination of Selected Advertiser Attribute values), and each set of Selected Advertiser Attribute values used to define such Selected Advertiser Category; and

f)   each Advertiser Metric the Company provided to any other Person and the time periods for which such information was provided, stated separately for each Third-Party Category, Including, but not limited to, app developers, analytics partners, and advertisers.

24.   For each Digital Advertising Service, (i) by Advertising Placement, (ii) by Country Location where the advertisement was displayed, (iii) by Advertising Format, (iv) by each pricing model available for Advertising Objectives, (v) by whether sales are direct or by auction, (vi) by desktop and by mobile; provide, on a monthly basis, the number of advertisers and the value of each Advertiser Metric identified in response to Specification 23(a), for:

a)   all advertisers in total; and

b)   each mutually exclusive Selected Advertiser Category.

Provide with Your response a description of each Advertiser Metric, Including a description of how each Advertiser Metric is calculated, and a data dictionary with each such metric.

Submit a list of available mutually exclusive Selected Advertiser Categories to Commission counsel before submitting a full response to Specification 24.  If the Company lacks a value for a Selected Advertiser Attribute for any advertiser, the Company should treat "missing" as the value of that Selected Advertiser Attribute for the advertisers who lack a value.

For the limited purpose of illustrating Specification 24(b), assume that the Selected Advertiser Attributes are advertiser size, industry vertical, and spend tier, and that the mutually exclusive values for those Selected Advertiser Attributes are small business, large business, and "missing" for advertiser size; ecommerce, gaming, and "missing" for industry vertical; and "1" and "2" for spend tier.  The number of mutually exclusive Selected Advertiser Categories in the Company's response would be the product of the number of mutually exclusive values for each Selected Advertiser Attribute: N = (# of advertiser size values)*(# of industry vertical values)*(# of spend tier values).

In this example, the Company's response would Include 18 mutually exclusive Selected Advertiser Categories per month [(3 advertiser size values)*(3 industry vertical values)*(2 spend tier values) = 18], and the Company's response should Include the number of advertisers in each such group and the value of each Advertiser Metric, on a monthly basis, for each such group of advertisers.  The spreadsheet in Appendix B illustrates this example.

25.   For each Digital Advertising Service:

a) Identify, on a monthly basis:

    i) the top 100 advertisers in each mutually exclusive Selected Advertiser Category, by revenue generated by the Company on advertisements displayed in the United States; and

    ii) the top 100 advertisers in each mutually exclusive Selected Advertiser Category, by revenue generated by the Company on advertisements displayed worldwide; and

b) for each such advertiser and month identified in subparts (a)(i) and (a)(ii), provide:

    i) the value of each Selected Advertiser Attribute for the advertiser; and

    ii) the ad revenue in the relevant geography for the advertiser by (1) Advertising Format, (2) each pricing model available for Advertising Objectives, (3) whether advertising purchases are direct or by auction, and (4) desktop and mobile.

26. Submit all Documents Relating to the sale or provision of any Digital Advertising Service or the display of advertising to users in any Relevant Area, Including, but not limited to, all Documents Relating to:

a) the Company's collection of, or access to, information about user or consumer activities, attributes, or interests;

b) the tracking of user or consumer activity on or off of the Company's products or services;

c) the quality or accuracy of the Company's measurement or assessment of user activities, attributes, and interests, and the Company's ability to target advertising;

d) the effect of advertising, Including advertising load, on consumer behavior or user activity, engagement, growth, retention, or attrition; and

e) the effect of advertising load and advertising inventory volume on revenue, price, and profitability of the Company's Digital Advertising Services.

**Algorithms or Data Analytics**

27. For each Social Media and Video Streaming Service identified in response to Specification 5, state whether the Social Media and Video Streaming Service applies Algorithms or Data Analytics to Personal Information, and if so, Describe in Detail the specific categories of Personal Information to which the Algorithms or Data Analytics are applied and each of the ways the Company uses Algorithms or Data Analytics, Including:

a) the processes and techniques used:

i)   to prepare data for Analysis, Including but not limited to locating, acquiring, and ingesting data; assessing and cleaning data; reconciling and making data uniform; extracting, restricting, and linking data; coding and annotating data; and updating data as new information becomes available; and

ii)   to analyze data, Including but not limited to:

   (1)  descriptive and exploratory Analysis;

   (2)  predictive Analysis, such as machine learning, linear regression, non-linear regression classification, data mining, text analytics, Bayesian methods, and simulation; and

   (3)  prescriptive Analysis, such as stochastic models, and optimization;

b)   the sources of such Personal Information, Including

   i)   whether the source is the user, affiliate, third party or other, and if other, describe;

   ii)   the top 100 non-user sources of data;

   iii)  categories of data procured on existing users, uses for each category, the total cost and average cost per user for each category from each source, and the total value both overall and per user, Including revenue, derived from each category, per source and per use;

   iv)  categories of third-party data procured on nonusers, uses for each category, the total cost and average cost per user for each category from each source, and the total value both overall and per user, Including revenue, derived from each category, per source and per use; and

   v)   the processes and techniques used to integrate or otherwise monetize data from each third-party source, any new predictive capability or other Company outcome enabled by each integration, and the value, Including revenue, derived from any integration, predictive capability, and/or other Company use of external data;

c)   the purpose(s) for which the Company applies Algorithms or Data Analytics to the Personal Information, Including but not limited to:

   i)   to make inferences or conclusions, and if so, the types of inferences and conclusions the Company makes; and

   ii)   to make decisions, and if so, the types of decisions the Company makes;

d)  whether the Social Media and Video Streaming Service has any written policies and procedures with respect to the development or application of Algorithms or Data Analytics to Personal Information.  If so, produce such policies and procedures; and

e)  whether the Social Media and Video Streaming Service monetizes the development or application of such Algorithms or Data Analytics to the Personal Information, and if so, how the Company monetizes such applications (i.e., research and development, third-party sales, etc.).

28.  For each Social Media and Video Streaming Service that applies Algorithms or Data Analytics to Personal Information identified in response to Specification 27, Describe in Detail how the Company identifies and addresses privacy, security, or ethics issues with respect to the application of Algorithms or Data Analytics to Personal Information, Including:

a)  the Company's use of Classifiers, Including (i) how often Classifiers are revised, considered, and retrained; and (ii) whether it excludes or limits use of any Classifiers;

b)  whether the Company examines whether data sets are missing information from particular populations, and if so, how the Company examines data sets for missing information from particular populations and what steps it takes to address such missing information; and

c)  whether the Company examines any correlations and other empirical relationships found by the application of Algorithms or Data Analytics, and if so, how the Company determines whether the correlations and empirical relationships are meaningful.

29.  For each Social Media and Video Streaming Service that applies Algorithms or Data Analytics to Personal Information identified in response to Specification 27, Describe in Detail how the Company monitors and tests the application of Algorithms or Data Analytics to Personal Information, Including:

a)  the Person(s) responsible for monitoring and testing the Algorithms or Data Analytics;

b)  the process(es) by which the Company monitors and tests the accuracy or impact of the Algorithms or Data Analytics, Including the extent to which the processes are automated or rely on human intervention;

c)  the frequency with which the Company tests, validates, and reviews the accuracy or impact of any Algorithms or Data Analytics;

d)  whether the Company determines that any decisions made by Algorithms or Data Analytics are reliable, and if so, how the Company determines that any decisions made by Algorithms or Data Analytics are reliable;

e) how the Company determines the accuracy of any decisions made by the Algorithms or Data Analytics, Including the false-positive and false-negative rates;

f) whether the Company examines or tests data sets and Algorithms for bias, or allows affiliates or third parties to examine or test for bias, and if so how the Company, affiliates, or third parties examine and test data sets and Algorithms for bias, Including which types of demographic categories the Company, affiliates, or third parties analyze, and, if the Company or third party finds bias, the steps the Company takes to address it;

g) how the Company monitors any automated decision-making by the Algorithms or Data Analytics;

h) how the Company evaluates the usefulness of any particular Algorithm or Data Analytics; and

i) the frequency with which the Company updates or modifies its Algorithms or Data Analytics.

30. Produce all relevant policies and procedures, and any Analysis associated with evaluating, monitoring, testing, and validating the use or application of Algorithms or Data Analytics to Personal Information.

31. Describe in Detail how the Company uses Algorithms or Data Analytics to sell or provide any Digital Advertising Service or display advertising to users. Your response should Describe in Detail the process for and the frequency of updates to Algorithms or Data Analytics to remove inaccurate or unauthorized information (Including information on Children and Teens, or information retained after a user revokes consent), and information that users deleted. Produce Documents sufficient to show all:

a) Analyses of each such update, remedial actions taken following each such update, and/or strategies and rationale on timing of updates; and

b) Analyses of financial metrics associated with each such update, remedial actions taken following each such update, and/or strategies and rationale on timing of updates.

**User Engagement**

32. For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail how the Company measures, promotes, and researches User Engagement, Including:

a) tools the company uses, Including but not limited to Algorithms or Data Analytics, to increase User Engagement;

b)  how the Company studies and analyzes User Engagement, Including User Engagement with other products and services offered by the Company or User Engagement's impact on advertising revenue; and

c)  how a user's negative interactions with the Social Media and Video Streaming Service (e.g., blocking or unsubscribing from content) affect the user's engagement.

33.  For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail what factors influence what content (whether user-created or ad-based) users see in the Social Media and Video Streaming Service, Including:

a)  how the Company moderates content;

b)  how the Company targets, surfaces, or promotes content;

c)  what ranks and measures, Including if applicable User Attributes, the Company uses to target, surface, or promote content to users;

d)  whether the display of information differs if a user is logged in or logged out of an application or service; and

e)  how user-created content presentation is influenced by, impacted by, or in any way associated with the Company's advertising goals and outcomes.

34.  For each Social Media and Video Streaming Service identified in response to Specification 5, separately for each Relevant Area, Identify each rank, measure, or User Attribute that the Company uses, tracks, estimates, or derives, to target, surface, or promote content to users.  Additionally, Identify the top values most heavily weighted by the Company in order to target content or surface or promote user-created content.  If You provided this information in response to Specification 10 or Specification 32, please Identify the relevant information.

35.  For each Social Media and Video Streaming Service identified in response to Specification 5, submit all of the Company's content moderation policies and content promotion policies.

36.  For each Social Media and Video Streaming Service identified in response to Specification 5, submit Documents sufficient to show the Company's development, launch, growth, performance, termination, or discontinuance of any User Engagement strategy or Social Media and Video Streaming Service strategy for targeting, surfacing, or promoting user content, Including but not limited to:

a)  any efforts, strategies, or tools of the Company to increase the number of users or User Engagement;

b)  any efforts, strategies, or tools of the Company to develop new or improved features or functionality; and

     c)   any action or decision of the Company to terminate or discontinue any Social Media and Video Streaming Service offering or functionality.

37.    Provide representative samples of each type of promotional material the Company disseminates referring or Relating to User Engagement, Including revenue derived from such User Engagement.

38.    Describe in Detail any strategies, efforts, processes, plans, and/or presentations associated with producing higher revenue, generating growth, spurring User Engagement, or soliciting user agreement by making changes to user interfaces or designs, and the outcomes and/or metrics associated with any changes made to user interfaces or designs. To the extent Your responses to Specifications 12 or 17 Include this information, Identify the relevant information.

**Demographic Information**

39.    For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail the types of Demographic Information, Including how the Company categorizes this information (e.g., Hispanic/non-Hispanic) it collects, infers, or otherwise processes about (a) users, (b) their households, (c) non-users, and (d) their households.

40.    Describe in Detail how the Company identifies, predicts, determines, infers, or makes correlations with or about Demographic Information, Familial Status, or Familial Relationships, Including based on:

    a)   content a user posts on or shares with the Social Media and Video Streaming Service;

    b)   Algorithms or Data Analytics;

    c)   Personal Information, Including whether and how the Company uses location data (whether or not such data is associated with other identifiers or other data) for such purposes; and

    d)   content engagement (e.g., clicking on specific ads, joining groups, attending events, liking or following specific brands).

41.    Describe in Detail all the Company's uses of Demographic Information, Familial Status, or Familial Relationships, Including:

    a)   how the Company uses Demographic Information, Familial Status, or Familial Relationships for ad targeting or exclusions;

    b)   if the Company personalizes content based on Demographic Information, Describe in Detail all content and design features that are personalized, the purpose of personalizing (e.g., User Engagement, convenience, advertising, implementing choices, data Analysis, classification into segments, in-gaming content modification,

etc.), and what Demographic Information the Company uses to personalize those features;

    c)   how the Company uses such information in connection with lookalike modeling, and Describe in Detail whether and, if so, how the Company uses or avoids selecting protected characteristics for this process. Produce a representative list of all characteristics the Company offers for lookalike modeling; and

    d)   Identify the top five entities (by amount of revenue generated) with whom the Company has contracts that engage in or facilitate programmatic marketing (Including real-time bidding, guaranteed direct buying, and preferred deals) for advertising space on the Company's Social Media and Video Streaming Service(s).

42.    For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail what mechanisms, if any, users and non-users have to inquire about or request access or deletion of the Demographic Information the Company has collected, and provide all user interfaces for such requests or inquiries. Describe in Detail policies, practices, and procedures to ensure that the Company's internal divisions, affiliates, and third parties' use of Demographic Information complies with the Company's use and data limitations.

43.    Describe in Detail any methods the Company employs to attempt to determine when a user's account on the Social Media and Video Streaming Service is used by an individual other than the user, Including a malicious attacker, a friend, or a family member.

**Children and Teens**

44.    For each Social Media and Video Streaming Service identified in response to Specification 5:

    a)   state whether the Company has indicated to any third party or affiliate, Including but not limited to any app store, platform, or advertising network or platform, that the Social Media and Video Streaming Service or portions of content thereof is directed to Children and Teens. If so, Describe in Detail how the Company determines that the Social Media and Video Streaming Service or portions of content thereof are directed to Children and Teens; and

    b)   Describe in Detail the Company's policies, processes, procedures, and practices regarding users who indicate they are under thirteen years old, and between thirteen and seventeen, inclusively, Including:

        i)   whether the Company blocks such users from creating an account;

        ii)   whether the company collects Personal Information of Children or Teens without verified parental consent for "support for internal operations," and if so Describe in Detail all of the internal-operations purposes and the necessity of each piece of Personal Information to accomplish those purposes;

iii)  all strategies, plans, presentations, Analyses, machine learning or artificial intelligence, and/or efforts to Identify usage patterns associated with Children and Teens, validate results, and/or monetize this usage, Including all efforts to maintain and/or increase User Engagement by Children and Teens;

iv)  each use and its associated value, Including revenue, derived from the Personal Information of Children and Teens collected according to the following categories: (1) with verified consent, (2) without parental consent for "support of internal operations," (3) during usage associated with patterns indicating Children's and Teens' use of an adult account, and (4) without parental consent for another specified reason; and

v)  a description of any technical measures to enforce such policies, processes, procedures, and practices.

45.  For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail:

a)  the intended age range of the user base; and

b)  any information in the Company's possession about the actual age of the user base, Including any predictions or calculations of age through machine learning or artificial intelligence.

46.  For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail the Company's policies, processes, procedures, and practices when contacted by parents who wish to review or delete Personal Information that has been collected from their Child or Teen, or when the account is otherwise discovered to have been created or posted by a Child or Teen without parental consent.

47.  State whether the Company is a member of any self-regulatory organizations or programs Related to children's privacy, Including any FTC-approved Children's Online Privacy Protection Act safe harbor program.  If so, Identify each organization and state the dates of membership.

48.  For each Social Media and Video Streaming Service identified in response to Specification 5, state whether there are system(s) in place to automatically or algorithmically Identify Children and Teens.  If so, Describe in Detail the system(s) in place, Including whether the Company uses any other metrics to determine whether a user is a Child or a Teen.

49.  For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail whether the Company has ever relied on verified parental consent provided by an educational institution.  To the extent the Company uses the information for commercial purposes, provide the Company's user interfaces for getting consent.  Describe in Detail any policies or procedures Relating to the retention or deletion of such data.

**Relationship with Other Services**

50.   Submit all Documents Relating to competition in the sale or provision of each Social
      Media and Video Streaming Service identified in response to Specification 5, Including,
      but not limited to, market studies, forecasts, surveys, and all other Documents Relating
      to:

   a)   the ability or willingness of customers, consumers, or other Persons to switch to (or
        from) the Company's products or services from (or to) another product or service,
        Including by altering relative level of engagement such as time spent;

   b)   monitoring or collection of information about any other Person's Social Media and
        Video Streaming Service or Digital Advertising Service;

   c)   competition to attract, gain, and retain users to, or increase User Engagement with,
        the Company's Social Media and Video Streaming Services, Including competition
        to expand or improve product offerings, features, functionality, coverage, user
        interfaces, product quality, or level of service;

   d)   the ability or willingness of users to seek access to or use the Company's Social
        Media and Video Streaming Services while also using Social Media and Video
        Streaming Services offered by other Persons;

   e)   competition Relating to data protection and privacy;

   f)   competition to obtain data, information, or other content for the Company's products
        or services;

   g)   the effect of advertising load on (i) consumer or user perceptions or behavior, or (ii)
        advertising revenue, prices, or profitability;

   h)   the effect of User Engagement on advertising revenue, prices, or profitability;

   i)   competition between different types of Digital Advertising Services, or between
        Digital Advertising Services and any other form of advertising;

   j)   competition to attract, gain, or retain advertising customers of the Company's Digital
        Advertising Services, or attempts to win advertising customers or other revenue-
        generating customers from other companies, and losses of advertising customers or
        other revenue-generating customers; and

   k)   the value, Including conversion rate, lead quality, or advertiser return on investment,
        of the Company's or any other Person's advertising products or services.

51.   For each Social Media and Video Streaming Service identified in response to
      Specification 5, submit all Documents Relating to:

a) barriers to entry into the provision or sale of the Relevant Product, Including but not limited to customer or user lock-in effects, access to user data, and algorithmic sophistication; and

b) switching costs for users, Including loss or lack of access to data specific to any Relevant Product, Including users' social graph and social history, or difficulty in transferring such data.

52. For each Social Media and Video Streaming Service identified in response to Specification 5, Describe in Detail all material changes made by the Company to comply with the European Union's General Data Protection Regulation, Including whether those changes apply exclusively to users in the European Union or also to users in the United States and worldwide.  Describe in Detail any material changes to the ability of third parties to access or port data, Including changes to application program interfaces and software development kits.

**Other Documents**

53. Produce all Documents consulted or otherwise relied on to prepare Your response to this Order that were not otherwise specifically requested.

You are advised that penalties may be imposed under applicable provisions of federal law for failure to file special reports or for filing false reports.

The Special Report called for in this Order is to be filed on or before 45 days from the date of service.

By direction of the Commission, Commissioner Phillips dissenting.


_____
Joseph J. Simons, Chairman

SEAL

December 11, 2020

21

**Attachment A**

**DEFINITIONS & ADDITIONAL INSTRUCTIONS**

A.   "**Advertiser Metric**" means, and information shall be provided separately for, each metric of advertising performance or effectiveness that is tracked by, reported on, derived from other data by, or otherwise used by the Company for any Digital Advertising Service.

B.   "**Advertising Format**" means, and information shall be provided separately for, each type of ad by media type (e.g., text, photo, or video), ad type (e.g., carousel ad, slideshow ad, collection ad, playable ad), and location (e.g., specific locations on a web page or app) the Company uses to place advertisements for any Person on any Digital Advertising Service or any other application or website, whether or not owned by the Company.

C.   "**Advertising Objective**" means, and information shall be provided separately for, each selectable objective offered by the Company to advertisers on any Digital Advertising Service owned by the Company or other platform on which the Company displays advertisements, Including, but not limited to, objectives such as brand awareness, reach, traffic, engagement, app installs, video views, lead generation, messages, conversions, catalog sales, or store traffic.

D.   "**Advertising Placement**" means, and information shall be provided separately for, each location where the Company displays advertisements, stated separately for (1) each website, app, or other online platform owned or operated by the Company, and (2) each supply side platform owned or operated by the Company.

E.   "**Algorithms or Data Analytics**" means the process of examining and analyzing data in order to find patterns and make conclusions about that data, whether by machine or human analyst.

F.   "**Analysis**" or "**Analyses**" Include, but are not limited to, studies, reports, tests, and experiments.

G.   The terms "**and**" and "**or**" have both conjunctive and disjunctive meanings as necessary to bring within the scope of this Order anything that might otherwise be outside its scope. The singular form of a noun or pronoun Includes its plural form, and vice versa; and the present tense of any word Includes the past tense, and vice versa.

H.   "**Communication**" means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

I.   "**Child**" or "**Children**" means individuals under the age of thirteen (13).

J.   "**Classifiers**" means a machine-based process that sorts unlabeled data into categories.

K.      "**Company**" means **[COMPANY NAME]**, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between the Company and any other Person.

L.      "**Country Location**" means, <u>and information shall be provided separately for,</u> (1) the United States; (2) Australia; (3) Brazil; (4) Canada; (5) China; (6) France; (7) Germany; (8) India; (9) Indonesia; (10) Italy; (11) Japan; (12) Mexico; (13) the Netherlands; (14) Russia; (15) Saudi Arabia; (16) South Korea; (17) Spain; (18) Switzerland; (19) Turkey; (20) the United Kingdom; and (21) all other countries not in the foregoing list, combined.

M.      "**Demographic Information**" means characteristics of human populations, such as age, ethnicity, race, sex, disability, and socio-economic information.

N.      "**Describe in Detail**" means providing the information requested in narrative form, Including an explanation of each material change, if any, made during the applicable time period Relating to the practices described, as well as the effective date(s) of the change(s) and the reason(s) for such change(s).

O.      "**Digital Advertising Service**" Includes, and <u>information shall be provided separately for</u>: each Company product or offering that serves or displays, or Company service Relating to the service or display of, advertisements through an application or website on any device (e.g., personal computer, iOS device, Android device, etc.).

P.      "**Document**" and "**Documents**" mean any information, on paper or in electronic format, Including written, recorded, and graphic materials of every kind, in the possession, custody, or control of the Company.  The term "Documents" Includes, without limitation: computer files; email messages; audio files; instant messages; text messages; messages sent on any enterprise messaging system; any other form of electronic message; drafts of Documents; metadata and other bibliographic or historical data describing or Relating to Documents created, revised, or distributed electronically; copies of Documents that are not identical duplicates of the originals in that Person's files; and copies of Documents the originals of which are not in the possession, custody, or control of the Company.

    1.      Unless otherwise specified, the term "Documents" excludes:

        a.      bills of lading, invoices, purchase orders, customs declarations, and other similar Documents of a purely transactional nature;

        b.      architectural plans and engineering blueprints;

        c.      Documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues; and

        d.      relational and enterprise databases, except as required to comply with an individual Specification.

2.      The term "computer files" Includes information stored in, or accessible through, computers or other information retrieval systems.  Thus, the Company should produce Documents that exist in machine-readable form, Including Documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off Company premises.  If the Company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for Documents and information, You are encouraged to discuss a possible modification to this Definition with the Commission representative identified on the last page of this Request.  The Commission representative will consider modifying this Definition to:

a.      exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from those that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the Company;

b.      limit the portion of backup disks and tapes and archive disks and tapes that needs to be searched and produced to certain key individuals, certain time periods, or certain Specifications identified by the Commission representative; or

c.      Include other proposals consistent with Commission policy and the facts of the case.

Q.      The terms "**Each**," "**any**," and "**all**" mean "each and every."

R.      "**Electronically Stored Information**" or "**ESI**" means the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by You into a reasonably usable form. This Includes, but is not limited to, electronic mail, instant messaging, videoconferencing, and other electronic correspondence (whether active, archived, or in a deleted items folder), word processing files, spreadsheets, databases, and video and sound recordings, whether stored on: cards, magnetic or electronic tapes, disks, computer hard drives, network shares or servers, or other drives, cloud-based platforms, cell phones, PDAs, computer tablets, or other mobile devices, or other storage media.

S.      "**Familial Relationship(s)**" means a description of the Familial Status of all members of a household (e.g., family of four with two parents and two Children).

T.      "**Familial Status**" means the familial designation of a natural Person (e.g., spouse, Child, stepchild, parent, grandparent, parent-in-law, sibling-in-law, and child-in-law, among others).

U.   "**Identify**" or "**Specify**," when used in reference to a natural Person, mean to state the Person's (1) full name; (2) present or last-known residence and telephone number and present or last-known business address and telephone number; and (3) present or last-known employer and job title.  For any Person identified, if any of the above information was different during the time period relevant to the CID, supply both the current information and such different information as applies to the time period relevant to the CID.  Once a natural Person has been identified properly, it shall be sufficient thereafter when Identifying that same Person to state the name only.

The terms "Identify" or "Specify," when used in reference to a corporation or other non-natural Person, mean (1) to state that entity's name; (2) to describe its nature (e.g., corporation, partnership, etc.); (3) to state the location of its principal place of business; and (4) to Identify the natural Person or Persons employed by such entity whose actions on behalf of the entity are responsive to the CID.  Once such an entity has been identified properly, it shall be sufficient thereafter when Identifying that same entity to state the name only.

The terms "Identify" or "Specify," when used in reference to facts, acts, events, occurrences, Meetings, or Communications, mean to describe, with particularity, the fact, act, event, occurrence, Meeting, or Communication in question, Including, but not limited to, (1) Identifying the participants and witnesses of the fact, act, event, occurrence, Meeting, or Communication; (2) stating the date or dates on which the fact, act, event, occurrence, Meeting, or Communication took place; (3) stating the location(s) at which the fact, act, event, occurrence, Meeting, or Communication took place; and (4) providing a description of the substance of the fact, act, event, occurrence, Meeting, or Communication.

V.   The terms "**Include**" and "**Including**" mean "including, but not limited to."  The use of the term "Include" in any request shall not be used to limit the generality or scope of any request.  Nor shall the generality of any request be limited by the fact that another request touches on the same topic with a greater or lesser degree of specificity.

W.   "**Meeting**" means an assembly of two or more people, in-person or via telephone, voice-over-IP, video, video conferencing, WebEx, chat messaging, or similar means of Communication.

X.   "**Order**" means the Order, Including the attached Resolution, Specifications, and Attachment.

Y.   "**Person**" Includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

Z.   "**Personal Information**" means information about a specific individual or Device, Including: (1) first and last name; (2) home or other physical address, Including street name and name of city or town, or other information about the location of the individual, Including but not limited to location from cellular tower information, fine or coarse location, or GPS coordinates; (3) Email address or other online contact information, such

as an instant Messaging user identifier or screen name; (4) telephone number; (5) a persistent identifier, such as a customer number held in a "cookie," a static Internet Protocol ("IP") address, a device identifier, a device fingerprint, a hashed identifier, or a processor serial number; (6) nonpublic Communications and content, Including, but not limited to, e-mail, text messages, contacts, photos, videos, audio, or other digital images or audio content; (7) Internet browsing history, search history, or list of URLs visited; (8) video, audio, cable, or TV viewing history; (9) biometric data; (10) health or medical information; (11) Demographic Information or (12) any other information associated with that User or Device.

AA.  "**Publisher**" means any Person paid to show an advertisement to consumers.

BB.  "**Relate**," "**Related to**," and "**Relating to**" mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, Identifying, referring to, reflecting, reporting on, stating, or dealing with.

CC.  "**Relevant Area**" means, and information shall be provided separately for, (1) the United States, and (2) worldwide.

DD.  "**Relevant Product**" Includes, and information shall be provided separately for, any Social Media and Video Streaming Service or Digital Advertising Service.

EE.  "**Selected Advertiser Attribute**" means, and information shall be provided separately for, (1) the five (5) Advertiser Attributes that the Company uses most frequently in the provision or sale of advertising, and (2) each of the following Advertiser Attributes:

   a.  industry vertical (e.g., ecommerce, consumer packaged goods, professional services);

   b.  advertiser size (e.g., global business group, small business group);

   c.  advertising spend tier or bracket; and

   d.  status (e.g., active, inactive).

FF.  "**Selected Advertiser Category**" means, and information shall be provided separately for, each mutually exclusive group of advertisers resulting from every combination of values across each Selected Advertiser Attribute.

   For illustration purposes, assume "advertiser size," "industry vertical," and "spend tier," are the Selected Advertiser Attributes.  Assume further that "small business," and "large business" are mutually exclusive values for the "advertiser size" attribute; "ecommerce" and "gaming" are mutually exclusive values for the "industry vertical" attribute; and "1" and "2" are mutually exclusive values for the "spend tier" attribute.  In this example, "ecommerce small business with spend tier 1" and "ecommerce small business with spend tier 2" are mutually exclusive Selected Advertiser Categories.

GG.  "**Selected User Attribute**" means, and information shall be provided separately for, each of the following User Attributes: (1) age; (2) gender; (3) Country Location of the user; (4) network size; (5) education; (6) income; (7) race and ethnicity; (8) registration status of the user (e.g., registered or non-registered).

HH.  "**Selected User Group**" means, and information shall be provided separately for, each mutually exclusive group of users reflecting each mutually exclusive combination of values from the Selected User Attributes.

II.  "**Social Media and Video Streaming Service**" Includes, and information shall be provided separately for, any product or service that allows users to create and share content with other users (whether a private or group interaction) through an application or website on any device (e.g., personal computer, iOS device, Android device, etc.), or stream video, Including, but not limited to, any social networking service, messaging service, video streaming service, or photo, video, or other content sharing application, whether offered for a fee or for free.

JJ.  "**Teen**" or "**Teens**" means individuals between the ages of thirteen (13) and seventeen (17), inclusively.

KK.  "**Third-Party Category**" means, and information shall be provided separately for, each type of Person (e.g., app developers, analytic partners, or advertisers) with whom the Company provides application programming interface ("API") access or shares data, or with whom the Company otherwise has a business relationship.

LL.  "**User Attribute**" means, and information shall be provided separately for, each attribute or categorization of any user (e.g., age, gender, country, language, categorizations based on user interests, or categorizations based on other user behavior) of any Social Media and Video Streaming Service that is tracked or used by the Company for any purpose, Including, but not limited to, the provision or sale of any Social Media and Video Streaming Service or advertising.

MM.  "**User Engagement**" means how a user, on and off the Social Media and Video Streaming Service, interacts with any product or service of the Social Media and Video Streaming Service (Including, but not limited to, how frequently, for how long, and in what manner).

NN.  "**User Metric**" means, and information shall be provided separately for, each metric for user interaction with any web site or application owned or operated by any Person (Including the Company) on any device (e.g., personal computer, iOS device, or Android device).

OO.  "**User Network Size**" means, and information shall be provided separately for, each metric for the size of a user's network within any Social Media and Video Streaming Service owned by any Person (Including the Company), Including, but not limited to, the number of a user's friends, the number of a user's followers, the number of other users that a user follows, the number of a user's reciprocal followers, and the number of telephone contacts stored by a user.

PP.     "**You**" and "**Your**" means the individual or entity to whom this Order is issued and Includes the "Company."

QQ.     **Meet and Confer**:  You are encouraged to contact **Andrea Arias** at **(202) 326-2715** or **Caroline Schmitz** at **(202) 326-2621** as soon as possible to schedule a Meeting (telephonic or in person) in order to confer regarding Your response.

RR.     **Modification of Specifications**:  If You believe that the scope of the required search or response for any specification can be narrowed consistent with the Commission's need for Documents or information, You are encouraged to discuss such possible modifications, Including any modifications of definitions and instructions, with the Commission counsel named above.

SS.     **Electronic Submission of Documents**:  See the attached "Federal Trade Commission, Bureau of Consumer Protection Production Requirements," which details all requirements for submission of information, generally requiring that files be produced in native form and Specifying the metadata to be produced.  As noted in the attachment, some items require discussion with the FTC counsel **prior to** production, which can be part of the general "Meet and Confer" described above.  If You would like to arrange a separate discussion involving Persons specifically familiar with Your ESI systems and methods of retrieval, make those arrangements with FTC counsel when scheduling the general meet and confer discussion.

TT.     **Applicable Time Period**:  Unless otherwise directed in the Specifications, the applicable time period for the request shall be from **January 1, 2019 until the date of full and complete compliance with this Order**.

UU.     **Document Production**:  Because postal delivery to the Commission is subject to delay due to heightened security precautions, please use a courier service such as Federal Express or UPS.

VV.     **Production of Copies**:  Copies of marketing materials and advertisements shall be produced in color, and copies of other materials shall be produced in color if necessary to interpret them or render them intelligible.

WW.     **Sensitive Personally Identifiable Information**:  If any material called for by these requests contains sensitive Personally Identifiable information or sensitive health information of any individual, please contact us before sending those materials to discuss ways to protect such information during production.  For purposes of these requests, sensitive Personally Identifiable information Includes: an individual's Social Security number alone; or an individual's name or address or telephone number in combination with one or more of the following: date of birth, Social Security number, driver's license number or other state identification number, or a foreign country equivalent, passport number, financial account number, credit card number, or debit card number.  Sensitive health information Includes medical records and other individually identifiable health information Relating to the past, present, or future physical or mental health or conditions

of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

APPENDIX A

The Selected User Attributes (including the values associated with each Selected User Attribute) and User Metrics identified in this Appendix are exemplary, and are not intended to limit the Company's response to the CID.

**Selected User Attribute Definitions**

| Age | Origin | Country |
|-----|--------|---------|
| 1 (0-25) | Yes | US |
| 2 (26-50) | No | Other |
| 3 (50+) | Missing | Missing |
| 4 (Missing) | | |

**Example Data**

| Selected User Attributes | | | Number of Registered Users | Period | | User Metrics | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Age | Origin | Country | | Month | Year | Number of MAUs | Average Time Spent per MAU | Total Time Spent (Hours) | Average Posts per MAU | Total Posts |
| 1 | Yes | US | 13 | Jan | 2010 | 10 | 2.7 | 27 | 2.0 | 20 |
| 2 | Yes | US | 15 | Jan | 2010 | 12 | 2.8 | 33 | 2.3 | 27 |
| 3 | Yes | US | 16 | Jan | 2010 | 13 | 3.7 | 48 | 2.5 | 32 |
| 4 | Yes | US | 6 | Jan | 2010 | 3 | 2.7 | 8 | 2.3 | 7 |
| 1 | No | US | 11 | Jan | 2010 | 8 | 2.6 | 21 | 4.4 | 35 |
| 2 | No | US | 12 | Jan | 2010 | 9 | 2.7 | 24 | 6.2 | 56 |
| 3 | No | US | 13 | Jan | 2010 | 10 | 4.5 | 45 | 4.0 | 40 |
| 4 | No | US | 5 | Jan | 2010 | 2 | 3.0 | 6 | 7.0 | 14 |
| 1 | Missing | US | 5 | Jan | 2010 | 2 | 2.5 | 5 | 3.0 | 6 |
| 2 | Missing | US | 5 | Jan | 2010 | 2 | 3.0 | 6 | 4.0 | 8 |
| 3 | Missing | US | 5 | Jan | 2010 | 2 | 4.5 | 9 | 3.5 | 7 |
| 4 | Missing | US | 4 | Jan | 2010 | 1 | 1.0 | 1 | 2.0 | 2 |
| 1 | Yes | Other | 14 | Jan | 2010 | 11 | 7.3 | 80 | 2.7 | 30 |
| 2 | Yes | Other | 18 | Jan | 2010 | 15 | 2.8 | 42 | 4.7 | 70 |
| 3 | Yes | Other | 17 | Jan | 2010 | 14 | 5.6 | 78 | 6.5 | 91 |
| 4 | Yes | Other | 7 | Jan | 2010 | 4 | 2.8 | 11 | 4.5 | 18 |
| 1 | No | Other | 23 | Jan | 2010 | 20 | 2.9 | 57 | 4.8 | 95 |
| 2 | No | Other | 8 | Jan | 2010 | 5 | 2.4 | 12 | 3.2 | 16 |
| 3 | No | Other | 9 | Jan | 2010 | 6 | 2.5 | 15 | 2.5 | 15 |
| 4 | No | Other | 4 | Jan | 2010 | 1 | 3.0 | 3 | 4.0 | 4 |
| 1 | Missing | Other | 6 | Jan | 2010 | 3 | 4.7 | 14 | 4.3 | 13 |
| 2 | Missing | Other | 5 | Jan | 2010 | 2 | 2.5 | 5 | 4.5 | 9 |
| 3 | Missing | Other | 5 | Jan | 2010 | 2 | 4.5 | 9 | 5.5 | 11 |
| 4 | Missing | Other | 4 | Jan | 2010 | 1 | 1.0 | 1 | 2.0 | 2 |
| 1 | Yes | Missing | 10 | Jan | 2010 | 7 | 9.6 | 67 | 4.3 | 30 |
| 2 | Yes | Missing | 18 | Jan | 2010 | 15 | 2.8 | 42 | 4.7 | 70 |
| 3 | Yes | Missing | 15 | Jan | 2010 | 12 | 6.4 | 77 | 8.1 | 97 |
| 4 | Yes | Missing | 9 | Jan | 2010 | 6 | 2.2 | 13 | 3.8 | 23 |
| 1 | No | Missing | 21 | Jan | 2010 | 18 | 3.3 | 59 | 4.9 | 89 |
| 2 | No | Missing | 10 | Jan | 2010 | 7 | 1.7 | 12 | 2.3 | 16 |
| 3 | No | Missing | 8 | Jan | 2010 | 5 | 2.6 | 13 | 3.8 | 19 |
| 4 | No | Missing | 5 | Jan | 2010 | 2 | 1.5 | 3 | 2.0 | 4 |
| 1 | Missing | Missing | 7 | Jan | 2010 | 4 | 3.5 | 14 | 2.0 | 8 |
| 2 | Missing | Missing | 8 | Jan | 2010 | 5 | 1.0 | 5 | 1.4 | 7 |
| 3 | Missing | Missing | 5 | Jan | 2010 | 2 | 4.5 | 9 | 6.5 | 13 |
| 4 | Missing | Missing | 5 | Jan | 2010 | 2 | 3.0 | 6 | 3.5 | 7 |

**APPENDIX B**

The Selected Advertiser Attributes (including the values associated with each Selected Advertiser Attribute) and Advertiser Metrics identified in this Appendix are exemplary, and are not intended to limit the Company's response to the CID.

**Selected Advertiser Attribute Definitions**

| Advertiser Size | Industry Vertical | Spend Tier |
|---|---|---|
| 1 (Small business) | Ecommerce | 1 |
| 2 (Large business) | Gaming | 2 |
| 3 (Missing) | Missing | |

**Example Data**

| Selected Advertiser Attributes | | | Period | | Advertiser Metrics | | | |
|---|---|---|---|---|---|---|---|---|
| Advertiser Size | Industry Vertical | Spend Tier | Month | Year | Number of Advertisers | Total Ad Revenue | Total Number of Auctions | Average Winning Advertiser Bid |
| 1 | Ecommerce | 1 | Jan | 2010 | 10 | $ 90,000 | 27 | $ 16.50 |
| 2 | Ecommerce | 1 | Jan | 2010 | 12 | $ 110,000 | 33 | $ 8.50 |
| 3 | Ecommerce | 1 | Jan | 2010 | 13 | $ 110,000 | 33 | $ 6.55 |
| 1 | Gaming | 1 | Jan | 2010 | 8 | $ 70,000 | 21 | $ 1.76 |
| 2 | Gaming | 1 | Jan | 2010 | 9 | $ 80,000 | 24 | $ 8.15 |
| 3 | Gaming | 1 | Jan | 2010 | 10 | $ 90,000 | 27 | $ 2.35 |
| 1 | Missing | 1 | Jan | 2010 | 7 | $ 60,000 | 23 | $ 2.67 |
| 2 | Missing | 1 | Jan | 2010 | 5 | $ 55,000 | 17 | $ 5.13 |
| 3 | Missing | 1 | Jan | 2010 | 4 | $ 50,000 | 12 | $ 9.15 |
| 1 | Ecommerce | 2 | Jan | 2010 | 11 | $ 100,000 | 30 | $ 3.35 |
| 2 | Ecommerce | 2 | Jan | 2010 | 15 | $ 130,000 | 39 | $ 7.15 |
| 3 | Ecommerce | 2 | Jan | 2010 | 14 | $ 130,000 | 39 | $ 1.45 |
| 1 | Gaming | 2 | Jan | 2010 | 20 | $ 190,000 | 57 | $ 3.07 |
| 2 | Gaming | 2 | Jan | 2010 | 5 | $ 40,000 | 12 | $ 25.10 |
| 3 | Gaming | 2 | Jan | 2010 | 6 | $ 40,000 | 12 | $ 30.25 |
| 1 | Missing | 2 | Jan | 2010 | 9 | $ 80,000 | 21 | $ 15.80 |
| 2 | Missing | 2 | Jan | 2010 | 7 | $ 65,000 | 13 | $ 12.30 |
| 3 | Missing | 2 | Jan | 2010 | 3 | $ 25,000 | 8 | $ 13.50 |

# Exhibit 408

Parents

Snapchat 101    Safeguards for Teens    Tools & Resources    **Report a Concern**



# Snapchat 101

Snapchat is a communications service designed for people ages 13 and up. It's very popular with teenagers and young adults, who primarily use it to talk with their close friends, similar to the ways they interact in real life. It's similar to how older generations use text messaging or their phone to stay in touch with friends and family. If you don't use Snapchat, here's a quick look at how the app works.

## The Basics

Our goal is to provide a healthy and safe experience, and we purposely designed Snapchat differently from social media. Snapchat doesn't open to a public news feed powered by an algorithm with likes and comments. Instead, the app opens to a camera and has five tabs: Camera, Chat, Map, Stories, and Spotlight. Check out this video to learn more:

## Snapchat, Explained



## How Messaging Works on Snapchat



Conversations on Snapchat delete by default to reflect real-life conversations. Before social media, our fun, spontaneous, and silly interactions with friends only lived on in our memories! Snapchat is designed to mirror that dynamic, to help people feel comfortable expressing themselves without feeling pressure or judgment.

It's important to know that even though conversations on Snapchat delete by default, we can retain data while we review reports of harmful content from teens and parents. In some cases, this includes referring an incident to law enforcement. In case authorities want to follow up, we retain this data for an even longer period of time, and we work with law enforcement to help bring offenders to justice.

*Helpful to know! Snaps and Chats may delete by default, but anyone can screen grab anything off of a computer or phone screen without a person's consent. As with sharing anything online, it's important to be really careful about requesting or sending anyone – even a partner or close friend – private or sensitive images and information.*

# Community Guidelines

We have a clear set of Community Guidelines to help Snapchatters use our services safely. These rules prohibit illegal and potentially harmful content and behavior such as sexual exploitation, pornography, selling illicit drugs, violence, self-harm, and misinformation. We apply additional moderation to our public content platforms, Stories and Spotlight, to prevent content that violates our rules from reaching a large audience.

To enforce against violations of our Community Guidelines and avoid any potential dangers, we use both proactive detection tools and reports from Snapchatters, parents, and law enforcement.  We have a 24/7 global Trust & Safety team that investigates these reports and, in most cases, they take action within an hour in order to enforce Snapchat's safety standards. That can include warning users, removing content, banning an account, and escalating a report to law enforcement.



## Safeguards for Teens

See how we help keep teens safe on Snapchat.

**Learn More**

**Company**
Snap Inc.
Careers
News
Privacy and Safety

**Community**
Snapchat Support
Pixy Support
Community Guidelines

**Advertising**
Snapchat Ads
Advertising Policies
Political Ads Library
Brand Guidelines
Promotions Rules

**Legal**
Snap Terms
Law Enforcement
Cookie Policy
Cookie Settings
Report Infringement

**Snap Inc.**    Privacy Policy    Terms of Service

Language    English (US)

# Exhibit 409

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM      TO**

**Commission File Number 001-38017**

# SNAP INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **45-5452795** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

**2772 Donald Douglas Loop North, Santa Monica, California 90405**
**(Address of principal executive offices, including zip code)**

**(310) 399-3339**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.00001 per share | SNAP | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by checkmark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of Class A common stock on the New York Stock Exchange on June 30, 2020, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $24.9 billion.

As of February 2, 2021, the Registrant had 1,252,985,748 shares of Class A common stock, 23,691,358 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding.

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| Note Regarding Forward-Looking Statements | | 1 |
| Risk Factor Summary | | 2 |
| Note Regarding User Metrics and Other Data | | 4 |

**PART I**

| Item 1. | Business | 5 |
|---|---|---|
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 40 |
| Item 2. | Properties | 41 |
| Item 3. | Legal Proceedings | 41 |
| Item 4. | Mine Safety Disclosures | 41 |

**PART II**

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 42 |
|---|---|---|
| Item 6. | Selected Financial Data | 43 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 46 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 62 |
| Item 8. | Financial Statements and Supplementary Data | 63 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 97 |
| Item 9A. | Controls and Procedures | 97 |
| Item 9B. | Other Information | 97 |

**PART III**

| Item 10. | Directors, Executive Officers and Corporate Governance | 99 |
|---|---|---|
| Item 11. | Executive Compensation | 105 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 124 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 127 |
| Item 14. | Principal Accounting Fees and Services | 129 |

**PART IV**

| Item 15. | Exhibits, Financial Statement Schedules | 130 |
|---|---|---|
| Item 16. | Form 10-K Summary | 132 |
| | Signatures | 133 |

ii

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, about us and our industry that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this report, including statements regarding guidance, our future results of operations or financial condition, business strategy and plans, user growth and engagement, product initiatives, and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "going to," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions. We caution you that the foregoing may not include all of the forward-looking statements made in this report.

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations, and prospects. These forward-looking statements are subject to risks, uncertainties, and other factors described under "Risk Factor Summary" below, "Risk Factors" in Part I, Item 1A, and elsewhere in this Annual Report on Form 10-K, including among other things:

- our financial performance, including our revenues, cost of revenues, operating expenses, and our ability to attain and sustain profitability;

- our ability to generate and sustain positive cash flow;

- our ability to attract and retain users and partners;

- our ability to attract and retain advertisers;

- our ability to compete effectively with existing competitors and new market entrants;

- our ability to effectively manage our growth and future expenses;

- our ability to comply with modified or new laws, regulations, and executive actions applying to our business;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to successfully expand in our existing market segments and penetrate new market segments;

- our ability to attract and retain qualified employees and key personnel;

- our ability to repay outstanding debt;

- future acquisitions of or investments in complementary companies, products, services, or technologies; and

- the potential adverse impact of the COVID-19 pandemic on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.

Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Annual Report on Form 10-K. And while we believe that information provides a reasonable basis for these statements, that information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

The forward-looking statements made in this Annual Report on Form 10-K relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this report to reflect events or circumstances after the date of this report or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, dispositions, joint ventures, restructurings, legal settlements, or investments.

Investors and others should note that we may announce material business and financial information to our investors using our websites (including investor.snap.com), filings with the U.S. Securities and Exchange Commission, or SEC, webcasts, press releases, and conference calls. We use these mediums, including Snapchat and our website, to communicate with our members and the public about our company, our products, and other issues. It is possible that the information that we make available may be deemed to be material information. We therefore encourage investors and others interested in our company to review the information that we make available on our websites.

**RISK FACTOR SUMMARY**

Our business is subject to significant risks and uncertainties that make an investment in us speculative and risky. Below we summarize what we believe are the principal risk factors but these risks are not the only ones we face, and you should carefully review and consider the full discussion of our risk factors in the section titled "Risk Factors", together with the other information in this Annual Report on Form 10-K. If any of the following risks actually occurs (or if any of those listed elsewhere in this Annual Report on Form 10-K occur), our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business.

1. **Our Strategy and Advertising Business**

We operate in a highly competitive and rapidly changing environment so we must continually innovate our products and evolve our business model for us to succeed.

As a company, we emphasize rapid innovation and prioritize long-term user engagement over short-term financial conditions or results if we believe that it will benefit the aggregate user experience and will thereby improve our financial performance over the long term. We currently have a history of operating losses but, as a result of our long-term focus, we may prioritize investments and expenses we believe are necessary for our long-term growth over achieving short-term profitability. Investments in our future, including through new products or acquisitions, are inherently risky and may not pay off, which would further delay, or hinder our ability to settle the principal and interest payments on our convertible notes or other indebtedness when due, and to attain and sustain profitability. This in turn would hinder our ability to secure additional financing to meet our current and future financial needs on favorable terms, or at all.

We generate substantially all of our revenue from advertising. Our advertising business is most effective when our advertisers succeed. Driving their success requires continual investment in our advertising products and may be hindered by competitive challenges and various legal, regulatory, and operating system changes that make it more difficult for us to achieve and demonstrate a meaningful return for our advertisers. For example, recent changes to privacy laws and mobile operating systems have made it more difficult for us to collect and disclose user data or metrics that an advertiser needs to prove success, or that we need to demonstrate such success. In addition, our advertising business is seasonal and volatile, which could result in fluctuations in our quarterly revenues and operating results, including the expectations of our business prospects.

Our business and operations have also been adversely affected by events beyond our control, such as health epidemics, including the COVID-19 pandemic, impacting the markets and communities in which we and our partners, advertisers, and users operate.

2. **Our Community and Competition**

We need to continually innovate and create new products, and enhance our existing products, to attract, retain, and grow our global community. Products that we create may fail to attract or retain users, or to generate meaningful revenue, if at all. If our community does not see the value in our products or brand, or if competitors offer better alternatives, our community could easily switch to other services. While we have experienced rapid growth in the last few years, we have also experienced declines and there can be no assurance that won't happen again. We have and expect to continue to expand organically and through acquisitions, including in international markets, which we may not be able to effectively manage or scale.

Many of our competitors have significantly more resources and larger market shares than we do, each of which gives them advantages over us that can make it more difficult for us to succeed.

3. **Our Partners**

We primarily rely on Google, Apple, and Amazon to operate our service and provide the mobile operating systems for our applications. If these partners do not provide their services as we expect, terminate their services, or change the terms of our agreements or the functionality of their operating systems in ways that are adverse to us, our service may be interrupted, our product experience could be degraded, and these may harm our reputation, increase our costs, or make it harder for us to attain or sustain profitability. Many other parts of our business depend on partners, including content partners and advertising partners, so our success depends on our ability to attract and retain these partners.

**4.   Our Technology and Regulation**

Our business is complex and success depends on our ability to rapidly innovate and the interoperability of our service on many different smartphones and operating systems, and our ability to handle sensitive user data with the care our users expect. Because our systems and our products are constantly changing, we are susceptible to data breaches, bugs, and other errors in how our products work and are measured. We may also fail to maintain effective processes that report our metrics or financial results. Given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect to encounter issues, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable.

We are also subject to complex and evolving federal, state, and foreign laws and regulations regarding privacy, data protection, content, taxes, and other matters, which are subject to change and have uncertain interpretations. Any actual or perceived failure to comply with such legal and regulatory obligations, including in connection with our consent decree with the U.S. Federal Trade Commission or any economic or political instability, may adversely impact our business.

We also must actively protect our intellectual property. From time to time, we are subject to various legal claims, investigations, and proceedings, including class actions and matters involving intellectual property, that may be costly or distract management. We also rely on a variety of statutory and common-law frameworks for the content we provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, and the fair-use doctrine, each of which has been subject to adverse political and regulatory scrutiny in recent times.

**5.   Our Team and Capital Structure**

We need to attract and retain a high caliber team, including our Chief Executive Officer and Chief Technology Officer, to maintain our competitive position. We may incur significant costs and expenses in maintaining and growing our team, and may lose valuable members of our team as we compete globally, including with many of our competitors, for the key talent. A substantial portion of our employment costs are paid in our common stock, the price of which has been very volatile, and our ability to attract and retain talent may be adversely affected if our shares decline in value.

Our two co-founders control 99.5% of the voting capital stock, which means they control substantially all outcomes submitted to stockholders. Class A common stockholders have no voting rights, unless required by Delaware law. This concentrated control may result in our co-founders voting their shares in their best interest, which might not always be in the interest of our stockholders generally.

## NOTE REGARDING USER METRICS AND OTHER DATA

We define a Daily Active User, or DAU, as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We define average revenue per user, or ARPU, as quarterly revenue divided by the average DAUs. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on our determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This allocation differs from our components of revenue disclosure in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer. For information concerning these metrics as measured by us, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Unless otherwise stated, statistical information regarding our users and their activities is determined by calculating the daily average of the selected activity for the most recently completed quarter included in this report.

While these metrics are determined based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who have unauthorized or multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. We have not determined the number of such multiple accounts.

Changes in our products, infrastructure, mobile operating systems, or metric tracking system, or the introduction of new products, may impact our ability to accurately determine active users or other metrics and we may not determine such inaccuracies promptly. We also believe that we don't capture all data regarding each of our active users. Technical issues may result in data not being recorded from every user's application. For example, because some Snapchat features can be used without internet connectivity, we may not count a DAU because we don't receive timely notice that a user has opened the Snapchat application. This undercounting may increase as we grow in Rest of World markets where users may have poor connectivity. We do not adjust our reported metrics to reflect this underreporting. We believe that we have adequate controls to collect user metrics, however, there is no uniform industry standard. We continually seek to identify these technical issues and improve both our accuracy and precision, including ensuring that our investors and others can understand the factors impacting our business, but these and new issues may continue in the future, including if there continues to be no uniform industry standard.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from our age demographics or estimate their ages based on a sample of the self-reported ages that we do have. If our active users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor expectations.

In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate. We count a DAU only when a user opens the application and only once per user per day. We believe this methodology more accurately measures our user engagement. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, and becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application.

If we fail to maintain an effective analytics platform, our metrics calculations may be inaccurate. We regularly review, have adjusted in the past, and are likely in the future to adjust our processes for calculating our internal metrics to improve their accuracy. As a result of such adjustments, our DAUs or other metrics may not be comparable to those in prior periods. Our measures of DAUs may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology or data used.

**PART I**

**Item 1. Business.**

**Overview**

Snap Inc. is a camera company. We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a camera application that helps people communicate visually with friends and family through short videos and images called Snaps. By opening directly to the camera, we empower users to express themselves instantly. Snaps are deleted by default, so there is less pressure to look pretty or perfect when creating and sending images on Snapchat. By reducing the friction typically associated with creating and sharing content, Snapchat has become one of the most used cameras in the world.

In the way that the flashing cursor became the starting point for most products on desktop computers, we believe the camera screen will be the starting point for most products on smartphones. This is because images created by smartphone cameras contain more context and richer information than other forms of input like text entered on a keyboard. Given the magnitude of this opportunity, we invest heavily and take big risks in an attempt to create innovative and differentiated camera products that are better able to reflect and improve our life experiences.

**Snapchat**

Snapchat is our core mobile device application and contains five distinct tabs, complemented by additional tools that function outside of the application. With a breadth of visual communication and content experiences available within the application, Snapchatters can interact with all five, or a subset of those five tabs.

*Camera*: The Camera is the starting point for creation in Snapchat. Snapchat opens directly to the Camera, making it easy to create a Snap and send it to friends. Our augmented reality, or AR, capabilities within our Camera allow for creativity and self-expression. We offer millions of Lenses, created by both us and our community, along with creative tools and licensed music, which make it easy for people to personalize and contextualize their Snaps. We also offer voice and scanning technology within our Camera. While Snaps are deleted by default, users can save their creativity through a searchable collection of Memories stored on both their Snapchat account and their mobile device. A user can also create Snaps on our wearable devices, Spectacles. Spectacles connect seamlessly with Snapchat and capture photos and video from a human perspective.

*Communication*: Communication allows users to send Snaps to friends collectively or individually, through our ephemeral, efficient messaging architecture. Within Communication, users can send messages through text, Snaps, and voice or video calling. They can also communicate with our proprietary personalized avatar tool, Bitmoji, and its associated contextual stickers and images, which integrate seamlessly into both mobile devices and desktop browsers. Further, users can communicate by playing one of our Games together, many of which allow a user's avatar to be their Bitmoji, and through Minis, which bring bite-sized utility experiences to our community inside Snapchat.

*Snap Map*: Snap Map is a live and highly personalized map that allows Snapchatters to connect with friends and explore what is going on in their local area. Snap Map makes it easy to locate nearby friends who choose to share their location, view a heatmap of recent Snaps posted to Our Story by location, and locate local businesses. Places, rich profiles of local businesses that include information such as store hours and reviews, allow Snapchatters to take direct actions from Map, such as sharing a favorite store, ordering takeout, or making a reservation.

*Stories*: Stories feature content from a Snapchat's friends, our community, and our content partners. The Discover section of this tab displays content based on a Snapchat's subscriptions and interests, and features news and entertainment from both our creator community and publisher partners, as well as original content in Snap Originals. We also offer Brand Profiles, as a way for our advertising partners to memorialize and scale their content on our platform, as well as Public Profiles for our creator community.

*Spotlight*: Spotlight is a way to broadly share user-generated content with the entire Snapchat community. Here we surface the most entertaining Snaps from our community all in one place, which becomes tailored to each Snapchatter over time based on their preferences and favorites.

**Our Partner Ecosystem**

Many elements and features of Snapchat are enhanced by our expansive partner ecosystem that includes developers, creators, publishers, and advertisers, among others. We help them create and bring content and experiences into Snapchat, leverage Snapchat capabilities in their own applications and websites, and use advertising to promote these and other experiences to our large, engaged, and differentiated user base.

**Our Advertising Products**

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.
- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.
- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.
- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.
- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, visit a local business, call or text a business, download an app, or return to an app. Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.

*Measuring Advertising Effectiveness*: We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.

**Technology**

Our research and development efforts focus on product development, advertising technology, and large-scale infrastructure.

*Product Development*: We work relentlessly and invest heavily to create and improve products for our community and our partners. We develop a wide range of products related to visual communication and storytelling that are powered by a variety of new technologies.

*Advertising Technology*: We constantly develop and expand our advertising products and technology. In an effort to provide a strong and scalable return on investment to our advertisers, our advertising technology roadmap centers around improving our delivery framework, measurement capabilities, and self-serve tools.

*Large-scale Infrastructure*: We spend considerable resources and investment on the underlying architecture that powers our products, such as optimizing the delivery of billions of videos to millions of people around the world every day. We currently partner with providers like Google and Amazon to support the infrastructure for our growing needs. These partnerships have allowed us to scale quickly without upfront infrastructure costs, allowing us to focus our efforts on product innovation.

**Employees and Culture**

We seek to be a force for good through our products, our work to strengthen our communities, our efforts to make a positive impact on the planet, and our inclusive workplace.

*Supporting Our Team*: Our values at Snap are being kind, smart, and creative, and we put those values into action through how we support our team and how our team supports one another. Our practice of Council, which is a practice of active listening that promotes open-mindedness and cultivates empathy and compassion among participants, helps us build and sustain a community steeped in integrity, connection, collaboration, creativity, and kindness. Our talent development programs seek to unlock potential by helping team members advance, learn, and grow in a fair and equitable way at Snap. We focus on the health and well-being of our employees through programs and benefits that support their physical, emotional, and financial fitness. To attract and retain the best talent, we aim to offer challenging work in an environment that enables our employees to have a direct meaningful contribution to new and exciting projects. Underlying these values is our commitment to ethical conduct where we work to instill in our team that acting with integrity means being your whole self, being honest, and doing the right thing.

*Diversity, Equity, and Inclusion*: Snap has long supported a Diversity, Equity and Inclusion, or DEI, program, and we have made progress on a number of fronts, including diversifying our board of directors and executive leadership, introducing new accountability around DEI outcomes, rolling out an allyship program to inspire a more inclusive culture, and enhancing our recruiting process to continue driving diverse hiring. To aid in our mission, we published our first Diversity Annual Report in 2020 to discuss our goals with respect to diversity, equity, and inclusion efforts. This report outlines our beliefs around the idea that an inclusive workplace and inclusive products are central to achieving that purpose. This report is part of our larger Citizen Snap Report that details the work we're doing to support our communities, our planet, and our team, and is available on our website at www.snap.com.

*Human Capital*: As part of our human capital resource objectives, we seek to recruit, retain, and incentivize our highly talented existing and future employees. We believe that creating an inclusive environment where team members can grow, develop, and be their true selves is critical to attracting and retaining talent. Our compensation philosophies also align to that belief.

Our compensation philosophy is based around building a culture of ownership and high performance by putting both impact and our values at the center of our performance feedback process and pay outcomes. We utilize equity as part of our compensation practices to drive a long term orientation and have committed to paying a minimum living wage for all employees globally.

As of December 31, 2020, we had approximately 3,863 full-time employees, of whom approximately 54% are in engineering roles involved in the design, development, support, and manufacture of new and existing products and processes.

**Our Commitment to Privacy**

Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.

We built Snapchat as an antidote to the context-less communication that has plagued "social media." Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. Somewhere along the way, social media—by prioritizing virality and permanence—sapped conversations of this valuable context and choice. When we began to communicate online, we lost some of what made communication great: spontaneity, emotion, honesty—the full range of human expression that makes us human in the first place.

We don't think digital communication has to be this way. That's why choice matters. We build products and services that emphasize the context of a conversation—who, when, what, and where something is being said. If you don't have the autonomy to shape the context of a conversation, the conversation will simply be shaped by the permanent feeds that homogenize online conversations.

When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication. For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understand exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more. This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

**Competition**

We compete with other companies in every aspect of our business, particularly with companies that focus on mobile engagement and advertising. Many of these companies, such as Apple, Facebook (including Instagram and WhatsApp), Google (including YouTube), and Twitter, have significantly greater financial and human resources and, in some cases, larger user bases. Given the breadth of our product offerings, we also compete with companies that develop products or otherwise operate in the mobile, camera, communication, content, and advertising industries that offer, or will offer, products and services that may compete with Snapchat features or offerings. Our competitors span from internet technology companies and digital platforms, including advertising-supported video on demand platforms, to traditional companies in print, radio, and television sectors to underlying technologies like default smartphone cameras and messaging. Additionally, our competition for engagement varies by region. For instance, we face competition from companies like Kakao, LINE, Naver (including Snow), Bytedance (including TikTok), and Tencent in Asia.

We compete to attract and retain our users' attention, both in terms of reach and engagement. Since our products and those of our competitors are typically free, we compete based on our brand and the quality and nature of our product offerings rather than on price. As such, we invest heavily in constantly improving and expanding our product lines.

We also compete with other companies to attract and retain partners and advertisers, which depends primarily on our reach and ability to deliver a strong return on investment.

Finally, we compete to attract and retain highly talented individuals, including software engineers, designers, and product managers. In addition to providing competitive compensation packages, we compete for talent by fostering a culture of working hard to create great products and experiences and allowing our employees to have a direct meaningful contribution to new and exciting projects.

**Seasonality in Our Business**

We have historically seen seasonality in our business. Overall advertising spend tends to be strongest in the fourth quarter of the calendar year, and we have observed a similar pattern in our historical revenue. We have also experienced seasonality in our user engagement, generally seeing lower engagement during summer months and higher engagement in December.

**Intellectual Property**

Our success depends in part on our ability to protect our intellectual property and proprietary technologies. To protect our proprietary rights, we rely on a combination of intellectual property rights in the United States and other jurisdictions, including patents, trademarks, copyrights, trade secret laws, license agreements, internal procedures, and contractual provisions. We also enter into confidentiality and invention assignment agreements with our employees and contractors and sign confidentiality agreements with third parties. Our internal controls are designed to restrict access to proprietary technology.

As of December 31, 2020, we had approximately 872 issued patents and approximately 1,661 filed patent applications in the United States and foreign countries relating to our camera platform and other technologies. Our issued patents will expire between 2021 and 2045. We may not be able to obtain protection for our intellectual property, and our existing and future patents, trademarks, and other intellectual property rights may not provide us with competitive advantages or distinguish our products and services from those of our competitors. Our patent applications may not result in the issuance of patents, and any resulting issued patents may have claims narrower than those in our patent applications. Additionally, our current and future patents, trademarks, and other intellectual property rights may be contested, circumvented, or found unenforceable or invalid, and we may not be able to prevent third parties from infringing them. Our internal controls and contractual provisions may not always be effective at preventing unauthorized parties from obtaining our intellectual property and proprietary technologies.

We license content, trademarks, technology, and other intellectual property from our partners, and rely on our license agreements with those partners to use the intellectual property. We also enter into licensing agreements with third parties to receive rights to patents and other know-how. Third parties may assert claims related to intellectual property rights against our partners or us.

Other companies and "non-practicing entities" that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights related to the mobile, camera, communication, content, internet, and other technology-related industries frequently enter into litigation based on allegations of infringement, misappropriation, and other violations of intellectual property or other rights. Third parties, including our competitors and non-practicing entities, have and may continue to make claims from time to time that we have infringed their patents, trademarks, copyrights, trade secrets, or other intellectual property rights. We are party to many agreements under which we are obligated to indemnify our customers, suppliers, and channel partners against such claims. As our business continues to grow and competition increases, we will likely face more claims related to intellectual property and litigation matters.

**Government Regulation**

We are subject to many U.S. federal and state and foreign laws and regulations, including those related to privacy, rights of publicity, data protection, content regulation, intellectual property, health and safety, competition, protection of minors, consumer protection, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could harm our business. Compliance with these laws and regulations has not had, and is not expected to have, a material effect on our capital expenditures, results of operations, and competitive position as compared to prior periods, and we do not currently anticipate material capital expenditures for environmental control facilities.

In December 2014, the Federal Trade Commission resolved an investigation into some of our early practices by handing down a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year lifespan of the order, we must complete biennial independent privacy audits. In June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

9

Furthermore, foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. It is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely. Not all of our products are available in all locations and may not be due to such laws and regulations. We have a public policy team that monitors legal and regulatory developments in the United States, as well as many foreign countries, and communicates with policymakers and regulators in the United States and internationally.

**Corporate Information**

We were formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. We completed our initial public offering in March 2017 and our Class A common stock is listed on the New York Stock Exchange, or NYSE, under the symbol "SNAP."

Our principal executive offices are located at 2772 Donald Douglas Loop North, Santa Monica, California 90405, and our telephone number is (310) 399-3339. Snap Inc., "Snapchat," and our other registered and common-law trade names, trademarks, and service marks appearing in this Annual Report on Form 10-K are property of Snap Inc. or our subsidiaries.

**Information about Segment and Geographic Revenue**

Information about segment and geographic revenue is set forth in Notes 1 and 2 of the notes to our consolidated financial statements included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

**Available Information**

Our website address is www.snap.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to these reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are filed with the SEC. Such reports and other information filed or furnished by us with the SEC are available free of charge on our website at investor.snap.com when such reports are available on the SEC's website. We use our website, including investor.snap.com, as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

Information contained in, or accessible through, the websites referred to in this Annual Report on Form 10-K is not incorporated into this filing. Further, our references to website addresses are only as inactive textual references.

## Item 1A. Risk Factors.

*You should carefully consider the risks and uncertainties described below, together with all the other information in this Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the related notes. If any of the following risks actually occurs, our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. Unless otherwise indicated, references to our business being seriously harmed in these risk factors will include harm to our business, reputation, financial condition, results of operations, revenue, and future prospects. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

## Risks Related to Our Business and Industry

***Our ecosystem of users, advertisers, and partners depends on the engagement of our user base. We have seen the growth rate of our user base decline in the past and it may do so again in the future. If we fail to retain current users or add new users, or if our users engage less with Snapchat, our business would be seriously harmed.***

We had 265 million DAUs on average in the quarter ended December 31, 2020. We view DAUs as a critical measure of our user engagement, and adding, maintaining, and engaging DAUs have been and will continue to be necessary. Our DAUs and DAU growth rate have declined in the past and they may decline in the future due to various factors, including as the size of our active user base increases, as we achieve higher market penetration rates, as we face continued competition for our users and their time, or if there are performance issues with our application. For example, in 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. In addition, as we achieve maximum market penetration rates among younger users in developed markets, future growth in DAUs will need to come from older users in those markets, developing markets, or users with Android operating systems, which may not be possible or may be more difficult or time consuming for us to achieve. While we may experience periods when our DAUs increase due to products and services with short-term popularity, or due to a lack of other events that compete for our users' attention, such as during the recent COVID-19 pandemic, we may not always be able to attract new users, retain existing users, or maintain or increase the frequency and duration of their engagement if current or potential new users do not perceive our products to be fun, engaging, and useful. In addition, because our products typically require high bandwidth data capabilities, the majority of our users live in countries with high-end mobile device penetration and high bandwidth capacity cellular networks with large coverage areas. We therefore do not expect to experience rapid user growth or engagement in countries with low smartphone penetration even if such countries have well-established and high bandwidth capacity cellular networks. We may also not experience rapid user growth or engagement in countries where, even though smartphone penetration is high, consumers rely heavily on Wi-Fi due to the lack of sufficient cellular based data networks and therefore may not access our products regularly throughout the day. If our DAU growth rate slows or becomes stagnant, or we have a decline in DAUs, our financial performance will increasingly depend on our ability to elevate user activity or increase the monetization of our users.

Snapchat is free and easy to join, the barrier to entry for new entrants in our business is low, and the switching costs to another platform are also low. Moreover, the majority of our users are 18-34 years old. This demographic may be less brand loyal and more likely to follow trends, including viral trends, than other demographics. These factors may lead users to switch to another product, which would negatively affect our user retention, growth, and engagement. Snapchat also may not be able to penetrate other demographics in a meaningful manner. Falling user retention, growth, or engagement could make Snapchat less attractive to advertisers and partners, which may seriously harm our business. In addition, we continue to compete with other companies to attract and retain our users' attention. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the average. There are many factors that could negatively affect user retention, growth, and engagement, including if:

- users engage more with competing products instead of ours;

- our competitors continue to mimic our products or improve on them, which could harm our user engagement and growth;

- we fail to introduce new and exciting products and services or those we introduce or modify are poorly received;

- our products fail to operate effectively on the iOS and Android mobile operating systems;

- we are unable to continue to develop products that work with a variety of mobile operating systems, networks, and smartphones;

- we do not provide a compelling user experience because of the decisions we make regarding the type and frequency of advertisements that we display or the structure and design of our products;

- we are unable to combat spam or other hostile or inappropriate usage on our products;

- there are changes in user sentiment about the quality or usefulness of our products in the short term, long term, or both;

- there are concerns about the privacy implications, safety, or security of our products;

- our partners who provide content to Snapchat do not create content that is engaging, useful, or relevant to users;

- our partners who provide content to Snapchat decide not to renew agreements or devote the resources to create engaging content or do not provide content exclusively to us;

- advertisers and partners display ads that are untrue, offensive, or otherwise fail to follow our guidelines;

- our products are subject to increased regulatory scrutiny or approvals, or there are changes in our products that are mandated or prompted by legislation, regulatory authorities, executive actions, or litigation, including settlements or consent decrees, that adversely affect the user experience;

- technical or other problems frustrate the user experience, including by providers that host our platforms, particularly if those problems prevent us from delivering our product experience in a fast and reliable manner;

- we fail to provide adequate service to users, advertisers, or partners;

- we do not provide a compelling user experience to entice users to use the Snapchat application on a daily basis, or our users don't have the ability to make new friends to maximize the user experience;

- we, our partners, or other companies in our industry segment are the subject of adverse media reports or other negative publicity, some of which may be inaccurate or include confidential information that we are unable to correct or retract;

- we do not maintain our brand image or our reputation is damaged; or

- our current or future products reduce user activity on Snapchat by making it easier for our users to interact directly with our partners.

Any decrease to user retention, growth, or engagement could render our products less attractive to users, advertisers, or partners, and would seriously harm our business.

***Snapchat depends on effectively operating with mobile operating systems, hardware, networks, regulations, and standards that we do not control. Changes in our products or to those operating systems, hardware, networks, regulations, or standards may seriously harm our user retention, growth, and engagement.***

Because Snapchat is used primarily on mobile devices, the application must remain interoperable with popular mobile operating systems, primarily Android and iOS, application stores, and related hardware, including mobile-device cameras. The owners and operators of such operating systems and application stores, primarily Google and Apple, each have approval authority over our products and provide consumers with products that compete with ours, and there is no guarantee that any approval will not be rescinded in the future. Additionally, mobile devices and mobile-device cameras are manufactured by a wide array of companies. Those companies have no obligation to test the interoperability of new mobile devices or mobile-device cameras with Snapchat, and may produce new products that are incompatible with or not optimal for Snapchat. We have no control over these operating systems, application stores, or hardware, and any changes to these systems or hardware that degrade our products' functionality, or give preferential treatment to competitive products, or actions by government authorities that impact our access to these systems or hardware, could seriously harm Snapchat usage on mobile devices. Our competitors that control the operating systems and related hardware our application runs on could make interoperability of our products with those mobile operating systems more difficult or display their competitive offerings more prominently than ours. Additionally, our competitors that control the standards for the application stores for their operating systems could make Snapchat, or certain features of Snapchat, inaccessible for a potentially significant period of time or attempt to violate the terms of our agreements with them. We plan to continue to introduce new products and features regularly and have experienced that it takes time to optimize such products and features to function with these operating systems, hardware, and standards, impacting the popularity of such products, and we expect this trend to continue.

12

Moreover, our products require high-bandwidth data capabilities. If the costs of data usage increase or access to cellular networks is limited, our user retention, growth, and engagement may be seriously harmed. Additionally, to deliver high-quality video and other content over mobile cellular networks, our products must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control. In particular, any future changes to the iOS or Android operating systems or application stores may impact the accessibility, speed, functionality, and other performance aspects of our products and features, and result in issues in the future from time to time. In addition, the proposal or adoption of any laws, regulations, or initiatives that adversely affect the growth, popularity, or use of the internet, including laws governing internet neutrality, could decrease the demand for our products and increase our cost of doing business.

For example, in January 2018, the Federal Communications Commission, or FCC, issued an order that repealed the "open internet rules," which prohibit mobile providers in the United States from impeding access to most content, or otherwise unfairly discriminating against content providers like us and also prohibit mobile providers from entering into arrangements with specific content providers for faster or better access over their data networks. The FCC order repealing the open internet rules went into effect in June 2018. The core aspects of that order have been upheld by the United States Court of Appeals for the District of Columbia Circuit, but a number of states have adopted or are considering legislation or executive actions to impose state-level open internet rules, and those actions have been or can be expected to be challenged in court. We cannot predict whether the FCC order or state initiatives regulating providers will ultimately be upheld, modified, overturned, or vacated by further legal action, federal legislation, or the FCC under a different administration, or the degree to which such outcomes would adversely affect our business, if at all. Similarly, the European Union requires equal access to internet content, but as part of certain initiatives and reviews (including recent modifications to the European Electronic Communications Code and proposals to expand the scope and nature of the EU Network Information Security Directive), the European Union may impose additional obligations, including network security requirements, reporting and transparency obligations, disability access, or 911-like obligations on certain "over-the-top" services or those that qualify as "electronic communication services." If we are considered to be in the scope of such service definition, our costs of doing business could increase and our business could be seriously harmed. The European Union's highest court has also recently issued rulings that may limit our ability to engage in certain practices, such as "zero rating." If the FCC's repeal of the open internet rules is maintained, state initiatives are modified, overturned, or vacated, or the European Union modifies these open internet rules or limits commercial practices, mobile and internet providers may be able to limit our users' ability to access Snapchat or make Snapchat a less attractive alternative to our competitors' applications. Were that to happen, our ability to retain existing users or attract new users may be impaired, and our business would be seriously harmed.

We may not successfully cultivate relationships with key industry participants or develop products that operate effectively with these technologies, systems, networks, regulations, or standards. If it becomes more difficult for our users to access and use Snapchat on their mobile devices, if our users choose not to access or use Snapchat on their mobile devices, or if our users choose to use mobile products that do not offer access to Snapchat, our business and user retention, growth, and engagement could be seriously harmed.

***We rely on Google Cloud and Amazon Web Services, or AWS, for the vast majority of our computing, storage, bandwidth, and other services. Any disruption of or interference with our use of either platform would negatively affect our operations and seriously harm our business.***

Google and Amazon provide distributed computing infrastructure platforms for business operations, or what is commonly referred to as a "cloud" computing service. We currently run the vast majority of our computing on Google Cloud and AWS, and our systems are not fully redundant on the two platforms. Any transition of the cloud services currently provided by either Google Cloud or AWS to the other platform or to another cloud provider would be difficult to implement and will cause us to incur significant time and expense. We have committed to spend $2.0 billion with Google Cloud over five years and $1.1 billion with AWS over six years, in each case beginning January 2017, and have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google and AWS. Given this, any significant disruption of or interference with our use of Google Cloud or AWS would negatively impact our operations and our business would be seriously harmed. If our users or partners are not able to access Snapchat or specific Snapchat features, or encounter difficulties in doing so, due to issues or disruptions with Google Cloud or AWS, we may lose users, partners, or advertising revenue. The level of service provided by Google Cloud and AWS or similar providers may also impact our users', advertisers', and partners' usage of and satisfaction with Snapchat and could seriously harm our business and reputation. If Google Cloud, AWS, or similar providers experience interruptions in service regularly or for a prolonged basis, or other similar issues, our business would be seriously harmed. Hosting costs also have and will continue to increase as our user base and user engagement grows and may seriously harm our business if we are unable to grow our revenues faster than the cost of utilizing the services of Google Cloud, AWS, or similar providers.

In addition, each of Google and Amazon may take actions beyond our control that could seriously harm our business, including:

- discontinuing or limiting our access to its cloud platform;

- increasing pricing terms;

- terminating or seeking to terminate our contractual relationship altogether;

- establishing more favorable relationships or pricing terms with one or more of our competitors; and

- modifying or interpreting its terms of service or other policies in a manner that impacts our ability to run our business and operations.

Google and Amazon each has broad discretion to change and interpret its terms of service and other policies with respect to us, and those actions may be unfavorable to us. They may also alter how we are able to process data on their cloud platforms. If Google or Amazon makes changes or interpretations that are unfavorable to us, our business could be seriously harmed.

***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm our business.***

Substantially all of our revenue is generated from third parties advertising on Snapchat, a trend that we expect to continue. For the years ended December 31, 2020, 2019, and 2018, advertising revenue accounted for approximately 99%, 98%, and 99% of total revenue, respectively. Although we have and continue to try to establish longer-term advertising commitments with advertisers, most advertisers do not have long-term advertising commitments with us, and our efforts to establish long-term commitments may not succeed.

We are still early in developing our advertising business. Our advertising customers vary from small businesses to well-known brands. Many of our customers only recently started working with us and spend a relatively small portion of their overall advertising budget with us, but some customers have devoted meaningful budgets that contribute to our total revenue. Still, no individual customer accounts for more than 10% of our annual revenue. In addition, advertisers may view some of our products as experimental and unproven. Advertisers will not continue to do business with us if we do not deliver advertisements in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. As our business continues to develop, including globally, there may be new or existing advertisers or resellers, or advertisers or resellers from different geographic regions that contribute more significantly to our total revenue. For example, greater China represented more than 10% of our revenue for the three months ended June 30, 2020. Any economic or political instability, whether as a result of the COVID-19 pandemic or otherwise, in a specific country or region may negatively impact the global or local economy, advertising ecosystem, our customers and their budgets with us, or our ability to forecast our advertising revenue, and our business would be seriously harmed.

Moreover, we rely heavily on our ability to collect and disclose data and metrics to and for our advertisers to attract new advertisers and retain existing advertisers. Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers. For example, the General Data Protection Regulation, or GDPR, in the European Union, which went into effect in May 2018, expanded the rights of individuals to control how their personal data is collected and processed, and placed restrictions on the use of personal data of younger minors. In addition, the California Consumer Privacy Act, or CCPA, went into effect in January 2020 and places additional requirements on the handling of personal data for us, our partners, and our advertisers. The CCPA also provides for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. The potential effects of this legislation, including any regulations implemented by the legislation, are far-reaching, uncertain, and evolving, and may require us to modify our data processing practices and policies and incur substantial costs and expenses in an effort to comply. Other state, federal, and foreign legislative and regulatory bodies have also implemented or may implement similar legislation regarding the handling of personal data. Changes in the European Union's Electronic Communications Code, which became effective in December 2020, may result in the expanded applicability of the European Union's ePrivacy Directive over parts of our services, requiring us to make changes to how we process and store certain types of communications data of users in the European Union, which could have a material impact on the availability of data we rely on to improve and personalize our products and features. Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners, or adversely affect our ability to effectively target

14

advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including:

- a diminished or stagnant growth in the total and regional number of DAUs on Snapchat, or our inability to deliver advertisements to all of our users due to hardware, software, or network limitations;

- a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Communication, Snap Map, Stories, and Spotlight platforms;

- our inability to create new products that sustain or increase the value of our advertisements;

- changes in our user demographics that make us less attractive to advertisers;

- lack of ad creative availability by our advertising partners;

- our partners who provide content to us may not renew agreements or devote the resources to create engaging content or do not provide content exclusively to us;

- decreases in the perceived quantity, quality, usefulness, or relevance of the content provided by our users or partners;

- changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content;

- competitive developments or advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat;

- product changes or advertising inventory management decisions we may make that change the type, size, or frequency of advertisements displayed on Snapchat or the method used by advertisers to purchase advertisements;

- adverse legal developments relating to advertising, including changes mandated or prompted by legislation, regulation, executive actions, or litigation;

- adverse media reports or other negative publicity involving us, our founders, our partners, or other companies in our industry segment;

- advertiser or user perception that content published by us, our users, or our partners is objectionable;

- the degree to which users skip advertisements and therefore diminish the value of those advertisements to advertisers;

- changes in the way advertising is priced or its effectiveness is measured;

- our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements;

- our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful;

- difficulty and frustration from advertisers who may need to reformat or change their advertisements to comply with our guidelines; and

- the macroeconomic climate and the status of the advertising industry in general.

These and other factors could reduce demand for our advertising products, which may lower the prices we receive, or cause advertisers to stop advertising with us altogether. Either of these would seriously harm our business.

***Our two co-founders have control over all stockholder decisions because they control a substantial majority of our voting stock.***

Our two co-founders, Evan Spiegel and Robert Murphy, own or control voting shares of our capital stock that represent approximately 99% of the voting power of our outstanding capital stock as of December 31, 2020, and Mr. Spiegel alone can exercise voting control over a majority of our voting power. As a result, Mr. Spiegel and Mr. Murphy, or in many instances

15

Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO, or 32,383,178 shares of Class C common stock. Should either of our co-founders' Class C common stock be converted to Class B common stock, the remaining co-founder will be able to exercise voting control over our outstanding capital stock. Moreover, Mr. Spiegel and Mr. Murphy have entered into a proxy agreement under which each has granted to the other a voting proxy with respect to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over. The proxy would become effective on either founder's death or disability. Accordingly, on the death or incapacity of either Mr. Spiegel or Mr. Murphy, the other could individually control nearly all of the voting power of our outstanding capital stock.

In addition, in October 2016, we issued a dividend of one share of non-voting Class A common stock to all our equity holders, which will prolong our co-founders' voting control because our co-founders are able to liquidate their holdings of non-voting Class A common stock without diminishing their voting control. In the future, our board of directors may, from time to time, decide to issue special or regular stock dividends in the form of Class A common stock, and if we do so our co-founders' control could be further prolonged. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support. Conversely, this concentrated control could allow our co-founders to consummate such a transaction that our other stockholders do not support. In addition, our co-founders may make long-term strategic investment decisions and take risks that may not be successful and may seriously harm our business.

As our Chief Executive Officer, Mr. Spiegel has control over our day-to-day management and the implementation of major strategic investments of our company, subject to authorization and oversight by our board of directors. As board members and officers, Mr. Spiegel and Mr. Murphy owe a fiduciary duty to our stockholders and must act in good faith in a manner they reasonably believe to be in the best interests of our stockholders. As stockholders, even controlling stockholders, Mr. Spiegel and Mr. Murphy are entitled to vote their shares, and shares over which they have voting control, in their own interests, which may not always be in the interests of our stockholders generally. We have not elected to take advantage of the "controlled company" exemption to the corporate governance rules for companies listed on the New York Stock Exchange, or NYSE.

***Health epidemics, including the COVID-19 pandemic, have had, and could in the future have, an adverse impact on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.***

The ongoing global COVID-19 pandemic has adversely impacted, and may continue to adversely impact, many aspects of our business. As certain of our advertisers experience downturns or uncertainty in their own business operations and revenue because of the economic effects, including resulting from the spread of COVID-19, they have halted or decreased or may halt or decrease or continue to decrease, whether temporarily or permanently, their advertising spending and may focus their advertising spending more on other platforms, all of which may result in decreased advertising revenue. Furthermore, a portion of our advertising revenue is related to in-person events or activities, such as sporting events, music festivals, the Olympics, and in-person learning that have been or may be postponed or cancelled. In addition, the unpredictability of the COVID-19 pandemic may make it difficult to forecast our advertising revenue, and although we may benefit in the shorter term from changes in the current advertising landscape, any increases may not be indicative of longer-term trends. Any decline in advertising revenue or the collectability of our receivables could seriously harm our business.

In response to the COVID-19 pandemic, many state, local, and foreign governments have put in place, and others in the future may put in place, quarantines, executive actions, shelter-in-place orders, physical distancing requirements, and similar government orders and restrictions in order to control the spread of the disease. Such orders or restrictions, or the perception that such orders or restrictions could occur, have resulted in business closures, work stoppages, slowdowns and delays, work-from-home policies, travel restrictions, and cancellation or postponement of events, among other effects that could negatively impact productivity and disrupt our operations and those of our partners, advertisers, and users. We implemented and continue a work-from-home policy for substantially all of our employees, and we may take further actions that alter our operations as may be required by federal, state, or local authorities, or which we believe are in our best interests. While most

of our operations can be performed remotely, there is no guarantee that we will be as effective while working remotely because our team is dispersed, many employees may have additional personal needs to attend to (such as looking after children as a result of school closures or family who become sick), and employees may become sick themselves and be unable to work. Decreased effectiveness of our team could adversely affect our results due to our inability to meet in person with potential advertisers, longer time periods to review and approve ads, longer time to respond to application performance issues or spam, extended timelines for product reviews and a corresponding reduction in innovation, or other decreases in productivity that could seriously harm our business. Furthermore, we may decide to postpone or cancel planned investments in our business in response to changes in our business as a result of the spread of COVID-19, which may impact our user engagement and rate of innovation, either of which could seriously harm our business.

As a result of the COVID-19 pandemic, our partners who provide content or services to us may experience delays or interruptions in their ability to create content or provide services, if they are able to do so at all. A decrease in the amount or quality of content available on Snapchat, or an interruption in the services provided to us, could lead to a decline in user engagement, which could seriously harm our business.

The effects of the COVID-19 pandemic on user engagement or growth are highly uncertain, and may lead to unpredictable results in the short term and long term, including shorter-term increases in user engagement or growth that may not be indicative of longer-term trends. As physical distancing requirements and shelter-in-place orders continue or are reactivated, and there are fewer in-person activities, we may experience short-term and long-term disruption to user behavior and our business. We may also experience inconsistent or negative engagement as user behavior on our platform changes, including changes in user activity as a result of continued physical distancing requirements and shelter-in-place orders. In addition, while the potential impact and duration of the COVID-19 pandemic on the global economy and our business in particular may be difficult to assess or predict, the COVID-19 pandemic has resulted in, and may continue to result in, significant volatility and disruption of global financial markets, reducing our ability to access capital, which could negatively affect our liquidity in the future.

The global impact of COVID-19 has and continues to rapidly evolve, and we will continue to monitor the situation closely. The ultimate impact of the COVID-19 pandemic or a similar health epidemic is highly uncertain and subject to change. We do not yet know the full extent of potential delays or impacts on our business, operations, or the global economy as a whole, or the potential costs or impacts to our business and operations when we are able to return to our offices and resume in-person activities and events. While there have recently been vaccines developed and the spread of COVID-19 may eventually be contained or mitigated, there is no guarantee that a future outbreak of this or any other widespread epidemics will not occur, or that the global economy will recover, either of which could seriously harm our business.

***If we do not develop successful new products or improve existing ones, our business will suffer. We may also invest in new lines of business that could fail to attract or retain users or generate revenue.***

Our ability to engage, retain, and increase our user base and to increase our revenue will depend heavily on our ability to successfully create new products, both independently and together with third parties. We may introduce significant changes to our existing products or develop and introduce new and unproven products and services, including technologies with which we have little or no prior development or operating experience. These new products and updates may fail to increase the engagement of our users, advertisers, or partners, may subject us to increased regulatory requirements or scrutiny, and may even result in short-term or long-term decreases in such engagement by disrupting existing user, advertiser, or partner behavior or by introducing performance and quality issues. For example, beginning in 2017, we started transitioning our advertising sales to a self-serve platform, which decreased average advertising prices. In 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. The short- and long-term impact of any major change, like our early 2018 application redesign and the rewrite of our application for Android users in 2019, or even a less significant change such as a refresh of the application or a feature change, is difficult to predict. Although we believe that these decisions will benefit the aggregate user experience and improve our financial performance over the long term, we may experience disruptions or declines in our DAUs or user activity. Product innovation is inherently volatile, and if new or enhanced products fail to engage our users, advertisers, or partners, or if we fail to give our users meaningful reasons to return to our application, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, any of which may seriously harm our business in the short term, long term, or both. Additionally, we frequently launch new products and the products that we launch may have technical issues that diminish the performance of our application. These performance issues or issues that we encounter in the future could impact our user engagement.

Because our products created new ways of communicating, they have often required users to learn new behaviors to use our products, or to use our products repeatedly to receive the most benefit. These new behaviors, such as swiping and tapping in the Snapchat application, are not always intuitive to users. This can create a lag in adoption of new products and new user additions related to new products. To date, this has not hindered our user growth or engagement, but that may be the result of a large portion of our user base being in a younger demographic and more willing to invest the time to learn to use our products most effectively. To the extent that future users, including those in older demographics, are less willing to invest the time to learn to use our products, and if we are unable to make our products easier to learn to use, our user growth or engagement could be affected, and our business could be harmed. We may also develop new products or initiatives that increase user engagement and costs without increasing revenue. For example, in 2016, we introduced Memories, our cloud storage service for Snaps, which increases our storage costs but does not currently generate revenue.

In addition, we have invested and expect to continue to invest in new lines of business, new products, and other initiatives to generate revenue and increase our user base and user activity. For example, in 2019 we launched Snap Games, a live, multi-player gaming experience, and in November 2020 we launched Spotlight, a new entertainment platform for user-generated content within Snapchat. Such new lines of business, new products, and other initiatives may be costly, difficult to operate, and divert management's attention, and there is no guarantee that they will be positively received by our community or provide positive returns on our investment. In certain cases, new products that we develop may require regulatory approval prior to launch, or may require us to comply with additional regulations or legislation. There is no guarantee that we will be able to obtain such regulatory approval, and our efforts to comply with these laws and regulations could be costly and divert management's time and effort and may still not guarantee compliance. If we do not successfully develop new approaches to monetization or meet the expectations of our users or partners, we may not be able to maintain or grow our revenue as anticipated or recover any associated development costs, and our business could be seriously harmed.

***Our business is highly competitive. We face significant competition that we anticipate will continue to intensify. If we are not able to maintain or improve our market share, our business could suffer.***

We face significant competition in almost every aspect of our business both domestically and internationally. This ranges from smaller or newer companies to larger more established companies such as Apple, ByteDance (including TikTok), Facebook (including Instagram and WhatsApp), Google (including YouTube), Kakao, LINE, Naver (including Snow), Tencent, and Twitter which provide their users with a variety of products, services, content, and online advertising offerings, and advertising-supported video on demand platforms that offer, or will offer, products and services that may compete with Snapchat features or offerings. For example, Instagram, a competing application owned by Facebook, has incorporated many of our features, including a "stories" feature that largely mimics our Stories feature and may be directly competitive. Facebook has introduced, and likely will continue to introduce, more private ephemeral products into its various platforms which mimic other aspects of Snapchat's core use case. We may also lose users to companies that offer products and services that compete with specific Snapchat features because of the low cost for our users to switch to a different product or service. Moreover, in emerging international markets, where mobile devices often lack large storage capabilities, we may compete with other applications for the limited space available on a user's mobile device. We also face competition from traditional and online media businesses for advertising budgets. We compete broadly with the social media offerings of Apple, ByteDance, Facebook, Google, Pinterest, and Twitter, and with other, largely regional, social media platforms that have strong positions in particular countries. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

Many of our current and potential competitors have significantly greater resources and broader global recognition and occupy stronger competitive positions in certain market segments than we do. These factors may allow our competitors to respond to new or emerging technologies and changes in market requirements better than we can, undertake more far-reaching and successful product development efforts or marketing campaigns, or adopt more aggressive pricing policies. In addition, advertisers may use information that our users share through Snapchat to develop or work with competitors to develop products or features that compete with us. Certain competitors, including Apple, Facebook, and Google, could use strong or dominant positions in one or more market segments to gain competitive advantages against us in areas where we operate, including by:

- integrating competing social media platforms or features into products they control such as search engines, web browsers, advertising networks, or mobile device operating systems;

- making acquisitions for similar or complementary products or services; or

- impeding Snapchat's accessibility and usability by modifying existing hardware and software on which the Snapchat application operates.

18

Certain acquisitions by our competitors may result in reduced functionality of our products and services, provide our competitors with valuable insight into the performance of our and our partners' businesses, and provide our competitors with a pipeline of future acquisitions to maintain a dominant position. As a result, our competitors may acquire and engage users at the expense of our user base, growth, or engagement, which may seriously harm our business.

We believe that our ability to compete effectively depends on many factors, many of which are beyond our control, including:

- the usefulness, novelty, performance, and reliability of our products compared to our competitors;

- the number and demographics of our DAUs;

- the timing and market acceptance of our products, including developments and enhancements of our competitors' products;

- our ability to monetize our products;

- the availability of our products to users;

- the effectiveness of our advertising and sales teams;

- the effectiveness of our advertising products;

- our ability to establish and maintain advertisers' and partners' interest in using Snapchat;

- the frequency, relative prominence, and type of advertisements displayed on our application or by our competitors;

- the effectiveness of our customer service and support efforts;

- the effectiveness of our marketing activities;

- changes as a result of actual or proposed legislation, regulation, executive actions, or litigation, including settlements and consent decrees, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry segment;

- our ability to attract, retain, and motivate talented employees, particularly engineers, designers, and sales personnel;

- our ability to successfully acquire and integrate companies and assets;

- our ability to cost-effectively manage and scale our rapidly growing operations; and

- our reputation and brand strength relative to our competitors.

If we cannot effectively compete, our user engagement may decrease, which could make us less attractive to users, advertisers, and partners and seriously harm our business.

***We have incurred operating losses in the past, and may never achieve or maintain profitability.***

We began commercial operations in 2011 and we have historically experienced net losses and negative cash flows from operations. As of December 31, 2020, we had an accumulated deficit of $7.9 billion and for the year ended December 31, 2020, we experienced a net loss of $944.8 million. We expect our operating expenses to increase in the future as we expand our operations. If our revenue does not grow at a greater rate than our expenses, we will not be able to achieve and maintain profitability. We may incur significant losses in the future for many reasons, including due to the other risks and uncertainties described in this report. Additionally, we may encounter unforeseen expenses, operating delays, or other unknown factors that may result in losses in future periods. If our expenses continue to exceed our revenue, our business may be seriously harmed and we may never achieve or maintain profitability.

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could seriously harm our business.***

We depend on the continued services and performance of our key personnel, including Evan Spiegel and Robert Murphy. Although we have entered into employment agreements with Mr. Spiegel and Mr. Murphy, the agreements are at-will, which means that they may resign or could be terminated for any reason at any time. Mr. Spiegel and Mr. Murphy are high profile individuals who have received threats in the past and are likely to continue to receive threats in the future. Mr. Spiegel, as Chief Executive Officer, has been responsible for our company's strategic vision and Mr. Murphy, as Chief Technology Officer, developed the Snapchat application's technical foundation. Should either of them stop working for us

19

for any reason, it is unlikely that the other co-founder would be able to fulfill all of the responsibilities of the departing co-founder nor is it likely that we would be able to immediately find a suitable replacement. The loss of key personnel, including members of management and key engineering, product development, marketing, and sales personnel, could disrupt our operations, adversely impact employee retention and morale, and seriously harm our business.

As we continue to grow, we cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position. In particular, because we are headquartered in Los Angeles, we face significant competition in hiring and attracting qualified engineers, designers, and sales personnel to move to the Los Angeles area. In addition, if our reputation were to be harmed, whether as a result of media, legislative, or regulatory scrutiny or otherwise, it could make it more difficult to attract and retain personnel that are critical to the success of our business.

As we mature, or if our stock price declines, our equity awards may not be as effective an incentive to attract, retain, and motivate employees. Additionally, many of our current employees received substantial amounts of our capital stock, giving them a substantial amount of personal wealth, which can lead to an increase in attrition. As a result, it may be difficult for us to continue to retain and motivate these employees, and this wealth could affect their decision about whether they continue to work for us. Furthermore, if we issue significant equity to attract and retain employees, we would incur substantial additional stock-based compensation expense and the ownership of our existing stockholders would be further diluted. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively and our business could be seriously harmed.

***We have a continually evolving business model, which makes it difficult to evaluate our prospects and future financial results and increases the risk that we will not be successful.***

We began commercial operations in 2011 and began meaningfully monetizing Snapchat in 2015. We started transitioning our advertising sales to a self-serve platform in 2017. We have a continually evolving business model, based on reinventing the camera to improve the way that people live and communicate, which makes it difficult to effectively assess our future prospects. Accordingly, we believe that investors' future perceptions and expectations, which can be idiosyncratic and vary widely, and which we do not control, will affect our stock price. You should consider our business and prospects in light of the many challenges we face, including the ones discussed in this report.

***If our security is compromised or if our platform is subjected to attacks that frustrate or thwart our users' ability to access our products and services, our users, advertisers, and partners may cut back on or stop using our products and services altogether, which could seriously harm our business.***

Our efforts to protect the information that our users have shared with us may be unsuccessful due to the actions of third parties, software bugs or other technical malfunctions, employee error or malfeasance, or other factors. In addition, third parties may attempt to fraudulently induce employees or users to disclose information to gain access to our data or our users' data. If any of these events occur, our or our users' information could be accessed or disclosed improperly. We have previously suffered the loss of employee information related to an employee error. Our Privacy Policy governs how we may use and share the information that our users have provided us. Some advertisers and partners may store information that we share with them. If these third parties fail to implement adequate data-security practices or fail to comply with our terms and policies, our users' data may be improperly accessed or disclosed. And even if these third parties take all these steps, their networks may still suffer a breach, which could compromise our users' data.

Any incidents where our users' information is accessed without authorization, or is improperly used, or incidents that violate our Terms of Service or policies, could damage our reputation and our brand and diminish our competitive position. In addition, affected users or government authorities could initiate legal or regulatory action against us over those incidents, which could be time-consuming and cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. Maintaining the trust of our users is important to sustain our growth, retention, and user engagement. Concerns over our privacy practices, whether actual or unfounded, could damage our reputation and brand and deter users, advertisers, and partners from using our products and services. Any of these occurrences could seriously harm our business.

We also are or may in the future be subject to many federal, state, and foreign laws and regulations, including those related to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could seriously harm our business.

In addition, in December 2014, the U.S. Federal Trade Commission, or the FTC, resolved an investigation into some of our early practices by issuing a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year term of the order, we must complete biennial independent privacy audits. In addition, in June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of

Maryland implementing similar practices, including measures to prevent minors under the age of 13 from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could seriously harm our business.

***Our user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review metrics, including our DAUs and ARPU metrics, to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data gathered on an analytics platform that we developed and operate and have not been validated by an independent third party. While these metrics are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who have multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. Our user metrics are also affected by technology on certain mobile devices that automatically runs in the background of our Snapchat application when another phone function is used, and this activity can cause our system to miscount the user metrics associated with such account.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from age demographics or estimate their ages based on a sample of the self-reported ages we do have. If our users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor or advertiser expectations.

Errors or inaccuracies in our metrics or data could also result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of active users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies. We count a DAU when a user opens the application and only once per user per day. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application. However, we believe that we do not capture all data regarding our active users, which may result in understated metrics. This generally occurs because of technical issues, like when our systems do not record data from a user's application or when a user opens the Snapchat application and contacts our servers but is not recorded as an active user. We continually seek to address these technical issues and improve our accuracy, such as comparing our active users and other metrics with data received from other pipelines, including data recorded by our servers and systems. But given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect these issues to continue, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable. If advertisers, partners, or investors do not perceive our user, geographic, or other demographic metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user, geographic, or other demographic metrics, our reputation may be seriously harmed. Our advertisers and partners may also be less willing to allocate their budgets or resources to Snapchat, which could seriously harm our business. In addition, we calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average.

***Mobile malware, viruses, hacking and phishing attacks, spamming, and improper or illegal use of Snapchat could seriously harm our business and reputation.***

Mobile malware, viruses, hacking, and phishing attacks have become more prevalent and sophisticated in our industry, have occurred on our systems in the past, and may occur on our systems in the future. Because of our prominence, we believe that we are an attractive target for these sorts of attacks. Although it is difficult to determine what, if any, harm may directly result from an interruption or attack, any failure to detect such attack and maintain performance, reliability, security, and availability of our products and technical infrastructure to the satisfaction of our users may seriously harm our reputation and our ability to retain existing users and attract new users.

In addition, spammers attempt to use our products to send targeted and untargeted spam messages to users, which may embarrass or annoy users and make our products less user friendly. We cannot be certain that the technologies that we have developed to repel spamming attacks will be able to eliminate all spam messages from our products. Our actions to combat spam may also require diversion of significant time and focus from improving our products. As a result of spamming activities, our users may use our products less or stop using them altogether, and result in continuing operational cost to us.

Similarly, terror and other criminal groups may use our products to promote their goals and encourage users to engage in terror and other illegal activities. We expect that as more people use our products, these groups will increasingly seek to misuse our products. Although we invest resources to combat these activities, including by suspending or terminating accounts we believe are violating our Terms of Service and Community Guidelines, we expect these groups will continue to seek ways to act inappropriately and illegally on Snapchat. Combating these groups requires our teams to divert significant time and focus from improving our products. In addition, we may not be able to control or stop Snapchat from becoming the preferred application of use by these groups, which may become public knowledge and seriously harm our reputation or lead to lawsuits or attention from regulators. If these activities increase on Snapchat, our reputation, user growth and user engagement, and operational cost structure could be seriously harmed.

***Because we store, process, and use data, some of which contains personal information, we are subject to complex and evolving federal, state, and foreign laws, regulations, and executive actions regarding privacy, data protection, content, and other matters. Many of these laws, regulations, and executive actions are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.***

We are subject to a variety of laws, regulations, and executive actions in the United States and other countries that involve matters central to our business, including user privacy, security, rights of publicity, data protection, content, intellectual property, distribution, electronic contracts and other communications, competition, protection of minors, consumer protection, taxation, and online-payment services. These laws, regulations, and executive actions can be particularly restrictive in countries outside the United States. Both in the United States and abroad, these laws, regulations, and executive actions constantly evolve, remain subject to significant change, and may be issued with limited advance notice. For example, an executive order was recently issued prohibiting certain transactions with a Chinese-owned company, with the prohibition becoming effective 45 days after the date of the order. In addition, the application and interpretation of these laws, regulations, and executive actions are often uncertain, particularly in the new and rapidly evolving industry in which we operate. Because we store, process, and use data, some of which contains personal information, we are subject to complex and evolving federal, state, and foreign laws and regulations regarding privacy, data protection, content, and other matters. Many of these laws, regulations, and executive actions are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.

Several proposals have recently been adopted or are currently pending before, and we believe a number of investigations into other technology companies are currently being conducted by, federal, state, and foreign legislative and regulatory bodies that could significantly affect our business. GDPR in the European Union, which went into effect in May 2018, placed new data protection obligations and restrictions on organizations and may require us to further change our policies and procedures. If we are not compliant with GDPR requirements, we may be subject to significant fines and our business may be seriously harmed. In addition, the California Consumer Privacy Act went into effect in January 2020 and places additional requirements on the handling of personal data. The CCPA also provides for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. The potential effects of this legislation, including any regulations implemented the legislation, are far-reaching, uncertain, and evolving, and may require us, our partners, and advertisers to modify data processing practices and policies and to incur substantial costs and expenses in an effort to comply. Other state and federal legislative and regulatory bodies have enacted or may enact similar legislation regarding the handling of personal data, or conduct additional investigations into specific companies or the industry as a whole that could alter the existing regulatory environment in a manner that would be adverse to us. Changes in the European Union's Electronic Communications Code, which became effective in December 2020, may result in the expanded applicability of the European Union's ePrivacy Directive over parts of our services, requiring us to make changes to how we process and store certain types of communications data of users in the European Union, which could have a material impact on the availability of data we rely on to improve and personalize our products and features. Furthermore, in December 2018, the Australian government passed the Assistance and Access Bill 2018 that provides Australian law enforcement authorities with mechanisms to make requests for electronic communication, even if the data is end-to-end encrypted like in Snapchat, which may create new obligations for companies providing communication services and make their data less secure.

***Our financial condition and results of operations will fluctuate from quarter to quarter, which makes them difficult to predict.***

Our quarterly results of operations have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely on our past quarterly results of operations as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving market segments. Our financial condition and results of operations in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement;

- the development and introduction of new or redesigned products or services by us or our competitors;

- the ability of our data service providers to scale effectively and timely provide the necessary technical infrastructure to offer our service;

- our ability to attract and retain advertisers in a particular period;

- seasonal or other fluctuations in spending by our advertisers and product usage by our users, each of which may change as our product offerings evolve or as our business grows or as a result of unpredictable events such as the COVID-19 pandemic;

- the number of advertisements shown to users;

- the pricing of our advertisements and other products;

- our ability to demonstrate to advertisers the effectiveness of our advertisements;

- the diversification and growth of revenue sources beyond current advertising;

- increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

- our ability to maintain operating margins, cash used in operating activities, and Free Cash Flow;

- our ability to accurately forecast consumer demand for our hardware products and adequately manage inventory;

- system failures or breaches of security or privacy, and the costs associated with such breaches and remediations;

- inaccessibility of Snapchat, or certain features within Snapchat, due to third-party or governmental actions;

- stock-based compensation expense;

- our ability to effectively incentivize our workforce;

- adverse litigation judgments, settlements, or other litigation-related costs, or product recalls;

- changes in the legislative or regulatory environment, including with respect to privacy and data protection, enforcement by government regulators, including fines, orders, or consent decrees, or the issuance of executive orders or other similar executive actions that may adversely affect our revenues or restrict our business;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and interest rates or impairments of any assets on our balance sheet;

- changes in our effective tax rate;

- announcements by competitors of significant new products, licenses, or acquisitions;

- our ability to make accurate accounting estimates and appropriately recognize revenue for our products for which there are no relevant comparable products;

- our ability to meet minimum spending commitments in agreements with our infrastructure providers;

23

- changes in accounting standards, policies, guidance, interpretations, or principles; and

- changes in domestic and global business or macroeconomic conditions, including as a result of the current COVID-19 pandemic.

***If we are unable to continue to successfully grow our user base and further monetize our products, our business will suffer.***

We have made, and are continuing to make, investments to enable users, partners, and advertisers to create compelling content and deliver advertising to our users. Existing and prospective Snapchat users and advertisers may not be successful in creating content that leads to and maintains user engagement. We are continuously seeking to balance the objectives of our users and advertisers with our desire to provide an optimal user experience. We do not seek to monetize all of our products nor do we focus our efforts on users with higher ARPU, and we may not be successful in achieving a balance that continues to attract and retain users and advertisers. If we are not successful in our efforts to grow or effectively monetize our user base, or if we are unable to build and maintain good relations with our advertisers, our user growth and user engagement and our business may be seriously harmed. In addition, we may expend significant resources to launch new products that we are unable to monetize, which may seriously harm our business.

Additionally, we may not succeed in further monetizing Snapchat. We currently monetize Snapchat by displaying in the application advertisements that we sell and advertisements sold by our partners. As a result, our financial performance and ability to grow revenue could be seriously harmed if:

- we fail to increase or maintain DAUs;

- our user growth outpaces our ability to monetize our users, including if we don't attract sufficient advertisers or if our user growth occurs in markets that are not as monetizable;

- we fail to increase or maintain the amount of time spent on Snapchat, the amount of content that our users share, or the usage of our Camera, Communication, Snap Map, Stories, and Spotlight platforms;

- partners do not create engaging content for users or renew their agreements with us;

- we fail to attract sufficient advertisers to utilize our self-serve platform to make the best use of our advertising inventory;

- advertisers do not continue to introduce engaging advertisements;

- advertisers reduce their advertising on Snapchat;

- we fail to maintain good relationships with advertisers or attract new advertisers; or

- the content on Snapchat does not maintain or gain popularity.

***We cannot assure you that we will effectively manage our growth.***

The growth and expansion of our business, headcount, and products create significant challenges for our management, including managing multiple relationships with users, advertisers, partners, and other third parties, and constrain operational and financial resources. If our operations or the number of third-party relationships continues to grow, our information-technology systems and our internal controls and procedures may not adequately support our operations. In addition, some members of our management do not have significant experience managing large global business operations, so our management may not be able to manage such growth effectively. To effectively manage our growth, we must continue to improve our operational, financial, and management processes and systems and effectively expand, train, and manage our employee base. As part of that effort, in 2019, we reorganized the structure and operations of our ad sales team. Although we believe the reorganization will improve the efficiency of our sales team and result in better service for our advertisers over the long term, the reorganization may not have the intended effect and we may experience disruptions, employee turnover, and declines in revenue while our sales team and advertisers become accustomed to the new operations.

As our organization continues to mature and we are required to implement more complex organizational management structures, we may also find it increasingly difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance and seriously harm our business.

24

***Our costs may increase faster than our revenue, which could seriously harm our business or increase our losses.***

Providing our products to our users is costly, and we expect our expenses, including those related to people and hosting, to grow in the future. This expense growth will continue as we broaden our user base, as users increase the number of connections and amount of content they consume and share, as we develop and implement new product features that require more computing infrastructure, and as we grow our business. Historically, our costs have increased each year due to these factors, and we expect to continue to incur increasing costs. Our costs are based on development and release of new products and the addition of users and may not be offset by a corresponding growth in our revenue. We will continue to invest in our global infrastructure to provide our products quickly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization, if any. Our expenses may be greater than we anticipate, and our investments to make our business and our technical infrastructure more efficient may not succeed and may outpace monetization efforts. In addition, we expect to increase marketing, sales, and other operating expenses to grow and expand our operations and to remain competitive. Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.

***Our business depends on our ability to maintain and scale our technology infrastructure. Any significant disruption to our service could damage our reputation, result in a potential loss of users and decrease in user engagement, and seriously harm our business.***

Our reputation and ability to attract, retain, and serve users depends on the reliable performance of Snapchat and our underlying technology infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our products and services from time to time. Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could seriously harm our business. If Snapchat is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to Snapchat as often in the future, or at all. As our user base and the volume and types of information shared on Snapchat grow, we will need an increasing amount of technology infrastructure, including network capacity and computing power, to continue to satisfy our users' needs. It is possible that we may fail to effectively scale and grow our technology infrastructure to accommodate these increased demands. In addition, our business is subject to interruptions, delays, and failures resulting from earthquakes, other natural disasters, terrorism, pandemics, and other catastrophic events.

Substantially all of our network infrastructure is provided by third parties, including Google Cloud and Amazon Web Services. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could seriously harm our business. Any financial or other difficulties these providers face may seriously harm our business. And because we exercise little control over these providers, we are vulnerable to problems with the services they provide.

In 2020, we began work on the implementation of a new enterprise financial planning and reporting system. We went live with this new system in January 2021. As part of this implementation, we may experience difficulties in managing our existing systems and processes, which could disrupt our operations, the management of our finances, and the reporting of our financial results. Our failure to complete such system implementation on a timely basis, or its failure to operate in the intended manner, may result in our inability to manage the growth of our business and to accurately forecast and report our results, each of which could seriously harm our business.

***Our business emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes don't align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. We believe our culture fosters this goal. Our focus on innovations and quick reactions could result in unintended outcomes or decisions that are poorly received by our users, advertisers, or partners. We have made, and expect to continue to make, significant investments to develop and launch new products and services and we cannot assure you that users will purchase or use such new products and services in the future. We will also continue to attempt to find effective ways to show our community new and existing products and alert them to events, holidays, relevant content, and meaningful opportunities to connect with their friends. These methods may provide temporary increases in engagement that may ultimately fail to attract and retain users. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and will thereby improve our financial performance over the long term. For example, we monitor how advertising on Snapchat affects our users' experiences to ensure we do not deliver too many advertisements to our users, and we may decide to decrease the number of

advertisements to ensure our users' satisfaction in the product. In addition, we improve Snapchat based on feedback provided by our users, advertisers, and partners. These decisions may not produce the long-term benefits that we expect, in which case our user growth and engagement, our relationships with advertisers and partners, and our business could be seriously harmed.

*If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be seriously harmed. If we need to license or acquire new intellectual property, we may incur substantial costs.*

We aim to protect our confidential proprietary information, in part, by entering into confidentiality agreements and invention assignment agreements with all our employees, consultants, advisors, and any third parties who access or contribute to our proprietary know-how, information, or technology. We also rely on trademark, copyright, patent, trade secret, and domain-name-protection laws to protect our proprietary rights. In the United States and internationally, we have filed various applications to protect aspects of our intellectual property, and we currently hold a number of issued patents, trademarks, and copyrights in multiple jurisdictions. In the future, we may acquire additional patents or patent portfolios, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark, copyright and patent applications may not be approved. Further, the laws of certain foreign countries do not provide the same level of protection of corporate proprietary information and assets such as intellectual property, trade secrets, know-how, and records as the laws of the United States. For instance, the legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection. As a result, we may be exposed to material risks of theft of our proprietary information and other intellectual property, including technical data, manufacturing processes, data sets, or other sensitive information, and we may also encounter significant problems in protecting and defending our intellectual property or proprietary rights abroad. In any of these cases, we may be required to expend significant time and expense to prevent infringement or to enforce our rights. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business. If we are unable to protect our proprietary rights or prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished, and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could seriously harm our business.

In addition, we have contributed software source code under open-source licenses, have made other technology we developed available under other open licenses, and include open-source software in our products. From time to time, we may face claims from third parties claiming ownership of, or demanding release of, the open-source software or derivative works that we have developed using such software, which could include our proprietary source code, or otherwise seeking to enforce the terms of the applicable open-source license. These claims could result in litigation and could require us to make our software source code freely available, seek licenses from third parties to continue offering our products for certain uses, or cease offering the products associated with such software unless and until we can re-engineer them to avoid infringement, which may be very costly.

*If our users do not continue to contribute content or their contributions are not perceived as valuable to other users, we may experience a decline in user growth, retention, and engagement on Snapchat, which could result in the loss of advertisers and revenue.*

Our success depends on our ability to provide Snapchat users with engaging content, which in part depends on the content contributed by our users. If users, including influential users such as world leaders, government officials, celebrities, athletes, journalists, sports teams, media outlets, and brands, do not continue to contribute engaging content to Snapchat, our user growth, retention, and engagement may decline. That, in turn, may impair our ability to maintain good relationships with our advertisers or attract new advertisers, which may seriously harm our business.

*Foreign government initiatives and restrictions could seriously harm our business.*

Foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. Foreign governments may censor Snapchat in their countries, restrict access to Snapchat from their countries entirely, impose other restrictions that may affect their citizens' ability to access Snapchat for an extended period of time or even indefinitely, require data localization, or impose other laws or regulations that we cannot comply with, would be difficult for us to comply with, or would require us to rebuild our products or the infrastructure for our products. Any restriction on access to Snapchat due to foreign government actions or initiatives, or any withdrawal by us from certain countries because of such actions or initiatives, would adversely affect our DAUs, including by giving our competitors an opportunity to penetrate geographic markets that we cannot access. As a result, our user growth, retention, and engagement may be seriously harmed, and we may not be able to maintain or grow our revenue as anticipated and our business could be seriously harmed.

*Our users may increasingly engage directly with our partners and advertisers instead of through Snapchat, which may negatively affect our revenue and seriously harm our business.*

Using our products, some partners and advertisers not only can interact directly with our users but can also direct our users to content with third-party websites and products and downloads of third-party applications. The more our users engage with third-party websites and applications, the less engagement we may get from them, which would adversely affect the revenue we could earn from them. Although we believe that Snapchat reaps significant long-term benefits from increased user engagement with content on Snapchat provided by our partners, these benefits may not offset the possible loss of advertising revenue, in which case our business could be seriously harmed.

*If events occur that damage our brand or reputation, our business may be seriously harmed.*

We have developed a brand that we believe has contributed to our success. We also believe that maintaining and enhancing our brand is critical to expanding our user base, advertisers, and partners. Because many of our users join Snapchat on the invitation or recommendation of a friend or family member, one of our primary focuses is on ensuring that our users continue to view Snapchat and our brand favorably so that these referrals continue. Maintaining and enhancing our brand will depend largely on our ability to continue to provide useful, novel, fun, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products, make changes to existing products and services, or require our users to agree to new terms of service related to new and existing products that users do not like, which may negatively affect our brand in the short term, long term, or both. Additionally, our partners' actions may affect our brand if users do not appreciate what those partners do on Snapchat. We may also fail to adequately support the needs of our users, advertisers, or partners, which could erode confidence in our brand. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not be successful. If we fail to successfully promote and maintain our brand or if we incur excessive expenses in this effort, our business may be seriously harmed.

We and our founders also receive a high degree of media coverage globally. In the past, we have experienced, and we expect that we will continue to experience, media, legislative, and regulatory scrutiny. Unfavorable publicity regarding us, our privacy practices, product changes, product quality, litigation, employee matters, or regulatory activity, or regarding the actions of our founders, our partners, our users, or other companies in our industry, could seriously harm our reputation and brand. Negative publicity and scrutiny could also adversely affect the size, demographics, engagement, and loyalty of our user base and result in decreased revenue, fewer app installs (or increased app un-installs), or declining user base or growth rates, any of which could seriously harm our business.

*Expanding and operating in international markets requires significant resources and management attention. If we are not successful in expanding and operating our business in international markets, we may incur significant costs, damage our brand, or need to lay off employees in those markets, any of which may seriously harm our business.*

We have expanded to new international markets, which may have very different cultures and commercial, legal, and regulatory systems than where we predominately operate. In connection with our international expansion, we have also hired new employees in many of these markets. This international expansion may:

•    impede our ability to continuously monitor the performance of all of our employees;

•    result in hiring of employees who may not yet fully understand our business, products, and culture; or

•    cause us to expand in markets that may lack the culture and infrastructure needed to adopt our products.

These issues may eventually lead to layoffs of employees in these markets and may harm our ability to grow our business in these markets. In addition, scaling our business to international markets imposes complexity on our business, and requires additional financial, legal, and management resources. We may not be able to manage growth and expansion effectively, which could damage our brand, result in significant costs, and seriously harm our business.

*Operating our business requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay our Convertible Notes, and any other debt when due, which may seriously harm our business.*

Our ability to make principal or interest payments on, or to refinance, the Convertible Notes or other indebtedness depends on our future performance, which is subject to many factors beyond our control. Our business may not generate sufficient cash flow from operations in the future to service our debt and business. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt, obtaining additional debt financing, or issuing additional equity securities, any of which may be on terms that are not favorable to us or, in the

27

case of equity securities, highly dilutive to our stockholders. Our ability to refinance the Convertible Notes or our other indebtedness will depend on various factors, including the available capital markets, our business, and our financial condition at such time. We may not be able to engage in any of these activities or on desirable terms, which could result in a default on our debt obligations. In addition, our existing and future debt agreements, including our Convertible Notes and Credit Facility, may contain restrictive covenants that may prohibit us from adopting any of these alternatives. Our failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in the acceleration of our debt, and would seriously harm our business.

In addition, holders of the Convertible Notes will have the right to require us to repurchase all or a portion of the Convertible Notes on the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Convertible Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. Further, if a make-whole fundamental change as defined in each of the Indentures governing the Convertible Notes occurs prior to the maturity date of the Convertible Notes, we will in some cases be required to increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such make-whole fundamental change. On the conversion of the Convertible Notes, unless we elect to deliver solely shares of our Class A common stock to settle such conversion (other than paying cash in lieu of delivering any fractional share), we will be required to make cash payments for the Convertible Notes being converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make such repurchases of the Convertible Notes surrendered or pay cash with respect to the Convertible Notes being converted.

***We have spent and may continue to spend substantial funds in connection with the tax liabilities on the settlement of equity awards. The manner in which we fund these tax liabilities may cause us to spend substantial funds or dilute stockholders, either of which may have an adverse effect on our financial condition.***

When our employee equity awards vest, we withhold taxes and remit them to relevant taxing authorities on behalf of employees. To fund the withholding and remittance obligations for equity awards, we have either used our existing cash or sold a portion of vested equity awards on behalf of our employees near the applicable settlement dates in an amount that is substantially equivalent to the number of shares of common stock that we would withhold in connection with these settlements. In the future, we may also sell equity on our behalf and use the proceeds to fund the withholding and remittance obligations for equity awards. Any of these methods may have an adverse effect on our financial condition.

If we sell shares on behalf of our employees, although those newly issued shares should not be dilutive, such sales to the market could result in a decline to our stock price. If we use our existing cash, or if our cash reserves are not sufficient, we may choose to issue equity securities or borrow funds under our revolving credit facility. In such an event, we cannot assure you that we will be able to successfully match the proceeds of any such equity financing to the then applicable tax liability, and any such equity financing could result in a decline in our stock price and be dilutive to existing stockholders. If we elect to satisfy tax withholding and remittance obligations in whole or in part by drawing on our revolving credit facility, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

***Our products are highly technical and may contain undetected software bugs or hardware errors, which could manifest in ways that could seriously harm our reputation and our business.***

Our products are highly technical and complex. Snapchat, or any other products we may introduce in the future, may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently disabled products. We have a practice of rapidly updating our products and some errors in our products may be discovered only after a product has been released or shipped and used by users, and may in some cases be detected only under certain circumstances or after extended use. Spectacles, as an eyewear product, is regulated by the U.S. Food and Drug Administration, or the FDA, and may malfunction in a way that physically harms a user. We offer a limited one-year warranty in the United States and a limited two-year warranty in Europe, and any such defects discovered in our products after commercial release could result in a loss of sales and users, which could seriously harm our business. Any errors, bugs, or vulnerabilities discovered in our code after release could damage our reputation, drive away users, lower revenue, and expose us to damages claims, any of which could seriously harm our business.

We could also face claims for product liability, tort, or breach of warranty. In addition, our product contracts with users contain provisions relating to warranty disclaimers and liability limitations, which may not be upheld. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

28

*We have been, are currently, and may in the future be subject to regulatory inquiries, investigations and proceedings in the future, which could cause us to incur substantial costs or require us to change our business practices in a way that could seriously harm our business.*

We have been, are currently, and may in the future be subject to investigations and inquiries from government entities. These investigations and inquiries, and our compliance with any associated regulatory orders or consent decrees, may require us to change our policies or practices, subject us to substantial monetary fines or other penalties or sanctions, result in increased operating costs, divert management's attention, harm our reputation, and require us to incur significant legal and other expenses, any of which could seriously harm our business. For example, in the past, we responded to subpoenas and requests for information made by staff from the U.S. Department of Justice, or DOJ, and the SEC. We believe that these regulators were investigating issues related to allegations asserted in our federal securities class actions about our IPO disclosures. In September 2019, both the DOJ and SEC provided us with written confirmations that they are no longer pursuing their investigations of these matters.

*We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property claims that are expensive and time-consuming. If resolved adversely, these lawsuits and claims could seriously harm our business.*

Companies in the mobile, camera, communication, media, internet, and other technology-related industries own large numbers of patents, copyrights, trademarks, trade secrets, and other intellectual property rights, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights often attempt to aggressively assert their rights to extract value from technology companies. Furthermore, from time to time we may introduce new products or make other business changes, including in areas where we currently do not compete, which could increase our exposure to patent, copyright, trademark, trade secret, and other intellectual property rights claims from competitors and non-practicing entities. We have been subject to, and expect to continue to be subject to, claims and legal proceedings from holders of patents, trademarks, copyrights, and other intellectual property rights alleging that some of our products or content infringe their rights. For example, in April 2018, Blackberry Limited filed a lawsuit against us alleging that we infringe six of its patents. This lawsuit was dismissed in November 2019 after four of the patents were ruled to be invalid; and in December 2020, the U.S. Court of Appeals for the Federal Circuit affirmed the dismissal. As another example, in January 2020, You Map, Inc. filed a lawsuit in the U.S. District Court for the District of Delaware against us, our subsidiary Zenly, and certain of our respective employees alleging that we misappropriated various trade secrets regarding map technology used in Snapchat's and Zenly's map products. While we believe we have meritorious defenses to these claims, an unfavorable outcome in these lawsuits could seriously harm our business. If these or other matters continue in the future or we need to enter into licensing arrangements, which may not be available to us or on terms favorable to us, it may increase our costs and decrease the value of our products, and our business could be seriously harmed.

We rely on a variety of statutory and common-law frameworks for the content we provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, or CDA, and the fair-use doctrine. However, each of these statutes and doctrines is subject to uncertain judicial interpretation and regulatory and legislative amendments. For example, Congress amended the CDA in 2018 in ways that could expose some Internet platforms to an increased risk of litigation. In addition, Congress and the Executive branch have proposed further changes or amendments in 2019 and 2020, including advocating for the repeal of the CDA. While such latter efforts have not been enacted into law, any changes enacted in the future may decrease the protections provided by the CDA. Moreover, some of these statutes and doctrines provide protection only or primarily in the United States. If the rules around these doctrines change, if international jurisdictions refuse to apply similar protections, or if a court were to disagree with our application of those rules to our service, we could incur liability or be required to make significant changes to our products, business practices, or operations, and our business could be seriously harmed.

*From time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming and could seriously harm our business.*

We are involved in numerous lawsuits, including putative class-action lawsuits brought by users and investors, some of which may claim statutory damages. We anticipate that we will continue to be a target for lawsuits in the future. Because we have millions of users, class-action lawsuits against us that are purportedly filed by or on behalf of users typically claim enormous monetary damages in the aggregate even if the alleged per-user harm is small or non-existent. For example, in November 2020 a putative class filed an action against us in Illinois, alleging that we violated Illinois' Biometric Information Privacy Act with respect to many Illinois users of Snapchat and allege that we are liable to those users for statutory damages. While we believe we have meritorious defenses to these claims, an unfavorable outcome in these lawsuits could seriously harm our business. Similarly, because we have a large number of stockholders, class-action lawsuits on securities theories typically claim enormous monetary damages in the aggregate even if the alleged loss per stockholder is small. Any litigation to which we are a party may result in an onerous or unfavorable judgment that might not be reversed on appeal, or we may decide to settle lawsuits on adverse terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and seriously harm our business. Even if the outcome of any such litigation or claim is favorable, defending them is costly and can impose a significant burden on management and

employees. We may also receive unfavorable preliminary, interim, or final rulings in the course of litigation. For example, beginning on May 16, 2017, we, certain of our officers and directors, and the underwriters of our IPO were named as defendants in securities class actions in federal and state courts purportedly brought on behalf of purchasers of our Class A common stock. In January 2020, we entered into a preliminary agreement to settle the federal and state securities class actions and the agreement was preliminarily approved by the federal court in April 2020 and by the state court in November 2020. The settlement amount was paid into escrow in December 2020 and will be released following final approval.

***We may face lawsuits, incur liability, or need to seek licenses based on information posted to our products.***

We have faced, currently face, and will continue to face claims relating to information that is published or made available on our products, including Snapchat. In particular, the nature of our business exposes us to claims related to defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. For example, we do not monitor or edit the vast majority of content that is communicated through Snapchat, and such content may expose us to lawsuits. This risk is enhanced in certain jurisdictions outside the United States where our protection from liability for third-party actions may be unclear or evolving and where we may be less protected under local laws than we are in the United States. For example, in April 2019, the European Union passed a directive expanding online platform liability for copyright infringement and regulating certain uses of news content online, which member states are required to implement by June 2021. In addition, legislation in Germany may impose significant fines for failure to comply with certain content removal and disclosure obligations. Numerous other countries in Europe, Asia-Pacific, and Latin America are considering or have implemented similar legislation imposing penalties for failure to remove certain types of content or follow certain processes. In the United States, there have been various Congressional and Executive branch efforts to remove or restrict the scope of the protections available to online platforms under Section 230 of the CDA, including an amendment in 2018 and recent supportive statements by the current administration and members of Congress to repeal or limit Section 230 of the CDA, which could decrease or change our protections from liability for third-party content in the United States. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages, or license costs. We could also face fines or orders restricting or blocking our services in particular geographies as a result of content hosted on our services. If any of these events occur, we may incur significant costs or be required to make significant changes to our products, business practices, or operations and our business could be seriously harmed.

***We plan to continue expanding our international operations where we have limited operating experience and may be subject to increased business and economic risks that could seriously harm our business.***

We plan to continue expanding our business operations abroad and translating our products into other languages. Snapchat is currently available in more than 30 languages, and we have offices in more than 15 countries. We plan to enter new international markets where we have limited or no experience in marketing, selling, and deploying our products and advertisements. Our limited experience and infrastructure in such markets, or the lack of a critical mass of users in such markets, may make it more difficult for us to effectively monetize any increase in DAUs in those markets, and may increase our costs without a corresponding increase in revenue. If we fail to deploy or manage our operations in international markets successfully, our business may suffer. In the future, as our international operations increase, or more of our expenses are denominated in currencies other than the U.S. dollar, our operating results may be more greatly affected by fluctuations in the exchange rates of the currencies in which we do business. In addition, as our international operations and sales continue to grow, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, and economic instability;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship and requirements to provide user information to local authorities;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- complying with tax requirements of multiple jurisdictions;

- enhanced difficulties of integrating any foreign acquisitions;

- complying with a variety of foreign laws, including certain employment laws requiring national collective bargaining agreements that set minimum salaries, benefits, working conditions, and termination requirements;

- reduced protection for intellectual-property rights in some countries;

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and compliance costs associated with multiple international locations;

- regulations that might add difficulties in repatriating cash earned outside the United States and otherwise preventing us from freely moving cash;

- import and export restrictions and changes in trade regulation;

- complying with statutory equity requirements;

- complying with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and similar laws in other jurisdictions; and

- export controls and economic sanctions administered by the Department of Commerce Bureau of Industry and Security and the Treasury Department's Office of Foreign Assets Control.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our business could be seriously harmed.

***New legislation that would change U.S. or foreign taxation of business activities, including the imposition of tax based on gross revenue, could seriously harm our business.***

Reforming the taxation of international businesses has been a priority for politicians, and a wide variety of changes have been proposed or enacted. Due to the large and expanding scale of our international business activities, any changes in the taxation of such activities may increase our tax expense, the amount of taxes we pay, or both, and seriously harm our business. For example, the Tax Cuts and Jobs Act, or the Tax Act, was enacted in December 2017 and significantly reformed the U.S. Internal Revenue Code of 1986, as amended, or the Code. The Tax Act lowered U.S. federal corporate income tax rates, changed the utilization of future net operating loss carryforwards, allowed for the expensing of certain capital expenditures, and put into effect sweeping changes to U.S. taxation of international business activities. It is currently unclear what, if any, changes to the tax code the new administration in the United States will attempt to implement and how that may affect our business.

In addition, many jurisdictions and intergovernmental organizations have been discussing proposals that may change various aspects of the existing framework under which our tax obligations are determined in many of the jurisdictions in which we do business and in which our users are located. Some jurisdictions have enacted, and others have proposed, taxes based on gross receipts applicable to digital services regardless of profitability. The Organisation for Economic Co-operation and Development has been working on a proposal that may change how taxable presence for digital services is defined and result in the imposition of taxes based on net income in countries where we have no physical presence.

We continue to examine the impact these and other tax reforms may have on our business. The impact of these and other tax reforms is uncertain and one or more of these or similar measures could seriously harm our business.

***Exposure to United Kingdom political developments, including the effect of its withdrawal from the European Union, could be costly and difficult to comply with and could seriously harm our business.***

In June 2016, a referendum was passed in the United Kingdom to leave the European Union, commonly referred to as "Brexit." This decision created an uncertain political and economic environment in the United Kingdom and other European Union countries, and the formal process for leaving the European Union has taken years to complete. We have licensed a portion of our intellectual property to one of our United Kingdom subsidiaries and have based a significant portion of our non-U.S. operations in the United Kingdom. Although the United Kingdom and the European Union have recently entered into a trade and cooperation agreement, the long-term nature of the United Kingdom's relationship with the European Union remains unclear and there is considerable uncertainty as to their future political and economic relations. The political and economic instability created by Brexit has caused and may continue to cause significant volatility in global financial markets and uncertainty regarding the regulation of data protection in the United Kingdom. In addition, Brexit could lead to legal uncertainty and potentially divergent national laws and regulations as the United Kingdom determines which European Union laws to replace or replicate. For example, although the United Kingdom enacted a Data Protection Act in May 2018 that is consistent with the EU General Data Protection Regulation, uncertainty remains regarding how data transfers to and from the United Kingdom will be regulated. Brexit could also have the effect of disrupting the free movement of goods, services, capital, and people between the United Kingdom, the European Union, and elsewhere. The full effect of Brexit is uncertain and depends on any current and future agreements the United Kingdom makes with the European Union and others. Consequently, no assurance can be given about the impact of these developments, and our operational, tax, and other policies may require reassessment and our business may be seriously harmed.

***We plan to continue to make acquisitions and investments in other companies, which could require significant management attention, disrupt our business, dilute our stockholders, and seriously harm our business.***

As part of our business strategy, we have made and intend to make acquisitions to add specialized employees and complementary companies, products, and technologies, as well as investments in other companies in furtherance of our strategic objectives. Our ability to acquire and successfully integrate larger or more complex companies, products, and technologies is unproven. In the future, we may not be able to find other suitable acquisition or investment candidates, and we may not be able to complete acquisitions or investments on favorable terms, if at all. Our previous and future acquisitions and investments may not achieve our goals, and any future acquisitions or investments we complete could be viewed negatively by users, advertisers, partners, or investors. In addition, if we fail to successfully close transactions, integrate new teams, or integrate the products and technologies associated with these acquisitions into our company, our business could be seriously harmed. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. We may not successfully evaluate or use the acquired products, technology, and personnel, or accurately forecast the financial impact of an acquisition or investment transaction, including accounting charges. We may also incur unanticipated liabilities that we assume as a result of acquiring companies. We may have to pay cash, incur debt, or issue equity securities to pay for any acquisition or investment, any of which could seriously harm our business. Selling equity to finance any such acquisition or investment would also dilute our stockholders. Incurring debt would increase our fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

In addition, it generally takes several months after the closing of an acquisition to finalize the purchase price allocation. Therefore, it is possible that our valuation of an acquisition may change and result in unanticipated write-offs or charges, impairment of our goodwill, or a material change to the fair value of the assets and liabilities associated with a particular acquisition, any of which could seriously harm our business.

Our acquisition and investment strategy may not succeed if we are unable to remain attractive to target companies or expeditiously close transactions. Issuing shares of Class A common stock to fund an acquisition or investment would cause economic dilution to existing stockholders but not voting dilution. If we develop a reputation for being a difficult acquirer or having an unfavorable work environment, or target companies view our non-voting Class A common stock unfavorably, we may be unable to consummate key acquisition transactions essential to our corporate strategy and our business may be seriously harmed.

***As our business expands, we have offered and may continue to offer credit to our partners to stay competitive, and as a result we may be exposed to credit risk of some of our partners, which may seriously harm our business.***

As our business continues to grow and expand, we have decided to engage in business with some of our partners on an open credit basis. While we attempt to monitor individual partner payment capability when we grant open credit arrangements and maintain allowances we believe are adequate to cover exposure for doubtful accounts, we cannot assure investors these programs will be effective in managing our credit risks in the future. This may be especially true as our business expands, we engage with partners that have limited operating history, or we engage with partners that we may not be familiar with. If we are unable to adequately control these risks, our business could be seriously harmed.

***If we default on our credit obligations, our operations may be interrupted and our business could be seriously harmed.***

We have a Credit Facility that we may draw on to finance our operations, acquisitions, and other corporate purposes, such as funding our tax-withholding and remittance obligations in connection with settling equity awards. If we default on these credit obligations, our lenders may:

- require repayment of any outstanding amounts drawn on our Credit Facility;

- terminate our Credit Facility; or

- require us to pay significant damages.

If any of these events occur, our operations may be interrupted and our ability to fund our operations or obligations, as well as our business, could be seriously harmed. In addition, our Credit Facility contains operating covenants, including customary limitations on the incurrence of certain indebtedness and liens, restrictions on certain intercompany transactions, and limitations on the amount of dividends and stock repurchases. Our ability to comply with these covenants may be affected by events beyond our control, and breaches of these covenants could result in a default under the Credit Facility and any future financing agreements into which we may enter. If not waived, defaults could cause our outstanding indebtedness under our Credit Facility and any future financing agreements that we may enter into to become immediately due and payable. For more information on our Credit Facility, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

*We may have exposure to greater-than-anticipated tax liabilities, which could seriously harm our business.*

Our income tax obligations are based on our corporate operating structure and third-party and intercompany arrangements, including the manner in which we develop, value, and use our intellectual property and the valuations of our intercompany transactions. The tax laws applicable to our international business activities, including the laws of the United States and other jurisdictions, are subject to change and uncertain interpretation. The taxing authorities of the jurisdictions in which we operate may challenge our methodologies for valuing developed technology, intercompany arrangements, or transfer pricing, which could increase our worldwide effective tax rate and the amount of taxes we pay and seriously harm our business. Taxing authorities may also determine that the manner in which we operate our business is not consistent with how we report our income, which could increase our effective tax rate and the amount of taxes we pay and seriously harm our business. In addition, our future income taxes could fluctuate because of earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by U.S. federal and state and foreign tax authorities. Any adverse outcome from a review or audit could seriously harm our business. In addition, determining our worldwide provision for income taxes and other tax liabilities requires significant judgment by management, and there are many transactions where the ultimate tax determination is uncertain. Although we believe that our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements for such period or periods and may seriously harm our business.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited, each of which could seriously harm our business.*

As of December 31, 2020, we had U.S. federal net operating loss carryforwards of approximately $5.3 billion and state net operating loss carryforwards of approximately $3.2 billion, as well as U.K. net operating loss carryforwards of approximately $2.1 billion. We also accumulated U.S. federal and state research tax credits of $302.6 million and $190.4 million, respectively, as of December 31, 2020. Under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a cumulative change in our ownership by "5% shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. In the event that we experience one or more ownership changes as a result of future transactions in our stock, then we may be limited in our ability to use our net operating loss carryforwards and other tax assets to reduce taxes owed on the net taxable income that we earn.

In the United States, net operating loss carryforwards arising in tax years beginning after December 31, 2017 can be carried forward indefinitely, but use of such carryforwards is limited to 80% of taxable income. Net operating loss carryforwards generated by us before January 1, 2018 will not be subject to the taxable income limitation and will continue to have a twenty-year carryforward period. In the U.K., net operating loss carryforwards can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income and may be subject to ownership change rules that restrict the use of net operating loss carryforwards.

Any limitations on the ability to use our net operating loss carryforwards and other tax assets, as well as the timing of any such use, could seriously harm our business.

*If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings, which could seriously harm our business.*

Under U.S. generally accepted accounting principles, or GAAP, we review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. As of December 31, 2020, we had recorded a total of $1.0 billion of goodwill and intangible assets, net related to our acquisitions. An adverse change in market conditions, particularly if such change has the effect of changing one of our critical assumptions or estimates, could result in a change to the estimation of fair value that could result in an impairment charge to our goodwill or intangible assets. Any such material charges may seriously harm our business.

*We cannot be certain that additional financing will be available on reasonable terms when needed, or at all, which could seriously harm our business.*

We have incurred net losses and negative cash flow from operations for all prior periods, and we may not achieve or maintain profitability. As a result, we may need additional financing. Our ability to obtain additional financing, if and when required, will depend on investor demand, our operating performance, our credit rating, the condition of the capital markets, and other factors. To the extent we use available funds or draw on our Credit Facility, we may need to raise additional funds and we cannot assure investors that additional financing will be available to us on favorable terms when required, or at all. If

33

we raise additional funds through the issuance of equity, equity-linked, or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A common stock, and our existing stockholders may experience dilution. In the event that we are unable to obtain additional financing on favorable terms, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

***We do not have manufacturing capabilities and depend on contract manufacturers. If we encounter problems with our contract manufacturers or if the manufacturing process stops or is delayed for any reason, we may not deliver our hardware products, such as Spectacles, to our customers on time, which may seriously harm our business.***

We have limited manufacturing experience for our only physical product, Spectacles, and we do not have any internal manufacturing capabilities. Instead, we rely on contract manufacturers to build Spectacles. Our contract manufacturers are vulnerable to capacity constraints and reduced component availability, and our control over delivery schedules, manufacturing yields, and costs, particularly when components are in short supply, or if we introduce a new product or feature, is limited. In addition, we have limited control over our manufacturers' quality systems and controls, and therefore must rely on our manufacturers to manufacture our products to our quality and performance standards and specifications. Delays, component shortages, including custom components that are manufactured for us at our direction, global trade conditions and agreements, and other manufacturing and supply problems could impair the distribution of our products and ultimately our brand. For example, the United States has threatened tougher trade terms with China and other countries, leading to the imposition, or announcement of future imposition, of substantially higher U.S. Section 301 tariffs on certain imports from China, which may adversely affect our products and seriously harm our business. Furthermore, any adverse change in our contract manufacturers' financial or business condition or our relationship with our contract manufacturers could disrupt our ability to supply our products to our retailers and distributors. If we are required to change our contract manufacturers or assume internal manufacturing operations, we may lose revenue, incur increased costs, and damage our reputation and brand. Qualifying a new contract manufacturer and commencing production is expensive and time-consuming. In addition, if we experience increased demand for our products, we may need to increase our component purchases, contract-manufacturing capacity, and internal test and quality functions. The inability of our contract manufacturers to provide us with adequate supplies of high-quality products could delay our order fulfillment, and may require us to change the design of our products to meet this increased demand. Any redesign would require us to re-qualify our products with any applicable regulatory bodies, which would be costly and time-consuming. This may lead to unsatisfied customers and users and increase costs to us, which could seriously harm our business.

***Components used in our products may fail as a result of a manufacturing, design, or other defect over which we have no control, and render our devices inoperable.***

We rely on third-party component suppliers to provide some of the functionalities needed to operate and use our products, such as Spectacles. Any errors or defects in that third-party technology could result in errors in our products that could seriously harm our business. If these components have a manufacturing, design, or other defect, they can cause our products to fail and render them permanently inoperable. For example, the typical means by which our Spectacles product connects to mobile devices is by way of a Bluetooth transceiver located in the Spectacles product. If the Bluetooth transceiver in our Spectacles product were to fail, it would not be able to connect to a user's mobile device and Spectacles would not be able to deliver any content to the mobile device and the Snapchat application. As a result, we may have to replace these products at our sole cost and expense. Should we have a widespread problem of this kind, the reputational damage and the cost of replacing these products could seriously harm our business.

The FDA and other state and foreign regulatory agencies regulate Spectacles. We may develop future products that are regulated as medical devices by the FDA or regulated by other governmental agencies. Government authorities, primarily the FDA and corresponding regulatory agencies, regulate the medical device industry. Unless there is an exemption, we must obtain regulatory approval from the FDA and corresponding agencies, or other applicable governmental authorities, before we can market or sell a new regulated product or make a significant modification to an existing product. Obtaining regulatory clearances to market a medical device or other regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any products under development could prevent us from launching new products. We could seriously harm our business and the ability to sell our products if we experience any product problems requiring reporting to governmental authorities, if we fail to comply with applicable state or foreign agency regulations, or if we are subject to enforcement actions such as fines, civil penalties, injunctions, product recalls, or failure to obtain regulatory clearances or approvals.

***We have faced inventory risk with respect to our Spectacles products.***

We have been and may in the future be exposed to inventory risks related to Spectacles as a result of rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand and consumer spending patterns, changes in

34

consumer tastes with respect to our products, and other factors. We try to accurately predict these trends and avoid overstocking or understocking inventory. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. Failure to manage our inventory, supplier commitments, or customer expectations could seriously harm our business.

**Risks Related to Ownership of Our Class A Common Stock**

*Holders of Class A common stock have no voting rights. As a result, holders of Class A common stock will not have any ability to influence stockholder decisions.*

Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2020, Mr. Spiegel and Mr. Murphy control approximately 99% of our voting power, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval. In addition, because our Class A common stock carries no voting rights (except as required by Delaware law), the issuance of the Class A common stock in future offerings, in future stock-based acquisition transactions, or to fund employee equity incentive programs could prolong the duration of Mr. Spiegel's and Mr. Murphy's current relative ownership of our voting power and their ability to elect certain directors and to determine the outcome of all matters submitted to a vote of our stockholders. This concentrated control eliminates other stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

*We cannot predict the impact our capital structure and the concentrated control by our founders may have on our stock price or our business.*

Although other U.S.-based companies have publicly traded classes of non-voting stock, to our knowledge, we were the first company to only list non-voting stock on a U.S. stock exchange. We cannot predict whether this structure, combined with the concentrated control by Mr. Spiegel and Mr. Murphy, will result in a lower trading price or greater fluctuations in the trading price of our Class A common stock, or will result in adverse publicity or other adverse consequences. In addition, some indexes have indicated they will exclude non-voting stock, like our Class A common stock, from their membership. For example, FTSE Russell, a provider of widely followed stock indexes, now requires new constituents of its indexes to have at least five percent of their voting rights in the hands of public stockholders. In addition, S&P Dow Jones, another provider of widely followed stock indexes, has stated that companies with multiple share classes will not be eligible for certain of their indexes. As a result, our Class A common stock is likely not eligible for these stock indexes. We cannot assure you that other stock indexes will not take a similar approach to FTSE Russell or S&P Dow Jones in the future. Exclusion from indexes could make our Class A common stock less attractive to investors and, as a result, the market price of our Class A common stock could be adversely affected. Additionally, the exclusion of our Class A common stock from these indexes may limit the types of investors who invest in our Class A common stock and could make the trading price of our Class A common stock more volatile.

*Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock.*

Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require periodic reporting of beneficial ownership by significant stockholders, including changes in that ownership. For example, in November 2017, Tencent Holdings Limited notified us that it, together with its affiliates, acquired 145,778,246 shares of our non-voting Class A common stock via open market purchases. As a result of our capital structure, neither we nor Tencent is obligated to disclose changes in Tencent's ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. Our directors and officers are required to file reports under Section 16 of the Exchange Act. Our significant stockholders, other than directors and officers, are exempt from the "short-swing" profit recovery provisions of Section 16 of the Exchange Act and related rules with respect to their purchases and sales of our securities. As such, stockholders will be unable to bring derivative claims for disgorgement of profits for trades by significant stockholders under Section 16(b) of the Exchange Act unless the significant stockholders are also directors or officers.

Since our Class A common stock is our only class of stock registered under Section 12 of the Exchange Act and that class is non-voting, we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, unless a vote of the Class A common stock is required by applicable law. Accordingly, legal causes of action and

35

remedies under Section 14 of the Exchange Act for inadequate or misleading information in proxy statements may not be available to holders of our Class A common stock. If we do not deliver any proxy statements, information statements, annual reports, and other information and reports to the holders of our Class B common stock and Class C common stock, then we will similarly not provide any of this information to holders of our Class A common stock. Because we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, any proxy statement, information statement, or notice of our annual meeting may not include all information under Section 14 of the Exchange Act that a public company with voting securities registered under Section 12 of the Exchange Act would be required to provide to its stockholders. Most of that information, however, will be reported in other public filings. For example, any disclosures required by Part III of Form 10-K as well as disclosures required by the NYSE for the year ended December 31, 2020 that are customarily included in a proxy statement are instead included in our Annual Report, rather than a proxy statement. But some information required in a proxy statement or information statement is not required in any other public filing. For example, we will not be required to comply with the proxy access rules under Section 14 of the Exchange Act. If we take any action in an extraordinary meeting of stockholders where the holders of Class A common stock are not entitled to vote, we will not be required to provide the information required under Section 14 of the Exchange Act. Nor will we be required to file a preliminary proxy statement under Section 14 of the Exchange Act. Since that information is also not required in a Form 10-K, holders of Class A common stock may not receive the information required under Section 14 of the Exchange Act with respect to extraordinary meetings of stockholders. In addition, we are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Act. As a result, our stockholders do not have an opportunity to provide a non-binding vote on the compensation of our executive officers. Moreover, holders of our Class A common stock will be unable to bring matters before our annual meeting of stockholders or nominate directors at such meeting, nor can they submit stockholder proposals under Rule 14a-8 of the Exchange Act.

*The trading price of our Class A common stock has been and will likely continue to be volatile.*

The trading price of our Class A common stock has been and is likely to continue to be volatile. Shares of Class A common stock were sold in our IPO in March 2017 at a price of $17.00 per share. Since then, the trading price of our Class A common stock has ranged from $4.82 to $54.71 through December 31, 2020. Declines or volatility in our trading price could make it more difficult to attract and retain talent, adversely impact employee retention and morale, and may require us to issue more equity to incentivize employees which could dilute stockholders. The market price of our Class A common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our user growth, retention, engagement, revenue, or other operating results;

- variations between our actual operating results and the expectations of investors and the financial community;

- the accuracy of our financial guidance or projections;

- any forward-looking financial or operating information we may provide, any changes in this information, or our failure to meet expectations based on this information;

- actions of investors who initiate or maintain coverage of us, changes in financial estimates by any investors who follow our company, or our failure to meet these estimates or the expectations of investors;

- whether our capital structure is viewed unfavorably, particularly our non-voting Class A common stock and the significant voting control of our co-founders;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if we issue shares to satisfy equity-related tax obligations;

- stock repurchase programs undertaken by us;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry segment, including our partners and competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits, executive actions, or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war, incidents of terrorism, pandemics, or responses to these events.

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices, including us. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class-action litigation following periods of market volatility. Beginning on May 16, 2017, we, certain of our officers and directors, and the underwriters for our IPO were named as defendants in securities class actions purportedly brought on behalf of purchasers of our Class A common stock. In January 2020, we entered into a preliminary agreement to settle the federal and state securities class actions and the agreement was preliminarily approved by the federal court in April 2020 and by the state court in November 2020. The settlement amount was paid into escrow in December 2020 and will be released following final approval. Any litigation could subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business.

### Conversion of the Convertible Notes may dilute the ownership interest of our stockholders or may otherwise depress the market price of our Class A common stock.

The conversion of some or all of the Convertible Notes may dilute the ownership interests of our stockholders. On conversion of the Convertible Notes, we have the option to pay or deliver, as the case may be, cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock. If we elect to settle our conversion obligation in shares of our Class A common stock or a combination of cash and shares of our Class A common stock, any sales in the public market of our Class A common stock issuable on such conversion could adversely affect prevailing market prices of our Class A common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the conversion of the Convertible Notes could be used to satisfy short positions, or anticipated conversion of the Convertible Notes into shares of our Class A common stock, any of which could depress the market price of our Class A common stock.

### We may still incur substantially more debt or take other actions that would diminish our ability to make payments on the Convertible Notes when due. Our ability to repay our debt depends on our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.

We and our subsidiaries may incur substantial additional debt in the future, subject to the restrictions contained in our current and future debt instruments. We are not restricted under the terms of the Indentures governing the Convertible Notes from incurring additional debt, securing existing or future debt, repurchasing our stock, making investments, paying dividends, recapitalizing our debt, or taking a number of other actions that could have the effect of diminishing our ability to make payments on the Convertible Notes when due.

Our ability to pay our debt when due or to refinance our indebtedness, including the Convertible Notes, depends on our financial condition at such time, the condition of capital markets, and our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.

### The conditional conversion feature of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.

Our Convertible Notes are convertible at the option of the holder. In the event the conditions for optional conversion of the 2025 Notes or 2026 Notes by holders continue to be met before the close of business on the business day immediately preceding February 1, 2025 or May 1, 2026, respectively, holders of the applicable Convertible Notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their Convertible Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our Class A common stock (other than paying cash in lieu of delivering any fractional share), we may settle all or a portion of our conversion obligation in cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Convertible Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Convertible Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital and may seriously harm our business.

37

***We entered into certain hedging positions that may affect the value of the Convertible Notes and the volatility and value of our Class A common stock.***

In connection with the issuance of the Convertible Notes, we entered into certain hedging positions with certain financial institutions. These hedging positions are expected generally to reduce potential dilution of our Class A common stock on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount of such converted Convertible Notes, as the case may be, with such reduction or offset subject to a cap.

The counterparties to these hedging positions or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our Class A common stock or purchasing or selling our Class A common stock in secondary market transactions prior to the maturity of the Convertible Notes (and are likely to do so during any observation period related to a conversion of Convertible Notes or following any repurchase of Convertible Notes by us on any fundamental change repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our Class A common stock or the Convertible Notes. In addition, if any such hedging positions fail to become effective, the counterparties to these hedging positions or their respective affiliates may unwind their hedge positions, which could adversely affect the value of our Class A common stock.

***Delaware law and provisions in our certificate of incorporation and bylaws, as well as our Indentures, could make a merger, tender offer, or proxy contest difficult or more expensive, thereby depressing the trading price of our Class A common stock.***

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our Class A common stock by acting to discourage, delay, or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- our certificate of incorporation provides for a tri-class capital structure. As a result of this structure, Mr. Spiegel and Mr. Murphy control all stockholder decisions, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. This includes the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. This concentrated control could discourage others from initiating any potential merger, takeover, or other change-of-control transaction that other stockholders may view as beneficial. As noted above, the issuance of the Class A common stock dividend, and any future issuances of Class A common stock dividends, could have the effect of prolonging the influence of Mr. Spiegel and Mr. Murphy on the company;

- our board of directors has the right to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect directors; and

- our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Any provision of our certificate of incorporation, bylaws, or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

Furthermore, certain provisions in the Indentures governing our Convertible Notes may make it more difficult or expensive for a third party to acquire us. For example, the Indentures require us, at the holders' election, to repurchase the Convertible Notes for cash on the occurrence of a fundamental change and, in certain circumstances, to increase the conversion rate for a holder that converts its Convertible Notes in connection with a make-whole fundamental change. A takeover of us may trigger the requirement that we repurchase the Convertible Notes or increase the conversion rate, which could make it more costly for a third party to acquire us. The Indentures also prohibit us from engaging in a merger or acquisition unless, among other things, the surviving entity assumes our obligations under the Convertible Notes and the Indentures. These and other provisions in the Indentures could deter or prevent a third party from acquiring us even when the acquisition may be favorable to holders of the Convertible Notes or our stockholders.

*Future sales of shares by existing stockholders could cause our stock price to decline.*

If our existing stockholders, including employees and service providers who obtain equity, sell, or indicate an intention to sell, substantial amounts of our Class A common stock in the public market, the trading price of our Class A common stock could decline. As of December 31, 2020, we had outstanding a total of 1.2 billion shares of Class A common stock, 23.7 million shares of Class B common stock, and 231.6 million shares of Class C common stock. In addition, as of December 31, 2020, 125.5 million shares of Class A common stock and 0.8 million shares of Class B common stock were subject to outstanding stock options and RSUs. All of our outstanding shares are eligible for sale in the public market, except approximately 393.5 million shares (including options exercisable and RSAs subject to forfeiture as of December 31, 2020) held by directors, executive officers, and other affiliates that are subject to volume limitations under Rule 144 of the Securities Act. Our employees, other service providers, and directors are subject to our quarterly trading window closures. In addition, we have reserved shares for issuance under our equity incentive plans. When these shares are issued and subsequently sold, it would be dilutive to existing stockholders and the trading price of our Class A common stock could decline.

*If securities or industry analysts either do not publish research about us, or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our Class A common stock could decline.*

The trading market for our Class A common stock is influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market, or our competitors. If one or more of the analysts initiate research with an unfavorable rating or downgrade our Class A common stock, provide a more favorable recommendation about our competitors, or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume to decline. Since we provide only limited financial guidance, this may increase the probability that our financial results are perceived as not in line with analysts' expectations, and could cause volatility to our Class A common stock price.

*We do not intend to pay cash dividends for the foreseeable future.*

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any cash dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases. In addition, our Credit Facility includes restrictions on our ability to pay cash dividends.

*If we are unable to maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our Class A common stock may be seriously harmed.*

We are required to maintain internal control over financial reporting, perform system and process evaluation and testing of those internal controls to allow management to report on their effectiveness, report any material weaknesses in such internal controls, and obtain an opinion from our independent registered public accounting firm regarding the effectiveness of such internal controls as required by Section 404 of the Sarbanes-Oxley Act, all of which is time-consuming, costly, and complicated. If we are unable to comply with these requirements in a timely manner, if we assert that our internal control over financial reporting is ineffective, if we identify material weaknesses in our internal control over financial reporting, or if our independent registered public accounting firm is unable to express an opinion or expresses a qualified or adverse opinion about the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected. In addition, we could become subject to investigations by the NYSE, the SEC, and other regulatory authorities, which could require additional financial and management resources.

***The requirements of being a public company may strain our resources, result in more litigation, and divert management's attention.***

We are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Complying with these rules and regulations have caused and will continue to cause us to incur additional legal and financial compliance costs, make some activities more difficult, be time-consuming or costly, and continue to increase demand on our systems and resources. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results, and that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting.

By complying with public disclosure requirements, our business and financial condition are more visible, which we believe may result in increased threatened or actual litigation, including by competitors and other third parties. For example, beginning on May 16, 2017, we, certain of our officers and directors, and the underwriters of our IPO were named as defendants in securities class actions purportedly brought on behalf of purchasers of our Class A common stock. In January 2020, we entered into a preliminary agreement to settle the federal and state securities class actions. The settlement agreement was preliminarily approved by the federal court in April 2020 and by the state court in November 2020. The settlement amount was paid into escrow in December 2020 and will be released following final approval. Shareholder litigation can subject us to substantial costs and divert resources and the attention of management from our business and, if the claims are successful, our business could be seriously harmed. Even if the claims do not result in litigation or are resolved in our favor, the time and resources needed to resolve them could divert our management's resources, impose large defense costs, and seriously harm our business.

***Our certificate of incorporation provides that the Court of Chancery of the State of Delaware and the federal district courts of the United States of America will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

- any action asserting a claim against us arising under the Delaware General Corporation Law, our certificate of incorporation, or our bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

These exclusive forum provisions may limit a stockholder's ability to bring an action in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. While the Delaware courts have determined that such choice of forum provisions are facially valid, a stockholder may nevertheless seek to bring an action in a venue other than those designated in the exclusive forum provisions. In such instance, we would expect to vigorously assert the validity and enforceability of our exclusive forum provisions, which may require significant additional costs associated with resolving such action in other jurisdictions, and there can be no assurance that the provisions will be enforced by a court in those other jurisdictions. If a court were to find either exclusive forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur further significant additional costs associated with resolving the dispute in other jurisdictions, all of which could seriously harm our business.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters are located in Santa Monica, California, where we occupy approximately 553,000 square feet, including some remaining Venice locations and excluding leases we have ceased use primarily as a result of moving to a centralized corporate office. As of December 31, 2020, our global facilities totaled an aggregate of approximately 1.0 million square feet of leased office space. We also maintain offices in multiple locations in the United States and internationally in Europe, Asia, and Australia. We may add additional offices as we expand our business to other continents and countries. We believe that our facilities are sufficient for our current needs and that, should it be needed, additional facilities will be available to accommodate the expansion of our business.

**Item 3. Legal Proceedings.**

We are currently involved in, and may in the future be involved in, legal proceedings, claims, inquiries, and investigations in the ordinary course of our business, including claims for infringing intellectual property rights related to our products and the content contributed by our users and partners. Although the results of these proceedings, claims, inquiries, and investigations cannot be predicted with certainty, we do not believe that the final outcome of these matters is reasonably likely to have a material adverse effect on our business, financial condition, or results of operations. Regardless of final outcomes, however, any such proceedings, claims, and investigations may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information for Common Stock**

Our Class A common stock has been listed on the NYSE under the symbol "SNAP" since March 2, 2017. Our Class B common stock and Class C common stock are not listed or traded on any stock exchange.

**Holders of Record**

As of December 31, 2020, there were 689 stockholders of record of our Class A common stock. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. The closing price of our Class A common stock on December 31, 2020 was $50.07 per share as reported on the NYSE. As of December 31, 2020, there were 87 stockholders of record of our Class B common stock and two stockholders of record of our Class C common stock.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate paying any cash dividends in the foreseeable future. The terms of our Credit Facility also restrict our ability to pay dividends, and we may also enter into credit agreements or other borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our capital stock.

We have paid a stock dividend of our Class A common stock on our capital stock in the past and from time to time in the future may pay special or regular stock dividends in the form of Class A common stock, which per the terms of our certificate of incorporation must be paid equally to all stockholders. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects, and other factors that our board of directors may deem relevant.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Stock Performance Graph**

*This performance graph shall not be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Snap Inc. under the Securities Act.*

The following graph shows a comparison from March 2, 2017 (the date our Class A common stock commenced trading on the NYSE) through December 31, 2020 of the cumulative total return for our Class A common stock, the Standard & Poor's 500 Stock Index (S&P 500 Index), and the NYSE Composite. The graph assumes that $100 was invested at the market close on March 2, 2017 in our Class A common stock, the S&P 500 Index, and the NYSE Composite, and data for the S&P 500 Index and the NYSE Composite assumes reinvestment of any dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Item 6. Selected Financial Data.**

The consolidated statements of operations data for each of the years ended December 31, 2020, 2019, and 2018 and the consolidated balance sheets data as of December 31, 2020 and 2019 are derived from our audited consolidated financial statements included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. The consolidated statements of operations data for the years ended December 31, 2017 and 2016 and the consolidated balance sheets data as of December 31, 2018, 2017, and 2016 are derived from our audited consolidated financial statements, except as otherwise noted, that are not included in this Annual Report on Form 10-K. Our historical results are not necessarily indicative of our results in any future period. You should read the following selected consolidated financial data together with "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our consolidated financial statements and the related notes included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. The selected consolidated financial data in this section are not intended to replace our consolidated financial statements and the related notes.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** |
| | (in thousands, except per share amounts) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 2,506,626 | $ 1,715,534 | $ 1,180,446 | $ 824,949 | $ 404,482 |
| Costs and expenses: | | | | | |
| Cost of revenue | 1,182,505 | 895,838 | 798,865 | 717,462 | 451,660 |
| Research and development | 1,101,561 | 883,509 | 772,185 | 1,534,863 | 183,676 |
| Sales and marketing | 555,468 | 458,598 | 400,824 | 522,605 | 124,371 |
| General and administrative | 529,164 | 580,917 | 477,022 | 1,535,595 | 165,160 |
| Total costs and expenses | 3,368,698 | 2,818,862 | 2,448,896 | 4,310,525 | 924,867 |
| Operating loss | (862,072) | (1,103,328) | (1,268,450) | (3,485,576) | (520,385) |
| Interest income | 18,127 | 36,042 | 27,228 | 21,096 | 4,654 |
| Interest expense | (97,228) | (24,994) | (3,894) | (3,456) | (1,424) |
| Other income (expense), net | 14,988 | 59,013 | (8,248) | 4,528 | (4,568) |
| Loss before income taxes | (926,185) | (1,033,267) | (1,253,364) | (3,463,408) | (521,723) |
| Income tax benefit (expense) | (18,654) | (393) | (2,547) | 18,342 | 7,080 |
| Net loss | $ (944,839) | $ (1,033,660) | $ (1,255,911) | $ (3,445,066) | $ (514,643) |
| Net loss per share attributable to Class A, Class B, and Class C common stockholders[(1)]: | | | | | |
| Basic | $ (0.65) | $ (0.75) | $ (0.97) | $ (2.95) | $ (0.64) |
| Diluted | $ (0.65) | $ (0.75) | $ (0.97) | $ (2.95) | $ (0.64) |

(1)    See Note 3 of the notes to our consolidated financial statements included in "Financial Statements and Supplementary Data" for a description of how we compute basic and diluted net loss per share attributable to Class A, Class B, and Class C common stockholders.

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** |
| | (in thousands) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents, and marketable securities | $ 2,537,540 | $ 2,112,805 | $ 1,279,063 | $ 2,043,039 | $ 987,368 |
| Working capital | 2,670,648 | 2,144,311 | 1,383,237 | 2,020,538 | 1,023,241 |
| Total assets | 5,024,238 | 4,011,924 | 2,714,106 | 3,421,566 | 1,722,792 |
| Total liabilities | 2,694,262 | 1,752,011 | 403,107 | 429,239 | 203,878 |
| Additional paid-in capital | 10,200,141 | 9,205,256 | 8,220,417 | 7,634,825 | 2,728,823 |
| Accumulated deficit | (7,891,542) | (6,945,930) | (5,912,578) | (4,656,667) | (1,207,862) |
| Total stockholders' equity | 2,329,976 | 2,259,913 | 2,310,999 | 2,992,327 | 1,518,914 |

**Non-GAAP Financial Measures**

To supplement our consolidated financial statements, which are prepared and presented in accordance with GAAP, we use certain non-GAAP financial measures, as described below, to understand and evaluate our core operating performance. These non-GAAP financial measures, which may be different than similarly titled measures used by other companies, are presented to enhance investors' overall understanding of our financial performance and should not be considered a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

We use the non-GAAP financial measure of Free Cash Flow, which is defined as net cash provided by (used in) operating activities, reduced by purchases of property and equipment. We believe Free Cash Flow is an important liquidity measure of the cash that is available, after capital expenditures, for operational expenses and investment in our business and is a key financial indicator used by management. Additionally, we believe that Free Cash Flow is an important measure since we use third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue generating activities. Free Cash Flow is useful to investors as a liquidity measure because it measures our ability to generate or use cash. Once our business needs and obligations are met, cash can be used to maintain a strong balance sheet and invest in future growth.

We use the non-GAAP financial measure of Adjusted EBITDA, which is defined as net income (loss); excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense and related payroll tax expense, and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We believe that Adjusted EBITDA helps identify underlying trends in our business that could otherwise be masked by the effect of the expenses that we exclude in Adjusted EBITDA.

We believe that both Free Cash Flow and Adjusted EBITDA provide useful information about our financial performance, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics used by our management for financial and operational decision-making. We are presenting the non-GAAP measures of Free Cash Flow and Adjusted EBITDA to assist investors in seeing our financial performance through the eyes of management, and because we believe that these measures provide an additional tool for investors to use in comparing our core financial performance over multiple periods with other companies in our industry.

These non-GAAP financial measures should not be considered in isolation from, or as substitutes for, financial information prepared in accordance with GAAP. There are a number of limitations related to the use of these non-GAAP financial measures compared to the closest comparable GAAP measure. Some of these limitations are that:

- Free Cash Flow does not reflect our future contractual commitments;

- Adjusted EBITDA excludes certain recurring, non-cash charges such as depreciation of fixed assets and amortization of acquired intangible assets and, although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future;

- Adjusted EBITDA excludes stock-based compensation expense and related payroll tax expense, which have been, and will continue to be for the foreseeable future, significant recurring expenses in our business and an important part of our compensation strategy; and

- Adjusted EBITDA excludes income tax expense.

The following table presents a reconciliation of Free Cash Flow to net cash used in operating activities, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| **Free Cash Flow reconciliation:** | | | |
| Net cash used in operating activities | $ (167,644) | $ (304,958) | $ (689,924) |
| Less: | | | |
| Purchases of property and equipment | (57,832) | (36,478) | (120,242) |
| Free Cash Flow | $ (225,476) | $ (341,436) | $ (810,166) |

The following table presents a reconciliation of Adjusted EBITDA to net loss, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| **Adjusted EBITDA reconciliation:** | | | |
| Net loss | (944,839) | (1,033,660) | (1,255,911) |
| Add (deduct): | | | |
| Interest income | (18,127) | (36,042) | (27,228) |
| Interest expense | 97,228 | 24,994 | 3,894 |
| Other (income) expense, net | (14,988) | (59,013) | 8,248 |
| Income tax (benefit) expense | 18,654 | 393 | 2,547 |
| Depreciation and amortization | 86,744 | 87,245 | 91,648 |
| Stock-based compensation expense | 770,182 | 686,013 | 538,211 |
| Payroll tax expense related to stock-based compensation | 50,309 | 27,840 | 21,927 |
| Securities class actions legal charges | — | 100,000 | — |
| Lease exit charges | — | — | 31,143 |
| Reduction in force charges | — | — | 9,884 |
| Adjusted EBITDA | $ 45,163 | $ (202,230) | $ (575,637) |

Securities class actions legal charges in the fourth quarter of 2019 were related to a preliminary agreement to settle the securities class actions that arose following our IPO in 2017. The preliminary settlement agreement was signed in January 2020 and provided for a resolution of all of the pending claims in the stockholder class actions for $187.5 million. We recorded legal settlement expense, net of amounts directly covered by insurance, of $100.0 million. These charges are non-recurring and not reflective of underlying trends in our business.

We exited various operating leases prior to the end of the contractual lease term, primarily as a result of moving to a centralized corporate office located in Santa Monica, California. In the year ended December 31, 2018, we recorded lease exit charges of $33.0 million. The charges primarily included the present value of our remaining lease obligation on the cease use dates that occurred during the quarter, net of estimated sublease income. As of December 31, 2018, we had exited all properties associated with this event. Changes to our estimated sublease income, including actual contracted sublease income, may result in incremental lease exit charge activity in the period determined. Additionally, we recognized a gain on the sale of buildings sold as a result of moving to our centralized corporate office, which is included in lease exit charges above for the year ended December 31, 2018. These charges are non-recurring and not reflective of underlying trends in our business.

Reduction in force charges in the first quarter of 2018 were related to a reduction in force plan impacting approximately 7% of our global headcount, primarily in engineering and sales. The charges are composed primarily of severance expense and related payroll tax expense. These charges are non-recurring and not reflective of underlying trends in our business. Additionally, we recognized a stock-based compensation forfeiture benefit of $31.5 million, which is included in stock-based compensation expense above for the year ended December 31, 2018.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs that involve significant risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to those differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in "Risk Factors," "Note Regarding Forward-Looking Statements," and "Note Regarding User Metrics and Other Data."*

*The following generally discusses 2020 and 2019 items and year-to-year comparisons between 2020 and 2019. Discussion of historical items and year-to-year comparisons between 2019 and 2018 that are not included in this discussion can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on February 4, 2020.*

**Overview of Full Year 2020 Results**

Our key user metrics and financial results for fiscal year 2020 are as follows:

*User Metrics*

- Daily Active Users, or DAUs, increased to 265 million in Q4 2020, compared to 218 million in Q4 2019.

- Average revenue per user, or ARPU, increased 33% to $3.44 in Q4 2020, compared to $2.58 in Q4 2019.

*Financial Results*

- Cash used in operating activities was $(167.6) million in 2020, compared to $(305.0) million in 2019.

- Free Cash Flow was $(225.5) million in 2020, compared to $(341.4) million in 2019.

- Common shares outstanding plus shares underlying stock-based awards, including restricted stock units, restricted stock awards, and outstanding stock options, totaled 1,630 million at December 31, 2020, compared with 1,576 million one year ago.

- Capital expenditures were $57.8 million in 2020, compared to $36.5 million in 2019.

- Cash, cash equivalents, and marketable securities were $2.5 billion as of December 31, 2020.

- Revenue increased 46% to $2.5 billion in 2020, compared to $1.7 billion in 2019.

- Total costs and expenses excluding stock-based compensation and related payroll tax expense increased 21% to $2.5 billion in 2020, compared to $2.1 billion in 2019.

- Net loss decreased 9% to $(944.8) million in 2020, compared to $(1.0) billion in 2019.

- Diluted net loss per share decreased 13% to $(0.65) in 2020, compared to $(0.75) in 2019.

- Adjusted EBITDA increased 122% to $45.2 million in 2020, compared to $(202.2) million in 2019.

**Overview**

Snap Inc. is a camera company.

We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a camera application that helps people communicate visually with friends and family through short videos and images called Snaps.

**Trends in User Metrics**

We define a DAU as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We define ARPU as quarterly revenue divided by the average DAUs. We assess the health of our business by measuring DAUs and ARPU because we believe that these metrics are important ways for both management and investors to understand engagement and monitor the performance of our platform.

*User Engagement*

We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We had 265 million DAUs on average in the fourth quarter of 2020, compared to 249 million in the prior quarter and 218 million in the fourth quarter of 2019.

**Quarterly Average Daily Active Users**
**(in millions)**



(1)     North America includes Mexico, the Caribbean, and Central America.

(2)     Europe includes Russia and Turkey.

47

*Monetization*

In the year ended December 31, 2020, we recorded revenue of $2.5 billion compared to revenue of $1.7 billion for the year ended December 31, 2019, an increase of 46% year-over-year. We monetize our business primarily through advertising. Our advertising products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

ARPU was $3.44 in the fourth quarter of 2020, up from $2.73 in the third quarter of 2020 and $2.58 in the fourth quarter of 2019. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on a determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This differs from the presentation of our revenue by geography in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer.

### Quarterly Average Revenue per User





(1)     North America includes Mexico, the Caribbean, and Central America.

(2)     Europe includes Russia and Turkey.

**Results of Operations**

*Components of Results of Operations*

*Revenue*

We generate substantially all of our revenue through the sale of our advertising products, which primarily include Snap Ads and AR Ads, and measurement services, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of our hardware product, Spectacles. This revenue is reported net of allowances for returns.

*Cost of Revenue*

Cost of revenue consists primarily of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs. Cost of revenue also includes payments for content and third-party selling costs, referred to as partner arrangements. In addition, cost of revenue includes advertising measurement services, and personnel-related costs, including salaries, benefits, and stock-based compensation expenses. Cost of revenue also includes facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs for Spectacles.

*Research and Development Expenses*

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our engineers, designers, and other employees engaged in the research and development of our products. In addition, research and development expenses include facilities and other supporting overhead costs, including depreciation and amortization. Research and development costs are expensed as incurred.

*Sales and Marketing Expenses*

Sales and marketing expenses consist primarily of personnel-related costs, including salaries, benefits, commissions, and stock-based compensation expense for our employees engaged in sales and sales support, business development, media, marketing, corporate partnerships, and customer service functions. Sales and marketing expenses also include costs incurred for advertising, market research, tradeshows, branding, marketing, promotional expense, and public relations, as well as facilities and other supporting overhead costs, including depreciation and amortization.

*General and Administrative Expenses*

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our finance, legal, information technology, human resources, and other administrative teams. General and administrative expenses also include facilities and supporting overhead costs, including depreciation and amortization, and external professional services.

*Interest Income*

Interest income consists primarily of interest earned on our cash, cash equivalents, and marketable securities.

*Interest Expense*

Interest expense consists primarily of interest expense associated with our senior convertible notes, or the Convertible Notes, and commitment fees and amortization of financing costs related to our revolving credit facility.

*Other Income (Expense), Net*

Other income (expense), net consists of realized gains and losses on sales of marketable securities, our portion of non-marketable investment income and losses, foreign currency transaction gains and losses, and gains and impairments on non-marketable investments. Other income (expense), net also includes any gains or losses on divestitures of businesses.

*Income Tax Benefit (Expense)*

We are subject to income taxes in the United States and numerous foreign jurisdictions. These foreign jurisdictions have different statutory tax rates than the United States. Additionally, certain of our foreign earnings may also be taxable in the United States. Accordingly, our effective tax rates will vary depending on the relative proportion of foreign to domestic income, use of tax credits, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws.

*Adjusted EBITDA*

We define Adjusted EBITDA as net income (loss), excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense and related payroll tax expense; and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We consider the exclusion of certain non-cash and non-recurring expenses in calculating Adjusted EBITDA to provide a useful measure for period-to-period comparisons of our business and for investors and others to evaluate our operating results in the same manner as does our management. Additionally, we believe that Adjusted EBITDA is an important measure since we use third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue-generating activities. See "Selected Financial Data—Non-GAAP Financial Measures" for additional information and a reconciliation of net loss to Adjusted EBITDA.

**Discussion of Results of Operations**

The following table sets forth our consolidated statements of operations data:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (in thousands) | | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | |
| Revenue | $ | 2,506,626 | $ | 1,715,534 | $ | 1,180,446 |
| Costs and expenses[(1)] [(2)]: | | | | | | |
| Cost of revenue | | 1,182,505 | | 895,838 | | 798,865 |
| Research and development | | 1,101,561 | | 883,509 | | 772,185 |
| Sales and marketing | | 555,468 | | 458,598 | | 400,824 |
| General and administrative | | 529,164 | | 580,917 | | 477,022 |
| Total costs and expenses | | 3,368,698 | | 2,818,862 | | 2,448,896 |
| Operating loss | | (862,072) | | (1,103,328) | | (1,268,450) |
| Interest income | | 18,127 | | 36,042 | | 27,228 |
| Interest expense | | (97,228) | | (24,994) | | (3,894) |
| Other income (expense), net | | 14,988 | | 59,013 | | (8,248) |
| Loss before income taxes | | (926,185) | | (1,033,267) | | (1,253,364) |
| Income tax benefit (expense) | | (18,654) | | (393) | | (2,547) |
| Net loss | $ | (944,839) | $ | (1,033,660) | $ | (1,255,911) |
| Adjusted EBITDA[(3)] | $ | 45,163 | $ | (202,230) | $ | (575,637) |

(1)     Stock-based compensation expense included in the above line items:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (in thousands) | | | | | |
| **Stock-based compensation expense:** | | | | | | |
| Cost of revenue | $ | 9,367 | $ | 6,365 | $ | 4,393 |
| Research and development | | 533,272 | | 464,639 | | 340,533 |
| Sales and marketing | | 108,270 | | 93,355 | | 84,059 |
| General and administrative | | 119,273 | | 121,654 | | 109,226 |
| Total | $ | 770,182 | $ | 686,013 | $ | 538,211 |

(2)     Depreciation and amortization expense included in the above line items:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (in thousands) | | | | | |
| **Depreciation and amortization expense:** | | | | | | |
| Cost of revenue | $ | 22,205 | $ | 21,271 | $ | 26,282 |
| Research and development | | 37,627 | | 33,208 | | 33,001 |
| Sales and marketing | | 12,916 | | 13,256 | | 15,089 |
| General and administrative | | 13,996 | | 19,510 | | 17,276 |
| Total | $ | 86,744 | $ | 87,245 | $ | 91,648 |

(3)     See "Selected Financial Data—Non-GAAP Financial Measures" of this Annual Report on Form 10-K for more information and for a reconciliation of Adjusted EBITDA to net loss, the most directly comparable financial measure calculated and presented in accordance with GAAP.

The following table sets forth the components of our consolidated statements of operations data for each of the periods presented as a percentage of revenue:

| | Year Ended December 31, | | |
| | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | 100% | 100% | 100% |
| Costs and expenses: | | | |
| Cost of revenue | 47 | 52 | 68 |
| Research and development | 44 | 52 | 65 |
| Sales and marketing | 22 | 27 | 34 |
| General and administrative | 21 | 34 | 40 |
| Total costs and expenses | 134 | 164 | 207 |
| Operating loss | 34 | 64 | 107 |
| Interest income | 1 | 2 | 2 |
| Interest expense | 4 | 1 | — |
| Other income (expense), net | 1 | 3 | 1 |
| Loss before income taxes | 37 | 60 | 106 |
| Income tax benefit (expense) | 1 | — | — |
| Net loss | 38% | 60% | 106% |

*Revenue*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
| | 2020 | 2019 | 2018 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| | | | (dollars in thousands) | | | | |
| Revenue | $ 2,506,626 | $ 1,715,534 | $ 1,180,446 | $ 791,092 | 46% | $ 535,088 | 45% |

*2020 compared to 2019*

Revenue for the year ended December 31, 2020 increased $791.1 million compared to the same period in 2019. Revenue increased due to a combination of growth in advertisers and advertising demand and optimization efficiencies, as well as a shift towards higher yielding products and regions.

*Cost of Revenue*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
| | 2020 | 2019 | 2018 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| | | | (dollars in thousands) | | | | |
| Cost of Revenue | $ 1,182,505 | $ 895,838 | $ 798,865 | $ 286,667 | 32% | $ 96,973 | 12% |

*2020 compared to 2019*

Cost of revenue for the year ended December 31, 2020 increased $286.7 million compared to the same period in 2019. The increase in cost of revenue primarily consisted of increased infrastructure costs of $96.7 million, attributable to DAU growth and increased user activity between the periods, net of infrastructure cost efficiencies. The increase was also a result of higher revenue share due to both the overall increase in revenue and a higher mix of revenue subject to revenue share as well as higher content acquisition costs.

51

*Research and Development Expenses*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Research and Development Expenses | $ 1,101,561 | $ 883,509 | $ 772,185 | $218,052 | 25% | $111,324 | 14% |

*2020 compared to 2019*

Research and development expenses for the year ended December 31, 2020 increased $218.1 million compared to the same period in 2019. The increase primarily consisted of an increase in personnel costs, driven by growth in research and development headcount that contributed to higher stock-based compensation expense, and changes to our cash compensation programs.

*Sales and Marketing Expenses*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Sales and Marketing Expenses | $ 555,468 | $ 458,598 | $ 400,824 | $96,870 | 21% | $ 57,774 | 14% |

*2020 compared to 2019*

Sales and marketing expenses for the year ended December 31, 2020 increased $96.9 million compared to the same period in 2019. The increase was primarily driven by increased marketing investments and an increase in personnel expenses due to the growth in sales and marketing headcount and stock-based compensation expense. The increase was partially offset by the impact of lower travel and event-related spending due to COVID-19 related restrictions on these activities.

*General and Administrative Expenses*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| General and Administrative Expenses | $ 529,164 | $ 580,917 | $ 477,022 | $ (51,753) | (9)% | $ 103,895 | 22% |

*2020 compared to 2019*

General and administrative expenses for the year ended December 31, 2020 decreased $51.8 million compared to the same period in 2019. The decrease was primarily due to the $100.0 million preliminary settlement of the securities class action in the prior period, partially offset by an increase in personnel expenses driven by an increase in headcount and changes to our cash compensation programs. This decrease was also due to a lower cost per head driven by a decrease in stock-based compensation expense as well as the impact of lower travel and event-related spending due to COVID-19 related restrictions on these activities.

*Interest Income*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Interest Income | $ 18,127 | $ 36,042 | $ 27,228 | $ (17,915) | (50)% | $ 8,814 | 32% |

*2020 compared to 2019*

Interest income for the year ended December 31, 2020 decreased $17.9 million compared to the same period in 2019. The decrease was primarily a result of lower interest rates on U.S. government-backed securities, partially offset by a higher overall invested cash balance.

*Interest Expense*

| | | Year Ended December 31, | | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) (NM = Not Meaningful) | | | | |
| Interest Expense | $ (97,228) | $ | (24,994) | $ | (3,894) | $ (72,234) | 289% | $ (21,100) | NM |

*2020 compared to 2019*

Interest expense for the year ended December 31, 2020 increased $72.2 million, compared to the same period in 2019. The increase in interest expense in the current period relates to the Convertible Notes.

*Other Income (Expense), Net*

| | | Year Ended December 31, | | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) (NM = Not Meaningful) | | | | |
| Other Income (Expense), Net | $ 14,988 | $ | 59,013 | $ | (8,248) | $ (44,025) | (75)% | $ 67,261 | NM |

*2020 compared to 2019*

Other income, net for the year ended December 31, 2020 decreased $44.0 million, compared to other income, net for the same period in 2019. Other income, net for the current year was primarily a result of gains on non-marketable investments partially offset by impairments of non-marketable investments. Other income, net in the comparable period in 2019 was primarily a result of a gain of $39.9 million on the divestiture of Placed, LLC, or Placed, a location-based measurement services company, as well as gains on non-marketable investments.

*Income Tax Benefit (Expense)*

| | | Year Ended December 31, | | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | **$** | **%** | **$** | **%** |
| | | | | | (dollars in thousands) | | | | |
| Income Tax Benefit (Expense) | $ (18,654) | $ | (393) | $ | (2,547) | $ (18,261) | 4647% | $ 2,154 | (85)% |
| Effective Tax Rate | (2.0)% | | (0.0)% | | (0.2)% | | | | |

*2020 compared to 2019*

Income tax expense was $18.7 million for the year ended December 31, 2020, compared to $0.4 million for the same period in 2019. This increase was primarily driven by a discrete expense resulting from intra-entity transfers of intangible assets, partially offset by a discrete benefit resulting from a partial valuation allowance release on our deferred tax assets due to deferred tax liabilities originating from acquisitions.

Our effective tax rate differs from the U.S. statutory tax rate primarily due to valuation allowances on our deferred tax assets as it is more likely than not that some or all of our deferred tax assets will not be realized.

For additional discussion, see Note 11 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

*Net Loss and Adjusted EBITDA*

| | Year Ended December 31, | | | 2020 vs 2019 Change | | 2019 vs 2018 Change | |
|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | $ | % | $ | % |
| | | (dollars in thousands) | | | | | |
| Net Loss | $ (944,839) | $ (1,033,660) | $ (1,255,911) | $ 88,821 | (9)% | $ 222,251 | (18)% |
| Adjusted EBITDA | $ 45,163 | $ (202,230) | $ (575,637) | $ 247,393 | (122)% | $ 373,407 | (65)% |

*2020 compared to 2019*

Net loss for the year ended December 31, 2020 was $944.8 million, compared to $1.0 billion for the same period in 2019. Adjusted EBITDA for the year ended December 31, 2020 was $45.2 million, compared to $(202.2) million for the same period in 2019. The decrease in net loss was attributable to a legal expense of $100.0 million for the preliminary settlement agreement of securities class actions in the prior period, partially offset by a gain of $39.9 million on the divestiture of Placed recognized in the prior period. The increase in Adjusted EBITDA was driven by increased revenues, partially offset by increased cost of revenue mainly due to higher infrastructure costs attributable to DAU growth and increased user activity between the periods.

For a discussion of the limitations associated with using Adjusted EBITDA rather than GAAP measures and a reconciliation of this measure to net loss, see "Selected Financial Data—Non-GAAP Financial Measures."

**Unaudited Quarterly Results of Operations Data**

The following table sets forth the primary components of our unaudited quarterly consolidated statements of cash flows for each of the four quarters in the periods ended December 31, 2020 and December 31, 2019. These unaudited quarterly statements of cash flows have been prepared on the same basis as our audited consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. In the opinion of management, the financial information reflects all normal recurring adjustments necessary for the fair statement of results of operations for these periods. This information should be read in conjunction with our consolidated financial statements and the related notes included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. The results of historical periods are not necessarily indicative of the results in any future period.

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Consolidated Statements of Cash Flows Data:** | | | | | | | | |
| Net cash provided by (used in) operating activities | $ (66,178) | $ (95,789) | $ (76,149) | $ (66,842) | $ 6,283 | $ (66,554) | $ (54,828) | $ (52,545) |
| Net cash provided by (used in) investing activities | (80,928) | 184,715 | (688,319) | (144,076) | 371,577 | (492,124) | (375,250) | (234,067) |
| Net cash provided by (used in) financing activities | 5,596 | 1,342 | 1,157,550 | 1,364 | 3,130 | 909,059 | 2,434 | 8,168 |
| Change in cash, cash equivalents, and restricted cash | $ (141,510) | $ 90,268 | $ 393,082 | $ (209,554) | $ 380,990 | $ 350,381 | $ (427,644) | $ (278,444) |

The following table sets forth the major components of our unaudited quarterly consolidated statements of operations for each of the four quarters in the periods ended December 31, 2020 and December 31, 2019. These unaudited quarterly results of operations have been prepared on the same basis as our audited consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. In the opinion of management, the financial information reflects all normal recurring adjustments necessary for the fair statement of results of operations for these periods. This information should be read in conjunction with our consolidated financial statements and the related notes included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. The results of historical periods are not necessarily indicative of the results in any future period.

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | | | |
| Revenue | $ 320,426 | $ 388,021 | $ 446,199 | $ 560,888 | $ 462,478 | $ 454,158 | $ 678,668 | $ 911,322 |
| Costs and expenses[1][2]: | | | | | | | | |
| Cost of revenue | 203,767 | 215,492 | 223,140 | 253,439 | 253,410 | 250,454 | 293,095 | 385,546 |
| Research and development | 216,185 | 236,199 | 211,599 | 219,526 | 238,613 | 260,863 | 283,639 | 318,446 |
| Sales and marketing | 97,882 | 111,504 | 123,240 | 125,972 | 122,205 | 132,118 | 143,511 | 157,634 |
| General and administrative | 118,653 | 129,644 | 117,073 | 215,547 | 134,614 | 121,331 | 126,287 | 146,932 |
| Total costs and expenses | 636,487 | 692,839 | 675,052 | 814,484 | 748,842 | 764,766 | 846,532 | 1,008,558 |
| Operating loss | (316,061) | (304,818) | (228,853) | (253,596) | (286,364) | (310,608) | (167,864) | (97,236) |
| Interest income | 7,816 | 7,446 | 10,317 | 10,463 | 8,589 | 4,768 | 2,801 | 1,969 |
| Interest expense | (756) | (809) | (8,654) | (14,775) | (15,113) | (24,727) | (28,212) | (29,176) |
| Other income (expense), net | (1,127) | 44,085 | (1,481) | 17,536 | (12,389) | 3,575 | (5,669) | 29,471 |
| Loss before income taxes | (310,128) | (254,096) | (228,671) | (240,372) | (305,277) | (326,992) | (198,944) | (94,972) |
| Income tax benefit (expense) | (279) | (1,078) | 1,296 | (332) | (659) | 1,041 | (909) | (18,127) |
| Net loss | $ (310,407) | $ (255,174) | $ (227,375) | $ (240,704) | $ (305,936) | $ (325,951) | $ (199,853) | $ (113,099) |

(1)    Stock-based compensation expense included in the above line items:

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Stock-based compensation expense:** | | | | | | | | |
| Cost of revenue | $ 1,849 | $ 1,786 | $ 1,332 | $ 1,398 | $ 1,782 | $ 2,066 | $ 2,623 | $ 2,896 |
| Research and development | 112,242 | 132,610 | 108,176 | 111,611 | 118,317 | 127,516 | 132,003 | 155,436 |
| Sales and marketing | 17,760 | 26,474 | 23,333 | 25,788 | 24,806 | 27,107 | 27,393 | 28,964 |
| General and administrative | 30,705 | 34,704 | 28,387 | 27,858 | 27,144 | 29,482 | 30,061 | 32,586 |
| Total | $ 162,556 | $ 195,574 | $ 161,228 | $ 166,655 | $ 172,049 | $ 186,171 | $ 192,080 | $ 219,882 |

(2)    Depreciation and amortization expense included in the above line items:

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Depreciation and amortization expense:** | | | | | | | | |
| Cost of revenue | $ 6,146 | $ 5,642 | $ 4,580 | $ 4,903 | $ 5,525 | $ 5,532 | $ 5,615 | $ 5,533 |
| Research and development | 8,650 | 7,188 | 8,632 | 8,738 | 8,915 | 8,463 | 9,526 | 10,723 |
| Sales and marketing | 4,015 | 3,045 | 3,109 | 3,087 | 3,166 | 3,381 | 3,233 | 3,136 |
| General and administrative | 4,508 | 6,785 | 4,325 | 3,892 | 3,598 | 3,549 | 3,430 | 3,419 |
| Total | $ 23,319 | $ 22,660 | $ 20,646 | $ 20,620 | $ 21,204 | $ 20,925 | $ 21,804 | $ 22,811 |

55

The following table presents a reconciliation of Free Cash Flow to net cash used in operating activities, the most comparable GAAP financial measure, for each of the periods presented:

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Reconciliation of Free Cash Flow:** | | | | | | | | |
| Net cash provided by (used in) operating activities | $ (66,178) | $ (95,789) | $ (76,149) | $ (66,842) | $ 6,283 | $ (66,554) | $ (54,828) | $ (52,545) |
| Less: | | | | | | | | |
| Purchases of property and equipment | (11,814) | (7,633) | (7,938) | (9,093) | (10,891) | (15,767) | (14,727) | (16,447) |
| Free Cash Flow | $ (77,992) | $ (103,422) | $ (84,087) | $ (75,935) | $ (4,608) | $ (82,321) | $ (69,555) | $ (68,992) |

The following table presents a reconciliation of Adjusted EBITDA to net loss, the most comparable GAAP financial measure, for each of the periods presented:

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Reconciliation of Adjusted EBITDA:** | | | | | | | | |
| Net loss | $ (310,407) | $ (255,174) | $ (227,375) | $ (240,704) | $ (305,936) | $ (325,951) | $ (199,853) | $ (113,099) |
| Add (deduct): | | | | | | | | |
| Interest income | (7,816) | (7,446) | (10,317) | (10,463) | (8,589) | (4,768) | (2,801) | (1,969) |
| Interest expense | 756 | 809 | 8,654 | 14,775 | 15,113 | 24,727 | 28,212 | 29,176 |
| Other (income) expense, net | 1,127 | (44,085) | 1,481 | (17,536) | 12,389 | (3,575) | 5,669 | (29,471) |
| Income tax (benefit) expense | 279 | 1,078 | (1,296) | 332 | 659 | (1,041) | 909 | 18,127 |
| Depreciation and amortization | 23,319 | 22,660 | 20,646 | 20,620 | 21,204 | 20,925 | 21,804 | 22,811 |
| Stock-based compensation expense | 162,556 | 195,574 | 161,228 | 166,655 | 172,049 | 186,171 | 192,080 | 219,882 |
| Payroll tax expense related to stock-based compensation | 6,737 | 7,871 | 4,604 | 8,628 | 11,874 | 7,942 | 10,341 | 20,152 |
| Securities class actions legal charges | — | — | — | 100,000 | — | — | — | — |
| Adjusted EBITDA | $ (123,449) | $ (78,713) | $ (42,375) | $ 42,307 | $ (81,237) | $ (95,570) | $ 56,361 | $ 165,609 |

The following table sets forth the components of our unaudited quarterly consolidated statements of operations for each of the periods presented as a percentage of revenue:

| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| **Consolidated Statements of Operations Data:** | | | | | | | | |
| Revenue | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Costs and expenses: | | | | | | | | |
| Cost of revenue | 64 | 56 | 50 | 45 | 55 | 55 | 43 | 42 |
| Research and development | 67 | 61 | 47 | 39 | 52 | 57 | 42 | 35 |
| Sales and marketing | 31 | 29 | 28 | 22 | 26 | 29 | 21 | 17 |
| General and administrative | 37 | 33 | 26 | 38 | 29 | 27 | 19 | 16 |
| Total costs and expenses | 199 | 179 | 151 | 145 | 162 | 168 | 125 | 111 |
| Operating loss | 99 | 79 | 51 | 45 | 62 | 68 | 25 | 11 |
| Interest income | 2 | 2 | 2 | 2 | 2 | 1 | — | — |
| Interest expense | — | — | 2 | 3 | 3 | 5 | 4 | 3 |
| Other income (expense), net | — | 11 | — | 3 | 3 | 1 | 1 | 3 |
| Loss before income taxes | 97 | 65 | 51 | 43 | 66 | 72 | 29 | 10 |
| Income tax benefit (expense) | — | — | — | — | — | — | — | 2 |
| Net loss | 97% | 66% | 51% | 43% | 66% | 72% | 29% | 12% |

## Liquidity and Capital Resources

Cash, cash equivalents, and marketable securities were $2.5 billion as of December 31, 2020, primarily consisting of cash on deposit with banks and highly liquid investments in U.S. government and agency securities, corporate debt securities, certificates of deposit, and commercial paper. Our primary source of liquidity is cash generated through financing activities. Our primary uses of cash include operating costs such as personnel-related costs and the infrastructure costs of the Snapchat application, facility-related capital spending, and acquisitions and investments. There are no known material subsequent events that could have a material impact on our cash or liquidity. We may contemplate and engage in merger and acquisition activity that could materially impact our liquidity and capital resource position.

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of senior convertible notes, or the 2025 Notes. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and cash used to pay the costs of the capped call transactions, or the 2025 Capped Call Transactions, discussed further in Note 7. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price for conversion was satisfied as of December 31, 2020 and as a result, the 2025 Notes first became eligible for optional conversion during the first quarter of 2021.

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of senior convertible notes, or the 2026 Notes. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and cash used to pay the costs of the capped call transactions, or the 2026 Capped Call Transactions, discussed further in Note 7. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price for conversion was satisfied as of December 31, 2020 and as a result, the 2026 Notes first became eligible for optional conversion during the first quarter of 2021.

In July 2016, we entered into a five-year senior unsecured revolving credit facility, or the Credit Facility, with lenders some of which are affiliated with certain members of the underwriting syndicate for our Convertible Notes offering, that allows us to borrow up to $1.1 billion to fund working capital and general corporate-purpose expenditures. The loan bears interest at LIBO plus 0.75%, as well as an annual commitment fee of 0.10% on the daily undrawn balance of the facility. No origination fees were incurred at the closing of the Credit Facility. In December 2016, the amount we are permitted to borrow under the Credit Facility was increased to $1.2 billion. In February 2018, the amount we are permitted to borrow under the Credit Facility was increased to $1.25 billion. In August 2018, we amended the Credit Facility to extend the term to August 2023 with respect to an aggregate of $1.05 billion of the $1.25 billion that we may borrow under the Credit Facility. In August 2019, we amended the Credit Facility to revise the covenants that restrict the repurchase of equity securities and the incurrence of indebtedness to permit the 2026 Capped Call Transactions and issuance of the 2026 Notes. In April 2020, we amended the Credit Facility to revise the covenants that restrict the incurrence of indebtedness to permit the 2025 Capped Call Transactions and issuance of the 2025 Notes. As of December 31, 2020, no amounts were outstanding under the Credit Facility. As of December 31, 2020, we had $25.4 million in the form of outstanding standby letters of credit.

We believe our existing cash balance is sufficient to fund our ongoing working capital, investing, and financing requirements for at least the next 12 months. Our future capital requirements will depend on many factors including our growth rate, headcount, sales and marketing activities, research and development efforts, the introduction of new features, products, and acquisitions, and continued user engagement. We continually evaluate opportunities to issue or repurchase equity or debt securities, obtain, retire, or restructure credit facilities or financing arrangements, or declare dividends for strategic reasons or to further strengthen our financial position.

As of December 31, 2020, approximately 9% of our cash, cash equivalents, and marketable securities was held outside the United States. These amounts were primarily held in the United Kingdom and are utilized to fund our foreign operations. Cash held outside the United States may be repatriated, subject to certain limitations, and would be available to be used to fund our domestic operations. However, repatriation of funds may result in additional tax liabilities. We believe our existing cash balance in the United States is sufficient to fund our working capital needs. The following table sets forth the major components of our consolidated statements of cash flows for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (dollars in thousands) | | |
| Net cash used in operating activities | $ (167,644) | $ (304,958) | $ (689,924) |
| Net cash provided by (used in) investing activities | (729,864) | (728,608) | 694,454 |
| Net cash provided by financing activities | 922,791 | 1,165,852 | 47,437 |
| Change in cash, cash equivalents, and restricted cash | $ 25,283 | $ 132,286 | $ 51,967 |
| Free Cash Flow [1] | $ (225,476) | $ (341,436) | $ (810,166) |

(1)    For information on how we define and calculate Free Cash Flow and a reconciliation to net cash used in operating activities to Free Cash Flow, see "Selected Financial Data—Non-GAAP Financial Measures."

### Net Cash Used in Operating Activities

*2020 compared to 2019*

Net cash used in operating activities decreased $137.3 million in the year ended December 31, 2020 compared to the same period in 2019. Net cash used in operating activities was $167.6 million for the year ended December 31, 2020, resulting primarily from net loss, adjusted for non-cash items, including stock-based compensation expense of $770.2 million, depreciation and amortization expense of $86.7 million, and amortization of debt discount and issuance costs of $81.4 million. Net cash used in operating activities was also driven by a $255.8 million increase in the accounts receivable balance due to an increase in revenue, partially offset by an increase in accrued expenses and other current liabilities of $108.6 million primarily due to the timing of payments.

### Net Cash Used in Investing Activities

*2020 compared to 2019*

Net cash used in investing activities was $729.9 million and $728.6 million for the years ended December 31, 2020 and 2019, respectively. Our investing activities in the current period consisted primarily of the purchase of marketable securities of $3.5 billion, partially offset by the sales and maturities of marketable securities of $3.1 billion. Net cash used in investing activities in the prior period consisted of the purchase of marketable securities of $2.5 billion partially offset by the sales and maturities of marketable securities of $1.8 billion.

### Net Cash Provided by Financing Activities

*2020 compared to 2019*

Net cash provided by financing activities was $922.8 million and $1.2 billion for the years ended December 31, 2020 and 2019, respectively. Our financing activities in the current period consisted primarily of net proceeds of $888.6 million from the issuance of the 2025 Notes and the purchase of the 2025 Capped Call Transactions. Net cash provided by financing activities in the prior periods consisted of net proceeds of $1.15 billion from the issuance of the 2026 Convertible Notes and the purchase of the 2026 Capped Call Transactions.

*Free Cash Flow*

*2020 compared to 2019*

Free Cash Flow was $(225.5) million and $(341.4) million for the years ended December 31, 2020 and 2019, respectively, and was composed of net cash used in operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also included purchases of property and equipment of $57.8 million and $36.5 million for the years ended December 31, 2020 and 2019, respectively.

## Off-Balance Sheet Arrangements

We do not have any off-balance sheet arrangements for any of the periods presented.

## Contingencies

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. We also disclose material contingencies when we believe that a loss is not probable but reasonably possible. Significant judgment is required to determine both probability and the estimated amount. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Many of these legal and tax contingencies can take years to resolve. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

## Commitments

The following table summarizes our contractual obligations as of December 31, 2020:

| | Total | 1 Year (2021) | 2-3 Years (2022 and 2023) | 4-5 Years (2024 and 2025) | After 5 Years (Thereafter) |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Hosting commitments | $ 1,029,000 | $ 646,667 | $ 382,333 | $ — | $ — |
| Lease commitments | 418,685 | 59,276 | 128,937 | 122,403 | 108,069 |
| Other commitments | 45,243 | 34,483 | 10,701 | 57 | 2 |
| Total contractual commitments | $ 1,492,928 | $ 740,426 | $ 521,971 | $ 122,460 | $ 108,071 |

For additional discussion on our leases, hosting, and other purchase commitments, see Note 8 and Note 9 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

In January 2017, we entered into the Google Cloud Platform License Agreement. Under the agreement, we were granted a license to access and use certain cloud services. The agreement has an initial term of five years and we are required to purchase at least $400.0 million of cloud services in each year of the agreement. For each of the first four years, up to 15% of this amount may be moved to a subsequent year. If we fail to meet the minimum purchase commitment during any year, we are required to pay the difference.

In March 2016, we entered into the AWS Enterprise Agreement for the use of cloud services from Amazon Web Services, Inc. We are committed to spend an aggregate of $1.1 billion between January 2017 and December 2022 on AWS services ($90.0 million in 2018, $150.0 million in 2019, $215.0 million in 2020, $280.0 million in 2021, and $349.0 million in 2022). If we fail to meet the minimum purchase commitment during any year, we are required to pay the difference. Any such payment may be applied to future use of AWS services during the term, although it will not count towards meeting the future minimum purchase commitments.

**Critical Accounting Policies and Estimates**

We prepare our financial statements in accordance with GAAP. Preparing these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

The critical accounting estimates, assumptions, and judgments that we believe to have the most significant impact on our consolidated financial statements are described below.

### Revenue Recognition

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is displayed. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

### Stock-Based Compensation

In the year ended December 31, 2020, total stock-based compensation expense recognized was $770.2 million. We have granted stock-based awards consisting primarily of restricted stock units, or RSUs, restricted stock awards, or RSAs, and to a lesser extent, stock options to employees, members of our board of directors, and non-employee advisors. The substantial majority of our stock-based awards have been made to employees. RSUs granted before January 1, 2017, or Pre-2017 RSUs, included both service-based and performance conditions to vest in the underlying common stock. The service-based condition for the majority of these awards is satisfied over four years. The performance condition related to these awards was satisfied on the effectiveness of the registration statement for our IPO, which occurred in March 2017. On the effectiveness of the registration statement for our IPO, we recognized $1.3 billion in stock-based compensation expense. All RSUs and RSAs granted after December 31, 2016, or Post-2017 Awards, vest on the satisfaction of only service-based conditions. The service condition for Post-2017 Awards granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. The service condition for Post-2017 Awards granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years.

We account for stock-based employee compensation under the fair value recognition and measurement provisions, in accordance with applicable accounting standards, which requires stock-based awards to be measured based on the grant date fair value. Stock-based compensation expense is recorded net of estimated forfeitures in our consolidated statements of operations. Accordingly, stock-based compensation expense is only recorded for those potential stock-based awards that we expect to vest. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. We will re-evaluate our estimated forfeiture rate if actual forfeitures differ from our initial estimates. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

*Restricted Stock Units and Restricted Stock Awards*

As of December 31, 2020, total unrecognized compensation cost related to Post-2017 Awards was $1.8 billion and is expected to be recognized over a weighted-average period of 2.6 years. All compensation cost related to Pre-2017 RSUs was recognized as of December 31, 2020.

*CEO Award*

On the closing of the IPO, our CEO received the CEO award for 37.4 million shares of Series FP preferred stock, which automatically converted into an equivalent number of shares of Class C common stock on the closing of the IPO. The CEO award represented 3.0% of all outstanding shares on the closing of the IPO, including shares sold by us in the IPO and vested stock options and RSUs on the closing of the IPO, net of shares withheld to satisfy tax withholding obligations. The CEO award vested immediately on the closing of the IPO, and such shares were being delivered to the CEO in equal quarterly installments over three years beginning in November 2017. As of December 31, 2020, all shares subject to the CEO award have been settled.

### Business Combinations and Valuation of Goodwill and Other Acquired Intangible Assets

We estimate the fair value of assets acquired and liabilities assumed in a business combination. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed. While we use our best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, our estimates are inherently uncertain and subject to refinement.

Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from acquired technology, useful lives, and discount rates. Although we believe the assumptions and estimates we have made in the past have been reasonable and appropriate, they are based in part on historical experience and information obtained from the management of the acquired companies and are inherently uncertain. During the measurement period, which may be up to one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. On the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to our consolidated statements of operations.

### Convertible Notes

We account for the Convertible Notes as separate liability and equity components. The carrying amount of the liability component is calculated by measuring the fair value of a similar liability that does not have an associated convertible feature. The carrying amount of the equity component representing the conversion option is calculated by deducting the fair value of the liability component from the principal amount of the Convertible Notes as a whole. We estimated the fair value of the liability and equity components using a convertible bond model, which includes subjective assumptions such as the expected term, expected volatility, and the interest rate of a similar non-convertible debt instrument. These assumptions involve inherent uncertainties and management judgement.

### Loss Contingencies

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. When there appears to be a range of possible costs with equal likelihood, a liability is recorded based on the low-end of such range. However, the likelihood of a loss is often difficult to predict and determining a meaningful estimate of the loss or a range of loss may not be practicable based on the information available, the potential effect of future events, and decisions by third parties impacting the ultimate resolution of the contingency. It is also not uncommon for such matters to be resolved over multiple reporting periods. During this time, relevant developments and new information must be continuously evaluated to determine both the likelihood of potential loss and whether it is possible to reasonably estimate a range of potential loss. We also disclose material contingencies when we believe that a loss is reasonably possible.

Significant judgment is required to determine both probability and the estimated amounts of loss contingencies. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change, it could have a material impact on our results of operations, financial position, and cash flows.

### Income Taxes

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our uncertain tax positions.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. Although we believe that we have adequately reserved for our uncertain tax positions, we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences may affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and results of operations.

**Recent Accounting Pronouncements**

See Note 1 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the date of this Annual Report on Form 10-K.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk and foreign currency risk as follows:

*Interest Rate Risk*

We had cash and cash equivalents totaling $545.6 million and $520.3 million at December 31, 2020 and December 31, 2019, respectively. We had marketable securities totaling $2.0 billion and $1.6 billion at December 31, 2020 and December 31, 2019, respectively. Our cash and cash equivalents consist of cash in bank accounts and marketable securities consisting of U.S. government debt and agency securities, corporate debt securities, certificates of deposit, and commercial paper. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. We do not enter into investments for trading or speculative purposes. Due to the relatively short-term nature of our investment portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

In April 2020, we issued 2025 Notes with an aggregate principal amount of $1.0 billion. We carry the 2025 Notes at face value less the unamortized debt discount and issuance costs on our consolidated balance sheets. The 2025 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2025 Notes. The fair value of the 2025 Notes changes when the market price of our stock fluctuates or market interest rates change.

In August 2019, we issued 2026 Notes with an aggregate principal amount of $1.265 billion. We carry the 2026 Notes at face value less the unamortized debt discount and issuance costs on our consolidated balance sheets. The 2026 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2026 Notes. The fair value of the 2026 Notes changes when the market price of our stock fluctuates or market interest rates change.

*Foreign Currency Risk*

For all periods presented, our sales and operating expenses were predominately denominated in U.S. dollars. We therefore have not had material foreign currency risk associated with sales and cost-based activities. The functional currency of our material operating entities is the U.S. dollar.

For the periods presented, our operations outside of the United States are not considered material and incur a majority of their operating expenses in foreign currencies. Therefore, our results of operations and cash flows are minimally subject to fluctuations from changes in foreign currency rates. We believe the exposure to foreign currency fluctuation from operating expenses is immaterial at this time as the related costs do not constitute a significant portion of our total expenses. As we grow operations, our exposure to foreign currency risk will likely become more significant.

For the periods presented, we did not enter into any foreign currency exchange contracts. We may, however, enter into foreign currency exchange contracts for purposes of hedging foreign exchange rate fluctuations on our business operations in future operating periods as our exposures are deemed to be material. For additional discussion on foreign currency risk, see "Risk Factors" elsewhere in this Annual Report on Form 10-K.

**Item 8. Financial Statements and Supplementary Data.**

**SNAP INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Reports of Independent Registered Public Accounting Firm                                    64

Consolidated Financial Statements:

Consolidated Statements of Cash Flows                                                       68

Consolidated Statements of Operations                                                       69

Consolidated Statements of Comprehensive Income (Loss)                                      70

Consolidated Balance Sheets                                                                 71

Consolidated Statements of Stockholders' Equity                                             72

Notes to Consolidated Financial Statements                                                  73

The supplementary financial information required by this Item 8 is included in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Unaudited Quarterly Results of Operations Data," which is incorporated herein by reference.

63

### Report of Independent Registered Public Accounting Firm

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Snap Inc. (the Company) as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 4, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

|  | **Revenue Recognition** |
|---|---|
| *Description of the Matter* | As described in Note 2 to the consolidated financial statements, the Company generates substantially all of its revenues by offering various advertising products on Snapchat. The substantial majority of such advertising revenues is generated based upon contractual agreements with customers that are on a fixed fee for advertisements delivered over a period of time, or fees based on the number of advertising impressions delivered. Revenue related to fixed fee agreements is recognized ratably over the service period while revenue related to agreements based on the number of advertising impressions delivered is recognized when the advertisement is displayed. |

The Company's revenue recognition process utilizes multiple, complex, proprietary systems and tools for the initiation, processing and recording of transactions which comprise a high volume of individually low monetary value transactions. This process is dependent on the effective design and operation of multiple systems, processes, data sources and controls which required significant audit effort. Also, the identification and evaluation of certain non-standard terms and conditions required incremental audit effort to determine the distinct performance obligations and the timing of revenue recognition.

*How We Addressed the Matter in Our Audit*

With the support of our information technology professionals, we identified and tested the relevant systems and tools used for the determination of initiation, processing, recording and billing of revenue, which included processes and controls related to access to the relevant systems and data, changes to the relevant systems and interfaces, and configuration of the relevant systems. We obtained an understanding, evaluated the design and tested the operating effectiveness of the Company's internal controls over the identification and evaluation of revenue recognition for standard and non-standard terms and conditions.

To test the Company's recognition of revenue, our audit procedures included, among others, testing the completeness and accuracy of the underlying data within the Company's billing systems, by agreeing amounts recognized to contractual terms and conditions, and tested revenue recognized to accounts receivables and cash receipts.  Additionally, we examined standard customer online terms and conditions to understand the distinct performance obligations and tested the timing of revenue recognition. Further, we selected a sample of non-standard contractual arrangements to understand the performance obligations and the timing of revenue recognition. To assess completeness of non-standard terms and conditions, we obtained confirmations of terms and conditions for a sample of customers.

### Convertible Notes

*Description of the Matter*

As described in Note 7 to the consolidated financial statements, in April 2020 the Company issued $1.0 billion of convertible senior notes due in 2025 (Convertible Notes), which permits the Company to settle the Convertible Notes in cash or stock at its option.  The Company entered into separate capped call transactions to reduce potential dilution upon conversion of the Convertible Notes. These transactions are collectively referred to as the Convertible Notes Transactions. The accounting for the Convertible Notes Transactions was complex as it required assessment of whether features in the Convertible Notes required bifurcation and an evaluation of the appropriate classification of those features in the financial statements. Additionally, the Convertible Notes Transactions were complex as the valuation of the conversion feature in the Convertible Notes involved estimation of the fair value of the liability component of the Convertible Notes on a stand-alone basis.

Auditing the Company's accounting for the Convertible Notes Transactions involved addressing the complexity in assessing the components for separability and assessing the valuation of the liability component on a stand-alone basis. The Company estimated the fair value of the liability component of the Convertible Notes, absent any embedded conversion features, using a discounted cash flow model with a risk adjusted yield. In estimating the risk adjusted yield, the Company utilized both income and market approaches. For the income approach, the Company used a convertible bond pricing model, which included several assumptions including estimates of the Company's equity volatility, dividend yield and a market risk free rate. For the market approach, the Company performed an evaluation of debt securities issued by companies with a similar credit risk rating to determine the fair value of the liability component. Additionally, the Company performed a detailed analysis of the terms of the Convertible Notes Transactions to identify whether any derivatives that required separate mark-to-market accounting under applicable accounting guidance were present.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design, and tested the operating effectiveness of internal controls over the Company's Convertible Notes Transactions, including its controls over the estimation of the fair value of the stand-alone liability component and evaluating the existence of embedded derivatives.

To test the Company's initial accounting for the Convertible Notes Transactions, our audit procedures included, among others, reading the underlying agreements and evaluating the Company's analysis of the initial accounting of the Convertible Notes Transactions, including the identification of any derivatives included in the arrangements.

Our testing of the fair value of the liability component included, among other procedures, evaluating the Company's selection of the valuation methodology and significant assumptions used by the Company, and evaluating the completeness and accuracy of the underlying data supporting the significant assumptions. Specifically, when assessing the key assumptions, we evaluated the appropriateness of the Company's estimates of its credit risk, volatility, dividend yield and the market risk free rate as well as its analysis of comparable issuances of debt securities by companies within a similar industry and with a similar credit risk rating. In addition, we involved a valuation specialist to assist in our evaluation of the methodology used by the Company and the appropriateness of significant assumptions.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.

Los Angeles, California

February 4, 2021

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Snap Inc.'s internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Snap Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2020, and the related notes and our report dated February 4, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California

February 4, 2021

**Snap Inc.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| **Cash flows from operating activities** | | | |
| Net loss | $ (944,839) | $ (1,033,660) | $ (1,255,911) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 86,744 | 87,245 | 91,648 |
| Stock-based compensation | 770,182 | 686,013 | 538,211 |
| Deferred income taxes | (6,326) | (491) | (383) |
| Gain on divestiture | — | (39,883) | — |
| Amortization of debt discount and issuance costs | 81,401 | 17,797 | — |
| Lease exit charges | — | — | 33,033 |
| Other | (961) | (28,575) | (903) |
| Change in operating assets and liabilities, net of effect of acquisitions: | | | |
| Accounts receivable, net of allowance | (255,818) | (147,862) | (77,506) |
| Prepaid expenses and other current assets | (14,587) | (9,849) | 1,594 |
| Operating lease right-of-use assets | 38,940 | 58,199 | — |
| Other assets | (11,442) | 1,169 | 21,785 |
| Accounts payable | 20,374 | 20,674 | (33,532) |
| Accrued expenses and other current liabilities | 108,601 | 146,063 | (14,325) |
| Operating lease liabilities | (49,730) | (60,844) | — |
| Other liabilities | 9,817 | (954) | 6,365 |
| Net cash used in operating activities | (167,644) | (304,958) | (689,924) |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (57,832) | (36,478) | (120,242) |
| Proceeds from divestiture, net | — | 73,796 | — |
| Cash paid for acquisitions, net of cash acquired | (168,850) | (77,119) | (815) |
| Non-marketable investments | (111,586) | (5,481) | (22,495) |
| Purchases of marketable securities | (3,524,599) | (2,477,388) | (1,653,918) |
| Sales of marketable securities | 389,974 | 184,179 | 45,007 |
| Maturities of marketable securities | 2,737,523 | 1,608,854 | 2,438,206 |
| Other | 5,506 | 1,029 | 8,711 |
| Net cash provided by (used in) investing activities | (729,864) | (728,608) | 694,454 |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible notes, net of issuance costs | 988,582 | 1,251,411 | — |
| Purchase of capped calls | (100,000) | (102,086) | — |
| Proceeds from the exercise of stock options | 34,209 | 16,527 | 47,988 |
| Stock repurchases from employees for tax withholdings | — | — | (551) |
| Net cash provided by financing activities | 922,791 | 1,165,852 | 47,437 |
| Change in cash, cash equivalents, and restricted cash | 25,283 | 132,286 | 51,967 |
| Cash, cash equivalents, and restricted cash, beginning of period | 521,260 | 388,974 | 337,007 |
| Cash, cash equivalents, and restricted cash, end of period | $ 546,543 | $ 521,260 | $ 388,974 |
| **Supplemental disclosures** | | | |
| Cash paid for income taxes, net | $ 3,692 | $ 156 | $ 3,598 |
| Cash paid for interest | $ 12,019 | $ 1,546 | $ — |
| **Supplemental disclosures of non-cash activities** | | | |
| Net change in accounts payable and accrued expenses and other current liabilities related to property and equipment additions | $ 2,732 | $ (6,027) | $ (7,764) |

See Notes to Consolidated Financial Statements.

68

**Snap Inc.**
**Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Revenue | $ 2,506,626 | $ 1,715,534 | $ 1,180,446 |
| Costs and expenses: | | | |
| Cost of revenue | 1,182,505 | 895,838 | 798,865 |
| Research and development | 1,101,561 | 883,509 | 772,185 |
| Sales and marketing | 555,468 | 458,598 | 400,824 |
| General and administrative | 529,164 | 580,917 | 477,022 |
| Total costs and expenses | 3,368,698 | 2,818,862 | 2,448,896 |
| Operating loss | (862,072) | (1,103,328) | (1,268,450) |
| Interest income | 18,127 | 36,042 | 27,228 |
| Interest expense | (97,228) | (24,994) | (3,894) |
| Other income (expense), net | 14,988 | 59,013 | (8,248) |
| Loss before income taxes | (926,185) | (1,033,267) | (1,253,364) |
| Income tax benefit (expense) | (18,654) | (393) | (2,547) |
| Net loss | $ (944,839) | $ (1,033,660) | $ (1,255,911) |
| Net loss per share attributable to Class A, Class B, and Class C common stockholders (Note 3): | | | |
| Basic | $ (0.65) | $ (0.75) | $ (0.97) |
| Diluted | $ (0.65) | $ (0.75) | $ (0.97) |
| Weighted average shares used in computation of net loss per share: | | | |
| Basic | 1,455,693 | 1,375,462 | 1,300,568 |
| Diluted | 1,455,693 | 1,375,462 | 1,300,568 |

See Notes to Consolidated Financial Statements.

69

**Snap Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
*(in thousands)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Net loss | $ (944,839) | $ (1,033,660) | $ (1,255,911) |
| Other comprehensive income (loss), net of tax | | | |
| Unrealized gain (loss) on marketable securities, net of tax | (516) | 797 | 710 |
| Foreign currency translation | 21,306 | (3,371) | (11,720) |
| Total other comprehensive income (loss), net of tax | 20,790 | (2,574) | (11,010) |
| Total comprehensive income (loss) | $ (924,049) | $ (1,036,234) | $ (1,266,921) |

See Notes to Consolidated Financial Statements.

70

**Snap Inc.**
**Consolidated Balance Sheets**
*(in thousands, except par value)*

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 545,618 | $ 520,317 |
| Marketable securities | 1,991,922 | 1,592,488 |
| Accounts receivable, net of allowance | 744,288 | 492,194 |
| Prepaid expenses and other current assets | 56,147 | 38,987 |
| Total current assets | 3,337,975 | 2,643,986 |
| Property and equipment, net | 178,709 | 173,667 |
| Operating lease right-of-use assets | 269,728 | 275,447 |
| Intangible assets, net | 105,929 | 92,121 |
| Goodwill | 939,259 | 761,153 |
| Other assets | 192,638 | 65,550 |
| Total assets | $ 5,024,238 | $ 4,011,924 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 71,908 | $ 46,886 |
| Operating lease liabilities | 41,077 | 42,179 |
| Accrued expenses and other current liabilities | 554,342 | 410,610 |
| Total current liabilities | 667,327 | 499,675 |
| Convertible senior notes, net | 1,675,169 | 891,776 |
| Operating lease liabilities, noncurrent | 287,292 | 303,178 |
| Other liabilities | 64,474 | 57,382 |
| Total liabilities | 2,694,262 | 1,752,011 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity | | |
| Class A non-voting common stock, $0.00001 par value. 3,000,000 shares authorized, 1,248,010 shares issued and outstanding at December 31, 2020 and 3,000,000 shares authorized, 1,160,127 shares issued and outstanding at December 31, 2019. | 12 | 12 |
| Class B voting common stock, $0.00001 par value. 700,000 shares authorized, 23,696 shares issued and outstanding at December 31, 2020 and 700,000 shares authorized, 24,522 shares issued and outstanding at December 31, 2019. | — | — |
| Class C voting common stock, $0.00001 par value. 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2020 and 260,888 shares authorized, 231,147 shares issued and outstanding at December 31, 2019. | 2 | 2 |
| Additional paid-in capital | 10,200,141 | 9,205,256 |
| Accumulated other comprehensive income (loss) | 21,363 | 573 |
| Accumulated deficit | (7,891,542) | (6,945,930) |
| Total stockholders' equity | 2,329,976 | 2,259,913 |
| Total liabilities and stockholders' equity | $ 5,024,238 | $ 4,011,924 |

See Notes to Consolidated Financial Statements.

71

**Snap Inc.**
**Consolidated Statements of Stockholders' Equity**
*(in thousands)*

| | Year Ended December 31, | | | | | |
| | 2020 | | 2019 | | 2018 | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|
| **Class A non-voting common stock** | | | | | | |
| Balance, beginning of period | 1,160,127 | 12 | 999,304 | 10 | 883,022 | 9 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 3,824 | — | 3,291 | — | 15,856 | — |
| Issuance of Class A non-voting common stock for vesting of restricted stock units and restricted stock awards, net | 78,042 | — | 86,519 | 1 | 64,831 | 1 |
| Conversion of Class B voting common stock to Class A non-voting common stock | 6,017 | — | 71,013 | 1 | 35,634 | — |
| Stock repurchases from employees for tax withholdings | — | — | — | — | (39) | — |
| Balance, end of period | 1,248,010 | 12 | 1,160,127 | 12 | 999,304 | 10 |
| **Class B voting common stock** | | | | | | |
| Balance, beginning of period | 24,522 | — | 93,846 | 1 | 122,564 | 1 |
| Shares issued in connection with exercise of vesting of restricted stock units, net | 754 | — | 1,389 | — | 3,414 | — |
| Issuance of Class B voting common stock for vesting of restricted stock units, net | — | — | 300 | — | 3,502 | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | (6,017) | — | (71,013) | (1) | (35,634) | — |
| Conversion of Class C voting common stock to Class B voting common stock | 4,437 | — | — | — | — | — |
| Balance, end of period | 23,696 | — | 24,522 | — | 93,846 | 1 |
| **Class C voting common stock** | | | | | | |
| Balance, beginning of period | 231,147 | 2 | 224,611 | 2 | 216,616 | 2 |
| Conversion of Class C voting common stock to Class B voting common stock | (4,437) | — | — | — | — | — |
| Issuance of Class C voting common stock for settlement of restricted stock units, net | 4,917 | — | 6,536 | — | 7,995 | — |
| Balance, end of period | 231,627 | 2 | 231,147 | 2 | 224,611 | 2 |
| **Additional paid-in capital** | | | | | | |
| Balance, beginning of period | — | 9,205,256 | — | 8,220,417 | — | 7,634,825 |
| Stock-based compensation expense | — | 771,084 | — | 686,013 | — | 538,211 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | — | 34,209 | — | 16,567 | — | 47,988 |
| Issuance of Class A non-voting common stock in connection with acquisitions and divestitures | — | 3,003 | — | 6,913 | — | — |
| Stock repurchases from employees for tax withholdings | — | — | — | — | — | (607) |
| Equity component of convertible senior notes, net | — | 286,589 | — | 377,432 | — | — |
| Purchase of capped calls | — | (100,000) | — | (102,086) | — | — |
| Balance, end of period | — | 10,200,141 | — | 9,205,256 | — | 8,220,417 |
| **Accumulated deficit** | | | | | | |
| Balance, beginning of period | — | (6,945,930) | — | (5,912,578) | — | (4,656,667) |
| Cumulative-effect adjustment from accounting changes | — | (773) | — | 308 | — | — |
| Net loss | — | (944,839) | — | (1,033,660) | — | (1,255,911) |
| Balance, end of period | — | (7,891,542) | — | (6,945,930) | — | (5,912,578) |
| **Accumulated other comprehensive income (loss)** | | | | | | |
| Balance, beginning of period | — | 573 | — | 3,147 | — | 14,157 |
| Other comprehensive income (loss), net of tax | — | 20,790 | — | (2,574) | — | (11,010) |
| Balance, end of period | — | 21,363 | — | 573 | — | 3,147 |
| **Total stockholders' equity** | 1,503,333 | $ 2,329,976 | 1,415,796 | $ 2,259,913 | 1,317,761 | $ 2,310,999 |

See Notes to Consolidated Financial Statements.

72

**Snap Inc.**
**Notes to Consolidated Financial Statements**

## 1. Summary of Significant Accounting Policies

Snap Inc. is a camera company.

Snap Inc. ("we," "our," or "us") was formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. Snap Inc. is headquartered in Santa Monica, California. Our flagship product, Snapchat, is a camera application that was created to help people communicate through short videos and images called "Snaps."

### Basis of Presentation

Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Our consolidated financial statements include the accounts of Snap Inc. and our wholly owned subsidiaries. All intercompany transactions and balances have been eliminated in consolidation. Our fiscal year ends on December 31.

### Use of Estimates

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. Management's estimates are based on historical information available as of the date of the consolidated financial statements and various other assumptions that we believe are reasonable under the circumstances. Actual results could differ from those estimates.

Key estimates relate primarily to determining the fair value of assets and liabilities assumed in business combinations, evaluation of contingencies, uncertain tax positions, lease exit charges, forfeiture rate, the fair value of convertible senior notes, the fair value of stock-based awards, and the fair value of non-marketable investments. On an ongoing basis, management evaluates our estimates compared to historical experience and trends, which form the basis for making judgments about the carrying value of assets and liabilities.

### Concentrations of Business Risk

We currently use both Google Cloud and Amazon Web Services for our hosting requirements. A disruption or loss of service from one or both of these partners could seriously harm our ability to operate. Although we believe there are other qualified providers that can provide these services, a transition to a new provider could create a significant disruption to our business and negatively impact our consolidated financial statements.

### Concentrations of Credit Risk

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash, cash equivalents, marketable securities, and accounts receivable. We maintain cash deposits, cash equivalent balances, and marketable securities with several financial institutions. Cash and cash equivalents may be withdrawn or redeemed on demand. We believe that the financial institutions that hold our cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to these balances. We also maintain investments in U.S. government debt and agency securities, corporate debt securities, certificates of deposit, and commercial paper that carry high credit ratings and accordingly, minimal credit risk exists with respect to these balances.

We extend credit to our customers based on an evaluation of their ability to pay amounts due under contractual arrangement and generally do not obtain or require collateral.

### Revenue Recognition

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. See Note 2 for additional information.

**Cost of Revenue**

Cost of revenue includes payments for content and third-party selling costs, referred to as partner arrangements. Under some of these arrangements, we pay a portion of the fees we receive from the advertisers for Snap Ads that are displayed within partner content on Snapchat. Partner arrangement costs were $324.3 million, $174.7 million, and $120.3 million for the years ended December 31, 2020, 2019, and 2018, respectively.

In addition, cost of revenue consists of expenses associated with infrastructure costs of the Snapchat mobile application, advertising measurement services, and personnel-related costs. Cost of revenue includes facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs for Spectacles.

**Advertising**

Advertising costs are expensed as incurred and were $29.5 million, $31.4 million, and $11.3 million for the years ended December 31, 2020, 2019, and 2018, respectively.

**Capital Structure**

In March 2017, we completed our initial public offering ("IPO") in which we issued and sold 160.3 million shares of Class A common stock, inclusive of the over-allotment, at an initial public offering price of $17.00 per share and excluding shares sold in the IPO by certain of our existing stockholders. On the closing of the IPO, all shares of our then-outstanding convertible preferred stock other than Series FP preferred stock automatically converted into an aggregate of 246.8 million shares of Class B common stock and all outstanding shares of Series FP preferred stock automatically converted into 215.9 million shares of Class C common stock. Following the IPO, we have three classes of authorized common stock – Class A common stock, Class B common stock, and Class C common stock.

On the closing of the IPO, our Chief Executive Officer ("CEO") received a restricted stock unit ("RSU") award ("CEO award") for 37.4 million shares of Series FP preferred stock, which automatically converted into an equivalent number of shares of Class C common stock on the closing of the IPO. The CEO award represented 3.0% of all outstanding shares on the closing of the IPO, including shares sold by us in the IPO and vested stock options and RSUs, net of shares withheld to satisfy tax withholding obligations, on the closing of the IPO. The CEO award vested immediately on the closing of the IPO, and such shares were delivered to the CEO in quarterly installments over three years beginning in November 2017. There was no continuing service requirement for our CEO. The stock-based compensation expense recognized related to the CEO award was $636.6 million, which was based on the vesting of 37.4 million shares of Class C common stock on the closing of the IPO, at the initial public offering price of $17.00 per share. As of December 31, 2020, all shares of Class C common stock deliverable under the CEO award were settled.

**Stock-based Compensation**

We measure and recognize compensation expense for stock-based payment awards, including stock options, RSUs, and restricted stock awards ("RSAs") granted to employees, directors, and advisors, based on the grant date fair value of the awards. The grant date fair value of stock options is estimated using a Black-Scholes option pricing model. The fair value of stock-based compensation for stock options is recognized on a straight-line basis, net of estimated forfeitures, over the period during which services are provided in exchange for the award. The grant date fair value of RSUs and RSAs is estimated based on the fair value of our underlying common stock.

Pre-2017 RSUs contained both service-based and performance conditions to vest in the underlying common stock. The service-based condition criteria is generally met 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. The performance condition related to these awards was satisfied on the effectiveness of the registration statement for our IPO, which occurred in March 2017. Awards which contain both service-based and performance conditions were recognized using the accelerated attribution method once the performance condition was probable of occurring.

All RSUs granted after December 31, 2016 vest on the satisfaction of only a service-based condition ("Post-2017 RSUs"). The service condition for RSUs granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. In limited instances, we have issued Post-2017 RSUs with vesting periods in excess of four years. The service condition for RSUs and RSAs granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years. For these awards, we recognize stock-based compensation expense on a straight-line basis over the vesting period.

Stock-based compensation expense recognized for all periods presented is based on awards that are expected to vest, including an estimate of forfeitures. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

The future tax benefits on settlement of the above RSUs and RSAs is not expected to be material as currently we have established valuation allowances to reduce our net deferred tax assets to the amount that is more likely than not to be realized. The majority of the future tax benefits that arise on settlement of the above RSUs are in jurisdictions for which our net deferred tax assets have a full valuation allowance.

**Income Taxes**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the deferred tax asset or liability is expected to be realized or settled.

In evaluating our ability to recover deferred tax assets, we consider all available positive and negative evidence, including historical operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis. Based on the level of historical losses, we have established a valuation allowance to reduce our net deferred tax assets to the amount that is more likely than not to be realized.

We recognize a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in our consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized. We recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheets.

**Currency Translation and Remeasurement**

The functional currency of the majority of our foreign subsidiaries is the U.S. dollar. Monetary assets and liabilities denominated in a foreign currency are remeasured into U.S. dollars at the exchange rate on the balance sheet date. Revenue and expenses are remeasured at the average exchange rates during the period. Equity transactions and other non-monetary assets are remeasured using historical exchange rates. Foreign currency transaction gains and losses are recorded in other income (expense), net on our consolidated statement of operations. For those foreign subsidiaries where the local currency is the functional currency, adjustments to translate those statements into U.S. dollars are recorded in accumulated other comprehensive income (loss) in stockholders' equity.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of highly liquid investments with original maturities of 90 days or less from the date of purchase.

**Restricted Cash**

We are required to maintain restricted cash deposits to back letters of credit for certain property leases. These funds are restricted and have been classified in other assets on our consolidated balance sheets due to the nature of restriction. At December 31, 2020 and 2019, restricted cash balances were immaterial.

**Marketable Securities**

We hold investments in marketable securities consisting of U.S. government securities, U.S. government agency securities, corporate debt securities, certificates of deposit, and commercial paper. We classify our marketable securities as available-for-sale investments in our current assets because they represent investments available for current operations. Our available-for-sale investments are carried at fair value with any unrealized gains and losses, included in accumulated other comprehensive (loss) income in stockholders' equity. We determine gains or losses on the sale or maturities of marketable securities using the specific identification method and these gains or losses are recorded in other income (expense), net in our consolidated statements of operations. Unrealized losses are recorded in other income (expense), net when a decline in fair value is determined to be other than temporary.

**Non-Marketable Investments**

Our investments in privately held companies are primarily non-marketable equity securities without readily determinable fair values. We adjust the carrying value of non-marketable equity securities to fair value upon observable transactions for identical or similar investments of the same issuer or upon impairment. Any adjustments to carrying value of these investments are recorded in other income (expense), net in our consolidated statements of operations.

When we exercise significant influence over, but do not control the investee, such non-marketable investments are accounted for using the equity method. Under the equity method of accounting, we record our share of the results of the investments within other income (expense), net in our consolidated statements of operations.

**Fair Value Measurements**

Certain financial instruments are required to be recorded at fair value. Other financial instruments, including cash and cash equivalents and restricted cash, are recorded at cost, which approximates fair value. Additionally, accounts receivable, accounts payable, and accrued expenses approximate fair value because of the short-term nature of these financial instruments.

**Accounts Receivable and Allowance for Doubtful Accounts**

Accounts receivable are recorded at the invoiced amount less any allowance for doubtful accounts to reserve for potentially uncollectible receivables. To determine the amount of the allowance, we make judgments about the creditworthiness of customers based on ongoing credit evaluation and historical experience. At December 31, 2020 and 2019, the allowance for doubtful accounts was immaterial.

**Property and Equipment**

Property and equipment are stated at cost, less accumulated depreciation. We compute depreciation using the straight-line method over the estimated useful lives of the assets, which is generally three years for computer hardware and software, five years for furniture and equipment, and over the shorter of lease term or useful life of the assets for leasehold improvements. Buildings are depreciated over a useful life ranging from 25 to 45 years. Maintenance and repairs are expensed as incurred.

**Leases**

We have various non-cancelable lease agreements for certain of our offices. Leases are recorded as operating lease right-of-use assets and operating lease liabilities on the consolidated balance sheets. Leases with an initial term of twelve months or less are not recorded on the consolidated balance sheets. We recognize rent expense on a straight-line basis over the lease term.

**Software Development Costs**

Software development costs include costs to develop software to be used to meet internal needs and applications used to deliver our services. We capitalize development costs related to these software applications once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended. Costs capitalized for developing such software applications were not material for the periods presented.

**Segments**

Our CEO is our chief operating decision maker. We have determined that we have a single operating segment. Our CEO evaluates performance and makes operating decisions about allocating resources based on financial data presented on a consolidated basis accompanied by disaggregated information about revenue by geographic region.

**Business Combinations**

We include the results of operations of the businesses that we acquire from the date of acquisition. We determine the fair value of the assets acquired and liabilities assumed based on their estimated fair values as of the respective date of acquisition. The excess purchase price over the fair values of identifiable assets and liabilities is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates including the selection of valuation methodologies, estimates of future revenue and cash flows, discount rates, and

selection of comparable companies. Our estimates of fair value are based on assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, not to exceed one year from the date of acquisition, we may record adjustments to the assets acquired and liabilities assumed, with a corresponding offset to goodwill. At the conclusion of the measurement period, any subsequent adjustments are reflected in the consolidated statements of operations.

When we issue payments or grants of equity to selling stockholders in connection with an acquisition, we evaluate whether the payments or awards are compensatory. This evaluation includes whether cash payments or stock award vesting is contingent on the continued employment of the selling stockholder beyond the acquisition date. If continued employment is required for the cash to be paid or stock awards to vest, the award is treated as compensation for post-acquisition services and is recognized as compensation expense.

Transaction costs associated with business combinations are expensed as incurred, and are included in general and administrative expenses in our consolidated statements of operations.

**Goodwill**

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in a business combination. We test goodwill for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. For all periods presented, we had a single operating segment and reporting unit structure.

In testing for goodwill impairment, we first assess qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If, after assessing the totality of events or circumstances, we determine it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, then additional impairment testing is not required. However, if we conclude otherwise, we perform the first of a two-step impairment test.

The first step compares the estimated fair value of a reporting unit to its book value, including goodwill. If the estimated fair value exceeds book value, goodwill is considered not to be impaired and no additional steps are necessary. However, if the fair value of the reporting unit is less than book value, then under the second step the carrying amount of the goodwill is compared to its implied fair value. There were no impairment charges in any of the periods presented.

**Intangible Assets**

Intangible assets are carried at cost and amortized on a straight-line basis over their estimated useful lives. We determine the appropriate useful life of our intangible assets by measuring the expected cash flows of acquired assets. The estimated useful lives of intangible assets are as follows:

| Intangible Asset | Estimated Useful Life |
|---|---|
| Domain names | 5 Years |
| Trademarks | 1 to 5 Years |
| Acquired developed technology | 4 to 7 Years |
| Customer relationships | 2 to 5 Years |
| Patents | 3 to 11 Years |

**Impairment of Long-Lived Assets**

We evaluate recoverability of our property and equipment and intangible assets, excluding goodwill, when events or changes indicate the carrying amount of an asset may not be recoverable. Events and changes in circumstances considered in determining whether the carrying value of long-lived assets may not be recoverable include: significant changes in performance relative to expected operating results; significant changes in asset use; and significant negative industry or economic trends and changes in our business strategy. Recoverability of these assets is measured by comparison of their carrying amount to future undiscounted cash flows to be generated. If impairment is indicated based on a comparison of the assets' carrying values and the undiscounted cash flows, the impairment loss is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets. We determined that there were no events or changes in circumstances that indicated our long-lived assets were impaired during any of the periods presented.

**Legal Contingencies**

For legal contingencies, we accrue a liability for an estimated loss if the potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated. Legal fees and expenses are expensed as incurred. Note 8 provides additional information regarding our legal contingencies.

**Convertible Notes**

We account for the Convertible Notes as separate liability and equity components. The carrying amount of the liability component is calculated by measuring the fair value of a similar liability that does not have an associated convertible feature. The carrying amount of the equity component, representing the conversion option, is calculated by deducting the fair value of the liability component from the total principal of the Convertible Notes. This amount represents a debt discount which is amortized to interest expense over the term of the Convertible Notes using the effective interest rate method, which maintains a constant rate of interest expense based on the increasing carrying value of the debt.

**Recent Accounting Pronouncements**

In August 2020, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. Under ASU 2020-06, the embedded conversion features are no longer separated from the host contract for convertible instruments with conversion features that are not required to be accounted for as derivatives under Topic 815, or that do not result in substantial premiums accounted for as paid-in capital. Consequently, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost, as long as no other features require bifurcation and recognition as derivatives. The new guidance also requires the if-converted method to be applied for all convertible instruments. ASU 2020-06 is effective for fiscal years beginning after December 15, 2021, with early adoption permitted. Adoption of the standard requires using either a modified retrospective or a full retrospective approach. Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million. Interest expense recognized in future periods will be reduced as a result of accounting for the convertible debt instrument as a single liability measured at its amortized cost.

In January 2020, the FASB issued ASU 2020-01, Investments-Equity Securities (Topic 321), Investments-Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815), which clarifies the interaction between the accounting for equity securities under Topic 321, the accounting for equity method investments in Topic 323, and the accounting for certain forward contracts and purchased options in Topic 815. The guidance is effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. Effective January 1, 2021, we adopted this standard on a prospective basis. We do not expect the adoption of this guidance to have a material impact on our consolidated financial statements, including accounting policies, processes, and systems.

In December 2019, the FASB issued ASU 2019-12, Simplifying the Accounting for Income Taxes, as part of its Simplification Initiative to reduce the cost and complexity in accounting for income taxes. ASU 2019-12 removes certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. ASU 2019-12 also amends other aspects of the guidance to help simplify and promote consistent application of GAAP. The guidance is effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. We early adopted ASU 2019-12 in the fourth quarter of 2019. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In August 2018, the FASB issued ASU 2018-15, Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract. ASU 2018-15 aligns the requirements for capitalizing implementation costs in a cloud computing arrangement service contract with the requirements for capitalizing implementation costs incurred for an internal-use software license. The guidance is effective for interim and annual periods beginning after December 15, 2019, with early adoption permitted. We adopted ASU 2018-15 effective January 1, 2020. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In

June 2016, the FASB issued ASU 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments. ASU 2016-13 replaced the incurred loss impairment methodology under current GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. ASU 2016-13 requires use of a forward-looking expected credit loss model for accounts receivables, loans, and other financial instruments. ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, with early adoption permitted. Adoption of the standard requires using a modified retrospective approach through a cumulative-effect adjustment to retained earnings as of the effective date to align existing credit loss methodology with the new standard. In November 2019, the FASB issued ASU 2019-11, Codification Improvements to Topic 326, Financial Instruments—Credit Losses. ASU 2019-11 requires entities that did not adopt the amendments in ASU 2016-13 as of November 2019 to adopt ASU 2019-11. This ASU contains the same effective dates and transition requirements as ASU 2016-13. We adopted ASU 2016-13 and ASU 2019-11 effective January 1, 2020. The impact of adoption of these standards on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

## 2. Revenue

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is displayed. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

We also generate revenue from sales of our hardware product, Spectacles. For the periods presented, revenue from the sales of Spectacles was not material.

The following table represents our revenue disaggregated by geography based on the billing address of the advertising customer:

| | Year Ended December 31, | | | | | |
| | 2020 | | 2019 | | 2018 | |
| | (in thousands) | | | | | |
| Revenue: | | | | | | |
| North America [1] [2] | $ | 1,649,937 | $ | 1,068,108 | $ | 780,992 |
| Europe [3] | | 425,445 | | 299,913 | | 183,077 |
| Rest of world | | 431,244 | | 347,513 | | 216,377 |
| Total revenue | $ | 2,506,626 | $ | 1,715,534 | $ | 1,180,446 |

(1)     North America includes Mexico, the Caribbean, and Central America.
(2)     United States revenue was $1.6 billion, $1.0 billion, and $752.9 million for the years ended December 31, 2020, 2019, and 2018, respectively.
(3)     Europe includes Russia and Turkey.

## 3. Net Loss per Share

We compute net loss per share using the two-class method required for multiple classes of common stock. We have three classes of authorized common stock for which voting rights differ by class.

Basic net loss per share is computed by dividing net loss attributable to each class of stockholders by the weighted-average number of shares of stock outstanding during the period, adjusted for vested RSUs that have not been settled and RSAs for which the risk of forfeiture has not yet lapsed.

For the calculation of diluted net loss per share, net loss per share attributable to common stockholders for basic net loss per share is adjusted by the effect of dilutive securities, including awards under our equity compensation plans. Diluted net loss per share attributable to common stockholders is computed by dividing the resulting net loss attributable to common stockholders by the weighted-average number of fully diluted common shares outstanding. We use the if-converted method for calculating any potential dilutive effect of the Convertible Notes on diluted net loss per share. The Convertible Notes would have a dilutive impact on net income per share when the average market price of Class A common stock for a given period exceeds the respective conversion price of the Convertible Notes. For the periods presented, our potentially dilutive shares relating to stock options, RSUs, RSAs, and Convertible Notes were not included in the computation of diluted net loss per share as the effect of including these shares in the calculation would have been anti-dilutive.

The numerators and denominators of the basic and diluted net loss per share computations for our common stock are calculated as follows for the years ended December 31, 2020, 2019, and 2018:

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | | | 2019 | | | 2018 | | |
| | (in thousands, except per share data) | | | | | | | | |
| | Class A Common | Class B Common | Class C Common | Class A Common | Class B Common | Class C Common | Class A Common | Class B Common | Class C Common |
| Numerator: | | | | | | | | | |
| Net loss | $ (775,801) | $ (15,577) | $ (153,461) | $ (817,156) | $ (33,341) | $ (183,164) | $ (921,235) | $ (94,897) | $ (239,779) |
| Net loss attributable to common stockholders | $ (775,801) | $ (15,577) | $ (153,461) | $ (817,156) | $ (33,341) | $ (183,164) | $ (921,235) | $ (94,897) | $ (239,779) |
| Denominator: | | | | | | | | | |
| Basic shares: | | | | | | | | | |
| Weighted-average common shares - Basic | 1,195,259 | 23,999 | 236,435 | 1,087,366 | 44,366 | 243,730 | 953,992 | 98,271 | 248,305 |
| Diluted shares: | | | | | | | | | |
| Weighted-average common shares - Diluted | 1,195,259 | 23,999 | 236,435 | 1,087,366 | 44,366 | 243,730 | 953,992 | 98,271 | 248,305 |
| Net loss per share attributable to common stockholders: | | | | | | | | | |
| Basic | $ (0.65) | $ (0.65) | $ (0.65) | $ (0.75) | $ (0.75) | $ (0.75) | $ (0.97) | $ (0.97) | $ (0.97) |
| Diluted | $ (0.65) | $ (0.65) | $ (0.65) | $ (0.75) | $ (0.75) | $ (0.75) | $ (0.97) | $ (0.97) | $ (0.97) |

The following potentially dilutive shares were excluded from the calculation of diluted net loss per share because their effect would have been anti-dilutive for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (in thousands) | | |
| Stock options | 5,624 | 10,262 | 16,291 |
| Unvested RSUs and RSAs | 131,172 | 148,797 | 158,264 |
| Convertible Notes (if-converted) | 101,591 | 55,468 | — |

## 4. Stockholders' Equity

### Common Stock

As of December 31, 2020, we are authorized to issue 3,000,000,000 shares of Class A nonvoting common stock, 700,000,000 shares of Class B voting common stock, and 260,887,848 shares of Class C voting common stock, each with a par value of $0.00001 per share. Class A common stock has no voting rights, Class B common stock is entitled to one vote per share, and Class C common stock is entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common

stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer. Any dividends paid to the holders of the Class A common stock, Class B common stock, and Class C common stock will be paid on a pro rata basis. For the year ended December 31, 2020, we did not declare any dividends. On a liquidation event, as defined in our certificate of incorporation, any distribution to common stockholders is made on a pro rata basis to the holders of the Class A common stock, Class B common stock, and Class C common stock.

As of December 31, 2020, there were 1,248,010,076 shares, 23,696,369 shares, and 231,626,943 shares of Class A common stock, Class B common stock, and Class C common stock, respectively, issued and outstanding.

## Stock-based Compensation Plans

We maintain three share-based employee compensation plans: the 2017 Equity Incentive Plan ("2017 Plan"), the 2014 Equity Incentive Plan ("2014 Plan"), and the 2012 Equity Incentive Plan ("2012 Plan", and collectively with the 2017 Plan and the 2014 Plan, the "Stock Plans"). In January 2017, our board of directors adopted the 2017 Plan, and in February 2017 our stockholders approved the 2017 Plan, effective on March 1, 2017, which serves as the successor to the 2014 Plan and 2012 Plan and provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. We do not expect to grant any additional awards under the 2014 Plan or 2012 Plan as of the effective date of the 2017 Plan, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France under the 2014 Plan. Outstanding awards under the 2014 Plan and 2012 Plan continue to be subject to the terms and conditions of the 2014 Plan and 2012 Plan, respectively. Shares available for grant under the 2014 Plan and 2012 Plan, which were reserved but not issued or subject to outstanding awards under the 2014 Plan or 2012 Plan, respectively, as of the effective date of the 2017 Plan, were added to the reserves of the 2017 Plan.

We initially reserved 87,270,108 shares of our Class A common stock for future issuance under the 2017 Plan. An additional number of shares of Class A common stock will be added to the 2017 Plan equal to (i) 96,993,064 shares of Class A common stock reserved for future issuance pursuant to outstanding stock options and unvested RSUs under the 2014 Plan, (ii) 37,228,865 shares of Class A common stock issuable on conversion of Class B common stock underlying stock options and unvested RSUs outstanding under the 2012 Plan, (iii) 17,858,235 shares of Class A common stock that were reserved for issuance under the 2014 Plan as of the date the 2017 Plan became effective, (iv) 11,004,580 shares of Class A common stock issuable on conversion of Class B common stock that were reserved for issuance under the 2012 Plan as of the date the 2017 Plan became effective, and (v) a maximum of 86,737,997 shares of Class A common stock that will be added pursuant to the following sentence. With respect to each share that returns to the 2017 Plan pursuant to (i) and (ii) of the prior sentence that was associated with an award that was outstanding under the 2014 Plan and 2012 Plan as of October 31, 2016, an additional share of Class A common stock will be added to the share reserve of the 2017 Plan, up to a maximum of 86,737,997 shares. The number of shares reserved for issuance under the 2017 Plan will increase automatically on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 5.0% of the total number of shares of our capital stock outstanding on December 31st of the immediately preceding calendar year, and (ii) a number determined by our board of directors. The maximum term for stock options granted under the 2017 Plan may not exceed ten years from the date of grant. The 2017 Plan will terminate ten years from the date our board of directors approved the plan, unless it is terminated earlier by our board of directors.

## 2017 Employee Stock Purchase Plan

In January 2017, our board of directors adopted the 2017 Employee Stock Purchase Plan ("2017 ESPP"). Our stockholders approved the 2017 ESPP in February 2017. The 2017 ESPP became effective in connection with the IPO. A total of 16,484,690 shares of Class A common stock were initially reserved for issuance under the 2017 ESPP. No shares of our Class A common stock have been issued or offered under the 2017 ESPP. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (ii) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (i) and (ii).

**Restricted Stock Units and Restricted Stock Awards**

The following table summarizes the RSU and RSA activity during the year ended December 31, 2020:

| | Class A Outstanding | | Weighted-Average Grant Date Fair Value per RSU |
|---|---|---|---|
| | (in thousands, except per share data) | | |
| Unvested at December 31, 2019 | 148,797 | $ | 12.39 |
| Granted | 61,337 | $ | 19.67 |
| Vested | (71,301) | $ | 13.60 |
| Forfeited | (7,661) | $ | 13.19 |
| Unvested at December 31, 2020 | 131,172 | $ | 15.10 |

The total fair value of RSUs and RSAs vested during the years ended December 31, 2020, 2019, and 2018 was $969.4 million, $964.7 million, and $890.4 million, respectively.

All compensation cost related to Pre-2017 RSUs was recognized as of December 31, 2020. Total unrecognized compensation cost related to Post-2017 Awards was $1.8 billion as of December 31, 2020 and is expected to be recognized over a weighted-average period of 2.6 years

Additionally, we had 9.4 million RSUs that were vested but have not yet settled as of December 31, 2019, respectively. The balance as of December 31, 2019 was primarily related to the CEO Award. RSUs related to the CEO Award were fully settled as of December 31, 2020.

**Stock Options**

The following table summarizes the stock option award activity under the Stock Plans during the year ended December 31, 2020:

| | Class A Number of Shares | Class B Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value[1] |
|---|---|---|---|---|---|
| | (in thousands, except per share data) | | | | |
| Outstanding at December 31, 2019 | 8,712 | 1,550 | $ 9.00 | 5.59 | $ 75,460 |
| Granted | 90 | — | $ 24.95 | — | $ — |
| Exercised | (3,824) | (754) | $ 7.47 | — | $ — |
| Forfeited | (150) | — | $ 13.78 | — | $ — |
| Outstanding at December 31, 2020 | 4,828 | 796 | $ 10.37 | 5.20 | $ 223,230 |
| Exercisable at December 31, 2020 | 3,466 | 796 | $ 9.35 | 4.37 | $ 173,581 |
| Vested and expected to vest at December 31, 2020 | 4,761 | 796 | $ 10.34 | 5.17 | $ 220,777 |

(1)    The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying stock option awards and the closing market price of our Class A common stock as of December 31, 2020 and December 31, 2019, respectively.

The weighted-average fair value of stock options granted during the years ended December 31, 2020 and 2019 was $12.11 and $7.44 per share, respectively. The expense is estimated based on the option's fair value as calculated by the Black-Scholes option pricing model. Stock-based compensation expense for stock options was not material in the years ended December 31, 2020, 2019, and 2018.

Total unrecognized compensation cost related to unvested stock options was $8.4 million as of December 31, 2020 and is expected to be recognized over a weighted-average period of 1.3 years.

82

The total grant date fair value of stock options that vested in the years ended December 31, 2020, 2019, and 2018 was $11.1 million, $23.3 million, and $24.8 million, respectively. The intrinsic value of stock options exercised in the years ended December 31, 2020, 2019, and 2017 was $75.5 million, $44.0 million, and $289.1 million, respectively.

**Stock-Based Compensation Expense**

Total stock-based compensation expense by function was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| Cost of revenue | $ 9,367 | $ 6,365 | $ 4,393 |
| Research and development | 533,272 | 464,639 | 340,533 |
| Sales and marketing | 108,270 | 93,355 | 84,059 |
| General and administrative | 119,273 | 121,654 | 109,226 |
| Total | $ 770,182 | $ 686,013 | $ 538,211 |

**5. Business Acquisitions and Divestitures**

**2020 Acquisitions**

For the year ended December 31, 2020, we completed acquisitions to enhance our existing platform, technology, and workforce. The aggregate allocation of acquisition date fair value was as follows:

| | Total |
|---|---|
| | (in thousands) |
| Technology | $ 46,112 |
| Goodwill | 162,747 |
| Net deferred tax liability | (5,741) |
| Other assets acquired and liabilities assumed, net | 1,392 |
| Total | $ 204,510 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $49.6 million is deductible for tax purposes.

**2019 Acquisitions and Divestiture**

*AI Factory, Inc.*

In December 2019, we acquired the remaining ownership interest in AI Factory, Inc. ("AI Factory"), a content and technology company. Prior to the acquisition, we owned a minority interest in the company. The purpose of the acquisition was to enhance the functionality of our platform.

The acquisition date fair value of AI Factory was $128.1 million, which primarily represents current and future cash consideration payments to sellers, as well as the $13.5 million estimated fair value of our original minority interest. We recognized the change in pre-acquisition fair value of our original minority interest as a gain in Other income (expense), net on the consolidated statement of operations. The allocation of acquisition date fair value is preliminary and is subject to additional information related to the assets and liabilities that existed as of the acquisition date.

The allocation of acquisition date fair value was as follows:

| | Total |
|---|---|
| | (in thousands) |
| Technology | $ 16,000 |
| Goodwill | 110,734 |
| Other assets acquired and liabilities assumed, net | 1,353 |
| Total | $ 128,087 |

The goodwill amount represents synergies related to our existing platform expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Placed, LLC*

In June 2019, we divested our membership interest in Placed, a location-based measurement services company, to Foursquare Labs, Inc. ("Foursquare"). The total cash consideration received was $77.8 million, which includes amounts paid for severance and equity compensation. $66.9 million represents purchase consideration and we recognized a net gain on divestiture of $39.9 million, which is included in other income (expense), net, on our consolidated statements of operations. The operating results of Placed were not material to our consolidated revenue or consolidated operating loss for all periods presented. We determined that Placed did not meet the criteria to be classified as discontinued operations.

Placed assets and liabilities on completion of the divestiture were as follows:

|  | Total |
|---|---|
|  | (in thousands) |
| Trademarks, net | $ 1,052 |
| Technology, net | 14,193 |
| Customer relationships, net | 5,246 |
| Goodwill | 2,682 |
| Other assets and liabilities, net | 3,827 |
| Total | $ 27,000 |

*Other Acquisitions*

In the fourth quarter of 2019, we acquired a business to enhance our existing platform, technology, and workforce. The purchase consideration was $34.0 million of which $23.5 million was allocated to goodwill and the remainder primarily to identifiable intangible assets. The goodwill amount represents synergies related to our existing platform expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are deductible for tax purposes.

*Additional Information on 2020 and 2019 Acquisitions*

Unaudited pro forma results of operations assuming the above acquisitions had taken place at the beginning of each period are not provided because the historical operating results of the acquired entities were not material and pro forma results would not be materially different from reported results for the periods presented.

**6. Goodwill and Intangible Assets**

The changes in the carrying amount of goodwill for the years ended December 31, 2020 and 2019 were as follows:

|  | Goodwill |
|---|---|
|  | (in thousands) |
| Balance as of December 31, 2018 | $ 632,370 |
| Goodwill acquired | 134,255 |
| Goodwill divested | (2,682) |
| Foreign currency translation | (2,790) |
| Balance as of December 31, 2019 | $ 761,153 |
| Goodwill acquired | 162,747 |
| Foreign currency translation | 15,359 |
| Balance as of December 31, 2020 | $ 939,259 |

84

Intangible assets consisted of the following:

| | December 31, 2020 | | | |
|---|---|---|---|---|
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands, except years) | | |
| Domain names | 1.6 | $ 414 | $ 283 | $ 131 |
| Acquired developed technology | 3.2 | 206,197 | 111,129 | 95,068 |
| Patents | 4.9 | 19,860 | 9,130 | 10,730 |
| | | $ 226,471 | $ 120,542 | $ 105,929 |

| | December 31, 2019 | | | |
|---|---|---|---|---|
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands except years) | | |
| Domain names | 2.6 | $ 5,414 | $ 5,200 | $ 214 |
| Trademarks | — | 3,072 | 3,072 | — |
| Acquired developed technology | 3.6 | 175,414 | 95,921 | 79,493 |
| Customer relationships | — | 2,172 | 2,172 | — |
| Patents | 5.9 | 19,710 | 7,296 | 12,414 |
| | | $ 205,782 | $ 113,661 | $ 92,121 |

Amortization of intangible assets for the years ended December 31, 2020, 2019, and 2018 was $33.5 million, $33.4 million, and $42.6 million, respectively.

As of December 31, 2020, the estimated intangible asset amortization expense for the next five years and thereafter is as follows:

| | Estimated Amortization |
|---|---|
| | (in thousands) |
| Year ending December 31, | |
| 2021 | $ 37,366 |
| 2022 | 28,406 |
| 2023 | 24,258 |
| 2024 | 13,971 |
| 2025 | 1,411 |
| Thereafter | 517 |
| Total | $ 105,929 |

## 7. Long-Term Debt

### Convertible Notes

### 2025 Notes

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of senior convertible notes (the "2025 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). The 2025 Notes consisted of an $850.0 million initial placement and an over-allotment option that provided the initial purchasers of the 2025 Notes with the option to purchase an additional $150.0 million aggregate principal amount of the 2025 Notes, which was fully exercised. The 2025 Notes were issued pursuant to an Indenture, dated April 28, 2020 (the "Indenture"). The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and cash used to purchase the 2025 Capped Call Transactions discussed below.

The 2025 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on November 1, 2020 at a rate of 0.25% per year. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with the terms prior to such date.

The 2025 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 46.1233 shares of Class A common stock per $1,000 principal amount of 2025 Notes, which is equivalent to an initial conversion price of approximately $21.68 (the "2025 Conversion Price") per share of our Class A common stock. The conversion rate is subject to customary adjustments for certain events as described in the Indenture.

We may redeem for cash all or any portion of the 2025 Notes, at our option, on or after May 6, 2023 if the last reported sale price of our Class A common stock has been at least 130% of the 2025 Conversion Price then in effect for at least 20 trading days at a redemption price equal to 100% of the principal amount of the 2025 Notes to be redeemed, plus accrued and unpaid interest.

Holders of the 2025 Notes may convert all or a portion of their 2025 Notes at their option prior to February 1, 2025, in multiples of $1,000 principal amounts, only under the following circumstances:

- if the last reported sale price of our Class A common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the preceding calendar quarter is greater than or equal to 130% of the applicable conversion price of the 2025 Notes on each such trading day;

- during the five business day period after any ten consecutive trading day period in which the trading price per $1,000 principal amount of the 2025 Notes for each day of that ten consecutive trading day period was less than 98% of the product of the last reported sale price of our Class A common stock and the applicable conversion rate of the 2025 Notes on such trading day;

- on a notice of redemption, in which case we may be required to increase the conversion rate for the 2025 Notes so surrendered for conversion in connection with such redemption notice; or

- on the occurrence of specified corporate events.

On or after February 1, 2025, the 2025 Notes are convertible at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

Holders of the 2025 Notes who convert in connection with a make-whole fundamental change, as defined in the Indenture, or in connection with a redemption are entitled to an increase in the conversion rate. Additionally, in the event of a fundamental change, holders of the 2025 Notes may require us to repurchase all or a portion of the 2025 Notes at a price equal to 100% of the principal amount of 2025 Notes, plus any accrued and unpaid interest, including any additional interest.

In accounting for the issuance of the 2025 Notes, we separated the 2025 Notes into liability and equity components. The carrying amount of the equity component was $289.9 million and was recorded as a debt discount, which is amortized to interest expense at an effective interest rate of 7.39%. We allocated $3.3 million of debt issuance costs to the equity component and the remaining debt issuance costs of $8.1 million were allocated to the liability component, which are amortized to interest expense under the effective interest rate method. The equity component of the 2025 Notes will not be remeasured as long as it continues to meet the conditions for equity classification.

## 2026 Notes

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of senior convertible notes (the "2026 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and cash used to purchase the 2026 Capped Call Transactions discussed below.

The 2026 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on February 1, 2020 at a rate of 0.75% per year. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with the terms prior to such date.

The 2026 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 43.8481 shares of Class A common stock per $1,000 principal amount of 2026 Notes, which is equivalent to an initial conversion price of approximately $22.81 (the "2026 Conversion Price") per share of our Class A common stock.

The Convertible Notes consisted of the following:

| | As of December 31, 2020 | | | | As of December 31, 2019 | |
| | 2025 Notes | | 2026 Notes | | 2026 Notes | |
| | | | (in thousands) | | | |
| Liability: | | | | | | |
| Principal | $ | 1,000,000 | $ | 1,265,000 | $ | 1,265,000 |
| Unamortized debt discount and issuance costs | | (263,956) | | (325,875) | | (373,224) |
| Net carrying amount | $ | 736,044 | $ | 939,125 | $ | 891,776 |
| Carrying amount of the equity component | $ | 286,589 | $ | 377,432 | $ | 377,432 |

As of December 31, 2020, the debt discount and debt issuance costs on the 2025 Notes and 2026 Notes will be amortized over the remaining period of approximately 4.3 years and 5.6 years, respectively.

Interest expense related to the amortization of debt discount and issuance costs was $81.4 million and $17.8 million for the years ended December 31, 2020 and 2019, respectively, while contractual interest expense was $11.2 million and $3.7 million for the years ended December 31, 2020 and 2019, respectively. As neither of the Convertible Notes were outstanding in 2018, no interest expense related to these notes was recorded for the year ended December 31, 2018.

As of December 31, 2020, the if-converted value of the 2025 Notes and 2026 Notes exceeded the principal amount by $1,512 million and $1,309 million, respectively. The sale price for conversion was satisfied as of December 31, 2020 and as a result, the Convertible Notes first became eligible for optional conversion during the first quarter of 2021.

**Capped Call Transactions**

In connection with the pricing of the 2025 Notes and 2026 Notes, we entered into the 2025 Capped Call Transactions and the 2026 Capped Call Transactions (together, the "Capped Call Transactions"), respectively, with certain counterparties at a net cost of $100.0 million and $102.1 million, respectively. The cap price of the 2025 Capped Call Transactions is initially $32.12 per share of our Class A common stock and the cap price of the 2026 Capped Call Transaction is $32.58 per share of our Class A common stock. Both are subject to certain adjustments under the terms of the Capped Call Transactions. Conditions that cause adjustments to the initial strike price of the Capped Call Transactions mirror conditions that result in corresponding adjustments for the Convertible Notes.

The Capped Call Transactions are intended to reduce potential dilution to holders of our Class A common stock beyond the conversion prices up to the cap prices on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount, as the case may be, with such reduction or offset subject to a cap. The cost of the Capped Call Transactions was recorded as a reduction of our additional paid-in capital in our consolidated balance sheets. As of December 31, 2020, the Capped Call Transactions were in-the-money and will not be remeasured as long as they continue to meet the conditions for equity classification.

**Credit Facility**

In July 2016, we entered into a five-year senior unsecured revolving credit facility ("Credit Facility") with lenders some of which are affiliated with certain members of the underwriting syndicate for our Convertible Notes offering, that allows us to borrow up to $1.1 billion to fund working capital and general corporate-purpose expenditures. The loan bears interest at LIBO plus 0.75%, as well as an annual commitment fee of 0.10% on the daily undrawn balance of the facility. No origination fees were incurred at the closing of the Credit Facility. In December 2016, the amount we are permitted to borrow under the Credit Facility was increased to $1.2 billion. In February 2018, the amount we are permitted to borrow under the Credit Facility was increased to $1.25 billion. In August 2018, we amended the Credit Facility to extend the term to August 2023 with respect to an aggregate of $1.05 billion of the $1.25 billion that we may borrow under the Credit Facility. In August 2019, we amended the Credit Facility to revise the covenants that restrict the repurchase of equity securities and the

incurrence of indebtedness to permit the 2026 Capped Call Transactions and issuance of the 2026 Notes. In April 2020, we amended the Credit Facility to revise the covenants that restrict the incurrence of indebtedness to permit the 2025 Capped Call Transactions and issuance of the 2025 Notes. As of December 31, 2020, no amounts were outstanding under the Credit Facility. As of December 31, 2020, we had $25.4 million in the form of outstanding standby letters of credit.

## 8. Commitments and Contingencies

### Commitments

We have non-cancelable contractual agreements related to the hosting of our data storage processing, storage, and other computing services.

In January 2017, we entered into the Google Cloud Platform License Agreement. Under the agreement, we were granted a license to access and use certain cloud services. The agreement has an initial term of five years and we are required to purchase at least $400.0 million of cloud services in each year of the agreement. For each of the first four years, up to 15% of this amount may be moved to a subsequent year. If we fail to meet the minimum purchase commitment during any year, we are required to pay the difference.

In March 2016, we entered into the AWS Enterprise Agreement for the use of cloud services from Amazon Web Services, Inc. ("AWS"). Under the agreement, as amended, we are committed to spend an aggregate of $1.1 billion between January 2017 and December 2022 on AWS services ($90.0 million in 2018, $150.0 million in 2019, $215.0 million in 2020, $280.0 million in 2021, and $349.0 million in 2022). If we fail to meet the minimum purchase commitment during any year, we are required to pay the difference. Any such payment may be applied to future use of AWS services during the term, although it will not count towards meeting the future minimum purchase commitments.

The future minimum contractual commitment including commitments less than one year, as of December 31, 2020 for each of the next five years are as follows:

| | | Minimum Commitment |
| --- | --- | --- |
| | | (in thousands) |
| Year ending December 31, | | |
| 2021 | $ | 681,150 |
| 2022 | | 392,882 |
| 2023 | | 152 |
| 2024 | | 57 |
| 2025 | | — |
| Thereafter | | 2 |
| Total minimum commitments | $ | 1,074,243 |

### Contingencies

We record a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also disclose material contingencies when we believe a loss is not probable but reasonably possible. Accounting for contingencies requires us to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. Many legal and tax contingencies can take years to be resolved.

#### Pending Matters

Beginning in May 2017, we, certain of our officers and directors, and the underwriters for our IPO were named as defendants in securities class actions purportedly brought on behalf of purchasers of our Class A common stock, alleging violation of securities laws that arose following our IPO.

On January 17, 2020, we reached a preliminary agreement to settle the securities class actions. The preliminary settlement agreement was signed in January 2020 and provided for a resolution of all of the pending claims in the securities class actions for $187.5 million. In the fourth quarter of 2019, we recorded legal expense, net of amounts directly covered by insurance, of $100.0 million for the expected settlement of the stockholder actions since we concluded the loss was probable and estimable. The amount was recorded in general and administrative expense in our consolidated statements of operations. The settlement agreement was preliminarily approved by the federal court in April 2020 and by the state court in November 2020. The settlement amount was paid into escrow in December 2020 and will be released following final approval.

On April 3, 2018, BlackBerry Limited filed a lawsuit against us alleging that we infringe six of its patents. This lawsuit was dismissed in November 2019 after four of the patents were ruled to be invalid; and in December 2020, the U.S. Court of Appeals for the Federal Circuit affirmed the dismissal.

In 2017, Vaporstream, Inc. filed a lawsuit against us alleging that we infringe a number of its patents. In March 2020, we reached a preliminary agreement to settle the matter and in the first quarter of 2020 we recorded legal expense of $10.0 million related to the expected settlement since we concluded the loss was probable and estimable. The amount was recorded in general and administrative expense in our consolidated statements of operations. In April 2020, the case was dismissed pursuant to a settlement agreement.

The outcomes of our legal proceedings are inherently unpredictable, subject to significant uncertainties, and could be material to our financial condition, results of operations, and cash flows for a particular period. For the pending matters described above, it is not possible to estimate the reasonably possible loss or range of loss.

We are subject to various other legal proceedings and claims in the ordinary course of business, including certain patent, trademark, privacy, regulatory, and employment matters. Although occasional adverse decisions or settlements may occur, we do not believe that the final disposition of any of our other pending matters will seriously harm our business, financial condition, results of operations, and cash flows.

**Indemnifications**

In the ordinary course of business, we may provide indemnifications of varying scope and terms to customers, vendors, lessors, investors, directors, officers, employees, and other parties with respect to certain matters. Indemnification may include losses from our breach of such agreements, services we provide, or third party intellectual property infringement claims. These indemnifications may survive termination of the underlying agreement and the maximum potential amount of future indemnification payments may not be subject to a cap. We have not incurred material costs to defend lawsuits or settle claims related to these indemnifications as of December 31, 2020. We believe the fair value of these liabilities is immaterial and accordingly have no liabilities recorded for these agreements at December 31, 2020.

**9. Leases**

We have various non-cancelable lease agreements for certain of our offices with original lease periods expiring between 2021 and 2042. Our lease terms may include options to extend or terminate the lease when it is reasonably certain we will exercise that option. Certain of the arrangements have free rent periods or escalating rent payment provisions. Leases with an initial term of twelve months or less are not recorded on the consolidated balance sheets. We recognize rent expense on a straight-line basis over the lease term. Additionally, we sublease certain operating leases to third parties primarily as a result of moving to a centralized corporate office in Santa Monica, California in 2018.

**Lease Cost**

The components of lease cost were as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| | (in thousands) | |
| Operating lease expense | $ 60,450 | $ 60,921 |
| Sublease income | (2,815) | (4,716) |
| Total net lease costs | $ 57,635 | $ 56,205 |

**Lease Term and Discount Rate**

The weighted-average remaining lease term (in years) and discount rate related to the operating leases were as follows:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Weighted-average remaining lease term | 7.6 | 8.1 |
| Weighted-average discount rate | 5.5% | 5.7% |

As most of our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease commencement date to determine the present value of lease payments.

**Maturity of Lease Liabilities**

The present value of our operating lease liabilities as of December 31, 2020 were as follows:

| | Operating Leases |
| --- | --- |
| | (in thousands) |
| Year ending December 31, | |
| 2021 | $ 59,129 |
| 2022 | 63,968 |
| 2023 | 59,859 |
| 2024 | 59,731 |
| 2025 | 55,341 |
| Thereafter | 107,125 |
| Total lease payments | $ 405,153 |
| Less: Imputed interest | (76,784) |
| Present value of lease liabilities | $ 328,369 |

As of December 31, 2020, we have additional operating leases for facilities that have not yet commenced with lease obligations of $13.5 million. These operating leases will commence between 2021 and 2022 with lease terms of greater than one year to five years. This table does not include lease payments that were not fixed at commencement or modification.

In 2018, we exited various operating leases prior to the end of the contractual lease term, primarily as a result of moving to a centralized corporate office located in Santa Monica, California. The charges, recorded as general and administrative expenses, primarily included the present value of our remaining lease obligation on the cease use dates that occurred during the period, net of estimated sublease income. As of December 31, 2018, we had exited all properties associated with this event. On January 1, 2019, under the transition provisions of ASU 2016-02 (Topic 842), we adjusted the initial measurement of the lease asset related to the lease exit properties by $32.1 million which represents the carrying amount of the associated lease exit liability as of December 31, 2018. Changes to our estimated sublease income, including actual contracted sublease income, may result in impairment of the right-of-use asset in the period determined.

Prior to January 1, 2019, we had several lease agreements where we were deemed the owner under build-to-suit lease accounting. The value of the leased property and corresponding financing obligations was included in property and equipment, net and other liabilities, respectively, on our consolidated balance sheets as of December 31, 2018. Net assets capitalized under build-to-suit leases were $48.4 million as of December 31, 2018. As part of the adoption of Topic 842, we derecognized those assets and liabilities and recorded the difference as an adjustment to accumulated deficit at January 1, 2019. These leases are included within the right-of-use asset and lease liability balances on our consolidated balance sheet as of December 31, 2020 and 2019.

**Other Information**

Cash payments included in the measurement of our operating lease liabilities were $73.3 million and $66.3 million for the years ended December 31, 2020 and 2019, respectively.

Lease liabilities arising from obtaining operating lease right-of-use assets were $36.2 million and $35.2 million for the years ended December 31, 2020 and 2019, respectively.

90

**10. Fair Value Measurements**

Assets and liabilities measured at fair value are classified into the following categories:

• Level 1: Quoted market prices in active markets for identical assets or liabilities.

• Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

• Level 3: Unobservable inputs reflecting the reporting entity's own assumptions or external inputs from inactive markets.

We classify our cash equivalents and marketable securities within Level 1 or Level 2 because we use quoted market prices or alternative pricing sources and models utilizing market observable inputs to determine their fair value. There were no transfers between levels during the periods presented.

The following table sets forth our financial assets as of December 31, 2020 and 2019 that are measured at fair value on a recurring basis during the period:

| | December 31, 2020 | | | |
| --- | --- | --- | --- | --- |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| | | (in thousands) | | |
| Cash | $ 464,006 | $ — | $ — | $ 464,006 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,272,125 | 122 | (21) | 1,272,226 |
| U.S. government agency securities | 245,055 | 8 | (24) | 245,039 |
| Level 2 securities: | | | | |
| Corporate debt securities | 81,158 | 1 | (18) | 81,158 |
| Commercial paper | 425,861 | — | — | 425,861 |
| Certificates of deposit | 49,267 | — | — | 49,267 |
| Total | $ 2,537,472 | $ 131 | $ (63) | $ 2,537,540 |

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| | | (in thousands) | | |
| Cash | $ 416,099 | $ — | $ — | $ 416,099 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,305,145 | 604 | (49) | 1,305,700 |
| U.S. government agency securities | 269,278 | 48 | (32) | 269,294 |
| Level 2 securities: | | | | |
| Corporate debt securities | 28,420 | 13 | (4) | 28,429 |
| Commercial paper | 84,498 | — | — | 84,498 |
| Certificates of deposit | 8,785 | — | — | 8,785 |
| Total | $ 2,112,225 | $ 665 | $ (85) | $ 2,112,805 |

Gross unrealized losses were not material as of December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020, we considered any decreases in fair value on our marketable securities to be driven by factors other than credit risk, including market risk. All of our marketable securities have contractual maturities of less than one year.

For certain non-marketable investments we have elected the fair value option, using Level 3 inputs, where changes in fair value are recorded in other income (expense), net. Unrealized gains and losses related to these debt investments were not material for the period ended December 31, 2020. As of December 31, 2020 the fair value of the debt investments was recorded within other assets and was not material.

We carry the Convertible Notes at face value less the unamortized discount and issuance costs on our consolidated balance sheets and present that fair value for disclosure purposes only. As of December 31, 2020, the fair value of the 2025 Notes and the 2026 Notes was $2.4 billion and $2.8 billion, respectively. The estimated fair value of the Convertible Notes, which are classified as Level 2 financial instruments, was determined based on the estimated or actual bid prices of the Convertible Notes in an over-the-counter market on the last business day of the period.

## 11. Income Taxes

The domestic and foreign components of pre-tax loss were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| Domestic | $ (320,757) | $ (770,448) | $ (969,922) |
| Foreign | (605,428) | (262,819) | (283,442) |
| Loss before income taxes | $ (926,185) | $ (1,033,267) | $ (1,253,364) |

The components of our income tax (benefit) expense were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 1,035 | 113 | 106 |
| Foreign | 23,945 | 771 | 2,824 |
| Total current income tax (benefit) expense | 24,980 | 884 | 2,930 |
| Deferred: | | | |
| Federal | (1,720) | (277) | (15) |
| State | (414) | (85) | (40) |
| Foreign | (4,192) | (129) | (328) |
| Total deferred income tax (benefit) expense | (6,326) | (491) | (383) |
| Income tax (benefit) expense | $ 18,654 | $ 393 | $ 2,547 |

The following is a reconciliation of the statutory federal income tax rate to our effective tax rate:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Tax benefit (expense) computed at the federal statutory rate | 21.0% | 21.0% | 21.0% |
| State tax benefit (expense), net of federal benefit | 8.3 | 7.6 | 5.1 |
| Change in valuation allowance | (58.9) | (38.5) | (28.4) |
| Differences between U.S. and foreign tax rates on foreign income | (1.4) | (1.0) | (0.9) |
| Stock-based compensation benefit (expense) | 17.8 | 0.8 | (1.2) |
| U.S. federal research & development credit benefit | 8.4 | 6.3 | 5.2 |
| U.K. corporate rate increase | 4.3 | — | — |
| Acquisitions and divestitures | (0.1) | 3.4 | 0.2 |
| Other benefits (expenses) | (1.4) | 0.4 | (1.2) |
| Total income tax benefit (expense) | (2.0)% | (0.0)% | (0.2)% |

The significant components of net deferred tax balances were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | | 2019 |
| | (in thousands) | | |
| Deferred tax assets: | | | |
| Accrued expenses | $ 23,719 | $ | 31,746 |
| Intangible assets | 175,397 | | 172,228 |
| Stock-based compensation | 41,246 | | 134,489 |
| Loss carryforwards | 1,714,870 | | 1,201,569 |
| Tax credit carryforwards | 460,302 | | 337,497 |
| Lease liability | 80,794 | | 84,154 |
| Other[1] | 6,374 | | 5,390 |
| Total deferred tax assets | $ 2,502,702 | $ | 1,967,073 |
| Deferred tax liabilities: | | | |
| Convertible debt | (138,832) | | (87,904) |
| Right-of-use asset | (63,122) | | (63,595) |
| Other[1] | (7,394) | | (4,325) |
| Total deferred tax liabilities | $ (209,348) | $ | (155,824) |
| Total net deferred tax assets before valuation allowance | 2,293,354 | | 1,811,249 |
| Valuation allowance | (2,293,361) | | (1,811,666) |
| Net deferred taxes | $ (7) | $ | (417) |

(1)   "Other" was originally presented net in our Annual Report on Form 10-K for the period ending December 31, 2019, and is now separated into "Other Assets" and "Other Liabilities" for both comparative periods. "Property and Equipment" for the year ended December 31, 2019 was originally presented on a standalone basis in our December 31, 2019 Annual Report, and is now included within "Other Liabilities".

Income tax expense was $18.7 million for the year ended December 31, 2020, compared to a tax expense of $0.4 million for the year ended December 31, 2019. This increase was primarily driven by a discrete expense resulting from intra-entity transfers of intangible assets, partially offset by a discrete benefit resulting from a partial valuation allowance release on our deferred tax assets due to deferred tax liabilities originating from acquisitions.

On July 22, 2020 the U.K. Finance Bill 2020 was enacted, increasing the U.K. tax rate from 17% to 19% effective April 1, 2020. This change in tax rate resulted in an increase to our U.K. net deferred tax assets, which are predominantly loss carryforwards, before valuation allowance of $39.7 million, which was fully offset by an increase in our valuation allowance.

The issuance of the Convertible Notes in April 2020 and August 2019 resulted in a temporary difference between the carrying amount and tax basis of the Convertible Notes due to the allocation of debt proceeds and debt issuance costs between the liability and equity components. This basis difference resulted in the recognition of a $69.9 million and $92.1 million net deferred tax liability recorded to additional paid-in-capital in 2020 and 2019, respectively, which is fully offset by a change to our valuation allowance, also recorded to additional paid-in-capital.

In June 2019, the United States Court of Appeals for the Ninth Circuit overturned the 2015 U.S. Tax Court decision in Altera Corp. v. Commissioner, thereby upholding the portion of the U.S. Treasury regulations issued under Section 482 of the Code, requiring related-party participants in a cost sharing arrangement to share stock-based compensation costs. In June 2020, the U.S. Supreme Court denied the taxpayer's petition to review the Ninth Circuit's decision. As a result, we recorded a cumulative adjustment to our intercompany cost sharing transactions from prior years, which resulted in an immaterial reduction to our deferred tax assets, caused by the differences in tax rates in the impacted jurisdictions. This reduction in our deferred tax assets resulted in an offsetting reduction to our valuation allowance.

As of December 31, 2020, we had an immaterial amount of unremitted earnings related to certain foreign subsidiaries. We intend to continue to reinvest these foreign earnings indefinitely and do not expect to incur any significant taxes related to such amounts.

As of December 31, 2020, we had accumulated U.S. federal and state net operating loss carryforwards of $5.3 billion and $3.2 billion, respectively. Of the $5.3 billion of federal net operating loss carryforwards, $1.5 billion was generated before January 1, 2018 and is subject to a 20-year carryforward period. The remaining $3.8 billion can be carried forward indefinitely but is subject to an 80% taxable income limitation. The pre-2018 federal and all state net operating loss carryforwards will begin to expire in 2031 and 2026, respectively. As of December 31, 2020, we had $2.1 billion of U.K. net operating loss carryforwards that can be carried forward indefinitely, however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income. As of December 31, 2020, we had accumulated U.S. federal and state research tax credits of $302.6 million and $190.4 million, respectively. The U.S. federal research tax credits will begin to expire in 2032. The U.S. state research tax credits do not expire.

We recognize valuation allowances on deferred tax assets if it is more likely than not that some or all of the deferred tax assets will not be realized. We had valuation allowances against net deferred tax assets of $2.3 billion and $1.8 billion as of December 31, 2020 and 2019, respectively. In 2020, the increase in the valuation allowance was primarily attributable to a net increase in our deferred tax assets resulting from the loss from operations and windfall tax benefits from share-based compensation, which was partially offset by the release of valuation allowance in additional paid-in-capital related to the issuance of the 2025 Notes.

## Uncertain Tax Positions

The following table summarizes the activity related to our gross unrecognized tax benefits during the years ended December 31, 2020 and 2019:

| | Year Ended December 31, | |
| | 2020 | 2019 |
| --- | --- | --- |
| | (in thousands) | |
| Beginning balance of unrecognized tax benefits | $ 286,605 | $ 251,808 |
| Additions for current year tax positions | 56,226 | 40,221 |
| Additions for prior year tax positions | 3,218 | 1,977 |
| Reductions for prior year tax positions | (712) | (7,425) |
| Changes due to lapse of statute of limitations | (570) | — |
| Changes due to foreign currency translation adjustments | 204 | 24 |
| Ending balance of unrecognized tax benefits (excluding interest and penalties) | $ 344,971 | $ 286,605 |
| Interest and penalties associated with unrecognized tax benefits | 357 | 200 |
| Ending balance of unrecognized tax benefits (including interest and penalties) | $ 345,328 | $ 286,805 |

The total amount of gross unrecognized tax benefits, including related interest and penalties, was $345.3 million and $286.8 million as of December 31, 2020 and 2019, respectively.

Substantially all of the unrecognized tax benefit was recorded as a reduction in our gross deferred tax assets, offset by a corresponding reduction in our valuation allowance. We have net unrecognized tax benefits of $11.8 million and $1.5 million that are included in other liabilities on our consolidated balance sheet as of December 31, 2020 and 2019, respectively. Assuming there continues to be a valuation allowance against deferred tax assets in future periods when gross unrecognized tax benefits are realized, this would result in a tax benefit of $12.3 million within our provision of income taxes at such time.

Our policy is to recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheet. During the year ended December 31, 2020, interest expense recorded related to uncertain tax positions was not material.

The income taxes we pay are subject to review by taxing jurisdictions globally. Our estimate of the potential outcome of any uncertain tax position is subject to management's assessment of relevant risks, facts, and circumstances existing at that time. We believe that our estimate has adequately provided for these matters. However, our future results may include adjustments to estimates in the period the audits are resolved, which may impact our effective tax rate.

Tax years ending on or after December 31, 2012 are subject to examination in the U.S., and tax years ending on or after December 31, 2019 are subject to examination in the U.K. We are currently under examination by the U.S. Internal Revenue Service for the tax year ending December 31, 2018.

## 12. Accumulated Other Comprehensive Income (Loss)

The table below presents the changes in accumulated other comprehensive income (loss) ("AOCI") by component and the reclassifications out of AOCI:

| | Changes in Accumulated Other Comprehensive Income (Loss) by Component | | |
|---|---|---|---|
| | Marketable Securities | Foreign Currency Translation | Total |
| | (in thousands) | | |
| Balance at December 31, 2019 | $ 429 | $ 144 | $ 573 |
| OCI before reclassifications | 99 | 21,306 | 21,405 |
| Amounts reclassified from AOCI [1] | (615) | — | (615) |
| Net current period OCI | (516) | 21,306 | 20,790 |
| Balance at December 31, 2020 | $ (87) | $ 21,450 | $ 21,363 |

(1)    Realized gains and losses on marketable securities are reclassified from AOCI into other income (expense), net in the consolidated statements of operations.

## 13. Property and Equipment, Net

Property and equipment, net, consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Computer hardware and software | $ 35,040 | $ 27,528 |
| Leasehold improvements | 175,850 | 165,150 |
| Furniture and equipment | 74,987 | 85,366 |
| Construction in progress | 27,284 | 8,183 |
| Total | 313,161 | 286,227 |
| Less: accumulated depreciation and amortization | (134,452) | (112,560) |
| Property and equipment, net | $ 178,709 | $ 173,667 |

Depreciation and amortization expense on property and equipment was $53.2 million, $53.8 million, and $49.0 million for the years ended December 31, 2020, 2019, and 2018, respectively.

The following table lists property and equipment, net by geographic area:

| | As of December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Property and equipment, net: | | |
| United States | $ 157,596 | $ 153,771 |
| Rest of world [1] | 21,113 | 19,896 |
| Total property and equipment, net | $ 178,709 | $ 173,667 |

(1)    No individual country exceeded 10% of our total property and equipment, net for any period presented.

**14. Balance Sheet Components**

Accrued expenses and other current liabilities at December 31, 2020 and 2019 consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (in thousands) | |
| Accrued compensation and related expenses | $ 141,046 | $ 43,985 |
| Accrued infrastructure costs | 138,082 | 116,184 |
| Partner revenue share liability | 92,092 | 30,606 |
| Acquisition liability | 55,098 | 18,676 |
| Accrued tax liability | 38,119 | 18,593 |
| Securities class actions legal charges | — | 100,000 |
| Other | 89,905 | 82,566 |
| Total accrued expenses and other current liabilities | $ 554,342 | $ 410,610 |

**15. Non-Marketable Investments**

We held investments in privately held companies with a carrying value of $169.5 million and $55.0 million as of December 31, 2020 and 2019, respectively, which consist primarily of equity securities. Non-marketable investments are included within other assets on the consolidated balance sheet. Such investments are reviewed periodically for impairments. We recorded impairments of $29.5 million for the year ended December 31, 2020 and $7.2 million for the year ended December 31, 2018, within other income (expense), net in the consolidated statements of operations. The impairment recorded for the year ended December 31, 2019 was not material. Additionally, we recognized gains on non-marketable investments of $42.4 million and $20.8 million for the years ended December 31, 2020 and 2019, respectively, within other income (expense), net on the consolidated statement of operations. The gains on non-marketable investments for the year ended December 31, 2018 were not material.

**16. Employee Benefit Plans**

We have a defined contribution 401(k) plan (the "401(k) Plan") for our U.S.-based employees. The 401(k) Plan is available for all full-time employees who meet certain eligibility requirements. Eligible employees may contribute up to 100% of their annual compensation, but are limited to the maximum annual dollar amount allowable under the Code. We match 100% of each participant's contribution up to a maximum of 3% of the participant's base salary, bonus, and commissions paid during the period, and we match 50% of each participant's contribution between 3% and 5% of the participant's base salary, bonus, and commissions paid during the period. During the years ended December 31, 2020, 2019, and 2018, we recognized expense of $18.4 million, $15.4 million, and $16.1 million, respectively, related to matching contributions.

**17. Related Party Transactions**

In November 2020, we entered into a ground sublease with an entity that is controlled by our CEO that allows us to build and operate a hangar to support our aviation program. This entity subleases the ground to us for $0 and in exchange may utilize a specified percentage of the hangar space. If the entity needs additional space within the hangar, it will pay rent to Snap at a fair market value rate determined at the time this arrangement was entered into. Any space utilized by this entity will be space that is not required for Snap's aviation program. Subject to certain limited exceptions, neither party may terminate this sublease for at least six years. After this period, Snap or this entity may terminate the lease at any time on 24 months' prior written notice. Upon termination of the sublease, this entity will purchase the hangar from Snap at its fair market value on the termination date.

The value of these arrangements are not material to our consolidated financial statements for the current period or for the term of the agreement.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

## Item 9A. Controls and Procedures.

### *Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2020, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in this Annual Report on Form 10-K was (a) reported within the time periods specified by SEC rules and regulations, and (b) communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding any required disclosure.

### *Changes in Internal Control*

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *Limitations on Effectiveness of Controls and Procedures*

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

### *Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2020 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

## Item 9B. Other Information.

### *Amended and Restated Bylaws*

On February 2, 2021, as part of its periodic review of our governing documents, our board of directors approved amendments to our amended and restated bylaws, to require the full board of directors (not a subcommittee of the board) to authorize the issuance of any voting stock.

The foregoing description of the changes is qualified in its entirety by reference to the full text of our amended and restated bylaws, a copy of which is attached as Exhibit 3.2 and incorporated by reference.

Snap's amended and restated bylaws reflecting those amendments became effective immediately on approval by the board of directors.

We are including this disclosure in this Form 10-K rather than filing a Form 8-K under Item 5.03 at a later date.

*2021 Discretionary Bonus Program*

On February 3, 2021, the compensation committee of the board of directors approved the 2021 Bonus Program. The 2021 Bonus Program provides executive officers and other eligible employees the opportunity to earn bonuses based on the level of achievement of certain corporate objectives and key results from January 1, 2021 through December 31, 2021.

The compensation committee will set the corporate objectives and key results based on the recommendations of the chief executive officer, and determine the degree to which they have been met after considering the recommendations of management. Each eligible participant in the 2021 Bonus Program may receive a bonus in an amount up to 100% of such participant's annual base salary earned in 2021. The compensation committee may pay all or any portion of an earned bonus in shares of Class A common stock granted under the Snap Inc. 2017 Equity Incentive Plan. The compensation committee also has the right to adjust the bonus target of any participant upward in the event of over-achievement of the corporate objectives and key results.

There is no set formula for determining the bonus amount under the 2021 Bonus Program based on the achievement of the corporate objectives and key results. Rather, the compensation committee will exercise its discretion in determining the bonus amount actually earned by each participant. Awards under the 2021 Bonus Program are expected to occur in the first quarter of 2022. A participant must remain an employee on the payment date under the 2021 Bonus Program to be eligible to earn a bonus.

The description of the 2021 Bonus Program does not purport to be complete and is qualified in its entirety by reference to the 2021 Bonus Program, a copy of which is attached as Exhibit 10.22 and incorporated by reference.

We are including this disclosure in this Form 10-K rather than filing a Form 8-K under Item 5.02 at a later date.

*New Employment Agreement and Transition Agreement*

On February 3, 2021, we entered into a new employment agreement and transition agreement with Jared Grusd. Under the agreement, Mr. Grusd will enter into a new fixed term employment agreement that will include continued vesting of a portion of his previously granted equity. In addition, following execution of a standard release, Mr. Grusd will receive acceleration of his outstanding equity awards that were scheduled to vest through March 15, 2021, and his salary had he remained our Chief Strategy Officer through March 31, 2021.

The foregoing description is qualified in its entirety by reference to the full text of the transition agreement, a copy of which is attached as Exhibit 10.30 and incorporated by reference.

We are including this disclosure in this Form 10-K rather than filing a Form 8-K under Item 5.02 at a later date.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

The following table sets forth information for our directors and executive officers, and their ages as of December 31, 2020.

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| Evan Spiegel | 30 | Co-Founder, Chief Executive Officer, and Director |
| Robert Murphy | 32 | Co-Founder, Chief Technology Officer, and Director |
| Derek Andersen | 42 | Chief Financial Officer |
| Jeremi Gorman | 43 | Chief Business Officer |
| Jared Grusd | 45 | Chief Strategy Officer |
| Jerry Hunter | 56 | Senior Vice President, Engineering |
| Rebecca Morrow | 47 | Chief Accounting Officer and Controller |
| Michael O'Sullivan | 55 | General Counsel |
| *Non-Employee Directors* | | |
| Michael Lynton[1][2] | 61 | Director and Chairman of the Board |
| Kelly Coffey[3] | 55 | Director |
| Joanna Coles[2] | 58 | Director |
| Liz Jenkins[3] | 43 | Director |
| A.G. Lafley[1][2] | 73 | Director |
| Stanley Meresman[3] | 74 | Director |
| Scott D. Miller[1][3] | 68 | Director |
| Poppy Thorpe[1][3] | 36 | Director |

(1)     Member of the compensation committee.
(2)     Member of the nominating and corporate governance committee.
(3)     Member of the audit committee.


**Executive Officers**

*Evan Spiegel.* Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. We believe that Mr. Spiegel is qualified to serve as a member of our board based on the perspective and experience he brings as our co-founder and Chief Executive Officer.

*Robert Murphy.* Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Murphy is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Technology Officer.

*Derek Andersen.* Mr. Andersen has served as Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A from Acadia University, an M.B.A from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

*Jeremi Gorman.* Ms. Gorman has served as our Chief Business Officer since November 2018. Ms. Gorman was employed at Amazon.com, Inc., serving as Head of Global Field Advertising Sales from June 2018 to November 2018, as Head of Field Advertising Sales, U.S. from April 2015 to June 2018, and as Head of Entertainment Advertising Sales from 2012 to April 2015. Ms. Gorman holds a B.A. from the University of California, Los Angeles.

*Jared Grusd.* Mr. Grusd has served as our Chief Strategy Officer since November 2018. Mr. Grusd was employed by Oath Inc. as Chief Executive Officer, HuffPost and Global Head of News and Information at Oath Inc. from June 2017 to October 2018. Prior to that, Mr. Grusd served as Chief Executive Officer of HuffPost (formerly Huffington Post) from September 2015 to June 2017. From October 2011 to September 2015, Mr. Grusd was employed by Spotify Technology S.A. as General Counsel and Global Head of Corporate Development. Mr. Grusd holds an M.B.A. from Columbia Business School, a J.D. from University of Chicago Law School, and a B.A. from University of Pennsylvania.

*Jerry Hunter.* Mr. Hunter has served as our Senior Vice President, Engineering since November 2017 and previously served as Vice President of Core Engineering since October 2016. From August 2010 to October 2016, Mr. Hunter served as Vice President of Infrastructure at Amazon.com, Inc., and previously as Vice President of Corporate Applications at Amazon from October 2007 to August 2010. Mr. Hunter holds a B.S. and M.S. in Systems Engineering from the University of Arizona.

*Rebecca Morrow.* Ms. Morrow has served as our Chief Accounting Officer and Controller since September 2019. From January 2018 to August 2019, Ms. Morrow served as Chief Accounting Officer at GoDaddy Inc., and previously served as Vice President of Finance and Head of Technical Accounting and Reporting from March 2015 to January 2018. Prior to that, Ms. Morrow served in various roles at Deloitte & Touche LLP, most recently serving as Managing Director in the Advisory Services practice from August 2013 to March 2015, and as Senior Manager in the Advisory Services practice from October 2008 to August 2013. Ms. Morrow holds a B.S. degree in Business and Accounting from the University of Idaho and a Masters of Accountancy degree from the David Eccles School of Business of the University of Utah.

*Michael O'Sullivan.* Mr. O'Sullivan has served as our General Counsel since July 2017. From 1992 to July 2017, Mr. O'Sullivan was a lawyer in private practice. He served since 1996 as a lawyer at the law firm of Munger, Tolles & Olson LLP in Los Angeles, California, where he focused his practice on advising companies, their boards of directors, and founders on corporate transactions, governance matters, and significant disputes. Mr. O'Sullivan holds a J.D. from University of Southern California's Gould School of Law and a B.A. from University of Pennsylvania.

**Non-Employee Directors**

*Michael Lynton.* Mr. Lynton has served on our board of directors since April 2013 and has been Chairman of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton has served as a member of the board of directors of Ares Management, L.P., Pearson, Warner Music Group Corp., Schrodinger, Inc., and The Boston Beer Company. Mr. Lynton also served as a member of the board of directors of Pandora Media, Inc. from August 2017 until February 2019. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School. We believe that Mr. Lynton is qualified to serve as a member of our board of directors and Chairman due to his extensive leadership experience.

*Kelly Coffey.* Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey has served as Chief Executive Officer at City National Bank, a subsidiary of the Royal Bank of Canada (RBC), since February 2019. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently serving as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College. We believe that Ms. Coffey is qualified to serve as a member of our board of directors due to her extensive leadership experience.

*Joanna Coles.* Ms. Coles has served on our board of directors since December 2015. Ms. Coles has served as Chairperson and Chief Executive Officer of Northern Star Acquisition Corp. and Northern Star Acquisition Corp. II, or collectively Northern Star, since July 2020 and December 2020, respectively. Prior to joining Northern Star, Ms. Coles served as Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Sonos, Inc., and is on the board of Women Entrepreneurs New York City, an initiative to encourage female entrepreneurship, with a focus on underserved communities. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia. We believe that Ms. Coles is qualified to serve as a member of our board of directors due to her extensive experience working with content providers and advertisers.

*Liz Jenkins.* Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) since January 2021, and served as Chief Financial Officer at Be Sunshine, LLC (Hello Sunshine from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October 2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves on the board of GLAAD. Ms. Jenkins holds an MBA from The Wharton School at the University of Pennsylvania and a BA in Economics from Stanford University. We believe that Ms. Jenkins is qualified to serve as a member of our board of directors due to her extensive leadership experience and experience working with content providers.

*A.G. Lafley.* Mr. Lafley has served on our board of directors since July 2016. Mr. Lafley held various positions within The Procter & Gamble Company since 1977 and served as its President, Chief Executive Officer, and as a member of the board of directors from June 2000 until June 2009 and again from May 2013 to October 2015. He also served as Chairman of the Board from July 2002 through February 2010 and again from May 2013 through June 2016. From April 2010 to May 2013, Mr. Lafley served as a consultant and as a Senior Adviser at Clayton, Dubilier & Rice, LLC, a private equity firm. Mr. Lafley holds a B.A. from Hamilton College and an M.B.A. from Harvard Business School. We believe that Mr. Lafley is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Stanley Meresman.* Mr. Meresman has served on our board of directors since July 2015. During the last ten years, Mr. Meresman has served on the boards of directors of various public and private companies, including service as chair of the audit committee for some of these companies. He currently serves on the board of directors and as chair of the audit committee of Cloudflare, Inc., DoorDash, Inc., Guardant Health, Inc., and Medallia, Inc. He served as a member of the board of directors and as chair of the audit committees of Palo Alto Networks, Inc. from September 2014 to December 2018, LinkedIn Corporation from October 2010 to December 2016, and Zynga Inc. from June 2011 to June 2015; and on the board of directors of Meru Networks, Inc. from September 2010 to May 2013, and Riverbed Technology, Inc. from March 2005 to May 2012. He also serves on the board of directors of several private companies and board of trustees of the Panetta Institute of Public Policy, a non-profit organization. From January 2004 to December 2004, Mr. Meresman was a Venture Partner with Technology Crossover Ventures, a private equity firm, and was General Partner and Chief Operating Officer of Technology Crossover Ventures from November 2001 to December 2003. During the four years before joining Technology Crossover Ventures, Mr. Meresman was a private investor and board member and advisor to several technology companies. From 1989 to 1997, Mr. Meresman served as the Senior Vice President and Chief Financial Officer of Silicon Graphics, Inc. Mr. Meresman holds a B.S. in Industrial Engineering and Operations Research from the University of California, Berkeley and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Meresman is qualified to serve as a member of our board of directors and chair of our audit committee due to his background as a member of the board and chair of the audit committee of other public companies and his financial and accounting expertise from his prior extensive experience as chief financial officer of two publicly traded companies.

*Scott D. Miller.* Mr. Miller has served on our board of directors since October 2016. Mr. Miller is a founder and Chief Executive Officer of G100 Companies, which operates G100 Network and SSA & Company. Before joining G100 Companies in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller currently serves on the board of directors of QTS Realty Trust, Inc. and served on the boards of Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago. We believe that Mr. Miller is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Poppy Thorpe.* Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe has served as Chief Marketing Officer at Sesame Inc. since March 2020. Prior to that, Ms. Thorpe served as Head of Brand Marketing at Glossier Inc., a beauty brand, from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017.Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco. We believe that Ms. Thorpe is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies and with advertisers.

There are no family relationships among any of the directors or executive officers.

101

**Independent Chairman**

Our board of directors appointed Mr. Lynton to serve as our independent Chairman of our board of directors in September 2016. As Chairman of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present. Mr. Lynton also performs such additional duties as our board of directors may otherwise determine and delegate. Mr. Lynton is an independent director and satisfies the independence requirements under NYSE listing standards.

**Composition of Our Board of Directors**

Our board of directors may establish the authorized number of directors from time to time by resolution. Our board of directors currently consists of ten members.

No stockholder has any special rights regarding the election or designation of members of our board of directors. There is no contractual arrangement by which any of our directors are appointed to our board of directors. Our current directors will continue to serve as directors until our 2021 annual meeting of stockholders and until their successor is duly elected, or if sooner, until their earlier death, resignation, or removal.

So long as any shares of our Class C common stock are outstanding, we will not have a classified board of directors, and all directors will be elected for annual terms.

Following the conversion of all of our Class C common stock to Class B common stock, and subsequent conversion of all of our Class B common stock to Class A common stock, we will have a classified board of directors consisting of three classes. Each class will be approximately equal in size, with each director serving staggered three-year terms. Directors will be assigned to a class by the then-current board of directors.

When our board of directors is classified, we expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control.

Our board of directors held five meetings during 2020. No member of our board of directors attended fewer than 75% of the aggregate of (a) the total number of meetings of the board of directors (held during the period for which he or she was a director) and (b) the total number of meetings held by all committees of the board of directors on which such director served (held during the period that such director served). Members of our board of directors are invited and encouraged to attend our annual meeting of stockholders. In 2020, all members of our board of directors attended our annual meeting of stockholders.

**Executive Sessions of Independent Directors**

In order to promote open discussion among non-management directors, and as required under applicable NYSE rules, our board of directors conducts executive sessions of non-management directors during each regularly scheduled board meeting and at such other times if requested by a non-management director. In 2020, the non-management directors met in executive session at least once. The non-management directors provide feedback to executive management, as needed, promptly after the executive session. Neither Mr. Spiegel nor Mr. Murphy participates in such sessions. As Chairman of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present.

**Committees of Our Board of Directors**

Our board of directors has established an audit committee, a compensation committee, and a nominating and corporate governance committee. The composition and responsibilities of each of these committees of our board of directors are described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Our board of directors may have or establish other committees as it deems necessary or appropriate from time to time.

*Audit Committee*

Our audit committee consists of Ms. Coffey, Ms. Jenkins, Mr. Meresman, Mr. Miller, and Ms. Thorpe, each of whom our board of directors has determined satisfies the independence requirements under NYSE listing standards and Rule 10A-3(b)(1) of the Exchange Act. Mr. Lynton was a member of the audit committee until December 2020. The chair of our audit

committee is Mr. Meresman, who our board of directors has determined is an "audit committee financial expert" within the meaning of SEC regulations. Each member of our audit committee can read and understand fundamental financial statements in accordance with applicable requirements. In arriving at these determinations, the board of directors has examined each audit committee member's scope of experience and the nature of their employment in the corporate finance sector. No member of the audit committee, other than Mr. Meresman, simultaneously serves on the audit committees of more than three public companies. Mr. Meresman currently serves on the audit committees of four other public companies, in addition to our company. Our board of directors has determined that such simultaneous service would not impair the ability of Mr. Meresman to effectively serve on our audit committee. During 2020, the audit committee met nine times. Our board of directors has adopted a written charter for the audit committee, which is available on our website at www.snap.com.

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits, and to oversee our independent registered accounting firm.

Specific responsibilities of our audit committee include:

- helping our board of directors oversee our corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related person transactions;

- reviewing cybersecurity and data privacy risks;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes our internal quality control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and

- approving, or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

### *Compensation Committee*

Our compensation committee consists of Mr. Lafley, Mr. Lynton, Mr. Miller, and Ms. Thorpe. Our board of directors has determined that each of Mr. Lafley, Mr. Lynton, Mr. Miller, and Ms. Thorpe is independent under NYSE listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act. The chair of our compensation committee is Mr. Lynton. During 2020, the compensation committee met six times. Our board of directors has adopted a written charter for the compensation committee, which is available on our website at www.snap.com.

The primary purpose of our compensation committee is to discharge the responsibilities of our board of directors in overseeing our compensation policies, plans, and programs and to review and determine the compensation to be paid to our executive officers, directors, and other senior management, as appropriate.

Specific responsibilities of our compensation committee include:

- reviewing and approving the compensation of our Chief Executive Officer, other executive officers, and senior management;

- reviewing and recommending to our board of directors the compensation paid to our directors;

- reviewing and approving the compensation arrangements with our executive officers and other senior management;

- administering our equity incentive plans and other benefit programs;

- reviewing, adopting, amending, and terminating incentive compensation and equity plans, severance agreements, profit sharing plans, bonus plans, change-of-control protections, and any other compensatory arrangements for our executive officers and other senior management;

- reviewing, evaluating, and recommending to our board of directors succession plans for our executive officers; and

- reviewing and establishing general policies relating to compensation and benefits of our employees, including our overall compensation philosophy.

See the sections titled "Item 11. Executive Compensation—Compensation Discussion and Analysis" and "—Director Compensation" for a description of our processes and procedures for the consideration and determination of executive officer and director compensation.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Ms. Coles, Mr. Lafley, and Mr. Lynton. The chair of our nominating and corporate governance committee is Mr. Lafley. Our board of directors has determined that each member of the nominating and corporate governance committee is independent under the NYSE listing standards, a non-employee director, and free from any relationship that would interfere with the exercise of his or her independent judgment. During 2020, the nominating and corporate governance committee met four times. Our board of directors has adopted a written charter for the nominating and corporate governance committee, which is available on our website at www.snap.com.

Specific responsibilities of our nominating and corporate governance committee include:

- identifying and evaluating candidates, including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on our board of directors;

- considering and making recommendations to our board of directors regarding the composition and chairmanship of the committees of our board of directors;

- instituting plans or programs for the continuing education of our board of directors and orientation of new directors;

- developing and making recommendations to our board of directors regarding corporate governance guidelines and matters; and

- overseeing periodic evaluations of the board of directors' performance, including committees of the board of directors and management.

## Code of Conduct

We have adopted a Code of Conduct that applies to all our employees, officers, and directors. This includes our principal executive officer, principal financial officer, and principal accounting officer or controller, or persons performing similar functions. The full text of our Code of Conduct is available on our website at www.snap.com. We intend to disclose on our website any future amendments of our Code of Conduct or waivers that exempt any principal executive officer, principal financial officer, principal accounting officer or controller, persons performing similar functions, or our directors from provisions in the Code of Conduct. You can request a copy of our Code of Conduct by writing to our Secretary at Snap Inc., 2772 Donald Douglas Loop North, Santa Monica, CA 90405.

Our board of directors believes that good corporate governance is important to ensure that the company is managed for the long-term benefit of our stockholders. The full text of our corporate governance guidelines is also available on our website at www.snap.com.

## Procedures by Which Stockholders May Nominate Directors

The nominating and corporate governance committee and our board of directors will review and evaluate candidates proposed by stockholders. The nominating and corporate governance committee and our board of directors will apply the same criteria, and follow substantially the same process in considering the candidates, as they do in considering other candidates. The factors generally considered by the nominating and corporate governance committee and our board of directors are set out in our Corporate Governance Guidelines, which are available on our website at www.snap.com. If a stockholder who is eligible to vote at the 2021 annual meeting of stockholders wishes to nominate a candidate to be considered for election as a director, it must comply with the procedures set forth in our bylaws and give timely notice of the nomination in writing to our Secretary. All stockholder proposals should be marked for the attention of our Secretary at Snap Inc., 2772 Donald Douglas Loop North, Santa Monica, CA 90405.

104

**Communications with the Board of Directors**

Any stockholder, including a holder of Class A common stock, or any interested party may contact our board of directors regarding genuine issues or questions about us by sending a letter to the board of directors at: Snap Inc., c/o Secretary, 2772 Donald Douglas Loop North, Santa Monica, CA 90405, Attention: Board of Directors. Each communication should specify the person sending the communication, the general topic of the communication, and the class and number of shares of our stock that are owned of record (if a record holder) or beneficially (if not a record holder). If any stockholder, including a holder of Class A common stock, wants to contact the independent members of the board of directors, the stockholder should address the communication to the attention of the Chairman (c/o Secretary) of the board of directors at the address above. Our legal department will review communications before forwarding them to the recipient, and will not forward a communication that is unrelated to the duties and responsibilities of the board of directors, irrelevant, primarily commercial in nature, addressed already on our website or in other filings, or is unduly hostile, threatening, illegal, or similarly unsuitable. Any communication that is not forwarded will be made available to any director on request.

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires our executive officers and directors to file initial reports of ownership and reports of changes in ownership with the SEC and to furnish us with copies of all Section 16(a) forms they file. Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Section 16 of the Exchange Act. For more information, see "Risk Factors—Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock."

To our knowledge, based solely on our review of the copies of such reports furnished to us or written representations from such persons, we believe that, with respect to the year ended December 31, 2020, such persons complied with all such filing requirements.

**Item 11. Executive Compensation.**

**Compensation Discussion and Analysis**

The compensation provided to our named executive officers is detailed in the Summary Compensation Table, other tables and the accompanying footnotes, and narrative following this section. This compensation discussion and analysis summarizes the material aspects of our compensation programs that we provide to our named executive officers. Our named executive officers for 2020 were:

- Evan Spiegel, Co-Founder and Chief Executive Officer;

- Derek Andersen, Chief Financial Officer;

- Jeremi Gorman, Chief Business Officer;

- Jerry Hunter, Senior Vice President, Engineering; and

- Michael O'Sullivan, General Counsel.

Our board of directors has delegated to the compensation committee the authority and responsibility for reviewing, evaluating, and determining the compensation to be paid to executive officers, overseeing our compensation policies, and administering the compensation plans and programs for Snap.

**General Compensation Philosophy and Objectives**

*Philosophy*

We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together. We seek kind, smart, and creative individuals to accomplish this goal. Our compensation philosophy supports this goal by attracting the best people to join Snap and incentivizing them to innovate, create, and drive long-term results.

Today, we compensate our executive officers mostly with equity that vests over multiple years. Our focus on equity compensation encourages executives to operate like owners, linking their interests with the interests of our stockholders. In 2020, we introduced an annual incentive compensation program. As our company grows, we will continue to evaluate our compensation philosophy and programs to ensure they continue to meet our objectives.

### Objectives

We designed our compensation program for all employees, including our named executive officers, to support four main objectives:

- recruit and retain the most talented people in a competitive market;

- reinforce our values, which serve to motivate our employees to deliver the highest level of performance;

- reward success when both our company and the individual succeed; and

- align employee and stockholder interests to share in long-term success.

## Compensation-Setting Process

### Compensation Committee's Role

The compensation committee has overall responsibility for determining the compensation of our executive officers, including our Chief Executive Officer. Members of the compensation committee are appointed by our board of directors. The compensation committee consists of four members of our board of directors: Michael Lynton, A.G. Lafley, Scott D. Miller, and Poppy Thorpe, none of whom is an executive officer of Snap and each of whom qualifies as an "independent director" under the NYSE rules. Our Chief Executive Officer and other members of our management team provide input to the compensation committee.

### Compensation Consultant's Role

The compensation committee has the authority to engage the services of outside consultants. The compensation committee first retained FW Cook, a national compensation consulting firm, in 2017 as its independent compensation consultant. FW Cook reports directly to the compensation committee.

In January 2021, our compensation committee reviewed FW Cook's independence under applicable SEC and NYSE rules. Our compensation committee concluded that FW Cook is independent within the meaning of such rules and that its engagement did not present any conflict of interest.

### Management's Role

Management's role is to make recommendations to the compensation committee regarding our compensation programs and policies, and to implement the programs and policies approved by the compensation committee. Our Chief Executive Officer makes recommendations to the compensation committee with respect to compensation for our executive officers, including our named executive officers, other than himself. The compensation committee considers our Chief Executive Officer's recommendations, but ultimately has final approval of all compensation for our executive officers, including the types of award and specific amounts. All such determinations by our compensation committee are discretionary. Our co-founders, who serve as Chief Executive Officer and Chief Technology Officer, respectively, each have base salaries of $1 per year and did not receive any equity awards in 2020.

No executive officer participated directly in the final deliberations or determinations regarding his or her own compensation package or was present during such determinations.

The compensation committee meets regularly in executive session. Our Chief Executive Officer is not present during compensation committee deliberations or votes on his compensation and also recuses himself from sessions of our board of directors where they act on his compensation.

106

**Peer Group**

We analyze market data for executive compensation periodically using the most relevant published survey sources, information available from public filings, and input from our compensation consultants. In 2020, the compensation committee requested that FW Cook perform a detailed review of our peer group, considering appropriateness of the current peer companies and potential additions based on similarity in market capitalization size and industry. Based on those considerations and FW Cook's review, our compensation committee approved removing Facebook, eBay, and TripAdvisor, and adding DocuSign, Pinterest, Slack, and Twilio. Our peer group for 2020 consisted of the following companies:

| | | |
|---|---|---|
| Activision | Intuit | Twilio |
| Autodesk | Match Group | Twitter |
| DocuSign | Pinterest | VMWare |
| Dropbox | Slack | Workday |
| Electronic Arts | Spotify | Zillow Group |
| IAC/InterActive | | |

We use the peer group as a general reference. In addition to the peer group, we also rely on the knowledge and experience of our compensation committee members and our management in determining the appropriate compensation for our executive officers.

**Elements of Executive Compensation**

Our current compensation program generally consists of the following components:

- base salary;

- equity-based awards;

- annual incentive compensation; and

- other benefits.

We combine these elements to formulate compensation packages that provide competitive pay, reward achievement of financial, operational, and strategic objectives, and align the interests of our executive officers with those of our stockholders. The overall use and weight of each compensation element is based on our subjective determination of the importance of each element in meeting our overall objectives, including motivating executive officers with an owner's mentality.

### Base Salary

We review the base salaries of our executive officers annually and may adjust them from time to time, if needed, to reflect changes in market conditions or other factors. Base salaries of our executive officers generally remain below the 50th percentile compared to our peer group, primarily because we compensate our executive officers mostly with equity awards.

The table below sets forth information regarding the year-end base salary amounts for 2020 for our named executive officers. No base salaries were changed for any of our named executive officers in 2020.

| Name | 2020 Base Salary |
|---|---|
| Evan Spiegel | $ 1 |
| Derek Andersen | 500,000 |
| Jeremi Gorman | 500,000 |
| Jerry Hunter | 500,000 |
| Michael O'Sullivan | 500,000 |

### Equity-based Awards

The majority of the total compensation for our executive officers, including our named executive officers, is provided through equity awards. By having a significant portion of our executive officers' total compensation payable in the form of equity awards that vest over a number of years and are thus subject to higher risk, our executive officers are motivated to align their long-term financial interests with those of our stockholders.

107

We generally issue three forms of equity awards:

*Restricted Stock Awards*. RSAs represent the right to receive one share of Class A common stock for each award granted, subject to a forfeiture condition, so the value of the RSAs is tied to the performance of our Class A common stock. The forfeiture condition will typically lapse over multiple years, subject to continued service through each lapse date.

*Restricted Stock Units*. RSUs represent the right to receive one share of Class A common stock for each unit granted, subject to continued service. Each RSU entitles the holder to one share of Class A common stock for each RSU granted, so the value of the RSUs is tied to the performance of our Class A common stock. RSUs typically vest over multiple years, subject to continued service through each vesting date.

RSAs and RSUs align the interests of our executive officers and other employees with those of our stockholders. Because RSAs and RSUs have value to the recipient even in the absence of stock price appreciation, these forms of equity awards help us retain and incentivize employees during periods of market volatility.

*Stock Options*. Stock options are granted with an exercise price based on the market price of Class A common stock on the date of grant (as quoted on the NYSE). The stock options will have value to our executive officers only if the fair market value of our Class A common stock increases after the date of grant, which provides a strong incentive to our executive officers to increase stockholder value. Additionally, stock options typically vest over multiple years, subject to continued service through each vesting date. We view stock options as inherently performance-based and an effective tool to motivate our executive officers to build stockholder value and reinforce our position as a growth company. Although we typically grant RSAs and RSUs to our executive officers, we have granted stock options to our executive officers in limited circumstances.

We generally grant larger, one-time new hire equity awards to our executive officers when they start employment with us. These initial awards are intended to establish a meaningful equity stake and motivate long-term value creation. While these awards generally cover multiple years, we may also consider providing additional equity grants to our executive officers to ensure appropriate incentives are in place to promote our long-term strategic and financial objectives and help us retain key executive officers. The size of these awards is not determined based on a specific formula, but rather through the exercise of judgment after considering various factors, including compensation provided to other executives with similar responsibilities in our peer group and within our company, the current unvested equity held by such executive officer, the perceived retentive value of the proposed awards, and for new-hires, amounts forfeited when joining our company. We also consider each executive officer's individual performance, including the results and contributions delivered during the year and how they align with our short-term and long-term goals, the executive's leadership of his or her team, the cash compensation received by the executive officer, and feedback received from the executive officer's peers and team.

### Annual Incentive Compensation

In February 2020, our board of directors approved the 2020 Bonus Program, which provided our named executive officers and other eligible employees the opportunity to earn bonuses on the level of achievement of certain company-wide objectives and key results, or Corporate OKRs, from January 1, 2020 through December 31, 2020. A participant must have remained an employee through the payment date under the 2020 Bonus Program to have earned a bonus.

The Corporate OKRs are approved by the compensation committee. Each Corporate OKR category is assigned a relative weighting by the compensation committee based on recommendations by the Chief Executive Officer, reflecting its importance to the achievement of our Corporate OKRs during the year.

Each eligible participant in the 2020 Bonus Program may receive a bonus in an amount up to 100% of such participant's annual base salary earned in 2020. Bonus targets for participants will be correspondingly adjusted downward in the event certain Corporate OKRs are deemed by the compensation committee to have not been fully achieved. The compensation committee also has the right, in its sole discretion, to adjust the bonus target of any participant upward in the event of over-achievement of the Corporate OKRs as determined by the compensation committee.

The Corporate OKRs consisted of growing the overall business, including growing our community, growing our business internationally while supporting local businesses, investing in partnerships to scale our platforms, and accelerating revenue growth and making progress towards adjusted EBITDA profitability.

In February 2021, the compensation committee approved an 80% payment of the bonus target amount to certain of our employees, including our named executive officers, pursuant to the 2020 Bonus Program. The bonus payment amounts approved by the compensation committee were based on their respective determinations of the degree to which such Corporate OKRs were achieved.

### Other Benefits

Like many other employees, our executive officers, including our named executive officers, participate in our employee benefit and welfare plans, including life and disability insurance, medical and dental care plans, and a 401(k) plan. In 2020, we matched contributions made to our 401(k) plan by our employees up to federal limits, including our named executive officers. All of the named executive officers, other than Mr. Spiegel, participated in our 401(k) plan. Our executive officers, including our named executive officers, also receive access to an on-call medical service and a medical advisor service paid for by us. Ms. Gorman and Messrs. Hunter and O'Sullivan participated in such on-call medical services in 2020, and Mr. Andersen participated in the medical advisor service in 2020, and we paid applicable tax gross ups related to such services. We generally do not provide our executive officers with additional retirement benefits, pensions, perquisites, or other personal benefits, except as further described in the section titled "—Summary Compensation Table." In the future, we may provide perquisites or other personal benefits in limited circumstances, such as where we believe it is appropriate to assist an individual executive in the performance of his or her duties, to make our executive team more efficient and effective, and for recruitment, motivation, or retention purposes. All future practices with respect to perquisites or other personal benefits for executives will be subject to review and approval by the compensation committee.

### Executive Security Policy

Based on our overall risk assessment, including the findings of security studies, we have approved an executive security policy that currently provides security for our Chief Executive Officer and Chief Technology Officer (who is not a named executive officer). The executive security policy may apply to other executive officers as needed. We believe that the personal safety of our executive officers is crucial to our success, and based on our risk assessment, we believe that the cost of the personal security measures for executive officers is an appropriate and necessary business expense. Although we do not consider personal security measures to be a perquisite for the covered executive officer's benefit, we have included the aggregate incremental costs to us, if any, in the "All Other Compensation" column of the Summary Compensation Table, as applicable. Please see the section titled "—Summary Compensation Table" for additional detail.

### Change of Control Benefits

Our employee equity awards with back-weighted vesting (i.e., 10/20/30/40 vesting), including certain awards held by our named executive officers, accelerate so that the equity award is evenly-weighted if the employee's employment is involuntary terminated other than for cause or voluntary termination for good reason following a change of control (i.e., "double-trigger"). We believe this change in control benefit makes sense because the logic of back-weighted vesting is that it incentivizes an employee to stay at a company for the entire vesting term; if there is a change in control of a company during the vesting term and the employee's employment is subsequently terminated by a company involuntarily or by the employee for good reason, the employee cannot stay for the entire vesting term due to reasons beyond the employee's control. We ceased issuing back-weighted equity awards in early 2018, and Messrs. Hunter and O'Sullivan are the only named executive officers with back-weighted equity vesting that could benefit from such a provision. Our named executive officers are not entitled to any other change of control benefits or post-employment payments with the limited exception of equity acceleration on a termination due to death. For more detail, please see the section titled "—Potential Payments Upon Change in Control."

## Tax and Accounting Considerations

### Deductibility of Executive Compensation

Section 162(m) of the Code limits the amount that we may deduct from our U.S. federal taxable income for compensation paid to persons who are "covered employees" for purposes of Section 162(m) to $1 million per covered employee per year. The U.S. Tax Cuts and Jobs Act, or the Tax Act, enacted in December 2017, made certain changes to Section 162(m). Under the prior law, compensation that qualified as "performance-based compensation" under Section 162(m) was not subject to this deduction limitation. Pursuant to the Tax Act, this exception for "performance-based compensation" was repealed with respect to taxable years beginning after December 31, 2017, except for certain transition relief for remuneration provided pursuant to a written binding contract that was in effect on November 2, 2017.

As a result, compensation paid to our covered employees in excess of $1 million per year generally will not be deductible unless, among other requirements, it qualifies for the transition relief provided by the Tax Act. As a newly public company, we may benefit from a transition rule under Section 162(m) so that deduction limits generally do not apply to compensation paid pursuant to equity plans and arrangements that were in effect at the time of our IPO, subject to certain exceptions. Because of uncertainties as to the application and interpretation of Section 162(m), no assurance can be given that any compensation paid by us will be deductible. We will continue to monitor the applicability of Section 162(m) to our ongoing compensation arrangements.

While we are mindful of the benefit of full tax deductibility of compensation, we also value the flexibility of compensating our executive officers in a manner that can best promote our corporate objectives. Therefore, we may approve compensation that may not be fully deductible.

### *No Tax Reimbursement of Parachute Payments and Deferred Compensation*

We did not provide any executive officer, including any named executive officer, with a "gross-up" or other reimbursement payment for any tax liability that he or she might owe as a result of the application of Sections 280G, 4999, or 409A of the Code during 2020, and we have not agreed and are not otherwise obligated to provide any named executive officer with such a "gross-up" or other reimbursement.

### *Accounting Treatment*

We account for stock-based compensation in accordance with the authoritative guidance set forth in ASC Topic 718, which requires companies to measure and recognize the compensation expense for all share-based awards made to employees and directors, including RSAs, RSUs, and stock options, over the period during which the award recipient is required to perform services in exchange for the award.

## Compensation Policies and Practices as they Relate to Risk Management

Our management team and our compensation committee, with the assistance of our independent compensation consultants, each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices, and policies for all employees, including our named executive officers. In 2020, we reviewed our compensation plans and philosophy and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse impact on our business or our financial condition. The objective of the review was to identify any compensation plans, practices, or policies that may encourage employees to take unnecessary risk that could threaten our company. No such plans, practices, or policies were identified. The risk assessment process included, among other things, a review of our cash and equity incentive-based compensation plans to ensure that they are aligned with our company performance goals and ensure an appropriate balance between fixed and variable pay components and between short-term and long-term incentives. The base salary component of our compensation program is designed to provide income independent of our stock price performance so that employees will not focus exclusively on stock price performance to the detriment of other important business metrics. The annual bonus component is scored with discretion by the compensation committee so that short-term outcomes are not over-weighted in the final results. The equity-based component of our compensation program is primarily designed to reward employees evenly throughout their tenure, which we believe discourages employees from taking actions that focus only on specific periods. Furthermore, our executive officers typically receive a substantial portion of their equity in the form of RSAs and RSUs, which does not require our stock price to be trading at certain price for the executive officer to realize value. Executive officer compensation is not tied to any singular performance metric. Additional controls, such as our Code of Conduct and related training, help further mitigate the risks of unethical behavior and inappropriate risk-taking.

### *Hedging and Pledging Prohibition*

Our insider trading policy prohibits all employees (including our executive officers), members of our board of directors, and consultants from engaging in derivative securities transactions, including hedging, pledging company securities as collateral, holding company securities in a margin account, or other inherently speculative transactions with respect to our capital stock.

*Rule 10b5-1 Sales Plans*

Our executive officers and members of our board of directors may adopt written plans, known as Rule 10b5-1 plans, in which they will contract with a broker to buy or sell shares of our capital stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades under parameters established by the individual when entering into the plan, without further direction from them. The director or officer may amend a Rule 10b5-1 plan in some circumstances and may terminate a plan at any time.

**Compensation Committee Report**

The compensation committee has reviewed and discussed the compensation discussion and analysis included in this Annual Report on Form 10-K with management and, based on such review and discussions, the compensation committee recommended to our board of directors that the compensation discussion and analysis be included in this Annual Report on Form 10-K.

Snap Inc. compensation committee,

Michael Lynton (Chairman)
A.G. Lafley
Scott D. Miller
Poppy Thorpe

**Summary Compensation Table**

The following table presents all of the compensation awarded to, earned by, or paid to our named executive officers during the fiscal years ended December 31, 2020, 2019, and 2018.

| Name and Principal Position | Year | Salary | Bonus | Stock Awards[1] | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Evan Spiegel | 2020 | $ 1 | $ — | $ — | $ — | $ 2,094,431 [2] | $ 2,094,432 |
| *Co-Founder and Chief* | 2019 | 1 | — | — | — | 1,669,809 [3] | 1,669,810 |
| *Executive Officer* | 2018 | 1 | — | — | — | 800,846 [4] | 800,847 |
| Derek Andersen[5] | 2020 | 500,000 | — | 6,242,566 | 400,000[6] | 24,841 [7] | 7,167,407 |
| *Chief Financial Officer* | 2019 | 422,404 | — | 8,866,092 | — | 11,271 [8] | 9,299,767 |
| Jeremi Gorman[9] | 2020 | 500,000 | — | 5,675,063 | 400,000[6] | 16,213 [10] | 6,591,276 |
| *Chief Business Officer* | 2019 | 500,000 | — | — | — | 17,038 [11] | 517,038 |
|  | 2018 | 67,308 | — | 22,418,321 | — | 127 | 22,485,756 |
| Jerry Hunter | 2020 | 500,000 | — | 24,970,262 | 400,000[6] | 20,489 [12] | 25,890,751 |
| *Senior Vice President,* | 2019 | 500,000 | — | 2,855,000 | — | 21,427 [13] | 3,376,427 |
| *Engineering* | 2018 | 501,101 | — | 882,446 | — | 21,108 [14] | 1,404,655 |
| Michael O'Sullivan | 2020 | 500,000 | — | 6,810,086 | 400,000[6] | 17,191 [15] | 7,727,277 |
| *General Counsel* | 2019 | 500,000 | — | 8,565,000 | — | 15,830 [16] | 9,080,830 |
|  | 2018 | 500,000 | — | 426,415 | — | 17,940 [17] | 944,355 |

(1)    Amounts reported represent the aggregate grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2)    Amount reported includes (a) $1,665,092 for security for Mr. Spiegel, (b) $22,271 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot reimburse under the Federal Aviation Regulations, (c) $407,062 in incremental costs for personal flights not reimbursed by Mr. Spiegel, and (d) $6 in life insurance premiums paid by us on behalf of Mr. Spiegel.

(3)    Amount reported includes (a) $1,276,623 for security for Mr. Spiegel, (b) $13,864 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot reimburse under the Federal Aviation Regulations, (c) $378,472 in incremental costs for personal flights not reimbursed by Mr. Spiegel, (d) life insurance premiums paid by us on behalf of Mr. Spiegel, (e) $420 for a financial services program provided to executives, and (f) related tax "gross up" payments paid to Mr. Spiegel to cover the imputed income associated with the membership in the financial services program. Amounts not quantified above total less than $10,000 in aggregate.

111

(4)    Amount reported includes (a) $132,235 for our payment of the fees associated with Mr. Spiegel's filing in 2018 under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or HSR Act, including legal fees incurred in connection with the filing, otherwise payable by Mr. Spiegel, as approved by the compensation committee of our board of directors in October 2018, (b) $166,195 in related tax "gross up" payments paid to Mr. Spiegel to cover the imputed income associated with the 2018 HSR Act filing fee and legal fees, (c) $486,781 for security for Mr. Spiegel, (d) $5,000 in medical on-call services paid by us on behalf of Mr. Spiegel, (e) life insurance premiums paid by us on behalf of Mr. Spiegel, (f) tax "gross up" payments paid to Mr. Spiegel to cover the imputed income associated with the medical on-call services, and (g) $6,376 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot reimburse under the Federal Aviation Regulations. Amounts not quantified above total less than $10,000 in aggregate.

(5)    Mr. Andersen was appointed as Chief Financial Officer effective May 20, 2019.

(6)    Represents amounts earned under the 2020 Bonus Program for performance from January 1, 2020 through December 31, 2020. Amounts under the 2020 Bonus Program will be paid in March 2021. See "Elements of Executive Compensation – Annual Incentive Compensation."

(7)    Amount reported includes (a) $11,400 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Andersen, (c) $6,750 in medical advisor services paid by us on behalf of Mr. Andersen, (d) tax "gross up" payments paid to Mr. Andersen to cover the imputed income associated with the medical advisor services. Amounts not quantified above total less than $10,000 in aggregate.

(8)    Amount reported includes (a) $9,788 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Andersen, (c) $420 in a financial services program provided to executives, (d) tax "gross up" payments paid to Mr. Andersen to cover the imputed income associated with the financial services program. Amounts not quantified above total less than $10,000 in aggregate.

(9)    Ms. Gorman joined us as Chief Business Officer effective November 5, 2018.

(10)    Amount reported includes (a) $6,154 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Ms. Gorman, (c) $5,000 in medical on-call services paid by us on behalf of Ms. Gorman, and (d) tax "gross up" payments paid to Ms. Gorman to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(11)    Amount reported includes (a) $6,692 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Ms. Gorman, (c) $5,000 in medical on-call services paid by us on behalf of Ms. Gorman, and (d) tax "gross up" payments paid to Ms. Gorman to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(12)    Amount reported includes (a) $11,400 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Hunter, (c) $5,000 in medical on-call services paid by us on behalf of Mr. Hunter, and (d) tax "gross up" payments paid to Mr. Hunter to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(13)    Amount reported includes (a) $11,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Hunter, (c) $5,000 in medical on-call services paid by us on behalf of Mr. Hunter, and (d) tax "gross up" payments paid to Mr. Hunter to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(14)    Amount reported includes (a) $11,000 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Hunter, (c) $5,000 in medical on-call services paid by us on behalf of Mr. Hunter, (d) meal allowance provided by us, and (e) tax "gross up" payments paid to Mr. Hunter to cover the imputed income associated with the medical on-call services and meal allowance. Amounts not quantified above total less than $10,000 in aggregate.

(15)    Amount reported includes (a) $6,962 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, and (d) tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(16)    Amount reported includes (a) $6,923 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, (d) $420 in a financial services program provided to executives, and (e) tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services and the financial services program. Amounts not quantified above total less than $10,000 in aggregate.

(17)    Amount reported includes (a) $6,923 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, (d) $420 in a financial services program provided to executives, (e) meal allowance provided by us, and (f) tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services, the financial services program, and meal allowance. Amounts not quantified above total less than $10,000 in aggregate.

112

**Grants of Plan-Based Awards in Fiscal 2020**

The following table provides information regarding grants of incentive plan-based awards made to each of our named executive officers during 2020 under our 2017 Plan. No named executive officer was granted options in 2020.

| Name | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units[1] | Grant Date Fair Value of Stock Awards[2] |
|---|---|---|---|
| Evan Spiegel | — | — | $ — |
| Derek Andersen | 2/18/2020 | 363,574 | 6,242,566 |
| Jeremi Gorman | 2/18/2020 | 330,522 | 5,675,063 |
| Jerry Hunter | 2/18/2020 | 1,454,296 | 24,970,262 |
| Michael O'Sullivan | 2/18/2020 | 396,627 | 6,810,086 |

(1) Except as indicated below, equity awards vest and the forfeiture condition lapses only on the satisfaction of a service-based vesting condition. If an employee dies while in service, the service-based vesting condition as to 100% of his or her shares subject to the award will be satisfied.

(2) The dollar amounts reflect the grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, see Notes 1 and 4 of the notes to our consolidated financial statements.

**Outstanding Equity Awards as of December 31, 2020**

The following table presents information regarding outstanding equity awards held by our named executive officers as of December 31, 2020. All awards are for Class A common stock and were granted under our 2017 Plan.

| Name | Grant Date | Stock Awards | | Option Awards | | | |
|---|---|---|---|---|---|---|---|
| | | Number of Shares or Units of Stock That Have Not Vested(#)[1] | Market Value of Shares or Units of Stock That Have Not Vested($)[2] | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable[1] | Option Exercise Price | Option Expiration Date |
| Evan Spiegel | — | — | $ — | — | — | $ — | — |
| Derek Andersen | 7/26/2018 | 311,723 (3) | 15,607,971 | — | — | — | — |
| | 3/4/2019 | 16,441 (4) | 823,201 | — | — | — | — |
| | 5/16/2019 | 468,750 (5) | 23,470,313 | — | — | — | — |
| | 2/18/2020 | 363,574 (6) | 18,204,150 | — | — | — | — |
| Jeremi Gorman | 11/5/2018 | 1,599,928 (7) | 80,108,395 | — | — | — | — |
| | 2/18/2020 | 330,522 (8) | 16,549,237 | — | — | — | — |
| Jerry Hunter | 12/29/2017 | 166,194 (9) | 8,321,334 | — | — | — | — |
| | 12/29/2017 | — | — | 420,000 | 280,000 (10) | 14.72 | 12/29/2027 |
| | 5/16/2019 | 156,250 (11) | 7,823,438 | — | — | — | — |
| | 2/18/2020 | 1,454,296 (12) | 72,816,601 | — | — | — | — |
| Michael O'Sullivan | 9/8/2017 | 319,615 (13) | 16,003,123 | — | — | — | — |
| | 5/16/2019 | 468,750 (11) | 23,470,313 | — | — | — | — |
| | 2/18/2020 | 396,627 (14) | 19,859,114 | — | — | — | — |

(1) Each of our named executive officers, other than Mr. Spiegel, holds equity awards that only vest, or the forfeiture condition only lapses, on the satisfaction of a service-based condition. The service-based condition for each of our named executive officers is further described below. If an executive officer dies while in our service, the service-based condition as to 100% of his or her shares subject to the award will be satisfied.

(2) The market value is based on the closing price of our Class A common stock on December 31, 2020, which was $50.07.

(3) The service-based condition for these RSUs is satisfied in 48 equal monthly installments after each month of continuous service from August 15, 2018.

(4) The service-based condition for these RSUs is satisfied in 48 equal monthly installments after each month of continuous service from February 15, 2019.

113

(5)    The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from June 15, 2019.

(6)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 18.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 81.8% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(7)    The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/48th of the shares underlying this RSA after each month of continuous service by Ms. Gorman from December 15, 2018.

(8)    The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA on February 15, 2023, subject to continuous service by Ms. Gorman through such date. Thereafter, the service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA after each quarter of continuous service by Ms. Gorman from February 15, 2023.

(9)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 10% of the RSUs on January 15, 2019; 20% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2019; 30% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2020; and 40% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2021. The unvested shares subject to these RSUs are subject to accelerated vesting as described in the section titled "—Employment, Severance, and Change in Control Agreements."

(10)    The service-based condition for these options is satisfied as follows (in each case subject to continued service through each vesting date): 10% of the options on December 29, 2018; 20% of the options in equal quarterly installments during the 12-month period following December 29, 2018; 30% of the options in equal quarterly installments during the 12-month period following December 29, 2019; and 40% of the options in equal quarterly installments during the 12-month period following December 29, 2020. The unvested shares subject to these options are subject to accelerated vesting as described in the section titled "—Employment, Severance, and Change in Control Agreements."

(11)    The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from May 15, 2019.

(12)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 27.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2020; 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(13)    The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 10% of the RSUs in equal quarterly installments during the 12-month period following August 15, 2017; 20% of the RSUs in equal quarterly installments during the 12-month period following August 15, 2018; 30% of the RSUs in equal quarterly installments during the 12-month period following August 15, 2019; and 40% of the RSUs in equal quarterly installments during the 12-month period following August 15, 2020. The unvested shares subject to these RSUs are subject to accelerated vesting as described in the section titled "—Employment, Severance, and Change in Control Agreements."

(14)    The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 33.3% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 66.7% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

**Option Exercises and Stock Vested**

The following table presents information regarding the vesting or lapse of the forfeiture condition during 2020 of RSUs and RSAs previously granted to the named executive officers. No named executive officer exercised options during 2020.

| | Stock Awards | |
| --- | --- | --- |
| Name | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($)(1) |
| Evan Spiegel(2) | — | $ — |
| Derek Andersen | 382,115 | 9,746,878 |
| Jeremi Gorman | 799,938 | 19,269,848 |
| Jerry Hunter | 939,970 | 23,170,651 |
| Michael O'Sullivan | 533,751 | 13,346,525 |

(1)    The value realized is based on the closing price of our Class A common stock on the vesting date.

(2)    Mr. Spiegel was granted an award of RSUs for 37,447,817 shares of Class C common stock, as described in the section titled "—Employment, Severance, and Change in Control Agreements—Offer Letters—Evan Spiegel." These RSUs were fully vested on the closing of our initial public offering in March 2017 and were delivered to Mr. Spiegel in equal quarterly installments over three years that began in November 2017. In 2020, 9,361,955 shares of Class C common

stock with an aggregate value of $173,820,297, based on the closing price of our Class A common stock on the applicable delivery dates, were delivered to Mr. Spiegel.

**Pension Benefits**

Other than our 401(k) plan, our named executive officers did not participate in, or otherwise receive any benefits under, any pension or retirement plan sponsored by us during the year ended December 31, 2020.

**Non-qualified Deferred Compensation**

Our named executive officers did not participate in, or earn any benefits under, a non-qualified deferred compensation plan sponsored by us during the year ended December 31, 2020.

**Employment, Severance, and Change in Control Agreements**

### *Offer Letters*

We have offer letters with each of our executive officers. The offer letters generally provide for at-will employment and set forth the executive officer's initial base salary, eligibility for employee benefits, and confirmation of the terms of previously issued equity grants, if applicable, including in some cases severance benefits on a qualifying termination of employment. If an executive officer dies, all outstanding equity awards will be deemed to satisfy the service-based requirement. In addition, each of our named executive officers has executed our standard proprietary information and inventions agreement. The key terms of employment with our executive officers are described below.

### *Evan Spiegel*

In October 2016, we entered into an amended and restated offer letter agreement with Evan Spiegel, our co-founder and Chief Executive Officer, with respect to his continuing employment with us. Mr. Spiegel's annual base salary as of December 31, 2020 was $1. Under the terms of his offer letter, Mr. Spiegel was granted an award of RSUs for 37,447,817 shares of Class C common stock, which represented 3.0% of our outstanding capital stock on an as-converted basis on the closing of our initial public offering in March 2017. These RSUs were fully vested on the closing of our initial public offering and were delivered to Mr. Spiegel in equal quarterly installments over three years that began on November 30, 2017. Our board of directors approved the award to Mr. Spiegel in July 2015 to motivate him to continue growing our business and improving our financial results so that we could undertake an initial public offering, which we regard as an important milestone that provided liquidity to our stockholders and employees.

### *Robert Murphy*

In October 2016, we entered into an amended and restated offer letter agreement with Robert Murphy, our co-founder and Chief Technology Officer, with respect to his continuing employment with us. Mr. Murphy's annual base salary as of December 31, 2020 was $1.

### *Derek Andersen*

In May 2019, we entered into an amended and restated offer letter agreement with Derek Andersen, our Chief Financial Officer, with respect to his continuing employment with us. Mr. Andersen's annual base salary as of December 31, 2020 was $500,000.

### *Jeremi Gorman*

In October 2018, we entered into an offer letter agreement with Jeremi Gorman, our Chief Business Officer, with respect to her employment with us. Ms. Gorman's annual base salary as of December 31, 2020 was $500,000.

### *Jared Grusd*

In October 2018, we entered into an offer letter agreement with Jared Grusd, our Chief Strategy Officer, with respect to his employment with us. Mr. Grusd's annual base salary as of December 31, 2020 was $500,000.

*Jerry Hunter*

In October 2020, we entered into an amended and restated offer letter agreement with Jerry Hunter, our Senior Vice President, Engineering, with respect to his continuing employment with us. Mr. Hunter's annual base salary as of December 31, 2020 was $500,000.

If Mr. Hunter's employment is terminated without cause or he terminates his employment for good reason, within 12 months following a change in control, then the service-based vesting requirement for the RSUs granted prior to 2018 will be deemed satisfied with respect to 1/16th of the RSUs for each completed quarter of service since the vesting commencement date. Mr. Hunter must sign a release of claims agreement as a pre-condition of receiving this termination benefit.

*Rebecca Morrow*

In July 2019, we entered into an offer letter agreement with Rebecca Morrow, our Chief Accounting Officer and Controller, with respect to her employment with us. Ms. Morrow's annual base salary as of December 31, 2020 was $414,000.

*Michael O'Sullivan*

In July 2017, we entered into an offer letter agreement with Michael O'Sullivan, our General Counsel, with respect to his employment with us. Mr. O'Sullivan's annual base salary as of December 31, 2020 was $500,000.

If Mr. O'Sullivan's employment is terminated without cause or he terminates his employment for good reason, within 12 months following a change in control, then the service-based vesting requirement for the RSUs granted prior to 2018 will be deemed satisfied with respect to 1/16th of the RSUs for each completed quarter of service since the vesting commencement date. Mr. O'Sullivan must sign a release of claims agreement as a pre-condition of receiving this termination benefit.

**Potential Payments upon Change in Control or Death**

The following table sets forth the estimated payments that would be received by each named executive officer if a hypothetical termination of employment without cause or following a resignation for good reason following a change of control of our company had occurred on December 31, 2020.

| Name | Accelerated Vesting of RSUs[1] |
|---|---|
| Evan Spiegel | $ — |
| Derek Andersen | — |
| Jeremi Gorman | — |
| Jerry Hunter | 3,941,260 |
| Michael O'Sullivan | 6,000,789 |

(1) The amount reported reflects the aggregate market value, based on the closing price of our Class A common stock of $50.07 on December 31, 2020, of the unvested RSUs that would be accelerated.

The table below reflects amounts that would have been received by each named executive officer assuming that his or her employment was terminated due to his or her death on December 31, 2020.

| Name | Accelerated Vesting of Stock Awards and Options[1] |
|---|---|
| Evan Spiegel | $ — |
| Derek Andersen | 58,105,634 |
| Jeremi Gorman | 96,657,632 |
| Jerry Hunter | 98,859,372 |
| Michael O'Sullivan | 59,332,549 |

116

(1)   The amount reported reflects the aggregate value, based on the closing price of our Class A common stock of $50.07 on December 31, 2020, of the unvested equity awards that would be accelerated. For such purpose, the value realized upon the exercise of an option is calculated as the difference between the closing price of our Class A common stock on December 31, 2020 and the exercise price of the option.

## Employee Benefit Plans

We believe that our ability to grant equity-based awards is a valuable and necessary compensation tool that aligns the long-term financial interests of our employees, consultants, and directors with the financial interests of our stockholders. In addition, we believe that our ability to grant equity-based awards helps us to attract, retain, and motivate employees, consultants, and directors, and encourages them to devote their best efforts to our business and financial success. The principal features of our equity incentive plans and our 401(k) plan are summarized below. These summaries are qualified in their entirety by reference to the actual text of the plans.

### 401(k) Plan and Similar Plans

We maintain a safe harbor 401(k) plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax advantaged basis. Eligible employees are able to defer eligible compensation up to certain Code limits, which are updated annually. We have the ability to make matching and discretionary contributions to the 401(k) plan. Currently, we make a match of each participant's contribution up to federal limits of the participant's base salary, bonus, and commissions paid during the period, and we make a match of 50% of each participant's contribution between 3% and 5% of the participant's base salary, bonus, and commissions paid during the period. Contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employees are immediately and fully vested in their own contributions and our contributions. The 401(k) plan is intended to be qualified under Section 401(a) of the Code, with the related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan are deductible by us when made, and contributions and earnings on those amounts are not taxable to the employees until withdrawn or distributed from the 401(k) plan.

Similar plans outside the United States, some of which are government mandated, cover employees of certain of our international subsidiaries. Several of these plans allow us to match, on a voluntary basis, a portion of the employee contributions.

### 2017 Equity Incentive Plan

Our board of directors adopted our 2017 Equity Incentive Plan, or our 2017 Plan, in January 2017, and our stockholders approved our 2017 Plan in February 2017. Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. Our 2017 Plan provides for the grant of incentive stock options, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. The 2017 Plan is the successor to our 2012 Equity Incentive Plan and 2014 Equity Incentive Plan, each of which is described below, or, together, the Prior Plans.

*Authorized Shares.* The maximum number of shares of our Class A common stock that may be issued under our 2017 Plan as of December 31, 2020 is 122,547,581. The number of shares of our Class A common stock reserved for issuance under our 2017 Plan will automatically increase on January 1st of each calendar year, starting on January 1, 2018 through January 1, 2027, in an amount equal to 5.0% of the total number of shares of our capital stock outstanding on the last day of the calendar month before the date of each automatic increase, or a lesser number of shares determined by our board of directors. The maximum number of shares of our Class A common stock that may be issued on the exercise of incentive stock options under our 2017 Plan is 367,642,743.

Shares subject to stock awards granted under our 2017 Plan that expire or terminate without being exercised in full, or that are paid out in cash rather than in shares, do not reduce the number of shares available for issuance under our 2017 Plan. Additionally, shares become available for future grant under our 2017 Plan if they were issued under stock awards under our 2017 Plan and if we repurchase them or they are forfeited. This includes shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award.

*Corporate Transactions.* Our 2017 Plan provides that in the event of certain specified significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of more than 50% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards:

- arrange for the assumption, continuation, or substitution of a stock award by a successor corporation;

- arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation;

- accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction;

- arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us;

- cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, or no payment, as determined by the board of directors; or

- make a payment, in the form determined by our board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the awards before the transaction over any exercise price payable by the participant in connection with the exercise.

The plan administrator is not obligated to treat all stock awards or portions of stock awards, even those that are of the same type, in the same manner and is not obligated to treat all participants in the same manner.

In the event of a change in control, awards granted under the 2017 Plan will not receive automatic acceleration of vesting and exercisability, although this treatment may be provided for in an award agreement. Under the 2017 Plan, a change in control is defined to include: (1) the acquisition by any person or company of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) a sale, lease, exclusive license, or other disposition of all or substantially all of our assets other than to an entity more than 50% of the combined voting power of which is owned by our stockholders, and (4) an unapproved change in the majority of the board of directors.

*Plan Amendment or Termination.* Our board of directors has the authority to amend, suspend, or terminate our 2017 Plan, provided that such action does not materially impair the existing rights of any participant without such participant's written consent. Certain material amendments also require the approval of our stockholders. No incentive stock options may be granted after the tenth anniversary of the date our board of directors adopted our 2017 Plan. No stock awards may be granted under our 2017 Plan while it is suspended or after it is terminated.

### 2014 Equity Incentive Plan

Our board of directors adopted, and our stockholders approved, our 2014 Equity Incentive Plan, or our 2014 Plan, in September 2014. Our 2014 Plan was amended most recently in October 2016. Our 2014 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to employees, directors, and consultants, including employees and consultants of our affiliates.

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2014 Plan following that date, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France. Any awards granted under the 2014 Plan will remain subject to the terms of our 2014 Plan and applicable award agreements.

*Authorized Shares.* The maximum number of shares of our Class A common stock that may be issued under our 2014 Plan is 166,164,100, minus the number of shares of our Class B common stock issued after September 4, 2014 under our 2012 Plan. In addition to the share reserve, an additional 53,357,397 shares of Class A common stock are reserved under the 2014 Plan in connection with the distribution of shares of Class A common stock provided as a dividend to the holders of all preferred stock and common stock outstanding on October 31, 2016. The maximum number of shares of Class A common stock that may be issued on the exercise of incentive stock options under our 2014 Plan is three times such maximum number of shares. Shares subject to stock awards granted under our 2014 Plan that expire, are forfeited, or terminate without being

exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2014 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2014 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2014 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2014 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2014 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2014 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2012 Equity Incentive Plan

Our board of directors adopted our 2012 Equity Incentive Plan, or our 2012 Plan, in May 2012, and our stockholders approved our 2012 Plan in August 2012. Our 2012 Plan was amended most recently in October 2016. Our 2012 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to our employees, directors, and consultants, including employees and consultants of our affiliates.

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2012 Plan following that date. Any awards granted under the 2012 Plan will remain subject to the terms of our 2012 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class B common stock that may be issued under our 2012 Plan is 91,292,140, minus the number of shares of our Class A common stock issued after September 4, 2014 under our 2014 Plan. In addition to the share reserve, an additional 50,022,362 shares of Class A common stock are reserved under the 2012 Plan in connection with the Class A Dividend, one share of which will be issued if and when a share from the share reserve is issued in connection with the settlement or exercise of a stock award that was outstanding as of October 31, 2016. The maximum number of shares of Class B common stock that may be issued on the exercise of incentive stock options under our 2012 Plan is such maximum number of shares. Shares subject to stock awards granted under our 2012 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2012 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax

withholding obligations related to a stock award become available for future grant under our 2012 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2012 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation, or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2012 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2012 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2012 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2017 Employee Stock Purchase Plan

Our board of directors adopted our 2017 Employee Stock Purchase Plan, or ESPP, in January 2017 and our stockholders approved our ESPP in February 2017. Our ESPP became effective when the registration statement in connection with our initial public offering was declared effective in March 2017. The purpose of the ESPP is to secure the services of new employees, to retain the services of existing employees, and to provide incentives for such individuals to exert maximum efforts toward our success and that of our affiliates. The ESPP is intended to qualify as an "employee stock purchase plan" within the meaning of Section 423 of the Code for U.S. employees. In addition, the ESPP authorizes grants of purchase rights that do not comply with Section 423 of the Code under a separate non-423 component. In particular, where such purchase rights are granted to employees who are foreign nationals or employed or located outside the United States, our board of directors may adopt rules that are beyond the scope of Section 423 of the Code.

*Share Reserve*. The ESPP authorizes the issuance of 16,484,690 shares of our Class A common stock under purchase rights granted to our employees or to employees of any of our designated affiliates. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (1) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (2) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (1) and (2). As of December 31, 2020, no shares of our Class A common stock have been purchased under the ESPP.

*Corporate Transactions*. In the event of certain significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding immediately before such transaction are

converted or exchanged into other property by virtue of the transaction, any then-outstanding rights to purchase our stock under the ESPP may be assumed, continued, or substituted for by any surviving or acquiring entity (or its parent company). If the surviving or acquiring entity (or its parent company) elects not to assume, continue, or substitute for such purchase rights, then the participants' accumulated payroll contributions will be used to purchase shares of our common stock within ten business days before such corporate transaction, and such purchase rights will terminate immediately.

*ESPP Amendment or Termination.* Our board of directors has the authority to amend or terminate our ESPP, provided that except in certain circumstances such amendment or termination may not materially impair any outstanding purchase rights without the holder's consent. We will obtain stockholder approval of any amendment to our ESPP as required by applicable law or listing requirements.

## Limitations on Liability and Indemnification Matters

Our certificate of incorporation contains provisions that limit the liability of our current and former directors for monetary damages to the fullest extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's duty of loyalty to the corporation or its stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions; or

- any transaction from which the director derived an improper personal benefit.

Such limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission.

Our certificate of incorporation authorizes us to indemnify our directors, officers, employees, and other agents to the fullest extent permitted by Delaware law. Our bylaws provide that we are required to indemnify our directors and officers to the fullest extent permitted by Delaware law and may indemnify our other employees and agents. Our bylaws also provide that, on satisfaction of certain conditions, we will advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee, or other agent for any liability arising out of his or her actions in that capacity regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered into, and expect to continue to enter into agreements to indemnify our directors, executive officers, and other employees as determined by the board of directors. With certain exceptions, these agreements provide for indemnification for related expenses including attorneys' fees, judgments, fines, and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these certificate of incorporation and bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain customary directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for directors, executive officers, or persons controlling us, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## Director Compensation

Under our non-employee director compensation policy, our non-employee directors receive an annual retainer for service on our board of directors and an additional retainer is provided to individuals who serve as chair of a committee or the board of directors. We also currently reimburse our directors for their reasonable out-of-pocket expenses in connection with attending board of directors and committee meetings.

Our non-employee director compensation policy provides that each non-employee director receives the following compensation for board of directors and committee services:

- an annual retainer for board of director membership of $75,000, paid in cash;

- an annual retainer of $75,000 for chairing the board of directors, paid in cash;

- an annual retainer of $25,000 for chairing the audit committee, $20,000 for chairing the compensation committee, and $10,000 for chairing the nominating and corporate governance committee, each paid in cash; and

- an annual grant of equity with a fair market value as of the date of grant of $250,000, comprised of 50% in RSUs vesting after one year, and 50% in stock options vesting after one year.

All annual cash retainers will be paid quarterly in arrears. Additionally, in the event of a change to the designated chair for a committee, the annual cash retainer for chairing such committee will be prorated based on the number of days the chair held the position. The annual grants of equity described above are subject to pro-rata acceleration on a director's discontinued service on our board of directors and automatic full acceleration in the event of a change in control, as defined in the 2017 Plan.

Non-employee directors are also encouraged to accumulate stock ownership equal in value to five times the annual retainer for board of director membership within the later of five years from the effective date of the non-employee director compensation policy or each non-employee director's initial election to serve on the board of directors. Previously owned and vested stock and shares held in trust for the benefit of the non-employee director or his or her immediate family members are counted for purposes of determining stock ownership.

### Director Compensation Table

The following table sets forth information concerning the compensation paid to our directors who are not named executive officers during the year ended December 31, 2020. The compensation received by Mr. Spiegel as an employee of our company is presented in "Executive Compensation—Summary Compensation Table."

In 2020, we paid fees and made equity awards to our non-employee directors. We granted each non-employee director (a) RSUs for 5,800 shares of Class A common stock under our 2017 Plan and (b) options to purchase 10,612 shares of Class A common stock under our 2017 Plan, with the exception of Ms. Jenkins who joined our board of directors in 2020 after the equity awards were granted. The service-based vesting condition will be fully satisfied for the RSUs and options on July 19, 2021. If a director's service ceases before July 19, 2021, vesting of the RSUs and options will be accelerated pro rata, based on the number of months of service provided by such director. In addition, in the event of a change in control, the service-based vesting condition of the RSUs and options will be deemed satisfied for 100% of the RSUs and options that have not yet satisfied the service-based vesting condition, immediately before the closing of such change in control.

Mr. Murphy did not receive compensation for his service as a director.

| Name | Fees Earned or Paid in Cash | | Stock Awards[1][7] | | Option Awards[1][7] | | Total | |
|---|---|---|---|---|---|---|---|---|
| Michael Lynton | $ | 170,000 | $ | 142,332 | $ | 125,009 | $ | 437,341 |
| Kelly Coffey[2] | | 34,239 | | 167,235 | | 144,920 | | 346,394 |
| Joanna Coles | | 75,000 | | 142,332 | | 125,009 | | 342,341 |
| Liz Jenkins[3] | | — | | 92,215 | | 72,937 | | 165,152 |
| A.G. Lafley[4] | | 145,000 | | 142,332 | | 125,009 | | 412,341 |
| Stanley Meresman | | 100,000 | | 142,332 | | 125,009 | | 367,341 |
| Scott D. Miller | | 75,000 | | 142,332 | | 125,009 | | 342,341 |
| Robert Murphy[5] | | 52,826 | | — | | — | | 52,826 |
| Poppy Thorpe | | 75,000 | | 142,332 | | 125,009 | | 342,341 |
| Christopher Young[6] | | 135,000 | | 142,332 | | 125,009 | | 402,341 |

(1)  Amounts reported represent the aggregate grant date fair value of RSUs and stock options granted during 2020 under our 2017 Plan without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the directors. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2)  Ms. Coffey joined the board of directors on May 18, 2020 and was granted (a) RSUs for 1,485 shares of Class A common stock under our 2017 Plan and (b) options to purchase 2,376 shares of Class A common stock under our 2017 Plan. The service-based vesting condition for these additional RSUs and options was fully satisfied on July 18, 2020.

(3)  Ms. Jenkins joined the board of directors on December 10, 2020.

(4)  Amount reported includes a $5,000 per month retainer for Mr. Lafley's services on a special committee.

(5)  Mr. Murphy does not receive any compensation for service as a director. Amount reported represents (a) $1 for his base salary as an employee, (b) $52,819 for security for Mr. Murphy, and (c) $6 for life insurance premiums paid by us on behalf of Mr. Murphy.

(6)  Chris Young resigned from our board of directors on November 10, 2020. Amount reported also includes a $5,000 per month retainer for Mr. Young's services on a special committee.

(7)  As of December 31, 2020, the aggregate number of shares underlying stock awards and option awards outstanding for each of our non-employee directors was:

| Name | Aggregate Stock Awards | Aggregate Option Awards |
|---|---|---|
| Michael Lynton | 5,800 | 46,645 |
| Kelly Coffey | 5,800 | 12,988 |
| Joanna Coles | 5,800 | 46,645 |
| Liz Jenkins | 1,735 | 2,988 |
| A.G. Lafley | 5,800 | 46,645 |
| Stanley Meresman | 5,800 | 46,645 |
| Scott D. Miller | 5,800 | 46,645 |
| Poppy Thorpe | 5,800 | 44,645 |

In 2020, we also provided Mr. Lynton with an executive administrative assistant for his duties as Chairman. The executive administrative assistant would occasionally assist Mr. Lynton with incidental personal matters, the cost of which to us is financially immaterial.

## Compensation Committee Interlocks and Insider Participation

None of the members of the compensation committee is currently, or has been at any time, one of our officers or employees. None of our executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of our board of directors or compensation committee.

## Pay Ratio Disclosure

As disclosed in the Summary Compensation Table, for the year ended December 31, 2020, the annual total compensation of our Chief Executive Officer was $2,094,432. The annual total compensation of our median employee, excluding our Chief Executive Officer, for the same period, using the same methodology used to calculate our Chief Executive Officer's annual total compensation, was $256,061. The ratio of these amounts is 8.2 to 1. We believe such ratio is a reasonable estimate calculated in a manner consistent with Item 402 of Regulation S-K under the Exchange Act.

To determine our median employee, we used the total compensation of our employees from our company records, including salary and wages (including overtime for hourly employees), bonuses, commissions, allowances and other imputed income, and grant date fair value of equity awards. We applied this measure to our global employee population as of October 1, 2020 and calculated total compensation for the 12 months prior to such date, annualizing all compensation other than equity awards for employees who did not work the full 12 months. We selected the individual who represented our median employee based on this information. For employees who were not paid in U.S. dollars, we converted their compensation to U.S. dollars using the exchange rate as of October 1, 2020.

The pay ratio above represents our reasonable estimate calculated in a manner consistent with the SEC rules, which allow for significant flexibility in how companies identify the median employee, and each company may use a different methodology and make different assumptions particular to that company. As a result, and as explained by the SEC when it adopted the pay ratio rules, the ratio was not designed to facilitate comparisons of pay ratios among different companies, even companies within the same industry, but rather to allow stockholders to better understand our compensation practices and pay ratio disclosures.

**Additional Disclosure Considerations**

We are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Wall Street Reform Act, and such sections are not included in this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The table below sets forth information, as of December 31, 2020, with respect to the beneficial ownership of: (a) our Class A common stock, Class B common stock, and Class C common stock by each named executive officer, each of our directors, and our directors and executive officers as a group; and (b) our Class B and Class C common stock by each person or entity known by us to own beneficially more than 5% of our Class B common stock or Class C common stock (by number or by voting power).

Because our Class A common stock is non-voting, significant holders of our Class A common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require significant stockholders to publicly report their ownership, including changes in that ownership. As a result, those stockholders and we are not obligated to disclose ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of such ownership or changes in such ownership. Furthermore, significant holders of our Class A common stock may hold our stock in nominee or "street name" with various brokers, such that we will not be able to identify their ownerships.

We have determined beneficial ownership in accordance with the rules and regulations of the SEC, and the information is not necessarily indicative of beneficial ownership for any other purpose. Except as indicated by the footnotes below, we believe, based on information furnished to us, that the persons and entities named in the table below have sole voting and sole investment power with respect to all shares that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 1,248,010,076 shares of Class A common stock, 23,696,369 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding as of December 31, 2020. In computing the number of shares beneficially owned by a person and the percentage ownership of such person, we deemed to be outstanding all shares subject to options and RSUs held by the person that are currently exercisable, or would become exercisable or would vest based on service-based vesting conditions within 60 days of December 31, 2020. However, except as described above, we did not deem such shares outstanding for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address for each beneficial owner listed in the table below is c/o Snap Inc., 2772 Donald Douglas Loop North, Santa Monica, CA 90405.

| Name of Beneficial Owner | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | % of Total Voting Power |
|---|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % | |
| **Directors and Named Executive Officers:** | | | | | | | |
| Evan Spiegel[1] | 53,405,450 | 4.3 % | 5,862,410 | 24.7 % | 123,683,019 | 53.4 % | 53.1 % |
| Robert Murphy[2] | 86,524,376 | 6.9 | 5,862,410 | 24.7 | 107,943,924 | 46.6 | 46.4 |
| Derek Andersen[3] | 973,067 | * | — | * | — | * | * |
| Jeremi Gorman[4] | 2,051,354 | * | — | * | — | * | * |
| Jerry Hunter[5] | 2,500,689 | * | — | * | — | * | * |
| Michael O'Sullivan[6] | 1,225,858 | * | — | * | — | * | * |
| Michael Lynton[7] | 1,058,995 | * | — | * | — | * | * |
| Kelly Coffey[8] | 3,861 | * | — | * | — | * | * |
| Joanna Coles[9] | 84,793 | * | — | * | — | * | * |
| Liz Jenkins | — | * | — | * | — | * | * |
| A.G. Lafley[10] | 217,213 | * | — | * | — | * | * |
| Stanley Meresman[11] | 55,213 | * | — | * | — | * | * |
| Scott D. Miller[12] | 119,467 | * | — | * | — | * | * |
| Poppy Thorpe[13] | 48,067 | * | — | * | — | * | * |
| All directors and executive officers as a group (16 persons)[14] | 150,283,311 | 12.0 | 11,724,820 | 49.5 | 231,626,943 | 100.0 | 99.5 |
| **5% Stockholders:** | | | | | | | |
| Entities affiliated with Tencent Holdings Limited[15] | ** | ** | 10,344,970 | 43.7 | — | — | * |

\*      Represents beneficial ownership of less than 1%.

\*\*     Unknown; as noted above, holders of our Class A common stock, other than our directors or officers, are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act and may hold the stock in nominee or "street name" such that we are not able to identify their ownerships. In November 2017, Tencent Holdings Limited notified us that it, together with its affiliates, acquired 145,778,246 shares of our non-voting Class A common stock via open market purchases. Because Tencent is not obligated to disclose changes in its ownership of our Class A common stock, we cannot confirm whether it still owns such shares and there can be no assurance that you, or we, will be notified of any changes to their ownership of such shares.

(1)     Includes 5,230,660 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Spiegel is trustee and holds voting power.

(2)     Includes 5,862,410 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Murphy is trustee and holds voting power.

(3)     Includes (a) 832,324 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2020 and (b) RSUs for 32,435 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2020.

(4)     Includes 1,930,450 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2020.

(5)     Includes (a) 1,610,546 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2020, (b) RSUs for 26,241 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2020, (c) 420,000 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020, and (d) 443,902 shares held in trust for which Mr. Hunter is trustee and holds dispositive power.

(6)     Includes (a) 865,377 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2020 and (b) RSUs for 106,538 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2020.

(7)     Includes (a) 945,876 shares of Class A common stock for which Mr. Lynton is trustee and (b) 36,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(8)     Includes 2,376 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(9)     Includes 36,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(10)    Includes (a) 172,243 shares held in trust for which Mr. Lafley is trustee and holds dispositive power, and (b) 36,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(11)    Includes 36,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(12)    Includes 36,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(13)    Includes 34,033 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020.

(14)    Consists of (a) 149,481,523 shares of Class A common stock (of which 7,168,504 shares are unvested and subject to forfeiture as of December 31, 2020, but for which the service-based vesting condition will be satisfied with respect to 436,330 shares within 60 days of December 31, 2020), 11,724,820 shares of Class B common stock, and 231,626,943 shares of Class C common stock held by our current directors and executive officers or for which they serve as trustees, (b) RSUs for 165,214 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2020, and (c) 636,574 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2020. Includes shares held by Mr. Grusd and Ms. Morrow.

(15)    Based on our corporate and transfer agent records.

**Securities Authorized for Issuance under Equity Incentive Plans**

The table set forth below provides information concerning the awards that may be issued under our 2012 Plan, 2014 Plan, and 2017 Plan as of December 31, 2020:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights(1) (a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights(2) (b) | Number of Securities Remaining Available for Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders(3) | 126,286,902 | $ | 10.37 | 122,547,581 |
| Equity compensation plans not approved by security holders | — | $ | — | — |
| Total | 126,286,902 | $ | 10.37 | 122,547,581 |

(1)     Excludes RSAs subject to forfeiture that are already included within issued and outstanding Class A common stock as of December 31, 2020.

(2)     The weighted-average exercise price does not reflect shares that will be issued in connection with the settlement of RSUs, since RSUs have no exercise price.

(3)     Prior to our initial public offering, we granted awards under our 2012 Plan and our 2014 Plan. Following our initial public offering, we granted awards under our 2017 Plan, other than certain awards to our employees and consultants in France, which were granted under our 2014 Plan.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

Other than compensation arrangements for our directors and executive officers, which are described elsewhere in this Annual Report on Form 10-K, below we describe transactions since January 1, 2020 to which we were a party or will be a party, in which:

- the amounts involved exceeded or will exceed $120,000; and

- any of our directors, executive officers, or holders of more than 5% of our capital stock, or any member of the immediate family of, or person sharing the household with, the foregoing persons, had or will have a direct or indirect material interest.

**Investor Rights Agreement**

We are party to an amended and restated investor rights agreement, which provides Mr. Spiegel and Mr. Murphy with certain registration rights with respect to up to an aggregate of 360,463,699 shares of our Class A common stock (including shares issuable on conversion of Class C common stock, which are initially convertible into Class B common stock). Under this agreement, Mr. Spiegel and Mr. Murphy have the right to request that their shares be covered by a registration statement that we are otherwise filing.

**Munger, Tolles & Olson LLP**

We have in the past engaged the law firm Munger, Tolles & Olson LLP, or Munger, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's father, John Spiegel, is a partner at Munger, although John Spiegel has not personally provided any material legal services to us. For the year ended December 31, 2020, total services provided by Munger were $944,669.

Our general counsel, Michael O'Sullivan, is a former attorney at Munger.

**Gibson, Dunn & Crutcher LLP**

We have in the past engaged the law firm Gibson, Dunn & Crutcher LLP, or Gibson, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's stepmother, Debra Wong Yang, is a partner at Gibson and has provided legal services to us. For the year ended December 31, 2020, total services provided by Gibson were $119,719.

**Entities Affiliated with Tencent**

In the ordinary course of business, Tencent Holdings Limited and its affiliates, who hold 5% or more of our Class B common stock at December 31, 2020, purchased $3,625,803 of our advertising products for the year ended December 31, 2020.

**Aviation Matters**

In June 2018, we entered into a lease of an aircraft from an entity controlled by Mr. Spiegel on terms that are advantageous to us. Under the terms of this lease, Mr. Spiegel's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Spiegel's entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Spiegel and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality and privacy.

Mr. Spiegel may use the aircraft leased by us for personal use pursuant to a time sharing agreement between us and Mr. Spiegel in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Spiegel and guests are flown by our pilots and crew members. Mr. Spiegel reimburses us for certain costs incurred by us in connection with these flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Spiegel has family or guests accompanying him on business flights, Mr. Spiegel cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations. In 2020, the amount that Mr. Spiegel could not reimburse was $22,271.

Additionally, we entered into a sublease of approximately 10,000 square feet of a hangar from an entity that is controlled by Mr. Spiegel. Under the terms of this sublease, Mr. Spiegel's entity leases the space to us for no charge. We cover the maintenance and insurance costs associated with the space. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We use the hangar space to store and operate the aircraft that we lease from Mr. Spiegel.

The underlying hangar lease expires in 2023. In anticipation of that expiration, Mr. Spiegel's entity previously entered into a ground lease for a site on which it is required to build a new hangar. In November 2020, we and Mr. Spiegel's entity entered into a twelve-year sublease for $0 allowing us to build and operate a new hangar on that site to support our aviation program, including the storage and operation of the aircraft that we lease from Mr. Spiegel. We plan to construct the hangar prior to the expiration of the current hangar's lease in 2023. Mr. Spiegel's entity will remain solely responsible for the ground lease rental payments, certain airport fees, and taxes, and is providing us with the existing plans and permits procured by Mr. Spiegel for construction of the hangar. In exchange for certain costs and ground lease payments that Mr. Spiegel's entity has incurred and will continue to incur, Mr. Spiegel's entity has the right to occupy space at the hangar that Snap does not require for its aviation program at a market rate determined at the time this arrangement was entered into. As of December 31, 2020, Mr. Spiegel's entity had a credit balance of approximately $1.0 million that can be used for future rent or, to the extent not utilized by the end of the term, to purchase the hangar from Snap under the terms of the sublease. No credit balance will be paid to Mr. Spiegel in cash.

Subject to certain limited exceptions, neither party may terminate this sublease for a minimum of six years. After this period, either party may terminate the sublease on 24 months' notice to the other party. Upon termination of the sublease, Mr. Spiegel's entity will purchase the hangar from Snap at its fair market value on the termination date. The audit and compensation committees of our board of directors approved this arrangement based on their assessment that it is fair and reasonable to us.

**Indemnification Agreements**

Our certificate of incorporation contains provisions limiting the liability of directors, and our bylaws provide that we will indemnify each of our directors and officers to the fullest extent permitted under Delaware law. Our certificate of incorporation and bylaws also provide our board of directors with discretion to indemnify our employees and other agents when determined appropriate by the board. In addition, we have entered into an indemnification agreement with each of our directors and executive officers, which requires us to indemnify them.

**Policies and Procedures for Transactions with Related Persons**

In July 2016, we entered into a policy that our executive officers, directors, nominees for election as a director, beneficial owners of more than 5% of any class of our common stock, and any members of the immediate family of any of the foregoing persons are not permitted to enter into a related person transaction with us without the approval or ratification of our board of directors or our audit committee. Any request for us to enter into a transaction with an executive officer, director, nominee for election as a director, beneficial owner of more than 5% of any class of our common stock, or any member of the immediate family of any of the foregoing persons, in which the amount involved exceeds $50,000 and such person would have a direct or indirect interest, must be presented to our board of directors or our audit committee for review, consideration, and approval. In approving or rejecting any such proposal, our board of directors or our audit committee is to consider the material facts of the transaction, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction. There were no 2020 transactions where our policy was not followed.

**Director Independence**

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Ms. Coffey, Ms. Coles, Ms. Jenkins, Mr. Lafley, Mr. Lynton, Mr. Meresman, Mr. Miller, and Ms. Thorpe do not have relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the listing standards. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our shares by each non-employee director and the transactions described above.

**Item 14. Principal Accountant Fees and Services.**

The following table sets forth the aggregate fees for professional service provided by our independent registered public accounting firm, Ernst & Young LLP, for the years ended December 31, 2020 and 2019:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| | (in thousands) | | | |
| Audit Fees[1] | $ | 8,327 | $ | 8,212 |
| Audit-Related Fees[2] | | 99 | | — |
| Tax Fees[3] | | 1,421 | | 881 |
| All Other Fees[4] | | 723 | | 548 |
| Total | $ | 10,570 | $ | 9,641 |

(1)   Audit fees consist of the fees for professional services rendered for the audit of our financial statements, audit of our internal control over financial reporting, review of our quarterly financial statements, filing of our registration statements, accounting consultations, and audits provided in connection with statutory filings.

(2)   Audit-related fees consist of fees for professional services rendered in connection with an internal controls review of an implementation of a new enterprise financial planning and reporting system.

(3)   Tax fees consist of the fees for professional services rendered in connection with tax compliance, tax advisory, and tax planning.

(4)   All other fees consist of fees for professional services other than the services reported in audit fees, audit-related fees, and tax fees.

The audit committee has adopted a pre-approval policy under which the audit committee approves in advance all audit and permissible non-audit services to be performed by the independent accountants (subject to a *de minimis* exception). These services may include audit services, audit-related services, tax services, and other non-audit services. As part of its pre-approval policy, the audit committee considers whether the provision of any proposed non-audit services is consistent with the SEC's rules on auditor independence. In accordance with its pre-approval policy, the audit committee has pre-approved certain specified audit and non-audit services to be provided by our independent auditor. If there are any additional services to be provided, a request for pre-approval must be submitted to the audit committee for its consideration under the policy. The audit committee generally pre-approves particular services or categories of services on a case-by-case basis. Finally, in accordance with the pre-approval policy, the audit committee has delegated pre-approval authority to the chair of the audit committee. The chair must report any pre-approval decisions to the audit committee at its next meeting.

All of the services of Ernst & Young LLP for 2020 and 2019 described above were in accordance with the audit committee pre-approval policy.

129

PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

We have filed the following documents as part of this Annual Report on Form 10-K:

1.   Consolidated Financial Statements

See Index to Financial Statements and Supplemental Data on page 62.

2.   Exhibits

The documents set forth below are filed herewith or incorporated herein by reference to the location indicated.

| Exhibit Number | Description | Incorporated by Reference | | | |
| --- | --- | --- | --- | --- | --- |
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of Snap Inc. | S-1 | 333-215866 | 3.2 | February 2, 2017 |
| 3.2 | Amended and Restated Bylaws of Snap Inc. | | | | |
| 4.1 | Form of Class A Common Stock Certificate | S-1 | 333-215866 | 4.1 | February 2, 2017 |
| 4.2 | Form of Class B Common Stock Certificate | S-8 | 333-216495 | 4.6 | March 7, 2017 |
| 4.3 | Form of Class C Common Stock Certificate | S-8 | 333-216495 | 4.7 | March 7, 2017 |
| 4.4 | Description of Securities | | | | |
| 4.5 | Indenture, dated August 9, 2019, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | August 9, 2019 |
| 4.6 | Form of Global Note, representing Snap Inc.'s 0.75% Convertible Senior Notes due 2026 (included as Exhibit A to the Indenture filed as Exhibit 4.5) | 8-K | 001-38017 | 4.2 | August 9, 2019 |
| 4.7 | Indenture, dated April 28, 2020, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 28, 2020 |
| 4.8 | Form of Global Note, representing Snap Inc.'s 0.25% Convertible Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.7) | 8.K | 001-38017 | 4.2 | April 28, 2020 |
| 10.1+ | Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.2 | February 2, 2017 |
| 10.2+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.3 | February 2, 2017 |
| 10.3+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.4 | February 2, 2017 |
| 10.4+ | Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.5 | February 2, 2017 |
| 10.5+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.6 | February 2, 2017 |
| 10.6+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.7 | February 2, 2017 |
| 10.7+ | Snap Inc. 2017 Equity Incentive Plan | S-8 | 333-216495 | 99.7 | March 7, 2017 |
| 10.8+ | Forms of global grant notice, stock option agreement and notice of exercise under the Snap Inc. 2017 Equity Incentive Plan | S-8 | 333-224591 | 10.9 | May 1, 2018 |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 10.9+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | | | | |
| 10.10+ | Forms of restricted stock award grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-Q | 001-38017 | 10.4 | October 26, 2018 |
| 10.11+ | Snap Inc. 2017 Employee Stock Purchase Plan | S-1 | 333-215866 | 10.11 | February 2, 2017 |
| 10.12+ | Form of indemnification agreement | S-1 | 333-215866 | 10.12 | February 2, 2017 |
| 10.13+ | Amended and Restated Offer Letter, by and between Snap Inc. and Evan Spiegel, dated October 27, 2016 | S-1 | 333-215866 | 10.13 | February 2, 2017 |
| 10.14+ | Amended and Restated Offer Letter, by and between Snap Inc. and Robert Murphy, dated October 27, 2016 | S-1 | 333-215866 | 10.14 | February 2, 2017 |
| 10.15+ | Offer Letter, by and between Snap Inc. and Michael O'Sullivan, dated July 24, 2017 | 10-Q | 001-38017 | 10.1 | November 8, 2017 |
| 10.16+ | Amended and Restated Offer Letter, by and between Snap Inc. and Jerry Hunter, dated October 7, 2020 | | | | |
| 10.17+ | Offer Letter, by and between Snap Inc. and Jared Grusd, dated October 19, 2018 | 10-K | 001-38017 | 10.24 | February 6, 2019 |
| 10.18+ | Offer Letter, by and between Snap Inc. and Jeremi Gorman, dated October 21, 2018 | 10-K | 001-38017 | 10.25 | February 6, 2019 |
| 10.19+ | Offer Letter, by and between Snap Inc. and Derek Andersen, dated May 16, 2019 | 8-K | 001-38017 | 10.1 | May 20, 2019 |
| 10.20+ | Offer Letter, by and between Snap Inc. and Rebecca Morrow, dated July 12, 2019 | 10-Q | 001-38017 | 10.1 | October 23, 2019 |
| 10.21+ | Snap Inc. 2020 Bonus Program | 10-K | 001-38017 | 10.22 | February 5, 2020 |
| 10.22+ | Snap Inc. 2021 Bonus Program | | | | |
| 10.23 | Revolving Credit Agreement, by and among Snap Inc., Morgan Stanley Senior Funding Inc., Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Bank USA, JPMorgan Chase Bank, N.A., Barclays Bank PLC, and Credit Suisse AG, Cayman Islands Branch, dated July 29, 2016 | S-1 | 333-215866 | 10.21 | February 2, 2017 |
| 10.24 | Joinder Agreement, by and among Snap Inc., Silicon Valley Bank, and Morgan Stanley Senior Funding, Inc., dated February 20, 2018 | 10-K | 001-38017 | 10.29 | February 22, 2018 |
| 10.25 | First Amendment to Revolving Credit Agreement, by and among Snap Inc., Morgan Stanley Senior Funding Inc., Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Bank USA, JPMorgan Chase Bank, N.A., Credit Suisse AG, Cayman Islands Branch, and Silicon Valley, dated August 13, 2018 | 8-K | 001-38017 | 10.1 | August 13, 2018 |
| 10.26 | Second Amendment to Revolving Credit Agreement, by and among Snap Inc., the lenders party thereto, and Morgan Stanley Senior Funding Inc., as administrative agent, dated August 6, 2019 | 8-K | 001-38017 | 10.1 | August 9, 2019 |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 10.27 | Third Amendment to Revolving Credit Agreement, by and among Snap Inc. the lenders party thereto, and Morgan Stanley Senior Funding Inc., as administrative agent, dated April 23, 2020 | 8-K | 001-38017 | 10.1 | April 28, 2020 |
| 10.28 | Snap Inc. Non-Employee Director Compensation Policy | 10-K | 001-38017 | 10.28 | February 22, 2018 |
| 10.29+ | Form of Time Share Agreement | 10-Q | 001-38017 | 10.3 | October 26, 2018 |
| 10.30+ | Employment Agreement and Transition Agreement, by and between Snap Inc. and Jared Grusd, dated February 3, 2021 | | | | |
| 21.1 | List of Subsidiaries | | | | |
| 23.1 | Consent of Ernst & Young, LLP, independent registered public accounting firm | | | | |
| 31.1 | Certification of the Chief Executive Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934, as amended | | | | |
| 31.2 | Certification of the Chief Financial Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934, as amended | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer of Snap Inc. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | |
| 101.INS | Inline XBRL Instance Document. | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | |
| 101.DEF | Inline XBRL Taxonomy Definition Linkbase Document. | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document. | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | |

+    Indicates management contract or compensatory plan.
*    The certifications furnished in Exhibit 32.1 hereto are deemed to accompany this Annual Report on Form 10-K and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the Registrant specifically incorporates it by reference.

**Item 16. Form 10-K Summary.**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized**.**

**SNAP INC.**

| | |
|---|---|
| Date: February 4, 2021 | /s/ Derek Andersen |
| | Derek Andersen |
| | Chief Financial Officer |
| | *(Principal Financial Officer)* |
| | |
| Date: February 4, 2021 | /s/ Rebecca Morrow |
| | Rebecca Morrow |
| | Chief Accounting Officer |
| | *(Principal Accounting Officer)* |

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Evan Spiegel<br>Evan Spiegel | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 4, 2021 |
| /s/ Robert Murphy<br>Robert Murphy | Director and Chief Technology Officer | February 4, 2021 |
| /s/ Derek Andersen<br>Derek Andersen | Chief Financial Officer<br>*(Principal Financial Officer)* | February 4, 2021 |
| /s/ Rebecca Morrow<br>Rebecca Morrow | Chief Accounting Officer<br>*(Principal Accounting Officer)* | February 4, 2021 |
| /s/ Kelly Coffey<br>Kelly Coffey | Director | February 4, 2021 |
| /s/ Joanna Coles<br>Joanna Coles | Director | February 4, 2021 |
| /s/ Elizabeth Jenkins<br>Elizabeth Jenkins | Director | February 4, 2021 |
| /s/ A.G. Lafley<br>A.G. Lafley | Director | February 4, 2021 |
| /s/ Michael Lynton<br>Michael Lynton | Director | February 4, 2021 |
| /s/ Stanley Meresman<br>Stanley Meresman | Director | February 4, 2021 |
| /s/ Scott D. Miller<br>Scott D. Miller | Director | February 4, 2021 |
| /s/ Poppy Thorpe<br>Poppy Thorpe | Director | February 4, 2021 |

Exhibit 3.2

**AMENDED AND RESTATED BYLAWS**

**OF**

**SNAP INC.**
**(A DELAWARE CORPORATION)**

1

Exhibit 3.2

AMENDED AND RESTATED BYLAWS

OF

SNAP INC.
(A DELAWARE CORPORATION)

## ARTICLE I

### OFFICES

**Section 1. Registered Office**. The registered office of the corporation in the State of Delaware is in the City of Wilmington, County of New Castle.

**Section 2. Other Offices.** The corporation will also have and maintain an office or principal place of business at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the corporation may require.

## ARTICLE II

### CORPORATE SEAL

**Section 3. Corporate Seal.** The Board of Directors may adopt a corporate seal. If adopted, the corporate seal will consist of a die bearing the name of the corporation and the inscription, "Corporate Seal-Delaware." Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE III

### STOCKHOLDERS' MEETINGS

**Section 4. Place of Meetings.** Meetings of the stockholders of the corporation may be held at such place, either within or without the State of Delaware, as may be determined from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting will not be held at any place, but may instead be held solely by means of remote communication as provided under the Delaware General Corporation Law ("***DGCL***").

**Section 5. Annual Meeting**.

**(a)** The annual meeting of the stockholders of the corporation, for the purpose of election of directors and for such other business as may properly come before it, will be held on such date and at such time as may be designated from time to time by the Board of Directors. Nominations of persons for election to the Board of Directors of the corporation and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders: (i) pursuant to the corporation's notice of meeting of stockholders (with respect to business other than nominations); (ii) brought specifically by or at the direction of the Board of Directors; or (iii) by any stockholder of the corporation who was a stockholder of record at the time of giving the stockholder's notice provided for in Section 5(b) below, who is entitled to vote at the meeting and who complied with the notice procedures set forth in Section 5. For the avoidance of doubt, clause (iii) above will be the exclusive means for a stockholder to make nominations and submit other business (other than matters properly included in the corporation's notice of meeting of stockholders or proxy statement under Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (the "***1934 Act***")) before an annual meeting of stockholders.

2

**(b)** At an annual meeting of the stockholders, only such business will be conducted as is a proper matter for stockholder action under Delaware law and as will have been properly brought before the meeting in accordance with the procedures below.

(1) For nominations for the election to the Board of Directors to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 5(a), the stockholder must be entitled to vote at the meeting and deliver written notice to the Secretary at the principal executive offices of the corporation on a timely basis as set forth in Section 5(b)(3) and must update and supplement such written notice on a timely basis as set forth in Section 5(c). Such stockholder's notice will set forth: (A) as to each nominee such stockholder proposes to nominate at the meeting: (1) the name, age, business address and residence address of such nominee, (2) the principal occupation or employment of such nominee, (3) the class and number of shares of each class of capital stock of the corporation which are owned of record and beneficially by such nominee, (4) the date or dates on which such shares were acquired and the investment intent of such acquisition and (5) such other information concerning such nominee as would be required to be disclosed in a proxy statement soliciting proxies for the election of such nominee as a director in an election contest (even if an election contest is not involved), or that is otherwise required to be disclosed pursuant to Section 14 of the 1934 Act and the rules and regulations promulgated thereunder (including such person's written consent to being named as a nominee and to serving as a director if elected); and (B) the information required by Section 5(b)(4). The corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as an independent director of the corporation or that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such proposed nominee.

(2) Other than proposals sought to be included in the corporation's proxy materials pursuant to Rule 14(a)-8 under the 1934 Act, for business other than nominations for the election to the Board of Directors to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 5(a), the stockholder must deliver written notice to the Secretary at the principal executive offices of the corporation on a timely basis as set forth in Section 5(b)(3), and must update and supplement such written notice on a timely basis as set forth in Section 5(c). Such stockholder's notice will set forth: (A) as to each matter such stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting, and any material interest (including any anticipated benefit of such business to any Proponent (as defined below) other than solely as a result of its ownership of the corporation's capital stock, that is material to any Proponent individually, or to the Proponents in the aggregate) in such business of any Proponent; and (B) the information required by Section 5(b)(4).

(3) To be timely, the written notice required by Section 5(b)(1) or 5(b)(2) must be received by the Secretary at the principal executive offices of the corporation not later than the close of business on the 90th day nor earlier than the close of business on the one hundred 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that, subject to the last sentence of this Section 5(b)(3), in the event that the date of the annual meeting is advanced more than 30 days prior to or delayed by more than 30 days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so received not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made. In no event will an adjournment or a postponement of an annual meeting for which notice has been given, or the public announcement thereof has been made, commence a new time period for the giving of a stockholder's notice as described above.

(4) The written notice required by Section 5(b)(1) or 5(b)(2) will also set forth, as of the date of the notice and as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (each, a "***Proponent***" and collectively, the "***Proponents***"): (A) the name and address of each Proponent, as they appear on the corporation's books; (B) the class, series and number of shares of the corporation that are owned beneficially and of record by each Proponent; (C) a description of any agreement, arrangement or understanding (whether oral or in writing) with respect to such nomination or proposal between or among any Proponent and any of its affiliates or associates, and any others (including their names) acting in concert, or otherwise under the agreement, arrangement or understanding, with any of the foregoing; (D) a representation that the Proponents are holders of record or beneficial owners, as the case may be, of shares of the corporation entitled to vote at the meeting and intend to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice (with respect to a notice under Section 5(b)(1)) or to propose the business that is specified in the notice (with respect to a notice under Section 5(b)(2)); (E) a representation as to whether the Proponents intend to deliver a proxy statement and form of proxy to

3

holders of a sufficient number of holders of the corporation's voting shares to elect such nominee or nominees (with respect to a notice under Section 5(b)(1)) or to carry such proposal (with respect to a notice under Section 5(b)(2)); (F) to the extent known by any Proponent, the name and address of any other stockholder supporting the proposal on the date of such stockholder's notice; and (G) a description of all Derivative Transactions (as defined below) by each Proponent during the previous 12 month period, including the date of the transactions and the class, series and number of securities involved in, and the material economic terms of, such Derivative Transactions.

**(c)** A stockholder providing written notice required by Section 5(b)(1) or (ii) will update and supplement such notice in writing, if necessary, so that the information provided or required to be provided in such notice is true and correct in all material respects as of (i) the record date for the meeting and (ii) the date that is 5 business days prior to the meeting and, in the event of any adjournment or postponement thereof, 5 business days prior to such adjourned or postponed meeting. In the case of an update and supplement pursuant to clause (i) of this Section 5(c), such update and supplement will be received by the Secretary at the principal executive offices of the corporation not later than 5 business days after the record date for the meeting. In the case of an update and supplement pursuant to clause (ii) of this Section 5(c), such update and supplement will be received by the Secretary at the principal executive offices of the corporation not later than 2 business days prior to the date for the meeting, and, in the event of any adjournment or postponement thereof, 2 business days prior to such adjourned or postponed meeting.

**(d)** Notwithstanding anything in Section 5(b)(3) to the contrary, in the event that the number of directors of the Board of Directors of the corporation is increased and there is no public announcement of the appointment of a director, or, if no appointment was made, of the vacancy, made by the corporation at least 10 days before the last day a stockholder may deliver a notice of nomination in accordance with Section 5(b)(3), a stockholder's notice required by this Section 5 and which complies with the requirements in Section 5(b)(1), other than the timing requirements in Section 5(b)(3), will also be considered timely, but only with respect to nominees for any new positions created by such increase, if it will be received by the Secretary at the principal executive offices of the corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the corporation. At such time that the corporation has a classified Board of Directors, this Section 5(d) shall only apply with respect to increases in an Expiring Class. For purposes of this Section 5(d), an "***Expiring Class***" shall mean a class of directors whose term shall expire at the next annual meeting of stockholders.

**(e)** A person will not be eligible for election or re-election as a director unless the person is nominated either in accordance with clause (ii) of Section 5(a), or in accordance with clause (iii) of Section 5(a). Except as otherwise required by law, the chairperson of the meeting will have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made, or proposed, as the case may be, in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, or the Proponent does not act in accordance with the representations in Sections 5(b)(4)(D) and 5(b)(4)(E), to declare that such proposal or nomination will not be presented for stockholder action at the meeting and will be disregarded, notwithstanding that proxies in respect of such nominations or such business may have been solicited or received.

**(f)** Notwithstanding the foregoing provisions of this Section 5, in order to include information with respect to a stockholder proposal in a proxy statement or information statement and form of proxy for a stockholders' meeting, if required and as determined by the corporation, a stockholder must also comply with all applicable requirements of the 1934 Act and the rules and regulations thereunder. Nothing in these Bylaws will be deemed to affect any rights of stockholders to request inclusion of proposals in the corporation's proxy statement pursuant to Rule 14a-8 under the 1934 Act; *provided, however,* that any references in these Bylaws to the 1934 Act or the rules and regulations thereunder are not intended to and will not limit the requirements applicable to proposals and nominations to be considered pursuant to Section 5(a)(iii).

**(g)** For purposes of Sections 5 and 6,

(1) "***affiliates***" and "***associates***" have the meanings set forth in Rule 405 under the Securities Act of 1933, as amended (the "1933 Act");

(2) "***Derivative Transaction***" means any agreement, arrangement, interest or understanding entered into by, or on behalf or for the benefit of, any Proponent or any of its affiliates or associates, whether record or beneficial: (A) the value of which is derived in whole or in part from the value of any class or series of shares or other securities of the corporation, (B) which otherwise provides any direct or indirect opportunity to gain or share in any gain derived from a change in the value of securities of the corporation, (C) the effect or intent of which is to mitigate loss, manage risk

4

or benefit of security value or price changes, or (D) which provides the right to vote or increase or decrease the voting power of such Proponent, or any of its affiliates or associates, with respect to any securities of the corporation, which agreement, arrangement, interest or understanding may include, without limitation, any option, warrant, debt position, note, bond, convertible security, swap, stock appreciation right, short position, profit interest, hedge, right to dividends, voting agreement, performance-related fee or arrangement to borrow or lend shares (whether or not subject to payment, settlement, exercise or conversion in any such class or series), and any proportionate interest of such Proponent in the securities of the corporation held by any general or limited partnership, or any limited liability company, of which such Proponent is, directly or indirectly, a general partner or managing member; and

(3) "**public announcement**" means disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the 1934 Act.

**Section 6. Special Meetings**.

**(a)** Special meetings of the stockholders of the corporation may be called, for any purpose as is a proper matter for stockholder action under Delaware law, by (A) the Chairperson of the Board of Directors, (B) the Chief Executive Officer, (C) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption), or (D) prior to the Final Conversion Date (as defined in the Certificate of Incorporation), by the holders of at least 30% of the voting power of the Company's Class A Common Stock, Class B Common Stock and Class C Common Stock, voting together as a single class, provided that such written request is in compliance with the requirements of Section 6(b) hereof ("**Stockholder-Requested Meeting**"). A Stockholder-Requested Meeting may not be called on or after the Final Conversion Date. A request to call a special meeting pursuant to Section 6(a)(D) will not be valid unless made in accordance with the requirements and procedures set forth in this Section 6. Except as may otherwise be required by law, the Board of Directors will determine, in its sole judgment, the validity of any request under Section 6(a)(D), including whether such request was properly made in compliance with these Bylaws.

**(b)** For a special meeting called pursuant to Section 6(a)(A), the Board of Directors will determine the time and place, if any, of such special meeting. Upon determination of the time and place, if any, of the meeting, the Secretary will cause a notice of meeting to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws. For a Stockholder-Requested Meeting, the request will (i) be in writing, signed and dated by a stockholder of record, (ii) set forth the purpose of calling the special meeting and include the information required by the stockholder's notice as set forth in Section 5(b)(1) and in Section 5(b)(2) (for the proposal of business other than nominations) and (iii) be delivered personally, sent by certified or registered mail, return receipt requested, to the Secretary at the principal executive offices of the corporation, or sent by electronic transmission to the Secretary of the corporation. If the Board of Directors determines that a request pursuant to Section 6(a)(D) is valid, the Board of Directors will determine the time and place, if any, of a Stockholder-Requested Meeting, which time will be not less than 30 days nor more than 90 days after the receipt of such request, and will set a record date for the determination of stockholders entitled to vote at such meeting in the manner set forth in Section 36 hereof. Following determination of the time and place, if any, of the meeting, the Secretary will cause a notice of meeting to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws. No business may be transacted at a special meeting, including a Stockholder-Requested Meeting otherwise than as specified in the notice of meeting.

**(c)** Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected (i) by or at the direction of the Board of Directors or (ii) by any stockholder of the corporation who is a stockholder of record at the time of giving notice provided for in this paragraph, who will be entitled to vote at the meeting and who delivers written notice to the Secretary of the corporation setting forth the information required by Section 5(b)(1). In the event the corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any such stockholder of record may nominate a person or persons (as the case may be) for election to such position(s) as specified in the corporation's notice of meeting, if written notice setting forth the information required by Section 5(b)(1) of these Bylaws will be received by the Secretary at the principal executive offices of the corporation not later than the close of business on the later of the 90th day prior to such meeting or the 10th day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. The stockholder will also update and supplement such information as required under Section 5(c). In no event will an

adjournment or a postponement of a special meeting for which notice has been given, or the public announcement thereof has been made, commence a new time period for the giving of a stockholder's notice as described above.

**(d)** Notwithstanding the foregoing provisions of this Section 6, a stockholder must also comply with all applicable requirements of the 1934 Act and the rules and regulations thereunder with respect to matters set forth in this Section 6. Nothing in these Bylaws will be deemed to affect any rights of stockholders to request inclusion of proposals in the corporation's proxy statement pursuant to Rule 14a-8 if required under the 1934 Act; *provided, however,* that any references in these Bylaws to the 1934 Act or the rules and regulations thereunder are not intended to and will not limit the requirements applicable to nominations for the election to the Board of Directors or proposals of other business to be considered pursuant to Section 6(a)(D) or to be considered pursuant to Section 6(c) of these Bylaws.

**Section 7. Notice of Meetings.** Except as otherwise provided by law, notice, given in writing or by electronic transmission, of each meeting of stockholders will be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour, in the case of special meetings, the purpose or purposes of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at any such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation. Notice of the time, place, if any, and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his or her attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting will be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

**Section 8. Quorum.** At all meetings of stockholders, the presence, in person, by remote communication, if applicable, or by proxy duly authorized, of the holders of a majority of the voting power of the outstanding shares of stock entitled to vote will constitute a quorum for the transaction of business, unless or except to the extent that a presence of a larger number may be required by law, the Certificate of Incorporation, or these Bylaws. In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairperson of the meeting or by vote of the holders of a majority of the voting power of the shares represented thereat, but no other business will be transacted at such meeting. The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Except as otherwise provided by statute or by applicable stock exchange rules, or by the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of the holders of a majority of the voting power of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote generally on the subject matter will be the act of the stockholders. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors will be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote generally on the election of directors. Where a separate vote by a class or classes or series is required, except where otherwise provided by statute, by applicable stock exchange rules or by the Certificate of Incorporation or these Bylaws, a majority of the voting power of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy duly authorized, will constitute a quorum entitled to take action with respect to that vote on that matter. Except where otherwise provided by statute, by applicable stock exchange rules or by the Certificate of Incorporation or these Bylaws, the affirmative vote of the holders of a majority (plurality, in the case of the election of directors) of voting power of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting will be the act of such class or classes or series.

**Section 9. Adjournment and Notice of Adjourned Meetings.** Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairperson of the meeting or by the affirmative vote of the holders of a majority of the voting power of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, thereof, and the means of remote communication, if any,

6

by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting will be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting in accordance with the DGCL, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such meeting as of the record date fixed for notice of such adjourned meeting.

**Section 10. Voting Rights.** For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date, as provided in Section 12 of these Bylaws, will be entitled to vote at any meeting of stockholders. Every person entitled to vote will have the right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Delaware law. An agent so appointed need not be a stockholder. No proxy will be voted after three years from its date of creation unless the proxy provides for a longer period.

**Section 11. Joint Owners of Stock.** If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting will have the following effect: (a) if only one votes, his or her act binds all; (b) if more than one votes, the act of the majority so voting binds all; (c) if more than one votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in the DGCL, Section 217(b). If the instrument filed with the Secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of subsection (c) will be a majority or even-split in interest.

**Section 12. List of Stockholders.** The Secretary will prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list will be open to the examination of any stockholder, for any purpose germane to the meeting, (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours, at the principal place of business of the corporation. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. The list will be open to examination of any stockholder during the time of the meeting as provided by law.

**Section 13. Action Without Meeting.**

**(a)** Unless otherwise provided in Article V Section 3.4 of the Certificate of Incorporation, any action required by statute to be taken at any annual or special meeting of the stockholders, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, or by electronic transmission until the Final Conversion Date setting forth the action so taken, will be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**(b)** In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, so long as such action is provided for, the Board of Directors may fix a record date for such action, which record date will not precede the date on which the resolution fixing the record date is adopted by the Board of Directors, and which date will not be more than 10 days after the date on which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, will be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book

in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office will be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting will be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action. If requested by a stockholder, any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent may (but is not required to), by written notice to the Secretary, request the Board of Directors to fix a record date. The Board of Directors will promptly, but in all events within 10 days after the date on which such a request is received, adopt a resolution fixing the record date.

**Section 14. Organization**.

**(a)** At every meeting of stockholders, the Chairperson of the Board of Directors, or, if a Chairperson has not been appointed or is absent, the Chief Executive Officer, or, if the Chief Executive Officer is absent, the President, or, if the President is absent, a chairperson of the meeting chosen by a majority of the voting power, present in person or by proxy, will act as chairperson. The Secretary, or, in his or her absence, an Assistant Secretary directed to do so by the Chief Executive Officer or the President, will act as secretary of the meeting.

**(b)** The Board of Directors of the corporation will be entitled to make such rules or regulations for the conduct of meetings of stockholders as it will deem necessary, appropriate or convenient. Subject to such rules and regulations of the Board of Directors, if any, the chairperson of the meeting will have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairperson, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on participation in such meeting to stockholders of record of the corporation and their duly authorized and constituted proxies and such other persons as the chairperson will permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters which are to be voted on by ballot. The date and time of the opening and closing of the polls for each matter on which the stockholders will vote at the meeting will be announced at the meeting. Unless and to the extent determined by the Board of Directors or the chairperson of the meeting, meetings of stockholders will not be required to be held in accordance with rules of parliamentary procedure.

**ARTICLE IV**

**DIRECTORS**

**Section 15. Number and Term of Office.** The authorized number of directors of the corporation will be fixed in accordance with the Certificate of Incorporation. Directors need not be stockholders unless so required by the Certificate of Incorporation. If for any cause, the directors will not have been elected at an annual meeting, they may be elected as soon thereafter as convenient at a special meeting of the stockholders called for that purpose in the manner provided in these Bylaws or by an action without a meeting.

**Section 16. Powers.** The business and affairs of the corporation will be managed by or under the direction of the Board of Directors, except as may be otherwise provided by statute or by the Certificate of Incorporation.

**Section 17. Classes of Directors.** Subject to the rights of the holders of any series of Preferred Stock (as defined in the Certificate of Incorporation) to elect additional directors under specified circumstances, for so long as the Final Conversion Date has not occurred, the corporation will not have a classified Board of Directors, and all directors will be elected at each annual meeting of stockholders to hold office until the next annual meeting. Notwithstanding the foregoing, immediately following the Final Conversion Date, the corporation will have a classified Board of Directors and the directors will be divided into three classes designated as Class I, Class II and Class III, respectively The Board of Directors is authorized to assign members of the Board of Directors already in office to such classes at the time the classification becomes effective. At the first annual meeting of stockholders after which the Final Conversion Date has occurred, the term of office of the Class I directors will expire and Class I directors will be elected for a full term of three years. At the second annual meeting of stockholders after which the Final Conversion Date has occurred, the

term of office of the Class II directors will expire and Class II directors will be elected for a full term of three years. At the third annual meeting of stockholders after which the Final Conversion Date has occurred, the term of office of the Class III directors will expire and Class III directors will be elected for a full term of three years. At each succeeding annual meeting of stockholders, directors will be elected for a full term of three years to succeed the directors of the class whose terms expire at such annual meeting.

Notwithstanding the foregoing provisions of this Section 17, each director will serve until his or her successor is duly elected and qualified or until his or her earlier death, resignation or removal. No decrease in the number of directors constituting the Board of Directors will shorten the term of any incumbent director.

**Section 18. Vacancies.** Unless (a) otherwise provided in Article V Section 3.4 of the Certificate of Incorporation, (b) the Board of Directors determines by resolution that a vacancy or newly created directorship will be filled by stockholders, or (c) a vacancy is to be filled by stockholders by written consent in lieu of an annual meeting in accordance with DGCL Section 211(b), and subject to the rights of the holders of any series of Preferred Stock or as otherwise provided by applicable law, any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors will be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum of the Board of Directors, or by a sole remaining director, and not by the stockholders. Notwithstanding the foregoing, if the Certificate of Incorporation entitles the holders of any class or classes of stock or series thereof to elect one or more directors, then, unless the Board of Directors determines by resolution that a vacancy or newly created directorship will be filled by stockholders, vacancies and newly created directorships of such class or classes or series will be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected, and not by the stockholders. Any director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor will have been elected and qualified. A vacancy in the Board of Directors will be deemed to exist under this Bylaw in the case of the death, removal or resignation of any director.

**Section 19. Resignation.** Any director may resign at any time by delivering his or her notice in writing or by electronic transmission to the Secretary. If no specification as to the effective time of such resignation is made, the Secretary, in his or her discretion, may either (a) require confirmation from the director prior to deeming the resignation effective, in which case the resignation will be deemed effective on receipt of such confirmation, or (b) deem the resignation effective at the time of delivery of the resignation to the Secretary. When one or more directors resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, will have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations will become effective, and each director so chosen will hold office for the unexpired portion of the term of the director whose place will be vacated and until his successor will have been duly elected and qualified.

**Section 20. Removal.**

**(a)** After the Final Conversion Date, subject to the rights of holders of any series of Preferred Stock to elect additional directors under specified circumstances, neither the Board of Directors nor any individual director may be removed without cause.

**(b)** Subject to any limitation imposed by applicable law and the requirements set forth in the Certificate of Incorporation, any individual director or directors may be removed from office at any time with cause, and until the Final Conversion Date, without cause, by the affirmative vote of the holders of a majority of the voting power of all then outstanding shares of capital stock of the corporation entitled to vote generally at an election of directors, voting together as a single class.

**Section 21. Meetings**

**(a) Regular Meetings.** Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may be held at any time or date and at any place within or without the State of Delaware which has been designated by the Board of Directors and publicized among all directors, either orally or in writing or by electronic mail or other electronic means. No further notice will be required for regular meetings of the Board of Directors.

Exhibit 3.2

**(b) Special Meetings.** Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or without the State of Delaware whenever called by the Chairperson of the Board, the Chief Executive Officer or a majority of the authorized number of directors.

**(c) Meetings by Electronic Communications Equipment.** Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means will constitute presence in person at such meeting.

**(d) Notice of Special Meetings.** Notice of the time, place, and brief purpose of all special meetings of the Board of Directors will be (1) in writing or (2) by electronic mail or other electronic means, during normal business hours, at least 24 hours before the date and time of the meeting. If notice is sent by US mail, it will be sent by first class mail, postage prepaid at least three days before the date of the meeting. Notice of any meeting may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

**(e) Waiver of Notice.** The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, will be as valid as though it had been transacted at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the directors not present who did not receive notice will sign a written waiver of notice or will waive notice by electronic transmission. All such waivers will be filed with the corporate records or made a part of the minutes of the meeting.

### Section 22. Quorum and Voting.

**(a)** Unless the Certificate of Incorporation requires a greater number, and except with respect to questions related to indemnification arising under Section 44 for which a quorum will be one-third of the exact number of directors fixed from time to time, a quorum of the Board of Directors will consist of a majority of the exact number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation; *provided, however,* at any meeting whether a quorum be present or otherwise, a majority of the directors present may adjourn from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

**(b)** At each meeting the Board of Directors at which a quorum is present, all questions and business will be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by law, the Certificate of Incorporation or these Bylaws.

### Section 23. Action Without Meeting.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing will be in paper form if the minutes are maintained in paper form and will be in electronic form if the minutes are maintained in electronic form.

### Section 24. Fees and Compensation.

Directors will be entitled to such compensation for their services as may be approved by the Board of Directors, including, if so approved, by resolution of the Board of Directors, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors. Nothing herein contained will be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

### Section 25. Committees.

**(a) Executive Committee.** The Board of Directors may appoint an Executive Committee to consist of one or more members of the Board of Directors. The Executive Committee, to the extent permitted by law and provided in the resolution of the Board of Directors will have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee will have the power or authority in reference to (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal

of directors) expressly required by the DGCL to be submitted to stockholders for approval, (ii) adopting, amending, or repealing any bylaw of the corporation, (iii) adopting, amending, or repealing the certificate of incorporation of the corporation, or (iv) before the Final Conversion Date, authorizing the issuance of any securities of the Company with voting rights (*provided*, *however*, that the foregoing restriction will not apply to securities that have only the voting rights that are required by law).

**(b) Other Committees.** The Board of Directors may, from time to time, appoint such other committees as may be permitted by law. Such other committees appointed by the Board of Directors will consist of one or more members of the Board of Directors and will have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees, but in no event will any such committee have the powers denied to the Executive Committee in these Bylaws.

**(c) Term.** The Board of Directors, subject to any requirements of any outstanding series of Preferred Stock and the provisions of subsections (a) or (b) of this Section 25 may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The membership of a committee member will terminate on the date of his death or voluntary resignation from the committee or from the Board of Directors. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

**(d) Meetings.** Unless the Board of Directors will otherwise provide, regular meetings of the Executive Committee or any other committee appointed pursuant to this Section 25 will be held at such times and places as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings of any such committee may be held at any place which has been determined from time to time by such committee, and may be called by any director who is a member of such committee, on notice to the members of such committee of the time and place of such special meeting given in the manner provided for the giving of notice to members of the Board of Directors of the time and place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee will constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present will be the act of such committee.

**Section 26. Duties of Chairperson of the Board of Directors.** The Chairperson of the Board of Directors, if appointed and when present, will preside at all meetings of the stockholders and the Board of Directors. The Chairperson of the Board of Directors will perform other duties commonly incident to the office and will also perform such other duties and have such other powers, as the Board of Directors will designate from time to time.

**Section 27. Organization.** At every meeting of the directors, the Chairperson of the Board of Directors, or, if a Chairperson has not been appointed or is absent, the Chief Executive Officer (if a director), or, if a Chief Executive Officer is absent, the President (if a director), or if the President is absent, the most senior Vice President (if a director), or, in the absence of any such person, a chairperson of the meeting chosen by a majority of the directors present, will preside over the meeting. The Secretary, or in his absence, any Assistant Secretary or other officer, director or other person directed to do so by the person presiding over the meeting, will act as secretary of the meeting.

ARTICLE V

OFFICERS

**Section 28. Officers Designated.** The officers of the corporation will include, if and when designated by the Board of Directors, the Chairperson, the Chief Executive Officer, the President, one or more Vice Presidents, the Secretary, the Chief Technology Officer, the Chief Financial Officer, and the Treasurer. The Board of Directors may also appoint one or more Assistant Secretaries and Assistant Treasurers and such other officers and agents with such powers and duties as it deems necessary. The Board of Directors may assign such additional titles to one or more of the officers as it deems appropriate. Any one person may hold any number of offices of the corporation at any one time unless specifically prohibited therefrom by law. The salaries and other compensation of the officers of the corporation will be fixed by or in the manner designated by the Board of Directors or a committee thereof to which the Board of Directors has delegated such responsibility.

**Section 29. Tenure and Duties of Officers.**

**(a) General.** All officers will hold office at the pleasure of the Board of Directors and until their successors have been duly elected and qualified, unless sooner removed. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

**(b) Duties of Chief Executive Officer.** The Chief Executive Officer will preside at all meetings of the stockholders and at all meetings of the Board of Directors (if a director), unless the Chairperson of the Board of Directors has been appointed and is present. Unless an officer has been appointed Chief Executive Officer of the corporation, the President will be the Chief Executive Officer of the corporation and will, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation. To the extent that a Chief Executive Officer has been appointed and no President has been appointed, all references in these Bylaws to the President will be deemed references to the Chief Executive Officer. The Chief Executive Officer will perform other duties commonly incident to the office and will also perform such other duties and have such other powers, as the Board of Directors designate from time to time.

**(c) Duties of President.** The President will preside at all meetings of the stockholders and at all meetings of the Board of Directors (if a director), unless the Chairperson of the Board of Directors, or the Chief Executive Officer has been appointed and is present. Unless another officer has been appointed Chief Executive Officer of the corporation, the President will be the chief executive officer of the corporation and will, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation. The President will perform other duties commonly incident to the office and will also perform such other duties and have such other powers, as the Board of Directors (or the Chief Executive Officer, if the Chief Executive Officer and President are not the same person and the Board of Directors has delegated the designation of the President's duties to the Chief Executive Officer) designate from time to time.

**(d) Duties of Vice Presidents.** A Vice President may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant (unless the duties of the President are being filled by the Chief Executive Officer). A Vice President will perform other duties commonly incident to their office and will also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or, if the Chief Executive Officer has not been appointed or is absent, the President designate from time to time.

**(e) Duties of Secretary.** The Secretary will attend all meetings of the stockholders and of the Board of Directors and will record all acts and proceedings thereof in the minute book of the corporation. The Secretary will give notice in conformity with these Bylaws of all meetings of the stockholders and of all meetings of the Board of Directors and any committee thereof requiring notice. The Secretary will perform all other duties provided for in these Bylaws and other duties commonly incident to the office and will also perform such other duties and have such other powers, as the Board of Directors will designate from time to time. The Chief Executive Officer, or if no Chief Executive Officer is then serving, the President may direct any Assistant Secretary or other officer to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary will perform other duties commonly incident to the office and will also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President designate from time to time.

**(f) Duties of Chief Financial Officer.** The Chief Financial Officer will keep or cause to be kept the books of account of the corporation in a thorough and proper manner and will render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors or the Chief Executive Officer, or if no Chief Executive

12

Officer is then serving, the President. The Chief Financial Officer, subject to the order of the Board of Directors, will have the custody of all funds and securities of the corporation. The Chief Financial Officer will perform other duties commonly incident to the office and will also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President designate from time to time. To the extent that a Chief Financial Officer has been appointed and no Treasurer has been appointed, all references in these Bylaws to the Treasurer will be deemed references to the Chief Financial Officer. The Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President may direct the Treasurer, if any, or any Assistant Treasurer, or the controller or any assistant controller to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer and each controller and assistant controller will perform other duties commonly incident to the office and will also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President designate from time to time.

**(g) Duties of Treasurer.** Unless another officer has been appointed Chief Financial Officer of the corporation, the Treasurer will be the chief financial officer of the corporation and will keep or cause to be kept the books of account of the corporation in a thorough and proper manner and will render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President, and, subject to the order of the Board of Directors, will have the custody of all funds and securities of the corporation. The Treasurer will perform other duties commonly incident to the office and will also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President and Chief Financial Officer (if not Treasurer) designate from time to time.

**(h) Duties of Chief Technology Officer.** The Chief Technology Officer shall have responsibility for the general research and development activities of the corporation, for supervision of the corporation's research and development personnel, for new product development and product improvements, for overseeing the development and direction of the corporation's intellectual property development and such other responsibilities as may be given to the Chief Technology Officer by the Board of Directors, subject to: (a) the provisions of these Bylaws; (b) the direction of the Board of Directors; and (c) the supervisory powers of the Chief Executive Officer of the corporation.

**Section 30. Delegation of Authority.** The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

**Section 31. Resignations.** Any officer may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President or to the Secretary. Any such resignation will be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation will become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation will not be necessary to make it effective. Any resignation will be without prejudice to the rights, if any, of the corporation under any contract with the resigning officer.

**Section 32. Removal.** Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the directors in office at the time, or by the unanimous written consent of the directors in office at the time, or by any committee or by the Chief Executive Officer or by other superior officers on whom such power of removal may have been conferred by the Board of Directors.

**ARTICLE VI**

**EXECUTION OF CORPORATE INSTRUMENTS AND VOTING
OF SECURITIES OWNED BY THE CORPORATION**

**Section 33. Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to enter into contracts on behalf of the corporation, except where otherwise provided by law or these Bylaws, and such execution or signature will be binding on the corporation. All checks and drafts drawn on banks or

other depositaries on funds to the credit of the corporation or in special accounts of the corporation will be signed by such person or persons as the Board of Directors authorize so to do. Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee will have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 34. Voting of Securities Owned by the Corporation.** All stock and other securities of other entities owned or held by the corporation for itself, or for other parties in any capacity, will be voted, and all proxies with respect thereto will be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairperson of the Board of Directors, the Chief Executive Officer, the President, or any Vice President.

## ARTICLE VII

## SHARES OF STOCK

**Section 35. Form and Execution of Certificates.** The shares of the corporation will be represented by certificates, or will be uncertificated if so provided by resolution or resolutions of the Board of Directors. Certificates for the shares of stock, if any, will be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock in the corporation represented by certificate will be entitled to have a certificate signed by or in the name of the corporation by any 2 of the Chairperson of the Board of Directors, the President, any Vice President, the Treasurer or Assistant Treasurer, the Secretary or Assistant Secretary, or any other authorized officers of the corporation, certifying the number of shares owned by him in the corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed on a certificate will have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.

**Section 36. Lost Certificates.** A new certificate or certificates will be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, on the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to agree to indemnify the corporation in such manner as it will require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

**Section 37. Transfers.**

**(a)** Transfers of record of shares of stock of the corporation will be made only on its books by the holders thereof, in person or by attorney duly authorized, and, in the case of stock represented by certificate, on the surrender of a properly endorsed certificate or certificates for a like number of shares.

**(b)** The corporation will have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

**Section 38. Fixing Record Dates.**

**(a)** In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date will not precede the date on which the resolution fixing the record date is adopted by the Board of Directors, and which record date will, subject to applicable law, not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders will be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders will apply to any adjournment of the meeting; *provided, however,* that the Board of Directors may fix a new record date for the adjourned meeting.

**(b)** In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which record date will not precede the date on which the resolution fixing the record date is adopted, and which record date will be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose will be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 39. Registered Stockholders.** The corporation will be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and will not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it will have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**ARTICLE VIII**

**OTHER SECURITIES OF THE CORPORATION**

**Section 40. Execution of Other Securities.** All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Section 36), may be signed by the Chairperson of the Board of Directors, the Chief Executive Officer, the President or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Chief Financial Officer or Treasurer or an Assistant Treasurer; *provided, however,* that where any such bond, debenture or other corporate security will be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security will be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, will be signed by the Treasurer or an Assistant Treasurer of the corporation or such other person as may be authorized by the Board of Directors, or bear imprinted thereon the facsimile signature of such person. In case any officer who will have signed or attested any bond, debenture or other corporate security, or whose facsimile signature will appear thereon or on any such interest coupon, will have ceased to be such officer before the bond, debenture or other corporate security so signed or attested will have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature will have been used thereon had not ceased to be such officer of the corporation.

**ARTICLE IX**

**DIVIDENDS**

**Section 41. Declaration of Dividends.** Dividends on the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors pursuant to law at any regular or special meeting. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and applicable law.

**Section 42. Dividend Reserve.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors will think conducive

15

to the interests of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

# ARTICLE X

# FISCAL YEAR

**Section 43. Fiscal Year.** The fiscal year of the corporation will be fixed by resolution of the Board of Directors.

# ARTICLE XI

# INDEMNIFICATION

**Section 44. Indemnification of Directors, Officers, Employees and Other Agents.**

**(a) Directors and Officers.** The corporation will indemnify its directors and officers to the fullest extent not prohibited by the DGCL or any other applicable law; *provided, however,* that the corporation may modify the extent of such indemnification by individual contracts with its directors and officers; and, *provided, further,* that the corporation will not be required to indemnify any director or officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the corporation, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the DGCL or any other applicable law or (iv) such indemnification is required to be made under paragraph (d) of this Section 44.

**(b) Employees and other Agents.** The corporation will have power to indemnify its employees and other agents as set forth in the DGCL or any other applicable law. The Board of Directors will have the power to delegate the determination of whether indemnification will be given to any such person as the Board of Directors determine.

**(c) Expenses.** The corporation will advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or officer, of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or officer in connection with such proceeding provided, however, that if the DGCL requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) will be made only on delivery to the corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it will ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 44 or otherwise. Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (e) of this Section 44, no advance will be made by the corporation to an officer of the corporation (except by reason of the fact that such officer is or was a director of the corporation in which event this sentence will not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i) by a majority vote of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority vote of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation.

**(d) Enforcement.** Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and officers under this Section 44 will be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the corporation and the director or officer. Any right to indemnification or advances granted by this Section 44 to a director or officer will be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is

16

denied, in whole or in part, or (ii) no disposition of such claim is made within 90 days of request therefor. To the extent permitted by law, the claimant in such enforcement action, if successful in whole or in part, will be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the corporation will be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an officer of the corporation (except in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such officer is or was a director of the corporation) for advances, the corporation will be entitled to raise a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his or her conduct was lawful. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the DGCL or any other applicable law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, will be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. In any suit brought by a director or officer to enforce a right to indemnification or to an advancement of expenses hereunder, the burden of proving that the director or officer is not entitled to be indemnified, or to such advancement of expenses, under this Section 44 or otherwise will be on the corporation.

**(e) Non-Exclusivity of Rights.** The rights conferred on any person by this Section 44 will not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or any other applicable law.

**(f) Survival of Rights.** The rights conferred on any person by this Section 44 will continue as to a person who has ceased to be a director, officer, employee or other agent and will inure to the benefit of the heirs, executors and administrators of such a person.

**(g) Insurance.** To the fullest extent permitted by the DGCL or any other applicable law, the corporation, on approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Section 44.

**(h) Amendments.** Any repeal or modification of this Section 44 will only be prospective and will not affect the rights under this Section 44 in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

**(i) Saving Clause.** If this Section 44 or any portion hereof will be invalidated on any ground by any court of competent jurisdiction, then the corporation will nevertheless indemnify each director and officer to the full extent not prohibited by any applicable portion of this Section 44 that will not have been invalidated, or by any other applicable law. If this Section 44 will be invalid due to the application of the indemnification provisions of another jurisdiction, then the corporation will indemnify each director and executive officer to the full extent under any other applicable law.

**(j) Certain Definitions.** For the purposes of this Section 44, the following definitions will apply:

(1) The term "proceeding" will be broadly construed and includes, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

(2) The term "expenses" will be broadly construed and includes, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(3) The term the "corporation" will include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving

Exhibit 3.2

at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, will stand in the same position under the provisions of this Section 44 with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(4) References to a "director," "executive officer," "officer," "employee," or "agent" of the corporation will include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

(5) References to "other enterprises" will include employee benefit plans; references to "fines" will include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" will include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

## ARTICLE XII

### NOTICES

**Section 45. Notices**.

**(a) Notice to Stockholders.** Written notice to stockholders of stockholder meetings will be given as provided in Section 7 herein. Without limiting the manner by which notice may otherwise be given effectively to stockholders under any agreement or contract with such stockholder, and except as otherwise required by law, written notice to stockholders for purposes other than stockholder meetings may be sent by United States mail or nationally recognized overnight courier.

**(b) Notice to Directors.** Any notice required to be given to any director may be given by the method stated in subsection (a) or as otherwise provided in these Bylaws. If such notice is not delivered personally, it will be sent to such address as such director has filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

**(c) Affidavit of Mailing.** An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected or other agent, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, will in the absence of fraud, be prima facie evidence of the facts therein contained.

**(d) Methods of Notice.** It will not be necessary that the same method of giving notice be employed in respect of all recipients of notice, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

**(e) Notice to Person with Whom Communication is Unlawful.** Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person will not be required and there will be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which will be taken or held without notice to any such person with whom communication is unlawful will have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate will state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

**(f) Notice to Stockholders Sharing an Address.** Except as otherwise prohibited under DGCL, any notice given under the provisions of DGCL, the Certificate of Incorporation or the Bylaws will be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Such consent will have been deemed to have been given if such stockholder fails to object in writing to the

18

Exhibit 3.2

corporation within 60 days of having been given notice by the corporation of its intention to send the single notice. Any consent will be revocable by the stockholder by written notice to the corporation.

## ARTICLE XIII

## AMENDMENTS

**Section 46. Amendments.** Subject to the limitations set forth in Section 44(h) of these Bylaws or the provisions of the Certificate of Incorporation, the Board of Directors is expressly empowered to adopt, amend or repeal the Bylaws of the corporation. Any adoption, amendment or repeal of the Bylaws of the corporation by the Board of Directors will require the approval of a majority of the authorized number of directors. The stockholders also will have power to adopt, amend or repeal the Bylaws of the corporation; provided, however, that, in addition to any vote of the holders of any class or series of stock of the corporation required by law or by the Certificate of Incorporation, such action by stockholders will require the affirmative vote of the holders of a majority of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class.

19

**DESCRIPTION OF THE REGISTRANT'S SECURITIES**
**REGISTERED PURSUANT TO SECTION 12 OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Snap Inc. ("we," "our," or "us") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our Class A common stock, $0.00001 par value per share. The following description of our capital stock is a summary and does not purport to be complete. It is qualified in its entirety by, and should be read in conjunction with, our certificate of incorporation, bylaws, and applicable Delaware law.

**Authorized Capital Stock**

Our authorized capital stock consists of 4,460,887,848 shares, of which:

- 3,000,000,000 shares are designated as Class A common stock, $0.00001 par value per share;

- 700,000,000 shares are designated as Class B common stock, $0.00001 par value per share;

- 260,887,848 shares are designated as Class C common stock, $0.00001 par value per share; and

- 500,000,000 shares are designated as preferred stock, $0.00001 par value per share.

**Class A Common Stock, Class B Common Stock, and Class C Common Stock**

*Voting Rights*

Our Class A common stock is non-voting and is not entitled to any votes on any matter that is submitted to a vote of our stockholders, except as required by Delaware law. Delaware law would permit holders of Class A common stock to vote, with one vote per share, on a matter if we were to:

- change the par value of the common stock; or

- amend our certificate of incorporation to alter the powers, preferences, or special rights of the common stock as a whole in a way that would adversely affect the holders of our Class A common stock.

In addition, Delaware law would permit holders of Class A common stock to vote separately, as a single class, if an amendment to our certificate of incorporation would adversely affect them by altering the powers, preferences, or special rights of the Class A common stock, but not the Class B common stock or Class C common stock. As a result, in these limited instances, the holders of a majority of the Class A common stock could defeat any amendment to our certificate of incorporation. For example, if a proposed amendment of our certificate of incorporation provided for the Class A common stock to rank junior to the Class B common stock and Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock, with each share of Class A common stock entitled to one vote per share. In this instance, the holders of a majority of Class A common stock could defeat that amendment to our certificate of incorporation. Moreover, if an amendment to our certificate of incorporation would alter the powers, preferences, or special rights of the Class A common stock and either the Class B common Stock or the Class C common stock in a way that would affect them adversely compared to the unaffected class, Delaware law would permit the holders of Class A common stock to vote with the other adversely affected class of common stock together as a single class. For example, if a proposed amendment to our certificate of incorporation provided for the Class A common stock and Class B common stock to rank junior to the Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock and Class B common stock voting together as a single class, with each share of Class A common stock and Class B common stock entitled to one vote per share. In this instance, the holders of a majority of the Class A common stock and Class B common stock, voting together as a single class, could defeat that amendment to our certificate of incorporation.

1

Exhibit 4.4

Our certificate of incorporation provides that the number of authorized shares of common stock or any class of common stock, including our Class A common stock, may be increased or decreased (but not below the number of shares of common stock then outstanding) by the affirmative vote of the holders of a majority of the Class B common stock and Class C common stock, voting together as a single class. As a result, the holders of a majority of the outstanding Class B common stock and Class C common stock can approve an increase or decrease in the number of authorized shares of Class A common stock without a separate vote of the holders of Class A common stock. This could allow us to increase and issue additional shares of Class A common stock beyond what is currently authorized in our certificate of incorporation without the consent of the holders of our Class A common stock.

Holders of our Class B common stock are entitled to one vote per share and holders of Class C common stock are entitled to ten votes per share on any matter submitted to our shareholders. Except as set forth above, holders of shares of Class B common stock and Class C common stock will vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders. In addition, each class of our common stock may have the right to vote separately in certain instances as listed below under "—Economic Rights."

On the date that all outstanding shares of Class C common stock have converted to Class B common stock, all shares of Class B common stock will convert to Class A common stock and the holders of Class A common stock will be entitled to one vote per share.

Our certificate of incorporation does not provide for cumulative voting for the election of directors.

### Founder Proxy Agreement

Evan Spiegel and Robert Murphy, our co-founders, have entered into a proxy agreement with each other. The agreement will apply to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over.

Under the proxy agreement, Mr. Spiegel has designated Mr. Murphy as his designated proxy holder, and Mr. Murphy has designated Mr. Spiegel as his designated proxy holder. Each co-founder has the right to select from time to time an alternate proxy holder who would exercise the proxy if the primary proxy holder were unable or unwilling to serve as a proxy. Mr. Spiegel and Mr. Murphy have each appointed Michael Lynton as his alternate proxy. Mr. Spiegel and Mr. Murphy may not change the primary proxy holder without the other's consent. A proxy holder will have the right to exercise all of the voting and consent rights of our shares of Class B common stock and Class C common stock beneficially owned by the deceased or disabled co-founder or over which he has voting control on and for the nine months following the co-founder's death or during his disability. Before any proxy holder may vote or act by written consent with respect to the shares of Class B common stock and Class C common stock over which they hold a proxy, that proxy holder will meet with the independent members of our board of directors within 90 days of the co-founder's death or disability.

The proxy agreement will terminate as soon as any of the following occur: (i) nine months after the death of both Mr. Spiegel and Mr. Murphy, (ii) the liquidation, dissolution, or winding up of our business operations, (iii) the execution by us of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of our property and assets, or (iv) the date as of which Mr. Spiegel and Mr. Murphy terminate the proxy agreement by written consent of Mr. Spiegel and Mr. Murphy, with notice to us.

### Economic Rights

Except as otherwise expressly provided in our certificate of incorporation or required by Delaware law, all shares of Class A common stock, Class B common stock, and Class C common stock will have the same rights and privileges and rank equally, share ratably, and be identical in all respects for all matters, including those described below:

*Dividends and Distributions*. Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably, on a per share basis, with respect to any dividend or distribution of cash or property paid or distributed by us, unless different treatment of the shares of the affected class is approved by the affirmative vote of the holders of a majority of the outstanding shares of the class treated

Exhibit 4.4

adversely voting separately as a class. Even though holders of Class A common stock are not normally entitled to a vote on matters presented to our stockholders, they would be entitled to vote separately as a class, with one vote per share, on dividends and distributions if the holders of Class A common stock were treated adversely. As a result, if the holders of Class A common stock were treated adversely in any dividend or distribution, the holders of a majority of Class A common stock could defeat that dividend or distribution. In addition, if any two classes of common stock are treated adversely relative to another class of common stock with respect to any dividend or distribution, the vote of the holders of a majority of the adversely affected classes, voting together as a single class, would be required to approve that dividend or distribution. For example, if we were to make a distribution of cash to the holders of Class C common stock but not make a cash distribution or make a distribution of stock instead of cash to the holders of Class A common stock and Class B common stock, the holders of a majority of Class A common stock and Class B common stock, voting together as a single class, would be required to approve that dividend or distribution. In that scenario, each share of Class A common stock and Class B common stock would be entitled to one vote per share.

*Liquidation Rights*. On our liquidation, dissolution, or winding-up, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably in all assets remaining after the payment of any liabilities, liquidation preferences, and accrued or declared but unpaid dividends, if any, with respect to any outstanding preferred stock, unless a different treatment is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class. As a result, the holders of a majority of each class of common stock, including the Class A common stock, could defeat a proposed distribution of any assets on our liquidation, dissolution, or winding-up if that distribution were not to be shared equally, identically, and ratably.

*Change of Control Transactions*. The holders of Class A common stock, Class B common stock, and Class C common stock will be treated equally and identically with respect to shares of Class A common stock, Class B common stock, or Class C common stock owned by them, unless different treatment of the shares of each class is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class, on (i) the closing of the sale, transfer, or other disposition of all or substantially all of our assets, (ii) the consummation of a merger, reorganization, consolidation, or share transfer which results in our voting securities outstanding immediately before the transaction (or the voting securities issued with respect to our voting securities outstanding immediately before the transaction) representing less than a majority of the combined voting power of the voting securities of the company or the surviving or acquiring entity, or (iii) the closing of the transfer (whether by merger, consolidation, or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons of securities of the company if, after closing, the transferee person or group would hold 50% or more of the outstanding voting power of the company (or the surviving or acquiring entity). However, consideration to be paid or received by a holder of common stock in connection with any such asset sale, merger, reorganization, consolidation, or share transfer under any employment, consulting, severance, or other arrangement will be disregarded for the purposes of determining whether holders of common stock are treated equally and identically. As a result, the holders of a majority of each class of common stock, including the holders Class A common stock, could defeat a change of control transaction if the holders of Class A common stock, Class B common stock, and Class C common stock were not to be treated equally and identically in such change of control transaction.

*Subdivisions and Combinations.* If we subdivide or combine in any manner outstanding shares of Class A common stock, Class B common stock, or Class C common stock, the outstanding shares of the other classes will be subdivided or combined in the same manner.

If holders of Class A common stock are treated the same as holders of Class B common stock and Class C common stock with respect to the dividends and distributions, liquidation rights, change of control transactions, and subdivisions and combinations, such holders of Class A common stock will not have the right to vote on such matters.

### No Preemptive or Similar Rights

Our Class A common stock, Class B common stock, and Class C common stock are not entitled to preemptive rights, and are not subject to conversion, redemption, or sinking fund provisions, except for the conversion provisions with respect to the Class B common stock and Class C common stock described below.

3

Exhibit 4.4

*Conversion*

Each share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. Each share of Class C common stock is convertible at any time at the option of the holder into one share of Class B common stock.

On any transfer of shares of Class B common stock, whether or not for value, each such transferred share will automatically convert into one share of Class A common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder continues to hold sole voting and dispositive power with respect to the shares transferred. Any holder's shares of Class B common stock will automatically convert into Class A common stock, on a one-to-one basis, on the death of the holder.

On any transfer of shares of Class C common stock, whether or not for value, each transferred share will automatically convert into one share of Class B common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder or a qualified trustee for that holder continues to hold sole voting and dispositive power with respect to the shares transferred, and transfers between founders.

Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, on the date on which the number of outstanding shares of Class C common stock held by that holder represents less than 30% of the Class C common stock held by that holder as of the date of the closing of our initial public offering in March 2017, or 32,383,178 shares of Class C common stock. Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months after the death of that holder. Once there are no shares of Class C common stock outstanding, all shares of Class B common stock will convert to Class A common stock, on a one-to-one basis, and all shares of Class A common stock will have one vote per share, as described in our certificate of incorporation. Either of our founders may transfer shares of Class B common stock or Class C common stock to the other founder or a founder's permitted transferee without such transferred shares converting into Class A common stock or Class B common stock, respectively. In addition, either founder may transfer shares of Class B common stock or Class C common stock to a qualified trustee without such transferred shares converting into Class A common stock or Class B common stock, respectively. A qualified trustee is a professional in the business of providing trustee services that is subject to appointment and removal solely by that founder or, following a founder's death or during the founder's disability event, by the founder's designated proxy (who may be the other founder or another person selected by the founder and approved to act in that role by the independent members of our board of directors). A qualified trustee may not have any pecuniary interest in any Class B common stock or Class C common stock held by any entity of which that person is a trustee. Shares of Class C common stock held by a founder's qualified trustee will convert to Class B common stock nine months after the death of that founder. Termination of a founder's employment or services with us does not result in conversion of Class C common stock held by such founder.

Once transferred and converted into Class A common stock, the Class B common stock may not be reissued. Once transferred and converted into Class B common stock, the Class C common stock may not be reissued.

**Preferred Stock**

Our board of directors may, without further action by our stockholders, fix the rights, preferences, privileges, and restrictions of up to an aggregate of 500,000,000 shares of preferred stock in one or more series and authorize their issuance. These rights, preferences, and privileges could include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, and the number of shares constituting any series or the designation of such series, any or all of which may be greater than the rights of our Class A common stock, Class B common stock, or Class C common stock. Any issuance of our preferred stock could adversely affect the voting power of holders of our Class B common stock or Class C common stock, and the likelihood that such holders would receive dividend payments and payments on liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring, or preventing a change of control or other corporate action.

**Anti-Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws**

Because our stockholders do not have cumulative voting rights, stockholders holding a majority of the voting power of our shares of common stock will be able to elect all of our directors. Our certificate of incorporation and bylaws provide for stockholder actions at a duly called meeting of stockholders or, before the date on which all shares of common stock convert into a single class, by written consent. A special meeting of stockholders may be called by a majority of the total number of authorized directors of our board of directors, the chair of our board of directors, our chief executive officer, or, before the date on which all shares of common stock convert into a single class, the holders of at least 30% of the total voting power of our Class A common stock, Class B common stock, and Class C common stock, voting together as a single class. Our bylaws include an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors.

Our certificate of incorporation further provides for a tri-class common stock structure, which provides Mr. Spiegel, our co-founder and Chief Executive Officer, and Mr. Murphy, our co-founder and Chief Technology Officer, or Mr. Spiegel alone, with control over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets.

The foregoing provisions will make it more difficult for our existing stockholders, other than Mr. Spiegel and Mr. Murphy, or Mr. Spiegel alone, to replace our board of directors as well as for another party to obtain control of us by replacing our board of directors. Since our board of directors has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management. In addition, the authorization of undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change our control.

These provisions, including the tri-class structure of our common stock, are intended to preserve our existing founder control structure, facilitate our continued product innovation and the risk-taking that it requires, permit us to continue to prioritize our long-term goals rather than short-term results, enhance the likelihood of continued stability in the composition of our board of directors and its policies, and discourage certain types of transactions that may involve an actual or threatened acquisition of us. These provisions are also designed to reduce our vulnerability to an unsolicited acquisition proposal and to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for our shares and may have the effect of deterring hostile takeovers or delaying changes in our control or management. As a consequence, these provisions may also inhibit fluctuations in the market price of our stock that could result from actual or rumored takeover attempts.

When we have a class of voting stock that is either listed on a national securities exchange or held of record by more than 2,000 stockholders, we will be subject to Section 203 of the Delaware General Corporation Law, or the DGCL. Section 203 of the DGCL prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years after the date that such stockholder became an interested stockholder, subject to certain exceptions.

**Choice of Forum**

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware will be the exclusive forum for: (i) any derivative action or proceeding brought on our behalf; (ii) any action asserting a breach of fiduciary duty; (iii) any action asserting a claim against us arising under the DGCL, our certificate of incorporation, or our bylaws; or (iv) any action asserting a claim against us that is governed by the internal affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of

5

Exhibit 4.4

incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

**Listing**

Our Class A common stock is listed on the New York Stock Exchange under the symbol "SNAP."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company, LLC.

6

**Exhibit 10.9**

**SNAP INC.**
**RESTRICTED STOCK UNIT GRANT NOTICE - GLOBAL**
**(2017 EQUITY INCENTIVE PLAN)**

Snap Inc. (the "**Company**"), pursuant to its 2017 Equity Incentive Plan (the "**Plan**"), hereby awards to Participant a Restricted Stock Unit Award for the number of shares of the Company's Common Stock ("**Restricted Stock Units**") set forth below (the "**Award**"). The Award is subject to all of the terms and conditions as set forth in this notice of grant (this "**Restricted Stock Unit Grant Notice**") and in the Plan and the Restricted Stock Unit Agreement (the "**Award Agreement**"), including any special terms and conditions for your country set forth in the attached appendix (the "**Appendix**"), all of which are attached hereto and incorporated herein in their entirety. Capitalized terms not otherwise defined herein will have the meanings set forth in the Plan or the Award Agreement (including the Appendix). In the event of any conflict between the terms in the Award and the Plan, the terms of the Plan will control.

| | |
|---|---|
| Employee Number: | |
| Participant: | |
| Grant Number: | |
| Date of Grant: | |
| Vesting Commencement Date: | |
| Number of Restricted Stock Units/Shares: | |

**Vesting Schedule:**   Participant will receive a benefit with respect to an RSU only if it vests.  A time and service-based requirement (the "**Service-Based Requirement**") must be satisfied in order for an RSU to vest.  An RSU shall actually vest (and therefore become a "**Vested RSU**") on the date on which the Service Based Requirement is satisfied with respect to that particular RSU (the "**Vesting Date**").  All RSUs that do not become Vested RSUs will be immediately forfeited to the Company upon expiration at no cost to the Company.

The Service-Based Requirement will be satisfied in installments as follows, subject to Participant providing Continuous Service from the Vesting Commencement Date through the dates indicated:

[_____]

If the Participant dies while in Continuous Service, the Service-Based Requirement will be satisfied as to 100% of the RSUs for which the Service-Based Requirement otherwise already was not satisfied.

**Issuance Schedule:**   Subject to any Capitalization Adjustment, one share of Common Stock will be issued for each Restricted Stock Unit that vests at the time set forth in Section 6 of the Award Agreement.

**Additional Terms/Acknowledgements:**  Participant acknowledges receipt of, and understands and agrees to, this Restricted Stock Unit Grant Notice, the Award Agreement (including the Appendix) and the Plan. Participant acknowledges and agrees that this Restricted Stock Unit Grant Notice and the Award Agreement (including the Appendix) may not be modified, amended or revised except as provided in the Plan. Participant further acknowledges that as of the Date of Grant, this Restricted Stock Unit Grant Notice, the Award Agreement (including the Appendix) and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of Common Stock pursuant to the Award and

1

Exhibit 10.9

supersede all prior oral and written agreements on that subject with the exception, if applicable, of (i) equity awards previously granted and delivered to Participant, (ii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law, and (iii) any written employment or severance arrangement that would provide for vesting acceleration of this Award upon the terms and conditions set forth therein.

By accepting this Award, Participant consents to receive such documents by electronic delivery and to participate in the Plan through an online or electronic system established and maintained by the Company or another third party designated by the Company.

**SNAP INC.**                                   **PARTICIPANT:**

By:                                             Digitally Accepted on:

          Atul Porwal

Title:      Associate General Counsel


**ATTACHMENTS**:      Award Agreement (including the Appendix), 2017 Equity Incentive Plan


2

**Exhibit 10.9**

**SNAP INC.**
**2017 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT - GLOBAL**

Pursuant to the Restricted Stock Unit Grant Notice (the "***Grant Notice***") and this Restricted Stock Unit Agreement (the "***Award Agreement***"), including any special terms and conditions for your country set forth in the attached appendix (the "***Appendix***"), and in consideration of your services, Snap Inc. (the "***Company***") has awarded you ("***Participant***") a Restricted Stock Unit Award (the "***Award***") pursuant to Section 11 of the Company's 2017 Equity Incentive Plan (the "***Plan***") for the number of Restricted Stock Units/shares indicated in the Grant Notice. Capitalized terms not explicitly defined in this Award Agreement or the Grant Notice will have the same meanings given to them in the Plan. The terms of your Award, in addition to those set forth in the Grant Notice and the Plan, are as follows:

**1.** **GRANT OF THE AWARD.** This Award represents the right to be issued on a future date one (1) share of Common Stock for each Restricted Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 below) as indicated in the Grant Notice. As of the Date of Grant, the Company will credit to a bookkeeping account maintained by the Company for your benefit (the "***Account***") the number of Restricted Stock Units/shares of Common Stock subject to the Award. This Award was granted in consideration of your services to the Company or an Affiliate. Except as otherwise provided herein, you will not be required to make any payment to the Company or an Affiliate (other than services to the Company or an Affiliate) with respect to your receipt of the Award, the vesting of the Stock Units or the delivery of the Company's Common Stock to be issued in respect of the Award. Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock upon vesting of your Stock Units, and, to the extent applicable, references in this Award Agreement and the Grant Notice to Common Stock issuable in connection with your Stock Units will include the potential issuance of its cash equivalent pursuant to such right.

**2.** **VESTING.** Subject to the limitations contained herein, your Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice, provided that vesting will cease upon the termination of your Continuous Service. Upon termination of your Continuous Service, the Restricted Stock Units/shares of Common Stock credited to the Account that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such underlying shares of Common Stock.

**3.** **NUMBER OF SHARES.** The number of Restricted Stock Units/shares subject to your Award may be adjusted from time to time for Capitalization Adjustments, as provided in the Plan. Any additional Restricted Stock Units, shares, cash or other property that becomes subject to the Award pursuant to this Section 3, if any, will be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other Restricted Stock Units and shares covered by your Award. Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock will be created pursuant to this Section 3. Any fraction of a share will be rounded down to the nearest whole share.

**4.** **SECURITIES LAW COMPLIANCE.** You may not be issued any Common Stock under your Award unless the shares of Common Stock underlying the Restricted Stock Units are either (i) then registered under the Securities Act, or (ii) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. Your Award must also comply with other applicable laws and regulations governing the Award, and you will not receive such Common Stock if the Company determines that such receipt would not be in material compliance with such laws and regulations.

1

Exhibit 10.9

**5.**     **TRANSFER RESTRICTIONS**. Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of this Award or the shares issuable in respect of your Award. For example, you may not use shares that may be issued in respect of your Restricted Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Restricted Stock Units. At your death, vesting of your Award will cease and your executor or administrator of your estate will be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

**6.**     **DATE OF ISSUANCE.**

(a)     The issuance of shares in respect of the Restricted Stock Units is intended to comply with Treasury Regulations Section 1.409A-1(b)(4) and will be construed and administered in such a manner. Subject to the satisfaction of the withholding obligations set forth in this Award Agreement, in the event one or more Restricted Stock Units vests, the Company will issue to you one (1) share of Common Stock for each Restricted Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 above, and subject to any different provisions in the Grant Notice). The issuance date determined by this paragraph is referred to as the "***Original Issuance Date***".

(b)     If the Original Issuance Date falls on a date that is not a business day, delivery will instead occur on the next following business day. In addition, if:

(i)     the Original Issuance Date does not occur (1) during an "open window period" applicable to you, as determined by the Company in accordance with the Company's then-effective policy on trading in Company securities, or (2) on a date when you are otherwise permitted to sell shares of Common Stock on an established stock exchange or stock market (including but not limited to under a previously established written trading plan that meets the requirements of Rule 10b5-1 under the Exchange Act and was entered into in compliance with the Company's policies (a "***10b5-1 Plan***")), *and*

(ii)     either (1) Withholding Taxes do not apply, or (2) the Company decides, prior to the Original Issuance Date, (A) not to satisfy the Withholding Taxes by withholding shares of Common Stock from the shares otherwise due, on the Original Issuance Date, to you under this Award, and (B) not to permit you to enter into a "same day sale" commitment with a broker-dealer pursuant to Section 11 of this Award Agreement (including but not limited to a commitment under a 10b5-1 Plan) and (C) not to permit you to pay the Withholding Taxes in cash or from other compensation otherwise payable to you by the Company,

<u>then</u> the shares that would otherwise be issued to you on the Original Issuance Date will not be delivered on such Original Issuance Date and will instead be delivered on the first business day when you are not prohibited from selling shares of the Company's Common Stock in the open public market, but in no event later than December 31 of the calendar year in which the Original Issuance Date occurs (that is, the last day of your taxable year in which the Original Issuance Date occurs), or, <u>if and only if</u> permitted in a manner that complies with Treasury Regulations Section 1.409A-1(b)(4), no later than the date that is the 15th day of the third calendar month of the applicable year following the year in which the shares of Common Stock under this Award are no longer subject to a "substantial risk of forfeiture" within the meaning of Treasury Regulations Section 1.409A-1(d).

(c)     The form of delivery of the shares of Common Stock in respect of your Award (*e.g.*, a stock certificate or electronic entry evidencing such shares) will be determined by the Company.

**7.**     **DIVIDENDS.** You will receive no benefit or adjustment to your Award with respect to any cash dividend, stock dividend or other distribution that does not result from a Capitalization Adjustment;

2

Exhibit 10.9

provided, however, that this sentence will not apply with respect to any shares of Common Stock that are delivered to you in connection with your Award after such shares have been delivered to you.

8.      RESTRICTIVE LEGENDS. The shares of Common Stock issued under your Award will be endorsed with appropriate legends as determined by the Company.

9.      EXECUTION OF DOCUMENTS. You hereby acknowledge and agree that the manner selected by the Company by which you indicate your consent to your Grant Notice is also deemed to be your execution of your Grant Notice and of this Award Agreement. You further agree that such manner of indicating consent may be relied upon as your signature for establishing your execution of any documents to be executed in the future in connection with your Award.

10.      AWARD NOT A SERVICE CONTRACT.

(a)      Your Continuous Service with the Company or an Affiliate is not for any specified term and may be terminated by you or by the Company or an Affiliate at any time, for any reason, with or without cause and with or without notice (subject to applicable law and the terms of your employment or engagement agreement, if any). Nothing in this Award Agreement (including, but not limited to, the vesting of your Award or the issuance of the shares subject to your Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Award Agreement or the Plan will: (i) confer upon you any right to continue in the employ of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or affiliation; (iii) confer any right or benefit under this Award Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Award Agreement or Plan; or (iv) deprive the Company or an Affiliate of the right to terminate your employment without regard to any future vesting opportunity that you may have.

(b)      By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award is earned only by continuing as an employee, director or consultant of the Company or an Affiliate and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or Affiliates at any time or from time to time, as it deems appropriate (a "***reorganization***"). You further acknowledge and agree that such a reorganization could result in the termination of your Continuous Service, or the termination of Affiliate status of your employer and the loss of benefits available to you under this Award Agreement, including but not limited to, the termination of the right to continue vesting in the Award. You further acknowledge and agree that this Award Agreement, the Plan, the transactions contemplated hereunder and the vesting schedule set forth herein or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an employee or consultant for the term of this Award Agreement, for any period, or at all, and will not interfere in any way with your right or the right of the Company or an Affiliate to terminate your Continuous Service at any time, with or without cause and with or without notice, and will not interfere in any way with the Company's right to conduct a reorganization.

(c)      By accepting your Award, you acknowledge, understand and agree that:

(i)      the Plan is established voluntarily by the Company, it is discretionary in nature, and may be amended, suspended or terminated by the Company at any time, to the extent permitted under the Plan;

3

Exhibit 10.9

(ii)      the grant of your Award is voluntary and occasional and does not create any contractual or other right to receive future grants of awards (whether on the same or different terms), or benefits in lieu of awards, even if awards have been granted in the past;

(iii)      your Award and any shares of Common Stock acquired under the Plan, and the income and value of same, are not part of normal or expected compensation for any purpose, including, without limitation, calculating any severance, resignation, termination, redundancy, vacation, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

(iv)      no claim or entitlement to compensation or damages shall arise from forfeiture of this Award resulting from the termination of your Continuous Service (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment or service agreement, if any), and in consideration of the grant of this Award to which you are otherwise not entitled, you irrevocably agree never to institute any claim against the Company or any Affiliate, waive your ability, if any, to bring any such claim, and release the Company and any Affiliate from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, you shall be deemed irrevocably to have agreed not to pursue such claim and agree to execute any and all documents necessary to request dismissal or withdrawal of such claim.

11.      WITHHOLDING OBLIGATIONS.

(a)      On each vesting date, and on or before the time you receive a distribution of the shares underlying your Restricted Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and otherwise agree to make adequate provision in cash for any sums required to satisfy the federal, state, local and foreign tax and social security withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "**Withholding Taxes**"). Additionally, the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Taxes obligation relating to your Award by any of the following means or by a combination of such means: (i) withholding from any compensation otherwise payable to you by the Company or an Affiliate; (ii) causing you to tender a cash payment; (iii) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "**FINRA Dealer**") (pursuant to this authorization and without further consent) whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Restricted Stock Units to satisfy the Withholding Taxes and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Taxes directly to the Company and its Affiliates; or (iv) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued to you pursuant to Section 6) equal to the amount of such Withholding Taxes; *provided*, *however*, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Company's required tax withholding obligations using the minimum statutory withholding rates for federal, state, local and, if applicable, foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided further*, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Company's Compensation Committee. However, the Company does not guarantee that you will be able to satisfy the Withholding Taxes through any of the methods described in the preceding provisions and in all circumstances you remain responsible for timely and fully satisfying the Withholding Taxes.

4

Exhibit 10.9

(b)       Unless the tax and social security withholding obligations of the Company and any Affiliate are satisfied, the Company will have no obligation to deliver to you any Common Stock or other consideration pursuant to this Award.

(c)       In the event the Company or Affiliate's obligation to withhold arises prior to the delivery to you of Common Stock or it is determined after the delivery of Common Stock to you that the amount of the Company's withholding obligation was greater than the amount withheld by the Company, you agree to indemnify and hold the Company harmless from any failure by the Company to withhold the proper amount.

**12.      TAX CONSEQUENCES.** The Company has no duty or obligation to minimize the tax or social security consequences to you of this Award and will not be liable to you for any adverse tax or social security consequences to you arising in connection with this Award. You are hereby advised to consult with your own personal tax, financial and legal advisors regarding the tax and social security consequences of this Award and by signing the Grant Notice, you have agreed that you have done so or knowingly and voluntarily declined to do so. You understand that you (and not the Company) will be responsible for your own tax liability that may arise as a result of this investment or the transactions contemplated by this Award Agreement.

**13.      UNSECURED OBLIGATION.** Your Award is unfunded, and as a holder of a vested Award, you will be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares or other property pursuant to this Award Agreement. You will not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Award Agreement until such shares are issued to you pursuant to Section 6 of this Award Agreement. Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company. Nothing contained in this Award Agreement, and no action taken pursuant to its provisions, will create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.

**14.      NOTICES.** Any notice or request required or permitted hereunder will be given in writing to each of the other parties hereto and will be deemed effectively given on the earlier of (i) the date of personal delivery, including delivery by express courier, or delivery via electronic means, or (ii) the date that is five (5) days after deposit in the national Post Office (whether or not actually received by the addressee), by registered or certified mail with postage and fees prepaid, addressed to the Company at its primary executive offices, attention: Stock Plan Administrator, and addressed to you at your address as on file with the Company at the time notice is given.

**15.      HEADINGS.** The headings of the Sections in this Award Agreement are inserted for convenience only and will not be deemed to constitute a part of this Award Agreement or to affect the meaning of this Award Agreement.

**16.      ADDITIONAL ACKNOWLEDGEMENTS.** You hereby consent and acknowledge that:

(a)       Participation in the Plan is voluntary and therefore you must accept the terms and conditions of the Plan and this Award Agreement and Grant Notice as a condition to participating in the Plan and receipt of this Award. This Award and any other awards under the Plan are voluntary and occasional and do not create any contractual or other right to receive future awards or other benefits in lieu of future awards, even if similar awards have been granted repeatedly in the past. All determinations with respect to any such future awards, including, but not limited to, the time or times when such awards are made, the size of such awards and performance and other conditions applied to the awards, will be at the sole discretion of the Company.

5

**Exhibit 10.9**

(b)  The future value of your Award and the underlying shares of Common Stock is unknown, indeterminable, and cannot be predicted with certainty. Neither the Company nor any Affiliate shall be liable for any exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of your Award or of any amounts due to you on the subsequent sale of any shares of Common Stock distributed to you on the vesting of your Award.

(c)  The rights and obligations of the Company under your Award will be transferable by the Company to any one or more persons or entities, and all covenants and agreements hereunder will inure to the benefit of, and be enforceable by, the Company's successors and assigns.

(d)  You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

(e)  You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

(f)  This Award Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

(g)  All obligations of the Company under the Plan and this Award Agreement will be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and assets of the Company.

**17.**  **GOVERNING PLAN DOCUMENT.** Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. Your Award (and any compensation paid or shares issued under your Award) is subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company and any compensation recovery policy otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to voluntarily terminate employment upon a resignation for "good reason," or for a "constructive termination" or any similar term under any plan of or agreement with the Company.

**18.**  **EFFECT ON OTHER EMPLOYEE BENEFIT PLANS.** The value of the Award subject to this Award Agreement will not be included as compensation, earnings, salaries, or other similar terms used when calculating benefits under any employee benefit plan (other than the Plan) sponsored by the Company or any Affiliate except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any or all of the employee benefit plans of the Company or any Affiliate.

**19.**  **CHOICE OF LAW.** The interpretation, performance and enforcement of this Award Agreement will be governed by the law of the State of Delaware without regard to that state's conflicts of laws rules.

**20.**  **SEVERABILITY.** If all or any part of this Award Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity will not invalidate any portion of this Award Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Award Agreement (or part of such a Section) so declared to be unlawful or invalid will, if possible, be

6

Exhibit 10.9

construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

21.      OTHER DOCUMENTS. You hereby acknowledge receipt of and the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act, which includes the Plan prospectus. In addition, you acknowledge receipt of the Company's policy permitting certain individuals to sell shares only during certain "window" periods and the Company's insider trading policy, in effect from time to time.

22.      AMENDMENT. This Award Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Award Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Award Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no such amendment materially adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the provisions of this Award Agreement in any way it may deem necessary or advisable to carry out the purpose of the Award as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change will be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

23.      COMPLIANCE WITH SECTION 409A OF THE CODE. This Award is intended to comply with the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4). Notwithstanding the foregoing, if it is determined that the Award fails to satisfy the requirements of the short-term deferral rule and is otherwise deferred compensation subject to Section 409A, and if you are a "Specified Employee" (within the meaning set forth in Section 409A(a)(2)(B)(i) of the Code) as of the date of your "separation from service" (within the meaning of Treasury Regulation Section 1.409A-1(h) and without regard to any alternative definition thereunder), then the issuance of any shares that would otherwise be made upon the date of the separation from service or within the first six (6) months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the earlier of: (i) the fifth business day following your death, or (ii) the date that is six (6) months and one day after the date of the separation from service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of adverse taxation on you in respect of the shares under Section 409A of the Code. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2).

24.      DATA TRANSFER.

(a)      You explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer, the Company and its Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.  You understand that the Company, its Affiliates and your employer hold certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social security number (or other identification number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, purchased, exercised, vested, unvested or outstanding in your favor for the purpose of implementing, managing and administering the Plan ("**Data**").  You understand that the Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, in particular in the United States, and that the recipient country may have different data privacy

7

Exhibit 10.9

laws providing less protections of your personal data than your country.  You may request a list with the names and addresses of any potential recipients of the Data by contacting equityquestions@snap.com or the stock plan administrator at the Company (the "***Stock Plan Administrator***").  You authorize the recipients to receive, possess, process, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data, as may be required to a broker or other third party with whom you may elect to deposit any shares of Common Stock acquired upon the vesting of the Award.  You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan.  You may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein, in any case without cost, by contacting the Stock Plan Administrator in writing.  You understand that refusing or withdrawing consent may affect your ability to participate in the Plan.  For more information on the consequences of refusing to consent or withdrawing consent, you may contact the Stock Plan Administrator.

(b)        For the purposes of operating the Plan in the European Union, Switzerland and the United Kingdom, the Company will collect and process information relating to you in accordance with the privacy notice from time to time in force.

25.        NO ADVICE REGARDING GRANT.  The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan, or your acquisition or sale of the underlying shares of Common Stock.  You should consult with your own personal tax, legal and financial advisors regarding your participation in the Plan before taking any action related to the Plan.

26.        LANGUAGE.  You acknowledge that you are sufficiently proficient in the English language, or have consulted with an advisor who is sufficiently proficient in English, so as to allow you to understand the terms and conditions of this Award Agreement. If you have received this Award Agreement, or any other document related to this Award and/or the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

27.        FOREIGN ASSET/ACCOUNT, EXCHANGE CONTROL AND TAX REPORTING.  You may be subject to foreign asset/account, exchange control and/or tax reporting requirements as a result of the acquisition, holding and/or transfer of shares of Common Stock or cash (including dividends and the proceeds arising from the sale of shares of Common Stock) derived from your participation in the Plan in, to and/or from a brokerage/bank account or legal entity located outside your country.  The applicable laws in your country may require that you report such accounts, assets and balances therein, the value thereof and/or the transactions related thereto to the applicable authorities in such country. You may also be required to repatriate sale proceeds or other funds received as a result of your participation in the Plan to your country through a designated bank or broker within a certain time after receipt.  You acknowledge that it is your responsibility to be compliant with such regulations and you are encouraged to consult with your personal legal advisor for any details.

28.        CHOICE OF LAW. The interpretation, performance and enforcement of this Award Agreement shall be governed by the laws of the State of Delaware without regard to that state's conflicts of laws rules.

29.        APPENDIX.  Notwithstanding any provisions in this Restricted Stock Unit Award Agreement, your Award shall be subject to the special terms and conditions for your country set forth in the Appendix attached hereto.  Moreover, if you relocate to one of the countries included therein, the terms and conditions for such country will apply to you to the extent the Company determines that the application

8

**Exhibit 10.9**

of such terms and conditions is necessary or advisable for legal or administrative reasons.  The Appendix constitutes part of this Restricted Stock Unit Award Agreement.

\* \* \* \* \*

This Award Agreement will be deemed to be signed by the Company and the Participant upon the signing or electronic acceptance by the Participant of the Restricted Stock Unit Grant Notice to which it is attached.

9

**Exhibit 10.9**

APPENDIX TO RESTRICTED STOCK UNIT AWARD AGREEMENT

This Appendix includes special terms and conditions that govern the Restricted Stock Units granted to you under the Plan if you reside or work in one of the countries listed below.

The information contained below is general in nature and may not apply to your particular situation. You are advised to seek appropriate professional advice as to how the relevant laws in your country may apply to your situation.

AUSTRALIA

**Breach of Law.**  Notwithstanding anything else in the Plan or the Restricted Stock Unit Award Agreement, you will not be entitled to, and shall not claim any benefit (including without limitation a legal right) under the Plan if the provision of such benefit would give rise to a breach of Part 2D.2 of the Corporations Act 2001 (Cth), any other provision of that Act, or any other applicable statute, rule or regulation which limits or restricts the giving of such benefits.  Further, the Employer is under no obligation to seek or obtain the approval of its shareholders in general meeting for the purpose of overcoming any such limitation or restriction.

**Securities Law Information.**  The grant of the Award is intended to comply with the provisions of the Corporations Act 2001, ASIC Regulatory Guide 49 and ASIC Class Order CO 14/1000.  Additional details are set forth in the Offer Document for the Offer of Restricted Stock Units to Australian Resident Employees, which was distributed with the Grant Notice, this Award Agreement and any other Plan documents.

**Exchange Control Information.**  Exchange control reporting is required for cash transactions exceeding A$10,000 and international fund transfers.  You understand that the Australian bank assisting with the transaction may file the report on your behalf.  If there is no Australian bank involved in the transfer, you will be required to file the report.  You should consult with your personal advisor to ensure proper compliance with applicable reporting requirements in Australia.

**Privacy**.  Section 24 (Data Transfer) is deleted and replaced with the following:

     **24. PRIVACY.** You explicitly and unambiguously consent to the collection, holding, use and disclosure, in electronic or other form, of your personal information (as that term is defined in the *Privacy Act 1988* (Cth)) as described in this document by and among, as applicable, your employer, the Company and its Affiliates for the purpose of implementing, administering and managing your participation in the Plan.  You understand that the Company, its Affiliates and your employer hold certain personal information about you, including, but not limited to, name, home address and telephone number, email address and other contact details, date of birth, tax file number (or other identification number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, purchased, exercised, vested, unvested or outstanding in your favor for the purpose of implementing, managing and administering the Plan ("***Data***"). The collection of this information may be required for compliance with various legislation, including the *Corporations Act 2001* (Cth) and applicable taxation legislation.  You understand that the Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, in particular in the United States, and that the recipient country may have different data privacy laws providing less protection of your personal data than your country.  You may request a list with the names and addresses of any potential recipients of the Data by contacting equityquestions@snap.com or the stock plan administrator at the Company (the "***Stock Plan***

10

Exhibit 10.9

*Administrator*"). You authorize the recipients to collect, hold, use and disclose the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data, as may be required to a broker or other third party with whom you may elect to deposit any shares of the Common Stock acquired upon the vesting of the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan or for the period required by law, whichever is the longer.  You may, at any time, refuse or withdraw the consents herein, in any case without cost, by contacting the Stock Plan Administrator in writing. You understand that refusing or withdrawing consent may affect your ability to participate in the Plan. You acknowledge that further information on how your employer, the Company and its Affiliates collect, hold, use and disclose Data and other personal information (and how you can access, correct or complain about the handling of that Data or other personal information by your employer, the Company and its Affiliates) can be found in the privacy policies of your employer, the Company and its Affiliates (as applicable).

### Austria

**Compliance with Law.** By accepting the Award and accepting the terms of the Award, you acknowledge and agree that you are responsible for complying with all applicable Austrian laws and you shall not assume that the terms of the Award summarize all requirements under applicable laws.

**Data Transfer.** Section 24 (Data Transfer) is deleted and replaced with the following:

24. Data Transfer.   Before Snap Inc receives any of your personal data, you will be asked by your local employer, if you want to participate and – in order to do so – freely decide to consent to the transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer, the Company and its Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.  You understand that the Company, its Affiliates and your employer hold certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social security number (or other identification number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, purchased, exercised, vested, unvested or outstanding in your favor for the purpose of implementing, managing and administering the Plan ("*Data*").  You understand that the Data may be transferred to any third parties, acting as data processors, assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, in particular in the United States, and that the recipient country may have different data privacy laws providing less protections of your personal data than your country.  You may request a list with the names and addresses of any potential recipients of the Data by contacting equityquestions@snap.com or the stock plan administrator at the Company (the "*Stock Plan Administrator*").  You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan.  You may, at any time, view the Data, request additional information about the storage and processing of the Data (right to information), require any necessary amendments to the Data (right to rectification) or refuse or withdraw the consents herein, in any case without cost, by contacting the Stock Plan Administrator in writing. You may also have a right to erasure, data portability, restriction of the processing and **objection**. You understand that refusing or withdrawing consent may affect your ability to participate in the Plan.  For more information on the consequences of refusing to consent or withdrawing consent, you may contact the Stock Plan Administrator.

11

<b>Exhibit 10.9</b>

**Cause.** This provision supplements the definition of "**Cause**" set out in the Plan to the effect that it shall include any other solid grounds for termination ("*wichtiger Grund*") within the meaning of sec 25 and 27 of the Austrian Act on White-Collar Workers ("*Angestelltengesetz*").

BELGIUM

[**Holding Period.** For a period of two years after the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of these shares.]1

**Foreign Asset / Account Reporting**. Belgian residents are required to report any security (e.g., shares of Common Stock acquired under the Plan) or bank account established outside of Belgium on their annual tax return. In a separate report, Belgian residents are also required to provide the National Bank of Belgium with certain details regarding such foreign accounts (including the account number, bank name and country in which any such account was opened). The forms to complete this report are available on the website of the National Bank of Belgium. Belgian residents should consult with their personal tax advisors to determine their personal reporting obligations.

**Stock Exchange Tax**. A stock exchange tax applies to transactions executed by a Belgian resident through a non-Belgian financial intermediary, such as a U.S. broker. The stock exchange tax likely will apply when the shares of Common Stock are sold. You should consult with your personal tax advisor for additional details on your obligations with respect to the stock exchange tax.

BRAZIL

**Compliance with Law.** By accepting the Award and accepting the terms of the Award Agreement, you acknowledge and agree to comply with all applicable Brazilian laws and pay any and all applicable Withholding Taxes associated with the Award, the sale of shares of Common Stock acquired under the Plan, and the receipt of any dividends paid on such shares of Common Stock.

**Exchange Control Information.** If you are a Brazilian resident, you must periodically disclose to the Central Bank of Brazil a declaration of assets and rights held abroad. The reporting is made by means of a Statement of Brazilian Capitals Abroad ("*DCBE*") and must be submitted annually if the aggregate value of such assets and rights is US$100,000 or more. Notwithstanding the above, the declaration is required quarterly if at the dates of March 31, June 30 and September 30, of each year, the aggregate value of such assets and rights held outside of Brazil is US$100,000,000 or more. Assets and rights that must be reported include shares of Common Stock acquired under the Plan. You should consult with a personal advisor to ensure compliance with the applicable exchange control requirements.

**Securities Law Information.** Please note that the offer of an award under the 2017 Equity Incentive Plan does not constitute a public offer in Brazil, and therefore it is not subject to registration with the Brazilian authorities.

**Tax on Financial Transaction (IOF).** Payments to foreign countries and repatriation of funds into Brazil, and the conversion between BRL and USD associated with such fund transfers, may be subject to the Tax on Financial Transactions. It is your responsibility to comply with any applicable Tax on Financial Transactions arising from your participation in the Plan. You should consult with your personal tax advisor for additional details. "*Tax on Financial Transactions*" means the Brazilian federal tax (IOF) levied on credit, exchange, insurance and securities transactions executed through financial institutions at such rate as determined by the Brazilian federal government from time to time.

**Acknowledgment of Forfeiture and Clawback Provisions.** By accepting the Award, you acknowledge being subject to the provisions of any forfeiture and claw-back policy implemented by the Company, including, without limitation, any clawback policy adopted to comply with the requirements of applicable law.

**Additional Acknowledgements.** The following sub-section is added as Section 16(h):

(h) In accepting this Award Agreement, you acknowledge being subject to the provisions of any forfeiture and claw-back policy implemented by the Company, including, without limitation, any claw-back policy adopted to comply with the requirements of Applicable Law.

CANADA

**Grant of the Award.** The final sentence of Clause 1 ("Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock upon vesting of your Stock Units, and, to the extent applicable, references in this Award Agreement and the Grant Notice to Common Stock issuable in connection with your Stock Units will include the potential issuance of its cash equivalent pursuant to such right.") is deleted.

**Continuous Service.** This provision supplements the definition of "*Continuous Service*" set out in the Plan. The Participant's Continuous Service will be determined without regard to any period of statutory, contractual, common law or other reasonable notice of termination of employment or any period of salary continuance or deemed employment.

**Securities Law Information.** You understand that you are permitted to sell shares of Common Stock acquired pursuant to the Plan provided

the sale of the shares acquired pursuant to the Plan takes place outside of Canada through the facilities of a stock exchange on which the shares are listed, and if any designated broker is appointed under the Plan, you shall sell such shares through the designated broker.

**Foreign Asset/Account Reporting Information.** If you are a Canadian resident, you may be required to report your foreign property on form T1135 (Foreign Income Verification Statement) if the total cost of the foreign property exceeds C$100,000 at any time in the year. Foreign property includes shares of Common Stock acquired under the Plan, and may include the Restricted Stock Units. The Restricted Stock Units must be reported--generally at a nil cost--if the C$100,000 cost threshold is exceeded because of other foreign property you hold.  If shares of Common Stock are acquired, their cost generally is the adjusted cost base ("**ACB**") of the shares of Common Stock. The ACB ordinarily would equal the fair market value of the shares at the time of acquisition, but if you own other shares of Common Stock, this ACB may have to be averaged with the ACB of the other shares. The form T1135 generally must be filed by April 30 of the following year. You should consult with a personal advisor to ensure compliance with the applicable reporting requirements.

**Award Not a Service Contract.** In Sections 10(a) and 10(b), references to "and with or without notice" are deleted.

**Withholding Obligations.** Section 11(a) is deleted and replaced with the following:

---

1 *Note to draft: Optional clause to be deleted or retained for an award depending on particular circumstances.*

12

**Exhibit 10.9**

## 11. WITHHOLDING OBLIGATIONS.

(a) On each vesting date, and on or before the time you receive a distribution of the shares underlying your Restricted Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you agree to make adequate arrangements satisfactory to the Company or adequate provision in cash for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "***Withholding Taxes***"). Additionally, the Company or any Affiliate may satisfy all or any portion of the Withholding Taxes obligation relating to your Award by any of the following means or by a combination of such means: (i) withholding from any compensation otherwise payable to you by the Company or an Affiliate; (ii) causing you to tender a cash payment; (iii) permitting you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "***FINRA Dealer***") (subject to your written consent) whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Restricted Stock Units to satisfy the Withholding Taxes and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Taxes directly to the Company and its Affiliates; or (iv) permitting you (subject to your written consent) to surrender Restricted Stock Units to the Company for a cash payment which shall be used to satisfy the Withholding Taxes, whereby the number of Restricted Stock Units that may be surrendered for a cash payment shall be equal to the Withholding Taxes divided by a Fair Market Value (measured as of the date shares of Common Stock are otherwise issuable to you pursuant to Section 6). However, the Company does not guarantee that you will be able to satisfy the Withholding Taxes through any of the methods described in the preceding provisions and in all circumstances you remain responsible for timely and fully satisfying the Withholding Taxes.

The following provision only applies if you reside in Quebec:

**Language Consent.** The parties acknowledge that it is their express wish that the Award Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de cette convention («Agreement»), ainsi que cette Annexe, ainsi que de tous documents, avis et procédures judiciaires, exécutés, donnés ou intentés en vertu de, ou liés directement ou indirectement à, la présente convention.*

**CHINA**

The following provisions govern your participation in the Plan if you are a national of the People's Republic of China ("***PRC***" or "***China***"). Notwithstanding the foregoing, the Company reserves the right to apply any or all of the following provisions to individuals who are not PRC nationals but resident in the PRC to the extent it determines such is necessary or advisable:

**Vesting.** Notwithstanding Section 2 or anything to the contrary in the Award Agreement or the Grant Notice, an Award will not vest and shall not become a Vested RSU until any necessary approval or registration (if required) from the PRC State Administration of Foreign Exchange or its local counterpart ("***SAFE***") under applicable exchange control rules has been received with respect to such RSU on or before the RSU expires.

**Settlement of Awards and Sale of Common Stock.** The Company may require that any shares of Common Stock acquired pursuant to the RSUs be sold, either immediately after issuance or within a specified period following the termination of your Continuous Service. You agree that the Company is authorized to instruct its designated broker to assist with the mandatory sale of such shares (on your behalf pursuant to this authorization), and you expressly authorize the designated broker to complete the sale of such shares. You

13

Exhibit 10.9

also agree to sign any agreements, forms and/or consents that may be reasonably requested by the Company (or the designated broker) to effectuate the sale of the shares (including, without limitation, as to the transfers of the proceeds and other exchange control matters provided below) and shall otherwise cooperate with the Company with respect to such matters, provided that you shall not be permitted to exercise any influence over how, when or whether the sales occur.  You acknowledge that the designated broker is under no obligation to arrange for the sale of the shares at any particular price.  Due to fluctuations in the share price and/or applicable exchange rates between the date the shares are issued and (if later) the date on which the shares are sold, the amount of proceeds ultimately distributed to you may be more or less than the Market Value of the shares on the Vesting Date or the date the shares are issued.

Upon the sale of the shares, the Company agrees to pay the cash proceeds from the sale (less any applicable Withholding Taxes, brokerage fees or commissions) to you in accordance with applicable exchange control laws and regulations.

**Foreign Exchange Obligations.** You understand and agree that, pursuant to exchange control laws in the PRC, you will be required to immediately repatriate to the PRC the cash proceeds from the sale of any shares issued upon vesting of the RSUs and, if applicable, any dividends you may receive in relation to the shares.  You further understand that, under applicable law, such repatriation of your cash proceeds may need to be effected through a special exchange control account established by the Company or a Subsidiary in the PRC, and you hereby consent and agree that any proceeds you may receive as a result of participation in the Plan may be transferred to such special account prior to being delivered to you.  Further, you acknowledge that the Company or a Subsidiary has no obligation to, but may, convert the proceeds that you realize from your participation in the Plan from U.S. dollars to Renminbi using any exchange rate chosen by the Company and, if funds are so converted, they will be converted as soon as practicable, which may not be immediately after the date that such proceeds were realized.  If such currency conversion occurs, you will bear the risk of any fluctuation in the U.S. dollar/Renminbi exchange rate between the date you realize U.S. dollar proceeds from your participation in the Plan and the date that you receive cash proceeds converted to Renminbi.  If the proceeds from your participation in the Plan are paid to you in U.S. dollars, you understand that you will be required to set up a U.S. dollar denominated bank account in the PRC and provide the bank account details to the Company or your employer so that your proceeds may be deposited into the account.  Finally, you agree to comply with any other requirements that may be imposed by the Company in the future to facilitate compliance with exchange control requirements in the PRC, as determined by the Company in its sole discretion.

## GERMANY

**Sole Contact and Contractual Partner Information.** Please note that the RSU Award, the RSU Grant Notice, the Award Agreement, the Appendix and your participation in the Plan do not create any claims against the Affiliate of the Company you are employed by/your German employer either directly or indirectly.  To be clear: your sole contact and sole contractual partner regarding the Plan and the granted RSUs is the Company and they are not part of your contractual salary.

**Exchange Control Information.**  Cross-border payments in excess of €12,500 must be reported monthly to the German Federal Bank (*Bundesbank*).  In case of payments in connection with securities (including proceeds realized upon the sale of shares of Common Stock or the receipt of dividends), the report must be made by the 5th day of the month following the month in which the payment was received.  The report must be filed electronically and the form of report ("*Allgemeine Meldeportal Statistik*") can be accessed via the Bundesbank's website (www.bundesbank.de) in both German and English.  You are responsible for making this report.

14

**Exhibit 10.9**

## INDIA

The following provisions govern your participation in the Plan if you are a person resident in India. It is clarified that the Company reserves the right to apply any or all of the following provisions to individuals who are not Indian citizens/nationals, but considered as persons resident in India, to the extent it determines necessary or advisable under applicable Indian laws.

**Compliance with Law.** By accepting the Award and accepting the terms of the Award Agreement, you acknowledge and agree to comply with all applicable Indian laws and pay any and all applicable taxes associated with the Award, the sale of shares of Common Stock acquired under the Plan, and the receipt of any dividends paid on such shares of Common Stock.

**Foreign Exchange Obligations.** Notwithstanding anything contained in the Plan, the Award Agreement and/or the Restricted Stock Unit Grant Notice, the offer and issuance of any shares to a person resident in India shall be subject to, and in accordance with applicable laws, including the (Indian) Foreign Exchange Management Act, 1999 and the rules and regulations framed thereunder (as amended from time to time) ("**FEMA**"). You understand and agree that, pursuant to the FEMA, the proceeds from the sale of any shares of Common Stock issued upon vesting of the Restricted Stock Units will be required to be repatriated to India immediately on receipt thereof and in any case not later than 90 (ninety) days from the date of sale of such shares. Separately, you understand and agree that any dividends you may receive in relation to the shares of Common Stock must be repatriated to India within 60 (sixty) days from the date of it falling due. The Company agrees to pay any dividend declared on the shares to your designated bank account in India in accordance with applicable exchange control laws and regulations, including the FEMA.

**Exchange Control Reporting Requirements.** In relation to the shares of Common Stock that may be issued to you by the Company, you agree and acknowledge that you may be required to submit to the Reserve Bank of India, through your designated Authorised Dealer Bank, every year on or before December 31, an Annual Performance Report (APR) in Part II of Form ODI and such other reports or documents as may be prescribed by the Reserve Bank of India from time to time.

**Tax.** By accepting the Award and accepting the terms of the Award Agreement, you acknowledge and agree to comply with all applicable Indian laws and report any income and pay any and all applicable taxes, as required by Indian laws, associated with the Award, the sale of shares of Common Stock acquired under the Plan, and the receipt of any dividends paid on such shares of Common Stock. You will co-operate with the board of directors of the Company and the Affiliate to ensure that the Company and the Affiliate are at all times compliant with all applicable laws. Without prejudice to the aforesaid, you will forthwith provide all necessary information upon request by the Affiliate in order for the Affiliate to make necessary filings with the regulatory authorities as required under applicable law. Where necessary and so directed by the Affiliate, you will make such payments/ deposit such amounts with the Affiliate so as to enable the Affiliate to comply with its tax obligations under applicable laws. You acknowledge and confirm that the entitlement to the shares of Common Stock is contingent upon you complying with your obligations herein, the Award Agreement and the Plan.

**Transfer Restrictions.** Section 5 (Transfer Restrictions) is deleted and replaced with the following:

     **5. TRANSFER RESTRICTIONS.** Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell, or otherwise dispose of this Award or the shares issuable in respect of your Award. For example, you may not use shares that may be issued in respect of your Restricted Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Restricted Stock Units. You agree and acknowledge that any transfer of shares issued to you in respect of your vested Restricted Stock Units shall be undertaken in accordance

15

**Exhibit 10.9**

with all applicable laws, including the FEMA. At your death, vesting of your Award will cease and your executor or administrator of your estate will be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

**Award Not a Service Contract.** In Sections 10(a) and 10(b), references to "and with or without notice" are deleted. In Section 10(b), references to "or consultant" are deleted.

**Tax Withholding Obligations.** Section 11(a) (Withholding Obligations) is deleted and replaced with the following:

11.        WITHHOLDING OBLIGATIONS.

(a)        On each vesting date, and on or before the time you receive a distribution of the shares underlying your Restricted Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and otherwise agree to make adequate provision in cash for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "***Withholding Taxes***"). Additionally, the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Taxes obligation relating to your Award by any of the following means or by a combination of such means: (i) withholding from any compensation otherwise payable to you by the Company or an Affiliate; (ii) causing you to tender a cash payment; (iii) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (pursuant to this authorization and without further consent) whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Restricted Stock Units to satisfy the Withholding Taxes; or (iv) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued to you pursuant to Section 6) equal to the amount of such Withholding Taxes; *provided*, *however*, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Company's required tax withholding obligations using the minimum statutory withholding rates for federal, state, local and, if applicable, foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided further*, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Company's Compensation Committee. However, the Company does not guarantee that you will be able to satisfy the Withholding Taxes through any of the methods described in the preceding provisions and in all circumstances you remain responsible for timely and fully satisfying the Withholding Taxes.

**Tax Withholding Obligations.** The following supplements Section 11 (Withholding Obligations) of the Award Agreement:

(d)        As a condition of the vesting of your Award, you therefore unconditionally and irrevocably agree:

(i)        to place the Company in funds and indemnify the Company in respect of (1) all liability to Indian income tax which the Company is liable to account for on your behalf directly to Government of India; (2) all liability towards depositing provident fund contributions which the Company is liable to deposit on your behalf with the provident fund commissioner; and (3) all liability towards provident fund contributions for which the Company is liable which arises as a consequence of or in connection with your Award (the "***India Tax Liability***"); or

16

Exhibit 10.9

        (ii)     to permit the Company to sell at the best price which it can reasonably obtain such number of shares of Common Stock allocated or allotted to you following vesting and as will provide the Company with an amount equal to the India Tax Liability; and to permit the Company to withhold an amount not exceeding the India Tax Liability from any payment made to you (including, but not limited to salary); and

        (iii)     to sign, promptly, all documents required by the Company to effect the terms of this provision, and references in this provision to "the Company" shall, if applicable, be construed as also referring to any Affiliate.

**Privacy**. Section 24 (Data Transfer) is deleted and replaced with the following:

     **24. PRIVACY.** You explicitly and unambiguously consent to the collection, use, disclosure and transfer, in electronic or other form, of your personal information (as such term is defined in the Information Technology Act, 2000 read with the Information Technology (Reasonable Security Practices and Procedures and Sensitive Personal Data or Information) Rules, 2011) as described in this document by and among, as applicable, your employer, the Company and its Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan. You understand that the Company, its Affiliates and your employer hold certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social security number (or other identification number), salary, nationality, job title, any shares of stock or directorships held in the Company and/or any Affiliate, details of all options or any other entitlement to shares of stock awarded, canceled, purchased, exercised, vested, unvested or outstanding in your favor for the purpose of implementing, managing and administering the Plan ("***Data***"). You understand and consent that the Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, in particular in the United States, and that the recipient country may have different data privacy laws providing less protections of your personal data than your country. You may request a list with the names and addresses of any potential recipients of the Data by contacting equityquestions@snap.com or the stock plan administrator at the Company (the "***Stock Plan Administrator***"). You authorize the recipients to receive, possess, process, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data, as may be required to a broker or other third party with whom you may elect to deposit any shares of Common Stock acquired upon the vesting of the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein, in any case without cost, by contacting the Stock Plan Administrator in writing. You understand that refusing or withdrawing consent may affect your ability to participate in the Plan. For more information on the consequences of refusing to consent or withdrawing consent, you may contact the Stock Plan Administrator.

**JAPAN**

**Securities Law Information.** The Company notifies to you, and you acknowledge, that: (i) the solicitation of the Awards falls under the category of solicitation towards small number investors as provided in article 23-13.4 of the Financial Instruments and Exchange Law of Japan (*kinyuu shouhin torihiki hou*) (Law No. 25 of 1948, as amended) and therefore no notification under article 4.1 of the same has been made in respect of the solicitation; (ii) you are prohibited from transferring the Awards unless transferred as a whole; and (iii) the Awards cannot be divided into parts.

17

Exhibit 10.9

**Foreign Asset/Account Reporting Information.** Japanese residents are required to report details of any assets held outside of Japan as of December 31, including shares of Common Stock acquired under the Plan, to the extent such assets have a total net fair market value exceeding ¥50,000,000. Such report will be due by March 15 each year. You are responsible for complying with this reporting obligation if applicable to you and you should consult your personal tax advisor in this regard. If you do not comply with this reporting obligation, you may be subject to imprisonment of up to 1 year or a fine of up to ¥500,000.

**MEXICO**

**No Entitlement or Claims for Compensation.**  These provisions supplement Section 10 (Award Not A Service Contract) of the Award Agreement that clarify that the grant, vesting or settlement of your Award does not give you a right to continued service/employment with your employer.

**Modification.**  By accepting the grant of an Award, you understand and agree that any modification of the Plan or the Award Agreement or its termination shall not constitute a change or impairment of the terms and conditions of your employment with your employer, as this benefit derives from a commercial relationship between you and the Company.

**Policy Statement.**  The grant of the Award by the Company under the Plan is unilateral and discretionary and, therefore, the Company reserves the absolute right to amend it and discontinue it at any time without any liability.  Under such scenario, is it expressly agreed by you that such situation would not be deemed as impacting your employment relationship with your employer in any way.

The Company, with registered offices at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808, United States of America, is solely responsible for the administration and participation in the Plan and the acquisition of shares of Common Stock does not, in any way, establish an employment relationship between you and the Company since you are participating in the Plan on a wholly commercial basis and your sole employer is a subsidiary of the Company ("***Employer***"), nor does it establish any rights between you and the Employer as the latter does not sponsor, contribute to, make any payment, grant any Award or have any relationship with the Plan, the Agreement and/or the Award, all of which are sponsored solely and exclusively by the Company which is the only party responsible for the contribution of any amount pursuant to the Plan and/or the Award Agreement and the only party responsible for making any payment or granting any RSU Awards thereunder. Pursuant to the foregoing, you expressly agree and recognize for all legal purposes that your participation in the Plan, and any benefit associated therewith shall not be construed as being part of, derived from, or in any way related to the employment relationship that you may have with the Employer.  As a result, the Award would not be considered for salary integration purposes, on the understanding that only those benefits that are directly covered by the Employer as a result of the employment relationship can be considered for this purpose, which is not the case in respect of the Award.

**Plan Document Acknowledgment.**  By accepting the grant of an Award, you acknowledge that you have received a copy of the Plan, have reviewed the Plan and the Award Agreement in their entirety and fully understand and accept all provisions of the Plan and the Award Agreement.

In addition, by signing the Award Agreement, you further acknowledge that you have read and specifically and expressly approved the terms and conditions in Section 10 of the Agreement (Award Not A Service Contract) that clarify that the grant, vesting or settlement of an RSU Award does not give you a right to continued service/employment with the Employer, in which the following is clearly described and established: (i) participation in the Plan does not constitute an acquired right; (ii) the Plan and participation in the Plan is offered by the Company on a wholly discretionary basis; (iii) participation in the Plan is

18

**Exhibit 10.9**

voluntary; and (iv) neither the Company nor any Affiliate is responsible for any decrease in the value of the shares of Common Stock underlying the Award.

Finally, you hereby declare that you do not reserve any action or right to bring any claim against the Company for any compensation or damages as a result of your participation in the Plan and therefore you also grant a full and broad release to the Employer, the Company and any Affiliate with respect to any claim that may arise under the Plan.

**Tax obligations.** By accepting the grant of the Award and signing the Restricted Stock Unit Grant Notice, you acknowledge that it is your responsibility to review and confirm the tax effects that may be generated or derived from this acceptance, with your tax advisors.

You also acknowledge that you are aware that any tax triggered or derived from the granting and/or vesting of the Award shall be recognized in the monthly and annual income tax return or returns that shall be filed pursuant to Mexican law and the corresponding income tax payment shall be properly, duly and timely paid, if any. It is your sole obligation to provide to your Employer, no later than 15 days after such payment was due, the evidence of the applicable monthly and annual income tax returns filed and the payment of applicable taxes.

Notwithstanding the foregoing, if your Employer is obliged to withhold the corresponding tax pursuant to applicable law, depending on the payment method of the vested Award, your Employer will provide you with a notice, no later than 5 days after the vesting of your Award, informing you that your Employer will make the corresponding withholdings, which would substitute your obligations to make a direct filing of the monthly income tax return and the corresponding payment.

**Termination of Continuous Service.**  By accepting the grant of an Award and signing the Restricted Stock Unit Grant Notice, you acknowledge that you have read and specifically and expressly approved the terms and conditions in Section 6(b)(vi) of the Plan (Termination of Participant's Continuous Service) that clarify that if your Continuous Service with the Employer terminates for any reason, any portion of your Award that has not vested will be forfeited upon such termination and you will have no further right, title or interest in the Award, the shares of Common Stock issuable pursuant to the Award, or any consideration in respect of the Award.

In addition, by signing the Award Agreement, you further acknowledge and agree that for the purposes of the Award, your Continuous Service will be considered terminated as of the date you are no longer actively providing services to the Employer (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and your right to vest in the Award under the Plan, if any, will terminate as of such date and will not be extended by any notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any); and the Plan Administrator shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Award (including whether you may still be considered to be providing services while on a leave of absence).

**Language.**  You acknowledge that you are sufficiently proficient in the English language, or have consulted with an advisor who is sufficiently proficient in English, so that you have a complete and accurate understanding of each and every of the terms and conditions of the Plan, the Award Agreement and the Restricted Stock Unit Grant Notice. If you have received the Plan, the Agreement, the Restricted Stock Unit Grant Notice, or any other document related to this Award translated into a language other than English and if the meaning of the translated version is different than the English version, you expressly agree that the English version will control.

19

**Exhibit 10.9**

**Spanish Translation**

*Términos y Condiciones*

**Renuncia de Derechos o Reclamos por Compensación.** *Estas disposiciones complementan la Sección 10 del Acuerdo, la cual aclara que el otorgamiento, conclusión del período para hacer exigible (vesting) o la liquidación de su "Award" no garantizan la continuación de sus servicios/relación con el Empleador.*

**Modificación.** *Al aceptar el otorgamiento de su "Award", usted reconoce y acuerda que cualquier modificación del Plan o del Acuerdo de "Award" o su terminación, no constituirá un cambio o detrimento de los términos y condiciones de su relación con el Empleador, toda vez que este beneficio deriva de una relación comercial entre usted y la Compañía.*

**Declaración de Política.** *El Otorgamiento de su "Award" por la Compañía en virtud del Plan es unilateral y discrecional y, por lo tanto, la Compañía se reserva el derecho absoluto de modificar y discontinuar el mismo en cualquier tiempo, sin responsabilidad alguna. Bajo este supuesto, queda expresamente aceptado por usted que dicha situación no podrá ser interpretada como un impacto sobre su relación de trabajo con el Empleador de ninguna manera. La Compañía, Snap, Inc., con oficinas registradas ubicadas en c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808, United States of America, es la única responsable de la administración del Plan y de la participación en el mismo y la adquisición de Acciones no establece de forma alguna una relación de trabajo entre usted y la Compañía, ya que su participación en el Plan es completamente de naturaleza comercial y su único empleador es una subsidiaria de la Empresa ("**Empleador**"), así como tampoco establece ningún derecho entre usted y el Empleador toda vez que éste no patrocina, contribuye, hace pago alguno, otorga ninguna gratificación o compensación o tiene ninguna relación con el Plan, el Acuerdo y/o su "Award", los cuales son patrocinados única y exclusivamente por la Compañía, la cual es la única parte responsable por contribuir cualesquiera montos en términos del Plan y/o el Acuerdo y es la única parte responsable por realizar cualesquiera pagos u otorgar cualquier gratificación o compensación en términos del Plan, el Acuerdo y/o su "Award". En términos de lo anterior, usted acuerda y reconoce expresamente para todos los efectos legales a los que haya lugar que no se entenderá que su participación en el Plan, así como cualquier beneficio que derive del mismo, sean parte, deriven de o estén relacionados de cualquier forma con la relación laboral que usted pueda tener con el Empleador. En consecuencia, el "Award" no será considerado para efectos de integración salarial, en el entendido de que sólo aquellas prestaciones que cubre directamente el Empleador con motivo de la relación laboral pueden ser consideradas para tal efecto, lo cual no sucede en el caso del "Award".*

**Reconocimiento del Documento del Plan.** *Al aceptar el Otorgamiento de su "Award", usted reconoce que ha recibido una copia del Plan, ha revisado el mismo así como el Acuerdo de "Award" en su totalidad y que ha entendido y aceptado completamente todas las disposiciones contenidas en el Plan y en el Acuerdo de "Award".*

*Adicionalmente, al firmar el Acuerdo de "Award", reconoce que ha leído, y que aprueba específica y expresamente los términos y condiciones contenidos en la Sección 10 del Acuerdo ("Award Not A Service Contract") en el cual se aclara que el otorgamiento, conclusión del período para hacer exigible (vesting) o la liquidación de su "Award", no garantizan la continuación de sus servicios/relación con el Empleador y donde además se encuentra claramente descrito y establecido lo siguiente: (i) la participación en el Plan no constituye un derecho adquirido; (ii) el Plan y la participación en el mismo es ofrecido por la Compañía de forma enteramente discrecional; (iii) la participación en el Plan es voluntaria; y (iv) ni la Compañía, ni cualquier Filial son responsables por cualquier disminución en el valor de las Acciones en relación a su "RSU Award".*

20

Exhibit 10.9

*Finalmente, usted declara que no se reserva ninguna acción o derecho para interponer cualquier demanda en contra de la Compañía por cualquier compensación y/o daño o perjuicio alguno, como resultado de su participación en el Plan y, en consecuencia, otorga también el más amplio finiquito al Empleador, así como a la Compañía y cualquier Filial con respecto a cualquier demanda que pudiera originarse en virtud del Plan.*

***Obligaciones fiscales.*** *Al aceptar el otorgamiento de su "Award" y al firmar el Aviso de Otorgamiento, usted reconoce que es su responsabilidad el revisar y confirmar los efectos fiscales que pudieran derivarse como consecuencia de esta aceptación, con sus asesores fiscales.*

*Usted también reconoce que es de su conocimiento que cualquier impuesto generado por el otorgamiento y ejecución de su "Award" deberán ser reconocidos en su declaración o declaraciones mensuales y anuales de impuesto sobre la renta que deberá ser presentada conforme a la ley aplicable y, el impuesto sobre la renta correspondiente deberá ser pagado en tiempo y forma, si hubiera alguno. Es su obligación personal entregar a su Empleador, dentro de los 15 días siguientes contados a partir de la fecha límite para efectuar dicho pago, la documentación comprobatoria aplicable de la presentación de su declaración mensual provisional de impuesto sobre la renta, así como el pago de los impuestos aplicables.*

*No obstante, en caso de que su Empleador estuviese obligado a efectuar la retención de impuestos correspondiente, dependiendo del método de pago de su "Award", su Empleador le dará una notificación, dentro de los 5 días siguientes a partir del ejercicio de su "Award", con la intención de informarle que su Empleador realizará la retención de impuesto sobre la renta, la cual sustituirá su obligación de la presentación directa de la declaración mensual provisional de impuesto sobre la renta y el pago de impuestos correspondiente.*

***Terminación de Servicio Continuo.*** *Al aceptar el otorgamiento de su "Award" y firmar el Acuerdo de "Award", usted reconoce que ha leído y aprobado específicamente y de manera expresa los términos y condiciones de la Sección 6(b)(vi) del Plan ("Termination of Participant's Continuous Service") la cual aclara que si su Servicio Continuo con el Empleador termina por cualquier razón, cualquier porción de su "Award" que no haya completado el período para ser exigible (vesting) se perderá al momento de dicha terminación y usted no tendrá ningún derecho, propiedad o interés con relación a su "Award", las Acciones que pudieran emitirse en virtud de su "Award" o cualquier otra forma de compensación con relación a su "Award".*

*Adicionalmente a lo anterior, al firmar el Acuerdo de "Award", usted reconoce que la cual aclara que para efectos de su "Award", se considerará que su Servicio Continuo ha terminado en la fecha en la cual usted deje de prestar servicios activos al Empleador (sin importar la razón de dicha terminación o si se determina en cualquier momento que dicha terminación es invalida o violatoria a las leyes laborales de la jurisdicción donde usted preste sus servicios o los términos de su contrato de trabajo, en caso de aplicar) y que su derecho a hacer exigible (vest) su "Award" en los términos del Plan, en caso de aplicar, terminará a partir de dicha fecha y no se extenderá por cualquier período de aviso previo a la terminación, de suspensión (garden leave) o cualquier período similar que sea aplicable en términos de las leyes laborales de la jurisdicción donde usted preste sus servicios o los términos de su contrato de trabajo, en caso de aplicar, así como el que el Administrador del Plan tendrá la discreción exclusiva para determinar el momento a partir del cual usted no esté prestando servicios activamente para efectos de su "RSU Award" (así como para determinar si se considerará que usted está prestando servicios durante un período de ausencia [leave of absence]).*

***Idioma.*** *Usted reconoce dominar y conocer el idioma inglés lo suficiente o en su defecto, que ha consultado con un experto que domina y conoce el idioma inglés lo suficiente para que usted tenga un entendimiento completo y preciso de todos y cada uno de los términos y condiciones del Plan, del Acuerdo y del Aviso de*

21

**Exhibit 10.9**

*Otorgamiento. Si usted ha recibido una copia del Plan, el Acuerdo, el Aviso de Otorgamiento o cualquier otro documento relacionado con su "Award" traducido a cualquier idioma que no sea inglés y si en su caso el significado de dicha traducción es distinto al de la versión en inglés, usted acepta expresamente que la versión en inglés prevalecerá.*

**NETHERLANDS**

**NORWAY**

**Data Transfer.**  This provision supplements Section 24 of the Restricted Stock Unit Award Agreement:

The data controller is Snap Inc. 63 Market Street, Venice, CA 90291, United States. The data controller's representative in Norway is Snap Norway AS.

Where Data is to be transferred to a country which is not recognized as providing the same level of legal protection of personal data as in the European Economic Area, the Company, its Affiliates and your employer shall implement appropriate safeguards (e.g., the European Commission's Standard Contractual Clauses or the EU-U.S. Privacy Shield) in accordance with the applicable statutory requirements to ensure that any such transfer of Data is performed in accordance with such applicable legal requirements.

**SINGAPORE**

**Restriction on Sale of Shares**.  Shares of Common Stock acquired under the Plan prior to the six (6) month anniversary of the date of grant may not be sold or otherwise offered for sale in Singapore, unless such sale or offer is made (i) more than six months after the date of grant; or (ii) pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the Singapore Securities and Futures Act (Chapter 289) of Singapore ("**SFA**") or pursuant to, and in accordance with the conditions of, any other applicable provision(s) of the SFA.

**Securities Law Information**.  The Award is being granted to you pursuant to the "qualifying person" exemption under section 273(1)(i), read with section 273(4) of the SFA.  The Plan has not been, nor will it be, lodged or registered as a prospectus with the Monetary Authority of Singapore.

**Chief Executive Officer and Director Notification Obligation**.  You acknowledge that if you are the Chief Executive Officer ("**CEO**") or a director, as defined under the Companies Act (Chapter 50) of Singapore ("**Singapore Companies Act**") of a Singapore-incorporated subsidiary ("**Singapore Subsidiary**"), you are subject to certain disclosure requirements under the Singapore Companies Act.  Among these requirements is an obligation to notify the Singapore Subsidiary in writing of any interest in shares, debentures, rights, participatory interests (where you are a director) or options (e.g., Awards or shares of Common Stock) in the Singapore Subsidiary and/or its "related corporation" as defined under the Singapore Companies Act, within two business days of (i) its acquisition or disposal, or (ii) becoming a CEO or a director, whichever is later. In addition, you are also required to notify the Singapore Subsidiary in writing of any change in previously disclosed interest (*e.g.*, when the shares of Common Stock are sold) within two business days after the occurrence of the event giving rise to the change.

22

**Exhibit 10.9**

**Personal Data**. Section 24 (Data Transfer) of the Award Agreement is deleted and replaced with the following:

"You explicitly and unambiguously acknowledge and consent to the collection, use, disclosure and transfer, in electronic or other form, of your Personal Data as described in this document by and among, as applicable, your employer, the Company and its Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.  You understand that the Personal Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, in particular in the US, and that the recipient country may have different data privacy laws providing less protections of your Personal Data than Singapore, in which case the Company will ensure that such recipient(s) provide a standard of protection to such Personal Data so transferred that is comparable to the protection under the Singapore Personal Data Protection Act 2012 (No. 26 of 2012) ("**PDPA**").  You may request a list with the names and addresses of any potential recipients of the Personal Data by contacting the stock plan administrator at the Company (the "**Stock Plan Administrator**").  You acknowledge that the recipients may receive, possess, process, use, retain and transfer the Personal Data, in electronic or other form, for the purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Personal Data, as may be required to a broker or other third party with whom you may elect to deposit any shares of Common Stock acquired upon the vesting of your RSU Award.  You understand that Personal Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that the purposes for which your Personal Data will be collected or held may continue to apply even in situations where your employment with your employer has been terminated or altered. You may, at any time, view the Personal Data, request additional information about the storage and processing of the Personal Data, require any necessary amendments to the Personal Data or refuse or withdraw the consents herein, in any case without cost, by contacting the Stock Plan Administrator in writing.

For the purposes of this clause, "Personal Data" has the same meaning as set out in the PDPA."

**S<small>WEDEN</small>**

There are no country-specific terms.

**S<small>WITZERLAND</small>**

**Grant of the Award.**  The Award granted to a Swiss Participant is a voluntary gratuity (*Gratifikation*) as determined at the Company's sole discretion which the Participant has no entitlement to and which does not constitute an entitlement of the Participant for a grant of further Awards in the future.

**Language Acknowledgement.**  You confirm having read and understood the documents relating to the Plan, including the Award Agreement, with all terms and conditions included therein, which were provided in the English language only.  You confirm that you have sufficient language capabilities to understand these terms and conditions in full.

*Du bestätigst, dass du den Plan sowie die dazugehörigen Dokumente, inklusive der Vereinbarung, mit all den darin enthaltenen Bedingungen und Voraussetzungen, welche in englischer Sprache verfasst sind, gelesen und verstanden hast. Du bestätigst dass Deine Sprachkenntnisse genügend sind, um die Bedingungen und Voraussetzungen zu verstehen.*

**Securities Law Information.**  You acknowledge that the Plan is not intended to be publicly offered in or from Switzerland.  Neither the Award Agreement nor any other materials relating to the option constitutes a prospectus as such term is understood pursuant to article 652a of the Swiss Code of Obligations, and

23

Exhibit 10.9

neither the Award Agreement nor any other materials relating to the option may be publicly distributed nor otherwise made publicly available in Switzerland.

**UKRAINE**

**Securities Law and Other Compliance.**  You are solely liable for obtaining all permits, authorizations, licenses and/or approvals from, and/or make any and all notifications to, any governmental authorities in Ukraine, including without limitation, an individual license for foreign investments, as may be required by any applicable laws of Ukraine, to enable you to legitimately participate in the Plan and/or receive the Award.

**Tax.**  By accepting the Award and accepting the terms of the Award Agreement, you acknowledge and agree to comply with all applicable Ukrainian laws and report any income and pay any and all applicable taxes and other mandatory contributions, as required by Ukrainian laws, associated with the Award, the sale of shares of Common Stock acquired under the Plan, and the receipt of any dividends paid on such shares of Common Stock.

**No Award for the Entrepreneurial Activity Statement for Employees.**  If you work for the Company or its Affiliates under an employment agreement, by accepting the Award and accepting the terms of the Award Agreement you acknowledge and agree that the Award is provided to you not in connection with your entrepreneurial activity (if any conducted by you) but in connection with your Continuous Service as an employee of the Company or its Affiliate.

**Language.**  You confirm having read and understood the documents relating to the Plan, including the Award Agreement with all terms and conditions included therein, which were provided in the English language.  You accept the terms of those documents accordingly and do not need their translation into Ukrainian.

**UNITED ARAB EMIRATES**

**Securities Law Information.**  Participation in the Plan is being offered only to Employees, Consultants and Directors of the Company and its Affiliates, and is in the nature of providing equity incentives to those providing services in the United Arab Emirates.  The Plan and the Award Agreement are intended for distribution only to such participants and must not be delivered to, or relied on by, any other person.  You should conduct your own due diligence on the securities.  If you do not understand the contents of the Plan or the Award Agreement, you understand that you should consult an authorized financial adviser.

This Award Agreement and the Plan have not been approved or licensed by the UAE Central Bank, the Securities and Commodities Authority or any other relevant licensing authorities or governmental agencies in the United Arab Emirates.  This Award Agreement is strictly private and confidential and the terms of the Award Agreement and the Plan have not been reviewed by, deposited or registered with the UAE Central Bank, the Securities and Commodities Authority or any other licensing authority or governmental agencies in the United Arab Emirates.  This offer is being issued from outside the United Arab Emirates to a limited number of employees of an Affiliate of the Company and must not be provided to any person other than the original recipient and may not be reproduced or used for any other purpose.  Further, the information contained in this Award Agreement and the Plan is not intended to lead to the issue of any securities or the conclusion of any other contract of whatsoever nature within the territory of the United Arab Emirates.

24

**Exhibit 10.9**

### UNITED KINGDOM

**Award Not a Service Contract.** The following supplements Section 10 of the Award Agreement:

(c)        You waive all rights to compensation or damages in consequence of the termination of your office or employment with the Company or any affiliate for any reason whatsoever (whether lawful or unlawful and including, without prejudice to the foregoing, in circumstances giving rise to a claim for wrongful dismissal) in so far as those rights arise or may arise from you ceasing to hold or being able to vest your Award, or from the loss on diminution in value of any rights or entitlements in connection with the Plan.

**Tax Withholding Obligations.**  The following supplements Section 11 of the Award Agreement:

        **(d)**        As a condition of the vesting of your Award, you therefore unconditionally and irrevocably agree:

        (i)        to place the Company in funds and indemnify the Company in respect of (1) all liability to UK income tax which the Company is liable to account for on your behalf directly to HM Revenue & Customs; (2) all liability to national insurance contributions which the Company is liable to account for on your behalf to HM Revenue & Customs (including secondary class 1 (employer's) national insurance contributions for which you are liable); and (3) all liability to national insurance contributions for which the Company is liable which arises as a consequence of or in connection with your Award (the "***UK Tax Liability***"); or

        (ii)        to permit the Company to sell at the best price which it can reasonably obtain such number of shares of Common Stock allocated or allotted to you following vesting as will provide the Company with an amount equal to the UK Tax Liability; and to permit the Company to withhold an amount not exceeding the UK Tax Liability from any payment made to you (including, but not limited to salary); and

        (iii)        if so required by the Company, and, to the extent permitted by law, to enter into a joint election or other arrangements under which the liability for all or part of such employer's national insurance contributions liability is transferred to you; and

        (iv)        if so required by the Company, to enter into a joint election within Section 431 of (UK) Income Tax (Earnings and Pensions) Act 2003 ("***ITEPA***") in respect of computing any tax charge on the acquisition of "restricted securities" (as defined in Section 423 and 424 of ITEPA); and

        (v)        to sign, promptly, all documents required by the Company to effect the terms of this provision, and references in this provision to "the Company" shall, if applicable, be construed as also referring to any Affiliate.

**Acknowledgment of Forfeiture and Clawback Provisions.** By accepting the Award, you acknowledge being subject to the provisions of any forfeiture and claw-back policy implemented by the Company, including, without limitation, any clawback policy adopted to comply with the requirements of applicable law.

25

Exhibit 10.16

**Snap Inc.**

October 7, 2020

Jerry Hunter
Via email
Dear Jerry,
This letter confirms the expectations of Snap Inc. (the "Company") with regard to the following terms of your full-time, exempt position of SVP, Engineering going forward:

You primarily will work at our office located in Seattle, Washington.  Of course, the Company may change your position, duties, and work location from time to time at its discretion, and you occasionally may need to work from the Company's other locations, including Santa Monica, California.

You will receive an annual salary of $500,000, which will be paid bi-weekly, less applicable payroll deductions and tax withholdings. You will continue your same eligibility for our broad range of benefits. Keep in mind that the Company may change compensation and benefits from time to time at its discretion.

Your employment relationship with the Company continues to remain at-will. You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the Company. Likewise, the Company may terminate your employment at any time, with or without cause or advance notice. Your employment at-will status can only be modified in a written agreement signed by you and by an officer of the Company.

This letter forms the complete and exclusive statement of the revised expectations of your employment with the Company. It supersedes any other agreements or promises made to you by anyone, whether oral or written. Changes in your employment terms, other than those changes expressly reserved to the Company's discretion in this letter, require a written modification signed by an officer of the Company.

Sincerely,
 /s/ Lara Sweet

Lara Sweet
Chief People Officer

Accepted and agreed:

 /s/ Jerry Hunter

Jerry Hunter

Exhibit 10.22

**SNAP INC.**
**2021 BONUS PROGRAM**

**Overview**

This Snap Inc. (the "**Company**") 2021 Bonus Program (the "**Program**") is effective as of January 1, 2021 (the "**Effective Date**"). The Program is designed to motivate, retain, and reward Company employees through corporate performance-based incentive compensation objectives from the Effective Date through December 31, 2021 (the "**Performance Period**").

To be eligible to earn and receive a bonus under the Program, individuals must be employed by the Company during the Performance Period and designated for participation by the Compensation Committee of the Company's Board of Directors (the "**Committee**") and be employed by the Company on the Payment Date (as defined below) (each a "**Participant**"). The Program will be administered by the Committee.

The Program is designed to award a bonus payment (each a "**Bonus**") for performance during the Performance Period to Participants based in part on the level of achievement by the Company of certain Company-wide objectives and key results (the "**Corporate OKRs**").

**Program Objectives**

The Program is intended to encourage and reward the achievement of Corporate OKRs and the contributions and efforts of the Participants.

**Determination of Program Objectives**

The Corporate OKRs will be approved by the Committee. Each Corporate OKR category will be assigned a relative weighting by the Committee based on recommendations by the Chief Executive Officer, reflecting its importance to the achievement of the Company's key results during the Performance Period. The Committee may adjust the weighting of the Corporate OKRs in its sole discretion at any time.

**Program Bonus Targets**

Under the Program, each Participant is eligible to earn a Bonus in an amount up to a specified percentage of his or her annual base salary that is earned in 2021, with such percentage based in part on the position such Participant holds with the Company (the "**Bonus Target**"). Under the Program, the Bonus Targets are up to 100% of a Participant's 2021 base salary.

**Determining the Bonus Payments**

The Company will determine the level of achievement of Corporate OKRs shortly after the end of the Performance Period.

- *Corporate OKRs*: The Committee will determine, after receiving and considering any analyses and recommendations from management, the degree to which the Corporate OKRs have been met, expressed as a percentage of the Corporate OKRs achieved, taking into consideration the weighting assigned to each Corporate OKR. Based on the percentage of Corporate OKRs achieved, the Committee will then determine the final aggregate bonus pool under the Program for all Participants (the "**Bonus Pool**").

Exhibit 10.22

- *Adjustment of Bonus Targets*: Bonus Target levels for Participants will be adjusted based on the level of achievement of Corporate OKRs as determined by the Committee. The Committee also has the right, in its sole discretion, to adjust the Bonus Target level for any Participant upward in the event of over-achievement of the Corporate OKRs as determined by the Committee.

- *Determination of Bonus Payments*: The actual Bonus earned by a Participant is based on the Participant's (1) level of contribution to the achievement of the Corporate OKRs and (2) Bonus Target. There is no set formula for determining the amount of the Bonus earned based on the achievement of Corporate OKRs. Rather, the Committee will exercise its discretion in determining the amount of the Bonus actually earned, which determination will be final and binding.

In making its determination, the Committee will consider the recommendations made by the Chief Executive Officer. In addition, the Committee may also take into account the achievement of publicly announced targets, strategic goals, cross-functional teamwork and collaboration, and unforeseen changes in the economy.

**Timing of Bonus Payments**

Payment of Bonuses earned under the Program is expected to occur in the first quarter of 2022 following the conclusion of the Performance Period as determined by the Committee in its sole discretion (the "**Payment Date**"). Any Bonuses earned by Participants will be paid in cash or shares of Snap Inc. Class A common stock granted under the Snap Inc. 2017 Equity Incentive Plan at the Company's discretion. A Participant must be employed by the Company on the Payment Date to earn any Bonus. In the event that a Participant terminates employment or service with the Company for any reason prior to the Payment Date, the Participant will forfeit his or her right to payment of any Bonus.

**Miscellaneous Provisions**

Participation in the Program will not alter Participant's at-will employment, and such employment may be terminated at any time for any reason, with or without cause, and with or without prior notice. Nothing in this Program will be construed to be a guarantee that any Participant will receive all or part of a Bonus or to imply a contract between the Company and any Participant.

This Program supersedes and replaces all prior incentive and bonus plans of the Company. The Committee may amend or terminate this Program at any time, with or without notice. The Committee may likewise terminate an individual's participation in the Program at any time, with or without notice. Further, the Committee may modify the Corporate OKRs, the Bonus Targets, ot the weighting of the Corporate OKRs at any time.

Any Bonuses paid under this Program will be subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company, or as is otherwise required by applicable law.

It is intended that the Program and any Bonuses granted and paid under the Program be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the Committee will interpret and administer the Program accordingly.

The Program will be interpreted in accordance with California law without reference to conflicts of law principles.

Jared Grusd
Via Email

Re: New Employment Agreement and Transition Agreement

Jared,

This letter outlines the terms of the transition of your role at Snap Inc. ("Snap") from Chief Strategy Officer to Strategic Advisor. The effective date of this letter is the date Snap signs below.

1.  You and Snap plan to enter into a new fixed term employment agreement, beginning on February 1, 2021 and ending on June 30, 2022.  Snap may extend the term of the fixed term agreement, if we mutually agree.  Your last day as our Chief Strategy Officer will be January 31, 2021.

2.  The vesting of your equity award and the other terms of your new employment agreement will be agreed upon separately.  After the equity acceleration in Section 3, you will continue to vest 21.44% of all remaining unvested Snap equity, subject to continued employment, in monthly equal installments from April 2021 through June 2022, with the remaining equity award forfeited.

3.  Following your execution of our standard release agreement and expiration of any required rescission period, Snap will:

    - accelerate the vesting of any unvested equity awards already granted to you, that vest pursuant to a monthly schedule, that are scheduled to vest through March 15, 2021; and

    - pay you the salary that you would have earned had you remained our Chief Strategy Officer through March 31, 2021, including your executive bonus under the 2020 Bonus Program.

4.  You confirm that this transition to a new role is not related to any disagreement with Snap on any matter relating to Snap's accounting, strategy, management, operations, policies, regulatory matters, or practices (financial or otherwise).

If this agreement is acceptable to you, please sign below and return the original to Snap.

Sincerely,

Snap Inc.

/s/ Michael O'Sullivan
Michael O'Sullivan
Date:  February 3, 2021

Accepted and agreed:

/s/ Jared Grusd
Jared Grusd
Date: February 3, 2021

Exhibit 21.1

**Subsidiaries of the Registrant**

| Name of Subsidiary | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Snap LLC | Nevada |
| Snap Group Limited | United Kingdom |
| Snap International I Limited | United Kingdom |
| Snap International II Limited | United Kingdom |
| Snap Intermediate Inc. | Delaware |
| Snap Group SAS | France |
| Snap Aus Pty Ltd | Australia |

**Exhibit 23.1**

### Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

(1)   Registration Statements (Form S-8 No. 333-216495, 333-224591, 333-229530, 333-236257) pertaining to the Snap Inc. Amended and Restated 2012 Equity Incentive Plan, Snap Inc. Amended and Restated 2014 Equity Incentive Plan, Snap Inc. 2017 Equity Incentive Plan, Snap Inc. 2017 Employee Stock Purchase Plan, and the Snap Inc. Restricted Stock Unit Award Agreement with Evan Spiegel

(2)   Registration Statement (Form S-3 ASR No. 333-224592) of Snap Inc.

of our reports dated February 4, 2021, with respect to the consolidated financial statements of Snap Inc., and the effectiveness of internal control over financial reporting of Snap Inc., included in this Annual Report (Form 10-K) for the year ended December 31, 2020.

/s/ Ernst & Young LLP
Los Angeles, California
February 4, 2021

Exhibit 31.1

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Evan Spiegel, certify that:

1. I have reviewed this annual report on Form 10-K of Snap Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 4, 2021

/s/ Evan Spiegel
_____
Evan Spiegel
Chief Executive Officer
*(Principal Executive Officer)*

Exhibit 31.2

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Derek Andersen, certify that:

1.   I have reviewed this annual report on Form 10-K of Snap Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 4, 2021

/s/ Derek Andersen
Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

Exhibit 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Snap Inc. (the "Company") on Form 10-K for the year ended December 31, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: February 4, 2021

/s/ Evan Spiegel
Evan Spiegel
Chief Executive Officer
*(Principal Executive Officer)*

Date: February 4, 2021

/s/ Derek Andersen
Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

# Exhibit 410

Case 1:20-cv-03590-JEB    Document 324-91    Filed 04/05/24    Page 662 of 664

# How to Get a Snap Show to Make Money As an Influencer: Talent Manager

**BI** **businessinsider.com**/snap-show-top-strategies-pitching-snapchat-influencer-manager-content-video-2023-4

Marta Biino, Shriya Bhattacharya



- Snapchat creators can pitch shows that appear on the platform's stories feed.
- If approved by the company, the show and creator make money through ad-revenue sharing.
- Cameron Ajdari, an influencer manager who's landed four shows, shared his tips for a successful pitch.

Of all the ways Snapchat creators can monetize their content, shows are becoming increasingly attractive because of the exposure they get on the platform.

Introduced on Snapchat in 2016, shows are similar to stories, which are vertical pieces of short-form content that last for 24 hours. However, unlike stories, shows don't expire. They typically consist of three-to-five-minute long episodes that are more polished than stories and focus on

specific topics or themes. They're promoted prominently on the platform's Discover feed, which is on the stories page that's directly to the right of the camera.

On shows — and, more recently, on stories — creators earn a cut of the revenue from ads that appear in the content. Snap does not publicly disclose what the revenue split is, but some creators have said the ad-revenue program in general has been quite lucrative for them.

While anyone can pitch a show through a Google form, shows are created by a select community of partners, including news outlets, media companies, creators, sports teams, and more, a Snap spokesperson told Insider. The content needs to be original, and the creator or licensor needs to have the rights to it.

Cameron Ajdari, founder of the digital-talent management firm Currents, has landed four shows for his clients since the start of 2023.

The first and most successful one, "Couple Pranks," averages 12 million to 15 million views a month with roughly two videos a week, Ajdari said.

Related stories

Ajdari shared the best practices that have helped his company pitch shows to Snap successfully.

A man and a woman hugging each other and smiling at the camera in front of a purple background.

Chris and Chenoa Vale host the "Couple Pranks" Snap show. Currents Management

## Here are Ajdari's top 3 strategies for landing a successful Snap show:

### Go to a licensed content partner

Pitching a show requires "a bit of behind-the-scenes maneuvering," Ajdari said.

While there are technically no limitations for individual creators to pitch a Snap show, Ajdari recommends creators get help from licensing partners, like Jellysmack and Studio71, or smaller players like his firm Currents, rather than try their own luck.

These companies help liaise with Snap, and handle the administration and distribution of shows in exchange for a portion of the revenue.

"One of the things I've observed with Snap is they have strict guidelines," Ajdari said. "They want to make sure they've vetted you."

3/27/24, 2:25 PM
Case 1:20-cv-03590-JEB Document 324-93ke Filed 04/05/24r Manager of 664
How to get a Snap show to take off, according to Snap's content manager

For smaller firms that want to ensure their success when pitching a show, Ajdari recommends building relationships with Snap employees first. Otherwise, the process can be "a bit of a black box," he said.

## Make sure you have a 'Snappy' theme

Unlike with stories from individual creators that can focus on everyday life, Snap only green-lights shows with specific themes.

The subject needs to be "Snappy," Ajdari said, meaning that it needs to "match the ecosystem of Snap."

In his experience, this means something attention-grabbing, a little sensational, with an interesting visual component, and with quick cuts to help increase retention.

Here are some topics that can work for shows, according to an email Ajdari received from Snap:

- Beauty creator shows
- Satisfying content (e.g. pressure washing, slime, hydraulic presses)
- General entertainment format shows (i.e. MTV's "Fear Factor" revival, "Hot Ones")
- Fashion-person deep dives
- Aspirational living
- Hosted or personality-driven hard news
- Single-topic or explainer hard news
- Inspirational non-traditional sports
- Combat sports

## Repurpose your existing content

Creators can lay the groundwork for a show pitch by looking to the content they're already publishing on other video platforms like YouTube or TikTok, Ajdari said.

"Think about the key theme or some of the key elements that make your content unique," he said. "Highlight that, describe it in a concise way, then package the best content you have out there already into three- to five-minute videos."

Creators of long-form content, like podcasts, can try a different avenue: splicing short clips of the most "meaty" parts of their podcast episodes, the way many creators do for other short-form platforms, Adjari said.