# Volume 28: Exhibits 411-427

# Exhibit 411



# What is Snapchat – A Marketers Guide for 2024

Sarah Anderson

December 12, 2023

Blog, Marketing, Social



Often described as the digital playground for the modern generation, Snapchat is a unique social media platform that has disrupted how we communicate, share moments, and tell our stories. Its defining feature? The temporary nature of the content it hosts.

Beneath the surface of its disappearing photos and videos lies a vibrant world of innovation and connectivity, transforming the way we interact with our friends, family, and even the world at

Source: https://perma.cc/2LMT-8BSZ                                    Created 2024-04-01 at 09:26

large.

You probably have several questions like: what is Snapchat, what is Snapchat used for, and what is a Snapchat streak? I'll answer all these questions so you can know how to leverage the platform and elevate your digital presence and storytelling prowess.

Let's delve into the fascinating world of Snapchat and discover why it's more than just a passing fad.

## What is Snapchat

Snapchat is a multimedia messaging app that has taken the social media world by storm. Launched in 2011 by Evan Spiegel, Bobby Murphy, and Reggie Brown, this platform has redefined how we share moments with friends and followers.

At its core, Snapchat allows users to send photos, videos, and messages that have a unique twist – they self-destruct after being viewed, typically within a matter of seconds.

## Snapchat Features and Terminologies

If you have accounts on popular social media platforms, you're probably familiar with terminologies, such as Reels, Stories, Pins, Vines, Subreddits, Boards, etc. These platform-specific terms are designed to make it easier for users to engage with and navigate these unique digital spaces.

Snapchat is no exception when it comes to having its own unique platform-specific terminology. I've listed the most common Snapchat features and terminologies so you won't have a hard time figuring them out the first time you see them:

- **Snaps:** These are photos or short videos you can send to

Source: https://perma.cc/2LMT-8BSZ                                        Created 2024-04-01 at 09:26

your friends or add to your story. You can embellish Snaps with various filters, stickers, text, and drawings.

- **Bitmoji:** Bitmoji is an avatar-creation feature that allows you to create a personalized emoji that looks like you. You can use your Bitmoji in Snaps, chat, and Stories.

- **Geofilters:** These are location-based filters that can be applied to your Snaps when you're in specific geographic areas. They're often associated with landmarks, events, or popular places.

- **Snapstreak:** A Snapstreak is created when you and a friend exchange Snaps for consecutive days. The longer the streak, the more emojis you unlock to represent it.

- **Snapcode:** A Snapcode is a unique QR code that allows users to add friends on Snapchat easily. You can scan someone's Snapcode to add them to your friend list.

- **Snap Map:** This feature enables you to share your location with friends and view their locations on a map. You can choose to share your location with specific friends or stay in "Ghost Mode" for privacy.

- **Other Snapchatters:** These are the users who viewed your Snapchat story that you don't follow on the app.

- **Stories:** Snapchat Stories allow users to create a compilation of Snaps that friends can view for 24 hours. This feature is a way to share your day's highlights and is a popular form of self-expression.

- **Discover:** Discover is a section of Snapchat where you can find content from publishers, brands, and creators. It features articles, videos, and interactive content on various topics.

- **Lenses:** Lenses are interactive filters you can apply to your face in real-time. They can change your appearance, add animations, and even play music when you open your mouth.

- **Chat**: Snapchat has a chat feature that lets you send text, images, and video messages to your friends. You can also start group chats and send Snaps within chats.

- **Memories:** Memories is a feature that allows you to save and organize your Snaps and Stories. You can access and reshare them at a later time.

- **Score:** Every user on Snapchat has a score, which represents their activity on the platform. You earn points for sending and receiving Snaps, stories, and other interactions.

- **Discover Friends:** This feature helps you discover new friends on Snapchat by matching your phone contacts with Snapchat usernames.

These are some of the most common features and terms associated with Snapchat. The platform continues to evolve, introducing new features and terminologies to keep its user base engaged and entertained.

## Schedule Social Media Posts Like a Champ!

Switch to Social Champ to experience powerful social media management like never before with multiple automation features & integrations.

Get Started FREE    View Pricing

# How to Get Started as a Business on Snapchat in 2024?

Like you need a Facebook business page for your business, you need to have a Snapchat business account. This is essential for

advertising and provides access to Snapchat's advertising platform, Ads Manager.

Follow the steps below to get started:

1. ## Download the Snapchat App

   Hop on your smartphone or tablet and head over to your device's app store (Apple App Store for iOS or Google Play Store for Android). Search for "Snapchat" and click "Install."

   

   Snapchat – Step 1

2. ## Create a Personal Snapchat Account

After installing Snapchat on your device, go ahead and tap on the app icon to open it. You can then follow the steps below:

- **Sign up**



Business on Snapchat – Step 2

On the initial screen, tap the "Sign Up" button.

- **Enable app permissions**



Business on Snapchat – Step 3

Once you click on the Sign-Up button, Snapchat will prompt you to enable app permissions. Click "Continue."

- **Provide your first name and last name**



Business on Snapchat – Step 4

Source: https://perma.cc/2LMT-8BSZ                                                                                    Created 2024-04-01 at 09:26



Business on Snapchat – Step 4 (a)

Enter your first and last name and tap "Continue."

- **Set your birthday**



Business on Snapchat – Step 5

Set your month, date, and year, and then click the "Continue" button.

- **Choose a username**

Source: https://perma.cc/2LMT-8BSZ                                                    Created 2024-04-01 at 09:26



Business on Snapchat – Step 6

Create a unique username. This will be your identity on Snapchat.

- **Create a password**



Business on Snapchat – Step 7

Choose a strong password for your account.

- **Enter your phone number**

You'll be asked to select your country and phone number.

Source: https://perma.cc/2LMT-8BSZ



Business on Snapchat – Step 8

Once you've added your phone number, you can tap "Finish." Snapchat will send a verification code to the chosen option. Check your email or phone for the verification code and enter it in the Snapchat app to confirm your contact information.

**[Optional Steps]**

- Snapchat may prompt you to find friends from your contact list. You can add friends from your contacts.
- You can create or link a Bitmoji avatar to your

Snapchat account.

- Snapchat will request permission to send you notifications. You can choose to enable or disable this feature.

- Snapchat may offer a brief tour of the app's features. You can choose to take the tour or skip it.

Once you create your account, you can start using Snapchat to send Snaps, add friends, and explore the app's features.

That's it! You've successfully created a Snapchat account and can now start using the app to share photos and videos with your friends, add to your Story, and engage with the Snapchat community.

3. **Register for a Business Snapchat Account**

After setting up a personal Snapchat account, you can proceed to register for a business account. Here are the steps to follow:

- **Go to the Snapchat Ads landing page**

Source: https://perma.cc/2LMT-8BSZ                                    Created 2024-04-01 at 09:26



## Register for a Business Snapchat – Step 1

You can only set up your business Snapchat account through the platforms ads page, which you can access via the Snapchat Business Manager.  It will take you to the page below:

Register for a Business Snapchat – Step 2

You'll need to log in to Snapchat using the same username and password that you use for your personal Snapchat account. You may be required to complete a puzzle to verify you're human.



Register for a Business Snapchat – Step 3

Once you've passed the verification process, you'll be directed to your account. You can then access the Ads page from the menu.



Register for a Business Snapchat – Step 4

Once you click on "Ads Manager," you'll be directed to the following page:

Enter your business's name, business email address, and your name. Click "Next."

- **State where you do business**



Register for a Business Snapchat – Step 5

Snapchat will prompt you to share your business location, currency, and your business phone number. Note that not all countries are available on the drop-down menu. As at October 2023, business sign up was available in select countries.

Nevertheless, you can click next and continue with the signup process even if sign-up is not available for your

country.

- **Complete your public profile**



Register for a Business Snapchat – Step 6

Once you click next, you can add a profile photo and decide whether to use a different username.

If you want to use the current username, you can click "Create Public Profile," and your Snapchat business account will be all set and ready for use.

**Related Article:** *How to Optimize Snapchat for Business*

## 5 Benefits of Snapchat as a Business

Snapchat offers a range of benefits for businesses looking to connect with a younger, engaged audience. Still unsure? Well, here are five benefits your business can derive from having a presence on Snapchat:

1. ## Access to a Young Demographic

Snapchat is extremely popular among younger users, making it an ideal platform to target Generation Z and Millennials. Thanks to the platform's creative advertising options, including filters, lenses, and interactive content, you can showcase your brand innovatively, fostering a deeper connection with younger consumers who appreciate brand authenticity and transparency.

How can marketing to the younger generation on this platform benefit my business? You ask. Statistics reveal that 97% of Gen Z consumers now use social media as their top source of shopping inspiration.

2. ## Creative Advertising Options

The creative advertising options offered by Snapchat present an invaluable opportunity for businesses to stand out and leave a lasting impression. Whether it's Snap Ads, Filters, or Lenses, these interactive formats provide a unique and engaging way to connect with a young, tech-savvy audience.

Snap Ads, for instance, allow for short, captivating videos that can be seamlessly integrated into users' Stories, putting your brand front and center. As for Filters and Lenses, they offer an immersive and shareable experience, allowing users to interact with your brand through playful animations or augmented reality effects.

In a crowded digital landscape, Snapchat's creative advertising options are a breath of fresh air, helping businesses build stronger connections and inspire brand loyalty in a generation that values innovation and

authenticity.

3. **Real-Time Interaction**

According to a Salesforce report, 76% of customers expect consistent interactions across departments. This underscores the importance of real-time interaction between businesses and their customers.

Snapchat's real-time interaction capabilities offer a dynamic and authentic way for businesses to connect with their audience. In an era where consumers seek instant and personalized communication, Snapchat's real-time interaction keeps businesses in tune with their customers' demands.

The platform's chat and messaging features enable immediate communication and engagement, fostering a personal connection with customers. This direct interaction allows businesses to address inquiries, provide real-time customer support, and gather valuable feedback, all of which contribute to building trust and credibility.

4. **Location-Based Marketing**

Statistics reveal that 9 in 10 marketers believe location-based marketing leads to higher sales and increased customer engagement. Snapchat is one of the social media platforms with location-based marketing capabilities that provide businesses with a powerful tool to target and engage customers at a hyper-local level.

With features like Geofilters and Snap Map, companies can create location-specific promotions, events, and branded filters, allowing them to connect with potential

Source: https://perma.cc/2LMT-8BSZ                                                Created 2024-04-01 at 09:26

customers in real-world settings. This localization not only enhances engagement but also drives foot traffic to physical stores or events.

5. **Discoverability**

Discoverability is important because it directly impacts user experience and how potential customers interact with digital products. Snapchat underscores the importance of discoverability, which is why they offer the Discover feature. This is essentially a curated section where users explore content from various publishers, brands, and creators.

To ensure that your target audience discovers your business, you can share news, entertainment, and information on the Discover section. This exposure can increase brand awareness and provide a valuable channel to share relevant and engaging content.

The above five benefits, combined with the platform's unique and creative features, make Snapchat a valuable tool for businesses aiming to connect with younger consumers and promote their products or services.

**Related Article:** 50 Snapchat Statistics: Why Do They Matter to Marketers in 2023

# Navigating the world of Snapchat

Being new to Snapchat can indeed be a bewildering experience, leaving you  feeling a bit lost. While the initial confusion might be a common experience, it's also the

beginning of an exciting journey into the world of Snapchat.

Here's an outline to help you navigate the key aspects of Snapchat:

1. **Home Screen**



Snapchat Home Screen

When you open the app using an Android phone, you're greeted with the camera screen. This is where you can take and send photos and videos. Simply tap the screen to take a photo or hold it to record a video.

The camera interface includes several features and functions, including:

- **Camera switch**: On the upper right corner, you'll find the camera switch icon that allows you to toggle between the front and rear camera.
- **Flash**: The flash icon allows you to control the flash settings, including turning it on, off, or setting it to "auto" based on lighting conditions.
- **Camera roll**: You can access your device's photo gallery to upload and share existing photos and videos by tapping the camera roll icon.
- **Sounds:** You can tap on the audio icon to search and add music, or create a sound.
- **Night mode:** This icon appears as a moon and its purpose is to reduce glare and strain on the eyes when using your device in low-light conditions, such as during the evening or at night.
- **+ icon**: When you tap the "+" icon, you'll access more features like the grid to get proportions right, timer for setting a countdown or video timer, and multi snap for taking multiple snaps in one session, etc.
- **Scanner**: You can use this feature to scan Snapcodes, which are unique QR codes associated with Snapchat profiles. When you scan a Snapcode using this feature, you can quickly add a friend, follow a brand, or unlock various features and lenses.

2. **Chat**

To access your chat conversations with friends, you can either click "Chat" or swipe right from the camera screen.



Snapchat Chat

Here, you can send text, photos, and videos to your friends.

3. **Stories**

Source: https://perma.cc/2LMT-8BSZ

Created 2024-04-01 at 09:26



Snapchat stories

You can click "Stories" or swipe left from the camera screen to access the Stories page.

Here, you can view Stories posted by your friends and explore content from Discover, which includes publishers, creators, and brands.

4. **Snap Map**

Source: https://perma.cc/2LMT-8BSZ                                    Created 2024-04-01 at 09:26

Click on "Map" or swipe down on the camera screen to access the Snap Map.



Snap Maps

The map shows your friends' locations on a map if they have enabled location sharing.

5. **Discover**

Source: https://perma.cc/2LMT-8BSZ



Snapchat Discover

On the Stories page, you should swipe to the right to access Discover, where you can explore content from various publishers, creators, and brands.

6. **Profile**

Tap your Bitmoji or profile icon in the upper left corner of the camera screen to access your profile.



Snapchat Profile

Here, you can create your Avatar, edit your Bitmoji, view your Snapcode, and access settings.

7. **Settings**

Access the settings by tapping the gear icon on your profile.



Snapchat settings

Here, you can manage your account settings, privacy, notifications, and more. See below:

Source: https://perma.cc/2LMT-8BSZ                                                                                          Created 2024-04-01 at 09:26



Snapchat Settings (a)

8. **Filters and Lenses**



Snapchat filters

While taking a Snap, swipe left or right to access various filters, stickers, and Lenses to enhance your content.

9. **Memories**



Snapchat memories

To access your saved Snaps and Stories, swipe up on the camera screen.

You can also upload content from your device to Memories.

10. **Snap Map and Location Sharing**



Snapchat location

Adjust your location settings by going to your profile, selecting settings, and then "See My Location" to control who can see your location.

## 11. **Discover Friends**



Snapchat friends

To add friends from your contacts, go to your profile, select "Add Friends," and then "Find Friends."

Those are the most frequently used features on Snapchat. Of course there are dozens, if not hundreds, of features on the platform. Luckily, navigating Snapchat becomes more intuitive as you use the app regularly.

Keep in mind that Snapchat often introduces new features and updates, so staying up to date with the platform's changes can enhance your experience and keep your interactions current.

# Sending Snaps & Uploading Stories Using Snapchat

Creating a Snap on Snapchat is a simple process. Here are the steps to guide you through it:

- **Open Snapchat**
  Launch the Snapchat app on your smartphone or tablet. Make sure you're logged into your account.You will start on the camera screen, which is the default view when you open the app. This is where you can create your Snap.

- **Capture a Photo or Video**To take a photo, tap the large circular button at the bottom center of the screen.To record a video, hold down the same button. Release it when you want to stop recording.

- **Add Filters and Effects (Optional)**After capturing your Snap, swipe left or right on the screen to access various filters, stickers, text, and augmented reality (AR) effects. You can adjust these as desired.

- **Add a Caption (Optional)**If you want to add a caption to your Snap, tap the "T" icon, then type your text and place it on your Snap.

- **Set a Time Limit (Optional)**You can set a time limit for how long your Snap will be visible to the recipient. Tap the number in the bottom-left corner to adjust the duration (1 to 10 seconds), or select "∞" for no time limit.To make your Snap a "Story" (visible for 24 hours), you should tap "Story."

- **Send Your Snap**To send your Snap to specific friends, tap the next icon in the bottom-right corner.Select the recipients, and tap the "Send" button.You can also save your Snap to your device's camera roll by tapping the save icon.

# Conclusion

In 2023, Snapchat is more than just a platform; it's a canvas for creative expression, storytelling, and building a brand that resonates with the ever-discerning digital audience. So, get out there, Snap away, and let your business shine in the ephemeral, exciting world of Snapchat.

Just as Snapchat's content vanishes in the blink of an eye, the timeliness and precision of social media scheduling tools like Social Champ can make a difference in effectively conveying your message to the world.

## Get our Free Social Media Scheduler Today!

Manage your content with our publish tool using premium features such as workspace, integrations, drafts, queue, repeat, Auto RSS, Bulk upload, geo-tagging, and more!

Get Started FREE    View Pricing

## Frequently Asked Questions

### What is Snapchat Used For?

Snapchat is a multimedia messaging app primarily used for sharing photos and videos, often with added creative elements such as filters, stickers, and text. It's commonly used for casual and fun communication between friends, as well as for





Source: https://perma.cc/2LMT-8BSZ                              Created 2024-04-01 at 09:26

**3. What is Snapchat Plus?**

**4. What is Streaks on Snapchat**

**5. Why Did You Lose Your Snapchat Streak?**

**6. Why Won't Snapchat Help Me Get My Snapstreak Back?**



## Sarah Anderson

Sarah is a seasoned social media marketing expert with a proven track record of helping brands boost their online presence. Her innovative strategies and insights have driven success for numerous businesses.

## 1 thought on "What is Snapchat – A Marketers Guide for 2024"



**ALEJANDRA**
DECEMBER 12, 2023 AT 7:19 PM

I just wanted to drop by and express my gratitude for the tremendous effort you've put into your blog.
Your dedication to delivering quality content doesn't go unnoticed

thank you for sharing your expertise!

Reply

## Leave a Comment

Your email address will not be published. Required fields are marked *

Type here..

Name*

Email*

Website

☐  Save my name, email, and website in this browser for the next time I comment.

Post Comment »

# Related Posts



## All You Need to Know About the Buffer Pricing Model in 2023

Back in 2010, Joel Gascoigne started working on an app for tweeting on Twitter. This was around the time when a free social media scheduler was a rare

READ MORE »

June 16, 2022   •   1 Comment

Source: https://perma.cc/2LMT-8BSZ                                                        Created 2024-04-01 at 09:26



## 10+ Marketing Campaign Examples to Uplift Your Next Project in 2024

Did you ever stop to watch the whole YouTube skippable ad? If yes, then surely the ad probably has your favorite celebrity featured in it, or the storyline

**READ MORE »**

June 5, 2023   •   No Comments



Source: https://perma.cc/2LMT-8BSZ                                                   Created 2024-04-01 at 09:26

## How to Create a Winning Social Media Marketing Plan

As a business/startup owner or even a social media marketer, one of the most daunting and time-consuming tasks is to create a social media marketing plan that delivers

**READ MORE »**

August 12, 2021 • No Comments

SOCIALCHAMP

## Get your mobile app









**Quick Links**

Why Social Champ

About

Pricing

Blog

Updates

Careers

Partners

Roadmap

Contact Us

Affiliate Program

WordPress Plugin

Ambassador Program

Join Our Community

Terms & Conditions

**Features**

Team

Mobile Application

Bulk Upload

Free Social Media Scheduler

Champ AI Suite

Chrome Extension

Content Curation

Monitoring Analysis

Auto RSS

Tailored Post

Calendar

**Alternatives**

Later Alternatives

Loomly Alternatives

Tailwind Alternatives

Crowdfire Alternatives

MeetEdgar Alternatives

Kontentino Alternatives

Zoho Social Alternatives

Sprout Social Alternatives

Cloud Campaign Alternatives

**Compare**

Buffer vs Later

Hootsuite vs Later

Buffer vs Hootsuite

Hootsuite vs Loomly

Hootsuite vs Sendible

Buffer vs Social Champ

Hootsuite vs Social Champ

Hootsuite vs Sprout Social

Sprout Social vs Social Champ



© 2024 Social Champ. All Rights Reserved | Privacy Policy | Sitemap

Sunset Lake Road, Newark, Delaware 19702 – +1 415 903 5007

# Exhibit 412



Today we're introducing Spotlight to shine a light on the most entertaining Snaps created by the Snapchat community.

Submit your best video Snaps to Spotlight for the opportunity to earn a share of more than $1 million that we're distributing to creators every day!

Or, lean back, watch, and pick your favorites!



For the opportunity to earn money, the Snaps you submit to Spotlight must follow our content guidelines and Terms. You must be 16 or older to earn.

We designed Spotlight to entertain our community while living up to Snapchat values, with our community's well being as a top priority. Spotlight content is moderated and doesn't allow for public comments.

Spotlight is available starting in the US, Canada, Australia, New Zealand, the UK, Ireland, Norway, Sweden, Denmark, Germany, and France, with more countries coming soon.

Of course, we'll continue to evolve Spotlight based on your feedback.

We can't wait to see what you'll create.

Happy Snapping!

*Ed. Note (3/16/21): Spotlight is now available to Snapchatters in Brazil, India, and Mexico.*

**Back To News**

**Company**

Snap Inc.

Careers

News

**Community**

Snapchat Support

Pixy Support

Community Guidelines

**Advertising**

Snapchat Ads

Advertising Policies

Political Ads Library

**Legal**

Snap Terms

Law Enforcement

Cookie Policy

Privacy and Safety

Brand Guidelines                Cookie Settings

Promotions Rules                Report Infringement

## Snap Inc.

Privacy Policy

Terms of Service

**Language**    English (US)    ⌄

# Exhibit 413

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/snap-counters-tiktok-with-spotlight-video-sharing-feature-11606140000

TECH

# Snap Counters TikTok With Spotlight Video-Sharing Feature

New service pushes owner of Snapchat into fraught but potentially lucrative business of viral content

*By Georgia Wells* Follow

*Nov. 23, 2020 9:00 am ET*



To post to Spotlight, users will tap the button that says 'Spotlight' on the 'Send To' screen after recording a video. PHOTO: SNAP

Snap Inc. SNAP **1.24%** ▲ is launching a video-sharing feature to rival TikTok, a move that will for the first time let its users produce content with hopes of it going viral.

The feature, called Spotlight, launches Monday within the company's core app, Snapchat.

The new service is a departure from a long-held focus on communication between friends and on professionally curated posts, pushing Snap into the fraught but potentially lucrative business of viral content.

Snap said it plans to pay out more than $1 million a day as a way to reward the people who post the best content. It is betting that Spotlight could drive up how long customers spend on the app, providing more opportunities for the company to serve ads to its users. Snap shares have more than doubled this year.

"Spotlight will be defined by our community—how they use it, what they create, and the stories they tell," Snap said in a written statement. Like Snapchat, the Spotlight function is free to users.

Wading into the business of viral content poses risks for nine-year-old Snap. The proliferation of hate speech and misinformation, as well attempts to control its spread, has put Facebook Inc., Twitter Inc. and other social-media companies in the firing line of activists and politicians.

Snap executives for years worried that encouraging users to post public content with the goal of going viral could make their platform toxic and held off on enabling such message-spreading. They now say they can avoid that fallout by encouraging users to post fun and healthy content. The money it plans to pay out is a carrot to encourage good behavior, according to Snap, making it a new tool in moderating content.

The function will draw on an algorithm to serve personalized content to users, similar to the main screen on TikTok.

Snap isn't the first social-media company pledging to create a space that only encourages the promotion of enjoyable content. In its early days, TikTok employees said their platform wouldn't face the same moderation challenges that Facebook and Twitter faced because users only came to their app for lighthearted videos. Enforcing those values became more difficult as TikTok grew.

Santa Monica, Calif.-based Snap said it would moderate the content in Spotlight and take down items that violate its rules against things such as hate speech, bullying and conspiracy theories—in line with the practices of others. Snap will rely on humans and software to look for rule-violating content, and the company said it is hiring more content moderators to keep up with the demand.

Videos on Spotlight that garner more users will draw more scrutiny. Those that reach the widest audience on Spotlight will need to pass a review by a human moderator.

Snap's steps to add TikTok-like features follow a similar move by Facebook. In July, the social-media giant began offering payouts to TikTok users to persuade them to join Facebook's rival product, called Reels.

Borrowing ideas from others isn't unusual among social-media companies. Twitter this month launched Fleets, a Snapchat-like feature allowing users to post text, audio and video that disappears after 24 hours. Facebook's Instagram has adopted some Snap-like features.

Snap's approach with Spotlight differs from some taken by other platforms. For instance, personal profiles on Spotlight will be private by default and won't include public comments that can become an area where content creators receive abusive messages.

**Write to** Georgia Wells at Georgia.Wells@wsj.com

*Appeared in the November 24, 2020, print edition as 'Snap Counters TikTok With Sharing Feature'.*

# Exhibit 414

BUSINESS INSIDER

US MARKETS CLOSED

DOW JONES +0.12%    NASDAQ -0.14%    S&P 500 +0.11%    META -1.68%    TSLA -2.25%    AAPL -1.06%

Ads by Google
Send feedback    Why this ad? ▷

TECH

## Snapchat is launching a TikTok-like tab called Spotlight and offering users $1 million to submit entertaining posts

Shona Ghosh · Nov 23, 2020, 9:00 AM EST

↱ Share    🔖 Save



Snapchat

- Snapchat has unveiled a new TikTok-like section for its app called Spotlight.

- Spotlight will show up on its own tab and is a curated feed of "entertaining" posts submitted by users, a little like TikTok's "For You" page.

- Snapchat is seeking submissions from users for the Spotlight feed, and will pay a share of $1 million every day for the best entries.

- Visit Business Insider's homepage for more stories.

INSIDER TODAY  NEW LOOK

Sign up to get the inside scoop on today's biggest stories in markets, tech, and business — delivered daily. Read preview

Enter your email        Sign up

By clicking 'Sign Up', you accept our Terms of Service and Privacy Policy. You can opt-out at any time.


SPONSORED CONTENT by Intel vPRO
How to get back to business with a PC fleet refresh

Snapchat is gunning for TikTok with a new app feature called Spotlight, a curated, scrollable feed of short videos generated by users.

Spotlight will occupy the fifth tab inside the Snapchat app, replacing what used to be the dedicated Discover tab.

Clicking into the feature opens up a feed of user-generated posts (or snaps) where users can broadcast their skills to a bigger audience.

### Related stories

    

Advertisement


Recommended video


Next
Stay

Advertisement
Sponsored Content by Intel vPRO



**Everything to know about Instagram Reels: What they are, when to use them, and how they compare to video**

**How Instagram is beating TikTok**

**Prepare for the #motivational doom scroll — LinkedIn is trialing TikTok-style short videos**



How to drive your business forward with a PC fleet refresh

Anyone who wants to submit a post to be featured on Spotlight can create a snap and then submit it via the Send To feature.



SPONSORED CONTENT by Intel vPRO
**How to get back to business with a PC fleet refresh**

Here's a GIF from Snapchat showing how it'll look:



The new feature looks a lot like TikTok's For You feed  Snapchat

The feature is noticeably similar to TikTok's "For You" page, or FYP, the rolling feed of user-created clips that show up when you first open the TikTok app. TikTok's FYP is lightly curated, [albeit by an algorithm](#) that learns to show you more relevant content over time.

Snap's Spotlight has a few differences.

Unlike TikTok's FYP, it won't be the first thing you see when you open the app. And because Snapchat is by default a private platform, users have to explicitly submit posts to show up in the Spotlight tab — snaps aren't automatically blasted out to a large public audience. User profiles are private by default, and Spotlight won't feature public comments, though you can like and forward entertaining snaps. The company does say, however, it'll learn people's preferences over time and show more tailored content.

Advertisement



SPONSORED CONTENT by UK Department for Business and Trade
**Aerospace businesses in the UK take flight**

The idea seems to be to enable Snap to extract maximum value and views by broadcasting entertaining clips more widely that may otherwise only be seen by one person, or a small group of people.

To try and prompt Snapchatters to share their best material publicly, Snapchat is offering a daily $1 million funding pot to be distributed between the most entertaining creators. You don't need to be a professional influencer, and the cash is distributed based on how many people watch your clip, how long they watch it, and whether they favorite the clip. You do need to be over 16 years old — [here are the full terms](#).

The feature is initially available in the US, Canada, Australia, New Zealand, the UK, Ireland, Norway, Sweden, Denmark, Germany, France, with more countries to follow.

TikTok's creativity crown. Business Insider reported exclusively on Thursday that its parent firm Snap had acquired TikTok-like songwriting app Voisey, potentially with an eye to surfacing new artists through Snapchat.

## Read next



**TECH**
Everything to know about Instagram Reels: What they are, when to use them, and how they compare to video



**ADVERTISING**
How Instagram is beating TikTok



**TECH**
Prepare for the #motivational doom scroll — LinkedIn is trialing TikTok-style short videos

Snapchat    TikTok    Social Media    More...

Advertisement

Sponsored Content by Intel vPRO

How to get back to business with a PC fleet refresh



THIS 5 Min Quiz Tells You What Your Body Actually Needs To Lose Weight
Noom | Sponsored    Learn More



Brittney Griner And Her New Partner Who You'll Easily Recognize
Sweet Penny Stocks | Sponsored

Hand Arthritis Breakthrough: U.S. Seniors Speechless
Health Insight Journal | Sponsored    Learn More



A LEGO Fest Is Coming To Landover, MD, Tons Of Fun For All Ages!
Awesome Family Events | Sponsored    Learn More



A mom who's stuck with the bill for her ex-husband's student loans is struggling to pay the $365,000 balance and help her kids at the same time
Shannon Rowan, 51, cannot separate her student-loan balance from her ex-husband's, and she's in default because she can't afford to pay his portion.
Business Insider



The 'uncommitted' campaign against Biden has gone national, winning hundreds of thousands of votes in swing states
Over 45,000 voters chose "uncommitted" in Minnesota, more than the number of votes that Clinton won over Trump in 2016.
Business Insider



Do You Remember Her? Take A Deep Breath Before Looking At Her

Finance Wealth Post | Sponsored



**Shoppers are scrambling to get their hands on Trader Joe's $3 mini tote bags, leading to a lucrative online resale market**

Trader Joe's mini tote bags, available in four colors, are the new must-have accessory. Desperate shoppers have been turning to eBay to snap them up.

Business Insider



**A blogger who's been to every US state at least 3 times picked his 6 favorites— and 4 he wouldn't go out of his way to visit again**

Lee Abbamonte picked his favorite and least favorite states based on the diversity of their natural landscapes and the vibrancy of their cities.

Business Insider





**CEO "Accidentally" Forgets Wallet To Test Staff. He Faints When He Sees Employer Doing This**

sportsspotter.com | Sponsored





**I spent 11 hours with 3 strangers in a shared cabin on a sleeper train in Europe for $84. 6 surprises made me regret my choice.**

Business Insider's reporter struggled to sleep in one of six bunks in a 74-square-foot shared sleeper cabin on a night train from Vienna to Venice.

Business Insider

**Black Hawk helicopter hit by snowmobile, rider sues US govt for $9.5M: AP**

Jeff Smith lost the use of his left arm and has been unable able to return to full-time work since the incident. The Associated Press reported.

Business Insider



**Jewish passenger sues JetBlue after he refused to sit with woman, was thrown off plane**

The passenger said that he was kicked off the flight from Palm Springs to JFK after trying to swap seats due to his religious beliefs.

Business Insider





**'Liquid Aderal' is Now Legally Sold Online Without Rx**

Health Headlines | Sponsored        [Try Now]

**Prime is Now $179, But Few Know this Free Savings Hack**

Online Shopping Tools | Sponsored        [Learn More]



**THIS 5 Min Quiz Tells You What Your Body Actually Needs To Lose Weight**

Noom | Sponsored        [Learn More]





# Exhibit 415

3/27/24, 6:08 PM
Case 1:20-cv-03590-JEB Document 324-32 Filed 04/05/24 Page 62 of 502
Snapchat officially launches in-app TikTok competitor called Spotlight - The Verge



 Menu +

TECH / CREATORS / SNAPCHAT

# Snapchat officially launches in-app TikTok competitor called Spotlight / It'll pay creators to post viral content

By **Ashley Carman**

Nov 23, 2020, 9:00 AM EST

   | **0** **Comments (0 New)**



Snap

Snap is finally ready to compete with TikTok and will pay creators to post on the platform. The company is officially announcing a new section of Snapchat today called Spotlight that'll surface vertical video content from users that's more meme-like and jokey instead of the day-in-the-life content Snap previously encouraged. Imagine, basically, TikTok but in Snapchat.

Case 1:20-cv-03590-JEB Document 324-32 Filed 04/05/24 Page 63 of 502

To entice people to post snaps regularly, the company says it'll divvy up $1 million between the most popular creators on the app per day through the end of 2020. This means if someone has a particularly viral video, they might earn a large chunk of the $1 million pot. It doesn't matter whether that person has a massive number of subscribers; the amount people receive is primarily based on unique views compared to other snaps that day. Users can continue to earn from their video if it's popular for multiple days at a time.

Spotlight, which will have its own dedicated tab in the app, is launching in 11 countries, including the US, UK, France, Germany, and Australia. The videos you'll see in the section can be up to 60 seconds long and, as of right now, cannot be watermarked. That means people can't just download their (or others') viral TikToks and upload them to Snapchat. Once you tap into Spotlight, you'll see snaps programmed to what Snapchat's algorithm thinks you might enjoy. It bases this decision mostly on what you've viewed in the past and how long you've watched. Anyone can submit a snap, they'll just have to tap "Spotlight" when posting to ensure it populates the section.

Although the format will be familiar to anyone who's ever watched TikTok, Snap says it's made specific decisions based on its user base. For one, Spotlight snaps won't feature a public comments section, and profiles themselves are private by default, so Snapchatters can keep their accounts locked down while still posting content.

The Spotlight section has been hinted at for months, given that Snapchat announced music in snaps back in August. The app lacked a feed for these snaps up until now, however. The company already allows users to submit their snaps as part of a location that anyone can drop into and watch to get a feel of what's happening in a given place at any moment. They appear in Snap Map. But unlike that feature, which is more documentary in nature, Spotlight is specifically designed for viral video formats.

With Spotlight, Snap is clearly acknowledging the success of TikTok's short-form viral videos, similar to Instagram's admission with its launch of Reels in August. In Instagram's case, however, it plainly allows people to bring their TikTok content

over to the platform. Snap is instead trying to encourage people to use its own creation tools and prevent monetization fraud by keeping people in its app. Stories used to be the format everyone wanted to copy, thanks to its success on Snapchat. Now, it's the TikTok video.

💬 0 COMMENTS (0 NEW)

More from **Tech**

## Sony's portable PlayStation Portal is back in stock

## The Nintendo Switch 2 will now reportedly arrive in 2025 instead of 2024

## The best Presidents Day deals you can already get

## Interview: Figma's CEO on life after the company's failed sale to Adobe

TERMS OF USE / PRIVACY NOTICE / COOKIE POLICY / DO NOT SELL OR SHARE MY PERSONAL INFO / LICENSING FAQ / ACCESSIBILITY / PLATFORM STATUS / HOW WE RATE AND REVIEW PRODUCTS

CONTACT / TIP US / COMMUNITY GUIDELINES / ABOUT / ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US / JOBS @ VOX MEDIA

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

# Exhibit 416

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

# Snapchat launches a TikTok-like feed called Spotlight, kick-started by paying creators

**Sarah Perez**    @sarahpereztc    /    9:00 AM EST • November 23, 2020           💬 Comment



📷 **Image Credits:** Snap

After taking on TikTok with music-powered features last month, Snapchat this morning is officially launching a dedicated place within its app where users can watch short, entertaining videos in a vertically scrollable, TikTok-like feed. This new feature, called Spotlight, will showcase the community's creative efforts, including the videos now backed by music, as well as other Snaps users may find interesting.

Snapchat says its algorithms will work to surface the most engaging Snaps to display to each user on a personalized basis.

To do so, it will rank the Snaps in the new feed using a combination of factors, like how many other people found a particular Snap interesting, how long people spent watching it, if it was favorited or shared with friends and more. The algorithms will also consider negative factors, like if a viewer skipped watching the Snap quickly, for example. Over time, the feed will become tailored to the individual user based on their own interactions, preferences and favorites. This is a similar system to what TikTok uses for its "For You" feed.



**Image Credits:** *Snap*

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

However, on TikTok, only users with public profiles can have their videos hit the "For You" feed. Spotlight, meanwhile, can feature Snaps from users with both private or public accounts. These Snaps can be sent to Spotlight directly or posted to Our Story. The company says the Snaps from the private accounts will be featured in an unattributed fashion — that is, no name will be attached to the content. There will also be no way to comment on these Snaps or message the creator, Snapchat explains.

Users who are over 18 can opt in to public profiles in order to have their names displayed, which allows them to build a following. But while this allows users to private and directly reply to the creators, there are no public comment mechanisms on Spotlight.

That's a different setup than on TikTok, and gives Snapchat a way to avoid the much larger hassle of handling comment moderation.

---

**TechCrunch Disrupt 2024**
**Join 10,000 Startup Leaders**

**Innovation For Every Stage** San Francisco, October 28-30

*Register Now*

---

The Spotlight feed itself, though, is moderated. The company says all Snaps that appear on the new feed will have to adhere to Snapchat's Community Guidelines, which prohibit the spread of false information (including conspiracy theories), misleading content, hate speech, explicit or profane content, bullying, harassment, violence and other toxic content. The Snaps must also adhere to Snapchat's new Spotlight Guidelines, Terms of Service and Spotlight Terms.



*Image Credits: Snap*

The Spotlight Guidelines specify what sort of content Snapchat wants, the format for the Snaps and other rules. For example, they state the Snaps should be vertical videos with sound up to 60 seconds in length. They should also include a #topic hashtag and should make use of Snapchat's Creative Tools like Captions, Sounds, Lenses or GIFs, if possible. The Snaps have to be appropriate for a 13+ audience, as well.

Captions are a new feature, designed for use in Spotlight. Also new is a continuous shooting mode for longer Snaps and the ability to trim singular Snaps.

### Apple eyes the TikTok generation with an updated version of Clips

 Apple is today rolling out an update to its video creation app, Clips, which brings much-needed support for vertical videos, allowing for sharing to TikTok and the "Stories" feature in other social apps. The addition is one of several arriving with the release of Clips 3.0, which also introduces support for horizontal video, as well … *Continue reading*

 TechCrunch

The Snaps can also only use the licensed music from Snapchat's own Sounds library and must feature original content, not content repurposed from somewhere else on the internet. That could limit accounts that repost internet memes, which tend to draw large subscriber bases on rival platforms, like Instagram and TikTok.

In addition, Snaps in Spotlight won't disappear from being surfaced in the feed unless the creator chooses to delete them.

Users will be alerted to the new Spotlight feature when they return to Snapchat following Monday's launch. Afterward, they'll be able to take Snaps as usual, then choose whether they want to send them to their friends, to their Story, to Snap Map or now to Spotlight.



*Image Credits: Snap*

The feed itself will be accessible through a prominent new fifth tab on the Snapchat home screen's main navigation, and is designated with a Play icon.

To encourage users to publish to Spotlight, the company will distribute more than US\$1 million every day to Snapchat users (16 and up) who create the top Snaps on Spotlight. This will continue through the end of 2020. The earnings will be determined by Snapchat's proprietary algorithm that rewards users based on the total number of unique views a Snap gets per day (calculated using Pacific Time), as compared with others on the platform.

The company says it expects many users to earn money from this fund each day, but those with the most views will earn more than others. It will also monitor this feed for fraud, it warns.

With the music licensing aspects already ironed out, Snapchat is now looking to leverage the more than 4 billion Snaps created by its users every day to power the new Spotlight feed. This move represents Snapchat's biggest attempt at taking on TikTok to date — and one that it's willing to kickstart with direct payments, too. That will likely encourage plenty of participation among Snapchat's young user base, given they're already using the app on a regular basis. And once posting to Spotlight becomes a habit, Snapchat could have a viable competitor on its hands, at least among the younger demographic that favors its app.

## Snapchat launches its TikTok rival, Sounds on Snapchat

 Snapchat this summer announced it would soon release a new music-powered feature that would allow users to set their Snaps to music. Today, the company made good on that promise with the launch of "Sounds on Snapchat" on iOS, a feature that lets users enhance their Snaps with music from a curated catalog of both … Continue reading

 TechCrunch

Its biggest disadvantage, of course, is that it has struggled to reach beyond its young user base. That's something TikTok has done better with, by comparison. The Wall St. Journal last week noted that TikTok teens were often following accounts from senior citizens, for instance, and the AARP had earlier reported TikTok had attracted a middle-aged crowd, as well.

Snapchat says Spotlight is live today on both iOS and Android in the U.S., Canada, Australia, New Zealand, the U.K., Ireland, Norway, Sweden, Denmark, Germany and France, with more countries to come soon.

---

**More TechCrunch**









---

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

## Sign up for Newsletters

See all newsletters

☐ Daily News

☐ Week in Review

☐ Startups Weekly

☐ Event Updates

☐ Advertising Updates

By subscribing, you are agreeing to Yahoo's Terms and Privacy Policy.

Email *

**Subscribe**

https://tcrn.ch/398xc3B          Copy

## Tags

Apps   Australia   France   Germany   Instagram   Instant Messaging   internet memes   ireland

Mobile   mobile applications



## TikTok ban could harm Amazon sellers looking for alternatives

**Rita Liao**

1:00 PM EDT • March 30, 2024

Case 1:20-cv-03590-JEB Document 324-32 Filed 04/05/24 Page 72 of 502

Login

Search

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

### Deal Dive: Iron Sheepdog is fixing short-haul trucking from the bottom up

Rebecca Szkutak

12:00 PM EDT • March 30, 2024



### Women in AI: Kate Devlin of King's College is researching AI and intimacy

Kyle Wiggers

11:00 AM EDT • March 30, 2024



### AT&T resets account passcodes after millions of customer records leak online

Zack Whittaker

10:10 AM EDT • March 30, 2024

### This Week in AI: Let us not forget the humble data annotator

Kyle Wiggers

9:01 AM EDT • March 30, 2024



### Google Podcasts is shutting down soon, users urged to move to YouTube Music

Sarah Perez

3:49 PM EDT • March 29, 2024



### Startups Weekly: Big shake-ups at the AI heavyweights

Haje Jan Kamps

3:05 PM EDT • March 29, 2024



3/30/24, 1:06 PM
Snapchat Launches a TikTok-like Feed Called Spotlight, Kick-started by paying creators | TechCrunch
Case 1:20-cv-03590-JEB  Document 324-32  Filed 04/05/24  Page 73 of 502

### Orbit Fab unveils $30K port to refuel satellites

Aria Alamalhodaei

2:34 PM EDT • March 29, 2024



Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More



### Nine crypto VCs on why Q1 investments were so hot and how it compares to previous bull market

Jacquelyn Melinek

2:28 PM EDT • March 29, 2024

### Google DeepMind CEO Demis Hassabis gets UK knighthood for 'services to artificial intelligence'

Paul Sawers

2:24 PM EDT • March 29, 2024



### Instagram is developing 'Blend,' recommended Reels for you and a friend

Aisha Malik

1:37 PM EDT • March 29, 2024



### OpenAI built a voice cloning tool, but you can't use it… yet

Kyle Wiggers

1:00 PM EDT • March 29, 2024



### The AI world needs more data transparency and web3 startup Space and Time says it can help

Jacquelyn Melinek

1:00 PM EDT • March 29, 2024



### X confirms plans for NSFW Communities

Sarah Perez

12:07 PM EDT • March 29, 2024



### Pitch Deck Teardown: Plantee Innovations' $1.4M seed deck

Haje Jan Kamps

12:00 PM EDT • March 29, 2024



### TechCrunch Minute: Sam Bankman-Fried's sentencing marks an end to the FTX saga

Alex Wilhelm

12:00 PM EDT • March 29, 2024



### Databricks' GPT rival and who's investing in 'underdog' founders

Alex Wilhelm, Mary Ann Azevedo, Kirsten Korosec, Theresa Loconsolo

10:05 AM EDT • March 29, 2024



### How a tiny 4-person startup, Supaglue, caught Stripe's eye

Christine Hall

9:30 AM EDT • March 29, 2024



### What is Elon Musk's Grok chatbot and how does it work?

Kyle Wiggers

9:00 AM EDT • March 29, 2024



### The final countdown: Early Stage 2024 ticket savings end tonight

TechCrunch Events

8:00 AM EDT • March 29, 2024



Login

Search

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

SBF Sentenced

OpenAI Voice Cloning

Google Podcasts Shuts Down

Apple RCS

Robinhood Credit Card

Tech Layoffs

ChatGPT

Login

Search 🔍

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Facebook

YouTube

LinkedIn

X

Instagram

Mastodon

© 2024 Yahoo.

All rights reserved.

Powered by WordPress VIP.

# Exhibit 417

**Snap Inc.**

2021 Annual Report

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM            TO**

**Commission File Number 001-38017**

# SNAP INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **45-5452795** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3000 31st Street, Santa Monica, California 90405**
**(Address of principal executive offices, including zip code)**

**(310) 399-3339**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Class A Common Stock, par value $0.00001 per share | SNAP | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by checkmark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of Class A common stock on the New York Stock Exchange on June 30, 2021, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $81.7 billion.

As of February 1, 2022, the Registrant had 1,369,920,406 shares of Class A common stock, 22,749,440 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding.

Auditor Firm Id: 42          Auditor Name: Ernst & Young LLP          Auditor Location: Los Angeles, CA, United States

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Note Regarding Forward-Looking Statements | | 1 |
| Risk Factor Summary | | 3 |
| Note Regarding User Metrics and Other Data | | 5 |
| | | |
| **PART I** | | |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 45 |
| Item 2. | Properties | 45 |
| Item 3. | Legal Proceedings | 45 |
| Item 4. | Mine Safety Disclosures | 45 |
| | | |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 46 |
| Item 6. | Reserved | 47 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 63 |
| Item 8. | Financial Statements and Supplementary Data | 65 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 101 |
| Item 9A. | Controls and Procedures | 101 |
| Item 9B. | Other Information | 102 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 102 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 103 |
| Item 11. | Executive Compensation | 108 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 126 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 129 |
| Item 14. | Principal Accounting Fees and Services | 132 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 133 |
| Item 16. | Form 10-K Summary | 136 |
| | Signatures | 137 |

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, about us and our industry that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this report, including statements regarding guidance, our future results of operations or financial condition, business strategy and plans, user growth and engagement, product initiatives, and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "going to," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions. We caution you that the foregoing may not include all of the forward-looking statements made in this report.

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends, including our financial outlook and the ongoing COVID-19 pandemic, that we believe may continue to affect our business, financial condition, results of operations, and prospects. These forward-looking statements are subject to risks, uncertainties, and other factors described under "Risk Factor Summary" below, "Risk Factors" in Part I, Item 1A, and elsewhere in this Annual Report on Form 10-K, including among other things:

- our financial performance, including our revenues, cost of revenues, operating expenses, and our ability to attain and sustain profitability;

- our ability to generate and sustain positive cash flow;

- our ability to attract and retain users and partners;

- our ability to attract and retain advertisers;

- our ability to compete effectively with existing competitors and new market entrants;

- our ability to effectively manage our growth and future expenses;

- our ability to comply with modified or new laws, regulations, and executive actions applying to our business;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to successfully expand in our existing market segments and penetrate new market segments;

- our ability to attract and retain qualified team members and key personnel;

- our ability to repay outstanding debt;

- future acquisitions of or investments in complementary companies, products, services, or technologies; and

- the potential adverse impact of climate change, natural disasters, and health epidemics, including the COVID-19 pandemic on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.

Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Annual Report on Form 10-K. And while we believe that information provides a reasonable basis for these statements, that information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

The forward-looking statements made in this Annual Report on Form 10-K relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this report to reflect events or circumstances after the date of this report or to reflect new information or the occurrence of unanticipated events,

1

except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, dispositions, joint ventures, restructurings, legal settlements, or investments.

Investors and others should note that we may announce material business and financial information to our investors using our websites (including investor.snap.com), filings with the U.S. Securities and Exchange Commission, or SEC, webcasts, press releases, and conference calls. We use these mediums, including Snapchat and our website, to communicate with our members and the public about our company, our products, and other issues. It is possible that the information that we make available may be deemed to be material information. We therefore encourage investors and others interested in our company to review the information that we make available on our websites.

### Risk Factor Summary

Our business is subject to significant risks and uncertainties that make an investment in us speculative and risky. Below we summarize what we believe are the principal risk factors but these risks are not the only ones we face, and you should carefully review and consider the full discussion of our risk factors in the section titled "Risk Factors", together with the other information in this Annual Report on Form 10-K. If any of the following risks actually occurs (or if any of those listed elsewhere in this Annual Report on Form 10-K occurs), our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business.

### 1.      Our Strategy and Advertising Business

We operate in a highly competitive and rapidly changing environment so we must continually innovate our products and evolve our business model for us to succeed.

We emphasize rapid innovation and prioritize long-term user engagement over short-term financial conditions or results if we believe that it will benefit the aggregate user experience and improve our financial performance over the long term. We currently have a history of operating losses but, as a result of our long-term focus, we may prioritize investments and expenses we believe are necessary for our long-term growth over achieving short-term profitability. Investments in our future, including through new products or acquisitions, are inherently risky and may not pay off, which would adversely affect our ability to settle the principal and interest payments on our outstanding convertible senior notes or other indebtedness when due, and further delay or hinder our ability to attain and sustain profitability. This in turn would hinder our ability to secure additional financing to meet our current and future financial needs on favorable terms, or at all.

We generate substantially all of our revenue from advertising. Our advertising business is most effective when our advertisers succeed. Driving their success requires continual investment in our advertising products and may be hindered by competitive challenges and various legal, regulatory, and operating system changes that make it more difficult for us to achieve and demonstrate a meaningful return for our advertisers. For example, on-going changes to privacy laws and mobile operating systems have made it more difficult for us to measure the effectiveness of advertisements on our services, and alternative methods will take time to develop and become more widely adopted by our advertisers, and may not be as effective as prior methods. We believe that this impact on our targeting, measurement, and optimization capabilities has negatively affected our operating results. In addition, our advertising business is seasonal and volatile, which could result in fluctuations in our quarterly revenues and operating results, including the expectations of our business prospects.

Our business and operations have been, and could in the future be, adversely affected by events beyond our control, such as health epidemics, including the COVID-19 pandemic (including any variants) and macroeconomic factors like labor shortages, supply chain disruptions, and inflation impacting the markets and communities in which we and our partners, advertisers, and users operate.

### 2.      Our Community and Competition

We need to continually innovate and create new products, and enhance our existing products, to attract, retain, and grow our global community. Products that we create may fail to attract or retain users, or to generate meaningful revenue, if at all. If our community does not see the value in our products or brand, or if competitors offer better alternatives, our community could easily switch to other services. While we have experienced rapid growth in our community over the last few years, we have also experienced declines and there can be no assurance that won't happen again. We have and expect to continue to expand organically and through acquisitions, including in international markets, which we may not be able to effectively manage or scale.

Many of our competitors have significantly more resources and larger market shares than we do, each of which gives them advantages over us that can make it more difficult for us to succeed.

### 3.      Our Partners

We primarily rely on Google, Apple, and Amazon to operate our service and provide the mobile operating systems for our applications. If these partners do not provide their services as we expect, terminate their services, or change the terms of our agreements or the functionality of their operating systems in ways that are adverse to us, our service may be interrupted and our product experience could be degraded, and these may harm our reputation, increase our costs, or make it harder for us to

attain or sustain profitability. Many other parts of our business depend on partners, including content partners and advertising partners, so our success depends on our ability to attract and retain these partners.

**4.        Our Technology and Regulation**

Our business is complex and success depends on our ability to rapidly innovate, the interoperability of our service on many different smartphones and operating systems, and our ability to handle sensitive user data with the care our users expect. Because our systems and our products are constantly changing, we are susceptible to data breaches, bugs, and other errors in how our products work and are measured. We may also fail to maintain effective processes that report our metrics or financial results. Given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect to encounter issues, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable.

We are also subject to complex and evolving federal, state, local, and foreign laws and regulations regarding privacy, data protection, content, taxes, and other matters, which are subject to change and have uncertain interpretations. Any actual or perceived failure to comply with such legal and regulatory obligations, including in connection with our consent decree with the U.S. Federal Trade Commission, or any economic or political instability, may adversely impact our business.

We also must actively protect our intellectual property. From time to time, we are subject to various legal proceedings, claims, inquiries, and investigations, including class actions and matters involving intellectual property, that may be costly or distract management. We also rely on a variety of statutory and common-law frameworks for the content we provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, and the fair-use doctrine, each of which has been subject to adverse judicial, political, and regulatory scrutiny in recent times.

**5.        Our Team and Capital Structure**

We need to attract and retain a high caliber team, including our Chief Executive Officer and Chief Technology Officer, to maintain our competitive position. We may incur significant costs and expenses in maintaining and growing our team, and may lose valuable members of our team as we compete globally, including with many of our competitors, for key talent. A substantial portion of our employment costs is paid in our common stock, the price of which has been volatile, and our ability to attract and retain talent may be adversely affected if our shares decline in value.

Our two co-founders control over 99% of the voting power of our outstanding capital stock, which means they control substantially all outcomes submitted to stockholders. Class A common stockholders have no voting rights, unless required by Delaware law. This concentrated control may result in our co-founders voting their shares in their best interest, which might not always be in the interest of our stockholders generally.

### NOTE REGARDING USER METRICS AND OTHER DATA

We define a Daily Active User, or DAU, as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We define average revenue per user, or ARPU, as quarterly revenue divided by the average DAUs. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on our determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This allocation differs from our components of revenue disclosure in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer. For information concerning these metrics as measured by us, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Unless otherwise stated, statistical information regarding our users and their activities is determined by calculating the daily average of the selected activity for the most recently completed quarter included in this report.

While these metrics are determined based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who have unauthorized or multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. We have not determined the number of such multiple accounts.

Changes in our products, infrastructure, mobile operating systems, or metric tracking system, or the introduction of new products, may impact our ability to accurately determine active users or other metrics and we may not determine such inaccuracies promptly. We also believe that we don't capture all data regarding each of our active users. Technical issues may result in data not being recorded from every user's application. For example, because some Snapchat features can be used without internet connectivity, we may not count a DAU because we don't receive timely notice that a user has opened the Snapchat application. This undercounting may increase as we grow in Rest of World markets where users may have poor connectivity. We do not adjust our reported metrics to reflect this underreporting. We believe that we have adequate controls to collect user metrics, however, there is no uniform industry standard. We continually seek to identify these technical issues and improve both our accuracy and precision, including ensuring that our investors and others can understand the factors impacting our business, but these and new issues may continue in the future, including if there continues to be no uniform industry standard.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from our age demographics or estimate their ages based on a sample of the self-reported ages that we do have. If our active users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor expectations.

In the past we have relied on third-party analytics providers to calculate our metrics, but today we rely primarily on our analytics platform that we developed and operate. We count a DAU only when a user opens the application and only once per user per day. We believe this methodology more accurately measures our user engagement. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, and becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application.

If we fail to maintain an effective analytics platform, our metrics calculations may be inaccurate. We regularly review, have adjusted in the past, and are likely in the future to adjust our processes for calculating our internal metrics to improve their accuracy. As a result of such adjustments, our DAUs or other metrics may not be comparable to those in prior periods. Our measures of DAUs may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology or data used.

## PART I

**Item 1. Business.**

**Overview**

Snap Inc. is a camera company. We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a camera application that helps people communicate visually with friends and family through short videos and images called Snaps. By opening directly to the camera, we empower users to express themselves instantly. Snaps are deleted by default, so there is less pressure to look pretty or perfect when creating and sending images on Snapchat. By reducing the friction typically associated with creating and sharing content, Snapchat has become one of the most used cameras in the world.

In the way that the flashing cursor became the starting point for most products on desktop computers, we believe the camera screen will be the starting point for most products on smartphones. This is because images created by smartphone cameras contain more context and richer information than other forms of input like text entered on a keyboard. Given the magnitude of this opportunity, we invest heavily and take big risks in an attempt to create innovative and differentiated camera products that are better able to reflect and improve our life experiences.

**Snapchat**

Snapchat is our core mobile device application and contains five distinct tabs, complemented by additional tools that function outside of the application. With a breadth of visual communication and content experiences available within the application, Snapchatters can interact with all five, or a subset of those five tabs.

*Camera*: The Camera is the starting point for creation in Snapchat. Snapchat opens directly to the Camera, making it easy to create a Snap and send it to friends. Our augmented reality, or AR, capabilities within our Camera allow for creativity and self-expression. We offer millions of Lenses, created by both us and our community, along with creative tools and licensed music and audio clips, which make it easy for people to personalize and contextualize their Snaps. We also offer voice and scanning technology within our Camera. While Snaps are deleted by default, users can save their creativity through a searchable collection of Memories stored on both their Snapchat account and their mobile device. A user can also create Snaps on our wearable devices, Spectacles. Spectacles connect seamlessly with Snapchat and capture photos and video from a human perspective. Our latest version of Spectacles, designed for creators, overlays AR Lenses directly onto the world.

*Communication*: Communication allows users to send Snaps to friends collectively or individually, through our ephemeral, efficient messaging architecture. Within Communication, users can send messages through text, Snaps, and voice or video calling. They can also communicate with our proprietary personalized avatar tool, Bitmoji, and its associated contextual stickers and images, which integrate seamlessly into both mobile devices and desktop browsers. Further, users can communicate by playing one of our Games together, many of which allow a user's avatar to be their Bitmoji, and through Minis, which bring bite-sized utility experiences to our community inside Snapchat.

*Snap Map*: Snap Map is a live and highly personalized map that allows Snapchatters to connect with friends and explore what is going on in their local area. Snap Map makes it easy to locate nearby friends who choose to share their location, view a heatmap of recent Snaps posted to Our Story by location, and locate local businesses. Places, rich profiles of local businesses that include information such as store hours and reviews, overlay specialized experiences from select partners on top of Snap Map, and allow Snapchatters to take direct actions from Snap Map, such as sharing a favorite store, ordering takeout, or making a reservation.

*Stories*: Stories feature content from a Snapchatter's friends, our community, and our content partners. Friends Stories allow our community to express themselves in narrative form through photos and videos, shown in chronological order, to their friends. The Discover section of this tab displays curated content based on a Snapchatter's subscriptions and interests, and features news and entertainment from both our creator community and publisher partners, as well as original content in Snap Originals. We also offer Public Profiles, as a way for our creator community and our advertising partners to memorialize and scale their content and AR Lenses on our platform.

*Spotlight*: Spotlight is a way to broadly share user-generated content with the entire Snapchat community. Here we surface the most entertaining Snaps from our community all in one place, which becomes tailored to each Snapchatter over time based on their preferences and favorites. The Trending page allows Snapchatters to discover and engage with popular topics and genres.

## Our Partner Ecosystem

Many elements and features of Snapchat are enhanced by our expansive partner ecosystem that includes developers, creators, publishers, and advertisers, among others. We help them create and bring content and experiences into Snapchat, leverage Snapchat capabilities in their own applications and websites, and use advertising to promote these and other experiences to our large, engaged, and differentiated user base.

Developers are able to integrate with Snapchat in many ways, including through Games, Minis, and Snap Kit. Snap Kit invites developers to easily build with Snapchat, bringing the best of Snapchat's technology to grow their businesses and create engaging experiences. Through Camera Kit, our partners can embed Snap's AR platform directly into their application, extending our reach and expanding our opportunity to learn through new AR use cases. Partners can access a turnkey suite of tools and services, from Lenses AR experiences creation to Lens carousel management and analytics, to enable AR technology for their community. Snap Kit products include Camera Kit, Creative Kit, Login Kit, Bitmoji Kit, Story Kit, Ad Kit, and Sticker Kit.

AR creators can use Lens Studio, our powerful desktop application designed for creators and developers, to build augmented reality experiences for Snapchatters. Spotlight creators can utilize our content creation tools to reach millions of Snapchatters and build their businesses through various monetization opportunities. Our Creator Marketplace connects both AR and Spotlight creators directly with our advertising partners.

Publisher partners can expand their audiences and monetize content through our Discover platform. In addition, we work with various telecommunications providers and original equipment manufacturers, particularly as we build our presence in new markets.

## Our Advertising Products

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences, including the ability to sample and try on products such as beauty, apparel, accessories, and footwear. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Public Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: We aim to continually improve the way these ad formats are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, make a purchase, visit a local business, call or text a business, watch a story or video, download an app, or return to an app, among others. Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.

*Measuring Advertising Effectiveness*: We offer first-party and third-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.

## Technology

Our research and development efforts focus on product development, advertising technology, and large-scale infrastructure.

*Product Development*: We work relentlessly and invest heavily to create and improve products for our community and our partners. We develop a wide range of products related to visual communication and storytelling that are powered by a variety of new technologies.

*Advertising Technology*: We constantly develop and expand our advertising products and technology. In an effort to provide a strong and scalable return on investment to our advertisers, our advertising technology roadmap centers around improving our delivery framework, measurement capabilities, and self-serve tools.

*Large-scale Infrastructure*: We spend considerable resources and investment on the underlying architecture that powers our products, such as optimizing the delivery of billions of videos to hundreds of millions of people around the world every day. We currently partner with third party providers to support the infrastructure for our growing needs. These partnerships have allowed us to scale quickly without upfront physical infrastructure costs, allowing us to focus our efforts on product innovation.

## Employees and Culture

We seek to be a force for good through our products, our work to strengthen our communities, our efforts to make a positive impact on the planet, and our inclusive workplace.

*Supporting Our Team*: Our values at Snap are being kind, smart, and creative, and we put those values into action through how we support our team and how our team supports one another. Council, which is a practice of active listening that promotes open-mindedness and cultivates empathy and compassion among participants, helps us build and sustain a community steeped in integrity, connection, collaboration, creativity, and kindness. Our talent development programs seek to unlock potential by helping team members advance, learn, and grow in a fair and equitable way at Snap. We focus on the health and well-being of our employees through programs and benefits that support their physical, emotional, and financial fitness. To attract and retain the best talent, we aim to offer challenging work in an environment that enables our employees to have a direct meaningful contribution to new and exciting projects. Underlying these values is our commitment to ethical conduct where we work to instill in our team that acting with integrity means being your whole self, being honest, and doing the right thing.

*Diversity, Equity, and Inclusion*: Snap has long supported a Diversity, Equity and Inclusion, or DEI, program, and we have made progress on a number of fronts, including diversifying our board of directors and executive leadership, introducing new accountability around DEI outcomes, rolling out an allyship program to inspire a more inclusive culture, and enhancing our recruiting process to continue driving diverse hiring. To aid in our mission, we publish a Diversity Annual Report that discusses our goals with respect to diversity, equity, and inclusion efforts. This report outlines our beliefs around the idea that an inclusive workplace and inclusive products are central to achieving that purpose. This report is excerpted in our broader CitizenSnap Report that details the work we're doing to support our communities, our planet, and our team, and is available on our website at www.snap.com.

*Human Capital*: As part of our human capital resource objectives, we seek to recruit, retain, and incentivize our highly talented existing and future employees. We believe that creating an inclusive environment where team members can grow, develop, and be their true selves is critical to attracting and retaining talent. Our compensation philosophies also align to that belief.

Our compensation philosophy is based around building a culture of ownership and high performance by putting both impact and our values at the center of our performance feedback process and pay outcomes. We utilize equity as part of our compensation practices to drive a long-term orientation and have committed to paying a minimum living wage for all employees globally.

As of December 31, 2021, we had approximately 5,661 full-time employees, of whom approximately 54% are in engineering roles involved in the design, development, support, and manufacture of new and existing products and processes.

*Climate Change:* We are deepening our commitment to help combat climate change. In 2021, we adopted science-based emissions reduction targets approved by the Science Based Targets Initiative. We became historically carbon neutral in 2021 by purchasing offsets to balance emissions attributable to Snap from our founding in 2011 through December 31, 2020. We also purchased renewable energy certificates in 2021 sufficient to cover all of the electricity consumed in our U.S. operations for the year ended December 31, 2020.

## Our Commitment to Privacy

Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.

We built Snapchat as an antidote to the context-less communication that has plagued "social media." Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. Somewhere along the way, social media—by prioritizing virality and permanence—sapped conversations of this valuable context and choice. When we began to communicate online, we lost some of what made communication great: spontaneity, emotion, honesty—the full range of human expression that makes us human in the first place.

We don't think digital communication has to be this way. That's why choice matters. We build products and services that emphasize the context of a conversation—who, when, what, and where something is being said. If you don't have the autonomy to shape the context of a conversation, the conversation will simply be shaped by the permanent feeds that homogenize online conversations.

When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication. For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understands exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more. This is where you'll also find our Transparency Report in which we provide insight into these efforts and visibility into the nature and volume of content reported on our platform.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

## Competition

We compete with other companies in every aspect of our business, particularly with companies that focus on mobile engagement and advertising. Many of these companies, such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Meta (including Facebook, Instagram, and WhatsApp), Pinterest, and Twitter, may have greater financial and human resources and, in some cases, larger user bases. Given the breadth of our product offerings, we also compete with

companies that develop products or otherwise operate in the mobile, camera, communication, content, and advertising industries that offer, or will offer, products and services that may compete with Snapchat features or offerings. Our competitors span from internet technology companies and digital platforms, to traditional companies in print, radio, and television sectors to underlying technologies like default smartphone cameras and messaging. Additionally, our competition for engagement varies by region. For instance, we face competition from companies like Kakao, LINE, Naver (including Snow), and Tencent in Asia.

We compete to attract and retain our users' attention, both in terms of reach and engagement. Since our products and those of our competitors are typically free, we compete based on our brand and the quality and nature of our product offerings rather than on price. As such, we invest heavily in constantly improving and expanding our product lines.

We also compete with other companies to attract and retain partners and advertisers, which depends primarily on our reach and ability to deliver a strong return on investment.

Finally, we compete to attract and retain highly talented individuals, including software engineers, designers, and product managers. In addition to providing competitive compensation packages, we compete for talent by fostering a culture of working hard to create great products and experiences and allowing our employees to have a direct meaningful contribution to new and exciting projects.

**Seasonality in Our Business**

We have historically seen seasonality in our business. Overall advertising spend tends to be strongest in the fourth quarter of the calendar year, and we have observed a similar pattern in our historical revenue. We have also experienced seasonality in our user engagement, generally seeing lower engagement during summer months and higher engagement in December.

**Intellectual Property**

Our success depends in part on our ability to protect our intellectual property and proprietary technologies. To protect our proprietary rights, we rely on a combination of intellectual property rights in the United States and other jurisdictions, including patents, trademarks, copyrights, trade secret laws, license agreements, internal procedures, and contractual provisions. We also enter into confidentiality and invention assignment agreements with our employees and contractors and sign confidentiality agreements with third parties. Our internal controls are designed to restrict access to proprietary technology.

As of December 31, 2021, we had approximately 1,524 issued patents and approximately 2,223 filed patent applications in the United States and foreign countries relating to our camera platform and other technologies. Our issued patents will expire between 2022 and 2046. We may not be able to obtain protection for our intellectual property, and our existing and future patents, trademarks, and other intellectual property rights may not provide us with competitive advantages or distinguish our products and services from those of our competitors.

We license content, trademarks, technology, and other intellectual property from our partners, and rely on our license agreements with those partners to use the intellectual property. We also enter into licensing agreements with third parties to receive rights to patents and other know-how. Third parties may assert claims related to intellectual property rights against our partners or us.

Other companies and "non-practicing entities" that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights related to the mobile, camera, communication, content, internet, and other technology-related industries frequently enter into litigation based on allegations of infringement, misappropriation, and other violations of intellectual property or other rights. As our business continues to grow and competition increases, we will likely face more claims related to intellectual property and litigation matters.

**Government Regulation**

We are subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, data protection, content regulation, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could harm our business. Compliance with these laws

and regulations has not had, and is not expected to have, a material effect on our capital expenditures, results of operations, and competitive position as compared to prior periods, and we do not currently anticipate material capital expenditures for environmental control facilities.

In December 2014, the Federal Trade Commission resolved an investigation into some of our early practices by handing down a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year lifespan of the order, we must complete biennial independent privacy audits. In June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

Furthermore, foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. It is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely. Not all of our products are available in all locations and may not be due to such laws and regulations. Our public policy team monitors legal and regulatory developments in the United States, as well as many foreign countries, and communicates with policymakers and regulators in the United States and internationally.

**Corporate Information**

We were formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. We completed our initial public offering in March 2017 and our Class A common stock is listed on the New York Stock Exchange, or NYSE, under the symbol "SNAP."

Our principal executive offices are located at 3000 31st Street, Santa Monica, California 90405, and our telephone number is (310) 399-3339. Snap Inc., "Snapchat," and our other registered and common-law trade names, trademarks, and service marks appearing in this Annual Report on Form 10-K are property of Snap Inc. or our subsidiaries.

**Information about Segment and Geographic Revenue**

Information about segment and geographic revenue is set forth in Notes 1 and 2 of the notes to our consolidated financial statements included in "Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

**Available Information**

Our website address is www.snap.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to these reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are filed with the SEC. Such reports and other information filed or furnished by us with the SEC are available free of charge on our website at investor.snap.com when such reports are available on the SEC's website. We use our website, including investor.snap.com, as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

Information contained in, or accessible through, the websites referred to in this Annual Report on Form 10-K is not incorporated into this filing. Further, our references to website addresses are only as inactive textual references.

**Item 1A. Risk Factors**

*You should carefully consider the risks and uncertainties described below, together with all the other information in this Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the related notes. If any of the following risks actually occurs our business could be seriously harmed. Unless otherwise indicated, references to our business being seriously harmed in these risk factors will include harm to our business, reputation, financial condition, results of operations, revenue, and future prospects. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment. .*

**Risks Related to Our Business and Industry**

***Our ecosystem of users, advertisers, and partners depends on the engagement of our user base. We have seen the growth rate of our user base decline in the past and it may do so again in the future. If we fail to retain current users or add new users, or if our users engage less with Snapchat, our business would be seriously harmed.***

We had 319 million DAUs on average in the quarter ended December 31, 2021. We view DAUs as a critical measure of our user engagement, and adding, maintaining, and engaging DAUs have been and will continue to be necessary. Our DAUs and DAU growth rate have declined in the past and they may decline in the future due to various factors, including as the size of our active user base increases, as we achieve higher market penetration rates, as we face continued competition for our users and their time, or if there are performance issues with our application. For example, in 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. In addition, as we achieve maximum market penetration rates among younger users in developed markets, future growth in DAUs will need to come from older users in those markets, developing markets, or users with Android operating systems, which may not be possible or may be more difficult or time-consuming for us to achieve. While we may experience periods when our DAUs increase due to products and services with short-term popularity, or due to a lack of other events that compete for our users' attention, we may not always be able to attract new users, retain existing users, or maintain or increase the frequency and duration of their engagement if current or potential new users do not perceive our products to be fun, engaging, and useful. In addition, because our products typically require high bandwidth data capabilities in order for users to benefit from all of the features and capabilities of our application, many of our users live in countries with high-end mobile device penetration and high bandwidth capacity cellular networks with large coverage areas. We therefore do not expect to experience rapid user growth or engagement in regions with either low smartphone penetration or a lack of well-established and high bandwidth capacity cellular networks. If our DAU growth rate slows or becomes stagnant, or we have a decline in DAUs, our financial performance will increasingly depend on our ability to elevate user activity or increase the monetization of our users.

Snapchat is free and easy to join, the barrier to entry for new entrants in our business is low, and the switching costs to another platform are also low. Moreover, the majority of our users are 18-34 years old. This demographic may be less brand loyal and more likely to follow trends, including viral trends, than other demographics. These factors may lead users to switch to another product, which would negatively affect our user retention, growth, and engagement. Snapchat also may not be able to penetrate other demographics in a meaningful manner. Falling user retention, growth, or engagement could make Snapchat less attractive to advertisers and partners, which may seriously harm our business. In addition, we continue to compete with other companies to attract and retain our users' attention. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average. There are many factors that could negatively affect user retention, growth, and engagement, including if:

- users engage more with competing products instead of ours;
- our competitors continue to mimic our products or improve on them, which could harm our user engagement and growth;
- we fail to introduce new and exciting products and services or those we introduce or modify are poorly received;
- our products fail to operate effectively on the iOS or Android mobile operating systems;
- we are unable to continue to develop products that work with a variety of mobile operating systems, networks, and smartphones;

- we do not provide a compelling user experience because of the decisions we make regarding the type and frequency of advertisements that we display or the structure and design of our products;

- we are unable to combat spam or other hostile or inappropriate usage on our products;

- there are changes in user sentiment about the quality or usefulness of our products in the short term, long term, or both;

- there are concerns about the privacy implications, safety, or security of our products;

- our partners who provide content to Snapchat do not create content that is engaging, useful, or relevant to users;

- our partners who provide content to Snapchat decide not to renew agreements or devote the resources to create engaging content, or do not provide content exclusively to us;

- advertisers and partners display ads that are untrue, offensive, or otherwise fail to follow our guidelines;

- our products are subject to increased regulatory scrutiny or approvals, or there are changes in our products that are mandated or prompted by legislation, regulatory authorities, executive actions, or litigation, including settlements or consent decrees, that adversely affect the user experience;

- technical or other problems frustrate the user experience, including by providers that host our platforms, particularly if those problems prevent us from delivering our product experience in a fast and reliable manner;

- we fail to provide adequate service to users, advertisers, or partners;

- we do not provide a compelling user experience to entice users to use the Snapchat application on a daily basis, or our users don't have the ability to make new friends to maximize the user experience;

- we, our partners, or other companies in our industry segment are the subject of adverse media reports or other negative publicity, some of which may be inaccurate or include confidential information that we are unable to correct or retract;

- we do not maintain our brand image or our reputation is damaged; or

- our current or future products reduce user activity on Snapchat by making it easier for our users to interact directly with our partners.

Any decrease to user retention, growth, or engagement could render our products less attractive to users, advertisers, or partners, and would seriously harm our business.

***Snapchat depends on effectively operating with mobile operating systems, hardware, networks, regulations, and standards that we do not control. Changes in our products or to those operating systems, hardware, networks, regulations, or standards may seriously harm our user retention, growth, and engagement.***

Because Snapchat is used primarily on mobile devices, the application must remain interoperable with popular mobile operating systems, primarily Android and iOS, application stores, and related hardware, including mobile-device cameras. The owners and operators of such operating systems and application stores, primarily Google and Apple, each have approval authority over our products and provide consumers with products that compete with ours, and there is no guarantee that any approval will not be rescinded in the future. Additionally, mobile devices and mobile-device cameras are manufactured by a wide array of companies. Those companies have no obligation to test the interoperability of new mobile devices, mobile-device cameras, or related devices with Snapchat, and may produce new products that are incompatible with or not optimal for Snapchat. We have no control over these operating systems, application stores, or hardware, and any changes to these systems or hardware that degrade our products' functionality, or give preferential treatment to competitive products, or actions by government authorities that impact our access to these systems or hardware, could seriously harm Snapchat usage on mobile devices. Our competitors that control the operating systems and related hardware our application runs on could make interoperability of our products with those mobile operating systems more difficult or display their competitive offerings more prominently than ours. Additionally, our competitors that control the standards for the application stores for their operating systems could make Snapchat, or certain features of Snapchat, inaccessible for a potentially significant period of time. We plan to continue to introduce new products and features regularly and have experienced that it takes time to optimize such products and features to function with these operating systems, hardware, and standards, impacting the popularity of such products, and we expect this trend to continue.

Moreover, our products require high-bandwidth data capabilities. If the costs of data usage increase or access to cellular networks is limited, our user retention, growth, and engagement may be seriously harmed. Additionally, to deliver high-quality video and other content over mobile cellular networks, our products must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control. In particular, any future changes to the iOS or Android operating systems or application stores may impact the accessibility, speed, functionality, and other performance aspects of our products and features, and result in issues in the future from time to time. In addition, the proposal or adoption of any laws, regulations, or initiatives that adversely affect the growth, popularity, or use of the internet, including laws governing internet neutrality, could decrease the demand for our products and increase our cost of doing business.

For example, in January 2018, the Federal Communications Commission, or FCC, issued an order that repealed the "open internet rules," which prohibit mobile providers in the United States from impeding access to most content, or otherwise unfairly discriminating against content providers like us and also prohibit mobile providers from entering into arrangements with specific content providers for faster or better access over their data networks. The FCC order repealing the open internet rules went into effect in June 2018. The core aspects of that order have been upheld by the United States Court of Appeals for the District of Columbia Circuit, but a number of states have adopted or are considering legislation or executive actions to impose state-level open internet rules, and those actions have been or can be expected to be challenged in court. More recently, U.S. President Biden issued an executive order encouraging the FCC to restore the open internet rules. We cannot predict whether the FCC order or state initiatives regulating providers will ultimately be upheld, modified, overturned, or vacated by further legal action, federal legislation, or the FCC, or the degree to which such outcomes would adversely affect our business, if at all. Similarly, the European Union requires equal access to internet content, but as part of certain initiatives and reviews (including recent modifications to the European Electronic Communications Code and proposals to expand the scope and nature of the EU Network and Information Security Directive), the European Union may impose additional obligations, including network security requirements, reporting and transparency obligations, disability access, or 911-like obligations on certain "over-the-top" services or those that qualify as "electronic communication services." If we are considered to be in the scope of such service definition, our costs of doing business could increase and our business could be seriously harmed. The European Union's highest court has also issued rulings that may limit our ability to engage in certain practices, such as "zero rating." If the FCC's repeal of the open internet rules is maintained, state initiatives are modified, overturned, or vacated, or the European Union modifies these open internet rules or limits commercial practices, mobile and internet providers may be able to limit our users' ability to access Snapchat or make Snapchat a less attractive alternative to our competitors' applications. Were that to happen, our ability to retain existing users or attract new users may be impaired, and our business would be seriously harmed.

We may not successfully cultivate relationships with key industry participants or develop products that operate effectively with these technologies, systems, networks, regulations, or standards. If it becomes more difficult for our users to access and use Snapchat on their mobile devices, if our users choose not to access or use Snapchat on their mobile devices, or if our users choose to use mobile products that do not offer access to Snapchat, our business and user retention, growth, and engagement could be seriously harmed.

***We rely on Google Cloud and Amazon Web Services, or AWS, for the vast majority of our computing, storage, bandwidth, and other services. Any disruption of or interference with our use of either platform would negatively affect our operations and seriously harm our business.***

Google and Amazon provide distributed computing infrastructure platforms for business operations, or what is commonly referred to as a "cloud" computing service. We currently run the vast majority of our computing on Google Cloud and AWS, have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google and AWS, and our systems are not fully redundant on the two platforms. Any transition of the cloud services currently provided by either Google Cloud or AWS to the other platform or to another cloud provider would be difficult to implement and would cause us to incur significant time and expense. Given this, any significant disruption of or interference with our use of Google Cloud or AWS would negatively impact our operations and our business would be seriously harmed. If our users or partners are not able to access Snapchat or specific Snapchat features, or encounter difficulties in doing so, due to issues or disruptions with Google Cloud or AWS, we may lose users, partners, or advertising revenue. The level of service provided by Google Cloud and AWS or similar providers may also impact our users', advertisers', and partners' usage of and satisfaction with Snapchat and could seriously harm our business and reputation. If Google Cloud, AWS, or similar providers experience interruptions in service regularly or for a prolonged basis, or other similar issues, our business would be seriously harmed. Hosting costs also have and will continue to increase as our user base and user engagement grows and may seriously harm our business if we are unable to grow our revenues faster than the cost of utilizing the services of Google Cloud, AWS, or similar providers.

In addition, each of Google and Amazon may take actions beyond our control that could seriously harm our business, including:

- discontinuing or limiting our access to its cloud platform;

- increasing pricing terms;

- terminating or seeking to terminate our contractual relationship altogether;

- establishing more favorable relationships or pricing terms with one or more of our competitors; and

- modifying or interpreting its terms of service or other policies in a manner that impacts our ability to run our business and operations.

Google and Amazon each has broad discretion to change and interpret its terms of service and other policies with respect to us, and those actions may be unfavorable to us. They may also alter how we are able to process data on their cloud platforms. If Google or Amazon makes changes or interpretations that are unfavorable to us, our business could be seriously harmed.

***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm our business.***

Substantially all of our revenue is generated from third parties advertising on Snapchat. For the years ended December 31, 2021, 2020, and 2019, advertising revenue accounted for approximately 99%, 99%, and 98% of total revenue, respectively. We expect this trend to continue for the foreseeable future. Although we have and continue to try to establish longer-term advertising commitments with advertisers, most advertisers do not have long-term advertising commitments with us, and our efforts to establish long-term commitments may not succeed.

We are still early in developing our advertising business. Our advertising customers vary from small businesses to well-known brands. Many of our customers only recently started working with our advertising solutions and spend a relatively small portion of their overall advertising budget with us, but some customers have devoted meaningful budgets that contribute to our total revenue. In addition, advertisers may view some of our products as experimental and unproven, or prefer certain of our products over others. Advertisers will not continue to do business with us if we do not deliver advertisements in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. As our business continues to develop, including globally, there may be new or existing advertisers or resellers, or advertisers or resellers from different geographic regions that contribute more significantly to our total revenue. Any economic or political instability, whether as a result of the COVID-19 pandemic or otherwise, in a specific country or region may negatively impact the global or local economy, advertising ecosystem, our customers and their budgets with us, or our ability to forecast our advertising revenue, and our business would be seriously harmed.

Moreover, we rely heavily on our ability to collect and disclose data and metrics to our advertisers so we can attract new advertisers and retain existing advertisers. Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers. For example, the General Data Protection Regulation, or GDPR, in the European Union, which went into effect in May 2018, expanded the rights of individuals to control how their personal data is collected and processed, and placed restrictions on the use of personal data of younger minors. In addition, in the United States, the California Consumer Privacy Act, or CCPA, went into effect in January 2020, and the California Privacy Rights Act of 2020, or CPRA, which replaces the CCPA and goes into effect in January 2023, place additional requirements on the handling of personal data for us, our partners, and our advertisers. The CCPA and CPRA also provide for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. The potential effects of this legislation, including any regulations implemented by the legislation, are far-reaching, uncertain, and evolving, and may require us to modify our data processing practices and policies and incur substantial costs and expenses in an effort to comply. Other state, federal, and foreign legislative and regulatory bodies have also implemented or may implement similar legislation regarding the handling of personal data. For example, in the United States, the Commonwealth of Virginia enacted the Consumer Data Protection Act and the State of Colorado enacted the Colorado Privacy Act, both of which take effect January 1, 2023 and may impose obligations similar to or more stringent than those we may face under other data protection laws. Further, changes in the European Union's Electronic Communications Code, which became effective in December 2020, may result in the expanded applicability of the European Union's ePrivacy Directive over parts of our services, requiring us to make changes to how we process and store certain types of communications data of users in the European Union, which could have a material impact on the availability of data we rely on to improve and personalize our products and features.

Furthermore, in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data. Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well. These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business. The impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including:

- a diminished or stagnant growth in the total and regional number of DAUs on Snapchat;

- our inability to deliver advertisements to all of our users due to hardware, software, or network limitations;

- a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Communication, Snap Map, Stories, and Spotlight platforms;

- our inability to create new products that sustain or increase the value of our advertisements;

- changes in our user demographics that make us less attractive to advertisers;

- lack of ad creative availability by our advertising partners;

- our partners who provide content to us not renewing agreements or devoting the resources to create engaging content, or not providing content exclusively to us;

- decreases in the perceived quantity, quality, usefulness, or relevance of the content provided by our users or partners;

- changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content;

- competitive developments or advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat;

- product changes or advertising inventory management decisions we may make that change the type, size, or frequency of advertisements displayed on Snapchat or the method used by advertisers to purchase advertisements;

- adverse legal developments relating to advertising, including changes mandated or prompted by legislation, regulation, executive orders, or litigation;

- adverse media reports or other negative publicity involving us, our founders, our partners, or other companies in our industry segment;

- advertiser or user perception that content published by us, our users, or our partners is objectionable;

- the degree to which users skip advertisements and therefore diminish the value of those advertisements to advertisers;

- changes in the way advertising is priced or its effectiveness is measured;

- our inability, or perceived inability, to measure the effectiveness of our advertising or target the appropriate audience for advertisements;

- our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful;

- difficulty and frustration from advertisers who may need to reformat or change their advertisements to comply with our guidelines; and

- the macroeconomic climate and the status of the advertising industry in general, including labor shortages, supply chain disruptions, and inflation.

These and other factors could reduce demand for our advertising products, which may lower the prices we receive, or cause advertisers to stop advertising with us altogether. Either of these would seriously harm our business.

***Our two co-founders have control over all stockholder decisions because they control a substantial majority of our voting stock.***

Our two co-founders, Evan Spiegel and Robert Murphy, control over 99% of the voting power of our outstanding capital stock as of December 31, 2021, and Mr. Spiegel alone can exercise voting control over a majority of our outstanding capital stock. As a result, Mr. Spiegel and Mr. Murphy, or in many instances Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO, or 32,383,178 shares of Class C common stock. Should either of our co-founders' Class C common stock be converted to Class B common stock, the remaining co-founder will be able to exercise voting control over our outstanding capital stock. Moreover, Mr. Spiegel and Mr. Murphy have entered into a proxy agreement under which each has granted to the other a voting proxy with respect to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over. The proxy would become effective on either founder's death or disability. Accordingly, on the death or incapacity of either Mr. Spiegel or Mr. Murphy, the other could individually control nearly all of the voting power of our outstanding capital stock.

In addition, in October 2016, we issued a dividend of one share of non-voting Class A common stock to all our equity holders, which will prolong our co-founders' voting control because our co-founders are able to liquidate their holdings of non-voting Class A common stock without diminishing their voting control. In the future, our board of directors may, from time to time, decide to issue special or regular stock dividends in the form of Class A common stock, and if we do so our co-founders' control could be further prolonged. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support. Conversely, this concentrated control could allow our co-founders to consummate such a transaction that our other stockholders do not support. In addition, our co-founders may make long-term strategic investment decisions and take risks that may not be successful and may seriously harm our business.

As our Chief Executive Officer, Mr. Spiegel has control over our day-to-day management and the implementation of major strategic investments of our company, subject to authorization and oversight by our board of directors. As board members and officers, Mr. Spiegel and Mr. Murphy owe a fiduciary duty to our stockholders and must act in good faith in a manner they reasonably believe to be in the best interests of our stockholders. As stockholders, even controlling stockholders, Mr. Spiegel and Mr. Murphy are entitled to vote their shares, and shares over which they have voting control, in their own interests, which may not always be in the interests of our stockholders generally. We have not elected to take advantage of the "controlled company" exemption to the corporate governance rules for companies listed on the New York Stock Exchange, or NYSE.

***Health epidemics, including the COVID-19 pandemic, have had, and could in the future have, an adverse impact on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.***

The ongoing global COVID-19 pandemic adversely impacted, and may continue to adversely impact, many aspects of our business. As some of our advertisers experience downturns or uncertainty in their own business operations and revenue because of the economic effects resulting from the spread of COVID-19 and the emergence of variants, they halted or decreased or may halt, decrease, or continue to decrease, temporarily or permanently, their advertising spending or may focus their advertising spending more on other platforms, all of which may result in decreased advertising revenue. Labor shortages, supply chain disruptions, and inflation continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may also halt or decrease advertising spending. Furthermore, a portion of our advertising revenue is related to in-person events or activities, such as sporting events, music festivals, and in-person learning, which were postponed, cancelled, or limited during the COVID-19 pandemic and may continue to be adversely affected. In addition, the unpredictability of the COVID-19 pandemic may make it difficult to forecast our advertising revenue, and although we may benefit in the shorter term from changes in the current advertising landscape, any increases may not be indicative of longer-term trends. Any decline in advertising revenue or the collectability of our receivables could seriously harm our business.

In response to the COVID-19 pandemic, many federal, state, local, and foreign governments put in place, and others in the future may put in place, quarantines, executive actions, shelter-in-place orders, physical distancing requirements, and similar government orders and restrictions in order to control the spread of the disease. Such orders or restrictions, or the perception

that such orders or restrictions could occur, continue, or be reimplemented, have resulted in business closures, work stoppages, slowdowns and delays, work-from-home policies, travel restrictions, and cancellation or postponement of events, among other effects that could negatively impact productivity and disrupt our operations and those of our partners, advertisers, and users. We implemented and continue a flexible work-from-home policy for substantially all of our team members, and we may take further actions that alter our operations as may be required by federal, state, or local authorities, or which we believe are in our best interests. While most of our operations can be performed remotely, there is no guarantee that we will be as effective while working remotely because our team is dispersed, many team members may have additional personal needs to attend to (such as looking after children as a result of school closures or family who become sick), and team members may become sick themselves and be unable to work. Decreased effectiveness of our team could adversely affect our results due to our inability to meet in person with potential advertisers, longer time periods to review and approve ads, longer time to respond to application performance issues or spam, extended timelines for product reviews and a corresponding reduction in innovation, or other decreases in productivity that could seriously harm our business. Furthermore, we may decide to postpone or cancel planned investments in our business in response to changes in our business as a result of the spread of COVID-19 or the emergence of variants, which may impact our user engagement and rate of innovation, either of which could seriously harm our business.

As a result of the COVID-19 pandemic, our partners and community who provide content or services to us may experience delays or interruptions in their ability to create content or provide services, if they are able to do so at all. A decrease in the amount or quality of content available on Snapchat, or an interruption in the services provided to us, could lead to a decline in user engagement, which could seriously harm our business.

The effects of the COVID-19 pandemic on user engagement or growth are highly uncertain, and may lead to unpredictable results in the short term and long term, including shorter-term increases in user engagement or growth that may not be indicative of longer-term trends. As physical distancing requirements and shelter-in-place orders continue or are reactivated, and as fewer in-person activities take place, we may experience short-term and long-term disruption to user behavior and our business. We may also experience inconsistent or negative engagement as user behavior on our platform changes, including changes in user activity as a result of continued physical distancing requirements and shelter-in-place orders. In addition, while the potential impact and duration of the COVID-19 pandemic on the global economy and our business in particular may be difficult to assess or predict, the COVID-19 pandemic has resulted in, and may continue to result in, significant volatility and disruption of global financial markets, reducing our ability to access capital, which could negatively affect our liquidity in the future.

The global impact of COVID-19 has and continues to rapidly evolve, and we will continue to monitor the situation closely. While there have been vaccines developed and administered, and the spread of COVID-19 may eventually be contained or mitigated, we cannot predict the timing of the vaccine adoption or roll-out globally or the efficacy of such vaccines, including against variants that emerge, and we do not yet know how businesses, advertisers, or our partners will operate in a post-COVID-19 environment. Our users may change how they use our products and services in an environment where the perceived risk of COVID-19 and regulations surrounding it have changed. There may be additional costs or impacts to our business and operations, including when we are able to return to our offices and resume in-person activities, travel, and events. In addition, there is no guarantee that a future outbreak of this or any other widespread epidemics will not occur, or if or when the global economy will fully recover. The ultimate impact of the COVID-19 pandemic or a similar health epidemic on our business, operations, or the global economy as a whole remains highly uncertain.

***If we do not develop successful new products or improve existing ones, our business will suffer. We may also invest in new lines of business that could fail to attract or retain users or generate revenue.***

Our ability to engage, retain, and increase our user base and to increase our revenue will depend heavily on our ability to successfully create new products, both independently and together with third parties. We may introduce significant changes to our existing products or develop and introduce new and unproven products and services, including technologies with which we have little or no prior development or operating experience. These new products and updates may fail to increase the engagement of our users, advertisers, or partners, may subject us to increased regulatory requirements or scrutiny, and may even result in short-term or long-term decreases in such engagement by disrupting existing user, advertiser, or partner behavior or by introducing performance and quality issues. For example, beginning in 2017, we started transitioning our advertising sales to a self-serve platform, which decreased average advertising prices. In 2018, we believe our DAUs declined primarily due to changes in the design of our application and continued performance issues with the Android version of our application. The short- and long-term impact of any major change, like our early 2018 application redesign and the rewrite of our application for Android users in 2019, or even a less significant change such as a refresh of the application or a feature change, is difficult to predict. Although we believe that these decisions will benefit the aggregate user experience and improve our financial performance over the long term, we may experience disruptions or declines in our DAUs or user activity broadly or concentrated on certain portions of our application. Product innovation is inherently volatile, and if new or enhanced products

fail to engage our users, advertisers, or partners, or if we fail to give our users meaningful reasons to return to our application, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, any of which may seriously harm our business in the short term, long term, or both. Additionally, we frequently launch new products and the products that we launch may have technical issues that diminish the performance of our application. These performance issues or issues that we encounter in the future could impact our user engagement.

Because our products created new ways of communicating, they have often required users to learn new behaviors to use our products, or to use our products repeatedly to receive the most benefit. These new behaviors, such as swiping and tapping in the Snapchat application, are not always intuitive to users. This can create a lag in adoption of new products and new user additions related to new products. We believe this has not hindered our user growth or engagement, but that may be the result of a large portion of our user base being in a younger demographic and more willing to invest the time to learn to use our products most effectively. To the extent that future users, including those in older demographics, are less willing to invest the time to learn to use our products, and if we are unable to make our products easier to learn to use, our user growth or engagement could be affected, and our business could be harmed. We may also develop new products or initiatives that increase user engagement and costs without increasing revenue. For example, in 2016, we introduced Memories, our cloud storage service for Snaps, which increases our storage costs but does not currently generate revenue.

In addition, we have invested, and expect to continue to invest, in new lines of business, new products, and other initiatives to increase our user base and user activity, and attempt to monetize the platform. For example, in 2019 we launched Snap Games, a live, multi-player gaming experience, and in November 2020 we launched Spotlight, a new entertainment platform for user-generated content within Snapchat. Such new lines of business, new products, and other initiatives may be costly, difficult to operate, and divert management's attention, and there is no guarantee that they will be positively received by our community or provide positive returns on our investment. In certain cases, new products that we develop may require regulatory approval prior to launch or may require us to comply with additional regulations or legislation. There is no guarantee that we will be able to obtain such regulatory approval, and our efforts to comply with these laws and regulations could be costly and divert management's time and effort and may still not guarantee compliance. If we do not successfully develop new approaches to monetization or meet the expectations of our users or partners, we may not be able to maintain or grow our revenue as anticipated or recover any associated development costs, and our business could be seriously harmed.

***Our business is highly competitive. We face significant competition that we anticipate will continue to intensify. If we are not able to maintain or improve our market share, our business could suffer.***

We face significant competition in almost every aspect of our business both domestically and internationally, especially because our products and services operate across a broad list of categories, including camera, communication, content, games, and augmented reality. Our competitors range from smaller or newer companies to larger more established companies such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Kakao, LINE, Meta (including Facebook, Instagram, and WhatsApp), Naver (including Snow), Pinterest, Tencent, and Twitter. Our competitors also include platforms that offer, or will offer, a variety of products, services, content, and online advertising offerings that compete or may compete with Snapchat features or offerings. For example, Instagram, a competing application owned by Meta, has incorporated many of our features, including a "stories" feature that largely mimics our Stories feature and may be directly competitive. Meta has introduced, and likely will continue to introduce, more private ephemeral products into its various platforms which mimic other aspects of Snapchat's core use case. We also compete for users and their time, so we may lose users or their attention not only to companies that offer products and services that specifically compete with Snapchat features or offerings, but to companies with products or services that target or otherwise appeal to certain demographics, such as Discord or Roblox. Moreover, in emerging international markets, where mobile devices often lack large storage capabilities, we may compete with other applications for the limited space available on a user's mobile device. We also face competition from traditional and online media businesses for advertising budgets. We compete broadly with the social media offerings of Alphabet, Apple, ByteDance, Meta, Pinterest, and Twitter, and with other, largely regional, social media platforms that have strong positions in particular countries. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition. In addition, ongoing changes to privacy laws and mobile operating systems have made it more difficult for us to target and measure advertisements effectively. As a result, our competitors may, and in some cases will, acquire and engage users or generate advertising or other revenue at the expense of our own efforts, which would negatively affect our business.

Many of our current and potential competitors have significantly greater resources and broader global recognition and occupy stronger competitive positions in certain market segments than we do. These factors may allow our competitors to respond to new or emerging technologies and changes in market requirements better than we can, undertake more far-reaching and successful product development efforts or marketing campaigns, or adopt more aggressive pricing policies. In addition, advertisers may use information that our users share through Snapchat to develop or work with competitors to develop products or features that compete with us. Certain competitors, including Alphabet, Apple, and Meta, could use strong or dominant positions in one or more market segments to gain competitive advantages against us in areas where we operate, including by:

- integrating competing social media platforms or features into products they control such as search engines, web browsers, advertising networks, or mobile device operating systems;

- making acquisitions for similar or complementary products or services; or

- impeding Snapchat's accessibility and usability by modifying existing hardware and software on which the Snapchat application operates.

Certain acquisitions by our competitors may result in reduced functionality of our products and services, provide our competitors with valuable insight into the performance of our and our partners' businesses, and provide our competitors with a pipeline of future acquisitions to maintain a dominant position. As a result, our competitors may acquire and engage users at the expense of our user base, growth, or engagement, which may seriously harm our business.

We believe that our ability to compete effectively depends on many factors, many of which are beyond our control, including:

- the usefulness, novelty, performance, and reliability of our products compared to our competitors;

- the number and demographics of our DAUs;

- the timing and market acceptance of our products, including developments and enhancements of our competitors' products;

- our ability to monetize our products;

- the availability of our products to users;

- the effectiveness of our advertising and sales teams;

- the effectiveness of our advertising products;

- our ability to establish and maintain advertisers' and partners' interest in using Snapchat;

- the frequency, relative prominence, and type of advertisements displayed on our application or by our competitors;

- the effectiveness of our customer service and support efforts;

- the effectiveness of our marketing activities;

- changes as a result of actual or proposed legislation, regulation, executive actions, or litigation, including settlements and consent decrees, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry segment;

- our ability to attract, retain, and motivate talented team members, particularly engineers, designers, and sales personnel;

- our ability to successfully acquire and integrate companies and assets;

- our ability to cost-effectively manage and scale our rapidly growing operations; and

- our reputation and brand strength relative to our competitors.

If we cannot effectively compete, our user engagement may decrease, which could make us less attractive to users, advertisers, and partners and seriously harm our business.

***We have incurred operating losses in the past, and may not be able to maintain profitability.***

We began commercial operations in 2011 and we have historically experienced net losses and negative cash flows from operations. As of December 31, 2021, we had an accumulated deficit of $8.3 billion and, while we achieved profitability in the fourth quarter of 2021, for the year ended December 31, 2021, we experienced a net loss of $488.0 million. We expect our operating expenses to increase in the future as we expand our operations.  We may incur significant losses in the future for many reasons, including due to the other risks and uncertainties described in this report. Additionally, we may encounter unforeseen expenses, operating delays, or other unknown factors that may result in losses in future periods. If our revenue does not grow at a greater rate than our expenses, our business may be seriously harmed and we may not be able to maintain profitability.

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could seriously harm our business.***

We depend on the continued services and performance of our key personnel, including Mr. Spiegel and Mr. Murphy. Although we have entered into employment agreements with Mr. Spiegel and Mr. Murphy, the agreements are at-will, which means that they may resign or could be terminated for any reason at any time. Mr. Spiegel and Mr. Murphy are high profile individuals who have received threats in the past and are likely to continue to receive threats in the future. Mr. Spiegel, as Chief Executive Officer, has been responsible for our company's strategic vision and Mr. Murphy, as Chief Technology Officer, developed the Snapchat application's technical foundation. Should either of them stop working for us for any reason, it is unlikely that the other co-founder would be able to fulfill all of the responsibilities of the departing co-founder nor is it likely that we would be able to immediately find a suitable replacement. The loss of key personnel, including members of management and key engineering, product development, marketing, and sales personnel, could disrupt our operations, adversely impact employee retention and morale, and seriously harm our business.

As we continue to grow, we cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position. We face significant competition in hiring and attracting qualified engineers, designers, and sales personnel, and the recent move by companies to offer a remote or hybrid work environment may increase the competition for such employees from employers outside of our traditional office locations. Further, labor is subject to external factors that are beyond our control, including our industry's highly competitive market for skilled workers and leaders, cost inflation, the ongoing COVID-19 pandemic, and workforce participation rates. In addition, if our reputation were to be harmed, whether as a result of media, legislative, or regulatory scrutiny or otherwise, it could make it more difficult to attract and retain personnel that are critical to the success of our business.

As we mature, or if our stock price declines, our equity awards may not be as effective an incentive to attract, retain, and motivate team members. Additionally, many of our current team members received substantial amounts of our capital stock, giving them a substantial amount of personal wealth, which can lead to an increase in attrition. As a result, it may be difficult for us to continue to retain and motivate these team members, and this wealth could affect their decision about whether they continue to work for us. Furthermore, if we issue significant equity to attract and retain team members, we would incur substantial additional stock-based compensation expense and the ownership of our existing stockholders would be further diluted. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining and motivating existing personnel, we may be unable to grow effectively and our business could be seriously harmed.

***We have a continually evolving business model, which makes it difficult to evaluate our prospects and future financial results and increases the risk that we will not be successful.***

We began commercial operations in 2011 and began meaningfully monetizing Snapchat in 2015. We started transitioning our advertising sales to a self-serve platform in 2017. We have a continually evolving business model, based on reinventing the camera to improve the way that people live and communicate, which makes it difficult to effectively assess our future prospects. Accordingly, we believe that investors' future perceptions and expectations, which can be idiosyncratic and vary widely, and which we do not control, will affect our stock price. You should consider our business and prospects in light of the many challenges we face, including the ones discussed in this report.

***If our security is compromised or if our platform is subjected to attacks that frustrate or thwart our users' ability to access our products and services, our users, advertisers, and partners may cut back on or stop using our products and services altogether, which could seriously harm our business.***

Our efforts to protect the information that our users and advertisers have shared with us may be unsuccessful due to the actions of third parties, software bugs or other technical malfunctions, employee error or malfeasance, or other factors. In

addition, third parties may attempt to fraudulently induce employees, users, or advertisers to disclose information to gain access to our data or our users' or advertisers' data. If any of these events occur, our or our users' or advertisers' information could be accessed or disclosed improperly. We have previously suffered the loss of employee information related to an employee error. Our Privacy Policy governs how we may use and share the information that our users have provided us. Some advertisers and partners may store information that we share with them. If these third parties fail to implement adequate data-security practices or fail to comply with our terms and policies, our users' data may be improperly accessed or disclosed. And even if these third parties take all of these steps, their networks may still suffer a breach, which could compromise our users' data.

Any incidents where our users' or advertisers' information is accessed without authorization, or is improperly used, or incidents that violate our Terms of Service or policies, could damage our reputation and our brand and diminish our competitive position. In addition, affected users or government authorities could initiate legal or regulatory action against us over those incidents, which could be time-consuming and cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. Maintaining the trust of our users is important to sustain our growth, retention, and user engagement. Concerns over our privacy practices, whether actual or unfounded, could damage our reputation and brand and deter users, advertisers, and partners from using our products and services. Any of these occurrences could seriously harm our business.

Ransomware attacks are becoming increasingly prevalent and severe. To alleviate the financial, operational, and reputational impact of a ransomware attack, it may be preferable to make extortion payments, but we may be unwilling or unable to do so, including, for example, if applicable laws or regulations prohibit such payments. Similarly, supply chain attacks have increased in frequency and severity, and we cannot guarantee that third parties in our supply chain have not been compromised or that they do not contain exploitable defects or bugs that could result in a breach of or disruption to our platform, systems, and networks or the systems and networks of third parties that support us and our services. Any such attack, or the perception that one has occurred, could result in a loss of our users' or advertisers' confidence in the security of our platform and damage to our brand, reduce the demand for our products and services, disrupt business operations, result in the exfiltration of proprietary data, including source code, require us to spend material resources to investigate or correct the breach and to prevent future security breaches and incidents, expose us to legal liabilities, including litigation, regulatory enforcement, and indemnity obligations, claims by our customers or other relevant parties that we have failed to comply with contractual obligations, and seriously harm our business.

We also are or may in the future be subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could seriously harm our business.

In addition, in December 2014, the U.S. Federal Trade Commission resolved an investigation into some of our early practices by issuing a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year term of the order, we must complete biennial independent privacy audits. In addition, in June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors under the age of 13 from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could seriously harm our business.

***Our user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review metrics, including our DAUs and ARPU metrics, to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data gathered on an analytics platform that we developed and operate and have not been validated by an independent third party. While these metrics are based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who have multiple Snapchat accounts, even though we forbid that in our Terms of Service and implement measures to detect and suppress that behavior. Our user metrics are also affected by technology on certain mobile devices that automatically runs in the background of our Snapchat application when another phone function is used, and this activity can cause our system to miscount the user metrics associated with such account.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from age demographics or estimate their ages based on a sample of the self-reported ages we do have. If our users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor or advertiser expectations.

Errors or inaccuracies in our metrics or data could also result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of active users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies. We count a DAU when a user opens the application, but only once per user per day. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application. However, we believe that we do not capture all data regarding our active users, which may result in understated metrics. This generally occurs because of technical issues, for instance when our systems do not record data from a user's application or when a user opens the Snapchat application and contacts our servers but is not recorded as an active user. We continually seek to address these technical issues and improve our accuracy, such as comparing our active users and other metrics with data received from other pipelines, including data recorded by our servers and systems. But given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect these issues to continue, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable. If advertisers, partners, or investors do not perceive our user, geographic, or other demographic metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user, geographic, or other demographic metrics, our reputation may be seriously harmed. Our advertisers and partners may also be less willing to allocate their budgets or resources to Snapchat, which could seriously harm our business. In addition, we calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average.

***Mobile malware, viruses, hacking and phishing attacks, spamming, and improper or illegal use of Snapchat could seriously harm our business and reputation.***

Mobile malware, viruses, hacking, and phishing attacks have become more prevalent and sophisticated in our industry, have occurred on our systems in the past, and may occur on our systems in the future. Because of our prominence, we believe that we are an attractive target for these sorts of attacks. Although it is difficult to determine what, if any, harm may directly result from an interruption or attack, any failure to detect such attack and maintain performance, reliability, security, and availability of our products and technical infrastructure to the satisfaction of our users may seriously harm our reputation and our ability to retain existing users and attract new users.

In addition, spammers attempt to use our products to send targeted and untargeted spam messages to users, which may embarrass or annoy users and make our products less user friendly. We cannot be certain that the technologies that we have developed to repel spamming attacks will be able to eliminate all spam messages from our products. Our actions to combat spam may also require diversion of significant time and focus from improving our products. As a result of spamming activities, our users may use our products less or stop using them altogether, and result in continuing operational cost to us.

Similarly, terrorists, criminals, and other bad actors may use our products to promote their goals and encourage users to engage in terror and other illegal activities. We expect that as more people use our products, these bad actors will increasingly seek to misuse our products. Although we invest resources to combat these activities, including by suspending or terminating accounts we believe are violating our Terms of Service and Community Guidelines, we expect these bad actors will continue to seek ways to act inappropriately and illegally on Snapchat. Combating these bad actors requires our teams to divert significant time and focus from improving our products. In addition, we may not be able to control or stop Snapchat from becoming the preferred application of use by these bad actors, which may become public knowledge and seriously harm our reputation or lead to lawsuits or attention from regulators. If these activities increase on Snapchat, our reputation, user growth and user engagement, and operational cost structure could be seriously harmed.

*Because we store, process, and use data, some of which contains personal data, we are subject to complex and evolving federal, state, and foreign laws, regulations, and executive actions regarding privacy, data protection, content, and other matters. Many of these laws, regulations, and executive actions are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.*

We are subject to a variety of laws, regulations, and executive actions in the United States and other countries that involve matters central to our business, including user privacy, security, rights of publicity, data protection, content, intellectual property, distribution, electronic contracts and other communications, competition, protection of minors, consumer protection, taxation, and online-payment services. These laws, regulations, and executive actions can be particularly restrictive in countries outside the United States. Both in the United States and abroad, these laws, regulations, and executive actions constantly evolve, remain subject to significant change, and may be issued with limited advance notice. For example, an executive order under the prior U.S. administration was issued prohibiting certain transactions with a Chinese-owned company, with the prohibition becoming effective 45 days after the date of the order. In addition, the application and interpretation of these laws, regulations, and executive actions are often uncertain, particularly in the new and rapidly evolving industry in which we operate. Because we store, process, and use data, some of which contains personal data, we are subject to complex and evolving federal, state, and foreign laws and regulations regarding privacy, data protection, content, and other matters. Many of these laws, regulations, and executive actions are subject to change and uncertain interpretation, and could result in investigations, claims, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.

Several proposals have recently been adopted or are currently pending before, and we believe a number of investigations into other technology companies are currently being conducted by, federal, state, and foreign legislative and regulatory bodies that could significantly affect our business. GDPR in the European Union, which went into effect in May 2018, placed new data protection obligations and restrictions on organizations and may require us to further change our policies and procedures. If we are not compliant with GDPR requirements, we may be subject to significant fines and our business may be seriously harmed. In addition, the CCPA went into effect in January 2020 and the CPRA, which replaces the CCPA and goes into effect in January 2023, place additional requirements on the handling of personal data. The CCPA and CPRA also provide for civil penalties for violations, as well as a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation. The potential effects of this or any other legislation, including any implementing regulations, are or may be far-reaching, uncertain, and evolving, and may require us, our partners, and advertisers to modify data processing practices and policies and to incur substantial costs and expenses in an effort to comply. Other state, federal, and foreign legislative and regulatory bodies have enacted or may enact similar legislation regarding the handling of personal data, or conduct additional investigations into specific companies or the industry as a whole that could alter the existing regulatory environment in a manner that would be adverse to us. Changes in the European Union's Electronic Communications Code, which became effective in December 2020, may result in the expanded applicability of the European Union's ePrivacy Directive over parts of our services, requiring us to make changes to how we process and store certain types of communications data of users in the European Union, which could have a material impact on the availability of data we rely on to improve and personalize our products and features. The U.K.'s Age Appropriate Design Code, or AADC, which focuses on online safety and protection of children's privacy online became effective in September 2021. Noncompliance with the AADC may result in audits by the U.K.'s Information Commissioner Office, or ICO, the regulatory body set up to uphold information rights, and other EU regulators as noncompliance with the AADC may indicate noncompliance with the GDPR. The ICO continues to engage with industry leaders to interpret and maintain compliance with the AADC. Furthermore, in December 2018, the Australian government passed the Assistance and Access Bill 2018 that provides Australian law enforcement authorities with mechanisms to make requests for electronic communication, even if the data is end-to-end encrypted like some of the data in Snapchat, which may create new obligations for companies providing communication services and make their data less secure.

*Our financial condition and results of operations will fluctuate from quarter to quarter, which makes them difficult to predict.*

Our quarterly results of operations have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely on our past quarterly results of operations as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving market segments. Our financial condition and results of operations in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement;

- the development and introduction of new or redesigned products or services by us or our competitors;

- the ability of our cloud service providers to scale effectively and timely provide the necessary technical infrastructure to offer our service;

- our ability to attract and retain advertisers in a particular period;

- seasonal or other fluctuations in spending by our advertisers and product usage by our users, each of which may change as our product offerings evolve or as our business grows or as a result of unpredictable events such as the COVID-19 pandemic;

- the number of advertisements shown to users;

- the pricing of our advertisements and other products;

- our ability to demonstrate to advertisers the effectiveness of our advertisements;

- the diversification and growth of revenue sources beyond current advertising;

- increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

- our ability to maintain operating margins, cash used in operating activities, and Free Cash Flow;

- our ability to accurately forecast consumer demand for our physical products and adequately manage inventory;

- system failures or breaches of security or privacy, and the costs associated with such breaches and remediations;

- inaccessibility of Snapchat, or certain features within Snapchat, due to third-party or governmental actions;

- stock-based compensation expense;

- our ability to effectively incentivize our workforce;

- adverse litigation judgments, settlements, or other litigation-related costs, or product recalls;

- changes in the legislative or regulatory environment, including with respect to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, enforcement by government regulators, including fines, orders, or consent decrees, or the issuance of executive orders or other similar executive actions that may adversely affect our revenues or restrict our business;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and interest rates or impairments of any assets on our balance sheet;

- changes in our effective tax rate;

- announcements by competitors of significant new products, licenses, or acquisitions;

- our ability to make accurate accounting estimates and appropriately recognize revenue for our products for which there are no relevant comparable products;

- our ability to meet minimum spending commitments in agreements with our infrastructure providers;

- changes in accounting standards, policies, guidance, interpretations, or principles; and

- changes in domestic and global business or macroeconomic conditions, including as a result of the current COVID-19 pandemic and resulting labor shortages, supply chain disruptions, and inflation.

***If we are unable to continue to successfully grow our user base and further monetize our products, our business will suffer.***

We have made, and are continuing to make, investments to enable users, partners, and advertisers to create compelling content and deliver advertising to our users. Existing and prospective Snapchat users and advertisers may not be successful in creating content that leads to and maintains user engagement. We are continuously seeking to balance the objectives of our users and advertisers with our desire to provide an optimal user experience. We do not seek to monetize all of our products nor do we focus our efforts on users with higher ARPU, and we may not be successful in achieving a balance that continues to attract and retain users and advertisers. We focus on growing engagement across our service, and from time to time our efforts

25

may reduce user activity with certain monetizable products in favor of other products we do not currently monetize. If we are not successful in our efforts to grow or effectively monetize our user base, or if we are unable to build and maintain good relations with our advertisers, our user growth and user engagement and our business may be seriously harmed. In addition, we may expend significant resources to launch new products that we are unable to monetize, which may seriously harm our business.

Additionally, we may not succeed in further monetizing Snapchat. We currently monetize Snapchat by displaying in the application advertisements that we sell and advertisements sold by our partners. As a result, our financial performance and ability to grow revenue could be seriously harmed if:

- we fail to increase or maintain DAUs;

- our user growth outpaces our ability to monetize our users, including if we don't attract sufficient advertisers or if our user growth occurs in markets that are not as monetizable;

- we fail to increase or maintain the amount of time spent on Snapchat, the amount of content that our users share, or the usage of our Camera, Communication, Snap Map, Stories, and Spotlight platforms;

- partners do not create engaging content for users or renew their agreements with us;

- we fail to attract sufficient advertisers to utilize our self-serve platform to make the best use of our advertising inventory;

- advertisers do not continue to introduce engaging advertisements;

- advertisers reduce their advertising on Snapchat;

- we fail to maintain good relationships with advertisers or attract new advertisers, or demonstrate to advertisers the effectiveness of advertising on Snapchat; or

- the content on Snapchat does not maintain or gain popularity.

### We cannot assure you that we will effectively manage our growth.

The growth and expansion of our business, headcount, and products create significant challenges for our management, including managing multiple relationships with users, advertisers, partners, and other third parties, and constrain operational and financial resources. If our operations or the number of third-party relationships continues to grow, our information-technology systems and our internal controls and procedures may not adequately support our operations. In addition, some members of our management do not have significant experience managing large global business operations, so our management may not be able to manage such growth effectively. To effectively manage our growth, we must continue to improve our operational, financial, and management processes and systems and effectively expand, train, and manage our employee base. However, the actions we take to achieve such improvements may not have the intended effect and may instead result in disruptions, employee turnover, declines in revenue, and other adverse effects.

As our organization continues to mature and we are required to implement more complex organizational management structures, we may also find it increasingly difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance and seriously harm our business.

### Our costs may increase faster than our revenue, which could seriously harm our business or increase our losses.

Providing our products to our users is costly, and we expect our expenses, including those related to people and hosting, to grow in the future. This expense growth will continue as we broaden our user base, as users increase the number of connections and amount of content they consume and share, as we develop and implement new product features that require more computing infrastructure, and as we grow our business. Historically, our costs have increased each year due to these factors, and we expect to continue to incur increasing costs. Our costs are based on development and release of new products and the addition of users and may not be offset by a corresponding growth in our revenue. We will continue to invest in our global infrastructure to provide our products quickly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization, if any. Our expenses may be greater than we anticipate, and our investments to make our business and our technical infrastructure more efficient may not succeed and may outpace monetization efforts. In addition, we expect to increase marketing, sales, and other operating expenses to grow and expand our operations and to remain competitive. Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.

***Our business depends on our ability to maintain and scale our technology infrastructure. Any significant disruption to our service could damage our reputation, result in a potential loss of users and decrease in user engagement, and seriously harm our business.***

Our reputation and ability to attract, retain, and serve users depends on the reliable performance of Snapchat and our underlying technology infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our products and services from time to time. Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could seriously harm our business. If Snapchat is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to Snapchat as often in the future, or at all. As our user base and the volume and types of information shared on Snapchat grow, we will need an increasing amount of technology infrastructure, including network capacity and computing power, to continue to satisfy our users' needs. It is possible that we may fail to effectively scale and grow our technology infrastructure to accommodate these increased demands. In addition, our business is subject to interruptions, delays, and failures resulting from earthquakes, other natural disasters, terrorism, pandemics, and other catastrophic events. Global climate change could also result in natural disasters occurring more frequently or with more intense effects, which could cause business interruptions.

Substantially all of our network infrastructure is provided by third parties, including Google Cloud and AWS. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could seriously harm our business. Any financial or other difficulties these providers face may seriously harm our business. And because we exercise little control over these providers, we are vulnerable to problems with the services they provide.

During the first quarter of 2021, we completed the initial phase of our new enterprise resource planning, or ERP, system implementation and migrated our general ledger, consolidation, and planning processes onto the new system. In connection with this implementation, we modified the design and documentation of our internal control processes and procedures relating to the new system. As part of this implementation, we may experience difficulties in managing our existing systems and processes, which could disrupt our operations, the management of our finances, and the reporting of our financial results, which in turn, may result in our inability to manage the growth of our business and to accurately forecast and report our results, each of which could seriously harm our business.

***Our business emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes don't align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. We believe our culture fosters this goal. Our focus on innovations and quick reactions could result in unintended outcomes or decisions that are poorly received by our users, advertisers, or partners. We have made, and expect to continue to make, significant investments to develop and launch new products and services and we cannot assure you that users will purchase or use such new products and services in the future. We will also continue to attempt to find effective ways to show our community new and existing products and alert them to events, holidays, relevant content, and meaningful opportunities to connect with their friends. These methods may provide temporary increases in engagement that may ultimately fail to attract and retain users. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and improve our financial performance over the long term. For example, we monitor how advertising on Snapchat affects our users' experiences to ensure we do not deliver too many advertisements to our users, and we may decide to decrease the number of advertisements to ensure our users' satisfaction in the product. In addition, we improve Snapchat based on feedback provided by our users, advertisers, and partners. These decisions may not produce the long-term benefits that we expect, in which case our user growth and engagement on our service or on certain platforms, our relationships with advertisers and partners, and our business could be seriously harmed.

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be seriously harmed. If we need to license or acquire new intellectual property, we may incur substantial costs.***

We aim to protect our confidential proprietary information, in part, by entering into confidentiality agreements and invention assignment agreements with our employees, consultants, advisors, and third parties who access or contribute to our proprietary know-how, information, or technology. We also rely on trademark, copyright, patent, trade secret, and domain-name-protection laws to protect our proprietary rights. In the United States and internationally, we have filed various applications to protect aspects of our intellectual property, and we currently hold a number of issued patents, trademarks, and

copyrights in multiple jurisdictions. In the future, we may acquire additional patents or patent portfolios, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, and pending and future trademark, copyright, and patent applications may not be approved. Further, the laws of certain foreign countries do not provide the same level of protection of corporate proprietary information and assets such as intellectual property, trade secrets, know-how, and records as the laws of the United States. For instance, the legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection. As a result, we may be exposed to material risks of theft of our proprietary information and other intellectual property, including technical data, manufacturing processes, data sets, or other sensitive information, and we may also encounter significant problems in protecting and defending our intellectual property or proprietary rights abroad. In any of these cases, we may be required to expend significant time and expense to prevent infringement or to enforce our rights. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products or concepts that are substantially similar to ours and compete with our business. If we are unable to protect our proprietary rights or prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished, and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could seriously harm our business.

In addition, we have contributed software source code under open-source licenses, have made other technology we developed available under other open licenses, and include open-source software in our products. From time to time, we may face claims from third parties claiming ownership of, or demanding release of, the open-source software or derivative works that we have developed using such software, which could include our proprietary source code, or otherwise seeking to enforce the terms of the applicable open-source license. These claims could result in litigation and could require us to make our software source code freely available, seek licenses from third parties to continue offering our products for certain uses, or cease offering the products associated with such software unless and until we can re-engineer them to avoid infringement, which may be very costly.

***If our users do not continue to contribute content or their contributions are not perceived as valuable to other users, we may experience a decline in user growth, retention, and engagement on Snapchat, which could result in the loss of advertisers and revenue.***

Our success depends on our ability to provide Snapchat users with engaging content, which in part depends on the content contributed by our users. If users, including influential users such as world leaders, government officials, celebrities, athletes, journalists, sports teams, media outlets, and brands, do not continue to contribute engaging content to Snapchat, our user growth, retention, and engagement may decline. That, in turn, may impair our ability to maintain good relationships with our advertisers or attract new advertisers, which may seriously harm our business.

***Foreign government initiatives and restrictions could seriously harm our business.***

Foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. Foreign governments may censor Snapchat in their countries, restrict access to Snapchat from their countries entirely, impose other restrictions that may affect their citizens' ability to access Snapchat for an extended period of time or even indefinitely, require data localization, or impose other laws or regulations that we cannot comply with, would be difficult for us to comply with, or would require us to rebuild our products or the infrastructure for our products. Such restrictions may also be implemented or lifted selectively to target or benefit other companies or products, which may result in sudden or unexpected fluctuations in competition in regions where we operate. Any restriction on access to Snapchat due to foreign government actions or initiatives, or any withdrawal by us from certain countries because of such actions or initiatives, or any increased competition due to actions and initiatives of foreign governments would adversely affect our DAUs, including by giving our competitors an opportunity to penetrate geographic markets that we cannot access or to which they previously did not have access. As a result, our user growth, retention, and engagement may be seriously harmed, and we may not be able to maintain or grow our revenue as anticipated and our business could be seriously harmed.

***Our users may increasingly engage directly with our partners and advertisers instead of through Snapchat, which may negatively affect our revenue and seriously harm our business.***

Using our products, some partners and advertisers not only can interact directly with our users but can also direct our users to content with third-party websites and products and downloads of third-party applications. In addition, our users may generate content by using Snapchat features, but then share, use, or post it on a different platform. The more our users engage with third-party websites and applications, the less engagement we may get from them, which would adversely affect the revenue we could earn from them. Although we believe that Snapchat reaps significant long-term benefits from increased user engagement with content on Snapchat provided by our partners, these benefits may not offset the possible loss of advertising revenue, in which case our business could be seriously harmed.

***If events occur that damage our brand or reputation, our business may be seriously harmed.***

We have developed a brand that we believe has contributed to our success. We also believe that maintaining and enhancing our brand is critical to expanding our user base, advertisers, and partners. Because many of our users join Snapchat on the invitation or recommendation of a friend or family member, one of our primary focuses is on ensuring that our users continue to view Snapchat and our brand favorably so that these referrals continue. Maintaining and enhancing our brand will depend largely on our ability to continue to provide useful, novel, fun, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products, make changes to existing products and services, or require our users to agree to new terms of service related to new and existing products that users do not like, which may negatively affect our brand in the short term, long term, or both. Additionally, our partners' actions may affect our brand if users do not appreciate what those partners do on Snapchat. We may also fail to adequately support the needs of our users, advertisers, or partners, which could erode confidence in our brand. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not be successful. If we fail to successfully promote and maintain our brand or if we incur excessive expenses in this effort, our business may be seriously harmed.

We and our founders also receive a high degree of media coverage globally. In the past, we have experienced, and we expect that we will continue to experience, media, legislative, and regulatory scrutiny. Unfavorable publicity regarding us, our privacy practices, product changes, product quality, litigation, employee matters, or regulatory activity, or regarding the actions of our founders, our partners, our users, or other companies in our industry, could seriously harm our reputation and brand. Negative publicity and scrutiny could also adversely affect the size, demographics, engagement, and loyalty of our user base and result in decreased revenue, fewer app installs (or increased app un-installs), or declining user base or growth rates, any of which could seriously harm our business.

***Expanding and operating in international markets requires significant resources and management attention. If we are not successful in expanding and operating our business in international markets, we may incur significant costs, damage our brand, or need to lay off team members in those markets, any of which may seriously harm our business.***

We have expanded to new international markets and are growing our operations in existing international markets, which may have very different cultures and commercial, legal, and regulatory systems than where we predominately operate. In connection with our international expansion and growth, we have also hired new team members in many of these markets. This international expansion may:

- impede our ability to continuously monitor the performance of all of our team members;
- result in hiring of team members who may not yet fully understand our business, products, and culture; or
- cause us to expand in markets that may lack the culture and infrastructure needed to adopt our products.

These issues may eventually lead to turnover or layoffs of team members in these markets and may harm our ability to grow our business in these markets. In addition, scaling our business to international markets imposes complexity on our business, and requires additional financial, legal, and management resources. We may not be able to manage growth and expansion effectively, which could damage our brand, result in significant costs, and seriously harm our business.

Additionally, as we increase the number of our team members internationally, we are exposed to political, social, and economic instability in additional countries and regions. For example, we have team members in Ukraine, and any political instability in the region may disrupt our operations and negatively impact our business.

***Our products are highly technical and may contain undetected software bugs or hardware errors, which could manifest in ways that could seriously harm our reputation and our business.***

Our products are highly technical and complex. Snapchat, or any other products we may introduce in the future, may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently disabled products. We have a practice of rapidly updating our products and some errors in our products may be discovered only after a product has been released or shipped and used by users, and may in some cases be detected only under certain circumstances or after extended use. Spectacles, as an eyewear product, is regulated by the U.S. Food and Drug Administration, or the FDA, and may malfunction in a way that results in physical harm to a user or others around the user. We offer a limited one-year warranty in the United States and a limited two-year warranty in Europe, and any such defects discovered in our products after commercial release could result in a loss of sales and users, which could seriously harm our business. Any errors, bugs, or vulnerabilities discovered in our code after release could damage our reputation, drive away users, lower revenue, and expose us to damages claims, any of which could seriously harm our business.

We could also face claims for product liability, tort, or breach of warranty. In addition, our product contracts with users contain provisions relating to warranty disclaimers and liability limitations, which may not be upheld. Defending a lawsuit, regardless of its merit, is costly and may divert management's attention and seriously harm our reputation and our business. In addition, if our liability insurance coverage proves inadequate or future coverage is unavailable on acceptable terms or at all, our business could be seriously harmed.

***We have been, are currently, and may in the future be subject to regulatory inquiries, investigations, and proceedings in the future, which could cause us to incur substantial costs or require us to change our business practices in a way that could seriously harm our business.***

We have been, are currently, and may in the future be subject to investigations and inquiries from government entities. These investigations and inquiries, and our compliance with any associated regulatory orders or consent decrees, may require us to change our policies or practices, subject us to substantial monetary fines or other penalties or sanctions, result in increased operating costs, divert management's attention, harm our reputation, and require us to incur significant legal and other expenses, any of which could seriously harm our business.

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property claims that are expensive and time-consuming. If resolved adversely, these lawsuits and claims could seriously harm our business.***

Companies in the mobile, camera, communication, media, internet, and other technology-related industries own large numbers of patents, copyrights, trademarks, trade secrets, and other intellectual property rights, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" and other entities that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights often attempt to aggressively assert their rights to extract value from technology companies. Furthermore, from time to time we may introduce new products or make other business changes, including in areas where we currently do not compete, which could increase our exposure to patent, copyright, trademark, trade secret, and other intellectual property rights claims from competitors and non-practicing entities. We have been subject to, and expect to continue to be subject to, claims and legal proceedings from holders of patents, trademarks, copyrights, trade secrets, and other intellectual property rights alleging that some of our products or content infringe their rights. For example, in January 2020, You Map, Inc. filed a lawsuit in the U.S. District Court for the District of Delaware against us, our subsidiary Zenly, and certain of our respective employees alleging that we misappropriated various trade secrets regarding map technology used in Snapchat's and Zenly's map products and that the Snapchat and Zenly applications infringe a You Map patent. While we believe we have meritorious defenses to these claims, an unfavorable outcome in these and other similar lawsuits could seriously harm our business. If these or other matters continue in the future or we need to enter into licensing arrangements, which may not be available to us or on terms favorable to us, it may increase our costs and decrease the value of our products, and our business could be seriously harmed.

We rely on a variety of statutory and common-law frameworks for the content we host and provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, or CDA, and the fair-use doctrine. However, each of these statutes and doctrines is subject to uncertain judicial interpretation and regulatory and legislative amendments. For example, the U.S. Congress amended the CDA in 2018 in ways that could expose some Internet platforms to an increased risk of litigation. In addition, the U.S. Congress and the Executive branch have proposed further changes or amendments each year since 2019 including, among other things, proposals that would narrow the CDA immunity, expand government enforcement power relating to content moderation concerns, or repeal the CDA altogether. Some U.S. states have also enacted or proposed

legislation that would undercut, or conflict with, the CDA's protections. Although such state laws have been or can be expected to be challenged in court, if these laws were upheld or if additional similar laws or the changes or amendments to the CDA proposed by the U.S. Congress and the Executive branch were enacted, such changes may decrease the protections provided by the CDA and expose us to lawsuits, penalties, and additional compliance obligations. Moreover, some of these statutes and doctrines that we rely on provide protection only or primarily in the United States. If the rules around these doctrines change, if international jurisdictions refuse to apply similar protections, or if a court were to disagree with our application of those rules to our service, we could incur liability or be required to make significant changes to our products, business practices, or operations, and our business could be seriously harmed.

### *From time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming and could seriously harm our business.*

We are involved in numerous lawsuits, including putative class-action lawsuits brought by users and investors, some of which may claim statutory damages. We anticipate that we will continue to be a target for lawsuits in the future. Because we have millions of users, class-action lawsuits against us that are purportedly filed by or on behalf of users typically claim enormous monetary damages in the aggregate even if the alleged per-user harm is small or non-existent. For example, in November 2020, a putative class filed an action against us in Illinois, alleging that we violated Illinois' Biometric Information Privacy Act, or BIPA, with respect to many Illinois users of Snapchat and that we are liable to those users for statutory damages. We compelled arbitration, which the court granted, dismissing the case and ordering the parties to arbitrate the matter; that ruling compelling arbitration is currently being appealed. Some plaintiffs' attorneys have also indicated a desire to initiate arbitrations against us, arguing that we violated BIPA, in some cases on behalf of large numbers of Illinois users. We believe we have meritorious defenses to these lawsuits and arbitrations, but an unfavorable outcome in these lawsuits or arbitrations could seriously harm our business. Similarly, because we have a large number of stockholders, class-action lawsuits on securities theories typically claim enormous monetary damages in the aggregate even if the alleged loss per stockholder is small. Any litigation to which we are a party may result in an onerous or unfavorable judgment that might not be reversed on appeal, or we may decide to settle lawsuits on adverse terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and seriously harm our business. Even if the outcome of any such litigation or claim is favorable, defending them is costly and can impose a significant burden on management and employees. We may also receive unfavorable preliminary, interim, or final rulings in the course of litigation. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. We believe we have meritorious defenses to this lawsuit, but an unfavorable outcome could seriously harm our business.

### *We may face lawsuits, incur liability, or need to seek licenses based on information posted to our products.*

We have faced, currently face, and will continue to face claims relating to information that is published or made available on our products, including Snapchat. In particular, the nature of our business exposes us to claims related to defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. For example, we do not monitor or edit the vast majority of content that is communicated through Snapchat, and such content may expose us to lawsuits. This risk is enhanced in certain jurisdictions outside the United States where our protection from liability for third-party actions may be unclear or evolving and where we may be less protected under local laws than we are in the United States. For example, in April 2019, the European Union passed a directive expanding online platform liability for copyright infringement and regulating certain uses of news content online, which member states were required to implement by June 2021. In addition, legislation in Germany may impose significant fines for failure to comply with certain content removal and disclosure obligations. Numerous other countries in Europe, the Middle East, Asia-Pacific, and Latin America are considering or have implemented similar legislation imposing penalties for failure to remove certain types of content or follow certain processes. In the United States, there have been various Congressional and Executive branch efforts to remove or restrict the scope of the protections available to online platforms under Section 230 of the CDA. For example, the CDA was amended in 2018, and the U.S. Congress and the Executive branch have proposed further changes or amendments each year since 2019, including among other things proposals that would narrow CDA immunity, expand government enforcement power relating to content moderation concerns, or repeal the CDA altogether. Such changes could decrease or change our protections from liability for third-party content in the United States. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages, or license costs. We could also face fines or orders restricting or blocking our services in particular geographies as a result of content hosted on our services. If any of these events occur, we may incur significant costs or be required to make significant changes to our products, business practices, or operations and our business could be seriously harmed.

*We plan to continue expanding our international operations where we have limited operating experience and may be subject to increased business and economic risks that could seriously harm our business.*

We plan to continue expanding our business operations abroad and translating our products into other languages. Snapchat is currently available in more than 40 languages, and we have offices in more than 15 countries. We plan to enter new international markets and expand our operations in existing international markets, where we have limited or no experience in marketing, selling, and deploying our products and advertisements. Our limited experience and infrastructure in such markets, or the lack of a critical mass of users in such markets, may make it more difficult for us to effectively monetize any increase in DAUs in those markets, and may increase our costs without a corresponding increase in revenue. If we fail to deploy or manage our operations in international markets successfully, our business may suffer. In the future, as our international operations increase, or more of our expenses are denominated in currencies other than the U.S. dollar, our operating results may be more greatly affected by fluctuations in the exchange rates of the currencies in which we do business. In addition, as our international operations and sales continue to grow, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, and economic instability;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship and requirements to provide user information to local authorities;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- complying with tax requirements of multiple jurisdictions;

- enhanced difficulties of integrating any foreign acquisitions;

- complying with a variety of foreign laws, including certain employment laws requiring national collective bargaining agreements that set minimum salaries, benefits, working conditions, and termination requirements;

- reduced protection for intellectual-property rights in some countries;

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and compliance costs associated with multiple international locations;

- regulations that might add difficulties in repatriating cash earned outside the United States and otherwise preventing us from freely moving cash;

- import and export restrictions and changes in trade regulation;

- complying with statutory equity requirements;

- complying with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and similar laws in other jurisdictions; and

- export controls and economic sanctions administered by the Department of Commerce Bureau of Industry and Security and the Treasury Department's Office of Foreign Assets Control.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our business could be seriously harmed.

*Exposure to United Kingdom political developments, including the effect of its withdrawal from the European Union, could be costly and difficult to comply with and could harm our business.*

We have based a significant portion of our European operations in the United Kingdom and have licensed a portion of our intellectual property to one of our United Kingdom subsidiaries. These operations continue to face risks and potential disruptions related to the withdrawal of the United Kingdom from the European Union, commonly referred to as "Brexit." Although the United Kingdom and the European Union have entered into a trade and cooperation agreement, the long-term nature of the United Kingdom's relationship with the European Union remains unclear. For example, Brexit could lead to potentially divergent laws and regulations, such as with respect to data protection and data transfer laws, that could be costly

and difficult to comply with. While we continue to monitor these developments, the full effect of Brexit on our operations is uncertain and our business could be harmed by trade disputes or political differences between the United Kingdom and the European Union in the future.

***We plan to continue to make acquisitions and strategic investments in other companies, which could require significant management attention, disrupt our business, dilute our stockholders, and seriously harm our business.***

As part of our business strategy, we have made and intend to make acquisitions to add specialized team members and complementary companies, products, and technologies, as well as investments in public and private companies in furtherance of our strategic objectives. Our ability to acquire and successfully integrate larger or more complex companies, products, and technologies is unproven. In the future, we may not be able to find other suitable acquisition or investment candidates, and we may not be able to complete acquisitions or investments on favorable terms, if at all. Our previous and future acquisitions and investments may not achieve our goals, and any future acquisitions or investments we complete could be viewed negatively by users, advertisers, partners, or investors. In addition, if we fail to successfully close transactions, integrate new teams, or integrate the products and technologies associated with these acquisitions into our company, our business could be seriously harmed. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. We may not successfully evaluate or use the acquired products, technology, and personnel, or accurately forecast the financial impact of an acquisition or investment transaction, including accounting charges. We may also incur unanticipated liabilities that we assume as a result of acquiring companies. We may have to pay cash, incur debt, or issue equity securities to pay for any acquisition or investment, any of which could seriously harm our business. Selling or issuing equity to finance or carry out any such acquisition or investment would also dilute our existing stockholders. Incurring debt would increase our fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

In addition, it generally takes several months after the closing of an acquisition to finalize the purchase price allocation. Therefore, it is possible that our valuation of an acquisition may change and result in unanticipated write-offs or charges, impairment of our goodwill, or a material change to the fair value of the assets and liabilities associated with a particular acquisition, any of which could seriously harm our business.

The strategic investments we make in public and private companies around the world range from early-stage companies still defining their strategic direction to mature companies with established revenue streams and business models. Many of the instruments in which we invest are non-marketable and illiquid at the time of our initial investment, and we are not always able to achieve a return in a timely fashion, if at all. Our ability to realize a return on our investment in a private company, if any, is typically dependent on the company participating in a liquidity event, such as a public offering or acquisition. To the extent any of the companies in which we invest are not successful, which can include failures to achieve business objectives as well as bankruptcy, we could recognize an impairment or lose all or part of our investment.

Our acquisition and investment strategy may not succeed if we are unable to remain attractive to target companies or expeditiously close transactions. For example, if we develop a reputation for being a difficult acquirer or having an unfavorable work environment, or target companies view our non-voting Class A common stock unfavorably, we may be unable to source and close acquisition targets. In addition, members of the U.S. administration and Congress have proposed new legislation that could limit, hinder, or delay the acquisition process and target opportunities. If we are unable to consummate key acquisition transactions essential to our corporate strategy, it may limit our ability to grow or compete effectively and our business may be seriously harmed.

***If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings, which could seriously harm our business.***

Under U.S. generally accepted accounting principles, or GAAP, we review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. As of December 31, 2021, we had recorded a total of $1.9 billion of goodwill and intangible assets, net related to our acquisitions. An adverse change in market conditions, particularly if such change has the effect of changing one of our critical assumptions or estimates, could result in a change to the estimation of fair value that could result in an impairment charge to our goodwill or intangible assets. Any such material charges may seriously harm our business.

*We have spent and may continue to spend substantial funds in connection with the tax liabilities on the settlement of equity awards. The manner in which we fund these tax liabilities may cause us to spend substantial funds or dilute stockholders, either of which may have an adverse effect on our financial condition.*

When our employee equity awards vest, we withhold taxes and remit them to relevant taxing authorities on behalf of team members. To fund the withholding and remittance obligations for equity awards, we have either used our existing cash or sold a portion of vested equity awards on behalf of our team members near the applicable settlement dates in an amount that is substantially equivalent to the number of shares of common stock that we would withhold in connection with these settlements. In the future, we may also sell equity on our behalf and use the proceeds to fund the withholding and remittance obligations for equity awards. Any of these methods may have an adverse effect on our financial condition.

If we sell shares on behalf of our team members, although those newly issued shares should not be dilutive, such sales to the market could result in a decline to our stock price. If we use our existing cash, or if our cash reserves are not sufficient, we may choose to issue equity securities or borrow funds under our revolving credit facility. In such an event, we cannot assure you that we will be able to successfully match the proceeds of any such equity financing to the then applicable tax liability, and any such equity financing could result in a decline in our stock price and be dilutive to existing stockholders. If we elect to satisfy tax withholding and remittance obligations in whole or in part by drawing on our revolving credit facility, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

*There are numerous risks associated with our internal and contract manufacturing of our physical products and components. If we encounter problems with either our internal or contract manufacturing, we may not deliver our products within specifications or on time, which may seriously harm our business.*

Manufacturing processes are highly complex, require advanced and costly equipment, and must be continuously modified to improve yields and performance. We rely on suppliers and contract manufacturers in connection with the production of our own physical products and components. We and our contract manufacturers are all vulnerable to capacity constraints and reduced component availability, and have limited control over delivery schedules, manufacturing yields, and costs, particularly when components are in short supply, or if we introduce a new product or feature. In addition, we have limited control over our suppliers' and manufacturers' quality systems and controls, and therefore must rely on them to meet our quality and performance standards and specifications. Delays, component shortages, including custom components that are manufactured for us at our direction, global trade conditions and agreements, and other manufacturing and supply problems could impair the distribution of our products and ultimately our brand. For example, the United States has threatened tougher trade terms with China and other countries, leading to the imposition, or potential future imposition, of substantially higher U.S. Section 301 tariffs on certain imports from China, which may adversely affect our products and seriously harm our business.

Furthermore, any adverse change in our suppliers' or contract manufacturers' financial or business condition or our relationship with them could disrupt our ability to supply our products. If we change our suppliers or contract manufacturers, or shift to more internal manufacturing operations, we may lose revenue, incur increased costs, and damage our reputation and brand. Qualifying and commencing operations with a new supplier or contract manufacturer is expensive and time-consuming. In addition, if we experience increased demand for our products, we may need to increase our material or component purchases, internal or contract-manufacturing capacity, and internal test and quality functions. The inability of our suppliers or contract manufacturers to provide us with adequate high-quality materials and products could delay our order fulfillment, and may require us to change the design of our products to meet this increased demand. Any redesign may require us to re-qualify our products with any applicable regulatory bodies or customers, which would be costly and time-consuming. This may lead to unsatisfied customers and users and increase costs to us, which could seriously harm our business. As we increase or acquire additional manufacturing capacity, we are subject to many complex and evolving environmental, health, and safety laws, regulations, and rules in each jurisdiction in which we operate. If we fail to comply with any such laws and regulations, then we could incur regulatory penalties, fines, and legal liabilities, suspension of production, significant compliance requirements, alteration of our manufacturing processes, or restrictions on our ability to modify or expand our facilities, any of which could seriously harm our business.

In addition, any errors or defects in any parts or technology incorporated into our products could result in product failures that could seriously harm our business. Further, any defect in manufacturing, design, or other could cause our products to fail or render them permanently inoperable. For example, the typical means by which our Spectacles product connects to mobile devices is by way of a Bluetooth transceiver located in the Spectacles product. If the Bluetooth transceiver in our Spectacles product were to fail, it would not be able to connect to a user's mobile device and Spectacles would not be able to deliver any content to the mobile device and the Snapchat application. As a result, we may have to replace these products at our sole cost and expense, face litigation, or be subject to other liabilities. Should we have a widespread problem of this kind, the reputational damage and the cost of replacing these products, or other liabilities, could seriously harm our business.

***Some of our products are in regulated industries. Clearances to market regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products.***

The FDA and other state and foreign regulatory agencies regulate Spectacles. We may develop future products that are regulated as medical devices by the FDA or regulated by other governmental agencies. Government authorities, primarily the FDA and corresponding regulatory agencies, regulate the medical device industry. Unless there is an exemption, we must obtain regulatory approval from the FDA and corresponding agencies, or other applicable governmental authorities, before we can market or sell a new regulated product or make a significant modification to an existing product. Obtaining regulatory clearances to market regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any products under development could prevent us from launching new products. We could seriously harm our business and the ability to sell our products if we experience any product problems requiring reporting to governmental authorities, if we fail to comply with applicable state or foreign agency regulations, or if we are subject to enforcement actions such as fines, civil penalties, injunctions, product recalls, or failure to obtain regulatory clearances or approvals.

***We have faced inventory risk with respect to our physical products, such as Spectacles.***

We have been and may in the future be exposed to inventory risks related to our physical products, such as Spectacles, as a result of rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand and consumer spending patterns, changes in consumer tastes with respect to our products, and other factors. We try to accurately predict these trends and avoid overstocking or understocking inventory. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. Failure to manage our inventory, supplier commitments, or customer expectations could seriously harm our business.

**Risks Related to Credit and Financing**

*We have offered and may continue to offer credit to our partners to stay competitive, and as a result we may be exposed to credit risk of some of our partners, which may seriously harm our business.*

We engage in business with some of our partners on an open credit basis. While we attempt to monitor individual partner payment capability when we grant open credit arrangements and maintain allowances we believe are adequate to cover exposure for doubtful accounts, we cannot assure investors these programs will be effective in managing our credit risks in the future. This may be especially true as our business grows and expands, we engage with partners that have limited operating history, or we engage with partners that we may not be familiar with. If we are unable to adequately control these risks, our business could be seriously harmed.

*Operating our business requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay the Convertible Notes, and any other debt when due, which may seriously harm our business.*

Our ability to make principal or interest payments on, or to refinance, the Convertible Notes or other indebtedness depends on our future performance, which is subject to many factors beyond our control. Our business may not generate sufficient cash flow from operations in the future to service our debt and business. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt, obtaining additional debt financing, or issuing additional equity securities, any of which may be on terms that are not favorable to us or, in the case of equity securities, highly dilutive to our stockholders. Our ability to refinance the Convertible Notes or our other indebtedness will depend on various factors, including the available capital markets, our business, and our financial condition at such time. We may not be able to engage in any of these activities or on desirable terms, which could result in a default on our debt obligations. In addition, our existing and future debt agreements, including the Convertible Notes and Credit Facility, may contain restrictive covenants that may prohibit us from adopting any of these alternatives. Our failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in the acceleration of our debt, and would seriously harm our business.

In addition, holders of the Convertible Notes have the right to require us to repurchase all or a portion of the Convertible Notes on the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Convertible Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. Further, if a make-whole fundamental change as defined in each of the indentures governing the Convertible Notes, or the Indentures, occurs prior to the maturity date of the Convertible Notes, we will in some cases be required to increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such make-whole fundamental change. On the conversion of the Convertible Notes, unless we elect to deliver solely shares of our Class A common stock to settle such conversion (other than paying cash in lieu of delivering any fractional share), we will be required to make cash payments for the Convertible Notes being converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make such repurchases of the Convertible Notes surrendered or pay cash with respect to the Convertible Notes being converted.

*If we default on our credit obligations, our operations may be interrupted and our business could be seriously harmed.*

We have a Credit Facility that we may draw on to finance our operations, acquisitions, and other corporate purposes. If we default on these credit obligations, our lenders may:

- require repayment of any outstanding amounts drawn on our Credit Facility;

- terminate our Credit Facility; or

- require us to pay significant damages.

If any of these events occur, our operations may be interrupted and our ability to fund our operations or obligations, as well as our business, could be seriously harmed. In addition, our Credit Facility contains operating covenants, including customary limitations on the incurrence of certain indebtedness and liens, restrictions on certain intercompany transactions, and limitations on the amount of dividends and stock repurchases. Our ability to comply with these covenants may be affected by events beyond our control, and breaches of these covenants could result in a default under the Credit Facility and any future financial agreements into which we may enter. If not waived, defaults could cause our outstanding indebtedness under our outstanding Convertible Notes or our Credit Facility, including any future financing agreements that we may enter into, to

become immediately due and payable. For more information on our Credit Facility, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

***We cannot be certain that additional financing will be available on reasonable terms when needed, or at all, which could seriously harm our business.***

We have incurred net losses and negative cash flow from operations in prior periods, and we may not achieve or maintain profitability. As a result, we may need additional financing. Our ability to obtain additional financing, if and when required, will depend on investor demand, our operating performance, our credit rating, the condition of the capital markets, and other factors. To the extent we use available funds or draw on our Credit Facility, we may need to raise additional funds and we cannot assure investors that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-linked, or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A common stock, and our existing stockholders may experience dilution. In the event that we are unable to obtain additional financing on favorable terms, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

## Risks Related to Taxes

***New legislation that would change U.S. or foreign taxation of business activities, including the imposition of tax based on gross revenue, could seriously harm our business, or the financial markets and the market price of our Class A common stock.***

Reforming the taxation of international businesses has been a priority for politicians, and a wide variety of changes have been proposed or enacted. Due to the large and expanding scale of our international business activities, any changes in the taxation of such activities may increase our tax expense, the amount of taxes we pay, or both, and seriously harm our business. For example, the Tax Cuts and Jobs Act, or the Tax Act, was enacted in December 2017 and significantly reformed the U.S. Internal Revenue Code of 1986, as amended, or the Code. The Tax Act lowered U.S. federal corporate income tax rates, changed the utilization of future net operating loss carryforwards, allowed for the expensing of certain capital expenditures, and put into effect sweeping changes to U.S. taxation of international business activities. However, the current U.S. administration has indicated a desire to reform the Code, including by potentially increasing U.S. federal corporate income tax rates, and it is currently unclear what, if any, changes to the Code will be enacted and how that may affect our business or the financial markets and the market price of our Class A common stock.

In addition, many jurisdictions and intergovernmental organizations have been discussing proposals that may change various aspects of the existing framework under which our tax obligations are determined in many of the jurisdictions in which we do business and in which our users are located. Some jurisdictions have enacted, and others have proposed, taxes based on gross receipts applicable to digital services regardless of profitability. The Organisation for Economic Co-operation and Development has been working on a proposal that may change how taxable presence for digital services is defined and result in the imposition of taxes based on net income in countries where we have no physical presence.

We continue to examine the impact these and other tax reforms may have on our business. The impact of these and other tax reforms is uncertain and one or more of these or similar measures could seriously harm our business.

***We may have exposure to greater-than-anticipated tax liabilities, which could seriously harm our business.***

Our income tax obligations are based on our corporate operating structure and third-party and intercompany arrangements, including the manner in which we develop, value, and use our intellectual property and the valuations of our intercompany transactions. The tax laws applicable to our international business activities, including the laws of the United States and other jurisdictions, are subject to change and uncertain interpretation. The taxing authorities of the jurisdictions in which we operate may challenge our methodologies for valuing developed technology, intercompany arrangements, or transfer pricing, which could increase our worldwide effective tax rate and the amount of taxes we pay and seriously harm our business. Taxing authorities may also determine that the manner in which we operate our business is not consistent with how we report our income, which could increase our effective tax rate and the amount of taxes we pay and seriously harm our business. In addition, our future income taxes could fluctuate because of earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by U.S. federal and state and foreign tax authorities. Any adverse outcome from a review or audit could seriously harm our business. In addition, determining our worldwide provision for income taxes and other tax liabilities

requires significant judgment by management, and there are many transactions where the ultimate tax determination is uncertain. Although we believe that our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements for such period or periods and may seriously harm our business.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited, each of which could seriously harm our business.*

As of December 31, 2021, we had U.S. federal net operating loss carryforwards of approximately $7.5 billion and state net operating loss carryforwards of approximately $4.4 billion, as well as U.K. net operating loss carryforwards of approximately $3.2 billion. We also accumulated U.S. federal and state research tax credits of $476.6 million and $292.8 million, respectively, as of December 31, 2021. Under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a cumulative change in our ownership by "5% shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. In the event that we experience one or more ownership changes as a result of future transactions in our stock, then we may be limited in our ability to use our net operating loss carryforwards and other tax assets to reduce taxes owed on the net taxable income that we earn.

In the United States, net operating loss carryforwards arising in tax years beginning after December 31, 2017 can be carried forward indefinitely but use of such carryforwards is limited to 80% of taxable income. Net operating loss carryforwards generated by us before January 1, 2018 will not be subject to the taxable income limitation and will continue to have a twenty-year carryforward period. In the U.K., net operating loss carryforwards can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income and may be subject to ownership change rules that restrict the use of net operating loss carryforwards.

Any limitations on the ability to use our net operating loss carryforwards and other tax assets, as well as the timing of any such use, could seriously harm our business.

**Risks Related to Ownership of Our Class A Common Stock**

*Holders of Class A common stock have no voting rights. As a result, holders of Class A common stock will not have any ability to influence stockholder decisions.*

Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2021, Mr. Spiegel and Mr. Murphy control over 99% of the voting power of our capital stock, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval. In addition, because our Class A common stock carries no voting rights (except as required by Delaware law), the issuance of the Class A common stock in future offerings, in future stock-based acquisition transactions, or to fund employee equity incentive programs could prolong the duration of Mr. Spiegel's and Mr. Murphy's current relative ownership of our voting power and their ability to elect certain directors and to determine the outcome of all matters submitted to a vote of our stockholders. This concentrated control eliminates other stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

*We cannot predict the impact our capital structure and the concentrated control by our founders may have on our stock price or our business.*

Although other U.S.-based companies have publicly traded classes of non-voting stock, to our knowledge, we were the first company to only list non-voting stock on a U.S. stock exchange. We cannot predict whether this structure, combined with the concentrated control by Mr. Spiegel and Mr. Murphy, will result in a lower trading price or greater fluctuations in the trading price of our Class A common stock, or will result in adverse publicity or other adverse consequences. In addition, some indexes have indicated they will exclude non-voting stock, like our Class A common stock, from their membership. For example, FTSE Russell, a provider of widely followed stock indexes, requires new constituents of its indexes to have at least five percent of their voting rights in the hands of public stockholders. In addition, S&P Dow Jones, another provider of widely followed stock indexes, has stated that companies with multiple share classes will not be eligible for certain of their indexes. As a result, our Class A common stock is likely not eligible for these stock indexes. We cannot assure you that other stock indexes will not take a similar approach to FTSE Russell or S&P Dow Jones in the future. Exclusion from indexes could make

our Class A common stock less attractive to investors and, as a result, the market price of our Class A common stock could be adversely affected. Additionally, the exclusion of our Class A common stock from these indexes may limit the types of investors who invest in our Class A common stock and could make the trading price of our Class A common stock more volatile.

***Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock.***

Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require periodic reporting of beneficial ownership by significant stockholders, including changes in that ownership. For example, we believe that Tencent Holdings Limited, together with its affiliates, holds greater than 10% of our Class A common stock based in part on Tencent Holdings Limited's public reporting. As a result of our capital structure, holders are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. Our directors and officers are required to file reports under Section 16 of the Exchange Act. Our significant stockholders, other than directors and officers, are exempt from the "short-swing" profit recovery provisions of Section 16 of the Exchange Act and related rules with respect to their purchases and sales of our securities. As such, stockholders will be unable to bring derivative claims for disgorgement of profits for trades by significant stockholders under Section 16(b) of the Exchange Act unless the significant stockholders are also directors or officers.

Since our Class A common stock is our only class of stock registered under Section 12 of the Exchange Act and that class is non-voting, we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, unless a vote of the Class A common stock is required by applicable law. Accordingly, legal causes of action and remedies under Section 14 of the Exchange Act for inadequate or misleading information in proxy statements may not be available to holders of our Class A common stock. If we do not deliver any proxy statements, information statements, annual reports, and other information and reports to the holders of our Class B common stock and Class C common stock, then we will similarly not provide any of this information to holders of our Class A common stock. Because we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, any proxy statement, information statement, or notice of our annual meeting may not include all information under Section 14 of the Exchange Act that a public company with voting securities registered under Section 12 of the Exchange Act would be required to provide to its stockholders. Most of that information, however, will be reported in other public filings. For example, any disclosures required by Part III of Form 10-K as well as disclosures required by the NYSE for the year ended December 31, 2021 that are customarily included in a proxy statement are instead included in our Annual Report, rather than a proxy statement. But some information required in a proxy statement or information statement is not required in any other public filing. For example, we will not be required to comply with the proxy access rules under Section 14 of the Exchange Act. If we take any action in an extraordinary meeting of stockholders where the holders of Class A common stock are not entitled to vote, we will not be required to provide the information required under Section 14 of the Exchange Act. Nor will we be required to file a preliminary proxy statement under Section 14 of the Exchange Act. Since that information is also not required in a Form 10-K, holders of Class A common stock may not receive the information required under Section 14 of the Exchange Act with respect to extraordinary meetings of stockholders. In addition, we are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Act. As a result, our stockholders do not have an opportunity to provide a non-binding vote on the compensation of our executive officers. Moreover, holders of our Class A common stock will be unable to bring matters before our annual meeting of stockholders or nominate directors at such meeting, nor can they submit stockholder proposals under Rule 14a-8 of the Exchange Act.

***The trading price of our Class A common stock has been and will likely continue to be volatile.***

The trading price of our Class A common stock has been and is likely to continue to be volatile. Shares of Class A common stock were sold in our IPO in March 2017 at a price of $17.00 per share. Since then, the trading price of our Class A common stock has ranged from $4.82 to $83.34 through December 31, 2021. Declines or volatility in our trading price could make it more difficult to attract and retain talent, adversely impact employee retention and morale, and may require us to issue more equity to incentivize team members which could dilute stockholders. The market price of our Class A common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our user growth, retention, engagement, revenue, or other operating results;

- variations between our actual operating results and the expectations of investors and the financial community;

- the accuracy of our financial guidance or projections;

- any forward-looking financial or operating information we may provide, any changes in this information, or our failure to meet expectations based on this information;

- actions of investors who initiate or maintain coverage of us, changes in financial estimates by any investors who follow our company, or our failure to meet these estimates or the expectations of investors;

- whether our capital structure is viewed unfavorably, particularly our non-voting Class A common stock and the significant voting control of our co-founders;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if we issue shares to satisfy equity-related tax obligations;

- stock repurchase programs undertaken by us;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry segment, including our partners and competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits, executive actions, or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war, incidents of terrorism, pandemics, or responses to these events.

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices, including us. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class-action litigation following periods of market volatility. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's ATT framework would have on our business. We believe we have meritorious defenses to this lawsuit, but an unfavorable outcome could seriously harm our business. Any litigation could subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business.

***Conversions or exchanges of the Convertible Notes may dilute the ownership interest of our stockholders or may otherwise affect the market price of our Class A common stock.***

The conversion of some or all of the Convertible Notes may dilute the ownership interests of our stockholders. On conversion of the Convertible Notes, we have the option to pay or deliver, as the case may be, cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock. If we elect to settle our conversion obligation in shares of our Class A common stock or a combination of cash and shares of our Class A common stock, any sales in the public market of our Class A common stock issuable on such conversion could adversely affect prevailing market prices of our Class A common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the conversion of the Convertible Notes could be used to satisfy short positions, or anticipated conversion of the Convertible Notes into shares of our Class A common stock, any of which could depress the market price of our Class A common stock.

We may also engage in exchanges, repurchase, or induce conversions, of the Convertible Notes in the future. Holders of the Convertible Notes that participate in any of these exchanges, repurchases, or induced conversions may enter into or unwind various derivatives with respect to our Class A common stock or sell shares of our Class A common stock in the open market to hedge their exposure in connection with these transactions. These activities could decrease (or reduce the size of any increase in) the market price of our Class A common stock or the Convertible Notes, or dilute the ownership interests of our stockholders. In addition, the market price of our Class A common stock is likely to be affected by short sales of our Class A common stock or the entry into or unwind of economically equivalent derivative transactions with respect to our Class A common stock by

investors that do not participate in the exchange transactions and by the hedging activity of the counterparties to our Capped Call Transactions or their respective affiliates.

***We may still incur substantially more debt or take other actions that would diminish our ability to make payments on the Convertible Notes when due. Our ability to repay our debt depends on our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.***

We and our subsidiaries may incur substantial additional debt in the future, subject to the restrictions contained in our current and future debt instruments. We are not restricted under the terms of the Indentures governing the Convertible Notes from incurring additional debt, securing existing or future debt, repurchasing our stock, making investments, paying dividends, recapitalizing our debt, or taking a number of other actions that could have the effect of diminishing our ability to make payments on the Convertible Notes when due.

Our ability to pay our debt when due or to refinance our indebtedness, including the Convertible Notes, depends on our financial condition at such time, the condition of capital markets, and our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.

***The conditional conversion feature of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.***

The Convertible Notes are convertible at the option of the holder. In the event the conditions for optional conversion of the 2025 Notes, 2026 Notes, or 2027 Notes by holders are met before the close of business on the business day immediately preceding February 1, 2025, May 1, 2026, or February 1, 2027, respectively, holders of the applicable Convertible Notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their Convertible Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our Class A common stock (other than paying cash in lieu of delivering any fractional share), we may settle all or a portion of our conversion obligation in cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Convertible Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Convertible Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital and may seriously harm our business.

***We entered into certain hedging positions that may affect the value of the Convertible Notes and the volatility and value of our Class A common stock.***

In connection with the issuance of the Convertible Notes, we entered into certain hedging positions with certain financial institutions. These hedging positions are expected generally to reduce potential dilution of our Class A common stock on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount of such converted Convertible Notes, as the case may be, with such reduction or offset subject to a cap.

The counterparties to these hedging positions or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our Class A common stock or purchasing or selling our Class A common stock in secondary market transactions prior to the maturity of the Convertible Notes (and are likely to do so during any observation period related to a conversion of Convertible Notes or following any repurchase of Convertible Notes by us on any fundamental change repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our Class A common stock or the Convertible Notes. In addition, if any such hedging positions fail to become effective, the counterparties to these hedging positions or their respective affiliates may unwind their hedge positions, which could adversely affect the value of our Class A common stock.

***Delaware law and provisions in our certificate of incorporation and bylaws, as well as our Indentures, could make a merger, tender offer, or proxy contest difficult or more expensive, thereby depressing the trading price of our Class A common stock.***

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our Class A common stock by acting to discourage, delay, or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- our certificate of incorporation provides for a tri-class capital structure. As a result of this structure, Mr. Spiegel and Mr. Murphy control all stockholder decisions, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. This includes the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. This concentrated control could discourage others from initiating any potential merger, takeover, or other change-of-control transaction that other stockholders may view as beneficial. As noted above, the issuance of the Class A common stock dividend, and any future issuances of Class A common stock dividends, could have the effect of prolonging the influence of Mr. Spiegel and Mr. Murphy on the company;

- our board of directors has the right to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect directors; and

- our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Any provision of our certificate of incorporation, bylaws, or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

Furthermore, certain provisions in the Indentures governing the Convertible Notes may make it more difficult or expensive for a third party to acquire us. For example, the Indentures require us, at the holders' election, to repurchase the Convertible Notes for cash on the occurrence of a fundamental change and, in certain circumstances, to increase the conversion rate for a holder that converts its Convertible Notes in connection with a make-whole fundamental change. A takeover of us may trigger the requirement that we repurchase the Convertible Notes or increase the conversion rate, which could make it more costly for a third party to acquire us. The Indentures also prohibit us from engaging in a merger or acquisition unless, among other things, the surviving entity assumes our obligations under the Convertible Notes and the Indentures. These and other provisions in the Indentures could deter or prevent a third party from acquiring us even when the acquisition may be favorable to holders of the Convertible Notes or our stockholders.

***Future sales of shares by existing stockholders could cause our stock price to decline.***

If our existing stockholders, including employees and service providers who obtain equity, sell, or indicate an intention to sell, substantial amounts of our Class A common stock in the public market, the trading price of our Class A common stock could decline. As of December 31, 2021, we had outstanding a total of 1.4 billion shares of Class A common stock, 22.8 million shares of Class B common stock, and 231.6 million shares of Class C common stock. In addition, as of December 31, 2021, 82.2 million shares of Class A common stock and 0.6 million shares of Class B common stock were subject to outstanding stock options and RSUs. As a result of our capital structure, holders who are not required to file reports under Section 16 of the Exchange Act are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. All of our outstanding shares are eligible for sale in the public market, except approximately 374.0 million shares (including options exercisable and RSAs subject to forfeiture as of December 31, 2021) held by directors, executive officers, and other affiliates that are subject to volume limitations under Rule 144 of the Securities Act. Our employees, other service providers, and directors are subject to our quarterly trading window closures. In addition, we have reserved shares for issuance under our equity incentive plans. We may also issue shares of our Class A common stock or securities convertible into our Class A common stock from time to time in connection with a financing, acquisition, investment, or otherwise. When these shares are issued and subsequently sold, it would be dilutive to existing stockholders and the trading price of our Class A common stock could decline.

*If securities or industry analysts either do not publish research about us, or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our Class A common stock could decline.*

The trading market for our Class A common stock is influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market, or our competitors. If one or more of the analysts initiate research with an unfavorable rating or downgrade our Class A common stock, provide a more favorable recommendation about our competitors, or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume to decline. Since we provide only limited financial guidance, this may increase the probability that our financial results are perceived as not in line with analysts' expectations, and could cause volatility to our Class A common stock price.

*We do not intend to pay cash dividends for the foreseeable future.*

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any cash dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases. In addition, our Credit Facility includes restrictions on our ability to pay cash dividends.

*If we are unable to maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our Class A common stock may be seriously harmed.*

We are required to maintain internal control over financial reporting, perform system and process evaluation and testing of those internal controls to allow management to report on their effectiveness, report any material weaknesses in such internal controls, and obtain an opinion from our independent registered public accounting firm regarding the effectiveness of such internal controls as required by Section 404 of the Sarbanes-Oxley Act, all of which is time-consuming, costly, and complicated. If we are unable to comply with these requirements in a timely manner, if we assert that our internal control over financial reporting is ineffective, if we identify material weaknesses in our internal control over financial reporting, or if our independent registered public accounting firm is unable to express an opinion or expresses a qualified or adverse opinion about the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected. In addition, we could become subject to investigations by the NYSE, the SEC, and other regulatory authorities, which could require additional financial and management resources.

*The requirements of being a public company may strain our resources, result in more litigation, and divert management's attention.*

We are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Complying with these rules and regulations have caused and will continue to cause us to incur additional legal and financial compliance costs, make some activities more difficult, be time-consuming or costly, and continue to increase demand on our systems and resources. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results, and that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting.

By complying with public disclosure requirements, our business and financial condition are more visible, which we believe may result in increased threatened or actual litigation, including by competitors and other third parties. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's ATT framework would have on our business. We believe we have meritorious defenses to this lawsuit, but an unfavorable outcome could seriously harm our business. Shareholder litigation can subject us to substantial costs and divert resources and the attention of management from our business and, if the claims are successful, our business could be seriously harmed. Even if the claims do not result in litigation or are resolved in our favor, the time and resources needed to resolve them could divert our management's resources, impose large defense costs, and seriously harm our business.

***Our certificate of incorporation provides that the Court of Chancery of the State of Delaware and the federal district courts of the United States of America will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

- any action asserting a claim against us arising under the Delaware General Corporation Law, our certificate of incorporation, or our bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

These exclusive forum provisions may limit a stockholder's ability to bring an action in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. While the Delaware courts have determined that such choice of forum provisions are facially valid, a stockholder may nevertheless seek to bring an action in a venue other than those designated in the exclusive forum provisions. In such an instance, we would expect to vigorously assert the validity and enforceability of our exclusive forum provisions, which may require significant additional costs associated with resolving such action in other jurisdictions, and there can be no assurance that the provisions will be enforced by a court in those other jurisdictions. If a court were to find either exclusive forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur further significant additional costs associated with resolving the dispute in other jurisdictions, all of which could seriously harm our business.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters are located in Santa Monica, California, where we occupy approximately 603,000 square feet, including some remaining Venice locations and excluding leases we have ceased to use primarily as a result of moving to a centralized corporate office. As of December 31, 2021, our global facilities totaled an aggregate of approximately 1.4 million square feet of leased office space. We also maintain offices in multiple locations in North America and internationally in Europe, Asia, and Australia. We may add additional offices as we expand our business to other continents and countries. We believe that our facilities are sufficient for our current needs and that, should it be needed, additional facilities will be available to accommodate the expansion of our business.

**Item 3. Legal Proceedings.**

On November 11, 2021, we, and certain of our officers, were named as defendants in a federal securities class action lawsuit filed in the United States District Court Central District of California. The lawsuit was purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. Defendants seek monetary damages and other relief. We believe we have meritorious defenses to this lawsuit, and intend to defend the lawsuit vigorously.

We are also currently involved in, and may in the future be involved in, legal proceedings, claims, inquiries, and investigations in the ordinary course of our business, including claims for infringing intellectual property rights related to our products and the content contributed by our users and partners. Although the results of these proceedings, claims, inquiries, and investigations cannot be predicted with certainty, we do not believe that the final outcome of these matters is reasonably likely to have a material adverse effect on our business, financial condition, or results of operations. Regardless of final outcomes, however, any such proceedings, claims, inquiries, and investigations may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information for Common Stock**

Our Class A common stock has been listed on the NYSE under the symbol "SNAP" since March 2, 2017. Our Class B common stock and Class C common stock are not listed or traded on any stock exchange.

**Holders of Record**

As of December 31, 2021, there were 916 stockholders of record of our Class A common stock. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. The closing price of our Class A common stock on December 31, 2021 was $47.03 per share as reported on the NYSE. As of December 31, 2021, there were 80 stockholders of record of our Class B common stock and two stockholders of record of our Class C common stock.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate paying any cash dividends in the foreseeable future. The terms of our Credit Facility also restrict our ability to pay dividends, and we may also enter into credit agreements or other borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our capital stock.

We have paid a stock dividend of our Class A common stock on our capital stock in the past and from time to time in the future may pay special or regular stock dividends in the form of Class A common stock, which per the terms of our certificate of incorporation must be paid equally to all stockholders. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects, and other factors that our board of directors may deem relevant.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Recent Sale of Unregistered Securities and Use of Proceeds**

During the three months ended December 31, 2021, we agreed to issue a total of 880,440 shares of our Class A common stock as consideration in connection with acquisitions, all in private transactions exempt from the registration requirements of the Securities Act pursuant to Section 4(a)(2), Regulation D, or Regulation S under the Securities Act.

**Stock Performance Graph**

*This performance graph shall not be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Snap Inc. under the Securities Act.*

The following graph shows a comparison from March 2, 2017 (the date our Class A common stock commenced trading on the NYSE) through December 31, 2021 of the cumulative total return for our Class A common stock, the Standard & Poor's 500 Stock Index (S&P 500 Index), and the NYSE Composite. The graph assumes that $100 was invested at the market close on March 2, 2017 in our Class A common stock, the S&P 500 Index, and the NYSE Composite, and data for the S&P 500 Index and the NYSE Composite assumes reinvestment of any dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Item 6. Reserved.**

Not required.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs that involve significant risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to those differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in "Risk Factors," "Note Regarding Forward-Looking Statements," and "Note Regarding User Metrics and Other Data."*

*The following generally discusses 2021 and 2020 items and year-to-year comparisons between 2021 and 2020. Discussion of historical items and year-to-year comparisons between 2020 and 2019 that are not included in this discussion can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on February 4, 2021.*

**Overview of Full Year 2021 Results**

Our key user metrics and financial results for fiscal year 2021 are as follows:

*User Metrics*

- Daily Active Users, or DAUs, increased to 319 million in Q4 2021, compared to 265 million in Q4 2020.

- Average revenue per user, or ARPU, increased 18% to $4.06 in Q4 2021, compared to $3.44 in Q4 2020.

*Financial Results*

- Revenue increased 64% year-over-year to reach $4.1 billion in 2021.

- Total costs and expenses excluding stock-based compensation and other payroll related tax expense, increased 42% to $3.6 billion in 2021.

- Net loss improved by $456.9 million year-over-year to $(488.0) million in 2021.

- Diluted net loss per share improved by 52% to $(0.31) in 2021, compared to $(0.65) in 2020.

- Adjusted EBITDA improved by $571.5 million year-over-year to $616.7 million in 2021.

- Cash provided by (used in) operating activities was $292.9 million in 2021, compared to $(167.6) million in 2020.

- Capital expenditures were $69.9 million in 2021, compared to $57.8 million in 2020.

- Free Cash Flow was $223.0 million in 2021, compared to $(225.5) million in 2020.

- Cash, cash equivalents, and marketable securities were $3.7 billion as of December 31, 2021.

- Common shares outstanding plus shares underlying stock-based awards, including restricted stock units, restricted stock awards, and outstanding stock options, totaled 1,702 million at December 31, 2021, compared to 1,630 million one year ago.

**Overview**

Snap Inc. is a camera company.

We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a camera application that helps people communicate visually with friends and family through short videos and images called Snaps.

**Trends in User Metrics**

We define a DAU as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We define ARPU as quarterly revenue divided by the average DAUs. We assess the health of our business by measuring DAUs and ARPU because we believe that these metrics are important ways for both management and investors to understand engagement and monitor the performance of our platform. We also measure ARPU because we believe that this metric helps our management and investors to assess the extent to which we are monetizing our service.

*User Engagement*

We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We had 319 million DAUs on average in the fourth quarter of 2021, compared to 306 million in the prior quarter and 265 million in the fourth quarter of 2020.

**Quarterly Average Daily Active Users**
**(in millions)**





(1)   North America includes Mexico, the Caribbean, and Central America.

(2)   Europe includes Russia and Turkey.

*Monetization*

In the year ended December 31, 2021, we recorded revenue of $4.1 billion compared to revenue of $2.5 billion for the year ended December 31, 2020, an increase of 64% year-over-year. We monetize our business primarily through advertising. Our advertising products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

ARPU was $4.06 in the fourth quarter of 2021, up from $3.49 in the third quarter of 2021 and $3.44 in the fourth quarter of 2020. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on a determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This differs from the presentation of our revenue by geography in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer.

**Quarterly Average Revenue per User**



(1)  North America includes Mexico, the Caribbean, and Central America.

(2)  Europe includes Russia and Turkey.

**Results of Operations**

### *Components of Results of Operations*

#### *Revenue*

We generate substantially all of our revenue through the sale of our advertising products, which primarily include Snap Ads and AR Ads, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from the sales of hardware products. This revenue is reported net of allowances for returns.

#### *Cost of Revenue*

Cost of revenue consists primarily of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs. Cost of revenue also includes payments for content, developer, and advertiser partner costs. In addition, cost of revenue includes third-party selling costs, personnel-related costs, including salaries, benefits, and stock-based compensation expenses. Cost of revenue also includes facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

#### *Research and Development Expenses*

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our engineers, designers, and other employees engaged in the research and development of our products. In addition, research and development expenses include facilities and other supporting overhead costs, including depreciation and amortization. Research and development costs are expensed as incurred.

#### *Sales and Marketing Expenses*

Sales and marketing expenses consist primarily of personnel-related costs, including salaries, benefits, commissions, and stock-based compensation expense for our employees engaged in sales and sales support, business development, media, marketing, corporate partnerships, and customer service functions. Sales and marketing expenses also include costs incurred for advertising, market research, tradeshows, branding, marketing, promotional expense, and public relations, as well as facilities and other supporting overhead costs, including depreciation and amortization.

#### *General and Administrative Expenses*

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our finance, legal, information technology, human resources, and other administrative teams. General and administrative expenses also include facilities and supporting overhead costs, including depreciation and amortization, and external professional services.

#### *Interest Income*

Interest income consists primarily of interest earned on our cash, cash equivalents, and marketable securities.

#### *Interest Expense*

Interest expense consists primarily of interest expense associated with our senior convertible notes, or the Convertible Notes, and commitment fees related to our revolving credit facility.

#### *Other Income (Expense), Net*

Other income (expense), net consists of realized and unrealized gains and losses on marketable securities, foreign currency transaction gains and losses, and gains and impairment on strategic investments.

#### *Income Tax Benefit (Expense)*

We are subject to income taxes in the United States and numerous foreign jurisdictions. These foreign jurisdictions have different statutory tax rates than the United States. Additionally, certain of our foreign earnings may also be taxable in the

United States. Accordingly, our effective tax rates will vary depending on the relative proportion of foreign to domestic income, use of tax credits, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws.

*Adjusted EBITDA*

We define Adjusted EBITDA as net income (loss), excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; and payroll and other tax expense related to stock-based compensation; and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We consider the exclusion of certain non-cash and non-recurring expenses in calculating Adjusted EBITDA to provide a useful measure for period-to-period comparisons of our business and for investors and others to evaluate our operating results in the same manner as does our management. Additionally, we believe that Adjusted EBITDA is an important measure since we use third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue-generating activities. See "Non-GAAP Financial Measures" for additional information and a reconciliation of net loss to Adjusted EBITDA.

**Discussion of Results of Operations**

The following table sets forth our consolidated statements of operations data:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| | | (in thousands) | |
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | $ 4,117,048 | $ 2,506,626 | $ 1,715,534 |
| Costs and expenses[1] [2]: | | | |
|    Cost of revenue | 1,750,246 | 1,182,505 | 895,838 |
|    Research and development | 1,565,467 | 1,101,561 | 883,509 |
|    Sales and marketing | 792,764 | 555,468 | 458,598 |
|    General and administrative | 710,640 | 529,164 | 580,917 |
| Total costs and expenses | 4,819,117 | 3,368,698 | 2,818,862 |
| Operating loss | (702,069) | (862,072) | (1,103,328) |
| Interest income | 5,199 | 18,127 | 36,042 |
| Interest expense | (17,676) | (97,228) | (24,994) |
| Other income (expense), net | 240,175 | 14,988 | 59,013 |
| Loss before income taxes | (474,371) | (926,185) | (1,033,267) |
| Income tax benefit (expense) | (13,584) | (18,654) | (393) |
| Net loss | $ (487,955) | $ (944,839) | $ (1,033,660) |
| Adjusted EBITDA[3] | $ 616,686 | $ 45,163 | $ (202,230) |

(1) Stock-based compensation expense included in the above line items:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| | | (in thousands) | |
| **Stock-based compensation expense:** | | | |
|    Cost of revenue | $ 17,221 | $ 9,367 | $ 6,365 |
|    Research and development | 740,130 | 533,272 | 464,639 |
|    Sales and marketing | 164,241 | 108,270 | 93,355 |
|    General and administrative | 170,543 | 119,273 | 121,654 |
|     Total | $ 1,092,135 | $ 770,182 | $ 686,013 |

(2) Depreciation and amortization expense included in the above line items:

| | Year Ended December 31, | | |
| | 2021 | 2020 | 2019 |
| | | (in thousands) | |
|---|---|---|---|
| **Depreciation and amortization expense:** | | | |
| Cost of revenue | $ 19,711 | $ 22,205 | $ 21,271 |
| Research and development | 62,159 | 37,627 | 33,208 |
| Sales and marketing | 21,772 | 12,916 | 13,256 |
| General and administrative | 15,499 | 13,996 | 19,510 |
| Total | $ 119,141 | $ 86,744 | $ 87,245 |

(3) See "Non-GAAP Financial Measures" of this Annual Report on Form 10-K for more information and for a reconciliation of Adjusted EBITDA to net loss, the most directly comparable financial measure calculated and presented in accordance with GAAP.

The following table sets forth the components of our consolidated statements of operations data for each of the periods presented as a percentage of revenue:

| | Year Ended December 31, | | |
| | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | 100% | 100% | 100% |
| Costs and expenses: | | | |
| Cost of revenue | 43 | 47 | 52 |
| Research and development | 38 | 44 | 52 |
| Sales and marketing | 19 | 22 | 27 |
| General and administrative | 17 | 21 | 34 |
| Total costs and expenses | 117 | 134 | 164 |
| Operating loss | 17 | 34 | 64 |
| Interest income | — | 1 | 2 |
| Interest expense | — | 4 | 1 |
| Other income (expense), net | 6 | 1 | 3 |
| Loss before income taxes | 12 | 37 | 60 |
| Income tax benefit (expense) | — | 1 | — |
| Net loss | 12% | 38% | 60% |

*Revenue*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | (dollars in thousands) | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | $4,117,048 | $ 2,506,626 | $ 1,715,534 | $1,610,422 | 64% | $791,092 | 46% |

*2021 compared to 2020*

Revenue for the year ended December 31, 2021 increased $1,610.4 million compared to the same period in 2020. Revenue increased due to a combination of growth in advertisers and auction-based advertising demand and optimization efficiencies.

*Cost of Revenue*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | **2021** | **2020** | **2019** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Cost of Revenue | $1,750,246 | $ 1,182,505 | $ 895,838 | $567,741 | 48% | $286,667 | 32% |

*2021 compared to 2020*

Cost of revenue for the year ended December 31, 2021 increased $567.7 million compared to the same period in 2020. The increase in cost of revenue was primarily driven by higher content costs, including Spotlight, which launched in the fourth quarter of 2020 as well as growth in revenue share due to the overall increase in revenue and higher proportion of revenue subject to revenue share. The increases were also a result of increased infrastructure costs attributable to DAU growth net of infrastructure cost efficiencies and content review costs across the platform.

*Research and Development Expenses*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | **2021** | **2020** | **2019** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Research and Development Expenses | $1,565,467 | $ 1,101,561 | $ 883,509 | $463,906 | 42% | $218,052 | 25% |

*2021 compared to 2020*

Research and development expenses for the year ended December 31, 2021 increased $463.9 million compared to the same period in 2020. The increase was primarily driven by greater personnel expenses due to growth in research and development headcount, including increased cash- and stock-based compensation expenses.

*Sales and Marketing Expenses*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | **2021** | **2020** | **2019** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| Sales and Marketing Expenses | $ 792,764 | $ 555,468 | $ 458,598 | $237,296 | 43% | $96,870 | 21% |

*2021 compared to 2020*

Sales and marketing expenses for the year ended December 31, 2021 increased $237.3 million compared to the same period in 2020. The increase was primarily driven by greater personnel expenses due to growth in sales and marketing headcount, including increased cash- and stock-based compensation expenses, as well as increased marketing investments.

*General and Administrative Expenses*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | **2021** | **2020** | **2019** | **$** | **%** | **$** | **%** |
| | | | (dollars in thousands) | | | | |
| General and Administrative Expenses | $ 710,640 | $ 529,164 | $ 580,917 | $181,476 | 34% | $(51,753) | (9)% |

*2021 compared to 2020*

General and administrative expenses for the year ended December 31, 2021 increased $181.5 million compared to the same period in 2020. The increase was primarily driven by greater personnel expenses due to growth in headcount, including increased cash- and stock-based compensation expenses, as well as an increase in professional service fees.

### Interest Income

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Interest Income | $ 5,199 | $ 18,127 | $ 36,042 | $(12,928) | (71)% | $(17,915) | (50)% |

*2021 compared to 2020*

Interest income for the year ended December 31, 2021 decreased $12.9 million compared to the same period in 2020. The decrease was primarily a result of lower interest rates on U.S. government-backed securities, partially offset by a higher overall invested cash balance.

### Interest Expense

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Interest Expense | $ (17,676) | $ (97,228) | $ (24,994) | $79,552 | (82)% | $(72,234) | 289% |

*2021 compared to 2020*

Interest expense for the year ended December 31, 2021 decreased $79.6 million, compared to the same period in 2020 primarily due to the early adoption of ASU 2020-06 on January 1, 2021. As a result of this adoption, we account for the Convertible Notes as a single liability, which eliminates the amortization of the debt discount. Prior to January 1, 2021, the carrying amount of the equity component was recorded as a debt discount and amortized to interest expense. Interest expense related to the amortization of debt issuance costs was $4.3 million for the year ended December 31, 2021, while interest expense related to the amortization of debt discount and issuance costs was $81.4 million for the year ended December 31, 2020. Contractual interest expense was $8.9 million for the year ended December 31, 2021 and $11.2 million for the year ended December 31, 2020.

### Other Income (Expense), Net

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Other Income (Expense), Net | $ 240,175 | $ 14,988 | $ 59,013 | $225,187 | 1,502% | $(44,025) | (75)% |

*2021 compared to 2020*

Other income, net for the year ended December 31, 2021 increased $225.2 million, compared to other income, net for the same period in 2020. Other income, net for the current year was primarily a result of $207.7 million of unrealized gains and $27.8 million of realized gains on strategic investments, and $59.4 million of unrealized gains on publicly traded securities reclassified from strategic investments to marketable securities in the fourth quarter. This increase is partially offset by an induced conversion expense related to the Convertible Notes of $41.5 million. Other income, net in the comparable period in 2020 was primarily a result of unrealized gains on strategic investments partially offset by impairments of strategic investments.

*Income Tax Benefit (Expense)*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Income Tax Benefit (Expense) | $ (13,584) | $ (18,654) | $ (393) | $5,070 | (27)% | $(18,261) | 4,647% |
| Effective Tax Rate | (2.9)% | (2.0)% | (0.0)% | | | | |

*2021 compared to 2020*

Income tax expense was $13.6 million for the year ended December 31, 2021, compared to $18.7 million for the same period in 2020.

Our effective tax rate differs from the U.S. statutory tax rate primarily due to valuation allowances on our deferred tax assets as it is more likely than not that some or all of our deferred tax assets will not be realized.

For additional discussion, see Note 12 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

*Net Loss and Adjusted EBITDA*

| | Year Ended December 31, | | | 2021 vs 2020 Change | | 2020 vs 2019 Change | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2019 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Net Loss | $(487,955) | $ (944,839) | $(1,033,660) | $456,884 | (48)% | $ 88,821 | (9)% |
| Adjusted EBITDA | $ 616,686 | $ 45,163 | $ (202,230) | $571,523 | 1,265% | $247,393 | (122)% |

*2021 compared to 2020*

Net loss for the year ended December 31, 2021 was $488.0 million, compared to $944.8 million for the same period in 2020. Adjusted EBITDA for the year ended December 31, 2021 was $616.7 million, compared to $45.2 million for the same period in 2020. The increase in Adjusted EBITDA was attributable to increased revenues, partially offset by increased cost of revenue primarily due to higher content acquisition costs between the periods. The decreases in net loss were also partially offset by an increase in stock-based compensation expense.

For a discussion of the limitations associated with using Adjusted EBITDA rather than GAAP measures and a reconciliation of this measure to net loss, see "Non-GAAP Financial Measures."

**Liquidity and Capital Resources**

Cash, cash equivalents, and marketable securities were $3.7 billion as of December 31, 2021, primarily consisting of cash on deposit with banks and highly liquid investments in U.S. government and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. Our primary source of liquidity is cash generated through financing activities. Our primary uses of cash include operating costs such as personnel-related costs and the infrastructure costs of the Snapchat application, facility-related capital spending, and acquisitions and investments. There are no known material subsequent events that could have a material impact on our cash or liquidity. We may contemplate and engage in merger and acquisition activity that could materially impact our liquidity and capital resource position.

In 2021, we entered into various exchange agreements, or the Exchange Agreements, with certain holders of the convertible senior notes due in 2025, or the 2025 Notes, and the convertible senior notes due in 2026, or the 2026 Notes, pursuant to which we exchanged approximately $715.9 million principal amount of the 2025 Notes and approximately $426.5 million principal amount of the 2026 Notes for aggregate consideration of approximately 52.4 million shares of Class A common stock.

In April 2021, we entered into a purchase agreement for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027, or the 2027 Notes. The net proceeds from the issuance of the 2027 Notes were $1.05

billion, net of debt issuance costs and the cash used to pay the costs of the capped call transactions, or the 2027 Capped Call Transactions discussed further in Note 7. The 2027 Notes mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The 2027 Notes were not convertible as of December 31, 2021.

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of the 2025 Notes. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and the cash used to pay the costs of the capped call transactions, or the 2025 Capped Call Transactions, discussed further in Note 7. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was satisfied as of December 31, 2021 and as a result, the 2025 Notes will continue to be eligible for optional conversion during the first quarter of 2022.

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of the 2026 Notes. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and the cash used to pay the costs of the capped call transactions, or the 2026 Capped Call Transactions, discussed further in Note 7. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was satisfied as of December 31, 2021 and as a result, the 2026 Notes will continue to be eligible for optional conversion during the first quarter of 2022.

In July 2016, we entered into a senior unsecured revolving credit facility, or the Credit Facility, with certain lenders, some of which are affiliated with certain members of the underwriting syndicate for our Convertible Notes offerings, to fund working capital and general corporate-purpose expenditures. Since July 2016, we have amended the Credit Facility multiple times. As of December 31, 2021, the Credit Facility has a maximum borrowing amount of $1.05 billion, bears interest at LIBO plus 0.75%, as well as an annual commitment fee of 0.10% on the daily undrawn balance of the facility and terminates in August 2023. As of December 31, 2021, no amounts were outstanding under the Credit Facility. As of December 31, 2021, we had $23.9 million in the form of outstanding standby letters of credit.

We believe our existing cash balance is sufficient to fund our ongoing working capital, investing, and financing requirements for at least the next 12 months. Our future capital requirements will depend on many factors including our growth rate, headcount, sales and marketing activities, research and development efforts, the introduction of new features, products, and acquisitions, and continued user engagement. We continually evaluate opportunities to issue or repurchase equity or debt securities, obtain, retire, or restructure credit facilities or financing arrangements, or declare dividends for strategic reasons or to further strengthen our financial position.

As of December 31, 2021, approximately 6% of our cash, cash equivalents, and marketable securities was held outside the United States. These amounts were primarily held in the United Kingdom and are utilized to fund our foreign operations. Cash held outside the United States may be repatriated, subject to certain limitations, and would be available to be used to fund our domestic operations. However, repatriation of funds may result in additional tax liabilities. We believe our existing cash balance in the United States is sufficient to fund our working capital needs.

The following table sets forth the major components of our consolidated statements of cash flows for the periods presented:

|  | Year Ended December 31, | | |
|  | 2021 | 2020 | 2019 |
|  | (dollars in thousands) | | |
| Net cash provided by (used in) operating activities | $ 292,880 | $ (167,644) | $ (304,958) |
| Net cash provided by (used in) investing activities | 90,227 | (729,864) | (728,608) |
| Net cash provided by financing activities | 1,065,073 | 922,791 | 1,165,852 |
| Change in cash, cash equivalents, and restricted cash | $ 1,448,180 | $ 25,283 | $ 132,286 |
| Free Cash Flow [1] | $ 223,005 | $ (225,476) | $ (341,436) |

(1) For information on how we define and calculate Free Cash Flow and a reconciliation to net cash used in operating activities to Free Cash Flow, see "Non-GAAP Financial Measures."

### Net Cash Provided By (Used In) Operating Activities

*2021 compared to 2020*

Net cash provided by operating activities was $292.9 million in the year ended December 31, 2021, as compared to net cash used in operations of $167.6 million in the year ended December 31, 2020, resulting primarily from our net loss, adjusted for non-cash items, including stock-based compensation expense of $1.1 billion and depreciation and amortization expense of $119.1 million, partially offset by gains on debt and equity securities, net of $289.1 million. Net cash provided by operating activities for the year ended December 31, 2021 was also impacted by an increase in the accounts receivable balance of $333.0 million due to an increase in revenue compared to the prior period.

### Net Cash Provided By (Used In) Investing Activities

*2021 compared to 2020*

Net cash provided by investing activities was $90.2 million for the year ended December 31, 2021, compared to net cash used in investing activities of $729.9 million for the same period in 2020. Our investing activities in the year ended December 31, 2021 consisted of cash provided by the sales and maturities of marketable securities of $2.9 billion, partially offset by the purchase of marketable securities of $2.4 billion and cash paid for acquisitions of $310.9 million. Net cash used in investing activities for the year ended December 31, 2020 consisted of cash used in the purchase of marketable securities of $3.5 billion, cash paid for acquisitions of $168.9 million, and cash used in strategic investments of $111.6 million, partially offset by the sales and maturities of marketable securities of $3.1 billion.

### Net Cash Provided By Financing Activities

*2021 compared to 2020*

Net cash provided by financing activities was $1.1 billion and $0.9 billion for the years ended December 31, 2021 and 2020, respectively. Our financing activities for the year ended December 31, 2021 consisted primarily of net proceeds of $1.1 billion from the issuance of the 2027 Notes, offset by the purchase of the 2027 Capped Call Transactions of $86.8 million. Our financing activities for the year ended December 31, 2020 consisted primarily of net proceeds of $988.6 million from the issuance of the 2025 Notes, offset by the purchase of the 2025 Capped Call Transactions of $100.0 million. Net cash provided by financing activities in all periods presented includes proceeds from the exercise of stock options.

### Free Cash Flow

*2021 compared to 2020*

Free Cash Flow was $223.0 million for the year ended December 31, 2021 and was composed of net cash provided by operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also included purchases of property and equipment of $69.9 million for the year ended December 31, 2021. See "Non-GAAP Financial Measures."

Free Cash Flow was $(225.5) million for the year ended December 31, 2020 and was composed of net cash used in operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also included purchases of property and equipment of $57.8 million for the year ended December 31, 2020. See "Non-GAAP Financial Measures."

### Non-GAAP Financial Measures

To supplement our consolidated financial statements, which are prepared and presented in accordance with GAAP, we use certain non-GAAP financial measures, as described below, to understand and evaluate our core operating performance. These non-GAAP financial measures, which may be different than similarly titled measures used by other companies, are presented to enhance investors' overall understanding of our financial performance and should not be considered a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

We use the non-GAAP financial measure of Free Cash Flow, which is defined as net cash provided by (used in) operating activities, reduced by purchases of property and equipment. We believe Free Cash Flow is an important liquidity measure of the cash that is available, after capital expenditures, for operational expenses and investment in our business and is a key financial indicator used by management. Additionally, we believe that Free Cash Flow is an important measure since we use

third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue generating activities. Free Cash Flow is useful to investors as a liquidity measure because it measures our ability to generate or use cash. Once our business needs and obligations are met, cash can be used to maintain a strong balance sheet and invest in future growth.

We use the non-GAAP financial measure of Adjusted EBITDA, which is defined as net income (loss); excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; and payroll and other tax expense related to stock-based compensation; and certain other non-cash or non-recurring items impacting net income (loss) from time to time. We believe that Adjusted EBITDA helps identify underlying trends in our business that could otherwise be masked by the effect of the expenses that we exclude in Adjusted EBITDA.

We believe that both Free Cash Flow and Adjusted EBITDA provide useful information about our financial performance, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics used by our management for financial and operational decision-making. We are presenting the non-GAAP measures of Free Cash Flow and Adjusted EBITDA to assist investors in seeing our financial performance through the eyes of management, and because we believe that these measures provide an additional tool for investors to use in comparing our core financial performance over multiple periods with other companies in our industry.

These non-GAAP financial measures should not be considered in isolation from, or as substitutes for, financial information prepared in accordance with GAAP. There are a number of limitations related to the use of these non-GAAP financial measures compared to the closest comparable GAAP measure. Some of these limitations are that:

- Free Cash Flow does not reflect our future contractual commitments.

- Adjusted EBITDA excludes certain recurring, non-cash charges such as depreciation of fixed assets and amortization of acquired intangible assets and, although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future;

- Adjusted EBITDA excludes stock-based compensation expense and payroll and other tax expense related to stock-based compensation, which have been, and will continue to be for the foreseeable future, significant recurring expenses in our business and an important part of our compensation strategy; and

- Adjusted EBITDA excludes income tax expense.

The following table presents a reconciliation of Free Cash Flow to net cash used in operating activities, the most comparable GAAP financial measure, for each of the periods presented:

|  | Year Ended December 31, | | |
|  | 2021 | 2020 | 2019 |
|  | | (in thousands) | |
| **Free Cash Flow reconciliation:** | | | |
| Net cash provided by (used in) operating activities | $ 292,880 | $ (167,644) | $ (304,958) |
| Less: | | | |
| Purchases of property and equipment | (69,875) | (57,832) | (36,478) |
| Free Cash Flow | $ 223,005 | $ (225,476) | $ (341,436) |

The following table presents a reconciliation of Adjusted EBITDA to net loss, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
| | 2021 | 2020 | 2019 |
| --- | --- | --- | --- |
| | | (in thousands) | |
| **Adjusted EBITDA reconciliation:** | | | |
| Net loss | (487,955) | (944,839) | (1,033,660) |
| Add (deduct): | | | |
| Interest income | (5,199) | (18,127) | (36,042) |
| Interest expense | 17,676 | 97,228 | 24,994 |
| Other (income) expense, net | (240,175) | (14,988) | (59,013) |
| Income tax (benefit) expense | 13,584 | 18,654 | 393 |
| Depreciation and amortization | 119,141 | 86,744 | 87,245 |
| Stock-based compensation expense | 1,092,135 | 770,182 | 686,013 |
| Payroll and other tax expense related to stock-based compensation | 107,479 | 50,309 | 27,840 |
| Securities class actions legal charges[1] | — | — | 100,000 |
| Adjusted EBITDA | $ 616,686 | $ 45,163 | $ (202,230) |

Securities class actions legal charges in the fourth quarter of 2019 were related to a preliminary agreement to settle the securities class actions that arose following our initial public offering in 2017. The preliminary settlement agreement was signed in January 2020 and provided for a resolution of all of the pending claims in the stockholder class actions for $187.5 million. We recorded legal settlement expense, net of amounts directly covered by insurance, of $100.0 million. These charges are non-recurring and not reflective of underlying trends in our business.

**Contingencies**

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. We also disclose material contingencies when we believe that a loss is not probable but reasonably possible. Significant judgment is required to determine both probability and the estimated amount. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Many of these legal and tax contingencies can take years to resolve. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

**Commitments**

We have non-cancelable contractual agreements primarily related to the hosting of our data storage processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $2.7 billion in commitments, as of December 31, 2021, primarily due within three years.

**Critical Accounting Policies and Estimates**

We prepare our financial statements in accordance with GAAP. Preparing these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

The critical accounting estimates, assumptions, and judgments that we believe to have the most significant impact on our consolidated financial statements are described below.

### *Revenue Recognition*

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is displayed. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

### *Stock-Based Compensation*

In the year ended December 31, 2021, total stock-based compensation expense recognized was $1.1 billion. We have granted stock-based awards consisting primarily of restricted stock units, or RSUs, restricted stock awards, or RSAs, and to a lesser extent, stock options to employees, members of our board of directors, and non-employee advisors. The substantial majority of our stock-based awards have been made to employees. RSUs vest and RSAs lapse to a forfeiture condition on the satisfaction of service conditions. The service conditions for RSUs and RSAs granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. The service condition for RSUs and RSAs granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years.

We account for stock-based employee compensation under the fair value recognition and measurement provisions, in accordance with applicable accounting standards, which requires stock-based awards to be measured based on the grant date fair value. Stock-based compensation expense is recorded net of estimated forfeitures in our consolidated statements of operations. Accordingly, stock-based compensation expense is only recorded for those potential stock-based awards that we expect to vest. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. We will re-evaluate our estimated forfeiture rate if actual forfeitures differ from our initial estimates. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

*Restricted Stock Units and Restricted Stock Awards*

As of December 31, 2021, total unrecognized compensation cost related to outstanding RSUs and RSAs was $2.0 billion and is expected to be recognized over a weighted-average period of 2.2 years.

### *Business Combinations and Valuation of Goodwill and Other Acquired Intangible Assets*

We estimate the fair value of assets acquired and liabilities assumed in a business combination. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed. While we use our best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, our estimates are inherently uncertain and subject to refinement.

Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from acquired technology, useful lives, and discount rates. Although we believe the assumptions and estimates we have made in the past have been reasonable and appropriate, they are based in part on historical experience and information obtained from the management of the acquired companies and are inherently uncertain. During the measurement period, which may be up to one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. On the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to our consolidated statements of operations.

### *Convertible Notes*

Prior to January 1, 2021, we accounted for the 2025 Notes and the 2026 Notes as separate liability and equity components. On issuance, the carrying amount of the liability component was calculated by measuring the fair value of a similar liability that did not have an associated convertible feature. The carrying amount of the equity component representing the conversion option was calculated by deducting the fair value of the liability component from the principal amount of the Convertible Notes as a whole. We estimated the fair value of the liability and equity components using a convertible bond model, which includes subjective assumptions such as the expected term, expected volatility, and the interest rate of a similar non-convertible debt instrument. These assumptions involved inherent uncertainties and management judgement.

Effective January 1, 2021, we early adopted Accounting Standards Update, or ASU, 2020-06 using the modified retrospective approach. As a result, the 2025 Notes and 2026 Notes are each accounted for as a single liability measured at its amortized cost, as no other embedded features require bifurcation and recognition as derivatives. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million.

### *Loss Contingencies*

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. When there appears to be a range of possible costs with equal likelihood, a liability is recorded based on the low-end of such range. However, the likelihood of a loss is often difficult to predict and determining a meaningful estimate of the loss or a range of loss may not be practicable based on the information available, the potential effect of future events, and decisions by third parties impacting the ultimate resolution of the contingency. It is also not uncommon for such matters to be resolved over multiple reporting periods. During this time, relevant developments and new information must be continuously evaluated to determine both the likelihood of potential loss and whether it is possible to reasonably estimate a range of potential loss. We also disclose material contingencies when we believe that a loss is reasonably possible.

Significant judgment is required to determine both probability and the estimated amounts of loss contingencies. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change, it could have a material impact on our results of operations, financial position, and cash flows.

### *Income Taxes*

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our uncertain tax positions.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. Although we believe that we have adequately reserved for our uncertain tax positions, we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences may affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and results of operations.

## Recent Accounting Pronouncements

See Note 1 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the date of this Annual Report on Form 10-K.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk and foreign currency risk as follows:

### Interest Rate Risk

We had cash and cash equivalents totaling $2.0 billion and $545.6 million at December 31, 2021 and December 31, 2020, respectively. We had marketable securities totaling $1.7 billion and $2.0 billion at December 31, 2021 and December 31, 2020, respectively. Our cash and cash equivalents consist of cash in bank accounts and marketable securities consisting of U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. We do not enter into investments for trading or speculative purposes. Due to the relatively short-term nature of our investment portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

In April 2021, we issued the 2027 Notes with an aggregate principal amount of $1.15 billion, the full amount of which is outstanding as of December 31, 2021. We carry the 2027 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2027 Notes do not bear regular interest; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2027 Notes. The fair value of the 2027 Notes changes when the market price of our stock fluctuates or market interest rates change.

In April 2020, we issued the 2025 Notes with an aggregate principal amount of $1.0 billion, of which $0.3 billion remains outstanding as of December 31, 2021. We carry the 2025 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2025 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2025 Notes. The fair value of the 2025 Notes changes when the market price of our stock fluctuates or market interest rates change.

In August 2019, we issued the 2026 Notes with an aggregate principal amount of $1.265 billion, of which $0.8 billion remains outstanding as of December 31, 2021. We carry the 2026 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2026 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2026 Notes. The fair value of the 2026 Notes changes when the market price of our stock fluctuates or market interest rates change.

### Foreign Currency Risk

For all periods presented, our sales and operating expenses were predominately denominated in U.S. dollars. We therefore have not had material foreign currency risk associated with sales and cost-based activities. The functional currency of our material operating entities is the U.S. dollar.

For all periods presented, we believe the exposure to foreign currency fluctuation from operating expenses is immaterial as the related costs do not constitute a significant portion of our total expenses. As we grow operations, our exposure to foreign currency risk will likely become more significant.

For all periods presented, we did not enter into any foreign currency exchange contracts. We may, however, enter into foreign currency exchange contracts for purposes of hedging foreign exchange rate fluctuations on our business operations in future operating periods as our exposures are deemed to be material. For additional discussion on foreign currency risk, see "Risk Factors" elsewhere in this Annual Report on Form 10-K.

**Item 8. Financial Statements and Supplementary Data.**

**SNAP INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

Reports of Independent Registered Public Accounting Firm ............................................................... 66

Consolidated Financial Statements:

Consolidated Statements of Cash Flows ....................................................................................... 69

Consolidated Statements of Operations ........................................................................................ 70

Consolidated Statements of Comprehensive Income (Loss) ........................................................ 71

Consolidated Balance Sheets ........................................................................................................ 72

Consolidated Statements of Stockholders' Equity ....................................................................... 73

Notes to Consolidated Financial Statements ............................................................................... 74

## Report of Independent Registered Public Accounting Firm

To the Stockholders and the Board of Directors of Snap Inc.

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Snap Inc. (the Company) as of December 31, 2021 and 2020, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 3, 2022 expressed an unqualified opinion thereon.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### Critical Audit Matter

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

*Revenue Recognition*

*Description of the Matter*

As described in Note 2 to the consolidated financial statements, the Company generates substantially all of its revenues by offering various advertising products on Snapchat. The substantial majority of such advertising revenues is generated based upon contractual agreements with customers that are on a fixed fee basis for advertisements delivered over a period of time, or fees based on the number of advertising impressions delivered. Revenues related to fixed fee agreements are recognized ratably over the service period while revenues related to agreements based on the number of advertising impressions delivered are recognized when the advertisements are displayed.

The Company's revenue recognition process utilizes multiple, complex, proprietary systems and tools for the initiation, processing and recording of transactions which comprise a high volume of individually low monetary value transactions. This process is dependent on the effective design and operation of multiple systems, sub-processes, data sources and controls which required significant audit effort. Also, the identification and evaluation of certain non-standard terms and conditions required incremental audit effort to determine the distinct performance obligations and the timing of revenue recognition.

*How We Addressed the Matter in Our Audit*

With the support of our information technology professionals, we identified and tested the relevant systems and tools used for the determination of initiation, processing, recording and billing of revenue, which included processes and controls related to access to the relevant systems and data, changes to the relevant systems and interfaces, and configuration of the relevant systems. We obtained an understanding, evaluated the design and tested the operating effectiveness of the Company's internal controls over the identification and evaluation of revenue recognition for standard and non-standard terms and conditions.

To test the Company's recognition of revenue, our audit procedures included, among others, testing the completeness and accuracy of the underlying data within the Company's billing systems, by agreeing amounts recognized to contractual terms and conditions, and testing revenue recognized to accounts receivable and cash receipts. Additionally, we examined standard customer online terms and conditions to understand the distinct performance obligations and tested the timing of revenue recognition. Further, we selected a sample of non-standard contractual arrangements to understand the performance obligations and the timing of revenue recognition. To assess completeness of non-standard terms and conditions, we obtained external confirmations of terms and conditions for a sample of customers.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.

Los Angeles, California

February 3, 2022

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Snap Inc.'s internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Snap Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2021 and 2020, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes and our report dated February 3, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California

February 3, 2022

**Snap Inc.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **Cash flows from operating activities** | | | |
| Net loss | $ (487,955) | $ (944,839) | $ (1,033,660) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 119,141 | 86,744 | 87,245 |
| Stock-based compensation | 1,092,135 | 770,182 | 686,013 |
| Amortization of debt discount and issuance costs | 4,311 | 81,401 | 17,797 |
| (Gains) losses on debt and equity securities, net | (289,052) | (10,250) | (18,982) |
| Induced conversion expense related to convertible notes | 41,538 | — | — |
| Gain on divestiture | — | — | (39,883) |
| Other | 8,643 | 2,963 | (10,084) |
| Change in operating assets and liabilities, net of effect of acquisitions: | | | |
| Accounts receivable, net of allowance | (332,967) | (255,818) | (147,862) |
| Prepaid expenses and other current assets | (26,607) | (14,587) | (9,849) |
| Operating lease right-of-use assets | 47,258 | 38,940 | 58,199 |
| Other assets | (10,916) | (11,442) | 1,169 |
| Accounts payable | 53,579 | 20,374 | 20,674 |
| Accrued expenses and other current liabilities | 117,092 | 108,601 | 146,063 |
| Operating lease liabilities | (49,294) | (49,730) | (60,844) |
| Other liabilities | 5,974 | 9,817 | (954) |
| Net cash provided by (used in) operating activities | 292,880 | (167,644) | (304,958) |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (69,875) | (57,832) | (36,478) |
| Purchases of strategic investments | (41,160) | (111,586) | (5,481) |
| Cash paid for acquisitions, net of cash acquired | (310,915) | (168,850) | (77,119) |
| Proceeds from divestiture, net | — | — | 73,796 |
| Purchases of marketable securities | (2,438,983) | (3,524,599) | (2,477,388) |
| Sales of marketable securities | 379,555 | 389,974 | 184,179 |
| Maturities of marketable securities | 2,536,725 | 2,737,523 | 1,608,854 |
| Other | 34,880 | 5,506 | 1,029 |
| Net cash provided by (used in) investing activities | 90,227 | (729,864) | (728,608) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible notes, net of issuance costs | 1,137,227 | 988,582 | 1,251,411 |
| Purchase of capped calls | (86,825) | (100,000) | (102,086) |
| Proceeds from the exercise of stock options | 14,671 | 34,209 | 16,527 |
| Net cash provided by financing activities | 1,065,073 | 922,791 | 1,165,852 |
| Change in cash, cash equivalents, and restricted cash | 1,448,180 | 25,283 | 132,286 |
| Cash, cash equivalents, and restricted cash, beginning of period | 546,543 | 521,260 | 388,974 |
| Cash, cash equivalents, and restricted cash, end of period | $ 1,994,723 | $ 546,543 | $ 521,260 |
| **Supplemental disclosures** | | | |
| Cash paid for income taxes, net | $ 25,333 | $ 3,692 | $ 156 |
| Cash paid for interest | $ 10,887 | $ 12,019 | $ 1,546 |
| **Supplemental disclosures of non-cash activities** | | | |
| Net change in accounts payable and accrued expenses and other current liabilities related to property and equipment additions | $ 6,498 | $ 2,732 | $ (6,027) |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | **2020** | | **2019** |
| Revenue | $ | 4,117,048 | $ | 2,506,626 | $ | 1,715,534 |
| Costs and expenses: | | | | | | |
| Cost of revenue | | 1,750,246 | | 1,182,505 | | 895,838 |
| Research and development | | 1,565,467 | | 1,101,561 | | 883,509 |
| Sales and marketing | | 792,764 | | 555,468 | | 458,598 |
| General and administrative | | 710,640 | | 529,164 | | 580,917 |
| Total costs and expenses | | 4,819,117 | | 3,368,698 | | 2,818,862 |
| Operating loss | | (702,069) | | (862,072) | | (1,103,328) |
| Interest income | | 5,199 | | 18,127 | | 36,042 |
| Interest expense | | (17,676) | | (97,228) | | (24,994) |
| Other income (expense), net | | 240,175 | | 14,988 | | 59,013 |
| Loss before income taxes | | (474,371) | | (926,185) | | (1,033,267) |
| Income tax benefit (expense) | | (13,584) | | (18,654) | | (393) |
| Net loss | $ | (487,955) | $ | (944,839) | $ | (1,033,660) |
| Net loss per share attributable to Class A, Class B, and Class C common stockholders (Note 3): | | | | | | |
| Basic | $ | (0.31) | $ | (0.65) | $ | (0.75) |
| Diluted | $ | (0.31) | $ | (0.65) | $ | (0.75) |
| Weighted average shares used in computation of net loss per share: | | | | | | |
| Basic | | 1,558,997 | | 1,455,693 | | 1,375,462 |
| Diluted | | 1,558,997 | | 1,455,693 | | 1,375,462 |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
*(in thousands)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Net loss | $ (487,955) | $ (944,839) | $ (1,033,660) |
| Other comprehensive income (loss), net of tax | | | |
| Unrealized gain (loss) on marketable securities, net of tax | (1,735) | (516) | 797 |
| Foreign currency translation | (14,107) | 21,306 | (3,371) |
| Total other comprehensive income (loss), net of tax | (15,842) | 20,790 | (2,574) |
| Total comprehensive income (loss) | $ (503,797) | $ (924,049) | $ (1,036,234) |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Consolidated Balance Sheets**
*(in thousands, except par value)*

| | December 31, | |
|---|---|---|
| | **2021** | **2020** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 1,993,809 | $ 545,618 |
| Marketable securities | 1,699,076 | 1,991,922 |
| Accounts receivable, net of allowance | 1,068,873 | 744,288 |
| Prepaid expenses and other current assets | 92,244 | 56,147 |
| Total current assets | 4,854,002 | 3,337,975 |
| Property and equipment, net | 202,644 | 178,709 |
| Operating lease right-of-use assets | 322,252 | 269,728 |
| Intangible assets, net | 277,654 | 105,929 |
| Goodwill | 1,588,452 | 939,259 |
| Other assets | 291,302 | 192,638 |
| Total assets | $ 7,536,306 | $ 5,024,238 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 125,282 | $ 71,908 |
| Operating lease liabilities | 52,396 | 41,077 |
| Accrued expenses and other current liabilities | 674,108 | 554,342 |
| Total current liabilities | 851,786 | 667,327 |
| Convertible senior notes, net | 2,253,087 | 1,675,169 |
| Operating lease liabilities, noncurrent | 325,509 | 287,292 |
| Other liabilities | 315,756 | 64,474 |
| Total liabilities | 3,746,138 | 2,694,262 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity | | |
| Class A non-voting common stock, $0.00001 par value. 3,000,000 shares authorized, 1,364,887 shares issued and outstanding at December 31, 2021 and 3,000,000 shares authorized, 1,248,010 shares issued and outstanding at December 31, 2020. | 14 | 12 |
| Class B voting common stock, $0.00001 par value. 700,000 shares authorized, 22,769 shares issued and outstanding at December 31, 2021 and 700,000 shares authorized, 23,696 shares issued and outstanding at December 31, 2020. | — | — |
| Class C voting common stock, $0.00001 par value. 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2021 and 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2020. | 2 | 2 |
| Additional paid-in capital | 12,069,097 | 10,200,141 |
| Accumulated other comprehensive income (loss) | 5,521 | 21,363 |
| Accumulated deficit | (8,284,466) | (7,891,542) |
| Total stockholders' equity | 3,790,168 | 2,329,976 |
| Total liabilities and stockholders' equity | $ 7,536,306 | $ 5,024,238 |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Consolidated Statements of Stockholders' Equity**
*(in thousands)*

| | Year Ended December 31, | | | | | |
| | 2021 | | 2020 | | 2019 | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|
| **Class A non-voting common stock** | | | | | | |
| Balance, beginning of period | 1,248,010 | 12 | 1,160,127 | 12 | 999,304 | 10 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 1,174 | — | 3,824 | — | 3,291 | — |
| Issuance of Class A non-voting common stock for vesting of restricted stock units and restricted stock awards, net | 55,466 | 1 | 78,042 | — | 86,519 | 1 |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | 52,410 | 1 | — | — | — | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | 1,095 | — | 6,017 | — | 71,013 | 1 |
| Issuance of Class A non-voting common stock in connection with acquisitions | 6,732 | — | — | — | — | — |
| Balance, end of period | 1,364,887 | 14 | 1,248,010 | 12 | 1,160,127 | 12 |
| **Class B voting common stock** | | | | | | |
| Balance, beginning of period | 23,696 | — | 24,522 | — | 93,846 | 1 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 168 | — | 754 | — | 1,389 | — |
| Issuance of Class B voting common stock for vesting of restricted stock units, net | — | — | — | — | 300 | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | (1,095) | — | (6,017) | — | (71,013) | (1) |
| Conversion of Class C voting common stock to Class B voting common stock | — | — | 4,437 | — | — | — |
| Balance, end of period | 22,769 | — | 23,696 | — | 24,522 | - |
| **Class C voting common stock** | | | | | | |
| Balance, beginning of period | 231,627 | 2 | 231,147 | 2 | 224,611 | 2 |
| Conversion of Class C voting common stock to Class B voting common stock | — | — | (4,437) | — | — | — |
| Issuance of Class C voting common stock for settlement of restricted stock units, net | — | — | 4,917 | — | 6,536 | — |
| Balance, end of period | 231,627 | 2 | 231,627 | 2 | 231,147 | 2 |
| **Additional paid-in capital** | | | | | | |
| Balance, beginning of period | — | 10,200,141 | — | 9,205,256 | — | 8,220,417 |
| Stock-based compensation expense | — | 1,088,506 | — | 771,084 | — | 686,013 |
| Cumulative-effect adjustment from accounting changes | — | (664,021) | — | — | — | — |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | — | 14,680 | — | 34,209 | — | 16,567 |
| Issuance of Class A non-voting common stock in connection with acquisitions and divestitures | — | 341,425 | — | 3,003 | — | 6,913 |
| Equity component of convertible senior notes, net | — | — | — | 286,589 | — | 377,432 |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | — | 1,175,191 | — | — | — | — |
| Purchase of capped calls | — | (86,825) | — | (100,000) | — | (102,086) |
| Balance, end of period | — | 12,069,097 | — | 10,200,141 | — | 9,205,256 |
| **Accumulated deficit** | | | | | | |
| Balance, beginning of period | — | (7,891,542) | — | (6,945,930) | — | (5,912,578) |
| Cumulative-effect adjustment from accounting changes | — | 95,031 | — | (773) | — | 308 |
| Net loss | — | (487,955) | — | (944,839) | — | (1,033,660) |
| Balance, end of period | — | (8,284,466) | — | (7,891,542) | — | (6,945,930) |
| **Accumulated other comprehensive income (loss)** | | | | | | |
| Balance, beginning of period | — | 21,363 | — | 573 | — | 3,147 |
| Other comprehensive income (loss), net of tax | — | (15,842) | — | 20,790 | — | (2,574) |
| Balance, end of period | — | 5,521 | — | 21,363 | — | 573 |
| **Total stockholders' equity** | $ 1,619,283 | $ 3,790,168 | $ 1,503,333 | $ 2,329,976 | $ 1,415,796 | $ 2,259,913 |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Notes to Consolidated Financial Statements**

## 1. Summary of Significant Accounting Policies

Snap Inc. is a camera company.

Snap Inc. ("we," "our," or "us") was formed as Future Freshman, LLC, a California limited liability company, in 2010. We changed our name to Toyopa Group, LLC in 2011, incorporated as Snapchat, Inc., a Delaware corporation, in 2012, and changed our name to Snap Inc. in 2016. Snap Inc. is headquartered in Santa Monica, California. Our flagship product, Snapchat, is a camera application that was created to help people communicate through short videos and images called "Snaps."

### Basis of Presentation

Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Our consolidated financial statements include the accounts of Snap Inc. and our wholly owned subsidiaries. All intercompany transactions and balances have been eliminated in consolidation. Our fiscal year ends on December 31.

### Use of Estimates

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. Management's estimates are based on historical information available as of the date of the consolidated financial statements and various other assumptions that we believe are reasonable under the circumstances. Actual results could differ from those estimates.

Key estimates relate primarily to determining the fair value of assets and liabilities assumed in business combinations, evaluation of contingencies, uncertain tax positions, forfeiture rate, the fair value of convertible senior notes, the fair value of stock-based awards, and the fair value of strategic investments. On an ongoing basis, management evaluates our estimates compared to historical experience and trends, which form the basis for making judgments about the carrying value of assets and liabilities.

### Concentrations of Business Risk

We currently use both Google Cloud and Amazon Web Services for our hosting requirements. A disruption or loss of service from one or both of these partners could seriously harm our ability to operate. Although we believe there are other qualified providers that can provide these services, a transition to a new provider could create a significant disruption to our business and negatively impact our consolidated financial statements.

### Concentrations of Credit Risk

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash, cash equivalents, marketable securities, and accounts receivable. We maintain cash deposits, cash equivalent balances, and marketable securities with several financial institutions. Cash and cash equivalents may be withdrawn or redeemed on demand. We believe that the financial institutions that hold our cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to these balances. We also maintain investments in U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper that carry high credit ratings and accordingly, minimal credit risk exists with respect to these balances.

We extend credit to our customers based on an evaluation of their ability to pay amounts due under contractual arrangement and generally do not obtain or require collateral.

### Revenue Recognition

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. See Note 2 for additional information.

**Cost of Revenue**

Cost of revenue includes payments for content, developer, and advertiser partner costs. Under some of these arrangements, we pay a portion of the fees we receive from the advertisers for Snap Ads that are displayed within partner content on Snapchat. Partner arrangement costs were $679.0 million, $324.3 million, and $174.7 million for the years ended December 31, 2021, 2020, and 2019, respectively.

In addition, cost of revenue consists of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs. Cost of revenue also includes third-party selling costs, personnel-related costs, facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

**Advertising**

Advertising costs are expensed as incurred and were $62.4 million, $29.5 million, and $31.4 million for the years ended December 31, 2021, 2020, and 2019, respectively.

**Capital Structure**

We have three classes of authorized common stock – Class A common stock, Class B common stock, and Class C common stock. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer.

**Stock-based Compensation**

We measure and recognize compensation expense for stock-based payment awards, including stock options, restricted stock units ("RSUs"), and restricted stock awards ("RSAs") granted to employees, directors, and advisors, based on the grant date fair value of the awards. The grant date fair value of stock options is estimated using a Black-Scholes option pricing model. The fair value of stock-based compensation for stock options is recognized on a straight-line basis, net of estimated forfeitures, over the period during which services are provided in exchange for the award. The grant date fair value of RSUs and RSAs is estimated based on the fair value of our underlying common stock.

RSUs vest on the satisfaction of service conditions. The service condition for RSUs granted prior to February 2018 is generally satisfied over four years, 10% after the first year of service, 20% over the second year, 30% over the third year, and 40% over the fourth year. In limited instances, we have issued RSUs with vesting periods in excess of four years. The service condition for RSUs and RSAs granted after February 2018 is generally satisfied in equal monthly or quarterly installments over three or four years. For these awards, we recognize stock-based compensation expense on a straight-line basis over the vesting period.

Stock-based compensation expense recognized for all periods presented is based on awards that are expected to vest, including an estimate of forfeitures. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

The future tax benefits on settlement of the above RSUs and RSAs is not expected to be material as currently we have established valuation allowances to reduce our net deferred tax assets to the amount that is more likely than not to be realized. The majority of the future tax benefits that arise on settlement of the above RSUs are in jurisdictions for which our net deferred tax assets have a full valuation allowance.

**Income Taxes**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax basis of assets and liabilities and are measured

using the enacted tax rates and laws that will be in effect when the deferred tax asset or liability is expected to be realized or settled.

In evaluating our ability to recover deferred tax assets, we consider all available positive and negative evidence, including historical operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis. Based on the level of historical losses, we have established a valuation allowance to reduce our net deferred tax assets to the amount that is more likely than not to be realized.

We recognize a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in our consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized. We recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheets.

**Currency Translation and Remeasurement**

The functional currency of the majority of our foreign subsidiaries is the U.S. dollar. Monetary assets and liabilities denominated in a foreign currency are remeasured into U.S. dollars at the exchange rate on the balance sheet date. Revenue and expenses are remeasured at the average exchange rates during the period. Equity transactions and other non-monetary assets are remeasured using historical exchange rates. Foreign currency transaction gains and losses are recorded in other income (expense), net on our consolidated statement of operations. For those foreign subsidiaries where the local currency is the functional currency, adjustments to translate those statements into U.S. dollars are recorded in accumulated other comprehensive income (loss) in stockholders' equity.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of highly liquid investments with original maturities of 90 days or less from the date of purchase.

**Restricted Cash**

We are required to maintain restricted cash deposits to back letters of credit for certain property leases. These funds are restricted and have been classified in other assets on our consolidated balance sheets due to the nature of restriction. At December 31, 2021 and 2020, restricted cash balances were immaterial.

**Marketable Securities**

We hold investments in marketable securities consisting of U.S. government securities, U.S. government agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. We classify marketable investments in debt securities as available-for-sale investments in our current assets because they represent investments available for current operations.

Our available-for-sale investments in debt securities are carried at fair value with any unrealized gains and losses, included in accumulated other comprehensive (loss) income in stockholders' equity. Available-for-sale debt securities with an amortized cost basis in excess of estimated fair value are assessed to determine what amount of that difference, if any, is caused by expected credit losses, with any allowance for credit losses recognized as a charge in other income (expense), net on our consolidated statements of income. We did not record any credit losses for the years ended December 31, 2021 and December 31, 2020 on our available-for-sale debt securities. We determine gains or losses on the sale or maturities of marketable securities using the specific identification method and these gains or losses are recorded in other income (expense), net in our consolidated statements of operations.

Publicly traded equity securities are carried at fair value with any unrealized gains and losses recorded in other income (expense), net in our consolidated statements of operations.

**Strategic Investments**

We hold strategic investments in privately held companies, consisting primarily of equity securities without readily determinable fair values, and to a lesser extent, debt securities. We adjust the carrying value of these equity securities to fair

value upon observable transactions for identical or similar investments of the same issuer or upon impairment. Any adjustments to carrying value of these investments are recorded in other income (expense), net in our consolidated statements of operations. Strategic investments are included within other assets on the consolidated balance sheets.

When we exercise significant influence over, but do not control the investee, such strategic investments are accounted for using the equity method. Under the equity method of accounting, we record our share of the results of the investments within other income (expense), net in our consolidated statements of operations.

### Fair Value Measurements

Certain financial instruments are required to be recorded at fair value. Other financial instruments, including cash and cash equivalents and restricted cash, are recorded at cost, which approximates fair value. Additionally, accounts receivable, accounts payable, and accrued expenses approximate fair value because of the short-term nature of these financial instruments.

### Accounts Receivable and Allowance for Doubtful Accounts

Accounts receivable are recorded at the invoiced amount less any allowance for doubtful accounts to reserve for potentially uncollectible receivables. To determine the amount of the allowance, we make judgments about the creditworthiness of customers based on ongoing credit evaluation and historical experience. At December 31, 2021 and 2020, the allowance for doubtful accounts was immaterial.

### Property and Equipment

Property and equipment are stated at cost, less accumulated depreciation. We compute depreciation using the straight-line method over the estimated useful lives of the assets, which is generally three years for computer hardware, software and equipment, five years for furniture, and over the shorter of lease term or useful life of the assets for leasehold improvements. Buildings are depreciated over a useful life ranging from 20 to 45 years. Maintenance and repairs are expensed as incurred.

### Leases

We have various non-cancelable lease agreements for certain of our offices. Leases are recorded as operating lease right-of-use assets and operating lease liabilities on the consolidated balance sheets. Leases with an initial term of twelve months or less are not recorded on the consolidated balance sheets. We recognize rent expense on a straight-line basis over the lease term.

### Software Development Costs

Software development costs include costs to develop software to be used to meet internal needs and applications used to deliver our services. We capitalize development costs related to these software applications once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended. Costs capitalized for developing such software applications were not material for the periods presented.

### Segments

Our CEO is our chief operating decision maker. We have determined that we have a single operating segment. Our CEO evaluates performance and makes operating decisions about allocating resources based on financial data presented on a consolidated basis accompanied by disaggregated information about revenue by geographic region.

### Business Combinations

We include the results of operations of the businesses that we acquire from the date of acquisition. We determine the fair value of the assets acquired and liabilities assumed based on their estimated fair values as of the respective date of acquisition. The excess purchase price over the fair values of identifiable assets and liabilities is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates including the selection of valuation methodologies, estimates of future revenue and cash flows, discount rates, and selection of comparable companies. Our estimates of fair value are based on assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, not to exceed one year from the date of acquisition, we may record adjustments to the assets acquired and liabilities assumed, with a corresponding

offset to goodwill. At the conclusion of the measurement period, any subsequent adjustments are reflected in the consolidated statements of operations.

When we issue payments or grants of equity to selling stockholders in connection with an acquisition, we evaluate whether the payments or awards are compensatory. This evaluation includes whether cash payments or stock award vesting is contingent on the continued employment of the selling stockholder beyond the acquisition date. If continued employment is required for the cash to be paid or stock awards to vest, the award is treated as compensation for post-acquisition services and is recognized as compensation expense.

Transaction costs associated with business combinations are expensed as incurred, and are included in general and administrative expenses in our consolidated statements of operations.

## Goodwill

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in a business combination. We test goodwill for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. For all periods presented, we had a single operating segment and reporting unit structure.

In testing for goodwill impairment, we first assess qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If, after assessing the totality of events or circumstances, we determine it is not more likely than not that the fair value of the reporting unit is less than its carrying amount, then additional impairment testing is not required. However, if we conclude otherwise, we perform the first of a two-step impairment test.

The first step compares the estimated fair value of a reporting unit to its book value, including goodwill. If the estimated fair value exceeds book value, goodwill is considered not to be impaired and no additional steps are necessary. However, if the fair value of the reporting unit is less than book value, then under the second step the carrying amount of the goodwill is compared to its implied fair value. There were no impairment charges in any of the periods presented.

## Intangible Assets

Intangible assets are carried at cost and amortized on a straight-line basis over their estimated useful lives. We determine the appropriate useful life of our intangible assets by measuring the expected cash flows of acquired assets. The estimated useful lives of intangible assets are generally as follows:

| Intangible Asset | Estimated Useful Life |
|---|---|
| Domain names | 5 Years |
| Trademarks | 1 to 5 Years |
| Acquired developed technology | 4 to 7 Years |
| Customer relationships | 2 to 5 Years |
| Patents | 3 to 11 Years |

## Impairment of Long-Lived Assets

We evaluate recoverability of our property and equipment and intangible assets, excluding goodwill, when events or changes indicate the carrying amount of an asset may not be recoverable. Events and changes in circumstances considered in determining whether the carrying value of long-lived assets may not be recoverable include: significant changes in performance relative to expected operating results; significant changes in asset use; and significant negative industry or economic trends and changes in our business strategy. Recoverability of these assets is measured by comparison of their carrying amount to future undiscounted cash flows to be generated. If impairment is indicated based on a comparison of the assets' carrying values and the undiscounted cash flows, the impairment loss is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets. We determined that there were no events or changes in circumstances that indicated our long-lived assets were impaired during any of the periods presented.

**Legal Contingencies**

For legal contingencies, we accrue a liability for an estimated loss if the potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated. Legal fees and expenses are expensed as incurred. Note 8 provides additional information regarding our legal contingencies.

**Convertible Notes**

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of convertible senior notes due in 2025 (the "2025 Notes"). In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of convertible senior notes due in 2026 (the "2026 Notes"). Prior to January 1, 2021, we accounted for the 2025 Notes and the 2026 Notes as separate liability and equity components. On issuance, the carrying amount of the liability component was calculated by measuring the fair value of a similar liability that did not have an associated convertible feature. The carrying amount of the equity component representing the conversion option was calculated by deducting the fair value of the liability component from the principal amount of the convertible notes as a whole. This amount represents a debt discount which is amortized to interest expense over the term of the convertible notes using the effective interest rate method, which maintains a constant rate of interest expense based on the increasing carrying value of the debt.

Effective January 1, 2021, we early adopted Accounting Standards Update ("ASU") 2020-06 using the modified retrospective approach. As a result, the Convertible Notes are each accounted for as a single liability measured at its amortized cost, as no other embedded features require bifurcation and recognition as derivatives. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million.

**Recent Accounting Pronouncements**

In October 2021, the Financial Accounting Standards Board ("FASB") issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. Under ASU 2021-08, an acquirer must recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with Topic 606. The guidance is effective for interim and annual periods beginning after December 15, 2022, with early adoption permitted. Effective January 1, 2022, we early adopted ASU 2021-08 on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In August 2020, the FASB issued ASU 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity. Under ASU 2020-06, the embedded conversion features are no longer separated from the host contract for convertible instruments with conversion features that are not required to be accounted for as derivatives under Derivatives and Hedging (Topic 815), or that do not result in substantial premiums accounted for as paid-in capital. Consequently, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost, as long as no other features require bifurcation and recognition as derivatives. The guidance also requires the if-converted method to be applied for all convertible instruments. ASU 2020-06 is effective for fiscal years beginning after December 15, 2021, with early adoption permitted. Adoption of the standard requires using either a modified retrospective or a full retrospective approach. Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million. Interest expense recognized in the current and future periods will be reduced as a result of accounting for the convertible debt instrument as a single liability measured at its amortized cost.

In January 2020, the FASB issued ASU 2020-01, Investments-Equity Securities (Topic 321), Investments-Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815), which clarifies the interaction between the accounting for equity securities in Topic 321, the accounting for equity method investments in Topic 323, and the accounting for certain forward contracts and purchased options in Topic 815. The guidance is effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. Effective January 1, 2021, we adopted this standard on a prospective basis. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In August 2018, the FASB issued ASU 2018-15, Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract. ASU 2018-15 aligns the requirements for capitalizing implementation costs in a cloud computing arrangement service contract with the requirements for capitalizing implementation costs incurred for an internal-use software license. The guidance is effective for interim and annual periods beginning after December 15, 2019, with early adoption permitted. We adopted ASU 2018-15 effective January 1, 2020. The impact of adoption of this standard on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

In June 2016, the FASB issued ASU 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments. ASU 2016-13 replaced the incurred loss impairment methodology under current GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. ASU 2016-13 requires use of a forward-looking expected credit loss model for accounts receivables, loans, and other financial instruments. ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, with early adoption permitted. Adoption of the standard requires using a modified retrospective approach through a cumulative-effect adjustment to retained earnings as of the effective date to align existing credit loss methodology with the new standard. In November 2019, the FASB issued ASU 2019-11, Codification Improvements to Topic 326, Financial Instruments—Credit Losses. ASU 2019-11 requires entities that did not adopt the amendments in ASU 2016-13 as of November 2019 to adopt ASU 2019-11. This ASU contains the same effective dates and transition requirements as ASU 2016-13. We adopted ASU 2016-13 and ASU 2019-11 effective January 1, 2020. The impact of adoption of these standards on our consolidated financial statements, including accounting policies, processes, and systems, was not material.

## 2. Revenue

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either on a fixed fee basis over a period of time or based on the number of advertising impressions delivered. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is displayed. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

We also generate revenue from sales of hardware products. For the periods presented, revenue from the sales of hardware products was not material.

The following table represents our revenue disaggregated by geography based on the billing address of the advertising customer:

| | Year Ended December 31, | | |
| | 2021 | 2020 (in thousands) | 2019 |
|---|---|---|---|
| Revenue: | | | |
| North America [1] [2] | $ 2,871,369 | $ 1,649,937 | $ 1,068,108 |
| Europe [3] | 660,473 | 425,445 | 299,913 |
| Rest of world | 585,206 | 431,244 | 347,513 |
| Total revenue | $ 4,117,048 | $ 2,506,626 | $ 1,715,534 |

(1) North America includes Mexico, the Caribbean, and Central America.
(2) United States revenue was $2.8 billion, $1.6 billion, and $1.0 billion for the years ended December 31, 2021, 2020, and 2019, respectively.
(3) Europe includes Russia and Turkey.

### 3. Net Loss per Share

We compute net loss per share using the two-class method required for multiple classes of common stock. We have three classes of authorized common stock for which voting rights differ by class.

Basic net loss per share is computed by dividing net loss attributable to each class of stockholders by the weighted-average number of shares of stock outstanding during the period, adjusted for vested RSUs that have not been settled and RSAs for which the risk of forfeiture has not yet lapsed.

For the calculation of diluted net loss per share, net loss per share attributable to common stockholders for basic net loss per share is adjusted by the effect of dilutive securities, including awards under our equity compensation plans. Diluted net loss per share attributable to common stockholders is computed by dividing the resulting net loss attributable to common stockholders by the weighted-average number of fully diluted common shares outstanding. We use the if-converted method for calculating any potential dilutive effect of the Convertible Notes on diluted net loss per share. The Convertible Notes would have a dilutive impact on net income per share when the average market price of Class A common stock for a given period exceeds the respective conversion price of the Convertible Notes. For the periods presented, our potentially dilutive shares relating to stock options, RSUs, RSAs, and Convertible Notes were not included in the computation of diluted net loss per share as the effect of including these shares in the calculation would have been anti-dilutive.

The numerators and denominators of the basic and diluted net loss per share computations for our common stock are calculated as follows for the years ended December 31, 2021, 2020, and 2019:

| | Year Ended December 31, | | | | | | | | |
| | 2021 | | | 2020 (in thousands, except per share data) | | | 2019 | | |
| | Class A Common | Class B Common | Class C Common | Class A Common | Class B Common | Class C Common | Class A Common | Class B Common | Class C Common |
|---|---|---|---|---|---|---|---|---|---|
| Numerator: | | | | | | | | | |
| Net loss | $ (408,118) | $ (7,339) | $ (72,498) | $ (775,801) | $ (15,577) | $ (153,461) | $ (817,156) | $ (33,341) | $ (183,164) |
| Net loss attributable to common stockholders | $ (408,118) | $ (7,339) | $ (72,498) | $ (775,801) | $ (15,577) | $ (153,461) | $ (817,156) | $ (33,341) | $ (183,164) |
| Denominator: | | | | | | | | | |
| Basic shares: | | | | | | | | | |
| Weighted-average common shares - Basic | 1,303,921 | 23,449 | 231,627 | 1,195,259 | 23,999 | 236,435 | 1,087,366 | 44,366 | 243,730 |
| Diluted shares: | | | | | | | | | |
| Weighted-average common shares - Diluted | 1,303,921 | 23,449 | 231,627 | 1,195,259 | 23,999 | 236,435 | 1,087,366 | 44,366 | 243,730 |
| Net loss per share attributable to common stockholders: | | | | | | | | | |
| Basic | $ (0.31) | $ (0.31) | $ (0.31) | $ (0.65) | $ (0.65) | $ (0.65) | $ (0.75) | $ (0.75) | $ (0.75) |
| Diluted | $ (0.31) | $ (0.31) | $ (0.31) | $ (0.65) | $ (0.65) | $ (0.65) | $ (0.75) | $ (0.75) | $ (0.75) |

The following potentially dilutive shares were excluded from the calculation of diluted net loss per share because their effect would have been anti-dilutive for the periods presented:

| | Year Ended December 31, | | |
| | 2021 | 2020 | 2019 |
|---|---|---|---|
| | | (in thousands) | |
| Stock options | 4,304 | 5,624 | 10,262 |
| Unvested RSUs and RSAs | 86,180 | 131,172 | 148,797 |
| Convertible Notes (if-converted) | 62,755 | 101,591 | 55,468 |

## 4. Stockholders' Equity

**Common Stock**

As of December 31, 2021, we are authorized to issue 3,000,000,000 shares of Class A nonvoting common stock, 700,000,000 shares of Class B voting common stock, and 260,887,848 shares of Class C voting common stock, each with a par value of $0.00001 per share. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer. Any dividends paid to the holders of the Class A common stock, Class B common stock, and Class C common stock will be paid on a pro rata basis. For the year ended December 31, 2021, we did not declare any dividends. On a liquidation event, as defined in our certificate of incorporation, any distribution to common stockholders is made on a pro rata basis to the holders of the Class A common stock, Class B common stock, and Class C common stock.

As of December 31, 2021, there were 1,364,886,581 shares, 22,769,005 shares, and 231,626,943 shares of Class A common stock, Class B common stock, and Class C common stock, respectively, issued and outstanding.

**Stock-based Compensation Plans**

We maintain three share-based employee compensation plans: the 2017 Equity Incentive Plan ("2017 Plan"), the 2014 Equity Incentive Plan ("2014 Plan"), and the 2012 Equity Incentive Plan ("2012 Plan", and collectively with the 2017 Plan and the 2014 Plan, the "Stock Plans"). In January 2017, our board of directors adopted the 2017 Plan, and in February 2017 our stockholders approved the 2017 Plan, effective on March 1, 2017, which serves as the successor to the 2014 Plan and 2012 Plan and provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, RSAs, RSUs, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. We do not expect to grant any additional awards under the 2014 Plan or 2012 Plan as of the effective date of the 2017 Plan, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France under the 2014 Plan. Outstanding awards under the 2014 Plan and 2012 Plan continue to be subject to the terms and conditions of the 2014 Plan and 2012 Plan, respectively. Shares available for grant under the 2014 Plan and 2012 Plan, which were reserved but not issued or subject to outstanding awards under the 2014 Plan or 2012 Plan, respectively, as of the effective date of the 2017 Plan, were added to the reserves of the 2017 Plan.

We initially reserved 87,270,108 shares of our Class A common stock for future issuance under the 2017 Plan. An additional number of shares of Class A common stock will be added to the 2017 Plan equal to (i) 96,993,064 shares of Class A common stock reserved for future issuance pursuant to outstanding stock options and unvested RSUs under the 2014 Plan, (ii) 37,228,865 shares of Class A common stock issuable on conversion of Class B common stock underlying stock options and unvested RSUs outstanding under the 2012 Plan, (iii) 17,858,235 shares of Class A common stock that were reserved for issuance under the 2014 Plan as of the date the 2017 Plan became effective, (iv) 11,004,580 shares of Class A common stock issuable on conversion of Class B common stock that were reserved for issuance under the 2012 Plan as of the date the 2017 Plan became effective, and (v) a maximum of 86,737,997 shares of Class A common stock that will be added pursuant to the following sentence. With respect to each share that returns to the 2017 Plan pursuant to (i) and (ii) of the prior sentence that was associated with an award that was outstanding under the 2014 Plan and 2012 Plan as of October 31, 2016, an additional share of Class A common stock will be added to the share reserve of the 2017 Plan, up to a maximum of 86,737,997 shares. The number of shares reserved for issuance under the 2017 Plan will increase automatically on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 5.0% of the total number of shares of our

capital stock outstanding on December 31st of the immediately preceding calendar year, and (ii) a number determined by our board of directors. The maximum term for stock options granted under the 2017 Plan may not exceed ten years from the date of grant. The 2017 Plan will terminate ten years from the date our board of directors approved the plan, unless it is terminated earlier by our board of directors.

**2017 Employee Stock Purchase Plan**

In January 2017, our board of directors adopted the 2017 Employee Stock Purchase Plan ("2017 ESPP"). Our stockholders approved the 2017 ESPP in February 2017. The 2017 ESPP became effective in connection with the IPO. A total of 16,484,690 shares of Class A common stock were initially reserved for issuance under the 2017 ESPP. No shares of our Class A common stock have been issued or offered under the 2017 ESPP. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (ii) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (i) and (ii).

**Restricted Stock Units and Restricted Stock Awards**

The following table summarizes the RSU and RSA activity during the year ended December 31, 2021:

| | Class A Outstanding | | Weighted-Average Grant Date Fair Value per RSU |
|---|---|---|---|
| | (in thousands, except per share data) | | |
| Unvested at December 31, 2020 | 131,172 | $ | 15.10 |
| Granted | 23,131 | $ | 59.28 |
| Vested | (59,009) | $ | 16.20 |
| Forfeited | (9,114) | $ | 16.32 |
| Unvested at December 31, 2021 | 86,180 | $ | 26.07 |

The total fair value of RSUs and RSAs vested during the years ended December 31, 2021, 2020, and 2019 was $3.6 billion, $1.7 billion, and $1.0 billion, respectively.

Total unrecognized compensation cost related to outstanding RSUs and RSAs was $2.0 billion as of December 31, 2021 and is expected to be recognized over a weighted-average period of 2.2 years.

**Stock Options**

The following table summarizes the stock option award activity under the Stock Plans during the year ended December 31, 2021:

| | Class A Number of Shares | Class B Number of Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value[1] |
|---|---|---|---|---|---|---|---|
| | (in thousands, except per share data) | | | | | | |
| Outstanding at December 31, 2020 | 4,828 | 796 | $ | 10.37 | 5.20 | $ | 223,230 |
| Granted | 48 | — | $ | 49.63 | | | |
| Exercised | (1,174) | (168) | $ | 10.95 | | | |
| Forfeited | (26) | — | $ | 17.26 | | | |
| Outstanding at December 31, 2021 | 3,676 | 628 | $ | 10.59 | 4.19 | $ | 157,374 |
| Exercisable at December 31, 2021 | 3,303 | 628 | $ | 10.08 | 3.93 | $ | 145,315 |
| Vested and expected to vest at December 31, 2021 | 3,668 | 628 | $ | 10.59 | 4.18 | $ | 157,106 |

(1)   The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying stock option awards and the closing market price of our Class A common stock as of December 31, 2021 and December 31, 2020, respectively.

The weighted-average fair value of stock options granted during the years ended December 31, 2021 and 2020 was $36.17 and $12.11 per share, respectively. The expense is estimated based on the option's fair value as calculated by the Black-Scholes option pricing model. Stock-based compensation expense for stock options was not material in the years ended December 31, 2021, 2020, and 2019.

Total unrecognized compensation cost related to unvested stock options was $2.9 million as of December 31, 2021 and is expected to be recognized over a weighted-average period of 1.0 year.

The total grant date fair value of stock options that vested in the years ended December 31, 2021, 2020, and 2019 was $7.7 million, $11.1 million, and $23.3 million, respectively. The intrinsic value of stock options exercised in the years ended December 31, 2021, 2020, and 2019 was $69.4 million, $75.5 million, and $44.0 million, respectively.

## Stock-Based Compensation Expense

Total stock-based compensation expense by function was as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| | (in thousands) | | |
| Cost of revenue | $ 17,221 | $ 9,367 | $ 6,365 |
| Research and development | 740,130 | 533,272 | 464,639 |
| Sales and marketing | 164,241 | 108,270 | 93,355 |
| General and administrative | 170,543 | 119,273 | 121,654 |
| Total | $ 1,092,135 | $ 770,182 | $ 686,013 |

## 5. Business Acquisitions and Divestitures

### 2021 Acquisitions

*Wave Optics*

In May 2021, we acquired Wave Optics Limited ("Wave Optics"), a display technology company that supplies light engines and diffractive waveguides for augmented reality displays. The total consideration was $541.8 million, of which $510.4 million represents purchase consideration and primarily consisted of 4.7 million shares of our Class A common stock with a fair value of $252.0 million, cash of $13.7 million, and a $238.4 million payable due no later than May 2023 in either cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election. The remaining $31.4 million of total consideration transferred represents compensation for future employment services.

The allocation of purchase price is subject to change based on information received related to the assets and liabilities that existed as of the acquisition date. The allocation of the total purchase consideration for this acquisition is estimated as follows:

| | Total |
| --- | --- |
| | (in thousands) |
| Trademarks | $ 20,584 |
| Technology | 77,118 |
| Customer relationships | 32,708 |
| Goodwill | 370,236 |
| Net deferred tax liability | (3,313) |
| Other assets acquired and liabilities assumed, net | 13,111 |
| Total | $ 510,444 |

The goodwill amount represents synergies expected to be realized from the business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Fit Analytics*

In March 2021, we acquired Fit Analytics GmbH ("Fit Analytics"), a sizing technology company that powers solutions for retailers and brands, to grow our e-commerce and shopping offerings. The purchase consideration for Fit Analytics was $124.4 million, which primarily represents current and future cash consideration payments.

The allocation of purchase price is subject to change based on information received related to the assets and liabilities that existed as of the acquisition date. The allocation of the total purchase consideration for this acquisition is as follows:

|  | Total |
|---|---|
|  | (in thousands) |
| Trademarks | $ 800 |
| Technology | 17,000 |
| Customer relationships | 17,000 |
| Goodwill | 88,132 |
| Net deferred tax liability | (5,643) |
| Other assets acquired and liabilities assumed, net | 7,160 |
| Total | $ 124,449 |

The goodwill amount represents synergies expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Other 2021 Acquisitions*

For the year ended December 31, 2021, we completed other acquisitions to enhance our existing platform, technology, and workforce. The aggregate purchase consideration was $266.1 million, which included $139.5 million in cash, $93.7 million in shares of our Class A common stock, and $32.9 million recorded in other liabilities on the consolidated balance sheet.

The aggregate allocation of purchase consideration was as follows:

|  | Total |
|---|---|
|  | (in thousands) |
| Technology | $ 64,150 |
| Customer relationships | 4,000 |
| Goodwill | 203,482 |
| Net deferred tax liability | (11,871) |
| Other assets acquired and liabilities assumed, net | 6,325 |
| Total | $ 266,086 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $8.2 million is deductible for tax purposes.

**2020 Acquisitions**

For the year ended December 31, 2020, we completed acquisitions to enhance our existing platform, technology, and workforce. The aggregate allocation of acquisition date fair value was as follows:

|  | Total |
|---|---|
|  | (in thousands) |
| Technology | $ 46,112 |
| Goodwill | 162,747 |
| Net deferred tax liability | (5,741) |
| Other assets acquired and liabilities assumed, net | 1,392 |
| Total | $ 204,510 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $49.6 million is deductible for tax purposes.

## 2019 Acquisitions and Divestiture

*AI Factory, Inc.*

In December 2019, we acquired the remaining ownership interest in AI Factory, Inc. ("AI Factory"), a content and technology company. Prior to the acquisition, we owned a minority interest in the company. The purpose of the acquisition was to enhance the functionality of our platform.

The acquisition date fair value of AI Factory was $128.1 million, which primarily represents current and future cash consideration payments to sellers, as well as the $13.5 million estimated fair value of our original minority interest. We recognized the change in pre-acquisition fair value of our original minority interest as a gain in Other income (expense), net on the consolidated statement of operations.

The allocation of acquisition date fair value was as follows:

|  | Total (in thousands) |
|---|---|
| Technology | $ 16,000 |
| Goodwill | 110,734 |
| Other assets acquired and liabilities assumed, net | 1,353 |
| Total | $ 128,087 |

The goodwill amount represents synergies related to our existing platform expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Placed, LLC*

In June 2019, we divested our membership interest in Placed, a location-based measurement services company, to Foursquare Labs, Inc. ("Foursquare"). The total cash consideration received was $77.8 million, which includes amounts paid for severance and equity compensation. $66.9 million represents purchase consideration and we recognized a net gain on divestiture of $39.9 million, which is included in other income (expense), net, on our consolidated statements of operations. The operating results of Placed were not material to our consolidated revenue or consolidated operating loss for all periods presented. We determined that Placed did not meet the criteria to be classified as discontinued operations.

Placed assets and liabilities on completion of the divestiture were as follows:

|  | Total (in thousands) |
|---|---|
| Trademarks, net | $ 1,052 |
| Technology, net | 14,193 |
| Customer relationships, net | 5,246 |
| Goodwill | 2,682 |
| Other assets and liabilities, net | 3,827 |
| Total | $ 27,000 |

*Other Acquisitions*

In the fourth quarter of 2019, we acquired a business to enhance our existing platform, technology, and workforce. The purchase consideration was $34.0 million of which $23.5 million was allocated to goodwill and the remainder primarily to identifiable intangible assets. The goodwill amount represents synergies related to our existing platform expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are deductible for tax purposes.

*Additional Information on 2021, 2020, and 2019 Acquisitions*

The operating results of the above acquisitions were included in the results of our operations from the acquisition date and were not material to our consolidated revenue or consolidated operating loss. In addition, unaudited pro forma results of operations assuming the above acquisitions had taken place at the beginning of each period are not provided because the historical operating results of the acquired entities were not material and pro forma results would not be materially different from reported results for the periods presented.

## 6. Goodwill and Intangible Assets

The changes in the carrying amount of goodwill for the years ended December 31, 2021 and 2020 were as follows:

|  | Goodwill (in thousands) |
| --- | --- |
| Balance as of December 31, 2019 | $ 761,153 |
| Goodwill acquired | 162,747 |
| Foreign currency translation | 15,359 |
| Balance as of December 31, 2020 | $ 939,259 |
| Goodwill acquired | 661,850 |
| Foreign currency translation | (12,657) |
| Balance as of December 31, 2021 | $ 1,588,452 |

Intangible assets consisted of the following:

| | December 31, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands, except years) | | |
| Domain names | 4.6 | $ 967 | $ 365 | $ 602 |
| Trademarks | 4.3 | 21,384 | 2,613 | 18,771 |
| Technology | 3.6 | 343,800 | 142,588 | 201,212 |
| Customer relationships | 5.1 | 53,709 | 6,332 | 47,377 |
| Patents | 4.0 | 21,195 | 11,503 | 9,692 |
| | | $ 441,055 | $ 163,401 | $ 277,654 |

| | December 31, 2020 | | | |
| --- | --- | --- | --- | --- |
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands except years) | | |
| Domain names | 1.6 | $ 414 | $ 283 | $ 131 |
| Technology | 3.2 | 206,197 | 111,129 | 95,068 |
| Patents | 4.9 | 19,860 | 9,130 | 10,730 |
| | | $ 226,471 | $ 120,542 | $ 105,929 |

Amortization of intangible assets for the years ended December 31, 2021, 2020, and 2019 was $63.2 million, $33.5 million, and $33.4 million, respectively.

As of December 31, 2021, the estimated intangible asset amortization expense for the next five years and thereafter is as follows:

| | Estimated Amortization (in thousands) |
|---|---|
| Year ending December 31, | |
| 2022 | $ 79,186 |
| 2023 | 73,240 |
| 2024 | 61,590 |
| 2025 | 44,331 |
| 2026 | 14,624 |
| Thereafter | 4,683 |
| Total | $ 277,654 |

## 7. Long-Term Debt

**Convertible Notes**

**2027 Notes**

In April 2021, we entered into a purchase agreement with certain counterparties for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027 (the "2027 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). The 2027 Notes consisted of a $1.0 billion initial placement and an over-allotment option that provided the initial purchasers of the 2027 Notes with the option to purchase an additional $150.0 million aggregate principal amount of the 2027 Notes, which was fully exercised. The 2027 Notes were issued pursuant to an indenture dated April 30, 2021. The net proceeds from the issuance of the 2027 Notes were $1.05 billion, net of debt issuance costs and cash used to purchase the capped call transactions ("2027 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2027 Notes are unsecured and unsubordinated obligations which do not bear regular interest and for which the principal balance will not accrete. The 2027 Notes will mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2027 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 11.2042 shares of Class A common stock per $1,000 principal amount of 2027 Notes, which is equivalent to an initial conversion price of approximately $89.25 per share of our Class A common stock. The conversion rate is subject to customary adjustments for certain events as described in the indenture governing the 2027 Notes.

We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after May 5, 2024 if the last reported sale price of our Class A common stock has been at least 130% of the conversion price then in effect for at least 20 trading days at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus accrued and unpaid special interest or additional interest, if any.

Holders of the 2027 Notes may convert all or a portion of their 2027 Notes at their option prior to February 1, 2027, in multiples of $1,000 principal amounts, only under the following circumstances:

- if the last reported sale price of our Class A common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the preceding calendar quarter is greater than or equal to 130% of the applicable conversion price of the 2027 Notes on each such trading day;

- during the five business day period after any ten consecutive trading day period in which the trading price per $1,000 principal amount of the 2027 Notes for each day of that ten consecutive trading day period was less than 98% of the product of the last reported sale price of our Class A common stock and the applicable conversion rate of the 2027 Notes on such trading day;

- on a notice of redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date, in which case we may be required to increase the conversion rate for the 2027 Notes so surrendered for conversion in connection with such redemption notice; or

- on the occurrence of specified corporate events.

On or after February 1, 2027, the 2027 Notes are convertible at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

Holders of the 2027 Notes who convert the 2027 Notes in connection with a make-whole fundamental change, as defined in the indenture governing the 2027 Notes, or in connection with a redemption are entitled to an increase in the conversion rate. Additionally, in the event of a fundamental change, holders of the 2027 Notes may require us to repurchase all or a portion of the 2027 Notes at a price equal to 100% of the principal amount of 2027 Notes, plus any accrued and unpaid special interest, if any.

We accounted for the issuance of the 2027 Notes as a single liability measured at its amortized cost, as no other embedded features require bifurcation and recognition as derivatives.

## 2025 Notes

In April 2020, we entered into the 2025 Notes in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and cash used to purchase the capped call transactions (the "2025 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2025 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on November 1, 2020 at a rate of 0.25% per year. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2025 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 46.1233 shares of Class A common stock per $1,000 principal amount of 2025 Notes, which is equivalent to an initial conversion price of approximately $21.68 per share of our Class A common stock. We may redeem for cash all or portions of the 2025 Notes, at our option, on or after May 6, 2023 based on certain circumstances.

## 2026 Notes

In August 2019, we entered into the 2026 Notes (and together with the 2027 Notes and the 2025 Notes, the "Convertible Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and cash used to purchase the capped call transactions ("2026 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2026 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on February 1, 2020 at a rate of 0.75% per year. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with the terms prior to such date.

The 2026 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 43.8481 shares of Class A common stock per $1,000 principal amount of 2026 Notes, which is equivalent to an initial conversion price of approximately $22.81 per share of our Class A common stock. We may redeem for cash all or portions of the 2026 Notes, at our option, on or after August 6, 2023 based on certain circumstances.

The Convertible Notes consisted of the following:

| | | As of December 31, 2021 | | | As of December 31, 2020 | |
| | 2027 Notes | 2025 Notes | 2026 Notes | 2025 Notes | 2026 Notes |
| | | | (in thousands) | | |
| Liability: | | | | | |
| Principal | $ 1,150,000 | $ 284,105 | $ 838,493 | $ 1,000,000 | $ 1,265,000 |
| Unamortized debt discount and issuance costs[1] | (11,361) | (2,168) | (5,982) | (263,956) | (325,875) |
| Net carrying amount | $ 1,138,639 | $ 281,937 | $ 832,511 | $ 736,044 | $ 939,125 |

(1)   The 2020 amounts include unamortized debt discount expense prior to the adoption of ASU 2020-06 on January 1, 2021.

Prior to January 1, 2021, we separated the 2025 Notes and the 2026 Notes into liability and equity components. On issuance, the carrying amount of the equity components was recorded as a debt discount and subsequently amortized to interest expense. Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. As a result, the 2025 Notes and 2026 Notes are each accounted for as a single liability measured at its amortized cost, as no other embedded features require bifurcation and recognition as derivatives. Adoption of the new standard resulted in a decrease to accumulated deficit of $95.0 million, a decrease to additional paid-in capital of $664.0 million, and an increase to convertible senior notes, net of $569.0 million. The 2027 Notes were issued after January 1, 2021.

As of December 31, 2021, the debt issuance costs on the 2027 Notes, the 2025 Notes, and the 2026 Notes will be amortized over the remaining period of approximately 5.3 years, 3.3 years and 4.6 years, respectively.

Interest expense related to the amortization of debt issuance costs was $4.3 million for the year ended December 31, 2021. Interest expense related to the amortization of debt discount and issuance costs was $81.4 million and $17.8 million for the years ended December 31, 2020 and 2019, respectively. Contractual interest expense was $8.9 million, $11.2 million, and $3.7 million for the years ended December 31, 2021, 2020, and 2019, respectively.

As of December 31, 2021, the if-converted value of the 2025 Notes and 2026 Notes exceeded the principal amount by $332.2 million and $890.6 million, respectively. As of December 31, 2021, the if-converted value of the 2027 Notes did not exceed the principal amount. The sale price for conversion was satisfied as of December 31, 2021 for the 2025 Notes and the 2026 Notes, and as a result, the 2025 Notes and 2026 Notes will continue to be eligible for optional conversion during the first quarter of 2022. The 2027 Notes were not eligible for conversion as of December 31, 2021. No sinking fund is provided for the Convertible Notes, which means that we are not required to redeem or retire them periodically.

**Capped Call Transactions**

In connection with the pricing of the 2027 Notes, 2025 Notes, and 2026 Notes, we entered into the 2027 Capped Call Transactions, the 2025 Capped Call Transactions, and the 2026 Capped Call Transactions (collectively, the "Capped Call Transactions"), respectively, with certain counterparties at a net cost of $86.8 million, $100.0 million, and $102.1 million, respectively. The cap price of the 2027 Capped Call Transactions, the 2025 Capped Call Transactions, and the 2026 Capped Call Transaction is initially $121.02, $32.12, and $32.58 per share of our Class A common stock, respectively. All are subject to certain adjustments under the terms of the Capped Call Transactions. Conditions that cause adjustments to the initial strike price of the Capped Call Transactions mirror conditions that result in corresponding adjustments for the Convertible Notes.

The Capped Call Transactions are intended to reduce potential dilution to holders of our Class A common stock beyond the conversion prices up to the cap prices on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount, as the case may be, with such reduction or offset subject to a cap. The cost of the Capped Call Transactions was recorded as a reduction of our additional paid-in capital in our consolidated balance sheets. The Capped Call Transactions will not be remeasured as long as they continue to meet the conditions for equity classification. As of December 31, 2021, the 2025 Capped Call Transactions and the 2026 Capped Call Transactions were in-the-money.

**Exchange Transactions**

In 2021, we entered into various exchange agreements (collectively, the "Exchange Agreements") with certain holders of the 2025 Notes and the 2026 Notes pursuant to which we exchanged approximately $715.9 million principal amount of the 2025 Notes and approximately $426.5 million principal amount of the 2026 Notes for aggregate consideration of approximately 52.4 million shares of Class A common stock (the "Exchange Shares"). The Exchange Shares included an additional 0.7 million shares of our Class A common stock not provided for under the original conversion terms of the 2025 Notes and the 2026 Notes to induce the holders to agree to the exchange.

The Exchange Agreements were accounted for as an induced conversion with the fair value of 0.7 million Exchange Shares, less accrued interest, recognized as an inducement expense in other income (expense), net in our consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Inducement expense recorded for the year ended December 31, 2021 was $41.5 million. The common stock consideration issued under the original terms of the 2025 Notes and 2026 Notes was accounted for under the general conversion accounting guidance with the net carrying amount of $1,132.6 million recorded in additional paid-in-capital and as a non-cash transaction excluded from cash activities on the consolidated statements of cash flows.

**Credit Facility**

In July 2016, we entered into a senior unsecured revolving credit facility ("Credit Facility") with certain lenders, some of which are affiliated with certain members of the underwriting syndicate for our Convertible Notes offerings, to fund working capital and general corporate-purpose expenditures. Since July 2016, we have amended the Credit Facility multiple times. As of December 31, 2021, the Credit Facility has a maximum borrowing amount of $1.05 billion, bears interest at LIBO plus 0.75%, as well as an annual commitment fee of 0.10% on the daily undrawn balance of the facility and terminates in August 2023. As of December 31, 2021, no amounts were outstanding under the Credit Facility. As of December 31, 2021, we had $23.9 million in the form of outstanding standby letters of credit.

**8. Commitments and Contingencies**

**Commitments**

We have non-cancelable contractual agreements primarily related to the hosting of our data storage processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $2.7 billion in commitments as of December 31, 2021, primarily due within three years. For additional discussion on leases, see Note 9 to our consolidated financial statements.

**Contingencies**

We record a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also disclose material contingencies when we believe a loss is not probable but reasonably possible. Accounting for contingencies requires us to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. Many legal and tax contingencies can take years to be resolved.

*Pending Matters*

Beginning in May 2017, we, certain of our officers and directors, and the underwriters for our IPO were named as defendants in securities class actions purportedly brought on behalf of purchasers of our Class A common stock, alleging violation of securities laws that arose following our IPO.

On January 17, 2020, we reached a preliminary agreement to settle the securities class actions. The preliminary settlement agreement was signed in January 2020 and provided for a resolution of all of the pending claims in the securities class actions for $187.5 million. In the fourth quarter of 2019, we recorded legal expense, net of amounts directly covered by insurance, of $100.0 million for the expected settlement of the stockholder actions since we concluded the loss was probable and estimable. The amount was recorded in general and administrative expense in our consolidated statements of operations. The settlement agreement was preliminarily approved by the federal court in April 2020 and by the state court in November 2020. The settlement amount was paid into escrow in December 2020. In March 2021, the federal court granted final approval of the settlement and entered judgment while the state court granted final approval of the settlement in March 2021 and entered judgment in April 2021. The settlement amount is being released from escrow as determined by the plaintiffs' lawyers and the settlement administrator.

In November 2021, we and certain of our officers and directors, were named as defendants in a securities class actions purportedly brought on behalf of purchasers of our Class A common stock, alleging that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. Management believes these lawsuits are without merit and intends to vigorously defend them. Based on the preliminary nature of the proceedings in this case, the outcome of this matter remains uncertain.

The outcomes of our legal proceedings are inherently unpredictable, subject to significant uncertainties, and could be material to our financial condition, results of operations, and cash flows for a particular period. For the pending matters described above, it is not possible to estimate the reasonably possible loss or range of loss.

We are subject to various other legal proceedings and claims in the ordinary course of business, including certain patent, trademark, privacy, regulatory, and employment matters. Although occasional adverse decisions or settlements may occur, we do not believe that the final disposition of any of our other pending matters will seriously harm our business, financial condition, results of operations, and cash flows.

## Indemnifications

In the ordinary course of business, we may provide indemnifications of varying scope and terms to customers, vendors, lessors, investors, directors, officers, employees, and other parties with respect to certain matters. Indemnification may include losses from our breach of such agreements, services we provide, or third party intellectual property infringement claims. These indemnifications may survive termination of the underlying agreement and the maximum potential amount of future indemnification payments may not be subject to a cap. We have not incurred material costs to defend lawsuits or settle claims related to these indemnifications as of December 31, 2021. We believe the fair value of these liabilities is immaterial and accordingly have no liabilities recorded for these agreements at December 31, 2021.

## 9. Leases

We have various non-cancelable lease agreements for certain of our offices with original lease periods expiring between 2022 and 2042. Our lease terms may include options to extend or terminate the lease when it is reasonably certain we will exercise that option. Certain of the arrangements have free rent periods or escalating rent payment provisions. Leases with an initial term of twelve months or less are not recorded on the consolidated balance sheets. We recognize rent expense on a straight-line basis over the lease term.

## Lease Cost

The components of lease cost were as follows:

|  | Year Ended December 31, | | | |
|  | 2021 | | 2020 | |
|  | (in thousands) | | | |
|---|---|---|---|---|
| Operating lease expense | $ | 69,831 | $ | 60,450 |
| Sublease income | | (2,478) | | (2,815) |
| Total net lease costs | $ | 67,353 | $ | 57,635 |

## Lease Term and Discount Rate

The weighted-average remaining lease term (in years) and discount rate related to the operating leases were as follows:

|  | For the Year Ended December 31, | |
|  | 2021 | 2020 |
|---|---|---|
| Weighted-average remaining lease term | 6.6 | 7.6 |
| Weighted-average discount rate | 5.0% | 5.5% |

As most of our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease commencement date to determine the present value of lease payments.

**Maturity of Lease Liabilities**

The present value of our operating lease liabilities as of December 31, 2021 were as follows:

| | Operating Leases (in thousands) |
|---|---|
| Year ending December 31, | |
| 2022 | $ 69,857 |
| 2023 | 84,573 |
| 2024 | 82,312 |
| 2025 | 77,406 |
| 2026 | 34,635 |
| Thereafter | 99,092 |
| Total lease payments | $ 447,875 |
| Less: Imputed interest | (69,970) |
| Present value of lease liabilities | $ 377,905 |

As of December 31, 2021, we have additional operating leases for facilities that have not yet commenced with lease obligations of $104.4 million. These operating leases will commence in 2022 with lease terms of greater than one year to ten years. This table does not include lease payments that were not fixed at commencement or modification.

**Other Information**

Cash payments included in the measurement of our operating lease liabilities were $73.9 million and $73.3 million for the years ended December 31, 2021 and 2020, respectively.

Lease liabilities arising from obtaining operating lease right-of-use assets were $99.3 million and $36.2 million for the years ended December 31, 2021 and 2020, respectively.

**10. Strategic Investments**

We hold strategic investments in privately held companies with a carrying value of $262.7 million and $169.5 million as of December 31, 2021 and December 31, 2020, respectively, which consist primarily of equity securities, and to a lesser extent, debt securities. These strategic investments are primarily recorded at fair value on a non-recurring basis. The estimation of fair value for these privately held strategic investments requires the use of significant unobservable inputs, such as the issuance of new equity by the company, and as a result, we deem these assets as Level 3 financial instruments within the fair value measurement framework.

We recognized unrealized gains on investments in privately held companies of $145.0 million and $42.4 million for the year ended December 31, 2021 and 2020, respectively and realized gains of $27.8 million for the year ended December 31, 2021. Unrealized and realized gains on all strategic investments are included within other income (expense), net on the consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Strategic investments are included within other assets on the consolidated balance sheets.

In the fourth quarter of 2021, we reclassified a publicly traded strategic investment to marketable securities. See Note 11 for further information.

All strategic investments are reviewed periodically for impairment. Impairment expense recorded for the year ended December 31, 2020 was $29.5 million. Impairment expense for the year ended December 31, 2021 was not material.

**11. Fair Value Measurements**

Assets and liabilities measured at fair value are classified into the following categories:

- Level 1: Quoted market prices in active markets for identical assets or liabilities.

- Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

- Level 3: Unobservable inputs reflecting the reporting entity's own assumptions or external inputs from inactive markets.

We classify our cash equivalents and marketable securities within Level 1 or Level 2 because we use quoted market prices or alternative pricing sources and models utilizing market observable inputs to determine their fair value.

The following table sets forth our financial assets as of December 31, 2021 and 2020 that are measured at fair value on a recurring basis during the period:

| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| | **December 31, 2021** | | | |
| | | | (in thousands) | |
| Cash | $ 1,966,966 | $ — | $ — | $ 1,966,966 |
| Level 1 securities: | | | | |
| U.S. government securities | 811,092 | 1 | (1,454) | 809,639 |
| U.S. government agency securities | 77,409 | 1 | (8) | 77,402 |
| Publicly traded equity securities[1] | 71,139 | 122,064 | — | 193,203 |
| Level 2 securities: | | | | |
| Corporate debt securities | 143,124 | — | (207) | 142,917 |
| Commercial paper | 422,328 | — | (1) | 422,327 |
| Certificates of deposit | 80,431 | — | — | 80,431 |
| Total | $ 3,572,489 | $ 122,066 | $ (1,670) | $ 3,692,885 |

(1)  In the third quarter of 2021, we reclassified a strategic investment from Level 3 to Level 1 at its fair value using the beginning-of-period approach, following the commencement of public market trading of the investment during the period (which was subject to short-term lock-up restrictions as of December 31, 2021).

| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| | **December 31, 2020** | | | |
| | | | (in thousands) | |
| Cash | $ 464,006 | $ — | $ — | $ 464,006 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,272,125 | 122 | (21) | 1,272,226 |
| U.S. government agency securities | 245,055 | 8 | (24) | 245,039 |
| Level 2 securities: | | | | |
| Corporate debt securities | 81,158 | 1 | (18) | 81,141 |
| Commercial paper | 425,861 | — | — | 425,861 |
| Certificates of deposit | 49,267 | — | — | 49,267 |
| Total | $ 2,537,472 | $ 131 | $ (63) | $ 2,537,540 |

We held an investment in a publicly traded company with a carrying value of $193.2 million as of December 31, 2021, recorded as a marketable security. We recorded $122.1 million in unrealized gains related to this investment. Unrealized gains are included within other income (expense), net on the consolidated statements of operations.

Gross unrealized losses were not material as of December 31, 2021 and December 31, 2020, respectively. As of December 31, 2021, we considered any decreases in fair value on our marketable securities to be driven by factors other than credit risk, including market risk. As of December 31, 2021, $283.1 million of our total $1.5 billion in marketable debt securities have contractual maturities between one and five years. All other marketable debt securities have contractual maturities less than one year.

We carry the Convertible Notes at face value less the unamortized discount and issuance costs on our consolidated balance sheets and present that fair value for disclosure purposes only. As of December 31, 2021, the fair value of the 2027 Notes, the 2025 Notes and the 2026 Notes was $1.1 billion, $650.1 million and $1.9 billion, respectively. The estimated fair value of the Convertible Notes, which are classified as Level 2 financial instruments, was determined based on the estimated or actual bid prices of the Convertible Notes in an over-the-counter market on the last business day of the period.

## 12. Income Taxes

The domestic and foreign components of pre-tax loss were as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2019 | |
| | (in thousands) | | | | | |
| Domestic[1] | $ | 364,989 | $ | (320,757) | $ | (770,448) |
| Foreign[1] | | (839,360) | | (605,428) | | (262,819) |
| Loss before income taxes | $ | (474,371) | $ | (926,185) | $ | (1,033,267) |

(1) Includes the impact of intercompany charges to foreign affiliates for management fees and research and development cost sharing, inclusive of stock-based compensation.

The components of our income tax (benefit) expense were as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2019 | |
| | (in thousands) | | | | | |
| Current: | | | | | | |
| Federal | $ | — | $ | — | $ | — |
| State | | 919 | | 1,035 | | 113 |
| Foreign | | 22,078 | | 23,945 | | 771 |
| Total current income tax expense | | 22,997 | | 24,980 | | 884 |
| Deferred: | | | | | | |
| Federal | | 6,295 | | 1,720 | | 277 |
| State | | 445 | | 414 | | 85 |
| Foreign | | 2,673 | | 4,192 | | 129 |
| Total deferred income tax benefit | | 9,413 | | 6,326 | | 491 |
| Income tax expense | $ | 13,584 | $ | 18,654 | $ | 393 |

The following is a reconciliation of the statutory federal income tax rate to our effective tax rate:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Tax benefit (expense) computed at the federal statutory rate | 21.0% | 21.0% | 21.0% |
| State tax benefit (expense), net of federal benefit[1] | 31.5 | 8.3 | 7.6 |
| Change in valuation allowance | (246.3) | (58.9) | (38.5) |
| Differences between U.S. and foreign tax rates on foreign income | 3.9 | (1.4) | (1.0) |
| Stock-based compensation benefit | 119.3 | 17.8 | 0.8 |
| U.S. federal research & development credit benefit | 36.7 | 8.4 | 6.3 |
| U.K. corporate rate increase | 39.8 | 4.3 | — |
| Acquisitions and divestitures | (8.0) | (0.5) | 3.5 |
| Other benefits (expenses) | (0.8) | (1.0) | 0.3 |
| Total income tax benefit (expense) | (2.9)% | (2.0)% | (0.0)% |

(1) Inclusive of state research and development credits

The significant components of net deferred tax balances were as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| | (in thousands) | |
| Deferred tax assets: | | |
| Accrued expenses | $ 30,169 | $ 23,719 |
| Intangible assets | 183,441 | 175,397 |
| Stock-based compensation | 61,885 | 41,246 |
| Loss carryforwards | 2,631,230 | 1,714,870 |
| Tax credit carryforwards | 715,844 | 460,302 |
| Lease liability | 93,312 | 80,794 |
| Other | 29,572 | 6,374 |
| Total deferred tax assets | $ 3,745,453 | $ 2,502,702 |
| Deferred tax liabilities: | | |
| Convertible debt | — | (138,832) |
| Right-of-use asset | (75,782) | (63,122) |
| Investments[1] | (66,792) | (3,862) |
| Other | (2,549) | (3,532) |
| Total deferred tax liabilities | $ (145,123) | $ (209,348) |
| Total net deferred tax assets before valuation allowance | 3,600,330 | 2,293,354 |
| Valuation allowance | (3,611,242) | (2,293,361) |
| Net deferred taxes | $ (10,912) | $ (7) |

(1) For the year ended December 31, 2020 was originally included in "Other Liabilities" in our December 31, 2020 Annual Report as it was not significant. The increase in the current year is primarily due to unrealized gains on our marketable securities and strategic investments.

Income tax expense was $13.6 million for the year ended December 31, 2021, compared to a tax expense of $18.7 million for the year ended December 31, 2020.

On July 22, 2020 the U.K. Finance Bill 2020 was enacted, increasing the U.K. tax rate from 17% to 19% effective April 1, 2020. On June 10, 2021, the U.K. Finance Act 2021 was enacted to further increase the tax rate from 19% to 25% effective April 1, 2023. These changes to the U.K. tax rate resulted in an increase to our U.K. net deferred tax assets (before valuation allowance) of $188.9 million and $39.7 million for the periods ending December 31, 2021 and 2020, respectively, both of which were fully offset by an increase in our valuation allowance.

Prior to January 1, 2021, the separation of the Convertible Notes into liability and equity components resulted in a temporary difference for which a net deferred tax liability, with an offsetting valuation allowance, was recognized in additional paid-in capital. Upon the adoption of ASU 2020-06 on January 1, 2021, the existing temporary difference on the Convertible

Notes was eliminated, which resulted in the derecognition of a $138.8 million deferred tax liability. Both the $138.8 million reduction to deferred tax liability and the offsetting increase to our valuation allowance were recorded to additional paid-in capital and accumulated deficit under the modified retrospective approach.

As of December 31, 2021, we had an immaterial amount of unremitted earnings related to certain foreign subsidiaries. We intend to continue to reinvest these foreign earnings indefinitely and do not expect to incur any significant taxes related to such amounts.

As of December 31, 2021, we had accumulated U.S. federal and state net operating loss carryforwards of $7.5 billion and $4.4 billion, respectively. Of the $7.5 billion of federal net operating loss carryforwards, $1.6 billion was generated before January 1, 2018 and is subject to a 20-year carryforward period. The remaining $5.9 billion can be carried forward indefinitely but is subject to an 80% taxable income limitation. The pre-2018 federal and certain state net operating loss carryforwards will begin to expire in 2031 and 2025, respectively. As of December 31, 2021, we had $3.2 billion of U.K. net operating loss carryforwards that can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income. As of December 31, 2021, we had accumulated U.S. federal and state research tax credits of $476.6 million and $292.8 million, respectively. The U.S. federal research tax credits will begin to expire in 2032. The U.S. state research tax credits do not expire.

We recognize valuation allowances on deferred tax assets if it is more likely than not that some or all of the deferred tax assets will not be realized. We had valuation allowances against net deferred tax assets of $3.6 billion and $2.3 billion as of December 31, 2021 and 2020, respectively. In 2021, the increase in the valuation allowance was primarily attributable to a net increase in our deferred tax assets resulting from the loss from operations, the U.K. tax rate increase, windfall tax benefits from share-based compensation, and the recognition of valuation allowance in additional paid-in-capital related to the adoption of ASU 2020-06 pertaining to the Convertible Notes.

**Uncertain Tax Positions**

The following table summarizes the activity related to our gross unrecognized tax benefits during the years ended December 31, 2021 and 2020:

|  | Year Ended December 31, | |
|  | 2021 | 2020 |
|  | (in thousands) | |
| Beginning balance of unrecognized tax benefits | $ 344,971 | $ 286,605 |
| Additions for current year tax positions | 119,938 | 56,226 |
| Additions for prior year tax positions | 180 | 3,218 |
| Reductions for prior year tax positions | (996) | (712) |
| Changes due to lapse of statute of limitations | (2,077) | (570) |
| Changes due to foreign currency translation adjustments | (357) | 204 |
| U.K. corporate rate increase | 7,914 | — |
| Ending balance of unrecognized tax benefits (excluding interest and penalties) | $ 469,573 | $ 344,971 |
| Interest and penalties associated with unrecognized tax benefits | 124 | 357 |
| Ending balance of unrecognized tax benefits (including interest and penalties) | $ 469,697 | $ 345,328 |

The total amount of gross unrecognized tax benefits, including related interest and penalties, was $469.7 million and $345.3 million as of December 31, 2021 and 2020, respectively.

Substantially all of the unrecognized tax benefit was recorded as a reduction in our gross deferred tax assets, offset by a corresponding reduction in our valuation allowance. We have net unrecognized tax benefits of $15.9 million and $11.8 million that is included in other liabilities on our consolidated balance sheet as of December 31, 2021 and 2020, respectively. Assuming there continues to be a valuation allowance against deferred tax assets in future periods when gross unrecognized tax benefits are realized, this would result in a tax benefit of $15.9 million within our provision of income taxes at such time.

Our policy is to recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheet. During the year ended December 31, 2021, interest expense recorded related to uncertain tax positions was not material.

The income taxes we pay are subject to review by taxing jurisdictions globally. Our estimate of the potential outcome of any uncertain tax position is subject to management's assessment of relevant risks, facts, and circumstances existing at that time. We believe that our estimate has adequately provided for these matters. However, our future results may include adjustments to estimates in the period the audits are resolved, which may impact our effective tax rate.

Tax years ending on or after December 31, 2012 are subject to examination in the U.S., and tax years ending on or after December 31, 2020 are subject to examination in the U.K. We are currently under examination by the U.S. Internal Revenue Service for the tax year ending December 31, 2018.

## 13. Accumulated Other Comprehensive Income (Loss)

The table below presents the changes in accumulated other comprehensive income (loss) ("AOCI") by component and the reclassifications out of AOCI:

| | Changes in Accumulated Other Comprehensive Income (Loss) by Component | | |
| --- | --- | --- | --- |
| | Marketable Securities | Foreign Currency Translation | Total |
| | | (in thousands) | |
| Balance at December 31, 2020 | $ (87) | $ 21,450 | $ 21,363 |
| OCI before reclassifications | (1,664) | (14,107) | (15,771) |
| Amounts reclassified from AOCI [1] | (71) | — | (71) |
| Net current period OCI | (1,735) | (14,107) | (15,842) |
| Balance at December 31, 2021 | $ (1,822) | $ 7,343 | $ 5,521 |

(1) Realized gains and losses on marketable securities are reclassified from AOCI into other income (expense), net in the consolidated statements of operations.

**14. Property and Equipment, Net**

Property and equipment, net, consisted of the following:

|  | As of December 31, | |
|  | 2021 | 2020 |
|  | (in thousands) | |
|---|---|---|
| Computer hardware and software | $ 51,984 | $ 35,040 |
| Leasehold improvements | 203,124 | 175,850 |
| Furniture and equipment | 78,492 | 74,987 |
| Construction in progress | 44,304 | 27,284 |
| Total | 377,904 | 313,161 |
| Less: accumulated depreciation and amortization | (175,260) | (134,452) |
| Property and equipment, net | $ 202,644 | $ 178,709 |

Depreciation and amortization expense on property and equipment was $55.9 million, $53.2 million, and $53.8 million for the years ended December 31, 2021, 2020, and 2019, respectively.

The following table lists property and equipment, net by geographic area:

|  | As of December 31, | |
|  | 2021 | 2020 |
|  | (in thousands) | |
|---|---|---|
| Property and equipment, net: | | |
| United States | $ 174,826 | $ 157,596 |
| Rest of world [1] | 27,818 | 21,113 |
| Total property and equipment, net | $ 202,644 | $ 178,709 |

(1)  No individual country exceeded 10% of our total property and equipment, net for any period presented.

## 15. Balance Sheet Components

Accrued expenses and other current liabilities at December 31, 2021 and 2020 consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| | (in thousands) | |
| Accrued compensation and related expenses | $ 177,659 | $ 141,046 |
| Accrued infrastructure costs | 168,942 | 138,082 |
| Partner revenue share liability | 86,991 | 92,092 |
| Acquisition liability | 49,870 | 55,098 |
| Other operating costs | 48,635 | 30,713 |
| Deferred revenue | 44,473 | 27,814 |
| Other | 97,538 | 69,497 |
| Total accrued expenses and other current liabilities | $ 674,108 | $ 554,342 |

Other liabilities at December 31, 2021 and 2020 consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| | (in thousands) | |
| Acquisition liability | $ 280,194 | $ 48,662 |
| Other | 35,562 | 15,812 |
| Total other liabilities | $ 315,756 | $ 64,474 |

## 16. Employee Benefit Plans

We have a defined contribution 401(k) plan (the "401(k) Plan") for our U.S.-based employees. The 401(k) Plan is available for all full-time employees who meet certain eligibility requirements. Eligible employees may contribute up to 100% of their eligible compensation, but are limited to the maximum annual dollar amount allowable under the Code. We match 100% of each participant's contribution up to a maximum of 3% of the participant's eligible compensation paid during the period, and we match 50% of each participant's contribution between 3% and 5% of the participant's eligible compensation paid during the period. During the years ended December 31, 2021, 2020, and 2019, we recognized expense of $25.0 million, $18.4 million, and $15.4 million, respectively, related to matching contributions.

## 17. Related Party Transactions

In November 2020, we entered into a ground sublease with an entity that is controlled by our CEO that allows us to build and operate a hangar to support our aviation program. This entity subleases the ground to us for $0 and in exchange may utilize a specified percentage of the hangar space. If the entity needs additional space within the hangar, it will pay rent to Snap at a fair market value rate determined at the time this arrangement was entered into. Any space utilized by this entity will be space that is not required for Snap's aviation program. Subject to certain limited exceptions, neither party may terminate this sublease for at least six years. After this period, Snap or this entity may terminate the lease at any time on 24 months' prior written notice. Upon termination of the sublease, this entity will purchase the hangar from Snap at its fair market value on the termination date.

The value of these arrangements is not material to our consolidated financial statements for the current period or for the term of the agreement.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2021, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in this Annual Report on Form 10-K was (a) reported within the time periods specified by SEC rules and regulations, and (b) communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding any required disclosure.

*Changes in Internal Control*

During the first quarter of 2021, we completed the initial phase of our new enterprise resource planning, or ERP, system implementation and migrated our general ledger, consolidation, and planning processes onto the new system. In connection with this implementation, we modified the design and documentation of our internal control processes and procedures relating to the new system. As the phased implementation of the new ERP system continues, we could have changes to our processes and procedures, which in turn, could result in changes to our internal control over financial reporting. As such changes occur, we will evaluate quarterly whether they materially affect our internal control over financial reporting.

Following implementation, the changes to our control environment were validated according to our established processes. No other changes in our internal control over financial reporting were identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Limitations on Effectiveness of Controls and Procedures*

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

*Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2021 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

**Item 9B. Other Information.**

*2022 Discretionary Bonus Program*

On February 2, 2022, the compensation committee of the board of directors approved the 2022 Bonus Program. The 2022 Bonus Program provides executive officers and other eligible employees the opportunity to earn bonuses based on the level of achievement of certain corporate objectives and key results from January 1, 2022 through December 31, 2022.

The compensation committee will set the corporate objectives and key results based on the recommendations of the chief executive officer, and determine the degree to which they have been met after considering the recommendations of management. Each eligible participant in the 2022 Bonus Program may receive a bonus in an amount up to 100% of such participant's annual base salary earned in 2022. The compensation committee may pay all or any portion of an earned bonus in shares of Class A common stock granted under the Snap Inc. 2017 Equity Incentive Plan. The compensation committee also has the right to adjust the bonus target of any participant upward in the event of over-achievement of the corporate objectives and key results.

There is no set formula for determining the bonus amount under the 2022 Bonus Program based on the achievement of the corporate objectives and key results. Rather, the compensation committee will exercise its discretion in determining the bonus amount actually earned by each participant. Awards under the 2022 Bonus Program are expected to occur in the first quarter of 2023. A participant must remain an employee on the payment date under the 2022 Bonus Program to be eligible to earn a bonus.

The description of the 2022 Bonus Program does not purport to be complete and is qualified in its entirety by reference to the 2021 Bonus Program, a copy of which is attached as Exhibit 10.22 and incorporated by reference.

We are including this disclosure in this Form 10-K rather than filing a Form 8-K under Item 5.02 at a later date.

**Item 9C. Disclosure Regarding Foreign Jurisdictions That Prevent Inspections.**

Not applicable.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance.**

The following table sets forth information for our directors and executive officers, and their ages as of December 31, 2021.

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| Evan Spiegel | 31 | Co-Founder, Chief Executive Officer, and Director |
| Robert Murphy | 33 | Co-Founder, Chief Technology Officer, and Director |
| Derek Andersen | 43 | Chief Financial Officer |
| Jeremi Gorman | 44 | Chief Business Officer |
| Jerry Hunter | 57 | Senior Vice President, Engineering |
| Rebecca Morrow | 48 | Chief Accounting Officer and Controller |
| Michael O'Sullivan | 56 | General Counsel |
| *Non-Employee Directors* | | |
| Michael Lynton(1)(2) | 62 | Director and Chairman of the Board |
| Kelly Coffey(3) | 56 | Director |
| Joanna Coles(2) | 59 | Director |
| Liz Jenkins(3) | 44 | Director |
| A.G. Lafley(1)(2)(4) | 74 | Director |
| Stanley Meresman(3) | 75 | Director |
| Scott D. Miller(1)(3) | 69 | Director |
| Poppy Thorpe(1)(3) | 37 | Director |
| Fidel Vargas | 53 | Director |

(1)   Member of the compensation committee.
(2)   Member of the nominating and corporate governance committee.
(3)   Member of the audit committee.
(4)   Mr. Lafley resigned as a member of our board of directors, effective December 31, 2021. Committee membership noted is as of 2021.

**Executive Officers**

*Evan Spiegel.* Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. We believe that Mr. Spiegel is qualified to serve as a member of our board based on the perspective and experience he brings as our co-founder and Chief Executive Officer.

*Robert Murphy.* Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Murphy is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Technology Officer.

*Derek Andersen.* Mr. Andersen has served as Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A from Acadia University, an M.B.A from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

*Jeremi Gorman.* Ms. Gorman has served as our Chief Business Officer since November 2018. Ms. Gorman was employed at Amazon.com, Inc., serving as Head of Global Field Advertising Sales from June 2018 to November 2018, as Head of Field Advertising Sales, U.S. from April 2015 to June 2018, and as Head of Entertainment Advertising Sales from 2012 to April 2015. Ms. Gorman serves on the board of directors of Samba TV, Inc. Ms. Gorman holds a B.A. from the University of California, Los Angeles.

*Jerry Hunter.* Mr. Hunter has served as our Senior Vice President, Engineering since November 2017 and previously served as Vice President of Core Engineering since October 2016. From August 2010 to October 2016, Mr. Hunter served as Vice President of Infrastructure at Amazon.com, Inc., and previously as Vice President of Corporate Applications at Amazon.com, Inc. from October 2007 to August 2010. Mr. Hunter holds a B.S. and M.S. in Systems Engineering from the University of Arizona.

*Rebecca Morrow.* Ms. Morrow has served as our Chief Accounting Officer and Controller since September 2019. From January 2018 to August 2019, Ms. Morrow served as Chief Accounting Officer at GoDaddy Inc., and previously served as Vice President of Finance and

Head of Technical Accounting and Reporting from March 2015 to January 2018. Prior to that, Ms. Morrow served in various roles at Deloitte & Touche LLP, most recently serving as Managing Director in the Advisory Services practice from August 2013 to March 2015, and as Senior Manager in the Advisory Services practice from October 2008 to August 2013. Ms. Morrow holds a B.S. degree in Business and Accounting from the University of Idaho and a Masters of Accountancy degree from the David Eccles School of Business of the University of Utah.

*Michael O'Sullivan*. Mr. O'Sullivan has served as our General Counsel since July 2017. From 1992 to July 2017, Mr. O'Sullivan was a lawyer in private practice. He served since 1996 as a lawyer at the law firm of Munger, Tolles & Olson LLP in Los Angeles, California, where he focused his practice on advising companies, their boards of directors, and founders on corporate transactions, governance matters, and significant disputes. Mr. O'Sullivan holds a J.D. from University of Southern California's Gould School of Law and a B.A. from University of Pennsylvania.

**Non-Employee Directors**

*Michael Lynton*. Mr. Lynton has served on our board of directors since April 2013 and has been Chairman of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton has served as a member of the board of directors of Ares Management Corp, Warner Music Group Corp., Schrodinger, Inc., and The Boston Beer Company. Mr. Lynton also served as a member of the board of directors of Pandora Media, Inc. from August 2017 until February 2019 and Pearson plc, from January 2018 to April 2021. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School. We believe that Mr. Lynton is qualified to serve as a member of our board of directors and Chairman due to his extensive leadership experience.

*Kelly Coffey*. Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey has served as Chief Executive Officer at City National Bank, a subsidiary of the Royal Bank of Canada (RBC), since February 2019. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently serving as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College. We believe that Ms. Coffey is qualified to serve as a member of our board of directors due to her extensive leadership experience.

*Joanna Coles*. Ms. Coles has served on our board of directors since December 2015. Ms. Coles served as Chairperson and Chief Executive Officer of Northern Star Acquisition Corp. since July 2020, until its merger with Bark, Inc. (formerly Barkbox Inc.) in June 2021. Ms. Coles has served as Chairperson and Chief Executive Officer of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV since November 2020. Prior to joining the Northern Star entities, Ms. Coles served as Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Bark, Inc., Sonos, Inc., and is on the board of Women Entrepreneurs New York City, an initiative to encourage female entrepreneurship, with a focus on underserved communities. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia. We believe that Ms. Coles is qualified to serve as a member of our board of directors due to her extensive experience working with content providers and advertisers.

*Liz Jenkins*. Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) since January 2021, and served as Chief Financial Officer at Be Sunshine, LLC (Hello Sunshine) from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October 2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves on the board of GLAAD. Ms. Jenkins holds an MBA from The Wharton School at the University of Pennsylvania and a BA in Economics from Stanford University. We believe that Ms. Jenkins is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies.

*Stanley Meresman*. Mr. Meresman has served on our board of directors since July 2015. During the last ten years, Mr. Meresman has served on the boards of directors of various public and private companies, including service as chair of the audit committee for some of these companies. He currently serves on the board of directors and as chair of the audit committee of Cloudflare, Inc., DoorDash, Inc., and Guardant Health, Inc. He served as a member of the board of directors and as chair of the audit committees of Palo Alto Networks, Inc. from September 2014 to December 2018, LinkedIn Corporation from October 2010 to December 2016, and Zynga Inc. from June 2011 to June 2015, and Medallia, Inc. from June 2015 to October 2021; and on the board of directors of Meru Networks, Inc. from September 2010 to May 2013, and Riverbed Technology, Inc. from March 2005 to May 2012. He also serves on the board of trustees of the Panetta Institute of Public Policy, a non-profit organization. From January 2004 to December 2004, Mr. Meresman was a Venture Partner with Technology Crossover Ventures, a private equity firm, and was General Partner and Chief Operating Officer of Technology Crossover Ventures from November 2001 to December 2003. During the four years before joining Technology Crossover Ventures, Mr. Meresman was a private investor and board member and advisor to several technology companies. From 1989 to 1997, Mr. Meresman served as the Senior Vice President and Chief Financial Officer of Silicon Graphics, Inc. Mr. Meresman holds a B.S. in Industrial Engineering and Operations Research from the

104

University of California, Berkeley and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Meresman is qualified to serve as a member of our board of directors and chair of our audit committee due to his background as a member of the board and chair of the audit committee of other public companies and his financial and accounting expertise from his prior extensive experience as chief financial officer of two publicly traded companies.

*Scott D. Miller*. Mr. Miller has served on our board of directors since October 2016. Mr. Miller is a founder and Chief Executive Officer of Council Advisors (formerly known as G100 Companies), and is also a founder and chairman of G100 Network and SSA & Company. Before joining Council Advisors in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller served on the boards of QTS Realty Trust, Inc. from 2013 to 2021, Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago. We believe that Mr. Miller is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Poppy Thorpe*. Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe is a freelance brand consultant. Previously, Ms. Thorpe served as Chief Marketing Officer at Sesame Inc. from March 2020 to May 2021, Head of Brand Marketing at Glossier Inc., a beauty brand, from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017. Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco. We believe that Ms. Thorpe is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies and with advertisers.

*Fidel Vargas*. Mr. Vargas has served on our board of directors since July 2021. Mr. Vargas has served as Chief Executive Officer of the Hispanic Scholarship Fund since January 2013. Prior to joining the Hispanic Scholarship Fund, Mr. Vargas worked as a Partner at Centinela Capital Partners from June 2006 to December 2012, and from 1992 to 1997, Mr. Vargas served as Mayor for the City of Baldwin Park, California. Mr. Vargas serves on the President's Commission on White House Fellowships. Mr. Vargas holds an M.B.A. and an A.B. in Social Studies from Harvard University. We believe that Mr. Vargas is qualified to serve as a member of our board of directors due to his extensive leadership experience.

There are no family relationships among any of the directors or executive officers.

## Independent Chairman

Our board of directors appointed Mr. Lynton to serve as our independent Chairman of our board of directors in September 2016. As Chairman of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present. Mr. Lynton also performs such additional duties as our board of directors may otherwise determine and delegate. Mr. Lynton is an independent director and satisfies the independence requirements under NYSE listing standards.

## Composition of Our Board of Directors

Our board of directors may establish the authorized number of directors from time to time by resolution. Our board of directors currently consists of ten members.

No stockholder has any special rights regarding the election or designation of members of our board of directors. There is no contractual arrangement by which any of our directors are appointed to our board of directors. Our current directors will continue to serve as directors until our 2022 annual meeting of stockholders and until their successor is duly elected, or if sooner, until their earlier death, resignation, or removal.

So long as any shares of our Class C common stock are outstanding, we will not have a classified board of directors, and all directors will be elected for annual terms.

Following the conversion of all of our Class C common stock to Class B common stock, and subsequent conversion of all of our Class B common stock to Class A common stock, we will have a classified board of directors consisting of three classes. Each class will be approximately equal in size, with each director serving staggered three-year terms. Directors will be assigned to a class by the then-current board of directors.

When our board of directors is classified, we expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control.

Our board of directors held five meetings during 2021. No member of our board of directors attended fewer than 75% of the aggregate of (a) the total number of meetings of the board of directors (held during the period for which he or she was a director) and (b) the total

number of meetings held by all committees of the board of directors on which such director served (held during the period that such director served). Members of our board of directors are invited and encouraged to attend our annual meeting of stockholders. In 2021, eight members of our board of directors attended our annual meeting of stockholders.

## Executive Sessions of Independent Directors

In order to promote open discussion among non-management directors, and as required under applicable NYSE rules, our board of directors conducts executive sessions of non-management directors during each regularly scheduled board meeting and at such other times if requested by a non-management director. In 2021, the non-management directors met in executive session at least once. The non-management directors provide feedback to executive management, as needed, promptly after the executive session. Neither Mr. Spiegel nor Mr. Murphy participates in such sessions. As Chairman of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present.

## Committees of Our Board of Directors

Our board of directors has established an audit committee, a compensation committee, and a nominating and corporate governance committee. The composition and responsibilities of each of these committees of our board of directors are described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Our board of directors may have or establish other committees as it deems necessary or appropriate from time to time.

### Audit Committee

Our audit committee consists of Ms. Coffey, Ms. Jenkins, Mr. Meresman, Mr. Miller, and Ms. Thorpe, each of whom our board of directors has determined satisfies the independence requirements under NYSE listing standards and Rule 10A-3(b)(1) of the Exchange Act. The chair of our audit committee is Mr. Meresman, who our board of directors has determined is an "audit committee financial expert" within the meaning of SEC regulations. Each member of our audit committee can read and understand fundamental financial statements in accordance with applicable requirements. In arriving at these determinations, the board of directors has examined each audit committee member's scope of experience and the nature of their employment in the corporate finance sector. No member of the audit committee, other than Mr. Meresman, simultaneously serves on the audit committees of more than three public companies. Mr. Meresman currently serves on the audit committees of three other public companies, and for a part of 2021 served on the audit committees of four other public companies, in addition to our company. Our board of directors has determined that such simultaneous service would not impair the ability of Mr. Meresman to effectively serve on our audit committee. During 2021, the audit committee met six times. Our board of directors has adopted a written charter for the audit committee, which is available on our website at www.snap.com.

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits, and to oversee our independent registered accounting firm.

Specific responsibilities of our audit committee include:

- helping our board of directors oversee our corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related person transactions;

- reviewing cybersecurity and data privacy risks;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes our internal quality control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and

- approving, or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

### Compensation Committee

Our compensation committee consists of Mr. Lynton, Mr. Miller, and Ms. Thorpe. Mr. Lafley was a member of the compensation committee until his resignation from the board of directors, effective December 31, 2021. Our board of directors has determined that each of

Mr. Lynton, Mr. Miller, and Ms. Thorpe is, and in 2021 Mr. Lafley was, independent under NYSE listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act. The chair of our compensation committee is Mr. Lynton. During 2021, the compensation committee met five times. Our board of directors has adopted a written charter for the compensation committee, which is available on our website at www.snap.com.

The primary purpose of our compensation committee is to discharge the responsibilities of our board of directors in overseeing our compensation policies, plans, and programs and to review and determine the compensation to be paid to our executive officers, directors, and other senior management, as appropriate.

Specific responsibilities of our compensation committee include:

- reviewing and approving the compensation of our Chief Executive Officer, other executive officers, and senior management;

- reviewing and recommending to our board of directors the compensation paid to our directors;

- reviewing and approving the compensation arrangements with our executive officers and other senior management;

- administering our equity incentive plans and other benefit programs;

- reviewing, adopting, amending, and terminating incentive compensation and equity plans, severance agreements, profit sharing plans, bonus plans, change-of-control protections, and any other compensatory arrangements for our executive officers and other senior management;

- reviewing, evaluating, and recommending to our board of directors succession plans for our executive officers; and

- reviewing and establishing general policies relating to compensation and benefits of our employees, including our overall compensation philosophy.

See the sections titled "Item 11. Executive Compensation—Compensation Discussion and Analysis" and "—Director Compensation" for a description of our processes and procedures for the consideration and determination of executive officer and director compensation.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Ms. Coles, Mr. Lynton, and Mr. Vargas. As of January 1, 2022, Ms. Coles became the chair of our nominating and corporate governance committee and Mr. Vargas joined as a member of the nominating and corporate governance committee. Mr. Lafley was a member, and served as the chairman of, our nominating and corporate governance committee until his resignation from the board of directors, effective December 31, 2021. Our board of directors has determined that each current member, and member during 2021, of the nominating and corporate governance committee is and was, respectively, independent under the NYSE listing standards, a non-employee director, and free from any relationship that would interfere with the exercise of his or her independent judgment. During 2021, the nominating and corporate governance committee met four times. Our board of directors has adopted a written charter for the nominating and corporate governance committee, which is available on our website at www.snap.com.

Specific responsibilities of our nominating and corporate governance committee include:

- identifying and evaluating candidates, including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on our board of directors;

- considering and making recommendations to our board of directors regarding the composition and chairmanship of the committees of our board of directors;

- instituting plans or programs for the continuing education of our board of directors and orientation of new directors;

- developing and making recommendations to our board of directors regarding corporate governance guidelines and matters; and

- overseeing periodic evaluations of the board of directors' performance, including committees of the board of directors and management.

### Code of Conduct

We have adopted a Code of Conduct that applies to all our employees, officers, and directors. This includes our principal executive officer, principal financial officer, and principal accounting officer or controller, or persons performing similar functions. The full text of our Code of Conduct is available on our website at www.snap.com. We intend to disclose on our website any future amendments of our Code of Conduct or waivers that exempt any principal executive officer, principal financial officer, principal accounting officer or controller, persons performing similar functions, or our directors from provisions in the Code of Conduct. You can request a copy of our Code of Conduct by writing to our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

Our board of directors believes that good corporate governance is important to ensure that the company is managed for the long-term benefit of our stockholders. The full text of our corporate governance guidelines is also available on our website at www.snap.com.

**Procedures by Which Stockholders May Nominate Directors**

The nominating and corporate governance committee and our board of directors will review and evaluate candidates proposed by stockholders. The nominating and corporate governance committee and our board of directors will apply the same criteria, and follow substantially the same process in considering the candidates, as they do in considering other candidates. The factors generally considered by the nominating and corporate governance committee and our board of directors are set out in our Corporate Governance Guidelines, which are available on our website at www.snap.com. If a stockholder who is eligible to vote at the 2022 annual meeting of stockholders wishes to nominate a candidate to be considered for election as a director, it must comply with the procedures set forth in our bylaws and give timely notice of the nomination in writing to our Secretary. All stockholder proposals should be marked for the attention of our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

**Communications with the Board of Directors**

Any stockholder, including a holder of Class A common stock, or any interested party may contact our board of directors regarding genuine issues or questions about us by sending a letter to the board of directors at: Snap Inc., c/o Secretary, 3000 31st Street, Santa Monica, CA 90405, Attention: Board of Directors. Each communication should specify the person sending the communication, the general topic of the communication, and the class and number of shares of our stock that are owned of record (if a record holder) or beneficially (if not a record holder). If any stockholder, including a holder of Class A common stock, wants to contact the independent members of the board of directors, the stockholder should address the communication to the attention of the Chairman (c/o Secretary) of the board of directors at the address above. Our legal department will review communications before forwarding them to the recipient, and will not forward a communication that is unrelated to the duties and responsibilities of the board of directors, irrelevant, primarily commercial in nature, addressed already on our website or in other filings, or is unduly hostile, threatening, illegal, or similarly unsuitable. Any communication that is not forwarded will be made available to any director on request.

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires our executive officers and directors to file initial reports of ownership and reports of changes in ownership with the SEC and to furnish us with copies of all Section 16(a) forms they file. Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Section 16 of the Exchange Act. For more information, see "Risk Factors—Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock."

To our knowledge, based solely on our review of the copies of such reports furnished to us or written representations from such persons, we believe that, with respect to the year ended December 31, 2021, such persons complied with all such filing requirements, except Mr. O'Sullivan inadvertently filed one late Form 4 with respect to four transactions.

## Item 11. Executive Compensation.

## Compensation Discussion and Analysis

The compensation provided to our named executive officers is detailed in the Summary Compensation Table, other tables and the accompanying footnotes, and narrative following this section. This compensation discussion and analysis summarizes the material aspects of our compensation programs that we provide to our named executive officers. Our named executive officers for 2021 were:

- Evan Spiegel, Co-Founder and Chief Executive Officer;
- Derek Andersen, Chief Financial Officer;
- Jeremi Gorman, Chief Business Officer;
- Jerry Hunter, Senior Vice President, Engineering;
- Michael O'Sullivan, General Counsel; and
- Jared Grusd, former Chief Strategy Officer.

Our board of directors has delegated to the compensation committee the authority and responsibility for reviewing, evaluating, and determining the compensation to be paid to executive officers, overseeing our compensation policies, and administering the compensation plans and programs for Snap.

## General Compensation Philosophy and Objectives

*Philosophy*

We believe that reinventing the camera represents our greatest opportunity to improve the way that people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together. We seek kind, smart, and creative individuals to accomplish this goal. Our compensation philosophy supports this goal by attracting the best people to join Snap and incentivizing them to innovate, create, and drive long-term results.

Today, we compensate our executive officers mostly with equity that vests over multiple years. Our focus on equity compensation encourages executives to operate like owners, linking their interests with the interests of our stockholders. As our company grows, we will continue to evaluate our compensation philosophy and programs to ensure they continue to meet our objectives.

### Objectives

We designed our compensation program for all employees, including our named executive officers, to support four main objectives:

- recruit and retain the most talented people in a competitive market;

- reinforce our values, which serve to motivate our employees to deliver the highest level of performance;

- reward success when both our company and the individual succeed; and

- align employee and stockholder interests to share in long-term success.

## Compensation-Setting Process

### Compensation Committee's Role

The compensation committee has overall responsibility for determining the compensation of our executive officers, including our Chief Executive Officer. Members of the compensation committee are appointed by our board of directors. The compensation committee consists of three members of our board of directors: Michael Lynton, Scott D. Miller, and Poppy Thorpe. In 2021, A.G. Lafley served as a member of the compensation committee until his resignation from the board of directors, effective December 31, 2021. No member of the compensation committee are, or were in 2021, an executive officer of Snap, and each of them qualifies, or in the case of Mr. Lafley, qualified in 2021, as an "independent director" under the NYSE rules.

### Compensation Consultant's Role

The compensation committee has the authority to engage the services of outside consultants. The compensation committee first retained FW Cook, a national compensation consulting firm, in 2017 as its independent compensation consultant. FW Cook reports directly to the compensation committee.

In January 2022, our compensation committee reviewed FW Cook's independence under applicable SEC and NYSE rules. Our compensation committee concluded that FW Cook is independent within the meaning of such rules and that its engagement did not present any conflict of interest.

### Management's Role

Management makes recommendations to the compensation committee regarding our compensation programs and policies, and implements the programs and policies approved by the compensation committee. Our Chief Executive Officer makes recommendations to the compensation committee with respect to compensation for our executive officers, including our named executive officers, other than himself. The compensation committee considers our Chief Executive Officer's recommendations, but ultimately has final approval of all compensation for our executive officers, including the types of award and specific amounts. All such determinations by our compensation committee are discretionary. Our co-founders, who serve as Chief Executive Officer and Chief Technology Officer, respectively, each have base salaries of $1 per year and did not receive any equity awards in 2021.

No executive officer participated directly in the final deliberations or determinations regarding his or her own compensation package or was present during such determinations.

The compensation committee meets regularly in executive session. Our Chief Executive Officer is not present during compensation committee deliberations or votes on his compensation and also recuses himself from sessions of our board of directors where they act on his compensation.

**Peer Group**

We analyze market data for executive compensation periodically using the most relevant published survey sources, information available from public filings, and input from our compensation consultants. In 2021, the compensation committee requested that FW Cook perform a detailed review of our peer group, considering appropriateness of the current peer companies and potential additions based on similarity in market capitalization size and industry. Based on those considerations and FW Cook's review, our compensation committee approved removing Dropbox, Electronic Arts, IAC/InterActive, Slack, and VMWare and adding Etsy, Roku, ServiceNow, Shopify, Block (formerly Square), Uber, and Zoom Video. Our peer group for 2021 consisted of the following companies:

| | | |
|---|---|---|
| Activision Blizzard | Pinterest | Twilio |
| Autodesk | Roku | Twitter |
| DocuSign | ServiceNow | Uber |
| Etsy | Shopify | Workday |
| Intuit | Spotify | Zillow Group |
| Match Group | Block (formerly Square) | Zoom Video |

We use the peer group as a general reference. In addition to the peer group, we also rely on the knowledge and experience of our compensation committee members and our management in determining the appropriate compensation for our executive officers.

**Elements of Executive Compensation**

Our current compensation program generally consists of the following components:

- base salary;
- equity-based awards;
- annual incentive compensation; and
- other benefits.

We combine these elements to formulate compensation packages that provide competitive pay, reward achievement of financial, operational, and strategic objectives, and align the interests of our executive officers with those of our stockholders. The overall use and weight of each compensation element is based on our subjective determination of the importance of each element in meeting our overall objectives, including motivating executive officers with an owner's mentality.

***Base Salary***

We review the base salaries of our executive officers annually and may adjust them from time to time, if needed, to reflect changes in market conditions or other factors. Base salaries of our executive officers generally remain below the 50th percentile compared to our peer group, primarily because we compensate our executive officers mostly with equity awards.

The table below sets forth information regarding the year-end base salary amounts for 2021 for our named executive officers. Other than Mr. Grusd, no base salaries were changed for any of our named executive officers in 2021.

| Name | 2021 Base Salary |
|---|---|
| Evan Spiegel | $ 1 |
| Derek Andersen | 500,000 |
| Jeremi Gorman | 500,000 |
| Jerry Hunter | 500,000 |
| Michael O'Sullivan | 500,000 |
| Jared Grusd(1) | 500,000 |

(1)   Mr. Grusd served as our Chief Strategy Officer until January 31, 2021, and then transitioned to a Strategic Advisor. Through January 31, 2021, Mr. Grusd's annual base salary was $500,000.

### Equity-based Awards

The majority of the total compensation for our executive officers, including our named executive officers, is provided through equity awards. By having a significant portion of our executive officers' total compensation payable in the form of equity awards that vest over a number of years and are thus subject to higher risk, our executive officers are motivated to align their long-term financial interests with those of our stockholders.

We generally issue three forms of equity awards:

*Restricted Stock Awards.* RSAs represent one share of Class A common stock for each award granted, subject to a forfeiture condition, so the value of the RSAs is tied to the performance of our Class A common stock. The forfeiture condition will typically lapse over multiple years, subject to continued service through each lapse date.

*Restricted Stock Units.* RSUs represent the right to receive one share of Class A common stock for each unit granted, subject to a continued service requirement, so the value of the RSUs is tied to the performance of our Class A common stock. RSUs typically vest over multiple years, subject to continued service through each vesting date.

RSAs and RSUs align the interests of our executive officers and other employees with those of our stockholders. Because RSAs and RSUs have value to the recipient even in the absence of stock price appreciation, these forms of equity awards help us retain and incentivize employees during periods of market volatility.

*Stock Options.* Stock options are granted with an exercise price based on the market price of Class A common stock on the date of grant (as quoted on the NYSE). The stock options will have value to our executive officers only if the fair market value of our Class A common stock increases after the date of grant, which provides a strong incentive to our executive officers to increase stockholder value. Additionally, stock options typically vest over multiple years, subject to continued service through each vesting date. We view stock options as inherently performance-based and an effective tool to motivate our executive officers to build stockholder value and reinforce our position as a growth company. Although we typically grant RSAs and RSUs to our executive officers, we have granted stock options to our executive officers in limited circumstances.

We generally grant larger, one-time new hire equity awards to our executive officers when they start employment with us. These initial awards are intended to establish a meaningful equity stake and motivate long-term value creation. While these awards generally cover multiple years, we may also consider providing additional equity grants to our executive officers to ensure appropriate incentives are in place to promote our long-term strategic and financial objectives and help us retain key executive officers. The size of these awards is not determined based on a specific formula, but rather through the exercise of judgment after considering various factors, including compensation provided to other executives with similar responsibilities in our peer group and within our company, the current unvested equity held by such executive officer, the perceived retentive value of the proposed awards, and for new-hires, amounts forfeited when joining our company. We also consider each executive officer's individual performance, including the results and contributions delivered during the year and how they align with our short-term and long-term goals, the executive's leadership of his or her team, the cash compensation received by the executive officer, and feedback received from the executive officer's peers and team.

### Annual Incentive Compensation

In February 2021, our board of directors approved the 2021 Bonus Program, which provided our named executive officers and other eligible employees the opportunity to earn bonuses on the level of achievement of certain company-wide objectives

and key results, or Corporate OKRs, from January 1, 2021 through December 31, 2021. A participant must remain an employee through the payment date under the 2021 Bonus Program to earn a bonus.

The Corporate OKRs are approved by the compensation committee. Each Corporate OKR category is assigned a relative weighting by the compensation committee based on recommendations by the Chief Executive Officer, reflecting its importance to the achievement of our Corporate OKRs during the year.

Each eligible participant in the 2021 Bonus Program may receive a bonus in an amount up to 100% of such participant's annual base salary earned in 2021. Bonus targets for participants will be correspondingly adjusted downward in the event certain Corporate OKRs are deemed by the compensation committee to have not been fully achieved. The compensation committee also has the right, in its sole discretion, to adjust the bonus target of any participant upward in the event of over-achievement of the Corporate OKRs.

The Corporate OKRs consisted of growing the overall business, including growing our community, growing our Snapchat application into monetizable platforms, and investing in partnerships to scale our platforms and content.

In February 2022, the compensation committee approved a 45% payment of the bonus target amount to certain of our employees, including our named executive officers, pursuant to the 2021 Bonus Program. The bonus payment amounts approved by the compensation committee were based on their respective determinations of the degree to which such Corporate OKRs were achieved.

### Other Benefits

Like other employees, our executive officers, including our named executive officers, are able to participate in our employee benefit and welfare plans, including life and disability insurance, medical and dental care plans, and a 401(k) plan. In 2021, we matched contributions made to our 401(k) plan by our employees up to federal limits, including our named executive officers. All of the named executive officers, other than Mr. Spiegel, participated in our 401(k) plan. Our executive officers, including our named executive officers, also receive access to an on-call medical service paid for by us. Ms. Gorman and Mr. O'Sullivan participated in such on-call medical services in 2021, and we paid applicable tax gross ups related to such services. We generally do not provide our executive officers with additional retirement benefits, pensions, perquisites, or other personal benefits, except as further described in the section titled "—Summary Compensation Table." In the future, we may provide perquisites or other personal benefits in limited circumstances, such as where we believe it is appropriate to assist an individual executive in the performance of his or her duties, to make our executive team more efficient and effective, and for recruitment, motivation, or retention purposes. All future practices with respect to perquisites or other personal benefits for executives will be subject to review and approval by the compensation committee.

### Executive Security Policy

Based on our overall risk assessment, including the findings of security studies, we have approved an executive security policy that currently provides security for our Chief Executive Officer and Chief Technology Officer (who is not a named executive officer). The executive security policy may apply to other executive officers as needed. We believe that the personal safety of our executive officers is crucial to our success, and based on our risk assessment, we believe that the cost of the personal security measures for executive officers is an appropriate and necessary business expense. Although we do not consider personal security measures to be a perquisite for the covered executive officer's benefit, we have included the aggregate incremental costs to us, if any, in the "All Other Compensation" column of the Summary Compensation Table, as applicable. Please see the section titled "—Summary Compensation Table" for additional detail.

### Change of Control Benefits

Some employee equity awards with back-weighted vesting (i.e., 10%/20%/30%/40% vesting), including certain awards held by certain named executive officers, accelerate so that the equity award is evenly-weighted if the employee's employment is involuntarily terminated other than for cause or voluntary termination for good reason following a change of control (i.e., "double-trigger"). We believe this change in control benefit makes sense because the logic of back-weighted vesting is that it incentivizes an employee to stay at a company for the entire vesting term; if there is a change in control of a company during the vesting term and the employee's employment is subsequently terminated by a company involuntarily or by the employee for good reason, the employee cannot stay for the entire vesting term due to reasons beyond the employee's control. We ceased issuing back-weighted equity awards in early 2018, and Mr. Hunter is the only named executive officer with back-weighted equity vesting that could benefit from such a provision. Our named executive officers are not entitled to any other change of

control benefits or post-employment payments with the limited exception of equity acceleration on a termination due to death. For more detail, please see the section titled "—Potential Payments Upon Change in Control."

**Tax and Accounting Considerations**

### Deductibility of Executive Compensation

Compensation paid to each of our "covered employees" under Section 162(m) of the Code that exceeds $1 million per taxable year is generally non-deductible. Although our compensation committee will continue to consider tax implications as one factor in determining executive compensation, it also considers other factors in making its decisions and retains the flexibility to provide compensation to our executive officers in a manner that can best promote our corporate objectives. Therefore, we may approve compensation that is not deductible.

### No Tax Reimbursement of Parachute Payments and Deferred Compensation

We did not provide any executive officer, including any named executive officer, with a "gross-up" or other reimbursement payment for any tax liability that he or she might owe as a result of the application of Sections 280G, 4999, or 409A of the Code during 2021, and we have not agreed and are not otherwise obligated to provide any named executive officer with such a "gross-up" or other reimbursement.

### Accounting Treatment

We account for stock-based compensation in accordance with the authoritative guidance set forth in Accounting Standards Codification Topic 718, or ASC Topic 718, which requires companies to measure and recognize the compensation expense for all share-based awards made to employees and directors, including RSAs, RSUs, and stock options, over the period during which the award recipient is required to perform services in exchange for the award.

**Compensation Policies and Practices as they Relate to Risk Management**

Our management team and our compensation committee, with the assistance of our independent compensation consultants, each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices, and policies for all employees, including our named executive officers. In 2021, we reviewed our compensation plans and philosophy and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse impact on our business or our financial condition. The objective of the review was to identify any compensation plans, practices, or policies that may encourage employees to take unnecessary risk that could threaten our company. No such plans, practices, or policies were identified. The risk assessment process included, among other things, a review of our cash and equity incentive-based compensation plans to ensure that they are aligned with our company performance goals and ensure an appropriate balance between fixed and variable pay components and between short-term and long-term incentives. The base salary component of our compensation program is designed to provide income independent of our stock price performance so that employees will not focus exclusively on stock price performance to the detriment of other important business metrics. The annual bonus component is scored with discretion by the compensation committee so that short-term outcomes are not over-weighted in the final results. The equity-based component of our compensation program is primarily designed to reward employees evenly throughout their tenure, which we believe discourages employees from taking actions that focus only on specific periods. Furthermore, our executive officers typically receive a substantial portion of their equity in the form of RSAs and RSUs, which does not require our stock price to be trading at a certain price for the executive officer to realize value. Executive officer compensation is not tied to any singular performance metric. Additional controls, such as our Code of Conduct and related training, help further mitigate the risks of unethical behavior and inappropriate risk-taking.

### Hedging and Pledging Prohibition

Our insider trading policy prohibits all employees (including our executive officers), members of our board of directors, and consultants from engaging in derivative securities transactions, including hedging, pledging company securities as collateral, holding company securities in a margin account, or other inherently speculative transactions with respect to our capital stock.

*Rule 10b5-1 Sales Plans*

Our executive officers and members of our board of directors may adopt written plans, known as Rule 10b5-1 plans, in which they will contract with a broker to buy or sell shares of our capital stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades under parameters established by the individual when entering into the plan, without further direction from them. The director or officer may amend a Rule 10b5-1 plan in some circumstances and may terminate a plan at any time, so long as such termination was made in good faith.

## Compensation Committee Report

The compensation committee has reviewed and discussed the compensation discussion and analysis included in this Annual Report on Form 10-K with management and, based on such review and discussions, the compensation committee recommended to our board of directors that the compensation discussion and analysis be included in this Annual Report on Form 10-K.

Snap Inc. compensation committee,

Michael Lynton (Chairman)
Scott D. Miller
Poppy Thorpe

## Summary Compensation Table

The following table presents all of the compensation awarded to, earned by, or paid to our named executive officers during the fiscal years ended December 31, 2021, 2020, and 2019.

| Name and Principal Position | Year | Salary | Bonus | Stock Awards(1) | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Evan Spiegel | 2021 | $ 1 | $ — | $ — | $ — | $ 3,290,615 (2) | $ 3,290,616 |
| *Co-Founder and Chief* | 2020 | 1 | — | — | — | 2,094,431 | 2,094,432 |
| *Executive Officer* | 2019 | 1 | — | — | — | 1,669,809 | 1,669,810 |
| Derek Andersen | 2021 | 500,000 | — | 5,876,814 | 225,000 (3) | 14,364 (4) | 6,616,178 |
| *Chief Financial Officer* | 2020 | 500,000 | — | 6,242,566 | 400,000 | 24,841 | 7,167,407 |
| | 2019 | 422,404 | — | 8,866,092 | — | 11,271 | 9,299,767 |
| Jeremi Gorman | 2021 | 500,000 | — | 5,876,814 | 225,000 (3) | 21,631 (5) | 6,623,445 |
| *Chief Business Officer* | 2020 | 500,000 | — | 5,675,063 | 400,000 | 16,213 | 6,591,276 |
| | 2019 | 500,000 | — | — | — | 17,038 | 517,038 |
| Jerry Hunter | 2021 | 500,000 | — | 9,402,903 | 225,000 (3) | 12,164 (6) | 10,140,067 |
| *Senior Vice President,* | 2020 | 500,000 | — | 24,970,262 | 400,000 | 20,489 | 25,890,751 |
| *Engineering* | 2019 | 500,000 | — | 2,855,000 | — | 21,427 | 3,376,427 |
| Michael O'Sullivan | 2021 | 500,000 | — | 4,701,451 | 225,000 (3) | 21,631 (7) | 5,448,082 |
| *General Counsel* | 2020 | 500,000 | — | 6,810,086 | 400,000 | 17,191 | 7,727,277 |
| | 2019 | 500,000 | — | 8,565,000 | — | 15,830 | 9,080,830 |
| Jared Grusd(8) | 2021 | 307,315 | — | 26,651,711 (9) | — | 11,853 (10) | 26,970,879 |
| *Former Chief Strategy Officer* | | | | | | | |

(1) Amounts reported represent the aggregate grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2) Amount reported includes (a) $2,265,182 for security for Mr. Spiegel, (b) $73,220 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot reimburse under the Federal Aviation Regulations, (c) $952,207 in incremental costs for personal flights not reimbursed by Mr. Spiegel, and (d) $6 in life insurance premiums paid by us on behalf of Mr. Spiegel.

(3) Represents amounts earned under the 2021 Bonus Program for performance from January 1, 2021 through December 31, 2021. Amounts under the 2021 Bonus Program will be paid in March 2022. See "Elements of Executive Compensation – Annual Incentive Compensation."

(4)   Amount reported includes (a) $11,600 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Andersen, and (c) contributions by the Company to Mr. Andersen's health savings account. Amounts not quantified above total less than $10,000 in aggregate.

(5)   Amount reported includes (a) $11,600 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Ms. Gorman, (c) $5,000 in medical on-call services paid by us on behalf of Ms. Gorman, and (d) tax "gross up" payments paid to Ms. Gorman to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(6)   Amount reported includes (a) $11,600 in 401(k) plan matching contributions by us, and (b) life insurance premiums paid by us on behalf of Mr. Hunter. Amounts not quantified above total less than $10,000 in aggregate.

(7)   Amount reported includes (a) $11,600 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, and (d) tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(8)   Represents all compensation for 2021. Mr. Grusd served as Chief Strategy Officer until January 31, 2021, but continues to serve as a Strategic Advisor. Mr. Grusd was not a named executive officer in 2019 or 2020.

(9)   Amount reported is the aggregate modification date fair value of previously granted equity awards in accordance with ASC Topic 718. This amount does not reflect a new award or the actual economic value that may be realized by Mr. Grusd.

(10)  Amount reported includes (a) $11,600 in 401(k) plan matching contributions by us, and (b) life insurance premiums paid by us on behalf of Mr. Grusd. Amounts not quantified above total less than $10,000 in aggregate.

## Grants of Plan-Based Awards in Fiscal 2021

The following table provides information regarding grants of incentive plan-based awards made to each of our named executive officers during 2021 under our 2017 Plan. No named executive officer was granted options in 2021.

| Name | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units(1) | Grant Date Fair Value of Stock Awards(2) |
|---|---|---|---|
| Evan Spiegel | — | — | $ — |
| Derek Andersen | 2/3/2021 | 99,170 | 5,876,814 |
| Jeremi Gorman | 2/3/2021 | 99,170 | 5,876,814 |
| Jerry Hunter | 2/3/2021 | 158,672 | 9,402,903 |
| Michael O'Sullivan | 2/3/2021 | 79,336 | 4,701,451 |
| Jared Grusd | — | — | — |

(1)   Except as indicated below, equity awards vest and the forfeiture condition lapses only on the satisfaction of a service-based vesting condition. If an employee dies while in service, the service-based vesting condition as to 100% of his or her shares subject to the award will be satisfied.

(2)   The dollar amounts reflect the grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, see Notes 1 and 4 of the notes to our consolidated financial statements.

**Outstanding Equity Awards as of December 31, 2021**

The following table presents information regarding outstanding equity awards held by our named executive officers as of December 31, 2021. All awards are for Class A common stock and were granted under our 2017 Plan.

| Name | Grant Date | Number of Shares or Units of Stock That Have Not Vested(#)(1) | Market Value of Shares or Units of Stock That Have Not Vested($)(2) | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable(1) | Option Exercise Price | Option Expiration Date |
|---|---|---|---|---|---|---|---|
| Evan Spiegel | — | — | $ — | — | — | $ — | — |
| Derek Andersen | 7/26/2018 | 124,697 (3) | 5,864,500 | — | — | — | — |
| | 3/4/2019 | 8,854 (4) | 416,404 | — | — | — | — |
| | 5/16/2019 | 281,250 (5) | 13,227,188 | — | — | — | — |
| | 2/18/2020 | 363,574 (6) | 17,098,885 | — | — | — | — |
| | 2/3/2021 | 99,170 (7) | 4,663,965 | — | — | — | — |
| Jeremi Gorman | 11/5/2018 | 799,990 (8) | 37,623,530 | — | — | — | — |
| | 2/18/2020 | 330,522 (9) | 15,544,450 | — | — | — | — |
| | 2/3/2021 | 99,170 (7) | 4,663,965 | — | — | — | — |
| Jerry Hunter | 12/29/2017 | 34,988 (10) | 1,645,486 | — | — | — | — |
| | 12/29/2017 | — | — | 700,000 | — | 14.72 | 12/29/2027 |
| | 5/16/2019 | 93,750 (11) | 4,409,063 | — | — | — | — |
| | 2/18/2020 | 1,057,670 (12) | 49,742,220 | — | — | — | — |
| | 2/3/2021 | 158,672 (7) | 7,462,344 | — | — | — | — |
| Michael O'Sullivan | 5/16/2019 | 281,250 (11) | 13,227,188 | — | — | — | — |
| | 2/18/2020 | 396,627 (13) | 18,653,368 | — | — | — | — |
| | 2/3/2021 | 79,336 (7) | 3,731,172 | — | — | — | — |
| Jared Grusd | 11/5/2018 | 130,670 (14) | 6,145,410 | — | — | — | — |

(1) Each of our named executive officers, other than Mr. Spiegel, holds equity awards that only vest, or the forfeiture condition only lapses, on the satisfaction of a service-based condition. The service-based condition for each of our named executive officers is further described below. If an executive officer dies while in our service, the service-based condition as to 100% of his or her shares subject to the award will be satisfied.

(2) The market value is based on the closing price of our Class A common stock on December 31, 2021, which was $47.03.

(3) The service-based condition for these RSUs is satisfied in 48 equal monthly installments after each month of continuous service from August 15, 2018.

(4) The service-based condition for these RSUs is satisfied in 48 equal monthly installments after each month of continuous service from February 15, 2019.

(5) The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from June 15, 2019.

(6) The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 18.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 81.8% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(7) The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA on March 15, 2024, subject to continuous service by the executive officer through such date. Thereafter, the service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA after each quarter of continuous service by such executive officer from March 15, 2024.

(8) The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/48th of the shares underlying this RSA after each month of continuous service by Ms. Gorman from December 15, 2018.

(9) The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA on February 15, 2023, subject to continuous service by Ms. Gorman through such date. Thereafter, the service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA after each quarter of continuous service by Ms. Gorman from February 15, 2023.

(10) The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 10% of the RSUs on January 15, 2019; 20% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2019; 30% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2020; and 40% of the RSUs in equal quarterly installments during the 12-month period following January 15, 2021. The unvested shares subject to these RSUs are subject to accelerated vesting as described in the section titled "—Employment, Severance, and Change in Control Agreements."

(11)   The service-based condition will be satisfied, and the forfeiture condition will lapse, as to 1/16th of the shares underlying this RSA after each quarter of continuous service from May 15, 2019.

(12)   The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 27.2% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2020; 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 36.4% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(13)   The service-based condition will be satisfied, and the forfeiture condition will lapse for this RSA as follows (in each case subject to continued service through each date): 33.3% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2021; and 66.7% of the RSAs in equal quarterly installments during the 12-month period following November 15, 2022.

(14)   The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/6th of the shares underlying this RSA after each month of continuous service by Mr. Grusd from December 16, 2021.

## Option Exercises and Stock Vested

The following table presents information regarding the vesting or lapse of the forfeiture condition during 2021 of RSUs and RSAs previously granted to the named executive officers. No named executive officer exercised options during 2021.

| | Stock Awards | |
| Name | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($)(1) |
| --- | --- | --- |
| Evan Spiegel | — | $         — |
| Derek Andersen | 382,113 | 23,586,660 |
| Jeremi Gorman | 799,938 | 49,542,833 |
| Jerry Hunter | 590,332 | 36,512,477 |
| Michael O'Sullivan | 507,115 | 31,687,080 |
| Jared Grusd | 380,606 | 23,074,466 |

(1)   The value realized is based on the closing price of our Class A common stock on the vesting date.

## Pension Benefits

Other than our 401(k) plan, our named executive officers did not participate in, or otherwise receive any benefits under, any pension or retirement plan sponsored by us during the year ended December 31, 2021.

## Non-qualified Deferred Compensation

Our named executive officers did not participate in, or earn any benefits under, a non-qualified deferred compensation plan sponsored by us during the year ended December 31, 2021.

## Employment, Severance, and Change in Control Agreements

### Offer Letters

We have offer letters with each of our executive officers. The offer letters generally provide for at-will employment and set forth the executive officer's initial base salary, eligibility for employee benefits, and confirmation of the terms of previously issued equity grants, if applicable, including in some cases severance benefits on a qualifying termination of employment. If an executive officer dies, all outstanding equity awards will be deemed to satisfy the service-based requirement. In addition, each of our named executive officers has executed our standard proprietary information and inventions agreement. The key terms of employment with our executive officers are described below.

### Evan Spiegel

In October 2016, we entered into an amended and restated offer letter agreement with Evan Spiegel, our co-founder and Chief Executive Officer, with respect to his continuing employment with us. Mr. Spiegel's annual base salary as of December 31, 2021 was $1.

*Robert Murphy*

In October 2016, we entered into an amended and restated offer letter agreement with Robert Murphy, our co-founder and Chief Technology Officer, with respect to his continuing employment with us. Mr. Murphy's annual base salary as of December 31, 2021 was $1.

*Derek Andersen*

In May 2019, we entered into an amended and restated offer letter agreement with Derek Andersen, our Chief Financial Officer, with respect to his continuing employment with us. Mr. Andersen's annual base salary as of December 31, 2021 was $500,000.

*Jeremi Gorman*

In October 2018, we entered into an offer letter agreement with Jeremi Gorman, our Chief Business Officer, with respect to her employment with us. Ms. Gorman's annual base salary as of December 31, 2021 was $500,000.

*Jared Grusd*

In October 2018, we entered into an offer letter agreement with Jared Grusd to serve as our Chief Strategy Officer. Through January 31, 2021, Mr. Grusd's annual base salary was $500,000.

In February 2021, we entered into a new employment agreement and transition agreement with Jared Grusd. Under the agreements, Mr. Grusd agreed to enter into a new fixed term employment agreement as a Strategic Advisor that ends on June 30, 2022, which included continued vesting of a portion of his previously granted equity in monthly installments from April 2021 to June 2022, subject to continued employment. In addition, following execution of a standard release, Mr. Grusd's outstanding equity awards that were scheduled to vest through March 15, 2021 and his salary had he remained our Chief Strategy Officer through March 31, 2021 were accelerated. Mr. Grusd's annual base salary as of December 31, 2021 was $141,177.

*Jerry Hunter*

In October 2020, we entered into an amended and restated offer letter agreement with Jerry Hunter, our Senior Vice President, Engineering, with respect to his continuing employment with us. Mr. Hunter's annual base salary as of December 31, 2021 was $500,000.

If Mr. Hunter's employment is terminated without cause or he terminates his employment for good reason, within 12 months following a change in control, then the service-based vesting requirement for the RSUs granted prior to 2018 will be deemed satisfied with respect to 1/16th of the RSUs for each completed quarter of service since the vesting commencement date. Mr. Hunter must sign a release of claims agreement as a pre-condition of receiving this termination benefit.

*Rebecca Morrow*

In July 2019, we entered into an offer letter agreement with Rebecca Morrow, our Chief Accounting Officer and Controller, with respect to her employment with us. Ms. Morrow's annual base salary as of December 31, 2021 was $415,000.

*Michael O'Sullivan*

In July 2017, we entered into an offer letter agreement with Michael O'Sullivan, our General Counsel, with respect to his employment with us. Mr. O'Sullivan's annual base salary as of December 31, 2021 was $500,000.

*Potential Payments upon Change in Control or Death*

The following table sets forth the estimated payments that would be received by each named executive officer if a hypothetical termination of employment without cause or following a resignation for good reason following a change of control of our company had occurred on December 31, 2021.

| Name | Accelerated Vesting of RSUs(1) |
|---|---|
| Evan Spiegel | $ — |
| Derek Andersen | — |
| Jeremi Gorman | — |
| Jerry Hunter | 1,645,486 |
| Michael O'Sullivan | — |
| Jared Grusd | — |

(1)   The amount reported reflects the aggregate market value, based on the closing price of our Class A common stock of $47.03 on December 31, 2021, of the unvested RSUs that would be accelerated.

The table below reflects amounts that would have been received by each named executive officer assuming that his or her employment was terminated due to his or her death on December 31, 2021.

| Name | Accelerated Vesting of Stock Awards (1) |
|---|---|
| Evan Spiegel | $ — |
| Derek Andersen | 41,270,941 |
| Jeremi Gorman | 57,831,944 |
| Jerry Hunter | 63,259,112 |
| Michael O'Sullivan | 35,611,727 |
| Jared Grusd | 6,145,410 |

(1)   The amount reported reflects the aggregate value, based on the closing price of our Class A common stock of $47.03 on December 31, 2021, of the unvested equity awards that would be accelerated.

## Employee Benefit Plans

We believe that our ability to grant equity-based awards is a valuable and necessary compensation tool that aligns the long-term financial interests of our employees, consultants, and directors with the financial interests of our stockholders. In addition, we believe that our ability to grant equity-based awards helps us to attract, retain, and motivate employees, consultants, and directors, and encourages them to devote their best efforts to our business and financial success. The principal features of our equity incentive plans and our 401(k) plan are summarized below. These summaries are qualified in their entirety by reference to the actual text of the plans.

### 401(k) Plan and Similar Plans

We maintain a safe harbor 401(k) plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax advantaged basis. Eligible employees are able to defer eligible compensation up to certain Code limits, which are updated annually. We have the ability to make matching and discretionary contributions to the 401(k) plan. Currently, we make a match of each participant's contribution up to federal limits of the participant's base salary, bonus, and commissions paid during the period, and we make a match of 50% of each participant's contribution between 3% and 5% of the participant's base salary, bonus, and commissions paid during the period. Contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employees are immediately and fully vested in their own contributions and our contributions. The 401(k) plan is intended to be qualified under Section 401(a) of the Code, with the related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan are deductible by us when made, and contributions and earnings on those amounts are not taxable to the employees until withdrawn or distributed from the 401(k) plan.

Similar plans outside the United States, some of which are government mandated, cover employees of certain of our international subsidiaries. Several of these plans allow us to match, on a voluntary basis, a portion of the employee contributions.

### 2017 Equity Incentive Plan

Our board of directors adopted our 2017 Equity Incentive Plan, or our 2017 Plan, in January 2017, and our stockholders approved our 2017 Plan in February 2017. Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. Our 2017 Plan provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. The 2017 Plan is the successor to our 2012 Equity Incentive Plan and 2014 Equity Incentive Plan, each of which is described below, or, together, the Prior Plans.

*Authorized Shares.* The maximum number of shares of our Class A common stock that may be issued under our 2017 Plan as of December 31, 2021 is 450,210,611. The number of shares of our Class A common stock reserved for issuance under our 2017 Plan will automatically increase on January 1st of each calendar year, starting on January 1, 2018 through January 1, 2027, in an amount equal to 5.0% of the total number of shares of our capital stock outstanding on the last day of the calendar month before the date of each automatic increase, or a lesser number of shares determined by our board of directors. The maximum number of shares of our Class A common stock that may be issued on the exercise of incentive stock options under our 2017 Plan is three times the share reserve under the 2017 Plan.

Shares subject to stock awards granted under our 2017 Plan that expire or terminate without being exercised in full, or that are paid out in cash rather than in shares, do not reduce the number of shares available for issuance under our 2017 Plan. Additionally, shares become available for future grant under our 2017 Plan if they were issued under stock awards under our 2017 Plan and if we repurchase them or they are forfeited. This includes shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award.

*Corporate Transactions.* Our 2017 Plan provides that in the event of certain specified significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of more than 50% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards:

- arrange for the assumption, continuation, or substitution of a stock award by a successor corporation;

- arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation;

- accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction;

- arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us;

- cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, or no payment, as determined by the board of directors; or

- make a payment, in the form determined by our board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the awards before the transaction over any exercise price payable by the participant in connection with the exercise.

The plan administrator is not obligated to treat all stock awards or portions of stock awards, even those that are of the same type, in the same manner and is not obligated to treat all participants in the same manner.

In the event of a change in control, awards granted under the 2017 Plan will not receive automatic acceleration of vesting and exercisability, although this treatment may be provided for in an award agreement. Under the 2017 Plan, a change in control is defined to include: (1) the acquisition by any person or company of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) a sale, lease, exclusive license, or other disposition of all or substantially all of our assets

other than to an entity more than 50% of the combined voting power of which is owned by our stockholders, and (4) an unapproved change in the majority of the board of directors.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2017 Plan, provided that such action does not materially impair the existing rights of any participant without such participant's written consent. Certain material amendments also require the approval of our stockholders. No incentive stock options may be granted after the tenth anniversary of the date our board of directors adopted our 2017 Plan. No stock awards may be granted under our 2017 Plan while it is suspended or after it is terminated.

### 2014 Equity Incentive Plan

Our board of directors adopted, and our stockholders approved, our 2014 Equity Incentive Plan, or our 2014 Plan, in September 2014. Our 2014 Plan was amended most recently in October 2016. Our 2014 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to employees, directors, and consultants, including employees and consultants of our affiliates.

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2014 Plan following that date, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France. Any awards granted under the 2014 Plan will remain subject to the terms of our 2014 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class A common stock that may be issued under our 2014 Plan is 166,164,100, minus the number of shares of our Class B common stock issued after September 4, 2014 under our 2012 Plan. In addition to the share reserve, an additional 53,357,397 shares of Class A common stock are reserved under the 2014 Plan in connection with the distribution of shares of Class A common stock provided as a dividend to the holders of all preferred stock and common stock outstanding on October 31, 2016. The maximum number of shares of Class A common stock that may be issued on the exercise of incentive stock options under our 2014 Plan is three times such maximum number of shares. Shares subject to stock awards granted under our 2014 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2014 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2014 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2014 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2014 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2014 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and

(4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2014 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2012 Equity Incentive Plan

Our board of directors adopted our 2012 Equity Incentive Plan, or our 2012 Plan, in May 2012, and our stockholders approved our 2012 Plan in August 2012. Our 2012 Plan was amended most recently in October 2016. Our 2012 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to our employees, directors, and consultants, including employees and consultants of our affiliates.

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2012 Plan following that date. Any awards granted under the 2012 Plan will remain subject to the terms of our 2012 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class B common stock that may be issued under our 2012 Plan is 91,292,140, minus the number of shares of our Class A common stock issued after September 4, 2014 under our 2014 Plan. In addition to the share reserve, an additional 50,022,362 shares of Class A common stock are reserved under the 2012 Plan in connection with the Class A Dividend, one share of which will be issued if and when a share from the share reserve is issued in connection with the settlement or exercise of a stock award that was outstanding as of October 31, 2016. The maximum number of shares of Class B common stock that may be issued on the exercise of incentive stock options under our 2012 Plan is such maximum number of shares. Shares subject to stock awards granted under our 2012 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2012 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2012 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2012 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation, or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2012 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2012 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2012 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2017 Employee Stock Purchase Plan

Our board of directors adopted our 2017 Employee Stock Purchase Plan, or ESPP, in January 2017 and our stockholders approved our ESPP in February 2017. Our ESPP became effective when the registration statement in connection with our initial public offering was declared effective in March 2017. The purpose of the ESPP is to secure the services of new employees, to retain the services of existing employees, and to provide incentives for such individuals to exert maximum efforts toward our success and that of our affiliates. The ESPP is intended to qualify as an "employee stock purchase plan" within the meaning of Section 423 of the Code for U.S. employees. In addition, the ESPP authorizes grants of purchase rights that do not comply with Section 423 of the Code under a separate non-423 component. In particular, where such purchase rights are granted to employees who are foreign nationals or employed or located outside the United States, our board of directors may adopt rules that are beyond the scope of Section 423 of the Code.

*Share Reserve*. The ESPP authorizes the issuance of 16,484,690 shares of our Class A common stock under purchase rights granted to our employees or to employees of any of our designated affiliates. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (1) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (2) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (1) and (2). As of December 31, 2021, no shares of our Class A common stock have been purchased under the ESPP.

*Corporate Transactions*. In the event of certain significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding immediately before such transaction are converted or exchanged into other property by virtue of the transaction, any then-outstanding rights to purchase our stock under the ESPP may be assumed, continued, or substituted for by any surviving or acquiring entity (or its parent company). If the surviving or acquiring entity (or its parent company) elects not to assume, continue, or substitute for such purchase rights, then the participants' accumulated payroll contributions will be used to purchase shares of our common stock within ten business days before such corporate transaction, and such purchase rights will terminate immediately.

*ESPP Amendment or Termination*. Our board of directors has the authority to amend or terminate our ESPP, provided that except in certain circumstances such amendment or termination may not materially impair any outstanding purchase rights without the holder's consent. We will obtain stockholder approval of any amendment to our ESPP as required by applicable law or listing requirements.

## Limitations on Liability and Indemnification Matters

Our certificate of incorporation contains provisions that limit the liability of our current and former directors for monetary damages to the fullest extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's duty of loyalty to the corporation or its stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions; or

- any transaction from which the director derived an improper personal benefit.

Such limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission.

Our certificate of incorporation authorizes us to indemnify our directors, officers, employees, and other agents to the fullest extent permitted by Delaware law. Our bylaws provide that we are required to indemnify our directors and officers to the fullest extent permitted by Delaware law and may indemnify our other employees and agents. Our bylaws also provide that, on satisfaction of certain conditions, we will advance expenses incurred by a director or officer in advance of the final

disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee, or other agent for any liability arising out of his or her actions in that capacity regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered into, and expect to continue to enter into agreements to indemnify our directors, executive officers, and other employees as determined by the board of directors. With certain exceptions, these agreements provide for indemnification for related expenses including attorneys' fees, judgments, fines, and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these certificate of incorporation and bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain customary directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for directors, executive officers, or persons controlling us, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## Director Compensation

Under our non-employee director compensation policy, our non-employee directors receive an annual retainer for service on our board of directors and an additional retainer is provided to individuals who serve as chair of a committee or the board of directors. We also currently reimburse our directors for their reasonable out-of-pocket expenses in connection with attending board of directors and committee meetings.

Our non-employee director compensation policy provides that each non-employee director receives the following compensation for board of directors and committee services:

- an annual retainer for board of director membership of $75,000, paid in cash;

- an annual retainer of $75,000 for chairing the board of directors, paid in cash;

- an annual retainer of $25,000 for chairing the audit committee, $20,000 for chairing the compensation committee, and $10,000 for chairing the nominating and corporate governance committee, each paid in cash; and

- an annual grant of equity with a fair market value as of the date of grant of $250,000, comprised of 50% in RSUs vesting after one year, and 50% in stock options vesting after one year.

All annual cash retainers will be paid quarterly in arrears. Additionally, in the event of a change to the designated chair for a committee, the annual cash retainer for chairing such committee will be prorated based on the number of days the chair held the position. The annual grants of equity described above are subject to pro-rata acceleration on a director's discontinued service on our board of directors and automatic full acceleration in the event of a change in control, as defined in the 2017 Plan.

Non-employee directors are also encouraged to accumulate stock ownership equal in value to five times the annual retainer for board of director membership within the later of five years from the effective date of the non-employee director compensation policy or each non-employee director's initial election to serve on the board of directors. Previously owned and vested stock and shares held in trust for the benefit of the non-employee director or his or her immediate family members are counted for purposes of determining stock ownership.

### Director Compensation Table

The following table sets forth information concerning the compensation paid to our directors who are not named executive officers during the year ended December 31, 2021. The compensation received by Mr. Spiegel as an employee of our company is presented in "Executive Compensation—Summary Compensation Table."

In 2021, we paid fees and made equity awards to our non-employee directors. We granted each non-employee director (a) RSUs for 1,965 shares of Class A common stock under our 2017 Plan and (b) options to purchase 4,044 shares of Class A common stock under our 2017 Plan. The service-based vesting condition will be fully satisfied for the RSUs and options on July 20, 2022. If a director's service ceases before July 20, 2022, vesting of the RSUs and options will be accelerated pro rata,

based on the number of months of service provided by such director. In addition, in the event of a change in control, the service-based vesting condition of the RSUs and options will be deemed satisfied for 100% of the RSUs and options that have not yet satisfied the service-based vesting condition, immediately before the closing of such change in control.

Mr. Murphy did not receive compensation for his service as a director.

| Name | Fees Earned or Paid in Cash | Stock Awards(1)(8) | Option Awards(1)(8) | Total |
|---|---|---|---|---|
| Michael Lynton(2) | $    172,692 | $    124,561 | $    125,000 | $    422,253 |
| Kelly Coffey | 75,000 | 124,561 | 125,000 | 324,561 |
| Joanna Coles | 75,000 | 124,561 | 125,000 | 324,561 |
| Liz Jenkins | 67,255 | 124,561 | 125,000 | 316,816 |
| A.G. Lafley(3)(4) | 145,000 | 124,561 | 125,000 | 394,561 |
| Stanley Meresman(5) | 100,398 | 124,561 | 125,000 | 349,959 |
| Scott D. Miller(3) | 132,935 | 124,561 | 125,000 | 382,496 |
| Robert Murphy(6) | 184,437 | — | — | 184,437 |
| Poppy Thorpe | 75,000 | 124,561 | 125,000 | 324,561 |
| Fidel Vargas(7) | 21,399 | 124,561 | 125,000 | 270,960 |

(1) Amounts reported represent the aggregate grant date fair value of RSUs and stock options granted during 2021 under our 2017 Plan without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the directors. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2) Includes $2,692 of imputed income relating to incremental costs of family or guests accompanying Mr. Lynton on business flights that Mr. Lynton cannot reimburse under the Federal Aviation Regulations, as approved by the compensation committee of our board of directors.

(3) Amount reported includes a $5,000 per month retainer for services on a special committee.

(4) Mr. Lafley resigned as a member of our board of directors, effective December 31, 2021.

(5) Includes $398 of imputed income relating to incremental costs of family or guests accompanying Mr. Meresman on business flights that Mr. Meresman cannot reimburse under the Federal Aviation Regulations, as approved by the compensation committee of our board of directors.

(6) Mr. Murphy does not receive any compensation for service as a director. Amount reported represents (a) $1 for his base salary as an employee, (b) $184,430 for security for Mr. Murphy, and (c) $6 for life insurance premiums paid by us on behalf of Mr. Murphy.

(7) Mr. Vargas joined the board of directors on July 20, 2021.

(8) As of December 31, 2021, the aggregate number of shares underlying stock awards and option awards outstanding for each of our non-employee directors was:

| Name | Aggregate Stock Awards | Aggregate Option Awards |
|---|---|---|
| Michael Lynton | 1,965 | 50,689 |
| Kelly Coffey | 1,965 | 17,032 |
| Joanna Coles | 1,965 | 50,689 |
| Liz Jenkins | 1,965 | 7,032 |
| A.G. Lafley(1) | — | 48,330 |
| Stanley Meresman | 1,965 | 50,689 |
| Scott D. Miller | 1,965 | 50,689 |
| Poppy Thorpe | 1,965 | 48,689 |
| Fidel Vargas | 1,965 | 4,044 |

(1) Mr. Lafley resigned as a member of our board of directors, effective December 31, 2021. Pursuant to our non-employee director compensation policy, vesting of RSUs and options was accelerated pro rata, based on the number of months of service provided by Mr. Lafley.

In 2021, we also provided Mr. Lynton with an executive administrative assistant for his duties as Chairman. The executive administrative assistant would occasionally assist Mr. Lynton with incidental personal matters, the cost of which to us is financially immaterial.

**Compensation Committee Interlocks and Insider Participation**

None of the members of the compensation committee is currently, or has been at any time, one of our officers or employees. None of our executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of our board of directors or compensation committee.

**Pay Ratio Disclosure**

As disclosed in the Summary Compensation Table, for the year ended December 31, 2021, the annual total compensation of our Chief Executive Officer was $3,290,616. The annual total compensation of our median employee, excluding our Chief Executive Officer, for the same period, using the same methodology used to calculate our Chief Executive Officer's annual total compensation, was $327,710. The ratio of these amounts is 10 to 1. We believe such ratio is a reasonable estimate calculated in a manner consistent with Item 402 of Regulation S-K under the Exchange Act.

To determine our median employee, we used the total compensation of our employees from our company records, including salary and wages, bonuses, commissions, allowances, and grant date fair value of equity awards. We applied this measure to our global employee population as of October 1, 2021 and calculated total compensation for the 12 months prior to such date, annualizing all compensation other than equity awards for employees who did not work the full 12 months. We selected the individual who represented our median employee based on this information. For employees who were not paid in U.S. dollars, we converted their compensation to U.S. dollars using the exchange rate as of October 1, 2021.

The pay ratio above represents our reasonable estimate calculated in a manner consistent with the SEC rules, which allow for significant flexibility in how companies identify the median employee, and each company may use a different methodology and make different assumptions particular to that company. As a result, and as explained by the SEC when it adopted the pay ratio rules, the ratio was not designed to facilitate comparisons of pay ratios among different companies, even companies within the same industry, but rather to allow stockholders to better understand our compensation practices and pay ratio disclosures.

**Additional Disclosure Considerations**

We are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Wall Street Reform Act, and such sections are not included in this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The table below sets forth information, as of December 31, 2021, with respect to the beneficial ownership of: (a) our Class A common stock, Class B common stock, and Class C common stock by each named executive officer, each of our directors, and our directors and executive officers as a group; and (b) our Class B and Class C common stock by each person or entity known by us to own beneficially more than 5% of our Class B common stock or Class C common stock (by number or by voting power).

Because our Class A common stock is non-voting, significant holders of our Class A common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require significant stockholders to publicly report their ownership, including changes in that ownership. As a result, those stockholders and we are not obligated to disclose ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of such ownership or changes in such ownership. Furthermore, significant holders of our Class A common stock may hold our stock in nominee or "street name" with various brokers, such that we will not be able to identify their ownerships.

We have determined beneficial ownership in accordance with the rules and regulations of the SEC, and the information is not necessarily indicative of beneficial ownership for any other purpose. Except as indicated by the footnotes below, we believe, based on information furnished to us, that the persons and entities named in the table below have sole voting and sole investment power with respect to all shares that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 1,364,886,581 shares of Class A common stock, 22,769,005 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding as of December 31, 2021. In computing the number of shares beneficially owned by a person and the percentage ownership of such person, we deemed to be outstanding all shares subject to options and RSUs held by the person that are currently exercisable, or would become exercisable or would

vest based on service-based vesting conditions within 60 days of December 31, 2021. However, except as described above, we did not deem such shares outstanding for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address for each beneficial owner listed in the table below is c/o Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

| Name of Beneficial Owner | Class A Common Stock Shares | % | Class B Common Stock Shares | % | Class C Common Stock Shares | % | % of Total Voting Power |
|---|---|---|---|---|---|---|---|
| **Directors and Named Executive Officers:** | | | | | | | |
| Evan Spiegel(1) | 40,463,540 | 3.0% | 5,862,410 | 25.7% | 123,683,019 | 53.4% | 53.1% |
| Robert Murphy(2) | 82,267,528 | 6.0 | 5,862,410 | 25.7 | 107,943,924 | 46.6 | 46.4 |
| Derek Andersen(3) | 951,605 | * | — | * | — | * | * |
| Jeremi Gorman(4) | 1,542,062 | * | — | * | — | * | * |
| Jerry Hunter(5) | 2,659,206 | * | — | * | — | * | * |
| Michael O'Sullivan(6) | 1,103,072 | * | — | * | — | * | * |
| Jared Grusd(7) | 201,815 | * | — | * | — | * | * |
| Michael Lynton(8) | 1,075,407 | * | — | * | — | * | * |
| Kelly Coffey(9) | 20,273 | * | — | * | — | * | * |
| Joanna Coles(10) | 82,607 | * | — | * | — | * | * |
| Liz Jenkins(11) | 4,723 | * | — | * | — | * | * |
| A.G. Lafley(12) | 236,128 | * | — | * | — | * | * |
| Stanley Meresman(13) | 71,625 | * | — | * | — | * | * |
| Scott D. Miller(14) | 135,969 | * | — | * | — | * | * |
| Poppy Thorpe(15) | 62,333 | * | — | * | — | * | * |
| Fidel Vargas | 180 | * | — | * | — | * | * |
| All directors and executive officers as a group (15 persons)(16) | 130,684,135 | 9.6 | 11,724,820 | 51.5 | 231,626,943 | 100.0 | 99.5 |
| **5% Stockholders:** | | | | | | | |
| T. Rowe Price Associates, Inc.(17) | 126,220,479 | 9.2 | — | * | — | * | * |
| Vanguard Group Inc.(18) | 73,910,018 | 5.4 | — | * | — | * | * |
| Entities affiliated with Tencent Holdings Limited(19) | 232,655,030 | 17.0 | 10,344,970 | 45.4 | — | — | * |

\*      Represents beneficial ownership of less than 1%.

(1)    Includes 4,577,844 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Spiegel is trustee and holds voting power.

(2)    Includes 5,307,526 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Murphy is trustee and holds voting power.

(3)    Includes (a) 743,994 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2021 and (b) RSUs for 32,436 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2021.

(4)    Includes 1,229,682 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2021.

(5)    Includes (a) 1,310,092 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2021, (b) RSUs for 34,988 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2021, (c) 700,000 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021, and (d) 614,126 shares held in trust for which Mr. Hunter is trustee and holds dispositive power.

(6)    Includes (a) 757,213 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2021, (b) 345,539 shares of Class A common stock held in trust for which Mr. O'Sullivan is trustee and holds dispositive power, and (c) 160 shares of Class A common stock held by members of Mr. O'Sullivan's immediate family for which Mr. O'Sullivan disclaims beneficial ownership except as to indirect pecuniary interest, if any.

(7)    Includes 130,670 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2021.

(8)    Includes (a) 945,876 shares of Class A common stock for which Mr. Lynton is trustee and (b) 46,645 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(9)    Includes 12,988 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(10)   Includes 46,645 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

127

(11) Includes 2,988 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(12) Includes (a) 186,980 shares held in trust for which Mr. Lafley is trustee and holds dispositive power, and (b) 48,330 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(13) Includes 46,645 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(14) Includes 46,645 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(15) Includes 44,645 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021.

(16) Consists of (a) 129,669,510 shares of Class A common stock (of which 4,209,206 shares are unvested and subject to forfeiture as of December 31, 2021), 11,724,820 shares of Class B common stock, and 231,626,943 shares of Class C common stock held by our current directors and executive officers or for which they serve as trustees, (b) RSUs for 67,424 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2021, and (c) 947,201 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2021. Includes shares held by Ms. Morrow, and does not include shares held by Mr. Grusd, as he was not an executive officer as of December 31, 2021, and Mr. Lafley, who resigned as a member of our board of directors, effective December 31, 2021.

(17) Based on information reported by T. Rowe Price Associates, Inc. on Schedule 13G/A filed with the SEC on February 16, 2021. T. Rowe Price Associates, Inc. reported that it has sole dispositive power with respect to 126,220,479 shares of Class A common stock and sole voting power with respect to 50,083,450 shares of Class A common stock. T. Rowe Price Associates, Inc. listed its address as 100 E. Pratt Street, Baltimore, MD 21202.

(18) Based on information reported by The Vanguard Group on Schedule 13G/A filed with the SEC on February 10, 2021. The Vanguard Group reported that it has sole dispositive power with respect to 73,910,018 shares of Class A common stock, sole voting power with respect to 0 shares of Class A common stock, shared dispositive power with respect to 1,308,784 shares of Class A common stock, and shared voting power with respect to 644,655 shares of Class A common stock. The Vanguard Group listed its address as 100 Vanguard Blvd., Malvern, PA 19355.

(19) Tencent Holdings Limited reported in its 2021 Interim Report that, as of June 30, 2021, it was interested in approximately 243 million shares of Snap Inc. We believe, based on such reporting and our corporate and transfer agent records, that Tencent Holdings Limited and its affiliates beneficially own 10,344,970 shares of Class B Common Stock, and the balance of shares reported are Class A Common Stock. As noted above, holders of our Class A common stock, other than our directors or officers, are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act and may hold the stock in nominee or "street name" such that we are not able to identify or confirm their ownerships. Tencent Holdings Limited listed its registered address as Hutchins Drive, P.O. Box 2681, Grand Cayman KY1-1111 Cayman Islands.

## Securities Authorized for Issuance under Equity Incentive Plans

The table set forth below provides information concerning the awards that may be issued under our 2012 Plan, 2014 Plan, and 2017 Plan as of December 31, 2021:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights(1) (a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights(2) (b) | Number of Securities Remaining Available for Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders(3) | 82,724,366 | $ | 10.59 | 184,434,919 |
| Equity compensation plans not approved by security holders | — | $ | — | — |
| Total | 82,724,366 | $ | 10.59 | 184,434,919 |

(1) Excludes RSAs subject to forfeiture that are already included within issued and outstanding Class A common stock as of December 31, 2021.

(2)   The weighted-average exercise price does not reflect shares that will be issued in connection with the settlement of RSUs, since RSUs have no exercise price.

(3)   Prior to our initial public offering, we granted awards under our 2012 Plan and our 2014 Plan. Following our initial public offering, we granted awards under our 2017 Plan, other than certain awards to our employees and consultants in France, which were granted under our 2014 Plan.


## Item 13. Certain Relationships and Related Transactions, and Director Independence.

Other than compensation arrangements for our directors and executive officers, which are described elsewhere in this Annual Report on Form 10-K, below we describe transactions since January 1, 2021 to which we were a party or will be a party, in which:

- the amounts involved exceeded or will exceed $120,000; and

- any of our directors, executive officers, or holders of more than 5% of our capital stock, or any member of the immediate family of, or person sharing the household with, the foregoing persons, had or will have a direct or indirect material interest.


### Investor Rights Agreement

We are party to an amended and restated investor rights agreement, which provides Mr. Spiegel and Mr. Murphy with certain registration rights with respect to up to an aggregate of 344,472,641 shares of our Class A common stock (including shares issuable on conversion of Class C common stock, which are initially convertible into Class B common stock). Under this agreement, Mr. Spiegel and Mr. Murphy have the right to request that their shares be covered by a registration statement that we are otherwise filing.


### Munger, Tolles & Olson LLP

We have in the past engaged the law firm Munger, Tolles & Olson LLP, or Munger, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's father, John Spiegel, is a partner at Munger, although John Spiegel has not personally provided any material legal services to us. For the year ended December 31, 2021, total services provided by Munger were $941,567.

Our general counsel, Michael O'Sullivan, is a former attorney at Munger.


### Gibson, Dunn & Crutcher LLP

We have in the past engaged the law firm Gibson, Dunn & Crutcher LLP, or Gibson, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's stepmother, Debra Wong Yang, is a partner at Gibson and has provided legal services to us. For the year ended December 31, 2021, total services provided by Gibson were $839,274.


### Entities Affiliated with Tencent

In the ordinary course of business, Tencent Holdings Limited and its affiliates, who hold 5% or more of our Class B common stock at December 31, 2021, purchased $4,591,102 of our advertising products for the year ended December 31, 2021.


### Aviation Matters

In June 2018, we entered into a lease of an aircraft from an entity controlled by Mr. Spiegel on terms that are advantageous to us. Under the terms of this lease, Mr. Spiegel's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Spiegel's entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Spiegel and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality and privacy.

Mr. Spiegel may use the aircraft leased by us for personal use pursuant to a time-sharing agreement between us and Mr. Spiegel in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Spiegel and guests are flown by our pilots and crew members. Mr. Spiegel reimburses us for certain costs incurred by us in connection with these

flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Spiegel has family or guests accompanying him on business flights, Mr. Spiegel cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations. In 2021, the amount that Mr. Spiegel could not reimburse was $73,220.

Additionally, we entered into a sublease of approximately 10,000 square feet of a hangar from an entity that is controlled by Mr. Spiegel. Under the terms of this sublease, Mr. Spiegel's entity leases the space to us for no charge. We cover the maintenance and insurance costs associated with the space. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We use the hangar space to store and operate the aircraft that we lease from Mr. Spiegel.

The underlying hangar lease expires in 2023. In anticipation of that expiration, Mr. Spiegel's entity previously entered into a ground lease for a site on which it is required to build a new hangar. In November 2020, we and Mr. Spiegel's entity entered into a twelve-year sublease for $0 allowing us to build and operate a new hangar on that site to support our aviation program, including the storage and operation of the aircraft that we lease from Mr. Spiegel. We plan to construct the hangar prior to the expiration of the current hangar's lease in 2023. Mr. Spiegel's entity will remain solely responsible for the ground lease rental payments, certain airport fees, and taxes, and is providing us with the existing plans and permits procured by Mr. Spiegel for construction of the hangar. In exchange for certain costs and ground lease payments that Mr. Spiegel's entity has incurred and will continue to incur, Mr. Spiegel's entity has the right to occupy space at the hangar that Snap does not require for its aviation program at a market rate determined at the time this arrangement was entered into. As of December 31, 2021, Mr. Spiegel's entity had a credit balance of approximately $1.4 million that can be used for future rent or, to the extent not utilized by the end of the term, to purchase the hangar from Snap under the terms of the sublease. No credit balance will be paid to Mr. Spiegel in cash.

Subject to certain limited exceptions, neither party may terminate this sublease for a minimum of six years. After this period, either party may terminate the sublease on 24 months' notice to the other party. Upon termination of the sublease, Mr. Spiegel's entity will purchase the hangar from Snap at its fair market value on the termination date. The audit and compensation committees of our board of directors approved this arrangement based on their assessment that it is fair and reasonable to us.

### Employment Relationships

Mr. Hunter's son, John Hunter, has been employed by us since May 2021. In 2021, John Hunter's prorated base salary was $76,923, and he received benefits comparable with similar roles at Snap Inc. In addition, he received 2,694 restricted stock units subject to vesting over thirty-six months. John Hunter is not part of Mr. Hunter's household.

### Indemnification Agreements

Our certificate of incorporation contains provisions limiting the liability of directors, and our bylaws provide that we will indemnify each of our directors and officers to the fullest extent permitted under Delaware law. Our certificate of incorporation and bylaws also provide our board of directors with discretion to indemnify our employees and other agents when determined appropriate by the board. In addition, we have entered into an indemnification agreement with each of our directors and executive officers, which requires us to indemnify them.

### Policies and Procedures for Transactions with Related Persons

In July 2016, we entered into a policy that our executive officers, directors, nominees for election as a director, beneficial owners of more than 5% of any class of our common stock, and any members of the immediate family of any of the foregoing persons are not permitted to enter into a related person transaction with us without the approval or ratification of our board of directors or our audit committee. Any request for us to enter into a transaction with an executive officer, director, nominee for election as a director, beneficial owner of more than 5% of any class of our common stock, or any member of the immediate family of any of the foregoing persons, in which the amount involved exceeds $50,000 and such person would have a direct or indirect interest, must be presented to our board of directors or our audit committee for review, consideration, and approval. In approving or rejecting any such proposal, our board of directors or our audit committee is to consider the material facts of the transaction, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction. There were no 2021 transactions where our policy was not followed.

**Director Independence**

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Ms. Coffey, Ms. Coles, Ms. Jenkins, Mr. Lafley (in 2021), Mr. Lynton, Mr. Meresman, Mr. Miller, Ms. Thorpe, and Mr. Vargas do not have relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the listing standards. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our shares by each non-employee director and the transactions described above.

**Item 14. Principal Accountant Fees and Services.**

The following table sets forth the aggregate fees for professional service provided by our independent registered public accounting firm, Ernst & Young LLP, for the years ended December 31, 2021 and 2020:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| | (in thousands) | | | |
| Audit Fees(1) | $ | 8,955 | $ | 8,327 |
| Audit-Related Fees(2) | | 99 | | 99 |
| Tax Fees(3) | | 2,287 | | 1,421 |
| All Other Fees(4) | | 461 | | 723 |
| Total | $ | 11,802 | $ | 10,570 |

(1)   Audit fees consist of the fees for professional services rendered for the audit of our financial statements, audit of our internal control over financial reporting, review of our quarterly financial statements, filing of our registration statements, accounting consultations, and audits provided in connection with statutory filings.

(2)   Audit-related fees consist of fees for professional services rendered in connection with an internal controls review of an implementation of a new enterprise financial planning and reporting system.

(3)   Tax fees consist of the fees for professional services rendered in connection with tax compliance, tax advisory, and tax planning.

(4)   All other fees consist of fees for professional services other than the services reported in audit fees, audit-related fees, and tax fees.

The audit committee has adopted a pre-approval policy under which the audit committee approves in advance all audit and permissible non-audit services to be performed by the independent accountants (subject to a *de minimis* exception). These services may include audit services, audit-related services, tax services, and other non-audit services. As part of its pre-approval policy, the audit committee considers whether the provision of any proposed non-audit services is consistent with the SEC's rules on auditor independence. In accordance with its pre-approval policy, the audit committee has pre-approved certain specified audit and non-audit services to be provided by our independent auditor. If there are any additional services to be provided, a request for pre-approval must be submitted to the audit committee for its consideration under the policy. The audit committee generally pre-approves particular services or categories of services on a case-by-case basis. Finally, in accordance with the pre-approval policy, the audit committee has delegated pre-approval authority to the chair of the audit committee. The chair must report any pre-approval decisions to the audit committee at its next meeting.

All of the services of Ernst & Young LLP for 2021 and 2020 described above were in accordance with the audit committee pre-approval policy.

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules.**

We have filed the following documents as part of this Annual Report on Form 10-K:

1.   Consolidated Financial Statements

See Index to Financial Statements and Supplemental Data on page 65.

2.   Exhibits

The documents set forth below are filed herewith or incorporated herein by reference to the location indicated.

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of Snap Inc. | S-1 | 333-215866 | 3.2 | February 2, 2017 |
| 3.2 | Amended and Restated Bylaws of Snap Inc. | 10-K | 001-38017 | 3.2 | February 4, 2021 |
| 4.1 | Form of Class A Common Stock Certificate | S-1 | 333-215866 | 4.1 | February 2, 2017 |
| 4.2 | Form of Class B Common Stock Certificate | S-8 | 333-216495 | 4.6 | March 7, 2017 |
| 4.3 | Form of Class C Common Stock Certificate | S-8 | 333-216495 | 4.7 | March 7, 2017 |
| 4.4 | Description of Securities | 10-K | 001-38017 | 4.4 | February 4, 2021 |
| 4.5 | Indenture, dated August 9, 2019, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | August 9, 2019 |
| 4.6 | Form of Global Note, representing Snap Inc.'s 0.75% Convertible Senior Notes due 2026 (included as Exhibit A to the Indenture filed as Exhibit 4.5) | 8-K | 001-38017 | 4.2 | August 9, 2019 |
| 4.7 | Indenture, dated April 28, 2020, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 28, 2020 |
| 4.8 | Form of Global Note, representing Snap Inc.'s 0.25% Convertible Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.7) | 8.K | 001-38017 | 4.2 | April 28, 2020 |
| 4.9 | Indenture, dated April 30, 2021, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 30, 2021 |
| 4.10 | Form of Global Note, representing Snap Inc.'s 0% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.9) | 8-K | 001-38017 | 4.2 | April 30, 2021 |
| 10.1+ | Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.2 | February 2, 2017 |
| 10.2+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.3 | February 2, 2017 |
| 10.3+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.4 | February 2, 2017 |

| Exhibit Number | Description | Incorporated by Reference | | | |
| --- | --- | --- | --- | --- | --- |
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 10.4+ | Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.5 | February 2, 2017 |
| 10.5+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.6 | February 2, 2017 |
| 10.6+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.7 | February 2, 2017 |
| 10.7+ | Snap Inc. 2017 Equity Incentive Plan | S-8 | 333-216495 | 99.7 | March 7, 2017 |
| 10.8+ | Forms of global grant notice, stock option agreement and notice of exercise under the Snap Inc. 2017 Equity Incentive Plan | | | | |
| 10.9+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | | | | |
| 10.10+ | Forms of restricted stock award grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-Q | 001-38017 | 10.4 | October 26, 2018 |
| 10.11+ | Snap Inc. 2017 Employee Stock Purchase Plan | S-1 | 333-215866 | 10.11 | February 2, 2017 |
| 10.12+ | Form of indemnification agreement | S-1 | 333-215866 | 10.12 | February 2, 2017 |
| 10.13+ | Amended and Restated Offer Letter, by and between Snap Inc. and Evan Spiegel, dated October 27, 2016 | S-1 | 333-215866 | 10.13 | February 2, 2017 |
| 10.14+ | Amended and Restated Offer Letter, by and between Snap Inc. and Robert Murphy, dated October 27, 2016 | S-1 | 333-215866 | 10.14 | February 2, 2017 |
| 10.15+ | Offer Letter, by and between Snap Inc. and Michael O'Sullivan, dated July 24, 2017 | 10-Q | 001-38017 | 10.1 | November 8, 2017 |
| 10.16+ | Amended and Restated Offer Letter, by and between Snap Inc. and Jerry Hunter, dated October 7, 2020 | 10-K | 001-38017 | 10.16 | February 4, 2021 |
| 10.17+ | Offer Letter, by and between Snap Inc. and Jared Grusd, dated October 19, 2018 | 10-K | 001-38017 | 10.24 | February 6, 2019 |
| 10.18+ | Offer Letter, by and between Snap Inc. and Jeremi Gorman, dated October 21, 2018 | 10-K | 001-38017 | 10.25 | February 6, 2019 |
| 10.19+ | Offer Letter, by and between Snap Inc. and Derek Andersen, dated May 16, 2019 | 8-K | 001-38017 | 10.1 | May 20, 2019 |
| 10.20+ | Offer Letter, by and between Snap Inc. and Rebecca Morrow, dated July 12, 2019 | 10-Q | 001-38017 | 10.1 | October 23, 2019 |
| 10.21+ | Snap Inc. 2021 Bonus Program | 10-K | 001-38017 | 10.1 | February 4, 2021 |
| 10.22+ | Snap Inc. 2022 Bonus Program | | | | |
| 10.23 | Revolving Credit Agreement, by and among Snap Inc., Morgan Stanley Senior Funding Inc., Deutsche Bank AG Cayman Islands Branch, | S-1 | 333-215866 | 10.21 | February 2, 2017 |

| Exhibit Number | Description | Incorporated by Reference | | | |
| --- | --- | --- | --- | --- | --- |
| | | Schedule Form | File Number | Exhibit | Filing Date |
| | Goldman Sachs Bank USA, JPMorgan Chase Bank, N.A., Barclays Bank PLC, and Credit Suisse AG, Cayman Islands Branch, dated July 29, 2016 | | | | |
| 10.24 | Joinder Agreement, by and among Snap Inc., Silicon Valley Bank, and Morgan Stanley Senior Funding, Inc., dated February 20, 2018 | 10-K | 001-38017 | 10.29 | February 22, 2018 |
| 10.25 | First Amendment to Revolving Credit Agreement, by and among Snap Inc., Morgan Stanley Senior Funding Inc., Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Bank USA, JPMorgan Chase Bank, N.A., Credit Suisse AG, Cayman Islands Branch, and Silicon Valley, dated August 13, 2018 | 8-K | 001-38017 | 10.1 | August 13, 2018 |
| 10.26 | Second Amendment to Revolving Credit Agreement, by and among Snap Inc., the lenders party thereto, and Morgan Stanley Senior Funding Inc., as administrative agent, dated August 6, 2019 | 8-K | 001-38017 | 10.1 | August 9, 2019 |
| 10.27 | Third Amendment to Revolving Credit Agreement, by and among Snap Inc. the lenders party thereto, and Morgan Stanley Senior Funding Inc., as administrative agent, dated April 23, 2020 | 8-K | 001-38017 | 10.1 | April 28, 2020 |
| 10.28 | Fourth Amendment to Revolving Credit Agreement, by and among Snap Inc., the lenders party thereto, and Morgan Stanley Senior Funding Inc., as administrative agent, dated April 27, 2021 | 8-K | 001-38017 | 10.1 | April 30, 2021 |
| 10.29 | Snap Inc. Non-Employee Director Compensation Policy | 10-K | 001-38017 | 10.28 | February 22, 2018 |
| 10.30+ | Form of Time Share Agreement | 10-Q | 001-38017 | 10.3 | October 26, 2018 |
| 10.31+ | Employment Agreement and Transition Agreement, by and between Snap Inc. and Jared Grusd, dated February 3, 2021 | 10-K | 001-38017 | 10.30 | February 4, 2021 |
| 21.1 | List of Subsidiaries | | | | |
| 23.1 | Consent of Ernst & Young, LLP, independent registered public accounting firm | | | | |
| 31.1 | Certification of the Chief Executive Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934, as amended | | | | |
| 31.2 | Certification of the Chief Financial Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934, as amended | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer of Snap Inc. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | |
| 101.INS | Inline XBRL Instance Document. | | | | |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | |
| 101.DEF | Inline XBRL Taxonomy Definition Linkbase Document. | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document. | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | |

+   Indicates management contract or compensatory plan.

*   The certifications furnished in Exhibit 32.1 hereto are deemed to accompany this Annual Report on Form 10-K and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the Registrant specifically incorporates it by reference.

**Item 16. Form 10-K Summary.**

   None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SNAP INC.**

Date: February 3, 2022

/s/ Derek Andersen
Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

Date: February 3, 2022

/s/ Rebecca Morrow
Rebecca Morrow
Chief Accounting Officer
*(Principal Accounting Officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Evan Spiegel<br>Evan Spiegel | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 3, 2022 |
| /s/ Robert Murphy<br>Robert Murphy | Director and Chief Technology Officer | February 3, 2022 |
| /s/ Derek Andersen<br>Derek Andersen | Chief Financial Officer<br>*(Principal Financial Officer)* | February 3, 2022 |
| /s/ Rebecca Morrow<br>Rebecca Morrow | Chief Accounting Officer<br>*(Principal Accounting Officer)* | February 3, 2022 |
| /s/ Kelly Coffey<br>Kelly Coffey | Director | February 3, 2022 |
| /s/ Joanna Coles<br>Joanna Coles | Director | February 3, 2022 |
| /s/ Elizabeth Jenkins<br>Elizabeth Jenkins | Director | February 3, 2022 |
| /s/ Michael Lynton<br>Michael Lynton | Director | February 3, 2022 |
| /s/ Stanley Meresman<br>Stanley Meresman | Director | February 3, 2022 |
| /s/ Scott D. Miller<br>Scott D. Miller | Director | February 3, 2022 |
| /s/ Poppy Thorpe<br>Poppy Thorpe | Director | February 3, 2022 |
| /s/ Fidel Vargas<br>Fidel Vargas | Director | February 3, 2022 |

# Exhibit 418

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM TO**

**Commission File Number 001-38017**

# SNAP INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **45-5452795** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**3000 31st Street, Santa Monica, California 90405**
**(Address of principal executive offices, including zip code)**

**(310) 399-3339**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.00001 per share | SNAP | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by checkmark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of Class A common stock on the New York Stock Exchange on June 30, 2023, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $14.8 billion.

As of February 2, 2024, the Registrant had 1,598,476,711 shares of Class A common stock, 22,528,406 shares of Class B common stock, and 231,026,943 shares of Class C common stock outstanding.

Auditor Firm Id: 42      Auditor Name: Ernst & Young LLP    Auditor Location: Los Angeles, CA, United States

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Note Regarding Forward-Looking Statements |  | 1 |
| Risk Factor Summary |  | 3 |
| Note Regarding User Metrics and Other Data |  | 5 |
| **PART I** |  |  |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 50 |
| Item 1C. | Cybersecurity | 50 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 52 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6. | Reserved | 54 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 55 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 71 |
| Item 8. | Financial Statements and Supplementary Data | 73 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 109 |
| Item 9A. | Controls and Procedures | 109 |
| Item 9B. | Other Information | 109 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 110 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 111 |
| Item 11. | Executive Compensation | 117 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 136 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 139 |
| Item 14. | Principal Accountant Fees and Services | 142 |
| **PART IV** |  |  |
| Item 15. | Exhibit and Financial Statement Schedules | 143 |
| Item 16. | Form 10-K Summary | 146 |
|  | Signatures | 147 |

### NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, about us and our industry that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this report, including statements regarding guidance, our future results of operations or financial condition, our future stock repurchase programs or stock dividends, business strategy and plans, user growth and engagement, product initiatives, objectives of management for future operations, and advertiser and partner offerings, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "going to," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions. We caution you that the foregoing may not include all of the forward-looking statements made in this report.

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends, including our financial outlook, macroeconomic uncertainty, and geo-political conflicts, that we believe may continue to affect our business, financial condition, results of operations, and prospects. These forward-looking statements are subject to risks, uncertainties, and other factors described under "Risk Factor Summary" below, "Risk Factors" in Part I, Item 1A, and elsewhere in this Annual Report on Form 10-K, including among other things:

- our financial performance, including our revenues, cost of revenues, operating expenses, and our ability to attain and sustain profitability;

- our ability to generate and sustain positive cash flow;

- our ability to attract and retain users and partners;

- our ability to attract and retain advertisers;

- our ability to compete effectively with existing competitors and new market entrants;

- our ability to effectively manage our growth and future expenses;

- our ability to comply with modified or new laws, regulations, and executive actions applying to our business;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to successfully expand in our existing market segments and penetrate new market segments;

- our ability to attract and retain qualified team members and key personnel;

- our ability to repay or refinance outstanding debt, or to access additional financing;

- future acquisitions of or investments in complementary companies, products, services, or technologies; and

- the potential adverse impact of climate change, natural disasters, health epidemics, macroeconomic conditions, and war or other armed conflict on our business, operations, and the markets and communities in which we and our partners, advertisers, and users operate.

Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. The results, events, and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Annual Report on Form 10-K. And while we believe that information provides a reasonable basis for these statements, that information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

1

Table of Contents

The forward-looking statements made in this Annual Report on Form 10-K relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this report to reflect events or circumstances after the date of this report or to reflect new information or the occurrence of unanticipated events, including future developments related to geo-political conflicts and macroeconomic conditions, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, dispositions, joint ventures, restructurings, legal settlements, or investments.

Investors and others should note that we may announce material business and financial information to our investors using our websites (including investor.snap.com), filings with the U.S. Securities and Exchange Commission, or SEC, webcasts, press releases, investor letters, and conference calls. We use these mediums, including Snapchat and our website, to communicate with our members and the public about our company, our products, and other issues. It is possible that the information that we make available may be deemed to be material information. We therefore encourage investors and others interested in our company to review the information that we make available on our websites.

Table of Contents

## Risk Factor Summary

Our business is subject to significant risks and uncertainties that make an investment in us speculative and risky. Below we summarize what we believe are the principal risk factors but these risks are not the only ones we face, and you should carefully review and consider the full discussion of our risk factors in the section titled "Risk Factors," together with the other information in this Annual Report on Form 10-K.

### 1.   Our Strategy and Advertising Business

We operate in a highly competitive and rapidly changing environment so we must continually innovate our products and evolve our business model for us to succeed.

We emphasize rapid innovation and prioritize long-term user engagement over short-term financial conditions or results if we believe that it will benefit the aggregate user experience and improve our financial performance over the long term. Although we have achieved profitability in certain periods, we have a history of operating losses and, as a result of our long-term focus, we may prioritize investments and expenses we believe are necessary for our long-term growth over achieving short-term profitability. Investments in our future, including through new products or acquisitions, are inherently risky and may not pay off, which would adversely affect our ability to settle the principal and interest payments on our outstanding convertible senior notes or other indebtedness when due, and further delay or hinder our ability to sustain profitability. This in turn would hinder our ability to secure additional financing to meet our current and future financial needs on favorable terms, or at all.

We generate substantially all of our revenue from advertising. Our advertising business is most effective when our advertisers succeed. Driving their success requires continual investment in our advertising products and may be hindered by competitive challenges and various legal, regulatory, and operating system changes that make it more difficult for us to achieve and demonstrate a meaningful return for our advertisers. For example, on-going changes to privacy and data protection laws and mobile operating systems continue to present issues for us in measuring the effectiveness of advertisements on our services. Additionally, individuals are becoming increasingly resistant to the processing of personal data to deliver behavioral, interest-based, or targeted advertisements, and regulators are likewise scrutinizing such data processing activities, which could reduce the demand for our products and services and threaten our primary revenue stream. Alternative methods, to the extent we can develop such methods in compliance with current or future privacy and data protection laws, mobile operating system requirements, and other requirements, may take time to develop and be adopted by our advertisers and users, and may not be as effective as prior methods.

We believe that this impact on our targeting, measurement, and optimization capabilities has negatively affected and may continue to negatively affect our operating results. In addition, our advertising business is seasonal, volatile, and cyclical, which could result in fluctuations in our quarterly revenues and operating results, including the expectations of our business prospects.

Our business and operations have been, and in the future could be, adversely affected by events beyond our control, such as health epidemics and geo-political events and conflicts. In addition, macroeconomic factors like labor shortages and disruptions, supply chain disruptions, banking instability, and inflation continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may also halt or decrease advertising spending, and harm our business.

### 2.   Our Community and Competition

We need to continually innovate and create new products, and enhance our existing products, to attract, retain, and grow our global community. Products that we create may fail to attract or retain users or partners, or to generate meaningful revenue, if any. In addition, we have and expect to continue to expand organically and through acquisitions, including in international markets, which we may not be able to effectively manage or scale. If our community does not see the value in our products or brand, or if competitors offer better alternatives, our community could easily switch to other services. Although we have experienced rapid growth in our community over the last few years, we have also experienced declines and there can be no assurance that declines won't happen again.

Many of our competitors have significantly more resources and larger market shares than we do, which gives them advantages over us that can make it more difficult for us to succeed.

3

### 3.   Our Partners

We primarily rely on Google, Apple, and Amazon to provide their mobile operating systems and other services for our applications and other core services, including our platform. If these partners do not provide their services as we expect, terminate their services, or change the terms, or their interpretation of the terms, of our agreements, or change the functionality of their mobile operating systems in ways that are adverse to us, our service may be interrupted and our product experience could be degraded, which may harm our reputation, increase our costs, or make it harder for us to sustain profitability. Many other parts of our business depend on partners, including content partners and advertising partners, so our success depends on our ability to attract and retain these partners.

### 4.   Our Technology and Regulation

Our business is complex and success depends on our ability to rapidly innovate, the interoperability of our service on many different smartphones and mobile operating systems, and our ability to handle sensitive user data with the care our users expect. Because our systems and our products are constantly changing, we are susceptible to data breaches, cyberattacks, security incidents, bugs, and other vulnerabilities and errors in how our products work and are measured. We may also fail to maintain effective processes that report our metrics or financial results. Given the complexity of the systems involved and the rapidly changing nature of mobile devices and operating systems, we expect to encounter issues, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable.

We are also subject to complex and evolving federal, state, local, and foreign laws and regulations regarding privacy, data protection, biometric processing, content, artificial intelligence, taxes, and other matters, which are subject to change and have uncertain interpretations. Given the nature of our business, we are particularly susceptible to changes in such laws regarding privacy and data protection, which may require us to change our products and may impact our revenue stream. Any actual or perceived failure to comply with such legal and regulatory obligations, including in connection with our consent decree with the U.S. Federal Trade Commission, may lead to costly litigation or otherwise adversely impact our business.

We also must actively protect our intellectual property. We are subject to various legal proceedings, claims, class actions, inquiries, and investigations related to our intellectual property, which may be costly or distract management. We also rely on a variety of statutory and common-law frameworks for the content we provide our users, including the Digital Millennium Copyright Act, the Communications Decency Act, and the fair-use doctrine, each of which has been subject to adverse judicial, political, and regulatory scrutiny in recent times.

### 5.   Our Team and Capital Structure

We need to attract and retain a high caliber team to maintain our competitive position. We may incur significant costs and expenses in maintaining and growing our team, and may lose valuable members of our team as we compete globally, including with our competitors, for key talent. A substantial portion of our employment costs is paid in our common stock, the price of which has been volatile, and our ability to attract and retain talent may be adversely affected if our shares decline in value.

Our two co-founders, who serve as our Chief Executive Officer and Chief Technology Officer, control over 99% of the voting power of our outstanding capital stock, which means they control substantially all outcomes submitted to stockholders. Class A common stockholders have no voting rights, unless required by Delaware law. This concentrated control may result in our co-founders voting their shares in their best interest, which might not always be in the interest of our stockholders generally.

Table of Contents

## NOTE REGARDING USER METRICS AND OTHER DATA

We define a Daily Active User, or DAU, as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We define average revenue per user, or ARPU, as quarterly revenue divided by the average DAUs. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on our determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This allocation differs from our components of revenue disclosure in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer. For information concerning these metrics as measured by us, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Unless otherwise stated, statistical information regarding our users and their activities is determined by calculating the daily average of the selected activity for the most recently completed quarter included in this report.

While these metrics are determined based on what we believe to be reasonable estimates of our user base for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, there may be individuals who attempt to create accounts for malicious purposes, including at scale, even though we forbid that in our Terms of Service and Community Guidelines. We implement measures in our user registration process and through other technical measures to prevent, detect and suppress that behavior, although we have not determined the number of such accounts.

Changes in our products, infrastructure, mobile operating systems, or metric tracking system, or the introduction of new products, may impact our ability to accurately determine active users or other metrics and we may not determine such inaccuracies promptly. We also believe that we don't capture all data regarding each of our active users. Technical issues may result in data not being recorded from every user's application. For example, because some Snapchat features can be used without internet connectivity, we may not count a DAU because we don't receive timely notice that a user has opened the Snapchat application. This undercounting may increase as we grow in Rest of World markets where users may have poor connectivity. We do not adjust our reported metrics to reflect this underreporting. We believe that we have adequate controls to collect user metrics, however, there is no uniform industry standard. We continually seek to identify these technical issues and improve both our accuracy and precision, including ensuring that our investors and others can understand the factors impacting our business, but these technical issues and new issues may continue in the future, including if there continues to be no uniform industry standard.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from our age demographics or estimate their ages based on a sample of the self-reported ages that we do have. If our active users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor expectations.

We count a DAU only when a user opens the application and only once per user per day. We believe this methodology more accurately measures our user engagement. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, and becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application.

If we fail to maintain an effective analytics platform, our metrics calculations may be inaccurate. We regularly review, have adjusted in the past, and are likely in the future to adjust our processes for calculating our internal metrics to improve their accuracy. As a result of such adjustments, our DAUs or other metrics may not be comparable to those in prior periods. Our measures of DAUs may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology or data used.

**PART I**

**Item 1. Business.**

**Overview**

Snap Inc. is a technology company. We believe the camera presents the greatest opportunity to improve the way people live and communicate. We contribute to human progress by empowering people to express themselves, live in the moment, learn about the world, and have fun together.

Our flagship product, Snapchat, is a visual messaging application that enhances your relationships with friends, family, and the world. Visual messaging is a fast, fun way to communicate with friends and family using augmented reality, video, voice, messaging, and creative tools. Snaps are deleted by default to mimic real-life conversations, so there is less pressure to look popular or perfect when creating and sending images on Snapchat. By reducing the friction typically associated with creating and sharing content, Snapchat has become one of the most used cameras in the world.

The camera is a powerful tool for communication and the entry point for augmented reality experiences. By opening directly to the camera, Snapchat empowers our community to express themselves instantly and offers millions of augmented reality Lenses for self expression, learning, and play. In the way that the flashing cursor became the starting point for most products on desktop computers, we believe the camera screen will be the starting point for most products on smartphones. This is because images created by smartphone cameras contain more context and richer information than other forms of input like text entered on a keyboard. Given the magnitude of this opportunity, we are investing and innovating to continue to deliver products and services that are differentiated and that are better able to reflect and improve our life experiences.

**Snapchat**

Snapchat is our core mobile device application and contains five distinct tabs, complemented by additional tools that function outside of the application. With a breadth of visual messaging and content experiences available within the application, Snapchatters can interact with any or all of the five tabs.

*Camera*: The Camera is a powerful tool for communication and the entry point for augmented reality experiences in Snapchat. Snapchat opens directly to the Camera, making it easy to create a Snap and send it to friends. Our augmented reality, or AR, capabilities within our Camera allow for creativity and self-expression. We offer millions of Lenses, created by both us and our community, along with creative tools and licensed music and audio clips, which make it easy for people to personalize and contextualize their Snaps. We also offer voice and scanning technology within our Camera. While Snaps are deleted by default to mimic real-life conversations, users can save their creativity through a searchable collection of Memories stored on both their Snapchat account and their mobile device. A user can also create Snaps on our wearable devices, Spectacles. Spectacles connect seamlessly with Snapchat and capture photos and video from a human perspective. Our latest version of Spectacles, designed for creators, overlays AR Lenses directly onto the world.

*Visual Messaging*: Visual Messaging is a fast, fun way to communicate with friends and family using augmented reality, video, voice, messaging, and creative tools. We also offer My AI, our AI-powered chatbot, which helps our community foster creativity and connection with friends, receive real-world recommendations, and learn more about their interests and favorite subjects. They can also communicate through our proprietary personalized avatar tool, Bitmoji, and its associated contextual stickers and images, which integrate seamlessly into both mobile devices and desktop browsers.

*Snap Map*: Snap Map is a live and highly personalized map that allows Snapchatters to connect with friends and explore what is going on in their local area. Snap Map makes it easy to locate nearby friends who choose to share their location, view a heatmap of recent Snaps posted to Our Story by location, and locate local businesses. Places, rich profiles of local businesses that include information such as store hours and reviews, overlay specialized experiences from select partners on top of Snap Map, and allow Snapchatters to take direct actions from Snap Map, such as sharing a favorite store, ordering takeout, or making a reservation.

*Stories*: Stories are a fun way to stay connected with people you care most about. Stories feature content from a Snapchatter's friends, our community, and our content partners. Friends Stories allow our community to express themselves in narrative form through photos and videos, shown in chronological order, to their friends. The Discover section of this tab displays curated content based on a Snapchatter's subscriptions and interests, and features news and

Table of Contents

entertainment from both our creator community and publisher partners. We also offer Public Profiles, as a way for our creator community and our advertising partners to memorialize and scale their content and AR Lenses on our platform.

*Spotlight*: Spotlight showcases the best of Snapchat, helping people discover new creators and content in a personalized way. Here we surface the most entertaining Snaps from our community all in one place, which becomes tailored to each Snapchatter over time based on their preferences and favorites. The Trending page allows Snapchatters to discover and engage with popular topics and genres.

Additionally, we offer Snapchat+, our subscription product that provides subscribers access to exclusive, experimental, and pre-release features. Snapchat+ offers a variety of features from allowing Snapchatters to customize the look and feel of their app, to giving special insights into their friendships. We also offer Snapchat for Web, a browser-based product that brings Snapchat's signature capabilities to the web.

**Our Partner Ecosystem**

Many elements and features of Snapchat are enhanced by our expansive partner ecosystem that includes developers, creators, publishers, and advertisers, among others. We help them create and bring diverse content and experiences into Snapchat, leverage Snapchat capabilities in their own applications and websites, and use advertising to promote these and other experiences to our large, engaged, and differentiated user base. We seek to reward our partner ecosystem for their creativity, and continue to support them as they grow their audience and build their business on Snapchat.

Developers are able to integrate with Snapchat and its core technologies, like Snap's AR Camera and Bitmoji, through a variety of tools. Creative Kit gives developers and their communities a seamless sharing experience from their app directly to Snapchat. Through Camera Kit, our partners can embed Snap's AR platform directly into their application, extending the use of AR beyond self-expression and communication use cases. We also provide developers a turnkey suite of tools and services that enable them to create AR Lenses and track the performance of those through analytics. Finally, developers can bring an inclusive mode of identity and expression to their apps and games with our Bitmoji for Developers APIs and SDKs.

AR creators can use Lens Studio, our powerful desktop application designed for creators and developers, to build augmented reality experiences for Snapchatters. Spotlight creators can utilize our content creation tools to reach millions of Snapchatters and build their businesses through various monetization opportunities. Our Creator Marketplace connects both AR and Spotlight creators directly with our advertising partners. We provide monetizable opportunities through programs like the Snap Lens Network and Ghost, which provide grants to support AR product development across many industries. We also support our content creator community through a number of programs, including advertising revenue sharing on our mid-roll advertisements in Snap Stars' Stories.

Publisher partners can expand their audiences and monetize content through our Discover platform. In addition, we work with various telecommunications providers and original equipment manufacturers, particularly as we build our presence in new markets.

**Our Advertising Products**

We connect brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way through AR Lenses. AR Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences, including the ability to visualize and try on products such as beauty, apparel, accessories, and footwear. AR Lenses can be memorialized on Snapchat, through Public Profiles that aggregate content and lenses in a single, easy to find place.

Table of Contents

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: We aim to continually improve the way these ad formats are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, make a purchase, visit a local business, call or text a business, watch a story or video, download an app, or return to an app, among others. Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.

*Measuring Advertising Effectiveness*: We offer first-party measurement solutions and we support our advertising partners preferred third-party measurement solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.

## Technology

Our research and development efforts focus on product development, advertising technology, and large-scale infrastructure.

*Product Development*: We work relentlessly and invest deliberately to create and improve products for our community and our partners. We develop a wide range of products related to visual messaging and storytelling that are powered by a variety of new technologies.

*Advertising Technology*: We constantly develop and expand our advertising products and technology. In an effort to provide a strong and scalable return on investment to our advertisers, our advertising technology roadmap centers around improving our delivery framework, measurement capabilities, and self-serve tools.

*Large-scale Infrastructure*: We spend considerable resources and investment on the underlying architecture that powers our products, such as optimizing the delivery of billions of videos to hundreds of millions of people around the world every day. We currently partner with third party providers to support the infrastructure for our growing needs. These partnerships have allowed us to scale quickly without upfront physical infrastructure costs, allowing us to focus our efforts on product innovation.

## Employees and Culture

We seek to be a force for good through our products, our work to strengthen our communities, our efforts to make a positive impact on the planet, and our inclusive workplace.

*Supporting Our Team*: Our values at Snap are being kind, smart, and creative, and we put those values into action through how we support our team and how our team supports one another. Council, which is a practice of active listening that promotes open-mindedness and cultivates empathy and compassion among participants, helps us build and sustain a community steeped in integrity, connection, collaboration, creativity, and kindness. Our talent development programs seek to unlock potential by helping team members advance, learn, and grow in a fair and equitable way at Snap. We focus on the health and well-being of our employees through programs and benefits that support their physical, emotional, and financial fitness. To attract and retain the best talent, we aim to offer challenging work in an environment that enables our employees to have a direct meaningful contribution to new and exciting projects. Underlying these values is our commitment to ethical conduct where we work to instill in our team that acting with integrity means being your whole self, being honest, and doing the right thing.

*Diversity, Equity, and Inclusion*: Snap has long supported Diversity, Equity and Inclusion, or DEI, initiatives, and we have made progress on a number of fronts, including diversifying our board of directors and executive leadership, introducing new accountability around DEI outcomes, maintaining an allyship program to inspire a more inclusive culture, and enhancing our recruiting process to continue driving diverse hiring. To aid in our mission, we publish a Diversity Annual Report that discusses our goals with respect to diversity, equity, and inclusion efforts. This report outlines our beliefs around the idea that an inclusive workplace and inclusive products are central to achieving that purpose. This report is excerpted in our broader CitizenSnap Report that details the work we're doing to support our communities, our planet, and our team, and is available on our website at www.snap.com.

*Human Capital*: As part of our human capital resource objectives, we seek to recruit, retain, and incentivize our highly talented existing and future employees. We believe that creating an inclusive environment where team members can grow, develop, and be their true selves is critical to attracting and retaining talent. Our compensation philosophies also align to that belief.

Our compensation philosophy is based around building a culture of ownership and high performance by putting both impact and our values at the center of our performance feedback process and pay outcomes. We utilize equity as part of our compensation practices to drive a long-term orientation and have committed to paying a minimum living wage for all employees globally.

As of December 31, 2023, we had 5,289 full-time employees, of whom approximately 54% are in engineering roles involved in the design, development, support, and manufacture of new and existing products and processes.

*Climate Change:* Our commitment to combating climate change remains unchanged. In 2021, we adopted science-based emissions reduction targets approved by the Science Based Targets Initiative. Additionally, in 2021, we achieved carbon neutrality from our founding in 2011 through 2020. In 2023 and 2022, we maintained our carbon-neutral status by purchasing offsets to emissions attributable to Snap as of December 31, 2022 and 2021, respectively. We remain committed to achieve net negative carbon emissions by 2030. In 2023 and 2022, we purchased renewable energy certificates covering all electricity consumed in our global operations for the years ended December 31, 2022 and 2021, respectively.

**Our Commitment to Privacy**

Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.

We built Snapchat as an antidote to the context-less communication that has plagued "social media." Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. Somewhere along the way, social media—by prioritizing virality and permanence—sapped conversations of this valuable context and choice. When we began to communicate online, we lost some of what made communication great: spontaneity, emotion, honesty—the full range of human expression that makes us human in the first place.

We don't think digital communication has to be this way. That's why choice matters. We build products and services that emphasize the context of a conversation—who, when, what, and where something is being said. If you don't have the autonomy to shape the context of a conversation, the conversation will simply be shaped by the permanent feeds that homogenize online conversations.

When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication. For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understands exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Safety and Privacy Hub where we show that context and choice are more than talking points. There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more. This is where you'll also find our Transparency Report in which we provide insight into these efforts and visibility into the nature and volume of content reported on our platform.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

**Competition**

We compete with other companies in every aspect of our business, particularly with companies that focus on mobile engagement and advertising. Many of these companies, such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Meta (including Facebook, Instagram, Threads, and WhatsApp), Pinterest, and X (formerly Twitter), may have greater financial and human resources and, in some cases, larger user bases. Given the breadth of our product offerings, we also compete with companies that develop products or otherwise operate in the mobile, camera, communication, content, and advertising industries that offer, or will offer, products and services that may compete with Snapchat features or offerings. Our competitors span from internet technology companies and digital platforms, to traditional companies in print, radio, and television sectors to underlying technologies like default smartphone cameras and messaging. Additionally, our competition for engagement varies by region. For instance, we face competition from companies like Kakao, LINE, Naver (including Snow), and Tencent in Asia.

We compete to attract and retain our users' attention, both in terms of reach and engagement. Since our products and those of our competitors are typically free, we compete based on our brand and the quality and nature of our product offerings rather than on price. As such, we invest heavily in constantly improving and expanding our product lines.

We also compete with other companies to attract and retain partners and advertisers, which depends primarily on our reach and ability to deliver a strong return on investment.

Finally, we compete to attract and retain highly talented individuals, including software engineers, designers, and product managers. In addition to providing competitive compensation packages, we compete for talent by fostering a culture of working hard to create great products and experiences and allowing our employees to have a direct meaningful contribution to new and exciting projects.

**Seasonality in Our Business**

We have historically seen seasonality in our business. Overall advertising spend tends to be strongest in the fourth quarter of the calendar year, and we have observed a similar pattern in our historical revenue. We have also experienced seasonality in our user engagement, generally seeing lower engagement during summer months and higher engagement in December.

**Intellectual Property**

Our success depends in part on our ability to protect our intellectual property and proprietary technologies. To protect our proprietary rights, we rely on a combination of intellectual property rights in the United States and other jurisdictions, including patents, trademarks, copyrights, trade secret laws, license agreements, internal procedures, and contractual provisions. We also enter into confidentiality and invention assignment agreements with our employees and contractors and sign confidentiality agreements with third parties. Our internal controls are designed to restrict access to proprietary technology.

Table of Contents

As of December 31, 2023, we had approximately 3,174 issued patents and approximately 3,111 filed patent applications in the United States and foreign countries relating to our camera platform and other technologies. Our issued patents will expire between 2024 and 2047. We may not be able to obtain protection for our intellectual property, and our existing and future patents, trademarks, and other intellectual property rights may not provide us with competitive advantages or distinguish our products and services from those of our competitors.

We license content, trademarks, technology, and other intellectual property from our partners, and rely on our license agreements with those partners to use the intellectual property. We also enter into licensing agreements with third parties to receive rights to patents and other know-how. Third parties may assert claims related to intellectual property rights against our partners or us.

Other companies and "non-practicing entities" that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights related to the mobile, camera, communication, content, internet, and other technology-related industries frequently enter into litigation based on allegations of infringement, misappropriation, and other violations of intellectual property or other rights. As our business continues to grow and competition increases, we will likely face more claims related to intellectual property and litigation matters.

## Government Regulation

We are subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, data protection, content regulation, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended in a manner that could harm our business. Compliance with these laws and regulations has not had, and is not expected to have, a material effect on our capital expenditures, results of operations, and competitive position as compared to prior periods, and we do not currently anticipate material capital expenditures for environmental control facilities.

In December 2014, the Federal Trade Commission resolved an investigation into some of our early practices by handing down a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year lifespan of the order, we must complete biennial independent privacy audits. In June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

Furthermore, foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. It is possible that certain governments may seek to block or limit our products or otherwise impose other restrictions that may affect the accessibility or usability of any or all our products for an extended period of time or indefinitely. Not all of our products are available in all locations and may not be due to such laws and regulations. Our public policy team monitors legal and regulatory developments in the United States, as well as many foreign countries, and communicates with policymakers and regulators in the United States and internationally.

## Information about Segment and Geographic Revenue

Information about segment and geographic revenue is set forth in Notes 1 and 2 of the notes to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

## Available Information

Our website address is www.snap.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to these reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are filed with the SEC. Such reports and other information filed or furnished by us with the SEC are available free of charge on our website at investor.snap.com when such reports are available on the SEC's website. We use our website, including investor.snap.com, as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

Information contained in, or accessible through, the websites referred to in this Annual Report on Form 10-K is not incorporated into this filing. Further, our references to website addresses are only as inactive textual references.

### Item 1A. Risk Factors.

*You should carefully consider the risks and uncertainties described below, together with all the other information in this Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the related notes. If any of the following risks actually occurs (or if any of those discussed elsewhere in this Annual Report on Form 10-K occurs), our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. Unless otherwise indicated, references to our business being seriously harmed in these risk factors will include harm to our business, reputation, financial condition, results of operations, revenue, and future prospects. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business and Industry

***Our ecosystem of users, advertisers, and partners depends on the engagement of our user base. Our user base growth rate has declined in the past and it may do so again in the future. If we fail to retain current users or add new users, or if our users engage less with Snapchat, our business would be seriously harmed.***

We had 414 million daily active users, or DAUs, on average in the quarter ended December 31, 2023. We view DAUs as a critical measure of our user engagement, and adding, maintaining, and engaging DAUs have been and will continue to be necessary. Our DAUs and DAU growth rate have declined in the past and they may decline in the future due to various factors, including as the size of our active user base increases, as we achieve higher market penetration rates, as we face continued competition for our users and their time, or if there are performance issues with our service. In addition, as we achieve maximum market penetration rates among younger users in developed markets, future growth in DAUs will need to come from older users in those markets or from developing markets, which may not be possible or may be more difficult, expensive, or time-consuming for us to achieve. While we may experience periods when our DAUs increase due to products and services with short-term popularity, we may not always be able to attract new users, retain existing users, or maintain or increase the frequency and duration of their engagement if current or potential new users do not perceive our products to be fun, engaging, or useful. In addition, because our products typically require high bandwidth data capabilities for users to benefit from all of the features and capabilities of our application, many of our users live in countries with high-end mobile device penetration and high bandwidth capacity cellular networks with large coverage areas. We therefore do not expect to experience rapid user growth or engagement in regions with either low smartphone penetration or a lack of well-established and high bandwidth capacity cellular networks. As our DAU growth rate continues to slow or if the number of DAUs becomes stagnant, or we have a decline in DAUs, our financial performance will increasingly depend on our ability to elevate user activity or increase the monetization of our users.

Snapchat is free and easy to join, the barrier to entry for new entrants in our business is low, and the switching costs to another platform are also low. Moreover, the majority of our users are 18-34 years old. This demographic may be less brand loyal and more likely to follow trends, including viral trends, than other demographics. These factors may lead users to switch to another product, which would negatively affect our user retention, growth, and engagement. Snapchat also may not be able to penetrate other demographics in a meaningful manner. Falling user retention, growth, or engagement could make Snapchat less attractive to advertisers and partners, which may seriously harm our business. In addition, we continue to compete with other companies to attract and retain our users' attention. There are many factors that could negatively affect user retention, growth, and engagement, including if:

- users engage more with competing products instead of ours;

- our competitors continue to mimic our products or improve on them;

- we fail to introduce new and exciting products and services or those we introduce or modify are poorly received;

- our products fail to operate effectively or compatibly on the iOS or Android mobile operating systems;

- we are unable to continue to develop products that work with a variety of mobile operating systems, networks, and smartphones;

- we do not provide a compelling user experience because of the decisions we make regarding the type and frequency of advertisements that we display or the structure and design of our products;

- we are unable to combat bad actors, spam, or other hostile or inappropriate usage on our products;

- there are changes in user sentiment about the quality or usefulness of our products in the short-term, long-term, or both;

- there are concerns about the privacy implications, safety, or security of our products and our processing of personal data;

- our content partners do not create content that is engaging, useful, or relevant to users;

- our content partners decide not to renew agreements or devote the resources to create engaging content, or do not provide content exclusively to us;

- advertisers and partners display ads that are untrue, offensive, or otherwise fail to follow our guidelines;

- our products are subject to increased regulatory scrutiny or approvals, including from foreign privacy regulators, or there are changes in our products that are mandated or prompted by legislation, regulatory authorities, executive actions, or litigation, including settlements or consent decrees, that adversely affect the user experience;

- technical or other problems frustrate the user experience or negatively impact users' trust in our service, including by providers that host our platforms, particularly if those problems prevent us from delivering our product experience in a fast and reliable manner, or cyberattacks, breaches, or other security incidents that compromise our sensitive user data;

- we fail to provide adequate service to users, advertisers, or partners;

- we do not provide a compelling user experience to entice users to use the Snapchat application on a daily basis, or our users don't have the ability to make new friends to maximize the user experience;

- we, our partners, or other companies in our industry segment are the subject of adverse media reports or other negative publicity, some of which may be inaccurate or include confidential information that we are unable to correct or retract;

- we do not maintain our brand image or our reputation is damaged; or

- our current or future products reduce user activity on Snapchat by making it easier for our users to interact directly with our partners.

Any decrease to user retention, growth, or engagement could render our products less attractive to users, advertisers, or partners, and would seriously harm our business.

***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm our business.***

Substantially all of our revenue is generated from third parties advertising on Snapchat. For the years ended December 31, 2023, 2022, and 2021, advertising revenue accounted for approximately 96%, 99%, and 99% of our total revenue, respectively. Even though we have introduced other revenue streams, including a subscription model for one of our products, we still expect this trend to continue for the foreseeable future. Most advertisers do not have long-term advertising commitments with us, and our efforts to establish long-term commitments may not succeed.

Our advertising customers range from small businesses to well-known brands, and may include advertising resellers. Many of our customers spend a relatively small portion of their overall advertising budget with us, but some customers have devoted meaningful budgets that contribute more significantly to our total revenue. In addition, advertisers may view some of our advertising solutions as experimental and unproven, or prefer certain of our products over others. Advertisers, including our customers who have devoted meaningful advertising budgets to our product, will not continue to do business with us if we do not deliver advertisements in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. As our business continues to develop, there may be new or existing customers, including from different geographic regions, that contribute more significantly to our total revenue, and a loss of such customers or a significant reduction in how much they spend with us could adversely impact our business. Any economic or political instability, whether as a result of the macroeconomic climate, war or other armed conflict, terrorism, or otherwise, in a specific country or region, may negatively impact the global or local economy, advertising ecosystem, our customers and their budgets with us, or our ability to forecast our advertising revenue, and could seriously harm our business.

Table of Contents

Moreover, we rely heavily on our ability to collect and disclose data and metrics to our customers so we can attract new customers and retain existing customers. Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data and metrics that our customers find useful would impede our ability to attract and retain advertisers. Regulators in many of the countries in which we operate or have users are increasingly scrutinizing and regulating the collection, use, and sharing of personal data related to advertising, which could materially impact our revenue and seriously harm our business. Many of these laws and regulations expand the rights of individuals to control how their personal data is collected and processed, and place restrictions on the use of personal data of teens. The processing of personal data for personalized advertising continues to be under increased scrutiny from regulators, which includes ongoing regulatory action against large technology companies like ours, the outcomes of which may be uncertain and subject to appeal. These laws may prohibit us and our customers from targeting advertising to teens based on the profiling of personal data. Other legislative proposals and present laws and regulations may also apply to our or our advertisers' activities and require significant operational changes to our business. These laws and regulations could have a material impact on the development and deployment of AI and machine learning in the context of our targeted advertising activities. Other laws to which we are or may become subject further regulate behavioral, interest-based, or targeted advertising, making certain online advertising activities more difficult and subject to additional scrutiny. These laws grant users the right to opt-out of sharing of their personal data for certain advertising purposes in exchange for money or other valuable consideration, or require parental consent to be obtained for the processing of personal data of users under a certain age and restrict tracking and use of teens' data, including for advertising. Regulators have issued significant monetary fines in certain circumstances where the regulators alleged that appropriate consent was not obtained in connection with targeted advertising activities. In addition, legislative proposals and present laws and regulations in countries where we operate regulate the use of cookies and other tracking technologies, electronic communications, and marketing.

Furthermore, in April 2021, Apple issued an iOS update that imposed heightened restrictions on our access and use of user data by allowing users to more easily opt-out of tracking of activity across devices. Additionally, Google announced that it will implement similar changes with respect to its Android operating system, and major web browsers, like Firefox, Safari, and Chrome, have or plan to make similar changes as well. The implemented changes have had, and the announced or planned changes likely will have, an adverse effect on our targeting, measurement, and optimization capabilities, and in turn our ability to target advertisements and measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business. The longer-term impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community remains uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any alternative solutions we implement are subject to rules and standards set by the owners of such mobile operating systems which may be unclear, change, or be interpreted in a manner adverse to us and require us to halt or change our solutions, any of which could seriously harm our business. In addition, if we are unable to mitigate or respond to these and future developments, and alternative solutions do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Our advertising revenue could also be seriously harmed by many other factors, including:

- diminished or stagnant growth, or a decline, in the total or regional number of DAUs on Snapchat;

- our inability to deliver advertisements to all of our users due to legal restrictions or hardware, software, or network limitations;

- a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Visual Messaging, Map, Stories, and Spotlight platforms;

- our inability to create new products that sustain or increase the value of our advertisements;

- changes in our user demographics that make us less attractive to advertisers;

- lack of ad creative availability by our advertising partners;

- a decline in our available content, including if our content partners do not renew agreements, devote the resources to create engaging content, or provide content exclusively to us;

- decreases in the perceived quantity, quality, usefulness, or relevance of the content provided by us, our community, or partners;

- increases in resistance by users to our collecting, using, and sharing their personal data for advertising-related purposes;

14

Table of Contents

- changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content;

- competitive developments or advertiser perception of the value of our products that change the rates we can charge for advertising or the volume of advertising on Snapchat;

- product changes or advertising inventory management decisions we may make that change the type, size, frequency, or effectiveness of advertisements displayed on Snapchat or the method used by advertisers to purchase advertisements;

- adverse legal developments relating to advertising, including changes mandated or prompted by legislation, regulation, executive actions, or litigation regarding the collection, use, and sharing of personal data for certain advertising-related purposes;

- adverse media reports or other negative publicity involving us, our founders, our partners, or other companies in our industry;

- advertiser or user perception that content published by us, our users, or our partners is objectionable;

- the degree to which users skip advertisements and therefore diminish the value of those advertisements to advertisers;

- changes in the way advertising is priced or its effectiveness is measured;

- our inability, or perceived inability, to achieve an advertiser's intended performance metric, measure the effectiveness of our advertising, or target the appropriate audience for advertisements;

- our inability to access, collect, and disclose user's personal data, including advertising or similar deterministic identifiers that new and existing advertisers may find useful;

- difficulty and frustration from advertisers who may need to reformat or change their advertisements to comply with our guidelines;

- volatility in the equity markets, which may reduce our advertisers' capacity or desire for aggressive advertising spending towards growth; and

- the political, economic, and macroeconomic climate and the status of the advertising industry in general, including impacts related to labor shortages and disruptions, supply chain disruptions, banking instability, inflation, and as a result of war, terrorism, or armed conflict.

Moreover, individuals are also becoming increasingly aware of and resistant to the collection, use, and sharing of personal data in connection with advertising. Individuals are becoming more aware of options and certain rights related to consent and other options to opt-out of such data processing, including through media attention about privacy and data protection. Some users have opted out of allowing Snap to combine certain data from third-party apps and websites with certain data from Snapchat for advertising purposes, which has negatively impacted our ability to collect certain user data and our advertising partners' ability to deliver relevant content, all of which could negatively impact our business

These and other factors could reduce demand for our advertising products, which may lower the prices we receive, or cause advertisers to stop advertising with us altogether. Either of these would seriously harm our business.

***Snapchat depends on effectively operating with mobile operating systems, hardware, networks, regulations, and standards that we do not control. Changes in our products or to those mobile operating systems, hardware, networks, regulations, or standards may seriously harm our user retention, growth, and engagement.***

Because Snapchat is used primarily on mobile devices, the application must remain interoperable with popular mobile operating systems, primarily Android and iOS, application stores, and related hardware, including mobile-device cameras. The owners and operators of such mobile operating systems and application stores, primarily Google and Apple, each have approval authority over whether to feature our core products on their application stores and make available to consumers third-party products that compete with ours. Furthermore, there is no guarantee that any approval previously provided by such owner or operator will not be rescinded in the future. Additionally, mobile devices and mobile-device cameras are manufactured by a wide array of companies. Those companies have no obligation to test the interoperability of new mobile devices, mobile-device cameras, or related devices with Snapchat, and may produce new products that are incompatible with or not optimal for Snapchat. We have no control over these mobile operating systems, application stores,

or hardware, and any changes may degrade our products' functionality, or give preferential treatment to competitive products. Actions by government authorities may also impact our access to these systems or hardware and could seriously harm Snapchat usage. Our competitors that control the mobile operating systems and related hardware could make interoperability of our products more difficult or display their competitive offerings more prominently than ours. Additionally, our competitors that control the standards for the application stores could make Snapchat, or certain features of Snapchat, inaccessible for a potentially significant period of time or require us to make changes to maintain access. We plan to continue to introduce new products and features regularly, including some features that may only work on the latest systems and hardware, and have experienced that it takes significant time to optimize new products and features to function with the variety of existing mobile operating systems, hardware, and standards, impacting the popularity of such products, and we expect this trend to continue.

Moreover, our products require high-bandwidth data capabilities. If the costs of data usage increase or access to cellular networks is limited, our user retention, growth, and engagement may be seriously harmed. Additionally, to deliver high-quality video and other content over mobile cellular networks, our products must work well with a range of mobile technologies, systems, networks, regulations, and standards that we do not control and which may be subject to future changes. In addition, the proposal or adoption of any laws, regulations, or initiatives that adversely affect the growth, popularity, or use of the internet, including laws governing internet neutrality, could decrease the demand for our products, including by impairing our ability to retain existing users or attract new users, make Snapchat a less attractive alternative to our competitors' applications, and increase our cost of doing business.

We may not successfully cultivate relationships with key industry participants or develop products that operate effectively with these technologies, systems, networks, regulations, or standards. If it becomes more difficult for our users to access and use Snapchat, if our users choose not to access or use Snapchat, or if our users choose to use products that do not offer access to Snapchat, our business and user retention, growth, and engagement could be seriously harmed.

***We rely on Google Cloud and Amazon Web Services, or AWS, for the vast majority of our computing, storage, bandwidth, and other services. Any disruption of or interference with our use of either platform would negatively affect our operations and seriously harm our business.***

Google and Amazon provide distributed computing infrastructure platforms for business operations, commonly referred to as a "cloud" computing service. We currently run the vast majority of our computing on Google Cloud and AWS and have built our software and computer systems to use computing, storage capabilities, bandwidth, and other services provided by Google and AWS. Our systems are not fully redundant on the two platforms. Any transition of the cloud services currently provided by either Google Cloud or AWS to the other platform or to another cloud provider would be difficult to implement and would cause us to incur significant time and expense. Given this, any significant disruption of or interference with Google Cloud or AWS, whether temporary, regular, or prolonged, would negatively impact our operations and our business would be seriously harmed. If our users or partners are not able to access Snapchat or specific Snapchat features, or encounter difficulties in doing so, due to issues or disruptions with Google Cloud or AWS, we may lose users, partners, or advertising revenue. The level of service provided by Google Cloud and AWS or similar providers may also impact our users', advertisers', and partners' usage of and satisfaction with Snapchat and could seriously harm our business and reputation if the level of service decreases. Hosting costs also have and will continue to increase as our user base and user engagement grows and may seriously harm our business if we are unable to grow our revenues faster than the cost of utilizing the services of Google Cloud, AWS, or similar providers.

In addition, Google or Amazon may take actions beyond our control that could seriously harm our business, including:

- discontinuing or limiting our access to its cloud platform;

- increasing pricing terms;

- terminating or seeking to terminate our contractual relationship altogether;

- establishing more favorable relationships or pricing terms with one or more of our competitors; or

- modifying or interpreting its terms of service or other policies in a manner that impacts our ability to run our business and operations.

16

Table of Contents

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be seriously harmed. If we need to license or acquire new intellectual property, we may incur substantial costs.***

We aim to protect our confidential proprietary information, in part, by entering into confidentiality agreements and invention assignment agreements with our employees, consultants, advisors, and third parties who access or contribute to our proprietary know-how, information, or technology. We, however, cannot assure you that these agreements will be effective in controlling access to, or preventing unauthorized distribution, use, misuse, misappropriation, reverse engineering, or disclosure of our proprietary information, know-how, and trade secrets. These agreements may be breached, and we may not have adequate remedies for any such breach. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret or know-how can be difficult, expensive, and time-consuming, and the outcome can be unpredictable. Furthermore, these agreements do not prevent our competitors or partners from independently developing offerings that are substantially equivalent or superior to ours.

We also rely on trademark, copyright, patent, trade secret, and domain-name protection laws to protect our proprietary rights. In the United States and internationally, we have filed various applications to protect aspects of our intellectual property, and we currently hold a number of issued patents, trademarks, and copyrights in multiple jurisdictions. In the future, we may acquire additional patents or patent portfolios in the future, which could require significant cash expenditures. However, third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge proprietary rights held by us, third parties may design around our proprietary rights or independently develop competing technology, and pending and future trademark, copyright, and patent applications may not be approved. Moreover, we cannot ensure that the claims of any granted patents will be sufficiently broad to protect our technology or platform and provide us with competitive advantages. Additionally, failure to comply with applicable procedural, documentary, fee payment, and other similar requirements could result in abandonment or lapse of the affected patent, trademark, or copyright application or registration.

Moreover, a portion of our intellectual property has been acquired or licensed from one or more third parties. While we have conducted diligence with respect to such acquisitions and licenses, because we did not participate in the development or prosecution of much of the acquired intellectual property, we cannot guarantee that our diligence efforts identified and remedied all issues related to such intellectual property, including potential ownership errors, potential errors during prosecution of such intellectual property, and potential encumbrances that could limit our ability to enforce such intellectual property rights.

Further, the laws of certain foreign countries do not provide the same level of protection of corporate proprietary information and assets such as intellectual property, trade secrets, know-how, and records as the laws of the United States. For instance, the legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection. As a result, we may be exposed to material risks of theft of our proprietary information and other intellectual property, including technical data, manufacturing processes, data sets, or other sensitive information, and we may also encounter significant problems in protecting and defending our intellectual property or proprietary rights abroad. In any of these cases, we may be required to expend significant time and expense to prevent infringement or to enforce our rights. Our efforts to enforce our intellectual property rights may be met with defenses, counterclaims, and countersuits attacking the validity and enforceability of our intellectual property rights, and, if such defenses, counterclaims, and countersuits are successful, we could lose valuable intellectual property rights. Our inability to protect our proprietary technology against unauthorized copying or use, as well as any costly litigation or diversion of our management's attention and resources, could impair the functionality of our platform, delay introductions of enhancements to our platform, result in our substituting inferior or more costly technologies into our platform, or harm our reputation and brand. In addition, we may be required to license additional technology from third parties to develop and market new platform features, which may not be on commercially reasonable terms, or at all, and would adversely affect our ability to compete. Although we have taken measures to protect our proprietary rights, there can be no assurance that others will not offer products, brands, content, or concepts that are substantially similar to ours and compete with our business. If we are unable to protect our proprietary rights or prevent unauthorized use or appropriation by third parties, the value of our brand and other intangible assets may be diminished, and competitors may be able to more effectively mimic our service and methods of operations. Any of these events could seriously harm our business.

***Our two co-founders have control over all stockholder decisions because they control a substantial majority of our voting stock.***

Our two co-founders, Evan Spiegel and Robert Murphy, control over 99% of the voting power of our outstanding capital stock as of December 31, 2023, and Mr. Spiegel alone can exercise voting control over a majority of our

outstanding capital stock. As a result, Mr. Spiegel and Mr. Murphy, or in many instances Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO, or 32,383,178 shares of Class C common stock. Should either of our co-founders' Class C common stock be converted to Class B common stock, the remaining co-founder will be able to exercise voting control over our outstanding capital stock. Moreover, Mr. Spiegel and Mr. Murphy have entered into a proxy agreement under which each has granted to the other a voting proxy with respect to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over. The proxy would become effective on either founder's death or disability. Accordingly, on the death or incapacity of either Mr. Spiegel or Mr. Murphy, the other could individually control nearly all of the voting power of our outstanding capital stock.

In addition, in October 2016, we issued a dividend of one share of non-voting Class A common stock to all our equity holders, which will prolong our co-founders' voting control because our co-founders are able to liquidate their holdings of non-voting Class A common stock without diminishing their voting control. Furthermore, in July 2022, our board of directors approved the future declaration and payment of a special dividend of one share of Class A Common stock on each outstanding share of Snap's common stock, subject to certain triggering conditions. In the future, our board of directors may, from time to time, decide to issue additional special or regular stock dividends in the form of Class A common stock, and if we do so our co-founders' control could be further prolonged. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support. Conversely, this concentrated control could allow our co-founders to consummate such a transaction that our other stockholders do not support. In addition, our co-founders may make long-term strategic investment decisions for the company and take risks that may not be successful and may seriously harm our business.

As our Chief Executive Officer, Mr. Spiegel has control over our day-to-day management and the implementation of major strategic investments of our company, subject to authorization and oversight by our board of directors. As board members and officers, Mr. Spiegel and Mr. Murphy owe a fiduciary duty to our stockholders and must act in good faith in a manner they reasonably believe to be in the best interests of our stockholders. As stockholders, even controlling stockholders, Mr. Spiegel and Mr. Murphy are entitled to vote their shares, and shares over which they have voting control, in their own interests, which may not always be in the interests of our stockholders generally. We have not elected to take advantage of the "controlled company" exemption to the corporate governance rules for companies listed on the New York Stock Exchange, or NYSE.

***Macroeconomic uncertainties, including labor shortages and disruptions, supply chain disruptions, banking instability, inflation, and recession risks, have in the past and may continue to adversely impact our business.***

Global economic and business activities continue to face widespread macroeconomic uncertainties, including labor shortages and disruptions, supply chain disruptions, banking instability, inflation, and recession risks, which may continue for an extended period, and some of which have adversely impacted, and may continue to adversely impact, many aspects of our business.

As some of our advertisers experienced downturns or uncertainty in their own business operations and revenue, they halted or decreased or may halt, decrease, or continue to decrease, temporarily or permanently, their advertising spending or may focus their advertising spending more on other platforms, all of which may result in decreased advertising revenue. Labor shortages and disruptions, supply chain disruptions, banking instability, and inflation continue to cause logistical challenges, increased input costs, inventory constraints, and liquidity uncertainty for our advertisers, which in turn may also halt or decrease advertising spending and may make it difficult to forecast our advertising revenue. Any decline in advertising revenue or the collectability of our receivables could seriously harm our business.

As a result of macroeconomic uncertainties, our partners and community who provide content or services to us may experience delays or interruptions in their ability to create content or provide services, if they are able to do so at all. Members of our community may also alter their usage of our products and services, particularly relative to prior periods when travel restrictions were in place. A decrease in the amount or quality of content available on Snapchat, or an

18

interruption in the services provided to us, could lead to a decline in user engagement, which could seriously harm our business.

To the extent that macroeconomic uncertainties continue to impact our business, many of the other risks described in these risk factors may be exacerbated.

***Exposure to geo-political conflicts and events could put our employees and partners at substantial risk, interrupt our operations, increase costs, create additional regulatory burdens, and have significant negative macroeconomic effects, any of which could seriously harm our business.***

Significant geo-political conflicts and events have had, and will likely continue to have, a substantial effect on our business and operations. We have had, and will likely continue to have, team members and their families in impacted regions who face substantial personal risk, unprecedented disruption of their lives, and uncertainty as to the future. We have provided emergency assistance and support to these team members and their families, and we expect to continue this support in the future. In addition, we have offices, hardware, and other assets in impacted regions that may be at risk of destruction or theft. We have incurred, and will likely continue to incur, costs to support our team members and reorganize our operations to address these ongoing challenges. In addition, our management has spent significant time and attention on these and related events. The ongoing disruptions to our team members, our management, and our operations could seriously harm our business.

Generally, during times of war and other major conflicts, we, the third parties on which we rely, and our partners are vulnerable to a heightened risk of cyberattacks, including retaliatory cyberattacks, that could seriously disrupt our business. We have experienced an increase in attempted cyberattacks on our products, systems, and networks, which we believe are related to the conflicts. We may also face retaliatory attacks by governments, entities, or individuals who do not agree with our public expressions with regards to any conflicts or support for team members. Any such attack could cause disruption to our platform, systems, and networks, result in security breaches or data loss, damage our brand, or reduce demand for our services or advertising products. In addition, we may face significant costs (including legal and litigation costs) to prevent, correct, or remediate any such breaches. We may also be forced to expend additional resources monitoring our platform for evidence of disinformation or misuse in connection with the ongoing conflict.

Geo-political conflicts and events are inherently unpredictable, evolve quickly, and may have negative long-term impacts. On a macroeconomic level, geo-political conflicts may disrupt trade, intensify problems in the global supply chain, and contribute to inflationary pressures. All of these factors may negatively impact the demand for advertising as companies face limited product availability, restricted sales opportunities, and condensed margins. Any pause or reduction in advertising spending in connection with geo-political conflicts or events could negatively impact our revenue and harm our business.

***If we do not develop successful new products or improve existing ones, our business will suffer. We may also invest in new lines of business that could fail to attract or retain users or generate revenue.***

Our ability to engage, retain, and increase our user base and to increase our revenue will depend heavily on our ability to successfully create new products, both independently and together with third parties. We may introduce significant changes to, or discontinue, our existing products or develop and introduce new and unproven products and services, including technologies with which we have little or no prior development or operating experience. These new products and updates may fail to increase the engagement of our users, advertisers, or partners, may subject us to increased regulatory requirements or scrutiny, and may even result in short-term or long-term decreases in such engagement by disrupting existing user, advertiser, or partner behavior or by introducing performance and quality issues. For example, in January 2023, we made changes to our advertising platform, which we believe will lay the foundation for future growth, but which have been disruptive to our customers and how some of them utilized our platform. The short- and long-term impact of any major change, or even a less significant change such as a refresh of the application or a feature change, is difficult to predict. Although we believe that these decisions will benefit the aggregate user experience and improve our financial performance over the long term, we may experience disruptions or declines in our DAUs or user activity broadly or concentrated on certain portions of our application. Product innovation is inherently volatile, and if new or enhanced products fail to engage our users, advertisers, or partners, or if we fail to give our users meaningful reasons to return to our application, we may fail to attract or retain users or to generate sufficient revenue, operating margin, or other value to justify our investments, any of which may seriously harm our business in the short term, long term, or both.

19

Because our products created new ways of communicating, they have often required users to learn new behaviors to use our products, or to use our products repeatedly to receive the most benefit. These new behaviors, such as swiping and tapping in the Snapchat application, are not always intuitive to users. This can create a lag in adoption of new products and new user additions related to new products. We believe this has not hindered our user growth or engagement, but that may be the result of a large portion of our user base being in a younger demographic and more willing to invest the time to learn to use our products most effectively. To the extent that future users, including those in older demographics, are less willing to invest the time to learn to use our products, and if we are unable to make our products easier to learn to use, our user growth or engagement could be affected, and our business could be harmed. We may also develop new products or initiatives that increase user engagement and costs without increasing revenue in the short or long term.

In addition, we have invested, and expect to continue to invest, in new lines of business, new products, and other initiatives to increase our user base and user activity, and attempt to monetize the platform. For example, in 2020, we launched Spotlight, a new entertainment platform for user-generated content within Snapchat, in 2022, we launched Snapchat+, a subscription product that gives subscribers access to exclusive, experimental, and pre-release features, and Snapchat for Web, a browser-based product that brings Snapchat's signature capabilities to the web, and in 2023, we launched My AI, an artificial intelligence powered chatbot. Such new lines of business, new products, and other initiatives may be costly, difficult to operate and monetize, increase regulatory scrutiny and product liability and litigation risk, and divert management's attention, and there is no guarantee that they will be positively received by our community or provide positive returns on our investment. We frequently launch new products and the products that we launch may have technical issues that diminish the performance of our application, experience product failures, or become subject to product recalls. These performance issues or issues that we encounter in the future could impact our user engagement. In addition, new products or features that we launch may ultimately prove unsuccessful or no longer fit with our priorities, and may be eliminated in the future. Such eliminations may require us to reduce our workforce and incur significant expenses. In certain cases, new products that we develop may require regulatory approval prior to launch or may require us to comply with additional regulations or legislation, including laws that are rapidly changing. There is no guarantee that we will be able to obtain such regulatory approval, and our efforts to comply with these laws and regulations could be costly and divert management's time and effort and may still not guarantee compliance. If we do not successfully develop new approaches to monetization or meet the expectations of our users or partners, we may not be able to maintain or grow our revenue as anticipated or recover any associated development costs, and our business could be seriously harmed.

***Our business is highly competitive. We face significant competition that we anticipate will continue to intensify. If we are not able to maintain or improve our market share, our business could suffer.***

We face significant competition in almost every aspect of our business both domestically and internationally, especially because our products and services operate across a broad list of categories, including camera, visual messaging, content, and augmented reality. Our competitors range from smaller or newer companies to larger, more established companies such as Alphabet (including Google and YouTube), Apple, ByteDance (including TikTok), Kakao, LINE, Meta (including Facebook, Instagram, Threads, and WhatsApp), Naver (including Snow), Pinterest, Tencent, and X (formerly Twitter). Our competitors also include platforms that offer, or will offer, a variety of products, services, content, and online advertising offerings that compete or may compete with Snapchat features or offerings. For example, Instagram, a competing application owned by Meta, has incorporated many of our features, including a "stories" feature that largely mimics our Stories feature and may be directly competitive. Meta has introduced, and likely will continue to introduce, more private ephemeral products into its various platforms which mimic other aspects of Snapchat's core use case. We also compete for users and their time, so we may lose users or their attention not only to companies that offer products and services that specifically compete with Snapchat features or offerings, but to companies with products or services that target or otherwise appeal to certain demographics, such as Discord or Roblox. Moreover, in emerging international markets, where mobile devices often lack large storage capabilities, we may compete with other applications for the limited space available on a user's mobile device. We also face competition from traditional and online media businesses for advertising budgets. We compete broadly with the products and services of Alphabet, Apple, ByteDance, Meta, Pinterest, and X (formerly Twitter), and with other, largely regional, social media platforms that have strong positions in particular countries. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

Many of our current and potential competitors have significantly greater resources and broader global recognition, and occupy stronger competitive positions in certain market segments, than we do. These factors may allow our competitors to respond to new or emerging technologies and changes in market requirements better than we can, undertake more far-reaching and successful product development efforts or marketing campaigns, or adopt more aggressive pricing policies. In addition, ongoing changes to privacy and data protection laws and mobile operating systems have made it more

20

Table of Contents

difficult for us to target and measure advertisements effectively, and advertisers may prioritize the solutions of larger, more established companies. As a result, our competitors may, and in some cases will, acquire and engage users or generate advertising or other revenue at the expense of our own efforts, which would negatively affect our business. Advertisers may use information that our users share through Snapchat to develop or work with competitors to develop products or features that compete with us. Certain competitors, including Alphabet, Apple, and Meta, could use strong or dominant positions in one or more market segments to gain competitive advantages against us in areas where we operate, including by:

- integrating competing social media platforms or features into products they control such as search engines, web browsers, artificial intelligence services, advertising networks, or mobile operating systems;

- making acquisitions for similar or complementary products or services; or

- impeding Snapchat's accessibility and usability by modifying existing hardware and software on which the Snapchat application operates.

Certain acquisitions by our competitors may result in reduced functionality of our products and services, provide our competitors with valuable insight into the performance of our and our partners' businesses, and provide our competitors with a pipeline of future acquisitions to maintain a dominant position. As a result, our competitors may acquire and engage users at the expense of our user base, growth, or engagement, which may seriously harm our business.

We believe that our ability to compete effectively depends on many factors, many of which are beyond our control, including:

- the usefulness, novelty, performance, and reliability of our products compared to our competitors' products;

- the number and demographics of our DAUs;

- the timing and market acceptance of our products, including developments and enhancements of our competitors' products;

- our ability to monetize our products and services, including new products and services;

- the availability of our products to users;

- the effectiveness of our advertising and sales teams;

- the effectiveness of our advertising products;

- our ability to establish and maintain advertisers' and partners' interest in using Snapchat;

- the frequency, relative prominence, and type of advertisements displayed on our application or by our competitors;

- the effectiveness of our customer service and support efforts;

- the effectiveness of our marketing activities;

- actual or proposed legislation, regulation, executive actions, or litigation, including settlements and consent decrees, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry segment;

- our ability to attract, retain, and motivate talented team members, particularly engineers, designers, and sales personnel;

- our ability to successfully acquire and integrate companies and assets;

- the security, or perceived security, of our products and data protection measures compared to our competitors' products;

- our ability to cost-effectively manage and scale our operations; and

- our reputation and brand strength relative to our competitors.

If we cannot effectively compete, our user engagement may decrease, which could make us less attractive to users, advertisers, and partners and seriously harm our business.

Table of Contents

***We have incurred operating losses in the past, and may not be able to attain and sustain profitability.***

We began commercial operations in 2011 and we have historically experienced net losses and negative cash flows from operations. As of December 31, 2023, we had an accumulated deficit of $11.7 billion and for the year ended December 31, 2023, we had a net loss of $1.3 billion. We expect our operating expenses to increase in the future as we expand our operations. We may incur significant losses in the future for many reasons, including due to the other risks and uncertainties described in this report. Additionally, we may encounter unforeseen expenses, operating delays, or other unknown factors that may result in losses in future periods. If our revenue does not grow at a greater rate than our expenses, our business may be seriously harmed and we may not be able to attain and sustain profitability.

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could seriously harm our business.***

We depend on the continued services and performance of our key personnel, including Mr. Spiegel and Mr. Murphy. Although we have entered into employment agreements with Mr. Spiegel and Mr. Murphy, the agreements are at-will, which means that they may resign or could be terminated for any reason at any time. Mr. Spiegel and Mr. Murphy are high profile individuals who have received threats in the past and are likely to continue to receive threats in the future. Mr. Spiegel, as Chief Executive Officer, has been responsible for our company's strategic vision and Mr. Murphy, as Chief Technology Officer, developed the Snapchat application's technical foundation. Should either of them stop working for us for any reason, it is unlikely that the other co-founder would be able to fulfill all of the responsibilities of the departing co-founder nor is it likely that we would be able to immediately find a suitable replacement. The loss of key personnel, including members of management and key engineering, product development, marketing, and sales personnel, could disrupt our operations, adversely impact employee retention and morale, and seriously harm our business.

We cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position. We face significant competition in hiring and attracting qualified engineers, designers, and sales personnel, and the change by companies to offer a remote or hybrid work environment may increase the competition for such employees from employers outside of our traditional office locations. In February 2023, we implemented our return to office plan that still encompasses a hybrid approach, but requires greater in-office attendance. While we intend to continue offering flexible work arrangements based on the different needs of teams across our company on a case-by-case basis, we may face difficulty in hiring and retaining our workforce as a result of this shift to have greater in-office attendance. Further, labor is subject to external factors that are beyond our control, including our industry's highly competitive market for skilled workers and leaders, inflation, other macroeconomic uncertainties, and workforce participation rates. In addition, if our reputation were to be harmed, whether as a result of our strategic decisions or media, legislative, or regulatory scrutiny or otherwise, it could make it more difficult to attract and retain personnel that are critical to the success of our business.

As we mature, or if our stock price declines, our equity awards may not be as effective an incentive to attract, retain, and motivate team members. Stock price declines may also cause us to offer additional equity awards to our existing team members to aid in retention. Furthermore, if we issue significant equity to attract and retain team members, we would incur substantial additional stock-based compensation expense and the ownership of our existing stockholders would be further diluted. If we do not succeed in attracting, hiring, and integrating excellent personnel, or retaining or motivating existing personnel, we may be unable to grow or effectively manage our business and our business could be seriously harmed.

***We have a continually evolving business model, which makes it difficult to evaluate our prospects and future financial results and increases the risk that we will not be successful.***

We began commercial operations in 2011, began meaningfully monetizing Snapchat in 2015, and we launched Snapchat+, a paid subscription product, in 2022. We have a continually evolving business model, which makes it difficult to effectively assess our future prospects. Accordingly, we believe that investors' future perceptions and expectations, which can be idiosyncratic and vary widely, and which we do not control, will affect our stock price. For example, investors may believe our timing and path to increased monetization will be faster or more effective than our current plans or than actually takes place. You should consider our business and prospects in light of the many challenges we face, including the ones discussed in this report.

***If the security of our information technology systems or data is compromised or if our platform is subjected to attacks that frustrate or thwart our users' ability to access our products and services, our users, advertisers, and partners may cut back on or stop using our products and services altogether, which could seriously harm our business.***

In the ordinary course of business, we collect, store, use, and share personal data and other sensitive information, including proprietary and confidential business data, trade secrets, third-party sensitive information, and intellectual property (collectively, sensitive information). Our efforts to protect our sensitive information, including information that our users, advertisers, and partners have shared with us, may be unsuccessful due to the actions of third parties, including traditional "black hat" hackers, nation states, nation-state supported groups, organized criminal enterprises, hacktivists, and our personnel and contractors (through theft, misuse, or other risk). We and the third parties on which we rely are subject to a variety of evolving threats, including social-engineering attacks (for example by fraudulently inducing employees, users, or advertisers to disclose information to gain access to our sensitive information, including data or our users' or advertisers' data, such as through the use of deep fakes, which may be increasingly more difficult to identify as fake), malware, malicious code, hacking, credential stuffing, denial of service, and other threats, including attacks enhanced or facilitated by artificial intelligence. While certain of these threats have occurred in the past, they have become more prevalent and sophisticated in our industry, and may occur in the future. Because of our prominence and value of our sensitive information, we believe that we are an attractive target for these sorts of attacks.

In particular, severe ransomware attacks are becoming increasingly prevalent. To alleviate the financial, operational, and reputational impact of these attacks, it may be preferable to make extortion payments, but we may be unwilling or unable to do so, including, for example, if applicable laws or regulations prohibit such payments. And, even if we make such payments, cyber threat actors may still disclose data, engage in further extortion, or otherwise harm our systems or data. Moreover, for certain employees we permit a hybrid work environment, which has increased risks to our information technology systems and data, as our employees utilize network connections, computers, and devices outside our premises or network, including working at home, while in transit and in public locations.

In addition, cyber threat actors have also increased the complexity of their attempts to compromise user accounts, despite our defenses and detection mechanisms to prevent these account takeovers. User credentials may be obtained off-platform, including through breaches of third-party platforms and services, password stealing malware, social engineering, or other tactics and techniques like credential harvesting, and used to launch coordinated attacks. Some of these attacks may be hard to detect at scale and may result in cyber threat actors using our service to spam or abuse other users, access user personal data, further compromise additional user accounts, or to compromise employee account credentials or social engineer employees into granting further access to systems.

We rely on third-party service providers and technologies to operate critical business systems to process sensitive information in a variety of contexts, including cloud-based infrastructure, data center facilities, artificial intelligence, encryption and authentication technology, employee email, content delivery, and other functions. We may also rely on third-party service providers to provide other products or services to operate our business or enable features in our platform. Additionally, some advertisers and partners store sensitive information that we share with them. Our ability to monitor these third parties' information security practices is limited, and these third parties may not have adequate information security measures in place despite their contractual representations to implement such measures and our third-party service provider vetting process. If these third parties fail to implement adequate data security practices or fail to comply with our terms, policies, or contractual obligations, our sensitive information may be improperly accessed or disclosed, and we may experience adverse consequences. And even if these third parties take all of these steps, their networks may still suffer a breach, which could compromise our sensitive information. We or our third-party providers may also experience failures or malfunctions of hardware or software, the loss of technology assets, or the loss of data that, while not caused by threat actors, may have a similar impact and risk to our business. While we may be entitled to damages if our third-party service providers fail to satisfy their privacy or security-related obligations to us, or cause the loss of our data or prolonged downtime, any award may be insufficient to cover our damages, or we may be unable to recover such award.

Moreover, supply chain attacks have increased in frequency and severity, and we cannot guarantee that third parties in our supply chain have not been compromised or that their systems, networks, or code are free from exploitable defects or bugs that could result in a breach of or disruption to our platform, systems, and networks or the systems and networks of third parties that support us and our services. We are also reliant on third-party and open source software that may contain bugs, vulnerabilities, or errors that could be exploited or disclosed before a patch or fix is available.

While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective. We take steps designed to detect and remediate vulnerabilities in our

23

information systems (such as our hardware and software, including that of third parties upon which we rely), and we work with security researchers through our bug bounty program to help us identify vulnerabilities. We may not, however, detect, become aware of, and remediate all such vulnerabilities including on a timely basis, and there is no guarantee security researchers will disclose all vulnerabilities they become aware of or do so responsibly. Further, we may experience delays in developing or deploying remedial measures and patches designed to address identified vulnerabilities. Vulnerabilities could be exploited and result in a security or privacy incident.

If any of these or similar events occur, our or our third-party partners' sensitive information and information technology systems could be accessed, acquired, modified, destroyed, lost, altered, encrypted, or disclosed in an unauthorized, unlawful, accidental, or other improper manner, resulting in a security incident or other interruption.

We may expend significant resources or modify our business activities to adopt additional measures designed to protect against security incidents. Certain data privacy and security obligations may require us to implement and maintain specific security measures or industry-standard or reasonable security measures to protect our systems and sensitive information. While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective.

We have previously suffered the loss of sensitive information related to employee error, insider threats, and vendor breaches. Any security incident experienced by us or our third-party partners could damage our reputation and our brand, and diminish our competitive position. Applicable privacy and security obligations may require us to notify relevant stakeholders, including affected individuals, customers, regulators, and investors, of security incidents. Such disclosures are costly and the failure to comply with these legal requirements could lead to adverse consequences. Governments and regulatory agencies (including the Securities and Exchange Commission, or the SEC) have and may continue to enact new disclosure requirements for cybersecurity events. In addition, affected users or government authorities could initiate legal or regulatory action against us, including class-action claims, mass arbitration demands, investigations, penalties, and audits, which could be time-consuming and cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. We could also experience loss of user or advertiser confidence in the security of our platform, additional reporting requirements or oversight, restrictions on processing sensitive information, claims by our partners or other relevant parties that we have failed to comply with contractual obligations or our policies, and indemnification obligations. We could also spend material resources to investigate or correct the incident and to prevent future incidents. Maintaining the trust of our users is important to sustain our growth, retention, and user engagement. Concerns over our privacy and security practices, whether actual or unfounded, could damage our reputation and brand and deter users, advertisers, and partners from using our products and services. Any of these occurrences could seriously harm our business.

Our contracts may not contain limitations of liability, and even where they do, there can be no assurance that limitations of liability in our contracts are sufficient to protect us from liabilities, damages, or claims related to our data privacy and security obligations. We cannot be sure that our insurance coverage will be adequate or sufficient to protect us from or to mitigate liabilities arising out of our privacy and security practices, that such coverage will continue to be available on commercially reasonable terms or at all, or that such coverage will pay future claims.

In addition to experiencing a security incident, third parties may gather, collect, or infer sensitive information about us from public sources, data brokers, or other means that reveals competitively sensitive details about our organization and could be used to undermine our competitive advantage or market position.

***Our user metrics and other estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may seriously harm and negatively affect our reputation and our business.***

We regularly review and share metrics, including our DAUs and ARPU metrics, with our investors, advertisers, and partners to evaluate growth trends, measure our performance, and make strategic decisions. These metrics are calculated using internal company data gathered on an analytics platform that we developed and operate and our methodologies have not in all instances been validated by an independent third party. In addition, we may change the way we measure and report metrics from time to time in connection with changes to our products, making comparisons to prior periods more difficult. While these metrics are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally that may require significant judgment and are subject to technical errors. For example, there may be individuals attempt to create accounts for malicious purposes, including at scale, even though we forbid that in our Terms of Service and Community Guidelines. We implement measures in our user registration process and through other technical measures

Table of Contents

to prevent, detect, and suppress that behavior, although we have not determined the number of such accounts, or the effectiveness of such measures. Our user metrics are also affected by technology on certain mobile devices that automatically runs in the background of our Snapchat application when another phone function is used, and this activity can cause our system to miscount the user metrics associated with such account.

Some of our demographic data may be incomplete or inaccurate. For example, because users self-report their dates of birth, our age-demographic data may differ from our users' actual ages. And because users who signed up for Snapchat before June 2013 were not asked to supply their date of birth, we may exclude those users from age demographics or estimate their ages based on a sample of the self-reported ages we do have. If our users provide us with incorrect or incomplete information regarding their age or other attributes, then our estimates may prove inaccurate and fail to meet investor or advertiser expectations.

Errors or inaccuracies in our metrics or data could also result in incorrect business decisions and inefficiencies. For instance, if a significant understatement or overstatement of active users were to occur, we may expend resources to implement unnecessary business measures or fail to take required actions to attract a sufficient number of users to satisfy our growth strategies. We count a DAU when a user opens the application, but only once per user per day. We have multiple pipelines of user data that we use to determine whether a user has opened the application during a particular day, becoming a DAU. This provides redundancy in the event one pipeline of data were to become unavailable for technical reasons, and also gives us redundant data to help measure how users interact with our application. However, we believe that we do not capture all data regarding our active users, which may result in understated metrics. This generally occurs because of technical issues, for instance when our systems do not record data from a user's application or when a user opens the Snapchat application and contacts our servers but is not recorded as an active user. We continually seek to address these technical issues and improve our measurement processes and accuracy, such as comparing our active users and other metrics with data received from other pipelines, including data recorded by our servers and systems. But given the complexity of the systems involved and the rapidly changing nature of mobile devices and systems, we expect these issues to continue, particularly if we continue to expand in parts of the world where mobile data systems and connections are less stable. If advertisers, partners, or investors do not perceive our user, geographic, other demographic metrics, or measurements of advertising effectiveness to be accurate, or if we discover material inaccuracies in our metrics, our reputation may be seriously harmed. Our advertisers and partners may also be less willing to allocate their budgets or resources to Snapchat, which could seriously harm our business. In addition, we calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. This calculation may mask any individual days or months within the quarter that are significantly higher or lower than the quarterly average.

***Improper or illegal use of Snapchat could seriously harm our business and reputation.***

We cannot be certain that the technologies that we have developed to repel spamming attacks will be able to eliminate all spam messages from our products. Spammers attempt to use our products to send targeted and untargeted spam messages to users, which may embarrass, offend, threaten, or annoy users and make our products less user friendly. Our actions to combat spam may also divert significant time and focus from improving our products. As a result of spamming activities, our users may use our products less or stop using them altogether, and result in continuing operational cost to us.

Similarly, terrorists, criminals, and other bad actors may use our products to promote their goals and encourage users to engage in terror and other illegal activities discussed in our Transparency Report. We expect that as more people use our products, these bad actors will increasingly seek to misuse our products. Although we invest resources to combat these activities, including by suspending or terminating accounts we believe are violating our Terms of Service and Community Guidelines, we expect these bad actors will continue to seek ways to act inappropriately and illegally on Snapchat. Maintaining a safe platform, including by combating these bad actors, requires us to incur costs, which may be significant. In addition, we may not be able to control or stop Snapchat from becoming the preferred application of use by these bad actors, which may seriously harm our reputation or lead to lawsuits or attention from regulators. If these activities continue on Snapchat, our reputation, user growth and user engagement, and operational cost structure could be seriously harmed.

***Because we store, process, and use data, some of which contains personal data, we are subject to complex and evolving federal, state, local and foreign laws, regulations, executive actions, rules, contractual obligations, policies, and other obligations regarding privacy, data protection, content, the use of artificial intelligence, and other matters. Many of these obligations are subject to change and uncertain interpretation, and our actual or perceived failure to comply with***

*such obligations could result in investigations, claims (including class actions), mass arbitration demands, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, or other adverse consequences, any of which could seriously harm our business.*

In the ordinary course of business, we collect, store, use, and share personal data and other sensitive information, including proprietary and confidential business data, trade secrets, third-party sensitive information, and intellectual property. Accordingly, we are subject to a variety of laws, regulations, industry standards, policies, contractual requirements, executive actions, and other obligations relating to privacy, security, and data protection. We also are or may in the future be subject to many federal, state, local, and foreign laws and regulations, including those related to privacy, rights of publicity, content, data protection, artificial intelligence, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation.

Under certain of these laws, we could face temporary or definitive bans on data processing and other corrective actions, substantial monetary fines, or private litigation related to processing of personal data brought by classes of data subjects or consumer protection organizations authorized to represent their interests. The transfer of personal data continues to be under increased regulatory attention and scrutiny, and certain jurisdictions in which we operate have significantly limited the lawful basis on which personal data can be transferred to other jurisdictions and increased the assessments required to do so. We have attempted to structure our operations in a manner designed to help us partially avoid some of these concerns; however, we still transfer some data using mechanisms that comply with applicable law. Some of these mechanisms are subject to legal challenges, and there is no assurance that we can satisfy or rely on these mechanisms to lawfully transfer personal data in the future. If there is no lawful manner for us to transfer personal data, or if the requirements for a legally compliant transfer are too onerous, we could face significant adverse consequences, including the interruption or degradation of our operations, the need to relocate part of or all of our business or data processing activities to other jurisdictions at significant expense, increased exposure to regulatory actions, substantial fines and penalties, the inability to transfer data and work with partners, vendors, and other third parties, and injunctions against our processing or transferring of personal data necessary to operate our business. Regulators may seek to restrict our data processing activities if they believe we have violated cross-border data transfer limitations, which would seriously harm our business. Additionally, companies like us that transfer personal data between jurisdictions, particularly to the United States, are subject to increased scrutiny from regulators, individual litigants, and activist groups.

Legislation in certain of the countries in which we operate has imposed extensive obligations, and potential monetary fines, on certain online service providers, including us, who enable the sharing of user-generated content, to identify, mitigate, and manage the risks of harm to users from illegal and harmful content, such as terrorism, child sexual exploitation and abuse, and harassment or stalking. In addition, the privacy of teens' personal data collected online, and use of commercial websites, online services, or other interactive platforms, generally, are also becoming increasingly scrutinized. Regulations focused on online safety and protection of teens' privacy online have and may in the future require us to change our services and incur costs to do so. Moreover, various laws to restrict or govern the use of commercial websites, online services, or other interactive platforms by teens have passed or have been proposed, including laws prohibiting showing teens advertising, requiring age verification, limiting the use of minors' personal data, and requiring parental consent or providing for other parental rights. These laws may be, or in some cases already have been, subject to legal challenges and changing interpretations, which may further complicate our efforts to comply with laws applicable to us. These new laws may result in restrictions on the use of certain of our products or services by minors, decrease DAUs or user engagement in those jurisdictions, require changes to our products and services to achieve compliance, and increase legal risk and compliance costs for us and our third-party partners, any of which could seriously harm our business.

Laws and regulations focused on privacy, security, and data protection, including data breach notification laws, personal data privacy laws, consumer protection laws, wiretapping laws, and other similar laws have imposed obligations on companies that collect personal data from users, including providing specific disclosures in privacy notices, expanding the requirements for handling personal data, requiring consents to process personal data in certain circumstances, and affording residents with certain rights concerning their personal data. Such rights may include the right to access, correct, or delete certain personal data, and to opt-out of certain data processing activities, such as targeted advertising, profiling, and automated decision-making. The exercise of these rights may impact our business and ability to provide our products and services, and our inability or failure to obtain consent for these practices where required could result in adverse consequences, including class-action litigation and mass arbitration demands. Certain of these laws also impose stricter requirements for processing certain personal data, including sensitive information, such as conducting data privacy impact assessments. These laws also allow for statutory fines for noncompliance and, in some instances, provide for civil penalties for violations and a private right of action for data breaches, which may increase the likelihood and cost of data breach litigation, and could seriously harm our business.

Additionally, several jurisdictions in which we operate have enacted statutes banning or restricting the collection of biometric information. Certain of these laws provide for substantial penalties and statutory damages and have generated significant class-action activity. Although we maintain the position that our technologies do not collect any biometric information, we have in the past, and may in the future, settle these disputes to avoid potentially costly litigation and have in certain instances made changes to our products in an abundance of caution.

We use artificial intelligence, or AI, in consumer-facing features of our products and services, including My AI. The development and use of AI presents various privacy and security risks that may impact our business. AI is subject to privacy and data security laws, as well as increasing regulation and scrutiny. Several countries in which we operate or have users have proposed or enacted, or are considering, laws governing AI, which we are or may be subject to. The legal landscape around intellectual property rights in AI, and the use, training, implementation, privacy, and safety of AI, is evolving, including ongoing litigation against our peers relating to the use of data protected by global intellectual property and privacy laws. These obligations may make it harder for us to use AI in our products or services, lead to regulatory fines or penalties, or require us to change our business practices, retrain our AI, or prevent or limit our use of AI. We are subject to ongoing investigations by the UK Information Commissioner's Office, or ICO, and other regulatory agencies regarding the use and operation of My AI, and in October 2023 the ICO issued a preliminary enforcement notice regarding our data impact assessment of My AI. Given the current unsettled nature of the legal and regulatory environment surrounding AI, our or our partners' AI features and use, training, and implementation of AI could subject us to regulatory action, product restrictions, fines, litigation, and reputational harm, and require us to expend significant resources, all of which may seriously harm our business. Additionally, if our AI products fail to perform as intended, or produce outputs that are harmful, misleading, inaccurate, or biased, in addition to the risks above, our reputation and user engagement may be harmed, and we may be required to change our business practices, retrain our AI, or limit our use of AI. Furthermore, certain proposed regulations related to AI could, if adopted, impose onerous obligations related to the use of AI-related systems and may require us to change our products or business practices to comply with such obligations.

Privacy advocates and industry groups have proposed, and may propose in the future, standards with which we are legally or contractually obligated to comply. Moreover, we are also bound by contractual obligations related to data privacy and security, and our efforts to comply with such obligations may not be successful. We also publish privacy policies, marketing materials, and other statements regarding data privacy and security. If these policies, materials, or statements are found to be deficient, lacking in transparency, deceptive, unfair, or misrepresentative of our practices, we may be subject to investigation, enforcement actions by regulators, or other adverse consequences.

The implementation and enforcement, including through private rights of action, of these increasingly complex, onerous, or divergent laws and regulations, and the introduction, interpretation, or revision of any new such laws or regulations, with respect to privacy, security, data protection, and our industry are uncertain and may further complicate compliance efforts, lead to fragmentation of the service, and may increase legal risk and compliance costs for us and our third-party partners. Many of these obligations are becoming increasingly stringent and subject to rapid change and uncertain interpretation. Preparing for and complying with these obligations requires us to devote significant resources, and there is no guarantee that our compliance efforts to date, or in the future, will be deemed compliant or sufficient. These obligations may necessitate changes to our products and services, information technologies, systems, and practices and to those of any third parties that process personal data on our behalf. In addition, these obligations may require us to change our business model. Our business model materially depends on our ability to process personal data in connection with our advertising offerings, so we are particularly exposed to the risks associated with the rapidly changing legal landscape regarding privacy, security, and data protection. For example, privacy regulators have targeted us and some of our competitors, including by investigating data processing activities and in the past have issued large fines to our competitors. Such enforcement actions may cause us to revise our business plans and operations. Moreover, we believe a number of investigations into other technology companies are currently being conducted by federal, state, and foreign legislative and regulatory bodies. We therefore may be at heightened risk of regulatory scrutiny, as regulators focus their attention on data processing activities of companies like us, and any changes in the regulatory framework or enforcement actions, whether against us or our competitors, could require us to fundamentally change our business model, and seriously harm our business.

We may at times fail, or be perceived to have failed, in our efforts to comply with our privacy, security, and data protection obligations. Moreover, despite our efforts, our personnel or third parties on whom we rely may fail to comply with such obligations, which could negatively impact our business operations. If we or the third parties on which we rely fail, or are perceived to have failed, to address or comply with applicable privacy, security, or data protection obligations, we could face significant consequences, including government enforcement actions (such as investigations, claims, audits, and penalties), litigation (including class-action litigation) and mass arbitration demands, additional reporting requirements

Table of Contents

or oversight, bans on processing personal data, negative publicity, and orders to destroy or not use personal data. In particular, plaintiffs have become increasingly more active in bringing privacy-related claims against companies, including class claims and mass arbitration demands. Some of these claims allow for the recovery of statutory damages on a per violation basis, and, if viable, carry the potential for monumental statutory damages, depending on the volume of data and the number of violations. Any of these events could have a material adverse effect on our business, including loss of users and advertisers, inability to process personal data or operate in certain jurisdictions, changes to our business practices, increased cost of operations, and declines in user growth, retention, or engagement, any of which could seriously harm our business.

We have in the past been subject to enforcement actions, investigations, proceedings, orders, or various government inquiries regarding our data privacy and security practices and processing. For example, in December 2014, the FTC resolved an investigation into some of our early practices by issuing a final order. That order requires, among other things, that we establish a robust privacy program to govern how we treat user data. During the 20-year term of the order, we must complete biennial independent privacy audits. In addition, in June 2014, we entered into a 10-year assurance of discontinuance with the Attorney General of Maryland implementing similar practices, including measures to prevent minors under the age of 13 from creating accounts and providing annual compliance reports. Violating existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could seriously harm our business.

***Our financial condition and results of operations will fluctuate from quarter to quarter, which makes them difficult to predict.***

Our quarterly results of operations have fluctuated in the past and will fluctuate in the future. Additionally, we have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. As a result, you should not rely on our past quarterly results of operations as indicators of future performance. You should take into account the risks and uncertainties frequently encountered by companies in rapidly evolving market segments. Our financial condition and results of operations in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:

- our ability to maintain and grow our user base and user engagement;

- the development and introduction of new or redesigned products or services by us or our competitors;

- the ability of our cloud service providers to scale effectively and timely provide the necessary technical infrastructure to offer our service;

- our ability to attract and retain advertisers in a particular period;

- seasonal or other fluctuations in spending by our advertisers and product usage by our users, each of which may change as our product offerings evolve or as our business grows or as a result of unpredictable events such as labor shortages and disruptions, supply chain disruptions, banking instability, inflationary pressures, or geo-political conflicts;

- restructuring or other charges and unexpected costs or other operating expenses;

- the number of advertisements shown to users;

- the pricing of our advertisements and other products;

- the effectiveness, and our ability to demonstrate to advertisers the effectiveness, of our advertisements;

- the diversification and growth of revenue sources beyond current advertising;

- increases in marketing, sales, research and development, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

- our ability to maintain operating margins, cash provided by operating activities, and Free Cash Flow;

- our ability to accurately forecast consumer demand for our physical products and adequately manage inventory;

- system failures or security incidents, and the costs associated with such incidents and remediations;

- inaccessibility of Snapchat, or certain features within Snapchat, due to third-party or governmental actions;

- stock-based compensation expense;

- our ability to effectively incentivize our workforce;

Table of Contents

- adverse litigation judgments, settlements, or other litigation-related costs, or product recalls;

- changes in the legislative or regulatory environment, including with respect to privacy, rights of publicity, content, data protection, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, enforcement by government regulators, including fines, orders, sanctions, or consent decrees, or the issuance of executive orders or other similar executive actions that may adversely affect our revenues or restrict our business;

- new privacy, data protection, and security laws and other obligations and increased regulatory scrutiny on our or our competitors' data processing activities and privacy and information security practices, including through enforcement actions potentially resulting in large penalties or other severe sanctions and increased restrictions on the data processing activities and personal data transfers critical to the operation of our current business model;

- fluctuations in currency exchange rates and changes in the proportion of our revenue and expenses denominated in foreign currencies;

- fluctuations in the market values of our portfolio investments and interest rates or impairments of any assets on our consolidated balance sheet;

- changes in our effective tax rate;

- announcements by competitors of significant new products, licenses, or acquisitions;

- our ability to make accurate accounting estimates and appropriately recognize revenue for our products;

- our ability to meet minimum spending commitments in agreements with our infrastructure providers;

- changes in accounting standards, policies, guidance, interpretations, or principles;

- the effect of war or other armed conflict on our workforce, operations, or the global economy; and

- changes in domestic and global business or macroeconomic conditions, including as a result of inflationary pressures, banking instability, geo-political conflicts, terrorism, or responses to these events.

***If we are unable to continue to maintain or successfully grow our user base and further monetize our products, our business will suffer.***

We have made, and are continuing to make, investments to enable users, partners, and advertisers to create compelling content and deliver advertising to our users. Existing and prospective Snapchat users and advertisers may not be successful in creating content that leads to and maintains user engagement. We are continuously seeking to balance the objectives of our users and advertisers with our desire to provide an optimal user experience. We do not seek to monetize all of our products nor do we solely focus our efforts on users with higher ARPU, and we may not be successful in achieving a balance that continues to attract and retain users and advertisers. We focus on growing engagement across our service, and from time to time our efforts may reduce user activity with certain monetizable products in favor of other products we do not currently monetize. If we are not successful in our efforts to grow or effectively and timely monetize our user base, or if we are unable to build and maintain good relations with our advertisers, our user growth and user engagement and our business may be seriously harmed. In addition, we may expend significant resources to launch new products that we are unable to monetize, which may seriously harm our business.

Additionally, we may not succeed in further monetizing Snapchat. We currently primarily monetize Snapchat by displaying advertisements sold by us and our partners. As a result, our financial performance and ability to grow revenue could be seriously harmed if:

- we fail to increase or maintain DAUs, especially in regions where we have higher monetization;

- our user growth outpaces our ability to monetize our users, including if we don't attract sufficient advertisers or if our user growth occurs in markets that are not as monetizable;

- we fail to increase or maintain the amount of time spent on Snapchat, the amount of content that our users share, or the usage of our Camera, Visual Messaging, Map, Stories, and Spotlight platforms;

- partners and users do not create sufficient engaging content for users or partners do not renew their agreements with us;

- we fail to attract sufficient advertisers to utilize our self-serve platform to make the best use of our advertising inventory;

- advertisers do not continue to introduce engaging advertisements;

- advertisers reduce their advertising on Snapchat;

- we fail to maintain good relationships with advertisers or attract new advertisers, or demonstrate to advertisers the effectiveness of advertising on Snapchat; or

- the content on Snapchat does not maintain or gain popularity.

***We cannot assure you that we will effectively manage our growth or changes to our business.***

The growth and expansion of our business, headcount, and products create significant challenges for our management, including managing multiple relationships with users, advertisers, partners, and other third parties, and constrain operational and financial resources. If our operations or the number of third-party relationships continues to grow, our information-technology systems and our internal controls and procedures may not adequately support our operations and may require significant investments of time and capital to improve. In addition, some members of our management do not have significant experience managing large global business operations, so our management may not be able to manage such growth effectively. To effectively manage our growth, we must continue to improve our operational, financial, and management processes and systems and effectively expand, train, and manage our employee base. However, the actions we take to achieve such improvements may not have the intended effect and may instead result in disruptions, delays in new products, employee turnover, declines in revenue, and other adverse effects.

As our organization continues to mature and we are required to implement more complex organizational management structures, we may also find it increasingly difficult to maintain the benefits of our corporate culture, including our ability to quickly develop and launch new and innovative products. This could negatively affect our business performance and seriously harm our business.

In August 2022, we undertook a broad strategic reprioritization to focus on our top priorities, improve cost efficiencies, and drive toward profitability and positive free cash flow. As a result of the strategic reprioritization, in the year ended December 31, 2022, we incurred pre-tax charges of $188.9 million, primarily consisting of severance and related charges, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. As we continue to adapt and update our business model and priorities, we may make additional restructurings, reprioritizations, or reductions in the future. Any such changes could disrupt our operations, increase costs, make it harder to service our users or customers, adversely impact employee retention, hiring, and morale, negatively impact our reputation, or distract management, any of which could seriously harm our business.

***Our costs may increase faster than our revenue, which could seriously harm our business or increase our losses.***

Providing our products to our users is costly, and we expect our expenses, including those related to people, research and development, and hosting, to grow in the future. This expense growth will continue as we broaden our user base, as users increase the number of connections and amount of content they consume and share, as we develop and implement new product features that require more computing infrastructure or products that are not revenue generating, and as we grow our business. Historically, our costs have increased each year due to these factors, and we expect to continue to incur increasing costs. Our costs are based on development and release of new products and the addition of users and may not be offset by a corresponding growth in our revenue. We will continue to invest in our global infrastructure to provide our products quickly and reliably to all users around the world, including in countries where we do not expect significant short-term monetization, if any. Our expenses may be greater than we anticipate, and our investments to make our business and our technical infrastructure more efficient may not succeed and may outpace monetization efforts. In addition, we expect to increase marketing, sales, and other operating expenses to grow and expand our operations and to remain competitive. Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.

***Our business depends on our ability to maintain and scale our technology infrastructure. Any significant disruption to our service could damage our reputation, result in a potential loss of users and decrease in user engagement, and seriously harm our business.***

Our reputation and ability to attract, retain, and serve users depends on the reliable performance of Snapchat and our underlying technology infrastructure. We have in the past experienced, and may in the future experience, interruptions in the availability or performance of our products and services from time to time. Our systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages that could seriously harm our business. If Snapchat is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to Snapchat as often in the future, or at all. As our user base and the volume and types of information shared on Snapchat grow, we will need an increasing amount of technology infrastructure, including network capacity and computing power, to continue to satisfy our users' needs which could significantly increase our costs. It is possible that we may fail to effectively scale and grow our technology infrastructure to accommodate these increased demands, or that improving our current technology infrastructure will require significant resources and delay or hinder the development of other products or services. In addition, our business is subject to interruptions, delays, and failures resulting from earthquakes, other natural disasters, geo-political conflicts, terrorism, pandemics, and other catastrophic events. Global climate change could also result in natural disasters occurring more frequently or with more intense effects, which could cause business interruptions. Wars or other armed conflicts could damage or diminish our access to our technology infrastructure or regional networks and disrupt our services, which could seriously harm our business and financial performance.

As discussed in these risk factors, substantially all of our network infrastructure is provided by third parties, including Google Cloud and AWS. We also rely on third parties for other technology related services, including certain artificial intelligence functions. Any disruption or failure in the services we receive from these providers could harm our ability to handle existing or increased traffic and could seriously harm our business. Any financial or other difficulties these providers face may seriously harm our business. And because we exercise little control over these providers, we are vulnerable to problems with the services they provide and increases in the costs of these services.

We periodically augment and enhance our financial systems and we may experience difficulties in managing our systems and processes, which could disrupt our operations, the management of our finances, and the reporting of our financial results, which in turn, may result in our inability to manage the growth of our business and to accurately forecast and report our results, each of which could seriously harm our business.

***Our business emphasizes rapid innovation and prioritizes long-term user engagement over short-term financial condition or results of operations. That strategy may yield results that sometimes don't align with the market's expectations. If that happens, our stock price may be negatively affected.***

Our business is growing and becoming more complex, and our success depends on our ability to quickly develop and launch new and innovative products. We believe our culture fosters this goal. Our focus on innovations and quick reactions could result in unintended outcomes or decisions that are poorly received by our users, advertisers, or partners. We have made, and expect to continue to make, significant investments to develop and launch new products and services and we cannot assure you that users will purchase or use such new products and services in the future. We will also continue to attempt to find effective ways to show our community new and existing products and alert them to events, holidays, relevant content, and meaningful opportunities to connect with their friends. These methods may provide temporary increases in engagement that may ultimately fail to attract and retain users. Our culture also prioritizes our long-term user engagement over short-term financial condition or results of operations. We frequently make decisions that may reduce our short-term revenue or profitability if we believe that the decisions benefit the aggregate user experience and improve our financial performance over the long term. For example, we monitor how advertising on Snapchat affects our users' experiences to attempt to ensure we do not deliver too many advertisements to our users, and we may decide to decrease the number of advertisements to increase our users' satisfaction in the product. In addition, we improve Snapchat based on feedback provided by our users, advertisers, and partners. These decisions may not produce the long-term benefits that we expect, in which case our user growth, retention and engagement on our service or on certain platforms, our relationships with advertisers and partners, and our business could be seriously harmed.

***Some of our software and systems contain open source software, which may pose particular risks to our proprietary applications.***

We use software licensed to us by third-party developers under "open source" licenses in connection with the development or deployment of our products and expect to continue to use open source software in the future. Some open

source licenses contain express requirements or impose conditions, which may be triggered under certain circumstances, with respect to the exploitation of proprietary source code or other intellectual property by users of open source software. While we employ practices designed to monitor our compliance with the licenses of third-party open source software and to avoid using the open source software in a manner that would put our valuable proprietary source code at risk, there is a risk that we could have used, or may in the future use, open source software in a manner which could require us to release our proprietary source code to users of our software or to the public, require us to license our proprietary software for purposes of making modifications or derivative works, or prohibit us from charging fees for the use of our proprietary software. This could result in loss of revenue, and allow our competitors to create similar offerings with lower development costs, and ultimately could result in a loss of our competitive advantages. Furthermore, there is an increasing number of open source software license types, almost none of which have been tested in a court of law, resulting in guidance regarding the proper legal interpretation of such licenses and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our products. If we were to receive a claim of non-compliance with the terms of any of our open source licenses, we may be required to publicly release certain portions of our proprietary source code or expend substantial time and resources to re-engineer some or all of our software, which may divert resources away from our product development efforts and, as a result, adversely affect our business. In addition, we could be required to seek licenses from third parties to continue offering our products for certain uses, or cease offering the products associated with such software, which may be costly.

In addition, our use of open source software may present greater risks than use of other third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the code. To the extent that our e-commerce capabilities and other business operations depend on the successful and secure operation of open source software, any undetected or unremediated vulnerabilities, errors, or defects in open source software that we use could prevent the deployment or impair the functionality of our systems and injure our reputation. In addition, the public availability of such software may make it easier for others to compromise our systems. Any of these risks could be difficult to eliminate or manage and, if not addressed, could have an adverse effect on our business.

***If our users do not continue to contribute content or their contributions are not perceived as valuable to other users, we may experience a decline in user growth, retention, and engagement on Snapchat, which could result in the loss of advertisers and revenue.***

Our success depends on our ability to provide Snapchat users with engaging content, which in part depends on the content contributed by our users. If users, including influential users such as world leaders, government officials, celebrities, athletes, journalists, sports teams, media outlets, and brands, do not continue to contribute engaging content to Snapchat, our user growth, retention, and engagement may decline. That, in turn, may impair our ability to maintain good relationships with our advertisers or attract new advertisers, which may seriously harm our business.

***Differing government initiatives and restrictions in regions in which our products and services are offered could seriously harm our business.***

Foreign data protection, privacy, consumer protection, content regulation, and other laws and regulations are often more restrictive than those in the United States. In addition, federal, state, and local governments in the United States have taken increasingly divergent approaches to legislating, regulating, and taking enforcement action with respect to technologies that are related to our products and services, including considering or passing laws and regulations that are different than those applicable to other regions in the United States. Foreign governments may censor Snapchat in their countries, restrict access to Snapchat from their countries entirely, impose age-based restrictions on access to Snapchat, impose other restrictions that may affect their citizens' ability to access Snapchat for an extended period of time or even indefinitely, require data localization, or impose other laws or regulations that we cannot comply with, would be difficult for us to comply with, or would require us to rebuild our products or the infrastructure for our products. Federal, state, or local governments in the United States may take, or attempt, similar steps. Such restrictions may also be implemented or lifted selectively to target or benefit other companies or products, which may result in sudden or unexpected fluctuations in competition in regions where we operate. In addition, geo-political conflicts may cause countries to target and restrict our operations, or to promote other companies' products in place of ours. Any restriction on access to Snapchat due to government actions or initiatives, or any withdrawal by us from certain countries or regions because of such actions or initiatives, or any increased competition due to actions and initiatives of governments would adversely affect our DAUs, including by giving our competitors an opportunity to penetrate geographic markets that we cannot access or to which they previously did not have access. As a result, our user growth, retention, and engagement may be seriously harmed, and we may not be able to maintain or grow our revenue as anticipated and our business could be seriously harmed.

***Our users may increasingly engage directly with our partners and advertisers instead of through Snapchat, which may negatively affect our revenue and seriously harm our business.***

Using our products, some partners and advertisers not only can interact directly with our users but can also direct our users to content on third-party websites or downloads of third-party applications. In addition, our users may generate content by using Snapchat features, but then share, use, or post the content on a different platform. The more our users engage with third-party websites and applications, the less engagement we may get from them, which would adversely affect the revenue we could earn from them. Although we believe that Snapchat reaps significant long-term benefits from increased user engagement with content on Snapchat provided by our partners, these benefits may not offset the possible loss of advertising revenue, in which case our business could be seriously harmed.

***If events occur that damage our brand or reputation, our business may be seriously harmed.***

We have developed a brand that we believe has contributed to our success. We also believe that maintaining and enhancing our brand is critical to expanding our user base, advertisers, and partners. Because many of our users join Snapchat on the invitation or recommendation of a friend or family member, one of our primary focuses is on ensuring that our users continue to view Snapchat and our brand favorably so that these referrals continue. Maintaining and enhancing our brand will depend largely on our ability to continue to provide useful, novel, fun, reliable, trustworthy, and innovative products, which we may not do successfully. We may introduce new products, make changes to existing products and services, or require our users to agree to new terms of service related to new and existing products that users do not like, which may negatively affect our brand in the short term, long term, or both. Additionally, our partners' actions may affect our brand if users do not appreciate what those partners do on Snapchat. We may also fail to adequately support the needs of our users, advertisers, or partners, which could erode confidence in our brand. Maintaining and enhancing our brand may require us to make substantial investments and these investments may not be successful. If we fail to successfully promote and maintain our brand or if we incur excessive expenses in this effort, our business may be seriously harmed.

In the past, we have experienced, and we expect that we will continue to experience, media, legislative, and regulatory scrutiny. Unfavorable publicity regarding us, our privacy or security practices, product changes, product quality, illicit use of our product, litigation, employee matters, or regulatory activity, or regarding the actions of our founders, our partners, our users, or other companies in our industry, could seriously harm our reputation and brand. Negative publicity and scrutiny could also adversely affect the size, demographics, engagement, and loyalty of our user base, as well as parental perception of our industry or Snapchat in particular, and result in decreased revenue, fewer application installs (or increased application un-installs), or declining engagement or growth rates, including among teens who need parental approval for use of our products, any of which could seriously harm our business.

***Expanding and operating in international markets requires significant resources and management attention. If we are not successful in expanding and operating our business in international markets, we may incur significant costs, damage our brand, or need to lay off team members in those markets, any of which may seriously harm our business.***

We have expanded to new international markets and are growing our operations in existing international markets, which may have very different cultures and commercial, legal, and regulatory systems than where we predominantly operate. In connection with our international expansion and growth, we also hire new team members in many of these markets. This international expansion may:

- impede our ability to continuously monitor the performance of all of our team members;

- result in hiring of team members who may not yet fully understand our business, products, and culture; or

- cause us to expand in markets that may lack the culture and infrastructure needed to adopt our products.

These issues may eventually lead to turnover or layoffs of team members in these markets and may harm our ability to grow our business in these markets. In addition, scaling our business to international markets imposes complexity on our business, and requires additional financial, legal, and management resources. We may not be able to manage growth and expansion effectively, which could damage our brand, result in significant costs, and seriously harm our business. For example, in August 2022, we undertook a broad strategic reprioritization to focus on our top priorities, improve cost efficiencies, and drive toward profitability and positive free cash flow. As a result of the strategic reprioritization, in the year ended December 31, 2022, we incurred pre-tax charges of $188.9 million, primarily consisting of severance and related charges, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. As we continue to adapt and update our business model and priorities, we may make additional restructurings, reprioritizations, or reductions in the future. Any such changes could

Table of Contents

disrupt our operations, increase costs, make it harder to service our users or customers, adversely impact employee retention, hiring and morale, negatively impact our reputation, or distract management, any of which could seriously harm our business.

Additionally, because we have team members internationally, we are exposed to political, social, and economic instability in additional countries and regions.

***Our products are highly technical and may contain undetected software vulnerabilities, bugs, or hardware errors, which could manifest in ways that could seriously harm our reputation and our business.***

Our products are highly technical and complex. Snapchat, our other products, or products we may introduce in the future, may contain undetected software bugs, hardware errors, and other vulnerabilities. These bugs and errors can manifest in any number of ways in our products, including through diminished performance, security vulnerabilities, malfunctions, or even permanently disabled products. We have a practice of updating our products, but some errors in our products may be discovered only after a product has been released or shipped and used by users, and may in some cases be detected only under certain circumstances or after extended use. While we maintain an application security program designed to detect and remediate bugs and vulnerabilities in our products prior to their launch and a bug bounty program to allow security researchers to assist us in identifying vulnerabilities in our products before they are exploited by malicious threat actors, there is no guarantee that we will be able to discover and remediate vulnerabilities or threats to our products, including in a timely manner. We may be unable to detect bugs, vulnerabilities or threats because no testing can reveal all bugs and vulnerabilities in highly technical and complex products that are constantly evolving, cyber threat actors are developing sophisticated and often undisclosed exploit development tools and techniques, and vulnerabilities in open source and third-party software that may be included in our products are disclosed daily. Any errors, bugs, or vulnerabilities discovered in our products or code (particularly after release) could damage our reputation, result in a security incident (and attendant consequences), drive away users, lower revenue, and expose us to litigation claims or regulatory investigations or enforcement actions, any of which could seriously harm our business. We may also experience delays in developing and deploying remedial measures and patches designed to address identified vulnerabilities.

Spectacles, as an eyewear product, is regulated by the U.S. Food and Drug Administration, or the FDA, and may malfunction in a way that results in physical harm to a user or others around the user. We offer a limited one-year warranty in the United States and a limited two-year warranty in Europe, and any such defects discovered in our products after commercial release could result in a loss of sales and users, which could seriously harm our business. Moreover, certain jurisdictions in which we operate require manufacturers of connected devices to comply with legal and contractual obligations that govern the way data generated by such connected devices is shared and used. If we are unable to comply with these requirements in a timely manner, or if we face technical difficulties in the implementation of some requirements, we could become subject to investigations and enforcement actions, which could require additional financial and management resources.

We may face claims for product liability, tort, or breach of warranty, or experience product recalls. For example, in the first quarter of 2024, we voluntarily decided to recall our Pixy drone product and refund consumers after determining that, in a very small number of cases, the batteries overheated. The product had been discontinued in August 2022. Our product contracts with users contain provisions relating to warranty disclaimers and liability limitations, which may not be upheld. In addition, our liability insurance coverage may prove inadequate or future coverage may be unavailable on acceptable terms or at all. The occurrence of any of these events could increase our costs, divert management attention, and seriously harm our reputation and our business.

***We have been, are currently, and may in the future be subject to regulatory inquiries, investigations, and proceedings which could cause us to incur substantial costs or require us to change our business practices in a way that could seriously harm our business.***

We have been, are currently, and may in the future be subject to inquiries, investigations, and proceedings instituted by government entities. We regularly report information about our business to federal, state, and foreign regulators in the ordinary course of operations. For example, many companies in our industry have received additional information requests from the U.S. Equal Employment Opportunity Commission, and companies with operations in California, including us, have received additional information requests and notices of cause from the California Civil Rights Department (formerly the California Department of Fair Employment and Housing) regarding employment practices, including pay equity. These actions, including any potential unfavorable outcomes, and our compliance with any associated regulatory orders, consent decrees, or settlements, may require us to change our policies or practices, subject us to substantial monetary fines or other penalties or sanctions, result in increased operating costs, divert management's

attention, harm our reputation, and require us to incur significant legal and other expenses, any of which could seriously harm our business.

***We are currently, and expect to be in the future, party to patent lawsuits and other intellectual property claims that are expensive and time-consuming. If resolved adversely, these lawsuits and claims could seriously harm our business.***

Companies in the mobile, camera, communication, media, internet, and other technology-related industries own large numbers of patents, copyrights, trademarks, trade secrets, and other intellectual property rights, and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" and other entities that own patents, copyrights, trademarks, trade secrets, and other intellectual property rights often attempt to aggressively assert their rights to extract value from technology companies. Furthermore, from time to time we may introduce new products or make other business changes, including in areas where we currently do not compete, which could increase our exposure to patent, copyright, trademark, trade secret, and other intellectual property rights claims from competitors and non-practicing entities. We have been subject to, and expect to continue to be subject to, claims and legal proceedings from holders of patents, trademarks, copyrights, trade secrets, and other intellectual property rights alleging that some of our products or content infringe their rights. An unfavorable outcome in any of these lawsuits could seriously harm our business. If these or other matters continue in the future or we need to enter into licensing arrangements, which may not be available to us or on terms favorable to us, it may increase our costs and decrease the value of our products, and our business could be seriously harmed. If a third party does not offer us a license to its intellectual property on commercially reasonable terms, or at all, we may be required to develop, acquire or license alternative, non-infringing technology, which could require significant time, effort, and expense, and may ultimately not be successful. Any of these events would adversely affect our business.

Moreover, we may not be aware if our platform is infringing, misappropriating, or otherwise violating third-party intellectual property rights, and third parties may bring claims alleging such infringement, misappropriation, or violation. Because patent applications can take years to issue and are often afforded confidentiality for some period of time, there may currently be pending applications, unknown to us, that later result in issued patents that could cover one or more of our products and there is also a risk that we could adopt a technology without knowledge of a pending patent application, which technology would infringe a third-party patent once that patent is issued. Moreover, the law continues to evolve and be applied and interpreted by courts in novel ways that we may not be able to adequately anticipate, and such changes may subject us to additional claims and liabilities. In a patent infringement claim against us, we may assert, as a defense, that we do not infringe the relevant patent claims, that the patent is invalid or both. The strength of our defenses will depend on the patents asserted, the interpretation of these patents and our ability to invalidate the asserted patents. However, we could be unsuccessful in advancing non-infringement or invalidity arguments in our defense. In the United States, issued patents enjoy a presumption of validity, and the party challenging the validity of a patent claim must present clear and convincing evidence of invalidity, which is a high burden of proof. Conversely, the patent owner need only prove infringement by a preponderance of the evidence, which is a lower burden of proof. Intellectual property claims, whether or not successful, could divert management time and attention away from our business and harm our reputation and financial condition. Moreover, there could be public announcements of the results of hearings, motions or other interim proceedings or developments and if securities analysts or investors perceive these results to be negative, it could have a substantial adverse effect on our business.

***We are currently, and expect to be in the future, party to lawsuits contending that we should be legally responsible to content created by our users or harms experienced by our users. These lawsuits can be expensive and time-consuming. If resolved adversely, these lawsuits and claims could seriously harm our business.***

We rely on a variety of Constitutional, statutory, and common-law frameworks that provide that we are not legally responsible for content created by our users, including the Digital Millennium Copyright Act, the Communications Decency Act, or CDA, the First Amendment, and the fair-use doctrine. However, these provisions, statutes, and doctrines are subject to uncertain judicial interpretation and regulatory and legislative amendments. For example, the U.S. Congress amended the CDA in 2018 in ways that could expose some Internet platforms to an increased risk of litigation. In addition, the U.S. Congress and the Executive branch have proposed further changes or amendments each year since 2019 including, among other things, proposals that would narrow the CDA immunity, expand government enforcement power relating to content moderation concerns, or repeal the CDA altogether. Some U.S. states have also enacted or proposed legislation that would undercut, or conflict with, the CDA's protections. Some of these state-specific laws grant individuals a private right of action to sue to enforce these laws, with statutory damages. Although such state laws have been or can be expected to be challenged in court, if these laws were upheld or if additional similar laws or the changes or amendments to the CDA proposed by the U.S. Congress and the Executive branch were enacted, such changes may decrease the protections

provided by the CDA and expose us to lawsuits, penalties, and additional compliance obligations. If courts begin to interpret the CDA more narrowly than they have historically done, this could expose us to additional lawsuits and potential judgments and seriously harm our business. Moreover, some of these statutes and doctrines that we rely on provide protection only or primarily in the United States. If the rules around these doctrines change, if international jurisdictions refuse to apply similar protections, or if a court were to disagree with our application of those rules to our service, we could incur liability or be required to make significant changes to our products, business practices, or operations, and our business could be seriously harmed.

Notwithstanding these Constitutional, statutory, and common-law protections, we have faced, currently face, and will continue to face claims relating to information that is published or made available on our products, including Snapchat. In particular, the nature of our business exposes us to claims related to defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. For example, we do not monitor or edit the vast majority of content that is communicated through Snapchat, and such content has, and may in the future, expose us to lawsuits. Specifically, we are currently facing several lawsuits alleging that we are liable for allowing users to communicate with each other, and that those communications sometimes result in harm. In addition, other lawsuits allege that the design of our platform and those of our competitors is addictive and harmful to minor users' mental health. Other plaintiffs have argued that we should be legally responsible for fentanyl overdoses or poisoning if communications about a drug transaction occurred on our platform. We believe we have meritorious defenses to these lawsuits, but litigation is inherently uncertain. Unfavorable outcomes could seriously harm our business. These actions, including any potential unfavorable outcomes, and our compliance with any associated court orders or settlements, may require us to change our policies or practices, subject us to substantial monetary judgments, fines, penalties, or sanctions, result in increased operating costs, divert management's attention, harm our reputation, and require us to incur significant legal and other expenses, any of which could seriously harm our business. Even if the outcome of any such litigation or claim is favorable, defending against such lawsuits is costly and can impose a significant burden on management and employees. We may also receive unfavorable preliminary, interim, or final rulings in the course of litigation.

This risk is enhanced in certain jurisdictions outside the United States where our protection from liability for third-party actions may be less than the protection that exists in the United States. For example, in April 2019, the European Union passed a directive expanding online platform liability for copyright infringement and regulating certain uses of news content online, which member states were required to implement by June 2021. In addition, legislation in Germany may impose significant fines for failure to comply with certain content removal and disclosure obligations. Numerous other countries in Europe, the Middle East, Asia-Pacific, and Latin America are considering or have implemented similar legislation imposing penalties for failure to remove certain types of content or follow certain processes.

We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages, or license costs. We could also face fines or orders restricting or blocking our services in particular geographies as a result of content hosted on our services. If any of these events occur, we may incur significant costs or be required to make significant changes to our products, business practices, or operations and our business could be seriously harmed.

***From time to time, we are involved in class-action lawsuits and other litigation matters that are expensive and time-consuming and could seriously harm our business.***

We are involved in numerous lawsuits, including putative class-action lawsuits brought by users and investors, some of which may claim statutory damages. We anticipate that we will continue to be a target for lawsuits in the future. Because we have millions of users, class-action lawsuits against us that are purportedly filed by or on behalf of users typically claim enormous monetary damages in the aggregate even if the alleged per-user harm is small and non-existent. For example, in November 2020, a putative class filed an action against us in Illinois, alleging that we violated an Illinois statute concerning the handling of biometric data, which we settled. Other plaintiffs have chosen to pursue a strategy of joining with other plaintiffs to bring a large number of individual claims, rather than pursuing a class action.

Similarly, because we have a large number of stockholders, class-action lawsuits on securities theories typically claim enormous monetary damages in the aggregate even if the alleged loss per stockholder is small. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class-action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency, or ATT, framework would have on our business. In August 2022, we, and certain of our directors, were named as defendants in a class-action lawsuit in Delaware Chancery Court purportedly brought on behalf of Class A stockholders, alleging that a transaction between the company's co-founders and the company, in which the co-founders

agreed to employment agreements and we agreed to amend our certificate of incorporation and issue a stock dividend if certain conditions were met, was not advantageous to the stockholders and constituted a breach of fiduciary duty. In December 2023, we entered into an Amended Stipulation of Compromise and Settlement to settle and dismiss the lawsuit, subject to approval by the court and the satisfaction of various conditions.

We believe we have meritorious defenses to these lawsuits, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business. Any litigation to which we are a party may result in an onerous or unfavorable judgment that might not be reversed on appeal, or we may decide to settle lawsuits on adverse terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to our products or business practices, and seriously harm our business. Even if the outcome of any such litigation or claim is favorable, defending against such lawsuits is costly and can impose a significant burden on management and employees. We may also receive unfavorable preliminary, interim, or final rulings in the course of litigation.

*We plan to continue expanding our international operations, including in markets where we have limited operating experience and may be subject to increased business and economic risks that could seriously harm our business.*

We plan to continue expanding our business operations abroad and to enter new international markets and expand our operations in existing international markets, where in some cases we have limited or no experience in marketing, selling, and deploying our products and advertisements. Our limited experience and infrastructure in such markets, or the lack of a critical mass of users in such markets, may make it more difficult for us to effectively monetize any increase in DAUs in those markets, and may increase our costs without a corresponding increase in revenue. If we fail to deploy or manage our operations in international markets successfully, our business may suffer. We do not currently enter into foreign currency exchange contracts, which means our business, financial condition, and operating results may be impacted by fluctuations in the exchange rates of the currencies in which we do business. In the future, as our international operations increase, or more of our revenue agreements or operating expenses are denominated in currencies other than the U.S. dollar, these impacts may become material. In addition, as our international operations and sales continue to grow, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, and economic instability, including war and other armed conflict, and significant political developments or disruptions in foreign jurisdictions, such as the ongoing legal and regulatory changes in the United Kingdom as a result of the withdrawal of the United Kingdom from the European Union;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy, rights of publicity, content, data protection, cybersecurity, intellectual property, health and safety, competition, protection of minors, consumer protection, employment, money transmission, import and export restrictions, gift cards, electronic funds transfers, anti-money laundering, advertising, algorithms, encryption, and taxation, and unexpected changes in laws, regulatory requirements, and enforcement;

- potential damage to our brand and reputation due to compliance with local laws, including potential censorship and requirements to provide user information to local authorities;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- complying with tax requirements of multiple jurisdictions;

- enhanced difficulties of integrating any foreign acquisitions;

- complying with a variety of foreign laws, including certain employment laws requiring national collective bargaining agreements that set minimum salaries, benefits, working conditions, and termination requirements;

- complying with a variety of foreign disclosure and reporting obligations, including those related to environmental, social, and corporate governance impacts and security breaches;

- reduced protection for intellectual-property rights in some countries;

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and compliance costs associated with multiple international locations;

- regulations that might add difficulties in repatriating cash earned outside the United States and otherwise preventing us from freely moving cash;

- import and export restrictions and changes in trade regulation;

Table of Contents

- complying with statutory equity requirements;

- complying with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and similar laws in other jurisdictions; and

- export controls and economic sanctions administered by the Department of Commerce Bureau of Industry and Security, the Treasury Department's Office of Foreign Assets Control, or other similar foreign regulatory bodies.

If we are unable to expand internationally and manage the complexity of our global operations successfully, our business could be seriously harmed.

***We plan to continue to make acquisitions and strategic investments in other companies, which could require significant management attention, disrupt our business, dilute our stockholders, and seriously harm our business.***

As part of our business strategy, we have made and intend to make acquisitions to add specialized team members and complementary companies, products, and technologies, as well as investments in public and private companies in furtherance of our strategic objectives. Our ability to acquire and successfully integrate larger or more complex companies, products, and technologies is unproven. In the future, we may not be able to find other suitable acquisition or investment candidates, and we may not be able to complete acquisitions or investments on favorable terms, if at all. Our previous and future acquisitions and investments may not achieve our goals, and any future acquisitions or investments we complete could be viewed negatively by users, advertisers, partners, or investors. In addition, if we fail to successfully close transactions, integrate new teams, or integrate the products, technologies, and systems associated with these acquisitions into our company, our business could be seriously harmed. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. For example, future or past business transactions could expose us to additional cybersecurity risks and vulnerabilities, as our systems could be negatively affected by vulnerabilities present in acquired or integrated entities' systems and technologies. We may not successfully evaluate or use the acquired products, technology, and personnel, or accurately forecast the financial impact of an acquisition or investment transaction, including accounting charges. We may also incur unanticipated liabilities and litigation exposure that we assume as a result of acquiring companies. We may have to pay cash, incur debt, or issue equity securities to pay for any acquisition or investment, any of which could seriously harm our business. Selling or issuing equity to finance or carry out any such acquisition or investment would also dilute our existing stockholders. Incurring debt would increase our fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

In addition, it generally takes several months after the closing of an acquisition to finalize the purchase price allocation. Therefore, it is possible that our valuation of an acquisition may change and result in unanticipated write-offs or charges, impairment of our goodwill, or a material change to the fair value of the assets and liabilities associated with a particular acquisition, any of which could seriously harm our business.

The strategic investments we make in public and private companies around the world range from early-stage companies still defining their strategic direction to mature companies with established revenue streams and business models. Many of the instruments in which we invest are non-marketable and illiquid at the time of our initial investment, and our ability to realize a return on our investment, if any, is typically dependent on the issuer participating in a liquidity event, such as a public offering or acquisition. We are not always able to achieve a return on our investments in a timely fashion, if at all, even for those companies that have achieved a liquidity event. To the extent any of the companies in which we invest are not successful, which can include failures to achieve business objectives as well as bankruptcy, we could recognize an impairment or lose all or part of our investment.

Our acquisition and investment strategy may not succeed if we are unable to remain attractive to target companies or expeditiously close transactions. For example, if we develop a reputation for being a difficult acquirer or having an unfavorable work environment, or target companies view our non-voting Class A common stock unfavorably, we may be unable to source and close acquisition targets. In addition, members of the U.S. administration and Congress have proposed new legislation, and the U.S. Federal Trade Commission and Department of Justice have adopted new procedures, that could limit, hinder, or delay the acquisition process and target opportunities. If we are unable to consummate key acquisition transactions essential to our corporate strategy, it may limit our ability to grow or compete effectively and our business may be seriously harmed.

***If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings, which could seriously harm our business.***

Under U.S. generally accepted accounting principles, or GAAP, we review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment at least annually. As of December 31, 2023, we had recorded a total of $1.8 billion of goodwill and intangible assets, net related to our acquisitions. An adverse change in market conditions, particularly if such change has the effect of changing one of our critical assumptions or estimates, could result in a change to the estimation of fair value that could result in an impairment charge to our goodwill or intangible assets. Any such material charges may seriously harm our business.

***Our use of equity awards to compensate and motivate our employees causes dilution to existing stockholders. Efforts to manage this dilution are likely to reduce the amount of cash we have available for other purposes.***

We use equity awards that vest over multiple years to compensate and motivate our employees. When our employee equity awards vest, we typically withhold taxes and remit them, along with any employee and employer social security contributions, to relevant taxing authorities on behalf of team members and, where applicable, their employers.

While the issuance of stock-based compensation to our employees does not deplete our cash balance, it is dilutive to existing stockholders. To help manage and mitigate this dilution, we can choose to use our existing cash to fund the withholding and remittance obligations on equity awards when they vest (instead of selling a portion of the vested equity award on behalf of our employees), or engage in stock repurchases. However, doing so would reduce the amount of cash we have available to fund working capital, capital expenditures, strategic acquisitions or business opportunities, and other general corporate purposes and may increase stock price volatility. If we were to elect to satisfy tax withholding and remittance obligations in whole or in part by drawing on our revolving credit facility, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business.

***There are numerous risks associated with our internal and contract manufacturing of our physical products and components. If we encounter problems with either our internal or contract manufacturing, we may not deliver our products within specifications or on time, which may seriously harm our business.***

Manufacturing processes are highly complex, require advanced and costly equipment, and must be continuously modified to improve yields and performance. We largely rely on third-party suppliers and contract manufacturers in connection with the production of our own physical products and components. We and our contract manufacturers are all vulnerable to capacity constraints and reduced component availability, and have limited control over delivery schedules, manufacturing yields, and costs, particularly when components are in short supply, or if we introduce a new product or feature. In addition, we have limited control over our suppliers' and manufacturers' quality systems and controls, and therefore must rely on them to meet our quality and performance standards and specifications. Delays, component shortages, including custom components that are manufactured for us at our direction, global trade conditions and agreements, and other manufacturing and supply problems could impair the distribution of our products and ultimately our brand. For example, the United States has threatened tougher trade terms with China and other countries, leading to the imposition, or potential future imposition, of substantially higher U.S. Section 301 tariffs on certain imports from China, which may adversely affect our products and seriously harm our business.

Furthermore, any adverse change in our suppliers' or contract manufacturers' financial or business condition or our relationship with them could disrupt our ability to supply our products. If we change our suppliers or contract manufacturers, or shift to more internal manufacturing operations, we may lose revenue, incur increased costs, and damage our reputation and brand. Qualifying and commencing operations with a new supplier or contract manufacturer is expensive and time-consuming. In addition, if we experience increased demand for our products, we may need to increase our material or component purchases, internal or contract-manufacturing capacity, and internal test and quality functions. The inability of our suppliers or contract manufacturers to provide us with adequate high-quality materials and products could delay our order fulfillment, and may require us to change the design of our products to meet this increased demand. Any redesign may require us to re-qualify our products with any applicable regulatory bodies or customers, which would be costly and time-consuming. This may lead to unsatisfied customers and users and increase costs to us, which could seriously harm our business. As we increase or acquire additional manufacturing capacity, we are subject to many complex and evolving environmental, health, and safety laws, regulations, and rules in each jurisdiction in which we operate. If we fail to comply with any such laws and regulations, then we could incur regulatory penalties, fines, and legal liabilities, suspension of production, significant compliance requirements, alteration of our manufacturing processes, or restrictions on our ability to modify or expand our facilities, any of which could seriously harm our business.

39

In addition, any errors or defects in any parts or technology incorporated into our products could result in product failures or recalls that could seriously harm our business. Further, any defect in manufacturing, design, or other could cause our products to fail or render them permanently inoperable. As a result of such product failures or recalls, we may have to replace or offer refunds for these products at our sole cost and expense, face litigation, including class-action lawsuits, or be subject to other liabilities. Should we have a widespread problem of this kind, the reputational damage and the cost of replacing these products, or other liabilities, could seriously harm our business.

***Some of our products are in regulated industries. Clearances to market regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products.***

The FDA and other state and foreign regulatory agencies regulate Spectacles. We may develop future products that are regulated as medical devices by the FDA or regulated by other governmental agencies. Government authorities, primarily the FDA and corresponding regulatory agencies, regulate the medical device industry. Unless there is an exemption, we must obtain regulatory approval from the FDA and corresponding agencies, or other applicable governmental authorities, before we can market or sell a new regulated product or make a significant modification to an existing product. Obtaining regulatory clearances to market a medical device or other regulated products can be costly and time-consuming, and we may not be able to obtain these clearances or approvals on a timely basis, or at all, for future products. Any delay in, or failure to receive or maintain, clearance or approval for any products under development could prevent us from launching new products. We could seriously harm our business and the ability to sell our products if we experience any product problems requiring reporting to governmental authorities, if we fail to comply with applicable federal, state, or foreign agency regulations, or if we are subject to enforcement actions such as fines, civil penalties, injunctions, product recalls, or failure to obtain regulatory clearances or approvals.

***We have faced inventory risk with respect to our physical products.***

We have been and may in the future be exposed to inventory risks related to our physical products as a result of rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand and consumer spending patterns, changes in consumer tastes with respect to our products, and other factors. We try to accurately predict these trends and avoid overstocking or understocking inventory. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. The acquisition of certain types of inventory or components may require significant lead-time and prepayment and they may not be returnable. Failure to manage our inventory, supplier commitments, or customer expectations could seriously harm our business.

**Risks Related to Credit and Financing**

***We have offered and may continue to offer credit to our partners to stay competitive, and as a result we may be exposed to credit risk of some of our partners, which may seriously harm our business.***

We engage in business with some of our partners on an open credit basis. While we attempt to monitor individual partner payment capability when we grant open credit arrangements and maintain allowances we believe are adequate to cover exposure for doubtful accounts, we cannot assure investors these programs will be effective in managing our credit risks in the future. This may be especially true as our business grows and expands, we engage with partners that have limited operating history, or we engage with partners that we may not be familiar with. If we are unable to adequately control these risks, our business could be seriously harmed.

***Operating our business requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay the Convertible Notes, and any other debt when due, which may seriously harm our business.***

Our ability to make principal or interest payments on, or to refinance, the Convertible Notes or other indebtedness depends on our future performance, which is subject to many factors beyond our control. Our business may not generate sufficient cash flow from operations in the future to service our debt and business. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt, obtaining additional debt financing, or issuing additional equity securities, any of which may be on terms that are not favorable to us or, in the case of equity securities, highly dilutive to our stockholders. The Convertible Notes will mature beginning in May 2025, unless earlier converted, redeemed, or repurchased. Our ability to repay or refinance the Convertible Notes or our other indebtedness will depend on various factors, including the accessibility of capital markets, our business, and our financial condition at such time. We may not be able to engage in any of these activities or on desirable terms, which could result in a default on our debt obligations. In addition, our existing and future debt agreements, including the Convertible Notes and

Table of Contents

Credit Facility, may contain restrictive covenants that may prohibit us from adopting any of these alternatives. Our failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in the acceleration of our debt, and would seriously harm our business.

In addition, holders of the Convertible Notes have the right to require us to repurchase all or a portion of the Convertible Notes on the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Convertible Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. Further, if a make-whole fundamental change as defined in each of the indentures governing the Convertible Notes, or the Indentures, occurs prior to the maturity date of the Convertible Notes, we will in some cases be required to increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such make-whole fundamental change. On the conversion of the Convertible Notes, unless we elect to deliver solely shares of our Class A common stock to settle such conversion (other than paying cash in lieu of delivering any fractional share), we will be required to make cash payments for the Convertible Notes being converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make such repurchases of the Convertible Notes surrendered or pay cash with respect to the Convertible Notes being converted.

***If we default on our credit obligations, our operations may be interrupted and our business could be seriously harmed.***

We have a Credit Facility that we may draw on to finance our operations, acquisitions, and other corporate purposes. If we default on these credit obligations, our lenders may:

- require repayment of any outstanding amounts drawn on our Credit Facility;
- terminate our Credit Facility; or
- require us to pay significant damages.

If any of these events occur, our operations may be interrupted and our ability to fund our operations or obligations, as well as our business, could be seriously harmed. In addition, our Credit Facility contains operating covenants, including customary limitations on the incurrence of certain indebtedness and liens, restrictions on certain intercompany transactions, and limitations on the amount of dividends and stock repurchases. Our ability to comply with these covenants may be affected by events beyond our control, and breaches of these covenants could result in a default under the Credit Facility and any future financial agreements into which we may enter. If not waived, defaults could cause our outstanding indebtedness under our outstanding Convertible Notes or our Credit Facility, including any future financing agreements that we may enter into, to become immediately due and payable. For more information on our Credit Facility, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

***We cannot be certain that additional financing will be available on reasonable terms when needed, or at all, which could seriously harm our business.***

We have historically incurred net losses and negative cash flow from operations, and we may not attain and sustain profitability in future periods. As a result, we may need additional financing. Our ability to obtain additional financing, if and when required, will depend on investor demand, our operating performance, our credit rating, the condition of the capital markets, and other factors. To the extent we use available funds or draw on our Credit Facility, we may need to raise additional funds and we cannot assure investors that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-linked, or debt securities, those securities may have rights, preferences, or privileges senior to the rights of our Class A common stock, and our existing stockholders may experience dilution. In the event that we are unable to obtain additional financing on favorable terms, our interest expense and principal repayment requirements could increase significantly, which could seriously harm our business. In addition, our ability to draw on our Credit Facility relies on our lenders under that facility's continued operation and ability to fund.

**Risks Related to Taxes**

***Existing, new, and proposed tax laws and regulations that would affect the U.S. or foreign taxation of business activities, including the imposition of, or increase in, tax based on gross revenue, could seriously harm our business, or the financial markets and the market price of our Class A common stock.***

Reforming the taxation of international businesses has been a priority for politicians at a global level, and a wide variety of changes have been proposed or enacted. Due to the large and expanding scale of our international business activities, any changes in the taxation of such activities may increase our tax expense, the amount of taxes we pay, or both, and seriously harm our business. For example, legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017, significantly reformed the U.S. Internal Revenue Code of 1986, as amended, or the Code. The Tax Cuts and Jobs Act put into effect significant changes to U.S. taxation of international business activities, including lowering U.S. federal corporate income tax rates, changing the utilization of future net operating loss carryforwards, allowing certain capital expenditures to be expensed, eliminating the option to currently deduct research and development expenditures and requiring taxpayers to capitalize and amortize U.S.-based and non-U.S.-based research and development expenditures over five and fifteen years, respectively. In August 2022, the Inflation Reduction Act, or the IRA, was enacted, the provisions of which include a minimum tax equal to 15% of the adjusted financial statement income of certain large corporations, as well as a 1% excise tax on certain share buybacks by public corporations that would be imposed on such corporations. It is possible that changes or interpretations under the Tax Cuts and Jobs Act, the IRA, or other tax legislation could increase our future tax liability, which could in turn adversely impact our business and future profitability.

In addition, many jurisdictions and intergovernmental organizations have implemented or are in the process of implementing proposals that have changed (or are likely to change) various aspects of the existing framework under which our tax obligations are determined in many of the jurisdictions in which we do business and in which our users are located. Some jurisdictions have enacted, and others have proposed, in each case potentially on a temporary basis pending the implementation of the "two-pillar solution" described below, taxes based on gross receipts applicable to digital services regardless of profitability. In addition, the Organisation for Economic Co-operation and Development, or the OECD, has led international efforts to devise, and to implement on a permanent basis, a two-pillar solution to address the tax challenges arising from the digitalization of the economy. Pillar One focuses on nexus and profit allocation, and Pillar Two provides for a global minimum effective corporate tax rate of 15%. Pillar One would apply to multinational enterprises with annual global revenue above 20 billion euros and profitability above 10%, with the revenue threshold potentially reduced to 10 billion euros in the future. While it remains uncertain whether Pillar One will be adopted, based on these thresholds, we currently expect to be outside the scope of the Pillar One proposals, though we anticipate that we will be subject to Pillar One in the future if it is ultimately adopted and if our global revenue exceeds the Pillar One thresholds. A number of countries, including the United Kingdom, have enacted legislation to implement core elements of the Pillar Two proposal from the start of 2024. Based on our current understanding of the minimum revenue thresholds contained in the proposed Pillar Two rules, we expect that we may be within their scope and so their implementation could impact the amount of tax we have to pay and we may be required to incur additional material costs and expenditures to ensure compliance with any such rules in each of the relevant jurisdictions within which we carry on our business.

We continue to examine the impact these and other tax reforms may have on our business. The impact of these and other tax reforms is uncertain and one or more of these or similar measures could seriously harm our business.

***We may have exposure to greater-than-anticipated tax liabilities, which could seriously harm our business.***

Our income tax obligations are based on our corporate operating structure and third-party and intercompany arrangements, including the manner in which we develop, value, and use our intellectual property and the valuations of our intercompany transactions. The tax laws applicable to our international business activities, including the laws of the United States and other jurisdictions, are subject to change and uncertain interpretation. The taxing authorities of the jurisdictions in which we operate may challenge our methodologies for valuing developed technology, intercompany arrangements, or transfer pricing, which could increase our worldwide effective tax rate and the amount of taxes we pay and seriously harm our business. Taxing authorities may also determine that the manner in which we operate our business is not consistent with how we report our income, which could increase our effective tax rate and the amount of taxes we pay and seriously harm our business. In addition, our future income taxes could fluctuate because of earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by U.S. federal and state and foreign tax authorities. Any adverse outcome from a review or audit could seriously harm our business. In addition, determining our worldwide provision for income taxes and other tax liabilities requires significant judgment by management, and there are many

transactions where the ultimate tax determination is uncertain. Although we believe that our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements for such periods and may seriously harm our business.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited, each of which could seriously harm our business.***

As of December 31, 2023, we had U.S. federal net operating loss carryforwards of approximately $6.7 billion and state net operating loss carryforwards of approximately $4.5 billion, as well as U.K. net operating loss carryforwards of approximately $4.5 billion. We also accumulated U.S. federal and state research tax credits of $816.6 million and $478.9 million, respectively, as of December 31, 2023. Under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a cumulative change in our ownership by "5% shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. In the event that we experience one or more ownership changes as a result of transactions in our stock, then we may be limited in our ability to use our net operating loss carryforwards and other tax assets to reduce taxes owed on the net taxable income that we earn.

For U.S. federal income tax purposes, net operating losses arising in tax years beginning before January 1, 2018 can be carried forward to the earlier of the next subsequent twenty years or until such losses are fully utilized. Net operating losses arising in tax years beginning after December 31, 2017 are not subject to the twenty-year limitation, but our use of such net operating losses in a tax year may not exceed 80% of such year's taxable income. U.S. federal research tax credits can be carried forward to the earlier of the next subsequent twenty years or until such credits are fully utilized, and use of those credits generally cannot exceed 75% of the net income tax liability for such tax year. In the United Kingdom, net operating loss carryforwards can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income and may be subject to ownership change rules that restrict the use of net operating loss carryforwards.

Any limitations on the ability to use our net operating loss carryforwards and other tax assets, as well as the timing of any such use, could seriously harm our business.

***Our operating results may be negatively affected if we are required to pay additional sales and use tax, value added tax, or other transaction taxes, and we could be subject to liability with respect to all or a portion of past or future transactions.***

We currently collect and remit sales and use, value added and other transaction taxes in certain of the jurisdictions where we do business based on our assessment of the amount of taxes owed by us in such jurisdictions. However, in some jurisdictions in which we do business, we do not believe that we owe such taxes, and therefore we currently do not collect and remit such taxes in those jurisdictions or record contingent tax liabilities in respect of those jurisdictions. A successful assertion that we are required to pay additional taxes in connection with sales of our products and solutions, or the imposition of new laws or regulations or the interpretation of existing laws and regulations requiring the payment of additional taxes, would result in increased costs and administrative burdens for us. If we are subject to additional taxes and determine to offset such increased costs by collecting and remitting such taxes from our customers, or otherwise passing those costs through to our customers, companies may be discouraged from purchasing our products and solutions. Any increased tax burden may decrease our ability or willingness to compete in relatively burdensome tax jurisdictions, result in substantial tax liabilities related to past or future sales or otherwise seriously harm our business.

### Risks Related to Ownership of Our Class A Common Stock

***Holders of Class A common stock have no voting rights. As a result, holders of Class A common stock will not have any ability to influence stockholder decisions.***

Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2023, Mr. Spiegel and Mr. Murphy control over 99% of the voting power of our capital stock, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval. In addition, because our Class A common stock carries no voting rights (except as required by Delaware law), the issuance of the Class A common stock in future offerings, in future stock-based acquisition transactions, or to fund employee equity incentive programs could prolong the duration of Mr. Spiegel's and Mr. Murphy's current relative

ownership of our voting power and their ability to elect certain directors and to determine the outcome of all matters submitted to a vote of our stockholders. This concentrated control eliminates other stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

***Our capital structure may adversely impact our stock price.***

Although other U.S.-based companies have publicly traded classes of non-voting stock, to our knowledge, we were the first company to only list non-voting stock on a U.S. stock exchange. Some indexes have since determined that they will exclude non-voting stock, like our Class A common stock, from their membership. For example, FTSE Russell, a provider of widely followed stock indexes, requires new constituents of its indexes to have at least five percent of their voting rights in the hands of public stockholders. The S&P Dow Jones, another provider of widely followed stock indexes, previously excluded companies with multiple share classes, but subsequently reversed course to remove that exclusion. As a result, our Class A common stock is not eligible for stock indexes with these or similar restrictions. We cannot assure you that other stock indexes will not take a similar approach to FTSE Russell in the future. Exclusion from indexes could make our Class A common stock less attractive to investors and, as a result, the market price of our Class A common stock could be adversely affected. Additionally, the exclusion of our Class A common stock from these indexes may limit the types of investors who invest in our Class A common stock and could make the trading price of our Class A common stock more volatile

***Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock.***

Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require periodic reporting of beneficial ownership by significant stockholders, including changes in that ownership. For example, we believe that Tencent Holdings Limited, together with its affiliates, may hold greater than 10% of our Class A common stock based in part on Tencent Holdings Limited's public reporting. As a result of our capital structure, holders are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. Our directors and officers are required to file reports under Section 16 of the Exchange Act. Our significant stockholders, other than directors and officers, are exempt from the "short-swing" profit recovery provisions of Section 16 of the Exchange Act and related rules with respect to their purchases and sales of our securities. As such, stockholders will be unable to bring derivative claims for disgorgement of profits for trades by significant stockholders under Section 16(b) of the Exchange Act unless the significant stockholders are also directors or officers.

Since our Class A common stock is our only class of stock registered under Section 12 of the Exchange Act and that class is non-voting, we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, unless a vote of the Class A common stock is required by applicable law. Accordingly, legal causes of action and remedies under Section 14 of the Exchange Act for inadequate or misleading information in proxy statements may not be available to holders of our Class A common stock. If we do not deliver any proxy statements, information statements, annual reports, and other information and reports to the holders of our Class B common stock and Class C common stock, then we will similarly not provide any of this information to holders of our Class A common stock. Because we are not required to file proxy statements or information statements under Section 14 of the Exchange Act, any proxy statement, information statement, or notice of our annual meeting may not include all information under Section 14 of the Exchange Act that a public company with voting securities registered under Section 12 of the Exchange Act would be required to provide to its stockholders. Most of that information, however, will be reported in other public filings. For example, any disclosures required by Part III of Form 10-K as well as disclosures required by the NYSE for the year ended December 31, 2023 that are customarily included in a proxy statement are instead included in our Annual Report. But some information required in a proxy statement or information statement is not required in any other public filing. For example, we are not required to comply with the proxy access rules or the "pay versus performance" disclosure rules under Section 14 of the Exchange Act. If we take any action in an extraordinary meeting of stockholders where the holders of Class A common stock are not entitled to vote, we will not be required to provide the information required under Section 14 of the Exchange Act. Since that information is also not required in a Form 10-K, holders of Class A common stock may not receive the information required under Section 14 of the Exchange Act with respect to extraordinary meetings of stockholders. In addition, we are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Act. As a result, our stockholders do not have an opportunity to provide a non-binding vote on the compensation of our executive officers. Moreover, holders of

Table of Contents

our Class A common stock will be unable to bring matters before our annual meeting of stockholders or nominate directors at such meeting, nor can they submit stockholder proposals under Rule 14a-8 of the Exchange Act.

***The trading price of our Class A common stock has been and will likely continue to be volatile.***

The trading price of our Class A common stock has been and is likely to continue to be volatile. From January 1, 2022 to December 31, 2023, the trading price of our Class A common stock ranged from $7.33 to $47.71. Declines or volatility in our trading price could make it more difficult to attract and retain talent, adversely impact employee retention and morale, and has required, and may continue to require, us to issue more equity to incentivize team members which is likely to dilute stockholders. The market price of our Class A common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our user growth, retention, engagement, revenue, or other operating results;

- variations between our actual operating results and the expectations of investors and the financial community;

- the accuracy of our financial guidance or projections;

- any forward-looking financial or operating information we may provide, any changes in this information, or our failure to meet expectations based on this information;

- actions of investors who initiate or maintain coverage of us, changes in financial estimates by any investors who follow our company, or our failure to meet these estimates or the expectations of investors;

- significant acquisitions or divestitures of our stock by investors, whether voluntarily or to comply with regulatory or other requirements;

- whether our capital structure is viewed unfavorably, particularly our non-voting Class A common stock and the significant voting control of our co-founders;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if we issue shares to satisfy equity-related tax obligations;

- stock repurchase programs undertaken by us;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- announcements by us or estimates by third parties of actual or anticipated changes in the size of our user base or the level of user engagement;

- changes in operating performance and stock market valuations of technology companies in our industry segment, including our partners and competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole, inflationary pressures, banking instability, war or other armed conflict, terrorism, or responses to these events;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits, executive actions, or regulatory actions, including interim or final rulings by judicial or regulatory bodies, whether such developments may impact us or our competitors; and

- other events or factors, including those resulting from war, incidents of terrorism, pandemics, or responses to these events.

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices, including ours. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class-action litigation following periods of market volatility. For example, in November 2021, we, and certain of our officers, were named as defendants in a securities class-action lawsuit in federal court purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's ATT framework would have on our business. We believe we have meritorious defenses to this lawsuit, but an unfavorable outcome could seriously harm our business. Any litigation could

subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business.

***We may not realize the anticipated long-term stockholder value of any stock repurchase program undertaken by us and any failure to repurchase our Class A common stock after we have announced our intention to do so may negatively impact our stock price.***

Our board of directors has in the past and may from time to time in the future authorize stock repurchase programs, pursuant to which repurchases of Class A common stock may be made either through open market transactions (including pre-set trading plans) or through other transactions in accordance with applicable securities laws. Any repurchase programs may be modified, suspended, or terminated at any time. Any failure to repurchase stock after we have announced our intention to do so may negatively impact our reputation and investor confidence in us and may negatively impact our stock price.

The existence of a stock repurchase program could cause our stock price to trade higher than it otherwise would be and could potentially reduce the market liquidity for our stock. Although stock repurchase programs are intended to enhance long-term stockholder value, there is no assurance they will do so because the market price of our Class A common stock may decline below the levels at which we repurchased shares and short-term stock price fluctuations could reduce the effectiveness of any such program.

Repurchasing our Class A common stock reduces the amount of cash we have available to fund working capital, capital expenditures, strategic acquisitions or business opportunities, and other general corporate purposes, and we may fail to realize the anticipated long-term stockholder value of any stock repurchase program.

***Conversions or exchanges of the Convertible Notes may dilute the ownership interest of our stockholders or may otherwise affect the market price of our Class A common stock.***

The conversion of some or all of the Convertible Notes may dilute the ownership interests of our stockholders. On conversion of the Convertible Notes, we have the option to pay or deliver, as the case may be, cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock. If we elect to settle our conversion obligation in shares of our Class A common stock or a combination of cash and shares of our Class A common stock, any sales in the public market of our Class A common stock issuable on such conversion could adversely affect prevailing market prices of our Class A common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the conversion of the Convertible Notes could be used to satisfy short positions, or anticipated conversion of the Convertible Notes into shares of our Class A common stock, any of which could depress the market price of our Class A common stock.

We may also engage in exchanges, repurchase, or induce conversions, of the Convertible Notes in the future. Holders of the Convertible Notes that participate in any of these exchanges, repurchases, or induced conversions may enter into or unwind various derivatives with respect to our Class A common stock or sell shares of our Class A common stock in the open market to hedge their exposure in connection with these transactions. These activities could decrease (or reduce the size of any increase in) the market price of our Class A common stock or the Convertible Notes, or dilute the ownership interests of our stockholders. In addition, the market price of our Class A common stock is likely to be affected by short sales of our Class A common stock or the entry into or unwind of economically equivalent derivative transactions with respect to our Class A common stock by investors that do not participate in the exchange transactions and by the hedging activity of the counterparties to our Capped Call Transactions or their respective affiliates.

***We may still incur substantially more debt or take other actions that would diminish our ability to make payments on the Convertible Notes when due. Our ability to repay our debt depends on our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.***

We and our subsidiaries may incur substantial additional debt in the future, subject to the restrictions contained in our current and future debt instruments. We are not restricted under the terms of the Indentures governing the Convertible Notes from incurring additional debt, securing existing or future debt, repurchasing our stock, making investments, paying dividends, recapitalizing our debt, or taking a number of other actions that could have the effect of diminishing our ability to make payments on the Convertible Notes when due.

46

Our ability to pay our debt when due or to refinance our indebtedness, including the Convertible Notes, depends on our financial condition at such time, the condition of capital markets, and our future performance, which is subject to economic, financial, competitive, and other factors beyond our control.

***The conditional conversion feature of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.***

The Convertible Notes are convertible at the option of the holder. In the event the conditions for optional conversion of the 2025 Notes, 2026 Notes, 2027 Notes, or 2028 Notes by holders are met before the close of business on the business day immediately preceding February 1, 2025, May 1, 2026, February 1, 2027, or December 1, 2027, respectively, holders of the applicable Convertible Notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their Convertible Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our Class A common stock (other than paying cash in lieu of delivering any fractional share), we may settle all or a portion of our conversion obligation in cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Convertible Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Convertible Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital and may seriously harm our business.

***We entered into certain hedging positions that may affect the value of the Convertible Notes and the volatility and value of our Class A common stock.***

In connection with the issuance of the Convertible Notes, we entered into certain hedging positions with certain financial institutions. These hedging positions are expected generally to reduce potential dilution of our Class A common stock on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount of such converted Convertible Notes, as the case may be, with such reduction or offset subject to a cap.

The counterparties to these hedging positions or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our Class A common stock or purchasing or selling our Class A common stock in secondary market transactions prior to the maturity of the Convertible Notes (and are likely to do so during any observation period related to a conversion of Convertible Notes or following any repurchase of Convertible Notes by us on any fundamental change repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our Class A common stock or the Convertible Notes. In addition, if any such hedging positions fail to become effective, the counterparties to these hedging positions or their respective affiliates may unwind their hedge positions, which could adversely affect the value of our Class A common stock.

***Delaware law and provisions in our certificate of incorporation and bylaws, as well as our Indentures, could make a merger, tender offer, or proxy contest difficult or more expensive, thereby depressing the trading price of our Class A common stock.***

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our Class A common stock by acting to discourage, delay, or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- our certificate of incorporation provides for a tri-class capital structure. As a result of this structure, Mr. Spiegel and Mr. Murphy control all stockholder decisions, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. This includes the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. This concentrated control could discourage others from initiating any potential merger, takeover, or other change-of-control transaction that other stockholders may view as beneficial. As noted above, the issuance of the Class A common stock dividend, and any future issuances of Class A common stock dividends, could have the effect of prolonging the influence of Mr. Spiegel and Mr. Murphy on the company;

- our board of directors has the right to elect directors to fill a vacancy created by the expansion of our board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect directors; and

Table of Contents

- our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Any provision of our certificate of incorporation, bylaws, or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

Furthermore, certain provisions in the Indentures governing the Convertible Notes may make it more difficult or expensive for a third party to acquire us. For example, the Indentures require us, at the holders' election, to repurchase the Convertible Notes for cash on the occurrence of a fundamental change and, in certain circumstances, to increase the conversion rate for a holder that converts its Convertible Notes in connection with a make-whole fundamental change. A takeover of us may trigger the requirement that we repurchase the Convertible Notes or increase the conversion rate, which could make it more costly for a third party to acquire us. The Indentures also prohibit us from engaging in a merger or acquisition unless, among other things, the surviving entity assumes our obligations under the Convertible Notes and the Indentures. These and other provisions in the Indentures could deter or prevent a third party from acquiring us even when the acquisition may be favorable to holders of the Convertible Notes or our stockholders.

***Future sales of shares by existing stockholders could cause our stock price to decline.***

If our existing stockholders, including employees and service providers who obtain equity, sell, or indicate an intention to sell, substantial amounts of our Class A common stock in the public market, the trading price of our Class A common stock could decline. As a result of our capital structure, holders who are not required to file reports under Section 16 of the Exchange Act are not obligated to disclose changes in ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of any such changes. All of our outstanding shares are eligible for sale in the public market, except shares held by directors, executive officers, and other affiliates that are subject to volume limitations under Rule 144 of the Securities Act. Our employees, other service providers, and directors are subject to our quarterly trading window closures. In addition, we have reserved shares for issuance under our equity incentive plans. We may also issue shares of our Class A common stock or securities convertible into our Class A common stock from time to time in connection with a financing, acquisition, investment, or otherwise. When these shares are issued and subsequently sold, it would be dilutive to existing stockholders and the trading price of our Class A common stock could decline.

***If securities or industry analysts either do not publish research about us, or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our Class A common stock could decline.***

The trading market for our Class A common stock is influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market, or our competitors. If one or more of the analysts initiate research with an unfavorable rating or downgrade our Class A common stock, provide a more favorable recommendation about our competitors, or publish inaccurate or unfavorable research about our business, our Class A common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume to decline. Since we provide only limited financial guidance, this may increase the probability that our financial results are perceived as not in line with analysts' expectations, and could cause volatility to our Class A common stock price.

***We do not intend to pay cash dividends for the foreseeable future.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any cash dividends in the foreseeable future. As a result, you may only receive a return on your investment in our Class A common stock if the market price of our Class A common stock increases. In addition, our Credit Facility includes restrictions on our ability to pay cash dividends.

48

***If we are unable to maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our Class A common stock may be seriously harmed.***

We are required to maintain adequate internal control over financial reporting, perform system and process evaluation and testing of those internal controls to allow management to report on their effectiveness, report any material weaknesses in such internal controls, and obtain an opinion from our independent registered public accounting firm regarding the effectiveness of such internal controls as required by Section 404 of the Sarbanes-Oxley Act, all of which is time-consuming, costly, and complicated. If we are unable to comply with these requirements in a timely manner, if we assert that our internal control over financial reporting is ineffective, if we identify material weaknesses in our internal control over financial reporting, or if our independent registered public accounting firm is unable to express an opinion or expresses a qualified or adverse opinion about the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Class A common stock could be negatively affected. In addition, we could become subject to investigations by the NYSE, the SEC, and other regulatory authorities, which could require additional financial and management resources.

***The requirements of being a public company have and may continue to strain our resources, result in more litigation, and divert management's attention.***

We are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the NYSE, and other applicable securities rules and regulations. Complying with these rules and regulations have caused and will continue to cause us to incur additional legal and financial compliance costs, make some activities more difficult, be time-consuming or costly, and continue to increase demand on our systems and resources. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results, and that our independent registered public accounting firm provide an attestation report on the effectiveness of our internal control over financial reporting. Failure to comply with these rules might also make it more difficult for us to obtain certain types of insurance, including director and officer liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a public company we are required to publicly disclose additional details about our business and financial condition information, which may result in threatened or actual litigation, including by competitors, regulators, and other third parties. If those claims are successful, our business could be harmed. Even if the claims do not result in litigation or are resolved in our favor, the time and resources needed to resolve them could divert our management's resources and harm our business.

***Our certificate of incorporation provides that the Court of Chancery of the State of Delaware and the federal district courts of the United States will be the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

- any action asserting a claim against us arising under the Delaware General Corporation Law, our certificate of incorporation, or our bylaws; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

These exclusive forum provisions may limit a stockholder's ability to bring an action in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us

49

and our directors, officers, and other employees. While the Delaware courts have determined that such choice of forum provisions are facially valid, federal courts have been split on the issue, and a stockholder may seek to bring an action in a venue other than those designated in the exclusive forum provisions. In such an instance, we would expect to vigorously assert the validity and enforceability of our exclusive forum provisions, which may require significant additional costs associated with resolving such action in other jurisdictions, and there can be no assurance that the provisions will be enforced by a court in those other jurisdictions. If a court were to find either exclusive forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur further significant additional costs associated with resolving the dispute in other jurisdictions, all of which could seriously harm our business.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 1C. Cybersecurity.**

**Risk Management and Strategy**

Our engineering security team, led by our Chief Information Security Officer, or CISO, uses a multi-pronged approach to assessing, identifying, and managing material risks from cybersecurity threats. This approach includes identifying and assessing risks through: (1) an enterprise risk management program, which is periodically refreshed and includes an identification of our top risks, including cybersecurity risks; (2) formalized security and privacy reviews designed to identify risks from many new features, software, and vendors; (3) a vulnerability management program designed to identify hardware and software vulnerabilities; (4) an internal "red team" program, which simulates cyber threats, intended to allow us to fix vulnerabilities before threat actors identify them; (5) a threat intelligence program designed to model and research our adversaries; and (6) a privacy and security incident response program designed to investigate, respond to, and remediate known incidents. These processes vary in scope and maturity across the business and are processes we work to continually improve.

Our risk management approach is supplemented by external and internal enterprise risk management audits, which are designed to test the effectiveness of our security controls. We conduct penetration testing on a periodic basis, and have established an external bug bounty program to allow security researchers to help identify vulnerabilities and weaknesses in our controls and configurations in our systems. We also maintain a vendor risk management program designed to identify and mitigate potential risks associated with third-party suppliers and business partners. This program includes pre-engagement diligence, use of contractual cybersecurity and notification provisions, and ongoing monitoring of vendors, as appropriate.

We use third-party service providers to assist us from time to time to identify, assess, and manage material risks from cybersecurity threats, including for example professional service firms (including legal counsel), threat intelligence services, and cybersecurity consultants.

The material cybersecurity threats identified through these processes are managed by our CISO and, where appropriate, our risk and compliance committee, in consultation with management. Together, they identify responsive actions for inclusion in our annual strategic planning, or earlier resolution depending on the nature of the risk.

For a description of the risks from cybersecurity threats that may materially affect us and how they may do so, see "Risk Factors" in Part I, Item 1A in this Annual Report on Form 10-K.

**Governance**

Our board of directors maintains oversight of risks from cybersecurity threats by meeting with and receiving periodic updates from our CISO, via our audit committee, which is assigned oversight of cybersecurity risks. In addition, the chair of our audit committee meets with our CISO on a quarterly basis to discuss cybersecurity threats and incidents, as well as the business's approach to responding to them. Our incident response plans also provide that our board of directors and audit committee are also notified in the event of a material cybersecurity incident.

Our CISO, Jim Higgins, has over 30 years of experience in the technology sector, including senior leadership roles in product security, information security engineering, and cloud enterprise. Mr. Higgins assisted the Linux Foundation in starting the Open Source Security Foundation to help increase awareness and promote technical solutions to address

validation of Open Source software. Mr. Higgins has worked in information security at Chevron, Eastman Kodak, and Google, and, mostly recently, spent two years as the CISO of Block, Inc. (formerly Square).

Our CISO also regularly meets with our CEO and other members of our management team (or their designees), including our General Counsel, Chief Financial Officer, Chief Communications Officer, and Senior Vice President of Engineering, including as part of the cybersecurity incident response process.

Our CISO, and where necessary our management team and risk and compliance committee, are informed about and monitor the prevention, detection, mitigation, and remediation of cybersecurity incidents, through our security incident response process. We maintain internal aliases, which employees may use to identify a cybersecurity or privacy threat or incident, for escalation, investigation, containment, and remediation. A report to the alias triggers our Security Incident Response Policy and associated plans, which has defined roles for our cross-functional incident response team. The incident response team assesses the severity and priority of incidents on a rolling basis, with escalations of cybersecurity incidents provided to our management team by our CISO and General Counsel (or their designees) and escalations of certain cybersecurity incidents as appropriate to our board of directors. If a cybersecurity incident is determined to be a material cybersecurity incident, our Security Incident Response Policy and associated plans define the process to file a report regarding the incident with the SEC.

## Item 2. Properties.

Our corporate headquarters are located in Santa Monica, California, where we occupy approximately 718,000 square feet. As of December 31, 2023, our global facilities totaled an aggregate of approximately 1.8 million square feet of leased office space. We also maintain offices in multiple locations in North America and internationally in Europe, Asia, and Australia. We may add additional offices as we expand our business to other continents and countries. We believe that our facilities are sufficient for our current needs and that, should it be needed, additional facilities will be available to accommodate the expansion of our business.

## Item 3. Legal Proceedings.

On November 11, 2021, we, and certain of our officers, were named as defendants in a federal securities class-action lawsuit filed in the U.S. District Court Central District of California. The lawsuit was purportedly brought on behalf of purchasers of our Class A common stock. The lawsuit alleges that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. Defendants seek monetary damages and other relief. We believe we have meritorious defenses to the lawsuit, and continue to defend it vigorously, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business.

Beginning on January 20, 2022, we were named as defendants in various federal and state courts by plaintiffs alleging that the design and use of our platform, and those of our competitors, is addictive and harmful to minor users' mental health. The majority of cases have been consolidated in either a federal Multi-District Litigation pending in the U.S. District Court for the Northern District of California ("MDL") or a California Judicial Council Coordinated Proceeding ("JCCP") pending in the Complex Division of the Los Angeles County Superior Court. On October 13, 2023, the court in the JCCP litigation issued a ruling dismissing some of the claims against us, but allowing the plaintiffs' negligence claim to proceed. Numerous school districts have filed public nuisance claims based on similar allegations, which also have been consolidated in either the MDL or JCCP. We believe we have meritorious defenses to these lawsuits, and continue to defend them vigorously, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business.

On August 2, 2022, we, and certain of our directors, were named as defendants in a class-action lawsuit in Delaware Chancery Court purportedly brought on behalf of Class A stockholders, alleging that a transaction between our co-founders and us, in which our co-founders agreed to employment agreements and we agreed to amend our certificate of incorporation and issue a stock dividend if certain conditions were met, was not advantageous to the stockholders, constituted a breach of fiduciary duty, and should have been put to a vote of the Class A stockholders. In June 2023, we entered into a Stipulation of Compromise and Settlement to settle and dismiss the lawsuit, with prejudice, subject to approval by the court and the satisfaction of various conditions. The parties entered an amended Stipulation of Compromise and Settlement in December 2023. The settlement would, among other things, modify the conditions for the issuance of the stock dividend. While we continue to believe we have meritorious defenses to the lawsuit, we understand

Table of Contents

that litigation is inherently uncertain and have agreed to the settlement to resolve the disputes, avoid the costs and risks of further litigation, and avoid unwarranted distractions to our management.

On October 13, 2022, we were named as a defendant in a lawsuit in Los Angeles Superior Court alleging that we should be responsible for the deaths of young people who died from ingesting fatal doses of fentanyl after communicating on Snapchat with drug dealers concerning drug transactions. Other similar lawsuits were filed on behalf of other families, which were coordinated with the first-filed case and assigned to the same judge. On January 2, 2024, the judge granted in part and overruled in part our demurrer to the lawsuit, allowing several of the claims to proceed. We believe we have meritorious defenses to these lawsuits, and plan to continue to defend them vigorously, but litigation is inherently uncertain and an unfavorable outcome could seriously harm our business.

We are currently involved in, and may in the future be involved in, legal proceedings, claims, inquiries, and investigations in the ordinary course of our business, including claims for infringing intellectual property rights related to our products and the content contributed by our users and partners. Although the results of these proceedings, claims, inquiries, and investigations cannot be predicted with certainty, we do not believe that the final outcome of these matters is reasonably likely to have a material adverse effect on our business, financial condition, or results of operations. Regardless of final outcomes, however, any such proceedings, claims, inquiries, and investigations may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings.

**Item 4. Mine Safety Disclosures.**

Not applicable.

52

# PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information for Common Stock**

Our Class A common stock has been listed on the NYSE under the symbol "SNAP" since March 2, 2017. Our Class B common stock and Class C common stock are not listed or traded on any stock exchange.

**Holders of Record**

As of December 31, 2023, there were 937 stockholders of record of our Class A common stock. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. The closing price of our Class A common stock as of December 31, 2023 was $16.93 per share as reported on the NYSE. As of December 31, 2023, there were 74 stockholders of record of our Class B common stock and two stockholders of record of our Class C common stock.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate paying any cash dividends in the foreseeable future. The terms of our Credit Facility also restrict our ability to pay dividends, and we may also enter into credit agreements or other borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our capital stock.

We have paid a stock dividend of our Class A common stock on our capital stock in the past and from time to time in the future may pay special or regular stock dividends in the form of Class A common stock, which per the terms of our certificate of incorporation must be paid equally to all stockholders. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects, and other factors that our board of directors may deem relevant.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

The following table summarizes stock repurchase activity for the three months ended December 31, 2023 (in thousands, except per share data):

| | Total Number of Shares Purchased [1] | | Average Price Per Share [2] | Total Number of Shares Purchased as Part of Publicly Announced Program [1] | | Approximate Dollar Value of Shares that May Yet be Repurchased Under the Program [1] |
|---|---|---|---|---|---|---|
| October 1 - October 31, 2023 | 7,891 | $ | 9.46 | 7,891 | $ | 425,437 |
| November 1 - November 30, 2023 | 10,532 | $ | 10.90 | 10,532 | $ | 310,790 |
| December 1 - December 31, 2023 | — | $ | — | — | $ | 310,790 |
| Total | 18,423 | | | 18,423 | | |

(1)   In October 2023, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. During the fourth quarter of 2023, we repurchased 18.4 million shares of our Class A common stock for an aggregate of $189.4 million, including costs associated with the repurchases. As of December 31, 2023, the remaining availability under the stock repurchase authorization was $310.8 million.

(2)   Average price paid per share includes costs associated with the repurchases.

**Recent Sale of Unregistered Securities and Use of Proceeds**

None.

**Stock Performance Graph**

*This performance graph shall not be deemed "filed" with the SEC for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Snap Inc. under the Securities Act.*

The following graph shows a comparison, for the five years ended December 31, 2023, of the cumulative total return for our Class A common stock, the Standard & Poor's 500 Stock Index ("S&P 500 Index"), and the NYSE Composite. The graph assumes that $100 was invested at the market close on December 31, 2018 in our Class A common stock, the S&P 500 Index, and the NYSE Composite, and data for the S&P 500 Index and the NYSE Composite assumes reinvestment of any dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Item 6. Reserved.**

Not required.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs that involve significant risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to those differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in "Risk Factors," "Note Regarding Forward-Looking Statements," and "Note Regarding User Metrics and Other Data."*

*The following generally discusses 2023 and 2022 items and year-to-year comparisons between 2023 and 2022. Discussion of historical items and year-to-year comparisons between 2022 and 2021 that are not included in this discussion can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on February 1, 2023.*

**Overview of Full Year 2023 Results**

Our key user metrics and financial results for fiscal year 2023 are as follows:

*User Metrics*

- Daily Active Users, or DAUs, increased 10% year-over-year to 414 million in Q4 2023.

- Average revenue per user, or ARPU, was $3.29 in Q4 2023, compared to $3.47 in Q4 2022.

*Financial Results*

- Revenue was $4.6 billion in 2023, compared to $4.6 billion in 2022.

- Total costs and expenses were $6.0 billion in 2023, compared to $6.0 billion in 2022.

- Net loss was $1.3 billion in 2023, compared to $1.4 billion in 2022.

- Adjusted EBITDA was $161.6 million in 2023, compared to $377.6 million in 2022.

- Diluted net loss per share was $(0.82) in 2023, compared to $(0.89) in 2022.

- Cash provided by operating activities was $246.5 million in 2023, compared to $184.6 million in 2022.

- Free Cash Flow was $34.8 million in 2023, compared to $55.3 million in 2022.

- Cash, cash equivalents, and marketable securities were $3.5 billion as of December 31, 2023.

**Business and Macroeconomic Conditions**

In 2022, we realigned our priorities and we expect to continue to focus on our three strategic priorities: growing our community and deepening their engagement with our products, accelerating and diversifying our revenue growth, and investing in the future of augmented reality. We believe that we can be successful in our current operating environment, with various macroeconomic factors impacting our business, by rigorously prioritizing our investments and continuing to engage our community with our products while driving success for our advertising partners. However, the impact of this strategic reprioritization is difficult to predict.

Macroeconomic factors such as labor shortages and disruptions, supply chain disruptions, inflation, changes in interest and foreign currency exchange rates, banking instability, and other risks and uncertainties continue to cause logistical challenges, increased input costs, and inventory constraints for our advertisers, which in turn may cause our advertisers to halt or decrease advertising spending on our platform. Such macroeconomic factors may also negatively impact, in the short-term or long-term, the global economy, advertising ecosystem, our customers and their budgets with us, user engagement, other user metrics, and our business, financial condition, and results of operations.

In addition, competition for advertising dollars has increased and demand growth on our advertising platform has slowed. We expect to continue to experience increased competition, which may result in reduced advertising demand, and could adversely affect our revenue growth, pricing, business, financial condition, and results of operations. Demand has also been disrupted by recent changes we made to our advertising platform, and, in the future, we may

continue to experience adverse impacts to our revenue growth as a result of these changes.

Our revenue, particularly in North America, has further been impacted by platform policy changes and restrictions that affected our targeting, measurement, and optimization capabilities, and in turn our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced advertising revenue, especially if we are unable to mitigate these developments.

We compete with other companies in every aspect of our business. We must compete effectively for users and advertisers to grow our business and increase our revenue. These and other risks and uncertainties are further described in the sections titled "Competition" in Part I, Item 1. Business, and "Risk Factors" in Part I, Item 1A in this Annual Report on Form 10-K.

## Trends in User Metrics

We define a DAU as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We define ARPU as quarterly revenue divided by the average DAUs. We assess the health of our business by measuring DAUs and ARPU because we believe that these metrics are important ways for both management and investors to understand engagement and monitor the performance of our platform. We also measure ARPU because we believe that this metric helps our management and investors to assess the extent to which we are monetizing our service.

### User Engagement

We calculate average DAUs for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter. DAUs are broken out by geography because markets have different characteristics. We had 414 million DAUs on average in the fourth quarter of 2023, an increase of 39 million, or 10%, from the fourth quarter of 2022.



**Quarterly Average Daily Active Users [1]**
**(in millions)**

| YOY growth: | 20% | 18% | 18% | 19% | 17% | 15% | 14% | 12% | 10% |
|---|---|---|---|---|---|---|---|---|---|

(1)   Numbers may not foot due to rounding.



(2)   North America includes Mexico, the Caribbean, and Central America.
(3)   Europe includes Russia and Turkey.



### Monetization

In the year ended December 31, 2023, we recorded revenue of $4.6 billion compared to $4.6 billion for the year ended December 31, 2022. We monetize our business primarily through advertising. Our advertising products include Snap Ads and AR Ads.

We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base. ARPU was $3.29 in the fourth quarter of 2023, compared to $3.47 in the fourth quarter of 2022. For purposes of calculating ARPU, revenue by user geography is apportioned to each region based on a determination of the geographic location in which advertising impressions are delivered, as this approximates revenue based on user activity. This differs from the presentation of our revenue by geography in the notes to our consolidated financial statements, where revenue is based on the billing address of the advertising customer.

Table of Contents



(1)   North America includes Mexico, the Caribbean, and Central America.
(2)   Europe includes Russia and Turkey. Effective March 2022, we halted advertising sales to Russian and Belarusian entities.



## Results of Operations

### *Components of Results of Operations*

#### *Revenue*

We generate substantially all of our revenue through the sale of our advertising products, which primarily include Snap Ads and AR Ads, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the content partner. We also generate revenue from subscriptions and sales of hardware products, net of allowances for returns.

#### *Cost of Revenue*

Cost of revenue consists of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs, and payments for content, developer, and advertiser partner costs. In addition, cost of revenue includes third-party selling costs and personnel-related costs, including salaries, benefits, and stock-based compensation expenses. Cost of revenue also includes facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

#### *Research and Development Expenses*

Research and development expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our engineers, designers, and other employees engaged in the research and development of our products. In addition, research and development expenses include facilities and other supporting overhead costs, including depreciation and amortization. Research and development costs are expensed as incurred.

#### *Sales and Marketing Expenses*

Sales and marketing expenses consist primarily of personnel-related costs, including salaries, benefits, commissions, and stock-based compensation expense for our employees engaged in sales and sales support, business development, media, marketing, corporate partnerships, and customer service functions. Sales and marketing expenses also include costs incurred for advertising, market research, tradeshows, branding, marketing, promotional expense, and public relations, as well as facilities and other supporting overhead costs, including depreciation and amortization.

#### *General and Administrative Expenses*

General and administrative expenses consist primarily of personnel-related costs, including salaries, benefits, and stock-based compensation expense for our finance, legal, information technology, human resources, and other administrative teams. General and administrative expenses also include facilities and supporting overhead costs, including depreciation and amortization, and external professional services.

*Interest Income*

Interest income consists primarily of interest earned on our cash, cash equivalents, and marketable securities.

*Interest Expense*

Interest expense consists primarily of interest expense associated with convertible notes and commitment fees related to our revolving credit facility.

*Other Income (Expense), Net*

Other income (expense), net primarily consists of gains and losses on strategic investments, marketable securities, and foreign currency transactions.

*Income Tax Benefit (Expense)*

We are subject to income taxes in the United States and numerous foreign jurisdictions. These foreign jurisdictions have different statutory tax rates than the United States. Additionally, certain of our foreign earnings may also be taxable in the United States. Accordingly, our effective tax rates will vary depending on the relative proportion of foreign to domestic income, use of tax credits, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws.

*Adjusted EBITDA*

We define Adjusted EBITDA as net income (loss), excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; payroll and other tax expense related to stock-based compensation; and certain other items impacting net income (loss) from time to time. We consider the exclusion of these items in calculating Adjusted EBITDA to provide a useful measure for period-to-period comparisons of our business and for investors and others to evaluate our operating results in the same manner as does our management. See "Non-GAAP Financial Measures" for additional information and a reconciliation of net loss to Adjusted EBITDA.

**Discussion of Results of Operations**

The following table sets forth our consolidated statements of operations data:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| | | (in thousands) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | |
| Revenue | $ | 4,606,115 | $ | 4,601,847 | $ | 4,117,048 |
| Costs and expenses [1][2]: | | | | | | |
| Cost of revenue | | 2,114,117 | | 1,815,342 | | 1,750,246 |
| Research and development | | 1,910,862 | | 2,109,800 | | 1,565,467 |
| Sales and marketing | | 1,122,092 | | 1,118,746 | | 792,764 |
| General and administrative | | 857,423 | | 953,265 | | 710,640 |
| Total costs and expenses | | 6,004,494 | | 5,997,153 | | 4,819,117 |
| Operating loss | | (1,398,379) | | (1,395,306) | | (702,069) |
| Interest income | | 168,394 | | 58,597 | | 5,199 |
| Interest expense | | (22,024) | | (21,459) | | (17,676) |
| Other income (expense), net | | (42,414) | | (42,529) | | 240,175 |
| Loss before income taxes | | (1,294,423) | | (1,400,697) | | (474,371) |
| Income tax benefit (expense) | | (28,062) | | (28,956) | | (13,584) |
| Net loss | $ | (1,322,485) | $ | (1,429,653) | $ | (487,955) |
| Adjusted EBITDA [3] | $ | 161,577 | $ | 377,573 | $ | 616,686 |

(1)     Stock-based compensation expense included in the above line items:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| | | (in thousands) | | | | |
| **Stock-based compensation expense:** | | | | | | |
| Cost of revenue | $ | 9,555 | $ | 12,288 | $ | 17,221 |
| Research and development | | 893,026 | | 970,746 | | 740,130 |
| Sales and marketing | | 255,688 | | 203,092 | | 164,241 |
| General and administrative | | 165,735 | | 201,661 | | 170,543 |
| Total | $ | 1,324,004 | $ | 1,387,787 | $ | 1,092,135 |

(2)     Depreciation and amortization expense included in the above line items:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| | | (in thousands) | | | | |
| **Depreciation and amortization expense:** | | | | | | |
| Cost of revenue | $ | 12,751 | $ | 24,235 | $ | 19,711 |
| Research and development | | 106,278 | | 98,041 | | 62,159 |
| Sales and marketing | | 26,161 | | 67,169 | | 21,772 |
| General and administrative | | 23,251 | | 12,728 | | 15,499 |
| Total | $ | 168,441 | $ | 202,173 | $ | 119,141 |

(3)     See "Non-GAAP Financial Measures" in this Annual Report on Form 10-K for more information and for a reconciliation of Adjusted EBITDA to net loss, the most directly comparable financial measure calculated and presented in accordance with GAAP.

Table of Contents

The following table sets forth the components of our consolidated statements of operations data for each of the periods presented as a percentage of revenue:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | 100 % | 100 % | 100 % |
| Costs and expenses: | | | |
|    Cost of revenue | 46 | 39 | 43 |
|    Research and development | 41 | 46 | 38 |
|    Sales and marketing | 24 | 24 | 19 |
|    General and administrative | 19 | 21 | 17 |
|      Total costs and expenses | 130 | 130 | 117 |
| Operating loss | (30) | (30) | (17) |
| Interest income | 4 | 1 | — |
| Interest expense | (1) | — | — |
| Other income (expense), net | (1) | (1) | 6 |
| Loss before income taxes | (28) | (30) | (12) |
| Income tax benefit (expense) | (1) | (1) | — |
| Net loss | (29)% | (31)% | (12)% |

### *Revenue*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Revenue | $ 4,606,115 | $ 4,601,847 | $ 4,117,048 | $ 4,268 | — % | $ 484,799 | 12 % |

#### *2023 compared to 2022*

Revenue for the year ended December 31, 2023 increased $4.3 million compared to the same period in 2022. In 2023, subscription revenue increased, partially offset by a reduction in advertiser spend and auction-based advertising demand.

### *Cost of Revenue*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | $ | % | $ | % |
| | | | (dollars in thousands) | | | | |
| Cost of Revenue | $ 2,114,117 | $ 1,815,342 | $ 1,750,246 | $ 298,775 | 16 % | $ 65,096 | 4 % |

#### *2023 compared to 2022*

Cost of revenue for the year ended December 31, 2023 increased $298.8 million compared to the same period in 2022. The increase was primarily driven by increased infrastructure costs attributable to DAU growth and investments in machine learning and AI, partially offset by lower content and advertising partner costs and $20.6 million relating to restructuring charges in the prior period.

### *Research and Development Expenses*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | **2023** | **2022** | **2021** | **$** | **%** | **$** | **%** |
| | | | | (dollars in thousands) | | | |
| Research and Development Expenses | $ 1,910,862 | $ 2,109,800 | $ 1,565,467 | $ (198,938) | (9)% | $ 544,333 | 35 % |

*2023 compared to 2022*

Research and development expenses for the year ended December 31, 2023 decreased $198.9 million compared to the same period in 2022. The decrease was primarily driven by lower cash- and stock-based compensation expenses due to decreased headcount compared to the prior period and $78.9 million relating to restructuring charges in the prior period.

### *Sales and Marketing Expenses*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | **2023** | **2022** | **2021** | **$** | **%** | **$** | **%** |
| | | | | (dollars in thousands) | | | |
| Sales and Marketing Expenses | $ 1,122,092 | $ 1,118,746 | $ 792,764 | $ 3,346 | — % | $ 325,982 | 41 % |

*2023 compared to 2022*

Sales and marketing expenses for the year ended December 31, 2023 increased $3.3 million compared to the same period in 2022. The increase was primarily driven by higher stock-based compensation expenses and increased marketing investments, partially offset by lower cash-based compensation expenses. The prior period included higher amortization expense from our revision of the useful lives of certain customer relationships and trademarks and $30.8 million relating to restructuring charges.

### *General and Administrative Expenses*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | **2023** | **2022** | **2021** | **$** | **%** | **$** | **%** |
| | | | | (dollars in thousands) | | | |
| General and Administrative Expenses | $ 857,423 | $ 953,265 | $ 710,640 | $ (95,842) | (10)% | $ 242,625 | 34 % |

*2023 compared to 2022*

General and administrative expenses for the year ended December 31, 2023 decreased $95.8 million compared to the same period in 2022. The decrease was primarily driven by lower personnel expenses, including cash- and stock-based compensation expenses compared to the prior period, and $58.7 million relating to restructuring charges in the prior period.

*Interest Income*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
| | 2023 | 2022 | 2021 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| | | | | (dollars in thousands) | | | |
| | | | | (NM = Not Meaningful) | | | |
| Interest Income | $ 168,394 | $ 58,597 | $ 5,199 | $ 109,797 | 187 % | $ 53,398 | NM |

*2023 compared to 2022*

Interest income for the year ended December 31, 2023 increased $109.8 million compared to the same period in 2022, primarily due to higher interest rates on U.S. government-backed securities, offset by a lower overall invested cash balance.

*Interest Expense*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
| | 2023 | 2022 | 2021 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| | | | | (dollars in thousands) | | | |
| Interest Expense | $ (22,024) | $ (21,459) | $ (17,676) | $ (565) | 3 % | $ (3,783) | 21 % |

*2023 compared to 2022*

Interest expense for the year ended December 31, 2023 increased $0.6 million compared to the same period in 2022. Interest expense for all periods consists primarily of amortization of debt issuance costs and contractual interest expense.

*Other Income (Expense), Net*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
| | 2023 | 2022 | 2021 | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| | | | | (dollars in thousands) | | | |
| Other Income (Expense), Net | $ (42,414) | $ (42,529) | $ 240,175 | $ 115 | — % | $ (282,704) | (118)% |

*2023 compared to 2022*

Other expense, net for the year ended December 31, 2023 was $42.4 million, compared to other expense, net of $42.5 million for the same period in 2022. Other expense, net for the current year was primarily a result of $28.4 million in unrealized losses on strategic investments and $6.7 million in total losses on publicly traded securities classified as marketable securities. Other expense, net in the comparable period in 2022 was primarily a result of $101.3 million in total losses on publicly traded securities primarily classified as marketable securities, offset by $19.9 million in unrealized gains and $45.9 million in realized gains on strategic investments.

*Income Tax Benefit (Expense)*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | $ | % | $ | % |
| | | | | (dollars in thousands) | | | |
| Income Tax Benefit (Expense) | $ (28,062) | $ (28,956) | $ (13,584) | $ 894 | 3 % | $ (15,372) | (113)% |
| Effective Tax Rate | (2.2)% | (2.1)% | (2.9)% | | | | |

*2023 compared to 2022*

Income tax expense was $28.1 million for the year ended December 31, 2023, compared to $29.0 million for the same period in 2022. Our effective tax rate differs from the U.S. statutory tax rate primarily due to valuation allowances on our deferred tax assets as it is more likely than not that some or all of our deferred tax assets will not be realized.

For additional discussion, see Note 12 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K.

*Net Loss and Adjusted EBITDA*

| | Year Ended December 31, | | | 2023 vs 2022 Change | | 2022 vs 2021 Change | |
|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | $ | % | $ | % |
| | | | | (dollars in thousands) | | | |
| Net Loss | $ (1,322,485) | $ (1,429,653) | $ (487,955) | $ 107,168 | 7 % | $ (941,698) | (193)% |
| Adjusted EBITDA | $ 161,577 | $ 377,573 | $ 616,686 | $ (215,996) | (57)% | $ (239,113) | (39)% |

*2023 compared to 2022*

Net loss for the year ended December 31, 2023 was $1,322.5 million, compared to $1,429.7 million for the same period in 2022. Adjusted EBITDA for the year ended December 31, 2023 was $161.6 million, compared to $377.6 million for the same period in 2022. The decrease in Adjusted EBITDA was attributable to increased cost of revenue and sales and marketing expenses, partially offset by decreased research and development and general and administrative expenses.

For a discussion of the limitations associated with using Adjusted EBITDA rather than GAAP measures and a reconciliation of this measure to net loss, see "Non-GAAP Financial Measures."

**Liquidity and Capital Resources**

Cash, cash equivalents, and marketable securities were $3.5 billion as of December 31, 2023, primarily consisting of cash on deposit with banks and highly liquid investments in U.S. government and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. Our primary source of liquidity is cash generated through financing activities. Our primary uses of cash include operating costs such as personnel-related costs and the infrastructure costs of the Snapchat application, facility-related capital spending, and acquisitions and investments. There are no known material subsequent events that could have a material impact on our cash or liquidity. We may contemplate and engage in merger and acquisition activity that could materially impact our liquidity and capital resource position.

In October 2023, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. During the fourth quarter of 2023, we repurchased 18.4 million shares of our Class A common stock for an aggregate of $189.4 million, including costs associated with the repurchases. As of December 31, 2023, the remaining availability under the stock repurchase authorization was $310.8 million.

In May 2022, we entered into a five-year senior unsecured revolving credit facility, or Credit Facility, with certain lenders that allows us to borrow up to $1.05 billion to fund working capital and general corporate-purpose expenditures. Loans bear interest, at our option, at a rate equal to (i) a term secured overnight financing rate, or SOFR, plus 0.75% or the

base rate, if selected by us, for loans made in U.S. dollars, (ii) the Sterling overnight index average plus 0.7826% for loans made in Sterling, or (iii) foreign indices as stated in the credit agreement plus 0.75% for loans made in other permitted foreign currencies. The base rate is defined as the greatest of (i) the Wall Street Journal prime rate, (ii) the greater of the (a) federal funds rate and (b) the overnight bank funding rate, plus 0.50%, and (iii) the applicable SOFR for a period of one month (but not less than zero) plus 1.00. The Credit Facility also contains an annual commitment fee of 0.10% on the daily undrawn balance of the facility. As of December 31, 2023, we had $49.6 million in the form of outstanding standby letters of credit, with no amounts outstanding under the Credit Facility.

In February 2022, we entered into a purchase agreement for the sale of an aggregate of $1.5 billion principal amount of convertible senior notes due in 2028. The net proceeds from the issuance of the 2028 Notes were $1.31 billion, net of debt issuance costs and the 2028 Capped Call Transactions discussed further in Note 7. The 2028 Notes mature on March 1, 2028 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2023 and as a result, the 2028 Notes will not be eligible for optional conversion during the first quarter of 2024.

In April 2021, we entered into a purchase agreement for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027. The net proceeds from the issuance of the 2027 Notes were $1.05 billion, net of debt issuance costs and the 2027 Capped Call Transactions discussed further in Note 7. The 2027 Notes mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2023 and as a result, the 2027 Notes will not be eligible for optional conversion during the first quarter of 2024.

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of convertible senior notes due in 2025, of which $284.1 million remains outstanding as of December 31, 2023. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and the 2025 Capped Call Transactions discussed further in Note 7. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2023 and as a result, the 2025 Notes will not be eligible for optional conversion during the first quarter of 2024.

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of convertible senior notes due in 2026, of which $838.5 million remains outstanding as of December 31, 2023. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and the 2026 Capped Call Transactions discussed further in Note 7. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with their terms prior to such date. The sale price requirement for conversion was not satisfied as of December 31, 2023 and as a result, the 2026 Notes will not be eligible for optional conversion during the first quarter of 2024.

We believe our existing cash balance is sufficient to fund our ongoing working capital, investing, and financing requirements for at least the next 12 months. Our future capital requirements will depend on many factors including our growth rate, headcount, sales and marketing activities, research and development efforts, the introduction of new features, products, and acquisitions, and continued user engagement. We continually evaluate opportunities to issue or repurchase equity or debt securities, obtain, retire, or restructure credit facilities or financing arrangements, or declare dividends for strategic reasons or to further strengthen our financial position.

As of December 31, 2023, approximately 3% of our cash, cash equivalents, and marketable securities was held outside the United States. These amounts were primarily held in the United Kingdom and are utilized to fund our foreign operations. Cash held outside the United States may be repatriated, subject to certain limitations, and would be available to be used to fund our domestic operations. However, repatriation of funds may result in additional tax liabilities. We believe our existing cash balance in the United States is sufficient to fund our working capital needs.

The following table sets forth the major components of our consolidated statements of cash flows for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| | | (dollars in thousands) | |
| Net cash provided by (used in) operating activities | $ 246,521 | $ 184,614 | $ 292,880 |
| Net cash provided by (used in) investing activities | 570,954 | (1,062,275) | 90,227 |
| Net cash provided by (used in) financing activities | (458,789) | 306,714 | 1,065,073 |
| Change in cash, cash equivalents, and restricted cash | $ 358,686 | $ (570,947) | $ 1,448,180 |
| Free Cash Flow [(1)] | $ 34,794 | $ 55,308 | $ 223,005 |

(1)    For information on how we define and calculate Free Cash Flow and a reconciliation to net cash provided by (used in) operating activities to Free Cash Flow, see "Non-GAAP Financial Measures."

### *Net Cash Provided by (Used in) Operating Activities*

*2023 compared to 2022*

Net cash provided by operating activities was $246.5 million for the year ended December 31, 2023, compared to net cash provided by operating activities of $184.6 million for the year ended December 31, 2022, resulting primarily from our net loss, adjusted for non-cash items, including stock-based compensation expense of $1.3 billion and depreciation and amortization expense of $168.4 million. Net cash provided by operating activities for the year ended December 31, 2023 was also driven by a $95.0 million increase in accounts payable and a $62.1 million increase in accrued expenses and other current liabilities, primarily due to the timing of payments, partially offset by a $98.1 million increase in accounts receivables due to the timing of collections and an increase in billings in the period.

### *Net Cash Provided by (Used in) Investing Activities*

*2023 compared to 2022*

Net cash provided by investing activities was $571.0 million for the year ended December 31, 2023, compared to net cash used in investing activities of $1.1 billion for the year ended December 31, 2022. Our investing activities in the year ended December 31, 2023 consisted primarily of maturities of marketable securities of $2.4 billion and sales of marketable securities of $459.5 million, partially offset by purchases of marketable securities of $2.0 billion and purchases of property and equipment of $211.7 million. Our investing activities for the year ended December 31, 2022 consisted of purchases of marketable securities of $3.5 billion, partially offset by maturities of marketable securities of $2.5 billion.

### *Net Cash Provided by (Used in) Financing Activities*

*2023 compared to 2022*

Net cash used in financing activities was $458.8 million for the year ended December 31, 2023, compared to net cash provided by financing activities of $306.7 million for the year ended December 31, 2022. Our financing activities for the year ended December 31, 2023 consisted primarily of $189.4 million of repurchases of our Class A common stock and $270.4 million of deferred payments for acquisitions completed in prior periods. Our financing activities for the year ended December 31, 2022 consisted primarily of net proceeds of $1.5 billion from the issuance of the 2028 Notes, offset by the purchase of the 2028 Capped Call Transactions of $177.0 million and repurchases of our Class A common stock for an aggregate of $1.0 billion.

### *Free Cash Flow*

*2023 compared to 2022*

Free Cash Flow was $34.8 million for the year ended December 31, 2023, compared to $55.3 million for the year ended December 31, 2022. Free Cash Flow in all periods was composed of net cash provided by operating activities, resulting primarily from net loss, adjusted for non-cash items and changes in working capital. Free Cash Flow also

Table of Contents

included purchases of property and equipment of $211.7 million for the year ended December 31, 2023, compared to $129.3 million for the year ended December 31, 2022. See "Non-GAAP Financial Measures."

**Non-GAAP Financial Measures**

To supplement our consolidated financial statements, which are prepared and presented in accordance with GAAP, we use certain non-GAAP financial measures, as described below, to understand and evaluate our core operating performance. These non-GAAP financial measures, which may be different than similarly titled measures used by other companies, are presented to enhance investors' overall understanding of our financial performance and should not be considered a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

We use the non-GAAP financial measure of Free Cash Flow, which is defined as net cash provided by (used in) operating activities, reduced by purchases of property and equipment. We believe Free Cash Flow is an important liquidity measure of the cash that is available, after capital expenditures, for operational expenses and investment in our business and is a key financial indicator used by management. Additionally, we believe that Free Cash Flow is an important measure since we use third-party infrastructure partners to host our services and therefore we do not incur significant capital expenditures to support revenue generating activities. Free Cash Flow is useful to investors as a liquidity measure because it measures our ability to generate or use cash. Once our business needs and obligations are met, cash can be used to maintain a strong balance sheet and invest in future growth.

We use the non-GAAP financial measure of Adjusted EBITDA, which is defined as net income (loss); excluding interest income; interest expense; other income (expense), net; income tax benefit (expense); depreciation and amortization; stock-based compensation expense; payroll and other tax expense related to stock-based compensation; and certain other items impacting net income (loss) from time to time. We believe that Adjusted EBITDA helps identify underlying trends in our business that could otherwise be masked by the effect of the expenses that we exclude in Adjusted EBITDA.

We believe that both Free Cash Flow and Adjusted EBITDA provide useful information about our financial performance, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics used by our management for financial and operational decision-making. We are presenting the non-GAAP measures of Free Cash Flow and Adjusted EBITDA to assist investors in seeing our financial performance through the eyes of management, and because we believe that these measures provide an additional tool for investors to use in comparing our core financial performance over multiple periods with other companies in our industry.

These non-GAAP financial measures should not be considered in isolation from, or as substitutes for, financial information prepared in accordance with GAAP. There are a number of limitations related to the use of these non-GAAP financial measures compared to the closest comparable GAAP measure. Some of these limitations are that:

- Free Cash Flow does not reflect our future contractual commitments;

- Adjusted EBITDA excludes certain recurring, non-cash charges such as depreciation of fixed assets and amortization of acquired intangible assets and, although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future;

- Adjusted EBITDA excludes stock-based compensation expense and payroll and other tax expense related to stock-based compensation, which have been, and will continue to be for the foreseeable future, significant recurring expenses in our business and an important part of our compensation strategy; and

- Adjusted EBITDA excludes income tax benefit (expense).

The following table presents a reconciliation of Free Cash Flow to net cash provided by (used in) operating activities, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
| --- | --- | --- | --- |
| | (in thousands) | | |
| **Free Cash Flow reconciliation:** | | | |
| Net cash provided by (used in) operating activities | $ 246,521 | $ 184,614 | $ 292,880 |
| Less: | | | |
| Purchases of property and equipment | (211,727) | (129,306) | (69,875) |
| Free Cash Flow | $ 34,794 | $ 55,308 | $ 223,005 |

The following table presents a reconciliation of Adjusted EBITDA to net loss, the most comparable GAAP financial measure, for each of the periods presented:

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
| --- | --- | --- | --- |
| | (in thousands) | | |
| **Adjusted EBITDA reconciliation:** | | | |
| Net loss | $ (1,322,485) | $ (1,429,653) | $ (487,955) |
| Add (deduct): | | | |
| Interest income | (168,394) | (58,597) | (5,199) |
| Interest expense | 22,024 | 21,459 | 17,676 |
| Other (income) expense, net | 42,414 | 42,529 | (240,175) |
| Income tax (benefit) expense | 28,062 | 28,956 | 13,584 |
| Depreciation and amortization | 159,999 | 186,434 | 119,141 |
| Stock-based compensation expense | 1,319,783 | 1,353,283 | 1,092,135 |
| Payroll and other tax expense related to stock-based compensation | 39,324 | 44,213 | 107,479 |
| Restructuring charges [1] | 40,850 | 188,949 | — |
| Adjusted EBITDA | $ 161,577 | $ 377,573 | $ 616,686 |

(1)   Restructuring charges in 2023 relating to the wind down of our AR Enterprise business were composed primarily of cash severance, stock-based compensation expense, and charges related to the revision of the useful lives and disposal of certain acquired intangible assets. Additionally, we recognized an income tax benefit of $5.7 million relating to the wind down, which is included in the income tax (benefit) expense line item above. Restructuring charges in 2022 relating to the strategic reprioritization plan were composed primarily of severance and related charges of $97.1 million, stock-based compensation expense, lease exit and related charges, impairment charges, contract termination charges, and intangible asset amortization. These charges are not reflective of underlying trends in our business. See Note 18 to our consolidated financial statements included in the "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for more information.

**Contingencies**

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. We also disclose material contingencies when we believe that a loss is not probable but reasonably possible. Significant judgment is required to determine both probability and the estimated amount. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Many of these legal and tax contingencies can take years to resolve. Should any of these estimates and assumptions change or prove to be incorrect, it could have a material impact on our results of operations, financial position, and cash flows.

## Commitments

We have non-cancelable contractual agreements primarily related to the hosting of our data processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $3.0 billion in commitments, as of December 31, 2023, primarily due within three years. For additional discussion on our leases, see Note 9 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

## Critical Accounting Policies and Estimates

We prepare our financial statements in accordance with GAAP. Preparing these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

The critical accounting estimates, assumptions, and judgments that we believe to have the most significant impact on our consolidated financial statements are described below.

### *Revenue Recognition*

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Lenses, which allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either based on the number of advertising impressions delivered or on a fixed fee basis over a period of time. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is served. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

### *Business Combinations and Valuation of Goodwill and Other Acquired Intangible Assets*

We estimate the fair value of assets acquired and liabilities assumed in a business combination. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed. While we use our best estimates and assumptions to accurately value assets acquired and liabilities assumed at the acquisition date, our estimates are inherently uncertain and subject to refinement.

Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from acquired technology, useful lives, and discount rates. Although we believe the assumptions and estimates we have made in the past have been reasonable and appropriate, they are based in part on historical experience and information obtained from the management of the acquired companies and are inherently uncertain. During the measurement period, which may be up to one year from the acquisition date, we record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. On the conclusion of the measurement period or final determination of the

Table of Contents

values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to our consolidated statements of operations.

*Loss Contingencies*

We are involved in claims, lawsuits, tax matters, government investigations, and proceedings arising in the ordinary course of our business. We record a provision for a liability when we believe that it is both probable that a liability has been incurred and the amount can be reasonably estimated. When there appears to be a range of possible costs with equal likelihood, a liability is recorded based on the low-end of such range. However, the likelihood of a loss is often difficult to predict and determining a meaningful estimate of the loss or a range of loss may not be practicable based on the information available, the potential effect of future events, and decisions by third parties impacting the ultimate resolution of the contingency. It is also not uncommon for such matters to be resolved over multiple reporting periods. During this time, relevant developments and new information must be continuously evaluated to determine both the likelihood of potential loss and whether it is possible to reasonably estimate a range of potential loss. We also disclose material contingencies when we believe that a loss is reasonably possible.

Significant judgment is required to determine both probability and the estimated amounts of loss contingencies. Such claims, suits, and proceedings are inherently unpredictable and subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change, it could have a material impact on our results of operations, financial position, and cash flows.

*Income Taxes*

We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgment is required in determining our uncertain tax positions.

We recognize tax benefits from uncertain tax positions only if we believe that it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. Although we believe that we have adequately reserved for our uncertain tax positions, we can provide no assurance that the final tax outcome of these matters will not be materially different. We make adjustments to these reserves when facts and circumstances change, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences may affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and results of operations.

## Recent Accounting Pronouncements

See Note 1 to our consolidated financial statements included in "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the date of this Annual Report on Form 10-K.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk and foreign currency risk as follows:

*Interest Rate Risk*

We had cash and cash equivalents totaling $1.8 billion and $1.4 billion at December 31, 2023 and December 31, 2022, respectively. We had marketable securities totaling $1.8 billion and $2.5 billion at December 31, 2023 and December 31, 2022, respectively. Our cash and cash equivalents consist of cash in bank accounts and marketable securities consisting of U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. The primary objectives of our investment activities are to preserve principal and provide liquidity without significantly increasing risk. We do not enter into investments for trading or speculative purposes. Due to the relatively short-term nature of our investment portfolio, a hypothetical 100 basis point change in interest rates would not have a material effect on the fair value of our portfolio for the periods presented.

In February 2022, we issued the 2028 Notes with an aggregate principal amount of $1.5 billion, the full amount of which is outstanding as of December 31, 2023. We carry the 2028 Notes at face value less the unamortized debt issuance

costs on our consolidated balance sheets. The 2028 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2028 Notes. The fair value of the 2028 Notes changes when the market price of our stock fluctuates or market interest rates change.

In April 2021, we issued the 2027 Notes with an aggregate principal amount of $1.15 billion, the full amount of which is outstanding as of December 31, 2023. We carry the 2027 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2027 Notes do not bear regular interest; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2027 Notes. The fair value of the 2027 Notes changes when the market price of our stock fluctuates or market interest rates change.

In April 2020, we issued the 2025 Notes with an aggregate principal amount of $1.0 billion, of which $284.1 million remains outstanding as of December 31, 2023. We carry the 2025 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2025 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2025 Notes. The fair value of the 2025 Notes changes when the market price of our stock fluctuates or market interest rates change.

In August 2019, we issued the 2026 Notes with an aggregate principal amount of $1.265 billion, of which $838.5 million remains outstanding as of December 31, 2023. We carry the 2026 Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets. The 2026 Notes have a fixed interest rate; therefore, we have no financial statement risk associated with changes in interest rates with respect to the 2026 Notes. The fair value of the 2026 Notes changes when the market price of our stock fluctuates or market interest rates change.

### *Foreign Currency Risk*

For all periods presented, our revenue and operating expenses were predominately denominated in U.S. dollars. We therefore have not had material foreign currency risk associated with revenue and cost-based activities. However, due to fluctuations in exchange rates, we have experienced, and may in the future experience, negative impacts to our revenue and operating expenses denominated in currencies other than the U.S. dollar. The functional currency of our material operating entities is the U.S. dollar.

For the periods presented, we believe the exposure to foreign currency fluctuation from operating expenses is immaterial as the related costs do not constitute a significant portion of our total expenses. As we grow operations, our exposure to foreign currency risk will likely become more significant.

For the periods presented, we did not enter into any foreign currency exchange contracts. We may, however, enter into foreign currency exchange contracts for purposes of hedging foreign exchange rate fluctuations on our business operations in future operating periods as our exposures are deemed to be material. For additional discussion on foreign currency risk, see "Risk Factors" elsewhere in this Annual Report on Form 10-K.

Table of Contents

**Item 8. Financial Statements and Supplementary Data.**

**SNAP INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 74 |
| Consolidated Financial Statements: | |
| Consolidated Statements of Cash Flows | 77 |
| Consolidated Statements of Operations | 78 |
| Consolidated Statements of Comprehensive Income (Loss) | 79 |
| Consolidated Balance Sheets | 80 |
| Consolidated Statements of Stockholders' Equity | 81 |
| Notes to Consolidated Financial Statements | 82 |

73

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Snap Inc. (the Company) as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 6, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

74

Table of Contents

|  | ***Revenue Recognition*** |
|---|---|
| *Description of the Matter* | As described in Note 2 to the consolidated financial statements, the Company generates substantially all of its revenues by offering various advertising products on Snapchat. The substantial majority of such advertising revenues is generated based upon contractual agreements with customers that are either based on the number of advertising impressions delivered or on a fixed fee basis for advertisements delivered over a period of time. Revenues related to agreements based on the number of advertising impressions delivered are recognized when the advertisements are served while fixed fee agreements are recognized ratably over the service period. |
|  | The Company's advertising revenue recognition process utilizes proprietary systems for the initiation, processing, and recording of transactions which comprise a high volume of individually low monetary value transactions. This process is dependent on the effective design and operation of systems, data sources, and controls that required significant audit effort. |
| *How We Addressed the Matter in Our Audit* | With the support of our information technology professionals, we identified and tested the relevant systems used for the determination of initiation, processing, recording, and billing of revenue, which included processes and controls related to access to the relevant systems and data, changes to the relevant systems and interfaces, and configuration of the relevant systems. |
|  | To test the Company's recognition of advertising revenue, our audit procedures included, among others, testing the completeness and accuracy of the underlying data within the Company's billing systems by agreeing amounts recognized to contractual terms and conditions, and testing revenue recognized to accounts receivable and cash receipts. Additionally, we examined standard customer online terms and conditions to understand the distinct performance obligations and tested the timing of revenue recognition. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.

Los Angeles, California

February 6, 2024

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Snap Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Snap Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Snap Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2023, and the related notes and our report dated February 6, 2024 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California

February 6, 2024

76

Table of Contents

**Snap Inc.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| **Cash flows from operating activities** | | | |
| Net loss | $ (1,322,485) | $ (1,429,653) | $ (487,955) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 168,441 | 202,173 | 119,141 |
| Stock-based compensation | 1,324,004 | 1,387,787 | 1,092,135 |
| Amortization of debt issuance costs | 7,361 | 6,865 | 4,311 |
| Losses (gains) on debt and equity securities, net | 33,027 | 36,838 | (289,052) |
| Induced conversion expense related to convertible notes | — | — | 41,538 |
| Other | (26,958) | 15,596 | 8,643 |
| Change in operating assets and liabilities, net of effect of acquisitions: | | | |
| Accounts receivable, net of allowance | (98,127) | (119,780) | (332,967) |
| Prepaid expenses and other current assets | (9,920) | (40,917) | (26,607) |
| Operating lease right-of-use assets | 70,674 | 71,441 | 47,258 |
| Other assets | 2,238 | (504) | (10,916) |
| Accounts payable | 94,988 | 46,492 | 53,579 |
| Accrued expenses and other current liabilities | 62,130 | 71,706 | 117,092 |
| Operating lease liabilities | (68,007) | (68,886) | (49,294) |
| Other liabilities | 9,155 | 5,456 | 5,974 |
| Net cash provided by (used in) operating activities | 246,521 | 184,614 | 292,880 |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (211,727) | (129,306) | (69,875) |
| Purchases of strategic investments | (7,770) | (26,346) | (41,160) |
| Sales of strategic investments | 7,559 | 63,276 | 36,777 |
| Cash paid for acquisitions, net of cash acquired | (50,254) | (67,067) | (310,915) |
| Purchases of marketable securities | (2,048,273) | (3,485,638) | (2,438,983) |
| Sales of marketable securities | 459,481 | 75,716 | 379,555 |
| Maturities of marketable securities | 2,424,717 | 2,525,215 | 2,536,725 |
| Other | (2,779) | (18,125) | (1,897) |
| Net cash provided by (used in) investing activities | 570,954 | (1,062,275) | 90,227 |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible notes, net of issuance costs | — | 1,483,500 | 1,137,227 |
| Purchase of capped calls | — | (177,000) | (86,825) |
| Proceeds from the exercise of stock options | 1,038 | 4,272 | 14,671 |
| Payments of debt issuance costs | — | (3,006) | — |
| Repurchases of Class A non-voting common stock | (189,394) | (1,001,052) | — |
| Deferred payments for acquisitions | (270,433) | — | — |
| Net cash provided by (used in) financing activities | (458,789) | 306,714 | 1,065,073 |
| Change in cash, cash equivalents, and restricted cash | 358,686 | (570,947) | 1,448,180 |
| Cash, cash equivalents, and restricted cash, beginning of period | 1,423,776 | 1,994,723 | 546,543 |
| Cash, cash equivalents, and restricted cash, end of period | $ 1,782,462 | $ 1,423,776 | $ 1,994,723 |
| **Supplemental disclosures** | | | |
| Cash paid for income taxes, net | $ 30,924 | $ 12,087 | $ 25,333 |
| Cash paid for interest | $ 10,244 | $ 8,873 | $ 10,887 |

See Notes to Consolidated Financial Statements.

**Snap Inc.**
**Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Revenue | $ 4,606,115 | $ 4,601,847 | $ 4,117,048 |
| Costs and expenses: | | | |
| Cost of revenue | 2,114,117 | 1,815,342 | 1,750,246 |
| Research and development | 1,910,862 | 2,109,800 | 1,565,467 |
| Sales and marketing | 1,122,092 | 1,118,746 | 792,764 |
| General and administrative | 857,423 | 953,265 | 710,640 |
| Total costs and expenses | 6,004,494 | 5,997,153 | 4,819,117 |
| Operating loss | (1,398,379) | (1,395,306) | (702,069) |
| Interest income | 168,394 | 58,597 | 5,199 |
| Interest expense | (22,024) | (21,459) | (17,676) |
| Other income (expense), net | (42,414) | (42,529) | 240,175 |
| Loss before income taxes | (1,294,423) | (1,400,697) | (474,371) |
| Income tax benefit (expense) | (28,062) | (28,956) | (13,584) |
| Net loss | $ (1,322,485) | $ (1,429,653) | $ (487,955) |
| Net loss per share attributable to Class A, Class B, and Class C common stockholders (Note 3): | | | |
| Basic | $ (0.82) | $ (0.89) | $ (0.31) |
| Diluted | $ (0.82) | $ (0.89) | $ (0.31) |
| Weighted average shares used in computation of net loss per share: | | | |
| Basic | 1,612,504 | 1,608,304 | 1,558,997 |
| Diluted | 1,612,504 | 1,608,304 | 1,558,997 |

See Notes to Consolidated Financial Statements.

78

**Snap Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
*(in thousands)*

|  | Year Ended December 31, | | | | | |
|  | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Net loss | $ | (1,322,485) | $ | (1,429,653) | $ | (487,955) |
| Other comprehensive income (loss), net of tax |  |  |  |  |  |  |
|   Unrealized gain (loss) on marketable securities, net of tax |  | 8,269 |  | (9,307) |  | (1,735) |
|   Foreign currency translation |  | 12,836 |  | (10,188) |  | (14,107) |
| Total other comprehensive income (loss), net of tax |  | 21,105 |  | (19,495) |  | (15,842) |
| Total comprehensive loss | $ | (1,301,380) | $ | (1,449,148) | $ | (503,797) |

See Notes to Consolidated Financial Statements.

79

Table of Contents

**Snap Inc.**
**Consolidated Balance Sheets**
*(in thousands, except par value)*

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 1,780,400 | $ 1,423,121 |
| Marketable securities | 1,763,680 | 2,516,003 |
| Accounts receivable, net of allowance | 1,278,176 | 1,183,092 |
| Prepaid expenses and other current assets | 153,587 | 134,431 |
| Total current assets | 4,975,843 | 5,256,647 |
| Property and equipment, net | 410,326 | 271,777 |
| Operating lease right-of-use assets | 516,862 | 370,952 |
| Intangible assets, net | 146,303 | 204,480 |
| Goodwill | 1,691,827 | 1,646,120 |
| Other assets | 226,597 | 279,562 |
| Total assets | $ 7,967,758 | $ 8,029,538 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 278,961 | $ 181,774 |
| Operating lease liabilities | 49,321 | 46,485 |
| Accrued expenses and other current liabilities | 805,836 | 987,340 |
| Total current liabilities | 1,134,118 | 1,215,599 |
| Convertible senior notes, net | 3,749,400 | 3,742,520 |
| Operating lease liabilities, noncurrent | 546,279 | 386,271 |
| Other liabilities | 123,849 | 104,450 |
| Total liabilities | 5,553,646 | 5,448,840 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity | | |
| Class A non-voting common stock, $0.00001 par value. 3,000,000 shares authorized, 1,440,541 shares issued, 1,391,341 shares outstanding at December 31, 2023, and 3,000,000 shares authorized, 1,371,242 shares issued, 1,319,930 shares outstanding at December 31, 2022. | 14 | 13 |
| Class B voting common stock, $0.00001 par value. 700,000 shares authorized, 22,528 shares issued and outstanding at December 31, 2023, and 700,000 shares authorized, 22,529 shares issued and outstanding at December 31, 2022. | — | — |
| Class C voting common stock, $0.00001 par value. 260,888 shares authorized, 231,627 shares issued and outstanding at December 31, 2023 and December 31, 2022. | 2 | 2 |
| Treasury stock, at cost. 49,200 and 51,312 shares of Class A non-voting common stock at December 31, 2023 and December 31, 2022, respectively. | (479,903) | (500,514) |
| Additional paid-in capital | 14,613,404 | 13,309,828 |
| Accumulated deficit | (11,726,536) | (10,214,657) |
| Accumulated other comprehensive income (loss) | 7,131 | (13,974) |
| Total stockholders' equity | 2,414,112 | 2,580,698 |
| Total liabilities and stockholders' equity | $ 7,967,758 | $ 8,029,538 |

See Notes to Consolidated Financial Statements.

80

**Snap Inc.**
**Consolidated Statements of Stockholders' Equity**
*(in thousands)*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | **2021** | |
| | **Shares** | **Amount** | **Shares** | **Amount** | **Shares** | **Amount** |
| **Class A non-voting common stock** | | | | | | |
| Balance, beginning of period | 1,319,930 | $ 13 | 1,364,887 | $ 14 | 1,248,010 | $ 12 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 599 | — | 334 | — | 1,174 | — |
| Issuance of Class A non-voting common stock in connection with acquisitions | — | — | 1,277 | — | 6,732 | — |
| Issuance of Class A non-voting common stock for vesting of restricted stock units and restricted stock awards, net | 86,557 | 1 | 58,342 | — | 55,466 | 1 |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | — | — | — | — | 52,410 | 1 |
| Conversion of Class B voting common stock to Class A non-voting common stock | 566 | — | 298 | — | 1,095 | — |
| Repurchases of Class A non-voting common stock | (18,423) | — | (105,208) | (1) | — | — |
| Reissuances of Class A non-voting common stock for vesting of restricted stock units | 2,112 | — | — | — | — | — |
| Balance, end of period | 1,391,341 | 14 | 1,319,930 | 13 | 1,364,887 | 14 |
| **Class B voting common stock** | | | | | | |
| Balance, beginning of period | 22,529 | — | 22,769 | — | 23,696 | — |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | 565 | — | 58 | — | 168 | — |
| Conversion of Class B voting common stock to Class A non-voting common stock | (566) | — | (298) | — | (1,095) | — |
| Balance, end of period | 22,528 | — | 22,529 | — | 22,769 | — |
| **Class C voting common stock** | | | | | | |
| Balance, beginning of period | 231,627 | 2 | 231,627 | 2 | 231,627 | 2 |
| Issuance of Class C voting common stock for settlement of restricted stock units, net | — | — | — | — | — | — |
| Balance, end of period | 231,627 | 2 | 231,627 | 2 | 231,627 | 2 |
| **Treasury stock** | | | | | | |
| Balance, beginning of period | 51,312 | (500,514) | — | — | — | — |
| Repurchases of Class A non-voting common stock | 18,423 | (189,394) | 105,208 | (1,001,052) | — | — |
| Retirement of Class A non-voting common stock | (18,423) | 189,394 | (53,896) | 500,538 | — | — |
| Reissuances of Class A non-voting common stock for vesting of restricted stock units | (2,112) | 20,611 | — | — | — | — |
| Balance, end of period | 49,200 | (479,903) | 51,312 | (500,514) | — | — |
| **Additional paid-in capital** | | | | | | |
| Balance, beginning of period | — | 13,309,828 | — | 12,069,097 | — | 10,200,141 |
| Stock-based compensation expense | — | 1,323,149 | — | 1,369,407 | — | 1,088,506 |
| Shares issued in connection with exercise of stock options under stock-based compensation plans | — | 1,038 | — | 4,285 | — | 14,680 |
| Cumulative-effect adjustment from accounting changes | — | — | — | — | — | (664,021) |
| Issuance of Class A non-voting common stock in connection with acquisitions and divestitures | — | — | — | 44,039 | — | 341,425 |
| Issuance of Class A non-voting common stock for the induced conversion related to convertible senior notes | — | — | — | — | — | 1,175,191 |
| Purchase of capped calls | — | — | — | (177,000) | — | (86,825) |
| Reissuances of Class A non-voting common stock for vesting of restricted stock units | — | (20,611) | — | — | — | — |
| Balance, end of period | — | 14,613,404 | — | 13,309,828 | — | 12,069,097 |
| **Accumulated deficit** | | | | | | |
| Balance, beginning of period | — | (10,214,657) | — | (8,284,466) | — | (7,891,542) |
| Cumulative-effect adjustment from accounting changes | — | — | — | — | — | 95,031 |
| Net loss | — | (1,322,485) | — | (1,429,653) | — | (487,955) |
| Retirement of Class A non-voting common stock | — | (189,394) | — | (500,538) | — | — |
| Balance, end of period | — | (11,726,536) | — | (10,214,657) | — | (8,284,466) |
| **Accumulated other comprehensive income (loss)** | | | | | | |
| Balance, beginning of period | — | (13,974) | — | 5,521 | — | 21,363 |
| Other comprehensive income (loss), net of tax | — | 21,105 | — | (19,495) | — | (15,842) |
| Balance, end of period | — | 7,131 | — | (13,974) | — | 5,521 |
| **Total stockholders' equity** | 1,694,696 | $ 2,414,112 | 1,625,398 | $ 2,580,698 | 1,619,283 | $ 3,790,168 |

See Notes to Consolidated Financial Statements.

81

Table of Contents

**Snap Inc.**
**Notes to Consolidated Financial Statements**

## 1. Summary of Significant Accounting Policies

Snap Inc. is a technology company.

Snap Inc. ("we," "our," or "us"), a Delaware corporation, is headquartered in Santa Monica, California. Our flagship product, Snapchat, is a visual messaging application that was created to help people communicate through short videos and images called "Snaps."

### Basis of Presentation

Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Our consolidated financial statements include the accounts of Snap Inc. and our wholly owned subsidiaries. All intercompany transactions and balances have been eliminated in consolidation. Our fiscal year ends on December 31. Certain reclassifications have been made in the prior periods to conform to the current year's presentation. None of these reclassifications had a material impact on our consolidated financial statements.

### Use of Estimates

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. Management's estimates are based on historical information available as of the date of the consolidated financial statements and various other assumptions that we believe are reasonable under the circumstances. Actual results could differ from those estimates.

Key estimates relate primarily to determining the fair value of assets and liabilities assumed in business combinations, evaluation of contingencies, uncertain tax positions, and the fair value of strategic investments. On an ongoing basis, management evaluates our estimates compared to historical experience and trends, which form the basis for making judgments about the carrying value of assets and liabilities.

### Concentrations of Business Risk

We currently use both Google Cloud and Amazon Web Services for our hosting requirements. A disruption or loss of service from one or both of these partners could seriously harm our ability to operate. Although we believe there are other qualified providers that can provide these services, a transition to a new provider could create a significant disruption to our business and negatively impact our consolidated financial statements.

### Concentrations of Credit Risk

Financial instruments that potentially subject us to significant concentrations of credit risk consist principally of cash, cash equivalents, marketable securities, and accounts receivable. We maintain cash deposits, cash equivalent balances, and marketable securities with several financial institutions. Cash and cash equivalents may be withdrawn or redeemed on demand. We believe that the financial institutions that hold our cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to these balances. We also maintain investments in U.S. government debt and agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper that carry high credit ratings and accordingly, minimal credit risk exists with respect to these balances.

We extend credit to our customers based on an evaluation of their ability to pay amounts due under contractual arrangement and generally do not obtain or require collateral.

### Revenue Recognition

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. See Note 2 for additional information.

**Cost of Revenue**

Cost of revenue includes payments for content, developer, and advertiser partner costs. Under some of these arrangements, we pay a portion of the fees we receive from the advertisers for Snap Ads that are displayed within partner content on Snapchat. Partner arrangement costs were $675.0 million, $681.9 million, and $679.0 million for the years ended December 31, 2023, 2022, and 2021, respectively.

In addition, cost of revenue consists of payments to third-party infrastructure partners for hosting our products, which include expenses related to storage, computing, and bandwidth costs. Cost of revenue also includes third-party selling costs, personnel-related costs, facilities and other supporting overhead costs, including depreciation and amortization, and inventory costs.

**Advertising**

Advertising costs are expensed as incurred and were $24.9 million, $42.7 million, and $62.4 million for the years ended December 31, 2023, 2022, and 2021, respectively.

**Capital Structure**

We have three classes of authorized common stock – Class A common stock, Class B common stock, and Class C common stock. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer.

**Future Stock Split to be Effected in the Form of a Stock Dividend**

In July 2022, our board of directors determined that it was advisable and in our best interest to approve a stock split to be effected in the form of a special dividend of one share of Class A common stock on each outstanding share of our common stock at a future date (the "Future Stock Split"). In connection with the Future Stock Split, we entered into certain agreements (the "Co-Founder Agreements") with Evan Spiegel and Robert Murphy, our co-founders, and certain of their respective affiliates requiring them, among other things, to convert shares of Class B common stock and Class C common stock into Class A common stock under certain circumstances. The Future Stock Split will not be declared and paid until the first business day following the date on which the average of the volume weighted average price (the "VWAP") per share of Class A common stock equals or exceeds $40 per share for 65 consecutive trading days. If this does not occur by July 21, 2032, the Future Stock Split will not be declared and paid, and the Co-Founder Agreements will terminate.

In June 2023, in connection with a proposed settlement of a class-action lawsuit, and as amended in December 2023, we agreed to modify the conditions for the Future Stock Split, subject to various conditions, including judicial approval of the settlement. If approved, the Future Stock Split will not be declared and paid until the first business day following the date on which (i) the VWAP per share of Class A common stock equals or exceeds $40 per share for 90 consecutive trading days (the "90-Day VWAP") and (ii) the ratio of the 90-Day VWAP to $8.70 equals or exceeds the ratio of the average closing price of the S&P 500 Total Return index for the same 90 trading days for which the 90-Day VWAP was calculated to 8,862.85. The original ten year time period to trigger the Future Stock Split would remain unchanged.

No adjustments have been made to share or per share amounts for Class A common stock in the accompanying consolidated financial statements for the effects of the Future Stock Split as these triggering conditions have not been met.

**Stock-based Compensation**

We measure and recognize compensation expense for stock-based payment awards, including stock options, restricted stock units ("RSUs"), and restricted stock awards ("RSAs") granted to employees, directors, and advisors, based on the grant date fair value of the awards. The grant date fair value of stock options is estimated using a Black-Scholes option pricing model. The fair value of stock-based compensation for stock options is recognized on a straight-line basis, net of estimated forfeitures, over the period during which services are provided in exchange for the award. The grant date fair value of RSUs and RSAs is estimated based on the fair value of our underlying common stock.

RSUs and RSAs vest on the satisfaction of a service-based condition. The service condition for RSUs and RSAs is generally satisfied in equal monthly or quarterly installments over three or four years. For these awards, we recognize stock-based compensation expense on a straight-line basis over the requisite service period.

Stock-based compensation expense recognized for all periods presented is based on awards that are expected to vest, including an estimate of forfeitures. We estimate the forfeiture rate using historical forfeitures of equity awards and other expected changes in facts and circumstances, if any. A modification of the terms of a stock-based award is treated as an exchange of the original award for a new award with total compensation cost equal to the grant-date fair value of the original award plus the incremental value of the modification to the award.

The future tax benefits on settlement of the above RSUs and RSAs is not expected to be material as currently we have established valuation allowances to reduce our net deferred tax assets to the amount that is more likely than not to be realized. The majority of the future tax benefits that arise on settlement of the above RSUs are in jurisdictions for which our net deferred tax assets have a full valuation allowance.

**Income Taxes**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the deferred tax asset or liability is expected to be realized or settled.

In evaluating our ability to recover deferred tax assets, we consider all available positive and negative evidence, including historical operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis. Based on the level of historical losses, we have established a valuation allowance to reduce our net deferred tax assets to the amount that is more likely than not to be realized.

We recognize a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in our consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized. We recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheets.

**Currency Translation and Remeasurement**

The functional currency of the majority of our foreign subsidiaries is the U.S. dollar. Monetary assets and liabilities denominated in a foreign currency are remeasured into U.S. dollars at the exchange rate on the balance sheet date. Revenue and expenses are remeasured at the average exchange rates during the period. Equity transactions and other non-monetary assets are remeasured using historical exchange rates. Foreign currency transaction gains and losses are recorded in other income (expense), net on our consolidated statement of operations. For those foreign subsidiaries where the local currency is the functional currency, adjustments to translate those statements into U.S. dollars are recorded in accumulated other comprehensive income (loss) in stockholders' equity.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of highly liquid investments with original maturities of 90 days or less from the date of purchase.

**Restricted Cash**

We are required to maintain restricted cash deposits to back letters of credit for certain property leases. These funds are restricted and have been classified in other assets on our consolidated balance sheets due to the nature of restriction. At December 31, 2023 and 2022, restricted cash balances were immaterial.

**Marketable Securities**

We hold investments in marketable securities consisting of U.S. government securities, U.S. government agency securities, publicly traded equity securities, corporate debt securities, certificates of deposit, and commercial paper. We classify marketable investments in debt securities as available-for-sale investments in our current assets because they represent investments available for current operations.

Our available-for-sale investments in debt securities are carried at fair value with any unrealized gains and losses, included in accumulated other comprehensive (loss) income in stockholders' equity. Available-for-sale debt securities with an amortized cost basis in excess of estimated fair value are assessed to determine what amount of that difference, if any, is caused by expected credit losses, with any allowance for credit losses recognized as a charge in other income (expense), net on our consolidated statements of income. We did not record any credit losses on our available-for-sale debt securities in any of the periods presented. We determine gains or losses on the sale or maturities of marketable securities using the specific identification method and these gains or losses are recorded in other income (expense), net in our consolidated statements of operations.

Publicly traded equity securities are carried at fair value with any unrealized gains and losses recorded in other income (expense), net in our consolidated statements of operations.

**Strategic Investments**

We hold strategic investments primarily in privately held companies, consisting primarily of equity securities without readily determinable fair values, and to a lesser extent, debt securities. We adjust the carrying value of these equity securities to fair value upon observable transactions for identical or similar investments of the same issuer or upon impairment. All strategic investments are reviewed periodically for impairment. Any adjustments to carrying value of these investments are recorded in other income (expense), net in our consolidated statements of operations. Strategic investments are included within other assets in our consolidated balance sheets.

When we exercise significant influence over, but do not control the investee, such strategic investments are accounted for using the equity method. Under the equity method of accounting, we record our share of the results of the investments within other income (expense), net in our consolidated statements of operations.

**Fair Value Measurements**

Certain financial instruments are required to be recorded at fair value. Other financial instruments, including cash and cash equivalents and restricted cash, are recorded at cost, which approximates fair value. Additionally, accounts receivable, accounts payable, and accrued expenses approximate fair value because of the short-term nature of these financial instruments.

**Accounts Receivable and Allowance for Doubtful Accounts**

Accounts receivable are recorded at the invoiced amount less any allowance for doubtful accounts to reserve for potentially uncollectible receivables. To determine the amount of the allowance, we make judgments about the creditworthiness of customers based on ongoing credit evaluation and historical experience. At December 31, 2023 and 2022, the allowance for doubtful accounts was immaterial.

**Property and Equipment**

Property and equipment are stated at cost, less accumulated depreciation. We compute depreciation using the straight-line method over the estimated useful lives of the assets, which is generally three years for computer hardware, software, and equipment, five years for furniture, and over the shorter of lease term or useful life of the assets for leasehold improvements. Buildings are generally depreciated over a useful life ranging from 20 to 45 years. Maintenance and repairs are expensed as incurred.

**Leases**

We have non-cancelable lease agreements for primarily offices that are recorded as operating lease right-of-use assets and operating lease liabilities in our consolidated balance sheets. We account for lease and non-lease components as a single lease component and do not record leases with an initial term of twelve months or less in our consolidated balance

Table of Contents

sheets. We use our incremental borrowing rate based on the information available at the lease commencement date to determine the present value of lease payments over the lease term. Our lease terms may include options to extend or terminate the lease when it is reasonably certain we will exercise that option. Certain agreements have free rent periods or escalating rent payment provisions. Rent expense is recognized on a straight-line basis over the lease term.

## Software Development Costs

Software development costs include costs to develop software to be used to meet internal needs and applications used to deliver our services. We capitalize development costs related to these software applications once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended. Costs capitalized for developing such software applications were not material for the periods presented.

## Segments

Our CEO is our chief operating decision maker ("CODM"). We have determined that we have a single operating segment. Our CEO evaluates performance and makes operating decisions about allocating resources based on financial data presented on a consolidated basis accompanied by disaggregated information about revenue by geographic region.

## Business Combinations

We include the results of operations of the businesses that we acquire from the date of acquisition. We determine the fair value of the assets acquired and liabilities assumed based on their estimated fair values as of the respective date of acquisition. The excess purchase price over the fair values of identifiable assets and liabilities is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates including the selection of valuation methodologies, estimates of future revenue and cash flows, discount rates, and selection of comparable companies. Our estimates of fair value are based on assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, not to exceed one year from the date of acquisition, we may record adjustments to the assets acquired and liabilities assumed, with a corresponding offset to goodwill. At the conclusion of the measurement period, any subsequent adjustments are reflected in our consolidated statements of operations.

When we issue payments or grants of equity to selling stockholders in connection with an acquisition, we evaluate whether the payments or awards are compensatory. This evaluation includes whether cash payments or stock award vesting is contingent on the continued employment of the selling stockholder beyond the acquisition date. If continued employment is required for the cash to be paid or stock awards to vest, the award is treated as compensation for post-acquisition services and is recognized as compensation expense.

Transaction costs associated with business combinations are expensed as incurred, and are included in general and administrative expenses in our consolidated statements of operations.

## Goodwill

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in a business combination. We test goodwill for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. For all periods presented, we had a single operating segment and reporting unit structure. There were no impairment charges in any of the periods presented.

Table of Contents

**Intangible Assets**

Intangible assets are carried at cost and amortized on a straight-line basis over their estimated useful lives. We determine the appropriate useful life of our intangible assets by measuring the expected cash flows of acquired assets. The estimated useful lives of intangible assets are generally as follows:

| Intangible Asset | Estimated Useful Life |
|---|---|
| Domain names | 5 Years |
| Trademarks | 3 Years |
| Acquired developed technology | 3 to 7 Years |
| Customer relationships | 2 to 8 Years |
| Patents | 4 to 14 Years |

**Impairment of Long-Lived Assets**

We evaluate recoverability of our property and equipment and intangible assets, excluding goodwill, when events or changes indicate the carrying amount of an asset may not be recoverable. Events and changes in circumstances considered in determining whether the carrying value of long-lived assets may not be recoverable include: significant changes in performance relative to expected operating results; significant changes in asset use; and significant negative industry or economic trends and changes in our business strategy. Recoverability of these assets is measured by comparison of their carrying amount to future undiscounted cash flows to be generated. If impairment is indicated based on a comparison of the assets' carrying values and the undiscounted cash flows, the impairment loss is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Legal Contingencies**

For legal contingencies, we accrue a liability for an estimated loss if the potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated. Legal fees and expenses are expensed as incurred. Note 8 provides additional information regarding our legal contingencies.

**Recent Accounting Pronouncements**

In December 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-09, Income Taxes (Topic 740): Improvements to Income Tax Disclosures, which requires public entities to provide greater disaggregation within their annual rate reconciliation, including new requirements to present reconciling items on a gross basis in specified categories, disclose both percentages and dollar amounts, and disaggregate individual reconciling items by jurisdiction and nature when the effect of the items meet a quantitative threshold. The guidance also requires disaggregating the annual disclosure of income taxes paid, net of refunds received, by federal (national), state, and foreign taxes, with separate presentation of individual jurisdictions that meet a quantitative threshold. The guidance is effective for annual periods beginning after December 15, 2024 on a prospective basis, with a retrospective option, and early adoption is permitted. We are currently evaluating the impact of adoption of this standard on our consolidated financial statements and disclosures.

In November 2023, the FASB issued ASU 2023-07, Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures, which requires public entities with a single reportable segment to provide all the disclosures required by this standard and all existing segment disclosures in Topic 280 on an interim and annual basis, including new requirements to disclose significant segment expenses that are regularly provided to the CODM and included within the reported measure(s) of a segment's profit or loss, the amount and composition of any other segment items, the title and position of the CODM, and how the CODM uses the reported measure(s) of a segment's profit or loss to assess performance and decide how to allocate resources. The guidance is effective for annual periods beginning after December 15, 2023, and interim periods beginning after December 15, 2024, applied retrospectively with early adoption permitted. We are currently evaluating the impact of adoption of this standard on our consolidated financial statements and disclosures.

87

## 2. Revenue

We determine revenue recognition by first identifying the contract or contracts with a customer, identifying the performance obligations in the contract, determining the transaction price, allocating the transaction price to the performance obligations in the contract, and recognizing revenue when, or as, we satisfy a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to receive in exchange for those goods or services. We determine collectability by performing ongoing credit evaluations and monitoring customer accounts receivable balances. Sales tax, including value added tax, is excluded from reported revenue.

We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Lenses, which allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

The substantial majority of advertising revenue is generated from the display of advertisements on Snapchat through contractual agreements that are either based on the number of advertising impressions delivered or on a fixed fee basis over a period of time. Revenue related to agreements based on the number of impressions delivered is recognized when the advertisement is served. Revenue related to fixed fee arrangements is recognized ratably over the service period, typically less than 30 days in duration, and such arrangements do not contain minimum impression guarantees.

In arrangements where another party is involved in providing specified services to a customer, we evaluate whether we are the principal or agent. In this evaluation, we consider if we obtain control of the specified goods or services before they are transferred to the customer, as well as other indicators such as the party primarily responsible for fulfillment, inventory risk, and discretion in establishing price. For advertising revenue arrangements where we are not the principal, we recognize revenue on a net basis. For the periods presented, revenue for arrangements where we are the agent was not material.

We also generate revenue from subscriptions and sales of hardware products. For the periods presented, all such revenue was not material.

The following table represents our revenue disaggregated by geography based on the billing address of the customer:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| | | (in thousands) | | | | |
| North America [1] [2] | $ | 2,952,301 | $ | 3,205,554 | $ | 2,871,369 |
| Europe [3] | | 772,078 | | 712,764 | | 660,473 |
| Rest of world | | 881,736 | | 683,529 | | 585,206 |
| Total revenue | $ | 4,606,115 | $ | 4,601,847 | $ | 4,117,048 |

(1)     North America includes Mexico, the Caribbean, and Central America.
(2)     United States revenue was $2.9 billion, $3.1 billion, and $2.8 billion for the years ended December 31, 2023, 2022, and 2021, respectively.
(3)     Europe includes Russia and Turkey. Effective March 2022, we halted advertising sales to Russian and Belarusian entities.

## 3. Net Loss per Share

We compute net loss per share using the two-class method required for multiple classes of common stock. We have three classes of authorized common stock for which voting rights differ by class.

Basic net loss per share is computed by dividing net loss attributable to each class of stockholders by the weighted-average number of shares of stock outstanding during the period, adjusted for RSAs for which the risk of forfeiture has not yet lapsed.

For the calculation of diluted net loss per share, net loss per share attributable to common stockholders for basic net loss per share is adjusted by the effect of dilutive securities, including awards under our equity compensation plans. Diluted net loss per share attributable to common stockholders is computed by dividing the resulting net loss attributable to common stockholders by the weighted-average number of fully diluted common shares outstanding. We use the if-converted method for calculating any potential dilutive effect of the convertible senior notes due in 2025, 2026, 2027, and 2028 (collectively, the "Convertible Notes") on diluted net loss per share. The Convertible Notes would have a dilutive impact on net income per share when the average market price of Class A common stock for a given period exceeds the respective conversion price of the Convertible Notes. For the periods presented, our potentially dilutive shares relating to stock options, RSUs, RSAs, and Convertible Notes were not included in the computation of diluted net loss per share as the effect of including these shares in the calculation would have been anti-dilutive.

The numerators and denominators of the basic and diluted net loss per share computations for our common stock are calculated as follows for the years ended December 31, 2023, 2022, and 2021:

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2023 | | | 2022 | | | 2021 | | |
| | (in thousands, except per share data) | | | | | | | | |
| | Class A | Class B | Class C | Class A | Class B | Class C | Class A | Class B | Class C |
| **Numerator:** | | | | | | | | | |
| Net loss | $ (1,114,039) | $ (18,479) | $ (189,967) | $ (1,203,614) | $ (20,141) | $ (205,898) | $ (408,118) | $ (7,339) | $ (72,498) |
| Net loss attributable to common stockholders | $ (1,114,039) | $ (18,479) | $ (189,967) | $ (1,203,614) | $ (20,141) | $ (205,898) | $ (408,118) | $ (7,339) | $ (72,498) |
| **Denominator:** | | | | | | | | | |
| **Basic shares:** | | | | | | | | | |
| Weighted-average common shares - Basic | 1,358,345 | 22,532 | 231,627 | 1,354,019 | 22,658 | 231,627 | 1,303,921 | 23,449 | 231,627 |
| **Diluted shares:** | | | | | | | | | |
| Weighted-average common shares - Diluted | 1,358,345 | 22,532 | 231,627 | 1,354,019 | 22,658 | 231,627 | 1,303,921 | 23,449 | 231,627 |
| **Net loss per share attributable to common stockholders:** | | | | | | | | | |
| Basic | $ (0.82) | $ (0.82) | $ (0.82) | $ (0.89) | $ (0.89) | $ (0.89) | $ (0.31) | $ (0.31) | $ (0.31) |
| Diluted | $ (0.82) | $ (0.82) | $ (0.82) | $ (0.89) | $ (0.89) | $ (0.89) | $ (0.31) | $ (0.31) | $ (0.31) |

The following potentially dilutive shares were excluded from the calculation of diluted net loss per share because their effect would have been anti-dilutive for the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (in thousands) | | |
| Stock options | 1,697 | 3,159 | 4,304 |
| Unvested RSUs and RSAs | 157,130 | 132,392 | 86,180 |
| Convertible Notes (if-converted) | 89,379 | 89,379 | 62,755 |

## 4. Stockholders' Equity

### Common Stock

As of December 31, 2023, we are authorized to issue 3,000,000,000 shares of Class A non-voting common stock, 700,000,000 shares of Class B voting common stock, and 260,887,848 shares of Class C voting common stock, each with a par value of $0.00001 per share. Class A common stockholders have no voting rights, Class B common stockholders are entitled to one vote per share, and Class C common stockholders are entitled to ten votes per share. Shares of our Class B common stock are convertible into an equivalent number of shares of our Class A common stock and generally convert into shares of our Class A common stock upon transfer. Shares of our Class C common stock are convertible into an equivalent number of shares of our Class B common stock and generally convert into shares of our Class B common stock upon transfer. Any dividends paid to the holders of the Class A common stock, Class B common stock, and Class C common stock will be paid on a pro rata basis. For the year ended December 31, 2023, we did not declare any dividends. On a liquidation event, as defined in our certificate of incorporation, any distribution to common stockholders is made on a pro rata basis to the holders of the Class A common stock, Class B common stock, and Class C common stock.

As of December 31, 2023, there were 1,440,540,591 shares issued and 1,391,341,262 shares outstanding of Class A common stock, and 22,528,406 shares and 231,626,943 shares issued and outstanding of Class B common stock and Class C common stock, respectively.

### Stock-based Compensation Plans

We maintain three share-based employee compensation plans: the 2017 Equity Incentive Plan ("2017 Plan"), the 2014 Equity Incentive Plan ("2014 Plan"), and the 2012 Equity Incentive Plan ("2012 Plan," and collectively with the 2017 Plan and the 2014 Plan, the "Stock Plans"). In January 2017, our board of directors adopted the 2017 Plan, and in February 2017 our stockholders approved the 2017 Plan, effective on March 1, 2017, which serves as the successor to the 2014 Plan and 2012 Plan and provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, RSAs, RSUs, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. We do not expect to grant any additional awards under the 2014 Plan or 2012 Plan as of the effective date of the 2017 Plan, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France under the 2014 Plan. Outstanding awards under the 2014 Plan and 2012 Plan continue to be subject to the terms and conditions of the 2014 Plan and 2012 Plan, respectively. Shares available for grant under the 2014 Plan and 2012 Plan, which were reserved but not issued or subject to outstanding awards under the 2014 Plan or 2012 Plan, respectively, as of the effective date of the 2017 Plan, were added to the reserves of the 2017 Plan.

We initially reserved 87,270,108 shares of our Class A common stock for future issuance under the 2017 Plan. An additional number of shares of Class A common stock will be added to the 2017 Plan equal to (i) 96,993,064 shares of Class A common stock reserved for future issuance pursuant to outstanding stock options and unvested RSUs under the 2014 Plan, (ii) 37,228,865 shares of Class A common stock issuable on conversion of Class B common stock underlying stock options and unvested RSUs outstanding under the 2012 Plan, (iii) 17,858,235 shares of Class A common stock that were reserved for issuance under the 2014 Plan as of the date the 2017 Plan became effective, (iv) 11,004,580 shares of Class A common stock issuable on conversion of Class B common stock that were reserved for issuance under the 2012 Plan as of the date the 2017 Plan became effective, and (v) a maximum of 86,737,997 shares of Class A common stock that will be added pursuant to the following sentence. With respect to each share that returns to the 2017 Plan pursuant to (i) and (ii) of the prior sentence that was associated with an award that was outstanding under the 2014 Plan and 2012 Plan as of October 31, 2016, an additional share of Class A common stock will be added to the share reserve of the 2017 Plan, up to a maximum of 86,737,997 shares. The number of shares reserved for issuance under the 2017 Plan will increase automatically on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 5.0% of the total number of shares of our capital stock outstanding on December 31st of the immediately preceding calendar year, and (ii) a number determined by our board of directors. The maximum term for stock options granted under the 2017 Plan may not exceed ten years from the date of grant. The 2017 Plan will terminate ten years from the date our board of directors approved the plan, unless it is terminated earlier by our board of directors.

### 2017 Employee Stock Purchase Plan

In January 2017, our board of directors adopted the 2017 Employee Stock Purchase Plan ("2017 ESPP"). Our stockholders approved the 2017 ESPP in February 2017. The 2017 ESPP became effective in connection with the IPO. A total of 16,484,690 shares of Class A common stock were initially reserved for issuance under the 2017 ESPP. No shares of

our Class A common stock have been issued or offered under the 2017 ESPP. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (i) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (ii) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (i) and (ii).

**Restricted Stock Units and Restricted Stock Awards**

The following table summarizes the RSU and RSA activity during the year ended December 31, 2023:

|  | Class A Number of Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
|  | (in thousands, except per share data) | | |
| Unvested at December 31, 2022 | 132,392 | $ | 18.28 |
| Granted | 148,701 | $ | 10.41 |
| Vested | (91,641) | $ | 15.71 |
| Forfeited | (32,322) | $ | 15.90 |
| Unvested at December 31, 2023 | 157,130 | $ | 12.82 |

The total fair value of RSUs and RSAs vested for the years ended December 31, 2023, 2022, and 2021 was $1.0 billion, $1.2 billion, and $3.6 billion, respectively.

Total unrecognized compensation cost related to outstanding RSUs and RSAs was $1.7 billion as of December 31, 2023 and is expected to be recognized over a weighted-average period of 2.0 years.

**Stock Options**

The following table summarizes the stock option award activity under the Stock Plans during the year ended December 31, 2023:

|  | Class A Number of Shares | Class B Number of Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value [1] |
|---|---|---|---|---|---|---|---|
|  | (in thousands, except per share data) | | | | | | |
| Outstanding at December 31, 2022 | 2,589 | 570 | $ | 9.68 | 4.05 | $ | 9,669 |
| Granted | — | — | $ | — | | | |
| Exercised | (599) | (565) | $ | 0.89 | | | |
| Forfeited | (298) | — | $ | 14.27 | | | |
| Outstanding at December 31, 2023 | 1,692 | 5 | $ | 14.90 | 4.41 | $ | 5,225 |
| Exercisable at December 31, 2023 | 1,692 | 5 | $ | 14.90 | 4.41 | $ | 5,225 |
| Vested and expected to vest at December 31, 2023 | 1,692 | 5 | $ | 14.90 | 4.41 | $ | 5,225 |

(1)   The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying stock option awards and the closing market price of our Class A common stock as of December 31, 2023 and December 31, 2022, respectively.

The weighted-average fair value of stock options granted during the year ended December 31, 2022 and 2021 was $8.41 and $36.17 per share. The expense is estimated based on the option's fair value as calculated by the Black-Scholes option pricing model. Stock-based compensation expense for stock options was not material for the years ended December 31, 2023, 2022, and 2021.

As of December 31, 2023, there was no unrecognized compensation cost related to stock options granted under the Stock Plans.

The total grant date fair value of stock options that vested for the years ended December 31, 2023, 2022, and 2021 was $1.1 million, $3.2 million, and $7.7 million, respectively. The intrinsic value of stock options exercised for the years ended December 31, 2023, 2022, and 2021 was $12.3 million, $5.9 million, and $69.4 million, respectively.

**Stock-Based Compensation Expense**

Total stock-based compensation expense by function was as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2021 | |
| | (in thousands) | | | | | |
| Cost of revenue | $ | 9,555 | $ | 12,288 | $ | 17,221 |
| Research and development | | 893,026 | | 970,746 | | 740,130 |
| Sales and marketing | | 255,688 | | 203,092 | | 164,241 |
| General and administrative | | 165,735 | | 201,661 | | 170,543 |
| Total | $ | 1,324,004 | $ | 1,387,787 | $ | 1,092,135 |

**Stock Repurchases**

In October 2023, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. During the fourth quarter of 2023, we repurchased 18.4 million shares of our Class A common stock for an aggregate of $189.4 million, including costs associated with the repurchases. As of December 31, 2023, the remaining availability under the stock repurchase authorization was $310.8 million.

In October 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the fourth quarter of 2022, during which we repurchased, and subsequently retired, 53.9 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases.

In July 2022, our board of directors authorized a stock repurchase program of up to $500.0 million of our Class A common stock. The program was completed in the third quarter of 2022, during which we repurchased 51.3 million shares of our Class A common stock for an aggregate of $500.5 million, representing the entire amount approved by our board of directors and including costs associated with the repurchases. These shares are recorded as treasury stock on our consolidated balance sheets and remain available for re-issuance.

**5. Business Acquisitions**

**2023 Acquisitions**

In 2023, aggregate purchase consideration for business acquisitions was $73.1 million, which primarily consisted of $56.3 million in cash and $12.6 million recorded in other liabilities in our consolidated balance sheet. Of the aggregate purchase consideration, $42.8 million was allocated to goodwill and the remainder primarily to identifiable intangible assets. The acquired assets are expected to enhance our existing platform, technology, and workforce. The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

**2022 Acquisitions**

In 2022, we completed acquisitions to enhance our existing platform, technology, and workforce. The aggregate purchase consideration was $120.5 million, which included $17.7 million in cash, $44.0 million in shares of our Class A common stock, and $58.8 million recorded in other liabilities on our consolidated balance sheet. Of the aggregate purchase consideration, $69.3 million was allocated to goodwill and the remainder primarily to identifiable intangible assets. The goodwill amount represents synergies related to our existing platform expected to be realized from the business

acquisitions and assembled workforce. Of the acquired goodwill and intangible assets, $101.7 million is deductible for tax purposes.

**2021 Acquisitions**

*Wave Optics*

In May 2021, we acquired Wave Optics Limited ("Wave Optics"), a display technology company that supplies light engines and diffractive waveguides for augmented reality displays. The total consideration was $541.8 million, of which $510.4 million represented purchase consideration and primarily consisted of 4.7 million shares of our Class A common stock with a fair value of $252.0 million, cash of $13.7 million, and a $238.4 million payable due no later than May 2023 in either cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election. The remaining $31.4 million of total consideration transferred represented compensation for future employment services.

The allocation of the total purchase consideration for this acquisition was as follows:

| | Total |
| --- | --- |
| | (in thousands) |
| Trademarks | $ 20,584 |
| Technology | 77,118 |
| Customer relationships | 32,708 |
| Goodwill | 370,236 |
| Net deferred tax liability | (3,313) |
| Other assets acquired and liabilities assumed, net | 13,111 |
| Total | $ 510,444 |

The goodwill amount represents synergies expected to be realized from the business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

*Fit Analytics*

In March 2021, we acquired Fit Analytics GmbH ("Fit Analytics"), a sizing technology company that powers solutions for retailers and brands, to grow our e-commerce and shopping offerings. The purchase consideration for Fit Analytics was $124.4 million, which primarily represented current and future cash consideration payments.

The allocation of the total purchase consideration for this acquisition was as follows:

| | Total |
| --- | --- |
| | (in thousands) |
| Trademarks | $ 800 |
| Technology | 17,000 |
| Customer relationships | 17,000 |
| Goodwill | 88,132 |
| Net deferred tax liability | (5,643) |
| Other assets acquired and liabilities assumed, net | 7,160 |
| Total | $ 124,449 |

The goodwill amount represents synergies expected to be realized from this business combination and assembled workforce. The associated goodwill and intangible assets are not deductible for tax purposes.

93

*Other 2021 Acquisitions*

For the year ended December 31, 2021, we completed other acquisitions to enhance our existing platform, technology, and workforce. The aggregate purchase consideration was $266.1 million, which included $139.5 million in cash, $93.7 million in shares of our Class A common stock, and $32.9 million recorded in other liabilities on our consolidated balance sheets.

The aggregate allocation of purchase consideration was as follows:

| | | Total |
|---|---|---:|
| | | (in thousands) |
| Technology | $ | 64,150 |
| Customer relationships | | 4,000 |
| Goodwill | | 203,482 |
| Net deferred tax liability | | (11,871) |
| Other assets acquired and liabilities assumed, net | | 6,325 |
| Total | $ | 266,086 |

The goodwill amount represents synergies related to our existing platform expected to be realized from the business acquisitions and assembled workforces. Of the acquired goodwill and intangible assets, $8.2 million is deductible for tax purposes.

*Additional Information on 2023, 2022, and 2021 Acquisitions*

The operating results of the above acquisitions were included in the results of our operations from the acquisition date and were not material to our consolidated revenue or consolidated operating loss. In addition, unaudited pro forma results of operations assuming the above acquisitions had taken place at the beginning of each period are not provided because the historical operating results of the acquired entities were not material and pro forma results would not be materially different from reported results for the periods presented.

## 6. Goodwill and Intangible Assets

The changes in the carrying amount of goodwill for the years ended December 31, 2023 and 2022 were as follows:

| | | Goodwill |
|---|---|---:|
| | | (in thousands) |
| Balance as of December 31, 2021 | $ | 1,588,452 |
| Goodwill acquired | | 69,291 |
| Foreign currency translation | | (11,623) |
| Balance as of December 31, 2022 | $ | 1,646,120 |
| Goodwill acquired | | 42,780 |
| Foreign currency translation | | 2,927 |
| Balance as of December 31, 2023 | $ | 1,691,827 |

Table of Contents

Intangible assets consisted of the following:

| | December 31, 2023 | | | |
|---|---|---|---|---|
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands, except years) | | |
| Domain names | 3.0 | $ 745 | $ (546) | $ 199 |
| Technology | 2.8 | 323,313 | (197,608) | 125,705 |
| Patents | 8.8 | 39,373 | (19,099) | 20,274 |
| Other | — | 6,000 | (5,875) | 125 |
| | | $ 369,431 | $ (223,128) | $ 146,303 |

| | December 31, 2022 | | | |
|---|---|---|---|---|
| | Weighted-Average Remaining Useful Life - Years | Gross Carrying Amount | Accumulated Amortization | Net |
| | | (in thousands, except years) | | |
| Domain names | 4.0 | $ 954 | $ (690) | $ 264 |
| Trademarks | 1.2 | 800 | (478) | 322 |
| Technology | 3.1 | 340,375 | (178,427) | 161,948 |
| Customer relationships | 5.7 | 21,000 | (6,641) | 14,359 |
| Patents | 9.1 | 39,373 | (14,912) | 24,461 |
| Other | 1.0 | 6,000 | (2,874) | 3,126 |
| | | $ 408,502 | $ (204,022) | $ 204,480 |

Amortization of intangible assets for the years ended December 31, 2023, 2022, and 2021 was $81.1 million, $132.3 million, and $63.2 million, respectively. In 2023, we recognized $19.9 million in charges related to the revision of the useful lives and disposal of certain acquired intangible assets. In 2022, we revised the useful lives of certain customer relationships, trademarks, domain names, and technology, which resulted in a $49.3 million increase to amortization expense for the year ended December 31, 2022.

As of December 31, 2023, the estimated intangible asset amortization expense for the next five years and thereafter is as follows:

| | Estimated Amortization |
|---|---|
| | (in thousands) |
| Year ending December 31, | |
| 2024 | $ 58,532 |
| 2025 | 42,513 |
| 2026 | 20,776 |
| 2027 | 12,104 |
| 2028 | 4,323 |
| Thereafter | 8,055 |
| Total | $ 146,303 |

**7. Long-Term Debt**

**Convertible Notes**

*2028 Notes*

In February 2022, we entered into a purchase agreement for the sale of an aggregate of $1.50 billion principal amount of convertible senior notes due in 2028 (the "2028 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). The net proceeds from the issuance of the 2028 Notes were $1.31 billion, net of debt issuance costs and cash used to purchase the capped call transactions ("2028 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2028 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on September 1, 2022 at a rate of 0.125% per year. The 2028 Notes mature on March 1, 2028 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2028 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 17.7494 shares of Class A common stock per $1,000 principal amount of 2028 Notes, which is equivalent to an initial conversion price of approximately $56.34 per share of our Class A common stock. We may redeem for cash all or any portion of the 2028 Notes, at our option, on or after March 5, 2025 based on certain circumstances.

*2027 Notes*

In April 2021, we entered into a purchase agreement for the sale of an aggregate of $1.15 billion principal amount of convertible senior notes due in 2027 (the "2027 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2027 Notes were $1.05 billion, net of debt issuance costs and cash used to purchase the capped call transactions (the "2027 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2027 Notes are unsecured and unsubordinated obligations which do not bear regular interest and for which the principal balance will not accrete. The 2027 Notes will mature on May 1, 2027 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2027 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 11.2042 shares of Class A common stock per $1,000 principal amount of 2027 Notes, which is equivalent to an initial conversion price of approximately $89.25 per share of our Class A common stock. We may redeem for cash all or portions of the 2027 Notes, at our option, on or after May 5, 2024 based on certain circumstances.

*2025 Notes*

In April 2020, we entered into a purchase agreement for the sale of an aggregate of $1.0 billion principal amount of convertible senior notes due in 2025 (the "2025 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2025 Notes were $888.6 million, net of debt issuance costs and cash used to purchase the capped call transactions (the "2025 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2025 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on November 1, 2020 at a rate of 0.25% per year. The 2025 Notes mature on May 1, 2025 unless repurchased, redeemed, or converted in accordance with their terms prior to such date.

The 2025 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 46.1233 shares of Class A common stock per $1,000 principal amount of 2025 Notes, which is equivalent to an initial conversion price of approximately $21.68 per share of our Class A common stock. We may redeem for cash all or portions of the 2025 Notes, at our option, on or after May 6, 2023 based on certain circumstances.

96

*2026 Notes*

In August 2019, we entered into a purchase agreement for the sale of an aggregate of $1.265 billion principal amount of convertible senior notes due in 2026 (the "2026 Notes") in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act. The net proceeds from the issuance of the 2026 Notes were $1.15 billion, net of debt issuance costs and cash used to purchase the capped call transactions (the "2026 Capped Call Transactions") discussed below. The debt issuance costs are amortized to interest expense using the effective interest rate method.

The 2026 Notes are unsecured and unsubordinated obligations. Interest is payable in cash semi-annually in arrears beginning on February 1, 2020 at a rate of 0.75% per year. The 2026 Notes mature on August 1, 2026 unless repurchased, redeemed, or converted in accordance with the terms prior to such date.

The 2026 Notes are convertible into cash, shares of our Class A common stock, or a combination of cash and shares of our Class A common stock, at our election, at an initial conversion rate of 43.8481 shares of Class A common stock per $1,000 principal amount of 2026 Notes, which is equivalent to an initial conversion price of approximately $22.81 per share of our Class A common stock. We may redeem for cash all or portions of the 2026 Notes, at our option, on or after August 6, 2023 based on certain circumstances.

*Exchange Transactions*

In 2021, we entered into various exchange agreements (collectively, the "Exchange Agreements") with certain holders of the 2025 Notes and the 2026 Notes pursuant to which we exchanged approximately $715.9 million principal amount of the 2025 Notes and approximately $426.5 million principal amount of the 2026 Notes for aggregate consideration of approximately 52.4 million shares of Class A common stock (the "Exchange Shares"). The Exchange Shares included an additional 0.7 million shares of our Class A common stock not provided for under the original conversion terms of the 2025 Notes and the 2026 Notes to induce the holders to agree to the exchange.

The Exchange Agreements were accounted for as an induced conversion with the fair value of 0.7 million Exchange Shares, less accrued interest, recognized as an inducement expense in other income (expense), net in our consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Inducement expense recorded for the year ended December 31, 2021 was $41.5 million. The common stock consideration issued under the original terms of the 2025 Notes and 2026 Notes was accounted for under the general conversion accounting guidance with the net carrying amount of $1,132.6 million recorded in additional paid-in-capital and as a non-cash transaction excluded from cash activities on our consolidated statements of cash flows.

The Convertible Notes consisted of the following:

| | As of December 31, | | | | | |
| | 2023 | | | 2022 | | |
| | Principal | Unamortized Debt Issuance Costs | Net Carrying Amount | Principal | Unamortized Debt Issuance Costs | Net Carrying Amount |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| 2025 Notes | $ 284,105 | $ (871) | $ 283,234 | $ 284,105 | $ (1,521) | $ 282,584 |
| 2026 Notes | 838,482 | (3,402) | 835,080 | 838,482 | (4,698) | 833,784 |
| 2027 Notes | 1,150,000 | (7,114) | 1,142,886 | 1,150,000 | (9,239) | 1,140,761 |
| 2028 Notes | 1,500,000 | (11,800) | 1,488,200 | 1,500,000 | (14,609) | 1,485,391 |
| Total | $ 3,772,587 | $ (23,187) | $ 3,749,400 | $ 3,772,587 | $ (30,067) | $ 3,742,520 |

As of December 31, 2023, the debt issuance costs on the 2025 Notes, 2026 Notes, 2027 Notes, and 2028 Notes will be amortized over the remaining period of approximately 1.3 years, 2.6 years, 3.3 years and 4.2 years, respectively.

Interest expense related to the amortization of debt issuance costs was $6.9 million, $6.5 million, and $4.3 million for the years ended December 31, 2023, 2022, and 2021, respectively. Contractual interest expense was $8.9 million, $8.7 million, and $8.9 million for the years ended December 31, 2023, 2022, and 2021, respectively.

As of December 31, 2023, the if-converted value of the Convertible Notes did not exceed the principal amount. The sale price for conversion was not satisfied as of December 31, 2023 for the Convertible Notes, and as a result, the Convertible Notes will not be eligible for optional conversion during the first quarter of 2024. No sinking fund is provided for the Convertible Notes, which means that we are not required to redeem or retire them periodically.

*Capped Call Transactions*

In connection with the pricing of the 2025 Notes, the 2026 Notes, the 2027 Notes, and the 2028 Notes, we entered into the 2025 Capped Call Transactions, the 2026 Capped Call Transactions, the 2027 Capped Call Transactions, and the 2028 Capped Call Transactions (collectively, the "Capped Call Transactions"), respectively, with certain counterparties at a net cost of $100.0 million, $102.1 million, $86.8 million, and $177.0 million, respectively. The cap price of the 2025 Capped Call Transactions, the 2026 Capped Call Transactions, the 2027 Capped Call Transactions, and the 2028 Capped Call Transactions is initially $32.12, $32.58, $121.02, and $93.90 per share of our Class A common stock, respectively. All are subject to certain adjustments under the terms of the Capped Call Transactions. Conditions that cause adjustments to the initial strike price of the Capped Call Transactions mirror conditions that result in corresponding adjustments for the Convertible Notes.

The Capped Call Transactions are intended to reduce potential dilution to holders of our Class A common stock beyond the conversion prices up to the cap prices on any conversion of the Convertible Notes or offset any cash payments we are required to make in excess of the principal amount, as the case may be, with such reduction or offset subject to a cap. The cost of the Capped Call Transactions was recorded as a reduction of our additional paid-in capital in our consolidated balance sheets. The Capped Call Transactions will not be remeasured as long as they continue to meet the conditions for equity classification. As of December 31, 2023, the Capped Call Transactions were out-of-the-money.

## Credit Facility

In May 2022, we entered into a five-year senior unsecured revolving credit facility ("Credit Facility") with certain lenders that allows us to borrow up to $1.05 billion to fund working capital and general corporate-purpose expenditures. Loans bear interest, at our option, at a rate equal to (i) a term secured overnight financing rate ("SOFR") plus 0.75% or the base rate, if selected by us, for loans made in U.S. dollars, (ii) the Sterling overnight index average plus 0.7826% for loans made in Sterling, or (iii) foreign indices as stated in the credit agreement plus 0.75% for loans made in other permitted foreign currencies. The base rate is defined as the greatest of (i) the Wall Street Journal prime rate, (ii) the greater of the (a) federal funds rate and (b) the overnight bank funding rate, plus 0.50%, and (iii) the applicable SOFR for a period of one month (but not less than zero) plus 1.00. The Credit Facility also contains an annual commitment fee of 0.10% on the daily undrawn balance of the facility. As of December 31, 2023, we had $49.6 million in the form of outstanding standby letters of credit, with no amounts outstanding under the Credit Facility.

## 8. Commitments and Contingencies

### Commitments

We have non-cancelable contractual agreements primarily related to the hosting of our data processing, storage, and other computing services, as well as lease, content and developer partner, and other commitments. We had $3.0 billion in commitments as of December 31, 2023, primarily due within three years. For additional discussion on leases, see Note 9 to our consolidated financial statements.

### Contingencies

We record a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. We also disclose material contingencies when we believe a loss is not probable but reasonably possible. Accounting for contingencies requires us to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. Many legal and tax contingencies can take years to be resolved.

*Pending Matters*

In November 2021, we and certain of our officers and directors, were named as defendants in a securities class-action lawsuit purportedly brought on behalf of purchasers of our Class A common stock, alleging that we and certain of our officers made false or misleading statements and omissions concerning the impact that Apple's App Tracking Transparency framework would have on our business. We believe we have meritorious defenses to this lawsuit and

continue to defend the lawsuit vigorously. Based on the preliminary nature of the proceedings in this case, the outcome of this matter remains uncertain.

The outcomes of our legal proceedings are inherently unpredictable, subject to significant uncertainties, and could be material to our financial condition, results of operations, and cash flows for a particular period. For the pending matter described above, it is not possible to estimate the reasonably possible loss or range of loss.

We are subject to various other legal proceedings and claims in the ordinary course of business, including certain patent, trademark, privacy, regulatory, and employment matters. Although occasional adverse decisions or settlements may occur, we do not believe that the final disposition of any of our other pending matters will seriously harm our business, financial condition, results of operations, and cash flows.

**Indemnifications**

In the ordinary course of business, we may provide indemnifications of varying scope and terms to customers, vendors, lessors, investors, directors, officers, employees, and other parties with respect to certain matters. Indemnification may include losses from our breach of such agreements, services we provide, or third-party intellectual property infringement claims. These indemnifications may survive termination of the underlying agreement and the maximum potential amount of future indemnification payments may not be subject to a cap. We have not incurred material costs to defend lawsuits or settle claims related to these indemnifications as of December 31, 2023. We believe the fair value of these liabilities is immaterial and accordingly have no liabilities recorded for these agreements at December 31, 2023.

**9. Leases**

We have non-cancelable lease agreements for certain of our offices with original lease terms expiring between 2023 and 2042. Total operating lease costs were $101.0 million, $109.5 million, and $69.8 million for the years ended December 31, 2023, 2022, and 2021, respectively.

The weighted-average remaining lease term (in years) and discount rate related to the operating leases were as follows:

|  | As of December 31, | |
|---|---|---|
|  | **2023** | **2022** |
| Weighted-average remaining lease term | 10.0 | 6.8 |
| Weighted-average discount rate | 6.1 % | 5.0 % |

The maturities of our operating lease liabilities as of December 31, 2023, were as follows:

|  | Operating Leases |
|---|---|
|  | (in thousands) |
| Year ending December 31, |  |
| 2024 | $ 86,440 |
| 2025 | 72,225 |
| 2026 | 84,100 |
| 2027 | 75,521 |
| 2028 | 72,890 |
| Thereafter | 432,152 |
| Total lease payments | $ 823,328 |
| Less: Imputed interest | (227,728) |
| Present value of lease liabilities | $ 595,600 |

As of December 31, 2023, we had additional operating leases that have not yet commenced for facilities with lease obligations of $70.7 million. These operating leases will commence starting in 2024 with lease terms of approximately 7 years to 11 years.

Table of Contents

Cash payments included in the measurement of our operating lease liabilities were $97.7 million, $94.9 million, and $73.9 million for the years ended December 31, 2023, 2022, and 2021, respectively.

Lease liabilities arising from obtaining operating lease right-of-use assets were $220.2 million, $147.4 million, and $99.3 million for the years ended December 31, 2023, 2022, and 2021, respectively.

## 10. Strategic Investments

We hold strategic investments primarily in privately held companies, which consist of equity securities, and to a lesser extent, debt securities. These strategic investments are primarily recorded at fair value on a non-recurring basis. The estimation of fair value for these privately held strategic investments requires the use of significant unobservable inputs, such as the issuance of new equity by the company, and as a result, we deem these assets as Level 3 financial instruments within the fair value measurement framework.

The following table summarizes our strategic investments as of December 31, 2023 and 2022:

| | As of December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | (in thousands) | |
| Initial cost | $ 106,368 | $ 125,564 |
| Cumulative upward adjustments | 147,317 | 157,186 |
| Cumulative downward adjustments, including impairments | (58,357) | (30,411) |
| Carrying value | $ 195,328 | $ 252,339 |

Gains and losses recognized during the periods presented were as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| | (in thousands) | | |
| Gains (losses) recognized on strategic investments sold during the period, net | $ — | $ 45,935 | $ 27,820 |
| Unrealized gains on strategic investments still held at the reporting date | 1,368 | 19,946 | 145,010 |
| Unrealized losses, including impairments, on strategic investments still held at the reporting date | (28,423) | (1,421) | (2,854) |
| Gains (losses) on strategic investments, net | $ (27,055) | $ 64,460 | $ 169,976 |

Gains and losses on all strategic investments are included within other income (expense), net on our consolidated statements of operations and included as an adjustment to reconcile net loss to net cash provided by (used in) operating activities in our consolidated statements of cash flows. Strategic investments are included within other assets on our consolidated balance sheets.

## 11. Fair Value Measurements

Assets and liabilities measured at fair value are classified into the following categories:

• Level 1: Quoted market prices in active markets for identical assets or liabilities.

• Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

• Level 3: Unobservable inputs reflecting the reporting entity's own assumptions or external inputs from inactive markets.

We classify our cash equivalents and marketable securities within Level 1 or Level 2 because we use quoted market prices or alternative pricing sources and models utilizing market observable inputs to determine their fair value.

The following tables set forth our financial assets that are measured at fair value on a recurring basis, excluding publicly traded equity securities, as of December 31, 2023 and 2022:

| | December 31, 2023 | | | |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| | | (in thousands) | | |
|---|---|---|---|---|
| Cash | $ 1,780,402 | $ — | $ — | $ 1,780,402 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,295,918 | 894 | (3,919) | 1,292,893 |
| U.S. government agency securities | 138,420 | 31 | (188) | 138,263 |
| Level 2 securities: | | | | |
| Corporate debt securities | 234,336 | 577 | (99) | 234,814 |
| Commercial paper | 65,380 | — | — | 65,380 |
| Certificates of deposit | 18,725 | — | — | 18,725 |
| Total | $ 3,533,181 | $ 1,502 | $ (4,206) | $ 3,530,477 |

| | December 31, 2022 | | | |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| | | (in thousands) | | |
|---|---|---|---|---|
| Cash | $ 1,325,946 | $ — | $ — | $ 1,325,946 |
| Level 1 securities: | | | | |
| U.S. government securities | 1,630,224 | 109 | (9,484) | 1,620,849 |
| U.S. government agency securities | 175,269 | 19 | (188) | 175,100 |
| Level 2 securities: | | | | |
| Corporate debt securities | 309,942 | 32 | (1,462) | 308,512 |
| Commercial paper | 290,589 | — | — | 290,589 |
| Certificates of deposit | 157,965 | — | (1) | 157,964 |
| Total | $ 3,889,935 | $ 160 | $ (11,135) | $ 3,878,960 |

Gross unrealized losses on marketable debt securities were not material for the years ended December 31, 2023 and 2022. As of December 31, 2023 and 2022, we considered any decreases in fair value on our marketable debt securities to be driven by factors other than credit risk, including market risk. As of December 31, 2023, $760.2 million of our total $1.8 billion in marketable debt securities have contractual maturities between one and five years. All other marketable debt securities have contractual maturities less than one year.

We hold investments in publicly traded companies with an aggregate carrying value of $13.6 million and $91.5 million as of December 31, 2023 and 2022, respectively, primarily recorded as marketable securities. We classify these publicly traded equity securities within Level 1 because we use quoted market prices to determine their fair value.

101

Gains and losses recognized during the periods presented, which are included within other income (expense), net on our consolidated statements of operations, were as follows:

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| | (in thousands) | | |
| Gains (losses) recognized on publicly traded equity securities sold during the period, net | $ 11,046 | $ (22,095) | $ — |
| Unrealized gains (losses) on publicly traded equity securities still held at the reporting date, net | (17,731) | (79,214) | 122,064 |
| Gains (losses) on publicly traded equity securities, net | $ (6,685) | $ (101,309) | $ 122,064 |

We carry the Convertible Notes at face value less the unamortized debt issuance costs on our consolidated balance sheets and present the fair value for disclosure purposes only. As of December 31, 2023, the fair value of the 2025 Notes, the 2026 Notes, the 2027 Notes, and the 2028 Notes was $300.9 million, $893.2 million, $921.5 million, and $1,181.7 million, respectively. As of December 31, 2022, the fair value of the 2025 Notes, the 2026 Notes, the 2027 Notes, and the 2028 Notes was $257.0 million, $711.9 million, $796.2 million, and $1.0 billion, respectively. The estimated fair value of the Convertible Notes, which are classified as Level 2 financial instruments, was determined based on the estimated or actual bid prices of the Convertible Notes in an over-the-counter market on the last business day of the period.

## 12. Income Taxes

The domestic and foreign components of pre-tax loss were as follows:

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| | (in thousands) | | |
| Domestic [1] | $ (285,330) | $ (538,311) | $ 364,989 |
| Foreign [1] | (1,009,093) | (862,386) | (839,360) |
| Loss before income taxes | $ (1,294,423) | $ (1,400,697) | $ (474,371) |

[1] Includes the impact of intercompany charges to foreign affiliates for financing, management fees, and research and development cost sharing, inclusive of stock-based compensation.

The components of our income tax (benefit) expense were as follows:

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| | (in thousands) | | |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 8,585 | 10,704 | 919 |
| Foreign | 26,727 | 22,404 | 22,078 |
| Total current income tax expense (benefit) | 35,312 | 33,108 | 22,997 |
| Deferred: | | | |
| Federal | 1,267 | 1,212 | (6,295) |
| State | 1,061 | 837 | (445) |
| Foreign | (9,578) | (6,201) | (2,673) |
| Total deferred income tax expense (benefit) | (7,250) | (4,152) | (9,413) |
| Income tax expense (benefit) | $ 28,062 | $ 28,956 | $ 13,584 |

The following is a reconciliation of the statutory federal income tax rate to our effective tax rate:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Tax benefit (expense) computed at the federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| State tax benefit (expense), net of federal benefit [1] | 2.2 | 2.9 | 31.5 |
| Change in valuation allowance | (31.5) | (32.0) | (246.3) |
| Differences between U.S. and foreign tax rates on foreign income | 3.3 | 2.5 | 3.9 |
| Stock-based compensation | (7.0) | (0.1) | 119.3 |
| U.S. federal research & development credit benefit | 8.6 | 5.0 | 36.7 |
| U.K. corporate rate increase | — | — | 39.8 |
| Acquisitions and divestitures | 1.8 | (0.7) | (8.0) |
| Other benefits (expenses) | (0.6) | (0.7) | (0.8) |
| Total income tax benefit (expense) | (2.2)% | (2.1)% | (2.9)% |

(1)   Inclusive of state research and development credits.

The significant components of net deferred tax balances were as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | (in thousands) | |
| Deferred tax assets: | | |
| Accruals and reserves | $ 22,475 | $ 37,731 |
| Intangible assets | 168,661 | 177,762 |
| IRC 174 capitalized R&D | 449,253 | 265,485 |
| Stock-based compensation | 70,563 | 102,364 |
| Loss carryforwards | 2,774,231 | 2,651,812 |
| Tax credit carryforwards | 969,368 | 824,220 |
| Lease liability | 126,637 | 98,668 |
| Other | 51,764 | 20,154 |
| Total deferred tax assets | 4,632,952 | 4,178,196 |
| Deferred tax liabilities: | | |
| Right-of-use asset | (111,777) | (75,212) |
| Investments | (20,183) | (30,962) |
| Other | (28,416) | (17,309) |
| Total deferred tax liabilities | (160,376) | (123,483) |
| Total net deferred tax assets before valuation allowance | 4,472,576 | 4,054,713 |
| Valuation allowance | (4,471,571) | (4,060,943) |
| Net deferred taxes | $ 1,005 | $ (6,230) |

On December 20, 2021, the Organisation for Economic Co-operation and Development ("OECD") published Pillar Two Model Rules defining the global minimum tax, which calls for the taxation of large corporations at a minimum rate of 15%. The OECD has since issued administrative guidance providing transition and safe harbor rules around the implementation of the Pillar Two global minimum tax. A number of countries, including the United Kingdom, are currently proposing or have enacted legislation to implement core elements of the Pillar Two proposal by the start of 2024. On February 1, 2023, the FASB indicated that they believe the minimum tax imposed under Pillar Two is an alternative minimum tax, and, accordingly, deferred tax assets and liabilities associated with the minimum tax would not be recognized or adjusted for the estimated future effects of the minimum tax but would be recognized in the period incurred. While we are still closely monitoring developments and evaluating the potential impact on future periods, we do not expect

Pillar Two to have a significant impact on our financial results, particularly due to safe harbor relief during the transition period.

Beginning January 1, 2022, the Tax Cuts and Jobs Act eliminated the option to currently deduct research and development expenditures in the period incurred and required taxpayers to capitalize and amortize such expenditures over five or fifteen years, as applicable, pursuant to Section 174 of the Internal Revenue Code. Although this tax law change did not result in any U.S. federal tax liability through December 31, 2023 due to the use of existing U.S. federal net operating loss carryforwards, it did result in incremental state tax liability and expense due to limitations on the use of existing state net operating loss carryforwards.

On June 10, 2021, the U.K. Finance Act 2021 was enacted, increasing the U.K. tax rate from 19% to 25% effective April 1, 2023. This change in tax rate resulted in a $188.9 million increase to our U.K. net deferred tax assets, which was fully offset by an increase in our valuation allowance, for the period ending December 31, 2021.

As of December 31, 2023, we had an immaterial amount of unremitted earnings related to certain foreign subsidiaries. We intend to continue to reinvest these foreign earnings indefinitely and do not expect to incur any significant taxes related to such amounts.

As of December 31, 2023, we had accumulated U.S. federal and state net operating loss carryforwards of $6.7 billion and $4.5 billion, respectively. Of the $6.7 billion of federal net operating loss carryforwards, $0.5 billion was generated before January 1, 2018 and is subject to a 20-year carryforward period. The remaining $6.2 billion can be carried forward indefinitely but is subject to an 80% taxable income limitation. The pre-2018 federal and certain significant state net operating loss carryforwards will begin to expire in 2037 and 2031, respectively. As of December 31, 2023, we had $4.5 billion of U.K. net operating loss carryforwards that can be carried forward indefinitely; however, use of such carryforwards in a given year is generally limited to 50% of such year's taxable income. As of December 31, 2023, we had accumulated U.S. federal and state research tax credits of $816.6 million and $478.9 million, respectively. The U.S. federal research tax credits will begin to expire in 2032. The U.S. state research tax credits do not expire.

We recognize valuation allowances on deferred tax assets if it is more likely than not that some or all of the deferred tax assets will not be realized. We had valuation allowances against net deferred tax assets of $4.5 billion and $4.1 billion as of December 31, 2023 and 2022, respectively. In 2023, the increase in the valuation allowance was primarily attributable to a net increase in our deferred tax assets resulting from the loss from operations.

**Uncertain Tax Positions**

The following table summarizes the activity related to our gross unrecognized tax benefits for the years ended December 31, 2023, 2022, and 2021:

|  | Year Ended December 31, | | |
|  | 2023 | 2022 | 2021 |
| --- | --- | --- | --- |
|  | (in thousands) | | |
| Beginning balance of unrecognized tax benefits | $ 510,669 | $ 469,573 | $ 344,971 |
| Additions for current year tax positions | 46,188 | 47,366 | 119,938 |
| Additions for prior year tax positions | 10,171 | 115 | 180 |
| Reductions for prior year tax positions | (16,736) | (3,569) | (996) |
| Changes due to lapse of statute of limitations | (31,786) | (1,887) | (2,077) |
| Reductions for settlements with taxing authorities | (4,927) | — | — |
| Changes due to foreign currency translation adjustments | (175) | (929) | (357) |
| U.K. corporate rate increase | — | — | 7,914 |
| Ending balance of unrecognized tax benefits (excluding interest and penalties) | 513,404 | 510,669 | 469,573 |
| Interest and penalties associated with unrecognized tax benefits | 967 | 385 | 124 |
| Ending balance of unrecognized tax benefits (including interest and penalties) | $ 514,371 | $ 511,054 | $ 469,697 |

Substantially all of the unrecognized tax benefit was recorded as a reduction in our gross deferred tax assets, offset by a corresponding reduction in our valuation allowance. We have net unrecognized tax benefits of $27.3 million and $21.7 million included in other liabilities on our consolidated balance sheet as of December 31, 2023 and 2022, respectively, which, if recognized, would result in a tax benefit.

Our policy is to recognize interest and penalties associated with tax matters as part of the income tax provision and include accrued interest and penalties with the related income tax liability on our consolidated balance sheet. During the year ended December 31, 2023, interest expense recorded related to uncertain tax positions was not material.

The income taxes we pay are subject to potential review by taxing jurisdictions globally. Our estimate of the potential outcome of any uncertain tax position is subject to management's assessment of relevant risks, facts, and circumstances existing at that time. We believe that our estimate has adequately provided for these matters. However, our future results may include adjustments to estimates in the period the audits are resolved, which may impact our effective tax rate.

The material tax jurisdictions in which we are subject to potential examination include the United States for tax years ending on or after 2012, and the United Kingdom for tax years ending on or after 2020. We are currently under examination by the U.K. tax authorities for tax years 2020 and 2021, and also in various other jurisdictions covering multiple tax years.

## 13. Accumulated Other Comprehensive Income (Loss)

The table below presents the changes in accumulated other comprehensive income (loss) ("AOCI") by component and the reclassifications out of AOCI:

| | Changes in Accumulated Other Comprehensive Income (Loss) by Component | | |
| --- | --- | --- | --- |
| | Marketable Securities | Foreign Currency Translation | Total |
| | (in thousands) | | |
| Balance at December 31, 2022 | $ (11,129) | $ (2,845) | $ (13,974) |
| OCI before reclassifications | 8,643 | 12,836 | 21,479 |
| Amounts reclassified from AOCI [1] | (374) | — | (374) |
| Net current period OCI | 8,269 | 12,836 | 21,105 |
| Balance at December 31, 2023 | $ (2,860) | $ 9,991 | $ 7,131 |

(1)   Realized gains and losses on marketable securities are reclassified from AOCI into other income (expense), net in our consolidated statements of operations.

**14. Property and Equipment, Net**

Property and equipment, net, consisted of the following:

| | As of December 31, | | |
|---|---|---|---|
| | **2023** | | **2022** |
| | (in thousands) | | |
| Computer hardware and software | $ | 67,989 | $ | 62,945 |
| Buildings | | 21,486 | | 21,486 |
| Leasehold improvements | | 332,721 | | 225,647 |
| Furniture and equipment | | 162,476 | | 100,025 |
| Construction in progress | | 90,038 | | 80,267 |
| Total | | 674,710 | | 490,370 |
| Less: accumulated depreciation and amortization | | (264,384) | | (218,593) |
| Property and equipment, net | $ | 410,326 | $ | 271,777 |

Depreciation and amortization expense on property and equipment was $87.3 million, $69.9 million, and $55.9 million for the years ended December 31, 2023, 2022, and 2021, respectively. Noncash property and equipment additions in accounts payable, accrued expenses and other current liabilities were $44.5 million, $28.0 million, and $14.2 million as of December 31, 2023, 2022, and 2021, respectively.

The following table lists property and equipment, net by geographic area:

| | As of December 31, | | |
|---|---|---|---|
| | **2023** | | **2022** |
| | (in thousands) | | |
| United States | $ | 247,106 | $ | 214,857 |
| United Kingdom | | 122,013 | | 36,774 |
| Rest of world [1] | | 41,207 | | 20,146 |
| Total property and equipment, net | $ | 410,326 | $ | 271,777 |

(1)    No individual country exceeded 10% of our total property and equipment, net for any period presented.

**15. Balance Sheet Components**

Accrued expenses and other current liabilities at December 31, 2023 and 2022 consisted of the following:

| | As of December 31, | | |
|---|---|---|---|
| | **2023** | | **2022** |
| | (in thousands) | | |
| Accrued infrastructure costs | $ | 281,682 | $ | 169,886 |
| Partner revenue share liabilities | | 99,877 | | 83,395 |
| Accrued compensation and related expenses | | 95,600 | | 206,441 |
| Deferred revenue [1] | | 93,706 | | 50,782 |
| Other operating costs | | 75,905 | | 75,376 |
| Acquisition liabilities | | 7,359 | | 293,332 |
| Other | | 151,707 | | 108,128 |
| Total accrued expenses and other current liabilities | $ | 805,836 | $ | 987,340 |

(1)    We expect a substantial majority of our deferred revenue to be realized in less than one year.

**16. Employee Benefit Plans**

We have a defined contribution 401(k) plan (the "401(k) Plan") for our U.S.-based employees. The 401(k) Plan is available for all full-time employees who meet certain eligibility requirements. Eligible employees may contribute up to 100% of their eligible compensation, but are limited to the maximum annual dollar amount allowable under the Code. We match 100% of each participant's contribution up to a maximum of 3% of the participant's eligible compensation paid during the period, and also match 50% of each participant's contribution between 3% and 5% of the participant's eligible compensation paid during the period. During the years ended December 31, 2023, 2022, and 2021, we recognized expense of $34.0 million, $33.6 million, and $25.0 million, respectively, related to matching contributions.

**17. Related Party Transactions**

In November 2020, we entered into a ground sublease with an entity that is controlled by our CEO that allows us to build and operate a hangar to support our aviation program. This entity subleases the ground to us for $0 and in exchange may utilize a specified percentage of the hangar space. If the entity needs additional space within the hangar, it will pay rent to Snap at a fair market value rate determined at the time this arrangement was entered into. Any space utilized by this entity will be space that is not required for Snap's aviation program. Subject to certain limited exceptions, neither party may terminate this sublease for at least six years. After this period, Snap or this entity may terminate the lease at any time on 24 months' prior written notice. Upon termination of the sublease, this entity will purchase the hangar from Snap at its fair market value on the termination date.

The value of these arrangements is not material to our consolidated financial statements for the periods presented or for the term of the agreement.

**18. Restructuring**

**AR Enterprise Strategic Review**

In the third quarter of 2023, we initiated the wind down of our AR Enterprise business, which included a reduction of our global employee headcount by approximately 3%. We substantially completed the program in the fourth quarter of 2023.

During the year ended December 31, 2023, we recognized pre-tax restructuring charges of $40.8 million, primarily recorded in sales and marketing and general and administrative expenses in our consolidated statement of operations, and an income tax benefit of $5.7 million. The pre-tax restructuring charges primarily include cash severance, stock-based compensation expense, and charges related to the revision of the useful lives and disposal of certain acquired intangible assets.

**Strategic Reprioritization**

In the third quarter of 2022, we initiated a strategic reprioritization plan, which included a reduction of our global employee headcount by approximately 20%. We substantially completed the reprioritization plan in the fourth quarter of 2022.

The following table summarizes the restructuring charges (benefits) in our consolidated statements of operations for the year ended December 31, 2022:

| | Severance and Related Charges [1] | Stock-Based Compensation Expense (Benefit) | Lease Exit and Related Charges [2] | Other [3] | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Cost of revenue | $ 2,291 | $ 709 | $ — | $ 17,585 | $ 20,585 |
| Research and development | 46,994 | 29,188 | — | 2,733 | 78,915 |
| Sales and marketing | 30,565 | (504) | — | 730 | 30,791 |
| General and administrative | 17,211 | 5,111 | 31,227 | 5,109 | 58,658 |
| Total | $ 97,061 | $ 34,504 | $ 31,227 | $ 26,157 | $ 188,949 |

(1)     Severance and related charges include cash severance expense and other termination benefits. The majority of cash paid for restructuring in 2022 was related to severance and benefits.

(2)     Lease exit and related charges are non-cash and presented in other cash flows from operating activities in our consolidated statements of cash flows.

(3)     Other includes impairment charges, contract termination charges, and intangible asset amortization.

The liabilities related to the strategic reprioritization plan were immaterial as of December 31, 2023 and 2022.

## 19. Subsequent Events

On February 5, 2024, we announced a plan to reduce our global headcount by approximately 10% of our global full-time employees. As a result, we currently estimate that we will incur pre-tax charges in the range of $55 million to $75 million, primarily consisting of severance and related costs, and other charges, of which $45 million to $55 million are expected to be future cash expenditures. The majority of these costs are expected to be incurred during the first quarter of 2024.

Table of Contents

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2023, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in this Annual Report on Form 10-K was (a) reported within the time periods specified by SEC rules and regulations, and (b) communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding any required disclosure.

*Changes in Internal Control*

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Limitations on Effectiveness of Controls and Procedures*

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

*Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2023 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Ernst & Young LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 in this Annual Report on Form 10-K.

**Item 9B. Other Information**

*Insider Trading Arrangements*

During the quarter ended December 31, 2023, our directors and officers (as defined in Rule 16a-1(f) under the Exchange Act) adopted or terminated the contracts, instructions, or written plans for the purchase or sale of our securities set forth in the table below:

| Name and Position | Date | Type of Trading Arrangement | | Expiration Date | Total Shares of Class A Common Stock to be Sold |
|---|---|---|---|---|---|
| | | Action | Rule 10b5-1 [1] | | |
| Michael O'Sullivan, General Counsel | 11/20/2023 | Adoption | X | 1/31/2025 | 216,160 |

(1)     Contract, instruction, or written plan intended to satisfy the affirmative defense conditions of Rule 10b5-1(c) under the Exchange Act.

***2024 Discretionary Bonus Program***

On February 5, 2024, the compensation committee of our board of directors approved the 2024 Bonus Program. The 2024 Bonus Program provides executive officers and other eligible employees the opportunity to earn bonuses for the period from January 1, 2024 through December 31, 2024. Bonuses will be based on the achievement of certain company-wide priorities and objectives and the contributions and efforts of the eligible participants, in each case as determined by the compensation committee.

After December 31, 2024, we will evaluate the level of achievement of certain company-wide priorities and objectives, and the contributions and efforts of the eligible participants, for review and final approval by the compensation committee. Each eligible participant in the 2024 Bonus Program may receive a bonus in an amount up to 50% of such participant's annual base salary as at December 31, 2024. The compensation committee may pay all or any portion of an earned bonus in shares of Class A common stock granted under the Snap Inc. 2017 Equity Incentive Plan. The compensation committee also has the right to adjust the bonus target of any participant upward in the event of over-achievement of the corporate objectives and key results.

There is no set formula for determining the bonus amount under the 2024 Bonus Program. Rather, the compensation committee will exercise its discretion in determining the bonus amount actually earned by each participant. Awards under the 2024 Bonus Program are expected to occur in the first quarter of 2025. A participant must remain an employee on the payment date under the 2024 Bonus Program to be eligible to earn a bonus.

The description of the 2024 Bonus Program does not purport to be complete and is qualified in its entirety by reference to the 2024 Bonus Program, a copy of which is attached as Exhibit 10.27 and incorporated by reference.

We are including this disclosure in Item 9B of this Form 10-K rather than filing a Form 8-K under Item 5.02 at a later date.

**Item 9C. Disclosure Regarding Foreign Jurisdictions That Prevent Inspections.**

Not applicable.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance.**

The following table sets forth information for our directors and executive officers, and their ages as of December 31, 2023.

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| Evan Spiegel | 33 | Co-Founder, Chief Executive Officer, and Director |
| Robert Murphy | 35 | Co-Founder, Chief Technology Officer, and Director |
| Derek Andersen | 45 | Chief Financial Officer |
| Rebecca Morrow | 50 | Chief Accounting Officer |
| Michael O'Sullivan | 58 | General Counsel |
| Eric Young | 47 | Senior Vice President of Engineering |
| *Non-Employee Directors* | | |
| Michael Lynton [(1)(2)(3)] | 64 | Director and Chairperson of the Board |
| Kelly Coffey [(3)] | 58 | Director |
| Joanna Coles [(2)] | 61 | Director |
| Liz Jenkins [(3)] | 46 | Director |
| Scott D. Miller [(1)(3)] | 71 | Director |
| Patrick Spence | 49 | Director |
| Poppy Thorpe [(1)(3)] | 39 | Director |
| Fidel Vargas [(2)] | 55 | Director |

(1)     Member of the compensation committee.
(2)     Member of the nominating and corporate governance committee.
(3)     Member of the audit committee.

**Executive Officers**

*Evan Spiegel.* Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. Mr. Spiegel has served on the board of directors of KKR & Co. Inc. since October 2021. We believe that Mr. Spiegel is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Executive Officer.

*Robert Murphy.* Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Murphy is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Technology Officer.

*Derek Andersen.* Mr. Andersen has served as our Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A. from Acadia University, an M.B.A. from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

*Rebecca Morrow.* Ms. Morrow has served as our Chief Accounting Officer since September 2019. From January 2018 to August 2019, Ms. Morrow served as Chief Accounting Officer at GoDaddy Inc., and previously served as Vice President of Finance and Head of Technical Accounting and Reporting from March 2015 to January 2018. Prior to that, Ms. Morrow served in various roles at Deloitte & Touche LLP, most recently serving as Managing Director in the Advisory Services practice from August 2013 to March 2015, and as Senior Manager in the Advisory Services practice

111

from October 2008 to August 2013. Ms. Morrow holds a B.S. in Business and Accounting from the University of Idaho and a Masters of Accountancy degree from the David Eccles School of Business of the University of Utah.

*Michael O'Sullivan*. Mr. O'Sullivan has served as our General Counsel since July 2017. From 1992 to July 2017, Mr. O'Sullivan was a lawyer in private practice. He served since 1996 as a lawyer at the law firm of Munger, Tolles & Olson LLP in Los Angeles, California, where he focused his practice on advising companies, their boards of directors, and founders on corporate transactions, governance matters, and significant disputes. Mr. O'Sullivan holds a J.D. from University of Southern California's Gould School of Law and a B.A. from University of Pennsylvania.

*Eric Young*. Mr. Young has served as our Senior Vice President of Engineering since June 2023. Mr. Young was previously employed at Alphabet Inc., serving in a variety of roles, most recently as Vice President of Engineering at Google. Prior to Google, Mr. Young served in a variety of roles at Amazon.com, Inc. Mr. Young holds a B.S. from Vanderbilt University and an M.B.A. from the Wharton School at the University of Pennsylvania.

## Non-Employee Directors

*Michael Lynton*. Mr. Lynton has served on our board of directors since April 2013 and has been Chairperson of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton has served as a member of the board of directors of Ares Management Corporation since 2014, Warner Music Group Corp. since 2019, and Schrodinger, Inc. since 2018. Mr. Lynton also served as a member of the board of directors of Pandora Media, Inc., Pearson plc, and The Boston Beer Company. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School. We believe that Mr. Lynton is qualified to serve as a member of our board of directors and Chairperson due to his extensive leadership experience.

*Kelly Coffey*. Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey has served as Chief Executive Officer at City National Entertainment, a unit of City National Bank, since November 2023. Ms. Coffey served as Chief Executive Officer of City National Bank, a subsidiary of the Royal Bank of Canada (RBC), from February 2019 to November 2023. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently serving as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College. We believe that Ms. Coffey is qualified to serve as a member of our board of directors due to her extensive leadership experience.

*Joanna Coles*. Ms. Coles has served on our board of directors since December 2015. Ms. Coles served as chairperson and Chief Executive Officer of Northern Star Acquisition Corp. from July 2020 until its merger with Bark, Inc. in June 2021. Previously, Ms. Coles served as Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Sonos, Inc., and is on the board of Women Entrepreneurs New York City, an initiative to encourage female entrepreneurship, with a focus on underserved communities and the Fallen Journalists Memorial Fund. Previously, Ms. Coles served as a director of Bark, Inc., Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia. We believe that Ms. Coles is qualified to serve as a member of our board of directors due to her extensive experience working with content providers and advertisers.

*Liz Jenkins*. Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Business Officer at NBCUniversal Studio Group since September 2023. Ms. Jenkins served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) from January 2021 to September 2023, and Chief Financial Officer from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October 2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves as Chair of the board of GLAAD. Ms. Jenkins holds an M.B.A. from The Wharton School at the University of Pennsylvania and a B.A. in Economics from Stanford University. We believe that Ms. Jenkins is qualified to serve as a member of our board of

directors and chair of our audit committee due to her experience working with digital and technology companies and her financial and accounting expertise from her prior experience as Chief Financial Officer of Hello Sunshine.

*Scott D. Miller*. Mr. Miller has served on our board of directors since October 2016. Mr. Miller is a founder and Chief Executive Officer of Council Advisors (formerly known as G100 Companies), and is also a founder and chairman of G100 Network and SSA & Company. Before joining Council Advisors in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller served on the boards of QTS Realty Trust, Inc. from 2013 to 2021, Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago. We believe that Mr. Miller is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Patrick Spence*. Mr. Spence has served on our board of directors since September 2023. Mr. Spence has served as Chief Executive Officer and member of the board of directors of Sonos, Inc. since January 2017. Prior to joining Sonos, Mr. Spence spent 14 years at Research In Motion Limited, a consumer electronics company and the developer of the BlackBerry device, in a variety of senior roles, including most recently as the Senior Vice President and Managing Director of Global Sales and Regional Marketing. Mr. Spence holds a B.A. in business administration from the Ivey Business School at the University of Western Ontario. We believe that Mr. Spence is qualified to serve as a member of our board of directors due to his extensive leadership experience.

*Poppy Thorpe*. Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe has served as CEO and co-founder of There, There, a marketing and strategy consultancy, since March 2022. Previously, Ms. Thorpe was a freelance brand consultant from June 2021 to February 2022, served as Chief Marketing Officer at Sesame Inc. from March 2020 to May 2021, Head of Brand Marketing at Glossier Inc., a beauty brand, from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017. Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco. We believe that Ms. Thorpe is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies and with advertisers.

*Fidel Vargas*. Mr. Vargas has served on our board of directors since July 2021. Mr. Vargas has served as Chief Executive Officer of the Hispanic Scholarship Fund since January 2013. Prior to joining the Hispanic Scholarship Fund, Mr. Vargas worked as a Partner at Centinela Capital Partners from June 2006 to December 2012, and from 1992 to 1997, Mr. Vargas served as Mayor for the City of Baldwin Park, California. Mr. Vargas serves on the President's Commission on White House Fellowships. Mr. Vargas holds an M.B.A. and an A.B. in Social Studies from Harvard University. We believe that Mr. Vargas is qualified to serve as a member of our board of directors due to his extensive leadership experience.

There are no family relationships among any of the directors or executive officers.

## Independent Chairperson

Our board of directors appointed Mr. Lynton to serve as our independent Chairperson of our board of directors in September 2016. As Chairperson of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present. Mr. Lynton also performs such additional duties as our board of directors may otherwise determine and delegate. Mr. Lynton is an independent director and satisfies the independence requirements under NYSE listing standards.

## Composition of Our Board of Directors

Our board of directors may establish the authorized number of directors from time to time by resolution. Our board of directors currently consists of ten members.

No stockholder has any special rights regarding the election or designation of members of our board of directors. There is no contractual arrangement by which any of our directors are appointed to our board of directors. Our current directors will continue to serve as directors until our 2024 annual meeting of stockholders and until their successor is duly elected, or if sooner, until their earlier death, resignation, or removal.

113

So long as any shares of our Class C common stock are outstanding, we will not have a classified board of directors, and all directors will be elected for annual terms.

Following the conversion of all of our Class C common stock to Class B common stock, and subsequent conversion of all of our Class B common stock to Class A common stock, we will have a classified board of directors consisting of three classes. Each class will be approximately equal in size, with each director serving staggered three-year terms. Directors will be assigned to a class by the then-current board of directors.

When our board of directors is classified, we expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change in control.

Our board of directors held six meetings during 2023. No member of our board of directors attended fewer than 75% of the aggregate of (a) the total number of meetings of the board of directors (held during the period for which he or she was a director) and (b) the total number of meetings held by all committees of the board of directors on which such director served (held during the period that such director served). Members of our board of directors are invited and encouraged to attend our annual meeting of stockholders. In 2023, nine members of our board of directors attended our annual meeting of stockholders (at the time of the 2023 annual meeting of stockholders, our board of directors consisted of nine members).

## Executive Sessions of Independent Directors

In order to promote open discussion among non-management directors, and as required under applicable NYSE rules, our board of directors conducts executive sessions of non-management directors during each regularly scheduled board meeting and at such other times if requested by a non-management director. In 2023, the non-management directors met in executive session at least once. The non-management directors provide feedback to executive management, as needed, promptly after the executive session. Neither Mr. Spiegel nor Mr. Murphy participates in such sessions. As Chairperson of our board of directors, Mr. Lynton presides over meetings of our independent directors without management present.

## Committees of Our Board of Directors

Our board of directors has established an audit committee, a compensation committee, and a nominating and corporate governance committee. The composition and responsibilities of each of these committees of our board of directors are described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Our board of directors may have or establish other committees as it deems necessary or appropriate from time to time.

### *Audit Committee*

Our audit committee consists of Ms. Coffey, Ms. Jenkins, Mr. Lynton, Mr. Miller, and Ms. Thorpe. Stanley Meresman was a member of the audit committee until the expiration of his board term on July 24, 2023. Our board of directors has determined that each of Ms. Coffey, Ms. Jenkins, Mr. Lynton, Mr. Miller, and Ms. Thorpe satisfies, and, until the expiration of his board term, Mr. Meresman satisfied, the independence requirements under NYSE listing standards and Rule 10A-3(b)(1) of the Exchange Act. The chair of our audit committee is Ms. Jenkins, who our board of directors has determined is an "audit committee financial expert" within the meaning of SEC regulations. Each member of our audit committee can read and understand fundamental financial statements in accordance with applicable requirements. In arriving at these determinations, the board of directors has examined each audit committee member's scope of experience and the nature of their employment in the corporate finance sector. No member of the audit committee simultaneously serves on the audit committees of more than three public companies. During 2023, the audit committee met six times. Our board of directors has adopted a written charter for the audit committee, which is available on our website at www.snap.com.

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits, and to oversee our independent registered accounting firm.

Specific responsibilities of our audit committee include:

- helping our board of directors oversee our corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related person transactions;

- reviewing cybersecurity and data privacy risks;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes our internal quality control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and

- approving, or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

### *Compensation Committee*

Our compensation committee consists of Mr. Lynton, Mr. Miller, and Ms. Thorpe, each of whom our board of directors has determined is independent under NYSE listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act. The chair of our compensation committee is Mr. Lynton. During 2023, the compensation committee met four times. Our board of directors has adopted a written charter for the compensation committee, which is available on our website at www.snap.com.

The primary purpose of our compensation committee is to discharge the responsibilities of our board of directors in overseeing our compensation policies, plans, and programs for directors and employees and to review and determine the compensation to be paid to our executive officers and other senior management, as appropriate.

Specific responsibilities of our compensation committee include:

- reviewing and approving the compensation of our Chief Executive Officer, other executive officers, and senior management;

- reviewing and recommending to our board of directors the compensation paid to our directors;

- reviewing and approving the compensation arrangements with our executive officers and other senior management;

- administering our equity incentive plans and other benefit programs;

- reviewing, adopting, amending, and terminating incentive compensation and equity plans, severance agreements, profit sharing plans, bonus plans, change-of-control protections, and any other compensatory arrangements for our executive officers and other senior management;

- reviewing, evaluating, and recommending to our board of directors succession plans for our executive officers;

- reviewing and establishing general policies relating to compensation and benefits of our employees, including our overall compensation philosophy; and

- reviewing and approving policies and procedures with respect to perquisites or other personal benefits provided to executive officers, directors, and other senior management.

See the sections titled "Item 11. Executive Compensation—Compensation Discussion and Analysis" and "—Director Compensation" for a description of our processes and procedures for the consideration and determination of executive officer and director compensation.

*Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Ms. Coles, Mr. Lynton, and Mr. Vargas, each of whom our board of directors has determined is independent under the NYSE listing standards, a non-employee director, and free from any relationship that would interfere with the exercise of his or her independent judgment. The chair of our nominating and corporate governance committee is Ms. Coles. During 2023, the nominating and corporate governance committee met four times. Our board of directors has adopted a written charter for the nominating and corporate governance committee, which is available on our website at www.snap.com.

Specific responsibilities of our nominating and corporate governance committee include:

- identifying and evaluating candidates, including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on our board of directors;

- considering and making recommendations to our board of directors regarding the composition and chairperson of the committees of our board of directors;

- instituting plans or programs for the continuing education of our board of directors and orientation of new directors;

- developing and making recommendations to our board of directors regarding corporate governance guidelines and matters;

- overseeing periodic evaluations of the board of directors' performance, including committees of the board of directors; and

- monitoring, reviewing, and making recommendations to our board of directors regarding its succession planning.

## Code of Conduct

We have adopted a Code of Conduct that applies to all our employees, officers, and directors. This includes our principal executive officer, principal financial officer, and principal accounting officer or controller, or persons performing similar functions. The full text of our Code of Conduct is available on our website at www.snap.com. We intend to disclose on our website any future amendments of our Code of Conduct or waivers that exempt any principal executive officer, principal financial officer, principal accounting officer or controller, persons performing similar functions, or our directors from provisions in the Code of Conduct. You can request a copy of our Code of Conduct by writing to our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

Our board of directors believes that good corporate governance is important to ensure that the company is managed for the long-term benefit of our stockholders. The full text of our corporate governance guidelines is also available on our website at www.snap.com.

## Procedures by Which Stockholders May Nominate Directors

The nominating and corporate governance committee and our board of directors will review and evaluate candidates proposed by stockholders. The nominating and corporate governance committee and our board of directors will apply the same criteria, and follow substantially the same process in considering the candidates, as they do in considering other candidates. The factors generally considered by the nominating and corporate governance committee and our board of directors are set out in our Corporate Governance Guidelines, which are available on our website at www.snap.com. If a stockholder who is eligible to vote at the 2024 annual meeting of stockholders wishes to nominate a candidate to be considered for election as a director, it must comply with the procedures set forth in our bylaws and give timely notice of the nomination in writing to our Secretary. All stockholder proposals should be marked for the attention of our Secretary at Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

## Communications with the Board of Directors

Any stockholder, including a holder of Class A common stock, or any interested party may contact our board of directors regarding genuine issues or questions about us by sending a letter to the board of directors at: Snap Inc., c/o Secretary, 3000 31st Street, Santa Monica, CA 90405, Attention: Board of Directors. Each communication should specify the person sending the communication, the general topic of the communication, and the class and number of shares of our stock that are owned of record (if a record holder) or beneficially (if not a record holder). If any stockholder, including a holder of Class A common stock, wants to contact the independent members of the board of directors, the stockholder

Table of Contents

should address the communication to the attention of the Chairperson (c/o Secretary) of the board of directors at the address above. Our legal department will review communications before forwarding them to the recipient, and will not forward a communication that is unrelated to the duties and responsibilities of the board of directors, irrelevant, primarily commercial in nature, addressed already on our website or in other filings, or is unduly hostile, threatening, illegal, or similarly unsuitable. Any communication that is not forwarded will be made available to any director on request.

## Delinquent Section 16(a) Reports

Section 16(a) of the Exchange Act requires our executive officers and directors to file initial reports of ownership and reports of changes in ownership with the SEC and to furnish us with copies of all Section 16(a) forms they file. Because our Class A common stock is non-voting, significant holders of our common stock are exempt from the obligation to file reports under Section 16 of the Exchange Act. For more information, see "Risk Factors—Because our Class A common stock is non-voting, we and our stockholders are exempt from certain provisions of U.S. securities laws. This may limit the information available to holders of our Class A common stock."

To our knowledge, based solely on our review of the copies of such reports furnished to us or written representations from such persons, we believe that, with respect to the year ended December 31, 2023, such persons complied with all such filing requirements.

## Item 11. Executive Compensation.

### Compensation Discussion and Analysis

The compensation provided to our named executive officers is detailed in the Summary Compensation Table, other tables and the accompanying footnotes, and narrative following this section. This compensation discussion and analysis summarizes the material aspects of our compensation programs that we provide to our named executive officers. Our named executive officers for 2023 were:

- Evan Spiegel, Co-Founder and Chief Executive Officer;

- Derek Andersen, Chief Financial Officer;

- Rebecca Morrow, Chief Accounting Officer;

- Michael O'Sullivan, General Counsel;

- Eric Young, Senior Vice President of Engineering; and

- Jerry Hunter, Chief Operating Officer.

Our board of directors has delegated to the compensation committee the authority and responsibility for reviewing, evaluating, and determining the compensation to be paid to executive officers, overseeing our compensation policies, and administering the compensation plans and programs for our company.

### General Compensation Philosophy and Objectives

#### *Philosophy*

We seek kind, smart, and creative individuals to accomplish our business goals. Our compensation philosophy supports this objective by attracting the best people to join our company and incentivizing them to innovate, create, and drive long-term results.

Today, we compensate our executive officers mostly with equity that vests over multiple years. Our focus on equity compensation encourages executives to operate like owners, linking their interests with the interests of our stockholders. We evaluate our compensation philosophy and programs annually to ensure they continue to meet our objectives.

#### *Objectives*

We designed our compensation program for all employees, including our named executive officers, to support four main objectives:

- recruit and retain the most talented people in a competitive market;

- reinforce our values, which serve to motivate our employees to deliver the highest level of performance;

Table of Contents

- reward success when both our company and the individual succeed; and

- align employee and stockholder interests to share in long-term success.

**Compensation-Setting Process**

*Compensation Committee's Role*

The compensation committee has overall responsibility for determining the compensation of our executive officers, including our Chief Executive Officer. Members of the compensation committee are appointed by our board of directors. The compensation committee consists of three members of our board of directors: Michael Lynton, Scott D. Miller, and Poppy Thorpe. No member of the compensation committee is, or was in 2023, an executive officer of Snap Inc., and each of them qualifies as an "independent director" under the NYSE rules.

*Compensation Consultant's Role*

The compensation committee has the authority to engage the services of outside consultants. For the first half of 2023, the compensation committee retained FW Cook as its compensation consultants. In 2023, the compensation committee reviewed bids for compensation consulting services from multiple firms. Following this review, it determined to retain Semler Brossy Consulting Group, or Semler Brossy, as its independent compensation consultant going forward. Semler Brossy reports directly to the compensation committee.

In January 2024, our compensation committee reviewed Semler Brossy's independence under applicable SEC and NYSE rules. Our compensation committee concluded that Semler Brossy is independent within the meaning of such rules and that its engagement did not present any conflict of interest.

*Management's Role*

Management makes recommendations to the compensation committee regarding our compensation programs and policies, and implements the programs and policies approved by the compensation committee. Our Chief Executive Officer makes recommendations to the compensation committee with respect to compensation for our executive officers, including our named executive officers, other than himself. The compensation committee considers our Chief Executive Officer's recommendations, but ultimately has final approval of all compensation for our executive officers, including the types of award and specific amounts. All such determinations by our compensation committee are discretionary. Our co-founders, who serve as Chief Executive Officer and Chief Technology Officer, respectively, each have base salaries of $1 per year and did not receive any equity awards in 2023.

No executive officer participated directly in the final deliberations or determinations regarding his or her own compensation package or was present during such determinations.

The compensation committee meets regularly in executive session. Our Chief Executive Officer is not present during compensation committee deliberations or votes on his compensation and also recuses himself from sessions of our board of directors where they act on his compensation.

**Peer Group**

We analyze market data for executive compensation periodically using the most relevant published survey sources, information available from public filings, and input from our compensation consultants. In order to determine pay levels for 2023, the compensation committee used the same peer group as in 2022. The peer group was based on a detailed review by FW Cook conducted in 2022, considering appropriateness of the current peer companies and potential additions based

Table of Contents

on similarity in market capitalization size and industry. The peer group that the compensation committee considered to determine pay levels for 2023 consisted of the following companies:

| | | |
|---|---|---|
| Activision Blizzard | Match Group | Twilio |
| Autodesk | Pinterest | X (formerly Twitter) |
| Block (formerly Square) | Roku | Uber |
| DocuSign | ServiceNow | Workday |
| Etsy | Shopify | Zillow Group |
| Intuit | Spotify | Zoom Video |

Publicly available pay data from this peer group is supplemented with third party survey data to inform the compensation committee of the market for executive talent. In addition to the peer group, we also rely on the knowledge and experience of our compensation committee members and our management in determining the appropriate compensation for our executive officers.

**Elements of Executive Compensation**

Our current compensation program generally consists of the following components:

- base salary;

- equity-based awards;

- annual incentive compensation; and

- other benefits.

We combine these elements to formulate compensation packages that provide competitive pay, reward achievement of financial, operational, and strategic objectives, and align the interests of our executive officers with those of our stockholders. The overall use and weight of each compensation element is based on our subjective determination of the importance of each element in meeting our overall objectives, including motivating executive officers with an owner's mentality.

*Base Salary*

We review the base salaries of our executive officers annually and may adjust them from time to time, if needed, to reflect changes in market conditions or other factors. The table below sets forth information regarding the year-end base salary amounts for 2023 for our named executive officers.

In April 2023, the compensation committee analyzed market data for executive compensation using the most relevant published survey sources, information available from our peer group's public filings, and input from our compensation consultants. After the review, the compensation committee approved an annual base salary increase for each of Derek Andersen, Jerry Hunter, and Michael O'Sullivan from $500,000 to $1,000,000 and for Rebecca Morrow from $431,600 to $500,000, in each case effective April 1, 2023. These changes are intended to account for the changes made to the bonus program, where payouts are only made in the event of outperformance, bolster retention, and ensure competitiveness with the market. We continue to maintain significant weight on equity compensation to ensure alignment of their long-term financial interests with those of stockholders.

| Name | 2023 Base Salary |
|---|---|
| Evan Spiegel | $ 1 |
| Derek Andersen | 1,000,000 |
| Rebecca Morrow | 500,000 |
| Michael O'Sullivan | 1,000,000 |
| Eric Young | 1,000,000 |
| Jerry Hunter [1] | 1,000,000 |

(1)   In October 2023, Mr. Hunter notified us of his intent to retire on July 1, 2024. Mr. Hunter's duties and responsibilities were transitioned by October 31, 2023.

### Equity-based Awards

The majority of the total compensation for our executive officers, including our named executive officers, is provided through equity awards. By having a significant portion of our executive officers' total compensation payable in the form of equity awards that vest over a number of years and are thus subject to higher risk, our executive officers are motivated to align their long-term financial interests with those of our stockholders.

We generally issue two forms of equity awards:

*Restricted Stock Awards*. RSAs represent one share of Class A common stock for each award granted, subject to a forfeiture condition, so the value of the RSAs is tied to the performance of our Class A common stock. The forfeiture condition will typically lapse over multiple years, subject to continued service through each lapse date.

*Restricted Stock Units*. RSUs represent the right to receive one share of Class A common stock for each unit granted, subject to a continued service requirement, so the value of the RSUs is tied to the performance of our Class A common stock. RSUs typically vest over multiple years, subject to continued service through each vesting date.

RSAs and RSUs align the interests of our executive officers and other employees with those of our stockholders. Because RSAs and RSUs have value to the recipient even in the absence of stock price appreciation, these forms of equity awards help us retain and incentivize employees during periods of market volatility.

We generally grant larger, one-time new hire equity awards to our executive officers when they start employment with us or are promoted. These initial awards are intended to establish a meaningful equity stake and motivate long-term value creation. While these awards generally cover multiple years, we may also consider providing additional equity grants to our executive officers to ensure appropriate incentives are in place to promote our long-term strategic and financial objectives and help us retain key executive officers. The size of these awards is not determined based on a specific formula, but rather through the exercise of judgment after considering various factors, including compensation provided to other executives with similar responsibilities in our peer group and within our company, the current unvested equity held by such executive officer, the perceived retentive value of the proposed awards, and for new-hires, amounts forfeited when joining our company. We also consider each executive officer's individual performance, including the results and contributions delivered during the year and how they align with our short-term and long-term goals, the executive's leadership of his or her team, the cash compensation received by the executive officer, and feedback received from the executive officer's peers and team.

### Annual Incentive Compensation

In April 2023, our board of directors approved the 2023 Bonus Program, which provided our named executive officers, with the exception of Ms. Morrow and Mr. Young, and other eligible employees the opportunity to earn bonuses only on the achievement of outperformance against certain company-wide objectives and key results, or Corporate OKRs, from January 1, 2023 through December 31, 2023. A participant must remain an employee through the payment date under the 2023 Bonus Program to earn a bonus.

The Corporate OKRs are approved by the compensation committee. Each Corporate OKR category is assigned a relative weighting by the compensation committee based on recommendations by the Chief Executive Officer, reflecting its importance to the achievement of our Corporate OKRs during the year.

Each eligible participant in the 2023 Bonus Program may receive a bonus in an amount up to 50% of such participant's annual base salary as at December 31, 2023. Bonus targets for participants will be correspondingly adjusted downward in the event certain Corporate OKRs are deemed by the compensation committee to have not been fully achieved. The compensation committee also has the right, in its sole discretion, to adjust the bonus target of any participant upward in the event of over-achievement of the Corporate OKRs.

The Corporate OKRs consisted of growing our community and engagement, growing revenue and earnings, and leading in augmented reality.

In January 2024, the compensation committee reviewed 2023 performance against its Corporate OKRs. It was determined that the Company did not outperform against the Corporate OKRs, and no payment would be made under this program.

In 2023, Ms. Morrow was eligible to earn a bonus under our performance award program. These bonuses are paid out at the Company's discretion following a review of Ms. Morrow's performance in a given year. In 2023, the amount paid to Ms. Morrow was $215,800. Later in 2023, the performance award program was replaced with the outperformance equity program, where equity awards, in the form of RSUs, are granted at the Company's discretion following a review of one's performance in a given quarter. These equity awards vest over a 12 month period. Ms. Morrow and Mr. Young were eligible to receive equity awards under the outperformance equity program in 2023. In 2023, Mr. Young was granted an equity award with a grant date fair value of $973,098 under this program.

### Other Benefits

Like other employees, our executive officers, including our named executive officers, are able to participate in our employee benefit and welfare plans, including life and disability insurance, medical and dental care plans, and a 401(k) plan. In 2023, we matched contributions made to our 401(k) plan by our employees up to federal limits, including our named executive officers. All of the named executive officers participated in our 401(k) plan. On occasion, we may provide new executives with sign-on compensation in the form of cash or equity as an inducement to join Snap. In 2023, Mr. Young received a cash sign-on bonus of $500,000 paid in four quarterly installments from June 2023. Our executive officers, including our named executive officers, also receive access to an on-call medical service paid for by us. Messrs. Hunter and O'Sullivan participated in such on-call medical services in 2023, and we paid applicable tax gross ups related to such services. We generally do not provide our executive officers with additional retirement benefits, pensions, perquisites, or other personal benefits, except as further described in the section titled "—Summary Compensation Table." In the future, we may provide perquisites or other personal benefits in limited circumstances, such as where we believe it is appropriate to assist an individual executive in the performance of his or her duties, to make our executive team more efficient and effective, and for recruitment, motivation, or retention purposes. All future practices with respect to perquisites or other personal benefits for executives will be subject to review and approval by the compensation committee.

### Executive Security Policy

Based on our overall risk assessment, including the findings of security studies, we have approved an executive security policy that currently provides security for our Chief Executive Officer and Chief Technology Officer (who is not a named executive officer). The executive security policy may apply to other executive officers as needed. We believe that the personal safety of our executive officers is crucial to our success, and based on our risk assessment, we believe that the cost of the personal security measures for executive officers is an appropriate and necessary business expense. Although we do not consider personal security measures to be a perquisite for the covered executive officer's benefit, we have included the aggregate incremental costs to us, if any, in the "All Other Compensation" column of the Summary Compensation Table, as applicable. Please see the section titled "—Summary Compensation Table" for additional detail.

### Change of Control Benefits

Our named executive officers are not entitled to any other change of control benefits or post-employment payments with the limited exception of equity acceleration on a termination due to death. In addition, unpaid portions of

Table of Contents

Mr. Young's sign-on bonus will be paid unless Mr. Young resigns his employment. For more detail, please see the section titled "—Potential Payments Upon Termination, Change in Control, or Death."

**Tax and Accounting Considerations**

*Deductibility of Executive Compensation*

Compensation paid to each of our "covered employees" under Section 162(m) of the Code that exceeds $1 million per taxable year is generally non-deductible. Although our compensation committee will continue to consider tax implications as one factor in determining executive compensation, it also considers other factors in making its decisions and retains the flexibility to provide compensation to our executive officers in a manner that can best promote our corporate objectives. Therefore, we may approve compensation that is not deductible.

*No Tax Reimbursement of Parachute Payments and Deferred Compensation*

We did not provide any executive officer, including any named executive officer, with a "gross-up" or other reimbursement payment for any tax liability that he or she might owe as a result of the application of Sections 280G, 4999, or 409A of the Code during 2023, and we have not agreed and are not otherwise obligated to provide any named executive officer with such a "gross-up" or other reimbursement.

*Accounting Treatment*

We account for stock-based compensation in accordance with the authoritative guidance set forth in Accounting Standards Codification Topic 718, or ASC Topic 718, which requires companies to measure and recognize the compensation expense for all share-based awards made to employees and directors, including RSAs, RSUs, and stock options, over the period during which the award recipient is required to perform services in exchange for the award.

**Compensation Policies and Practices as they Relate to Risk Management**

Our management team and our compensation committee, with the assistance of our independent compensation consultants, each play a role in evaluating and mitigating any risk that may exist relating to our compensation plans, practices, and policies for all employees, including our named executive officers. In 2023, we reviewed our compensation plans and philosophy and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse impact on our business or our financial condition. The objective of the review was to identify any compensation plans, practices, or policies that may encourage employees to take unnecessary risk that could threaten our company. No such plans, practices, or policies were identified. The risk assessment process included, among other things, a review of our cash and equity incentive-based compensation plans to ensure that they are aligned with our company performance goals and ensure an appropriate balance between fixed and variable pay components and between short-term and long-term incentives. The base salary component of our compensation program is designed to provide income independent of our stock price performance so that employees will not focus exclusively on stock price performance to the detriment of other important business metrics. The annual bonus component is scored with discretion by the compensation committee so that short-term outcomes are not over-weighted in the final results. The equity-based component of our compensation program is designed to reward employees evenly throughout their tenure, which we believe discourages employees from taking actions that focus only on specific periods. Furthermore, our executive officers typically receive a substantial portion of their equity in the form of RSAs and RSUs, which does not require our stock price to be trading at a certain price for the executive officer to realize value. Executive officer compensation is not tied to any singular performance metric. Additional controls, such as our Code of Conduct and related training, help further mitigate the risks of unethical behavior and inappropriate risk-taking. In addition, on November 29, 2023, we adopted the Snap Inc. Incentive Compensation Recoupment Policy to comply with listing standards adopted by the NYSE that implement the new SEC rules under the Dodd-Frank Wall Street Reform and Consumer Protection Act. This clawback policy applies to incentive compensation that is received by a covered individual (including our named executive officers) on or after October 2, 2023.

*Hedging and Pledging Prohibition*

Our insider trading policy prohibits all employees (including our executive officers), members of our board of directors, and consultants from engaging in derivative securities transactions, including hedging, pledging company securities as collateral, holding company securities in a margin account, or other inherently speculative transactions with respect to our capital stock.

*Rule 10b5-1 Sales Plans*

Our executive officers and members of our board of directors may adopt written plans, known as Rule 10b5-1 plans, in which they will contract with a broker to buy or sell shares of our capital stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades under parameters established by the individual when entering into the plan, without further direction from them. Rule 10b5-1 plans may be amended or modified to change the amount, price, or timing of the purchase or sale of our common stock only when the individual does not possess material nonpublic information about us, and only during an open trading window. Rule 10b5-1 plans are subject to further rules adopted by the Securities and Exchange Commission, including the number of plans an individual may have at one time, cooling-off periods, and certain certification requirements.

## Compensation Committee Report

The compensation committee has reviewed and discussed the compensation discussion and analysis included in this Annual Report on Form 10-K with management and, based on such review and discussions, the compensation committee recommended to our board of directors that the compensation discussion and analysis be included in this Annual Report on Form 10-K.

Snap Inc. compensation committee,

Michael Lynton (Chairperson)
Scott D. Miller
Poppy Thorpe

## Summary Compensation Table

The following table presents all of the compensation awarded to, earned by, or paid to our named executive officers during the fiscal years ended December 31, 2023, 2022, and 2021.

| Name and Principal Position | Year | Salary | Bonus | Stock Awards [1] | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Evan Spiegel | 2023 | $ 1 | $ — | $ — | $ — | $ 3,339,730 (2) | $ 3,339,731 |
| *Co-Founder and Chief* | 2022 | 1 | — | — | — | 2,747,394 | 2,747,395 |
| *Executive Officer* | 2021 | 1 | — | — | — | 3,290,615 | 3,290,616 |
| Derek Andersen | 2023 | 855,769 | — | 16,532,384 | — | 15,941 (3) | 17,404,094 |
| *Chief Financial Officer* | 2022 | 500,000 | — | 7,747,984 | 100,000 | 14,964 | 8,362,948 |
| | 2021 | 500,000 | — | 5,876,814 | 225,000 | 14,364 | 6,616,178 |
| Rebecca Morrow [4] | 2023 | 480,269 | 215,800 (5) | 679,890 | — | 13,721 (6) | 1,389,680 |
| *Chief Accounting Officer* | 2022 | 427,131 | 259,375 | 921,192 | — | 12,682 | 1,620,380 |
| Michael O'Sullivan | 2023 | 855,769 | — | 8,491,369 | — | 24,347 (7) | 9,371,485 |
| *General Counsel* | 2022 | 500,000 | — | 4,018,740 | 100,000 | 22,173 | 4,640,913 |
| | 2021 | 500,000 | — | 4,701,451 | 225,000 | 21,631 | 5,448,082 |
| Eric Young [8] | | | | | | | |
| *Senior Vice President of Engineering* | 2023 | 538,462 | 375,000 (9) | 47,812,564 | — | 291 (10) | 48,726,317 |
| Jerry Hunter [11] | 2023 | 855,770 | — | 25,443,754 | — | 22,423 (12) | 26,321,947 |
| *Chief Operating Officer* | 2022 | 500,000 | — | 28,977,743 | 100,000 | 22,125 | 29,599,868 |
| | 2021 | 500,000 | — | 9,402,903 | 225,000 | 12,164 | 10,140,067 |

(1)   Amounts reported represent the aggregate grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2)   Amount reported includes (a) $2,466,859 for security for Mr. Spiegel, (b) $144,136 of imputed income relating to incremental costs of family or guests accompanying Mr. Spiegel on business flights that Mr. Spiegel cannot

reimburse under the Federal Aviation Regulations, (c) $728,729 in incremental costs for personal flights not reimbursed by Mr. Spiegel, and (d) $6 in life insurance premiums paid by us on behalf of Mr. Spiegel.

(3) Amount reported includes (a) $13,200 in 401(k) matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Andersen, and (c) contributions by the Company to Mr. Andersen's health savings account. Amounts not quantified above total less than $10,000 in aggregate.

(4) Ms. Morrow was not a named executive officer in fiscal year 2021.

(5) Represents amount awarded under the company's performance award program.

(6) Amount reported includes (a) $13,200 in 401(k) plan matching contributions by us, and (b) life insurance premiums paid by us on behalf of Ms. Morrow. Amounts not quantified above total less than $10,000 in aggregate.

(7) Amount reported includes (a) $13,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. O'Sullivan, (c) $5,000 in medical on-call services paid by us on behalf of Mr. O'Sullivan, and (d) $5,607 in tax "gross up" payments paid to Mr. O'Sullivan to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

(8) Mr. Young joined the company in June 2023.

(9) Represents amount paid as of December 31, 2023 as part of sign-on bonus of $500,000. The sign-on bonus is payable in four quarterly installments from June 2023.

(10) Amount reported includes life insurance premiums paid by us on behalf of Mr. Young

(11) In October 2023, Mr. Hunter notified us of his intent to retire on July 1, 2024. Mr. Hunter's duties and responsibilities were transitioned by October 31, 2023.

(12) Amount reported includes (a) $13,200 in 401(k) plan matching contributions by us, (b) life insurance premiums paid by us on behalf of Mr. Hunter, (c) medical on-call services paid by us on behalf of Mr. Hunter, and (d) tax "gross up" payments paid to Mr. Hunter to cover the imputed income associated with the medical on-call services. Amounts not quantified above total less than $10,000 in aggregate.

**Grants of Plan-Based Awards in Fiscal 2023**

The following table provides information regarding grants of incentive plan-based awards made to each of our named executive officers during 2023 under our 2017 Plan. No named executive officer was granted options in 2023.

| Name | Grant Date | All Other Stock Awards: Number of Shares of Stock or Units [1] | Grant Date Fair Value of Stock Awards [2] |
|---|---|---|---|
| Evan Spiegel | — | — | $ — |
| Derek Andersen | 1/30/2023 | 1,490,747 | 16,532,384 |
| Rebecca Morrow | 4/26/2023 | 22,928 | 226,529 |
| | 5/10/2023 | 26,718 | 232,446 |
| | 9/11/2023 | 23,402 | 220,915 |
| Michael O'Sullivan | 1/30/2023 | 765,678 | 8,491,369 |
| Eric Young | 7/25/2023 | 3,744,162 | 46,839,466 |
| | 11/29/2023 | 74,969 | 973,098 |
| Jerry Hunter | 1/30/2023 | 2,294,297 | 25,443,754 |

(1) Except as indicated below, equity awards vest and the forfeiture condition lapses only on the satisfaction of a service-based vesting condition. If an employee dies while in service, the service-based vesting condition as to 100% of his or her shares subject to the award will be satisfied.

(2) The dollar amounts reflect the grant date fair value of the equity awards without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the named executive officers. For a discussion of the valuation of the equity awards, see Notes 1 and 4 of the notes to our consolidated financial statements.

**Outstanding Equity Awards as of December 31, 2023**

The following table presents information regarding outstanding equity awards held by our named executive officers as of December 31, 2023. All awards are for Class A common stock and were granted under our 2017 Plan.

| | | Stock Awards | | Option Awards | | | |
|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) (1) | Market Value of Shares or Units of Stock That Have Not Vested ($) (2) | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable (1) | Option Exercise Price | Option Expiration Date |
| Evan Spiegel | — | — | $ — | — | — | $ — | — |
| Derek Andersen | 2/3/2021 | 99,170 (3) | 1,678,948 | — | — | — | — |
| | 2/2/2022 | 125,392 (4) | 2,122,887 | — | — | — | — |
| | 5/11/2022 | 77,830 (5) | 1,317,662 | — | — | — | — |
| | 1/30/2023 | 1,381,286 (6) | 23,385,172 | — | — | — | — |
| Rebecca Morrow | 5/13/2020 | 2,191 (7) | 37,094 | — | — | — | — |
| | 5/12/2021 | 19,772 (3) | 334,740 | — | — | — | — |
| | 5/11/2022 | 33,019 (8) | 559,012 | — | — | — | — |
| | 4/26/2023 | 22,928 (9) | 388,171 | — | — | — | — |
| | 5/10/2023 | 22,265 (10) | 376,946 | — | — | — | — |
| | 9/11/2023 | 23,402 (9) | 396,196 | — | — | — | — |
| Michael O'Sullivan | 2/3/2021 | 79,336 (3) | 1,343,158 | — | — | — | — |
| | 2/2/2022 | 83,594 (11) | 1,415,246 | — | — | — | — |
| | 5/11/2022 | 56,992 (12) | 964,875 | — | — | — | — |
| | 1/30/2023 | 765,678 (13) | 12,962,929 | — | — | — | — |
| Eric Young | 7/25/2023 | 3,276,142 (14) | 55,465,084 | — | — | — | — |
| | 11/29/2023 | 74,969 (15) | 1,269,225 | — | — | — | — |
| Jerry Hunter | 12/29/2017 | — | — | 700,000 | — | 14.72 | 12/29/2027 |
| | 2/3/2021 | 158,672 (3) | 2,686,317 | — | — | — | — |
| | 2/2/2022 | 167,188 (11) | 2,830,493 | — | — | — | — |
| | 5/11/2022 | 113,982 (16) | 1,929,715 | — | — | — | — |
| | 8/31/2022 | 1,101,352 (17) | 18,645,889 | — | — | — | — |
| | 1/30/2023 | 2,294,297 (18) | 38,842,449 | — | — | — | — |

(1)   Each of our named executive officers, other than Mr. Spiegel, holds equity awards that only vest, or the forfeiture condition only lapses, on the satisfaction of a service-based condition. The service-based condition for each of our named executive officers is further described below. If an executive officer dies while in our service, the service-based condition as to 100% of his or her shares subject to the award will be satisfied.

(2)   The market value is based on the closing price of our Class A common stock on December 31, 2023, which was $16.93.

(3)   The service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA on March 15, 2024, subject to continuous service by the executive officer through such date. Thereafter, the service-based condition will be satisfied, and the forfeiture condition will lapse as to 1/4th of the shares underlying this RSA after each quarter of continuous service by such executive officer from March 15, 2024.

(4)   The service-based condition of these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 10,450 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 114,942 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(5)   The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 41,576 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 36,254 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

125

(6)      The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 218,922 of these RSUs in equal quarterly installments during the 24-month period following December 15, 2023 (109,461 shares underlying the original grant on January 30, 2023 already vested as of December 31, 2023); 450,869 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 711,495 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2025.

(7)      The service-based condition will be satisfied, and the forfeiture condition will lapse, for this RSA in equal quarterly installments after each quarter of continuous service during the 6-month period following October 15, 2023 (15,333 shares underlying the original grant on May 13, 2020 already vested as of December 31, 2023).

(8)      The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 5,528 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 27,491 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(9)      The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 12-month period following November 15, 2025.

(10)     The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 30-month period following November 15, 2023 (4,453 shares underlying the original grant on May 10, 2023 already vested as of December 31, 2023).

(11)     The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 12-month period following December 15, 2024.

(12)     The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 30,625 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 26,367 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(13)     The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 327,835 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 437,843 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2025.

(14)     The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 39-month period following November 15, 2023 (468,020 shares underlying the original grant on July 25, 2023 already vested as of December 31, 2023).

(15)     The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 12-month period following November 15, 2023.

(16)     The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 61,249 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 52,733 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2024.

(17)     The service-based condition for these RSUs is satisfied in equal quarterly installments after each quarter of continuous service during the 24-month period following December 15, 2023 (688,345 shares underlying the original grant on August 31, 2022 already vested as of December 31, 2023).

(18)     The service-based condition for these RSUs is satisfied as follows (in each case subject to continued service through each vesting date): 761,847 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2023; and 1,532,450 of these RSUs in equal quarterly installments during the 12-month period following December 15, 2025.

**Option Exercises and Stock Vested**

The following table presents information regarding the vesting or lapse of the forfeiture condition during 2023 of RSUs and RSAs previously granted to the named executive officers. No named executive officer exercised options during 2023.

| Name | Stock Awards | |
|---|---|---|
| | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) [1] |
| Evan Spiegel | — | $ — |
| Derek Andersen | 601,139 | 6,556,176 |
| Rebecca Morrow | 93,849 | 1,013,618 |
| Michael O'Sullivan | 358,168 | 3,693,504 |
| Eric Young | 468,020 | 5,092,058 |
| Jerry Hunter | 1,251,543 | 13,966,087 |

(1)    The value realized is based on the closing price of our Class A common stock on the vesting date.

**Pension Benefits**

Other than our 401(k) plan, our named executive officers did not participate in, or otherwise receive any benefits under, any pension or retirement plan sponsored by us during the year ended December 31, 2023.

**Non-qualified Deferred Compensation**

Our named executive officers did not participate in, or earn any benefits under, a non-qualified deferred compensation plan sponsored by us during the year ended December 31, 2023.

**Employment, Severance, and Change in Control Agreements**

*Employment Agreements and Offer Letters*

We have employment agreements or offer letters with each of our executive officers. Except as otherwise described below, the employment agreements and offer letters generally provide for at-will employment and set forth the executive officer's initial base salary, eligibility for employee benefits, and confirmation of the terms of previously issued equity grants, if applicable, including in some cases severance benefits on a qualifying termination of employment. If an executive officer dies, all outstanding equity awards will be deemed to satisfy the service-based requirement. In addition, each of our named executive officers has executed our standard proprietary information and inventions agreement. The key terms of employment with our executive officers are described below.

*Evan Spiegel and Robert Murphy*

In July 2022, we entered into employment agreements with Evan Spiegel, our co-founder and Chief Executive Officer, and Robert Murphy, our co-founder and Chief Technology Officer, with respect to their continuing employment with us. The annual base salary for each of Messrs. Spiegel and Murphy as of December 31, 2023 was $1. The employment agreements are each effective as of January 1, 2022, and will have an initial term of five years, subject to automatic renewals for successive five year periods unless earlier terminated as provided in their respective employment agreements.

In July 2022, our board of directors determined that it was advisable and in our best interest to approve the Future Stock Split. In connection with the Future Stock Split, we entered into the Co-Founder Agreements with each of Messrs. Spiegel and Murphy, and certain of their respective affiliates requiring them, among other things, to convert shares of Class B common stock and Class C common stock into Class A common stock under certain circumstances.

The Future Stock Split will be not be declared and paid until the first business day following the date on which the average of the volume weighted average price (the "VWAP") per share of Class A common stock equals or exceeds $40 per share for 65 consecutive trading days. If this does not occur by July 21, 2032, the Future Stock Split will not be declared and paid, and the Co-Founder Agreements will terminate.

127

In connection with a proposed settlement of a class-action lawsuit, we agreed in June 2023, as amended in December 2023, to modify the conditions for the Future Stock Split, subject to various conditions, including judicial approval of the settlement. If approved, the Future Stock Split will not be declared and paid until the first business day following the date on which (i) the VWAP per share of Class A common stock equals or exceeds $40 per share for 90 consecutive trading days (the "90-Day VWAP") and (ii) the ratio of the 90-Day VWAP to $8.70 equals or exceeds the ratio of the average closing price of the S&P 500 Total Return index for the same 90 trading days for which the 90-Day VWAP was calculated to 8,862.85. The original ten year time period to trigger the Future Stock Split would remain unchanged.

*Derek Andersen*

In May 2019, we entered into an amended and restated offer letter agreement with Derek Andersen, our Chief Financial Officer, with respect to his continuing employment with us. Mr. Andersen's annual base salary as of December 31, 2023 was $1,000,000.

*Rebecca Morrow*

In July 2019, we entered into an offer letter agreement with Rebecca Morrow, our Chief Accounting Officer, with respect to her employment with us. Ms. Morrow's annual base salary as of December 31, 2023 was $500,000.

*Michael O'Sullivan*

In July 2017, we entered into an offer letter agreement with Michael O'Sullivan, our General Counsel, with respect to his employment with us. Mr. O'Sullivan's annual base salary as of December 31, 2023 was $1,000,000.

*Eric Young*

In June 2023, we entered into an offer letter agreement with Eric Young, our Senior Vice President of Engineering, with respect to his employment with us. Mr. Young's annual base salary as of December 31, 2023 was $1,000,000. Mr. Young's offer letter agreement included a $500,000 sign-on bonus paid in four quarterly installments from June 2023, of which $375,000 had been paid as of December 31, 2023.

*Jerry Hunter*

In October 2020, we entered into an amended and restated offer letter agreement with Jerry Hunter, our Chief Operating Officer, with respect to his continuing employment with us. Mr. Hunter's annual base salary as of December 31, 2023 was $1,000,000. In October 2023, Mr. Hunter notified us of his intent to retire on July 1, 2024. Mr. Hunter's duties and responsibilities were transitioned by October 31, 2023.

***Potential Payments upon Termination, Change in Control, or Death***

Currently, no named executive officer is entitled to any payments upon a termination of employment or a resignation, in each case, following a change of control of our company; provided, however, that unpaid portions of Mr. Young's sign-on bonus will be paid unless Mr. Young resigns his employment.

No named executive officer is also entitled to any payments following a resignation for good reason, other than Mr. Spiegel. If Mr. Spiegel resigns for good reason as an employee and member of our board of directors, then Mr. Spiegel is entitled to continue receiving his existing aircraft usage and security benefits provided by us, in each case, subject to the terms of his employment agreement entered into with us in July 2022.

128

Table of Contents

The table below reflects amounts that would have been received by each named executive officer assuming that his or her employment was terminated due to his or her death on December 31, 2023.

| Name | Accelerated Vesting of Stock Awards [1] | | Remaining Sign-on Bonus | | Total | |
|---|---|---|---|---|---|---|
| Evan Spiegel | $ | — | $ | — | $ | — |
| Derek Andersen | | 28,504,669 | | — | | 28,504,669 |
| Rebecca Morrow | | 2,092,159 | | — | | 2,092,159 |
| Michael O'Sullivan | | 16,686,208 | | — | | 16,686,208 |
| Eric Young | | 56,734,309 | | 125,000 | | 56,859,309 |
| Jerry Hunter | | 64,934,863 | | — | | 64,934,863 |

(1)     The amount reported reflects the aggregate value, based on the closing price of our Class A common stock of $16.93 on December 31, 2023, of the unvested equity awards that would be accelerated.

### Employee Benefit Plans

We believe that our ability to grant equity-based awards is a valuable and necessary compensation tool that aligns the long-term financial interests of our employees, consultants, and directors with the financial interests of our stockholders. In addition, we believe that our ability to grant equity-based awards helps us to attract, retain, and motivate employees, consultants, and directors, and encourages them to devote their best efforts to our business and financial success. The principal features of our equity incentive plans and our 401(k) plan are summarized below. These summaries are qualified in their entirety by reference to the actual text of the plans.

#### *401(k) Plan and Similar Plans*

We maintain a 401(k) plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax advantaged basis. Eligible employees are able to defer eligible compensation up to certain Code limits, which are updated annually. We have the ability to make matching and discretionary contributions to the 401(k) plan. Currently, we match 100% of each participant's contribution up to a maximum of 3% of the participant's eligible compensation paid during the period, and also match 50% of each participant's contribution between 3% and 5% of the participant's eligible compensation paid during the period. Contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participants' directions. Employees are immediately and fully vested in their own contributions and our contributions. The 401(k) plan is intended to be qualified under Section 401(a) of the Code, with the related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan are deductible by us when made, and contributions and earnings on those amounts are not taxable to the employees until withdrawn or distributed from the 401(k) plan.

Similar plans outside the United States, some of which are government mandated, cover employees of certain of our international subsidiaries. Several of these plans allow us to match, on a voluntary basis, a portion of the employee contributions.

#### *2017 Equity Incentive Plan*

Our board of directors adopted our 2017 Equity Incentive Plan, or our 2017 Plan, in January 2017, and our stockholders approved our 2017 Plan in February 2017. Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. Our 2017 Plan provides for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance stock awards, performance cash awards, and other forms of stock awards to employees, directors, and consultants, including employees and consultants of our affiliates. The 2017 Plan is the successor to our 2012 Equity Incentive Plan and 2014 Equity Incentive Plan, each of which is described below, or, together, the Prior Plans.

*Authorized Shares.* The maximum number of shares of our Class A common stock available for future issuance under our 2017 Plan as of December 31, 2023 is 120,389,053. The number of shares of our Class A common stock reserved for issuance under our 2017 Plan will automatically increase on January 1st of each calendar year, starting on

January 1, 2018 through January 1, 2027, in an amount equal to 5.0% of the total number of shares of our capital stock outstanding on the last day of the calendar month before the date of each automatic increase, or a lesser number of shares determined by our board of directors. The maximum number of shares of our Class A common stock that may be issued on the exercise of incentive stock options under our 2017 Plan is three times the share reserve under the 2017 Plan.

Shares subject to stock awards granted under our 2017 Plan that expire or terminate without being exercised in full, or that are paid out in cash rather than in shares, do not reduce the number of shares available for issuance under our 2017 Plan. Additionally, shares become available for future grant under our 2017 Plan if they were issued under stock awards under our 2017 Plan and if we repurchase them or they are forfeited. This includes shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award.

*Corporate Transactions.* Our 2017 Plan provides that in the event of certain specified significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of more than 50% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards:

- arrange for the assumption, continuation, or substitution of a stock award by a successor corporation;

- arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation;

- accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction;

- arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us;

- cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, or no payment, as determined by the board of directors; or

- make a payment, in the form determined by our board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the awards before the transaction over any exercise price payable by the participant in connection with the exercise.

The plan administrator is not obligated to treat all stock awards or portions of stock awards, even those that are of the same type, in the same manner and is not obligated to treat all participants in the same manner.

In the event of a change in control, awards granted under the 2017 Plan will not receive automatic acceleration of vesting and exercisability, although this treatment may be provided for in an award agreement. Under the 2017 Plan, a change in control is defined to include: (1) the acquisition by any person or company of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) a sale, lease, exclusive license, or other disposition of all or substantially all of our assets other than to an entity more than 50% of the combined voting power of which is owned by our stockholders, and (4) an unapproved change in the majority of the board of directors.

*Plan Amendment or Termination.* Our board of directors has the authority to amend, suspend, or terminate our 2017 Plan, provided that such action does not materially impair the existing rights of any participant without such participant's written consent. Certain material amendments also require the approval of our stockholders. No incentive stock options may be granted after the tenth anniversary of the date our board of directors adopted our 2017 Plan. No stock awards may be granted under our 2017 Plan while it is suspended or after it is terminated.

### *2014 Equity Incentive Plan*

Our board of directors adopted, and our stockholders approved, our 2014 Equity Incentive Plan, or our 2014 Plan, in September 2014. Our 2014 Plan was amended most recently in October 2016. Our 2014 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to employees, directors, and consultants, including employees and consultants of our affiliates.

Table of Contents

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2014 Plan following that date, other than awards for up to 2,500,000 shares of Class A common stock to our employees and consultants in France. Any awards granted under the 2014 Plan will remain subject to the terms of our 2014 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class A common stock that may be issued under our 2014 Plan is 166,164,100, minus the number of shares of our Class B common stock issued after September 4, 2014 under our 2012 Plan. In addition to the share reserve, an additional 53,357,397 shares of Class A common stock are reserved under the 2014 Plan in connection with the distribution of shares of Class A common stock provided as a dividend to the holders of all preferred stock and common stock outstanding on October 31, 2016. The maximum number of shares of Class A common stock that may be issued on the exercise of incentive stock options under our 2014 Plan is three times such maximum number of shares. Shares subject to stock awards granted under our 2014 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2014 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2014 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2014 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2014 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2014 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2014 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2012 Equity Incentive Plan

Our board of directors adopted our 2012 Equity Incentive Plan, or our 2012 Plan, in May 2012, and our stockholders approved our 2012 Plan in August 2012. Our 2012 Plan was amended most recently in October 2016. Our 2012 Plan allows for the grant of incentive stock options to employees, including employees of any parent or subsidiary, and for the grant of nonstatutory stock options, stock appreciation rights, restricted stock awards, and restricted stock units to our employees, directors, and consultants, including employees and consultants of our affiliates.

131

Our 2017 Plan became effective once the registration statement in connection with our initial public offering was declared effective in March 2017. As a result, we do not expect to grant any additional awards under the 2012 Plan following that date. Any awards granted under the 2012 Plan will remain subject to the terms of our 2012 Plan and applicable award agreements.

*Authorized Shares*. The maximum number of shares of our Class B common stock that may be issued under our 2012 Plan is 91,292,140, minus the number of shares of our Class A common stock issued after September 4, 2014 under our 2014 Plan. In addition to the share reserve, an additional 50,022,362 shares of Class A common stock are reserved under the 2012 Plan in connection with the Class A Dividend, one share of which will be issued if and when a share from the share reserve is issued in connection with the settlement or exercise of a stock award that was outstanding as of October 31, 2016. The maximum number of shares of Class B common stock that may be issued on the exercise of incentive stock options under our 2012 Plan is such maximum number of shares. Shares subject to stock awards granted under our 2012 Plan that expire, are forfeited, or terminate without being exercised in full or are settled in cash do not reduce the number of shares available for issuance under our 2012 Plan. Additionally, shares used to pay the exercise price of a stock award or to satisfy the tax withholding obligations related to a stock award become available for future grant under our 2012 Plan, although such shares may not be subsequently issued pursuant to the exercise of an incentive stock option.

*Corporate Transactions*. Our 2012 Plan provides that in the event of certain specified significant corporate transactions, generally including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of at least 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of common stock outstanding before such transaction are converted or exchanged into other property by virtue of the transaction, unless otherwise provided in an award agreement or other written agreement between us and the award holder, the administrator may take one or more of the following actions with respect to such stock awards: (i) arrange for the assumption, continuation, or substitution of a stock award by a successor corporation, (ii) arrange for the assignment of any reacquisition or repurchase rights held by us to a successor corporation, (iii) accelerate the vesting, in whole or in part, of the stock award and provide for its termination before the transaction, (iv) arrange for the lapse, in whole or in part, of any reacquisition or repurchase rights held by us, (v) cancel or arrange for the cancellation of the stock award before the transaction in exchange for a cash payment, if any, determined by the board of directors, or (vi) make a payment, in the form determined by the board of directors, equal to the excess, if any, of the value of the property the participant would have received on exercise of the stock award before the transaction over any exercise price payable by the participant in connection with the exercise. The plan administrator is not obligated to treat all stock awards, even those that are of the same type, or all participants, in the same manner.

In the event of a change in control, awards granted under the 2012 Plan will not receive automatic acceleration of vesting and exercisability, although the board of directors may provide for this treatment in an award agreement. Under the 2012 Plan, a change in control is defined to include: (1) the acquisition by any person of more than 50% of the combined voting power of our then outstanding stock, (2) a merger, consolidation, or similar transaction in which our stockholders immediately before the transaction do not own, directly or indirectly, more than 50% of the combined voting power of the surviving entity (or the parent of the surviving entity), (3) our stockholders approve or our board of directors approves a plan of complete dissolution or liquidation or a complete dissolution or liquidation otherwise occurs except for a liquidation into a parent corporation, and (4) a sale, lease, exclusive license, or other disposition of all or substantially all of the assets to an entity that did not previously hold more than 50% of the voting power of our stock.

*Plan Amendment or Termination*. Our board of directors has the authority to amend, suspend, or terminate our 2012 Plan, although certain material amendments require the approval of our stockholders, and amendments that would impair the rights of any participant require the consent of that participant.

### 2017 Employee Stock Purchase Plan

Our board of directors adopted our 2017 Employee Stock Purchase Plan, or ESPP, in January 2017 and our stockholders approved our ESPP in February 2017. Our ESPP became effective when the registration statement in connection with our initial public offering was declared effective in March 2017. The purpose of the ESPP is to secure the services of new employees, to retain the services of existing employees, and to provide incentives for such individuals to exert maximum efforts toward our success and that of our affiliates. The ESPP is intended to qualify as an "employee stock purchase plan" within the meaning of Section 423 of the Code for U.S. employees. In addition, the ESPP authorizes grants of purchase rights that do not comply with Section 423 of the Code under a separate non-423 component. In particular,

Table of Contents

where such purchase rights are granted to employees who are foreign nationals or employed or located outside the United States, our board of directors may adopt rules that are beyond the scope of Section 423 of the Code.

*Share Reserve*. The ESPP authorizes the issuance of 16,484,690 shares of our Class A common stock under purchase rights granted to our employees or to employees of any of our designated affiliates. The number of shares of our Class A common stock reserved for issuance will automatically increase on January 1st of each calendar year, beginning on January 1, 2018 through January 1, 2027, by the lesser of (1) 1.0% of the total number of shares of our common stock outstanding on the last day of the calendar month before the date of the automatic increase, and (2) 15,000,000 shares; provided that before the date of any such increase, our board of directors may determine that such increase will be less than the amount set forth in clauses (1) and (2). As of December 31, 2023, no shares of our Class A common stock have been purchased under the ESPP.

*Corporate Transactions*. In the event of certain significant corporate transactions, including: (1) a sale of all or substantially all of our assets, (2) the sale or disposition of 90% of our outstanding securities, (3) the consummation of a merger or consolidation where we do not survive the transaction, and (4) the consummation of a merger or consolidation where we do survive the transaction but the shares of our common stock outstanding immediately before such transaction are converted or exchanged into other property by virtue of the transaction, any then-outstanding rights to purchase our stock under the ESPP may be assumed, continued, or substituted for by any surviving or acquiring entity (or its parent company). If the surviving or acquiring entity (or its parent company) elects not to assume, continue, or substitute for such purchase rights, then the participants' accumulated payroll contributions will be used to purchase shares of our common stock within ten business days before such corporate transaction, and such purchase rights will terminate immediately.

*ESPP Amendment or Termination*. Our board of directors has the authority to amend or terminate our ESPP, provided that except in certain circumstances such amendment or termination may not materially impair any outstanding purchase rights without the holder's consent. We will obtain stockholder approval of any amendment to our ESPP as required by applicable law or listing requirements.

## Limitations on Liability and Indemnification Matters

Our certificate of incorporation contains provisions that limit the liability of our current and former directors and officers for monetary damages to the fullest extent permitted by Delaware law. Delaware law provides that directors and officers of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's or officer's duty of loyalty to the corporation or its stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions; or

- any transaction from which the director derived an improper personal benefit.

Such limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission. In addition, Delaware courts could find certain of these limitations of liability in our certificate of incorporation to be inapplicable or unenforceable in an action.

Our certificate of incorporation authorizes us to indemnify our directors, officers, employees, and other agents to the fullest extent permitted by Delaware law. Our bylaws provide that we are required to indemnify our directors and officers to the fullest extent permitted by Delaware law and may indemnify our other employees and agents. Our bylaws also provide that, on satisfaction of certain conditions, we will advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee, or other agent for any liability arising out of his or her actions in that capacity regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered into, and expect to continue to enter into agreements to indemnify our directors, executive officers, and other employees as determined by the board of directors. With certain exceptions, these agreements provide for indemnification for related expenses including attorneys' fees, judgments, fines, and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these certificate of incorporation and bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain customary directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws, if permitted by applicable law, may discourage stockholders from bringing a lawsuit against our directors or officers for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted for directors, executive officers, or persons controlling us, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## Director Compensation

Under our non-employee director compensation policy, our non-employee directors receive an annual retainer for service on our board of directors and an additional retainer is provided to individuals who serve as chair of a committee or the board of directors. We also currently reimburse our directors for their reasonable out-of-pocket expenses in connection with attending board of directors and committee meetings.

Our non-employee director compensation policy provides that each non-employee director receives the following compensation for board of directors and committee services:

- an annual retainer for board of director membership of $75,000, paid in cash;

- an annual retainer of $75,000 for chairing the board of directors, paid in cash;

- an annual retainer of $25,000 for chairing the audit committee, $20,000 for chairing the compensation committee, and $10,000 for chairing the nominating and corporate governance committee, each paid in cash; and

- an annual grant of equity with a fair market value as of the date of grant of $250,000, comprised of RSUs vesting after one year.

All annual cash retainers will be paid quarterly in arrears. Additionally, in the event of a change to the designated chair for a committee, the annual cash retainer for chairing such committee will be prorated based on the number of days the chair held the position.

The annual grants of equity described above are subject to pro-rata acceleration on a director's discontinued service on our board of directors and automatic full acceleration in the event of a change in control, as defined in the 2017 Plan. Non-employee directors also have the option to elect to defer the settlement of their equity awards until the termination of their service on the Board.

Non-employee directors are also encouraged to accumulate stock ownership equal in value to five times the annual retainer for board of director membership within the later of five years from the effective date of the non-employee director compensation policy or each non-employee director's initial election to serve on the board of directors. Previously owned and vested stock and shares held in trust for the benefit of the non-employee director or his or her immediate family members are counted for purposes of determining stock ownership.

### *Director Compensation Table*

The following table sets forth information concerning the compensation paid to our directors who are not named executive officers during the year ended December 31, 2023. The compensation received by Mr. Spiegel as an employee of our company is presented in "Executive Compensation—Summary Compensation Table."

In 2023, we paid fees and made equity awards to our non-employee directors. We granted each non-employee director serving as of July 24, 2023 RSUs for 23,401 shares of Class A common stock under our 2017 Plan, for which the service-based vesting condition will be fully satisfied for the RSUs on July 24, 2024. Mr. Spence, who joined the board in September 2023, was granted RSUs for 22,718 shares of Class A common stock under our 2017 Plan, for which the service-based vesting condition will be fully satisfied on July 25, 2024. If a director's service ceases before such director's applicable service-based vesting date, vesting of the RSUs will be accelerated pro rata, based on the number of months of service provided by such director. In addition, in the event of a change in control, the service-based vesting condition of the

134

RSUs will be deemed satisfied for 100% of the RSUs that have not yet satisfied the service-based vesting condition, immediately before the closing of such change in control.

Mr. Murphy did not receive compensation for his service as a director.

| Name | Fees Earned or Paid in Cash | Stock Awards [1][6] | Total |
|---|---|---|---|
| Michael Lynton | $ 170,000 | $ 292,747 | $ 462,747 |
| Kelly Coffey | 75,000 | 292,747 | 367,747 |
| Joanna Coles | 85,000 | 292,747 | 377,747 |
| Liz Jenkins | 100,000 | 292,747 | 392,747 |
| Stanley Meresman [2] | 42,391 | — | 42,391 |
| Scott D. Miller [3] | 135,000 | 292,747 | 427,747 |
| Robert Murphy [4] | 801,334 | — | 801,334 |
| Patrick Spence [5] | 22,215 | 215,594 | 237,809 |
| Poppy Thorpe [3] | 135,000 | 292,747 | 427,747 |
| Fidel Vargas [3] | 135,000 | 292,747 | 427,747 |

(1) Amounts reported represent the aggregate grant date fair value of RSUs and stock options granted during 2023 under our 2017 Plan without regard to forfeitures, calculated in accordance with ASC Topic 718. These amounts do not reflect the actual economic value realized by the directors. For a discussion of the valuation of the equity awards, including the assumptions used, see Notes 1 and 4 of the notes to our consolidated financial statements.

(2) Mr. Meresman's board term expired on July 24, 2023.

(3) Amount reported includes a $5,000 per month retainer for services on a special committee.

(4) Mr. Murphy does not receive any compensation for service as a director. Amount reported represents (a) $1 for his annual base salary as an employee, (b) $557,210 for security for Mr. Murphy, (c) $6 for life insurance premiums paid by us on behalf of Mr. Murphy, (d) $37,325 of imputed income relating to incremental costs of family or guests accompanying Mr. Murphy on business flights that Mr. Murphy cannot reimburse under the Federal Aviation Regulations, and (e) $206,792 in incremental costs for personal flights not reimbursed by Mr. Murphy.

(5) Mr. Spence joined the board of directors on September 14, 2023.

(6) As of December 31, 2023, the aggregate number of shares underlying stock awards and option awards outstanding for each of our non-employee directors was:

| Name | Aggregate Stock Awards | Aggregate Option Awards |
|---|---|---|
| Michael Lynton | 23,401 | 65,553 |
| Kelly Coffey | 23,401 | 31,896 |
| Joanna Coles | 23,401 | 65,553 |
| Liz Jenkins | 23,401 | 21,896 |
| Scott D. Miller | 23,401 | 65,553 |
| Patrick Spence | 22,718 | — |
| Poppy Thorpe | 23,401 | 63,553 |
| Fidel Vargas | 23,401 | 18,908 |

In 2023, we also provided Mr. Lynton with an executive administrative assistant for his duties as Chairperson. The executive administrative assistant would occasionally assist Mr. Lynton with incidental personal matters, the cost of which to us is financially immaterial.

### Compensation Committee Interlocks and Insider Participation

None of the members of the compensation committee is currently, or has been at any time, one of our officers or employees. None of our executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of our board of directors or compensation committee.

**Pay Ratio Disclosure**

As disclosed in the Summary Compensation Table, for the year ended December 31, 2023, the annual total compensation of our Chief Executive Officer was $3,339,731. The annual total compensation of our median employee, excluding our Chief Executive Officer, for the same period, using the same methodology used to calculate our Chief Executive Officer's annual total compensation, was $346,462. The ratio of these amounts is approximately 9.6 to 1. We believe such ratio is a reasonable estimate calculated in a manner consistent with Item 402 of Regulation S-K under the Exchange Act.

To determine our median employee, we used the total compensation of our employees from our company records, including salary and wages, bonuses, commissions, allowances, and grant date fair value of equity awards. We applied this measure to our global employee population as of October 1, 2023 and calculated total compensation for the 12 months prior to such date, annualizing all compensation other than equity awards for employees who did not work the full 12 months. We selected the individual who represented our median employee based on this information. For employees who were not paid in U.S. dollars, we converted their compensation to U.S. dollars using the exchange rate as of October 1, 2023.

The pay ratio above represents our reasonable estimate calculated in a manner consistent with the SEC rules, which allow for significant flexibility in how companies identify the median employee, and each company may use a different methodology and make different assumptions particular to that company. As a result, and as explained by the SEC when it adopted the pay ratio rules, the ratio was not designed to facilitate comparisons of pay ratios among different companies, even companies within the same industry, but rather to allow stockholders to better understand our compensation practices and pay ratio disclosures.

**Additional Disclosure Considerations**

We are not subject to the "say-on-pay" and "say-on-frequency" provisions of the Dodd–Frank Wall Street Reform Act, and such sections are not included in this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The table below sets forth information, as of December 31, 2023, with respect to the beneficial ownership of: (a) our Class A common stock, Class B common stock, and Class C common stock by each named executive officer, each of our directors, and our directors and executive officers as a group; and (b) our Class B and Class C common stock by each person or entity known by us to own beneficially more than 5% of our Class B common stock or Class C common stock (by number or by voting power).

Because our Class A common stock is non-voting, significant holders of our Class A common stock are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act. These provisions generally require significant stockholders to publicly report their ownership, including changes in that ownership. As a result, those stockholders and we are not obligated to disclose ownership of our Class A common stock, so there can be no assurance that you, or we, will be notified of such ownership or changes in such ownership. Furthermore, significant holders of our Class A common stock may hold our stock in nominee or "street name" with various brokers, such that we will not be able to identify their ownership.

We have determined beneficial ownership in accordance with the rules and regulations of the SEC, and the information is not necessarily indicative of beneficial ownership for any other purpose. Except as indicated by the footnotes below, we believe, based on information furnished to us, that the persons and entities named in the table below have sole voting and sole investment power with respect to all shares that they beneficially own, subject to applicable community property laws.

Applicable percentage ownership is based on 1,391,341,262 shares of Class A common stock, 22,528,406 shares of Class B common stock, and 231,626,943 shares of Class C common stock outstanding as of December 31, 2023. In computing the number of shares beneficially owned by a person and the percentage ownership of such person, we deemed to be outstanding all shares subject to options and RSUs held by the person that are currently exercisable, or would become exercisable or would vest based on service-based vesting conditions within 60 days of December 31, 2023. However, except as described above, we did not deem such shares outstanding for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address for each beneficial owner listed in the table below is c/o Snap Inc., 3000 31st Street, Santa Monica, CA 90405.

| Name of Beneficial Owner | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | % of Total Voting Power |
|---|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % | |
| **Directors and Named Executive Officers:** | | | | | | | |
| Evan Spiegel [1] | 39,663,540 | 2.9 % | 5,862,410 | 26.0 % | 123,683,019 | 53.4 % | 53.1 % |
| Robert Murphy [2] | 72,541,934 | 5.2 | 5,862,410 | 26.0 | 107,943,924 | 46.6 | 46.4 |
| Derek Andersen [3] | 643,858 | * | — | * | — | * | * |
| Rebecca Morrow [4] | 208,733 | * | — | * | — | * | * |
| Michael O'Sullivan [5] | 553,501 | * | — | * | — | * | * |
| Eric Young [6] | 506,357 | * | — | * | — | * | * |
| Jerry Hunter [7] | 2,111,070 | * | — | * | — | * | * |
| Michael Lynton [8] | 875,888 | * | — | * | — | * | * |
| Kelly Coffey [9] | 50,260 | * | — | * | — | * | * |
| Joanna Coles [10] | 92,594 | * | — | * | — | * | * |
| Liz Jenkins [11] | 34,710 | * | — | * | — | * | * |
| Scott D. Miller [12] | 165,956 | * | — | * | — | * | * |
| Patrick Spence | — | * | — | * | — | * | * |
| Poppy Thorpe [13] | 86,416 | * | — | * | — | * | * |
| Fidel Vargas [14] | 30,167 | * | — | * | — | * | * |
| Stanley Meresman | 10,172 | * | — | * | — | * | * |
| All directors and executive officers as a group (14 persons) [15] | 115,453,914 | 8.3 | 11,724,820 | 52.0 | 231,626,943 | 100.0 | 99.5 |
| **5% Stockholders:** | | | | | | | |
| FMR LLC [16] | 147,283,704 | 10.6 | — | * | — | * | * |
| Entities affiliated with Tencent Holdings Limited [17] | 232,655,030 | 16.7 | 10,344,970 | 45.9 | — | * | * |
| The Vanguard Group [18] | 89,625,880 | 6.4 | — | * | — | * | * |

\*      Represents beneficial ownership of less than 1%.

(1)    Includes 3,777,844 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Spiegel is trustee and holds voting power.

(2)    Includes 5,307,526 shares of Class A common stock and 5,862,410 shares of Class B common stock held in trust for which Mr. Murphy is trustee and holds voting power.

(3)    Includes 99,170 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2023.

(4)    Includes (a) 21,963 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2023, and (b) 3,321 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2023.

(5)    Includes (a) 79,336 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2023, (b) 473,845 shares of Class A common stock held in trust for which Mr. O'Sullivan retains investment power, and (c) 160 shares of Class A common stock held by members of Mr. O'Sullivan's immediate family for which Mr. O'Sullivan disclaims beneficial ownership except as to indirect pecuniary interest, if any.

(6)    Includes RSUs for 252,752 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2023.

(7)    Includes (a) 158,672 shares of Class A common stock that are unvested and subject to forfeiture as of December 31, 2023, (b) 700,000 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023, and (c) 1,252,398 shares held in trust for which Mr. Hunter is trustee and holds dispositive power.

(8)    Includes (a) 720,927 shares of Class A common stock held in trust for which Mr. Lynton is trustee and (b) 65,553 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(9)    Includes 31,896 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(10)    Includes 65,553 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(11)    Includes 21,896 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(12)    Includes 65,553 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(13)    Includes 63,553 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(14)    Includes 18,908 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023.

(15)    Consists of (a) 114,864,929 shares of Class A common stock (of which 200,469 shares are unvested and subject to forfeiture as of December 31, 2023), 11,724,820 shares of Class B common stock, and 231,626,943 shares of Class C common stock held by our current directors and executive officers or for which they serve as trustees, (b) RSUs for 256,073 shares of Class A common stock for which the service-based vesting condition would be satisfied within 60 days of December 31, 2023, and (c) 332,912 shares of Class A common stock issuable upon exercise of stock options exercisable within 60 days of December 31, 2023. Does not include shares held by Mr. Hunter, as he was not an executive officer as of December 31, 2023, or Mr. Meresman, as he was not a director as of December 31, 2023.

(16)    Based on information reported by FMR LLC on Schedule 13G/A filed with the SEC on February 9, 2023. FMR LLC reported as a parent holding company that certain of its subsidiaries have sole dispositive power with respect to 147,283,704 shares of Class A common stock and sole voting power with respect to 138,445,270 shares of Class A common stock. FMR LLC reported that Fidelity Management & Research Company LLC beneficially owns 5% or greater of the outstanding shares of Class A common stock. FMR LLC listed its address as 245 Summer Street, Boston, Massachusetts 02210.

(17)    Tencent Holdings Limited reported in its 2021 Interim Report that, as of June 30, 2021, it was interested in approximately 243 million shares of Snap Inc., and has not provided any update in subsequent reports. We believe, based on such reporting and our corporate and transfer agent records, that Tencent Holdings Limited and its affiliates beneficially own 10,344,970 shares of Class B Common Stock, and the balance of any remaining shares they hold are Class A Common Stock. As noted above, holders of our Class A common stock, other than our directors or officers, are exempt from the obligation to file reports under Sections 13(d), 13(g), and 16 of the Exchange Act and may hold the stock in nominee or "street name" such that we are not able to identify or confirm their ownership. Tencent Holdings Limited listed its registered address as Hutchins Drive, P.O. Box 2681, Grand Cayman KY1-1111 Cayman Islands.

(18)    Based on information reported by The Vanguard Group on Schedule 13G filed with the SEC on February 9, 2023. The Vanguard Group reported that it has sole voting power with respect to 0 shares of Class A common stock, sole dispositive power with respect to 88,507,986 shares of Class A common stock, and shared dispositive power with respect to 1,117,894 shares of Class A common stock. The Vanguard Group listed its address as 100 Vanguard Blvd., Malvern, Pennsylvania 19355.

Table of Contents

**Securities Authorized for Issuance under Equity Incentive Plans**

The table set forth below provides information concerning the awards that may be issued under our 2012 Plan, 2014 Plan, and 2017 Plan as of December 31, 2023:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights [1] (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights [2] (b) | Number of Securities Remaining Available for Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders [3] | 157,962,988 | $ 14.90 | 120,389,053 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 157,962,988 | $ 14.90 | 120,389,053 |

(1) Excludes RSAs subject to forfeiture that are already included within issued and outstanding Class A common stock as of December 31, 2023.

(2) The weighted-average exercise price does not reflect shares that will be issued in connection with the settlement of RSUs, since RSUs have no exercise price.

(3) Prior to our initial public offering, we granted awards under our 2012 Plan and our 2014 Plan. Following our initial public offering, we granted awards under our 2017 Plan, other than certain awards to our employees and consultants in France, which were granted under our 2014 Plan.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

Other than compensation arrangements for our directors and executive officers, which are described elsewhere in this Annual Report on Form 10-K, below we describe transactions since January 1, 2023 to which we were a party or will be a party, in which:

- the amounts involved exceeded or will exceed $120,000; and

- any of our directors, executive officers, or holders of more than 5% of our capital stock, or any member of the immediate family of, or person sharing the household with, the foregoing persons, had or will have a direct or indirect material interest.

**Investor Rights Agreement**

We are party to an amended and restated investor rights agreement, which provides Mr. Spiegel and Mr. Murphy with certain registration rights with respect to up to an aggregate of 334,747,047 shares of our Class A common stock (including shares issuable on conversion of Class C common stock, which are initially convertible into Class B common stock). Under this agreement, Mr. Spiegel and Mr. Murphy have the right to request that their shares be covered by a registration statement that we are otherwise filing.

**Co-Founder Agreements and Related Agreements**

We are party to a series of agreements with Mr. Spiegel and Mr. Murphy, and certain of their respective affiliates, as applicable, which include: (i) employment agreements pursuant to which each individual will continue to serve in their respective roles at Snap for an initial five-year term ending on January 1, 2027, subject to automatic renewals for successive five year periods unless earlier terminated as provided in their respective employment agreements, (ii) the Future Stock Split, which shall not be declared and paid until the first business day following the date on which the average of the volume weighted average price per share of Class A common stock equals or exceeds $40 per share for 65 consecutive trading days by July 21, 2032 (subject to revised terms pursuant to a potential settlement, as described above in "Employment, Severance, and Change in Control Agreements"), and (iii) the Co-Founder Agreements, which include (a) the requirement under certain circumstances to convert an equal number of shares of Class B common stock or Class C

common stock into Class A common stock in connection with sales by such individual of shares of Class A common stock received in the special dividend, (b) conversion of such individual's remaining shares of Class C common stock into Class B common stock at such time as such Class C common stock represents in the aggregate less than 60% of such individual's Base Class C Common Stock (as such term is defined in our certification of incorporation), and (c) in the event of any sale or liquidation of Snap Inc. following the special dividend, shares of Class A common stock, Class B common stock, and Class C common stock are to be treated identically, equally, and ratably, on a per share basis, with respect to any consideration received.

### Munger, Tolles & Olson LLP

We have in the past engaged the law firm Munger, Tolles & Olson LLP, or Munger, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's father, John Spiegel, is a partner at Munger and has provided legal services to us. For the year ended December 31, 2023, total services provided by Munger were approximately $12.2 million.

Our general counsel, Michael O'Sullivan, is a former attorney at Munger.

### Gibson, Dunn & Crutcher LLP

We have in the past engaged the law firm Gibson, Dunn & Crutcher LLP, or Gibson, to provide certain legal services to us, and may do so in the future. Mr. Spiegel's stepmother, Debra Wong Yang, is a partner at Gibson and has provided legal services to us. For the year ended December 31, 2023, total services provided by Gibson were approximately $2.9 million.

### Entities Affiliated with FMR LLC

In the ordinary course of business, FMR LLC and its affiliates, who hold 5% or more of our Class A common stock at December 31, 2023, purchased approximately $4.7 million of our advertising products for the year ended December 31, 2023. In addition, we use affiliates of FMR LLC for certain services related to our 401(k) plan. For the year ended December 31, 2023 total services provided by affiliates of FMR LLC were approximately $0.3 million.

### Entities Affiliated with Tencent

In the ordinary course of business, Tencent Holdings Limited and its affiliates (other than affiliates in which we do not believe Tencent Holdings Limited holds or held a material interest), who hold 5% or more of our Class B common stock at December 31, 2023, purchased approximately $9.6 million of our advertising products for the year ended December 31, 2023.

### Aviation Matters

*Airplane Leases*

In June 2018, we entered into a lease of an aircraft from an entity controlled by Mr. Spiegel on terms that are advantageous to us. Under the terms of this lease, Mr. Spiegel's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Spiegel's entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Spiegel and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality, privacy, and safety.

Mr. Spiegel may use aircraft leased by us for personal use pursuant to a time sharing agreement between us and Mr. Spiegel in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Spiegel and guests are flown by our pilots and crew members. Mr. Spiegel reimburses us for certain costs incurred by us in connection with these flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Spiegel has family or guests accompanying him on business flights, Mr. Spiegel cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations. In 2023, the amount that Mr. Spiegel could not reimburse was $144,136.

In September 2022, we entered into a lease of an aircraft from an entity controlled by Mr. Murphy on terms that are advantageous to us. Under the terms of this lease, Mr. Murphy's entity leases the aircraft to us for $0. We cover all the operating, maintenance, and insurance costs, and property taxes associated with the aircraft. The lease has a one-year term, which is automatically extended for successive one-year periods unless terminated by either party. We or Mr. Murphy's entity may terminate the lease at any time on one year's prior written notice. The audit and compensation committees of our board of directors approved this lease based on our overall security program for Mr. Murphy and their assessment that such an arrangement is more efficient and flexible, and better ensures confidentiality, privacy, and safety.

Mr. Murphy may use aircraft leased by us for personal use pursuant to a time sharing agreement between us and Mr. Murphy in accordance with the provisions of Federal Aviation Regulations 91.501(c). On these flights, Mr. Murphy and guests are flown by our pilots and crew members. Mr. Murphy reimburses us for certain costs incurred by us in connection with these flights, up to the maximum permitted under the Federal Aviation Regulations 91.501(d). When Mr. Murphy has family or guests accompanying him on business flights, Mr. Murphy cannot reimburse the incremental cost to us for such family or guests under the Federal Aviation Regulations.

*Hangar Leases*

In November 2020, we and Mr. Spiegel's entity entered into a twelve-year sublease for $0 allowing us to build and operate a new hangar on that site to support our aviation program, including the storage and operation of the aircraft that we lease from Mr. Spiegel and Mr. Murphy. Construction of this hangar was completed in 2022. Mr. Spiegel's entity is solely responsible for the ground lease rental payments, certain airport fees, and taxes. In exchange for certain construction-related costs and ground lease payments that Mr. Spiegel's entity has incurred and will continue to incur, Mr. Spiegel's entity has the right to occupy space at the hangar that Snap does not require for its aviation program at a market rate determined at the time this arrangement was entered into. As of December 31, 2023, Mr. Spiegel's entity had a credit balance of approximately $2.0 million that can be used for future rent or, to the extent not utilized by the end of the term, to purchase the hangar from Snap under the terms of the sublease. No credit balance will be paid to Mr. Spiegel in cash.

Subject to certain limited exceptions, neither party may terminate this sublease for a minimum of six years. After this period, either party may terminate the sublease on 24 months' notice to the other party. Upon termination of the sublease, Mr. Spiegel's entity will purchase the hangar from Snap at its fair market value on the termination date. The audit and compensation committees of our board of directors approved this arrangement based on their assessment that it is fair and reasonable to us.

**Employment Relationships**

Mr. Hunter's son, John Hunter, has been employed by us since May 2021. In 2023, John Hunter's base salary and discretionary bonus was $146,688, which along with other benefits he received, were commensurate with similar roles at Snap Inc. In addition, in 2023 he received 3,929 restricted stock units, subject to vesting in various periods from 2023 through 2025, in each case commensurate with similar roles at Snap Inc. John Hunter is not part of Mr. Hunter's household.

**Indemnification Agreements**

Our certificate of incorporation contains provisions limiting the liability of directors, and our bylaws provide that we will indemnify each of our directors and officers to the fullest extent permitted under Delaware law. Our certificate of incorporation and bylaws also provide our board of directors with discretion to indemnify our employees and other agents when determined appropriate by the board. In addition, we have entered into an indemnification agreement with each of our directors and executive officers, which requires us to indemnify them.

**Policies and Procedures for Transactions with Related Persons**

In May 2023, we entered into a revised policy that our executive officers, directors, nominees for election as a director, beneficial owners of more than 5% of any class of our common stock, and any members of the immediate family of any of the foregoing persons are not permitted to enter into a related person transaction with us without the approval or ratification of our board of directors, our audit committee, or any other independent board committee, as appropriate. Any request for us to enter into a transaction with an executive officer, director, nominee for election as a director, beneficial owner of more than 5% of any class of our common stock, or any member of the immediate family of any of the foregoing persons, in which the amount involved exceeds $120,000 ($50,000 prior to the May 2023 revision) and such person would

have a direct or indirect interest, must be presented to our board of directors, audit committee, or, as appropriate, an independent committee for review, consideration, and approval. In approving or rejecting any such proposal, the relevant approver is to consider the material facts of the transaction, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related person's interest in the transaction. Finally, as part of the revised policy the board reviewed and pre-approved certain categories of related party transactions. There were no 2023 transactions where the applicable policy was not followed.

## Director Independence

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Ms. Coffey, Ms. Coles, Ms. Jenkins, Mr. Lynton, Mr. Meresman (through July 2023), Mr. Miller, Mr. Spence, Ms. Thorpe, and Mr. Vargas do not have relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the listing standards. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our shares by each non-employee director and the transactions described above.

## Item 14. Principal Accountant Fees and Services.

The following table sets forth the aggregate fees for professional service provided by our independent registered public accounting firm, Ernst & Young LLP, for the years ended December 31, 2023 and 2022:

|  | Year Ended December 31, | | | |
|  | 2023 | | 2022 | |
|  | (in thousands) | | | |
|---|---|---|---|---|
| Audit Fees [1] | $ | 8,339 | $ | 8,766 |
| Audit-Related Fees |  | — |  | — |
| Tax Fees [2] |  | 2,952 |  | 1,399 |
| All Other Fees [3] |  | 836 |  | 593 |
| Total | $ | 12,127 | $ | 10,758 |

(1)   Audit fees consist of the fees for professional services rendered for the audit of our financial statements, audit of our internal control over financial reporting, review of our quarterly financial statements, filing of our registration statements, accounting consultations, and audits provided in connection with statutory filings.
(2)   Tax fees consist of the fees for professional services rendered in connection with tax compliance, tax advisory, and tax planning.
(3)   All other fees consist of fees for professional services other than the services reported in audit fees, audit-related fees, and tax fees.

The audit committee has adopted a pre-approval policy under which the audit committee approves in advance all audit and permissible non-audit services to be performed by the independent accountants (subject to a *de minimis* exception). These services may include audit services, audit-related services, tax services, and other non-audit services. As part of its pre-approval policy, the audit committee considers whether the provision of any proposed non-audit services is consistent with the SEC's rules on auditor independence. In accordance with its pre-approval policy, the audit committee has pre-approved certain specified audit and non-audit services to be provided by our independent auditor. If there are any additional services to be provided, a request for pre-approval must be submitted to the audit committee for its consideration under the policy. The audit committee generally pre-approves particular services or categories of services on a case-by-case basis. Finally, in accordance with the pre-approval policy, the audit committee has delegated pre-approval authority to the chair of the audit committee. The chair must report any pre-approval decisions to the audit committee at its next meeting.

All of the services of Ernst & Young LLP for 2023 and 2022 described above were in accordance with the audit committee pre-approval policy.

**PART IV**

**Item 15. Exhibit and Financial Statement Schedules.**

We have filed the following documents as part of this Annual Report on Form 10-K:

1.       Consolidated Financial Statements

See Index to Financial Statements and Supplementary Data on page 73.

2.       Financial Statement Schedules

All schedules have been omitted because they are not required, not applicable, not present in amounts sufficient to require submission of the schedule, or the required information is otherwise included.

3.       Exhibits

The documents set forth below are filed herewith or incorporated herein by reference to the location indicated.

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of Snap Inc. | S-1 | 333-215866 | 3.2 | February 2, 2017 |
| 3.2 | Amendment No. 1 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K | 001-38017 | 3.1 | July 21, 2022 |
| 3.3 | Certificate of Correction to Amendment No. 1 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K/A | 001-38017 | 3.1 | August 8, 2022 |
| 3.4 | Amendment No. 2 to the Amended and Restated Certificate of Incorporation of Snap Inc. | 8-K | 001-38017 | 3.1 | August 26, 2022 |
| 3.5 | Amended and Restated Bylaws of Snap Inc. | 10-K | 001-38017 | 3.2 | February 4, 2021 |
| 4.1 | Form of Class A Common Stock Certificate | S-1 | 333-215866 | 4.1 | February 2, 2017 |
| 4.2 | Form of Class B Common Stock Certificate | S-8 | 333-216495 | 4.6 | March 7, 2017 |
| 4.3 | Form of Class C Common Stock Certificate | S-8 | 333-216495 | 4.7 | March 7, 2017 |
| 4.4 | Description of Securities | | | | |
| 4.5 | Indenture, dated August 9, 2019, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | August 9, 2019 |
| 4.6 | Form of Global Note, representing Snap Inc.'s 0.75% Convertible Senior Notes due 2026 (included as Exhibit A to the Indenture filed as Exhibit 4.5) | 8-K | 001-38017 | 4.2 | August 9, 2019 |
| 4.7 | Indenture, dated April 28, 2020, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 28, 2020 |
| 4.8 | Form of Global Note, representing Snap Inc.'s 0.25% Convertible Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.7) | 8.K | 001-38017 | 4.2 | April 28, 2020 |
| 4.9 | Indenture, dated April 30, 2021, by and between Snap Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-38017 | 4.1 | April 30, 2021 |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 4.10 | Form of Global Note, representing Snap Inc.'s 0% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.9) | 8-K | 001-38017 | 4.2 | April 30, 2021 |
| 4.11 | Indenture, dated February 11, 2022, by and between Snap Inc. and U.S. Bank Trust Company, National Association, as Trustee. | 8-K | 001-38017 | 4.1 | February 11, 2022 |
| 4.12 | Form of Global Note, representing Snap Inc.'s 0.125% Convertible Senior Notes due 2028 (included as Exhibit A to the Indenture filed as Exhibit 4.1) | 8-K | 001-38017 | 4.2 | February 11, 2022 |
| 10.1+ | Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.2 | February 2, 2017 |
| 10.2+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.3 | February 2, 2017 |
| 10.3+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-215866 | 10.4 | February 2, 2017 |
| 10.4+ | Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.5 | February 2, 2017 |
| 10.5+ | Forms of grant notice, stock option agreement and notice of exercise under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.6 | February 2, 2017 |
| 10.6+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. Amended and Restated 2014 Equity Incentive Plan | S-1 | 333-215866 | 10.7 | February 2, 2017 |
| 10.7+ | Snap Inc. 2017 Equity Incentive Plan | S-8 | 333-216495 | 99.7 | March 7, 2017 |
| 10.8+ | Forms of global grant notice, stock option agreement and notice of exercise under the Snap Inc. 2017 Equity Incentive Plan | 10-K | 001-38017 | 10.8 | February 3, 2022 |
| 10.9+ | Forms of restricted stock unit grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-Q | 001-38017 | 10.1 | October 24, 2023 |
| 10.10+ | Forms of restricted stock award grant notice and award agreement under the Snap Inc. 2017 Equity Incentive Plan | 10-Q | 001-38017 | 10.4 | October 26, 2018 |
| 10.11+ | Snap Inc. 2017 Employee Stock Purchase Plan | S-1 | 333-215866 | 10.11 | February 2, 2017 |
| 10.12+ | Form of indemnification agreement | S-1 | 333-215866 | 10.12 | February 2, 2017 |
| 10.13 | Co-Founder's Agreement among Snap Inc., Evan Spiegel, and other Holders signatory thereto, made as of July 21, 2022 | 8-K | 001-38017 | 10.1 | July 21, 2022 |
| 10.14 | Co-Founder's Agreement among Snap Inc., Robert Murphy, and other Holders signatory thereto, made as of July 21, 2022 | 8-K | 001-38017 | 10.2 | July 21, 2022 |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 10.15+ | Employment Agreement by and between Snap Inc. and Evan Spiegel, dated July 21, 2022 | 8-K | 001-38017 | 10.3 | July 21, 2022 |
| 10.16+ | Employment Agreement by and between Snap Inc. and Robert Murphy, dated July 21, 2022 | 8-K | 001-38017 | 10.4 | July 21, 2022 |
| 10.17+ | Offer Letter, by and between Snap Inc. and Michael O'Sullivan, dated July 24, 2017 | 10-Q | 001-38017 | 10.1 | November 8, 2017 |
| 10.18+ | Amended and Restated Offer Letter, by and between Snap Inc. and Jerry Hunter, dated October 7, 2020 | 10-K | 001-38017 | 10.16 | February 4, 2021 |
| 10.19+ | Offer Letter, by and between Snap Inc. and Derek Andersen, dated May 16, 2019 | 8-K | 001-38017 | 10.1 | May 20, 2019 |
| 10.20+ | Offer Letter, by and between Snap Inc. and Rebecca Morrow, dated July 12, 2019 | 10-Q | 001-38017 | 10.1 | October 23, 2019 |
| 10.21+ | Offer Letter, by and between Snap Inc. and Erick Young, dated April 14, 2023 | 8-K | 001-3817 | 10.1 | June 5, 2023 |
| 10.22+ | Snap Inc. 2023 Bonus Program | 10-Q | 001-38017 | 10.1 | April 27, 2023 |
| 10.23 | Revolving Credit Agreement by and among Snap Inc., the lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, dated May 6, 2022 | 10-Q | 001-38017 | 10.2 | July 21, 2022 |
| 10.24 | Snap Inc. Non-Employee Director Compensation Policy | 10-Q | 001-38017 | 10.3 | July 25, 2023 |
| 10.25+ | Form of Time Share Agreement | 10-Q | 001-38017 | 10.3 | October 26, 2018 |
| 10.26+ | Snap Inc. Incentive Compensation Recoupment Policy | | | | |
| 10.27+ | Snap Inc. 2024 Bonus Program | | | | |
| 21.1 | List of Subsidiaries | 10-K | 001-38017 | 21.1 | January 31, 2023 |
| 23.1 | Consent of Ernst & Young, LLP, independent registered public accounting firm | | | | |
| 31.1 | Certification of the Chief Executive Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934 | | | | |
| 31.2 | Certification of the Chief Financial Officer of Snap Inc. pursuant to Rule 13a-14(a)/15d-14(a) under the Securities Exchange Act of 1934 | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer of Snap Inc. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | |
| 101.INS | Inline XBRL Instance Document (the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document). | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | | | | |

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Schedule Form | File Number | Exhibit | Filing Date |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | |

\+   Indicates management contract or compensatory plan.
\*   The certifications furnished in Exhibit 32.1 hereto are deemed to accompany this Annual Report on Form 10-K and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the Registrant specifically incorporates it by reference.

**Item 16. Form 10-K Summary.**

None.

146

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized**.**

**SNAP INC.**

Date: February 6, 2024 /s/ Derek Andersen

Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

Date: February 6, 2024 /s/ Rebecca Morrow

Rebecca Morrow
Chief Accounting Officer
*(Principal Accounting Officer)*

147

Pursuant to the requirements of the Securities Exchange Act of 1934 this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Evan Spiegel<br>Evan Spiegel | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 6, 2024 |
| /s/ Robert Murphy<br>Robert Murphy | Director and Chief Technology Officer | February 6, 2024 |
| /s/ Derek Andersen<br>Derek Andersen | Chief Financial Officer<br>*(Principal Financial Officer)* | February 6, 2024 |
| /s/ Rebecca Morrow<br>Rebecca Morrow | Chief Accounting Officer<br>*(Principal Accounting Officer)* | February 6, 2024 |
| /s/ Kelly Coffey<br>Kelly Coffey | Director | February 6, 2024 |
| /s/ Joanna Coles<br>Joanna Coles | Director | February 6, 2024 |
| /s/ Elizabeth Jenkins<br>Elizabeth Jenkins | Director | February 6, 2024 |
| /s/ Michael Lynton<br>Michael Lynton | Director | February 6, 2024 |
| /s/ Patrick Spence<br>Patrick Spence | Director | February 6, 2024 |
| /s/ Scott D. Miller<br>Scott D. Miller | Director | February 6, 2024 |
| /s/ Poppy Thorpe<br>Poppy Thorpe | Director | February 6, 2024 |
| /s/ Fidel Vargas<br>Fidel Vargas | Director | February 6, 2024 |

Exhibit 4.4

## DESCRIPTION OF THE REGISTRANT'S SECURITIES
### REGISTERED PURSUANT TO SECTION 12 OF THE
### SECURITIES EXCHANGE ACT OF 1934

Snap Inc. ("we," "our," or "us") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our Class A common stock, $0.00001 par value per share. The following description of our capital stock is a summary and does not purport to be complete. It is qualified in its entirety by, and should be read in conjunction with, our certificate of incorporation, bylaws, and applicable Delaware law.

**Authorized Capital Stock**

Our authorized capital stock consists of 4,460,887,848 shares, of which:

- 3,000,000,000 shares are designated as Class A common stock, $0.00001 par value per share;
- 700,000,000 shares are designated as Class B common stock, $0.00001 par value per share;
- 260,887,848 shares are designated as Class C common stock, $0.00001 par value per share; and
- 500,000,000 shares are designated as preferred stock, $0.00001 par value per share.

**Class A Common Stock, Class B Common Stock, and Class C Common Stock**

*Voting Rights*

Our Class A common stock is non-voting and is not entitled to any votes on any matter that is submitted to a vote of our stockholders, except as required by Delaware law. Delaware law would permit holders of Class A common stock to vote, with one vote per share, on a matter if we were to:

- change the par value of the common stock; or
- amend our certificate of incorporation to alter the powers, preferences, or special rights of the common stock as a whole in a way that would adversely affect the holders of our Class A common stock.

In addition, Delaware law would permit holders of Class A common stock to vote separately, as a single class, if an amendment to our certificate of incorporation would adversely affect them by altering the powers, preferences, or special rights of the Class A common stock, but not the Class B common stock or Class C common stock. As a result, in these limited instances, the holders of a majority of the Class A common stock could defeat any amendment to our certificate of incorporation. For example, if a proposed amendment of our certificate of incorporation provided for the Class A common stock to rank junior to the Class B common stock and Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock, with each share of Class A common stock entitled to one vote per share. In this instance, the holders of a majority of Class A common stock could defeat that amendment to our certificate of incorporation. Moreover, if an amendment to our certificate of incorporation would alter the powers, preferences, or special rights of the Class A common stock and either the Class B common Stock or the Class C common stock in a way that would affect them adversely compared to the unaffected class, Delaware law would permit the holders of Class A common stock to vote with the other adversely affected class of common stock together as a single class. For example, if a proposed amendment to our certificate of incorporation provided for the Class A common stock and Class B common stock to rank junior to the Class C common stock with respect to (i) any dividend or distribution, (ii) the distribution of proceeds were we to be acquired, or (iii) any other right, Delaware law would require the vote of the Class A common stock and Class B common stock voting together as a single class, with each share of Class A common stock and Class B common stock entitled to one vote per share. In this instance, the holders of a majority of the Class A common stock and Class B common stock, voting together as a single class, could defeat that amendment to our certificate of incorporation.

Our certificate of incorporation provides that the number of authorized shares of common stock or any class of common stock, including our Class A common stock, may be increased or decreased (but not below the number of shares of common stock then outstanding) by the affirmative vote of the holders of a majority of the Class B

common stock and Class C common stock, voting together as a single class. As a result, the holders of a majority of the outstanding Class B common stock and Class C common stock can approve an increase or decrease in the number of authorized shares of Class A common stock without a separate vote of the holders of Class A common stock. This could allow us to increase and issue additional shares of Class A common stock beyond what is currently authorized in our certificate of incorporation without the consent of the holders of our Class A common stock.

Holders of our Class B common stock are entitled to one vote per share and holders of Class C common stock are entitled to ten votes per share on any matter submitted to our shareholders. Except as set forth above, holders of shares of Class B common stock and Class C common stock will vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders. In addition, each class of our common stock may have the right to vote separately in certain instances as listed below under "-Economic Rights."

On the date that all outstanding shares of Class C common stock have converted to Class B common stock, all shares of Class B common stock will convert to Class A common stock and the holders of Class A common stock will be entitled to one vote per share.

Our certificate of incorporation does not provide for cumulative voting for the election of directors.

### Founder Proxy Agreement

Evan Spiegel and Robert Murphy, our co-founders, have entered into a proxy agreement with each other. The agreement will apply to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over.

Under the proxy agreement, Mr. Spiegel has designated Mr. Murphy as his designated proxy holder, and Mr. Murphy has designated Mr. Spiegel as his designated proxy holder. Each co-founder has the right to select from time to time an alternate proxy holder who would exercise the proxy if the primary proxy holder were unable or unwilling to serve as a proxy. Mr. Spiegel and Mr. Murphy may not change the primary proxy holder without the other's consent. Mr. Spiegel and Mr. Murphy have each appointed Michael Lynton as his alternate proxy. Mr. Spiegel and Mr. Murphy may not change the primary proxy holder without the other's consent. A proxy holder will have the right to exercise all of the voting and consent rights of our shares of Class B common stock and Class C common stock beneficially owned by the deceased or disabled co-founder or over which he has voting control on and for the nine months following the co-founder's death or during his disability. Before any proxy holder may vote or act by written consent with respect to the shares of Class B common stock and Class C common stock over which they hold a proxy, that proxy holder will meet with the independent members of our board of directors within 90 days of the co-founder's death or disability.

The proxy agreement will terminate as soon as any of the following occur: (i) nine months after the death of both Mr. Spiegel and Mr. Murphy, (ii) the liquidation, dissolution, or winding up of our business operations, (iii) the execution by us of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of our property and assets, or (iv) the date as of which Mr. Spiegel and Mr. Murphy terminate the proxy agreement by written consent of Mr. Spiegel and Mr. Murphy, with notice to us.

### Co-Founder's Agreements

Each of Evan Spiegel and Robert Murphy has also entered into a co-founder's agreement, pursuant to which, under certain circumstances related to the Special Dividend (as defined under the heading "Economic Rights – Dividends and Distributions" below) Mr. Spiegel and Mr. Murphy must convert a share of Class B common stock or Class C common stock, as the case may be, into a share of Class A common stock.

Specifically, (i) in the event Mr. Spiegel or Mr. Murphy sells during any Conversion Period (as defined below) a share of Class A common stock received as the Special Dividend on a share of Class B common stock, he shall be required to convert such share of Class B common stock into a share of Class A common stock and (ii) in the event Mr. Spiegel or Mr. Murphy sells during any Conversion Period a share of Class A common stock received as the Special Dividend on a share of Class C common stock, he shall be required to convert such share of Class C common stock into one share of Class A common stock ((i) and (ii) collectively, the "Conversion Requirement"), unless a majority of the Independent Directors (as defined in our certificate of incorporation) waives the Conversion Requirement prior to such conversion.

"Conversion Period" shall mean either of the following periods of time: (i) beginning on June 30, 2023 and ending on January 1, 2027; or (ii) beginning on the date (if any) on which Mr. Spiegel or Mr. Murphy, as applicable, has neither been a director nor an employee for a continuous period of two (2) years (subject to certain exceptions), and ending on the date (if any) on which Mr. Spiegel or Mr. Murphy, as applicable, resumes service with us as a director or employee; provided, that no Conversion Period shall commence prior to the declaration and payment of the Special Dividend.

The Conversion Requirement does not apply to any sale (i) that would meet the requirements of a permitted transfer or (ii) (x) that constitutes a donation of such dividend shares to a tax-exempt organization or (y) the net proceeds of which are donated to a tax-exempt organization.

Each co-founder's agreement will terminate as soon as any of the following occur: (i) Mr. Spiegel or Mr. Murphy, as applicable, along with their permitted transferees and qualified trusts and certain affiliates, ceases to own any shares of Class C common stock or Class B common stock following the payment of the Special Dividend (including as a result of the occurrence of the Final Conversion Date (as defined in our certificate of incorporation)); (ii) if the condition for the declaration of the Special Dividend has not been satisfied as of such date, the tenth (10th) anniversary of the effective date of the co-founder's agreement; or (iii) the date as of which Mr. Spiegel or Mr. Murphy, as applicable, agrees to terminate the co-founder's agreement and such termination has been approved by a majority of the Independent Directors and executed on our behalf.

### Economic Rights

Except as otherwise expressly provided in our certificate of incorporation or required by Delaware law, all shares of Class A common stock, Class B common stock, and Class C common stock will have the same rights and privileges and rank equally, share ratably, and be identical in all respects for all matters, including those described below:

*Dividends and Distributions.* Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably, on a per share basis, with respect to any dividend or distribution of cash or property paid or distributed by us, unless different treatment of the shares of the affected class is approved by the affirmative vote of the holders of a majority of the outstanding shares of the class treated adversely voting separately as a class. Even though holders of Class A common stock are not normally entitled to a vote on matters presented to our stockholders, they would be entitled to vote separately as a class, with one vote per share, on dividends and distributions if the holders of Class A common stock were treated adversely. As a result, if the holders of Class A common stock were treated adversely in any dividend or distribution, the holders of a majority of Class A common stock could defeat that dividend or distribution. In addition, if any two classes of common stock are treated adversely relative to another class of common stock with respect to any dividend or distribution, the vote of the holders of a majority of the adversely affected classes, voting together as a single class, would be required to approve that dividend or distribution. For example, if we were to make a distribution of cash to the holders of Class C common stock but not make a cash distribution or make a distribution of stock instead of cash to the holders of Class A common stock and Class B common stock, the holders of a majority of Class A common stock and Class B common stock, voting together as a single class, would be required to approve that dividend or distribution. In that scenario, each share of Class A common stock and Class B common stock would be entitled to one vote per share.

On July 19, 2022, our board of directors, after receiving the recommendation of a special committee of the board of directors (the "Special Committee"), determined that it is advisable and in our best interests, and in the best interests of our stockholders (other than Mr. Spiegel and Mr. Murphy and certain of their respective affiliates that hold shares of our capital stock, as to whom no determination was made), to declare and pay a special dividend of one share of Class A common stock as a one-time stock dividend on each outstanding share of our common stock (the "Special Dividend"); provided, however, that the Special Dividend shall not be declared until the later of (i) June 30, 2023 and (ii) the first business day following the date on which the 65-Day VWAP (as defined below) equals or exceeds $40 per share, or, if the board of directors so determines, a date that is within five business days after the later of such two dates. "65-Day VWAP" means the average of the volume weighted average price per share of Class A common stock traded on the New York Stock Exchange, or any other national securities exchange on which the shares of Class A common stock are then traded, for each of the 65 trading days ending on, and including, the first trading day immediately preceding the date of determination of the 65-Day VWAP. If the 65-Day VWAP does not exceed $40 per share by July 21, 2032, the Special Dividend will not be declared and paid and the co-founder's agreements shall terminate and be of no further force and effect.

*Liquidation Rights.* On our liquidation, dissolution, or winding-up, the holders of Class A common stock, Class B common stock, and Class C common stock will be entitled to share equally, identically, and ratably in all assets remaining after the payment of any liabilities, liquidation preferences, and accrued or declared but unpaid dividends, if any, with respect to any outstanding preferred stock, unless a different treatment is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class. As a result, the holders of a majority of each class of common stock, including the Class A common stock, could defeat a proposed distribution of any assets on our liquidation, dissolution, or winding-up if that distribution were not to be shared equally, identically, and ratably.

*Change of Control Transactions*. The holders of Class A common stock, Class B common stock, and Class C common stock will be treated equally and identically with respect to shares of Class A common stock, Class B common stock, or Class C common stock owned by them, unless different treatment of the shares of each class is approved by the affirmative vote of the holders of a majority of the outstanding shares of each class of common stock, including the Class A common stock, voting separately as a class, on (i) the closing of the sale, transfer, or other disposition of all or substantially all of our assets, (ii) the consummation of a merger, reorganization, consolidation, or share transfer which results in our voting securities outstanding immediately before the transaction (or the voting securities issued with respect to our voting securities outstanding immediately before the transaction) representing less than a majority of the combined voting power of the voting securities of the company or the surviving or acquiring entity, or (iii) the closing of the transfer (whether by merger, consolidation, or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons of securities of the company if, after closing, the transferee person or group would hold 50% or more of the outstanding voting power of the company (or the surviving or acquiring entity). However, consideration to be paid or received by a holder of common stock in connection with any such asset sale, merger, reorganization, consolidation, or share transfer under any employment, consulting, severance, or other arrangement will be disregarded for the purposes of determining whether holders of common stock are treated equally and identically. As a result, the holders of a majority of each class of common stock, including the holders Class A common stock, could defeat a change of control transaction if the holders of Class A common stock, Class B common stock, and Class C common stock were not to be treated equally and identically in such change of control transaction.

*Subdivisions and Combinations*. If we subdivide or combine in any manner outstanding shares of Class A common stock, Class B common stock, or Class C common stock, the outstanding shares of the other classes will be subdivided or combined in the same manner.

If holders of Class A common stock are treated the same as holders of Class B common stock and Class C common stock with respect to the dividends and distributions, liquidation rights, change of control transactions, and subdivisions and combinations, such holders of Class A common stock will not have the right to vote on such matters.

### No Preemptive or Similar Rights

Our Class A common stock, Class B common stock, and Class C common stock are not entitled to preemptive rights, and are not subject to conversion, redemption, or sinking fund provisions, except for the conversion provisions with respect to the Class B common stock and Class C common stock described below.

### Conversion

Each share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. Each share of Class C common stock is convertible at any time at the option of the holder into one share of Class B common stock.

On any transfer of shares of Class B common stock, whether or not for value, each such transferred share will automatically convert into one share of Class A common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder continues to hold sole voting and dispositive power with respect to the shares transferred. Any holder's shares of Class B common stock will automatically convert into Class A common stock, on a one-to-one basis, on the death of the holder.

On any transfer of shares of Class C common stock, whether or not for value, each transferred share will automatically convert into one share of Class B common stock, except for certain transfers described in our certificate of incorporation, including transfers for tax and estate planning purposes, so long as the transferring holder or a qualified trustee for that holder continues to hold sole voting and dispositive power with respect to the shares transferred, and transfers between founders.

Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, on the date on which the number of outstanding shares of Class C common stock held by that holder represents less than 32,383,178 shares of Class C common stock, which represents 30% of the 107,943,924 shares of Class C common stock held by that holder on the date of the closing of our initial public offering. Any holder's shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months after the death of that holder. Once there are no shares of Class C common stock outstanding, all shares of Class B common stock will convert to Class A common stock, on a one-to-one basis, and all shares of Class A common stock will have one vote per share, as described in our certificate of incorporation. Either of our founders may transfer shares of Class B common stock or Class C common stock to the other founder or a founder's permitted transferee without such transferred shares converting into Class A common stock or Class B common

4

stock, respectively. In addition, either founder may transfer shares of Class B common stock or Class C common stock to a qualified trustee without such transferred shares converting into Class A common stock or Class B common stock, respectively. A qualified trustee is a professional in the business of providing trustee services that is subject to appointment and removal solely by that founder or, following a founder's death or during the founder's disability event, by the founder's designated proxy (who may be the other founder or another person selected by the founder and approved to act in that role by the independent members of our board of directors). A qualified trustee may not have any pecuniary interest in any Class B common stock or Class C common stock held by any entity of which that person is a trustee. Shares of Class C common stock held by a founder's qualified trustee will convert to Class B common stock nine months after the death of that founder. Termination of a founder's employment or services with us does not result in conversion of Class C common stock held by such founder.

Once transferred and converted into Class A common stock, the Class B common stock may not be reissued. Once transferred and converted into Class B common stock, the Class C common stock may not be reissued.

## Preferred Stock

Our board of directors may, without further action by our stockholders, fix the rights, preferences, privileges, and restrictions of up to an aggregate of 500,000,000 shares of preferred stock in one or more series and authorize their issuance. These rights, preferences, and privileges could include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, and the number of shares constituting any series or the designation of such series, any or all of which may be greater than the rights of our Class A common stock, Class B common stock, or Class C common stock. Any issuance of our preferred stock could adversely affect the voting power of holders of our Class B common stock or Class C common stock, and the likelihood that such holders would receive dividend payments and payments on liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring, or preventing a change of control or other corporate action.

## Anti-Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws

Because our stockholders do not have cumulative voting rights, stockholders holding a majority of the voting power of our shares of common stock will be able to elect all of our directors. Our certificate of incorporation and bylaws provide for stockholder actions at a duly called meeting of stockholders or, before the date on which all shares of common stock convert into a single class, by written consent. A special meeting of stockholders may be called by a majority of the total number of authorized directors of our board of directors, the chair of our board of directors, our chief executive officer, or, before the date on which all shares of common stock convert into a single class, the holders of at least 30% of the total voting power of our Class A common stock, Class B common stock, and Class C common stock, voting together as a single class. Our bylaws include an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors.

Our certificate of incorporation further provides for a tri-class common stock structure, which provides Mr. Spiegel, our co-founder and Chief Executive Officer, and Mr. Murphy, our co-founder and Chief Technology Officer, or Mr. Spiegel alone, with control over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets.

The foregoing provisions will make it more difficult for our existing stockholders, other than Mr. Spiegel and Mr. Murphy, or Mr. Spiegel alone, to replace our board of directors as well as for another party to obtain control of us by replacing our board of directors. Since our board of directors has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management. In addition, the authorization of undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change our control.

These provisions, including the tri-class structure of our common stock, are intended to preserve our existing founder control structure, facilitate our continued product innovation and the risk-taking that it requires, permit us to continue to prioritize our long-term goals rather than short-term results, enhance the likelihood of continued stability in the composition of our board of directors and its policies, and discourage certain types of transactions that may involve an actual or threatened acquisition of us. These provisions are also designed to reduce our vulnerability to an unsolicited acquisition proposal and to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for our shares and may have the effect of deterring hostile takeovers or delaying changes in our control or management. As a consequence, these provisions may also inhibit fluctuations in the market price of our stock that could result from actual or rumored takeover attempts.

When we have a class of voting stock that is either listed on a national securities exchange or held of record by more than 2,000 stockholders, we will be subject to Section 203 of the Delaware General Corporation Law, or the DGCL. Section 203 of the DGCL prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years after the date that such stockholder became an interested stockholder, subject to certain exceptions.

**Choice of Forum**

Our certificate of incorporation provides that the Court of Chancery of the State of Delaware will be the exclusive forum for: (i) any derivative action or proceeding brought on our behalf; (ii) any action asserting a breach of fiduciary duty; (iii) any action asserting a claim against us arising under the DGCL, our certificate of incorporation, or our bylaws; or (iv) any action asserting a claim against us that is governed by the internal affairs doctrine.

This provision would not apply to actions brought to enforce a duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Furthermore, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all Securities Act claims, which means both courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our certificate of incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act.

**Listing**

Our Class A common stock is listed on the New York Stock Exchange under the symbol "SNAP."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is Equiniti Trust Company.

Exhibit 10.26

SNAP INC.
INCENTIVE COMPENSATION RECOUPMENT POLICY
(ADOPTED NOVEMBER 29, 2023)

**1.   INTRODUCTION**

The Compensation Committee (the "**Compensation Committee**") of the Board of Directors (the "**Board**") of Snap Inc., a Delaware corporation (the "**Company**"), has determined that it is in the best interests of the Company and its stockholders to adopt this Incentive Compensation Recoupment Policy (this "***Policy***") providing for the Company's recoupment of Recoverable Incentive Compensation that is received by Covered Officers of the Company under certain circumstances. Certain capitalized terms used in this Policy have the meanings given to such terms in Section 3 below.

This Policy is designed to comply with, and will be interpreted to be consistent with, Section 10D of the Exchange Act, Rule 10D-1 promulgated thereunder ("**Rule 10D-1**") and Section 303A.14 of the New York Stock Exchange Listed Company Manual (the "**Listing Standards**").

**2.   EFFECTIVE DATE**

This Policy will apply to all Incentive Compensation that is received by a Covered Officer on or after October 2, 2023 (the "**Effective Date**"). Incentive Compensation is deemed "**received**" in the Company's fiscal period in which the Financial Reporting Measure specified in the Incentive Compensation award is attained, even if the payment or grant of such Incentive Compensation occurs after the end of that period.

**3.   DEFINITIONS**

"**Accounting Restatement**" means an accounting restatement that the Company is required to prepare due to the material noncompliance of the Company with any financial reporting requirement under applicable securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

"**Accounting Restatement Date**" means the earlier to occur of (a) the date that the Board, a committee of the Board authorized to take such action, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an Accounting Restatement, or (b) the date that a court, regulator, or other legally authorized body having jurisdiction directs the Company to prepare an Accounting Restatement.

"**Administrator**" means the Compensation Committee or, in the absence of such committee, the Board.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"**Covered Officer**" means each current and former Executive Officer.

"**Exchange**" means the New York Stock Exchange or any subsequent national securities exchange in which the Company's securities are listed.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Executive Officer**" means the Company's president, principal financial officer, principal accounting officer (or if there is no such accounting officer, the controller), any vice-president of the Company in charge of a principal business unit, division, or function (such as sales, administration, or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the Company. Executive officers of the Company's subsidiaries are deemed executive officers of the Company if they perform such policy-making functions for the Company. Policy-making function is not intended to include policy-making functions that are not significant. Identification of an executive officer for purposes of this Policy would include at a minimum executive officers identified pursuant to Item 401(b) of Regulation S-K promulgated under the Exchange Act.

"**Financial Reporting Measures**" means measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures derived wholly or in part from such measures, including Company stock price and total stockholder return ("**TSR**"). A measure need not be presented in the Company's financial statements or included in a filing with the SEC in order to be a Financial Reporting Measure.

"**Incentive Compensation**" means any compensation that is granted, earned or vested based wholly or in part on the attainment of a Financial Reporting Measure.

"**Lookback Period**" means the three completed fiscal years immediately preceding the Accounting Restatement Date, as well as any transition period (resulting from a change in the Company's fiscal year) within or immediately following those three completed fiscal years (except that a transition period of at least nine months shall count as a completed fiscal year). Notwithstanding the foregoing, the Lookback Period will not include fiscal years completed prior to the Effective Date.

"**Recoverable Incentive Compensation**" means Incentive Compensation received by a Covered Officer during the Lookback Period that exceeds the amount of Incentive Compensation that would have been received had such amount been determined based on the Accounting Restatement, computed without regard to any taxes paid (*i.e.*, on a gross basis without regarding to tax withholdings and other deductions). For any compensation plans or programs that take into account Incentive Compensation, the amount of Recoverable Incentive Compensation for purposes of this Policy will include, without limitation, the amount contributed to any notional account based on Recoverable Incentive Compensation and any earnings to date on that notional amount. For any Incentive Compensation that is based on stock price or TSR, where the Recoverable Incentive Compensation is not subject to mathematical recalculation directly from the information in an Accounting Restatement, the Administrator will determine the amount of Recoverable Incentive Compensation based on a reasonable estimate of the effect of the Accounting Restatement on the stock price or TSR upon which the Incentive Compensation was received. The Company will maintain documentation of the determination of that reasonable estimate and provide such documentation to the Exchange in accordance with the Listing Standards.

"**SEC**" means the U.S. Securities and Exchange Commission.

**4.**     RECOUPMENT

**(a)**     **Applicability of Policy**. This Policy applies to Incentive Compensation received by a Covered Officer (i) after beginning services as an Executive Officer, (ii) who served as an Executive Officer at any time during the performance period for such Incentive Compensation, (iii) while the Company had a class of securities listed on a national securities exchange or a national securities association, and (iv) during the Lookback Period.

**(b)**     **Recoupment Generally**. Pursuant to the provisions of this Policy, if there is an Accounting Restatement, the Company must reasonably promptly recoup the full amount of the Recoverable Incentive Compensation, unless the conditions of one or more subsections of Section 4(c) of this Policy are met and the Compensation Committee, or, if such committee does not consist solely of independent directors, a majority of the independent directors serving on the Board, has made a determination that recoupment would be impracticable. Recoupment is required regardless of whether the Covered Officer engaged in any misconduct and regardless of fault, and the Company's obligation to recoup Recoverable Incentive Compensation is not dependent on whether or when any restated financial statements are filed.

**(c)**     **Impracticability of Recovery**. Recoupment may be determined to be impracticable if, and only if:

(i)     the direct expense paid to a third party to assist in enforcing this Policy would exceed the amount of the applicable Recoverable Incentive Compensation; provided that, before concluding that it would be impracticable to recover any amount of Recoverable Incentive Compensation based on expense of enforcement, the Company will make a reasonable attempt to recover such Recoverable Incentive Compensation, document such reasonable attempt to recover, and provide that documentation to the Exchange in accordance with the Listing Standards; or

(ii)     recoupment of the applicable Recoverable Incentive Compensation would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of Code Section 401(a)(13) or Code Section 411(a) and regulations thereunder.

**(d)**     **Sources of Recoupment**. To the extent permitted by applicable law, the Administrator will, in its sole discretion, determine the timing and method for recouping Recoverable Incentive Compensation under this Policy, provided that such recoupment is undertaken reasonably promptly. The Administrator may, in its discretion, seek recoupment from a Covered Officer from any of the following sources or a combination thereof, whether the applicable compensation was approved, awarded, granted, payable, or paid to the Covered Officer prior to, on or after the Effective Date: (i) direct repayment of Recoverable Incentive Compensation previously paid to the Covered Officer; (ii) cancelling prior cash or equity-based awards (whether vested or unvested and whether paid or unpaid); (iii) cancelling or offsetting against any planned future cash or equity-based awards; (iv) forfeiture of deferred compensation, subject to compliance with Code Section 409A; and (v) any other method authorized by applicable law or contract. Subject to compliance with any applicable law, the Administrator may

effectuate recoupment under this Policy from any amount otherwise payable to the Covered Officer, including amounts payable to such individual under any otherwise applicable Company plan or program, *e.g.*, base salary, bonuses, or commissions and compensation previously deferred by the Covered Officer. The Administrator need not utilize the same method of recovery for all Covered Officers or with respect to all types of Recoverable Incentive Compensation.

(e)     **No Indemnification of Covered Officers**. Notwithstanding any indemnification agreement, applicable insurance policy, or any other agreement or provision of the Company's certificate of incorporation or bylaws to the contrary, no Covered Officer will be entitled to indemnification or advancement of expenses in connection with any enforcement of this Policy by the Company, including paying or reimbursing such Covered Officer for insurance premiums to cover potential obligations to the Company under this Policy.

(f)     **Indemnification of Administrator**. Any members of the Administrator, and any other members of the Board who assist in the administration of this Policy, will not be personally liable for any action, determination or interpretation made with respect to this Policy and will be indemnified by the Company to the fullest extent under applicable law and Company policy with respect to any such action, determination or interpretation. The foregoing sentence will not limit any other rights to indemnification of the members of the Board under applicable law or Company policy.

**5.     ADMINISTRATION**

Except as specifically set forth in this Policy, this Policy will be administered by the Administrator. The Administrator will have full and final authority to make any and all determinations required under this Policy. Any determination by the Administrator with respect to this Policy will be final, conclusive, and binding on all interested parties and need not be uniform with respect to each individual covered by this Policy. In carrying out the administration of this Policy, the Administrator is authorized and directed to consult with the full Board or such other committees of the Board as may be necessary or appropriate as to matters within the scope of such other committee's responsibility and authority. Subject to applicable law, the Administrator may authorize and empower any officer or employee of the Company to take any and all actions that the Administrator, in its sole discretion, deems necessary or appropriate to carry out the purpose and intent of this Policy (other than with respect to any recovery under this Policy involving such officer or employee).

**6.     SEVERABILITY**

If any provision of this Policy or the application of any such provision to a Covered Officer is adjudicated to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions of this Policy, and the invalid, illegal, or unenforceable provisions will be deemed amended to the minimum extent necessary to render any such provision or application enforceable.

**7.     NO IMPAIRMENT OF OTHER REMEDIES**

Nothing contained in this Policy, and no recoupment or recovery as contemplated in this Policy, will limit any claims, damages, or other legal remedies the Company or any of its affiliates may have

4

against a Covered Officer arising out of or resulting from any actions or omissions by the Covered Officer. This Policy does not preclude the Company from taking any other action to enforce a Covered Officer's obligations to the Company, including, without limitation, termination of employment and/or institution of civil proceedings. This Policy is in addition to the requirements of Section 304 of the Sarbanes-Oxley Act of 2002 that are applicable to the Company's Chief Executive Officer and Chief Financial Officer and to any other compensation recoupment policy and/or similar provisions in any employment, equity plan, equity award, or other individual agreement, to which the Company is a party or which the Company has adopted or may adopt and maintain from time to time.

**8.**     **AMENDMENT; TERMINATION**

The Administrator may amend, terminate, or replace this Policy or any portion of this Policy at any time and from time to time in its sole discretion. The Administrator will amend this Policy as it deems necessary to comply with applicable law or any Listing Standard.

**9.**     **SUCCESSORS**

This Policy is binding and enforceable against all Covered Officers and, to the extent required by Rule 10D-1 and/or the applicable Listing Standards, their beneficiaries, heirs, executors, administrators, or other legal representatives.

**10.**     **REQUIRED FILINGS**

The Company will make any disclosures and filings with respect to this Policy that are required by law, including as required by the SEC.

\*   \*   \*   \*

5

**SNAP INC.**
**2024 BONUS PROGRAM**

**Overview**

This Snap Inc. (the "**Company**") 2024 Bonus Program (the "**Program**") is effective as of January 1, 2024 (the "**Effective Date**"). The Program is designed to motivate, retain, and reward certain executive officers and other Company employees with performance-based incentive compensation from the Effective Date through December 31, 2024 (the "**Performance Period**").

To be eligible to earn and receive a bonus under the Program, individuals must be employed by the Company during the Performance Period and designated for participation by the Compensation Committee of the Company's Board of Directors (the "**Committee**") and be employed by the Company on the Payment Date (as defined below) (each a "**Participant**"). The Program will be administered by the Committee.

The Program is designed to award a bonus payment (each a "**Bonus**") to Participants for performance during the Performance Period based in part on the level of achievement of certain Company-wide priorities and objectives.

**Program Objective**

The Program is intended to encourage and reward the achievement of Company-wide priorities and objectives and the contributions and efforts of the Participants, as determined from time-to-time by the Committee.

**Program Bonus Targets**

Under the Program, each Participant is eligible to earn a Bonus in an amount up to a specified percentage of his or her base salary as at December 31, 2024, with such percentage based in part on the position such Participant holds with the Company (the "**Bonus Target**"). Under the Program, the Bonus Targets are up to 50% of a Participant's base salary as at December 31, 2024.

**Determining the Bonus Payments**

After the end of the Performance Period, the Company will evaluate the level of achievement by the Company of certain Company-wide priorities and objectives, and the relative contributions and efforts of the Participants. The Company will present such evaluation to the Committee for its review and final approval. Bonus Target levels for Participants may be adjusted, as determined by the Committee. The Committee also has the right, in its sole discretion, to adjust the Bonus Target for any Participant upward in the event of over-achievement, significant performance, or effort, as determined by the Committee. There is no set formula for determining the amount of the Bonus earned. Rather, the Committee will exercise its discretion in determining the amount of the Bonus actually earned, which determination will be final and binding.

In making its determination, the Committee will consider the recommendations made by the Chief Executive Officer. In addition, the Committee may also take into account the achievement of publicly announced targets, strategic goals, cross-functional teamwork and collaboration, and unforeseen changes in the economy.

**Timing of Bonus Payments**

Payment of Bonuses earned under the Program is expected to occur in the first quarter of 2025 following the conclusion of the Performance Period as determined by the Committee in its sole discretion (the "**Payment Date**"). Any Bonuses earned by Participants will be paid in cash or shares of Snap Inc. Class A common stock granted under the Snap Inc. 2017 Equity Incentive Plan at the Company's discretion. A Participant must be employed by the Company on the Payment Date to earn any Bonus. In the event that a

Participant terminates employment or service with the Company for any reason prior to the Payment Date, the Participant will forfeit his or her right to payment of any Bonus.

**Miscellaneous Provisions**

Participation in the Program will not alter Participant's at-will employment, and such employment may be terminated at any time for any reason, with or without cause, and with or without prior notice. Nothing in this Program will be construed to be a guarantee that any Participant will receive all or part of a Bonus or to imply a contract between the Company and any Participant.

This Program supersedes and replaces all prior incentive and bonus plans of the Company with respect to the Participants. The Committee may amend or terminate this Program at any time, with or without notice. The Committee may likewise terminate an individual's participation in the Program at any time, with or without notice. Further, the Committee may modify the Company-wide priorities and objectives, the Bonus Targets, or any other evaluation or award criteria at any time.

Any Bonuses paid under this Program will be subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company, or as is otherwise required by applicable law.

It is intended that the Program and any Bonuses granted and paid under the Program be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the Committee will interpret and administer the Program accordingly.

The Program will be interpreted in accordance with California law without reference to conflicts of law principles.

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements (Form S-8 No. 333-216495, 333-224591, 333-229530, 333-236257, 333-252789, 333-262543, 333-271507) pertaining to the Snap Inc. Amended and Restated 2012 Equity Incentive Plan, Snap Inc. Amended and Restated 2014 Equity Incentive Plan, Snap Inc. 2017 Equity Incentive Plan, Snap Inc. 2017 Employee Stock Purchase Plan, and a separate Snap Inc. Restricted Stock Unit Award Agreement of our reports dated February 6, 2024, with respect to the consolidated financial statements of Snap Inc., and the effectiveness of internal control over financial reporting of Snap Inc., included in this Annual Report (Form 10-K) for the year ended December 31, 2023.

/s/ Ernst & Young LLP

Los Angeles, California
February 6, 2024

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Evan Spiegel, certify that:

1.  I have reviewed this annual report on Form 10-K of Snap Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 6, 2024

/s/ Evan Spiegel
Evan Spiegel
Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

## CERTIFICATION PURSUANT TO
## RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
## AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Derek Andersen, certify that:

1.     I have reviewed this annual report on Form 10-K of Snap Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 6, 2024

/s/ Derek Andersen
Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Snap Inc. (the "Company") on Form 10-K for the year ended December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: February 6, 2024

/s/ Evan Spiegel

Evan Spiegel
Chief Executive Officer
*(Principal Executive Officer)*

Date: February 6, 2024

/s/ Derek Andersen

Derek Andersen
Chief Financial Officer
*(Principal Financial Officer)*

# Exhibit 419

# Explained: What is MeWe?

webwise.ie/parents/explainer-what-is-mewe/



## What is MeWe?

MeWe is an ad-free social network, which is free to access via a browser or mobile app. It has drawn comparisons to Facebook, for it's layout, appearance, and functionality.

The platform allows users to post text and images on their timelines, share other member's content, send disappearing messages, join and create groups, and to take part in private or group chats.

The platform doesn't use a newsfeed algorithm, so members see their friend's content in chronological order.

## How does it work?

Users can access and update their MeWe profile on the platform's app, or using a browser.

### Posting content on your MeWe profile

While, MeWe profiles are private by default, when posting to their profile users also have the option to adjust the setting of each individual post to control who can view that post.

To control who can see posts, users can choose to restrict it to *'My Contacts'*, '*Close Friends'*, or allow anyone on the platform to view it by choosing *'Public'*.

1/6



**Groups**

Members can search for groups or content that they are interested in. Some groups are public, but to join a private group the creator or an admin of that group must approve your request.



Members can also set up their own Groups, and choose to make them public, or create a private group where members need to be invited or get approval to join.



## Chat

**Users can use the chat function for conversations with their contacts, and members who are in the same groups, however users can adjust their privacy settings to restrict this to contacts only.** The chat function allows users to send content including text, disappearing images, links, and voice notes.



## Blocking and Reporting

**It is possible to Block and Report users if you want to prevent unwanted contact.** The blocking and reporting tools can be accessed from within the chat, or through a user's profile.

*Via MeWe chat:*



*Via a MeWe profile:*



## What are the risks?

MeWe's Terms of Service require users to be over the age of 16, and the content on the platform is geared towards an adult audience. In groups users exchange conversation about their hobbies and interests, but as in any online platform there is the possibility of encountering inappropriate content, or unwanted contact, and it is important to be familiar with the privacy settings and reporting tools available.

Note: In Ireland the digital age of consent is set at 16.

## Talking to your teen about online safety

Elaine Byrnes, Doctoral Researcher-Psychology, NUI Galway discusses some of the key things parents need to teach their teenagers, in order to be safe online.

## Advice for Parents

- Before allowing your child to use the platform, spend some time becoming familiar with it to determine if it is appropriate for them.
- Have a discussion about making friends online or connecting with people anonymously. For more about about how to start the conversation, read our talking points article **here**.
- It is a good idea to speak to your child about what is ok to share, and remind them that once we post something online we may lose control of where that content goes. The Webwise **SHARE** checklist, and advice article on managing your online reputation could be a useful support.
- Ensure your child knows how to block or report other users and groups who may engage in online harassment or other inappropriate behaviour.
- Talk to your child about what they find interesting about the platform, and reassure them that they can talk to you if they encounter something that makes them feel uncomfortable.

# Exhibit 420

MetaFTC-DX-99
6 (5-22-23)

WWW.DIGITALEVIDENCEGROUP.COM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

## META PLATFORMS, INC.'S LIST OF FEATURES OR ACTIVITIES FOR CLASSIFICATION BY THE FEDERAL TRADE COMMISSION

        Pursuant to the Court's August 1, 2022 Order, the list below identifies features or activities that have been available to users on Facebook, Instagram, WhatsApp, or Facebook Messenger at some or all times since January 1, 2011 through the present "that Meta wishes the FTC to categorize as included or excluded from the definition of 'personal social networking[.]' . . . By September 12, 2022, the FTC shall inform Meta whether each such feature or activity is or is not within that definition[.]"  ECF No. 165, at 2; *see* Meta's First Set of Interrogatories to the FTC at 8 (Mar. 30, 2022) (Instruction No. 15 stating, "the relevant time period for all interrogatories is from January 1, 2011 to the present").

        Unless the FTC otherwise specifies, Meta will assume that the FTC's classification of the feature or activity applies for the entire time that feature or activity was or has been available to users since January 1, 2011.  If the FTC's classification of a feature or activity is not the same throughout the period when the feature or activity was available, the FTC should specify in its response the time period when use of that feature or activity qualified as use of personal social networking and the time period when use of that feature or activity did not qualify as use of

1

personal social networking.  Pursuant to the Court's Order, "[i]f, at any point in the future, the FTC takes a different position on any such feature or activity, the FTC shall so supplement its response."  ECF No. 165, at 2.

For the avoidance of doubt, the list of features or activities below is not an exhaustive list of all features or activities that are or have been available on Facebook, Instagram, WhatsApp, and Messenger, but are a selection that "Meta wishes the FTC to categorize as included or excluded from the definition of 'personal social networking[.]' "  *Id.*  Meta reserves its right to seek further information from the FTC with respect to the FTC's classification of features or activities offered by Meta and other companies.

Meta's inclusion of certain activities on this list is not an indication that Meta believes that any feature or activity will or will not meet the FTC's alleged criteria to qualify as "personal social networking," nor is it an indication that Meta does or not does not measure usage of or the level of engagement with that feature or activity in the ordinary course.

Meta includes citations to various publicly accessible sources describing certain features or activities as of a particular date.  Those citations are provided for clarification and should not be construed to limit the feature or activity to the functions described as of the particular date of the cited source or to limit the FTC's obligation to classify the feature or activity for the entire period that the listed feature or activity has been available to users since January 1, 2011.

| | Location | Feature/Activity |
|---|---|---|
| **FACEBOOK** | | |
| 1. | Watch[1] | Viewing publicly accessible video(s) on the "For You," "Live," "Music," Gaming," "Following," "Saved," or "Shows" Tabs posted by a Page[2] User[3] follows. |
| 2. | Watch | Viewing publicly accessible video(s) on the "For You," "Live," "Music," Gaming," "Following," "Saved," or "Shows" Tabs posted by a person User follows that is not Facebook Friends[4] with User. |
| 3. | Watch | Viewing video(s) on the "For You," "Live," "Music," Gaming," "Following," "Saved," or "Shows" Tabs posted by an account that is Facebook Friends with User. |
| 4. | Watch | Viewing video(s) on the "For You," "Live," "Music," Gaming," "Saved," or "Shows" Tabs posted by a Page or person User does not follow. |
| 5. | Watch | Viewing advertisement(s). |
| 6. | Marketplace[5] | Viewing content of any form (such as Items for Sale) that was not posted by one of User's Facebook Friends. |
| 7. | Marketplace | Viewing content of any form (such as Items for Sale) that was posted by one of User's Facebook Friends. |
| 8. | Marketplace | Posting content of any form. |
| 9. | Reels[6] | Viewing Reel(s) posted by a Page User follows. |

---

[1] Facebook Watch: A description of Facebook Watch as of June 24, 2022 can be found at https://www.facebook.com/help/1041553655923544 [https://perma.cc/RRH3-DFXE].

[2] Pages: A description of Pages as of June 24, 2022 can be found at https://www.facebook.com/help/282489752085908 [https://perma.cc/W4ZR-BJFP].

[3] User: A hypothetical regular person that can or could access or engage in the listed features or activities on Meta's products.

[4] Friending: A description of Facebook Friending as of August 19, 2022 can be found at https://www.facebook.com/help/1540345696275090 [https://perma.cc/J2E3-EB7C].

[5] Facebook Marketplace: A description of Marketplace as of June 24, 2022 can be found at https://www.facebook.com/help/1713241952104830 [https://perma.cc/892J-5M9G].

[6] Facebook Reels: A description of Facebook Reels as of June 24, 2022 can be found at https://www.facebook.com/creators/reels-for-facebook [https://perma.cc/BC5Z-CG46].

| | Location | Feature/Activity |
|---|---|---|
| 10. | Reels | Viewing Reel(s) posted by a Public Figure[7] or other Personal Account[8] User follows that is not Facebook Friends with User. |
| 11. | Reels | Viewing Reel(s) posted by User's Facebook Friend. |
| 12. | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User or a person or Page User follows. |
| 13. | Reels | Viewing Reel(s) posted by User's Facebook Friend that User did not use the People You May Know ("PYMK")[9] feature to form a friendship with on the application. |
| 14. | Reels | Viewing advertisement(s). |
| 15. | Reels | Posting Reel(s) to a Public Audience.[10] |
| 16. | Reels | Posting Reel(s) to an audience limited exclusively to User's Facebook Friends. |
| 17. | Reels | Commenting on or reacting to Reel(s) not posted by User's Facebook Friend or a person or Page User follows. |
| 18. | Reels | Commenting on or reacting to Reel(s) posted by User's Facebook Friend. |
| 19. | Reels | Commenting on or reacting to Reel(s) posted by a Page User follows. |

---

[7] Public Figure: A description of Public Figure as of September 10, 2019 can be found at https://www.facebook.com/formedia/blog/new-features-for-public-figures [https://perma.cc/33ZF-AFQT].

[8] "Personal Account," when used in the context of the Facebook section of this chart, refers to any user's account on Facebook that is utilized by an individual rather than a business or other entity. "Personal Account," when used in the context of the Instagram section of this chart, refers to any user's account on Instagram that is utilized by an individual rather than a business or other entity.

[9] People You May Know (PYMK): A description of PYMK as of August 19, 2022 can be found at https://www.facebook.com/help/1163341187771886 [https://perma.cc/8MWK-GVXB].

[10] Public Audience: A description of the audiences available, including "Public" as of August 22, 2022 can be found at https://www.facebook.com/help/211513702214269?helpref=faq_content [https://perma.cc/7JFV-66QR].

4

|     | Location | Feature/Activity |
| --- | --- | --- |
| 20. | Groups[11] | Viewing or posting content in a Group User joined based on the User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group.[12] |
| 21. | Groups | Viewing or posting content in a Group of any size where 0-15% of pairs of members of the Group are Facebook Friends. |
| 22. | Groups | Viewing or posting content in a Group of any size where 16-50% of pairs of members of the Group are Facebook Friends. |
| 23. | Groups | Viewing or posting content in a Group of any size where more than 50% of pairs of members of the Group are Facebook Friends. |
| 24. | Groups | Viewing or posting content in a Group that contains more than 10,000 members. |
| 25. | Groups | Viewing or posting content in a Group that contains between 1,001 and 10,000 members. |
| 26. | Groups | Viewing or posting content in a Group that contains between 250 and 1,000 members. |
| 27. | Groups | Viewing or posting content in a Group that contains fewer than 250 members. |
| 28. | Groups | Viewing or posting content in a Group of any size regarding buying, selling, trading, or giving away items. |
| 29. | Groups | Viewing or posting content in a Group focused on a geographic community, such as a neighborhood or city. |
| 30. | Fundraisers & Donations[13] | Donating to or creating fundraiser(s). |
| 31. | Pages | Viewing or posting content on a Page. |
| 32. | Games/Gaming[14] | Playing game(s). |
| 33. | Games/Gaming | Watching gaming video(s) or live stream gaming. |
| 34. | Stories[15] | Viewing Story(ies) posted by Facebook Friend. |

---

[11] Groups: A description of Groups as of June 24, 2022 can be found at https://www.facebook.com/help/1629740080681586 [https://perma.cc/MB9L-XNDU].

[12] The "Slow Cooker/Instant Pot Recipes" Group as of August 19, 2022 can be found at https://www.facebook.com/groups/887806611311727/ [https://perma.cc/K8E7-ZYLP].

[13] Fundraisers and Donations: A description of Fundraisers and Donations as of August 17, 2022 can be found at https://www.facebook.com/help/833144153745643 [https://perma.cc/EF2F-Z78S].

[14] Gaming: A description of Gaming as of August 17, 2022 can be found at https://www.facebook.com/help/2402655169966967?helpref=hc_fnav [https://perma.cc/9WZ7-FFUZ].

[15] Facebook Stories: A description of Facebook Stories as of June 24, 2022 can be found at https://www.facebook.com/business/learn/lessons/facebook-stories-creators [https://perma.cc/F8F4-TN7K].

5

|     | Location | Feature/Activity |
| --- | --- | --- |
| 35. | Stories | Viewing Sponsored Story(ies). |
| 36. | Stories | Viewing Story(ies) posted by a Page User follows. |
| 37. | Stories | Viewing Story(ies) posted by a Public Figure or other Personal Account User follows that is not Facebook Friends with User. |
| 38. | Stories | Posting Story(ies). |
| 39. | Live[16] | Viewing Live video(s) posted by an account User follows that is not Facebook Friends with User. |
| 40. | Live | Viewing Live video(s) posted by an account that is Facebook Friends with User. |
| 41. | Live | Viewing Live video(s) posted by a Page or account User does not follow. |
| 42. | Feed[17] | Viewing advertisement(s). |
| 43. | Feed | Posting to all of User's Facebook Friends encouraging them to attend an industry-networking event hosted by User's employer. |
| 44. | Feed | Posting to User's Facebook Friends to promote User's small business. |
| 45. | Feed | Posting to a limited audience of User's Facebook Friends who are exclusively User's work colleagues. |
| 46. | Feed | Viewing post(s) to all of poster's Facebook Friends encouraging them to attend an industry-networking event hosted by the poster's employer. |
| 47. | Feed | Viewing content posted by User's Facebook Friend that User has never met in person, or spoken to individually. |
| 48. | Feed | Posting content to a limited audience of five or fewer Facebook Friends whose mobile telephone number User possessed prior to joining Facebook. |
| 49. | Feed | Viewing content that was posted to a limited audience of five or fewer Facebook Friends whose mobile telephone number the User possessed prior to joining Facebook. |
| 50. | Feed | Viewing Original[18] content that was posted by User's Facebook Friend that User did not use the PYMK feature to form a friendship with on the application. |

[16] Facebook Live: A description of Facebook Live as of June 24, 2022 can be found at https://www.facebook.com/formedia/tools/facebook-live [https://perma.cc/5H2H-BAY6].

[17] Facebook Feed: A description of Facebook Feed as of June 24, 2022 can be found at https://www.facebook.com/help/1155510281178725 [https://perma.cc/CZ8R-9LCL].  Feed was formerly called "News Feed" and was launched on or around September 5, 2006.

[18] Original here means created by the poster, as opposed to the poster resharing content created by another user.

| | Location | Feature/Activity |
|---|---|---|
| 51. | Feed | Posting Original content that encourages users that reside in close physical proximity to one another to attend a local social event. |
| 52. | Feed | Viewing Original photo(s) posted by a Facebook Friend. |
| 53. | Feed | Posting Original photo(s). |
| 54. | Feed | Viewing Original video(s) posted by a Facebook Friend. |
| 55. | Feed | Posting Original video(s). |
| 56. | Feed | Viewing comments or reactions to Original post(s) by a Facebook Friend. |
| 57. | Feed | Viewing content (e.g., The New York Times ("NYT") article or 20 minute comedy routine from a famous comedian that was posted on YouTube) that was linked in a Facebook Friend's post. |
| 58. | Feed | Viewing content that User's Facebook Friend reshared that was posted by a Page that Facebook Friend followed. |
| 59. | Feed | Viewing content that User's Facebook Friend reshared that was posted in a Group that Facebook Friend joined or a Page that Facebook Friend followed. |
| 60. | Feed | Viewing content that was posted by a Facebook Friend of one of User's Facebook Friends (who is not Facebook Friends with User) and reshared by User's Facebook Friend. |
| 61. | Feed | Viewing content posted by a Public Figure or other Personal Account User follows or subscribes[19] to on Facebook but is not Facebook Friends with. |
| 62. | Feed | Viewing content without a link posted by a Page User follows on Facebook. |
| 63. | Feed | Viewing content linked in a post (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Page User follows on Facebook. |
| 64. | Feed | Viewing content posted in a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. |
| 65. | Feed | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. |

---

[19] During the relevant time period, Facebook changed certain terminology from "subscribe" to "follow."

| | Location | Feature/Activity |
|---|---|---|
| 66. | Feed | Viewing content posted from a Group of any size where 0-15% of pairs of members of the Group are Facebook Friends. |
| 67. | Feed | Viewing content posted from a Group of any size where 16-50% of pairs of members of the Group are Facebook Friends. |
| 68. | Feed | Viewing content posted from a Group of any size where more than 50% of pairs of members of the Group are Facebook Friends. |
| 69. | Feed | Viewing content posted from a Group that contains more than 10,000 members. |
| 70. | Feed | Viewing content posted from a Group that contains between 1,001 and 10,000 members. |
| 71. | Feed | Viewing content posted from a Group that contains between 250 and 1,000 members. |
| 72. | Feed | Viewing content posted from a Group that contains fewer than 250 members. |
| 73. | Feed | Viewing content posted from a Group of any size regarding buying, selling, trading, or giving away items. |
| 74. | Feed | Viewing content posted from a Group focused on a geographic community, such as a neighborhood or city. |
| 75. | Feed | Viewing comments or reactions to post(s) by a person User follows or subscribes to on Facebook but is not Facebook Friends with. |
| 76. | Feed | Viewing comments or reactions to post(s) by a Page User follows. |
| 77. | Feed | Viewing comments or reactions to a post(s) from a Group User has joined. |
| 78. | Feed | Viewing Recommended[20] video content that does not originate from people or Pages User follows or Groups User has joined. |
| 79. | Feed | Viewing Recommended user-generated non-video content that does not originate from User's Facebook Friends, or people or Pages User follows or subscribes to or Groups User has joined. |
| 80. | Feed | Viewing PYMK content. |

[20] A description of Recommended content as of August 19, 2022 can be found at https://transparency.fb.com/data/widely-viewed-content-report/ [https://perma.cc/FN5A-7H2W] (explaining that "[r]ecommended content is unconnected").

|  | Location | Feature/Activity |
|---|---|---|
| 81. | Memories[21] | Viewing content posted on Memories. |
| 82. | Dating[22] | Posting or viewing content on Facebook Dating. |
| 83. | Photos[23] | Viewing User's own library of photos User took. |
| 84. | Timeline/Profile/Wall[24] | Viewing photos of User posted on User's Timeline/Profile/Wall. |
| 85. | Timeline/Profile/Wall | Viewing content from a Page that User's Facebook Friend reshared. |
| 86. | Timeline/Profile/Wall | Viewing content that User's Facebook Friend reshared that was posted in a Group that a Facebook Friend joined. |
| 87. | Timeline/Profile/Wall | Viewing content on a Timeline/Profile/Wall of User's Facebook Friend. |
| 88. | Timeline/Profile/Wall | Viewing content on a Timeline/Profile/Wall of an account that User is not Facebook Friends with. |
| 89. | Notifications[25] | Viewing Notifications based on activity from User's Facebook Friends. |
| 90. | Notifications | Viewing Notifications based on activity from any source other than User's Facebook Friends. |
| 91. | Messaging/Facebook Chat[26] | Sending or viewing message(s) sent to one other Facebook Friend. |
| 92. | Messaging/Facebook Chat | Sending or viewing message(s) sent to one other user who is not Facebook Friends with User. |

---

[21] Memories: A description of Memories as of August 17, 2022 can be found at https://www.facebook.com/help/1056848067697293/?helpref=hc_fnav [https://perma.cc/TU33-ME2P].

[22] Facebook Dating: A description of Facebook Dating as of August 17, 2022 can be found at https://www.facebook.com/help/312959615934334/?helpref=hc_fnav [https://perma.cc/559K-4RGL].

[23] Your Photos: A description of Your Photos and Videos as of August 17, 2022 can be found at https://www.facebook.com/help/1069521513115444/?helpref=hc_fnav [https://perma.cc/GHM3-BMNA].

[24] Profile: A description of Profiles as of August 22, 2022 can be found at https://www.facebook.com/help/327202558928776 [https://perma.cc/9VGE-RZNS].

[25] Notifications: A description of Notifications as of August 22, 2022 can be found at https://www.facebook.com/help/notifications [https://perma.cc/L3FP-CT2F].

[26] The "Messaging" functionality that is being referred to in this "Facebook" section of the chart is referring to the Messaging functionality that is and has been available through the Facebook application, rather than through the stand-alone Messenger application.

| | Location | Feature/Activity |
|---|---|---|
| 93. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 2-5 other users. [27] |
| 94. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 6-10 other users. |
| 95. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 11-20 other users. |
| 96. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 21-30 other users. |
| 97. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 31-50 other users. |
| 98. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 51-100 other users. |
| 99. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 101-199 other users. |
| 100. | Messaging/Facebook Chat | Sending or viewing message(s) sent to a group of 200 or more other users. |
| 101. | Messaging/Facebook Chat | Sending or viewing content that was posted elsewhere on Facebook (such as on Feed) by User's Facebook Friend. |
| 102. | Messaging/Facebook Chat | Sending or viewing unconnected content that was posted elsewhere on Facebook (such as on Feed or on a Page). |
| 103. | Messaging/Facebook Chat | Sending or viewing message(s) to or from a contact that User connected with using PYMK. |
| 104. | Messaging/Facebook Chat | Sending or viewing a message to or from a contact that User did not connect with using PYMK. |
| 105. | Messaging/Facebook Chat | Sending or viewing a message containing a link (e.g., to a YouTube video or a NYT article). |
| 106. | Messaging/Facebook Chat | Sending or viewing message(s) containing sender's Original photo(s). |
| 107. | Messaging/Facebook Chat | Sending or viewing message(s) containing reshared photo(s). |
| 108. | Messaging/Facebook Chat | Sending or viewing message(s) containing sender's Original video(s). |
| 109. | Messaging/Facebook Chat | Sending or viewing message(s) containing reshared video(s). |
| 110. | Messaging/ Facebook Chat Rooms | Voice calling with one other user. |
| 111. | Messaging/Facebook Chat Rooms | Voice calling with more than one other user. |
| 112. | Messaging/ Facebook Chat | Video calling with one other user. |

---

[27] The terminology "group" in this and the following rows relating to "Messaging/Facebook Chat" does not imply a "Facebook Group."

|      | Location | Feature/Activity |
|------|----------|------------------|
| 113. | Messaging/Facebook Chat Rooms | Video calling with more than one other user. |
| 114. | Pay[28] | Paying or requesting or receiving payment from one of User's Facebook Friends. |
| 115. | Pay | Paying or requesting or receiving payment from someone that User is not Facebook Friends with. |
| 116. | Search[29] | Using the Search feature to find Page(s) or Group(s) User is interested in. |
| 117. | Events[30] | Viewing event(s) not posted by one of User's Facebook Friends. |
| 118. | Events | Viewing event(s) posted by one of User's Facebook Friends. |
| 119. | Questions[31] | Posting or viewing content in Questions. |
| 120. | Feedback[32] | Posting or viewing content in Feedback. |
| 121. | Places[33] | Posting or viewing content in Places. |
| 122. | Podcasts | Listening to Podcast(s) or Live Audio Room(s).[34] |
| 123. | News[35] | Viewing content in News. |

[28] Meta Pay: A description of Meta Pay as of August 19, 2022 can be found at https://pay.facebook.com/faqs/ [https://perma.cc/V4HA-FURP].

[29] Search: A description of how to use Search as of August 19, 2022 can be found at https://www.facebook.com/help/103764609715185 [https://perma.cc/LZ52-88U8].

[30] Events: A description of Events as of August 17, 2022 can be found at https://www.facebook.com/help/1076296042409786/?helpref=hc_fnav [https://perma.cc/AB3D-4AB8].

[31] Questions: An article describing Questions can be found at *Searching for Answers? Ask Facebook Questions*, Facebook (July 28, 2010), https://web.archive.org/web/201008 20171709/http://blog.facebook.com/blog.php?post=411795942130.

[32] Feedback: A description of Reporting a Problem with Facebook: Give Us Feedback as of August 17, 2022 can be found at https://www.facebook.com/help/1126628984024935/?helpref=hc_fnav [https://perma.cc/7SU9-XJ66].

[33] Places: A link to Facebook Places as of August 22, 2022 can be found at https://www.facebook.com/places/ [https://perma.cc/76UL-SHKF].

[34] Podcasts and Live Audio Rooms: A description of Podcasts and Live Audio Rooms as of June 21, 2021 can be found at https://about.fb.com/news/2021/06/live-audio-rooms-and-podcasts-on-facebook/ [https://perma.cc/97C7-MDTH].

[35] News: A description of how News works as of August 19, 2022 can be found at https://www.facebook.com/news/howitworks [https://perma.cc/RXK5-2NBM].

|  | Location | Feature/Activity |
|---|---|---|
| | | **INSTAGRAM** |
| 1. | Reels[36] | Viewing Reel(s) posted by an account that User follows that does not follow User.[37] |
| 2. | Reels | Viewing Reel(s) posted by an account for a business, non-profit, or other organization that User follows that does not follow User.[38] |
| 3. | Reels | Viewing Reel(s) posted by an Instagram Creator Account[39] that User follows that does not follow User. |
| 4. | Reels | Viewing Reel(s) posted by any Personal Account with under 100 followers that User follows that does not follow User. |
| 5. | Reels | Viewing Reel(s) posted by any Personal Account with between 100 and 999 followers that User follows that does not follow User. |
| 6. | Reels | Viewing Reel(s) posted by any Personal Account with between 1,000 and 1,999 followers that User follows that does not follow User. |
| 7. | Reels | Viewing Reel(s) posted by any Personal Account that has between 2,000 and 10,000 followers that User follows that does not follow User. |
| 8. | Reels | Viewing Reel(s) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. |
| 9. | Reels | Viewing Reel(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. |
| 10. | Reels | Viewing Reel(s) posted by a celebrity or influencer that User follows that does not follow User. |
| 11. | Reels | Viewing Reel(s) posted by any Personal Account User follows that does not follow User, where User has never met |

---

[36] Instagram Reels: A description of Reels as of June 24, 2022 can be found at https://about.instagram.com/features/reels [https://perma.cc/F29V-LYF6].

[37] The type of follow described in this row is a non-reciprocal follow.  *See* FTC's Second Set of Requests for Production of Documents at 4 (No. 49(c)), *FTC v. Meta Platforms, Inc.*, 1:20-cv-03590-JEB (D.D.C. July 12, 2022) (asking about content that was not posted or shared by a "reciprocal follow" and describing such content as "unconnected content").

[38] This activity includes accounts for businesses, non-profits, and other organizations, even if they are not actually using a business profile.  *See* https://business.instagram.com/getting-started [https://perma.cc/K3PF-KMPL] (describing business accounts).

[39] Instagram Creator Account: A description of Instagram Creator Accounts as of August 17, 2022 can be found at https://creators.instagram.com/ [https://perma.cc/7R32-2BVA].

| | Location | Feature/Activity |
|---|---|---|
| | | the owner of the account in person or spoken to them individually. |
| 12. | Reels | Viewing Reel(s) posted by an account for a business, non-profit, or other organization that User follows and that follows User.[40] |
| 13. | Reels | Viewing Reel(s) posted by an Instagram Creator Account that follows User and that User follows. |
| 14. | Reels | Viewing Reel(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. |
| 15. | Reels | Viewing Reel(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. |
| 16. | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. |
| 17. | Reels | Viewing advertisement(s). |
| 18. | Reels | Viewing branded content in Reel(s). |
| 19. | Reels | Posting Reel(s) to an audience limited to User's followers. |
| 20. | Reels | Posting Reel(s) to a Public Audience. |
| 21. | Reels | Viewing comments or reactions to Reel(s) posted by an account that User does not follow. |
| 22. | Reels | Commenting on or reacting to Reel(s) posted by an account User follows that does not follow User. |
| 23. | Reels | Viewing comments or reactions to Reel(s) posted by an account that User follows that does not follow User. |
| 24. | Reels | Commenting on or reacting to Reel(s) posted by an account User follows and that follows User. |
| 25. | Reels | Commenting on or reacting to Reel(s) posted by an account that User does not follow, and that does not follow User. |
| 26. | Reels | Viewing comments or reactions in response to Reel(s) posted by an Instagram Creator Account that User follows that does not follow User. |
| 27. | Reels | Commenting on or reacting to Reel(s) posted by an Instagram Creator Account that User follows that does not follow User. |

---

[40] This is a reciprocal follow (meaning that User follows an account, and that account follows User's account).  *See* FTC's Second Set of Requests for Production of Documents at 4 (No. 49(b)), *FTC v. Meta Platforms, Inc.*, 1:20-c-v-03590-JEB (D.D.C. July 12, 2022) (asking about content shared or posted by "reciprocal follows").  A non-reciprocal follow occurs when User follows an account that does not follow User's account.

|  | Location | Feature/Activity |
|---|---|---|
| 28. | Stories[41] | Viewing Story(ies) posted by an account that User follows that does not follow User. |
| 29. | Stories | Viewing Story(ies) posted by an account for a business, non-profit, or other organization that User follows that does not follow User. |
| 30. | Stories | Viewing Story(ies) posted by an Instagram Creator Account that User follows that does not follow User. |
| 31. | Stories | Viewing Story(ies) by a Personal Account with under 100 followers that User follows that does not follow User. |
| 32. | Stories | Viewing Story(ies) posted by any Personal Account that has between 100 and 999 followers that User follows that does not follow User. |
| 33. | Stories | Viewing Story(ies) posted by any Personal Account that has between 1,000 and 2,000 followers that User follows that does not follow User. |
| 34. | Stories | Viewing Story(ies) posted by any Personal Account that has between 2,001 and 10,000 followers that User follows that does not follow User. |
| 35. | Stories | Viewing Story(ies) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. |
| 36. | Stories | Viewing Story(ies) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. |
| 37. | Stories | Viewing Story(ies) posted by a celebrity or influencer that User follows that does not follow User. |
| 38. | Stories | Viewing Story(ies) posted by any Personal Account User follows that does not follow User, where User has never met the owner of the account in person or spoken to them individually. |
| 39. | Stories | Viewing Story(ies) posted by an account for a business, non-profit, or other organization that User follows and that follows User. |
| 40. | Stories | Viewing Story(ies) posted by an Instagram Creator Account that follows User and that User follows. |
| 41. | Stories | Viewing Story(ies) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. |

---

[41] Instagram Stories: A description of Instagram Stories as of June 24, 2022 can be found at https://about.instagram.com/features/stories [https://perma.cc/G9UG-HWHB].

|     | Location | Feature/Activity |
| --- | --- | --- |
| 42. | Stories | Viewing Story(ies) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. |
| 43. | Stories | Viewing Story(ies) posted by an account that User does not follow, and that does not follow User. |
| 44. | Stories | Viewing Story(ies) posted by a celebrity or influencer that User follows that does not follow User. |
| 45. | Stories | Viewing Sponsored Story(ies). |
| 46. | Stories | Reacting to or messaging in response to Story(ies) posted by an account User follows but that does not follow User. |
| 47. | Stories | Reacting to or messaging in response to Story(ies) posted by an account User follows and that follows User. |
| 48. | Stories | Reacting to or messaging in response to Story(ies) posted by an account that User does not follow, and that does not follow User. |
| 49. | Stories | Reacting to or messaging in response to Story(ies) posted by a celebrity or influencer that User follows that does not follow User. |
| 50. | Stories | Messaging in response to Sponsored Story(ies). |
| 51. | Live[42] | Viewing Live video(s) posted by an account User follows that does not follow User. |
| 52. | Live | Viewing Live video(s) posted by an account that User does not follow and that does not follow User. |
| 53. | Live | Viewing Live video(s) posted by an account User follows that follows User. |
| 54. | Shop[43] | Viewing content on Shops User does not follow. |
| 55. | Shop | Viewing content on Shops User follows. |
| 56. | Shop | Viewing content on Shops for You. |
| 57. | Explore/Popular | Viewing content from the Explore or Popular Page posted by an account that User does not follow. |
| 58. | Explore/Popular | Viewing content on the Explore or Popular Page posted by a celebrity or influencer that the User follows. |
| 59. | IGTV[44] | Watching video(s) on IGTV. |

[42] Instagram Live: A description of Live as of August 17, 2022 can be found at https://help.instagram.com/272122157758915 [https://perma.cc/7L6W-QMQA].

[43] Instagram Shop: A description of Shop as of June 24, 2022 can be found at https://help.instagram.com/194355285783006 [https://perma.cc/BF3X-7Y6W].

[44] IGTV: A description of IGTV dated June 20, 2018 can be found at https://about.instagram.com/blog/announcements/welcome-to-igtv [https://perma.cc/563M-GN9B].

| | Location | Feature/Activity |
|---|---|---|
| 60. | IGTV/Feed | Viewing preview(s) of IGTV video(s) on Feed. |
| 61. | Feed[45] | Viewing Sponsored post(s). |
| 62. | Feed | Viewing content posted by an account that User follows that does not follow User. |
| 63. | Feed | Posting to all of User's followers, encouraging them to attend an industry-networking event hosted by User's employer. |
| 64. | Feed | Viewing post(s) by an account User follows encouraging people to attend an industry-networking event hosted by the account's employer. |
| 65. | Feed | Posting content to a limited audience of five or fewer followers whose mobile telephone number User possessed prior to joining Instagram. |
| 66. | Feed | Viewing content that was posted to a limited audience of five or fewer followers whose mobile telephone number the User possessed prior to joining Instagram. |
| 67. | Feed | Posting Original content that encourages Users that reside in close physical proximity to one another to attend a local social event. |
| 68. | Feed | Viewing Original photo(s) posted by an account that User follows and that follows User, where neither follow was based on Suggested for you accounts.[46] |
| 69. | Feed | Viewing Original photo(s) posted by an account that User follows and that follows User, where either follow was based on Suggested for you accounts. |
| 70. | Feed | Viewing Original photo(s) posted by an account that User does not follow, and that does not follow User. |
| 71. | Feed | Viewing Original photo(s) posted by an account for a business, non-profit, or other organization that User follows but does not follow User. |
| 72. | Feed | Viewing Original photo(s) posted by an Instagram Creator Account that User follows but does not follow User. |
| 73. | Feed | Viewing Original photo(s) posted by any Personal Account with under 25 followers that User follows that does not follow User. |
| 74. | Feed | Viewing Original photo(s) posted by any Personal Account with 25-99 followers that User follows that does not follow User. |

---

[45] Instagram Feed: A description of Instagram Feed as of June 24, 2022 can be found at https://help.instagram.com/1986234648360433 [https://perma.cc/C86D-U9ZV].

[46] Suggestions For You: A description of suggestions as of August 22, 2022 can be found at https://help.instagram.com/530450580417848 [https://perma.cc/56DA-6BM6].

|  | Location | Feature/Activity |
|---|---|---|
| 75. | Feed | Viewing Original photo(s) posted by any Personal Account with 100 to 999 followers that User follows that does not follow User. |
| 76. | Feed | Viewing Original photo(s) posted by any Personal Account with 1,000 to 1,999 followers that User follows that does not follow User. |
| 77. | Feed | Viewing Original photo(s) posted by any Personal Account that has between 2,000 and 10,000 followers that User follows that does not follow User. |
| 78. | Feed | Viewing Original photo(s) posted by any Personal Account that has over 10,000 followers that User follows that does not follow User. |
| 79. | Feed | Viewing Original photo(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. |
| 80. | Feed | Viewing Original photo(s) posted by a celebrity or influencer that User follows but does not follow User. |
| 81. | Feed | Viewing Original photo(s) posted by any account User follows that does not follow User, where User has never met the owner of the account in person or spoken to the owner individually. |
| 82. | Feed | Viewing Original photo(s) posted by an account for a business, non-profit, or other organization that User follows, and that follows User. |
| 83. | Feed | Viewing Original photo(s) posted by an Instagram Creator Account that follows User and that User follows. |
| 84. | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. |
| 85. | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. |
| 86. | Feed | Viewing a Paid partnership post[47] posted by an account User follows. |
| 87. | Feed | Viewing comments or reactions to content posted by an account User follows that does not follow User. |

---

[47] Branded Content on Instagram: A description of Branded Content on Instagram – Creators, Public Figures and Publishers as of August 17, 2022 can be found at https://help.instagram.com/116947042301556 [https://perma.cc/DTZ2-S2B3]. *E.g.*, Simone Biles and Athleta jointly post Biles wearing Athleta clothing.

| | Location | Feature/Activity |
|---|---|---|
| 88. | Feed | Viewing comments or reactions to content posted by an Instagram Creator Account that User follows that does not follow User. |
| 89. | Feed | Viewing comments or reactions to a post of Original photo(s) by a celebrity or influencer that User follows but does not follow User. |
| 90. | Feed | Viewing comments or reactions to Original photo(s) by an account User follows that has more followers than 99% of all accounts on Instagram. |
| 91. | Feed | Commenting on or reacting to Original photo(s) posted by an account User follows that follows User. |
| 92. | Feed | Commenting on or reacting to Original photo(s) posted by an account that User does not follow, but that follows User. |
| 93. | Feed | Commenting on or reacting to Original photo(s) posted by an account that User does not follow, and that does not follow User. |
| 94. | Feed | Commenting on or reacting to Paid partnership post(s) posted by an account User follows. |
| 95. | Feed | Commenting on or reacting to Original photo(s) posted by an account User follows that does not follow User. |
| 96. | Feed | Commenting on or reacting to Original photo(s) posted by a business, non-profit, or other organization that User follows that does not follow User. |
| 97. | Feed | Commenting on or reacting to Original photo(s) posted by an Instagram Creator Account that User follows that does not follow User. |
| 98. | Feed | Commenting on or reacting to Original photo(s) posted by a celebrity or influencer that User follows that does not follow User. |
| 99. | Feed | Commenting on or reacting to Original photo(s) by an account User follows that has more followers than 99% of all accounts on Instagram. |
| 100. | Feed | Viewing Original video(s) posted by an account that User follows and that follows User, where neither follow was based on Suggested for you accounts. |
| 101. | Feed | Viewing Original videos(s) posted by an account that User follows and that follows User, where either follow was based on Suggested for you accounts. |
| 102. | Feed | Viewing Original video(s) posted by an account that User does not follow, and that does not follow User. |
| 103. | Feed | Viewing Original video(s) posted by an account for a business, non-profit, or other organization that User follows that does not follow User. |

| | Location | Feature/Activity |
|---|---|---|
| 104. | Feed | Viewing Original video(s) posted by an Instagram Creator Account that User follows that does not follow User. |
| 105. | Feed | Viewing Original video(s) posted by any Personal Account with under 25 followers that User follows that does not follow User. |
| 106. | Feed | Viewing Original video(s) posted by any Personal Account with 25-99 followers that does not follow User. |
| 107. | Feed | Viewing Original video(s) posted by any Personal Account with 100 to 999 followers that does not follow User. |
| 108. | Feed | Viewing Original video(s) posted by any Personal Account with 1,000 to 1,999 followers that User follows that does not follow User. |
| 109. | Feed | Viewing Original video(s) posted by any Personal Account with between 2,000 and 10,000 followers that User follows that does not follow User. |
| 110. | Feed | Viewing Original video(s) posted by any Personal Account with over 10,000 followers that User follows that does not follow User. |
| 111. | Feed | Viewing Original video(s) posted by any Personal Account that has more followers than 99% of all other accounts, that User follows that does not follow User. |
| 112. | Feed | Viewing Original video(s) posted by a celebrity or influencer that User follows that does not follow User. |
| 113. | Feed | Viewing Original video(s) posted by any account User follows that does not follow User, where User has never met the owner of the account in person or spoken to them individually. |
| 114. | Feed | Viewing Original video(s) posted by an account for a business, non-profit, or other organization that User follows and that follows User. |
| 115. | Feed | Viewing Original video(s) posted by an Instagram Creator Account that follows User and that User follows. |
| 116. | Feed | Viewing Original video(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person or spoken to them individually. |
| 117. | Feed | Viewing Original video(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account in person or spoken to them individually. |
| 118. | Feed | Viewing Original video(s) posted by an account that User follows and that follows User. |
| 119. | Feed | Posting Original video(s). |
| 120. | Profile | Viewing User's own posts of Original photos. |

|  | **Location** | **Feature/Activity** |
|---|---|---|
| 121. | Profile | Viewing photo(s) in which User is tagged. |
| 122. | Profile | Viewing content on a profile of a Personal Account that User follows and that follows User. |
| 123. | Profile | Viewing content on a profile of a business, non-profit, or other organization that User follows and that follows User. |
| 124. | Profile | Viewing content on a profile of an account that User follows but does not follow User. |
| 125. | Profile | Viewing content on a profile of an Instagram Creator Account that User follows but does not follow User. |
| 126. | Profile | Viewing content on a profile of any Personal Account that User follows where User has never met the owner of the account in person or spoken to the owner individually. |
| 127. | Profile | Viewing posts on profile of account that User does not follow and that does not follow User. |
| 128. | Instagram Direct[48] | Sending or viewing message(s) to or from an account User follows that does not follow User. |
| 129. | Instagram Direct | Sending or viewing message(s) to or from an account User does not follow and that does not follow User. |
| 130. | Instagram Direct | Sending or viewing message(s) sent to a group of 2-5 other users. |
| 131. | Instagram Direct | Sending or viewing message(s) sent to a group of 6-10 other users. |
| 132. | Instagram Direct | Sending or viewing message(s) sent to a group of 11-20 other users. |
| 133. | Instagram Direct | Sending or viewing message(s) sent to a group of 21-30 other users. |
| 134. | Instagram Direct | Sending or viewing message(s) sent to a group of 31-50 other users. |
| 135. | Instagram Direct | Sending or viewing message(s) sent to a group of 51-100 other users. |
| 136. | Instagram Direct | Sending or viewing message(s) sent to a group of 101-199 other users. |
| 137. | Instagram Direct | Sending or viewing message(s) sent to a group of 200 or more other users. |
| 138. | Instagram Direct | Sending or viewing message(s) containing sender's Original photo(s). |
| 139. | Instagram Direct | Sending or viewing message(s) containing sender's Original videos(s). |

---

[48] An explanation of users sending a post they see on Instagram as a direct message as of August 22, 2022 can be found at https://help.instagram.com/1209246439090858 [https://perma.cc/2ETQ-2EDD].

| | Location | Feature/Activity |
|---|---|---|
| 140. | Instagram Direct | Sending or viewing message(s) containing content posted by an account User does not follow on Instagram. |
| 141. | Instagram Direct | Sending or viewing message(s) containing content posted by an account User follows that does not follow User. |
| 142. | Instagram Direct | Sending or viewing disappearing message(s). |
| 143. | Instagram Direct | Voice calling with one other user. |
| 144. | Instagram Direct | Voice calling with more than one other user. |
| 145. | Instagram Direct | Video calling with one other user. |
| 146. | Instagram Direct | Video calling with more than one other user. |

|     | Location | Feature/Activity |
| --- | --- | --- |
| **WHATSAPP** | | |
| 1. | WhatsApp | Posting or viewing Status(es).[49] |
| 2. | WhatsApp | Posting or viewing profile photo(s). |
| 3. | WhatsApp | Voice Calling[50] with one other user. |
| 4. | WhatsApp | Voice Calling with more than one other user. |
| 5. | WhatsApp | Video Calling[51] with one other user. |
| 6. | WhatsApp | Video Calling with a more than other user. |
| 7. | WhatsApp | Sending or viewing message(s) sent to one other user. |
| 8. | WhatsApp | Sending or viewing  message(s) sent to a group of 2-5 other users. |
| 9. | WhatsApp | Sending or viewing message(s) sent to a group of 6-10 other users. |
| 10. | WhatsApp | Sending or viewing message(s) sent to a group of 11-20 other users. |
| 11. | WhatsApp | Sending or viewing message(s) sent to a group of 21-30 other users. |
| 12. | WhatsApp | Sending or viewing message(s) sent to a group of 31-50 other users. |
| 13. | WhatsApp | Sending or viewing message(s) sent to a group of 51-100 other users. |
| 14. | WhatsApp | Sending or viewing message(s) sent to a group of 100-199 other users. |
| 15. | WhatsApp | Sending or viewing message(s) sent to a group of more than 200 other users. |
| 16. | WhatsApp | Sending or viewing message(s) sent to a group that contains 2-5 people whose contact information (number *and* name) User does not possess. |
| 17. | WhatsApp | Sending or viewing message(s) sent to a group that contains 6-10 people whose contact information (number *and* name) User does not possess. |

[49] WhatsApp Status: A description of how to use WhatsApp Status as of August 19, 2022 can be found at https://faq.whatsapp.com/2538892862990242/?locale=en_US [https://perma.cc/G9T3-KV8Q].

[50] WhatsApp Voice Calling: A description of how to make a WhatsApp voice call as of August 19, 2022 can be found at https://faq.whatsapp.com/1576927845844091/?locale=en_US [https://perma.cc/888Z-2HRP].

[51] WhatsApp Video Calling: A description of how to make a WhatsApp Video Call as of August 19, 2022 can be found at https://faq.whatsapp.com/785056755306362/?locale=en_US [https://perma.cc/PF73-LARR].

|  | Location | Feature/Activity |
|---|---|---|
| 18. | WhatsApp | Sending or viewing message(s) sent to a group that contains 11-20 people whose contact information (number *and* name) User does not possess. |
| 19. | WhatsApp | Sending or viewing message(s) sent to a group that contains 21-30 people whose contact information (number *and* name) User does not possess. |
| 20. | WhatsApp | Sending or viewing message(s) sent to a group that contains 31-50 people whose contact information (number *and* name) User does not possess. |
| 21. | WhatsApp | Sending or viewing message(s) sent to a group that contains 51-100 people whose contact information (number *and* name) User does not possess. |
| 22. | WhatsApp | Sending or viewing message(s) sent to a group that contains 100+ people whose contact information (number *and* name) User does not possess. |
| 23. | WhatsApp | Sending or viewing disappearing message(s). |
| 24. | WhatsApp | Sending or viewing message(s) containing link(s) (e.g., to a YouTube video or a NYT article). |
| 25. | WhatsApp | Sending or viewing message(s) containing sender's Original photo(s). |
| 26. | WhatsApp | Sending or viewing message(s) containing reshared photo(s). |
| 27. | WhatsApp | Sending or viewing message(s) containing sender's Original video(s). |
| 28. | WhatsApp | Sending or viewing message(s) containing reshared video(s). |

|  | Location | Feature/Activity |
|---|---|---|
| **MESSENGER** | | |
| 1. | Messenger | Posting Story(ies). |
| 2. | Messenger | Voice Calling[52] with one other user. |
| 3. | Messenger | Voice Calling with more than one other user. |
| 4. | Messenger | Video Calling with one other user. |
| 5. | Messenger | Video Calling[53] with more than one other user. |
| 6. | Messenger | Sending or viewing message(s) sent to one other user. |
| 7. | Messenger | Sending or viewing message(s) sent to a group of 2-5 other users. |
| 8. | Messenger | Sending or viewing message(s) sent to a group of 6-10 other users. |
| 9. | Messenger | Sending or viewing message(s) sent to group of 11-20 other users. |
| 10. | Messenger | Sending or viewing message(s) sent to a group of 21-30 other users. |
| 11. | Messenger | Sending or viewing message(s) sent to a group of 31-50 other users. |
| 12. | Messenger | Sending or viewing message(s) sent to a group of 51-100 other users. |
| 13. | Messenger | Sending or viewing message(s) sent to a group of 100-199 other users. |
| 14. | Messenger | Sending or viewing message(s) sent to a group of more than 200 other users. |
| 15. | Messenger | Viewing Stories. |
| 16. | Messenger | Sending or viewing message(s) to or from a contact that User is not Facebook Friends with. |
| 17. | Messenger | Sending or viewing message(s) to or from a contact that User connected with using PYMK. |
| 18. | Messenger | Sending or viewing a message to or from a contact that User did not connect with using PYMK. |
| 19. | Messenger | Sending or viewing disappearing message(s). |
| 20. | Messenger | Sending or viewing a message containing a link (e.g., to a YouTube video or a NYT article). |
| 21. | Messenger | Sending or viewing message(s) containing sender's Original photo(s). |

---

[52] Voice Calling: A description of how to Voice Call on Messenger as of August 19, 2022 can be found at https://www.facebook.com/help/messenger-app/1106443359454049 [https://perma.cc/C4A2-HZY5].

[53] Video Calling: A description of how to Video Call on Messenger as of August 19, 2022 can be found at https://www.facebook.com/help/messenger-app/1414800065460231/?helpref=related_articles [https://perma.cc/5JAP-596M].

|  | Location | Feature/Activity |
|---|---|---|
| 22. | Messenger | Sending or viewing message(s) containing reshared photo(s). |
| 23. | Messenger | Sending or viewing message(s) containing sender's Original video(s). |
| 24. | Messenger | Sending or viewing message(s) containing reshared video(s). |
| 25. | Messenger | Playing games on Play Together.[54] |

Dated: August 22, 2022

Respectfully submitted,

 /s/ Mark C. Hansen
Mark C. Hansen (D.C. Bar No. 425930)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036 (202) 623-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*

---

[54] Play Together: A description of Play Together as of August 22, 2022 can be found at https://www.facebook.com/help/messenger-app/549253825739224 [https://perma.cc/LF68-JVVG].

25

# Exhibit 421

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-03590-JEB |
| META PLATFORMS, INC., | |
| Defendant. | |

**META PLATFORMS, INC.'S SECOND SET OF INTERROGATORIES
TO THE FEDERAL TRADE COMMISSION**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Meta Platforms, Inc., requests that the Federal Trade Commission serve a written response to this Second Set of Interrogatories. The requested answers must be provided within thirty (30) days after service of these interrogatories or at such other time as may be directed by the Court or agreed to by the parties. Plaintiff shall answer the following interrogatories separately and fully in writing, under oath, and serve the answers at the offices of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., located at 1615 M Street, N.W., Suite 400, Washington, D.C. 20036.

**DEFINITIONS**

1.      "Action" means the above-captioned action pending in this Court, including any related discovery, pretrial, trial, post-trial, or appellate proceedings.

2.      "Amended Complaint" means the Substitute Amended Complaint for Injunctive and Other Equitable Relief filed in this Action by Plaintiff, the Federal Trade Commission on September 8, 2021.

3.      "Communication" means the transmittal of information or request for information, including, but not limited to, any written contact between two or more people by such means as letters, memoranda, facsimile transmissions, and emails, and oral contact between two or more people by such means as face-to-face meetings and telephone conversations.

4.      "Complaint" means the Complaint filed in this Action by Plaintiff, the Federal Trade Commission on December 9, 2020.

5.      "Date" means the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

6.      "Document" or "Documents" means all documents or Electronically Stored Information as defined in Federal Rule of Civil Procedure 34(a).

7.      "Electronically-Stored Information" or "ESI" means all Documents that are stored in any electronic medium from which information can be obtained, including source code.

8.      "Facebook," unless the context requires otherwise, means the application and website offered by Meta that is sometimes referenced internally at Meta as "Facebook Blue," and described in the Amended Complaint as "Facebook Blue."

9.      "Feature or Activity Response" means the FTC's September 12, 2022 Response to Meta's August 22, 2022 List of Features or Activities for Classification.

10.      "Instagram" means Instagram, LLC and all Persons or entities acting or that have acted on its behalf, including, but not limited to, divisions, subsidiaries, holding companies, parents, successors, predecessors, Instagram, Inc., and any other related entity.

11.      "Meta" means Meta Platforms, Inc., and all Persons or entities acting or that have acted on its behalf, including, but not limited to, divisions, subsidiaries, holding companies,

parents, successors, predecessors, Facebook, Inc., Instagram, WhatsApp, and any other related entity.

12.     "Person" means any person and includes natural persons, corporations, firms, partnerships, proprietorships, associations, joint ventures, State, Territory, government agencies or entities, and other enterprises or legal entities.

13.     "Product" means any product, application, software, technology, or service offered by a company, including, but not limited to, any product, software, technology, or service that is no longer offered to users today.  This definition of Product includes, but is not limited to, any product, application, software, technology, or service offered by Meta, Facebook, Instagram, WhatsApp, or any other company.

14.     "Relating to" or "in relation to" means concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

15.     "User" means a hypothetical regular person that can or could access or engage in the listed features or activities on a product or service.

16.     "You" or "Your" or "Federal Trade Commission" refers to Plaintiff, United States Federal Trade Commission, including, but not limited to, any components, agents, representatives, consultants, contractors, employees, attorneys, economists, experts, and any other Person(s) acting or purporting to act with or on its behalf.

17.     "WhatsApp" means WhatsApp LLC and all Persons or entities acting or that have acted on its behalf, including, but not limited to, divisions, subsidiaries, holding companies, parents, successors, predecessors, and any other related entity.

3

18.     The definitions set forth above shall apply to all interrogatories.

## **GENERAL INSTRUCTIONS**

1.     The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of these interrogatories any information that would otherwise not be brought within their scope.

2.     The singular forms shall include the plural and vice versa wherever such dual construction will serve to bring within the scope of these interrogatories any information that would otherwise not be brought within their scope.

3.     The words "any," "each," and "every" shall be construed to mean individually and collectively wherever such dual construction will serve to bring within the scope of these interrogatories any information that would otherwise not be brought within their scope.

4.     The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of these interrogatories any information that might otherwise be construed to be outside of its scope.

5.     These interrogatories call for all information (including any information contained in or on any Document or writing) that is known or available to You or any other Person acting under Your behalf or under Your direction or control.

6.     Pursuant to Federal Rule of Civil Procedure 33(d), if an answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing Your business records (including Electronically-Stored Information), specify, in Your response to the interrogatory, the records that must be reviewed by Bates number or other means sufficient to enable Meta to locate and identify the records as readily as You could.

4

7.      Each interrogatory, including subparts, is to be answered by You separately, completely, and fully, under oath.  If You object to any part of an interrogatory, set forth the basis for Your objection and respond to all parts of the interrogatory to which You do not object. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived.  All objections must be made with particularity and must set forth all the information upon which You intend to rely in response to any motion to compel.

8.      All objections must state with particularity whether, and in what manner, the objection is being relied upon as a basis for limiting the response.  If You are withholding responsive information pursuant to any general objection, You should so expressly indicate.  If, in responding to any interrogatory, You claim any ambiguity in interpreting either the interrogatory or a definition or instruction applicable thereto, You shall set forth as part of Your response the language deemed to be ambiguous and the interpretation used in responding to the interrogatory, and shall respond to the interrogatory as You interpret it.

9.      If You cannot answer all or part of any interrogatory after exercising due diligence to secure the full information to do so, so state and answer to the fullest extent possible, specifying Your inability to answer the remainder.  State whatever information or knowledge You have concerning the unanswered portion, and detail what You did in attempting to secure the unknown information.

10.      Except as modified by the Scheduling Order between the parties, if information or a Document is withheld under claim of privilege, including, but not limited to, attorney-client privilege and or work product doctrine: (1) identify the date, the author, and all recipients of the Document or information; (2) describe the form of the Document, Communication, or

information (e.g., whether it is a letter, memorandum, email, conversation, etc.); (3) describe generally the content of the Document or information withheld; (4) state the specific privilege upon which You rely and the specific basis for asserting such privilege; and (5) identify the interrogatory to which the allegedly privileged information is responsive.

11.     Each interrogatory shall be construed independently and, therefore, no interrogatory shall be construed to limit any other interrogatory.

12.     For each interrogatory requesting that You "state" or "explain" or "identify" or "specify" the basis for Your contentions, decisions, assertions, claims, calculations, position, answer, or classification, Your response shall describe in detail the basis for Your contentions, assertions, claims, decisions, calculations, position, answer, or classification and include (and specifically identify) any related facts, witnesses (name, title, address, and phone number), and Documents (Bates number), including any studies, analyses, models, or other Documents that You considered or relied upon as a basis for each contention, decision, assertion, claim, calculation, position, answer, or classification.

13.     For each interrogatory requesting that You identify an action, event, occurrence, meeting, or Communication, separately state for each responsive action, event, occurrence, meeting, or Communication the Persons involved in the action, event, occurrence, meeting, or Communication, their position and employer (or other relevant affiliation), the date of the action, event, occurrence, meeting, or Communication, the medium of the action, event, occurrence, meeting, or Communication (e.g., phone, in-person, email, letter, twitter, press conference, etc.), and identify all Documents (by Bates number) memorializing or constituting the action, event, occurrence, meeting, or Communication, and a description of the facts conveyed in the action, event, occurrence, meeting, or Communication to the extent they are not memorialized in a

Document produced in this Action.  If such Documents or information are withheld on the basis of a privilege, provide all information required for a privilege log, as described in these instructions.

14.     For each interrogatory requesting that You identify a Person, (i) state the full name; (ii) state the present or last known business address, and, in the case of a natural person, residence address; (iii) state the present or last known business telephone number, and, in the case of a natural person, residence telephone number and email address; and (iv) state the Person's present or last known position, employer, and primary line of business.

15.     Unless otherwise stated, the relevant time period for all interrogatories is from January 1, 2011 to the present.

16.     These interrogatories are continuing in nature.  If further information, evidence, or documentation comes into Your possession, custody, or control or is brought to the attention of You or Your attorneys or agents at any time subsequent to the service of any responses, prompt and complete supplementation of the responses to these interrogatories is required pursuant to the Federal Rules of Civil Procedure.

## **INTERROGATORIES**

## **INTERROGATORY NO. 13:**

For each feature or activity that You include within the definition of "personal social networking" in Your Feature or Activity Response such that time spent on the feature or activity counts as time spent using a "personal social networking service," state whether use of that feature or activity or similar feature or activity counts as time spent using a "personal social networking

service" when the feature or activity is used or performed on Snapchat, Google+, MeWe, Path, Friendster, Myspace, or Orkut, and explain why or why not.

**INTERROGATORY NO. 14:**

For each feature or activity that You include within the definition of "personal social networking" in Your Feature or Activity Response such that time spent on the feature or activity counts as time spent using a "personal social networking service," state whether use of that feature or activity or similar feature or activity counts as time spent using a "personal social networking service" when the feature or activity is used or performed on Strava, LinkedIn, iMessage, Twitter, Reddit, Pinterest, YouTube, Spotify, Nextdoor, Netflix, Hulu, or TikTok, and explain why or why not.

**INTERROGATORY NO. 15:**

Identify each industry participant, including any companies identified in the FTC's initial disclosures, that has recognized a distinct market for personal social networking services, as defined by the FTC and consisting of the specific entities the FTC has identified as providers of personal social networking services, in ordinary course business documents or otherwise.

Dated: October 17, 2022                              Respectfully submitted,

                                        */s/ Mark C. Hansen*
                                        Mark C. Hansen (D.C. Bar No. 425930)
                                        KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Tel: (202) 326-7900
                                        mhansen@kellogghansen.com

                                        *Counsel for Defendant Meta Platforms, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2022, I caused true and correct copies of the

foregoing SECOND SET OF INTERROGATORIES to be served via electronic mail on counsel

listed below:

Daniel Matheson
Owen Masters
Michael Smith
Krisha Cerilli
Robert Zuver
Maggie DiMoscato
Sunila Steephen
Dominique Wilson
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Tel: 202-326-2075
dmatheson@ftc.gov
omasters@ftc.gov
msmith9@ftc.gov
kcerilli@ftc.gov
rzuver@ftc.gov
mdimoscato@ftc.gov
ssteephen@ftc.gov
dwilson1@ftc.gov

*/s/ Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*

# Exhibit 422

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 1:20-cv-03590-JEB

## META PLATFORMS, INC.'S LIST OF FEATURES OR ACTIVITIES FOR EXPLANATION BY THE FEDERAL TRADE COMMISSION

Pursuant to the agreement set forth in the parties' December 15, 2022 Joint Status Report, ECF No. 227, Meta Platforms, Inc., ("Meta") provides the attached list of 100 features and activities for explanation by the Federal Trade Commission ("FTC"). Per the terms of the parties' agreement, the FTC will provide "further elaboration of its position" within three weeks of service, and then, within five weeks of service, the FTC will explain why each feature or activity in Column E does—or does not—count as time spent using a "personal social networking service" ("PSNS"). *See id.* at 8. The FTC will also provide "any relevant facts supporting its explanation." *Id*. at 18.

The FTC's response should also address the particular feature or activity on Meta's product that is similar to the feature or activity on the other listed product. Specifically, Columns B-D identify a selection of features or activities on Meta's products that the FTC has previously indicated qualify as PSNS. *See* ECF No. 206, Ex. 1. Pursuant to the parties' agreement, the FTC's explanation should "include details and any relevant facts on why the FTC classifies" the feature or activity on Meta's product in Column D similarly or differently than the feature or activity on the

1

different product in the same row in Column E.  *See* ECF No. 227 at 18.  For example, if the activity in Column D is "viewing Reel(s) posted by a celebrity . . . User follows that does not follow User" on Instagram and the activity in Column E is "viewing videos posted on TikTok by a celebrity User follows that does not follow User," the FTC's response should explain why it classifies the former as PSNS and the latter as non-PSNS, and include any relevant facts supporting its explanation.  In that example, those facts should explain why—in the FTC's view—engagement with the feature or activity on Instagram is a substitute for all engagement on other PSNS products but not for engagement with the similar feature or activity on TikTok.

For the avoidance of doubt, the listing of features or activities below should not be construed as any statement or admission by Meta.  The features or activities below are not an exhaustive list of all features or activities that are or have been available on Meta's products or the other listed products, but merely a selection that Meta requests that the FTC address in its response.  Moreover, the fact that two activities are listed as similar is not an indication that Meta views those activities as the most analogous among the many competitive offerings available.  Additionally, the fact that Meta lists two similar features should not be construed to indicate that Meta believes that the listed feature competes only with the similar listed feature or that Meta believes that competition should be considered on a feature-by-feature basis.

Unless the FTC specifies otherwise, Meta will assume that the FTC's explanation relating to each feature or activity applies for the entire time the feature or activity has been available to users since January 1, 2011.  If the FTC's explanation is not the same throughout the period when the feature or activity was available to users, then the FTC should say so in its response and explain when and why use of that feature or activity qualified as use of PSNS and when and why it did not.

If, at any point in the future, the FTC takes a different position on any feature or activity, the FTC should timely supplement its response.  *See* Fed. R. Civ. P. 26(e); *see also* ECF No. 165, at 2.

Meta includes citations to various publicly accessible sources describing certain features or activities as of a particular date.  Meta provides those citations for clarification, and they should not be construed to limit the feature or activity to the functions described as of the particular date of the cited source or to limit the FTC's obligation to address the feature or activity for the entire period that the listed feature or activity has been available to users since January 1, 2011.

Meta reserves its right to seek additional discovery from the FTC relating to any of these issues.

**Comparisons to Features or Activities on Facebook Blue**

| A | B | C | D | E |
|---|---|---|---|---|
| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
| 1 | 1 | Watch[2] | Viewing publicly accessible video(s) on the "For You" . . . Tab posted by a Page[3] User[4] follows. | Viewing publicly accessible video(s) on YouTube's "Home"[5] Tab, posted by an account User subscribes to. |
| 2 | 5 | Watch | Viewing advertisement(s) on Watch. | Viewing advertisement(s) on YouTube. |
| 3 | 6 | Marketplace[6] | Viewing [items for sale] that [were] not posted by one of User's Facebook Friends.[7] | Viewing item(s) for sale under the Shop Tab[8] from a Verified Merchant[9] on Pinterest. |
| 4 | 7 | Marketplace | Viewing [items for sale] posted by one of User's Facebook Friends. | Viewing items for sale posted by one of User's Nextdoor |

[1] *See* Meta Platform, Inc.'s List of Features or Activities for Classification by the Federal Trade Commission (Aug. 22, 2022); Pl. Federal Trade Commission's Resp. to Meta Platforms, Inc.'s List of Features or Activities (Sept. 12, 2022).

[2] Facebook Watch: A description of Facebook Watch as of June 24, 2022 can be found at https://www.facebook.com/help/1041553655923544 [https://perma.cc/RRH3-DFXE].

[3] Pages: A description of Pages as of June 24, 2022 can be found at https://www.facebook.com/help/282489752085908 [https://perma.cc/W4ZR-BJFP].

[4] User: A hypothetical regular person that can or could access or engage in the listed features or activities on Meta's products and the other identified products.

[5] "Home" Tab. A description of the Home Tab as of August 31, 2017 can be found at https://www.youtube.com/watch?v=69tpVNunQEU [https://perma.cc/9PFE-MJ9J].

[6] Facebook Marketplace: A description of Marketplace as of June 24, 2022 can be found at https://www.facebook.com/help/1713241952104830 [https://perma.cc/892J-5M9G].

[7] Friending: A description of Facebook Friending as of August 19, 2022 can be found at https://www.facebook.com/help/1540345696275090 [https://perma.cc/J2E3-EB7C].

[8] Shop Tab: A description of Pinterest's "Shop" Tab as of December 17, 2022 can be found at https://help.pinterest.com/en/business/article/create-a-shop [https://perma.cc/X9ZN-JHV3].

[9] Verified Merchants: A description of Verified Merchants on Pinterest as of December 17, 2022 can be found at https://help.pinterest.com/en/business/article/verified-merchant-program [https://perma.cc/X9Z9-MXX9].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | | Connections[10] on the "For Sale and Free"[11] Tab. |
| 5 | 9 | Reels[12] | Viewing Reel(s) posted by a Page User follows. | Viewing video(s) posted by a Business Account[13] User follows on TikTok. |
| 6 | 11 | Reels | Viewing Reel(s) posted by User's Facebook Friend. | Viewing video(s) on TikTok posted by User's TikTok Friend.[14] |
| 7 | 12 | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User . . . . | Viewing video(s) on TikTok posted by an account that is not a TikTok Friend of User. |
| 8 | 12 | Reels | Viewing Reel(s) posted by an account that is not a Facebook Friend of User . . . . | Viewing video(s) on Snapchat Spotlight[15] posted by an account that User does not subscribe to, and that does not subscribe to User. |
| 9 | 16 | Reels | Posting Reel(s) to an audience limited exclusively to User's Facebook Friends. | Posting TikTok video(s) to an audience limited exclusively to User's TikTok Friends. |
| 10 | 19 | Reels | Commenting on . . . Reel(s) | Commenting on YouTube |

[10] Nextdoor Connections: A description of Nextdoor Connections as of December 17, 2022 can be found at https://help.nextdoor.com/s/article/About-Nextdoor-Connections?language=en_US [https://perma.cc/YPH8-MWEV?type=image].

[11] "For Sale & Free" Tab: A description of the "For Sale & Free" Tab as of December 17, 2022 can be found at https://help.nextdoor.com/s/article/Best-practices-For-Sale-Free?language=en_US [https://perma.cc/EQH6-VCN5?type=image].

[12] Facebook Reels: A description of Facebook Reels as of June 24, 2022 can be found at https://www.facebook.com/creators/reels-for-facebook [https://perma.cc/BC5Z-CG46].

[13] Business Account: A description of Business Account as of December 17, 2022 can be found at https://support.tiktok.com/en/using-tiktok/growing-your-audience/switching-to-a-creator-or-business-account [https://perma.cc/2UJZ-62K4].

[14] A "Friend" on TikTok refers to accounts the User follows that follow the User back. A description of "Friends" as of December 17, 2022 can be found at https://support.tiktok.com/en/using-tiktok/creating-videos/duets [https://perma.cc/E5JD-VDWZ].

[15] Snapchat Spotlight: A description of Snapchat Spotlight as of December 17, 2022 can be found at https://support.snapchat.com/en-GB/a/spotlight [https://perma.cc/Q4F8-R6DU].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | posted by a Page User follows. | Shorts[16] posted by an account User subscribes to. |
| 11 | 20 | Groups[17] | [P]osting content in a Group User joined based on the User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group.[18] | Posting content in a Community on Reddit User joined based on the User's interests, such as the "Instant Pot" Community.[19] |
| 12 | 20 | Groups | Viewing or posting content in a Group User joined based on the User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group.[20] | Viewing or posting content in a Community[21] User joined on Google+ based on the User's interests. |
| 13 | 21 | Groups | Viewing . . . content in a Group of any size where 0-15% of . . . members of the Group are Facebook Friends. | Viewing content in a Reddit Community of any size where 0-15% of the members of the community are User's friends or family members. |
| 14 | 23 | Groups | Viewing . . . content in a Group [containing 20 Users that are all User's family members]. | Viewing content in an iMessage group chat containing 20 Users that are all User's family members. |
| 15 | 29 | Groups | Viewing . . . content in a Group focused on a | Using Nextdoor's |

[16] YouTube Shorts: A description of YouTube Shorts as of December 17, 2022 can be found at https://support.google.com/youtube/answer/10059070?hl=en [https://perma.cc/4D72-X267].

[17] Groups: A description of Groups as of June 24, 2022 can be found at https://www.facebook.com/help/1629740080681586 [https://perma.cc/MB9L-XNDU].

[18] The "Slow Cooker/Instant Pot Recipes" Group as of August 19, 2022 can be found at https://www.facebook.com/groups/887806611311727/ [https://perma.cc/K8E7-ZYLP].

[19] Communities: A description of Reddit Communities, also known as "Subreddits," as of December 17, 2022 can be found at https://reddit.zendesk.com/hc/en-us/articles/204533569-What-are-communities-or-subreddits- [https://perma.cc/WJG2-3ZH2].

[20] The "Slow Cooker/Instant Pot Recipes" Group as of August 19, 2022 can be found at https://www.facebook.com/groups/887806611311727/ [https://perma.cc/K8E7-ZYLP].

[21] Communities: A description of Google Communities as of December 17, 2022 can be found at https://support.google.com/googlecurrents/answer/6320394?hl=en&co=GENIE.Platform%3DDesktop [https://perma.cc/HHX2-WYUC].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | geographic community, such as a neighborhood or city. | "Neighborhood Name"[22] Tab to view content in User's immediate neighborhood only. |
| 16 | 33 | Games/ Gaming[23] | Watching . . . live-stream gaming. | Watching live-stream gaming videos on YouTube Live.[24] |
| 17 | 34 | Stories[25] | Viewing Story(ies) posted by User's Facebook Friend. | Viewing Story(ies) posted by User's Connection[26] on LinkedIn. |
| 18 | 34 | Stories | Viewing Story(ies) posted by User's Facebook Friend. | Viewing Story(ies) posted by User's Friend[27] on Snapchat. |
| 19 | 40 | Live[28] | Viewing Live video(s) posted by an account that is Facebook Friends with User. | Viewing video(s) on YouTube Live posted by an account that is a friend or family member of the User. |
| 20 | 43 | Feed[29] | Posting to all of User's | Posting to all of User's |

[22] Neighborhood Name: A description of the Neighborhood Name Tab as of December 17, 2022 can be found at https://help.nextdoor.com/s/article/About-Nearby-Neighborhoods?language=en_US [https://perma.cc/69US-WNQ5?type=image].

[23] Gaming: A description of Gaming as of August 17, 2022 can be found at https://www.facebook.com/help/2402655169966967?helpref=hc_fnav [https://perma.cc/9WZ7-FFUZ].

[24] YouTube Live: A description of YouTube Live as of December 17, 2022 can be found at https://www.youtube.com/howyoutubeworks/product-features/live/#youtube-live [https://perma.cc/9QVP-BZY4].

[25] Facebook Stories: A description of Facebook Stories as of June 24, 2022 can be found at https://www.facebook.com/business/learn/lessons/facebook-stories-creators [https://perma.cc/F8F4-TN7K].

[26] Connection: A description of Connections on LinkedIn as of December 17, 2022 can be found at https://www.linkedin.com/help/linkedin/answer/a563052/connections-overview?lang=en [https://perma.cc/SH95-37Z2].

[27] Friend: A description of Friend within the context of Snapchat as of December 17, 2022 can be found at https://support.snapchat.com/en-GB/article/add-friends [https://perma.cc/6ERJ-JGQP].

[28] Facebook Live: A description of Facebook Live as of June 24, 2022 can be found at https://www.facebook.com/formedia/tools/facebook-live [https://perma.cc/5H2H-BAY6].

[29] Facebook Feed: A description of Facebook Feed as of June 24, 2022 can be found at https://www.facebook.com/help/1155510281178725 [https://perma.cc/CZ8R-9LCL].  Feed was

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | Facebook Friends, encouraging them to attend an industry-networking event hosted by User's employer. | Followers on Google+, encouraging them to attend an industry-networking event hosted by User's employer. |
| 21 | 44 | Feed | Posting to User's Facebook Friends to promote User's small business. | Posting to User's LinkedIn Connections to promote User's small business. |
| 22 | 48 | Feed | Posting content to a limited audience of five or fewer Facebook Friends whose mobile telephone number User possessed prior to joining Facebook. | Posting content on iMessage to a limited audience of five or fewer of User's friends or family members whose mobile telephone number User possesses. |
| 23 | 51 | Feed | Posting Original[30] content that encourages users that reside in close physical proximity to one another to attend a local social event. | Posting Original content on Strava, encouraging User's personal friends that reside in close physical proximity to one another to attend a local social event. |
| 24 | 52 | Feed | Viewing Original photo(s) posted by a Facebook Friend. | Viewing Original photo(s) on Twitter posted by a person who User follows and who also follows User. |
| 25 | 52 | Feed | Viewing Original photo(s) posted by a Facebook Friend. | Viewing Original photo(s) on Twitter posted by User's friend or family member. |
| 26 | 52 | Feed | Viewing Original photo(s) posted by a Facebook Friend. | Viewing Original photo(s) on Pinterest posted by User's family member. |
| 27 | 53 | Feed | Posting Original photo(s) [about a highly personal milestone (such as a health event)]. | Posting Original photo(s) about a highly personal milestone (such as a health event) on LinkedIn. |
| 28 | 53 | Feed | Posting Original photo(s). | Posting Original photos in a Tweet on Twitter. |
| 29 | 54 | Feed | Viewing Original video(s) | Viewing Original video(s) |

formerly called "News Feed" and was launched on or around September 5, 2006.

[30] Original here means created by the poster, as opposed to the poster re-sharing content created by another user.

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | posted by User's Facebook Friend [showing their child's first steps]. | posted by a User's friend or family member on YouTube showing their child's first steps. |
| 30 | 56 | Feed | Viewing comments . . . to Original post(s) by a Facebook Friend. | Viewing comments to Original post(s) by a User's Nextdoor Connection. |
| 31 | 57 | Feed | Viewing content (e.g., The New York Times ("NYT") article or 20 minute comedy routine from a famous comedian that was posted on YouTube) . . . linked in a Facebook Friend's post. | Viewing content (e.g. a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) linked in a Tweet by an individual who User follows and who also follows User on Twitter. |
| 32 | 60 | Feed | Viewing content that was posted by a Facebook Friend of one of User's Facebook Friends (who is not Facebook Friends with User) and reshared by User's Facebook Friend. | Viewing a Retweet[31] posted by a person who User follows and who also follows User when the Original tweet was posted by an account User does not follow. |
| 33 | 61 | Feed | Viewing content posted by a Public Figure[32] . . . User follows or subscribes[33] to on Facebook but is not Facebook Friends with. | Viewing content posted by a public figure User subscribes to on YouTube but that does not subscribe to User. |
| 34 | 61 | Feed | Viewing content posted by a Public Figure . . . User follows or subscribes to on Facebook but is not Facebook Friends with. | Viewing content posted by a public figure User follows on Google+ but that does not follow User. |

---

[31] Retweet:  A description of a Retweet as of December 17, 2022 can be found at https://help.twitter.com/en/using-twitter/how-to-retweet [https://perma.cc/H2ZE-7XH4].

[32] Public Figure: A description of Public Figure as of September 10, 2019 can be found at https://www.facebook.com/formedia/blog/new-features-for-public-figures [https://perma.cc/33ZF-AFQT].

[33] During the relevant period, Facebook changed certain terminology from "subscribe" to "follow."

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| 35 | 61 | Feed | Viewing content posted by a Public Figure[34] . . . User follows or subscribes[35] to on Facebook but is not Facebook Friends with. | Viewing content posted by a public figure User follows on MeWe but that does not follow User. |
| 36 | 62 | Feed | Viewing content without a link posted by a Page User follows on Facebook. | Viewing content without a link posted by a Professional Account User follows on Twitter. |
| 37 | 64 | Feed | Viewing content posted in a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Viewing content posted in a Community User joined on Reddit based on User's interests, such as the "Instant Pot" Community. |
| 38 | 64 | Feed | Viewing content posted in a Group User joined based on User's interests . . . . | Viewing content posted in a LinkedIn Group[36] User joined based on User's interests. |
| 39 | 65 | Feed | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Group User joined based on User's interests, such as the "Slow Cooker/Instant Pot Recipes" Group. | Viewing linked content (e.g., a NYT article or 20 minute comedy routine from a famous comedian that was posted on YouTube) from a Community User joined on Reddit based on User's interests, such as the "Instant Pot" community. |
| 40 | 69 | Feed | Viewing content posted from a Group that contains more than 10,000 members. | Viewing content posted in a Reddit Community that contains more than 10,000 members. |
| 41 | 74 | Feed | Viewing content posted | Viewing content posted on |

---

[34] Public Figure: A description of Public Figure as of September 10, 2019 can be found at https://www.facebook.com/formedia/blog/new-features-for-public-figures [https://perma.cc/33ZF-AFQT].

[35] During the relevant period, Facebook changed certain terminology from "subscribe" to "follow."

[36] LinkedIn Group:  A description of LinkedIn Groups as of December 17, 2022 can be found at https://www.linkedin.com/help/linkedin/answer/a540824/linkedin-groups-membership-overview [https://perma.cc/K96F-BBQE].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | from a Group focused on a geographic community, such as a neighborhood . . . . | Nextdoor in one's immediate neighborhood only by selecting the Tab with User's Neighborhood Name. |
| 42 | 75 | Feed | Viewing comments . . . to post(s) by a person User follows or subscribes to on Facebook but is not Facebook Friends with. | Viewing comments to Tweets posted by a person User follows on Twitter that does not follow User back. |
| 43 | 78 | Feed | Viewing Recommended[37] video content that does not originate from people or Pages User follows or Groups User has joined. | Viewing Suggested video content that does not originate from accounts User subscribes to on YouTube. |
| 44 | 78 | Feed | Viewing Recommended video content that does not originate from people or Pages User follows or Groups User has joined. | Viewing suggested video content on TikTok's "For You" Feed that does not originate from people or accounts User follows. |
| 45 | 78 | Feed | Viewing Recommended video content that does not originate from people or Pages User follows or Groups User has joined. | Viewing recommended Idea Pins[38] on Pinterest's Watch Tab that do not originate from people or Boards User follows. |
| 46 | 78 | Feed | Viewing Recommended video content that does not originate from people or Pages User follows or Groups User has joined. | Viewing recommended video(s) on Netflix. |
| 47 | 78 | Feed | Viewing Recommended video content that does not originate from people or Pages User follows or Groups User has joined. | Viewing recommended video(s) on Myspace that does not originate from User's friends or connections. |

---

[37] A description of Recommended content as of August 19, 2022 can be found at https://transparency.fb.com/data/widely-viewed-content-report/ [https://perma.cc/FN5A-7H2W] (explaining that "[r]ecommended content is unconnected").

[38] Idea Pins: A description of Idea Pins as of December 17, 2022 can be found at https://help.pinterest.com/en/article/story-pins [https://perma.cc/NQ5R-R346].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| 48 | 89 | Notifications[39] | Viewing Notifications based on activity from User's Facebook Friends. | Viewing Notifications[40] when User's Nextdoor Connection mentions them in a comment. |
| 49 | 91 | Messaging/ Facebook Chat[41] | Sending . . . message(s) . . . to one other Facebook Friend. | Sending message(s) to one other friend or family member on iMessage. |
| 50 | 91 | Messaging/ Facebook Chat | Sending . . . message(s) . . . to one other Facebook Friend. | Sending message(s) to one other Snapchat Friend. |
| 51 | 91 | Messaging/ Facebook Chat | Sending . . . message(s) . . . to one other Facebook Friend [to wish him a happy birthday]. | Sending message(s) on LinkedIn to a friend or family member to wish him a happy birthday. |
| 52 | 96 | Messaging/ Facebook Chat | Sending . . . message(s) . . . to a group[42] of 21-30 other users. | Sending message(s) to a group of 21-30 other users on iMessage. |
| 53 | 106 | Messaging/ Facebook Chat | Sending . . . message(s) containing sender's Original photo(s). | Using iMessage to send an album of Original photo(s) from iCloud Photos to a group of User's friends or family members.[43] |
| 54 | 110 | Messaging/ Facebook Chat Rooms | Voice calling with one other User. | Voice calling with one friend or family member using iMessage/FaceTime Audio. |
| 55 | 112 | Messaging/ | Video calling with one other | Video calling with one friend |

---

[39] Notifications: A description of Notifications as of August 22, 2022 can be found at https://www.facebook.com/help/notifications [https://perma.cc/L3FP-CT2F].

[40] Notifications: A description of Notifications on Nextdoor as of December 17, 2022 can be found at https://help.nextdoor.com/s/article/How-to-change-your-mobile-notifications?language=en_US [https://perma.cc/FJV3-VVDP?type=image].

[41] The "Messaging" functionality that is being referred to in this "Facebook" section of the chart is referring to the Messaging functionality that is and has been available through the Facebook application, rather than through the stand-alone Messenger application.

[42] The terminology "group" in this and the following rows relating to "Messaging/Facebook Chat" does not imply a "Facebook Group."

[43] iCloud Photos: A description of iCloud Photos as of December 17, 2022 can be found at https://www.apple.com/icloud/ [https://perma.cc/7LNZ-A5WW].

| No. | No. On First List[1] | Location on Facebook | Feature or Activity Classified as PSNS by the FTC on Facebook | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | Facebook Chat | User. | or family member using iMessage/FaceTime Video. |
| 56 | 113 | Messaging/ Facebook Chat Rooms | Video calling with more than one other User. | Video calling with more than one friend or family member using iMessage/FaceTime Video. |
| 57 | 116. | Search[44] | Using the Search feature to find Page(s) . . . User is interested in. | Using the search feature on Reddit to find Communities User is interested in. |
| 58 | 122. | Podcasts | Listening to Podcast(s) or Live Audio Room(s).[45] | Listening to live audio in a Space[46] on Twitter. |
| 59 | 122. | Podcasts | Listening to Podcast(s) or Live Audio Room(s). | Listening to Podcast(s) on Spotify. |

**Comparisons to Features or Activities on Instagram**

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| 60 | 10 | Reels[47] | Viewing Reel(s) posted by a celebrity . . . User follows that does not follow User. | Viewing videos posted on TikTok by a celebrity User follows that does not follow User. |
| 61 | 10 | Reels | Viewing Reel(s) posted by a celebrity . . . User follows that does not follow User. | Viewing YouTube Shorts posted by a celebrity User subscribes to who does not subscribe to User. |
| 62 | 15 | Reels | Viewing Reel(s) posted by any Personal Account[48] that | Viewing video(s) on TikTok posted by any Personal |

---

[44] Search: A description of how to use Search as of August 19, 2022 can be found at https://www.facebook.com/help/103764609715185 [https://perma.cc/LZ52-88U8].

[45] Podcasts and Live Audio Rooms: A description of Podcasts and Live Audio Rooms as of June 21, 2021 can be found at https://about.fb.com/news/2021/06/live-audio-rooms-and-podcasts-on-facebook/ [https://perma.cc/97C7-MDTH].

[46] Twitter Spaces: A description of Spaces as of December 17, 2022 can be found at https://help.twitter.com/en/using-twitter/spaces [https://perma.cc/5APP-2U5P].

[47] Instagram Reels: A description of Reels as of June 24, 2022 can be found at https://about.instagram.com/features/reels [https://perma.cc/F29V-LYF6].

[48] "Personal Account," when used in the context of the Instagram section of this chart, refers

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | User follows and that follows User where User has met the owner of the account . . . . | Account that is User's TikTok Friend where User has met the owner of the account. |
| 63 | 15 | Reels | Viewing Reel(s) posted by any Personal Account that User follows and that follows User where User has met the owner of the account . . . . | Viewing video(s) using Twitter's immersive media viewer[49] posted by any Personal Account that User follows and that follows User where User has met the owner of the account. |
| 64 | 16 | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. | Viewing video(s) on TikTok posted by an account that User does not follow, and that does not follow User. |
| 65 | 16 | Reels | Viewing Reel(s) posted by an account that User does not follow, and that does not follow User. | Viewing video(s) on Snapchat Spotlight posted by an account that User does not follow, and that does not follow User. |
| 66 | 18 | Reels | Viewing branded content in Reel(s). | Viewing branded content on YouTube. |
| 67 | 19 | Reels | Posting Reel(s) to an audience limited to User's followers. | Posting video(s) to TikTok using the "Friends Only" setting. |
| 68 | 20 | Reels | Posting Reel(s) to a Public Audience. | Posting video(s) to Snapchat Spotlight to a public audience. |
| 69 | 20 | Reels | Posting Reel(s) to a Public Audience. | Posting video(s) to a public audience on TikTok. |
| 70 | 20 | Reels | Posting Reel(s) to a Public Audience. | Posting Idea Pins to User's public Pinterest Board. |
| 71 | 22 | Reels | Commenting on . . . Reel(s) posted by an account User follows that does not follow | Commenting on YouTube Shorts posted by an account User subscribes to that does |

to any user's account on Instagram that is utilized by an individual rather than a business or other entity.

[49] Immersive Media Viewer: A description of Twitter's Immersive Media Viewer as of September 29, 2022 can be found at https://blog.twitter.com/en_us/topics/product/2022/new-video-products-make-easier-watch-what-happening-twitter [https://perma.cc/HVP7-36UW].

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | User. | not subscribe to User. |
| 72 | 24 | Reels | Commenting on . . . Reel(s) posted by an account User follows and that follows User. | Commenting on videos on TikTok's Friends Tab[50] posted by User's TikTok Friend. |
| 73 | 28 | Stories[51] | Viewing Story(ies) posted by an account that User follows that does not follow User. | Viewing Story(ies) on Snapchat Discover[52] posted by an account that User subscribes to that does not subscribe to User. |
| 74 | 29 | Stories | Viewing Story(ies) posted by an account for a business . . . User follows that does not follow User. | Viewing Story(ies) on Snapchat Discover posted by an account for a business User subscribes to that does not subscribe to User. |
| 75 | 38 | Stories | Viewing Story(ies) posted by any Personal Account User follows that does not follow User, where User has never met the owner of the account . . . . | Viewing Story(ies) posted on Snapchat by any Personal Account User subscribes to that does not subscribe to User, where User has never met the owner of the account. |
| 76 | 42 | Stories | Viewing Story(ies) posted by [User's personal friend or family member.] | Viewing TikTok Story(ies) posted by User's personal friend or family member. |
| 77 | 47 | Stories | Reacting to . . . Story(ies) posted by an account User follows and that follows User. | Reacting to Story Pins on Pinterest posted by an account User follows and that follows User. |
| 78 | 53 | Live[53] | Viewing Live video(s) | Viewing live video(s) on |

---

[50] Friends Tab: A description of TikTok's Friends Tab as of December 17, 2022 can be found at https://support.tiktok.com/en/using-tiktok/exploring-videos/friends-tab [https://perma.cc/4C2X-C92V].

[51] Instagram Stories: A description of Instagram Stories as of June 24, 2022 can be found at https://about.instagram.com/features/stories [https://perma.cc/G9UG-HWHB].

[52] Snapchat Discover: A description of Snapchat Discover as of December 17, 2022 can be found at https://support.snapchat.com/en-US/article/how-we-rank-content-discover [https://perma.cc/E22G-YT85].

[53] Instagram Live: A description of Live as of August 17, 2022 can be found at https://hel60p.instagram.com/272122157758915 [https://perma.cc/7L6W-QMQA].

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|---|---|---|---|---|
| | | | posted by an account User follows that follows User. | TikTok posted by User's TikTok Friend. |
| 79 | 53 | Live | Viewing Live video(s) posted by an account User follows that follows User. | Viewing live video(s) on Twitter posted by User's friend or family member. |
| 80 | 56 | Shop[54] | Viewing content on Shops for You. | Viewing Product Pins on Pinterest's Shop Tab. |
| 81 | 59 | IGTV[55] | Watching video(s) on IGTV. | Watching video(s) on Pinterest TV. |
| 82 | 59 | IGTV | Watching video(s) on IGTV. | Watching a movie trailer on YouTube |
| 83 | 59 | IGTV | Watching video(s) on IGTV. | Watching video(s) on Hulu. |
| 84 | 62 | Feed | Viewing content posted by an account that User follows that does not follow User. | Viewing content on YouTube posted by account that User subscribes to that does not subscribe to User. |
| 85 | 62 | Feed[56] | Viewing content posted by an account that User follows that does not follow User. | Viewing content on User's Home timeline on Twitter posted by an account that User follows that does not follow User. |
| 86 | 62 | Feed | Viewing content posted by an account that User follows that does not follow User. | Viewing content on TikTok posted by account that User follows that does not follow User. |
| 87 | 66 | Feed | Viewing content that was posted to a limited audience of five or fewer followers whose mobile telephone number the User possessed prior to joining Instagram. | Viewing content that was posted to a Twitter Circle[57] with five or fewer members whose mobile telephone number User possessed prior to joining Twitter. |

---

[54] Instagram Shop: A description of Shop as of June 24, 2022 can be found at https://help.instagram.com/194353285783006 [https://perma.cc/BF3X-7Y6W].

[55] IGTV: A description of IGTV dated June 20, 2018 can be found at https://about.instagram.com/blog/announcements/welcome-to-igtv [https://perma.cc/563M-GN9B].

[56] Instagram Feed: A description of Instagram Feed as of June 24, 2022 can be found at https://help.instagram.com/1986234648360433 [https://perma.cc/C86D-U9ZV].

[57] Twitter Circle: A description of Twitter Circle as of December 17, 2022 can be found at https://help.twitter.com/en/using-twitter/twitter-circle [https://perma.cc/RX4S-Z7UF].

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|-----|------|------|------|------|
| 88 | 67 | Feed | Posting Original content that encourages Users that reside in close physical proximity . . . to attend a local social event. | Tweeting Original content that encourages Users that reside in close physical proximity to attend a local social event. |
| 89 | 68 | Feed | Viewing Original photo(s) posted by an account that User follows and that follows User, where neither follow was based on Suggested for you accounts.[58] | Viewing Original photo(s) posted by a Nextdoor Connection, when User was friends with Connection before connecting online. |
| 90 | 84 | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person . . . . | Viewing Original photo(s) posted by a Personal Account on Friendster's Bulletin Board, where User has never met the owner of the account in person. |
| 91 | 84 | Feed | Viewing Original photo(s) posted by any Personal Account that User follows and that follows User where User has never met the owner of the account in person . . . . | Viewing Original photo(s) posted by an individual on Orkut, where User has never the met the owner of the account in person. |
| 92 | 91 | Feed | Commenting on . . . Original photo(s) posted by an account User follows that follows User. | Commenting on Original Static Pin(s)[59] on Pinterest posted by User's friend or family member. |
| 93 | 119 | Feed | Posting Original video(s) [to a public audience]. | Using Path Social to promote User's Original videos to a public audience. |
| 94 | 122 | Profile | Viewing content on a profile of a Personal Account that User follows and that follows User. | Viewing content on a LinkedIn profile of a Personal Account that is a Connection with User. |

[58] Suggestions For You: A description of suggestions as of August 22, 2022 can be found at https://help.instagram.com/530450580417848 [https://perma.cc/56DA-6BM6].

[59] Static Pins: A description of Static Pins as of December 17, 2022 can be found at https://help.pinterest.com/en/business/article/pinterest-product-specs [https://perma.cc/ARD4-43DP].

| No. | No. On First List | Location on Instagram | Feature or Activity Classified as PSNS by the FTC on Instagram | Feature or Activity on Non-Meta Product |
|-----|------|------|------|------|
| 95 | 123 | Profile | Viewing content on a profile of a business . . . User follows and that follows User. | Viewing content on a Twitter profile of a business User follows and that follows User. |
| 96 | 124 | Profile | Viewing content on a profile of an account that User follows [that] does not follow User. | Viewing content on a TikTok profile of an account that User follows that does not follow User. |
| 97 | 128 | Instagram Direct[60] | Sending . . . message(s) to . . . an account User follows that does not follow User. | Sending or viewing message(s) on Pinterest to an account User follows that does not follow User. |
| 98 | 140 | Instagram Direct | Sending . . . message(s) containing content posted by an account User does not follow on Instagram. | Sending message(s) containing content posted by an account User does not follow on TikTok. |
| 99 | 142 | Instagram Direct | Sending . . . disappearing message(s). | Sending disappearing message(s) on Snapchat. |

**Comparison to Feature or Activity on Messenger**

| No. | No. On First List | Location on Messenger | Feature or Activity Classified as PSNS by the FTC on Messenger | Feature or Activity on Non-Meta Product |
|-----|------|------|------|------|
| 100 | 1 | Messenger | Viewing Stories. | Viewing Twitter Fleets[61] posted by an account that follows User, who user also follows. |

---

[60] An explanation of users sending a post they see on Instagram as a direct message as of August 22, 2022 can be found at https://help.instagram.com/1209246439090858 [https://perma.cc/2ETQ-2EDD].

[61] Twitter Fleets: A description of Twitter Fleets as of May 18, 2021 can be found at https://blog.hubspot.com/marketing/twitter-fleets [https://perma.cc/KA5V-DJ4U].

Dated: December 20, 2022

Respectfully submitted,

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

 */s/ Kevin B. Huff*
Kevin B. Huff (D.C. Bar No. 462043)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 623-7900
khuff@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2022, I caused the foregoing to be served on FTC counsel via electronic mail.

Daniel Matheson
Owen Masters
Michael Smith
Krisha Cerilli
Robert Zuver
Maggie DiMoscato
Sunila Steephen
Dominique Wilson
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Tel: 202-326-2075
dmatheson@ftc.gov
omasters@ftc.gov
msmith9@ftc.gov
kcerilli@ftc.gov
rzuver@ftc.gov
mdimoscato@ftc.gov
ssteephen@ftc.gov
dwilson1@ftc.gov

/s/ Kevin B. Huff
Kevin B. Huff (D.C. Bar No. 462043)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
khuff@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*

20

# Exhibit 423

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
FEDERAL TRADE COMMISSION,          )  Civil Action
              Plaintiff,           )  No. 20-3590
vs.                                )
                                   )
META PLATFORMS, INC.,              )  May 15, 2023
              Defendant.           )  10:01 a.m.
                                   )  Washington, D.C.
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE JAMES E. BOASBERG,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

*(All parties appearing by videoteleconference.)*

<u>**APPEARANCES**</u>:

```
FOR THE FEDERAL TRADE COMMISSION:
                SUSAN MUSSER
                DANIEL JOHN MATHESON
                Federal Trade Commission
                Bureau of Competition
                400 7th Street, SW
                Washington, DC 20024
                (573) 680-5191
                Email: smusser@ftc.gov
                Email: dmatheson@ftc.gov


FOR META:       MARK CHARLES HANSEN
                GEOFFREY M. KLINEBERG
                Kellogg, Hansen, Todd, Figel & Frederick, PLLC
                1615 M Street, NW, Suite 400
                Washington, DC 20036
                (202) 326-7904
                Email: mhansen@kellogghansen.com
                Email: gklineberg@kellogghansen.com


Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
```

This hearing was held via videoconference and is, therefore,
subject to the limitations associated with audio difficulties
while using technology, i.e., audio feedback, static
interference, etc.

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  We're here today for a

3      motion hearing in Civil Matter 20-3590, Federal Trade

4      Commission versus Meta Platforms, Inc.

5                  Beginning with counsel for the plaintiff, state

6      your name for the record.

7                  MS. MUSSER:  Good morning.

8                  This is Susan Musser, and I'm joined by my

9      colleague Daniel Matheson on behalf of the FTC.

10                 THE COURT:  Welcome.

11                 MR. KLEINBERG:  Good morning, Your Honor.

12                 Geoffrey Klineberg from Kellogg Hansen, on behalf

13     of Meta Platforms, Inc.  Joining me this morning are Eric

14     Meiring, who is the associate general counsel with Meta's

15     legal department; and my partner Daniel Dorris, from Kellogg

16     Hansen, who will be addressing the Court's questions on

17     Meta's motion to compel.

18                 THE COURT:  Okay.  Great.  Thank you.

19                 Welcome to you, folks, as well.

20                 All right.  I was hoping to do this rather quickly

21     this morning.  A few questions.

22                 Let me start with Interrogatory 16.  I guess I am

23     not sure what the problem is here.

24                 Mr. Dorris, if the FTC certifies that it has

25     provided a full and complete response to Interrogatory

1    No. 16 based on the evidence available to it at this time,

2    why isn't that good enough?

3              MR. DORRIS:  Your Honor, this one, thankfully, has

4    been resolved.  The certification provided in the FTC's

5    certification's brief satisfies us.  Up until then, it

6    wasn't clear, but the brief satisfies us.

7              THE COURT:  Glad to know what I thought was an

8    easy one was resolved.

9              Any of the others before I start, Mr. Dorris, or

10   no such luck?

11             MR. DORRIS:  No resolution on the other ones yet.

12             THE COURT:  All right.  So we have got 20 through

13   23.  I guess -- so it seems to me that Meta is generally

14   right on 20 to 21.

15             You know, I looked, Ms. Musser, for example, at

16   paragraph 221 of your amended complaint, and 222.  And it

17   seems you allege fairly clearly that Meta's monopoly has

18   deprived consumers of additional innovation, quality

19   improvements, consumer choice; and then you say Facebook has

20   been able to provide lower levels of service quality or

21   privacy and data protection.

22             So why shouldn't you have to give facts -- and so

23   it seems to me 20 and 21 rise and fall together.  Why

24   shouldn't you then have to identify each additional

25   innovation, quality improvement, consumer choice, and better

1    levels of service quality that the consumers would have had

2    absent the acquisition; isn't that, sort of, the fundamental

3    point of your suit?

4        MS. MUSSER:  Your Honor, I think it's helpful to

5    go back to the actual language that they request in the

6    interrogatories.  What they asked for isn't for the issues

7    that you just stated but, rather, for a -- with the relevant

8    facts that support the FTC's contention that the -- that

9    there would have been a better product.  Right?

10       And when you look at the allegations in -- 220

11   through 222, what those allege is that:  But for Meta's

12   illegal conduct there would have been -- consumers would

13   have benefited from competition.  Now, how consumers would

14   have benefited from competition, the specific parameters,

15   will be analyzed by our expert or experts during expert

16   discovery.  So I think it is important to kind of

17   differentiate those two.

18       In the FTC's mind, what 220 to 222 actually do is

19   look at that "but for" world, which is very similar to

20   Interrogatory 20 that Your Honor decided that Meta did not

21   have to answer last week.  So --

22       THE COURT:  But I feel like it's more closer to

23   the one that I required Meta to answer, saying that "such

24   as," for example, wasn't sufficient; that, in 221, we have a

25   lot of "such as" language and "including but not limited to"

1    language, right?

2            MS. MUSSER:  Yes, Your Honor.

3            However, again, I think when you look at the

4    actual question that they ask, that is not a contention that

5    the FTC has made in those paragraphs but, rather, talks

6    about the holistic benefits of competition in that "but for"

7    world.  The actual allegation that the products would have

8    been better is not a contention made, although that will

9    certainly be part of the contours of expert analysis.  So I

10    think that's the fundamental disconnect here.

11            THE COURT:  I mean, that seems to me -- I am not

12    sure I am agreeing that you are saying that the complaint

13    doesn't allege that it would be better.  But when you say in

14    the complaint that Meta -- that Facebook's monopoly has

15    deprived consumers of certain things, isn't that pretty

16    clear that you are saying that they would be better without

17    that monopoly; in other words, they wouldn't be deprived, so

18    things would be better?

19            MS. MUSSER:  What we're alleging, Your Honor, is

20    that competition could have manifested in a myriad of ways;

21    not only that products were better but, rather, that there

22    could have been differentiation or more services available,

23    that there would have been more choice for consumers.  It's

24    not that narrow contention that Meta is trying to cabin us

25    into; but, rather, a complete analysis of the "but for"

```
1     world.  We look at all of those factors.  Are there more

2     choices?  Does the product have a new feature that would

3     have arisen but for Meta's in a competitive product?

4            THE COURT:  All right.  Mr. Dorris, do you want to

5     respond to that?

6            MR. DORRIS:  Yes, Your Honor.

7            I think, in paragraph 222, as you pointed out, the

8     allegation is both:  Facebook has been able to provide lower

9     levels of service quality on privacy and data protection

10    than it would have been able to provide in a competitive

11    market; so that is an allegation about the "but for" world,

12    about how the products are better or worse.  So we think

13    that that is what the FTC alleged.

14            In any event, even if it wasn't, I think what I

15    just heard the FTC say was that they will be contending that

16    the products are worse as a result of these acquisitions;

17    and what we're looking for is the factual basis for that

18    now, understanding there may be an additional expert gloss

19    on this.  But if the FTC has facts currently to support

20    those allegations, it should provide them right now.

21            THE COURT:  I am going to require you to respond,

22    Ms. Musser, on 220 -- I'm sorry, on 20 and 21; that you have

23    got to give facts that support those contentions that

24    consumer-rooted products or services that are better.  So I

25    think -- specifically, on the four that I mentioned,
```

1    additional innovation, quality improvement, consumer choice,

2    and the lower levels of service, quality or privacy and data

3    protection.  I think that's what is contended, and I think

4    that Meta gets a chance to hear what you have to say.

5            Again, you are going to -- we're at almost expert

6    discovery and, again, you are going to be able to do that

7    and provide further analysis in expert discovery, but I

8    think you need to respond to 20 and 21, as I mentioned.

9            Okay.  22, probably because Mr. Klineberg drafted

10   this, I am sure this one -- I can't really follow

11   Interrogatory 22, so I am not blaming the FTC for not being

12   able to follow it.

13           I think it reads a little bit more like what a

14   table of contents might be in a summary judgment motion.  So

15   I think given this phrasing I am not going to require the

16   FTC to respond to that one.

17           On 23, I am going to require a response on this.

18           Again, Snapchat discovery is finished, right,

19   Ms. Musser?  Any further Snapchat discovery ongoing?

20           MS. MUSSER:  I believe we still have additional

21   depositions that will take place.

22           THE COURT:  On Snapchat, folks?  You are saying

23   Snapchat people --

24           MS. MUSSER:  Yes.

25           THE COURT:  All right.  So I will let you answer

1    it when those are done, but you have to answer it.

2            In other words, I believe they're providing PSNS

3    and, then, that is entitled to all of the facts you think

4    support that.  I don't think that Interrogatory 13 fully

5    responds, so I think that fully covers you.  I think you do

6    need to respond to 23.  I won't make you respond until you

7    are done with them; Snapchat discovery.

8            So I assume that's -- all of that is going to be

9    done soon.  But, when it's done, you are going to need to

10   respond to that.

11           So the answer is:  I am granting Facebook's motion

12   on 20, 21, and 23.  I am denying 22, and 16 is moot.

13           Any other questions?

14           And, Mr. Dorris, do you want a timetable to

15   respond?  Part of it, maybe, depends on where you folks are

16   in your discussions about wrapping up this discovery in the

17   next couple of weeks.

18           MR. DORRIS:  Yes.  Certainly, that will be

19   helpful, Your Honor.  You know, the expert reports are

20   coming up, and that's really what we want the materials for.

21           So for them to be meaningful responses, it needs

22   to come in advance of the FTC's report so our experts can

23   start to use the information and work on their own reports.

24           On the Snap [sic] depositions, Ms. Musser is

25   right, there are two left I believe to be conducted within

1    the next week, or maybe a little more than a week.  But I

2    don't understand those two to relate to the specific

3    definition in the market definition; they relate to

4    advertising and infrastructure issues.  So I think they

5    fairly have all of the discovery they're going to need to

6    respond to this one.

7              I don't have a specific date in mind; but knowing

8    that the expert reports are due July 3rd, for it to be

9    meaningful, the responses need to come in advance of that.

10             THE COURT:  Okay.  Ms. Musser, do you want to give

11   me a proposed date for the response of the three

12   interrogatories that I am ordering today?

13             MS. MUSSER:  Yes, with just one correction from

14   Mr. Dorris.

15             We do have one Snap [sic] deposition that's taking

16   place out of time.  I also understand that the specific

17   issues that they are testifying to has changed.  So our view

18   is that we do need those depositions in order to fully

19   request that.

20             So I would -- for these interrogatories, say two

21   weeks after the last Snap deposition for a response.  And I

22   will also note that I believe Your Honor ordered a response

23   to 'rogs 10 to 12 supplementation that the FTC still hasn't

24   gotten, so we would like an understanding that we can have a

25   mutually agreed-upon time here.  But that would be our

```
1    proposal.

2              THE COURT:  All right.  So 23, though, that is the

3    only one that refers to Snapchat.  How about the other two?

4    By the end of May, May 31st, for the others?

5              MS. MUSSER:  Yes.  May 31st will work.

6              THE COURT:  And, Mr. Dorris or Mr. Klineberg, you

7    can get the FTC your responses to Interrogatories 10 through

8    12 by the 31st?

9              MR. KLINEBERG:  Yes, Your Honor.  We certainly can

10   by the 31st.

11             THE COURT:  And then, I will say -- when is the

12   last Snap deposition, Ms. Musser?

13             MS. MUSSER:  Your Honor, one second.  I am asking

14   my colleague.  I believe it's the week after the close of

15   fact discovery.  There is one out of time, but I am not sure

16   right now.

17             THE COURT:  I will say -- I will say --

18             MR. DORRIS:  If it helps, I believe it's May 25th,

19   the last deposition.

20             THE COURT:  All right.  I am going to say --

21   thanks.

22             I will say June 7 for the Interrogatory 23

23   response, Ms. Musser.  That's almost two weeks after the

24   last one, if Mr. Dorris is correct.  Okay?

25             MS. MUSSER:  Thank you, Your Honor.
```

```
 1              THE COURT:  Okay.  So any other issues on this

 2      motion or anything else that -- well, let's start, anything

 3      else?

 4              I think that this covers this motion.

 5              Mr. Dorris?

 6              MR. DORRIS:  Yes, Your Honor.  It does.

 7      Thank you.

 8              THE COURT:  Ms. Musser?

 9              MS. MUSSER:  Yes, it does, Your Honor.

10              THE COURT:  All right.  So then does Meta have any

11      idea -- I guess the briefs are due at noon today -- I think;

12      whether we're getting disputes for what we are having a

13      hearing for on Wednesday or not?

14              MR. KLINEBERG:  I think, Your Honor, it is still

15      up in the air.  My understanding is that negotiations are

16      happening.  So it's possible, but I don't know for sure yet.

17              THE COURT:  Sorry to take you both away from those

18      negotiations as the clock winds down.  Okay.  We'll see what

19      we have.

20              And then, otherwise -- I am sure you folks have

21      things crammed in for the next couple of weeks, and then I

22      will see what the next -- what the final fact discovery

23      report -- I think the end of May is due.

24              Any other issues that either side wants me to

25      address today, Mr. Klineberg or Mr. Dorris?
```

```
 1              MR. DORRIS:  Nothing, Your Honor.

 2              THE COURT:  Okay.  Ms. Musser?

 3              MS. MUSSER:  Nothing from FTC.

 4              THE COURT:  All right.  Thanks so much.  Good luck

 5     finishing up.  We'll memorialize this in an order.

 6              Thank you.

 7              MR. KLINEBERG:  Thank you, Your Honor.

 8              MS. MUSSER:  Thank you.

 9              (Whereupon, the proceeding concludes, 10:15 a.m.)

10                        *  *  *  *  *

11                         CERTIFICATE

12

13              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

14     certify that the foregoing constitutes a true and accurate

15     transcript of my stenographic notes, and is a full, true,

16     and complete transcript of the proceedings to the best of my

17     ability.

18              This certificate shall be considered null and void

19     if the transcript is disassembled and/or photocopied in any

20     manner by any party without authorization of the signatory

21     below.

22
         Dated this 16th day of May, 2023.
23
         /s/ Elizabeth Saint-Loth, RPR, FCRR
24       Official Court Reporter

25
```

# Exhibit 424

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

META PLATFORMS, INC.,

      Defendant.

Case No. 1:20-cv-03590-JEB

**META PLATFORMS, INC.'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF THE FEDERAL TRADE COMMISSION**

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Meta Platforms, Inc. ("Meta"), by and through undersigned counsel, will take the

deposition of Plaintiff Federal Trade Commission ("FTC" or "Plaintiff") beginning at

9:00 a.m. EST on May 8, 2023 at the office of Kellogg, Hansen, Todd, Figel & Frederick

P.L.L.C., 1615 M Street, N.W., Washington, D.C. 20036, or alternatively at such other time and

place as the parties mutually agree.  The deposition will continue for at least one, seven-hour

day, and is subject to continuance or adjournment until completed.  The deposition will be

recorded by video and stenographic means, and it will be taken before a notary public or other

person authorized to administer oaths, for use as discovery, as evidence at trial, or for any other

purposes allowed by the Federal Rules of Civil Procedure and the Rules of the Court.  As

required by Rule 30(b)(6) of the Federal Rules of Civil Procedure, the FTC is obligated to

designate one or more officers, directors, managing agents, employees, or other Persons who

consent to testify on its behalf with respect to the topics set forth in Schedule A.  The Person or

Persons so designated must be capable of testifying on such topics as to the matters known or

- 1 -

reasonably available to the FTC.  Meta requests that FTC provide, on or before May 1, 2023, the

identities of the individual(s) designated, and the topics on which the individual(s) will provide

testimony.


Dated:  April 3, 2023                                    /s/ Mark C. Hansen

                                                        Mark C. Hansen (D.C. Bar No. 425930)
                                                        KELLOGG, HANSEN, TODD,
                                                          FIGEL & FREDERICK, P.L.L.C.
                                                        1615 M Street, N.W., Suite 400
                                                        Washington, D.C. 20036
                                                        Tel: (202) 326-7900
                                                        mhansen@kellogghansen.com

                                                        *Counsel for Defendant Meta Platforms, Inc.*

## SCHEDULE A

## INSTRUCTIONS

1.      Each topic shall be construed independently and no topic shall limit the scope of any other topic.

2.      Unless otherwise specified, the timeframe of these deposition topics is from January 1, 2011 to the present.

3.      To the extent that You consider any deposition topic objectionable, state with specificity that part of the topic as to which You raise objection and each ground for each such objection.

4.      The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of a topic all information that might otherwise be construed to be outside of its scope.

5.      The words "all" means "any and all" and "any" means "any and all."  The words "any," "each," and "every" shall be construed to mean individually and collectively wherever such dual construction will serve to bring within the scope of a topic any information that would otherwise not be within its scope.

6.      The singular forms shall be construed to include the plural, and vice versa, whenever such a dual construction will serve to bring within the scope of a topic any information that would otherwise not be within its scope.

7.      The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a topic all information that might otherwise be construed to be outside of its scope.

8.      Should You find the meaning of any term in the topics to be unclear, You should assume a reasonable meaning, state what that assumed meaning is, and be prepared to respond to the topic on the basis of that assumed meaning.

## **DEFINITIONS**

1.      "Action" means the above-captioned action pending in this Court, including any related discovery, pretrial, trial, post-trial, or appellate proceedings.

2.      "Advertiser" means any Person that advertises or purchases advertising.

3.      "Amended Complaint" means the Substitute Amended Complaint for Injunctive and Other Equitable Relief filed in this Action by Plaintiff Federal Trade Commission on September 8, 2021.

4.      "Communication" means the transmittal of information or request for information, including, but not limited to, any written contact between two or more people by such means as letters, memoranda, facsimile transmissions, text messages, instant messages, and e-mails, as well as orally, by such means as face-to-face meetings, videoconferencing, and telephone conversations.

5.      "Concerning" means relating to, in relation to, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

6.      "Document" or "Documents" means all documents or data, whether hard copy or Electronically Stored Information as defined in Federal Rule of Civil Procedure 34(a).

7.       "Electronically-Stored Information" or "ESI" means all Documents that are stored in any electronic medium from which information can be obtained.

8.      "Facebook," unless the context requires otherwise, means the application and website offered by Meta that is sometimes referenced internally at Meta as "Facebook Blue," and described in the Amended Complaint as "Facebook Blue."

9.      "FTC Facebook Accounts" means all accounts maintained and operated by the FTC on Facebook, including (i) the @federaltradecommission account (https://www.facebook.com/federaltradecommission), and (ii) the @MilitaryConsumer account (https://www.facebook.com/MilitaryConsumer/) as described at https://www.ftc.gov/news-events/stay-connected/social-media.

10.      "FTC LinkedIn Account" means all accounts maintained and operated by the FTC on the mobile application and website offered by LinkedIn, including the @federal-trade-commission account (https://www.linkedin.com/company/federal-trade-commission/) as described at https://www.ftc.gov/news-events/stay-connected/social-media.

11.      "FTC Reddit Account" means all accounts maintained and operated by the FTC on the mobile application and website offered by Reddit, including the account maintained at https://www.reddit.com/user/The_FTC as described at https://www.ftc.gov/news-events/stay-connected/social-media.

12.      "FTC Twitter Accounts" means all accounts maintained and operated by the FTC on the mobile application and website offered by Twitter, including (i) the @FTC account (http://twitter.com/FTC), (ii) the @TechFTC account (http://twitter.com/techFTC), (iii) the La FTC account (https://twitter.com/laftc), (iv) the @MilConsumer account (http://twitter.com/milconsumer), (v) the @LinaKhanFTC account (https://twitter.com/linakhanftc), (vi) the @RKSlaughterFTC (https://twitter.com/rkslaughterftc), (vii) the @CSWilsonFTC account (https://twitter.com/CSWilsonFTC), and (viii) the

@BedoyaFTC account (https://mobile.twitter.com/bedoyaftc) as described at https://www.ftc.gov/news-events/stay-connected/social-media.

13.     "FTC YouTube Account" means all accounts maintained and operated by the FTC on the mobile application and website offered by YouTube, including the @ftcvideos account (http://youtube.com/FTCvideos) as described at https://www.ftc.gov/news-events/stay-connected/social-media.

14.     "FTC Account" means any FTC Facebook Accounts, FTC LinkedIn Account, FTC Reddit Account, FTC Twitter Accounts, or FTC YouTube Account.

15.     "Meta" means Meta Platforms, Inc. and all Persons or entities acting or that have acted on its behalf, including, but not limited to, divisions, subsidiaries, holding companies, parents, successors, predecessors, including, but not limited to, Facebook, Inc., Instagram, WhatsApp, and Onavo, and any other related entity.

16.     "Person" means any person and includes natural persons, corporations, firms, partnerships, proprietorships, associations, joint ventures, State, Territory, government agencies or entities, and other enterprises or legal entities.

17.     "PSNS" means "personal social networking services" as used in the Amended Complaint.

18.     "Relating to," "related to," or "in relation to" means concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

19.     "Service" or "Services" shall mean Discord, Facebook, Instagram, LinkedIn, Pinterest, Reddit, Snap, Twitter, TikTok, Twitch, WhatsApp, and YouTube.

20.    "Use" shall mean to create, post, or share content of any kind on a Service (e.g., profiles, text, photos, videos, etc.) or to interact with other users of a Service (e.g., following, friending, liking, retweeting, etc.) in connection with any function, activity, or business of the FTC.

21.    "You," "Your," "Federal Trade Commission," or "FTC" refers to Plaintiff, United States Federal Trade Commission, including, but not limited to, any components, agents, Commissioners, representatives, consultants, contractors, employees, attorneys, representatives, economists, experts, and any other Person(s) acting or purporting to act with or on its behalf.

## TOPICS FOR EXAMINATION

1.    The authenticity and reliability of Documents You produced in this Action, including the Documents identified in this Notice.  This topic includes, but is not limited to, whether the Documents meet the criteria for records of a regularly conducted business activity, as set forth in Federal Rule of Evidence 803(6).

2.    The purpose of any Use of any Services, including FTC Accounts, by the FTC or its officials in their official capacity.

3.    The nature and manner of any Use of any Services, including FTC Accounts, by the FTC or its officials in their official capacity.

4.    Your evaluation of whether the FTC should Use any Services, including the purposes for such Use and the reasons why the FTC did or did not Use the Service.

5.    Your Social Media Weekly Reports.

6.    The facts supporting Your Response to Meta's List of Features or Activities (Sept. 12, 2022) and Your responses to Meta's Interrogatory Nos. 13, 14, and 16.

7.      Your understanding of the term "social media" as used (1) on the FTC's website at https://www.ftc.gov/news-events/stay-connected/social-media and (2) in the FTC's "Social Media Overview" dated March 2021 (or any previous versions).

8.      Which companies offer "Social Media and Video Streaming Services"[1] as defined in the Section 6(b) orders issued to at least Amazon.com, Inc., ByteDance Ltd., Discord Inc., Facebook, Inc., Reddit, Inc., Snap Inc., Twitter, Inc., WhatsApp Inc., and YouTube LLC pursuant to the December 11, 2020 "Resolution Directing Use of Compulsory Process to Collect Information Regarding Social Media and Video Streaming Service Providers' Privacy Practices," and the nature of those services offered.

9.      Which companies offer "Social Media and Video Streaming Services"[2] as defined in the Section 6(b) orders issued to at least Instagram, LLC, Meta Platforms, Inc., Pinterest, Inc., Snap, Inc., TikTok, Inc., Twitch Interactive, Inc., Twitter, Inc., and YouTube, LLC pursuant to the March 16, 2023 "Resolution Directing Use of Compulsory Process to Collect Information Regarding Social Media and Video Streaming Platforms' Review and Monitoring of Commercial Advertising to Detect, Prevent, and Reduce Deceptive Advertisements, Including Related to Fraudulent Health-Care Products, Financial Scams, and the Sale of Fake Goods," https://www.ftc.gov/system/files/ftc_gov/pdf/P224500-Social-Media-6b-Resolution.pdf, and the nature of those services offered.

---

[1] In a sample Section 6(b) order, the FTC defined "Social Media and Video Streaming Service" as a "product or service that allows users to create and share content with other users (whether a private or group interaction) through an application or website on any device (e.g., personal computer, iOS device, Android device, etc.), or stream video, Including, but not limited to, any social networking service, messaging service, video streaming service, or photo, video, or other content sharing application, whether offered for a fee or for free." *See* Order To File A Special Report, FTC Matter No. P205402, https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-service-providers/6bs_order_os_final.pdf

[2] In a sample Section 6(b) order, the FTC defined "Social Media and Video Streaming

Dated: April 3, 2023                    Respectfully,


                                        _/s/ Mark C. Hansen_
                                        Mark C. Hansen (D.C. Bar No. 425930)
                                        KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Tel: (202) 326-7900
                                        mhansen@kellogghansen.com

                                        _Counsel for Defendant Meta Platforms, Inc._

---

Services" as "any product or service that allows users of the product or service to create and
share content with other users of the product or service (whether a private or group interaction)
through an application or website on any device (e.g., personal computer, iOS device, Android
device, etc.), or stream video, including, but not limited to, any social networking service,
messaging service, video streaming service, or photo, video, or other content sharing application,
whether offered for a fee or for free."  Order To File A Special Report, FTC Matter No.
P224500, https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-
social-media-service-providers/6bs_order_os_final.pdf.

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically transmitted the foregoing to the

following e-mail addresses:

Daniel Matheson
Owen Masters
Michael Smith
Krisha Cerilli
Robert Zuver
Maggie DiMoscato
Sunila Steephen
Dominique Wilson
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Tel: 202-326-2075
dmatheson@ftc.gov
omasters@ftc.gov
msmith9@ftc.gov
kcerilli@ftc.gov
rzuver@ftc.gov
mdimoscato@ftc.gov
ssteephen@ftc.gov
dwilson1@ftc.gov

/s/ *Geoffrey J.H. Block*
Geoffrey J.H. Block*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
gblock@kellogghansen.com

*Admitted in Maryland.  Not Admitted in the District of Columbia.  Practice supervised by members of the firm.

*Counsel for Defendant Meta Platforms, Inc.*

# Exhibit 425

Provided for non-commercial research and education use.
Not for reproduction, distribution or commercial use.



This article appeared in a journal published by Elsevier. The attached
copy is furnished to the author for internal non-commercial research
and education use, including for instruction at the authors institution
and sharing with colleagues.

Other uses, including reproduction and distribution, or selling or
licensing copies, or posting to personal, institutional or third party
websites are prohibited.

In most cases authors are permitted to post their version of the
article (e.g. in Word or Tex form) to their personal website or
institutional repository. Authors requiring further information
regarding Elsevier's archiving and manuscript policies are
encouraged to visit:

http://www.elsevier.com/copyright



Meta-FTC-DX
Exhibit No. 151
Date 2-8-24
T. Alfaro

Author's personal copy

Computers in Human Behavior 27 (2011) 2322–2329



Contents lists available at ScienceDirect

# Computers in Human Behavior

journal homepage: www.elsevier.com/locate/comphumbeh



# Facebook as a toolkit: A uses and gratification approach to unbundling feature use

Andrew D. Smock [a,*], Nicole B. Ellison [b], Cliff Lampe [c], Donghee Yvette Wohn [b]

[a] Department of Communication, University of Wisconsin Oshkosh, 800 Algoma Blvd., Arts & Communication Center, Oshkosh, WI 54901, USA
[b] Department of Telecommunication, Information Studies and Media, Michigan State University, 409 Communication Arts & Sciences Building, East Lansing, MI 48824, USA
[c] School of Information, University of Michigan, 4322 North Quad, 105 S. State St., Ann Arbor, MI 48109, USA

## ARTICLE INFO

Article history:
Available online 9 August 2011

Keywords:
Uses and gratifications
Social network sites
Facebook
Communication technology

## ABSTRACT

Research on social network sites (SNSs) typically employ measures that treat SNS use as homogenous although the user-base, user practices, and feature sets of these tools are increasingly diverse. Using a uses and gratifications approach, we address this problem by reconceptualizing SNSs as *collections of features*. Survey data collected from undergraduate students at a large Midwestern university ($n = 267$) revealed that users' motivations for using Facebook predict their use of different features, such as status updates and Wall posts, but features that share similar capabilities do not necessarily share underlying motivations for use. When these results are contrasted against models employing a more unidimensional measure of Facebook use, we find differences between motivations for both general Facebook use and use of specific features of the site. This suggests that unidimensional measures of SNS use obfuscate motivations for using specific features. Theoretical and methodological implications of these findings and this approach are discussed.

© 2011 Elsevier Ltd. All rights reserved.

## 1. Introduction

Social network sites (SNSs) provide users with a variety of communication tools. For example, the SNS Facebook allows users to broadcast messages to large audiences using status updates and Wall posts, while also providing features, such as chat, for messages the user wishes to keep private. While the diversity of features available on SNSs allow for equally diverse forms of communication, previous research addressing the motivations for using SNSs have not fully considered the possibility that users may be attending to different features for different reasons.

One method for distinguishing among different kinds of Facebook use is offered by the uses and gratifications approach, a traditional mass media framework which enables researchers to study how users select media and content to meet their individual goals (Katz, Blumler, & Gurevich, 1974). In recent years, researchers have applied this approach to Internet use in order to identify a wide range of motivations driving the use of various online sites and services, including SNSs such as MySpace and Facebook (Papacharissi & Mendelson, 2011; Raacke & Bonds-Raacke, 2008).

Although previous research has looked at how motivations affect general use of SNSs, often measured as overall time spent on the site, little is known about what motivates users to utilize particular site *features*. Given the wide range of activities possible on these sites, it is likely users' motivations for utilizing the various features

available will differ. This study explores the user motivations associated with the use of specific features of Facebook, enabling SNS scholars to move beyond measures of general usage and thus providing insight into the interaction between user motivations and the characteristics of specific features of technical systems that support social interaction.

### 1.1. Understanding Facebook use

A growing body of research explores various uses of Facebook. Early work showed how Facebook was used to connect with previously existing social connections, rather than make new connections (Lampe, Ellison, & Steinfield, 2006). Furthermore, researchers have shown that Facebook provides features that enable these connections (Lampe, Ellison, & Steinfield, 2007) and that the connections that are made reflect similar closeness of ties between online and offline ties (Gilbert & Karahalios, 2009).

However, central to the focus of this study, researchers have shown how Facebook use varies among users (Burke, Kraut, & Marlow, 2011; Ellison, Steinfield, & Lampe, in press; Lampe, Ellison, & Steinfield, 2008). For example, users differ on measures of social capital and loneliness depending on whether they use the site actively or passively (Burke, Marlow, & Lento, 2010). Research suggests that status updates can support offline student interactions (Barkhuus & Tashiro, 2010), be used to answer questions posed to the social network (Morris, Teevan, & Panovich, 2010), or can be mined to describe geographic "happiness" levels (Kramer, 2010). Other work examines differences in the use of SNSs in the workplace (DiMicco et al., 2008; Skeels & Grudin, 2009).

* Corresponding author. Tel.: +1 734 730 4765, fax: +1 517 355 1292.
E-mail addresses: smocka@uwosh.edu (A.D. Smock), nellison@msu.edu (N.B. Ellison), cacl@umich.edu (C. Lampe), wohndong@msu.edu (D.Y. Wohn).

0747-5632/$ – see front matter © 2011 Elsevier Ltd. All rights reserved.
doi:10.1016/j.chb.2011.07.011

Author's personal copy

A.D. Smock et al./Computers in Human Behavior 27 (2011) 2322–2329          2323

Additionally, research has found that the manner in which people use Facebook changes over time (Lampe et al., 2008). Taken together, this literature shows that Facebook can support a wide range of social activities. Given the heterogeneous nature of these sites, and the diversity of users of these sites, it is likely that different users come to Facebook for different reasons and that these reasons may be associated with different types of use, such as connecting with strangers or interacting only with close friends.

### 1.2. Measures of SNS use

In this paper, we extend SNS research on Facebook use by specifically exploring users' motivations as they relate to use of individual features on the site, rather than use of the site as a whole. Facebook use has typically been measured through self-reported metrics such as assessments of time on the site (Joinson, 2008), number of friends (Tong, Heide, Langwell, & Walther, 2008), and the *Facebook Intensity* scale (FBI) created by Ellison and colleagues (2007) and used by others (Valenzuela, Park, & Kee, 2009). FBI takes a number of Facebook-related metrics into consideration, such as number of friends, time spent on site, as well as Likert-scale items such as, "Facebook is part of my everyday life." While FBI does include multiple dimensions of use and is thus more nuanced than measures of time on site, FBI does not enable researchers to distinguish among different kinds of uses. These uses can range from participating in Groups where one is likely to interact with strangers to using other communication tools, such as chat, which are more frequently used to support interaction with Friends. These general measures of use may obfuscate outcomes associated with individual features because positive and negative trends may cancel each other out.

Thinking about the various features of the platform, it is possible that Facebook is more usefully conceived of as a *collection of tools* utilized in different ways to meet different needs. We define a "feature" as a technical tool on the site that enables activity on the part of the user. In this paper we focus on features that enable or facilitate communication among users. The features considered in this research include: status updates, comments, Wall posts, private messages, chat, and Groups. Status updates are short messages contributed by users that are visible to other users via the News Feed, a feature that aggregates the Facebook activity of one's friend network. Any piece of user-generated content on Facebook can be commented on, unless the owner of the content has used a privacy setting to restrict comments. The Wall is the hub of a user's profile and displays aggregated posts, photos, videos, and applications-related content from the profile holder, as well as comments and other content contributed by Facebook Friends. Each Facebook user has the ability to send private messages to most other users using a feature similar to email or can engage in synchronous communication using Facebook's chat (or instant messaging) service. Users can also join Groups, often centered around common interests.

## 2. Theoretical background and research questions

### 2.1. Uses and gratifications

Uses and gratifications (U&G) is a theoretical framework that is used to study how media, including social media, are utilized to fulfill the needs of individual users with different goals. Individuals distinguish between different forms of media based on the needs the user expects to satisfy through his or her use (Katz, Gurevitch, & Haas, 1973; Perse & Courtright, 1993).

The U&G approach allows technology and media researchers to explicate users' various goals when engaging with media, allowing for a better understanding of differing behaviors, outcomes, and perceptions. Katz et al. (1973) highlight the recursive relationship between user expectations and gratifications inherent in U&G approaches, which examine the "social and psychological origins of needs, which generate expectations of the mass media or other sources, which lead to differential patterns of media exposure, resulting in need gratifications and other consequences" (p. 510). They emphasize that U&G studies have two distinct approaches: how needs are gratified by media and how gratifications reconstruct needs.

### 2.2. Uses and gratifications of social media

Scholars have employed the U&G perspective to answer foundational questions about the motivations for using social media. For example, Lampe and colleagues (2010) used U&G to explain motivations to contribute to a content-generation community, and showed that different motivations for use were tied to different patterns of contribution by site members and to intentions to contribute in the future. Additionally, researchers have used U&G in order to better understand the extent to which users expect various needs and desires will be fulfilled by use of Facebook (Bumgarner, 2007; Foregger, 2008; Papacharissi & Mendelson, 2011; Raacke & Bonds-Raacke, 2008). These studies reveal various motivations for general Facebook use. More specifically, Papacharissi and Mendelson (2011) used factor analysis to extract nine distinct scales of motives for using Facebook: habitual pass time, relaxing entertainment, expressive information sharing, escapism, cool and new trend, companionship, professional advancement, social interaction and meeting new people.

Beyond providing an understanding of the motives for using Facebook, U&G has also been used to predict frequency of site visits (Joinson, 2008). According to this work, uses and gratifications related to photographs, social investigation (e.g., using the site to meet new people or find out more information about specific users), and status updates were all significant predictors of the frequency of Facebook visits.

These Facebook studies explain the different motivations that predict general use of the site and, in the case of Joinson (2008), predict the amount of time users spend on the site. However, previous research on traditional forms of mass media highlight the need for a more granular approach to the measurement of use, one that acknowledges that individuals attend to specific features or type of content (e.g., comedy) within a larger media framework (e.g., television). For instance, past research on television has focused not only on the motivations that predict media choice, but also the motivations that lead to *selection of specific content* in a given medium. Ferguson and Perse (2000) applied this approach to the World Wide Web and found that motives for use significantly predicted specific types of use. More recently, research addressing YouTube use has identified similar genre motivations when predicting engagement with specific types of content (Haridakis & Hanson, 2008). Shen and Williams (2011) employed a related approach to Internet and Massively Multiplayer Online Games (MMO) use: the researchers identified different types of Internet and MMO use in order to better understand how specific types of use, in addition to a general measure of use, were related to psychosocial well-being (e.g., loneliness, family communication quality, and sense of community online). Results suggest that the way individuals use the Internet, such as for gathering information, meeting new people, and communicating with both geographically distant and close others, "contributes to the prediction of psychosocial outcomes over and above time spent online" (p. 20). Similar results were found concerning MMO uses, such as social motivation, achievement motivation, and immersion motivation. Likewise, we consider Facebook to be a collection of communication tools rather

Author's personal copy

than a single, one-dimensional medium used only in uniform ways, and our approach reflects this understanding.

A research approach that links specific genres of content within a single media environment to user motivations seems particularly important when considering Facebook, which is essentially a toolkit of features, each of which allow different activities to be performed. According to the research on media choice, user perceptions of the affordances of a tool will affect which medium users choose for a particular task (Daft, Lengel, & Trevino, 1987). While we are not measuring feature choice on a task-by-task basis, our approach is still informed by the understanding that user expectations about the nature of their interpersonal, informational, and other needs will influence their media choices. Within an umbrella service like Facebook, users will select the features that they believe will best meet their needs, much like television watchers tune into a genre of programming when they want to relax or Internet users frequent specific websites when they wish to be informed.

In light of the above, we ask which motivations predict the use of certain features of Facebook:

RQ1a: What motives predict the use of status updates?
RQ1b: What motives predict the use of comments?
RQ1c: What motives predict the use of Wall posts?
RQ1d: What motives predict the use of private messages?
RQ1e: What motives predict the use of chat?
RQ1f: What motives predict the use of Groups?

In the second stage of our analysis, we compare models predicting specific features to a model that predicts general use of the site. This comparison enables us to determine the efficacy of disaggregating different types of use and to test whether different motivations predict overall use versus the use of specific features.

RQ2: Are the motivations that predict general Facebook use different from the motivations that predict use of specific Facebook features?

## 3. Research methods

### 3.1. Data collection and participants

Our sample consisted of 267 undergraduate students from two entry-level telecommunication courses at a large Midwestern university. Students were invited to participate in an online survey about their use of SNSs. For their participation, students were offered extra credit. Participants were 65% male with an average age of 20. Most of our sample (90%) reported being residents of the state and 5% were international.

### 3.2. Measures

Information technology usage is influenced by individual motivation as well as characteristics such as age and gender (Kang, 2002; Lucas & Sherry, 2004; Valkenburg and Soeters, 2001). Accordingly, we included a number of demographic variables that have been used in prior research on Facebook (Ellison et al., 2007). We asked participants about demographic factors such as gender, age, year in school, affiliation with a fraternity or sorority, ethnicity, current residence (on/off campus), in-state/out-of-state, and daily Internet use, which we used as control variables. Use of specific Facebook features was measured by a set of items about frequency of use: "I use (name of feature) often." Respondents were asked to rank how much they agreed with this statement on a 5-point Likert-type scale ranging from "Strongly Disagree" to

**Table 1**
Summary of the single items measuring Facebook feature use.

|  | Mean | SD |
| --- | --- | --- |
| I update my status on Facebook often. | 2.96 | 1.19 |
| I use the comments feature on Facebook often. | 3.62 | 1.06 |
| I write Wall posts on my friends' pages often. | 3.42 | 1.00 |
| I use the private messages feature on Facebook often. | 3.24 | 1.04 |
| I use Facebook chat often. | 3.32 | 1.29 |
| I use Facebook Groups often. | 2.53 | 1.04 |
| I use applications often. | 2.77 | 1.19 |

_Note:_ All items shared a common prompt: "Indicate how much you agree with each option by marking the appropriate response" and were measured with a 5-point Likert-type scale ranging from "Strongly Disagree" to "Strongly Agree."

"Strongly Agree." See Table 1 for item wording and descriptive statistics.

Motives for Facebook use were assessed using scales developed by Papacharissi and Mendelson (2011). Items in the scales began with "I use Facebook..." Each scale and its respective items are described in Table 2.

## 4. Results

Previous research on Facebook from the U&G perspective has explored motivations for using the site (Bumgarner, 2007; Joinson, 2008; Papacharissi & Mendelson, 2011). Our approach disassembles Facebook use to explore the motivations that predict use of specific features as opposed to more global measures of overall use. To answer RQ1a–f, we ran six separate OLS regressions, each with use of different Facebook feature as the dependent variable (status updates, comments, Wall posts, private messages, chat, and Groups). As mentioned above, Facebook feature use was measured by a set of items about frequency of use: "I use (name of feature) often." The nine motives previously established by Papacharissi and Mendelson (2011) were used as the independent variables. Internet usage and the demographic items noted above were included as control variables.

### 4.1. Predicting use of features

In regards to RQ1a, which focused on predictors of _status updates_, expressive information sharing ($\beta = 0.182$, $p < 0.05$) ($R^2 = 0.263$) was significant, indicating an association between the motivation of expressive information sharing and the use of status updates. (Betas for scales are standardized. All others are unstandardized.) Results of this regression, and the others addressing RQ1b–f, may be seen in Table 3.

The model addressing RQ1b ($R^2 = 0.454$), concerning motives that predict use of _comments_, had three significant predictors: relaxing entertainment ($\beta = 0.333$, $p < 0.01$), companionship ($\beta = -0.174$, $p < 0.05$), and social interaction ($\beta = 0.214$, $p < 0.01$). In-state students ($\beta = -0.672$, $p < 0.01$) and students in the Greek system ($\beta = -0.290$, $p < 0.05$) were negatively associated with use of this feature.

The regression model for RQ1c ($R^2 = 0.329$) found three motives that positively predict _writing on Facebook Friends' Walls_: habitual pass time ($\beta = 0.276$, $p < 0.05$), professional advancement ($\beta = 0.229$, $p < 0.01$), and social interaction ($\beta = 0.220$, $p < 0.01$). Additionally, participants who were non-white were negatively associated with writing wall posts ($\beta = -0.325$, $p < 0.05$).

The regression for RQ1d looking at _private message_ use ($R^2 = 0.214$) showed two motives as significant predictors: professional advancement ($\beta = 0.179$, $p < 0.05$) and social interaction ($\beta = 0.168$, $p < 0.05$). Students in the Greek system ($\beta =$

Author's personal copy

**Table 2**
Summary of Facebook motivation scales and individual items.

| | Alpha | Mean | SD |
|---|---|---|---|
| *Relaxing entertainment* | *0.88* | *3.39* | *0.78* |
| Because it's enjoyable. | | 3.67 | 0.88 |
| Because it's entertaining. | | 3.71 | 0.84 |
| Because it relaxes me. | | 3.13 | 1.01 |
| Because it allows me to unwind. | | 3.16 | 1.03 |
| Because it is a pleasant rest. | | 3.29 | 0.98 |
| *Expressive information sharing* | *0.86* | *3.41* | *0.75* |
| To provide information. | | 3.45 | 0.96 |
| To present information about a special interest of mine. | | 3.34 | 0.98 |
| To share information that may be of use or interest to others. | | 3.45 | 0.89 |
| To provide personal information about myself. | | 3.24 | 0.98 |
| To tell others a little bit about myself. | | 3.57 | 0.87 |
| *Escapism* | *0.67* | *2.99* | *0.78* |
| So I can forget about school, work, or other things. | | 3.20 | 1.02 |
| So I can get away from the rest of my family or others. | | 2.41 | 0.96 |
| So I can get away from what I'm doing. | | 3.37 | 1.03 |
| *Cool and new trend* | *0.82* | *2.95* | *0.94* |
| Because everybody else is doing it. | | 2.95 | 1.11 |
| Because it is the thing to do. | | 2.89 | 1.07 |
| Because it is cool. | | 3.00 | 1.11 |
| *Companionship* | *0.77* | *2.78* | *0.91* |
| So I won't have to be alone. | | 2.56 | 1.06 |
| When there's no one else to talk or be with. | | 3.13 | 1.12 |
| Because it makes me feel less lonely. | | 2.65 | 1.10 |
| *Professional advancement* | *0.79* | *2.57* | *0.83* |
| It is helpful for my professional future. | | 2.71 | 1.01 |
| To post my resume and/or other work online. | | 2.36 | 0.93 |
| To help me network with professional contacts. | | 2.63 | 1.01 |
| *Social interaction* | *0.74* | *4.14* | *0.74* |
| To keep in touch with friends and family. | | 4.14 | 0.84 |
| To communicate with distanced friends. | | 4.13 | 0.81 |
| *Habitual pass time* | *0.85* | *3.61* | *0.78* |
| Because I just like to play around on Facebook. | | 3.52 | 0.93 |
| Because it is a habit, just something I do. | | 3.57 | 1.00 |
| When I have nothing better to do. | | 3.68 | 1.02 |
| Because it passes the time away, particularly when I'm bored. | | 3.65 | 1.01 |
| Because it gives me something to do to occupy my time. | | 3.60 | 1.01 |
| *To meet new people (single item)* | | *2.99* | *1.18* |

*Note:* All items shared a common prompt: "Indicate how much you agree with each option by marking the appropriate response" and were measured with a 5-point Likert-type scale ranging from "Strongly Disagree" to "Strongly Agree."

**Table 3**
Predictors of Facebook use by feature.

| | Status updates | Comments | Wall posts | Private messages | Chat | Groups |
|---|---|---|---|---|---|---|
| (Intercept) | .306 | 1.060 | 1.089 | 1.242 | 2.087 | 2.003 |
| Gender (Female) | .026 | −.262 | .178 | −.004 | −.573** | −.033 |
| Age | −.059 | −.021 | −.029 | .015 | −.039 | −.011 |
| Year in school | −.078 | .094 | −.044 | .100 | −.183 | .025 |
| Current residence (on campus/off campus) | .260 | −.291 | .102 | −.130 | .164 | .096 |
| State status (from in-state or out-of-state) | −.026 | −.672* | −.047 | −.201 | −.733** | .078 |
| Greek (fraternity/sorority) | −.110 | −.469* | −.023 | −.547* | −.150 | .203 |
| Ethnicity (white/non-white) | −.065 | .105 | −.325* | −.390* | −.069 | −.202 |
| Internet use per day | .001 | .000 | .000 | 0.000 | 0.000 | −.001 |
| Habitual pass time | −.017 | .174 | .276* | .140 | .194 | −.046 |
| Relaxing entertainment | .234 | .333** | .179 | .082 | .220 | .252 |
| Expressive information sharing | .182* | .146 | −.072 | −.070 | −.111 | .358*** |
| Escapism | .112 | −.010 | −.023 | −.071 | −.105 | −.114 |
| Cool new trend | −.006 | −.078 | −.057 | .167 | −.032 | −.083 |
| Companionship | −.084 | −.174* | −.090 | −.058 | .157 | .045 |
| Professional advancement | .130 | −.008 | .229** | .179* | .069 | .106 |
| Social interaction | .121 | .214** | .220** | .186* | .186* | −.194* |
| To meet new people | .006 | −.014 | −.070 | −.028 | −.057 | −.100 |
| $R^2$ | .263 | .454 | .329 | .214 | .393 | .238 |

* $p < 0.05$.
** $p < 0.01$.
*** $p < 0.001$.

Author's personal copy

**Table 4**
Correlation analysis of Facebook feature use.

|  | Status updates | Comments | Wall posts | Private messages | Chat | Groups |
|---|---|---|---|---|---|---|
| Status updates | 1.000 | .504[**] | .583[**] | .249[**] | .354[**] | .237[**] |
| Comments |  | 1.000 | .570[**] | .371[**] | .475[**] | .228[**] |
| Wall posts |  |  | 1.000 | .387[**] | .437[**] | .223[**] |
| Private messages |  |  |  | 1.000 | .320[**] | .310[**] |
| Chat |  |  |  |  | 1.000 | .212[**] |
| Groups |  |  |  |  |  | 1.000 |

[**] $p < 0.01$ (2-tailed).

$-0.547, p < 0.05$) and non-white students ($\beta = -0.390, p < 0.05$) were negatively associated with use of this feature.

Addressing RQ1e, the use of *Facebook chat* ($R^2 = 0.393$), social interaction ($\beta = 0.186, p < 0.05$) was the only motive that predicted use of the chat feature. However, gender ($\beta = -0.573, p < 0.01$) and state residence ($\beta = -0.733, p < 0.01$) were both predictors of using Facebook chat, as being female and an out-of-state student were negatively associated with using this feature.

The regression for RQ1f, predicting the use of *Facebook Groups* ($R^2 = 0.238$), found two significant predictors: expressive information sharing ($\beta = 0.358, p < 0.001$) and social interaction, which was negative ($\beta = -0.194, p < 0.05$). Thus Facebook Groups are used less by those who are motivated by social interaction, but more by those who are motivated by expressive information sharing.

To address RQ2, which asked whether the motivations that predict general Facebook use differ from the motivations that predict use of specific Facebook features, we ran an OLS regression with average time spent on Facebook per day as the dependent variable and the nine motivations as independent variables. Demographics and time spent on the Internet were used as control variables. As noted above, previous U&G studies of Facebook have conceptualized "use" as time spent on the site. Results of the regression ($R^2 = 0.315$) in Table 5 show that the motives of relaxing entertainment ($\beta = 0.270, p < 0.05$), expressive information sharing ($\beta = -0.203, p < 0.05$), and social interaction ($\beta = 0.190, p < 0.05$) are all predictors of overall use. Additionally, membership in a fraternity or sorority ($\beta = 1.503, p < 0.05$) and Internet use per day were also predictors.

*4.2. Supplementary analysis*

Correlations of dependent variables, presented in Table 4, suggest that the use of individual features is non orthogonal, consistent with prior studies looking at granular features of a medium (e.g., Chang, 2008; Yee, 2006). To determine if the different uses grouped together, a factor analysis with a Promax rotation, which reflects inherent correlations between the components (Cureton, 1975), was performed. However, the rotation could not be completed, as there was only one factor. We feel that the correlation between feature uses does not affect our main contribution, which is that differences between features are meaningful in how they are associated with use. Even with the one factor, that contribution remains relevant.

**5. Discussion**

This study extends past research exploring the relationship between expected gratifications and Facebook use by focusing on use of *specific Facebook features* as opposed to generic use of the site, suggesting that disassembling feature use is a productive strategy for SNS researchers. Our findings suggest that studying Facebook as a *toolkit* of features, each with a different set of affordances, as opposed to a singular *tool*, may provide more insight

**Table 5**
Regression model of general Facebook use based on time spent on Facebook ($N = 267$).

|  | Time on FB |
|---|---|
| (Intercept) | .897 |
| Gender (Female) | −.136 |
| Age | −.146 |
| Year in school | −.149 |
| Current residence (on campus/off campus) | −.182 |
| State status (from in-state or out-of-state) | −1.173 |
| Greek (fraternity/sorority) | 1.503[*] |
| Ethnicity (white/non-white) | .231 |
| Internet use per day | 0.005[**] |
| Habitual pass time | −.035 |
| Relaxing entertainment | .270[*] |
| Expressive information sharing | −.203[*] |
| Escapism | .143 |
| Cool new trend | .146 |
| Companionship | −.106 |
| Professional advancement | .075 |
| Social interaction | .190[*] |
| To meet new people | −.046 |
| $R^2$ | 0.315 |

[***] $p < 0.001$.
[*] $p < 0.05$.
[**] $p < 0.01$.

into why people are using the site and what they expect to achieve through their use. Our findings begin to lay a foundation for future research that considers feature use as opposed to generic SNS use.

*5.1. Comparing general use versus feature use*

This granular focus on features can illuminate trends in use that would otherwise be obscured and which may provide insight into user perceptions and practices. Our findings indicate that motivations which significantly predict general use of Facebook paint an incomplete picture of motivations for using the site and obscure our ability to gain insight into user motivations for feature use. Only three motivations—relaxing entertainment, expressive information sharing, and social interaction—significantly predict general use (see Table 5), but six motivations significantly predict use of specific features. This suggests that measuring Facebook use by the overall time that users spend on Facebook tells us little about the psychological processes that motivate media choice and usage. For instance, expressive information sharing was a significant positive predictor of use of status updates and groups. In the general use regression, however, this motivation was found to be a significant negative predictor of use. These results echo recent work by Shen and Williams (2011) which found that specific uses of the Internet and MMOs revealed relationships with psychosocial well-being that were otherwise hidden when use was measured by time spent.

As discussed above, SNS researchers examining social capital and loneliness have found differences among Facebook users associated with active or passive use of the site (Burke et al., 2010;

Author's personal copy

A.D. Smock et al./Computers in Human Behavior 27 (2011) 2322–2329                2327

Kramer, 2010). Considered in conjunction with our findings, a growing body of work suggests that examining specific communication behaviors on the site, as opposed to aggregated measures of use, may enable researchers to uncover previously obscured relationships between SNS use, social capital outcomes, and loneliness.

### 5.2. Explaining predictors of feature use

Our approach to differentiating among features is consistent with scholarship that highlights the affordances of ICTs as a way to understand their use and impact (Resnick, 2001). Affordances refer to "the range of possible activities" a thing may perform (Norman, 1999) (p. 40). For example, affordances of email include the ability to engage in both one-to-one or one-to-many communication and asynchronicity. Considering the affordances of Facebook features may assist in interpreting the patterns of use and motivation uncovered by our findings.

#### 5.2.1. Explaining expressive information sharing
Results show that expressive information sharing significantly predicts use of one-to-many communication features (such as status updates and Groups) but not one-to-one communication (such as private messaging and chat). Based on the prompt associated with the status update tool ("What's on your mind?"), it is unsurprising that expressive information sharing is a predictor of its use; this feature is the easiest way to broadcast updates, requests, and information to one's entire network. Doing so through chat or private messaging reaches a much smaller audience.

Additionally predicted by expressive information sharing, the use of Groups also allows for communication with a large audience. At the time of data collection, when a Facebook user joined a Group, their new affiliation was broadcast to their friends through the News Feed feature and also listed on their profile page. Moreover, joining a Group may provide the user with a forum for sharing information about a topic of interest with both his or her network (through the News Feed) and a larger audience of like-minded strangers. Of course, user practices that influence how information is shared (such as whether users post Group activity to their News Feed and whether the Group is open or closed) will impact user expectations and outcomes. Future research should consider variables such as privacy settings and include these in models of use.

Considering users' self-presentational goals can also help illuminate why use of Groups and status updates are associated with expressive information sharing. Posting a message to a Group is a form of direct expressive information sharing with other Group members, but by broadcasting membership of one's group affiliation to one's Friend network (through the News Feed and profile page), users may feel Group membership provides a more reliable signal about their tastes, above and beyond statements in their profile. For example, a user may say in their "About Me" profile field that they like the band The Shins, but being a member of and contributing to a Shins-focused Facebook Group further evidences their affinity with the band. Although both these signals are relatively conventional (or cheap to produce), as interpreted through Donath's (2007) adaptation of signaling theory, users may see additional cues as stronger evidence of self-presentational statements, an intriguing idea that warrants further research.

Communication directed at an individual while simultaneously broadcast to a larger audience, as is possible through status updates, is an example of *masspersonal* communication (O' Sullivan, 2005), a conceptual lens that has not been applied to the SNS context. The term "masspersonal" describes communication utterances that span interpersonal and mass (broadcast) contexts, such as when an individual uses a channel traditionally associated with mass (broadcast) communication to convey a message that is interpersonal in nature (e.g., calling into a radio program to wish a friend "happy birthday" on air). While examples outside of the social media genre (such as marriage proposals on billboards) are rare, Facebook's Wall and comments features may represent more accessible opportunities for users to engage in masspersonal communication and thus may constitute an important research context for synthesizing interpersonal and mass media theories.

The ability of SNSs to enable masspersonal communication is a promising research focus. Some Facebook features operate at the nexus of interpersonal and mass communication, creating communicative possibilities around which norms are still developing. Additional research is needed to explore how tools that allow for one-to-many communication are perceived and used, and to what extent users' conceptualization of the size of their audience influences their communication practices and outcomes.

#### 5.2.2. Explaining social interaction & habitual passtime
The motive of social interaction, characterized by communication with friends and family, positively predicted commenting, private messaging, chat, and Wall posts. Wall posts were also the only feature predicted by the motive of habitual pass time. One of the norms of Facebook use is writing on Friends' Walls with birthday greetings, a form of "social grooming" (Donath, 2007) on the site; writing these messages may be both a routine (or habitual) part of one's Facebook experience and a form of maintaining relationships. Commenting, private messaging, and chatting are logical features to use to fulfill social interaction needs, especially since they facilitate more direct, one-to-one communication. Interestingly, social interaction negatively predicted the use of Groups. As discussed above, the only motive that positively predicted the use of Groups was expressive information sharing. Groups provide users with the opportunity to interact with others that might share a similar interest. In combination, these findings could be interpreted to mean that Facebook users view Groups as sources of information, not locations for social interaction. While the make up of Groups varies greatly, many Groups appear to be composed mainly of individuals without previous social connections to each other. Consequently, the negative association of social interaction with Groups could be a function of how Facebook is viewed by users: as a platform for maintaining social connections, not building new ones (Ellison et al., 2007). While social interaction may be occurring within Groups, users do not visit groups with the goal of engaging with others in a social manner. That appears to be a motive reserved for instances when the user is more likely to know those he or she is communicating with.

#### 5.2.3. Explaining companionship
The use of comments was also the only feature predicted, although negatively, by the motive of companionship (characterized by behaviors related to avoiding feelings of loneliness), suggesting that those seeking companionship through their Facebook use are less likely to report use of the comments feature. Considering that comments are a form of asynchronous communication and that companionship – as measured by items such as "so I won't have to be alone" and "because it makes me feel less lonely" – is more likely to be assuaged through synchronous communication, this finding is not surprising. However, use of the chat feature, which affords synchronous communication did not have a significant relationship with companionship ($\beta = 0.157$, $p = 0.85$). This may warrant further attention in future research, especially as previous work has shown an association between the use of stand-alone instant messaging applications and companionship (Recchiuti, 2003). Exploring whether the synchronicity of the medium affects perceptions of its ability to meet companionship needs is an area researchers should explore in the future, especially since recent SNS research suggests that Facebook can play a role in

Author's personal copy

providing users with access to emotional support (Vitak, Ellison, & Steinfield, 2011).

*5.2.4. Explaining professional advancement*

The motivation of professional advancement, characterized by behavior and perceived helpfulness related to professional goals, was predicted by use of Wall posts and private messages. This motivation to use Wall posts can be understood through a "strength of weak ties" perspective (Granovetter, 1973). As Ellison and colleagues (2007) suggest, college friends may be valuable sources for professional opportunities in the future. As such, it may be that our participants are using Facebook to maintain connections that they perceive will one day assist them in securing a job, and are maintaining these ties through the occasional Wall post (e.g., on one's birthday), which enables them to publicly groom the relationship in a low-effort manner.

The use of private messages could also be for the purpose of maintaining a connection, but it may be that people are more comfortable discussing issues related to professional goals through channels that are perceived as more private. For example, asking about job availabilities or for career advice may be activities that an individual does not wish to broadcast to their entire network, especially if their network includes co-workers. Similarly, grooming a professional connection might be better done through a one-to-one channel that signals a targeted message and more focused attention, as opposed to a broadcast channel.

*5.2.5. Demographic predictors*

We did not find many differences in terms of individual traits and use. However, users who were out-of-state students reported less use of chat and commenting. Also, users who were affiliated with a fraternity or sorority reported less use of commenting and private messages than who were not. It could be that the social interaction needs, a predictor of comment and private message use, of fraternity and sorority members are being met by social functions of their respective organizations or the Greek system as a whole, resulting in less use of these features. Future research could explore the relationship between offline social interaction opportunities and the use of SNSs for meeting social interaction needs.

Additionally, females in our sample were found to be associated with less use of the chat feature than males. Other research has found gender to be a significant predictor of frequency of use of Facebook, such that females are more frequent visitors than males (Joinson, 2008). Prior work focusing on various forms of Internet use has also found a number of gender differences (Odell, Korgen, Schumacher, & Delucchi, 2000). However, it should be noted that these gender differences, as well as those revealed in our study, are based on perceptions of use, not measures of actual use. Future research addressing gender differences in Facebook use should strive to make comparisons between perceptions of use and actual use.

*5.2.6. Limitations and future research*

The research presented above is limited by a number of factors. Due to the use of a non-random sample, results cannot be generalized to other populations. We used existing motivation scales as opposed to open-ended questions about use; we therefore do not know if there are motivations for Facebook use that are not expressed through our measures. Future research should build and expand upon these scales in an effort to capture a greater diversity of motives for using different Facebook features. For example, additional items should be created for the "to meet new people" measure. This one-item measure, developed by Papacharissi and Mendelson (2011), could be expanded to create a scale measuring additional aspects of relationship development.

Additionally, future research should employ U&G to look at Facebook from a functional alternative approach. Facebook has many communicative features that are also available as stand-alone applications from other providers, such as email, instant messaging, and photo sharing. Future research should begin to untangle under what circumstances Facebook users rely on the features of Facebook for goal attainment and under what circumstances they seek other media to attain similar goals. Furthermore, in this study, we divided use according to feature; however, a cross-media study may reveal more overarching themes of use.

## 6. Conclusions

Research addressing SNS use has produced insights into predictors of use, user practices, and outcomes of SNS use, which continue to evolve at a rapid pace. Traditionally, SNS use has been treated as homogeneous, implicitly operating under the assumption that users are employing the same set of features in the same manner. The research reported here complements and extends these studies by using the motivations found by prior studies and examining how motivations predict specific feature use.

We found that Facebook use is not uniform across users, and that conceptualizing the site as a collection of features allows for a more granular understanding of why users are using site, uncovering patterns that would otherwise be obscured when SNS use is measured as a single item. This study not only advances the study of SNSs, providing alternative avenues for the measurement of social media use, but also contributes to extending U&G theory. The methods and resulting findings of this study expand the application of U&G in the study of new media. Unlike traditional media, new media such as SNSs are a convergence of various types of media, making this granular approach an important step in understanding use through the lens of U&G.

Additionally, this research is an important contribution to the study of SNS use. By comparing how motivations predict general use and how motivations predict use of specific features, this study suggests that measuring overall social media use instead of specific feature use obfuscates granular patterns regarding use: who is using what tool to what end. Our results indicate that dividing general use into different features accounts for a more detailed explanation of how motivations are related to use and, in some cases, pinpoints different positive and negative associations between motivations and uses that would not emerge in a study of general use. Consequently, the results of this study provide evidence indicating that significant insights into the use of social media can be gained by focusing on feature use instead of more unidimensional approaches.

## Acknowledgment

This material is based upon work supported by the National Science Foundation under Grant No. 0916019.

## References

Barkhuus, L., & Tashiro, J. (2010). Student socialization in the age of Facebook. In *Proceedings of the 28th international conference on human factors in computing systems* (pp. 133–142). New York: ACM Press.

Bumgarner, B. A. (2007). You have been poked: Exploring the uses and gratifications of Facebook among emerging adults. *First Monday, 12* (11). Retrieved from <http://firstmonday.org/htbin/cgiwrap/bin/ojs/index.php/fm/article/viewArticle/2026/1897>.

Burke, M., Kraut, R., & Marlow, C. (2011). Social capital on Facebook: Differentiating uses and users. In *Proceedings of the 2011 annual conference on human factors in computing systems* (pp. 571–580). New York: ACM Press.

Burke, M., Marlow, C., & Lento, T. (2010). Social network activity and social well-being. In *Paper presented at the proceedings of the 28th international conference on human factors in computing systems* (pp. 1901–1912). New York: ACM Press. doi:10.1145/1753326.1753613.

Author's personal copy

Chang, M. K. (2008). Factor structure for Young's internet addiction test: A confirmatory study. *Computers in Human Behavior, 24*, 2597–2619. doi:10.1016/j.chb.2008.03.001.

Cureton, E. E. (1975). The weighted varimax rotation and the promax rotation. *Psychometrika, 40*, 183–195. doi:10.1007/BF02291565.

Daft, R. L., Lengel, R. H., & Trevino, L. K. (1987). Message equivocality, media selection, and manager performance: Implications for information systems. *MIS Quarterly, 11*, 355–366. Retrieved from <http://www.jstor.org/stable/248682>.

DiMicco, J., Millen, D. R., Geyer, W., Dugan, C., Brownholtz, B., & Muller, M. (2008). Motivations for social networking at work. In *Proceedings of the 2008 conference on computer supported cooperative work* (pp. 711–720). New York: ACM Press. doi:10.1145/1460563.1460674.

Donath, J. S. (2007). Signals in social supernets. *Journal of Computer-Mediated Communication, 13*, 231–251. doi:10.1111/j.1083-6101.2007.00394.x.

Ellison, N.B., Steinfield, C., & Lampe, C. (in press). Connection strategies: Social capital implications of Facebook-enabled communication practices. *New Media & Society*. doi:10.1177/1461444810385389.

Ellison, N. B., Steinfield, C., & Lampe, C. (2007). The benefits of Facebook "friends:" Social capital and college students' use of online social network sites. *Journal of Computer-Mediated Communication, 12*, 1143–1168. doi:10.1111/j.1083-6101.2007.00367.x.

Ferguson, D. A., & Perse, E. M. (2000). The world wide web as a functional alternative to television. *Journal of Broadcasting & Electronic Media, 44*, 155–174. doi:10.1207/s15506878jobem4402_1.

Foregger, S. K. (2008). *Uses and gratifications of Facebook.Com*. (Doctoral Dissertation). Retrieved from *ProQuest Dissertations & Theses (PQDT)*.

Gilbert, E., & Karahalios, K. (2009). Predicting the strength with social media. In *Proceedings of the 27th international conference on human factors in computing systems* (pp. 211–220). New York: ACM Press. doi:10.1145/1518701.1518736.

Granovetter, M. S. (1973). The strength of weak ties. *American Journal of Sociology, 78*, 1360–1480. doi:10.1086/225469.

Haridakis, P., & Hanson, G. (2008). YouTube users watching and sharing the news: A uses and gratifications approach. *Journal of Electronic Publishing, 11*(3). doi:10.3998/3336451.0011.305.

Joinson, A. N. (2008). Looking at, looking up or keeping up with people?: Motives and use of Facebook. In *Proceedings of the twenty-sixth annual SIGCHI conference on human factors in computing systems* (pp. 1027–1036). New York: ACM Press. doi:10.1145/1357054.1357213.

Kang, M. H. (2002). Interactivity in television: Use and impact of an interactive program guide. *Journal of Broadcasting & Electronic Media, 46*, 330–345. doi:10.1207/s15506878jobem4603_2.

Katz, E., Blumler, G., & Gurevich, M. (1974). Utilization of mass communication by the individual. In J. G. Blumler & E. Katz (Eds.), *The uses of mass communication: Current perspectives on gratifications research* (pp. 19–32). Beverly Hills, CA: Sage.

Katz, E., Gurevith, M., & Haas, H. (1973). On the use of the mass media for important things. *American Sociological Review, 38*, 164–181. Retrieved from <http://www.jstor.org/stable/2094393>.

Kramer, A. D. I. (2010). An unobtrusive behavioral model of "gross national happiness". In *Proceedings of the 28th international conference on human factors in computing systems* (pp. 287–290). New York: ACM Press.

Lampe, C., Ellison, N., & Steinfield, C. (2006). A Face(book) in the crowd: Social searching vs. social browsing. In *Proceedings of the 2006 20th anniversary conference on computer supported cooperative work* (pp. 167–170). New York: ACM Press. doi:10.1145/1180875.1180901.

Lampe, C., Ellison, N., & Steinfield, C. (2007). A familiar Face(book): Profile elements as signals in an online social network. In *Proceedings of the SIGCHI conference on human factors in computing systems* (pp. 435–444). New York: ACM Press. doi:10.1145/1240624.1240695.

Lampe, C., Ellison, N., & Steinfield, C. (2008). Changes in use and perception of Facebook. In *Proceedings of the 2008 conference on computer-supported cooperative work* (pp. 721–730). New York: ACM Press. doi:10.1145/1460563.1460675.

Lampe, C., Wash, R., Velasquez, A., & Ozkaya, E. (2010). Motivations to participate in online communities. In *Proceedings of the 28th international conference on human factors in computing systems* (pp. 1927–1936). New York: ACM. doi:10.1145/1753326.1753616.

Lucas, K., & Sherry, J. (2004). Sex differences in video game play. *Communication Research, 31*, 499–523. doi:10.1177/0093650204267930.

Morris, M.R., Teevan, J.,& Panovich, K. (2010). What do people ask their social networks, and why?: A survey study of status message q&a behavior. In (pp. 1738–1749). New York: ACM. doi:10.1145/1753326.1753587.

Norman, D. A. (1999). Affordance, conventions, and design. *Interactions, 6*(3), 38–43. doi:10.1145/301153.301168.

O' Sullivan, P. B. (2005). Masspersonal communication: Rethinking the mass interpersonal divide. In *Paper presented at the annual meeting of the international communication association*, New York (May).

Odell, P. M., Korgen, K. O., Schumacher, P., & Delucchi, M. (2000). Internet use among female and male college students. *CyberPsychology & Behavior, 3*(5), 855–862. doi:10.1089/10949310050191836.

Papacharissi, Z., & Mendelson, A. (2011). Toward a new(er) sociability: Uses, gratifications and social capital on Facebook. In S. Papathanassopoulos (Ed.), *Media perspectives for the 21st century* (pp. 212–230). New York: Routledge.

Perse, E. M., & Courtright, J. A. (1993). Normative images of communication media: Mass and interpersonal channels in the new media environment. *Human Communication Research, 19*, 485–503. doi:10.1111/j.1468-2958.1993.tb00310.x.

Raacke, J. & Bonds-Raacke, J. (2008).MySpace and Facebook: Applying the uses and gratifications theory to exploring friend-networking sites. *CyberPsychology & Behavior, 11*(2), 169–174. doi:10.1089/cpb.2007.0056.

Recchiuti, J. K. (2003). *College students' use and motives for e-mail, instant messaging, and online chat rooms*. (Unpublished master's thesis). University of Delaware.

Resnick, P. (2001). Beyond bowling together: SocioTechnical capital. In J. M. Carroll (Ed.), *Human–computer interaction in the new millennium*. Reading, MA: Addison Wesley.

Shen, C., & Williams, D. (2011). Unpacking time online: Connecting internet and massively multiplayer online game use with psychosocial well-being. *Communication Research, 38*, 123–149. doi:10.1177/0093650210377196.

Skeels, M. M., & Grudin, J. (2009). When social networks cross boundaries: A case study of workplace use of Facebook and linkedin. In *Proceedings of the ACM 2009 international conference on supporting group work* (pp. 95–104). New York: ACM Press. doi:10.1145/1531674.1531689.

Tong, S. T., Heide, B. V. D., Langwell, L., & Walther, J. B. (2008). Too much of a good thing? The relationship between number of friends and interpersonal impressions on Facebook. *Journal of Computer-Mediated Communication, 13*, 531–549. doi:10.1111/j.1083-6101.2008.00409.x.

Valenzuela, S., Park, N., & Kee, K. F. (2009). Is there social capital in a social network site?: Facebook use and college students' life satisfaction, trust, and participation. *Journal of Computer-Mediated Communication, 14*, 875–901. doi:10.1111/j.1083-6101.2009.01474.x.

Valkenburg, P. M., & Soeters, K. E. (2001). Children's positive and negative experiences with the internet: An exploratory survey. *Communication Research, 28*, 652–675. doi:10.1177/009365001028005004.

Vitak, J., Ellison, N., & Steinfield, C. (2011). The ties that bond: Re-examining the relationship between Facebook use and bonding social capital. In *Proceedings of the 44th annual hawaii international conference on system sciences (CD-ROM)*. doi:10.1109/HICSS.

Yee, N. (2006). Motivations for play in online games. *CyberPsychology and Behavior, 9*, 772–775. doi:10.1089/cpb.2006.9.772.

# Exhibit 426

OFFICE OF FAIR TRADING

Anticipated acquisition by Facebook Inc of Instagram Inc

ME/5525/12

The OFT's decision on reference given on 14 August 2012. Full text of decision published 22 August 2012.

**Please note that the square brackets indicate figures or text which have been deleted or replaced in ranges at the request of the parties or third parties for reasons of commercial confidentiality.**

## PARTIES

1.  **Facebook, Inc.** (**Facebook**) is an internet platform for people to stay connected and to express themselves to their family and friends. Within the Facebook environment, there are multiple ways for users to share information including: posting news items, individual messages, displaying photos and videos, playing games and organising events. Third party software developers can develop apps and websites and make them available to users in the Facebook environment. In the year ended 31 December 2011, Facebook earned revenues of US$3.7 billion from advertising, and sales of digital and virtual goods.

2.  **Instagram Inc. (Instagram)** was founded in March 2010 and as at 6 June 2012 consisted of 13 employees. Instagram's product is a free mobile phone photo application. It functions by allowing users to take photos, apply digital filters to those photos, and then share those photos on the Instagram network or via other social networks, including Facebook. Instagram has generated no revenue since it was established.

## TRANSACTION

3.  Facebook proposes to acquire the entire issued share capital of Instagram for consideration of $300 million in cash and 22,999,412 shares of

Facebook common stock (**Transaction**). Facebook proposes to acquire Instagram through [ ].

4.   The Office of Fair Trading (**OFT**) opened its own investigation into the Transaction on 21 May 2012. The administrative deadline is 16 August 2012.

## JURISDICTION

5.   As a result of the Transaction Facebook and Instagram will cease to be distinct. Given that Instagram has not generated any turnover since it was established, the turnover test set out in section 23(1)(b) of the Enterprise Act 2002 (the **Act**) is not met. The parties overlap in the supply of virtual social networking services. Facebook's share of supply in the UK of virtual social networking services is over 25 per cent[1] and, given that Instagram is active in the supply of virtual social networking services, the Transaction would result in an increment.[2] Consequently, the share of supply test in section 23 of the Act is met.

6.   The OFT therefore believes that it is or may be the case that arrangements are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation.

## FRAME OF REFERENCE

7.   Social networks are two-sided markets. They compete to add users and to attract advertising revenue. Advertisers are willing to pay to purchase advertising space on the social networks' sites and apps based on the number of users that the network has and the information that the networks records on those users (for example, their demographics).

**Product scope**

8.   Facebook is active in the provision of three relevant services: social networking to users, a camera app to users (launched after the

---

[1] As measured by Experian Hitwise Data: www.hitwise.com/uk/press-centre/press-releases/microsoft-bing-improves-uk-search-market-share/
[2] The parties are deemed to supply these services even though they do not charge for them by virtue of section 128(3)(c) of the Act.

announcement of the transaction), and advertising space to advertisers. The majority of Facebook's advertising is display advertising.

9.   Instagram provides an app allowing users to take and modify photos and share those photos with other users on the Instagram network or post the photos to other social networks (including Facebook).

10.  As no substantial competition concerns arise on any reasonable frame of reference affected or potentially affected by the Transaction, it was not necessary for the OFT to reach a conclusion on the exact scope of the frame of reference in this respect.

**Geographic scope**

11.  Subject to limited exceptions, users can access Facebook anywhere in the UK that they can obtain an internet connection. Advertisers are interested in targeting users with particular demographic, psychographic, and behavioural characteristics. Third parties told the OFT that the scope of the geographic market may be limited by national boundaries because of idiosyncrasies of language and culture.

12.  Instagram users need internet access to download the app and share photos electronically, but do not need internet access to take photos. Once uploaded to say the iTunes store (for example), apps can be downloaded from anywhere that the mobile telephone user has an internet connection.

13.  The relevant frames of reference are likely to be international, albeit some advertising is likely to be national. As no substantial competition concerns arise on any reasonable frame of reference affected by the Transaction, it was not necessary for the OFT to reach a conclusion on the exact scope of the geographic frame of reference in this respect.

## HORIZONTAL ISSUES

14.  The OFT considered two unilateral effects theories of harm: actual competition in the supply of photo apps and potential competition in the supply of social network services.

**Actual competition in the supply of photo apps**

15.  Instagram allows users to take photos, apply digital filters to those photos, and then share those photos on the Instagram network or via other social networks. Facebook launched its mobile photo app in May 2012, weeks after it had announced that it would acquire Instagram. Facebook's app has similar functionality to Instagram's. It allows users to apply filters, tag photos, comment on photos, and post the photos to Facebook.

16.  The parties advised that virtually all smart phones have a photo-app pre-installed by the original equipment manufacturer ('OEM'). These apps often allow users to take and share photos, although they tend to have more limited photo enhancement functions than dedicated third party apps. It is unlikely that these apps are close substitutes to Instagram. Third parties identified other photo sharing apps as being the closest competitors to Instagram. These include Camera Awesome, Camera +, Flickr, Hipstamatic, Path, and Pixable.

17.  According to data provided by the parties, Camera Awesome and Hipstamatic have been downloaded more than three times more than Facebook Camera, Facebook's camera app. Camera+ has been downloaded more than six times more than Facebook's camera app. Instagram has been downloaded more than 45 more times than Facebook Camera. Whilst this is an imprecise measure of market share and does not scale for Facebook Camera's relative recent entry onto the market, it gives some indication of the availability and popularity of other photo sharing apps.

18.  In terms of whether Instagram may have the potential to compete with Facebook's photo sharing app for advertising revenue, one third party told the OFT that it does not consider that Instagram provides significant marketing opportunities. The commercial opportunities are limited because consumers take and upload photos, but do not spend a significant amount of time in the app. This limits its attractiveness to advertisers for two reasons. First, eyeballs are not on the app for a significant period of time and second, limited user data is captured.

19.  Some third parties took a different view, namely that social apps and websites do not always present monetisation opportunities from the outset, but rather grow their user base and then develop monetisation

opportunities once they have a large enough user base to be attractive to advertisers. Few third parties, however, believed that Instagram presented immediate monetisation opportunities.

20. One third party took the view that the transaction would lead to better advertising opportunities, not because Instagram's photo app itself presents a direct monetisation opportunity, but because it will improve consumer engagement with Facebook and thereby increase usage of Facebook.

21. To conclude, there are several relatively strong competitors to Instagram in the supply of camera and photo editing apps, and those competitors appear at present to be a stronger constraint on Instagram than Facebook's new app. The majority of third parties did not believe that photo apps are attractive to advertisers on a stand-alone basis, but that they are complementary to social networks. The OFT therefore does not believe that the transaction gives rise to a realistic prospect of a substantial lessening of competition in the supply of photo apps.

**Potential competition in the supply of online display advertising**

22. The merger parties and third parties told the OFT that the functionality of Instagram's social network and Facebook's social network are significantly different. While Facebook is predominantly used by off-line friends using their real identities to connect online and share experiences (including photos), Instagram is predominantly used to share artful images by individuals often using pseudonyms. The information posted on Facebook is generally shared amongst friends only. By contrast, on Instagram the default position is that photos are available to all other users of the service. Users of Instagram can also post individual photos to other social networks (including Facebook).

23. The parties' revenue models are also very different. While Facebook generates revenue from advertising and users purchasing virtual and digital goods via Facebook, Instagram does not generate any revenue.

24. Instagram is not currently an actual competitor to Facebook for advertising revenue and it has limited social networking functions. The OFT therefore considered whether Instagram is perceived as a potential competitor to Facebook. For example, Facebook may have been concerned that if it

increased its advertising prices then Instagram would have the incentive to alter its offering to be a closer competitor in terms of functionality or display advertising inventory to Facebook's.

25. It is likely that pre-merger Facebook was aware of Instagram's growing user base: Instagram was Apple's App of the Year in 2011 and had several high profile users (such as Barack Obama). Given that Instagram's user base was growing rapidly it may have been the case that Facebook perceived that Instagram would grow to be a credible social network competitor. Third parties advised that it would not be difficult or expensive for Instagram to expand its services to a website and to add at least some functionality similar to Facebook's.

26. Internal documents provided by the parties indicate that [ ].

27. The parties did not provide market share information for its UK advertising sales. They advised, however, that Facebook has a market share of [0-10] per cent of European [online] display advertising by revenue and [0-10] per cent of European online advertising[3] revenues. The parties advised that Google has a 44 per cent share of global online advertising expenditure.

28. Third parties advised that the main constraints on Facebook for advertising income are sites that gather user demographic and behavioural data (amongst other information) and are effective outlets for brand advertising. These sites include Google, Yahoo, and Microsoft. This contrasts with sites that are effective for advertising designed to directly lead to a sale (described by one third party as 'transactional advertising'). Sites identified as being appropriate for such advertising are eBay and Amazon.

29. In summary, the evidence before the OFT does not show that Instagram would be particularly well placed to compete against Facebook in the short run. In addition, there are other firms that appear to be presently able to compete against Facebook for brand advertising. For these reasons, the OFT believes that there is no realistic prospect that the merger may result in a substantial lessening of competition in the supply of display advertising.

---

[3] Includes display, classified and directory, and search advertising.

## VERTICAL ISSUES

30. The OFT considered two vertical effects theories of harm: the foreclosure of social networks competing with Facebook by limiting Instagram users to uploading their photos to Facebook and the foreclosure of other photo apps by preventing them from uploading their photos to Facebook. The OFT's ability, incentive, effect criteria for this kind of theory of harm are cumulative: all of the limbs must hold for the theory of harm to stand[4].

**Foreclosure of competing social networks**

31. The OFT considered whether the merger parties would foreclose rival social networks by (a) preventing Instagram users from uploading their photographs to those networks and the effect of such an action on competition; or (b) deteriorating the quality of the connection of the API between Instagram and rival social networks.

32. Third parties agreed that the parties have the technical ability to prevent Instagram users from uploading their photos to rival social networks. In terms of incentive, the benefit of the foreclosure strategy may be to increase the likelihood that a photo taken with Instagram would be posted to Facebook. The cost would be that Instagram may become less attractive to users if its social functionality were more limited.

33. However, third parties were unclear about the impact of any such restriction on the popularity of the Instagram app. They noted that at least part of Instagram's appeal is that photos can be uploaded to other social networks. It is also the case that there are a myriad of photo apps with similar functionality to Instagram which can upload photos to social networks.

34. One third party informed the OFT that Google is the strongest constraint to Facebook because it has a social network, Google+, and because its combined services allow it to gather large volumes of information on users making it an attractive proposition for advertisers. Google has an additional ability to constrain Facebook through its Adsense subsidiary which matches advertisers to online advertising space. In this regard, the OFT

---

[4] OFT 1254 A joint publication of the Competition Commission and the Office of Fair Trading *Merger Assessment Guidelines*, paragraph 5.6.7.

notes that Google recently acquired Wildfire Interactive, a marketing firm that specialises in social media marketing. The third party advised the OFT that, whereas websites such as eBay are appropriate for 'transactional advertising' (described above), websites such as Facebook and Google may be more appropriate for advertisers intending to engage users and to create brand awareness.

35.   In addition to its strength in advertising, its competitor status through Google+ and its important role as an advertising intermediary, Google also operates Google Play, an online app store for the Android mobile operating software. Overall, Google appears to have several options for retaliation in the event that its social network was foreclosed by the merger parties.

36.   In terms of whether other apps or social networks could replicate Instagram's success, it is relevant that Instagram grew rapidly from having 1.4 million users in January 2011 to around 24 million users in February 2012. Whilst this indicates the strength of Instagram's product, it also indicates that barriers to expansion are relatively low and that the attractiveness of apps can be 'faddish'. Indeed there is some speculation that the acquisition by Facebook in itself may discourage some Instagram users from using the app.

37.   In conclusion, third parties generally perceived that the merger parties may have the technical ability to foreclose rival social networks. It is likely to be the case that at least part of the value that users place on Instagram is owing to the ability to post to several social networks including Facebook. Blocking users from uploading their photos to other social networks would likely diminish the value of the app, at least in part and may cause users to switch to other apps and social networks.

**Foreclosure of competing mobile photo apps**

38.   The OFT considered whether the merger parties would foreclose competitors' mobile photo apps from posting to Facebook and the effect of this strategy on competition.

39.   Third parties generally agreed that the merger parties would have the technical ability to foreclose rivals or to partially foreclose rivals by reducing their ability to upload to Facebook. The majority of third parties did not, however, believe that this would be a sensible commercial strategy

on the merger parties' part. They believed that Facebook has the incentive to allow its users to upload photos from as many sources as possible – customer engagement increases the volume of user information that Facebook has and thereby makes the network more appealing to advertisers.

40. In terms of the effect of any such action, third parties told the OFT that camera apps would still be able to upload photos to social networks other than Facebook. The OFT also note that there is at least one app, TwitPic, dedicated to uploading photos to Twitter, a rival social network. Moreover, it is possible to link in Facebook to photos on other social networks.

41. On balance, it appears as though the merger parties may have the technical ability to foreclose competing photo apps. The majority of third parties did not believe that the parties would have the incentive to pursue such a strategy because it would likely decrease users' level of engagement with Facebook. In any event, users would not be prohibited from using competing camera apps nor from posting their photos to several other popular outlets.

## THIRD PARTY VIEWS

42. Some third parties expressed concerns about the merged entity's ability and incentive to foreclose rivals. These comments have been incorporated where relevant in the decision.

## ASSESSMENT

43. The OFT examined this merger on the basis that the parties overlap in the supply of social networking services.

44. In the photo app space, there are several relatively strong competitors to Instagram which appear to impose a stronger constraint on Instagram than Facebook's new camera app currently does. In the social networking space, the OFT has no reason to believe that Instagram would be uniquely placed to compete against Facebook, either as a potential social network or as a provider of advertising space.

45. Although the OFT considers that the merger parties may have the technical ability to engage in input or customer foreclosure, the evidence received by the OFT does not suggest that the parties would have the incentive to pursue such a strategy.

46. Consequently, the OFT does not believe that it is or may be the case that the merger may be expected to result in a substantial lessening of competition within a market or markets in the United Kingdom".

## DECISION

47. This merger will therefore **not be referred** to the Competition Commission under section 33(1) of the Act.

# Exhibit 427

Live Webinar and Q&A: Deep Dive into the Architecture of an Indexing Engine (Live Webinar Nov 9, 2023)    Save Your Seat

Facilitating The Spread Of Knowledge And Innovation In Professional Software Development

English Edition    Write for InfoQ    Search    SIGN UP / LOGIN

**Development**    **Architecture & Design**    **AI, ML & Data Engineering**    **Culture & Methods**    **DevOps**

**QCon San Francisco: Video-Only Pass**
Video-Only Pass for professionally edited conference recordings. Available from Oct 20, 2023.

**QCon London**
Discover new ideas and insights from senior practitioners driving change in software. Attend in-person.

**The Software Architects' Newsletter**
Your monthly guide to all the topics, technologies and techniques that every professional needs to know about. Subscribe for free.

InfoQ Homepage    Presentations    How A Small Team Scales Instagram

QCon London (April 8-10, 2024): Learn the

# How a Small Team Scales Instagram

LIKE    DISCUSS

View Presentation    Speed:    1X  1.25X  1.5X  2X

Download    MP3    SLIDES    51:33

## Summary

Mike Krieger discusses Instagram's best and worst infrastructure decisions, building and deploying scalable and extensible services.

## About the conference

Software is Changing the World. QCon empowers software development by facilitating the spread of knowledge and innovation in the developer community. A practitioner-driven conference, QCon is designed for technical team leads, architects, engineering directors, and project managers who influence innovation in their teams.

## Bio

Mike Krieger (@mikeyk) graduated from Stanford University where he studied Symbolic Systems with a focus in Human-Computer Interaction. During his undergrad, he interned at Microsoft's PowerPoint team and after graduating, he worked at Meebo for a year and a half as a user experience designer and as a front-end engineer before joining the Instagram team doing design & development.

This content is in the QCon Software Development Conference topic

Live Webinar and Q&A: Deep Dive into the Architecture of an Indexing Engine (Live Webinar Nov 9, 2023)        Save Your Seat

PERFORMANCE & SCALABILITY

SPONSORED CONTENT



Why choose a purpose-built time series database?

**InfluxData**

Architecting Distributed Transactional Applications - Download Now (By O'Reilly)

**Cockroach Labs**

# Tell us what you think

| Please enter a subject. |
|---|

Message

Allowed html: a,b,br,blockquote,i,li,pre,u,ul,p

Email me replies to any of my messages in this thread

POST MESSAGE

# Community comments

WATCH THREAD

| DEVELOPMENT | ARCHITECTURE & DESIGN | CULTURE & METHODS | AI, ML & DATA ENGINEERING | DEVOPS |
|---|---|---|---|---|
| Combating AI-Generated Fake Images with JavaScript Libraries, by Kate Sills at QCon San Francisco | Change Data Capture for Microservices | Why Technical Experience Matters: How To Build a Lifelong Career in Software Development | Modern Compute Stack for Scaling Large AI/ML/LLM Workloads at QCon San Francisco | Disaster Recovery across a Million Pieces: Michelle Brush at QCon San Francisco |
| Microsoft Announces Copilot Copyright Commitment to Address IP Infringement Concerns | Distributed Materialized Views: How Airbnb's Riverbed Processes 2.4 Billion Daily Events | Overcoming Some Challenges Engineering Managers Face | Ray: The Next Generation Compute Runtime for ML Applications | Effective Performance Engineering at Twitter-Scale: Yao Yue at QCon San Francisco |
|  | Managing 238 Million Memberships of Netflix: Surabhi | The Challenges of Producing Quality | Defensible Moats: Unlocking Enterprise Value with Large |  |

Live Webinar and Q&A: Deep Dive into the Architecture of an Indexing Engine (Live Webinar Nov 9, 2023)    Save Your Seat

Application

# The InfoQ Newsletter

A round-up of last week's content on InfoQ sent out every Tuesday. Join a community of over 250,000 senior developers. View an example

Get a quick overview of content published on a variety of innovator and early adopter technologies

Learn what you don't know that you don't know

Stay up to date with the latest information from the topics you are interested in

Enter your e-mail address

SUBSCRIBE

We protect your privacy.

October 2-6, 2023.

Attend in-person. Or get a Video-Only Pass to watch rec

QCon San Francisco International Software Conference retu More than 1000 software professionals will join together an emerging trends they should pay attention to in 2023, how t avoid pitfalls, and how to embrace the best practices.

Join the experience and get implementable ideas to shape yc beyond the conference.

SAVE YOUR SPOT NOW

Home

**Create Account**

Login

QCon Conferences

Events

Write For InfoQ

InfoQ Editors

About InfoQ

About C4Media

Media Kit

InfoQ Developer Marketing Blog

Diversity

Events

QCon San Francisco
OCTOBER 2-6, 2023

QCon London
APRIL 8-10, 2024

Follow us on

**Youtube**
223K Followers

**Linkedin**
21K Followers

**RSS**
19K Readers

**X**
53.4k Followers

**Facebook**
21K Likes

**Alexa**
New

Stay in the k

The InfoQ Po

Engineering (

The Software

Live Webinar and Q&A: Deep Dive into the Architecture of an Indexing Engine (Live Webinar Nov 9, 2023)     Save Your Seat

General Feedback
feedback@infoq.com

Advertising
sales@infoq.com

Editorial
editors@infoq.com

Marketing
marketing@infoq.com

InfoQ.com and all content copyright © 20

**Privacy Notice**. **Terms And Conditions**.