# Volume 30: Exhibits 441-459

# Exhibit 441

3/24/24, 6:26 PM
Instagram launches disappearing Live video and messages | TechCrunch
Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 3 of 203

Join TechCrunch+

Login

Search 🔍

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

# Instagram launches disappearing Live video and messages

**Josh Constine**   @joshconstine /   10:00 AM EST • November 21, 2016          💬 Comment

  

**Instagram is combining** the best of Snapchat and Periscope to help you get comfortable on camera. Rather than overlap with Facebook Live and Messenger, Instagram is putting an ephemeral spin on video streaming and private messaging.

Today, two big new features begin rolling out to Instagram Stories on iOS and Android over the next few weeks. Instagram Live lets you broadcast video to your followers in real-time, but they can only watch while you're still streaming. No replays. But you will be able to browse an algorithmically curated Explore page of the best Instagram Live videos happening right now.

And if you don't feel like sharing a doodle and text-covered Instagram Stories post to all your followers, you'll be able to send it as a ephemeral Direct message to just a few of your closest friends. But they can only watch it twice before it disappears.

"We pivoted" Instagram's head of product Kevin Weil tells me. "Instagram should be all of your moments, not just your highlights." Since the new Live and Direct content self-destructs, Instagram hopes users will be less concerned about how they look or if they're doing something cool. The features sway the balance of who Instagram is for further towards users rather than public figures and polished social media celebrities — a balance other apps get wrong.

## Instagram Live

Instagram Live is the most ephemeral of the major Live streaming platforms now that Meerkat is defunct.

While Periscope started with a 24 hour expiration date, it eventually allowed permanent replays like Facebook Live. Instagram Live videos disappear as soon as the stream stops, which could get people broadcasting more frequently rather than saving the capability just for big flashy events or citizen journalism. Meanwhile, viewers will feel greater urgency to watch immediately because they know it's their only chance.

Product manager Shilpa Sarkar tells me her company was "interested in people going live to hang out with friends.", which is becoming popular in Live group video chat app Houseparty. Instagram was spotted testing Live in Russia by T Journal last month, and last week told The Verge it would build a Live product.

Join TechCrunch+

Login

Search 🔍

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More



*See friends who are Live atop your feed, start your own broadcast, or discover the top Live streams in Explore*

To go Live, you'll swipe from the Instagram Stories camera. Instagram will choose some close friends who've shown interest in Live video to hit with notifications to come watch, as well as showing a Live tag on your Instagram Stories bubble that appears at the top of the feeds of your followers. Not alerting everyone who follows you prevents notification overload that plagued Periscope early on.

Viewers can comment, or tap repeatedly to add hearts exactly like on Periscope but with their face in some of the hearts. Broadcasters can add comments too, and helpfully pin one of theirs or a viewer's to the top of the reel. For a more peaceful, FaceTimey experience, streamers can hide comments or all the buttons, and they can block or report anyone who harasses them.

Since none of your friends might be Live at any given moment, Instagram's Explore tab Stories section will highlight the best Live streams happening now. Based on view count, geography, and language, Instagram will provide a curated channel you can swipe through, creating the most laid-back Live discovery and consumption experience around.

Join TechCrunch+

Login

Search ⌕

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

# Sorry
## This video does not exist.

## Instagram Direct Ephemeral

Instagram Direct already has 300 million monthly users, but all of the messages are permanent. The existing product lets you send text, photos, and videos, and posts from Instagram to friends and discuss them. But with Instagram Stories now letting you communicate visually with overlaid text and drawing, Instagram needed a way to share these 'Gramsterpieces privately.

Now Direct will have an ephemeral Stories messages bar at the top along with a list of permanent threads below. When you go to share a photo or video to Instagram Stories, you'll be able to also select friends or groups of friends to send it to. It's much like how you can send Snapchat Stories as private messages, but adds in a groups feature.



*Shoot something in Instagram Stories, pick friends to Direct message it to, and they can watch before the content disappears*

Recipients can watch the messages once, and replay them once, but then they're gone. This way if you want to make a racy joke or share something vulnerable not fit for your public Story or all your friends, you can send it Direct and be sure it will disappear. If lots of friends contribute to one of these group "camera conversations", the thread becomes sort of a collaborative Story slideshow you can

tap through, reminiscent of the cooperative video app Riff that Facebook tried building.

The dual Direct inbox is certainly a bit complicated, but both ephemeral and permanent messaging makes sense in Instagram so it needed a way to collect both. A third option could be coming. When I asked if Instagram would ever let you Direct Live stream privately to a group of friends, the company said that makes sense and it's thinking about how to do it. However, Instagram needs to be careful that it doesn't become confusing with so many features.

## Sorry

This video does not exist.

What's special about Instagram's ephemeral Live and Direct updates is that they give creators total control over their audience. You see if someone starts watching your Live stream, and they can't watch it later, while you select exactly who receives your Directs. That means no one can snoop on this content without you knowing immediately, something not even Snapchat offers for public accounts.

Typically, every piece of social media we create comes with the sneaking suspicion that a co-worker or family member might see it. That forces creativity to bend to the lowest common moral and intimacy denominator. Everything has to be inoffensive and guarded enough for everybody. But that extinguishes the true potential of Instagram unlocked by these features: the freedom to be yourself by choosing who you be yourself around.

**More TechCrunch**

**Join TechCrunch+**

Login

Search 🔍

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

**Join TechCrunch+**

Login

Search

TechCrunch+
Startups
Venture
Security
AI
Crypto
Apps
Events
Startup Battlefield
More

## Sign up for Newsletters

See all newsletters

- [ ] Daily
- [ ] Week in Review
- [ ] Startups Weekly
- [ ] Event Updates
- [ ] Advertising Updates
- [ ] TechCrunch+ Announcements
- [ ] TechCrunch+ Events

☐ TechCrunch+ Roundup

Email *

**Subscribe**

http://tcrn.ch/2gesbsN    Copy

**Tags**

Instagram    Instagram Direct    Instagram Live    Instagram Stories    Periscope

Snapchat

**Join TechCrunch+**

Login

Search 🔍

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

### PayPal faces new antitrust lawsuit claiming it unfairly stifles competition with Stripe, Shopify and more

Mary Ann Azevedo

2:29 PM EDT • October 5, 2023



**TC+** Growth

### Want to detect bad actors? Look on the bright side

Anna Heim

2:14 PM EDT • October 5, 2023



### Uber still dragging its feet on algorithmic transparency, Dutch court finds

Natasha Lomas

2:00 PM EDT • October 5, 2023



### As its workers strike over burnout and low wages, Kaiser Permanente strikes a deal to use an AI Copilot from Nabla

Ingrid Lunden

12:42 PM EDT • October 5, 2023



**TC+** Market Analysis

### Rivian reminds investors that making EVs is incredibly expensive

Alex Wilhelm

12:15 PM EDT • October 5, 2023





### 'TikTok whisperer' Annie Wu Henry on social media and 2024

Morgan Sung

12:14 PM EDT • October 5, 2023

---

### Google DeepMind unites researchers in bid to create an ImageNet of robot actions

Brian Heater

12:12 PM EDT • October 5, 2023



---

### EngFlow and tipi.build launch a remote CMake build execution service for your C and C++ code

Frederic Lardinois

12:00 PM EDT • October 5, 2023



---

### Thoughts debuts an app designed to inspire you, not distract you

Sarah Perez

11:57 AM EDT • October 5, 2023



---

### Spotify's new artist profiles highlight music, Stories, merch and events

Sarah Perez

11:14 AM EDT • October 5, 2023



---

### Machina Labs raises $32M to bring flexibility to manufacturing

Brian Heater

11:00 AM EDT • October 5, 2023



Join TechCrunch+

Login

Search 🔍

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More



Join TechCrunch+

Login

Search ⌕

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

## Sony will offer Emerge's tactile ultrasound device through a Bravia camera bundle

Brian Heater

11:00 AM EDT • October 5, 2023



 Events

## 3 VCs weigh in on when to follow the hype cycle — and when to ignore it

Walter Thompson

11:00 AM EDT • October 5, 2023



 Work

## Advancing generative AI exploration safely and securely

Jason Rader

10:20 AM EDT • October 5, 2023



## AI-powered parking platform Metropolis raises $1.7B to acquire SP Plus

Kyle Wiggers

10:16 AM EDT • October 5, 2023



## Zero-days for hacking WhatsApp are now worth millions of dollars

Lorenzo Franceschi-Bicchierai

10:05 AM EDT • October 5, 2023



## Likewise debuts Pix, an AI chatbot for entertainment recommendations

Sarah Perez

10:04 AM EDT • October 5, 2023



## SBF's trial has started, and here's what you missed

Alex Wilhelm, Jacquelyn Melinek, Theresa Loconsolo

10:00 AM EDT • October 5, 2023



## Bastille challenges the iconic Brompton bikes with a new folding bicycle

Romain Dillet

10:00 AM EDT • October 5, 2023



## Google agrees to reform its data terms after German antitrust intervention

Natasha Lomas

9:41 AM EDT • October 5, 2023

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

TechCrunch+ Terms

Your Privacy Choices

Code of Conduct

About Our Ads

**Trending Tech Topics**

SBF Trial

Google Pixel 8

WhatsApp Hacking

Electric Hydrogen

Google Pixel Event

Tech Layoffs

ChatGPT

Join TechCrunch+

Login

Search

TechCrunch+

Startups

Venture

Security

AI

Crypto

Apps

Events

Startup Battlefield

More

Facebook

Twitter

YouTube

Instagram

LinkedIn

Mastodon

© 2023 Yahoo.

All rights reserved.

Powered by WordPress VIP.

# Exhibit 442

3/22/24, 5:28 PM
Go Live on Instagram with a Friend | Instagram Blog
Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 13 of 203

Log in



# Go Live on Instagram with a Friend

🕐 October 24, 2017

0:00 / 0:32

Starting today, we're introducing a fun way to go live with a friend. Now, you can hang out and go live together, whether you're just doing homework or catching up on your day.

Go Live on Instagram with a Friend | Instagram Blog    Lieg.in

Live video helps you share in an authentic way, but sometimes it can be intimidating when you're on your own. It's easy to add a guest while you're broadcasting. Simply tap the new icon on the bottom right and tap "Add" to invite anyone who's currently watching. Once they join, you'll see the screen split into two and your friend pop up right below you.



You can remove your guest and add someone else at any time, or they can also choose to exit on their own. Share your live video to stories when your broadcast has ended, or choose "Discard" and your live video will disappear from the app as usual.

When someone you follow is going live with a friend, you'll see two circles stacked together in your stories bar. You can tap on it to watch, and like and comment as you follow along.

  

Since introducing live video last November, millions of people have used it to connect with friends and followers in an authentic way. Now, you can have even more fun connecting with people in the moment.

To learn more about today's updates, check out the                    .

These updates are available as part of Instagram version 20 available for iOS in the                    and for Android in                    .

RELATED ARTICLES

# Check out more announcements about product

#PRODUCT #INSTAGRAM #ANNOUNCEMENTS

Log in →

## Introducing Trending Now on Threads

#PRODUCT #INSTAGRAM #ANNOUNCEMENTS

## Instagram Announces New Messaging Improvements

→

#ANNOUNCEMENTS #PRODUCT #INSTAGRAM

## Introducing New Parental Controls and Teen Privacy Defaults

→

About Us

Safety

Features

Blog

Community

Brand

Business ↗

Help ↗

Threads

Careers

Terms ↗

Privacy ↗

Engineering

3/22/24, 5:28 PM
Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 17 of 203
Connect on Instagram with a friend | Instagram Blog

Sitemap

English (US)    Instagram from Meta

Log in

# Exhibit 443

 Meta

← Back to Newsroom

Facebook

# Launching Reels on Facebook in the US

September 29, 2021



Today we're launching Reels on Facebook for iOS and Android in the US. We're bringing short form, entertaining video experiences and tools that have inspired creators on Instagram to more creators and audiences on the Facebook app.

With the ability to create reels and have their Instagram reels suggested to people on Facebook, creators — whether they're just starting out or already have a large

**Related Pages**

Facebook

**Topics**

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

**Featured News**



Meta

Introducing the New Ray-Ban | Meta Smart Glasses

September 27, 2023



Meta

Privacy Matters: Meta's Generative AI Features

September 27, 2023

following — will have more ways to express themselves, grow their communities and reach new audiences.

Reels on Facebook can consist of music, audio, effects and more. You can find them in News Feed or in Groups, and when viewing a reel on Facebook, you can easily follow the creator directly from the video, like and comment on it, or share it with friends.





## Connect with New Audiences

Creators can build an audience with Reels in different ways across Facebook:

- **Get Discovered in News Feed**: Reels can reach everyone, not just your existing followers, making it possible for the most creative, funny and inspiring people to break out. People can discover reels based on their interests and what's popular both at the top of News Feed alongside Stories and Rooms and in a new, dedicated News Feed section.

- **Express Yourself in Groups:** Creators and group members can create and share reels in Groups to express themselves and engage in a more fun and visual way with their favorite interest communities, like The Galactic Empire of Chonky Woofers and Post-Apocalypse Office. And for admins, we're rolling out a new 'Single Theme' group setting that makes it easy to prompt members to share their reels.

- **Share from Instagram to Facebook to Reach New Audiences:** We're testing the ability for Instagram creators to have their reels recommended on Facebook. In this test, a small number of Instagram creators will see an option to have their reel recommended on Facebook. The choice to do this is completely in their control.



## Earn Money for Reels with Bonuses

As part of our commitment to invest over $1 billion in creators through 2022, we're also offering a new bonus program to help creators earn money when people view their reels. The Reels Play bonus pays eligible creators based on the performance of their reels, and will be available on both Facebook and Instagram. After seeing creators embrace the Instagram Reels Summer bonus, we hope this new bonus will allow more creators like @imjeremyclyde to make money from their content:

> "The 'Reels Summer' bonus enhanced my motivation for creating more Reels and my overall creativity as a content creator. It's also always great to see other content creators posting more and being the creatives that they are — it's inspiring!"

The Reels Play bonus will initially be invite-only, beginning in the US and potentially expanding globally over time. Interested creators can sign up to learn more about the Facebook Reels Play bonus and can visit our Facebook for Creators blog to learn best practices for creating reels.

We're focused on developing a suite of creator monetization options and will explore additional opportunities for them to earn money for their Reels. On Facebook, we will test sticker ads and banner ads in Reels and explore integrating with Stars.

And similar to Instagram Reels, we'll soon begin testing full-screen and immersive ads between reels to help small businesses and brands connect with new audiences in delightful ways. Just like with organic Reels content, people can comment, like, view, save, share and skip them.



## Unleash Your Creativity with Reels

Anyone can create a reel on Facebook and become a creator on the global stage or just share them with friends and family. Simply create a reel from the top of Feed or while you're watching a reel and either select video clips from your camera roll or capture something new. You can also tap Reels at the top of News Feed or within a group's feed.

As you're creating reels on Facebook, you can access a variety of creative editing tools, including:

- **Audio:** Search for a song from the Facebook music library for your reel. You can also use your own original audio by simply recording a reel with it. You can add audio from the camera before you capture a clip, or you can add audio later after you have captured or uploaded a clip. You can also create a reel with original audio from other public reels by selecting Use Audio from the other person's reel.

- **AR Effects:** Select one of the many effects in our augmented reality library, created by either Facebook or third-party developers, to record multiple clips with different effects.

- **Timer and Countdown:** Set the timer to record any of your clips hands-free without having to press the shutter button.

- **Speed:** Speed up or slow down the video while you record, which helps you stay on a beat or make slow motion videos.

- **Multi-clip:** Stitch together multiple clips into a single reel either by recording them together or selecting them from the gallery.

After you've created a reel, you can choose how to share it. Reels on Facebook are set to be public for creators who are over 18, but you can change the audience at any time. Audience options include Public, Friends or Friends except.

---

Categories: Facebook, Product News

Tags: Reels

  

---

**RELATED NEWS**

## Facebook

### Expanding Ads on Reels

We're expanding our Ads on Reels tests so more creators can earn money for creating engaging public reels.

May 9, 2023



 Meta

Follow Us

   

**Virtual reality**

Shop Meta Quest

Refurbished Meta Quest 2

VR for Good

Forums

Referrals

Blog

Creators

Download SDKs

Developers

**Smart glasses**

Shop Ray-Ban Stories

Privacy information

Terms of service

Data policy

Supported countries

**Support**

Shop Help Center

Order status

**About us**

About Meta

Media gallery

Brand resources

For investors

**Our community**

Support SMB

Giving together

Social impact

Made for Meta partner program

Meta Quest health & safety information

Meta Quest safety center

VR for work

Returns

Find a product demo

Legal

Facebook Help Center

Messenger Help Center

Instagram Help Center

WhatsApp Help Center

Workplace Help Center

Meta Quest

Meta Verified

Business and community growth

VR for Good

### Our actions

Data and privacy

Safety and expression

Elections

COVID-19 response

Regulations

© 2023 Meta    Community Standards    Data Policy    Terms    Cookie policy

United States (English) ▾

# Exhibit 444

POSTED ON JUNE 26, 2015 TO <u>SECURITY</u>

## Fighting spam with Haskell



By <u>Simon Marlow</u>

  

One of our weapons in the fight against spam, malware, and other abuse on Facebook is a system called Sigma. Its job is to proactively identify malicious actions on Facebook, such as spam, phishing attacks, posting links to malware, etc. Bad content detected by Sigma is removed automatically so that it doesn't show up in your News Feed.

We recently completed a two-year-long major redesign of Sigma, which involved replacing the <u>in-house FXL language</u> previously used to program Sigma with <u>Haskell</u>. The Haskell-powered Sigma now runs in production, serving more than one million requests per second.

Haskell isn't a common choice for large production systems like Sigma, and in this post, we'll explain some of the thinking that led to that decision. We also wanted to share the experiences and lessons we learned along the way. We made several improvements to GHC (the Haskell compiler) and fed them back upstream, and we were able to achieve better performance from Haskell compared with the previous implementation.

### How does Sigma work?

Sigma is a *rule engine*, which means it runs a set of rules, called policies. Every interaction on Facebook — from posting a status update to clicking "like" — results in Sigma evaluating a set of policies specific to that type of interaction. These policies make it possible for us to identify and block malicious interactions before they affect people on Facebook.

Policies are continuously deployed. At all times, the source code in the repository is the code running in Sigma, allowing us to move quickly to deploy policies in response to new abuses. This also means that safety in the language we write policies in is important. We don't allow code to be checked into the repository unless it is type-correct.



*Louis Brandy of Facebook's Site Integrity team discusses scalable spam fighting and the anti-abuse structure at Facebook and Instagram in a 2014 @Scale talk.*

### Why Haskell?

The original language we designed for writing policies, FXL, was not ideal for expressing the growing scale and complexity of Facebook policies. It lacked certain abstraction facilities, such as user-defined data types and modules, and its implementation, based on an interpreter, was slower than we wanted. We wanted the performance and expressivity of a fully fledged programming language. Thus, we decided to migrate to an existing language rather than try to improve FXL.

The following features were at the top of our list when we were choosing a replacement.

1. **Purely functional and strongly typed.** This ensures that policies can't inadvertently interact with each other, they can't crash Sigma, and they are easy to test in isolation. Strong types help eliminate many bugs before putting policies into production.

2. **Automatically batch and overlap data fetches.** Policies typically fetch data from other systems at Facebook, so we want to employ concurrency wherever possible for efficiency. We want concurrency to be implicit, so that engineers writing policies can concentrate on fighting spam and not worry about concurrency. Implicit concurrency also prevents the code from being cluttered with efficiency-related details that would obscure the functionality, and make the code harder to understand and modify.

3. **Push code changes to production in minutes.** This enables us to deploy new or updated policies quickly.

4. **Performance.** FXL's slower performance meant that we were writing anything performance-critical in C++ and putting it in Sigma itself. This had a number of drawbacks, particularly the time required to roll out changes.

5. **Support for interactive development.** Developers working on policies want to be able to experiment and test their code interactively, and to see the results immediately.

[Haskell](#) measures up quite well: It is a purely functional and strongly typed language, and it has a mature optimizing compiler and an interactive environment (GHCi). It also has all the abstraction facilities we would need, it has a rich set of libraries available, and it's backed by an active developer community.

That left us with two features from our list to address: (1) automatic batching and concurrency, and (2) hot-swapping of compiled code.

## Automatic batching and concurrency: The Haxl framework

All the existing concurrency abstractions in Haskell are explicit, meaning that the user needs to say which things should happen concurrently. For data-fetching, which can be considered a purely functional operation, we wanted a programming model in which the system just exploits whatever concurrency is available, without the programmer having to use explicit concurrency constructs. We developed the Haxl framework to address this issue: Haxl enables multiple data-fetching operations to be automatically batched and executed concurrently.

We discussed Haxl in [an earlier blog post](#), and we published a [paper on Haxl](#) at the ICFP 2014 conference. Haxl is open source and available on [GitHub](#).

In addition to the Haxl framework, we needed help from the Haskell compiler in the form of the [Applicative do-notation](#). This allows programmers to write sequences of statements that the compiler automatically rearranges to exploit concurrency. We also designed and implemented Applicative do-notation in GHC.

## Hot-swapping of compiled code

Every time someone checks new code into the repository of policies, we want to have that code running on every machine in the Sigma fleet as quickly as possible. Haskell is a compiled language, so that involves compiling the code and distributing the new compiled code to all the machines running Sigma.

We want to update the compiled rules in a running Sigma process on the fly, while it is serving requests. Changing the code of a running program is a tricky problem in general, and it has been the subject of a great deal of research in the academic community. In our case, fortunately, the problem is simpler: Requests to Sigma are short-lived, so we don't need to switch a running request to new code. We can serve new requests on the new code and let the existing requests finish before we discard the old code. We're careful to ensure that we don't change any code associated with persistent state in Sigma.

Loading and unloading code currently uses GHC's built-in runtime linker, although in principle, we could use the system dynamic linker. To unload the old version of the code, the [garbage collector gets involved](#). The garbage collector detects when old code is no longer being used by a running request, so we know when it is safe to unload it from the running process.

## How Haskell fits in

Haskell is sandwiched between two layers of C++ in Sigma. At the top, we use the C++ thrift server. In principle, Haskell can act as a thrift server, but the C++ thrift server is more mature and performant. It also supports more features. Furthermore, it can work seamlessly with the Haskell layers below because we can call into Haskell from C++. For these reasons, it made sense to use C++ for the server layer.

At the lowest layer, we have existing C++ client code for talking to other internal services. Rather than rewrite this code in Haskell, which would duplicate the functionality and create an additional maintenance burden, we wrapped each C++ client in a Haxl data source using Haskell's Foreign Function Interface (FFI) so we could use it from Haskell.

Haskell's FFI is designed to call C rather than C++, so calling C++ requires an intermediate C layer. In most cases, we were able to avoid the intermediate C layer by using a compile-time tool that demangles C++ function names so they can be called directly from Haskell.

## Performance

Perhaps the biggest question here is "Does it run fast enough?" Requests to Sigma result from users performing actions on Facebook, such as sending a message on Messenger, and Sigma must respond before the action can take place. So we wanted to serve requests fast enough to avoid interruptions to the user experience.

The graph below shows the relative throughput performance between FXL and Haskell for the 25 most common types of requests served by Sigma (these requests account for approximately 95 percent of Sigma's typical workload).



Haskell performs as much as three times faster than FXL for certain requests. On a typical workload mix, we measured a 20 percent to 30 percent improvement in overall throughput, meaning we can serve 20 percent to 30 percent more traffic with the same hardware. We believe additional improvements are possible through performance analysis, tuning, and optimizing the GHC runtime for our workload.

Achieving this level of performance required a lot of hard work, profiling the Haskell code, and identifying and resolving performance bottlenecks.

Here are a few specific things we did:

- We implemented automatic memoization of top-level computations using a source-to-source translator. This is particularly beneficial in our use-case where multiple policies can refer to the same shared value, and we want to compute it only once. Note, this is per-request memoization rather than global memoization, which lazy evaluation already provides.
- We made a change to the way GHC manages the heap, to reduce the frequency of garbage collections on multicore machines. GHC's default heap settings are frugal, so we also use a larger allocation area size of at least 64 MB per core.
- Fetching remote data usually involves marshaling the data structure across the C++/Haskell boundary. If the whole data structure isn't required, it is better to marshal only the pieces needed. Or better still, don't fetch the whole thing — although that's only possible if the remote service implements an appropriate API.
- We uncovered a nasty performance bug in aeson, the Haskell JSON parsing library. Bryan O'Sullivan, the author of aeson, wrote a nice blog post about how he fixed it. It turns out that when you do things at Facebook scale, those one-in-a-million corner cases tend to crop up all the time.

## Resource limits

In a latency-sensitive service, you don't want a single request using a lot of resources and slowing down other requests on the same machine. In this case, the "resources" include everything on the machine that is shared by the running requests — CPU, memory, network bandwidth, and so on.

A request that uses a lot of resources is normally a bug that we want to fix, it does happen from time to time, often as a result of a condition that occurs in production that wasn't encountered during testing — perhaps an innocuous operation provided with some unexpectedly large input data, or pathological performance of an algorithm on certain rare inputs, for example. When this happens, we want Sigma to terminate the affected request with an error (that will subsequently result in the bug being fixed) and continue without any impact on the performance of other requests being served.

To make this possible, we implemented _allocation limits_ in GHC, which places a bound on the amount of memory a thread can allocate before it is terminated. Terminating a computation safely is a hard problem in general, but Haskell provides a safe way to abort a computation in the form of asynchronous exceptions. Asynchronous exceptions allow us to write most of most of our code ignoring the potential for summary termination and still have all the nice guarantees that we need in the event that the limit is hit, including safe releasing of resources, closing network connections, and so forth.

The following graph illustrates of how well allocation limits work in practice. It tracks the maximum live memory across various groups of machines in the Sigma fleet. When we enabled one request that had some resource-intensive outliers, we saw large spikes in the maximum live memory, which disappeared when we enabled allocation limits.



### Enabling interactive development

Facebook engineers develop policies interactively, testing code against real data as they go. To enable this workflow in Haskell, we needed the GHCi environment to work with our full stack, including making requests to other back-end services from the command line.

To make this work, we had to make our build system link all the C++ dependencies of our code into a shared library that GHCi could load. We also customized the GHCi front end to implement some of our own commands and streamline the desired workflows. The result is an interactive environment in which developers can load their code from source in a few seconds and work on it with a fast turnaround time. They have the full set of APIs available and can test against real production data sources.

While GHCi isn't as easy to customize as it could be, we've already made several improvements and contributed them upstream. We hope to make more improvements in the future.

### Packages and build systems

In addition to GHC itself, we make use of a lot of open-source Haskell library code. Haskell has its own packaging and build system, Cabal, and the open-source packages are all hosted on Hackage. The problem with this setup is that the pace of change on Hackage is fast, there are often breakages, and not all combinations of packages work well together. The system of version dependencies in Cabal relies too much on package authors getting it right, which is hard to ensure, and the tool support isn't what it could be. We found that using packages directly from Hackage together with Facebook's internal build tools meant adding or updating an existing package sometimes led to a yak-shaving exercise involving a cascade of updates to other packages, often with an element of trial and error to find the right version combinations.

As a result of this experience, we switched to Stackage as our source of packages. Stackage provides a set of package versions that are known to work together, freeing us from the problem of having to find the set by trial and error.

### Did we find bugs in GHC?

Yes, most notably:

- We fixed a bug in GHC's garbage collector that was causing our Sigma processes to crash every few hours. The bug had gone undetected in GHC for several years.
- We fixed a bug in GHC's handling of finalizers that occasionally caused crashes during process shutdown.

Following these fixes, we haven't seen any crashes in either the Haskell runtime or the Haskell code itself across our whole fleet.

## What else?

At Facebook, we're using Haskell at scale to fight spam and other types of abuse. We've found it to be reliable and performant in practice. Using the Haxl framework, our engineers working on spam fighting can focus on functionality rather than on performance, while the system can exploit the available concurrency automatically.

For more information on spam fighting at Facebook, check out our Protect the Graph page, or watch videos from our recent Spam Fighting @Scale event.

TAGS:   BACKEND

Like    Share    20 people like this. Sign Up to see what your friends like.



**‹ Prev**
Delivering high scroll performance

**Next ›**
72 hours to launch Celebrate Pride

## Read More in Security

View All ▸



MAR 6, 2024

Making messaging interoperability with third parties safe for users in Europe



DEC 6, 2023
Building end-to-end security for Messenger



NOV 8, 2023
Enhancing the security of WhatsApp calls



SEP 12, 2023

Meta Quest 2: Defense through offense



AUG 29, 2023

Scheduling Jupyter Notebooks at Meta



AUG 8, 2023

How Meta is improving password security and preserving privacy

## Related Posts

## Related Positions

Privacy Engineer, Incident Response and Investigation
LONDON, UK

Security Engineer, XRM
NEW YORK, US

Global Security, Physical Security Area Lead
REDMOND, US

Integrity Compliance Manager
DUBLIN, IRELAND

Integrity Compliance Manager
LONDON, UK

See All Jobs

## Available Positions

Privacy Engineer, Incident Response and Investigation
LONDON, UK
Security Engineer, XRM
NEW YORK, US
Global Security, Physical Security Area Lead
REDMOND, US
Integrity Compliance Manager
DUBLIN, IRELAND
Integrity Compliance Manager
LONDON, UK

See All Jobs

## Stay Connected


Engineering at Meta
Like


Meta Open Source
Follow


Meta Research

## Open Source

Meta believes in building community through open source technology. Explore our latest projects in Artificial Intelligence, Data Infrastructure, Development Tools, Front End, Languages, Platforms, Security, Virtual Reality, and more.

ANDROID

iOS



Like



Meta for Developers

Like

RSS

Subscribe

WEB



BACKEND

HARDWARE

Learn More

ထ Meta

Engineering at Meta is a technical news resource for engineers interested in how we solve large-scale technical challenges at Meta.

Home

Company Info

Careers

© 2024 Meta
Terms Privacy Cookies Help

# Exhibit 445

# Deep Entity Classification: Abusive Account Detection for Online Social Networks

*Teng Xu* [👍]   *Gerard Goossen* [👍]   *Huseyin Kerem Cevahir* [👍]   *Sara Khodeir* [👍]   *Yingyezhe Jin* [👍]
*Frank Li* [👍🐝]   *Shawn Shan* [👍🎓]   *Sagar Patel* [👍]   *David Freeman* [👍]   *Paul Pearce* [👍🐝]

[👍]*Facebook, Inc*   [🎓]*University of Chicago*   [🐝]*Georgia Institute of Technology*

## Abstract

Online social networks (OSNs) attract attackers that use *abusive accounts* to conduct malicious activities for economic, political, and personal gain. In response, OSNs often deploy abusive account classifiers using machine learning (ML) approaches. However, a practical, effective ML-based defense requires carefully engineering features that are robust to adversarial manipulation, obtaining enough ground truth labeled data for model training, and designing a system that can scale to all active accounts on an OSN (potentially in the billions).

To address these challenges we present *Deep Entity Classification (DEC)*, an ML framework that detects abusive accounts in OSNs that have evaded other, traditional abuse detection systems. We leverage the insight that while accounts in isolation may be difficult to classify, their embeddings in the social graph—the network structure, properties, and behaviors of themselves and those around them—are fundamentally difficult for attackers to replicate or manipulate *at scale*. Our system:

- Extracts "deep features" of accounts by aggregating properties and behavioral features from their direct and indirect neighbors in the social graph.

- Employs a "multi-stage multi-task learning" (MS-MTL) paradigm that leverages imprecise ground truth data by consuming, in separate stages, both a small number of high-precision human-labeled samples and a large amount of lower-precision automated labels. This architecture results in a single model that provides high-precision classification for multiple types of abusive accounts.

- Scales to billions of users through various sampling and reclassification strategies that reduce system load.

DEC has been deployed at Facebook, where it classifies all users continuously, resulting in an estimated reduction of abusive accounts on the network by 27% beyond those already detected by other, traditional methods.

## 1   Introduction

Online Social Networks (OSNs) connect billions of users around the globe. The largest social network, Facebook, has more than two billion active users sharing content each month [45]. The vast scale of these networks in turn attracts adversaries that seek to exploit the platforms for economic, political, and personal gain. While most OSN activity comes from legitimate users, attackers invest significant resources in signing up fake accounts (i.e., accounts not representative of a real person), creating accounts that impersonate real people, or compromising the accounts of real users. These *abusive accounts* are used to drive a range of negative behaviors including spam, fake engagement, pornography, violence, and terrorism—all actions which violate community norms [12] and are widely studied forms of abuse [1].

A core challenge faced by OSNs is how to identify and remediate abusive accounts in such a way that is both *scalable* and *precise*. Scalability requires approaches that can operate on billions of users and tens of billions of daily actions to detect dozens of different abuse types. Systems that prioritize precision are necessary because abusive accounts are relatively rare [44, 45] and thus a drop in precision would lead to the OSN taking errant actions against a large number of benign users.

OSNs use a broad set of techniques ranging from rule-based heuristics [49] to modern machine-learning algorithms [26, 48] to classify and remediate abusive accounts at scale. Rule-based heuristics act as a first line of defense [4], identifying basic or common attacker tools, techniques, and resources. These heuristics however lack power: they focus on precision rather than recall, they often do not capture the complexity of account *behaviors*, and they are by definition *reactive* [25]. Machine learning systems overcome some of these problems: they generalize from past labeled data in order to improve recall, and they can be iterated on over time to adapt to adversarial evolution [8]. However, precise machine learning systems require a large amount of high-quality labeled ground truth data, can be costly to deploy (in both engineering effort and computational resources), and can be evaded by adversaries who learn how to mimic the appearance of real accounts [17]. Rule-based heuristics and traditional machine learning systems can identify and remediate

the vast majority of abuse [4], but identifying the remaining hard-to-classify accounts—those that closely resemble real users and/or evade OSN defenses—requires fundamentally different and more complex solutions.

A critical insight is that while attackers can produce abusive accounts that appear legitimate *in isolation*, those accounts' embedding in and engagement with the social graph are fundamentally difficult to forge. For example, the number of friend requests sent by a given user is easy for an attacker to control, but the number of friend requests sent by all of that user's friends is outside of the attacker's control.[1] Although attackers can attempt to camouflage their accounts by connecting to legitimate nodes in the graph, this strategy not only is prohibitive to implement at scale, but also creates side effects (e.g., large numbers of rejected friend requests) that are detectable by traditional means.

Leveraging this insight, we develop *Deep Entity Classification (DEC)*,[2] a method and supporting system for OSN abusive account detection. Instead of classifying accounts based on "direct" features and behaviors, DEC leverages social network structure, extracting more than 20,000 features for each account, by operating across the graph. These features are used to train supervised machine learning models that *classify accounts across many different kinds of abuse.* The DEC system consists of label generation and feature extraction, as well as model training, deployment, and updating. Ultimately DEC produces per-account abusive classification results that are robust to adversarial iteration (Section 7).

The large number of features generated by DEC's graph traversal imposes two challenges in terms of model training. First, if applied naïvely, the large feature space could dramatically increase the underlying model complexity, resulting in poor generalization and degraded performance. Second, obtaining proper generalization across so many features would require a prohibitively large training set in a problem space where high-quality human-labeled data is difficult to obtain at billion-user scale.

The second key DEC insight is that in addition to small-scale, high-quality human-labeled data, we can utilize the results of rule-based heuristics as additional "approximate labels." The classifications from such rules are not human reviewed and thus have lower precision than human-reviewed data, but the absolute quantity is much higher.

Building on this insight, we design a "multi-stage multi-task learning" (MS-MTL) framework. Our framework extracts low-dimensional transferable representations via a deep neural network trained using the high-volume approximate labels, then fine-tunes dedicated models given the learned representations and the high-quality human-labeled data.

Model training occurs in two separate stages. The first stage trains a *multi-task* deep neural network [6] on the collected features using the large number of lower-precision approximate labels. Since accounts identified by these lower-precision signals exhibit a multitude of different abuse types (e.g., spam, objectionable content, or malware), we formulate a learning "task" for each abuse type. We then extract the penultimate layer of the neural network as a low-dimensional feature vector [22]. This vector is input to the second stage of the model, which is trained using *per-task* high-precision human-labeled data with a standard binary classifier.

MS-MTL allows DEC to learn the underlying common representations of different abuse types in the first model stage, and then to distinguish different abuse types using high-precision data with separate models in the second stage, resulting in a score for each abuse type for each account. In this way we can use a single model to label as "abusive" accounts exhibiting any of a multitude of abuse types (e.g., scams, spam, adult content, etc.).

Our DEC design is deployed at Facebook, where it has run in production for more than two years. During that time DEC led to the identification and remediation of hundreds of millions of abusive accounts. By comparing the number of accounts actioned by DEC with an unbiased estimate of the number of abusive accounts remaining on the platform, we infer that DEC is responsible for reducing the volume of abusive accounts by approximately 27%.

In summary, our contributions include:

- The algorithmic design, system architecture, and implementation of DEC. Extracting more than 20,000 features per entity, across multiple hops, for billions of active users, presents a unique set of systems challenges (Section 4).
- A novel feature extraction process that produces "deep features" (Section 5) that, over our evaluation, showed no signs of adversarial adaptation (Section 7.4).
- The MS-MTL classification paradigm, which allows us to use a single model architecture to produce high-precision classifiers for each abuse class (Section 6).
- A quantitative evaluation of DEC and MS-MTL vs. other approaches, as well as a qualitative assessment of the impact DEC has had on the overall state of abusive accounts not caught by other systems (i.e., those hardest to classify) at Facebook (Section 7).
- A discussion of the lessons learned from two years of production deployment at Facebook (Section 8).

## 2  Background

Here we present an overview of abusive accounts on OSNs, existing defenses, and relevant machine learning terminology.

### 2.1  Abusive Accounts

We define an *abusive account* to be any account that violates the written policies of a given OSN (e.g., [12]). Attackers use abusive accounts for various reasons, including for financially motivated schemes (e.g., spreading spam, scams, objection-

---

[1] See Section 8.4 for consideration of the case where attacker creates groups of abusive accounts that are connected to each other.

[2] In this context "deep" refers to the features generated via network fanout from each account, not neural network structure.

able content, or phishing links [13–15]) and for causing user harm (e.g., online harassment or terrorism [16]). Abusive accounts can be broadly broken down along two dimensions:

1. **Account Provenance.** An abusive account can be *fake*, where the account does not represent an actual person or organization, or *real*, where it is a legitimate user account, though potentially hijacked by an attacker.[3]

2. **Abusive Behavior.** An abusive account can be characterized by the type of abuse it conducts, such as spreading *scams* or *spam*.

## 2.2 Defenses

There are multiple types of defenses against abusive accounts on OSNs. Rule-based heuristics, such as rate limits on particular user actions, are straightforward, easy to design and evaluate, and can be quite powerful in practice. However, they are often reactive, permitting some amount of abuse before a threshold is crossed and a rule is triggered. In addition, they conservatively focus on precision rather than recall to avoid false positives.

Another large-scale detection technique is machine learning-based classification, which affords increased complexity of the detection algorithm through digesting more features. However, adversaries can adapt (sometimes quickly) in response to classifier actions [10], making it challenging to properly design features that are difficult for adversaries to discover and evade. Another challenge of this approach is to collect enough high-precision training data. Human labeling is typically the most reliable source but can be expensive in terms of time, money, and human effort.

Rule-based heuristics and typical machine-learning based classifiers are able to identify the vast majority of abusive activity in online services [4]. Identifying those accounts that are able to evade the primary detection systems presents a especially difficult challenge, as they represent the *hardest* to classify accounts. For example, such accounts may be those that adversaries have iterated on while adapting to OSN defenses, or they may very closely resemble real users. The system we present in this paper is designed to mitigate these issues by employing sparse aggregated features on the social graph that should be difficult for attackers to manipulate, and by using a multi-stage training framework.

## 2.3 Machine Learning Terminology

In this section we describe the machine learning terminology relevant to DEC.

### 2.3.1 Deep Neural Networks

The first stage of DEC uses a deep neural network (DNN) architecture [31]. It is a cascade of multiple layers of nonlinear processing units for feature extraction and transformation.

Each successive layer uses the output from the previous layer as input. In deep learning, each layer learns to transform its input data into a slightly more abstract and composite representation, with the last layer outputting a single score.

### 2.3.2 Embeddings

In the context of neural networks, *embeddings* are low-dimensional, continuous, learned vector representations of a discrete feature vector. Neural network embeddings are useful because they can reduce the dimensionality of categorical variables and meaningfully represent categories in the transformed space [28]. A common usage of embeddings is to serve as input features for machine learning models. In each layer of a deep neural network, a low-dimensional vector can be extracted as the embedding of the layer.

### 2.3.3 Gradient Boosted Decision Trees

The embedding of the last layer of deep neural network in DEC's first stage is used as the input feature vector for the second stage of DEC training, which uses a model of gradient boosted decision trees (GBDTs). GBDTs are a machine learning approach that iteratively constructs an ensemble of weak decision tree learners through boosting. It is a widely used algorithm in classification and regression [20].

## 3 Related Work

The problem of detecting abusive accounts in OSNs has received a great deal of attention in the literature. We split the published efforts into three categories based on technique, and also describe the relevant machine learning literature.

## 3.1 Detecting Abusive Accounts

Several works have explored using graph structure and the features of neighboring nodes to detect abuse. Yang et al. examined the effectiveness of graph and neighbor-based features to identify spammers on Twitter [58]. Their work formalized 24 detection features—including four graph-based and three direct neighbor properties—showing how these features could identify spammers better than prior state-of-the-art solutions [32, 49, 53]. Our work creates a generalized machine-learning framework (utilizing these features among many others) based on graph, direct, and indirect neighbor features (the "deep entity") which scales to billions of social network users.

Other work has focused exclusively on graph structure, with the goal of identifying groups or connected components. Stringhini et al. produced EVILCHORT, a system designed to identify accounts with common networking resources (e.g., IP addresses) and ultimately generate groups of malicious actors [50]. Earlier, Zhao et al. created BotGraph, which creates an activity graph from user actions and uses that graph to identify tightly connected components indicative of abuse [64]. Instead of focusing on the structure of the graph, Nilizadeh et al. observed how spam moved through the graph to identify common propagation patterns [38]. Compared to these works, we

---

[3] Real user accounts that violate OSN policies *without* having been compromised are outside the scope of this work, as they are relatively small in volume and are actioned on by other systems.

focus on a generalized framework which leverages such features, as well as a scalable machine learning approach which is utilized continuously at Facebook.

An alternative approach uses "honeypot" accounts to ultimately yield features which could be used for detection. Stringhini et al. used honeypot Twitter accounts to collect direct account, behavior, and content signals which could be used to identify spammers [49]. Similarly, Lee et al. also used honeypot Twitter and myspace accounts to collect direct account, content, and timing signals, also identifying abuse [32]. The features from both these works were later formalized and further analyzed (along with other features) by Yang et al. [58].

## 3.2   Sybil Accounts

A *Sybil attack* refers to an attack where individual malicious users join the OSN multiple times under multiple fake identities. Many algorithms and systems have been proposed to defend against Sybil attacks.

Yu [61] conduct a comprehensive study comparing various Sybil defenses on social networks as of 2011. A typical graph theory-based Sybil defense systems is SybilGuard [63]. The protocol is based on the social graph among user identities, where an edge between two identities indicates a human-established trust relationship. The key observation is that malicious users can create many identities but few trust relationships. Thus there is a disproportionately small "cut" in the graph between the sybil nodes and the honest nodes. However, there are two downsides of SybilGuard: it can allow a large number of sybil nodes to be accepted, and it assumes that social networks are fast mixing, which has not been confirmed in the real world. Yu et al. [62] propose a SybilLimit protocol that leverages the same insight as SybilGuard but offers near-optimal guarantees. Yang et al. claim that sybils do not form tight knit communities, as other work has explored [59]; instead, linkages are formed between sybils and normal users "accidentally" and therefore tight linkage-based defenses in isolation are problematic.

SybilInfer, proposed by Danezis and Mittal [9], is another sybil detection system. It uses a probabilistic model of honest social networks and a Bayesian inference engine that returns potential regions of dishonest nodes. SybilRank [5] is a detection framework that has been deployed in Tuenti's operation center. It relies on social graph properties to rank users according to their perceived likelihood of being fake, and has been shown to be computationally efficient and scalable. Wang et al. [54] take a different appproach, instead focusing on user actions as a stream and making the observation that the stream of actions for some types of attacks will be different than that of regular users.

While most Sybil defense algorithms and systems focus on exploring connections inside the social graph, this approach may fail to detect some types of abuse such as compromised accounts since they are not distinguishable on the social graph. DEC instead operates by combining information from the social graph with direct user features to conduct general abuse classification, irrespective of Sybil properties.

## 3.3   User Footprint

A "user footprint" is a signal that can be used to identify the behaviors of a same user across different OSNs. Malhotra et al. [37] propose the use of publicly available information to create a digital footprint of any user using social media services. This footprint can be used to detect malicious behaviors across different OSN platforms. Xiangnan et al. [29] study the problem of inferring anchor links across multiple heterogeneous social networks to detect users with multiple accounts. The key idea is that if a user is abusive on one platform, they are likely to be abusive on other platforms. However, the user footprint is not helpful when a user is only dedicated to spreading abuse in a single platform, which is the focus of DEC.

## 3.4   Machine Learning

In this section we describe the relevant machine learning works that DEC draws inspiration from.

### 3.4.1   ML for Abuse Detection

Machine learning-based classification is widely used in abuse detection. Stein et al. [48] proposed one of the first machine learning frameworks for abuse detection, applied to Facebook in 2011. The system extracts users' behavioral features and trains a machine learning model for classification. A similar spam detection system using content attributes and user behavior attributes has been deployed on Twitter as described by Benevenuto et al. [3]. These efforts laid the groundwork for our "behavioral" model described in Section 7.2.

Fire et al. [18] propose the use of topological anomalies on the social graph to identify spammers and fake profiles. Their approach uses only four features per user, all of which are related to the degree of graph connection of the user and their friends. The approach is proven to be useful in various OSNs. For DEC we employed a similar approach for feature extraction, however with a greatly expanded feature space.

In terms of classification algorithms, Tan et al. [51] designed an unsupervised spam detection scheme, called UNIK. Instead of detecting spammers directly, UNIK works by deliberately removing non-spammers from the network, leveraging both the social graph and the user-link graph. In the context of supervised learning, Lin et al. [35] conducted experiments on a Twitter dataset to compare the performance of a wide range of mainstream machine learning algorithms, aiming to identify the ones offering satisfactory detection performance and stability based on a large amount of ground truth data.

### 3.4.2   Other Relevant ML Work

Recent advances in machine learning, especially in graph learning, transfer learning, and online learning, can also be applied to ML-based abusive account detection.

*Graph learning* seeks to learn a node embedding or make predictions using relations in the graph. Variants of the techniques have been applied to modeling social networks [40], object interactions [24], citation networks [27], and abstract data structures in program verification [34]. Perozzi et al. [40] proposed an unsupervised graph learning technique to learn node embeddings using random walks in the local graph. Recent works on graph neural networks (GNNs) [27, 33, 55] extend convolutional neural networks to perform node classifications. However, none of the existing graph learning approaches has been shown to scale to billions of nodes as in a typical OSN social graph. We are actively experimenting with GNNs for DEC and have encountered numerous technical challenges in getting the system to work on a graph as large and diverse as that of an OSN. Our exploratory work does suggest potential improvements in model performance, but at a much higher computational cost for training.

*Transfer learning* uses existing pre-trained models or embeddings as a basis for training models for new tasks. The technique is commonly used to improve the performance of ML models (e.g., facial recognition or image segmentation [39, 60]), especially in cases where little labeled training data is available. In DEC, we leverage transfer learning to boost our model performance by training the first-stage embedding on a second set of labels.

*Online learning*, first proposed by Saad et al. [43], is a technique to tune existing ML classifiers in real time using newly available training data. Classified samples are sent for labeling, which updates the training set to better capture potential adaptive behaviors; retraining then strengthens the classifier against such behaviors [2]. In theory DEC could be adapted to incorporate online learning; however, our human labels are expensive and take a long time to collect, so the benefit of online learning over our current approach of regular offline retraining would be minimal.

*Active learning* [7, 46], similar to online learning, is a technique to retrain the model with new data. In active learning, only the data points in which the model has low confidence are assigned to human labellers for review. This approach is intended to achieve maximum model performance improvement with limited labeling resource. In our work we select accounts *at random* for expert labelling. While active learning is a potential avenue for improvement, we have been unable to test it because of labeling constraints: random-sample labeling is used not only for training DEC but also for other applications across Facebook, so any active learning experiments would require additional labellers.

## 4   DEC System Overview

DEC extracts features from active Facebook accounts, classifies them, and then takes actions on the classified abusive accounts. In order to deploy such a system in a scalable way, we need to address multiple challenges, including scalability, latency, variety of abuse types, and false positives. DEC



Figure 1: DEC system overview. When an user action occurs on Facebook, the online component will, concurrent with user activity, classify and potentially begin remediation on the user and/or action. Meanwhile, the extracted features from the online component, together with the training data, are used by the offline component to train new models.

uses multiple components in order to handle these challenges separately.

Figure 1 shows the DEC architecture. At the highest level, we break down DEC into online and offline components, discussed subsequently.

### 4.1   Online Component

DEC is triggered by Facebook user actions. When an action occurs, DEC may, based on heuristics (see Section 5.2), schedule a task concurrent with the user activity to start extracting the raw features for the target node and sampled neighboring nodes. For an average account on Facebook, DEC needs to extract hundreds of features for each of hundreds of neighboring nodes, resulting in tens of thousands of raw features to be extracted. Such queries are computationally expensive, and thus the whole process is done asynchronously offline without influencing the user's normal site activity. After feature extraction, DEC aggregates the raw features to form numerical sparse features (further discussed in Section 6). DEC then generates the classification result for the account based on the aggregated features and the in-production model. If the account is classified as abusive, DEC exercises enforcement on the account.

### 4.2   Offline Component

The offline component of DEC includes model training, and feedback handling.

To classify multiple types of abuse, DEC maintains multiple models, where each model handles a different type of abuse. Each dedicated model is trained on the learned low-dimensional embeddings from the raw features collected as part of the concurrent feature extraction (online component). DEC uses the MS-MTL training framework to simultaneously

train and maintain models for different abuse types (further discussed in Section 6).

As part of our implementation within Facebook, DEC has integrated both human labeling as well as user feedback into the training and enforcement process. Facebook uses a dedicated team of specialists who can label whether an account is abusive. These specialists label accounts both proactively (based on features) and reactively (based on user feedback). For proactive labeling, human labellers check accounts surfaced by various detection signals, take samples, label them, and then take actions accordingly. For the reactive labeling, the process begins when a user appeals an enforcement action (as surfaced through the Facebook product). A human reviewer then investigates the account and either accepts the appeal (false positive from DEC's perspective) or rejects the appeal (true positive). Both proactive and reactive human label results are fed into DEC model training as labeled data. Offline model training uses the human labeled data combined with the extracted features from the online component. After repeated offline and online testing, updated models are deployed into production. DEC is regularly retrained by Facebook to leverage the most recent abuse patterns and signals.

To summarize, DEC:

1. Extracts "deep features" across all active accounts on Facebook to allow classification.
2. Uses classification to predict the level of abusiveness for all active accounts, keeping up-to-date classification results for all users actively engaging with the network.
3. Incorporates user and labeler feedback to iterate classifier models.

## 5 Methods: Deep Feature Extraction

Feature extraction is a core part of DEC. Compared to traditional abuse detection systems, DEC uses the process of aggregate feature calculations which aims to extract deep features of a "target" account.

### 5.1 Deep features

In the context of DEC, "deep" refers to the process of fanning out in the social graph. This graph consists of not only users but all *entities* that the platform supports, such as groups, posts, and more. A *direct feature* is a feature that is a function of a particular entity only, such as account age or group size. A *deep feature* is a feature that is a function of the direct features of entities linked to the entity in question. For example, "average age of an account's friends" is a deep feature for the account. Deep features can be defined recursively, as aggregations of deep features on linked accounts; for example, a deep feature on a photo could be "average number of groups joined by friends of people tagged in the photo."

Deep features are useful for classification because they reveal the position of target node in social graph by looking at neighboring nodes. For instance, in the detection of fake accounts, a common pattern that can be revealed by deep fea-

Table 1: Types of entities with their example direct features and example deep entities in DEC.

| Entity Type | Direct Features | Deep Entities |
|---|---|---|
| User | age, gender | entities administered, posts |
| Group | member count, age | admins, group members |
| Device | operating system | users sharing the device |
| Photo | like count, hash value | users in the photo |
| Status Update | like count, age | groups it shared to |
| Group Post | has a link? | users commenting |
| Share | number of times shared | original creator |
| IP Address | country, reputation | registered accounts |

tures is the batch creation of fake accounts. When classifying fake accounts, deep features include the features from the IP address that registers the account, as well as all the other accounts created from the IP address. When classifying using the above features, the scripted activity of batch account registration can be easily detected.

A key insight is that deep features not only give additional information about an account, but also are difficult for adversaries to manipulate. Most direct features can easily be changed by the person controlling the entity. For example, account age is controlled by the account owner, and group membership is controlled by the group admin. In contrast, aggregated features that are generated from entities associated with the target account are much more difficult to change. For example, if we consider the age of all of a user's friends, the mean value would be much more difficult to alter by that user, especially when the number of friends is large. Eventually, we can even take a step further by scrutinizing all the friends of friends, and it becomes almost impossible for an adversary to completely change such information.

Table 1 lists some of the entity types considered by DEC, including user, group, device, photo, status update, and group post. For each entity type, we list a few examples of direct features and deep (or fan-out) entities. For direct features, we use features effectively leveraged by other ML classifiers, as well as those found useful during manual investigations.

Figure 2 illustrates an example deep feature. This feature is based on neighboring nodes within two hops from an example account (center, color orange). An edge between two nodes represents the relation of mutual friends. This 2-hop deep feature has exponentially more dependent values comprising the feature than a direct feature.

### 5.2 Implementation

To extend the above examples to work in production, we have three issues to address: (a) What kind of neighboring nodes do we look at? (b) How can we generate the deep features meaningfully? and (c) How do we keep the computational cost from exploding as we fan out?

The complex and varied nature of OSN products requires us to build our system as generically as possible, allowing us to incorporate a wide variety of entities and edges between them. We also want to be able to add new types of entities or edges as



Figure 2: Visualization of the level-2 social graph for a single "target" account in DEC. The centered orange node is the target node to classify. The blue nodes are the neighboring nodes from the first fan-out level. The red nodes are from the second fan-out level. An edge between two nodes represents the relation of mutual friends. For each node visualized in this graph, hundreds of features are extracted and aggregated for classification.

new features and products appear on Facebook. In the social graph, even a single pair of entities can be connected with multiple types of edges. For example, a user can be connected to a group by being the admin of the group. They can also be connected through membership, which is a weaker connection. Even further, a user can be connected by commenting on a post from the group.

To define deep features, we apply aggregation techniques on the set of direct features of nodes, following the lead of Xiao et al. [57], who effectively leveraged aggregated features across clusters of accounts to identify fake ones. As shown in Table 2, we use different aggregation methods for numerical features and categorical features. To aggregate numerical features such as age, we calculate statistics on their distribution such as mean and percentiles. On the other hand, for categorical features such as home country, our strategy is to aggregate them statistically into numerical features. Lastly, we also jointly aggregate numeric features with categorical features by observing the distribution of the numeric features for a given categorical feature. For example, a feature can be the number of accounts that logged in from the same device as the target account, given the device uses the Android operating system.

The use of aggregation has two advantages: first, it produces a dense feature vector, reducing the dimensionality of the model. Second, it helps the model resist adversarial adaptation as discussed in Section 5.1 above. Note that we do not need to define each deep feature explicitly: we can define var-

Table 2: Example aggregation methods for deep features. Here $p25$ and $p75$ refer to the 25th and 75th percentiles, respectively.

| Feature Type | Aggregation Method |
| --- | --- |
| Numeric | min, max, mean, variance, $p25$, $p75$ |
| Categorical | percentage of the most common category, percentage of empty values, entropy of the category values, number of distinct categories |
| Both Numeric & Categorical | max of numeric A from category B, p75 of numeric A from most common category |

ious graph traversal steps (e.g., user → user, or user → group → photo) and automatically apply all aggregation methods to all the direct features of the target entity. In practice, this method produces thousands of distinct deep features.

Ideally, we would trigger a new feature extraction and classification *every* time a user action happens on Facebook. This is not possible at billion-user scale given the necessary computational resources. DEC relies on heuristics to decide when to begin the process of feature extraction and (re-)classification. The core idea is the use of a "cool-down period" between reclassifications, where the length of the cool-down period increases as the account spends more time active on the platform. Our motivating intuition is that accounts that have been active for longer have gone through many previous checks and are generally less likely to be abusive, while newly registered accounts are more likely to be created to abuse.

While (re-)classification is triggered in production in real time, feature extraction and aggregation are computed asynchronously without interfering with an account's experience on Facebook. Given the expense of extracting all deep features, especially for an account with many connections in the social graph, we restrict the amount of computational resources used per account. Specifically, we place a limit on the number of neighboring nodes used to compute a deep feature, and sample randomly if the number is over the limit. The random sample is different on each reclassification; our goal is to capture the position of the entity in the graph from many different angles. This sampling procedure allows us to limit computational cost without reducing the diversity of features.[4]

## 5.3   Feature selection

We only use deep features of a target account, and not direct features, for classification in DEC. The primary motivation for this choice is that we observed that direct target account features are extremely likely to become dominant features in the model. This undesired dominance is caused by the bias inherent in our training data. For example, one of our

---

[4]In our implementation, we use up to 50 neighboring nodes to compute a deep feature, downsampling if the number of neighboring nodes exceeds that threshold. On average, two fan-out levels of neighboring entities are used for feature computations.

experimental spam detection models used whether a user posts a URL as a feature; it turns out that this feature easily becomes the dominant one in the model because spammers are much more likely to include URLs in their posts than benign users. However, it creates a huge number of false positives as it classifies almost all users posting URLs as abusive. In addition, direct features are easy for the attacker to manipulate; once the attacker learns that "has posted URL" is a feature, they can switch from directly posting URLs to putting URLs as overlay in a photo in order to avoid detection.

## 5.4   Feature modification

As adversaries adapt and as we gain new insights about their behavior, we will wish to add new features to DEC and/or retire poorly performing features to save computation cost. There are two issues to consider when modifying features. The first is the influence on the current detection model. Once we add or remove any feature, the classification result from the original DEC model will be influenced as the model is still trained using the original list of features. Our solution is to split the feature logging into two pipelines: experimental features and production features. We can log (or not log) newly added (or removed) features into the experimental group, from which we can train a new model. Meanwhile, the production classifier still uses the production list of features. When the new model is pushed to production, we switch the experimental feature set into the production pipeline.

A second problem with adding features is the computational cost of re-computing across the entire graph. When we add a new direct feature to an entity $A$, it not only influences $A$, but also all the connected entities because they use features from $A$ to calculate their own deep features. Conversely, most direct features have multiple dependent deep features, and multiple levels of fan-out can easily require the re-computation of the whole feature space when a single feature is added. For example, DEC needs to extract `new_feature` from all of the friends of friends in order to compute 75th percentile, $p75$(`friends.friends.new_feature`). Traversing through other features along with friends ultimately results in re-extracting features of any active entity. To limit the impact of the re-computation overhead, we define isolated *universes of features*. The old and new versions of features will run in parallel universes, with existing models using the old universe of features, until feature generation for the new universe is complete. At that point the functionality of the old universe is subsumed, and it can be discarded as new models will be trained using the new universe of features.

Again referring to Figure 2, we see the potential computational impact of feature changes. In this example a change or addition of a new direct feature with dependent deep features has exponentially more dependent computations than the direct feature.



Figure 3: MS-MTL model training flow. Stage 1 uses the raw deep features with low precision labels to train a multi-task deep neural network. By extracting the embedding from the last hidden layer of the deep neural network, we train dedicated GBDT models for each task in stage 2 with human labeled data.

## 6   Methods: Multi-Stage Multi-Task Learning

Multi-task learning [6] (MTL) is a type of transfer learning [41] used to improve model generalization. MTL trains multiple related "tasks" in parallel using a single neural network model. The core idea is that what the model learns for each task can boost the performance of other tasks. In our context of abusive account classification, we define "task" and "label" as follows:

- A *task* refers to the classification of a specific category of abusive accounts on an OSN (e.g., fake accounts, spamming accounts).
- A *label* of a training sample is a boolean value indicating whether or not the sample falls into an abusive account category. Each training example has multiple labels, one for each task. This *multi-label* is represented by a vector of boolean values.

As a concrete example, if we take four tasks in DEC model training to be classifying fake, compromised, spamming, and scamming accounts, the label vector of one account might be $[1, 0, 0, 1]$. This vector indicates the account was identified as fake and carrying out scams, but is not identified as compromised or spreading spam.

## 6.1   Motivation

We employ a multi-stage framework to detect abusive accounts on Facebook. Our framework addresses three key challenges in abusive account classification: simultaneously supporting a variety of abuse types, leveraging a high-dimensional feature space, and overcoming a shortage (relative to billions of accounts) of high quality human labels.

First, since there are many different ways in which an account can be abusive, we use different tasks to represent different sub-types of abuse, and multi-task learning to increase the amount of information encoded in the model. The underlying assumption is that the features distinguishing abusive accounts from benign ones are correlated between abuse types. As a result, the knowledge learned for one abuse type can be beneficial for determining other abuse types because an account exhibiting one abuse type is more likely to show other abusive behaviors. As compared with splitting labeled data based on abuse types and training a separate model for each type, multi-task training gives us a full picture of the account by collectively looking at all associated abusive behavior. We expect that this knowledge sharing across tasks will allow us to achieve better prediction accuracy using multi-task learning, especially for smaller tasks.

Second, the multi-stage framework addresses the "curse of dimensionality" [23] by reducing the high-dimensional raw feature vector to a low-dimensional representation. Specifically, our two stages of training reduce the number of features from more than $10^4$ (raw deep feature space) to around $10^2$ (learned low-dimensional representation space). We achieve this reduction by using the embedding from the last hidden layer of the multi-task deep neural network as input features for the second stage of training.

Finally, a practical engineering problem is that human labeled data is very expensive, and particularly so in the domain of account labeling. In order to label an account as abusive or benign, a human reviewer needs to look at many aspects of the account and consider multiple factors when making a decision. On the other hand, we have a large amount of lower-confidence labeled data in the form of machine-generated labels. This scenario is ideal for multi-task leaning as it has proven to be successful to extract useful information from noisily labeled data [52].

## 6.2   Training Data Collection

We have two sources of data labels on abusive accounts in DEC. The first consists of human reviewers, who are shown hundreds of signals from each account and asked to provide a judgment on whether the account is abusive. Labels provided in this manner have high accuracy, but are also computationally expensive, and therefore can only be obtained in low volume (relative to the billions of accounts on Facebook).

The second label source consists of automated (non-DEC) algorithms designed to detect abusive accounts, as well as user reported abusive accounts. These algorithms may be focused on a specific attack or abuse type, or may be previous versions of global abuse detection models. We consider the accounts identified by these algorithms to be *approximately labeled* abusive accounts. We then split the labels into different tasks based on the type of abuse per each account. To obtain approximately labeled non-abusive accounts, we randomly sample accounts that have never been actioned on. Our approximate labels have lower precision than human reviewed data, but are much cheaper to obtain and can be obtained in high volume. For example, in our evaluation the training dataset has over 30 million approximate labels and only 240,000 human labels (Table 3).

While 30 million labels may seem significant, it represents less than 2% of the billions of accounts on Facebook. Thus, any adversary attempting a poisoning attack [21, 36, 47] on the training data would need to create thousands of accounts in order to ensure that some of them were sampled for our training set as negative examples (and tens of thousands if trying to poison the second stage). On the other hand, the fact that there are millions of negative samples implies that any one account cannot have outsize influence on the model, thus increasing the required attack size even further. Such large attacks are easy for both rule-based systems and human reviewers to detect and label, and thus the adversary's intention of poisoning the training set will be foiled. Furthermore, even if somehow the adversary obtains enough accounts to poison the training process, they will need to manipulate the features on these accounts to produce very specific values, which (as discussed in Section 5.1) is difficult to achieve with our "deep feature" architecture.

To provide insight into the reliability of this approach, we took a random sample of approximately labeled accounts and sent them through the manual review process described previously. In those experiments the approximate labeling precision varied between 90% and 95%, indicating that the approximate labels still provide significant discerning power.

## 6.3   Model Training Flow

Figure 3 shows the two stage training flow of the MS-MTL framework. The first stage, trained on a large volume of low precision data, learns the embedding of the raw features. We then apply a transfer learning techique and use the embedding along with high precision labels to train the second stage model. The classification results are generated as the outputs from the second stage.

### 6.3.1   First Stage: Low Precision Training

The objective of the first training stage is to reduce the high-dimensional vector of aggregated raw deep features to a low-dimensional embedding vector. This dimensionality reduction is done through the training of a multi-task deep neural network model [6] using our approximate label data. Each sample in the training data has a vector of labels where each label corresponds to a task, and each task corresponds to classifica-

tion of a sub-type of abusive accounts on Facebook. After the training has converged, we take the outputs of the last hidden layer of the neural network as the learned low-dimensional embeddings.

For our implementation, we use a neural network model with 3 fully connected hidden layers having 512, 64, and 32 neurons respectively. For each task, the model outputs a probability using a sigmoid activation function. The inputs are normalized using a Box-Cox transformation. We trained the model using PyTorch [42] for an epoch using per-task binary cross entropy and an Adagrad optimizer [11], with a learning rate of 0.01.

### 6.3.2   Second Stage: High Precision Training

We leverage a technique from transfer learning [41] and extract the last hidden layer's output from the first stage model as the input for the second stage. We train the second stage (GBDT model) with high precision human-labeled data to classify abusive accounts regardless of the sub-types of violations. The scores output by the GBDT model are the final DEC classification scores.

Our implementation of the GBDT model uses an ensemble of 7 trees with a maximum depth of 4. We trained the model with a company-internal gradient boosting framework similar to XGBoost [56], using penalized stochastic gradient boosting, with a learning rate of 0.03 and a feature sampling rate of 0.2.

## 7   Evaluation

In this section we evaluate the performance of our MS-MTL approach and the DEC system as a whole. Specifically we analyze three abusive account models:

1. A behavioral-only model, which represents traditional detection techniques employed by OSNs;
2. DEC as a single multi-task neural network ("Single Stage," SS), and
3. DEC with MS-MTL.

We performed our evaluation on *active* accounts on Facebook. These accounts have already gone through multiple early-stage security systems such as registration or login-time actioning, but have not yet gone through full behavioral (i.e., activity- and content-based) detection. We also investigate adversarial adaptation, in particular looking at the stability of DEC's precision and recall over time.

### 7.1   Datasets

Table 3 summarizes the dataset used for our experiments and evaluation of DEC.

**Training Data.** We test DEC's performance on production Facebook data. We consider four types of abusive accounts (tasks) in our MS-MTL implementation: fake, compromised, spam, and scam. We split the abuse types into these four different categories for two reasons. First, they are violating different policies of Facebook, which causes the detected accounts

Table 3: Datasets: Number and composition of labels used for our training and evaluation. The longitudinal dataset is measured in # of samples per day.

| Training Dataset | Label Type | Training Stage | # Samples |
|---|---|---|---|
| Fake | Approximate | First | $3.0 \times 10^7$ |
| Comp. | Approximate | First | $7.8 \times 10^5$ |
| Spam | Approximate | First | $6.2 \times 10^5$ |
| Scam | Approximate | First | $6.2 \times 10^5$ |
| Benign | Approximate | First | $2.6 \times 10^8$ |
| Abusive | Human | Second | $1.2 \times 10^5$ |
| Benign | Human | Second | $1.2 \times 10^5$ |

| Evaluation Dataset | Label Type | Evaluation Mechanism | # Samples |
|---|---|---|---|
| Abusive | Human | Offline | $3.0 \times 10^4$ |
| Benign | Human | Offline | $3.0 \times 10^4$ |
| Longitudinal | Human | Online | $2.0 \times 10^4$/day |

to be actioned on by separate enforcement systems, each employing distinct appeals flows. Second, the positive samples of different abuse types are not homogeneous by nature. For example, fake accounts are largely driven by scripted creation, while compromised accounts usually result from malware or phishing. The behavioral patterns and social connections of these accounts are distinctive for each abuse type, lending themselves well to different "tasks" in our formulation.

We maintain separate datasets of approximate (lower-precision) and human labels. The quantity of approximate labels is significantly larger than human labels. The first training stage uses four approximate datasets of abusive accounts and one of benign accounts, while the second stage requires only human-reviewed accounts labeled as abusive or benign. The approximately labeled data comes from three sources:

1. **User reports**: Users on Facebook can report other users as abusive. This source is noisy [19], but appropriate as low-precision labels for the first stage of training.

2. **Rule-based systems**: Outside of DEC, there are other existing enforcement rules on Facebook. We take users caught by these enforcements, categorized by the type of abuse, as an additional approximate label source. Some examples of users labeled by rule-based systems include:
   - Users sending friend requests too quickly;
   - Users with multiple items of content deleted by spam-detection systems;
   - Users distributing links to known phishing domains.
   In total, rule-based systems account for more than half of our abusive account labels.

3. **Discovered attacks**: It's common to have "waves" of scripted attacks on OSNs, such as malware or phishing attacks. When Facebook notices such a wave they can identify a "signature" for the accounts involved and use the signature as an approximate label for our first stage. These discovered attacks comprise approximately 10% of our abusive account labels.

All of the above sources provide noisy, low-precision abuse data. While inappropriate for full system training, they are apt

for the first stage of training. For the first stage, we construct a set of benign users by randomly sampling active users and excluding those contained in approximate abuse dataset.

In contrast, we generate training data for the second stage by having human labellers employed by Facebook manually review randomly sampled users on the platform. Accounts labeled as abusive are used as positive samples for training, and accounts labeled as benign are negative samples.

**Evaluation Data.** To evaluate DEC's performance, we create an evaluation dataset of accounts by sampling *active* users from Facebook. These are users that have already passed through several early-stage abuse detection systems, and as such contain the *hardest* abusive accounts to classify. We perform manual human labeling of a large number of randomly selected accounts using the same methodology and process that Facebook uses for ground truth measurement. We then randomly select $3 \times 10^4$ accounts labeled abusive and $3 \times 10^4$ accounts labeled benign for offline evaluation.

## 7.2   Model Evaluation

We use three different models to evaluate the performance of our DEC approach (single stage and with MS-MTL) both in isolation, and in comparison to traditional techniques. Note that the objective of DEC is to identify accounts committing a wide spectrum of abuse types. This approach goes beyond traditional Sybil defense techniques which primarily focus on detecting fake accounts.

A summary of these models, their training data, and their evaluation data can be found in Table 4. The three models we compare are:

1. **Behavioral**: This GBDT model classifies accounts based only on the direct behavioral features of each account (e.g., number of friends), and outputs whether the account is abusive (regardless of the specific abuse type). Thus, this model does not use deep features and is not multi-task. Since the number of behavioral features is relatively small, we train the model with the human labeled dataset. This model is representative of traditional ML based detection techniques used in OSNs, similar to the system described by Stein et al. [48]. By operating on an evaluation dataset drawn from active accounts on Facebook that have already undergone early-stage remediation, adding this behavioral (later-stage) system is representative of an end-to-end solution. We employ a GBDT architecture with an ensemble of 200 trees of depth of 16, each with 32 leaf nodes.

2. **DEC-SS**: This model uses the DEC approach outlined in this paper to extract deep features, but does not leverage the MS-MTL learning approach. A single deep neural network model is trained by combining all the approximate data across multiple tasks. If a user is identified as violating by any one of the included tasks, we consider this as a positive sample. Because of the huge number of features extracted by DEC, the quantity of human labeled data is too small to be used for training.



Figure 4: Comparison of ROC curves for different models on evaluation data. Both DEC models (single stage and with MS-MTL) perform significantly better than the behavioral model at all points in the curve.

3. **DEC-MS-MTL**: This is is the complete end-to-end framework and model described in Section 6. It combines the DEC-only approach with MS-MTL.

Outside of this evaluation section, references to DEC without a MS-MTL or SS qualifier refer to DEC MS-MTL.

## 7.3   Performance Comparisons

We compare various metrics based on the results of above three models.

### 7.3.1   ROC Curves

Figure 4 examines the ROC performance of all three models. ROC curves capture the trade-off in a classifier between false positives and false negatives. For all operating points on the curve, the DEC models (both MS-MTL and SS) perform significantly better than a behavioral-only approach—by as much as 20%, depending on the operating point. From a ROC perspective, both DEC models perform similarly.

While ROC curves are important measures of the effectiveness of models, they are inherently *scaleless*, as the *x*-axis considers only ground-truth negatives and the *y*-axis considers only ground-truth positives. If the dataset is being classified is imbalanced, as is the case with abusive accounts (there are significantly more benign accounts than abusive accounts), ROC curves may not capture the actual operating performance of classification systems—particularly precision, a critical measure in accessing abuse detection systems.

### 7.3.2   Precision and Recall

Figure 5 compares the precision and recall of the models. We find the behavioral model is unable to obtain precision above 0.95 and has very poor recall throughout the precision range. Both DEC models perform significantly better than the behavioral model, being able to achieve a higher precision and have significantly higher recall at all relevant operating

Table 4: Comparisons of the three evaluation models' type, training features, training data, and evaluation data.

| Name | Model | Training Features | Training Data | Evaluation Data |
|---|---|---|---|---|
| Behaviorial | GBDT | Account behavior features ($\sim 10^2$) | Human labels | Human labels |
| DEC- SS | Multi-Task DNN | DEC deep features ($\sim 10^4$) | Approximate labels | Human labels |
| DEC- MS-MTL | Multi-Task DNN + GBDT | DEC deep features ($\sim 10^4$) | Approximate labels+human labels | Human labels |



Figure 5: Comparison of precision vs recall curves for different models on our evaluation data. Both DEC models perform significantly better than the behavioral model, and the DEC-MS-MTL has higher recall across the entire operating space. This evaluation is over accounts that have already gone through several stages of security evaluation, and as such this population represents the hardest accounts to classify. Given the difficult classification nature of this sub-population, such recall performance is considered excellent by Facebook.

regions. DEC with MS-MTL significantly improves the system recall over single stage DEC at high precision operating points, improving by as much as 30%.

We note that this evaluation is over accounts that have already gone through other security classifications such as registration time or login-time remediation (i.e., the *hardest* to classify accounts). As such, the overall recall level is expected to be lower than that of a system which operates on all active accounts (Section 7.4).

DEC with MS-MTL's improvement in recall over behavioral models makes it particularly attractive in a real world operating environment where recall over hard to classify accounts is an important operating characteristic.

### 7.3.3 Quantiative Assessment: Area Under the (AUC) Curve and Precision / Recall

Table 5 shows a comparison of precision, recall, and ROC performance between the three models. ROC performance is calculated as the total area under the curve (AUC). Precision is fixed at 0.95, a common operating point for assessing performance. The behavioral model is unable to achieve a precision of 0.95 at any recall, and is excluded. We find that while

Table 5: Comparison of the area under the curve (AUC) and recall at precision 0.95 for different models on evaluation data. The DEC with MS-MTL model achieves the best result by a significant margin, a nearly 30% absolute improvement. The behavioral model is unable to obtain precision 0.95.

| Model | AUC | Recall @ Precision 0.95 |
|---|---|---|
| Behavioral | 0.81 | NA |
| DEC- SS | 0.89 | 0.22 |
| DEC- MS-MTL | 0.90 | 0.50 |

DEC both single stage and with MS-MTL have similar AUC performance, adding MS-MTL more than doubles the model recall, increasing it from 22% to 50%. This increased performance, both over behavioral and over DEC without MS-MTL, enables significantly better real-world impact when deployed in production.

## 7.4   Results In Production Environment

Building on our design and evaluation of DEC (with MS-MTL), we deployed the system into production at Facebook. The system not only identified abusive accounts, but also triggered user-facing systems to take action on the accounts identified. To assess the model's real-world impact and longevity, we evaluate our system in production by looking at the stability of precision and recall over time.

**Precision Over Time.** Figure 6 examines the 3-day moving average of the precision of our DEC with MS-MTL system in production at Facebook. As with our prior evaluation, we obtain ground truth for our measurements by relying on manual human labeling of a random sample of accounts classified as abusive by DEC. We find that the precision of the system is stable, with the precision never dropping below 0.97, and frequently being higher than 0.98.

**Recall Over Time.** We examine the stability of our production DEC-MS-MTL model's recall by considering its false negative rate (FNR), where FNR = 1 − recall. Using a longitudinal sample of $2 \times 10^4$ users randomly chosen and manually labeled each day, we compute an unbiased FNR statistical measure of the volume of abusive accounts on Facebook, regardless of direct detection. This measure is denoted as the "prevalence" of abusive accounts and can be thought of as the false negative rate of all abusive account detection systems (including DEC) combined. If we add to the prevalence measurement the number of abusive accounts caught by DEC



Figure 6: Precision over time: 3-day moving average of deployed (DEC-MS-MTL) model precision on live Facebook production data, spanning one month. Precision is stable, never decreasing below 0.97. The *y*-axis is truncated.



Figure 7: Recall over time: DEC defense over a 30-day window, using 3-day moving averages. The green line is the observed volume (as a percent) of abusive accounts on Facebook, and the red marked line is the volume of accounts taken down by DEC. The blue line is the sum of the other two and estimates what the volume of abusive accounts would have been in the absence of DEC; the gray shaded area thus represents the inferred impact of DEC.

Table 6: Area under the curve (AUC) and recall at precisions 0.95 and 0.99 for DEC over a random sample of all accounts on Facebook.

| Population | AUC | Recall @ Prec. 0.95 | Recall @ Prec. 0.99 |
|---|---|---|---|
| All accts. | 0.981 | 0.981 | 0.955 |

specifically (and not other detection systems), we obtain an estimate of what the prevalence of abusive accounts *would have been* in the absence of DEC.

Figure 7 plots the observed prevalence of abusive accounts (with DEC deployed) and inferred prevalence without DEC, over the period of a month. A loss in DEC's recall (equivalently, an increase in DEC's FNR) would manifest as either an increase in overall abusive account prevalence, or a decrease in the power of DEC compared to non-DEC methods (a decrease in the difference between the two measures). We observed neither of these phenomena over our one-month experiment, indicating that DEC's recall did not meaningfully shift during this period and suggesting that there was not adversarial adaptation to DEC.

Before DEC's launch, Facebook reported instances of adversaries adapting within hours to new detection systems; since the advent of DEC there have been no such reports. Our hypothesis is that the "deep feature" architecture of DEC makes the system more resistant to adversarial adaptation than other abusive account detection systems. As discussed in Section 5.1, an adversary wishing to manipulate a user feature aggregated through the graph must control that feature on *all* of the relevant entities connected to the original user. When we apply this reasoning to the multitude of different entity associations — including but not limited to user friendship, group membership, device ownership, and IP address appearance — we are drawn to the conclusion that manipulating many such features would be far more expensive for an attacker than manipulating "direct" user features such as country, age, or friend count.

Since deployment, DEC has become one of the key abusive account detection systems on Facebook, where it has been responsible for the identification and deactivation of hundreds of millions of accounts. Over our evaluation period the average estimated prevalence without DEC would have been 5.2%, while the average observed volume of abusive accounts

on Facebook was 3.8%— an improvement of 27%.

**DEC Over All Accounts.** Our evaluation of DEC thus far has focused on the *hardest* types of abuse to classify—accounts that were not identified by other production abuse detection systems. A separate question is how effective could DEC be at identifying *all* abusive accounts, including those caught by these other systems. To answer this question we evaluated DEC over $1.6 \times 10^4$ active accounts sampled at random from the entire population of accounts on Facebook, including those that had been detected as abusive by other systems. These accounts were definitively labeled by expert human labellers and used as ground truth for our evaluation. Table 6 shows the performance of DEC across this population of all accounts. DEC performs well over this population, with an AUC of 0.981, recall at precision 0.95 of 0.981 and recall at precision 0.99 of 0.955. As expected, both the AUC and recall at fixed precision are significantly higher on the full population than on the sub-population of accounts not detected by other systems (Table 5).

## 8   Discussion and Lessons Learned

After more than two years of deployment at Facebook, we have learned multiple lessons and identified several limitations from developing and using DEC.

## 8.1   Reducing Computational & Human Load

It is computationally expensive to extract graph features for all active users at the scale of Facebook. Given our current implementation of feature extraction within two hops from the target node in graph, for each user we might need to reach out to hundreds or thousands of neighboring nodes in order to extract all of their information and aggregate it back to the target node. To mitigate this problem we have developed caching strategies that reuse previous feature extraction results as much as possible. However, because many features have time sensitivity, we still need to update and re-extract a considerable amount of them at each reclassification.

The computational load of DEC is high—equivalent to 0.7% of global CPU resources of Facebook. However, the deployment of DEC actually **reduced** global CPU usage of Facebook. DEC achieved this counter-intuitive result by identifying and removing such a large volume of abusive accounts that the combined CPU usage of those abusive accounts more than accounted for the computation required for feature extraction, training, and deployment of DEC.

DEC also greatly reduced human costs, in terms of human review resources that would have been needed to evaluate and take down abusive accounts manually. DEC's deployment reduced the total review resources needed for abusive account detection by between 15% and 20%.

## 8.2   Segmentation and Fairness

One key finding is that a single-task classifier performs differently across different segments within the task. For example, if we segment accounts by the self-reported age of their owners, an abusive account classifier might show a higher false positive rate on one age segment than others. Similarly, the performance might vary over different geographies, as we are building a single model to fit a global product that may be used differently across different cultures. Such variation, which can be expected across such a large and heterogenous user base, may be interpreted as the model treating some groups of people unfairly relative to others.[5] In the data set used for this paper we were not able to find any segments on which classifier performance differed to a statistically significant extent, but it is possible that with retraining and/or different segmentation such unfairness may arise. As a result, we have proactively considered several measures to reduce variation across different segments.

Our key insight is that segmentation effects are highly correlated with bias in the training data. Suppose for example that we use the account owner's age as a feature, and that the owners of abusive samples in the training data are younger on average the owners of non-abusive samples. In this case, if we do not adjust the proportions of different segments in our training data, the classifier may reach the conclusion that accounts owned by young people are more likely to be abusive.

As a first step towards preventing such bias, we have removed from the model all "direct" user demographic features, including age, gender, and country. While these features could be helpful in predicting abuse, they could easily introduce unfairness in the model as in the age example above — we don't want to penalize younger benign users just because attackers usually choose to set their fake accounts to have a young age.

The next approach we considered is to sample the labeled data in order to create a training set that reflects overall OSN distributions as closely as possible. In ongoing work, we are experimenting with training DEC using stratified sampling based on attack clustering, in particular downsampling large clusters so as to minimize the influence of a single attack on the ultimate model. This approach would make sure that a large attack from a given user demographic does not teach the model that most users from that demographic are abusive. However, stratified sampling becomes prohibitively costly as we try to match the distribution of more and more segments. In addition, as we add more dimensions the segments get smaller, and statistical noise soon introduces enough error to outweigh the precision gains from sampling.

A final approach is to split particular segments out and create dedicated tasks in the MS-MTL framework for them; however, this approach requires us to collect sufficient training data for each segment, and the maintenance cost increases with the number of models trained. Instead of training and maintaining multiple models, Facebook has chosen to monitor specific high-profile segments for false positive spikes and address any issues by tuning the overall model to reduce segment-specific false positives.

## 8.3   Measuring in an Adversarial Setting

Since abuse detection systems inherently operate in an adversarial environment, measuring the impact of system changes is a particularly difficult problem. A common adversarial iteration looks like:

1. The attacker finds a successful method to abuse Facebook.
2. Facebook adjusts its detection system and mitigates the attack.
3. The attacker iterates until they either achieve (1) again, or the resource cost becomes too high and they stop.

Assuming constant effort on the part of the attacker and Facebook, the above cycle eventually settles on an equilibrium. Because of this cycle, it is difficult to properly measure the effect of our models using A/B tests during deployment. If our experiment group is too small, we never reach step 3 because the attacker has no incentive to change. Our metrics might look good in the experiment group, but we will hit step 3 when we launch more broadly and performance will decline.

One way to mitigate this problem is to add a "holdout group" to feature launches. The holdout group is a random sample of users that are predicted by the model to be abusive.

---

[5]Note that the assessment of "fairness" will depend on the metric used, and one may get different results when using, for example, accuracy vs. precision vs. false positive rate.

Instead of acting to block these accounts immediately upon detection, we stand back and confirm the abuse happened as expected before enforcing on these users. Such holdouts help us to more accurately measure the precision of our classifier, but must be carefully weighed against the potential impact, as holdouts can lead to further abuse. For this reason, holdouts are not used for all types of abuse.

## 8.4  Adversarial Attacks on DEC

An attacker may attempt to *poison* the first stage of low-quality labels by creating numerous colluding accounts that seek to be labelled benign by the rule-based detection systems. Given the scope of DEC's training data and the relatively low sample rate, it would be extremely difficult for attackers to generate such accounts at a scale that would significantly impact the trained model (Section 6.2), especially given that other (non-DEC) systems exist specifically to limit the creation of fake accounts at massive scale.

An attacker may attempt to *evade* the classifier by creating large groups of fake accounts connected to each other so that they can control all of the deep features. This subgraph would have to either be isolated from the rest of the friend graph (which is itself suspicious) or have a reasonable number of connections to the main graph. In the latter case, since DEC operates on second-order connections, almost all of the DEC features would include data from real accounts outside the adversary's control. In addition, while the adversary controls the fake accounts' behavior, they don't know how a similar set of connected *legitimate users* behaves, and the coordinated activity of the fake accounts would be detected as anomalous by DEC.

An attacker could also attempt to *trick* DEC into misclassifying a benign user as abusive, based on features of its neighbors that the victim has no control over. For example, an attacker could create a subgraph of abusive accounts as above and attempt to friend a victim using these accounts. If the victim accepts one or more friend requests, they embed themselves in the abusive sub-graph, which could cause DEC to incorrectly act on the victim. This "forced-embedding" attack is also challenging to execute. First, "attempted" links between entities (e.g., unresolved or denied friend requests) are not features in DEC. Second, a single bad edge between the victim and an abusive sub-graph is insufficient to cause a false classification. A victim would need to be deceived numerous times for there to be a risk of misclassification. Finally, DEC-identified accounts are given the opportunity to complete challenges or request human review as a fail-safe to guard against incorrect classification [30].

## 8.5  Limitations and Future Directions

While DEC has been highly effective at detecting abusive accounts in practice, its design offers several opportunities for improvement:

- DEC is computationally expensive, particularly due to its use of deep features. However, in Section 8.1 we discussed how this high computational cost is actually balanced by resource savings from identifying more abusive accounts. Reducing the computational cost further is an active area of work that is receiving at least as much attention as improving model quality.

- Intuitively, DEC's classifications are based on an account's position and connections within the Facebook graph. Accounts that exhibit low levels of activity or connections provide fewer signals for DEC to leverage for inference, limiting its effectiveness. However, even if such accounts are abusive, they inherently have less impact on Facebook and its users. We are currently exploring approaches to include features that better capture these low-signal accounts.

- DEC's machine learning model lacks interpretability, as it relies on a DNN to reduce the high-dimensional space of deep features into the low-dimension embedding used for classification decisions. This characteristic makes it difficult to debug and understand the reasoning behind DEC's decisions. Making the model interpretable is an active area of research.

- DEC's approach of aggregating data from many users to produce features for classification is less sensitive to outliers than an approach of using direct features. As a consequence, DEC may be less discriminative of extreme feature values than other model families. We have taken a "defense-in-depth" approach to address this challenge, as extreme outliers can be captured quite effectively by manual rules. It still remains an open question to address such outliers within the DEC framework.

- DEC, like other supervised or semi-supervised machine learning systems, is heavily dependent on the quality of its training data labels. Adversaries that manage to induce inaccurate human labeling at scale may be able to manipulate or interfere with DEC's classifications. We are constantly working to improve our labeling process to address any observed or potential limitations.

Even with these limitations, our evaluation on production data at Facebook indicates that DEC offers better performance than traditional detection approaches.

## 9  Conclusion

We have presented Deep Entity Classification (DEC), a machine learning framework developed to detect abusive accounts in OSNs. Our framework addresses two problems in the existing abuse detection systems: First, its "deep feature" extraction method creates features that are powerful for classification and (thus far) show no signs of the adversarial adaptation typical for account or behavioral features. Second, it uses a novel machine learning training framework to leverage both high-quantity, low-precision and low-quantity, high-precision training data to improve model performance.

Our evaluation on production data at Facebook indicates that DEC offers better performance than traditional detection

approaches. Moreover, DEC's performance is stable over time, suggesting that it is robust to adversarial adaptation. During DEC's deployment for more than two years at Facebook, it has detected hundreds of millions of abusive accounts. We estimate that DEC is responsible for a 27% reduction in the volume of active abusive accounts on the platform.

## 10   Acknowledgements

Many individuals at Facebook contributed to the development of DEC and to this publication. Among them we would like to thank Daniel Bernhardt, Scott Renfro, Vishwanath Sarang, and Gregg Stefancik.

We would also like to thank the anonymous reviewers for their valuable feedback that substantially improved this work's quality.

## References

[1] Leman Akoglu, Hanghang Tong, and Danai Koutra. Graph based anomaly detection and description: A survey. In *Data mining and knowledge discovery*, volume 29, pages 626–688, 2015.

[2] Raman Arora, Ofer Dekel, and Ambuj Tewari. Online bandit learning against an adaptive adversary: From regret to policy regret. *arXiv preprint arXiv:1206.6400*, 2012.

[3] Fabricio Benevenuto, Gabriel Magno, Tiago Rodrigues, and Virgilio Almeida. Detecting spammers on Twitter. In *Collaboration, electronic messaging, anti-abuse and spam conference (CEAS)*, volume 6, page 12, 2010.

[4] Elie Bursztein. How to successfully harness AI to combat fraud and abuse. https://elie.net/talk/how-to-successfully-harness-ai-to-combat-fraud-and-abuse/, 2018. RSA.

[5] Qiang Cao, Michael Sirivianos, Xiaowei Yang, and Tiago Pregueiro. Aiding the detection of fake accounts in large scale social online services. In *USENIX NSDI*, pages 15–15, 2012.

[6] Rich Caruana. Multitask learning. In *Machine learning*, volume 28, pages 41–75. Springer, 1997.

[7] David A Cohn, Zoubin Ghahramani, and Michael I Jordan. Active learning with statistical models. *Journal of artificial intelligence research*, 4:129–145, 1996.

[8] Nilesh Dalvi, Pedro Domingos, Sumit Sanghai, Deepak Verma, et al. Adversarial classification. In *SIGKDD conference on knowledge discovery and data mining (KDD)*, pages 99–108. ACM, 2004.

[9] George Danezis and Prateek Mittal. Sybilinfer: Detecting sybil nodes using social networks. In *NDSS*, pages 1–15, 2009.

[10] Louis DeKoven, Trevor Pottinger, Stefan Savage, Geoffrey Voelker, and Nektarios Leontiadis. Following their footsteps: Characterizing account automation abuse and defenses. In *Internet Measurement Conference (IMC)*, pages 43–55. ACM, 2018.

[11] John Duchi, Elad Hazan, and Yoram Singer. Adaptive subgradient methods for online learning and stochastic optimization. *Journal of machine learning research*, 12(Jul):2121–2159, 2011.

[12] Facebook.com. https://www.facebook.com/communitystandards/, 2019.

[13] Facebook.com. https://www.facebook.com/help/287137088110949, 2019.

[14] Facebook.com. https://www.facebook.com/help/166863010078512?helpref=faq_content, 2019.

[15] Facebook.com. https://www.facebook.com/communitystandards/objectionable_content, 2019.

[16] Facebook.com. https://www.facebook.com/communitystandards/safety, 2019.

[17] Alhussein Fawzi, Omar Fawzi, and Pascal Frossard. Analysis of classifiers' robustness to adversarial perturbations. In *Machine learning*, volume 107, pages 481–508. Springer, 2018.

[18] Michael Fire, Gilad Katz, and Yuval Elovici. Strangers intrusion detection: Detecting spammers and fake profiles in social networks based on topology anomalies. In *Human journal*, volume 1, pages 26–39, 2012.

[19] David Mandell Freeman. Can you spot the fakes?: On the limitations of user feedback in online social networks. In *Proceedings of the 26th International Conference on World Wide Web*, pages 1093–1102, 2017.

[20] Jerome H Friedman. Greedy function approximation: A gradient boosting machine. *Annals of statistics*, pages 1189–1232, 2001.

[21] Tianyu Gu, Brendan Dolan-Gavitt, and Siddharth Garg. Badnets: Identifying vulnerabilities in the machine learning model supply chain. *arXiv preprint arXiv:1708.06733*, 2017.

[22] Geoffrey E Hinton and Ruslan R Salakhutdinov. Reducing the dimensionality of data with neural networks. In *Science*, volume 313, pages 504–507, 2006.

[23] Piotr Indyk and Rajeev Motwani. Approximate nearest neighbors: Towards removing the curse of dimensionality. In *ACM symposium on theory of computing*, pages 604–613. ACM, 1998.

[24] Ashesh Jain, Amir R Zamir, Silvio Savarese, and Ashutosh Saxena. Structural-RNN: Deep learning on spatio-temporal graphs. In *Proceedings of the IEEE conference on computer vision and pattern recognition*, pages 5308–5317, 2016.

[25] Meng Jiang, Peng Cui, and Christos Faloutsos. Suspicious behavior detection: Current trends and future directions. In *IEEE intelligent systems*, volume 31, pages 31–39. IEEE, 2016.

[26] Xin Jin, C Lin, Jiebo Luo, and Jiawei Han. A data mining-based spam detection system for social media networks. In *Proceedings of the VLDB endowment*, volume 4, pages 1458–1461, 2011.

[27] Thomas N Kipf and Max Welling. Semi-supervised classification with graph convolutional networks. *arXiv preprint arXiv:1609.02907*, 2016.

[28] W. Koehrsen. Embeddings in neural network. https://towardsdatascience.com/neural-network-embeddings-explained-4d028e6f0526, 2018.

[29] Xiangnan Kong, Jiawei Zhang, and Philip S Yu. Inferring anchor links across multiple heterogeneous social networks. In *International conference on information & knowledge management*, pages 179–188. ACM, 2013.

[30] Fedor Kozlov, Isabella Yuen, Jakub Kowalczy, Daniel Bernhardt, David Freeman, Paul Pearce, and Ivan Ivanov. A method for evaluating changes to fake account verification systems. In *RAID*, 2020.

[31] Yann LeCun, Yoshua Bengio, and Geoffrey Hinton. Deep learning. In *Nature*, volume 521, page 436, 2015.

[32] Kyumin Lee, James Caverlee, and Steve Webb. Uncovering social spammers: Social honeypots + machine learning. In *Conference on Research and Development in Information Retrieval (SIGIR)*, 2010.

[33] Qimai Li, Zhichao Han, and Xiao-Ming Wu. Deeper insights into graph convolutional networks for semi-supervised learning. In *Thirty-Second AAAI Conference on Artificial Intelligence*, 2018.

[34] Yujia Li, Daniel Tarlow, Marc Brockschmidt, and Richard Zemel. Gated graph sequence neural networks. *arXiv preprint arXiv:1511.05493*, 2015.

[35] Guanjun Lin, Nan Sun, Surya Nepal, Jun Zhang, Yang Xiang, and Houcine Hassan. Statistical Twitter spam detection demystified: Performance, stability and scalability. In *IEEE access*, volume 5, pages 11142–11154. IEEE, 2017.

[36] Yingqi Liu, Shiqing Ma, Yousra Aafer, Wen-Chuan Lee, Juan Zhai, Weihang Wang, and Xiangyu Zhang. Trojaning attack on neural networks. In *NDSS*, 2017.

[37] Anshu Malhotra, Luam Totti, Wagner Meira Jr, Ponnurangam Kumaraguru, and Virgilio Almeida. Studying user footprints in different online social networks. In *International conference on advances in social networks analysis and mining (ASONAM)*, pages 1065–1070. IEEE Computer Society, 2012.

[38] Shirin Nilizadeh, Francois Labrèche, Alireza Sedighian, Ali Zand, José Fernandez, Christopher Kruegel, Gianluca Stringhini, and Giovanni Vigna. Poised: Spotting Twitter spam off the beaten paths. In *CCS*, 2017.

[39] Sinno Jialin Pan and Qiang Yang. A survey on transfer learning. *IEEE Transactions on knowledge and data engineering*, 22(10):1345–1359, 2009.

[40] Bryan Perozzi, Rami Al-Rfou, and Steven Skiena. Deepwalk: Online learning of social representations. In *Proceedings of the 20th ACM SIGKDD international conference on Knowledge discovery and data mining*, pages 701–710, 2014.

[41] Lorien Y Pratt. Discriminability-based transfer between neural networks. In *Advances in neural information processing systems*, pages 204–211, 1993.

[42] PyTorch. https://pytorch.org/.

[43] David Saad. Online algorithms and stochastic approximations. *Online Learning*, 5:6–3, 1998.

[44] United States Securities and Exchange Commission. Facebook archive form 10-q. https://www.sec.gov/Archives/edgar/data/1326801/000132680117000007/fb-12312016x10k.htm, 2016.

[45] United States Securities and Exchange Commission. Facebook archive form 10-q. https://www.sec.gov/Archives/edgar/data/1326801/000132680118000067/fb-09302018x10q.htm, 2018.

[46] Burr Settles. Active learning literature survey. Technical report, University of Wisconsin-Madison Department of Computer Sciences, 2009.

[47] Ali Shafahi, W Ronny Huang, Mahyar Najibi, Octavian Suciu, Christoph Studer, Tudor Dumitras, and Tom Goldstein. Poison frogs! targeted clean-label poisoning attacks on neural networks. In *Advances in Neural Information Processing Systems*, pages 6103–6113, 2018.

[48] Tao Stein, Erdong Chen, and Karan Mangla. Facebook immune system. In *Workshop on social network systems*, page 8. ACM, 2011.

[49] Gianluca Stringhini, Christopher Kruegel, and Giovanni Vigna. Detecting spammers on social networks. In *Annual Computer Security Applications Conference (AC-SAC)*, 2010.

[50] Gianluca Stringhini, Pierre Mourlanne, Gregoire Jacob, Manuel Egele, Christopher Kruegel, and Giovanni Vigna. EVILCOHORT: Detecting communities of malicious accounts on online services. In *USENIX Security*, 2015.

[51] Enhua Tan, Lei Guo, Songqing Chen, Xiaodong Zhang, and Yihong Zhao. UNIK: Unsupervised social network spam detection. In *International conference on information & knowledge management*, pages 479–488. ACM, 2013.

[52] Andreas Veit, Neil Alldrin, Gal Chechik, Ivan Krasin, Abhinav Gupta, and Serge J Belongie. Learning from noisy large-scale datasets with minimal supervision. In *CVPR*, pages 6575–6583, 2017.

[53] A. H. Wang. Don't follow me: Spam detection in Twitter. In *Conference on Security and Cryptography (SE-CRYPT)*, 2010.

[54] Gang Wang, Tristan Konolige, Christo Wilson, Xiao Wang, Haitao Zheng, and Ben Y. Zhao. You are how you click: Clickstream analysis for sybil detection. In *USENIX Security*, 2013.

[55] Felix Wu, Tianyi Zhang, Amauri Holanda de Souza Jr, Christopher Fifty, Tao Yu, and Kilian Q Weinberger. Simplifying graph convolutional networks. *arXiv preprint arXiv:1902.07153*, 2019.

[56] XGBoost. https://xgboost.ai/.

[57] Cao Xiao, David Mandell Freeman, and Theodore Hwa. Detecting clusters of fake accounts in online social networks. In *Workshop on artificial intelligence and security*, pages 91–101. ACM, 2015.

[58] Chao Yang, Robert Chandler Harkreader, and Guofei Gu. Die free or live hard? empirical evaluation and new design for fighting evolving Twitter spammers. In *Conference on Recent Advances in Intrusion Detection (RAID)*, 2011.

[59] Zhi Yang, Christo Wilson, Xiao Wang, Tingting Gao, Ben Y. Zhao, and Yafei Dai. Uncovering social network sybils in the wild. In *Internet Measurement Conference (IMC)*, 2011.

[60] Jason Yosinski, Jeff Clune, Yoshua Bengio, and Hod Lipson. How transferable are features in deep neural networks? In *Proceedings of the Conference on Neural Information Processing Systems*, 2014.

[61] Haifeng Yu. Sybil defenses via social networks: A tutorial and survey. In *ACM SIGACT news*, volume 42, pages 80–101. ACM, 2011.

[62] Haifeng Yu, Phillip B Gibbons, Michael Kaminsky, and Feng Xiao. Sybillimit: A near-optimal social network defense against sybil attacks. In *Symposium on security and privacy*, pages 3–17. IEEE, 2008.

[63] Haifeng Yu, Michael Kaminsky, Phillip B Gibbons, and Abraham Flaxman. Sybilguard: Defending against sybil attacks via social networks. In *ACM SIGCOMM computer communication review*, volume 36, pages 267–278. ACM, 2006.

[64] Yao Zhao, Yinglian Xie, Fang Yu, Qifa Ke, Yuan Yu, Yan Chen, and Eliot Gillum. Botgraph: Large scale spamming botnet detection. In *USENIX NSDI*, 2009.

# Exhibit 446

Case 1:20-cv-03590-JEB Document 324-34 Filed 04/05/24 Page 55 of 203
Migrating From AWS to FB | by Instagram Engineering | Instagram Engineering

Sign up    Sign In

Search Medium

Write

# Migrating From AWS to FB



**Instagram Engineering** · Follow

Published in Instagram Engineering · 4 min read · Jun 25, 2014

173

When Instagram joined Facebook in 2012, we quickly found numerous integration points with Facebook's infrastructure that allowed us to accelerate our product development and make our community safer. In the beginning, we built these integrations by effectively bouncing through Facebook web services using ad-hoc endpoints. However, we found that this could be cumbersome and it limited our ability to use internal Facebook services.

Starting in April of 2013, we began a massive migration to move Instagram's back-end stack from Amazon Web Services (AWS) into Facebook's data centers. This would ease the integration with other internal Facebook systems and allow us to take advantage of tooling built to manage large scale server deployments. The primary goals of the migration were to keep the site

fully available during the transition, avoid impacting feature development, and minimize infrastructure-level changes to avoid operational complexity.

The migration seemed simple enough at first: set up a secure connection between Amazon's Elastic Compute Cloud (EC2) and a Facebook data center, and migrate services across the gap piece by piece. Easy.

Not so much. The main blocker to this easy migration was that Facebook's private IP space conflicts with that of EC2. We had but one route: migrate to Amazon's Virtual Private Cloud (VPC) first, followed by a subsequent migration to Facebook using Amazon Direct Connect. Amazon's VPC offered the addressing flexibility necessary to avoid conflicts with Facebook's private network.

This task looked incredibly daunting on the face of it; we were running many thousands of instances in EC2, with new ones spinning up every day. In order to minimize downtime and operational complexity, it was essential that instances running in both EC2 and VPC seemed as if they were part of the same network. AWS does not provide a way of sharing security groups nor bridging private EC2 and VPC networks. The only way to communicate between the two private networks is to use the public address space.

So we developed Neti — a dynamic iptables manipulation daemon, written in Python, and backed by ZooKeeper. Neti provides both the missing security group functionality as well as a single address for each instance, regardless of whether it is running in EC2 or VPC. It manages thousands of local NAT and filter rules on each instance to allow secure communication using a single, flat "overlay" address space. The NAT rules selected the most efficient path for communication based on the source and destination instances. Communication between instances across the VPC and EC2 boundary would

Case 1:20-cv-03590-JEB Document 324-34 Filed 04/05/24 Page 57 of 203

use the public network, while internal traffic would use the private network. This was transparent to our application and backend systems because Neti applied the appropriate iptables rules on every instance.

It took less than three weeks to migrate all of the various components that make up Instagram's stack to the VPC environment from EC2 — something that we believe would have taken much longer without Neti. We experienced no significant downtime during the process and as far as we are aware, this was the fastest-ever VPC migration of this scale.

With the VPC migration complete and our instances running in a compatible address space, Instagram was ready to complete its migration into Facebook's data centers.

An existing set of EC2-centric tools for managing Instagram's production systems had been built over the years. This included configuration management scripts, Chef for provisioning, as well as Fabric for a wide range of operations tasks, from application deployment to database master promotion. This tooling made assumptions specific to EC2 that were no longer valid in the Facebook environment.

To provide portability for our provisioning tools, all of the Instagram-specific software now runs inside of a Linux Container (LXC) on the servers in Facebook's data centers. Facebook provisioning tools are used to build the base system, and Chef runs inside the container to install and configure Instagram-specific software. To support an infrastructure that spans both EC2 and Facebook's data centers, our existing Chef recipes were augmented with new logic that allowed them to support the CentOS platform used inside Facebook, alongside Ubuntu, which was used in EC2.

3/24/24, 5:47 PM
Case 1:20-cv-03590-JEB Document 324-34 Filed 04/05/24 Page 58 of 203
Migrating From AWS to AWS When Facebook acquired Instagram | Instagram Engineering

The EC2-specific command-line tools used for basic tasks, such as enumerating running hosts as well as the provisioning support in the Chef "knife" tool, were replaced with a single tool. This tool was designed as an abstraction layer and provided a similar workflow to the one used in EC2. That eased the human and technical transition into this new environment.

Once the tooling was ready and environment was in place, the migration of Instagram's production infrastructure from VPC to Facebook's data centers was completed in two weeks.

This multi-stage effort was hugely successful and hit the major goals laid out when the project began. In addition, during the planning and execution phases of the migration the team shipped major features such as Instagram Direct and our user base nearly doubled in size. We held true to our initial objective of minimizing change, so the transition was mostly transparent to our engineering teams.

Looking back, there were a few key takeaways from the year-long project:

- Plan to change just the bare minimum needed to support the new environment, and avoid the temptation of "while we're here."

- Sometimes "crazy" ideas work — Neti is proof of that.

- Invest in making your tools; the last thing you need is unexpected curveballs when conducting a large-scale migration like this.

- Reuse the concepts and workflows familiar to the team to avoid compounding the complexity of communicating changes to the team.

This was a coordinated effort that spanned multiple teams and a number of individual contributors. We'll be providing a deeper dive on the work that

3/24/24, 5:47 PM    Migrating From GraphQL to EB When Instagram joined Facebook in 2012 | by Instagram Engineering | Instagram Engineering

Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 59 of 203

went into the migration in the weeks to come, so keep an eye on this space.

Mobile    Photos



# Written by Instagram Engineering

Follow

25K Followers   ·   Editor for Instagram Engineering

---

## More from Instagram Engineering and Instagram Engineering

Sharding & IDs at Instagram

   Instagram Engineering   in   Instagram Engineering

What Powers Instagram: Hundreds of Instances, Dozens of Technologies

Instagram Engineering   in   Instagram Engineering

### Sharding & IDs at Instagram

With more than 25 photos and 90 likes every second, we store a lot of data here at...

5 min read   ·   Dec 30, 2012

### What Powers Instagram: Hundreds of Instances, Dozens of...

One of the questions we always get asked at meet-ups and conversations with other...

6 min read   ·   Dec 2, 2011

3/24/24, 5:47 PM  Migrating to Python 3 with LibCST | When our current bias... Facebook... a new Instagram augmented... | Instagram Engineering

Case 1:20-cv-03590-JEB Document 324-34 Filed 04/05/34 Page 60 of 203

👏 5K  💬 39                    👏 3.4K  💬 19                    🔖+

 Static Analysis at Scale: An Instagram Story

👤 Benjamin Woodruff in Instagram Engineering

 Storing hundreds of millions of simple key-value pairs in Redis

👤 Instagram Engineering in Instagram Engineering

## Static Analysis at Scale: An Instagram Story

How Instagram develops and uses linting and codemod tools based on LibCST to maintain...

13 min read · Aug 15, 2019

## Storing hundreds of millions of simple key-value pairs in Redis

When transitioning systems, sometimes you have to build a little scaffolding. At Instagra...

3 min read · Nov 1, 2011

👏 1.6K  💬 5                    👏 1.95K  💬 11

See all from Instagram Engineering          See all from Instagram Engineering

## Recommended from Medium

 An illustration of an astronaut in space with a green background who is drawing constellations among planets.

👤 Maude Trudeau in Shopify UX

 8 misconceptions about UX writing and how we're breaking them at Qonto

👤 Brad Fujimoto in The Qonto Way

Case 1:20-cv-03590-JEB Document 324-34 Filed 04/05/24 Page 61 of 203

## The UX design story behind Shopify's Flex Comp tool

How we used an adaptive design mindset to build a complex internal tool

10 min read · Dec 2, 2022

 199

## 8 misconceptions about UX writing and how we're breaking them at...

Change your life. Learn to code.

8 min read · Apr 25

 401    3

## Lists

 **Icon Design**

30 stories · 110 saves

**Interesting Design Topics**

203 stories · 172 saves

**Staff Picks**

467 stories · 327 saves

Flexible Daily Budgets option in Ads Create Experience on the Pinterest Ads Manager. Text: We will aim to deliver your average daily budget each week. Daily spend has the potential to go above or below the amount input.

Create slackbot using slack bolt API and Node.js

 Aakanksha in Walmart Global Tech Blog

### Create slackbot using slack bolt API and Node.js

Slack

 Pinterest Engineering in Pinterest Engineering Blog

### Flexible Daily Budgeting at Pinterest

Kelvin Jiang, Software Engineer, Ads Intelligence | Keshava Subramanya,...

6 min read · Nov 15, 2022

👏 31    💬 2                    🔖+

7 min read · May 3

👏 163    💬 1                    🔖+

Designers working on various screens.

Designing a switch to app experience for Licious | From Ignored to Installed

 Nicole Gallardo in Entrepreneur's Handbook

 Manish Das in Licious Technology

### UX Design for Startups: Problem-Solving or Problem-Preventing?

A story of my startup failure offers a fresh perspective on how to approach problems a...

### Designing a switch to app experience for Licious | From...

In this UX case study, we designed the switch to app modal on Licious M.Web, aiming to...

✨ · 6 min read · Apr 11

👏 343    💬 1                    🔖+

5 min read · Jun 29

👏 216    💬 1                    🔖+

See more recommendations

# Exhibit 447

# 4th Quarter and FY2015 Results

**February 5, 2016 | Investor Relations**

kakao

© Kakao Corp.



Meta-FTC-DX
Exhibit No. 1174
Date: 2-16-24
T. Alfaro

# Disclaimer

Financial information contained in this document is based on consolidated K–IFRS that have not been audited by an independent auditor: therefore, the information and financial data contained in this document are subject to change upon an independent auditor's audit.

Also, this document contains the unaudited pro–forma combined financial information of the Daum Communications and the Kakao Corp., for the pre–merger periods, solely for the convenience of the investors. Please note that such financial information are not subject to an independent auditor's audit.

The company does not make any representation or accept liability, as to the accuracy or completeness of the information contained in this material. The format and contents of this document are subject to change for future filings and reports. Kakao is not liable for providing future updates on all figures included in this document.

kakao
1
© Kakao Corp.

## Milestone



**Feb 1995**
Established
Daum Communications

**1999**
Daum Café

**2005**
Daum Blog
"Tistory"

**2009**
Map. Mobile
Service

**2013**
Global Utility Apps
"SolMail"
"SolCalendar"

**1997**
Daum E-mail
"Hanmail"

**2000**
Daum
Search

**2006**
Daum TV
"TV Pot"

**Jun 2015**
Kakao# Search
Kakao Channel
Kakao TV

**Jan 2015**
K Venture Group

**May 2015**
Path

**Nov. 2015**
Kakao Taxi Black
Kakao Bank

kakao

**Oct. 1, 2014**
Merger between Daum and Kakao

*Mobile Lifestyle Platform*

**Nov 2014**
Bank
Wallet
Kakao

**Mar 2015**
Kakao Taxi

**May 2015**
LOC&ALL
(KimGiSa)

**Sep. 2015**
Changed
name to
Kakao

**Mar 2010**
Kakao Talk

**Mar 2012**
Kakao Story

**Aug 2014**
Yellow ID

**Dec 2006**
Established
IWILAB

**Sep 2010**
Changed
name to
Kakao

**Jul 2012**
Kakao Game

**Sep 2014**
Kakao Pay

kakao

3

© Kakao Corp.

## Service Portfolio



**Contents**
·Kakao Page
·Kakao Music
·Kakao TV
·Daum News

**Commerce**
·Kakao Style
·Kakao Talk Gift Shop
·Kakao Friends

**O2O**
·Kakao Taxi
·Kakao Taxi Black
·Kidz Note

**Communication**
·Kakao Talk (#, Channel)
·Kakao Story
·Daum Café
·Plain
·Brunch

**Game**
·Kakao Game
·Kakao Game Shop
·Daum Game

**Fintech**
·Kakao Pay
·Kakao Bank
·Bank Wallet Kakao

**Investment**
·K Ventures Group
·K Cube Ventures

**Global**
·Path

kakao

4

© Kakao Corp.

## Kakao Talk Monthly Active Users (MAUs)

- Continue to grow our domestic active users: qoq +846K
- Total countries serviced: 230+ (based on country codes), in 15 languages



| (000) | 1Q13 | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Korea** | 32,490 | 33,669 | 34,626 | 35,729 | 36,350 | 36,489 | 37,212 | 37,417 | 38,158 | 38,660 | 39,209 | 40,055 |
| **Global** | 40,096 | 46,132 | 48,916 | 50,619 | 50,386 | 48,769 | 48,411 | 48,254 | 48,207 | 48,073 | 48,464 | 48,321 |

Average of monthly MAUs.  Global includes domestic MAUs.

kakao

**5**

© Kakao Corp.

# Summary Results

- 4Q Mobile revenue was 137.2bn Won, accounted for 57% of total revenue, up 7% yoy and up 1% qoq
- FY2015 mobile revenue was 521.2bn Won, accounted for 55% of total revenue, up 12% yoy

(in million KRW)

| | 4Q15 | 3Q15 | QoQ | 4Q14 | YoY | FY2015 | FY2014 | YoY |
|---|---|---|---|---|---|---|---|---|
| Total Revenue | 241,706 | 229,580 | 12,126 | 254,046 | −12,339 | 932,161 | 898,386 | 33,775 |
| Advertising | 148,403 | 142,949 | 5,455 | 165,363 | −16,959 | 583,841 | 583,409 | 432 |
| Game | 57,019 | 51,383 | 5,636 | 68,289 | −11,270 | 232,378 | 257,601 | −25,223 |
| Commerce | 22,698 | 15,339 | 7,359 | 14,284 | 8,414 | 67,241 | 36,664 | 30,577 |
| Others | 13,586 | 1) 19,909 | −6,323 | 6,110 | 7,476 | 48,701 | 20,712 | 27,989 |
| Operating Expense | 221,318 | 213,396 | 7,922 | 188,632 | 32,686 | 843,803 | 689,491 | 154,312 |
| Operating Income | 20,388 | 16,184 | 4,205 | 65,414 | −45,025 | 88,358 | 208,895 | −120,537 |
| *% of Revenue* | 8% | 7% | 1%p | 26% | −18%p | 9% | 23% | −14%p |
| EBIT | 23,920 | 21,782 | 2,138 | 62,551 | −38,631 | 111,909 | 178,320 | −66,411 |
| Net Income | 2) 10,225 | 14,767 | −4,542 | 51,743 | −41,518 | 3) 77,207 | 141,465 | −64,258 |
| EBITDA | 40,694 | 35,657 | 5,037 | 81,702 | −41,008 | 163,773 | 263,039 | −99,266 |

1) Non-recurring revenue of 10.3bn Won from the change in revenue recognition methods of Kakao Page and Kakao Music reflected in 3Q

2) Include the 4.7bn Won gift tax applied to the transfer by gift of 28.6% stakes of the 'PodoTree' and additional 1.5bn income tax due to 2014 Amendments to the Tax Act which included the taxation of corporate reserves.

3) Effective Income Tax Rate for FY2015 is 31%

kakao                                          6                                    © Kakao Corp.

## Revenue



Legend: ■ Advertising ■ Game ■ Commerce ■ Others

| | Advertising | Game | Commerce | Others |
|---|---|---|---|---|
| **Advertising** | Daum online•mobile ad. Plus Friend(Kakao Talk) Yellow ID(Kakao Talk) Brand Emoticon(Kakao Talk) Kakao Story ad. Kakao Talk PC version ad. | | | |
| **Game** | Kakao Game(Kakao Talk) Daum Game Kakao Game Shop | | | |
| **Commerce** | Gift Shop(Kakao Talk) Kakao Style Kakao Friends Brand | | | |
| **Others** | B2C Emoticon(Kakao Talk) Kakao Music Kakao Page Kakao Pay(Kakao Talk) & Miscellaneous | | | |

(in million KRW)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Total** | 197,365 | 225,172 | 221,803 | 254,046 | 234,392 | 226,482 | 229,580 | 241,706 |
| **Online** | 106,622 | 118,825 | 111,247 | 119,143 | 105,550 | 109,272 | 100,643 | 104,482 |
| **Mobile** | 90,743 | 106,347 | 110,556 | 134,903 | 128,842 | 117,210 | 128,937 | 137,224 |

kakao

7

© Kakao Corp.

# Revenue: Advertising platforms



■ Mobile   ■ Online

**Total Ad**  Down 10% yoy  Up 4% qoq

**Online**  Down 16% yoy  Up 1% qoq

**Mobile**  Up 0.4% yoy  Up 8% qoq

- Increase in mobile advertising revenue and the seasonal effect resulted in sequential growth despite the decrease in PC traffic

- [NEW] 'ChoongJunSo', an ad platform embedded within Kakao Talk, that has been visited by more than 12 million Kakao Talk users since the opening on December 22, 2015

(in million KRW)

|        | 1Q14    | 2Q14    | 3Q14    | 4Q14    | 1Q15    | 2Q15    | 3Q15    | 4Q15    |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|
| Total  | 128,688 | 147,443 | 141,915 | 165,363 | 141,753 | 150,736 | 142,949 | 148,403 |
| Online | 96,728  | 108,424 | 101,928 | 109,822 | 93,961  | 96,382  | 91,359  | 92,637  |
| Mobile | 31,960  | 39,019  | 39,987  | 55,541  | 48,092  | 54,354  | 51,589  | 55,766  |

kakao

© Kakao Corp.

## Revenue: Game platforms

■ Mobile   ■ Online



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |

(in million KRW)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total | 59,273 | 62,574 | 67,464 | 68,289 | 69,991 | 53,984 | 51,383 | 57,019 |
| Online | 7,813 | 7,003 | 7,845 | 7,710 | 11,225 | 10,996 | 8,114 | 8,784 |
| Mobile | 51,460 | 55,571 | 59,619 | 60,579 | 58,766 | 42,989 | 43,269 | 48,235 |

**Total Game  Down 17% yoy  Up 11% qoq**
**Mobile  Down 20% yoy  Up 11% qoq**
**Online  Up 14% yoy  Up 8% qoq**

– Improved performance of the existing 'for Kakao' games, and strong performance of new games including '100 Shots 100 Hits', 'The King of Fighters' and our own brand IP utilized game 'Friends Pop' contributed to the sequential growth

– Increased competition and the disposal of shares in Onnet resulted in yoy decrease in game revenue

– [NEW] 'Mobile Game Board Zone', a new game zone within Kakao Game

kakao

9

© Kakao Corp.

## Revenue: Commerce platforms



**Commerce  Up 59% yoy  Up 48% qoq**

– In addition to the seasonal effect, upward trend continues throughout the platforms due to the increased product lineup, diversifying commerce channels and ongoing effort to enhance the UX/UI(User Experience and User Interface)

(in million KRW)

| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|---|---|---|
| Mobile | 5,818 | 8,806 | 7,756 | 14,284 | 15,526 | 13,678 | 15,339 | 22,698 |

kakao

10

© Kakao Corp.

## Revenue: Other platforms

■ Mobile   ■ Online



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
| Total | 3,586 | 6,349 | 4,668 | 6,110 | 7,122 | 8,084 | 19,909 | 13,586 |
| Online | 2,081 | 3,397 | 1,475 | 1,611 | 1,540 | 1,895 | 2,435 | 3,060 |
| Mobile | 1,505 | 2,952 | 3,193 | 4,499 | 5,582 | 6,189 | 17,474 | 10,526 |

(in million KRW)

**Total Others   Up 122% yoy  Down 32% qoq**
**Mobile   Up 134% yoy  Down 40% qoq**

– Sequential decrease was due to the non-recurring revenue recognized in 3Q, for the revenue recognition method changes in Kakao Page and Kakao Music

– Continued organic growth in mobile content business including emoticon sales to Kakao Talk users, Kakao Music and Kakao Page

– [NEW] 'AlrimTalk', a notification messaging service that is already being used by 70 companies and 1,500 local stores.

kakao

11

© Kakao Corp.

# Expense

- Total operating expenses for 4Q2015 was 221.3bn Won, up 17% yoy and up 4% qoq
- Total operating expenses for FY2015 was 843.8bn Won, up 22% yoy

(in million KRW)

| | 4Q15 | 3Q15 | QoQ | 4Q14 | YoY | FY2015 | FY2014 | YoY |
|---|---|---|---|---|---|---|---|---|
| **OP Expenses** | 221,318 | 213,396 | 7,922 | 188,632 | 32,686 | 843,803 | 689,491 | 154,312 |
| Labor costs | 55,694 | 56,455 | -761 | 47,242 | 8,452 | 218,542 | 195,154 | 23,388 |
| Fringe benefits | 10,964 | 12,813 | -1,849 | 8,782 | 2,182 | 51,083 | 35,275 | 15,808 |
| Depreciation | 12,960 | 12,375 | 585 | 10,596 | 2,364 | 49,122 | 38,653 | 10,469 |
| Rental fees | 4,531 | 4,666 | -135 | 4,287 | 244 | 18,594 | 15,237 | 3,357 |
| Commissions | 64,957 | 62,876 | 1) 2,081 | 55,865 | 9,092 | 236,859 | 189,837 | 47,022 |
| Advertising | 13,074 | 6,843 | 2) 6,231 | 9,116 | 3,958 | 56,800 | 40,122 | 16,678 |
| Bad Debt Exp. | 1,123 | 8 | 1,115 | 1,583 | -460 | 1,504 | 470 | 1,034 |
| Amortization | 7,345 | 7,099 | 246 | 5,692 | 1,653 | 26,292 | 15,491 | 10,801 |
| Content fees | 12,698 | 15,626 | 3) -2,928 | 7,111 | 5,587 | 48,174 | 29,879 | 18,295 |
| Ad agency fees | 27,553 | 27,068 | 485 | 30,154 | -2,601 | 105,615 | 103,394 | 2,221 |
| Event fees | 560 | 148 | 412 | 1,833 | -1,273 | 1,190 | 2,830 | -1,640 |
| Others | 9,859 | 7,420 | 2,439 | 6,371 | 3,488 | 30,028 | 23,148 | 6,880 |

1)  Increase in professional fee and outsourcing fee
2)  Seasonal events for Kakao Talk Gift Shop, and promotional marketing for Kakao Taxi Black and Kakao Pay
3)  Decreased mainly due to the non-recurring cost related to the Kakao Music recognized in 3Q

kakao

© Kakao Corp.

# Profits

| Operating Profits | Net Profits |
|---|---|

4Q2015 20.4bn Won, Down 69% yoy  Up 26% qoq
FY2015 88.4bn Won, Down 58% yoy

4Q2015 10.2bn Won, Down 80% yoy Down 31% qoq
FY2015 77.2bn Won, Down 45% yoy





kakao

13

© Kakao Corp.

## CapEx



# Consolidated Financial Statements

## Consolidated Statements of Income

| (in million KRW) | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
|---|---|---|---|---|---|
| **Sales Revenues** | **254,046** | **234,392** | **226,482** | **229,580** | **241,706** |
| Advertising Platform | 165,363 | 141,753 | 150,736 | 142,949 | 148,403 |
| Game Platform | 68,289 | 69,991 | 53,984 | 51,383 | 57,019 |
| Commerce Platform | 14,284 | 15,526 | 13,678 | 15,339 | 22,698 |
| Others | 6,110 | 7,122 | 8,084 | 19,909 | 13,586 |
| **Operating Expenses** | **188,632** | **194,040** | **215,049** | **213,396** | **221,318** |
| Labor Costs | 47,242 | 51,803 | 54,590 | 56,455 | 55,694 |
| Fringe Benefits | 8,782 | 9,970 | 17,337 | 12,813 | 10,964 |
| Depreciation | 10,596 | 11,455 | 12,333 | 12,375 | 12,960 |
| Rental Fees | 4,287 | 5,034 | 4,363 | 4,666 | 4,531 |
| Commissions | 55,865 | 52,645 | 56,381 | 62,876 | 64,957 |
| Advertising | 9,116 | 17,221 | 19,662 | 6,843 | 13,074 |
| Bad Debt Expenses | 1,583 | -21 | 394 | 8 | 1,123 |
| Amortization | 5,692 | 5,937 | 5,911 | 7,099 | 7,345 |
| Content Fees | 7,111 | 8,452 | 11,398 | 15,626 | 12,698 |
| Ad Agency Fees | 30,154 | 24,418 | 26,576 | 27,068 | 27,553 |
| Event Fees | 1,833 | 171 | 312 | 148 | 560 |
| Others | 6,371 | 6,955 | 5,794 | 7,420 | 9,859 |
| **Operating Profit** | **65,414** | **40,352** | **11,434** | **16,184** | **20,388** |
| *Operating Profit Margin* | *25.7%* | *17.2%* | *5.0%* | *7.0%* | *8.4%* |
| **Other Revenues** | **485** | **1,339** | **9,822** | **6,706** | **10,020** |
| **Other Expenses** | **6,345** | **2,715** | **12,925** | **4,611** | **5,711** |
| **Financial Income** | **3,574** | **3,252** | **18,240** | **3,543** | **4,936** |
| **Financial Expenses** | **69** | **330** | **951** | **325** | **2,427** |
| **Equity-method Income** | **-508** | **-553** | **-756** | **284** | **-3,286** |
| Gains on Equity Method Invest. | 181 | 35 | 591 | 2,972 | -147 |
| Losses on Equity Method Invest. | 689 | 588 | 1,346 | 2,688 | 3,139 |
| **Profit before Income Tax Expenses** | **62,551** | **41,344** | **24,863** | **21,782** | **23,920** |
| **Income Tax Expenses** | **10,809** | **10,498** | **3,494** | **7,015** | **13,695** |
| **Net Profit from Continued Operations** | **51,743** | **30,846** | **21,369** | **14,767** | **10,225** |
| **Net Profit** | **51,743** | **30,846** | **21,369** | **14,767** | **10,225** |
| Net Profit of Controlling Interests | 51,914 | 31,097 | 20,556 | 13,004 | 9,534 |
| Net Profit of Non-controlling Int. | -171 | -250 | 814 | 1,762 | 691 |

## Consolidated Statements of Financial Position

| (in million KRW) | 2014.12.31 | 2015.12.31 |
|---|---|---|
| **Current Assets** | **798,291** | **975,035** |
| Cash and Cash Equivalents | 451,228 | 397,179 |
| Short-term Financial Instruments | 184,548 | 373,389 |
| Accounts Receivable | 108,431 | 88,829 |
| Other Current Financial Assets | 25,843 | 59,671 |
| Other Current Assets | 24,709 | 45,373 |
| Others | 3,532 | 10,594 |
| **Non-Current Assets** | **1,969,734** | **2,215,188** |
| Long-term Available for Sales | 25,258 | 30,892 |
| Equity Method Investments | 18,712 | 68,543 |
| Tangible Assets | 196,894 | 219,052 |
| Intangible Assets | 1,688,974 | 1,856,691 |
| Other Non-current Financial Assets | 33,702 | 33,177 |
| Other Non-current Assets | 6,194 | 6,832 |
| **Total Assets** | **2,768,025** | **3,190,223** |
| **Liabilities** | **227,487** | **298,160** |
| Trade Payables and Non-trade Payables | 109,126 | 89,297 |
| Accrued Expenses | 5,443 | 6,949 |
| Advances from Customers | 34,488 | 109,397 |
| Income Taxes Payable | 20,680 | 29,236 |
| Other Current Liabilities | 57,751 | 63,280 |
| **Non-Current Liabilities** | **77,309** | **304,183** |
| Bonds | – | 199,383 |
| Defined Benefit Liabilities | 3,362 | 8,344 |
| Deferred Income Tax Liabilities | 50,083 | 47,951 |
| Other Non-Current Liabilities | 23,864 | 48,505 |
| **Total Liabilities** | **304,797** | **602,343** |
| **Paid-in Capital** | **29,121** | **30,098** |
| Capital Surplus | 2,258,974 | 2,279,510 |
| Capital Adjustments | -26,268 | -9,032 |
| Accum. Other Comprehen. Inc. | 2,114 | 753 |
| Retained Earnings | 190,678 | 254,838 |
| Non-controlling Interests | 8,609 | 31,714 |
| **Total Equity** | **2,463,228** | **2,587,880** |
| **Total Liabilities & Equity** | **2,768,025** | **3,190,223** |

kakao

15

© Kakao Corp.

## Employees / Subsidiaries

| | | | | | | | | (in person) |
|---|---|---|---|---|---|---|---|---|
| | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 |
| **Kakao** | **2,162** | **2,272** | **2,250** | **2,262** | **2,255** | **2,271** | **2,299** | **2,375** |
| L Daum | 1,589 | 1,593 | 1,525 | | | | | |
| L Kakao | 573 | 679 | 725 | | | | | |
| **Kakao Subsidiaries** | 1,059 | 1,089 | 1,217 | 1,269 | 1,348 | 1,413 | 1,447 | 1,725 |
| **Consolidated total** | **3,221** | **3,361** | **3,467** | **3,531** | **3,603** | **3,684** | **3,746** | **4,100** |

- Above number of employees include full-time and part-time employees

- Subsidiaries:  Daum Global Holdings Corp, Kakao Singapore PTE. Ltd., DK CHINA Co., Ltd., DK CHINA YanJiao Co., Ltd.,
  ImageOn Corp, Daum Game Co., Ltd., Dialod Corp., TNK Factory Co., Ltd., Buzzpia Co., Ltd. Thinkreals Corp.,
  Lotiple Inc., Kakao Lab Corp., Sunnyloft Corp., Beijing Kakao Co., Ltd., Ultra Caption Corp., Ltd., Kakao JAPAN Corp.,
  Kids Note Inc., K–cube Venture Fund, Kakao Venture Fund, K–cube Ventures, K Venture Group, Sellit Inc.,
  LOCNALL Inc., KakaoFriends Inc., Daum Games Europe B.V., Ultra Interactive, Inc., Tangram Design Lab.,
  Tangram Factory, Tangram Factory America, Inc., DK Business, DK Service, DK Techin, Path Mobile Inc.,
  Valuepotion, Nzin, Cadac, Valuepotion Pte. LTD, Zinny Labs Corp., Aina, Supernova Eleven, Co., Ltd.,
  Black Star Games, Co., Ltd., Red Star Games, Co., Ltd., Mmagnet Corporation, NGLE Corporation,
  BULLHOCsoft Corp., Podotree, Inc., About Time Corp. (Total **47** subsidiaries as of December 31, 2015)

# Exhibit 448



# Exhibit 449

☰  **EL PAÍS**                                                                    SUBSCRIBE  👤

INTERVIEW WITH THE FOUNDERS OF WHATSAPP

# "We don't want to be a social network or a gaming platform"

Brian Acton and Jan Koum insist their messaging app is viable because they do not carry advertising

**ROSA JIMÉNEZ CANO**

San Francisco - May 19, 2013 - 15:37
Updated  MAY 20, 2013 - 02:50 EDT

   

MetaFTC-DX

423



Brian Acton (left) and Jan Koum.
**R. J. C. (EL PAÍS)**

There are no trolleys laden with food or colorful drinks. Forget about yoga classes and massages, too. There is just a small table with a few snacks at the entrance. Unlike so many offices in Silicon Valley, next to San Francisco Bay, there is no space here for striking a pose. The founders sit at the same tables as their employees, surrounded by graffiti in the middle of which appears the company logo: WhatsApp. But from the street you would never know. It's hard to find this building in Mountain View even with the address; the only name visible on the outside is that of a firm which makes sleeves for Apple devices. Yet we are in the heart of the valley, near the headquarters of Cisco, Google and Facebook.

What WhatsApp has are more than 200 million users. Brian Acton (born in the USA, 1972) and Jan Koum (Ukraine, 1976) are hardly typical examples of the local species of entrepreneur. They are no longer crazy kids and their motto is to steer clear of all that is inessential. Their application WhatsApp, launched in 2009, has sent the SMS to the graveyard. Every day 40 people oversee the sending of nine billion messages and the receipt of 15 billion, the second figure being higher due to group messaging.



Koum had the idea. Acton joined the project soon after. In February 2009 the first version was launched. Then it was just a status application for iPhone, which issued warning that someone was not available at that moment through a preset message: "Don't call me," "I'm sleeping," or "I'm at work..." They saw its potential and changed course. That summer they set to work on making it into the messaging service it is today. That was when Acton left his job at Yahoo! and joined up, not just as an employee but also as an investor. The team swelled to five people at the same time as they began to charge 99 cents for the app.

At the start of 2010, they took another step forward with the arrival of Nokia and Android smartphones. The team doubled to 10, and then again at the beginning of 2011 when WhatsApp for Blackberry was launched. At times they give the impression of being a couple of game show contestants, talking *sotto voce* and passing the questions between them: "This one's for you, it's your area."

**Question.** How is it that a service with so many users seems so mysterious?

**Jan Koum**. We haven't bothered too much about our image, but rather that of our users and we're proud of that. We're a technology company.

**Q.** In which countries do you have the most customers?

**J. K.** We try not to look at a single country. We offer a global product which has to work well in Brazil, India, Germany, Russia and Canada. Countries like Brazil and India are where we are growing most because they are getting more and more smartphones.



The SMS is black and white and we want to be color television"

**Q.** What is your perception of Spain?

**J. K.** Spain is one of our most heavily used countries. We put a lot of effort into making sure our service is good there, like the translation on the app and the website.

**Q.** What is the next thing we will be able to send on WhatsApp?

**Brian Acton.** We're going to focus on enriching the experience. The example I use is color television, and the SMS is black and white. We can't reveal what we haven't released yet but we never think we're done.

**Q.** Some people complain they get loads of messages and alerts and it distracts them.

**J. K.** We're the first company where you can silence alerts. In fact, we patented that. You can mute a group or a chat. You can also put a specific tone to a person to distinguish their messages. I know that with phone conversations and messaging going on, it can get a bit chatty. But we focus a lot on making sure our application is one of scales.

**Q.** But isn't it invasive that you can receive a message from anyone?

**J. K.** This is not new for WhatsApp. If you know someone's number, you can send them an SMS. We based our system on that service when we created WhatsApp and it seemed natural.

**B. A.** A lot of operators do not permit you to block incoming calls or messages from a particular number. We do. That's the reason why some people have to change phone when they break up with their partner for example.

**Q.** Is WhatsApp free and how long will I have to pay for it?

**B. A.** It's not free. We believe the best business is where the customer is the user and the customer is not the product. We can hear our users and improve our product better this way. I had a very bad experience

in my previous workplace and ended up very fed up with advertising. We think one dollar a year is a reasonable price and we want the iPhone business to match the Android business.

**Q.** Is your service viable for one dollar a year?



How can there be a free product; what makes it free? There must be a hidden cost"

**B. A.** Yes, we don't pay for TV or celebrity endorsements [in reference to Line.] We rely on our active user base to recommend the service.

**Q.** Will you ever have advertising?

**J. K**. We are pretty clear on this. I mean, would you like advertising on WhatsApp? We wouldn't. We want messaging to be as simple and easy as possible. We don't want our application to be a social network or a gaming network, but a messaging network. Your phone itself is very personal to you. You wake up, you look at your phone. You go to sleep, you check your phone. We want to be purely about messaging.

**Q.** At what times do you see the greatest activity?

**B. A.** When there are things going on that relate to personal interests like soccer, when there is a big match, for example. So it's big sporting events and royal weddings, but also world events, great natural disasters or security threats. New Year's is also a great day for us.

**Q.** As it used to be for telephone operators. Are you aware of the damage you have done to their business?

**J. K.** It's natural evolution in the way people communicate. You can make an argument that SMS replaced calls, which replaced telegraphs, which replaced people delivering messages on horses and carrier pigeons. The human desire to communicate and stay in touch is fundamental to our civilization. We live in a free market and people choose the best way to communicate.

**Q.** Are we going to see a computer version?

**B. A**. Our product plans are not something we talk about publicly. A computer is a way to communicate and it's something we think about. But there's still not much we can tell you about how it might work.

**Q.** Will there be a version for the Firefox operating system?

**J. K.** That is not in our plans, at the moment.

**Q.** If I change phone, how can I keep my messages?

**J. K.** If you back up do a full back up to ITunes. All your messages and everything you keep should be there.

**Q.** What phone do you use?

**J. K**. A Nexus 4 and a Blackberry.

**B. A.** A HTC One and a Nokia con a keyboard; I like a keyboard phone and that is getting hard to find.

**Q.** Where are my messages stored and how secure are they?

**B. A.** Since we are not an advertising-driven company, our goal is to know as little about the customer as possible. We don't ask people their gender, their birthday, where they live or what their spending habits are. Once a message has been delivered to a device and acknowledged as successfully delivered, we don't keep them.

**Q.** What do the little green *check marks* mean?

**B. A.** One means it has been received by our server. The double check mark means it has been delivered to the receiver's phone. It doesn't mean it has been read, just delivered.

**Q.** How much do you compress images?

**J. K.** Just what's necessary to strike a balance between speed and quality. If someone wants to send a large image, for storage purposes, then there is email. WhatsApp is for direct communication and not to send 20-mega photos. We use techniques to compress and resize it so you get a good-quality image on your phone.

**Q.** What do you think of competitors such as Line?

**J. K.** How can there be a free product; what makes it free? There must be a hidden cost. Something can be free for a time, but not for ever. People realize that the no games-or-gimmick philosophy is a price worth paying.

**Comments** ›                                                                                     Rules ›

**More information**



### Inside the world of WhatsApp

LAIA REVENTÓS | SAN FRANCISCO

Adheres to
More information ›

The Trust Project

If you are interested in licensing this content, please contact ventacontenidos@prisamedia.com

Tab**OO**la Feed

Sponsored Content

**District Of Columbia: New "Grocery Allowance" Everyone on Medicare Can Apply for**

FLEX ALLOWANCE

**Look For Any High School Yearbook, It's Free**

CLASSMATES

**New "Grocery Allowance" Everyone On Medicare Can apply For**

COMPARISONS.ORG

Sponsored Content

**DC Homeowners, Your Garage Will Never Look The Same Thanks To This 1-Day Transformation**

RENUITY GARAGE COATING

**Belly Fat Removal Without Surgery in Washington: The Price Might Surprise You**

BELLY FAT DESK | SEARCH ADS

**Look for any high school yearbook, it's free**

CLASSMATES.COM

**NEWSLETTER**  ✉

Sign up to EL PAÍS in English Edition bulletin

**MOST VIEWED**

**1.** David Liu, chemist: 'We now have the technology to correct misspellings in our DNA that cause known genetic diseases'

**2.** Christie's largest jewelry sale: A billionaire widow, diamonds and a fortune built on Nazi plunder

**3.** One of the world's most cited scientists, Rafael Luque, suspended without pay for 13 years

**4.** The wonders of ancient Rome: A guided tour

**5.** The revindication of Françoise Gilot, the woman who got fed up with Pablo Picasso

Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 91 of 203

Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 94 of 203

**NEWSLETTER**  ✉

### Receive the best stories

An emailed selection of the best features from EL PAÍS every Saturday.

---

**Archive** >



---

**Download the App**

              Apple Store

---

### If you want to support quality journalism

**SUBSCRIBE NOW**

---

© EDICIONES EL PAÍS

EL PAÍS expressly reserves the right to reproduce and use the works and other services accessible from this website by machine-readable media or other suitable means in accordance with Article 67.3 of Royal Decree-Law 24/2021, November 2, 2011

Legal notice   Privacy Policy   Cookie settings   Cookie policy



Webs de PRISA ▲

# Exhibit 450

# Premerger Notification and the Merger Review Process

**FTC** ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/premerger-notification-merger-review-process



Under the Hart-Scott-Rodino (HSR) Act, parties to certain large mergers and acquisitions must file premerger notification and wait for government review. The parties may not close their deal until the waiting period outlined in the HSR Act has passed, or the government has granted early termination of the waiting period. The FTC administers the premerger notification program, and its staff members answer questions and maintain a website with helpful information about how and when to file. The FTC also provides daily updates of deals that receive early termination.

## Steps in the Merger Review Process

### Step One: Filing Notice of a Proposed Deal

Not all mergers or acquisitions require a premerger filing. Generally, the deal must first have a minimum value and the parties must be a minimum size. These filing thresholds are updated annually. In addition, some stock or asset purchases are exempt, as are purchases of some types of real property. For further help with filing requirements, see the FTC's Guides to the Premerger Notification Program. There is a filing fee for premerger filings.

For most transactions requiring a filing, both buyer and seller must file forms and provide data about the industry and their own businesses. Once the filing is complete, the parties must wait 30 days (15 days in the case of a cash tender offer or a bankruptcy) or until the agencies grant early termination of the waiting period before they can consummate the deal.

## Step Two: Clearance to One Antitrust Agency

Parties proposing a deal file with both the FTC and DOJ, but only one antitrust agency will review the proposed merger. Staff from the FTC and DOJ consult and the matter is "cleared" to one agency or the other for review (this is known as the "clearance process"). Once clearance is granted, the investigating agency can obtain non-public information from various sources, including the parties to the deal or other industry participants.

## Step Three: Waiting Period Expires or Agency Issues Second Request

After a preliminary review of the premerger filing, the agency can:

1. terminate the waiting period prior to the end of the waiting period (grant Early Termination or "ET");
2. allow the initial waiting period to expire; or
3. issue a Request for Additional Information ("Second Request") to each party, asking for more information.

If the waiting period expires or is terminated, the parties are free to close their deal. If the agency has determined that it needs more information to assess the proposed deal, it sends both parties a Second Request. This extends the waiting period and prevents the companies from completing their deal until they have "substantially complied" with the Second Request and observed a second waiting period. A Second Request typically asks for business documents and data that will inform the agency about the company's products or services, market conditions where the company does business, and the likely competitive effects of the merger. The agency may conduct interviews (either informally or by sworn testimony) of company personnel or others with knowledge about the industry.

## Step Four: Parties Substantially Comply with the Second Requests

Typically, once both companies have substantially complied with the Second Request, the agency has an additional 30 days to review the materials and take action, if necessary. (In the case of a cash tender offer or bankruptcy, the agency has 10 days to complete its review and the time begins to run as soon as the buyer has substantially complied.) The length of time for this phase of review may be extended by agreement between the parties and the government in an effort to resolve any remaining issues without litigation.

## Step Five: The Waiting Period Expires or the Agency Challenges the Deal

The potential outcomes at this stage are:

1. close the investigation and let the deal go forward unchallenged;
2. enter into a negotiated consent agreement with the companies that includes provisions that will restore competition; or
3. seek to stop the entire transaction by filing for a preliminary injunction in federal court pending an administrative trial on the merits.

Unless the agency takes some action that results in a court order stopping the merger, the parties can close their deal at the end of the waiting period. Sometimes, the parties will abandon their plans once they learn that the agency is likely to challenge the proposed merger.

In many merger investigations, the potential for competitive harm is not a result of the transaction as a whole, but rather occurs only in certain lines of business. One example would be when a buyer competes in a limited line of products with the company it seeks to buy. In this situation the parties may resolve the concerns about the merger by agreeing to sell off the particular overlapping business unit or assets of one of the merging parties, but then complete the remainder of the merger as proposed. This allows the procompetitive benefits of the merger to be realized without creating the potential for anticompetitive harm. Many merger challenges are resolved with a consent agreement between the agency and the merging parties.

- Previous: Frequently Asked Questions About Merger Consent Order Provisions
- Up

# Exhibit 451

EN

## *Case No COMP/M.7217 - FACEBOOK/ WHATSAPP*

Only the English text is available and authentic.

## REGULATION (EC) No 139/2004
## MERGER PROCEDURE

### Article 6(1)(b) NON-OPPOSITION
### Date: 03/10/2014

*In electronic form on the EUR-Lex website under*
*document number 32014M7217*

Office for Publications of the European Union
L-2985 Luxembourg


Meta-FTC - DX
Exhibit No. 1082
Date: 1.8.24
T. Alfaro



EUROPEAN COMMISSION

Brussels, 03.10.2014
C(2014) 7239 final

In the published version of this decision, some
information has been omitted pursuant to Article
17(2) of Council Regulation (EC) No 139/2004
concerning non-disclosure of business secrets and
other confidential information. The omissions are
shown thus [...]. Where possible the information
omitted has been replaced by ranges of figures or a
general description.

PUBLIC VERSION

MERGER PROCEDURE

**To the notifying party**

Dear Sir/Madam,

**Subject:**  **Case M.7217 – Facebook/ WhatsApp**
**Commission decision pursuant to Article 6(1)(b) of Council Regulation**
**No 139/2004[1]**

(1)  On 29 August 2014, the European Commission received notification of a proposed
concentration pursuant to Article 4 of the Merger Regulation, and following a referral
pursuant to Article 4(5) of the Merger Regulation, by which Facebook, Inc.
("Facebook", USA) acquires within the meaning of Article 3(1)(b) of the Merger
Regulation control of the whole of WhatsApp Inc. ("WhatsApp", USA) by way of
purchase of shares (the "Transaction"). Jointly, Facebook and WhatsApp are
designated hereinafter as the "Parties".

**1.    THE PARTIES**

(2)  **Facebook** (hereinafter also referred to as the "Notifying Party") is a provider of
websites and applications for mobile devices ("apps") offering social networking,
consumer communications and photo/video sharing functionalities. Facebook also
provides online advertising space. In particular, Facebook offers the social networking

---

[1]   OJ L 24, 29.1.2004, p. 1 ('the Merger Regulation'). With effect from 1 December 2009, the Treaty on the
Functioning of the European Union ('TFEU') has introduced certain changes, such as the replacement of
'Community' by 'Union' and 'common market' by 'internal market'. The terminology of the TFEU will be
used throughout this decision.

Commission européenne, DG COMP MERGER REGISTRY, 1049 Bruxelles, BELGIQUE
Europese Commissie, DG COMP MERGER REGISTRY, 1049 Brussel, BELGIË

Tel: +32 229-91111. Fax: +32 229-64301. E-mail: COMP-MERGER-REGISTRY@ec.europa.eu.

platform "Facebook", the consumer communications app "Facebook Messenger" and the photo and video-sharing platform "Instagram".

(3)     **WhatsApp** is a provider of consumer communications services via the mobile app "WhatsApp". WhatsApp does not sell advertising space.

## 2.     THE CONCENTRATION

(4)     The Transaction consists of the acquisition of WhatsApp by Facebook for a purchase price of USD 19 billion.[2] Pursuant to an Agreement and Plan of Merger and Reorganization signed on 19 February 2014, WhatsApp will successively merge with and into wholly-owned subsidiaries of Facebook. As a result of the Transaction, Facebook will solely control the entity into which WhatsApp will have merged.

(5)     Therefore, the Transaction constitutes a concentration within the meaning of Article 3(1)(b) of the Merger Regulation.

(6)     The Transaction contributes to Facebook's current strategy of focusing its business on mobile development. According to Facebook's internal documents, there are two main ways in which the Transaction serves this objective.

(7)     [...].

(8)     [...].

## 3.     UNION DIMENSION

(9)     The Transaction does not have a Union dimension within the meaning of Article 1(2) or Article 1(3) of the Merger Regulation as the EU turnover of one of the Parties (WhatsApp) amounted to only EUR [...] in 2013.

(10)    Nonetheless, the Transaction fulfils the two conditions set out in Article 4(5) of the Merger Regulation since it is a concentration within the meaning of Article 3 of the Merger Regulation and it is capable of being reviewed under the national competition laws of three Member States, namely [...].

(11)    On 19 May 2014, the Notifying Party informed the Commission by means of a reasoned submission that the Transaction should be examined by the Commission pursuant to Article 4(5) of the Merger Regulation. A copy of that submission was transmitted to the Member States on 19 May 2014.

---

[2]     The purchase price comprises: (i) USD 12 billion in Facebook stock shares; (ii) USD 4 billion in cash; (iii) USD 3 billion in Facebook restricted stock units after closing of the Transaction. [T]he valuation of WhatsApp on a value-per-user basis is consistent with valuations for other comparable transactions. [Using] Enterprise Value and Monthly Active User data to compare the Transaction with earlier comparable transactions, such as Rakuten's 2014 acquisition of Viber (for USD 905 million), Facebook's 2012 acquisition of Instagram (for USD 1 billion) and Microsoft's acquisition of Skype (for USD 8.5 billion) [, t]he value-per-user ratio for Facebook's acquisition of WhatsApp [would be] calculated to be USD [42] [This is within the range of prior transactions].
Likewise, in July 2014, it was reported that the consumer communications app LINE filed for an IPO with a potential valuation of approximately USD 10 billion (http://www.bloomberg.com/news/2014-07-17/line-is-said-to-pursue-u-s-ipo-with-confidential-filing-to-sec.html, visited on 24 September 2014), or between USD 10 and 20 billion (http://www.reuters.com/article/2014/07/18/us-line-ipo-us-idUSKBN0FN01N20140718, visited on 24 September 2014).
[...].

(12) As none of the Member States competent to review the Transaction expressed its disagreement as regards the request to refer the case, the Transaction is deemed to have a Union dimension pursuant to Article 4(5) of the Merger Regulation.

## 4.      RELEVANT MARKETS

### 4.1.      Consumer communications services

#### *4.1.1.   Introduction*

(13) The Transaction concerns consumer communications services. Consumer communications services are multimedia communications solutions that allow people to reach out to their friends, family members and other contacts in real time.

(14) Historically, those services were developed and offered as software applications for personal computers ("PCs"). Gradually, they have shifted away from PCs towards smart mobile devices, in particular smartphones and tablets. Today, consumer communications services are one of the fastest-growing types of mobile apps ("consumer communications apps").

(15) Consumer communications services can be offered as a stand-alone app (for example, WhatsApp, Viber, Facebook Messenger and Skype), or as functionality that is part of a broader offering such as a social networking platform (for example, Facebook or LinkedIn). Consumer communications services can be differentiated on the basis of various elements.

(16) First, as regards functionalities, consumer communications apps enable one-to-one and/or group real-time communication in various forms, such as voice and multimedia (text, photo or video) messaging, video chat, group chat, voice call, sharing of location, etc., although not all functionalities are available on all consumer communications apps (in particular, voice calls).

(17) Second, certain consumer communications apps are available on only one operating system (so called "proprietary apps"), such as Apple's FaceTime and iMessage, while an ever-growing number of consumer communications apps are offered for download on multiple operating systems ("cross-platform apps"). For example, WhatsApp is available on a variety of mobile operating systems, including iOS, Android, BlackBerry 7 and 10, Windows Phone, and Nokia Series 40 (Asha) and 60 (Symbian). Likewise, Facebook Messenger currently runs on Android, iOS, BlackBerry, Windows Phone and certain Nokia Asha handsets.

(18) Third, certain consumer communications apps are available for all types of devices, while others are not: for example, WhatsApp is only available on smartphones, but not on tablets and PCs, whilst Facebook Messenger is available on smartphones, tablets and PCs.

#### *4.1.2.   Product market definition*

##### 4.1.2.1. Notifying Party's view

(19) The Notifying Party submits that the relevant product market includes all consumer communications services, without any further sub-segmentation. This is in particular because of the incremental nature of any functional differences, the pace of

development and blurring between the targeted use cases of competing consumer communications apps.

4.1.2.2. Commission's assessment

(20) The Commission has considered the market for consumer communications services in previous cases, notably in *Microsoft / Skype* and, more recently, in *Microsoft / Nokia*.[3] In the decisions in these cases, the Commission identified separate markets for consumer communications services and enterprise communications services. In addition, while ultimately leaving the market definition open, the Commission investigated whether the consumer communications market should be further segmented by functionality, by platform or by operating system.[4]

(21) The Commission notes that the segmentation that is most relevant for the assessment of the present case is the segmentation based on platforms, since WhatsApp is offered only for smartphones and it does not have any plan to expand its offering to other platforms. Therefore, the present case can be assessed on the basis of a relevant product market including only consumer communications apps for smartphones.

(22) On the basis of the results of the market investigation, further segmentations of the market for consumer communications apps on the basis of the operating system or the functionalities offered do not seem to be appropriate.

(23) Indeed, regarding the operating system, with a few exceptions (notably iMessage), the overwhelming majority of consumer communications apps are offered for download on at least both Android and iOS, which are the operating systems installed on the greatest share of smartphones (together representing over 81% of global smartphone operating systems in use in 2013).[5] The market investigation indicated that, while different operating systems may enable slightly different experiences, consumer communications apps available for different operating systems are normally regarded as a single product by users and providers.[6]

(24) Moreover, with respect to functionalities, the following should be noted.

(25) First, the market investigation did not provide any indication that only certain functionalities (text messaging, rather than photo or video messaging or calls) should be considered essential to a consumer communications service. It instead pointed to the fact that, while different services may take different approaches to facilitating

---

[3]   Commission decision of 7 October 2011 in Case M.6281 – *Microsoft / Skype*; Commission decision of 4 December 2013 in Case M.7047 – *Microsoft / Nokia*.

[4]   As regards a segmentation by functionality (i.e., instant messaging (IM), voice calls and video calls), in both decisions the Commission considered such a sub-segmentation, noted that consumers increasingly demand an integrated range of communications functionalities, and that most providers offer the whole range of functionalities, but ultimately left the precise market definition open. As regards a segmentation by platform (PCs, smartphones, tablets, gaming consoles and TVs), the Commission in *Microsoft / Skype* noted that differences existed at that time in terms of quality of the services on the different types of platforms. Finally, as regards a segmentation by OS, while the Commission in *Microsoft / Skype* stressed the limited degree of cross-OS availability, in *Microsoft / Nokia*, it noted that several apps are now available for various mobile OS, although a limited number of apps still remains confined to the OS developer's proprietary OS.

[5]   Form CO, paragraph 217, referring to Strategy Analytics, Global Smartphone User Base Forecast by OS for 88 Countries: 2007-2017, June 2013.

[6]   Commission pre-notification questionnaire to competitors, question 14; Commission questionnaire Q1 - Questionnaire to competitors, question 13.

consumer communications, that does not put those services into different markets or market segments.[7]

(26) Second, while all competitors to the market investigation explained that the time and cost associated with the development of each functionality depend on the complexity of the relevant feature, all consumer communications apps providers offer a range of functionalities which greatly overlap with the functionalities offered by Facebook Messenger and WhatsApp.

(27) Therefore, the Commission considers that for the assessment of the present case the relevant product market should encompass consumer communications apps offered for all operating systems and including all communications functionalities.

(28) Another issue is whether the product market definition should be broadened to include traditional electronic communications services. Indeed, the functionalities offered by consumer communications apps are also accessible via traditional electronic communications services, such as voice calls, SMS, MMS, or e-mails.

(29) The majority of the respondents to the market investigation consider that traditional electronic communications services, such as voice calls, SMS, MMS, e-mails, etc., can be regarded as substitutable to the communications functionalities offered by consumer communications apps.[8] However, there are also elements which suggest an imperfect substitutability or complementarity between the two types of services.

(30) While the two types of services are used for the same general purpose (communication), the overall experience of the user is richer in terms of functionalities in consumer communications apps. Hence, consumer communications apps provide additional functionalities to their users, for example users can see when their contacts are online, when they are typing or when they last accessed the application.

(31) Moreover, to a great extent, there is a difference in the pricing conditions, since consumer communications apps are mainly offered free of charge and in any event not priced per messages. Although there are offerings of bundles of messages by telecom operators, users are still usually charged separately when they send MMS, messages to other countries or messages from abroad (while roaming), which is not the case with consumer communications apps.

(32) Finally, telecoms operators who took part in the market investigation consistently explained that there is a competitive interaction between the two services, but only one way (that is, consumer communications apps constrain traditional electronic communications services but not the other way around).

(33) Nevertheless, the Commission notes that if traditional electronic communications services were to be included in the relevant market, the Parties' combined position on such hypothetical larger market would be weaker. Therefore, the Commission considers that for the purpose of the assessment of the present case the exact product market definition can be left open. Indeed, the Transaction does not raise serious

---

[7]   Commission questionnaire Q1 - Questionnaire to competitors, question 6.

[8]   Commission pre-notification questionnaire to competitors, question 10; Commission questionnaire Q1 - Questionnaire to competitors, question 9.

doubts as to its compatibility with the internal market even on the basis of the narrowest product market definition limited to consumer communications apps for smartphones and excluding traditional communication services.

### 4.1.2.3.  Conclusion on product market definition

(34)  In the light of the above, taking into account that the Parties' combined position would be attenuated in a market including traditional electronic communications services, the Commission will assess the effects of the Transaction in the narrowest relevant product market for consumer communications services, that is the market for consumer communications apps for smartphones.

### 4.1.3.   *Geographic market definition*

### 4.1.3.1.  Notifying Party's view

(35)  According to the Notifying Party, the geographic scope of the market for consumer communications apps is EEA-wide, if not worldwide. Indeed, the functionality provided by consumer communications apps is inherently cross-border. As consumers are free to install any app they want, the geographic scope for either demand or supply of consumer communications apps is not limited to the Member State where the consumer acquires connectivity to her/his device. Moreover, developers distribute similar products to all of their customers regardless of their geographic location. According to the Notifying Party, the fact that the market shares of Facebook and WhatsApp may vary significantly between different Member States does not change that conclusion, and neither does the existence of national "app stores".

### 4.1.3.2.  Commission's assessment

(36)  In previous decisions, while ultimately leaving the exact geographic market definition open, the Commission found that a number of factors suggested that the geographic market for consumer communications apps would be at least EEA-wide, if not worldwide.[9] The factors pointing to such conclusion included the lack of legal or technical barriers restricting the use or trade of consumer communications apps, the lack of differences in terms of quality, price and features (with the exception of some geographic areas), the identical users' habits in consumer communications apps within the EEA and worldwide and, finally, the fact that suppliers of consumer communications apps provide their services on a global level with limited differentiation in the quality and the features in the EEA.[10]

(37)  The market investigation conducted in the present case revealed that no major differences exist in the offering of consumer communications apps across the world. All respondents stated that the consumer communications apps they offer do not differ depending on the region or country concerned, either in terms of price, functionalities, platforms or operating system.[11] This is consistent with the fact that all consumers with

---

[9]   See Commission decision of 7 October 2011 in Case M.6281 – *Microsoft / Skype*, paragraphs 66, 68; Commission decision of 4 December 2013 in Case M.7047 – *Microsoft / Nokia*, paragraph 81.

[10]   See Commission decision of 7 October 2011 in Case M.6281 – *Microsoft / Skype*, paragraphs 65-66.

[11]   Commission pre-notification questionnaire to competitors, question 15; Commission questionnaire Q1 - Questionnaire to competitors, question 15. One competitor explained that certain factors may vary depending on the region/country concerned, such as marketing costs, language, legal and regulatory aspects, communication environment and the differences in specifications of each operating system.

unrestricted access to the Internet are in principle free to download and install any app they want, irrespective of their geographic location anywhere in the world.

(38)  However, certain consumer communications apps enjoy a greater reach than others in certain world regions. For example, WhatsApp is widespread in the EEA, but not so much in the USA; LINE and WeChat are particularly popular in Asia. The Commission considers that the different degree of penetration is the indication of different competitive dynamics, which could be explained by different consumer preferences,[12] regulatory environment and marketing efforts. In particular, in the EEA customers enjoy freedoms of movement and communicate across borders much more than in other regions of the world. However, when using cross-border mobile communications services EEA customers, unlike US ones for instance, still incur roaming and international charges. This creates a specific environment for the proliferation of consumer communications apps.

(39)  Moreover, the Parties' market shares are greater in the EEA than at worldwide level.

(40)  In this context, while there are indications that the geographic scope of the consumer communications apps market could be global, the Commission considers that the relevant geographic market for the assessment of the case is EEA-wide in line with a more conservative approach.

(41)  As regards the possibility of an even narrower geographic definition within the EEA, while the degree of penetration of the Parties' apps differs from one Member State to the other, the Parties' apps tend to be consistently number 1 and number 2 in all large Member States (except for Spain and France).[13] In smaller Member States, other market players have stronger market positions than either or both of the Parties.[14]

(42)  Moreover, the fact that WhatsApp is not free but is subject to a subscription fee in some Member States (currently, Italy and the United Kingdom)[15] is not sufficient to justify the definition of national markets, since WhatsApp has introduced such subscription-based business model on an experimental basis only for users of iOS and Android phones in certain countries (where the payment infrastructure currently allows it) with the aim of potentially extending it to further countries.

(43)  Finally, the main factors relevant for the assessment of the Transaction (such as closeness of competition, customer switching, entry barriers) do not differ according to the Member State concerned. In particular, if the factors taken into account by the

---

[12]  For example, stickers in consumer apps proved to be particularly popular with the users in Asia.

[13]  On the basis of the market share data provided by the Notifying Party (in this regard see Section 5.1.2), in the period between November 2013 and May 2014 in Spain WhatsApp was the market leader ([30-40]%), followed by Twitter ([10-20]%), LINE ([10-20]%), Google Hangouts ([5-10]%) and Facebook Messenger ([5-10]%). In France the market leaders were Android's messaging platform and Facebook Messenger (both [10-20]%), followed by WhatsApp.

[14]  For example, the market leader is Viber in Croatia and Greece, Android's messaging platform in Denmark and Snapchat in Norway. In Hungary, Poland and Lithuania, Facebook Messenger is the market leader, while WhatsApp is at best the third player. In Ireland and in the Netherlands, WhatsApp is the market leader and Facebook Messenger is the third player.

[15]  Users of iPhones and Android phones in Germany and Spain also paid a subscription fee until spring 2014. Outside of the EEA, WhatsApp currently charges a subscription fee to users in the USA and in Canada.

Commission in its analysis of the Transaction were considered at national (as opposed to EEA) level, the Commission's conclusions would not change.

4.1.3.3.  Conclusion on geographic market definition

(44)  In light of the above, the Commission considers that the relevant geographic market for the assessment of the Transaction is at least EEA-wide, if not worldwide.

## 4.2.  Social networking services

### 4.2.1.  Introduction

(45)  A core service offered by Facebook is its online social networking platform, which connects more than 1.3 billion people around the world.

(46)  Online social networking services are a relatively recent phenomenon with a majority of today's providers having launched their services in the 2000s.[16] Their business models and functionalities vary considerably and are constantly evolving. While there is no established definition, social networking services can be generally described as services which enable users to connect, share, communicate and express themselves online or through a mobile app.

(47)  The vast majority of social networking services are provided free of monetary charges. They can however be monetised through other means, such as advertising or charges for premium services.

### 4.2.2.  Product market definition

4.2.2.1.  Notifying Party's view

(48)  According to the Notifying Party, Facebook's social networking service consists of the following core functionalities: user profile,[17] newsfeed,[18] and timeline.[19]

(49)  The Notifying Party explains that Facebook's users can express themselves in a variety of ways, including by posting pictures or links to their timelines, commenting on or "liking" other user's activities, or playing games connected to Facebook. In this way, Facebook provides a rich social experience organised around users' and their friends' online identities. In the Notifying Party's view, the other services that are characterised as social networks (such as Google+, LinkedIn, MySpace, Pinterest and InterNations) offer similarly rich experiences.

---

[16]  For example, LinkedIn, Facebook and Google+ launched their social networking services in 2003, 2004 and 2011, respectively.

[17]  User profile corresponds to the user online identity, providing information on the user's jobs, school/university attended, relationship status, birthday, major life events, etc., as well as likes and interests (that is, music, movies, etc.). A user can generally select to which degree the information in its profile is accessible to the public.

[18]  Newsfeed is a regularly updating personalised display of stories (that is, posts, photos, etc.) from friends, pages, and other entities to which the user is connected.

[19]  Timeline enables users to organise and display the events and activities that matter most to them (for example, interests, photos, education, work history, relationship status, and contact information), such that they can curate their memories in a searchable personal narrative that is organised chronologically.

(50) The Notifying Party does not pronounce itself on the existence of a distinct market for social networking services. However, the Notifying Party submits that in any event WhatsApp is not active in such potential market in competition with Facebook. This is notably due to the lack of core social networking functionalities in WhatsApp. In particular, WhatsApp is focussed on facilitating fast and simple communications between users and does not enable users to create detailed profiles containing a number of data fields like date of birth, relationship status, job status, etc., time-lines or news feeds, or to post information, explore other users' networks (that is, through visible "friend lists") or carry out many of the other features that form part of the social networking user experience.

### 4.2.2.2. Commission's assessment

(51) The overwhelming majority of respondents to the market investigation indicate that the essential functionalities of a social networking service include creation of a public or semi-public profile and list of friends/contacts.[20] Other important features include exchanging messages (one-to-one, one-to-group or one-to-many), sharing information (for example, posting pictures, video or links), commenting on postings and recommending friends. A service does not necessarily have to have all of these functionalities to be qualified as a social network.

(52) As concerns the comparison of social networking services with consumer communications apps, the respondents to the market investigation noted that there is a certain overlap in the functionalities of these two types of services. The lines between social networking services and consumer communications apps are becoming blurred and each of these services adopts traditional functionalities of the other. Most importantly, similarly to social networks, consumer communications apps enable users to exchange content (text messages, video, audio and photos) with other people.

(53) However, the market investigation revealed a number of important differences between social networking services and consumer communications services.

(54) On a general level, social networking services tend to offer a richer social experience compared to consumer communications apps. For example, the users of social networks are able to indicate their interests, activities or life events, create photo albums and express opinions on other users' postings (for example, by commenting or "liking"). Also, in social networks, a user's contact list is by default visible to other users which facilitates adding new contacts. The functionalities of consumer communications apps today are more limited and focus on enabling basic communication between users rather than creating a richer experience around their digital identity.

(55) Also, while both social networks and consumer communications apps enable communication between users, the communications functionalities and their usage differ. Hence, consumer communications apps facilitate instant real-time communication (with handsets ringing and notifications being pushed to recipients). Responses are generally sent promptly allowing a conversation. By contrast, messages in social networks, such as comments on a posting, are not normally expected to be responded to in real time.

---

[20]   Commission questionnaire Q1 - Questionnaire to competitors, question 16.

(56) Moreover, social networks tend to enable communication and information sharing with a wider audience than consumer communications apps, which are more personal and targeted. For example, postings on a social network are generally shared with all contacts of a user (unless restricted), while communication on such consumer communications apps as Facebook Messenger and WhatsApp occurs mainly on a one-to-one basis (more than [90-100]% of all messages are one-to-one). Also, even though Facebook Messenger and WhatsApp enable users to create groups, their size is relatively limited (on average in the EEA, [0-5] users for WhatsApp and [0-10] users for Facebook Messenger). By contrast, social networks enable creation of larger groups which can consist of users who do not directly know each other (for example, an event or an interest group).

(57) The Commission further assessed whether it is appropriate to segment social networking services according to the platform (that is, PC, smartphone and tablet) or the operating system (such as Windows, Mac, Android or iOS) on which they are available.

(58) Respondents to the market investigation generally consider a social networking service which is offered on several platforms or on several operating systems to be a single service. From a supply side perspective, while the development of a social networking service for a particular platform or operating system requires time and resources, these do not appear to be significant enough to support the existence of separate markets. Finally, most social networks are accessible on multiple platforms and operating systems.

(59) Therefore, social networking services should not be further segmented according to a platform or an operating system. Finally, social networking services could be further differentiated depending on their intended use. Respondents to the market investigation generally consider that a distinction could be drawn between social networking services promoting interpersonal contact for private and entertainment purposes (such as Facebook or Google+) and services which are used for professional purposes (such as LinkedIn or Xing). Nevertheless, respondents acknowledge that there are overlaps between the purposes of intended use.

(60) In the present case, it can be left open whether social networking services should be segmented according to the intended use since no competition concerns arise under any alternative market definition.

(61) Based on the above, the Commission concludes that while consumer communications apps like Facebook Messenger and WhatsApp offer certain elements which are typical of a social networking service, in particular sharing of messages and photos, there are important differences between WhatsApp and social network services, as described in paragraphs (50) and (53)-(56).

4.2.2.3. Conclusion on product market definition

(62) For the purposes of the present case, the exact boundaries of the market for social networking services, in particular whether consumer communications apps such as Facebook Messenger and WhatsApp fall within the scope of such a potential market can be left open, since the Transaction would not give rise to serious doubts as to its compatibility with the internal market under any alternative market definition.

*4.2.3.   Geographic market definition*

4.2.3.1. Notifying Party's view

(63)  The Notifying Party does not take a firm view as to the geographic dimension of the market for social networking services.

4.2.3.2. Commission's assessment

(64)  It is common for the same social networking services to be available throughout the world, or at least in most geographic regions, given the global scope of the Internet.

(65)  Respondents to the market investigation state that there are generally no differences in a social networking service offered in different geographic regions or countries, in particular in terms of price, functionalities, platforms and operating systems served. However, it appears that limited adjustments such as language and minor functionalities are present. Other possible differences include marketing costs, legal/regulatory requirements and customers' preferences.

(66)  Moreover, the Parties' market shares are greater in the EEA than at worldwide level

(67)  In this context, while there are indications that the geographic scope of the market for social networking services could be global, the Commission considers that the relevant geographic market for the assessment of the case is EEA-wide in line with a more conservative approach.

4.2.3.3. Conclusion on geographic market definition

(68)  In light of the above, the Commission concludes that the geographic scope for the market for social networking services is at least EEA-wide, if not worldwide.

**4.3.    Online advertising services**

*4.3.1.   Introduction*

(69)  Facebook's activities in the advertising sector consist of the provision of online (non-search) advertising services on Facebook's core social networking platform,[21] both on PCs and on mobile devices.[22] By contrast, Facebook does not currently serve any ads on its Facebook Messenger app.

(70)  For the purpose of its online advertising activities, Facebook collects data regarding the users of its social networking platform and analyses them in order to serve advertisements on behalf of advertisers, which are as much as possible "targeted" at each particular user of its social networking platform. However, Facebook does neither sell any of the user data it collects nor provides data analytics services to

---

[21]  Since 2013, Facebook also serves ads to users of its photo and video sharing platform, Instagram, in the USA. In September 2014, Facebook began to introduce limited ads on Instagram in the United Kingdom. [...].

[22]  In addition, Facebook is active in intermediation in online advertising through LiveRail (acquired on 14 August 2014), and Facebook Audience Network (currently in beta testing, but which Facebook anticipates launching by year end 2014). Facebook is also active in the provision of online display ad serving technology, through Atlas Solutions (acquired on 28 February 2013) and LiveRail.

advertisers or other third parties as a stand-alone product separate from the advertising space itself.[23]

(71) WhatsApp does not currently sell any form of advertising and does not store or collect data about its users that would be valuable for advertising purposes (for example, concerning age, verified name, gender, social group, activities, consuming habits or other characteristics).[24] Moreover, messages that users send through WhatsApp are not stored in WhatsApp's servers, but only on the users' mobile devices or elected cloud.

(72) The Commission has investigated the market definition as regards advertising, since Facebook is currently active in that market. The Commission has not investigated any possible market definition with respect to the provision of data or data analytics services, since, subject to paragraph (70) above, neither of the Parties is currently active in any such potential markets.

### 4.3.2.  Product market definition

#### 4.3.2.1. Notifying Party's view

(73) According to the Notifying Party, given the continuous evolution of online advertising it is not appropriate to differentiate between the various types of online advertising. As regards the possibility to define a separate market for online advertising on social networking websites, the Notifying Party takes the view that there is no basis for defining such a market, in particular because advertisers place ads within a broad range of online publishers within any given advertising campaign.

#### 4.3.2.2. Commission's assessment

(74) In previous decisions, the Commission distinguished between the provision of online and offline advertising space.[25] The Commission also considered whether the market for online advertising could be sub-segmented into search and non-search advertising, but ultimately left this question open.[26] The Commission also assessed whether, within online advertising, mobile (search or non-search) advertising constitutes a product

---

[23]  Facebook makes available certain non-personally identifiable data (aggregate or anonymous data) to advertisers to help measure the effectiveness of their ads. For example, Facebook shares basic ad performance information with advertisers, such as the number of people who saw or clicked on their ads, the cost of those ad placements, and the number of people who "converted," for example, by visiting the advertiser's website after viewing an ad on Facebook. See https://www.facebook.com/about/privacy/advertising. However, Facebook does not share personally identifiable information with advertisers absent user consent. Moreover, Facebook shares data with third-party service providers that help Facebook and advertisers measure the effectiveness of advertising campaigns on online or offline sales or app downloads. Finally, Facebook complies with requests for access to user data made by law enforcement agencies, courts and other agencies with a legal right to require such access.

[24]  WhatsApp currently only stores limited information about its users (namely, user name, picture, status message, phone number and the phone numbers in the user's phone book).

[25]  See Commission decision of 18 February 2010 in Case M.5727 – *Microsoft / Yahoo! Search Business*, paragraph 61; Commission decision of 11 March 2008 in Case M. 4731 – *Google / DoubleClick*, paragraphs 45-46; 56.

[26]  See Commission decision of 18 February 2010 in Case M.5727 – *Microsoft / Yahoo! Search Business*, paragraphs 71-75; Commission decision of 11 March 2008 in Case M. 4731 – *Google / DoubleClick*, paragraphs 49-56.

market separate from static online (search or non-search) advertising.[27] The Commission noted that mobile and static online advertising currently present significant differences, which may diminish at some point in the future, but left open whether a distinction should be made.[28]

(75) The market investigation conducted for the purpose of reviewing the Transaction clearly confirmed the distinction made in the Commission precedents between the provision of online and offline advertising.[29]

(76) The market investigation also supported to a large extent the existence of a further sub-segmentation of the online advertising market between search and non-search advertising. Indeed, the majority of the advertisers who took part in the market investigation considered that search and non-search ads are not substitutable as they serve different purposes (for search ads, mainly generating direct user traffic to the merchant's website, while, for non-search ads, mainly building brand awareness) and, as a result, most advertisers would not be likely to switch from one type to another in the event of a 5-10% price increase.[30] Similarly, the majority of the competitors who took part in the market investigation submitted that search and non-search ads are not substitutable from an advertiser's point of view.[31]

(77) In addition, the Commission also examined whether a separate product market should be defined for the provision of online non-search advertising services on social networking websites. However, the results of the market investigation were mixed in this regard. A number of respondents considered that other forms of non-search advertising are not as effective as advertising on social networking websites and notably on Facebook, due to Facebook's large and highly engaged audience and its ad targeting opportunities. However, other respondents took the view that many other advertising platforms offering non-search ads are equally well-placed to serve non-search needs.[32]

(78) As regards a possible distinction between online advertising on different platforms (PCs vs. mobile devices), the results of the market investigation were also mixed. While some respondents highlighted the differences between advertising on different platforms (for example, in terms of technical characteristics, user experience and ad profitability), other respondents submitted that they are essentially substitutable.[33]

4.3.2.3. Conclusion on product market definition

(79) In line with its decisions in *Google / DoubleClick* and *Microsoft / Yahoo! Search Business*, the Commission concludes that online advertising constitutes a relevant

---

[27] See Commission decision of 4 September 2012 in Case M.6314 – *Telefónica UK / Vodafone UK / Everything Everywhere / JV*, paragraphs 153-159; Commission decision of 18 February 2010, Case M.5727 – *Microsoft / Yahoo! Search Business*, paragraphs 77-81.

[28] See Commission decision of 4 September 2012 in Case M.6314 – *Telefónica UK / Vodafone UK / Everything Everywhere / JV*, paragraphs 158-159.

[29] Commission questionnaire Q1 - Questionnaire to competitors, question 30; Commission questionnaire Q2 - Questionnaire to advertisers, question 3.

[30] Commission questionnaire Q2 - Questionnaire to advertisers, question 4.

[31] Commission questionnaire Q1 - Questionnaire to competitors, question 31.1.

[32] Commission questionnaire Q1 - Questionnaire to competitors, question 32; Commission questionnaire Q2 - Questionnaire to advertisers, question 5.

[33] Commission questionnaire Q1 - Questionnaire to competitors, question 33.

market separate from offline advertising. Whether segments of that market constitute relevant markets in their own right can be left open for the purposes of this decision, because the Transaction would not give rise to serious doubts as to its compatibility with the internal market under any such narrower product market definition.

### 4.3.3.   *Geographic market definition*

#### 4.3.3.1.  Notifying Party's view

(80)  The Notifying Party does not take a firm view as to the geographic dimension of the market for online advertising or its possible sub-segments.

#### 4.3.3.2.  Commission's assessment

(81)  In previous decisions, the Commission concluded that the market for online advertising space is to be divided alongside national or linguistic borders within the EEA, although it ultimately left the geographic market definition open in one case.[34] Factors pointing to a national or linguistic geographic market definition included customers' purchasing preferences and languages, and the presence of support and sales networks located at national level.[35]

(82)  The market investigation in this case generally confirmed the Commission's previous findings as regards the geographic market definition for online advertising. The majority of the respondents to the market investigation stated that advertisers typically purchase online advertising space and conduct advertising campaigns on a national (or linguistic) basis, although a number of respondents also pointed out that, depending on the type of campaign, global companies may also procure advertising space on a broader geographic scale (EEA-wide or even worldwide).[36] Moreover, the majority of the respondents submitted that prices for online advertising tend to differ depending on the country, based on a number of factors, such as demand and supply, local market conditions, Internet penetration rate, etc.[37]

#### 4.3.3.3.  Conclusion on geographic market definition

(83)  In line with its decisions in *Google / DoubleClick* and *Microsoft / Yahoo! Search Business*, the Commission concludes that the online advertising market and its possible sub-segments should be defined as national in scope or alongside linguistic borders within the EEA.

---

[34]  See Commission decision of 4 September 2012 in Case M.6314 – *Telefónica UK / Vodafone UK / Everything Everywhere / JV*, paragraphs 226-229; Commission decision of 18 February 2010 in Case M.5727 – *Microsoft / Yahoo! Search Business*, paragraphs 91-93; Commission decision of 11 March 2008 in Case M.4731 – *Google / DoubleClick*, paragraphs 83-84.

[35]  *Ibid.*

[36]  Commission questionnaire Q1 - Questionnaire to competitors, question 34; Commission questionnaire Q2 - Questionnaire to advertisers, question 7.

[37]  Commission questionnaire Q1 - Questionnaire to competitors, question 35; Commission questionnaire Q2 - Questionnaire to advertisers, question 8.

## 5.   COMPETITIVE ASSESSMENT

### 5.1.   Consumer communications services

#### 5.1.1.   Introduction

(84) The Parties operate two consumer communications apps, Facebook Messenger (which has approximately [250-350] million users worldwide and [100-200] million users in the EEA) and WhatsApp (which has approximately 600 million users worldwide and [50-150] million users in the EEA).

(85) A number of other players provide consumer communications apps in competition with the Parties in the EEA and worldwide. These include integrated companies active also in the provision of smartphone hardware and operating systems, such as Apple with iMessage, BlackBerry with BBM, Samsung with ChatON, Google with Google Hangouts and the Android messaging platform, Microsoft with Skype. Competing consumer communications apps are also provided by mobile network operators along with traditional telecommunications services: examples of these apps are Joyn (the brand name of the Rich Communication Services program launched by the GSM Association ("GSMA") for the creation of inter-operator communication services over the Internet),[38] Libon by Orange and Tuenti by Telefónica. Finally, many other providers of consumer communications apps are active on the market, such as LINE, Viber, Threema, Telegram, Snapchat and WeChat.

(86) On the basis of the results of the market investigation, the Commission notes that the main drivers of the competitive interaction between consumer communications apps appear to be (i) the functionalities offered and (ii) the underlying network.[39]

(87) First, consumer communications customers have a broad range of choices when it comes to selecting and using consumer communications apps. Many of them use more than one consumer communications app simultaneously depending on their specific needs (so-called "multi-homing").[40] In this context, consumer communications apps compete for customers by attempting to offer the best communication experience. The functionalities offered are at the heart of the consumer communications apps' value proposition to customers and their improvement in order to gain the largest user base is a key innovation driver. In this regard, according to the market investigation, important areas of improvement include: (i) reliability of the communications service, which has a direct impact on the service's reputation and its appeal to users; and (ii) privacy and security, the importance of which varies from user to user but which are becoming increasingly valued, as shown by the introduction of consumer communications apps specifically addressing privacy and security issues and by WhatsApp's plan to introduce [...] (see paragraph (169) below).

(88) Second, a consumer communications service can offer utility to customers if the people they want to communicate with are also users of that service. Therefore, the relevance of the user base appears to be more important than its overall size. In this context, however, the size of the network of a consumer communications app can

---

[38]   Such services are currently offered in the EEA by Deutsche Telekom, Orange, Vodafone and Telefónica.

[39]   See the replies of the overwhelming majority of respondents to the market investigation - Commission questionnaire Q1 - Questionnaire to competitors, question 36.

[40]   See paragraph (105) below.

have a value for customers in two ways: (i) a larger network implies that it is more likely that existing contacts will already be using a consumer communications app; and (ii) a larger network will afford greater opportunities for contact acquisition and discovery.

(89) Furthermore, perceived trendiness and "coolness" amongst groups of users is also an important factor in attracting new users and thus shaping the competitive landscape.

(90) Finally, price is one factor that influences the popularity of a consumer communications app. Indeed, the users of consumer communications apps tend to be very price-sensitive[41] and expect a consumer communications app to be provided for free. This is a standard practice in the industry, with virtually all consumer communications apps not charging any fees. There are few exceptions to this: Threema, which offers increased security of communications, and partially WhatsApp, which can be downloaded against an annual subscription fee of around EUR 0.89 in Italy, the United Kingdom, Canada and the United States.[42]

(91) In this respect, the Commission notes that WhatsApp was previously charging subscription fees also in Germany and Spain. However, WhatsApp cancelled subscription fees in these two Member States in the first half for 2014 for several reasons, among which: […].

### 5.1.2. *Notifying Party's view*

(92) The Notifying Party takes the view that market shares are of limited use for the assessment of the Transaction, since it concerns services which are characterised by ease and rapidity of entry and fast growth, as well as multi-homing, and which are mainly offered for free.

(93) The Notifying Party claims that, regardless of any analysis of market shares, the Transaction will not result in any anticompetitive horizontal unilateral effects. Indeed the market would be characterised by the presence of many other alternative service providers and the Parties' would not be close competitors.

(94) Moreover, barriers to entry and expansion for competitors and switching costs for customers would be very low, so that any attempt of the merged entity to leverage its market position could be easily countered. In particular, should the merged entity introduce or raise its prices or stop innovating, customers could easily switch to competing services which are available free of charge and which will provide new features and better quality services.

---

[41] This has been supported also by a customer survey submitted to the Commission by a competitor in the context of the market investigation.

[42] For the majority of all other consumer communications apps, monetisation is achieved not through fees but through advertising, stickers and in-app purchases. Facebook Messenger is not currently monetised: it is funded by the monetisation of Facebook's networking platform through advertising.

*5.1.3.   Commission's assessment*

5.1.3.1.  Market shares

(95)  According to the Horizontal Merger Guidelines, market shares and concentration levels provide useful first indications of the market structure and of the competitive importance of both the merging parties and their competitors.[43]

(96)  On the basis of the data provided by the Parties, their combined share in the EEA market for consumer communications apps on iOS and Android smartphones in the period between November 2013 and May 2014 was around [30-40]% (WhatsApp: [20-30]%; Facebook Messenger: [10-20]%), followed by Android's messaging platform ([5-10]%), Skype ([5-10]%), Twitter ([5-10]%), Google Hangouts ([5-10]%), iMessage ([5-10]%), Viber ([5-10]%), Snapchat ([0-5]%) and other market players with a share of [0-5]% or less. The Parties submit that they have no reason to believe that their usage of consumer communications apps globally is higher than it is in the EEA.

(97)  The Commission notes that the market shares indicated above are likely to underestimate the Parties' position, and present some shortcomings.[44] During the market investigation, the Commission attempted to collect additional metrics to measure the competitive importance of players in the market for consumer communications apps. However, no reliable dataset could be produced. For example, assessing the traffic volumes of consumer communications apps was vitiated by the lack of data from some providers and inconsistent recording methods (for example, in relation to the number of messages sent, messages received, group messages, etc.).[45]

---

[43]  See *Guidelines on the assessment of horizontal mergers under the Council Regulation on the control of concentrations between undertakings* ('Horizontal Merger Guidelines'), OJ C 31, 5.2.2004, p. 5, paragraph 14.

[44]  First, they are based on Onavo data, an app owned by Facebook which tracks "reach data" (that is, the percentage of panelled users that have used an app over 30 days) only on iOS and Android smartphones. Second, they do not properly measure the effective use of the services, but rather the penetration rate of an app among users (the so called "reach"). Third, they overestimate the strength of smaller market players since it suffices that a user uses an app one day over a month for a share of usage to be attributed to an app during that given month. Fourth, they assume that 75% of iPhone users use iMessage since Onavo cannot collect iMessage data. Fifth, the Parties have included players which offer communications functionalities integrated in their social networking apps, such as LinkedIn and Twitter, regardless of whether the app was used for communication purposes or not.

[45]  Certain third parties indicated that the best metric to measure competitive forces would be monthly minutes of use (how long a user engages with the app), as this metric captures (i) the importance of the application to the end consumer (i.e. consumer engagement) and (ii) its potential value either through direct monetisation from the consumer or indirectly through advertising. However, the Commission, on the basis of the results of the market investigation, does not consider this metric to be particularly meaningful to weigh relative market positions in the market for consumer communications apps. Indeed, what actually matters for consumer communications apps is not the length of the communications itself, which could depend on exogenous factors such as the relationship between the users of the service. User engagement with a service is better demonstrated by the fact that the service is actually used every month and day or by the number of messages, if it did not present the issues indicated in paragraph (98). In any event, the Commission notes that irrespective of the methodology used for calculating market shares, Facebook Messenger and WhatsApp would still be number 1 and number 2 in the EEA and at worldwide level.

(98) In this context the Commission considers that the methodology proposed by the Parties for the calculation of market shares still represents the best (albeit imperfect) available proxy to measure relative market positions in this sector.

(99) Even if the data provided by the Parties were to underestimate the Parties' combined market shares, the Commission notes that the consumer communications sector is a recent and fast-growing sector which is characterised by frequent market entry and short innovation cycles in which large market shares may turn out to be ephemeral. In such a dynamic context, the Commission takes the view that in this market high market shares are not necessarily indicative of market power and, therefore, of lasting damage to competition.[46]

(100) In order to assess the impact of the Transaction for consumers, the Commission has examined the competitive constraints that the Parties exert on each other pre-merger as well as those that they will continue to face post-merger.

### 5.1.3.2. Closeness of competition

(101) The Commission notes that the Parties' offerings in consumer communications apps are different in several respects. These differences are mainly the result of Facebook Messenger being a stand-alone app which has been developed from functionalities originally offered by the Facebook social network.[47]

(102) These differences relate to: (i) the identifiers used to access the services (phone numbers for WhatsApp, Facebook ID for Facebook Messenger);[48] (ii) the source of the contacts (the user handset's address book for WhatsApp, all Facebook users in Facebook Messenger); (iii) the user experience (which is richer in Facebook Messenger given the integration with the core aspects of Facebook social network); (iv) the privacy policy (contrary to WhatsApp, Facebook Messenger enables Facebook to collect data regarding its users that it uses for the purposes of its advertising activities);[49] and (v) the intensity with which the apps are used [...].[50]

(103) All these elements make the look and feel of the Parties' consumer communications apps different in the views of the respondents to the Commission's market investigation. The only factors on the basis of which WhatsApp and Facebook Messenger were considered close competitors by certain respondents are the communications functionalities offered and the size of their respective networks.[51]

---

[46] See Case T-79/12 *Cisco Systems Inc v Commission* [2013], paragraph 69.

[47] Facebook Messenger was first released on 9 August 2011 for iOS and Android.

[48] To enable communication functionalities, consumer communications apps require the creation of an account with a unique user identifier. Depending on the consumer communications app, existing mobile phone numbers or email addresses can serve as user IDs (for example, WhatsApp, Viber); certain consumer communications apps require instead the creation of a new user identifier (for example, Facebook Messenger, Skype). These different technical features affect the whole functioning of the consumer communications app and in particular the selection of the list of contacts with which communication is established: such contacts may derive from the handset's native address book (as in case of WhatsApp and Viber) or from other users of the related social network (such as on Facebook Messenger) or users of the messaging application (for example, Skype).

[49] [...].

[50] [...].

[51] In this regard see Section 5.1.3.5.

(104) However, the Commission notes that there is no feature offered by Facebook Messenger or WhatsApp which is not offered also by other market players.[52] Moreover, the Commission notes a significant overlap exists between the networks of WhatsApp and Facebook[53] which could rather point to a complementarity in the use of the two apps rather than to close competition.

(105) Furthermore, the EEA market for consumer communications apps features a significant degree of "multi-homing", that is, users have installed, and use, on the same handset several consumer communications apps at the same time.[54] In particular, WhatsApp and Facebook Messenger have been reported as being the two main consumer communications apps simultaneously used by the majority of the users in the EEA.[55] This fact suggests that the two consumer communications apps are to some extent complementary, rather than being in direct competition with each other.

(106) On the basis of their characteristics, WhatsApp's offering seems to be closer to that of Viber and of other similar consumer communications apps which use phone numbers or email addresses to let users access the services and do not require the "affiliation" to a social network, as is the case for Facebook Messenger or Twitter. In contrast, Facebook Messenger seems to be in closer competition with services offered by Google Hangouts or Twitter, since to access the consumer communications service users are required to register on a social network or in any event for a broader range of services (such as email).

(107) In light of the above, the Commission considers that Facebook Messenger and WhatsApp are not close competitors.

### 5.1.3.3. Consumers' ability to switch providers

(108) The majority of respondents to the Commission's market investigation indicated that post-Transaction there will remain a number of alternative providers of consumer communications apps.[56] The Commission has investigated whether consumers can easily switch to these providers, with the result of constraining the behaviour of the merged entity.

(109) In line with the Notifying Party's arguments, the Commission has found in its market investigation that there are no significant costs preventing consumers from switching between different consumer communications apps.[57] This is for the following reasons. First, all consumer communications apps are offered for free or at a very low price.[58]

---

[52] Moreover, the greatest share of the Parties' traffic is constituted by text messages, a functionality offered by all market players.

[53] See paragraph (140) below.

[54] When multi-homing, customers choose the consumer communications app to use on a communication-by-communication basis depending on the urgency, purpose and nature of the communication, the fact that the addressee of the message uses a certain consumer communications app and other preference factors.

[55] Commission questionnaire Q1 - Questionnaire to competitors, question 37.

[56] Commission questionnaire Q1 - Questionnaire to competitors, question 46, although some questioned their ability to recreate in a short time the network externalities reached by the Facebook and WhatsApp. In this regard, see Section 5.1.3.5.

[57] Commission questionnaire Q1 - Questionnaire to competitors, question 42. See also Case T-79/12 *Cisco Systems Inc v Commission* [2013], paragraph 79.

[58] See paragraph (90).

Second, all consumer communications apps are easily downloadable on smartphones and can coexist on the same handset without taking much capacity. Third, once consumer communications apps are installed on a device, users can pass from one to another in no-time.[59] Fourth, consumer communications apps are normally characterised by simple user interfaces so that learning costs of switching to a new app are minimal for consumers. Fifth, information about new apps is easily accessible given the ever increasing number of reviews of consumer communications apps on app stores.

(110) In this context, the Commission notes that customers of consumer communications apps normally multi-home.[60] This means that, when they try new consumer communications apps, users do not generally stop using the consumer communications apps they were previously using. On the basis of the data provided by the Notifying Party, approximately [80-90]% of EEA users of consumer communications apps use more than one service per month, and approximately [50-60]% use more than one such service on a daily basis.[61] The existence of multi-homing has been acknowledged by the overwhelming majority of the respondents to the market investigation.[62] According to these respondents, users have installed on their smart-phones three or more consumer communications apps and on average use two or more apps every month.[63]

(111) The Commission also notes that neither Facebook Messenger nor WhatsApp are pre-installed on a large basis of handsets.[64] Software pre-installation can make switching more difficult, in view of users' inertia which leads to the so-called "*status quo* bias."[65] In this case, however, users normally have to actively download both Facebook Messenger and WhatsApp. Users are therefore also more likely to actively download a competing consumer communications app in case of subsequent dissatisfaction with the Parties' services, or preference for multi-homing.

(112) The Commission also considers that the Transaction is unlikely to give rise to an increase in switching costs. None of the Parties has control over the operating system of a smartphone, and therefore none of them could make it more burdensome for users to switch between different consumer communications apps.

(113) Several telecom operators indicated that switching costs for consumers would be represented by the loss of all data and interaction history when changing consumer communications app. In the present case, the Commission has not found any evidence suggesting that data portability issues would constitute a significant barrier to consumers' switching in the case of consumer communications apps. Indeed, communication via apps tends to consist to a significant extent of short, spontaneous chats, which do not necessarily carry long-term value for consumers. In any event,

---

[59]   This is also supported by a customer survey submitted to the Commission by a competitor in the context of the market investigation.

[60]   See paragraph (105).

[61]   Form CO, paragraph 4.

[62]   Commission questionnaire Q1 - Questionnaire to competitors, question 44.

[63]   Commission questionnaire Q1 - Questionnaire to competitors, question 44.

[64]   Facebook estimates that its social networking app is pre-installed in only approximately 10% of the smartphone devices sold in the EEA in 2014, while WhatsApp has only an agreement with Nokia for the pre-installation of its app on some of Nokia's models via a soft-launcher (that is, a pre-installed icon which, when tapped, redirects the user to the app store to download the application).

[65]   See Commission decision of 16 December 2009 in Case C-3/39.530 - *Microsoft (Tying)*.

data portability is unlikely to prevent switching since the messaging history from a consumer communication app remains accessible on a user's smartphone even if the user starts using a different consumer communications app, as long as the user does not decide to delete such history or to uninstall the app. Finally, the contact list of a WhatsApp user can be ported: a competing app would have access to it, subject to a user's authorisation.

(114) The market investigation has however revealed that switching providers may be difficult in terms of convenience due to the need for the users to recreate their network.[66] Such network effects will be analysed in the next Section 5.1.3.5.

(115) In light of the above, the Commission considers that, with the exception of network effects, there is no significant barrier to switching for users in the market for consumer communications apps.[67]

### 5.1.3.4. General barriers to entry and expansion

(116) The consumer communications apps market has been characterised by disruptive innovation. For example, BlackBerry launched the first successful smartphones with integrated consumer communications app and had a very significant market position. However BlackBerry Messenger was available only for BlackBerry smartphones and lost importance with the emergence of multi-platform apps once Android and iOS devices gained a larger part of the smartphone market. Another example of successful entry sustained by the responsiveness to a new customer need is Telegram, a consumer communication app that was launched in September 2013 and had over 35 million monthly active users by March 2014, primarily due to its new feature of message encryption. WhatsApp itself was launched in 2009, when the shift of users of consumer communications services from PC to smartphone started, and today it has approximately 600 million active users. Similar market dynamics can be found with respect to LINE and WeChat, which were both launched in 2011 and each of which has now more than 400 million active users worldwide.

(117) In this context and in line with the Notifying Party's arguments, the Commission has found in its market investigation that there are no significant "traditional" barriers for a new consumer communications app to enter the market, that is, to be offered to users for download.

(118) First, the market for consumer communications apps is dynamic and fast-growing. In 2013, the use of messaging and social apps grew by 203%, more than any other type of apps. This growth is expected to continue in the future.[68] New consumer

---

[66]   Commission questionnaire Q1 - Questionnaire to competitors, question 42.

[67]   In this regard the Commission notes that the vast majority of the traffic on the Parties' consumer communications apps (about [90-100]%) is represented by one-to-one messages. Group messages constitute a small proportion of the Parties' traffic: [10-20]% for WhatsApp and [5-10]% for Facebook Messenger. Moreover, group chats tend to be between a relatively small number of users (on average in the EEA, [0-5] users for WhatsApp and [0-10] users for Facebook Messenger (the larger number of users in group chats on Facebook Messenger is likely to derive from the greater social networking functionalities)). In this context the Commission considers that a potential migration of one-to-one traffic is more relevant to constrain the merged entity and therefore there is no need to assess whether customers' switching is more difficult for group functionalities.

[68]   Report by mobile analytics firm Flurry (https://software.intel.com/en-us/blogs/2014/01/13/mobile-app-growth-continues-to-rise).

communications apps are continuously offered for download to customers and are expected to be launched also in the future.[69]

(119) Developing and launching a consumer communications app does not require a significant amount of time and investment. According to the information provided by the Notifying Party, the time and cost of launching and operating a new mobile consumer communications app can be relatively low, the main cost being server capacity which increases with scale. For example, WhatsApp developed the first version of its app over a period of six months and it cost less than USD […] in capital, operational and employee costs. The majority of the respondents to the market investigation acknowledged that developing and launching on the market a consumer communications app is fairly easy.[70]

(120) Second, there are no known patents, know-how or IPRs that would constitute barriers to entry, and the technologies implemented in consumer communications apps are increasingly standardised. This has been confirmed by the respondents to the market investigation.[71] In any event, WhatsApp does not hold any patents on which messaging technologies may read; whilst Facebook has some patents, none of these has been declared essential to any standard.

(121) Third, the Commission considers that the Transaction is unlikely to give rise to an increase in entry barriers, as the Parties do not have control over any element influencing entry. In the first place, the Parties do not have control over the operating system of smartphones, and are not therefore in the position to foreclose access to the final user of the consumer communications service. In the second place, email addresses, phone numbers and other elements which could be used as identifiers to access competing apps are ultimately controlled by the users. In the third place, the handsets' native address book for phone numbers or email addresses which could be used to build up a communication network is potentially available to all rival consumer communications apps providers.

(122) A few respondents to the market investigation indicated that barriers to entry would be represented by lack of data portability and interoperability between different consumer communications apps. Data portability issues are addressed in paragraph (113). With regard to interoperability (i.e., the ability of users of an app to reach and communicate with users of another app), the Commission notes that interoperability is not currently offered by any of the Parties' main competitors on smartphones, and in particular it was not an element that sustained the entry and expansion of WhatsApp, Facebook Messenger or other popular consumer communications apps. Only the Joyn initiative of the GSMA sets certain criteria for telecoms operators in order to provide an interconnected IP communications platform to customers. The Commission understands that the respondents' concern in this regard relates to the ability of new entrants to challenge existing players with an established underlying network of users and therefore to the issue of network effects which is analysed in Section 5.1.3.5.

(123) In any event, the Commission notes that the Transaction should not have any impact on the interoperability issues described above, unless Facebook decided to merge the

---

[69]   Commission questionnaire Q1 - Questionnaire to competitors, questions 52 and 53.

[70]   Commission questionnaire Q1 - Questionnaire to competitors, question 47, they indicated that attracting users would be difficult given the presence of network effects. In this regard, see Section 5.1.3.5.

[71]   Commission questionnaire Q1 - Questionnaire to competitors, question 50.

two platforms or to allow cross-platform communication. As explained further below (paragraphs (137)-(140)), these forms of integration appear to be significantly more challenging from a technical perspective than what has been submitted by some third parties.

(124) As regard expansion, consumer communications apps are also generally characterised by ease of distribution. Once a consumer communications app is available in an app store, customers wishing to download that app have only to click on it to install it on their device. The fact that neither Facebook Messenger nor WhatsApp is pre-installed on a large base of handsets also implies that distribution of rival apps is not made more difficult by potential barriers created by a "*status quo* bias".

(125) Consumer communications apps also appear to proliferate through word of mouth. If users like a consumer communications app, they will inform their contacts and usage will spread. Consumer communications apps may therefore grow quickly in terms of user base. For example, WhatsApp reached one million users in a few months after its launch in 2009. Likewise, some of the Parties' competitors gained a significant number of new users following WhatsApp's four hour service outage that occurred on 22 February 2014. For example, Telegram[72] and LINE[73] gained 5 million and 2 million new users respectively in the 24 hours following WhatsApp's outage. Finally, Kik Messenger was released in 2010, had 10 million users in April 2012 and reached 100 million in December 2013.

(126) However, a number of competitors who replied to the Commission's market investigation submitted that a significant barrier to entry and expansion is constituted by the presence of established players with a large user base and network effects in consumer communications apps.[74] A competing consumer communications app would have to build a significant user network in order to become attractive to consumers. Network effects are analysed in detail in the Section 5.1.3.5.

5.1.3.5. Network effects

(127) Network effects arise when the value of a product/service to its users increases with the number of other users of the product/service.[75]

(128) The Commission notes that, in the present case, both Parties have large networks of users: WhatsApp had close to 600 million users and Facebook Messenger had close to [250-350] million users in July 2014 worldwide.[76]

(129) Respondents to the market investigation indicated that the size of the user base and the number of a user's friends/relatives on the same consumer communications app is of important or critical value to customers of consumer communications apps.[77] These

---

[72]  See   http://thenextweb.com/facebook/2014/02/21/whatsapp-lost-500000-users-to-telegram-but-most-others-seem-happy-to-stay/.

[73]  See   http://thenextweb.com/asia/2014/02/25/line-says-it-added-2m-users-and-saw-record-growth-in-useurope-following-whatsapp-outage/.

[74]  Commission questionnaire Q1 - Questionnaire to competitors, questions 47, 48, 49 and 50.

[75]  A typical example is a telephone network. The more people have a telephone, the more valuable it is for each of them to have a telephone since the number of people they can call increases. As the network becomes more attractive, more people join, in a positive feedback loop.

[76]  Facebook's social network users account for approximately 1.3 billion.

[77]  Commission questionnaire Q1 - Questionnaire to competitors, questions 36.3 and 36.4.

parameters increase the utility of the service for a user since they increase the number of people he or she can reach. Therefore, the Commission considers that in the present case network effects exist in the market for consumer communications apps.

(130) The existence of network effects as such does not *a priori* indicate a competition problem in the market affected by a merger. Such effects may however raise competition concerns in particular if they allow the merged entity to foreclose competitors and make more difficult for competing providers to expand their customer base. Network effects have to be assessed on a case-by-case basis.

(131) In the present case, there are a number of factors which mitigate the role of network effects in impeding entry or expansion.

(132) First, as mentioned in paragraph (118), consumer communications apps are a fast-moving sector, where customers' switching costs and barriers to entry/expansion are low. In this market any leading market position even if assisted by network effects is unlikely to be incontestable. The market of consumer communications apps has a long track record of entry by new players. Also, competing consumer communications apps are able to grow despite network effects, both over time[78] and following disruptions in the market.[79] Such threat from new players constitutes and is likely to keep constituting a significant disciplining factor for the merged entity, regardless of the size of its network.

(133) Second, the use of one consumer communications app (for example, of the merged entity) does not exclude the use of competing consumer communications apps by the same user. A majority of users of consumer communications apps in the EEA have installed and are using two or more consumer communications apps (see paragraph (109)). Multi-homing is facilitated by the ease of downloading a consumer communications app, which is generally free, easy to access and does not take up much capacity on a smartphone. Also, using multiple consumer communications apps is easy, since a user does not have to log in each time, when switching an app, and the messages are "pushed" (that is, delivered automatically) onto a user's device. Hence, the fact that a large number of users will be on the merged entity's network is unlikely to preclude them from using also competing consumer communications apps.

(134) Third, as mentioned in paragraph (121), the Parties do not control any essential parts of the network or any mobile operating system. Users of consumer communications apps are not locked-in to any particular physical network, hardware solution or anything else that needs to be replaced in order to use competing products. While some third parties noted that the merged entity would control and limit portability of data (such as message history), this is unlikely to result in a lock-in of users, who typically retain access to message history on their handset even if they start using another consumer communications app. In addition, the merged entity would have no means to preclude competitors from recreating a user's network on WhatsApp since it is based on a user's phone book, which will remain available to any actual or potential competitor. Lastly, as mentioned in paragraph (111), neither Facebook Messenger nor

---

[78]   For example, both LINE and WeChat launched in 2011, and today, after three years, each of them counts more than 400 million active users worldwide.

[79]   See for some examples, paragraph (125). Also, after the announcement of WhatsApp's acquisition by Facebook and because of privacy concerns, thousands of users downloaded different messaging platforms, in particular Telegram which offers increased privacy protection.

WhatsApp are pre-installed on a large base of handsets, and therefore there is no "*status quo* bias" potentially affecting consumers' choices.

(135) Therefore, the Commission considers that, while network effects exist in the market for consumer communications apps, in the present case, on balance, they are unlikely to shield the merged entity from competition from new and existing consumer communications apps.

(136) For the sake of completeness, the Commission has examined whether the Transaction is likely to lead to any merger-specific substantial strengthening of network effects. Network effects could be strengthened if the Transaction were to combine the separate user networks of WhatsApp and Facebook into one, substantially larger network. Such a combination would necessarily require some kind of integration between the Parties' services.

(137) During the market investigation, several third parties suggested that some form of integration of WhatsApp with Facebook (including Facebook Messenger) is likely following the Transaction. For example, one of the suggested forms of integration was cross-platform communication between WhatsApp and Facebook, enabling WhatsApp and Facebook users to communicate with each other. Third parties stated that it would be relatively easy for Facebook to implement such integration from a technical perspective.

(138) The Notifying Party submitted that integration between WhatsApp and Facebook would pose significant technical difficulties. Notably, integration of WhatsApp's and Facebook's networks would require matching WhatsApp users' profiles with their profiles on Facebook (or *vice versa*). This would be complicated without the users' involvement since Facebook and WhatsApp use different unique user identifiers: Facebook ID and mobile phone number, respectively.[80] Consequently, Facebook would be unable to automatically and reliably associate a Facebook ID with a valid phone number used by a user on WhatsApp. Matching of WhatsApp profiles with Facebook profiles would most likely have to be done manually by users,[81] which in the Notifying Party's view is likely to result in a significant backlash from both users of Facebook and WhatsApp who do not want to match their accounts. Finally, the Notifying Party stated that, beyond the difficulties in matching user IDs, significant engineering hurdles would have to be overcome to enable cross-platform communications, reflecting the fundamentally different architecture of Facebook and WhatsApp (including the former being cloud-based, the latter not).

(139) Based on the above, the Commission considers that technical integration between WhatsApp and Facebook is unlikely to be as straightforward from a technical perspective as presented by third parties. Moreover, it would pose a business risk for the merged entity as users could switch to competing consumer communications apps.

---

[80]   While some Facebook users choose to indicate their mobile phone numbers in their Facebook profiles (around [30-40]% of Facebook users have done so in the EEA and [50-60]% worldwide), Facebook does not validate these numbers. Hence they may be outdated, not be mobile numbers or contain other errors.

[81]   In particular, WhatsApp users would either have to indicate their phone number in their Facebook profile (if they have one) or to register on Facebook (if they do not yet have a profile). Similarly, Facebook users would have to introduce and/or validate the mobile phone number which they use on WhatsApp.

(140) In any event, even if some integration of WhatsApp with Facebook were to take place post-Transaction, it would be mitigated by the fact that there is already a significant overlap between the networks of WhatsApp and Facebook. Indeed, on the basis of the estimates provided by the Notifying Party,[82] in the period between December 2013 and April 2014, between [20-30]% and [50-60]% of WhatsApp users already used Facebook Messenger and between [70-80]% and [80-90]% of WhatsApp users were Facebook users and were therefore already within the reach of Facebook Messenger. Conversely, over the same period 60% to 70% of Facebook Messenger active users already used WhatsApp. Therefore, the net gain in terms of new members to the communications network would be much more limited than the addition of WhatsApp users to the Facebook user base would suggest. This means that pre-existing network effects would be unlikely to be substantially strengthened by the Transaction.

### 5.1.4.    Conclusion on consumer communications services

(141) With only one exception, all competing providers of consumer communications apps considered that the Transaction would not have a negative impact on competition in the consumer communications market. Only telecoms operators indicated that the Transaction would give rise to negative effects in the market for consumer communications apps. For the reasons outlined above, however, these concerns are not considered to be well-grounded.

(142) In light of the findings above, the Commission considers that the Transaction does not give rise to serious doubts as regards its compatibility with the internal market with respect to the market for consumer communications apps.

## 5.2.    Social networking services

### 5.2.1.    Introduction

(143) Facebook operates the world's largest social network which connects over 1.3 billion users worldwide and [200-300] million in the EEA. As explained in section 4.2, social networking services enable users to connect, share, communicate and express themselves in a digital environment.

(144) During the market investigation, several third parties argued that (i) absent the Transaction WhatsApp would become a provider of social networking services in competition with Facebook; or that (ii) WhatsApp is already a provider of social networking services competing with Facebook.

(145) As regards the first claim concerning potential competition, the Commission collected and assessed relevant evidence, […]. No indication was found of WhatsApp's plans to become a social network which would compete with Facebook absent the merger. Indeed, the focus of WhatsApp has traditionally been on offering a light and simple communications service on smartphones only.

(146) Concerning the claim regarding actual competition between WhatsApp and the Facebook social network, as set out in section 4.2, the Commission does not take a final view on the existence and exact boundaries of the potential market for social networking services, which are continuously evolving. Nevertheless, in this section

---

[82]    Estimates calculated on the basis of Onavo data.

5.2 the Commission examines the likely competitive effects of the Transaction under a broader definition of the potential market for social networking services assuming that both WhatsApp and Facebook were actual competitors in that market.

### 5.2.2.   Competitive landscape

(147) A large number of companies offer online services which include a social networking functionality. These services are highly differentiated in their nature and focus. For example, social networking services may be designed for keeping in touch with friends and family, establishing professional contacts, reconnecting with classmates, sharing content (pictures, music, etc.) or pursuing a common interest.

(148) The results of the market investigation indicate that the companies which are most clearly perceived by respondents as providers of social networking services are Facebook, Google+, LinkedIn, Twitter and MySpace.[83] The services of these providers facilitate a rich social experience characteristic of a typical social network by enabling users to create their digital identity and to interact in a variety of forms in reflection of their preferences and interests.

(149) Some respondents to the market investigation stated that also consumer communications apps such as WhatsApp are active in providing social networking services, in particular since they enable information and content sharing between users, including groups.

(150) If consumer communications apps were included in the potential market for social networking services, the number of alternative providers would expand substantially. In particular, it would encompass such market players as WhatsApp, LINE, WeChat, iMessage, Skype, Snapchat, Viber, and Hangouts. The market would also potentially include other non-consumer communications services providers which enable interaction and exchange of content between users, such as YouTube.

(151) Given the high degree of differentiation between the above-mentioned providers, they are not used exclusively by consumers but rather in a complementary manner depending on a specific need. Indeed, as mentioned in paragraph (109), users of consumer communications apps extensively multi-home. In addition, the respondents to the market investigation confirm that users of consumer communications apps to a large extent also tend to use (other) social networking services.[84] This is corroborated by the considerable overlap existing between the user bases of WhatsApp and Facebook.[85]

(152) Consequently, if the potential market for social networking services includes consumer communications apps such as WhatsApp, there are a significant number of alternative service providers, which are used by consumers interchangeably.

---

[83]   Commission questionnaire Q1 - Questionnaire to competitors, question 17.
[84]   Commission questionnaire Q1 - Questionnaire to competitors, question 82.
[85]   [70-90]% of WhatsApp active users are also Facebook users (paragraph 220 of the Form CO).

5.2.3.   *Closeness of competition*

(153) Both WhatsApp and Facebook are similar in that they allow interaction and sharing of information and content (such as pictures) between users. At the same time, both services display significant differences.

(154) The Facebook user experience centres around the newsfeed, which is the core feature of a user's homepage on the Facebook website and mobile app. The newsfeed is a regularly updating dynamic display of stories from friends, pages, and other entities to which the person is connected. It includes posts, photos, event updates, group memberships, and other activities. Each user's newsfeed is personalised based on his or her interests and the sharing activity of his or her friends and connections.

(155) Another core feature of the Facebook social network is the timeline that allows users to organise and display the most important events and activities, enabling them to curate their memories in a searchable personal narrative that is organised chronologically. Users choose the information to share on their timeline, such as their interests, photos, education, work history, relationship status, and contact information, and users control with whom content is shared on their timeline.

(156) In contrast, WhatsApp does not offer homepages, feeds or timelines to its users. Users are not able to organise and curate memories and create personal narratives. While WhatsApp has a status functionality, it is being used only by [5-10]% of its EEA-users, according to WhatsApp's estimates. Indeed, WhatsApp offers a light and simple communications tool built for real-time messaging, which is, according to the data presented in paragraph (56), predominantly one-to-one.

(157) The fact that WhatsApp and Facebook are not close substitutes is further evidenced by the Notifying Party's data showing that a considerable number of users of one service also use the other service.[86] This suggests that the needs fulfilled by each service are different.

(158) Therefore, given the considerable differences between the functionalities and focus of WhatsApp and Facebook, the Commission concludes that these providers are not close competitors in the potential market for social networking services.

5.2.4.   *Potential integration of WhatsApp and Facebook*

(159) As described in section 5.1.3.5, during the market investigation third parties expressed concerns regarding potential integration between the Parties post-Transaction, including WhatsApp's integration with the Facebook social network. Such integration could, for example, take the form of cross-platform communication between WhatsApp and Facebook, enabling Facebook posts, status updates etc. to be delivered to WhatsApp, posting to Facebook from WhatsApp, or merging both services into one single platform. The integration of WhatsApp could strengthen Facebook's position in the potential market for social networking services by adding additional users and/or functionalities to the Facebook social network.

---

[86]   According to the Notifying Party, [60-70]% of Facebook active users were WhatsApp users and [70-90]% of WhatsApp active users are also Facebook users (paragraph 220 of the Form CO).

(160) As explained in paragraphs (138)-(139), the Commission takes into account that there are likely to be significant technical hurdles to enable the integration of WhatsApp and Facebook. In particular, such integration would likely require involvement of users of both WhatsApp and Facebook to match/create their profiles on both platforms. Any forced transfer of WhatsApp users onto the Facebook social network (for example, by compelling WhatsApp users to register on Facebook) may alienate users and cause their outflow to competing consumer communications apps. Moreover, enabling cross-platform communication would necessitate substantial re-engineering of the services and re-writing of their code, given the differences in their architecture.

(161) The current plans of Facebook, as evidenced by its submissions to the Commission, public statements and internal documents, do not provide support for a future integration of WhatsApp with Facebook of the sort that would strengthen Facebook's position in the potential market for social networking services.

(162) In any event, even if an integration of WhatsApp with Facebook were to take place, it would be mitigated by the fact that a large number of WhatsApp's active users ([70-90]%) are already users of Facebook. Therefore, potential net gain in terms of new members to the social network would be much more limited than the addition of WhatsApp users to the Facebook user base (also considering that addition of all users is unlikely).

### 5.2.5.   Conclusion on social networking services

(163) Based on the results of the investigation and the analysis above, the Commission considers that the Transaction would not give rise to serious doubts as to its compatibility with the internal market as regards the potential market for the provision of social networking services.

## 5.3.   Online advertising services

### 5.3.1.   Introduction

(164) For the purposes of this decision, the Commission has analysed potential data concentration only to the extent that it is likely to strengthen Facebook's position in the online advertising market or in any sub-segments thereof. Any privacy-related concerns flowing from the increased concentration of data within the control of Facebook as a result of the Transaction do not fall within the scope of the EU competition law rules but within the scope of the EU data protection rules.

(165) Since only Facebook, and not WhatsApp, is active in the provision of online advertising services, the Transaction does not give rise to any horizontal overlaps in the market for online advertising or in any sub-segment thereof.

(166) Moreover, WhatsApp does not currently collect data about its users concerning age, verified name, gender, social group, activities, consuming habits or other characteristics that are valuable for advertising purposes. Also, WhatsApp does not store messages once they are delivered, and a message is sent only to and from the handsets that are associated with the mobile phone numbers used. **Once a user's message has been delivered WhatsApp has no record of the content of that message.** Therefore, since WhatsApp does not currently collect any user data that are valuable

for advertising purposes, the Transaction does not increase the amount of data potentially available to Facebook for advertising purposes.

(167) However, the Commission has examined whether the Transaction could nevertheless have the effect of strengthening Facebook's position in the online advertising market, thereby raising serious doubts as to its compatibility with the market. For this purpose, the Commission has analysed two main possible theories of harm, according to which Facebook could strengthen its position in online advertising by: (i) introducing advertising on WhatsApp, and/or (ii) using WhatsApp as a potential source of user data for the purpose of improving the targeting of Facebook's advertising activities outside WhatsApp. Each of these two possible theories of harm is examined below.

### 5.3.2.   *WhatsApp as a potential provider of online advertising space*

(168) According to this possible theory of harm, post-Transaction, the merged entity could introduce targeted advertising on WhatsApp by analysing user data collected from WhatsApp's users (and/or from Facebook users who are also WhatsApp users). This would have the effect of reinforcing Facebook's position in the online advertising market or sub-segments thereof.[87]

### 5.3.2.1.  Notifying Party's view

(169) According to the Notifying Party, no market for advertising, however defined, would be affected by the Transaction, because WhatsApp does not currently sell ads. As explained in its blog, WhatsApp does not allow ads because it believes that they would disrupt the experience that it wants to deliver to its users.[88] […]

(170) Moreover, the Notifying Party submits that Facebook has no current plans to introduce advertising on WhatsApp post-Transaction. While WhatsApp is exploring further monetisation avenues for the medium term (in addition to subscription fees), such as […],[89] these do not entail the introduction of advertisements on WhatsApp.

### 5.3.2.2.  Commission's assessment

(171) According to data provided by the Notifying Party, Facebook's market shares are equal to or above [20-30]% in a number of Member States in a potential market for overall online advertising,[90] as well as in potential sub-segments, such as online non-search advertising.[91]

(172) A number of respondents to the market investigation stated that they expect the Transaction to materially strengthen Facebook's position in the provision of online

---

[87] One respondent also suggested that Facebook could split WhatsApp into two different versions, one operating on the basis of a subscription fee and one to be monetised with ads. The Commission's assessment set out below also applies to this possible scenario.

[88] See https://blog.whatsapp.com/245/Why-we-dont-sell-ads.

[89] […].

[90] Bulgaria ([30-40]%), Croatia ([20-30]%), Romania ([40-50]%) and Slovenia ([20-30]%). Market shares have been calculated on the basis of IAB Europe data.

[91] Belgium ([20-30]%), Bulgaria ([50-60]%), Croatia ([60-70]%), Finland ([20-30]%), Germany ([20-30]%), Greece ([20-30]%), Ireland ([30-40]%), Romania ([40-50]%), Slovakia ([20-30]%) and Slovenia ([40-50]%). Market shares relate to the market for online display advertising. Market shares have been calculated on the basis of IAB Europe data.

advertising services,[92] although only very few claimed that this would happen as a result of Facebook introducing advertising on WhatsApp.[93]

(173) As regards the ability of the merged entity to introduce targeted advertising on WhatsApp, this would theoretically be possible, subject to WhatsApp changing its privacy policy. Moreover, in order to collect sufficient data to serve targeted ads, […].

(174) However, as regards the incentive of the merged entity to introduce advertising on WhatsApp, many respondents pointed out that, by doing so, WhatsApp would deviate from the "no ads" product strategy that it has followed so far, which may prompt certain users who feel that the ads disrupt their experience to switch to competing apps free of ads (for example, Viber).[94] Moreover, the Commission notes that the need to retract WhatsApp's current plan to introduce […] may reduce Facebook's incentive to introduce ads on WhatsApp, since abandoning end-to-end encryption could create dissatisfaction among the increasing number of users who significantly value privacy and security. As mentioned in paragraph (116) above, Telegram's success in attracting users (with 35 million monthly active users reached just six months after the launch of the app) is believed to be primarily due to its message […] feature.[95] Privacy concerns also seem to have prompted a high number of German users to switch from WhatsApp to Threema in the 24 hours following the announcement of Facebook's acquisition of WhatsApp.[96]

(175) Moreover, Facebook's internal documents, which the Commission reviewed for the purpose of assessing the Transaction, […].

(176) In any event, even if the merged entity were to introduce advertising on WhatsApp, the Transaction would only raise competition concerns if post-Transaction there were not to be a sufficient number of effective alternatives to Facebook for the purchase of online advertising space.

(177) In this regard, most of Facebook's advertising customers who took part in the market investigation recognised the importance of advertising on Facebook, due to its large

---

[92]   Commission questionnaire Q1 - Questionnaire to competitors, question 77; Commission questionnaire Q2 - Questionnaire to advertisers, question 10.

[93]   Most of the respondents who expect Facebook's position in advertising to be materially strengthened stated that this would be the result of Facebook having access to an increased amount of user data. This claim is addressed below (section 5.3.3).
       In addition, certain respondents suggested that Facebook could increase WhatsApp's subscription fee, as a result of which WhatsApp's users would switch to Facebook, thereby increasing Facebook's subscribers and, thus, Facebook's advertising revenues and/or power vis-à-vis advertisers. However, respondents did not provide any evidence that users would switch to Facebook in response to a potential increase in WhatsApp's subscription fees. Quite the contrary, as explained above in Section 5.1.3.2, the Commission has found that WhatsApp is not the closest competitor to Facebook Messenger (let alone to Facebook's social networking site). In any event, even if such increase in WhatsApp's subscription fee and subsequent user switching were to take place, as will be explained further below, the market investigation indicated that a sufficient number of alternative providers of online advertising will remain active post-Transaction alongside Facebook.

[94]   Commission questionnaire Q1 - Questionnaire to competitors, question 79.1.

[95]   See  https://telegram.org/faq#security;  http://techcrunch.com/2014/03/24/telegram-hits-35m-monthly-users-15m-daily-with-8b-messages-received-over-30-days/;
       http://www.theverge.com/2014/2/25/5445864/telegram-messenger-hottest-app-in-the-world.

[96]   See        http://techcrunch.com/2014/02/21/bye-bye-whatsapp-germans-switch-to-threema-for-privacy-reasons/;        http://www.sueddeutsche.de/digital/seit-facebook-deal-whatsapp-konkurrent-threema-verdoppelt-nutzerzahl-1.1894768.

and highly engaged user base, its ad targeting opportunities and the generally high return on investment.[97] However, all of these respondents also considered that there are (and will be, post-Transaction) a sufficient number of alternative providers of advertising services that compete with Facebook.[98] These include Google (comprising Google Search, Google+ and YouTube), Yahoo!, MSN and local providers.[99] More in general, customers did not raise any particular concerns with regard to the effect of the Transaction on the online advertising market.

(178) Similarly, most of the competitors who replied to the market investigation considered that a sufficient number of alternative providers of advertising space will remain in competition with Facebook post-Transaction.[100]

(179) Therefore, the Commission notes that, regardless of whether the merged entity will introduce advertising on WhatsApp, there will continue to be a sufficient number of other actual and potential competitors who are equally well placed as Facebook to offer targeted advertising.

### 5.3.3.   *WhatsApp as a potential source of user data valuable for advertising purposes*

(180) According to this possible theory of harm, post-Transaction, the merged entity could start collecting data from WhatsApp users with a view to improving the accuracy of the targeted ads served on Facebook's social networking platform[101] to WhatsApp users that are also Facebook users.

#### 5.3.3.1.  Notifying Party's view

(181) The Notifying Party submits that the data that WhatsApp has access to is at best of marginal **utility for Facebook's advertising purposes and would not enhance Facebook's ability to target advertisements on its services.**[102] Today, the only data that WhatsApp has about its users is their names and the mobile phone numbers with which the accounts are associated. This data is available to all suppliers of apps **installed on users' handsets, including Facebook. […]**

(182) According to the Notifying Party, the Transaction would not impact the type of data that WhatsApp collects and stores. Facebook has publicly made it clear that it has no **current plans to modify WhatsApp's collection and use of user data.**[103] As with all Facebook services, to the extent an affiliate of Facebook engages in any sharing of

---

[97]  Commission questionnaire Q2 - Questionnaire to advertisers, questions 5-6.

[98]  Commission questionnaire Q2 - Questionnaire to advertisers, question 13.

[99]  Commission questionnaire Q2 - Questionnaire to advertisers, questions 9, 13.

[100]  Commission questionnaire Q1 - Questionnaire to competitors, question 78.

[101]  A similar theory could hypothetically apply with respect to Facebook's photo and video sharing platform Instagram, given that Facebook recently started introducing advertising on Instagram in the EEA (see footnote 21 above).

[102]  WhatsApp users may add public-facing photos, their names and status messages. However, they cannot add any further data such as birth date, address, etc. that assist in identifying the user.

[103]  After the announcement of the Transaction, WhatsApp's CEO Jan Koum stated on WhatsApp's blog that "[r]*espect for* [users'] *privacy is coded into our DNA, and we built WhatsApp around the goal of knowing as little about* [users] *as possible.*" He added that "[i]*f partnering with Facebook meant that we had to change our values, we wouldn't have done it.*" See http://blog.whatsapp.com/529/Setting-the-record-straight.

data with another affiliate, it will do so in a manner consistent with the promises the relevant affiliates have made to users and with notice to the extent required by law.

(183) As a result, in the view of the Notifying Party, the Transaction will not have any effect on the data potentially available for **Facebook's use in targeting ads**.

### 5.3.3.2. Commission's assessment

(184) A number of respondents to the market investigation stated that they expect the Transaction to materially strengthen Facebook's position in the provision of online advertising services as a result of the increased amount of data which will come under Facebook's control.[104] In particular, as explained above (paragraph (137)), certain respondents suggested that post-Transaction Facebook would integrate its social networking platform and consumer communications app with WhatsApp and described a number of alternative forms that such integration could take. According to these respondents, such integration would allow Facebook to have access to additional data from WhatsApp users to be monetised through advertising.

(185) As regards the ability of the merged entity to collect data from WhatsApp users who also have a Facebook account and use them for advertising on Facebook, this would require, first, a change in WhatsApp's privacy policy. Second, this would require Facebook, regardless of whether or not it would carry out some form of integration with WhatsApp, to match each user's WhatsApp profile with her/his Facebook profile, provided she/he has one. While certain respondents argued that such matching would be easily achievable, the Notifying Party submitted that there are major technical obstacles thereto.[105] Third, in order to collect data from WhatsApp text messages, Facebook would have to retract WhatsApp's current plan to introduce […].

(186) As regards the incentive of the merged entity to start collecting data from WhatsApp users (for example, age, gender, country, message content), a number of respondents pointed out that, if the merged entity were to do so, this may prompt some users to switch to different consumer communications apps that they perceive as less intrusive.[106] Moreover, the Commission notes that, as explained above (174), the need to abandon WhatsApp's plan for […] may reduce Facebook's incentive to start collecting data from WhatsApp messages.

(187) In any event, even if the merged entity were to start collecting and using data from WhatsApp users, the Transaction would only raise competition concerns if the concentration of data within Facebook's control were to allow it to strengthen its position in advertising.

(188) In this regard, the Commission refers to the results of the market investigation presented above (paragraph (177)), which indicate that, post-Transaction, there will remain a sufficient number of alternative providers of online advertising services. In

---

[104]  Commission questionnaire Q1 - Questionnaire to competitors, question 77.

[105]  As explained above (paragraphs (138) and (160)), according to the Notifying Party, the fact that Facebook Messenger and WhatsApp use different identifiers (Facebook ID in the case of Facebook and mobile phone numbers in the case of WhatsApp) makes it impossible to match a user's WhatsApp account with that user's Facebook account on an automated basis. That matching would need to be done manually by each WhatsApp user or by each of Facebook Messenger user and would entail a series of steps which, according to the Notifying Party, most users would be reluctant to take.

[106]  Commission questionnaire Q1 - Questionnaire to competitors, question 79.2.

addition, the Commission notes that there are currently a significant number of market participants that collect user data alongside Facebook. These include, first of all Google, which accounts for a significant portion of the Internet user data and, in addition, companies such as Apple, Amazon, eBay, Microsoft, AOL, Yahoo!, Twitter, IAC, LinkedIn, Adobe and Yelp, among others. The graph below provides an overview of the estimated share of data collection across the web:[107]

## Share of Data Collection Across the Web



Source: Ghostery panel data, Jan–Mar 2013.
Ordered by frequency of panel user interactions with tracking applications

(189) Therefore, the Commission notes that, regardless of whether the merged entity will start using WhatsApp user data to improve targeted advertising on Facebook's social network, there will continue to be a large amount of Internet user data that are valuable for advertising purposes and that are not within Facebook's exclusive control.

### 5.3.4.    Conclusion on online advertising services

(190) Based on the results of the market investigation and the analysis outlined above, the Commission considers that the Transaction does not give rise to serious doubts as to its compatibility with the internal market as regards the market for the provision of online advertising services, including its potential sub-segments.

---

[107] The data in this graph originate from an external market intelligence company and have been produced for purposes unrelated to the assessment of the Transaction. Those data are presented here for purely illustrative purposes and are without prejudice to any possible market definition as regards the provision of data, which, as explained above paragraph (72) is not covered by the Commission's assessment in the present decision.

## 6.    CONCLUSION

(191) For the above reasons, the European Commission has decided not to oppose the Transaction and to declare it compatible with the internal market and with the EEA Agreement. This decision is adopted in application of Article 6(1)(b) of the Merger Regulation.

*For the Commission*
*(Signed)*
*Joaquín ALMUNIA*
*Vice-President*

# Exhibit 452

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 or 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of report (Date of earliest event reported): October 4, 2014**

# Facebook, Inc.

**(Exact Name of Registrant as Specified in Charter)**

| Delaware | 001-35551 | 20-1665019 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| 1601 Willow Road Menlo Park, California | 94025 |
|---|---|
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(650) 543-4800**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the Registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.01. Completion of Acquisition or Disposition of Assets.**

On October 6, 2014, Facebook, Inc. (the " *Company* " ) completed its previously announced acquisition of WhatsApp Inc., a Delaware corporation (" *WhatsApp* "), pursuant to the terms of an Agreement and Plan of Merger and Reorganization (as amended, the " *Merger Agreement* ") dated as of February 19, 2014, with Rhodium Acquisition Sub II, Inc., a Delaware corporation and wholly owned (in part directly and in part indirectly) subsidiary of the Company (" *Acquirer* "), Rhodium Merger Sub, Inc., a Delaware corporation, a direct wholly owned subsidiary of Acquirer (" *Merger Sub* "), WhatsApp, and Fortis Advisors LLC, as the stockholders' agent.

The acquisition was accomplished by the merger of Merger Sub with and into WhatsApp (the " *First Merger* "), and upon consummation of the First Merger, Merger Sub ceased to exist and WhatsApp became a wholly owned subsidiary of Acquirer. The surviving corporation of the First Merger then merged with and into Acquirer, which will continue to exist as a wholly owned (in part directly and in part indirectly) subsidiary of the Company. At the closing, all outstanding shares of WhatsApp capital stock and options to purchase WhatsApp capital stock were cancelled in exchange for an aggregate of 177,760,669 shares of the Company's Class A common stock and approximately $4.59 billion in cash to existing WhatsApp securityholders. A portion of the aggregate consideration is being held in escrow to secure the indemnification obligations of the WhatsApp securityholders. In addition, the Company awarded 45,941,775 restricted stock units (" *RSUs* ") to WhatsApp employees. On the closing date, Jan Koum, WhatsApp's co-founder and CEO, became a member of the Company's Board of Directors (the " *Board* ").

The Company has entered into a registration rights agreement (the " *Registration Rights Agreement* ") with the stockholders of WhatsApp, the terms of which require the Company to file, following the release of the Company's earnings report for the third quarter of 2014, a Registration Statement on Form S-3 covering the resale of the shares of the Company's Class A common stock issued to the stockholders of WhatsApp and certain of their transferees. Except with respect to the indemnification rights provided thereunder, the Registration Rights Agreement shall terminate six months following the closing date or such earlier date when all stock registered in accordance with its terms has been sold. A copy of the Registration Rights Agreement will be filed as an exhibit to the Registration Statement on Form S-3 to be filed the Securities and Exchange Commission (the " *SEC* ").

The Company issued the shares of Class A common stock described herein in reliance upon the exemptions from registration afforded by Section 4(a)(2) and Rule 506 promulgated under the Securities Act of 1933, as amended.

The foregoing summary of the Merger Agreement and the transactions contemplated thereby do not purport to be complete and are subject to, and qualified in their entirety by, the full text of the Merger Agreement, which was filed as Exhibit 2.1 to the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2014.

**Item 3.02. Unregistered Sales of Equity Securities.**

See the disclosure under Item 2.01 of this Current Report on Form 8-K.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On October 4, 2014, Jan Koum, WhatsApp's co-founder and CEO, was appointed to serve as a member of the Board, effective upon the closing of the acquisition. As described under Item 2.01 of this Current Report on Form 8-K, Mr. Koum was appointed to the Board in connection with the acquisition of WhatsApp by the Company. Mr. Koum will not receive any additional compensation as a member of the Board and will not serve on any committees of the Board.

In connection with his continued employment as WhatsApp's Chief Executive Officer, WhatsApp entered into an offer letter agreement with Mr. Koum (the " *Offer Letter* "). The Offer Letter has no specific term and constitutes at-will employment. The Offer Letter provides that Mr. Koum will receive an annual base salary of $1 and he will not be eligible for a bonus under the Company's bonus plan. In addition, Mr. Koum will receive an inducement grant of 24,853,468 RSUs.

The inducement RSUs will vest and settle over a four-year quarterly vesting schedule, with approximately 20% of the RSUs vesting on November 15, 2015 and, following such date, with respect to the first eight quarterly vesting dates, 1/20th of the RSUs shall vest on each quarterly vesting date, and with respect to the last four quarterly vesting dates, approximately 1/10th of the RSUs shall vest on each quarterly vesting date, subject to Mr. Koum's continued service through each vesting date. In the event Mr. Koum's employment is terminated by the Company or WhatsApp without cause or by Mr. Koum for good reason, he will be entitled to accelerated vesting of 100% of the unvested RSUs. The RSUs are subject to the terms and conditions of a Non-Plan Restricted Stock Unit Award Agreement (the "RSU Agreement") and Offer Letter. A copy of the Offer Letter will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2014, and a copy of the form of notice and RSU Agreement to be used for Mr. Koum's inducement award was filed as an exhibit to a Registration Statement on Form S-8 (File No. 333-199172) filed to register the RSUs.

In addition to the compensation that Mr. Koum will receive in connection with his continued employment, the Company has entered into a standard form of indemnification agreement with Mr. Koum. The indemnification agreement, among other things, would require the Company to indemnify Mr. Koum for certain expenses, including attorneys' fees, judgments, penalties, fines and settlement amounts actually and reasonably incurred by him in any action or proceeding arising out of his service as one of the Company's directors, or service to any of the Company's subsidiaries or any other company or enterprise to which he provides services at the Company's request. A form of the indemnification agreement was previously filed by the Company as Exhibit 10.1 to the Company's Registration Statement on Form S-1 (File No. 333-179287), as originally filed with the SEC on February 1, 2012, as subsequently amended.

In satisfaction of the disclosure required by Item 404(a) of Regulation S-K, see the disclosure under Item 2.01 of this Current Report on Form 8-K. In connection with the acquisition of WhatsApp, Mr. Koum or his affiliated entities were issued 76,357,462 shares of the Company's Class A common stock and received approximately $1.97 billion in cash, a portion of which consideration is being held in escrow to secure the indemnification obligations of the WhatsApp securityholders.

## Item 9.01. Financial Statements and Exhibits.

(a)   *Financial statements of businesses acquired.*  The financial information required by Item 9.01(a) of this Current Report on Form 8-K has not been included with this filing and will be filed by amendment to this Current Report on Form 8-K not later than seventy-one (71) calendar days after the date that this Current Report on Form 8-K must be filed.

(b)   *Pro forma financial information.*  The financial information required by Item 9.01(b) of this Current Report on Form 8-K has not been included with this filing and will be filed by amendment to this Current Report on Form 8-K not later than seventy-one (71) calendar days after the date that this Current Report on Form 8-K must be filed.

(d)   Exhibits

| Number | Description |
| --- | --- |
| 2.1 | Merger Agreement. (Filed as Exhibit 2.1 to the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2014 and incorporated herein by reference). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**FACEBOOK, INC.**

Date: October 6, 2014                                     By:  /s/ Colin S. Stretch
_____

                                                         Name: Colin S. Stretch
                                                         Title: Vice President, General Counsel,
                                                            and Secretary

**EXHIBIT INDEX**

| Number | Description |
| --- | --- |
| 2.1 | Merger Agreement. (Filed as Exhibit 2.1 to the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2014 and incorporated herein by reference). |

# Exhibit 453

**Meta Platforms, Inc. (META)**
**Third Quarter 2022 Results Conference Call**
**October 26th, 2022**

**Deborah Crawford, VP, Investor Relations**

Thank you. Good afternoon and welcome to Meta Platforms third quarter 2022 earnings conference call. Joining me today to discuss our results are Mark Zuckerberg, CEO and Dave Wehner, CFO. Susan Li, VP of Finance and our incoming CFO and Marne Levine, Chief Business Officer are also on the call and will join Mark and Dave for the Q&A portion.

Before we get started, I would like to take this opportunity to remind you that our remarks today will include forward-looking statements. Actual results may differ materially from those contemplated by these forward-looking statements.

Factors that could cause these results to differ materially are set forth in today's press release, and in our quarterly report on form 10-Q filed with the SEC. Any forward-looking statements that we make on this call are based on assumptions as of today and we undertake no obligation to update these statements as a result of new information or future events.

During this call we may present both GAAP and non-GAAP financial measures. A reconciliation of GAAP to non-GAAP measures is included in today's earnings press release. The press release and an accompanying investor presentation are available on our website at investor.fb.com.

And now, I'd like to turn the call over to Mark.

**Mark Zuckerberg, CEO**

Hey everyone, thanks for joining today.

Our community continued to grow this quarter. We now reach more than 3.7 billion people monthly across our family of apps.

And while we continue to navigate some challenging dynamics -- a volatile macroeconomy, increasing competition, ads signal loss, and growing costs from our long-term investments -- I have to say that our product trends look better from what I see than some of the commentary I've seen suggests.

There has been a bunch of speculation about engagement on our apps and what we're seeing is more positive. On Facebook specifically, the number of people using the service each day is the highest it's ever been -- nearly 2 billion -- and engagement trends are strong. Instagram has more than 2 billion monthly actives. WhatsApp has more than 2 billion daily actives, also with the exciting trend that North America is now our fastest growing region. Across the family, some apps may be saturated in some countries or some demographics, but overall our apps continue to grow from a large base. We're also seeing engagement grow -- especially strong growth in Reels -- and I'll share more details around that when I discuss our product priorities shortly.

In terms of our business, total revenue grew slightly this quarter on a constant currency basis. We're still behind where I think we should be, but we believe that we will return to healthier revenue growth

trends next year. That said, it's not clear that the economy has stabilized yet so we're planning our budget somewhat more conservatively.

In 2023, we're going to focus our investments on a small number of high priority growth areas. So that means some teams will grow meaningfully, but most other teams will stay flat or shrink over the next year. In aggregate, we expect to end 2023 as either roughly the same size, or even a slightly smaller organization than we are today.

Three of the primary areas we're going to focus on are our AI discovery engine that's powering Reels and other recommendation experiences, our ads and business messaging platforms, and our future vision for the metaverse. The internal indications I've seen suggest we're doing leading work and we're on the right track with these investments, so I think we should keep investing heavily in these areas.

As I've shared before, our goal is to grow Family of Apps operating income, such that even with our AI infrastructure and Reality Labs investments, we can still meaningfully grow our overall company operating income in the long run. Our current surge in capex is largely due to building out our AI infrastructure and we would expect capex to come down as a percent of revenue over the long term. We expect Reality Labs expenses will increase meaningfully again in 2023, with the biggest drivers of that being the launch of the next generation of our consumer Quest headset and hiring that's been done in 2022 but for which we'll be paying the first full year of salaries next year. More broadly, beyond 2023, we expect to pace Reality Labs investments to ensure that we can achieve our goal of growing overall company operating income. Our capital allocation philosophy over the long term is to allocate a portion of the profits generated from the Family of Apps towards these future focused areas while enabling greater return of capital to shareholders.

Now, I'd like to share some updates on the progress that we're seeing in these product areas.

Our AI discovery engine is playing an increasingly important role across our products -- especially as advances enable us to recommend more interesting content from across our networks in feeds that used to be primarily driven just by the people and accounts you follow.

This of course includes Reels, which continues to grow quickly across our apps -- both in production and consumption. There are now more than 140 billion Reels plays across Facebook and Instagram each day. That's a 50% increase from six months ago. Reels is incremental to time spent on our apps. The trends look good here, and we believe that we're gaining time spent share on competitors like TikTok.

Over time, I expect a few things to set our products apart here. First is that our discovery engine work allows us to recommend all types of content beyond Reels as well, including photos, text, links, communities, short and long-form videos, and more. Second is that we can mix this content alongside posts from your family and friends, which can't be generated by AI alone. Third, as more social interactions move to messaging, we're developing a flywheel between discovery and messaging that are going to make these apps stronger. On Instagram alone, people already reshare Reels 1 billion times a day through DMs.

Moving to monetization, I've discussed in the past how the growth of short-form video creates near-term challenges since Reels doesn't monetize at the rate of feed or stories yet. That means as Reels grows, we're displacing revenue from higher-monetizing surfaces. I think this is clearly the right thing to do so that Reels can grow with the demand we're seeing, but closing this gap is also a high priority. Even

with the progress we've made, we're still choosing to take a more than $500 million quarterly revenue headwind with this shift. But we expect to get to a more neutral place over the next 12-18 months. I mentioned last quarter that Instagram Reels had crossed $1 billion annual revenue run rate. We continue scaling monetization across both Instagram and Facebook, and the combined run rate across these apps is now $3 billion.

Beyond Reels, messaging is another major monetization opportunity. Billions of people and millions of businesses use WhatsApp and Messenger every day, and we're confident we can connect them in ways that create valuable experiences.

We started with Click-to-Messaging ads, which let businesses run ads on Facebook and Instagram that start a thread on Messenger, WhatsApp or Instagram Direct so they can communicate with customers directly. This is one of our fastest growing ads products, with a $9 billion annual run rate. This revenue is mostly on Click-to-Messenger today since we started there first, but Click-to-WhatsApp just passed a $1.5 billion run rate, growing more than 80% year-over-year.

Paid messaging is another opportunity that we're starting to tap into, and it continues to grow quickly but from a smaller base. We're putting the foundation in place now to scale this with key partnerships like Salesforce, which lets all businesses on their platform use WhatsApp as the main messaging service to answer customer questions, send updates, and sell directly in chat. We also launched JioMart on WhatsApp in India and it's our first end-to-end shopping experience that shows the potential for chat-based commerce through messaging.

Between Click-to-Messaging and paid messaging, I'm confident that this is going to be a big opportunity.

The last area that I want to discuss today is the metaverse.

We just had our Connect conference and announced Quest Pro, which we just started shipping. It's our new high-end VR headset that delivers high-resolution mixed reality so you can blend virtual objects into the physical environment around you. It's pretty amazing when you see it, and it's going to enable all kinds of new experiences in socializing, gaming, fitness, and work. I'm really looking forward to seeing what people build with this new capability.

Work in the metaverse is a big theme for Quest Pro. There are 200 million people who get new PCs every year, mostly for work. Our goal for the Quest Pro line over the next several years is to enable more and more of these people to get their work done in virtual and mixed reality, eventually even better than they could on PCs.

To deliver a great work and productivity experience, I'm excited about the partnerships we announced with Microsoft bringing their suite of productivity and enterprise management services to Quest, Adobe and Autodesk bringing their creative tools, Zoom bringing their communication platform, Accenture building solutions for enterprises, and more.

There's still a long road ahead to build the next computing platform, but we are clearly doing leading work here. This is a massive undertaking and it's often going to take a few versions of each product before they become mainstream. But I think our work is going to be of historic importance and create

the foundation for an entirely new way that we will interact with each other and blend technology into our lives, as well as a foundation for the long term of our business.

Between the AI discovery engine, our ads and business messaging platforms, and our future vision for the metaverse, those are three of the areas that we're very focused on. I believe the tougher prioritization, discipline, and efficiency that we're driving across the organization will help us navigate the current environment and emerge an even stronger company. As always, I'm grateful to everyone at Meta for your hard work, and to all of you for being on this journey with us.

With that, I'll turn it over to Dave.

**Dave Wehner, CFO**

Thanks Mark and good afternoon everyone.

Let's begin with our consolidated results. All comparisons are on a year-over-year basis unless otherwise noted.

Q3 total revenue was $27.7 billion, down 4% or up 2% on a constant currency basis. Had foreign exchange rates remained constant with Q3 of last year, total revenue would have been approximately $1.8 billion higher.

Q3 total expenses were $22.1 billion, up 19% compared to last year. This includes a $413 million impairment of certain operating leases as part of our ongoing work to align our office facilities footprint with our anticipated operating needs. In terms of the specific line items:

Cost of revenue decreased 1%, as a reduction in Reality Labs hardware costs was offset by growth in infrastructure and content-related expenses.

R&D increased 45%, mainly driven by hiring within our Family of Apps and Reality Labs segments, as well as Reality Labs technology development costs.

Lastly, Marketing & Sales and G&A increased 6% and 15% respectively, mainly driven by headcount-related costs.

Our pace of hiring slowed in the third quarter, consistent with our previously-stated plans. We added 3,700 net new hires in Q3, down from our Q2 net additions of 5,700 despite Q3 typically being a seasonally stronger hiring period. We expect hiring to slow dramatically going forward and to hold headcount roughly flat next year relative to current levels, which I will cover in my outlook section.

Third quarter operating income was $5.7 billion, representing a 20% operating margin.

Our tax rate was 21%.

Net income was $4.4 billion or $1.64 per share.

Capital expenditures, including principal payments on finance leases, were $9.5 billion, driven by investments in servers, data centers, and network infrastructure.

Free cash flow was $173 million. We repurchased $6.5 billion of our Class A common stock in the third quarter and completed an inaugural debt offering of $10 billion. We ended the quarter with $41.8 billion in cash and marketable securities.

Moving now to our segment results.

I'll begin with our Family of Apps segment.

Our community across the Family of Apps continues to grow. We estimate that approximately 2.9 billion people used at least one of our Family of Apps on a daily basis in September, and that approximately 3.7 billion people used at least one on a monthly basis.

Facebook continues to grow globally and engagement remains strong. Facebook daily active users were 1.98 billion, up 3% or 54 million compared to last year. DAUs represented approximately 67% of the 2.96 billion monthly active users in September. MAUs grew 48 million or 2% compared to last year.

Q3 Total Family of Apps revenue was $27.4 billion, down 4%.

Q3 Family of Apps ad revenue was $27.2 billion, down 4% but up 3% on a constant currency basis. Consistent with our expectations, the headwind to year-over-year growth from Apple's ATT changes diminished in Q3 as we lapped the first full quarter post the launch of iOS14.5. However, this was offset by weak advertising demand, which we believe continues to be impacted by the uncertain and volatile macroeconomic landscape. As a result, our Q3 constant currency growth rate was in-line with our Q2 rate.

The healthcare and travel verticals were the largest positive contributors to growth in Q3. However, this was offset by continued softness in other verticals, including online commerce, gaming, financial services and CPG. On an advertiser size basis, revenue growth from large advertisers remains challenged while we've seen more resilience amongst smaller advertisers.

Foreign currency was a significant headwind to advertising revenue growth in all international regions. On a user geography basis, year-over-year ad revenue growth was strongest in Asia-Pacific and Rest of World at 6% and 3%, respectively, with both regions continuing to benefit meaningfully from strong growth in click-to-messaging ads. North America and Europe declined 3% and 16%, respectively.

In Q3, the total number of ad impressions served across our services increased 17% and the average price per ad decreased 18%.

Impression growth was driven by Asia-Pacific and Rest of World. The year-over-year decline in pricing was primarily driven by strong impression growth, especially from lower monetizing surfaces and regions, foreign currency depreciation and lower advertiser demand.

Family of Apps other revenue was $192 million, up 9%, driven by strong business messaging growth from our WhatsApp Business Platform partially offset by a decline in other line items.

We continue to direct the majority of our investments toward the development and operation of our Family of Apps. In Q3, Family of Apps expenses were $18.1 billion, representing 82% of our overall

expenses. FoA expenses grew 18% driven mostly by employee-related costs, infrastructure-related costs, and the impairment of certain operating leases for office facilities that we plan to exit.

Family of Apps operating income was $9.3 billion, representing a 34% operating margin.

Within our Reality Labs segment, Q3 revenue was $285 million, down 49% due to lower Quest 2 sales.

Reality Labs expenses were $4.0 billion, up 24% due primarily to employee-related costs and technology development expenses.

Reality Labs operating loss was $3.7 billion.

Turning now to the outlook.

We expect fourth quarter 2022 total revenue to be in the range of $30-32.5 billion. Our guidance assumes foreign currency will be an approximately 7% headwind to year-over-year total revenue growth in the fourth quarter, based on current exchange rates.

Before turning to the expense outlook, I wanted to provide some context on the approach we are taking towards setting our 2023 budget. We are making significant changes across the board to operate more efficiently. We are holding some teams flat in terms of headcount, shrinking others and investing headcount growth only in our highest priorities. As a result, we expect headcount at the end of 2023 will be approximately in-line with third quarter 2022 levels.

We have increased scrutiny on all areas of operating expenses. However, these moves follow a substantial investment cycle so they will take time to play out in terms of our overall expense trajectory. Some steps, like the ongoing rationalization of our office footprint, will lead to incremental costs in the near term. This should set us up well for future years, when we expect to return to higher rates of revenue growth.

Turning now to the specific expense outlook for 2022 and 2023.

We expect 2022 total expenses to be in the range of $85-87 billion, updated from our prior outlook of $85-88 billion. This includes an estimated $900 million in additional charges related to consolidating our office facilities footprint that we expect to record in the fourth quarter of 2022.

We anticipate our full-year 2023 total expenses will be in the range of $96-101 billion. This includes an estimated $2 billion in charges related to consolidating our office facilities footprint.

We expect the slight majority of our 2023 expense dollar growth to be driven by operating expenses, with the remaining growth coming from cost of revenue. We expect the percentage growth rate of 2023 operating expenses to decelerate meaningfully as we curtail non-headcount related expense growth and keep 2023 headcount roughly flat with current levels. Conversely, our growth in cost of revenue is expected to accelerate, driven by infrastructure-related expenses and, to a lesser extent, Reality Labs hardware costs driven by the launch of our next generation of our consumer Quest headset later next year.

Reality Labs expenses are included in our total expense guidance. We do anticipate that Reality Labs operating losses in 2023 will grow significantly year-over-year. Beyond 2023, we expect to pace Reality Labs investments such that we can achieve our goal of growing overall company operating income in the long run.

Before turning to our capex outlook, I'd like to provide some context on our infrastructure investment approach. We are currently going through an investment cycle, which is being primarily driven by two large areas of investment:

First, we are significantly expanding our AI capacity. These investments are driving substantially all of our capital expenditure growth in 2023. There is some increased capital intensity that comes with moving more of our infrastructure to AI. It requires more expensive servers and networking equipment, and we are building new data centers specifically equipped to support next generation AI-hardware. We expect these investments to provide us a technology advantage and unlock meaningful improvements across many of our key initiatives, including Feed, Reels and ads. We are carefully evaluating the return we achieve from these investments, which will inform the scale of our AI investment beyond 2023.

Second, we are making ongoing investments in our data center footprint. In recent years, we have stepped up our investment in bringing more data center capacity online and that work is ongoing in 2023. We believe the additional data center capacity will provide us greater flexibility with the types of servers we purchase and allow us to use them for longer, which we expect to generate greater cost efficiencies over time.

These investments, along with revenue headwinds, are contributing to higher capital expenditures as a percentage of revenue in 2022 and 2023 than we expect over the long-term.

Turning now to the specific capex outlook for 2022 and 2023.

We expect 2022 capital expenditures, including principal payments on finance leases, to be in the range of $32-33 billion, updated from our prior range of $30-34 billion.

For 2023, we expect capital expenditures to be in the range of $34-39 billion, driven by our investments in data centers, servers, and network infrastructure. An increase in AI capacity is driving substantially all of our capital expenditure growth in 2023.

Turning to tax. Absent any changes to U.S. tax law, we expect our fourth quarter 2022 and our full year 2023 tax rate to be similar to the third quarter 2022 rate.

In addition, as noted on previous calls, we continue to monitor developments regarding the viability of transatlantic data transfers and their potential impact on our European operations.

In closing, we are pleased with the growth of the community using our Family of Apps and the engagement improvements we are driving with efforts such as Reels and our AI-powered content recommendations. While we are facing near-term headwinds on revenue, the fundamentals are there for a return to stronger top-line growth. We are approaching 2023 with a focus on efficiency and spending discipline, and I am optimistic that these moves will set us up well to achieve our goal of driving operating income growth over the long-term while investing for future growth.

On a personal note, I will be closing out a decade at Meta in the next couple weeks including the last 8 years as CFO. In my new role, I am looking forward to continuing to help the company achieve its long-term mission and execute on its financial plan. I couldn't be happier to hand off the CFO role to Susan Li who is one of the most talented executives that I have had a chance to work with in my long career in finance and tech.

And with that, Martin, let me open up the call for questions.

Operator:          Thank you. We will now open the lines for a question and answer session. To ask a question, press one followed by the number four on your touchtone phone. Please pick up your handset before asking your question to ensure clarity. If you are streaming today's call, please mute your computer speakers. And your first question comes from the line of Brian Nowak with Morgan Stanley.

Brian Nowak:     Thanks for taking my questions. If I could squeeze in two. The first one is on CapEx and return on invested capital. The CapEx spend and forward expectations are remaining somewhat higher than investors expected.

So Mark, can you maybe just give us some examples of what these new AI investments are going to enable you to do differently going forward than in the past? And what's a reasonable period in which investors should expect to see material incremental engagement or revenue from these?

And then the second one is on engagement. I thought your comments about incremental time spent from Reels were interesting. But maybe just to sort of address the big topic around time spent, can you give us any update on what U.S. time spent trends look like just to sort of give investors some incremental confidence in the durability of the platform in your oldest market? Thanks.

David Wehner:    Yes, hey Brian, why don't I take the time spent question first, and then I'll hand it off to Susan on the CapEx question. So on time spent, we are really pleased with what we're seeing on engagement. And as Mark mentioned, Reels is incremental to time spent.

Specifically, in terms of aggregate time spent on Instagram and Facebook, both are up year-over-year in both the U.S. and globally. So while we're not specifically optimizing for time spent, those trends are positive. And we aren't specifically optimizing for time spent because that would tend to tilt us towards longer-form video, and we're actually focused more on short-form and other types of content. So just some color on time spent. And Susan, do you want to take the CapEx question?

Susan Li:          Yes. Thanks, Brian. So as Dave mentioned in his script, we expect 2023 CapEx to be in the range of $34 billion to $39 billion, with our investments in AI driving all of that growth. We're very focused on evaluating the ROI of our AI investments, and that'll inform our level of future spend. But so far, we've seen continued strong impact on our recommendations products from advancing developments in our AI work.

In the Q2 call, we had shared that a single AI advancement in scaling our recommendations models had led to a 15% watch time gain for Facebook Reels, and that gain has continued to grow. And we expect that there will be additional Watch time improvements coming from that work.

On the ads side, we're also continuing to roll out more AI and ML improvements in some of the new ads offerings, and we're encouraged by all of the early examples that we've seen. So this is something that we'll be watching very closely.

We think we're early in this journey, but our level of CapEx investment will depend on the returns that we generate through these investments in AI. And if we generate significant engagement and revenue gains, we'll continue investing here. And if we don't, we'll pace our spending accordingly.

Operator:         Your next question comes from the line of Mark Shmulik with Bernstein.

Mark Shmulik:    Yes, hi, thanks for taking the question. A couple, if I may. Mark, the first one, you kind of mentioned in your opening remarks that you expect to get back to kind of revenue growth in 2023. Any color you can share on kind of the key drivers behind that? And how much of that is macro-driven versus some of these initiatives that you guys are working on?

And then secondly, for Susan, as we think about kind of the operating expense guidance into 2023, I know historically, those numbers have tended to skew a bit conservative. How much conservatism is baked in there? And how much flexibility is there to kind of toggle some of those expenses depending on the health of core?

David Wehner:    So Mark, it's Dave. I'll take the first question. Obviously, we're continuing to see significant macro headwinds in the business. We do think there's a big cyclical factor here, so some of it is just going to depend on the broader economy and recovery that we see.

But we're continuing to make progress in a number of areas in terms of growth, and Mark cited one of those, which is click-to-messaging ads, which has been a solid grower. It's a $9 billion revenue run rate today, and we're continuing to make good progress on click-to-messaging ads as a driver that's especially been important in some of the developing markets.

And overall, we're focusing on a number of areas to grow revenue as we get through this tough cycle. And we're seeing progress on a number of fronts, but it's going to depend to some extent on what the overall macro climate is like. We're not going to be facing as significant headwinds next year from the signals point of view as we are now lapping the big changes that were made on the iOS platform. So that's going to also not factor in as strongly in our growth rates next year.

Susan Li:        And I'll take that second question on next year's OpEx guide. One thing I'd point out first is just next year's guide includes an estimated $2 billion in 2023 expenses that are one-time charges as part of our office facilities consolidation as we continue to

9

rationalize our real estate footprint. We also expect a little over half of our expense dollar growth in 2023 to come from OpEx, with the rest coming from cost of revenue.

On the OpEx side, the growth in 2023 OpEx is primarily driven by headcount-related costs from employees that we've already hired through 2022, and those hires have primarily been concentrated in technical and more senior roles. So we expect the slowdown in payroll growth in 2023 will be the result of the slowdown in headcount growth overall. As we mentioned, we expect to end 2023 with headcount roughly flat to where we are now.

And on the cost of revenue side, we expect the growth rate of cost of revenue to accelerate in '23 driven by the increased depreciation that we're seeing play through from the big CapEx investments that we've made so far and then as well as from Reality Labs with the launch of the next generation of the consumer Quest headset later next year.

Operator:          Your next question comes from the line of Justin Post with Bank of America.

Justin Post:       Great, a couple of questions on the Reels transition. When you think about that business, and people coming to the site, do you think -- how does it compare to the News Feed as far as repeat rates or retention? And are you a little worried that it's a little less proprietary than your prior content?

And then second, I think there are a lot of questions on CapEx. Just wondering if the build here for this year and next is one-time to kind of get your capabilities in place, and then maybe you can go back to kind of a mid-teens level as a percentage of revenue or is just the transition in the business just a higher capital intensity business. Thank you.

David Wehner:     So Justin, on the Reels transition, as Mark noted, it is incremental to time spent. So we are seeing a benefit from Reels to contributing to overall engagement on the platform.

And it's contributing to healthy engagement dynamics. And I'd say that, coupled with our recommendation engine, which is also increasing engagement on the platform, are both promising trends on the engagement front. From a monetization perspective, we are still working to close the gap between Reels and Feeds and Stories, but it's going to take time before Reels becomes a tailwind to revenue.

As Mark mentioned, we're on about a $3 billion run rate today, but Reels was still negative overall to revenue by about $500 million in the quarter. So we expect that it should be a tailwind to the business eventually. And we're sort of saying that's probably in the 12- to 18-month time frame. But overall, we're pleased with the impact that Reels has on the business, specifically on the engagement front.

Susan Li:          And on your second question about the CapEx guide, I would really think about our CapEx investment as kind of the AI and non-AI components. On the AI side, which

10

really is driving all of the CapEx growth in 2023, we will be pacing that future investment on the basis of the returns that we're able to see and measure. So frankly, we're hopeful that there will be a big opportunity to invest more here because we expect that this will be a high ROI area of investment for us.

On the non-AI side, a lot of that spend is in ongoing investments on our data center footprint where we had stepped up our investment in recent years to build sort of ahead of our anticipated capacity needs, and that work continues in 2023. We do expect this component of our CapEx spend to become more efficient over time, and we're actively looking for more efficiencies there.

So I don't know that we are benchmarking to an exact number on the combination of those two things. The future intensity, I think, is going to depend on the returns that we generate through those increased AI investments.

Mark Zuckerberg:   Yes. And maybe I'll just add some color on how I'm seeing this, too, just because the Reels and discovery engine work is such a big part of what we're spending our time and energy on right now.

I think there are two comparisons to the things that we've done in the past here that are worth anchoring on. For Reels monetization specifically, any time we've had a new format, like when we added Stories or even before that when we were primarily on desktop and we shifted to mobile feed, we sort of had this dynamic where we focused on increasing engagement and growing demand for the product.

But while that was happening, monetization efficiency for the new format lagged behind kind of the News Feed or mobile News Feed compared to Stories for some period while that was ramping up. And while it's really hard for us to answer questions now that are like what is the eventual monetization efficiency going to be, it's really hard to predict that in advance.

What I can say is I think on Stories, we've ended up achieving something that was way greater than what we even hoped to achieve at the time, right, in terms of where we thought that Stories could net out. And a lot of the progress that we've been making on Reels monetization so far has been at a clip that we've been pretty happy with.

So obviously, we want to close the monetization gap as quickly as possible. We want this to be a tailwind, not a headwind. I think we're going to get there. It's -- but I think we've gone through a few of these transitions, and I think that'll just take some time.

On the engagement side, in terms of how incremental this is, the basic way to think about this is you have a set amount of inventory across the system. There's content from family and friends, which is quite differentiated and valuable and accounts that you follow.

But now there's this whole larger corpus that we can use AI to effectively understand what the content means and understand individually what you might be interested in, just have access to a much bigger corpus of content to put into your feeds and increase engagement.

And we're seeing that start to work already and be incremental in terms of having more people use the services, having them spend more time, having them spend -- just engage more in feeds overall. So that part of things we think is going well.

We think we'll -- we should be able to continue driving results. Some of the results already have been due to some of the AI investments and infrastructure that we've made. If our bets are correct, then the AI CapEx that we're bringing online should be able to drive incremental engagement that's pretty meaningful there. But we think qualitatively that investment makes just a lot of sense given the direction that the world seems to be going in.

And I do think that our somewhat unique mix of both having the kind of social friends and family content and the ability to drive recommendations, which I agree with some -- the premise of the question there, and that creators do want their content to be on multiple platforms, which I think is a little bit different from friends content where you want to, for the most part, share where your friends are, and you're not trying to have it be everywhere.

I think we should be able to do pretty well on both of those, and that should grow over time. But that's -- it's hard for us to be more specific than that now, but I do think that these trends -- I mean I get that this takes a little longer to play out than you would want. But we've been through a couple of these cycles before already, and I'm pretty confident this is going in a good direction.

Operator:            Your next question comes from the line of Doug Anmuth with JPMorgan.

Doug Anmuth:         Thanks for taking the questions. I have two. Dave, you talked about the ATT impact diminishing in 3Q just as you lap the rollout. Curious if you're seeing any meaningful improvements around ATT. Or is this just a function of the year-over-year comp dynamic?

                     And then second, can you just talk about your efforts to attract content creators to Reels? And does revenue sharing impact your margin structure versus the current ad formats and surfaces? Thanks.

David Wehner:        So in terms of ATT impact, we're -- the primary factor is the lapping factor relative to Q2. So in Q2 of 2021, ATT had not been fully rolled out. It was largely rolled out by Q3 of '21. So the fact that we were lapping that period in the third quarter, we got a benefit relative to the second quarter, but that was offset by continued macro weakness.

12

In terms of the efforts to attract content creators, and specifically as it relates to the overall cost structure, we don't anticipate that that's going to have a meaningful impact to the cost structure. And obviously, it's factored into our expense guidance.

Operator:            Your next question comes from the line of Eric Sheridan with Goldman Sachs.

Eric Sheridan:       Thanks for taking the questions. Maybe two, if I can. Mark, I would love you to weigh in. Obviously, the company has faced a lot of headwinds from platform changes, competitive dynamics, and a lot of macro impact, as we've talked about over the last 12 to 24 months.

How much of this investment cycle is informed by your views around future-proofing the platform, so there are less externalities that can impact it and you're in control more of your own destiny versus elements of curveballs that can be thrown at you that can cause volatility in the business in the medium to long term?

And then I'd love to ask one on the metaverse. Understood on the investment cadence in the metaverse over the next couple of years. Even if qualitatively, how should investors think about the revenue opportunity over the next 3 to 5 years split between the hardware opportunity and the non-hardware opportunity as you see it as the metaverse evolves?

Mark Zuckerberg:     Sure. Let's -- I can take the first one and then -- I mean I guess I could take the second one, too. So the first question was -- what was this... Yeah. Right. Okay. So I think that that's a factor, but it's not the primary thing that's driving it. So on the business side, I think certainly, you see dynamics like what Apple has done with ATT and continues to do in some ways with the policy that they announced yesterday, which are obviously big risks and we see as issues.

But there are also other things that -- like we just believe that -- and we've invested so much in measurement over time because -- since our ads help people higher up in the funnel than search ads, for example, we think that often, less of the value of sales is attributed to us than it should be.

So for all these reasons, having a funnel that's more integrated where we do more commerce internally, this is a big part of what we hope to achieve with business messaging.

And the fact that you can find a customer, have a thread directly with them in a business chat and be able to sell a product directly or to be able to do customer support and then help people out with the product and then maybe sell them something else, that kind of integration, I think, is going to be valuable very broadly in terms of making sure that the value that we're creating for businesses and consumers can be more efficiently measured and attributed to our services.

A lot of this, though, is it's not just about fortifying against outside threats. A lot of this is just you can build new and innovative things by -- when you control more of the stack yourself.

13

I mean in the metaverse sense, a lot of the things that we're trying to enable, right, this feeling of presence, which in a lot of ways is sort of the ultimate social experience when you do it physically or eventually when -- as you're doing it virtually, being able to design the hardware so that way you can have sensors that can help map your facial expressions and emotions to the avatar that you have, virtually, I think, is going to be just a very profound experience.

And you can start to experience that with Quest Pro, which is out now. And it's just not clear if we weren't driving this forward that anyone else would be. So I think that that sort of integration and innovation is really helpful.

Similarly, I think the fact that we can create a lot of the business and commerce platform around our messaging products, but then link to them from Facebook and Instagram creates some unique experiences that I think would be very hard to create otherwise as well just in terms of having that kind of full loop in the product.

So that like enabling more experiences, I think, is really the primary driver. And then the sort of fortification against external risks is certainly a strategic advantage over the long term, but probably not the only reason why we're doing this.

| Operator: | Your next question comes from the line of Youssef Squali with Truist. |
|---|---|

| Youssef Squali: | Great, thank you very much. Maybe one question for Dave or Susan and then one for Mark. What kind of base case assumptions for macro are you guys baking in for 2023 with -- against that 12% to 15% increase in OpEx and CapEx guide? And can you talk about maybe the fixed versus variable component in the expense guide that could give you the flexibility to address any material macro changes next year? |

And Mark, relative to your own expectations when you decided to pursue the metaverse strategy a couple of years ago, how would you rate the company's performance to date in terms of product rollout, engagement with things like Horizon World, et cetera? And is the opportunity evolving in line with your expectations? And if not, what are the key gating factors? Thank you.

| Susan Li: | Hi, it's Susan on the first question. We haven't given revenue guidance yet for 2023, but our Q4 2022 guide is a range, and that range certainly encompasses, I think, a wide variety of macro expectations. We're certainly in a period right now where we are seeing a slowdown in advertising demand, and that correlates with a lot of things that we're seeing outside of just our sector here, including rising inflation and supply chain issues sort of more broadly across the economy. |

So with that in mind, we have undertaken a 2023 budget process that has applied higher scrutiny to almost all of the areas of our very broad investment portfolio, and we have taken what is an intentionally more conservative approach to our budget and our anticipated growth.

You asked about the sort of fixed versus variable components of the 2023 OpEx guide. I think I'd mentioned that over half -- a little over half of that is coming from OpEx, the rest from cost of revenue. So the cost of revenue piece that has the sort of the growth in depreciation, which is certainly fixed and is just playing through from prior year CapEx growth. Part of that is coming from Reality Labs and the launch of the next-gen consumer Quest headset. So that sort of corresponds to the product launch.

And then on the OpEx side, we -- a lot of the growth in 2023 OpEx is coming from employees who we've already hired. We expect that we're going to have the same number of employees end of 2023. So that's an area where we're pretty focused on being disciplined also. And then finally, I'd just mention, again, there's that $2 billion office facilities consolidation charge that's also included in the '23 OpEx guide.

Mark Zuckerberg:   Sure. And in terms of the metaverse efforts and kind of how we're doing compared to what I expected, it's a pretty wide portfolio of things that we're working on, which I think is important to internalize because the -- what I think most people see are the VR headsets, right? Because that's sort of the first thing that we launched, and Quest 2 is the first mainstream VR headset. I kind of think about what we're doing.

There's four major platforms that we're focused on developing. One is the kind of social metaverse platform where you see an early version of that with Horizon with the avatar system. And that's an area where we're really -- we're iterating out in the open, right? It's a kind of a live early product platform, and that's evolving quickly, but obviously has a long way to go before it's going to be what we aspire for it to be.

But that's one important area that's given what we do is sort of the social company that's about people interacting, how you express yourself in all forms, the kind of expressive avatars, the photorealistic avatars. We think we're doing some leading work there. But obviously, we need to get that into the product and continue iterating on that.

VR is the second major platform. And there, I think that there's going to be a consumer-focused product that probably will reach very large scale, but there's also, I think, going to be a work-focused product that -- it's like you don't do most of your work on a $500 device. We have computers and workstations that are much more powerful and have more technology in them. And I think that that's going to end up being similar here as well. So we started that with Quest Pro, and that's -- we're sort of at the start of the journey there.

The two other areas, which are mostly -- which are still internal, is a lot of the work on augmented reality, which is a quite a large effort but we, think, is going to be just a huge part of the value that gets created over time. And there, we -- a lot of what I'm judging is how well are the R&D efforts going. There are some kind of basic things that we need to get right, some integration of things, some figuring out how to manufacture things and where we're making progress on that.

And I'd say a bunch of that is that there are some things that are going better than I expected, some things that seem like they might take a bit longer. But overall, I mean, there's -- none of the indications that I have would suggest that anyone else in the world is doing leading work ahead of us in those areas, even though we have not obviously shipped the AR glasses yet.

And then the fourth platform after the kind of social platforms, VR and AR, is neural interfaces, which I think the kind of risk-based EMG interface, which is, for all these computing platforms, there's going to end up being -- input is a really important part, how do you basically control the computing platform.

And we think by the time that you have glasses, and you're kind of walking down the street with glasses, you're not going to have controllers with that, you're not going to want to have your hands kind of like hovering in the air, and you're not always going to want to talk to the thing, even though that's going to be one way that we use them a bunch of the time. Sometimes you're going to want something that's more private.

So we think that having a discrete way to basically communicate with the device is going to be critical. And that's also an area where, as far as I can see, the research that we're doing is really leading here. So it's a pretty big surface.

I know that sometimes when we ship a product, there's a meme where people say, "Hey, you're spending all this money, and you've produced this thing," and it's -- I think that that's not really the right way to think about it. I think there's a number of different products and platforms that we're building where we think we're doing leading work that will become -- launching consumer products and then eventually mature products at different cadences in different periods of time over the next 5 to 10 years. And in all of these areas, I think the teams are making very good progress. And I think that this will be fundamentally important for the future.

Nothing that we're seeing suggests that that's not going to be the case. We are pacing a bunch of the investments given the kind of macroeconomic environment and the rest of the business performance.

But ultimately, I mean, look, I get that a lot of people might disagree with this investment. But from what I can tell, I think that this is going to be a very important thing, and I think it would be a mistake for us to not focus on any of these areas, which I think are going to be fundamentally important to the future. So we're going to try to do this in a way that is responsible and matches the way that the rest of the business is growing over time.

And I think we've built up the team to a point now where I think we'll be able to kind of match that growth with the rest of the business more going forward. But over time, I think that these are going to end up being very important investments for the future of our business. And I think it's some of the most historic work that we're doing that I think people are going to look back on decades from now and talk about the importance of the work that was done here.

16

| | |
|---|---|
| Operator: | Your next question comes from the line of Mark Mahaney with Evercore ISI. |
| Mark Mahaney: | I want to follow up on a prior question. It's back on the ad tools. And I'm trying to figure out how much of a priority it is for the company and how long the company thinks it can take to kind of recover or to create a new, I don't know, probabilistic ad attribution model, probabilistically based ad targeting model. |
| | This is something that took $10 billion maybe out of your business. I mean it had a material financial impact. And listening to the call, I just don't hear it as a major investment priority. So the challenge -- the question is, is it a major investment priority? Or is it that, that goal is just elusive, and it's better to focus on other things? Thanks a lot. |
| Marne Levine: | Hi Mark, I'll take this question. We have continued our broader work to rebuild meaningful elements of our ad tech. So our system can improve performance and measurement with -- and we've been making investments in the short and the medium term and over the long term. |
| | In the short and the medium term, what we've been very focused on is evolving our ad system by growing on-site conversions with products like lead ads and ads that click-to-message. And we're continuing to make investments in AI and machine learning to improve measurement, targeting and delivery. |
| | We have been pleased with our progress that we've made this quarter to help advertisers improve performance, targeting and measurement. I would be remiss if I didn't talk about how AI and ML is really helping advertisers. One example of this is Advantage+ Shopping. We launched it in August. It's a product that's enabled by machine learning that helps clients test, learn and optimize their campaigns faster. |
| | It's early, but a recent test across a cross-section of advertisers found that those using Advantage+ Shopping campaign saw a 32% increase in return on ad spend. Over the longer term, we're focused on investing in privacy-enhancing technologies, both our own portfolio of solutions, but also working with the industry to do that. And all of this is in the spirit of investing in this technology to help advertisers get more value. |
| Deborah Crawford: | Great. Thanks, Marne. We have -- operator, we have time for one last question. |
| Operator: | Thank you. That will come from the line of Brent Thill with Jefferies. |
| Brent Thill: | I think kind of summing up how investors are feeling right now is that there are just too many experimental bets versus proven bets on the core. And I'm curious if you can just add more color why you don't feel these are experimental. You feel like they pay off. There's obviously a lot of focus on the investment side. I think everyone would love to hear why you think this pays off. |

17

David Wehner:    Yes. Let me take at least part of that. I mean we're making a number of investments across the portfolio. Marne outlined some that we're making in the ad space. Obviously, the investments that we're making in product areas like Reels and the business messaging platform at WhatsApp are ones that we think will have a significant payoff for the -- in business, both in terms of engagement and monetization.

So we're making a wide portfolio of bets. Still, the majority of our spending is directed towards our Family of Apps investment, and those are across both engagement and monetization, leveraging AI in many cases.

And we're making good progress on those fronts and then leveraging as well what is today a fairly under-monetized resource in terms of our messaging platforms, building more scale around those as being a source of future revenue growth. We've already proven it out with our business -- our click-to-message ads with a $9 billion business today. We think we can build a substantial sized business around paid messaging, which will complement that as well. So I think we've got a lot of bets across the Family of Apps portfolio in addition to the work that we're doing on Reality Labs and the Metaverse.

Mark Zuckerberg:    Yes. I mean I'd just say that there's a difference between something being experimental and not knowing how good it's going to end up being. But I think a lot of the things that we're working on across the Family of Apps are we're quite confident that they're going to work and be good.

The Reels work, the discovery engine work, all the ads work on signals, the business messaging work, I -- we can't tell you right now how big they're going to scale to be. But I think that each of these things are kind of going in the right direction. Obviously, the metaverse work is a longer-term set of efforts that we're working on. But I don't know. I think that that is going to end up working, too.

So yes. I think that, look, there are a number of different -- there are a lot of things going on right now in the business and in the world. And so it's hard to have, like, a simple we're going to do this one thing, and that's going to solve all the issues. I mean there's macroeconomic issues. There's a lot of competition. There's ads challenges, especially coming from Apple.

And then there's some of the longer-term things that we're taking on expenses because we believe that they're going to provide greater returns over time. And I think we're going to resolve each of these things over different periods of time. And I appreciate the patience. And I think that those who are patient and invest with us will end up being rewarded.

Marne Levine:    Just adding to what Mark just said, it is a challenging time for advertisers. And what they are focused on given the economic uncertainty is getting a strong return on investment. Going back to the Family of Apps and services, Reels continues to be the fastest-growing format on Instagram and Facebook, and it is a great way for people to discover new interests, creators and connect with businesses.

What we're focused on is making sure that businesses get a strong ROI on Reels. And one example that shows that we're delivering on this in terms of our investments is CORKCICLE, which is the insulated drinkware brand that added Reels to its business-as-usual strategy and saw a 34% higher return on ad spend and a 34% higher sales. So we are making progress with our investments and helping advertisers find that ROI that they're looking for.

Deborah Crawford: Great. Thank you, everybody, for joining us today. We appreciate your time, and we look forward to speaking with you again.

Operator: And this concludes today's conference call. Thank you for joining us. You may now disconnect your lines.

# Exhibit 454

Download        Nitro        Discover        Safety

Login

Support        Blog        Careers

# CREATE SPACE FOR EVERYONE TO FIND BELONGING

It's where your world hangs out. Discord is a voice, video and text communication service used by over a hundred million people to hang out and talk with their friends and communities.



# Our story

Discord is about giving people the power to create space to find belonging in their lives. We want to make it easier for you to talk regularly with the people you care about. We want you to build genuine relationships with your friends and communities close to home or around the world. Original, reliable, playful, and relatable. These are the values that connect our users and our employees at Discord.

# Prologue

Discord was started to solve a big problem: how to communicate with friends around the world while playing games online. Since childhood, founders Jason Citron and Stan Vishnevskiy both shared a love of video games, cherishing the friendships and connections that formed while playing them. At the time, all the tools built for this job were slow, unreliable, and complex. Jason and Stan knew they could make a better service that encouraged talking, helped form memories,



and recreated the feeling of togetherness all found through gaming.

# Chapter One

So, in 2015, Stan and Jason started to bring Discord to life. People from all over the world loved it. Discord made it easy to genuinely communicate with friends, going beyond casual talking. Friends were staying in touch with their various communities. Discord was making it easy to participate in conversation, hopping around text, voice and video to talk. The technology was complex but the goal was simple: make Discord an inviting and comfortable home to jump into with

your communities and friends. Within a few years, Discord began to take off, and devoted people who loved our product sprung up around the world.



# Where are we now?

Discord is used by everyone from local hiking clubs, to art communities, to study groups. Discord has millions of people creating places for their friends and communities, talking for upwards of 4 hours per day on the platform. Discord is now where the world talks, hangs out, and builds relationships. Discord lets anyone create a space to find belonging—just like it did for Jason and Stan.



# Our metrics

## 150 Million

Monthly active users

## 19 Million

Active servers per week

## 4 Billion

Server conversation minutes daily

## Our office





# Come make some Discord with us

Become part of a group of passionate people passionately crafting exceptional products they're passionate about. We're also passionate about health and safety, so you'll be kicking it from your couch while our office is closed.

**Open Jobs**

🇺🇸 English

### Product

Download

Nitro

Status

App Directory

New Mobile Experience

### Company

About

Jobs

Brand

Newsroom

### Resources

College

Support

Safety

Blog

Feedback

StreamKit

Creators

Community

Developers

Gaming

Quests

Official 3rd Party Merch

### Policies

Terms

Privacy

Cookie Settings

Guidelines

Acknowledgements

Licenses

Company Information

Sign up

# Exhibit 455

Search blog...

‹ Back to Blog

# Improved Calling on WhatsApp



While WhatsApp is best known for bringing private and secure messaging to users across the world, more and more people are using WhatsApp as a way to connect with voice and video calls. That's why over the course of this year we've launched several improvements to calling on WhatsApp, for catching up with your loved ones, colleagues and communities securely.

We've introduced new features for better connecting as a group on calls:

- **32 person calls**: Just like with voice calls, you can now do video calls on your mobile with up to 32 people, four times the number of people than before

- **Message or mute call participants**: Long pressing on a participant will enlarge the video or audio feed and allow you to either mute or message them separately while keeping the calls going

- **Call links**: Whether making a last minute call or planning ahead, you can easily invite people to a group call by sharing a call link

We've also made design changes for a more seamless calling experience:

- **Colorful waveforms**: Now you can easily see who is speaking if their camera is off

- **In-call banner notifications**: See when someone new joins a group call

- **Picture in Picture on iOS**: Now in beta testing and rolling out in the new year, easily multitask while on a call thanks to a minimized in-call video screen

As always, all calls on WhatsApp are end-to-end encrypted by default to protect people's privacy and safety.

We'll keep making improvements next year as we continue supporting high quality, private calling on WhatsApp wherever you are in the world.

December 14, 2022

 

# Exhibit 456

WhatsApp Blog

# New Features for More Privacy, More Protection, More Control

At WhatsApp, Privacy is in our DNA, and we will never stop building new ways to protect your personal conversations. We believe messaging and calling should always be as private and secure as having face-to-face conversations. Kind of like if two people were talking and no one else was around.

WhatsApp protects the personal calls and messages of users with default end-to-end encryption, so no one but the intended recipient can hear or see them. But that is just one important part of protecting your privacy. Over the years, we've added new layers of privacy protections to give you multiple ways to secure your messages, including disappearing messages that self-destruct, end-to-end encrypted backups when you want to save your chat history, 2-step verification for added security, and the ability to block and report unwanted chats.

**Today, we're excited to bring several new privacy features that provide even more layers of protection** and give you more control over your messages. This is all part of how we work to keep your conversations secure on WhatsApp.



- **Leave Groups Silently**: We love our group chats but some are not forever. We're making it possible to exit a group privately without making it a big deal to everyone. Now, instead of notifying the full group when you are leaving, only the admins will be notified. This feature will start to roll out to all users this month.

- **Choose Who Can See When You're Online**: Seeing when friends or family are online helps us feel connected to one another, but we've all had times when we wanted to check our WhatsApp privately. For the moments you want to keep your online presence private, we're introducing the ability to select who can and can't see when you're online. This will start rolling out to all users this month.

- **Screenshot Blocking For View Once Messages**: View Once is already an incredibly popular way to share photos or media that don't need to have a permanent digital record. Now we're enabling screenshot blocking for View Once messages for an added layer of protection. We're testing this feature now and are excited to roll it out to users soon.

To spread the word about these new layers of protection, **we're also kicking off a campaign to educate people about the new features and our continued commitment to protecting your private conversations on WhatsApp.** We hope people enjoy getting to use these new features and benefit from several options that help you keep your messages secure. We look forward to your feedback on what to build next.

August 9, 2022

Tweet        Share

# Exhibit 457

WhatsApp Blog

# New Security Features: Account Protect, Device Verification, Automatic Security Codes

At WhatsApp, we believe that your messages should be as private and secure as an in-person conversation. Protecting your personal messages with default end-to-end encryption is the foundation of that security, and we'll never stop building new features to give you extra layers of privacy, and more control over your messages.

A lot of this work happens behind the scenes without you having to do a thing. Today, we're excited to tell you about some of the additional security features we'll be adding in the coming months.



**Account Protect:** If you need to switch your WhatsApp account to a new device – we want to double check that it's really you. From now on, we may ask you on your old device to verify that you want to take this step as an extra security check. This feature can help alert you to an unauthorized attempt to move your account to another device.

3/24/24, 6:35 PM
Case 1:20-cv-03590-JEB   Document 324-34   Filed 04/05/24   Page 186 of 203
New Security Features to Protect Your Privacy and Security on WhatsApp | Meta Blog

**Device Verification:** Mobile device malware is one of the biggest threats to people's privacy and security today because it can take advantage of your phone without your permission and use your WhatsApp to send unwanted messages. To help prevent this, we have added checks to help authenticate your account - with no action needed from you - and better protect you if your device is compromised. This lets you continue using WhatsApp uninterrupted. Go deeper on the tech here.

**Automatic Security Codes:** Our most security conscious users have always been able to take advantage of our security code verification feature, which helps ensure you are chatting with the intended recipient. You can check this manually by going to the encryption tab under a contact's info. To make this process easier and more accessible to everyone, we're rolling out a security feature based on a process called "Key Transparency" that allows you to automatically verify that you have a secure connection. What it means for you is that when you click on the encryption tab, you'll be able to verify right away that your personal conversation is secured. For those interested in going deeper into the tech, click here.

These are three additional ways we're helping secure your account. While there's many things we can do to make security easy for everyone, there are two features that only you can turn on: two-step verification and use of end-to-end encrypted backups. If you're already using both, please tell your friends about them so more people can benefit from these layers of security too.

We hope people enjoy the increased security these features offer, and we look forward to announcing more updates soon.

April 13, 2023

Tweet          Share

# Exhibit 458

Search blog...

‹ Back to Blog

## Chat Lock: Making your most intimate conversations even more private

  

Our passion is to find new ways to help keep your messages private and secure. Today, we're excited to bring to you a new feature we're calling Chat Lock, which lets you protect your most intimate conversations behind one more layer of security.

Locking a chat takes that thread out of the inbox and puts it behind its own folder that can only be accessed with your device password or biometric, like a fingerprint. It also automatically hides the contents of that chat in notifications, too.

We think this feature will be great for people who have reason to share their phones from time to time with a family member or those moments where someone else is holding your phone at the exact moment an extra special chat arrives. You can lock a chat by tapping the name of a one-to-one or group and selecting the lock option. To reveal these chats, slowly pull down on your inbox and enter your phone password or biometric.

Over the next few months we're going to be adding more options for Chat Lock, including locking for companion devices and creating a custom password for your chats so that you can use a unique password different from the one you use for your phone.

Tell your friends about Chat Lock, which is rolling out now.



May 15, 2023



# Exhibit 459

 Meta

Language ▼

Transparency Center

Home → Features

# Our Approach to Facebook Feed Ranking

**UPDATED** NOV 28, 2023

Facebook's goal is to make sure you see posts from the people, interests, and ideas that you find valuable, whether that content comes from people you're already connected to or from those you may not yet know. When you open Facebook and see Feed in your Home tab, you experience a mix of "connected content" (e.g., content from the people you're friends with or are following, Groups you've joined, and Pages you've liked) as well as "recommended content" (e.g., content we think you'll be interested in from those you may want to know). We also show you ads that are tailored to you.

Below you'll find information about how we use ranking in Feed, focusing specifically on connected content. We're now providing a deeper look at the types of signals and prediction models we use in this process to help you better understand the details around how our ranking systems work.

## TABLE OF CONTENTS

Why We Use Personalized Ranking

How Feed Ranking Works for Connected Content

Giving People More Control Over What They See in Feed

A Deeper Dive into Predicting What You Want to See

Signals Used in Ranking Connected Content

Prediction Models Used in Ranking Connected Content

# Why We Use Personalized Ranking

We personalize each Feed for our more than 2 billion users by using state-of-the-art machine learning systems to rank content. Because most people have more content in their Feed than they could possibly browse in one session, these ranking systems help ensure that people see the content that is most valuable to them. While many different factors affect the ordering of content in Feed, the information below will give you more insight into the types of predictions and signals that generally have the biggest impact on how our systems determine what you see.

# How Feed Ranking Works for Connected Content

To determine the ranking of connected content in your Feed, the system works in four steps:

## ∧ Inventory

First, we gather your recent inventory – all potential new posts, or posts with new activity, that you could see when you open Facebook. This includes all the posts shared by 1) the people you have connected to as "friends," 2) the Pages you follow, and 3) the Groups you have joined, and excludes content flagged for violating our Community Standards.

## ∧ Signals

Then, for each of these posts, we consider thousands of "signals" to make predictions about what you will find most interesting. Many of these signals are pieces of information you give us directly when you like or share a post, you connect with a friend or Group, or you comment on a Page's post; others are inferred based on the actions you've taken on Facebook. We've shared more information about the types of signals used in ranking below.

## ∧ Predictions

From there, we use these signals to make a series of personalized predictions about which content you'll find most relevant and valuable. For example, our systems predict how likely you are to comment on a post, how likely it is that your friends will comment on the post if you share it, or how likely the post is to spark a conversation or back and forth discussion. We also use surveys to ask people whether a post was "worth your time" and these surveys are used to

make predictions about other content you'll find worthwhile. We also make predictions about whether a piece of content is problematic and should receive reduced distribution. All of these predictions are combined in the next step to produce the final ordering. We've shared more information about the predictions used in ranking below.

---

## ⌃ Ranking posts by score

Next, the system calculates a "relevance score" for each post and puts the posts in order based on this score. Generally, posts the system predicts will provide more value for you are shown higher up in your Feed. The system also tries to ensure your Feed has a balanced mix of content types. That means, for example, you are less likely to see multiple posts from the same Groups or from the same Page in a row; rather, you'll see a range of posts from different sources.

---

Once our ranking system has calculated the relevance scores, the second-to-last step we take is to intersperse recommended content: we add this to help you explore and discover more about your interests through other people who share them, regardless of whether you're already connected. Finally, we also include ads in Feed. Once this process is complete, your personalized Feed is ready!

Take a look at the video below to see more about how our ranking process works.

# Giving People More Control Over What They See in Feed

When you engage with content in Feed, you give us a combination of explicit signals (e.g., liking, commenting, or resharing content, etc.), and implicit signals (e.g., viewing posts) that help us predict what's meaningful to you. And because we believe it's important you have even more control over your Feed experience, we've built tools to help you further customize what you see. These controls include:

- Feed Preferences: provides options to fine-tune the way content is ranked in your Feed, including the ability to prioritize posts from your Favorites; Snooze or Unfollow people, Pages, and Groups to stop seeing their posts; and Reconnect with anyone you may have unfollowed.

- Show More and Show Less: lets you directly tell us what you want to see more or less of by selecting "Show more" or "Show less" on the posts you see. Selecting "Show more" will temporarily increase the ranking score for that post and posts like it, and selecting "Show less" will temporarily decrease its ranking score.

- Reduce: allows users to adjust the degree to which we demote problematic or low quality content in their Feed. (Our Content Distribution Guidelines outline some of the most significant reasons why problematic or low quality content may receive reduced distribution in Feed.)

- Feeds tab: allows you to see the newest posts first; content is sorted in reverse chronological order (alongside ads).

## A Deeper Dive into Predicting What You Want to See

The following two components are most important to determining what connected content you see at the top of your Feed - signals that tell us more about what you want to see, and the personalized prediction models powered by these signals that then create your unique Feed.

## Signals Used in Ranking Connected Content

We use thousands of different signals to make predictions about whether you'll find something more or less valuable. The categories of signals listed below represent the vast majority of the signals currently used in Feed ranking for connected content to make these personalized predictions. By drilling down into each category, you can learn more about the types of data we leverage in our models and some examples of individual signals.

To note, we have included categories and examples of signals specifically used for identifying problematic content, which we demote (or show lower in Feed). The information we're sharing

Documenting Facebook Feed ranking | Transparency Center

here around this subset of signals is purposefully more limited to guard against bad actors abusing our systems. Additionally, this information is subject to change.

---

## ∧ Data specific to you

---

## ∧ Data about your basic account information

**Basic account information**

- How long you've been using Facebook
- Language you are using Facebook in
- Location-related information such as IP address and other device signals if you allow us to receive it

---

## ∧ Data about how you're accessing Facebook

**The time, frequency and duration of your activities on Facebook**

- Time of day for the location where you are
- Number of days you've been active on Facebook, during a certain period of time

**Device you're using**

- The device and software you're using, and other device characterisitics for example, the type of device, details about its operating system, details about its hardware and software, battery level, signal strength

---

## ∧ Data about your activity on Facebook

**How you've shared different content**

- The number of different posts you've shared, for example videos, photos, Reels, etc.

**How you've interacted with different content**

- Types of content you've interacted with and how you've interacted with them, for example the total number of times you've clicked on photo posts or how many times you've commented on video posts

**How you've viewed different content**

- Types of content you view and how long you view them for, for example how long you spend looking at photos, how much time you spend reading comments or how much time you spend watching video

---

∧ **Data about your connections (friends, Pages, Groups, etc)**

**Data about the overall available posts from your friends, Pages and Groups**

- How many new posts are available for you to see and the different types of posts that are available
- How many of the posts from your connections have new comments

**Data about Friends**

- How many friends you have
- How often you interact with content from each friend

**Data about Pages you Follow**

- Total number of Pages you follow
- Number of Pages you've visited, during a certain period of time

**Data about the Groups you are a member of**

- The number of Groups you've joined, during a certain period of time

---

∧ **Data specific to the Post being ranked**

∧ **Data about the settings or attributes of the Post**

## The privacy setting or visibility of a post

- Whether the post is public or visible to only friends, custom, or only me

## What type of post this is and what media it contains

- Whether the post contains photos, video, Live video, a link, etc.
- Is the post a live video or was the video previously live

## Data about the post content

- If the post contains a URL, the ratio of the popularity of a domain on FB vs the internet as a whole
- The percentage of identical content between this post and other posts
- Whether the post likely contains nudity, graphic violence, or any other likely Community Standards violation
- If the content in the post has been rated false or partially false by one of our independent fact-checking partners

## Data about the media, like photo or video, contained in the post

- Width and height in pixels of the photo being shared
- What visuals are contained in the photo
- If the post contains video that loops and/or is a still image

## Topic(s) the post is about

---

## ∧  Data about the actor that created the Post

## Attributes of the actor

- Is the actor posting to a profile, Page or to a Group
- If a Group post, the number of members in that Group
- Number of confirmed Community Standards violations the account has accrued

## Actions this actor has taken on Facebook

- How many posts (videos, links, photos, etc) the actor has shared, during a certain period of time

### How other users have viewed this actor or content from this actor before

- How many times this Page has been viewed by users, during a certain period of time
- Total number of people following the Page, during a certain period of time

### How other users have interacted with content from this actor before

- Total number of times content from this Page has been shared by users
- Total comments, likes, shares on the Page

---

## ^ Data about the actor who shared the Post *(when different from actor who created the Post)*

### Attributes of the actor

- Is the actor posting to a profile, Page or to a Group
- If a Group, the number of members in that Group
- Number of confirmed Community Standards violations an account has accrued

### Actions this actor has taken on Facebook

- How many posts (videos, links, photos, etc) the actor has shared, during a certain period of time

### How other users have viewed this actor or content from this actor before

- How many times this Page has been viewed by users, during a certain period of time
- Total number of people following the Page, during a certain period of time

### How other users have interacted with content from this actor before

- Total number of times content from this Page has been shared by users
- Total comments on content from this Page by users

∧ **Data about how other users have interacted with this Post**

**Views on this post from all users**

- Total or average amount of time people have spent viewing this post
- Total or average amount of time people have viewed a video in the post

**Interactions on this post from all users**

- Total number of likes on the post
- Total number of comments on the post
- Ratio of clicks, likes, and comments on a post out of all times it's been viewed

---

∧ **Data specific to you and the Post being ranked**

∧ **Data about how you have interacted with the Post**

**Your interactions with this post**

- If you've liked this post

---

∧ **Data about how you have interacted with Posts similar to the one being ranked**

**How you've viewed similar content**

- Your total views on other content of the same type

**How you've interacted with similar content**

- Your total shares of other content of the same type

---

∧ **Data about you and the actor who created the Post**

**Your relationship to the actor who created the post**

- Whether you are the admin of the Page or your friend is an admin of the Page that shared the post

**How you've viewed content from this actor before**

- Your total views of other posts from this Group

**How you've interacted with content from this actor before**

- Your total shares of other content from this Page

---

∧ **Data about you and the actor who shared the Post** *(when different from actor who created the Post)*

**Your relationship to the actor who shared the post**

- Whether you are the admin of the Page or your friend is an admin of the Page that shared the post

**How you've viewed content from this actor before**

- Your total views of other posts from this Group

**How you've interacted with content from this actor before**

- Your total shares of other content from this Page

---

## Prediction Models Used in Ranking Connected Content

The Feed ranking system has over 100 different prediction models. Generally, these prediction models fall into four categories:

1. Predictions about actions you'll take on the post
2. Predictions about how you'll spend time viewing the post
3. Predictions about your interest in the post or person, Page or Group that shared the post

4.   Predictions about how others will interact with the post if you take a certain
     action, such as commenting or sharing a post

Each prediction is a potential indicator of how valuable a person might find certain content. For
example, sharing a post with other people can be an indication that you found that post to be
valuable, so predicting whether you'll share a post is a good signal of value for us to use to
show certain posts higher in Feed versus other posts. As you might imagine, no one prediction
is a perfect gauge of whether a post is valuable to you, which is why we use multiple prediction
models in combination with the overall goal of making the Facebook app valuable for people in
the long-term, not just in the specific moment when they're seeing this content.

Below you'll see more details on the different prediction models we currently use most
frequently in Feed ranking. In certain situations where the individual models are very similar in
what they predict, we've combined multiple models into one description. For example, we have
multiple models about predicting where you might click on a post - whether you'll click on the
post, on a photo in the post, into the comments of the post, etc. In this list, we've referred to all
of these models as "How likely you are to click on some part of the post."

The list below is grouped by how well these models are able to determine whether or not a post
will be valuable; the models in the top group tend to be used most frequently in determining
the ordering of the content in your Feed versus those in the following two groups. However, it's
the combination of all these models together that's most important.

Because Feed ranking is personalized, the relative impact of each prediction model on Feed will
vary depending on the person and the content, since everyone has different preferences about
what they like and how they want to interact with content. For example, predictions about how
long you might spend watching a video may be a stronger indicator of value for a video post
than whether or not you will click on the video, while the opposite may be true for a post
containing a link to an article. Another example is that for some people, "liking" a post is a
strong indicator that they found that post valuable, whereas for others (such as people who
don't use the "Like" button), spending time reading the post may be a more useful prediction.

We continuously strive to improve our ranking systems to better deliver the most valuable
experience to our users so the information outlined here might change over time. In addition, in
an effort to deliver a more personalized experience for people, we continue to test and refine
our approach to how political content is surfaced on Facebook.

# Types of Prediction Models

*Within each group, models are listed alphabetically and are not in a ranked order. Some of these
predictions are only used if the post is relevant to the model, for example predictions about
posts from Groups would only apply if the post being ranked is a Group post.*

4/3/24, 2:10 AM

Case 1:20-cv-03590-JEB    Document 324-34    Filed 04/05/24    Page 201 of 203
Facebook Feed Ranking - How It Works | Transparency Center

## ∧ Used Most Frequently

- How likely you are to be interested in content from your friends

- How likely you are to be interested in the Group that shared the post or content from the Group, as measured by engagement with the Group or its content

- How likely you are to be interested in the Page that shared the post or content from the Page, as measured by engagement with the Page or its content

- How likely you are to click on some part of the post

- How likely you are to interact with a post in some way by liking, reacting or commenting on it

- How likely you are to meaningfully interact with the post, through some combination of commenting/liking/reacting/sharing to messenger/resharing and/or spending time viewing it

- How likely you are to share the post

- How likely you are to spend time viewing comments on the post

- How likely you are to spend time viewing the post or content in the post (as opposed to just scrolling past it)

- How likely you are to visit a Page after seeing a post from that Page

- How likely you are to want to see more or see less content from the person or Page who shared the post

- How likely you are to watch a video contained in the post and the predicted amount of time you'll spend watching it

- How likely your interactions on the post from a Page will encourage the admin of that Page to share more content in the future that is valuable to you

- The predicted amount of additional comments or replies a post will get if you comment or share the post

## ∧ Used Occasionally

- How likely you are to comment on the post

- How likely you are to find a news article informative, if the post contains a link to a news articles

- How likely you are to find the post worth your time

- How likely you are to follow a Page after seeing a Page post re-shared by a friend

- How likely you are to hide, snooze or unsubscribe on the post (used to reduce the distribution of a post)

- How likely you are to like the post

- How likely you are to react to the post (love, care, haha, wow, sad, angry); predictions about an angry reaction are used to reduce the distribution of a post

- How likely you are to RSVP to an event, if the post contains a Facebook event

- How likely you are to scroll through a post with a product listing from a Buy/Sell Group

- How likely you are to send a message on a product sale post, where data privacy laws permit

- How likely you are to spend time viewing the Event in a post, if you click on it

- How likely your interactions with the Group post will encourage other members to share additional content to the Group or interact with other content from the Group in the future

- The predicted number of additional times the post will be shared if the post will get if you share the post

- The predicted number of likes the post will get if you share the post

## Used Less Frequently

- How likely you are to join a community chat from a Group post

- How likely you are to like the post and to spend time viewing the post from a Page that you have favorited

- How likely you are to make a donation on a post with a fundraiser

- How likely you are to report the post (used to reduce the distribution of a post)

- How likely you are to send the post in a message (where data privacy laws permit)

- How likely you are to take an action to support a Creator, e.g. sending a Star

- How likely you are to watch a video in full screen viewer, if the post contains a video

- The predicted amount of time you might spend in the web browser, if you click through on a url in the post



POLICIES

ENFORCEMENT

SECURITY

FEATURES

OVERSIGHT

REPORTS

RESEARCH TOOLS

Privacy Policy    Terms of Service    Cookies