# PX0641



TECHNOLOGY    SPORTS

# How Strava is building a niche social network for athletes — without ads

Strava is big with cyclists. It wants to be big with everyone else, too.

By Kurt Wagner  |  Sep 30, 2017, 2:50pm EDT

PX0641-001

Jan Hetfleisch / Getty Images for Ironman

Strava may very well have the most active employees in San Francisco.

Walk into the San Francisco headquarters of the 140-person startup, which bills itself as the "social network for athletes," and you'll find a bike room with well over 50 road bikes stashed by commuting employees. One wall is covered with dozens of race bibs, from 5Ks to Iron Mans, and many on staff will spend Wednesday afternoons running together near the ballpark, or spend Thursday mornings on a company bike ride.

"It feels like being on a sports team," says CEO James Quarles, a big runner and swimmer. "There's always an activity."

That makes sense: Strava is trying to build a social network for the world's most active athletes, so active employees are almost a necessity. The company, which was founded in 2009 and has raised around $70 million, has gained popularity with cyclists because it lets them track and then share data about their rides with other cyclists through Strava's app. Strava has "tens of millions" of registered users, Quarles said, though it doesn't share a monthly active users metric like larger social networks.

In May, Quarles came in from running business operations at Instagram to be the company's new CEO — and to help Strava expand into more sports, classes and business models. (Instagram exec Kevin Weil is also on Strava's board.) Users can post their activity data to the app today, but Strava is preparing to open it up so that users can post other things, too, like links or questions.

With more than six years combined at Facebook and Instagram, Quarles is ready to build a social network of his own. We sat down with him to talk about what he learned at Facebook, why he isn't interested in advertising and why Strava and Switzerland might have more in common than you'd think.

The following transcript has been edited for clarity and brevity.



Kurt Wagner / Recode

**Recode: It feels like people are shying away from the "social network" label these days because it leads to a lot of Facebook comparisons. Why do you want to be a social network?**

**James Quarles, Strava CEO:** I'm not bothered by the comparison, because I think there's clearly room for, and a movement toward, narrower communities of interest. You see that in groups products, you see that in messaging products. I open Facebook to share pictures of my kids with family members who are distant. I open Instagram when I'm traveling to document my photos. I open Twitter to try and beat CNN for breaking news. When I'm running, when I'm swimming, when I'm looking for advice to stay active, I open Strava. It's very specialist in that way.

**What did you learn from your time at Facebook and Instagram that you've taken with you?**

How to scale globally [was one]. Strava's lucky — 80 percent of our audience is outside of the United States. People think we're just a Silicon Valley phenomenon. It's just the opposite. What I learned at Instagram, we took a trip to Japan — and I think this is so true — everyone in these countries, they don't want a global or international product. Instagram Japan, the Top 100 accounts, they're all wonderfully Japanese. So how do we at Strava

PX0641-003

make sure that our domestic experience really feels like Strava is a French phenomena, it's a German phenomenon, it's a Japanese or it's a Brazilian phenomenon.

**What's something that you saw at Facebook or Instagram that you want to do differently at Strava?**

I think the first thing is just avoid surprises. So you remember [Facebook's] social reader? Social reader was when you'd read an article and then it would post back to your feed. I had one where my wife had read a Cosmopolitan article that was very badly titled ... [it] posted to her friends. That was a surprise. People don't like surprises.

The second one: The quality of connections is as important as the quantity of connections, and maybe more so. This intimate view into peoples' lives is more valuable to you when it's people you know. So, as we're growing peoples' networks, as we're helping them discover content that's motivating ... It's really important for us to stay balanced on both [friends and influencers].

**Strava is mostly known for cycling, but you want to get into other areas, especially indoor activities like aerobics classes. Why not stay super-narrow?**

The personal data shows that about a third of what [athletes] do is outdoor and has a GPS track. [Roughly] 56 percent are indoor. So it's in a gym, in a studio or it's in their home. In order to have more appeal to passion athletes, we have to represent more of her active life. So a big part of our strategy of broadening our appeal is to say that we have to be outdoor and indoor.

**You let people upload data from a lot of devices directly to Strava. Do device manufacturers like you?**

We have very strong relationships. If I just take Garmin, Apple and Fitbit specifically, all three of them have great products and they have apps to make sure you're getting the most [data]. But what they definitely recognize is that, it would be a big bummer if ... we were really great training partners, and I'm in the Garmin network and you're in the Fitbit one, so sorry, we can't have any of this interaction. You need a network that abstracts from devices.

**So you're like Switzerland?**

We do use that flag.

**Do you have any desire to build your own hardware?**

No. It's not our strength. And I think our partners are years ahead of us in experience. Hardware's hard. That's a very different cycle than ours. You never say never, but I don't think we're best as a hardware company.

**Do you make any money?**

We have a premium subscription business. We also have a metro business, which is aggregating and anonymizing commute data to sell that back to departments of transportation so they can better plan pedestrian bicycle routes in cities. So we're not profitable, but I think those are all indications of the types of businesses we will grow as the network grows.

**No advertising?**

It's not what we're working on right now as a business line. Obviously with my background, I know what kind of scale is required, and also user experience — I don't think it would fit well today in Strava. So we're exploring other business lines from the ones we've talked about, and advertising isn't one of them.

**I'm surprised. Most social companies make all their money from advertising. Why isn't it a fit?**

Today, the way that the product works, it's like Nascar stickers. Trying to do banner ads and things like that, it just doesn't feel like it dovetails with what people are opening the app for.

*This article originally appeared on Recode.net.*

*You've read 4 articles in the last 30 days.*

## Will you support Vox today?

We believe that everyone deserves to understand the world that they live in. That kind of knowledge helps create better citizens, neighbors, friends, parents, and stewards of this planet. Producing

| One-Time | Monthly | Annual |
| --- | --- | --- |

○ **$5/month**    ○ $10/month

○ $25/month    ○ $50/month

deeply researched, explanatory journalism takes resources. **You can support this mission by making a financial gift to Vox today. Will you join us?**



◯ Other

**Yes, I'll give $5/month**

We accept credit card, Apple Pay, and Google Pay. You can also contribute via



## Today, Explained

Understand the world with a daily explainer plus the most compelling stories of the day.

Email (required)

SUBSCRIBE

By submitting your email, you agree to our Terms and Privacy Notice. You can opt out at any time. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply. For more newsletters, check out our newsletters page.

# PX0642

**The New York Times** | https://www.nytimes.com/2023/06/29/technology/twitter-ceo-linda-yaccarino.html

# *Twitter's New Chief Eases Into the Hot Seat*

Linda Yaccarino, who initially could not take ad sales meetings because of a noncompete clause, is adjusting to her new role reporting to Elon Musk.

  

**By Ryan Mac, Tiffany Hsu and Benjamin Mullin**

Ryan Mac reports on Twitter, Tiffany Hsu on advertising and misinformation, and Ben Mullin on media.

June 29, 2023

When Elon Musk announced last month that he had hired Linda Yaccarino as Twitter's chief executive, he said he was "excited" to bring on someone who could "focus primarily on business operations."

But just over three weeks into her new job, Ms. Yaccarino, the former head of advertising at NBCUniversal, has been prevented from working on a key component of what she was hired to do: drum up advertising for Twitter.

Ms. Yaccarino, 60, has spoken with some of Twitter's advertisers about unsavory content on the site, four people with knowledge of the conversations said. But she has not engaged in public hobnobbing and hands-on negotiating with advertisers to increase Twitter's revenue.

That's because a contractual agreement with NBCUniversal prevented Ms. Yaccarino — at least initially — from working on advertising deals that would conflict with the interests of her former employer, three people familiar with the arrangement said.

It is all part of an adjustment as Ms. Yaccarino settles into her new role and reports to a new boss. After working for traditional media organizations in New York for decades, she is now helping to lead a San Francisco-based social media company

PX0642-001

that has undergone rapid changes under Mr. Musk, who bought Twitter last year.

Restricted from hammering out advertising deals, Ms. Yaccarino has instead repaired at least one relationship, between Twitter and Google; talked with regulators; and focused on employee morale. She has held happy hours and tried rallying workers with mission statements and more internal communication.

"Twitter is on a mission to become the world's most accurate real-time information source and a global town square for communication," she wrote this month in her first companywide email, which The New York Times obtained. "We're on the precipice of making history."

Twitter did not make Ms. Yaccarino, a longtime Madison Avenue power player, available for an interview. A person close to her said the noncompete clause extended only for her first few weeks at Twitter, while another said it was difficult for NBCUniversal to enforce. The clause's expiration date was unclear.

Mr. Musk did not respond to a request for comment.

Ms. Yaccarino began as Twitter's chief executive on June 5. Two days earlier, the native Long Islander and longtime New Yorker tweeted a photo of the Manhattan skyline with the message: "Bay Area views coming soon!" She took at least one NBCUniversal colleague with her to Twitter.

Mr. Musk had not made a companywide announcement about Ms. Yaccarino's hiring at Twitter, three employees said. Instead, in an email to the company's sales team before Ms. Yaccarino started, her appointment was the second bullet point below an update about a new feature for advertisers.

Ms. Yaccarino quickly struck an upbeat note at Twitter.

At an internal ad sales meeting on June 12, she addressed the state of Twitter's advertising. Mr. Musk had removed guardrails at the site, allowing misinformation and toxic content to flourish and deterring brands from advertising. The company's U.S. ad revenue has fallen nearly 60 percent, and Mr. Musk has said he expects revenue this year to be around $3 billion, down from $5.1 billion in 2021.

Ms. Yaccarino acknowledged that some "big brands" had stayed away from the platform, according to a recording of the meeting that The Times obtained, and said she and other sales employees would have to engage in "hand-to-hand combat" to persuade them to return. She did not mention her inability at the time to discuss ad deals with clients.

Ms. Yaccarino also said she would take a different position from Mr. Musk's rocky relationship with the media. Her strategy, she said, is to "have very good relationships with them so they become our advocates or mouthpieces to amplify our strategies."

But Ms. Yaccarino also made it clear that she knew who was in charge. She referred to Mr. Musk, who was not in attendance, as "the boss."

Two days later, Ms. Yaccarino met with Twitter's investors and lenders in San Francisco alongside Mr. Musk, a person familiar with the meeting said. Together, they presented their plans for the company to focus more on video, work with influencers and news publishers, and integrate payment capabilities. Reuters reported earlier on the presentation.

While Ms. Yaccarino's noncompete clause with NBC held her back from major advertising discussions, she stayed busy.

David Cohen, the chief executive of the Interactive Advertising Bureau, a trade group, said that he had emailed with Ms. Yaccarino and that she had been on "a kind of fact-finding tour." She is leveraging her relationships in the advertising industry to discern where Twitter stands on issues such as how to keep ads away from objectionable content, he said, adding, "She's definitely listening."

Yet when Publicis Groupe, one of the world's largest advertising agencies, held a conference in Paris on June 16, its chairman interviewed Mr. Musk without Ms. Yaccarino, who was in San Francisco. During the trip, Mr. Musk also lunched with Bernard Arnault, the founder of LVMH, the world's largest luxury company and a major advertiser.

Ms. Yaccarino also did not appear last week at the Cannes Lions advertising festival, a glittering networking event on the French Riviera that is often considered the apex of the ad industry calendar. Twitter significantly scaled back its spending and presence there compared with previous years.

Still, Ms. Yaccarino tweeted that she was soliciting feedback from Cannes attendees. "I'm here for ALL of it!" she wrote.

She had remained in San Francisco at Twitter's headquarters, where she hosted a European Union delegation led by Commissioner Thierry Breton. The group was testing whether Twitter's content moderation systems would comply with a new European law, the Digital Services Act, that holds social platforms responsible for policing illicit content and disinformation. It goes into effect in August.

> Twitter is the 1st platform to undergo a "stress test" to prepare for #DSA EU
>
> The company is taking this exercise very seriously.
>
> Constructive dialogue in San Franciscous with @elonmusk & CEO @lindayacc ahead of the "real test" — on 25 August.
>
> Sufficient resources will be key. pic.twitter.com/99uz5hqNUG
> — Thierry Breton (@ThierryBreton) June 22, 2023

Ms. Yaccarino has made progress in some areas, including helping to mend Twitter's relationship with Google. That relationship frayed under Mr. Musk when Twitter partly stopped paying Google for cloud computing services. Twitter owed Google more than $42 million in unpaid invoices and was trying to stop its use of Google's products by the end of June, according to an internal memo obtained by The Times.

Ms. Yaccarino spoke this month to Thomas Kurian, the head of Google Cloud, to resolve the issue and ordered the bill paid, a person familiar with the conversation said. She also persuaded Mr. Musk to embrace the new developments, the person said.

Google declined to comment. Bloomberg News reported earlier that Twitter had resumed paying Google.

Ms. Yaccarino has also tried reaching out more to Twitter's work force, which has shrunk more than 75 percent through layoffs and other departures since Mr. Musk bought the company. Twitter framed a copy of one of her motivational tweets about "wearing 4 inch heels" while working as an executive and hung it in a dining common area in the San Francisco office. She has also held happy hours there and in New York, four current and former employees said.

And she has been relentlessly optimistic in her conversations, two of those people said. In her meeting with the sales team this month, Ms. Yaccarino said Twitter had an "opportunity that comes out of being challenged the last bunch of months."

"Point me in the right directions," she said. "I know what it's going to take."

**Ryan Mac** covers corporate accountability across the global technology industry. More about Ryan Mac

**Tiffany Hsu** reports on misinformation and disinformation and its origins, movement and consequences. She has been a journalist for more than two decades. More about Tiffany Hsu

**Benjamin Mullin** reports on the major companies behind news and entertainment. Contact Ben securely on Signal at +1 530-961-3223 or email at benjamin.mullin@nytimes.com. More about Benjamin Mullin

# PX0643

THE BROOKINGS INSTITUTION


THE "TOWN SQUARE" IN THE SOCIAL MEDIA ERA:
A CONVERSATION WITH TWITTER CEO DICK COSTOLO

Washington, D.C.
Wednesday, June 26, 2013



PARTICIPANTS:

**Introduction:**

      STROBE TALBOTT
      President
      The Brookings Institution

**Moderator:**

      JONATHAN RAUCH
      Senior Fellow
      The Brookings Institution

**Featured Speaker:**

      DICK COSTOLO
      Chief Executive Officer
      Twitter, Inc.



* * * * *

PX0643-001

```
TWITTER-2013/06/26
```

# P R O C E E D I N G S

MR. TALBOT:  Good morning, everybody.  I'm Strobe Talbot, and

it is my great pleasure to welcome you all here this morning for a conversation with

Dick Costolo.  As you're going to, well, all of you, obvious, already know, this is a

guy who is all about innovation.  And, Dick, I didn't have a chance to tell you this in

the other room, but you are responsible for a major innovation from this podium.

This is the first time in 11 years, and probably the first time in, whatever it is, 97

years, that the President of Brookings has appeared at this lectern without a tie.

Now, clearly, Jonathan Rauch did not get the word, butand, by the

way, next time you come back, let's both lose the jackets, as well.

MR. RAUCH:  Okay.

MR. TALBOT:  I think the sartorial innovation is actually kind of a

welcome thing here on the banks of the Potomac, there are a lot of things that

could be fixed, here, and maybe if you brought a little bit more of the ethos of the

Bay area, this place, Washington, D.C., would work even better.  But Dick actually

brings more than just a fresh note of how we ought to dress here in Washington,

he's going to talk to us today in conversation with Jonathan about a revolution in

PX0643-002

3

`TWITTER-2013/06/26`

communications, networking, politics, governance, and, of course, commerce and

entrepreneurship.

Twitter is only seven years old.  Dick joined as COO in 2009, and

became CEO the following year.  There are now, as I think all of you know, about,

what is it, 200 million active users who are tweeting something like 500 million

times a day.  A few of those have even come from me, and any of you in the

audience who know me might find that as astonishing as I do.  I've only been at

this for 9 months, and I've already developed a sense of competition with others

who are out there.  I have to acquire another 9,200--  I'm sorry, 992,577 followers--

in order to catch up with Dick Costolo.  But I have got some consolation in that he's

got to get another 32 million in order to catch up with Barack Obama, which tells

you something about the role of Twitter in governance and politics.

I've got to confess that I started out, being of a certain age and a

certain background, always having worn a tie, to being very skeptical about Twitter

when I first heard about it.  I had to be pushed, some would say even dragged

kicking and screaming into the use of Twitter, but now I am really glad to be part of

this community.  And that's for a couple of reasons, one of which I was discussing

with Dick before we came in here, and that is that being on Twitter has

PX0643-003

TWITTER-2013/06/26

considerably both deepened and broadened my reading habits.  It's exposed me,

particularly through smart tweets, and there are a lot of those out there, and the

links that go with them, the publications that hadn't been part of my life before, and

it's also allowed me to engage in conversation with people all around the world on

subjects that we have in common, although we very often have different views

about.

As for the Brookings Institution, Twitter has become key to what we

do and how we do it, it's given us an understanding of the role that Twitter has

played, not only in our domestic politics in this country, but also around the world.

And everybody here is, of course, aware of the role that Twitter played in the

protests after the phony elections in Iran in 2009, and during the Arab awakening,

not to mention its importance in 2012 Presidential election in this country.  It's also

instrumentally very valuable for us at Brookings because it gives us a way of

promulgating our product, broadening our audience and enhancing our impact.

Just yesterday, for example, a number of us here at Brookings

used Twitter to call attention to a new feature on our website called the Brookings

Essay, which is an attempt to help resuscitate long form essay and journalism, and

thus give us kind of an anchor to windward in more traditional kinds of

PX0643-004

TWITTER-2013/06/26

communication as we sail into the future of social media. So now I'm going to turn the proceedings over to my colleague, Jonathan Rauch, who is a Senior Fellow in Governance Studies, and in the spirit of the topic today, that conversation is going to include as many of you as possible.

Over the years, this is another Twitter-induced innovation, I've always ended these introductions by saying please turn off your mobiles and your cell phones, I'm looking at a number of you who are clearly not going to do that, and all of you are welcome to keep, as long as they're in silent mode, your devices at hand so that you can Tweet this event, and that is at #TwitterCEO, and if you want to send a direct message to Dick himself, it is @DickC. That's not dixie, that's Dick C.

Over to you, Jonathan.

MR. RAUCH: Thank you, Strobe. Thank you, Dick, it's a pleasure to have you at Brookings, thank you all for coming. We'll talk for 20, 25 minutes, and then open it up, we're taking questions by Twitter, we're taking questions in the room, the main rule is please don't filibuster, our time together here is short. The usual first question de rigueur is: when is the IPO? I'm not going to ask you that today; in fact, I don't even want you to tell us, even if you choose to. Topic

PX0643-005

TWITTER-2013/06/26

one in Washington is data mining, the NSA, the Snowden crisis, and everything

else.

I know there are restrictions on what you can say, but tell us what

your life has been like, what's been going through your head as CEO of a major

information company since this story broke.

MR. COSTOLO:  So, I think we've been very clear about having

an articulated, a very principled policy around access to user data, which I will

summarize as when, you know, when we receive a valid legal request in the

countries in which we operate, we will abide by the rule of law.  But our stance is

that when,and those are specific legal questions, we will abide by the rule of law

and do what, comply with that legal request.  Other requests that may be more

broad in scope, and not specific legal requests that don't meet our principle of

being a specific valid legal request, we will push back on.  And I think we've been

very clear about that, we're very transparent about the requests we get and react

to, we publish those with, Google, Google publishes theirs, as well.  We would like

to see more companies publish those.

We've got another transparency report for the six months ending

about a week from now, coming up probably in about a month, I think.  And so

PX0643-006

TWITTER-2013/06/26

people can see how, the kinds of requests that we get and how we respond to

them.

MR. RAUCH:  Can you tell us anything about what's true or false

about the information out there about Twitter and these programs, for example,

you were, Twitter was not mentioned on the famous PRISM slide.  Do you feel

dissed by that? (Laughter)

MR. COSTOLO:  So I would just go back to, I kind of tried to

speak to that in my first answer.  I think we have a very specific what we feel is a

principled approach to this, which is that we will comply with specific valid legal

requests, and we stick to that line pretty hard and push back on things that don't,

that aren't specific valid legal requests.  And I think we've, historically, people have

seen the kinds of attention and user privacy rights that we've defended in other

cases like the Wikileaks case and others.

MR. RAUCH:  You have actually fought some of these measures,

yes?  You fought a gag order that was attached to one of these orders some time

ago.

MR. COSTOLO:  Yeah.  Well, I guess what I would say, generally

speaking is, we feel that our users have a right to know when their information is

PX0643-007

TWITTER-2013/06/26

being requested, and some of those cases that we have fought are requests for

user information that have resulted in us wanting to say we feel that the users

should be informed that their information is being requested so that they can fight

that request if they wish.  And those are the kinds of ways we think about this,

right, we just feel that the users, these kinds of users should know when their

information is being requested.

    MR. RAUCH:  Has Twitter's pushing back on this elicited any

negative problems with the government?

    MR. COSTOLO:  Well, so, again, generally speaking, I would say

no, because we're sort of engaging in a discussion about the policy and the rule of

law in the country.  And, again, this is not just something that we deal with in the

U.S. now, we have to deal with this in all the countries in which we operate.  And,

as you might expect, the laws in other countries are very, very different in regard to

these matters, and so we're, I would say our policy internationally is evolving as we

learn to understand the ways in which we have to take our general principle to

these different places in which we operate.

    MR. RAUCH:  That's got to be very hard, you're dealing

    MR. COSTOLO:  Yes.

PX0643-008

`TWITTER-2013/06/26`

MR. RAUCH:   you're dealing with an international, a global

service

MR. COSTOLO:  Sure.

MR. RAUCH:   in many countries.  How many countries, 100some

MR. COSTOLO:  Well,yeah.

MR. RAUCH:   they all have different standards and different laws

MR. COSTOLO:  Of course.

MR. RAUCH:   how in the heck do you navigate that?

MR. COSTOLO:  Well, you know, it's a process, and we're

learning, and I think getting better at it.  You know, there are, again, specific,

specific laws, country specific laws that we comply with in the countries in which

we operate, and then there are the ways in which certain broad requests are made

in different countries that we are kind of discerning how to go deal with in the

different sorts of countries.

I would say that, initially, we were maybe a bit too, a bit too

parochial, I guess, is maybe the word, in the way in which we approached it, taking

our sort of local headquarters office perspective and saying, well, we'll just do the

`TWITTER-2013/06/26`

same thing we do here.  And, obviously, we've had to realize that that wasn't

necessarily the right way to deal with things internationally.

           MR. RAUCH:  How much bandwidth does it take at Twitter dealing

with laws, regulations, privacy, this must be a substantial portion of what you're

doing?

           MR. COSTOLO:  Yeah.  We have our General Counsel, Alex

Macgillivray, has a significantly sized team that spends a good deal of time on this.

           MR. RAUCH:  And I'm guessing it comes up in your day pretty

regularly.

           MR. COSTOLO:  It comes fairly regularly, yes.

           MR. RAUCH:  There's a poll out just the other day from Allstate

National Journal Heartland Monitor, I don't know if you saw it, but the results are

interesting.  Because this is a poll that was taken before the NSA story broke, so

none of that is taken into account, and it finds that a majority of adults believe the

explosive increase in data available to business, law enforcement and government

is more negative than positive, that's 55 percent negative; nine in 10 people

believe the next generation will have even less privacy than they do now; 48

percent want more commitment by companies not to share users' information.

PX0643-010

```
TWITTER-2013/06/26
```

And social media ranks last, 14 out of 14 institutions that were

asked about the question of trust to responsibly use information about so there's a

big trust gap forming out there with the public in terms of privacy.  But here's the

odd thing; they are fatalistic about it.  They say they don't want a lot of government

intervention, and they don't really believe much can be done about it.  So we find,

you find yourself in this environment where people are pessimistic about privacy.

MR. COSTOLO:  I think that the transparency reports go a long

way toward helping people understand precisely what kind of when you don't have

any idea what sorts of information is being requested, you know, you can assume

anything you want to assume.  So the transparency report that we provide, and the

ability for anyone to go look at that up on the website makes it much easier for

people to see, oh, okay, now I understand these are the kinds of things that are

being requested, these were the kind of requests that were rejected as not legally

valid, these are the kinds of requests this were, oh, that makes sense, that was a

valid legal request for a very specific thing, pointing to some illegal piece of

content, that makes sense to me, I get that.

So I think it is important, as I said earlier, for more organizations to

participate in these transparency reports because it goes a long way toward

PX0643-011

TWITTER-2013/06/26

helping people understand what exactly is going on.  Then, to be perfectly frank,

you can then disagree or agree with the specifics instead of some assumption that

may or may not be true.

       MR. RAUCH:  You've got another one coming out in a couple

weeks?

       MR. COSTOLO:  Yes, in just a few weeks, I think it will be based

on the last six months ending about a week from now.

       MR. RAUCH:  Now, you all joined Google, I think, and some other

companies in asking the government for permission to reveal more than you've

been allowed to?

       MR. COSTOLO:  We were, I think that was sort of anecdotally one

of our attorneys jumped in on Twitter based on some conversation between a

couple other companies, I don't think we've done anything formally there.

       MR. RAUCH:  How much more would you like to be reportable for

the industry in general and country?

       MR. COSTOLO:  Again, I think, like I really sincerely believe that

transparency in so many of these things goes a long way toward helping people

having context for what exactly is going on.  And I think that can be done  okay, so

PX0643-012

TWITTER-2013/06/26

then you have to say, go down to the next step and say, well, if we're transparent

about the requests that are being made, then that will help people understand what

they, how to navigate around that.  I think there are ways to be transparent about

the requests that are being made without, you know, harming sort of the needs of

the intelligence organizations.

MR. RAUCH:  Is there a better way to think about privacy than we

do traditionally in this world where everyone's relinquishing data all the time?

MR. COSTOLO:  I think that this is going to be a constantly

evolving thing, particularly with the just tremendously rapid migration to mobile.  So

I think that you will see, I mean, it's sort of fairly obvious, lots of emerging

discussion about geolocation as people's location is constantly broadcasted, and

issues or policies emerge around that.  So I think it's going to start to have to

evolve very, very quickly as these capabilities become ubiquitous and everybody

from your 7 year-old to whoever is walking around broadcasting, with a device

that's broadcasting location.

So I think that the discussion will need to catch up to this very

quickly, but I think it will continue to evolve, and we'll see more of it, not less of it.

PX0643-013

```
TWITTER-2013/06/26
```

So when you said that people are sort of fatalistic about it, I do think you will see

more discussion about this.

MR. RAUCH:  Have you given any thought to a sort of successor

regime for privacy?

MR. COSTOLO:  I-- in what respect?

MR. RAUCH:  Well, a lot of people say that, with all that data

being relinquished voluntarily, that thinking about privacy the way the law

traditionally has, you know, you've got your home and you've got copper wires,

and all that's protected, but what you tell someone else is not private.  This no

longer makes sense when you can aggregate data, so people talk about standards

around use rather than collection, and so on.  Any of that surfaced on your radar?

MR. COSTOLO:  Again, I think that stuff will evolve over time, we'll

see how it goes.  We're very, our geolocation service is opt-in, you opt-in before

you select that you want to start broadcasting where you're Tweeting from, et

cetera, and I think that something like that will emerge as a standard.

MR. RAUCH:  The interesting thing about Twitter is so much of it

is, by definition, already transparent, I mean, it's all there

MR. COSTOLO:  Yeah, that's right

`TWITTER-2013/06/26`

MR. RAUCH:   you can look at it.

MR. COSTOLO:  it's very, we like to say Twitter is the global town square, it's all public, real time conversational and widely distributed, and public is the first word in there.  The fact that it's all public and broadcast, and not, you know, a private network conversation makes some of these things easier for us to deal with.

MR. RAUCH:  Global town square, a sort of planetary conversation, is that how you-- what is Twitter, fundamentally?  You're dealing with some,  I'm a newbie to Twitter, a lot of people in Washington are, we're sort of the last redoubt of the old everything.  What is Twitter?

MR. COSTOLO:  Yeah.  You just said it.  We think of it as the global town square, right, this notion of a very, again, public, live, in the moment conversational platform.  And I think that that is, those characteristics put together differentiate us from everything else that may be one or two, but not all of those things.

MR. RAUCH:  It's mobile, right, it's in your pocket, it goes with you, it comes to you.

PX0643-015

TWITTER-2013/06/26

MR. COSTOLO:  It's mobile and it's increasingly mobile, our usage

is, has been primarily mobile for a while and is increasingly mobile.  The

fascinating thing about our mobile users maybe not surprising that they use it more

than desktop users, but the fascinating thing about our mobile users is that they do

everything more; they favorite things more, they Re-tweet more, they reply more,

et cetera.  So I think that this migration to mobile is something that very much

favors services like Twitter and we'll see how that evolves.

MR. RAUCH:  Is this part of what's driving, Twitter keeps popping

up in social revolutions and change around the world, is this why?  Because it's in

your pocket, it's always with you, it's so easy to tweet and it's so easy to Re-tweet?

MR. COSTOLO:  Well, I think it's the combination of all those

characteristics, right, that make it this town square.  The town square happens to

be a particularly good place to aggregate and protest, right, and so you can have

these direct conversations with everybody in the moment, real time, that feel

similarly about some issue, or certainly want to debate some issue.  So that town

square aspect of it is, I think, why people take to it as a platform for organizing

things like protests.

PX0643-016

`TWITTER-2013/06/26`

MR. RAUCH:  There's a marvelous documentary I just saw about Ai Weiwei, the Chinese dissident.

MR. COSTOLO:  Yeah.

MR. RAUCH:  The Chinese authorities cut off his internet years ago, his standard web access.  They could not or did not cut off his Twitter feed, that's what he uses.

MR. COSTOLO:  Yeah.  He's been, he's spoken very, very eloquently about Twitter on a number of occasions, we even have video clips of the kinds of things he's said about it, played it in the office in our all-hands meetings several times.  He's a big supporter of the platform and a big fan of it, and I of him.

MR. RAUCH:  Makes you wonder if Twitter had been around in 1776, would the Declaration of Independence have been written in 140 characters, all men are created equal #equality. (Laughter)

Here's a fact that maybe you didn't know about Twitter, this is also from the National Journal Allstate Heartland Monitor poll.  You have to say all that in Washington polls, very sensitive.  18 percent of users, this is a polling sample, a population sample, 18 percent have used Twitter in the last month.

PX0643-017

```
TWITTER-2013/06/26
```

That's kind of astonishing, it's almost 1 in 5 adults surveyed in this poll are on

Twitter.

MR. COSTOLO:  Yeah.  We have every belief in the company that

we have an obligation to reach every person on the planet.  You know, we saw

time after time, whether it's things like you just mentioned, organizing protests, or

emergency relief in the aftermath of the earthquake and ensuing tsunami in

Fukushima, Japan, that it is a particularly great service at broadcasting necessary

conversation.  And so places that we can't get to and people that we don't get to

yet, we want to be able to get to, and we'll do everything we can do to get to them.

MR. RAUCH:  Do the trends look like linear or exponential, or

hitting saturation, or what?

MR. COSTOLO:  It changes.  There are seasonal trends to growth

where you'll see inflection points seasonally; there are holiday trends to growth,

new devices come out, and you'll see the growth inflection change; there are

country specific inflection points around things like events, the events in Turkey

and Brazil, elections cause increases in active usage, et cetera.

So there are all sorts of interesting trends that drive inflection

points and growth, certain, we call them VITs, Very Important Tweeters, certain

PX0643-018

TWITTER-2013/06/26

celebrities, or kinds of accounts that jump into a platform will cause dramatically

increased usage, teams in the Bundesliga, the German soccer league participating

in a cause, you know, a rapid increase in growth in Germany.

        MR. RAUCH:  Once people are

        MR. COSTOLO:  There are all sorts of different things that

happen

        MR. RAUCH:   sticky, right?  Once people get in, they tend to stick

around.

        MR. COSTOLO:  I would say that once you are using, once you

are a core user of Twitter, it becomes increasingly indispensable to you, so that's

obviously another great trend for us.

        MR. RAUCH:  So you say you want everyone on the planet, you

probably won't get everyone, is there a saturation point out there for this medium?

        MR. COSTOLO:  I don't think so, no.

        MR. RAUCH:  I guess, eventually, it's part of your phone's

operating system, and it's just running in our lives in the background?

        MR. COSTOLO:  If that were the case, that would be just fine with

us.  (Laughter)

PX0643-019

TWITTER-2013/06/26

MR. RAUCH:  You wouldn't mind that a bit?  So where do you go with a service like this?  I mean, you, people know how it works, it's developed its own argut, what's next for Twitter?

MR. COSTOLO:  There are lots of ways we can enhance that global town square experience.  I just talked about things like unplanned events, natural disasters, protests, et cetera, versus, contrast that to a planned event like the Super Bowl; we know when it is, we know who the participants are, et cetera, and that ability to track and monitor the moments within an event either as they happen or to catch up with them is something we want to enhance.

For example, last night, again, the filibuster in Texas was the number one trending topic nationally here in the U.S. on Twitter, and that was an amazing thing, but if you were following on Twitter, it was fascinating to watch.  We want to make that experience even better, so sort of curating the moments within the event, the media from it, and making it that much easier to navigate.

MR. RAUCH:  Can you be a bit more specific about how you could do that?

MR. COSTOLO:  Well, so, right now, you get purely the reverse chronological order of the Tweets, and you kind of go all the way through them.  It

---

TWITTER-2013/06/26

would be nice to see things like a graphic of spikes in the conversation, and what time did they happen, and, oh, that was a half hour ago, there was a big spike in the conversation about this particular trend, and be able to peel back, kind scroll back to that time and see what happened at that particular moment.

You can start to think about it in the context, start to think about that in the context of planned events like televised events that people might be watching on a delayed basis, and so forth, and being able to sort of follow along with Twitter in a DVR mode would be interesting.

MR. RAUCH:  That idea might be sort of a

MR. COSTOLO:  So those are the kinds of things we're experimenting with.

MR. RAUCH:  Sort of a two layer sort of system where you can monitor the substance of the conversation and the trends in the conversation

MR. COSTOLO:  Yeah, that's right, precisely.

MR. RAUCH:   move back and forth in a parallel level.  And this is in the works, or developing?

MR. COSTOLO:  It's something we're experimenting with.  I think that, when I've been talking about Twitter at events and Twitter as the second

PX0643-021

TWITTER-2013/06/26

screen for TV for a while, and we're playing around with different models and

different ideas, but you'll see us continue to do a bunch of work there.  One of the

fascinating things about Twitter and events is this; people will frequently ask me,

well, how do you surface the signal from the noise?  Right there, if there are 500

million Tweets a day, and then the Super Bowl is on, or the Olympics are

happening, or the World Cup is happening, two things that are going to happen

next year in Brazil, how can you, when Brazil scores a goal in a soccer game and

everyone in Brazil Tweets goal, and you have to scroll through, you do you surface

the signal from that? (Laughter)

And so the fascinating thing about that, we tried a couple things

during the Olympics where we said, well, we'll just curate the really high authority

accounts of, you know, the commentators and the athletes, and we'll pull those

Tweets out and show those as the event, and that will be interesting, and you won't

have to dig through everything else.  And the amazing thing about that was that

you lost the roar of the crowd that really made Twitter feel like Twitter.

MR. RAUCH:  It sort of flattened out?

MR. COSTOLO:  It just felt, yeah, it felt like, you know when you're

in a cosmopolitan city like this in your hotel room, you throw the window open, and

PX0643-022

TWITTER-2013/06/26

you can hear what's going on?  It felt like you were in a very, very quiet studio, and

every once in a while, something was being beamed in.  So it lost that roar of the

crowd that makes it, it makes it the public town square.

          MR. RAUCH:  So you're more of an aggregator and less of a

          MR. COSTOLO:  Yeah, suddenly more of an aggregator and less

of the public town square.  So we need to be able to maintain that roar of the

crowd while surfacing these moments, and that's the kind of thing we're trying to

do with the experiments we're running.

          MR. RAUCH:  Yeah.  I'm a new user, I have trouble with the noise,

it's, you know, it goes fast, and if you miss something, it's gone, and it's hard to find

the good stuff in that stream.  Maybe I'm not following the right people, but I'd like

to see ways to get to the stuff that interests me faster, without losing the raw

experience.

          MR. COSTOLO:  Yeah.  I'm very excited about the kinds of things

we're trying out now, that we're publicly experimenting with, and we'll see where

they take us.

          MR. RAUCH:  It's also interesting this business people are

Tweeting while they watch TV, and you start to wonder, well, life developed this

PX0643-023

TWITTER-2013/06/26

meta layer where we've got the layer at which we do things, and the layer at which

we watch things, and then the layer which we watch what we watch.

MR. COSTOLO:  Well, I think about it this way, our, Deb Roy, the

founder of Bluefin Labs, the company we acquired likes to call Twitter the social

sound track for TV.  And I think that there's always been this desire to talk about

the things we're experiencing it, it used to just be that you could only talk about

them with the people either in the room or the "water cooler" the next day at work,

and now, when you have the ability to talk about them with the people everywhere

else in the world who are watching it, and some of the authorities on the subject,

and some of the participants in that support or the politic or the, you know, the

domain experts who are also commenting on it, and directly interact with them.

That's fascinating, right?

I mean, again, when you think about, I use the public town square

for a specific reason, it used to be        the case, in the town square, before,

thousands of years ago in the Greek Agora, that's where you went to find out what

was going on and talk about it, right?  You came and talked about what was going

on in your part of the village, and I came and talked about what was going on in

mine, and the politician was there, and we listened to the issues of the day, and a

PX0643-024

TWITTER-2013/06/26

musician was there and a preacher was there, et cetera, and it was multidirectional and it was unfiltered, and it was inside out, meaning the news was coming from the people it was happening to, not some observer.

And, you know, along comes the printing press, and then radio, and then television, et cetera, et cetera, and all of these advances in technology are in service to removing the friction of distance and time in distributing the information. So we get to the point, ultimately, with CNN World Wide News, that you've completely eliminated the friction of time and distance, and then along comes a service like Twitter that has the elimination of time and distance built into it, but also brings back all those capabilities of the Agora. It's inside out again, it's coming from the participants.

MR. RAUCH: Thinking through all this changes the experience of watching TV and doing stuff, right? Because, you know, in the Greek Agora, you're there, you're in the square, you're nowhere else. If I am watching TV and Tweeting about it, I'm in the room, I'm also in the TV experience, and I'm in the Twitterverse all at once, sort of navigating all these three levels.

MR. COSTOLO: I have to tell you, for me, it's absolutely for me, now, the case that when I'm watching some major event on television, if I don't

PX0643-025

`TWITTER-2013/06/26`

have my device with me and I'm not on Twitter during it, I feel like I'm watching it

with the volume off.

MR. RAUCH:  Increasingly common, I'm sure.  Of course, this

event is all about me, so I want to know is this curtains for me?  I'm a long form

journalist, I write narrative for places like the Atlantic, the world's second oldest

journal, we are at Brookings, the world's oldest think tank, we specialize in the idea

that people want to sit and think about be in that experience and not be distracted

and really work something through.

Twitter is 140 characters, it's fast, it's instant, it's distracting;

is this the end of my business model, is it the end of concentration, is it ADD

forever?

MR. COSTOLO:  No.  And I'll answer that on

MR. RAUCH:  All right.

MR. COSTOLO:  Yeah, good.  And I'll answer that on two sort of

axes.  One, I think that there's, I don't agree with the hypothesis that, because it's,

like, 140 characters and it's short that it's distracting or causing us to not be

thoughtful about things, et cetera.  There are some incredibly thoughtful and

eloquent 140 character Tweets, the author Salman Rushdie is one of the amazing

PX0643-026

TWITTER-2013/06/26

users of the platform and speaks eloquently about things like character

development and the difference between novelists on it.

But, to the first part of the question, we are not going to be in the

business, period, of synthesizing, analyzing, and I've already told you we proved to

not particularly like the way we were curating experiences on Twitter.  We're going

to be the platform that distributes this information that the hundreds of millions of

people around the world who use it want to talk about.  I think it's the journalists

and the news organizations in the world who will take all this information and

analyze it and curate it and synthesize it, as they have always done.

Yes, it may be the case that, well, people are breaking these

stories on Twitter now, so we're not going to be, we may or may not anymore be

the first place to break something.  But, look, it's now the case that when anyone,

when something is broken on some televised news show, that everybody else

picks it up instantaneously anyway, and the advantage is in the real journalism,

synthesis analysis and curation of what's going on.

So I think that that's, all of that advantage and benefit of journalism

doesn't go away at all, and is increasingly important, because you do have a lot of

information coming in at once, and there have to be some organizations that are

PX0643-027

TWITTER-2013/06/26

synthesizing it and thinking about it and analyzing it, and writing up those analyses

or broadcasting those analyses.

MR. RAUCH: Well, let's go to the audience. Before we do, a sign

went up a bit earlier saying that the Supreme Court has ruled the Defense of

Marriage Act unconstitutional; no precedent on gay marriage in Proposition 8, as

well as expected; and same-sex marriage will, as a result, be legal again in

California.

Only you guys filed, signed on to a brief supporting the

overturning of the Defense of Marriage Act, if I'm not mistaken. So this is good

news for Twitter why?

MR. COSTOLO: So, I think that the brief that we signed on to with

hundreds of other companies, I think is correct, was all about, look, we just want to

have some understanding of consistency in the way we're going to be able to,

we've got employees all over the place, and we want to have some sort of

consistent way of knowing how we're going to be able to deal with these things,

which is what that brief specifically was about.

PX0643-028

TWITTER-2013/06/26

In our own case, now, separating ourselves from that particular

brief, we've been very supportive as a company with our own employees of these

progressive policies in the state of California, et cetera

MR. RAUCH:  Thank you, I'm gay, I'm married, I appreciate that.

Let's go to the audience.  We'll start with the gentleman in the back.  I'm going take

two or three at a time and write them down so we can move through them a little

faster.  Please keep it short, and please keep it a question, I beg you all.  Thank

you, sir.

MR. LEVER:  Yes, hi.  Rob Lever from AFP.  Getting back to

PRISM, there are some things that we don't know about how it works and how

companies respond.  Can you say with any certainty whether companies like yours

have the ability to opt-in or opt-out?

MR. RAUCH:  Thank you.  Let's go to a couple others and we'll

come back.

MR. COSTOLO:  You want me to not answer those yet?

MR. RAUCH:  Not yet.

MR. COSTOLO:  You're going to take them all.

PX0643-029

`TWITTER-2013/06/26`

MR. RAUCH:  I'm going to try to move through them pretty quickly.

Let's go to the gentleman in the aisle, here.

QUESTIONER:  Hi.  I had a quick question regarding Turkey.

Turkish Prime Minister actually criticized Twitter because of the gatherings that

happened in Turkey about the protest that you mentioned also, and he said Twitter

is a menace for all the societies around the world, even though he was in Silicon

Valley and he visited the companies, including two of them maybe, or even though

he has millions of followers on Twitter.

So what is your take on this, I mean, how do you see it?

MR. RAUCH:  Thank you, let's

QUESTIONER:   and also a quick question regarding illegal basis

of these protests.  The Turkish police arrested some Twitter users in Turkey, did

they contact you to get some private information about the users, and what is your

response?

MR. RAUCH:  Thank you.  Let's do one more from this side, the

gentleman, the second in from the aisle.

MR. VALDERRAMA:  Rodrigo Valderrama, Plantation

International.  I have two kids in South America, 13 and 15, how is Twitter going to

PX0643-030

```
TWITTER-2013/06/26
```

be developing so that they can use this more in their education, as well as their

social Tweets?  Because they're getting into that already.

          MR. RAUCH:  Good.  Do you want to talk about opting in or out of

PRISM?

          MR. COSTOLO:  Yeah.  I don't think it's  and I'm not going to

speak specifically about the PRISM stuff, I think I'll go back to what I said initially, I

won't restate that here.  But I think I gave about as clear a perspective on how we

think about these things as possible.  We're going to be principled, but abide by the

specific rule of law in the countries in which we operate.

          MR. RAUCH:  Alas, folks, I don't think we're going to get much

more out of Dick Costolo on PRISM today.  Turkey, is Twitter a menace to society

in Turkey, and have you been in touch with any of the folks arrested over there, or

their lawyers?

          MR. COSTOLO:  I'm very familiar with Prime Minister Erdogan's

comments, and obviously been watching and observing what's been going on

there.  The beauty of having this open public platform that allows everybody

around you to see and hear what you think is that, is that, is that it's this public

town square.  That's what it is, we don't editorialize what's on it, we don't say, well,

PX0643-031

TWITTER-2013/06/26

if you believe this, you can't use our platform for that, you can use our platform to

say what you believe.

            So that's what the people of Turkey, and those elsewhere who are

commenting on the events in Turkey, are using the platform for it.

            MR. RAUCH:  They're getting

            MR. COSTOLO:  So the platform itself doesn't have any

perspective on these things, it's a vehicle for people to use to give their own

perspectives.  I would say that, in response to your other question, one of the

fascinating things about Twitter is that, since, because you can use a pseudonym,

it is a particularly helpful platform for political speech, because you can sign up

with your ID, in fact, in Tunisia, one of the protestors was @slim404, who is now

an Interior Minister in the new government in Tunisia.

            And, you know, we don't ask for a phone number, or a mailing

address, or things like that, so, of course, it's a great platform for the capability to

use political speech.  Of course, the flip side to that coin is, it also allows, frankly,

for people to behave like trolls with celebrities and say all sorts of horrendous

things, hiding behind a pseudonym that they might not normally say if they were

saying it with their full name.

PX0643-032

TWITTER-2013/06/26

MR. RAUCH:  We won't forget the education question, which is important, but this is a good time to interject with one that came from online.  This may be a silly question, but as the CEO, why isn't your profile verified? (Laughter)

MR. COSTOLO:  I always like to give different answers to that question that I get every day, like I'm verified on the inside

MR. RAUCH:  You've had that question before, have you? (Laughter)

MR. COSTOLO:  My mom verifies me.  We use verification, generally speaking, for things like are there, will it be hard for people to understand which of these is the real account, or are there impersonators of this account that make it important for us to verify this account, and then sort of several other items on the list.  I have long felt that, within the company, we shouldn't just be verifying employees because they work at Twitter, as long as they don't meet some of the other criteria, and since nobody's pretending to be me on the platform, at least not anything except sarcastically.

There are a few fictional internal employee accounts that make fun of me that I'm perfectly fine with.  But, I just don't worry about stuff like that.

PX0643-033

TWITTER-2013/06/26

MR. RAUCH: It could get hairy if someone impersonates the Associated Press, as we now know.

MR. COSTOLO: Well, they're verified, and most of the major news organizations are verified. That was a case where, I think, the account got phished, and we are working closely with news organizations now in a much more concerted and, I think, organized way to help them make sure they've got to right sort of security policies implemented around their accounts.

MR. RAUCH: Twitter and education, how can Twitter help the Brazilian gentleman's kids in school?

MR. COSTOLO: Oh, yeah, thanks for coming back to that one. You know, I think that one of the fascinating things about Twitter is that irrespective of the subject matter in which you're interested, the domain experts are on the platform. And I mentioned Salman Rushdie earlier, but there are tons of some of the world's greatest authors having conversations about character development or who's a better South African novelist, Coates, or this person.

And it's fascinating, if you're a student of literature, to follow these authors and see the kinds of conversations they have. If you're interested in, you know, cooking, the best chefs in the world are on there having conversations about

PX0643-034

TWITTER-2013/06/26

these things.  These Arabic scholars are having, I remember talking to someone

from a news organization that was researching where Mubarak had hidden assets,

and found that the best place to go do research for this report about where

Mubarak had hidden assets was a set of Arab scholars, Arabic scholars who were

discussing this very topic on Twitter.

MR. RAUCH:  Do you all have an educational division?

MR. COSTOLO:  We have people within our, I guess we'd

generally call it our media team who focus on specific verticals like news, sports,

music, education, et cetera

MR. RAUCH:  So you can't, like, sign up for a school Twitter feed

MR. COSTOLO:  nonprofit, et cetera

MR. RAUCH:   or use it as a pedagogically yet?

MR. COSTOLO:  We just have a couple people who work on that

stuff, so it's not a big group.

MR. RAUCH:  This could get interesting.  Let's go back to the

back, here, let's go, we've got second from the aisle towards the back.

MS. GARBUTT:  Hi, I'm from Georgia, my name is Julie Garbutt,

and not the state Georgia, the country Georgia.  And my question is the following;

PX0643-035

`TWITTER-2013/06/26`

in my country, it's not poplar to Tweet, and there are people who use the other social media tools.  So what's your strategy to get out there, and how do you want to popularize Twitter in countries like Georgia?  Thank you.

MR. RAUCH:  Thank you.  Let's do another couple before we, the gentleman third from the aisle about halfway back in the dark suit.

QUESTIONER:  Thank you.  You mentioned how there is much anonymous nature for Twitter.  The flip side of that is not only the trolls, but also in younger people, the cyber bullying, and I was wondering what is Twitter doing to combat this growing issue of cyber bullying?

MR. RAUCH:  Thank you, these are great questions.  And on the other side, gentleman in looks like a blue polo shirt.

MR. HERMAN:  Joey Herman, University of Michigan.  Just a quick question about, since its inception, Twitter has been a trendsetter, not only with the hashtag, but now the inception of Vine, and Facebook just came out with Instagram video, and I just wanted to know in regards to that, how you guys look to combat the innovations by your competitors and look to better your own products.

MR. RAUCH:  Very good.  Let's do those three.  So, what efforts are you making to popularize Twitter in the Republic of Georgia?

PX0643-036

```
TWITTER-2013/06/26
```

MR. COSTOLO:  So we have a specific international market development strategy that involves, really, a global approach to this with focuses on some regions and countries.  And it generally involves making sure that we have an app that is fast and functional on the kinds of mobile devices that are the most prevalent in that area.  In places, there are lots of places that smart phone penetration is still very, very small, and will be for some time.  There are places in which it is helpful to have direct relationships with the mobile operators who will market your service and app as a part of, you know, using their particular plans.

So we have gotten, I think, a lot more savvy in the last, I would say, 12 months about doing those kinds of things.  I think it's fair to say that we were a little bit later to doing that than some of our, than some of the other people in the space, but we think we have a good plan there now and will invest heavily in that.

MR. RAUCH:  Are there any countries that just don't have Twitter, for whatever reason?

MR. COSTOLO:  Well, we're blocked in Iran and China, and we would love to not be blocked there.  Obviously, as you mentioned, when you talked about Ai Weiwei, there are

PX0643-037

TWITTER-2013/06/26

MR. RAUCH:  There are ways around

MR. COSTOLO:  lots of folks in China who know how to get

around that, but we are blocked there, and we would love not to be blocked there.

MR. RAUCH:  A milestone, like when CocaCola was in every

country after the death of Salazar, when Twitter is in every country in the world.

MR. COSTOLO:  That would be wonderful, we would dearly love

for that to be the case.

MR. RAUCH:  Cyber bullying, has that issue surfaced inside

Twitter?

MR. COSTOLO:  Yeah.  So, I think that the point I would make

there is that, again, because it's public, because it's entirely public, some of that is

alleviated.  Yes, you can still be a troll and hide behind an anonymous ID and say

something horrible to someone, a lot of the historic cyber bullying cases have been

on platforms where, as you know, it's a little bit harder for everybody to see what

was going on, and it was just within this particular circle of people who knew each

other who had access to each other's information.

So we have to do a better job on the at-connect experience, your

reply stream of filtering out what are obviously just egregious and repeated, like,

TWITTER-2013/06/26

harassment.  We've been working on that for a little while, it's really a ranking

problem, but the challenge there, you might say, well, if this person is just saying

the same thing over and over again, why don't you pull that out.  You want to come

up with a scaleable solution that doesn't eliminate the serendipity of hearing from

someone you've never heard from before who just joined and has zero followers

and says this amazing thing to you.

You want to retain that while eliminating the, you know, the trolling

behavior or the abusive behavior.  So we're working on that, we've tried several

things, we have another experiment we're running now and trying out, and it's

definitely something we continue to invest in it, and I continue to pay personal

attention to.  Because I do think that the flip side to the political speech enabling of

using a pseudonym is one that we need to go combat and causes people all sorts

of trauma.

MR. RAUCH:  These are technological solutions you're talking

about?

MR. COSTOLO:  Yeah, they're technological solutions, that's right.

MR. RAUCH:  Video, Facebook, breathing down your neck?

MR. COSTOLO:  Oh, Instagram video.

PX0643-039

TWITTER-2013/06/26

MR. RAUCH:  Yeah.

MR. COSTOLO:  Look, people can do whatever they want to do, you know.  Like we're going to continue to look forward to a point on the horizon that we want to move toward.  And the beauty of Vine was that when Dom and Russ and Colin created it, and Jack and I saw, Jack saw it first  sorry, Jack Dorsey, one of the founders of the company, of Twitter, an inventor of the product, called me and said you've got to see these guys before they go back to New York.

And we saw them and we bought the company before it even launched and then changed the product a little bit more before it launched here.  We have a very specific notion of where we want to go, and it's this constrained media, public, real time, conversational, widely distributed, so Vine can be distributed anywhere, embedded in sites just like Tweets can, and other people can replicate that, or take pieces of it they like and pieces of it they don't like and do whatever they want to do, if that's what they want to do.

I am, everyone inside the company has heard me say the goals not competitors all the time.  I think it's so much more important to understand the competitive landscape in the context of where you want to go, but not let what those guys are doing drive what you're going to do.  And, you know, let the chips

PX0643-040

TWITTER-2013/06/26

fall where they may.  No one's ever, you know, if we do what we want to do and go

where we want to go, we'll be fine and everything will take care of itself, and we

don't have to worry about how big that thing is or how fast this new thing is, really.

MR. RAUCH:  Speaking about that this morning, it's not even clear

to me Twitter actually has any real competitors, per se, it's just so different from

everything else.  Here's one from online, which I love.  I hope you can answer this.

How can we use

MR. COSTOLO:  Wow.

MR. RAUCH:   Twitter to improve decision making in Congress?

MR. COSTOLO:  I don't know what the answer to that is.

(Laughter)

MR. RAUCH:  Not even the genius from Silicon Valley has the

answer to that one.

MR. COSTOLO:  Pass.

MR. RAUCH:  Maybe 140-character legislation.  This does give

me the opportunity to ask, we saw a Politico story about Twitter is hashtag lying

low, but apparently, you've got a Washington operation, you've got seven or eight

people here

TWITTER-2013/06/26

MR. COSTOLO:  Yeah, several of them are in the room.  A couple

policy folks here, the rest of the team is doing things like helping on board

government agencies, working with folks in government to better understand the

use of Twitter, some sales and marketing folks, et cetera.  So we still have a pretty

small group of folks here.

MR. RAUCH:  What are your policy folks doing?

MR. COSTOLO:  Paying attention to the policies that are being

developed here in Washington.

MR. RAUCH:  That's good.  Are they lobbying for any particular

policies at the moment?

MR. COSTOLO:  We're  you know, when I'm here, I spend all,

most of my time, as do our policy folks here, listening, and just trying to understand

the tenor of the discussion on, obviously, a variety of topics, as oppose to angling

for anything specific.  We're still quite small in comparison to some of these other

companies.

MR. RAUCH:  How does Washington look from where you sit?

PX0643-042

TWITTER-2013/06/26

        MR. COSTOLO:  Well, in what respect?  One of the things I've

noticed is that people dress up a lot more here, as Strobe pointed out.  I threw you

guys by putting  a suit on this morning.

        MR. RAUCH:  I wonder what happens if someone gives you

neckties at Christmas.

        MR. COSTOLO:  I'll say this; I think that sometimes, you know, if

you're in Los Angeles, you get these discussions between, the difference between

southern California and northern California, when you're in New York or here, you

get these differences between east coast, west coast.  I think that these tend to be

exaggerated in many, many ways.  Look, people in this, people here are, and it's

kind of my answer to the previous question, how can Twitter be used to help the

government make better decisions.  It is a matter of fact that most of the folks,

most of the representatives, most of the Senators are already on it and using it and

leveraging it quite well, and paying, very much paying attention to it.

        So I don't think that there's this, I don't think that there's really the

sense of what needs to happen here to make it more like there.  I just don't think

that way.  People tend to pigeon hole different parts of the world or different parts

of the country as being more this than the other guys, I just don't think that's true.

PX0643-043

44

`TWITTER-2013/06/26`

MR. RAUCH:  You guys move in minutes, Washington moves in years, decades, getting anything through this Congress, and so on.  We have about two minutes left, so I'm going to call on two more people, and one of them is going to be Gary Mitchell, who is always brief, and one other person for quick questions, and we'll do a lightning round.  Do we have one other person who wants to get in?  Gary first.

MR. COSTOLO:  I thought we were in the lightning round.  We're going to the lightning round?

MR. MITCHELL:  Thanks.  I'm Gary Mitchell, and I write the Metro Report, or for this purposes, I'm at Mitch Report.  So, about a year or so after Disneyland opened, Walt Disney was interviewed and asked where'd the idea come from.  Presumption was that he would say, I created all these marvelous characters and I wanted to build a home for them, and he didn't.  And he didn't hesitate, and he said, oh, it's very simple, I needed a place to take my daughter on the weekends.

So, where did the idea for Twitter really come from?

MR. RAUCH:  Yeah, that's one you can answer in 30 seconds.

PX0643-044

TWITTER-2013/06/26

MR. COSTOLO:  Yeah.  So, Jack Dorsey, again, one of the

founders and the inventor of the product had been fascinated by these dispatch

systems when he was working as an engineer, and thought it would be compelling

to create a system in which you could just broadcast your status or your location,

or what you needed, and then everyone could see it instead of going through some

sort of, as we all know, inefficient queing mechanisms for taxis as they exist today.

And that was the genesis of it, his fascination with these

dispatch systems, and what if you could just broadcast where you were and what

you needed and what was happening, and the things that would supply you would

see that and could rush to you right away, and they'd all get the information at

once.  And he just extrapolated that to, well, wouldn't that be great if everybody

could see that, and you'd be able to jump into those things.

MR. RAUCH:  And it is a place to take your daughter.  Let's do

one more, we've got about a minute left.  There was a young woman here right

behind.

MS. SOLUCOM:  Hi.  My name is Elena Solucom with Reuters.

You said that you would like to see Twitter be accessed by everyone, or accessible

to everyone around the world.  Part of the challenge there, of course, is not

`TWITTER-2013/06/26`

everyone has access to the internet.  Does Twitter have any plans to get involved

in broadband expansion in the U.S., anywhere around the world, in the sort of kind

of network level?

        MR. COSTOLO:  I think that we're still a small enough

organization that we're focused more on the core product itself and know that other

companies are focused on those efforts.  It will probably be some time before we

expand into anything like that.  We work regularly, obviously, with the kind of the

companies that are focused on those things, I mentioned relationships with the

mobile operators in some of these countries, and we'll probably attack it from that

angle, working with the existing providers in those locations, as opposed to doing it

ourselves.

        MR. RAUCH:  Here is the last question to sign off on, this came

from online.  Do you have a favorite personal Twitter moment, a time when you

looked at the way the service was used and were just blown away?

        MR. COSTOLO:  Well, it changes for me regularly, they happen

over and over and over again.  I certainly have some favorite Twitter moments,

and I'll just mention one of them, which is, I remember Sarah Silverman, the

comedian, sent out this Tweet that said, you know, it was around the holidays.

PX0643-046

TWITTER-2013/06/26

She said, if your family is really bugging you around the holidays, just pretend

you're in a Woody Allen movie.  And Mia Farrow responded, I tried that, it didn't

work.  (Laughter) So that's probably my favorite Twitter moment.

           MR. RAUCH:  Thank you, Dick Costolo, for being with us today.

(Applause)

* * * * *

PX0643-047

```
TWITTER-2013/06/26
```

CERTIFICATE OF NOTARY PUBLIC


      I, Carleton J. Anderson, III do hereby certify that the forgoing electronic

file when originally transmitted was reduced to text at my direction; that said transcript is

a true record of the proceedings therein referenced; that I am neither counsel for, related

to, nor employed by any of the parties to the action in which these proceedings were

taken; and, furthermore, that I am neither a relative or employee of any attorney or

counsel employed by the parties hereto, nor financially or otherwise interested in the

outcome of this action.


Carleton J. Anderson, III



<u>(Signature and Seal on File)</u>

Notary Public in and for the Commonwealth of Virginia

Commission No. 351998

Expires: November 30, 2016


```
                    ANDERSON COURT REPORTING
                   706 Duke Street, Suite 100
                      Alexandria, VA 22314
          Phone (703) 519-7180  Fax (703) 519-7190
```

# PX0644

On This Page

# Sharing

Enable people to post to Facebook from your app.

 **Sharing on iOS**
Share from your iOS app.

 **Sharing on Android**
Share from your Android app.

 **Sharing on Web**
Share from your website or web app.

**More Expressive Sharing**

When you use Facebook's Share dialogs on all platforms, you can give people an expressive sharing experience regardless of how they've logged into your app. With the dialogs, you can add quotes to a link share, post photos and videos at the same time, or add a hashtag to let people connect with a community on Facebook - all while giving people a consistent experience that gives them the functionality they expect.

**Sharing for Webmasters**

Learn about the Facebook crawler which collects content from your site to share, Open Graph markup, migrating content, and optimizing your web content for sharing to Facebook.

**Best Practices**

Check out our best practices to provide the best experience for people sharing to Facebook.

[ iOS ]   [ Android ]   [ Web ]

**Sharing**

Overview

iOS

Android

PX0644-001

Sharing

Web

Devices

Messenger

Sharing to Stories

Webmasters

Domain Verification

Referral Insights

Open Graph Stories

Best Practices

PX0644-002

# PX0645

5/17/24, 2:34 PM                                              Crossposting | Meta for Media

∞ Meta

**Meta for Media**



FIND TOOLS

## Crossposting

You can automatically crosspost Instagram posts and Stories to Facebook, as well as crosspost Instagram Video to Facebook.

**Try Now**

# By using Facebook and Instagram together, you can reach even more people looking to you for inspiration.

### Increase your reach automatically

**Automatically crosspost Instagram posts and Stories to Facebook, as well as crosspost Instagram Video to Facebook.**



PX0645-001

∞ Meta

**Meta for Media**



If there are individual posts and Stories you don't want crossposted, you'll be able to exclude them before posting.

## Features

You can automatically crosspost Instagram posts and Stories to Facebook, as well as crosspost IGTV videos to Facebook. If there are individual posts and Stories you don't want crossposted, you'll be able to exclude them before posting.

## Make sure your Instagram posts are syncing to Facebook

Go to your Instagram profile and tap the three lines in the top right

Tap **Settings**, then **Account**, then **Linked Accounts** and then select **Facebook**

Enter your Facebook login information

By default, your Instagram account will link to your personal Facebook timeline. To link to a Page instead, tap Facebook again and then tap Share to choose a Page that you manage

## Automatically crosspost Instagram Stories to your Facebook Page

Open the Instagram app on your phone

Tap the camera icon

Tap the settings icon

Select **Share Your Story to Facebook**

## Changing crossposting settings

If your Instagram account is linked to multiple Facebook Pages, you can change which of those Pages you want to crosspost your Instagram Stories.

Open the Instagram app on your phone.

Tap your profile picture, then the menu icon.

Tap **Settings**, then **Account**, then **Linked Accounts**.

PX0645-002

Crossposting | Meta for Media

## ∞ Meta

**Meta for Media**

   Tap **Facebook** and select **Share** to the respective Facebook Page*

*For any admin on Android, this final step must happen each time an Admin switches Instagram accounts, even if previously done.*

You can change your Facebook Page preferences from the Instagram mobile app by going to:

**Settings → Linked Accounts → Facebook → Share to → Choose a Page**

To get the most out of cross posting your videos, use the **Facebook Video Template** for your Page. This template for Pages includes a spotlight section to give you more flexibility to spotlight your top videos. Think about creating playlists to organize your videos around different themes so your community can easily find and watch their favorites. The switch is easy and available to all Pages globally.

Don't forget you can manage your content and get insights on both Facebook and Instagram by using Creator Studio. Follow these simple steps to get set up.

## Related Tools



Rights Manager

Manage and protect your copyrighted content on Facebook and Instagram.

PX0645-003

Meta

Meta for Media



Facebook Pages

Increase awareness of your business with a free online presence you can make in minutes.



Online Events

Learn to create virtual experiences utilizing Facebook's platforms and tools.

## Explore more content related to Crossposting from Instagram to Facebook



**SUCCESS STORIES**

Essential remix tips: 9GAG shares 5 elements of a winni...



**ANNOUNCEMENTS**

First scaled video masterclass series launches with 12...



**ANNOUNCEMENTS**

Meta and ICFJ launch Journalism Ethics Training in the Middl...



**SUCCESS STORIES**

Conmebol Libertadores increase reach by crossposti...

PX0645-004

∞ Meta

**Meta for Media**

**Sites**

Meta Audience Network

Meta for Business

Meta for Creators

Meta Elevate

Facebook Gaming

**Resources**

Social Editorial Calendar

Media Academy

Media Support Portal

Help Center

**Blog**

**Follow Us**

---

© 2024 Meta

English (US) ▾

Privacy

Terms

Cookies

PX0645-005

# PX0646

Overview - Facebook App Ads

On This Page

# Overview

The Facebooks Ads for Apps Overview describes the components and tools you will use to run ads on Facebook for your apps.

## Components

### Ad Campaigns

You can create and run app ads with the app installs as the objective using the Marketing API or the Ads Manager. Learn more.

### Ads Manager

You can use the Ads Manager to create an App Ad and to track both automated and manual app ads. Learn more.

### App Ads Helper

Check the performance of your mobile app ads, see the latest install events, and verify that app events and deep links are working. Learn more.

### App Events

App events allow you to track specific actions or events that occur on your app. Learn more.

### Business Manager

PX0646-001

To run ads on Facebook, you must have or be a part of a Facebook Business Manager that is connected to your app. Learn more.

## Facebook App

To get the most out of your app ads, you will want to register your app with Facebook, and connect your app to your business manager and your ad account. Learn more.

## Facebook SDK

If you want to use ad objectives other than App Installs, you will need to implement one of the following: * The Facebook SDK * The Marketing API's Conversions API * A Partner Integration with Meta

# Next Steps

- Get Started with App Ads.

**Facebook App Ads**

**Overview**

**Get Started**

**Add Deep Links**

**Guides for App Ads**

**FAQ**

**Resources**

PX0646-002

# PX0647

# COMMENTS ON THE JANUARY 2022 DOJ AND FTC RFI ON MERGER ENFORCEMENT

**John Asker, Kostis Hatzitaskos, Bob Majure, Ana McDowall, Nathan Miller, and Aviv Nevo [†]**

*April 20, 2022*

1. Introduction ..................................................................................................................3

2. Updates should take care to not undermine the Guidelines' credibility .........................6

2.1. The Horizontal Merger Guidelines are viewed as a reliable summary of the tools commonly used to evaluate merger effects ...........................................................................................7

2.2. An overhaul of the Guidelines that deviates from the mainstream academic literature will undermine the Guidelines' credibility and usefulness .......................................................7

2.3. The mainstream academic consensus is consistent with the law: while some mergers are anticompetitive, others enhance competition, and the purpose of merger review is to distinguish between the two ................................................................................................8

2.4. The 2010 HMG have largely stood the test of time and the evidence does not support large deviations from their approach on multiple topics.............................................................10

2.5. The call for stronger structural presumptions is unlikely to meaningfully aid the agencies in more successfully blocking harmful mergers .................................................................15

3. Specific areas where the Guidelines could be updated to make enforcement more effective....................................................................................................................... 17

3.1. Types of evidence ................................................................................................... 17

3.2. Market definition .....................................................................................................18

3.2.1. A further emphasis that direct evidence of competitive effects can inform market definition ..................................................................................................................19

3.2.2. The legacy of earlier HMG's algorithmic market definition approach is inconsistent with the newer emphasis on competitive effects, and should be clarified or eliminated....... 20

3.2.3. Clarifying competition between one-sided sellers and two-sided platforms ................ 22

3.2.4. Bundle and cluster markets ................................................................................23

---

[†] John Asker is the Armen A. Alchian Chair in Economic Theory at the University of California, Los Angeles. Kostis Hatzitaskos is a Vice President in Cornerstone Research's Chicago office and co-head of its antitrust practice. Bob Majure is a Vice President in Cornerstone Research's Washington DC office. Ana McDowall is a Senior Manager in Cornerstone Research's Chicago office. Nathan Miller is the Saleh Romeih Associate Professor at the Georgetown University McDonough School of Business. Aviv Nevo is the George A. Weiss and Lydia Bravo Weiss Penn Integrates Knowledge Professor at the University of Pennsylvania. The authors would like to thank Matthew Calvin, Michael Chen, Jamie M. Daubenspeck, Nikhil Gupta, and Andrew Litten for research assistance. The views expressed in this article are solely the authors' and are not purported to reflect the views of Cornerstone Research.

PX0647-001

3.2.5. Clarifying the Hypothetical Monopolist Test (HMT) outside the linear posted price framework ................................................................................................................. 24

3.2.6. Market definition in cases involving potential competition............................................ 26

3.2.7. Clarifying targeted customer markets and price discrimination..................................... 26

3.3. Horizontal competitive effects ........................................................................................27

3.3.1. The Guidelines should warn against the misuse of regressions of price on the HHI ... 28

3.3.2. The Guidelines should make clear what features of nascent or potential competitors make them more likely to evolve into a competitive constraint to the buyer absent the transaction .......................................................................................................................... 29

3.4. Non-horizontal competitive effects ............................................................................... 30

3.4.1. The discussion of vertical theories should separate the technical ability to foreclose from foreclosure's effects on competition....................................................................... 31

3.4.2. The discussion of foreclosure should clarify the definition and role of essential inputs ....................................................................................................................................32

3.4.3. The Guidelines should recognize the potential for the elimination of double marginalization ("EDM") when there are incentives to foreclose or raise rival's costs .......... 34

3.5. Mitigating factors...........................................................................................................35

**4. Concluding remarks and procedural changes...............................................................36**

PX0647-002

# 1. Introduction

We offer these comments in response to the DOJ's and FTC's January 18, 2022 Request for Information on Merger Enforcement ("RFI").[1] We commend the agencies for this and other recent efforts aimed at improving merger enforcement and protecting U.S. consumers and workers. Our goal with these comments is to provide useful input into the process of updating the Horizontal Merger Guidelines and, potentially, replacing the Vertical Merger Guidelines,[2] based on our collective experience as participants in several merger reviews on both the government and merging party side.[3]

A useful starting point is to ask why the agencies should revise the Guidelines. The answer in our view is that a revision is sensible if the goal is to bring more clarity to points made in prior Guidelines, and to update the Guidelines with advances in economic and legal thinking that have occurred since issuing the previous Guidelines. If, alternatively, the reason is to shift agency practice based on a perception of under-enforcement, we see a significant risk that this will devalue the role and credibility of the Guidelines. We also believe that this approach is unlikely to be the most effective way to improve the government's ability to successfully litigate merger cases, and that more fruitful courses exist to do this.

We begin our discussion by noting the important benefits that have followed from the Guidelines reflecting a broad consensus of how to conduct merger review (§ 2.1). Any updates to the Guidelines should take care to reflect the

---

[1] U.S. Department of Justice and U.S. Federal Trade Commission, "Request for Information on Merger Enforcement," January 18, 2022, available at https://www.justice.gov/opa/press-release/file/1463566/download.

[2] Throughout this document we refer to the 2010 Horizontal Merger Guidelines with the "2010 HMG" shorthand and, similarly, to the 2020 Vertical Merger Guidelines with the "2020 VMG" shorthand. We use "Horizontal Merger Guidelines" to refer not just to the 2010 HMG but also to its predecessors. And to the extent that we make a comment that refers to both sets of guidelines, horizontal and vertical, we use the term "Guidelines."

[3] The authors have participated in merger reviews as consultants or testifying experts for both government agencies and merging parties. Roles in litigated merger matters involve John Asker as an expert for merging parties in *T-Mobile/Sprint*; Kostis Hatzitaskos supporting government experts in *Aetna/Humana*, *Wilhelmsen/Drew*, and *Sabre/Farelogix*, and merging party experts in *Sysco/US Foods* and *T-Mobile/Sprint*; Bob Majure as an expert for merging parties in *Canadian Pacific/Kansas City Southern*; Nathan Miller as an expert for the Canadian government in *Parrish/Heimbecker* and *Secure/Tervita*; and Aviv Nevo as an expert for the government in *Aetna/Humana*, *Wilhelmsen/Drew*, and *Sabre/Farelogix*. In addition, the authors have worked for the agencies and merging parties on numerous mergers that were not litigated.

mainstream economic literature and practice, as failure to do so would risk undermining the Guidelines' credibility and ultimately their usefulness (§ 2.2).

We raise this point because recently politicians, (some) academics, and the popular press have argued that the U.S. economy is becoming less competitive. Partly in response to these claims, new (and sometimes not so new) theories of harm have been suggested. We are generally sympathetic to new theories and methods that help protect the competitive process and benefits consumers and workers. We note, however, that the existing toolkit is quite flexible in that it can and does address many of the concerns raised.[4] Any attempt to update the Guidelines should be based on solid evidence and rigorous analysis. Our review of the evidence concludes that in many areas it is not clear that the threshold has been met. We therefore conclude that mainstream economic literature does not support large deviations from the 2010 HMG's existing prescriptions (§§ 2.3–2.4). Changes to the Guidelines that are not supported by proper research risk hurting the long-term credibility of the Guidelines. Furthermore, we expect that proposals to strengthen enforcement through changes to presumption thresholds are likely to be met with skepticism by courts (§ 2.5).

Having noted concerns the agencies might face when updating the Guidelines, we turn to a set of specific comments. It has been more than a decade since the 2010 HMG, and so there is room to improve and update them. We see three categories of updates that would facilitate more clarity and more focus on the substantive questions of merger analysis. First, the 2010 HMG are naturally silent on certain legal and economic developments that have taken place since their release. Courts could benefit from the Guidelines clarifying

---

[4] For example, the toolkit is not limited to the study of price effects under the lens of consumer welfare. The 2010 HMG are explicit that mergers may lead to other forms of harm, e.g., loss of quality or reduced incentives for innovation (2010 HMG, at p. 2). The 2010 HMG are also explicit that the same tools can be used to evaluate monopsonistic harm (2010 HMG, at § 12). While labor markets are not explicitly mentioned in the 2010 HMG, the same tools can be used to evaluate harm to labor markets where applicable. While the tools are applicable, we are not aware of any mergers that were blocked because of their effects on labor markets. See Ioana Marinescu and Herbert Hovenkamp, "Anticompetitive Mergers in Labor Markets," *Indiana Law Journal*, 94(3), 2019, available at https://www.repository.law.indiana.edu/ilj/vol94/iss3/5. At the same time, labor markets raise various market definition and other issues that mean that it may be wrong to reach quick conclusions about labor market harm. See "A Comment on Labor Market Definition," Kavan Kucko, Justin McCrary, Bryan Ricchetti, and Rainer Schwabe, April 2022 (submitted in this proceeding).

how these developments fit into and inform the existing analytical framework.[5] Second, the Guidelines could be clearer on certain elements of the analysis. Clarifying these elements can avoid situations where economic testimony in merger trials is dominated by confusing debates over methodology rather than focusing on the facts relevant to the case.[6] Third, developments in the literature suggest certain areas where the analysis could be streamlined.[7] We discuss potential updates on the discussion of the types of evidence used in merger review (§ 3.1), the analysis of market definition (§ 3.2), horizontal competitive effects (§ 3.3), non-horizontal competitive effects (§ 3.4), and mitigating factors such as efficiencies and entry (§ 3.5).

As we note, historically the Horizontal Merger Guidelines have reflected contemporary agency practice, which in turn has generally reflected the then-best available consensus tools by which to distinguish procompetitive from anticompetitive horizontal mergers. Implicit in that framework is a consensus that a common set of principles govern the task of the reviewing agency and ultimately of a court in making that distinction for horizontal mergers. The Guidelines bring together a broad set of economic frameworks and empirical tools.

In principle, the same approach should be applied when rewriting the 2020 VMG. However, non-horizontal effects are much broader in nature. They have proven more difficult to generalize into guidelines because the facts of a given case can suggest a theory that has little in common with other potential theories. As for the 2020 VMG, the agencies should recognize and seek to preserve the value of all the effort that produced a document addressing merger

---

[5] For example, the 2010 HMG are silent on the treatment of two-sided platforms, an issue that has increasingly raised market definition questions since the Supreme Court's 2018 opinion in *Ohio v. American Express* (§ 3.2.3).

As another example, the 2010 HMG are silent on cluster markets and bundle markets, two related but distinct notions of market definition that have been featured more prominently in several recent merger trials (§ 3.2.4).

[6] For example, the Guidelines could be clearer on the fact that the analysis needs to adapt to the specific facts of the case at hand and that not all industries lend themselves to the same degree of specificity in predictions of harm (§ 3.1).

As another example, the 2010 HMG moved away from the narrowest market principle in favor of greater flexibility in market definition. Yet traces of the earlier language on narrowest market principle remain that could confuse the market definition debate in certain cases (§ 3.2.2).

[7] For example, recent research argues that under certain assumptions the agencies could dismiss the possibility that entry mitigates merger harm, which could simplify the analysis of certain mergers (§ 3.5).

effects beyond the purely horizontal. However, it is not obvious to us how the agencies can best proceed with any revisions to this document.[8]  We can only urge caution and suggest that revisions focus narrowly on eliminating overstatements while keeping in mind that the overall goal of revisions should be to enhance clarity and not to attempt a change in law, which might ultimately undermine rather than bolster enforcement.

We conclude by noting an issue that is not strictly a matter of guidelines, but is an issue that we think has made agency leaders predisposed to believe claims that they have been under-enforcing: antitrust cases are complicated and expensive for the government to prosecute. That does not seem like a good reason to ignore the legitimate questions at the heart of such disputes. Rather, it seems like an issue that calls for procedural changes that in our experience would facilitate clarity in merger trials, which in turn could help resolve contentious mergers earlier on in the review process, or prevent problematic mergers from making it out of the boardroom altogether (§ 4).

## 2. Updates should take care to not undermine the Guidelines' credibility

The 2010 HMG have been successful in large part because of their widespread acceptance. Merging parties accept them as a reliable summary of the tools commonly used to evaluate merger effects, which means that agencies can go to court without the distraction of major debates over the basic framework. This acceptance has also helped courts accept new merger review tools that were introduced in the 2010 HMG (§ 2.1).

An overhaul of the Guidelines that deviates from the mainstream economic literature and practice will undermine the Guidelines' credibility and usefulness to merger enforcement (§ 2.2). The mainstream academic literature does not call for major changes to the Guidelines. The evidence is consistent with some

---

[8] For example, one seemingly simple question is whether the vertical effects of mergers should be discussed in the same document as the horizontal effects. Combining into one document might help preserve one advancement in the 2020 VMG – the addition of an explicit statement that mergers should not be pigeonholed into either a vertical or a horizontal framework but might raise some issues that can be examined from one or both perspectives to more useful effect than a debate over which label to apply. Conversely, a single document may make it harder to preserve the essential difference of approach that made the 2020 VMG possible – i.e., recognizing that vertical effects are more varied and harder to articulate with a general framework in the same way that horizontal effects have successfully been articulated in many iterations of the Horizontal Merger Guidelines.

mergers being anticompetitive and with others enhancing competition, with a continuing need to distinguish between the two (§ 2.3). And while there is interesting new research on a number of related topics such as labor markets or rising markups, the evidence does not yet support large deviations from the 2010 HMG (§ 2.4). Furthermore, we do not expect that strengthening the structural presumption is likely to be effective in strengthening enforcement (§ 2.5).

## 2.1. The Horizontal Merger Guidelines are viewed as a reliable summary of the tools commonly used to evaluate merger effects

Guidelines have always been written from the perspective of the agencies. Nevertheless, the Guidelines are generally seen as a well-accepted summary of much of the relevant academic literature and case law.

In our experience, merging parties have typically endorsed the Horizontal Merger Guidelines during agency investigations and at trial have attempted to use them to make their own arguments. Courts accept and rely on the Horizontal Merger Guidelines in part because both sides endorse them, but also because they are grounded in well-established economic theory and methods.

Correspondingly, a study of the judicial response to the 2010 HMG found that when these guidelines introduced several modern economic tools for the assessment of unilateral effects (e.g., diversion ratios, price-cost margins, and merger simulation), these tools became well established in case law over the decade following the publication of the 2010 HMG.[9]

## 2.2. An overhaul of the Guidelines that deviates from the mainstream academic literature will undermine the Guidelines' credibility and usefulness

An update of the Guidelines should connect to mainstream academic research and to the broadly accepted theory and practice of merger review. To do otherwise would be a mistake.

Updating the Guidelines in ways that deviate from mainstream approaches could severely undermine their credibility and usefulness to enforcement. Merging parties may no longer endorse the Guidelines as a well-accepted summary of relevant economic methods. That may mean that merger trials will dedicate much of their time to confusing debates over methodology and

---

[9] Carl Shapiro, and Howard Shelanski, "Judicial Response to the 2010 Horizontal Merger Guidelines," *Review of Industrial Organization*, 58, 2021, pp. 51–79.

whether the updated version of the Guidelines is reliable.[10] Changes that contradict precedent, are not strongly supported by mainstream economic literature and practice, and are challenged by the merging parties would be harder for courts to accept. Courts may sidestep the battle of the experts by continuing to rely on the 2010 HMG, which may be seen as more widely accepted and already endorsed as helpful by prior judicial opinions. As a result, even updates in the Guidelines that are not in dispute might be ignored.

Less credible Guidelines could set back not only merger enforcement by federal agencies but enforcement of the antitrust laws more broadly, including state enforcement of mergers and private enforcement in conduct cases.[11] Moreover, such a setback would take time to reverse. Updating the Guidelines takes time. Should the Guidelines take a major reputational hit, it could take years to rebuild their credibility. Should unhelpful case law be introduced, that may also take time to reverse and might influence future judicial decisions.

Furthermore, an unbalanced update of the Guidelines would likely limit the longevity of the updates. Each administration may see fit to issue a new set of Guidelines, or at least to revoke the prior edition. The examples of the 2020 VMG and the DOJ's 2008 Section 2 Report that was withdrawn in 2009 should be reason for caution. Despite a great deal of work, the useful contributions of both documents were quickly revoked as soon as administrations changed because of portions that the new administration perceived to stray away from a consensus and into a statement of non-consensus policy goals. Continuing down that path risks the Guidelines being reduced to a mission statement of sorts rather than a balanced document that will be useful to courts.

## 2.3. The mainstream academic consensus is consistent with the law: while some mergers are anticompetitive, others enhance competition, and the purpose of merger review is to distinguish between the two

In thinking of how the Guidelines could be revised, it is worth keeping in mind that Section 7 of the Clayton Act does not prohibit all mergers but rather only those mergers whose effect "may be substantially to lessen competition, or to

---

[10] Of course, this already happens to some extent, but the debates tend to be more constrained if the merging parties otherwise accept the Guidelines. For example, the *Aetna/Humana* trial spent a non-trivial amount debating whether the 2010 HMG call for an algorithmic approach to market definition (§ 3.2.2), but the merging parties largely agreed on the government's general analytical framework.

[11] In our experience, economic experts and courts frequently rely on the Guidelines in civil antitrust suits on topics such as market definition and competitive effects.

PX0647-008

tend to create a monopoly." Accordingly, merger review attempts to distinguish between those mergers that may substantially lessen competition and those that are competitively neutral or procompetitive.

There has been a suggestion that some recent academic studies support changing enforcement policy, if not the antitrust laws as a whole. One strain of literature that proponents of greater enforcement point to are specific individual case studies that show some harm from certain mergers that did happen. It is not logically clear why these examples would suggest the enforcement policy is too lenient. Making enforcement decisions without the luxury of waiting to see what happens is good practice, but it inherently involves a necessary risk that enforcement decisions may incorrectly predict future outcomes.

Good enforcement policy is not about perfectly predicting the future but about creating a decision rule that tries to optimally balance the false positives and false negatives of a predictive exercise. And while some have argued that false negatives might be costlier than false positives because they can lead to long-term competitive harms,[12] others have pointed out that false positives can also have unintended consequences that reduce innovation, investment, and employment.[13]  Neither argument should be taken to imply that only one type of error should be considered in evaluating policy.  So, the question remains whether the outcomes that can be observed suggest the current balance warrants adjustment.

It is worth keeping in mind that, along with the emerging literature identifying harmful mergers, there is a parallel literature that indicates that the overall effect of mergers and of existing enforcement policies appears to be procompetitive. For example, while this evidence is from Europe rather than the U.S., Geurts and Van Biesenbroeck (2019) examine the universe of mergers in Belgium between 2005 and 2012 and find that approximately 80 percent led to an increase in employment, consistent with an increase in output.[14]

---

[12] See for example, Steven Salop, "Proposed Improvements in Merger Enforcement and Guidelines," March 22, 2022 (submitted in this proceeding as comment 245), at pp. 1–2, 8.

[13] For example, see "DOJ and FTC RFI on Merger Enforcement – Considerations with Venture-Backed M&A Targets," Ravi Sinha, Brendan Rudolph, and Alex Vasaly, April 2022 (submitted in this proceeding).

[14] Karen Geurts and Johannes Van Biesebroeck, "Employment Growth Following Takeovers," *RAND Journal of Economics*, 50(4), 2019, pp. 916–950. Note that even mergers that led to a decrease in employment could be procompetitive. Indeed, realized

Given the prevalence of mergers in the modern economy (the U.S. saw 1,546 merger filings on average during the DOJ and FTC's fiscal years 2010–2017, and about 2,030 in fiscal years 2018 and 2019),[15] if existing enforcement policies were significantly out of balance toward allowing anticompetitive mergers, one would expect much more evidence of competitive harm from mergers.

A recent extensive survey of this strain of the literature finds that the evidence on the effects of mergers is mixed and not obviously unbalanced in either direction.[16] The authors of the study survey the top-five general-interest journals in economics as well as the more central industrial organization field journals for every merger retrospective study they could find published between 2000 and 2020. Despite the literature's focus on larger mergers, where data are more likely to be available, the survey finds a wide range of price impacts, in many cases competitively neutral or procompetitive.

Any changes to the Guidelines should therefore stay consistent with the statutory language that calls for blocking only those mergers that may substantially lessen competition or tend to lead to monopoly, and the evidence that a substantial share of mergers are either competitively neutral or procompetitive.

## 2.4. The 2010 HMG have largely stood the test of time and the evidence does not support large deviations from their approach on multiple topics

As noted by DOJ and FTC staff and front office economists in late 2020, the 2010 HMG continue to accurately reflect the practices of the agencies and highlight practices and techniques of continued relevance to modern practice.[17] We agree. Despite concerns voiced by commentators and raised in some academic studies, our read of the evidence is that it does not support large

---

efficiencies may allow the merged firm to lower prices and increase production with lower levels of labor.

[15] Cornerstone Research, "Trends in Merger Investigations and Enforcement at the U.S. Antitrust Agencies: Fiscal Years 2010–2019 (Sixth Edition)," at Figure 1.

[16] John Asker and Volker Nocke, "Collusion, Mergers, and Related Antitrust Issues," *Handbook of Industrial Organization*, 5(1), 2021, at §§ 3.7 and 5 (submitted in these proceedings as part of comment 55).

[17] Alison Oldale, Joel Schrag, Christopher Taylor, "The 2010 Horizontal Merger Guidelines at Ten: A View from the FTC's Bureau of Economics," *Review of Industrial Organization*, 58, 2021, pp. 33–50, at p. 33; and Craig Peters and Jeffrey Wilder, "Ten Years of the 2010 HMG: A Perspective from the Department of Justice," *Review of Industrial Organization*, 58, 2021, pp. 13–31, at p. 13.

deviations from the approach in the 2010 HMG or the 2020 VMG. We discuss specific areas where the Guidelines could usefully be updated below (§ 3), but first we discuss here several areas that our read of the evidence suggests do not warrant large updates.

As discussed in the previous section, public discourse mischaracterizes mixed results as a consensus that all mergers are bad. Similarly, there is lack of consensus among economists on some of the other topics that have fueled the push to revise the Guidelines. Here are a few examples:

De Loecker, Eeckhout, and Unger (2020) claim that aggregate markups have risen considerably since 1980. They claim that this increase is largely driven by an increase in the top of the distribution and reallocation of market share from low- to high-markup firms.[18] They interpret these findings as evidence of increased market power. Other studies make similar claims based on increased concentration of employment and profits in the hands of a few "superstar" firms.[19]

The policy discussion has mostly taken these results as a given and has interpreted them in ways not meant by the original authors. This policy discussion has also ignored the fact that academics are actively examining, discussing, and challenging these results. For example, several papers have challenged the De Loecker et al. (2020) paper on methodological grounds and the robustness of the findings.[20] Modern Industrial Organization has long recognized that the study of market power requires careful study of demand and supply in specific industries.[21] Recent studies that have followed this

---

[18] Jan De Loecker, Jan Eeckhout, and Gabriel Unger, "The Rise of Market Power and the Macroeconomic Implications," *Quarterly Journal of Economics*, 135(2), 2020, pp. 561–644.

[19] See, for example, David Autor, David Dorn, Lawrence F Katz, Christina Patterson, John Van Reenen, The Fall of the Labor Share and the Rise of Superstar Firms, *Quarterly Journal of Economics*, 135(2), 2020, pp. 645–709.

[20] For example, Steve Bond, Arshia Hashemi, Greg Kaplan, and Piotr Zoch, "Some unpleasant markup arithmetic: Production function elasticities and their estimation from production data," *Journal of Monetary Economics*, 121(C), 2021, pp. 1–14 (highlighting econometric issues with the method used by De Loecker et al. (2020)) and Jan De Loecker, "Comment on (Un)pleasant ... by Bond et al (2020)," *Journal of Monetary Economics*, 121(C), 2021, pp. 15–18 (responding to the critique); and Devesh Raval, "Testing the Production Approach to Markup Estimation," October 21, 2020, available at https://ssrn.com/abstract=3324849 (showing that the method used by De Loecker et al. (2020) is sensitive to inputs used in the estimation).

[21] Timothy F. Bresnahan, "Empirical Studies of Industries with Market Power," *Handbook of Industrial Organization*, 2, Chapter 17, 1989, 1011-1057; and Amit Gandhi

tradition have generally not found a consistent cross-industry pattern.[22]

Even if we ignore these discussions and take the pattern of rising markups as fact, the literature has yet to establish a credible reason for what is driving the pattern. For example, the higher markups could be a result of innovation and the introduction of new products, which would generally imply that consumers are better off. Alternatively, higher markups could be a result of newer pricing models that might discriminate between consumers and potentially make consumers better off in aggregate. They could be driven by large technological change that drives efficiency, reduces cost, and might increase quality.[23] And they could be driven by a change in the mode of competition that focuses on competing via differentiation and quality.[24] Most importantly, there is no credible evidence that higher markups are largely a result of increased concentration and the under-enforcement of mergers.[25]

---

and Aviv Nevo, "Empirical Models of Demand and Supply in Differentiated Products Industries," *Handbook of Industrial Organization* (forthcoming).

[22] For example, see Hendrik Döpper, Alexander MacKay, Nathan H. Miller and Joel Stiebale, "Rising Markups and the Role of Consumer Preferences," working paper, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3939126; Paul L. E. Grieco, Charles Murry, and Ali Yurukoglu, "The Evolution of Market Power in the US Automobile Industry," working paper, 2022, available at https://web.stanford.edu/~ayurukog/CarMarkups_June2021.pdf; and James Brand, "Differences in Differentiation: Rising Variety and Markups in Retail Food Stores," working paper, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3712513.

[23] For example, in addition to the aforementioned Döpper et al. (2021) and Grieco et al. (2022), see also Nathan Miller, Matthew Osborne, Gloria Sheu, and Gretchen Sileo, "The Evolution of Concentration and Markups in the United States Cement Industry," working paper, 2022, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4041168; and Sharat Ganapati, "The Modern Wholesaler: Global Sourcing, Domestic Distribution, and Scale Economies," working paper, 2021, available at https://www.sganapati.com/files/Ganapati_Wholesalers_2020.pdf.

[24] For example, see R. Andrew Butters and Thomas N. Hubbard, "Industry Structure, Segmentation, and Competition in the U.S. Hotel Industry," *NBER*, working paper 26579, available at https://www.nber.org/papers/w26579.

[25] Indeed, the evidence of increased concentration is itself not clear. For example, see Lanier Benkard, Ali Yurukoglu, and Anthony Lee Zhang, "Concentration in Product Markets," *NBER,* working paper 28745, 2021, available at https://ssrn.com/abstract=3838512 (who find that concentration has actually been decreasing since 1994); and Esteban Rossi-Hansberg, Pierre-Daniel Sarte, and Nicholas Trachter, "Diverging Trends in National and Local Concentration," *NBER Macroeconomics Annual*, 35(1), 2021, pp. 115–150 (claiming that the positive trend

Similarly, claims that cross ownership has increased prices are frequently stated as if they are established fact,[26] while in reality both the theory and the evidence are heavily debated.[27]

Another interesting development in the academic literature is the discussion of monopsony power in labor markets. Historically, with few notable exceptions, labor economists viewed labor markets as generally competitive and not particularly concentrated. A recent literature has challenged this view by claiming that labor markets are quite concentrated, and that concentration is negatively correlated with wages.[28]

One should be very careful in inferring a causal relationship from these studies for several reasons. A long academic literature has shown measurement of concentration is quite difficult, especially in cross-industry comparisons. The same literature has raised concerns with both econometric issues of

---

observed in national product market concentration between 1990 and 2014 becomes a negative trend when using measures of local concentration).

[26] For example, see Jose Azar, Martin Schmalz, and Isabel Tecu, "Anticompetitive Effects of Common Ownership," *Journal of Finance*, 73(4), 2018, pp. 1513–1565 (claiming that common ownership of competitors by diversified asset managers predicts higher product prices).

[27] For example, see Matthew Backus, Christopher Conlon, and Michael Sinkinson, "Common Ownership in America: 1980–2017," *American Economic Journal: Microeconomics*, 13(3), 2021, pp. 273-308.; Matthew Backus, Christopher Conlon, and Michael Sinkinson, "Common Ownership and Competition in the Ready-To-Eat Cereal Industry," working paper, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3768263; Daniel P. O'Brien, "Anticompetitive Effects of Common Ownership: Overview of the Theory, and Review of the Empirical Findings of Azar, et al.," *Transportation, Energy & Antitrust*, American Bar Association Section of Antitrust Law, Fall Issue, 2015, pp. 3–17; Daniel P. O'Brien and Keith Waehrer, "The Competitive Effects of Common Ownership: We Know Less than We Think," 81(3), *Antitrust Law Journal*, 2017, pp. 729–76; and Miguel Anton, Florian Ederer, Mireia Gine, Martin Schmalz, "Common Ownership, Competition, and Top Management Incentives," working paper, 2022, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2802332.

[28] For example, see Jose Azar, Ioana Marinescu, Marshall Steinbaum, "Labor Market Concentration," *Journal of Human Resources*, 57(S), 2020; Jose Azar, Ioana Marinescu, Marshall Steinbaum, and Bledi Taska, "Concentration in US labor markets: Evidence from online vacancy data," *Labour Economics*, 66, 2020; and Efraim Benmelech, Nittai Bergman, and Hyunseob Kim, "Strong Employers and Weak Employees: How does Employer Concentration Affect Wages?," *Journal of Human Resources*, 57(S), 2020.

endogeneity and the interpretation of the results.[29]

More convincing results are from studies that focus on mergers to identify how concentration affects labor markets. For example, Prager and Schmitt (2021) studied hospital mergers from 2000–2010 and found that wages decreased following mergers that raised concentration substantially.[30] Still, the literature is in its infancy. While this is an important policy question, we think that it is too early to use the existing results as a basis for radical changes. The agencies should continue to explore the topic and gather more evidence to better understand the mechanism. Nonetheless, some clarification on how the agencies might extend existing tools to consider such questions might be helpful.

Finally, while many merger challenges include allegations of coordinated effects, courts have generally been reluctant to block a proposed merger using only a coordinated effects theory, unless the industry features a history of past collusion. Part of the issue is a lack of precision, with the 2010 HMG offering a checklist of factors that might make coordinated effects more likely but no way to predict whether the effects will actually occur or whether they will be substantial.[31]

Since the release of the 2010 HMG, the academic literature has made some progress on retrospectively identifying coordinated effects in specific instances. For example, Miller and Weinberg (2017) found evidence that the 2008 merger between beer companies Miller and Coors led to similar price increases for Miller Lite, Coors Light, and their domestic competitor Bud Light that could not be explained by cost changes. Nor were these price changes matched by major beer importers that competed closely with these companies.[32] Similarly,

---

[29] For example, see Nancy Rose, "Thinking Through Anticompetitive Effects of Mergers on Workers," 2019, and Nathan Miller et al., "On the Misuse of Regressions of Price on the HHI in Merger Review," 2022, Working Paper.

[30] Elena Prager and Matt Schmitt, "Employer Consolidation and Wages: Evidence from Hospitals," *American Economic Review*, 111(2), 2021, pp. 397–427.

[31] For example, the coordinated effects that plaintiffs offered in *T-Mobile/Sprint* was limited to the (disputed) checklist of factors and an illustrative calculation of harm. See Kostis Hatzitaskos, David L. Meyer, and Aviv Nevo, "The Future of Economics in Merger Trials: Rumors of Its Demise Are Greatly Exaggerated," *Antitrust*, 35(2), Spring 2021, at p. 50.

[32] Nathan H. Miller and Matthew C. Weinberg, "Understanding the Price Effects of the MillerCoors Joint Venture," *Econometrica*, 85(6), November 2017, pp. 1763–1791, at p. 1769 ("The most theoretically interesting aspects of Figure 1 are that (i) the price of Bud Light increases by roughly the same amount as the prices of Miller Lite and Coors Light

Bjornerstedt and Verboven (2016) found some evidence of post-merger coordinated effects in the market for painkillers in Sweden.[33]

Nonetheless, this literature is too limited to create concern about widespread coordinated effects, or to suggest broader departures from the framework in the 2010 HMG. More work is needed to identify the mechanisms for coordination and apply them in a predictive fashion, something that the literature is just beginning to tackle.[34]

In summary, this is an exciting time for studies of competition policy with multiple new ideas and constant developments. We hope the energy brought into the field will continue and that the agencies will actively participate and contribute to the discussion. That said, we do not think that a balanced reading of the current state of academic knowledge justifies radical changes to the Guidelines.

## 2.5. The call for stronger structural presumptions is unlikely to meaningfully aid the agencies in more successfully blocking harmful mergers

Some proponents favor strengthening structural presumptions and lowering the presumption thresholds. This, they argue, would be an important step toward strengthening enforcement and reducing the number of harmful mergers passing unchallenged. Our view is that this would not be the most productive route for the agencies to pursue to successfully prevent harmful

---

and (ii) Modelo and Heineken prices do not increase, at least no persistently. Post-merger coordination between ABI and MillerCoors is one possible explanation.").

[33] Jonas Bjornerstedt and Frank Verboven, "Does Merger Simulation Work? Evidence from the Swedish Analgesics Market," *American Economic Journal: Applied Economics*, 8(3), July 2016, pp. 125–164, at p. 156 ("We consider several supply side explanations that may explain these findings: a plausible marginal cost increase after the merger because several firms reduced their package size, and the possibility of partial collusion. Both factors help to explain the observed price increases, but we document that some unobserved factors remain.").

[34] For example, Miller, Sheu, and Weinberg (2021) build on the retrospective work in Miller and Weinberg (2017) about the beer industry. Having identified a mechanism by which coordination played out in the earlier work, Miller, Sheu, and Weinberg (2021) go on to propose a modeling approach that allows for the prospective evaluation of mergers in that industry (or other industries that display the competitive dynamic of oligopolistic price leadership). See Nathan H. Miller, Gloria Sheu, and Matthew C. Weinberg, "Oligopolistic Price Leadership and Mergers: The United States Beer Industry," *American Economic Review*, 111:10, 2021, pp. 3123–3159.

mergers, and could backfire by putting even further emphasis on market definition and structural presumptions.

If the agencies were to substantially change the presumption thresholds, they would also need to persuade courts that the new thresholds were at the right level. Is the evidence there to do so? The existing body of research on this question is, today, thin and mostly based on individual case studies in a handful of industries. Our reading of the literature is that it is not clear and persuasive enough, at this point in time, to support a substantially different threshold that will be applied across the board to all industries and market conditions.

Alternatively, there is a theoretical literature that argues that the change in concentration may be more informative than the level for certain mergers. While this literature is also in its early stages and is not empirically tested, we note that it does not call for a change in thresholds but rather for a more nuanced interpretation of the existing thresholds.[35]

Finally, we note that efforts to "simplify" the analysis by leaning more heavily on structural presumptions are unlikely to be effective. Despite the effort in the 2010 HMG to focus on competitive effects, courts continue to emphasize market definition and the outcome of many trials appear to hinge on whether the government wins that debate.[36] A greater emphasis on structural presumptions is likely to make fights over market definition more important rather than less important, with merging parties not deferring their detailed direct evidence on effects but rather repurposing it into an element of the market definition debate. It is possible that by making it ever more important for the courts to "sign off" on the agencies' market definition, this could make it even harder for them to win cases.

The recent *Sabre/Farelogix* case provides an example of how a greater emphasis on market definition and structural presumptions can create difficulties for enforcement. First, market definition is generally articulated in a

---

[35] Volker Nocke and Michael Whinston, "Concentration Screens for Horizontal Mergers," working paper, 2022, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3658827; and Nathan Miller and Gloria Sheu, "Quantitative Methods for Evaluating the Unilateral Effects of Mergers," *Review of Industrial Organization*, 58(1), 2021, pp. 143–177.

[36] For example, see Adam Di Vincenzo, Brian Ryoo, and Joshua Wade, "Refining, Not Redefining, Market Definition: A Decade Under the 2010 Horizontal Merger Guidelines," *Antitrust Source*, August 2020, at p. 10 ("Market definition has retained a central and often outcome-determinative role in courts' merger analysis beyond the presumption of anticompetitive effects; in this respect, market definition is as important today as it was prior to the 2010 Guidelines.").

linear posted price framework. In *Sabre* prices were instead set through bargaining. Merging parties argued that the standard market definition analysis therefore did not reflect market realities.[37] Second, the government's proposed market definition was sufficiently narrow that, had it been accepted, it would have led to a presumption of harm. Yet the market excluded competitors that the merging parties argued were important, hurting the government case's credibility.[38]

## 3. Specific areas where the Guidelines could be updated to make enforcement more effective

Despite our view that the evidence does not support large deviations from the broad approach of the existing Guidelines, there are specific areas where the Guidelines could usefully be updated.

We describe some potential changes on the topics of types of evidence (§ 3.1), market definition (§ 3.2), horizontal competitive effects (§ 3.3), non-horizontal competitive effects (§ 3.4), and mitigating factors (§ 3.5).

### 3.1. Types of evidence

The 2010 HMG helpfully added a more fulsome discussion of the types of evidence that the agencies consider in merger review. That discussion makes clear that documentary and empirical evidence of various forms all play an important role. It also makes clear that the agencies do not expect evidence to be "perfect," nor to unambiguously predict future outcomes.

Nonetheless, the Guidelines could benefit from a clearer articulation of how different types of evidence can inform the same questions, how agencies reconcile evidence that points in different directions on the same issue, and

---

[37] The court found persuasive Defendants' expert's argument that due to bargaining, the hypothetical monopolist's customers would have resisted a price increase by neither paying the hypothetical monopolist nor walking away, but instead negotiating with the hypothetical monopolist in a different manner. See *U.S. v. Sabre and Farelogix*, Memorandum Opinion, at ¶ 216.

[38] The court found that airline.com had to be included in the relevant product market for OTAs and criticized the government's expert's market definition analysis for excluding it. When airline.com was included, concentration measures did not meet the presumption thresholds. See *U.S. v. Sabre and Farelogix*, Memorandum Opinion, at ¶¶ 206, 215, 228.

PX0647-017

how agencies weigh evidence when the data may not be as reliable.

In particular, the discussion of the types of evidence could benefit from clear examples of how the agencies interweave different types of evidence. It could also benefit from clear examples of under what circumstances a particular piece of information may receive greater or lower weight. For instance, consumer packaged goods industries are frequently rich in detailed scanner panel data, which sometimes allow for compelling natural experiments and merger simulation exercises. Similarly, mergers involving health care providers and insurers typically involve rich data and can rely on modeling and results from a long academic literature.[39] On the other hand, business-to-business industries, or acquisitions in digital markets, especially those involving potential future competition, may lack the data that are frequently used for demand estimation.

Therefore, a data source that may represent the most informative available data in a business-to-business setting may be given less prominence in a consumer packaged goods setting where more technical, econometrically sophisticated, analysis may be possible using a more granular, industry specific, data source. Such discussions could help avoid misunderstandings that could lead to a so-called "CSI effect" where economic analysis could be held up to an unreasonably high standard.[40]

## 3.2. Market definition

Most antitrust trials turn on market definition. This topic is therefore frequently the subject of intense debate at trial, which has drawn attention to several issues that the 2010 HMG either do not cover at all or cover in a way that could generate ambiguity and confusion.

---

[39] For example, for a discussion of how such data were successfully used by the DOJ in its case against the *Aetna/Humana* merger, see Denrick Bayot, Kostis Hatzitaskos, Brad Howells, and Aviv Nevo, "The Aetna-Humana Proposed Merger," *Antitrust Revolution, Seventh Edition*, 2018, eds. John Kwoka and Lawrence White.

[40] The "CSI effect" is the notion that unrealistic depictions of forensic science in television shows like *CSI: Crime Scene Investigation* might lead juries to have unrealistic expectations of the prosecution's evidence in criminal cases. Whether the effect is real or not in criminal cases is a matter of debate. See, e.g., Simon Cole and Rachel Dioso-Villa, "Investigating the 'CSI Effect' Effect: Media and Litigation Crisis in Criminal Law," *Stanford Law Review*, 61(6), 2009, pp. 1335–1374.

### 3.2.1. A further emphasis that direct evidence of competitive effects can inform market definition

The 2010 HMG note that the hypothetical monopolist test "does not lead to a single relevant market."[41] They also note that when different relevant markets "lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects."[42]

Two important points that can be clarified is that products do not compete in a single relevant antitrust market, and that compelling direct evidence of competitive effects can establish that the merging party products compete in *some* relevant antitrust market, even if the evidence on effects does not demarcate the exact boundaries of that market.

Additional guidance on how and when compelling evidence of competitive effects should be probative on market definition would help clarify the respective roles of market definition and competitive effects in merger analysis, particularly if relevant markets need not have a precise delineation.[43]

As an example of where this additional clarity could be helpful, consider the *Sabre/Farelogix* decision. The court accepted several of the DOJ's arguments regarding competitive effects, including that the parties compete with each other and that the merger would give Sabre the incentive to raise prices and stifle innovation, while lowering the bargaining leverage of its customers.[44] Despite agreeing with much of the plaintiff's case on competitive effects, the court ruled to allow the merger, largely on the grounds that the DOJ failed to make its case on market definition.[45] Additional guidance may allow

---

[41] 2010 HMG, at p. 9.

[42] 2010 HMG, at p. 7. See also 2010 HMG, p. 7 ("Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market.").

[43] 2010 HMG, at p. 7 ("Relevant markets need not have precise metes and bounds.").

[44] *U.S. v. Sabre and Farelogix,* Opinion of Judge Stark, at p. 74 ("the Court has found as a matter of real-world economic reality that Sabre and Farelogix do compete"), p. 87 ("this evidence suggests that Sabre will have the incentive to raise prices, reduce availability of FLX OC, and stifle innovation,") and p. 66 ("It follows that the loss of an independent Farelogix will somewhat reduce airlines' leverage in the next round of negotiations with GDSs.").

[45] *U.S. v. Sabre and Farelogix,* Opinion of Judge Stark, at p. 68. ("Based on the Court's findings of fact, set out above, and as further explained below, the Court concludes that DOJ failed to establish a prima facie case that the merger of Sabre and Farelogix will

enforcement agencies to better define markets based on their ability to demonstrate harm, and reduce the scope for decisions that hinge on the narrow discussion of market definition at the expense of the economic realities of harm.

### 3.2.2. The legacy of earlier HMG's algorithmic market definition approach is inconsistent with the newer emphasis on competitive effects, and should be clarified or eliminated

The 2010 HMG also deprioritized the so-called "narrowest market principle" by noting that:

> "The agencies may evaluate a merger in *any* relevant market satisfying the [hypothetical monopolist] test, *guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects*. Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they *usually* do so in the smallest relevant market satisfying the hypothetical monopolist test."[46] (Emphasis added)

The first sentence in the quote above is an important statement that needs to be better highlighted and further expanded. The 2010 HMG do not explicitly describe how products can exist in multiple product markets. Nor do they describe under what circumstances the agencies may *not* focus on the smallest relevant market satisfying the hypothetical monopolist test.

The 2010 HMG therefore weaken but do not eliminate the narrowest market principle. This legacy piece of the earlier Horizontal Merger Guidelines' more algorithmic approach to market definition is inconsistent with the 2010 HMG's emphasis on market definition facilitating the analysis of competitive effects, and should be either clarified or removed.

---

violate Section 7 of the Clayton Act. Specifically, DOJ has not identified a proper relevant market. As a matter of antitrust law, Sabre, a two-sided transaction platform, only competes with other two-sided platforms, but Farelogix only operates on the airline side of Sabre's platform."). See also Lindsey M. Edwards and Jonathan M. Jacobson, "Missing the Forest for the Trees: The Application of *Amex* in *United States v. Sabre*," *Antitrust Source*, June 2021, at p. 8 ("In *Sabre/Farelogix*, the court detailed the ways in which Sabre and Farelogix compete for opportunities to distribute content for airlines, only to turn a blind eye to that evidence and conclude that the parties do not compete in a relevant market as a matter of antitrust law").

[46] 2010 HMG, at pp. 9–10.

In particular, consider the narrowest market principle in conjunction with Example 6 in the 2010 HMG, another legacy of the earlier algorithmic approach. Example 6 and the language introducing it note that relevant markets "normally" would not exclude any products that are closer substitutes to included products than are other included products.[47] Taken together, the unspecified exceptions implied by "usually" and "normally" aside, these legacy elements would still imply an algorithmic approach to market definition: that one needs to rank every substitute to the focal merging party product according to how a close of a substitute is, then go down the list in order until a set of products passes the hypothetical monopolist test.

Farrell and Shapiro (2021) explain how an overly algorithmic approach to market definition could prevent the agencies from challenging some mergers on technical grounds, even though those mergers would likely prove anticompetitive.[48] This problem may be exacerbated if data on closeness of substitution are incomplete.

The *Aetna/Humana* case gives a notable example of how qualitative evidence and common sense sometimes calls for markets that are broader than the smallest market that satisfies the hypothetical monopolist test. The market definition debate there is described in detail in Hatzitaskos, Hill, and Howells (2017).[49] In brief, the government argued that an intuitive set of all Medicare Advantage plans (including very small, likely competitively insignificant ones) constituted a relevant antitrust product market. The merging parties attacked the market definition as gerrymandered and inconsistent with Example 6. Yet the merging parties did not present any evidence that the competitive effects conclusion would meaningfully change under any alternative.[50]

---

[47] 2010 HMG, p. 9 ("When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product.").

[48] Joseph Farrell and Carl Shapiro, "The 2010 Horizontal Merger Guidelines After 10 Years," *Review of Industrial Organization*, 58, 2021, pp. 1–11, at pp. 4–5.

[49] Kostis Hatzitaskos, Nicholas Hill, and Brad Howells, "*Aetna-Humana* and Algorithmic Market Definition in the Guidelines," *Antitrust Source*, October 2017.

[50] Indeed, the likely outcome would have been a relevant antitrust market that was narrower than the government's. Given econometric results presented by both sides' experts, the smallest market that satisfied the hypothetical monopolist test may have consisted of predominantly or exclusively a subset of the most competitively significant Medicare Advantage plans.

Consistent with the *Aetna* court's rejection of this argument,[51] any updated Guidelines would be well served to clarify or remove the legacy language described above. Furthermore, they would benefit from a discussion of how the ideas of *Brown Shoe* can be reconciled with the 2010 HMG's appropriate overarching principle that the purpose of market definition is facilitating the evaluation of competitive effects.

### 3.2.3. *Clarifying competition between one-sided sellers and two-sided platforms*

The Supreme Court's 2018 *Amex* decision stated that "courts must include both sides of the platform—merchants and cardholders—when defining the credit-card market" and "Only other two-sided platforms can compete with a two-sided platform for transactions."[52]

It should be noted that there is no consensus that this is true as a matter of economics.[53] Yet even if one accepts the assertion (or acknowledges it as a matter of law), the Guidelines should clarify the distinction between transaction platforms and other two-sided platforms. While all two-sided platforms offer services to buyers and sellers and may exhibit indirect network effects on at least one side of the platform, transaction platforms are structured in such a way that the product that they ultimately deliver is the transaction itself, consumed jointly and simultaneously by both sides.

How to then reconcile evidence that what may otherwise look like a two-sided transaction platform in some respects actually does compete with one-sided products? Compelling evidence of competition with one-sided products might indicate that the primary product offered by the platform is *not* the transaction itself, but the series of services that they provide to each side which

---

[51] *U.S. et al. v. Aetna and Humana*, Memorandum Opinion, at p. 53 ("The Court disagrees. If taken to its logical conclusion, defendants' position implies a purely econometric approach to market definition [...] But that technical approach is not taken by the cases. Econometric evidence can be powerful evidence, but it is not the only evidence that courts consider in defining the relevant market. Indeed, the cases relied upon by both parties here have considered the *Brown Shoe* factors and ordinary course of business documents, in addition to econometric evidence, before reaching conclusions about the proper market definition.").

[52] *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018).

[53] For example, see David Evans and Richard Schmalensee, "Markets with Two-Sided Platforms," *Issues In Competition Law and Policy*, 2008, pp. 667–693, at p. 668 ("Two-sided platforms often compete with ordinary (single-sided) firms and sometimes compete on one side with two-sided platforms that serve a different second side.").

could be disintermediated and competed away by one-sided competitors.

An example of this is *Sabre/Farelogix*. Despite several findings of direct competition between Sabre and Farelogix,[54] the court ultimately ruled, citing to *Amex*, that because Farelogix "offers services to airlines, not to travel agencies – it does not compete with Sabre."[55] As noted above in the discussion of how effects can inform market definition, this conclusion is nonsensical. The evidence of competitive effects implies that the merging parties must compete in *some* relevant antitrust product market.

The Guidelines can help future courts recognize the distinctions between transaction platforms and other two-sided platforms and avoid reading into *Amex* an unintended antitrust exemption for any firm that happens to provide two-sided transactions as part of its products.[56]

### 3.2.4. Bundle and cluster markets

The 2010 HMG are silent on the subject of bundle markets and cluster markets, two distinct market definition concepts. Bundle markets occur when customers value that a single supplier provides a bundle of products, sometimes referred to as one-stop-shopping, e.g., at supermarkets. Cluster markets are not about customer preferences, but rather refer to the litigation shortcut of treating multiple relevant product markets that share similar conditions as if they were a single market, purely for analytical convenience.

Hahm and Smith (2021) provide a useful summary of the case law and of the relationship and differences between the two concepts.[57]

A lack of clarity on these concepts risks confusion and has the potential to lead courts astray or, at a minimum, to waste precious litigation resources on a confused methodological debate. Consider the example of *Wilhelmsen/Drew*.

---

[54] For example, the court noted that "some at Sabre viewed the acquisition of Farelogix as way to neutralize this perceived threat," that "evidence suggests that Sabre will have the incentive to raise prices, reduce availability of FLX, and stifle innovation," and that "the merger will likely reduce some of the leverage airlines currently have in negotiations with Sabre." See *U.S. v. Sabre and Farelogix,* Opinion of Judge Stark, at pp. 87, 89.

[55] *U.S. v. Sabre and Farelogix,* Opinion of Judge Stark, p. 71.

[56] For more on *Sabre*, see Lindsey M. Edwards and Jonathan M. Jacobson, "Missing the Forest for the Trees: The Application of *Amex* in *United States v. Sabre*," *Antitrust Source*, June 2021.

[57] Kevin Hahm and Loren Smith, "Clarifying Bundle Markets and Distinguishing Them from Cluster Markets," *Antitrust Source*, February 2021.

The merging parties offered several products that customers would sometimes buy together. However, the evidence indicated that customers did not emphasize the ability to one-stop-shop from a single supplier and instead bought from several vendors depending on who offered the best deals on any particular item. The FTC challenged the merger over two particular products and defined a single cluster market that included both. This simplified the presentation at trial: as the two products faced similar competitive conditions, analyzing them separately would likely have meant presenting redundant evidence. The merging parties argued that the government needed to also include other products that the merging parties sold to customers. The court sided with the government, finding that including these additional products would be inappropriate, as they faced different competitive conditions.[58]

Put simply, cluster markets are an analytical shortcut to simplify litigation. Since the underlying products all face similar competitive conditions, whether or not they are treated separately or together as a cluster market should not impact the bottom line conclusion. Including additional products that face different competitive conditions and may change the bottom line conclusion would be inappropriate unless the bundle of all of these products is effectively a different product or service. That is, if there is evidence that consumers purchase these products as a bundle and sufficiently value the ability to do so as opposed to buying the component products or services separately. Clarifying the intuition and, ideally, the governing principles of these two concepts in the Guidelines would be useful.

### 3.2.5. Clarifying the Hypothetical Monopolist Test (HMT) outside the linear posted price framework

Many markets, especially business-to-business markets, involve price-setting mechanisms other than linear posted prices for standardized products. For example, prices might be set through negotiation and bargaining. In these markets, the application of the HMT is not always as clear cut as in the case of linear posted prices.

In describing the hypothetical monopolist test, the 2010 HMG state that "a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase

---

[58] *FTC v. Wilh. Wilhemsen Holding ASA et al.*, 341 F.Supp.3d 27 (2018), at *49–*50.

in price ("SSNIP")."[59] This language does not lend itself well, for example, to the context of bargaining.

The standard formulation of the HMT assumes that the hypothetical monopolist "imposes" a SSNIP and can therefore be seen as analogous to the hypothetical monopolist (seller) making a take-it-or-leave-it offer (to buyers). The essence of the test is to ask whether enough substitutes are included in the market so that a (hypothetical) monopolist would want to increase prices relative to the pre-merger price. Suppose that the observed (pre-merger) prices are a result of bargaining between buyers and sellers. In this context, using the standard formulation of the HMT, one might conclude that a hypothetical monopolist will want to impose a SSNIP simply because the difference between observed prices, which were generated by some bargaining process, and those implied by a take-it-or-leave-it offer is larger than a SSNIP. However, this difference in prices is driven by the difference in bargaining strategy and not a difference in pricing incentives of the hypothetical monopolist because of the inclusion of more substitutes.

The essence of the HMT is to consider how pricing incentives change with the set of substitutes, *everything else equal*. If this were interpreted very literally in a context with bargaining, it may put the plaintiff and defendants in the position of having to present (likely intricate) analyses of the parties' current bargaining strategies and how they may relate to some specific hypothetical bargaining strategy adopted by a hypothetical monopolist. This would either mimic the full effects analysis, replace it with something at least as complicated, or add yet another complicated and time-consuming step to the analysis. Regardless, it would defeat the point of doing any structural analysis as an initial screen before engaging in the full analysis of effects.

The issues we raise are not specific to bargaining situations, and are present in essentially all cases where observed prices are not set by linear posted prices.[60]  In principle, the Guidelines could try to anticipate different pricing models and offer variants of the HMT to fit each. We think that this would be a mistake. It would be difficult, maybe even impossible, to anticipate all the possible current and future pricing models. Furthermore, in many of these cases, the HMT could be quite complicated and as we noted conducting it would defeat the purpose of relatively simple upfront analysis.

The Guidelines should therefore clarify that market definition and structural

---

[59] 2010 HMG, at p. 9.

[60] The concern is not a theoretical: it was at the center of the *Sabre* decision. See the discussion above (§ 2.5).

analysis outside the linear posted price setting may require abstracting from several features of the market and focusing on a stylized environment that allows a simplified application of the SSNIP test. Indeed, this adds further support to any move to deemphasize market definition and the structural case and to focus on competitive effects (§§ 3.2.1–3.2.2).

### 3.2.6. Market definition in cases involving potential competition

Much has been made of whether and how mergers that involve potential competitors should be challenged. As potential competitors, the merging parties do not participate in the same relevant antitrust market at the time of the merger review, but might do so in the future.[61]

These cases raise market definition questions in the spirit of rapid entry.[62] Namely, if the question is not present competition but potential future competition, how ought one measure market shares? What types of evidence would the agencies find reliable and how would they deal with the uncertainty involved in the measurement exercise? These were important questions, for example, in the *Sabre/Farelogix* case, and merger review would benefit from increased research, debate, and guidance on the topic. (See also § 3.3.2, below.)

### 3.2.7. Clarifying targeted customer markets and price discrimination

Additional explanation might also be helpful on the topic of targeted customer markets and price discrimination. While the 2010 HMG note that the question is whether price discrimination "is feasible," courts sometimes risk getting confused over whether targeted customer markets require evidence that price discrimination occurs today. [63]

The Guidelines could further explain the intuition that the key question is whether some customers have more competitive alternatives than others do in a context where there is differential pricing and no arbitrage. If some set of customers today relies on competition that would be eliminated in a

---

[61] Potential competition raises similar evidentiary questions to but is distinct from nascent competition, where an established company merges with a smaller company in the same relevant antitrust market that does not currently impose a competitive constraint but could grow to do so in the future. See, e.g., Scott Hemphill and Tim Wu, "Nascent Competitors," *University of Pennsylvania Law Review*, 2020, available at https://scholarship.law.columbia.edu/faculty_scholarship/2661/.

[62] 2010 HMG, at pp. 15–16.

[63] 2010 HMG, at p. 6.

PX0647-026

counterfactual exercise, they could be harmed even if other customers are not, and even if those same customers are not today because that competition exists.

Consider a case where large customers are powerful buyers that enjoy lower than average prices. This fact pattern might only arise because these customers can play the merging parties against one another. If the competition between the merging parties were eliminated, smaller customers might have other alternatives while larger customers (who are in need of more services or of services in more geographies) may not, and the latter might be left paying higher than average prices.[64]

For example, the court recognized such a dynamic in the *Wilhelmsen/Drew* trial. Large global fleets required service on short notice at virtually every port around the world, making the merging parties their primary practical option. On the other hand, smaller or more local fleets tended to have more substitution options and thus could more easily rely on other suppliers.[65]

### 3.3. Horizontal competitive effects

While the 2010 HMG introduced a section on the types of evidence that the agencies consider on "the central question of whether a merger may substantially lessen competition,"[66] the discussion on types of evidence is focused on higher level evidence of harm, such as actual effects observed in consummated mergers and direct comparisons based on experience.[67] The unilateral and coordinated effects sections, by comparison, focus on theories of harm without much guidance as to what types of evidence prove or disprove these theories.

In a document that is likely to last for years, there is good reason not to be too specific about how a set of facts will be analyzed. One would not want to preclude using tools that have been developed since the last writing. For example, in recent years the literature has continued to develop merger simulation tools that can better capture the institutional details of certain

---

[64] Note that the same logic would apply to a broader set of products if conducting a hypothetical monopolist test.

[65] *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA et al.*, 341 F.Supp.3d 27 (2018), at *56–*58.

[66] 2010 HMG, at p. 2.

[67] 2010 HMG, at § 2.1. See also our discussion of that section in § 3.1, above.

markets, such as bargaining or product repositioning.[68] Nevertheless, broad methodological approaches could be spelled out to enhance the Guidelines. For instance, recent advances in this area would not be precluded by an explanation that the agencies may seek to model the mechanism for harm and simulate a merger to evaluate competitive effects (as well as the effect of a merger to a hypothetical monopoly for market definition) reflecting various market realities as the current economics literature allows.

Below we propose a few other potential additions that would help bridge this gap by explaining what evidence the agencies consider to be credible.

### 3.3.1. The Guidelines should warn against the misuse of regressions of price on the HHI

In order to rebut the structural case, the merging parties frequently attempt to make the following erroneous argument. They regress competitive outcomes (e.g., price or quality) on measures of concentration (typically the HHI), finding a weak or no relationship between the two. They may then attempt to argue that the market is defined too narrowly or that the HHI does not properly measure competition. In both cases the argument is that it is competitive pressure from outside the market that is keeping outcomes competitive as the HHI increases. At times, parties might even try to use these results to predict the effect of a proposed merger.[69]

---

[68] On bargaining, see Gautam Gowrisankaran, Aviv Nevo, and Robert Town, "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry," *American Economic Review*, 105(1), 2015, pp. 172–203. On product repositioning see Ying Fan, "Ownership Consolidation and Product Characteristics: A Study of the US Daily Newspaper Market," *American Economic Review*, 103(5), 2013, pp. 1598–1628; Tom Wollmann, "Trucks without Bailouts: Equilibrium Product Characteristics for Commercial Vehicles," *American Economic Review*, 108(6), 2018, pp. 1364–1406; and Sophia Li, Joe Mazur, Yongjoon Park, James Roberts, Andrew Sweeting, and Jun Zhang, "Repositioning and Market Power After Airline Mergers," *RAND Journal of Economics*, 53(1), 2022, pp. 166–199.

[69] Denrick Bayot, Kostis Hatzitaskos, Brad Howells, and Aviv Nevo, "The Aetna-Humana Proposed Merger," *Antitrust Revolution, Seventh Edition*, 2018, eds. John Kwoka and Lawrence White, at p. 13. ("Even though he had all the information he needed from these estimates to conduct standard hypothetical monopolist tests, the defendants' expert did not conduct these tests. Instead he offered for market definition a regression analysis that is usually offered for competitive effects analysis. This analysis regressed plan level premiums for Medicare Advantage plans on the concentration of Medicare Advantage plans in that county, measured by the Herfindahl-Hirschmann index ("HHI"). The results suggested that the effect of concentration on premiums was

Miller et al. (2021) explain why regressions of price on the HHI do not generally predict the competitive effects of mergers and should not be used in merger review.[70] There are many reasons why concentration can vary over time and across geographic markets, so it is not surprising that these regressions frequently find a weak or no relationship between price and HHI. The authors provide some simple examples that demonstrate how this might be the case.

Note that other simple regressions can be useful in merger review. For example, merger retrospectives, i.e., regressions of price or other market outcomes to the event of a merger that also appropriately control for other contemporaneous industry changes.[71]

In our experience, the erroneous argument outlined above is put forth with sufficient frequency that the Guidelines would benefit from preemptively rejecting it along the lines of the logic discussed in Miller et al. (2021).

### 3.3.2. The Guidelines should make clear what features of nascent or potential competitors make them more likely to evolve into a competitive constraint to the buyer absent the transaction

Evaluating the potential for anticompetitive harm from mergers involving a nascent or potential competitor to an established firm can be challenging, given the inherent uncertainty in predicting how the smaller firm will evolve over time. For example, an analysis involving a potential competitor might have to predict what the potential competitor's eventual products might be; where they will sit in characteristics space, and thus what products they will compete most closely with; how attractive they will be to consumers; whether entry by any other potential competitors is likely to affect overall competitive conditions; and whether the seller is likely to be bought by a different incumbent absent the

---

negligible. Even going from an HHI of 0 to 10,000 would result in a price effect less than a SSNIP.")

[70] Nathan Miller, Steven Berry, Fiona Scott Morton, Jonathan Baker, Timothy Bresnahan, Martin Gaynor, Richard Gilbert, George Hay, Ginger Jin, Bruce Kobayashi, Francine Lafontaine, James Levinsohn, Leslie Marx, John Mayo, Aviv Nevo, Ariel Pakes, Nancy Rose, Daniel Rubinfeld, Steven Salop, Marius Schwartz, Katja Seim, Carl Shapiro, Howard Shelanski, David Sibley, and Andrew Sweeting, "On the Misuse of Regressions of Price on the HHI in Merger Review," working paper, 2021 (submitted in these proceedings as part of comment 170).

[71] For example, in *Aetna/Humana* the government presented econometric evidence on the effects of mergers that the merging parties had previously consummated. See the discussion of efficiencies in Denrick Bayot, Kostis Hatzitaskos, Brad Howells, and Aviv Nevo, "The Aetna-Humana Proposed Merger," *Antitrust Revolution, Seventh Edition*, 2018, eds. John Kwoka and Lawrence White.

present merger.[72] With the possible exception of products that require FDA approval, it is typically difficult to answer such questions.

The 2010 HMG state that the agencies will evaluate mergers involving potential competitors using projected market shares,[73] but do not explain how these projections are made or when they might be more or less reliable. Nor do they discuss how other questions about the potential or nascent competitor's competitive significance might be addressed. To the extent that enforcement of such mergers is to increase, it would be helpful for the Guidelines to discuss what criteria might be used to address these questions.

### 3.4. Non-horizontal competitive effects

To date, the U.S. agencies and the European Commission have chosen to offer separate guidelines for horizontal mergers and vertical or non-horizontal mergers. There is some logic to that. When a horizontal overlap exists between the merging parties, the mechanism for competitive harm is generally well-understood and the analytical framework for evaluating horizontal effects is readily generalizable across most industries and market structures. By contrast, vertical theories tend to be much broader – input foreclosure is one common theory considered but by no means the universal vertical theory. Guidelines for vertical effects would likely need to look more like the (now withdrawn by the FTC) 2020 VMG and FTC's commentary on vertical merger enforcement,[74] laying out general principles and examples instead of trying to detail every potential scenario or offer sweeping safe harbors.

Many mergers cannot neatly be categorized as solely "vertical" or "horizontal." Many mergers raise both horizontal and vertical (or non-horizontal) issues. Such cases may be increasingly common if we see more mergers involving more complicated lines of business. As long as there are separate vertical and horizontal guidelines, some degree of pigeonholing is

---

[72] Mergers involving nascent competitors might feature more information on what the smaller firm offers today, but that product will typically not be a meaningful competitive constraint on the buyer. Thus the analysis will call for addressing similar questions on whether and how the nascent competitors will grow to become meaningful competitive constraints for the buyer's products.

[73] 2010 HMG, at p. 18.

[74] Federal Trade Commission, "Commentary on Vertical Merger Enforcement," December 2020, available at https://www.ftc.gov/system/files/documents/reports/federal-trade-commissions-commentary-vertical-merger-enforcement/p180101verticalmergercommentary_1.pdf.

inevitable and questions are likely to arise in litigation about which regime the merger should be analyzed under and how the two interact. Bringing together the discussion of non-horizontal and horizontal issues, both anti- and pro-competitive, could help to clarify the relationship between the two. It would also shift the focus toward competitive effect analysis and away from a classification of mergers. This shift will help courts avoid getting confused over mergers that can be cast as both horizontal and vertical, and so avoid spending energy and resources on meaningless classifications rather than substance.[75]

All that said, we also recognize that, given the different nature, history, and framework of the two sets of competitive effects, there is some risk to the agencies issuing a single set of Guidelines. Debates over the appropriate way to analyze non-horizontal mergers, and over the best way to encode the agencies' typical practice of this much broader set of effects, might limit the usefulness of their horizontal guidance. Therefore, whether the agencies choose to consolidate all guidance under one set of Guidelines or to issue separate Guidelines, it is important that the frameworks remain clearly distinct.

### 3.4.1. The discussion of vertical theories should separate the technical ability to foreclose from foreclosure's effects on competition

The 2020 VMG set out the standard economic framework for the analysis of vertical foreclosure theories based on two key elements that determine the likelihood of harm: the merged firm's *ability* to lessen competition by foreclosing their rivals, and its *incentive* to do so.[76]

It is worth adding more language or examples that clarify the definition of ability. In our experience across several vertical merger investigations since the 2020 VMG were released, there can be confusion over whether *ability* refers to the technical ability to foreclose or the ability to lessen competition via

---

[75] For example, in *Sabre/Farelogix*, the draft 2020 VMG were released late in expert discovery, giving the merging parties an opportunity to argue that the merger was vertical instead of horizontal, and thus procompetitive. That is, the merging parties argued that they could review the merger as vertical and that if this showed the merger was procompetitive, that review should color any review under the 2010 HMG. While the government brought an (ultimately unsuccessful in federal court) horizontal case in *Sabre/Farelogix*, one can also frame a vertical theory of harm. See Andrew Sweeting and Sinan Corus, "Economic Issues in Merger Analysis for Platforms," *Competition Law Insight*, November 24, 2021, available at https://www.competitionlawinsight.com/competition-issues/economic-issues-in-merger-analysis-for-platforms-149722.htm.

[76] 2020 VMG, at pp. 4–5.

foreclosure. It is the latter that is critical in a competitive analysis.

Technical ability is, of course, a necessary but not sufficient condition for the ability to lessen competition. A merged firm may lack the technical ability to foreclose if, e.g., it acquires control over an input or outlet, but the terms governing access to the input or outlet in question are set by long-term contracts that the merged firm cannot exit.

Yet the *ability to lessen competition via foreclosure* requires not only the technical ability to foreclose, but also for competitors to lack readily available alternatives to the foreclosed product, including self-supply, switching to which would not entail any meaningful effect on the price, quality, or availability of their products and services. This definition of ability from the 2020 VMG is consistent with the discussion in the academic literature.[77]

One way to clarify the discussion is to more explicitly ask the question of whether the envisioned foreclosure will actually have an effect, i.e., actually lessen competition. This could be either by adopting an ability-incentive-effect framework,[78] or just by adding language to clarify what *ability* means and how efficiencies are handled.

### 3.4.2. The discussion of foreclosure should clarify the definition and role of essential inputs

Related to the confusion that can arise over the definition of ability is whether the product being foreclosed has to be "essential," "must-have," or "competitively significant" for foreclosure concerns to arise.

From an economics perspective, the answer is yes to all of the above. Despite the differences in language, thinking through the economic logic reveals that the three are effectively the same. For example, consider the following passage summarizing the literature on foreclosure theories of harm:

---

[77] Patrick Rey and Jean Tirole, "A Primer on Foreclosure," *Handbook of Industrial Organization*, 3, Chapter 33, pp. 2145–2220 at pp. 2148, 2156.

[78] The framework is frequently already presented as an ability-incentive-effect framework, even if the ability and effect prongs may be redundant in the absence of efficiencies. For example, see European Commission, "Guidelines on the Assessment of Non-Horizontal Mergers under the Council Regulation on the Control of Concentrations between Undertakings," 2008, available at https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2008:265:0006:0025:en:PDF, at ¶¶ 34–35, 47–57.

PX0647-032

"Foreclosure refers to a dominant firm's denial of proper access to an essential good it produces, with the intent of extending monopoly power from that segment of the market (the bottleneck segment) to an adjacent segment (the potentially competitive segment). ... An input produced by a dominant firm is essential if it cannot be *cheaply* duplicated by users who are denied access to it. ... Bottlenecks [i.e., essential inputs] are rarely pure bottlenecks. They most often *compete* with inferior goods or services." (emphasis added)[79]

Thus essential inputs need not refer to inputs without which a buyer must cease production. They do face competition, but lack sufficiently close substitutes so that foreclosure may impair rivals' ability to compete, e.g., because their products will experience a reduction in quality or an increase in costs. Thus the input must be sufficiently differentiated and have at least some degree of market power in the upstream market.[80]

The discussion of *ability* (or ability and effect) in the Guidelines should clarify whether, in the agencies' view, inputs need to be "essential" and what is meant by that term or by any related language that the agencies may instead

---

[79] Patrick Rey and Jean Tirole, "A Primer on Foreclosure," *Handbook of Industrial Organization*, 3, Chapter 33, pp. 2145–2220 at pp. 2148, 2156.

[80] See also European Commission, "Guidelines on the Assessment of Non-Horizontal Mergers under the Council Regulation on the Control of Concentrations between Undertakings," 2008, available at https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2008:265:0006:0025:en:PDF, at ¶¶ 34–35 ("Input foreclosure may raise competition problems only if it concerns an important input for the downstream product. ... For instance, the input may be a critical component without which the downstream product could not be manufactured or effectively sold on the market, or it may represent a significant source of product differentiation for the downstream product. It may also be that the cost of switching to alternative inputs is relatively high. For input foreclosure to be a concern, the vertically integrated firm resulting from the merger must have a significant degree of market power in the upstream market. It is only in these circumstances that the merged firm can be expected to have a significant influence on the conditions of competition in the upstream market and thus, possibly, on prices and supply conditions in the downstream market."); and Carl Shapiro, "Testing Vertical Mergers for Input Foreclosure," June 7, 2019, available at https://one.oecd.org/document/DAF/COMP/WD(2019)75/en/pdf, at ¶ 12 ("The first step is to ask whether the upstream input involved in the merger is competitively significant to the downstream rivals that have been using that input. An input is competitively significant to a downstream rival if that firm's ability to compete would be substantially impaired if [it] were to lose access to the input. In this step, one should consider these rivals' best response to that lack of access, which could involve using a substitute input or modifying their products or services").

PX0647-033

adopt.

### 3.4.3. The Guidelines should recognize the potential for the elimination of double marginalization ("EDM") when there are incentives to foreclose or raise rival's costs

Some of the criticisms levied against the 2020 VMG prior to the FTC withdrawing them were that they emphasized the potential for efficiencies with the particular efficiency of EDM singled out. As a matter of economics, horizontal and vertical mergers do differ in their potential for efficiency gains to consumers.

The efficiencies specific to a horizontal merger tend to be due to reallocating assets that are presently used to compete with one another. While their new use might be more efficient, and that efficiency might be shared with consumers, the private gain from reallocating these assets includes some profit merely from stopping their present use, *i.e.*, from eliminating competition. In that context, some appropriate skepticism of efficiency claims is understandable.

Vertical merger efficiencies tend to be due to ownership changing the nature of agreements that can be effectively implemented between firms that are already working together, to some extent, to produce a product or service. At the core of this is a realignment of incentives between firms. The potential efficiency need not involve any reallocation of assets nor any reduction in competition. That said, the nature of new agreements or incentives may affect competitors to one of the firms, and distinguishing if those effects on competitors are in the nature of enhanced or restrained competition is often the crux of the analysis. Applying the same sort of skepticism about efficiencies in a vertical merger as in a horizontal merger can amount to assuming away a portion of the economics that is at the heart of the vertical investigation.

One clear example of this dual nature of vertical theories is the model of linear pricing, which generates a raising rivals' cost incentive and also generates a potential procompetitive incentive in the form of elimination of double-marginalization ("EDM"). Not every merger will present facts that fit this particular model. But, if that model is the basis of an investigation, its full range of implications should be considered.[81]

In this regard, where it arises, EDM is analogous to upward pricing pressure in horizontal mergers. Like in horizontal mergers where the merged firm can have an incentive to increase prices because it can now recapture some of the

---

[81] Gopal Das Varma, "EDM: Merger Specificity or Alternative Reality?," *Antitrust Magazine Online*, December 2021.

sales previously lost to rivals, in vertical mergers the merged firm can have an incentive to decrease prices because it can now attract sales from rivals. The 2020 VMG correctly understood that determining the extent to which EDM occurs is a merger-specific exercise and discouraged assuming that raising rivals' costs could be considered as a theory independent of the EDM possibility.

To the extent the 2020 VMG's particular emphasis on EDM relative to other vertical benefits or efficiencies is peculiar and may suggest that EDM is a different phenomenon, it would be appropriate to bring the 2020 VMG back into consistency with the consensus of economics in this area. However, that consensus would be to recognize that vertical mergers do have a more natural and fundamental relationship with the potential for merger-specific benefits or efficiencies.

### 3.5. Mitigating factors

One source of potential waste of resources for agency staff is that the merging parties often make extensive arguments about mitigating factors without developing strong supporting evidence. One way to make the process more effective could be for the Guidelines to articulate more clearly what would make for a good mitigating factors claim.

With respect to efficiencies and other benefits from a proposed merger, the Guidelines would benefit from clearer guidance on what merging parties need to do to substantiate such claims, and whether there are circumstances under which the agencies will take the position that efficiency claims are in fact evidence of anticompetitive harm. If the guidance regarding such claims were clearer, the agencies might receive claims that are more compelling and verifiable, or no such claims at all. For example, one of the most common efficiency claims is that merging parties can consolidate cost centers, such as the general counsel's office or customer support. The Guidelines could clarify what may constitute compelling evidence of scale efficiencies, as opposed to the potential harm that might come from reductions in quality or the leveraging of bargaining power over employees to make them work longer to do more with fewer resources.

With respect to entry, some recent research provides theoretical results that demonstrate that entry that preserves pre-merger consumer surplus renders merger unprofitable under a wide range of conditions. Thus observing a merger could be taken to imply that the merging parties expect entry to be unlikely,

PX0647-035

untimely, or insufficient.[82] The agencies could adopt the position that claims about entry as a mitigating factor will generally be rejected unless they can demonstrate that the conditions for this analytical result do not hold in the particular merger. At a minimum, the discussion of entry could be expanded to explain that lack of successful and effective entry "tends to suggest that successful entry is slow or difficult" in broader circumstances than merely "non-transitory increases in the margins earned."[83] This could lighten the agencies' load in any investigation, while also giving merging parties a specific set of evidence that they could bring to bear to refute such presumptions.

## 4. Concluding remarks and procedural changes

The Guidelines have played an important role in merger enforcement by providing clear guidance on the set of economic frameworks and empirical tools used by the agencies to review mergers. Courts view the Guidelines as a summary of well-accepted principles and have relied on them heavily not only in merger cases but in antitrust litigation more broadly. Therefore, the principles set out in the Guidelines have made their way into case law over time.

There are valuable additions and clarifications that can be made to updated Guidelines. We have proposed several revisions in Section 3 which would reflect advances in the literature on merger effects, for example, in how to evaluate merger effects when there is bargaining, or how to define bundle or cluster markets. We also suggest revisions that can provide more clarity on topics that have generated confusion in recently litigated mergers (and that could also affect non-merger litigation matters), such as how to deal with the interaction of two-sided and one-sided platforms.

---

[82] Peter Caradonna, Nathan Miller, and Gloria Sheu, "Mergers, entry, and consumer welfare," working paper, 2021 (submitted in these proceedings as part of comment 124). Similarly, but in the context of collusion, see early research by Amanda Starc and Thomas Wollmann, "Does Entry Remedy Collusion? Evidence from the Generic Prescription Drug Cartel," working paper, 2022, available at https://faculty.chicagobooth.edu/~/media/faculty/Thomas-Wollmann/Research/does_entry_manuscript.pdf.

[83] 2010 HMG, at p. 28. For example, in *Wilhelmsen/Drew* the court found that the merging parties' entry claims were "at odds with inferences drawn from the state of the current market and with documentary and testimonial evidence from customers and suppliers." See *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA et al.*, 341 F.Supp.3d 27 (2018), at *68.

PX0647-036

More drastic revisions to the Guidelines, driven by a view that there has been systematic under-enforcement of mergers and that this has caused the U.S. economy to become less competitive, are not presently warranted. In our view, the evidence on these questions is far from conclusive – the profession and the agencies should continue to pursue this important research agenda and develop the new ideas and techniques that are emerging. However, given where the literature is today, a major overhaul of the Guidelines would risk seriously harming their credibility and usefulness. Revisions to the Guidelines should focus on bringing more clarity to points made in prior versions, and on introducing more recent innovations in economic and legal thinking.

Yet the agencies might be able to strengthen enforcement with changes that go beyond revisions to the Guidelines. Some commentators have suggested that a lesser emphasis on economics would make antitrust enforcement more cost-effective. Rather than limiting the agencies' toolkit by ignoring the input of economics, we suggest that costs could be reduced with a few procedural changes that the agencies could seek to implement instead. In our view and based on our litigation experience, any procedural changes that make litigation more efficient and more predictable might reduce the need for litigation in the first place.

Given the central role of economic questions in merger review, procedural questions around expert testimony can have significant impact on merger trials. The more opaque the expert testimony is to the court, the more uncertain the outcome and the greater the likelihood that the court will fundamentally misunderstand basic economic principles and get the wrong answer. Procedural changes can help reduce uncertainty, making it easier to resolve contentious mergers earlier on in the review process, or prevent certain mergers from being proposed in the first place.

Several procedural changes could help clarify the economic expert testimony and thus reduce uncertainty. First, **written direct testimony** would help distill typically lengthy expert reports to be more digestible to the court. This is of course what every economic expert endeavors to do at trial, but in practice a written document, potentially written in Q&A format, tends to be clearer and easier to follow than live delivery. The written direct testimony can be paired with a shorter live direct to give the court the opportunity to ask questions and to evaluate the credibility of the expert beyond just the cross and re-direct examination. This approach was successfully used, for example, in the *Epic v.*

*Apple* trial.[84]

Entering the **expert reports into evidence** as trial exhibits would serve a similar purpose. While we cannot speak to the legal considerations around this, a lot of time and effort goes into trying to make these reports as clear as possible and to outline the supporting evidence in a level of detail that is simply not possible during trial. Having the reports in evidence can help clarify potentially crucial debates that might otherwise get short shrift. It would also preserve a rich record for potential appeals.

Another frequent source of confusion at merger trials is that the serial nature of expert testimony can lead to the two sides talking past each other, leaving fundamental disagreements unresolved or a very confused record. **Concurrent expert testimony** wherein economic experts from the two sides testify together and can ask and answer questions of each other in real time are likely to improve courts' ability to judge the credibility and support of economic arguments. It would likely also clarify the points on which the experts do agree, sharpening the disagreements that the court actually needs to adjudicate.[85]

Similarly, courts hiring independent **experts as technical advisors** would help clarify and interpret the economic debate, as well as identify when an expert takes positions that deviate from basic principles.[86] If the court is also using concurrent expert testimony, the technical advisor can act as a moderator and help translate the conflicting testimony to the court. But technical advisors would also be very helpful to courts in any battle of the experts, regardless of the format of expert testimony.

Finally, while some merger trials see as many as three rounds of

---

[84] See also a discussion of why written direct testimony could have clarified the market definition debate in *Sysco/US Foods* in Gregory Werden, "The Hypothetical Monopolist Test in *Sysco*: A Litigation Muddle Needing Analytical Clarity," *Journal of Competition Law & Economics*, 2016, 12(2), 341–350, at 349–350.

[85] We understand that so-called "hot tub" testimony was introduced in Australia but is also used in other jurisdictions such as Canada, New Zealand, and the U.K., and occasionally in the U.S. See Judge Steven Rares, "Using the 'Hot Tub': How Concurrent Expert Evidence Aids Understanding Issues," *Federal Court of Australia*, October 12, 2013, available at https://www.fedcourt.gov.au/digital-law-library/judges-speeches/justice-rares/rares-j-20131012#; and Ryan Thompson, "Concurrent Expert Evidence: Hot Tubbing in America? Experts Jump In," *National Law Review*, November 6, 2018, available at https://www.natlawreview.com/article/concurrent-expert-evidence-hot-tubbing-america-experts-jump.

[86] Werden (2016) makes the point that experts as technical advisors to courts are commonly used in patent cases. See Gregory Werden, "The Hypothetical Monopolist Test in *Sysco*: A Litigation Muddle Needing Analytical Clarity," *Journal of Competition Law & Economics*, 2016, 12(2), 341–350, at 350.

PX0647-038

simultaneously exchanged reports, there are still frequently concerns that certain arguments are made too late in expert discovery, or even past the end of expert discovery. The process would benefit from **clearer burden shifting** in the report phase of the litigation. It is typical for the plaintiff to begin the exchange by making its affirmative case assuming no efficiencies. What is less typical is for there to be a clear expectation that the defendants lay out their evidence of efficiencies early in the process. Doing so would help fully brief both sides of the argument and appropriately give each side the opportunity to rebut and account for the other side's arguments.[87] Similarly, while we understand that the court ultimately has the prerogative of what testimony and evidence to admit in trial, the process could benefit from agreement on **when expert discovery ends** and how late would be too late to introduce certain types of new arguments and evidence.

These procedural changes are likely to be a more productive route forward for the agencies, if the aim is to strengthen their ability to block anticompetitive mergers. Other proposals that have been put forward, such as reducing the thresholds for anticompetitive presumptions, or lowering the standard on the likelihood of harm, are likely to be met with skepticism by courts and may leave the agencies wrestling even more with issues, such as market definition, that are not central to the question of competitive harm. A measured approach, that builds on the valuable legacy of the Guidelines and preserves their focus on areas of consensus in economics, is in our view the most fruitful path to strengthen merger enforcement.

---

[87] For a discussion of how this could apply in the context of vertical mergers, see Carl Shapiro, "Vertical Mergers and Input Foreclosure Lessons from the *AT&T/Time Warner* Case," *Review of Industrial Organization*, 2021, at § 6.

PX0647-039

# PX0648

COVER STORIES

*Antitrust*, Vol. 36, No. 2, Spring 2022. © 2022 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# What Next for the Horizontal Merger Guidelines?

### NANCY L. ROSE AND CARL SHAPIRO

O N 9 JULY 2021, PRESIDENT BIDEN issued an executive order that included the following statement:

To address the consolidation of industry in many markets across the economy, as described in section 1 of this order, the Attorney General and the Chair of the FTC are encouraged to review the horizontal and vertical merger guidelines and consider whether to revise those guidelines.[1]

On January 18, 2022, the Department of Justice and the Federal Trade Commission "launched a joint public inquiry aimed at strengthening enforcement against illegal mergers" and issued a detailed Request for Information on Merger Enforcement (RFI).[2]

This article offers recommendations on how best to update the current Horizontal Merger Guidelines (HMGs), which were issued in 2010 by the DOJ and the FTC (the Agencies).[3]

## Why Revise the Horizontal Merger Guidelines Now?

The impetus to update the HMGs seems primarily to be based on the view that competition has declined in recent years in the American economy. President Biden's executive order states that "over the last several decades, as industries have consolidated, competition has weakened in too many markets, denying Americans the benefits of an open economy and widening racial, income, and wealth inequality." These concerns apply to labor markets, not just product markets. According to the executive order, it is the policy of the Biden Administration to enforce the antitrust laws "especially in labor markets" along with certain specified product markets.

We have reviewed the evidence about trends in competition in the American economy very closely.[4] As we read the primary research results, the overall evidence from merger retrospectives supports the conclusion that many consummated mergers have lessened competition,[5] including mergers that escaped Hart-Scott-Rodino review.[6] Few mergers are investigated, still fewer challenged,[7] and litigated challenges are focused on mergers with enormous increases in concentration in markets already dominated by no more than a few firms.[8] While such anticompetitive mergers should be blocked, these patterns suggest that mergers in many highly concentrated markets were allowed to move forward.[9] At the same time, some research suggests that much of the growing share of U.S. economic activity accounted for by large businesses may result from highly efficient "superstar" firms growing at the expense of other, perhaps less-efficient, firms, a competitive outcome that can improve welfare.[10] That competitive process has been fueled by massive advances in information technology, the growing importance of intangible assets, and globalization.[11] Consistent with this, increases in concentration at the national sector level were in many cases associated with decreases in concentration in more local geographies and at the level of relevant antitrust product markets.[12]

We believe the empirical evidence strongly supports a tightening of overall merger enforcement.[13] The observed trends in concentration, price/cost margins, and profits are no doubt the result of underenforcement against mergers in some markets, and pro-competitive growth by large efficient firms in others. But even in markets where current high levels of concentration reflect past growth by more efficient firms that are successfully harnessing economies of scale and scope, close scrutiny of acquisitions is needed to prevent market leaders from acquiring actual or potential rivals whose growth might otherwise put competitive pressure on incumbents. The Biden Administration's call to strengthen merger enforcement, in part by updating the HMGs, can serve this goal, as did the 2010 revisions. Our recommendations take as given that the updated HMGs should and will articulate a more assertive merger enforcement policy.[14]

*Nancy L. Rose is the Charles P. Kindleberger Professor of Applied Economics at the Massachusetts Institute of Technology and Matina S. Horner Distinguished Visiting Professor at Harvard's Radcliffe Institute for Advanced Study, which she thanks for fellowship support. Carl Shapiro is a Distinguished Professor of the Graduate School at the University of California at Berkeley. During 2009-2010, Shapiro led the working group at the DOJ charged with updating the Horizontal Merger Guidelines. We thank Bill Baer, Jonathan Baker, Joe Farrell, Dave Gelfand, Scott Hemphill, Herb Hovenkamp, Joe Matelis, Jon Sallet, Steve Salop, and Fiona Scott Morton for valuable comments on an earlier draft. Our opinions are our own. No one has funded this article.*

PX0648-001

Given limited space, we focus our recommendations for revising the HMGs to strengthen merger enforcement on three main areas. While these are only a subset of revisions that should be considered, we believe implementing them would substantially improve merger enforcement. First, we suggest several ways that the HMGs can strengthen the structural presumption in a manner consistent with sound economics and with how the courts have been analyzing mergers in recent decades. Most important, the HMGs can do more to explain how and why the Hypothetical Monopolist Test (HMT), embraced by the courts for decades as a method to define relevant markets, often leads to quite narrow markets. They also can add presumptions based solely on *increase* in concentration caused by the merger, to address unilateral harms that currently may escape redress. Second, we recommend that the HMGs elaborate on how the Agencies determine whether a merger may substantially lessen *dynamic* competition, which includes potential competition and innovation. The historical emphasis of merger law on static market structure has made it unduly difficult for the government to challenge mergers that may lessen dynamic competition. Updated HMGs can help fix this historical oversight. Third, merger enforcement has not paid enough attention to how mergers may lessen competition among employers to hire workers. We suggest that the updated HMGs include a new section, "Mergers of Competing Employers," to explain how the Agencies assess such harms to workers.[15]

## Guiding Principles

The purpose of the HMGs is to "describe the principal analytical techniques and the main types of evidence on which the Agencies usually rely to predict whether a horizontal merger may substantially lessen competition" (HMGs, § 1). Historically, the Guidelines have been written with three audiences and goals in mind: (1) to inform the business community, so as to deter anticompetitive mergers without imposing unnecessary costs on other mergers; (2) to participate in a dialogue with the courts, so as to further the development of the case law; and (3) to provide a handbook to Agency staff, so as to guide them in how best to investigate horizontal mergers.

Three principles have governed all previous updates of the Guidelines.[16]

- **Law Enforcement**: The Guidelines address a law enforcement activity, so they must be broadly consistent with the case law, even when they seek to influence the evolution of the case law in the common law tradition.

- **Transparency**: The Guidelines should accurately reflect how the Agencies will actually investigate mergers and make enforcement decisions.

- **New Learning**: The Guidelines should reflect the accumulation of Agency experience, including the most current and reliable economic evidence and analytical techniques.

These three principles should govern the current update of the Guidelines. Departing from the first by adopting merger enforcement policies unlikely to be accepted by the courts would imperil the extraordinary status of the Guidelines as a document prepared by government enforcers that the courts, and even merging parties, have generally accepted as a valid guide rather than a piece of advocacy. Departing from the second principle would violate basic norms of good government. The Agencies should be prepared to adhere to whatever they put in the updated HMGs. And departing from the third would miss an opportunity to improve merger enforcement based on changes in the American economy and based on new learning.

The Agencies have reaffirmed that they intend to follow these three principles. The RFI states that the merger guidelines "are under review to ensure that they (1) reflect current learning about competition based on modern market realities, and (2) faithfully track the statutory text, legislative history, and established case law around merger enforcement."[17]

## Strengthening the Structural Presumption

For nearly sixty years, based on the Supreme Court's decision in the Philadelphia National Bank case, merger enforcement has relied heavily on the presumption that mergers that substantially increase concentration in highly concentrated markets are illegal.[18] However, the strength of the structural presumption has declined in the past 45 years.[19] We support efforts to facilitate the ability of the government to establish its prima facie case. Updated HMGs can help do that, so long as they are convincing and adhere to the Law Enforcement principle (above), avoiding any marked inconsistency with established case law.

The challenge is how to update the structural presumption to reflect the dramatic changes that have taken place in the American economy since 1963, when the Supreme Court established the presumption in *Philadelphia National Bank*. Manufacturing now accounts for a much smaller share of GDP; intellectual property and intangible assets play a much bigger role in giving firms market power, especially in high-tech and digital markets; and product differentiation is the norm, not the exception. These changes have transformed merger enforcement. The bulk of merger investigations in the past 20 years have centered around unilateral effects, not coordinated effects, which dominated merger analysis 50 years ago.

Updated HMGs can help merger enforcement adjust to today's economy by modifying how the Hypothetical Monopolist Test is performed to better reflect the economics of unilateral effects and by introducing a presumption based solely on the increase in concentration caused by a merger. Such a presumption would be well-grounded in both economic theory and empirical evidence demonstrating the predictive value of changes in concentration for post-merger price increases and output reductions.[20]

*Market Definition and the Hypothetical Monopolist Test.* One promising route to stronger merger enforcement

is to build on the changes made in the HMGs in 2010 by clarifying that proper application of the HMT can and should lead to quite narrow markets.[21] Those changes, which were well grounded in economics, have proved invaluable to the Agencies when they have litigated mergers over the past decade. Litigated cases often turn on whether the courts accept the relevant markets proposed by the Agencies. They often did so during the past decade, giving the government a high win rate in litigated mergers.[22]

We recommend that the Agencies *simplify* the HMT and shed the idea that the HMT is a precise algorithm that leads to a single, correct relevant market. This can be achieved by emphasizing the following statement from Section 4.1.1 of the 2010 HMGs as the governing principle: "The Agencies may evaluate a merger in any relevant market satisfying the test."[23] This change will better reflect actual practice and avoid distracting detours that arise when the merging parties ask why the Agencies selected one qualifying relevant market rather than another.

The HMGs should further explain that when looking to see if the structural presumption applies, the Agencies focus their attention on candidate relevant markets that include competing products sold by both merging firms. The presence or absence of other relevant markets in which there is no overlap between the merging firms is irrelevant for this purpose. Building markets around an *overlap* of concern focuses attention on the direct loss of competition that will result from the merger.

If the two overlap products alone satisfy the HMT—based on the very same calculation that the Agencies routinely perform to evaluate unilateral price effects—then they alone constitute a relevant market.[24] The merger will create a monopoly in that narrow, two-product relevant market. The 2010 HMGs already point this out, but this idea will be easier to utilize if the Guidelines explicitly state that relevant markets can be built around an overlap of concern.

> **Example 5A**: Example 5 in the 2010 HMGs explains how Product A and B may satisfy the HMT and thus form a relevant product market. A merger combining Products A and B would be a merger to monopoly in that market. Suppose that Product X is just slightly more distant from Product A than is Product B, so a hypothetical monopolist controlling Products A and X would raise both of their prices by 10 percent. Then Products A and X *also* form a relevant market, and a merger combining Products A and X would be a merger to monopoly in that market. This is a correct and informative application of the HMT, notwithstanding that one could also define a broader relevant market containing Products A, B, and X.

These updates to the HMT will allow the Agency to establish its prima facie case for mergers where unilateral price effects are likely to arise. The economic basis for this approach is very strong.[25] These updates would continue the process of unifying and reconciling the market definition part of merger analysis with the evaluation of unilateral price effects.[26]

The Agencies will then have the discretion to define broader markets as needed when they go to court in order to address other more qualitative evidence that the courts use to delineate relevant markets. Section 4 of the HMGs already anticipates that tensions can arise between markets defined using the HMT and broader collections of products that may reflect common industry usage: "Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term 'market.'"

The HMGs should explain that relevant markets do not *partition* products, with each product properly belonging in just one relevant market. As one example, relevant markets can be nested. The Agencies have brought enforcement actions involving nested markets, with harm clearer in a narrower market that is nested inside a broader market. The HMGs should articulate that principle. They also should explain that the most informative relevant market(s) typically depend on the transaction under study.

The HMGs should address "cluster markets," i.e., situations in which the Agencies define a relevant product market that includes a collection of products that are often sold by the same suppliers but are *not* substitutes for each other. For example, in hospital mergers the FTC often alleges a relevant product market for "general acute care inpatient hospital services." One rationale for defining cluster markets is purely practical: market shares may be much easier to measure for the cluster than for individual components. Aggregating in this way produces reliable and informative market shares if competitive conditions are similar for the different items in the cluster.[27]

The HMGs also should be updated to explain how to handle markets in which the price is zero.[28] This comes up in markets where firms offer free products or services to consumers and earn their revenue from advertising. In these situations, a group of products satisfies the HMT if a hypothetical monopolist controlling that group of products would significantly lower *quality*. Here quality can refer to any non-price dimension of the product valued by consumers, such as policies that protect consumers' privacy by limiting if or how data generated by their transactions will be used. Closely related, the HMGs need to explain how relevant markets are defined for multi-sided platforms. These issues are raised in the RFI.[29] They merit attention and space in the revised guidelines.

***Market Concentration Thresholds.*** In 2010, there was a yawning gap between the HHI thresholds found in the HMGs and the Agencies' actual enforcement policy. The 1992 HMGs stated: "Where the post-merger HHI exceeds 1800, it will be presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." However, the average post-merger HHI for litigated mergers from 2000 to 2010 was a whopping 6535, and the average increase in the HHI was 1987, vastly above the 100 level in the 1992 HMGs.[30]

PX0648-003

When the HMGs were updated in 2010, the Agencies sought to substantially narrow this gap. The goal was to tighten merger enforcement by raising the HHI thresholds, focusing attention and resources on the mergers most likely to harm competition, and assertively enforcing at those new levels, thereby deterring firms from proposing mergers well above the new enforcement thresholds. However, in part due to resource constraints, the Agencies did not succeed in reducing the HHI levels of litigated mergers by very much. The average post-merger HHI for litigated mergers from 2010 to 2020 was 5805, and the average increase in the HHI was 1938.[31] These data suggest that merger enforcement over the past twenty years has failed to stop some firms from attempting mergers to duopoly or even monopoly, well beyond the levels presumed to be anticompetitive. Worse yet, the parties proposing such mergers often are sufficiently optimistic about their chances in court that they are willing to litigate rather than abandon the transaction when facing a DOJ or FTC challenge.

Moreover, merging parties often argue that mergers not in the Red Zone (currently a post-merger HHI greater than 2500 and an increase in the HHI of 200 or more) are presumptively legal. That was not the intention of the Yellow Zone in the 2010 HMGs (a post-merger HHI between 1500 and 2500 and an increase in the HHI of 100 or more, or a post-merger HHI of more than 2500 and increase in HHI of 100 to 200). The 2010 HMGs state that mergers in the Yellow Zone "potentially raise significant competitive concerns and often warrant scrutiny." The Agencies should make very clear that mergers falling in the Yellow Zone are *not* presumptively legal.

What more should be done? One approach would be for the Agencies to retain the 2010 HHI levels and consistently enforce at those levels, both in the Red Zone and, when appropriate, the Yellow Zone. That alone would involve a significant tightening of merger enforcement, which would require substantial additional resources. However, it would not address concerns that the drift in merger enforcement prior to 2010 created an overly permissive policy toward mergers in what became the Yellow Zone after 2010. Therefore, if resources permit, the Agencies also should consider lowering the HHI thresholds for the Red Zone and enforcing at those new levels. We do not offer specific new HHI threshold levels here, partly because we do not believe the empirical literature is clear on what those should be. But we do offer several specific suggestions for expanding the structural presumption in ways that reflect Agency experience, economic evidence and economic theory, and are consistent with evolving case law.

- **Presumption Based on the Increase in HHI Alone**: We recommend that the Agencies adopt a presumption against mergers that increase the HHI by 200 or more in cases where the theory of harm is based on unilateral effects.[32]

  A test based on the increase in the HHI is strongly supported by economic theory.[33] The increase in the

HHI is equal to $2S_1S_2$ where $S_1$ and $S_2$ are the market shares of the merging firms. If Diversion Ratios are proportional to market shares, the increase in the HHI is a measure of the extent of direct competition between the merging firms that is eliminated by the merger.

Furthermore, the 2010 HMGs laid the groundwork to support this change. Section 6.1 in the 2010 HMGs states: "The Agencies rely much more on the value of diverted sales than on the level of the HHI for diagnosing unilateral price effects in markets with differentiated products." The increase in the HHI is linked to the value of diverted sales.[34]

- **Restoration of the Leading Firm Proviso**: We recommend a presumption against a merger between a firm with at least 50 percent market share and a firm with at least a 1 percent market share.[35]

  The 1982 Merger Guidelines contained the following Leading Firm Proviso: "the Department is likely to challenge the merger of any firm with a market share of at least 1 percent with the leading firm in the market, provided that the leading firm has a market share that is at least 35 percent and is approximately twice as large as that of the second largest firm in the market." This provision was dropped in 1992, when a more extensive treatment of unilateral effects was added.

  Competition is often harmed when a dominant firm acquires one of its rivals, even a small one. Normally, the dominant firm has abundant internal capabilities, so the acquisition is not needed for it to be a strong competitor.

  We tentatively suggest these 50 percent/1 percent levels, but our central point is to use a lower threshold for the structural presumption for mergers involving the leading firm in the market.[36] The post-merger HHI associated with a 50 percent + 1 percent merger is over 2500, but the increase in the HHI is only 100, so this merger would not trigger a presumption that is based on an increase of 200 or more in the HHI (although a 50 percent + 2 percent merger would).

  In these cases, the target firm's *projected* market share will often be more informative than its historical share. Projections made in advance of merger discussions are particularly informative. The Agencies should express skepticism of projections prepared by the merging parties in anticipation of litigation.

- **Sliding Scale**: We recommend that the Agencies explicitly state that stronger and more convincing evidence is needed to rebut the structural presumption, the larger is the post-merger HHI and the increase in the HHI.

Such a statement would build naturally on what the 2010 HMGs already say: "The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood

that the Agencies will request additional information to conduct their analysis." Stronger language here is warranted, especially given that the courts are already applying a sliding scale.

Lastly, we would like to stress that one can only measure market concentration after a relevant market has been defined. In the real world of merger litigation, Agency success hinges far more on the courts accepting the government's proposed markets than on the HHI thresholds. That is why the 2010 HMGs explained in detail how the HMT can lead to narrow markets. Twelve years later, strengthening merger enforcement likely rests much more on increasing enforcement resources and explaining the implications of the HMT than on lowering the HHI thresholds.

## Dynamic Competition

The structural presumption applies to mergers between firms that are *current* competitors, but share-based analysis has very limited ability to identify and protect *future* competition. The 2010 HMGs took three steps to address this shortcoming. First, Section 5.2 states: "The Agencies may project historical market shares into the foreseeable future when this can be done reliably." Second, Section 5.3 states: "In analyzing mergers between an incumbent and a recent or potential entrant, to the extent the Agencies use the change in concentration to evaluate competitive effects, they will do so using projected market shares." Third, Section 6.4 addresses unilateral effects on "Innovation and Product Variety," a topic not developed in earlier Guidelines.

Updated HMGs should build on these advances and explain in much greater detail how the Agencies diagnose a lessening of dynamic competition.[37] We use this term to encompass two distinct ways in which a merger may lessen future competition. First, a merger may cause harm through future unilateral effects, even if it will not cause immediate unilateral effects. Second, a merger may reduce the incentives of the merging firms to innovate by making investments in new and improved products, production processes, or business models.[38] For a recent, excellent example of how the HMGs might treat harm to future competition, see Section 5, "Potential and Dynamic Competition," in the U.K. CMA's Merger Assessment Guidelines.[39]

Protecting dynamic competition is inherently challenging. The fundamental problem is that incumbent firms often find it more profitable to acquire potential rivals than to compete against them.[40] Therefore, the Agencies and the courts must be alert to the danger that merging firms will stymie effective merger enforcement by combining at a relatively early date, when the evidence a loss of dynamic competition is less clear, especially to those outside the industry. The D.C. Circuit recognized a very similar concern in the *Microsoft* case.[41] Both the Clayton Act and the Sherman Act provide authority for the Agencies to challenge mergers that lessen competition from nascent, disruptive firms.[42]

In the merger context, the greatest danger arises when an incumbent firm with substantial market power seeks to merge with a potential competitor. One promising way to prevent incumbent firms from acting on their anticompetitive incentives is to prohibit mergers that *may* substantially lessen future product-market competition, even if such future rivalry cannot yet (when the merger is proposed) be shown to be more likely than not. The Supreme Court already has recognized that future competition is probabilistic and that antitrust law protects future competition that might arise (but might not).[43] This approach is very much consistent with the goal of "arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency."[44] It also fits with Herbert Hovenkamp's view of how incipiency tests should be used in antitrust law: "The appropriate use of incipiency tests is to prevent certain bad outcomes early when antitrust rules make it difficult or impossible to prevent them later.[45]

Given the inevitable evidentiary challenges the Agencies face when they challenge mergers based on a loss of dynamic competition, we urge the Agencies to emphasize in the updated HMGs that they focus on the *ability and incentive* of the merged firms to invest and introduce competing products in the future.[46] If the merging firms are two of a small number of firms that have the ability and incentive to make such investments in a defined area, the merger may well lessen dynamic competition, even if neither firm has a specific plan to introduce a product that will compete against the other.[47] The merging firms will likely argue that such future effects are "speculative," but that merely highlights why the HMGs need to explain that merger enforcement in dynamic markets does not require a specific prediction of how the market will evolve, which is typically not possible. Especially for cases involving potential competition and innovation, the Agencies should emphasize "the congressional intent that merger enforcement should interdict competitive problems in their incipiency and that certainty about anticompetitive effect is seldom possible and not required for a merger to be illegal."[48] The HMGs also can explain the types of evidence that the Agencies rely upon to identify mergers that may harm dynamic competition. We next sketch out some ways that might be done.

***Future Unilateral Effects.*** Future unilateral effects are unilateral effects that will not arise until some point in the future.[49] The typical merger in which future unilateral effects arise is one between a strong incumbent firm and a potential entrant.[50] For clarity, our discussion refers to that fact pattern.

Future unilateral effects are very much like conventional unilateral effects, except (a) they will not occur for some period of time, and (b) they will only occur probabilistically.

**Example**: Firm A designs and sells the leading modem chip used in mobile devices, earning substantial operating profits. Firm B, which designs and sells other types of chips, is developing a modem chip. If those development efforts are

PX0648-005

successful, Firm B's modem chip will provide substantial new competition for Firm A's modem chip. The merger of Firm A and Firm B will cause future unilateral effects. Whether these effects are substantial depends on the likelihood that Firm B will successfully complete the development of its modem chip and the extent of competition between the two modem chips in that event. Evidence about Firm B's plans and prospects for its modem chip will be highly relevant to those two issues, as will be evidence about how Firm A assesses the threat posed by Firm B's modem chip to the profits Firm A is earning on its modem chip.

Empirical evidence has mounted that large, successful firms often grow by expanding into adjacent product markets or geographic markets. Indeed, this expansion explains the why we are seeing increases in concentration in many *sectors* of the economy together with decreases in concentration in *relevant markets* within those sectors. This same evidence should serve as a warning that mergers between firms in adjacent markets can eliminate potential competition. With large firms now controlling a greater share of economic activity, often earning substantial profits that would be threatened by disruptive entrants, the ability of the Agencies to stop mergers that eliminate potential competition is now more important than ever. There is a small but growing body of empirical evidence on acquisition of potential competitors,[51] and acquisitions of potential competitors have been of particular concern in the tech space.[52]

The Agencies and the courts face two central challenges in cases involving future unilateral effects. First, it may be difficult to assess the likelihood that the product under development will ever be introduced. Second, unlike conventional unilateral effects cases, it will typically not be possible to estimate diversion ratios based on the available evidence. That makes it far more difficult to assess the magnitude of the future unilateral effects.

The Agencies should emphasize that a merger between a dominant incumbent and a potential entrant is likely to cause future unilateral effects if the potential entrant has the incentive and ability to compete with the incumbent through entry into the market, especially if that entry involves the introduction of a disruptive product or business model. Such acquisitions will often tend to create a monopoly. The HMGs should identify the types of evidence the Agencies usually rely upon to make this assessment. Premerger business plans, forecasts, and strategy discussions are especially important. Econometric quantification will rarely be feasible. Attempts by the potential entrant to walk away from its pre-merger entry or expansion plans when the Agencies investigate the merger should be viewed with great skepticism, as should attempts by the incumbent to play down the threat it faces.

The Agencies should state that they are likely to challenge a merger based on future unilateral effects if one merging firm is selling a successful and profitable product and the other is credibly developing a new product that significantly threatens those profits. Harm to competition does not require that successful introduction of the new product be highly likely, much less certain.

**Harm to Innovation.** Competition is a dynamic process. Indeed, the greatest benefits to the public from competition arguably result from the dynamic process by which firms invest to develop new and improved products, business models, and methods of production.[53] Mergers can undermine that process. We refer to such adverse effects as *harm to innovation*.

**Example**: In the previous example, suppose that Firm B must make substantial risky investments to develop its new modem chip. The merged firm will have reduced incentives to undertake these investments because many of the sales of Firm B's modem chip would come at the expense of Firm A's modem-chip business. The merger also will reduce Firm A's incentive to improve its own modem chips by removing the competitive pressure from Firm B. The merger will thus harm innovation in modem chips. These effects are largest if Firm A faces few other actual or potential modem-chip rivals.

Critically, mergers can cause an immediate harm to innovation even if the actual product-market competition that they eliminate is *nascent*, i.e., will not arise for some time and is probabilistic. Stopping incumbent firms from acquiring nascent competitors is particularly problematic in innovative markets, where such mergers can threaten both the competitive process by which firms contest future sales and the innovation pipeline.[54]

These basic ideas can be found in the 2010 HMGs. Section 6.4 explains that "curtailment of innovation could take the form of reduced incentives to continue with an existing product-development effort or reduced incentive to initiate development of new products." But much more can and should be done, given the importance of innovation to economic growth.

Updated HMGs should significantly expand the discussion of innovation to reflect advances in economic learning and the accumulation of Agency experience. The overarching principle is that mergers can harm competition by reducing the *contestability* of future sales.[55] The main motivation for a contestable incumbent to innovate is to protect its market position, and the main motivation for an entrant to innovate is to disrupt the market and capture sales from incumbents. A merger between a strong incumbent and a potential entrant can undermine *both* of these incentives. These ideas have been well understood by economists studying innovation for decades, but they have not been fully implemented in the HMGs or in merger enforcement.[56]

## Mergers of Competing Employers

Antitrust law acknowledges that competitive markets are essential to protect not only consumers of products and services, but also suppliers to firms, including workers.[57] Economists and antitrust enforcers have increasingly recognized that mergers between firms that compete to employ workers may harm workers by substantially lessening competition in

relevant labor markets.[58] Workers may be especially vulnerable to reductions in competition, as typical low labor supply elasticities may give remaining employers considerable market power over wages.[59]

The approach to analyzing competitive overlaps in labor markets has many analogs to those used for product markets. Section 12 of the 2010 HMGs, which discusses Agency approaches to evaluating potential harm from mergers of competing buyers, should be accompanied by a new section or subsection that makes explicit the inclusion of labor market harms and describe how the Agencies will assess that possibility.

Market power in labor markets may arise from monopsony power, through which firms can profitably restrict hiring to force lower wages, benefits, or non-wage compensation, including working conditions. Alternatively, it may be exercised through bargaining leverage, imposing lower compensation on workers, possibly without employment effects.

Question 9 in the RFI asks about Monopsony Power and Labor Markets. Part (b) asks: "How should the guidelines treat a merger that may generate monopsony power, but does not substantially lessen competition in any output market?" Section 12 of the 2010 HMGs answers this question.

> The Agencies do not view a short-run reduction in the quantity purchased as the only, or best, indicator of whether a merger enhances buyer market power. Nor do the Agencies evaluate the competitive effects of mergers between competing buyers strictly, or even primarily, on the basis of effects in the downstream markets in which the merging firms sell.

> *Example 24:* Merging Firms A and B are the only two buyers in the relevant geographic market for an agricultural product. Their merger will enhance buyer power and depress the price paid to farmers for this product, causing a transfer of wealth from farmers to the merged firm and inefficiently reducing supply. These effects can arise even if the merger will not lead to an increase in the price charged by the merged firm for its output.

This important principle should be retained and extended to the context of labor markets.

Many labor markets may be substantially more narrow in geographic scope than are corresponding product markets, and the ability of workers to move from one employer or occupational category to another may be difficult to evaluate. Job postings and hiring records may help to construct diversion measures and identify groups of workers who are particularly dependent upon competition between the merging firms. The Hypothetical Monopsonist Test can be applied to help define the affected labor markets, with consideration given both to the geographic reach of labor markets and to disparate effects across different occupations affected by the merger.

The Agencies should affirm that the structural presumption applies to labor markets. That said, there is no *a priori* reason to expect that numeric thresholds based on product markets will necessarily be the most accurate predictions of

labor market harm. The Agencies should consider whether the empirical economic evidence supports different levels for the HHI-based thresholds for labor and product markets, recognizing that the burgeoning academic literature and ongoing Agency experience will inevitably help refine these over time.

For many mergers, potential product market and labor market harms will be concomitant. This is especially likely in cases where both product and labor markets are local and there are workers with skills that are specific to a small number of local employers, making them vulnerable to elimination of an independent employer, as may occur for specialized health care workers in hospital mergers.[60] Because a merger is illegal if it may substantially lessen competition in any relevant market, the Agency need not include all harmed markets in a complaint, and a challenge could be made on the basis of either product or labor market harms, or both.[61] In other situations, firms may compete in the same labor pool but not necessarily the same product market. This can lead to anticompetitive effects in labor markets regardless of any effects on product market competition. A merger between a hospital and a nearby skilled nursing facility might be an example of this, reducing local competition to hire nurses but not harming competition in any product market. Or it may be that geographic differences in labor and product markets give rise to labor market harm even when product market competition is not substantially affected.

> **Example**: Firms A and B manufacture products that do not directly compete with one another, so their merger does not pose the risk of product market harm. However, they each employ the same type of specialized skilled workers, and several of their facilities are in local markets where they are two of a small number of employers competing for those workers. The merger will substantially lessen competition for this group of workers in these local labor markets and will depress total compensation for these workers.

Given scarce enforcement resources, it may be most effective to identify early in investigations situations where labor and product markets are *not* aligned, and focus labor market investigations on those where there is no product market harm. Understanding the nature of labor market competition also may be important in assessing whether proposed divestiture remedies fully remediate competitive concerns; for example, by ensuring divestiture locations are chosen to maintain robust employer competition, or that such settlements are rejected if there is no divestiture that preserves both product and labor market competition.

Lastly, the updated Guidelines should make clear that employment, compensation, or workplace quality reductions that result from eliminating *competition* between employers are merger-specific harms and cannot be claimed as a cognizable merger efficiency.[62]

## Conclusion

We encourage the DOJ and the FTC to update the Horizontal Merger Guidelines in a manner that builds on the

PX0648-007

advances made in 2010 and reflects the accumulation of evidence that merger enforcement has been too lax in recent decades. To be effective, updated Guidelines must clearly explain how the Agencies investigate and analyze horizontal mergers in a way that will be convincing to the courts as they seek to determine whether a merger "may substantially lessen competition." We emphasize (1) how the Hypothetical Monopolist Test can properly lead to narrow relevant markets in which market concentration can be measured, (2) how mergers may substantially lessen future competition even if they do not substantially increase current market concentration, and (3) how mergers of competing employers can harm workers.

As highlighted in the RFI, a number of additional topics are ripe for updating based on past experience and new learning. Though space limitations preclude detailed discussion here, we would highlight these additional topics:

- **Coordinated Effects**: The Agencies could do more to explain the industry conditions under which the Agencies are likely to find that a merger may lessen competition based on coordinated effects. For example, Jonathan Baker and Joseph Farrell suggest that "a detailed competitive effects analysis should turn on whether the coordinated effects concern principally involves purposive or nonpurposive strategic conduct."[63]

- **Efficiencies**: The Agencies could signal greater skepticism about the prevalence of cognizable efficiencies, especially for mergers that otherwise present competitive problems. Skepticism is warranted because there is no robust body of empirical evidence showing that most mergers realize cognizable efficiencies.[64] Updated HMGs could restore language from the 1982 Guidelines, which stated that any efficiencies must be proven by "clear and convincing evidence" and that efficiencies are only considered in "extraordinary cases" that would otherwise be "close cases."[65] The Agencies could be especially skeptical of claimed efficiencies for mergers that "tend to create a monopoly."

- **Serial Acquisitions**: The Agencies could explain how they handle serial acquisitions, where a series of acquisitions by a single firm over time may substantially lessen competition, even if no individual acquisition does. One approach would be to challenge a whole series of acquisitions that collectively harms competition, including a number that have been consummated, when some threshold of harm is reached.

- **Settlements**: Updated HMGs might address the deep connections between how the Agencies analyze horizontal mergers and how they assess proposed remedies. They could explain the circumstances under which the Agencies disfavor settlements of anticompetitive mergers, and why. In many cases, the Agencies evaluate a merger together with a remedy that the merging parties have proposed, either during the

investigative phase or the litigation phase.[66] Updated HMGs could discuss the Agencies' experience with various remedies, both structural and behavioral, including remedies that *failed* to protect competition. They could state, for example, that while contracts can mitigate the anticompetitive effects of a merger in the short term, they are not a substitute for competition, especially over the longer term. Updated HMGs could clearly enunciate the principle that eliminating competitive overlaps does not itself remediate harm; an acceptable remedy must restore the competition that would otherwise be eliminated by the merger. The updated Guidelines could apply this principle to explain why there is a strong presumption that acceptable divestitures involve a coherent collection of assets and capabilities with a proven track record of competing effectively. They also could explain why this principle means that in practice there may be no remedy, short of stopping the merger altogether, that will prevent the harm from an anticompetitive merger. ■

1 The White House. *Executive Order on Promoting Competition in the American Economy* (July 9, 2021), Section 5(c).

2 See https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-seek-strengthen-enforcement-against-illegal.

3 U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines* (August 19, 2010). We do not address updating the 2020 Vertical Merger Guidelines, which were withdrawn by the FTC in September 2021 but remain in place at the DOJ. Our recommendations apply whether or not the Agencies choose to issue a single updated set of guidelines covering both horizontal and vertical mergers.

4 Nancy L. Rose, *Concerns about Competition*, in Maintaining the Strength of American Capitalism (Melissa S. Kearney and Amy Ganz, eds., Aspen Institute Economic Strategy Group, November 2019).

5 Carl Shapiro, *Protecting Competition in the American Economy: Merger Control, Tech Titans, Labor Markets*, 33 J. Econ. Persps. 69 (2019). John Asker and Volker Nocke, *Collusion, Mergers, and Related Antitrust Issues*, (NBER Working Paper No 29175, August 2021) (appendix summarizing merger retrospectives studies).

6 Thomas G. Wollmann, *Stealth Acquisitions: Evidence from an Amendment to the Hart-Scott-Rodino Act*, 1 Am. Econ. Rev.: Insights 77 (2019). Thomas G. Wollmann, *How to Get Away with a Merger: Stealth Consolidation and its Effect on US Healthcare*, (NBER Working Paper No. 27274, July 2021).

7 Nancy L. Rose and Jonathan Sallet, *The Dichotomous Treatment of Efficiencies in Horizontal Mergers: Too Much? Too Little? Getting it Right*, 168 U. Penn. L. Rev 1967, sec. III and IV (2020).

8 See *infra* notes 30 and 31 and associated discussion in the text.

9 This may reflect inadequate budgets at enforcement agencies; see Michael Kades, *The state of U.S. federal antitrust enforcement*, (Wash. Ctr. for Equitable Growth, Sept. 2019), and does not capture settled challenges. Tightening merger enforcement guidelines without substantially increasing agency budgets is unlikely to greatly mitigate any underenforcement.

10 *E.g.*, David Autor, David Dorn, Lawrence Katz, Christina Patterson, and John Van Reenen, *The Fall of the Labor Share and the Rise of Superstar Firms*, 135 Q.J. Econ. 645 (2020). John Van Reenen, *Increasing Differences Between Firms: Market Power and the Macroeconomy*, (Ctr. for Econ. Performance Discussion Paper No. 1576, 2018).

11 *E.g.*, Nicolas Crouzet and Janice Eberly, *Understanding Weak Capital Investment: the Role of Market Concentration and Intangibles* (NBER Working Paper No. 25869, 2019).

PX0648-008

[12] C. Lanier Benkard, Ali Yurukoglu, and Anthony Zhang, *Concentration in Product Markets* (NBER Working Paper No. 28745, April 2021) (median concentration levels in consumer products have declined since the mid-1990s, reflecting modest declines in concentration for the most highly concentrated product markets at the start of that period); Esteban Rossi-Hansberg, Pierre-Daniel Sarte, and Nicholas Trachter, *Diverging Trends in National and Local Concentration*, 35 NBER Macroeconomics Annual 115 (2020) (showing declines in concentration measured at the local level across most sectors).

[13] Carl Shapiro, *Antitrust in a Time of Populism*, 61 Int'l J. Indus. Org, 714 (2018); and Carl Shapiro, *Protecting Competition in the American Economy: Merger Control, Tech Titans, Labor Markets*, 33 J. Econ. Persps. 69 (2019).

[14] For one set of proposals along these lines, see Steven Salop and Fiona Scott Morton, *The 2010 HMGs Ten Years Later: Where Do We Go From Here?* 58 Rev. Indus. Org. 81 (2021).

[15] FTC Chair Lina Khan has signaled her interest in labor markets: ". . . do the guidelines adequately assess whether mergers may lessen competition in labor markets, thereby harming workers?" *Remarks of Chair Lina M. Khan Regarding the Request for Information on Merger Enforcement* (18 January 2022), p.3.

[16] Some of the history of the merger guidelines is provided in Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 701 (2010).

[17] RFI, *supra* note 2, p. 1 (footnote omitted).

[18] United States v. Philadelphia National Bank, 374 U.S. 321 (1963) at 363 (". . .a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.").

[19] *See*, especially, United States v. General Dynamics, 415 US 486 (1974), and United States v. Baker Hughes, 908 F.2d 981 (D.C. Cir. 1990). For diagnosis and suggestions for strengthening the structural presumption, see Herbert Hovenkamp and Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L. J. 1996 (2018).

[20] Volker Nocke and Michael Whinston, *Concentration Screens for Horizontal Mergers* (NBER Working Paper No. 27533, July 2020) (forthcoming, *American Economic Review*).

[21] See Section 4.1.1 and especially Example 5: "Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose." Narrow markets may include markets for targeted customers.

[22] *See* Carl Shapiro and Howard Shelanski, *Judicial Response to the 2010 Horizontal Merger Guidelines*, 58 Rev. Indus. Org. 51 (2020).

[23] This simplification includes eliminating the language in Section 4.1.1 indicating that the Agencies "normally" include products in a certain order based on the magnitude of revenue diversion, and Example 6. The statement that the Agencies "usually" use the smallest relevant market satisfying the HMT also should be softened to "often," for the reason given, i.e., because the share of more distant substitutes "often" overstates their significance.

[24] The RFI points in this direction, noting that "the tests for an antitrust market can often be satisfied using direct evidence of likely effects." *Supra* note 2, p. 3.

[25] *See* Nocke and Whinston, *supra* note 20, and Joseph Farrell and Carl Shapiro, *Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition*, 10 B.E. J. Theoretical Econ. (2010).

[26] In addition, the Agencies could add material relating to unilateral price effects indicating that the Agencies often conclude that mergers that create significant upward pricing pressure will lead to significant unilateral price effects, unless there is evidence that product repositioning or entry would deter or counteract those effects. That change might smooth the path for the Agencies to win in court *without* invoking the structural presumption.

[27] An entirely different analysis applies if the Agency is alleging a *market for bundles*, in which suppliers must offer most or all the components in the bundle to compete effectively.

[28] The HMGs should explain that outputs, not revenues, are used to measure market shares in these markets.

[29] Question 11(c) in the RFI asks: "How should the guidelines approach market definition in zero-price markets, negative-price markets, or markets without explicit prices? Can 'quality' and other characteristics play the same role as price in market definition?"

[30] *See* Table 2 in Shapiro and Shelanski, *supra* note 22. See also Federal Trade Commission, *Horizontal Merger Investigation Data: Fiscal Years 1996-2011* (January 2013) (showing very few enforcement actions in markets with a post-merger HHI of less than 2400, among mergers that received second requests from the FTC, except for grocery markets and oil markets).

[31] *Id*.

[32] The RFI invites presumptions that depend on the theory of harm. "Would the inclusion of multiple alternative presumptions better reflect the diversity of transactions and evidence presented by the modern economy." (RFI, *supra* note 2, p.5)

[33] *See* Nocke and Whinston, *supra* note 20, and Farrell and Shapiro, *supra* note 25.

[34] We also would support a presumption against mergers that create significant upward pricing pressure, as recommended by Salop and Scott Morton, *supra* note 14. The 2010 HMGs point in that direction but do not explicitly state such a presumption. Now that unilateral effects and upward pricing pressure are well established, a presumption based on significant upward pricing pressure would be a much smaller step forward. The RFI invites such an approach, asking: "Should the guidelines identify thresholds for customer diversion and margins that, solely or together, create a presumption of competitive harm from certain mergers?" (RFI, *supra* note 2, p. 4)

[35] We also favor a presumption against mergers between a dominant firm and a significant *potential* competitor. See below.

[36] Salop and Scott Morton, *supra* note 14 make a similar recommendation, without specific thresholds.

[37] Question 7 in the RFI asks about Potential and Nascent Competition. "What changes in standards or approaches would appropriately strengthen enforcement against mergers that eliminate potential competition?" (RFI, *supra* note 2, p. 6)

[38] *See, e.g.*, Giulio Federico, Carl Shapiro, and Fiona Scott Morton, *Antitrust and Innovation: Welcoming and Protecting Disruption, in* Innovation Policy and the Economy, 20, 125-190 (Josh Lerner and Scott Stern, eds., 2020) (developing this concept and explaining how future unilateral effects and innovation effects can be assessed).

[39] Competition and Markets Authority, Merger Assessment Guidelines, March 2021 (UK).

[40] This is a very general and robust economic principle. This same principle explains why we see pay-for-delay deals in the pharmaceutical industry. For an early articulation of this basic principle, see Richard Gilbert and David Newbery, *Preemptive Patenting and the Persistence of Monopoly*, 72 Am. Econ. Rev. 514 (1982).

[41] *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001). (Acknowledging the inherent uncertainty of nascent competitive threats, the court concluded that imposing a high burden of plaintiffs "to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.").

[42] C. Scott Hemphill and Tim Wu, *Nascent Competitors*, 168 U. Penn. L. Rev. 1879 (2020).

[43] *FTC v. Actavis*, 570 U.S. 136 (2013) (even a "small risk" of future competition "constitutes the relevant anticompetitive harm").

[44] *Brown Shoe v. United States*, 370 U.S. 294, 317 (1963).

[45] Herbert Hovenkamp, *Prophylactic Merger Policy*, 70 Hastings L.J. 45 (2019).

[46] Assistant Attorney General Jonathan Kanter has invited updates along these lines. "In a dynamic, multi-dimensional economy, the static formalism

PX0648-009

of market definition may not always be the most reliable tool for assessing the potential harm from mergers." *Modern Competition Challenges Require Modern Merger Guidelines* (18 January 2022).

47 The RFI (*supra* note 2, p. 6) asks whether the analysis should focus on whether one merging firm (a) is contemplating entry into a market where the other firm has substantial market power, (b) is well situated to enter, or (c) is simply capable of entering. We recommend focusing on one merging firm's ability and incentive to enter and compete against the other merging firm in a market where that firm is dominant, not on whether it is currently planning to do so.

48 HMGs, *supra* note 3, Section 1.

49 The U.K. Guidelines explain that a merger eliminates potential competition when "entry or expansion by either or both merger firms may have resulted in new or increased competition between them." ¶ 5.1

50 The "potential entrant" could also be a current market participant that is developing a new and improved product. We use the term "potential entrant" for clarity, but we do not intend to rule out that fact pattern.

51 *E.g.*, Colleen Cunningham, Florian Ederer, and Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649 (2021); Wollmann (2019) and Wollmann (2021), *supra* note 6.

52 *E.g.*, Federal Trade Commission, Non-HSR Reported Acquisitions by Select Technology Platforms, 2010-2019, Sept. 15, 2021; Lear, Ex-post Assessment of Merger Control Decisions in Digital Markets, Final Report," prepared for the Competition and Markets Authority, May 2019; Federal Trade Commission v. Facebook, Case 1:20-cv-03590-JEB (amended complaint filed August 19, 2021).

53 For a comprehensive treatment of competition policy in innovative industries, see Richard Gilbert, Innovation Matters: Competition Policy for the High-Technology Economy (MIT Press, 2020).

54 Hemphill and Wu, *supra* note 42.

55 Carl Shapiro, *Competition and Innovation: Did Arrow Hit the Bull's Eye?* in The Rate & Direction of Economic Activity Revisited (Josh Lerner and Scott Stern, eds., NBER, 2012) (explaining that innovation incentives are strongest when future sales are contestable among multiple firms well-positioned to innovate).

56 *See* Shapiro, *id.*, and Federico, Shapiro, and Scott Morton, *supra* note 38.

57 See, e.g., Section 12 of the 2010 HMGs; U.S. Department of Justice and Federal Trade Commission, Antitrust Guidance for Human Resource Professionals (Oct. 2016); C. Scott Hemphill and Nancy L. Rose, *Mergers that Harm Sellers*, 127 Yale L.J. 2078 (2018); and Ioana Marinescu and Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Indiana L.J. 1031 (2019).

58 *See* Elena Prager and Matt Schmitt, *Employer Consolidation and Wages: Evidence from Hospitals*, 111 Am. Econ. Rev. 397 (2021); David Arnold, Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes, Oct. 29, 2021. The Agencies explicitly elevated consideration of labor market harms in merger evaluations beginning in 2018.

59 *E.g.*, Marinescu and Hovenkamp, *supra* note 57.

60 Prager and Schmitt, *supra* note 58.

61 *See also* the "Concurring Statement of Commission Rebecca Kelly Slaughter and Chair Lina M. Khan Regarding FTC and State of Rhode Island v. Lifespan Corporation and Care New England Health System," Commission File No. 2110031 February 17, 2022 https://www.ftc.gov/system/files/documents/public_statements/1601039/public_statement_of_commr_slaughter_chair_khan_re_lifespan-cne_redacted.pdf.

62 Hemphill and Rose, *supra* note 57, at 2082.

63 Jonathan Baker and Joseph Farrell, *Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement*, 168 U. Penn. L. Rev. 1985 at 2009 (2020). *See also* Joseph Farrell and Jonathan Baker, *Natural Oligopoly Responses, Repeated Games, and Coordinated Effects in Merger Analysis: A Perspective and Research Agenda*, 58 Rev. Indus. Org. 103 (2021).

64 See Rose and Sallet, *supra* note 7.

65 See Section V.A of the 1982 Merger Guidelines, "Efficiencies."

66 In *United States v. AT&T*, 916 F.3d 1029 (D.C. Cir. 2019), the D.C. Circuit even credited letters sent out by AT&T, one week after the DOJ went to court to stop the merger, "irrevocably offering" to engage in arbitration for seven years.

PX0648-010

# PX0649

the**antitrust**source ■ www.antitrustsource.com ■ October 2017                    1

# Aetna-Humana and Algorithmic Market Definition in the Guidelines

**Kostis Hatzitaskos, Nicholas Hill, and Brad T. Howells**

The Department of Justice and Federal Trade Commission Horizontal Merger Guidelines outline the Agencies' enforcement policy on horizontal mergers.[1] The Guidelines play an important role during all phases of the merger review process, including litigation.[2] Because merger review is fact specific and because facts vary greatly across mergers, the Guidelines must be general enough to accommodate the nuances of a wide range of potential scenarios. This need to preserve generality can lead to ambiguities that can complicate counseling, merger review, and litigation.

We discuss here one such ambiguity in the Guidelines, concerning whether market definition must be strictly algorithmic or may instead be a more holistic process informed by both qualitative and quantitative evidence. The recent Aetna-Humana health insurance merger trial was the first since the 2010 revisions of the Guidelines to focus squarely on this ambiguity. A number of products were at issue in the trial, but the key question was whether the merger would reduce competition in the sale of Medicare Advantage plans to seniors eligible for Medicare. In what follows, we explore the market definition questions raised at trial and their implications for practitioners.

## Constructing a Candidate Market

In an effort to limit the potential for gerrymandering,[3] earlier versions of the Guidelines laid out an algorithmic approach to defining markets. For example, the 1992 Guidelines, as revised in 1997, described a product market definition process that would begin with a single product and add substitutes one at a time, in order of their closeness of substitution, until the collection of products passed the hypothetical monopolist test.[4] This algorithmic approach ensured that a market can-

■

*Kostis Hatzitaskos is a Vice President and **Brad T. Howells** is a Senior Manager at Cornerstone Research. **Nicholas Hill** is a Principal at Bates White Economic Consulting. During the Aetna-Humana litigation, Dr. Hill was an Assistant Section Chief in the Department of Justice Economic Analysis Group Justice and Dr. Hatzitaskos and Dr. Howell supported Professor Aviv Nevo, who testified on behalf of the DOJ. The views expressed in this article are solely those of the authors and are not purported to reflect the views of Bates White Economic Consulting, Cornerstone Research, or the Department of Justice.*

---

[1] U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines (2010), http://ftc.gov/os/2010/08/100819hmg.pdf [hereinafter 2010 Guidelines].

[2] For example, the court in *Aetna* noted that "[a]lthough the Guidelines are not binding, the D.C. Circuit and other courts have looked to them for guidance in previous merger cases." United States v. Aetna Inc., 240 F. Supp. 3d 1, 11 n.7 (D.D.C. 2017) (citing FTC v. H.J. Heinz Co., 246 F.3d 708, 716 n.9 (D.C. Cir. 2001)); FTC v. Sysco Corp., 113 F. Supp. 3d 1, 38 (D.D.C. 2015).

[3] In this context, gerrymandering refers to defining a market whose boundaries exclude an important substitute or include an unimportant substitute, leading to erroneous conclusions about competitive effects.

[4] U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines § 1.11 & n.9 (1992, rev. 1997), https://www.ftc.gov/sites/default/files/attachments/merger-review/hmg.pdf [hereinafter 1992 Guidelines] ("Specifically, the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price, but the terms of sale of all other products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next best substitute for the merging firm's product. . . . Throughout the Guidelines, the term 'next best substitute' refers to the alternative which, if available in unlimited quantities at constant prices, would account for the greatest value of diversion of demand in response to a 'small but significant and nontransitory' price increase.").

not be gerrymandered to exclude a close substitute. If a market that begins with product A includes product C, and product B is a closer substitute for product A, then product B must also be in the market. Indeed, it will have been added before product C.

The 2010 Guidelines retain the use of the hypothetical monopolist test but do not contain a formal algorithm for constructing the group of products to be tested. Instead, they emphasize that there may be more than one valid relevant market and that market definition is a means to an end.

> The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market. The Agencies may evaluate a merger in any relevant market satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects.[5]

*The 2010 Guidelines retain the use of the hypothetical monopolist test but do not contain a formal algorithm for constructing the group of products to be tested.*

The approach described in the 2010 Guidelines better reflects how product markets are defined in practice. Namely, the Agencies focus on testing candidate markets that constitute intuitive, natural groupings of products that are based upon documentary and other qualitative evidence and can be tested using available data. This is consistent with the *Brown Shoe* indicia that remain persuasive in litigation.[6] The key *Brown Shoe* indicia include "industry or public recognition" of the market, a "product's peculiar characteristics or uses," "distinct customers," and "specialized vendors."[7]

This approach, however, gives the Agencies discretion in constructing the products to be tested and thus creates a risk that an incorrect market definition will lead to incorrect conclusions about competitive effects. The 2010 Guidelines contain language to mitigate this risk. Unfortunately, this language, and related language that follows, admits multiple interpretations. The merging parties in *Aetna*, for example, read this language to suggest that the 2010 Guidelines prescribe a variant of the earlier algorithmic approach.

The language in question begins before Example 6 in the 2010 Guidelines and continues through the end of that example.

> When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will *normally* also include a third product if that third product is a closer substitute for the first product than is the second product.
>
> . . . .
>
> *Example 6:* In Example 5, suppose that half of the unit sales lost by Product A when it raises its price are diverted to Product C, which also has a price of $100, while one-third are diverted to Product B. Product C is a closer substitute for Product A than is Product B. Thus Product C will *normally* be included in the relevant market, even though Products A and B together satisfy the hypothetical monopolist test.[8]

---

[5] 2010 Guidelines, *supra* note 1, § 4.1.1.

[6] *See, e.g.*, Petition for Review of a Decision of the Fed. Trade Comm'n, McWane, Inc. v. FTC, No. 14-11363 at 26 (11th Cir. Apr. 15, 2015) ("'Courts routinely rely on qualitative economic evidence to define relevant markets.' . . . Thus, for example, in *Polypore*, the Commission's market definition was affirmed by this Court on the basis of the *Brown Shoe* indicia, apparently without an econometric study." (citation omitted)); FTC v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1039 (D.C. Cir. 2008) ("We look to the *Brown Shoe* indicia, among which the economic criteria are primary"); United States v. H&R Block, Inc., 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." (citations omitted)).

[7] Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

[8] 2010 Guidelines, *supra* note 1, § 4.1.1 (emphasis added).

Absent the word "normally," and read without further context, this language implies that any rel-evant market must be consistent with the algorithmic approach to market definition specified in earlier versions of the Guidelines. Specifically, a product cannot be included in a candidate mar-ket unless every other product that is a closer substitute is also included. Under this approach, one could rank every substitute by how close of a substitute it is to the focal merging party prod-uct. The only market definition question would then be how far down this list one would have to go to pass the hypothetical monopolist test.[9]

However, the Guidelines make clear by using the word "normally" twice that there are reason-able exceptions to such an algorithmic approach. This is consistent with the language quoted ear-lier, which notes that there are typically multiple valid relevant markets and that market definition is a means to assessing competitive effects.[10] What the Guidelines do not do is specify precise-ly when exceptions to the algorithmic approach are reasonable.

A clarification that is consistent with common practice would be that the starting point for can-didate markets can be any natural and intuitive grouping of products that is consistent with the type of *Brown Shoe* indicia that courts and practitioners routinely consider. Following the algo-rithmic approach can instead lead to counterintuitive markets that look gerrymandered in com-parison, particularly when data on closeness of substitution are incomplete.

### Product Market Construction in the *Aetna-Humana* case

Consider the example of *Aetna*. At the heart of the market definition fight in that case was the question of which products must be included in the candidate market before performing the hypothetical monopolist test. Seniors who are eligible for Medicare have two broad options in how they get their Medicare coverage. Most seniors either purchase a privately operated Medicare Advantage plan (which the government subsidizes) or get their Medicare coverage directly from the government. The latter option is frequently referred to as Original Medicare. The evidence at trial established that seniors frequently supplement the coverage provided by Original Medicare with private insurance that limits their exposure to cost sharing for medical care and prescription drugs.[11]

In *Aetna*, the government[12] alleged a product market of Medicare Advantage plans in 362 sep-arate counties. This product market excluded all Original Medicare coverage options. Their gov-ernment economic expert, Aviv Nevo, tested this product market using several versions of the hypothetical monopolist test, all of which it passed. The government therefore concluded, in con-junction with other evidence, that Medicare Advantage plans were a relevant product in those 362 counties.[13]

---

[9] Earlier versions of the Guidelines also contained an explicit smallest market prescription, so how far down the list one must go was also specified: one stopped as soon as the group of products was large enough to pass the hypothetical monopolist test. The 2010 Guidelines state that the Agencies usually use the smallest relevant market that satisfies the hypothetical monopolist test, without specifying when they might deviate from this approach.

[10] *See* 2010 Guidelines, *supra* note 1, § 4.1.1. This language directly follows Example 6, further softening reliance on an algorithmic approach.

[11] Medicare Advantage plans have built-in limits to out-of-pocket medical costs and typically include prescription drug coverage.

[12] The plaintiffs in *Aetna*, here collectively referred to as "the government," included the United States, the States of Delaware, Florida, Georgia, Illinois, Iowa, and Ohio, the Commonwealths of Pennsylvania and Virginia, and the District of Columbia.

[13] *Aetna*, 240 F. Supp. 3d at 21 ("The government's economist, Dr. Aviv Nevo, analyzed whether the proposed market for the sale of individ-ual Medicare Advantage plans would satisfy the hypothetical monopolist test. . . . Because Medicare Advantage passed under all formula-tions of his hypothetical monopolist tests, Nevo concluded that individual Medicare Advantage plans constitute a relevant product market.").

The defendants countered that at least some Original Medicare coverage options should have been included in the candidate market. They argued that the government was improperly excluding Original Medicare coverage options. In short, the defense alleged that the government was gerrymandering the market by excluding close substitutes that the merging parties did not own while including more distant substitutes.[14]

The defendants in *Aetna* attempted to find support for their argument in the language of Example 6. They argued that some of the less popular Medicare Advantage plans that were included in the relevant product market were more distant substitutes than were the most popular Original Medicare coverage options. As such, they argued that at least some Original Medicare coverage options should also have been included in the market, making it immaterial that the government's proposed product market passed the hypothetical monopolist test.[15]

*[T]he defense alleged that the government was gerrymandering the market by excluding close substitutes that the merging parties did not own while including more distant substitutes.*

Proving this claim was difficult. Accurate data were available on the enrollment of Medicare Advantage plans at the county level but data on enrollment in Original Medicare coverage options were not, nor were switching data from Medicare Advantage plans to specific Original Medicare coverage options.[16] The defendants' economic expert, Jonathan Orszag, therefore relied upon an argument that diversion to the smallest Medicare Advantage plan in some counties was so close to zero that it must have been the case that diversion was higher to at least one Original Medicare coverage option. The defendants' argument can be summarized like this:

(1) Some Medicare Advantage plans have very low enrollment.

(2) Diversion from other Medicare Advantage plans to these plans must be low.

(3) There are Original Medicare coverage options with high enrollment.

(4) Thus, even though an enrollee in a Medicare Advantage plan is generally less likely to switch to Original Medicare than to another Medicare Advantage plan, the enrollee is still more likely to switch to the most popular Original Medicare coverage option than to switch to the least popular Medicare Advantage plan.

(5) Thus, a proposed market that includes the least popular Medicare Advantage plan but excludes the most popular Original Medicare coverage option violates Example 6.

This approach has three significant flaws. First, while logically sound, it is speculative, as the defendants did not actually identify a specific Original Medicare coverage option that proved that Example 6 had been violated.[17]

Second, it ignores the fact that a candidate market that excluded the smallest Medicare Advantage plans would likely have passed the hypothetical monopolist test in many counties. Plans with negligible market share are not generally material to market concentration or compet-

---

[14] *Id.* at 18 ("As a result of this overlap, defendants believe that 'a Medicare Advantage plan's closest cousins are often one or more Original Medicare options instead of other Medicare Advantage plans. Excluding all Original Medicare options in order to create an MA-only market would ignore the ample overlap between the two types of plans.'"); Testimony of Jonathan Orszag at 3068:9–3069:10, United States v. Aetna Inc., No. 1:16-cv-01494 (D.D.C. Dec. 19, 2016) [hereinafter Orszag Testimony].

[15] *Aetna*, 240 F. Supp. 3d at 24 ("The crux of Orszag's argument is that, in response to a price increase on a particular Medicare Advantage plan, there are likely to be Original Medicare options that enjoy greater diversion than the plan's most distant Medicare Advantage substitute. . . . Applying what he calls the 'circle principle,' which he derives from 'Example 6' of the Guidelines, Orszag argues that any such Original Medicare options must be included in the product market. By ignoring the circle principle, defendants assert, Nevo has defined an overly narrow and conceptually flawed product market.").

[16] *Id.* at 26 n.19; Orszag Testimony, supra note 14, at 3070:7–13; Testimony of Jonathan Orszag at 3256:4–25, United States v. Aetna Inc., No. 1:16-cv-01494 (D.D.C. Dec. 20, 2016).

[17] As Judge Bates put it: "The problem was this more nuanced argument, however, is that it is almost entirely speculative. Orszag has not identified an Original Medicare product of the kind that he describes above . . . ." *Aetna*, 240 F. Supp. 3d at 26.

the**antitrust**source ■ www.antitrustsource.com ■ October 2017

itive effects, and excluding them would not have affected the government's argument. But the qualitative and quantitative evidence showed that Medicare Advantage plans are a cohesive group of products, so a market definition that excluded them would have looked incomplete and less intuitive.[18]

Third, given the lack of county-level data on Original Medicare coverage option enrollment, the realistic product market options were either a Medicare Advantage market or a market that includes all Medicare Advantage plans and all Original Medicare coverage options. A market including all Original Medicare coverage options is clearly too broad given the qualitative evidence and the data on switching from Medicare Advantage to Original Medicare.[19] Such an omnibus market would serve to obscure rather than illuminate the merger's potential competitive effect: that there is valuable competition between Medicare Advantage plans offered by Aetna and Humana and that the merger would eliminate this competition.[20]

The court weighed both sets of arguments and found for the government, agreeing that Medicare Advantage plans in each of the alleged counties constituted a relevant product market. The opinion emphasizes the qualitative evidence that industry participants view Medicare Advantage plans as a natural grouping of products and the fact that such a grouping passed multiple hypothetical monopolist tests. As such, the judge appears to have used the approach suggested by the government   that it is reasonable to test a coherent group of products that shed light on competitive effects using the hypothetical monopolist test   and rejected the allegation of gerrymandering advanced by the defendants:

> [D]efendants plainly believe that the lack of a complete set of diversion ratios undermines the government's ability to carry its burden on market definition.
>
> The Court disagrees. If taken to its logical conclusion, defendants' position implies a purely econometric approach to market definition, requiring the government to calculate individual diversion ratios for all the products potentially in the market, rank them from highest to lowest, and, at some point, draw a line between those products that fall within the market and those products that fall outside. But that technical approach is not taken by the cases. Econometric evidence can be powerful evidence, but it is not the only evidence that courts consider in defining the relevant market. Indeed, the cases relied upon by both parties here have considered the *Brown Shoe* factors and ordinary course of business documents, in addition to econometric evidence, before reaching conclusions about the proper market definition.[21]

*[T]he judge appears to have used the approach suggested by the government—that it is reasonable to test a coherent group of products that shed light on competitive effects using the hypothetical monopolist test—and rejected the allegation of gerrymandering advanced by the defendants . . .*

---

[18] The opinion discusses, among other pieces of evidence, the fact that the two firms manage and price their Medicare Advantage products separately from their Medicare Supplement businesses, the dearth of company Medicare Advantage documents discussing competition from Original Medicare, the abundance of company Medicare Advantage documents discussing intense competition from other Medicare Advantage companies, and switching data that support the notion that Medicare Advantage plans attract distinct customers. *Id.* at 14–17.

[19] For example, the Kaiser Family Foundation estimated that more Medicare Advantage enrollees die in a given year than switch to Original Medicare. Testimony of Richard Frank at 113:18–114:10, United States v. Aetna Inc., No. 1:16-cv-01494 (D.D.C. Dec. 5, 2016).

[20] The defendants also did not show that alternative product markets would necessarily have led to lower levels of concentration. For example, if smaller Medicare Advantage plans were owned by third parties, a narrower market that excluded them may actually have increased concentration. Testimony of Aviv Nevo at 3568:9–3569:13, United States v. Aetna Inc., No. 1:16-cv-01494 (D.D.C. Dec. 21, 2016). Similarly, even if Original Medicare options had higher total enrollment than Medicare Advantage plans in a county, a broader market that included Original Medicare options may not have been less concentrated if Aetna and Humana had high enrollment in the Medigap and Part D plans in that county. Moreover, the government did not argue that there is no competitive interaction between Medicare Advantage plans and Original Medicare, and their market definition did not mean that they ignored the influence of Original Medicare. Their expert included competition from Original Medicare in his competitive effects analysis. *Aetna*, 240 F. Supp. 3d at 31; Testimony of Aviv Nevo at 1603:6–15, United States v. Aetna Inc., No. 1:16-cv-01494 (D.D.C. Dec. 12, 2016).

[21] *Aetna*, 240 F. Supp. 3d at 26.

the**antitrust**source ■ www.antitrustsource.com ■ October 2017    **6**

The key takeaway is that a court has endorsed a product market that reflects business realities but may run afoul of the strict hypothetical monopolist test algorithm that appears in past versions of the Guidelines. While the algorithmic approach is closely related to Example 6 in the present version of the Guidelines, a more holistic approach is consistent with specific language elsewhere in the Guidelines (see, e.g., Section 4.1.3) and, more generally, with the emphasis throughout the Guidelines on the primacy of competitive effects relative to market definition.

*The key takeaway is*

*that a court has*

*endorsed a product*

*market that reflects*

*business realities but*

*may run afoul of the*

*strict hypothetical*

*monopolist test*

*algorithm that appears*

*in past versions of*

*the Guidelines.*

## Conclusion

To block any proposed transaction that they believe to be anticompetitive, the Agencies must typically prevail at trial or be likely to do so. Trials therefore offer an opportunity to test the Guidelines as a coherent framework for merger analysis rather than just a summary of the Agencies' stated practices. This process can reveal ambiguities in the Guidelines if parties hold opposing views on what exactly the Guidelines prescribe.

In *Aetna*, Judge Bates ruled on one such ambiguity when he rejected the notion that market definition should proceed algorithmically based on total diversion alone. In doing so, he affirmed a more flexible view of market definition in which the products that make up a market are based on both qualitative and quantitative evidence. This approach is consistent with the more flexible Guidelines that were introduced in 2010, and with the move in those Guidelines away from market definition and a focus on competitive effects.●

# PX0650

Common Thread
Back

## Stories

# What's in a name? The case for inclusivity through anonymity

By
Common Thread
Tuesday, 21 September 2021



For 32-year-old Brooke, earning her doctorate degree was a moment for celebration — in real life and on her timeline, where she Tweets as @LadyBPhD (https://twitter.com/LadyBPhD). During graduation season earlier this year, she posted a photo of her newly minted diploma (2,168 Likes), a video showing off her custom-bound dissertation (66 Likes), and a selfie in her doctoral regalia, replete with its scarlet satin hood and black velvet cap (201 Likes).

But those celebratory Tweets didn't get nearly as much attention as the 17-word message she shared on July 25, 2021.

She received almost 10,000 Likes on that Tweet and the response she followed up with, where she talked about feeling like she was in a "funk" after working so hard to achieve her degree.

Being able to express vulnerability and the messiness of real life is important to Brooke, which is why she Tweets under a pseudonym. (We are withholding her full name for privacy reasons.) This is the handle where she can be herself, including talking frankly about the challenges of job searching, without worrying about turning off a potential employer.

"I feel like if an employer were to see that they'd think, 'She's outspoken. She's not going to follow the rules.' Stuff like that freaks me out," she said. "So I don't want my name out there. I want to be able to express myself and have people feel like they can express themselves."
([https://twitter.com/iamb](https://twitter.com/iamb))
For Brooke, her anonymity allows her to delve into topics she wouldn't feel comfortable talking about otherwise. Judging from the hundreds of responses she got from people who showed their support and shared their own struggles — and a few messages that could only be characterized as lecturing — her honest tone clearly struck a nerve.

"Identity on the internet is extremely complex and nuanced," said B Astrella, director of product management at Twitter whose work focuses on helping regular folks — as opposed to brands or professional influencers — participate in the public conversation. "You can represent yourself however you want, and that's been a powerful building block of what Twitter is."

**Anonymous, but still real.**

There's a common misconception that trust begins with knowing who a person really is, starting with knowing their real name. But trust isn't that simple. It's not as easy as knowing this one fact about someone — a name — that will lead you to trust them.

A recent study conducted by Twitter among its customers in the US found that people assess trust based on multiple signals, beginning with knowing the account is a genuine person and not a bot, for instance. It's also derived from the content someone posts and how they connect with others. Sharing a personal connection with a fellow person on Twitter, even if that person is posting anonymously, can still stoke empathy.

Put simply, trust is based on what you do, not who you are. And anonymity provides space for more people to express themselves freely and safely, in ways that actually engender that sort of trust-building connection.

But it's a double-edged sword.

"In the best case, anonymity helps people express themselves more fully. It gives them the room to express themselves particularly in places where they feel unsafe," Astrella said, citing stories of women living in parts of the world where expressing themselves could put them at risk. "At the same time, there's the experience that a lot of folks have had on Twitter, which is anonymous accounts harassing them or being toxic in replies."

This experience with anonymous trolls has led many to believe that requiring people to use their "real" names would reduce toxicity and encourage accountability among people on Twitter. The thinking goes, if we're required to tell the world who we really are, we won't misbehave.

But Astrella said academic studies (https://jilliancyork.com/2021/01/14/everything-old-is-new-part-2-why-online-anonymity-matters/) and research from Twitter shows that anonymity alone does not lead to harassment. In many cases people post harassing, toxic replies under their real name, with a photo of their real face, as those who do so anonymously, he said.

"We want to get rid of harassment — it's still against Twitter's rules," he said. "Toxicity is damaging to the platform and to our customers, but the pseudonymous nature isn't what creates it or encourages it."

Twitter works to prevent spam and fake accounts from harassing customers both at the sign-up stage so they won't be able to join, and by kicking off accounts that have been proven to cause trouble.

People can also use tools such as muting or blocking to feel more in control of their experience, said Anita Butler, Twitter's design director who oversees health, privacy, and identity. And they should not be used sparingly.

"If somebody's being mean to you, block them," said Butler. "A lot of users think using our safety tools is for the extreme. No, we want you to create the environment that makes you feel safe. So if that means you have to block 50 people, block them."

**Requiring real IDs could make Twitter less safe — not more**

PX0650-003

In the UK, a petition requiring social media companies to verify user identification made its way to Parliament earlier this year. Started in 2020 by an English media personality whose son had been the target of online bullying, the petition gained a swell of support in July following England's loss in the UEFA European Championship. The loss resulted in racist abuse being hurled at several players' social media accounts.

After receiving nearly 700,000 signatures, the UK government responded to the petition (https://petition.parliament.uk/petitions/575833) saying that requiring ID verification would restrict freedom of expression. More importantly, it would disproportionately affect vulnerable groups, such as people from marginalized communities, women, transgender individuals, activists — the list goes on.

"Introducing mandatory real-name verification would drive these groups away from Twitter," said Astrella.

Not to mention, IDs themselves are an issue. According to the World Bank (https://id4d.worldbank.org/global-dataset), an estimated 1B people worldwide do not have an official form of identification. It is the marginalized, vulnerable, and impoverished who lack IDs, including 11% of US adults (https://www.learningforjustice.org/sites/default/files/general/Percentage%20of%20People%20Who%20Lack%20ID_0.pdf).

"Those are the voices we should be amplifying in society, not suppressing," said Astrella.

**Being tall on Twitter**

Anonymity, besides providing safety, gives people the ability to be flexible about how they present themselves.

"There's all these interesting ways in which our online identities reflect who we are in the offline world. And all these interesting ways in which they diverge, where we can't be embodied in the same way. You are not tall or short on Twitter." said Astrella. "At the same time, offline you can never be in a room talking to a hundred thousand people."

As a woman in science, Brooke's anonymity gives her the freedom to be part of multiple communities — including her Dungeons & Dragons cohort — and still be honest about the struggles of academic life.

"I feel that if you're able to be vulnerable about things, you'll be able to grow more as a person," she said. "For me, it's important to have those kinds of conversations because I know there's other people out there who want to share that information, but sometimes they're scared or they don't want to start the conversation because they're afraid of backlash."

These concerns are well-precedented. Brooke has seen it firsthand from being the target of aggressive behavior online by men she doesn't know to being mansplained to on the topic she literally holds the highest degree in.

But she's also managed to cultivate a sense of trust and kinship on social media. She's made friends all over the world, from South Africa to Norway, where she's developed a community of fellow scientists.

"It's nice when you're having a bad day or you just feel really alone in your work to go on Twitter and just talk to people," she said.

PX0650-005

# PX0653

 Help Center          General    Business

# All about Pinterest

What is Pinterest?    Browse your home feed    Discover ideas    Save, share and shop    ›

## What is Pinterest?

Pinterest is a visual discovery engine for finding ideas like recipes, home and style inspiration, and more.

With billions of Pins on Pinterest, you'll always find ideas to spark inspiration. When you discover Pins you love, save them to boards to keep your ideas organized and easy to find. You can also create Pins to share your ideas with other people on Pinterest.

You have to meet minimum age requirements to sign up, and we have certain protections in place for teens. Learn more about teen safety on Pinterest.

## Browse your home feed

Your home feed is where you'll find Pins, people and businesses we think you'll love, based on your recent activity. We'll also show you Pins from the people and boards you choose to follow.

You can also search for Pins by typing in keywords into the search bar. Try typing "birthday party" in the search bar to see ideas for birthday party decor, party food recipes, and birthday gift ideas.

### Other articles

**Intro to Pinterest**    —

All about Pinterest

Get a Pinterest account

Types of Pins on Pinterest

Discover ideas    +

Interact with a Pin    +

Set up your profile    +

Pinterest and your device    +

Features and tools    +

PX0653-001

# Discover ideas

[Use the search bar](#) to discover ideas, people and trends. Explore suggested topics or search for topics of your own. Tap **Profiles** on the search page to discover creators, people and brands based on your search. Use your camera to find ideas relevant to your photos and narrow beauty results by skin tone range or hair pattern.

## Save, share and shop Pins

Pins are bookmarks that people use to save content they love on Pinterest. Pins can be images, videos or products.



If you click through the Pin, you can visit the website to learn how to make it or where to buy it. As you discover Pins you love, click the red **Save** button to save them to your boards. Tried the perfect birthday cake recipe? [Add a comment](#) to tell people how it went or add helpful tips.

PX0653-002

Sometimes you'll find a Pin that you know a friend will love. Click ⬆ to send Pins directly to a friend or a group in a message to pass the inspiration around. You can also use messages to chat with your friends. You can see your messages by clicking 💬 on your computer or by tapping 💬 followed by **Messages** on your mobile device.

You can also search Pinterest for products to buy. Find a product Pin and click it to visit the retailer's website.

## Create Pins

Upload an image from your computer or mobile device to create a Pin on Pinterest.

You can also create and save Pins from images you find online by installing a Pinterest Save Extension on your browser. Add a title and a description to each Pin you create and a website link if you have one.

You can edit a Pin's information at any time and move it to any board.

## Create boards

The Pins you save live on your boards. Name your boards and arrange them on your profile however you want. Invite other people on Pinterest to collaborate on Group boards to find even more ideas.

To organize your Pins within boards, create board sections. Add a "Decorations" or "Party games" section to your Birthday party board to keep similar ideas in the same place. Organize your Pins in whatever way makes sense to you.

If you prefer to keep your Pins private or you're throwing a surprise birthday party, you can make your board secret. Only you and anyone you invite can see your secret boards.

# View your profile

Find all the Pins you save, boards you create, and Pins you try in your profile. You can also see who's following you and the boards and people you follow. Only you can see your secret boards when you view your own profile.

Still need help?    Contact us

## Was this article helpful?

    

**Pinterest**

### Languages

English (US)

**About us**

What's Pinterest

Our Pinterest page

Engineering blog

Brand guidelines

Careers

Help Center

Pinterest Labs

**Our policies**

Copyright

Personalized ads

Terms of service

Privacy

**More info**

For businesses

For developers

For press

For investors

© Pinterest 2024

PX0653-004

PX0653-005

# PX0654

5/17/24, 4:57 PM                    Instagram is offering huge bonuses for posting on Reels, its TikTok clone | TechCrunch



Media & Entertainment

# Instagram is offering huge bonuses for posting on Reels, its TikTok clone

**Amanda Silberling**
11:57 AM PST • November 11, 2021

 Comment



📷 **Image Credits:** Instagram

Instagram really wants you to post Reels — they'll even pay you up to $10,000 for one, if you're lucky.

As TikTok surpasses the 1 billion monthly active users mark, competitor platforms like YouTube Shorts, Snapchat Spotlight and Instagram Reels are incentivizing users to post their short-form content on their apps instead. YouTube established a $100 million creator fund for Shorts, Snapchat is offering cash prizes for submissions to Spotlight challenges and, now, Instagram is upping the ante on its monthly Reels Play bonus program.

PX0654-001

5/17/24, 4:57 PM                                    Instagram is offering huge bonuses for posting on Reels, its TikTok clone | TechCrunch

But creators are confused about what factors determine how big a bonus they're eligible for from Instagram, and the platform isn't helping clear up their concerns. Instagram told TechCrunch that the program is experimental and still in its early stages. But the lack of transparency can be troubling for creators who use these platforms to make a living. The bonus program even experienced a glitch this week, causing eligible creators to be told that they were actually ineligible for the payout. Instagram told TechCrunch that this glitch has been fixed.

Maddy Corbin, who has ~52,000 followers on Instagram, was offered up to $1,000 for her reels in a month. She noticed, though, that other creators were being offered different deals.

"I saw some people that had more followers than me and they could only make $600," Corbin told TechCrunch. Some others with fewer followers were offered $800. "I wish I knew more on how that was generated. All I can think of is maybe it's based off of past reels' performance."

A creator with about 24,000 Instagram followers — less than half as many as Corbin — told TechCrunch that last month, they were offered a bonus of up to $800 if they got 1.7 million views on all reels posted that month. The bonus isn't all-or-nothing — the creator intentionally posted one reel per day during the bonus period and managed to get 1.49 million plays on their reels, earning a $689.90 payout. Still, they were disappointed when all Meta-owned apps like Instagram went offline for six hours due to server issues last month, which slowed the spread of their Reels.

But this month, Instagram kicked the bonus up a notch: Now this creator can get up to $8,500 for 9.28 million views. Proportionally, this is a higher payout-per-view than last month's rate, and of course, there's the potential to make over 10 times more money. The creator said that this is a higher payout-per-view than they get on TikTok, where they have 32,000 followers.



It's difficult to determine how Instagram's bonus offer is calculated — one Reddit user was offered up to $35,000 for over 58 million views in a month. Miguel Lozada, a Twitch streamer with around 800 Instagram followers, got the same $8,500 offer as a creator with 24,000 followers. Another user with 59,000 followers told TechCrunch that they were offered an $850 bonus this month.

"We're continuing to test payments as we roll out to more creators, and expect them to fluctuate while we're still getting started," Instagram told TechCrunch. "We've designed bonuses so that we can help as many creators as we can in a way that is achievable and drives meaningful earnings. Our goal is for bonuses to become more personalized over time."

PX0654-002



**Miguel Lozada** ✔
@MLozada · **Follow**

Instagram is paying up to $8.5K for reels posts for the next month?! But look at the requirement views needed to make the full bag 😅

1:44 PM · Oct 29, 2021                                    ⓘ

❤ 205      💬 **Reply**    ⬆ **Share**

**Read 51 replies**

Some creators reported that they felt like their reels weren't getting as much attention once they joined the bonus program.

"The first three days [I had access to bonuses], I was probably making about $40 a day, and it literally crashed after about week one, and it went down to like cents and dollars per day," Corbin said. "So it's been interesting because I really haven't changed that much the way that I'm putting my content out."

According to Instagram's support page, these bonuses are "rolling out slowly" and are not available to all users yet. To start, these bonuses are only available in the U.S.

Instagram told TechCrunch that to be eligible for these promotions, users need to be at least 18 years old and meet the platform's partner monetization policies, which are a bit vague. Per the policy, creators must maintain a "sufficient follower base," but Instagram doesn't quantify what counts as "sufficient" — TechCrunch spoke to creators who were offered the bonus whose follower counts ranged between 800 and 59,000.

Instagram also announced the Reels Surprise bonus program this week, which will reward up to 150 U.S.-based creators per week with up to $10,000 for a particularly inspiring, entertaining reel. To be eligible, U.S.-based creators must be at least 18 years old, meet Instagram's community guidelines and partner monetization policies, have an existing reel with at least 1,000 views, and have not yet received a bonus.

To discourage users from recycling content from TikTok, the Instagram algorithm deflates content that has watermarks from other social media platforms. But YouTube Shorts has gotten even more aggressive with its tactics to sway popular creators to its platform. Business Insider reported this week that some popular TikTokers got offered $50,000 to post 100 YouTube Shorts over six months. This program was not public and is separate from YouTube's $100 million Shorts fund. According to the talent managers who spoke to Business Insider, creators had to wait seven days after posting a short on YouTube before they could repost it to another platform.

PX0654-003

TikTok only continues to grow, but the platform is up against long-standing giants like Google-owned YouTube and Meta-owned Instagram — and for those companies, throwing $10,000 at an individual user's short video isn't a huge business expense.

*Additional reporting by* Sarah Perez



## More TechCrunch



YouTube TV's 'multiview' feature is now available on Android phones and tablets



Meta's latest experiment copies BeReal and Snapchat's core ideas



Reddit reintroduces its awards system



Slack under attack over sneaky AI training policy

**Get the industry's biggest tech news**

Explore all newsletters ↗

PX0654-004

5/17/24, 4:57 PM                          Instagram is offering huge bonuses for posting on Reels, its TikTok clone | TechCrunch



**TechCrunch Daily News**                    ⊕         **Startups Weekly**                         ⊕
Every weekday and Sunday, you can get the best of      Startups are the core of TechCrunch, so get our best coverage
TechCrunch's coverage.                                 delivered weekly.

**TechCrunch Fintech**                       ⊕         **TechCrunch Mobility**                     ⊕
The latest Fintech news and analysis, delivered every Sunday.  TechCrunch Mobility is your destination for transportation news
                                                       and insight.

**Email address (required)**

| Email address | Subscribe |
|---|---|

*By submitting your email, you agree to our* Terms *and* Privacy Notice.

# Tags

social media, YouTube, Instagram, Software, technology, TikTok, computing, mobile software, mobile applications, video hosting, Snapchat

Apps

## Meta's latest experiment copies BeReal and Snapchat's core ideas

**Aisha Malik**
21 mins ago



Startups

## Startups Weekly: It's the dawning of the age of AI — plus, Musk is raging against the machine

**Haje Jan Kamps**
2 hours ago

Biotech & Health

## IndieBio's SF incubator lineup is making some wild biotech promises

**Devin Coldewey**
3 hours ago

PX0654-005

Apps

# YouTube TV's 'multiview' feature is now available on Android phones and tablets

**Aisha Malik**
4 hours ago

Featured Article

# Two Santa Cruz students uncover security bug that could let millions do their laundry for free

**Zack Whittaker**
5 hours ago

AI

# OpenAI created a team to control 'superintelligent' AI — then let it wither, source says

**Kyle Wiggers**
5 hours ago

Startups

# Harness the TechCrunch Effect: Host a Side Event at Disrupt 2024

**TechCrunch Events**
5 hours ago

PX0654-006

Fundraising

## Pitch Deck Teardown: Goodcarbon's $5.5M seed deck

**Haje Jan Kamps**
5 hours ago

AI

## Slack under attack over sneaky AI training policy

**Ivan Mehta, Ingrid Lunden**
5 hours ago

Security

## Healthcare company WebTPA discloses breach affecting 2.5 million people

**Lorenzo Franceschi-Bicchierai**
6 hours ago

Featured Article

## Microsoft dodges UK antitrust scrutiny over its Mistral AI stake

**Paul Sawers**
7 hours ago

PX0654-007

5/17/24, 4:57 PM                                 Instagram is offering huge bonuses for posting on Reels, its TikTok clone | TechCrunch

Fintech

## Embedded finance is still trendy as accounting automation startup Ember partners with HSBC UK

**Romain Dillet**
7 hours ago

Fintech

## Kudos lands $10M for an AI smart wallet that picks the best credit card for purchases

**Christine Hall**
9 hours ago

Government & Policy

## EU warns Microsoft it could be fined billions over missing GenAI risk info

**Natasha Lomas**
9 hours ago

Startups

## A US Trustee wants troubled fintech Synapse to be liquidated via Chapter 7 bankruptcy, cites 'gross mismanagement'

**Mary Ann Azevedo**
22 hours ago

Space

## Seraphim's latest space accelerator welcomes nine companies

**Aria Alamalhodaei**
22 hours ago

AI

## OpenAI inks deal to train AI on Reddit data

**Kyle Wiggers**
23 hours ago

PX0654-008

Social

# X pushes more users to Communities

**Sarah Perez**
1 day ago

Social

# Mark Zuckerberg's makeover: Midlife crisis or carefully crafted rebrand?

**Amanda Silberling**
1 day ago

AI

# Strava taps AI to weed out leaderboard cheats, unveils 'family' plan, dark mode and more

**Paul Sawers**
1 day ago

Robotics

# Astronauts fall over. Robotic limbs can help them back up.

**Brian Heater**
1 day ago

Enterprise

# Microsoft's custom Cobalt chips will come to Azure next week

**Frederic Lardinois**
1 day ago

Transportation

# Tesla keeps cutting jobs and the feds probe Waymo

**Kirsten Korosec**
1 day ago

PX0654-009

AI

## Sony Music warns tech companies over 'unauthorized' use of its content to train AI

**Aisha Malik**
1 day ago

AI

## GrubMarket buys Butter to give its food distribution tech an AI boost

**Rita Liao**
1 day ago

Fintech

## Bolt founder Ryan Breslow wants to settle an investor lawsuit by returning $37 million worth of shares

**Christine Hall**
1 day ago

Enterprise

## With the end of Workplace, it's fair to wonder if Meta was ever serious about the enterprise

**Ron Miller**
1 day ago

Social

## Meta Threads is testing pinned columns on the web, similar to the old TweetDeck

**Ivan Mehta**
1 day ago

Apps

## Google expands hands-free and eyes-free interfaces on Android

**Devin Coldewey**
1 day ago

PX0654-010

Security

# Hacker claims theft of India's Samco account data

**Jagmeet Singh**
1 day ago

| Startup Battlefield | Launch Your Startup At Disrupt |
|---|---|
| APPLY TODAY | |

**About**

TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

**Legal**

Terms of Service

Privacy Policy

RSS Terms of Use

Privacy Dashboard

Code of Conduct

About Our Ads

**Trending Tech Topics**

Google I/O 2024

GPT-4o

Facebook Workplace

GlueAI

AWS CEO

Tech Layoffs

ChatGPT



Facebook    X    YouTube    Instagram    LinkedIn    Mastodon

© 2024 Yahoo. All rights reserved. Powered by WordPress VIP

PX0654-011

# PX0655

**TECH**

# Meta lost $13.7 billion on Reality Labs in 2022 as Zuckerberg's metaverse bet gets pricier

PUBLISHED WED, FEB 1 2023•4:15 PM EST    UPDATED WED, FEB 1 2023•4:47 PM EST

**Jonathan Vanian**
@IN/JONATHAN-VANIAN-B704432/



**Ari Levy**
@LEVYNEWS



## KEY POINTS

- Meta's Reality Labs unit recorded a $4.28 billion operating loss in the fourth quarter, bringing its total for 2022 to $13.72 billion.

- The business houses Meta's ambitious metaverse technologies, which CEO Mark Zuckerberg has said will be the company's future.

- Facebook changed its name to Meta in late 2021, but the company still relies on advertising for substantially all of its revenue.

Follow your favorite stocks  **CREATE FREE ACCOUNT**

**In this article**

META  -0.57 (-0.12%)  🌙  ⊞



   

PX0655-001

5/17/24, 6:24 PM                    Meta lost $13.7 billion on Reality Labs in 2022 after metaverse pivot



**Mark Zuckerberg, CEO of Meta Platforms, demonstrates the Meta Quest Pro during the virtual Meta Connect event in New York on Oct. 11, 2022.**

*Michael Nagle | Bloomberg | Getty Images*

Mark Zuckerberg's dream of a future in the metaverse is costing investors a boatload of money.

In its earnings report after the bell on Wednesday, Meta ⊞ said its Reality Labs division, home to the company's virtual reality technologies and projects, posted a $4.28 billion operating loss in the fourth quarter, bringing its total for 2022 to $13.72 billion.

It was a tough first full year for the new Meta, the company formerly known as Facebook. In late 2021, Zuckerberg changed the company's name and said its future would be in the metaverse, a digital universe where people will work, shop, play and learn.

But for now, it's just a cost center, and Meta is still an online ad company.

Reality Labs generated $727 million in the fourth quarter, and $2.16 billion in revenue for all of 2022 — a decline from $2.27 billion in 2021 — including sales of Quest



PX0655-002

headsets. In other words, the division lost more than six times the amount of money it generated in revenue last year, while accounting for less than 2% of total sales at Meta.

Analysts were expecting Reality Labs to record an quarterly operating loss of $4.36 billion on revenue of $715.1 million, according to StreetAccount.

Sales of VR headsets in the U.S. declined 2% in 2022 from the prior year as of early December, according to data shared with CNBC by research firm NPD Group.

In July, Meta announced it was raising the price of its Quest 2 VR headset by $100. The company said at the time that the price hike was necessary to account for inflationary pressures. Meta then debuted its more expensive Quest Pro VR headset in October, pitching it to companies as an enterprise-workplace device for $1,500. This week, Meta is running a sale on its high-end VR headset, shaving off $400 for a limited time.



Metaverse investments — Jim Cramer's interview with Meta CEO Mark Zuckerberg

Zuckerberg told CNBC's Jim Cramer last summer that he hopes to "get to around a billion people in the metaverse doing hundreds of dollars of commerce" by the second half of the decade.



PX0655-003

But before the Facebook founder's dreams become a reality, Meta has to spend many billions of dollars developing the VR and augmented-reality technologies that underpin the metaverse concept.

The company said last year that it expects "Reality Labs operating losses in 2023 will grow significantly year-over-year."

"Beyond 2023, we expect to pace Reality Labs investments such that we can achieve our goal of growing overall company operating income in the long run," Meta said at the time.

Shareholders have been less than thrilled with the results so far. Meta lost almost two-thirds of its value last year as metaverse costs soared and the company's core online ad business suffered from a struggling economy, increased competition from TikTok and Apple's ⊞ privacy update, limiting ad targeting.

The company on Wednesday reported fourth-quarter results that beat analysts' revenue estimates and announced a $40 billion buyback, sending the stock up more than 17% in extended trading.

**WATCH:** Snap lower guidance symbolic of overall economic caution and headwinds



PX0655-004

5/17/24, 6:24 PM                          Meta lost $13.7 billion on Reality Labs in 2022 after metaverse pivot





In this article

META -0.57 (-0.12%)



Subscribe to CNBC PRO                       Subscribe to Investing Club

Licensing & Reprints                        CNBC Councils

Select Personal Finance                     CNBC on Peacock

Join the CNBC Panel                         Supply Chain Values

Select Shopping                             Closed Captioning

Digital Products                            News Releases

Internships                                 Corrections

About CNBC                                  Ad Choices

Site Map                                    Podcasts

Careers                                     Help

PX0655-005

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## Advertise With Us

PLEASE CONTACT US

## CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

**Privacy Policy**

**Your Privacy Choices**

**CA Notice**

**Terms of Service**

© 2024 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

**Market Data Terms of Use and Disclaimers**

Data also provided by REFINITIV



PX0655-006

# PX0657

Home     Download     FAQ     Blog     Contact

## WhatsApp Blog

### one billion messages

**ARCHIVES**

Coinciding with our planet crossing the 7 billion population mark this week, last week WhatsApp crossed its own milestone for the first time by sending just over 1 billion messages in a single day.  Similar to the awe we feel that our planet will now hold over 7 billion people, all of us at WhatsApp are extremely humbled and excited about the future.

Just how much is 1 billion messages? That is 41,666,667 messages an hour, 694,444 messages a minute, and 11,574 messages a second.

1 billion messages a day is a significant milestone and also a small step closer towards our goal: providing a great mobile messaging system for a global market, regardless of your handset.

The loyalty and passion consumers have for our product leaves us feeling great gratitude, we really couldn't do it without you.

October 31, 2011 by admin

OCTOBER 2011
SEPTEMBER 2011
JULY 2011
FEBRUARY 2011
NOVEMBER 2010
SEPTEMBER 2010
APRIL 2010
JANUARY 2010
DECEMBER 2009
NOVEMBER 2009
SEPTEMBER 2009
AUGUST 2009

**WHATSAPP FOR YOUR PHONE**

**SHARE WHATSAPP WITH FRIENDS**

**About WhatsApp**

WhatsApp Messenger is a cross-platform mobile messaging app which allows you to exchange messages without having to pay for SMS. WhatsApp Messenger is available for iPhone, BlackBerry, Android, Windows Phone and Nokia.

**WhatsApp**

About
Jobs
Media
Privacy & Terms

**Get in touch**

Contact us
Facebook
Twitter

**Download**

for iPhone
for Android
for BlackBerry
for Nokia S60
for Nokia S40
for Windows Phone

© 2011 WhatsApp Inc. All rights reserved

PX0657-001

# PX0658

# Understanding WhatsApp's Architecture & System Design

Have you ever wondered how WhatsApp works? We've studied the high-level system design and architecture of WhatsApp's technology. Dive in to see what we learned.

Cosette Cressler • Oct 11, 2021



How WhatsApp Stores Chat L...                                    ⌄

Which app has over 2.5 billion active users, over 5 billion downloads, and is the most popular app in over 100 countries?

cometchat                              Log in      Schedule a demo      ☰

PX0658-001

Yes, that's right. WhatsApp is the most popular messaging service in the world. According to Mark Zuckerberg, over 100 billion messages are sent over WhatsApp every day.

With such almost-astronomical traffic, one can't help but wonder how WhatsApp works - its system design, server architecture, technology . How does it handle so many concurrent users and messages? What kind of frameworks and programming languages enable that kind of scale? How do they keep all that data secure? So many questions!

In this article, we are going to take a deep dive into WhatsApp's architecture and system design. We'll answer all the above-mentioned questions and more. If you've ever wondered about the top dog in the chat app world, keep reading.

WhatsApp Front-End Tech Stack

Let's start with the frontend and work our way to the hardware on the backend.

The first part of the WhatsApp system design that a user interacts with is the mobile or web app. WhatsApp supports nearly all platforms. It has an iOS app, Android app, desktop app, web app, and Windows Phone app. Up until 2017, you could even use WhatsApp on a BlackBerry.

With so many supported platforms, you may have guessed that WhatsApp would be a hybrid app. But, in fact, it's not. They actually built a native app for each platform. Here's a list of all the supported platforms with the front-end language(s) that were used to build each one:

‣ **Android:** Java

‣ **iOS:** Swift

‣ **Windows Phone:** C#

‣ **Web app:** JavaScript/HTML/CSS/

‣ **Mac Desktop app:** Swift/Objective-C

‣ **PC Desktop app:** C/C#/Java

cometchat                                        Log in          Schedule a demo          ☰

PX0658-002

In addition to the programming language itself, another important technology that WhatsApp uses on the frontend is an SQLite database. SQLite is a stand-alone, self-contained, relational database that is meant to be embedded into applications—which means it lives on your device. WhatsApp uses it to store conversations. Since it would be a waste of resources to download all the messages from the cloud every time you open the app, WhatsApp chooses to store the messages locally. In fact, WhatsApp only stores messages until they are received at which point they get removed.

Which Messaging Protocols Does WhatsApp Use?

WhatsApp uses a highly modified version of XMPP on an Ejabberd server (more on that later) to communicate with the clients.

The XMPP on the client opens an SSL socket to the WhatsApp servers. All the sent messages are queued on the servers until the client opens or reconnects to this socket to retrieve the messages. Once a message is successfully retrieved by the client, a success status is sent back to the WhatsApp server. The server then forwards this status to the original sender; letting them know that the message was received by adding the "checkmark" icon next to the successfully sent message.

Keep in mind that, while XMPP is one of the most popular messaging protocols for chat apps, it is definitely not the only option for choosing a messaging protocol.

**WhatsApp Encryption Technology**

WhatsApp uses end-to-end encryption. Ideally, this means that only the original sender and the true recipient of the message can read the message in plain text.

When you send a message, it gets encrypted using a specific encryption protocol (more on that next). WhatsApp then stores this encrypted message on their servers until it's delivered to the recipient. Upon delivery, the recipient's device decrypts the message back into a readable, plaintext message using a unique cryptographic key. Across this entire process, WhatsApp never knows the content of your message.

WhatsApp's encryption technology is called Signal Encryption Protocol, which was developed by Open System Whispers to be a modern, open-source, strong encryption protocol for asynchronous messaging systems.

cometchat                                        Log in      Schedule a demo

PX0658-003

WhatsApp Back-End Tech Stack

Let's move on to the backend.

To the best of our knowledge, the current WhatsApp back-end system design looks like this:

‣ **Erlang** is the main programming language

‣ **FreeBSD** is the operating system

‣ **Ejabberd** is the XMPP application server

‣ **BEAM** is the Erlang-based virtual machine

‣ **Mnesia** is their Erlang-based database

‣ **YAWS is their multimedia web server**

Let's explore some of the more interesting aspects of WhatsApp's back-end architecture:

## Erlang

WhatsApp's choice of programming language is in large part what allows it to work on such a colossal scale.

Erlang is a functional programming language that is oriented towards building concurrent, scalable, and reliable systems. It uses a process-based model called the "actor model" in which small, isolated processes communicate with each other through messages. These processes can create new processes, send messages and modify their state in response to receiving messages.

Its process-based property gives Erlang its extremely high concurrency, scalability, and reliability.

These processes can also communicate with processes outside of the core on which it runs. This makes it easy to scale the system horizontally (by adding more machines) or vertically (by adding more cores). Lastly, since the processes can communicate with each other and, more importantly, restart each other, it's easy to build self-healing systems. If a bug crashes a process, another process can restart it.

cometchat                                      Log in        Schedule a demo

PX0658-004

An interesting technical choice by WhatsApp's founders was picking FreeBSD as an operating system instead of a more widely used system (like Linux).

Brian Acton, one of the cofounders of WhatsApp, said this in an interview with Wired about the decision:

"Linux is a beast of complexity. FreeBSD has the advantage of being a single distribution with an extraordinarily good ports collection."

Also, when it comes to raw performance, especially in regards to system load per packet, no other operating system can beat FreeBSD.

However, when it comes down to it, the real reason that they decided to use FreeBSD is probably because both co-founders had a long history of working with it at Yahoo!.

## Ejabberd

Ejabberd is an open-source XMPP server that is written in Erlang. WhatsApp uses a modified version of XMPP as its protocol for handling message delivery. Even the Ejabberd server that WhatsApp uses is heavily customized to optimize for server performance.

What's the purpose of Ejabberd?

Well, it handles the message routing, deliverability, and general instant messaging aspects of the app. Features of Ejabberd include:

‣ One-on-one messaging

‣ Group chat

‣ Storing and forwarding offline messages

‣ Contact list and presence

## Mnesia

To store data and temporary messages, WhatsApp uses an Erlang-based, distributed DBMS (Database Management System) called Mnesia. This DBMS provides benefits that many traditional databases don't such as:

cometchat                                   Log in      Schedule a demo      ≡

PX0658-005

‣ High fault tolerance

‣ Dynamic reconfiguration

‣ Complex objects

Mnesia is also the only DBMS that's written in Erlang. This in itself is a benefit because there are no data structure differences between Erlang in the application and Erlang in the DBMS. Coding is, therefore, quicker and more explicit.

## BEAM

BEAM, short for "Bogdan's Erlang Abstract Machine", is a virtual machine that compiles and executes Erlang source code. The BEAM is designed specifically for highly concurrent applications - perfect for WhatsApp's use case. BEAM's secret sauce is light-weight processes that don't share memory and are managed by schedulers. These schedulers can manage millions of processes across multiple cores. This makes BEAM highly scalable and resistant to failures, such as those caused by high traffic loads, system updates, and network outages.

BEAM is so crucial to the WhatsApp system design that the WhatsApp team has published many patches and fixes to the core source code.

## YAWS

YAWS (Yet Another Web Server) is an Erlang-based web server that's ideal for dynamic content. WhatsApp uses YAWS for storing multimedia data. YAWS itself uses HTML5 WebSockets that simplify two-way communication by establishing a reliable and fast connection between the server and the app. Through the use of this technology, WhatsApp is able to send and receive multimedia data across billions of devices—in near real time.

# WhatsApp Hardware Components

In 2017, four years after being acquired by Facebook, WhatsApp was taken off of IBM SoftLayer's cloud and brought into Facebook's proprietary data centers.

What we do know is that in 2014 WhatsApp required around 550 servers and over 11,000 cores that ran Erlang. We also know that WhatsApp's user base was "only" around half a billion in 2014 compared to the more than 2 billion users it reached in 2020. So, with that data in mind, we'll let you imagine how many servers and cores WhatsApp now requires. We imagine it's a lot.

WhatsApp Architecture Diagram

cometchat                                          Log in        Schedule a demo

PX0658-006



The easiest way to get a full understanding of WhatsApp's architecture design is, of course, through a WhatsApp architecture diagram.

Starting from the left side we have multiple different clients (mobile and web apps), each of which hosts a local SQLite database for storing conversations.

The clients use HTTP WebSockets to send and retrieve multimedia data like images and videos from the YAWS web server. But, as you can see, XMPP is used to actually send those files and other messages to other users.

When an XMPP message is sent, it goes through the series of steps depicted above. First, it gets sent to WhatsApp's custom Ejjaberd server which runs on BEAM and FreeBSD. The Ejabberd server saves the message in a Mnesia database table where it gets put into a queue. When the receiving user opens the app, thereby reconnecting to the socket, the message in the queue gets routed through the Ejabberd server and delivered to the recipient. Once successful delivery can be confirmed, the message gets deleted from the Mnesia database.

## Conclusion

While we don't know the exact specifications of WhatsApp's technical architecture and system design, we can get a good idea based on the technologies that WhatsApp employs. We hope this article, exploring the WhatsApp architecture design, has answered your burning questions. Now that

cometchat                                Log in        Schedule a demo        ≡

PX0658-007

architecture diagram...maybe you're feeling empowered to take on a chat app project of your own.

If you're ready to give WhatsApp a run for their money, sign up to our developer dashboard and start building your chat app for free.

But keep in mind that many of the technologies in the WhatsApp technology stack were specifically chosen for their ability to scale and handle extremely high concurrency.

If you're trying to build a dating app or telemedicine, (or anything that doesn't need almost the entire world to be online at the same time), you may not need the amount of scale that WhatsApp does.

In other words, the WhatsApp tech stack, while perfect for WhatsApp, may not be the best solution for you. To learn about the ideal architecture and tech stack for a chat app, head to this article.

If you still have questions about what IS right for you, feel free to talk to our experts and before you start building your own chat app.

Just hungry for more? Here are some more great resources to dive into:

‣ The Myth of End-to-End Encryption in Messaging Apps

‣ Understanding the Architecture & System Design of a Chat Application

‣ 11 Silly Mistake Developers Make When Building a Chat Application

## About the Author

Cosette Cressler is a passionate content marketer specializing in SaaS, technology, careers, productivity, entrepreneurship and self-development. She helps grow businesses of all sizes by creating consistent, digestible content that captures attention and drives action.

cometchat                              Log in      Schedule a demo

PX0658-008



**Cosette Cressler**
CometChat

Cosette Cressler is a passionate content marketer specializing in SaaS, technology, careers, productivity, entrepreneurship and self-development. She helps grow businesses of all sizes by creating consistent, digestible content that captures attention and drives action.

# Try out CometChat in action

Experience CometChat's messaging with this interactive demo built with CometChat's UI kits and SDKs.

Try the interactive demo

cometchat

## Platform

Features

Chat & Messaging

Voice & Video Calls

Implementation

UI Kits

cometchat

## Solutions

By use cases

On-demand

Online Marketplaces

SaaS Businesses

Healthcare

Log in        Schedule a demo

PX0658-009

Widgets

Online education

Chat UI Kits

Events & streaming

React chat UI kit

Community & Social

Flutter Chat UI Kit

Dating

Android Chat UI Kit

React native chat UI kit

## Developers

## Resources

Supported Technologies

Blog

React Chat SDK

Tutorials

React Native Chat SDK

Help Center

Android Chat SDK

Open-source Apps

iOS Swift Chat SDK

Product Status

Flutter Chat SDK

Angular Chat SDK

Calling and conferencing SDKS

Kotlin Chat SDK

React Native Video Call SDK

Vue Chat SDK

Android Video Call SDK

Ionic Chat SDK

Flutter Video Call SDK

PHP Chat Widget

iOS Swift Video Call SDK

Wordpress Chat Widget

React Video Call SDK

Laravel Chat Widget

## Company

Careers

cometchat                                        Log in       Schedule a demo

PX0658-010

Pricing

Chat with us

Comparison guides

Best chat SDKs

Best video calling SDKs

Best sendbird alternative

Best streamchat alternative

Best pubnub alternative

2024 © CometChat    Terms of service    Privacy Policy        Facebook        LinkedIn

Data Processing Addendum    Sub-processors List        Youtube        Twitter

Github

PX0658-011

# PX0659

**High Scalability**    🔍  ☰



EXAMPLE

# How WhatsApp Grew to Nearly 500 Million Users, 11,000 cores, and 70 Million Messages a Second



**High Scalability**
Mar 31, 2014 — 11 min read



When we last visited WhatsApp they'd just been acquired by Facebook for $19 billion. We learned about their early architecture, which centered around a maniacal focus on optimizing Erlang into handling 2 million connections a server, working on All The Phones, and making users happy through simplicity.

Two years later traffic has grown 10x. How did WhatsApp make that jump to the next level of scalability?

Rick Reed tells us in a talk he gave at the Erlang Factory: That's 'Billion' with a 'B': Scaling to the next level at WhatsApp (slides), which revealed some eye popping WhatsApp stats:

(Q) Subscribe

PX0659-001

Case 1:20-cv-03590-JEB   Document 344-21   Filed 05/24/24   Page 180 of 531

> What has hundreds of nodes, thousands of cores, hundreds of terabytes of RAM, and hopes to serve the billions of smartphones that will soon be a reality around the globe? The Erlang/FreeBSD-based server infrastructure at WhatsApp. We've faced many challenges in meeting the ever-growing demand for our messaging services, but as we continue to push the envelope on size (>8000 cores) and speed (>70M Erlang messages per second) of our serving system.

What are some of the most notable changes from two years ago?

Obviously much bigger in every dimension, except the number of engineers. More boxes, more datacenters, more memory, more users, and more scale problems. Handling this level of growth with so few engineers is what Rick is most proud of: 40 million users per engineer. This is part of the win of the cloud. Their engineers work on their software. The network, hardware, and datacenter is handled by someone else.

They've gone away from trying to support as many connections per box as possible because of the need to have enough head room to handle the overall increased load on each box. Though their general strategy of keeping down management overhead by getting really big boxes and running efficiently on SMP machines, remains the same.

Transience is nice. With multimedia, pictures, text, voice, video all being part of their architecture now, not having to store all these assets for the long term simplifies the system greatly. The architecture can revolve around throughput, caching, and partitioning.

Erlang is its own world. Listening to the talk it became clear how much of everything you do is in the world view of Erlang, which can be quite disorienting. Though in the end it's a distributed system and all the issues are the same as in any other distributed system.

Mnesia, the Erlang database, seemed to be a big source of problem at their scale. It made me wonder if some other database might be more appropriate and if the need

PX0659-002

to stay within the Erlang family of solutions can be a bit blinding?

Lots of problems related to scale as you might imagine. Problems with flapping connections, queues getting so long they delay high priority operations, flapping of timers, code that worked just fine at one traffic level breaking badly at higher traffic levels, high priority messages not getting serviced under high load, operations blocking other operations in unexpected ways, failures causing resources issues, and so on. These things just happen and have to be worked through no matter what system you are using.

I remain stunned and amazed at Rick's ability to track down and fix problems. Quite impressive.

Rick always gives a good talk. He's very generous with specific details that obviously derive directly from issues experienced in production. Here's my gloss on his talk...

# Stats

- 465M monthly users.

- 19B messages in & 40B out per day

- 600M pics, 200M voice, 100M videos

- 147M peak concurrent connections - phones connected to the systems

- 230K peak logins/sec - phones connecting and disconnecting

- 342K peak msgs in/sec, 712K out

- ~10 team member works on Erlang and they handle both development and ops.

- Holidays highest usage for multimedia.

  - 146Gb/s out (Christmas Eve), quite a bit of bandwidth going out to phones

  - 360M videos downloaded (Christmas Even)

  - 2B pics downloaded (46k/s) (New Years Eve)

  - 1 pic downloaded 32M times (New Years Eve)

PX0659-003

# Stack

Erlang R16B01 (plus their own patches)

FreeBSD 9.2

Mnesia (database)

Yaws

SoftLayer is their cloud provider, bare metal machines, fairly isolated within the network, dual datacenter configuration

# Hardware

- ~ 550 servers + standby gear
  - ~150 chat servers (~1M phones each, 150 million peak connections)
  - ~250 mms (multimedia) servers
  - 2x2690v2 Ivy Bridge 10-core (40 threads total with hyperthreading)
  - Database nodes have the 512GB of RAM
  - Standard compute nodes have 64GB of RAM
  - SSD primarily for reliability, except when storing video because more storage is required
  - Dual-link GigE x2 (public which is user facing & private which faces the backend systems)
- > 11,000 cores run the Erlang system

# System Overview

PX0659-004

- Erlang love.
  - Great language to support so many users with so few engineers.
  - Great SMP scalability. Can run very large boxes and keep the node count low. Operational complexity scales with number of nodes, not the number of cores.
  - Can update code on the fly.

- Scalability is like clearing a minefield. They are generally able to detect and clear problems before they explode. Events which test the system are world events, especially soccer, which creates big vertical load spikes. Server failures, usually RAM. Network failures. And bad software pushes.

- Conventional looking architecture:
  - Phones (clients) connect to chat and MMS (multimedia).
  - Chat connects to transient offline storage. Backend systems hold on to messages while they are in transit between users.
  - Chat connects to databases like Account, Profile, Push, Group, ...

- Messages to phones:
  - Actual text messages
  - Notifications: group subjects, profile photo changes, etc
  - Presence messages: typing, idle, connected/not connected, etc

- Multimedia database:
  - In-memory Mnesia database using about 2TB of RAM sharded across 16 partitions to store about 18 billion records.
  - Messages and multimedia are only stored while they are being delivered, but while the media is being delivered information about the media is stored in the database.

- Run at 1 million connections per server instead of the two million connections per server they did two years ago, generally because the servers are a lot busier:
  - With more users they want to run with more head room on each server to soak up peak loads.

PX0659-005

Case 1:20-cv-03590-JEB   Document 344-21   Filed 05/24/24   Page 184 of 531

- Users are more active than they were two years ago. They are sending more messages so the servers are doing more.

- Functionality that used to be outside these servers was moved to run on them so they are doing more.

# Decoupling

- Isolate bottlenecks so they don't spread through the system

  - Tight coupling causes cascading failures.

  - Backend systems that are deeper in the stack shouldn't bubble up to the front-end.

  - Everything is partitioned so that if one partition is in trouble the other partitions won't be impacted.

  - Keep as much throughput going as you can while problems are being addressed.

- Asynchronicity to minimize impact of latency on throughput

  - Allows keeping throughput as high as possible even when there is latency at various points in the system or when latency is unpredictable.

  - Reduces coupling and allows systems to work as fast as they can.

- Avoid head-of-line blocking

  - Head-of-line block is where processing on the first packet in a queue starves all those items queued behind it.

  - Separate read and write queues. Especially where performing transactions on tables so if there's any latency on the write side it doesn't block the read side. Generally the read side is going much faster so any blocking will pile up readers.

  - Separate inter-node queues. If a node or network connecting nodes runs into trouble, it can block work in an application. So when sending to different nodes the messages are given to different procs (lightweight concurrency in Erlang) so only messages destined for a problem node are backed up. This allows messages to healthy nodes to flow freely. The problem is isolated to where the

problem is. Patched mnesia to do this well at async_dirty replication time. The app sending the message is decoupled from the sending and does not feel any back pressure if there's a problem with a node.

○ When working with non-deterministic latency a "queuer" FIFO worker dispatch model is used.

• Meta-clustering

○ Note, this section is at about 29 minutes into the talk and is covered very briefly, unfortunately.

○ Needed a way to contain the size of a single cluster and also allow it to span long distances.

○ Built wandist, a dist-like transport over gen_tcp, that consists of a mesh of the nodes that need to talk to each other.

○ A transparent routing layer above pg2 creates a single hop routing dispatch system.

○ Example: two main clusters in two datacenters, two multimedia clusters in two different datacenters, and a shared global cluster between the two datacenters. They all have wandist connections between them.

• Examples:

○ Avoid mnesia transaction coupling by using async_dirty. Most of the transactions are not used.

○ Use calls only when getting back from the database, otherwise casting everything to preserve asynchronous mode of operation. In Erlang, handle_call blocks for a response and messages are queued up, handle_cast doesn't block because the result of the operation isn't of interest.

○ Calls use timeouts, not monitors. Reduces contention on procs on the far end and reduces traffic over the distribution channel.

○ When only need best effort delivery use nosuspend on casts. This isolates a node from downstream problems if either a node has problems or the network has problems, in which case distribution buffers back up on the sending node and procs that try to send start to get suspended by the scheduler which causes a cascading failure where everyone is waiting and no work is getting done.

○ Use large distribution buffers to absorb problems in the network and on downstream nodes.

# Parallelize

- Work distribution:

  ○ Need to distribute work over 11,000 cores.

  ○ Start with a single threaded gen_server. Then created a gen_factory to spread the work across multiple workers.

  ○ At a certain load the dispatch process itself became a bottleneck and not just because of the execute time. There's a high fan-in with a lot of nodes feeding into the dispatch process for a box, the locks on the process become a bottleneck with the distribution ports coming in and the process itself.

  ○ So created a gen_industry, a layer above gen_factory, so that there are multiple dispatch procs which allows for the parallelization of all the input coming into the box as well as the dispatch to the workers themselves.

  ○ Workers are selected by a key for database operations. For the cases where there's non-deterministic latency, like for IO, a FIFO model is used to distribute work to prevent head-of-line blocking problems.

- Partition services:

  ○ Partition between 2 and 32 ways. Most services are partitioned 32 ways.

  ○ pg2 addressing, which are distributed process groups, is used to address partitions across the cluster.

  ○ Nodes are run in pairs. One is primary and the other secondary. If one or the other goes down they they will be handling primary and secondary traffic.

  ○ Generally try to limit the number of procs that access a single ets (built-in term storage) or single mnesia fragment to 8. This keeps the lock contention under control.

- Mnesia:

  ○ Because they don't use transactions to get as much consistency as possible they serialize access to records on a single process on a single node by

PX0659-008

hashing. Hash to a partition, which maps to a [mnesia fragment](#), and ends up being dispatched into one factory, one worker. So all access to a single record goes to a single erlang process.

○ Each mnesia fragment is only being written to or read from at the application level on one node, which allows replication streams that only go in one direction.

○ When there's a replication stream going between peers there's a bottleneck in how fast the fragments can be updated. They patched OTP to have multiple transaction managers running for async_dirty only so record updates happen in parallel which give a lot more replication throughput.

○ Patch to allow the mnesia library directory to be split over multiple libraries, which means it could be written to multiple drives, which increases throughput to the disk. Real issue is when mnesia loads from a peer. Spreading IO over multiple drives, even SSDs, gives a lot more scalability in terms how fast the database is loaded.

○ Shrinking mnesia islands to two nodes per island. An island is an mnesia cluster. Even with 32 partitions there will be 16 islands that support a table. Gives better opportunity to support schema operations under load because there's only two nodes that have to complete the schema operation. Reduces load time coordination if trying to bring one or both nodes up at the same time.

○ Deal with network partitions in mnesia by alerting quickly. They continue running. And then have a manual reconciliation process to merge them together.


# Optimize

• The offline storage system used to be a big bottleneck under load spikes. Just couldn't push stuff to the file system fast enough.

○ Most messages are read quickly by users, like 50% within 60 seconds.

○ Added a write-back cache so messages could be delivered before they had to be written to the filesystem. 98% cache hit rate.

Case 1:20-cv-03590-JEB   Document 344-21   Filed 05/24/24   Page 188 of 531

○ If the IO system is backed up because of load, the cache gives extra buffering to deliver messages at full rate while the IO system works to catch up.

- Fixed head-of-line blocking in async file IO by patching BEAM (the Erlang VM) to round-robin file port requests across all async worker threads which smoothed writes in the cases where there was a large mailbox or a slow disk.

- Keep large mailboxes out of the cache. Some people are in a large number of groups and get thousands of messages per hour. They polluted the cache and slowed things down. Evict them from the cache. Note, dealing with disproportionately large users is a problem for every system, including Twitter.

- Slow access to mnesia table with lots of fragments

  ○ The account table as 512 fragments which are partitioned into the islands, which means there's a sparse mapping of users to these 512 fragments. Most of the fragments will be empty and idle.

  ○ Doubling the number of hosts caused the throughput to go down. It turned out record access was really slow because hash chain sizes were over 2K when the target is 7.

  ○ What was happening is the hashing scheme caused a large number of empty buckets to be created and few that were extremely long. A two line change improved performance by 4 to 1.

# Patching

Ran into contention on the timer wheel. With a few million connections into a single host and each of those is setting and resetting a timer whenever something happens with a particular phone, the results is hundreds of thousands of timer sets and resets per second. With one timer wheel and one lock it was a significant source of contention. Solution was to create multiple timer wheels to eliminate the contention.

mnesia_tm is a big select loop and under load when trying to load tables the backlog could get to a point of no return because of the selective receive. Patch to pull stuff out of the incoming transactions stream and save it to process later.

Add multiple mnesia_tm async_dirty senders.

PX0659-010

Case 1:20-cv-03590-JEB   Document 344-21   Filed 05/24/24   Page 189 of 531

Add mark/set for prim_file commands.

Some clusters span a continent, so mnesia should load from a nearby node rather than across the country.

Add round-robin scheduling for async file IO.

Seed ets hash to break coincidence w/ phash2.

Optimize ets main/name tables for scale.

Don't queue mnesia dump if already dumping. Can't complete a schema operation with dumps pending so if a lot of dumps are queued it wasn't possible to do schema ops.

# The 2/22 Outage

Even with all this work stuff happens. And it happened at the worst time, a 210 minute outage occurred right after the Facebook acquisition.

Did not happen because of load. It began with a back-end router problem.

The router dropped a VLAN which caused a massive node disconnect/reconnect throughout the cluster. When everything reconnected it was in an unstable state they had never seen before.

Finally decided they had to stop everything and bring it back up, which they hadn't done in years. It took a while to bring everything down and bring it back up.

In the process they found an overly-coupled subsystem. With disconnects and reconnects pg2 can get in a state where it's doing n^3 messaging. They saw pg2 message queues going from zero to 4 million within seconds. Rolling out a patch.

PX0659-011

# Release

Can't simulate traffic at this scale, especially with huge spikes, like News Years Eve at midnight. If they are trying something out that is extremely disruptive it is rolled out very slowly. It will only take a small piece of the traffic. Then quickly iterate until it works well, then roll out to the rest of the cluster.

Rollout is a rolling upgrade. Everything is redundant. If they want to do a BEAM upgrade it is installed and then gradually execute restarts across the cluster to pick up the new changes. Sometimes of it's just a hot patch it can be rolled out without a complete restart. This is rare. Usually upgrade the whole thing.

# Remaining Challenges

Databases get reloaded on a fairly regular basis due to upgrades. The problem with so much data it takes a long time to load and that the loads fail for various reasons at larger scales.

Real-time cluster status & control at scale. The old shell window approach won't work anymore.

Power-of-2 partitioning. At 32 partitions now. The next step is 64, which will work, but 128 partitions will be impractical. Not much discussion on this point.

5/20/24, 3:39 PM
Case 1:20-cv-03590-JEB Document 344-2 Filed 05/24/24 Page 191 of 531
How WhatsApp Grew to Nearly 500 Million Users, 11,000 cores, and 70 Million Messages a Second - High Scalability -

**READ MORE**



### Kafka 101

This is a guest article by Stanislav Kozlovski...

By HS Editor
— May 9, 2024



### Capturing A Billion Emo(j)i-ons

This blog post was written by...

By HS Editor
— Mar 26, 2024



### Brief History of Scaling Uber

This blog post was written by Josh...

By HS Editor
— Mar 14, 2024



### Behind AWS S3's Massive Scale

This is a guest article by Stanisl...

By HS Editor
— Mar 6, 2024

# High Scalability

**Sign up**

# High Scalability

Building bigger, faster, more reliable websites.

PX0659-013

jamie@example.com        **Subscribe**

PX0659-014

# PX0660

Search blog...

‹ Back to Blog

# Introducing WhatsApp Channels. A Private Way to Follow What Matters

Today we're excited to introduce Channels: a simple, reliable, and private way to receive important updates from people and organizations, right within WhatsApp. We're building Channels in a new tab called Updates - where you'll find Status and channels you choose to follow - separate from your chats with family, friends, and communities.

Channels are a one-way broadcast tool for admins to send text, photos, videos, stickers, and polls. To help you select channels to follow, we're building a searchable directory where you can find your hobbies, sports teams, updates from local officials, and more. You can also get to a channel from invite links sent in chats, e-mail, or posted online.



We're aspiring to build the most private broadcast service available. This starts by protecting the personal information of both admins and followers. As a channel admin, your phone number and profile photo won't be shown to followers. Likewise, following a

PX0660-001

channel won't reveal your phone number to the admin or other followers. Who you decide to follow is your choice and it's private.

Similar to how we build messaging, we don't believe Channel updates should have to stick around forever. So we'll only store channel history on our servers for up to 30 days and we'll add ways to make updates disappear even faster from follower's devices. Admins will also have the option to block screenshots and forwards from their channel.

Lastly, we'll make it possible for admins to decide who can follow their channel and whether they want their channel to be discoverable in the directory or not. Given the aim of Channels is to reach a wide audience, channels are not end-to-end encrypted by default. We do think there are some cases where end-to-end encrypted channels to a limited audience might make sense, such as a non profit or health organization, and we're exploring this as a future option as well.

To kick off Channels, we're excited to work with leading global voices and select organizations in Colombia and Singapore, where Channels will first be available, to build, learn, and adapt the experience. We'll bring Channels to more countries and the ability for anyone to create a channel over the coming months.

We also believe there is an opportunity to support admins with a way for them to build a business around their channel using our expanding payment services as well as the ability to promote certain channels in the directory to help increase awareness.

Naturally, the core of how people use WhatsApp will continue to be private messaging among friends, family, and communities, and that will always be our first priority. Building channels is a big step our users have asked us to take for years. We think the time is finally right to introduce a simple, reliable, and private broadcast tool and we hope you enjoy using it in the months and years to come.

PX0660-002



June 8, 2023



PX0660-003

# PX0661



## Los Angeles Times

TECHNOLOGY AND THE INTERNET

# IBM acquires cloud computing company SoftLayer for $2 billion

By <a href="mailto:salvador.rodriguez@latimes.com">Salvador Rodriguez</a>

June 4, 2013 8:43 AM PT

In a move to bolster its cloud computing services, IBM has purchased Dallas company SoftLayer for a reported $2 billion.

"The acquisition will strengthen IBM's leadership position in cloud computing and will help speed business adoption of public and private cloud solutions," IBM said in announcing the acquisition.

SoftLayer is the largest privately held cloud computing firm, according to IBM. SoftLayer serves about 21,000 customers and has 13 data centers throughout the U.S., Asia and Europe. Those will complement the 10 cloud service data centers IBM already has, according to the New York Times, which reported on the value of the deal.

**PHOTOS: Top Cyber Attacks of 2013**

With the addition of SoftLayer, IBM expects its cloud services to generate $7 billion a year by the end of 2015.

In the last few years, the demand for cloud computing services has risen in the business world as it allows users to work on a shared database using any device with an Internet connection.

The SoftLayer acquisition is expected to close by the third quarter of this year, at which point IBM will launch a new Cloud Services division.

PX0661-001

**ALSO:**

HTC One smartphone heading to Verizon this summer

ADVERTISEMENT

Sean Parker to pay $2.5 million for unpermitted wedding project

Hackers are increasingly targeting Android devices, McAfee warns

## More to Read

### Capital One to buy Discover, forming nation's biggest credit card company

Feb. 19, 2024



### Microsoft's answer to OpenAI inquiry: It doesn't own a stake

Dec. 8, 2023



### Meta near deal to sell mixed-reality headsets in China

Nov. 10, 2023



PX0661-002

5/19/24, 1:11 PM                         IBM acquires cloud computing company SoftLayer for $2 billion - Los Angeles Times

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

PX0661-003

# PX0662

Log in     

# Introducing Instagram Stories

🕐 August 02, 2016



Today, we're introducing Instagram Stories, a new feature that lets you share all the moments of your day, not just the ones you want to keep on your profile. As you share multiple photos and videos, they appear together in a slideshow format: your story.

PX0662-001

5/19/24, 2:44 PM                    Introducing Instagram Stories | Instagram Blog

With Instagram Stories, you don't have to worry about overposting. Instead, you can share as much as you want throughout the day – with as much creativity as you want. You can bring your story to life in new ways with text and drawing tools. The photos and videos will Log in disappear after 24 hours and won't appear on your profile grid or in feed.

  

You'll see stories from people you follow in a bar at the top of your feed – from your best friends to your favorite popular accounts. When there's something new to see, their profile photo will have a colorful ring around it.

To view someone's story, just tap on their profile photo. It's easy to view stories at your own pace: tap to go back and forward or swipe to jump to another person's story. If you want to comment on something you see, you can tap and send a private message to that person on Instagram Direct. Unlike regular posts, there are no likes or public comments.

PX0662-002

5/19/24, 2:44 PM                          Introducing Instagram Stories | Instagram Blog

Log in



Your story follows the privacy settings of your account. If you set your account to private, your story is visible only to your followers. However, you can also easily hide your entire story from anyone you don't want to see it, even if they follow you. When watching your own story, swipe up to check out who's seen each photo and video. You can even choose to feature a particular part of your story by posting it on your profile.

PX0662-003

5/19/24, 2:44 PM                          Introducing Instagram Stories | Instagram Blog

Log in

 

Instagram has always been a place to share the moments you want to remember. Now you can share your highlights and everything in between, too.

Instagram Stories will be rolling out globally over the next few weeks on       and          . To learn more, check out the                    .

RELATED ARTICLES

# Check out more announcements about product

https://about.instagram.com/blog/announcements/introducing-instagram-stories

PX0662-004

#PRODUCT  #INSTAGRAM  #ANNOUNCEMENTS                     Log in        →

## Introducing Trending Now on Threads

#PRODUCT  #INSTAGRAM  #ANNOUNCEMENTS

## Instagram Announces New Messaging Improvements                          →

#ANNOUNCEMENTS  #PRODUCT  #INSTAGRAM

## Introducing New Parental Controls and Teen Privacy Defaults             →

About Us                    Safety

Features                    Blog

Community                   Brand

Business↗                   Help↗

Threads

Careers                     Terms↗

Privacy↗                    Engineering

PX0662-005

5/19/24, 2:44 PM                                    Introducing Instagram Stories | Instagram Blog

Sitemap

English (US)    Instagram from Meta                              Log in

PX0662-006

# PX0665

5/19/24, 8:52 PM                    With hacker attacks on the rise, Facebook Connect emerges as security solution - The Verge



Menu 

**REPORT**

## With hacker attacks on the rise, Facebook Connect emerges as security solution / Last week, Formspring servers were compromised and over 420,000 hashed user passwords were stolen. Formspring founder and CEO Ade Olonoh wrote a blog post apologizing for the data breach and advising users to create new passwords immediately. The final line of the 500-word blog post reads: "If you have linked Facebook to your account, you can safely use Facebook Connect to log in." The detail in Olonoh's post is an afterthought, but his sentiment is part of the reason many sites are turning to Facebook to handle identity verification. There hasn't yet been a Facebook username and password data breach, and you'd be hard-pressed to find a company more serious about protecting user data. "There's never been a breach of our login information," Facebook Security team member Fred Wolens told me.

By **Ellis Hamburger**

Jul 18, 2012, 11:50 AM EDT

    |  0  **Comments (0 New)**

PX0665-001

5/19/24, 8:52 PM                        With hacker attacks on the rise, Facebook Connect emerges as security solution - The Verge



log in with facebook blue

Last week, Formspring servers were compromised and over 420,000 hashed user passwords were stolen. Formspring founder and CEO Ade Olonoh wrote a blog post apologizing for the data breach and advising users to create new passwords immediately. The final line of the 500-word blog post reads: "If you have linked Facebook to your account, you can safely use Facebook Connect to log in." The detail in Olonoh's post is an afterthought, but his sentiment is part of the reason many sites are turning to Facebook to handle identity verification. You'd be hard-pressed to find a company more serious about protecting user data. "There's never been a breach of our login information," Facebook Security team member Fred Wolens told me.

PX0665-002

""There aren't too many tricks out there that we aren't using.""

Implementing Facebook Connect (also known as Facebook Login) is kind of like hiring a security detail for each of your users, and getting this service for free. "There aren't too many tricks out there that we aren't using," Wolens said, who previously detailed for me the various ways Facebook protects its users, like scanning data dump sites like Pastebin weekly in pursuit of user credentials. If any member's username or password shows up, Facebook alerts you. The company also recently partnered with leading anti-virus companies to expand its URL blacklist by hundreds of millions of links.

This isn't the first time Facebook Connect has been called out for saving users some trouble. During the Gawker data breach a few years ago, the company acknowledged that users who logged in using Facebook could ignore all the password theft drama. Of course, logging in using Facebook has some obvious limitations, like the fact that you must be a Facebook member to use it, and if Facebook goes down, you're screwed. Additionally, most sites don't enable users that are logged in via Facebook to use pseudonyms while commenting. Lastly, Facebook's "Authorize this site to access your information" dialog is intimidating for new users on your site, in part because sites frequently use the opportunity to ask for more permissions than they would otherwise need. The language in the dialog box ("any other information I've shared with everyone") isn't exactly transparent, either.

PX0665-003



But, on the whole, Facebook Connect has almost become a startup's go-to tool for onboarding, grabbing far more mindshare than other options like "Sign in with Google." Not only can sites like Turntable.fm offer unique invite-only schemes, but they can also avoid the hassle of asking users to create new accounts while limiting exposure to hackers — all with less than 50 lines of code. "For our users, it means not having to create yet another account, and immediately having your social graph represented on Songza when you sign up," Songza CEO Elias Roman told me. For large companies, however, building a log-in platform on top of Facebook can be risky. Changes in the social network's terms of service or Open Graph can be costly if 90% of your users have logged in using Facebook.

PX0665-004



Many of these companies choose to integrate other Facebook tools alongside Connect, like an Open Graph plugin that sends all the songs you listen to to friends' News Feeds. "Because of our Open Graph integration, in a given month each Facebook connected user generates at least one additional Facebook connected user, which is awesome," Roman said. "It's easy to get set up for anyone comfortable working with APIs," he elaborated. Unfortunately, sometimes annoying or deceptive Open Graph implementations overshadow the usefulness of Connect, which is inherently just an identity verification tool.

PX0665-005

""Developers don't need to keep iterating and improving on account recovery, because we have entire teams of people looking at that issue.""

Perhaps more importantly, installing Connect divorces site owners from having to create deep password recovery systems. Facebook already has various solutions in place to recover passwords, like asking you to identify the faces of a few friends. "Developers don't need to keep iterating and improving on account recovery, because we have entire teams of people looking at that issue," Wolens said. Few websites have the resources or time to devise "social captcha" algorithms for determining the likelihood that somebody is in fact who they say they are. "If you use the same computer every day and try to recover your password from that computer, it's a lot different than if you're halfway across the world," Wolens said. "We know that Ellis has used this computer in the last thirty days to log in, so we can create a lot less friction in getting you back into the account."

PX0665-006

In an age where many (or perhaps most) people use the same password for every site they log into, Facebook Connect has taken on the role of identity-keeper. Integrating Facebook Connect may sound like letting Big Brother handle the "frictionless" security checkpoint for your site, but as servers get hacked and sites go down, it's proven pretty damn tempting.

*For more on Facebook security, check out our report: Inside Facebook security: defending users from spammers, hackers, and 'likejackers'*

💬 0 COMMENTS (0 NEW)

More from **Web**

### You sound like a bot

### How much electricity does AI consume?

PX0665-007

**In defense of busywork**

**How AI can make history**

TERMS OF USE / PRIVACY NOTICE / COOKIE POLICY / DO NOT SELL OR SHARE MY PERSONAL INFO / LICENSING FAQ / ACCESSIBILITY / PLATFORM STATUS / HOW WE RATE AND REVIEW PRODUCTS

CONTACT / TIP US / COMMUNITY GUIDELINES / ABOUT / ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US / JOBS @ VOX MEDIA

PX0665-008

5/19/24, 8:52 PM                    With hacker attacks on the rise, Facebook Connect emerges as security solution - The Verge

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

PX0665-009

# PX0666

5/19/24, 9:37 PM                                                Instagram Blog

*Instagram*          GET THE FREE APP FOR **IOS**, **ANDROID**, OR **WINDOWS PHONE**


Welcome to the <u>Instagram</u> blog! See how Instagrammers are capturing and sharing the world's moments through **photo and video features**, **user spotlights**, **tips** and **news** from Instagram HQ.

# Instagram Today: 200 Million Strong

**#** INSTAGRAM NEWS

1 DAY AGO
1,411 NOTES




Today, we're excited to share that the Instagram community has grown to more than **200 million Instagrammers** capturing and sharing their lives every month.

From documenting a **passion for jazz** to **the protests in Kiev**, we're continually surprised and humbled by the moments you share. As we exceed 20 billion photos shared on Instagram to date, we look back in wonder at the beauty and importance of everything this community has created.

The vibrance and diversity of this community has increased as it has grown. Over the past six months, we've seen new communities coming together in cities and towns across the world, whether they be in **Guthrie, Oklahoma**, or **Guatemala City**. With January's **Worldwide InstaMeet 8**, we saw record turnouts of communities coming together to form friendships, explore new places and celebrate creativity in all corners of the globe from **New Dehli** to **New York**, **Bucharest**, **Nairobi** and beyond.

To the 50 million of you who've joined in the last six months, welcome. We're so glad you're here. And from our team to all 200 million of you, thank you for making Instagram great. We can't wait to see what you'll create next.

**1,411 notes**

PX0666-001

5/19/24, 9:37 PM                                        Instagram Blog

**Instagram.**              GET THE FREE APP FOR **iOS**, **ANDROID**, OR **WINDOWS PHONE**

**abrasmith** likes this

**krizmareigranchapin** reblogged this from **instagram**

**overthinkingart** likes this

**jarsofneonsmoke** likes this

**ciarageorgina13** likes this

**klariabreu** likes this

**fictionalthanfiction** likes this

**nikkidinglasa** likes this

**summerbravo** likes this

**darkrayne** likes this

**mimiyus** likes this

**bezhenarov** likes this

**pollysemka** reblogged this from **instagram**

**pollysemka** likes this

**ucahudalinas** likes this

**dominiquebretodeauu** likes this

**insikmoor** likes this

**heronvc** likes this

**2eonard3** likes this

**goldenangel873** likes this

**loveprincessrockz** likes this

**ambar2510frog** likes this

**katybett13** likes this

**allandubon** likes this

**benthal** likes this

**larskroll** likes this

**hedgehogwithglasses** likes this

**atilam2** likes this

**juliamelnik** likes this

**kang69** likes this

**laurence-tblr** reblogged this from **instagram**

**laurence-tblr** likes this

**amazingly-special** reblogged this from **instagram**

PX0666-002



*Instagram*    GET THE FREE APP FOR **IOS**, **ANDROID**, OR **WINDOWS PHONE**

**regieadan** likes this

**autumngracesme** likes this

**davidcfgg** likes this

**Show more notes**

**Blog Archive   RSS Feed   Engineering Blog   Instameets**                  **Facebook   Twitter**

ABOUT US   SUPPORT   API   JOBS   PRIVACY   TERMS                  © 2012 INSTAGRAM, INC.

PX0666-003

# PX0667

---

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

---

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021
**OR**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission file number: **001-37580**

# Alphabet Inc.

**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **61-1767919** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
(Address of principal executive offices, including zip code)
**(650) 253-0000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| **Class A Common Stock, $0.001 par value** | **GOOGL** | **Nasdaq Stock Market LLC** |
| | | **(Nasdaq Global Select Market)** |
| **Class C Capital Stock, $0.001 par value** | **GOOG** | **Nasdaq Stock Market LLC** |
| | | **(Nasdaq Global Select Market)** |

Securities registered pursuant to Section 12(g) of the Act:

**Title of each class**
**None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

---

PX0667-001

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of June 30, 2021, the aggregate market value of shares held by non-affiliates of the registrant (based upon the closing sale prices of such shares on the Nasdaq Global Select Market on June 30, 2021) was approximately $1,451.1 billion. For purposes of calculating the aggregate market value of shares held by non-affiliates, we have assumed that all outstanding shares are held by non-affiliates, except for shares held by each of our executive officers, directors and 5% or greater stockholders. In the case of 5% or greater stockholders, we have not deemed such stockholders to be affiliates unless there are facts and circumstances which would indicate that such stockholders exercise any control over our company, or unless they hold 10% or more of our outstanding common stock. These assumptions should not be deemed to constitute an admission that all executive officers, directors and 5% or greater stockholders are, in fact, affiliates of our company, or that there are not other persons who may be deemed to be affiliates of our company. Further information concerning shareholdings of our officers, directors and principal stockholders is included or incorporated by reference in Part III, Item 12 of this Annual Report on Form 10-K.

As of January 25, 2022, there were 300,754,904 shares of the registrant's Class A common stock outstanding, 44,576,938 shares of the registrant's Class B common stock outstanding, and 315,639,479 shares of the registrant's Class C capital stock outstanding.

---

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement for the 2022 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2021.

PX0667-002

**Alphabet Inc.**
**Form 10-K**
**For the Fiscal Year Ended December 31, 2021**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Note About Forward-Looking Statements |  | 3 |
| **PART I** |  |  |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 24 |
| Item 2. | Properties | 24 |
| Item 3. | Legal Proceedings | 24 |
| Item 4. | Mine Safety Disclosures | 24 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 25 |
| Item 6. | [Reserved] | 27 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Item 8. | Financial Statements and Supplementary Data | 45 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 86 |
| Item 9A. | Controls and Procedures | 86 |
| Item 9B. | Other Information | 86 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 87 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 88 |
| Item 11. | Executive Compensation | 88 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 88 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 88 |
| Item 14. | Principal Accountant Fees and Services | 88 |
| **PART IV** |  |  |
| Item 15. | Exhibits, Financial Statement Schedules | 89 |
| Item 16. | Form 10-K Summary | 92 |
| Signatures |  |  |

PX0667-003

5/19/24, 10:10 PM                                           goog-20211231

Table of Contents                                                                    Alphabet Inc.

## NOTE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These include, among other things, statements regarding:

- the ongoing effect of the novel coronavirus pandemic ("COVID-19"), including its macroeconomic effects on our business, operations, and financial results;

- the growth of our business and revenues and our expectations about the factors that influence our success and trends in our business;

- fluctuations in our revenue growth rate and operating margin and various factors contributing to such fluctuations;

- our expectation that the continuing shift from an offline to online world will continue to benefit our business;

- our expectation that the portion of our revenues that we derive from non-advertising revenues will continue to increase and may affect our margins;

- our expectation that our traffic acquisition costs (TAC) and the associated TAC rate will fluctuate, which could affect our overall margins;

- our expectation that our monetization trends will fluctuate, which could affect our revenues and margins;

- fluctuations in our revenue growth, as well as the change in paid clicks and cost-per-click and the change in impressions and cost-per-impression, and various factors contributing to such fluctuations;

- our expectation that we will continue to periodically review, refine, and update our methodologies for monitoring, gathering, and counting the number of paid clicks and impressions;

- our expectation that our results will be affected by our performance in international markets as users in developing economies increasingly come online;

- our expectation that our foreign exchange risk management program will not fully offset our net exposure to fluctuations in foreign currency exchange rates;

- the expected variability of gains and losses related to hedging activities under our foreign exchange risk management program;

- the amount and timing of revenue recognition from customer contracts with commitments for performance obligations, including our estimate of the remaining amount of commitments and when we expect to recognize revenue;

- fluctuations in our capital expenditures;

- our plans to continue to invest in new businesses, products, services and technologies, systems, land and buildings for data centers and offices, and infrastructure, as well as to continue to invest in acquisitions and strategic investments;

- our pace of hiring and our plans to provide competitive compensation programs;

- our expectation that our cost of revenues, research and development (R&D) expenses, sales and marketing expenses, and general and administrative expenses may increase in amount and/or may increase as a percentage of revenues and may be affected by a number of factors;

- estimates of our future compensation expenses;

- our expectation that our other income (expense), net (OI&E), will fluctuate in the future, as it is largely driven by market dynamics;

- fluctuations in our effective tax rate;

- seasonal fluctuations in internet usage and advertiser expenditures, underlying business trends such as traditional retail seasonality, which are likely to cause fluctuations in our quarterly results;

- the sufficiency of our sources of funding;

- our potential exposure in connection with new and pending investigations, proceedings, and other contingencies;

PX0667-004

goog-20211231

Alphabet Inc.

- the sufficiency and timing of our proposed remedies in response to decisions from the European Commission (EC) and other regulators and governmental entities;

- our expectations regarding the timing, design, and ongoing phased implementation of our new global enterprise resource planning (ERP) system;

- the expected timing, amount, and effect of Alphabet Inc.'s share repurchases; and

- our long-term sustainability and diversity goals;

as well as other statements regarding our future operations, financial condition and prospects, and business strategies. Forward-looking statements may appear throughout this report and other documents we file with the Securities and Exchange Commission (SEC), including without limitation, the following sections: Part I, Item 1 "Business;" Part I, Item 1A "Risk Factors;" and Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements generally can be identified by words such as "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "will be," "will continue," "may," "could," "will likely result," and similar expressions. These forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties, which could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this Annual Report on Form 10-K, and in particular, the risks discussed in Part I, Item 1A, "Risk Factors" of this report and those discussed in other documents we file with the SEC. We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements, except as required by law. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

As used herein, "Alphabet," "the company," "we," "us," "our," and similar terms include Alphabet Inc. and its subsidiaries, unless the context indicates otherwise.

"Alphabet," "Google," and other trademarks of ours appearing in this report are our property. This report contains additional trade names and trademarks of other companies. We do not intend our use or display of other companies' trade names or trademarks to imply an endorsement or sponsorship of us by such companies, or any relationship with any of these companies.

## PART I

## ITEM 1.    BUSINESS

### Overview

As our founders Larry and Sergey wrote in the original founders' letter, "Google is not a conventional company. We do not intend to become one." That unconventional spirit has been a driving force throughout our history, inspiring us to tackle big problems and invest in moonshots like artificial intelligence (AI) research and quantum computing. We continue this work under the leadership of Sundar Pichai, who has served as CEO of Google since 2015 and as CEO of Alphabet since 2019.

Alphabet is a collection of businesses — the largest of which is Google. We report Google in two segments, Google Services and Google Cloud; we also report all non-Google businesses collectively as Other Bets. Other Bets include earlier stage technologies that are further afield from our core Google business. We take a long-term view and manage the portfolio of Other Bets with the discipline and rigor needed to deliver long-term returns. Alphabet's structure is about helping each of our businesses prosper through strong leaders and independence.

### *Access and technology for everyone*

The Internet is one of the world's most powerful equalizers; it propels ideas, people and businesses large and small. Our mission to organize the world's information and make it universally accessible and useful is as relevant today as it was when we were founded in 1998. Since then, we have evolved from a company that helps people find answers to a company that also helps people get things done.

We are focused on building an even more helpful Google for everyone, and we aspire to give everyone the tools they need to increase their knowledge, health, happiness, and success. Every year, there are trillions of searches on Google, and 15% of the searches we see every day are new. We continue to invest deeply in AI and other technologies to ensure the most helpful search experience possible. YouTube provides people with entertainment, information, and opportunities to learn something new. And Google Assistant offers the best way to get things done seamlessly across different devices, providing intelligent help throughout a person's day, no matter where they are.

We are continually innovating and building new product features that will help our users, partners, customers, and communities. We have invested more than $100 billion in R&D over the last five years. In addition, with the onset of

PX0667-005

4

PX0667-006

the pandemic, we have focused in particular on features that help people in their daily lives and that support businesses working to serve their customers. For example, we have added live busyness trends in Google Maps that help users instantly spot when a neighborhood or part of town is near or at its busiest. We have also helped businesses navigate uncertainty during an uneven economic recovery, and we have worked to address the complex challenge of distributing critical information about COVID-19 vaccines to billions of people around the world. Importantly, we have made authoritative content a key focus area across both Google Search and YouTube to help users find trusted public health information.

Other Bets also remain focused on innovation through technology that can positively affect people's lives. For instance, Waymo is working toward our goal of making transportation safer and easier for everyone and Verily is developing tools and platforms to improve health outcomes.

### Moonshots

Many companies get comfortable doing what they have always done, making only incremental changes. This incrementalism leads to irrelevance over time, especially in technology, where change tends to be revolutionary, not evolutionary. People thought we were crazy when we acquired YouTube and Android and when we launched Chrome, but those efforts have matured into major platforms for digital video and mobile devices and a safer, popular browser. We continue to look toward the future and to invest for the long term within each of our segments. As we said in the original founders' letter, we will not shy away from high-risk, high-reward projects that we believe in, as they are the key to our long-term success.

### The power of AI

Across the company, investments in AI and machine learning are increasingly driving many of our latest innovations and have enabled us to build products that are smarter and more helpful. For example, in May of 2021, we introduced Multitask Unified Model — or MUM — which has the potential to transform how Google helps with complex tasks. MUM is trained across 75 different languages, which means that it can learn from sources written in one language and help bring that information to people in another. It is also multimodal, so it understands information across text and images and, in the future, can expand to more modalities like video and audio. We are currently experimenting with MUM's capabilities to make searching more natural and intuitive and even enable entirely new ways to search.

DeepMind also made a significant AI-powered breakthrough, solving a 50-year-old protein folding challenge, which will help the world better understand one of life's fundamental building blocks, and will enable researchers to tackle new and difficult problems, from fighting diseases to environmental sustainability. DeepMind has since shared its new AlphaFold protein structure database, which doubled the number of high-accuracy human protein structures available to researchers.

### Google

For reporting purposes, Google comprises two segments: Google Services and Google Cloud.

### Google Services

#### Serving our users

We have always been a company committed to building helpful products that can improve the lives of millions of people. Our product innovations have made our services widely used, and our brand one of the most recognized in the world. Google Services' core products and platforms include ads, Android, Chrome, hardware, Gmail, Google Drive, Google Maps, Google Photos, Google Play, Search, and YouTube, each with broad and growing adoption by users around the world.

Our products and services have come a long way since the company was founded more than two decades ago. Rather than the ten blue links in our early search results, users can now get direct answers to their questions using their computer, mobile device, or their own voice, making it quicker, easier and more natural to find what they are looking for.

This drive to make information more accessible and helpful has led us over the years to improve the discovery and creation of digital content both on the web and through platforms like Google Play and YouTube. With the continued adoption of mobile, people are consuming more digital content by watching more videos, playing more games, listening to more music, reading more books, and using more apps than ever before. Working with content creators and partners, we continue to build new ways for people around the world to find great digital content.

Fueling all of these great digital experiences are extraordinary platforms and hardware. That is why we continue to invest in platforms like our Android mobile operating system, Chrome browser, and Chrome operating system, as

5

PX0667-007

goog-20211231

Table of Contents

Alphabet Inc.

well as growing our family of hardware devices. We see tremendous potential for devices to be helpful and make people's lives easier by combining the best of our AI, software and hardware. This potential is reflected in our latest generation of hardware products such as Pixel 5a 5G and Pixel 6 phones, the Fitbit Charge 5, Chromecast with Google TV, and the new Google Nest Cams and Nest Doorbell. Creating products that people rely on every day is a journey that we are investing in for the long run.

The key to building helpful products for users is our commitment to privacy, security, and user choice. We protect user privacy and security with products that are secure by default and private by design, and that keep users in control of their data. Our privacy-preserving technologies safeguard individual privacy and enhance data protection. As the Internet evolves, so does our approach to privacy and security. We continue to enhance our anti-malware features in Chrome and drive improvements such as auto-delete controls that automatically delete web and app searches after 18 months. And we continue to keep users and their passwords safe through advances like our built-in password manager.

_How we make money_

We have built world-class advertising technologies for advertisers, agencies, and publishers to power their digital marketing businesses. Our advertising solutions help millions of companies grow their businesses through our wide range of products across devices and formats, and we aim to ensure positive user experiences by serving the right ads at the right time and by building deep partnerships with brands and agencies.

Google Services generates revenues primarily by delivering both performance and brand advertising that appears on Google Search & other properties, YouTube and Google Network partners' properties ("Google Network properties"). We continue to invest in both performance and brand advertising and seek to improve the measurability of advertising so advertisers understand the effectiveness of their campaigns.

- **Performance advertising** creates and delivers relevant ads that users will click on, leading to direct engagement with advertisers. Performance advertising lets our advertisers connect with users while driving measurable results. Our ads tools allow performance advertisers to create simple text-based ads.

- **Brand advertising** helps enhance users' awareness of and affinity for advertisers' products and services, through videos, text, images, and other interactive ads that run across various devices. We help brand advertisers deliver digital videos and other types of ads to specific audiences for their brand-building marketing campaigns.

We have allocated substantial resources to stopping bad advertising practices and protecting users on the web. We focus on creating the best advertising experiences for our users and advertisers in many ways, including filtering out invalid traffic, removing billions of bad ads from our systems every year, and closely monitoring the sites, apps, and videos where ads appear and blocklisting them when necessary to ensure that ads do not fund bad content.

We continue to look to the future and are making long-term investments that we expect to grow revenues beyond advertising, including revenues from Google Play, hardware, and YouTube non-advertising.

- **Google Play** generates revenues from sales of apps and in-app purchases and digital content sold in the Google Play store.

- **Hardware** generates revenues from sales of Fitbit wearable devices, Google Nest home products, Pixel phones, and other devices.

- **YouTube non-advertising** generates revenues from YouTube Premium and YouTube TV subscriptions and other services.

**Google Cloud**

Google was a company built in the cloud. We continue to invest in infrastructure, security, data management, analytics, and AI. We see significant opportunity in helping businesses utilize these strengths with features like data migration, modern development environments, and machine learning tools to provide enterprise-ready cloud services, including Google Cloud Platform and Google Workspace. Google Cloud Platform enables developers to build, test, and deploy applications on its highly scalable and reliable infrastructure. Google Workspace collaboration tools — which include apps like Gmail, Docs, Drive, Calendar, Meet and more — are designed with real-time collaboration and machine intelligence to help people work smarter. Because more and more of today's digital experiences are being built in the cloud, Google Cloud products help businesses of all sizes take advantage of the latest technology advances to operate more efficiently.

- **Google Cloud Platform** generates revenues from infrastructure, platform and other services.

6

PX0667-008

PX0667-009

goog-20211231

         Alphabet Inc.

- **Google Workspace** generates revenues from cloud-based collaboration tools for enterprises, such as Gmail, Docs, Drive, Calendar and Meet.

Our cloud services are generally provided on either a consumption or subscription basis and may have contract terms longer than a year.

### Other Bets

Across Alphabet, we are also using technology to try to solve big problems that affect a wide variety of industries. Alphabet's investment in the portfolio of Other Bets includes emerging businesses at various stages of development, ranging from those in the R&D phase to those that are in the beginning stages of commercialization, and our goal is for them to become thriving, successful businesses in the medium to long term. While these early-stage businesses naturally come with considerable uncertainty, some of them are already generating revenue and making important strides in their industries. Revenues from Other Bets are generated primarily from the sale of health technology and internet services.

Other Bets operate as independent companies and some of them have their own boards with independent members and outside investors. We are investing in the portfolio of Other Bets and being very deliberate about the focus, scale, and pace of investments.

### Competition

Our business is characterized by rapid change as well as new and disruptive technologies. We face formidable competition in every aspect of our business, including from:

- General purpose search engines and information services, such as Baidu, Microsoft's Bing, Naver, Seznam, Yahoo, and Yandex.
- Vertical search engines and e-commerce providers, such as Amazon and eBay (e-commerce), Booking's Kayak (travel queries), Microsoft's LinkedIn (job queries), and WebMD (health queries). Some users will navigate directly to such content, websites, and apps rather than go through Google.
- Social networks offered by ByteDance, Meta, Snap, and Twitter. Some users increasingly rely on social networks for product or service referrals, rather than seeking information through traditional search engines.
- Other online advertising platforms and networks, such as Amazon, AppNexus, Criteo, and Meta, that compete for advertisers that use Google Ads, our primary auction-based advertising platform.
- Other forms of advertising, such as billboards, magazines, newspapers, radio, and television. Our advertisers typically advertise in multiple media, both online and offline.
- Companies that design, manufacture, and market consumer hardware products, including businesses that have developed proprietary platforms, such as Amazon, Apple, and Microsoft.
- Digital assistant providers, such as Amazon and Apple.
- Providers of enterprise cloud services, such as Alibaba, Amazon, Microsoft, and Salesforce.
- Providers of digital video services, such as Amazon, Apple, AT&T, ByteDance, Disney, Hulu, Meta, and Netflix.
- Other digital content and application platform providers, such as Amazon and Apple.
- Providers of workspace connectivity and productivity products, such as Meta, Microsoft, Salesforce, and Zoom.

Competing successfully depends heavily on our ability to develop and distribute innovative products and technologies to the marketplace across our businesses. Specifically, for advertising, competing successfully depends on attracting and retaining:

- users, for whom other products and services are literally one click away, largely on the basis of the relevance of our advertising, as well as the general usefulness, security, and availability of our products and services;
- advertisers, primarily based on our ability to generate sales leads, and ultimately customers, and to deliver their advertisements in an efficient and effective manner across a variety of distribution channels; and
- content providers, primarily based on the quality of our advertiser base, our ability to help these partners generate revenues from advertising, and the terms of our agreements with them.

For additional information about competition, see Risk Factors in Item 1A of this Annual Report on Form 10-K.

PX0667-010

PX0667-011

**Ongoing Commitment to Sustainability**

We believe that every business has the opportunity and obligation to protect our planet. Sustainability is one of our core values at Google, and we strive to build sustainability into everything we do. We have been a leader on sustainability and climate change since Google's founding over 20 years ago. These are some of our key achievements over the past two decades:

- In 2007, we became the first major company to be carbon neutral for our operations.

- In 2017, we became the first major company to match 100% of our annual electricity use with renewable energy, which we have achieved for four consecutive years.

- In 2020, we issued $5.75 billion in sustainability bonds—the largest sustainability or green bond issuance by any company in history at the time. The net proceeds from the issuance are used to fund environmentally and socially responsible projects in the following eight areas: energy efficiency, clean energy, green buildings, clean transportation, circular economy and design, affordable housing, commitment to racial equity, and support for small businesses and COVID-19 crisis response. As of December 31, 2020, we have allocated $3.47 billion of the net proceeds, as outlined in our Sustainability Bond Impact Report published in 2021.

- Also in 2020, we compensated for our legacy carbon footprint, making Google the first major company to be carbon neutral for its entire operating history.

Our sustainability strategy is focused on three key pillars: accelerating the transition to carbon-free energy and a circular economy, empowering everyone with technology, and benefiting the people and places where we operate.

To accelerate the transition to a carbon-free economy, in 2020, we launched our third decade of climate action, and we are now working toward a new set of ambitious goals. By 2030, we aim to:

- achieve net-zero emissions across all of our operations and value chain;

- become the first major company to run on carbon-free energy 24 hours a day, seven days a week, 365 days a year;

- enable 5 gigawatts of new carbon-free energy through investments in our key manufacturing regions; and

- help more than 500 cities and local governments reduce an aggregate of 1 gigaton of carbon emissions annually.

To accelerate the transition to a circular economy, we are working to maximize the reuse of finite resources across our operations, products, and supply chains and to enable others to do the same. We are also working to empower everyone with technology by committing to help 1 billion people make more sustainable choices by the end of 2022 through our core products.

To benefit the people and places where we operate, we have set goals to replenish more water than we consume by 2030 and to support water security in communities where we operate. We will focus on three areas: enhancing our stewardship of water resources across Google office campuses and data centers; replenishing our water use and improving watershed health and ecosystems in water-stressed communities; and sharing technology and tools that help everyone predict, prevent, and recover from water stress.

We remain steadfast in our commitment to sustainability, and we will continue to lead and encourage others to join us in improving the health of our planet. We are proud of what we have achieved so far, and we are energized to help move the world closer to a more sustainable and carbon-free future for all.

More information on our approach to sustainability can be found in our annual sustainability reports, including Google's Environmental Report and Alphabet's 2021 Sustainability Bond Impact Report, which outlines the allocation of our net proceeds from our sustainability bonds. The contents of our sustainability reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC. For additional information about risks and uncertainties applicable to our commitments to attain certain sustainability goals, see Risk Factors in Item 1A of this Annual Report on Form 10-K.

**Culture and Workforce**

We are a company of curious, talented, and passionate people. We embrace collaboration and creativity, and encourage the iteration of ideas to address complex challenges in technology and society.

Our people are critical for our continued success, so we work hard to create an environment where employees can have fulfilling careers, and be happy, healthy, and productive. We offer industry-leading benefits and programs to take care of the diverse needs of our employees and their families, including opportunities for career growth and

goog-20211231

8

PX0667-013

development, resources to support their financial health, and access to excellent healthcare choices. Our competitive compensation programs help us to attract and retain top candidates, and we will continue to invest in recruiting talented people to technical and non-technical roles, and rewarding them well. We provide a variety of high quality training and support to our managers to build and strengthen their capabilities—ranging from courses for new managers, to learning resources that help them provide feedback and manage performance, to coaching and individual support.

At Alphabet, we are committed to making diversity, equity, and inclusion part of everything we do and to growing a workforce that is representative of the users we serve. More information on Google's approach to diversity can be found in our annual diversity reports, available publicly at diversity.google. The contents of our diversity reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

As of December 31, 2021, Alphabet had 156,500 employees. We have work councils and statutory employee representation obligations in certain countries, and we are committed to supporting protected labor rights, maintaining an open culture and listening to all employees. Supporting healthy and open dialogue is central to how we work, and we communicate information about the company through multiple internal channels to our employees.

When necessary, we contract with businesses around the world to provide specialized services where we do not have appropriate in-house expertise or resources, often in fields that require specialized training like cafe operations, content moderation, customer support, and physical security. We also contract with temporary staffing agencies when we need to cover short-term leaves, when we have spikes in business needs, or when we need to quickly incubate special projects. We choose our partners and staffing agencies carefully, and review their compliance with Google's Supplier Code of Conduct. We continually make improvements to promote a respectful and positive working environment for everyone — employees, vendors, and temporary staff alike.

**Government Regulation**

We are subject to numerous United States (U.S.) federal, state, and foreign laws and regulations covering a wide variety of subject matters. Like other companies in the technology industry, we face heightened scrutiny from both U.S. and foreign governments with respect to our compliance with laws and regulations. Many of these laws and regulations are evolving and their applicability and scope, as interpreted by the courts, remain uncertain.

Our compliance with these laws and regulations may be onerous and could, individually or in the aggregate, increase our cost of doing business, make our products and services less useful, limit our ability to pursue certain business models, cause us to change our business practices, affect our competitive position relative to our peers, and/or otherwise have an adverse effect on our business, reputation, financial condition, and operating results.

For additional information about government regulation applicable to our business, see Risk Factors in Item 1A, Trends in Our Business and Financial Effect in Part II, Item 7, and Legal Matters in Note 10 of the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K.

**Intellectual Property**

We rely on various intellectual property laws, confidentiality procedures and contractual provisions to protect our proprietary technology and our brand. We have registered, and applied for the registration of, U.S. and international trademarks, service marks, domain names and copyrights. We have also filed patent applications in the U.S. and foreign countries covering certain of our technology, and acquired patent assets to supplement our portfolio. We have licensed in the past, and expect that we may license in the future, certain of our rights to other parties. For additional information, see Risk Factors in Item 1A of this Annual Report on Form 10-K.

**Available Information**

Our website is located at www.abc.xyz, and our investor relations website is located at www.abc.xyz/investor. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and our Proxy Statements, and any amendments to these reports, are available through our investor relations website, free of charge, after we file them with the SEC. We also provide a link to the section of the SEC's website at www.sec.gov that has all of the reports that we file or furnish with the SEC.

We webcast via our investor relations website our earnings calls and certain events we participate in or host with members of the investment community. Our investor relations website also provides notifications of news or announcements regarding our financial performance and other items that may be material or of interest to our investors, including SEC filings, investor events, press and earnings releases, and blogs. We also share Google news and product updates on Google's Keyword blog at https://www.blog.google/, that may be material or of interest to our investors. Further, corporate governance information, including our certificate of incorporation, bylaws, governance

PX0667-014

PX0667-015

goog-20211231

Alphabet Inc.

guidelines, board committee charters, and code of conduct, is also available on our investor relations website under the heading "Other." The contents of our websites are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC, and any references to our websites are intended to be inactive textual references only.

## ITEM 1A.   RISK FACTORS

Our operations and financial results are subject to various risks and uncertainties, including but not limited to those described below, which could harm our business, reputation, financial condition, and operating results, and affect the trading price of our Class A and Class C stock.

### Risks Specific to our Company

***We generate a significant portion of our revenues from advertising, and reduced spending by advertisers, a loss of partners, or new and existing technologies that block ads online and/or affect our ability to customize ads could harm our business.***

We generated more than 80% of total revenues from the display of ads online in 2021. Many of our advertisers, companies that distribute our products and services, digital publishers, and content providers can terminate their contracts with us at any time. These partners may not continue to do business with us if we do not create more value (such as increased numbers of users or customers, new sales leads, increased brand awareness, or more effective monetization) than their available alternatives. Changes to our advertising policies and data privacy practices, as well as changes to other companies' advertising and/or data privacy practices have in the past, and may in the future, affect the advertising that we are able to provide, which could harm our business. In addition, technologies have been developed that make customized ads more difficult or that block the display of ads altogether and some providers of online services have integrated technologies that could potentially impair the availability and functionality of third-party digital advertising. Failing to provide superior value or deliver advertisements effectively and competitively could harm our reputation, financial condition, and operating results.

In addition, expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Adverse macroeconomic conditions have affected, and may in the future affect, the demand for advertising, resulting in fluctuations in the amounts our advertisers spend on advertising, which could harm our financial condition and operating results.

***We face intense competition. If we do not continue to innovate and provide products and services that are useful to users, customers, and other partners, we may not remain competitive, which could harm our business and operating results.***

Our business environment is rapidly evolving and intensely competitive. Our businesses face changing technologies, shifting user needs, and frequent introductions of rival products and services. To compete successfully, we must accurately anticipate technology developments and deliver innovative, relevant and useful products, services, and technologies in a timely manner. As our businesses evolve, the competitive pressure to innovate will encompass a wider range of products and services. We must continue to invest significant resources in R&D, including through acquisitions, in order to enhance our technology and new and existing products and services.

We have many competitors in different industries. Our current and potential domestic and international competitors range from large and established companies to emerging start-ups. Some competitors have longer operating histories and well established relationships in various sectors. They can use their experience and resources in ways that could affect our competitive position, including by making acquisitions, continuing to invest heavily in R&D and in talent, aggressively initiating intellectual property claims (whether or not meritorious), and continuing to compete aggressively for users, advertisers, customers, and content providers. Further, discrepancies in enforcement of existing laws may enable our lesser known competitors to aggressively interpret those laws without commensurate scrutiny, thereby affording them competitive advantages. Our competitors may also be able to innovate and provide products and services faster than we can or may foresee the need for products and services before us.

Our operating results may also suffer if our products and services are not responsive to the needs of our users, advertisers, publishers, customers, and content providers. As technologies continue to develop, our competitors may be able to offer experiences that are, or that are seen to be, substantially similar to or better than ours. This may force us to compete in different ways and expend significant resources in order to remain competitive. If our competitors are more successful than we are in providing compelling products and services or in attracting and retaining users, advertisers, publishers, customers, and content providers, our operating results could be harmed.

***Our ongoing investment in new businesses, products, services, and technologies is inherently risky, and could divert management attention and harm our financial condition and operating results.***

PX0667-016

goog-20211231

10

PX0667-017

goog-20211231

Alphabet Inc.

We have invested and expect to continue to invest in new businesses, products, services, and technologies. The investments that we are making across Google Services, Google Cloud, and Other Bets reflect our ongoing efforts to innovate and provide products and services that are useful to users, advertisers, publishers, customers, and content providers. Our investments in Google Services, Google Cloud, and Other Bets span a wide range of industries beyond online advertising. Such investments ultimately may not be commercially viable or may not result in an adequate return of capital and, in pursuing new strategies, we may incur unanticipated liabilities. These endeavors may involve significant risks and uncertainties, including diversion of resources and management attention from current operations and, with respect to Other Bets, the use of alternative investment, governance, or compensation structures that may fail to adequately align incentives across the company or otherwise accomplish their objectives.

Within Google Services, we continue to invest heavily in hardware, including our smartphones, home devices, and wearables, which is a highly competitive market with frequent introduction of new products and services, rapid adoption of technological advancements by competitors, short product life cycles, evolving industry standards, continual improvement in product price and performance characteristics, and price and feature sensitivity on the part of consumers and businesses. There can be no assurance we will be able to provide hardware that competes effectively.

Within Google Cloud, we devote significant resources to develop and deploy our enterprise-ready cloud services, including Google Cloud Platform and Google Workspace. We are incurring costs to build and maintain infrastructure to support cloud computing services and hire talent, particularly to support and scale our salesforce. At the same time, our competitors are rapidly developing and deploying cloud-based services. Pricing and delivery models are competitive and evolving, and we may not attain sufficient scale and profitability to achieve our business objectives.

Within Other Bets, we are investing significantly in the areas of health, life sciences, and transportation, among others. These investment areas face intense competition from large, experienced, and well-funded competitors and our offerings may not be able to compete effectively or to operate at sufficient levels of profitability.

In addition, new and evolving products and services, including those that use AI and machine learning, raise ethical, technological, legal, regulatory, and other challenges, which may negatively affect our brands and demand for our products and services. Because all of these new ventures are inherently risky, no assurance can be given that such strategies and offerings will be successful and will not harm our reputation, financial condition, and operating results.

***Our revenue growth rate could decline over time, and we anticipate downward pressure on our operating margin in the future.***

Our revenue growth rate could decline over time as a result of a number of factors, including increasing competition. Changes in device mix, geographic mix, ongoing product and policy changes, product mix, and property mix and an increasing competition for advertising may also affect our advertising revenue growth rate. We may also experience a decline in our revenue growth rate as our revenues increase to higher levels, if there is a decrease in the rate of adoption of our products, services, and technologies, or due to deceleration or decline in demand for devices used to access our services, among other factors.

In addition, we may also experience downward pressure on our operating margin resulting from a variety of factors, such as the continued expansion of our business into new fields, including products and services such as hardware, Google Cloud, and subscription products, as well as significant investments in Other Bets, all of which may have margins lower than those we generate from advertising. We may also experience downward pressure on our operating margins from increasing regulations, increasing competition, and increased costs for many aspects of our business. Due to these factors and the evolving nature of our business, our historical revenue growth rate and historical operating margin may not be indicative of our future performance. For additional information, see Trends in Our Business and Financial Effect in Part II, Item 7 of this Annual Report on Form 10-K.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services, and brands as well as affect our ability to compete.***

Our patents, trademarks, trade secrets, copyrights, and other intellectual property rights are important assets for us. Various events outside of our control pose a threat to our intellectual property rights, as well as to our products, services, and technologies. For example, effective intellectual property protection may not be available in every country in which our products and services are distributed or made available through the Internet. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. Although we seek to obtain patent protection for our innovations, it is possible we may not be able to protect some of these innovations. Moreover, we may not have adequate patent or copyright protection for certain innovations that later turn out to be important. There is always the possibility that the scope of the protection gained will be insufficient or that an issued patent may be deemed invalid or unenforceable.

goog-20211231

PX0667-019

goog-20211231

Table of Contents                                                                                       Alphabet Inc.

We also seek to maintain certain intellectual property as trade secrets. The secrecy of such trade secrets and other sensitive information could be compromised, which could cause us to lose the competitive advantage resulting from these trade secrets. We also face risks associated with our trademarks. For example, there is a risk that the word "Google" could become so commonly used that it becomes synonymous with the word "search." Some courts have ruled that "Google" is a protectable trademark, but it is possible that other courts, particularly those outside of the U.S., may reach a different determination. If this happens, we could lose protection for this trademark, which could result in other people using the word "Google" to refer to their own products, thus diminishing our brand.

Any significant impairment of our intellectual property rights could harm our business and our ability to compete. Also, protecting our intellectual property rights is costly and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and harm our operating results.

***Our business depends on strong brands, and failing to maintain and enhance our brands would hurt our ability to expand our base of users, advertisers, customers, content providers, and other partners.***

Our strong brands have significantly contributed to the success of our business. Maintaining and enhancing the brands within Google Services, Google Cloud, and Other Bets increases our ability to enter new categories and launch new and innovative products and services that better serve the needs of our users, advertisers, customers, content providers, and other partners. Our brands have been, and may in the future be, negatively affected by a number of factors, including, among others, reputational issues, third-party content shared on our platforms, data privacy and security issues and developments, and product or technical performance failures. For example, if we fail to respond appropriately to the sharing of misinformation or objectionable content on our services and/or products or objectionable practices by advertisers, or otherwise to adequately address user concerns, our users may lose confidence in our brands.

Furthermore, failure to maintain and enhance equity in our brands may harm our business, financial condition, and operating results. Our success will depend largely on our ability to remain a technology leader and continue to provide high-quality, trustworthy, innovative products and services that are truly useful and play a valuable role in a range of settings.

***We face a number of manufacturing and supply chain risks that could harm our financial condition, operating results, and prospects.***

We face a number of risks related to manufacturing and supply chain management, which could affect our ability to supply both our products and our internet-based services.

We rely on other companies to manufacture many of our finished products; to design certain of our components and parts; to participate in the distribution of our products and services; and to design, manufacture, or assemble certain components and parts in our technical infrastructure. Our business could be negatively affected if we are not able to engage these companies with the necessary capabilities or capacity on reasonable terms, or if those we engage fail to meet their obligations (whether due to financial difficulties or other reasons), or make adverse changes in the pricing or other material terms of our arrangements with them.

We have experienced and/or may in the future experience supply shortages and/or price increases that could negatively affect our operations, driven by raw material, component or part availability, manufacturing capacity, labor shortages, industry allocations, logistics capacity, tariffs, trade disputes and barriers, natural disasters or pandemics, the effects of climate change (such as sea level rise, drought, flooding, heat waves, wildfires and resultant air quality effects and power shutoffs associated with wildfire prevention, and increased storm severity), and significant changes in the financial or business condition of our suppliers. In addition, some of the components we use in our technical infrastructure and products are available from only one or limited sources, and we may not be able to find replacement vendors on favorable terms in the event of a supply chain disruption. In addition, a significant supply interruption that affects us or our vendors could delay critical data center upgrades or expansions and delay product availability.

We may enter into long-term contracts for materials and products that commit us to significant terms and conditions. We may be liable for materials and products that are not consumed due to market acceptance, technological change, obsolescences, quality, product recalls, and warranty issues. For instance, because certain of our hardware supply contracts have volume-based pricing or minimum purchase requirements, if the volume of our hardware sales decreases or does not reach projected targets, we could face increased materials and manufacturing costs or other financial liabilities that could make our products more costly per unit to manufacture and negatively affect our financial results. Furthermore, certain of our competitors may negotiate more favorable contractual terms based on volume and other commitments that may provide them with competitive advantages and may affect our supply.

12

PX0667-020

Our products and services have had, and in the future may have, quality issues resulting from design, manufacturing, or operations. Sometimes, these issues may be caused by components we purchase from other manufacturers or suppliers. If the quality of our products and services does not meet expectations or our products or services are defective, it could harm our reputation, financial condition, and operating results.

We require our suppliers and business partners to comply with laws and, where applicable, our company policies, such as the Google Supplier Code of Conduct, regarding workplace and employment practices, data security, environmental compliance, and intellectual property licensing, but we do not control them or their practices. Violations of law or unethical business practices could result in supply chain disruptions, canceled orders, harm to key relationships, and damage to our reputation. Their failure to procure necessary license rights to intellectual property could affect our ability to sell our products or services and expose us to litigation or financial claims.

***Interruption to, interference with, or failure of our complex information technology and communications systems could hurt our ability to effectively provide our products and services, which could harm our reputation, financial condition, and operating results. In addition, problems with the design or implementation of our new global enterprise resource planning system could harm our business and operations.***

The availability of our products and services and fulfillment of our customer contracts depend on the continuing operation of our information technology and communications systems. Our systems are vulnerable to damage, interference, or interruption from modifications or upgrades, terrorist attacks, natural disasters or pandemics, the effects of climate change (such as sea level rise, drought, flooding, heat waves, wildfires and resultant air quality effects and power shutoffs associated with wildfire prevention, and increased storm severity), power loss, telecommunications failures, computer viruses, ransomware attacks, computer denial of service attacks, phishing schemes, or other attempts to harm or access our systems. Some of our data centers are located in areas with a high risk of major earthquakes or other natural disasters. Our data centers are also subject to break-ins, sabotage, and intentional acts of vandalism, and, in some cases, potential disruptions resulting from problems experienced by facility operators. Some of our systems are not fully redundant, and disaster recovery planning cannot account for all eventualities. The occurrence of a natural disaster or pandemic, closure of a facility, or other unanticipated problems affecting our data centers could result in lengthy interruptions in our service. In addition, our products and services are highly technical and complex and have contained in the past, and may contain in the future, errors or vulnerabilities, which could result in interruptions in or failure of our services or systems.

In addition, we rely extensively on information systems and technology to manage our business and summarize operating results. We are in the process of a multi-year implementation of a new ERP system, which is designed to accurately maintain our financial records, enhance the flow of financial information, improve data management, and provide timely information to our management team. As the phased implementation continues, we may experience delays, increased costs, and other difficulties. Failure to successfully design and implement the ERP system as planned could harm our business, financial condition, and operating results. Additionally, if we do not effectively implement the ERP system as planned or the ERP system does not operate as intended, the effectiveness of our internal control over financial reporting could be negatively affected.

***Our international operations expose us to additional risks that could harm our business, our financial condition, and operating results.***

Our international operations are significant to our revenues and net income, and we plan to continue to grow internationally. International revenues accounted for approximately 54% of our consolidated revenues in 2021. In addition to risks described elsewhere in this section, our international operations expose us to other risks, including the following:

- restrictions on foreign ownership and investments, and stringent foreign exchange controls that might prevent us from repatriating cash earned in countries outside the U.S.;

- import and export requirements, tariffs and other market access barriers that may prevent or impede us from offering products or providing services to a particular market, or that could limit our ability to source assemblies and finished products from a particular market, and may increase our operating costs;

- longer payment cycles in some countries, increased credit risk, and higher levels of payment fraud;

- an evolving foreign policy landscape that may adversely affect our revenues and could subject us to new regulatory costs and challenges (including the transfer of personal data between the EU and the United Kingdom and new customer requirements), in addition to other adverse effects that we are unable to effectively anticipate;

13

goog-20211231

Alphabet Inc.

- anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, and other local laws prohibiting certain payments to government officials, violations of which could result in civil and criminal penalties;

- uncertainty regarding liability for services and content, including uncertainty as a result of local laws and lack of legal precedent; and

- different employee/employer relationships, existence of works councils and labor unions, and other challenges caused by distance, language, and cultural differences, making it harder to do business in certain jurisdictions.

Because we conduct business in currencies other than U.S. dollars but report our financial results in U.S. dollars, we have faced, and will continue to face, exposure to fluctuations in foreign currency exchange rates. Although we hedge a portion of our international currency exposure, significant fluctuations in exchange rates between the U.S. dollar and foreign currencies may adversely affect our revenues and earnings. Hedging programs are also inherently risky and could expose us to additional risks that could harm our financial condition and operating results.

### Risks Related to our Industry

***People access the Internet through a variety of platforms and devices that continue to evolve with the advancement of technology and user preferences. If manufacturers and users do not widely adopt versions of our products and services developed for these interfaces, our business could be harmed.***

People access the Internet through a growing variety of devices such as desktop computers, mobile phones, smartphones, laptops and tablets, video game consoles, voice-activated speakers, wearables, automobiles, and television-streaming devices. Our products and services may be less popular on some interfaces. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not be available or may only be available with limited functionality for our users or our advertisers on these devices as a result. Some manufacturers may also elect not to include our products on their devices. In addition, search queries are increasingly being undertaken via voice-activated speakers, apps, social media or other platforms, which could harm our business. It is hard to predict the challenges we may encounter in adapting our products and services and developing competitive new products and services. We expect to continue to devote significant resources to creating and supporting products and services across multiple platforms and devices. Failing to attract and retain a substantial number of new device manufacturers, suppliers, distributors, developers, and users, or failing to develop products and technologies that work well on new devices and platforms, could harm our business, financial condition, and operating results and ability to capture future business opportunities.

***Data privacy and security concerns relating to our technology and our practices could damage our reputation, cause us to incur significant liability, and deter current and potential users or customers from using our products and services. Software bugs or defects, security breaches, and attacks on our systems could result in the improper disclosure and use of user data and interference with our users' and customers' ability to use our products and services, harming our business operations and reputation.***

Concerns about, including the adequacy of, our practices with regard to the collection, use, governance, disclosure, or security of personal information or other data-privacy-related matters, even if unfounded, could harm our reputation, financial condition, and operating results. Our policies and practices may change over time as expectations and regulations regarding privacy and data change.

Our products and services involve the storage, handling, and transmission of proprietary and other sensitive information. Software bugs, theft, misuse, defects, vulnerabilities in our products and services, and security breaches expose us to a risk of loss or improper use and disclosure of such information, which could result in litigation and other potential liability, including regulatory fines and penalties, as well as reputational harm. Additionally, our products incorporate highly technical and complex technologies, and thus our technologies and software have contained, and are likely in the future to contain, undetected errors, bugs, or vulnerabilities. We have in the past discovered, and may in the future discover, some errors in our software code only after we have released the code. Systems and control failures, security breaches, failure to comply with our privacy policies, and/or inadvertent disclosure of user data could result in government and legal exposure, seriously harm our reputation, brand, and business, and impair our ability to attract and retain users or customers. Such incidents have occurred in the past and may continue to occur due to the scale and nature of our products and services. While there is no guarantee that such incidents will not cause significant damage, we expect to continue to expend significant resources to maintain security protections that limit the effect of bugs, theft, misuse, and security vulnerabilities or breaches.

We experience cyber attacks and other attempts to gain unauthorized access to our systems on a regular basis. Cyber attacks continue to evolve in sophistication and volume, and inherently may be difficult to detect for long periods of time. We have seen, and will continue to see, industry-wide vulnerabilities, such as the Log4j vulnerability reported in December 2021, which could affect our or other parties' systems. We expect to continue to experience such

PX0667-022

PX0667-023

goog-20211231

Table of Contents

incidents or vulnerabilities in the future. Our efforts to address undesirable activity on our platform may also increase the risk of retaliatory attack. We may experience future security issues, whether due to employee error or malfeasance or system errors or vulnerabilities in our or other parties' systems. While we may not determine some of these issues to be material at the time they occur and may remedy them quickly, there is no guarantee that these issues will not ultimately result in significant legal, financial, and reputational harm, including government inquiries and enforcement actions, litigation, and negative publicity. Because the techniques used to obtain unauthorized access to, disable or degrade service provided by or otherwise sabotage systems change frequently and often are recognized only after being launched against a target, even taking all reasonable precautions, including those required by law, we have been unable in the past and may continue to be unable to anticipate or detect attacks or vulnerabilities or implement adequate preventative measures.

Further, if any partners with whom we share user or other customer information fail to implement adequate data-security practices or fail to comply with our terms and policies or otherwise suffer a network or other security breach, our users' information may be improperly accessed, used, or disclosed. If an actual or perceived breach of our or our business partners' or service providers' security occurs, the market perception of the effectiveness of our security measures would be harmed, we could lose users and customers, our trade secrets or those of our business partners may be compromised, and we may be exposed to significant legal and financial risks, including legal claims (which may include class-action litigation) and regulatory action, fines, and penalties. Any of the foregoing consequences could have a material and adverse effect on our business, reputation, and results of operations.

While we have dedicated significant resources to privacy and security incident response capabilities, including dedicated worldwide incident response teams, our response process, particularly during times of a natural disaster or pandemic, may not be adequate, may fail to accurately assess the severity of an incident, may not be fast enough to prevent or limit harm, or may fail to sufficiently remediate an incident. As a result, we may suffer significant legal, reputational, or financial exposure, which could harm our business, financial condition, and operating results.

For additional information, see also our risk factor on privacy and data protection regulations under 'Risks Related to Laws and Regulations' below.

***Our ongoing investments in safety, security, and content review will likely continue to identify abuse of our platforms and misuse of user data.***

In addition to our efforts to prevent and mitigate cyber attacks, we are making significant investments in safety, security, and review efforts to combat misuse of our services and unauthorized access to user data by third parties, including investigation and review of platform applications that could access the information of users of our services. As a result of these efforts, we have in the past discovered, and may in the future discover, incidents of unnecessary access to or misuse of user data or other undesirable activity by third parties. However, we may not have discovered, and may in the future not discover, all such incidents or activity, whether as a result of our data limitations, including our lack of visibility over our encrypted services, the scale of activity on our platform, or other factors, including factors outside of our control such as a natural disaster or pandemic, and we may learn of such incidents or activity via third parties. Such incidents and activities may include the use of user data or our systems in a manner inconsistent with our terms, contracts or policies, the existence of false or undesirable user accounts, election interference, improper ad purchases, activities that threaten people's safety on- or off-line, or instances of spamming, scraping, or spreading disinformation. While we may not determine some of these incidents to be material at the time they occurred and we may remedy them quickly, there is no guarantee that these issues will not ultimately result in significant legal, financial, and reputational harm, including government inquiries and enforcement actions, litigation, and negative publicity.

We may also be unsuccessful in our efforts to enforce our policies or otherwise prevent or remediate any such incidents. Any of the foregoing developments may negatively affect user trust and engagement, harm our reputation and brands, require us to change our business practices in ways that harm our business operations and adversely affect our business and financial results. Any such developments may also subject us to additional litigation and regulatory inquiries, which could result in monetary penalties and damages, divert management's time and attention, and lead to enhanced regulatory oversight.

***Problematic content on our platforms, including low-quality user-generated content, web spam, content farms, and other violations of our guidelines could affect the quality of our services, which could damage our reputation and deter our current and potential users from using our products and services.***

We, like others in the industry, face violations of our content guidelines across our platforms, including sophisticated attempts by bad actors to manipulate our hosting and advertising systems to fraudulently generate revenues, or to otherwise generate traffic that does not represent genuine user interest or intent. While we invest significantly in efforts to promote high-quality and relevant results and to detect and prevent low-quality content and

PX0667-024

PX0667-025

invalid traffic, we have been unable and may continue to be unable to adequately detect and prevent all such abuses or promote uniformly high-quality content.

Many websites violate or attempt to violate our guidelines, including by seeking to inappropriately rank higher in search results than our search engine's assessment of their relevance and utility would rank them. Such efforts have affected, and may continue to affect, the quality of content on our platforms and lead them to display false, misleading, or undesirable content. Although English-language web spam in our search results has been reduced, and web spam in most other languages is limited, we expect web spammers will continue to seek inappropriate ways to improve their rankings. We continuously combat web spam in our search results, including through indexing technology that makes it harder for spam-like, less useful web content to rank highly. We also continue to invest in and deploy proprietary technology to detect and prevent web spam on our platforms. We also face other challenges from low-quality and irrelevant content websites, including content farms, which are websites that generate large quantities of low-quality content to help them improve their search rankings. We are continually launching algorithmic changes designed to detect and prevent abuse from low-quality websites. We also face other challenges on our platforms, including violations of our content guidelines involving incidents such as attempted election interference, activities that threaten the safety and/or well-being of our users on- or off-line, and the spreading of misinformation or disinformation.

If we fail to either detect and prevent an increase in problematic content or effectively promote high-quality content, it could hurt our reputation for delivering relevant information or reduce use of our platforms, harming our financial condition or operating results. It may also subject us to litigation and regulatory action, which could result in monetary penalties and damages and divert management's time and attention.

*Our business depends on continued and unimpeded access to the Internet by us and our users. Internet access providers may be able to restrict, block, degrade, or charge for access to certain of our products and services, which could lead to additional expenses and the loss of users and advertisers.*

Our products and services depend on the ability of our users to access the Internet, and certain of our products require significant bandwidth to work effectively. Currently, this access is provided by companies that have significant market power in the broadband and internet access marketplace, including incumbent telephone companies, cable companies, mobile communications companies, and government-owned service providers. Some of these providers have taken, or have stated that they may take measures that could degrade, disrupt, or increase the cost of user access to certain of our products by restricting or prohibiting the use of their infrastructure to support or facilitate our offerings, by charging increased fees to us or our users to provide our offerings, or by providing our competitors preferential access. Some jurisdictions have adopted regulations prohibiting certain forms of discrimination by internet access providers; however, substantial uncertainty exists in the U.S. and elsewhere regarding such protections. For example, in 2018 the U.S. Federal Communications Commission repealed net neutrality rules, which could permit internet access providers to restrict, block, degrade, or charge for access to certain of our products and services. In addition, in some jurisdictions, our products and services have been subject to government-initiated restrictions or blockages. These could harm existing key relationships, including with our users, customers, advertisers, and/or content providers, and impair our ability to attract new ones; damage our reputation; and increase costs, thereby negatively affecting our business.

### Risks Related to Laws, Regulations, and Policies

*We face increased regulatory scrutiny as well as changes in regulatory conditions, laws, and policies governing a wide range of topics that may negatively affect our business.*

We and other companies in the technology industry face increased regulatory scrutiny, enforcement action, and other proceedings. For instance, the U.S. Department of Justice, joined by a number of state Attorneys General, filed an antitrust complaint against Google on October 20, 2020, alleging that Google violated U.S. antitrust laws relating to Search and Search advertising. Similarly, on December 16, 2020, a number of state Attorneys General filed an antitrust complaint against Google in the U.S. District Court for the Eastern District of Texas, alleging that Google violated U.S. antitrust laws as well as state deceptive trade laws relating to its advertising technology. Various other regulatory agencies in the U.S. and around the world, including competition enforcers, consumer protection agencies, data protection authorities, grand juries, inter-agency consultative groups, and a range of other governmental bodies have and continue to review and in some cases challenge our products and services and their compliance with laws and regulations around the world. We continue to cooperate with these investigations and defend litigation where appropriate. Various laws, regulations, investigations, enforcement lawsuits, and regulatory actions have in the past, and may in the future, result in substantial fines and penalties, injunctive relief, ongoing auditing and monitoring obligations, changes to our products and services, alterations to our business models and operations, and collateral litigation, all of which could harm our business, reputation, financial condition, and operating results.

goog-20211231

16

PX0667-027

Changes in international and local social, political, economic, tax, and regulatory conditions or in laws and policies have in the past, and may in the future, increase our cost of doing business and limit our ability to pursue certain business models, offer products or services in certain jurisdictions, or cause us to change our business practices. We have in the past had to alter or stop offering certain products and services as a result of laws or regulations that made them unfeasible, and new laws or regulations could result in our having to terminate, alter, or withdraw products and services in the future. Additional costs of doing business, new limitations, or changes to our business model or practices could harm our business, reputation, financial condition, and operating results.

We are subject to regulations, laws, and policies that govern a wide range of topics, including those related to matters beyond our core products and services. For instance, new regulations, laws, policies, and international accords relating to environmental and social matters, including sustainability, climate change, human capital, and diversity, are being developed and formalized in Europe, the U.S., and elsewhere, which may entail specific, target-driven frameworks and/or disclosure requirements. We have implemented robust environmental and social programs, adopted reporting frameworks and principles, and announced a number of goals and initiatives, including those related to environmental sustainability and diversity. The implementation of these goals and initiatives may require considerable investments, and our goals, with all of their contingencies, dependencies, and in certain cases, reliance on third-party verification and/or performance, are complex and ambitious, and we cannot guarantee that we will achieve them.

Additionally, there can be no assurance that our current programs, reporting frameworks, and principles will be in compliance with any new environmental and social laws and regulations that may be promulgated in the U.S. and elsewhere, and the costs of changing any of our current practices to comply with any new legal and regulatory requirements in the U.S. and elsewhere may be substantial. Furthermore, industry and market practices may further develop to become even more robust than what is required under any new laws and regulations, and we may have to expend significant efforts and resources to keep up with market trends and stay competitive among our peers.

***A variety of new and existing laws and/or interpretations could harm our business.***

We are subject to numerous U.S. and foreign laws and regulations covering a wide variety of subject matters. New laws and regulations, or new interpretations or applications of existing laws and regulations in a manner inconsistent with our practices, have made, and may continue to make, our products and services less useful, limit our ability to pursue certain business models or offer certain products and services in certain jurisdictions, require us to incur substantial costs, expose us to civil or criminal liability, or cause us to change our business practices. These laws and regulations are evolving and involve matters central to our business, including, among others:

- Laws and regulations around the world focused on large technology platforms, including the Digital Markets Act in the European Union and proposed antitrust legislation on self-preferencing and mergers and acquisitions in the U.S., which may limit certain business practices, and in some cases, create the risk of significant penalties.

- Privacy laws, such as the GDPR, CCPA, CPRA, Virginia CDPA, and ColoPA (as defined and discussed further below).

- Data protection laws passed by many states within the U.S. and by certain countries regarding notification to data subjects and/or regulators when there is a security breach of personal data.

- Consumer protection laws, including EU's New Deal for Consumers, which could result in monetary penalties and create a range of new compliance obligations.

- New laws further restricting the collection, processing and/or sharing of advertising-related data. Copyright or similar laws around the world, including the EU Directive on Copyright in the Digital Single Market (EUCD) and EU member state transpositions. These and similar laws that have been adopted or proposed introduce new licensing regimes that could affect our ability to operate. The EUCD and similar laws could also increase the liability of some content-sharing services with respect to content uploaded by their users. Some of these laws, as well as follow-on administrative or judicial actions, have also created or may create a new property right in news publications that limits the ability of some online services to link to, interact with, or present such content. They may also require individual or collective compensation negotiations with news agencies and publishers for the use of such content, which may result in payment obligations that significantly exceed the value that such content provides to Google and its users, potentially harming our services, commercial operations, and business results.

- Data localization laws, which generally mandate that certain types of data collected in a particular country be stored and/or processed within that country.

17

PX0667-028

- Various U.S. and international laws that govern the distribution of certain materials to children and regulate the ability of online services to collect information from minors, including the Children's Online Privacy Protection Act of 1998 and the United Kingdom's Age-Appropriate Design Code.

- Various laws with regard to content moderation and removal, and related disclosure obligations, such as the Network Enforcement Act in Germany and the European Union's pending Digital Services Act, which may affect our businesses and operations and may subject us to significant fines if such laws are interpreted and applied in a manner inconsistent with our practices or when we may not proactively discover such content due to the scale of third-party content and the limitations of existing technologies. Other countries, including Singapore, Australia, and the United Kingdom, have implemented or are considering similar legislation imposing penalties for failure to remove certain types of content.

- Various legislative, litigation, and regulatory activity regarding our Google Play billing policies and business model, which could result in monetary penalties, damages and/or prohibition.

- Various legislative and regulatory activity requiring disclosure of information about the operation of our services and algorithms, which may make it easier for websites to artificially promote low-quality, deceptive, or harmful content on services like Google Search and YouTube, potentially harming the quality of our services.

In addition, the applicability and scope of these laws, as interpreted by the courts, remain uncertain and could harm our business. For example:

- We rely on statutory safe harbors, as set forth in the Digital Millennium Copyright Act and Section 230 of the Communications Decency Act in the U.S. and the E-Commerce Directive in Europe, against liability for various linking, caching, and hosting activities. Any legislation or court rulings affecting these safe harbors may adversely affect us. There are legislative proposals in both the U.S. and EU that could reduce our safe harbor protection.

- Court decisions such as the judgment of the Court of Justice of the European Union (CJEU) on May 13, 2014 on the 'right to be forgotten,' which allows individuals to demand that Google remove search results about them in certain instances, may limit the content we can show to our users and impose significant operational burdens.

The introduction of new businesses, products, services, and technologies, our activities in certain jurisdictions, or other actions we take have subjected us, and will likely continue to subject us, to additional laws and regulations. Our investment in a variety of new fields, such as healthcare and payment services, has expanded, and will continue to expand, the scope of regulations that apply to our business. The costs of compliance with these laws and regulations are high and are likely to increase in the future. Any failure on our part to comply with laws and regulations can result in negative publicity and diversion of management time and effort and may subject us to significant liabilities and other penalties.

***We are subject to claims, suits, government investigations, other proceedings, and consent decrees that may harm our business, financial condition, and operating results.***

We are subject to claims, suits, government investigations, other proceedings, and consent decrees involving competition, intellectual property, data privacy and security, consumer protection, tax, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, and other matters. Due to our manufacturing and sale of an expanded suite of products and services, including hardware as well as Google Cloud offerings, we also are subject to a variety of claims including product warranty, product liability, and consumer protection claims related to product defects, among other litigation. We may also be subject to claims involving health and safety, hazardous materials usage, other environmental effects, or service disruptions or failures.

Any of these types of legal proceedings can have an adverse effect on us because of legal costs, diversion of management resources, negative publicity and other factors. Determining reserves for our pending litigation is a complex, fact-intensive process that requires significant judgment. The resolution of one or more such proceedings has resulted in, and may in the future result in, additional substantial fines, penalties, injunctions, and other sanctions that could harm our business, financial condition, and operating results.

***We may be subject to legal liability associated with providing online services or content.***

Our products and services let users exchange information, advertise products and services, conduct business, and engage in various online activities. We also place advertisements displayed on other companies' websites, and we offer third-party products, services, and/or content. The law relating to the liability of online service providers for others' activities on their services is still somewhat unsettled around the world. Claims have been brought against us, and we

18

PX0667-030

expect will continue to be brought against us, for defamation, negligence, breaches of contract, copyright and trademark infringement, unfair competition, unlawful activity, torts, fraud, or other legal theories based on the nature and content of information available on or via our services.

We may be subject to claims by virtue of our involvement in hosting, transmitting, marketing, branding, or providing access to content created by third parties. Defense of such actions could be costly and involve significant time and attention of our management and other resources, may result in monetary liabilities or penalties, and may require us to change our business in an adverse manner.

***Privacy and data protection regulations are complex and rapidly evolving areas. Any failure or alleged failure to comply with these laws could harm our business, reputation, financial condition, and operating results.***

Authorities around the world have adopted and are considering a number of legislative and regulatory proposals concerning data protection and limits on encryption of user data. Adverse legal rulings, legislation, or regulation have resulted in, and may continue to result in, fines and orders requiring that we change our data practices, which could have an adverse effect on our ability to provide services, harming our business operations. Complying with these evolving laws could result in substantial costs and harm the quality of our products and services, negatively affecting our business, and may be particularly challenging during certain times, such as a natural disaster or pandemic. Amongst others, we are and will be subject to the following laws and regulations:

- The General Data Protection Regulation (GDPR), which applies to all of our activities conducted from an establishment in the EU or related to products and services that we offer to EU users or customers, or the monitoring of their behavior in the EU. Ensuring compliance with the range of obligations created by the GDPR is an ongoing commitment that involves substantial costs. Despite our efforts, governmental authorities or others have asserted and may continue to assert that our business practices fail to comply with its requirements. If our operations are found to violate the GDPR requirements, we may incur substantial fines, have to change our business practices, and face reputational harm, any of which could have an adverse effect on our business. Serious breaches of the GDPR can result in administrative fines of up to 4% of annual worldwide revenues. Fines of up to 2% of annual worldwide revenues can be levied for other specified violations.

- Various state privacy laws, such as the California Consumer Privacy Act of 2018 (CCPA), which came into effect in January of 2020; the California Privacy Rights Act (CPRA), which will go into effect in 2023; the Virginia Consumer Data Protection Act (Virginia CDPA), which will go into effect in 2023; and the Colorado Privacy Act (ColoPA), which will go into effect in 2023; all of which give new data privacy rights to their respective residents (including, in California, a private right of action in the event of a data breach resulting from our failure to implement and maintain reasonable security procedures and practices) and impose significant obligations on controllers and processors of consumer data.

- SB-327 in California, which regulates the security of data in connection with internet connected devices.

Further, we are subject to evolving laws and regulations that dictate whether, how, and under what circumstances we can transfer, process and/or receive personal data. The EU-U.S. and the Swiss-U.S. Privacy Shield frameworks that previously allowed U.S. companies that self-certify to the U.S. Department of Commerce and publicly commit to comply with specified requirements to import personal data from the EU and Switzerland have been invalidated by the CJEU. The CJEU upheld Standard Contractual Clauses (SCCs) as a valid transfer mechanism, provided they meet certain requirements. On June 4, 2021, the European Commission published new SCCs for this purpose, and we may have to adapt our existing contractual arrangements to meet these new requirements. The validity of data transfer mechanisms remains subject to legal, regulatory, and political developments in both Europe and the U.S., such as recent recommendations from the European Data Protection Board, decisions from supervisory authorities, recent proposals for reform of the data transfer mechanisms for transfers of personal data outside the United Kingdom, and potential invalidation of other data transfer mechanisms, which, together with increased enforcement action from supervisory authorities in relation to cross-border transfers of personal data, could have a significant adverse effect on our ability to process and transfer personal data outside of the European Economic Area and/or the United Kingdom.

These laws and regulations are evolving and subject to interpretation, including developments which create some uncertainty, and compliance obligations could cause us to incur costs or harm the operations of our products and services in ways that harm our business. For example, in the EU, several supervisory authorities have issued new guidance concerning the ePrivacy Directive's requirements regarding the use of cookies and similar technologies, including limitations on the use of data across messaging products and specific requirements for enabling users to accept or reject cookies, and have in some cases brought (and may seek to bring in the future) enforcement action in relation to those requirements. In the U.S., certain types of cookies may be deemed sales of personal information

PX0667-031

PX0667-032

within the CCPA and other state laws, such that certain disclosure requirements and limitations apply to the use of such cookies. In addition, some countries are considering or have passed legislation implementing data protection requirements or requiring local storage and processing of data that could increase the cost and complexity of delivering our services and carries the potential of service interruptions in those countries.

*We face, and may continue to face, intellectual property and other claims that could be costly to defend, result in significant damage awards or other costs (including indemnification awards), and limit our ability to use certain technologies in the future.*

We, like other internet, technology and media companies, are frequently subject to litigation based on allegations of infringement or other violations of intellectual property rights. In addition, patent-holding companies may frequently seek to generate income from patents they have obtained by bringing claims against us. As we have grown, the number of intellectual property claims against us has increased and may continue to increase as we develop new products, services, and technologies.

We have had patent, copyright, trade secret, and trademark infringement lawsuits filed against us claiming that certain of our products, services, and technologies infringe the intellectual property rights of others. Other parties have also sought broad injunctive relief against us by filing claims in U.S. and international courts and the U.S. International Trade Commission (ITC) for exclusion and cease-and-desist orders, which could limit our ability to sell our products or services in the U.S. or elsewhere if our products or services or those of our customers or suppliers are found to infringe the intellectual property subject to the claims. Adverse results in any of these lawsuits may include awards of monetary damages, costly royalty or licensing agreements (if licenses are available at all), or orders preventing us from offering certain features, functionalities, products, or services. They may also cause us to change our business practices and require development of non-infringing products, services, or technologies, which could result in a loss of revenues for us and otherwise harm our business.

Many of our agreements with our customers and partners, including certain suppliers, require us to defend against certain intellectual property infringement claims and in some cases indemnify them for certain intellectual property infringement claims against them, which could result in increased costs for defending such claims or significant damages if there were an adverse ruling in any such claims. Such customers and partners may also discontinue the use of our products, services, and technologies, as a result of injunctions or otherwise, which could result in loss of revenues and adversely affect our business. Moreover, intellectual property indemnities provided to us by our suppliers, when obtainable, may not cover all damages and losses suffered by us and our customers arising from intellectual property infringement claims. Furthermore, in connection with our divestitures, we have agreed, and may in the future agree, to provide indemnification for certain potential liabilities, including those associated with intellectual property claims. Regardless of their merits, intellectual property claims are often time consuming and expensive to litigate or settle. To the extent such claims are successful, they may harm our business, including our product and service offerings, financial condition, or operating results.

### Risks Related to Ownership of our Stock

*We cannot guarantee that any share repurchase program will be fully consummated or will enhance long-term stockholder value, and share repurchases could increase the volatility of our stock prices and could diminish our cash reserves.*

We engage in share repurchases of our Class A and Class C stock from time to time in accordance with authorizations from the Board of Directors of Alphabet. Our repurchase program does not have an expiration date and does not obligate Alphabet to repurchase any specific dollar amount or to acquire any specific number of shares. Further, our share repurchases could affect our share trading prices, increase their volatility, reduce our cash reserves and may be suspended or terminated at any time, which may result in a decrease in the trading prices of our stock.

*The concentration of our stock ownership limits our stockholders' ability to influence corporate matters.*

Our Class B stock has 10 votes per share, our Class A stock has one vote per share, and our Class C stock has no voting rights. As of December 31, 2021, Larry Page and Sergey Brin beneficially owned approximately 85.9% of our outstanding Class B stock, which represented approximately 51.4% of the voting power of our outstanding common stock. Through their stock ownership, Larry and Sergey have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets, for the foreseeable future. In addition, because our Class C stock carries no voting rights (except as required by applicable law), the issuance of the Class C stock, including in future stock-based acquisition transactions and to fund employee equity incentive programs, could continue Larry and Sergey's current relative voting power and their ability to elect all of our directors and to determine the outcome of most matters submitted to a vote of our stockholders. The share repurchases made pursuant to our repurchase program may also

20

PX0667-034

goog-20211231

Alphabet Inc.

affect Larry and Sergey's relative voting power. This concentrated control limits or severely restricts other stockholders' ability to influence corporate matters and we may take actions that some of our stockholders do not view as beneficial, which could reduce the market price of our Class A stock and our Class C stock.

***Provisions in our charter documents and under Delaware law could discourage a takeover that stockholders may consider favorable.***

Provisions in Alphabet's certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. These provisions include the following:

- Our certificate of incorporation provides for a tri-class capital stock structure. As a result of this structure, Larry and Sergey have significant influence over all matters requiring stockholder approval. This concentrated control could discourage others from initiating any potential merger, takeover, or other change of control transaction that other stockholders may view as beneficial.

- Our Board of Directors has the right to elect directors to fill a vacancy created by the expansion of the Board of Directors or the resignation, death, or removal of a director.

- Our stockholders may not act by written consent, which makes it difficult to take certain actions without holding a stockholders' meeting.

- Our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect director candidates.

- Stockholders must provide advance notice to nominate individuals for election to the Board of Directors or to propose matters that can be acted upon at a stockholders' meeting. These provisions may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

- Our Board of Directors may issue, without stockholder approval, shares of undesignated preferred stock, which makes it possible for our Board of Directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

As a Delaware corporation, we are also subject to certain Delaware anti-takeover provisions. Under Delaware law, a corporation may not engage in a business combination with any holder of 15% or more of its outstanding voting stock unless the holder has held the stock for three years or, among other things, the Board of Directors has approved the transaction. Our Board of Directors could rely on Delaware law to prevent or delay an acquisition of us.

**General Risks**

***The continuing effects of COVID-19 are highly unpredictable and could be significant, and may have an adverse effect on our business, operations and our future financial performance.***

Since COVID-19 was declared a global pandemic by the World Health Organization, our business, operations and financial performance have been, and may continue to be, affected by the macroeconomic impacts resulting from the efforts to control the spread of COVID-19. As a result of the scale of the ongoing pandemic, including the introduction of new variants of COVID-19 and vaccination and other efforts to control the spread, our revenue growth rate and expenses as a percentage of our revenues in future periods may differ significantly from our historical rates, and our future operating results may fall below expectations. Additionally, we may experience a significant and prolonged shift in user behavior such as a shift in interests to less commercial topics.

As a result of the pandemic, our workforce shifted to operating in a primarily remote working environment, which continues to create inherent productivity, connectivity, and oversight challenges. The effects of the ongoing pandemic are dynamic and uneven. As we prepare to return our workforce in more locations back to the office, we may experience increased costs and/or disruption as we experiment with hybrid work models, in addition to potential effects on our ability to operate effectively and maintain our corporate culture.

***Our operating results may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.***

Our operating results have fluctuated, and may in the future fluctuate, as a result of a number of factors, many outside of our control, including the cyclicality and seasonality in our business and geopolitical events. As a result, comparing our operating results (including our expenses as a percentage of our revenues) on a period-to-period basis may not be meaningful, and our past results should not be relied on as an indication of our future performance. Consequently, our operating results in future quarters may fall below expectations.

goog-20211231

21

PX0667-036

***Acquisitions, joint ventures, investments, and divestitures could result in operating difficulties, dilution, and other consequences that may harm our business, financial condition, and operating results.***

Acquisitions, joint ventures, investments and divestitures are important elements of our overall corporate strategy and use of capital, and these transactions could be material to our financial condition and operating results. We expect to continue to evaluate and enter into discussions regarding a wide array of such potential strategic transactions, which could create unforeseen operating difficulties and expenditures. Some of the areas where we face risks include:

- diversion of management time and focus from operating our business to challenges related to acquisitions and other strategic transactions;

- failure to obtain required approvals on a timely basis, if at all, from governmental authorities, or conditions placed upon approval that could, among other things, delay or prevent us from completing a transaction, or otherwise restrict our ability to realize the expected financial or strategic goals of a transaction;

- failure to successfully integrate and further develop the acquired business or technology;

- implementation or remediation of controls, procedures, and policies at the acquired company;

- integration of the acquired company's accounting, human resource (including cultural integration and retention of employees), and other administrative systems, and coordination of product, engineering, and sales and marketing functions;

- transition of operations, users, and customers onto our existing platforms;

- in the case of foreign acquisitions, the need to integrate operations across different cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries;

- liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, data privacy and security issues, violations of laws, commercial disputes, tax liabilities, warranty claims, product liabilities, and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired company, including claims from terminated employees, customers, former stockholders, or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and other strategic transactions could cause us to fail to realize their anticipated benefits, incur unanticipated liabilities, and harm our business generally.

Our acquisitions and other strategic transactions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, or amortization expenses, or impairment of goodwill and/or purchased long-lived assets, and restructuring charges, any of which could harm our financial condition or operating results. Also, the anticipated benefits or value of our acquisitions and other strategic transactions may not materialize. In connection with our divestitures, we have agreed, and may in the future agree, to provide indemnification for certain potential liabilities, which may harm our financial condition or operating results.

***If we were to lose the services of key personnel, we may not be able to execute our business strategy.***

Our future success depends in large part upon the continued service of key members of our senior management team. For instance, Sundar Pichai is critical to the overall management of Alphabet and its subsidiaries and plays an important role in the development of our technology, maintaining our culture, and setting our strategic direction. All of our executive officers and key employees are at-will employees, and we do not maintain any key-person life insurance policies. The loss of key personnel could seriously harm our business.

***We rely on highly skilled personnel and, if we are unable to retain or motivate key personnel, hire qualified personnel, or maintain our corporate culture, we may not be able to grow effectively.***

Our performance largely depends on the talents and efforts of highly skilled individuals. Our ability to compete effectively and our future success depends on our continuing to identify, hire, develop, motivate, and retain highly skilled personnel for all areas of our organization. Competition in our industry for qualified employees is intense, and certain of our competitors have directly targeted our employees. In addition, our compensation arrangements, such as our equity award programs, may not always be successful in attracting new employees and retaining and motivating our existing employees. Restrictive immigration policy and regulatory changes may also affect our ability to hire, mobilize, or retain some of our global talent.

22

PX0667-037

PX0667-038

In addition, we believe that our corporate culture fosters innovation, creativity, and teamwork. As our organization grows and evolves, we may need to implement more complex organizational management structures or adapt our corporate culture and work environments to ever-changing circumstances, such as during times of a natural disaster or pandemic, and these changes could affect our ability to compete effectively or have an adverse effect on our corporate culture.

***We are exposed to fluctuations in the fair values of our investments and, in some instances, our financial statements incorporate valuation methodologies that are subjective in nature resulting in fluctuations over time.***

The fair value of our investments may in the future be, and certain investments have been in the past, negatively affected by liquidity, credit deterioration or losses, performance and financial results of the underlying entities, foreign exchange rates, changes in interest rates, including changes that may result from the implementation of new benchmark rates, the effect of new or changing regulations, the stock market in general, or other factors.

We measure certain of our non-marketable equity and debt securities, certain other instruments including stock-based compensation awards settled in the stock of certain Other Bets, and certain assets and liabilities acquired in a business combination, at fair value on a nonrecurring basis. The determination of fair value involves use of appropriate valuation methods and certain unobservable inputs, requires management judgment and estimation, and may change over time. We adjust the carrying value of our non-marketable equity securities to fair value for observable transactions of identical or similar investments of the same issuer or for impairments. All gains and losses on non-marketable equity securities, are recognized in other income (expense), which increases the volatility of our other income (expense). The unrealized gains and losses we record from fair value remeasurements of our non-marketable equity securities in any particular period may differ significantly from the gains or losses we ultimately experience on such investments.

As a result of these factors, the value or liquidity of our cash equivalents, as well as our marketable and non-marketable securities could decline and result in a material impairment, which could adversely affect our financial condition and operating results.

***We could be subject to changes in tax rates, the adoption of new U.S. or international tax legislation, or exposure to additional tax liabilities.***

Our future income taxes could be negatively affected by earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, the net gains and losses recognized by legal entities on certain hedges and related hedged intercompany and other transactions under our foreign exchange risk management program, decreases in our stock price for shares paid as employee compensation, changes in the valuation of our deferred tax assets or liabilities, the application of different provisions of tax laws or changes in tax laws, regulations, or accounting principles (including changes in the interpretation of existing laws), as well as certain discrete items.

In addition, we are subject to regular review and audit by both domestic and foreign tax authorities. As a result, we have received, and may in the future receive, assessments in multiple jurisdictions, including in Europe, on various tax-related assertions, such as transfer-pricing adjustments or permanent-establishment claims. Any adverse outcome of such a review or audit could have a negative effect on our operating results and financial condition and could require us to change our business practices in a manner adverse to our business. It may also subject us to additional litigation and regulatory inquiries, resulting in the diversion of management's time and attention. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment, and there are many transactions and calculations for which the ultimate tax determination is uncertain. Although we believe our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may affect our financial results in the period or periods for which such determination is made.

Furthermore, due to shifting economic and political conditions, tax policies, laws, or rates in various jurisdictions may be subject to significant changes in ways that impair our financial results. Various jurisdictions around the world have enacted or are considering digital services taxes, which could lead to inconsistent and potentially overlapping international tax regimes. The Organization for Economic Cooperation and Development (OECD) continues to advance proposals relating to its initiative for modernizing international tax rules, with the goal of having different countries implement a modernized and aligned international tax framework, but there can be no guarantee that this will occur.

In addition, in response to significant market volatility and disruptions to business operations resulting from the global spread of COVID-19, legislatures and taxing authorities in many jurisdictions in which we operate may propose changes to their tax rules. These changes could include modifications that have temporary effect, and more permanent

PX0667-039

goog-20211231

Table of Contents                                                                                                    Alphabet Inc.

changes. The effect of these potential new rules on us, our long-term tax planning, and our effective tax rate could be material.

**The trading price for our Class A stock and non-voting Class C stock may continue to be volatile.**

The trading price of our stock has at times experienced substantial price volatility and may continue to be volatile. In addition to the factors discussed in this report, the trading price of our Class A stock and Class C stock have fluctuated, and may continue to fluctuate widely, in response to various factors, many of which are beyond our control, including, among others, the activities of our peers and changes in broader economic and political conditions around the world. These broad market and industry factors may harm the market price of our Class A stock and our Class C stock, regardless of our actual operating performance.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2.   PROPERTIES

Our headquarters are located in Mountain View, California. We also own and lease office and building space in the surrounding areas near our headquarters. In addition, we own and lease office/building space and R&D sites around the world, primarily in North America, Europe, South America, and Asia. We own and operate data centers in the U.S., Europe, South America, and Asia. We believe our existing facilities, both owned and leased, are in good condition and suitable for the conduct of our business.

## ITEM 3.   LEGAL PROCEEDINGS

For a description of our material pending legal proceedings, see Legal Matters in Note 10 of the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K, which is incorporated herein by reference.

## ITEM 4.   MINE SAFETY DISCLOSURES

Not applicable.

PX0667-040

## PART II

### ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

As of October 2, 2015, Alphabet Inc. became the successor issuer of Google Inc. pursuant to Rule 12g-3(a) under the Exchange Act. Our Class A common stock has been listed on the Nasdaq Global Select Market under the symbol "GOOG" since August 19, 2004 and under the symbol "GOOGL" since April 3, 2014. Prior to August 19, 2004, there was no public market for our stock. Our Class B common stock is neither listed nor traded. Our Class C capital stock has been listed on the Nasdaq Global Select Market under the symbol "GOOG" since April 3, 2014.

### Holders of Record

As of December 31, 2021, there were approximately 4,907 and 1,733 stockholders of record of our Class A common stock and Class C capital stock, respectively. Because many of our shares of Class A common stock and Class C capital stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. As of December 31, 2021, there were approximately 64 stockholders of record of our Class B common stock.

### Dividend Policy

We have never declared or paid any cash dividend on our common or capital stock. The primary use of capital continues to be to invest for the long-term growth of the business. We regularly evaluate our cash and capital structure, including the size, pace, and form of capital return to stockholders.

### Issuer Purchases of Equity Securities

The following table presents information with respect to Alphabet's repurchases of Class A common stock and Class C capital stock during the quarter ended December 31, 2021:

| Period | Total Number of Class A Shares Purchased (in thousands) [1] | Total Number of Class C Shares Purchased (in thousands) [1] | Average Price Paid per Class A Share [2] | Average Price Paid per Class C Share [2] | Total Number of Shares Purchased as Part of Publicly Announced Programs (in thousands) [1] | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Program (in millions) |
|---|---|---|---|---|---|---|
| October 1 - 31 | 126 | 1,445 | $ 2,812.76 | $ 2,794.72 | 1,571 | $ 26,450 |
| November 1 - 30 | 289 | 1,393 | $ 2,943.97 | $ 2,956.73 | 1,682 | $ 21,479 |
| December 1 - 31 | 250 | 1,169 | $ 2,880.79 | $ 2,898.56 | 1,419 | $ 17,371 |
| Total | 665 | 4,007 | | | 4,672 | |

[1]    The repurchases are being executed from time to time, subject to general business and market conditions and other investment opportunities, through open market purchases or privately negotiated transactions, including through Rule 10b5-1 plans. The repurchase program does not have an expiration date. See Note 11 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information related to share repurchases.

[2]    Average price paid per share includes costs associated with the repurchases.

25

PX0667-041

Table of Contents
                                                                    Alphabet Inc.

**Stock Performance Graphs**

The graph below matches Alphabet Inc. Class A's cumulative 5-year total stockholder return on common stock with the cumulative total returns of the S&P 500 index, the NASDAQ Composite index, and the RDG Internet Composite index. The graph tracks the performance of a $100 investment in our common stock and in each index (with the reinvestment of all dividends) from December 31, 2016 to December 31, 2021. The returns shown are based on historical results and are not intended to suggest future performance.

**COMPARISON OF CUMULATIVE 5-YEAR TOTAL RETURN***

**ALPHABET INC. CLASS A COMMON STOCK**

Among Alphabet Inc., the S&P 500 Index, the

NASDAQ Composite Index, and the RDG Internet Composite Index



*$100 invested on December 31, 2016 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.

Copyright© 2022 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

26

5/19/24, 10:10 PM                                                    goog-20211231

Table of Contents                                                                    Alphabet Inc.

The graph below matches Alphabet Inc. Class C's cumulative 5-year total stockholder return on capital stock with the cumulative total returns of the S&P 500 index, the NASDAQ Composite index, and the RDG Internet Composite index. The graph tracks the performance of a $100 investment in our Class C capital stock and in each index (with the reinvestment of all dividends) from December 31, 2016 to December 31, 2021. The returns shown are based on historical results and are not intended to suggest future performance.

**COMPARISON OF CUMULATIVE 5-YEAR TOTAL RETURN\***

**ALPHABET INC. CLASS C CAPITAL STOCK**

Among Alphabet Inc., the S&P 500 Index, the

NASDAQ Composite Index, and the RDG Internet Composite Index



*$100 invested on December 31, 2016 in stock or in index, including reinvestment of dividends. Fiscal year ending December 31.

Copyright© 2022 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

**ITEM 6.**    **[Reserved]**

27

PX0667-043

## ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Please read the following discussion and analysis of our financial condition and results of operations together with "Note about Forward-Looking Statements," Part I, Item 1 "Business," Part I, Item 1A "Risk Factors," and our consolidated financial statements and related notes included under Item 8 of this Annual Report on Form 10-K.

We have omitted discussion of 2019 results where it would be redundant to the discussion previously included in Item 7 of our 2020 Annual Report on Form 10-K.

### Understanding Alphabet's Financial Results

Alphabet is a collection of businesses — the largest of which is Google. We report Google in two segments, Google Services and Google Cloud; we also report all non-Google businesses collectively as Other Bets. Other Bets include earlier stage technologies that are further afield from our core Google business. For further details on our segments, see Part I, Item 1 "Business" and Note 15 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

### *Trends in Our Business and Financial Effect*

The following long-term trends have contributed to the results of our consolidated operations, and we anticipate that they will continue to affect our future results:

**• Users' behaviors and advertising continue to shift online as the digital economy evolves.**

The continuing shift from an offline to online world has contributed to the growth of our business since inception, contributing to revenue growth, and we expect that this online shift will continue to benefit our business.

**• Users are increasingly using diverse devices and modalities to access our products and services, and our advertising revenues are increasingly coming from new formats.**

Our users are accessing the Internet via diverse devices and modalities, such as smartphones, wearables and smart home devices, and want to be able to be connected no matter where they are or what they are doing. We are focused on expanding our products and services to stay in front of these trends in order to maintain and grow our business.

We are increasingly generating advertising revenues from different channels, including mobile, and newer advertising formats. The margins on advertising revenues from these channels and newer products have generally been lower than those from traditional desktop search. Additionally, as the market for a particular device type or modality matures, our revenues may be affected. For example, growth in the global smartphone market has slowed due to various factors, including increased market saturation in developed countries, which can affect our mobile advertising revenue growth rates.

We expect TAC paid to our distribution partners and Google Network partners to increase as our revenues grow and TAC as a percentage of our advertising revenues ("TAC rate") to be affected by changes in device mix; geographic mix; partner mix; partner agreement terms; the percentage of queries channeled through paid access points; product mix; the relative revenue growth rates of advertising revenues from different channels; and revenue share terms.

We expect these trends to continue to affect our revenue growth rates and put pressure on our margins.

**• As online advertising evolves, we continue to expand our product offerings, which may affect our monetization.**

As interactions between users and advertisers change, and as online user behavior evolves, we continue to expand and evolve our product offerings to serve these changing needs. Over time, we expect our monetization trends to fluctuate. For example, we have seen an increase in revenues from ads on YouTube and Google Play, which monetize at a lower rate than our traditional search ads.

**• As users in developing economies increasingly come online, our revenues from international markets continue to increase and movements in foreign exchange rates affect such revenues.**

The shift to online, as well as the advent of the multi-device world, has brought opportunities outside of the U.S., including in emerging markets, such as India. We continue to invest heavily and develop localized versions of our products and advertising programs relevant to our users in these markets. This has led to a trend of increased revenues from emerging markets. We expect that our results will continue to be affected by our performance in these markets, particularly as low-cost mobile devices become more available. This trend could affect our revenues as developing markets initially monetize at a lower rate than more mature markets.

PX0667-044

28

PX0667-045

International revenues represent a significant portion of our revenues and are subject to fluctuations in foreign currency exchange rates relative to the U.S. dollar. While we have a foreign exchange risk management program designed to reduce our exposure to these fluctuations, this program does not fully offset their effect on our revenues and earnings.

- **The portion of revenues that we derive from non-advertising revenues is increasing and may adversely affect margins.**

Non-advertising revenues have grown over time. We expect this trend to continue as we focus on expanding our offerings through products and services like Google Cloud, Google Play, hardware products, and YouTube subscriptions. We currently derive non-advertising revenues primarily from sales of apps and in-app purchases, digital content products, and hardware; and licensing and service fees, including fees received for Google Cloud services and subscription and other services. A number of Other Bets initiatives are in their initial development stages, and as such, revenues from these businesses could be volatile. In addition, the margins on these revenues vary significantly and may be lower than the margins on our advertising revenues.

- **As we continue to serve our users and expand our businesses, we will invest heavily in operating and capital expenditures.**

We continue to make significant R&D investments in areas of strategic focus across Google Services, Google Cloud and Other Bets. We also expect to continue to invest in land and buildings for data centers and offices, and information technology assets, which includes servers and network equipment, to support the long-term growth of our business. In addition, acquisitions and strategic investments contribute to the breadth and depth of our offerings, expand our expertise in engineering and other functional areas, and build strong partnerships around strategic initiatives. For example, in January 2021 we closed the acquisition of Fitbit, Inc. for $2.1 billion, which is expected to help spur innovation in wearable devices.

- **We face continuing changes in regulatory conditions, laws, and public policies, which could affect our business practices and financial results.**

Changes in social, political, economic, tax, and regulatory conditions or in laws and policies governing a wide range of topics and related legal matters have resulted in fines and caused us to change our business practices. As these global trends continue, our cost of doing business may increase, and our ability to pursue certain business models or offer certain products or services may be limited. Examples include the antitrust complaints filed by the U.S. Department of Justice and a number of state Attorneys General, the Digital Markets Act in Europe, and various legislative proposals in the U.S. focused on large technology platforms.

- **Our employees are critical to our success and we expect to continue investing in them.**

Our employees are among our best assets and are critical for our continued success. We expect to continue hiring talented employees around the globe and to provide competitive compensation programs. For additional information see Culture and Workforce in Part I, Item 1 "Business."

### *Seasonality and other*

Our advertising revenues are affected by seasonal fluctuations in internet usage, advertising expenditures, and underlying business trends, such as traditional retail seasonality. Additionally, our non-advertising revenues, including those generated from Google Cloud, Google Play, hardware, and YouTube, may be affected by fluctuations driven by changes in pricing, digital content releases, fee structures, new product and service launches, other market dynamics, as well as seasonality.

### *Revenues and Monetization Metrics*

#### *Google Services*

Google Services revenues consist of revenues generated from advertising ("Google advertising") as well as revenues from other sources ("Google other revenues").

##### *Google Advertising*

Google advertising revenues are comprised of the following:

- Google Search & other, which includes revenues generated on Google search properties (including revenues from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc.), and other Google owned and operated properties like Gmail, Google Maps, and Google Play;

- YouTube ads, which includes revenues generated on YouTube properties; and

goog-20211231

29

PX0667-047

5/19/24, 10:10 PM                                       goog-20211231

- Google Network, which includes revenues generated on Google Network properties participating in AdMob, AdSense, and Google Ad Manager.

We use certain metrics to track how well traffic across various properties is monetized as it relates to our advertising revenues: paid clicks and cost-per-click pertain to traffic on Google Search & other properties, while impressions and cost-per-impressions pertain to traffic on our Network partners' properties.

Paid clicks represent engagement by users and include clicks on advertisements by end-users on Google search properties and other Google owned and operated properties including Gmail, Google Maps, and Google Play. Cost-per-click is defined as click-driven revenues divided by our total number of paid clicks and represents the average amount we charge advertisers for each engagement by users.

Impressions include impressions displayed to users on Google Network properties participating primarily in AdMob, AdSense, and Google Ad Manager. Cost-per-impression is defined as impression-based and click-based revenues divided by our total number of impressions, and represents the average amount we charge advertisers for each impression displayed to users.

As our business evolves, we periodically review, refine, and update our methodologies for monitoring, gathering, and counting the number of paid clicks and the number of impressions, and for identifying the revenues generated by the corresponding click and impression activity.

Our advertising revenue growth, as well as the change in paid clicks and cost-per-click on Google Search & other properties and the change in impressions and cost-per-impression on Google Network properties and the correlation between these items, have been affected and may continue to be affected by various factors, including:

- advertiser competition for keywords;
- changes in advertising quality, formats, delivery or policy;
- changes in device mix;
- changes in foreign currency exchange rates;
- fees advertisers are willing to pay based on how they manage their advertising costs;
- general economic conditions, including the effect of COVID-19;
- seasonality; and
- traffic growth in emerging markets compared to more mature markets and across various advertising verticals and channels.

*Google Other*

Google other revenues are comprised of the following:

- Google Play, which includes sales of apps and in-app purchases and digital content sold in the Google Play store;
- Devices and Services, which includes sales of hardware, including Fitbit wearable devices, Google Nest home products, and Pixel phones;
- YouTube non-advertising, which includes YouTube Premium and YouTube TV subscriptions; and
- other products and services.

*Google Cloud*

Google Cloud revenues are comprised of the following:

- Google Cloud Platform, which includes fees for infrastructure, platform, and other services;
- Google Workspace, which includes fees for cloud-based collaboration tools for enterprises, such as Gmail, Docs, Drive, Calendar and Meet; and
- other enterprise services.

*Other Bets*

Revenues from Other Bets are generated primarily from the sale of health technology and internet services.

PX0667-048

30

PX0667-049

For further details on how we recognize revenue, see Note 1 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

**Costs and Expenses**

Our cost structure has two components: cost of revenues and operating expenses. Our operating expenses include costs related to R&D, sales and marketing, and general and administrative functions. Certain of these expenses, including those associated with the operation of our technical infrastructure as well as components of our operating expenses, are generally less variable in nature and may not correlate to the changes in revenue.

<u>Cost of Revenues</u>

Cost of revenues is comprised of TAC and other costs of revenues.

- TAC includes:
    - Amounts paid to our distribution partners who make available our search access points and services. Our distribution partners include browser providers, mobile carriers, original equipment manufacturers, and software developers.
    - Amounts paid to Google Network partners primarily for ads displayed on their properties.
- Other cost of revenues includes:
    - Content acquisition costs, which are payments to content providers from whom we license video and other content for distribution on YouTube and Google Play (we pay fees to these content providers based on revenues generated or a flat fee).
    - Expenses associated with our data centers (including bandwidth, compensation expenses, depreciation, energy, and other equipment costs) as well as other operations costs (such as content review as well as customer and product support costs).
    - Inventory and other costs related to the hardware we sell.

The cost of revenues as a percentage of revenues generated from ads placed on Google Network properties are significantly higher than the cost of revenues as a percentage of revenues generated from ads placed on Google Search & other properties, because most of the advertiser revenues from ads served on Google Network properties are paid as TAC to our Google Network partners.

<u>Operating Expenses</u>

Operating expenses are generally incurred during our normal course of business, which we categorize as either R&D, sales and marketing, or general and administrative.

The main components of our R&D expenses are:

- compensation expenses for engineering and technical employees responsible for R&D related to our existing and new products and services;
- depreciation; and
- professional services fees primarily related to consulting and outsourcing services.

The main components of our sales and marketing expenses are:

- compensation expenses for employees engaged in sales and marketing, sales support, and certain customer service functions; and
- spending relating to our advertising and promotional activities in support of our products and services.

The main components of our general and administrative expenses are:

- compensation expenses for employees in finance, human resources, information technology, legal, and other administrative support functions;
- expenses related to legal matters, including fines and settlements; and
- professional services fees, including audit, consulting, outside legal, and outsourcing services.

PX0667-050

31

PX0667-051

Table of Contents                                                          Alphabet Inc.

### Other Income (Expense), Net

Other income (expense), net primarily consists of interest income (expense), the effect of foreign currency exchange gains (losses), net gains (losses) and impairment on our marketable and non-marketable securities, performance fees, and income (loss) and impairment from our equity method investments.

For additional details, including how we account for our investments and factors that can drive fluctuations in the value of our investments, see Note 1 and Note 3 of the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K as well as Item 7A, "Quantitative and Qualitative Disclosures About Market Risk".

### Provision for Income Taxes

Provision for income taxes represents the estimated amount of federal, state, and foreign income taxes incurred in the U.S. and the many jurisdictions in which we operate. The provision includes the effect of reserve provisions and changes to reserves that are considered appropriate as well as the related net interest and penalties.

For additional details, including a reconciliation of the U.S. federal statutory rate to our effective tax rate, see Note 14 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

### Executive Overview

The following table summarizes consolidated financial results for the years ended December 31, 2020 and 2021 unless otherwise specified (in millions, except for per share information and percentages):

|  | Year Ended December 31, | | | | $ Change | | % Change |
|---|---|---|---|---|---|---|---|
|  | | 2020 | | 2021 | | | |
| Consolidated revenues | $ | 182,527 | $ | 257,637 | $ | 75,110 | 41 % |
| Change in consolidated constant currency revenues |  |  |  |  |  |  | 39 % |
| Cost of revenues | $ | 84,732 | $ | 110,939 | $ | 26,207 | 31 % |
| Operating expenses | $ | 56,571 | $ | 67,984 | $ | 11,413 | 20 % |
| Operating income | $ | 41,224 | $ | 78,714 | $ | 37,490 | 91 % |
| Operating margin |  | 23 % |  | 31 % |  |  | 8 % |
| Other income (expense), net | $ | 6,858 | $ | 12,020 | $ | 5,162 | 75 % |
| Net Income | $ | 40,269 | $ | 76,033 | $ | 35,764 | 89 % |
| Diluted EPS | $ | 58.61 | $ | 112.20 | $ | 53.59 | 91 % |
| Number of Employees |  | 135,301 |  | 156,500 |  | 21,199 | 16 % |

- Revenues were $257.6 billion, an increase of 41%. The increase in revenues was primarily driven by Google Services and Google Cloud. The adverse effect of COVID-19 on 2020 advertising revenues also contributed to the year-over-year growth.

- Cost of revenues was $110.9 billion, an increase of 31%, primarily driven by increases in TAC and content acquisition costs. An overall increase in data centers and other operations costs was partially offset by a reduction in depreciation expense due to the change in the estimated useful life of our servers and certain network equipment.

- Operating expenses were $68.0 billion, an increase of 20%, primarily driven by headcount growth, increases in advertising and promotional expenses and charges related to legal matters.

### Other information:

- Operating cash flow was $91.7 billion, primarily driven by revenues generated from our advertising products.

- Share repurchases were $50.3 billion, an increase of 62%. See Note 11 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information.

PX0667-052

- Capital expenditures, which primarily reflected investments in technical infrastructure, were $24.6 billion.

- In January 2021, we updated the useful lives of certain of our servers and network equipment, resulting in a reduction in depreciation expense of $2.6 billion recorded primarily in cost of revenues and R&D. See Note 1 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information.

- Our acquisition of Fitbit closed in early January 2021, and the related revenues are included in Google other. See Note 9 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information.

- On February 1, 2022, the Company announced that the Board of Directors had approved and declared a 20-for-one stock split in the form of a one-time special stock dividend on each share of the Company's Class A, Class B, and Class C stock. See Note 11 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information.

### The Effect of COVID-19 on our Financial Results

We began to observe the effect of COVID-19 on our financial results in March 2020 when, despite an increase in users' search activity, our advertising revenues declined compared to the prior year. This was due to a shift of user search activity to less commercial topics and reduced spending by our advertisers. For the quarter ended June 30, 2020 our advertising revenues declined due to the continued effects of COVID-19 and the related reductions in global economic activity, but we observed a gradual return in user search activity to more commercial topics. This was followed by increased spending by our advertisers, which continued throughout the second half of 2020. Additionally, over the course of 2020, we experienced variability in our margins as many of our expenses are less variable in nature and/or may not correlate to changes in revenues. Market volatility contributed to fluctuations in the valuation of our equity investments. Further, our assessment of the credit deterioration of our customers due to changes in the macroeconomic environment during the period was reflected in our allowance for credit losses for accounts receivable.

Throughout 2021 we remained focused on innovating and investing in the services we offer to consumers and businesses to support our long-term growth. The impact of COVID-19 on 2020 financial results affected year-over-year growth trends. The COVID-19 pandemic continues to evolve, be unpredictable and affect our business and financial results. Our past results may not be indicative of our future performance, and historical trends in our financial results may differ materially.

### Financial Results

#### Revenues

The following table presents revenues by type (in millions):

|  | Year Ended December 31, | |
|  | 2020 | 2021 |
| --- | --- | --- |
| Google Search & other | $ 104,062 | $ 148,951 |
| YouTube ads | 19,772 | 28,845 |
| Google Network | 23,090 | 31,701 |
| Google advertising | 146,924 | 209,497 |
| Google other | 21,711 | 28,032 |
| Google Services total | 168,635 | 237,529 |
| Google Cloud | 13,059 | 19,206 |
| Other Bets | 657 | 753 |
| Hedging gains (losses) | 176 | 149 |
| Total revenues | $ 182,527 | $ 257,637 |

#### Google Services

##### Google advertising revenues

###### Google Search & other

Google Search & other revenues increased $44.9 billion from 2020 to 2021. The overall growth was driven by interrelated factors including increases in search queries resulting from growth in user adoption and usage, primarily

33

PX0667-053

PX0667-054

goog-20211231

Alphabet Inc.

on mobile devices, growth in advertiser spending, and improvements we have made in ad formats and delivery. The adverse effect of COVID-19 on 2020 revenues also contributed to the year-over-year increase.

### YouTube ads

YouTube ads revenues increased $9.1 billion from 2020 to 2021. Growth was driven by our direct response and brand advertising products. Growth for our direct response advertising products was primarily driven by increased advertiser spending as well as improvements to ad formats and delivery. Growth for our brand advertising products was primarily driven by increased spending by our advertisers and the adverse effect of COVID-19 on 2020 revenues.

### Google Network

Google Network revenues increased $8.6 billion from 2020 to 2021. The growth was primarily driven by strength in AdMob, Google Ad Manager, and AdSense. The adverse effect of COVID-19 on 2020 revenues also contributed to the year-over-year increase.

### Monetization Metrics

### Paid clicks and cost-per-click

The following table presents changes in paid clicks and cost-per-click (expressed as a percentage) from 2020 to 2021:

|  | Year Ended December 31, |
| --- | --- |
|  | 2021 |
| Paid clicks change | 23 % |
| Cost-per-click change | 15 % |

Paid clicks increased from 2020 to 2021 driven by a number of interrelated factors, including an increase in search queries resulting from growth in user adoption and usage, primarily on mobile devices; an increase in clicks relating to ads on Google Play; growth in advertiser spending; and improvements we have made in ad formats and delivery. The adverse effect of COVID-19 on 2020 paid clicks also contributed to the increase.

The increase in cost-per-click from 2020 to 2021 was driven by a number of interrelated factors including changes in device mix, geographic mix, growth in advertiser spending, ongoing product changes, and property mix, as well as the adverse effect of COVID-19 in 2020.

### Impressions and cost-per-impression

The following table presents changes in impressions and cost-per-impression (expressed as a percentage) from 2020 to 2021:

|  | Year Ended December 31, |
| --- | --- |
|  | 2021 |
| Impressions change | 2 % |
| Cost-per-impression change | 35 % |

Impressions increased from 2020 to 2021 primarily driven by growth in AdMob, partially offset by a decline in impressions related to AdSense. The increase in cost-per-impression was primarily driven by the adverse effect of COVID-19 in 2020 as well as the effect of interrelated factors including ongoing product and policy changes and improvements we have made in ad formats and delivery, changes in device mix, geographic mix, product mix, and property mix.

### Google other revenues

Google other revenues increased $6.3 billion from 2020 to 2021. The growth was primarily driven by YouTube non-advertising and hardware, followed by Google Play. Growth for YouTube non-advertising was primarily due to an increase in paid subscribers. Growth in hardware reflects the inclusion of Fitbit revenues, as the acquisition closed in January 2021, and an increase in phone sales. Growth for Google Play was primarily driven by sales of apps and in-app purchases.

34

PX0667-055

### Google Cloud

Google Cloud revenues increased $6.1 billion from 2020 to 2021. The growth was primarily driven by GCP followed by Google Workspace offerings. Google Cloud's infrastructure and platform services were the largest drivers of growth in GCP.

### Revenues by Geography

The following table presents revenues by geography as a percentage of revenues, determined based on the addresses of our customers:

|                | Year Ended December 31, | |
|----------------|---------|---------|
|                | 2020    | 2021    |
| United States  | 47 %    | 46 %    |
| EMEA           | 30 %    | 31 %    |
| APAC           | 18 %    | 18 %    |
| Other Americas | 5 %     | 5 %     |

For further details on revenues by geography, see Note 2 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

### Use of Constant Currency Revenues and Constant Currency Revenue Percentage Change

The effect of currency exchange rates on our business is an important factor in understanding period to period comparisons. We use non-GAAP constant currency revenues and non-GAAP percentage change in constant currency revenues for financial and operational decision-making and as a means to evaluate period-to-period comparisons. We believe the presentation of results on a constant currency basis in addition to U.S. Generally Accepted Accounting Principles (GAAP) results helps improve the ability to understand our performance because it excludes the effects of foreign currency volatility that are not indicative of our core operating results.

Constant currency information compares results between periods as if exchange rates had remained constant period over period. We define constant currency revenues as total revenues excluding the effect of foreign exchange rate movements and hedging activities, and use it to determine the constant currency revenue percentage change on a year-on-year basis. Constant currency revenues are calculated by translating current period revenues using prior year comparable period exchange rates, as well as excluding any hedging effects realized in the current period.

Constant currency revenue percentage change is calculated by determining the change in current period revenues over prior year comparable period revenues where current period foreign currency revenues are translated using prior year comparable period exchange rates and hedging effects are excluded from revenues of both periods.

These results should be considered in addition to, not as a substitute for, results reported in accordance with GAAP. Results on a constant currency basis, as we present them, may not be comparable to similarly titled measures used by other companies and are not a measure of performance presented in accordance with GAAP.

35

PX0667-056

The following table presents the foreign exchange effect on international revenues and total revenues (in millions, except percentages):

|  | Year Ended December 31, | | % Change from Prior Year |
|  | 2020 | 2021 | |
| --- | --- | --- | --- |
| EMEA revenues | $ 55,370 | $ 79,107 | 43 % |
| EMEA constant currency revenues |  | 76,321 | 38 % |
| | | | |
| APAC revenues | 32,550 | 46,123 | 42 % |
| APAC constant currency revenues |  | 45,666 | 40 % |
| | | | |
| Other Americas revenues | 9,417 | 14,404 | 53 % |
| Other Americas constant currency revenues |  | 14,317 | 52 % |
| | | | |
| United States revenues | 85,014 | 117,854 | 39 % |
| | | | |
| Hedging gains (losses) | 176 | 149 | |
| Total revenues | $ 182,527 | $ 257,637 | 41 % |
| Revenues, excluding hedging effect | $ 182,351 | $ 257,488 | |
| Exchange rate effect |  | (3,330) | |
| Total constant currency revenues |  | $ 254,158 | 39 % |

EMEA revenue growth from 2020 to 2021 was favorably affected by foreign currency exchange rates, primarily due to the U.S. dollar weakening relative to the Euro and British pound.

APAC revenue growth from 2020 to 2021 was favorably affected by foreign currency exchange rates, primarily due to the U.S. dollar weakening relative to the Australian dollar, partially offset by the U.S. dollar strengthening relative to the Japanese yen.

Other Americas growth change from 2020 to 2021 was favorably affected by changes in foreign currency exchange rates, primarily due to the U.S. dollar weakening relative to the Canadian dollar, partially offset by the U.S. dollar strengthening relative to the Argentine peso and the Brazilian real.

### Costs and Expenses

### Cost of Revenues

The following tables present cost of revenues, including TAC (in millions, except percentages):

|  | Year Ended December 31, | |
|  | 2020 | 2021 |
| --- | --- | --- |
| TAC | $ 32,778 | $ 45,566 |
| Other cost of revenues | 51,954 | 65,373 |
| Total cost of revenues | $ 84,732 | $ 110,939 |
| Total cost of revenues as a percentage of revenues | 46.4 % | 43.1 % |

Cost of revenues increased $26.2 billion from 2020 to 2021. The increase was due to an increase in other cost of revenues and TAC of $13.4 billion and $12.8 billion, respectively.

The increase in TAC from 2020 to 2021 was due to an increase in TAC paid to distribution partners and to Google Network partners, primarily driven by growth in revenues subject to TAC. The TAC rate decreased from 22.3% to 21.8% from 2020 to 2021 primarily due to a revenue mix shift from Google Network properties to Google Search & other properties. The TAC rate on Google Search & other properties revenues and the TAC rate on Google Network revenues were both substantially consistent from 2020 to 2021.

The increase in other cost of revenues from 2020 to 2021 was driven by increases in content acquisition costs primarily for YouTube, data center and other operations costs, and hardware costs. The increase in data center and

goog-20211231

36

PX0667-058

other operations costs was partially offset by a reduction in depreciation expense due to the change in the estimated useful life of our servers and certain network equipment beginning in the first quarter of 2021.

### Research and Development

The following table presents R&D expenses (in millions, except percentages):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2021 |
| Research and development expenses | $ 27,573 | $ 31,562 |
| Research and development expenses as a percentage of revenues | 15.1 % | 12.3 % |

R&D expenses increased $4.0 billion from 2020 to 2021. The increase was primarily due to an increase in compensation expenses of $3.5 billion, largely resulting from an 11% increase in headcount, and an increase in professional service fees of $516 million. This increase was partially offset by a reduction in depreciation expense of $450 million including the effect of our change in the estimated useful life of our servers and certain network equipment.

### Sales and Marketing

The following table presents sales and marketing expenses (in millions, except percentages):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2021 |
| Sales and marketing expenses | $ 17,946 | $ 22,912 |
| Sales and marketing expenses as a percentage of revenues | 9.8 % | 8.9 % |

Sales and marketing expenses increased $5.0 billion from 2020 to 2021, primarily driven by an increase in advertising and promotional activities of $2.5 billion and an increase in compensation expenses of $2.2 billion. The increase in advertising and promotional activities was driven by both increased spending in the current period and a reduction in spending in 2020 due to COVID-19. The increase in compensation expenses was largely due to a 14% increase in headcount.

### General and Administrative

The following table presents general and administrative expenses (in millions, except percentages):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2021 |
| General and administrative expenses | $ 11,052 | $ 13,510 |
| General and administrative expenses as a percentage of revenues | 6.1 % | 5.2 % |

General and administrative expenses increased $2.5 billion from 2020 to 2021. The increase was primarily driven by a $1.7 billion increase in charges relating to legal matters and a $664 million increase in compensation expenses, largely resulting from a 14% increase in headcount. These increases were partially offset by a reduction in expense of $808 million related to a decline in allowance for credit losses for accounts receivable, as 2020 reflected a higher allowance related to the economic effect of COVID-19.

37

### Segment Profitability

The following table presents segment operating income (loss) (in millions).

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2021 |
| Operating income (loss): | | | |
| Google Services | $ | 54,606 | $ | 91,855 |
| Google Cloud | | (5,607) | | (3,099) |
| Other Bets | | (4,476) | | (5,281) |
| Corporate costs, unallocated[(1)] | | (3,299) | | (4,761) |
| Total income from operations | $ | 41,224 | $ | 78,714 |

[(1)]    Unallocated corporate costs primarily include corporate initiatives, corporate shared costs, such as finance and legal, including certain fines and settlements, as well as costs associated with certain shared R&D activities. Additionally, hedging gains (losses) related to revenue are included in corporate costs.

### Google Services

Google services operating income increased $37.2 billion from 2020 to 2021. The increase was due to growth in revenues partially offset by increases in TAC, content acquisition costs, compensation expenses, advertising and promotional expenses, and charges related to certain legal matters. The increase in expenses was partially offset by a reduction in costs driven by the change in the estimated useful life of our servers and certain network equipment. The effect of COVID-19 on 2020 results affected the year-over-year increase in operating income.

### Google Cloud

Google Cloud operating loss decreased $2.5 billion from 2020 to 2021. The decrease in operating loss was primarily driven by growth in revenues, partially offset by an increase in expenses, primarily driven by compensation expenses. The increase in expenses was partially offset by a reduction in costs driven by the change in the estimated useful life of our servers and certain network equipment.

### Other Bets

Other Bets operating loss increased $805 million from 2020 to 2021. The increase in operating loss was primarily driven by increases in compensation expenses, including an increase in valuation-based compensation charges during the second quarter of 2021.

### Other Income (Expense), Net

The following table presents other income (expense), net, (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2021 |
| Other income (expense), net | $ | 6,858 | $ | 12,020 |

Other income (expense), net, increased $5.2 billion from 2020 to 2021. The increase was primarily driven by increases in net unrealized gains recognized for our marketable and non-marketable equity securities of $6.9 billion, partially offset by an increase in accrued performance fees related to certain investments of $1.3 billion.

See Note 3 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information.

### Provision for Income Taxes

The following table presents provision for income taxes (in millions, except for effective tax rate):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2021 |
| Provision for income taxes | $ | 7,813 | $ | 14,701 |
| Effective tax rate | | 16.2 % | | 16.2 % |

The provision for income taxes increased from 2020 to 2021, primarily due to an increase in pre-tax earnings, including in countries that have higher statutory rates, partially offset by an increase in the stock-based compensation related tax benefit, and the U.S. federal Foreign-Derived Intangible Income tax deduction benefit. Our effective tax rate

PX0667-060

goog-20211231

38

PX0667-061

was substantially consistent from 2020 to 2021. See Note 14 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information.

**Financial Condition**

**Cash, Cash Equivalents, and Marketable Securities**

As of December 31, 2021, we had $139.6 billion in cash, cash equivalents, and short-term marketable securities. Cash equivalents and marketable securities are comprised of time deposits, money market funds, highly liquid government bonds, corporate debt securities, mortgage-backed and asset-backed securities, and marketable equity securities.

**Sources, Uses of Cash and Related Trends**

Our principal sources of liquidity are cash, cash equivalents, and marketable securities, as well as the cash flow that we generate from operations. The primary use of capital continues to be to invest for the long-term growth of the business. We regularly evaluate our cash and capital structure, including the size, pace and form of capital return to stockholders.

The following table presents our cash flows (in millions):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2021 |
| Net cash provided by operating activities | $ 65,124 | $ 91,652 |
| Net cash used in investing activities | $ (32,773) | $ (35,523) |
| Net cash used in financing activities | $ (24,408) | $ (61,362) |

### Cash Provided by Operating Activities

Our largest source of cash provided by operations are advertising revenues generated by Google Search & other properties, Google Network properties, and YouTube ads. Additionally, we generate cash through sales of apps and in-app purchases, digital content products, and hardware; and licensing and service fees including fees received for Google Cloud offerings and subscription-based products.

Our primary uses of cash from operating activities include payments to distribution and Google Network partners, for compensation and related costs, and for content acquisition costs. In addition, uses of cash from operating activities include hardware inventory costs, income taxes, and other general corporate expenditures.

Net cash provided by operating activities increased from 2020 to 2021 primarily due to the net effect of an increase in cash received from revenues and cash paid for cost of revenues and operating expenses, and changes in operating assets and liabilities.

### Cash Used in Investing Activities

Cash provided by investing activities consists primarily of maturities and sales of our investments in marketable and non-marketable securities. Cash used in investing activities consists primarily of purchases of marketable and non-marketable securities, purchases of property and equipment, and payments for acquisitions.

Net cash used in investing activities increased from 2020 to 2021 primarily due to a decrease in maturities and sales of marketable securities, an increase in purchases of property and equipment, offset by a decrease in purchases of non-marketable securities.

### Cash Used in Financing Activities

Cash provided by financing activities consists primarily of proceeds from issuance of debt and proceeds from the sale of interest in consolidated entities. Cash used in financing activities consists primarily of repurchases of common and capital stock, net payments related to stock-based award activities, and repayments of debt.

Net cash used in financing activities increased from 2020 to 2021 primarily due to repayment of debt and an increase in cash payments for repurchases of common and capital stock.

**Liquidity and Material Cash Requirements**

We expect existing cash, cash equivalents, short-term marketable securities, cash flows from operations and financing activities to continue to be sufficient to fund our operating activities and cash commitments for investing and financing activities for at least the next 12 months and thereafter for the foreseeable future.

PX0667-062

PX0667-063

### Capital Expenditures and Leases

We make investments in land and buildings for data centers and offices and information technology assets through purchases of property and equipment and lease arrangements to provide capacity for the growth of our services and products.

#### Capital Expenditures

Our capital investments in property and equipment consist primarily of the following major categories:

- technical infrastructure, which consists of our investments in servers and network equipment for computing, storage and networking requirements for ongoing business activities, including machine learning (collectively referred to as our information technology assets) and data center land and building construction; and

- office facilities, ground up development projects and related building improvements.

Construction in progress consists primarily of technical infrastructure and office facilities which have not yet been placed in service for our intended use. The time frame from date of purchase to placement in service of these assets may extend from months to years. For example, our data center construction projects are generally multi-year projects with multiple phases, where we acquire qualified land and buildings, construct buildings, and secure and install information technology assets.

During the years ended December 31, 2020 and 2021, we spent $22.3 billion and $24.6 billion on capital expenditures, respectively. Depreciation of our property and equipment commences when the deployment of such assets are completed and are ready for our intended use. Land is not depreciated. For the years ended December 31, 2020 and 2021, our depreciation and impairment expenses on property and equipment were $12.9 billion and $11.6 billion, respectively.

#### Leases

For the years ended December 31, 2020 and 2021, we recognized total operating lease assets of $2.8 billion and $3.0 billion, respectively. As of December 31, 2021, the amount of total future lease payments under operating leases, which had a weighted average remaining lease term of 8 years, was $15.5 billion, of which $2.5 billion is short-term. As of December 31, 2021, we have entered into leases that have not yet commenced with future short-term and long-term lease payments of $606 million and $5.2 billion, excluding purchase options, that are not yet recorded on our Consolidated Balance Sheets. These leases will commence between 2022 and 2026 with non-cancelable lease terms of 1 to 25 years.

For the years ended December 31, 2020 and 2021, our operating lease expenses (including variable lease costs) were $2.9 billion and $3.4 billion, respectively. Finance lease costs were not material for the years ended December 31, 2020 and 2021. See Note 4 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information on leases.

#### Financing

We have a short-term debt financing program of up to $10.0 billion through the issuance of commercial paper, which increased from $5.0 billion in September 2021. Net proceeds from this program are used for general corporate purposes. As of December 31, 2021, we had no commercial paper outstanding.

As of December 31, 2021, we had $10.0 billion of revolving credit facilities with no amounts outstanding. In April 2021, we terminated the existing revolving credit facilities, which were scheduled to expire in July 2023, and entered into two new revolving credit facilities in the amounts of $4.0 billion and $6.0 billion, which will expire in April 2022 and April 2026, respectively. The interest rates for the new credit facilities are determined based on a formula using certain market rates, as well as our progress toward the achievement of certain sustainability goals. No amounts have been borrowed under the new credit facilities.

As of December 31, 2021, we have senior unsecured notes outstanding with a total carrying value of $12.8 billion with short-term and long-term future interest payments of $231 million and $4.0 billion, respectively. See Note 6 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for further information on our debt.

#### Share Repurchase Program

In April 2021, the Board of Directors of Alphabet authorized the company to repurchase up to $50.0 billion of its Class C stock. In July 2021, the Alphabet board approved an amendment to the April 2021 authorization, permitting the company to repurchase both Class A and Class C shares in a manner deemed in the best interest of the company and its stockholders, taking into account the economic cost and prevailing market conditions, including the relative trading

PX0667-064

prices and volumes of the Class A and Class C shares. In accordance with the authorizations of the Board of Directors of Alphabet, during 2021 we repurchased and subsequently retired 20.3 million aggregate shares for $50.3 billion. Of the aggregate amount repurchased and subsequently retired, 1.2 million shares were Class A stock repurchased for $3.4 billion. As of December 31, 2021, $17.4 billion remains available for Class A and Class C share repurchases under the amended authorization. The repurchases are being executed from time to time, subject to general business and market conditions and other investment opportunities, through open market purchases or privately negotiated transactions, including through Rule 10b5-1 plans. The repurchase program does not have an expiration date. See Note 11 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

### European Commission Fines

In 2017, 2018 and 2019, the EC announced decisions that certain actions taken by Google infringed European competition law and imposed fines of €2.4 billion ($2.7 billion as of June 27, 2017), €4.3 billion ($5.1 billion as of June 30, 2018), and €1.5 billion ($1.7 billion as of March 20, 2019), respectively. While each EC decision is under appeal, we included the fines in accrued expenses and other current liabilities on our Consolidated Balance Sheets as we provided bank guarantees (in lieu of a cash payment) for the fines.

### Taxes

As of December 31, 2021, we had short-term and long-term income taxes payable of $784 million and $5.7 billion related to a one-time transition tax payable incurred as a result of the U.S. Tax Cuts and Jobs Act ("Tax Act"). As permitted by the Tax Act, we will pay the transition tax in annual interest-free installments through 2025. We also have taxes payable of $3.5 billion primarily related to uncertain tax positions as of December 31, 2021.

### Purchase Commitments

We regularly enter into significant non-cancelable contractual obligations primarily related to data center operations and build-outs, information technology assets, office buildings, purchases of inventory, and network capacity arrangements. As of December 31, 2021, such purchase commitments, which do not qualify for recognition on our Consolidated Balance Sheets, amount to $13.7 billion, of which $11.9 billion is short-term. These amounts represent the non-cancelable portion of agreements or the minimum cancellation fee. For those agreements with variable terms, we do not estimate the non-cancelable obligation beyond any minimum quantities and/or pricing as of December 31, 2021.

## Critical Accounting Estimates

We prepare our consolidated financial statements in accordance with GAAP. In doing so, we have to make estimates and assumptions. Our critical accounting estimates are those estimates that involve a significant level of uncertainty at the time the estimate was made, and changes in them have had or are reasonably likely to have a material effect on our financial condition or results of operations. Accordingly, actual results could differ materially from our estimates. We base our estimates on past experience and other assumptions that we believe are reasonable under the circumstances, and we evaluate these estimates on an ongoing basis. We have reviewed our critical accounting estimates with the audit and compliance committee of our Board of Directors.

See Note 1 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for a summary of significant accounting policies and the effect on our financial statements.

### Fair Value Measurements of Non-Marketable Equity Securities

We measure certain financial instruments at fair value on a nonrecurring basis, consisting primarily of our non-marketable equity securities. These investments are accounted for under the measurement alternative and are measured at cost, less impairment, subject to upward and downward adjustments resulting from observable price changes for identical or similar investments of the same issuer. These adjustments require quantitative assessments of the fair value of our securities, which may require the use of unobservable inputs. Pricing adjustments are determined by using various valuation methodologies and involve the use of estimates using the best information available, which may include cash flow projections or other available market data.

Non-marketable equity securities are also evaluated for impairment, based on qualitative factors including the companies' financial and liquidity position and access to capital resources, among others. When indicators of impairment exist, we prepare quantitative measurements of the fair value of our equity investments using a market approach or an income approach, which requires judgment and the use of unobservable inputs, including discount rates, investee revenues and costs, and comparable market data of private and public companies, among others. When our assessment indicates that an impairment exists, we write down the investment to its fair value.

41

PX0667-066

We also have compensation arrangements with payouts based on realized returns from certain investments, i.e. performance fees. We recognize compensation expense based on the estimated payouts, which may result in expense recognized before investment returns are realized, and may require the use of unobservable inputs.

### Property and Equipment

We assess the reasonableness of the useful lives of our property and equipment periodically as well as when other changes occur, such as when there are changes to ongoing business operations, changes in the planned use and utilization of assets, or technological advancements, that could indicate a change in the period over which we expect to benefit from the assets.

### Income Taxes

We are subject to income taxes in the U.S. and foreign jurisdictions. Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes.

Recording an uncertain tax position involves various qualitative considerations, including evaluation of comparable and resolved tax exposures, applicability of tax laws, and likelihood of settlement. We evaluate uncertain tax positions periodically, considering changes in facts and circumstances, such as new regulations or recent judicial opinions, as well as the status of audit activities by taxing authorities. Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will affect the provision for income taxes and the effective tax rate in the period in which such determination is made.

The provision for income taxes includes the effect of reserve provisions and changes to reserves that are considered appropriate as well as the related net interest and penalties. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Services (IRS) and other tax authorities which may assert assessments against us. We regularly assess the likelihood of adverse outcomes resulting from these examinations and assessments to determine the adequacy of our provision for income taxes.

### Loss Contingencies

We are regularly subject to claims, suits, regulatory and government investigations, and other proceedings involving competition, intellectual property, privacy, tax and related compliance, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, personal injury consumer protection, and other matters. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. We record a liability when we believe that it is probable that a loss has been incurred and the amount can be reasonably estimated. If we determine that a loss is reasonably possible and the loss or range of loss can be estimated, we disclose the possible loss in Note 10 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

We evaluate, on a regular basis, developments in our legal matters that could affect the amount of liability that has been previously accrued, and the matters and related reasonably possible losses disclosed, and make adjustments and changes to our disclosures as appropriate. Significant judgment is required to determine both the likelihood and the estimated amount of a loss related to such matters. Until the final resolution of such matters, there may be an exposure to loss in excess of the amount recorded, and such amounts could be material.

### Change in Accounting Estimate

In January 2021, we completed an assessment of the useful lives of our servers and certain network equipment. In doing so, we determined we should adjust the estimated useful life. This change in accounting estimate was effective beginning fiscal year 2021 and is detailed further in Note 1 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

## ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to financial market risks, including changes in foreign currency exchange rates, interest rates, and equity investment risks.

### Foreign Currency Exchange Risk

We transact business globally in multiple currencies. International revenues, as well as costs and expenses denominated in foreign currencies, expose us to the risk of fluctuations in foreign currency exchange rates against the U.S. dollar. Principal currencies hedged included the Australian dollar, British pound, Canadian dollar, Euro, and Japanese yen. For the purpose of analyzing foreign currency exchange risk, we considered the historical trends in

PX0667-067

goog-20211231

42

PX0667-068

foreign currency exchange rates and determined that it was reasonably possible that adverse changes in exchange rates of 10% could be experienced in the near term.

We use foreign exchange forward contracts to offset the foreign exchange risk on assets and liabilities denominated in currencies other than the functional currency of the subsidiary. These forward contracts reduce, but do not entirely eliminate, the effect of foreign currency exchange rate movements on our assets and liabilities. The foreign currency gains and losses on these assets and liabilities are recorded in other income (expense), net, which are offset by the gains and losses on the forward contracts.

If an adverse 10% foreign currency exchange rate change was applied to total monetary assets, liabilities, and commitments denominated in currencies other than the functional currencies at the balance sheet date, it would have resulted in an adverse effect on income before income taxes of approximately $497 million and $285 million as of December 31, 2020 and 2021, respectively, after consideration of the effect of foreign exchange contracts in place for the years ended December 31, 2020 and 2021.

We use foreign currency forwards and option contracts, including collars (an option strategy comprised of a combination of purchased and written options) to protect forecasted U.S. dollar-equivalent earnings from changes in foreign currency exchange rates. When the U.S. dollar strengthens, gains from foreign currency options and forwards reduce the foreign currency losses related to our earnings. When the U.S. dollar weakens, losses from foreign currency collars and forwards offset the foreign currency gains related to our earnings. These hedging contracts reduce, but do not entirely eliminate, the effect of foreign currency exchange rate movements. We designate these contracts as cash flow hedges for accounting purposes. We reflect the gains or losses of foreign currency spot rate changes as a component of AOCI and subsequently reclassify them into revenues to offset the hedged exposures as they occur.

If the U.S. dollar weakened by 10% as of December 31, 2020 and 2021, the amount recorded in AOCI related to our foreign exchange contracts before tax effect would have been approximately $912 million and $1.3 billion lower as of December 31, 2020 and 2021, respectively. The change in the value recorded in AOCI would be expected to offset a corresponding foreign currency change in forecasted hedged revenues when recognized.

We use foreign exchange forward contracts designated as net investment hedges to hedge the foreign currency risks related to investment in foreign subsidiaries. These forward contracts serve to offset the foreign currency translation risk from our foreign operations.

If the U.S. dollar weakened by 10%, the amount recorded in cumulative translation adjustment (CTA) within AOCI related to our net investment hedge would have been approximately $1.0 billion lower as of both December 31, 2020 and 2021. The change in value recorded in CTA would be expected to offset a corresponding foreign currency translation gain or loss from our investment in foreign subsidiaries.

**Interest Rate Risk**

Our Corporate Treasury investment strategy is to achieve a return that will allow us to preserve capital and maintain liquidity. We invest primarily in debt securities, including those of the U.S. government and its agencies, corporate debt securities, mortgage-backed securities, money market and other funds, municipal securities, time deposits, asset backed securities, and debt instruments issued by foreign governments. By policy, we limit the amount of credit exposure to any one issuer. Our investments in both fixed rate and floating rate interest earning securities carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely affected due to a rise in interest rates, while floating rate securities may produce less income than predicted if interest rates fall. Unrealized gains or losses on our marketable debt securities are primarily due to interest rate fluctuations as compared to interest rates at the time of purchase. For certain fixed and variable rate debt securities, we have elected the fair value option for which changes in fair value are recorded in other income (expense), net. We measure securities for which we have not elected the fair value option at fair value with gains and losses recorded in AOCI until the securities are sold, less any expected credit losses.

We use value-at-risk (VaR) analysis to determine the potential effect of fluctuations in interest rates on the value of our marketable debt security portfolio. The VaR is the expected loss in fair value, for a given confidence interval, for our investment portfolio due to adverse movements in interest rates. We use a variance/covariance VaR model with 95% confidence interval. The estimated one-day loss in fair value of marketable debt securities as of December 31, 2020 and 2021 are shown below (in millions):

| | As of December 31, | | 12-Month Average As of December 31, | |
|---|---|---|---|---|
| | 2020 | 2021 | 2020 | 2021 |
| Risk Category - Interest Rate | $ 144 | $ 139 | $ 145 | $ 148 |

PX0667-069

goog-20211231

43

PX0667-070

Actual future gains and losses associated with our marketable debt security portfolio may differ materially from the sensitivity analyses performed as of December 31, 2020 and 2021 due to the inherent limitations associated with predicting the timing and amount of changes in interest rates and our actual exposures and positions. VaR analysis is not intended to represent actual losses but is used as a risk estimation.

**Equity Investment Risk**

Our marketable and non-marketable equity securities are subject to a wide variety of market-related risks that could substantially reduce or increase the fair value of our holdings.

Our marketable equity securities are publicly traded stocks or funds and our non-marketable equity securities are investments in privately held companies, some of which are in the startup or development stages.

We record marketable equity securities not accounted for under the equity method at fair value based on readily determinable market values, of which publicly traded stocks and mutual funds are subject to market price volatility, and represent $5.9 billion and $7.8 billion of our investments as of December 31, 2020 and 2021, respectively. A hypothetical adverse price change of 10% on our December 31, 2021 balance, which could be experienced in the near term, would decrease the fair value of marketable equity securities by $780 million. From time to time, we may enter into derivatives to hedge the market price risk on certain of our marketable equity securities.

Our non-marketable equity securities not accounted for under the equity method are adjusted to fair value for observable transactions for identical or similar investments of the same issuer or impairment (referred to as the measurement alternative). The fair value measured at the time of the observable transaction is not necessarily an indication of the current fair value as of the balance sheet date. These investments, especially those that are in the early stages, are inherently risky because the technologies or products these companies have under development are typically in the early phases and may never materialize, and they may experience a decline in financial condition, which could result in a loss of a substantial part of our investment in these companies. The success of our investment in any private company is also typically dependent on the likelihood of our ability to realize appreciation in the value of investments through liquidity events such as public offerings, acquisitions, private sales or other market events. As of December 31, 2020 and 2021, the carrying value of our non-marketable equity securities, which were accounted for under the measurement alternative, was $18.9 billion and $27.6 billion, respectively. Valuations of our equity investments in private companies are inherently more complex due to the lack of readily available market data. Volatility in the global economic climate and financial markets could result in a significant impairment charge relating to our non-marketable equity securities. Changes in valuation of non-marketable equity securities may not directly correlate with changes in valuation of marketable equity securities. Additionally, observable transactions at lower valuations could result in significant losses on our non-marketable equity securities. The effect of COVID-19 on our impairment assessment requires significant judgment due to the uncertainty around the duration and severity of the effect.

The carrying values of our equity method investments, which totaled approximately $1.4 billion and $1.5 billion as of December 31, 2020 and 2021, respectively, generally do not fluctuate based on market price changes. However, these investments could be impaired if the carrying value exceeds the fair value and is not expected to recover.

For further information about our equity investments, see Note 1 and Note 3 of the Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K.

44

PX0667-071

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

<div align="center">

**Alphabet Inc.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 46 |
| Financial Statements: | |
| Consolidated Balance Sheets | 49 |
| Consolidated Statements of Income | 50 |
| Consolidated Statements of Comprehensive Income | 51 |
| Consolidated Statements of Stockholders' Equity | 52 |
| Consolidated Statements of Cash Flows | 53 |
| Notes to Consolidated Financial Statements | 54 |

<div align="center">

45

</div>

PX0667-072

goog-20211231

Alphabet Inc.

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of Alphabet Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Alphabet Inc. (the Company) as of December 31, 2020 and 2021, the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes and financial statement schedule listed in the Index at Item 15 (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 1, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the U.S. Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

46

PX0667-073

### Loss Contingencies

| | |
|---|---|
| *Description of the Matter* | The Company is regularly subject to claims, suits, regulatory and government investigations, and other proceedings involving competition, intellectual property, privacy, tax and related compliance, labor and employment, commercial disputes, content generated by its users, goods and services offered by advertisers or publishers using their platforms, personal injury, consumer protection, and other matters. As described in Note 10 to the consolidated financial statements "Contingencies" such claims, suits, regulatory and government investigations, and other proceedings could result in adverse consequences.<br><br>Significant judgment is required to determine both the likelihood, and the estimated amount, of a loss related to such matters. Auditing management's accounting for and disclosure of loss contingencies from these matters involved challenging and subjective auditor judgment in assessing the Company's evaluation of the probability of a loss, and the estimated amount or range of loss. |
| *How We Addressed the Matter in Our Audit* | We tested relevant controls over the identified risks associated with management's accounting for and disclosure of these matters. This included controls over management's assessment of the probability of incurrence of a loss and whether the loss or range of loss was reasonably estimable and the development of related disclosures.<br><br>Our audit procedures included gaining an understanding of previous rulings issued by regulators and the status of ongoing lawsuits, reviewing letters addressing the matters from internal and external legal counsel, meeting with internal legal counsel to discuss the allegations, and obtaining a representation letter from management on these matters. We also evaluated the Company's disclosures in relation to these matters. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 1999.

San Jose, California
February 1, 2022

47

PX0667-074

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of Alphabet Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Alphabet Inc.'s internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, Alphabet Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the 2021 consolidated financial statements of the Company and our report dated February 1, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the U.S. Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

San Jose, California
February 1, 2022

48

**Alphabet Inc.**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share amounts which are reflected in thousands, and par value per share amounts)**

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 26,465 | $ 20,945 |
| Marketable securities | 110,229 | 118,704 |
| Total cash, cash equivalents, and marketable securities | 136,694 | 139,649 |
| Accounts receivable, net | 30,930 | 39,304 |
| Income taxes receivable, net | 454 | 966 |
| Inventory | 728 | 1,170 |
| Other current assets | 5,490 | 7,054 |
| Total current assets | 174,296 | 188,143 |
| Non-marketable securities | 20,703 | 29,549 |
| Deferred income taxes | 1,084 | 1,284 |
| Property and equipment, net | 84,749 | 97,599 |
| Operating lease assets | 12,211 | 12,959 |
| Intangible assets, net | 1,445 | 1,417 |
| Goodwill | 21,175 | 22,956 |
| Other non-current assets | 3,953 | 5,361 |
| Total assets | $ 319,616 | $ 359,268 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 5,589 | $ 6,037 |
| Accrued compensation and benefits | 11,086 | 13,889 |
| Accrued expenses and other current liabilities | 28,631 | 31,236 |
| Accrued revenue share | 7,500 | 8,996 |
| Deferred revenue | 2,543 | 3,288 |
| Income taxes payable, net | 1,485 | 808 |
| Total current liabilities | 56,834 | 64,254 |
| Long-term debt | 13,932 | 14,817 |
| Deferred revenue, non-current | 481 | 535 |
| Income taxes payable, non-current | 8,849 | 9,176 |
| Deferred income taxes | 3,561 | 5,257 |
| Operating lease liabilities | 11,146 | 11,389 |
| Other long-term liabilities | 2,269 | 2,205 |
| Total liabilities | 97,072 | 107,633 |
| Contingencies (Note 10) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value per share, 100,000 shares authorized; no shares issued and outstanding | 0 | 0 |
| Class A and Class B common stock, and Class C capital stock and additional paid-in capital, $0.001 par value per share: 15,000,000 shares authorized (Class A 9,000,000, Class B 3,000,000, Class C 3,000,000); 675,222 (Class A 300,730, Class B 45,843, Class C 328,649) and 662,121 (Class A 300,737, Class B 44,665, Class C 316,719) shares issued and outstanding | 58,510 | 61,774 |
| Accumulated other comprehensive income (loss) | 633 | (1,623) |
| Retained earnings | 163,401 | 191,484 |
| Total stockholders' equity | 222,544 | 251,635 |
| Total liabilities and stockholders' equity | $ 319,616 | $ 359,268 |

See accompanying notes.

goog-20211231

Alphabet Inc.

**Alphabet Inc.**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In millions, except per share amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Revenues | $ 161,857 | $ 182,527 | $ 257,637 |
| Costs and expenses: | | | |
| Cost of revenues | 71,896 | 84,732 | 110,939 |
| Research and development | 26,018 | 27,573 | 31,562 |
| Sales and marketing | 18,464 | 17,946 | 22,912 |
| General and administrative | 9,551 | 11,052 | 13,510 |
| European Commission fines | 1,697 | 0 | 0 |
| Total costs and expenses | 127,626 | 141,303 | 178,923 |
| Income from operations | 34,231 | 41,224 | 78,714 |
| Other income (expense), net | 5,394 | 6,858 | 12,020 |
| Income before income taxes | 39,625 | 48,082 | 90,734 |
| Provision for income taxes | 5,282 | 7,813 | 14,701 |
| Net income | $ 34,343 | $ 40,269 | $ 76,033 |
| | | | |
| Basic net income per share of Class A and B common stock and Class C capital stock | $ 49.59 | $ 59.15 | $ 113.88 |
| Diluted net income per share of Class A and B common stock and Class C capital stock | $ 49.16 | $ 58.61 | $ 112.20 |

See accompanying notes.

50

PX0667-077

**Alphabet Inc.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In millions)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2019 | 2020 | 2021 |
| Net income | $ 34,343 | $ 40,269 | $ 76,033 |
| Other comprehensive income (loss): |  |  |  |
| Change in foreign currency translation adjustment | (119) | 1,139 | (1,442) |
| Available-for-sale investments: |  |  |  |
| Change in net unrealized gains (losses) | 1,611 | 1,313 | (1,312) |
| Less: reclassification adjustment for net (gains) losses included in net income | (111) | (513) | (64) |
| Net change, net of income tax benefit (expense) of $(221), $(230), and $394 | 1,500 | 800 | (1,376) |
| Cash flow hedges: |  |  |  |
| Change in net unrealized gains (losses) | 22 | 42 | 716 |
| Less: reclassification adjustment for net (gains) losses included in net income | (299) | (116) | (154) |
| Net change, net of income tax benefit (expense) of $42, $11, and $(122) | (277) | (74) | 562 |
| Other comprehensive income (loss) | 1,104 | 1,865 | (2,256) |
| Comprehensive income | $ 35,447 | $ 42,134 | $ 73,777 |

See accompanying notes.

51

goog-20211231

Table of Contents

Alphabet Inc.

### Alphabet Inc.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (In millions, except share amounts which are reflected in thousands)

| | Class A and Class B Common Stock, Class C Capital Stock and Additional Paid-In Capital | | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance as of December 31, 2018 | 695,556 | $ 45,049 | $ (2,306) | $ 134,885 | $ 177,628 |
| Cumulative effect of accounting change | 0 | 0 | (30) | (4) | (34) |
| Common and capital stock issued | 8,120 | 202 | 0 | 0 | 202 |
| Stock-based compensation expense | 0 | 10,890 | 0 | 0 | 10,890 |
| Income tax withholding related to vesting of restricted stock units and other | 0 | (4,455) | 0 | 0 | (4,455) |
| Repurchases of capital stock | (15,341) | (1,294) | 0 | (17,102) | (18,396) |
| Sale of interest in consolidated entities | 0 | 160 | 0 | 0 | 160 |
| Net income | 0 | 0 | 0 | 34,343 | 34,343 |
| Other comprehensive income (loss) | 0 | 0 | 1,104 | 0 | 1,104 |
| Balance as of December 31, 2019 | 688,335 | 50,552 | (1,232) | 152,122 | 201,442 |
| Common and capital stock issued | 8,398 | 168 | 0 | 0 | 168 |
| Stock-based compensation expense | 0 | 13,123 | 0 | 0 | 13,123 |
| Income tax withholding related to vesting of restricted stock units and other | 0 | (5,969) | 0 | 0 | (5,969) |
| Repurchases of capital stock | (21,511) | (2,159) | 0 | (28,990) | (31,149) |
| Sale of interest in consolidated entities | 0 | 2,795 | 0 | 0 | 2,795 |
| Net income | 0 | 0 | 0 | 40,269 | 40,269 |
| Other comprehensive income (loss) | 0 | 0 | 1,865 | 0 | 1,865 |
| Balance as of December 31, 2020 | 675,222 | 58,510 | 633 | 163,401 | 222,544 |
| Common and capital stock issued | 7,225 | 12 | 0 | 0 | 12 |
| Stock-based compensation expense | 0 | 15,539 | 0 | 0 | 15,539 |
| Income tax withholding related to vesting of restricted stock units and other | 0 | (10,273) | 0 | 0 | (10,273) |
| Repurchases of common and capital stock | (20,326) | (2,324) | 0 | (47,950) | (50,274) |
| Sale of interest in consolidated entities | 0 | 310 | 0 | 0 | 310 |
| Net income | 0 | 0 | 0 | 76,033 | 76,033 |
| Other comprehensive income (loss) | 0 | 0 | (2,256) | 0 | (2,256) |
| Balance as of December 31, 2021 | 662,121 | $ 61,774 | $ (1,623) | $ 191,484 | $ 251,635 |

See accompanying notes.

52

PX0667-079

**Alphabet Inc.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| **Operating activities** | | | |
| Net income | $ 34,343 | $ 40,269 | $ 76,033 |
| Adjustments: | | | |
| Depreciation and impairment of property and equipment | 10,856 | 12,905 | 11,555 |
| Amortization and impairment of intangible assets | 925 | 792 | 886 |
| Stock-based compensation expense | 10,794 | 12,991 | 15,376 |
| Deferred income taxes | 173 | 1,390 | 1,808 |
| Gain on debt and equity securities, net | (2,798) | (6,317) | (12,270) |
| Other | (592) | 1,267 | (213) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | |
| Accounts receivable | (4,340) | (6,524) | (9,095) |
| Income taxes, net | (3,128) | 1,209 | (625) |
| Other assets | (621) | (1,330) | (1,846) |
| Accounts payable | 428 | 694 | 283 |
| Accrued expenses and other liabilities | 7,170 | 5,504 | 7,304 |
| Accrued revenue share | 1,273 | 1,639 | 1,682 |
| Deferred revenue | 37 | 635 | 774 |
| Net cash provided by operating activities | 54,520 | 65,124 | 91,652 |
| **Investing activities** | | | |
| Purchases of property and equipment | (23,548) | (22,281) | (24,640) |
| Purchases of marketable securities | (100,315) | (136,576) | (135,196) |
| Maturities and sales of marketable securities | 97,825 | 132,906 | 128,294 |
| Purchases of non-marketable securities | (1,932) | (7,175) | (2,838) |
| Maturities and sales of non-marketable securities | 405 | 1,023 | 934 |
| Acquisitions, net of cash acquired, and purchases of intangible assets | (2,515) | (738) | (2,618) |
| Other investing activities | 589 | 68 | 541 |
| Net cash used in investing activities | (29,491) | (32,773) | (35,523) |
| **Financing activities** | | | |
| Net payments related to stock-based award activities | (4,765) | (5,720) | (10,162) |
| Repurchases of common and capital stock | (18,396) | (31,149) | (50,274) |
| Proceeds from issuance of debt, net of costs | 317 | 11,761 | 20,199 |
| Repayments of debt | (585) | (2,100) | (21,435) |
| Proceeds from sale of interest in consolidated entities, net | 220 | 2,800 | 310 |
| Net cash used in financing activities | (23,209) | (24,408) | (61,362) |
| Effect of exchange rate changes on cash and cash equivalents | (23) | 24 | (287) |
| **Net increase (decrease) in cash and cash equivalents** | 1,797 | 7,967 | (5,520) |
| Cash and cash equivalents at beginning of period | 16,701 | 18,498 | 26,465 |
| **Cash and cash equivalents at end of period** | $ 18,498 | $ 26,465 | $ 20,945 |
| | | | |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for income taxes, net of refunds | $ 8,203 | $ 4,990 | $ 13,412 |

See accompanying notes.

53

## Alphabet Inc.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 1. Summary of Significant Accounting Policies

Google was incorporated in California in September 1998 and re-incorporated in the State of Delaware in August 2003. In 2015, we implemented a holding company reorganization, and as a result, Alphabet Inc. ("Alphabet") became the successor issuer to Google.

### Basis of Consolidation

The consolidated financial statements of Alphabet include the accounts of Alphabet and entities consolidated under the variable interest and voting models. All intercompany balances and transactions have been eliminated.

### Use of Estimates

Preparation of consolidated financial statements in conformity with GAAP requires us to make estimates and assumptions that affect the amounts reported and disclosed in the financial statements and the accompanying notes. Actual results could differ materially from these estimates due to uncertainties, including the effects of COVID-19. On an ongoing basis, we evaluate our estimates, including those related to the allowance for credit losses; fair values of financial instruments, intangible assets, and goodwill; useful lives of intangible assets and property and equipment; income taxes; and contingent liabilities, among others. We base our estimates on assumptions, both historical and forward looking, that are believed to be reasonable, and the results of which form the basis for making judgments about the carrying values of assets and liabilities.

In January 2021, we completed an assessment of the useful lives of our servers and network equipment and adjusted the estimated useful life of our servers from three years to four years and the estimated useful life of certain network equipment from three years to five years. This change in accounting estimate was effective beginning in fiscal year 2021. Based on the carrying value of servers and certain network equipment as of December 31, 2020 and those acquired during the year ended December 31, 2021, the effect of this change in estimate was a reduction in depreciation expense of $2.6 billion and an increase in net income of $2.0 billion, or $3.02 per basic share and $2.98 per diluted share, for the year ended December 31, 2021.

### Revenue Recognition

Revenues are recognized when control of the promised goods or services is transferred to our customers, and the collectibility of an amount that we expect in exchange for those goods or services is probable. Sales and other similar taxes are excluded from revenues.

#### *Advertising Revenues*

We generate advertising revenues primarily by delivering advertising on:

- Google Search and other properties, including revenues from traffic generated by search distribution partners who use Google.com as their default search in browsers, toolbars, etc. and other Google owned and operated properties like Gmail, Google Maps, and Google Play;

- YouTube properties; and

- Google Network properties, including revenues from Google Network properties participating in AdMob, AdSense, and Google Ad Manager.

Our customers generally purchase advertising inventory through Google Ads, Google Ad Manager, and Google Marketing Platform, among others.

We offer advertising by delivering both performance and brand advertising. We recognize revenues for performance advertising when a user engages with the advertisement, such as a click, a view, or a purchase. For brand advertising, we recognize revenues when the ad is displayed, or a user views the ad.

For ads placed on Google Network properties, we evaluate whether we are the principal (i.e., report revenues on a gross basis) or agent (i.e., report revenues on a net basis). Generally, we report advertising revenues for ads placed on Google Network properties on a gross basis, that is, the amounts billed to our customers are recorded as revenues, and amounts paid to Google Network partners are recorded as cost of revenues. Where we are the principal, we control the advertising inventory before it is transferred to our customers. Our control is evidenced by our sole ability to monetize the advertising inventory before it is transferred to our customers and is further supported by us being primarily responsible to our customers and having a level of discretion in establishing pricing.

PX0667-081

54

PX0667-082

***Google Cloud Revenues***

Google Cloud revenues consist of revenues from:

- Google Cloud Platform, which includes fees for infrastructure, platform, and other services;

- Google Workspace, which includes fees for cloud-based collaboration tools for enterprises, such as Gmail, Docs, Drive, Calendar, and Meet; and

- other enterprise services.

Our cloud services are generally provided on either a consumption or subscription basis and may have contract terms longer than a year. Revenues related to cloud services provided on a consumption basis are recognized when the customer utilizes the services, based on the quantity of services consumed. Revenues related to cloud services provided on a subscription basis are recognized ratably over the contract term as the customer receives and consumes the benefits of the cloud services.

***Google Other Revenues***

Google other revenues consist of revenues from:

- Google Play, which includes sales of apps and in-app purchases and digital content sold in the Google Play store;

- hardware, which includes sales of Fitbit wearable devices, Google Nest home products, and Pixel phones;

- YouTube non-advertising, which includes YouTube Premium and YouTube TV subscriptions; and

- other products and services.

As it relates to Google other revenues, the most significant judgment is determining whether we are the principal or agent for app sales and in-app purchases through the Google Play store. We report revenues from these transactions on a net basis because our performance obligation is to facilitate a transaction between app developers and end users, for which we earn a service fee.

***Arrangements with Multiple Performance Obligations***

Our contracts with customers may include multiple performance obligations. For such arrangements, we allocate revenues to each performance obligation based on its relative standalone selling price. We generally determine standalone selling prices based on the prices charged to customers or using expected cost plus margin.

***Customer Incentives and Credits***

Certain customers receive cash-based incentives or credits, which are accounted for as variable consideration. We estimate these amounts based on the expected amount to be provided to customers and reduce revenues. We believe that there will not be significant changes to our estimates of variable consideration.

***Sales Commissions***

We expense sales commissions when incurred and when the amortization period (the period of the expected benefit) is one year or less. We recognize an asset for certain sales commissions if we expect the period of benefit of these costs to exceed one year and recognize the expense over the amortization period. These costs are recorded within sales and marketing expenses.

**Cost of Revenues**

Cost of revenues consists of TAC and other costs of revenues.

- TAC includes:

  ◦ Amounts paid to our distribution partners who make available our search access points and services. Our distribution partners include browser providers, mobile carriers, original equipment manufacturers, and software developers.

  ◦ Amounts paid to Google Network partners primarily for ads displayed on their properties.

- Other cost of revenues includes:

  ◦ Content acquisition costs, which are payments to content providers from whom we license video and other content for distribution on YouTube and Google Play (we pay fees to these content providers based on revenues generated or a flat fee).

PX0667-083

goog-20211231

55

PX0667-084

◦  Expenses associated with our data centers (including bandwidth, compensation expenses, depreciation, energy, and other equipment costs) as well as other operations costs (such as content review as well as customer and product support costs).

◦  Inventory and other costs related to the hardware we sell.

## Software Development Costs

We expense software development costs, including costs to develop software products or the software component of products to be sold, leased, or marketed to external users, before technological feasibility is reached. Technological feasibility is typically reached shortly before the release of such products. As a result, development costs that meet the criteria for capitalization were not material for the periods presented.

Software development costs also include costs to develop software to be used solely to meet internal needs and cloud based applications used to deliver our services. We capitalize development costs related to these software applications once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the function intended. Costs capitalized for developing such software applications were not material for the periods presented.

## Stock-based Compensation

Stock-based compensation primarily consists of Alphabet restricted stock units (RSUs). RSUs are equity classified and measured at the fair market value of the underlying stock at the grant date. We recognize RSU expense using the straight-line attribution method over the requisite service period and account for forfeitures as they occur.

For RSUs, shares are issued on the vesting dates net of the applicable statutory income tax withholding to be paid by us on behalf of our employees. As a result, fewer shares are issued than the number of RSUs outstanding, and the income tax withholding is recorded as a reduction to additional paid-in capital.

Additionally, stock-based compensation also includes other stock-based awards, such as performance stock units (PSUs) that include market conditions and awards that may be settled in cash or the stock of certain Other Bets. PSUs and certain Other Bet awards are equity classified and expense is recognized over the requisite service period. Certain Other Bet awards are liability classified and remeasured at fair value through settlement. The fair value of Other Bet awards is based on the equity valuation of the respective Other Bet.

## Advertising and Promotional Expenses

We expense advertising and promotional costs in the period in which they are incurred. For the years ended December 31, 2019, 2020 and 2021, advertising and promotional expenses totaled approximately $6.8 billion, $5.4 billion, and $7.9 billion, respectively.

## Performance Fees

Performance fees refer to compensation arrangements with payouts based on realized returns from certain investments. We recognize compensation expense based on the estimated payouts, which may result in expense recognized before investment returns are realized, and may require the use of unobservable inputs. Performance fees are recorded as a component of other income (expense), net.

## Fair Value Measurements

Fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. As such, fair value is a market-based measurement that is determined based on assumptions that market participants would use in pricing an asset or a liability. Assets and liabilities recorded at fair value are measured and classified in accordance with a three-tier fair value hierarchy based on the observability of the inputs available in the market used to measure fair value:

Level 1 - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 - Inputs that are based upon quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques for which all significant inputs are observable in the market or can be derived from observable market data. Where applicable, these models project future cash flows and discount the future amounts to a present value using market-based observable inputs including interest rate curves, foreign exchange rates, and credit ratings.

Level 3 - Unobservable inputs that are supported by little or no market activities.

PX0667-086

goog-20211231

         *Alphabet Inc.*

The fair value hierarchy requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

Our financial assets and liabilities that are measured at fair value on a recurring basis include cash equivalents, marketable securities, derivative financial instruments, and certain non-marketable debt securities. Our financial assets measured at fair value on a nonrecurring basis include non-marketable equity securities. Other financial assets and liabilities are carried at cost with fair value disclosed, if required.

We measure certain other instruments, including stock-based compensation awards settled in the stock of certain Other Bets, and certain assets and liabilities acquired in a business combination, also at fair value on a nonrecurring basis. The determination of fair value involves the use of appropriate valuation methods and relevant inputs into valuation models.

**Financial Instruments**

Our financial instruments include cash, cash equivalents, marketable and non-marketable securities, derivative financial instruments and accounts receivable.

*Credit Risks*

We are subject to credit risk from cash equivalents, marketable securities, derivative financial instruments, including foreign exchange contracts, and accounts receivable. We manage our credit risk exposure through timely assessment of our counterparty creditworthiness, credit limits and use of collateral management. Foreign exchange contracts are transacted with various financial institutions with high credit standing. Accounts receivable are typically unsecured and are derived from revenues earned from customers located around the world. We manage our credit risk exposure by performing ongoing evaluations to determine customer credit and we limit the amount of credit we extend. We generally do not require collateral from our customers.

*Cash Equivalents*

We invest excess cash primarily in government bonds, corporate debt securities, mortgage-backed and asset-backed securities, time deposits, and money market funds.

*Marketable Securities*

We classify all marketable debt securities that have stated maturities of three months or less from the date of purchase as cash equivalents and those with stated maturities of greater than three months as marketable securities on our Consolidated Balance Sheets. We determine the appropriate classification of our investments in marketable debt securities at the time of purchase and reevaluate such designation at each balance sheet date. We have classified and accounted for our marketable debt securities as available-for-sale. After consideration of our risk versus reward objectives, as well as our liquidity requirements, we may sell these debt securities prior to their stated maturities. As we view these securities as available to support current operations, we classify highly liquid securities with maturities beyond 12 months as current assets under the caption marketable securities on the Consolidated Balance Sheets. We carry these securities at fair value, and report the unrealized gains and losses, net of taxes, as a component of stockholders' equity, except for the changes in allowance for expected credit losses, which are recorded in other income (expense), net. For certain marketable debt securities we have elected the fair value option, for which changes in fair value are recorded in other income (expense), net. We determine any realized gains or losses on the sale of marketable debt securities on a specific identification method, and we record such gains and losses as a component of other income (expense), net.

Our investments in marketable equity securities are measured at fair value with the related gains and losses, including unrealized, recognized in other income (expense), net. We classify our marketable equity securities subject to long-term lock-up restrictions beyond twelve months as other non-current assets on the Consolidated Balance Sheets.

*Non-Marketable Securities*

We account for non-marketable equity securities through which we exercise significant influence but do not have control over the investee under the equity method. Our non-marketable equity securities not accounted for under the equity method are primarily accounted for under the measurement alternative. Under the measurement alternative, the carrying value is measured at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer. Adjustments are determined primarily based on a market approach as of the transaction date and are recorded as a component of other income (expense), net.

Non-marketable debt securities are classified as available-for-sale securities.

PX0667-087

goog-20211231

PX0667-088

Non-marketable securities that do not have stated contractual maturity dates are classified as other non-current assets on the Consolidated Balance Sheets.

***Derivative Financial Instruments***

See Note 3 for the accounting policy pertaining to derivative financial instruments.

***Accounts Receivable***

Our payment terms for accounts receivable vary by the types and locations of our customers and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customers, we require payment before the products or services are delivered to the customer.

We maintain an allowance for credit losses for accounts receivable, which is recorded as an offset to accounts receivable, and changes in such are classified as general and administrative expense in the Consolidated Statements of Income. We assess collectibility by reviewing accounts receivable on a collective basis where similar characteristics exist and on an individual basis when we identify specific customers with known disputes or collectibility issues. In determining the amount of the allowance for credit losses, we consider historical collectibility based on past due status and make judgments about the creditworthiness of customers based on ongoing credit evaluations. We also consider customer-specific information, current market conditions (such as the effects caused by COVID-19), and reasonable and supportable forecasts of future economic conditions.

The allowance for credit losses on accounts receivable was $789 million and $550 million as of December 31, 2020 and 2021, respectively.

***Other***

Our financial instruments also include debt and equity investments in companies with which we also have commercial arrangements. For these transactions, judgment is required to assess the substance of the arrangements, such as the market value of similar transactions or the fair value of the investment based on stand-alone transactions, and whether the agreements should be accounted for as separate transactions under the applicable GAAP.

***Impairment of Investments***

We periodically review our debt and non-marketable equity securities for impairment.

For debt securities in an unrealized loss position, we determine whether a credit loss exists. The credit loss is estimated by considering available information relevant to the collectibility of the security and information about past events, current conditions, and reasonable and supportable forecasts. Any credit loss is recorded as a charge to other income (expense), net, not to exceed the amount of the unrealized loss. Unrealized losses other than the credit loss are recognized in accumulated other comprehensive income (AOCI). If we have an intent to sell, or if it is more likely than not that we will be required to sell a debt security in an unrealized loss position before recovery of its amortized cost basis, we will write down the security to its fair value and record the corresponding charge as a component of other income (expense), net.

For non-marketable equity securities, including equity method investments, we consider whether impairment indicators exist by evaluating the companies' financial and liquidity position and access to capital resources, among other indicators. If the assessment indicates that the investment is impaired, we write down the investment to its fair value by recording the corresponding charge as a component of other income (expense), net. We prepare quantitative measurements of the fair value of our equity investments using a market approach or an income approach.

### Inventory

Inventory consists primarily of finished goods and is stated at the lower of cost and net realizable value. Cost is computed using the first-in, first-out method.

### Variable Interest Entities

We determine at the inception of each arrangement whether an entity in which we have made an investment or in which we have other variable interests is considered a variable interest entity (VIE). We consolidate VIEs when we are the primary beneficiary. We are the primary beneficiary of a VIE when we have the power to direct activities that most significantly affect the economic performance of the VIE and have the obligation to absorb the majority of their losses or benefits. If we are not the primary beneficiary in a VIE, we account for the investment or other variable interests in a VIE in accordance with applicable GAAP.

Periodically, we assess whether any changes in our interest or relationship with the entity affect our determination of whether the entity is a VIE and, if so, whether we are the primary beneficiary.

58

PX0667-090

goog-20211231

Table of Contents

Alphabet Inc.

**Property and Equipment**

Property and equipment includes the following categories: land and buildings, information technology assets, construction in progress, leasehold improvements, and furniture and fixtures. Land and buildings include land, offices, data centers, and related building improvements. Information technology assets include servers and network equipment. We account for property and equipment at cost less accumulated depreciation. We compute depreciation using the straight-line method over the estimated useful lives of the assets, which we regularly evaluate. We depreciate buildings over periods of seven to 25 years. We depreciate information technology assets generally over periods of four to five years (generally, four years for servers and five years for network equipment).

We depreciate leasehold improvements over the shorter of the remaining lease term or the estimated useful lives of the assets. Construction in progress is the construction or development of property and equipment that have not yet been placed in service for our intended use. Depreciation for equipment, buildings, and leasehold improvements commences once they are ready for our intended use. Land is not depreciated.

**Leases**

We determine if an arrangement is a lease at inception. Our lease agreements generally contain lease and non-lease components. Payments under our lease arrangements are primarily fixed. Non-lease components primarily include payments for maintenance and utilities. We combine fixed payments for non-lease components with lease payments and account for them together as a single lease component which increases the amount of our lease assets and liabilities.

Certain lease agreements contain variable payments, which are expensed as incurred and not included in the lease assets and liabilities. These amounts include payments affected by the Consumer Price Index, payments contingent on wind or solar production for power purchase arrangements, and payments for maintenance and utilities.

Lease assets and liabilities are recognized at the present value of the future lease payments at the lease commencement date. The interest rate used to determine the present value of the future lease payments is our incremental borrowing rate, because the interest rate implicit in our leases is not readily determinable. Our incremental borrowing rate is estimated to approximate the interest rate on a collateralized basis with similar terms and payments, and in economic environments where the leased asset is located. Our lease terms include periods under options to extend or terminate the lease when it is reasonably certain that we will exercise that option. We generally use the base, non-cancelable, lease term when determining the lease assets and liabilities. Lease assets also include any prepaid lease payments and lease incentives.

Operating lease assets and liabilities are included on our Consolidated Balance Sheet. The current portion of our operating lease liabilities is included in accrued expenses and other current liabilities, and the long-term portion is included in operating lease liabilities. Finance lease assets are included in property and equipment, net. Finance lease liabilities are included in accrued expenses and other current liabilities or long-term debt.

Operating lease expense (excluding variable lease costs) is recognized on a straight-line basis over the lease term.

**Long-Lived Assets, Goodwill and Other Acquired Intangible Assets**

We review property and equipment and intangible assets, excluding goodwill, for impairment when events or changes in circumstances indicate the carrying amount may not be recoverable. The evaluation is performed at the lowest level of identifiable cash flows independent of other assets. We measure recoverability of these assets by comparing the carrying amounts to the future undiscounted cash flows that the assets or the asset group are expected to generate. If the carrying value of the assets or asset group is not recoverable, the impairment recognized is measured as the amount by which the carrying value exceeds its fair value. Impairments were not material for the periods presented.

We allocate goodwill to reporting units based on the expected benefit from the business combination. We evaluate our reporting units periodically, as well as when changes in our operating segments occur. For changes in reporting units, we reassign goodwill using a relative fair value allocation approach. We test our goodwill for impairment at least annually, or more frequently if events or changes in circumstances indicate that the asset may be impaired. Goodwill impairments were not material for the periods presented.

Intangible assets with definite lives are amortized over their estimated useful lives on a straight-line basis generally over periods ranging from one to twelve years.

59

PX0667-091

### Income Taxes

We account for income taxes using the asset and liability method, under which we recognize the amount of taxes payable or refundable for the current year and deferred tax assets and liabilities for the future tax consequences of events that have been recognized in our financial statements or tax returns. We measure current and deferred tax assets and liabilities based on provisions of enacted tax law. We evaluate the realization of our deferred tax assets based on all available evidence and establish a valuation allowance to reduce deferred tax assets when it is more likely than not that they will not be realized.

We recognize the financial statement effects of a tax position when it is more likely than not that, based on technical merits, the position will be sustained upon examination. The tax benefits of the position recognized in the financial statements are then measured based on the largest amount of benefit that is greater than 50% likely to be realized upon settlement with a taxing authority. In addition, we recognize interest and penalties related to unrecognized tax benefits as a component of the income tax provision.

### Business Combinations

We include the results of operations of the businesses that we acquire as of the acquisition date. We allocate the purchase price of the acquisitions to the assets acquired and liabilities assumed based on their estimated fair values. The excess of the purchase price over the fair values of identifiable assets and liabilities is recorded as goodwill. Acquisition-related expenses are recognized separately from the business combination and are expensed as incurred.

### Foreign Currency

We translate the financial statements of our international subsidiaries to U.S. dollars using month-end exchange rates for assets and liabilities, and average rates for the annual period derived from month-end exchange rates for revenues, costs, and expenses. We record translation gains and losses in AOCI as a component of stockholders' equity. We reflect net foreign exchange transaction gains and losses resulting from the conversion of the transaction currency to functional currency as a component of foreign currency exchange gain (loss) in other income (expense), net.

### Prior Period Reclassifications

Certain amounts in prior periods have been reclassified to conform with current period presentation.

### Note 2. Revenues

### Revenue Recognition

The following table presents revenues disaggregated by type (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2019 | 2020 | 2021 |
| Google Search & other | $ 98,115 | $ 104,062 | $ 148,951 |
| YouTube ads | 15,149 | 19,772 | 28,845 |
| Google Network | 21,547 | 23,090 | 31,701 |
| Google advertising | 134,811 | 146,924 | 209,497 |
| Google other | 17,014 | 21,711 | 28,032 |
| Google Services total | 151,825 | 168,635 | 237,529 |
| Google Cloud | 8,918 | 13,059 | 19,206 |
| Other Bets | 659 | 657 | 753 |
| Hedging gains (losses) | 455 | 176 | 149 |
| Total revenues | $ 161,857 | $ 182,527 | $ 257,637 |

No individual customer or groups of affiliated customers represented more than 10% of our revenues in 2019, 2020, or 2021.

PX0667-092

The following table presents revenues disaggregated by geography, based on the addresses of our customers (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | |
| United States | $ 74,843 | 46 % | $ 85,014 | 47 % | $ 117,854 | 46 % |
| EMEA[1] | 50,645 | 31 | 55,370 | 30 | 79,107 | 31 |
| APAC[1] | 26,928 | 17 | 32,550 | 18 | 46,123 | 18 |
| Other Americas[1] | 8,986 | 6 | 9,417 | 5 | 14,404 | 5 |
| Hedging gains (losses) | 455 | 0 | 176 | 0 | 149 | 0 |
| Total revenues | $ 161,857 | 100 % | $ 182,527 | 100 % | $ 257,637 | 100 % |

[1]   Regions represent Europe, the Middle East, and Africa (EMEA); Asia-Pacific (APAC); and Canada and Latin America ("Other Americas").

### Revenue Backlog and Deferred Revenues

As of December 31, 2021 we had $51.0 billion of remaining performance obligations ("revenue backlog"), primarily related to Google Cloud, and expect to recognize approximately half of this amount as revenues over the next 24 months with the remaining thereafter. Our revenue backlog represents commitments in customer contracts for future services that have not yet been recognized as revenues. The amount and timing of revenue recognition for these commitments is largely driven by when our customers utilize services and our ability to deliver in accordance with relevant contract terms, which could affect our estimate of revenue backlog and when we expect to recognize such as revenues. Revenue backlog includes related deferred revenue currently recorded as well as amounts that will be invoiced in future periods, and excludes contracts with an original expected term of one year or less and cancellable contracts.

We record deferred revenues when cash payments are received or due in advance of our performance, including amounts which are refundable. Deferred revenues primarily relate to Google Cloud and Google other. Total deferred revenue as of December 31, 2020 was $3.0 billion, of which $2.3 billion was recognized as revenues for the year ending December 31, 2021.

### Note 3. Financial Instruments

### Debt Securities

We classify our marketable debt securities, which are accounted for as available-for-sale within Level 2 in the fair value hierarchy, because we use quoted market prices to the extent available or alternative pricing sources and models utilizing market observable inputs to determine fair value.

For certain marketable debt securities, we have elected the fair value option for which changes in fair value are recorded in other income (expense), net. The fair value option was elected for these securities to align with the unrealized gains and losses from related derivative contracts. Unrealized net gains (losses) related to debt securities still held where we have elected the fair value option were $87 million and $(35) million as of December 31, 2020 and December 31, 2021, respectively. As of December 31, 2020 and December 31, 2021, the fair value of these debt securities was $2.0 billion and $4.7 billion, respectively.

61

goog-20211231

Alphabet Inc.

The following tables summarize debt securities, for which we did not elect the fair value option, by significant investment categories as of December 31, 2020 and 2021 (in millions):

|  | As of December 31, 2020 | | | | | |
|  | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Cash and Cash Equivalents | Marketable Securities |
|---|---|---|---|---|---|---|
| Level 2: | | | | | | |
| Time deposits[1] | $ 3,564 | $ 0 | $ 0 | $ 3,564 | $ 3,564 | $ 0 |
| Government bonds | 55,156 | 793 | (9) | 55,940 | 2,527 | 53,413 |
| Corporate debt securities | 31,521 | 704 | (2) | 32,223 | 8 | 32,215 |
| Mortgage-backed and asset-backed securities | 16,767 | 364 | (7) | 17,124 | 0 | 17,124 |
| Total | $ 107,008 | $ 1,861 | $ (18) | $ 108,851 | $ 6,099 | $ 102,752 |

|  | As of December 31, 2021 | | | | | |
|  | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Cash and Cash Equivalents | Marketable Securities |
|---|---|---|---|---|---|---|
| Level 2: | | | | | | |
| Time deposits[1] | $ 5,133 | $ 0 | $ 0 | $ 5,133 | $ 5,133 | $ 0 |
| Government bonds | 53,288 | 258 | (238) | 53,308 | 5 | 53,303 |
| Corporate debt securities | 35,605 | 194 | (223) | 35,576 | 12 | 35,564 |
| Mortgage-backed and asset-backed securities | 18,829 | 96 | (112) | 18,813 | 0 | 18,813 |
| Total | $ 112,855 | $ 548 | $ (573) | $ 112,830 | $ 5,150 | $ 107,680 |

[1]    The majority of our time deposits are domestic deposits.

We determine realized gains or losses on the sale or extinguishment of debt securities on a specific identification method. We recognized gross realized gains of $292 million, $899 million, and $432 million for the years ended December 31, 2019, 2020, and 2021, respectively. We recognized gross realized losses of $143 million, $184 million, and $329 million for the years ended December 31, 2019, 2020, and 2021, respectively. We reflect these gains and losses as a component of other income (expense), net.

The following table summarizes the estimated fair value of investments in marketable debt securities by stated contractual maturity dates (in millions):

|  | As of December 31, 2021 |
|---|---|
| Due in 1 year or less | $ 16,192 |
| Due in 1 year through 5 years | 78,625 |
| Due in 5 years through 10 years | 4,675 |
| Due after 10 years | 12,864 |
| Total | $ 112,356 |

The following tables present fair values and gross unrealized losses recorded to AOCI as of December 31, 2020 and 2021, aggregated by investment category and the length of time that individual securities have been in a continuous loss position (in millions):

|  | As of December 31, 2020 | | | | | |
|  | Less than 12 Months | | 12 Months or Greater | | Total | |
|  | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|---|---|---|---|---|---|---|
| Government bonds | $ 5,516 | $ (9) | $ 3 | $ 0 | $ 5,519 | $ (9) |
| Corporate debt securities | 1,999 | (1) | 0 | 0 | 1,999 | (1) |
| Mortgage-backed and asset-backed securities | 929 | (5) | 242 | (2) | 1,171 | (7) |
| Total | $ 8,444 | $ (15) | $ 245 | $ (2) | $ 8,689 | $ (17) |

62

PX0667-094

|  | As of December 31, 2021 | | | | | |
|  | Less than 12 Months | | 12 Months or Greater | | Total | |
|  | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|---|---|---|---|---|---|---|
| Government bonds | $ 32,843 | $ (236) | $ 71 | $ (2) | $ 32,914 | $ (238) |
| Corporate debt securities | 22,737 | (152) | 303 | (5) | 23,040 | (157) |
| Mortgage-backed and asset-backed securities | 11,502 | (106) | 248 | (6) | 11,750 | (112) |
| Total | $ 67,082 | $ (494) | $ 622 | $ (13) | $ 67,704 | $ (507) |

During the years ended December 31, 2020 and 2021, we did not recognize significant credit losses and the ending allowance for credit losses was immaterial. See Note 7 for further details on other income (expense), net.

**Equity Investments**

The following discusses our marketable equity securities, non-marketable equity securities, gains and losses on marketable and non-marketable equity securities, as well as our equity securities accounted for under the equity method.

Our marketable equity securities are publicly traded stocks or funds measured at fair value and classified within Level 1 and 2 in the fair value hierarchy because we use quoted prices for identical assets in active markets or inputs that are based upon quoted prices for similar instruments in active markets.

Our non-marketable equity securities are investments in privately held companies without readily determinable market values. The carrying value of our non-marketable equity securities is adjusted to fair value upon observable transactions for identical or similar investments of the same issuer or impairment (referred to as the measurement alternative). Non-marketable equity securities that have been remeasured during the period based on observable transactions are classified within Level 2 or Level 3 in the fair value hierarchy because we estimate the value based on valuation methods which may include a combination of the observable transaction price at the transaction date and other unobservable inputs including volatility, rights, and obligations of the securities we hold. The fair value of non-marketable equity securities that have been remeasured due to impairment are classified within Level 3.

*Gains and losses on marketable and non-marketable equity securities*

Gains and losses reflected in other income (expense), net, for marketable and non-marketable equity securities are summarized below (in millions):

|  | Year Ended December 31, | |
|  | 2020 | 2021 |
|---|---|---|
| Net gain (loss) on equity securities sold during the period | $ 1,339 | $ 1,196 |
| Unrealized gain (loss) on equity securities held as of the end of the period | 4,253 | 11,184 |
| Total gain (loss) recognized in other income (expense), net | $ 5,592 | $ 12,380 |

In the table above, net gain (loss) on equity securities sold during the period reflects the difference between the sale proceeds and the carrying value of the equity securities at the beginning of the period or the purchase date, if later.

Cumulative net gains (losses) on equity securities sold during the period, which is summarized in the following table (in millions), represents the total net gains (losses) recognized after the initial purchase date of the equity security. While these net gains may have been reflected in periods prior to the period of sale, we believe they are important supplemental information as they reflect the economic net gains recognized on the securities sold during the period. Cumulative net gains are calculated as the difference between the sale price and the initial purchase price for the equity security sold during the period.

63

PX0667-095

| | Equity Securities Sold During the Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Total sale price | $ 4,767 | $ 5,604 |
| Total initial cost | 2,674 | 1,206 |
| Cumulative net gains[1] | $ 2,093 | $ 4,398 |

[1]    Cumulative net gains excludes cumulative losses of $738 million resulting from our equity derivatives, which hedged the changes in fair value of certain marketable equity securities sold during the year ended December 31, 2021. The associated derivative liabilities arising from these losses were settled against our holdings of the underlying equity securities.

### Carrying value of marketable and non-marketable equity securities

The carrying value is measured as the total initial cost plus the cumulative net gain (loss). The carrying values for marketable and non-marketable equity securities are summarized below (in millions):

| | As of December 31, 2020 | | |
| --- | --- | --- | --- |
| | Marketable Equity Securities | Non-Marketable Equity Securities | Total |
| Total initial cost | $ 2,227 | $ 14,616 | $ 16,843 |
| Cumulative net gain (loss)[1] | 3,631 | 4,277 | 7,908 |
| Carrying value[2] | $ 5,858 | $ 18,893 | $ 24,751 |

[1]    Non-marketable equity securities cumulative net gain (loss) is comprised of $6.1 billion gains and $1.9 billion losses (including impairment).
[2]    The long-term portion of marketable equity securities (subject to long-term lock-up restrictions) of $429 million is included within other non-current assets.

| | As of December 31, 2021 | | |
| --- | --- | --- | --- |
| | Marketable Equity Securities | Non-Marketable Equity Securities | Total |
| Total initial cost | $ 4,211 | $ 15,135 | $ 19,346 |
| Cumulative net gain (loss)[1] | 3,587 | 12,436 | 16,023 |
| Carrying value[2] | $ 7,798 | $ 27,571 | $ 35,369 |

[1]    Non-marketable equity securities cumulative net gain (loss) is comprised of $14.1 billion gains and $1.7 billion losses (including impairment).
[2]    The long-term portion of marketable equity securities (subject to long-term lock-up restrictions) of $1.4 billion is included within other non-current assets.

### Marketable equity securities

The following table summarizes marketable equity securities measured at fair value by significant investment categories as of December 31, 2020 and 2021 (in millions):

| | As of December 31, 2020 | | As of December 31, 2021 | |
| --- | --- | --- | --- | --- |
| | Cash and Cash Equivalents | Marketable Equity Securities | Cash and Cash Equivalents | Marketable Equity Securities |
| Level 1: | | | | |
| Money market funds | $ 12,210 | $ 0 | $ 7,499 | $ 0 |
| Marketable equity securities[1][2] | 0 | 5,470 | 0 | 7,447 |
| | 12,210 | 5,470 | 7,499 | 7,447 |
| Level 2: | | | | |
| Mutual funds | 0 | 388 | 0 | 351 |
| Total | $ 12,210 | $ 5,858 | $ 7,499 | $ 7,798 |

[1]    The balance as of December 31, 2020 and 2021 includes investments that were reclassified from non-marketable equity securities following the commencement of public market trading of the issuers or acquisition by public entities (certain investments are subject to short-term lock-up restrictions).
[2]    As of December 31, 2020 and 2021, the long-term portion of marketable equity securities (subject to long-term lock-up restrictions) of $429 million and $1.4 billion, respectively, is included within other non-current assets.

64

PX0667-097

goog-20211231

Alphabet Inc.

### Non-marketable equity securities

The following is a summary of unrealized gains and losses recorded in other income (expense), net, which are included as adjustments to the carrying value of non-marketable equity securities held as of the end of the period (in millions):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2020 | 2021 |
| Unrealized gains on non-marketable equity securities | $ 3,020 | $ 9,971 |
| Unrealized losses on non-marketable equity securities (including impairment) | (1,489) | (122) |
| Total unrealized gain (loss) recognized on non-marketable equity securities | $ 1,531 | $ 9,849 |

During the year ended December 31, 2021, included in the $27.6 billion of non-marketable equity securities held as of the end of the period, $18.6 billion were measured at fair value resulting in a net unrealized gain of $9.8 billion.

### Equity securities accounted for under the Equity Method

As of December 31, 2020 and 2021, equity securities accounted for under the equity method had a carrying value of approximately $1.4 billion and $1.5 billion, respectively. Our share of gains and losses, including impairments, are included as a component of other income (expense), net, in the Consolidated Statements of Income. See Note 7 for further details on other income (expense), net.

### Derivative Financial Instruments

We enter into derivative instruments to manage risks relating to our ongoing business operations. The primary risk managed with derivative instruments is foreign exchange risk. We use foreign currency contracts to reduce the risk that our cash flows, earnings, and investment in foreign subsidiaries will be adversely affected by foreign currency exchange rate fluctuations. We also enter into derivative instruments to partially offset our exposure to other risks and enhance investment returns.

We recognize derivative instruments as either assets or liabilities in the Consolidated Balance Sheets at fair value and classify the derivatives primarily within Level 2 in the fair value hierarchy. We present our collar contracts (an option strategy comprised of a combination of purchased and written options) at net fair values where both the purchased and written options are with the same counterparty. For other derivative contracts, we present at gross fair values. We primarily record changes in the fair value in the Consolidated Statements of Income as either other income (expense), net, or revenues, or in the Consolidated Balance Sheets in AOCI, as discussed below.

We enter into master netting arrangements, which reduce credit risk by permitting net settlement of transactions with the same counterparty. Further, we enter into collateral security arrangements that provide for collateral to be received or pledged when the net fair value of certain financial instruments fluctuates from contractually established thresholds. Cash collateral received related to derivative instruments under our collateral security arrangements are included in other current assets with a corresponding liability. Cash and non-cash collateral pledged related to derivative instruments under our collateral security arrangements are included in other current assets.

### Cash Flow Hedges

We designate foreign currency forward and option contracts (including collars) as cash flow hedges to hedge certain forecasted revenue transactions denominated in currencies other than the U.S. dollar. These contracts have maturities of 24 months or less.

Cash flow hedge amounts included in the assessment of hedge effectiveness are deferred in AOCI and subsequently reclassified to revenue when the hedged item is recognized in earnings. We exclude the change in forward points and time value from our assessment of hedge effectiveness. The initial value of the excluded component is amortized on a straight-line basis over the life of the hedging instrument and recognized in revenues. The difference between fair value changes of the excluded component and the amount amortized to revenues is recorded in AOCI. If the hedged transactions become probable of not occurring, the corresponding amounts in AOCI are reclassified to other income (expense), net in the period of de-designation.

As of December 31, 2021, the net accumulated gain on our foreign currency cash flow hedges before tax effect was $518 million, which is expected to be reclassified from AOCI into earnings within the next 12 months.

### Fair Value Hedges

We designate foreign currency forward contracts as fair value hedges to hedge foreign currency risks for our investments denominated in currencies other than the U.S. dollar. Fair value hedge amounts included in the

65

PX0667-099

goog-20211231

Table of Contents                                                                    Alphabet Inc.

assessment of hedge effectiveness are recognized in other income (expense), net, along with the offsetting gains and losses of the related hedged items. We exclude changes in forward points from the assessment of hedge effectiveness and recognize changes in the excluded component in other income (expense), net.

### Net Investment Hedges

We designate foreign currency forward contracts as net investment hedges to hedge the foreign currency risks related to our investment in foreign subsidiaries. Net investment hedge amounts included in the assessment of hedge effectiveness are recognized in AOCI along with the foreign currency translation adjustment. We exclude changes in forward points from the assessment of hedge effectiveness and recognize changes in the excluded component in other income (expense), net.

### Other Derivatives

Other derivatives not designated as hedging instruments consist primarily of foreign currency forward contracts that we use to hedge intercompany transactions and other monetary assets or liabilities denominated in currencies other than the functional currency of a subsidiary. Gains and losses on these contracts, as well as the related costs, are recognized in other income (expense), net, along with the foreign currency gains and losses on monetary assets and liabilities.

We also use derivatives not designated as hedging instruments to manage risks relating to interest rates, commodity prices, credit exposures and to enhance investment returns. Additionally, from time to time, we enter into derivatives to hedge the market price risk on certain of our marketable equity securities. Gains (losses) arising from these derivatives are reflected within the "other" component of other income (expense), net and the offsetting recognized gains (losses) on the marketable equity securities are reflected within the gain (loss) on equity securities, net component of other income (expense), net. See Note 7 for further details on other income (expense), net.

The gross notional amounts of outstanding derivative instruments were as follows (in millions):

|  | As of December 31, | | | |
|---|---|---|---|---|
|  |  | 2020 | | 2021 |
| **Derivatives Designated as Hedging Instruments:** |  |  |  |  |
| Foreign exchange contracts |  |  |  |  |
| Cash flow hedges | $ | 10,187 | $ | 16,362 |
| Fair value hedges | $ | 1,569 | $ | 2,556 |
| Net investment hedges | $ | 9,965 | $ | 10,159 |
| **Derivatives Not Designated as Hedging Instruments:** |  |  |  |  |
| Foreign exchange contracts | $ | 39,861 | $ | 41,031 |
| Other contracts | $ | 2,399 | $ | 4,275 |

66

PX0667-100

Table of Contents                                                    Alphabet Inc.

The fair values of outstanding derivative instruments were as follows (in millions):

|  | Balance Sheet Location | As of December 31, 2020 | | |
|---|---|---|---|---|
|  |  | Fair Value of Derivatives Designated as Hedging Instruments | Fair Value of Derivatives Not Designated as Hedging Instruments | Total Fair Value |
| **Derivative Assets:** |  |  |  |  |
| Level 2: |  |  |  |  |
| Foreign exchange contracts | Other current and non-current assets | $ 33 | $ 316 | $ 349 |
| Other contracts | Other current and non-current assets | 0 | 16 | 16 |
| Total |  | $ 33 | $ 332 | $ 365 |
| **Derivative Liabilities:** |  |  |  |  |
| Level 2: |  |  |  |  |
| Foreign exchange contracts | Accrued expenses and other liabilities, current and non-current | $ 395 | $ 185 | $ 580 |
| Other contracts | Accrued expenses and other liabilities, current and non-current | 0 | 942 | 942 |
| Total |  | $ 395 | $ 1,127 | $ 1,522 |

|  | Balance Sheet Location | As of December 31, 2021 | | |
|---|---|---|---|---|
|  |  | Fair Value of Derivatives Designated as Hedging Instruments | Fair Value of Derivatives Not Designated as Hedging Instruments | Total Fair Value |
| **Derivative Assets:** |  |  |  |  |
| Level 2: |  |  |  |  |
| Foreign exchange contracts | Other current and non-current assets | $ 867 | $ 42 | $ 909 |
| Other contracts | Other current and non-current assets | 0 | 52 | 52 |
| Total |  | $ 867 | $ 94 | $ 961 |
| **Derivative Liabilities:** |  |  |  |  |
| Level 2: |  |  |  |  |
| Foreign exchange contracts | Accrued expenses and other liabilities, current and non-current | $ 8 | $ 452 | $ 460 |
| Other contracts | Accrued expenses and other liabilities, current and non-current | 0 | 121 | 121 |
| Total |  | $ 8 | $ 573 | $ 581 |

67

PX0667-101

The gains (losses) on derivatives in cash flow hedging and net investment hedging relationships recognized in other comprehensive income (OCI) were summarized below (in millions):

| | Gains (Losses) Recognized in OCI on Derivatives Before Tax Effect | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
| **Derivatives in Cash Flow Hedging Relationship:** | | | |
| Foreign exchange contracts | | | |
| Amount included in the assessment of effectiveness | $ 38 | $ 102 | $ 806 |
| Amount excluded from the assessment of effectiveness | (14) | (37) | 48 |
| **Derivatives in Net Investment Hedging Relationship:** | | | |
| Foreign exchange contracts | | | |
| Amount included in the assessment of effectiveness | 131 | (851) | 754 |
| Total | $ 155 | $ (786) | $ 1,608 |

The effect of derivative instruments on income was summarized below (in millions):

| | Gains (Losses) Recognized in Income | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | 2019 | | 2020 | | 2021 | |
| | Revenues | Other income (expense), net | Revenues | Other income (expense), net | Revenues | Other income (expense), net |
| Total amounts presented in the Consolidated Statements of Income in which the effects of cash flow and fair value hedges are recorded | $ 161,857 | $ 5,394 | $ 182,527 | $ 6,858 | $ 257,637 | $ 12,020 |
| Gains (Losses) on Derivatives in Cash Flow Hedging Relationship: | | | | | | |
| Foreign exchange contracts | | | | | | |
| Amount of gains (losses) reclassified from AOCI to income | $ 367 | $ 0 | $ 144 | $ 0 | $ 165 | $ 0 |
| Amount excluded from the assessment of effectiveness recognized in earnings based on an amortization approach | 88 | 0 | 33 | 0 | (16) | 0 |
| Gains (Losses) on Derivatives in Fair Value Hedging Relationship: | | | | | | |
| Foreign exchange contracts | | | | | | |
| Hedged items | 0 | (19) | 0 | 18 | 0 | (95) |
| Derivatives designated as hedging instruments | 0 | 19 | 0 | (18) | 0 | 95 |
| Amount excluded from the assessment of effectiveness | 0 | 25 | 0 | 4 | 0 | 8 |
| Gains (Losses) on Derivatives in Net Investment Hedging Relationship: | | | | | | |
| Foreign exchange contracts | | | | | | |
| Amount excluded from the assessment of effectiveness | 0 | 243 | 0 | 151 | 0 | 82 |
| Gains (Losses) on Derivatives Not Designated as Hedging Instruments: | | | | | | |
| Foreign exchange contracts | 0 | (413) | 0 | 718 | 0 | (860) |
| Other Contracts | 0 | 0 | 0 | (906) | 0 | 101 |
| Total gains (losses) | $ 455 | $ (145) | $ 177 | $ (33) | $ 149 | $ (669) |

68

PX0667-102

### Offsetting of Derivatives

The gross amounts of derivative instruments subject to master netting arrangements with various counterparties, and cash and non-cash collateral received and pledged under such agreements were as follows (in millions):

### Offsetting of Assets

| | | | | As of December 31, 2020 | | | | |
| | | | | | Gross Amounts Not Offset in the Consolidated Balance Sheets, but Have Legal Rights to Offset | | | |
| | Gross Amounts of Recognized Assets | Gross Amounts Offset in the Consolidated Balance Sheets | Net Presented in the Consolidated Balance Sheets | Financial Instruments | Cash Collateral Received | Non-Cash Collateral Received | Net Assets Exposed |
|---|---|---|---|---|---|---|---|
| Derivatives | $ 397 | $ (32) | $ 365 | $ (295) [1] | $ (16) | $ 0 | $ 54 |

| | | | | As of December 31, 2021 | | | | |
| | | | | | Gross Amounts Not Offset in the Consolidated Balance Sheets, but Have Legal Rights to Offset | | | |
| | Gross Amounts of Recognized Assets | Gross Amounts Offset in the Consolidated Balance Sheets | Net Presented in the Consolidated Balance Sheets | Financial Instruments | Cash Collateral Received | Non-Cash Collateral Received | Net Assets Exposed |
|---|---|---|---|---|---|---|---|
| Derivatives | $ 999 | $ (38) | $ 961 | $ (434) [1] | $ (394) | $ (12) | $ 121 |

[1] The balances as of December 31, 2020 and 2021 were related to derivative liabilities which are allowed to be net settled against derivative assets in accordance with our master netting agreements.

### Offsetting of Liabilities

| | | | | As of December 31, 2020 | | | | |
| | | | | | Gross Amounts Not Offset in the Consolidated Balance Sheets, but Have Legal Rights to Offset | | | |
| | Gross Amounts of Recognized Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Presented in the Consolidated Balance Sheets | Financial Instruments | Cash Collateral Pledged | Non-Cash Collateral Pledged | Net Liabilities |
|---|---|---|---|---|---|---|---|
| Derivatives | $ 1,554 | $ (32) | $ 1,522 | $ (295) [2] | $ (1) | $ (943) | $ 283 |

| | | | | As of December 31, 2021 | | | | |
| | | | | | Gross Amounts Not Offset in the Consolidated Balance Sheets, but Have Legal Rights to Offset | | | |
| | Gross Amounts of Recognized Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Presented in the Consolidated Balance Sheets | Financial Instruments | Cash Collateral Pledged | Non-Cash Collateral Pledged | Net Liabilities |
|---|---|---|---|---|---|---|---|
| Derivatives | $ 619 | $ (38) | $ 581 | $ (434) [2] | $ (4) | $ (110) | $ 33 |

[2] The balances as of December 31, 2020 and 2021 were related to derivative assets which are allowed to be net settled against derivative liabilities in accordance with our master netting agreements.

### Note 4. Leases

We have entered into operating lease agreements primarily for data centers, land and offices throughout the world with lease periods expiring between 2022 and 2063.

Components of operating lease expense were as follows (in millions):

| | Year Ended December 31, | |
| | 2020 | 2021 |
|---|---|---|
| Operating lease cost | $ 2,267 | $ 2,699 |
| Variable lease cost | 619 | 726 |
| Total operating lease cost | $ 2,886 | $ 3,425 |

69

Supplemental information related to operating leases was as follows (in millions):

| | Year Ended December 31, | |
| | 2020 | 2021 |
| --- | --- | --- |
| Cash payments for operating leases | $ 2,004 | $ 2,489 |
| New operating lease assets obtained in exchange for operating lease liabilities | $ 2,765 | $ 2,951 |

As of December 31, 2021, our operating leases had a weighted average remaining lease term of 8 years and a weighted average discount rate of 2.3%. Future lease payments under operating leases as of December 31, 2021 were as follows (in millions):

| | |
| --- | --- |
| 2022 | $ 2,539 |
| 2023 | 2,527 |
| 2024 | 2,226 |
| 2025 | 1,815 |
| 2026 | 1,401 |
| Thereafter | 4,948 |
| Total future lease payments | 15,456 |
| Less imputed interest | (1,878) |
| Total lease liability balance | $ 13,578 |

As of December 31, 2021, we have entered into leases that have not yet commenced with short-term and long-term future lease payments of $606 million and $5.2 billion, excluding purchase options, that are not yet recorded on our Consolidated Balance Sheets. These leases will commence between 2022 and 2026 with non-cancelable lease terms of 1 to 25 years.

**Note 5. Variable Interest Entities**

**Consolidated VIEs**

We consolidate VIEs in which we hold a variable interest and are the primary beneficiary. The results of operations and financial position of these VIEs are included in our consolidated financial statements.

For certain consolidated VIEs, their assets are not available to us and their creditors do not have recourse to us. As of December 31, 2020 and 2021, assets that can only be used to settle obligations of these VIEs were $5.7 billion and $6.0 billion, respectively, and the liabilities for which creditors only have recourse to the VIEs were $2.3 billion and $2.5 billion, respectively.

Total noncontrolling interests (NCI), including redeemable noncontrolling interests (RNCI), in our consolidated subsidiaries was $3.9 billion and $4.3 billion as of December 31, 2020 and 2021, respectively. NCI and RNCI are included within additional paid-in capital. Net loss attributable to noncontrolling interests was not material for any period presented and is included within the "other" component of other income (expense), net. See Note 7 for further details on other income (expense), net.

*Waymo*

In June 2021, Waymo, a self-driving technology development company and a consolidated VIE, completed an investment round of $2.5 billion, the majority of which represented investment from Alphabet. The investments from external parties were accounted for as equity transactions and resulted in recognition of noncontrolling interests.

**Unconsolidated VIEs**

We have investments in VIEs in which we are not the primary beneficiary. These VIEs include private companies that are primarily early stage companies and certain renewable energy entities in which activities involve power generation using renewable sources.

We have determined that the governance structures of these entities do not allow us to direct the activities that would significantly affect their economic performance. Therefore, we are not the primary beneficiary, and the results of operations and financial position of these VIEs are not included in our consolidated financial statements. We account for these investments as non-marketable equity securities or equity method investments.

The maximum exposure of these unconsolidated VIEs is generally based on the current carrying value of the investments and any future funding commitments. We have determined that the single source of our exposure to these

goog-20211231

70

PX0667-105

VIEs is our capital investments in them. The carrying value, and maximum exposure of these unconsolidated VIEs were $1.7 billion and $1.9 billion, respectively, as of December 31, 2020 and $2.7 billion and $2.9 billion, respectively, as of December 31, 2021.

### Note 6. Debt

#### Short-Term Debt

We have a debt financing program of up to $10.0 billion through the issuance of commercial paper, which increased from $5.0 billion in September 2021. Net proceeds from this program are used for general corporate purposes. We had no commercial paper outstanding as of December 31, 2020 and 2021.

Our short-term debt balance also includes the current portion of certain long-term debt.

#### Long-Term Debt

Total outstanding debt is summarized below (in millions, except percentages):

| | | | Effective Interest | As of December 31, | |
| | Maturity | Coupon Rate | Rate | 2020 | 2021 |
| --- | --- | --- | --- | --- | --- |
| **Debt** | | | | | |
| 2011-2020 Notes Issuances | 2024 - 2060 | 0.45% - 3.38% | 0.57% - 3.38% | $    14,000 | $    13,000 |
| Future finance lease payments, net[1] | | | | 1,201 | 2,086 |
| **Total debt** | | | | 15,201 | 15,086 |
| Unamortized discount and debt issuance costs | | | | (169) | (156) |
| Less: Current portion of Notes[2] | | | | (999) | — |
| Less: Current portion future finance lease payments, net[1][2] | | | | (101) | (113) |
| **Total long-term debt** | | | | $    13,932 | $    14,817 |

[1]    Net of imputed interest.

[2]    Total current portion of long-term debt is included within other accrued expenses and current liabilities. See Note 7.

The notes in the table above are comprised of fixed-rate senior unsecured obligations and generally rank equally with each other. We may redeem the notes at any time in whole or in part at specified redemption prices. The effective interest rates are based on proceeds received with interest payable semi-annually.

The total estimated fair value of the outstanding notes, including the current portion, was approximately $14.0 billion and $12.4 billion as of December 31, 2020 and December 31, 2021, respectively. The fair value was determined based on observable market prices of identical instruments in less active markets and is categorized accordingly as Level 2 in the fair value hierarchy.

As of December 31, 2021, the aggregate future principal payments for long-term debt, including finance lease liabilities, for each of the next five years and thereafter were as follows (in millions):

| | |
| --- | --- |
| 2022 | $         187 |
| 2023 | 146 |
| 2024 | 1,159 |
| 2025 | 1,162 |
| 2026 | 2,165 |
| Thereafter | 10,621 |
| Total | $    15,440 |

#### Credit Facility

As of December 31, 2021, we have $10.0 billion of revolving credit facilities. No amounts were outstanding under the credit facilities as of December 31, 2020 and 2021.

71

In April 2021, we terminated the existing $4.0 billion revolving credit facilities, which were scheduled to expire in July 2023, and entered into two new revolving credit facilities in the amounts of $4.0 billion and $6.0 billion, which will expire in April 2022 and April 2026, respectively. The interest rates for the new credit facilities are determined based on a formula using certain market rates, as well as our progress toward the achievement of certain sustainability goals. No amounts have been borrowed under the new credit facilities.

## Note 7. Supplemental Financial Statement Information

### Property and Equipment, Net

Property and equipment, net, consisted of the following (in millions):

|  | As of December 31, | |
|  | 2020 | 2021 |
|---|---|---|
| Land and buildings | $ 49,732 | $ 58,881 |
| Information technology assets | 45,906 | 55,606 |
| Construction in progress | 23,111 | 23,171 |
| Leasehold improvements | 7,516 | 9,146 |
| Furniture and fixtures | 197 | 208 |
| Property and equipment, gross | 126,462 | 147,012 |
| Less: accumulated depreciation | (41,713) | (49,414) |
| Property and equipment, net | $ 84,749 | $ 97,599 |

### Accrued expenses and other current liabilities

Accrued expenses and other current liabilities consisted of the following (in millions):

|  | As of December 31, | |
|  | 2020 | 2021 |
|---|---|---|
| European Commission fines[1] | $ 10,409 | $ 9,799 |
| Payables to brokers for unsettled investment trades | 754 | 397 |
| Accrued customer liabilities | 3,118 | 3,505 |
| Accrued purchases of property and equipment | 2,197 | 2,415 |
| Current operating lease liabilities | 1,694 | 2,189 |
| Other accrued expenses and current liabilities | 10,459 | 12,931 |
| Accrued expenses and other current liabilities | $ 28,631 | $ 31,236 |

[1] Includes the effects of foreign exchange and interest. See Note 10 for further details.

72

## Accumulated Other Comprehensive Income (Loss)

Components of AOCI, net of income tax, were as follows (in millions):

| | Foreign Currency Translation Adjustments | Unrealized Gains (Losses) on Available-for-Sale Investments | Unrealized Gains (Losses) on Cash Flow Hedges | Total |
|---|---|---|---|---|
| Balance as of December 31, 2018 | $ (1,884) | $ (688) | $ 266 | $ (2,306) |
| Cumulative effect of accounting change | 0 | 0 | (30) | (30) |
| Other comprehensive income (loss) before reclassifications | (119) | 1,611 | 36 | 1,528 |
| Amounts excluded from the assessment of hedge effectiveness recorded in AOCI | 0 | 0 | (14) | (14) |
| Amounts reclassified from AOCI | 0 | (111) | (299) | (410) |
| Other comprehensive income (loss) | (119) | 1,500 | (277) | 1,104 |
| Balance as of December 31, 2019 | (2,003) | 812 | (41) | (1,232) |
| Other comprehensive income (loss) before reclassifications | 1,139 | 1,313 | 79 | 2,531 |
| Amounts excluded from the assessment of hedge effectiveness recorded in AOCI | 0 | 0 | (37) | (37) |
| Amounts reclassified from AOCI | 0 | (513) | (116) | (629) |
| Other comprehensive income (loss) | 1,139 | 800 | (74) | 1,865 |
| Balance as of December 31, 2020 | (864) | 1,612 | (115) | 633 |
| Other comprehensive income (loss) before reclassifications | (1,442) | (1,312) | 668 | (2,086) |
| Amounts excluded from the assessment of hedge effectiveness recorded in AOCI | 0 | 0 | 48 | 48 |
| Amounts reclassified from AOCI | 0 | (64) | (154) | (218) |
| Other comprehensive income (loss) | (1,442) | (1,376) | 562 | (2,256) |
| Balance as of December 31, 2021 | $ (2,306) | $ 236 | $ 447 | $ (1,623) |

The effects on net income of amounts reclassified from AOCI were as follows (in millions):

| | | Gains (Losses) Reclassified from AOCI to the Consolidated Statements of Income | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| AOCI Components | Location | 2019 | 2020 | 2021 |
| Unrealized gains (losses) on available-for-sale investments | | | | |
| | Other income (expense), net | $ 149 | $ 650 | $ 82 |
| | Benefit (provision) for income taxes | (38) | (137) | (18) |
| | Net of income tax | 111 | 513 | 64 |
| Unrealized gains (losses) on cash flow hedges | | | | |
| Foreign exchange contracts | Revenue | 367 | 144 | 165 |
| Interest rate contracts | Other income (expense), net | 6 | 6 | 6 |
| | Benefit (provision) for income taxes | (74) | (34) | (17) |
| | Net of income tax | 299 | 116 | 154 |
| Total amount reclassified, net of income tax | | $ 410 | $ 629 | $ 218 |

73

## Other Income (Expense), Net

Components of other income (expense), net, were as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Interest income | $ 2,427 | $ 1,865 | $ 1,499 |
| Interest expense[1] | (100) | (135) | (346) |
| Foreign currency exchange gain (loss), net [2] | 103 | (344) | (240) |
| Gain (loss) on debt securities, net | 149 | 725 | (110) |
| Gain (loss) on equity securities, net | 2,649 | 5,592 | 12,380 |
| Performance fees | (326) | (609) | (1,908) |
| Income (loss) and impairment from equity method investments, net | 390 | 401 | 334 |
| Other[3] | 102 | (637) | 411 |
| Other income (expense), net | $ 5,394 | $ 6,858 | $ 12,020 |

[1] Interest expense is net of interest capitalized of $167 million, $218 million, and $163 million for the years ended December 31, 2019, 2020, and 2021, respectively.

[2] Our foreign currency exchange gain (loss), net, is primarily related to the forward points for our foreign currency hedging contracts and foreign exchange transaction gains and losses from the conversion of the transaction currency to the functional currency, offset by the foreign currency hedging contracts' losses and gains.

[3] During the year ended December 31, 2020, we entered into derivatives that hedged the changes in fair value of certain marketable equity securities, which resulted in losses of $902 million and gains of $92 million for the years ended December 31, 2020 and 2021, respectively. The offsetting recognized gains and losses on the marketable equity securities are reflected in Gain (loss) on equity securities, net.

## Note 8. Acquisitions

### Fitbit

In January 2021, we closed the acquisition of Fitbit, a leading wearables brand for $2.1 billion. The addition of Fitbit to Google Services is expected to help spur innovation in wearable devices. The assets acquired and liabilities assumed were recorded at fair value. The purchase price excludes post acquisition compensation arrangements. The purchase price was attributed to $440 million cash acquired, $590 million of intangible assets, $1.2 billion of goodwill and $92 million of net liabilities assumed. Goodwill was recorded in the Google Services segment and primarily attributable to synergies expected to arise after the acquisition. Goodwill is not expected to be deductible for tax purposes.

### Other Acquisitions

During the year ended December 31, 2021, we completed other acquisitions and purchases of intangible assets for total consideration of approximately $885 million, net of cash acquired, of which the total amount of goodwill expected to be deductible for tax purposes is approximately $118 million. Pro forma results of operations for these acquisitions have not been presented because they are not material to our consolidated results of operations, either individually or in the aggregate.

74

## Note 9. Goodwill and Other Intangible Assets

### Goodwill

Changes in the carrying amount of goodwill for the years ended December 31, 2020 and 2021 were as follows (in millions):

| | Google | Google Services | Google Cloud | Other Bets | Total |
|---|---|---|---|---|---|
| Balance as of December 31, 2019 | $ 19,921 | $ 0 | $ 0 | $ 703 | $ 20,624 |
| Acquisitions | 204 | 53 | 189 | 0 | 446 |
| Foreign currency translation and other adjustments | 46 | 56 | 5 | (2) | 105 |
| Allocation in the fourth quarter of 2020[1] | (20,171) | 18,408 | 1,763 | 0 | 0 |
| Balance as of December 31, 2020 | 0 | 18,517 | 1,957 | 701 | 21,175 |
| Acquisitions | 0 | 1,325 | 382 | 103 | 1,810 |
| Foreign currency translation and other adjustments | 0 | (16) | (2) | (11) | (29) |
| Balance as of December 31, 2021 | $ 0 | $ 19,826 | $ 2,337 | $ 793 | $ 22,956 |

[1]    Represents reallocation of goodwill as a result of our change in segments in the fourth quarter of 2020. See Note 15 for further details.

### Other Intangible Assets

Information regarding purchased intangible assets was as follows (in millions):

| | As of December 31, 2020 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Patents and developed technology | $ 4,639 | $ 3,649 | $ 990 |
| Customer relationships | 266 | 49 | 217 |
| Trade names and other | 624 | 461 | 163 |
| Total definite-lived intangible assets | 5,529 | 4,159 | 1,370 |
| Indefinite-lived intangible assets | 75 | 0 | 75 |
| Total intangible assets | $ 5,604 | $ 4,159 | $ 1,445 |

| | As of December 31, 2021 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Patents and developed technology | $ 4,786 | $ 4,112 | $ 674 |
| Customer relationships | 506 | 140 | 366 |
| Trade names and other | 534 | 295 | 239 |
| Total definite-lived intangible assets | 5,826 | 4,547 | 1,279 |
| Indefinite-lived intangible assets | 138 | 0 | 138 |
| Total intangible assets | $ 5,964 | $ 4,547 | $ 1,417 |

Patents and developed technology, customer relationships, and trade names and other have weighted-average remaining useful lives of 0.7 years, 3.5 years, and 4.5 years, respectively.

For all intangible assets acquired and purchased during the year ended December 31, 2021, patents and developed technology have a weighted-average useful life of 4.1 years, customer relationships have a weighted-average useful life of 4.3 years, and trade names and other have a weighted-average useful life of 9.9 years.

Amortization expense relating to purchased intangible assets was $795 million, $774 million, and $875 million for the years ended December 31, 2019, 2020, and 2021, respectively.

As of December 31, 2021, expected amortization expense relating to purchased intangible assets for each of the next five years and thereafter was as follows (in millions):

| | | |
|---|---|---:|
| 2022 | $ | 537 |
| 2023 | | 255 |
| 2024 | | 226 |
| 2025 | | 98 |
| 2026 | | 61 |
| Thereafter | | 102 |
| | $ | 1,279 |

### Note 10. Contingencies

#### Indemnifications

In the normal course of business, including to facilitate transactions in our services and products and corporate activities, we indemnify certain parties, including advertisers, Google Network partners, customers of Google Cloud offerings, lessors and service providers with respect to certain matters. We have agreed to hold certain parties harmless against losses arising from a breach of representations or covenants, or out of intellectual property infringement or other claims made against certain parties. Several of these agreements limit the time within which an indemnification claim can be made and the amount of the claim. In addition, we have entered into indemnification agreements with our officers and directors, and our bylaws contain similar indemnification obligations to our agents.

It is not possible to make a reasonable estimate of the maximum potential amount under these indemnification agreements due to the unique facts and circumstances involved in each particular agreement. Additionally, we have a limited history of prior indemnification claims, and the payments we have made under such agreements have not had a material adverse effect on our results of operations, cash flows, or financial position. However, to the extent that valid indemnification claims arise in the future, future payments by us could be significant and could have a material adverse effect on our results of operations or cash flows in a particular period.

As of December 31, 2021, we did not have any material indemnification claims that were probable or reasonably possible.

#### Legal Matters

##### Antitrust Investigations

On November 30, 2010, the EC's Directorate General for Competition opened an investigation into various antitrust-related complaints against us.

On June 27, 2017, the EC announced its decision that certain actions taken by Google regarding its display and ranking of shopping search results and ads infringed European competition law. The EC decision imposed a €2.4 billion ($2.7 billion as of June 27, 2017) fine. On September 11, 2017, we appealed the EC decision to the General Court, and on September 27, 2017, we implemented product changes to bring shopping ads into compliance with the EC's decision. We recognized a charge of $2.7 billion for the fine in the second quarter of 2017. On November 10, 2021, the General Court rejected our appeal, and we subsequently filed an appeal with the European Court of Justice on January 20, 2022.

On July 18, 2018, the EC announced its decision that certain provisions in Google's Android-related distribution agreements infringed European competition law. The EC decision imposed a €4.3 billion ($5.1 billion as of June 30, 2018) fine and directed the termination of the conduct at issue. On October 9, 2018, we appealed the EC decision. On October 29, 2018, we implemented changes to certain of our Android distribution practices. We recognized a charge of $5.1 billion for the fine in the second quarter of 2018.

On March 20, 2019, the EC announced its decision that certain contractual provisions in agreements that Google had with AdSense for Search partners infringed European competition law. The EC decision imposed a fine of €1.5 billion ($1.7 billion as of March 20, 2019) and directed actions related to AdSense for Search partners' agreements, which we implemented prior to the decision. On June 4, 2019, we appealed the EC decision. We recognized a charge of $1.7 billion for the fine in the first quarter of 2019.

While each EC decision is under appeal, we included the fines in accrued expenses and other current liabilities on our Consolidated Balance Sheets as we provided bank guarantees (in lieu of a cash payment) for the fines.

76

PX0667-112

goog-20211231

Table of Contents

Alphabet Inc.

From time to time we are subject to formal and informal inquiries and investigations on competition matters by regulatory authorities in the U.S., Europe, and other jurisdictions. In August 2019, we began receiving civil investigative demands from the U.S. Department of Justice (DOJ) requesting information and documents relating to our prior antitrust investigations and certain aspects of our business. The DOJ and a number of state Attorneys General filed a lawsuit on October 20, 2020 alleging that Google violated U.S. antitrust laws relating to Search and Search advertising. Separately, on December 16, 2020, a number of state Attorneys General filed an antitrust complaint against Google in the U.S. District Court for the Eastern District of Texas, alleging that Google violated U.S. antitrust laws as well as state deceptive trade laws relating to its advertising technology. On June 22, 2021, the EC opened a formal investigation into Google's advertising technology business practices. On July 7, 2021, a number of state Attorneys General filed an antitrust complaint against us in the U.S. District Court for the Northern District of California, alleging that Google's operation of Android and Google Play violated U.S. antitrust laws and state antitrust and consumer protection laws. We believe these complaints are without merit and will defend ourselves vigorously. The DOJ and state Attorneys General continue their investigations into certain aspects of our business. We continue to cooperate with federal and state regulators in the U.S., the EC and other regulators around the world.

### Patent and Intellectual Property Claims

We have had patent, copyright, trade secret, and trademark infringement lawsuits filed against us claiming that certain of our products, services, and technologies infringe others' intellectual property rights. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements, or orders preventing us from offering certain features, functionalities, products, or services. As a result, we may have to change our business practices and develop non-infringing products or technologies, which could result in a loss of revenues for us and otherwise harm our business. In addition, the U.S. International Trade Commission (ITC) has increasingly become an important forum to litigate intellectual property disputes because an ultimate loss in an ITC action can result in a prohibition on importing infringing products into the U.S. Because the U.S. is an important market, a prohibition on importation could have an adverse effect on us, including preventing us from importing many important products into the U.S. or necessitating workarounds that may limit certain features of our products.

Furthermore, many of our agreements with our customers and partners require us to indemnify them against certain intellectual property infringement claims, which would increase our costs as a result of defending such claims, and may require that we pay significant damages if there were an adverse ruling in any such claims. In addition, our customers and partners may discontinue the use of our products, services, and technologies, as a result of injunctions or otherwise, which could result in loss of revenues and adversely affect our business.

In 2010, Oracle America, Inc. (Oracle) brought a copyright lawsuit against Google in the Northern District of California, alleging that Google's Android operating system infringes Oracle's copyrights related to certain Java application programming interfaces (Java APIs). After trial, final judgment was entered by the district court in favor of Google on June 8, 2016, and the court decided post-trial motions in favor of Google. Oracle appealed and on March 27, 2018, the Federal Circuit Court of Appeals reversed and remanded the case for a trial on damages. On May 29, 2018, we filed a petition for a rehearing at the Federal Circuit, and on August 28, 2018, the Federal Circuit denied the petition. On January 24, 2019, we filed a petition to the U.S. Supreme Court to review the case. On April 29, 2019, the Supreme Court requested the views of the Solicitor General regarding our petition. On September 27, 2019, the Solicitor General recommended denying our petition, and we provided our response on October 16, 2019. On November 15, 2019, the Supreme Court granted our petition and made a decision to review the case. The Supreme Court heard oral arguments in our case on October 7, 2020. On April 5, 2021, the Supreme Court reversed the Federal Circuit's ruling and found that Google's use of the Java APIs was a fair use as a matter of law. The Supreme Court remanded the case to the Federal Circuit for further proceedings in conformity with the Supreme Court opinion. On May 14, 2021, the Federal Circuit entered an order affirming the district court's final judgment in favor of Google. On June 21, 2021, the Federal Circuit issued a mandate returning the case to the district court, and the case is now concluded.

### Other

We are also regularly subject to claims, suits, regulatory and government investigations, other proceedings, and consent decrees involving competition, intellectual property, privacy, tax and related compliance, labor and employment, commercial disputes, content generated by our users, goods and services offered by advertisers or publishers using our platforms, personal injury, consumer protection, and other matters. For example, we have a number of privacy investigations and suits ongoing in multiple jurisdictions. Such claims, suits, regulatory and government investigations, other proceedings, and consent decrees could result in substantial fines and penalties, injunctive relief, ongoing auditing and monitoring obligations, changes to our products and services, alterations to our business models and operations, and collateral related civil litigation or other adverse consequences, all of which could harm our business, reputation, financial condition, and operating results.

PX0667-113

Certain of these outstanding matters include speculative, substantial or indeterminate monetary amounts. We record a liability when we believe that it is probable that a loss has been incurred, and the amount can be reasonably estimated. If we determine that a loss is reasonably possible and the loss or range of loss can be estimated, we disclose the reasonably possible loss. We evaluate developments in our legal matters that could affect the amount of liability that has been previously accrued, and the matters and related reasonably possible losses disclosed, and make adjustments as appropriate. Significant judgment is required to determine both the likelihood of there being and the estimated amount of a loss related to such matters.

With respect to our outstanding matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in aggregate, have a material adverse effect on our business, consolidated financial position, results of operations, or cash flows. However, the outcome of such matters is inherently unpredictable and subject to significant uncertainties.

We expense legal fees in the period in which they are incurred.

### Non-Income Taxes

We are under audit by various domestic and foreign tax authorities with regards to non-income tax matters. The subject matter of non-income tax audits primarily arises from disputes on the tax treatment and tax rate applied to the sale of our products and services in these jurisdictions and the tax treatment of certain employee benefits. We accrue non-income taxes that may result from examinations by, or any negotiated agreements with, these tax authorities when a loss is probable and reasonably estimable. If we determine that a loss is reasonably possible and the loss or range of loss can be estimated, we disclose the reasonably possible loss. Due to the inherent complexity and uncertainty of these matters and judicial process in certain jurisdictions, the final outcome may be materially different from our expectations.

For information regarding income tax contingencies, see Note 14.

### Note 11. Stockholders' Equity

### Preferred Stock

Our Board of Directors has authorized 100 million shares of preferred stock, $0.001 par value, issuable in series. As of December 31, 2020 and 2021, no shares were issued or outstanding.

### Class A and Class B Common Stock and Class C Capital Stock

Our Board of Directors has authorized three classes of stock, Class A and Class B common stock, and Class C capital stock. The rights of the holders of each class of our common and capital stock are identical, except with respect to voting. Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 10 votes per share. Class C capital stock has no voting rights, except as required by applicable law. Shares of Class B common stock may be converted at any time at the option of the stockholder and automatically convert upon sale or transfer to Class A common stock.

### Share Repurchases

In April 2021, the Board of Directors of Alphabet authorized the company to repurchase up to $50.0 billion of its Class C stock. In July 2021, the Alphabet board approved an amendment to the April 2021 authorization, permitting the company to repurchase both Class A and Class C shares in a manner deemed in the best interest of the company and its stockholders, taking into account the economic cost and prevailing market conditions, including the relative trading prices and volumes of the Class A and Class C shares. As of December 31, 2021, $17.4 billion remains available for Class A and Class C share repurchases under the amended authorization.

In accordance with the authorizations of the Board of Directors of Alphabet, during the years ended December 31, 2020 and 2021, we repurchased and subsequently retired 21.5 million and 20.3 million aggregate shares for $31.1 billion and $50.3 billion, respectively. Of the aggregate amount repurchased and subsequently retired during 2021, 1.2 million shares were Class A stock for $3.4 billion.

### Stock Split Effected in Form of Stock Dividend ("Stock Split")

On February 1, 2022, the Company announced that the Board of Directors had approved and declared a 20-for-one stock split in the form of a one-time special stock dividend on each share of the Company's Class A, Class B, and Class C stock. The Stock Split is subject to stockholder approval of an amendment to the Company's Amended and Restated Certificate of Incorporation to increase the number of authorized shares of Class A, Class B, and Class C stock to accommodate the Stock Split.

78

PX0667-115

If approval is obtained, each of the Company's stockholders of record at the close of business on July 1, 2022 (the "Record Date"), will receive, after the close of business on July 15, 2022, a dividend of 19 additional shares of the same class of stock for every share held by such stockholder as of the Record Date.

**Note 12. Net Income Per Share**

We compute net income per share of Class A, Class B, and Class C stock using the two-class method. Basic net income per share is computed using the weighted-average number of shares outstanding during the period. Diluted net income per share is computed using the weighted-average number of shares and the effect of potentially dilutive securities outstanding during the period. Potentially dilutive securities consist of restricted stock units and other contingently issuable shares. The dilutive effect of outstanding restricted stock units and other contingently issuable shares is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted net income per share of Class A stock assumes the conversion of Class B stock, while the diluted net income per share of Class B stock does not assume the conversion of those shares.

The rights, including the liquidation and dividend rights, of the holders of our Class A, Class B, and Class C stock are identical, except with respect to voting. Furthermore, there are a number of safeguards built into our certificate of incorporation, as well as Delaware law, which preclude our Board of Directors from declaring or paying unequal per share dividends on our Class A, Class B, and Class C stock. Specifically, Delaware law provides that amendments to our certificate of incorporation which would have the effect of adversely altering the rights, powers, or preferences of a given class of stock must be approved by the class of stock adversely affected by the proposed amendment. In addition, our certificate of incorporation provides that before any such amendment may be put to a stockholder vote, it must be approved by the unanimous consent of our Board of Directors. As a result, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A, Class B, and Class C stock as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis.

In the years ended December 31, 2019, 2020 and 2021, the net income per share amounts are the same for Class A, Class B, and Class C stock because the holders of each class are entitled to equal per share dividends or distributions in liquidation in accordance with the Amended and Restated Certificate of Incorporation of Alphabet Inc.

The following tables set forth the computation of basic and diluted net income per share of Class A, Class B, and Class C stock (in millions, except share amounts which are reflected in thousands and per share amounts):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | | |
| | Class A | Class B | Class C |
| **Basic net income per share** | | | |
| Numerator | | | |
| Allocation of undistributed earnings | $ 14,846 | $ 2,307 | $ 17,190 |
| Denominator | | | |
| Number of shares used in per share computation | 299,402 | 46,527 | 346,667 |
| Basic net income per share | $ 49.59 | $ 49.59 | $ 49.59 |
| **Diluted net income per share:** | | | |
| Numerator | | | |
| Allocation of undistributed earnings for basic computation | $ 14,846 | $ 2,307 | $ 17,190 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 2,307 | 0 | 0 |
| Reallocation of undistributed earnings | (126) | (20) | 126 |
| Allocation of undistributed earnings | $ 17,027 | $ 2,287 | $ 17,316 |
| Denominator | | | |
| Number of shares used in basic computation | 299,402 | 46,527 | 346,667 |
| Weighted-average effect of dilutive securities | | | |
| Add: | | | |
| Conversion of Class B to Class A shares outstanding | 46,527 | 0 | 0 |
| Restricted stock units and other contingently issuable shares | 413 | 0 | 5,547 |
| Number of shares used in per share computation | 346,342 | 46,527 | 352,214 |
| Diluted net income per share | $ 49.16 | $ 49.16 | $ 49.16 |

79

goog-20211231

Table of Contents

Alphabet Inc.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | | |
| | Class A | Class B | Class C |
| Basic net income per share: | | | |
| Numerator | | | |
| Allocation of undistributed earnings | $ 17,733 | $ 2,732 | $ 19,804 |
| Denominator | | | |
| Number of shares used in per share computation | 299,815 | 46,182 | 334,819 |
| Basic net income per share | $ 59.15 | $ 59.15 | $ 59.15 |
| Diluted net income per share: | | | |
| Numerator | | | |
| Allocation of undistributed earnings for basic computation | $ 17,733 | $ 2,732 | $ 19,804 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 2,732 | 0 | 0 |
| Reallocation of undistributed earnings | (180) | (25) | 180 |
| Allocation of undistributed earnings | $ 20,285 | $ 2,707 | $ 19,984 |
| Denominator | | | |
| Number of shares used in basic computation | 299,815 | 46,182 | 334,819 |
| Weighted-average effect of dilutive securities | | | |
| Add: | | | |
| Conversion of Class B to Class A shares outstanding | 46,182 | 0 | 0 |
| Restricted stock units and other contingently issuable shares | 87 | 0 | 6,125 |
| Number of shares used in per share computation | 346,084 | 46,182 | 340,944 |
| Diluted net income per share | $ 58.61 | $ 58.61 | $ 58.61 |

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2021 | | |
| | Class A | Class B | Class C |
| Basic net income per share: | | | |
| Numerator | | | |
| Allocation of undistributed earnings | $ 34,200 | $ 5,174 | $ 36,659 |
| Denominator | | | |
| Number of shares used in per share computation | 300,310 | 45,430 | 321,910 |
| Basic net income per share | $ 113.88 | $ 113.88 | $ 113.88 |
| Diluted net income per share: | | | |
| Numerator | | | |
| Allocation of undistributed earnings for basic computation | $ 34,200 | $ 5,174 | $ 36,659 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 5,174 | 0 | 0 |
| Reallocation of undistributed earnings | (581) | (77) | 581 |
| Allocation of undistributed earnings | $ 38,793 | $ 5,097 | $ 37,240 |
| Denominator | | | |
| Number of shares used in basic computation | 300,310 | 45,430 | 321,910 |
| Weighted-average effect of dilutive securities | | | |
| Add: | | | |
| Conversion of Class B to Class A shares outstanding | 45,430 | 0 | 0 |
| Restricted stock units and other contingently issuable shares | 15 | 0 | 10,009 |
| Number of shares used in per share computation | 345,755 | 45,430 | 331,919 |
| Diluted net income per share | $ 112.20 | $ 112.20 | $ 112.20 |

80

PX0667-117

## Note 13. Compensation Plans

### Stock Plans

Our stock plans include the Alphabet Amended and Restated 2012 Stock Plan, the Alphabet 2021 Stock Plan and Other Bet stock-based plans. Under our stock plans, RSUs and other types of awards may be granted. An RSU award is an agreement to issue shares of our Class C stock at the time the award vests. RSUs generally vest over four years contingent upon employment on the vesting date.

As of December 31, 2021, there were 37,479,707 shares of Class C stock reserved for future issuance under the Alphabet 2021 Stock Plan.

### *Stock-Based Compensation*

For the years ended December 31, 2019, 2020, and 2021, total stock-based compensation expense was $11.7 billion, $13.4 billion, and $15.7 billion, including amounts associated with awards we expect to settle in Alphabet stock of $10.8 billion, $12.8 billion, and $15.0 billion, respectively.

For the years ended December 31, 2019, 2020, and 2021, we recognized tax benefits on total stock-based compensation expense, which are reflected in the provision for income taxes in the Consolidated Statements of Income, of $1.8 billion, $2.7 billion, and $3.1 billion, respectively.

For the years ended December 31, 2019, 2020, and 2021, tax benefit realized related to awards vested or exercised during the period was $2.2 billion, $3.6 billion, and $5.9 billion, respectively. These amounts do not include the indirect effects of stock-based awards, which primarily relate to the R&D tax credit.

### *Stock-Based Award Activities*

The following table summarizes the activities for unvested Alphabet RSUs for the year ended December 31, 2021:

| | Unvested Restricted Stock Units | |
| --- | --- | --- |
| | Number of Shares | Weighted-Average Grant-Date Fair Value |
| Unvested as of December 31, 2020 | 19,288,793 | $ 1,262.13 |
| Granted | 10,582,700 | $ 1,949.16 |
| Vested | (11,209,486) | $ 1,345.98 |
| Forfeited/canceled | (1,767,294) | $ 1,425.48 |
| Unvested as of December 31, 2021 | 16,894,713 | $ 1,626.13 |

The weighted-average grant-date fair value of RSUs granted during the years ended December 31, 2019 and 2020 was $1,092.36 and $1,407.97, respectively. Total fair value of RSUs, as of their respective vesting dates, during the years ended December 31, 2019, 2020, and 2021 were $15.2 billion, $17.8 billion, and $28.8 billion, respectively.

As of December 31, 2021, there was $25.8 billion of unrecognized compensation cost related to unvested employee RSUs. This amount is expected to be recognized over a weighted-average period of 2.5 years.

### 401(k) Plans

We have two 401(k) Savings Plans that qualify as deferred salary arrangements under Section 401(k) of the Internal Revenue Code. Under these 401(k) Plans, matching contributions are based upon the amount of the employees' contributions subject to certain limitations. We recognized expense of approximately $724 million, $855 million, and $916 million for the years ended December 31, 2019, 2020, and 2021, respectively.

## Note 14. Income Taxes

Income from continuing operations before income taxes consisted of the following (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2021 |
| Domestic operations | $ 16,426 | $ 37,576 | $ 77,016 |
| Foreign operations | 23,199 | 10,506 | 13,718 |
| Total | $ 39,625 | $ 48,082 | $ 90,734 |

81

PX0667-119

Provision for income taxes consisted of the following (in millions):

|  | Year Ended December 31, | | |
|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| Current: | | | |
| Federal and state | $ 2,424 | $ 4,789 | $ 10,126 |
| Foreign | 2,713 | 1,687 | 2,692 |
| Total | 5,137 | 6,476 | 12,818 |
| Deferred: | | | |
| Federal and state | 286 | 1,552 | 2,018 |
| Foreign | (141) | (215) | (135) |
| Total | 145 | 1,337 | 1,883 |
| Provision for income taxes | $ 5,282 | $ 7,813 | $ 14,701 |

The reconciliation of federal statutory income tax rate to our effective income tax rate was as follows:

|  | Year Ended December 31, | | |
|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| U.S. federal statutory tax rate | 21.0 % | 21.0 % | 21.0 % |
| Foreign income taxed at different rates | (4.9) | (0.3) | 0.2 |
| Foreign-derived intangible income deduction | (0.7) | (3.0) | (2.5) |
| Stock-based compensation expense | (0.7) | (1.7) | (2.5) |
| Federal research credit | (2.5) | (2.3) | (1.6) |
| Deferred tax asset valuation allowance | 0.0 | 1.4 | 0.6 |
| State and local income taxes | 1.1 | 1.1 | 1.0 |
| Effective tax rate | 13.3 % | 16.2 % | 16.2 % |

Our effective tax rate for 2019 was affected significantly by earnings realized in foreign jurisdictions with statutory tax rates lower than the federal statutory tax rate because substantially all of the income from foreign operations was earned by an Irish subsidiary. As of December 31, 2019, we have simplified our corporate legal entity structure and now license intellectual property from the U.S. that was previously licensed from Bermuda resulting in an increase in the portion of our income earned in the U.S.

On July 27, 2015, the U.S. Tax Court, in an opinion in Altera Corp. v. Commissioner, invalidated the portion of the Treasury regulations issued under IRC Section 482 requiring related-party participants in a cost sharing arrangement to share stock-based compensation costs. The U.S. Tax Court issued the final decision on December 28, 2015. As a result of that decision, we recorded a tax benefit related to the anticipated reimbursement of cost share payment for previously shared stock-based compensation costs.

On June 7, 2019, the U.S. Court of Appeals for the Ninth Circuit overturned the 2015 Tax Court decision in Altera Corp. v. Commissioner, and upheld the portion of the Treasury regulations issued under IRC Section 482 requiring related-party participants in a cost sharing arrangement to share stock-based compensation costs. As a result of the Ninth Circuit court decision, our cumulative net tax benefit of $418 million related to previously shared stock-based compensation costs was reversed in the year ended December 31, 2019.

In 2020, there was an increase in valuation allowance for net deferred tax assets that are not likely to be realized relating to certain of our Other Bets.

**Deferred Income Taxes**

Deferred income taxes reflect the net effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of our deferred tax assets and liabilities were as follows (in millions):

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Deferred tax assets: | | |
| Accrued employee benefits | $          580 | $          549 |
| Accruals and reserves not currently deductible | 1,049 | 1,816 |
| Tax credits | 3,723 | 5,179 |
| Net operating losses | 1,085 | 1,790 |
| Operating leases | 2,620 | 2,503 |
| Intangible assets | 1,525 | 2,034 |
| Other | 981 | 925 |
| Total deferred tax assets | 11,563 | 14,796 |
| Valuation allowance | (4,823) | (7,129) |
| Total deferred tax assets net of valuation allowance | 6,740 | 7,667 |
| Deferred tax liabilities: | | |
| Property and equipment, net | (3,382) | (5,237) |
| Net investment gains | (1,901) | (3,229) |
| Operating leases | (2,354) | (2,228) |
| Other | (1,580) | (946) |
| Total deferred tax liabilities | (9,217) | (11,640) |
| Net deferred tax assets (liabilities) | $       (2,477) | $       (3,973) |

As of December 31, 2021, our federal, state, and foreign net operating loss carryforwards for income tax purposes were approximately $5.6 billion, $4.6 billion, and $1.7 billion respectively. If not utilized, the federal net operating loss carryforwards will begin to expire in 2023, foreign net operating loss carryforwards will begin to expire in 2025 and the state net operating loss carryforwards will begin to expire in 2028. It is more likely than not that certain net operating loss carryforwards will not be realized; therefore, we have recorded a valuation allowance against them. The net operating loss carryforwards are subject to various annual limitations under the tax laws of the different jurisdictions.

As of December 31, 2021, our California R&D carryforwards for income tax purposes were approximately $5.0 billion that can be carried over indefinitely. We believe the state tax credit is not likely to be realized.

As of December 31, 2021, our investment tax credit carryforwards for state income tax purposes were approximately $700 million and will begin to expire in 2025. We use the flow-through method of accounting for investment tax credits. We believe this tax credit is not likely to be realized.

As of December 31, 2021, we maintained a valuation allowance with respect to California deferred tax assets, certain federal net operating losses, certain state tax credits, net deferred tax assets relating to certain Other Bets, and certain foreign net operating losses that we believe are not likely to be realized. We continue to reassess the remaining valuation allowance quarterly, and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

PX0667-121

### Uncertain Tax Positions

The following table summarizes the activity related to our gross unrecognized tax benefits (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2019 | 2020 | 2021 |
| Beginning gross unrecognized tax benefits | $ 4,652 | $ 3,377 | $ 3,837 |
| Increases related to prior year tax positions | 938 | 372 | 529 |
| Decreases related to prior year tax positions | (143) | (557) | (263) |
| Decreases related to settlement with tax authorities | (2,886) | (45) | (329) |
| Increases related to current year tax positions | 816 | 690 | 1,384 |
| Ending gross unrecognized tax benefits | $ 3,377 | $ 3,837 | $ 5,158 |

The total amount of gross unrecognized tax benefits was $3.4 billion, $3.8 billion, and $5.2 billion as of December 31, 2019, 2020, and 2021, respectively, of which $2.3 billion, $2.6 billion, and $3.7 billion, if recognized, would affect our effective tax rate, respectively.

As of December 31, 2020 and 2021, we accrued $222 million and $270 million in interest and penalties in provision for income taxes, respectively.

We file income tax returns in the U.S. federal jurisdiction and in many state and foreign jurisdictions. Our two major tax jurisdictions are the U.S. federal and Ireland. We are subject to the continuous examination of our income tax returns by the IRS and other tax authorities. The IRS is currently examining our 2016 through 2018 tax returns. We have also received tax assessments in multiple foreign jurisdictions asserting transfer pricing adjustments or permanent establishment. We continue to defend any and all such claims as presented.

The tax years 2014 through 2020 remain subject to examination by the appropriate governmental agencies for Irish tax purposes. There are other ongoing audits in various other jurisdictions that are not material to our financial statements.

We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes. We continue to monitor the progress of ongoing discussions with tax authorities and the effect, if any, of the expected expiration of the statute of limitations in various taxing jurisdictions.

We believe that an adequate provision has been made for any adjustments that may result from tax examinations. However, the outcome of tax audits cannot be predicted with certainty. If any issues addressed in our tax audits are resolved in a manner not consistent with management's expectations, we could be required to adjust our provision for income taxes in the period such resolution occurs. Although the timing of resolution, settlement, and closure of audits is not certain, it is reasonably possible that our unrecognized tax benefits from certain U.S. federal, state and non U.S. tax positions could decrease by approximately $2.0 billion in the next 12 months. Positions that may be resolved include various U.S. and non-U.S. matters.

### Note 15. Information about Segments and Geographic Areas

We report our segment results as Google Services, Google Cloud, and Other Bets:

- Google Services includes products and services such as ads, Android, Chrome, hardware, Google Maps, Google Play, Search, and YouTube. Google Services generates revenues primarily from advertising; sales of apps and in-app purchases, digital content products, and hardware; and fees received for subscription-based products such as YouTube Premium and YouTube TV.

- Google Cloud includes Google's infrastructure and platform services, collaboration tools, and other services for enterprise customers. Google Cloud generates revenues from fees received for Google Cloud Platform services, Google Workspace collaboration tools and other enterprise services.

- Other Bets is a combination of multiple operating segments that are not individually material. Revenues from Other Bets are generated primarily from the sale of health technology and internet services.

Revenues, certain costs, such as costs associated with content and traffic acquisition, certain engineering activities, and hardware, as well as certain operating expenses are directly attributable to our segments. Due to the integrated nature of Alphabet, other costs and expenses, such as technical infrastructure and office facilities, are managed centrally at a consolidated level. The associated costs, including depreciation and impairment, are allocated to operating segments as a service cost generally based on usage or headcount.

https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm                          122/136

PX0667-122

PX0667-123

Unallocated corporate costs primarily include corporate initiatives, corporate shared costs, such as finance and legal, including certain fines and settlements, as well as costs associated with certain shared R&D activities. Additionally, hedging gains (losses) related to revenue are included in corporate costs.

Our operating segments are not evaluated using asset information.

Information about segments during the periods presented were as follows (in millions). For comparative purposes, amounts in prior periods have been recast:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2020 | | 2021 |
| Revenues: | | | | | | |
| Google Services | $ | 151,825 | $ | 168,635 | $ | 237,529 |
| Google Cloud | | 8,918 | | 13,059 | | 19,206 |
| Other Bets | | 659 | | 657 | | 753 |
| Hedging gains (losses) | | 455 | | 176 | | 149 |
| Total revenues | $ | 161,857 | $ | 182,527 | $ | 257,637 |
| Operating income (loss): | | | | | | |
| Google Services | $ | 48,999 | $ | 54,606 | $ | 91,855 |
| Google Cloud | | (4,645) | | (5,607) | | (3,099) |
| Other Bets | | (4,824) | | (4,476) | | (5,281) |
| Corporate costs, unallocated[(1)] | | (5,299) | | (3,299) | | (4,761) |
| Total income from operations | $ | 34,231 | $ | 41,224 | $ | 78,714 |

[(1)]   Corporate costs, unallocated includes a fine and legal settlement totaling $2.3 billion for the year ended December 31, 2019.

For revenues by geography, see Note 2.

The following table presents long-lived assets by geographic area, which includes property and equipment, net and operating lease assets (in millions):

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2020 | | 2021 |
| Long-lived assets: | | | | |
| United States | $ | 69,315 | $ | 80,207 |
| International | | 27,645 | | 30,351 |
| Total long-lived assets | $ | 96,960 | $ | 110,558 |

85

PX0667-124

goog-20211231

Alphabet Inc.

## ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A.    CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act, as of the end of the period covered by this Annual Report on Form 10-K.

Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of December 31, 2021, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

### Changes in Internal Control over Financial Reporting

We rely extensively on information systems to manage our business and summarize and report operating results. In 2019, we began a multi-year implementation of a new global ERP system, which will replace much of our existing core financial systems. The ERP system is designed to accurately maintain our financial records, enhance the flow of financial information, improve data management and provide timely information to our management team. The implementation is expected to continue in phases over the next few years. We completed the implementation of certain of our subledgers, which included changes to our processes, procedures and internal controls over financial reporting during the second quarter of 2021. There have been no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. However, as the phased implementation of the new ERP system continues, we will change our processes and procedures, which in turn, could result in changes to our internal control over financial reporting. As such changes occur, we will evaluate quarterly whether such changes materially affect our internal control over financial reporting.

As a result of COVID-19, our global workforce continued to operate primarily in a work from home environment for the quarter ended December 31, 2021. While we continue to evolve our work model in response to the uneven effects of the ongoing pandemic around the world, we believe that our internal controls over financial reporting continue to be effective. We have continued to re-evaluate and refine our financial reporting process to provide reasonable assurance that we could report our financial results accurately and in a timely manner.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2021. Management reviewed the results of its assessment with our Audit and Compliance Committee. The effectiveness of our internal control over financial reporting as of December 31, 2021 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in its report which is included in Item 8 of this Annual Report on Form 10-K.

### Limitations on Effectiveness of Controls and Procedures

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

## ITEM 9B.    OTHER INFORMATION

None.

86

PX0667-125

PX0667-126

goog-20211231

Table of Contents

**ITEM 9C.     DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

87

PX0667-127

## PART III

### ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item will be included under the caption "Directors, Executive Officers, and Corporate Governance" in our Proxy Statement for the 2022 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2021 (2022 Proxy Statement) and is incorporated herein by reference. The information required by this item regarding delinquent filers pursuant to Item 405 of Regulation S-K will be included under the caption "Delinquent Section 16(a) Reports" in the 2022 Proxy Statement and is incorporated herein by reference.

### ITEM 11.    EXECUTIVE COMPENSATION

The information required by this item will be included under the captions "Director Compensation," "Executive Compensation" and "Directors, Executive Officers, and Corporate Governance—Corporate Governance and Board Matters—Compensation Committee Interlocks and Insider Participation" in the 2022 Proxy Statement and is incorporated herein by reference.

### ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item will be included under the captions "Common Stock Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in the 2022 Proxy Statement and is incorporated herein by reference.

### ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item will be included under the captions "Certain Relationships and Related Transactions" and "Directors, Executive Officers, and Corporate Governance—Corporate Governance and Board Matters—Director Independence" in the 2022 Proxy Statement and is incorporated herein by reference.

### ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this item will be included under the caption "Independent Registered Public Accounting Firm" in the 2022 Proxy Statement and is incorporated herein by reference.

88

PX0667-128

## PART IV

## ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES

We have filed the following documents as part of this Annual Report on Form 10-K:

### 1. Consolidated Financial Statements

Reports of Independent Registered Public Accounting Firm                              46
Financial Statements:
    Consolidated Balance Sheets                                  49
    Consolidated Statements of Income                            50
    Consolidated Statements of Comprehensive Income             51
    Consolidated Statements of Stockholders' Equity             52
    Consolidated Statements of Cash Flows                        53
    Notes to Consolidated Financial Statements                   54

### 2. Financial Statement Schedules

### Schedule II: Valuation and Qualifying Accounts

The table below details the activity of the allowance for credit losses and sales credits for the years ended December 31, 2019, 2020 and 2021 (in millions):

|  | Balance at Beginning of Year | Additions | Usage | Balance at End of Year |
|---|---|---|---|---|
| Year ended December 31, 2019 | $ 729 | $ 1,481 | $ (1,457) | $ 753 |
| Year ended December 31, 2020 | $ 753 | $ 2,013 | $ (1,422) | $ 1,344 |
| Year ended December 31, 2021 | $ 1,344 | $ 2,092 | $ (2,047) | $ 1,389 |

Note:    Additions to the allowance for credit losses are charged to expense. Additions to the allowance for sales credits are charged against revenues.

All other schedules have been omitted because they are not required, not applicable, or the required information is otherwise included.

### 3. Exhibits

| Exhibit Number | | Description | Incorporated by reference herein | |
|---|---|---|---|---|
| | | | Form | Date |
| 2.01 | | Agreement and Plan of Merger, dated October 2, 2015, by and among Google Inc., the Registrant and Maple Technologies Inc. | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 3.01 | | Amended and Restated Certificate of Incorporation of the Registrant, dated October 2, 2015 | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 3.02 | | Amended and Restated Bylaws of the Registrant, dated October 21, 2020 | Current Report on Form 8-K/A (File No. 001-37580) | October 27, 2020 |
| 4.01 | | Specimen Class A Common Stock certificate | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.02 | | Specimen Class C Capital Stock certificate | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.03 | | Alphabet Inc. Deferred Compensation Plan | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.04 | | Transfer Restriction Agreement, dated October 2, 2015, between the Registrant and Larry Page and certain of his affiliates | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.05 | | Transfer Restriction Agreement, dated October 2, 2015, between the Registrant and Sergey Brin and certain of his affiliates | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.06 | * | Joinder Agreement, dated December 31, 2021, among the Registrant, Sergey Brin and certain of his affiliates | | |

PX0667-129

89

PX0667-130

| Exhibit Number | | Description | Incorporated by reference herein | |
|---|---|---|---|---|
| | | | Form | Date |
| 4.07 | | Transfer Restriction Agreement, dated October 2, 2015, between the Registrant and Eric E. Schmidt and certain of its affiliates | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.08 | | Class C Undertaking, dated October 2, 2015, executed by the Registrant | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 4.09 | | Indenture, dated February 12, 2016, between the Registrant and The Bank of New York Mellon Trust Company, N.A., as Trustee | Registration Statement on Form S-3 (File No. 333-209510) | February 12, 2016 |
| 4.10 | | Registrant Registration Rights Agreement dated December 14, 2015 | Registration Statement on Form S-3 (File No. 333-209518) | February 12, 2016 |
| 4.11 | | First Supplemental Indenture, dated April 27, 2016, between the Registrant and The Bank of New York Mellon Trust Company, N.A., as trustee | Current Report on Form 8-K (File No. 001-37580) | April 27, 2016 |
| 4.12 | | Form of the Registrant's 3.375% Notes due 2024 (included in Exhibit 4.11) | | |
| 4.13 | | Form of the Registrant's 1.998% Note due 2026 | Current Report on Form 8-K (File No. 001-37580) | August 9, 2016 |
| 4.14 | | Form of Global Note representing the Registrant's 0.450% notes due 2025 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.15 | | Form of Global Note representing the Registrant's 0.800% notes due 2027 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.16 | | Form of Global Note representing the Registrant's 1.100% notes due 2030 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.17 | | Form of Global Note representing the Registrant's 1.900% notes due 2040 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.18 | | Form of Global Note representing the Registrant's 2.050% notes due 2050 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.19 | | Form of Global Note representing the Registrant's 2.250% notes due 2060 | Current Report on Form 8-K (File No. 001-37580) | August 5, 2020 |
| 4.20 | * | Description of Registrant's Securities | | |
| 10.01 | ◆ | Form of Indemnification Agreement entered into between the Registrant, its affiliates and its directors and officers | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 10.02 | ◆ | Compensation Plan Agreement, dated October 2, 2015, between Google Inc. and the Registrant | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 10.03 | ◆ | Director Arrangements Agreement, dated October 2, 2015, between Google Inc. and the Registrant | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 10.04 | ◆ | Alphabet Inc. Deferred Compensation Plan | Current Report on Form 8-K (File No. 001-37580) | October 2, 2015 |
| 10.05 | ◆ | Google Inc. 2004 Stock Plan, as amended | Current Report on Form 8-K (File No. 000-50726) | June 7, 2011 |
| 10.05.1 | ◆ | Google Inc. 2004 Stock Plan - Form of Google Stock Option Agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |
| 10.05.2 | ◆ | Google Inc. 2004 Stock Plan - Form of Google Restricted Stock Unit Agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |
| 10.05.3 | ◆ | Google Inc. 2004 Stock Plan - Amendment to Stock Option Agreements | Registration Statement on Form S-3 (File No. 333-142243) | April 20, 2007 |
| 10.06 | ◆ | Alphabet Inc. Amended and Restated 2012 Stock Plan | Current Report on Form 8-K (File No. 001-37580) | June 5, 2020 |

90

PX0667-131

PX0667-132

Table of Contents                                                                    Alphabet Inc.

| Exhibit Number | | | Description | Incorporated by reference herein | |
|---|---|---|---|---|---|
| | | | | Form | Date |
| 10.06.1 | ◆ | | Alphabet Inc. Amended and Restated 2012 Stock Plan - Form of Alphabet Restricted Stock Unit Agreement | Annual Report on Form 10-K (File No. 001-37580) | February 4, 2020 |
| 10.06.2 | ◆ | | Alphabet Inc. Amended and Restated 2012 Stock Plan - Performance Stock Unit Agreement | Annual Report on Form 10-K (File No. 001-37580) | February 4, 2020 |
| 10.07 | ◆ | | Alphabet Inc. 2021 Stock Plan | Current Report on Form 8-K (file No. 001-37580) | June 4, 2021 |
| 10.07.1 | ◆ | | Alphabet Inc. 2021 Stock Plan - Form of Alphabet Restricted Stock Unit Agreement | Quarterly Report on Form 10-Q (file No. 001-37580) | July 28, 2021 |
| 10.07.2 | ◆ | * | Alphabet Inc. 2021 Stock Plan - Form of Alphabet 2022 Non-CEO Performance Stock Unit Agreement | | |
| 10.08 | ◆ | * | Alphabet Inc. Company Bonus Plan | | |
| 14.01 | | | Code of Conduct of the Registrant as amended on September 21, 2017 | Annual Report on Form 10-K (File No. 001-37580) | February 6, 2018 |
| 21.01 | * | | Subsidiaries of the Registrant | | |
| 23.01 | * | | Consent of Independent Registered Public Accounting Firm | | |
| 24.01 | * | | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) | | |
| 31.01 | * | | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | |
| 31.02 | * | | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | |
| 32.01 | ‡ | | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | |
| 101.INS | * | | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | | |
| 101.SCH | * | | Inline XBRL Taxonomy Extension Schema Document | | |
| 101.CAL | * | | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | |
| 101.DEF | * | | Inline XBRL Taxonomy Extension Definition Linkbase Document | | |
| 101.LAB | * | | Inline XBRL Taxonomy Extension Label Linkbase Document | | |
| 101.PRE | * | | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | |
| 104 | | | Cover Page Interactive Data File (embedded within the Inline XBRL document and contained in Exhibit 101) | | |

91

PX0667-133

---

◆      Indicates management compensatory plan, contract, or arrangement.

\*      Filed herewith.

‡      Furnished herewith.

**ITEM 16.    FORM 10-K SUMMARY**

None.

92

PX0667-134

goog-20211231

Alphabet Inc.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 1, 2022

**ALPHABET INC.**

By:                      /S/    SUNDAR PICHAI
                         Sundar Pichai
                         Chief Executive Officer
                (Principal Executive Officer of the Registrant)

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Sundar Pichai and Ruth M. Porat, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

93

PX0667-135

| Signature | Title | Date |
|---|---|---|
| /S/ SUNDAR PICHAI<br>**Sundar Pichai** | Chief Executive Officer and Director (Principal Executive Officer) | February 1, 2022 |
| /S/    RUTH M. PORAT<br>**Ruth M. Porat** | Senior Vice President and Chief Financial Officer (Principal Financial Officer) | February 1, 2022 |
| /S/    AMIE THUENER O'TOOLE<br>**Amie Thuener O'Toole** | Vice President and Chief Accounting Officer (Principal Accounting Officer) | February 1, 2022 |
| /S/    FRANCES H. ARNOLD<br>**Frances H. Arnold** | Director | February 1, 2022 |
| /S/    SERGEY BRIN<br>**Sergey Brin** | Co-Founder and Director | February 1, 2022 |
| /S/    L. JOHN DOERR<br>**L. John Doerr** | Director | February 1, 2022 |
| /S/    ROGER W. FERGUSON, JR.<br>**Roger W. Ferguson, Jr.** | Director | February 1, 2022 |
| /S/    JOHN L. HENNESSY<br>**John L. Hennessy** | Director, Chair | February 1, 2022 |
| /S/    ANN MATHER<br>**Ann Mather** | Director | February 1, 2022 |
| /S/    ALAN R. MULALLY<br>**Alan R. Mulally** | Director | February 1, 2022 |
| /S/    LARRY PAGE<br>**Larry Page** | Co-Founder and Director | February 1, 2022 |
| /S/    K. RAM SHRIRAM<br>**K. Ram Shriram** | Director | February 1, 2022 |
| /S/    Robin L. Washington<br>**Robin L. Washington** | Director | February 1, 2022 |

94

PX0667-136

# PX0668

Newsroom

News   Company   Press assets   Contact

# A better feed that actually feeds the soul



**About Pinterest**

Pinterest is the visual inspiration platform where people come to search, save, and shop the best ideas in the world for all of life's moments. Whether it's planning an outfit, trying a new beauty ritual, renovating a home, or discovering a new recipe, Pinterest is the best place to confidently go from inspiration to action. Headquartered in San Francisco, Pinterest launched in 2010 and has 498 million monthly active users worldwide.[1] Available on iOS and Android, and at pinterest.com.

# Fast facts

**518 million**

monthly active users[1]

**1.5 billion**

Pins saved every week[2]

**85%**

of weekly Pinterest users say Pinterest is where they go to start a new project[3]

**8 out of 10**

people vote Pinterest as a positive place online[4]

**85%**

of weekly Pinterest users have made a purchase from a Pin[3]

**80%**

of weekly Pinterest users have discovered a new brand or product on Pinterest[3]



## Meet Pinterest's leadership

Get to know our executive team. Read bios and download headshots for media use.

Meet the team

# Latest news



In Pinterest's latest campaign, the P is for Performance



Pinterest launches first-ever streaming TV show with Tastemade



Pinterest Predicts 2024: Today's 'cheat sheet' for tomorrow's trends

PX0668-002



SS → Subscribe via RSS → Subscribe via RSS → Subscribe via RSS → Subscribe via RSS → Subscribe via RSS

Footnotes                                                                                                    +



*Pinterest*

English (US)

**About**
What's Pinterest
Our Pinterest profile
Contact
Careers
Brand guidelines

**Resources**
Help Center
Media gallery
Subscribe via RSS
For businesses
For creators
For developers
For investors

**Policies**
Copyright & Trademark
Terms of service
Privacy & Cookies
Personalized ads

© 2024 Pinterest

# PX0669





# How To Search Pinterest Without Actually Logging In

By Mandy Carr  —  May 2, 2023



Star Wars

Pinterest



If a user wants to get inspiration from Pinterest without creating an account, they are in luck because there are a few ways to do that. The social platform is a great way to get inspiration for redecorating a room, choosing an outfit, or finding popular and easy recipes. Users can even shop live with Pinterest TV, and an augmented reality (AR) feature allows users to try furniture in a home before purchasing. While there's no denying Pinterest offers great features for users who have an account, some people may just want to browse the platform without signing up.

---

Ad

---

The easiest way to explore Pinterest without logging in is to go to the search bar in a web browser on a desktop and enter the address pinterest.com/ideas. This will direct the user to a home page with categories at the top, and a 'More' button which expands the view to bring up additional topics. Below this, there's a section labeled 'Explore popular ideas' with various pins. While pop-ups may keep appearing urging users to sign in while browsing, they can be ignored or dismissed by clicking on the 'x' button.

 RELATED:

PX0669-001

**Why It's Time To Switch To Pinterest**
Link copied to clipboard

Ad

## Use An Extension To Explore Pinterest



Ad

Another way to browse Pinterest without logging in is by using the Pinterest Guest extension on Firefox. This extension enables the user to stop a sign-in pop-up from continuously appearing. To add the Pinterest Guest extension, open Firefox, then click on the menu (three lines) and go to '*Add-ons and themes*.' Search for '*pinterest-guest*' and click on it in the search results. Alternatively, click on the link above. Now select '*Add to Firefox'*. A pop-up menu will appear. Click '*Add'*. Another pop-up will appear asking the user if they want to manage add-ons. Click '*Okay, Got It*.'

Users should note that this extension is not monitored by Mozilla security. When ready to browse pins, go to the Pinterest website. This will open up a home page with suggested pins. There may be a pop-up menu asking the users to log in. To stop this, click on the down symbol next to '*Sign up*' and toggle on '*Stop request to log in*.'

PX0669-002

Now, users can browse with no annoyance. It's even easier on a mobile as the pop-up doesn't appear when looking at Pinterest on the web browser.

Link copied to clipboard

Ad

Ad

There are many ways to explore from here. Browse the suggested pins, search a specific subject or company, click on '*Today*' to see what's been posted recently, or click on '*Explore*,' which will bring the user to the same page as mentioned above. Here click on a category. For example, if the user clicked on '*Animals*,' they would see featured articles at the top, followed by suggestions for '*Activities for animal lovers*,' then '*Top 10 ideas for Animals*,' '*Behold these baby animals*,' '*Top Pinterest searches for Animals*' and '*Popular ideas*.' All categories are set up the same with themes that fit the subject matter.

## Find Specific Users On Pinterest



PX0669-003

Link copied to clipboard

Ad

Ad

It's also possible to search for specific Pinterest creators without logging in. Visiting Pinterest's explore page by either of the aforementioned methods will give users access to the platform's search bar, too. Here, the user can type in a creator's name or username if they know it. As they type, a dropdown of search options will appear, including a section labeled '*People*.' Once users see the creator they're looking for, they just need to click the profile icon to head to that user's account and see all of their pins and boards.

Another useful way to search for a Pinterest account (if a user knows the account name), is by using a search engine like Google. On a browser, search for a Pinterest account of choice. For example, typing '*Martha Stewart Pinterest*' will bring up the official '*Martha Stewart Living*' Pinterest profile. Click on the search result, which will open the profile in Pinterest. From here, it's possible to see all the pins on the account page. Click on either the '*Created*' or '*Saved*' tabs at the top to toggle between the two options.

Ad

Users can click on an account's saved pins or collections to explore further. A pop-up prompting a sign-in might appear from time to time, but it can easily be dismissed. When browsing a pin from an account, clicking on the image to open the link will ask users to log in. However, there's still a way to view an article linked to an image. To do this, click on the '*Article from*' text next to the image to open the link. Users can also explore related pins from Pinterest by scrolling down on a pin and browsing the '*More like this*' section. Now, dive in and get all the inspiration without creating or logging in to a **Pinterest** account.

Source: Pinterest, Mozilla

Link copied to clipboard

Ad

Ad

Tech      Pinterest

⬚ Follow    |    f    X    ◯    +

## ★ POPULAR



## Star Wars Theory Reveals The Secret Origin Of The Inquisitors... A Decade Before The Clone Wars

An incredible Star Wars theory suggests that one key Jedi may have been behind the number of Imperial Inquisitors that emerged during

**By Liz Declan**
3 hours ago

PX0669-005

5/19/24, 10:25 PM                          How To Search Pinterest Without Actually Logging In



Link copied to clipboard



### One of 2024's Biggest Upcoming Anime Breaks a Shonen Jump Tradition

By J.R. Waugh
2 hours ago

### New $28 Million Horror Movie Success Is The Perfect Reminder To Watch 37-Year-Old Vampire Comedy Starring Kiefer Sutherland

By Jordan Williams
4 hours ago





### 8 Important Star Trek Events That Happened In The Badlands

By Mark Donaldson
4 hours ago

### Kingdom Of The Planet Of The Apes Sets Up A Remake Of 53-Year-Old Sequel

By Robert Pitman
3 hours ago

 RECOMMENDED

PX0669-006

Ad





### A Trusted Teen Titan Stole a Devastatingly Strong Anti-Kryptonian Weapon - & It Saved the World

Superman trusted the Teen Titans to see his Fortress of Solitude,...

By Taya Riley
3 hours ago


### Surreal New Anime Proves Why It's the Season's Smartest Series With One Genius Move

Train to the End of the World masterfully uses witty humor, so muc...

By Kevin Chu
4 hours ago






### Netflix's Best Fantasy Anime Introduces a Genius Twist on the Cat Girl Trope

Manga fans have long awaited the last member of the Touden part...

By Kevin Chu
1 hour ago


### Nightwing's Award-Winning Run Can ONLY End with Alfred's Return - Theory Explained

Despite the darker storyline teased for Tom Taylor's last Nightwing...

By Taylor Blake Forsberg
1 hour ago


5/19/24, 10:25 PM                          How To Search Pinterest Without Actually Logging In



Link copied to clipboard

Ad



**One Dark Spy x Family Theory Explains Why Anya Can't Read A Key Character's Mind**

Anya Forger is Spy x Family's beloved mascot, somehow granted...

By J.R. Waugh
3 hours ago                                    

**Harry Potter Star Tom Felton To Star In New Action Sci-Fi Movie**

Harry Potter's Draco Malfoy actor Tom Felton is set to star in the $...

By Matthew Biggin
2 hours ago                                    

Join Our Team
Our Audience
About Us
Press & Events
Contact Us

**Follow Us**



Advertising
Careers
Terms
Privacy
Policies

PX0669-008

How To Search Pinterest Without Actually Logging In

ScreenRant is part of the Valnet Publishing Group

**Link copied to clipboard**

Ad

Copyright © 2024 Valnet Inc.

PX0669-009

# PX0670



# With a focus on high growth companies across all sectors, the team at Connery Consulting provides unparalleled white glove service, advice and partnership.

Ranging from Series A start-ups gaining traction to publicly traded companies and everything in between, we help executives design, execute and measure all aspects of their HR operations and people strategy to drive sustainable growth and value creation.

## Clients







ACADEMIA











ANDREESSEN
HOROWITZ





PX0670-002

**Big Health**

 **Bolt**

*braze*

**Chan Zuckerberg Initiative**

**Checkr**

**Clubhouse**

**coinbase**

 **cedar**

PX0670-003













PX0670-004

























PX0670-006















PX0670-007













PX0670-008













PX0670-009















PX0670-010













twenty



PX0670-011

















PX0670-012











PX0670-013

**in**

Contingent Search

Compensation

Executive Search

General Recruitment

Human Resources

Home

Clients

About

Join Us

Contact

PX0670-014

# PX0673

Open in app ↗                                                                      ⬭ Sign up   Sign in

◉ Medium          🔍 Search                                        ✎ Write   ⊚

# MezzFS — Mounting object storage in Netflix's media processing platform



**Netflix Technology Blog** · Follow

Published in **Netflix TechBlog** · 9 min read · Mar 6, 2019

👏 847    💬 4                                          🔖 ▶ ⬆

*By [Barak Alon](#) (on behalf of Netflix's Media Cloud Engineering team)*

MezzFS (short for "Mezzanine File System") is a tool we've developed at Netflix that mounts cloud objects as local files via FUSE. It's used extensively in our media processing platform, which includes services like Archer and runs features like video encoding and title image generation on tens of thousands of Amazon EC2 instances. There are similar tools out there, but we've developed some unique features like "replays" and "adaptive buffering" that we think are worth sharing.

## What problem are we solving?

We are constantly innovating on video encoding technology at Netflix, and we have a lot of content to encode. Video encoding is what MezzFS was originally designed for and remains one of its canonical use cases, so we'll focus on video encoding to describe the problem that MezzFS solves.

PX0673-001

Video encoding is the process of converting an uncompressed video into a compressed format defined by a codec, and it's an essential part of preparing content to be streamed on Netflix. A single movie at Netflix might be encoded dozens of times for different codecs and video resolutions. Encoding is not a one-time process — large portions of the entire Netflix catalog are re-encoded whenever we've made significant advancements in encoding technology.

We scale out video encoding by processing segments of an uncompressed video (we segment movies by scene) in parallel. We have one file — the original, raw movie file — and many worker processes, all encoding different segments of the file. That file is stored in our object storage service, which splits and encrypts the file into separate chunks, storing the chunks in Amazon S3. This object storage service also handles content security, auditing, disaster recovery, and more.

The individual video encoders process their segments of the movie with tools like FFmpeg, which doesn't speak our object storage service's API and expects to deal with a file on the local filesystem. Furthermore, the movie file is very large (often several 100s of GB), and we want to avoid downloading the entire file for each individual video encoder that might be processing only a small segment of the whole movie.

This is just one of many use cases that MezzFS supports, but all the use cases share a similar theme: stream the right bits of a remote object efficiently and expose those bits as a file on the filesystem.

## The solution: MezzFS

PX0673-002



MezzFS is a Python application that implements the FUSE interface. It's built as a Debian package and installed by applications running on our media processing platform, which use MezzFS's command line interface to mount remote objects as local files.

MezzFS has a number of features, including:

- **Stream objects** — MezzFS exposes multi-terabyte objects without requiring any disk space.

- **Assemble and decrypt parts** — Our object storage service splits objects into many parts and stores them in S3. MezzFS knows how to assemble and decrypt the parts.

- **Mount multiple objects** — Multiple cloud objects can be mounted on the local filesystem simultaneously.

- **Disk Caching** — MezzFS can be configured to cache objects on the local disk.

- **Mount ranges of objects** — Arbitrary ranges of a cloud object can be mounted as separate files on the local file system. This is particularly useful in media computing, where it is common to mount the frames of a movie scene as separate files.

PX0673-003

- **Regional caching** — Netflix operates in multiple AWS regions. If an application in region A is using MezzFS to read from an object stored in region B, MezzFS will cache the object in region A. In addition to improving download speed, this is useful for cutting down on cross-region transfer costs when many workers will be processing the same data — we only pay the transfer costs for one worker, and the rest use the cached object.

- **Replays** — More on this below…

- **Adaptive buffering** — More on this below…

We've been using MezzFS in production for 5 years, and have validated it at scale — during a typical week at Netflix, MezzFS performs ~100 million mounts for dozens of different use cases and streams about ~25 petabytes of data.

## MezzFS "replays"

MezzFS has become a crucial tool for us, and we don't just send it out into the wild with a packed lunch and hope it will be fine.

MezzFS collects metrics on data throughput, download efficiency, resource usage, etc. in <u>Atlas</u>, Netflix's in-memory dimensional time series database. Its logs are collected in an <u>ELK</u> stack. But one of the more novel tools we've developed for debugging and developing is the MezzFS "replay".

At mount time, MezzFS can be configured to record a "replay" file. This file includes:

1. **Metadata** — This includes: the remote objects that were mounted, the environment in which MezzFS is running, etc.

2. **File operations** — All "open" and "read" operations. That is, all mounted files that were opened and every single byte range read that MezzFS

PX0673-004

received.

3. **Actions** — MezzFS records everything it buffers and everything it caches

4. **Statistics** — Finally, MezzFS will record various statistics about the mount, including: total bytes downloaded, total bytes read, total time spent reading, etc.

A single replay may include million of file operations, so these files are packed in a custom binary format to minimize their footprint.

Based on these replay files, we've built tools that:

### Visualize a replay

This has proven very useful for quickly gaining insight into data access patterns and why they might be causing performance issues.

Here's a GIF of what these visualization look like:



PX0673-005

Visualization of a MezzFS "replay"

The bytes of a remote object are represented by pixels on the screen, where the top left is the start of the remote object and the bottom right is the end. The different colors mean different things — green means the bytes have been scheduled for downloading, yellow means the bytes are being actively downloaded, blue means the bytes have been successfully returned, etc. What we see in the above visualization is a very simple access pattern — a remote object is mounted and then streamed through sequentially.

Here is a more interesting, "sparse" access pattern, and one that inspired "adaptive buffering" described later in this post. We can see lots of little green bars quickly sprinkle the screen — these bars represent the bytes that were downloaded:



Visualization of a sparse MezzFS "replay"

## Rerun a replay

PX0673-006

We mount the same objects and rerun all of the operations recorded in the replay file. We use this to debug errors and performance issues in specific mounts.

### Rerun a batch of replays

We collect replays from actual MezzFS mounts in production, and we rerun large batches of replays for regression and performance tests. We've integrated these tests into our build pipeline, where a build will fail if there are any errors across the gamut of replays or if the performance of a new MezzFS commit falls below some threshold. We parallelize rerun jobs with Titus, Netflix's container management platform, which allows us to exercise many hundreds of replay files in minutes. The results are aggregated in Elasticsearch, allowing us to quickly analyze MezzFS's performance across the entire batch.

## Adaptive Buffering

These replays have proven essential for developing optimizations like "adaptive buffering".

One of the challenges of efficiently streaming bits in a FUSE system is that the kernel will break reads into chunks. This means that if an application reads, for example, 1 GB from a mounted file, MezzFS might receive that as 16,384 consecutive reads of 64KB. Making 16,384 separate HTTP calls to S3 for 64KB will suffer significant overhead, so it's better to "read ahead" larger chunks of data from S3, speeding up subsequent reads by anticipating that the data will be read sequentially. We call the size of the chunks being read ahead the "buffer size".

While large buffer sizes speed up sequential data access, they can *slow down* "sparse" data access — that is, the application is not reading through the file consecutively, but is reading small segments dispersed throughout the file (as shown in the visualization above). In this scenario, most of the buffered

PX0673-007

data isn't actually going to be used, leading to a lot of unnecessary downloading and very slow reads.

One option is to expect applications to specify a buffer size when mounting with MezzFS. This is not always easy for application developers to do, since applications might be using third party tools and developers might not actually know their access pattern. It gets even messier when an application changes access patterns during a single MezzFS mount.

With "adaptive buffering," we aimed to make MezzFS "just work" for a variety of access patterns, without requiring application developers to maintain MezzFS configuration.

## How it works

MezzFS records a sliding window of the most recent reads. When it receives a read for data that has not already been buffered, it calculates an appropriate buffer size. It does this by first grouping the window of reads into "clusters", where a cluster is a contiguous set of reads.

Here's an illustration of how reads relate to clusters:

PX0673-008



If the average number of bytes per read divided by the average number of bytes per cluster is close to 1, we classify the access pattern as "sparse". In the "sparse" case, we try to match the buffer size to the average number of bytes per read. If number is closer to 0, we classify the access pattern as "dense", and we set the buffer size to the maximum allowed buffer size divided by the number of clusters (We divide by the number of clusters to account for a common case when an application might have multiple threads all reading different parts from the same file, but each thread is reading its part "densely." If we used the maximum allowed buffer size for each thread, our buffers would consume too much memory).

Here's an attempt to represent this logic with some pseudo code:

PX0673-009

There is a limit on the throughput you can get out of a single HTTP connection to S3. So when the calculated buffer size is large, we divide the buffer into separate requests and parallelize them across multiple threads. So for "sparse" access patterns we improve performance by choosing a small buffer size, and for "dense" access patterns we improve performance by buffering lots of data in parallel.

## How much faster is this?

We've been using adaptive buffering in production across a number of different use cases. For the purpose of clarity in demonstration, we used the

PX0673-010

"rerun a batch of replays" technique described above to run a quick and dirty test comparing the old buffering technique against the new.

Two replay files that represent two canonical access patterns were used:

1. **Dense/Sequential** — Sequentially read 1GB from a remote object.

2. **Sparse/Random** — Read 32MB in chunks of 64KB, dispersed randomly throughout a remote object.

And we compared two buffering strategies:

1. **Fixed Sized Buffering**— This is the old technique, where the buffer size is fixed at 8MB (we chose 8MB as a "one-size-fits-all" buffer size after running some experiments across MezzFS use cases at the time).

2. **Adaptive Buffering**— The shiny new technique described above.

We ran each combination of replay file and buffering strategy 10 times each inside containers with 2 Gbps network and 16 CPUs, recording the total time to process all the operations in the replay files. The following table represents the *minimum* of all 10 runs (while mean and standard deviation often seem like good aggregations, we use minimum here because variability is often caused by other processes interrupting MezzFS, or variability in network conditions outside of MezzFS's control).

PX0673-011

Looking at the dense/sequential replay, fixed buffering has a throughput of ~0.5 Gbps, while adaptive buffering has a throughput of ~1.1Gbps.

While a handful of seconds might not seem worth all the trouble, these seconds become hours for many of our use cases that stream significantly more bytes. And shaving off hours is especially beneficial in latency sensitive workflows, like encoding videos that are released on Netflix the day they are shot.

## Conclusion

PX0673-012

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 401 of 531

5/22/24, 10:04 AM                    MezzFS — Mounting object storage in Netflix's media processing platform | by Netflix Technology Blog | Netflix TechBlog

MezzFS has become a core part of our media transformation and innovation platform. We've built some pretty fancy tools around it that we're actively using to quickly and confidently develop new features and optimizations.

The next big feature on our roadmap is support for writes, which has exciting potential for our next generation media processing platform and our growing, global network of movie production studios.

*Netflix's media processing platform is maintained by the Media Cloud Engineering (MCE) team. If you're excited about large-scale distributed computing problems in media processing, <u>we're hiring</u>!*

Distributed Systems    Python    Algorithms    Video Encoding    Amazon S3



## Written by Netflix Technology Blog



410K Followers   ·   Editor for Netflix TechBlog

Learn more about how Netflix designs, builds, and operates our systems and engineering organizations

PX0673-013

**More from Netflix Technology Blog and Netflix TechBlog**



 Netflix Technology Blog

### Data Gateway — A Platform for Growing and Protecting the Data...

Shahar Zimmerman, Vidhya Arvind, Joey Lynch, Vinay Chella

13 min read · Apr 23, 2024

441    4

 Netflix Technology Blog in Netflix TechBlog

### Reverse Searching Netflix's Federated Graph

By Ricky Gardiner, Alex Hutter, and Katie Lefevre

8 min read · Apr 4, 2024

444    3



 Netflix Technology Blog in Netflix TechBlog

### The Making of VES: the Cosmos Microservice for Netflix Video...

Liwei Guo, Vinicius Carvalho, Anush Moorthy, Aditya Mavlankar, Lishan Zhu

11 min read · Apr 9, 2024

186    6

 Netflix Technology Blog

### Investigation of a Cross-regional Network Performance Issue

Hechao Li, Roger Cruz

10 min read · Apr 24, 2024

864    9

See all from Netflix Technology Blog      See all from Netflix TechBlog

PX0673-014

## Recommended from Medium



 Netflix Technology Blog in Netflix TechBlog

### Building In-Video Search

Empowering video editors with multimodal machine learning to discover perfect...

6 min read · Nov 6, 2023

 1.5K     14                    🔖



 Pinterest Engineering in Pinterest Engineering Blog

### PinCompute: A Kubernetes Backed General Purpose Compute...

Harry Zhang, Jiajun Wang, Yi Li, Shunyao Li, Ming Zong, Haniel Martino, Cathy Lu, Quenti...

18 min read · Oct 31, 2023

237    2                    🔖

## Lists

 **Coding & Development**
11 stories · 617 saves

  **Predictive Modeling w/ Python**
20 stories · 1206 saves

 **Practical Guides to Machine Learning**
10 stories · 1455 saves

 **ChatGPT**
21 stories · 642 saves

PX0673-015





 blobb

 CA Amit Singh in Free or Open Source software's

### Netflix & Chill : The Netflix Story

Netflix's Origin story

### How to Connect Apache Superset with Apache SparkSQL

Learn to Connect Apache Superset (open-source modern data exploration and...

4 min read · Jan 10, 2024

3 min read · Feb 6, 2024

1



 Ayush Yadav



 İsa Rota

### Solr — The alternative to Elastic Search you should know about

Solr is an Opensource search platform built on Apache Lucene. It's similar to Elastic...

### Presto and Trino Comparison

In today's world, data is incredibly important, and being able to quickly search through an...

3 min read · Jan 6, 2024

6 min read · Mar 13, 2024

6

10

See more recommendations

PX0673-016

# PX0674

# Instagration Pt. 2: Scaling our infrastructure to multiple data centers



Instagram Engineering · Follow

Published in Instagram Engineering · 8 min read · Nov 11, 2015

691    💬 3                                              🔖⁺  ▶  ⬆

In 2013, about a year after we joined Facebook, 200m people were using Instagram every month and we were storing 20b photos. With no slow-down in sight, we began Instagration — our move from AWS servers to Facebook's infrastructure. Two years later, Instagram has grown to be a community of 400 million monthly active users with 40b photos and videos, serving over a million requests per second. To keep supporting this growth, and to make sure the community has a reliable experience on Instagram, we decided to scale our infrastructure geographically. In this post, we'll talk about why we expanded our infrastructure from one to three data centers and some of the technical challenges we met along the way.

## Motivation

Mike Krieger, Instagram's co-founder and CTO, recently wrote a post that included a story about the time in 2012 when a huge storm in Virginia

PX0674-001

Case 1:20-cv-03590-JEB     Document 344-2     Filed 05/24/24     Page 407 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

brought down nearly half of our instances. The small team spent the next 36 hours rebuilding almost all of our infrastructure, which was an experience they never wanted to repeat. Natural disasters like this have the potential to temporarily or permanently damage a data center — and we need to make sure to sustain the loss with minimal impact on user experience.

Other motivations for scaling out geographically include:

- **Resilience to regional issues:** More common than natural disasters are network disconnects, power issues, etc. For example, soon after we expanded our services to Oregon, one of the racks containing memcache and async tier servers was powered off, which caused large exceptions to user requests. With our new infrastructure in place, we were able to shift traffic away from the region to mitigate the issue while we recovered from the power failure.

- **Flexible capacity expansion:** Facebook has a few data centers. It is much easier to expand Instagram's capacity where it is available when our infrastructure is ready to expand beyond one region and even when there is considerable delay in network latency. It helps to make quick decisions on getting new features ready for users without having to scramble for



So how did we start spreading things out? First let's take a look at Instagram's overall infrastructure stack.



The key to expanding to multiple data centers is to distinguish global data and local data. Global data needs to be replicated across data centers, while local data can be different for each region (for example, the async jobs created by web server would only be viewed in that region).

The next consideration is hardware resources. These can be roughly divided into three types: storage, computing and caching.

**Storage**

Instagram mainly uses two backend database systems: PostgreSQL and Cassandra. Both PostgreSQL and Cassandra have mature replication frameworks that work well as a globally consistent data store.

Global data neatly maps to data stored in these servers. The goal is to have eventual consistency of these data across data centers, but with potential delay. Because there are vastly more read than write operations, having read replica each region avoids cross data center reads from web servers.

PX0674-003

Writing to PostgreSQL, however, still goes across data centers because they always write to the primary.

## CPU Processing

Web servers, async servers are both easily distributed computing resources that are stateless, and only need to access data locally. Web servers can create async jobs that are queued by async message brokers, and then consumed by async servers, all in the same region.

# Caching

The cache layer is the web servers' most frequently accessed tier, and they need to be collocated within a data center to avoid user request latency. This means that updates to cache in one data center are not reflected in another data center, therefore creating a challenge for moving to multiple data centers.

Imagine a user commented on your newly posted photo. In the one data center case, the web server that served the request can just update the cache with the new comment. A follower will see the new comment from the same cache.

In the multi data center scenario, however, if the commenter and the follower are served in different regions, the follower's regional cache will not be updated and the user will not see the comment.

Our solution is to use PgQ and enhance it to insert cache invalidation events to the databases that are being modified.

On the primary side:

PX0674-004

Case 1:20-cv-03590-JEB      Document 344-2      Filed 05/24/24      Page 410 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

- Web server inserts a comment to PostgreSQL DB;

- Web server inserts a cache invalidation entry to the same DB.

On the replica side:

- Replicate primary DB, including both the newly inserted comment as well as the cache invalidation entry

- Cache invalidation process reads the cache invalidation entry and invalidates regional cache

- Djangos will read from DB with the newly inserted comment and refill the cache

This solves the cache consistency issue. On the other hand, compared to the one-region case where django servers directly update cache without re-reading from DB, this would create increased read load on databases. In order to mitigate this problem, we took two approaches: 1) reduce computational resources needed for each read by denormalizing counters; 2) reduce number of reads by using cache leases.

## De-normalizing Counters

The most commonly cached keys are counters. For example, we would use a counter to determine the number of people who liked a specific post from Justin Bieber. When there was just one region, we would update the memcache counters by incrementing from web servers, therefore avoiding a "select count(*)" call to the database, which would take hundreds of milliseconds.

PX0674-005

But with two regions and PgQ invalidation, each new like creates a cache invalidation event to the counter. This will create a lot of "select count(*)", especially on hot objects.

To reduce the resources needed for each of these operations, we denormalized the counter for likes on the post. Whenever a new like comes in, the count is increased in the database. Therefore, each read of the count will just be a simple "select" which is a lot more efficient.

There is also an added benefit of denormalizing counters in the same database where the liker to the post is stored. Both updates can be included in one transaction, making the updates atomic and consistent all the time. Whereas before the change, the counter in cache could be inconsistent with what was stored in the database due to timeout, retries etc.

## Memcache Lease

In the above example of a new post from Justin Bieber, during the first few minutes of the post, both the viewing of the new post and likes for the post spikes. With each new like, the counter is deleted from cache. It is very common that multiple web servers would try to retrieve the same counter from cache, but it will have a "cache miss". If they all go to the database server for retrieval, it would create a thundering herd problem.

We used memcache lease mechanism to solve this problem. It works likes this:

- Web server issues a "lease get", not the normal "get" to memcache server.

- Memcache server returns the value if it's a hit. In this case, it is no different than a normal "get."

PX0674-006

- If the memcache server does not find the key, it returns a "first miss" to just one web server within *n* seconds; any other "lease get" requests during that time will get a "hot miss." In the case of "hot miss"where the key had been deleted from cache *recently,* it would return stale value. If the cache key is not filled within *n* seconds, it again issues a "first miss" to a "lease get" request.

- When a web server receives "first miss," it goes to the database to retrieve data and fill the cache.

- When a web server receives "hot miss" with a stale value, it can typically use that value. If it receives "hot miss" without any value, it can choose to wait for the cache to be filled by the "first miss" web server.

In summary, with both of the above implementations, we can mitigate the increased database load by reducing the number of accesses to the database, as well as the resources required for each access.

It also improved the reliability of our backend in the cases when some hot counters fall out of cache, which wasn't an infrequent occurrence in early days of Instagram. Each of these occurrence would cause some hurried work from an engineer to manually fix the cache. With these changes, those incidents have become memories for old-timer engineers.

## From 10ms Latency to 60ms

So far, we have focused mostly on cache consistency when caches become regional. Network latency between data centers across the continent was another challenge that impacted multiple designs. Between data centers, a 60ms network latency can cause problems in database replication as well as

PX0674-007

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 413 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

web servers' updates to the database. We needed to solve the following problems in order to support a seamless expansion:

## PostgreSQL Read Replicas Can't Catch up

As a Postgres primary takes in writes, it generates delta logs. The faster the writes come in, the more frequent these logs are generated. The primaries themselves store the most recent log files for occasional needs from the replicas, but they archive all the logs to storage to make sure that they are saved and accessible by any replicas that need older data than what the primary has retained. This way, the primary does not run out of disk space.

When we build a new readreplica, the readreplica starts to read a snapshot of the database from the primary. Once it's done, it needs to apply the logs that have happened since the snapshot to the database. When all the logs are applied, it will be up-to-date and can stream from the primary and serve reads from web servers.

However, when a large database's write rate is quite high, and there is a lot of network latency between the replica and storage device, it is possible that the rate at which the logs are read is slower than the log creation rate. The replica will fall further and further behind and never catch up!

Our fix was to start a second streamer on the new readreplica as soon as it starts to transfer the base snapshot from the primary. It streams logs and stores it on local disk. When snapshot finishes transfer, the readreplica can read the logs locally, making it a much faster recovery process.

This not only solved our database replication issues across the US, but also cut down the time it took to build a new replica by half. Now, even if the

PX0674-008

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 414 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

primary and replica are in the same region, operational efficiency is drastically increased.

## Summary

Instagram is now running in multiple data centers across the US, giving us more flexible capacity planning and acquisition, higher reliability, and better preparedness for the kind of natural disaster that happened in 2012. In fact, we recently survived a staged "disaster." Facebook regularly tests its data centers by shutting them down during peak hours. About a month ago, right as we had finished migrated our data to a new data center, Facebook ran a test and took it down. It was a high-stakes simulation, but fortunately we survived the loss of capacity without users noticing. Instagration part 2 was a success!

Infra    Performance



## Written by Instagram Engineering

26K Followers · Editor for Instagram Engineering

Follow  

PX0674-009

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 415 of 531

5/20/24, 10:31 AM    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

## More from Instagram Engineering and Instagram Engineering





 Instagram Engineering in Instagram Engineering

 Instagram Engineering in Instagram Engineering

### Sharding & IDs at Instagram

With more than 25 photos and 90 likes every second, we store a lot of data here at...

### What Powers Instagram: Hundreds of Instances, Dozens of...

One of the questions we always get asked at meet-ups and conversations with other...

5 min read · Dec 30, 2012

6 min read · Dec 2, 2011

 5.3K   40

 3.6K  19

PX0674-010

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 416 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering



Instagram Engineering in Instagram Engineering

## Storing hundreds of millions of simple key-value pairs in Redis

When transitioning systems, sometimes you have to build a little scaffolding. At Instagra...

3 min read · Nov 1, 2011

2K    11

Instagram Engineering in Instagram Engineering

## Dismissing Python Garbage Collection at Instagram

By dismissing the Python garbage collection (GC) mechanism, which reclaims memory by...

8 min read · Jan 17, 2017

2K    13

See all from Instagram Engineering

See all from Instagram Engineering

# Recommended from Medium





PX0674-011

Case 1:20-cv-03590-JEB     Document 344-2     Filed 05/24/24     Page 417 of 531

5/20/24, 10:31 AM                    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering

 Pinterest Engineering in Pinterest Engineering Blog           Mike Kasberg in strava-engineering

**Improving Efficiency Of Goku Time Series Database at Pinterest (Part...**

Monil Mukesh Sanghavi, Kapil Bajaj, Ming-May Hu, Xiao Li and Zhenxiao Luo

14 min read · Nov 22, 2023

243

**Scaling Challenge Leaderboards for Millions of Athletes**

Strava challenges offer a fun way for athletes to compete against themselves and others!...

13 min read · Jan 18, 2024

69   1

## Lists

          A Guide to Choosing, Planning, and Achieving...

13 stories · 1305 saves

          Staff Picks

646 stories · 982 saves

PX0674-012

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 418 of 531

5/20/24, 10:31 AM    Instagration Pt. 2: Scaling our infrastructure to multiple data centers | by Instagram Engineering | Instagram Engineering









Sachin Japate in Flipkart Tech Blog

## Scaling TiDB To 1 Million QPS

A Flipkart journey

9 min read · Jul 11, 2023

439    2

A Akhilesh Mahajan

## LLD-3 Schema Design — Netflix Schema Design

In this article, we will try to design a basic schema for Netflix.

3 min read · Jan 7, 2024

4    1





Netflix Technology Blog in Netflix TechBlog

## Rebuilding Netflix Video Processing Pipeline with...

This is the first blog in a multi-part series on how Netflix rebuilt its video processing...

9 min read · Jan 10, 2024

1.4K    23

Victor in The Airbnb Tech Blog

## Improving Performance with HTTP Streaming

How HTTP Streaming can improve page performance and how Airbnb enabled it on a...

7 min read · May 17, 2023

1.1K    17

PX0674-013

See more recommendations

PX0674-014

# PX0675

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 421 of 531

5/20/24, 10:41 AM    Open-sourcing a 10x reduction in Apache Cassandra tail latency | by Instagram Engineering | Instagram Engineering



# Open-sourcing a 10x reduction in Apache Cassandra tail latency



Instagram Engineering · Follow
Published in Instagram Engineering · 6 min read · Mar 5, 2018

👏 4.7K    💬 17

At Instagram, we have one of the world's largest deployments of the Apache Cassandra database. We began using Cassandra in 2012 to replace Redis and support product use cases like fraud detection, Feed, and the Direct inbox. At first we ran Cassandra clusters in an AWS environment, but migrated them over to Facebook's infrastructure when the rest of Instagram moved. We've had a really good experience with the reliability and availability of Cassandra, but saw room for improvement in read latency.

Last year Instagram's Cassandra team started working on a project to reduce Cassandra's read latency significantly, which we call Rocksandra. In this post, I will describe the motivation for this project, the challenges we overcame, and performance metrics in both internal and public cloud environments.

## Motivation

At Instagram, we use Apache Cassandra heavily as a general key value storage service. The majority of Instagram's Cassandra requests are online, so in order to provide a reliable and responsive user experience for hundreds of millions of Instagram users, we have very tight SLA on the metrics.

Instagram maintains a 5–9s reliability SLA, which means at any given time, the request failure rate should be less than 0.001%. For performance, we actively monitor the throughput and latency of different Cassandra clusters, especially the P99 read latency.

Here's a graph that shows the client-side latency of one production Cassandra cluster. The blue line is the average read latency (5ms) and the orange line is the P99 read latency (in the range of 25ms to 60ms and changing a lot based on client traffic).



PX0675-002

Case 1:20-cv-03590-JEB    Document 344-2    Filed 05/24/24    Page 423 of 531

5/20/24, 10:41 AM                    Open-sourcing a 10x reduction in Apache Cassandra tail latency | by Instagram Engineering | Instagram Engineering



After investigation, we found the JVM garbage collector (GC) contributed a lot to the latency spikes. We defined a metric called GC stall percentage to measure the percentage of time a Cassandra server was doing stop-the-world GC (Young Gen GC) and could not serve client requests. Here's another graph that shows the GC stall percentage on our production Cassandra servers. It was 1.25% during the lowest traffic time windows, and could be as high as 2.5% during peak hours.

The graph shows that a Cassandra server instance could spend 2.5% of runtime on garbage collections instead of serving client requests. The GC overhead obviously had a big impact on our P99 latency, so if we could lower the GC stall percentage, we would be able to reduce our P99 latency significantly.

## Solution

PX0675-003

Apache Cassandra is a distributed database with it's own LSM tree-based storage engine written in Java. We found that the components in the storage engine, like memtable, compaction, read/write path, etc., created a lot of objects in the Java heap and generated a lot of overhead to JVM. To reduce the GC impact from the storage engine, we considered different approaches and ultimately decided to develop a C++ storage engine to replace existing ones.

We did not want to build a new storage engine from scratch, so we decided to build the new storage engine on top of RocksDB.

RocksDB is an open source, high-performance embedded database for key-value data. It's written in C++, and provides official API language bindings for C++, C, and Java. RocksDB is optimized for performance, especially on fast storage like SSD. It's widely used in the industry as the storage engine for MySQL, mongoDB, and other popular databases.

## Challenges

We overcame three main challenges when implementing the new storage engine on RocksDB.

The first challenge was that Cassandra does not have a pluggable storage engine architecture yet, which means the existing storage engine is coupled together with other components in the database. To find a balance between massive refactoring and quick iterations, we defined a new storage engine API, including the most common read/write and streaming interfaces. This way we could implement the new storage engine behind the API and inject it into the related code paths inside Cassandra.

Secondly, Cassandra supports rich data types and table schema, while

PX0675-004

RocksDB provides purely key-value interfaces. We carefully defined the encoding/decoding algorithms to support Cassandra's data model within RocksDB's data structure and supported same-query semantics as original Cassandra.

The third challenge was about streaming. Streaming is an important component for a distributed database like Cassandra. Whenever we join or remove a node from a Cassandra cluster, Cassandra needs to stream data among different nodes to balance the load across the cluster. The existing streaming implementation was based on the details in the current storage engine. Accordingly, we had to decouple them from each other, make an abstraction layer, and re-implement the streaming using RocksDB APIs. For high streaming throughput, we now stream data into temp sst files first, and then use the RocksDB ingest file API to bulk load them into the RocksDB instance at once.

## Performance metrics

After about a year of development and testing, we have finished a first version of the implementation and successfully rolled it into several production Cassandra clusters in Instagram. In one of our production clusters, the P99 read latency dropped from 60ms to 20ms. We also observed that the GC stalls on that cluster dropped from 2.5% to 0.3%, which was a 10X reduction!

We also wanted to verify whether Rocksandra would perform well in a public cloud environment. We setup a Cassandra cluster in an AWS environment using three i3.8 xlarge EC2 instances, each with 32 cores CPU, 244GB memory, and raid0 with 4 nvme flash disks.

PX0675-005

We used NDBench for the benchmark, and the default table schema in the framework:

```
TABLE emp (

emp_uname text PRIMARY KEY,

emp_dept text,

emp_first text,

emp_last text

)
```

We pre-loaded 250M 6KB rows into the database (each server stores about 500GB data on disk). We configured 128 readers and 128 writers in NDBench.

We tested different workloads and measured the avg/P99/P999 read/write latencies. As you can see, Rocksandra provided much lower and consistent tail read/write latency.

PX0675-006

5/20/24, 10:41 AM    Open-sourcing a 10x reduction in Apache Cassandra tail latency | by Instagram Engineering | Instagram Engineering





PX0675-007

We also tested a read-only workload and observed that, at similar P99 read latency (2ms), Rocksandra could provide 10X higher read throughput (300K/s for Rocksandra vs. 30K/s for C* 3.0).





PX0675-008

# Future work

We have open sourced our Rocksandra code base and benchmark framework, which you can download from Github to try out in your own environment! Please let us know how it performs.

As our next step, we are actively working on the development of more C* features support, like secondary indexes, repair, etc. We are also working on a C* pluggable storage engine architecture to contribute our work back to the Apache Cassandra community.

If you are in the Bay Area and are interested in learning more about our Cassandra developments, join us at our next meetup event here.

*Dikang Gu is an infrastructure engineer at Instagram.*

Cassandra    Open Source    Rocksdb    Instagram



## Written by Instagram Engineering

26K Followers · Editor for Instagram Engineering

 

PX0675-009

**More from Instagram Engineering and Instagram Engineering**





 Instagram Engineering in Instagram Engineering

 Instagram Engineering in Instagram Engineering

### Sharding & IDs at Instagram

With more than 25 photos and 90 likes every second, we store a lot of data here at…

5 min read · Dec 30, 2012

5.3K    40

### What Powers Instagram: Hundreds of Instances, Dozens of…

One of the questions we always get asked at meet-ups and conversations with other…

6 min read · Dec 2, 2011

3.6K    19





Instagram Engineering in Instagram Engineering

Instagram Engineering in Instagram Engineering

### Storing hundreds of millions of simple key-value pairs in Redis

When transitioning systems, sometimes you have to build a little scaffolding. At Instagra…

3 min read · Nov 1, 2011

### Dismissing Python Garbage Collection at Instagram

By dismissing the Python garbage collection (GC) mechanism, which reclaims memory by…

8 min read · Jan 17, 2017

PX0675-010

👏 2K    💬 11                          🔖⁺          👏 2K    💬 13                                    🔖⁺

[ See all from Instagram Engineering ]    [ See all from Instagram Engineering ]

## Recommended from Medium







 Sachin Japate in Flipkart Tech Blog           Mike Kasberg in  strava-engineering

### Scaling TiDB To 1 Million QPS          ### Scaling Challenge Leaderboards for Millions of Athletes

A Flipkart journey                          Strava challenges offer a fun way for athletes to compete against themselves and others!...

9 min read · Jul 11, 2023                    13 min read · Jan 18, 2024

👏 439    💬 2                          🔖⁺          👏 69    💬 1                                      🔖⁺

## Lists

 **data science and AI**
40 stories · 161 saves

 **Icon Design**
36 stories · 307 saves

 **Natural Language Processing**
1459 stories · 969 saves

 **Staff Picks**
646 stories · 982 saves



 Akhilesh Mahajan

### LLD-3 Schema Design — Netflix Schema Design

In this article, we will try to design a basic schema for Netflix.

3 min read · Jan 7, 2024

 4      1



Netflix Technology Blog in Netflix TechBlog

### Rebuilding Netflix Video Processing Pipeline with...

This is the first blog in a multi-part series on how Netflix rebuilt its video processing...

9 min read · Jan 10, 2024

 1.4K      23



ChaiChapters

### System Design #3: Architecting real-time Chat Systems like Slack,...

Functional Requirements:

Rohit Verma

### My Interview Experience at Google [L5 Offer]

PX0675-012

✦ · 6 min read · Apr 7, 2024

Comprehensive Insights: A Deep Dive into the
Journey from Preparation Through Interview…

👏 1  💬

9 min read · Nov 25, 2023

👏 6.4K  💬 45

See more recommendations

PX0675-013

# PX0676

EXCERPT



JOHN L. **HENNESSY**    DAVID A. **PATTERSON**

# COMPUTER ARCHITECTURE

*A Quantitative Approach*

FIFTH EDITION

EXCERPT

## In Praise of *Computer Architecture: A Quantitative Approach* Fifth Edition

"The 5th edition of *Computer Architecture: A Quantitative Approach* continues the legacy, providing students of computer architecture with the most up-to-date information on current computing platforms, and architectural insights to help them design future systems. A highlight of the new edition is the significantly revised chapter on data-level parallelism, which demystifies GPU architectures with clear explanations using traditional computer architecture terminology."

—Krste Asanović, University of California, Berkeley

"*Computer Architecture: A Quantitative Approach* is a classic that, like fine wine, just keeps getting better. I bought my first copy as I finished up my undergraduate degree and it remains one of my most frequently referenced texts today. When the fourth edition came out, there was so much new material that I needed to get it to stay current in the field. And, as I review the fifth edition, I realize that Hennessy and Patterson have done it again. The entire text is heavily updated and Chapter 6 alone makes this new edition required reading for those wanting to really understand cloud and warehouse scale-computing. Only Hennessy and Patterson have access to the insiders at Google, Amazon, Microsoft, and other cloud computing and internet-scale application providers and there is no better coverage of this important area anywhere in the industry."

—James Hamilton, Amazon Web Services

"Hennessy and Patterson wrote the first edition of this book when graduate students built computers with 50,000 transistors. Today, warehouse-size computers contain that many servers, each consisting of dozens of independent processors and billions of transistors. The evolution of computer architecture has been rapid and relentless, but *Computer Architecture: A Quantitative Approach* has kept pace, with each edition accurately explaining and analyzing the important emerging ideas that make this field so exciting."

—James Larus, Microsoft Research

"This new edition adds a superb new chapter on data-level parallelism in vector, SIMD, and GPU architectures. It explains key architecture concepts inside mass-market GPUs, maps them to traditional terms, and compares them with vector and SIMD architectures. It's timely and relevant with the widespread shift to GPU parallel computing. *Computer Architecture: A Quantitative Approach* furthers its string of firsts in presenting comprehensive architecture coverage of significant new developments!"

—John Nickolls, NVIDIA

EXCERPT

"The new edition of this now classic textbook highlights the ascendance of explicit parallelism (data, thread, request) by devoting a whole chapter to each type. The chapter on data parallelism is particularly illuminating: the comparison and contrast between Vector SIMD, instruction level SIMD, and GPU cuts through the jargon associated with each architecture and exposes the similarities and differences between these architectures."

—Kunle Olukotun, Stanford University

"The fifth edition of *Computer Architecture: A Quantitative Approach* explores the various parallel concepts and their respective tradeoffs. As with the previous editions, this new edition covers the latest technology trends. Two highlighted are the explosive growth of Personal Mobile Devices (PMD) and Warehouse Scale Computing (WSC)—where the focus has shifted towards a more sophisticated balance of performance and energy efficiency as compared with raw performance. These trends are fueling our demand for ever more processing capability which in turn is moving us further down the parallel path."

—Andrew N. Sloss, Consultant Engineer, ARM
Author of *ARM System Developer's Guide*

PX0676-003

EXCERPT

# **Computer Architecture**
## A Quantitative Approach

*Fifth Edition*

PX0676-004

EXCERPT

**John L. Hennessy** is the tenth president of Stanford University, where he has been a member of the faculty since 1977 in the departments of electrical engineering and computer science. Hennessy is a Fellow of the IEEE and ACM; a member of the National Academy of Engineering, the National Academy of Science, and the American Philosophical Society; and a Fellow of the American Academy of Arts and Sciences. Among his many awards are the 2001 Eckert-Mauchly Award for his contributions to RISC technology, the 2001 Seymour Cray Computer Engineering Award, and the 2000 John von Neumann Award, which he shared with David Patterson. He has also received seven honorary doctorates.

In 1981, he started the MIPS project at Stanford with a handful of graduate students. After completing the project in 1984, he took a leave from the university to cofound MIPS Computer Systems (now MIPS Technologies), which developed one of the first commercial RISC microprocessors. As of 2006, over 2 billion MIPS microprocessors have been shipped in devices ranging from video games and palmtop computers to laser printers and network switches. Hennessy subsequently led the DASH (Director Architecture for Shared Memory) project, which prototyped the first scalable cache coherent multiprocessor; many of the key ideas have been adopted in modern multiprocessors. In addition to his technical activities and university responsibilities, he has continued to work with numerous start-ups both as an early-stage advisor and an investor.

**David A. Patterson** has been teaching computer architecture at the University of California, Berkeley, since joining the faculty in 1977, where he holds the Pardee Chair of Computer Science. His teaching has been honored by the Distinguished Teaching Award from the University of California, the Karlstrom Award from ACM, and the Mulligan Education Medal and Undergraduate Teaching Award from IEEE. Patterson received the IEEE Technical Achievement Award and the ACM Eckert-Mauchly Award for contributions to RISC, and he shared the IEEE Johnson Information Storage Award for contributions to RAID. He also shared the IEEE John von Neumann Medal and the C & C Prize with John Hennessy. Like his co-author, Patterson is a Fellow of the American Academy of Arts and Sciences, the Computer History Museum, ACM, and IEEE, and he was elected to the National Academy of Engineering, the National Academy of Sciences, and the Silicon Valley Engineering Hall of Fame. He served on the Information Technology Advisory Committee to the U.S. President, as chair of the CS division in the Berkeley EECS department, as chair of the Computing Research Association, and as President of ACM. This record led to Distinguished Service Awards from ACM and CRA.

At Berkeley, Patterson led the design and implementation of RISC I, likely the first VLSI reduced instruction set computer, and the foundation of the commercial SPARC architecture. He was a leader of the Redundant Arrays of Inexpensive Disks (RAID) project, which led to dependable storage systems from many companies. He was also involved in the Network of Workstations (NOW) project, which led to cluster technology used by Internet companies and later to cloud computing. These projects earned three dissertation awards from ACM. His current research projects are Algorithm-Machine-People Laboratory and the Parallel Computing Laboratory, where he is director. The goal of the AMP Lab is develop scalable machine learning algorithms, warehouse-scale-computer-friendly programming models, and crowd-sourcing tools to gain valueable insights quickly from big data in the cloud. The goal of the Par Lab is to develop technologies to deliver scalable, portable, efficient, and productive software for parallel personal mobile devices.

EXCERPT

# **Computer Architecture**
## A Quantitative Approach

*Fifth Edition*

### **John L. Hennessy**
*Stanford University*

### **David A. Patterson**
*University of California, Berkeley*

**With Contributions by**

**Krste Asanović**
*University of California, Berkeley*

**Jason D. Bakos**
*University of South Carolina*

**Robert P. Colwell**
*R&E Colwell & Assoc. Inc.*

**Thomas M. Conte**
*North Carolina State University*

**José Duato**
*Universitat Politècnica de València and Simula*

**Diana Franklin**
*University of California, Santa Barbara*

**David Goldberg**
*The Scripps Research Institute*

**Norman P. Jouppi**
*HP Labs*

**Sheng Li**
*HP Labs*

**Naveen Muralimanohar**
*HP Labs*

**Gregory D. Peterson**
*University of Tennessee*

**Timothy M. Pinkston**
*University of Southern California*

**Parthasarathy Ranganathan**
*HP Labs*

**David A. Wood**
*University of Wisconsin–Madison*

**Amr Zaky**
*University of Santa Clara*



ELSEVIER

Amsterdam • Boston • Heidelberg • London
New York • Oxford • Paris • San Diego
San Francisco • Singapore • Sydney • Tokyo



MORGAN KAUFMANN

PX0676-006

EXCERPT

**Acquiring Editor: Todd Green**
**Development Editor: Nate McFadden**
**Project Manager: Paul Gottehrer**
**Designer: Joanne Blank**

*Morgan Kaufmann* is an imprint of Elsevier
225 Wyman Street, Waltham, MA 02451, USA

© 2012 Elsevier, Inc. All rights reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Details on how to seek permission, further information about the Publisher's permissions policies and our arrangements with organizations such as the Copyright Clearance Center and the Copyright Licensing Agency, can be found at our website: *www.elsevier.com/permissions*.

This book and the individual contributions contained in it are protected under copyright by the Publisher (other than as may be noted herein).

**Notices**
Knowledge and best practice in this field are constantly changing. As new research and experience broaden our understanding, changes in research methods or professional practices, may become necessary. Practitioners and researchers must always rely on their own experience and knowledge in evaluating and using any information or methods described herein. In using such information or methods they should be mindful of their own safety and the safety of others, including parties for whom they have a professional responsibility.

To the fullest extent of the law, neither the Publisher nor the authors, contributors, or editors, assume any liability for any injury and/or damage to persons or property as a matter of products liability, negligence or otherwise, or from any use or operation of any methods, products, instructions, or ideas contained in the material herein.

**Library of Congress Cataloging-in-Publication Data**
Application submitted

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

ISBN: 978-0-12-383872-8

For information on all MK publications
visit our website at *www.mkp.com*

Printed in the United States of America
11  12  13  14  15    10 9 8 7 6 5 4 3 2 1

*Typeset by*: diacriTech, Chennai, India

Working together to grow
libraries in developing countries

www.elsevier.com | www.bookaid.org | www.sabre.org

ELSEVIER    BOOK AID International    Sabre Foundation

EXCERPT

*To Andrea, Linda, and our four sons*

PX0676-008

EXCERPT

This page intentionally left blank

PX0676-009

EXCERPT

# Foreword

*by Luiz André Barroso, Google Inc.*

The first edition of Hennessy and Patterson's *Computer Architecture: A Quantitative Approach* was released during my first year in graduate school. I belong, therefore, to that first wave of professionals who learned about our discipline using this book as a compass. Perspective being a fundamental ingredient to a useful Foreword, I find myself at a disadvantage given how much of my own views have been colored by the previous four editions of this book. Another obstacle to clear perspective is that the student-grade reverence for these two superstars of Computer Science has not yet left me, despite (or perhaps because of) having had the chance to get to know them in the years since. These disadvantages are mitigated by my having practiced this trade continuously since this book's first edition, which has given me a chance to enjoy its evolution and enduring relevance.

The last edition arrived just two years after the rampant industrial race for higher CPU clock frequency had come to its official end, with Intel cancelling its 4 GHz single-core developments and embracing multicore CPUs. Two years was plenty of time for John and Dave to present this story not as a random product line update, but as a defining computing technology inflection point of the last decade. That fourth edition had a reduced emphasis on instruction-level parallelism (ILP) in favor of added material on thread-level parallelism, something the current edition takes even further by devoting two chapters to thread- and data-level parallelism while limiting ILP discussion to a single chapter. Readers who are being introduced to new graphics processing engines will benefit especially from the new Chapter 4 which focuses on data parallelism, explaining the different but slowly converging solutions offered by multimedia extensions in general-purpose processors and increasingly programmable graphics processing units. Of notable practical relevance: If you have ever struggled with CUDA terminology check out Figure 4.24 (teaser: "Shared Memory" is really local, while "Global Memory" is closer to what you'd consider shared memory).

Even though we are still in the middle of that multicore technology shift, this edition embraces what appears to be the next major one: cloud computing. In this case, the ubiquity of Internet connectivity and the evolution of compelling Web services are bringing to the spotlight very small devices (smart phones, tablets)

PX0676-010

EXCERPT

and very large ones (warehouse-scale computing systems). The ARM Cortex A8, a popular CPU for smart phones, appears in Chapter 3's "Putting It All Together" section, and a whole new Chapter 6 is devoted to request- and data-level parallelism in the context of warehouse-scale computing systems. In this new chapter, John and Dave present these new massive clusters as a distinctively new class of computers—an open invitation for computer architects to help shape this emerging field. Readers will appreciate how this area has evolved in the last decade by comparing the Google cluster architecture described in the third edition with the more modern incarnation presented in this version's Chapter 6.

Return customers of this book will appreciate once again the work of two outstanding computer scientists who over their careers have perfected the art of combining an academic's principled treatment of ideas with a deep understanding of leading-edge industrial products and technologies. The authors' success in industrial interactions won't be a surprise to  those who have witnessed how Dave conducts his biannual project retreats, forums meticulously crafted to extract the most out of academic–industrial collaborations. Those who recall John's entrepreneurial success with MIPS or bump into him in a Google hallway (as I occasionally do) won't be surprised by it either.

Perhaps most importantly, return and new readers alike will get their money's worth. What has made this book an enduring classic is that each edition is not an update but an extensive revision that presents the most current information and unparalleled insight into this fascinating and quickly changing field. For me, after over twenty years in this profession, it is also another opportunity to experience that student-grade admiration for two remarkable teachers.

EXCERPT

# **Contents**

| | | |
|---|---|---:|
| | **Foreword** | **ix** |
| | **Preface** | **xv** |
| | **Acknowledgments** | **xxiii** |

| Chapter 1 | **Fundamentals of Quantitative Design and Analysis** | |
|---|---|---:|
| | 1.1  Introduction | 2 |
| | 1.2  Classes of Computers | 5 |
| | 1.3  Defining Computer Architecture | 11 |
| | 1.4  Trends in Technology | 17 |
| | 1.5  Trends in Power and Energy in Integrated Circuits | 21 |
| | 1.6  Trends in Cost | 27 |
| | 1.7  Dependability | 33 |
| | 1.8  Measuring, Reporting, and Summarizing Performance | 36 |
| | 1.9  Quantitative Principles of Computer Design | 44 |
| | 1.10 Putting It All Together: Performance, Price, and Power | 52 |
| | 1.11 Fallacies and Pitfalls | 55 |
| | 1.12 Concluding Remarks | 59 |
| | 1.13 Historical Perspectives and References | 61 |
| | Case Studies and Exercises by Diana Franklin | 61 |

| Chapter 2 | **Memory Hierarchy Design** | |
|---|---|---:|
| | 2.1  Introduction | 72 |
| | 2.2  Ten Advanced Optimizations of Cache Performance | 78 |
| | 2.3  Memory Technology and Optimizations | 96 |
| | 2.4  Protection: Virtual Memory and Virtual Machines | 105 |
| | 2.5  Crosscutting Issues: The Design of Memory Hierarchies | 112 |
| | 2.6  Putting It All Together: Memory Hierachies in the | |
| | ARM Cortex-A8 and Intel Core i7 | 113 |
| | 2.7  Fallacies and Pitfalls | 125 |

|     | 2.8 | Concluding Remarks: Looking Ahead | 129 |
|     | 2.9 | Historical Perspective and References | 131 |
|     |     | Case Studies and Exercises by Norman P. Jouppi, Naveen Muralimanohar, and Sheng Li | 131 |

| Chapter 3 | | **Instruction-Level Parallelism and Its Exploitation** | |
| | 3.1 | Instruction-Level Parallelism: Concepts and Challenges | 148 |
| | 3.2 | Basic Compiler Techniques for Exposing ILP | 156 |
| | 3.3 | Reducing Branch Costs with Advanced Branch Prediction | 162 |
| | 3.4 | Overcoming Data Hazards with Dynamic Scheduling | 167 |
| | 3.5 | Dynamic Scheduling: Examples and the Algorithm | 176 |
| | 3.6 | Hardware-Based Speculation | 183 |
| | 3.7 | Exploiting ILP Using Multiple Issue and Static Scheduling | 192 |
| | 3.8 | Exploiting ILP Using Dynamic Scheduling, Multiple Issue, and Speculation | 197 |
| | 3.9 | Advanced Techniques for Instruction Delivery and Speculation | 202 |
| | 3.10 | Studies of the Limitations of ILP | 213 |
| | 3.11 | Cross-Cutting Issues: ILP Approaches and the Memory System | 221 |
| | 3.12 | Multithreading: Exploiting Thread-Level Parallelism to Improve Uniprocessor Throughput | 223 |
| | 3.13 | Putting It All Together: The Intel Core i7 and ARM Cortex-A8 | 233 |
| | 3.14 | Fallacies and Pitfalls | 241 |
| | 3.15 | Concluding Remarks: What's Ahead? | 245 |
| | 3.16 | Historical Perspective and References | 247 |
| | | Case Studies and Exercises by Jason D. Bakos and Robert P. Colwell | 247 |

| Chapter 4 | | **Data-Level Parallelism in Vector, SIMD, and GPU Architectures** | |
| | 4.1 | Introduction | 262 |
| | 4.2 | Vector Architecture | 264 |
| | 4.3 | SIMD Instruction Set Extensions for Multimedia | 282 |
| | 4.4 | Graphics Processing Units | 288 |
| | 4.5 | Detecting and Enhancing Loop-Level Parallelism | 315 |
| | 4.6 | Crosscutting Issues | 322 |
| | 4.7 | Putting It All Together: Mobile versus Server GPUs and Tesla versus Core i7 | 323 |
| | 4.8 | Fallacies and Pitfalls | 330 |
| | 4.9 | Concluding Remarks | 332 |
| | 4.10 | Historical Perspective and References | 334 |
| | | Case Study and Exercises by Jason D. Bakos | 334 |

| Chapter 5 | | **Thread-Level Parallelism** | |
| | 5.1 | Introduction | 344 |
| | 5.2 | Centralized Shared-Memory Architectures | 351 |
| | 5.3 | Performance of Symmetric Shared-Memory Multiprocessors | 366 |

**5.4**  Distributed Shared-Memory and Directory-Based Coherence   378
**5.5**  Synchronization: The Basics   386
**5.6**  Models of Memory Consistency: An Introduction   392
**5.7**  Crosscutting Issues   395
**5.8**  Putting It All Together: Multicore Processors and Their Performance   400
**5.9**  Fallacies and Pitfalls   405
**5.10**  Concluding Remarks   409
**5.11**  Historical Perspectives and References   412
Case Studies and Exercises by Amr Zaky and David A. Wood   412

Chapter 6    **Warehouse-Scale Computers to Exploit Request-Level and Data-Level Parallelism**

**6.1**  Introduction   432
**6.2**  Programming Models and Workloads for Warehouse-Scale Computers   436
**6.3**  Computer Architecture of Warehouse-Scale Computers   441
**6.4**  Physical Infrastructure and Costs of Warehouse-Scale Computers   446
**6.5**  Cloud Computing: The Return of Utility Computing   455
**6.6**  Crosscutting Issues   461
**6.7**  Putting It All Together: A Google Warehouse-Scale Computer   464
**6.8**  Fallacies and Pitfalls   471
**6.9**  Concluding Remarks   475
**6.10**  Historical Perspectives and References   476
Case Studies and Exercises by Parthasarathy Ranganathan   476

Appendix A    **Instruction Set Principles**

**A.1**  Introduction   A-2
**A.2**  Classifying Instruction Set Architectures   A-3
**A.3**  Memory Addressing   A-7
**A.4**  Type and Size of Operands   A-13
**A.5**  Operations in the Instruction Set   A-14
**A.6**  Instructions for Control Flow   A-16
**A.7**  Encoding an Instruction Set   A-21
**A.8**  Crosscutting Issues: The Role of Compilers   A-24
**A.9**  Putting It All Together: The MIPS Architecture   A-32
**A.10**  Fallacies and Pitfalls   A-39
**A.11**  Concluding Remarks   A-45
**A.12**  Historical Perspective and References   A-47
Exercises by Gregory D. Peterson   A-47

Appendix B    **Review of Memory Hierarchy**

**B.1**  Introduction   B-2
**B.2**  Cache Performance   B-16
**B.3**  Six Basic Cache Optimizations   B-22

| B.4 | Virtual Memory | B-40 |
| B.5 | Protection and Examples of Virtual Memory | B-49 |
| B.6 | Fallacies and Pitfalls | B-57 |
| B.7 | Concluding Remarks | B-59 |
| B.8 | Historical Perspective and References | B-59 |
| | Exercises by Amr Zaky | B-60 |

**Appendix C    Pipelining: Basic and Intermediate Concepts**

| C.1 | Introduction | C-2 |
| C.2 | The Major Hurdle of Pipelining—Pipeline Hazards | C-11 |
| C.3 | How Is Pipelining Implemented? | C-30 |
| C.4 | What Makes Pipelining Hard to Implement? | C-43 |
| C.5 | Extending the MIPS Pipeline to Handle Multicycle Operations | C-51 |
| C.6 | Putting It All Together: The MIPS R4000 Pipeline | C-61 |
| C.7 | Crosscutting Issues | C-70 |
| C.8 | Fallacies and Pitfalls | C-80 |
| C.9 | Concluding Remarks | C-81 |
| C.10 | Historical Perspective and References | C-81 |
| | Updated Exercises by Diana Franklin | C-82 |

*Online Appendices*

**Appendix D    Storage Systems**

**Appendix E    Embedded Systems**
*By Thomas M. Conte*

**Appendix F    Interconnection Networks**
*Revised by Timothy M. Pinkston and José Duato*

**Appendix G    Vector Processors in More Depth**
*Revised by Krste Asanovic*

**Appendix H    Hardware and Software for VLIW and EPIC**

**Appendix I    Large-Scale Multiprocessors and Scientific Applications**

**Appendix J    Computer Arithmetic**
*by David Goldberg*

**Appendix K    Survey of Instruction Set Architectures**

**Appendix L    Historical Perspectives and References**

| **References** | **R-1** |
| **Index** | **I-1** |

EXCERPT

# Preface

## Why We Wrote This Book

Through five editions of this book, our goal has been to describe the basic principles underlying what will be tomorrow's technological developments. Our excitement about the opportunities in computer architecture has not abated, and we echo what we said about the field in the first edition: "It is not a dreary science of paper machines that will never work. No! It's a discipline of keen intellectual interest, requiring the balance of marketplace forces to cost-performance-power, leading to glorious failures and some notable successes."

Our primary objective in writing our first book was to change the way people learn and think about computer architecture. We feel this goal is still valid and important. The field is changing daily and must be studied with real examples and measurements on real computers, rather than simply as a collection of definitions and designs that will never need to be realized. We offer an enthusiastic welcome to anyone who came along with us in the past, as well as to those who are joining us now. Either way, we can promise the same quantitative approach to, and analysis of, real systems.

As with earlier versions, we have strived to produce a new edition that will continue to be as relevant for professional engineers and architects as it is for those involved in advanced computer architecture and design courses. Like the first edition, this edition has a sharp focus on new platforms—personal mobile devices and warehouse-scale computers—and new architectures—multicore and GPUs. As much as its predecessors, this edition aims to demystify computer architecture through an emphasis on cost-performance-energy trade-offs and good engineering design. We believe that the field has continued to mature and move toward the rigorous quantitative foundation of long-established scientific and engineering disciplines.

PX0676-016

EXCERPT

## This Edition

We said the fourth edition of *Computer Architecture: A Quantitative Approach* may have been the most significant since the first edition due to the switch to multicore chips. The feedback we received this time was that the book had lost the sharp focus of the first edition, covering everthing equally but without emphasis and context. We're pretty sure that won't be said about the fifth edition.

We believe most of the excitement is at the extremes in size of computing, with personal mobile devices (PMDs) such as cell phones and tablets as the clients and warehouse-scale computers offering cloud computing as the server. (Observant readers may seen the hint for cloud computing on the cover.) We are struck by the common theme of these two extremes in cost, performance, and energy efficiency despite their difference in size. As a result, the running context through each chapter is computing for PMDs and for warehouse scale computers, and Chapter 6 is a brand-new chapter on the latter topic.

The other theme is parallelism in all its forms. We first idetify the two types of application-level parallelism in Chapter 1: *data-level parallelism (DLP)*, which arises because there are many data items that can be operated on at the same time, and *task-level parallelism (TLP)*, which arises because tasks of work are created that can operate independently and largely in parallel. We then explain the four architectural styles that exploit DLP and TLP: *instruction-level parallelism (ILP)* in Chapter 3; *vector architectures* and *graphic processor units (GPUs)* in Chapter 4, which is a brand-new chapter for this edition; *thread-level parallelism* in Chapter 5; and *request-level parallelism* (RLP) via warehouse-scale computers in Chapter 6, which is also a brand-new chapter for this edition. We moved memory hierarchy earlier in the book to Chapter 2, and we moved the storage systems chapter to Appendix D. We are particularly proud about Chapter 4, which contains the most detailed and clearest explanation of GPUs yet, and Chapter 6, which is the first publication of the most recent details of a Google Warehouse-scale computer.

As before, the first three appendices in the book give basics on the MIPS instruction set, memory hierachy, and pipelining for readers who have not read a book like *Computer Organization and Design*. To keep costs down but still supply supplemental material that are of interest to some readers, available online at http://booksite.mkp.com/9780123838728/ are nine more appendices. There are more pages in these appendices than there are in this book!

This edition continues the tradition of using real-world examples to demonstrate the ideas, and the "Putting It All Together" sections are brand new. The "Putting It All Together" sections of this edition include the pipeline organizations and memory hierarchies of the ARM Cortex A8 processor, the Intel core i7 processor, the NVIDIA GTX-280 and GTX-480 GPUs, and one of the Google warehouse-scale computers.

EXCERPT

## Topic Selection and Organization

As before, we have taken a conservative approach to topic selection, for there are many more interesting ideas in the field than can reasonably be covered in a treatment of basic principles. We have steered away from a comprehensive survey of every architecture a reader might encounter. Instead, our presentation focuses on core concepts likely to be found in any new machine. The key criterion remains that of selecting ideas that have been examined and utilized successfully enough to permit their discussion in quantitative terms.

Our intent has always been to focus on material that is not available in equivalent form from other sources, so we continue to emphasize advanced content wherever possible. Indeed, there are several systems here whose descriptions cannot be found in the literature. (Readers interested strictly in a more basic introduction to computer architecture should read *Computer Organization and Design: The Hardware/Software Interface.*)

## An Overview of the Content

Chapter 1 has been beefed up in this edition. It includes formulas for energy, static power, dynamic power, integrated circuit costs, reliability, and availability. (These formulas are also found on the front inside cover.) Our hope is that these topics can be used through the rest of the book. In addition to the classic quantitative principles of computer design and performance measurement, the PIAT section has been upgraded to use the new SPECPower benchmark.

Our view is that the instruction set architecture is playing less of a role today than in 1990, so we moved this material to Appendix A. It still uses the MIPS64 architecture. (For quick review, a summary of the MIPS ISA can be found on the back inside cover.) For fans of ISAs, Appendix K covers 10 RISC architectures, the 80x86, the DEC VAX, and the IBM 360/370.

We then move onto memory hierarchy in Chapter 2, since it is easy to apply the cost-performance-energy principles to this material and memory is a critical resource for the rest of the chapters. As in the past edition, Appendix B contains an introductory review of cache principles, which is available in case you need it. Chapter 2 discusses 10 advanced optimizations of caches. The chapter includes virtual machines, which offers advantages in protection, software management, and hardware management and play an important role in cloud computing. In addition to covering SRAM and DRAM technologies, the chapter includes new material on Flash memory. The PIAT examples are the ARM Cortex A8, which is used in PMDs, and the Intel Core i7, which is used in servers.

Chapter 3 covers the exploitation of instruction-level parallelism in high-performance processors, including superscalar execution, branch prediction, speculation, dynamic scheduling, and multithreading. As mentioned earlier, Appendix C is a review of pipelining in case you need it. Chapter 3 also surveys the limits of ILP. Like Chapter 2, the PIAT examples are again the ARM Cortex A8 and the Intel Core i7. While the third edition contained a great deal

EXCERPT

**xviii** ■ Preface

on Itanium and VLIW, this material is now in Appendix H, indicating our view that this architecture did not live up to the earlier claims.

The increasing importance of multimedia applications such as games and video processing has also increased the importance of achitectures that can exploit data-level parallelism. In particular, there is a rising interest in computing using graphical processing units (GPUs), yet few architects understand how GPUs really work. We decided to write a new chapter in large part to unveil this new style of computer architecture. Chapter 4 starts with an introduction to vector architectures, which acts as a foundation on which to build explanations of multimedia SIMD instruction set extensions and GPUs. (Appendix G goes into even more depth on vector architectures.) The section on GPUs was the most difficult to write in this book, in that it took many iterations to get an accurate description that was also easy to understand. A significant challenge was the terminology. We decided to go with our own terms and then provide a translation between our terms and the official NVIDIA terms. (A copy of that table can be found in the back inside cover pages.) This chapter introduces the Roofline performance model and then uses it to compare the Intel Core i7 and the NVIDIA GTX 280 and GTX 480 GPUs. The chapter also describes the Tegra 2 GPU for PMDs.

Chapter 5 describes multicore processors. It explores symmetric and distributed-memory architectures, examining both organizational principles and performance. Topics in synchronization and memory consistency models are next. The example is the Intel Core i7. Readers interested in interconnection networks on a chip should read Appendix F, and those interested in larger scale multiprocessors and scientific applications should read Appendix I.

As mentioned earlier, Chapter 6 describes the newest topic in computer architecture, warehouse-scale computers (WSCs). Based on help from engineers at Amazon Web Services and Google, this chapter integrates details on design, cost, and performance of WSCs that few architects are aware of. It starts with the popular MapReduce programming model before describing the architecture and physical implemention of WSCs, including cost. The costs allow us to explain the emergence of cloud computing, whereby it can be cheaper to compute using WSCs in the cloud than in your local datacenter. The PIAT example is a description of a Google WSC that includes information published for the first time in this book.

This brings us to Appendices A through L. Appendix A covers principles of ISAs, including MIPS64, and Appendix K describes 64-bit versions of Alpha, MIPS, PowerPC, and SPARC and their multimedia extensions. It also includes some classic architectures (80x86, VAX, and IBM 360/370) and popular embedded instruction sets (ARM, Thumb, SuperH, MIPS16, and Mitsubishi M32R). Appendix H is related, in that it covers architectures and compilers for VLIW ISAs.

As mentioned earlier, Appendices B and C are tutorials on basic caching and pipelining concepts. Readers relatively new to caching should read Appendix B before Chapter 2 and those new to pipelining should read Appendix C before Chapter 3.

EXCERPT

Appendix D, "Storage Systems," has an expanded discussion of reliability and availability, a tutorial on RAID with a description of RAID 6 schemes, and rarely found failure statistics of real systems. It continues to provide an introduction to queuing theory and I/O performance benchmarks. We evaluate the cost, performance, and reliability of a real cluster: the Internet Archive. The "Putting It All Together" example is the NetApp FAS6000 filer.

Appendix E, by Thomas M. Conte, consolidates the embedded material in one place.

Appendix F, on interconnection networks, has been revised by Timothy M. Pinkston and José Duato. Appendix G, written originally by Krste Asanović, includes a description of vector processors. We think these two appendices are some of the best material we know of on each topic.

Appendix H describes VLIW and EPIC, the architecture of Itanium.

Appendix I describes parallel processing applications and coherence protocols for larger-scale, shared-memory multiprocessing. Appendix J, by David Goldberg, describes computer arithmetic.

Appendix L collects the "Historical Perspective and References" from each chapter into a single appendix. It attempts to give proper credit for the ideas in each chapter and a sense of the history surrounding the inventions. We like to think of this as presenting the human drama of computer design. It also supplies references that the student of architecture may want to pursue. If you have time, we recommend reading some of the classic papers in the field that are mentioned in these sections. It is both enjoyable and educational to hear the ideas directly from the creators. "Historical Perspective" was one of the most popular sections of prior editions.

## Navigating the Text

There is no single best order in which to approach these chapters and appendices, except that all readers should start with Chapter 1. If you don't want to read everything, here are some suggested sequences:

- *Memory Hierarchy:* Appendix B, Chapter 2, and Appendix D.
- *Instruction-Level Parallelism:* Appendix C, Chapter 3, and Appendix H
- *Data-Level Parallelism:* Chapters 4 and 6, Appendix G
- *Thread-Level Parallelism:* Chapter 5, Appendices F and I
- *Request-Level Parallelism:* Chapter 6
- *ISA:* Appendices A and K

Appendix E can be read at any time, but it might work best if read after the ISA and cache sequences. Appendix J can be read whenever arithmetic moves you. You should read the corresponding portion of Appendix L after you complete each chapter.

EXCERPT

## Chapter Structure

The material we have selected has been stretched upon a consistent framework that is followed in each chapter. We start by explaining the ideas of a chapter. These ideas are followed by a "Crosscutting Issues" section, a feature that shows how the ideas covered in one chapter interact with those given in other chapters. This is followed by a "Putting It All Together" section that ties these ideas together by showing how they are used in a real machine.

Next in the sequence is "Fallacies and Pitfalls," which lets readers learn from the mistakes of others. We show examples of common misunderstandings and architectural traps that are difficult to avoid even when you know they are lying in wait for you. The "Fallacies and Pitfalls" sections is one of the most popular sections of the book. Each chapter ends with a "Concluding Remarks" section.

## Case Studies with Exercises

Each chapter ends with case studies and accompanying exercises. Authored by experts in industry and academia, the case studies explore key chapter concepts and verify understanding through increasingly challenging exercises. Instructors should find the case studies sufficiently detailed and robust to allow them to create their own additional exercises.

Brackets for each exercise (<chapter.section>) indicate the text sections of primary relevance to completing the exercise. We hope this helps readers to avoid exercises for which they haven't read the corresponding section, in addition to providing the source for review. Exercises are rated, to give the reader a sense of the amount of time required to complete an exercise:

[10] Less than 5 minutes (to read and understand)

[15] 5–15 minutes for a full answer

[20] 15–20 minutes for a full answer

[25] 1 hour for a full written answer

[30] Short programming project: less than 1 full day of programming

[40] Significant programming project: 2 weeks of elapsed time

[Discussion] Topic for discussion with others

Solutions to the case studies and exercises are available for instructors who register at *textbooks.elsevier.com*.

## Supplemental Materials

A variety of resources are available online at http://booksite.mkp.com/9780123838728/, including the following:

EXCERPT

- Reference appendices—some guest authored by subject experts—covering a range of advanced topics
- Historical Perspectives material that explores the development of the key ideas presented in each of the chapters in the text
- Instructor slides in PowerPoint
- Figures from the book in PDF, EPS, and PPT formats
- Links to related material on the Web
- List of errata

New materials and links to other resources available on the Web will be added on a regular basis.

## Helping Improve This Book

Finally, it is possible to make money while reading this book. (Talk about cost-performance!) If you read the Acknowledgments that follow, you will see that we went to great lengths to correct mistakes. Since a book goes through many printings, we have the opportunity to make even more corrections. If you uncover any remaining resilient bugs, please contact the publisher by electronic mail (*ca5bugs@mkp.com*).

We welcome general comments to the text and invite you to send them to a separate email address at *ca5comments@mkp.com*.

## Concluding Remarks

Once again this book is a true co-authorship, with each of us writing half the chapters and an equal share of the appendices. We can't imagine how long it would have taken without someone else doing half the work, offering inspiration when the task seemed hopeless, providing the key insight to explain a difficult concept, supplying reviews over the weekend of chapters, and commiserating when the weight of our other obligations made it hard to pick up the pen. (These obligations have escalated exponentially with the number of editions, as the biographies attest.) Thus, once again we share equally the blame for what you are about to read.

*John Hennessy* ■ *David Patterson*

EXCERPT

This page intentionally left blank

EXCERPT

# Acknowledgments

Although this is only the fifth edition of this book, we have actually created ten different versions of the text: three versions of the first edition (alpha, beta, and final) and two versions of the second, third, and fourth editions (beta and final). Along the way, we have received help from hundreds of reviewers and users. Each of these people has helped make this book better. Thus, we have chosen to list all of the people who have made contributions to some version of this book.

## Contributors to the Fifth Edition

Like prior editions, this is a community effort that involves scores of volunteers. Without their help, this edition would not be nearly as polished.

### Reviewers

Jason D. Bakos, University of South Carolina; Diana Franklin, The University of California, Santa Barbara; Norman P. Jouppi, HP Labs; Gregory Peterson, University of Tennessee; Parthasarathy Ranganathan, HP Labs; Mark Smotherman, Clemson University; Gurindar Sohi, University of Wisconsin–Madison; Mateo Valero, Universidad Politécnica de Cataluña; Sotirios G. Ziavras, New Jersey Institute of Technology

Members of the University of California–Berkeley Par Lab and RAD Lab who gave frequent reviews of Chapter 1, 4, and 6 and shaped the explanation of GPUs and WSCs: Krste Asanović, Michael Armbrust, Scott Beamer, Sarah Bird, Bryan Catanzaro, Jike Chong, Henry Cook, Derrick Coetzee, Randy Katz, Yunsup Lee, Leo Meyervich, Mark Murphy, Zhangxi Tan, Vasily Volkov, and Andrew Waterman

### Advisory Panel

Luiz André Barroso, Google Inc.; Robert P. Colwell, R&E Colwell & Assoc. Inc.; Krisztian Flautner, VP of R&D at ARM Ltd.; Mary Jane Irwin, Penn State;

PX0676-024

David Kirk, NVIDIA; Grant Martin, Chief Scientist, Tensilica; Gurindar Sohi, University of Wisconsin–Madison; Mateo Valero, Universidad Politécnica de Cataluña

### Appendices

Krste Asanović, University of California, Berkeley (Appendix G); Thomas M. Conte, North Carolina State University (Appendix E); José Duato, Universitat Politècnica de València and Simula (Appendix F); David Goldberg, Xerox PARC (Appendix J); Timothy M. Pinkston, University of Southern California (Appendix F)

José Flich of the Universidad Politécnica de Valencia provided significant contributions to the updating of Appendix F.

### Case Studies with Exercises

Jason D. Bakos, University of South Carolina (Chapters 3 and 4); Diana Franklin, University of California, Santa Barbara (Chapter 1 and Appendix C); Norman P. Jouppi, HP Labs (Chapter 2); Naveen Muralimanohar, HP Labs (Chapter 2); Gregory Peterson, University of Tennessee (Appendix A); Parthasarathy Ranganathan, HP Labs (Chapter 6); Amr Zaky, University of Santa Clara (Chapter 5 and Appendix B)

Jichuan Chang, Kevin Lim, and Justin Meza assisted in the development and testing of the case studies and exercises for Chapter 6.

### Additional Material

John Nickolls, Steve Keckler, and Michael Toksvig of NVIDIA (Chapter 4 NVIDIA GPUs); Victor Lee, Intel (Chapter 4 comparison of Core i7 and GPU); John Shalf, LBNL (Chapter 4 recent vector architectures); Sam Williams, LBNL (Roofline model for computers in Chapter 4); Steve Blackburn of Australian National University and Kathryn McKinley of University of Texas at Austin (Intel performance and power measurements in Chapter 5); Luiz Barroso, Urs Hölzle, Jimmy Clidaris, Bob Felderman, and Chris Johnson of Google (the Google WSC in Chapter 6); James Hamilton of Amazon Web Services (power distribution and cost model in Chapter 6)

Jason D. Bakos of the University of South Carolina developed the new lecture slides for this edition.

Finally, a special thanks once again to Mark Smotherman of Clemson University, who gave a final technical reading of our manuscript. Mark found numerous bugs and ambiguities, and the book is much cleaner as a result.

This book could not have been published without a publisher, of course. We wish to thank all the Morgan Kaufmann/Elsevier staff for their efforts and support. For this fifth edition, we particularly want to thank our editors Nate McFadden

and Todd Green, who coordinated surveys, the advisory panel, development of the case studies and exercises, focus groups, manuscript reviews, and the updating of the appendices.

We must also thank our university staff, Margaret Rowland and Roxana Infante, for countless express mailings, as well as for holding down the fort at Stanford and Berkeley while we worked on the book.

Our final thanks go to our wives for their suffering through increasingly early mornings of reading, thinking, and writing.

## Contributors to Previous Editions

### *Reviewers*

George Adams, Purdue University; Sarita Adve, University of Illinois at Urbana–Champaign; Jim Archibald, Brigham Young University; Krste Asanović, Massachusetts Institute of Technology; Jean-Loup Baer, University of Washington; Paul Barr, Northeastern University; Rajendra V. Boppana, University of Texas, San Antonio; Mark Brehob, University of Michigan; Doug Burger, University of Texas, Austin; John Burger, SGI; Michael Butler; Thomas Casavant; Rohit Chandra; Peter Chen, University of Michigan; the classes at SUNY Stony Brook, Carnegie Mellon, Stanford, Clemson, and Wisconsin; Tim Coe, Vitesse Semiconductor; Robert P. Colwell; David Cummings; Bill Dally; David Douglas; José Duato, Universitat Politècnica de València and Simula; Anthony Duben, Southeast Missouri State University; Susan Eggers, University of Washington; Joel Emer; Barry Fagin, Dartmouth; Joel Ferguson, University of California, Santa Cruz; Carl Feynman; David Filo; Josh Fisher, Hewlett-Packard Laboratories; Rob Fowler, DIKU; Mark Franklin, Washington University (St. Louis); Kourosh Gharachorloo; Nikolas Gloy, Harvard University; David Goldberg, Xerox Palo Alto Research Center; Antonio González, Intel and Universitat Politècnica de Catalunya; James Goodman, University of Wisconsin–Madison; Sudhanva Gurumurthi, University of Virginia; David Harris, Harvey Mudd College; John Heinlein; Mark Heinrich, Stanford; Daniel Helman, University of California, Santa Cruz; Mark D. Hill, University of Wisconsin–Madison; Martin Hopkins, IBM; Jerry Huck, Hewlett-Packard Laboratories; Wen-mei Hwu, University of Illinois at Urbana–Champaign; Mary Jane Irwin, Pennsylvania State University; Truman Joe; Norm Jouppi; David Kaeli, Northeastern University; Roger Kieckhafer, University of Nebraska; Lev G. Kirischian, Ryerson University; Earl Killian; Allan Knies, Purdue University; Don Knuth; Jeff Kuskin, Stanford; James R. Larus, Microsoft Research; Corinna Lee, University of Toronto; Hank Levy; Kai Li, Princeton University; Lori Liebrock, University of Alaska, Fairbanks; Mikko Lipasti, University of Wisconsin–Madison; Gyula A. Mago, University of North Carolina, Chapel Hill; Bryan Martin; Norman Matloff; David Meyer; William Michalson, Worcester Polytechnic Institute; James Mooney; Trevor Mudge, University of Michigan; Ramadass Nagarajan, University of Texas at Austin; David Nagle, Carnegie Mellon University; Todd Narter; Victor Nelson; Vojin Oklobdzija, University of California, Berkeley; Kunle Olukotun, Stanford University; Bob Owens, Pennsylvania State University; Greg Papadapoulous, Sun

Microsystems; Joseph Pfeiffer; Keshav Pingali, Cornell University; Timothy M. Pinkston, University of Southern California; Bruno Preiss, University of Waterloo; Steven Przybylski; Jim Quinlan; Andras Radics; Kishore Ramachandran, Georgia Institute of Technology; Joseph Rameh, University of Texas, Austin; Anthony Reeves, Cornell University; Richard Reid, Michigan State University; Steve Reinhardt, University of Michigan; David Rennels, University of California, Los Angeles; Arnold L. Rosenberg, University of Massachusetts, Amherst; Kaushik Roy, Purdue University; Emilio Salgueiro, Unysis; Karthikeyan Sankaralingam, University of Texas at Austin; Peter Schnorf; Margo Seltzer; Behrooz Shirazi, Southern Methodist University; Daniel Siewiorek, Carnegie Mellon University; J. P. Singh, Princeton; Ashok Singhal; Jim Smith, University of Wisconsin–Madison; Mike Smith, Harvard University; Mark Smotherman, Clemson University; Gurindar Sohi, University of Wisconsin–Madison; Arun Somani, University of Washington; Gene Tagliarin, Clemson University; Shyamkumar Thoziyoor, University of Notre Dame; Evan Tick, University of Oregon; Akhilesh Tyagi, University of North Carolina, Chapel Hill; Dan Upton, University of Virginia; Mateo Valero, Universidad Politécnica de Cataluña, Barcelona; Anujan Varma, University of California, Santa Cruz; Thorsten von Eicken, Cornell University; Hank Walker, Texas A&M; Roy Want, Xerox Palo Alto Research Center; David Weaver, Sun Microsystems; Shlomo Weiss, Tel Aviv University; David Wells; Mike Westall, Clemson University; Maurice Wilkes; Eric Williams; Thomas Willis, Purdue University; Malcolm Wing; Larry Wittie, SUNY Stony Brook; Ellen Witte Zegura, Georgia Institute of Technology; Sotirios G. Ziavras, New Jersey Institute of Technology

### *Appendices*

The vector appendix was revised by Krste Asanović of the Massachusetts Institute of Technology. The floating-point appendix was written originally by David Goldberg of Xerox PARC.

### *Exercises*

George Adams, Purdue University; Todd M. Bezenek, University of Wisconsin–Madison (in remembrance of his grandmother Ethel Eshom); Susan Eggers; Anoop Gupta; David Hayes; Mark Hill; Allan Knies; Ethan L. Miller, University of California, Santa Cruz; Parthasarathy Ranganathan, Compaq Western Research Laboratory; Brandon Schwartz, University of Wisconsin–Madison; Michael Scott; Dan Siewiorek; Mike Smith; Mark Smotherman; Evan Tick; Thomas Willis

### *Case Studies with Exercises*

Andrea C. Arpaci-Dusseau, University of Wisconsin–Madison; Remzi H. Arpaci-Dusseau, University of Wisconsin–Madison; Robert P. Colwell, R&E Colwell & Assoc., Inc.; Diana Franklin, California Polytechnic State University, San Luis Obispo; Wen-mei W. Hwu, University of Illinois at Urbana–Champaign; Norman P. Jouppi, HP Labs; John W. Sias, University of Illinois at Urbana–Champaign; David A. Wood, University of Wisconsin–Madison

PX0676-027

EXCERPT

### *Special Thanks*

Duane Adams, Defense Advanced Research Projects Agency; Tom Adams; Sarita Adve, University of Illinois at Urbana–Champaign; Anant Agarwal; Dave Albonesi, University of Rochester; Mitch Alsup; Howard Alt; Dave Anderson; Peter Ashenden; David Bailey, Defense Advanced Research Projects Agency; Luiz Barroso, Compaq's Western Research Lab; Andy Bechtolsheim; C. Gordon Bell; Fred Berkowitz; John Best, IBM; Dileep Bhandarkar; Jeff Bier, BDTI; Mark Birman; David Black; David Boggs; Jim Brady; Forrest Brewer; Aaron Brown, University of California, Berkeley; E. Bugnion, Compaq's Western Research Lab; Alper Buyuktosunoglu, University of Rochester; Mark Callaghan; Jason F. Cantin; Paul Carrick; Chen-Chung Chang; Lei Chen, University of Rochester; Pete Chen; Nhan Chu; Doug Clark, Princeton University; Bob Cmelik; John Crawford; Zarka Cvetanovic; Mike Dahlin, University of Texas, Austin; Merrick Darley; the staff of the DEC Western Research Laboratory; John DeRosa; Lloyd Dickman; J. Ding; Susan Eggers, University of Washington; Wael El-Essawy, University of Rochester; Patty Enriquez, Mills; Milos Ercegovac; Robert Garner; K. Gharachorloo, Compaq's Western Research Lab; Garth Gibson; Ronald Greenberg; Ben Hao; John Henning, Compaq; Mark Hill, University of Wisconsin–Madison; Danny Hillis; David Hodges; Urs Hölzle, Google; David Hough; Ed Hudson; Chris Hughes, University of Illinois at Urbana–Champaign; Mark Johnson; Lewis Jordan; Norm Jouppi; William Kahan; Randy Katz; Ed Kelly; Richard Kessler; Les Kohn; John Kowaleski, Compaq Computer Corp; Dan Lambright; Gary Lauterbach, Sun Microsystems; Corinna Lee; Ruby Lee; Don Lewine; Chao-Huang Lin; Paul Losleben, Defense Advanced Research Projects Agency; Yung-Hsiang Lu; Bob Lucas, Defense Advanced Research Projects Agency; Ken Lutz; Alan Mainwaring, Intel Berkeley Research Labs; Al Marston; Rich Martin, Rutgers; John Mashey; Luke McDowell; Sebastian Mirolo, Trimedia Corporation; Ravi Murthy; Biswadeep Nag; Lisa Noordergraaf, Sun Microsystems; Bob Parker, Defense Advanced Research Projects Agency; Vern Paxson, Center for Internet Research; Lawrence Prince; Steven Przybylski; Mark Pullen, Defense Advanced Research Projects Agency; Chris Rowen; Margaret Rowland; Greg Semeraro, University of Rochester; Bill Shannon; Behrooz Shirazi; Robert Shomler; Jim Slager; Mark Smotherman, Clemson University; the SMT research group at the University of Washington; Steve Squires, Defense Advanced Research Projects Agency; Ajay Sreekanth; Darren Staples; Charles Stapper; Jorge Stolfi; Peter Stoll; the students at Stanford and Berkeley who endured our first attempts at creating this book; Bob Supnik; Steve Swanson; Paul Taysom; Shreekant Thakkar; Alexander Thomasian, New Jersey Institute of Technology; John Toole, Defense Advanced Research Projects Agency; Kees A. Vissers, Trimedia Corporation; Willa Walker; David Weaver; Ric Wheeler, EMC; Maurice Wilkes; Richard Zimmerman.

*John Hennessy ▪ David Patterson*

EXCERPT

| 1.1 | Introduction | 2 |
|-----|--------------|---|
| 1.2 | Classes of Computers | 5 |
| 1.3 | Defining Computer Architecture | 11 |
| 1.4 | Trends in Technology | 17 |
| 1.5 | Trends in Power and Energy in Integrated Circuits | 21 |
| 1.6 | Trends in Cost | 27 |
| 1.7 | Dependability | 33 |
| 1.8 | Measuring, Reporting, and Summarizing Performance | 36 |
| 1.9 | Quantitative Principles of Computer Design | 44 |
| 1.10 | Putting It All Together: Performance, Price, and Power | 52 |
| 1.11 | Fallacies and Pitfalls | 55 |
| 1.12 | Concluding Remarks | 59 |
| 1.13 | Historical Perspectives and References | 61 |
| | Case Studies and Exercises by Diana Franklin | 61 |

PX0676-029

EXCERPT

# 1

# Fundamentals of Quantitative Design and Analysis

I think it's fair to say that personal computers have become the most empowering tool we've ever created. They're tools of communication, they're tools of creativity, and they can be shaped by their user.

**Bill Gates, February 24, 2004**

Computer Architecture. DOI: 10.1016/B978-0-12-383872-8.00002-1
© 2012 Elsevier, Inc. All rights reserved.

PX0676-030

EXCERPT

**2** ▪ Chapter One *Fundamentals of Quantitative Design and Analysis*

### 1.1    Introduction

Computer technology has made incredible progress in the roughly 65 years since the first general-purpose electronic computer was created. Today, less than $500 will purchase a mobile computer that has more performance, more main memory, and more disk storage than a computer bought in 1985 for $1 million. This rapid improvement has come both from advances in the technology used to build computers and from innovations in computer design.

Although technological improvements have been fairly steady, progress arising from better computer architectures has been much less consistent. During the first 25 years of electronic computers, both forces made a major contribution, delivering performance improvement of about 25% per year. The late 1970s saw the emergence of the microprocessor. The ability of the microprocessor to ride the improvements in integrated circuit technology led to a higher rate of performance improvement—roughly 35% growth per year.

This growth rate, combined with the cost advantages of a mass-produced microprocessor, led to an increasing fraction of the computer business being based on microprocessors. In addition, two significant changes in the computer marketplace made it easier than ever before to succeed commercially with a new architecture. First, the virtual elimination of assembly language programming reduced the need for object-code compatibility. Second, the creation of standardized, vendor-independent operating systems, such as UNIX and its clone, Linux, lowered the cost and risk of bringing out a new architecture.

These changes made it possible to develop successfully a new set of architectures with simpler instructions, called RISC (Reduced Instruction Set Computer) architectures, in the early 1980s. The RISC-based machines focused the attention of designers on two critical performance techniques, the exploitation of *instruction-level parallelism* (initially through pipelining and later through multiple instruction issue) and the use of caches (initially in simple forms and later using more sophisticated organizations and optimizations).

The RISC-based computers raised the performance bar, forcing prior architectures to keep up or disappear. The Digital Equipment Vax could not, and so it was replaced by a RISC architecture. Intel rose to the challenge, primarily by translating 80x86 instructions into RISC-like instructions internally, allowing it to adopt many of the innovations first pioneered in the RISC designs. As transistor counts soared in the late 1990s, the hardware overhead of translating the more complex x86 architecture became negligible. In low-end applications, such as cell phones, the cost in power and silicon area of the x86-translation overhead helped lead to a RISC architecture, ARM, becoming dominant.

Figure 1.1 shows that the combination of architectural and organizational enhancements led to 17 years of sustained growth in performance at an annual rate of over 50%—a rate that is unprecedented in the computer industry.

The effect of this dramatic growth rate in the 20th century has been fourfold. First, it has significantly enhanced the capability available to computer users. For many applications, the highest-performance microprocessors of today outperform the supercomputer of less than 10 years ago.

PX0676-031



**Figure 1.1  Growth in processor performance since the late 1970s.** This chart plots performance relative to the VAX 11/780 as measured by the SPEC benchmarks (see Section 1.8). Prior to the mid-1980s, processor performance growth was largely technology driven and averaged about 25% per year. The increase in growth to about 52% since then is attributable to more advanced architectural and organizational ideas. By 2003, this growth led to a difference in performance of about a factor of 25 versus if we had continued at the 25% rate. Performance for floating-point-oriented calculations has increased even faster. Since 2003, the limits of power and available instruction-level parallelism have slowed uniprocessor performance, to no more than 22% per year, or about 5 times slower than had we continued at 52% per year. (The fastest SPEC performance since 2007 has had automatic parallelization turned on with increasing number of cores per chip each year, so uniprocessor speed is harder to gauge. These results are limited to single-socket systems to reduce the impact of automatic parallelization.) Figure 1.11 on page 24 shows the improvement in clock rates for these same three eras. Since SPEC has changed over the years, performance of newer machines is estimated by a scaling factor that relates the performance for two different versions of SPEC (e.g., SPEC89, SPEC92, SPEC95, SPEC2000, and SPEC2006).

Second, this dramatic improvement in cost-performance leads to new classes of computers. Personal computers and workstations emerged in the 1980s with the availability of the microprocessor. The last decade saw the rise of smart cell phones and tablet computers, which many people are using as their primary computing platforms instead of PCs. These mobile client devices are increasingly using the Internet to access warehouses containing tens of thousands of servers, which are being designed as if they were a single gigantic computer.

Third, continuing improvement of semiconductor manufacturing as predicted by Moore's law has led to the dominance of microprocessor-based computers across the entire range of computer design. Minicomputers, which were

PX0676-032

EXCERPT

**4**  ■  Chapter One  *Fundamentals of Quantitative Design and Analysis*

traditionally made from off-the-shelf logic or from gate arrays, were replaced by servers made using microprocessors. Even mainframe computers and high-performance supercomputers are all collections of microprocessors.

The hardware innovations above led to a renaissance in computer design, which emphasized both architectural innovation and efficient use of technology improvements. This rate of growth has compounded so that by 2003, high-performance microprocessors were 7.5 times faster than what would have been obtained by relying solely on technology, including improved circuit design; that is, 52% per year versus 35% per year.

This hardware renaissance led to the fourth impact, which is on software development. This 25,000-fold performance improvement since 1978 (see Figure 1.1) allowed programmers today to trade performance for productivity. In place of performance-oriented languages like C and C++, much more programming today is done in managed programming languages like Java and C#. Moreover, scripting languages like Python and Ruby, which are even more productive, are gaining in popularity along with programming frameworks like Ruby on Rails. To maintain productivity and try to close the performance gap, interpreters with just-in-time compilers and trace-based compiling are replacing the traditional compiler and linker of the past. Software deployment is changing as well, with Software as a Service (SaaS) used over the Internet replacing shrink-wrapped software that must be installed and run on a local computer.

The nature of applications also changes. Speech, sound, images, and video are becoming increasingly important, along with predictable response time that is so critical to the user experience. An inspiring example is Google Goggles. This application lets you hold up your cell phone to point its camera at an object, and the image is sent wirelessly over the Internet to a warehouse-scale computer that recognizes the object and tells you interesting information about it. It might translate text on the object to another language; read the bar code on a book cover to tell you if a book is available online and its price; or, if you pan the phone camera, tell you what businesses are nearby along with their websites, phone numbers, and directions.

Alas, Figure 1.1 also shows that this 17-year hardware renaissance is over. Since 2003, single-processor performance improvement has dropped to less than 22% per year due to the twin hurdles of maximum power dissipation of air-cooled chips and the lack of more instruction-level parallelism to exploit efficiently. Indeed, in 2004 Intel canceled its high-performance uniprocessor projects and joined others in declaring that the road to higher performance would be via multiple processors per chip rather than via faster uniprocessors.

This milestone signals a historic switch from relying solely on instruction-level parallelism (ILP), the primary focus of the first three editions of this book, to *data-level parallelism* (DLP) and *thread-level parallelism* (TLP), which were featured in the fourth edition and expanded in this edition. This edition also adds warehouse-scale computers and *request-level parallelism* (RLP). Whereas the compiler and hardware conspire to exploit ILP implicitly without the programmer's attention, DLP, TLP, and RLP are explicitly parallel, requiring the

EXCERPT

restructuring of the application so that it can exploit explicit parallelism. In some instances, this is easy; in many, it is a major new burden for programmers.

This text is about the architectural ideas and accompanying compiler improvements that made the incredible growth rate possible in the last century, the reasons for the dramatic change, and the challenges and initial promising approaches to architectural ideas, compilers, and interpreters for the 21st century. At the core is a quantitative approach to computer design and analysis that uses empirical observations of programs, experimentation, and simulation as its tools. It is this style and approach to computer design that is reflected in this text. The purpose of this chapter is to lay the quantitative foundation on which the following chapters and appendices are based.

This book was written not only to explain this design style but also to stimulate you to contribute to this progress. We believe this approach will work for explicitly parallel computers of the future just as it worked for the implicitly parallel computers of the past.

## 1.2    Classes of Computers

These changes have set the stage for a dramatic change in how we view computing, computing applications, and the computer markets in this new century. Not since the creation of the personal computer have we seen such dramatic changes in the way computers appear and in how they are used. These changes in computer use have led to five different computing markets, each characterized by different applications, requirements, and computing technologies. Figure 1.2 summarizes these mainstream classes of computing environments and their important characteristics.

| Feature | Personal mobile device (PMD) | Desktop | Server | Clusters/warehouse-scale computer | Embedded |
|---|---|---|---|---|---|
| Price of system | $100–$1000 | $300–$2500 | $5000–$10,000,000 | $100,000–$200,000,000 | $10–$100,000 |
| Price of micro-processor | $10–$100 | $50–$500 | $200–$2000 | $50–$250 | $0.01–$100 |
| Critical system design issues | Cost, energy, media performance, responsiveness | Price-performance, energy, graphics performance | Throughput, availability, scalability, energy | Price-performance, throughput, energy proportionality | Price, energy, application-specific performance |

**Figure 1.2  A summary of the five mainstream computing classes and their system characteristics.** Sales in 2010 included about 1.8 billion PMDs (90% cell phones), 350 million desktop PCs, and 20 million servers. The total number of embedded processors sold was nearly 19 billion. In total, 6.1 billion ARM-technology based chips were shipped in 2010. Note the wide range in system price for servers and embedded systems, which go from USB keys to network routers. For servers, this range arises from the need for very large-scale multiprocessor systems for high-end transaction processing.

### Personal Mobile Device (PMD)

*Personal mobile device* (*PMD*) is the term we apply to a collection of wireless devices with multimedia user interfaces such as cell phones, tablet computers, and so on. Cost is a prime concern given the consumer price for the whole product is a few hundred dollars. Although the emphasis on energy efficiency is frequently driven by the use of batteries, the need to use less expensive packaging—plastic versus ceramic—and the absence of a fan for cooling also limit total power consumption. We examine the issue of energy and power in more detail in Section 1.5. Applications on PMDs are often Web-based and media-oriented, like the Google Goggles example above. Energy and size requirements lead to use of Flash memory for storage (Chapter 2) instead of magnetic disks.

Responsiveness and predictability are key characteristics for media applications. A *real-time performance* requirement means a segment of the application has an absolute maximum execution time. For example, in playing a video on a PMD, the time to process each video frame is limited, since the processor must accept and process the next frame shortly. In some applications, a more nuanced requirement exists: the average time for a particular task is constrained as well as the number of instances when some maximum time is exceeded. Such approaches—sometimes called *soft real-time*—arise when it is possible to occasionally miss the time constraint on an event, as long as not too many are missed. Real-time performance tends to be highly application dependent.

Other key characteristics in many PMD applications are the need to minimize memory and the need to use energy efficiently. Energy efficiency is driven by both battery power and heat dissipation. The memory can be a substantial portion of the system cost, and it is important to optimize memory size in such cases. The importance of memory size translates to an emphasis on code size, since data size is dictated by the application.

### Desktop Computing

The first, and probably still the largest market in dollar terms, is desktop computing. Desktop computing spans from low-end netbooks that sell for under $300 to high-end, heavily configured workstations that may sell for $2500. Since 2008, more than half of the desktop computers made each year have been battery operated laptop computers.

Throughout this range in price and capability, the desktop market tends to be driven to optimize *price-performance.* This combination of performance (measured primarily in terms of compute performance and graphics performance) and price of a system is what matters most to customers in this market, and hence to computer designers. As a result, the newest, highest-performance microprocessors and cost-reduced microprocessors often appear first in desktop systems (see Section 1.6 for a discussion of the issues affecting the cost of computers).

Desktop computing also tends to be reasonably well characterized in terms of applications and benchmarking, though the increasing use of Web-centric, interactive applications poses new challenges in performance evaluation.

## Servers

As the shift to desktop computing occurred in the 1980s, the role of servers grew to provide larger-scale and more reliable file and computing services. Such servers have become the backbone of large-scale enterprise computing, replacing the traditional mainframe.

For servers, different characteristics are important. First, availability is critical. (We discuss availability in Section 1.7.) Consider the servers running ATM machines for banks or airline reservation systems. Failure of such server systems is far more catastrophic than failure of a single desktop, since these servers must operate seven days a week, 24 hours a day. Figure 1.3 estimates revenue costs of downtime for server applications.

A second key feature of server systems is scalability. Server systems often grow in response to an increasing demand for the services they support or an increase in functional requirements. Thus, the ability to scale up the computing capacity, the memory, the storage, and the I/O bandwidth of a server is crucial.

Finally, servers are designed for efficient throughput. That is, the overall performance of the server—in terms of transactions per minute or Web pages served per second—is what is crucial. Responsiveness to an individual request remains important, but overall efficiency and cost-effectiveness, as determined by how many requests can be handled in a unit time, are the key metrics for most servers. We return to the issue of assessing performance for different types of computing environments in Section 1.8.

| Application | Cost of downtime per hour | Annual losses with downtime of | | |
|---|---|---|---|---|
| | | 1% (87.6 hrs/yr) | 0.5% (43.8 hrs/yr) | 0.1% (8.8 hrs/yr) |
| Brokerage operations | $6,450,000 | $565,000,000 | $283,000,000 | $56,500,000 |
| Credit card authorization | $2,600,000 | $228,000,000 | $114,000,000 | $22,800,000 |
| Package shipping services | $150,000 | $13,000,000 | $6,600,000 | $1,300,000 |
| Home shopping channel | $113,000 | $9,900,000 | $4,900,000 | $1,000,000 |
| Catalog sales center | $90,000 | $7,900,000 | $3,900,000 | $800,000 |
| Airline reservation center | $89,000 | $7,900,000 | $3,900,000 | $800,000 |
| Cellular service activation | $41,000 | $3,600,000 | $1,800,000 | $400,000 |
| Online network fees | $25,000 | $2,200,000 | $1,100,000 | $200,000 |
| ATM service fees | $14,000 | $1,200,000 | $600,000 | $100,000 |

**Figure 1.3** Costs rounded to nearest $100,000 of an unavailable system are shown by analyzing the cost of downtime (in terms of immediately lost revenue), assuming three different levels of availability and that downtime is distributed uniformly. These data are from Kembel [2000] and were collected and analyzed by Contingency Planning Research.

## Clusters/Warehouse-Scale Computers

The growth of Software as a Service (SaaS) for applications like search, social networking, video sharing, multiplayer games, online shopping, and so on has led to the growth of a class of computers called *clusters*. Clusters are collections of desktop computers or servers connected by local area networks to act as a single larger computer. Each node runs its own operating system, and nodes communicate using a networking protocol. The largest of the clusters are called *warehouse-scale computers* (WSCs), in that they are designed so that tens of thousands of servers can act as one. Chapter 6 describes this class of the extremely large computers.

Price-performance and power are critical to WSCs since they are so large. As Chapter 6 explains, 80% of the cost of a $90M warehouse is associated with power and cooling of the computers inside. The computers themselves and networking gear cost another $70M and they must be replaced every few years. When you are buying that much computing, you need to buy wisely, as a 10% improvement in price-performance means a savings of $7M (10% of $70M).

WSCs are related to servers, in that availability is critical. For example, Amazon.com had $13 billion in sales in the fourth quarter of 2010. As there are about 2200 hours in a quarter, the average revenue per hour was almost $6M. During a peak hour for Christmas shopping, the potential loss would be many times higher. As Chapter 6 explains, the difference from servers is that WSCs use redundant inexpensive components as the building blocks, relying on a software layer to catch and isolate the many failures that will happen with computing at this scale. Note that scalability for a WSC is handled by the local area network connecting the computers and not by integrated computer hardware, as in the case of servers.

*Supercomputers* are related to WSCs in that they are equally expensive, costing hundreds of millions of dollars, but supercomputers differ by emphasizing floating-point performance and by running large, communication-intensive batch programs that can run for weeks at a time. This tight coupling leads to use of much faster internal networks. In contrast, WSCs emphasize interactive applications, large-scale storage, dependability, and high Internet bandwidth.

## Embedded Computers

Embedded computers are found in everyday machines; microwaves, washing machines, most printers, most networking switches, and all cars contain simple embedded microprocessors.

The processors in a PMD are often considered embedded computers, but we are keeping them as a separate category because PMDs are platforms that can run externally developed software and they share many of the characteristics of desktop computers. Other embedded devices are more limited in hardware and software sophistication. We use the ability to run third-party software as the dividing line between non-embedded and embedded computers.

Embedded computers have the widest spread of processing power and cost. They include 8-bit and 16-bit processors that may cost less than a dime, 32-bit

microprocessors that execute 100 million instructions per second and cost under
$5, and high-end processors for network switches that cost $100 and can execute
billions of instructions per second. Although the range of computing power in the
embedded computing market is very large, price is a key factor in the design of
computers for this space. Performance requirements do exist, of course, but the
primary goal is often meeting the performance need at a minimum price, rather
than achieving higher performance at a higher price.

Most of this book applies to the design, use, and performance of embedded
processors, whether they are off-the-shelf microprocessors or microprocessor
cores that will be assembled with other special-purpose hardware. Indeed, the
third edition of this book included examples from embedded computing to illus-
trate the ideas in every chapter.

Alas, most readers found these examples unsatisfactory, as the data that drive
the quantitative design and evaluation of other classes of computers have not yet
been extended well to embedded computing (see the challenges with EEMBC,
for example, in Section 1.8). Hence, we are left for now with qualitative descrip-
tions, which do not fit well with the rest of the book. As a result, in this and the
prior edition we consolidated the embedded material into Appendix E. We
believe a separate appendix improves the flow of ideas in the text while allowing
readers to see how the differing requirements affect embedded computing.

## Classes of Parallelism and Parallel Architectures

Parallelism at multiple levels is now the driving force of computer design across
all four classes of computers, with energy and cost being the primary constraints.
There are basically two kinds of parallelism in applications:

1. *Data-Level Parallelism (DLP)* arises because there are many data items that
   can be operated on at the same time.

2. *Task-Level Parallelism (TLP)* arises because tasks of work are created that
   can operate independently and largely in parallel.

Computer hardware in turn can exploit these two kinds of application parallelism
in four major ways:

1. *Instruction-Level Parallelism* exploits data-level parallelism at modest levels
   with compiler help using ideas like pipelining and at medium levels using
   ideas like speculative execution.

2. *Vector Architectures* and *Graphic Processor Units (GPUs)* exploit data-level
   parallelism by applying a single instruction to a collection of data in parallel.

3. *Thread-Level Parallelism* exploits either data-level parallelism or task-level
   parallelism in a tightly coupled hardware model that allows for interaction
   among parallel threads.

4. *Request-Level Parallelism* exploits parallelism among largely decoupled
   tasks specified by the programmer or the operating system.

EXCERPT

These four ways for hardware to support the data-level parallelism and task-level parallelism go back 50 years. When Michael Flynn [1966] studied the parallel computing efforts in the 1960s, he found a simple classification whose abbreviations we still use today. He looked at the parallelism in the instruction and data streams called for by the instructions at the most constrained component of the multiprocessor, and placed all computers into one of four categories:

1. *Single instruction stream, single data stream* (SISD)—This category is the uniprocessor. The programmer thinks of it as the standard sequential computer, but it can exploit instruction-level parallelism. Chapter 3 covers SISD architectures that use ILP techniques such as superscalar and speculative execution.

2. *Single instruction stream, multiple data streams* (SIMD)—The same instruction is executed by multiple processors using different data streams. SIMD computers exploit *data-level parallelism* by applying the same operations to multiple items of data in parallel. Each processor has its own data memory (hence the MD of SIMD), but there is a single instruction memory and control processor, which fetches and dispatches instructions. Chapter 4 covers DLP and three different architectures that exploit it: vector architectures, multimedia extensions to standard instruction sets, and GPUs.

3. *Multiple instruction streams, single data stream* (MISD)—No commercial multiprocessor of this type has been built to date, but it rounds out this simple classification.

4. *Multiple instruction streams, multiple data streams* (MIMD)—Each processor fetches its own instructions and operates on its own data, and it targets task-level parallelism. In general, MIMD is more flexible than SIMD and thus more generally applicable, but it is inherently more expensive than SIMD. For example, MIMD computers can also exploit data-level parallelism, although the overhead is likely to be higher than would be seen in an SIMD computer. This overhead means that grain size must be sufficiently large to exploit the parallelism efficiently. Chapter 5 covers tightly coupled MIMD architectures, which exploit *thread-level parallelism* since multiple cooperating threads operate in parallel. Chapter 6 covers loosely coupled MIMD architectures—specifically, *clusters* and *warehouse-scale computers*—that exploit *request-level parallelism*, where many independent tasks can proceed in parallel naturally with little need for communication or synchronization.

This taxonomy is a coarse model, as many parallel processors are hybrids of the SISD, SIMD, and MIMD classes. Nonetheless, it is useful to put a framework on the design space for the computers we will see in this book.

PX0676-039

1.3    **Defining Computer Architecture**

The task the computer designer faces is a complex one: Determine what attributes are important for a new computer, then design a computer to maximize performance and energy efficiency while staying within cost, power, and availability constraints. This task has many aspects, including instruction set design, functional organization, logic design, and implementation. The implementation may encompass integrated circuit design, packaging, power, and cooling. Optimizing the design requires familiarity with a very wide range of technologies, from compilers and operating systems to logic design and packaging.

Several years ago, the term *computer architecture* often referred only to instruction set design. Other aspects of computer design were called *implementation,* often insinuating that implementation is uninteresting or less challenging.

We believe this view is incorrect. The architect's or designer's job is much more than instruction set design, and the technical hurdles in the other aspects of the project are likely more challenging than those encountered in instruction set design. We'll quickly review instruction set architecture before describing the larger challenges for the computer architect.

### Instruction Set Architecture: The Myopic View of Computer Architecture

We use the term *instruction set architecture* (ISA) to refer to the actual programmer-visible instruction set in this book. The ISA serves as the boundary between the software and hardware. This quick review of ISA will use examples from 80x86, ARM, and MIPS to illustrate the seven dimensions of an ISA. Appendices A and K give more details on the three ISAs.

1. *Class of ISA*—Nearly all ISAs today are classified as general-purpose register architectures, where the operands are either registers or memory locations. The 80x86 has 16 general-purpose registers and 16 that can hold floating-point data, while MIPS has 32 general-purpose and 32 floating-point registers (see Figure 1.4). The two popular versions of this class are *register-memory* ISAs, such as the 80x86, which can access memory as part of many instructions, and *load-store* ISAs, such as ARM and MIPS, which can access memory only with load or store instructions. All recent ISAs are load-store.

2. *Memory addressing*—Virtually all desktop and server computers, including the 80x86, ARM, and MIPS, use byte addressing to access memory operands. Some architectures, like ARM and MIPS, require that objects must be *aligned*. An access to an object of size *s* bytes at byte address *A* is aligned if $A \bmod s = 0$. (See Figure A.5 on page A-8.) The 80x86 does not require alignment, but accesses are generally faster if operands are aligned.

3. *Addressing modes*—In addition to specifying registers and constant operands, addressing modes specify the address of a memory object. MIPS addressing

PX0676-040

**12** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

| Name | Number | Use | Preserved across a call? |
|---|---|---|---|
| $zero | 0 | The constant value 0 | N.A. |
| $at | 1 | Assembler temporary | No |
| $v0–$v1 | 2–3 | Values for function results and expression evaluation | No |
| $a0–$a3 | 4–7 | Arguments | No |
| $t0–$t7 | 8–15 | Temporaries | No |
| $s0–$s7 | 16–23 | Saved temporaries | Yes |
| $t8–$t9 | 24–25 | Temporaries | No |
| $k0–$k1 | 26–27 | Reserved for OS kernel | No |
| $gp | 28 | Global pointer | Yes |
| $sp | 29 | Stack pointer | Yes |
| $fp | 30 | Frame pointer | Yes |
| $ra | 31 | Return address | Yes |

**Figure 1.4 MIPS registers and usage conventions.** In addition to the 32 general-purpose registers (R0–R31), MIPS has 32 floating-point registers (F0–F31) that can hold either a 32-bit single-precision number or a 64-bit double-precision number.

modes are Register, Immediate (for constants), and Displacement, where a constant offset is added to a register to form the memory address. The 80x86 supports those three plus three variations of displacement: no register (absolute), two registers (based indexed with displacement), and two registers where one register is multiplied by the size of the operand in bytes (based with scaled index and displacement). It has more like the last three, minus the displacement field, plus register indirect, indexed, and based with scaled index. ARM has the three MIPS addressing modes plus PC-relative addressing, the sum of two registers, and the sum of two registers where one register is multiplied by the size of the operand in bytes. It also has autoincrement and autodecrement addressing, where the calculated address replaces the contents of one of the registers used in forming the address.

4. *Types and sizes of operands*—Like most ISAs, 80x86, ARM, and MIPS support operand sizes of 8-bit (ASCII character), 16-bit (Unicode character or half word), 32-bit (integer or word), 64-bit (double word or long integer), and IEEE 754 floating point in 32-bit (single precision) and 64-bit (double precision). The 80x86 also supports 80-bit floating point (extended double precision).

5. *Operations*—The general categories of operations are data transfer, arithmetic logical, control (discussed next), and floating point. MIPS is a simple and easy-to-pipeline instruction set architecture, and it is representative of the RISC architectures being used in 2011. Figure 1.5 summarizes the MIPS ISA. The 80x86 has a much richer and larger set of operations (see Appendix K).

| Instruction type/opcode | Instruction meaning |
|---|---|
| *Data transfers* | *Move data between registers and memory, or between the integer and FP or special registers; only memory address mode is 16-bit displacement + contents of a GPR* |
| LB, LBU, SB | Load byte, load byte unsigned, store byte (to/from integer registers) |
| LH, LHU, SH | Load half word, load half word unsigned, store half word (to/from integer registers) |
| LW, LWU, SW | Load word, load word unsigned, store word (to/from integer registers) |
| LD, SD | Load double word, store double word (to/from integer registers) |
| L.S, L.D, S.S, S.D | Load SP float, load DP float, store SP float, store DP float |
| MFC0, MTC0 | Copy from/to GPR to/from a special register |
| MOV.S, MOV.D | Copy one SP or DP FP register to another FP register |
| MFC1, MTC1 | Copy 32 bits to/from FP registers from/to integer registers |
| *Arithmetic/logical* | *Operations on integer or logical data in GPRs; signed arithmetic trap on overflow* |
| DADD, DADDI, DADDU, DADDIU | Add, add immediate (all immediates are 16 bits); signed and unsigned |
| DSUB, DSUBU | Subtract, signed and unsigned |
| DMUL, DMULU, DDIV, DDIVU, MADD | Multiply and divide, signed and unsigned; multiply-add; all operations take and yield 64-bit values |
| AND, ANDI | And, and immediate |
| OR, ORI, XOR, XORI | Or, or immediate, exclusive or, exclusive or immediate |
| LUI | Load upper immediate; loads bits 32 to 47 of register with immediate, then sign-extends |
| DSLL, DSRL, DSRA, DSLLV, DSRLV, DSRAV | Shifts: both immediate (DS__) and variable form (DS__V); shifts are shift left logical, right logical, right arithmetic |
| SLT, SLTI, SLTU, SLTIU | Set less than, set less than immediate, signed and unsigned |
| *Control* | *Conditional branches and jumps; PC-relative or through register* |
| BEQZ, BNEZ | Branch GPRs equal/not equal to zero; 16-bit offset from PC + 4 |
| BEQ, BNE | Branch GPR equal/not equal; 16-bit offset from PC + 4 |
| BC1T, BC1F | Test comparison bit in the FP status register and branch; 16-bit offset from PC + 4 |
| MOVN, MOVZ | Copy GPR to another GPR if third GPR is negative, zero |
| J, JR | Jumps: 26-bit offset from PC + 4 (J) or target in register (JR) |
| JAL, JALR | Jump and link: save PC + 4 in R31, target is PC-relative (JAL) or a register (JALR) |
| TRAP | Transfer to operating system at a vectored address |
| ERET | Return to user code from an exception; restore user mode |
| *Floating point* | *FP operations on DP and SP formats* |
| ADD.D, ADD.S, ADD.PS | Add DP, SP numbers, and pairs of SP numbers |
| SUB.D, SUB.S, SUB.PS | Subtract DP, SP numbers, and pairs of SP numbers |
| MUL.D, MUL.S, MUL.PS | Multiply DP, SP floating point, and pairs of SP numbers |
| MADD.D, MADD.S, MADD.PS | Multiply-add DP, SP numbers, and pairs of SP numbers |
| DIV.D, DIV.S, DIV.PS | Divide DP, SP floating point, and pairs of SP numbers |
| CVT._._ | Convert instructions: CVT.x.y converts from type x to type y, where x and y are L (64-bit integer), W (32-bit integer), D (DP), or S (SP). Both operands are FPRs. |
| C.__.D, C.__.S | DP and SP compares: "__" = LT,GT,LE,GE,EQ,NE; sets bit in FP status register |

**Figure 1.5** Subset of the instructions in MIPS64. SP = single precision; DP = double precision. Appendix A gives much more detail on MIPS64. For data, the most significant bit number is 0; least is 63.

**14** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

6. *Control flow instructions*—Virtually all ISAs, including these three, support conditional branches, unconditional jumps, procedure calls, and returns. All three use PC-relative addressing, where the branch address is specified by an address field that is added to the PC. There are some small differences. MIPS conditional branches (BE, BNE, etc.) test the contents of registers, while the 80x86 and ARM branches test condition code bits set as side effects of arithmetic/logic operations. The ARM and MIPS procedure call places the return address in a register, while the 80x86 call (CALLF) places the return address on a stack in memory.

7. *Encoding an ISA*—There are two basic choices on encoding: *fixed length* and v*ariable length*. All ARM and MIPS instructions are 32 bits long, which simplifies instruction decoding. Figure 1.6 shows the MIPS instruction formats. The 80x86 encoding is variable length, ranging from 1 to 18 bytes. Variable-length instructions can take less space than fixed-length instructions, so a program compiled for the 80x86 is usually smaller than the same program compiled for MIPS. Note that choices mentioned above will affect how the instructions are encoded into a binary representation. For example, the number of registers and the number of addressing modes both have a significant impact on the size of instructions, as the register field and addressing mode field can appear many times in a single instruction. (Note that ARM and MIPS later offered extensions to offer 16-bit length instructions so as to reduce program size, called Thumb or Thumb-2 and MIPS16, respectively.)

Basic instruction formats



Floating-point instruction formats



**Figure 1.6 MIPS64 instruction set architecture formats.** All instructions are 32 bits long. The R format is for integer register-to-register operations, such as DADDU, DSUBU, and so on. The I format is for data transfers, branches, and immediate instructions, such as LD, SD, BEQZ, and DADDIs. The J format is for jumps, the FR format for floating-point operations, and the FI format for floating-point branches.

PX0676-043

EXCERPT

The other challenges facing the computer architect beyond ISA design are particularly acute at the present, when the differences among instruction sets are small and when there are distinct application areas. Therefore, starting with the last edition, the bulk of instruction set material beyond this quick review is found in the appendices (see Appendices A and K).

We use a subset of MIPS64 as the example ISA in this book because it is both the dominant ISA for networking and it is an elegant example of the RISC architectures mentioned earlier, of which ARM (Advanced RISC Machine) is the most popular example. ARM processors were in 6.1 billion chips shipped in 2010, or roughly 20 times as many chips that shipped with 80x86 processors.

## Genuine Computer Architecture: Designing the Organization and Hardware to Meet Goals and Functional Requirements

The implementation of a computer has two components: organization and hardware. The term *organization* includes the high-level aspects of a computer's design, such as the memory system, the memory interconnect, and the design of the internal processor or CPU (central processing unit—where arithmetic, logic, branching, and data transfer are implemented). The term *microarchitecture* is also used instead of organization. For example, two processors with the same instruction set architectures but different organizations are the AMD Opteron and the Intel Core i7. Both processors implement the x86 instruction set, but they have very different pipeline and cache organizations.

The switch to multiple processors per microprocessor led to the term *core* to also be used for processor. Instead of saying multiprocessor microprocessor, the term *multicore* has caught on. Given that virtually all chips have multiple processors, the term central processing unit, or CPU, is fading in popularity.

*Hardware* refers to the specifics of a computer, including the detailed logic design and the packaging technology of the computer. Often a line of computers contains computers with identical instruction set architectures and nearly identical organizations, but they differ in the detailed hardware implementation. For example, the Intel Core i7 (see Chapter 3) and the Intel Xeon 7560 (see Chapter 5) are nearly identical but offer different clock rates and different memory systems, making the Xeon 7560 more effective for server computers.

In this book, the word *architecture* covers all three aspects of computer design—instruction set architecture, organization or microarchitecture, and hardware.

Computer architects must design a computer to meet functional requirements as well as price, power, performance, and availability goals. Figure 1.7 summarizes requirements to consider in designing a new computer. Often, architects also must determine what the functional requirements are, which can be a major task. The requirements may be specific features inspired by the market. Application software often drives the choice of certain functional requirements by determining how the computer will be used. If a large body of software exists for a certain instruction set architecture, the architect may decide that a new computer

**16** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

| Functional requirements | Typical features required or supported |
|---|---|
| *Application area* | *Target of computer* |
| Personal mobile device | Real-time performance for a range of tasks, including interactive performance for graphics, video, and audio; energy efficiency (Ch. 2, 3, 4, 5; App. A) |
| General-purpose desktop | Balanced performance for a range of tasks, including interactive performance for graphics, video, and audio (Ch. 2, 3, 4, 5; App. A) |
| Servers | Support for databases and transaction processing; enhancements for reliability and availability; support for scalability (Ch. 2, 5; App. A, D, F) |
| Clusters/warehouse-scale computers | Throughput performance for many independent tasks; error correction for memory; energy proportionality (Ch 2, 6; App. F) |
| Embedded computing | Often requires special support for graphics or video (or other application-specific extension); power limitations and power control may be required; real-time constraints (Ch. 2, 3, 5; App. A, E) |
| *Level of software compatibility* | *Determines amount of existing software for computer* |
| At programming language | Most flexible for designer; need new compiler (Ch. 3, 5; App. A) |
| Object code or binary compatible | Instruction set architecture is completely defined—little flexibility—but no investment needed in software or porting programs (App. A) |
| *Operating system requirements* | *Necessary features to support chosen OS (Ch. 2; App. B)* |
| Size of address space | Very important feature (Ch. 2); may limit applications |
| Memory management | Required for modern OS; may be paged or segmented (Ch. 2) |
| Protection | Different OS and application needs: page vs. segment; virtual machines (Ch. 2) |
| *Standards* | *Certain standards may be required by marketplace* |
| Floating point | Format and arithmetic: IEEE 754 standard (App. J), special arithmetic for graphics or signal processing |
| I/O interfaces | For I/O devices: Serial ATA, Serial Attached SCSI, PCI Express (App. D, F) |
| Operating systems | UNIX, Windows, Linux, CISCO IOS |
| Networks | Support required for different networks: Ethernet, Infiniband (App. F) |
| Programming languages | Languages (ANSI C, C++, Java, Fortran) affect instruction set (App. A) |

**Figure 1.7 Summary of some of the most important functional requirements an architect faces.** The left-hand column describes the class of requirement, while the right-hand column gives specific examples. The right-hand column also contains references to chapters and appendices that deal with the specific issues.

should implement an existing instruction set. The presence of a large market for a particular class of applications might encourage the designers to incorporate requirements that would make the computer competitive in that market. Later chapters examine many of these requirements and features in depth.

Architects must also be aware of important trends in both the technology and the use of computers, as such trends affect not only the future cost but also the longevity of an architecture.

## 1.4   Trends in Technology

If an instruction set architecture is to be successful, it must be designed to survive rapid changes in computer technology. After all, a successful new instruction set architecture may last decades—for example, the core of the IBM mainframe has been in use for nearly 50 years. An architect must plan for technology changes that can increase the lifetime of a successful computer.

To plan for the evolution of a computer, the designer must be aware of rapid changes in implementation technology. Five implementation technologies, which change at a dramatic pace, are critical to modern implementations:

■ *Integrated circuit logic technology*—Transistor density increases by about 35% per year, quadrupling somewhat over four years. Increases in die size are less predictable and slower, ranging from 10% to 20% per year. The combined effect is a growth rate in transistor count on a chip of about 40% to 55% per year, or doubling every 18 to 24 months. This trend is popularly known as Moore's law. Device speed scales more slowly, as we discuss below.

■ *Semiconductor DRAM* (dynamic random-access memory)—Now that most DRAM chips are primarily shipped in DIMM modules, it is harder to track chip capacity, as DRAM manufacturers typically offer several capacity products at the same time to match DIMM capacity. Capacity per DRAM chip has increased by about 25% to 40% per year recently, doubling roughly every two to three years. This technology is the foundation of main memory, and we discuss it in Chapter 2. Note that the rate of improvement has continued to slow over the editions of this book, as Figure 1.8 shows. There is even concern as whether the growth rate will stop in the middle of this decade due to the increasing difficulty of efficiently manufacturing even smaller DRAM cells [Kim 2005]. Chapter 2 mentions several other technologies that may replace DRAM if it hits a capacity wall.

| CA:AQA Edition | Year | DRAM growth rate | Characterization of impact on DRAM capacity |
|---|---|---|---|
| 1 | 1990 | 60%/year | Quadrupling every 3 years |
| 2 | 1996 | 60%/year | Quadrupling every 3 years |
| 3 | 2003 | 40%–60%/year | Quadrupling every 3 to 4 years |
| 4 | 2007 | 40%/year | Doubling every 2 years |
| 5 | 2011 | 25%–40%/year | Doubling every 2 to 3 years |

**Figure 1.8** Change in rate of improvement in DRAM capacity over time. The first two editions even called this rate the DRAM Growth Rule of Thumb, since it had been so dependable since 1977 with the 16-kilobit DRAM through 1996 with the 64-megabit DRAM. Today, some question whether DRAM capacity can improve at all in 5 to 7 years, due to difficulties in manufacturing an increasingly three-dimensional DRAM cell [Kim 2005].

PX0676-046

- *Semiconductor Flash* (electrically erasable programmable read-only memory)—This nonvolatile semiconductor memory is the standard storage device in PMDs, and its rapidly increasing popularity has fueled its rapid growth rate in capacity. Capacity per Flash chip has increased by about 50% to 60% per year recently, doubling roughly every two years. In 2011, Flash memory is 15 to 20 times cheaper per bit than DRAM. Chapter 2 describes Flash memory.

- *Magnetic disk technology*—Prior to 1990, density increased by about 30% per year, doubling in three years. It rose to 60% per year thereafter, and increased to 100% per year in 1996. Since 2004, it has dropped back to about 40% per year, or doubled every three years. Disks are 15 to 25 times cheaper per bit than Flash. Given the slowed growth rate of DRAM, disks are now 300 to 500 times cheaper per bit than DRAM. This technology is central to server and warehouse scale storage, and we discuss the trends in detail in Appendix D.

- *Network technology*—Network performance depends both on the performance of switches and on the performance of the transmission system. We discuss the trends in networking in Appendix F.

These rapidly changing technologies shape the design of a computer that, with speed and technology enhancements, may have a lifetime of three to five years. Key technologies such as DRAM, Flash, and disk change sufficiently that the designer must plan for these changes. Indeed, designers often design for the next technology, knowing that when a product begins shipping in volume that the next technology may be the most cost-effective or may have performance advantages. Traditionally, cost has decreased at about the rate at which density increases.

Although technology improves continuously, the impact of these improvements can be in discrete leaps, as a threshold that allows a new capability is reached. For example, when MOS technology reached a point in the early 1980s where between 25,000 and 50,000 transistors could fit on a single chip, it became possible to build a single-chip, 32-bit microprocessor. By the late 1980s, first-level caches could go on a chip. By eliminating chip crossings within the processor and between the processor and the cache, a dramatic improvement in cost-performance and energy-performance was possible. This design was simply infeasible until the technology reached a certain point. With multicore microprocessors and increasing numbers of cores each generation, even server computers are increasingly headed toward a single chip for all processors. Such technology thresholds are not rare and have a significant impact on a wide variety of design decisions.

## Performance Trends: Bandwidth over Latency

As we shall see in Section 1.8, *bandwidth* or *throughput* is the total amount of work done in a given time, such as megabytes per second for a disk transfer. In contrast, *latency* or *response time* is the time between the start and the completion of an event, such as milliseconds for a disk access. Figure 1.9 plots the relative



**Figure 1.9** **Log–log plot of bandwidth and latency milestones from Figure 1.10 relative to the first milestone.** Note that latency improved 6X to 80X while bandwidth improved about 300X to 25,000X. Updated from Patterson [2004].

improvement in bandwidth and latency for technology milestones for microprocessors, memory, networks, and disks. Figure 1.10 describes the examples and milestones in more detail.

Performance is the primary differentiator for microprocessors and networks, so they have seen the greatest gains: 10,000–25,000X in bandwidth and 30–80X in latency. Capacity is generally more important than performance for memory and disks, so capacity has improved most, yet bandwidth advances of 300–1200X are still much greater than gains in latency of 6–8X.

Clearly, bandwidth has outpaced latency across these technologies and will likely continue to do so. A simple rule of thumb is that bandwidth grows by at least the square of the improvement in latency. Computer designers should plan accordingly.

## Scaling of Transistor Performance and Wires

Integrated circuit processes are characterized by the *feature size*, which is the minimum size of a transistor or a wire in either the $x$ or $y$ dimension. Feature sizes have decreased from 10 microns in 1971 to 0.032 microns in 2011; in fact, we have switched units, so production in 2011 is referred to as "32 nanometers," and 22 nanometer chips are under way. Since the transistor count per square

PX0676-048

EXCERPT

**20** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

| Microprocessor | 16-bit address/ bus, microcoded | 32-bit address/ bus, microcoded | 5-stage pipeline, on-chip I & D caches, FPU | 2-way superscalar, 64-bit bus | Out-of-order 3-way superscalar | Out-of-order superpipelined, on-chip L2 cache | Multicore OOO 4-way on chip L3 cache, Turbo |
|---|---|---|---|---|---|---|---|
| Product | Intel 80286 | Intel 80386 | Intel 80486 | Intel Pentium | Intel Pentium Pro | Intel Pentium 4 | Intel Core i7 |
| Year | 1982 | 1985 | 1989 | 1993 | 1997 | 2001 | 2010 |
| Die size ($mm^2$) | 47 | 43 | 81 | 90 | 308 | 217 | 240 |
| Transistors | 134,000 | 275,000 | 1,200,000 | 3,100,000 | 5,500,000 | 42,000,000 | 1,170,000,000 |
| Processors/chip | 1 | 1 | 1 | 1 | 1 | 1 | 4 |
| Pins | 68 | 132 | 168 | 273 | 387 | 423 | 1366 |
| Latency (clocks) | 6 | 5 | 5 | 5 | 10 | 22 | 14 |
| Bus width (bits) | 16 | 32 | 32 | 64 | 64 | 64 | 196 |
| Clock rate (MHz) | 12.5 | 16 | 25 | 66 | 200 | 1500 | 3333 |
| Bandwidth (MIPS) | 2 | 6 | 25 | 132 | 600 | 4500 | 50,000 |
| Latency (ns) | 320 | 313 | 200 | 76 | 50 | 15 | 4 |
| Memory module | DRAM | Page mode DRAM | Fast page mode DRAM | Fast page mode DRAM | Synchronous DRAM | Double data rate SDRAM | DDR3 SDRAM |
| Module width (bits) | 16 | 16 | 32 | 64 | 64 | 64 | 64 |
| Year | 1980 | 1983 | 1986 | 1993 | 1997 | 2000 | 2010 |
| Mbits/DRAM chip | 0.06 | 0.25 | 1 | 16 | 64 | 256 | 2048 |
| Die size ($mm^2$) | 35 | 45 | 70 | 130 | 170 | 204 | 50 |
| Pins/DRAM chip | 16 | 16 | 18 | 20 | 54 | 66 | 134 |
| Bandwidth (MBytes/s) | 13 | 40 | 160 | 267 | 640 | 1600 | 16,000 |
| Latency (ns) | 225 | 170 | 125 | 75 | 62 | 52 | 37 |
| Local area network | Ethernet | Fast Ethernet | Gigabit Ethernet | 10 Gigabit Ethernet | 100 Gigabit Ethernet | | |
| IEEE standard | 802.3 | 803.3u | 802.3ab | 802.3ac | 802.3ba | | |
| Year | 1978 | 1995 | 1999 | 2003 | 2010 | | |
| Bandwidth (Mbits/sec) | 10 | 100 | 1000 | 10,000 | 100,000 | | |
| Latency ($\mu$sec) | 3000 | 500 | 340 | 190 | 100 | | |
| Hard disk | 3600 RPM | 5400 RPM | 7200 RPM | 10,000 RPM | 15,000 RPM | 15,000 RPM | |
| Product | CDC WrenI 94145-36 | Seagate ST41600 | Seagate ST15150 | Seagate ST39102 | Seagate ST373453 | Seagate ST3600057 | |
| Year | 1983 | 1990 | 1994 | 1998 | 2003 | 2010 | |
| Capacity (GB) | 0.03 | 1.4 | 4.3 | 9.1 | 73.4 | 600 | |
| Disk form factor | 5.25 inch | 5.25 inch | 3.5 inch | 3.5 inch | 3.5 inch | 3.5 inch | |
| Media diameter | 5.25 inch | 5.25 inch | 3.5 inch | 3.0 inch | 2.5 inch | 2.5 inch | |
| Interface | ST-412 | SCSI | SCSI | SCSI | SCSI | SAS | |
| Bandwidth (MBytes/s) | 0.6 | 4 | 9 | 24 | 86 | 204 | |
| Latency (ms) | 48.3 | 17.1 | 12.7 | 8.8 | 5.7 | 3.6 | |

**Figure 1.10** Performance milestones over 25 to 40 years for microprocessors, memory, networks, and disks. The microprocessor milestones are several generations of IA-32 processors, going from a 16-bit bus, microcoded 80286 to a 64-bit bus, multicore, out-of-order execution, superpipelined Core i7. Memory module milestones go from 16-bit-wide, plain DRAM to 64-bit-wide double data rate version 3 synchronous DRAM. Ethernet advanced from 10 Mbits/sec to 100 Gbits/sec. Disk milestones are based on rotation speed, improving from 3600 RPM to 15,000 RPM. Each case is best-case bandwidth, and latency is the time for a simple operation assuming no contention. Updated from Patterson [2004].

millimeter of silicon is determined by the surface area of a transistor, the density of transistors increases quadratically with a linear decrease in feature size.

The increase in transistor performance, however, is more complex. As feature sizes shrink, devices shrink quadratically in the horizontal dimension and also shrink in the vertical dimension. The shrink in the vertical dimension requires a reduction in operating voltage to maintain correct operation and reliability of the transistors. This combination of scaling factors leads to a complex interrelationship between transistor performance and process feature size. To a first approximation, transistor performance improves linearly with decreasing feature size.

The fact that transistor count improves quadratically with a linear improvement in transistor performance is both the challenge and the opportunity for which computer architects were created! In the early days of microprocessors, the higher rate of improvement in density was used to move quickly from 4-bit, to 8-bit, to 16-bit, to 32-bit, to 64-bit microprocessors. More recently, density improvements have supported the introduction of multiple processors per chip, wider SIMD units, and many of the innovations in speculative execution and caches found in Chapters 2, 3, 4, and 5.

Although transistors generally improve in performance with decreased feature size, wires in an integrated circuit do not. In particular, the signal delay for a wire increases in proportion to the product of its resistance and capacitance. Of course, as feature size shrinks, wires get shorter, but the resistance and capacitance per unit length get worse. This relationship is complex, since both resistance and capacitance depend on detailed aspects of the process, the geometry of a wire, the loading on a wire, and even the adjacency to other structures. There are occasional process enhancements, such as the introduction of copper, which provide one-time improvements in wire delay.

In general, however, wire delay scales poorly compared to transistor performance, creating additional challenges for the designer. In the past few years, in addition to the power dissipation limit, wire delay has become a major design limitation for large integrated circuits and is often more critical than transistor switching delay. Larger and larger fractions of the clock cycle have been consumed by the propagation delay of signals on wires, but power now plays an even greater role than wire delay.

## 1.5   Trends in Power and Energy in Integrated Circuits

Today, power is the biggest challenge facing the computer designer for nearly every class of computer. First, power must be brought in and distributed around the chip, and modern microprocessors use hundreds of pins and multiple interconnect layers just for power and ground. Second, power is dissipated as heat and must be removed.

### Power and Energy: A Systems Perspective

How should a system architect or a user think about performance, power, and energy? From the viewpoint of a system designer, there are three primary concerns.

First, what is the maximum power a processor ever requires? Meeting this demand can be important to ensuring correct operation. For example, if a processor attempts to draw more power than a power supply system can provide (by drawing more current than the system can supply), the result is typically a voltage drop, which can cause the device to malfunction. Modern processors can vary widely in power consumption with high peak currents; hence, they provide voltage indexing methods that allow the processor to slow down and regulate voltage within a wider margin. Obviously, doing so decreases performance.

Second, what is the sustained power consumption? This metric is widely called the *thermal design power* (TDP), since it determines the cooling requirement. TDP is neither peak power, which is often 1.5 times higher, nor is it the actual average power that will be consumed during a given computation, which is likely to be lower still. A typical power supply for a system is usually sized to exceed the TDP, and a cooling system is usually designed to match or exceed TDP. Failure to provide adequate cooling will allow the junction temperature in the processor to exceed its maximum value, resulting in device failure and possibly permanent damage. Modern processors provide two features to assist in managing heat, since the maximum power (and hence heat and temperature rise) can exceed the long-term average specified by the TDP. First, as the thermal temperature approaches the junction temperature limit, circuitry reduces the clock rate, thereby reducing power. Should this technique not be successful, a second thermal overload trip is activated to power down the chip.

The third factor that designers and users need to consider is energy and energy efficiency. Recall that power is simply energy per unit time: 1 watt = 1 joule per second. Which metric is the right one for comparing processors: energy or power? In general, energy is always a better metric because it is tied to a specific task and the time required for that task. In particular, the energy to execute a workload is equal to the average power times the execution time for the workload.

Thus, if we want to know which of two processors is more efficient for a given task, we should compare energy consumption (not power) for executing the task. For example, processor A may have a 20% higher average power consumption than processor B, but if A executes the task in only 70% of the time needed by B, its energy consumption will be $1.2 \times 0.7 = 0.84$, which is clearly better.

One might argue that in a large server or cloud, it is sufficient to consider average power, since the workload is often assumed to be infinite, but this is misleading. If our cloud were populated with processor Bs rather than As, then the cloud would do less work for the same amount of energy expended. Using energy to compare the alternatives avoids this pitfall. Whenever we have a fixed workload, whether for a warehouse-size cloud or a smartphone, comparing energy will be the right way to compare processor alternatives, as the electricity bill for the cloud and the battery lifetime for the smartphone are both determined by the energy consumed.

When is power consumption a useful measure? The primary legitimate use is as a constraint: for example, a chip might be limited to 100 watts. It can be used

as a metric if the workload is fixed, but then it's just a variation of the true metric of energy per task.

## Energy and Power within a Microprocessor

For CMOS chips, the traditional primary energy consumption has been in switching transistors, also called *dynamic energy*. The energy required per transistor is proportional to the product of the capacitive load driven by the transistor and the square of the voltage:

$$\text{Energy}_{\text{dynamic}} \propto \text{Capacitive load} \times \text{Voltage}^2$$

This equation is the energy of pulse of the logic transition of $0 \to 1 \to 0$ or $1 \to 0 \to 1$. The energy of a single transition ($0 \to 1$ or $1 \to 0$) is then:

$$\text{Energy}_{\text{dynamic}} \propto 1/2 \times \text{Capacitive load} \times \text{Voltage}^2$$

The power required per transistor is just the product of the energy of a transition multiplied by the frequency of transitions:

$$\text{Power}_{\text{dynamic}} \propto 1/2 \times \text{Capacitive load} \times \text{Voltage}^2 \times \text{Frequency switched}$$

For a fixed task, slowing clock rate reduces power, but not energy.

Clearly, dynamic power and energy are greatly reduced by lowering the voltage, so voltages have dropped from 5V to just under 1V in 20 years. The capacitive load is a function of the number of transistors connected to an output and the technology, which determines the capacitance of the wires and the transistors.

---

**Example**   Some microprocessors today are designed to have adjustable voltage, so a 15% reduction in voltage may result in a 15% reduction in frequency. What would be the impact on dynamic energy and on dynamic power?

**Answer**   Since the capacitance is unchanged, the answer for energy is the ratio of the voltages since the capacitance is unchanged:

$$\frac{\text{Energy}_{\text{new}}}{\text{Energy}_{\text{old}}} = \frac{(\text{Voltage} \times 0.85)^2}{\text{Voltage}^2} = 0.85^2 = 0.72$$

thereby reducing energy to about 72% of the original. For power, we add the ratio of the frequencies

$$\frac{\text{Power}_{\text{new}}}{\text{Power}_{\text{old}}} = 0.72 \times \frac{(\text{Frequency switched} \times 0.85)}{\text{Frequency switched}} = 0.61$$

shrinking power to about 61% of the original.

---

**24** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

As we move from one process to the next, the increase in the number of transistors switching and the frequency with which they switch dominate the decrease in load capacitance and voltage, leading to an overall growth in power consumption and energy. The first microprocessors consumed less than a watt and the first 32-bit microprocessors (like the Intel 80386) used about 2 watts, while a 3.3 GHz Intel Core i7 consumes 130 watts. Given that this heat must be dissipated from a chip that is about 1.5 cm on a side, we have reached the limit of what can be cooled by air.

Given the equation above, you would expect clock frequency growth to slow down if we can't reduce voltage or increase power per chip. Figure 1.11 shows that this has indeed been the case since 2003, even for the microprocessors in Figure 1.1 that were the highest performers each year. Note that this period of flat clock rates corresponds to the period of slow performance improvement range in Figure 1.1.



**Figure 1.11 Growth in clock rate of microprocessors in Figure 1.1.** Between 1978 and 1986, the clock rate improved less than 15% per year while performance improved by 25% per year. During the "renaissance period" of 52% performance improvement per year between 1986 and 2003, clock rates shot up almost 40% per year. Since then, the clock rate has been nearly flat, growing at less than 1% per year, while single processor performance improved at less than 22% per year.

1.5    Trends in Power and Energy in Integrated Circuits    ■    **25**

Distributing the power, removing the heat, and preventing hot spots have become increasingly difficult challenges. Power is now the major constraint to using transistors; in the past, it was raw silicon area. Hence, modern microprocessors offer many techniques to try to improve energy efficiency despite flat clock rates and constant supply voltages:

1.  *Do nothing well.* Most microprocessors today turn off the clock of inactive modules to save energy and dynamic power. For example, if no floating-point instructions are executing, the clock of the floating-point unit is disabled. If some cores are idle, their clocks are stopped.

2.  *Dynamic Voltage-Frequency Scaling (DVFS).* The second technique comes directly from the formulas above. Personal mobile devices, laptops, and even servers have periods of low activity where there is no need to operate at the highest clock frequency and voltages. Modern microprocessors typically offer a few clock frequencies and voltages in which to operate that use lower power and energy. Figure 1.12 plots the potential power savings via DVFS for a server as the workload shrinks for three different clock rates: 2.4 GHz, 1.8 GHz, and 1 GHz. The overall server power savings is about 10% to 15% for each of the two steps.

3.  *Design for typical case.* Given that PMDs and laptops are often idle, memory and storage offer low power modes to save energy. For example, DRAMs have a series of increasingly lower power modes to extend battery life in PMDs and laptops, and there have been proposals for disks that have a mode that spins at lower rates when idle to save power. Alas, you cannot access DRAMs or disks in these modes, so you must return to fully active mode to read or write, no matter how low the access rate. As mentioned



**Figure 1.12** **Energy savings for a server using an AMD Opteron microprocessor, 8 GB of DRAM, and one ATA disk.** At 1.8 GHz, the server can only handle up to two-thirds of the workload without causing service level violations, and, at 1.0 GHz, it can only safely handle one-third of the workload. (Figure 5.11 in Barroso and Hölzle [2009].)

PX0676-054

EXCERPT

**26**  ■  Chapter One  *Fundamentals of Quantitative Design and Analysis*

above, microprocessors for PCs have been designed instead for a more typical case of heavy use at high operating temperatures, relying on on-chip temperature sensors to detect when activity should be reduced automatically to avoid overheating. This "emergency slowdown" allows manufacturers to design for a more typical case and then rely on this safety mechanism if someone really does run programs that consume much more power than is typical.

4.  *Overclocking*. Intel started offering *Turbo mode* in 2008, where the chip decides that it is safe to run at a higher clock rate for a short time possibly on just a few cores until temperature starts to rise. For example, the 3.3 GHz Core i7 can run in short bursts for 3.6 GHz. Indeed, the highest-performing microprocessors each year since 2008 in Figure 1.1 have all offered temporary overclocking of about 10% over the nominal clock rate. For single threaded code, these microprocessors can turn off all cores but one and run it at an even higher clock rate. Note that while the operating system can turn off Turbo mode there is no notification once it is enabled, so the programmers may be surprised to see their programs vary in performance due to room temperature!

Although dynamic power is traditionally thought of as the primary source of power dissipation in CMOS, static power is becoming an important issue because leakage current flows even when a transistor is off:

$$\text{Power}_{\text{static}} \propto \text{Current}_{\text{static}} \times \text{Voltage}$$

That is, static power is proportional to number of devices.

Thus, increasing the number of transistors increases power even if they are idle, and leakage current increases in processors with smaller transistor sizes. As a result, very low power systems are even turning off the power supply (*power gating*) to inactive modules to control loss due to leakage. In 2011, the goal for leakage is 25% of the total power consumption, with leakage in high-performance designs sometimes far exceeding that goal. Leakage can be as high as 50% for such chips, in part because of the large SRAM caches that need power to maintain the storage values. (The S in SRAM is for static.) The only hope to stop leakage is to turn off power to subsets of the chips.

Finally, because the processor is just a portion of the whole energy cost of a system, it can make sense to use a faster, less energy-efficient processor to allow the rest of the system to go into a sleep mode. This strategy is known as *race-to-halt*.

The importance of power and energy has increased the scrutiny on the efficiency of an innovation, so the primary evaluation now is tasks per joule or performance per watt as opposed to performance per $\text{mm}^2$ of silicon. This new metric affects approaches to parallelism, as we shall see in Chapters 4 and 5.

PX0676-055

## 1.6    **Trends in Cost**

Although costs tend to be less important in some computer designs—specifically supercomputers—cost-sensitive designs are of growing significance. Indeed, in the past 30 years, the use of technology improvements to lower cost, as well as increase performance, has been a major theme in the computer industry.

Textbooks often ignore the cost half of cost-performance because costs change, thereby dating books, and because the issues are subtle and differ across industry segments. Yet, an understanding of cost and its factors is essential for computer architects to make intelligent decisions about whether or not a new feature should be included in designs where cost is an issue. (Imagine architects designing skyscrapers without any information on costs of steel beams and concrete!)

This section discusses the major factors that influence the cost of a computer and how these factors are changing over time.

### The Impact of Time, Volume, and Commoditization

The cost of a manufactured computer component decreases over time even without major improvements in the basic implementation technology. The underlying principle that drives costs down is the *learning curve*—manufacturing costs decrease over time. The learning curve itself is best measured by change in *yield*—the percentage of manufactured devices that survives the testing procedure. Whether it is a chip, a board, or a system, designs that have twice the yield will have half the cost.

Understanding how the learning curve improves yield is critical to projecting costs over a product's life. One example is that the price per megabyte of DRAM has dropped over the long term. Since DRAMs tend to be priced in close relationship to cost—with the exception of periods when there is a shortage or an oversupply—price and cost of DRAM track closely.

Microprocessor prices also drop over time, but, because they are less standardized than DRAMs, the relationship between price and cost is more complex. In a period of significant competition, price tends to track cost closely, although microprocessor vendors probably rarely sell at a loss.

Volume is a second key factor in determining cost. Increasing volumes affect cost in several ways. First, they decrease the time needed to get down the learning curve, which is partly proportional to the number of systems (or chips) manufactured. Second, volume decreases cost, since it increases purchasing and manufacturing efficiency. As a rule of thumb, some designers have estimated that cost decreases about 10% for each doubling of volume. Moreover, volume decreases the amount of development cost that must be amortized by each computer, thus allowing cost and selling price to be closer.

*Commodities* are products that are sold by multiple vendors in large volumes and are essentially identical. Virtually all the products sold on the shelves of grocery stores are commodities, as are standard DRAMs, Flash memory, disks,

monitors, and keyboards. In the past 25 years, much of the personal computer industry has become a commodity business focused on building desktop and laptop computers running Microsoft Windows.

Because many vendors ship virtually identical products, the market is highly competitive. Of course, this competition decreases the gap between cost and selling price, but it also decreases cost. Reductions occur because a commodity market has both volume and a clear product definition, which allows multiple suppliers to compete in building components for the commodity product. As a result, the overall product cost is lower because of the competition among the suppliers of the components and the volume efficiencies the suppliers can achieve. This rivalry has led to the low end of the computer business being able to achieve better price-performance than other sectors and yielded greater growth at the low end, although with very limited profits (as is typical in any commodity business).

## Cost of an Integrated Circuit

Why would a computer architecture book have a section on integrated circuit costs? In an increasingly competitive computer marketplace where standard parts—disks, Flash memory, DRAMs, and so on—are becoming a significant portion of any system's cost, integrated circuit costs are becoming a greater portion of the cost that varies between computers, especially in the high-volume, cost-sensitive portion of the market. Indeed, with personal mobile devices' increasing reliance of whole *systems on a chip* (SOC), the cost of the integrated circuits is much of the cost of the PMD. Thus, computer designers must understand the costs of chips to understand the costs of current computers.

Although the costs of integrated circuits have dropped exponentially, the basic process of silicon manufacture is unchanged: A *wafer* is still tested and chopped into *dies* that are packaged (see Figures 1.13, 1.14, and 1.15). Thus, the cost of a packaged integrated circuit is

$$\text{Cost of integrated circuit} = \frac{\text{Cost of die} + \text{Cost of testing die} + \text{Cost of packaging and final test}}{\text{Final test yield}}$$

In this section, we focus on the cost of dies, summarizing the key issues in testing and packaging at the end.

Learning how to predict the number of good chips per wafer requires first learning how many dies fit on a wafer and then learning how to predict the percentage of those that will work. From there it is simple to predict cost:

$$\text{Cost of die} = \frac{\text{Cost of wafer}}{\text{Dies per wafer} \times \text{Die yield}}$$

The most interesting feature of this first term of the chip cost equation is its sensitivity to die size, shown below.



**Figure 1.13** Photograph of an Intel Core i7 microprocessor die, which is evaluated in **Chapters 2** through **5.** The dimensions are 18.9 mm by 13.6 mm (257 mm$^2$) in a 45 nm process. (Courtesy Intel.)



**Figure 1.14** Floorplan of Core i7 die in **Figure 1.13** on left with close-up of floorplan of second core on right.

PX0676-058

EXCERPT

**30** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*



**Figure 1.15** This 300 mm wafer contains 280 full Sandy Bridge dies, each 20.7 by 10.5 mm in a 32 nm process. (Sandy Bridge is Intel's successor to Nehalem used in the Core i7.) At 216 mm², the formula for dies per wafer estimates 282. (Courtesy Intel.)

The number of dies per wafer is approximately the area of the wafer divided by the area of the die. It can be more accurately estimated by

$$\text{Dies per wafer} = \frac{\pi \times (\text{Wafer diameter/2})^2}{\text{Die area}} - \frac{\pi \times \text{Wafer diameter}}{\sqrt{2} \times \text{Die area}}$$

The first term is the ratio of wafer area ($\pi r^2$) to die area. The second compensates for the "square peg in a round hole" problem—rectangular dies near the periphery of round wafers. Dividing the circumference ($\pi d$) by the diagonal of a square die is approximately the number of dies along the edge.

**Example**   Find the number of dies per 300 mm (30 cm) wafer for a die that is 1.5 cm on a side and for a die that is 1.0 cm on a side.

**Answer**   When die area is 2.25 cm$^2$:

$$\text{Dies per wafer} = \frac{\pi \times (30/2)^2}{2.25} - \frac{\pi \times 30}{\sqrt{2 \times 2.25}} = \frac{706.9}{2.25} - \frac{94.2}{2.12} = 270$$

Since the area of the larger die is 2.25 times bigger, there are roughly 2.25 as many smaller dies per wafer:

$$\text{Dies per wafer} = \frac{\pi \times (30/2)^2}{1.00} - \frac{\pi \times 30}{\sqrt{2 \times 1.00}} = \frac{706.9}{1.00} - \frac{94.2}{1.41} = 640$$

However, this formula only gives the maximum number of dies per wafer. The critical question is: What is the fraction of good dies on a wafer, or the *die yield*? A simple model of integrated circuit yield, which assumes that defects are randomly distributed over the wafer and that yield is inversely proportional to the complexity of the fabrication process, leads to the following:

$$\text{Die yield} = \text{Wafer yield} \times 1/(1 + \text{Defects per unit area} \times \text{Die area})^N$$

This Bose–Einstein formula is an empirical model developed by looking at the yield of many manufacturing lines [Sydow 2006]. *Wafer yield* accounts for wafers that are completely bad and so need not be tested. For simplicity, we'll just assume the wafer yield is 100%. Defects per unit area is a measure of the random manufacturing defects that occur. In 2010, the value was typically 0.1 to 0.3 defects per square inch, or 0.016 to 0.057 defects per square centimeter, for a 40 nm process, as it depends on the maturity of the process (recall the learning curve, mentioned earlier). Finally, $N$ is a parameter called the process-complexity factor, a measure of manufacturing difficulty. For 40 nm processes in 2010, $N$ ranged from 11.5 to 15.5.

**Example**   Find the die yield for dies that are 1.5 cm on a side and 1.0 cm on a side, assuming a defect density of 0.031 per cm$^2$ and $N$ is 13.5.

**Answer**   The total die areas are 2.25 cm$^2$ and 1.00 cm$^2$. For the larger die, the yield is

$$\text{Die yield} = 1/(1 + 0.031 \times 2.25)^{13.5} = 0.40$$

For the smaller die, the yield is

$$\text{Die yield} = 1/(1 + 0.031 \times 1.00)^{13.5} = 0.66$$

That is, less than half of all the large dies are good but two-thirds of the small dies are good.

**32** ▪ Chapter One *Fundamentals of Quantitative Design and Analysis*

The bottom line is the number of good dies per wafer, which comes from multiplying dies per wafer by die yield to incorporate the effects of defects. The examples above predict about 109 good 2.25 $cm^2$ dies from the 300 mm wafer and 424 good 1.00 $cm^2$ dies. Many microprocessors fall between these two sizes. Low-end embedded 32-bit processors are sometimes as small as 0.10 $cm^2$, and processors used for embedded control (in printers, microwaves, and so on) are often less than 0.04 $cm^2$.

Given the tremendous price pressures on commodity products such as DRAM and SRAM, designers have included redundancy as a way to raise yield. For a number of years, DRAMs have regularly included some redundant memory cells, so that a certain number of flaws can be accommodated. Designers have used similar techniques in both standard SRAMs and in large SRAM arrays used for caches within microprocessors. Obviously, the presence of redundant entries can be used to boost the yield significantly.

Processing of a 300 mm (12-inch) diameter wafer in a leading-edge technology cost between $5000 and $6000 in 2010. Assuming a processed wafer cost of $5500, the cost of the 1.00 $cm^2$ die would be around $13, but the cost per die of the 2.25 $cm^2$ die would be about $51, or almost four times the cost for a die that is a little over twice as large.

What should a computer designer remember about chip costs? The manufacturing process dictates the wafer cost, wafer yield, and defects per unit area, so the sole control of the designer is die area. In practice, because the number of defects per unit area is small, the number of good dies per wafer, and hence the cost per die, grows roughly as the square of the die area. The computer designer affects die size, and hence cost, both by what functions are included on or excluded from the die and by the number of I/O pins.

Before we have a part that is ready for use in a computer, the die must be tested (to separate the good dies from the bad), packaged, and tested again after packaging. These steps all add significant costs.

The above analysis has focused on the variable costs of producing a functional die, which is appropriate for high-volume integrated circuits. There is, however, one very important part of the fixed costs that can significantly affect the cost of an integrated circuit for low volumes (less than 1 million parts), namely, the cost of a mask set. Each step in the integrated circuit process requires a separate mask. Thus, for modern high-density fabrication processes with four to six metal layers, mask costs exceed $1M. Obviously, this large fixed cost affects the cost of prototyping and debugging runs and, for small-volume production, can be a significant part of the production cost. Since mask costs are likely to continue to increase, designers may incorporate reconfigurable logic to enhance the flexibility of a part or choose to use gate arrays (which have fewer custom mask levels) and thus reduce the cost implications of masks.

## Cost versus Price

With the commoditization of computers, the margin between the cost to manufacture a product and the price the product sells for has been shrinking. Those

margins pay for a company's research and development (R&D), marketing, sales, manufacturing equipment maintenance, building rental, cost of financing, pretax profits, and taxes. Many engineers are surprised to find that most companies spend only 4% (in the commodity PC business) to 12% (in the high-end server business) of their income on R&D, which includes all engineering.

### Cost of Manufacturing versus Cost of Operation

For the first four editions of this book, cost meant the cost to build a computer and price meant price to purchase a computer. With the advent of warehouse-scale computers, which contain tens of thousands of servers, the cost to operate the computers is significant in addition to the cost of purchase.

As Chapter 6 shows, the amortized purchase price of servers and networks is just over 60% of the monthly cost to operate a warehouse-scale computer, assuming a short lifetime of the IT equipment of 3 to 4 years. About 30% of the monthly operational costs are for power use and the amortized infrastructure to distribute power and to cool the IT equipment, despite this infrastructure being amortized over 10 years. Thus, to lower operational costs in a warehouse-scale computer, computer architects need to use energy efficiently.

## 1.7    Dependability

Historically, integrated circuits were one of the most reliable components of a computer. Although their pins may be vulnerable, and faults may occur over communication channels, the error rate inside the chip was very low. That conventional wisdom is changing as we head to feature sizes of 32 nm and smaller, as both transient faults and permanent faults will become more commonplace, so architects must design systems to cope with these challenges. This section gives a quick overview of the issues in dependability, leaving the official definition of the terms and approaches to Section D.3 in Appendix D.

Computers are designed and constructed at different layers of abstraction. We can descend recursively down through a computer seeing components enlarge themselves to full subsystems until we run into individual transistors. Although some faults are widespread, like the loss of power, many can be limited to a single component in a module. Thus, utter failure of a module at one level may be considered merely a component error in a higher-level module. This distinction is helpful in trying to find ways to build dependable computers.

One difficult question is deciding when a system is operating properly. This philosophical point became concrete with the popularity of Internet services. Infrastructure providers started offering *service level agreements* (SLAs) or *service level objectives* (SLOs) to guarantee that their networking or power service would be dependable. For example, they would pay the customer a penalty if they did not meet an agreement more than some hours per month. Thus, an SLA could be used to decide whether the system was up or down.

**34** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

Systems alternate between two states of service with respect to an SLA:

1. *Service accomplishment*, where the service is delivered as specified
2. *Service interruption*, where the delivered service is different from the SLA

Transitions between these two states are caused by *failures* (from state 1 to state 2) or *restorations* (2 to 1). Quantifying these transitions leads to the two main measures of dependability:

■ *Module reliability* is a measure of the continuous service accomplishment (or, equivalently, of the time to failure) from a reference initial instant. Hence, the *mean time to failure* (MTTF) is a reliability measure. The reciprocal of MTTF is a rate of failures, generally reported as failures per billion hours of operation, or *FIT* (for *failures in time*). Thus, an MTTF of 1,000,000 hours equals $10^9/10^6$ or 1000 FIT. Service interruption is measured as *mean time to repair* (MTTR). *Mean time between failures* (MTBF) is simply the sum of MTTF + MTTR. Although MTBF is widely used, MTTF is often the more appropriate term. If a collection of modules has exponentially distributed lifetimes—meaning that the age of a module is not important in probability of failure—the overall failure rate of the collection is the sum of the failure rates of the modules.

■ *Module availability* is a measure of the service accomplishment with respect to the alternation between the two states of accomplishment and interruption. For nonredundant systems with repair, module availability is

$$\text{Module availability} = \frac{\text{MTTF}}{(\text{MTTF} + \text{MTTR})}$$

Note that reliability and availability are now quantifiable metrics, rather than synonyms for dependability. From these definitions, we can estimate reliability of a system quantitatively if we make some assumptions about the reliability of components and that failures are independent.

---

**Example**  Assume a disk subsystem with the following components and MTTF:

■ 10 disks, each rated at 1,000,000-hour MTTF
■ 1 ATA controller, 500,000-hour MTTF
■ 1 power supply, 200,000-hour MTTF
■ 1 fan, 200,000-hour MTTF
■ 1 ATA cable, 1,000,000-hour MTTF

Using the simplifying assumptions that the lifetimes are exponentially distributed and that failures are independent, compute the MTTF of the system as a whole.

**Answer**    The sum of the failure rates is

$$\text{Failure rate}_{\text{system}} = 10 \times \frac{1}{1,000,000} + \frac{1}{500,000} + \frac{1}{200,000} + \frac{1}{200,000} + \frac{1}{1,000,000}$$

$$= \frac{10 + 2 + 5 + 5 + 1}{1,000,000 \text{ hours}} = \frac{23}{1,000,000} = \frac{23,000}{1,000,000,000 \text{ hours}}$$

or 23,000 FIT. The MTTF for the system is just the inverse of the failure rate:

$$\text{MTTF}_{\text{system}} = \frac{1}{\text{Failure rate}_{\text{system}}} = \frac{1,000,000,000 \text{ hours}}{23,000} = 43,500 \text{ hours}$$

or just under 5 years.

The primary way to cope with failure is redundancy, either in time (repeat the operation to see if it still is erroneous) or in resources (have other components to take over from the one that failed). Once the component is replaced and the system fully repaired, the dependability of the system is assumed to be as good as new. Let's quantify the benefits of redundancy with an example.

**Example**    Disk subsystems often have redundant power supplies to improve dependability. Using the components and MTTFs from above, calculate the reliability of redundant power supplies. Assume one power supply is sufficient to run the disk subsystem and that we are adding one redundant power supply.

**Answer**    We need a formula to show what to expect when we can tolerate a failure and still provide service. To simplify the calculations, we assume that the lifetimes of the components are exponentially distributed and that there is no dependency between the component failures. MTTF for our redundant power supplies is the mean time until one power supply fails divided by the chance that the other will fail before the first one is replaced. Thus, if the chance of a second failure before repair is small, then the MTTF of the pair is large.

Since we have two power supplies and independent failures, the mean time until one disk fails is $\text{MTTF}_{\text{power supply}}/2$. A good approximation of the probability of a second failure is MTTR over the mean time until the other power supply fails. Hence, a reasonable approximation for a redundant pair of power supplies is

$$\text{MTTF}_{\text{power supply pair}} = \frac{\text{MTTF}_{\text{power supply}}/2}{\dfrac{\text{MTTR}_{\text{power supply}}}{\text{MTTF}_{\text{power supply}}}} = \frac{\text{MTTF}_{\text{power supply}}^2/2}{\text{MTTR}_{\text{power supply}}} = \frac{\text{MTTF}_{\text{power supply}}^2}{2 \times \text{MTTR}_{\text{power supply}}}$$

Using the MTTF numbers above, if we assume it takes on average 24 hours for a human operator to notice that a power supply has failed and replace it, the reliability of the fault tolerant pair of power supplies is

$$\text{MTTF}_{\text{power supply pair}} = \frac{\text{MTTF}_{\text{power supply}}^2}{2 \times \text{MTTR}_{\text{power supply}}} = \frac{200,000^2}{2 \times 24} \cong 830,000,000$$

making the pair about 4150 times more reliable than a single power supply.

Having quantified the cost, power, and dependability of computer technology, we are ready to quantify performance.

## 1.8    Measuring, Reporting, and Summarizing Performance

When we say one computer is faster than another is, what do we mean? The user of a desktop computer may say a computer is faster when a program runs in less time, while an Amazon.com administrator may say a computer is faster when it completes more transactions per hour. The computer user is interested in reducing *response time*—the time between the start and the completion of an event—also referred to as *execution time*. The operator of a warehouse-scale computer may be interested in increasing *throughput*—the total amount of work done in a given time.

In comparing design alternatives, we often want to relate the performance of two different computers, say, X and Y. The phrase "X is faster than Y" is used here to mean that the response time or execution time is lower on X than on Y for the given task. In particular, "X is *n* times faster than Y" will mean:

$$\frac{\text{Execution time}_Y}{\text{Execution time}_X} = n$$

Since execution time is the reciprocal of performance, the following relationship holds:

$$n = \frac{\text{Execution time}_Y}{\text{Execution time}_X} = \frac{\dfrac{1}{\text{Performance}_Y}}{\dfrac{1}{\text{Performance}_X}} = \frac{\text{Performance}_X}{\text{Performance}_Y}$$

The phrase "the throughput of X is 1.3 times higher than Y" signifies here that the number of tasks completed per unit time on computer X is 1.3 times the number completed on Y.

Unfortunately, time is not always the metric quoted in comparing the performance of computers. Our position is that the only consistent and reliable measure of performance is the execution time of real programs, and that all proposed alternatives to time as the metric or to real programs as the items measured have eventually led to misleading claims or even mistakes in computer design.

Even execution time can be defined in different ways depending on what we count. The most straightforward definition of time is called *wall-clock time*, *response time*, or *elapsed time*, which is the latency to complete a task, including disk accesses, memory accesses, input/output activities, operating system overhead—everything. With multiprogramming, the processor works on another program while waiting for I/O and may not necessarily minimize the elapsed time of one program. Hence, we need a term to consider this activity. *CPU time* recognizes this distinction and means the time the processor is computing, *not* including the time waiting for I/O or running other programs. (Clearly, the response time seen by the user is the elapsed time of the program, not the CPU time.)

Computer users who routinely run the same programs would be the perfect candidates to evaluate a new computer. To evaluate a new system the users would simply compare the execution time of their *workloads*—the mixture of programs and operating system commands that users run on a computer. Few are in this happy situation, however. Most must rely on other methods to evaluate computers, and often other evaluators, hoping that these methods will predict performance for their usage of the new computer.

## Benchmarks

The best choice of benchmarks to measure performance is real applications, such as Google Goggles from Section 1.1. Attempts at running programs that are much simpler than a real application have led to performance pitfalls. Examples include:

■    *Kernels*, which are small, key pieces of real applications

■    *Toy programs*, which are 100-line programs from beginning programming assignments, such as quicksort

■    *Synthetic benchmarks*, which are fake programs invented to try to match the profile and behavior of real applications, such as Dhrystone

All three are discredited today, usually because the compiler writer and architect can conspire to make the computer appear faster on these stand-in programs than on real applications. Depressingly for your authors—who dropped the fallacy about using synthetic programs to characterize performance in the fourth edition of this book since we thought computer architects agreed it was disreputable—the synthetic program Dhrystone is still the most widely quoted benchmark for embedded processors!

Another issue is the conditions under which the benchmarks are run. One way to improve the performance of a benchmark has been with benchmark-specific flags; these flags often caused transformations that would be illegal on many programs or would slow down performance on others. To restrict this process and increase the significance of the results, benchmark developers often require the vendor to use one compiler and one set of flags for all the programs in the same language (C++ or C). In addition to the question of compiler flags, another question is whether source code modifications are allowed. There are three different approaches to addressing this question:

1. No source code modifications are allowed.

2. Source code modifications are allowed but are essentially impossible. For example, database benchmarks rely on standard database programs that are tens of millions of lines of code. The database companies are highly unlikely to make changes to enhance the performance for one particular computer.

3. Source modifications are allowed, as long as the modified version produces the same output.

PX0676-066

EXCERPT

**38**  ■  Chapter One  *Fundamentals of Quantitative Design and Analysis*

The key issue that benchmark designers face in deciding to allow modification of the source is whether such modifications will reflect real practice and provide useful insight to users, or whether such modifications simply reduce the accuracy of the benchmarks as predictors of real performance.

To overcome the danger of placing too many eggs in one basket, collections of benchmark applications, called *benchmark suites*, are a popular measure of performance of processors with a variety of applications. Of course, such suites are only as good as the constituent individual benchmarks. Nonetheless, a key advantage of such suites is that the weakness of any one benchmark is lessened by the presence of the other benchmarks. The goal of a benchmark suite is that it will characterize the relative performance of two computers, particularly for programs not in the suite that customers are likely to run.

A cautionary example is the Electronic Design News Embedded Microprocessor Benchmark Consortium (or EEMBC, pronounced "embassy") benchmarks. It is a set of 41 kernels used to predict performance of different embedded applications: automotive/industrial, consumer, networking, office automation, and telecommunications. EEMBC reports unmodified performance and "full fury" performance, where almost anything goes. Because these benchmarks use kernels, and because of the reporting options, EEMBC does not have the reputation of being a good predictor of relative performance of different embedded computers in the field. This lack of success is why Dhrystone, which EEMBC was trying to replace, is still used.

One of the most successful attempts to create standardized benchmark application suites has been the SPEC (Standard Performance Evaluation Corporation), which had its roots in efforts in the late 1980s to deliver better benchmarks for workstations. Just as the computer industry has evolved over time, so has the need for different benchmark suites, and there are now SPEC benchmarks to cover many application classes. All the SPEC benchmark suites and their reported results are found at *www.spec.org*.

Although we focus our discussion on the SPEC benchmarks in many of the following sections, many benchmarks have also been developed for PCs running the Windows operating system.

### Desktop Benchmarks

Desktop benchmarks divide into two broad classes: processor-intensive benchmarks and graphics-intensive benchmarks, although many graphics benchmarks include intensive processor activity. SPEC originally created a benchmark set focusing on processor performance (initially called SPEC89), which has evolved into its fifth generation: SPEC CPU2006, which follows SPEC2000, SPEC95 SPEC92, and SPEC89. SPEC CPU2006 consists of a set of 12 integer benchmarks (CINT2006) and 17 floating-point benchmarks (CFP2006). Figure 1.16 describes the current SPEC benchmarks and their ancestry.

SPEC benchmarks are real programs modified to be portable and to minimize the effect of I/O on performance. The integer benchmarks vary from part of a C

PX0676-067

| SPEC2006 benchmark description | Benchmark name by SPEC generation | | | | |
|---|---|---|---|---|---|
| | **SPEC2006** | **SPEC2000** | **SPEC95** | **SPEC92** | **SPEC89** |
| GNU C compiler | ← | | | | gcc |
| Interpreted string processing | ← | | perl | | espresso |
| Combinatorial optimization | ← | mcf | | | li |
| Block-sorting compression | ← | bzip2 | | compress | eqntott |
| Go game (AI) | go | vortex | go | sc | |
| Video compression | h264avc | gzip | ijpeg | | |
| Games/path finding | astar | eon | m88ksim | | |
| Search gene sequence | hmmer | twolf | | | |
| Quantum computer simulation | libquantum | vortex | | | |
| Discrete event simulation library | omnetpp | vpr | | | |
| Chess game (AI) | sjeng | crafty | | | |
| XML parsing | xalancbmk | parser | | | |
| CFD/blast waves | bwaves | | | | fpppp |
| Numerical relativity | cactusADM | | | | tomcatv |
| Finite element code | calculix | | | | doduc |
| Differential equation solver framework | dealII | | | | nasa7 |
| Quantum chemistry | gamess | | | | spice |
| EM solver (freq/time domain) | GemsFDTD | | | swim | matrix300 |
| Scalable molecular dynamics (~NAMD) | gromacs | | apsi | hydro2d | |
| Lattice Boltzman method (fluid/air flow) | lbm | | mgrid | su2cor | |
| Large eddie simulation/turbulent CFD | LESlie3d | wupwise | applu | wave5 | |
| Lattice quantum chromodynamics | milc | apply | turb3d | | |
| Molecular dynamics | namd | galgel | | | |
| Image ray tracing | povray | mesa | | | |
| Spare linear algebra | soplex | art | | | |
| Speech recognition | sphinx3 | equake | | | |
| Quantum chemistry/object oriented | tonto | facerec | | | |
| Weather research and forecasting | wrf | ammp | | | |
| Magneto hydrodynamics (astrophysics) | zeusmp | lucas | | | |
| | | fma3d | | | |
| | | sixtrack | | | |

**Figure 1.16** **SPEC2006 programs and the evolution of the SPEC benchmarks over time, with integer programs above the line and floating-point programs below the line.** Of the 12 SPEC2006 integer programs, 9 are written in C, and the rest in C++. For the floating-point programs, the split is 6 in Fortran, 4 in C++, 3 in C, and 4 in mixed C and Fortran. The figure shows all 70 of the programs in the 1989, 1992, 1995, 2000, and 2006 releases. The benchmark descriptions on the left are for SPEC2006 only and do not apply to earlier versions. Programs in the same row from different generations of SPEC are generally not related; for example, fpppp is not a CFD code like bwaves. Gcc is the senior citizen of the group. Only 3 integer programs and 3 floating-point programs survived three or more generations. Note that all the floating-point programs are new for SPEC2006. Although a few are carried over from generation to generation, the version of the program changes and either the input or the size of the benchmark is often changed to increase its running time and to avoid perturbation in measurement or domination of the execution time by some factor other than CPU time.

PX0676-068

compiler to a chess program to a quantum computer simulation. The floating-point benchmarks include structured grid codes for finite element modeling, particle method codes for molecular dynamics, and sparse linear algebra codes for fluid dynamics. The SPEC CPU suite is useful for processor benchmarking for both desktop systems and single-processor servers. We will see data on many of these programs throughout this text. However, note that these programs share little with programming languages and environments and the Google Goggles application that Section 1.1 describes. Seven use C++, eight use C, and nine use Fortran! They are even statically linked, and the applications themselves are dull. It's not clear that SPECINT2006 and SPECFP2006 capture what is exciting about computing in the 21st century.

In Section 1.11, we describe pitfalls that have occurred in developing the SPEC benchmark suite, as well as the challenges in maintaining a useful and predictive benchmark suite.

SPEC CPU2006 is aimed at processor performance, but SPEC offers many other benchmarks.

### Server Benchmarks

Just as servers have multiple functions, so are there multiple types of benchmarks. The simplest benchmark is perhaps a processor throughput-oriented benchmark. SPEC CPU2000 uses the SPEC CPU benchmarks to construct a simple throughput benchmark where the processing rate of a multiprocessor can be measured by running multiple copies (usually as many as there are processors) of each SPEC CPU benchmark and converting the CPU time into a rate. This leads to a measurement called the SPECrate, and it is a measure of request-level parallelism from Section 1.2. To measure thread-level parallelism, SPEC offers what they call high-performance computing benchmarks around OpenMP and MPI.

Other than SPECrate, most server applications and benchmarks have significant I/O activity arising from either disk or network traffic, including benchmarks for file server systems, for Web servers, and for database and transaction-processing systems. SPEC offers both a file server benchmark (SPECSFS) and a Web server benchmark (SPECWeb). SPECSFS is a benchmark for measuring NFS (Network File System) performance using a script of file server requests; it tests the performance of the I/O system (both disk and network I/O) as well as the processor. SPECSFS is a throughput-oriented benchmark but with important response time requirements. (Appendix D discusses some file and I/O system benchmarks in detail.) SPECWeb is a Web server benchmark that simulates multiple clients requesting both static and dynamic pages from a server, as well as clients posting data to the server. SPECjbb measures server performance for Web applications written in Java. The most recent SPEC benchmark is SPECvirt_Sc2010, which evaluates end-to-end performance of virtualized data-center servers, including hardware, the virtual machine layer, and the virtualized guest operating system. Another recent SPEC benchmark measures power, which we examine in Section 1.10.

PX0676-069

EXCERPT

Transaction-processing (TP) benchmarks measure the ability of a system to handle transactions that consist of database accesses and updates. Airline reservation systems and bank ATM systems are typical simple examples of TP; more sophisticated TP systems involve complex databases and decision-making. In the mid-1980s, a group of concerned engineers formed the vendor-independent Transaction Processing Council (TPC) to try to create realistic and fair benchmarks for TP. The TPC benchmarks are described at *www.tpc.org*.

The first TPC benchmark, TPC-A, was published in 1985 and has since been replaced and enhanced by several different benchmarks. TPC-C, initially created in 1992, simulates a complex query environment. TPC-H models ad hoc decision support—the queries are unrelated and knowledge of past queries cannot be used to optimize future queries. TPC-E is a new On-Line Transaction Processing (OLTP) workload that simulates a brokerage firm's customer accounts. The most recent effort is TPC Energy, which adds energy metrics to all the existing TPC benchmarks.

All the TPC benchmarks measure performance in transactions per second. In addition, they include a response time requirement, so that throughput performance is measured only when the response time limit is met. To model real-world systems, higher transaction rates are also associated with larger systems, in terms of both users and the database to which the transactions are applied. Finally, the system cost for a benchmark system must also be included, allowing accurate comparisons of cost-performance. TPC modified its pricing policy so that there is a single specification for all the TPC benchmarks and to allow verification of the prices that TPC publishes.

## Reporting Performance Results

The guiding principle of reporting performance measurements should be *reproducibility*—list everything another experimenter would need to duplicate the results. A SPEC benchmark report requires an extensive description of the computer and the compiler flags, as well as the publication of both the baseline and optimized results. In addition to hardware, software, and baseline tuning parameter descriptions, a SPEC report contains the actual performance times, shown both in tabular form and as a graph. A TPC benchmark report is even more complete, since it must include results of a benchmarking audit and cost information. These reports are excellent sources for finding the real costs of computing systems, since manufacturers compete on high performance and cost-performance.

## Summarizing Performance Results

In practical computer design, you must evaluate myriad design choices for their relative quantitative benefits across a suite of benchmarks believed to be relevant. Likewise, consumers trying to choose a computer will rely on performance measurements from benchmarks, which hopefully are similar to the user's applications. In both cases, it is useful to have measurements for a suite of bench-

PX0676-070

EXCERPT

marks so that the performance of important applications is similar to that of one or more benchmarks in the suite and that variability in performance can be understood. In the ideal case, the suite resembles a statistically valid sample of the application space, but such a sample requires more benchmarks than are typically found in most suites and requires a randomized sampling, which essentially no benchmark suite uses.

Once we have chosen to measure performance with a benchmark suite, we would like to be able to summarize the performance results of the suite in a single number. A straightforward approach to computing a summary result would be to compare the arithmetic means of the execution times of the programs in the suite. Alas, some SPEC programs take four times longer than others do, so those programs would be much more important if the arithmetic mean were the single number used to summarize performance. An alternative would be to add a weighting factor to each benchmark and use the weighted arithmetic mean as the single number to summarize performance. The problem would then be how to pick weights; since SPEC is a consortium of competing companies, each company might have their own favorite set of weights, which would make it hard to reach consensus. One approach is to use weights that make all programs execute an equal time on some reference computer, but this biases the results to the performance characteristics of the reference computer.

Rather than pick weights, we could normalize execution times to a reference computer by dividing the time on the reference computer by the time on the computer being rated, yielding a ratio proportional to performance. SPEC uses this approach, calling the ratio the SPECRatio. It has a particularly useful property that it matches the way we compare computer performance throughout this text—namely, comparing performance ratios. For example, suppose that the SPECRatio of computer A on a benchmark was 1.25 times higher than computer B; then we would know:

$$1.25 = \frac{\text{SPECRatio}_A}{\text{SPECRatio}_B} = \frac{\dfrac{\text{Execution time}_{\text{reference}}}{\text{Execution time}_A}}{\dfrac{\text{Execution time}_{\text{reference}}}{\text{Execution time}_B}} = \frac{\text{Execution time}_B}{\text{Execution time}_A} = \frac{\text{Performance}_A}{\text{Performance}_B}$$

Notice that the execution times on the reference computer drop out and the choice of the reference computer is irrelevant when the comparisons are made as a ratio, which is the approach we consistently use. Figure 1.17 gives an example.

Because a SPECRatio is a ratio rather than an absolute execution time, the mean must be computed using the *geometric* mean. (Since SPECRatios have no units, comparing SPECRatios arithmetically is meaningless.) The formula is

$$\text{Geometric mean} = \sqrt[n]{\prod_{i=1}^{n} sample_i}$$

PX0676-071

| Benchmarks | Ultra 5 time (sec) | Opteron time (sec) | SPECRatio | Itanium 2 time (sec) | SPECRatio | Opteron/Itanium times (sec) | Itanium/Opteron SPECRatios |
|---|---|---|---|---|---|---|---|
| wupwise | 1600 | 51.5 | 31.06 | 56.1 | 28.53 | 0.92 | 0.92 |
| swim | 3100 | 125.0 | 24.73 | 70.7 | 43.85 | 1.77 | 1.77 |
| mgrid | 1800 | 98.0 | 18.37 | 65.8 | 27.36 | 1.49 | 1.49 |
| applu | 2100 | 94.0 | 22.34 | 50.9 | 41.25 | 1.85 | 1.85 |
| mesa | 1400 | 64.6 | 21.69 | 108.0 | 12.99 | 0.60 | 0.60 |
| galgel | 2900 | 86.4 | 33.57 | 40.0 | 72.47 | 2.16 | 2.16 |
| art | 2600 | 92.4 | 28.13 | 21.0 | 123.67 | 4.40 | 4.40 |
| equake | 1300 | 72.6 | 17.92 | 36.3 | 35.78 | 2.00 | 2.00 |
| facerec | 1900 | 73.6 | 25.80 | 86.9 | 21.86 | 0.85 | 0.85 |
| ammp | 2200 | 136.0 | 16.14 | 132.0 | 16.63 | 1.03 | 1.03 |
| lucas | 2000 | 88.8 | 22.52 | 107.0 | 18.76 | 0.83 | 0.83 |
| fma3d | 2100 | 120.0 | 17.48 | 131.0 | 16.09 | 0.92 | 0.92 |
| sixtrack | 1100 | 123.0 | 8.95 | 68.8 | 15.99 | 1.79 | 1.79 |
| apsi | 2600 | 150.0 | 17.36 | 231.0 | 11.27 | 0.65 | 0.65 |
| **Geometric mean** | | | 20.86 | | 27.12 | 1.30 | 1.30 |

**Figure 1.17** SPECfp2000 execution times (in seconds) for the Sun Ultra 5—the reference computer of SPEC2000—and execution times and SPECRatios for the AMD Opteron and Intel Itanium 2. (SPEC2000 multiplies the ratio of execution times by 100 to remove the decimal point from the result, so 20.86 is reported as 2086.) The final two columns show the ratios of execution times and SPECRatios. This figure demonstrates the irrelevance of the reference computer in relative performance. The ratio of the execution times is identical to the ratio of the SPECRatios, and the ratio of the geometric means (27.12/20.86 = 1.30) is identical to the geometric mean of the ratios (1.30).

In the case of SPEC, $sample_i$ is the SPECRatio for program $i$. Using the geometric mean ensures two important properties:

1. The geometric mean of the ratios is the same as the ratio of the geometric means.

2. The ratio of the geometric means is equal to the geometric mean of the performance ratios, which implies that the choice of the reference computer is irrelevant.

Hence, the motivations to use the geometric mean are substantial, especially when we use performance ratios to make comparisons.

**Example**    Show that the ratio of the geometric means is equal to the geometric mean of the performance ratios, and that the reference computer of SPECRatio matters not.

*Answer*    Assume two computers A and B and a set of SPECRatios for each.

EXCERPT

**44** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

$$\frac{\text{Geometric mean}_A}{\text{Geometric mean}_B} = \frac{\sqrt[n]{\prod_{i=1}^{n} \text{SPECRatio A}_i}}{\sqrt[n]{\prod_{i=1}^{n} \text{SPECRatio B}_i}} = \sqrt[n]{\prod_{i=1}^{n} \frac{\text{SPECRatio A}_i}{\text{SPECRatio B}_i}}$$

$$= \sqrt[n]{\prod_{i=1}^{n} \frac{\dfrac{\text{Execution time}_{\text{reference}_i}}{\text{Execution time}_{A_i}}}{\dfrac{\text{Execution time}_{\text{reference}_i}}{\text{Execution time}_{B_i}}}} = \sqrt[n]{\prod_{i=1}^{n} \frac{\text{Execution time}_{B_i}}{\text{Execution time}_{A_i}}} = \sqrt[n]{\prod_{i=1}^{n} \frac{\text{Performance}_{A_i}}{\text{Performance}_{B_i}}}$$

That is, the ratio of the geometric means of the SPECRatios of A and B is the geometric mean of the performance ratios of A to B of all the benchmarks in the suite. Figure 1.17 demonstrates this validity using examples from SPEC.

## 1.9 Quantitative Principles of Computer Design

Now that we have seen how to define, measure, and summarize performance, cost, dependability, energy, and power, we can explore guidelines and principles that are useful in the design and analysis of computers. This section introduces important observations about design, as well as two equations to evaluate alternatives.

### Take Advantage of Parallelism

Taking advantage of parallelism is one of the most important methods for improving performance. Every chapter in this book has an example of how performance is enhanced through the exploitation of parallelism. We give three brief examples here, which are expounded on in later chapters.

Our first example is the use of parallelism at the system level. To improve the throughput performance on a typical server benchmark, such as SPECWeb or TPC-C, multiple processors and multiple disks can be used. The workload of handling requests can then be spread among the processors and disks, resulting in improved throughput. Being able to expand memory and the number of processors and disks is called *scalability*, and it is a valuable asset for servers. Spreading of data across many disks for parallel reads and writes enables data-level parallelism. SPECWeb also relies on request-level parallelism to use many processors while TPC-C uses thread-level parallelism for faster processing of database queries.

At the level of an individual processor, taking advantage of parallelism among instructions is critical to achieving high performance. One of the simplest ways to do this is through pipelining. (It is explained in more detail in Appendix C and is a major focus of Chapter 3.) The basic idea behind pipelining

PX0676-073

is to overlap instruction execution to reduce the total time to complete an instruction sequence. A key insight that allows pipelining to work is that not every instruction depends on its immediate predecessor, so executing the instructions completely or partially in parallel may be possible. Pipelining is the best-known example of instruction-level parallelism.

Parallelism can also be exploited at the level of detailed digital design. For example, set-associative caches use multiple banks of memory that are typically searched in parallel to find a desired item. Modern ALUs (arithmetic-logical units) use carry-lookahead, which uses parallelism to speed the process of computing sums from linear to logarithmic in the number of bits per operand. These are more examples of data-level parallelism.

## Principle of Locality

Important fundamental observations have come from properties of programs. The most important program property that we regularly exploit is the *principle of locality*: Programs tend to reuse data and instructions they have used recently. A widely held rule of thumb is that a program spends 90% of its execution time in only 10% of the code. An implication of locality is that we can predict with reasonable accuracy what instructions and data a program will use in the near future based on its accesses in the recent past. The principle of locality also applies to data accesses, though not as strongly as to code accesses.

Two different types of locality have been observed. *Temporal locality* states that recently accessed items are likely to be accessed in the near future. *Spatial locality* says that items whose addresses are near one another tend to be referenced close together in time. We will see these principles applied in Chapter 2.

## Focus on the Common Case

Perhaps the most important and pervasive principle of computer design is to focus on the common case: In making a design trade-off, favor the frequent case over the infrequent case. This principle applies when determining how to spend resources, since the impact of the improvement is higher if the occurrence is frequent.

Focusing on the common case works for power as well as for resource allocation and performance. The instruction fetch and decode unit of a processor may be used much more frequently than a multiplier, so optimize it first. It works on dependability as well. If a database server has 50 disks for every processor, storage dependability will dominate system dependability.

In addition, the frequent case is often simpler and can be done faster than the infrequent case. For example, when adding two numbers in the processor, we can expect overflow to be a rare circumstance and can therefore improve performance by optimizing the more common case of no overflow. This emphasis may slow down the case when overflow occurs, but if that is rare then overall performance will be improved by optimizing for the normal case.

PX0676-074

**46** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

We will see many cases of this principle throughout this text. In applying this simple principle, we have to decide what the frequent case is and how much performance can be improved by making that case faster. A fundamental law, called *Amdahl's law,* can be used to quantify this principle.

## Amdahl's Law

The performance gain that can be obtained by improving some portion of a computer can be calculated using Amdahl's law. Amdahl's law states that the performance improvement to be gained from using some faster mode of execution is limited by the fraction of the time the faster mode can be used.

Amdahl's law defines the *speedup* that can be gained by using a particular feature. What is speedup? Suppose that we can make an enhancement to a computer that will improve performance when it is used. Speedup is the ratio:

$$\text{Speedup} = \frac{\text{Performance for entire task using the enhancement when possible}}{\text{Performance for entire task without using the enhancement}}$$

Alternatively,

$$\text{Speedup} = \frac{\text{Execution time for entire task without using the enhancement}}{\text{Execution time for entire task using the enhancement when possible}}$$

Speedup tells us how much faster a task will run using the computer with the enhancement as opposed to the original computer.

Amdahl's law gives us a quick way to find the speedup from some enhancement, which depends on two factors:

1. *The fraction of the computation time in the original computer that can be converted to take advantage of the enhancement*—For example, if 20 seconds of the execution time of a program that takes 60 seconds in total can use an enhancement, the fraction is 20/60. This value, which we will call $\text{Fraction}_{\text{enhanced}}$, is always less than or equal to 1.

2. *The improvement gained by the enhanced execution mode, that is, how much faster the task would run if the enhanced mode were used for the entire program*—This value is the time of the original mode over the time of the enhanced mode. If the enhanced mode takes, say, 2 seconds for a portion of the program, while it is 5 seconds in the original mode, the improvement is 5/2. We will call this value, which is always greater than 1, $\text{Speedup}_{\text{enhanced}}$.

The execution time using the original computer with the enhanced mode will be the time spent using the unenhanced portion of the computer plus the time spent using the enhancement:

$$\text{Execution time}_{\text{new}} = \text{Execution time}_{\text{old}} \times \left( (1 - \text{Fraction}_{\text{enhanced}}) + \frac{\text{Fraction}_{\text{enhanced}}}{\text{Speedup}_{\text{enhanced}}} \right)$$

EXCERPT

The overall speedup is the ratio of the execution times:

$$\text{Speedup}_{\text{overall}} = \frac{\text{Execution time}_{\text{old}}}{\text{Execution time}_{\text{new}}} = \frac{1}{(1 - \text{Fraction}_{\text{enhanced}}) + \dfrac{\text{Fraction}_{\text{enhanced}}}{\text{Speedup}_{\text{enhanced}}}}$$

**Example**    Suppose that we want to enhance the processor used for Web serving. The new processor is 10 times faster on computation in the Web serving application than the original processor. Assuming that the original processor is busy with computation 40% of the time and is waiting for I/O 60% of the time, what is the overall speedup gained by incorporating the enhancement?

**Answer**    $\text{Fraction}_{\text{enhanced}} = 0.4$; $\text{Speedup}_{\text{enhanced}} = 10$; $\text{Speedup}_{\text{overall}} = \dfrac{1}{0.6 + \dfrac{0.4}{10}} = \dfrac{1}{0.64} \approx 1.56$

Amdahl's law expresses the law of diminishing returns: The incremental improvement in speedup gained by an improvement of just a portion of the computation diminishes as improvements are added. An important corollary of Amdahl's law is that if an enhancement is only usable for a fraction of a task then we can't speed up the task by more than the reciprocal of 1 minus that fraction.

A common mistake in applying Amdahl's law is to confuse "fraction of time converted *to use an enhancement*" and "fraction of time *after enhancement is in use*." If, instead of measuring the time that we *could use* the enhancement in a computation, we measure the time *after* the enhancement is in use, the results will be incorrect!

Amdahl's law can serve as a guide to how much an enhancement will improve performance and how to distribute resources to improve cost-performance. The goal, clearly, is to spend resources proportional to where time is spent. Amdahl's law is particularly useful for comparing the overall system performance of two alternatives, but it can also be applied to compare two processor design alternatives, as the following example shows.

**Example**    A common transformation required in graphics processors is square root. Implementations of floating-point (FP) square root vary significantly in performance, especially among processors designed for graphics. Suppose FP square root (FPSQR) is responsible for 20% of the execution time of a critical graphics benchmark. One proposal is to enhance the FPSQR hardware and speed up this operation by a factor of 10. The other alternative is just to try to make all FP instructions in the graphics processor run faster by a factor of 1.6; FP instructions are responsible for half of the execution time for the application. The design team believes that they can make all FP instructions run 1.6 times faster with the same effort as required for the fast square root. Compare these two design alternatives.

PX0676-076

EXCERPT

**48** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

*Answer*    We can compare these two alternatives by comparing the speedups:

$$\text{Speedup}_{FPSQR} = \frac{1}{(1-0.2) + \frac{0.2}{10}} = \frac{1}{0.82} = 1.22$$

$$\text{Speedup}_{FP} = \frac{1}{(1-0.5) + \frac{0.5}{1.6}} = \frac{1}{0.8125} = 1.23$$

Improving the performance of the FP operations overall is slightly better because of the higher frequency.

---

Amdahl's law is applicable beyond performance. Let's redo the reliability example from page 35 after improving the reliability of the power supply via redundancy from 200,000-hour to 830,000,000-hour MTTF, or 4150X better.

---

*Example*    The calculation of the failure rates of the disk subsystem was

$$\text{Failure rate}_{system} = 10 \times \frac{1}{1,000,000} + \frac{1}{500,000} + \frac{1}{200,000} + \frac{1}{200,000} + \frac{1}{1,000,000}$$

$$= \frac{10 + 2 + 5 + 5 + 1}{1,000,000 \text{ hours}} = \frac{23}{1,000,000 \text{ hours}}$$

Therefore, the fraction of the failure rate that could be improved is 5 per million hours out of 23 for the whole system, or 0.22.

*Answer*    The reliability improvement would be

$$\text{Improvement}_{power\ supply\ pair} = \frac{1}{(1-0.22) + \frac{0.22}{4150}} = \frac{1}{0.78} = 1.28$$

Despite an impressive 4150X improvement in reliability of one module, from the system's perspective, the change has a measurable but small benefit.

---

In the examples above, we needed the fraction consumed by the new and improved version; often it is difficult to measure these times directly. In the next section, we will see another way of doing such comparisons based on the use of an equation that decomposes the CPU execution time into three separate components. If we know how an alternative affects these three components, we can determine its overall performance. Furthermore, it is often possible to build simulators that measure these components before the hardware is actually designed.

## The Processor Performance Equation

Essentially all computers are constructed using a clock running at a constant rate. These discrete time events are called *ticks*, *clock ticks*, *clock periods*, *clocks*,

*cycles*, or *clock cycles*. Computer designers refer to the time of a clock period by its duration (e.g., 1 ns) or by its rate (e.g., 1 GHz). CPU time for a program can then be expressed two ways:

$$\text{CPU time} = \text{CPU clock cycles for a program} \times \text{Clock cycle time}$$

or

$$\text{CPU time} = \frac{\text{CPU clock cycles for a program}}{\text{Clock rate}}$$

In addition to the number of clock cycles needed to execute a program, we can also count the number of instructions executed—the *instruction path length* or *instruction count* (IC). If we know the number of clock cycles and the instruction count, we can calculate the average number of *clock cycles per instruction* (CPI). Because it is easier to work with, and because we will deal with simple processors in this chapter, we use CPI. Designers sometimes also use *instructions per clock* (IPC), which is the inverse of CPI.

CPI is computed as

$$\text{CPI} = \frac{\text{CPU clock cycles for a program}}{\text{Instruction count}}$$

This processor figure of merit provides insight into different styles of instruction sets and implementations, and we will use it extensively in the next four chapters.

By transposing the instruction count in the above formula, clock cycles can be defined as $\text{IC} \times \text{CPI}$. This allows us to use CPI in the execution time formula:

$$\text{CPU time} = \text{Instruction count} \times \text{Cycles per instruction} \times \text{Clock cycle time}$$

Expanding the first formula into the units of measurement shows how the pieces fit together:

$$\frac{\text{Instructions}}{\text{Program}} \times \frac{\text{Clock cycles}}{\text{Instruction}} \times \frac{\text{Seconds}}{\text{Clock cycle}} = \frac{\text{Seconds}}{\text{Program}} = \text{CPU time}$$

As this formula demonstrates, processor performance is dependent upon three characteristics: clock cycle (or rate), clock cycles per instruction, and instruction count. Furthermore, CPU time is *equally* dependent on these three characteristics; for example, a 10% improvement in any one of them leads to a 10% improvement in CPU time.

Unfortunately, it is difficult to change one parameter in complete isolation from others because the basic technologies involved in changing each characteristic are interdependent:

■  *Clock cycle time*—Hardware technology and organization

■  *CPI*—Organization and instruction set architecture

■  *Instruction count*—Instruction set architecture and compiler technology

PX0676-078

Luckily, many potential performance improvement techniques primarily improve one component of processor performance with small or predictable impacts on the other two.

Sometimes it is useful in designing the processor to calculate the number of total processor clock cycles as

$$\text{CPU clock cycles} = \sum_{i=1}^{n} \text{IC}_i \times \text{CPI}_i$$

where $\text{IC}_i$ represents the number of times instruction $i$ is executed in a program and $\text{CPI}_i$ represents the average number of clocks per instruction for instruction $i$. This form can be used to express CPU time as

$$\text{CPU time} = \left( \sum_{i=1}^{n} \text{IC}_i \times \text{CPI}_i \right) \times \text{Clock cycle time}$$

and overall CPI as

$$\text{CPI} = \frac{\sum_{i=1}^{n} \text{IC}_i \times \text{CPI}_i}{\text{Instruction count}} = \sum_{i=1}^{n} \frac{\text{IC}_i}{\text{Instruction count}} \times \text{CPI}_i$$

The latter form of the CPI calculation uses each individual $\text{CPI}_i$ and the fraction of occurrences of that instruction in a program (i.e., $\text{IC}_i \div$ Instruction count). $\text{CPI}_i$ should be measured and not just calculated from a table in the back of a reference manual since it must include pipeline effects, cache misses, and any other memory system inefficiencies.

Consider our performance example on page 47, here modified to use measurements of the frequency of the instructions and of the instruction CPI values, which, in practice, are obtained by simulation or by hardware instrumentation.

**Example**   Suppose we have made the following measurements:

Frequency of FP operations = 25%

Average CPI of FP operations = 4.0

Average CPI of other instructions = 1.33

Frequency of FPSQR = 2%

CPI of FPSQR = 20

Assume that the two design alternatives are to decrease the CPI of FPSQR to 2 or to decrease the average CPI of all FP operations to 2.5. Compare these two design alternatives using the processor performance equation.

EXCERPT

*Answer*     First, observe that only the CPI changes; the clock rate and instruction count remain identical. We start by finding the original CPI with neither enhancement:

$$\text{CPI}_{\text{original}} = \sum_{i=1}^{n} \text{CPI}_i \times \left(\frac{\text{IC}_i}{\text{Instruction count}}\right)$$

$$= (4 \times 25\%) + (1.33 \times 75\%) = 2.0$$

We can compute the CPI for the enhanced FPSQR by subtracting the cycles saved from the original CPI:

$$\text{CPI}_{\text{with new FPSQR}} = \text{CPI}_{\text{original}} - 2\% \times (\text{CPI}_{\text{old FPSQR}} - \text{CPI}_{\text{of new FPSQR only}})$$

$$= 2.0 - 2\% \times (20 - 2) = 1.64$$

We can compute the CPI for the enhancement of all FP instructions the same way or by summing the FP and non-FP CPIs. Using the latter gives us:

$$\text{CPI}_{\text{new FP}} = (75\% \times 1.33) + (25\% \times 2.5) = 1.625$$

Since the CPI of the overall FP enhancement is slightly lower, its performance will be marginally better. Specifically, the speedup for the overall FP enhancement is

$$\text{Speedup}_{\text{new FP}} = \frac{\text{CPU time}_{\text{original}}}{\text{CPU time}_{\text{new FP}}} = \frac{\text{IC} \times \text{Clock cycle} \times \text{CPI}_{\text{original}}}{\text{IC} \times \text{Clock cycle} \times \text{CPI}_{\text{new FP}}}$$

$$= \frac{\text{CPI}_{\text{original}}}{\text{CPI}_{\text{new FP}}} = \frac{2.00}{1.625} = 1.23$$

Happily, we obtained this same speedup using Amdahl's law on page 46.

It is often possible to measure the constituent parts of the processor performance equation. This is a key advantage of using the processor performance equation versus Amdahl's law in the previous example. In particular, it may be difficult to measure things such as the fraction of execution time for which a set of instructions is responsible. In practice, this would probably be computed by summing the product of the instruction count and the CPI for each of the instructions in the set. Since the starting point is often individual instruction count and CPI measurements, the processor performance equation is incredibly useful.

To use the processor performance equation as a design tool, we need to be able to measure the various factors. For an existing processor, it is easy to obtain the execution time by measurement, and we know the default clock speed. The challenge lies in discovering the instruction count or the CPI. Most new processors include counters for both instructions executed and for clock cycles. By periodically monitoring these counters, it is also possible to attach execution time and instruction count to segments of the code, which can be helpful to programmers trying to understand and tune the performance of an application. Often, a designer or programmer will want to understand performance at a more

PX0676-080

fine-grained level than what is available from the hardware counters. For example, they may want to know why the CPI is what it is. In such cases, simulation techniques used are like those for processors that are being designed.

Techniques that help with energy efficiency, such as dynamic voltage frequency scaling and overclocking (see Section 1.5), make this equation harder to use, since the clock speed may vary while we measure the program. A simple approach is to turn off those features to make the results reproducible. Fortunately, as performance and energy efficiency are often highly correlated—taking less time to run a program generally saves energy—it's probably safe to consider performance without worrying about the impact of DVFS or overclocking on the results.

## 1.10 Putting It All Together: Performance, Price, and Power

In the "Putting It All Together" sections that appear near the end of every chapter, we provide real examples that use the principles in that chapter. In this section, we look at measures of performance and power-performance in small servers using the SPECpower benchmark.

Figure 1.18 shows the three multiprocessor servers we are evaluating along with their price. To keep the price comparison fair, all are Dell PowerEdge servers. The first is the PowerEdge R710, which is based on the Intel Xeon X5670 microprocessor with a clock rate of 2.93 GHz. Unlike the Intel Core i7 in Chapters 2 through 5, which has 4 cores and an 8 MB L3 cache, this Intel chip has 6 cores and a 12 MB L3 cache, although the cores themselves are identical. We selected a two-socket system with 12 GB of ECC-protected 1333 MHz DDR3 DRAM. The next server is the PowerEdge R815, which is based on the AMD Opteron 6174 microprocessor. A chip has 6 cores and a 6 MB L3 cache, and it runs at 2.20 GHz, but AMD puts two of these chips into a single socket. Thus, a socket has 12 cores and two 6 MB L3 caches. Our second server has two sockets with 24 cores and 16 GB of ECC-protected 1333 MHz DDR3 DRAM, and our third server (also a PowerEdge R815) has four sockets with 48 cores and 32 GB of DRAM. All are running the IBM J9 JVM and the Microsoft Windows 2008 Server Enterprise x64 Edition operating system.

Note that due to the forces of benchmarking (see Section 1.11), these are unusually configured servers. The systems in Figure 1.18 have little memory relative to the amount of computation, and just a tiny 50 GB solid-state disk. It is inexpensive to add cores if you don't need to add commensurate increases in memory and storage!

Rather than run statically linked C programs of SPEC CPU, SPECpower uses a more modern software stack written in Java. It is based on SPECjbb, and it represents the server side of business applications, with performance measured as the number transactions per second, called *ssj_ops* for *server side Java operations per second*. It exercises not only the processor of the server, as does SPEC

| | System 1 | | System 2 | | System 3 | |
|---|---|---|---|---|---|---|
| | | Cost (% Cost) | | Cost (% Cost) | | Cost (% Cost) |
| **Component** | | | | | | |
| Base server | PowerEdge R710 | $653 (7%) | PowerEdge R815 | $1437 (15%) | PowerEdge R815 | $1437 (11%) |
| Power supply | 570 W | | 1100 W | | 1100 W | |
| Processor | Xeon X5670 | $3738 (40%) | Opteron 6174 | $2679 (29%) | Opteron 6174 | $5358 (42%) |
| Clock rate | 2.93 GHz | | 2.20 GHz | | 2.20 GHz | |
| Total cores | 12 | | 24 | | 48 | |
| Sockets | 2 | | 2 | | 4 | |
| Cores/socket | 6 | | 12 | | 12 | |
| DRAM | 12 GB | $484 (5%) | 16 GB | $693 (7%) | 32 GB | $1386 (11%) |
| Ethernet Inter. | Dual 1-Gbit | $199 (2%) | Dual 1-Gbit | $199 (2%) | Dual 1-Gbit | $199 (2%) |
| Disk | 50 GB SSD | $1279 (14%) | 50 GB SSD | $1279 (14%) | 50 GB SSD | $1279 (10%) |
| Windows OS | | $2999 (32%) | | $2999 (33%) | | $2999 (24%) |
| Total | | $9352 (100%) | | $9286 (100%) | | $12,658 (100%) |
| Max ssj_ops | 910,978 | | 926,676 | | 1,840,450 | |
| Max ssj_ops/$ | 97 | | 100 | | 145 | |

**Figure 1.18** **Three Dell PowerEdge servers being measured and their prices as of August 2010.** We calculated the cost of the processors by subtracting the cost of a second processor. Similarly, we calculated the overall cost of memory by seeing what the cost of extra memory was. Hence, the base cost of the server is adjusted by removing the estimated cost of the default processor and memory. Chapter 5 describes how these multi-socket systems are connected together.

CPU, but also the caches, memory system, and even the multiprocessor interconnection system. In addition, it exercises the Java Virtual Machine (JVM), including the JIT runtime compiler and garbage collector, as well as portions of the underlying operating system.

As the last two rows of Figure 1.18 show, the performance and price-performance winner is the PowerEdge R815 with four sockets and 48 cores. It hits 1.8M ssj_ops, and the ssj_ops per dollar is highest at 145. Amazingly, the computer with the largest number of cores is the most cost effective. In second place is the two-socket R815 with 24 cores, and the R710 with 12 cores is in last place.

While most benchmarks (and most computer architects) care only about performance of systems at peak load, computers rarely run at peak load. Indeed, Figure 6.2 in Chapter 6 shows the results of measuring the utilization of tens of thousands of servers over 6 months at Google, and less than 1% operate at an average utilization of 100%. The majority have an average utilization of between 10% and 50%. Thus, the SPECpower benchmark captures power as the target workload varies from its peak in 10% intervals all the way to 0%, which is called Active Idle.

Figure 1.19 plots the ssj_ops (SSJ operations/second) per watt and the average power as the target load varies from 100% to 0%. The Intel R710 always has the lowest power and the best ssj_ops per watt across each target workload level.

**54** ▪ Chapter One *Fundamentals of Quantitative Design and Analysis*



**Figure 1.19  Power-performance of the three servers in Figure 1.18.** Ssj_ops/watt values are on the left axis, with the three columns associated with it, and watts are on the right axis, with the three lines associated with it. The horizontal axis shows the target workload, as it varies from 100% to Active Idle. The Intel-based R715 has the best ssj_ops/watt at each workload level, and it also consumes the lowest power at each level.

One reason is the much larger power supply for the R815, at 1100 watts versus 570 in the R715. As Chapter 6 shows, power supply efficiency is very important in the overall power efficiency of a computer. Since watts = joules/second, this metric is proportional to SSJ operations per joule:

$$\frac{\text{ssj\_operations/sec}}{\text{Watt}} = \frac{\text{ssj\_operations/sec}}{\text{Joule/sec}} = \frac{\text{ssj\_operations}}{\text{Joule}}$$

To calculate a single number to use to compare the power efficiency of systems, SPECpower uses:

$$\text{Overall ssj\_ops/watt} = \frac{\sum \text{ssj\_ops}}{\sum \text{power}}$$

The overall ssj_ops/watt of the three servers is 3034 for the Intel R710, 2357 for the AMD dual-socket R815, and 2696 for the AMD quad-socket R815. Hence,

PX0676-083

EXCERPT

the Intel R710 has the best power-performance. Dividing by the price of the servers, the ssj_ops/watt/\$1000 is 324 for the Intel R710, 254 for the dual-socket AMD R815, and 213 for the quad-socket MD R815. Thus, adding power reverses the results of the price-performance competition, and the price-power-performance trophy goes to Intel R710; the 48-core R815 comes in last place.

## 1.11    Fallacies and Pitfalls

The purpose of this section, which will be found in every chapter, is to explain some commonly held misbeliefs or misconceptions that you should avoid. We call such misbeliefs *fallacies*. When discussing a fallacy, we try to give a counterexample. We also discuss *pitfalls*—easily made mistakes. Often pitfalls are generalizations of principles that are true in a limited context. The purpose of these sections is to help you avoid making these errors in computers that you design.

**Fallacy**    *Multiprocessors are a silver bullet.*

The switch to multiple processors per chip around 2005 did not come from some breakthrough that dramatically simplified parallel programming or made it easy to build multicore computers. The change occurred because there was no other option due to the ILP walls and power walls. Multiple processors per chip do not guarantee lower power; it's certainly possible to design a multicore chip that uses more power. The potential is just that it's possible to continue to improve performance by replacing a high-clock-rate, inefficient core with several lower-clock-rate, efficient cores. As technology improves to shrink transistors, this can shrink both capacitance and the supply voltage a bit so that we can get a modest increase in the number of cores per generation. For example, for the last few years Intel has been adding two cores per generation.

As we shall see in Chapters 4 and 5, performance is now a programmer's burden. The La-Z-Boy programmer era of relying on hardware designers to make their programs go faster without lifting a finger is officially over. If programmers want their programs to go faster with each generation, they must make their programs more parallel.

The popular version of Moore's law—increasing performance with each generation of technology—is now up to programmers.

**Pitfall**    *Falling prey to Amdahl's heartbreaking law.*

Virtually every practicing computer architect knows Amdahl's law. Despite this, we almost all occasionally expend tremendous effort optimizing some feature before we measure its usage. Only when the overall speedup is disappointing do we recall that we should have measured first before we spent so much effort enhancing it!

PX0676-084

**Pitfall** *A single point of failure.*

The calculations of reliability improvement using Amdahl's law on page 48 show that dependability is no stronger than the weakest link in a chain. No matter how much more dependable we make the power supplies, as we did in our example, the single fan will limit the reliability of the disk subsystem. This Amdahl's law observation led to a rule of thumb for fault-tolerant systems to make sure that every component was redundant so that no single component failure could bring down the whole system. Chapter 6 shows how a software layer avoids single points of failure inside warehouse-scale computers.

**Fallacy** *Hardware enhancements that increase performance improve energy efficiency or are at worst energy neutral.*

Esmaeilzadeh et al. [2011] measured SPEC2006 on just one core of a 2.67 GHz Intel Core i7 using Turbo mode (Section 1.5). Performance increased by a factor of 1.07 when the clock rate increased to 2.94 GHz (or a factor of 1.10), but the i7 used a factor of 1.37 more joules and a factor of 1.47 more watt-hours!

**Fallacy** *Benchmarks remain valid indefinitely.*

Several factors influence the usefulness of a benchmark as a predictor of real performance, and some change over time. A big factor influencing the usefulness of a benchmark is its ability to resist "benchmark engineering" or "benchmarketing." Once a benchmark becomes standardized and popular, there is tremendous pressure to improve performance by targeted optimizations or by aggressive interpretation of the rules for running the benchmark. Small kernels or programs that spend their time in a small amount of code are particularly vulnerable.

For example, despite the best intentions, the initial SPEC89 benchmark suite included a small kernel, called matrix300, which consisted of eight different $300 \times 300$ matrix multiplications. In this kernel, 99% of the execution time was in a single line (see SPEC [1989]). When an IBM compiler optimized this inner loop (using an idea called *blocking*, discussed in Chapters 2 and 4), performance improved by a factor of 9 over a prior version of the compiler! This benchmark tested compiler tuning and was not, of course, a good indication of overall performance, nor of the typical value of this particular optimization.

Over a long period, these changes may make even a well-chosen benchmark obsolete; Gcc is the lone survivor from SPEC89. Figure 1.16 on page 39 lists the status of all 70 benchmarks from the various SPEC releases. Amazingly, almost 70% of all programs from SPEC2000 or earlier were dropped from the next release.

**Fallacy** *The rated mean time to failure of disks is 1,200,000 hours or almost 140 years, so disks practically never fail.*

The current marketing practices of disk manufacturers can mislead users. How is such an MTTF calculated? Early in the process, manufacturers will put thousands

PX0676-085

of disks in a room, run them for a few months, and count the number that fail. They compute MTTF as the total number of hours that the disks worked cumulatively divided by the number that failed.

One problem is that this number far exceeds the lifetime of a disk, which is commonly assumed to be 5 years or 43,800 hours. For this large MTTF to make some sense, disk manufacturers argue that the model corresponds to a user who buys a disk and then keeps replacing the disk every 5 years—the planned lifetime of the disk. The claim is that if many customers (and their great-grandchildren) did this for the next century, on average they would replace a disk 27 times before a failure, or about 140 years.

A more useful measure would be percentage of disks that fail. Assume 1000 disks with a 1,000,000-hour MTTF and that the disks are used 24 hours a day. If you replaced failed disks with a new one having the same reliability characteristics, the number that would fail in a year (8760 hours) is

$$\text{Failed disks} = \frac{\text{Number of disks} \times \text{Time period}}{\text{MTTF}} = \frac{1000 \text{ disks} \times 8760 \text{ hours/drive}}{1,000,000 \text{ hours/failure}} = 9$$

Stated alternatively, 0.9% would fail per year, or 4.4% over a 5-year lifetime.

Moreover, those high numbers are quoted assuming limited ranges of temperature and vibration; if they are exceeded, then all bets are off. A survey of disk drives in real environments [Gray and van Ingen 2005] found that 3% to 7% of drives failed per year, for an MTTF of about 125,000 to 300,000 hours. An even larger study found annual disk failure rates of 2% to 10% [Pinheiro, Weber, and Barroso 2007]. Hence, the real-world MTTF is about 2 to 10 times worse than the manufacturer's MTTF.

**Fallacy**    *Peak performance tracks observed performance.*

The only universally true definition of peak performance is "the performance level a computer is guaranteed not to exceed." Figure 1.20 shows the percentage of peak performance for four programs on four multiprocessors. It varies from 5% to 58%. Since the gap is so large and can vary significantly by benchmark, peak performance is not generally useful in predicting observed performance.

**Pitfall**    *Fault detection can lower availability.*

This apparently ironic pitfall is because computer hardware has a fair amount of state that may not always be critical to proper operation. For example, it is not fatal if an error occurs in a branch predictor, as only performance may suffer.

In processors that try to aggressively exploit instruction-level parallelism, not all the operations are needed for correct execution of the program. Mukherjee et al. [2003] found that less than 30% of the operations were potentially on the critical path for the SPEC2000 benchmarks running on an Itanium 2.

The same observation is true about programs. If a register is "dead" in a program—that is, the program will write it before it is read again—then errors do



**Figure 1.20  Percentage of peak performance for four programs on four multiprocessors scaled to 64 processors.** The Earth Simulator and X1 are vector processors (see Chapter 4 and Appendix G). Not only did they deliver a higher fraction of peak performance, but they also had the highest peak performance and the lowest clock rates. Except for the Paratec program, the Power 4 and Itanium 2 systems delivered between 5% and 10% of their peak. From Oliker et al. [2004].

not matter. If you were to crash the program upon detection of a transient fault in a dead register, it would lower availability unnecessarily.

Sun Microsystems lived this pitfall in 2000 with an L2 cache that included parity, but not error correction, in its Sun E3000 to Sun E10000 systems. The SRAMs they used to build the caches had intermittent faults, which parity detected. If the data in the cache were not modified, the processor simply reread the data from the cache. Since the designers did not protect the cache with ECC (error-correcting code), the operating system had no choice but to report an error to dirty data and crash the program. Field engineers found no problems on inspection in more than 90% of the cases.

To reduce the frequency of such errors, Sun modified the Solaris operating system to "scrub" the cache by having a process that proactively writes dirty data to memory. Since the processor chips did not have enough pins to add ECC, the only hardware option for dirty data was to duplicate the external cache, using the copy without the parity error to correct the error.

The pitfall is in detecting faults without providing a mechanism to correct them. These engineers are unlikely to design another computer without ECC on external caches.

PX0676-087

EXCERPT

## 1.12    **Concluding Remarks**

This chapter has introduced a number of concepts and provided a quantitative framework that we will expand upon throughout the book. Starting with this edition, energy efficiency is the new companion to performance.

In Chapter 2, we start with the all-important area of memory system design. We will examine a wide range of techniques that conspire to make memory look infinitely large while still being as fast as possible. (Appendix B provides introductory material on caches for readers without much experience and background in them.) As in later chapters, we will see that hardware–software cooperation has become a key to high-performance memory systems, just as it has to high-performance pipelines. This chapter also covers virtual machines, an increasingly important technique for protection.

In Chapter 3, we look at instruction-level parallelism (ILP), of which pipelining is the simplest and most common form. Exploiting ILP is one of the most important techniques for building high-speed uniprocessors. Chapter 3 begins with an extensive discussion of basic concepts that will prepare you for the wide range of ideas examined in both chapters. Chapter 3 uses examples that span about 40 years, drawing from one of the first supercomputers (IBM 360/91) to the fastest processors in the market in 2011. It emphasizes what is called the *dynamic* or *run time approach* to exploiting ILP. It also talks about the limits to ILP ideas and introduces multithreading, which is further developed in both Chapters 4 and 5. Appendix C provides introductory material on pipelining for readers without much experience and background in pipelining. (We expect it to be a review for many readers, including those of our introductory text, *Computer Organization and Design: The Hardware/Software Interface*.)

Chapter 4 is new to this edition, and it explains three ways to exploit data-level parallelism. The classic and oldest approach is vector architecture, and we start there to lay down the principles of SIMD design. (Appendix G goes into greater depth on vector architectures.) We next explain the SIMD instruction set extensions found in most desktop microprocessors today. The third piece is an in-depth explanation of how modern graphics processing units (GPUs) work. Most GPU descriptions are written from the programmer's perspective, which usually hides how the computer really works. This section explains GPUs from an insider's perspective, including a mapping between GPU jargon and more traditional architecture terms.

Chapter 5 focuses on the issue of achieving higher performance using multiple processors, or multiprocessors. Instead of using parallelism to overlap individual instructions, multiprocessing uses parallelism to allow multiple instruction streams to be executed simultaneously on different processors. Our focus is on the dominant form of multiprocessors, shared-memory multiprocessors, though we introduce other types as well and discuss the broad issues that arise in any multiprocessor. Here again, we explore a variety of techniques, focusing on the important ideas first introduced in the 1980s and 1990s.

EXCERPT

**60**  ■  Chapter One  *Fundamentals of Quantitative Design and Analysis*

Chapter 6 is also new to this edition. We introduce clusters and then go into depth on warehouse-scale computers (WSCs), which computer architects help design. The designers of WSCs are the professional descendents of the pioneers of supercomputers such as Seymour Cray in that they are designing extreme computers. They contain tens of thousands of servers, and the equipment and building that holds them cost nearly $200 M. The concerns of price-performance and energy efficiency of the earlier chapters applies to WSCs, as does the quantitative approach to making decisions.

This book comes with an abundance of material online (see Preface for more details), both to reduce cost and to introduce readers to a variety of advanced topics. Figure 1.21 shows them all. Appendices A, B, and C, which appear in the book, will be review for many readers.

In Appendix D, we move away from a processor-centric view and discuss issues in storage systems. We apply a similar quantitative approach, but one based on observations of system behavior and using an end-to-end approach to performance analysis. It addresses the important issue of how to efficiently store and retrieve data using primarily lower-cost magnetic storage technologies. Our focus is on examining the performance of disk storage systems for typical I/O-intensive workloads, like the OLTP benchmarks we saw in this chapter. We extensively explore advanced topics in RAID-based systems, which use redundant disks to achieve both high performance and high availability. Finally, the chapter introduces queuing theory, which gives a basis for trading off utilization and latency.

Appendix E applies an embedded computing perspective to the ideas of each of the chapters and early appendices.

Appendix F explores the topic of system interconnect broadly, including wide area and system area networks that allow computers to communicate.

| Appendix | Title |
|---|---|
| A | Instruction Set Principles |
| B | Review of Memory Hierarchies |
| C | Pipelining: Basic and Intermediate Concepts |
| D | Storage Systems |
| E | Embedded Systems |
| F | Interconnection Networks |
| G | Vector Processors in More Depth |
| H | Hardware and Software for VLIW and EPIC |
| I | Large-Scale Multiprocessors and Scientific Applications |
| J | Computer Arithmetic |
| K | Survey of Instruction Set Architectures |
| L | Historical Perspectives and References |

**Figure 1.21  List of appendices.**

Appendix H reviews VLIW hardware and software, which, in contrast, are less popular than when EPIC appeared on the scene just before the last edition.

Appendix I describes large-scale multiprocessors for use in high-performance computing.

Appendix J is the only appendix that remains from the first edition, and it covers computer arithmetic.

Appendix K provides a survey of instruction architectures, including the 80x86, the IBM 360, the VAX, and many RISC architectures, including ARM, MIPS, Power, and SPARC.

We describe Appendix L below.

## 1.13    Historical Perspectives and References

Appendix L (available online) includes historical perspectives on the key ideas presented in each of the chapters in this text. These historical perspective sections allow us to trace the development of an idea through a series of machines or describe significant projects. If you're interested in examining the initial development of an idea or machine or interested in further reading, references are provided at the end of each history. For this chapter, see Section L.2, The Early Development of Computers, for a discussion on the early development of digital computers and performance measurement methodologies.

As you read the historical material, you'll soon come to realize that one of the important benefits of the youth of computing, compared to many other engineering fields, is that many of the pioneers are still alive—we can learn the history by simply asking them!

## Case Studies and Exercises by Diana Franklin

### Case Study 1: Chip Fabrication Cost

*Concepts illustrated by this case study*

- Fabrication Cost
- Fabrication Yield
- Defect Tolerance through Redundancy

There are many factors involved in the price of a computer chip. New, smaller technology gives a boost in performance and a drop in required chip area. In the smaller technology, one can either keep the small area or place more hardware on the chip in order to get more functionality. In this case study, we explore how different design decisions involving fabrication technology, area, and redundancy affect the cost of chips.

PX0676-090

EXCERPT

**62** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

| Chip | Die size (mm$^2$) | Estimated defect rate (per cm$^2$) | Manufacturing size (nm) | Transistors (millions) |
|---|---|---|---|---|
| IBM Power5 | 389 | .30 | 130 | 276 |
| Sun Niagara | 380 | .75 | 90 | 279 |
| AMD Opteron | 199 | .75 | 90 | 233 |

**Figure 1.22  Manufacturing cost factors for several modern processors.**

1.1   [10/10] <1.6> Figure 1.22 gives the relevant chip statistics that influence the cost of several current chips. In the next few exercises, you will be exploring the effect of different possible design decisions for the IBM Power5.

    a.  [10] <1.6> What is the yield for the IBM Power5?

    b.  [10] <1.6> Why does the IBM Power5 have a lower defect rate than the Niagara and Opteron?

1.2   [20/20/20/20] <1.6> It costs $1 billion to build a new fabrication facility. You will be selling a range of chips from that factory, and you need to decide how much capacity to dedicate to each chip. Your Woods chip will be 150 mm$^2$ and will make a profit of $20 per defect-free chip. Your Markon chip will be 250 mm$^2$ and will make a profit of $25 per defect-free chip. Your fabrication facility will be identical to that for the Power5. Each wafer has a 300 mm diameter.

    a.  [20] <1.6> How much profit do you make on each wafer of Woods chip?

    b.  [20] <1.6> How much profit do you make on each wafer of Markon chip?

    c.  [20] <1.6> Which chip should you produce in this facility?

    d.  [20] <1.6> What is the profit on each new Power5 chip? If your demand is 50,000 Woods chips per month and 25,000 Markon chips per month, and your facility can fabricate 150 wafers a month, how many wafers should you make of each chip?

1.3   [20/20] <1.6> Your colleague at AMD suggests that, since the yield is so poor, you might make chips more cheaply if you placed an extra core on the die and only threw out chips on which both processors had failed. We will solve this exercise by viewing the yield as a probability of no defects occurring in a certain area given the defect rate. Calculate probabilities based on each Opteron core separately (this may not be entirely accurate, since the yield equation is based on empirical evidence rather than a mathematical calculation relating the probabilities of finding errors in different portions of the chip).

    a.  [20] <1.6> What is the probability that a defect will occur on no more than one of the two processor cores?

    b.  [20] <1.6> If the old chip cost $20 dollars per chip, what will the cost be of the new chip, taking into account the new area and yield?

PX0676-091

## Case Study 2: Power Consumption in Computer Systems

*Concepts illustrated by this case study*

- Amdahl's Law
- Redundancy
- MTTF
- Power Consumption

Power consumption in modern systems is dependent on a variety of factors, including the chip clock frequency, efficiency, disk drive speed, disk drive utilization, and DRAM. The following exercises explore the impact on power that different design decisions and use scenarios have.

1.4 [20/10/20] <1.5> Figure 1.23 presents the power consumption of several computer system components. In this exercise, we will explore how the hard drive affects power consumption for the system.

    a. [20] <1.5> Assuming the maximum load for each component, and a power supply efficiency of 80%, what wattage must the server's power supply deliver to a system with an Intel Pentium 4 chip, 2 GB 240-pin Kingston DRAM, and one 7200 rpm hard drive?

    b. [10] <1.5> How much power will the 7200 rpm disk drive consume if it is idle roughly 60% of the time?

    c. [20] <1.5> Given that the time to read data off a 7200 rpm disk drive will be roughly 75% of a 5400 rpm disk, at what idle time of the 7200 rpm disk will the power consumption be equal, on average, for the two disks?

1.5 [10/10/20] <1.5> One critical factor in powering a server farm is cooling. If heat is not removed from the computer efficiently, the fans will blow hot air back onto the computer, not cold air. We will look at how different design decisions affect the necessary cooling, and thus the price, of a system. Use Figure 1.23 for your power calculations.

| Component type | Product | Performance | Power |
|---|---|---|---|
| Processor | Sun Niagara 8-core | 1.2 GHz | 72–79 W peak |
| | Intel Pentium 4 | 2 GHz | 48.9–66 W |
| DRAM | Kingston X64C3AD2 1 GB | 184-pin | 3.7 W |
| | Kingston D2N3 1 GB | 240-pin | 2.3 W |
| Hard drive | DiamondMax 16 | 5400 rpm | 7.0 W read/seek, 2.9 W idle |
| | DiamondMax 9 | 7200 rpm | 7.9 W read/seek, 4.0 W idle |

**Figure 1.23** Power consumption of several computer components.

**64** ■ Chapter One *Fundamentals of Quantitative Design and Analysis*

  a. [10] <1.5> A cooling door for a rack costs $4000 and dissipates 14 KW (into the room; additional cost is required to get it out of the room). How many servers with an Intel Pentium 4 processor, 1 GB 240-pin DRAM, and a single 7200 rpm hard drive can you cool with one cooling door?

  b. [10] <1.5> You are considering providing fault tolerance for your hard drive. RAID 1 doubles the number of disks (see Chapter 6). Now how many systems can you place on a single rack with a single cooler?

  c. [20] <1.5> Typical server farms can dissipate a maximum of 200 W per square foot. Given that a server rack requires 11 square feet (including front and back clearance), how many servers from part (a) can be placed on a single rack, and how many cooling doors are required?

1.6 [Discussion] <1.8> Figure 1.24 gives a comparison of power and performance for several benchmarks comparing two servers: Sun Fire T2000 (which uses Niagara) and IBM x346 (using Intel Xeon processors). This information was reported on a Sun Web site. There are two pieces of information reported: power and speed on two benchmarks. For the results shown, the Sun Fire T2000 is clearly superior. What other factors might be important and thus cause someone to choose the IBM x346 if it were superior in those areas?

1.7 [20/20/20/20] <1.6, 1.9> Your company's internal studies show that a single-core system is sufficient for the demand on your processing power; however, you are exploring whether you could save power by using two cores.

  a. [20] <1.9> Assume your application is 80% parallelizable. By how much could you decrease the frequency and get the same performance?

  b. [20] <1.6> Assume that the voltage may be decreased linearly with the frequency. Using the equation in Section 1.5, how much dynamic power would the dual-core system require as compared to the single-core system?

  c. [20] <1.6, 1.9> Now assume the voltage may not decrease below 25% of the original voltage. This voltage is referred to as the *voltage floor*, and any voltage lower than that will lose the state. What percent of parallelization gives you a voltage at the voltage floor?

  d. [20] <1.6, 1.9> Using the equation in Section 1.5, how much dynamic power would the dual-core system require as compared to the single-core system when taking into account the voltage floor?

|  | Sun Fire T2000 | IBM x346 |
|---|---|---|
| Power (watts) | 298 | 438 |
| SPECjbb (operations/sec) | 63,378 | 39,985 |
| Power (watts) | 330 | 438 |
| SPECWeb (composite) | 14,001 | 4348 |

**Figure 1.24** Sun power/performance comparison as selectively reported by Sun.

PX0676-093

## Exercises

1.8 [10/15/15/10/10] <1.4, 1.5> One challenge for architects is that the design created today will require several years of implementation, verification, and testing before appearing on the market. This means that the architect must project what the technology will be like several years in advance. Sometimes, this is difficult to do.

  a. [10] <1.4> According to the trend in device scaling observed by Moore's law, the number of transistors on a chip in 2015 should be how many times the number in 2005?

  b. [15] <1.5> The increase in clock rates once mirrored this trend. Had clock rates continued to climb at the same rate as in the 1990s, approximately how fast would clock rates be in 2015?

  c. [15] <1.5> At the current rate of increase, what are the clock rates now projected to be in 2015?

  d. [10] <1.4> What has limited the rate of growth of the clock rate, and what are architects doing with the extra transistors now to increase performance?

  e. [10] <1.4> The rate of growth for DRAM capacity has also slowed down. For 20 years, DRAM capacity improved by 60% each year. That rate dropped to 40% each year and now improvement is 25 to 40% per year. If this trend continues, what will be the approximate rate of growth for DRAM capacity by 2020?

1.9 [10/10] <1.5> You are designing a system for a real-time application in which specific deadlines must be met. Finishing the computation faster gains nothing. You find that your system can execute the necessary code, in the worst case, twice as fast as necessary.

  a. [10] <1.5> How much energy do you save if you execute at the current speed and turn off the system when the computation is complete?

  b. [10] <1.5> How much energy do you save if you set the voltage and frequency to be half as much?

1.10 [10/10/20/20] <1.5> Server farms such as Google and Yahoo! provide enough compute capacity for the highest request rate of the day. Imagine that most of the time these servers operate at only 60% capacity. Assume further that the power does not scale linearly with the load; that is, when the servers are operating at 60% capacity, they consume 90% of maximum power. The servers could be turned off, but they would take too long to restart in response to more load. A new system has been proposed that allows for a quick restart but requires 20% of the maximum power while in this "barely alive" state.

  a. [10] <1.5> How much power savings would be achieved by turning off 60% of the servers?

  b. [10] <1.5> How much power savings would be achieved by placing 60% of the servers in the "barely alive" state?

PX0676-094

    c. [20] <1.5> How much power savings would be achieved by reducing the voltage by 20% and frequency by 40%?

    d. [20] <1.5> How much power savings would be achieved by placing 30% of the servers in the "barely alive" state and 30% off?

1.11 [10/10/20] <1.7> Availability is the most important consideration for designing servers, followed closely by scalability and throughput.

    a. [10] <1.7> We have a single processor with a failures in time (FIT) of 100. What is the mean time to failure (MTTF) for this system?

    b. [10] <1.7> If it takes 1 day to get the system running again, what is the availability of the system?

    c. [20] <1.7> Imagine that the government, to cut costs, is going to build a supercomputer out of inexpensive computers rather than expensive, reliable computers. What is the MTTF for a system with 1000 processors? Assume that if one fails, they all fail.

1.12 [20/20/20] <1.1, 1.2, 1.7> In a server farm such as that used by Amazon or eBay, a single failure does not cause the entire system to crash. Instead, it will reduce the number of requests that can be satisfied at any one time.

    a. [20] <1.7> If a company has 10,000 computers, each with a MTTF of 35 days, and it experiences catastrophic failure only if 1/3 of the computers fail, what is the MTTF for the system?

    b. [20] <1.1, 1.7> If it costs an extra $1000, per computer, to double the MTTF, would this be a good business decision? Show your work.

    c. [20] <1.2> Figure 1.3 shows, on average, the cost of downtimes, assuming that the cost is equal at all times of the year. For retailers, however, the Christmas season is the most profitable (and therefore the most costly time to lose sales). If a catalog sales center has twice as much traffic in the fourth quarter as every other quarter, what is the average cost of downtime per hour during the fourth quarter and the rest of the year?

1.13 [10/20/20] <1.9> Your company is trying to choose between purchasing the Opteron or Itanium 2. You have analyzed your company's applications, and 60% of the time it will be running applications similar to wupwise, 20% of the time applications similar to ammp, and 20% of the time applications similar to apsi.

    a. [10] If you were choosing just based on overall SPEC performance, which would you choose and why?

    b. [20] What is the weighted average of execution time ratios for this mix of applications for the Opteron and Itanium 2?

    c. [20] What is the speedup of the Opteron over the Itanium 2?

1.14 [20/10/10/10/15] <1.9> In this exercise, assume that we are considering enhancing a machine by adding vector hardware to it. When a computation is run in vector mode on the vector hardware, it is 10 times faster than the normal mode of execution. We call the percentage of time that could be spent using vector mode

the *percentage of vectorization.* Vectors are discussed in Chapter 4, but you don't need to know anything about how they work to answer this question!

a. [20] <1.9> Draw a graph that plots the speedup as a percentage of the computation performed in vector mode. Label the *y*-axis "Net speedup" and label the *x*-axis "Percent vectorization."

b. [10] <1.9> What percentage of vectorization is needed to achieve a speedup of 2?

c. [10] <1.9> What percentage of the computation run time is spent in vector mode if a speedup of 2 is achieved?

d. [10] <1.9> What percentage of vectorization is needed to achieve one-half the maximum speedup attainable from using vector mode?

e. [15] <1.9> Suppose you have measured the percentage of vectorization of the program to be 70%. The hardware design group estimates it can speed up the vector hardware even more with significant additional investment. You wonder whether the compiler crew could increase the percentage of vectorization, instead. What percentage of vectorization would the compiler team need to achieve in order to equal an addition 2× speedup in the vector unit (beyond the initial 10×)?

1.15    [15/10] <1.9> Assume that we make an enhancement to a computer that improves some mode of execution by a factor of 10. Enhanced mode is used 50% of the time, measured as a percentage of the execution time *when the enhanced mode is in use*. Recall that Amdahl's law depends on the fraction of the original, *unenhanced* execution time that could make use of enhanced mode. Thus, we cannot directly use this 50% measurement to compute speedup with Amdahl's law.

a. [15] <1.9> What is the speedup we have obtained from fast mode?

b. [10] <1.9> What percentage of the original execution time has been converted to fast mode?

1.16    [20/20/15] <1.9> When making changes to optimize part of a processor, it is often the case that speeding up one type of instruction comes at the cost of slowing down something else. For example, if we put in a complicated fast floating-point unit, that takes space, and something might have to be moved farther away from the middle to accommodate it, adding an extra cycle in delay to reach that unit. The basic Amdahl's law equation does not take into account this trade-off.

a. [20] <1.9> If the new fast floating-point unit speeds up floating-point operations by, on average, 2×, and floating-point operations take 20% of the original program's execution time, what is the overall speedup (ignoring the penalty to any other instructions)?

b. [20] <1.9> Now assume that speeding up the floating-point unit slowed down data cache accesses, resulting in a 1.5× slowdown (or 2/3 speedup). Data cache accesses consume 10% of the execution time. What is the overall speedup now?

EXCERPT

    c. [15] <1.9> After implementing the new floating-point operations, what percentage of execution time is spent on floating-point operations? What percentage is spent on data cache accesses?

1.17 [10/10/20/20] <1.10> Your company has just bought a new Intel Core i5 dual-core processor, and you have been tasked with optimizing your software for this processor. You will run two applications on this dual core, but the resource requirements are not equal. The first application requires 80% of the resources, and the other only 20% of the resources. Assume that when you parallelize a portion of the program, the speedup for that portion is 2.

    a. [10] <1.10> Given that 40% of the first application is parallelizable, how much speedup would you achieve with that application if run in isolation?

    b. [10] <1.10> Given that 99% of the second application is parallelizable, how much speedup would this application observe if run in isolation?

    c. [20] <1.10> Given that 40% of the first application is parallelizable, how much *overall system speedup* would you observe if you parallelized it?

    d. [20] <1.10> Given that 99% of the second application is parallelizable, how much overall system speedup would you observe if you parallelized it?

1.18 [10/20/20/20/25] <1.10> When parallelizing an application, the ideal speedup is speeding up by the number of processors. This is limited by two things: percentage of the application that can be parallelized and the cost of communication. Amdahl's law takes into account the former but not the latter.

    a. [10] <1.10> What is the speedup with $N$ processors if 80% of the application is parallelizable, ignoring the cost of communication?

    b. [20] <1.10> What is the speedup with 8 processors if, for every processor added, the communication overhead is 0.5% of the original execution time.

    c. [20] <1.10> What is the speedup with 8 processors if, for every time the number of processors is doubled, the communication overhead is increased by 0.5% of the original execution time?

    d. [20] <1.10> What is the speedup with $N$ processors if, for every time the number of processors is doubled, the communication overhead is increased by 0.5% of the original execution time?

    e. [25] <1.10> Write the general equation that solves this question: What is the number of processors with the highest speedup in an application in which $P\%$ of the original execution time is parallelizable, and, for every time the number of processors is doubled, the communication is increased by 0.5% of the original execution time?

PX0676-097