# PX0677



Open in app ↗                                                              Sign up    Sign in

◖◍ Medium          🔍 Search                              ✎ Write    👤



# Instagram Just Geotagged Us To Hell

## When Politics Drive Product Decisions, We All Lose

  M.G. Siegler · Follow
Published in 500ish · 3 min read · May 12, 2014

👏 374       💬 1                                          

PX0677-001

Case 1:20-cv-03590-JEB   Document 344-3   Filed 05/24/24   Page 3 of 509

. . .

Earlier today, I went to post a photo to Instagram. I had done this <u>1,935 times before</u> without a problem. Today was different though.

My routine is always the same: load Instagram, pick a photo to upload, apply filters, tap area to geotag to the place the photo was taken, and… wait a minute. Something odd was afoot. For some reason, my photo wasn't geotagged. (It was because I was in an area without service, so I had put my iPhone on airplane mode). So I had to manually search for the location.

Somewhat of a hassle, but no big deal, right? Well, in the past, no. Today, however, it proved to be impossible. Because Instagram had quietly switched me over from Foursquare's excellent place database, to Facebook's shitty one. Try as I might, I could not locate the venue.

Naturally, I took to Twitter to rant about this as I so often do. However, the result this time was a bit different: Much responses. So rage. Basically, it seems like everyone I know is feeling this pain as well. And we're all annoyed for the same reason: Instagram clearly made a business decision, not one to better their product.

PX0677-002

# Twitter / parislemon: Instagram's decision to use ...

Instagram's decision to use Facebook's much worse place database over Foursquare's has made the product worse. Stupid.

https://twitter.com/parislemon/status/465554365286084608

But wait, Facebook now owns Instagram, so *of course* they're going to want to use their own place database, right? I guess. The issue I'm having is that for the first couple years after the deal, the database remained in the hands of Foursquare's trusty API. Now, for whatever reason, that has changed (at least for some users). And we're all worse off as a result.

PX0677-003

5/20/24, 12:32 PM                Instagram just geotagged us to hell | Dad c7166db4bd9fcag...

Case 1:20-cv-03590-JEB  Document 344-3  Filed 05/24/24  Page 5 of 509

That's the real problem here. I get that Facebook owns Instagram and so they want to bring the geo functionality in-house as well. But the product is worse because of this change. Facebook's place database is a nightmare of mislabeled and mislocated geo-barf. The data makes Apple Maps look like a pristine globe of information (more on that in a second).

Of course, Instagram/Facebook are hardly the first team to do such a thing. In fact, similar situations seem to happen quite often. The removal of Google Maps from the iPhone is perhaps the most well-known recent example.

There too, both Google and Apple <u>had their reasons</u>. From a business-perspective, it was likely the right call. But we all had to suffer as a result. Some of us are <u>still suffering</u> as a result. Apple Maps was and is simply not as good as Google Maps. Full stop. And so we're left with a worse experience.

And this isn't even the first time this has happened regarding Instagram. Remember the time when Instagram and/or Twitter removed the ability to view Instagram photos inline in the Twitter cards? Again, the end result was a shittier user experience. Due to politics. Or whatever.

I guess I'm still surprised that I get surprised each time something like this happens. I want to believe that all of these companies care first and foremost about serving up the best experience to their users. And they do — as long as it doesn't get in the way of business, or land on the wrong side of politics. Which is, of course, bullshit.

That doesn't make it any easier for us, the users, to swallow. In fact, it makes it harder.



https://twitter.com/parislemon/status/465555168851816448

PX0677-005

5/20/24, 12:32 PM
Case 1:20-cv-03590-JEB   Document 344-3   Filed 05/24/24   Page 7 of 509
Instagram Just Geotagged Us to Hell | by M.G. Siegler | 500ish



# Written by M.G. Siegler



**Follow**

422K Followers · Editor for 500ish

Writer turned investor turned investor who writes. General Partner at GV. I blog to think.

---

## More from M.G. Siegler and 500ish



 M.G. Siegler

### Once Bitten

A no-joke very bad centipede bite...

14 min read · Jul 15, 2023

 1K  💬 36

 M.G. Siegler in 500ish

### Fine, Woven

Apple's fine mess of a "premium" iPhone 15 case

6 min read · Sep 26, 2023

 373  💬 7

PX0677-006

Case 1:20-cv-03590-JEB    Document 344-3    Filed 05/24/24    Page 8 of 509





 M.G. Siegler in 500ish

 M.G. Siegler

## An Apple TV 'Ultra'?

Apple is closer than ever to a gaming console in the living room...

5 min read · Nov 23, 2022

## Fox News' Dangerous Gutfeld Game

The show is so fucking stupid, which is the problem.

4 min read · Jul 5, 2023

 421    9     

 94   4     

See all from M.G. Siegler    See all from 500ish

# Recommended from Medium





PX0677-007

 Sophia Omarji in UX Collective

 Jasmine Bina in Concept Bureau Insights

## Life after Spotify: what no one tells you about life after layoffs

## The 14 New Rules of Brand Strategy

In December 2023, I was part of the 17% impacted by the layoffs at Spotify as a User…

The world has changed. Here's how to adapt.

9 min read · May 7, 2024

15 min read · May 9, 2024

  1.7K    ◯ 25                                              ☐+

 5K    ◯ 118                                            ☐+

---

## Lists

 **Staff Picks**
646 stories · 983 saves

 **Stories to Help You Level-Up at Work**
19 stories · 611 saves

 **Self-Improvement 101**
20 stories · 1854 saves

 **Productivity 101**
20 stories · 1692 saves

---



 Nick Hilton

## The End of the Subscription Era is Coming

You're overpaying for your porn (and journalism)

10 min read · Aug 30, 2023

👏 15.4K    💬 277                          🔖



 Emilie

## The Art of Not Making a Decision

Help! I can't choose for myself.

5 min read · Jan 29, 2024

👏 10.3K    💬 153                          🔖



 Araci Almeida in Politics From Hell

## The Problem Isn't The Protests; it's What They're Protesting

What if you were in Gaza? What if those were your kids?

✨ · 8 min read · May 11, 2024

👏 2.4K    💬 46                            🔖

 Devon Price 🔵 in Human Parts

## Laziness Does Not Exist

Psychological research is clear: when people procrastinate, there's usually a good reason

✨ · 11 min read · Mar 23, 2018

👏 302K    💬 1391                          🔖

PX0677-009

See more recommendations

PX0677-010

# PX0678

Search here …  Q

 **Israel Competition Authority**

News   Legal information   Publications   Policies   Services                               ⌖   Q

# The Director General for Competition is considering to impose monetary sanctions on Facebook a for a violation of the Economic Competition Law by consummating transactions in Israel without the Director General's consent

‹

**The Director General for Competition notified Facebook today, May 11, 2021, that she is considering to determine that Facebook is in violation of the ECL since it consummated mergers without the Director General consent. Therefore the Director General is considering to impose on Facebook monetary sanctions in the total sum of approximately NIS 6 million, subject to a hearing**

**Type:** News  ·  **Publish Date:** 11.05.2021

The Hearing Letter was sent to Facebook after it was found that Facebook purchased two Israeli companies – RedKix, Inc. in 2018 and Service Friend Ltd. in 2019, without obtaining the consent of the General Director, contrary to the Economic Competition Law, 5748–1988 ("ECL").

The ICA's investigation shows that Facebook was obliged to report the transactions required the Director General's consent since Facebook is a "monopolist", who's market share in Israel exceeds 50%. Under the ECL a person who holds 50% or more in any relevant market, whether he is declared or not, is required to obtain the Director General's consent, before consummation of any transaction that constitute a "merger of companies" under the ECL.

The ICA's investigation shows that Facebook, together with Instagram is, prima facie, a monopolist in the market of social networks for private users in Israel since its market share exceeds half and therefore Facebook was obliged to obtain the Director General consent to the transactions.

Facebook did not obtain the Director General's consent before closing the transactions. Hence, the Director General notified Facebook she is considering imposing monetary sanctions in the total sum of approximately NIS 6 million, on Facebook Israel and her parent company, Facebook Inc.

PX0678-001

As part of the economic investigation that was conducted by Israel Competition Authority , the ICA performed a consumer survey to examine different questions. The Consumer Survey's findings are available on the ICA's website (in Hebrew) (link)

The Director General determination and her intention to impose monetary sanctions are subject to a hearing. Facebook has the right to submit its arguments to the Director General within 60 days.

**More on the subject**

לסקר מדיה חברתית

**Files for download**

 News – facebook hearing

**Useful information**

All services
Contact the government
RSS
Terms of use

**Support**

Call Us 1299
Central Government Call Center
Technical support for online services
Contact information security

**More information**

About
Accessibility
Site map
Freedom of Information (Heb)
Use of cookies

PX0678-002

5/20/24, 1:35 PM          The Director General for Competition is considering to impose monetary sanctions on Facebook a for a violation of the Economic …



PX0678-003

# PX0679

**Consent Decree per Section 50B of the Economic Competition Law, 1988**

### A. Definitions

In this decree, the following terms shall be interpreted as follows:

| | |
|---|---|
| **"Commissioner"** | Competition Commissioner. |
| **"Control"** | As defined by the Law. |
| **"Facebook Israel"** | Facebook Israel Ltd. |
| **"Meta"** | Meta Platforms Inc. |
| Merger of Companies | As defined in section 1 of the Law. |
| **"Related Person"** | a person controlling a corporate entity, a corporate entity controlled thereby and any entity controlled by any of them. |
| **"The Law"** | The Economic Competition Law, 5748-1988. |
| **"The Mergers"** | The acquisition by Meta of RedKix Inc. in an agreement of July 25, 2018 and the acquisition by Meta of Service Friend Ltd. in an agreement of July 28, 2019, in the matter of which merger notifications were not filed with the Competition Commissioner. |
| **"Tribunal"** | The Competition Tribunal. |

### B. The commitments that are subject to the decree

1. Meta will pay the State Treasury a total of NIS 25,000,000 within 30 days of the date of the Tribunal's decision to approve this decree in accordance with section 50B of the Law.

2. Starting from the date of signing this agreement, Meta undertakes to submit Mergers of Companies for the Commissioner's approval according to Section 17(a)(3) of the Law, on mergers that Meta or any entity controlled by it (including, for the avoidance of doubt, Facebook Israel) intends to carry out, and Meta and any entity controlled by it will not complete a Merger of Companies  without notifying the Commissioner and without its consent, in accordance with the provisions of Chapter III of the Law and the Commissioner's policies and guidelines  (the "Notification Obligation").

3. Subject to the approval of this consent decree by the Tribunal, and subject to the performance of clauses 1 and 2 above, the Commissioner will not take enforcement measures against Meta, Facebook Israel, or any of their Related Persons, or their employees, managers, advisors and shareholders in the past or present with respect to The Mergers.

4. Meta agrees that solely for the purpose of this consent decree, the address for service of documents and requests for information in relation to this decree, whether addressed to Meta or any Related Person or representative thereof, will be the registered address of Herzog, Fox & Neeman, Attorneys at Law.

5. This consent decree does not constitute an admission or agreement by Meta, Facebook Israel or any of their Related Persons, their employees, officers, advisors and shareholders, in the past or present of having breached any of the provisions of the Law or an admission as to the applicability of section 17(a)(3) of the Law to any mergers that they have performed or they or any of their Related Persons intend to perform.

6. Nothing in this decree shall derogate from any obligation or limitation imposed on Meta, Facebook Israel or any of their Related Persons under any law, including under the Law, and in particular from the obligation to notify the intention of Meta, Facebook Israel or any of their Related Persons, to perform a merger under sections 17(a)(1) or 17(a)(2) to the law.

7. This consent decree shall be in force for 6 years from the day of its approval by the Tribunal.

**IN WITNESS WHEREOF:**

| _____ | _____ | _____ |
|---|---|---|
| Tim Lamb | Meta Platforms Inc. | Date   8 January 2024 |

I, ___Iris Achmon___, legal counsel for Meta Platforms Inc. hereby confirm that ___Tim Lamb___ who signed above is an authorized signatory of Meta Platforms Inc.

PX0679-002

עו"ד איריס אכמון
מ.ר. 31719

Signature

_____          _____
The Competition Commissioner          Date

3

PX0679-003

# PX0680



Home > Tech > Tech Industry

# BeReal has 10 months left before it runs out of money

The photo sharing app is looking for a lifeline.

By [Elizabeth de Luna](#)  on March 15, 2024





Credit: Jakub Porzycki/NurPhoto via Getty Images

BeReal is in a real bind.

PX0680-001

According to Business Insider, employees were told at a February all-hands meeting that the app had about ten months of runway left before running out of money. While BeReal has maintained a relatively low head count of 60 employees, its server costs are significant. Now, leadership is scrambling to make the app appealing to investors.

ADVERTISEMENT

**Mashable Light Speed**

## Want more out-of-this world tech, space and science stories?

Sign up for Mashable's weekly Light Speed newsletter.

| Enter Email | Sign Me Up |
|---|---|

By signing up you agree to our Terms of Use and Privacy Policy.

**SEE ALSO:** BeReal unveils its latest attempt to Be Relevant again →

BeReal's unique, in-the-moment photo-sharing feature transformed it into a cultural phenomenon at the height of the COVID-19 pandemic. Heralded as the "anti-Instagram,"

PX0680-002

the company reached a valuation of $600 million in 2022 after securing $90 million in funding that same year. But the app's growth has since slowed, even after an attempt to diversify its appeal by adding new features in 2023.

## Related Stories

- **Why are underrepresented founders still not getting venture capital funding?**

- **This venture capital fund wants investors as passionate as philanthropists**

- **Startup launches tampon-based STI test**

According to internal metrics shared with Business Insider, BeReal currently has 40 million monthly active users and 25 million daily active users, up from 20 million in 2022. But sources said that jump is unimpressive in the eyes of investors and that the company was struggling to drum up interest in funding. Leadership also told employees that "We're talking to some of the biggest tech companies in the world" about a potential acquisition. But if a solution doesn't present itself soon, BeReal may be doomed — like the photos on the app — to disappear.

**Topics**   Social Media

ADVERTISEMENT

PX0680-003



## Elizabeth de Luna

### Culture Reporter

Elizabeth is a digital culture reporter covering the internet's influence on self-expression, fashion, and fandom. Her work explores how technology shapes our identities, communities, and emotions. Before joining Mashable, Elizabeth spent six years in tech. Her reporting can be found in *Rolling Stone*, *The Guardian*, *TIME*, and *Teen Vogue*. Follow her on Instagram here.

## Recommended For You

**Two MIT students charged for exploiting Ethereum blockchain bug, stole $25 million in crypto**

*05/16/2024   By Matt Binder*



PX0680-004

### 'Babes' Ilana Glazer and Michelle Buteau on showing the reality and hilarity of pregnancy

*05/17/2024   By Mark Stetson*



---

### What's Duolicious? I tried the 4chan dating app.

*05/18/2024   By Chance Townsend*



---

### 'Challengers' Zendaya, Josh O'Connor and Mike Faist on the significance of the 'I Told Ya' shirt

*04/25/2024   By Mark Stetson*



---

### Apple workers urge leadership to 'end their silence' on Palestine

*04/03/2024   By Meera Navlakha*



# More in Tech

### The Amazon Memorial Day Sale is already live with incredible deals on tech, summer prep, home goods, and more

*8 hours ago   By Lauren Allain and Samantha Mangino*



### Memorial Day sales are already kicking off — here's what you need to know

*05/17/2024   By Dylan Haas*



### Make a splash with the first 'Percy Jackson' adventure 'The Lightning Thief', 43% off at Amazon

*05/16/2024   By Brittany Vincent*



### Dive into 'The Three-Body Problem' after you watch the Netflix series for just $8

*05/16/2024   By Brittany Vincent*



**Get BookTok's book du jour 'Tomorrow, and Tomorrow, and Tomorrow" Kindle edition for just $5.99**

*05/15/2024   By Tabitha Britt*



## Trending on Mashable

**NYT Connections today: See hints and answers for May 20**

*22 hours ago   By Mashable Team*



**NASA spacecraft spots dead robot on Mars surface**

*05/18/2024   By Mark Kaufman*



**'Wordle' today: Here's the answer hints for May 20**

*21 hours ago   By Mashable Team*



PX0680-007

### NYT Connections today: See hints and answers for May 19

*05/19/2024   By Mashable Team*



---

### NASA spacecraft saw something incredible near Jupiter's Great Red Spot

*05/15/2024   By Elisha Sauers*



## The biggest stories of the day delivered to your inbox.

Email Address

**Subscribe**

This newsletter may contain advertising, deals, or affiliate links. Subscribing to a newsletter indicates your consent to our Terms of Use and Privacy Policy. You may unsubscribe from the newsletters at any time.

TECH

SCIENCE

PX0680-008



# LIFE

# SOCIAL GOOD

# ENTERTAINMENT

# BEST PRODUCTS

# DEALS

**About Mashable**

**Contact Us**

**We're Hiring**

**Newsletters**

**Sitemap**



Mashable supports **Group Black** and its mission to increase greater diversity in media voices and media ownership. Group Black's collective includes **Essence**, **TheShadeRoom** and **Afro-Punk**.

©2005–2024 Mashable, Inc., a Ziff Davis company. All Rights Reserved.
Mashable is a registered trademark of Ziff Davis and may not be used by third parties without express written permission.

About Ziff Davis

Privacy Policy

Terms of Use

PX0680-009



Advertise

Accessibility

Do Not Sell My Personal Information



 AdChoices

PX0680-010

# PX0681





ok at tidy cabling within an IBM Layer facility (source: IBM ayer)

CLOUD

# IBM SoftLayer Opening Melbourne, Australia Data Center

The latest data center in IBM SoftLayer's global cloud push is in Melbourne, Australia.

Aug 26, 2014

IBM is launching a new SoftLayer data center in
Melbourne, Australia. The company made a commitment of $1.2 billion to expand its global
cloud footprint by 15 data centers. Melbourne will be the sixth data center since it made the
commitment.

The new data center replicates the build of its other data centers around the globe. It will
have initial capacity of 5,000 servers with room to grow to up to 15,000 servers. SoftLayer's
full portfolio of services will be available out of Melbourne, all on one integrated platform.

The company is building in places where it already has an audience but no local data center.
Several Australian businesses including Rightship, the Loft Group, HotelsCombined and
several tech startups are already implementing IBM's cloud services in the country.

"Australia is an important market for IBM and SoftLayer. We are seeing a strong appetite
for cloud in this market, particularly towards the hybrid cloud model," said Lance Crosby
CEO SoftLayer. "We are investing in Australia, combining and strengthening our existing
cloud capabilities."

SoftLayer's reach continues to expand internationally under IBM. IBM acquired SoftLayer
for about $2 billion last year, SoftLayer forming the basis and infrastructure for its cloud
play. Since then, SoftLayer has added over 6,000 customers. The expansion plan is to open
15 new SoftLayer data centers globally, with IBM recently opening SoftLayer data centers
in London, Hong Kong and Toronto.

There are several cloud competitors in Australia including AWS, Dell, Telstra and
Dimension Data.

IBM has recently partnered with one of Australia's largest IT distributors, Avnet Technology
Solutions, to build a robust business partner network in Australia to deliver SoftLayer
services to the mid-market.

## SoftLayer adds to bare metal offerings

SoftLayer is also rolling out new hourly-billed bare metal server offerings across its entire
data center footprint. The pre-configured servers are available in four configurations and
are deployed in under 30 minutes.

PX0681-002

Bare metal offers the raw performance of a physical
server and is the evolution of dedicated servers.
SoftLayer has been offering bare metal for many years, but it continues to shrink the time to
deploy through automation. Competition in the space is also heating up, with Rackspace
recently launching On-Metal, its bare metal offering. Internap has long offered bare metal
and recently expanded its offering as well.

SoftLayer also offers public cloud in addition to bare metal. "We're huge proponents of
choice," said Marc Jones, VP Product Innovation. "Bare metal and virtualized public cloud
each have a front seat. There's great workloads for both."

**Does bare metal equal cloud? The lines are blurry**

The strictest definition of cloud requires it to be multi-tenant and virtualized, and billed like
a utility. These bare metal offerings are single tenant servers. However, the provisioning
time for bare metal has drastically reduced and it is offered hourly, further blurring the
lines. Bare metal has a performance advantage over public cloud and the flexibility
advantage gap that public cloud once had is shrinking.

"The idea of cloud is to help businesses solve their IT challenges with on-demand
resources," said Philbert Shih, managing director Structure Research. "But every business
has unique challenges, so to be a true solution cloud, services need to simultaneously be
flexible, diverse, and integrated. These hourly bare metal servers take the advantages that
the SoftLayer platform already offered—seamlessly integrated bare metal and virtual in one
platform, control system, and API—and adds even more flexibility, without sacrificing any
of the integration."

The  four pre-configured bare metal servers are:

   Intel 1270, Single processor, 8GB RAM, 2 1TB SATA storage, $0.46/hour: Good, solid
   server for standard workloads like a web server or caching node
   Intel 1270, 32GB RAM, 2 400GB SSD $1.09/hour: the SSD drives make this a
   performance box with better IO, good for running a database

The last two configurations are for running Big Data workloads such as Hadoop:

   -Intel 2620, 2 processors, 32 GB RAM, 4 x 1TB SATA $1.24/hour
   -Intel 2650, 2 processors, 64 GB RAM, 4 x1TB SATA $1.32/hour

PX0681-003

5/20/24, 11 02 PM
IBM SoftLayer Opens New Melbourne Data Center - Data Center Knowledge | News and analysis for the data center indus

Case 1:20-cv-03590-JEB   Document 344-3   Filed 05/24/24   Page 35 of 509

Customers may choose from four base configurations with CentOS, Debian, FreeBSD, or Ubuntu operating system installed. The base configuration is deployed within 30 minutes, after which the server may be further customized with additional OS or application installations.

TAGS:   ASIA-PACIFIC    IBM    SOFTLAYER (ACQUIRED BY IBM)

# PX0682

Review of Industrial Organization
https://doi.org/10.1007/s11151-024-09962-0



# The 2023 Merger Guidelines: A Critical Assessment

Dennis W. Carlton[1,2,3]

Accepted: 9 April 2024
© The Author(s) 2024

**Keywords** 2023 Merger Guidelines · Potential Competition · Vertical Mergers · Retrospective Studies

Economic thinking evolves in light of new evidence, experience, and theoretical developments as to how to evaluate mergers. It is therefore useful for the government agencies to update Merger Guidelines from time to time to reflect that new economic knowledge. The Guidelines have been updated in the past on a few occasions; the previous revision was in 2010.[1] Of course, there are always some points on which there can be disagreement, but I think it is fair to say that the Guidelines have served as a useful statement of economic thinking that merging parties have looked to and courts have relied upon in how they can use economic reasoning to evaluate evidence that bears on the likely effects of a merger.

Although I applaud the agencies' effort to update the Guidelines and appreciate the efforts of the drafters to listen to and incorporate at least some comments that I and many others raised with respect to the Draft Guidelines, there are several features of the 2023 Guidelines that I dislike as I explain in more detail in this article.

My main complaint is that the radically altered form of the 2023 Guidelines compared to prior Guidelines has transformed them from an economic guide on how to interpret evidence into a legal guide for how the enforcement agencies interpret the antitrust laws with regard to mergers and how the enforcement agencies will litigate an antitrust case that challenges a merger. I fear that this altered form will rob the Guidelines of what they have become: a durable guide to economic thinking.

Although I am critical of the altered form of the 2023 Guidelines, I do appreciate some of the analyses of economic issues that prior Guidelines had omitted. This is

---

[1] I exclude from my discussion the short-lived Vertical Merger Guidelines (2020), which were withdrawn soon after their appearance.

✉ Dennis W. Carlton
  Dennis.Carlton@chicagobooth.edu

1  David McDaniel Keller Professor of Economics Emeritus, Booth School of Business, University of Chicago, Chicago, USA

2  National Bureau of Economic Research, Cambridge, USA

3  Compass Lexecon, Chicago, USA

Published online: 03 May 2024

not the place for an in-depth discussion of the many economic issues in the prior and new Guidelines, since they have been extensively discussed over the years by me and many others. Instead, I will focus on a few high-level points.[2]

Section 1 of this paper begins my critique of the altered form of the 2023 Guidelines with its extensive case citations and implied interpretations. I explain why the very structure of the 2023 Guidelines, which is based on establishing a prima facie case followed by rebuttal, is not necessarily a good model for economic analysis – either before the agencies or in court, even if in litigation attorneys may structure their legal argument in that way. Section 2 discusses the generally hostile tone to mergers and efficiencies that seem to me to permeate the 2023 Guidelines. I turn next to an analysis of several individual Guidelines. Sections 3, 4, and 5 discuss the emphasis on market definition, mergers involving potential competitors and vertical mergers, respectively. I conclude in Sections 6 and 7 with a discussion of two important issues that are missing in these (and prior) Guidelines. There is a lack of recognition of the ability of private contracts to eliminate alleged harms, and an absence of any sense that the agencies will follow up on their decisions as to whether to challenge or not challenge a merger to see whether their theories and empirical predictions, as well as those of the parties involved, materialized.

## 1 Stress on Legal Cases Rather than Economic Analysis Threatens the Durable Nature of the Guidelines

The 2023 Guidelines represent a significant departure from past Guidelines. The 2023 Guidelines succeed in conveying the more aggressive antitrust policy of the current administration. They justify this more aggressive posture by citing numerous legal cases.[3] By turning the Guidelines into a guide for how the current administration thinks antitrust law should be interpreted, the 2023 Guidelines detract attention from what had been their main purpose: an explanation of what an evidence-based economic analysis requires.

To put this point into perspective: There are over 70 citations to cases in the new Guidelines. The number of case citations in the 2010 Guidelines and prior Guidelines is zero! This emphasis on case citations and the suggested interpretations may serve the goals of this administration in their efforts to influence courts; but my hunch, though I am not a lawyer, is that there will be much dispute as to whether the cases that are cited for various principles in the 2023 Guidelines accurately convey current antitrust law. And then, if I am correct, this dispute will taint how the 2023 Guidelines are received. I would not be surprised if courts reject some of the case interpretations that are contained in the 2023 Guidelines; and subsequent

---

[2] For some of my recent analyses of issues that are related to the 2010 Guidelines and 2023 Draft Guidelines, see Carlton and Israel (2010, 2021) and Carlton (2023a, 2023b). For a review of the 2010 Guidelines and 2023 Draft Guidelines by several other authors, see the February 2021 issue of *Review of Industrial Organization* and the ProMarket (2023).

[3] They also refer to "the collected experience of the Agencies…and…the public consultation process" (p. 4). It is unclear what experience they are referring to. I will discuss the importance of this point below.



administrations may well issue new Guidelines when they come into office to reflect their own preferences for how they interpret the antitrust law.

It is appropriate for an administration to inform the public as to how aggressive it will be in its enforcement of the antitrust laws so that businesses can act accordingly. But if every administration issues its own Guidelines, the reputation of the Guidelines as a durable guide to economic thinking will be undermined as will the idea that merger policy should be based on economic analysis.

It is precisely this concern that motivated me and 16 other former Chief Economists at the FTC and Department of Justice—of both Democratic and Republican administrations—to warn against using the Guidelines to cite and interpret legal cases and, instead, to keep the economic analysis separate from any legal analysis or policy statement.[4] Had the enforcement agencies done that, then the economic component of the Guidelines could have remained as a document of economic reasoning, even if the administration's desired legal interpretation of antitrust principles changes over time as new political administrations come into power. Indeed, as my discussion below makes clear, my main concerns are less with the Guidelines' discussion that is focused on economic analyses (Sect. 4), than with the first three sections of the 2023 Guidelines – which I suspect will be considered the heart of the new Guidelines.

In keeping with their focus on the law, not economics, the main individual Guidelines (Guidelines 1–6) are described as how a particular merger "can violate the law". That could be an indication that the agencies are looking for mergers that trigger violations of the antitrust laws as the agencies interpret them rather than, for example, mergers that harm competition, thereby reducing consumer (including, where relevant, input suppliers') welfare.[5] This might seem like a minor point to many; but to me it indicates that the agencies could be focused on whether they can win in court, not whether the merger actually harms competition.[6]

If there is a poorly decided Supreme Court case, would the enforcement agencies bring a case even if there is no actual harm to competition but they could win in court based on that poorly decided precedent? I hope not and would not expect the enforcement agencies to act in that way. But to remove any such concerns, I would have liked to have seen in the individual Guidelines a replacement of the phrase

---

[4] Baker et al. (2023).

[5] I cannot tell whether the Guidelines endorse or reject the idea that a harm to competition is a harm to the competitive process that results in a decline in consumer (including where relevant, input suppliers') welfare, as that term has been interpreted for many years. In light of pronouncements from agency officials where additional goals have been suggested, it would be useful for the agencies to clarify in a separate statement that the economic welfare of consumers (including, where relevant, input suppliers) will remain the focus of enforcement actions, and that other goals such as fairness (undefined), reduced income inequality, the promotion of democracy, or other worthy goals will not enter the decision-making with regard to antitrust enforcement actions. It is not that these other goals are not worthy ones; but an antitrust policy that lists multiple goals that can conflict with each other, but provides no method for making trade-offs among them, risks turning antitrust enforcement policy into an arbitrary, highly subjective process.

[6] I note that some of the cases that are cited for various antitrust "principles" often involve situations at which economists today would cringe if they were told that those cases represented a harm to competition. See, e.g., Hovenkamp (2023a,b).

"can violate the law" with a statement that the agencies will attack only mergers that "can harm competition".

## 2  The 2023 Guidelines Appear to be Hostile to Mergers and Efficiencies

Perhaps it is just me; but my initial reaction to the 2023 Guidelines is that they are openly hostile to mergers, and they cite statutes and cases to support that view. The Introduction stresses that the purpose of merger enforcement is to prevent a merger whose effect "*may* be to substantially lessen competition". I understand that the quote is from a decision citing the words in the Clayton Act, but the interpretation of that clause is a subject of many court decisions. I do not think it accurate to claim that the mere possibility of competitive harm, however remote, is enough to stop a merger under the antitrust laws, but I will leave that to the legal scholars to deny or confirm.

However, in interpreting the Clayton Act, the 2023 Guidelines chose to cite a case where the word "may" is italicized even though it does not appear that way in the Clayton Act. And, just before the reader is being instructed how to use the 2023 Guidelines, the reader is reminded that the agencies use a variety of tools to determine whether the merger "may" harm competition. Finally, at the start of Sect. 4's discussion of rebuttal evidence, the 2023 Guidelines remind the reader that the relevant legal standard is whether the merger "*may*" —again italicized—harm competition.

The hostility toward mergers is reflected in what appears to be little recognition that mergers can generate efficiencies and thereby benefit competition. There is no sentence in the Introduction acknowledging that mergers can enhance competition, although that should be obvious from the fact that only a small fraction of all mergers are considered by the agencies to be anticompetitive. In keeping with the legal framework of the prima facie case that ignores efficiencies, the discussion of efficiencies comes in only as rebuttal evidence that is described later on in Sect. 3 of the Guidelines, where the reader is cautioned that the agencies will be skeptical of those efficiency claims.

I would have preferred an introduction such as:

> "Merger transactions are common in our economy. They occur in a large majority of cases to improve the efficiency of the firms involved, as those firms see matters, and raise no competition issues. Instead they promote competition and bring benefits to our economy. However, some mergers can harm competition and thereby harm our economy. It is the task of the government agencies to prevent the undesirable mergers without removing the incentives to engage in the desirable ones. The purpose of these Guidelines is to inform businesses how the government agencies evaluate evidence in order to decide whether a proposed transaction raises a significant risk of harm to competition. This discussion is rooted in the use of economics to analyze evidence including data, business documents and testimony."

 Springer

Notice two things about this paragraph: First, it agrees that some mergers can harm competition, but also recognizes the indisputable fact that most mergers promote efficiency and do not raise antitrust issues. Second, it says nothing about what the antitrust laws compel and sticks to explaining the economic interpretation and analysis of evidence. The 2010 Guidelines, as well as prior Guidelines, would, I think, be compatible with this paragraph.

Moreover, nothing in this paragraph prevents increased aggressiveness in preventing mergers compared to prior years, when the economic evidence of past transactions lends support for more aggressive action: Even if no tools of economic analysis have changed since 2010, there is nothing in that paragraph or in the 2010 Guidelines that would prevent an agency from stating, for example, "We have reviewed lots of past mergers; and, in the majority of cases where the possibility of entry was claimed to constrain future price increases, we find that entry failed to materialize with the result that prices rose post-merger. Hence we will reduce the weight we place on such claimed entry as a constraint on pricing post- merger." Or: "We have reviewed past mergers and find that the majority of the mergers that we did not challenge raised prices when the HHI and its change exceeded certain levels. Accordingly, we will scrutinize such mergers more carefully."

Well, who cares how Carlton would have written the opening paragraphs? If you read the 2023 Guidelines in their entirety, these Guidelines do not deny that there can be efficiencies. But that now leads me to another point as to why I dislike several features of the 2023 Guidelines: The 2023 Guidelines make clear that an analysis proceeds first by establishing a prima facie case of harm. Then the parties can rebut that presumption with claims of efficiencies or other claims. Then the weight of those competing claims is evaluated.

While this might be how a court would require expert testimony to be structured or how a court might reason, it is not a natural way for economic analysis to be done. One cannot evaluate the competitive effect of a potentially harmful merger without understanding and incorporating efficiencies into the competitive effects analysis. Lower marginal costs from a horizontal merger, for example, generate downward pricing pressure and may mean that there is no harmful effect to "offset".

Efficiencies are not simply a rebuttal point. They are part of the competitive effects analysis. Indeed, all else equal, every horizontal merger—in the absence of efficiencies—typically creates upward pricing pressure. How does that observation assist in an economic analysis? Does that create a prima facie case against every horizontal merger, no matter how unconcentrated the market? Why not, especially if any price increase, not matter how small, should matter?

One answer that recognizes the likelihood of efficiencies is that in an unconcentrated market, given that mergers generally create some efficiencies, it is unlikely that a merger will create significant harm and more likely that it will create a benefit. From an enforcement perspective, it is best to deploy scarce enforcement resources to other matters.[7] That is why there are safe harbors. But without allowing in the

---

[7] Enforcement decisions should generally be based on the likely harm, so that mergers in bigger markets should receive more scrutiny; see Carlton (2007a). Enforcement decisions also affect the incentive of other firms to merge. More research on this topic is needed.

analysis for some efficiencies generally from mergers, there is no reason to have safe harbors and not demand rebuttal evidence on efficiencies for every horizontal merger. And, as I will discuss below, one cannot even begin to analyze properly the effects of many vertical mergers if one ignores the consequences of the elimination of double marginalization.

I hope that the highly-trained economists at the government agencies will do a thorough economic analysis of any merger including accounting for relevant efficiencies when performing their competitive effects analysis. The fact that a legal brief to a court might require something different may be true—I defer to the legal scholars—but that should not force the economists at the agencies to twist themselves into knots and be prevented from doing a proper economic analysis as an agency evaluates the merger.

Another manifestation of the hostility to efficiencies is the statement (a variant of which appears also in prior Guidelines) that being able to achieve the claimed efficiency benefits of merger through the alternative of contract can make an efficiency not merger-specific, and therefore deserving of no credit in the merger evaluation. Although this statement is unobjectionable as a theoretical matter, we should also be asking how to evaluate claims that such contracts are likely to occur: If it is possible to achieve this benefit by contract, why haven't the merging parties already entered into such contracts pre-merger? Does the lack of such contracts pre-merger suggest that there are impediments to achieving efficiencies via contract? And shouldn't that tell us something about the likelihood that such contracts will readily be used if the merger is blocked?

There are other places in the 2023 Guidelines where the hostility to efficiencies shows up. There is, for example, a suggestion that a trend toward concentration or toward increased vertical integration could be troubling. Fair enough; but couldn't a trend toward concentration or increased vertical integration also reflect that increased concentration or vertical integration is economically efficient and pro-competitive? And isn't that what the economists or others at the agencies should try to figure out?[8] Isn't the insight of Demsetz (1973)—that increased concentration can sometimes reflect pro-competitive efficiencies—highly relevant?

The hostility to efficiencies further shows up in Sect. 3.3 of the 2023 Guidelines. To their credit, the 2023 Guidelines correctly explain that speculative and unsupported claimed efficiencies will receive little weight. It is the role of the agencies to make sure that any claimed efficiencies are credible. But this section makes no mention that past experience can sometimes help identify efficiencies. I would guess that the drafters will say in response that the 2023 Guidelines allow such evidence; but if that is what they mean to say, it would have been helpful to have it stated clearly in the efficiency section. In general, I would have preferred a more balanced discussion of the evidence that would be and would not be persuasive in evaluating efficiencies.

Section 3.3 ends with a sentence that I had to read several times to understand, and I am still not sure that I do. The 2023 Guidelines define a "cognizable efficiency" as one that, among other things, prevents a lessening of competition. Yet the

---

[8] Economic experts typically are not engineers or business executives, so they often have to rely on the parties for assumed efficiencies in the absence of other evidence.



last sentence of Sect. 3.3 says "Cognizable efficiencies that would not prevent the creation of a monopoly cannot justify a merger that may tend to create a monopoly." I think that means that if there are lots of efficiencies so that the price to consumers would fall post-merger, but the merger creates a firm with a market share in excess of 50% (see footnote 30 of the Guidelines), then that merger will be challenged. If that is what it means, I am not sure I understand its intent: Isn't a merger desirable if it benefits consumers?[9]

There is one final feature I find especially troubling in Sect. 3.3: the claim that harms in one market cannot be balanced against benefits in another. It is noteworthy that the famous footnote in prior Guidelines[10]—that efficiencies that are inextricably linked to the transaction can be credited in a merger analysis—has been eliminated. Does this mean that an airline merger that involves redeploying an aircraft from a small origin–destination route to a route with many more passengers, which results in a huge increase in total travel, should be illegal? Isn't that the exact opposite of how the Department of Justice has generally handled many past legacy airline mergers, though some private plaintiffs have tried and failed with that argument? If a merger benefits 1,000 workers in Chicago but harms one worker in Des Moines, are the 2023 Guidelines telling us to stop the merger? I understand the difficulties of tracing effects throughout the economy; however, for the agencies to ignore such tradeoffs and to assert that they are irrelevant in all cases is unwise.[11]

Finally, there are discussions elsewhere in the 2023 Guidelines about the importance of innovation and dynamics. Those are important topics. But if one is trying to figure out whether a merger will spur innovation or alter long-run behavior, paying attention to fixed costs is necessary – and that is nowhere discussed.[12] Usually fixed cost savings are not credited as an efficiency in merger review on the grounds that they won't affect short-run pricing. Are the enforcement agencies advocating abandoning that practice because fixed costs savings can encourage innovation? I don't know the answer; but I would have appreciated some discussion of that point given the legitimate concern over the potential effect of a merger on long-run innovation.

Let me now turn to some specific disagreements I have with some of the individual Guidelines.

## 3 The 2023 Guidelines, Especially Guideline 1, will Lead to an Overemphasis on Market Definition and HHI Thresholds

Guideline 1 emphasizes market definition and structural presumptions. Guideline 1 discusses a prima facie case coming from application of numerical guidelines to the calculation of an HHI based on market definition. Since it is the first Guideline, it

---

[9] If my interpretation is correct, it illustrates a confusion of harm to the eliminated rivals with harm to competition. See note 5 above on the definition of harm to competition.

[10] See, e.g., footnote 14 in the 2010 Guidelines. The footnote appeared first in the 1997 Guidelines.

[11] See Carlton (2023c) for further discussion of how to analyze such trade-offs.

[12] The Antitrust Modernization Commission, a bi-partisan Congressionally created committee on which I served, made this point in Antitrust Modernization Commission: *Report and Recommendations* (2007).

seems to emphasize the primacy that will be given to market definition and HHI thresholds. There is insufficient recognition in the 2023 Guidelines that market definition is at best a crude tool and one of many tools used to evaluate competitive effects. It is a place to begin – not end – an analysis, as I (and others) have written elsewhere.[13] Perhaps its best use is to create a safe harbor for mergers in unconcentrated markets; but in concentrated markets it should create at most a weak presumption of harm whose possibility should be further analyzed. At least at the agencies with their many highly competent economists, I cannot imagine market definition and HHI analysis being the primary tool used to analyze merger evidence.

Again, if one looks hard enough, one could claim that the 2023 Guidelines recognize this point (I have no doubt the agencies' economists do); but I fear that it will not be clear to other readers. And, in turn, the lack of clarity will potentially bias enforcement and court decisions even when there is convincing direct evidence of no harm in a merger that violates the HHI thresholds or conversely when there is direct evidence of harm in a merger that does not violate the HHI thresholds in a broad market.

As for reducing the HHI thresholds from the 2010 Guidelines, that is not necessarily a problem as long as everyone realizes that these thresholds and the entire exercise of market definition are crude and that their use will often provide an unreliable guide to effects of a particular merger. In Guideline 1, I am not sure what the empirical basis is for the prohibition of a 28.1% firm acquiring a firm of 2%, other than a cite to an opinion in an antitrust case—again confusing legal and economic analysis. Indeed, more generally, I have in the past criticized the lack of an empirical basis for the HHI thresholds.[14]

There are many caveats in the 2023 Guidelines that are seemingly aimed at litigation that allow the agencies to have flexibility in how they define markets. One could interpret some of the language on market definition cynically as saying that if the agencies want to do so, they will find some market definition that produces the result they want. That is likely to lead to gerrymandering market definition to obtain the desired results. If there are lots of market definitions that are "plausible" but provide different guidance as to the effect of a merger, that might that indicate that this so-called tool of analysis using market definition is unreliable in this particular

---

[13] See, e.g., Carlton (2007b) and Carlton and Israel (2021). As I explain in those articles, I am not in favor of abandoning market definition since I believe it can serve a useful purpose sometimes, especially in creating safe harbors.

[14] There has been a growing literature on horizontal mergers and concentration that perhaps could have been noted in the Guidelines or some associated commentary. However one views the strength of that literature (see Carlton (2020) for an evaluation), one observation is that many mergers whose shares have violated the HHI thresholds have led to price increases; but it is also true that many such mergers have led to price decreases and that ex ante it is often hard to distinguish the two possibilities. See, e.g., Ashenfelter et al. (2014). But, even if one views this evidence as showing that a violation of HHI thresholds fails to create a strong presumption of harm, it does justify increased scrutiny for mergers that raise concentration substantially in already concentrated markets.

 Springer

PX0682-008

instance?[15] Without some principles to establish which products to include in a market definition, gerrymandering is a serious concern.[16] Prior Guidelines made clear that if one is concerned about the price of product A and one includes product C in the market, then one should normally also include product B if product B is a closer substitute to product A than is product C. That principle has apparently been abandoned. I fear that such an abandonment could lead to a situation where analysts claim that they are using a hypothetical monopolist test based not on any quantitative analysis but rather on their judgment – or, even worse, that they can ignore the quantitative evidence on substitution.

There are statements about using market definition and the HHI thresholds to indicate harms from a merger because some measure of quality falls. How does this apply if quality is not viewed similarly by consumers? For example, some may like a room's temperature to be hot, while others like it cold. If the relevant quality is a room's temperature, how does one proceed in assessing whether the merger will improve or harm quality? And even if there is homogeneity of preferences among consumers, how does this analysis square with theorems in the literature that a monopolist may choose a level of quality that is the same, higher, or lower as competitive firms would choose, depending on specific assumptions? That is, even with homogenous preferences, quality is not necessarily positively correlated with concentration, all else equal. And to add even more complication, when a variety of product qualities are sold, how should one evaluate the change in the range of products produced in the context of market definition? I predict that this attempt to deal with quality in the context of market definition will in many cases lead to confusion.[17]

## 4  Guideline 4 Opens the Door to Speculation with Regard to Potential Entry

Guideline 4 states a simple proposition that an acquisition by a current (or future) market participant of a firm that would otherwise enter and be a significant competitor in an otherwise concentrated market is likely to harm competition. That possibility is easy to agree with theoretically. The difficult part is figuring out whether such entry is likely empirically, as well as whether the potential entrant is uniquely well-positioned to enter or merely one of many potential entrants. There has been some (but not much) work on so-called "killer acquisitions", and more work is needed.

---

[15] There is no debate that there can be situations where a merger of firm X and Y, all else equal, or a merger of firm Y and Z, all else equal, will each increase prices. Therefore, there are two markets that pass a hypothetical monopoly test. But now ask how one could establish this possibility. One could use merger simulation. But then what is the point of defining a market if one has already done the merger simulation that shows that either merger would be harmful? See Carlton (2007b).

[16] See Werden (2002, 2023).

[17] It is well-known that the economic analysis in many situations is not so simple as to allow one to say that competition will produce better quality, a better range of products, or better innovations than a more concentrated market structure. Nevertheless, I would view skeptically claims justifying a merger in a concentrated industry based solely on improvements along these dimensions.

D. W. Carlton

My concern is that it is easy to speculate that some firm is an important potential entrant. Just as the Guidelines warn that claimed efficiencies will receive no weight if they are speculative, I would expect that the same standard would apply to claims that a firm is a potential entrant that after entry would become a significant competitor. Ever since the excellent study by Dunne, Roberts, and Samuelson (1988) that showed how rare successful entry and expansion is (and subsequent work has verified this finding—see, e.g., Foster et al. (2008)), the economics profession has been on notice not to overemphasize the ability of entry to discipline markets generally, especially in markets where entry has been rare.

Although I would like to see more research (more on this below) on how accurate are agencies' forecasts of the identity of entrants that develop into significant competitors, I would wager that it is not very good. For example, in a famous case that is cited in the 2023 Guidelines, *FTC v. Procter Gamble*,[18] the FTC prevailed in preventing P&G from buying Clorox on the grounds that P&G was a potential entrant into bleach. P&G never became a successful competitor in bleach.[19] I cite this example not because one instance proves a result but to illustrate that the blocking of that merger deprived the economy immediately of the likely efficiencies of the transaction in order to preserve a future speculative benefit from entry—a benefit that never materialized.

There are several other concerns that I have with regard to the Guidelines' treatment of evidence that would favor preventing the merger. I agree that when a potential entrant acquires an existing firm, one can and should ask whether the potential entrant is really a likely entrant. In the absence of plans to enter, speculation that "well, it is a big firm that could afford to enter" seems a weak argument – even though Guideline 4 suggests it as evidence to block a merger. Similarly, Guideline 4 discusses how it is evidence in favor of blocking the merger if the firm once evaluated de novo entry as an alternative to purchasing an existing firm. That strikes me as unbalanced unless one credits a rejection of such an entry plan also as probative. (This is a bit tricky because one needs to make sure that the rejection was not premised on buying into a concentrated industry.)

Guideline 4 also explains the perceived potential competition theory. In this theory, the potential entrant is thought by industry participants to be an entrant and significantly constrains price. I understand that possibility but I have two concerns.

First, how would one know that the potential entrant significantly constrains price? Should the agencies be required to show this empirically? Or is it enough that some rival (that might fear the creation of an efficient rival) says so? If one is skeptical of self-interested testimony, as the 2023 Guidelines are in other places, why are they not concerned about that here?

Second, the clear insight of the Areeda-Turner test for predation is that having a standard for legality that depends on a rival's costs is not sensible since a firm knows only its own costs, not its rival's costs. That is why pricing "above cost" – above one's own cost – is no longer considered to be an anticompetitive act. But suppose that a firm has rejected entry and therefore acquisition is its only route to enter the

---

[18] *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577–578 (1967).

[19] Dillon (2011).

 Springer

industry. Should the firm be deprived of that opportunity because its rivals testify that they believe (incorrectly) that the firm will enter on its own? Isn't that the same problem that Areeda-Turner pointed out with a predation standard based on rivals' costs? How is a firm supposed to know what its rivals are thinking?

Finally, again in the interests of balance, I would have liked to see some recognition that depriving a firm of the ability to purchase nascent firms could deprive those nascent firms of a way to cash out, thereby creating disincentives for them to enter. It is well known that exit choices influence entry rates. Will the agencies consider that? It is easy to see how in certain industries innovation is best done in small firms while the monetization of that innovation is best done by established firms. I see no recognition of that point in the 2023 Guidelines.

## 5  Guideline 5 Appears Hostile to Vertical Mergers

Guideline 5 is correct to explain that a vertical merger can harm competition. But as in the case of horizontal mergers, the Guideline's view seems to be a hostile one: Guideline 5 conveys an impression that the agencies believe that such mergers are frequently harmful and rarely beneficial. There is little if any explicit recognition, except perhaps in footnote 31, that a vertical merger involves a merger of complements in contrast to a horizontal merger that involves a merger of substitutes. By its very nature, a horizontal merger eliminates a rival and creates upward pricing pressure, all else equal. In contrast, by its very nature, a vertical merger creates a better alignment of incentives (e.g., the elimination of double marginalization) that should, all else equal, lead to downward, not upward, pricing pressure.

Of course, not all else is equal, especially in the case of a vertical merger. A vertical merger changes the incentive in setting the input price to (the now) downstream rivals and changes the incentive to set the downstream price of the merged firm. How all these forces play out depends in part on the diversion rates among the downstream products (and upstream products, if any). It also depends on how the pricing "game" changes. For example, if one thinks that, pre-merger, all prices are set in a sequential order involving Bertrand competition first at the upstream level and then at the downstream level, is it reasonable to continue that assumption post-merger when the upstream firm now controls both its upstream and downstream price?

My point is not to give vertical mergers a pass but instead that the Guidelines and enforcement based upon them should acknowledge the difference between horizontal and vertical mergers and the general lack of consensus in the economics profession about the likelihood of competitive harm from a vertical merger.[20]

But as in other parts of the 2023 Guidelines there seems to be a peculiar asymmetry in the treatment of evidence. Guideline 5 explains that there is evidence of a

---

[20] See, e.g., Carlton et al. (2019), Carlton (2020), Carlton and Israel (2021), Carlton et al. (2022), Crawford et al. (2018), Domnenko and Sibley (2023), and De Stefano and Salinger (2024). Carlton et al. (2022) contains a summary of the sparse empirical literature on vertical mergers. But see Loudermilk et al. (2023) and Salop (2018) for a different view.

possible harm if internal documents discuss limiting access post-merger. That seems right. But the Guideline goes on to suggest that it is not (equally?) probative if there are no such documents or apparently even documents indicating that there will be no such limitation of access. That does not seem balanced to me.

There is a discussion of contracts in footnote 31 as an alternative way to achieve any claimed benefits of a vertical merger that eliminates double marginalization. I will discuss contracts a bit more below; but here I ask why, if contracts can eliminate double marginalization, contracts have not already been written to do so?

But there is an even subtler point about contracts that the 2023 Guidelines have overlooked: Suppose absent the merger, the input monopolist uses non-linear pricing to write a contract with a downstream rival (with market power) to eliminate double marginalization AND as part of that contract also agrees to do this exclusively with this downstream firm. To all other downstream firms, the input price is a price above marginal cost. In return, the nonlinear pricing provides a payment to the input monopolist that splits the rents that arise downstream as a result of this favorable contract that harms the other downstream rivals. This is essentially an anti-competitive vertical merger that is achieved by contract.

Are the 2023 Guidelines claiming that this is better than the vertical merger? Or are they claiming that the agencies will investigate every vertical contract in every industry to make sure that there are no such payments?[21] If there are no transactions costs, then not only is the Guideline correct that the benefits of eliminating double marginalization by vertical integration can also be achieved by contract, but it also follows from that logic that the harmful effect on competition can be achieved by a vertical contract.

I understand that one response is that such a contract is illegal; but my point is that, given detection costs, harsh treatment of vertical mergers could lead to contracts that achieve similar ends but are hard to detect. Wouldn't it be better to have a vertical merger that is scrutinized and could involve a privately enforced contractual assurance of input supply at certain prices?

I fear that the agencies have not completely thought through the contract arguments in the 2023 Guidelines clearly. I will discuss this point further below.

Finally, as I discussed above, a vertical merger requires recalculating the altered incentives along a variety of dimensions. The upstream margin and downstream margins will change as a result of vertical integration and the resulting competition.[22] Guideline 5 says little explicitly about these margins as far as I can tell – other than the general statement that the competitive importance of the input will be evaluated.

---

[21] It was such concerns that motivated in part the Robinson-Patman Act, a law that is generally viewed as undesirable. Are the 2023 Guidelines suggesting that those views should be reexamined? If so, they should state this explicitly.

[22] The fact that vertical models are complicated means that, absent information on substitution among products and other information, one cannot isolate the effect of, say, elimination of double marginalization. In the *Illumina* case (*Illumina v. FTC*, No. 23–60,167 (5th Cir. 2023)), where I was a witness for the merging parties, I explained that, in the absence of a contract for the input, without a complete model one could do only illustrative calculations of, say, the benefit of the elimination of double marginalization; but, since no rival downstream products yet existed, there was no basis for me or the government's economist to estimate diversion ratios. I will return to the *Illumina* case briefly below.



For example, suppose a vertical merger involves an input monopolist (i.e., assume the input is sold by only one firm). If the downstream rivals are homogenous, and for some reason there is a margin downstream, then that merger can only benefit consumers[23]: Double marginalization is eliminated, and there is no harm to consumers if the downstream rivalry is eliminated. The overall margin goes down even if all downstream rivals are eliminated—and consumers benefit.

I would have liked to see some explicit recognition of this general point, even though the result need not always apply. For example, if goods are differentiated, then it might not apply.[24]

There is one additional point that is not mentioned in Guideline 5: Suppose that the vertical merger is announced and the enforcement agency is worried about complete foreclosure of downstream rivals by the input monopolist (the only supplier of the input). Also suppose that soon thereafter there are many new downstream rivals that announce that they have raised money to finance their downstream firms. Shouldn't that matter? The capital markets are telling us that they are not worried about complete foreclosure even though the enforcement agency is.

I would have liked to see at least some mention of this.

## 6 The 2023 Guidelines Pay No Attention to Contracts as a Way to Remove Harms to Competition from a Merger

I have already discussed the statements in the 2023 Guidelines that contracts might be able to achieve the benefits that are claimed by a proposed merger. Aside from these statements, the 2023 Guidelines are bereft of any discussion as to how contracts could eliminate concerns about harm to competition. It seems unbalanced to claim that contracts can be used to achieve the benefits of a merger, but not to recognize that contracts are capable of resolving the concerns of harm from a merger.

The point is most easily made in the context of a vertical merger: Suppose that an input monopolist acquires a downstream firm, which thereby raises the concern that the firm post-merger will foreclose other downstream rivals from access to the input or, alternatively, will raise the price of the input to the downstream rivals. To allay any such concerns, the firm offers a binding contract to any downstream rival that assures them access to the input at the pre-merger price. (To keep the example simple, assume that in the absence of the merger the input price would remain the same forever.)

Why doesn't that solve the concern with foreclosure? The downstream rivals have an enforceable contract whose breach would entail legal consequences. As long as the breach penalties are high enough, one should be able to create a self-enforcing

---

[23] A relevant issue is whether the assumption of an input monopolist is consistent with having large downstream margins. The discussion of critical loss earlier in the 2023 Guidelines emphasizes that the agencies will pay attention to margins to make sure that when an economic model such as critical loss is used to analyze a horizontal merger, the model is internally consistent with existing margins. That exact same logic should apply to vertical mergers – but it is not explicitly mentioned.

[24] See Carlton (2020, sec. 4).

contract that allays concerns about foreclosure.[25] Yet the 2023 Guidelines nowhere even suggest such a possibility, preferring in an early footnote (footnote 8) to state that remedies are not discussed.

A binding contract post-merger is an economic fact that one should take into account in assessing the effect of a proposed merger. Moreover, a binding contract among private parties is not a government-imposed remedy enforceable by the government. I understand that there can be a concern with government-enforced remedies, but a private contract does not raise those concerns – though it may raise concerns about private enforceability. It seems arbitrary to assert that such private contracts can never be properly enforced – especially if such contracts or similar ones already exist in the industry and especially if these types of contracts have resolved antitrust concerns in prior cases.[26]

## 7 Retrospective Studies

The 2023 Guidelines missed an opportunity to highlight the importance of retrospective studies. There are unavoidable tradeoffs in merger enforcement in deciding how aggressive or lax to be: Too aggressive a policy will scare off efficiency-enhancing mergers that would benefit consumers; and too lax a policy will harm consumers by harming competition. Balancing those tradeoffs appropriately can be aided greatly by examining how well past policy decisions have turned out. As I have discussed many times (see, e.g., Carlton (2009, 2022)), the best-situated economists to do those studies are the ones at the government agencies.

By a retrospective study, I mean much more than what is typically done where one examines whether prices went up or down after a merger. Notice that if the world is stable and only subject to random errors, then I would expect, absent other considerations, that half the time prices would go up and half the time down even if the merger had no adverse effect on competition; see Carlton (2009, 2022).

I would want to see a more in-depth study. For example, if a merger simulation model had been used, how well did those predictions turn out? If several such models had been used, which one did best? Was there information available during the merger investigation that would have allowed one to better predict the post-merger price increase if one did in fact occur? If the merging parties claimed that there would be efficiencies, were there? If the government blocks a merger because the

---

[25] Issues arising under contract law would have to be addressed to ensure that the contract is enforceable.

[26] For example, in the AT&T/Time Warner case (*United States v. AT&T, Inc.*, No. 18–5214 (D.C. Cir. 2018)), in which I served as an expert for the merging parties, Judge Leon noted that in a case that raised similar antitrust concerns (Comcast/NBCU) to those in the AT&T/Time Warner matter, the Department of Justice had argued that a remedy similar to the binding commitment that AT&T contractually obligated itself to in the AT&T/Time Warner matter had resolved the antitrust concerns of the Department of Justice. Judge Leon questioned why the contractual obligation in the AT&T/Time Warner case should not be expected to do the same. In the AT&T/Time Warner matter, the government unsuccessfully took the position, consistent with the 2023 Guidelines footnote 8 (which states that such "remedies" are beyond the scope of the Guidelines) that the legality of the merger should be addressed absent the "remedy." (Again, I defer to the legal scholars, but my reading is that the court again rejected that government position in *FTC v. Illumina*.)



PX0682-014

acquisition is of a potential entrant, did that firm actually enter subsequently and become a significant rival?

Without such studies to assess past policy, I fear that antitrust policy will be set by the subjective preferences of the politicians and their appointees, and not by evidence. Such studies are needed if merger policy is to be evidence-based.

## 8 Praise

Although I have been critical of the 2023 Guidelines, it would be wrong to conclude that I reject much of the economic analysis presented in the 2023 Guidelines. The economics – primarily Sect. 4 – build upon prior Guidelines; and those Guidelines, though not perfect, did a good job. The economics in these Guidelines make several useful additions. I particularly liked some of the discussions about platform industries – especially the point that a merger that involves an intermediary that was a facilitator of competition among platforms could raise antitrust concerns, though I would have liked also to have seen some discussion of the possibility of free riding across platforms.

I also liked the point about bargaining that the 2023 Guidelines make – not just because I had made it too[27] but because it raises some deep questions about antitrust. In a bargaining environment, a merger can give a firm more bargaining power, and this can improve both efficiency and the merged firm's profits. But then that creates an incentive for the other side of the market to merge so as to offset this bargaining power and argue that its improved bargaining power will also increase efficiency. Pretty soon we have one firm on each side of the market.

The fundamental issue here is that the market forces lead to a structure that is as far from atomistic competition as one can get. It illustrates what Demsetz (1968) once stated: In the absence of transaction costs, there is no need for antitrust since the efficient solution will be reached. I don't believe that—neither did he—but it is a warning about the plausibility of such arguments. Moreover, the 2023 Guidelines, to their credit, address dynamic consequences, though predicting such consequences can be difficult.

Given the emphasis on labor markets in the Guidelines, I would hope that any merger that results in, say, a reduction in wages would pay attention to the long-run supply curve. I think especially of doctors' complaining about insurance companies getting larger through merger and then reducing reimbursement rates and wonder what effect that will have on the future supply of doctors.

My conclusion is that there is some good economics that has been added to the 2023 Guidelines but that the use of case citations and interpretations, together with the hostile tone in places to mergers and efficiencies, could have been omitted or at least could have appeared as a separate document. I expect that the next revision of the Guidelines will be sooner than the 13 years that have elapsed since the 2010 Guidelines.

---

[27] Carlton (2020).

Springer
PX0682-015

**Author contributions**  Dennis Carlton is the sole author.

## Declarations

**Competing interests**  I frequently work on matters before the enforcement agencies that are related to mergers and have worked for and against many of the largest firms that are involved in current litigation. I served as Deputy Assistant Attorney General in the Antitrust Division of the Department of Justice during 2006-2008 and was involved with the preparation of prior Merger Guidelines. When I mention a case in this article, I will indicate if I was involved in the case. My CV at Compass Lexecon lists the matters where my involvement is public. I thank Thomas Barnett, David Gelfand, Ken Heyer, Lewis Kaplow, Daniel O'Brien, Gregory Pelnar, Sam Peltzman, Steven Salop, Allan Shampine, Yoad Shefi, Ryan Shores, Theresa Sullivan, Larry White, and participants at my talks at the Federal Reserve Board and George Mason University for helpful comments.

**Open Access**  This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

## References

Antitrust Modernization Committee. (2007). Report and recommendations. https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf

Ashenfelter, O., Hosken, D., & Weinberg, M. (2014). Did Robert Bork understate the competitive impact of mergers? Evidence from consummated mergers. *Journal of Law and Economics, 57*(S3), S67–S100. https://doi.org/10.1086/675862

Baker, J.B., Baye, M.R., Bresnahan, T., Bulow, J., Carlton, D.W., Froeb, L.M., Harris, B.C., Hay, G.A., Heyer, K., Kobayashi, B.H., Lafontaine, F., Rubinfeld, D.L., Salinger, M.A., Scheffman, D., Schwartz, M., Scott Morton, F., & Sweeting, A. (2023, November 27). Letter to the Editor: Former FTC and DOJ Chief Economists Urge Separation of Economic and Legal Analysis in Merger Guidelines, Promarket.org, https://www.promarket.org/2023/11/27/letter-to-the-editor-former-ftc-and-doj-chief-economists-urge-separation-of-economic-and-legal-analysis-in-merger-guidelines/

Carlton, D.W. (2022, September 14). How to make sensible merger policies? *Network Law Review*. https://www.networklawreview.org/carlton-mergers/

Carlton, D.W. (2023a). The Draft Merger Guidelines demote economics to justify aggressive antitrust enforcement. In ProMarket (2023, pp. 88–95). https://www.promarket.org/2023/09/12/dennis-carlton-the-draft-merger-guidelines-demote-economics-to-justify-aggressive-antitrust-enforcement/

Carlton, D.W. (2023b). Have the Draft Guidelines demoted economics? In ProMarket (2023, pp. 12–19). https://www.promarket.org/2023/08/04/have-the-draft-guidelines-demoted-economics/

Carlton, D.W. (2007a). Does antitrust need to be modernized? *Journal of Economic Perspectives, 21*(3), 155–176.

Carlton, D.W. (2007b). Market definition: Use and abuse. *Competition Policy International, 3*(1), 3–27.

Carlton, D.W. (2009). Why we need to measure the effect of merger policy and how to do it. *Competition Policy International, 5*(1), 87–100.

Carlton, D.W. (2020). Transaction costs and competition policy. *International Journal of Industrial Organization, 73*, 102539. https://doi.org/10.1016/j.ijindorg.2019.102539

 Springer

Carlton, D.W. (2023c). Errors in antitrust enforcement matter more than you think. *George Mason Law Review, 30*(4), 917–934.

Carlton, D.W., Giozov, G.V., Israel, M.A., & Shampine, A.L. (2022). A retrospective analysis of the AT&T/Time Warner merger. *Journal of Law and Economics, 65(S2)*, S461–S498. https://doi.org/10.1086/721268

Carlton, D.W., & Israel, M.A. (2010). Will the new guidelines clarify or obscure antitrust policy? *Antitrust Source, 10*, 11–14.

Carlton, D.W., & Israel, M.A. (2021). Effects of the 2010 Horizontal Merger Guidelines on merger review: Based on ten years of practical experience. *Review of Industrial Organization, 58(1)*, 213–234. https://doi.org/10.1007/s11151-020-09798-4

Carlton, D.W., Israel, M.A., MacSwain, I., & Orlov, E. (2019). Are legacy airline mergers pro-or anti-competitive? Evidence from recent U.S. airline mergers. *International Journal of Industrial Organization, 62*, 58–95. https://doi.org/10.1016/j.ijindorg.2017.12.002

Crawford, G.S., Lee, R.S., Whinston, M.D., & Yurukoglu, A. (2018). The welfare effects of vertical integration in multichannel television markets. *Econometrica, 86*(3), 891–954. https://doi.org/10.3982/ECTA14031

Demsetz, H. (1968). The costs of transacting. *Quarterly Journal of Economics, 82*(1), 33–53. https://doi.org/10.2307/1882244

Demsetz, H. (1973). Industry structure, market rivalry, and public policy. *Journal of Law and Economics, 16*(1), 1–9. https://doi.org/10.1086/466752

Dillon, K. (2011). I think of my failures as a gift. *Harvard Business Review*, *89*(4), 86–89. https://hbr.org/2011/04/i-think-of-my-failures-as-a-gift

Domnenko, G.B., & Sibley, D.S. (2023). Simulating vertical mergers. *Review of Industrial Organization, 62*(2), 99–118. https://doi.org/10.1007/s11151-023-09896-z

Dunne, T., Roberts, M., & Samuelson, L. (1988). Patterns of firm entry and exit in U.S. manufacturing industries. *The RAND Journal of Economics, 19*(4), 495–515. https://doi.org/10.2307/2555454

Foster, L., Haltiwanger, J., & Syverson, C. (2008). Reallocation, firm turnover, and efficiency: Selection on productivity or profitability? *American Economic Review, 98*(1), 394–425.

Hovenkamp, H. (2023a). Did the Supreme Court fix "Brown Shoe"? Promarket.org. https://www.promarket.org/2023/05/12/did-the-supreme-court-fix-brown-shoe/

Hovenkamp, H. (2023b). Brown Shoe merger policy and the glorification of waste. *CPI Antitrust Chronicle, 3*(2), 8–13.

Loudermilk, M., Sheu, G., & Taragin, C. (2023). Beyond "horizontal" and "vertical": The welfare effects of complex litigation. FEDS Working Paper No. 2023–5. https://doi.org/10.17016/FEDS.2023.005

ProMarket. (2023). *The Merger Guidelines Symposium*, Stigler Center at the University of Chicago Booth School of Business. https://www.chicagobooth.edu/-/media/research/stigler/pdfs/promarket-merger-guidelines-ebook.pdf

Salop, S.C. (2018). Invigorating vertical merger enforcement. *Yale Law Journal, 127*(7), 1962–1994.

De Stefano, M., & Salinger, M.A. (2024). The complicated simple economics of vertical mergers. Working paper. https://ssrn.com/abstract=4720113

Werden, G.J. (2002). Market delineation algorithms based on the hypothetical monopolist paradigm. Economic Analysis Group Discussion Paper No. 02–8. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=327282.

Werden, G.J. (2023). Gerrymandering redux: The relevant market under the Draft Merger Guidelines. Policy brief. Mercatus Center, George Mason University.



# PX0683



Menu

**INSTAGRAM**

# Why Instagram is taking on Twitter with Threads

The 'volatility' of Twitter under Elon Musk has opened a window to compete. It's a 'risky' bet worth trying, says Instagram boss Adam Mosseri.

By **Alex Heath**, a deputy editor and author of the Command Line newsletter. He's covered the tech industry for over a decade at The Information and other outlets.

Jul 5, 2023, 7:01 PM EDT



| 128 | Comments (128 New)

*If you buy something from a Verge link, Vox Media may earn a commission. See our ethics statement.*

PX0683-001



Image: Meta

While Mark Zuckerberg and Elon Musk are still preparing for a possible cage match, starting today, their two companies are officially battling.

Meta has released Threads, its standalone Twitter competitor that is based on Instagram's account system. According to the head of Instagram, Adam Mosseri, Twitter's "volatility" and "unpredictability" under Musk provided the opening to compete. In an interview, Mosseri says that Threads is designed for "public conversations," a direct reference to how Twitter execs have described the purpose of the service over the years.

"Obviously, Twitter pioneered the space," according to Mosseri. "And there are a lot of good offerings out there for public conversations. But just given everything that was going on, we thought there was an opportunity to build something that was open and something that was good for the community that was already using Instagram."

Meta has been planning to release Threads, its self-described "sanely run" version of Twitter, for a while. The backlash to Musk's recent limiting of how many tweets people can see per day was a catalyzing event for getting the app out the door this week, according to internal company documents I've seen. They also say that Meta expects "tens of millions" of people to try Threads within the first few months of availability.

As Mosseri describes it, Threads is a "risky endeavor," especially since it's a new app people have to download. Meta has made the onboarding process easier by letting you auto-populate your account info and follow list from your Instagram, which I was able to do quickly after being granted access to Threads earlier today.

## "I think it'd be a mistake to underestimate both Twitter and Elon."

Another dynamic Threads has to contend with is that Twitter has been around for a long time and built up a unique network that is hard, if not impossible, to replicate. Even with Musk's antics over the past several months, it's clear Meta knows that unseating Twitter won't be easy. "I think it'd be a mistake to underestimate both Twitter and Elon," says Mosseri. "Twitter has got a lot of history; it has an incredibly strong and vibrant community on it. The network effects are incredibly strong."

Threads is strikingly similar to Twitter in key ways. The app's main feed shows posts (or, as Mosseri calls them, "threads") from accounts you follow, along with accounts recommended by Instagram's algorithm. You can repost something with your own commentary, and replies are featured prominently in the main feed. There is no feed of only people you follow, though that could be added later.

PX0683-003

Image: Meta

Posts on Threads can be up to 500 characters long and include photos or videos that are up to five minutes long. There are no ads, at least for now — adding those will be a "champagne problem" if Threads achieves enough scale, per Mosseri.

There also isn't a paid verification scheme that unlocks additional functionality, though Instagram's blue checks will port over to Threads accounts. With some exceptions for extreme cases like the sharing of child exploitation imagery, moderation actions Meta takes against a Threads account will not impact its associated Instagram account, according to internal documents I've seen.

PX0683-004

Thanks to the deep ties between Threads and Instagram, you can quickly share posts from Threads to your Instagram story or feed. There's also the ability to share links to Threads posts in other apps, which Mosseri predicts will be helpful as "we try to bootstrap it out from nothing."

Meta has been busy this week onboarding a bunch of celebrities from the worlds of Hollywood, music, professional sports, business, and the like to Threads ahead of its public release. Celebs already spotted on the app include Karlie Kloss, Tony Robbins, Dana White, Gordon Ramsay, Ellie Goulding, Jack Black, Russell Wilson, and the Brazilian pop star Anitta.

Threads is initially available in 100 countries, including the US, but not in the European Union. It's being excluded from the EU initially due to "the complexities with complying with some of the laws coming into effect next year," according to Mosseri. That's likely a reference to the Digital Markets Act, which imposes a bunch of new legal obligations on so-called "gatekeeper" platforms like Meta.

**Related /**

- **Instagram's Threads: all the updates on the new Twitter competitor**
- **So where are we all supposed to go now?**
- **Can ActivityPub save the internet?**

Meta plans to eventually hook Threads into ActivityPub, the decentralized social media protocol that also powers Mastodon. That integration isn't ready at launch, though, as I previously reported. When it's enabled, Threads users will be able to interact with Mastodon users and take their accounts with them to other clients that support the ActivityPub standard.

PX0683-005

As Mosseri puts it, this is a move designed to appease creators who have grown increasingly wary of relying on the whims of centralized social media companies. "I think we might be a more compelling platform for creators, particularly for the newer creators who are more and more savvy, if we are a place where you don't have to feel like you have to trust us forever," he says.

# "It would be great if it gets really, really big, but I'm actually more interested in if it becomes culturally relevant"

In terms of what success looks like for Threads, Mosseri tells me that he isn't interested in killing Twitter or even getting the app to Instagram-level scale of over 1 billion users: "It would be great if it gets really, really big, but I'm actually more interested in if it becomes culturally relevant than if it gets hundreds of millions of users."

*You can read my full interview with Adam Mosseri, the head of Instagram, below. The following transcript has been lightly edited for clarity:*

**I'm curious how this project started. Whose idea was it? What was the strategy?**

Well, a couple of different things. The idea at a high level is we have this amazing creative community on Instagram. We have amazing creators on the platform. Obviously, Twitter pioneered the space, and there are a lot of good offerings out there for public conversations, but just given everything that was going on, we thought there was an opportunity to build something that was open and something that was good for the community that was already using Instagram.

And so we wanted to see what that might look like. Is it a tab in the app? Is it bringing text to feed? Is it a separate app? A bunch of different people [inside Meta] were playing in this space, as you can imagine. You've got a lot of sources, I know. I'm sure you heard a bunch of different things. People all over the company were playing. What we tried to do is pull everything together into a more focused effort so that instead of building a bunch of things not that well, we could try to place a meaningful, risky, but compelling bet together. So that all came together in the late winter.

**Was there anything specific with how Elon Musk is handling Twitter that led you all to move now? There are a lot of things one could point to, I think.**

PX0683-006

I think it'd be a mistake to underestimate both Twitter and Elon. Twitter has got a lot of history; it has an incredibly strong and vibrant community on it. The network effects are incredibly strong. A bunch of advertisers pulling their budgets doesn't necessarily affect the network engagement at all; in fact, it might even help and not hurt over the long run.

I do think there's a lot more noise around Twitter than there was. Just the volatility and the unpredictability of what seemed to be going on there seemed like it might present an opportunity. If things like stability started to become an issue or if they changed the product too drastically, those were things that might leave an opening for us in a space that otherwise looked pretty particularly difficult to compete in.

## "Any time you build a new app from scratch, it is much less likely to succeed than to succeed"

I want to be clear: any time you build a new app from scratch, it is much less likely to succeed than to succeed. So this is still a risky endeavor, but it just seemed like the landscape was changing. People were interested in having alternative options to have public conversations. It's not just us playing in the space in addition to Twitter, obviously. And we have this really strong, vibrant creator community. So it just seemed worth at least putting a small team together to explore some ideas. And then when we had a design and a direction we were excited about, then we were like, "Alright, let's take a swing and let's see what happens."

PX0683-007

**Why do it as a standalone app off of Instagram?**

It was a hugely contentious debate internally. You could be in feed. You could be a separate tab. You could be a separate app. The challenge with text posts in feed is that the post and comment model just fundamentally does not support public discourse as well as the model that Twitter pioneered with tweets and replies. Treating replies as equal as opposed to subordinate somehow just allows for a very different and much more broad range of public conversations. People do post text to Instagram all the time, even though we don't support it first class, and we're experimenting with that, too. That's great, but I think it solves a much smaller use case than public discourse more broadly.

Then there's a separate app versus separate tab. Separate tab is tough. There's only so much stuff you can shove in the app. It's already feeling too complicated. We're trying to actually simplify right now, and so it's certainly working against that. And generally, when you build a separate tab, you find you want to push all that distribution through a feed invariably in order to bootstrap it. You kind of end up right back in that first problem.

A separate app is way less likely to succeed because you have to bootstrap a user base from very little or from nothing. But if you do it, if you succeed, the upside is so much more significant. You've got more space to play with. You've got a different mental model with a new space. With a new app comes the opportunity to have people think about what they can do in that space much more differently than trying to climb from under the shadow of what the app has been for before. Most people still think of Instagram as primarily a photo sharing, feed app, and all the growth and sharing on Instagram for half a decade has been in stories and in messaging. But we still have that identity because that's our heritage. And so a new app allows you to shape that in a way, too.

PX0683-008

So, higher beta. More risk, more possible reward. Not everything we do like this is going to work, but we should always be placing a couple of high-risk bets like this if we're going to hope to really evolve forward as fast as I think we need to as a company.

**I'm sure naming this the name of another standalone app that you all shut down a couple of years ago, the irony of that is not lost on you?**

It is not.

**And you know this, too: You all's track record on launching standalone apps in-house, they don't tend to live after several years. Do you have any conviction that this time will be different? You described this as a bet. Are you all committing to it long term?**

If we're going to build a separate app, it makes no sense to do it if you're only going to do it for six months or a year. You have to give it a real run. You have to assume that out of the gate, it doesn't succeed [and] that you get a bunch of things wrong, and you need to learn and adapt.

I've been involved in a handful of new apps over the years. I do think the mistakes we made in the early years was building something that was too much like Facebook. It was just a different version of Facebook. So why would you even do it? Facebook Home, which I was involved in, which was the same content as Facebook. Paper was the same content, just a different design from Facebook. Then I think we actually pivoted too far away from that. We kind of overcorrected toward things that didn't seem to really lean on any strategic strengths that we had. We were just building a bunch of different apps.

My hope with this, with Threads — which I am telling you is very risky, but I am also telling you I'm more excited about this than I have been about any of the other projects — is that it's the right balance. We have a community that is interested. You can bring your identity from Instagram over to Threads. You can bring all the accounts you follow over to Threads with you. The two apps are interconnected and can promote each other and help each other. But it is sufficiently a different use case — public conversation — than visual sharing, which is obviously our bread and butter, that I'm hoping it's the right balance. But we'll see.

**The ActivityPub element of this I'm fascinated by. I reported that the plan was recently to integrate with that in a few months or so. It's not happening on day one. Why not do that at launch, and why are you doing that at all?**

PX0683-009

Let's start with why we are doing it at all. I do think that more and more people are going to be interested in and appreciate more open systems. And I think that's the direction of travel for the industry. That's going to be a painful shift for a lot of the larger platforms that already exist out there. But as people become more and more savvy about the benefits and the risks involved with using any of these platforms, then I think they're going to be demanding more.

## "I do think that more and more people are going to be interested in and appreciate more open systems."

Creators are a really good example. Creators are becoming more and more savvy. They're using more and more platforms. It's becoming rarer that a creator is completely attached to one platform because they're always worried about the risk of being overly beholden to one company that they obviously can't control. So I do think this is the direction of travel, and I think that a new app offers us the opportunity to really step into this space. It would be very, very difficult to take an existing app like Instagram and then integrate it.

But this allows us to learn because we're going to get a lot of criticism and a lot of feedback on how we integrate with ActivityPub and the Mastodon networks. I've already learned a lot from talking to people in the community. This is us leaning into where I think the world is going. And also, it has some really kind of nice benefits. I think the average creator today on Instagram probably doesn't know what Mastodon or ActivityPub is and probably doesn't need to. But when you start to think through the logical implications, or at least the opportunities of integrating fully over the long run, I think some pretty interesting opportunities arise.

The one that I think resonates the most with creators, in my experience, is that you should own your audience. If you decide to leave Threads one day, you should be able to bring your audience with you. I've talked about this idea in a couple of different contexts. There are, I think, better ways to do this over the long run, but I do think ActivityPub allows you to support that. I think we might be a more compelling platform for creators, particularly for the newer creators who are more and more savvy, if we are a place where you don't have to feel like you have to trust us forever or you can build up an audience, and then you can bring that audience with you elsewhere if you really have to at the end of the day.

PX0683-010

That's just one example of a benefit. I think there will be more over time. It's a combination of trying to lean into where the world is going, trying to empower creators, and also trying to learn and be honest and humble about the fact that we [Meta] come from a very different phase of the internet. We know that we need to evolve, or else we run the risk of becoming irrelevant. And so, let's be open-minded, let's try some new things, let's learn, and let's adapt.

**And not shipping it [ActivityPub integration] at launch? Is that just because...**

We just didn't have time. It requires a bunch more work. Think about everything we have to do. Like, if you're building safety classifiers, you need to be able to run those classifiers on datasets that aren't our typical datasets, right? If you're following accounts on other servers in the Threads app, how do we classify that content? There's a bunch of engineering work there. How do reporting flows work? How does strikes with accounts work? How does ranking work?

## "I didn't want us to miss our window entirely."

We knew it was going to slow us down. We were hoping to launch with support. But we got to a point where I was just like, "Look, we have to go because I think our window is going to close otherwise." And we just have to fast follow with this as quickly as we can. If that's a while later, it's a while later. And that's unfortunate. But at some point, I think timing is everything. I didn't want us to miss our window entirely.

**Did you want encrypted direct messages (DMs) in Threads?**

To start, we don't want to do any DMs. I don't know if that's going to last as a decision, but particularly in the US, I think people have a little bit of inbox fatigue. We all have a lot of different inboxes that we manage. What do you use for your sources? Signal?

**Yeah, Signal. But Twitter is a top-of-funnel thing. There's that from-tweet-to-DM loop that happens.**

PX0683-011

Instagram Threads: why Meta is competing with Twitter - The Verge

Yeah, exactly. But there's iMessage. There's Facebook Messenger for a bunch of people more on Android than iOS here in the US. There is obviously Instagram DMs, which has been really on fire lately. I live in Europe now, where WhatsApp is what everyone lives on.

The idea was to lean into openness, to allow people to share threads on other DM networks. And ideally, that would happen on Instagram DMs, but it could happen anywhere. And we'll see if that is sufficient. Maybe it's not a modern social network, but maybe it is. And if it is, we get to avoid further fragmenting the space, and we get the benefit of allowing people to raise awareness of threads on any network, which could be good as we try to bootstrap it out from nothing.

**Why is Threads not available in the European Union? That seems like a huge missed market opportunity. Is that due to uncertainty about the Digital Markets Act?**

The complexities with complying with some of the laws coming into effect next year are significant. We don't want to launch anything that isn't forward-compatible with what we know and what we think is coming. It's just going to take longer to make sure not only that it's compliant but that any claims we make about how we've implemented compliance stand up to our very high set of documentation and testing centers internally.

To be really honest, I'm bummed about it. I've been living outside of the US for a year now. I'm on a total kick pushing teams [inside Meta] to stop leaving things half-launched and get them out to the rest of the world. I meet creators who are asking questions like, "Do I need to move to the US to get access to such and such feature?" And it breaks my heart. But this one is just going to take a bunch of time.

**But it is coming eventually to the EU?**

That's the plan.

PX0683-012

**The same moderation rules will apply from Instagram to Threads?**

Yeah, in the app, it's the same community guidelines.

**And I assume you'll have a similar monetization model? There will eventually be ads in there as well?**

If we are successful, if we make something that lots of people love and keep using, we will, I'm sure, monetize it. And I would be confident that the business model will be ads. Right now, we are not focused on monetization. We're very, very focused on just trying to make something that people love to use. And then, if we get something to scale, that'll be a champagne problem.

**Is success killing Twitter?**

I don't think so. I think time has shown that there's room for multiple players in different spaces. There are definitely network effects, and there are definitely competitive effects. But I think you look at a lot of countries around the world, and there's a couple of major players in the social space between messaging and stories and feeds and in any combinations thereof. Brazil is a really good example. Instagram is on fire in Brazil, and WhatsApp status is enormous in Brazil. And they both continue to grow really rapidly over the last couple of years, despite the fact that they're both huge.

I think Twitter will continue to exist. I think success will be creating a vibrant community, particularly of creators, because I do think this sort of public space is really, even more than most other types of social networks, a place where a small number of people produce most of the content that most everyone consumes. So I think it's really about creators more than it is about average folks who I think are much more there just to be entertained.

PX0683-013

I think [we want] a vibrant community of creators that's really culturally relevant. It would be great if it gets really, really big, but I'm actually more interested in if it becomes culturally relevant and if it gets hundreds of millions of users. But we'll see how it goes over the next couple of months or probably a couple of years.

---

Sign up for **Command Line**, a paid weekly newsletter from Alex Heath about the tech industry's inside conversation. **Your first month is free!**

### Monthly

$7 / month

A flexible plan you can cancel anytime.

SUBSCRIBE

### Annual

$70 / year

A discounted plan to keep you up to date all year.

SUBSCRIBE

### Corporate

$60 / person / year

Keep your team informed on the inside conversation.

SUBSCRIBE

We accept credit card, Apple Pay and Google Pay.

---

☐ 128 COMMENTS (128 NEW)

---

FEATURED VIDEOS FROM THE VERGE

PX0683-014

Instagram Threads: why Meta is competing with Twitter - The Verge

More from this stream **Instagram's Threads: all the updates on the new Twitter competitor**

## Threads is testing 'Today's topics' to tell users what's trending in the US

Feb 12, 2024, 2:56 PM EST

## Threads will finally let you save posts.

Feb 7, 2024, 2:02 PM EST

## Threads is preparing to venture deeper into the fediverse.

PX0683-015

Feb 4, 2024, 8:42 AM EST

___

## Toward a unified taxonomy of text-based social media use

Feb 1, 2024, 5:34 PM EST

SEE ALL 131 STORIES

---

## SPONSORED CONTENT



Doctor: Sleep Apnea? Try This "Mouth Trick"…

Noctivio

Learn More



The Average Walk-In Shower Cost in 2024

westshorehomebaths.com

Learn More



New Edema Device Leaves Experts…

Health Inside Journal

Learn More



Locate Almost Anyone Online In Minutes

BeenVerified



Windows Users Didn't Know This Simple…

Safe Tech Tips

Read more



New Dental Implants Are So Cheap Now…

BestSearches | Search Ads

Click Here

PX0683-016

Instagram Threads: why Meta is competing with Twitter - The Verge

TERMS OF USE  /  PRIVACY NOTICE  /  COOKIE POLICY  /  DO NOT SELL OR SHARE MY PERSONAL INFO  /  LICENSING FAQ  /  ACCESSIBILITY  /  PLATFORM STATUS  /  HOW WE RATE AND REVIEW PRODUCTS

CONTACT  /  TIP US  /  COMMUNITY GUIDELINES  /  ABOUT  /  ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US  /  JOBS @ VOX MEDIA

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

PX0683-017

# PX0684



# Completed acquisition by Facebook, Inc (now Meta Platforms, Inc) of Giphy, Inc.

Final report

30 November 2021

PX0684-001

© Crown copyright 2021

You may reuse this information (not including logos) free of charge in any format or medium, under the terms of the Open Government Licence.

To view this licence, visit www.nationalarchives.gov.uk/doc/open-government-licence/ or write to the Information Policy Team, The National Archives, Kew, London TW9 4DU, or email: psi@nationalarchives.gsi.gov.uk.

The Competition and Markets Authority has excluded from this published version of the Provisional Findings report information which the inquiry group considers should be excluded having regard to the three considerations set out in section 244 of the Enterprise Act 2002 (specified information: considerations relevant to disclosure). The omissions are indicated by [✂]. Some numbers have been replaced by a range. These are shown in square brackets.

*Website:* www.gov.uk/cma

**Members of the Competition and Markets Authority
who conducted this inquiry**

Stuart McIntosh *(Chair of the Group)*

Margot Daly

Robin Cohen

Stephen Rose

**Chief Executive of the Competition and Markets Authority**

Andrea Coscelli

PX0684-003

**Contents**

*Page*

Summary .................................................................................................... 4
Who are the businesses and what services do they provide? ............................. 4
Our assessment.......................................................................................... 6
Conclusions ............................................................................................. 18
1. The reference ......................................................................................... 20
2. The Parties, Merger and Rationale .............................................................. 21
   The Parties ............................................................................................ 21
   The Merger ............................................................................................ 27
   The rationale for the Merger .................................................................... 28
3. Jurisdiction............................................................................................ 33
   Introduction ........................................................................................... 33
   Two or more enterprises .......................................................................... 33
   'Ceased to be distinct' ............................................................................ 35
   At a time or in circumstances falling within section 24 ................................. 36
   Turnover test.......................................................................................... 36
   Share of supply test ................................................................................ 36
   UK nexus, international comity and business certainty ................................... 48
   Conclusions on the relevant merger situation .............................................. 49
4. Industry Background ............................................................................... 50
   What are GIFs?....................................................................................... 50
   Overview and analysis of services related to GIF supply.................................. 51
   Characteristics and trends in GIF supply and usage........................................ 60
   Key players ............................................................................................ 67
5. Market Definition and Market Power ............................................................ 68
   Introduction and framework ...................................................................... 68
   The supply of searchable GIF libraries ........................................................ 71
   Social media .......................................................................................... 92
   Display advertising.................................................................................. 113
6. Counterfactual....................................................................................... 128
   Introduction .......................................................................................... 128
   The CMA's framework for assessment of the counterfactual............................ 128
   The Parties' views on the counterfactual .................................................... 129
   Our assessment of the appropriate counterfactual ....................................... 132
   Conclusion on the counterfactual.............................................................. 164
7. Horizontal Effects.................................................................................. 165
   Introduction .......................................................................................... 165
   Framework for analysis ........................................................................... 167
   Importance to dynamic competition of GIPHY's efforts to innovate and expand
   .......................................................................................................... 174
   Likelihood of expansion and UK entry by GIPHY............................................ 179
   Expected closeness of competition between Paid Alignment and Facebook's
   display advertising services ..................................................................... 213
   Assessment of Facebook's and others' likely response to potential competition
   absent the Merger.................................................................................. 216
   Loss of dynamic competition arising from the Merger..................................... 228
   Conclusion on horizontal unilateral effects.................................................. 232
8. Vertical Effects...................................................................................... 233
   Introduction .......................................................................................... 233

PX0684-004

Ability to foreclose.................................................................................. 234
Incentive to foreclose ............................................................................. 264
Effect of foreclosure on competition..................................................... 276
Conclusion on input foreclosure............................................................ 280
9. Countervailing Factors .......................................................................... 282
Entry and expansion ............................................................................. 282
Efficiencies............................................................................................ 307
10. Conclusions .......................................................................................... 309
11. Remedies .............................................................................................. 310
Introduction ........................................................................................... 310
Our remedy consideration process ....................................................... 310
Framework for the assessment of remedies ......................................... 311
Overview of remedy options .................................................................. 312
Full divestiture of GIPHY....................................................................... 312
Facebook's proposed remedy options ................................................... 352
Conclusions on remedy effectiveness................................................... 371
Relevant Customer Benefits (RCBs)...................................................... 371
Proportionality ....................................................................................... 374
Conclusion on remedies ........................................................................ 376

*Appendices*

A: Reference
B: Conduct of Inquiry
C: Jurisdiction shares of supply methodology
D: Market shares methodology
E: GIPHY's Timeline
F: GIPHY's Paid Alignment Model
G: GIPHY's data
H: Third Party submissions on Provisional Findings
I: Summary of Third Party Calls

Glossary

PX0684-005

**Summary**

# Overview of our findings

1. The Competition and Markets Authority (**CMA**) has found that the merger between Facebook, Inc. (**Facebook**) and GIPHY, Inc. (**GIPHY – together, the Parties**) (the **Merger**) has resulted or would result in a substantial lessening of competition (**SLC**) in social media and display advertising, harming social media users and businesses in the UK. Facebook, Inc. has recently been re-named Meta Platforms, Inc. but for the purposes of this report we have continued to refer to it as 'Facebook'.

2. On 12 August 2021, we announced our **Provisional Findings**, in which we provisionally concluded that the Merger would result in an SLC in social media and display advertising. Following a further period of consultation, we have now made our final decision, which we summarise here. The report and its appendices, which will be published together with or shortly after this summary, constitute the CMA's **Final Report**.

3. Facebook completed the acquisition of GIPHY on 15 May 2020, but has been required to hold the businesses separate since 9 June 2020, when the CMA imposed an Initial Enforcement Order (which was amended by a Variation Order on 29 June 2021). As explained in further detail below, we have decided that the only effective way to address the competition issues that we have identified is for Facebook to sell GIPHY, in its entirety, to a suitable buyer.

## Who are the businesses and what services do they provide?

### Facebook is by far the largest provider of social media and messaging services in the UK

4. Facebook offers various online products and services to customers in the UK. This includes popular social media and messaging platforms such as the Facebook app (also known as Facebook Blue), Instagram, Messenger and WhatsApp. Facebook is by far the largest provider of social media and messaging services in the UK, by number of users. Indeed, over 80% of UK internet users access at least one Facebook site per month. Such platforms are generally provided to users for no monetary cost. However, Facebook's platforms (in common with many other social media platforms) are multi-sided in nature, meaning that they supply services to two or more distinct, but related, customer groups. In Facebook's case, in addition to serving users, who use Facebook's social media and messaging platforms to

4

connect with their friends and family, it also serves advertisers, who use Facebook's platforms to market their products to users, and in return, pay Facebook a fee.

5.  Multi-sided platforms such as Facebook are often characterised by network effects, in that the value of the product for users on one side of the platform depends on the number of users either on the same side of the platform, or on the other side. For example, in Facebook's case, having a large user-base on its social media platforms makes it more attractive to advertisers. Facebook's business model, and the business model of other social media platforms, therefore relies on attracting and retaining users' attention (and gathering data about them), which they then use to sell advertising.

6.  An important way of attracting users' attention is by offering engaging content and features. Social media platforms, including Facebook and its rivals (eg Snapchat, TikTok, Twitter), therefore compete to offer users interesting content and features to keep them engaged on their platform for longer. Some of these features and content are provided by the social media platforms, while other features and content are provided by external providers, or by the platforms' users themselves (eg photo-sharing on Instagram).

7.  GIFs and GIF stickers, such as those provided by GIPHY, are popular features on social media and messaging platforms.

### GIPHY is the world's leading provider of free GIFs and GIF stickers

8.  GIPHY provides an online database and search engine that allows users to search and share GIFs and GIF stickers. A GIF (or video GIF) is a digital file that displays a short, looping, soundless video, while a GIF sticker displays an animated image comprised of a transparent (or semi-transparent) background which is placed over images or text (such as a Story on Instagram or Snapchat). We use the term 'GIF' to refer to both video GIFs and GIF stickers).

9.  While the GIF file format was invented in the 1980s, the onset of social media provided an opportunity to reimagine the GIF as a part of modern internet culture. The main GIF libraries that are used today were launched less than ten years ago, and the popularity of GIFs has grown enormously since then. Every day, millions of users in the UK post content that includes a GIF.

10.  GIPHY describes itself as the world's largest library of free GIFs and stickers. GIPHY offers its GIFs and GIF stickers to UK users both on its own

5

website and app, and via Application Programming Interfaces (**APIs**) or Software Development Kits (**SDKs**) that allow apps (eg Snapchat, TikTok, Facebook, Instagram) to integrate GIPHY's GIF and GIF sticker databases. These integrations allow GIPHY to reach a wide audience, making it the second largest search engine after Google by number of searches.

11.    Like Facebook, GIPHY's products are offered free of charge to users and companies using its APIs and SDKs, as well as on GIPHY's own website and app. While GIPHY's API partners do not pay for access to GIPHY's products, these products are important to some API partners as a tool for enhancing user engagement – in the UK alone, over a billion GIF searches are run by users each month on average using GIPHY's API integrations. From 2017 until May 2020, GIPHY generated revenues in the United States by offering brands and advertisers a 'Paid Alignment' service to align their GIFs with popular search terms (so that users see them first when searching for a GIF), or to insert them into GIPHY's trending feed, in exchange for payment. In the context of its acquisition of GIPHY, Facebook required the termination of all Paid Alignment activities.

## Our assessment

### *Why are we examining this Merger?*

12.    The CMA's primary duty is to seek to promote competition, both within and outside the UK, for the benefit of UK consumers. Following an initial 'phase 1' investigation, the Merger was referred for a more in-depth 'phase 2' investigation on 1 April 2021. At phase 2, the CMA considers whether:

   *(a)*  there is a 'relevant merger situation' for the purposes of the Enterprise Act 2002,

   *(b)*  that relevant merger situation has resulted, or may be expected to result, in a substantial lessening of competition (**SLC**) within any market or markets in the UK for goods or services, and

   *(c)*  if so, whether remedial action should be taken, and if so, what action and by whom.

13.    While both Facebook and GIPHY are US-based entities (and prior to the Merger, GIPHY's revenue-generating activities were limited to the US), the important question for the CMA is whether the Merger may have an impact on competition in the UK. This link to the UK is established by meeting one of two jurisdiction tests: (i) the turnover test (based on the target's turnover in the UK), and (ii) the share of supply test (requiring that the Parties together

6

PX0684-008

supply at least 25% of a particular good or service supplied in the UK, and there is an increment to the share of supply).

14.   Facebook and GIPHY are both active in the UK, and provide services to UK users. In this case, we conclude that the Merger has resulted in the creation of a relevant merger situation on the basis of the share of supply test, as the Parties overlap in the supply of apps and/or websites that allow UK users to search for and share GIFs, in which the Parties have a combined share (by average monthly searches) of [50-60]% with an increment of [0-5]%.

### *How have we examined this Merger?*

15.   In deciding whether a Merger has resulted, or may be expected to result, in an SLC, the CMA must apply a 'balance of probabilities' standard. This means that the CMA must decide whether it is *more likely than not* that a Merger will result in an SLC.

16.   To determine whether this is the case, we have gathered information from a wide variety of sources, using our statutory powers to ensure that we have as complete a picture as possible under the constraints of the statutory timetable to understand the implications of this Merger on competition. The evidence we have gathered has been tested rigorously, and the context in which the evidence was produced has been considered when deciding how much weight to give it.

17.   At phase 2, we have focused on two ways in which the Merger could give rise to an SLC. Both of these 'theories of harm' relate to the two-sided market for social media services and display advertising:

   *(a)* horizontal unilateral effects resulting from the loss of potential competition in display advertising; and

   *(b)* vertical effects on competition in the supply of social media arising from input foreclosure.

18.   We conclude that the Merger is more likely than not to give rise to an SLC on both counts. This is discussed in further detail below.

### *What evidence have we looked at?*

19.   In assessing this Merger, we looked at a wide range of evidence that we considered in the round to reach our decision.

20.   We examined the Parties' own internal documents which show how they run their businesses and how they view their partners and their rivals in the

PX0684-009

ordinary course of business. Such internal documents can also be helpful in understanding the Parties' plans for the future of their businesses. We undertook a widescale review having collected over 280,000 internal documents from the Parties.

21.   We spoke to and gathered evidence from other market participants in the industry to understand better the competitive landscape for the provision of GIF libraries, including the GIF advertising model, and to get their views on the impact of the Merger. In particular, we spoke to the following categories of market players:

   *(a)*   social media and messaging platforms;

   *(b)*   providers of keyboard apps;

   *(c)*   GIF providers;

   *(d)*   investors and potential investors in GIPHY; and

   *(e)*   advertising companies, advertising agencies, and brands familiar with GIPHY's Paid Alignment advertising services.

22.   We also considered the internal documents of certain social media and messaging platforms, and those of GIPHY's key investors, in order to determine how others viewed the GIPHY business prior to the Merger and GIFs more generally, and how they reacted to the Merger.

23.   We also calculated market shares. However, in markets such as the ones in which Facebook and GIPHY operate, there is a wide range of different products and offerings, and new features and products are introduced regularly. This can mean that it is difficult to define the precise boundaries of the 'market'. In these circumstances, when assessing the impact of the merger on competition, the CMA will consider evidence on market shares, if helpful, alongside evidence on how closely the merging parties compete (either currently or in the future). As well as the size of the Parties' market shares, our assessment of the extent to which Facebook and GIPHY have market power also took into account the stability of the relevant market shares, the strength of competitive constraints on the Parties, and the extent of past entry and exit from the relevant markets.

24.   Finally, as well as looking at how competition works currently (and the Parties' current shares of the relevant markets), we recognise that markets, and in particular markets for digital products and services such as those offered by the Parties, change over time. Our assessment is therefore

PX0684-010

forward-looking and considers the Parties' plans for their businesses in future.

25.   Following the announcement of our Provisional Findings in August 2021, the Parties provided submissions and further evidence in response. We also received submissions from third parties in response to our Provisional Findings, and followed up directly with a number of third parties to obtain supplementary information and to address specific issues raised by the Parties. We have carefully considered all new evidence and submissions and have taken them into account where appropriate in our Final Report.

***What did this evidence tell us…?***

*… about market power?*

26.   Market power is typically used to refer to firms who have such strength in a particular market that they are able to influence the price of the goods or services that they sell (eg charging higher prices than they would be able to if an industry was more competitive). This could also be the case in relation to non-price factors such as quality of a good or service, or level of innovation. We therefore considered the relative strength of the Parties in the core markets in which they operate. For GIPHY, this is searchable GIF libraries, while for Facebook, this is social media and display advertising. In assessing this relative strength, we considered the other options available to the Parties' customers or users and whether they offer a good alternative to the Parties.

27.   In relation to **searchable GIF libraries**, we have found that social media and messaging platforms have very limited choice of alternatives to GIPHY. Tenor (owned by Google) is GIPHY's only close competitor. GIPHY has a number of distinctive features that may make it particularly attractive to social media platforms, for example, the quality of its content, the sophistication of its search algorithm, its reach among distribution partners and the fact that, at the time of the Merger, GIPHY was the only significant provider of GIF-based advertising services. All of this points towards GIPHY having market power in the supply of searchable GIF libraries.

28.   In relation to the supply of **social media**, our investigation has found that Facebook has significant market power. In particular, we considered the fact that the Facebook platforms make up by far the highest share of user time spent on social media in the UK (73% in 2020) and that other platforms tend to be accessed in addition to the Facebook platforms, rather than as an alternative to them. These findings are also consistent with the findings of

PX0684-011

the CMA's Online Platforms and Digital Advertising Market Study (the **Market Study**) published in July 2020.

29.    Finally, in relation to **display advertising**, our view is that Facebook also has significant market power in display advertising in the UK. Display advertising is a form of digital advertising where advertisers pay online companies such as social media platforms to display their advertising on their web pages or mobile apps. Display advertising is an important industry in the UK, worth over GBP 7 billion in 2020. Our analysis shows that the Facebook platforms currently have a combined market share of around [40-50]%. Again, this is largely consistent with the findings of the Market Study.

*…about what would have happened had the Merger not taken place?*

30.    In order to provide a comparator and determine the impact that the Merger may have on competition, we have considered what would have happened had the Merger not taken place. This is known as the counterfactual.

31.    The Parties told us that it was likely that GIPHY would have become a significantly weakened business had it not been bought by Facebook. Our view is that, had the Merger not gone ahead, GIPHY would have continued to supply GIFs to social media platforms (including Facebook), as it had done before the Merger, and would have continued to innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products. This would have been the case regardless of GIPHY's ownership (ie whether it operated independently, as it did before the Merger, or in the hands of an alternative purchaser). We consider that GIPHY had a number of options for ensuring the ongoing funding of its business in the short and medium term in the absence of the Merger, including generating revenue through its Paid Alignment model, agreeing a fee for using its services on major social media platforms, obtaining additional funding from existing investors, or sale to an alternative purchaser.

32.    We also noted the short-term impact that Coronavirus (COVID-19) had on GIPHY's business prior to the Merger. However, we have not seen any evidence showing that Coronavirus (COVID-19) would have had a long-term, structural impact on GIPHY's ability to innovate and generate revenue had the Merger not taken place.

33.    We also considered what Facebook would have done had the Merger not taken place. As noted above, GIFs are an important driver of user engagement on social media and messaging platforms, including Facebook's platforms, and Facebook told us that a key part of its rationale

10

for acquiring GIPHY was to ensure its continued access to a supply of GIFs in future. We have therefore assessed the alternative options available to Facebook to ensure continued availability of high-quality GIFs had the Merger not gone ahead, namely: (i) paying some form of platform fee or licence fee to GIPHY, (ii) relying more heavily on other GIF providers (eg Tenor), or (iii) building its own GIF library.

34.   Following an assessment of the Parties' internal documents which discussed these options in some detail, our view is that it was likely that Facebook would have continued to procure GIFs from GIPHY had the Merger not taken place, at least in the short-term. We also consider that even if Facebook had developed its own GIF library, this would have been in the longer term and it would have continued to rely on GIPHY in the interim.

35.   Our assessment of the effects of the Merger is therefore considered in comparison to a scenario in which, had the Merger not gone ahead, GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore various options to further monetise its products, and Facebook would have continued to procure GIFs from GIPHY, at least in the short to medium term.

*…about any horizontal effects of the Merger?*

36.   One of the potential concerns that we have investigated is whether the Merger could lead to horizontal unilateral effects as a result of loss of potential competition. What we mean by this is the possibility that the Merger could remove from the market a business that was competing, or had the potential to compete, with Facebook. In this case we are particularly interested in whether GIPHY could have competed with Facebook in relation to display advertising in the UK. We describe this as 'horizontal' effects because, in this respect, Facebook and GIPHY would both be active at the same level of the supply chain (ie offering display advertising). We consider that GIPHY's Paid Alignment model competes closely with display advertising, such as that offered on Facebook's platforms, in particular because GIPHY's advertising model is typically used to raise brand awareness (as with display advertising), rather than to drive purchases of specific products or services (as with search advertising).

37.   In some sectors, including fast-moving technology markets such as the one in which Facebook and GIPHY operate, an important aspect of how firms compete involves efforts or investments aimed at protecting or expanding their profits in the future.

PX0684-013

38. One of GIPHY's key innovations was its Paid Alignment advertising proposition, which it first offered in 2017 in the US and which it was making efforts to expand. Under this model, advertisers paid GIPHY in exchange for GIF-based advertising. GIPHY had also entered into revenue-sharing agreements with certain social media partners in the US, under which GIPHY gave partners a share of its advertising revenues in exchange for the partners allowing GIPHY to run its Paid Alignment advertising on these partners' platforms. Paid Alignment was used by a number of leading international consumer brands, including Pepsi and Dunkin' Donuts, and was growing, both in terms of revenue and the number of advertisers using the service, until the Merger in May 2020. In the context of the Merger, Facebook required the termination of all GIPHY's Paid Alignment activities.

39. The Parties told us that GIPHY's advertising model was flawed for a number of reasons, including because GIPHY's user base was largely served through API integrations with social media platforms, it could not provide brands with helpful audience data and metrics, and it could not offer 'direct response' ads (where the user clicks on the ad to buy the product).

40. However, most of the advertisers that we spoke to were positive about their experience of working with GIPHY, and some of them told us that they had been able to monitor the effectiveness of their advertising with GIPHY to a level that they were satisfied with. This is also reflected in GIPHY's internal documents. Our investigation also found that there were a number of potential advantages to GIPHY's Paid Alignment model which may have outweighed its disadvantages – for example:

   (a) The advertising (in the form of a GIF) is specifically selected by the user to express a particular idea or emotion to the recipient, which has the potential to make the ad very personal and impactful.

   (b) Similarly, advertising through private messaging provides an air of credibility to the advertising, as it is shared by someone that you trust in a private forum.

   (c) We also heard that an advantage of advertising using GIFs was that they operate on a loop, meaning that the ad might be seen by users a number of times.

   (d) Finally, we note that messaging has historically been a difficult format for providers to use to generate revenue, as most forms of advertising significantly worsen the user experience. However, due to its GIF format, the Paid Alignment model of advertising is subtle and intrinsic to the message, rather than interrupting it. This is reflected in GIPHY's internal

PX0684-014

documents. Facebook's internal documents also discuss the importance of monetising messaging.

41.   We also note from GIPHY's internal documents that GIPHY hoped to develop its Paid Alignment product and expand its offering internationally, including into the UK. Prior to the Coronavirus (COVID-19) pandemic, GIPHY was considering how to respond to significant interest from advertisers regarding international expansion.

42.   Despite these plans for expansion, GIPHY's forecasts did not envisage becoming anything like the size or scale of Facebook in the medium term. However, given Facebook's significant market power in display advertising (as discussed above), the acquisition by Facebook of a potential entrant may be concerning, even if that potential entrant is expected to be relatively small.

43.   Following our Provisional Findings, the Parties made submissions regarding some specific challenges that GIPHY faced in relation to its Paid Alignment offering. Having carefully considered these submissions, we are still of the view that, by removing GIPHY from the market, the Merger has removed a firm with pre-Merger activities that we consider were likely to be valuable in driving or influencing other companies' (including Facebook's) efforts in display advertising. GIPHY's efforts to innovate and monetise its services prior to the Merger were valuable, as they increased the likelihood of new innovations and products being made available in future, even allowing for the possibility that GIPHY's Paid Alignment model ultimately might not have been successful. This is the case both for those products and innovations that GIPHY had already begun to develop itself or may have developed in future, and also for any developments that may have been made by Facebook in response to the possibility of competition from GIPHY, or from other social media platforms in partnership with GIPHY. By removing GIPHY as an independent competitor, the Merger has eliminated this form of 'dynamic' competition.

44.   We consider that the loss of GIPHY as a potential competitor in display advertising is substantial in the light of:

   *(a)* Facebook's significant market power in display advertising (as discussed above);

   *(b)* GIPHY's strong position as a leading provider of an important social media engagement tool;

13

(c) GIPHY's efforts in recent years to monetise its services, using an innovative advertising model, which had the potential to compete against Facebook for display advertising revenues;

(d) Evidence that Facebook and other market participants were also interested in monetising the same or similar social media features;

(e) The fact that successful expansion into a multi-sided market such as display advertising can be magnified by network effects (eg GIPHY's Paid Alignment model could have generated additional revenues for Facebook's rival social media platforms, leading them to invest more in attracting new users; while if Facebook owns and controls GIPHY, it will be able to reinforce its strong position in this space); and

(f) The high barriers to entry in display advertising, demonstrated by very limited successful entry in the market since Facebook became market leader. GIPHY has already developed a large user base and begun to grow its advertising revenue, despite a number of challenges. Another potential competitor may face even more challenges in a world in which the two largest GIF providers, GIPHY and Tenor, are owned by two of the largest tech companies, Facebook and Google.

45.   On the basis of the evidence we have seen, we therefore consider that the Merger will result in an SLC as a result of horizontal effects, in the form of a loss of potential competition in display advertising.

*…about any vertical effects of the Merger?*

46.   As set out above, GIPHY allows apps (eg social media platforms such as Snapchat, TikTok, Facebook, Instagram) to integrate GIPHY's GIF and GIF sticker databases into their own platforms via an API or SDK free of charge. One of the potential concerns that we have investigated is whether Facebook could disadvantage its rivals in social media by limiting their access to GIPHY in some way, either by preventing them from accessing GIPHY at all, or allowing them to access GIPHY on worse terms than they did before the Merger. This is known as foreclosure. We describe this as 'vertical' effects because, in this respect, Facebook and GIPHY are operating at different levels of the supply chain (ie GIPHY is acting as an input into Facebook's, and its rivals', products).

47.   Our assessment has focused on whether Facebook would have the **ability** and **incentive** to limit access to GIPHY in this way, and whether this 'foreclosure' would have an **effect** on the ability of rival apps to compete with Facebook in social media. We also specifically assessed whether Facebook

14

would be able to disadvantage its rivals by reprioritising innovation and development of GIPHY's services towards the requirements of Facebook's own platforms rather than those of other social media platforms, or by requiring rival platforms to provide more data (eg on individual or aggregate user behaviour) as a condition of accessing GIPHY.

48.    As discussed above, our assessment has shown that GIPHY has a number of distinctive qualities which mean that many social media platforms rely on it to facilitate user expression. Our assessment of the Parties' internal documents and our discussions with other players in the industry indicate that GIFs are an important feature for social media platforms (including Facebook), particularly in relation to encouraging user engagement. As noted above, GIFs are a popular feature of social media platforms, with the proportion of users posting content that included a GIF being over 25% on some platforms. We also found that there was only one other GIF provider offering a comparable service to GIPHY: Tenor, which is owned by Google. On this basis we consider that following the Merger, Facebook does have the ability to foreclose its rivals.

49.    In determining whether Facebook has the incentive to foreclose, we have assessed the costs and benefits of this strategy for Facebook. We have found that there would be direct benefits of foreclosure to Facebook, in that reducing the engaging features available on a rival social media platform is likely to mean that users switch at least a proportion of their time to other platforms and that, due to Facebook's high share of the market, this is likely to be to a Facebook platform; this in turn may encourage their friends and followers to switch too. We have also considered whether there would be a cost to Facebook of foreclosure, as by limiting access to GIPHY, Facebook would lose (at least partly) the benefit to GIPHY in having a wide pool of users (which makes it more attractive to content creators and to advertising partners). However, we have found that even if GIPHY were removed from all other platforms, the large user base of Facebook's platforms would mean that it would still be an attractive proposition for partners and creators. A foreclosure strategy targeting one or more specific rival platforms would have even fewer costs. On this basis we consider that Facebook would also have an incentive to foreclose its rivals from access to GIPHY.

50.    Our view is that this strategy would have the effect of strengthening Facebook's significant market power in social media, and reducing the competition that it faces from others. On the basis of the evidence we have seen, we therefore conclude that the Merger will result in an SLC in social media as a result of vertical effects, in the form of input foreclosure.

PX0684-017

*…about any countervailing factors?*

51. Where we have decided that a Merger could give rise to an SLC, we also consider whether there are any factors that might prevent or mitigate against that SLC from arising. These are known as countervailing factors. In this case, we focused on whether there could be any new entrants to the supply of searchable GIF libraries that could prevent an SLC from arising.

52. The evidence that we have collected shows that there are five main barriers to entering or expanding in relation to searchable GIF libraries, and on this basis a new entrant or an existing small provider would face considerable challenges in trying to grow or compete at scale:

   *(a)* A large, high-quality content library;

   *(b)* A sophisticated search engine;

   *(c)* Scale and brand;

   *(d)* A viable monetisation model; and

   *(e)* Capital.

53. As described above, recent new entrants and smaller GIF providers have not to date been able to reach the same size and quality as GIPHY and Tenor.

54. Our assessment has concluded that it is not likely that entry or expansion of sufficient scale would occur in a timely manner in order to prevent or reduce the impact of an SLC arising as a result of this Merger.

### How are we proposing to remedy the substantial lessening of competition we have found?

55. Where we conclude that a merger has resulted in, or may be expected to result in, an SLC, we are required to decide what, if any, action should be taken to remedy, mitigate or address that SLC, or any adverse effect resulting from the SLC.

56. Alongside our Provisional Findings, we published a Notice of Possible Remedies, in which we sought views on possible remedies to the SLCs that we had identified. The Notice set out our initial view that the only effective way to address the competition issues that we had identified was for Facebook to sell GIPHY, in its entirety, to a suitable buyer. In response, Facebook submitted its own alternative set of remedy proposals, which we have also assessed.

PX0684-018

57.     Facebook submitted the following remedy options:

   *(a)* An 'open access' remedy, which would maintain access to GIPHY's library to new and existing API partners.

   *(b)* A 'commingling' remedy, which would remove the restriction contained in GIPHY's current terms of service against commingling GIPHY search results with results of another GIF provider – Facebook submitted that this would enable a potential Paid Alignment provider to increase the attractiveness of its product by allowing it to intersperse GIPHY's GIFs with its own ads.

   *(c)* A white label licensing remedy, which would involve the creation and sale of a white label copy of GIPHY's content library and a licence to use GIPHY's search algorithm for five years.

58.     In assessing possible remedies, we first seek to identify remedies that will be effective in addressing the SLCs that we have found. We then select the least costly remedy that we consider to be effective.

59.     In this case, we have only found one effective remedy – the full divestiture of GIPHY. We did not consider that the remedies proposed by Facebook would be effective in addressing the SLCs. Facebook's proposed remedies (as described above) are behavioural in nature (ie they would seek to regulate the ongoing behaviour of the merger parties) rather than structural (ie re-establishing the structure of the market expected absent the merger). Structural remedies are normally preferable to behavioural remedies, as they address the adverse effects of the Merger at source. Although behavioural remedies may be suitable in certain cases, this Merger does not have such characteristics. In particular, the SLCs that we have found are dynamic in nature and are not time-limited, reducing the likelihood that a behavioural remedy would provide an effective and comprehensive solution. We also found a number of specific risks with Facebook's proposed remedy options, including their inability to comprehensively address the SLCs, the challenges in specifying Facebook's obligations, the risks of Facebook being able to circumvent these obligations, and the difficulties in monitoring and enforcing Facebook's compliance with these obligations. We therefore found that Facebook's remedy proposals would not be effective in addressing the SLCs we have found.

60.     As we have found only one effective remedy – the full divestiture of GIPHY – there is no less costly remedy that is similarly effective.

61.     We have also considered whether this remedy is a proportionate response to the SLCs. We have identified a number of adverse effects as a result of

PX0684-019

the Merger, and in a dynamic and growing sector these adverse effects are likely to be substantial and to increase over time if there is no effective action. On this basis we have concluded that a divestiture remedy is no more onerous than necessary to achieve the aim of remedying the SLCs. We have also considered the costs of the remedy and concluded that the remedy does not produce adverse effects that are disproportionate to the aim.

*Divestiture of GIPHY*

62.  As noted above, we have decided that the sale of GIPHY is the only effective remedy to the SLCs that we have found. While divestiture of the acquired business is not an uncommon outcome when the CMA finds an SLC, divestiture of the GIPHY business poses particular challenges arising as a consequence of the completion of the Merger, and Facebook's related actions, namely the termination of GIPHY's revenue function and team, the transfer of almost all GIPHY staff on to Facebook employment contracts and the transfer of GIPHY's back office functions to Facebook. These actions took place prior to the CMA issuing its Initial Enforcement Order holding the Facebook and GIPHY businesses separate and mean that, in several respects, GIPHY is in a significantly weaker position than it was pre-Merger.

63.  Accordingly, in order to overcome these challenges, we have decided that Facebook will be required to reinstate certain of GIPHY's activities and assets and to ensure that GIPHY has the necessary management, technical and creative personnel to enable it to compete effectively throughout and following the divestiture. We anticipate that Facebook will need to provide appropriate financial and other incentives to encourage former GIPHY employees to transfer back to GIPHY, and to recruit appropriate replacements for any key GIPHY staff who choose not to do so. We also anticipate that GIPHY will need to be divested with sufficient financial resources to allow it to operate and compete as it would have done had it not been acquired by Facebook.

## Conclusions

64.  As a result of our investigation and our assessment, we have concluded that the completed acquisition by Facebook of GIPHY has resulted in the creation of a relevant merger situation.

65.  We have also concluded that the Merger has resulted or may be expected to result in an SLC:

PX0684-020

(a) in the supply of display advertising in the UK due to horizontal unilateral effects arising from a loss of dynamic competition, and

(b) in the supply of social media services worldwide (including in the UK) due to vertical effects resulting from input foreclosure.

66.   Due to the multi-sided nature of the markets in which the Parties operate, a lessening of competition in the supply of social media services also has effects on competition in the supply of display advertising. The vertical effects resulting in a loss of competition in social media that we have highlighted above therefore exacerbate the effects on competition in display advertising arising from the elimination of a potential competitor.

67.   In order to address the SLCs that we have found, we have decided to require Facebook to sell GIPHY, in its entirety, to a suitable purchaser.

PX0684-021

# Findings

## 1. The reference

1.1 On 1 April 2021, the Competition and Markets Authority (**CMA**) in exercise of its duty under section 22(1) of the Enterprise Act 2002 (the **Act**), referred the completed acquisition by Facebook, Inc[1] (**Facebook**) of GIPHY, Inc. (**GIPHY**) (the **Merger**) for further investigation and report by a group of independent panel members on the following questions in accordance with section 35(1) of the Act:

(a) whether a relevant merger situation has been created; and

(b) if so, whether the creation of that situation has resulted, or may be expected to result, in a substantial lessening of competition (**SLC**) within any market or markets in the United Kingdom for goods or services.

1.2 Throughout this document, Facebook and GIPHY are referred to collectively as 'the **Parties**' and Facebook and GIPHY are referred to collectively following the Merger as 'the **Merged Entity'**.

1.3 Our terms of reference, along with information on the conduct of the inquiry, are set out in Appendices A and B.

1.4 Having decided to extend the statutory timetable by eight weeks, we are required to publish a final report by 1 December 2021.[2]

1.5 This document, together with its appendices, constitutes the Inquiry Group's findings (from here on referred to as the **Final Report**). Further information relevant to this investigation, including non-confidential versions of submissions, including from the Parties, can be found on the CMA case page.[3]

---

[1] On 28 October 2021, Facebook, Inc. changed its corporate name to Meta Platforms, Inc., pursuant to an amended and restated certificate of incorporation filed with the Delaware Secretary of State. For the purposes of this document, we continue to refer to the company by its former name (Facebook, Inc. or Facebook), as this was the name used at the time of the acquisition of GIPHY, Inc.
[2] See Notice of Extension, 10 September 2021.
[3] Facebook / GIPHY Merger Case Page.

PX0684-022

## 2.    The Parties, Merger and Rationale

## The Parties

### *GIPHY*

2.1    GIPHY was founded in 2013 and is headquartered in New York. GIPHY is an online database and search engine that allows users to search for and share video GIFs and GIF stickers.

2.2    A video GIF is a digital file that displays a short (typically 2.5 seconds), looping, soundless video,[4] which can be used to expressively convey emotions, or as a way of demonstrating an understanding of popular culture (eg clips from TV shows). A GIF sticker displays an animated image comprised of a transparent (or semi-transparent) background which can be placed over images or text. For the purposes of this Final Report, unless otherwise specified, the term '**GIFs**' refers to both video GIFs and GIF stickers.

2.3    GIPHY has built a large GIF library and search engine, along with a recognisable brand in GIFs, stickers and conversational content. It has also established partnerships with brands to obtain directly licensed content which it distributes directly and through a wide network of distribution partners.

2.4    GIPHY describes itself as the world's largest library of free GIFs and stickers.[5] GIPHY's worldwide user reach (through its owned and operated (**O&O**) channels as well as distribution partners) is over 800 million users and GIPHY facilitated, on average, [✂] monthly searches in 2020 through its Application Programming Interfaces (**API**)[6] and Software Development Kits (**SDK**)[7] distribution channels.[8]

2.5    Every day, millions of users in the UK post content that includes a GIF. In the UK in 2020, GIPHY delivered over [✂] monthly searches on average across

---

[4] GIPHY released a 'GIF with sound' feature in June 2021 that enables users to hear the GIFs; this is available on Android and iOS. digitalinformationworld.com.
[5] See for example, the description of GIPHY on the Apple app store and the Samsung Galaxy app store.
[6] An API is the software interface that allows computer programs and applications to connect with each other.
[7] GIPHY's SDK provides tools to third-party host apps to programme GIPHY's library in such a way that its integration is aligned with the style and functionality of the host app's user interface.
[8] Table 3 in Chapter 5, Market Definition and Market Power provides the monthly average number of searches via API and SDK in 2020 for each of GIPHY, Tenor and Gfycat.

PX0684-023

its entire distribution network (the majority through API/SDK partners and the remainder through its O&O website and app).[9]

2.6    GIPHY also identified [✂] UK IP addresses that were served GIPHY content (whether on its O&O site or via API/SDK partner platforms) during the course of a one-week period in March 2021. Based on data provided by Facebook across the same one-week period, in the UK, over [✂] pieces of content (eg messages, comments, posts and stories) containing a GIF were posted/sent across Facebook's family of platforms.[10] It is not possible to determine how much of that content was fulfilled by GIPHY due to Facebook's integration with both GIPHY and Tenor. However, on Instagram which integrates solely with GIPHY over 3 million UK users posted/shared content that included a GIF and over 9 million pieces of content containing a GIF were posted/shared by UK users during that one-week period.

2.7    GIPHY has innovated and developed its offering over time. For example, GIPHY told us that it facilitated the creation of a new search behaviour – searching and sharing expression and content for conversations – which is now integrated into almost every conversation platform. Other GIPHY product developments available to UK users include: (1) GIPHY Cam – a stand-alone tool that allows users to create their own GIFs; (2) GIPHY World – an augmented reality app that allows users to apply three-dimensional stickers to their surroundings; and (3) GIPHY Capture – a desktop application that lets users extract any video and convert it into a GIF.

2.8    GIPHY started to generate revenue in 2017 through '**Paid Alignment**' agreements, initially on its O&O channel. Paid Alignment offers brands and advertisers the ability to align their GIFs with popular search terms, so users see these brands' content first when searching for a GIF, or to insert their GIFs into GIPHY's 'trending feed' on its O&O channel, in exchange for a fee.

2.9    GIPHY expanded its revenue generation model in February 2018 through its API distribution network. GIPHY's Paid Alignment service continued to operate until the Merger was finalised in May 2020.

2.10   The Parties submitted conflicting statements regarding whether Facebook or GIPHY decided to terminate the Paid Alignments revenue stream and whether the Paid Alignment agreements were in fact terminated. In one

---

[9] GIPHY's API partners can choose to cache users' searches, which means that the total number of searches performed on individual API partners' platforms is not completely visible to GIPHY. In addition, GIPHY's UK-specific data are likely to be an under-estimate due to API partners proxying search requests from their own servers (which are typically based in the US, not the UK) on behalf of end-users. Therefore, the number of UK searches facilitated by GIPHY in 2020 likely represents the lower range of the actual searches performed in that year. CMA analysis based on GIPHY and Facebook submissions
[10] Facebook, Messenger, WhatsApp, and Instagram.

PX0684-024

submission Facebook stated that GIPHY had terminated and/or had given notice to terminate its Paid Alignment contracts with brand partners by 15 June 2020. Facebook later submitted that GIPHY had not terminated the Paid Alignment agreements but wound down its revenue-sharing agreements with its API partners which means GIPHY is no longer paying revenue shares in respect of these contracts. The Parties also submitted that the GIPHY revenue team was not made redundant but that their contracts were terminated, by GIPHY prior to the Merger and primarily as a result of Coronavirus (COVID-19).

2.11   However, we have seen evidence of Facebook's internal documents regarding the approval of the Merger which indicates that the decision to terminate GIPHY's Paid Alignment revenue stream came from Facebook, as well as the decision not to acquire the GIPHY revenue team as part of the Merger. For example, one document prepared in relation to the Merger noted: '[✂].'[11]

2.12   GIPHY's internal communications around the time of the completion of the Merger also indicate that there was no prior decision made by GIPHY to wind down its Paid Alignment agreements and confirms that the decision not to continue the revenue generation was made as a result of the Merger.

2.13   In an email from GIPHY to Facebook on 20 May 2020, GIPHY asks for guidance and approval from Facebook with regard to the messaging around its Paid Alignments service: 'We are getting a number of inbounds from agencies and client direct who are waiting on immediate deliverables from GIPHY - some coming with increasing levels of frustration'. Subsequently, GIPHY notified its advertisers and API partners about GIPHY 'sunsetting' its revenue part of the business. The decision to stop GIPHY's Paid Alignment contracts came as a surprise and disappointment to many of its advertisers and partners, with one advertiser inquiring how this decision would impact its '[✂]' and another advertiser noting 'what a big shift' this was for GIPHY.

2.14   Therefore, we consider that the decision to terminate GIPHY's Paid Alignment service was Merger-related, with Facebook requiring the termination of all of GIPHY's existing Paid Alignment arrangements and the cessation of all of GIPHY's revenue-generating activities. We also consider that GIPHY's revenue team's employment contracts were terminated prior to and as a result of the Merger, on the basis that they did not form part of the acquired business.

---

[11] Facebook noted [✂] that it was very different monetising your own audience ([✂]) and trying to monetise third-party traffic coming through an API.

PX0684-025

2.15   GIPHY's revenue in 2019, primarily as a result of its Paid Alignment service, was [✂],[12] all generated in the United States, with no revenue generated in the UK.

### *Facebook*

2.16   Facebook was incorporated in July 2004 and completed its initial public offering in May 2012, with the company's stock being listed on the NASDAQ stock exchange.

2.17   Facebook often refers to the 'Facebook family of apps',[13] which represents the following four products/platforms and which are its main user-facing platforms:

*(a)* The Facebook app (also known as **Facebook Blue**);

*(b)* Instagram;

*(c)* WhatsApp; and

*(d)* Messenger.

2.18   Facebook's family of apps are monetised through display advertising to varying degrees. In 2020, the Facebook Group generated revenue of USD 86 billion (equivalent to GBP 67 billion)[14] globally, an increase on the prior year of USD 15.3 billion (equivalent to GBP 11.9 billion).

2.19   Figure 1 below sets out Facebook's global revenues and EBIT. In the UK in 2020, Facebook Blue and Instagram alone generated [✂] (equivalent to [✂]) of revenue from display advertising.

---

[12] Using Bank of England average 2019 exchange rate of USD1.2766 to GBP1.
[13] We also use the term Facebook Group to refer to the Facebook company as a whole, including all its products and platforms.
[14] Bank of England annual average 2020 of USD1.2837 to GBP1.

PX0684-026

**Figure 1: Facebook Group's global revenue and EBIT (earnings before interest and tax) between 2012 and 2020**



Source: CMA analysis of Facebook Inc 10-K (updated following CMA Online platforms and digital advertising market study)

2.20   Facebook relies heavily on digital advertising to support its operations. In 2012, 84% of Facebook's total revenue was from digital advertising – this had increased to 98% by 2020 (a reduction of just 1% from 2019, which was 99%).

2.21   Since its inception, Facebook has been successful in growing its daily and monthly active user base year on year, increasing to 1.85 billion and 2.80 billion respectively in 2020. This makes the Facebook family of apps a very attractive proposition for advertisers with its wide and global reach.

2.22   The value to advertisers of the users of the Facebook family of apps is demonstrated in the consistently increasing 'average revenue earned per user' (**ARPU**) by Facebook (see Figure 2 below).

25

**Figure 2: Facebook ARPU split across geographical regions 2012 to 2020**



Source: CMA analysis of Facebook 10-K (updated following Market Study)

2.23  Facebook's ARPU in the UK has increased from less than GBP 5 in 2011 to over GBP 50 in 2019. This average was noted as being 'significantly higher than that of its competitors' as part of the analysis conducted during the CMA's Market Study into Online Platforms and Digital Advertising, which published its Final Report in July 2020 (the **Market Study**).[15]

2.24  During the Market Study, Facebook's revenue and accounting profit were reviewed, along with the company's estimated Return on Capital Employed (**ROCE**), to measure its profitability. To measure ROCE, the CMA adjusted accounting profits to provide an 'economically meaningful measure of profitability'. Calculations performed as part of the Market Study have been updated for the latest financial year available (year ended 31 December 2020) and are presented below in Figure 3.

---

[15] CMA, Online platforms and digital advertising market study, July 2020.

PX0684-028

**Figure 3: Facebook Group Return on Capital Employed 2012 to 2020**



Source: CMA analysis of Facebook Inc 10-K (updated following Market Study)[16]

2.25   There has been little change to Facebook's ROCE between 2019 and 2020. In fact, ROCE has slightly increased from 38% to 40%, demonstrating the lack of impact that the global Coronavirus (COVID-19) pandemic has had on Facebook's profitability.

2.26   The Market Study estimated the weighted average cost of capital (**WACC**) for the large digital platforms at around 9% in 2018.[17] Facebook's ROCE in 2020 of 40% therefore indicates that Facebook has been generating profits comfortably in excess of its cost of capital. There is no evidence to suggest that the WACC has changed since 2018 to such an extent that Facebook no longer generates excess profits.

## The Merger

2.27   Facebook set up a wholly owned subsidiary (Tabby Acquisition Sub, Inc) for the purpose of acquiring GIPHY. The Merger completed on 15 May 2020 and consequently all outstanding equity in GIPHY was cancelled on the date of completion.

---

[16] Market Study, Appendix D.
[17] Market Study, Figure 2.11.

PX0684-029

2.28    Facebook paid USD 315 million (equivalent to GBP 260 million)[18] [✂] for GIPHY, with an additional [✂] being provided to certain GIPHY personnel in the form of Facebook Restricted Stock Units (**RSUs**), [✂][19]

## The rationale for the Merger

### *Facebook's rationale*

2.29    Facebook submitted that its rationale for the Merger was threefold:

(a)  To sustain GIPHY. Facebook said it had concerns over GIPHY's viability due to ongoing losses made by the company as a result of failing to establish a successful monetisation model, exacerbated by the decline in the online advertising market due to Coronavirus (COVID-19). In particular:

(i)  If GIPHY ceased its operations, Facebook said its services would be compromised from a user experience perspective, due to the high degree of integration of GIPHY in Facebook's platforms.

(ii)  Facebook did not think it could develop its own supply of GIFs/GIF stickers (to be utilised in addition to Tenor) before losing access to GIPHY.

(b)  To enhance user experience through making significant investments in additional GIPHY services and additional integration of GIPHY's library into Facebook's services. Facebook said that integration of GIPHY's library into Facebook, as well as the ability to have direct control would enable Facebook to develop and launch additional features and deliver more relevant content to its users.

(c)  To integrate GIPHY's talent, specifically its creative production specialists. Facebook said that GIPHY's creative team would 'accelerate Facebook's efforts around other creative expression use cases across its services'.

2.30    The approval of the Merger was conducted largely by email. In order to secure internal approval for a transaction of this size at Facebook, Facebook's corporate development team (in this case led by [✂]) was required, in the first instance, to obtain [✂].

---

[18] Bank of England exchange rate as at 15 May 2020 of USD1.2126 to GBP1 on the date of the completion of the Merger.
[19] The purchase price of USD315m is before any adjustments for debt, variance in working capital, transaction expenses and payments of any special dividends.

PX0684-030

2.31    The level of executive and board approval of transactions at Facebook depends on the transaction value. [✂]. Therefore, in the case of the acquisition of GIPHY, which had a final transaction value of USD 315 million (not including Facebook RSUs), board approval was not required. Once a price had been agreed, a further deal approval request was submitted to [✂].

2.32    The email chains seeking approval for the Merger set out a short summary of the rationale for the Merger. While we have seen supporting evidence in these email chains, along with other Facebook internal documents, for the three reasons for the Merger outlined in Facebook's submissions (and set out at paragraph 2.29 above), we have also seen evidence in Facebook's internal documents of additional motivations for the Merger, namely that the Merger would:

    *(a)*  open new monetisation opportunities across the Facebook family of apps; and

    *(b)*  prevent competing social media services from acquiring GIPHY.

2.33    These additional motivations are discussed in further detail below.

*Facebook's consideration of alternatives to the Merger*

2.34    The importance of GIFs to the Facebook family of apps for driving user engagement and content creation was highlighted in Facebook's internal documents, with GIFs being described as a 'clearly important feature for consumers'. Further discussion of the importance of GIFs to driving user engagement is contained in Chapter 8, Vertical Effects.

2.35    Before pursuing the Merger, Facebook considered internally various alternative options with regard to its relationship with GIPHY, at least in part due to its concerns about losing access to GIPHY; these included building its own GIF and GIF sticker library, partnering with alternative GIF providers or paying an annual fee to access GIPHY's content. Facebook also considered a possible minority investment in GIPHY. All of these alternative options are discussed in detail in Chapter 6, Counterfactual.

*Our view*

2.36    Facebook's motivations for the Merger appear to have stemmed from two main objectives:

    *(a)*  To manage the downside risks of Facebook's reliance on GIPHY's GIFs and stickers; and

PX0684-031

(b) To capitalise on the possible upsides of integrating GIPHY more extensively into Facebook's ecosystem.

2.37  In terms of the downside risks, Facebook's platforms – Instagram in particular – rely on GIPHY for the provision of GIFs and stickers. Facebook was concerned about losing access to GIPHY, either due to GIPHY's exit through inability to sustain its operations or due to its acquisition by a competitor.

2.38  Other Facebook platforms (including WhatsApp and Messenger, but not Instagram) are integrated with Tenor (which is owned by Google) as well as GIPHY. However, Facebook was also concerned about being dependent on Google's services. By acquiring GIPHY, Facebook was guaranteeing ongoing access to GIPHY's services (thus securing a source of future supply of popular digital content for all of its platforms) and removing the possibility of GIPHY's acquisition by a competitor.

2.39  Facebook estimated that should Instagram lose access to GIPHY's content it would degrade Instagram's proposition to end users and therefore impact Instagram's monetisation. This deterioration was estimated to be valued at least at [✂] in 2020 alone.

2.40  In terms of the upsides, the monetisation opportunities offered a new ad format to Facebook, including within the sticker 'tray' on Instagram.[20] Facebook's team recognised that the upside presented by this potentially new ad format would require some development, but discussed the opportunity with enthusiasm and showed an intention to explore how this advertising method could be applied at scale.

2.41  Furthermore, the monetisation opportunity resulting from acquiring GIPHY was discussed repeatedly throughout the process of the evaluation of GIPHY as an acquisition target, demonstrating the importance of the possible revenue generation to Facebook's decision-making.

2.42  On seeking approval [✂] to acquire GIPHY, the monetisation potential to Instagram from the Merger was indicatively valued at [✂]. This was based on a model prepared by Instagram's Vice President of Product, who had primarily identified this monetisation opportunity to be in the sticker tray (where Instagram users can search for available GIFs and GIF stickers).

2.43  The importance of Instagram to the Facebook family of apps has been growing over the years and in a Facebook Board of Directors' presentation

---

[20] The sticker tray enables search and retrieval of GIFs and stickers to be used as part of the Instagram 'Story'.

PX0684-032

dated May 2019, it was stated that the base revenue forecast of the core business is '[✂].

2.44   Additionally, [✂].

2.45   Facebook's internal documentation setting out its wider product strategy discusses the shift in how users communicate online which has a direct impact on how Facebook can monetise its platforms. In a product strategy document, Facebook notes that the main location or opportunity to serve ads ([✂]) is being threatened by changes in user preferences and behaviour. The document claims there has been: 'A sharp shift in how people share: from feed sharing towards messaging and ephemeral sharing' and that [✂].

2.46   An internal document setting out Facebook's 5-year 'bets' does not explicitly mention how Facebook will achieve its strategy for each of the platforms, but what the document does present is the importance and prominence of Story production and Story consumption on Messenger to the 'Facebook ecosystem'. Therefore, any successful launch of a feature or development in Instagram Stories (the location where currently the majority of GIF stickers are being used)[21] is likely to be replicated on other Facebook surfaces where the Stories feature is also important.

2.47   Facebook's ability to personalise users' GIF searches across its user-facing platforms, which was not possible prior to the Merger, may enable Facebook to provide a better quality service compared to its social media competitors. This potentially increases its revenue-generation possibilities through increased user engagement across its platforms.

2.48   Finally, the consideration paid by Facebook was significantly impacted ([✂]) by Facebook's knowledge of the GIPHY management team's willingness to recommend an offer that was on par or below GIPHY's latest fund-raising valuation (which was completed in 2019) and the operational and financial challenges that GIPHY was facing (which were disclosed by GIPHY to Facebook prior to the Merger).

2.49   The CMA's view is therefore that Facebook's rationale for the acquisition of GIPHY took into account both the downside risks associated with Facebook losing the use of GIPHY's GIFs on its platforms, and the possible upsides of integrating GIPHY further within the Facebook ecosystem, whether that be

---

[21] Head of Instagram, Adam Mosseri notes the attractiveness of the Merger from a monetisation perspective of the sticker tray based on 'the volume of impressions being served there'

PX0684-033

directly through the monetisation of GIFs or stickers, or more indirectly through features such as personalisation of GIFs on Facebook platforms.

### *GIPHY's rationale*

2.50   GIPHY submitted that its rationale for the Merger was to enable it to obtain funding to continue its operations.

2.51   GIPHY's revenue levels in 2019 were not sufficient to cover its operational costs. Therefore, the company relied on regular external funding rounds to carry on its operations. As noted in further detail in Chapter 6, Counterfactual, GIPHY had undertaken a dual process of fund-raising since the middle of 2019, involving both M&A and an exploration of a possible external capital raise.

2.52   GIPHY submitted that the onset of Coronavirus (COVID-19) had put additional pressure on GIPHY's ability to raise finance in the first quarter of 2020. GIPHY faced increasing hosting costs due to the increased traffic,[22] general uncertainty in the venture capital market and a slowdown in the advertising market. These factors all contributed to GIPHY's management team's decision to recommend the sale of the company to Facebook.

2.53   Further discussion of GIPHY's financial position prior to the Merger is discussed in Chapter 6, Counterfactual. We also present further information on the views of GIPHY's main investors regarding the Merger in Appendix E: GIPHY's Timeline.

---

[22] Similar to other online platforms, such as Netflix, Facebook and YouTube, GIPHY saw an increase in traffic driven by changes in people's behaviour, with more people spending time online with many social activities being unavailable (see article in the nytimes.com). GIPHY notes in internal communications that in other circumstances, an increase in traffic (of about 30%) would be positive for the business. However, in parallel to increased traffic, the advertising market is noted by Alex Chung to be 'dampened', therefore increasing GIPHY's short-term costs with no instant upside from increased revenue.

PX0684-034

# 3.    Jurisdiction

## Introduction

3.1    In accordance with section 35(1) of the Act and pursuant to our terms of reference we are required to investigate and report on two statutory questions: (i) whether a relevant merger situation (**RMS**) has been created; and (ii) if so, whether the creation of that situation has resulted, or may be expected to result, in an SLC within any market or markets in the UK for goods or services.

3.2    We address the first of the statutory questions in this chapter and have considered each element of the jurisdictional test in turn.

3.3    An RMS has been created if: (i) two or more enterprises have ceased to be distinct enterprises at a time or in circumstances falling within section 24 of the Act; and (ii) the value of the turnover in the UK of the enterprise being taken over exceeds GBP70 million (the turnover test) or the share of supply test is satisfied.[23]

3.4    Our view is that an RMS has been created:

  *(a)* Facebook and GIPHY are both enterprises that have ceased to be distinct within the statutory period for reference; and

  *(b)* The share of supply test is met on the basis that the acquisition has resulted in an increment to the share of supply and the Parties supply, in the UK, at least 25% of apps and/or websites that allow UK users to search for and share GIFs.

## Two or more enterprises

3.5    The Act defines an 'enterprise' as 'the activities or part of the activities of a business'.[24] The term 'business' includes 'a professional practice and includes any other undertaking which is carried on for gain or reward or which is an undertaking in the course of which goods or services are supplied otherwise than free of charge'.[25]

---

[23] Section 23(1) of the Act.
[24] Section 129(1) of the Act.
[25] Section 129(1) of the Act.

PX0684-035

*The Parties' submissions*

3.6    The Parties submitted that GIPHY is not an enterprise for the purposes of the Act because GIPHY does not supply any services in the UK 'otherwise than free of charge', and that GIPHY's services in the UK are provided entirely free of charge.

*CMA's analysis*

3.7    Facebook was incorporated in July 2004 and the company's stock is listed on the NASDAQ stock exchange. As noted in Chapter 2, The Parties, Merger and Rationale, Facebook provides a number of products/platforms including Facebook Blue, Instagram, Messenger and WhatsApp. Through these platforms, Facebook makes GIFs available to users without charge, and engages in display advertising to support its operations. It is common ground that Facebook is an enterprise for the purposes of the Act.

3.8    GIPHY was incorporated in February 2013 and is and is headquartered in New York. GIPHY is a platform providing an online database and a search engine that allows users to search and share video GIFs and GIF stickers on its own website and app. It also makes these GIFs available to third-party platforms. GIPHY does not charge for access to its online database and search engine or generate other revenue in the UK. GIPHY generated revenue outside of the UK[26] from 2017 through Paid Alignment agreements which continued until completion of the Merger (May 2020), when Facebook terminated all existing paid arrangements in place and ceased the revenue-generating arm of the platform.

3.9    The CMA's Guidance on Jurisdiction and Procedure states that 'there is no requirement that the transferred activities generate a profit or dividend for shareholders: indeed, the transferred activities may be loss making or conducted on a not-for-profit basis'.[27]

3.10   We consider that GIPHY is an undertaking which is carried on for gain or reward. GIPHY completed a number of investment rounds in order to sustain and expand its commercial operations and develop its products and services. GIPHY promoted itself to investors as a business carried on for gain or reward. GIPHY had a range of pre-merger plans for revenue generation. The evidence shows that GIPHY had the aim and ambition to be a profitable business (see Chapter 6, Counterfactual and Chapter 7, Horizontal Effects). There is nothing unusual in a network business building up a user-base by

---

[26] Specifically, in the US.
[27] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA 2 – 2014) at paragraph 4.6.

PX0684-036

offering its services at little or no charge, and then leveraging that substantial user-base to fund its business through other arrangements, such as revenue from advertising. For example, Facebook does not charge users for using its Facebook Blue, Instagram or Messenger apps. As noted above, GIPHY was developing revenue generation plans that did not rely on charging UK users for access to its GIFs and GIF stickers.[28]

3.11   Furthermore, we consider that GIPHY was also, prior to completion of the Merger, 'an undertaking in the course of which goods or services are supplied otherwise than free of charge' for the following reasons:

(a)   Prior to the Merger, GIPHY charged for services outside of the UK.[29] There is nothing in the definition of 'enterprise' or 'business' that limits the geographic scope of the definition to the UK. We agree that in order for an RMS to be established there must be a UK nexus, but the statutory language is clear that this UK nexus falls to be assessed as part of the turnover or share of supply test, not as part of the assessment of whether the merger parties constitute enterprises.

(b)   Facebook has acquired the whole of the GIPHY business, not simply GIPHY's UK activities, and so it is the whole of the GIPHY business which must be taken into account.

3.12   For these reasons, our view is that GIPHY is a business[30] and is an 'enterprise' for the purposes of UK merger control.

## 'Ceased to be distinct'

3.13   Section 26 of the Act provides that enterprises have ceased to be distinct once they are brought under common ownership or common control.

3.14   On 15 May 2020, Facebook, through its wholly-owned subsidiary, Tabby Acquisition Sub, Inc., acquired all outstanding equity in GIPHY. The Merger has given Facebook a controlling interest (ie 'de jure', or 'legal' control) over GIPHY. As a result of the Merger, Facebook and GIPHY have therefore come under common ownership or control and have ceased to be distinct.

---

[28] GIPHY's Paid Alignment model generated revenue from advertisers. We note that GIPHY was separately exploring a platform fee (See Chapter 6, Counterfactual).
[29] Through Paid Alignment agreements.
[30] In particular, as set out above, it meets both disjunctive elements of the definition of 'business' although it is only necessary to establish that GIPHY is either 'an undertaking which is carried on for gain or reward' or 'an undertaking in the course of which goods or services are supplied otherwise than free of charge'.

PX0684-037

3.15   On this basis, our view is that each of Facebook and GIPHY is an enterprise and that as a result of the Merger these enterprises have ceased to be distinct.

## At a time or in circumstances falling within section 24

3.16   Section 24 of the Act requires that the completed merger must have taken place not more than four months before the reference is made.

3.17   The acquisition was completed and made public on 15 May 2020. The CMA started its Phase 1 investigation in June 2020, but time was extended on various occasions between 19 June 2020 and 31 December 2020 in accordance with section 25(2) of the Act, following the Parties' failures to comply, with or without reasonable excuse, with requirements of information notices issued by the CMA under section 109 of the Act.

3.18   The four month deadline under section 24 of the Act for a decision to refer became, therefore, 29 March 2021 unless further extended while the Parties decided whether to offer undertakings.[31] The CMA took a decision on 25 March 2021 to make a reference unless Facebook gave undertakings in lieu of a reference under section 73 of the Act by 1 April 2021, and the statutory deadline was extended to allow for the Parties to offer undertakings. As no such undertakings were given, a reference under section 22 of the Act to the Chair to constitute a Group was made on 1 April 2021.

3.19   The Merger was therefore completed within the statutory period for reference.

## Turnover test

3.20   The turnover test is met where the value of the turnover in the UK of the 'enterprise being taken over'[32] exceeds GBP70 million.[33] GIPHY did not generate more than GBP70 million of turnover in the UK in its most recent financial year and so the turnover threshold set out in section 23(1)(b)(i) of the Act is not satisfied.

## Share of supply test

3.21   Under section 23 of the Act, the share of supply test is satisfied if the merged enterprises both either supply or acquire goods or services of a particular

---

[31] Under section 25(4) and (5) of the Act.
[32] Section 28 of the Act confirms that turnover for the purposes of section 23(1) is determined by taking the total value of the UK turnover of the enterprises which cease to be distinct.
[33] Section 23(1)(b) of the Act.

PX0684-038

description in the UK, and will, after the merger, supply or acquire at least 25% or more of those goods or services in the UK as a whole, or in a substantial part of it.

3.22 The CMA has a wide discretion to identify a specific category of goods or services supplied or procured by the merger parties for the purposes of applying the share of supply test.[34] The CMA's Guidance on Jurisdiction and Procedure identifies a number of considerations to which the CMA will have regard when describing the relevant category of goods or services.[35] In particular, it notes that:

(a) The CMA will have regard to any reasonable description of a set of goods or services to determine whether the share of supply test is met. This will often mean that the share of supply used corresponds with a standard recognised by the industry in question, although this need not necessarily be the case; and

(b) The share of supply test is not an economic assessment of the type used in the CMA's substantive assessment; therefore, the group of goods or services to which the jurisdictional test is applied need not amount to a relevant economic market.[36]

3.23 In addition, the CMA has a wide discretion to apply whatever measure (eg value, cost, price, quantity, capacity, number of workers employed), or combination of measures, it considers appropriate to calculate the merging parties' share of supply and to determine whether the 25% threshold is met.[37]

3.24 The share of supply test requires that the merger would result in the creation or enhancement of at least a 25% share of supply or acquisition of goods or services either in the UK or in a substantial part of the UK. This does not require, however, that the merger parties be legally incorporated in the UK.[38] The Guidance on the CMA's jurisdiction and procedure states that services or goods are generally supplied in the UK where they are provided to customers who are located in the UK.[39]

---

[34] Section 23(8) of the Act.
[35] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA 2 – 2014) at paragraph 4.56.
[36] See for example the CMA's decision in *ION Investment Group Limited/Broadway Technology Holdings LLC* (7 July 2020).
[37] Section 23(5) of the Act.
[38] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA 2 – 2014) at paragraph 4.57.
[39] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA 2 – 2014) at paragraph 4.58.

PX0684-039

*The description of services*

3.25    The CMA has identified 'the supply of apps and/or websites that allow UK users to search for and share GIFs' as the relevant description of services. We have calculated shares of supply on the basis of the average number of monthly searches for GIFs in the UK on these apps and websites.

3.26    There are a number of ways someone in the UK can search for a GIF and share it with their friends, family, or other connections in their network:

(a)    That user can use the integrated GIF search function (if one is available) within the service they are using to communicate or share content. For example, if chatting with a friend on WhatsApp, a user can tap the 'GIF' and 'search' icons and enter a search term, which returns an array of GIF results from which the user can select one to share in their WhatsApp message.

(b)    That user can visit a GIF provider's O&O platform and search for a GIF and then share that GIF on another app or website.[40] For example, a user wanting to share a particular GIPHY GIF on a social media platform or messaging app can access the GIPHY app or website, select the GIF, click the 'share' button, and then choose a particular platform from the available options (such as Facebook Blue, Facebook Messenger, Instagram, WhatsApp, Snapchat, or Twitter).

(c)    That user can visit a general search engine and search for a GIF and then share that GIF on another app or website. For example, a user wanting to share a GIF with a friend expressing happiness can open Google Search, type 'happy GIF' into the search bar, select the GIF, and then click the 'share' symbol to select a method by which to share the GIF, such as Facebook, Twitter, or email.

3.27    All of these methods for searching and sharing GIFs allow UK users to use GIFs in a user-friendly way as part of their digital communications. It is the supply of apps and websites that allow UK users to search for and share GIFs that we have considered for the purposes of the share of supply test.

---

[40] The GIF could be shared through integrated share functionality (ie a 'share' button or icon on the webpage or app, which connects to other external services such as Facebook, Instagram, or Twitter) or by copying and pasting the GIF.

PX0684-040

*The Parties' submissions*

3.28    The Parties submitted that the Merger does not satisfy the share of supply test within the meaning of section 23 of the Act.[41]

3.29    The Parties submitted that the overlap the CMA identifies is artificial. The Parties consider, therefore, that the description of services is not reasonable.[42]

3.30    The Parties submitted that any overlap as part of the share of supply test must correspond to prospective competition concerns identified in assessing any horizontal theories of harm.[43] The Parties submitted that this position is supported by the recent Tribunal decision in *Sabre v CMA* where the Tribunal stated that the purpose of the share of supply test is to identify a merger which does not meet the turnover test, but in respect of which there is a sufficient prospect of a competition concern arising from an overlap in relevant commercial activity as to render it worthy of investigation.[44] The Parties submitted that the CMA has failed to establish a connection between the purported overlap embodied in the relevant description of services and its horizontal theory of harm relating to the loss of potential competition in the supply of display advertising services in the UK.[45] The Parties stated that the failure to establish this connection demonstrates that the Parties do not in fact overlap in any relevant commercial activity in the UK,[46] and that the CMA appears to have used the share of supply test to identify an artificial overlap so that it could assume jurisdiction, and then subsequently investigate other competition concerns quite unconnected to the jurisdictional overlap.[47]

3.31    The Parties further submitted that this failure to identify an overlap for the purposes of the share of supply that bears resemblance to the Parties' commercial activity demonstrates that the CMA has unreasonably stretched the bounds of the share of supply test for an improper purpose.[48]

3.32    The Parties also submitted that Facebook is not active in the supply of searchable GIF libraries. In particular, the Parties submitted that Facebook users do not search for GIFs on Facebook; Facebook users search for GIFs

---

[41] Parties' Response to Provisional Findings, 2 September 2021, section 3.
[42] The Parties' Initial Submission commented on a previous formulation of the description of services, which did not include the words 'and share'.
[43] Parties' Response to Provisional Findings, 2 September 2021, paragraphs 3.1-3.7.
[44] *Sabre Corporation v Competition and Markets Authority* [2021] CAT 11 at paragraph 144.
[45] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.3.
[46] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.4.
[47] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.6.
[48] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.5.

PX0684-041

on GIPHY or Tenor and Facebook is simply a mechanism that allows users to access GIFs provided by GIPHY or Tenor.

3.33   The Parties stated that in identifying an overlap, 'GIPHY's activities are being treated as both horizontally overlapping with Facebook (in terms of providing an access mechanism to a GIF search engine) and being vertically-integrated into Facebook's services (in terms of providing the GIF search engine that Facebook users access to search for GIFs). However, GIPHY cannot reasonably be both of those things at the same time for the purposes of calculating a single share of supply. As a result, the Parties submitted that this construction fails and the share of supply test is not met on this basis'.[49]

3.34   The Parties further submitted that, even if the CMA's description of services is reasonable, the Parties' combined share of supply does not exceed 25%:

(a)   The Parties submitted that they do not have a share of supply of 25% or more of apps/websites that allow UK users to search for GIFs 'as there are literally hundreds of such apps/websites'.

(b)   Even on the basis of average monthly searches, the Parties' combined share of supply does not exceed 25% as the CMA has failed to properly account for significant suppliers of GIFs such as Google, Apple and others, which the Parties say significantly understates the correct size of the denominator:

(i)   The Parties consider that Google is by some considerable margin the largest repository of GIFs in existence and that a 'very significant number of people searching for GIFs will originate from a Google Web Search on desktop and be directed to the GIPHY or Tenor website'. The Parties stated that to exclude GIF searches carried out by Google Web desktop searches on the basis that they return links or images rather than the GIF itself is arbitrary and unreasonable, and that Google Web does have a specialised GIF search function.[50] The Parties further stated that users that find a GIF through Google Web Search on desktop can 'share' that GIF, including through a share button. The Parties stated that although a user would need to 'navigate away from Google Web Search to the GIF provider' in order to share the GIF, it is inconsistent to exclude Google desktop searches from the description of services on this basis, given that a GIF search on 'Facebook directs users [away from Facebook] to GIPHY's searchable GIF library'. The Parties stated that this

---

[49] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.10.
[50] Parties' Response to Provisional Findings, at paragraphs 3.12 and 3.13(b).

PX0684-042

demonstrates that a search for a GIF on Google Web and Facebook are 'entirely substitutable from a user perspective'.

(ii) The Parties submitted that the *de minimis* number of searches the CMA has identified for Apple iMessage must be incorrect given Apple accounts for over 50% of mobile operating systems in the UK.

(iii) The Parties stated that the CMA has not accounted for other established GIF providers including Imgur, Gifbin, Reaction GIFs and others.

### CMA's analysis

*Description of services*

3.35   As noted above, there are a number of ways a person in the UK can search for and share a GIF. Search results can differ depending on whether a particular user searches for a GIF through a GIF provider's own website or app or through a third party website or app. This is because a third party website or app can integrate with a GIF provider in various ways, depending on its preferences and features, with some websites/apps only presenting search results from one GIF provider to users, while others access several GIF libraries for each search. For example, when a user conducts a GIF search on Facebook Messenger, the Messenger server combines GIPHY and Tenor GIFs and presents these to the user by randomly interweaving them. A third-party website can also use content caching servers to copy specific GIFs from the website of GIF providers onto its own servers and serve them from there rather than from the GIF provider's servers.

3.36   Facebook offers its users (including UK users) the ability to search for and share GIFs on its platforms, including Facebook Blue, Facebook Messenger, Instagram, and WhatsApp. GIPHY also allows its users (including UK users) to search for and share GIFs on its own website and app.

3.37   The GIFs that Facebook users can search for on Facebook platforms are provided to Facebook by GIPHY (or Tenor) through an API. However, we do not consider that this vertical relationship precludes the finding of an overlap in respect of the supply of services to UK users. As the Tribunal recently recognised in *Sabre v CMA*, 'the Mergers Guidance makes it clear that the exclusion of vertical relationships from the share of supply test applies only where that relationship is wholly vertical. Where there is some horizontal

PX0684-043

overlap between the services supplied by the Parties, the share of supply test is still applicable'.[51]

3.38    We consider that Facebook is not 'simply a mechanism that allows users to access GIFs provided by GIPHY or Tenor'. From a technical perspective, Facebook provides an interface to users through its websites and apps and is involved in the technical provision of the GIFs (for example, by choosing how to configure the API integration, or, in the case of Facebook Blue for instance, by interweaving GIPHY and Tenor GIFs in the array of returned results). Also, from the perspective of the user, Facebook supplies websites and apps within which users can search for and share GIFs seamlessly as part of their social media activity; the user does not leave the Facebook platform and may not even be aware that the GIFs they are searching for and sharing are powered by GIPHY or Tenor.

3.39    Accordingly, our view is that the Parties overlap in the supply of apps and/or websites that allow UK users to search for and share GIFs.

3.40    We consider this description of services to be reasonable: the Merger concerns the acquisition of a GIF database and search engine by a platform that also makes it possible for UK users to search and share GIFs within its own apps and websites. Contrary to the Parties' submission, we consider this overlap to be neither artificial nor unreasonably stretched.

3.41    As noted above, the Tribunal found in *Sabre v CMA* that 'the purpose of the share of supply test is to identify a merger which does not meet the turnover test, but in respect of which there is a sufficient prospect of a competition concern arising from an overlap in relevant commercial activity as to render it worthy of investigation'.[52] We do not agree that this supports the Parties' contention that the overlap identified as part of the share of supply test must correspond to the horizontal competition concerns considered as part of the SLC assessment. To read the Tribunal's statement in this way is not only inconsistent with section 23 of the Act (which contains no such limitation), but would also preclude the CMA from applying the share of supply test in cases where it only identifies vertical or conglomerate competition concerns.

3.42    In any event, even on the basis of the Parties' interpretation of *Sabre v CMA*, which we consider to be incorrect, we consider that there is sufficient connection between the overlap identified for the share of supply test and our competition concerns. The overlap identified for establishing jurisdiction relates, simply speaking, to the supply of apps/websites on which UK users

---

[51] *Sabre Corporation v Competition and Markets Authority* [2021] CAT 11 at paragraph 156.
[52] *Sabre Corporation v Competition and Markets Authority* [2021] CAT 11 at paragraph 144.

PX0684-044

can find GIFs for use in digital communications. This overlap is relevant to our horizontal theory of harm: it is through monetisation of GIFs that GIPHY was seeking to compete in display advertising and accordingly we consider that the horizontal competition concerns arise from the supply relating to GIFs. The fact that the description of services may not align with a classification used by the industry or the economic markets the CMA has defined does not make the description of services unreasonable or inappropriate for use as part of the share of supply test.[53]

*25% threshold*

3.43   We have calculated the shares of supply by reference to the average monthly searches on the apps and/or platforms falling within our description of services. Section 23(5) of the Act expressly states that for the purposes of deciding whether the 25% threshold is met, the CMA shall apply the criterion, or combination of criteria, that the CMA considers appropriate. In our view, the metric of average monthly searches provides an appropriate measure for the shares of supply as it allows us to assess the relative size and significance of the Parties and third parties in respect of GIF searches in the UK.

3.44   As set out in Table 1 below, on the basis of data provided by the Parties and third parties on the volume of GIF searches by UK users, the Parties have a combined share of supply of [50-60]% with an increment of [0-5]% in the supply of apps and/or websites that allow UK users to search for and share GIFs.

3.45   For a full explanation of our methodology and data sources, see Appendix C: Jurisdiction shares of supply methodology.

---

[53] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA 2 – 2014) at paragraph 4.56. See also *Sabre Corporation v Competition and Markets Authority* [2021] CAT 11 at paragraph 154.

PX0684-045

**Table 1: Estimates of shares in the supply of apps and/or websites that allow UK users to search for and share GIFs[54]**

| Platform | Average monthly searches (UK, 2020) | Share | Notes |
|---|---|---|---|
| Facebook | [✂] | [50-60]% | Searches run on Facebook Blue, Facebook Messenger, Instagram, and WhatsApp |
| GIPHY | [✂] | [0-5]% | Searches run on GIPHY's O&O website and app |
| Combined | [✂] | [50-60]% | |
| Tenor | [✂] | [0-5]% | Searches run on Tenor's O&O website and app |
| Gfycat | [✂] | [0-5]% | Searches run on Gfycat's O&O website and app |
| Google Search | [✂] | [0-5]% | All searches (mobile and desktop) run on Google Images plus mobile searches run on Google Web[55] |
| Other search engines | [✂] | [0-5]% | Estimate of searches run on all other general search engines (including Bing and Yahoo)[56] |
| Google Messages | [✂] | [0-5]% | All searches for GIFs and stickers run on Google's Messages service[57] |
| Apple iMessage | [✂] | [0-5]% | Searches run on Apple iMessage |
| Other platforms integrated with one or more of: GIPHY, Tenor, Gfycat, and Holler | [✂] | [40-50]% | Searches run on all other third party platforms integrated with GIPHY, Tenor, Gfycat, and/or Holler (excluding any platforms within the Facebook Group)[58] |
| Total | [✂] | 100% | |

Source: CMA analysis based on GIPHY and third-party data.

3.46   We address the Parties' submissions that the CMA has failed to properly account for significant suppliers of GIFs such as Google, Apple, and others below.

---

[54] The Parties are not aware of any publicly available sources on size of total supply. The CMA has therefore collected information on search (or equivalent) volumes from GIPHY, Tenor, Gfycat, Holler, Google, Bing, and Apple. The CMA has not received data from Imgur, Gifbin, or Reaction GIFs. However, market information indicates that these websites or apps have a very small presence in the UK. In addition, third parties generally consider that Tenor is GIPHY's closest competitor and that Gfycat is one of only a few other competitors. As such, we consider that all such searches taken together would be unlikely to materially increase the CMA's estimate of total supply and in particular would not be of such a size as to reduce Facebook and GIPHY's combined share of supply below 25%.

[55] The CMA included all searches (both desktop and mobile) for 'GIF' or 'GIFs' (not case sensitive), and/or filtered by 'Type: GIF', on Google Images search, and mobile searches for 'GIF' or 'GIFs' (not case sensitive) run on Google Web search. See further discussion in paragraph 3.46.

[56] See Appendix C: Jurisdiction shares of supply methodology for an explanation of how this share was estimated.

[57] [✂]. We estimated this based on the total number of Stickers sent by UK users; see Appendix C: Jurisdiction shares of supply methodology for further details.

[58] This share includes all other third party platforms integrated with one or more of: GIPHY, Tenor, Gfycat, and Holler. It is based on the sum of all searches recorded by these four GIF providers, excluding all searches on Facebook Blue, Facebook Messenger, Instagram, and WhatsApp (which are counted under the 'Facebook' share) and excluding the GIF providers' O&O searches (which are counted under the GIPHY, Tenor, and Gfycat shares, respectively, noting Holler does not provide O&O GIF search). See further discussion in Appendix C: Jurisdiction shares of supply methodology.

PX0684-046

- *Google*

(a) *Google Images*: We have included all searches run on Google Images for 'GIF' or 'GIFs' (non-case-sensitive) as search terms and all searches run on Google Images using the filter 'Type: GIF' (which appears under the 'Tools' menu on Google Images),[59] from both mobile and desktop.[60] We understand that a search for a GIF run on Google Images on a *mobile* device returns an array of animated (auto-playing) GIF results. We understand that a search for a GIF run on Google Images on a *desktop* computer returns an array of static images (labelled in the corner with 'GIF'). The user can then click onto one of these results and the static image is replaced by a GIF which will start auto-playing on screen. If the user wishes to share this GIF (eg to a social media platform), they can then do so directly by clicking onto the integrated 'share' button.

(b) *Google Web*: We have included all searches run on Google Web (ie the main search interface labelled as 'All') on a *mobile* device. Google confirmed to the CMA that, when a user searches for the term 'GIF' or 'GIFs' on Google Web, the *mobile* image preview is animated, while on *desktop* the image preview is static, and that this difference between mobile and desktop is the case for all UK users. We understand that on desktop, the only way for the user to view animated (auto-playing) GIF results is to click one of the static previewed GIF results (on Google Images). [✂] already be counted in the searches covered in part (a). The Parties submitted that it was arbitrary for the CMA to distinguish between results for static images and results for animated GIFs in this way and commented that Google Web search on desktop has an integrated share button.[61] However, this share feature is in fact available only once the user has clicked onto one of the previewed results from Google Images, [✂], ie it would already be counted. On the basis that users who searched Google Web using desktop can view actual GIF results (rather than static images) and share them easily using the integrated share functionality *only* if they click through onto a Google Images result ([✂], which would already be included in our data), we have excluded Google Web searches on desktop from our share of supply calculations. From a *mobile* Google Web search, the user can view the animated results with no further

---

[59] The Parties also submitted that Google has a specialised GIF search function [Parties' Response to Provisional Findings, paragraph 3.13(b)]. We understand that, in fact, Google Web search (the main search interface labelled as 'All') does not have a specialised GIF search function; this 'GIF' filter is available only on Google Images search. As described above, we have included all such 'Type: GIF' searches in Google's share of supply in Table 1.

[60] We have not included searches run under Google 'Videos', since these do not return GIFs or specific GIF previews, but rather links to third-party websites (eg those of GIPHY and Tenor).

[61] Parties' Response to Provisional Findings, paragraph 3.13(a).

PX0684-047

selection or click-through; in such a case, [✂] ([✂]).If the user wishes to share one of the GIFs (eg to a social media platform), they can select one of the results and click the integrated 'share' button, as described in part (a). However, it is important to note that the volume of searches on desktop for the term 'GIF' or 'GIFs' on Google Web is small and even if we included these searches in our share of supply calculations, the impact on Google's total share of supply would be less than [0-5%].[62]

*(c)* *Google Messages*: Google also provides a 'Messages' service on its Android phones, which enables users to search for and share GIFs and stickers. We have obtained data from Google for the number of GIF searches and the number of stickers sent by UK users on Google Messages and these searches are reflected in Table 1 above.[63]

- *Apple*

*(d)* The Parties challenged the proportion of GIF searches attributed to Apple on the basis that the searches seemed low given Apple's large share of mobile devices in the UK. We re-checked the search data provided by Apple, and Apple confirmed its accuracy. Furthermore, based on the figures given by Apple, we estimate there to be a ratio of 1 GIF search to approximately [✂] messages.[64] We have calculated the equivalent ratio of GIF searches to total number of messages sent for WhatsApp and Google Messages, and found these to be consistent with or lower than the ratio for Apple: [✂] and [✂], which indicates that the figures for Apple are highly plausible.[65]

- *Imgur, Gifbin, Reaction GIFs, and others*

*(e)* The Parties identified a small number of GIF providers that are not included in the CMA's share of supply estimates: Imgur, Gifbin, and Reaction GIFs. These platforms are not integrated with one of the larger GIF providers, and accordingly any searches undertaken on them would not be captured in the data we collected from GIPHY, Tenor, Gfycat and Holler. As noted above and explained further in Chapter 5, Market

---

[62] Data collected by the CMA during Phase 2 show that the number of Google Web searches for 'GIF' or 'GIFs' conducted via desktop in the UK (totalling approximately 2 million in 2020) is immaterial to our findings on share of supply.

[63] See Appendix C: Jurisdiction shares of supply methodology for a further explanation of our calculation of Google Messages' share.

[64] Apple submitted to the CMA that it estimates there were approximately [✂] GIF searches of #images, [✂] iMessages sent, by users in the UK in 2020. The CMA took the ratio of the mid-point of each range (ie ratio of [✂] to [✂]).

[65] See Appendix C: Jurisdiction shares of supply methodology for a full explanation of how we calculated these ratios.

PX0684-048

Definition and Market Power, we consider that these types of smaller providers are unlikely to have material search volumes in the UK and therefore are not likely to affect the Parties' share of supply.[66] To the extent there may be other suppliers that fall within our description of services not accounted for in Table 1 – for example, foreign platforms whose services are available in the UK, even if they are not used to any material degree by UK users – we are confident that these would represent a very small share of supply and that their exclusion would have no material impact on the Parties' share.

3.47   Accordingly, our view is that the share of supply test under section 23 of the Act is met in relation to the supply of apps and/or websites that allow UK users to search for and share GIFs.

***The supply of searchable libraries of animated (ie non-static) stickers, provided direct to users in the UK (including both GIF and non-GIF stickers)***

3.48   In its provisional findings published on 12 August 2021 (the **Provisional Findings**), the CMA also provisionally decided that the share of supply test was met on the basis of the supply of searchable libraries of animated (ie non-static) stickers, provided direct to users in the UK (including both GIF and non-GIF stickers).

3.49   In response to our Provisional Findings, the Parties made a number of submissions including:

(a)   The use of sticker library size was not an appropriate metric for assessing shares of supply as it has an insufficient UK nexus: the size of each Parties' global sticker library says nothing about UK usage or consumption, notwithstanding that those stickers can be accessed in the UK.[67]

(b)   The CMA has failed to properly account for the fact that Facebook's searchable sticker library is not made available direct to users on a standalone basis and accordingly Facebook's animated stickers should not fall within the description of services.[68]

---

[66] The CMA obtained contact details for six other providers (Animoto, Dongtu, GIFs.com, Imgflip, Imgur, and Stipop) to request information. One of these (Animoto) told us that it does not provide any search functionality for GIFs or animated stickers. The remainder did not respond. We note that several of these providers do not appear to offer users a GIF search functionality (Stipop), do not appear to return animated GIF results in response to a user search (eg Imgflip) or operate only in China (eg Dongtu).
[67] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.17.
[68] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.18.

PX0684-049

(c) Animated sticker content searchable on Google falls within the description of services and therefore should have been included in the CMA's calculations of the shares of supply.[69]

3.50 Given that the CMA has concluded that the share of supply test has been met on the basis of the supply of apps and/or websites that allow UK users to search for and share GIFs (as set out above), we consider that it is not necessary to conclude on whether jurisdiction can also be established on the basis of the supply of searchable libraries of animated (ie non-static) stickers and accordingly we have not reached a view on the merits of the Parties' arguments.

## UK nexus, international comity and business certainty

3.51 The Parties made a number of broader submissions on the issue of jurisdiction, in summary stating that:

(a) 'Facebook is a US entity. GIPHY is also a US entity, with no UK turnover, assets, employees, or any physical UK presence'.

(b) 'It is exorbitant from the perspective of international comity for the CMA to review this Transaction at all'.

(c) For the CMA to assert jurisdiction over this transaction would make 'the application of the UK merger regime highly unpredictable' and create 'high levels of business uncertainty'.

3.52 The CMA also received some comments from third parties submitting that the CMA was overreaching its mandate, and that this could have implications for investment in the UK. These submissions are discussed further at Appendix H.

3.53 The Tribunal has recently reviewed the case law regarding the CMA's jurisdiction under the Act to review transactions between overseas companies for merger control purposes, having regard to considerations of international comity. The Tribunal concluded that: 'Parliament has expressly identified the relevant connecting factors which enable consideration of a merger with an "extra-territorial" dimension. Both jurisdictional tests in section 23 are based on a UK territorial connection. As regards the turnover test, there exists a jurisdictional nexus with the United Kingdom because the relevant turnover arises "in the United Kingdom". As regards the share of supply test, the jurisdictional nexus to the United Kingdom is provided by the fact that the

---

[69] Parties' Response to Provisional Findings, 2 September 2021, paragraph 3.19.

PX0684-050

goods or services are supplied "in the United Kingdom, or in a substantial part of the United Kingdom". Considerations of territoriality (and thus comity) are addressed within the share of supply test itself. Parliament has deemed these territorial connections sufficient as the basis for the exercise of statutory powers by a UK authority …. Either the UK has jurisdiction under this territorially defined test, or it does not'.[70]

3.54   The CMA accordingly considers that if the jurisdictional tests in section 23 of the Act are met, it will have jurisdiction to review a transaction as a relevant merger situation for the purposes of merger control, and that 'considerations of territoriality (and thus comity) are addressed within the share of supply test itself' as set out in the Act.

## Conclusions on the relevant merger situation

3.55   Our view is that the conditions of section 23 of the Act are met and that therefore a relevant merger situation has been created as a result of the acquisition of GIPHY by Facebook.

---

[70] *Sabre Corporation v Competition and Markets Authority* [2021] CAT 11, paragraph 86.

PX0684-051

# 4.     Industry Background

4.1     As set out in Chapter 2, The Parties, Merger and Rationale, GIPHY is an online database and search engine that is used to search and share GIFs and GIF stickers. GIPHY offers its GIFs and GIF stickers both on its own website and app, and through APIs and SDKs that allow third party apps (eg Snapchat, TikTok or Instagram) to integrate access to GIPHY's GIF databases into their platforms.

4.2     Facebook operates a number of user-facing social media and messaging platforms such as Facebook, Instagram, WhatsApp, and Messenger (collectively referred to as the Facebook family of apps).

4.3     Facebook facilitates user expression via video GIFs and GIF stickers using third-party GIF suppliers (including GIPHY pre-Merger) via API/SDK integrations. Facebook also supplies its own in-house searchable non-GIF sticker library available to users of its Facebook Blue and Messenger apps, containing packs of both static and animated stickers. However, Facebook does not distribute these stickers to third party platforms, nor does it provide a variety of other tools surrounding GIF creation, hosting and distribution, which are discussed below.

4.4     This chapter sets out a brief description of GIFs (video GIFs and GIF stickers) and non-GIF stickers.

4.5     The chapter also provides an overview and analysis of the services involved in GIF supply, and an analysis of the characteristics and trends in GIF supply and usage.

## What are GIFs?

4.6     As explained in Chapter 2, The Parties, Merger and Rationale, a video GIF is a digital file that displays a short (typically 2.5 seconds), looping, soundless video, which can be used to expressively convey emotions or as a way of demonstrating an understanding of popular culture (eg clips from TV shows). A GIF sticker displays an animated image comprised of a transparent (or semi-transparent) background which can be placed over images or text. Unless otherwise specified, we use the term 'GIFs' to refer to both video GIFs and GIF stickers.

4.7     Facebook's own in-house sticker library (its 'Sticker Store') lets Facebook users download non-GIF stickers, in the form of enlarged emoji-like 'sticker' images. These stickers can be static or animated. The user can access these

50

in their sticker drawer 'in app' when using the Facebook feed or Messenger thread. This tool is not made available by Facebook to third party host apps.

4.8   GIFs are a popular form of content for use on social media and messaging applications. According to a survey performed by Statista, and commissioned by GIPHY, GIFs are almost as well-known as emojis in the US among people aged 16 to 44 (Figure 4).

**Figure 4: Percentage of people in the US between 16-44 who know about Emojis, GIFs and Digital Stickers**



Source: [✂].

4.9   An internally commissioned study for Facebook on the desirability of certain features within messaging, which was conducted at the end of 2018, found GIFs to be one of the top [✂] priority features with [✂] of the participants viewing GIFs as [✂][71] on Messenger.[72]

## Overview and analysis of services related to GIF supply

4.10   As a GIF supplier, GIPHY is engaged in a number of activities which either directly contribute to GIF supply to users or provide complementary features to enhance digital communication and creative expression. GIPHY's core activities directly related to supplying GIFs to users include the following:

---

[71] Performance feature in the context of the study demonstrates that the participants liked having this feature in Messenger.
[72] The study conducted used the Kano technique as well as an unmoderated study which includes over 1,000 participants. The Kano model asks the participants to evaluate how they feel about a product's feature, including what they expect and what delights them. GIFs were one of [✂] features that the participants were asked to categorise. The top [✂] features that were perceived as a must have according to the participants were [✂] and GIFs functionality [✂]. For comparison, top [✂] low priority features were [✂].

PX0684-053

(a) **Sourcing, moderating,**[73] **and hosting a library** of GIF content. The content in GIPHY's library includes both video GIFs and GIF stickers. Where a GIF is based on content that is itself protected by intellectual property rights (eg a TV show or film) GIPHY secures the rights to the usage and distribution of this content from the owner of the intellectual property for that content under a purpose-built licence.

(b) Using **search algorithms** to identify relevant content responsive to users' search queries, as well as displaying content in a 'trending' feed that shows the latest and most popular GIFs largely selected by GIPHY's editorial team.[74]

(c) **Distributing** (serving) the relevant GIFs to end users via several channels: to users of third party platforms (such as social media apps and third party mobile phone keyboard interfaces[75]) via an API or SDK, direct to users via an O&O platform (GIPHY's own website, mobile app and mobile phone keyboard interface), and through users choosing to embed GIFs within their own websites.

4.11   In addition to the activities above, GIPHY supplies a range of features and services that aim to promote user engagement with GIFs and/or increase the reputation of GIPHY's brand among the creative community and contributors to popular culture. For example:

(a) Tools and services for the creation of GIFs, including an in-house content creation studio and features on GIPHY's website and app allowing users to create their own GIFs.[76]

(b) GIF artist services, including GIPHY Artist channels (for digital and visual artists who would like to create and distribute their own artwork via

---

[73] Moderating refers to ensuring the library contains no content that may be harmful to users – see further below in paragraph 4.24.

[74] GIPHY submitted that, prior to the acquisition, GIPHY's editorial team selected GIFs to appear in the trending feed based on certain information and a set of principles for what to include (real-time trending topics and events such as holidays; reaction GIFs; currently popular memes, eg TV catchphrases; simple and clear GIFs; and avoid GIFs that are controversial, larger than 5 mega-bytes, poor quality, or with non-standard aspect ratios).

[75] A GIF keyboard is a downloadable app that smartphone users can install and enable. The keyboard is then accessed alongside the standard phone's keyboard and allows users to search for GIFs and send them on a variety of social media platforms and messaging services. Tenor explained that its initial method of distribution was its downloadable GIF keyboard, but it now also integrates directly (via a GIF button) with social media apps. For the purposes of our assessment we consider that there are two types of keyboards offering GIFs: O&O keyboards run by GIF providers (notably the GIPHY keyboard and Tenor keyboard), and third party keyboards (such as Samsung and Kika) that feature GIFs (alongside other features) sourced through an API/SDK integration from GIPHY or another GIF provider.

[76] For example, the GIPHY CAM app (which allows users to create their own GIFs) and GIPHY Capture (a desktop application that lets users extract any video and convert it into a GIF).

PX0684-054

GIPHY), and an Artist directory and 'Hire Me' button on artists' account profiles, allowing digital artists to connect with potential clients.[77]

(c) Provision of 'verified' status (blue tick badge) to officially recognised brands and artists, which allows their channel to appear as a search result on GIPHY's website/app and provides access to exclusive content creation tools.[78] Companies, celebrities/performing artists and public figures who wish to distribute content they own can also apply for a Brand Channel.[79]

4.12   Below we discuss GIPHY's core activities in further detail.

### *Sourcing, moderating, and hosting a library*

4.13   To **source a relevant library** of GIFs, GIPHY enables individuals and businesses, including GIPHY's own employees (eg as part of its in-house content studio), to create and/or upload GIFs using its O&O website or apps.[80] All users who adhere to GIPHY's guidelines can upload GIFs, but only a minority of this content enters the public library.[81] Only content uploaded by approved users and moderated by GIPHY enters the public library, after which it becomes available to users. The Parties submitted that around [✂] are uploaded to GIPHY per month on a worldwide basis, but the majority of content does not enter the public library (in the UK the number of user uploads was close to [✂], including both approved and non-approved users).

4.14   Figure 5 shows, by source, the proportions of GIPHY's total content library compared to the proportions of the subset of content included in the public search index (ie content that has been vetted by GIPHY) and the subset of content that was actually served (ie the relevant content returned in response to a given API/SDK search query), as of March 2020. Out of GIPHY's total library, only content that is included in the search index is searched and served to users. The search index does not include content that is not vetted; the majority of uploaded content that is not included in the search index is user-generated content (**UGC**) (by registered and signed-in users) and anonymous uploads (users who are not registered and signed-in). According

---

[77] Gaining an Artist channel requires an application and approval by GIPHY; for further details, see GIPHY Support 'Apply for an Artist Channel', accessed 29 November 2021.
[78] Gaining verified status requires an application and approval by GIPHY; for further details, see GIPHY Support 'Verified on GIPHY', accessed 29 November 2021.
[79] A Brand channel is a dedicated page on GIPHY's O&O site which hosts content created by that brand (eg to increase brand awareness) which is verified by GIPHY. Gaining a Brand channel requires an application and approval by GIPHY; for further details, see GIPHY Support 'Apply for a Brand Channel', accessed 29 November 2021.
[80] Users cannot upload GIFs from third party integrated platforms.
[81] Users can also create GIFs on GIPHY with the option of saving/downloading them for private use, without uploading them to the public library if they do not wish to.

PX0684-055

to data submitted by GIPHY, as of May 2021, only around [✂] of content in GIPHY's total library was included in its public search index,[82] suggesting the latter is strongly vetted and curated.

**Figure 5: Sources of GIPHY's content library (cumulatively, to 30 March 2020) vs. sources of GIFs actually served (during week of 24-30 March 2020)**

[✂]

Source: CMA analysis of data submitted by the Parties.
Note: Includes all content (video GIFs and GIF stickers). Within total library, content from Paid Alignment companies, in-house content studio, and scraped/copied from other websites make up a negligible proportion; the proportions of all types of content listed in the legend sum to 100%.

4.15   Figure 5 demonstrates that the distribution of content across different categories is different for content in the total library, the public search index, and content actually served. In particular:

*(a)*   [✂] of the total library cannot be attributed to a defined source ('Other') - these are largely 'anonymous' uploads, ie content uploaded by users who were not registered or signed-in to their account.[83] Despite the [✂] of this content uploaded to the library, it accounts for only [✂] of content included in the search index. We understand that this is because [✂].[✂] of the search index, this type of content accounts for [✂] of content served ([✂]). This may suggest that content created by anonymous users is [✂]. However, we understand that UGC and anonymous uploads are [✂] (ie it is probable that [✂].

*(b)*   UGC accounts for [✂] of the total library, [✂] of the public search index and [✂] of content served (however, as discussed directly above, 'other' includes anonymous uploads, which comprises UGC by users who were not registered or signed in). This category includes content uploaded directly to GIPHY's website or mobile app that is generated by registered users that have a GIPHY account and are signed-in (and are not verified as a 'brand', 'artist' or 'verified user').[84] It may include users who consider themselves artists or brands but have not applied for and/or been approved as verified users, as well as casual users.

*(c)*   The category 'Other companies' includes corporate brands, celebrity/performing artist brands, and studios (including verified 'Brand

---

[82] GIPHY submitted that there were 17.45 million GIFs were in its total library, with 6.07 million of these included in the search index.
[83] GIPHY submitted that since mid-2020, its users are required to have an account and be signed into their account in order to upload content. Prior to this date, any 'anonymous' content (uploaded by users who were not signed into an account) would be recorded under the 'other' category.
[84] Verified users are those with a blue tick badge, allowing their channel to appear as a search result on GIPHY's website. For further information about verified channels, see: Verified on GIPHY – GIPHY (accessed 29 November 2021).

PX0684-056

Channels' and 'Artist Channels')[85] refers to companies that own the original content copyright, with which GIPHY did not have a Paid Alignment agreement.[86] This category contributes only [✕] of the content in the total library, but accounts for the [✕] of content in the public search index ([✕]) and the [✕] ([✕]) of the content actually served. The fact that this category of content accounts for a [✕] of content served than content available in the search index might suggest that this type of content is relatively [✕] than other types of content included in the search index, in particular anonymous uploads. However, as noted above, we understand that anonymous uploads also account for the [✕] of content that does not get added to the search index, suggesting that GIPHY's content moderation team [✕].

*(d)* As regards GIFs from companies with which GIPHY had Paid Alignment agreements,[87] [✕] of content in the library and public search index. However, non-sponsored GIFs from such companies accounted for [✕] of content served.

*(e)* [✕] of total content are supplied by GIPHY's in-house studio[88] or copied or scraped from other platforms or websites.

4.16   The prominence of branded (ie 'company') content among results served in response to search queries suggests this type of content is identified by GIPHY as relatively more popular, engaging, and higher quality than GIFs from other sources. GIPHY told us that one reason for the prominence of branded GIFs among content served is that it deliberately prioritised these in the search algorithm because it knew this content would be rights-cleared with respect to intellectual property; see more on this below in paragraph 4.20.[89]

4.17   GIPHY submitted that users often appear to prefer UGC. This would appear to be supported by the fact that anonymously uploaded content accounts for a [✕] of content served despite accounting for only a [✕] of the search index. However, this result could also be driven by how GIPHY moderates the

---

[85] See earlier explanation of Brand Channels and Artist Channels at paragraph 4.11(c).
[86] Within the 'companies' categories, GIPHY does not maintain the data required to be able to disaggregate content produced by its in-house studio on behalf of these companies from their other branded content.
[87] 'Paid Alignment companies (sponsored GIFs)' refers to sponsored (promoted) GIFs from companies with which GIPHY has entered into a Paid Alignment agreement. 'Paid Alignment companies (other GIFs, not sponsored)' refers to GIFs from companies with which GIPHY has entered into a Paid Alignment agreement but are not specifically their sponsored (promoted) GIFs.
[88] 'In-house content studio' refers to original content produced by GIPHY's in-house content creation studio; any content produced by GIPHY's studio for advertisers or brand partners appears in the 'Paid Alignment companies' or 'other companies' categories respectively.
[89] However, GIPHY has submitted that many users prefer lower-quality, traditional GIFs to branded content, and that brand partners were not incentivised to protect the licensing of their output

PX0684-057

search index (see discussion in paragraph 4.15), and professionally created content still accounts for the [✂] of content served.

4.18   The idea that high-quality, professional content is perceived as important is also supported by GIPHY's internal documents. For example, in an email to a potential API partner, [✂]. In an internal e-mail, GIPHY notes that '[✂]', again suggesting that GIF providers see artistic content creation as an important dimension of competition. We discuss third party views on the relative quality and relevance of GIPHY's and other GIF providers' content libraries in Chapter 5, Market Definition and Market Power.

4.19   To attract creators of quality content, a GIF provider needs to offer wide user reach. This may give rise to cross-side network effects whereby smaller GIF suppliers may struggle to attract quality GIF content without securing significant traffic, and vice versa.

4.20   **Licensing rights to content**: For some content (such as clips from television shows or films), a licence may be required to ensure intellectual property is not infringed. GIPHY has created a purpose-built licensing agreement, enabling it to secure legal permission from the owner of the intellectual property for that content to use, edit and distribute content to downstream services and users. [✂]. Copyright holders who believe that their copyright has been infringed (for example, through clips uploaded directly by users) can report this. GIPHY will then initiate an investigation and, where required, remove any content from its public library if it has been found to infringe third-party copyright.[90] However, GIPHY does not proactively monitor its public library for IP or copyright infringement specifically.

4.21   In practice, the evidence shows that GIPHY's licensing agreements have not prevented the contents of its library from appearing in other GIF providers' libraries. We discuss the evidence on similarities and differences between GIF providers' libraries further in Chapter 5, Market Definition and Market Power.

4.22   GIPHY has submitted that it was incorrect in its prior belief that there was a gap in the market for high-quality, licensed GIFs, and that there is actually little appetite from brand partners to enforce licence exclusivity, as it is not in their interests to do so. GIPHY told us that brand partners were not incentivised to protect the licensing of their output and that even high-quality, branded content is therefore easily scraped and commoditised.

4.23   However, GIPHY's licensing agreements appear to be an important factor for some platforms in being willing to partner with GIPHY. [✂]. Two third party

---

[90] For further details, see GIPHY Support 'GIPHY DMCA Copyright Policy', accessed 29 November 2021.

PX0684-058

platforms told us GIPHY's claimed rights to distribute the content were an important consideration in the platform's choice of GIPHY over other GIF suppliers, but other platforms did not mention this as a consideration when choosing their GIF provider. [✕]

4.24   **Moderation**: As noted above, any content included in GIPHY's public library is first moderated to ensure that it is safe and suitable for use. GIPHY assigns all content a rating (in one of four ascending categories) based on the inclusion and degree of features such as profanity, sexual content, and violence.[91] Content that contains certain features or otherwise violates GIPHY's Community Guidelines is not permitted.[92] Users can flag GIFs they believe violate these rules.

4.25   Well-moderated content is important to social media platforms, including those who partner with GIPHY, as offensive content would degrade the user experience, and may cause reputational damage to the social media platform and expose it to legal liability. Various parties (including Facebook) have told us that they placed importance on the library being well-moderated to remove inappropriate content.[93] One 2018 incident, described as a 'content cleanup emergency' in a GIPHY internal document, highlights how seriously offensive content infractions are taken by third party platforms.[94] Facebook's assessment of the GIF provider landscape, undertaken shortly before the Merger, [✕].We discuss third party views of GIPHY's and its competitors' content moderation capabilities further in Chapter 5, Market Definition and Market Power.

*Search*

4.26   To effectively identify GIFs that are relevant and engaging, GIF providers maintain a **search algorithm** which responds to user queries by finding and ranking the most relevant GIFs. This involves labelling each GIF with a simple

---

[91] For further details, see GIPHY Support 'Content Rating', accessed 29 November 2021.
[92] Categories not permitted include, for example, real violence or death, self-harm, animal cruelty, and hate speech. For further details, see GIPHY Support 'GIPHY Community Guidelines', accessed 29 November 2021.
[93] For example, the Parties have submitted that one dimension in which GIF providers compete is by ensuring that their content is appropriately moderated. [✕] noted that it considers GIPHY able to do a better job than competitors of screening out objectionable, controversial content. Gfycat told us that one advantage of GIPHY's library (over its own) is that it is largely free from offensive content, which makes it easier to publish on partner platforms without internal filtering/moderation. See further discussion on 'GIPHY's position in the supply of searchable GIF libraries' in Chapter 5, Market Definition and Market Power.
[94] The document describes an incident in which a racist sticker (which had been mis-rated in error) surfaced on Snapchat and Instagram, causing both platforms to temporarily deactivate their integrations with GIPHY (Facebook also informed GIPHY that the next content infraction would likely result in deactivation). The document also describes users' complaints on Twitter and negative press generated by the incident, as well as the significant steps GIPHY took to ensure the renewed safety of the library.

PX0684-059

tag, and using these tags to identify and rank GIFs responsive to a search term.

4.27   The quality of the search algorithm appears to be an important element to GIF supply. Viber told us that it considered the search element of GIF provision to be just as important as the quality of the library. [✂].

4.28   GIPHY describes itself as 'a search engine for GIFs', and claims in its internal documents prepared for potential investors to be the second or third largest search engine in the world. In an internal presentation, GIPHY describes the search task (ie the task of finding and returning, or 'serving', relevant GIFs in response to a user's search query) as one that rarely has a 'right answer'. 'The GIFs we serve are a range of predictions for what the user actually might want to 'say'. To do this well, our system has to understand the complex interplay of linguistics (sarcasm, cynicism), culture (celebrities, media) and human behaviour (biases, perception) that combine together to make a user engage with a piece of content'. The search workflow is illustrated in Figure 6 below.

**Figure 6: GIPHY's search workflow**

[✂]

Source: [✂].

4.29   In the same internal presentation, GIPHY makes note of GIPHY-specific innovations that differentiate it from other GIF search engines. These include ranking [✂], among others.

4.30   Tenor describes its search algorithm as a 'machine learning-powered emotional search engine built around the Tenor Emotional Graph, which maps common search terms to GIFs that capture every sentiment, as well as the relationships between each emotion. For example, based on the habits of people searching for GIFs on Tenor, 'happy' is more closely related to 'thumbs up' and 'lol' than it is to 'love' or 'excited''.[95]

4.31   According to Tenor's website, the Tenor Emotional Graph is based on a dataset of over 300 million daily Tenor searches. Tenor explained that in order to [✂].

---

[95] Tenor partners with Samsung to launch GIFs within Messages experience | by Tenor | Tenor (accessed 29 November 2021).

PX0684-060

*Distribution*

4.32    GIF providers operate two main **distribution channels** to reach end users. These are:

(a)    **Supply to third parties via API/SDK**, whereby third party platforms (such as social media platforms or mobile phone keyboard apps) connect to the GIF library using the provider's API/SDK. Users of these platforms can access the provider's GIFs from within the platform by clicking on a symbol that brings up a GIF search bar (and in some cases displays a 'trending feed' of currently popular GIFs). As the user starts typing the desired term, a signal is sent through the API/SDK to the GIF provider's servers, which generate the results by 'serving' relevant content back to the platform. Data submitted by GIPHY indicates that it has supplied roughly [✂].[96]

(b)    **O&O channels**, ie the provider's own website and apps (including GIF keyboard apps/interfaces provided by GIPHY[97] and Tenor), from which users can directly search for, view, and download GIFs, as well as sharing them with others, for example, directly to their social media accounts.

4.33    In addition to the above, users and website owners or platform operators can embed GIFs within third party websites through a link. This requires a user to visit the O&O website or app, select the GIF they wish to embed, and then click an 'embed' button which provides code that can be copied into their HTML code.[98]

4.34    To the CMA's knowledge, those GIF providers that offer API/SDK integrations, including GIPHY, Tenor, Gfycat, Holler (for its SDK)[99] and Vlipsy offer them publicly free of charge (the only exception is Imgur).[100] API/SDK partnership is the most significant distribution method for the major GIF

---

[96] Annex 4 of GIPHY's response to Section 109 (27 May 2021). GIPHY provided a list of [✂] unique partners and API keys that are, or have been, active via an API or SDK integration since January 2020. Most of these were API keys (multiple API keys could be associated to the same API/SDK partner, meaning that the number of partners may be lower).
[97] GIPHY does not provide a standalone keyboard app; rather, keyboard features are integrated into its core mobile app. GIPHY submitted that the sole functionality of GIPHY's keyboard feature is to let users search for content on GIPHY's library directly from within the interface of another app as a 'plug-in' feature, without requiring the user to separately open the GIPHY app to search and select GIFs. Users can toggle this feature by enabling access to the keyboard through their device settings. See GIPHY's response to Question 5 of Section 109 dated 19 May 2021.
[98] For example, see GIPHY Support 'How to embed a GIF', accessed 29 November 2021. Embed traffic is included within the O&O figures analysed below.
[99] We understand that Holler charges a monthly subscription for its API, but offers its SDK for free.
[100] We understand that Imgur charges a fee for commercial uses of its API.

PX0684-061

providers. For GIPHY, in 2020, total API/SDK searches ([✂]) were far higher than O&O searches ([✂]). [✂].

## Characteristics and trends in GIF supply and usage

4.35   In this section we present our analysis of GIPHY's, and other GIF providers', data to assess the main characteristics of GIF supply.

(a)   First, we present an analysis of the evolution of GIF usage on third party platforms which are supplied by GIF providers via an API/SDK. Our analysis suggests that the use of GIFs has consistently increased over the last few years and leading up to the Merger.[101] The long-term growth in GIF usage appears to have been driven by both the growth in the popularity of GIFs on GIPHY's existing API/SDK partners, and the addition of new partners and formats (in particular, GIF stickers).

(b)   Second, we analyse the evolution of GIPHY's O&O channel traffic and assess the scale of GIPHY's O&O operations as compared to its overall operations and compared to other internet destinations unrelated to GIF supply. We find that GIPHY's O&O traffic accounts for a very small proportion of GIPHY's overall traffic. However, O&O traffic has been growing in absolute terms, with around [✂] billion monthly searches during the first quarter of 2021.

(c)   Third, we review evidence on the demographic profile of GIF users. We find that, on balance, GIFs may be used more by younger demographics, but some evidence suggests this may be changing.

### *Analysis of trends in GIF usage via API/SDK distribution*

4.36   Figure 7 shows the evolution of global monthly searches and content served by GIPHY to third parties via API/SDK, averaged on a quarterly basis from Q1 2018 to Q1 2021. Content served captures the number of GIFs returned in response to a search query.

**Figure 7: GIPHY monthly global searches and content served to third party platforms integrated via API/SDK, average by quarter**



Source: CMA analysis of GIPHY data. Includes video GIFs and GIF stickers.

---

[101] GIPHY's search volume dropped in Q3 2020; however, we understand this to be a temporary drop rather than a reversal in the long-term trend.

PX0684-062

4.37   Figure 7 shows that GIPHY's traffic increased steadily at least to the second quarter of 2020. The two metrics (searches and content served) diverge from Q3 2019. From Q3 2020, the searches metric declines and then roughly levels off; however, content served dips slightly in Q3 2020 but continues to increase thereafter. The peak in the first half of 2020 may have been caused by increased usage of digital communications at the onset of the Coronavirus (COVID-19) pandemic in March 2020 – see also Figure 14 in Chapter 5, Market Definition and Market Power, which shows a spike in social media usage at the same time. However, we note that the overall trend for both metrics is largely upward over the time period analysed.

4.38   We understand that, generally, the volume of content served is expected to be a multiple of the volume of searches, because the number of GIFs shown to a user in response to a search is pre-set. Thus, a correlation of the two metrics in the beginning of the period analysed (in this case at a ratio of about [✂] served to one search) is expected. A change in the ratio between searches and content served may occur if an API/SDK partner changes the settings of the integration, such that a larger volume of content is returned for each search. We would thus expect that the search volume is more representative of user *interest* in GIF use. However, content served may help us understand potential user *exposure* to GIFs.[102]

4.39   GIPHY's internal documents suggest that the volume of traffic (in terms of searches, media served, and platform user reach) also grew significantly in the years prior to the time period depicted above, growing steadily between 2015 and 2017 and more than quadrupling between 2017 and 2019. Figure 8 below (taken from a 2019 GIPHY board presentation) shows the trend in content served between 2015 and the first quarter of 2019. It demonstrates that while [✂].

**Figure 8: GIPHY global content served, GIFs and stickers, 2015-2019**

[✂]

Source: [✂].
Note: 'GIFs' refers to video GIFs; 'Stickers' refers to GIF stickers.

4.40   Overall, we interpret these data and documents to suggest that there has been long-term growth in GIPHY's API/SDK search traffic. The growth has been sustained at least up to the Merger. We note a possible decline or levelling off in GIPHY's search traffic from Q3 2020; however, we have not seen evidence to suggest an overall reversal in the trend in GIF use.[103]

---

[102] See further discussion of these metrics in Appendix D: Market shares methodology.
[103] For example, an internal Facebook presentation estimates that GIFs usage in messaging grew by [✂] in 2020 (compared to 0% growth in text).

PX0684-063

Therefore, given the long term trends shown in Figure 7 and Figure 8, we consider the developments in 2020 likely to be temporary, such that the growth in traffic would continue in the future.

4.41   We have also considered trends in the volume of global searches of the three largest GIF suppliers (competitive interactions between GIPHY and these and other GIF suppliers are discussed further in Chapter 5, Market Definition and Market Power). Data from Tenor and Gfycat were available from 2020. During this period, the growth of GIPHY's searches [✂] (see Figure 7). Figure 9 shows the monthly global search volume (via API/SDK) of each of these three providers separately, as well as the sum of the three, averaged on a quarterly basis.

**Figure 9: Global monthly searches of GIFs via API/SDK of GIPHY, Tenor, Gfycat and the three combined, average by quarter**



Source: CMA analysis of data provided by GIPHY, Tenor and Gfycat. Includes video GIFs and GIF stickers. Total is the sum of the three providers.

4.42   Figure 9 shows that GIPHY's search volume has fluctuated slightly during the time period analysed (2020 and the first quarter of 2021), which is in contrast to sustained growth up to Q1 2020 as shown in Figure 7. [✂] (see discussion on shares of supply in Chapter 5, Market Definition and Market Power). Given the fluctuations in GIPHY's volume [✂], [✂].

4.43   The historic long-term growth in GIF usage may be (at least partly) explained by the GIF format becoming more popular among users. GIPHY has told us that its growth in traffic over the past few years has been driven by several factors, including the addition of GIF stickers to its library (which became particularly popular on platforms such as Instagram and Snap), and as a result of greater numbers of people overall using the third party platforms with which GIPHY integrates. Another driver of GIPHY's traffic growth has been the addition of new API partners. The emergence of new API partners as a source of traffic is depicted in Figure0, which shows the distribution of global GIPHY search traffic by API partner from January 2018 to March 2021.

**Figure 10: GIPHY's third party search volume globally – shares by API partner (January 2018 – March 2021)**



Source: CMA analysis of GIPHY's data. Facebook includes Messenger. 'Rest of network' searches (included with 'Others') cannot be identified by API/SDK partner, but may contain searches on Facebook's platforms, particularly Instagram. GIPHY submitted that it believes a large increase in 'Rest of network' searches from May 2020 may be largely (but not solely) driven by technical changes in Instagram's integration (ie increased levels of proxying and caching by Instagram, which reduced its volume artificially).

PX0684-064

4.44    As Figure 10 demonstrates, although Facebook's platforms (Facebook, Messenger, Instagram, and WhatsApp) still accounted for around half of GIPHY's third party traffic in early 2020 (just prior to the Merger), their share has decreased steadily over time, as new platforms have integrated with GIPHY.[104] [✂].[105] [✂]).[106]

4.45    For video GIFs in particular, this trend has been even more marked. The share of video GIF searches accounted for by the Facebook owned group of platforms has declined [✂]. By contrast, as also shown in Figure 11, the Facebook Group still accounts for the large majority of GIPHY's GIF sticker searches, due to high volumes of stickers being used on Instagram.

**Figure 11: GIPHY's third party search volume, video GIFs and GIF stickers – share accounted for by Facebook family of apps (January 2018 – March 2021)**



Source: CMA analysis of GIPHY's data. These data exclude from the denominator 'Rest of network' searches as these were not disaggregated into video GIFs and GIF stickers in the data provided by GIPHY.

### *Analysis of trends in GIF usage via O&O*

4.46    We have also considered the evolution of GIF supply via O&O channels. Figure 12 shows the evolution of GIPHY's O&O search traffic since 2018, broken down by the mobile and web applications.

**Figure 12: Number of searches on GIPHY's website & mobile app globally (January 2018 – March 2021)**



Source: CMA analysis of GIPHY's data.
Note: These data include all searches on GIPHY's O&O channels; whilst the large majority of this content consists of GIFs, a small proportion comprises emojis (with a transparent background, similar to GIF stickers) and video clips (with audio and potentially longer duration than short GIF videos). GIPHY was unable to split out text and emojis from GIF stickers and video from GIFs due to technical limitations.

---

[104] Note that the share accounted for by Facebook platforms (notably Instagram) may be under-estimated in these data, particularly during certain periods of time. We understand that GIPHY's 'Rest of network' search volume (included with 'Others') may contain searches on Facebook's platforms. GIPHY submitted that it believes a substantial increase in 'Rest of network' searches from May 2020 may be largely (but not solely) driven by technical changes in Instagram's integration.

[105] As discussed further in Appendix D, there are technical differences in the way different platforms integrate with GIPHY and other GIF providers, which may artificially inflate or deflate relative search volumes. For example, GIPHY has submitted that, when a user opens a relevant Samsung app, GIPHY believes that Samsung makes approximately [✂] API calls to GIPHY for specified key words it uses to populate its pre-selected search product, which generates this same number of 'searches' before the user has necessarily entered a search term. The CMA has not been able to verify this with Samsung. GIPHY submitted it was not aware of a similar issue affecting other integration partners, but that it has not been able to investigate each partners' use of its APIs in detail.

[106] Between May 2020 and March 2021 as a whole, the Facebook Group's share was [✂]. However, as noted above, it is possible that the increase in the share accounted for by 'Others' over this time period is actually (at least partly) attributable to Instagram.

PX0684-065

4.47   Figure 12 shows that GIPHY's O&O traffic has also generally increased over the past few years, though with a dip in 2019. The majority of this traffic comes through GIPHY's mobile app (which includes GIPHY's keyboard features as these are integrated into its core mobile app). Despite the growth, GIPHY's O&O traffic remains a small fraction of its total traffic (representing [✁]).[107] Whilst API/SDK traffic in recent months was in the region of [✁] billion searches per month, O&O traffic had reached around [✁] billion searches.

4.48   A third party suggested that GIPHY's O&O channels are a well-known destination with a valued audience, even though this accounts for a small proportion of GIPHY's total search traffic. Indeed, GIPHY's O&O channels facilitated around [✁] billion monthly searches on average during the first quarter of 2021. We consider this to be a material volume of activity.

4.49   As search volume is a useful metric to gauge the popularity of GIPHY's website and app, we compare this to the search volume of other established search platforms (other than Google).[108] GIPHY had [✁] billion monthly O&O searches on average during 2020 via its O&O channels, while the search volumes of other search engines (excluding Google) are as follows:

(a)   The global search volume of Microsoft Bing, the largest search engine after Google, was around 12 billion per month in 2017.[109]

(b)   Public sources suggest that over the past three years Yahoo has had roughly half the global search market share of Bing.[110]

(c)   DuckDuckGo, a specialised search engine that emphasises privacy, had around 23.7 billion searches in 2020, or nearly 2 billion per month.[111]

(d)   Pinterest, a 'visual discovery engine' designed to provide ideas and inspiration through online pinboards (photos and videos), recently reported that it facilitates around 5 billion searches per month.[112]

4.50   Given the above, in terms of search volume, GIPHY's O&O search volume does not come close to the scale of Google's main challenger, Bing.[113]

---

[107] For the UK specifically, O&O represented around [✁] of total searches.
[108] We note that, whilst other search websites are a useful benchmark because a common metric can be used as a basis for comparison of reach (ie search volume), GIPHY's activities are wider than the provision of search for GIFs, and in any event GIPHY's advertising activities were closer to display advertising than the model of advertising offered by search engines. We discuss this further in Chapter 5, Market Definition and Market Power.
[109] Statista (Bing - Statistics & Facts | Statista), accessed on 29 November 2021.
[110] Search engine market share worldwide | Statista, accessed on 29 November 2021.
[111] DuckDuckGo Traffic, accessed on 29 November 2021.
[112] Naveen Gavini (20 May 2021) 'The evolution of search at Pinterest', The evolution of search at Pinterest | by Pinterest Engineering | Pinterest Engineering Blog | May, 2021 | Medium (accessed 29 November 2021).
[113] As noted above, GIPHY's O&O traffic remains a small fraction [✁] of its total traffic.

PX0684-066

However, GIPHY's O&O search volume is comparable to [✂]. This suggests that GIPHY's O&O operation is material in relative terms when compared with other search engines.

4.51   The Parties have submitted that GIPHY's O&O offering does not include basic offerings such as a messaging function, is used by an extremely small group of people to make and share GIFs, and therefore cannot be described as a material web destination. The Parties also questioned the choice of websites used as the benchmarks in our analysis. However, we consider that the finding that GIPHY's website and app receive significant traffic in absolute terms, at similar levels (or similar order of magnitude) to [✂], is informative, [✂]. We also note that the Parties have not suggested alternative benchmarks.

4.52   We have also compared GIPHY's O&O search volumes to those of its closest competitor, Tenor, during the period since January 2020 (for which we have comparable data). As shown in Figure 13, GIPHY's O&O search volumes have been substantially higher and with a generally upward trajectory, [✂].

**Figure 13: Number of monthly searches globally on O&O platforms, GIPHY and Tenor**

[✂]

Source: CMA analysis

4.53   We have also considered other metrics to assess the scale of GIPHY's O&O operation, in particular its active user base. The average number of monthly active users (**MAUs**) and daily active users (**DAUs**) of GIPHY's O&O platforms for 2018 to 2020 are shown in Table 2.

**Table 2: MAUs and DAUs of GIPHY's O&O platforms**

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| DAUs | [✂] | [✂] | [✂] |
| MAUs | [✂] | [✂] | [✂] |
| Ratio of DAUs to MAUs | [✂] | [✂] | [✂] |

Source: CMA analysis of data provided by GIPHY.
Note: Includes users of both GIPHY's website and app.

4.54   As shown in Table 2, GIPHY's MAUs have grown over the years to a [✂].[114] [✂].

4.55   A typical metric of user engagement (or 'stickiness') used in the digital sector is the DAU-to-MAU ratio, as it indicates how frequently users are visiting the

---

[114] Facebook reported having 2.80 billion MAUs in December 2020, see: Facebook - Facebook Reports Fourth Quarter and Full Year 2020 Results (fb.com) (accessed 19 November 2021).

PX0684-067

site (a maximum ratio of 100% would indicate that every user who visits monthly is visiting daily; a minimum ratio of 3.3% would indicate that every user who visits monthly is only visiting one day per month – ie 1/30 = 3.3%).[115] GIPHY's DAU-to-MAU ratio is [✕]. By contrast, Facebook reported having 1.84 billion DAUs in December 2020, indicating a DAU-to-MAU ratio of 66%.[116] We understand that a rule-of-thumb DAU-to-MAU target for apps aiming to build an engaged user base is around 20%.[117]

### *Demographic profile of GIF users*

4.56   We have also considered the demographic profile of GIF users and found that the evidence is mixed:

*(a)*   Facebook's internal documents indicate that the Merger will allow it to integrate GIPHY with Facebook and '[✕]', and one of GIPHY's documents suggests that GIPHY is particularly used by [✕].

*(b)*   Data submitted by Facebook to the CMA indicated that Facebook's UK users [✕].[118]

*(c)*   However, equivalent but more recent data submitted by Facebook (relating to reference weeks in March/April 2021) suggest [✕].[119]

*(d)*   Market research among a US representative sample commissioned by GIPHY in 2018 indicates a mixed picture. Younger users (aged 16-29) were more likely than those aged 30-44 to have heard of GIPHY, to spontaneously identify GIPHY in connection to the term 'GIF', and to be daily users of GIFs. However, people aged 30-44 were more likely than younger users to be daily or weekly users of GIPHY, and were more likely to use digital stickers in messaging or social media on a daily or weekly basis.

*(e)*   One social media platform submitted that maintaining a competitive GIF offering may be important for winning younger users.

*(f)*   One third party submitted that GIPHY likely skews towards a younger demographic. However, the same third party subsequently noted that the

---

[115] See Grey and Nigl (2018) 'AI and Machine Learning Applications for Social Media Platforms', see Skylab (accessed 19 November 2021).
[116] Facebook reported having 1.84 billion DAUs in December 2020, see: Facebook - Facebook Reports Fourth Quarter and Full Year 2020 Results (fb.com) (accessed 19 November 2021).
[117] See, for example, Kumulos (2016) 'MAU Vs DAU: How To Measure Mobile App Retention', MAU vs DAU: How to measure mobile app retention - Kumulos (accessed 19 November 2021).
[118] This was the case for Facebook Comments, Facebook Posts, Instagram Create and Instagram Direct Messages, but not for Facebook Stories, Messenger Messages, or Instagram Stories.
[119] [✕]

PX0684-068

usage of GIFs was previously associated with younger audiences, but has changed over time, with GIFs now consumed by people across a broad spectrum of society.

(g)   One company that had advertised with GIPHY told us that promoted GIFs were a suitable way of reaching a broad audience rather than targeting a specific demographic. By contrast, another advertiser described its campaign with GIPHY as allowing it to reach a younger audience (as opposed to other paid media, which tended to reach an older audience).

4.57   On balance, we consider that the majority of evidence indicates that GIFs are a communication feature mainly used by younger audiences. However, we note that there may be a new trend of older generations increasingly using GIFs too.

## Key players

4.58   Analysis of the competitive landscape in GIF supply is set out in Chapter 5, Market Definition and Market Power. As discussed in Chapter 5 in further detail, we consider that there are only three main GIF suppliers: GIPHY, Tenor, and (to a lesser extent) Gfycat.

4.59   GIPHY was founded in 2013, followed by Gfycat (launched in 2013 and incorporated in 2015), and Tenor in 2014. Tenor was acquired by Google in 2018 and GIPHY was acquired by Facebook in May 2020. [✂].

4.60   [✂], except Instagram, which is solely supplied by GIPHY [✂]. [✂] further explained it was important to have access to GIPHY's GIF stickers [✂].

4.61   There are also a number of smaller players in the industry, including Holler, Imgur, Vlipsy, and Gifbin (see Chapter 5, Market Definition and Market Power for a further discussion of them and the competitive landscape).

4.62   Historically, limited attempts have been made by other GIF providers to monetise the content they provide and, as such, GIF providers have predominantly relied on raising external finance, being vertically integrated with a large digital platform or generating revenue through other forms of digital advertising, eg banner advertising on their O&O sites. Further discussion of recent monetisation efforts by GIF providers is included in Chapter 7, Horizontal Effects.

PX0684-069

# 5.   Market Definition and Market Power

## Introduction and framework

5.1   This chapter sets out our findings with respect to the market definitions relevant for the competitive assessment of the Merger.

5.2   Where the CMA makes an SLC finding, this must be 'within any market or markets in the United Kingdom for goods or services'.[120] An SLC can affect the whole or part of a market or markets. Within that context, the assessment of the relevant market(s) is an analytical tool that forms part of the analysis of the competitive effects of the merger and should not be viewed as a separate exercise.[121]

5.3   Market definition involves identifying the most significant competitive alternatives available to customers of the merger firms and includes the sources of competition to the merger firms that are the immediate determinants of the effects of the merger.

5.4   In this case, the relevant products of the Parties and their rivals are complex, differentiated and include recent (and forthcoming) product developments. The potential issues under analysis relate in various ways to how competition between the merging Parties and their rivals will dynamically evolve over time. In these circumstances, the CMA will place more emphasis on the competitive assessment than on static market definition. In its assessment of the impact of the Merger on competition, it will consider evidence on concentration measures alongside evidence of closeness of competition. This involves assessing the strength of the current and likely future constraints between the products of the merging Parties and their rivals. Evidence on concentration and on closeness of competition can be interpreted and taken into account without the need for a precise definition of the relevant markets.[122]

5.5   Accordingly, our analysis does not seek to conclude on a bright-line definition of the relevant markets, but instead describes the competitive framework within which the Parties and their rivals operate. This is used to inform the assessment of competitive effects of the Merger, as set out in Chapter 7, Horizontal Effects and Chapter 8, Vertical Effects.

---

[120] The Act, section 35(1)(b).
[121] Merger Assessment Guidelines (CMA129), paragraph 9.1.
[122] Merger Assessment Guidelines (CMA129), paragraph 9.3.

PX0684-070

5.6   The starting point for our assessment is the relevant services provided by the Parties:

   *(a)* The supply of searchable GIF libraries;

   *(b)* The supply of social media; and

   *(c)* The supply of display advertising.

5.7   We discuss the provision of each of these services in turn. In doing so, we consider the broad range of services in which the Parties, or their competitors, are active. We consider the availability of substitutes to the Parties' services, as well as services outside of these markets that may pose a competitive constraint. Our assessment relies on information gathered by the CMA during its investigation of the Merger (including the Parties' internal documents and data, and views gathered from third parties), and, where appropriate, evidence from the CMA's Market Study, which was published on 1 July 2020.[123] We also set out a shares of supply analysis for each of the relevant markets or segments.

5.8   In setting out the evidence on substitutability of the Parties' services, we consider the extent to which the Parties have **market power** in the markets or segments where they operate. The evidence on market power of Facebook and GIPHY is relevant to the assessment of both the horizontal and vertical theories of harm and is discussed further in Chapter 7, Horizontal Effects, and Chapter 8, Vertical Effects. Evidence relevant to assessing market power includes the level and stability of market shares, the strength of competitive constraints, and the extent of past entry and exit.[124]

5.9   As with many digital sectors, the relevant markets in this case are constantly evolving. This chapter does not attempt to predict the direction in which these markets, and competition in these markets, will evolve in the future. Our views on these issues are set out in Chapter 7, Horizontal Effects, and Chapter 8, Vertical Effects.

5.10  The Parties submitted that the CMA's Provisional Findings in relation to market definition are based on an arbitrary 'functional characteristics' approach, that the CMA has not carried out an 'economically robust' market definition exercise, that they disagree with the findings of the Market Study, that the CMA erred by relying on such findings, and that the CMA has failed to

---

[123] Market Study, Final Report.
[124] Merger Assessment Guidelines (CMA129), paragraph 4.12.

PX0684-071

consider evidence on changes in competitive constraints and industry developments that have occurred in the time since the Market Study.[125]

5.11   We consider that our approach to the assessment of market definition and market power is appropriate and consistent with the CMA's Merger Assessment Guidelines (CMA129), March 2021 (**Merger Assessment Guidelines**).[126] Our analysis of substitutability for each relevant service, the Parties' main competitive constraints, and their respective positions in the relevant markets, draws on a range of evidence, including that submitted by the Parties. The CMA has not relied solely on functional characteristics to assess the competitive constraints faced by the Parties;[127] rather, we have also considered the extent to which their behaviour is constrained by other providers (see paragraphs 5.45 to 5.71, 5.109 and 5.110, 5.118 to 5.121, 5.131 and 5.132, 5.165 to 5.167, and 5.173 to 5.174). For example, in regard to the social media market, the strongest competitive constraints on Facebook will be imposed by providers whose services are close substitutes to Facebook's services, such that Facebook users would be able and willing to switch to using those providers' services in response to a worsening of Facebook's offer.

5.12   We have reviewed evidence gathered in the Market Study where it was relevant to our assessment, and we have taken into account recent market developments and updated the data collected in the Market Study (see paragraphs 5.135 to 5.138, 5.141 to 5.145, 5.187 to 5.190, and 5.195). This evidence was assessed together with evidence obtained in the course of this investigation (including that submitted by the Parties) for the purpose of reaching our views on market definition and market power. Taking all this evidence in the round, we do not consider it to support materially different conclusions from those reached in the Market Study in regard to the competitive constraints faced by Facebook in the social media and display advertising markets. We note that in response to our Provisional Findings, the Parties submitted a paper by Frontier Economics on 'Market Definition and Market Power' which Facebook had submitted to the CMA in March 2020 in response to the Market Study Interim Report.[128] The points raised in that paper were addressed in the Market Study Final Report; we have also reviewed the arguments and evidence set forth in that paper and consider them, where relevant, in the sections below. Further to the arguments set out in the Frontier Economics paper, the Parties submitted that the CMA has

---

[125] Parties' Response to Provisional Findings, paragraphs 4.4 and 4.8. Additional arguments made by the Parties on specific points are considered in the relevant sections below.
[126] Merger Assessment Guidelines, paragraph 9.2.
[127] However, we note that, pursuant to the Merger Assessment Guidelines (paragraph 4.13), products' characteristics or their intended use may provide relevant evidence indicative of substitutability.
[128] Parties' Response to Provisional Findings, Annex 1.

PX0684-072

ignored evidence concerning Facebook reacting to static and dynamic competitive pressure from YouTube and TikTok, and (as noted above) has not considered changes in market conditions since the publication of the Market Study, including those described in Ofcom's 2021 'Online Nation' report.[129] We address these points below in paragraphs 5.117 to 5.120. As noted above, we have reviewed evidence and data pertaining to the more recent time period of 2020 and early 2021 (going beyond the period covered in the Market Study to account for any material changes since that time), the analysis of which is set out below in the relevant sections on Social Media and Display Advertising respectively. In addition to what was covered in the Frontier Economics paper, the Parties' response includes arguments relating to GIPHY's position in the supply of searchable GIF libraries and digital advertising, which are addressed below at paragraphs 5.45 to 5.91 and 5.175 to 5.182.

5.13   In the remainder of this chapter we discuss each of the three services identified above in turn. For each, we first discuss the product and geographic market definitions, followed by a discussion of the position of the Parties in the relevant markets (including evidence on shares of supply).

## The supply of searchable GIF libraries

5.14   In this section we discuss the market definition relating to services involved in the **supply of searchable GIF libraries** and the position of GIPHY within that market.

5.15   Further information about the industry, an overview and analysis of services related to the supply of searchable GIF libraries, and trends in GIF usage are set out in Chapter 4, Industry Background. Analysis of the competitive landscape and key market participants is set out below from paragraph 5.43.

5.16   This section is structured as follows:

(a)   First, we set out our assessment of the **product and geographic market definitions** relevant for our competitive assessment of the Merger.

(b)   Second, we consider evidence on the strength of alternatives to GIPHY and the degree to which GIPHY has **market power** in the supply of searchable GIF libraries. Our assessment of GIPHY's market power draws from evidence on the strength of the alternative GIF providers

---

[129] Parties' Response to Provisional Findings, paragraphs 4.5 and 4.9.

PX0684-073

available to social media platforms, and from our analysis of the shares of supply.

### *Product market definition: supply of searchable GIF libraries*

5.17  As set out in Chapter 4, Industry Background, GIPHY is engaged in a range of activities contributing to the supply and distribution of GIFs to users. This involves maintaining a **GIF library**, a **search function**, and **distribution channels** (API/SDK and O&O). GIPHY's library includes both video GIFs and GIF stickers. In the remainder of this section we refer to this set of activities as the **supply of searchable GIF libraries**.

5.18  We considered substitutability along the following dimensions:

(a)  Whether video GIFs and GIF stickers should be considered within the same product frame of reference;

(b)  Whether GIF stickers should be considered within the same product frame of reference as other forms of sticker (ie non-GIF stickers); and

(c)  Whether the product frame of reference should be widened to include other types of content aimed at driving user engagement on social media (such as emojis, animojis, and avatars).

5.19  The Parties stated that GIFs (ie video GIFs) and GIF stickers may contain exactly the same image; one is just more transparent than the other, and it is not easy to tell GIFs and GIF stickers apart (eg Instagram and Snap both provide GIF stickers under a button that simply says 'GIFs'). However, the Parties also submitted that GIF stickers are commonly used as a content enhancement feature, as an overlay to an Instagram or Snapchat story, while video GIFs are more often used on a standalone basis, and some social media platform users appear to use GIF stickers considerably more often than video GIFs (eg Instagram's users). This is consistent with third party evidence. One social media platform told us it sees a distinction between video GIFs and GIF stickers – the former can be used as a standalone communication with limited or no interaction with other content, whereas the latter are translucent and can be placed over content, often as an addition to photos.

5.20  We found, consistent with the evidence above, that video GIFs and GIF stickers are used in different volumes on different social media platforms.[130]

---

[130] For example, GIPHY facilitates large volumes of searches for GIF stickers (but much smaller volumes of video GIFs) on Instagram and Snapchat, which are predominantly visual media platforms focused on sharing photos and videos, whereas on WhatsApp (predominantly a messaging platform) the reverse is true.

PX0684-074

[✂],[131] [✂]. Based on this evidence, we consider that, on the demand side, video GIFs and GIF stickers have different uses and, as such, demand-side substitutability may be somewhat limited.

5.21    However, on the supply side, we found that the larger GIF suppliers (GIPHY, Tenor and Gfycat) all supply both types of GIF. We also found that the same resources/assets (ie a creative team) could be used to produce both video GIFs and GIF stickers, such that the two types of GIFs could be considered part of the same product market based on supply-side considerations.[132] Thus, for the purposes of the competitive assessment we consider the two types of GIFs together, and consider any differences between the two where relevant. Accordingly, we found a more precise market definition was not required.

5.22    The Parties submitted that there are substantial differences between GIFs and other forms of stickers, including with Facebook's sticker offering. They submitted that GIF stickers are GIF files with at least 20% of the pixels transparent in the first frame, and are different in nature and serve different purposes than Facebook's stickers, which are more akin to emojis or avatars.

5.23    We found that third party views on the demand-side substitutability between non-GIF stickers and GIFs were mixed. Some GIPHY API/SDK partners submitted that other content types (including stickers) could be potential alternatives to GIFs in certain contexts.[133] However, other GIPHY partners – [✂] – submitted that they do not consider GIFs (including GIF stickers) to be fully substitutable with other content types.[134] On the supply side, we found that non-GIF stickers are supplied by different suppliers to those that supply GIFs: non-GIF stickers appear to be more often supplied by social media platforms themselves, for example, Facebook, Snap, and Viber.

5.24    Given the mixed evidence on the demand side and greater differences on the supply side, for the purposes of the competitive assessment, we did not include non-GIF stickers in the product frame of reference, but we took account of any constraint from non-GIF stickers.

5.25    Finally, we considered a range of evidence from the Parties and third parties on substitutability of GIFs with other types of content aimed at driving user

---

[131] The Merger was led within Facebook by Instagram, which (at least currently) predominantly uses [✂]. In the request for approval of the deal [✂], the stated rationale highlights in particular the volume of Instagram stories that use GIPHY's content (ie [✂]) and the upside from potential monetisation on Instagram alone.
[132] Merger Assessment Guidelines (CMA129), paragraph 9.8.
[133] Phase 1 third party questionnaire responses.
[134] For example, because GIFs (including GIF stickers) are animated, are likely to offer significantly greater volumes of content and variety/selection, are more likely to have pop culture references, and tend to be more expressive and individualised.

PX0684-075

engagement on social media. We found that GIFs do not appear to be closely substitutable with these other types of content.

5.26   The Parties submitted that they do not consider a functional characteristics approach to be a robust economic exercise to define the relevant market, and that, even based on characteristics, GIFs share many common characteristics with other engagement drivers.

5.27   However, we found that GIFs have distinctive characteristics that make them less likely to be substitutable with other creative content (such as emojis, animojis, and avatars). We found that GIFs: (i) are short, looping, soundless videos, often including a caption; (ii) often demonstrate an understanding of popular culture (with many being clips from TV shows, movies, sport events, etc); and (iii) allow for richer user expression (than a static picture or symbol, for example).

5.28   In addition, we found several other factors suggesting a lack of substitutability with other types of creative content:

(a)   First, an important part of the rationale of the Merger (as submitted by Facebook) is to sustain GIPHY and avoid a reduction in revenues that Facebook would incur if it lost access to GIPHY's GIFs (see Chapter 2, The Parties, Merger and Rationale). This suggests that GIFs are an important feature of Facebook's social media services that users would not readily substitute with other content offered by Facebook.[135]

(b)   Second, GIPHY's internal documents show GIPHY monitoring other GIF providers (in particular Tenor), but we did not find internal documents suggesting that GIPHY considers providers of other content types as material competitive constraints.

(c)   Third, several third party platforms [✂] submitted that they do not consider other types of creative content to be close alternatives to GIFs. Several other platforms submitted that other types of creative content may potentially be alternatives to GIFs; however, in all but one case, they caveated these statements with reference to the different characteristics of, or usual purposes served by, GIFs.[136]

---

[135] A 2018 Facebook Messenger study found that GIFs were rated by users as significantly higher-priority content than other creative features such as stickers and camera effects and filters.
[136] Phase 1 third party questionnaire responses.

PX0684-076

5.29   On the basis of all of this evidence, we did not include other types of content aimed at driving user engagement on social media in the product frame of reference.

5.30   Taking all the evidence into account, our assessment of the effects of the Merger focuses on the supply of searchable GIF libraries including both video GIFs and GIF stickers but excluding non-GIF stickers and other types of content. The importance of GIFs to social media platforms, and their substitutability with other types of content and features as a means to drive user engagement, is further considered in Chapter 7, Horizontal Effects, and Chapter 8, Vertical Effects.

5.31   We also considered the substitutability of the distribution channels for GIFs. In particular, we considered whether distribution of GIFs via API/SDK can be substituted with distribution via O&O platforms.

5.32   Users of social media and messaging platforms looking to search for and send/post a GIF would, in most cases, be able to do so via either API/SDK integration or the GIF supplier's O&O website/app. A GIF search bar integrated within their chosen platform through an API/SDK represents a considerably easier and quicker way to find and send a GIF, compared to navigating to a GIF provider's O&O website or app, conducting a search, and 'sharing' or copying the chosen GIF over to the user's preferred platform (as the latter involves more steps and greater time and 'friction' for the user). For advertisers, API/SDK distribution may enable them to reach a potentially wider audience than distribution via GIF providers' O&O channels.

5.33   We found that, although both the API/SDK and O&O channels are equally available to end-users looking to find and send a GIF, O&O distribution of GIFs to users may not be, in most cases, a *close* substitute to API/SDK distribution from the demand side.[137]

5.34   From the supply side, we found that the largest three suppliers of GIFs via API/SDK also supply GIFs via O&O channels (web and mobile) and that the same or similar production resources/assets (ie technical team) could be used to supply both API/SDK and O&O. The two channels can therefore be

---

[137] The Parties have argued that this is in contradiction to our Jurisdiction assessment (See Chapter 3, Jurisdiction) which considers that the Parties overlap because both allow searching and sharing of GIFs. We note searching for a GIF through GIPHY's O&O and through Facebook's integration of GIPHY and Tenor APIs are both services that have commonalities in that both enable users to find GIFs. However, this does not mean that the two methods are economic substitutes. As set out above, for users communicating via a social media platform the API/SDK integration presents a considerably easier way to find and share GIFs, and evidence suggests that access to GIFs in this way is important to platforms (see Chapter 8, Vertical Effects). Therefore, in our view the two methods are not close substitutes.

PX0684-077

considered part of the same product market based on supply-side considerations.[138]

5.35   We found that GIPHY's O&O traffic volume, while large in absolute volume of search, is very small compared to its API/SDK volume (see Figures 9 and 13 in Chapter 4, Industry Background), [✂].

5.36   We have concluded that, on the basis of the similarity of supply side constraints, and the relatively small scale of O&O operations compared to API/SDK operations, it is not necessary to distinguish between the two channels in the competitive assessment.

5.37   Our competitive assessment of the Merger therefore is focused on the supply of searchable GIF libraries, including video GIFs and GIF stickers, but excluding non-GIF stickers and other types of content, through API/SDK to third party platforms, and through O&O directly to users. We refer to this as the 'supply of searchable GIF libraries'. We did not consider that a precise market definition with respect to the type of GIF (video GIF and GIF sticker) and the distribution channel (API/SDK and O&O) was required as it would not materially affect the outcome of our competitive assessment.

***Geographic market definition: supply of searchable GIF libraries***

5.38   As with product markets, our focus in defining geographic markets is on identifying the most important competitive alternatives to the merger firms.[139] Geographic market definition in this case is not an essential determinant of our competitive assessment.

5.39   On the supply side, GIPHY's GIFs are generally available to users throughout the world, as are GIFs provided by GIPHY's competitors (eg Tenor and Gfycat). These three largest suppliers are all active globally and have broadly consistent competitive positions (respectively) across Western countries such as the UK and US. We found that GIPHY's API/SDK kits are publicly available to any third party regardless of geographic location.

5.40   On the demand side, GIPHY submitted that localisation was a comparatively weak aspect of its offering (see further discussion below from paragraph 5.63) and that it was strongest in Western/English-speaking countries.[140] We found that the salience of some GIF content (particularly that drawing on local

---

[138] Merger Assessment Guidelines (CMA129), paragraph 9.8.
[139] Merger Assessment Guidelines (CMA129), paragraph 9.13.
[140] For example, GIPHY had only relatively recently added multi-language support. GIPHY noted that over the past few years, it has hired international editors on short-term contracts to curate sets of GIFs targeting particular languages and cultural contexts (principally in Asian countries with higher numbers of users) but found that these were often [✂].

PX0684-078

cultural reference points) varied in different countries.[141] We found that at least one third party platform valued the localisation capabilities of its GIF provider.

5.41   We recognise that the demand for GIFs may vary between countries, reflecting these cultural and linguistic differences, and that this may lead to some differentiation in the content provided by global GIF suppliers in different countries and, potentially, the emergence of country/region-specific suppliers, particularly in China and some other Asian countries.[142] However, from a UK customer's perspective, the alternatives available are the same as in the US and include the three major suppliers (GIPHY, Tenor, and Gfycat) whose content is principally oriented towards a Western and English-speaking audience.

5.42   Based on this evidence, we have concluded that the effects of the Merger should be assessed on the **supply of searchable GIF libraries globally**, while leaving the precise geographic market definition open. We consider that our competitive assessment and its conclusions would not change if we were to consider a narrower geographic frame of reference (eg Western or English-speaking countries).

### *GIPHY's position in the supply of searchable GIF libraries*

5.43   We found that the relevant market for the competitive assessment of the Merger is the **supply of searchable GIF libraries** (including both video and non-video GIFs, but excluding non-GIF stickers and other types of content, and including both API/SDK and O&O distribution channels) on a global basis.[143] Our competitive assessment (and related analysis of market power)[144] therefore focused on API/SDK distribution of GIFs, which accounts for the vast majority of GIF distribution volume.

5.44   In approaching our assessment of GIPHY's position in the supply of searchable GIF libraries, we investigated the constraints GIPHY faces in this market and the degree to which it has market power, in particular whether

---

[141] GIPHY explained that certain content may be particularly relevant in some countries but less so in others; for example, the National Football League (NFL) would be more relevant to users in the United States. It considers that offering is primarily geared towards a US-centric and English-speaking audience. [✂].

[142] For example, Chinese GIF suppliers include Kuaishou and Dongtu.

[143] We note that GIPHY is active in this market, while Facebook is not. Facebook uses the API/SDK integrations of GIPHY and Tenor.

[144] In Chapter 8, Vertical Effects, we assess the effects arising from the Merger on competition in social media services in view of the importance of GIFs as an input to social media platforms. For that assessment, pursuant to our Merger Assessment Guidelines (CMA129) (paragraph 7.14(a)), we consider here whether social media platforms can easily switch away from GIPHY to a range of effective alternative suppliers so as to mitigate harm from any attempt at foreclosure (ie whether GIPHY has market power in the supply of searchable GIF libraries for the purposes of that competitive assessment).

PX0684-079

there is a range of effective alternatives to GIPHY for the supply of searchable GIF libraries.

(a) First, we took account of the evidence on the relative similarities and differences between existing GIF providers from the point of view of social media platforms, the primary users of GIPHY's API/SDK services.[145] We found that only Tenor is a close alternative to GIPHY. Smaller GIF suppliers fall short of providing a comparable service.

(b) Second, we took account of the evidence on switching and multi-homing between different GIF suppliers. We found that large social media platforms tend to multi-home. We found only limited evidence of social media platforms switching, with most examples of switching being a result of the Merger. We have not seen evidence of any significant social media platform multi-homing with, or switching to, suppliers other than GIPHY or Tenor.

(c) Finally, we conducted an analysis of GIPHY's share of GIF search volume. We found that GIPHY accounts for the majority of global GIF search volume.

*GIPHY's competitors and substitutability*

5.45   We took account of the evidence on the strength of competitors to GIPHY and assessed the degree to which third party platforms, primarily social media platforms, which use GIPHY's services via its API/SDK, may be able to switch to an alternative GIF provider. Evidence as to GIPHY's replicability and the ability of new competitors to enter the market, or smaller competitors to expand, is set out in Chapter 8, Vertical Effects and Chapter 9, Countervailing Factors.

5.46   The Parties submitted that there are many alternatives to GIPHY, including Tenor, Imgur, Gfycat, Gifbin, Vlipsy, and Holler, with Tenor viewed as largely interchangeable with GIPHY, and Gfycat also viewed as similar. The Parties argued that this space is highly dynamic and, while most of these other competitors are currently smaller than GIPHY, it is plausible that, were GIPHY to vacate the market, they would have become larger offerings. Moreover, the Parties submitted that GIPHY's API/SDK partners have the ability to switch to alternative GIF providers, with Tenor in particular being a 'perfect substitute',

---

[145] We note that the evidence we have gathered on alternatives to GIPHY primarily relates to views of social media platforms and other platforms integrating GIPHY's (or Tenor's) API/SDK, and as such we have not directly assessed the preferences of the end users of GIFs. However, the views of social media platforms represent their best understanding of what is preferred by the end users of their platforms.

PX0684-080

and that there are many examples of partners switching from GIPHY to Tenor in the past.

5.47   However, according to its submitted rationale for the Merger, Facebook was concerned about losing access to GIPHY should it have ceased operations,[146] which Facebook considered would lead to Facebook's services being compromised from a user experience perspective, thereby harming its business (see further discussion in Chapter 2, The Parties, Merger and Rationale). Before pursuing the Merger, Facebook considered various options, including partnering with alternative GIF providers or building its own library (see further discussion in Chapter 6, Counterfactual). Regarding the option of moving away from GIPHY and using an alternative GIF provider (such as Tenor, Gfycat, Imgur, or Vlipsy), Facebook's executives noted in an internal email exchange of March 2020 that, '[✂]'.

5.48   In our view, Facebook's preferred course of action of acquiring GIPHY – in part to ensure continued access to GIPHY's GIFs – is not consistent with a range of alternative providers being adequate substitutes to GIPHY.

5.49   Facebook's internal documents show that [✂]. For example, in one internal chat considering the possibility of acquiring GIPHY and discussing potential alternative suppliers, Facebook's Head of EMEA Corporate Development, Nir Blumberger, stated: '[✂].

5.50   The evidence we have seen suggests that most of the alternative providers mentioned by the Parties in their submission are very small (and some of them do not offer API/SDK integration with third party platforms). Based on evidence concerning substitutability from the Parties' internal documents and third party views, we found that they do not compete meaningfully with GIPHY. In particular:

   (a)   Imgur is primarily focused on its O&O destination with a variety of creative content, including GIFs, memes and images, and its API is only available for a fee unless used non-commercially. We have not seen internal documents from either GIPHY or Facebook suggesting that Imgur is a good substitute for GIPHY. In an assessment of the GIF provider landscape undertaken by Facebook shortly prior to the Merger, it identified Imgur as having an extensive library, but with lower quality content, limited stickers, and limited content moderation. No platforms

---

[146] We found, based on our assessment of Facebook's Internal Documents, that its acquisition of GIPHY was also partly [✂]; see Chapter 6, Counterfactual.

PX0684-081

among those the CMA has spoken to that are supplied by GIF providers
mentioned Imgur as an alternative to GIPHY.

(b) [✂] primarily distributes video clips with audio rather than GIFs. [✂] does
not feature prominently in the Parties' internal documents. In Facebook's
assessment of the GIF provider landscape, it rated [✂] as having a
smaller inventory and limited investment in content moderation, and noted
explicitly that [✂] would not be able to substitute for GIPHY.

(c) Holler submitted that it does not supply video GIFs at any material scale
and, with respect to video GIFs, offers its clients [✂] the ability to
integrate with a third party GIF provider (currently Tenor). At the time of
the Merger, Holler did not offer even this third party integration for video
GIFs, and supplied only stickers.[147] Holler told us that it sees itself as
differentiated from, and not competing closely with, GIF suppliers such as
GIPHY. [✂]. Holler was mentioned by two third party platforms as a
potential alternative to GIPHY, but was rated by both as a significantly
weaker competitor to GIPHY than Tenor. One of the platforms stated that
Holler focuses more on other types of content rather than GIFs.[148] The
other platform stated that Holler offers a product that is sufficient but not
scalable due to limited content and less sophisticated localization
features. In addition, it noted that Holler's SDK and user privacy
requirements are not in alignment with its own business' values and
needs. We understand that certain types of data collected by Holler as
part of its SDK terms of service appear more extensive than those
collected by GIPHY.[149] The Parties' internal documents do not suggest
that Holler currently competes with GIPHY in any meaningful way.

(d) Other GIF providers mentioned by the Parties, such as Gifbin, Imgflip,
Animoto, have not been mentioned by third parties as alternatives to
GIPHY (or Tenor), and do not feature in the Parties' internal
documents.[150]

---

[147] [✂].
[148] As noted above, Holler confirmed to the CMA that it does not consider itself a supplier of video GIFs and,
according to data provided to us, [✂]; [✂] and its own focus is on stickers. The CMA also notes that the Holler
website suggests that Holler also has a partnership with GIPHY, Tenor, Gfycat and GIFSKey to offer video GIFs.
[149] In particular, we note that Holler's published Privacy Statement explains that it collects 'Conversational
Metadata and Location Information': 'To help us identify relevant products, we may collect anonymized metadata
about your conversations, including, but not limited to, chat identifiers, keywords related to what you talk about
and location information, including your GPS location at the time of the conversation. Our systems automatically
process content and communications you and others provide to analyze context and what's in them for the
purposes described in this Privacy Statement'. Terms of Service | Holler (accessed 29 November 2021). [✂].
[150] One GIPHY partner, which offers a marketplace of partner-built apps and integrations, submitted that the only
other GIF provider of which it was aware on its marketplace (other than GIPHY) was RightGIF. It noted that the
RightGIF app was built by a developer that does not focus solely on GIFs, and that GIPHY is significantly more
popular with its customers, with eight times the number of installations as RightGIF.

PX0684-082

*(e)* We also note that Facebook supplies some in-house creative content for use on selected Facebook surfaces (Facebook feeds and Messenger threads). This includes the Facebook Sticker Store, which allows Facebook users to download virtual packs of animated and static stickers.[151] However, Facebook does not supply its Sticker Store via an API integration to third parties, and its library does not include GIFs.

5.51  In contrast, both Parties' internal documents and third party views suggest that Tenor[152] and, to a lesser degree, Gfycat may be seen as alternatives to GIPHY. Both of them supply a sizeable library of GIFs and offer API/SDK integrations for third parties such as social media and messaging platforms.[153]

5.52  We assessed how Tenor's and Gfycat's services compared to those of GIPHY, and whether either of them may be considered a close substitute to GIPHY. Our assessment is structured around the three sets of core services set out in Chapter 4, Industry Background: (i) sourcing, moderating, and hosting a library; (ii) search; and (iii) distribution.

5.53  In terms of **sourcing, moderating and hosting a GIF library**, according to its internal documents, GIPHY considers that the quality and safety of its content, and its established relationships with content partners are important elements of its competitive advantage. For example, in the 'Competitive Advantage' section of an investor pitch, GIPHY stated that '[✕]'.

5.54  However, the Parties submitted that GIPHY and Tenor have very similar libraries and that content creators often upload exactly the same content to GIPHY and Tenor. Based on evidence from the Parties' internal documents and third parties, Tenor appears to have a comparable content library to that of GIPHY, which is sourced, moderated, and protected under intellectual property licensing in a similar way. For example, Tenor told us that it does '[✕]'.

5.55  Over the course of our investigation, we received submissions from 11 third party platforms that are supplied by GIF providers. Of these, nine mentioned Tenor as an alternative to GIPHY. Of these nine platforms: (i) five described

---

[151] Facebook's stickers are all [✕]. Facebook submitted that approximately [✕] stickers are available on Facebook and approximately [✕] stickers are available on Messenger, as at 22 April 2021. When the user downloads the sticker pack, the stickers in the pack are added to the user's 'sticker drawer' (ie the interface with stickers it has downloaded that are ready for use). The user can access stickers in their sticker drawer 'in app' when communicating within a Facebook feed or Messenger thread.

[152] Tenor is owned by Google.

[153] Beyond GIF providers available in the UK, there are other examples of providers of GIF libraries internationally. These include, in China, Kuaishou (which launched in 2011 as a GIF platform, subsequently expanded into broader social media and e-commerce, and in early 2021 launched a USD 5 billion IPO), and Dongtu (a GIF platform that integrates with over 3,000 Chinese mobile apps). The CMA has been able to obtain only limited information with regard to these Chinese GIF platforms.

PX0684-083

Tenor as very similar to GIPHY (two of which explained that they had not noticed much or any difference in user experience after switching from one to the other); (ii) three described GIPHY as superior in one or more respects; and (iii) one described Tenor as superior in one or more respects.

(a) One third party (that integrates with both providers) told us that Tenor and GIPHY have similar libraries in terms of size and quality, including claims to extensive copyright licensing; however, it regards GIPHY as superior, particularly in regard to its content moderation.

(b) One third party (which uses GIPHY but not Tenor) considered that the volume and quality of Tenor's sticker offering was relatively on par with GIPHY's, but not quite as good.

(c) Another third party stated that it previously tested Tenor and another smaller GIF provider in one of its apps but had chosen to use GIPHY because it offered a more comprehensive library with better content to stimulate user conversation.

(d) Another third party (which is also supplied by GIPHY, but not Tenor) identified only Tenor as another major global GIF provider and commented that it was not aware of any other comparable provider. In its view, there is not a significant difference between the products of GIPHY and Tenor.

(e) As noted above, one platform rated Tenor as superior; this was due to its better localization capability, yielding a better user experience. This platform had run global user testing and had observed a 4% lift in GIFs being sent when integrated with Tenor compared to GIPHY.

5.56   We note that in an internal email exchange prior to the Merger, in which Facebook's executives discussed options (as alternatives to acquiring GIPHY), they commented that [✂]. [✂].

5.57   By contrast, the evidence submitted to us shows that Gfycat's content library is not of the same high quality or as secure (in terms of both content moderation and IP legal protection) as that of GIPHY and Tenor:

(a) Gfycat told us that all of its content is organically user-generated, in contrast to GIPHY, which sources/creates content with brand partners (for example around major events such as the Oscars), highlighting this as a key point of differentiation between them. Gfycat considered this to be a potential advantage for GIFs, as a wide user base can capture culturally trending context better than a team of employees.

PX0684-084

(b)  [✂].

(c)  Viber also told us that it considered the Gfycat inventory to be inferior to that of GIPHY and Tenor.

(d)  ByteDance told us that it believes that a balance between professional-quality branded content (for example, from studios and media providers) and UGC helps to enhance its users' experience.

(e)  One third party commented that GIPHY and Tenor are the most superior offerings in the market and Gfycat comes third. It noted that alternatives such as Gfycat may not have the same volume of, or licences to, content.

5.58   Consistent with the above, Facebook's internal documents show that [✂]. For example, in one internal chat considering the possibility of acquiring GIPHY and discussing potential alternative suppliers, Facebook's Head of EMEA Corporate Development, Nir Blumberger, comments that using Gfycat would be '[✂]'.

5.59   The Parties have submitted that we have not explained why [✂].

5.60   As noted at paragraph 5.58, Facebook's internal documents at the time of the Merger do not support the Parties' submission on Gfycat being a good alternative to GIPHY and Tenor, and in contrast show that Facebook did not regard [✂], particularly for Instagram (which, similarly to Snapchat, has a heavy focus on visual photo/video content).[154] Nir Blumberger's comment cited above – that using Gfycat would be '[✂]'– is moreover indicative of the scale of the challenge anticipated in developing Gfycat, even for an organisation with the technical and financial resources of Facebook. [✂]. [✂] is a content aggregation and discussion forum, with a strong focus on content that is created, curated and moderated by communities of users themselves, in a relatively decentralized way.[155] By contrast, platforms such as Facebook, Instagram, and Snapchat more closely control the content seen by users of their platforms and have more elaborate and sophisticated moderation systems. On that basis we consider [✂] use of Gfycat to be less informative as to the suitability of Gfycat for driving engagement and enhancing the competitiveness of social media platforms such as Snapchat.

---

[154] The Parties commented that this document reflects an informal chat between colleagues rather than a formal memo, and that 'there are no Instagram-specific mentions in the cited documentation'. In our view it is reasonable to take the comments in the chat as representing the views of those making them. We note that these comments were made in the context of Facebook discussing potential alternative providers of GIFs for Instagram, and that Instagram (**IG**) and its use of GIPHY stickers is mentioned several times in the course of the chat.
[155] [✂].

PX0684-085

5.61   [✁]. GIPHY's internal documents demonstrate GIPHY's suspicions that both Tenor and Gfycat may be copying content from GIPHY without attribution, but that it considers that '[✁]'. This evidence suggests that GIPHY differentiates itself by offering users engaging content in a timely manner and faster than competitors. Furthermore, as discussed in Chapter 4, Industry Background, evidence suggests that at least some platforms, including Facebook, require content to be licensed; therefore, even if a competitor copies GIPHY's library, this library may not be seen as a credible alternative to GIPHY in the absence of demonstrable content rights.

5.62   In terms of the sophistication of the **search algorithm**, Tenor appears to possess a comparable degree of capability to GIPHY. Tenor informed us that [✁]. The Parties submitted that conducting searches of GIPHY's and Tenor's libraries shows the similarity of their search algorithms, as these searches return similar and sometimes identical GIFs. Likewise, one third party platform highlighted the similarity in GIPHY's and Tenor's ability to organise GIFs in a way that surfaces the most interesting GIFs to the top of searches, making it easier for users to find the content they are looking for.

5.63   One aspect of the content library and search algorithm for which we have seen some evidence to suggest that Tenor may be superior to GIPHY is in its **localization capability**. This capability refers to maintaining and moderating, and ranking appropriately in search results, content that is relevant to users in different cultural and linguistic contexts outside of the US and Western world. According to one third party that has used both suppliers, Tenor offers superior localization capability and local language features. GIPHY itself told us that localization was a comparatively weak aspect of its offering.[156] In line with this, in one of GIPHY's internal documents (from 2019), members of its Product Team discussed a new strategy being developed to 'beat Tenor in search'. They noted that, 'According to our API partners, we have historically been outperformed in most non-English languages. Search queries have returned less than relevant results due to poor translations. More recently, partners have shared that we have fallen short in head-to-head testing against competition (Tenor specifically)'.[157]

5.64   We consider that the extent to which localization capability is an important dimension of competition will vary significantly by third party platform (depending on its user base). However, it is notable that we have not seen

---

[156] For example, GIPHY had only relatively recently added multi-language support. GIPHY noted that over the past few years, it has hired international editors on short-term contracts to curate sets of GIFs targeting particular languages and cultural contexts (principally in Asian countries with higher numbers of users) but found that these were often [✁].
[157] One particular issue raised in the discussion was the need to demonstrate to Samsung that GIPHY could perform well with Korean users.

PX0684-086

evidence from either third parties or the Parties' internal documents that suggest that any other global GIF provider (other than Tenor) has the ability to rival or outperform GIPHY in this respect. Furthermore, these localization capabilities are less relevant to our assessment on competitive constraints to GIPHY from the perspective of UK users, given that these capabilities are primarily relevant for adapting content to a non-Western and non-English-speaking audience.

5.65    [✂].

5.66    Finally, as regards **distribution** of GIFs, GIPHY and Tenor also appear to be set apart from other GIF providers in the number and prominence of their API/SDK distribution partners. Tenor told us that [✂]. GIPHY and Tenor both supply several of the most popular social media platforms, including Facebook, WhatsApp, and Twitter, as well as others.

5.67    By contrast, as noted above, [✂]. Gfycat told us that, although it has created some small distribution partnerships [✂], it is still relatively dependent on [✂] and has struggled to gain traction with larger API partners [✂] and Facebook. If users of platforms such as Facebook want to include a Gfycat GIF in their social media post or message, they would need to leave the Facebook website/app, visit Gfycat's O&O channels, and copy or share (using the integrated 'share' to Facebook button from Gfycat's O&O) the content from there. [✂].

5.68    We consider that GIF suppliers' ability to achieve wide distribution is reflective of their quality as perceived by third party platforms. Furthermore, as noted in Chapter 4, Industry Background, a GIF provider needs to offer wide user reach in order to attract creators of high-quality content. This may give rise to network effects whereby smaller GIF suppliers may struggle to attract quality GIF content without securing significant traffic, and vice versa.[158]

5.69    Prior to the Merger, as well as supplying the core services described above, GIPHY also supplied advertising services through its Paid Alignment model. As outlined in Chapter 2, this involved an advertiser paying GIPHY to promote (make more prominent) the advertiser's GIF, or set of GIFs, in the search results associated with certain search terms, and/or in the trending GIF feed. These services are described in further detail from paragraph 5.175 below (where we consider their positioning within the search and display advertising

---

[158] See our assessment of the costs and benefits of foreclosure in Chapter 8, Vertical Effects, from paragraph 8.112. In Chapter 8 we describe how Facebook could mitigate this cost and conclude that we do not consider this feature of the market would prevent the Merged Entity from foreclosing its rivals.

PX0684-087

markets) and are assessed in greater depth in Chapter 7, Horizontal Effects and Chapter 8, Vertical Effects.

5.70   At the time of the Merger, GIPHY was the only significant GIF supplier offering Paid Alignment or promoted GIF services.[159] [✁]. Holler creates branded stickers for advertisers, which are served on third party platforms via its SDK or API, a business which has attracted several large advertising partners. This business operates only in the US, but Holler hopes to expand over the coming years. Currently, however, this product appears relatively limited in scope; Holler's audience reach is much smaller than GIPHY's (due to its much more limited range of third party integrations). As explained above, Holler does not meaningfully compete with GIPHY from the perspective of social media and messaging platforms. Furthermore, Holler submitted [✁].

5.71   Based on the evidence set out above, we have concluded that **only Tenor is a close competitor to GIPHY** in the supply of searchable GIF libraries via API/SDK to third party platforms and that Gfycat does not currently provide a service that is a close substitute to GIPHY's.

*Evidence on switching and multi-homing*

5.72   Instances of platforms switching between GIF suppliers and multi-homing (whereby a platform sources GIFs from more than one provider) can inform the assessment of substitutability between suppliers.

5.73   The Parties submitted that some websites or apps may find it convenient or attractive to multi-home,[160] but that it is not necessary for social media providers to partner with more than one GIF provider. In the Main Party Hearing, Facebook told us that it will continue to use Tenor alongside GIPHY post-Merger, since 'one of the basic lessons of procurement is never to have a single provider and to make sure you have alternatives'. Evidence from third parties shows that the aim of multi-homing is primarily to mitigate the impact of GIF supply outages on the user experience on these platforms.[161]

---

[159] One advertiser commented that GIPHY was 'the leader in this space' ([✁]). Another advertiser told us that it was not aware of any other vendor offering these services, other than potentially Tenor; however, it had not engaged with Tenor as an alternative provider ([✁]). A third advertiser mentioned Holler as a supplier that it believed was developing click-through GIF adverts, though it had not partnered with Holler or any other provider of GIF advertising services ([✁]). An advertising agency mentioned that it was aware of Holler offering similar services and currently has active client campaigns with Holler ([✁]).
[160] They did not specify why it would be considered convenient or attractive.
[161] One third party told us that it considers it important to use more than one GIF provider to combat any technical challenges such as outages and continuity of service. Another third party explained that the benefit of having more than one provider would be to counter redundancy or continuity of service (although it did not consider this to be of major concern).

PX0684-088

5.74   Multi-homing appears relatively common among the large social media platforms. For example, WhatsApp is supplied by both GIPHY and Tenor, with individual users randomly assigned to one or the other provider. Facebook Blue and Messenger are also served by both GIPHY and Tenor, as are Twitter, [✂], and Kika.

5.75   However, some platforms have only one GIF supplier: notably, TikTok and Instagram (which are supplied solely by GIPHY)[162] and [✂], Viber, and [✂] (which are supplied solely by Tenor).

5.76   We have seen limited evidence of platforms switching GIF providers, and most of the known instances of switching were prompted by the Merger:

*(a)*   The Parties submitted that, since January 2018, three platforms have switched away from GIPHY to [✂], all following the Merger in 2020: [✂], and Viber and Telegram (both messaging platforms).[163]

*(b)*   Viber and [✂] confirmed to the CMA that they switched from GIPHY to Tenor as a result of the Merger.

*(c)*   Kika told us that following the Merger it has gradually reduced its use of GIPHY in favour of Tenor.

5.77   An internal document from GIPHY mentions Skype switching from Tenor to GIPHY around October 2019. Skype '[✂]'.

5.78   No evidence has been submitted to us that any significant social media platform is multi-homing with, or has switched to, suppliers other than GIPHY or Tenor.[164] This indicates that only Tenor is a close competitor to GIPHY (at least from the perspective of the social media platforms).

*GIPHY's position in the supply of searchable GIF libraries*

5.79   The evidence discussed above shows that GIPHY and Tenor's offerings are distinctive from that of other GIF providers in that they maintain an attractive and current content library, a sophisticated search engine, and a wide distribution network of API/SDK partners including, *inter alia*, many major social media and messaging platforms. Third party views as to how GIPHY and Tenor compare in terms of the quality of their offerings differ to an extent, with different third parties placing different weight on the various features and

---

[162] TikTok is supplied solely by GIPHY in the UK, Europe, and US.
[163] The Parties submitted that [✂] did not wish to work with Facebook and that it was Viber's corporate policy not to work with Facebook.
[164] [✂]. We also note that Gfycat has an API integration with one sizeable social media platform [✂], although this platform does not multi-home and has not switched away from a different provider to Gfycat.

PX0684-089

services offered by each supplier. Taking all this evidence into account, on balance we have concluded that GIPHY is consistently viewed as the market leader, with Tenor offering a broadly similar service and no other GIF provider currently offering a service of a comparable quality to GIPHY and Tenor.

5.80    This finding is also reflected in the volume of GIF traffic attributable to the different suppliers. Searches are a highly relevant measure of user engagement levels and are a key metric used by the GIF providers themselves to monitor how usage of their network is growing.[165] Table 3 shows the distribution of GIF search volume across GIPHY, Tenor, Gfycat, and Holler, calculated on the basis of average monthly API/SDK searches globally in 2020.

**Table 3: Shares of supply in GIF provision, based on global API/SDK search volume, 2020[166]**

| GIF provider | Number of searches (monthly average) | Share of supply |
|---|---|---|
| GIPHY | [✂] | [60-70]% |
| Tenor | [✂] | [30-40]% |
| Gfycat | [✂] | [0-5]% |
| Holler[167] | [✂] | [0-5]% |
| Total | [✂] | 100% |

Source: CMA analysis of data provided by GIPHY and third parties.

5.81    Table 3 shows that GIPHY and Tenor have substantial shares of API/SDK GIF searches globally, [✂]. Gfycat and Holler have [✂] respectively.

5.82    Although it is possible that other GIF providers also offer API/SDK integrations to search for GIFs, we were not able to obtain data from other providers.[168] Therefore, the shares presented in this table may over-estimate GIPHY's (as well as Tenor's, Gfycat's and Holler's) shares of supply. However, we

---

[165] GIPHY cited number of search requests as one of its key performance indicators (KPIs) regularly reviewed by its Board and Management. GIPHY also used monthly search volumes in presentations to potential investors.
[166] Limitations of this analysis, related to the definition of the search metric, are set out in Appendix D: Market shares methodology. We consider that the results of this analysis are consistent with our broader understanding of the market. That is, given that GIPHY and Tenor supply many of the largest social media platforms (including Facebook platforms), [✂].
[167] In 2020, Holler facilitated searches only for GIF stickers (not video GIFs). Holler's share is calculated on the basis of API/SDK searches, consistent with all other parties included in the analysis. Holler additionally provides 'suggestions' within some third party platforms with which it integrates (these are content options that appear on-screen while a user is typing a message, based on the particular words the user is typing). We do not consider such 'suggestions' to be commensurate with searches or informative for our assessment of shares of supply since they are generated automatically and irrespective of the user's intent with regard to GIFs/stickers (ie the user may not be interested in GIFs/stickers at all). We have also compared GIPHY and Holler by the volume of content served globally: Holler served only [✂] of the amount of content served by GIPHY in 2020. Taking this into account, as well as the third party evidence discussed above, we consider our finding that GIPHY has a large share of supply, while Holler has a very small one, to be robust.
[168] The CMA obtained contact details for six other providers (Animoto, Dongtu, GIFs.com, Imgflip, Imgur, and Stipop) to request information. One of these [✂] told us that it does not provide any search functionality for GIFs or animated stickers. The remainder did not respond. We note that several of these providers do not appear to provide API/SDK integrations with other platforms (eg Imgflip) or operate only in China (eg Dongtu).

PX0684-090

consider that any degree of over-estimation would be very small, based on the fact that these other providers are not used by any of the major platforms such as Facebook, Instagram, [✂], TikTok, or [✂] (which means that the traffic of any suppliers omitted from this analysis would be very small compared to the traffic already included in the analysis), and they were not mentioned as alternatives by third parties in the CMA's market testing. As discussed above, in addition to Tenor, the only other alternative GIF supplier mentioned frequently by third parties was Gfycat. We therefore consider that the shares presented in this table are a reasonable estimate of the shares of supply in the API/SDK distribution of GIFs.

5.83   We also considered several alternative metrics to estimate shares of supply, including:

(a)  *Amount of content served* (ie returned by the GIF providers on the basis of API search requests). However, [✂]. Nevertheless, we note that the amount of content served by Holler and Gfycat was [✂]).

(b)  *Number of GIFs actually selected/clicked*. However, the data available to GIPHY on this metric are very limited, pertaining only to API partners that use its 'Pingback' feature, and thereby excluding the majority of its traffic (including traffic through Facebook, Instagram, and WhatsApp).[169] Furthermore, GIPHY has submitted that even where clicks data are available for selected API partners, they may not be reliable. In addition, Gfycat submitted that it does not maintain data on this metric.

(c)  *Number of GIFs posted/shared by users on third party platforms*. However, GIF providers were unable to provide this data as their access to this information is limited. Such data would therefore need to be collected in a 'bottom up' way from every third party platform individually, which was not considered practicable within the scope of our investigation. However, we were able to explore this metric in a limited way for GIPHY's and Tenor's relative shares of GIFs posted/shared on Facebook and Messenger during the period February to April 2021, based on data supplied to us by Facebook. We found that Tenor had a higher share of content posted than GIPHY, accounting for [✂] of all GIFs posted on Facebook during February and March 2021 (versus [✂] for GIPHY), and [✂] of all GIFs sent on Messenger during the week of 20-26

---

[169] API partners for whom GIPHY could not provide reliable clicks data include Baidu, Design Keyboard, Discord, Facebook, GroupMe, Handcent, Instagram, Microsoft, Outlook, Samsung, Signal, Skype, Slack, Snapchat, Textra, Tinder, Twitter, WhatsApp, and Yellotalk.

PX0684-091

April 2021 (versus [✂] for GIPHY).[170] [✂].[171] On the one hand, this analysis may suggest that GIPHY's share by search volume on the basis of volume data supplied by GIF providers may be over-estimated (see Appendix D: Market shares methodology for a further discussion of the available metrics). On the other hand, this analysis is based on a very limited sample (in terms of platforms and timeframe) and, therefore, we do not draw wider conclusions. In any event, the broader evidence gathered in this investigation confirms that GIPHY and Tenor are the only two significant GIF suppliers, and the precise share of each is not material to our competitive assessment.

*(d) Size of library available to UK users (unique GIFs).* We sought data on the size of their libraries from each of the larger GIF providers (GIPHY, Tenor, and Gfycat), as well as Holler.[172] However, we do not consider this to be particularly informative for the purposes of the competitive assessment. While some third parties referred to the size of each provider as a differentiating factor (GIPHY was often mentioned as the largest), we understood such comments to refer more to the amount of high-quality content (including branded GIFs from major content producers) and also the scale of reach with major third party platforms than to the absolute number of GIFs in the library.

5.84   We note that GIPHY's share of API/SDK searches is likely to reflect its prominence on social media platforms, including Facebook platforms, rather than end users acting on a preference for GIPHY over other GIF providers (which, in most cases, they could only do by switching between social media platforms).

5.85   However, GIPHY's prominence on social media platforms gives it brand recognition among potential brand partners,[173] end users and prospective

---

[170] The CMA notes that these results present a different picture to those from the API searches. However, these proportions are dependent on how Facebook makes each GIF provider available and to which users, and as such the resulting shares of GIPHY and Tenor do not necessarily reflect user preferences between the two GIF providers. Because of that and given that this is a limited data sample (in terms of both timeframe and platforms), we place less weight on these findings than those for global API searches throughout 2020.

[171] [✂].

[172] We note that Holler's own library of video GIFs is [✂]. The CMA also notes that the Holler website suggests that Holler also has a partnership with GIPHY, Tenor, Gfycat and GIFSKey to offer video GIFs.

[173] Several third parties told us that GIPHY's brand partnerships with companies were an important competitive advantage, allowing it to provide high-quality and socially-relevant GIFs; for example, Notes of calls. As shown in Chapter 4, Industry Background, [✂] of GIFs served by GIPHY are provided by companies, indicating the popularity of these GIFs. As discussed further in Chapter 4, Industry Background, according to its internal documents, GIPHY considers that the quality of its content and its established relationships with content partners are important elements of its competitive advantage. In an investor presentation, GIPHY highlights that it has [✂]'.

PX0684-092

employees, helping it to maintain and improve its services in ways that makes it attractive to social media platforms.

(a) [✂] told us that GIPHY has many more brand partnerships than [✂]. [✂] thought that partnerships with, for example, movie studios could be quite profitable.

(b) Similarly, [✂].

(c) The Parties also told us that if GIPHY were to lose the scale of its distribution (as a result of foreclosure, discussed in Chapter 8, Vertical Effects), this would 'reduce demand for GIPHY's GIFs, which would undermine the combined entity's ability to attract and retain GIF licencing partners, creators and artists' and that wider distribution of GIPHY's GIFs therefore 'helps to maintain the quality of GIPHY's library'.

(d) As regards staff, Facebook submitted that GIPHY 'have a creative and content-oriented DNA that I think we are missing'. Integrating GIPHY's talented creative team, especially its creative production specialists, formed part of Facebook's rationale for the Merger (see Chapter 2, The Parties, Merger and Rationale).

5.86 The Parties contested our provisional view that GIPHY has market power in the global supply of searchable GIF libraries via API/SDK to third party platforms such as social media platforms (and indirectly, to their users).[174]

5.87 The Parties submitted that high market share is not a sufficient basis on which to conclude the existence of market power, and that it is necessary to consider whether the firm in question has been able to sustain prices above competitive levels or restrict output or quality below competitive levels. They submitted that GIPHY offers its GIFs for free and that API partners can easily switch to other providers.

5.88 We carefully considered the Parties' submissions. We did not rely on market shares alone and considered a range of evidence (as set out above in paragraphs 5.47 to 5.51, 5.53 to 5.58, 5.60 to 5.61, **Error! Reference source not found.** to 5.68, 5.76 to 5.78, 5.81, and 5.85) including Internal Documents and third party views, in addition to shares of supply, in coming to our conclusion on market power.

5.89 We disagree with the Parties that it is necessary to demonstrate that GIPHY exercised its market power pre-Merger. The purpose of our assessment of

---

[174] Our assessment focuses on API/SDK distribution of GIFs. However, the inclusion of O&O in this analysis would not change our view, given that O&O traffic is very small in volume relative to API/SDK traffic.

PX0684-093

GIPHY's market power in the supply of searchable GIF libraries is to inform our competitive assessment of vertical effects set out in Chapter 8, and in particular the Merged Entity's ability and incentives (after the Merger) to harm downstream rivals' competitiveness by partially or totally foreclosing access to GIPHY. Within that context, pursuant to the Merger Assessment Guidelines,[175] market power relates to the inability of downstream rivals to easily switch away to a range of effective alternative suppliers so as to mitigate harm from any attempt at foreclosure by the Merged Entity. On the basis of the evidence above, we find that social media platforms have very limited close alternatives to GIPHY, for the following reasons:

(a)  The distinctive **quality of GIPHY's content and search algorithm**, and its sizeable **reach** among the major distribution partners.

(b)  The fact that **Tenor is GIPHY's only sizeable and close competitor**, as it offers a service of a broadly similar quality, and [✂].

5.90   We considered the Parties' submission that GIPHY provides GIFs to API partners free of charge and is 'clearly pricing at, not above, the competitive level'.[176] In the context of a multi-sided platform (such as GIPHY's, which serves third party platforms and their users as well as advertisers and creators), it is uncontroversial that the profit-maximising strategy may be for the provider to serve one side free of charge or at discounted prices, while monetising another group of users. GIPHY has spent several years pursuing a strategy of building its distribution network, in order to rapidly scale its user reach and traffic, which it could then seek to monetise through advertising. The fact that its GIFs are offered at zero monetary price, following such a strategy, does not necessarily imply competitive market conditions.

5.91   We have therefore concluded that **GIPHY has market power in the global supply of searchable GIF libraries via API/SDK** to third party platforms such as social media platforms (and indirectly, to their users), reflecting the very limited effective alternatives to GIPHY in this market.

## Social media

5.92   In this section we discuss the market definition relating to services involved in the supply of social media and our assessment of Facebook's position within that market. Our assessment is informed by evidence obtained in the course

---

[175] Merger Assessment Guidelines (CMA129) (paragraph 7.14(a)).
[176] Parties' Response to Provisional Findings, paragraph 4.14 (a).

PX0684-094

of this investigation as well as evidence obtained for the purposes of the Market Study, which we have reviewed.

5.93   As noted above in paragraphs 5.2 and 5.3, market definition is an analytical tool that involves identifying the most significant competitive alternatives available to consumers and includes the sources of competition to the merging firms that are the immediate determinants of the effects of the merger. While market definition can sometimes be a useful tool, it is not an end in itself. The outcome of any market definition exercise does not determine the outcome of the CMA's analysis of the competitive effects of the merger in any mechanistic way.[177]

5.94   Our theory of harm as discussed in Chapter 8, Vertical Effects, relates to the possibility that the Merged Entity may foreclose Facebook's rivals from access to GIPHY. We have therefore considered whether and to what extent Facebook holds market power in social media, which would affect its incentive to foreclose social media rivals and exacerbate any effect on competition from foreclosure.[178] Below, from paragraph 5.127, we take account of a range of evidence on shares of supply, the extent of multi-homing, barriers to entry, and entry over recent years. Based on this evidence, we have concluded on whether Facebook has significant market power in social media.[179]

5.95   This section is structured as follows:

(a)  product market definition;

(b)  geographic market definition; and,

(c)  evidence on Facebook's position in social media and our conclusion.

### Product market definition: social media

5.96   The CMA most recently considered the market for social media in the Market Study, where social media platforms were described as follows:[180]

> 'Social media platforms facilitate interaction between their users, allowing them to communicate with each other, and share and discover engaging content. Social media platforms are generally available through a mobile app, with some also available via a

---

[177] Merger Assessment Guidelines, paragraph 9.4.
[178] Merger Assessment Guidelines, paragraphs 7.19 and 7.21.
[179] In the following section on Display Advertising, we also present a range of evidence relating to the other side of Facebook's two-sided platform, and assess whether Facebook has significant market power in display advertising.
[180] Market Study, paragraphs 2.30 to 2.31.

PX0684-095

web browser … Features commonly provided by social media platforms include: user profiles or accounts; user 'friends' or connections; a personalised 'feed' of news or other content; content sharing features; comments; private messaging features; and likes or 'reactions'.'

5.97   One important way in which GIFs are used on social media (and more generally) is within private messaging. We consider that messaging is an important feature of social media platforms, given it is a feature offered by every social media platform included in the Market Study.[181]

5.98   Facebook[182] runs several social media platforms, most notably Facebook Blue, Messenger, Instagram, and WhatsApp. GIPHY integrates with Facebook's and other social media platforms through its API/SDK. Facebook offers the full breadth of social media features across its platforms (including all those described in paragraph 5.96).

5.99   Evidence gathered in the course of the Market Study, including submissions by market participants, indicates that platforms compete for user attention through a combination of parameters:[183]

   *(a)*  Size and type of user network;

   *(b)*  Content;

   *(c)*  Innovative features (new ways to communicate or interact with content may attract user attention);

   *(d)*  Ad load and quality of advertising;

   *(e)*  Privacy;

   *(f)*  Platform governance (moderating content to prevent negative content from degrading user experience); and

   *(g)*  Price (most platforms provide services to consumers at zero monetary cost).

---

[181] See Table 3.1 in Market Study.
[182] In this section, we generally use 'Facebook' to refer to the Facebook Group (which includes the Facebook Blue, Messenger, Instagram, and WhatsApp platforms), and 'Facebook Blue' to refer to that particular platform. In the Market Study's discussion of social media, 'Facebook' was generally used to refer to 'Facebook Blue'. The Market Study's focus was on Facebook Blue, but it also considered the role of the wider Facebook ecosystem including Instagram and WhatsApp (Market Study, footnote 141).
[183] Market Study, paragraph 3.158.

PX0684-096

5.100   While different platforms may share common functionalities,[184] how closely they compete depends on the degree to which consumers consider them substitutes. In our view, platforms are more likely to be close substitutes if they fulfil similar user needs to one another than if they do not.

5.101   As set out in the Merger Assessment Guidelines, especially when considering differentiated products (as is the case with social media), it can be more helpful to describe the constraint posed by different suppliers as sitting on a continuum between 'strong' and 'weak'.[185] The CMA will generally not need to come to finely balanced judgements on what is 'inside' or 'outside' the market.

5.102   Given the description of social media set out above, we took as our starting point a relatively broad definition of social media consistent with that used in the Market Study, including a range of online platforms that allow consumers to interact with each other and with engaging content. Included in this group are: Facebook Blue, Facebook Messenger, Instagram (part of the Facebook Group), WhatsApp (part of the Facebook Group), LinkedIn, Pinterest, Reddit, Snapchat, TikTok, Tumblr, Twitter, and YouTube.[186] A number of these social media providers are currently, or have previously been, integration partners of GIPHY. Some of the platforms included in the group above may not be close competitors to Facebook (which means their inclusion may lead us to under-state Facebook's market power); however, we have given particular consideration to the extent of the competitive constraint on Facebook posed by YouTube, given its large scale in terms of user reach and user time spent; see further discussion at paragraphs 5.130 to 5.133.[187]

5.103   Third-party survey evidence and internal documents (including consumer research) reviewed in the Market Study indicated that there is differentiation between the social media platforms listed above, with some focusing more closely on content sharing and the provision of a personalised 'feed' of content, and others focusing mainly on messaging, and that there are important differences in the reasons cited by users for using different social

---

[184] See Market Study, Table 3.1.

[185] Merger Assessment Guidelines, paragraph 9.4.

[186] Market Study, paragraph 3.155. The Market Study acknowledged a range of smaller platforms that fall within the definition. However, those platforms accounted for a very small proportion of user time spent on social media. A wider range of more specialised platforms/services may compete with specific aspects of Facebook's offering – for instance, dating apps such as Tinder and Bumble (which also integrate GIFs) may compete with Facebook Dating. While we do not focus on these specialised services in our assessment (not least as they account for a very small share of users' time compared to the larger social media platforms listed), we do take into account the potential harm to such platforms' competitiveness as a result of foreclosure from GIPHY's services in our assessment of vertical effects (see Chapter 8, Vertical Effects).

[187] We consider YouTube as part of a broad definition of the market, consistent with the approach in the Market Study. However, given that in this Merger assessment we are interested in assessing the constraints on Facebook, and given that we find YouTube is a weak constraint on Facebook, we have excluded it from the shares of supply analysis and competitive assessment.

PX0684-097

media platforms.[188] This evidence also showed that Facebook stands out as able to serve a broad range of consumer needs, in contrast to other platforms which are more specialised in purpose.[189]

5.104   The Parties have submitted the following:[190]

(a)   The CMA has relied only on an assessment of functional characteristics to determine close substitutes to Facebook in social media and has not undertaken an exercise to establish economic substitutability.[191] The CMA's revised Merger Assessment Guidelines (March 2021) do not contain any reference to the hypothetical monopolist test, which is the standard global framework for assessing the issue of economic substitutability in a market definition context.[192] The CMA is required to carry out a robust market definition exercise, based on empirical evidence, in circumstances where its conclusion of market power is based solely or primarily on the level of market share.[193]

(b)   The CMA has not taken into account evidence on the changes in competitive constraints during a period of significant change (the Coronavirus (Covid-19) pandemic), which has occurred largely in the time since the Digital Market Study.[194] The Parties cited Ofcom's 2021 'Online Nation' report) as showing: (i) a significant increase in time spent online since 2019; (ii) changing dynamics in response to the Coronavirus (Covid-19) pandemic such as the 'extraordinary growth' of video calling services; and (iii) the competitive dynamics between services such as YouTube, TikTok, and Facebook.[195] They have also cited Instagram's public announcement in June 2021 that it is 'no longer a photo-sharing app' as demonstrating that Facebook has responded to the static and dynamic competitive pressure posed by YouTube and TikTok.[196]

(c)   The market definition should not be limited in scope to social media providers because Facebook faces competition from any website or service that attracts user time and attention away from it, including video

---

[188] Market Study, paragraphs 2.32 and 3.155. For example, Ofcom's survey research in its 2019 Online Nation report showed that Facebook is used primarily to keep in touch with friends and family, and YouTube is used primarily for watching videos.
[189] Market Study, paragraph 3.163.
[190] Some other more specific points raised by the Parties are addressed in the relevant sections below.
[191] Parties' Response to Provisional Findings, paragraph 4.4.
[192] Parties' Response to Provisional Findings, paragraph 4.6.
[193] Parties' Response to Provisional Findings, paragraph 4.6.
[194] Parties' Response to Provisional Findings, paragraph 4.9.
[195] The Market Study drew on evidence contained in Ofcom's 2019 Online Nation report.
[196] Parties' Response to Provisional Findings, paragraph 4.5. The Parties state that 'this move and public announcement was based on internal research by Facebook which suggested that Instagram's users' "*number one*" reason for using the app was to "*be entertained*", which is consistent with a market for user attention in which YouTube and many other firms are competitors.'

PX0684-098

and other streaming platforms and games. The existence of indirect network effects between the two sides of Facebook's platform (users and advertisers) means that there is a relevant economic market for user attention that is monetised through advertising, and, as such, Facebook competes with all platforms that also compete for (finite) user attention.[197]

5.105  We consider each of these three points in turn below.

*Functional characteristics and substitutability*

5.106  The Parties submitted[198] that:

'The CMA's provisional findings in relation to market definition are based on an arbitrary 'functional characteristics' approach which the Parties have highlighted is not economically robust, and the CMA has itself previously recognised that such an approach is essentially arbitrary and cannot be conclusive evidence in a market definition assessment. The CMA acknowledges that 'just because products display similar physical characteristics, this does not necessarily mean that customers would view them to be close substitutes.' [OFT, 2004, Market definition: understanding competition law, paragraph 3.7.]'

5.107  We note that the 2004 OFT guidance to which the Parties refer states (also in paragraph 3.7) that,

'Evidence on product characteristics may provide useful information where customer substitution patterns are likely to be influenced significantly by those characteristics. Where the objective characteristics of products are very similar and their intended uses the same this would be good evidence that the products are close substitutes.'[199]

Moreover, the CMA's current Merger Assessment Guidelines (2021) confirm this point, stating that 'products' characteristics or their intended use may provide relevant evidence indicative of substitutability'.[200] We took this into account when addressing the Parties' comments on YouTube and user attention as set out below.

---

[197] Parties' Response to Provisional Findings, paragraph 4.11.
[198] Parties' Response to Provisional Findings, paragraph 4.4.
[199] OFT 2004 'Market definition: Understanding competition law', paragraph 3.7.
[200] Merger Assessment Guidelines, paragraph 4.13.

PX0684-099

5.108 When assessing the competitive constraints faced by Facebook in social media, we considered the extent to which other providers constrained its behaviour. We expect the strongest competitive constraints on Facebook will be imposed by providers whose services could meet the same user needs as those fulfilled by Facebook platforms.

5.109 Market research by Ofcom and Facebook's internal documents show that interacting with existing close contacts (ie friends and family) remains the most important reason why consumers access Facebook Blue. In a survey conducted for Ofcom's 2019 'Online Nation' report, 'keeping in touch with friends and family' was rated as a 'fairly important' or 'very important' reason for using Facebook (Blue) by 79% of respondents.[201] One Facebook internal document, exploring the extent to which different interactions on Facebook are 'worth people's time', found that the top five interactions most valued by UK users of Facebook Blue all involved some form of interaction with close friends. With the exception of the ninth ranked interaction ('to check a business page for info'), each of the remaining top ten interactions also related to social interaction eg with acquaintances or groups. Facebook consumer research found that UK consumers were most likely to see the Facebook Blue platform as helping them to 'stay connected to friends and family', compared to a range of other potential benefits. As regards Instagram, Ofcom's 2019 survey[202] found that 'sharing photos and videos' was the top reason for people to access Instagram (rated as either 'fairly important' or 'very important' by 66% of respondents);[203] whilst 'keeping in touch with friends and family' was the third most important reason (after 'browsing to pass time'), rated as 'fairly important' or 'very important' by 59% of respondents.

5.110 In addition to its original and core social networking service, Facebook has expanded over time to offer a wide range of other services, including video-streaming, dating, and shopping. While certain elements of Facebook's offering may face some competitive constraint from more specialised services (eg Facebook Dating may face some constraint from other dating apps), these other services do not provide an effective alternative for users of Facebook Blue or the Facebook Group in the aggregate.

5.111 The Parties submitted that we failed to carry out a sufficiently robust market definition exercise and have ignored considerations that would be made under

---

[201] By contrast, 'keeping in touch with friends and family' was rated as a 'fairly important' or 'very important' reason to use YouTube for only 15% of respondents. Ofcom 2019 'Online Nation' report.
[202] Ofcom 2019 'Online Nation'.
[203] By contrast, in regard to YouTube, 'sharing photos or videos' was rated as either 'fairly important' or 'very important' by only 20% of respondents; and 'keeping in touch with friends and family' was rated as 'fairly important' or 'very important' by only 15% of respondents.

PX0684-100

a hypothetical monopolist test (HMT). We note that, since social media services are provided at zero monetary price to users, we are unable to observe user switching in response to changes in relative price. In principle, users could switch in response to worsening of non-price aspects of the service, such as advertising loads, but in order to gauge the ability and willingness of consumers to switch in response to small but significant changes in relative quality, in a manner similar to the HMT, one would need an objective measure of such changes in quality. In practice, the impact of changes in platform features on user experience is subjective, and therefore we are of the view that there is no appropriate way of applying the HMT to this market as a robust empirical test. For these reasons we do not think the HMT referred to by the Parties is either practicable or informative in this case.

5.112   We consider that our approach to the assessment of market definition and market power, taking account of substitutability based on the similarity of functional characteristics, is appropriate and consistent with the Merger Assessment Guidelines.[204] The Parties have not presented any evidence or identified any relevant source of evidence as to substitutability, in particular the willingness of users to switch away from Facebook platforms. We note that substantial adverse past publicity concerning data mishandling and user privacy abuses – which can be regarded as a worsening in the quality of Facebook's offering to users – has not led to large or sustained switching away from Facebook, indicative of barriers to switching and/or a lack of effective alternatives.[205]

5.113   In relation to the Parties' argument that the CMA is required to carry out a robust market definition exercise in circumstances where its conclusion of market power is based solely or primarily on the level of market share,[206] we note that our assessment of Facebook's market power does not primarily or solely rely on market shares analysis. As discussed below in paragraphs 5.128 to 5.129 and 5.144 to 5.153, we have taken into account a range of evidence relevant to market power, including shares of supply over time and in different consumer segments, multi-homing analysis, barriers to entry, and the absence of evidence of meaningful entry in recent years. Facebook has, across its platforms, been by far the leading social media provider for many years. Our multi-homing analysis below (from paragraph 5.144) shows that

---

[204] Merger Assessment Guidelines, paragraphs 4,13, 9.2, 9.7.
[205] The Federal Trade Commission (FTC) provides several examples where Facebook's activities generated significant user dissatisfaction, but it nevertheless experienced minimal loss of user engagement, including when news broke in 2018 that Facebook user data had been secretly harvested by Cambridge Analytica, and when Facebook agreed to Consent Orders and paid a USD5 billion penalty (in 2019) relating to a range of data mishandling and user privacy abuses. FTC (19 August 2021) First Amended Complaint for Injunctive and Other Equitable Relief, Case No: 1:20-cv-03590-JEB, paragraphs 205 and 206.
[206] Parties' Response to Provisional Findings, paragraph 4.6.

PX0684-101

while other providers (such as Snapchat and TikTok) have emerged, the majority of their users are also regular users of the Facebook platforms, though the reverse is not true. This indicates to us (consistent with the Market Study) that Facebook platforms may be seen as a 'must-have' by consumers, rather than being displaced by newer entrants.[207]

5.114  Evidence (cited in paragraph 5.109) shows that the primary purpose for users to access Facebook Blue and third most important reason to access Instagram is to connect with friends and family, giving rise to strong network effects,[208] which act as a barrier to entry and expansion, preventing smaller social media platforms from imposing a strong constraint on Facebook (see paragraph 5.152 below). Successful entry to the market (albeit at a significantly smaller scale than Facebook) has been limited. Snapchat entered in 2011 and TikTok entered in 2014,[209] but Google's 'Google+' attempt in 2011 failed.[210] While Snapchat's and TikTok's shares of user time spent have grown moderately over this time, and Facebook's has declined moderately, Facebook has retained a very high share. In addition, Facebook has also been highly profitable with its ROCE increasing from 38% in 2019 to 40% in 2020.[211,212]

5.115  We consider evidence pertaining to market power in display advertising (the other side of Facebook's two-sided platform) in the section on 'Display Advertising' below.

*Changes in competitive conditions since the Market Study*

5.116  We investigated whether there had been material changes in competitive conditions in the market since the publication of the Market Study (July 2020). The Parties have not provided evidence as to how any market developments over recent months have led to material changes relevant to the assessment of market power. In response to our Provisional Findings, the Parties re-submitted a paper on 'Market Definition and Market Power' from March 2020

---

[207] See also Market Study, paragraphs 3.163 and 3.193.

[208] In the presence of network effects, the utility to consumers increases when there are more consumers using the service (eg a Facebook user gains greater benefit from being on the platform if many of their friends and family are also on the platform).

[209] Market Study, Box 3.6.

[210] Market Study, Box 3.7.

[211] The Market Study (Figure 2.11) estimated the weighted average cost of capital for the large digital platforms at around 9% in 2018 and there is no evidence to suggest that this has changed substantially over the last two years. Facebook's ROCE in 2020 therefore indicates that it has been generating profits comfortably in excess of its cost of capital.

[212] Facebook does not charge users for its social media services; its revenues are mostly generated from display advertising. However, given the two-sided nature of its platform, with positive indirect network effects (ie Facebook attracts more advertising revenue by having more social media users), we consider that Facebook's profitability is relevant to the assessment of its market power also in social media. See further discussion at paragraph 5.191.

PX0684-102

by Frontier Economics that Facebook submitted following the Market Study Interim Report (and which was addressed in the Market Study Final Report).[213]

5.117  We took account of developments in the market and updated the quantitative analysis of shares of supply and multi-homing in order to examine trends up to March 2021, taking into account the period of the Coronavirus (Covid-19) pandemic (see from paragraph 5.134). We also reviewed Ofcom's 2021 'Online Nation' report.[214] The report notes that the line between social media and social video services[215] is becoming increasingly blurred. It notes that platforms such as Instagram, Snapchat, and TikTok place strong emphasis on sharing of photos and videos (as well as offering messaging and other features), and Facebook provides social video-sharing capabilities, among its wide portfolio of consumer services.[216]

5.118  Given Instagram's announcement it is increasing its focus on video (cited in paragraph (b)), the Parties' submission that the top reason for consumers to use Instagram is to 'be entertained',[217] and Ofcom's survey evidence suggesting that a larger proportion of people consider 'watching videos' a 'fairly important' or 'very important' reason to access Instagram (47%) than consider it a 'fairly important' or 'very important' reason to access Facebook Blue (38%),[218] we consider it likely that Instagram may compete more closely with video-sharing platforms such as TikTok and YouTube than do Facebook Blue, Messenger, or WhatsApp.[219]

5.119  We note that the timing of Instagram's increased focus on video-sharing since June 2021 may suggest that it is more likely to represent a response to the rise of TikTok than a response to YouTube, which has been well-established for many years. In any event we have not seen evidence that these two undertakings represent a significant competitive constraint for Instagram (or the broader suite of Facebook's platforms). Taking these in turn:

(a)  TikTok is included in our market shares analysis below (from paragraph 5.134). We have not seen evidence of users switching away from

---

[213] Market Study, paragraph 3.175.
[214] We note that Ofcom sometimes includes YouTube in its analysis of social media platforms (eg Figure 1.30) and sometimes does not (eg in its discussion of social media platforms' revenue performance during 2020, Ofcom notes that Facebook is the largest platform by UK advertising revenue, followed by Twitter and Snapchat; see page 147).
[215] Ofcom describes social video platforms as hosting videos generated by users, which the platforms organise and present to users. Their features typically enable users to upload and edit video content; share content either publicly or privately with their own network and interact with content (eg 'like' or comment on videos).
[216] Ofcom 2021 'Online Nation', pages 85-87.
[217] Parties' Response to Provisional Findings, paragraph 4.5.
[218] Ofcom 2019 'Online Nation' report.
[219] The Ofcom survey did not include similar questions about Messenger or WhatsApp.

PX0684-103

Instagram to TikTok, or that the growth of TikTok's share of supply in terms of user time spent in the UK has coincided with a decline in Instagram's share (up to our most recent data point of March 2021).[220]

(b) In relation to YouTube, Instagram's expansion into video would suggest it might win market share from YouTube, rather than YouTube winning market share from Instagram's existing business. For example, the Ofcom's 2019 'Online Nation' report found that 'keeping in touch with friends and family' is an important reason for a much greater proportion of users to access Instagram than to access YouTube (see further evidence noted above at paragraph 5.109). Furthermore, we consider that the constraint posed by YouTube on Facebook in the aggregate is weak, as it is not a close substitute for the various services available in the Facebook Group, particularly the latter's core social networking service (see further discussion of our treatment of YouTube below from paragraph 5.130).

5.120  With respect to video-calling services (such as Zoom and Microsoft Teams), Ofcom's report showed that their recent growth coincided with the onset of the Coronavirus (Covid-19) pandemic and associated lockdowns, which prevented friends, family, and work colleagues from meeting each other in person.[221] Ofcom's 2021 'Online Nation' report found that, 'During 2020, the coronavirus pandemic pushed people in the UK to use video-calling services to keep in touch with friends and family as well as for business purposes and education'.[222] This suggests that video-calling services have primarily substituted for in-person meetings between friends, family, and work colleagues. Video-calling services may offer an alternative for some aspects of certain of Facebook's platforms that can be used for making calls between individuals or small groups (such as Messenger and WhatsApp). However, we have not seen any evidence, including any submitted by the Parties, of a significant competitive constraint on Facebook's platforms from video-calling services (for example, evidence of users switching away from WhatsApp to Zoom; or evidence that users of Facebook's platforms are now more able and willing to switch away, such that Facebook has had to improve its offering to retain them). In addition, these video-calling services do not offer many of the core features and functions of social media, such as a social graph/network or a personalised feed of content, so they do not provide an effective alternative for Facebook's core social networking services. Based on the above, we are

---

[220] According to the Comscore data analysed below in Figure 14, Instagram's share of supply in terms of user time spent was in fact slightly higher in March 2021 (9.0%) than it was in September 2018 (8.5%), the point at which TikTok started growing from a zero/negligible share of the UK market.
[221] Ofcom found that the number of UK adults using Zoom and Microsoft Teams began to climb markedly from March 2020 (when the UK's first lockdown was introduced). Ofcom (2021) 'Early effects of Covid-19 on online consumption'.
[222] Ofcom 2021 'Online Nation' p. 28.

PX0684-104

of the view that video-calling services have primarily substituted for in-person meetings between friends, family, and work colleagues, and that they do not pose a significant competitive constraint on Facebook.

*Expanding market definition beyond social media*

5.121   We have considered whether the product market definition should include other types of offerings to attract and retain users' interest. In a broad sense, a range of different online and offline providers that serve different consumer needs are all seeking to capture user attention. However, the evidence reviewed in the Market Study shows that the strongest competitive constraints on Facebook are imposed by providers that are close substitutes, and that providers in other sectors are unlikely to provide a strong constraint on Facebook in relation to social media.[223] As discussed in paragraph 5.109, evidence shows that interacting with existing close contacts (ie friends and family) is the most important reason for which consumers access Facebook Blue,[224] and that Facebook additionally offers a wide portfolio of services that is unmatched by any other platform.[225]

5.122   The Parties submitted[226] that,

> 'The CMA's approach to market definition does not recognise the impact of any interactions between the two sides of the market (which an approach based on economic substitutability and the hypothetical monopolist test would incorporate). However, at several points in its Provisional Findings, the CMA recognises the indirect or 'cross-side' network effects between the user side and the advertiser side for ad-funded companies which aim to maximise user time spent in order to maximise advertising revenues. This analysis clearly supports Facebook's view that there is a relevant economic market for user attention that is then monetised through advertising, and so that Facebook competes with all platforms that also compete for (finite) user attention given the consequent impact on advertising revenues.'

5.123   We do not agree that there is a relevant economic market for user attention. Two-sided platforms, which intermediate between two distinct customer groups, may be characterised by indirect network effects, where the value of the product for customers on one side of the platform depends on the volume

---

[223] Market Study, paragraphs 3.198-3.201.
[224] Market Study, paragraph 3.186 and Table 3.2.
[225] Market Study, paragraph 3.191.
[226] Parties' Response to Provisional Findings, paragraph 4.11.

PX0684-105

of users on the other side.[227] However, it does not follow from the fact that Facebook monetises its social media user base through advertising that there must be a wider market for user attention. Facebook competes for an audience with other social media platforms/services that are close substitutes, and is then able to generate advertising revenue on the basis of this audience.

5.124 Finally, we note that we have not seen evidence to contradict the Market Study findings set out above, nor have the Parties supplied evidence demonstrating that these wider platforms/services provide a meaningful competitive constraint on Facebook. We therefore have concluded that our competitive assessment of the Merger is focused on the **supply of social media**.

### *Geographic market definition: social media*

5.125 The Parties submitted that their services are available on a global basis (subject to language variations). This is consistent with the European Commission's findings in *Facebook/WhatsApp*, which concluded that the geographic scope for the market for social networking services was at least EEA-wide, if not worldwide.[228]

5.126 We have not received any evidence to indicate that Facebook and its competitors' social media services are not generally available to users throughout most of the world.[229] We therefore have concluded that we should assess the effects of the Merger on the **supply of social media globally**.[230]

### *Facebook's position in social media*

5.127 As noted above, Facebook runs several social media platforms, most notably Facebook Blue, Messenger, Instagram, and WhatsApp. GIPHY integrates with Facebook's and other parties' social media platforms through its API/SDK.

5.128 Evidence obtained in the context of the Market Study shows that Facebook's portfolio of social media platforms (Facebook Blue, Facebook Messenger, Instagram, and WhatsApp) caters to a wide range of user needs. Facebook

---

[227] Merger Assessment Guidelines, paragraph 4.21.
[228] *Facebook/WhatsApp,* paragraph 68.
[229] We note that some services may not be available in selected locations, such as China.
[230] We note that there may be some countries that have a different set of social media platforms, for example China.

PX0684-106

Blue in particular stands out as a platform that can serve a broad range of consumer needs; as such, it may be seen as a 'must-have' by consumers.[231]

5.129   By contrast, other platforms, such as those listed in paragraph 5.101, while sharing some common functionalities, are differentiated in their users' needs and provide a more specialised offering.[232] For instance, Snapchat emphasises communication amongst close friends, especially through visual messages, and is commonly perceived as a more 'playful' and private platform which encourages its users to present themselves more authentically.[233] We consider that in practice, the specialisation of some social media platforms means that the competitive constraints are asymmetric, with the specialised platforms competing with only part of Facebook's offering or for a particular segment of Facebook's audience. The asymmetric constraints are evidenced by the cross-visiting analysis set out further below.

5.130   Our analysis of competitive constraints on Facebook below excludes YouTube. The Parties submitted that excluding YouTube is unreasonable given that it is an O&O website on which users can share content and interact with each other and accounts for a large share of users' time, and thereby exercises a competitive constraint on Facebook. The Parties submitted that Facebook responded to static and dynamic competitive pressure posed by YouTube, citing Instagram's announcement that it was no longer a photo sharing app and was expanding increasingly into video-sharing (see paragraph 5.104(b)).

5.131   However, in our view, excluding YouTube from the shares of supply analysis is appropriate based on the evidence that we have seen which indicates that YouTube does not impose a strong competitive constraint on Facebook. Ofcom's survey evidence and Google's internal documents, reviewed in the course of the Market Study, indicate that users access YouTube principally to watch videos (especially entertainment and 'how-to' videos), with 'keeping in touch with friends and family' *not* featuring as an important reason to access YouTube for 85% of respondents.[234] By contrast, and as noted above, 'keeping in touch with friends and family' was the top reason to access Facebook Blue (important for 79% of respondents) and was the third-top reason to access Instagram (important for 59% of respondents).[235] YouTube's focus is on providing video content rather than social networking and

---

[231] Market Study, paragraphs 3.163 and 3.193.
[232] Market Study, paragraphs 3.160 to 3.163.
[233] Market Study, paragraph 3.191.
[234] Ofcom 2019 'Online Nation'.
[235] Ofcom 2019 'Online Nation'.

communication services; it does not have a 'social graph'.[236] Thus, we have concluded that although YouTube, Facebook Blue, and Instagram have some features in common (eg offering social video capabilities, as discussed earlier at paragraph 5.117) and may act as substitutes for each other for certain activities, YouTube does not offer an effective alternative to Facebook Blue or the Facebook family of apps overall, despite its comparable reach and levels of consumer engagement, due to its more limited/specialised nature.[237]

5.132  Facebook submitted several internal documents to the Market Study, including [✂].[238]

5.133  Based on the evidence above, we have concluded that there is limited direct competition between YouTube and Facebook.

5.134  We analysed shares of supply and patterns in multi-homing in the UK social media market, as evidence for our assessment of Facebook's market power. We found that the Facebook family of apps has maintained its leading position in this market, accounting for a large majority of time spent through to March 2021, and that the majority of users of other social media platforms also use Facebook platforms, but that the reverse is not true.

5.135  Figure 14 shows the total time spent by UK consumers on social media platforms between January 2016 and March 2021.

---

[236] Google has confirmed to the CMA in the course of this Merger Investigation that YouTube does not have a 'social graph'. Social graphs give social media platforms the ability to identify connections between consumers. Therefore, YouTube cannot recommend videos based on consumers' friends' viewing behaviour or recommend content users may like based on friends' activity, as done by other social media platforms such as Facebook and Instagram. See Market Study paragraphs 3.184 to 3.188.
[237] We are of the view that YouTube would pose even less of a constraint on Messenger and WhatsApp than on Facebook Blue or Instagram, given the former are services to message and call with individual or small groups of pre-existing personal contacts, which are not services offered by YouTube.
[238] Market Study, paragraph 3.185.

PX0684-108

**Figure 14: Total time spent on social media platforms, UK**



Source: CMA analysis of Comscore data supplied by Comscore (for the period January 2016 to January 2020) and supplied by Facebook (for the period February 2020 to March 2021). Figures include MMX Multi-Platform, Total Digital Population, Desktop aged 6+, Mobile aged 13+, UK.
Note: Facebook includes Messenger as these are grouped in Comscore's data available to us. Facebook Group includes Facebook, Messenger, Instagram, and WhatsApp. Data for Tumblr was not available to the CMA for the period March 2020 to March 2021; we have therefore excluded Tumblr from this analysis.

5.136  Figure 14 shows that consumers spend the greatest quantity of time on Facebook's platforms, most notably on Facebook Blue (including Messenger)[239] itself. Having said this, the picture is not an entirely static one: new social media platforms have emerged and grown over time. Snapchat experienced fairly rapid growth from early 2017 and TikTok experienced a surge in time spent on it from early 2020.[240,241] We saw an increase in social media use, especially use of Facebook Blue, around March/April 2020, corresponding to the start of the Coronavirus (COVID-19) pandemic. After this, the use of Facebook Blue decreased from this peak. Figure 14 shows that Facebook Blue remains by far the most heavily used social media platform, and that this has persisted over a number of years.

---

[239] In this analysis, Facebook Blue and Facebook Messenger are grouped together since they are not disaggregated in the Comscore data available to us.
[240] Such platforms may be especially popular with certain demographics – see more in paragraph 5.139 below.
[241] The growth of TikTok is discussed also in the Ofcom report 2021 'Online Nation'. For instance, see pages 87-90.

PX0684-109

5.137  Table 4 shows the shares of supply based on total UK user time spent, for 2020 and for the first quarter of 2021.

**Table 4: Shares of supply by user time spent on social media, UK**

| Platform | Share of supply (2020) | Share of supply (Jan-Mar 2021) |
|---|---|---|
| Facebook Blue and Messenger | 52.7% | 48.8% |
| WhatsApp | 12.3% | 13.9% |
| Instagram | 7.8% | 8.7% |
| *Facebook Group* | *72.8%* | *71.5%* |
| TikTok | 9.9% | 12.4% |
| Snapchat | 7.1% | 4.7% |
| Twitter | 5.4% | 6.5% |
| Pinterest | 1.6% | 1.7% |
| LinkedIn | 1.6% | 1.4% |
| Reddit | 1.3% | 1.5% |
| Tumblr | 0.4% | 0.4% |

Source: CMA analysis of Comscore MMX Multi-Platform data supplied by Facebook. Total Digital Population, Desktop aged 6+, Mobile aged 13+, UK.

Note: Facebook Group includes Facebook Blue, Messenger, Instagram, and WhatsApp. With the exception of January and February 2020, data for Tumblr was not available to the CMA; we have therefore used data for equivalent months from 2019 as a proxy.

5.138  Table 4 shows that Facebook Blue plus Messenger have by far the highest share of user time spent in the UK, at 53% in 2020, declining slightly to 49% in the first quarter of 2021. The Facebook Group as a whole (including also Instagram and WhatsApp) had a consistent combined share of supply of around 72%. While the share of the Facebook Group has gradually declined somewhat over the years as the market has grown, it has nevertheless remained very high, persistently well over 70%.[242] The shares held by most other platforms have been, and continue to be, significantly lower, with TikTok representing the next highest share at 10% (2020), growing slightly to 12% (first quarter of 2021).

5.139  Social media platforms may be differentiated on the basis of their user base, with certain platforms being particularly popular amongst consumers within different age segments.[243] This is pertinent to our analysis because the evidence, although mixed, suggests that GIFs may be more popular with younger users (see evidence on demographics of GIF usage in Chapter 4, Industry Background). One third party told us that it would choose certain platforms (Snapchat, Twitter, TikTok, or Instagram) to target a younger

---

[242] Based on data used in the Market Study, going back to mid-2015. The Parties have submitted that, based on an appropriately defined market, Facebook's share would be between 13% and 21% (Annex 1 of Parties' Response to Provisional Findings; this paper was originally submitted in March 2020 by Facebook to the Market Study).
[243] For example, see discussion of Snapchat in Market Study, Box 3.6.

PX0684-110

demographic, whereas Facebook Blue would be used to target an older audience.

5.140 Data collected and analysed in the context of the Market Study (using February 2020 data) indicated that, in the UK, Instagram and Facebook Blue are the two most popular platforms amongst the youngest age group (18 to 24 year-olds) in terms of the number of MAUs.[244] However, by share of total time spent, Snapchat accounted for more than Facebook Blue and Instagram combined at that time.

5.141 We examined more recent data (from February 2020 to March 2021) on social media platforms' shares of time spent by users in this age group in the UK. This is shown in Figure 15.

**Figure 15: Shares of supply by user time spent (18 to 24 year-olds), UK**



Source: CMA analysis of Comscore MMX Multi-Platform data supplied by Facebook. Total Digital Population, 18-24 year-olds, UK.
Note: Facebook Blue includes Messenger. Facebook Group includes Facebook, Instagram, and WhatsApp. Tumblr has been excluded due to lack of data.

5.142 Figure 15 shows that amongst 18 to 24 year-olds, the Facebook family of apps (Facebook Blue, Messenger, Instagram, and WhatsApp) together accounted for the highest share of total user time spent: 39% in March 2021.

---

[244] While Comscore data is available for teenagers and selected data for children, the sample sizes are very small; therefore, we use the 18-24 age group to best represent the youth cohort.

PX0684-111

While Facebook Blue's share remained substantial, it declined slightly from 21% to 18% and had lower engagement (by time spent) among this group than among its overall user base.

5.143   Snapchat's share (38%), which began this period nearly as high as the Facebook Group share among this 18-24 age group, declined substantially during the first half of 2020 and then remained flat at around 16-18% through to March 2021.[245] TikTok's performance was a mirror image of this, growing rapidly from 14% (February 2020) to 34% (August 2020) and levelling off thereafter. We found that Facebook's share has remained largely unaffected throughout these developments.

5.144   Consumers typically use multiple different social media and messaging platforms, 'multi-homing' between them. To gauge the degree of multi-homing, we used Comscore's 'cross-visiting' data for selected major platforms.[246] Figure 16 shows the proportions of unique UK visitors to each (column) platform that also accessed each (row) platform during the month of March 2021.

**Figure 16: Consumer cross-visiting behaviour amongst social media platforms, March 2021 (UK)**

|  | Facebook Blue & Messenger | Instagram | WhatsApp | Snapchat | TikTok | Twitter |
|---|---|---|---|---|---|---|
| **Facebook Blue & Messenger** | 100.0 | 90.2 | 91.8 | 83.7 | 84.4 | 89.4 |
| **Instagram** | 62.5 | 100.0 | 67.0 | 86.9 | 80.1 | 72.3 |
| **WhatsApp** | 70.3 | 74.1 | 100.0 | 83.7 | 77.5 | 69.1 |
| **Snapchat** | 20.4 | 30.5 | 26.6 | 100.0 | 45.3 | 25.0 |
| **TikTok** | 29.9 | 40.9 | 35.8 | 66.0 | 100.0 | 37.5 |
| **Twitter** | 45.8 | 53.4 | 46.2 | 52.7 | 54.3 | 100.0 |

Source: CMA analysis of Comscore MMX Multi-Platform data supplied by Facebook. Total Digital Population, UK.
Note: Facebook Blue includes Messenger. Figures show the percentage of unique visitors that visited the column entity that also visited the row entity [bolded] during March 2021. For example, 83.7% of Snapchat's unique visitors also visited Facebook Blue & Messenger.

5.145   This analysis confirms that multi-homing is prevalent, but also asymmetric in favour of the Facebook family of apps (Facebook Blue and Messenger, Instagram, and WhatsApp). The large majority of other major platforms' users cross-visited with Facebook Blue, ranging from 84% of Snapchat and TikTok

---

[245] [✂]. We are not able to fully account for this difference and acknowledge the limitations of Comscore's data – see further explanation in Appendix D: Market shares methodology.
[246] Comscore's cross-visiting data does not account for intensity of use. We are also unable to assess the extent to which individual consumers cross-visit across more than two platforms, eg the proportion of consumers that accessed three or four platforms within the month.

PX0684-112

users to 89% of Twitter users. Similarly, the majority of Snapchat, TikTok and Twitter users also visited Instagram and WhatsApp. Among the Facebook Group platforms, Facebook Blue (including Messenger) is the most cross-visited. In contrast, the users of Facebook Group platforms cross-visited with non-Facebook platforms at far lower rates, in most cases well below 50%, the only exception being 53% of Instagram users also visiting Twitter.

5.146  The Parties argued that barriers to switching are low, and the fact that the results are asymmetric is a result of the size of the relative audiences; given users have a finite amount of time, all these other apps pose a constraint on Facebook because of the trade-off for consumers in choosing to spend more or less time on each app.

5.147  However, in our view, the cross-visiting analysis suggests that other social media platforms are accessed alongside the Facebook family of apps rather than as an alternative. This suggests that, even when consumers are using other platforms, they are not switching *away* from the Facebook Group. Rather than being displaced by newer entrants, the Facebook platforms have retained their central position as 'must-haves', indicative of market power.

5.148  Overall, our quantitative analysis set out above is consistent with the analysis presented in the Market Study. The main difference identified is some changes in the shares of time spent on smaller social media platforms, particularly among younger people. However, this development has not altered the share of Facebook in a material way.

5.149  The Parties submitted that, since 'Facebook offers its service to users for free, in common with other attention platforms, it is pricing at the competitive level', and this indicates it has no market power.[247]

5.150  However, the nature of two-sided markets is such that a provider may offer its services below cost, or free of charge, to one side of the market while monetising the other side. This in itself is not informative of whether the provider has market power in one or both sides of the market. While Facebook does not charge users directly for access to its platforms, it earns a positive return through revenues from advertisers, who seek as large an audience as possible. We discuss a similar point with respect to GIPHY's services above at paragraph 5.90 (noting that GIPHY is much earlier in its monetisation journey than Facebook).

---

[247] Parties' Response to Provisional Findings, paragraph 4.15.

111

5.151   Furthermore, we recognise that market power can be exercised through non-price parameters such as quality, range, service, and innovation.[248] The Market Study found that consumers could face a range of potential direct impacts from a lack of competition in social media, including reduced innovation and choice, excessive extraction of data, and low quality of service.[249] In addition, as discussed in the Market Study, whilst Facebook's social media services are provided at zero monetary price, it is plausible that the price charged in more competitive circumstances would be negative, with consumers rewarded for their engagement with the service because of the user-level data they provide in so doing.[250]

5.152   We considered whether Facebook's market power has been sustained over time and reinforced through **high barriers to entry into social media**. The Parties have submitted that Facebook's position derives from continual innovation rather than barriers to entry. We disagree with this characterisation. As described in the Market Study,[251] although Facebook initially grew through its innovative social networking service, it now has had a much larger network than other platforms for many years. Facebook's large scale, and same-side and cross-side network effects,[252] mean that Facebook benefits from positive feedback loops. For example, its large network of connected users helps it to attract and retain more consumers, while also attracting developers and content providers, which further increases its value to consumers. All social media platforms contacted as part of the Market Study agreed that network effects are important in this industry.[253] The Market Study found that network effects act as a barrier to entry and expansion for social media platforms and prevent smaller competitors from imposing a strong competitive constraint on Facebook. Their less developed consumer networks mean that smaller competitors are unable to fulfil the same range of consumer needs as Facebook. Therefore, consumers' ability to switch away from its services is restricted and Facebook experiences limited direct competition from competitors.[254] In addition to network effects, other key barriers to entry and expansion include lack of interoperability and access to

---

[248] Merger Assessment Guidelines, 2.4-2.5.
[249] Market Study, paragraph 2.84.
[250] Market Study, paragraph 2.84.
[251] Market Study, paragraphs 3.176 – 3.183, and section on 'Network Effects' from 3.203.
[252] Same-side network effects refers to network effects within one side of a multi-sided platform (eg the greater the number of Facebook's social media users, the more likely they are to attract more users). Cross-side network effects refers to network effects from one side of the platform to another (eg the greater the number of Facebook's social media users, the more likely they are to attract more content developers and advertisers).
[253] Market Study, paragraph 3.204.
[254] Market Study, paragraph 3.205.

PX0684-114

data[255] (see further discussion of Facebook's data advantages as relating to display advertising from paragraph 5.192(d)).

5.153 These findings are reinforced by the scarcity of new entrants at a meaningful scale into the market in recent years. As shown in the Market Study (Box 3.6), in the past decade only Instagram (now owned by Facebook), Snapchat, and TikTok have entered the UK market and achieved a share of more than 5%. These platforms are quite differentiated and remain far smaller than Facebook Blue.[256] Indeed, there has been no successful entry in the last 10 years by a direct competitor with a comparable set of services to those provided by Facebook, with Google's attempt, Google+, having failed.[257]

5.154 Taking account of the evidence set out above we have concluded that **Facebook has significant market power in social media**.

## Display advertising

5.155 In this section we consider the market definition relevant to the Parties' advertising activities. Our assessment is informed by the evidence collected in the course of the Market Study, as well as more recent data collected in the course of this investigation to update the estimated shares of supply in the UK display advertising market.

5.156 The Parties are, or in the case of GIPHY was pre-Merger, active in various forms of **digital advertising**, an increasingly important segment of advertising. The Market Study identified three broad types of digital advertising:

*(a)* **Search advertising** – where advertisers pay online companies to link their company website to a specific search word or phrase so that it appears in relevant search engine results.

*(b)* **Display advertising** – where advertisers pay online companies to display advertising using a range of advertising content types shown within defined ad units on web pages or mobile apps.

*(c)* **Classified advertising** – where advertisers pay online companies to list specific products or services on a specialised website serving a particular

---

[255] See discussion in Market Study, paragraphs 3.226 to 3.240.
[256] Snapchat was founded in 2011. TikTok was formerly called musical.ly; it was rebranded as TikTok in August 2018. Twitter launched in 2006; its share of UK time spent on social media has remained at around 4-6% over many years.
[257] Market Study, Box 3.7.

PX0684-115

market segment.[258] This type of advertising accounts for a small proportion of digital advertising.[259]

5.157   Facebook primarily derives its revenues from display advertising, by offering to advertisers 'inventory' on its social media platforms (most notably Facebook and Instagram).[260]

5.158   Prior to the Merger, GIPHY was a relatively new entrant into digital advertising and had developed a novel product called 'Paid Alignment'. These monetisation efforts involved offering to promote sponsored GIFs in its search results and in its 'trending feed'. As discussed below (from paragraph 5.175), we consider this type of advertising to have similarities to the type of display advertising offered on Facebook platforms, but also to have some differences.

5.159   As noted above in the Social Media section, the Parties submitted that the CMA is required to carry out a robust market definition exercise, based on empirical evidence, in circumstances where its conclusion of 'market power' is based solely or primarily on the level of market share, and that the CMA has failed to undertake a proper market definition exercise based on economic substitutability.[261] The Parties submitted that Facebook strongly disagrees with the conclusions of the Market Study, which considered display advertising to be distinct from other forms of advertising, and that it considers all forms of advertising to be substitutable.[262] They characterised the CMA's approach to delineating between types of advertising as based on arbitrary functional characteristics and hinging on an unsupported assumption that search advertising is relevant for targeting consumers with an 'intent to purchase' whilst display advertising is about brand awareness.[263] The Parties argue that advertisers allocate their budgets across all different advertising channels with the goal to maximise their return on investment; and that the characteristics and purpose of search and display have significantly converged over the past years.[264]

---

[258] Market Study, paragraphs 5.6.

[259] Market Study, paragraph 16.

[260] 'Inventory' is the term used to describe space on an app or a website, where an ad can be placed amongst other content.

[261] Parties' Response to Provisional Findings, paragraph 4.6.

[262] Parties' Response to Provisional Findings, paragraph 4.5(b). In support of their arguments, the Parties have re-submitted a paper on 'Market Definition and Market Power' by Frontier Economics that Facebook submitted in March 2020 in response to the Market Study Interim Report. This paper was first considered by the CMA in the course of the Market Study. We have also reviewed the arguments and evidence set forth in this paper and consider them, as relevant, in the sections below.

[263] Parties' Response to Provisional Findings, paragraph 4.5. The typical campaign goals associated with display and search advertising are discussed further below; these have not been assumed by the CMA but rather based on evidence gathered through market testing in the course of the Market Study.

[264] Parties' Response to Provisional Findings, paragraph 4.5

PX0684-116

5.160  We assessed a range of evidence on the availability of substitutes within and outside display advertising. Our assessment takes into account the views of advertisers submitted in the course of this investigation, and the Parties' internal documents, as well as evidence gathered as part of the Market Study, which collected views of media agencies and advertisers via interviews and a qualitative survey. We note that we do not rely solely on Facebook's share of supply for our assessment of its market power, but also take into account barriers to entry and expansion (paragraph 5.192), evidence on Facebook's profitability (paragraph 5.195), and the views of market participants (paragraph 5.196).

5.161  As regards GIPHY's Paid Alignment services, the Parties submitted that these were not a form of display advertising and did not compete with Facebook's advertising business, and that it is not clear how the CMA considers that there is a horizontal overlap where GIPHY's product is not a display advertising product.[265]

5.162  In our Provisional Findings, we provisionally concluded that the type of advertising offered by GIPHY was closer, in terms of competitive interaction, to Facebook's display advertising services than to search advertising.[266] As set out above at paragraph 5.4, in its assessment of the impact of the Merger on competition, the CMA considers evidence on concentration measures alongside evidence of closeness of competition. The Merger Assessment Guidelines note that evidence on concentration and on closeness of competition can be interpreted and taken into account without the need for a precise definition of the relevant markets.[267] Consistently with this, and not least because GIPHY's advertising product was novel and still relatively nascent in its development at the time of the Merger, we do not believe that it is necessary to reach a conclusion as to the precise categorisation of GIPHY's advertising product relative to display advertising.[268] We have focused instead, for the purpose of our assessment of horizontal effects (Chapter 7), on the closeness of competition between the merging parties' advertising services.

5.163  The rest of this sub-section is structured as follows:

(a)  First, we review the evidence on substitutes within and outside display advertising. We address the Parties' argument that all forms of advertising

---

[265] Parties' Response to Provisional Findings, paragraph 4.5(b).
[266] Provisional Findings, paragraph 5.140.
[267] Merger Assessment Guidelines (CMA129), paragraph 9.1.
[268] To be clear, while we have not reached a conclusion as to the precise categorisation of GIPHY's advertising product, we have reached the conclusion that it would have been a close substitute for the type of advertising provided by Facebook. See discussion of our assessment of GIPHY's advertising product from paragraph 5.175.

PX0684-117

compete by considering in turn the substitutability between display and search advertising, between display and traditional advertising, and within segments of display advertising. In this context, we also discuss the form of advertising offered by GIPHY prior to the Merger.

(b) Second, we discuss the geographic market definition.

(c) Finally, we review Facebook's position in display advertising, conducting a shares of supply analysis and also taking into account evidence presented in the Market Study, which found that Facebook has significant market power in display advertising.

### Product market definition: display advertising

5.164 Display advertising primarily meets the objectives of advertisers who want to reach 'out-of-market' consumers, ie raising brand awareness and reaching new audiences that might not yet have shown interest in the advertiser's products or services. Display advertising is typically sold on the basis of how many times it is viewed, and measured on the basis of cost per thousand impressions (**CPM** or cost-per-mille).[269]

### Display vs search advertising

5.165 Evidence from the views of market participants gathered for the purposes of the Market Study indicates that there is only **limited substitutability between display and search advertising from the advertiser perspective**. All media agencies and most advertisers told the CMA that search and display advertising were not substitutable. This is mainly because they perform different roles within the customer purchase journey:[270]

(a) Search is primarily intent-based advertising designed to provide immediate answers to consumers who have already shown interest in buying the product and are at the end of the purchase journey ('in-market consumers'); and

(b) Display is suitable for raising brand awareness and reaching new audiences that might not yet have shown interest ('out-of-market consumers').[271]

---

[269] Market Study, paragraphs 2.47-2.52.
[270] Market Study, Appendix N, paragraphs 67 to 76.
[271] Market Study, Appendix N, paragraph 67.

PX0684-118

5.166   Most advertisers said that they set budgets for search and display advertising independently and do not allocate them interchangeably.[272] Display advertising is primarily chosen by advertisers with the objective of targeting increased brand awareness for specific audiences.[273] Key performance indicators (KPIs) for display advertising tend to be focused on the reach achieved with a specific audience group. In contrast, search advertising is chosen by advertisers with the objective of converting 'in-market' consumers.[274]

5.167   However, the distinction between search and display is not absolute in all cases. In the Market Study, there was evidence, including from Facebook, that some advertisers are increasingly using display advertising for in-market conversions by convincing consumers who are already considering a product to actually purchase it, as well as for more general brand awareness.[275] For some of the spend of those advertisers, search advertising may be a substitute for display advertising. However, search advertising is unlikely to be a viable alternative for advertisers targeting brand awareness.

5.168   The Market Study also noted some differences in the parameters on which suppliers of search and display advertising compete. For example, the desire to target specific audiences effectively means that the use of user data is key for display advertising, significantly more so than for search advertising. Consequently, access to granular user data is a key dimension of competition between display advertising suppliers.[276]

5.169   A further distinction between display and search advertising stems from the fact that suppliers of display advertising face a trade-off in deciding how much inventory to create. A higher ad load (ie a greater number of adverts displayed to each user) may mean greater immediate financial reward. However, this can come at the expense of the consumer experience. Unlike search advertising, which is shown in response to specific consumer queries, display advertising is typically unwanted by consumers. This suggests there may be a

---

[272] Market Study, Appendix N, paragraph 73.
[273] Market Study, Appendix N, paragraphs 66 to 69.
[274] Market Study, Appendix N, paragraphs 66 to 69.
[275] Market Study, 5.120. See discussion of 'Search vs display' in Market Study, Appendix N. Some advertisers and media agencies responding to the CMA's questionnaire noted that search can also sometimes be used as an upper funnel to build brands, and display can sometimes be an effective sales driver. One advertiser stated that, as budgets for search advertising continue to increase, this allows the advertiser to target a higher level of generic keywords and therefore move further up the purchase funnel. Another advertiser stated that search and display can sometimes be substitutable depending on campaign objectives, with another advertiser stating that the benefits of search and display are most similar when there is a conversion goal as a key objective.
[276] Market Study, paragraphs 5.120, 5.127, 5.128.

PX0684-119

greater imperative for suppliers of display advertising to limit the quantity of advertising shown so as not to harm the consumer experience.[277]

5.170  Based on the evidence set out above we have concluded that for most advertisers there is a distinction between display and search, and that search advertising is not a close substitute for display advertising.

*Display advertising segments*

5.171  We have considered the following **segmentations within the display advertising sector**:

(a)  Video and non-video display advertising formats. From the demand side, evidence gathered in the Market Study was mixed as to the substitutability between these two formats. They convey the advertiser's message in different ways, with decisions on the format being taken early in the planning stages. However, on the supply side, Facebook's interface treats ad formats very similarly.[278]

(b)  Owned-and-operated[279] and open display advertising[280] channels. The Market Study found substitutability between these channels as advertisers choose among inventory across either channel depending on how the inventory can meet specific KPIs. The way advertising inventory is sold in these channels is also similar, typically involving real-time auctions or direct deals between advertisers and publishers.[281]

5.172  We have not seen any evidence in our investigation that undermines these findings of the Market Study, nor have we received any such evidence from the Parties. We therefore **assess the competitive effects of the Merger on the supply of display advertising, including both video and non-video formats, and both owned-and-operated and open display channels**. As regards video and non-video advertising formats, we did not need to conclude on whether these constitute a separate product market, as this would not have any bearing on the outcome of our competitive assessment.

---

[277] Market Study, paragraph 5.129.
[278] Market Study, paragraphs 5.124-5.126.
[279] Owned-and-operated platforms typically provide social media, which they use to attract consumer attention and create advertising inventory, which in turn they sell to advertisers using proprietary interfaces. They gather data on these consumers to enable advertisers to target specific audiences. (Market Study, paragraph 5.115).
[280] Open display is a market where publishers (such as suppliers of news media and app providers) also attract consumer attention through providing content, and serve ads amongst this content. The advertising inventory is sold through a complex chain of intermediaries, typically involving real-time auctions. (Market Study, paragraph 5.116).
[281] Market Study, paragraph 5.117.

PX0684-120

*Display advertising vs traditional advertising*

5.173  As noted above, the Parties submitted that all types of advertising (ie including non-digital) are substitutable.[282] In the Market Study, the CMA considered whether **traditional advertising media** (non-digital and offline advertising) may pose a competitive constraint on display advertising, but found this to be unlikely.[283] The evidence gathered in the Market Study indicated that all respondents (including both smaller and larger advertisers) saw online digital advertising as more important than offline advertising and many did not use any offline advertising at all.[284] When deciding how and where to advertise, respondents tended first to think about whether to advertise digitally or offline, indicating there is limited substitutability for advertisers between online and offline.[285] Some large advertisers thought that video-on-demand was the next best alternative to Facebook for display.[286] Nevertheless, advertisers may treat offline advertising as a complementary channel within their campaign to achieve certain KPIs. Of the respondents who did use offline media, reasons for doing so included: a matter of habit, wanting to support local businesses (eg magazines), building local presence (eg local newspapers), and targeting specific streets or postcodes (eg leaflet drops).[287]

5.174  Based on these views of advertisers and their reasons for choosing offline advertising (where they use it at all), and the fact that we have not seen any evidence to the contrary, we have concluded, consistent with the conclusion of the Market Study, that **offline is typically a complementary channel rather than a substitute for online display advertising**.

*Advertising offered by GIPHY*

5.175  The **advertising offered by GIPHY** pre-Merger involved an advertiser paying GIPHY to make the advertiser's GIF, or a set of GIFs, more prominent in the search results associated with certain search terms, and/or more prominent in the trending GIF feed (Paid Alignment). We considered the characteristics of this form of advertising and whether it was closer to display advertising, search advertising, or sits between the two.

5.176  The Parties submitted that GIPHY's Paid Alignment services are not a form of display advertising, that GIF ads are presented to users only in response to

---

[282] Parties' Response to Provisional Findings, paragraph 4.5(b).
[283] See evidence from Market Study, Appendix N, paragraphs 58 to 66.
[284] Market Study, Appendix N, paragraph 59.
[285] Market Study, Appendix N, paragraph 59.
[286] Market Study, Appendix N, paragraph 63.
[287] Market Study, Appendix N, paragraph 65.

PX0684-121

search terms, including on the trending feed which features GIFs for popular searches, and that GIPHY did not use user-level data to target ads (which they said the CMA described as an important characteristic of display advertising). In addition, GIPHY submitted that GIPHY and its advertisers considered GIF ads to be like search advertising, which is apparent from GIPHY's CPM (USD[✂]), which was well in excess of the display advertising average (USD1-USD3).[288] We address these points in turn below.

5.177   Consistent with our approach in assessing social media, we expect the strongest competitive constraints on Facebook as a provider of display advertising will be imposed by providers whose services could meet the same advertiser needs that can be fulfilled by Facebook platforms. The type of advertising offered by GIPHY involved increasing the prominence of sponsored content in the search results. However, the purpose of search in the context of GIFs is different to the typical purpose of search on general search engines such as Google or Bing. Search advertising on general search engines is presented when users use the engine to look up a product or a solution to a problem which they face (for example, someone searching for a gift may consider buying a box of donuts). In contrast, users searching for GIFs are looking for a way of expressing an emotion or feeling in messages or other modes of communication with others[289] (for example, a user looking to communicate hunger to a friend may use a GIF featuring donuts). Furthermore, individuals who receive a GIF sent to or shared with them by others (eg in their message chat) will have the ad displayed to them without having made any search. Therefore, we are of the view that Paid Alignment (at least in its form at the time of the Merger) is generally less likely to directly prompt a purchase of the product, and more likely to increase the user's brand awareness or affinity.[290] This means that the search term in GIPHY's advertising model merely helps to target the sponsored GIFs to specific audiences, rather than to identify an audience which may have an intent to purchase the product behind the sponsored GIF.

5.178   The promotion of branded GIFs within the 'trending feed' appears even more closely aligned to the concept of display (as opposed to search) advertising, since users experience these ads displayed to them without entering any search terms.[291] Whilst the content in GIPHY's trending feed is based, at least

---

[288] These CPM figures were submitted by GIPHY.
[289] The Parties submitted that GIFs are used to expressively convey emotions or as a way of demonstrating an understanding of popular culture. The Parties states that GIFs are predominantly used in messaging to express emotion and moods.
[290] This view is substantiated by the views of advertisers; see evidence below at paragraph 5.179.
[291] The Parties have noted that the GIF will only appear ultimately because of a specific search and must therefore be relevant to the conversation or interaction in question. In addition, for API services only the initial impression from the user who searched for the GIF would be monetised, ie the receiver of a GIF would not be monetised.

PX0684-122

in part, upon popular searches, the content is generic and not connected to the searches or intent of each particular user, which is the crux of the search advertising model of relevance.

5.179   GIPHY submitted its advertising model was like search advertising, but we note that in one of its internal documents discussing price-benchmarking for its Paid Alignment product, GIPHY commented that: 'GIPHY's search CPM is most closely on par with that of [✕] – although our search product is not necessarily comparable with that of [✕], in terms of user intent pre- and post-search', thus acknowledging the differences between Paid Alignment and search advertising (we discuss the comparisons in CPM at paragraph 5.181 below). In this same internal document, GIPHY referred to [✕] explicitly as a 'competitor' and included in its benchmarking exercise a range of social media platforms [✕], which the CMA notes provide display advertising (and not search advertising), as well as [✕]. Other documentary evidence appears to substantiate the view that GIPHY competed with Facebook and other providers of display advertising. For example, in an investor pitch, GIPHY compared its click-through rates to those of [✕], and also compared the lift in key brand metrics achieved by Paid Alignment campaigns with that achieved by [✕]. Likewise, market research studies commissioned by GIPHY from external agencies focused on assessing the impact of campaign media on consumers' perceptions of the brand, as measured by awareness, favorability, brand recommendation, and purchase consideration, rather than actions such as clicks or purchases (which is generally the case with search).

5.180   GIPHY has not provided any documentary or other evidence to show that its advertisers considered GIF ads to be like search advertising. The views of advertisers submitted to us also suggest that Paid Alignment (at least in its form at the time of the Merger) primarily serves the purpose of brand awareness, ie reaching out-of-market consumers. For example, one advertiser told us that its campaigns with GIPHY were to organically share its brands into different outlets with the primary goal of increasing brand awareness of its products. Another advertiser likened GIPHY's capability to reach a wide group of consumers very quickly to that of television advertising in previous years. A third advertiser, which ran several campaigns with GIPHY covering both search and trending feed, told us that 'awareness' was the marketing objective it was targeting with its GIPHY campaigns. Likewise, one advertising agency that had run various client campaigns with GIPHY told us it anticipated that Paid Alignment was better suited for driving upper funnel outcomes[292] because of the ads' format, efficiency and capacity to be shared

---

[292] Upper funnel advertising refers to messaging that reaches users before they are aware of the brand, product, or service.

PX0684-123

by users, although it had approached campaign testing with an open mind. As discussed above, brand awareness is the primary (although not necessarily only) goal of display advertising and contrasts to the primary goal of search advertising to convert in-market consumers who are close to the end of their purchase journey (see paragraph 5.165).

5.181  GIPHY submitted its CPM was higher than those of the typical range for display advertising. However, we note the following points:

(a)  The fact that the prices of products are similar does not mean they are competing. Conversely, products with different prices may be competing. For example, advertisers on GIPHY benefitted from the input of GIPHY's creative team in developing GIFs, and one ad agency ([✂]) said that certain advertisers considered 'impact to the brand (engagement metrics based on user experience) important so they chose GIPHY for the unique opportunities offered…'. Differences between typical display advertising CPMs and CPMs on GIPHY need to be considered in light of these qualitative differences.

(b)  The Market Study found that it is difficult to make direct comparisons between CPM on different platforms due to high variability and low transparency in pricing.[293] This high degree of variability is also reflected in GIPHY's pricing analysis document above, with display ad CPMs on several platforms well above the USD1-3 range cited in GIPHY's submission.

(c)  If GIPHY's CPM was around USD[✂] (per its submission), this is in fact closer to the CPM of display advertising platforms such as Facebook (which GIPHY stated was USD[✂] in its internal pricing analysis) than to Google's considerably higher CPM of around USD[✂]. A GIPHY internal document showing actual inventory utilisation and revenues by integration partner shows CPMs of around USD[✂] in the third and fourth quarters of 2019 and in the first quarter of 2020. An advertising agency that had used GIPHY for multiple client campaigns characterised GIPHY's CPM rates as generally efficient, with blended CPMs (across different units) tending to average around USD4, which it described as lower than similar services, which generally cost between approximately USD4 and USD10.

(d)  Finally, GIPHY was in the early stages of developing a novel advertising product and monetisation strategy. Therefore, in our view, GIPHY's CPMs

---

[293] Market Study, paragraph 5.192.

PX0684-124

in the initial stages of its monetisation are not necessarily informative as to how these would have evolved.

5.182  GIPHY's advertising product was novel and did not necessarily fall neatly into any single pre-existing advertising category. However, based on the evidence set out above, we have concluded that **the type of advertising that GIPHY was developing prior to the Merger through its Paid Alignment services would have been a close substitute for display advertising services of the type offered by Facebook**. In our competition assessment, we refer for convenience to GIPHY's entry and expansion in display advertising. To be clear, this reflects our view that GIPHY's Paid Alignment service is a close substitute to Facebook's display advertising services, regardless of whether the service should be categorised as 'display advertising'.

5.183  We consider the scope for GIPHY's advertising model to compete against Facebook's display advertising activities in Chapter 7, Horizontal Effects.

### *Geographic market definition: display advertising*

5.184  We consider that advertisers are often interested in targeting users with particular characteristics, including location, language and culture. For example, businesses advertising on Facebook can decide the country, city or community in which to run their advertising campaigns.[294] The Parties submitted that some demand from advertisers is likely to be national. In *Facebook/WhatsApp,* the European Commission concluded that the online advertising market and its sub-segments (including the display advertising market) should be defined as national in scope or along linguistic borders.[295]

5.185  We have concluded that we should assess the effects of the Merger on competition with Facebook in the **supply of display advertising in the UK**.

### *Facebook's position in display advertising*

5.186  Below we consider a range of evidence to assess whether Facebook holds market power in display advertising, including shares of supply, competitive constraints from within and outside the display advertising market, barriers to entry, and profitability.

---

[294] Facebook advertising targeting options | Facebook for Business.
[295] *Facebook/WhatsApp,* paragraph 83. See also, the Market Study, including Appendix N: understanding advertiser demand for digital advertising.

PX0684-125

5.187  We analysed the shares of supply of Facebook, Instagram, other major O&O platforms,[296] and the Open Display[297] segment of the UK display advertising market in 2020. For further details of the methodology used, see Appendix D: Market shares methodology.[298] The results are shown in Table 5.

**Table 5: Shares of supply in display advertising (UK), 2020**

|  | Share of supply |
|---|---|
| Facebook | [30-40]% |
| Instagram | [10-20]% |
| *Facebook Group* | *[40-50]%* |
| YouTube | [5-10]% |
| Other O&O* | [5-10]% |
| Open Display | [30-40]% |
| **Total** | **100%** |

Source: CMA analysis based on UK display advertising revenues submitted by Facebook, Instagram, YouTube, Amazon*, LinkedIn*, Pinterest*, Snapchat*, TikTok*, and Twitter*, and data on the number and value of ads served through Google AdManager, Google AdSense, Google AdMob, Taboola, and Freewheel (which together account for the majority of the Open Display segment).

5.188  Table 5 shows that the two largest O&O platforms are Facebook [30-40%] and Instagram [10-20%], giving the Facebook Group a combined share of [40-50%]. YouTube [5-10%] is the next largest O&O platform, with all the others together accounting for a further [5-10%]. The Open Display segment accounts for the final [30-40%] of the display advertising market.

5.189  We note that the Facebook Group's share is high and has remained so, although there was a decline from its share of [50-60%] in 2019 (based on the findings of the Market Study).

5.190  We further note that within the O&O segment, the Facebook Group has a significantly higher share of [70-80%].[299] As with the whole display advertising market, its share in this segment has declined but remains broadly consistent with its share in 2019 (based on the findings of the Market Study).

5.191  We also considered the competitive constraints faced by Facebook in display advertising. As concluded above in paragraph 5.154, we found that Facebook has significant market power in social media, which means that users have limited choice in social media platforms.[300] Due to significant network effects,

---

[296] YouTube, Amazon, LinkedIn, Pinterest, Snapchat, TikTok, and Twitter.
[297] The Open Display segment refers to the many publishers of smaller scale (for example, newspapers and app providers) which sell their inventory to advertisers, typically through a complex chain of intermediaries to auction advertising in real time.
[298] Our methodology is broadly consistent with that used in the Market Study, with a few small differences as discussed in detail in Appendix D: Market shares methodology.
[299] Based on the same sources and calculations as in Table 5, but removing from the denominator the Open Display segment.
[300] Market Study, paragraphs 5.135-5.136.

PX0684-126

this also means that advertisers are limited in their choice as no other social media platform offers similar audience reach. Second, as a display advertising platform, Facebook's only significant competitor is Google, which runs Google DV360, Google's demand-side platform for purchasing advertising in open display, followed by a number of smaller platforms that may pose a weaker constraint.[301] Third, as discussed at paragraphs 5.165 to 5.169 and 5.173 above, we have found little evidence of constraints from other forms of advertising outside the display advertising sector (ie search advertising and traditional advertising media).

5.192   Furthermore, Facebook's market power is reinforced by barriers to entry and expansion in display advertising:

(a)   *User side barriers*: Suppliers of display advertising need to grow, and then maintain their user base in order to gain access to consumer attention and data. To do this, suppliers need to generate an innovative or engaging product or service.[302]

(b)   *Advertiser behaviour*: Facebook's platform has a wide reach on the user side and is often the only display advertising platform an advertiser uses. Whilst some larger, more sophisticated advertisers may have little difficulty adding a new display advertising platform to their portfolio, smaller advertisers may find using an additional platform too costly.[303]

(c)   *Economies of scale*: Significant investments are required to develop an effective display advertising platform. These include technology, such as developing a website/app and back-end functionality to support the platform and technical equipment (eg servers); facilities, such as offices; and equipment and marketing, such as launch and brand awareness campaigns. The investments and fixed costs required to develop and maintain these inputs are likely to give rise to economies of scale.[304]

(d)   *Data advantages*: Consumer data has a significant value to advertisers in that it allows them to better target audiences. Access to higher quality or more granular data allows for more precise targeting of more specific audiences. Granular data is particularly valuable when combined with high reach among different audience types using the platform, as this allows for relatively large numbers of very specific audiences to be targeted. These factors can allow platforms with better data to sell their advertising inventory at higher prices. This creates a substantial

---

[301] Market Study, paragraphs 5.137-5.145.
[302] Market Study, paragraph 5.154.
[303] Market Study, paragraphs 5.156-5.158.
[304] Market Study, paragraphs 5.159-5.161.

PX0684-127

competitive advantage for Facebook and Google, both of which have access to much richer and higher quality datasets and benefit from much greater scale and reach than their rivals.[305]

5.193  With respect to point (d) on data advantages, we note that there are several recent and anticipated regulatory developments and third-party platform changes to privacy policies that impact tracking technologies used in display advertising.[306] Evidence gathered in the course of the Market Study and recent phase 1 merger investigation into *Facebook/Kustomer*,[307] including from Facebook's internal documents and third party views, suggests that while such changes may present a material challenge to Facebook's ads business, they will also impact most providers of display advertising, and that Facebook is better positioned than most of its rivals in this regard.[308]

5.194  We have not seen evidence of significant changes in Facebook's position in the display advertising market (or the O&O segment, or digital advertising more generally) since the publication of the CMA's Market Study.

5.195  Evidence shows that Facebook may have benefited from developments in the advertising industry, and the increase in online activity more generally, over the past 18 months:

   (a)  As discussed in Chapter 2, The Parties, Merger and Rationale, the Facebook Group's revenues and EBIT both increased substantially between 2019 and 2020. In line with this, Ofcom's 2021 'Online Nation' report found that Facebook (together with the other largest digital firms) experienced strong growth during the Coronavirus (COVID-19) pandemic in 2020.[309]

   (b)  Also as discussed in Chapter 2, Facebook's ROCE slightly increased from 38% in 2019 to 40% in 2020, suggesting that the Coronavirus (COVID-19) pandemic has not had an adverse effect on Facebook's profitability. As noted in Chapter 2, the Market Study estimated the weighted average cost of capital for the large digital platforms at around 9% in 2018[310] and there is no evidence to suggest that this has changed substantially over

---

[305] Market Study, paragraphs 5.162-5.168.
[306] Including Google's announcement in January 2020 that it intended to phase out support for third-party cookies in Chrome within two years, and new policies introduced as part of Apple's recently announced iOS 14 and 14.5 updates, which require apps to ask users for permission to collect and share data using Apple's device identifier and introduce an App Tracking Transparency feature. See also Market Study, paragraphs 5.313 – 5.330.
[307] *Facebook/Kustomer*, paragraphs 144-150.
[308] This is because Facebook has a wide range of mitigation strategies at its disposal, has access to a large amount of first-party data, and has many years of experience working with a very large number of advertisers.
[309] Ofcom 2021 'Online Nation'; see pages 26, 87, 120, and 123.
[310] Market Study, Figure 2.11.

PX0684-128

the last two years. Facebook's ROCE in 2020 therefore indicates that it has been generating profits comfortably in excess of its cost of capital.

5.196   Third party views obtained in the course of the recent phase 1 merger investigation into *Facebook/Kustomer* also indicate that Facebook has significant market power in online display advertising.[311] Competitors in display advertising commented that Facebook can leverage its enormous user base and the large amounts of data it has access to via its ecosystem of platforms and plug-ins, to offer unparalleled reach and targeting capabilities.

5.197   In summary, the evidence and analysis set out above show that Facebook has maintained a persistently high share of supply in the display advertising market (and very high share in the O&O segment), has significant market power with respect to the other side of its platform (with its extremely large user base on social media generating positive network effects), faces limited competitive constraints from within and outside the display advertising market, benefits from barriers to entry in the display advertising market, and has reported high levels of profitability in recent years. Based on these findings, we are of the view that **Facebook has significant market power in display advertising in the UK**.

---

[311] *Facebook/Kustomer*, paragraphs 144-150.

PX0684-129

# 6.    Counterfactual

## Introduction

6.1    In this chapter we have set out:

  *(a)*  the CMA's framework for assessing the counterfactual;

  *(b)*  the Parties' views on the counterfactual;

  *(c)*  our assessment of the appropriate counterfactual; and

  *(d)*  our conclusion on the counterfactual.

## The CMA's framework for assessment of the counterfactual

6.2    The counterfactual is an analytical tool used to help answer the question of whether a merger gives rise to an SLC.[312] It does this by providing the basis for a comparison of the competitive situation on the market with the merger against the likely future competitive situation on the market absent the merger.[313] The latter is called the counterfactual.[314]

6.3    The counterfactual is not, however, intended to be a detailed description of those conditions of competition that would have prevailed absent the merger.[315] The CMA's assessment of those conditions are considered in the competitive assessment.[316] The CMA also seeks to avoid predicting the precise details or circumstances that would have arisen absent the merger.[317]

6.4    The CMA will select the most likely conditions of competition as its counterfactual against which to assess the merger.[318] In its assessment of the counterfactual, the CMA may need to consider multiple possible scenarios, before identifying the relevant counterfactual.[319] As part of this assessment, the CMA will take into account whether any of the possible scenarios make a significant difference to the conditions of competition,[320] and if they do, the

---

[312] Merger Assessment Guidelines (CMA129), paragraph 3.1.
[313] Merger Assessment Guidelines (CMA129),  paragraph 3.1.
[314] Merger Assessment Guidelines (CMA129), paragraph 3.1.
[315] Merger Assessment Guidelines (CMA129), paragraph 3.7.
[316] Merger Assessment Guidelines (CMA129), paragraph 3.7.
[317] Merger Assessment Guidelines (CMA129), paragraph 3.11.
[318] Merger Assessment Guidelines (CMA129), paragraph 3.13.
[319] Merger Assessment Guidelines (CMA129), paragraph 3.13.
[320] Merger Assessment Guidelines (CMA129), paragraph 3.13.

PX0684-130

CMA will ultimately select the most likely conditions of competition absent the merger as the relevant counterfactual.[321]

6.5     The CMA recognises that evidence relating to future developments absent the merger may be difficult to obtain.[322] Uncertainty about the future will not in itself lead the CMA to assume the pre-merger situation to be the appropriate counterfactual. As part of its assessment of the counterfactual, the CMA may consider the ability and incentive (including but not limited to evidence of intention) of the merging parties to pursue alternatives to the merger, which may include reviewing evidence of specific plans where available.[323]

6.6     Further, the time horizon considered by the CMA in its assessment of the counterfactual will depend on the context and will be consistent with the time horizon used in the competitive assessment.[324]

6.7     As discussed in detail in this chapter, and having assessed the evidence before us, we have concluded that the most likely counterfactual which would have prevailed in the absence of the Merger is that: (i) Facebook would have continued to procure GIFs from GIPHY, and (ii) GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products. This counterfactual would have prevailed regardless of GIPHY's ownership, ie whether under its pre-Merger ownership structure (receiving financial support and commercial expertise from investors) or if it had been sold to an alternative purchaser, possibly another social media platform.

## The Parties' views on the counterfactual

6.8     In their response to the Provisional Findings, the Parties submit that, contrary to its own guidance, the CMA has incorporated a variety of counterfactuals within a single description in order to give the impression that the single most likely counterfactual has been selected, whereas, if properly and independently considered, each counterfactual scenario has significant implications for the conditions of competition against which the Merger should be assessed.[325] Facebook's interpretation of the CMA's approach to the counterfactual is incorrect. In this chapter, and consistent with its guidance,[326] the CMA has focused on identifying the most likely conditions of competition,

---

[321] Merger Assessment Guidelines (CMA129), paragraph 3.13.
[322] Merger Assessment Guidelines (CMA129), paragraph 3.14.
[323] Merger Assessment Guidelines (CMA129), paragraph 3.14.
[324] Merger Assessment Guidelines (CMA129), paragraph 3.15.
[325] Parties Response to Provisional Findings, paragraph 5.3.
[326] Merger Assessment Guidelines (CMA129).

PX0684-131

and it will not consider the relative likelihood of different scenarios where these do not make a significant difference to the conditions of competition.[327]

6.9   The Parties have submitted that the relevant counterfactual is the pre-merger conditions of competition, taking into account developments which would have resulted from the Coronavirus (COVID-19) pandemic, and that the most likely counterfactual is that GIPHY would have [✂].

6.10   The Parties further submit that the conditions of competition may have varied depending on the post-merger ownership structure of GIPHY.[328] In particular, the Parties submitted that, in the absence of the Merger, GIPHY would not have generated revenue or secured sufficient external investment to maintain or grow its business on the basis that:

(a)   GIPHY relied on regular rounds of external funding and whilst its turnover had grown year-on-year, GIPHY had not attained a sustainable level of profit at any stage prior to 2020, and was operating at a monthly loss of more than [✂].Even if GIPHY had been able to secure limited funding from investors, it would have been forced to scale back its plans and make significant redundancies, which would have adversely affected its ability to maintain its products and services in their current form,[329] and would have negatively impacted employee morale and retention.

(b)   [✂]. Furthermore, venture capital (VC) funds are not perpetual, long-term investors, and the business model of a typical VC is to maximise return on investment by exiting, ideally for a profit, within the life of the fund.

(c)   GIPHY was reliant on users of third party services, and [✂]% of users that interact with GIPHY do so in a third party environment. As a result, GIPHY had little available advertising inventory that it could use to scale revenue independently, and despite efforts, GIPHY was unable to grow its O&O traffic.

(d)   GIPHY could not demonstrate that a revenue-sharing, API-dependent model, which relied on monetising the actions of consumers on third party services, was sustainable. API distribution partners have no reason to share revenue with a third party like GIPHY, or experiment with unproven forms of advertising when they can rely on their own existing proven

---

[327] Merger Assessment Guidelines (CMA129), paragraphs 3.9 and 3.13.
[328] Parties Response to Provisional Findings, paragraph 5.3(b).
[329] Parties Response to Provisional Findings, paragraph 5.3(a).

PX0684-132

products. Furthermore, a platform fee arrangement would have been at the cost of GIPHY expanding its Paid Alignment business model.[330]

(e) GIPHY could not provide traditional advertising return on investment audience data and advertising metrics for proof-of-concept to provide a compelling Paid Alignment offering that would enable it to sell hundreds of millions of dollars (or more) of such ads each year.

6.11 Furthermore, the Parties submitted that there was no realistic prospect of an alternative purchaser emerging for GIPHY, given that:

(a) GIPHY contacted many companies about a potential acquisition, but whilst a number of parties indicated their willingness to discuss the opportunity, [✂].Furthermore, while the term sheet which GIPHY signed with Facebook in April 2020 included a no-shop provision (see paragraph 6.133 6.133 below), the Parties considered that this provision did not leave GIPHY in a position where it 'was unable to have discussions with any potentially interested parties'[331] because these discussions had already occurred;

(b) only Facebook signalled a firm interest in exploring the opportunity further and Facebook was the only party with whom discussions progressed to a term sheet stage. Even with confirmed interest from Facebook, [✂] did not seek to pivot existing discussions on a supply agreement to exploring an acquisition. The Parties also considered that [✂]; and

(c) Facebook's internal documents (which Facebook claims contain mere speculation of rivals' possible interest in GIPHY and have been mischaracterised by the CMA) are incapable of filling this gap in evidence. The Parties noted that speculation about possible purchasers of GIPHY within Facebook's internal documents cannot be substituted for evidence provided directly by GIPHY to the CMA.

6.12 Finally, in respect of the Coronavirus (COVID-19) pandemic, the Parties submitted that Coronavirus (COVID-19) exacerbated structural weaknesses in GIPHY's revenue model and substantially affected the market for new and unproven advertising products like those GIPHY could offer. This, in turn, caused a significant drop in advertising spend through GIPHY, as commercial partners chose to cancel or delay active campaigns, as well as terminate opportunities in the revenue pipeline. This was coupled with rising infrastructure costs from heightened Coronavirus (COVID-19) internet activity,

---

[330] Parties Response to Provisional Findings, paragraph 5.3(c).
[331] Provisional Findings, paragraph 6.122.

PX0684-133

both of which substantially weakened GIPHY's financial position and cash runway trajectory. The Parties also noted that the Coronavirus (COVID-19) pandemic disrupted financial markets and created a very challenging macroeconomic environment, damaging external investor interest more generally.

6.13   For the reasons explained in detail in this chapter, the CMA considers that GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products. This counterfactual would have prevailed regardless of GIPHY's ownership, ie whether under its pre-Merger ownership structure (receiving financial support and commercial expertise from investors) or if it had been sold to an alternative purchaser, possibly another social media platform. As explained in this chapter, we consider that these two scenarios do not make a significant difference to the conditions of competition and on this basis, the CMA does not consider it necessary to select one particular scenario for the purpose of identifying its counterfactual.[332]

## Our assessment of the appropriate counterfactual

6.14   As noted above, the counterfactual is an analytical tool that is used in answering the question of whether a merger gives rise to an SLC,[333] and compares the prospects for competition with the merger against the competitive conditions that would have prevailed absent the merger.

6.15   In assessing the appropriate counterfactual in this case, we consider:

(a) How Facebook would have behaved absent the Merger in relation to the procurement of GIFs; and

(b) How GIPHY would have behaved absent the Merger in relation to the supply of GIFs and GIF-based advertising.

### Facebook's behaviour absent the Merger in relation to the procurement of GIFs

6.16   In our assessment of the most likely counterfactual, we have considered how Facebook would have behaved absent the Merger in relation to its procurement of GIFs.

---

[332] Merger Assessment Guidelines (CMA129), paragraph 3.9.
[333] Merger Assessment Guidelines (CMA129), paragraph 3.1.

PX0684-134

6.17   In the context of Facebook's consideration of a potential acquisition of GIPHY, we have seen a number of internal Facebook documents which outlined the options available to Facebook to ensure continued GIF integration across its platforms, noting that the GIF media type was of 'strategic value' to Facebook.

6.18   We have relied on these internal documents in part to inform our view of how Facebook might have behaved absent the Merger in relation to the procurement of GIFs. Further discussion on GIPHY's behaviour absent the Merger (and our assessment of whether disruption to the supply of GIFs from GIPHY was likely) is outlined below.

6.19   We have considered three possible alternative options identified by Facebook at the time of the Merger. All three options seek to address Facebook's concern that its access to GIPHY's GIFs could have been disrupted absent the Merger.

(a)   Pay platform fees to GIPHY. As set out at paragraph 6.62 below, it is possible that GIPHY would have relied, at least in the short-term to see itself through the Coronavirus (COVID-19) pandemic, on a platform/licence fee from some API partners. Whilst Facebook's internal documents noted that this option was [✕],[334] Facebook was concerned that [✕], with Facebook needing to pay a '[✕]'. In the absence of any opportunity to acquire GIPHY, however, Facebook may have explored this option in order to ensure that there was no disruption to its supply of GIFs from GIPHY (on whom Facebook solely relies for the purposes of serving GIFs on the Instagram platform), as shown by the evidence set out at paragraph 6.60 below.

(b)   Move off the GIPHY API or dramatically reduce API calls made to GIPHY by relying on other partners. [✕]. We consider in paragraphs 6.23 and 6.24 below whether Facebook would have continued to rely on GIPHY had it been acquired by an alternative purchaser, in particular a social media platform.

(c)   Build Facebook's own centralised GIF database. Facebook's internal documents noted that this would [✕] (on whom Facebook solely relies for the purposes of serving GIFs on the Instagram platform) [✕]. Facebook has also submitted that there was no realistic prospect that it would have decided to build its own GIF capability. Whilst we have not seen any evidence to suggest that Facebook would have offered such a GIF library to third parties and the 'build' case appears to have been proposed solely

---

[334] An API call being a request from Facebook to GIPHY's servers in accordance with the API relationship between the Parties.

PX0684-135

for the purposes of self-supply, we note that Facebook was considering the build option in the context of a '[✂]' strategy. In other words, had there not been the potential to acquire GIPHY, it is possible that Facebook may have started to develop its own GIF library, but that this would have taken time (around two years).[335]

6.20    Whilst we also note that Facebook could have explored options to acquire another third party GIF provider, such as Gfycat, Imgur or Vlipsy, rather than just relying on such providers under an arms-length partnership arrangement, Facebook's internal documents do not discuss this as a realistic option, and indicated a need for a GIF provider with 'scale, breadth and content moderation'. Also it is not clear to us whether, [✂], other third party GIF providers would have been open to discussing an acquisition by Facebook at the time of the Merger, or whether Facebook would have considered this to be an attractive option given its concerns about content moderation and available inventory on these third party GIF platforms.[336] Facebook also submitted that it was not actively seeking out acquisition targets active in the same area as GIPHY.

6.21    Facebook has submitted that in the absence of the Merger, it would have continued to source GIF functionality for its services from GIPHY and Tenor. Conversely, however, Facebook has also submitted that it 'could have pulled the plug on its support for GIPHY at any point' if GIPHY had established indirect competition between Facebook and its social media rivals such that these would become even fiercer competitors in display advertising in the UK.

6.22    We note that had Facebook decided to stop procuring GIFs from GIPHY as a result of increased competition, it is likely that Facebook would have needed to rely on an alternative source for its GIFs. As noted above, internal Facebook correspondence shortly prior to the Merger suggested that no other GIF provider had the necessary scale or breadth of products as GIPHY, and Facebook also noted some concerns in extending its relationship with Tenor, given that the latter is owned by Facebook's rival, Google. It is possible that Facebook would have resorted to a build strategy; however, it would have needed to continue to procure GIFs from GIPHY for an interim period of time until it had developed an alternative option to GIPHY. A key factor of Facebook's rationale in pursuing the Merger was to maintain the user experience across its platforms where there is a high degree of integration of GIPHY's GIFs (see Chapter 2, The Parties, Merger and Rationale). It seems unlikely, therefore, that Facebook would have immediately ceased its reliance

---

[335] As discussed in Chapter 9, Countervailing Factors.
[336] See Chapter 8, Vertical Effects.

PX0684-136

on GIPHY, had GIPHY enabled more vigorous competition between Facebook and its social media rivals.

6.23   We have also considered whether, under third party ownership of GIPHY, in particular third party ownership by a social media player, Facebook would have continued to procure GIFs from GIPHY.

6.24   We note that whilst Facebook expressed some reservations about extending its partnership relationship with Tenor, Facebook continues to procure GIFs from Tenor across a number of its platforms today. Therefore, it is likely that Facebook would have continued to procure GIFs from GIPHY in the hands of an alternative purchaser, even a rival social media platform, at least in the short-term.

*Conclusion on Facebook's behaviour absent the Merger in relation to the procurement of GIFs*

6.25   On the basis of the evidence set out below, we consider that GIPHY would have continued to innovate and develop its products, and within that context, in view of the above, we also consider it likely that Facebook would have continued to procure GIFs from GIPHY absent the Merger (noting that if Facebook were to develop its own GIF library, this was a longer term proposition).

**GIPHY's behaviour absent the Merger in relation to the supply of GIFs**

6.26   For the purposes of identifying the most likely counterfactual, our view is that GIPHY, absent the Merger, would have continued to supply GIFs to third party social media platforms (including Facebook), and continued to innovate and develop its products and services. This is on the basis that there would be a benefit to GIPHY in maintaining widespread distribution of its products and services in these circumstances.

6.27   Furthermore, for the reasons set out in more detail in Chapter 7, Horizontal Effects, our view is that GIPHY would have continued to supply GIFs, generate revenue and explore various monetisation options with partners and investors, through Paid Alignment and revenue-sharing agreements.

6.28   As set out above at paragraph 6.9, the Parties submitted that absent the Merger, GIPHY would have [✂]. In respect of GIPHY's revenue generation potential, the Parties submitted that GIPHY's revenue model was flawed. They further submitted that (i) GIPHY would not have generated revenue or secured sufficient external investment (see paragraph 6.10), (ii) there was no realistic prospect of an alternative purchaser emerging for GIPHY (see

PX0684-137

paragraph 6.11), and (iii) the Coronavirus (COVID-19) pandemic exacerbated structural weaknesses in GIPHY's revenue model.

6.29   In the following sections we discuss:

(a) the impact of the Coronavirus (COVID-19) pandemic on GIPHY's business (see paragraphs 6.30 to 6.40);

(b) GIPHY's Paid Alignment/revenue-sharing agreement offering (see paragraphs 6.42 to 6.53);

(c) the possibility of the introduction of a platform fee or commercial agreement with one or more of GIPHY's API partners (see paragraphs 6.56 to 6(c));

(d) whether GIPHY could have secured additional funding either through existing investors, or new investors, to overcome any short term cash flow requirements and fund further expansion (see paragraphs 6.63 to 6.116); and

(e) whether GIPHY could have been sold to an alternative purchaser at the time of the Merger (see paragraphs 6.123 to 6.166).

*Coronavirus (COVID-19) pandemic*

6.30   As summarised above at paragraph 6.12, the Parties submitted that the Coronavirus (COVID-19) pandemic substantially affected the market for Paid Alignment services, resulting in a 'significant drop' in advertising spend. The Parties submitted that Coronavirus (COVID-19) exacerbated structural weaknesses in GIPHY's revenue model and substantially affected the market for new and unproven advertising products like those GIPHY could offer. A high-level overview of GIPHY's Paid Alignment/revenue-sharing agreement model is described in paragraphs 6.42 to 6.53 below, and discussed in more detail in Chapter 7, Horizontal Effects and related Appendix F: GIPHY's Paid Alignment Model.

6.31   The CMA's guidance on merger assessment during the Coronavirus (COVID-19) pandemic is clear that a 'merger control investigation typically looks beyond the short-term and considers what lasting structural impacts a merger might have on the markets at issue. Even significant short-term industry-wide economic shocks may not be sufficient, in themselves, to override competition concerns that a permanent structural change in the market brought about by a

PX0684-138

merger could raise'.[337] This is particularly the case in connection with theories of harm assessing the loss of future or dynamic competition.

6.32   Having regard to the Coronavirus (COVID-19) Guidance, we have not seen any evidence to demonstrate that Coronavirus (COVID-19) would have had a long-term, structural impact on GIPHY's ability to continue to supply GIFs, innovate and generate revenue, and the Parties have not submitted that this was the case.

6.33   Several of GIPHY's investors have expressed views in respect of the impact of the Coronavirus (COVID-19) pandemic on GIPHY. These are described in detail in Appendix E: GIPHY's Timeline. Broadly, investors submitted that:

*(a)*  [✂];

*(b)*  [✂];

*(c)*  Given the impact of Coronavirus (COVID-19) on GIPHY, its revenue trajectory changed quite dramatically by mid-April 2020; and

*(d)*  There were a number of options open to GIPHY, including a potential sale and investment by external third parties including private equity firms and strategic investors.

6.34   [✂]. We also note that whilst Coronavirus (COVID-19) resulted in some campaigns being cancelled and deferred, [✂] in new revenue was booked by GIPHY in Q2 2020. We consider that the (i) deferment, rather than cancellation, of GIPHY's planned campaigns, and (ii) fact that GIPHY was able to book new campaigns in the midst of the Coronavirus (COVID-19) pandemic, indicates that advertisers remained interested in GIPHY's Paid Alignment proposition (see Chapter 7, Horizontal Effects and related Appendix F: GIPHY's Paid Alignment Model).

6.35   As outlined above, the Parties have submitted that GIPHY would have [✂]. However, we have not seen any evidence to suggest that GIPHY was in such financial distress that it would have ceased operations at the time of the Merger. [✂], the evidence indicates that GIPHY had sufficient cash runway to last until Q4 2020 in its 'base case' scenario,[338] and had identified ways of extending its cash runway until January 2022. Furthermore, [✂] (see discussion at paragraph 6.72 below). [✂]. However, as considered later in this chapter, in the absence of the Merger, we consider that GIPHY's investors were likely to have invested further in GIPHY to overcome any short

---

[337] Merger assessments during the coronavirus (COVID-19) pandemic (**Coronavirus (COVID-19) Guidance**).
[338] CMA analysis of [✂]. Note however that the [✂] refers to GIPHY having sufficient cash runway until Q3 2020.

PX0684-139

term cash flow requirements (as a result of the Coronavirus (COVID-19) pandemic), and to fund further expansion.

6.36    Overall, whilst GIPHY may have experienced a shortfall in its projected revenues in Q1/Q2 2020 as a result of deferred advertising campaigns (brought about by Coronavirus (COVID-19)), we consider that this would have been a short-term effect given that digital advertising rebounded later in 2020.[339]

6.37    The Parties submitted that the CMA should not compare GIPHY to an established digital platform in terms of assessing the impact of the advertising market rebounding in 2020 given that GIPHY's ad product was new to the market and experimental (as opposed to other platforms which have a demonstrable return on investment-driven product). However, given that GIPHY had already attracted important advertisers to its ad product prior to, and during the Coronavirus (COVID-19) pandemic, the CMA believes that it would have been able to do so again when the digital advertising market rebounded later in 2020.

6.38    Additionally, if GIPHY had been required to operate under a restricted business model as a result of Coronavirus (COVID-19) (as the Parties have submitted, see paragraph 6.35), we have not seen any evidence to suggest that this would have been the case for a sustained period of time given that the demand for digital advertising recovered later in 2020, at which point GIPHY would have returned to its pre-Coronavirus (COVID-19) business model.

6.39    Further, whilst the Parties' submissions on the impact of the Coronavirus (COVID-19) pandemic on GIPHY's business centre on the view that Coronavirus (COVID-19) exacerbated weaknesses in an already flawed business model (see paragraph 6.12), Facebook's internal documents indicate that the decision to cease GIPHY's revenue-generating activities was driven by Facebook, rather than GIPHY. Facebook decided that: (i) it would not be hiring GIPHY's revenue team, and (ii) it would terminate GIPHY's current monetisation efforts and the associated revenue.[340]

6.40    Whilst we recognise that the Coronavirus (COVID-19) pandemic may have had an immediate impact on: (i) GIPHY's cash runway, (ii) GIPHY's ability to

---

[339] This article refers to a report commissioned by the International Advertising Bureau (IAB) and conducted by PwC which notes that digital advertising revenues increased by 12.2% in 2020 compared to 2019. The report also states that 'although Q2, year-over-year growth declined by 5.2%, revenues in Q3 and Q4 more than balanced the scales, returning positive year-over-year growth of 11.7% and 28.7%, respectively. In fact, Q4 2020 had the highest revenue on record for digital advertising in more than 20 years'.
[340] See Chapter 2, The Parties, Merger and Rationale for further detail.

PX0684-140

book new advertising campaigns with customers, and (iii) GIPHY's expected revenue from customers who had already planned advertising campaigns with GIPHY, our view is that the Coronavirus (COVID-19) pandemic would not have resulted in a long-lasting impact on GIPHY's ability to continue to supply GIFs or to continue its revenue-generating activities when demand for digital advertising recovered.

6.41   In the sections below, we set out our view on how, absent the Merger, GIPHY would have continued to supply GIFs and generate revenue by exploring various options to further monetise its products, in particular through: (i) GIPHY's Paid Alignment business model and (ii) the introduction of a platform fee as a short-term solution to its cashflow issues, which were exacerbated by the Coronavirus (COVID-19) pandemic. We then consider whether additional funding would have been raised to support such developments.

*GIPHY's Paid Alignment and revenue-sharing agreements*

6.42   The Parties submitted that GIPHY had failed to find a de-risked path to scaled monetisation and even after significant investment and a high level of cash burn, GIPHY was still unable to produce meaningful revenue growth in line with market expectations.

6.43   However, GIPHY's internal documents indicate that GIPHY was optimistic about its monetisation options, envisaging breakeven profitability in 2022 (and potentially even sooner).

6.44   In relation to potential challenges presented by GIPHY's Paid Alignment business model, GIPHY submitted that:

*(a)*  [✂].

*(b)*  [✂].

6.45   Prior to the Merger, GIPHY was already generating revenue through its Paid Alignment offering[341] (and related revenue-sharing agreements).[342] GIPHY had successfully grown its revenue since its Paid Alignments pilot testing was launched in 2017: GIPHY generated [✂] in annual revenue in 2017; this

---

[341] GIPHY entered into agreements with certain advertising partners who paid GIPHY based on the number of impressions served through: (i) promoted GIFs on GIPHY's O&O platform (referred to as 'trending feed ads'), and/or (ii) branded GIFs served through API partners where GIFs are searched by users and branded GIFs are selected based on that particular search term (referred to as 'promoted search ads').
[342] GIPHY entered into revenue share agreements with some of its API partners through which GIPHY ran the Paid Alignment offering. The revenue-sharing agreements set out a commission which GIPHY paid to the API partner whose users were generating the impressions based on the branded GIFs.

PX0684-141

increased to [✂] in 2018 and [✂] in 2019. The Parties have submitted that this is unimpressive for a company in GIPHY's position.

6.46    In an internal GIPHY board document prepared in Q1 2020, GIPHY provides an overview of its FY2019 revenue and key performance indicators. Based on this document, GIPHY booked revenues in 2019 of [✂],[343] which, whilst not in line with its forecast of [✂], represents a substantial [✂] year-on-year growth compared with revenue booked in 2018. The number of advertisers relying on GIPHY's Paid Alignment proposition also increased between 2018 and 2019, with [✂] active clients and [✂] associated advertising campaigns in 2018, compared with [✂] active clients and [✂] advertising campaigns in 2019. Furthermore, GIPHY's number of active clients stood at [✂],[344] with [✂] associated advertising campaigns as of 21 January 2020, demonstrating a strong start for GIPHY's Paid Alignment proposition in 2020. In addition, a key client of GIPHY, [✂], had spent [✂] in advertising through GIPHY's Paid Alignment channels in FY2019. At the Main Party Hearing, GIPHY stated that its relationship with [✂] was 'highly onerous' in the sense that GIPHY had to dedicate a team to creating GIF content for [✂], and offer attractive terms to [✂] which included stock options. On this basis, GIPHY submits that the [✂] arrangement was not scalable (as discussed in Chapter 7, Horizontal Effects, and related Appendix F: GIPHY's Paid Alignment Model).

6.47    In respect of the 2020 pipeline, the same GIPHY board document notes that, as of 21 January 2020, GIPHY had already booked approx. [✂] in target revenue with the likes of [✂]. Although this [✂] revenue represented only [✂] of GIPHY's target revenue for 2020, GIPHY projected to close Q1 2020 '[✂]' 100% of its budgeted revenue forecast of [✂].As set out in Appendix F: GIPHY's Paid Alignment Model, momentum in GIPHY's advertising sales was picking up in February 2020, with strong advertiser demand linked to the US Super Bowl, and a further pipeline of anticipated revenue under discussion with major brands. Further, GIPHY's revenue plan for 2020 projected a [✂] increase in revenue later in the year, with target revenues of [✂] in Q3 2020 and [✂] in Q4 2020. In Q1 2020 therefore, with booked revenues of [✂], GIPHY was largely operating according to its revenue plan.

6.48    The above shows that GIPHY generated revenue through its Paid Alignment offering prior to both the onset of the Coronavirus (COVID-19) pandemic and the sale of the business to Facebook (and, as noted above, our view is that

---

[343] With gross revenues of [✂].
[344] We understand that GIPHY's 'active clients' in this context reflects clients who had booked campaigns with GIPHY (as of 21 January 2020) to run throughout 2020.

the pandemic would not have resulted in a long-lasting impact on GIPHY's revenue-generating activities).

6.49    [✕], we consider that both issues represent potential challenges (although not insurmountable challenges) to the success of GIPHY's Paid Alignment model.

6.50    Chapter 7, Horizontal Effects, sets out the CMA's assessment of GIPHY's monetisation model, in particular its Paid Alignment and revenue-sharing agreement offering, the potential growth in this form of monetisation model and the prospect of expansion and entry into the UK by GIPHY, taking into account various factors, [✕].

6.51    For the purposes of the counterfactual, we do not seek to reach specific conclusions on [✕]. Instead, we have taken into account these challenges and possible developments in our assessment of the effects arising from the loss of potential competition in Chapter 7, Horizontal Effects.

6.52    Indeed, the evidence set out in Chapter 7, Horizontal Effects, shows that GIPHY was aware of these potential challenges but, consistent with the counterfactual identified in this chapter, did not see these as issues preventing it from further seeking to monetise its products. Based on this evidence and the assessment set out in Chapter 7, Horizontal Effects, we have reached the view that these challenges do not undermine the counterfactual as found in this Chapter (which is the same counterfactual set out in the Provisional Findings), that absent the Merger, we consider that GIPHY would have continued to generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products.

6.53    We consider that absent the Merger, GIPHY would have received access to funding in order to continue to supply GIFs, and develop and expand its Paid Alignment offering. As set out in the following sections, there were a number of options available to GIPHY to secure funding, in particular: (i) introducing a platform/licence fee (or other commercial arrangement) with API partners to generate revenue at least in the short term (see paragraphs 6.56 to 6.62 below), (ii) receiving further funding from some of GIPHY's existing investors who expressed continued support in GIPHY's business model (paragraphs 6.66 to 6.97 below), (iii) investment by a new investor (paragraphs 6.108 to 6.122 below), and (iv) exploring other options for a potential acquisition (paragraphs 6.126 to 6.166 below).

6.54    For the reasons set out in this chapter, the CMA considers that GIPHY would have continued to supply GIFs, innovate, develop its products and services,

PX0684-143

generate revenue and explored various options to further monetise its products. This would have likely been the case on the basis of one or more of the options available to GIPHY (as set out briefly above), and considered in detail in the sections below.

*Short-term monetisation and fundraising*

6.55   In the absence of the option of selling to Facebook, GIPHY would have needed to find short-term arrangements to see it through the Coronavirus (COVID-19) pandemic, and to raise further financing to continue to supply GIFs and to fund the expansion of its Paid Alignment offering.

*Platform fee*

6.56   GIPHY faced a short term funding issue during the Coronavirus (COVID-19) pandemic. As explained below, our view is that a platform fee was an option that GIPHY and one or more of its API partners would have considered absent the Merger as a solution to such short term funding issues. This in turn would have facilitated GIPHY in obtaining the necessary funding (see below our discussion of investors and alternative acquirers) to continue supply GIFs, innovate, develop its products and services, generate revenue and explore various monetisation options with partners and investors (including through its Paid Alignment and revenue-sharing offering). In February 2020, prior to the Merger, GIPHY was exploring a number of potential avenues to monetise its product. Whilst Paid Alignment and revenue-sharing agreements were the main avenues being explored (see Chapter 7, Horizontal Effects), another option being considered and actively discussed was a so-called 'platform fee' whereby GIPHY would charge its API partners for access to its product.

6.57   Therefore, in considering how GIPHY would have behaved absent the Merger in relation to the supply of GIFs, we have considered: (i) whether GIPHY would have negotiated platform fee arrangements with one or more of its API partners, (ii) whether such platform fees would have enabled GIPHY to overcome its short-term cashflow issues, and enabled GIPHY to continue to supply GIFs and (iii) whether a platform fee arrangement could have been pursued in parallel to GIPHY's Paid Alignment model.

6.58   GIPHY submitted that a platform fee with Facebook, [✂] and others was never its preferred option given that its business plan relied on an ability to access advertising inventory within these third party platforms. A platform fee would not have allowed GIPHY such access, and it would not have allowed GIPHY to build a scalable economic relationship with its partners. Furthermore, and as noted above in paragraph 6.10(d), in response to the

PX0684-144

CMA's Provisional Findings, the Parties submitted[345] that a GIPHY platform fee would have been at the cost of expanding its Paid Alignment business model.

6.59   The CMA considers that the evidence shows that, whilst the platform fee option was not GIPHY's preferred method of monetising, this (or some other form of commercial arrangement with API partners) was an option that GIPHY would have considered, especially in the short-term, in order to generate immediate revenue to ensure its survival through the Coronavirus (COVID-19) pandemic.

(a)   GIPHY recognised in its submissions to the CMA that whilst a platform fee was a less attractive option from GIPHY's perspective, it was still an option that the company considered. This is evident from both Facebook's and GIPHY's internal documents, which show that GIPHY was considering (and actively discussing) a platform fee/commercial agreement with [✄][346] and Facebook. GIPHY's internal documents also suggest that GIPHY had intended to leverage the potential agreements with [✄][347] in its discussions with Facebook in respect of a commercial agreement: '[✄]'.

(b)   As noted by GIPHY's CEO Alex Chung in an email to an investor on 6 April 2020, a platform fee arrangement presented a potential short-term solution to GIPHY's funding issues: '[✄]'.

(c)   The Paid Alignment offering and platform fee model are not mutually exclusive, in the sense that GIPHY could have continued to explore the possibility of a platform fee/commercial agreement model with some of its API partners, and a Paid Alignment and revenue-sharing agreement with other API partners, for example charging a platform fee for continued access to GIPHY to those API partners who were unwilling to sign up to a revenue-sharing agreement. Furthermore, the platform fee arrangement represented a possible short-term and immediate solution to GIPHY's funding issues (particularly through the Coronavirus (COVID-19) pandemic) and would not have prevented GIPHY from developing the Paid Alignment offering more generally (for example, working with other API partners,[348] or through the use of its O&O platform).

---

[345] Parties' Response to Provisional Findings, paragraph 5.3(c).
[346] [✄] however, GIPHY's internal documents referenced show that [✄] was indeed considering a platform fee/commercial arrangement with GIPHY in 2020.
[347] The discussions with [✄] pertain to a revenue-generating model memorandum of understanding which was being negotiated between [✄] and GIPHY.
[348] Such as Samsung, Twitter, [✄], Tinder, Kika.

PX0684-145

6.60   The Parties submitted that: (i) there is considerable evidence available to show that API partners are not willing to pay platform fees, (ii) it is not possible to implement platform fees while Tenor is available as a near-perfect substitute to GIPHY free of charge, and (iii) GIPHY was not able to enter into a single significant platform fee agreement.

6.61   However, the evidence shows that one or more of GIPHY's API partners would have at least considered paying a platform fee.

(a)   One of GIPHY's internal documents from March 2020, shortly prior to the Merger, notes: '[✂] - we are currently very close (2 - 4 weeks) to a [✂] (depending on the final amount). [✂] - we are currently ([✂]) to a [✂]. This suggests that GIPHY considered that it was making good progress in its negotiations on a platform fee with [✂] and [✂].

(b)   The evidence available to us is not conclusive on whether API partners would have ultimately agreed to pay a platform fee to GIPHY. However, it appears that some key API partners such as [✂] and Facebook were willing to at least consider an arrangement, and were actively discussing the terms of a platform fee/commercial arrangement.

GIPHY's internal documents show that in early April 2020, [✂] appeared eager to enter into a commercial arrangement with GIPHY, noting that it could be a 'major win-win' for both parties. [✂] also indicated that it wanted to progress these discussions quickly with the intention to turn the key terms of a commercial arrangement [✂].Whilst GIPHY viewed the initial commercial terms proposed by [✂], one of GIPHY's investors [✂].GIPHY (Alex Chung) provided further comments in response to this on 3 April 2020 explaining [✂] position, namely, [✂] and it is apparent that any further consideration of a platform fee or commercial arrangement with [✂] was quickly overtaken by acquisition discussions with Facebook. In their response to the Provisional Findings,[349] the Parties submitted that [✂]. [✂] . Given that: (i) the counterfactual analysis is intended to provide a basis for a comparison of the competitive situation in the market with the merger against the likely future competitive situation in the market absent the merger[350] and should not include events that would have happened as a consequence of the merger,[351] and, [✂], it is not

---

[349] Parties' Response to Provisional Findings, paragraph 1.35.
[350] Merger Assessment Guidelines (CMA129), paragraph 3.1.
[351] Merger Assessment Guidelines (CMA129), paragraph 3.4.

PX0684-146

appropriate for the CMA to consider the impact of [✂] in the counterfactual.

(i) Facebook appeared [✂], as evidenced by call notes prepared by Alex Chung following a discussion with the Director of Platform Partnerships at Facebook, Konstantinos Papamiltiadis on 5 March 2020: '[✂]'[352] and [✂]. Facebook was concerned that [✂], but also, in the context of the abovementioned GIPHY/Facebook call notes, there was a concern on behalf of Konstantinos Papamiltiadis that [✂]. It is possible, therefore, that Facebook's position on a platform fee was in part informed by the prospect of a potential minority investment or acquisition of GIPHY. Similarly, we note that Facebook was eager to ensure continued access to GIPHY.[353] If GIPHY had been able to agree a platform fee with [✂] (noting that GIPHY's internal document suggest that [✂] was enthusiastic about this potential arrangement), it is possible that GIPHY could have leveraged this commercial agreement with [✂] in its discussions with Facebook in order to encourage Facebook to enter into a similar platform fee arrangement in the absence of the Merger.

6.62 As explained above, the platform fee option represented a potential short-term solution in order to ensure its continued survival during the Coronavirus (COVID-19) pandemic. Although the introduction of a platform fee was not likely a long-term strategy of GIPHY, for the reasons set out in the following sections, GIPHY would have likely found other source of funding and on that basis our view is that, absent the Merger, the most likely counterfactual scenario involves GIPHY continuing to supply GIFs, innovate, develop its products and services, generate revenue and explore various monetisation options with partners and investors (including through its Paid Alignment and revenue-sharing offering).

*External fundraising*

6.63 As noted above at paragraph 6.8, the Parties submitted that, absent the Merger, it is possible that GIPHY may have secured limited funding from investors, but would have been forced to operate under a restricted business model and would not have attracted sufficient external investment to expand its offering.

6.64 However, the evidence summarised below and set out in detail in Appendix E: GIPHY's Timeline indicates that there were routes for GIPHY to obtain further

---

[352] The options outlined in this document included: [✂]
[353] See Chapter 2, The Parties, Merger and Rationale, for further detail.

PX0684-147

funding from both its existing and potential new investors in the short-term for the purposes of continuing to supply GIFs, innovate, develop its products and services, generate revenue and explore various monetisation options.

6.65   We also note that GIPHY's internal documents show that GIPHY was looking to some of its API partners (eg Facebook and [✂]) as well as other strategic partners (such as Playtika) for a minority investment in GIPHY in order to ensure its continued operation and to fund further expansion.

*Existing investors*

6.66   GIPHY has submitted to the CMA that its board members and investors discussed funding GIPHY at a [✂] valuation, which was the [✂]. In GIPHY's view, this demonstrated that those who were incentivised to bet on the long-term viability of GIPHY at a drastically reduced price declined to invest, meaning that the investors did not believe that GIPHY was likely to succeed as an independent business.

6.67   [✂]. [✂].In such a scenario, GIPHY submitted that most employees would have left the GIPHY business [✂].

6.68   Absent the Merger therefore, GIPHY submitted that it would only have received reduced funding from investors sufficient to continue in 'survival mode'[354] which would have 'dictated a requirement for scaled-back GIPHY operations thereby making it highly unlikely that GIPHY would have had the means to grow its revenue business, including by expanding into the UK.'

6.69   The Parties also submitted that the CMA's views regarding GIPHY's fundraising prospects are not supported by the typical model of VC investing given that VC funds are not perpetual, long-term investors, and the business model of a typical VC is to maximise return on investment by exiting, ideally for a profit, within the life of the fund. In addition, the Parties submitted that GIPHY had already raised four rounds of funding, which is above average for a firm backed by VCs, and that for later stage companies, the time between funding rounds generally declines as a successful venture-backed company matures.

6.70   The section below sets out GIPHY's existing (at the time of the Merger) investor views on whether they would have provided further funding to GIPHY. We assess these submissions and their implications on the issue of

---

[354] Parties' Response to Provisional Findings, paragraph 5.3(a).

PX0684-148

staff retention and GIPHY's strategy to continue developing its Paid Alignment business model.

6.71    [✂].

6.72    A GIPHY internal document indicates that, in mid-March 2020, Alex Chung was positive that GIPHY had the '[✂]' of its investors. [✂]. At the Main Party Hearing with GIPHY on 15 June 2021, and in response to this specific statement, Alex Chung noted: 'It turned out I was wrong on that. I made a bet, I thought the investors would have support. It seemed that they should be financially motivated, [✂], and so I was just wrong there'.

6.73    However, as discussed in more detail below and in Appendix E: GIPHY's Timeline, at the time of the Merger, the evidence suggests that at least two of GIPHY's existing investors had expressed their ongoing support to Alex Chung, investors were considering a further funding round for GIPHY (even after the offer from Facebook had been received), and ultimately, investors merely stated a preference to sell GIPHY to Facebook, rather than there being no appetite on behalf of investors to provide further funding to GIPHY in the absence of the Merger.

- *Betaworks*

6.74    On a call with the CMA, Betaworks described itself as a platform for early-stage consumer applications which builds and incubates companies, and also invests in companies at the early seed stage. Betaworks was an incubator of GIPHY and was its sole investor when the company was created.

6.75    Betaworks submitted that GIPHY was initially a discovery engine for emotion-based media, and GIPHY grew rapidly, quickly surpassing 100 million users. Betaworks held monetisation discussions with GIPHY very early on, partly because the company had grown so quickly, but also because it was costing a lot of money to host and serve GIFs. Betaworks noted that, in respect of funding, there were two options available to GIPHY: (i) raise funding, or (ii) monetise. However, at the time, monetisation was complicated and raising capital was fairly inexpensive. Coupled with the external investor interest in GIPHY, which was generated as a result of having a popular product, GIPHY was well-capitalised, which, as a result, delayed the monetisation process.

6.76    Betaworks submitted that in 2019, GIPHY was making significant progress in terms of its advertising; it was building a strong team and developing advertising relationships. Betaworks considered that GIPHY was innovative, offered a new way to advertise and, in 2019 and 2020, was still in the early stage of its development.

PX0684-149

6.77   Betaworks noted that whilst JP Morgan was engaged by GIPHY to run a dual-track process,[355] in December 2019 investors in GIPHY were keen to raise further financing and did not want to sell the business given GIPHY's success. As a result, pre-Coronavirus (COVID-19), GIPHY was exploring the option of fundraising with external private equity and VC investors, strategic investors and also third parties interested in potentially acquiring shares in GIPHY. Betaworks submitted that all of these options were open to GIPHY at the time when the Coronavirus (COVID-19) pandemic occurred.

6.78   As described in detail in Appendix E: GIPHY's Timeline, we asked Betaworks whether, absent the offer from Facebook, later-stage GIPHY investors would have been prepared to put more cash into GIPHY to extend its runway for the next six to twelve months. Betaworks submitted that, in the absence of the Merger, in light of the challenges brought about by Coronavirus (COVID-19) and in the knowledge that there was potentially a much lower offer from another platform, GIPHY's investors would have been prepared to invest further in GIPHY. Betaworks submitted that there were later stage investors who were keen to invest further in GIPHY in such circumstances, asking board members whether they should put in a term sheet. Betaworks also noted that the role of later stage investors is often to assist companies in getting through these kinds of challenges.

6.79   On the basis of our discussion with Betaworks, we do not consider that Betaworks would have invested further in GIPHY given the nature of its business model as an early 'seed stage' investor.

- *[✂]*

6.80   [✂].

6.81   [✂].

6.82   [✂].

6.83   [✂].

6.84   As outlined in detail in Appendix E: GIPHY's Timeline, [✂] explained that it did not deliberate on the possibility of providing additional cash to GIPHY (absent the Merger) and given the uncertainty around the Coronavirus (COVID-19) pandemic, [✂] submitted that it is difficult to estimate what decision [✂] would have made. We note that in an email from [✂], to Alex

---

[355] With an outreach to any party that may be interested in a full acquisition or minority investment in GIPHY.

PX0684-150

Chung on 29 March 2020, [✂] appeared to express strong support for the GIPHY business and its potential, noting:

(a) [✂]

(b) [✂]

(c) [✂]

6.85   In the absence of the Merger, [✂] may therefore have provided further funding to GIPHY in order to see it through the Coronavirus (COVID-19) pandemic, and to fund further expansion.

- *[✂]*

6.86   [✂].

6.87   [✂].

6.88   In February 2020 in the context of GIPHY's fundraising efforts, we note that GIPHY's internal documents show that [✂] invited Alex Chung to attend the [✂] where Alex Chung would have the opportunity to present GIPHY, as one of [✂] 'high conviction companies', to some of the largest investors in the world who worked closely with [✂]. The aim of such a presentation and attendance by Alex Chung at this event was, as [✂] stated, to 'build strong relationships with a sophisticated group of investors who can be long-term capital partners if needed, both for this round and for future rounds or an IPO.'

6.89   As outlined in Appendix E: GIPHY's Timeline, [✂] submitted that it was [✂] in leading another round of financing of GIPHY and considered that this would need to be led by someone [✂] given that raising funds from [✂] investors for the [✂] funding round was [✂]. However, in the context of a private discussion between Alex Chung and a GIPHY investor (see Appendix E: GIPHY's Timeline), on 30 March 2020 Alex Chung appeared to indicate that GIPHY continued to have support from [✂] despite the Coronavirus (COVID-19) challenges: [✂].

6.90   In an email exchange among GIPHY board representatives and other investors on 29 March 2020 in light of Facebook's offer to acquire GIPHY, GIPHY's investors agreed on their response to Facebook on the proposed financial offer for GIPHY, as discussed on their call (see Appendix E: GIPHY's Timeline). The agreed response noted that [✂] there was interest from GIPHY's investors in exploring raising a round of funding, instead of selling GIPHY. Later, on 30 March 2020, [✂] stated that [✂] preferred to pursue the best M&A offer than to seek further financing for GIPHY: '[✂]'. Based on this

PX0684-151

statement, it appears that [✄] was considering participating in a further funding round for GIPHY up to the point where GIPHY received the offer from Facebook to be acquired for [✄]. In light of the evidence and in the absence of the Merger, or any other credible offer from an alternative purchaser, we consider that it is likely that [✄] would have invested further in GIPHY.

- *[✄]*

6.91   [✄] is a VC firm and invested in GIPHY in its [✄] funding rounds.

6.92   As outlined in detail in Appendix E: GIPHY's Timeline, in a GIPHY email exchange from February 2020 following a meeting of the GIPHY board in January 2020, [✄] appeared positive about GIPHY's monetisation ability in 2020 noting that the revenue plan presented was a baseline only, and GIPHY should [✄]. In a private response, [✄] emailed Alex Chung to say [✄].

6.93   Given [✄] positive messages regarding GIPHY's monetisation potential at the start of 2020 and in light of the fact that GIPHY was largely on track with its revenue plan prior to the Coronavirus (COVID-19) pandemic, it is possible that, in the absence of the Merger, [✄] would have invested further in GIPHY and continued to support its Paid Alignment business model.

- *[✄]*

6.94   [✄] is a VC firm that invested in GIPHY in the series [✄] and series [✄] funding rounds in [✄].

6.95   In respect of [✄] appetite to invest further in GIPHY, [✄] submitted that, following the conclusion of the series [✄] investment in GIPHY in [✄]. In response to a question raised by the CMA, and while noting that it is impossible to answer a hypothetical question, [✄] submitted that in a scenario whereby GIPHY were unable to be acquired by a third party or receive additional capital via an external investor, the GIPHY management team, board and investors would have been left in the difficult situation of either: (i) exploring additional ways to extend GIPHY's cash runway though cost reduction measures, and/or (ii) considering emergency financing options (including a further investment by [✄]).

6.96   [✄] noted that the scale and form of any cost reduction measures and/or emergency financing options, if available, would have needed to be further explored, debated and negotiated by and among GIPHY's management team, board and investors in order to determine the best potential outcome for shareholders and employees.

PX0684-152

6.97   Based on [✂] response, the CMA's view is that in the absence of the Merger, [✂] would have at least been open to discussing providing further funding to GIPHY to ensure its continued survival through the pandemic.

- *Our view on the possibility of GIPHY raising funds from existing investors*

6.98   The responses from a number of GIPHY's investors to our requests for information suggests that investors did not discuss the question as to whether they would provide further funding to GIPHY absent the Merger. However, Alex Chung noted at the Main Party Hearing with GIPHY that he specifically went to each of GIPHY's investors [✂].[356] [✂]. However, the CMA has not been provided with any evidence in GIPHY's internal documents which explain investor views in relation to these discussions with Alex Chung.

6.99   While the Parties have submitted in response to the CMA's Provisional Findings that: [✂] the CMA has assessed these submissions in the round in addition to other evidence obtained during the course of this investigation. It is on this basis that the CMA believes that GIPHY's Paid Alignment model was promising and in early 2020, investors continued to support GIPHY's efforts to further develop its monetisation model, notwithstanding the potential challenges that the Paid Alignment model presented. This is discussed in further detail in Chapter 7, Horizontal Effects and Appendix F, GIPHY's Paid Alignment Model.

6.100  The internal documents seen by the CMA suggest that investor views were influenced by the option of a sale of GIPHY to Facebook. Rather than demonstrating that GIPHY's investors declined to invest in GIPHY (as submitted by the Parties, see paragraph 6.106.66 above), the CMA considers that the evidence demonstrates that existing investors considered participating in a further funding round for GIPHY as an alternative to a sale. They ultimately decided to pursue the Merger in preference to participating in a further funding round.

6.101  However, in the absence of the proposed Merger, it is likely that some of GIPHY's investors would have looked to raise further funding for GIPHY to see it through the pandemic, and to fund further expansion (especially given that the demand for digital advertising rebounded later in 2020),[357] given:

---

[356] [✂]. In GIPHY's response to question 8 of RFI 6, GIPHY stated that 'many of GIPHY's discussions with investors took place over telephone calls. As such, documentary evidence is limited.'
[357] See paragraph 6.36.

151

(a) positive messages of support and belief in GIPHY's business potential from late stage investors such as [✕] and [✕];

(b) [✕] comments in January 2020 on GIPHY's monetisation potential, notably that GIPHY's revenue projections of [✕] should be considered a baseline only; and

(c) [✕] comments that in the absence of the Merger, GIPHY would need to consider emergency financing options including a further investment by [✕].

- *Staff retention*

6.102  In respect of Alex Chung's concerns on staff retention as a result of issues in raising further funding (see paragraph 6.67 above), the CMA notes that this does indeed appear to have been a concern at the time of the Merger: '[✕]'.

6.103  However, in a private discussion in late March 2020 between Alex Chung and a GIPHY investor on the challenges presented by Coronavirus (COVID-19) and GIPHY's options going forward in light of the proposed Merger, Alex Chung also noted his commitment to, and belief in, GIPHY: '[✕]'.

6.104  At the Main Party Hearing, Alex Chung indicated that a lower valuation of GIPHY would have resulted in employees quitting GIPHY for start-ups where they could have 'potentially exponential returns' or less risky financial incentives. As noted earlier in this chapter, the Parties have submitted, in response to the CMA's Provisional Findings, that '[✕]'.

6.105  While we note that GIPHY was alert to this risk, we consider that the evidence demonstrates that: (i) GIPHY's Paid Alignment offering was growing prior to the onset of the Coronavirus (COVID-19) pandemic, and (ii) as explained above, there was investor appetite in exploring a further round of funding for GIPHY following receipt of the offer from Facebook to acquire GIPHY for [✕]. We also note that the pandemic caused significant disruption to labour markets, and it is not clear to us that GIPHY's employees would have had an incentive to leave GIPHY for other start-ups which would have been in a similar position to GIPHY, facing uncertainty at the time as regards the impact of Coronavirus (COVID-19) and future funding. Employees would also have forfeited their stock options entirely had they chosen to leave the company, whereas in the most likely counterfactual, the CMA considers that GIPHY had a number of options available to it and could have secured further funding from investors, thus avoiding the risk of a down round and the associated staff retention challenges. It is therefore unclear that these employees would have been incentivised to leave GIPHY absent the Merger.

PX0684-154

6.106  Further comments on staff retention are provided in Chapter 7, Horizontal Effects, in the context of GIPHY's Paid Alignment offering.

  • *Conclusion on the possibility of GIPHY raising funds from existing investors*

6.107  We have carefully considered the Parties' submissions in response to the Provisional Findings. However, in view of the evidence and views expressed by some of GIPHY's investors shortly prior to the Merger, we do not consider that in the most likely scenario all of GIPHY's investors would have 'taken the painful step of pulling the plug' on GIPHY in the absence of the Merger. We take this view on the basis that, while GIPHY [✕],GIPHY's Paid Alignment proposition experienced a strong start in 2020 with approximately [✕] in revenue booked as of 21 January 2020, increasing to [✕] booked to run as of 9 March 2020 (see also paragraphs 6.34 and 6.46 to 6.48 above). GIPHY was largely operating according to its 2020 revenue plan prior to the Coronavirus (COVID-19) pandemic in 2020, and there appeared to be interest from advertisers in GIPHY's Paid Alignment model. Furthermore, had GIPHY's investors required GIPHY to scale back its operations in the short-term, we do not believe that this would have been the case for a sustained period of time. Therefore, absent the Merger, obtaining funds from existing investors who supported GIPHY's Paid Alignment business model was an option available to GIPHY which would have maintained its ability to supply GIFs, innovate, develop its products and services, generate revenue and explore various options to further monetise its products.

*New investors*

6.108  GIPHY has submitted that it held preliminary talks with new external investors [✕].  As outlined in the analysis above (and in Appendix E: GIPHY's Timeline), the CMA considers that in the absence of the Merger, GIPHY could have received such support from some of its existing investors given positive statements made by existing investors prior to the Merger.

6.109  In a document prepared by JP Morgan dated 14 February 2020 in connection with GIPHY's options for external fundraising, JP Morgan noted that 'it has high confidence a Giphy [✕] to fuel near term organic growth will be broadly well received by the market.' JP Morgan explained that it made this statement on the basis of its extensive experience of fundraising in the tech industry. Its view was reached on the basis that GIPHY was a well-known brand that was used by c.800m people daily. JP Morgan noted, however, that the statement referred to above was not a statement as to the certainty of GIPHY obtaining investment, and that it was made prior to onset of the Coronavirus (COVID-

19) pandemic, which had a significant impact on the ability to obtain investment.

- *Playtika*

6.110 Playtika is a large, digital entertainment company, with a market capitalisation of USD9.47 billion[358] that has established an investment fund that provides growth capital and expertise to start-ups, [✂].

6.111 We spoke with representatives of Playtika[359] on 5 May 2021. Playtika explained that it was introduced to GIPHY through a VC in late January 2020, and engaged in active discussions with GIPHY until the end of April 2020 when Playtika heard that GIPHY had been sold to Facebook.

6.112 Playtika's interest in GIPHY was driven by the fact that GIPHY had a high number of active users and was building an ad product which could be significant if executed well. Playtika noted that GIPHY needed support from investors and that GIPHY still needed to build the platform to turn its business into a significant advertising platform (but that the efforts associated with the build should not be underestimated). Following a review by Playtika of materials shared by GIPHY in the context of a potential investment, Playtika explained that it was clear that GIPHY required assistance to realise and properly execute its monetisation ideas.

6.113 Playtika compared the potential of GIPHY to the likes of Google and Facebook, noting that it had a very high number of active daily users, and its daily search volume was equivalent to 15% of Google's. In Playtika's view, this effectively made GIPHY the third largest search engine in the world (see Chapter 5, Market Definition and Market Power where we compare GIPHY's O&O search volume to other search websites).

6.114 [✂].

6.115 We know from our call with Playtika that it had expressed an initial interest in investing between USD25 to USD40 million in GIPHY, and that GIPHY was also keen for Playtika to invest. However, Playtika received no further engagement from GIPHY after April 2020, was not invited to perform any due diligence and the opportunity to invest disappeared when the Merger occurred.

---

[358] PLTK | Playtika Holding Corp. Stock Price & News - WSJ.
[359] Playtika explained that it has a broad interest in consumer entertainment industries with the focus of its core business being investments in mobile games and in-app purchases.

PX0684-156

6.116  Given that Playtika did not perform any due diligence on GIPHY, it is not clear whether Playtika would have ultimately proceeded with an investment. However, Playtika was interested in exploring a minority investment in GIPHY in the region of USD25 to USD40 million, but received limited engagement from GIPHY once the opportunity for an acquisition of GIPHY by Facebook presented itself.

- *ByteDance*

6.117  As discussed in more detail below, ByteDance was contacted by JP Morgan as part of the GIPHY sales process in late 2019.

6.118  In its response to a CMA request for information, ByteDance has explained that it discussed a potential investment in GIPHY in late 2019 after it had signed a commercial agreement with GIPHY. However, given that there was an existing licensing agreement between ByteDance and GIPHY [✂], ByteDance considered that the needs of its business were already being substantially met by such agreement.

6.119  As a result, when the investment opportunity was presented to ByteDance by GIPHY, ByteDance had no intention of acquiring a significant percentage of GIPHY and noted that it 'only entertained a modest minority investment'. ByteDance has submitted that it communicated the minority investment idea to GIPHY to gauge its interest before proceeding with any detailed commercial term discussions; however, 'GIPHY did not reply to ByteDance with a confirmation regarding an intention to move forward', and after a period of limited responsiveness from GIPHY, ByteDance was informed that GIPHY was to be acquired by Facebook.

6.120  Based on this evidence, it appears that ByteDance was willing to discuss a minority investment in GIPHY (but it is unclear how much ByteDance would have been willing to invest); however, ByteDance received limited engagement from GIPHY on this offer.

- *Conclusion on the possibility of GIPHY raising funds from new investors*

6.121  The evidence provided by two potential investors (Playtika and ByteDance) suggests that there was some external investor interest in providing funding to/obtaining a minority interest in GIPHY prior to the Merger. As noted above, JP Morgan was also positive about the potential for [✂] given that it was used by 800 million people daily, and the fact that it operated a well-known brand. However, both potential external investors have expressed that they received

155

limited engagement from GIPHY in respect of such discussions.[360] As explained in paragraph 6.1336.133 below, based on the term sheet signed with Facebook on 7 April 2020, it appears that GIPHY was prevented from entertaining any such discussions after this date given the inclusion of a broad 'no-shop' provision in the term sheet.

6.122   The CMA considers that it is possible that external investors would have progressed their discussions with GIPHY in the absence of the Merger, although it is unclear whether external investors would have ultimately proceeded with an investment. Further, we consider that it is unlikely that GIPHY's existing investors would have accepted an investment in GIPHY from a new external investor at a valuation of between [✂] million (in view of the other funding options available, see paragraphs 6.163 to 6.166 below). Therefore, we consider that a new external investor providing funding to GIPHY at a valuation of more than [✂] million would have, in principle, maintained the same basic incentives as GIPHY to continue to supply GIFs, innovate, develop its products and services, generate revenue and explore various options to further monetise its products.

*Could GIPHY have been sold to an alternative purchaser?*

6.123   The Parties submitted that [✂] that an alternative purchaser would have been found for GIPHY.

6.124   However, several Facebook internal documents suggest that the acquisition of GIPHY was [✂], indicating that Facebook [✂]. A Facebook internal document also expressed Facebook's concerns that the sale of GIPHY could '[✂]'.

6.125   Further, [✂].

- *Sales process*

6.126   As summarised above, the Parties submitted that '[✂]' and 'Facebook was the only company to express a firm interest in acquiring GIPHY, let alone to proceed to exclusive negotiation or sign a term sheet'.

6.127   However, a third party informed us that an enquiry from a large Asian-based messaging platform ([✂]) initiated the M&A interest in GIPHY. Internal Facebook communications in February 2020 confirm that [✂].

---

[360] [✂].

PX0684-158

6.128   GIPHY engaged JP Morgan in October 2019 to assist in exploring potential options to provide GIPHY with financial support through an equity fundraise or acquisition. JP Morgan explained that it was engaged by GIPHY to reach out to potentially interested parties on the basis that such parties might have an interest or strategic rationale in acquiring GIPHY.

6.129   Throughout November 2019, JP Morgan reached out to a number of companies[361] to gauge their interest in a possible acquisition of GIPHY. After this initial outreach, JP Morgan stated that its role was to register their interest and engage with potential acquirers to assess their interest in meeting with GIPHY's management; however, JP Morgan stated that it did not hold key discussions with these parties and was not privy to specific drivers or the rationale behind each party's respective interest in GIPHY.

6.130   We do know, however, that a number of parties (other than Facebook) progressed with their interest to acquire GIPHY and signed NDAs. [✂]. All these parties also attended management presentations with GIPHY throughout November and December 2019 (with some parties also attending follow-up meetings), indicating a continued interest in a potential acquisition of GIPHY following the initial outreach in November 2019.

6.131   Whilst the Parties submitted that all other potential acquirers had '[✂]' the opportunity to acquire GIPHY, the CMA was unable to identify any internal documents which confirmed that this was indeed the case. GIPHY submitted that the reason for this is that potential acquirers often communicate their intentions verbally rather than in writing to avoid any risk of leaks and causing damage to the possibility of a sale to another party.

6.132   JP Morgan also submitted that it was unable to identify a central record explaining when and why each potential acquirer dropped out of the sales process, but it stated that interested parties withdrew from the process for a variety of reasons, where a reason was given, including: (i) business fit, (ii) potential purchase price, and (iii) a challenging financial climate as a result of the Coronavirus (COVID-19) pandemic. We note however that a majority of the bidders appeared to withdraw from the sales process before the Coronavirus (COVID-19) pandemic started.

6.133   JP Morgan further submitted that, in its view, [✂]. No other party submitted a bid, despite outreach to multiple other parties. Notwithstanding further outreach to [✂] following Facebook's offer, there was still no bid forthcoming. However, following the signing of the term sheet with Facebook on 7 April

---

[361] [✂].

PX0684-159

2020, it appears that GIPHY was unable to have discussions with any potentially interested parties given that the term sheet contained a broad 'no-shop provision', [✂]. It is therefore unsurprising that following the signing of the Facebook term sheet in early April 2020, no bids were submitted from any other interested parties.

6.134  The Parties have submitted that no-shop provisions are a common part of the M&A deal process, and that the no-shop provision between GIPHY and Facebook came into effect after discussions with other potential acquirers had already stalled. As a result, the Parties submitted that the no-shop provision did not leave GIPHY in a position where it was unable to have discussions with any potentially interested parties because these discussions had already occurred.

6.135  However, while the no-shop provision may not have impacted early discussions between GIPHY and potential acquirers, we consider that the inclusion of such a provision may help to explain the reason why external investors' discussions with GIPHY stalled in late March/early April 2020 (as discussed in the section above).

6.136  [✂] and therefore we do not agree with the Parties' submission that there was no other bid forthcoming.

6.137  The Parties submitted that the [✂] potential acquirers of GIPHY who had progressed with discussions beyond initial outreach [✂]:

   *(a)*  [✂].

   *(b)*  [✂].

   *(c)*  [✂].

   *(d)*  [✂].

   *(e)*  [✂].

   *(f)*  [✂].[✂].

   *(g)*  [✂].

6.138  [✂].

   •  *[✂]*

6.139  JP Morgan has submitted that [✂].

PX0684-160

6.140   As noted above, [✁] was engaged in active discussions with GIPHY in November 2019 and attended two in-person meetings with GIPHY. JP Morgan has explained that it did not initially reach out to [✁] as a potential acquirer of GIPHY in November 2019, [✁].

6.141   [✁].

6.142   GIPHY submitted that in January 2020, [✁] indicated that it was not interested in further pursuing an acquisition of GIPHY and expressed concerns that the integration of the GIPHY team within [✁] would result in distraction from other [✁] objectives. [✁].

6.143   In one of GIPHY's internal documents from early April 2020, GIPHY noted that it was waiting on JP Morgan to reach out to [✁] to start a '[✁]'. Based on GIPHY's internal documents, we infer that the purpose of this final outreach was to allow an opportunity for a counter-offer to the Facebook acquisition offer from the likes of [✁].

- *[✁]*

6.144   The Parties submitted that [✁].

6.145   However, GIPHY's internal documents identify [✁] as a 'potential interloper' in the deal being negotiated between GIPHY and Facebook in late March 2020. JP Morgan submitted that [✁] was identified as a potential interloper because it is [✁] with sufficient scale and the potential 'ability to pay'. In JP Morgan's view, [✁] were the only [✁] companies, other than Facebook, with scale and potential ability to integrate GIPHY within their platforms.

6.146   [✁].

6.147   Whilst JP Morgan submitted that [✁] expressed interest in a minority investment in GIPHY (not a full acquisition) which GIPHY ultimately decided not to pursue, [✁].

6.148   [✁].

6.149   [✁].

6.150   In their response to the Provisional Findings,[362] the Parties submitted that had GIPHY been acquired by an alternative purchaser, that purchaser would likely not have wanted to acquire GIPHY's revenue business and sales team given that Facebook did not. Further, the Parties considered that another buyer

---

[362] Parties' response to Provisional Findings, paragraph 5.3(b).

PX0684-161

would also likely not have wanted to pursue GIPHY's Paid Alignments business, because such a buyer would have had a more straightforward way of monetising GIPHY – by selling ads on its own service.[363]

6.151 [✂].

6.152 [✂]. Therefore, while Facebook may not have wished to pursue GIPHY's Paid Alignment model at the time of the Merger, this does not demonstrate that other potential acquirers of GIPHY would have behaved in the same way. Furthermore, a potential acquirer of GIPHY (who would have only been able to acquire GIPHY from GIPHY's existing investors at a valuation of more than [✂], see section below) would have maintained the incentive to continue exploring various ways to monetise GIPHY's products.

6.153 [✂], in our assessment of the relevant counterfactual, we have further considered:

*(a)* GIPHY's estimated valuation at the time of the Merger;

*(b)* [✂]; and

*(c)* Whether GIPHY, at the time of the Merger, would have accepted a lower offer than submitted by Facebook based on GIPHY's estimated valuation.

- *Valuation of GIPHY*

6.154 GIPHY submitted that in the period since January 2017, it did not prepare any internal documents for the purpose of raising additional capital or identifying an acquisition partner, nor did it commission third parties to prepare such materials. [✂].

6.155 We note that the estimated equity value in 2019 of [✂] is broadly in line with the total consideration paid by Facebook of [✂].

6.156 The CMA's analysis of GIPHY's latest series D-1 funding round in early 2019 (where GIPHY raised funds of [✂] at a price of [✂]), indicates a valuation of c.[✂] in early 2019, prior to the onset of the Coronavirus (COVID-19) pandemic. The Parties submitted that before the onset of the Coronavirus (COVID-19) pandemic, '[✂]', which is above the CMA's estimated value based on the share price of the series D-1 funding round.

6.157 At the time when Facebook was pursuing the Merger and seeking internal approval to acquire GIPHY, Facebook noted that GIPHY's valuation was

---

[363] Parties' response to Provisional Findings, paragraph 5.3(b).

PX0684-162

between [✁] and [✁], indicating that GIPHY's value may have increased since the Series D-1 funding round.

- *[✁]*

6.158  [✁], we questioned whether [✁] believed that Facebook's proposed purchase price was above the value of GIPHY at the time of the Merger. [✁] noted that whilst this was a difficult question to answer, [✁]. We note that [✁] estimated valuation of [✁].[364]

6.159  [✁].

6.160  [✁].

6.161  Given that the discussions did not progress much further, [✁] submitted that it did not have to definitively decide the maximum amount which it was willing to pay for GIPHY. It is possible, therefore, that [✁] might have increased its offer for GIPHY, but perhaps not to a level which GIPHY's board would have accepted.

6.162  [✁], and [✁],[✁].

- *Would GIPHY have accepted a lower offer from an alternative purchaser at the time of the Merger based on its valuation?*

6.163   The Parties submitted that '[✁].' The purchase price proposed by Facebook (USD315 million [✁] with circa. [✁] in RSUs), allowed GIPHY to pay back all of the money raised by GIPHY's investors, and for some investors, offered additional returns (see Table 6 below).

6.164  In a document prepared by JP Morgan in connection with the Facebook acquisition, JP Morgan sets out the return on invested capital for each of GIPHY's key investors based on an assumed purchase price of [✁].

**Table 6: Return on invested money based on [✁] valuation**

[✁]

Source: [✁].

6.165  The Parties submitted that a combination of the Coronavirus (COVID-19) pandemic and ongoing fundraising challenges presented existential challenges for the GIPHY business in 2020. Further, in GIPHY's view, the [✁].We have therefore considered whether, absent the Merger and

---

[364] See paragraph 6.156 above.

PX0684-163

notwithstanding the negative returns for shareholders, GIPHY would have sold to [✂] at a purchase price of [✂] to secure GIPHY's future.

6.166   Given that at the time of the Merger: (i) GIPHY was operating at a monthly average loss of c. [✂], (ii) [✂]and, (iii) there was a degree of uncertainty in financial markets caused by the Coronavirus (COVID-19) pandemic, it is possible that GIPHY's shareholders would have looked for an exit opportunity and might have accepted a discounted sale. The Parties submitted that GIPHY's revenue-generating business was uncertain, [✂].However, it seems unlikely that GIPHY's shareholders would have sold to [✂] at a purchase price of [✂] at the time of the Merger given that:

(a)   as discussed in more detail in Chapter 7, Horizontal Effects, GIPHY's internal documents indicate [✂] at the start of 2020. Further, the introduction of a platform fee (as discussed at paragraphs 6.56 to 6.626.59) may have provided GIPHY with an option for immediate access to capital (to ensure its continued ability to supply GIFs), with further funding being provided by investors later in 2020 to fund further expansion of the Paid Alignment offering when the digital advertising market recovered. The option of a platform fee could have been explored in combination with the Paid Alignment/revenue-sharing agreement monetisation model ie charging those API partners a platform fee if they were unwilling to enter into a revenue share agreement; and

(b)   JP Morgan's analysis as outlined in Table 6 above demonstrates that [✂] was far below GIPHY's estimated value at the time of the Series D-1 funding round when GIPHY's shareholders elected to invest further capital in GIPHY. At the time of the Series D-1 funding round, GIPHY's investors would have taken a view on what they estimated GIPHY's potential to be worth and it seems unlikely that GIPHY's shareholders would have been willing to suffer a loss and accept negative returns on their investment by selling GIPHY to [✂] (at the purchase price of [✂]) only one year after having invested [✂] in GIPHY. [✂].  As noted above, the evidence indicates that when considering Facebook's offer to acquire GIPHY at a valuation of [✂], GIPHY's investors discussed providing further funding to GIPHY as an alternative to the Merger. It seems unlikely, therefore, that GIPHY's investors would have accepted a sale of GIPHY at a valuation of between [✂]. Further, we also note that GIPHY had sufficient cash runway until Q4 2020 which it was looking to extend, and therefore we do not consider that GIPHY was in a position, prior to the Merger, where a fire sale [✂] was necessary. This also appears to be the view of the Parties, as explained in their supplementary submission '[t]his was not a rapid fire-sale.'

PX0684-164

*Our assessment of the options available to GIPHY absent the Merger*

6.167   In view of the above, we consider that at the time of the Merger, there were a number of options available to GIPHY which would have ensured its survival through the Coronavirus (COVID-19) pandemic, and would have allowed GIPHY to raise further capital to fund revenue growth, eg through expansion of its Paid Alignment offering.

6.168   Taking into account the evidence in the round, we consider that each of these options would have led to the same conditions of competition against which to assess the Merger, that is conditions of competition where GIPHY would have continued its efforts to supply GIFs, innovate, develop its products and services and generate revenues, doing so independently of Facebook.[365] This is therefore in our view the most likely counterfactual. We reach this view on the basis that:

(a)   a platform fee was an option that GIPHY and one or more of its API partners would have considered absent the Merger as a solution to GIPHY's short term funding issues arising from the Coronavirus (COVID-19) pandemic, which would have provided GIPHY with access to capital in order to ensure its continued survival during the pandemic;

(b)   we do not consider that in the most likely scenario, all of GIPHY's investors would have 'taken the painful step of pulling the plug' on GIPHY in the absence of the Merger. Rather, we consider that obtaining funds from existing investors who supported GIPHY's Paid Alignment business model was an option available to GIPHY which would have maintained its ability to supply GIFs, innovate, develop its products and services, generate revenue and explore various options to further monetise its products. Furthermore, had GIPHY's investors required GIPHY to scale back its operations in the short-term, we do not believe that this would have been the case for a sustained period of time;

(c)   it is possible that external investors would have progressed their discussions with GIPHY in the absence of the Merger, although it is unclear whether external investors would have ultimately proceeded with an investment. However, a new external investor would only have been able to secure an investment in GIPHY at a valuation of more than [✕] (in view of the other funding options available), and therefore, we consider that a new external investor providing funding on these terms would have,

---

[365] For this reason, we disagree with the Parties' submission that in the Provisional Findings, the CMA has not examined how GIPHY's business would be affected by the relevant counterfactual, ie how reduced funding would have affected GIPHY's prospects and business plan (see Parties' Response to Provisional Findings, paragraph 5.4).

PX0684-165

in principle, maintained the same basic incentives as GIPHY to continue to supply GIFs, innovate, develop its products and services, generate revenue and explore various options to further monetise its products; and

*(d)* while a sale to a third party, for example a social media platform, would have remained a possibility, it seems unlikely that GIPHY's shareholders would have accepted a sale of GIPHY at a valuation of between [✂], in view of the other funding options available. In fact, we consider that GIPHY's investors would have only considered a sale to an alternative purchaser at a valuation above [✂] (especially noting that at [✂], GIPHY's investors suggested to explore raising a further round of funding rather than selling GIPHY). Therefore, we consider that any such acquirer would have, in principle, maintained the same basic incentives as GIPHY to continue exploring ways of to monetise its products.[366]

## Conclusion on the counterfactual

6.169 Having assessed the evidence before us, we conclude that the most likely counterfactual which would have prevailed in the absence of the Merger is that: (i) Facebook would have continued to procure GIFs from GIPHY, and (ii) GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products. This counterfactual would have prevailed regardless of GIPHY's ownership, ie whether under its pre-Merger ownership structure (receiving financial support and commercial expertise from investors) or if it had been sold to an alternative purchaser, possibly another social media platform.

---

[366] We note that the incentives to foreclose rival platforms from GIPHY would likely be different under the ownership of another social media platform, compared to the incentives for Facebook to foreclose its rivals from GIPHY as set out in Chapter 8. This is primarily because any other social media platform would be significantly smaller than Facebook and would thus be less likely to benefit from foreclosing rivals.

PX0684-166

# 7.   Horizontal Effects

## Introduction

7.1    In this Chapter, we assess whether the Merger has led, or may be expected to lead, to a loss of potential competition in display advertising in the UK. As discussed below, this is a theory of harm arising from horizontal unilateral effects.

7.2    GIPHY is a leading provider of video GIFs and GIF stickers, accounting for the majority ([✂<])[367] of GIF searches globally, due to the distinctive quality of its content and search algorithm, and its sizeable reach among the major distribution partners.[368] As we discuss in Chapter 8, Vertical Effects, GIFs are popular among social media users and an important engagement tool for social media and other platforms. Prior to the Merger, GIPHY was seeking to build on its success as a GIF provider by monetising through its innovative Paid Alignment service. It had made some progress in attracting advertisers and third-party platforms to this service in the US but had not yet entered the UK market; however, it was continuing to develop and extend its Paid Alignment offer at the time of the Merger. As set out in Chapter 5, Market Definition and Market Power, we have concluded that the type of advertising that GIPHY was developing prior to the Merger through its Paid Alignment services would have been a close substitute for display advertising services of the type offered by Facebook.

7.3    Facebook operates two-sided platforms which offer social media services to users and display advertising services to advertisers. Facebook is, by a large margin, the largest provider in social media globally and of display advertising in the UK. As set out in Chapter 5, Market Definition and Market Power, we have found that it holds significant market power in both of these related markets. Through the Merger, Facebook has acquired the largest provider of GIFs (both globally and in the UK) in a market with just two major providers, GIPHY and Tenor (owned by Google).

7.4    For the reasons set out below, our view is that the Merger will lead to a **substantial lessening of competition in the supply of display advertising services in the UK arising from a loss of dynamic competition**.

7.5    As set out in Chapter 8, Vertical Effects, the CMA has also reached the conclusion that the Merger has resulted in a substantial lessening of

---

[367] Chapter 5, Market Definition and Market Power, Table 3.
[368] Chapter 4, Industry Background, Figure 9.

PX0684-167

competition in the supply of social media services. Because GIFs are an important driver of user engagement, which in turn drives the amount of time spent on a platform and hence the amount of available advertising inventory, GIFs are also important to social media platforms' ability to fund their business through the supply of display advertising in competition with Facebook. Given the linkages between social media and display advertising markets, the harm to the competitiveness of social media platforms in the supply of social media services set out in Chapter 8 would also translate into a weakening of competition between social media platforms in the market for display advertising. This in turn exacerbates the weakening of the competitive process in the display advertising market arising from the elimination of GIPHY as a potential competitor in display advertising.[369,370]

7.6   The remainder of this Chapter is structured as follows:

(a)   We set out the framework for our analysis of a loss of dynamic competition and address the Parties' comments on this framework.

(b)   We consider GIPHY's role, absent the Merger, in the dynamic competitive process as a potential competitor, including:

(i)   the importance of GIPHY's efforts to innovate and expand for dynamic competition, and the potential importance of these efforts in the context of Facebook's significant market power in display advertising; and

(ii)   the likelihood of GIPHY's successful expansion of its Paid Alignment services and of its entry into the UK market, based on our assessment of the strengths and weaknesses of GIPHY's Paid Alignment model.

(c)   We consider the potential impact GIPHY would have had absent the Merger on dynamic competition by other players in the relevant market, in the light of:

(i)   the expected closeness of competition between GIPHY's advertising service and Facebook's display advertising services; and

---

[369] For the avoidance of doubt, while these effects strengthen the effects on dynamic competition set out in this Chapter 7, Horizontal Effects, the CMA finds that the loss of dynamic competition arising from the elimination of GIPHY as a potential competitor in the provision of display advertising is sufficient to give rise to an SLC.
[370] As noted in paragraph 5.182, we refer for convenience to GIPHY's entry and expansion in display advertising. To be clear, this reflects our view that GIPHY's Paid Alignment services would have been a close substitute for Facebook's display advertising services, regardless of whether the service meets a particular description of display advertising.

PX0684-168

    (ii)  Facebook and others' likely response to potential competition absent the Merger.

*(d)*  We then assess the loss of dynamic competition arising from the Merger, and the extent to which it is substantial.

*(e)*  Based on the above assessment, we set out our conclusion on whether potential competition from GIPHY has been lost as a result of the Merger.

## Framework for analysis

7.7    Horizontal mergers combine firms that are currently active, or absent the merger would be active in the future, at the same level of the supply chain and that compete to supply products that are substitutable for each other.[371] Unilateral effects relate to the Merged Entity being able to profitably and unilaterally[372] raise its prices, worsen its quality or service and non-price factors of competition, or reduce innovation efforts at one or more of the pre-merger businesses.[373]

7.8    An assessment of horizontal unilateral effects arising from a merger essentially relates to the weakening or elimination of a competitive constraint. The competitive constraint eliminated by a merger may be an existing constraint, or a potential or future constraint.[374] As the Merger Assessment Guidelines confirm: 'The CMA's main consideration is whether there are sufficient remaining good alternatives to constrain the merged entity post-merger. Where there are few existing suppliers, the merger firms enjoy a strong position or exert a strong constraint on each other, or the remaining constraints on the merger firms are weak, competition concerns are likely. Furthermore, in markets with a limited likelihood of entry or expansion, any given lessening of competition will give rise to greater competition concerns'.[375]

7.9    Mergers involving a potential entrant can lessen competition in different ways.[376] First, a merger involving a potential entrant may imply a loss of the

---

[371] Merger Assessment Guidelines (CMA129), paragraph 2.15.
[372] As distinct from acting in coordination with other firms in the market.
[373] Merger Assessment Guidelines (CMA129), paragraph 2.17.
[374] Merger Assessment Guidelines (CMA129), paragraph 4.2.
[375] Merger Assessment Guidelines (CMA129), paragraph 4.3.
[376] It is a well-established principle that competition law protects not only actual competition, but also potential competition between undertakings. (See Merger Assessment Guidelines (CMA129), section 5; see also by analogy T-519/09, *Toshiba v Commission* EU:T:2014:263, paragraph 230.) This is because there is competitive interaction between a firm that has the potential to enter or expand in competition with other firms (Merger Assessment Guidelines (CMA129), paragraph 5.1). A potential competitor may exert competitive pressure on the firms in the market '*by reason merely that it exists*' (*C-307/18 Generics (UK) Ltd and Others v CMA*, EU:C:2020:28, paragraph 42).

PX0684-169

future competition between the merger firms after the potential entrant would have entered or expanded. Second, existing firms and potential competitors can interact in an ongoing dynamic competitive process, and a merger could lead to a loss of dynamic competition.[377]

7.10   Losses of future competition and losses of dynamic competition are interrelated, as they both involve the constraint from potential entrants, and both depend on the likelihood of entry or expansion by a potential entrant, and the impact of such entry or expansion on competition.[378]

***Competition concern and outline of the competitive assessment***

7.11   The question we are considering in this Chapter is whether the Merger has substantially lessened competition or may be expected to do so by removing GIPHY as a potential competitor to Facebook's display advertising offering.

7.12   The importance of GIPHY as a potential competitor in display advertising, and hence its importance to dynamic competition, depends on a range of factors, including the efforts it would have made to expand in the display advertising market, the value of its efforts to innovate, the likelihood of expansion of its monetisation activities,[379] the extent to which GIPHY may have stimulated innovation and competition by third parties (such as its API partners), the extent to which it may have been a competitive threat to Facebook, and Facebook's incentives to respond to this threat. While the competitive process of innovation and the development of products by global players such as GIPHY and Facebook takes place at a global level (such that developments will also be reflected in the UK), sales to customers occur at a national level. When assessing the effect of the Merger on the UK display advertising market it is therefore also necessary to consider the likelihood of GIPHY's entry into the UK and its efforts to achieve that goal.

7.13   We note that GIPHY's importance as an input to social media platforms strengthens its prospects in display advertising, both in attracting audiences to its advertising service, and in providing a foundation for developing its existing relationships with important social media platforms towards partnerships in the provision of display advertising.

---

[377] Merger Assessment Guidelines (CMA129), paragraph 5.2.
[378] Merger Assessment Guidelines (CMA129), footnote 102.
[379] By 'monetisation' activities we refer to GIPHY's Paid Alignment model and other advertising services it could have sought to develop. As discussed in Chapter 6, Counterfactual, GIPHY also considered the introduction of a platform fee as a short-term solution to its cashflow issues prior to the Merger. Our use of the term 'monetisation' does not include such platform fees.

PX0684-170

7.14   As part of our assessment, we are considering whether the Merger, by removing a potential competitor, has reduced the potential competitive pressure faced by Facebook in the UK display advertising market, thereby affecting the ongoing dynamic competitive process.[380] Firms such as GIPHY that are making efforts or investments that may eventually lead to their entry or expansion will do so based on the opportunity to win new sales and profits, which may in part be 'stolen' from the other merger firm, in this case Facebook. Incumbent firms such as Facebook that are making efforts to improve their own competitive offering may do so to mitigate the risk of losing future profits to potential entrants such as GIPHY.[381] This process of dynamic competition can also increase the likelihood of new innovations or products being made available, whether this would have been by GIPHY, Facebook or other firms. Dynamic competition therefore has economic value in the present.[382] Our Merger Assessment Guidelines recognise that the elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where entry by that entrant is unlikely and may ultimately be unsuccessful.[383]

7.15   This is because, where dynamic competition gives customers the chance to benefit from a wider variety of products or a future increase in competition, this represents value to customers even where there is some uncertainty that these products or services will ever ultimately be made available to customers.[384] In addition, existing firms may invest in order to protect future sales from dynamic competitors, and the removal of the threat of entry may lead to a significant reduction in innovation or efforts by other firms.[385]

7.16   The structure of the market, and Facebook's market position, are key elements in assessing the impact of GIPHY as a dynamic competitor. As noted in paragraph 7.3, we are of the view that Facebook has significant market power in display advertising in the UK. The impact of a potential entrant on competition is likely to be more significant when there are few strong existing competitive constraints (including potential entrants providing dynamic competition) and where the other merger party already has significant market power (with greater market power being associated with a

---

[380] On that basis, we disagree with the Parties' submission that the CMA cannot find an SLC in this context unless it is more likely than not that, absent the Merger, GIPHY would within a reasonable timeframe have evolved into such a meaningful advertising competitor in the UK that its acquisition could substantially lessen competition. There may be a loss of dynamic competition even if such an outcome was uncertain.
[381] Merger Assessment Guidelines (CMA129), paragraphs 5.1 – 5.3, and 5.19.
[382] Merger Assessment Guidelines (CMA129), paragraph 5.20.
[383] Merger Assessment Guidelines (CMA129), paragraph 5.23. See also by analogy *C-307/18 Generics (UK) Ltd and Others v CMA,* EU:C:2020:28, paragraph 38.
[384] Merger Assessment Guidelines (CMA129), paragraph 5.20. We note that in this case GIPHY had launched some of the relevant products, although not in the UK.
[385] Merger Assessment Guidelines (CMA129), paragraph 5.23.

PX0684-171

greater likelihood of an entrant having a bigger impact on competition). In such circumstances, even small increments in the market power held by a firm with a strong position in the market may give rise to competition concerns.[386]

7.17   As our Merger Assessment Guidelines note,[387] there may be some uncertainty about the outcome of investments and innovation efforts absent the merger, including whether the investments being made by merger firms would ultimately result in products or services being made available to customers. In the present case, as discussed below, GIPHY faced challenges to expanding its monetisation activities, and there is necessarily some uncertainty about how its business would have developed absent the Merger. However, uncertainty about the future outcome of a dynamic competitive process does not preclude the CMA from assessing the impact of a merger on that dynamic process – as noted, that dynamic process may have economic value in the present, by increasing the likelihood of new innovations or products being made available in future in response to competitive pressure.

### *Parties' views on the framework for assessment*

7.18   The Parties have submitted that the CMA's analysis of horizontal effects does not meet the required standard of proof and that the CMA should have concluded (but failed to do so) on the independent likelihood of a series of events that it considers necessary for the CMA analysis to hold. The Parties have submitted in this context that 'the loss of potential competition theory requires that an extended sequence of events to be [sic] more likely than not to occur'.[388]

7.19   In commenting on a CMA Working Paper relating to this Theory of Harm, the Parties submitted that:

> 'A long and unbroken chain of highly implausible events is required to bring about the hypothetical scenario that the Working Papers consider, where GIPHY would become a successful advertising rival to Facebook in the UK. Even if, as the CMA contends, it is not required to show that each independent step in this hypothetical chain of events is more likely than not to occur, it stands to reason that a counterfactual requiring multiple, sequential events to occur must be strongly supported by the evidence, and the CMA cannot simply disregard

---

[386] Merger Assessment Guidelines (CMA129), paragraphs 4.12(a) and 5.15.
[387] Merger Assessment Guidelines (CMA129), paragraph 5.20.
[388] Parties' Response to Provisional Findings, paragraph 6.8 to 6.12.

PX0684-172

highly implausible links in this chain of events in order to reach the conclusion that an SLC is more likely than not to occur'.

7.20    The Parties identified the following 'steps' in the chain: 1. GIPHY would need to have obtained significant external funding. 2. GIPHY's significant API Partners would need to have entered into revenue share agreements, including Facebook. 3. GIPHY would need to have successfully expanded its Paid Alignment services internationally, including into the UK. 4. GIPHY would need to have become a significant player as part of a broader digital advertising frame of reference in the UK. 5. GIPHY would need to have succeeded in monetising messaging with advertising where all others had failed.

7.21    The CMA disagrees with this framework for the assessment of the impact of the Merger on potential competition. As noted by the Court of Appeal in *BskyB*[389], 'It is not necessary for the [CMA] to isolate each step in the analytical process and to apply the balance of probability separately at each stage. The standard of proof applies to the CMA's conclusion on the points which it has to decide, [...], and then whether this would cause an SLC. It does not have to be applied separately to each element in the analysis which is used to reach a conclusion on each of these points.' The framework suggested by the Parties purports to introduce levels of certainty and foresight, in relation to sequential 'steps', which are neither necessary nor appropriate when determining whether the Merger may be expected to give rise to an SLC as a result of the lessening of potential competition. This is particularly the case with respect to the impact of the Merger on dynamic competition, which considers the ongoing competitive impact of a prospective entrant both before and after its entry.[390] For example, a loss of dynamic competition does not require that GIPHY would need to have become (on the balance of probability) a significant player in digital advertising ('step' 4) – see paragraph 7.14.[391]

---

[389] *BskyB v Competition Commission,* [2010] EWCA Civ 2 at [69].
[390] As noted by our Merger Assessment Guidelines (CMA129) (see paragraphs 5.4 and 5.20), the uncertainty around the scale and impact of entry and expansion does not, by itself, reduce the likelihood that a merger could give rise to competition concerns, and the presence of some uncertainty therefore does not in itself preclude the CMA from finding competition concerns on the basis of all the available evidence where the CMA is satisfied that the relevant standard of proof is met.
[391] We also note that the Competition Appeal Tribunal in *JD Sports v CMA* [2020] CAT 24 at [97] found: 'We find no reason in law to impose on the CMA's analytical approach the parameter-by-parameter taxonomy required by JD Sports. We agree with the CMA that the approach argued for by JD Sports is not required by the statute or by the [Merger Assessment Guidelines]. The [Merger Assessment Guidelines] make this clear in para 1.5: parties are not entitled to rely on an expectation that any particular analytical methodology will be used in each and every investigation. The CMA is of course bound to determine the statutory questions in a rational manner as set out most recently in Ecolab¸ but the requirements of rationality do not require the CMA to adopt a particular analytical technique. Given the case-specific nature of merger investigations, there can be no expectation that the analytical methodology will be applied in a rigid and mechanistic way. In addition, it is clear that the CMA can depart from the [Merger Assessment Guidelines] "where they consider it appropriate to do so".'

PX0684-173

7.22   The elements identified by the Parties are not sequential links in a chain that must each be demonstrated for an SLC on the basis of horizontal unilateral effects due to a loss of dynamic competition. In particular:

(a)   These 'steps' are not factually or economically independent of (or even entirely distinct from) one another. For example, GIPHY becoming a significant player ('step' 4) depends on the attractiveness of GIPHY's Paid Alignment model to advertisers (and hence their willingness to commit revenues to it), which in turn depends on its effectiveness as an advertising tool ('step' 5). From the perspective of API partners, the attractiveness of a revenue-sharing agreement ('step' 2) depends, at least in part, on the revenues they can expect to realise from such an agreement, which again depends on advertisers committing revenues to Paid Alignment. With sufficient advertising revenues, GIPHY would have become cash-positive and would not have needed further funding for its ongoing operations ('step' 1).[392] The question of whether GIPHY would have become a significant player as part of a broader digital advertising frame of reference in the UK ('step' 4) is closely related to whether it would have succeeded in monetising messaging with advertising ('step' 5) and successfully expanded its service to the UK ('step' 3).

(b)   The 'steps' are not binary in terms of outcome (ie success or failure). For example, it may not have been necessary for GIPHY to enter into revenue share agreements with all of its significant API partners (including Facebook) for successful expansion ('step' 2). In addition, successful expansion through revenue share agreements with a subset of its API partners (including those with which it already had such agreements) may have increased the attractiveness of such agreements from the perspective of other API partners.

7.23   In response to our Provisional Findings, the Parties submitted[393] that:

(a)   '…the CMA has failed to set out which of the steps it considers not to be sequential. The steps the Parties have identified are the correct sequence of events that would need to be demonstrated. If any one of these steps is unlikely, then it follows as a matter of logic that the whole theory of harm is unlikely.'

(b)   'The CMA further attempts to side-step this evidential requirement by arguing that the steps are interdependent, and so seems to suggest that if

---

[392] In addition, such an outcome would likely have made it easier for GIPHY to secure further funding as required.
[393] Parties' response to Provisional Findings, paragraph 6.9 to 6.10.

PX0684-174

it can demonstrate that one link in the chain holds, it can conclude that all the links in the chain hold.'

7.24   To clarify, our view is that these steps are not 'sequential' simply in the sense that GIPHY would not have needed to meet each condition before proceeding to the next – for example, GIPHY could have won revenue share agreements with its major API partners prior to securing additional funding, and in practice was seeking to address these and other challenges in parallel.

7.25   In light of the interdependence of the 'steps' identified by the Parties, we consider it appropriate to assess the effect of the Merger on dynamic competition in the round, taking account of the evidence relating to each aspect of this question, and that is the approach we have taken here and in Chapter 7 of our Provisional Findings. We have not suggested at any point that only 'one link in the chain' needs to hold in order for all the links to hold.

7.26   Finally, as noted above, the impact of the Merger on dynamic competition considers the ongoing competitive impact of a prospective entrant both before and after its entry. The 'steps' which the Parties have set out relate specifically to GIPHY's potential role as a future competitor, and not to the wider question of its importance to dynamic competition. For example, we note that GIPHY could play an important role in dynamic competition without ultimately succeeding in monetising messaging ('step' 5).

7.27   The Parties have further submitted that the CMA's analysis mischaracterises the role of GIPHY as an important source of dynamic competition in the advertising market.[394] In particular, the Parties submitted that the CMA should have (but failed to):

   (a)   forecasted at least in approximate terms the magnitude of GIPHY's potential UK revenues and market shares; [395]

   (b)   showed that the risk to Facebook profits met 'some minimum standard to prompt a reaction from the incumbent';[396]

   (c)   demonstrated that Facebook's competitive behaviour in the UK would differ significantly absent the Merger (and lead to worse outcomes as a result of the Merger).[397]

---

[394] Parties' Response to Provisional Findings, paragraphs 6.13 to 6.25.
[395] Parties' Response to Provisional Findings, paragraph 6.15.
[396] Parties' Response to Provisional Findings, paragraphs 6.15 and 6.16.
[397] Parties' Response to Provisional Findings, paragraph 6.21.

PX0684-175

7.28   We do not agree that it was necessary or appropriate to quantify (even in approximate terms) the potential UK revenues and market shares of GIPHY or its impact on Facebook's profits. For an innovative product offering such as GIPHY's Paid Alignment, whose model was still developing, any forecast would necessarily include a wide range of possible outcomes, from failure to expand, to growth significantly exceeding GIPHY's internal forecasts (see further paragraphs 7.183 to 7.188). This is particularly the case given the high-risk, high-reward nature of digital markets. For the same reasons, we do not think that the CMA is required (nor that it would have been useful in this case) to attempt to quantify a hypothetical loss of profits by Facebook arising from the potential expansion of GIPHY, since the magnitude of any such loss would again depend on the extent of GIPHY's success. The CMA does not typically conduct such an exercise in assessing horizontal unilateral effects in merger inquiries.

7.29   We do not agree with the Parties' submission that our assessment is based on an assumption that the loss of any possible future entrant would be sufficient to result in a loss of dynamic competition. Our assessment of the impact of the Merger on dynamic competition is based on a range of evidence which takes account of the characteristics of GIPHY and its role in driving dynamic competition in the specific circumstances of the relevant market, as well as evidence relating to Facebook's views on GIPHY's business model and its incentives to respond to potential competition in this market.

## Importance to dynamic competition of GIPHY's efforts to innovate and expand

7.30   In Chapter 6, Counterfactual, we conclude that, under our counterfactual, the prevailing conditions of competition would have seen GIPHY continuing to supply GIFs, innovate, develop its products and services, generate revenue and explore various monetisation options with partners and investors (including through its Paid Alignment and revenue-sharing offering).

7.31   In some sectors, including fast-moving technology markets, an important aspect of how firms compete involves efforts or investments aimed at protecting or expanding their profits in the future. This includes efforts that may give firms the ability to compete in entirely new areas (ie to enter), or the ability to compete more effectively in areas where they are already active (ie to expand). Where investment and innovation efforts represent an important part of the competitive process, this can lead to dynamic competitive

PX0684-176

interactions between existing competitors and potential entrants that are making efforts to enter or expand.[398]

7.32   In this section we assess the extent to which GIPHY was an innovative company and source of dynamic competition, and the importance of GIPHY's efforts to innovate and develop its products in the context of Facebook's significant market power in display advertising.

*Importance of GIPHY as an innovator*

7.33   Since its launch in 2013, GIPHY has been a pioneer in establishing GIFs as a popular feature of messaging apps. As noted in paragraph 7.2, it has become a leading provider in these services, which are a tool for driving user engagement on social media platforms. GIPHY has developed a powerful GIF search algorithm, assembled a high-calibre creative team, and achieved wide distribution of its API/SDK services across third-party platforms. From the start of 2018, the introduction of GIF stickers, which are particularly popular on Stories features, contributed to [✂].[399]

7.34   Facebook also recognised GIPHY's role as an innovator and saw the creativity of its team as an important driver in its decision to acquire GIPHY. In describing Facebook's reasons for acquiring GIPHY, Vishal Shah (VP and Head of Product at Instagram) commented that:

> '…what's easier to find are engineers that can write code. What's hard to find is those who can do that with a creative mindset, who understand how consumers think and can build products that are meaningfully important to consumers, and Giphy had those products. They just weren't some of the core parts of their business. You know, they had this gif search engine but they also had, you know, creative effects and they had a camera tool. If you look at the Giphy app, they were always experimenting with new ways in which people could, could share and, and, and express themselves in the content.  It wasn't their core business, but a lot of the work -- if you look back – I think some of the documents even men- mention this – over the years that we've been engaging with them they would, they would work with us in, in hackathons and, and, and coming up with creative ideas and new concepts. And it, it is very, very hard to go and build that culture and to do it in a way that aligns with the way that we think and we build. So this was a product-driven conversation first and foremost. And of course the, the numbers had to make sense. That's why we have experts like Nir as part of the deal. But the reason we

---

[398] Merger Assessment Guidelines (CMA129), paragraphs 5.17 – 5.18.
[399] Chapter 4, Industry Background, Figure 8.

PX0684-177

even went anywhere with this conversation was because I believed in Alex, I believed in his, his team, and I believed in the culture that they'd built.'

7.35   One of GIPHY's key innovations was a novel form of digital advertising through its 'Paid Alignment' service. GIPHY launched its Paid Alignment service to advertisers in 2017. The service allowed advertisers to ensure the prominence of GIFs which promoted their brands on GIPHY's services. For example, branded GIFs could include product placement within the GIF, celebrity endorsement, and/or the inclusion of a brand logo on the GIF. These GIFs could be 'aligned' with specific search terms, so that when a user searched for that term, the branded GIF would be first or prominent among the search results. Paid Alignment also allowed advertisers to insert their GIFs into GIPHY's 'trending feed' on its O&O sites.[400]

7.36   The Parties described Paid Alignment as follows:

'Although all users are able to create and upload GIFs to GIPHY for free, GIPHY generates limited revenues in the U.S. by offering commercial partners (e.g., Pepsi) the ability to promote their GIF content through the trending feed or with popular search terms on a rate card CPM basis. Partners have, for example, sought Paid Alignment to coincide with significant cultural moments that spark conversations. For example, GIPHY has partnered with Pepsi for the Super Bowl for Paid Alignments, as well as Dunkin Donuts for Valentine's Day'.

7.37   Paid Alignment was initially only available on GIPHY's O&O sites, but in February 2018, GIPHY expanded the service to its API partners. By 2019, GIPHY had also entered into revenue share agreements with [✂], which allowed GIPHY to run Paid Alignment advertising on these partners' inventory in the United States.

7.38   GIPHY's strong creative team was an important element of its Paid Alignment offering. Prior to the launch of Paid Alignment it already had close relationships with 'brand partners' for whom it created GIFs, and its creative team were involved in developing Paid Alignment GIFs:

(a)   In an internal Facebook document, Vishal Shah commented '[✂]'.

(b)   One advertiser ([✂]) told us that GIPHY had created GIFs for a campaign a number of years ago, and that following the success of that campaign and noting that GIPHY had partnerships with similar brands, the

---

[400] The GIPHY trending feed shows the latest and most popular GIFs based on service's search algorithms.

PX0684-178

advertiser began to expand the relationship with GIPHY. The advertiser told us it had committed spending to GIPHY in return, among other things, for access to GIPHY's content studio. It noted that GIPHY was the leader in this space in terms of content and relationships and also had the ability to produce GIFs quickly and in a cost-effective way, compared to having an ad agency produce them.

7.39   While Paid Alignment related to sponsored GIFs, GIPHY also internally considered extending the model to include [✂]. An email from GIPHY's CEO, Alex Chung, to the COO and VP of Revenue Strategy in March 2020 noted '[✂]'.[401] GIPHY's proposed [✂] is discussed in further detail in Appendix F: GIPHY's Paid Alignment Model.

7.40   GIPHY's Paid Alignment service continued to operate until the Merger was finalised in May 2020. Facebook required the termination of all of GIPHY's existing Paid Alignment arrangements and the cessation of all of GIPHY's revenue-generating activities.[402] However, as discussed below at paragraph 7.198 to 7.216, Facebook saw the monetisation of GIFs as a potentially important upside of acquiring GIPHY.

*Importance of GIPHY's efforts in the context of Facebook's significant market power*

7.41   We find in Chapter 5, Market Definition and Market Power, that Facebook has significant market power in display advertising in the UK. It is protected by such strong incumbency advantages – including network effects, economies of scale and unmatchable access to user data – that actual and potential rivals can no longer compete on equal terms (see further paragraphs 7.238 to 7.240). Weak competition in digital advertising increases the prices of goods and services across the economy.[403]

7.42   GIPHY's efforts to build and monetise its services were particularly relevant in this context, because:

   *(a)*   Investments involved in entering and expanding in the UK display advertising market represent an important part of the competitive process, in particular where Facebook already faces limited actual and potential competitive pressure (as discussed in Chapter 5, Market Definition and Market Power).

---

[401] An email chain between GIPHY and [✂] also suggests that there was some demand for this: [✂].
[402] See Chapter 2, The Parties, the Merger and Rationale for further discussion.
[403] Market Study, page 5.

PX0684-179

(b) Digital platforms operate within an industry where the process of entering and expanding into markets takes place over a long period of time and involves significant costs and risks.[404] Commercial success in digital markets can typically involve building an audience and then developing a way to monetise that audience (for example, through advertising).

(c) Following the Merger, we do not consider that any other potential competitor is playing, or is likely to play, a similarly important role in the dynamic competitive process as GIPHY would have done absent the Merger.  GIPHY had succeeded in building a global and UK audience for its GIFs. No other supplier had reached a material market share in the supply of GIFs apart from Tenor. GIPHY (unlike Tenor) had made substantial progress towards establishing its monetisation model (see also paragraphs 7.235 to 7.237 below where we discuss the significance of GIPHY to the efforts of others seeking to monetise GIFs). Any business seeking to enter the market for searchable GIF libraries faces significant barriers to entry in both GIF provision and ability to monetise through display advertising (see Chapter 9, Countervailing Factors).

7.43    The Parties have submitted that '…the CMA offers no (credible) explanation for why dynamic competition could only have come from a single competitor supplying GIFs, of all things -- nor is there one' and that the CMA has mischaracterised the role GIPHY would have played as an important source of dynamic competition by failing to consider dynamic competition from a myriad of existing and potential competitors. Our view is rather that no other potential competitor could have played a similar role to the one GIPHY played, specifically through its efforts to develop a GIF monetisation service. Clearly this does not preclude other forms of dynamic competition being present in the market from existing or potential competitors, centred on activities other than the monetisation of GIFs. However, we consider that dynamic competition from GIPHY was important for the reasons set out in this Chapter, and the fact that Facebook currently faces limited competition.

7.44    In addition, GIPHY's Paid Alignment model was a multi-sided platform serving both advertisers and third-party platforms. As such, it was subject to network effects; for example, greater advertiser spend on GIPHY Paid Alignment would make it more attractive to third party platforms, and as more platforms signed up for the service it would have more inventory to sell to advertisers. This had the potential to increase the threat to Facebook, including by

---

[404] Merger Assessment Guidelines (CMA129), paragraph 5.4.

PX0684-180

strengthening the competitive position of other display advertising providers in partnership with GIPHY.

*Our view*

7.45    GIPHY had achieved significant success in developing its GIF services and was widely recognised as an innovator, including by Facebook. GIPHY had started competing for advertising spend through its innovative Paid Alignment service, and it was continuing to innovate to develop this product, for example by seeking to offer sponsored GIF stickers, and to offer Paid Alignment on GIF stickers. As such, GIPHY was making important contributions to dynamic competition, particularly as a potentially close competitor to Facebook, which currently faces limited competition.

7.46    We consider that GIPHY's efforts prior to the Merger increased the likelihood of new innovations or products being made available in future (whether by GIPHY or by stimulating wider innovation by others responding to this competitive pressure).[405] This would give customers the chance to benefit from a wider variety of products and increased competition. We consider recent developments by other participants in the display advertising market in paragraphs 7.217 to 7.234 below.

7.47    Third party platforms with revenue share agreements with GIPHY would also have had an incentive to collaborate with GIPHY to further develop GIF monetisation, so that they could increase their advertising revenues (in competition with Facebook).

7.48    GIPHY's efforts were particularly important in the context of Facebook's significant market power in display advertising for the reasons set out above.

7.49    In the following sections, we consider other aspects of GIPHY's role in the dynamic competitive process as a potential competitor (including GIPHY's likelihood of expansion and the closeness of competition between Facebook and GIPHY), and the effects of the Merger on dynamic competition in the UK display advertising market, including the likely response of Facebook and other parties to GIPHY's activities.

## Likelihood of expansion and UK entry by GIPHY

7.50    As noted above, GIPHY was in the early stage of developing its monetisation model and had not started generating advertising revenues in the UK at the

---

[405] Merger Assessment Guidelines (CMA129), paragraph 5.20.

PX0684-181

time of the Merger (in the context of which its advertising activities were terminated by Facebook). The likelihood of successful entry by GIPHY is relevant to the constraint exerted by it on other firms,[406] although as noted in paragraph 7.14, elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where such entry or expansion is unlikely and may ultimately be unsuccessful. We assess in this section the strengths and weaknesses of GIPHY's monetisation model and the likelihood of GIPHY starting to offer its Paid Alignment services in the UK.

### *Strengths and weaknesses of GIPHY's Paid Alignment model*

7.51    The Parties submitted that GIPHY's Paid Alignment model faced unresolved, existential impediments. In particular, the Parties submitted that:

  *(a)* Because GIPHY lacked a meaningful user base of its own, it could not provide advertisers with the ability to monitor and track return on investment closely, offer 'direct response' ads (eg where the user clicks the ad in order to buy a product), or control third-party app environments where the ads would be seen.

  *(b)* Advertiser demand for Paid Alignment was unproven, and to date had been limited to experimental ad budgets.

  *(c)* GIPHY was dependent on entering into revenue-sharing agreements with larger API partners, and had struggled to sign such agreements.

  *(d)* GIPHY's O&O traffic has stagnated, and even on its O&O products, GIPHY did not collect data about its users which would allow targeting of advertisements.

  *(e)* GIPHY's sales team was inexperienced, [✕].

  *(f)* Brand partners (ie brands who worked with GIPHY to promote their brands via GIFs, including Paid Alignment customers) [✕], and there was no realistic prospect that GIPHY could have expanded its Paid Alignments business into other markets or geographies outside of the US.

7.52    In response to our Provisional Findings, GIPHY told us that it '[✕]'. GIPHY characterised these issues as '[✕]'. In particular, GIPHY submitted that:

  *(a)* '[✕]'

---

[406] Merger Assessment Guidelines (CMA129), paragraph 5.23.

PX0684-182

(b)  '[✂]'

7.53    For the reasons set out below, we consider that while GIPHY's model was still developing, and faced challenges and uncertainty, none of these amounted to 'existential impediments' or 'insurmountable obstacles' as suggested by the Parties. Indeed, it was attracting interest from large international advertisers and continued to have the support of its investors to develop its Paid Alignment offering. In addition, as we discuss below, we consider that the available contemporary evidence does not support GIPHY's submissions on the significance of [✂]. Rather, we consider that GIPHY was particularly well-placed to address the challenge of bringing this new business model to market at scale, and that it was making concerted efforts to achieve this, with the support of its investors.

7.54    As a preliminary point, one of the greatest challenges facing innovative, digital companies is building a sizeable user base for its products and services, which can be monetised subsequently, often through advertising. GIPHY had already built a very large user base by the time of the acquisition by Facebook and anticipated continued strong growth in users and search volumes. The potential future growth of Paid Alignment depends both on how effectively users can be monetised, and also on the future growth of GIF traffic. GIPHY's monthly global searches rose from [✂] at the start of 2018 to [✂][407] as of Q2 2020).[408] In September 2019, GIPHY's forecasts estimated that its 'Global potential inventory (impressions)' would grow from 253 billion in 2018 to 2.35 trillion in 2023 – a ninefold increase.

7.55    In the following, we consider:

(a)    Demand for GIPHY's advertising services:

(i)    GIPHY's ability to monitor and target advertising;

(ii)    Advantages of GIPHY's model from an advertiser perspective;

(iii)    Evidence of advertiser demand for GIPHY's services;

(b)    Scope for distribution of GIPHY's advertising services:

(i)    Revenue share agreements;

---

[407] See Chapter 4, Industry Background, Figure 7. Its searches fell to around [✂] by March 2021, which may in part have been a result of its acquisition by Facebook, which led to switching away by some API partners.
[408] We understand an impression to be a GIF that is visible to the user – which depends, *inter alia*, on its prominence in the search results, and how far the user scrolls down those results.

PX0684-183

      (ii)  O&O distribution;

      (iii)  [✂];

  *(c)*  [✂];

  *(d)*  Development of GIPHY's leadership/revenue team; and

  *(e)*  Investor confidence in GIPHY's monetisation activities.

7.56   Further assessment of these points is also included in Appendix F: GIPHY's Paid Alignment Model.

7.57   We also consider submissions from the Parties in response to our Provisional Findings relating to whether Paid Alignment was likely to succeed.

*Demand for GIPHY's advertising services*

   *GIPHY's ability to monitor and target advertising*

7.58   The Parties submitted that GIPHY's monetisation model was flawed, because advertisers on digital media wanted to monitor return on investment closely. They said that GIPHY was unable to meet this requirement because:

  *(a)*  Paid Alignments did not offer 'direct response' ads, eg where the viewer clicks the ad in order to buy a product.

  *(b)*  Its dependence on third party API distribution meant that GIPHY was unable to supply 'basic audience data' or control the user experience such as [✂].

  *(c)*  GIPHY could not collect much data on its O&O users, because most were not registered or logged in.

7.59   In the following, we consider whether GIPHY faced disadvantages in terms of its ability to monitor and target advertising, and offer direct response ads.

7.60   The Market Study noted that KPIs for display advertising tend to be focused on the reach achieved for a specific audience group.[409] This means that the use of data to identify target audiences is key for display advertising. Facebook's unique data advantages are one fundamental reason for its significant market power in display advertising.

---

[409] Market Study, paragraph 5.120.

PX0684-184

7.61   GIPHY's business model relied on third party platforms for most of its traffic. When a user searches GIPHY's library through an API/SDK partner platform, GIPHY is able to identify that the search has occurred, the search term, the IP address (which may indicate the country), and the platform.[410] However, it is typically unable to identify the individual user.

7.62   Given these limitations, GIPHY does not have the ability to target and monitor advertising with the same specificity as Facebook. As a result, it was not in a position to directly replicate the features of Facebook that are the basis of Facebook's significant market power in display advertising. However, we note that GIPHY had some ability to provide metrics to advertisers, and was taking steps to improve its monitoring of advertising on third party platforms.

7.63   GIPHY was able to mitigate its limited ability to monitor campaigns directly through the use of third-party services. For example, GIPHY carried out a number of ad effectiveness studies in 2017-2019. Figure 17 is an output from some of these studies, from which GIPHY was able to demonstrate a positive impact of its ads on brand metrics. A GIPHY internal document also reports that it has '[✂].' We understand that [✂] is a provider of advertising metrics.[411]

**Figure 17: GIPHY advertising effectiveness study results**

[✂]

Source: [✂]

7.64   Advertisers who had used GIPHY told us that they had been able to monitor at least some aspects of the effectiveness of their advertising with GIPHY. For example, one advertiser told us [✂]. An advertiser told us it was able to determine the number of impressions and how many of its ads were delivered based on the search terms selected. It was satisfied with this as a metric for measuring the effectiveness of its advertising. Another advertiser confirmed that its partnership with GIPHY was cost-structured for delivery on GIPHY's own platforms because there was no way to measure its impact on third party platforms. It noted it was aware there would be some carry-through to third party platforms, but this was more in the nature of a 'nice to have'. The advertiser noted that the main metric was an agreed upon number of impressions/CPM, although engagement with GIFs was also measured.

---

[410] The Parties state that: 'From GIPHY's perspective, the most meaningful pieces of data are: (1) the API key that is part of every API call, which uniquely identifies the API partner (eg, "Snap"); (2) the search string ("duck"); and (3) the user's IP address (eg, "34.123.243.107").' [✂] As noted in Chapter 8, Vertical Effects, some API/SDK partners implement proxying, which means that GIPHY would see the request as coming from the server of the partner rather than the end-user.
[411] [✂].

PX0684-185

7.65   As discussed in Appendix F: GIPHY's Paid Alignment Model, paragraphs 6 to 8, a May 2019 GIPHY strategy document discussed [✂],while a March 2020 document discussed deploying GIPHY's [✂] on third party platforms. In our view, these documents illustrate that GIPHY was taking steps to address its shortcomings in ad targeting and monitoring in the time period leading up to the Merger. In addition, we note that API/SDK partners with whom GIPHY had a revenue share agreement would have been incentivised to maximise their revenues under the agreement, which may have involved working with GIPHY to improve the targeting of its ads on their platforms.

7.66   As described in Appendix F: GIPHY's Paid Alignment Model, 'Monitoring and Tracking' section, GIPHY's investors recognised early on that building a more sophisticated ad tracking system was necessary for success. GIPHY aimed to reach agreements with revenue share and other partners to deploy [✂], to incentivise app publishers towards its SDK, and to make Advertising IDs a [✂] from SDK developers.[412] GIPHY could combine this data with purchased third-party data to provide rich demographic and interest data to provide a more attractive advertising product targeted at certain groups.

7.67   The Parties submitted that GIPHY's Paid Alignment model did not include click-through functionality.[413] This type of functionality is important for campaigns which have a 'conversion' objective (ie an objective in which a customer completes a desired goal, for example making a purchase). However, as noted in Chapter 5, Market Definition and Market Power, the views of advertisers and GIPHY's internal documents suggest that Paid Alignment primarily served the objective of promoting brand awareness. The Market Study found that in 2019, awareness campaigns (designed to generate interest in a product or service among consumers to increase the likelihood of a sale) on Facebook accounted for more than 15% of advertising spend,[414] suggesting a significant pool of advertiser demand which GIPHY could in principle have addressed without click-through functionality. In addition, we understand that GIPHY was exploring the development of [✂] to allow for user interaction with ads.

7.68   As noted above at paragraph 7.58, the Parties also submitted that GIPHY was unable to control the user experience or include advertising disclosures on third-party platforms. We have not seen evidence that this is a material obstacle to the success of Paid Alignment services. We note that social media

---

[412] Appendix F: GIPHY's Paid Alignment Model, 'Monitoring and tracking' section.
[413] [✂] 'Paid Alignments did not offer so-called "direct response" ads, whereby a user performs a specific action in response to being shown the ad with the advertiser able to track the tangible economic value of that action (eg, clicks the ad in order to buy a product)'.
[414] Market Study Appendix N, Figure N9 (page 11). The Market Study also noted (paragraph 5.23) evidence that display advertising, particularly on Facebook, was increasingly being used for conversions.

PX0684-186

platforms have a strong incentive to provide a high-quality user experience in order to increase user engagement. We consider GIPHY's further submissions in relation to [✂], made in response to our Provisional Findings, in paragraphs 0 to **Error! Reference source not found.** and Appendix F: GIPHY's Paid Alignment Model.

7.69    In view of the above, we recognise that GIPHY faced some limitations in its ability to offer ad functionality including monitoring and tracking. However, it was taking steps to develop its capabilities in this area, both via third-party services and through closer integration with platforms.

*Advantages of GIPHY's model from an advertiser perspective*

7.70    GIPHY's Paid Alignment model has advantages over other types of advertising, which advertisers could potentially see as compensating for limitations in targeting and monitoring. While display advertising typically appears alongside (or in the way of) content of interest to the user, a Paid Alignment GIF in a message has been selected by the sender to express an idea or emotion to its recipient(s). GIPHY emphasises this difference in an internal document as follows:

> 'GIPHY Ads Work for Marketers…Giphy's ad product is intent-based, non-interruptive, highly visual, personal, and impactful. Brands extend their TV commercials and social videos, or create bespoke "made for Giphy" creatives. Brands use Giphy Ads to become part of the conversation and culturally relevant as celebrities and media partners do on Giphy.
>
> With Giphy, brands literally become language. Giphy Ads generate higher engagement and share rates than any major social ad platform. Because users are sending ads to their friends in conversation, Giphy Ads generate significant brand metrics lift.'

7.71    Similarly, an advertiser commented that 'Advertising through private messaging comes with an air of credibility because you trust your friends and family.'

7.72    We also heard that an advantage of advertising using GIFs was the fact that they operate on a loop, meaning that one GIF might be seen by users a high number of times. One of GIPHY's investors noted that 'GIFs have an extraordinary re-review rate, way in excess of film and text messages. Users watch GIFs a lot, watching a loop of a GIF 30 times would be totally normal'.

7.73    As we discuss in paragraph 7.218, [✂].

PX0684-187

7.74   As noted above and discussed in Appendix F: GIPHY's Paid Alignment Model, GIPHY was also considering plans to offer advertising within [✂]. We consider that advertising within [✂] could potentially have similar advantages to those described above for GIFs.[415]

*Evidence of advertiser demand for GIPHY's services*

7.75   The Parties submitted that:

> 'In the year immediately prior to the Transaction, four years into its efforts to develop a successful business model, GIPHY had generated [✂] in advertising revenues, all in the US, with no revenues in the UK. [✂]'.

7.76   As the Parties note, [✂]. However, its sales had increased from the previous year, and as set out in Appendix F: GIPHY's Paid Alignment Model, paragraphs 18 and 19, [✂].By the first week of February 2020, GIPHY had already booked [✂] of its target revenues for the first quarter, and [✂] of its target revenues for the year (Appendix E: GIPHY's Timeline). In addition, in updates to the Board, GIPHY continued to expect, as late as 13 March 2020, that its revenues would grow very strongly over the next five years.

7.77   Previously, in [✂], [✂] had noted a [✂] degree of advertiser satisfaction with the outcome of their campaigns with GIPHY, with a [✂] level of [✂] and [✂] on subsequent campaigns.

7.78   GIPHY's larger advertising customers included major brands. Their campaigns with GIPHY to date had been a minor feature of their advertising strategy and represented a very small share of their respective budgets. However, most advertisers we spoke to[416] were positive about their experience working with GIPHY and the majority said they would have been willing to continue exploring this method of advertising. For example:

*(a)*   One advertiser told us that GIPHY's service had been good for it, and that while GIPHY did not have user data for precise targeting, it had a large volume of users of its services. It also noted that GIF usage was changing how (particularly younger) consumers were communicating with one another, and it wanted to be part of that trend. It considered that GIPHY might have had potential to 'unlock' the messaging space.

---

[415] This would depend in part on the nature of the GIF stickers – for example, they may be more effective as non-intrusive advertising if they were customised to be an intrinsic part of the communication, or less so if they were included as generic advertising (eg a company logo with no specific relevance to the communication).
[416] See Appendix I: Published Third Party Summary.

PX0684-188

(b) One advertiser told us that it considered GIPHY to be a 'unique opportunity to reach consumers organically' and was primarily used for brand awareness and to reach a broad audience. It also told us that had GIPHY's Paid Alignment services remained available, it would have continued to use GIPHY, alongside a number of other vendors.

(c) One advertiser told us that it would continue to engage with GIFs as one of its advertising mediums, although GIFs were not a big part of its advertising plans.

(d) One advertiser told us [✂].

(e) One advertiser told us that it valued GIPHY's Paid Alignment service because it guaranteed ownership of key terms/trends on the GIPHY GIF library during promotional periods, included content creation services that 'drove relevance for our products and virality of distribution', and offered distribution in media which are not typically open to paid advertising, noting that 'While we could not measure this reach, we know that GIFs are shared at astronomical rates as part of conversations every day and this got the [✂] brand into messages in a fun and engaging way for consumers.'

7.79 Submissions from advertising agencies noted advantages of using GIPHY's Paid Alignment service, as well as some drawbacks, in particular:

(a) [✂] told us that while some of its clients found GIPHY's ad measurement limited, others found the measurement tools suitable for their needs, saw GIPHY as offering unique opportunities, and experienced strong performance and engagement from ad campaigns on GIPHY. This depended on the type of brand. [✂] was expecting to at least maintain and possibly increase spend with GIPHY.

(b) [✂] noted that GIPHY Paid Alignment had advantages including the ability to reach users directly in a space where there were limited paid advertising opportunities, 'its potential to garner extensive earned reach beyond paid impressions (i.e. because users could share them)' and 'its unique, intimate, and native way to communicate with (especially younger) audiences'. However, it also noted disadvantages, including the inability to communicate brand attributes, a 'high chance of low effectiveness and message resonance', and a limited ability to measure performance. [✂] commented that 'It is likely that [✂] would have placed a limited number of further campaigns with GIPHY and, depending on the performance of those campaigns, either increased or reduced spend accordingly'.

PX0684-189

*(c)* [✂] commented that 'Advantages were that it was unique, sexy and creatively compelling. People love GIFs and it was a format that had the ability to generate a ton of "earned media" if done correctly. Disadvantages were that it was a lot of work for brands to try to arrive at the "right GIFs" and the lack of measurement around it made it hard for brands to determine the impact'.

7.80   The number of brands served by GIPHY Paid Alignment grew from [✂].[417] Its biggest customers for the year to March 2020 were [✂].

7.81   In early to mid-2020, advertisers continued to express enthusiasm for GIPHY's Paid Alignment service, and disappointment when it was withdrawn. For example:

*(a)* [✂]

*(b)* [✂]

*(c)* [✂]

*(d)* [✂]

7.82   In addition, as we discuss in paragraph 7.171, a number of advertisers expressed interest in advertising on GIPHY's international inventory. In our view, while GIPHY's initial revenues from Paid Alignment were below expectations, advertisers generally appeared to have had a positive experience of running campaigns on GIPHY, the number of advertisers using it had increased, and there was good evidence in early 2020 – prior to the Coronavirus (COVID-19) crisis – that advertiser demand could have grown strongly over the year.

7.83   In view of the above, we consider that while GIPHY's advertising model had some limitations relative to existing display advertising services, it also had important advantages over existing display advertising formats. Advertisers appeared to recognise these advantages, based on the evidence of repeat sales, growing demand for Paid Alignment, and positive comments about the service in internal documents and in our discussions with advertisers, and advertisers' responses to the termination of Paid Alignment.

---

[417] The number of brands in Q1 2020 was lower ([✂]) than in the previous quarter, possibly due to seasonality and Coronavirus (COVID-19) effects, but was higher than Q1 of the previous year ([✂]).

PX0684-190

*Scope for distribution of GIPHY's advertising services*

> *Revenue share agreements*

7.84   The Parties submitted that:

> 'GIPHY assumed that its Tier 1 partners (*i.e.,* [✂]) [418] would sign [✂] revenue share agreements by 2020…[✂] was not interested in entering into any form of revenue share agreement with GIPHY (let alone a revenue share agreement that gave GIPHY 50% of the revenues earned), and there is also no evidence that [✂] had any intention of entering into a revenue share agreement, regardless of terms. Together, [✂] accounted for the large majority of GIPHY's third-party user inventory, and therefore GIPHY's boldest revenue forecasts would (at the very least) need to be downgraded by a factor of over 50%. [But even if] [✂] would have entered into revenue share agreements with GIPHY, a high percentage of GIPHY's [P]aid [A]lignment revenues would not have been in competition with Facebook since they would have been generated in partnership on Facebook services'.

7.85   We recognise that securing revenue share agreements with [✂] was a challenge for GIPHY. As discussed in Appendix F: GIPHY's Paid Alignment Model, paragraph 26, Facebook [✂].

7.86   Investors recognised the risk in GIPHY's dependence on its distribution partners.[419] However, investors also noted that (i) achieving revenue-sharing agreements with major partners such as [✂] would help to demonstrate the viability of the model and could lead to further agreements with big platforms; and (ii) GIPHY was not totally reliant on Facebook platforms and was diversifying its distribution network. [✂]. The views of investors are supported by GIPHY internal documents:[420]

> *(a)*  [✂].
>
> *(b)*  [✂].
>
> *(c)*  [✂].

---

[418] We note that GIPHY's Inventory Model classifies TikTok and Twitter as Tier 1, in addition to Facebook platforms (including Instagram and WhatsApp) and Snap.
[419] See Appendix F: GIPHY's Paid Alignment Model, paragraph 34, for further discussion.
[420] [✂].

PX0684-191

*(d)*  GIPHY Board materials from March 2020 present projections for the potential revenue GIPHY could achieve on non-Facebook inventory (based on assumptions about CPM and sellable search inventory), showing that GIPHY could meet demand of [✂].

*(e)*  [✂].

7.87  In view of the above, we consider that securing revenue share agreements with larger platforms such as [✂] was a challenge for GIPHY. However, it had secured agreements with [✂] and smaller social media platforms, and GIPHY's investors considered that it was in a position to demonstrate the viability of its model on third-party platforms. Doing so would have put it in a stronger position to sign revenue share agreements with larger platforms.

*O&O distribution*

7.88  As described in Appendix F: GIPHY's Paid Alignment Model, GIPHY had ambitious plans for its O&O platforms. In September 2019 it forecast that these would account for [✂] in advertising revenues by 2023, out of a total [✂]. At that time, its estimated revenues from O&O in 2019 were [✂]. However, GIPHY achieved O&O revenues of only [✂] in 2019 (suggesting GIPHY expected a large proportion of its O&O revenues to occur late in the year, and then experienced a [✂]).

7.89  In March 2020, GIPHY produced a substantially revised five-year forecast for O&O revenues, of [✂], rather than [✂]. However, its forecasts continued to be of total gross revenues of [✂] in five years, but with a greater reliance on revenues from third-party platforms.

7.90  As shown in Chapter 4, Industry Background, Figure 12, O&O traffic grew [✂]. However, GIPHY told us that it struggled to attract high-quality, monetisable traffic to its O&O sites and that there is a high degree of 'bounce' (users who are referred through to GIPHY's website/app, but leave very quickly). As noted in Chapter 4, Industry Background, GIPHY's O&O sites have a [✂] DAU-to-MAU[421] ratio, which may be indicative of [✂].

7.91  Some of GIPHY's and Facebook's internal documents note the [✂].[422] However, this [✂] and the change in projected O&O revenues does not emerge as an important theme in GIPHY internal documents, or discussions with investors, over this time.

---

[421] Daily average user to monthly average user.
[422] See, for example [✂].

PX0684-192

7.92   Taking the evidence in the round, we consider that the revenue performance of the O&O platforms was [✂], and GIPHY clearly faced a particular challenge in monetising these platforms through Paid Alignment. However, the key challenge which GIPHY had identified to making a success of Paid Alignment was that of demonstrating the effectiveness of the model over third-party platforms. We have seen no evidence that the [✂] O&O growth undermined GIPHY's confidence in its overall business model.

*[✂]*

7.93   [✂].

7.94   [✂].

7.95   [✂]:

    *(a)*  '[✂].

    *(b)*  '[✂],

    *(c)*  '[✂].

7.96   [✂].

7.97   [✂].

7.98   [✂]:

    *(a)*  [✂];

    *(b)*  [✂],

    *(c)*  [✂].

- *[✂]*

7.99   [✂].

7.100  [✂]'

7.101  [✂].

7.102  [✂].

7.103  [✂].

7.104  [✂].

PX0684-193

7.105 [✂].

7.106 [✂].

7.107 [✂].

- *[✂]*

7.108 [✂]

7.109 [✂].

7.110 [✂]:

    *(a)* [✂].

    *(b)* [✂].

    *(c)* [✂].

    *(d)* [✂].

7.111 [✂].

7.112 [✂].

- *[✂]*

7.113 [✂].

7.114 [✂].

7.115 [✂].

7.116 [✂].

7.117 [✂].

7.118 [✂].

7.119 [✂].

7.120 [✂].

7.121 [✂].

PX0684-194

- *[✂]*

7.122 [✂].

7.123 [✂]:

    *(a)* [✂].

    *(b)* [✂].

    *(c)* [✂].

7.124 [✂].

7.125 [✂]

*[✂]*

7.126  [✂]:

      '[✂]'

7.127 [✂].

7.128 [✂]:

    *(a)* [✂].

    *(b)* [✂].

    *(c)* [✂].

    *(d)* [✂].

7.129 [✂].

7.130 [✂].

7.131 [✂].

PX0684-195

*Development of GIPHY's leadership/revenue team*

7.132  The Parties have told us that GIPHY faced challenges in staffing its revenue team and key leadership roles, [✂].[423] In a third party call, one of GIPHY's main investors told the CMA that, 'For some years, [✂]'.

7.133  In respect of the two successive VPs of Revenue who departed the company, GIPHY has submitted that Alex Magnin (VP of Revenue since June 2017, whose role was to lead GIPHY's revenue strategy) departed in October 2019 to '[✂].His replacement, Alexis Berger, was in post until January 2020, at which time she decided to leave the company as (according to GIPHY's submission) [✂]. GIPHY was not able to provide further detail or documentary evidence in relation to these departures.[424]

7.134  Further evidence concerning GIPHY's hiring developments is set out in Appendix 7: GIPHY's Paid Alignment model. We consider this evidence shows that, over the period 2019 to 2020, GIPHY faced challenges in hiring for its revenue team; in particular, it was still searching for a Chief Revenue Officer as of March 2020 (a search which had commenced prior to January 2019). However, GIPHY reported ongoing progress in adding key sales staff, including in a number of senior roles. As of December 2019, it described its revenue team as '[✂], and (pre-Merger) had been [✂]. As of March 2020, GIPHY was anticipating hiring for the Chief Revenue Officer role ([✂]).[✂] in neither case have we seen contemporary evidence that the employees left because they foresaw a fundamental impediment to GIPHY's success.

7.135  In our view, appointing the right sales team and leadership was one of the challenges GIPHY faced. However, the evidence indicates that GIPHY was making progress in building its sales team.

*Investor confidence in GIPHY's monetisation activities*

7.136  In the following section we consider evidence as to whether GIPHY's investors were confident in GIPHY's monetisation plans prior to the Merger. As we set out below, the Parties have submitted that the actions of GIPHY's investors are evidence that it was not likely to succeed in monetising at scale.

---

[423] At the GIPHY Main Party Hearing, Alex Chung highlighted the departures of the following key staff during 2019 and early 2020: [✂].
[424] GIPHY additionally submitted that its Chief Technology Officer departed the company in February 2020, and its Chief Operations Officer and VP Business and Corporate Development both departed on 15 May 2020 (the date of the acquisition). GIPHY submitted that the latter two employees' departures were not related to the acquisition and both had previously decided to leave, although it did not provide documentary or other evidence to substantiate this point..

PX0684-196

Further discussion of investors' views on GIPHY's monetisation plans is contained in Chapter 6, Counterfactual and Appendix E: GIPHY's Timeline.

*The Parties' submissions*

7.137   The Parties submitted that: '[I]t is clear from the evidence given at the Hearing that the scenarios presented were the best possible potential scenarios that could potentially be put to investors, rather than central forecasts. Moreover, the view expressed in these documents that GIPHY would be successful is in direct contradiction with actual evidence from the market. [✂] clearly demonstrates that the market did not believe that there was a realistic prospect of GIPHY successfully growing its advertising business in the manner suggested by the CMA – let alone it being "more likely than not"'.

7.138   The Parties have not stated which evidence, scenarios or documents they are referencing. In the GIPHY Main Party Hearing, in the context of a question about a September 2019 slide pack in which GIPHY forecast revenues of [✂] by 2023, Alex Chung commented: 'So, that was our high end projection. So, again, within the context of pitching to investors and salesmanship … this was our internal projections for the top, most possible in all possible worlds, the best case scenario that could possibly happen if every -- if all the stars aligned.'[425]

7.139   The Parties submitted a paper setting out their view that GIPHY had been unable to convince investors that it could effectively scale its monetisation model. This was because, according to the Parties, this model was unproven, and because GIPHY faced challenges including its reliance on third-party services and an inability to demonstrate value to advertisers. The Parties submitted *inter alia* that:

(a)   GIPHY's 2019 revenue results 'were disappointing and called into question GIPHY's ability to scale its monetisation'.

(b)   'After three years of seeking to overcome structural obstacles to stand-alone growth, GIPHY's management resolved to pursue an exit through sale…GIPHY had not proven a business model capable of supporting its activities on a standalone basis'.

7.140   The Parties also submitted that:

---

[425] We understand the Parties' reference to 'evidence given at the Hearing' to be to this and similar statements by GIPHY made during the Main Party Hearing. GIPHY did not present evidence in support of Mr Chung's comments about the nature of this forecast.

PX0684-197

'GIPHY in early 2019 achieved a [✂] in a Series D1 round; the amount raised was smaller than GIPHY's Series C round, in early 2016, and [✂].'

'No-one invested in GIPHY after early 2019…All [inside investors] declined to invest in GIPHY, including [✂], the company's longest-standing investor. Outside investors were not interested, even before they knew that the insiders had already declined. Consequently, based on the record before the CMA, it is not rational to conclude that GIPHY could have raised funds sufficient to enable it to continue meaningful operations, much less thrive and transform itself into a meaningful advertising player.'

'COVID-19 exacerbated structural weaknesses in the GIPHY business; structural weaknesses that would ultimately have obstructed GIPHY's independent growth regardless of COVID-19.'

'GIPHY was sold for $315 million. No company with serious advertising prospects, let alone a company that had finally solved the significant challenge of how to monetize direct messaging, would have been sold so cheaply. The purchase price shows that all of GIPHY's existing and potential investors had concluded -- independently -- that GIPHY was not likely to become a meaningful advertising player.'

*Evidence*

7.141  GIPHY ran pilot tests of its Paid Alignment service in 2017. In 2018, it commenced offering Paid Alignment on its O&O sites, earning [✂] in revenue. In December 2018, GIPHY projected that it would achieve [✂] in 2019, increasing to [✂] in 2022. In 2019, its revenues were [✂]. In September 2019, GIPHY presented revised revenue projections. While it continued to project rapid growth, it now projected that it would have revenues of [✂] by 2023, rather than [✂] by 2022.

7.142  We note that while these revenue projections were highly ambitious, GIPHY's plans were based on an aspiration that GIPHY would be able to take advantage of its very large (albeit largely indirect) user base and traffic in building its revenues.

7.143  As set out in Appendix E: GIPHY's Timeline:

(a)  Internal documents from investors and GIPHY indicate that [✂]. The Series D1 round appears to have attracted the required investment from existing investors, while also raising almost USD 20 million from new investors. It was successful in the sense of providing GIPHY with the

capital it needed to develop its business up to 2020, at which point it hoped to be cash positive. [✂] said that obtaining funds from [✂] investors for the [✂] round had been [✂].[426] However, [✂] told us that the round attracted interest from investors who could potentially have funded the full round, but that the CEO and existing investors were reluctant to give a board seat to such an investor.

(b) Towards the end of 2019, GIPHY's monetisation business had grown more slowly than expected but was getting closer to its target growth rate.[427] While GIPHY had begun contemplating an M&A route, it was also looking at raising funds to continue developing monetisation independently (and instructed JP Morgan accordingly).[428] It also considered that its monetisation was a potential aspect of value for an acquirer.[429] At this stage, Alex Chung appeared confident in the longer-term prospects of the business model, and was focused on communicating a credible growth plan to current and prospective investors, and not on cutting costs.[430]

(c) GIPHY's monetisation model was developing positively in early 2020. In addition, in updates to the Board, GIPHY continued to forecast very strong growth over the next five years.[431]

(d) The view from investors was that GIPHY had made a strong start to 2020, capitalising on the efforts it had made to monetise in 2019. At the start of the year, GIPHY was still actively considering the two options: (i) M&A, and (ii) raising sufficient funding (potentially in the form of platform fees from larger social media API/SDK partners) in order to continue developing its monetisation business independently.[432]

(e) Coronavirus (COVID-19) had a sudden and severe impact on GIPHY's short-term commercial prospects.[433] However, even when it received a proposal for an acquisition by Facebook, GIPHY's board continued to explore the option of a fund raise in order to allow GIPHY to continue as

---

[426] Appendix E: GIPHY's Timeline, paragraph 18.
[427] Appendix E: GIPHY's Timeline, paragraph 28.
[428] As described in Appendix E: GIPHY's Timeline, one of the reasons it chose not to use Allen & Co for this purpose was GIPHY's internal view that Allen & Co favoured an M&A approach rather than keeping both options open.
[429] Appendix E: GIPHY's Timeline, paragraph 25.
[430] Appendix E: GIPHY's Timeline, paragraph 29.
[431] Appendix E: GIPHY's Timeline, paragraphs 32-44.
[432] Appendix E: GIPHY's Timeline, paragraphs 32-44.
[433] Appendix E: GIPHY's Timeline, paragraphs 47-50.

PX0684-199

an independent business, both from existing investors and from a commercial deal with Facebook, [✂].[434]

(f) GIPHY's investors appeared to see the acquisition - and the final price - as a positive outcome.[435] However, this was in the context of the challenges presented by Coronavirus (COVID-19).

*Our assessment*

7.144  As regards the Parties' submission that the USD 315 million purchase price shows that investors had concluded that GIPHY was not likely to become a meaningful advertising player, we note that:

(a) At the point of the Merger, GIPHY had not yet demonstrated that its Paid Alignment model would be successful at scale. From an investor perspective, the valuation of the company would have reflected both expected future profits and the risk profile of the company.

(b) The circumstances created by the Coronavirus (COVID-19) crisis increased the business risk associated with GIPHY, as it needed to secure additional funding during 2021 and advertisers were cancelling or postponing ad spend.

(c) In addition, the Coronavirus (COVID-19) crisis had an impact on the investment climate, making investors more risk-averse in the short term.

(d) In spite of this, the existing GIPHY investors, after receiving a substantial offer from Facebook, continued to actively consider a further internal funding round to extend GIPHY's cash runway.

(e) We have seen no internal documentation indicating that any investor had concluded that GIPHY would not become a meaningful advertising player.

7.145  As outlined in Chapter 6, Counterfactual, we consider that there were routes for GIPHY to obtain further funding from its existing investors, and possibly also further funding from new investors, for the purposes of continuing to supply GIFs, innovate, develop its products and services, generate revenue and explore various monetisation options.[436] Accordingly, our view is that, absent the Merger, GIPHY would have continued to innovate and

---

[434] Appendix E: GIPHY's Timeline, paragraphs 52-56; 61.
[435] Appendix E: GIPHY's Timeline, paragraphs 64-66.
[436] In response to our Provisional Findings, the Parties submitted a report from Professor Paul Gompers in support of their views on future financing of GIPHY. We have considered points raised in this submission in Chapter 6, Counterfactual.

PX0684-200

develop its products and services, generate revenue and explore various monetisation options with partners and investors for the foreseeable future.

7.146  As a new entrant into display advertising, with an innovative advertising model, GIPHY unsurprisingly faced risks and challenges.[437] However, we consider that, prior to the Merger, GIPHY had the support of its investors to continue to develop and expand its Paid Alignment business.

*Further submissions on whether Paid Alignment would have succeeded*

7.147  In their response to our Provisional Findings, the Parties have submitted that 'The CMA's horizontal theory of harm entirely rests on the idea that GIPHY would most likely have been successful with its [P]aid [A]lignment business model and rapidly expanded it internationally. As we have observed, this conclusion is not consistent with the conduct of the actual and potential investors in GIPHY at the time (i.e., they did not invest)'. [438]

7.148  [✂].

7.149  The Parties further submitted[439] that '[i]f GIF [P]aid [A]lignments were the promising business model that the CMA believes they are, then one would expect to encounter them in the real-world at scale, either offered by stand-alone GIF providers or by vertically integrated firms such as Google/Tenor, Facebook/GIPHY, or [✂]. Yet that is not the case.' [✂].

7.150  The Parties submitted[440] that none of Facebook, Google or [✂] are currently offering [P]aid [A]lignment services, despite being well-placed to do so, suggesting that this is not a 'promising ad format'.

7.151  The Parties further submitted[441] that Facebook, Google and [✂] all compete in online advertising, and their acquisition, respectively, of GIPHY, Tenor [✂] is a means of creating better user experiences on their services, and as such is an aspect of competition, so that 'actual competition has increased since Facebook acquired GIPHY'.

7.152  Finally, the Parties also submitted that we have '…selectively focus[ed] on evidence, disregarding the necessary sequencing of events and ignoring factors which show that on any objective analysis that it is clear that GIPHY was unlikely to have entered "display advertising" in the UK in the medium

---

[437] Coronavirus (COVID-19) was a further source of business uncertainty at the time of the acquisition.
[438] Parties' Response to Provisional Findings, paragraph 1.5.
[439] Parties' Response to Provisional Findings, paragraph 1.13.
[440] Parties' Response to Provisional Findings, paragraphs 1.16 to 1.20.
[441] Parties' Response to Provisional Findings, paragraph 1.24.

PX0684-201

term. The PFs place little to no weight on evidence provided on GIPHY's fundraising struggles and the evidence from its investors which corroborate the fact that its revenue-generating model was experimental and unproven'.[442]

*Our view*

7.153  The Parties' submission that the Horizontal Theory of Harm 'entirely rests on the idea that GIPHY would most likely have been successful with its [P]aid [A]lignment business model and rapidly expanded it internationally'[443] is not an accurate characterisation of our theory of harm. As noted in paragraph 7.14 above, the elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where entry by that entrant is unlikely and may ultimately be unsuccessful, and our provisional view[444] was that the Merger led to an SLC arising from a loss of dynamic competition.

7.154  As noted in paragraph 7.146 we consider that, prior to the Merger, GIPHY had the support of its investors to continue to develop and expand its Paid Alignment business. Even when it received a proposal for an acquisition by Facebook for [✕], and despite being in the early stages of the Coronavirus (COVID-19) crisis, GIPHY's board continued to explore the option of a fundraise in order to continue GIPHY as an independent business (see Appendix E, paragraph 68).

7.155  As we have noted above and in our Provisional Findings (paragraph 7.98), at the point of the Merger, GIPHY had not yet demonstrated that its Paid Alignment model would be successful at scale. That third parties such as [✕] Google did not demonstrate a strong interest either in acquiring GIPHY's Paid Alignment business, or in developing similar business models of their own,[445] should be seen in the light of Paid Alignment being a new and untested model. However, we consider that GIPHY was particularly well-placed to address the challenge of bringing this new business model to market at scale, and that it was making concerted efforts to achieve this, with the support of its investors.

7.156  We note that the Parties have previously commented on the lack of competing bids for GIPHY, submitting that 'the first horizontal theory of harm is undermined by the simple fact that in a sales process extending over many months, [✕].

---

[442] Parties' Response to Provisional Findings, paragraph 6.11.
[443] Parties' Response to Provisional Findings, paragraph 1.5.
[444] Provisional Findings, paragraph 7.163.
[445] See Chapter 9, Countervailing Factors for further discussion of entry or expansion into Paid Alignment.

PX0684-202

7.157 [✂]. Alex Chung reportedly told an [✂]. However, [✂].

7.158 The Parties have submitted that '[a]nother buyer would [also] likely not have wanted to pursue experimental [P]aid [A]lignments, because such a buyer would have a much more straightforward way of monetizing GIPHY – by selling ads on its own service; in other words, exactly as Facebook intends to do'.[446] As such the Parties appear to recognise that a potential buyer's valuation of GIPHY's Paid Alignment model may have depended on the buyer's particular circumstances and market position, rather than reflecting the likelihood and scale of successful expansion of GIPHY's Paid Alignment business.

7.159 [✂].

7.160 [✂].

7.161 Similarly, we consider that Google's willingness to develop a Paid Alignment model through its purchase of Tenor would depend on factors including Google's perception of the risks to and potential for successful expansion of the model; the cost and the amount of management time and effort required from Google; and the compatibility and ease of integration with Google's existing operations. Again, Google would also likely have needed to evaluate each of these factors relative to other revenue growth opportunities. Further discussion of Google/Tenor's plans for entry or expansion into Paid Alignment is contained in Chapter 9, Countervailing Factors. [✂].

7.162 [✂] Indeed, as set out in paragraph 7.203, at the time of its acquisition of GIPHY, Facebook estimated that monetisation of GIPHY could yield over [✂] in annual revenue (on Instagram alone) within five years of launch. Vishal Shah commented to us that 'even the [✂] is a drop in the bucket compared to some of the work we do on Instagram more broadly'.

7.163 Next, we consider the Parties' submission that the acquisition of GIPHY, Tenor [✂] has led to an increase in competition in online advertising.

7.164 It is possible that Facebook's acquisition of GIPHY will allow it to improve its user experience, by more closely integrating GIPHY into its existing services. However, Facebook has not presented any evidence, at Phase 1 or Phase 2 of this investigation, that the Merger will lead to rivalry-enhancing efficiencies such as to prevent an SLC from arising (see paragraph 9.111). In addition, we note that:

---

[446] Parties' Response to Provisional Findings, paragraph 5.3(b).

PX0684-203

(a) Google's acquisition of Tenor was not an effect of the Merger. In addition, we note that Facebook's internal discussions leading up to the Merger do not support a view that the Merger was a response to [✂] arising from Google's acquisition of Tenor.[447]

(b) [✂]. In internal Facebook correspondence, Nir Blumberger commented that using Gfycat would be '[✂]'. As noted in Chapter 5, Market Definition and Market Power, and in Chapter 8, Vertical Effects, [✂]. In our view [✂] is unlikely to have made it a materially stronger competitor to Facebook in display advertising in the foreseeable future.

7.165 Finally, as to the Parties' submission that we have selectively focused on evidence, ignored the sequence of events, and failed to place weight on GIPHY's fundraising struggles and evidence from investors, we note that:

(a) Appendix E of our Provisional Findings set out the sequence of events covering GIPHY's efforts to develop its Paid Alignment business and secure funding, up to the point of the Merger. The Parties have not commented on the material in this Appendix, which is also included as Appendix E of the present report.

(b) The contemporaneous views of GIPHY and its investors were set out in detail in Appendix E of our Provisional Findings. In response, the Parties have cited:[448]

(i) A comment by a third party that GIPHY was 'not yet close to a breakthrough' with its advertising model;

(ii) A comment in our summary of third-party calls (Appendix I, paragraph 21) that 'most [third parties] recognised some substantial challenges with achieving success at scale'; and

(iii) A comment by GIPHY's Chief Strategy Officer at the Main Party Hearing, that [✂].

(c) We note that third parties expressed a range of views, both positive and negative, about GIPHY's prospects, and this is reflected in Appendix I, including in paragraph 21 which the Parties cite. The third party referred to by the Parties in their response to the CMA's Provisional Findings also

---

[447] In [✂], Facebook raises the possibility of acquiring GIPHY. Tenor is mentioned, but only in the context that [✂]. [✂], which requests approval for the Merger, does not mention Tenor. Facebook commented ([✂]) that 'the CMA's conclusions regarding competition cannot only be drawn from these two internal documents'. To be clear, our view is based on the absence of documentary evidence that the Merger was a response to stronger competition arising from Google's acquisition of Tenor. Facebook has not presented any evidence of such a response.

[448] Parties' Response to Provisional Findings, paragraph 6.11.

PX0684-204

considered that GIPHY 'had an advertising product that could be significant if executed well'.[449] As discussed below, we have considered this evidence, alongside the other evidence that we have received, in forming our view on the prospects of GIPHY's Paid Alignment model. We have considered the evidence as to the whether GIPHY would have entered the UK market in paragraphs 7.169 to 7.182 below.

*Our view on the strengths and weaknesses of GIPHY's monetisation model*

7.166  Based on the evidence set out above, our view is that:

(a)  GIPHY faced some limitations in its ability to offer ad functionality including monitoring and tracking. However, it was taking steps to develop its capabilities in this area, both via third-party services and through closer integration with platforms.

(b)  GIPHY's advertising model had important advantages over existing display advertising formats.

(c)  Advertisers appeared to recognise these advantages, based on the evidence of repeat sales, growing demand for Paid Alignment, and positive comments about the service in internal documents and in our discussions with advertisers, and advertisers' responses to the termination of Paid Alignment.

(d)  Securing revenue share agreements with larger platforms such as [✂] was a challenge for GIPHY. However, it had secured agreements with Samsung, Kika and smaller social media platforms, and GIPHY's investors considered that it was in a position to demonstrate the viability of its model on third-party platforms. Doing so would have put it in a stronger position to sign revenue share agreements with larger platforms.

(e)  While revenue growth on GIPHY's O&O platforms was [✂], we have seen no evidence that this undermined GIPHY's confidence in its overall business model.

(f)  [✂]

---

[449] The third party in question was [✂] (see Appendix I, Third Party Summary), which also considered that GIPHY had an advertising product that could be significant if executed well. [✂] considered the chance to build an advertising platform like Google or Facebook, and not just an advertising network, was very appealing and, prior to the Merger, it had expressed an interest in an investment in GIPHY in the range of [✂] although only preliminary diligence and discussion had taken place.

PX0684-205

*(g)* We have not seen evidence that [✂] were a material obstacle to the success of Paid Alignment services.

*(h)* GIPHY also faced a challenge in appointing the right sales team and leadership. However, GIPHY was making progress in building its sales team in early 2020.

*(i)* Prior to the Merger, GIPHY had the support of its investors to continue to develop and expand its Paid Alignment business despite the risks and challenges it faced as a new entrant into display advertising with an innovative advertising model.

7.167 We also consider that evidence from Facebook relating to the acquisition of GIPHY, and its subsequent testing of a monetisation model with some similarities to GIPHY's Paid Alignment, show that Facebook recognised the potential to monetise GIFs (see discussion below at paragraphs 7.198 to 7.223).

7.168 GIPHY was seeking to establish itself and expand in the display advertising market, which has significant entry barriers,[450] on the basis of an innovative business model, and these efforts were important to the dynamic competitive process (see above paragraphs 7.30 to 7.49). It faced a number of challenges to demonstrating the effectiveness of its model, both to advertisers and the third-party platforms on which it relied, and there was necessarily uncertainty about how it would develop in future. However, GIPHY had already been successful in establishing itself as the leading supplier of GIFs with a large user-base, it had made substantial progress in improving and expanding its model to monetise its user-base, and it had the support of its key investors for its Paid Alignment monetisation activities. We consider that GIPHY's success to date, and further efforts, to monetise GIFs materially increased the likelihood of new innovations or products being made available in display advertising[451] (whether by GIPHY or by stimulating wider innovation by other existing providers of digital advertising, such as Facebook, responding to GIPHY's activities to protect their future sales from increased competition).[452] As such, whilst the likelihood of successful expansion by GIPHY was necessarily uncertain at the time of the Merger, our view is that its ongoing efforts to innovate and expand would have driven dynamic competition in the display advertising market.

---

[450] See Chapter 9, Countervailing Factors, and Chapter 5, Market Definition and Market Power.
[451] Merger Assessment Guidelines (CMA129), paragraph 5.20.
[452] Merger Assessment Guidelines (CMA129), paragraph 5.18.

PX0684-206

*Expansion into the UK*

7.169   The Parties submitted that 'GIPHY has never sold a single ad in the UK (or anywhere else outside of the US) [✂].As noted above (paragraph 7.51), the Parties previously submitted that GIPHY's brand partners [✂], that GIPHY had suspended its efforts to explore international opportunities, and there was no realistic prospect that GIPHY could have expanded its Paid Alignment business into other markets or geographies outside of the US.

7.170   As noted in paragraph 7.12, the competitive process over innovation and the development of products by global players such as GIPHY and Facebook takes place at a global level, while sales to customers occur at a national level. Therefore, when assessing the effect of the Merger, it is necessary to consider the likelihood of GIPHY's entry into the UK, and its efforts towards achieving that goal. As set out in Appendix F: GIPHY's Paid Alignment Model, GIPHY's internal documents indicate that in late 2019 and early 2020, it was actively discussing a number of international monetisation possibilities, which it appeared to consider as a means of diversifying its revenue streams.

7.171   Between December 2019 and February 2020, GIPHY's revenue team was developing an 'International Ads Delivery' plan (which staff considered would require only a two-week period to implement from an engineering perspective), and sought internal approval to move ahead with operationalising it. It appears this plan was developed in response to significant interest from advertisers regarding international opportunities that GIPHY was fielding in the months prior to the onset of the Coronavirus (COVID-19) pandemic. For example, one internal email notes that '[✂]' – demand was identified from major brands such as [✂], among others.

7.172   The UK appears to have represented an important component of these international plans. GIPHY highlighted the UK as one of [✂] in which to service international brand campaigns, due to its substantial share of total GIF inventory (ie potential ad impressions). In late 2019, staff suggested a trip to the UK to explore market appetite.

7.173   There was also some interest from UK-based advertisers. In February 2020, GIPHY reported internally that [✂] was interested in expanding the [✂] US campaign into the UK. As of April 2020 (ie after the onset of the Coronavirus (COVID-19) pandemic), GIPHY was in discussions with an advertising company in the UK ([✂]),which reported interest in GIPHY's advertising model from UK-based brands including [✂] (excerpts below). These

PX0684-207

discussions appear to have been halted from GIPHY's side as a result of the Merger.[453]

'[✂]'.

*Submissions following Provisional Findings*

7.174 Following our Provisional Findings, the Parties submitted statements by [✂] and [✂] expressing the view that international expansion was not a realistic opportunity for GIPHY.

7.175 [✂] submitted that:

(a) It was the revenue team's job to consider ways in which revenue might be increased, but 'whether any of those ideas were in reality viable was a much wider question for the executive team'. Neither [✂] 'nor the other senior leaders gave any serious strategic consideration to [✂].

(b) 'the prospect of generating only [✂] of international revenue growth would not have been considered to be of any significance' to GIPHY. In addition, 'The revenue number hangs on "30+ inquiries" from clients ... An 'inquiry' cannot be translated automatically into demand', and only four such expressions had related to the UK. Also 'in order to attempt to make the case for the benefits of international growth, the revenue team assumed that GIPHY would sign 50% revenue share agreements with some of its top partners such as [✂].

(c) 'The document 'GIPHY Long Range Plan – Executive Summary' … suggests that for international expansion to have any prospect of success the revenue sales and support team would need to grow to [✂] full time employees, with [✂] of capital required.'

(d) 'This was against a backdrop where the Chief Financial Officer, Whit Richards, wrote to me to say: [✂].

(e) The Decision Brief for international expansion was limited to US firms paying in USD. Expanding beyond this would have required a physical presence outside the US and would have had tax implications.

(f) 'A fundamental impediment to GIPHY expansion to the UK would have been the need to include advertising disclosures in order to comply with local rules', while GDPR represented a further regulatory challenge.

---

[453] On 24 April, Cameron Smith (GIPHY employee) noted in an internal email exchange that [✂].

PX0684-208

(g) GIPHY's 'inability to resource moderation teams in local jurisdictions would have limited any expansion to English-speaking countries. This would have significantly reduced the attractiveness of any expansion'.

(h) GIPHY 'was unable to demonstrate to investors the viability of its revenue generation model even in the United States. I believe that for the same reasons that GIPHY failed to grow its revenue business in the United States at any significant scale, it would have failed to grow internationally'.

7.176 [✂] submitted that:

(a) [✂].

(b) 'GIPHY was ultimately forced to conclude that [international expansion] was not a meaningful long-term route to monetisation' because:

   (i) Interest from brands in advertising internationally was 'preliminary and cautious' rather than being concrete expressions of interest.

   (ii) GIPHY did not have access to basic user data to share with advertising partners.

   (iii) The 'Paid Alignments model was not easily scalable – crafting an effective branded GIF required significant input from GIPHY's creative strategists, which in turn required the brand to make a significant investment.'

*Our view*

7.177 As a general point, we note that while submissions and views expressed at hearings are an important part of our process, we place particular evidential weight on contemporaneous evidence such as internal documents in understanding the intentions of decision makers at the time. In assessing the new submissions from [✂] and [✂], we have therefore considered the extent to which their views are supported by, or are in tension with, evidence as to GIPHY's view of international expansion at the time.

7.178 Taking [✂] points in turn:

(a) **Senior team engagement:** As noted in paragraph 7.171, GIPHY's revenue team developed its international strategy over several months. [✂]. We have seen no evidence that the executive team saw international expansion as impossible, and such expansion was presented as a growth opportunity at senior level on a number of occasions:

PX0684-209

(i)   The document [✂] lists a number of 'upsides' to GIPHY's growth model, beginning with '[✂].

(ii)   [✂].

(iii)   [✂].

(b)   **Scale of opportunity:** [✂]. It is not an indication of the total scale of the opportunity from international expansion.

(c)   **Staff requirement:** The requirement for [✂] sales and support staff in the document [✂] is a total figure for GIPHY, supporting its long-term projected revenues. [✂].

(d)   **[✂]:** [✂].

(e)   **Tax implications:** We consider the Decision Brief to provide evidence of initial interest in international expansion. While a large-scale expansion would necessarily entail some additional costs, potentially including taxation, the Parties have not provided evidence as to the materiality of these costs.

(f)   **[✂]:** We have considered GIPHY's submissions in relation to [✂] in paragraphs 0 to **Error! Reference source not found.**.

(g)   **Content moderation:** The Decision Brief reports that [✂]% of GIPHY's impressions were outside the US. [✂]. We have not seen evidence that monetising this traffic would have required additional content moderation by GIPHY.

(h)   **Growth of US revenues:** [✂] comments relate to the issue of how successful GIPHY would have been in scaling up Paid Alignment. We have considered this issue in paragraphs 7.51 to 7.168 and Appendix E. Based on this assessment, we do not consider the evidence supports [✂] submission that GIPHY had been unable to demonstrate the viability of its revenue generation model in the US. The success and ultimate scale of Paid Alignment in the UK would likely have been subject to similar challenges to those GIPHY faced in the US. However, the internal documents we have discussed in paragraphs 7.169 to 7.173 indicate that GIPHY was developing plans to expand internationally in 2019 and early 2020, when Paid Alignment in the US had yet to achieve large scale. International expansion was seen as a form of 'revenue diversification', supporting GIPHY's monetisation efforts in the US.

7.179  Regarding the submission from [✂]:

PX0684-210

(a) We recognise that O&O banner ads may have been a limited opportunity for GIPHY. [✂].

(b) We have not seen any evidence that GIPHY was 'ultimately forced to conclude that [international expansion] was not a meaningful long-term route to monetisation'. As noted, international expansion was still being discussed at Board level into March 2020.

(c) We would not necessarily expect GIPHY to have received 'concrete expressions of interest' for international advertising at a time when it did not yet offer such a service. However, the requests from advertisers were an indication of potential demand for such a service, and the revenue team responded by seeking to develop such a service.

(d) The other issues raised relate to limitations of Paid Alignment more generally, which we have considered in paragraphs 7.51 to 7.168 and Appendix F.

7.180  For the reasons set out above, we consider that the submissions from [✂] and [✂] do not show either that barriers to UK entry for GIPHY made such entry unlikely, or that GIPHY had concluded prior to the Merger that international expansion (or UK entry in particular) was unattractive or unrealistic. On the contrary, GIPHY executives were discussing international expansion, including to the UK, as an opportunity in early 2020, and this opportunity continued to be raised at Board level up to March 2020.

7.181  We note that, at the time of the Merger, GIPHY was still at a relatively early stage of developing its Paid Alignment model, and it had not developed plans for a full international expansion. However, GIPHY was a global market leader in the supply of GIF services. GIPHY's most important partners, such as Facebook and Snap, had a strong presence in international markets and, accordingly, a substantial proportion of GIPHY's traffic was in those markets, including in the UK. We consider that GIPHY had a strong incentive to extend Paid Alignment to its international markets. As noted, even at the relatively early stage of development of Paid Alignment, it had identified international expansion as an opportunity at the senior level, and at operational level was developing plans in response to this opportunity. Taking the evidence in the round, we remain of the view that GIPHY was likely to have entered into the supply of Paid Alignment into the UK.

7.182  In addition, we note that the importance of GIPHY to the dynamic competitive process includes any innovation or efforts by incumbent firms made in response to GIPHY, and these would not necessarily be limited to the US even if GIPHY did not expand internationally. For example, Facebook is

PX0684-211

already present in the UK display advertising market, and efforts by Facebook to improve its services in response to GIPHY's efforts (eg in the US) would potentially also benefit UK consumers.

*GIPHY's potential scale in the UK*

7.183  The Parties submitted that:

(a) Our Provisional Findings were inconsistent with decisions in previous merger cases. Specifically, they submitted that: 'There are several precedent cases where the CMA has cleared a transaction, including at Phase 1, as a consequence of a small actual increment on a significant share…'. The Parties cited four previous CMA decisions and three European Commission decisions in support of their submission.

(b) It was unrealistic to suppose that the scale of GIPHY's entry in the UK display advertising market would have been such as to introduce significant further competition.[454] The Parties have commented that 'even if GIPHY's boldest (and highly implausible) revenue forecasts were met, GIPHY's share of "display advertising" in the UK would be [✂], [✂], using the CMA's own numbers. This cannot be considered material under any definition'. They submitted a paper by Frontier Economics[455] which sets out additional estimates of GIPHY's potential market share were it to enter the UK display advertising market. The Parties further submitted that if the CMA is to rely upon a hypothesis of additional competition, it is obliged to forecast, at least in approximate terms, the extend of future competition, and to assess whether the risk to Facebook's future profits met some 'minimum standard to prompt reaction from the incumbent – otherwise the threat of potential competition from any possible future entrant would be sufficient to foster dynamic competition and, on the CMA's approach, lead to competition concerns'.

7.184  As regards the Parties' reference to previous cases, we begin by noting that our Merger Assessment Guidelines state that the CMA will 'consider each merger with due regard to the particular circumstances of the case',[456] and cite the Competition Appeal Tribunal[457] as stating that 'merger decisions of the CMA do not constitute precedents and it is axiomatic that each case turns on its own facts and that the characteristics of one market may be very different from those of another. Consistency is achieved by the CMA applying

---

[454] Parties' Response to Provisional Findings, paragraphs 6.15.
[455] Note on GIPHY's international expansion prospects, Frontier Economics, October 2021.
[456] Merger Assessment Guidelines (CMA129), Paragraph 1.12.
[457] *Ecolab Inc. v Competition and Markets Authority* [2020] CAT 12, paragraph 93.

its statutory guidance…'.[458] In addition, we consider that the Parties' account of the past cases they cite is inaccurate – for example, one was cleared on *de minimis* grounds rather than because of a small increment, while in others the small increment was considered alongside other evidence in reaching a clearance decision.[459]

7.185  Turning to the Parties' submissions on the materiality of entry by GIPHY, specifically on GIPHY's revenue forecasts and the Frontier Economics estimates for GIPHY's potential market share, we note that:

(a)  The Frontier Economics paper which the Parties submitted following the Provisional Findings presents calculations based on two alternative GIPHY forecasts of its 2023 US revenues, of [✂] million and around [✂]. Frontier uses these figures to calculate an implied ARPU for GIPHY in the US. It then assumes that GIPHY's ARPU in the UK would be [✂] of this figure, on the basis that Facebook's ARPU in its 'Europe' region is [✂] of its ARPU in its 'US and Canada' region. Frontier then calculates a UK market share for GIPHY of [✂] based on alternative assumptions of UK market growth.

(b)  The Frontier Economics paper also refers to a January 2020 GIPHY document which estimates international opportunities for GIPHY at [✂], and a March 2020 document relating to running banner ads on GIPHY's O&O sites internationally, which refers to a [✂]. Based on these two documents, Frontier estimates GIPHY's UK market share at less than [✂]%.

(c)  As discussed above, two of Frontier's UK market share estimates are based on GIPHY's forecasts of its US revenues. However, GIPHY's future potential growth depended on a wide range of factors, each of which was uncertain, including its traffic growth on O&O and API platforms, advertiser demand and hence GIPHY's ability to develop Paid Alignment into an effective marketing tool, and GIPHY's ability to introduce new advertising products. While GIPHY's forecasts reflected its current understanding of the potential growth of its business (as well as the need to present an attractive case to investors), we have not seen evidence

---

[458] Merger Assessment Guidelines (CMA129), Footnote 13.
[459] In *Tattersalls/Brightwells*, the CMA stated (paragraph 14) that it could not rule out that the merger would result in the realistic prospect of an SLC as a result of unilateral horizontal effects (the merger was cleared on *de minimis* grounds, particularly in view of the market size). It is therefore incorrect for the Parties to state that this case was cleared as a consequence of a small increment in market share. In clearing the *Roper/CliniSys* merger, the CMA noted the small increase in market share of the merged entity. However, the decision was also informed by evidence of limited competition between the parties and a lack of third party concerns. Similarly, when clearing the *Henry Schein/Plandent* merger, while the CMA stated that there would be a minor increment as a result of the merger, it also considered the limited competitive constraints between the parties.

PX0684-213

that GIPHY had a view on any specific upper limit to its eventual scale as a business. Indeed, when GIPHY presented these forecasts to its Board, it also presented 'upside' or opportunities for revenue diversification beyond those incorporated into the model.[460]

(d)  In addition, we do not consider that the potential international revenues mentioned in GIPHY internal documents are informative as to the UK market share it could have achieved. These figures were used to inform the question of whether GIPHY should take forward specific international offers. For example, GIPHY executives commented on the USD 5 million estimate in the first of these documents as follows: Cameron Smith: 'would also be good to see how youre getting to that $5MM! whos got the most cash, legend!?!??'; Adam Bauer: I'm cool with listing brands but also providing a $$ bottoms up seems like overkill given we haven't even run a test yet... cool? Cameron Smith: 'makes sense. I just highly suspect that finance will ask how you got to $5MM. If there isnt a super solid answer, id call it a vague 'multi million opportunity''.

(e)  In our view, this exchange indicates that the USD 5 million figure was presented internally as indicating that international expansion was worthwhile pursuing as an opportunity, rather than being an evidenced assessment of GIPHY's long-term potential in international markets. As a result, we do not consider that this figure offers a meaningful basis for GIPHY's potential UK market share. We note that the Parties have not presented any evidence or reasoning as to whether GIPHY's potential UK market share might be greater or less than its potential US market share.

7.186  As regards the materiality of GIPHY's potential scale more generally, our Merger Assessment Guidelines note that[461] the acquisition of a potential competitor by a firm with market power may be concerning even if that potential entrant is expected to be small. As we have discussed, our concerns in the present case are informed by Facebook's significant market power in display advertising. This makes it very difficult for platforms offering innovative new services to enter and compete.[462] In this context, we consider that the loss of GIPHY is particularly concerning, given its importance to the dynamic competitive process, and hence to the incentives of other firms already active in the market to respond to that form of competition (see above paragraphs 7.30 to 7.49).

---

[460] For example, GIPHY's [✂], besides noting an upside to revenue plans from 'New Territories: Monetisation of Rest of World Inventory' also identified other upsides such as 'New products: Video etc', 'New Channels: Embeds' and 'Enhanced Inventory'.
[461] Merger Assessment Guidelines (CMA129), paragraph 5.15.
[462] Market Study, page 211.

PX0684-214

7.187  In addition, we note that:

(a)  Given the scale of the display advertising market, GIPHY's Paid Alignment model could potentially represent an alternative to Facebook for a substantial amount of advertising demand in absolute terms, without necessarily having a large market share.

(b)  While GIPHY generated internal forecasts of future growth, its actual future growth in display advertising would have depended on its ability to develop valuable new services for advertisers. How, and with what success, it would have achieved this remained to be seen at the time of the Merger, which makes it inherently difficult to estimate its potential market share in the longer term.

7.188  For the reasons given above, we do not consider that the Parties' submissions on GIPHY's potential scale are robust. In any case, we consider that even if GIPHY's initial expansion into the UK would have been modest relative to Facebook, this would not undermine GIPHY's importance to the dynamic competitive process. As we have discussed above, GIPHY was a leading provider of an important complementary service to social media platforms, and had a large volume of traffic which it was seeking to monetise through Paid Alignment. In this context, we consider that its efforts to reach scale as a provider of advertising services were important to dynamic competition.

## Expected closeness of competition between Paid Alignment and Facebook's display advertising services

7.189  The constraint exerted by a dynamic competitor on other firms depends in part on the expected closeness of competition between those other firms and the dynamic competitor.[463] If successful entry by an innovative firm is likely to bring it into direct competition with an incumbent, this will tend to strengthen the incentive of the incumbent to make efforts to protect itself from entry. We therefore assess in this section the expected closeness of competition between Facebook and GIPHY.

7.190  The Parties submitted that GIPHY could only be seen as a competitor to Facebook within a broad digital advertising market (in which, the Parties submit, Facebook does not have market power) and not within a display advertising market:[464]

---

[463] Merger Assessment Guidelines (CMA129), paragraph 5.23.
[464] The Parties also submitted that Facebook did not have market power in display advertising.

PX0684-215

'Facebook's advertising services consist of offering brands and customers space to display their ads, often customised to the end-user. By contrast, GIPHY's [P]aid [A]lignment offering gives Brand Partners the possibility of aligning their GIF content with one or multiple search terms and/or pinning it to the "trending" feed on GIPHY's website. Facebook's and GIPHY's activities are further differentiated in that they serve different purposes: advertisers would consider running ad campaigns on Facebook to raise brand awareness, introduce new products and features, raise exposure to a discount campaign, etc., with the ultimate goal of boosting traffic and sales. Indeed, virtually all ads on Facebook contain a click-through link to the advertisers' website or web-shop. By contrast, GIPHY's [P]aid [A]lignments do not fit the description of the CMA's own display advertising frame of reference. It does generally not contain any product features, descriptions, and indeed no invitation to buy or a link to the advertiser's website or web shop'.

7.191  As set out in Chapter 5, Market Definition and Market Power, our view is that the type of advertising that GIPHY was developing prior to the Merger through its Paid Alignment services would have been a close substitute for display advertising services of the type offered by Facebook.

7.192  Specifically, as set out in more detail in Chapter 5, Market Definition and Market Power, paragraphs 5.177 to 5.180 GIPHY's Paid Alignment services are closer to display advertising activities than to search advertising in that:

*(a)* At least in its current form at the time of the Merger, GIPHY Paid Alignment is generally less likely to directly prompt a purchase of the product (compared to search advertising), and more likely to increase the user's brand awareness (as with display advertising).

*(b)* Ads in GIPHY's trending feed of currently popular GIFs are not generated by search terms as is the case with search advertising: users experience these ads selected for and displayed to them by GIPHY without entering any search terms.

*(c)* The views of advertisers and GIPHY's internal documents also suggest that Paid Alignment (at least in its current form) primarily serves the purpose of brand awareness, which is also the primary (although not necessarily only) goal of display advertising.

7.193  We have also considered whether GIPHY may be a particularly close competitor to Facebook's display advertising. We note that:

PX0684-216

(a) Given the extent of Facebook's presence in the supply of display advertising in the UK, and the limited competition within that market, we would expect GIPHY to have been closely in competition with Facebook for at least part of companies' display advertising budgets following its entry.[465,466] For example, [✂], one of GIPHY's largest customers, told us that Facebook/Instagram is one of its bigger advertising partners.

(b) In light of GIPHY's presence on a range of social media platforms, we consider its Paid Alignment service to be closer to the 'O&O' segment of the display advertising market (see Chapter 5, Market Definition and Market Power), in which Facebook accounts for [70-80%] ([✂]%) share, than to the 'open display' segment in which Google largely operates. In particular, audiences for Paid Alignment ads on a social media platform, and for other display advertising on that platform, are both by definition users of that platform. While media agencies saw the two segments as substitutable,[467] we note that some advertisers may have a particular interest in advertising within communications between users – ie through social media and messaging. For example, one advertiser told us that it wanted to be part of the explosion in GIFs usage at that time, which was changing how consumers, particularly younger consumers, were communicating with each other. [✂].

(c) GIPHY internal documents have expressed a view that its service could allow others to compete against Facebook. [✂].

7.194 In addition, we note that Facebook's [✂] suggests this closeness of competition could have increased further. We consider this development in paragraphs 7.218 to 7.224 below. As set out there, while the Parties have pointed out differences between GIPHY's Paid Alignment model and [✂], both offer advertisers a way of advertising within personal communications. As such, we consider the two may have some similarities from an advertiser perspective. In addition, as noted in paragraph 7.39, GIPHY also considered extending its Paid Alignment model to include [✂].

7.195 Accordingly, we consider that a GIPHY Paid Alignment service would have been in close competition with Facebook's current display advertising offering in the UK.

---

[465] In practice, this competition could have been in the form of advertisers diverting some of their spend from Facebook to GIPHY, leading to Facebook achieving lower CPMs for its advertising.
[466] The Market Study notes (paragraph 5.18) that '[A]dvertising campaigns are typically planned by first defining the business's objectives (for example, to increase sales or raise awareness) and available budget to achieve these objectives'.
[467] Market Study, paragraph 5.23.

PX0684-217

## Assessment of Facebook's and others' likely response to potential competition absent the Merger

7.196  In this section we consider Facebook's and others' likely response to GIPHY's ongoing efforts to innovate and develop its products absent the Merger. As set out above, dynamic competition increases the likelihood of new innovations or products being made available, whether this is done by the potential entrant, the incumbent or other firms. This is for example because, as set out in Paragraph 1.4 of the Merger Assessment Guidelines, the threat of future disruption may inspire incumbent suppliers to improve their offer in the present, for the benefit of consumers. We have therefore taken into account evidence of Facebook's and others' likely response to potential competition from GIPHY absent the Merger, specifically:

(a)  Facebook's views on the potential for monetisation of GIFs and GIF stickers;

(b)  The commercial activities of Facebook and third parties in relation to monetisation via GIFs and related social media features; and

(c)  Other evidence on Facebook's incentive to respond to potential competition from GIPHY.

7.197  While we have not seen internal Facebook documents describing GIPHY as a threat, or evidence of any direct response to the threat of entry or expansion by GIPHY (which was removed as a result of the Merger), we have found evidence of Facebook's interest in monetising GIFs (and the importance of GIFs as an area of potential monetisation for Facebook and others), and of Facebook's incentives to respond to potential competition from GIPHY. This in turn contributes to our view that that GIPHY was important in driving dynamic competition.

### *Facebook's views on the potential for monetisation of GIFs and GIF stickers*

7.198  Facebook's views on the potential monetisation of GIFs and GIF stickers are relevant to understanding how Facebook might be expected to react to GIPHY's ongoing efforts to develop and expand its Paid Alignment services.

7.199  Facebook closed down GIPHY's Paid Alignment service at the time of the Merger.[468] Facebook told us that this was because GIPHY's Paid Alignment was based on third party engagement, and Facebook had no interest in this. However, as we discuss below, Facebook internal documents discussing the

---

[468] See Chapter 2, The Parties, the Merger and Rationale for further detail.

PX0684-218

acquisition of GIPHY consider the possible monetisation of GIPHY's services on Facebook platforms.

7.200 The Parties' submissions and internal documents indicate the value that Facebook places on monetising messaging:

(a) The Parties have commented that 'No one disputes that a company successfully monetizing direct messaging at scale would be capable of attracting advertisers... [✂].

(b) Similarly, the Parties submitted that 'GIPHY was sold for only USD 315 million and if there were any prospect of it being the key to monetising messaging at scale one would have expected a valuation likely in the billions, or tens of billions, thereby reflecting its value as the unicorn company finally capable of solving this conundrum'.[469]

(c) In Facebook's Form 10-Q for the quarter ended 30 June 2021,[470] among risks to investors Facebook notes that: 'We have historically monetized messaging in only a limited fashion, and we may not be successful in our efforts to generate meaningful revenue or profits from messaging over the long term.'

(d) In an internal email exchange in March 2020, Nir Blumberger, in the context of questioning the case for a minority investment in GIPHY, comments that '[✂]'. In our view, this comment indicates a concern that monetising via GIFs could become sufficiently important to Facebook that its reliance on GIPHY (and the impact of losing access to it) for this activity would be an increased risk to Facebook.

7.201 In view of this evidence, we consider that Facebook appears to recognise the importance of monetising messaging and the potential for GIPHY to enable this form of monetisation.

*Facebook's assessment of monetisation of GIPHY's services*

7.202 We set out below evidence relating to Facebook's assessment of the prospect of monetisation of GIPHY's services, which informs (i) our assessment of the strengths and weaknesses of GIPHY's monetisation model (see paragraphs 7.50 to 7.166); and (ii) our assessment of the impact of GIPHY's continued innovation and expansion (absent the Merger) on Facebook's conduct and therefore on dynamic competition in display advertising.

---

[469] We consider the Parties' arguments about GIPHY's purchase price in paragraph 7.144.
[470] Facebook Form 10-Q, Quarter ended 30 June 2021.

PX0684-219

7.203  On 1 April 2020, Nir Blumberger emailed Mark Zuckerberg, Sheryl Sandberg and David Wehner to request approval of the acquisition, and commented *inter alia* that:

>  [✂].

7.204  This possibility is further discussed in a detailed 'Value Analysis' paper prepared by Facebook ahead of the Merger as '[✂]'.

>  [✂]

7.205  The paper then cites a GIPHY estimate of [✂].[471] It comments that:

>  [✂].

7.206  Facebook then presents its own estimate of revenue from monetisation of GIPHY's GIFs, [✂].

7.207  Nir Blumberger discussed the acquisition in a March 2020 exchange with John P Poffenberger (Finance Director, Instagram, Messenger, WhatsApp). Mr Blumberger noted that:

>  *(a)*  [✂].

>  *(b)*  [✂].

7.208  Mr Poffenberger comments: [✂].

7.209  A number of points emerge from these documents:

>  *(a)*  The possibility of substantial monetisation of GIFs formed part of the request for approval of the acquisition,[472] and is the only benefit from the acquisition which is quantified in monetary terms in this request for approval.

>  *(b)*  Facebook's assessment of the opportunity is based on a model that [✂]:

>  >  (i)  [✂].[473]

---

[471] This is calculated by multiplying average monthly impressions on Instagram in 2019 by an assumed USD10 CPM.

[472] [✂].

[473] 'Marketing funnel' typically refers to an advertising budget allocation framework. At the top of the funnel, KPIs relate to improving the awareness of consumers that are 'out-of-market' and are not currently aware of the product or service. At the bottom of the funnel, KPIs relate to selling to those customers who are 'in-market', in that they may have expressed some preference for the product or service but have not yet bought it. See paragraph 5.19 and Figure 5.1 in the Market Study.

PX0684-220

(ii)  [✂].

(iii)  [✂].

7.210  As noted in Chapter 2, The Parties, the Merger and Rationale, the opportunity to monetise GIFs is mentioned frequently throughout Facebook's internal correspondence between various individuals involved in the review and analysis of the Merger.

7.211  The Parties submitted[474] that:

(a)  'The CMA relies on Facebook's internal documents to demonstrate that Facebook considered the possibility of monetising GIFs in the future as evidence that absent the merger it would develop products that might compete with GIPHY's [P]aid [A]lignments. That is incorrect. Monetizing GIFs does not mean monetizing GIFs with a [P]aid [A]lignment business model.'

(b)  'The CMA also ignores that the context of this discussion was as part of Facebook's internal correspondence in analysing potential benefits of the Transaction, and – critically – was ultimately considered too speculative to form part of the valuation or deal rationale.

7.212  We note that the Parties have not provided any evidence that suggests that Facebook's intention for monetising GIFs related to something different from a Paid Alignment model, nor have the Parties provided any alternative explanation for the documents cited above. In addition, we have set out in paragraph 7.209 above (and in paragraph 7.129 of the Provisional Findings), evidence from Facebook's internal documents that Facebook's model for monetising GIFs appears broadly similar to that which GIPHY had been developing. The Parties have not commented on this evidence.

7.213  We have not seen evidence that Facebook's estimate of the monetisation of GIPHY was too speculative to include in its valuation. Mr Blumberger's comments in paragraph 7.207 above suggests that Facebook was able to justify its valuation of GIPHY without making reference to the potential for monetisation, not that it excluded this as being too speculative.

7.214  In addition, we note that this projection was included in the deal rationale. As noted in paragraph 7.203 above, Mr Blumberger set out the potential value of monetisation of GIPHY in his email requesting approval from Mark

---

[474] Parties' Response to Provisional Findings, paragraph 6.21(a).

PX0684-221

Zuckerberg, Sheryl Sandberg and David Wehner for the GIPHY acquisition (under the heading 'background and rationale').

7.215   In the light of the above evidence, we consider that Facebook saw monetisation of GIFs as a potentially important upside of acquiring GIPHY, and this is further demonstrated by Facebook's [✂], as discussed below. In our view, Facebook's interest in monetising GIFs in the context of the Merger is relevant in that (i) it is further evidence that GIFs are an important area of potential monetisation and that GIPHY was well-placed to play a role in such monetisation, (ii) the greater Facebook's interest in monetising GIFs the more likely it would be, absent the Merger, to develop services that would compete with GIPHY's Paid Alignment services and the more likely it would be to see expansion by an independent GIPHY as a potential threat.

7.216   We note that:

(a)   Facebook had the advantage of direct access to a very large user base. However, as noted in paragraph 7.47 above, third party platforms partnering with GIPHY through revenue share agreements would have had an incentive to collaborate with GIPHY to develop GIPHY's Paid Alignment service on their platforms. One example of this would have been through the use of user data to improve advertiser metrics.

(b)   [✂]. In any case, the potential to monetise GIPHY on Facebook platforms was part of the decision-making process, and was communicated to the decision makers without qualifications as to its likelihood.

***Commercial activities of Facebook and third parties in relation to monetisation via GIFs and related social media features***

7.217   The efforts of Facebook and third parties to monetise GIFs and related social media features are also relevant to understanding how Facebook might be expected to react to GIPHY's ongoing efforts to develop and expand its Paid Alignment services.

*Recent developments in monetisation by Facebook*

7.218   [✂].

7.219   Under the plan, creators (ie users posting Stories) would have the option of adding stickers, including GIF stickers, which carry advertising, in return for which the creator earns a share of advertising revenue. Facebook's current focus for its plans to monetise Stories through stickers appears to be aimed at incentivising creators of Instagram Stories – through a share of revenues – to

220

create more Stories, leading to wide user engagement. Attracting creators appears to be an area of significant focus for Facebook.[475]

7.220  The proposals note that '[✂]'.

7.221  Facebook submitted that these sticker options 'differ fundamentally from GIPHY's Paid Alignment GIFs' because:

(a)  [✂].

(b)  [✂].

(c)  [✂].

7.222  Despite the differences identified by the Parties, both GIPHY's Paid Alignment model and Facebook's sticker option [✂]. As such, we consider the two may have some similarities from an advertiser perspective. In addition, we note that GIPHY was considering ways to create [✂], and that it was considering extending its Paid Alignment offer to [✂].

7.223  The Parties submitted[476] that 'Facebook is constantly running myriad ad (and other) experiments at all times. "[✂]" is but one small example of Facebook's constant (and consistent) drive to innovate, in the face of strong competition from a wide range of advertising offerings, and that testing is no longer even being carried out.'

7.224  We consider that, even if these tests were among many others that Facebook is carrying out, we would not expect Facebook to run tests on a service which it considered had no prospect of success. We consider that Facebook's [✂] GIF sticker monetisation is further evidence (i) that GIFs are an important area of potential monetisation, and (ii) of the possibility that Facebook would, absent the Merger, have developed services that would compete against GIPHY's Paid Alignment services, in which case it would be even more likely to see expansion by an independent GIPHY as a potential threat.

*Monetisation by other providers*

7.225  Other GIF providers have also offered, or considered offering, sponsored GIF services.

7.226  [✂].

---

[475] https://www.cnbc.com/2021/07/14/facebook-to-pay-creators-1-billion-through-2022.html.
[476] Parties Response to Provisional Findings, paragraph 6.21(b).

PX0684-223

7.227  [✕].

7.228  [✕].

7.229  [✕].

7.230  [✕] so that the author could share their perspective with members of their team and with Erick Hachenburg and David McIntosh (co-founders of Tenor). [✕].

7.231  [✕]:

    *(a)*  [✕].

    *(b)*  [✕].

7.232  [✕].[477]

7.233  In addition to these developments, we note that there is some evidence of monetisation by Holler, a smaller content provider. We understand that Holler offers an SDK[478] (free of charge) and an API (for a fee) and monetises through branded stickers integrated into selected platforms (including Venmo, a payment app, and keyboards and dating platforms).[479] However, as noted in Chapter 5, Market Definition and Market Power, the Parties' internal documents do not suggest that Holler currently competes with GIPHY in any meaningful way (indeed, Holler told us that it did not consider itself to compete closely with GIF suppliers, and that its business was instead focused on bringing together third party content providers, including GIF suppliers, and users). See Chapter 9, Countervailing Factors for further discussion of potential expansion by Holler.

7.234  We consider that these developments by third parties are further evidence that GIFs are an important area of potential monetisation, and hence of the importance to dynamic competition of GIPHY's efforts to innovate and expand in this area.

*Relevance of GIPHY to these commercial activities*

7.235  As noted, we consider that the efforts of Facebook and third parties to monetise GIFs are evidence of the potential commercial viability of monetising

---

[477] Chapter 9, Countervailing factors, contains further discussion of entry / expansion into GIF-based advertising.
[478] As noted in Chapter 5, Market Definition and Market Power, evidence suggests that certain types of data collected by Holler as part of its SDK terms of service appear more extensive and invasive than those collected by GIPHY.
[479] Marketers (holler.io).

PX0684-224

GIFs. Absent the Merger, the efforts of Facebook, [✂], to monetise GIFs would have been part of a dynamic competitive process which would have included GIPHY's efforts to develop and expand its Paid Alignment service.

7.236 In considering the importance of GIPHY within this process, we consider that, absent the Merger, GIPHY would have been a significant player among those seeking to monetise GIFs within the display advertising market:

(a) GIPHY's Paid Alignment model was an innovative approach to monetising messaging (and potentially other features via [✂]).

(b) Paid Alignment was built on GIPHY's strengths as a GIF provider, which it had developed over a number of years.

(i) GIPHY is seen by many market participants (including Facebook) as one of only two effective GIF providers, particularly in view of the quality of its sourcing, moderating and hosting of GIFs, the sophistication of its search engine, and its extensive distribution across API/SDK partners.[480] It also had a widely-recognised and award-winning creative team who were working closely with advertisers as part of the Paid Alignment service.

(ii) GIPHY had a leading presence in the GIF market, accounting for the majority ([✂]) of GIF searches. It also had a well-known brand and strong relationships with the major companies who were its brand partners.

(c) GIPHY (pre-Merger) was considerably more advanced in its GIF monetisation activities than other market participants. Its advertising revenues had grown from 2018 to 2019, and it had seen positive signs of strong growth in 2020 prior to the Coronavirus (COVID-19) crisis.

(d) In addition, GIPHY had a strong incentive to make a success of sponsored GIFs, as it had no other clear route to large-scale revenue generation[481] (in particular from monetising the value it delivers to social media platforms) and, as an independent player, it faced no risk of cannibalising existing advertising revenue streams.

7.237 We consider this evidence supports the view that GIPHY was an important player in a potentially growing segment of the display advertising market, and as such (taking account of the economic context, in particular the expected

---

[480] See Chapter 5, Market Definition and Market Power.
[481] As noted in Chapter 6, Counterfactual, GIPHY was considering platform fees as a short-term solution to its cashflow issues.

PX0684-225

closeness of competition between Facebook and GIPHY) an important part of a dynamic competitive process with Facebook and others.

***Other evidence on Facebook's incentives to respond to potential competition from GIPHY***

7.238  In the following, we consider other evidence on Facebook's incentives, absent the Merger, to respond to potential competition from GIPHY.

7.239  The extent of Facebook's incentive to respond to a dynamic threat of competition from GIPHY is likely to depend in part on the structure of the market in which Facebook operates. As found in the Market Study, two-sided platforms such as Facebook present general features that support a 'winner-takes-most' dynamic (see Box 2.2 Market Study), which contributes to the significant market power held by Facebook on both side of its platforms. In particular:

(a) Social media platforms are characterised by strong network effects, which means that the value of a service to existing users of a platform increases as the total number of users increases. Having a large network of connected users also attracts developers and content providers to the platform - which in turn further increases its value to users.[482] As more users are attracted to the platform, and as they spend more time on the platform, demand for advertising space on the platform increases, leading to more ad revenue for the platform operator. As noted above, network effects could also apply to GIPHY's Paid Alignment model, in that having a wide and prominent presence on third-party platforms makes it more attractive to advertisers, while increased advertising revenue makes it more attractive to platforms.

(b) Network effects can lead to a 'winner takes most' dynamic, in which platforms compete for market leadership. The self-reinforcing effect on the growth of a platform resulting from strong network effects may lead to a 'tipping point', where the scale achieved by one platform confers on it a strong or unassailable incumbency advantage and its rivals find it difficult to expand.[483]

(c) This also underlines the importance of the first-mover advantage, ie once a business reaches such a tipping point and establishes itself as the reference supplier for a given service, it becomes difficult for others to

---

[482] Market Study, paragraph 28.
[483] Merger Assessment Guidelines (CMA129), paragraph 5.4.

PX0684-226

supplant that business or exert any material competitive constraint on it.[484]

(d) Facebook Blue reached such a tipping point in social media around 2012, displacing MySpace as the market leader. Since then, the incumbency advantage has worked in its favour. However, Facebook's actions, particularly in acquiring Instagram and WhatsApp, and responding aggressively to social media entrants such as Google+, indicate that it is highly alert to the risk of entry.

(e) In their Initial Submission,[485] the Parties commented that if GIPHY had 'established indirect competition between Facebook and its social media rivals, such that these would become even fiercer competitors to Facebook', then 'Facebook could have pulled the plug on its support for GIPHY at any point, which would have severely damaged its future prospects or perhaps even been terminal to these…'.

7.240  The Market Study noted that one of the defining features of Facebook's business is that it has built a large 'ecosystem' of complementary products and services around its core service.[486] From its origins as a social network, Facebook has expanded into messaging, devices, gaming and retail. In a broader sense, the Facebook 'ecosystem' includes all other providers and services with which it interacts, including advertisers, complementary services, providers who rely on Facebook's platforms for access to consumers, and the makers of devices and operating systems.

7.241  In this context, we consider that any dynamic competitive threat from GIPHY's efforts to monetise its business has the potential to be amplified by these structural elements of the market (ie network effects leading to a 'winner takes most' dynamic, first mover advantage, and potential tipping points). In particular:

(a) As set out in paragraph 7.44, effective monetisation of GIPHY's GIFs would potentially make it more attractive to third-party platforms [✂]. In

---

[484] Facebook also recognises the importance of first-mover advantage. Facebook's CEO, Mark Zuckerberg, in discussing the reasons for the Instagram acquisition, expressed the view that '[O]nce someone wins at a specific mechanic [ie a social media feature] it's difficult for others to supplant them without doing something different…what we're really buying is time. Even if some new competitors spring […] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction'. (Cited in paragraph 14, FTC (13 January 2021) 'Complaint for Injunctive and Other Equitable Relief', Case No.: 1:20-cv-03590).
[485] Paragraph 7.18(b).
[486] Market Study, Appendix E: ecosystems of Google and Facebook.

PX0684-227

turn, increased presence on third-party platforms would help GIPHY to further grow its monetisation.

*(b)* GIPHY would have had scope to continue to innovate in partnership with larger platforms, including social media platforms which already compete with Facebook for users and display advertising revenue.

*(c)* GIPHY monetisation, in partnership with social media platforms, would also enhance the ability of its social media platform partners to generate revenues from their current users, and increase their incentive to invest in increasing user engagement and expanding their user base. In turn, this would create the scope for further monetisation by GIPHY on those platforms. More generally, any such growth in user engagement or base would increase their strength as display advertisers in competition with Facebook.

*(d)* GIPHY's strengths as a leading GIF provider, and the progress it had made in developing its Paid Alignment business meant that it potentially had a degree of first-mover advantage in monetising GIFs.

7.242   We have not identified evidence from Facebook's internal documents that it perceived GIPHY as a potential competitive threat in display advertising, despite its close relationship with GIPHY. However, we consider that as GIPHY's monetisation plans developed, there would have been an increasing prospect of it being seen as a material competitive threat by Facebook, leading to greater dynamic competition in the form of efforts by Facebook to respond to the possibility of competition from GIPHY, and/or other social media platforms in partnership with GIPHY.

7.243   The Parties have submitted[487] that '…in the US, where GIPHY's [P]aid [A]lignment proposition was available for multiple years, there does not seem to be any notable competitive response, even from competitors which offer near-identical products and services in all other respects, as is the case with Tenor. This is a critical failing (amongst others) in the CMA's PFs. The CMA has presented no evidence that would explain why Facebook or other competitors would only react to such a threat in the UK advertising market and not react to GIPHY's advertising activities in the US.'

7.244   We note that, while GIPHY had made substantial progress in developing Paid Alignment, at the time of the Merger it had generated only a limited amount of advertising revenue, and had not yet demonstrated that its Paid Alignment model could work at scale. However, as set out above, and in our Provisional

---

[487] Parties' response to Provisional Findings, paragraph 6.19.

PX0684-228

Findings, at paragraph 7.157, we consider that as GIPHY's monetisation plans developed there would have been an increasing prospect of its being seen as a material competitive threat. We note that our comments on this subject do not relate specifically to the UK, and we have not seen evidence that Facebook or other competitors would react differently to GIPHY between the US and the UK. Finally, we note that Tenor was already in competition with GIPHY as a GIF provider, and GIPHY's development of its Paid Alignment business was not necessarily a competitive threat to Tenor, as Tenor was not competing for ad revenues at the time.

7.245  As discussed in paragraphs 7.218 to 7.222, [✂]. We consider that Facebook's efforts illustrate that it sees potential in monetising this space. In addition, in our view Facebook's efforts to develop this part of its business would, absent the Merger, have interacted dynamically with those of GIPHY:

(a)  From an advertiser perspective, Facebook Stickers and GIPHY Paid Alignment would potentially have similar advantages in the sense of making advertising intrinsic to communications between social media users.

(b)  In addition, GIPHY was considering [✂] and could – for example – have partnered with a rival social media platform to provide a [✂]. This could have enabled that social media platform to compete against Facebook for display advertising and as part of this, potentially to competing for engagement by the creators [✂].

7.246  In summary, we consider that absent the Merger, as GIPHY continued to develop its GIF and [✂] advertising products, Facebook would have had an incentive to respond to a dynamic threat of competition from GIPHY. That incentive would have increased if GIPHY had expanded its Paid Alignment services in partnership with those rival social media platforms who already compete with Facebook for display advertising revenues.

7.247  In contrast, Facebook's incentives to develop its own services in this space – including [✂] – depend on whether the possible upsides from doing so[488] outweigh any cannibalisation of Facebook's existing display advertising business. Following the Merger, the upsides to Facebook from developing its own service no longer include any response to competitive pressure from GIPHY. We note that while Facebook's internal documents consider the possibility of using GIPHY to monetise GIFs in future, Facebook immediately shut down GIPHY's Paid Alignment service following the Merger, including

---

[488] [✂].

PX0684-229

cancelling some upcoming campaigns, suggesting it did not see an urgency to monetising GIFs in the absence of competition.

***Our view on Facebook's and others' likely response to potential competition***

7.248   In the light of the above evidence regarding Facebook and others' likely response to potential competition from GIPHY absent the Merger, we consider that:

(a) Facebook and others have shown interest in developing monetisation of messaging and Stories, an area of potential revenue growth for display advertising on which GIPHY's efforts were also focused - indeed Facebook saw monetisation of GIFs as a potentially important upside of acquiring GIPHY (see paragraphs 7.198 to 7.216).

(b) Absent the Merger, as GIPHY continued to develop its GIF and [✁] advertising products, Facebook would have had an incentive to respond to a dynamic threat of competition from GIPHY.

(c) We consider this evidence supports the view that GIPHY was an important player in a potentially growing segment of the display advertising market.

## Loss of dynamic competition arising from the Merger

7.249   As noted in paragraph 7.12, when assessing the impact of a loss of dynamic competition it is necessary to consider the likelihood of entry or expansion by the potential entrant, and the impact of such entry or expansion on competition. However, a substantial loss of dynamic competition does not require that, absent the Merger, GIPHY would have become a meaningful competitor to Facebook in the future – as noted in paragraph 7.14 and 7.15, the elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where entry by that entrant is unlikely and may ultimately be unsuccessful.

7.250   The Parties submitted that:

(a) '…the CMA has irrationally disregarded real-world evidence of the failure of GIPHY's experimental [P]aid [A]lignments advertising offering; concluding that its success is irrelevant to the analysis of "dynamic competition" and apparently suggesting that any attempt at (or desire for) success – without any quantification as to what the minimum threshold of success must be – is sufficient to result in an SLC.'

228

PX0684-230

(b) 'As the CMA's own guidance cautions, even a theory of harm based on a loss of "dynamic competition" must be supported by evidence that "the removal of the threat of entry may lead to a significant reduction in innovation or efforts by other firms to protect [...] future profits" (Merger Assessment Guidelines, para 5.23). It follows that in order for "dynamic competition" to arise as a result of a specific potential competitor, a rival firm must perceive a risk to their future profits resulting from that competitor's efforts to enter or expand in the market.' [489]

7.251   We consider that the Parties' account does not reflect our Provisional Findings. In Chapter 7 of our Provisional Findings, and in Appendices E and F, we presented detailed evidence of the progress that GIPHY had made prior to the Merger, and our view of GIPHY's prospects of overcoming the challenges it faced. The Parties have not commented on this evidence. We do not consider it necessary, nor do we have a basis, to specify a 'minimum threshold of success' for GIPHY. We have addressed the Parties' submissions as to GIPHY's potential UK market share in paragraphs 7.183 to 7.189.

7.252   In addition, we consider that the Parties have not accurately reflected our Merger Assessment Guidelines, which do not state that a theory of harm based on dynamic competition must be supported by evidence as to the efforts of other firms in the market. Paragraph 5.23 of the Merger Assessment Guidelines states that:

> 'The likelihood of successful entry by a dynamic competitor and the expected closeness of competition between a dynamic competitor and other firms are both relevant to the constraint exerted by a dynamic competitor on other firms and the CMA will take this into account. The elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where entry by that entrant is unlikely and may ultimately be unsuccessful. This may be the case if, for example, there is evidence that the competitor's entry or expansion would have a significant impact on other firms' future profits. In such circumstances, the removal of the threat of entry may lead to a significant reduction in innovation or efforts by other firms to protect those future profits'.

7.253   In the present case, in reaching our view as to the importance of GIPHY to dynamic competition, we have had regard to the likelihood of successful entry by GIPHY, its expected closeness of competition with other firms, and the

---

PX0684-231

impact of GIPHY's presence on innovation or efforts by other firms. In particular, in paragraph 7.168 above (and paragraph 7.103 of our Provisional Findings) we set out our view that GIPHY's success to date, and further efforts, to monetise GIFs materially increased the likelihood of new innovations or products being made available in display advertising, whether by GIPHY or by stimulating wider innovation by other existing providers of digital advertising, such as Facebook, responding to GIPHY's activities to protect their future sales from increased competition.  As such, whilst the likelihood of successful expansion by GIPHY was necessarily uncertain at the time of the Merger, our view is that its ongoing efforts to innovate and expand would have driven dynamic competition in the display advertising market.

7.254   In the light of the evidence set out in this Chapter, we consider that the loss of GIPHY as a potential competitor in display advertising is substantial. In particular, we consider that:

(a)   As discussed in paragraphs 7.3 and 7.16, we are of the view that Facebook has significant market power in display advertising in the UK. The impact of GIPHY on dynamic competition is likely to be more significant in the absence of strong existing competitive constraints to Facebook.

(b)   GIPHY's pre-Merger activities were valuable to the dynamic competitive process in themselves and in driving other competitors' efforts in that:

(i)   GIPHY is an innovative and leading provider of GIFs, which are an important tool for user engagement on social media platforms. Its position is supported by a high-quality service, a strong creative team, and a presence on major social media platforms (paragraphs 7.30 to 7.49).

(ii)   Building on its existing strengths, and in particular the large audience which it had already established, GIPHY had made concerted efforts in recent years to monetise its services, by means of an innovative advertising model, which had the potential to compete against Facebook for display advertising revenues if it entered the UK market. GIPHY had been making significant progress in winning advertising business, securing revenue share agreements with social media platforms, and otherwise improving and developing its Paid Alignment business (paragraphs 7.50 to 7.168).

(iii)   If GIPHY had extended its presence on third-party platforms (and its advertising revenues), those platforms would then have had an incentive to collaborate with GIPHY to further develop GIF

230

monetisation, so that they could increase their advertising revenues in competition with Facebook.

(iv) GIPHY was seeking to enter a market with significant entry barriers, on the basis of an innovative business model. GIPHY's efforts to monetise GIFs increased the likelihood of new innovations or products being made available, and of existing providers of display advertising, including Facebook, making efforts to protect their future sales from increased competition.

(v) Absent the Merger, GIPHY was likely to have entered into the supply of Paid Alignment services in the UK. This is supported by (i) GIPHY's position as a global market leader in the supply of GIF services, including in the UK; (ii) internal GIPHY documents expressing a strong interest in international expansion of Paid Alignment, including to the UK; (iii) internal GIPHY documents indicating that the efforts of such entry would be relatively low, and (iv) evidence of advertiser demand for Paid Alignment campaigns in the UK (paragraphs 7.169 to 7.182).

*(c)* Absent the Merger, GIPHY would have had a significant impact on dynamic competition by Facebook and other players in the relevant market. In particular, we consider that:

(i) GIPHY's Paid Alignment would have been a close competitor to Facebook in that it had the potential to become an important alternative to Facebook for at least some advertisers' display advertising budgets (paragraphs 7.189 to 7.195).

(ii) Facebook and others have shown interest in developing monetisation of messaging and Stories, an area of potential revenue growth for display advertising on which GIPHY's efforts were also focused. We consider this evidence supports the view that GIPHY was an important player in a potentially growing segment of the display advertising market (paragraphs 7.196 to 7.237).

(iii) Absent the Merger, as GIPHY continued to develop its GIF monetisation, Facebook would increasingly have had an incentive to respond to a dynamic threat of competition from GIPHY, in particular arising from GIPHY's partnership with those rival social media platforms who already compete with Facebook for display advertising revenues (paragraphs 7.238 to 7.249).

PX0684-233

## Conclusion on horizontal unilateral effects

7.255  On the basis of the above assessment, our view is that the Merger will lead to a **substantial lessening of competition in the supply of display advertising services in the UK arising from a loss of dynamic competition**. The effects on dynamic competition in display advertising arising from the elimination of GIPHY as a potential competitor are exacerbated by the weakening of competition between social media platforms as set out in Chapter 8, Vertical Effects.

PX0684-234

# 8.    Vertical Effects

## Introduction

8.1    This chapter analyses the Merger's effects on competition in the supply of social media services arising from input foreclosure. Facebook currently competes in the supply of social media services and GIPHY provides inputs to Facebook and other social media platforms in the form of video GIFs and GIF stickers.

8.2    The concern under the input foreclosure theory of harm is that the Merger may lead to Facebook foreclosing access to GIPHY's services to rival social media platforms in order to harm its rivals' current and future ability to compete in social media and, as a result, in display advertising. Specifically, we consider whether Facebook could harm its rivals' competitiveness by ceasing to supply GIPHY's GIFs via GIPHY's API/SDK integrations (total foreclosure), by worsening the terms of GIPHY's current GIF supply to rivals, by reprioritising innovation and development of GIPHY's API/SDK services towards the requirements of Facebook's own social media services over those of rival social media platforms, or by requiring rivals to provide data as a condition for access to GIPHY (partial foreclosure).

8.3    Social media platforms are multi-sided: in order to fund their business through the supply of digital advertising, they compete for user attention by offering innovative features to attract interesting content creators and users.[490]

8.4    We consider that the evidence set out in this chapter and in Chapter 5, Market Definition and Market Power, shows that social media platforms see GIFs as an important feature for facilitating and augmenting user expression, and for driving user engagement. In turn, this means that access by social media platforms to higher quality GIFs, such as those offered by GIPHY, may contribute to greater user engagement. And since user engagement drives the amount of time spent on a platform, access to higher quality GIFs by social media platforms may be also important to their ability to generate revenue from advertising.

8.5    On the basis of the evidence set out in Chapter 5, Market Definition and Market Power, we have found that GIPHY has market power in the supply of GIFs. Specifically, social media platforms cannot easily switch away from GIPHY to a range of effective alternative suppliers, for the following reasons:

---

[490] For a further discussion of the parameters of competition between social media platforms, see Market Study, paragraph 3.158.

PX0684-235

(i) the distinctive quality of its content, and its reach among the major distribution partners; and (ii) the fact that Tenor, the second largest GIF provider, is GIPHY's only sizeable and close competitor. Aside from Tenor, no other GIF providers appear to be able to meet the requirements of large social media platforms at present or in the near future.

8.6   Given GIPHY is the leading provider of GIFs with a high quality GIF offering, whose only close competitor is Tenor, we consider that access to GIPHY's GIFs, and to any future product development or improvement in its GIF-related services, is valuable to users and therefore important to the social media platforms' current and future competitiveness.

8.7   In our assessment of whether Facebook may harm its rivals' ability to compete in social media services by denying or worsening their access to GIPHY's GIFs we follow the framework set out in the Merger Assessment Guidelines[491] for assessing input foreclosure theories of harm. We consider whether three cumulative conditions are satisfied:[492]

   (a)   Would the Merged Entity have the **ability** to use its control of inputs to harm the competitiveness of its downstream rivals?

   (b)   Would it have the **incentive** to actually do so, ie would it be profitable?

   (c)   **Effects** of foreclosure: would the foreclosure of these rivals substantially lessen overall competition between social media platforms?

8.8   We consider these in turn in the remainder of this Chapter. For the reasons set out below, our conclusion is that the Merged Entity will have both the ability and incentive to foreclose its social media rivals in this way, thus having the effect of further strengthening Facebook's significant market power in social media. On that basis we conclude that the Merger has resulted, or may be expected to result, in a **substantial lessening of competition in the supply of social media services**.

## Ability to foreclose

8.9   The CMA's Merger Assessment Guidelines note that:

   'The CMA may consider a wide range of mechanisms through which the merged entity could potentially harm its rivals when supplying inputs. These may include, for example: refusing or

---

[491] Merger Assessment Guidelines (CMA129), paragraphs 7.9-7.22.
[492] Merger Assessment Guidelines (CMA129), paragraph 7.9.

PX0684-236

restricting supply, increasing prices, reducing quality or service levels, deteriorating product interoperability, slowing the rollout of upgrades, restricting licensing of intellectual property, shutting down APIs, […] reprioritising R&D spending, or limiting access to data. The CMA's focus will be on understanding if collectively these would allow the merged entity to foreclose its rivals, not on predicting the precise actions it would take'.[493]

8.10   In this case, we consider that Facebook could adopt a range of mechanisms to foreclose its rivals from GIPHY's GIFs, including:

(a)   **Total foreclosure** by refusing to supply GIPHY's GIFs to rival platforms;

(b)   **Partial foreclosure** by degrading the quality of GIPHY's service to rivals, including:

(i)   **By worsening the terms of supply of GIPHY's API/SDK services**, which could include Facebook requiring rival social media platforms to accept GIFs with advertising content as a condition for continued access to GIPHY's library (potentially without offering revenue-sharing as GIPHY would have done pre-Merger), or otherwise degrading the quality of GIPHY's current service to third parties (eg slower API/SDK responses, degrading the search function, reducing the range of content supplied, or requiring platforms to pay fees for API/SDK access).

(ii)   **By reprioritising innovation and development of GIPHY's API/SDK services going forward towards the requirements of Facebook's own social media services over those of other social media platforms**. Post-Merger, the balance of GIPHY's incentives (eg in determining innovation and product development priorities or availability of the API/SDK services) will change in favour of Facebook's commercial interests. In other words, these incentives will reflect the strategic priorities of Facebook's social media services, and the specific requirements of its own products, and will not also reflect the interests, priorities and requirements of other social media platforms, as they did pre-Merger. In addition, rival social media platforms no longer have the option to partner with an independent GIPHY in order to compete against Facebook by developing new GIF-related user experience features.

---

[493]   Merger Assessment Guidelines (CMA129), paragraph 7.13.

PX0684-237

(c) Partial foreclosure by making access to GIPHY's GIFs conditional on the API/SDK partner providing data about their users or aggregate trends to Facebook, in a way that puts the partner at a competitive disadvantage to Facebook (**data foreclosure**). In the event that the partner is unwilling to supply such data and decides to not use GIPHY at all, such a mechanism would lead to total foreclosure.

8.11    The foreclosure strategies could target both existing rival platforms and future new entrants in social media. They could also be used in combination and could be used to selectively target individual rivals.

8.12    With respect to the reprioritising innovation and data foreclosure mechanisms described in paragraph (b)(ii) and (c) above, the Parties argued that these mechanisms are an 'efficiency offense', in that they imply that Facebook would be using GIPHY to enhance its own product offering relative to rivals.[494] We note that this would be true only if the improvement of Facebook's offering relative to rivals was Merger-specific. However, this is not the mechanism envisaged by the CMA. As set out in Chapter 9, Countervailing Factors we have not seen evidence that there would be any such Merger efficiencies. Furthermore:

(a) With respect to the reprioritising innovation mechanism in 8.10(b)(ii) above, we are not suggesting that product improvements developed by GIPHY in line with Facebook's strategic interest would necessarily not be made available to other platforms, and we do not rule out that some of these improvements could benefit both Facebook and its competitors. Instead, the mechanism we are considering refers to product improvements that, absent the Merger, could have been developed to benefit some or all social media platforms, including developments that may not have been in line with Facebook's strategic interest. Indeed, whereas in the counterfactual GIPHY, independent from Facebook, would have had incentives to develop product improvements to the benefit of any of the platforms which integrate GIPHY, including platforms other than Facebook, following the Merger, GIPHY no longer has incentives to undertake such improvements that would have benefited Facebook's rivals (relative to Facebook), because Facebook has no incentive to develop product improvements that suit its competitors' offering more than its own.

(b) With respect to the data foreclosure mechanism described in 8.10(c), the mechanism we consider refers to the ability of Facebook to use GIPHY's

---

494 Parties' response to Provisional Findings, paragraphs 7.14 and 7.19.

PX0684-238

data to disadvantage its rivals in social media. The mechanism is not referring to Facebook improving its offering by using GIPHY's data (and hence benefiting customers). We set out ways in which Facebook could disadvantage competition by using GIPHY's data in paragraph 8.102.

8.13   Facebook's ability to engage in these types of actions and foreclose its rivals depends on the following:

(a)   **The extent to which rival social media platforms can substitute GIPHY with a range of effective alternative GIF providers** (ie the degree of the Merged Entity's market power in the input market). We find that Facebook's rivals do not have a range of effective alternatives to switch to, other than Tenor, and that GIPHY is uniquely placed to compete and innovate in GIF provision in the future.

(b)   **Whether GIFs are sufficiently important as an input into social media services** such that rival social media platforms' competitive positions can be harmed when the input is not available, or available on worse terms, or development of GIF products changes to favour Facebook's commercial interest. We find that GIFs are considered by Facebook itself, and by some of its main rivals, as important drivers of user engagement.

(c)   **The extent to which GIPHY collects, or may be able to collect, data from third party platforms that would place Facebook's rivals at a competitive disadvantage.** Our assessment suggests that although GIPHY's user-level data is potentially incrementally small compared to Facebook's existing data capabilities, GIPHY's aggregate data has the potential to improve and refine Facebook's ability to identify trends and spot competitive threats, particularly in areas where its existing market intelligence is incomplete (eg certain geographic markets or specialised social media services).

8.14   The three questions above are discussed in turn in the rest of this section. We then discuss the contractual restrictions to the Merged Entity's ability to foreclose.

***Availability of effective alternatives to GIPHY***

8.15   In this section we consider the extent to which rival social media platforms could mitigate or avoid any harm from a foreclosure strategy by switching away from GIPHY to another GIF supplier. The assessment is structured as follows:

PX0684-239

(a) First, we consider closeness of competition in the upstream market. The fewer close substitutes to GIPHY there are, the greater Facebook's ability to foreclose.

(b) Second, we assess the extent to which the availability of Tenor impacts Facebook's ability to foreclose. This includes a summary of the evidence of the reliance of social media platforms on GIPHY.

(c) Third, we consider the ease of replicability of GIPHY, either by a social media platform building self-supply or by a GIF supplier entering or expanding in the market.

(d) Finally, we summarise our view on the ability of social media platforms to substitute GIPHY.

*Availability of substitutes to GIPHY*

8.16   The Merger Assessment Guidelines state that if 'downstream rivals can easily switch away from the upstream party to a range of effective alternative suppliers, then they will be less likely to suffer harm than if the Merged Entity occupies an important position upstream'.[495] In this section we consider whether there are a range of effective alternative GIF suppliers to social media platforms.

8.17   The Parties submitted that, alongside Tenor, there are numerous alternatives to GIPHY, including Imgur, Gifbin, Gfycat, Vlipsy, and Holler.

8.18   However, Facebook's internal documents suggest that Facebook [✂]. As discussed in Chapter 5, Market Definition and Market Power, in internal correspondence, Nir Blumberger (Facebook's Head of EMEA Corporate Development) stated, '[✂]'.

8.19   As set out in Chapter 5, Market Definition and Market Power, our assessment of the evidence gathered in this investigation has found a lack of effective alternatives to GIPHY, other than Tenor:

(a) The evidence highlights that GIPHY's and Tenor's offerings are distinctive from that of other GIF providers in that they maintain an attractive and current content library, a sophisticated search algorithm, and a wide distribution network of API/SDK partners including, *inter alia*, many major social media and messaging platforms.

---

[495] Merger Assessment Guidelines (CMA129), paragraphs 7.14(a).

PX0684-240

(b) Although third party views as to how GIPHY and Tenor compare in terms of the quality of their offerings vary to an extent, with different third parties placing different weight on the various features and services offered by each supplier, on balance this evidence indicates that GIPHY is consistently viewed as the market leader, with Tenor offering a broadly similar service. No other GIF provider currently offers a service of a comparable quality to GIPHY and Tenor.

(c) Facebook's own stated rationale for the Merger, driven by a concern about losing access to GIPHY and the resulting harm to its business, is in our view not consistent with a range of alternative providers being adequate substitutes.[496]

(d) In 2020 GIPHY accounted for [✂] [60-70%] of global API/SDK searches, with Tenor accounting for [✂] ([✂] [30-40%]), and Gfycat and Holler having [✂] shares.[497] No other GIF supplier is comparable in scale to GIPHY and Tenor.

8.20  In their response to the CMA's Provisional Findings, the Parties argued that the vertical theory of harm is less credible given [✂], and that the CMA did not explain '[✂]'.[498] We have considered whether [✂]. However, we note that:

(a) [✂]. Neither Facebook [✂] viewed it as an effective alternative.

(b) [✂], it is also possible that the availability of an improved Gfycat could protect other platforms from foreclosure.[499] However, we note that:

(i)  [✂].

(ii) In an internal e-mail exchange Facebook itself commented that using Gfycat would be '[✂]'. [✂]. Therefore, we considered that the significant gap in the level of quality of Gfycat compared to that of GIPHY and Tenor prevents it from becoming a suitable alternative at least in the near future.

8.21  In view of the above, and also of the barriers to expansion in the supply of GIFs (see paragraphs 8.43 to 8.50 below), we consider it very unlikely that a new GIF-supplier will emerge in the near future as an effective alternative to GIPHY and Tenor. In the longer term, given GIPHY's significant scale and

---

[496] See Chapter 2, The Parties, Merger and Rationale and Chapter 5, Market Definition and Market Power.
[497] See Table 3 in Chapter 5, Market Definition and Market Power. The shares are global. As discussed in paragraphs 5.38-5.42, we do not expect GIPHY's position within the UK to be materially different.
[498] Parties' response to Provisional Findings, paragraphs 1.26-1.27.
[499] [✂].

PX0684-241

head start, we expect that these barriers to expansion will prevail and there will continue to be significant uncertainty over access to effective alternatives to GIPHY (see more on this below in the discussion of barriers to expansion and in Chapter 9, Countervailing Factors).

8.22   We are thus of the view that there is not a range of effective alternative suppliers to GIPHY, but only one such alternative: Tenor.

*Assessment of Tenor as a substitute*

8.23   The Parties submitted that 'it is clear that Tenor is a perfect substitute to GIPHY that is widely used by social media services and other partners, including Facebook, and that no SLC finding is possible unless it is shown that existing alternatives to GIPHY's GIFs -- including Tenor, a drop-in substitute for GIPHY -- are inadequate or unavailable to competing 'social media' services. Tenor's library attracted approximately 10 billion monthly searches and 330 million daily searches in 2018, and its popularity has since only increased'. In their response to the Provisional Findings, the Parties submitted that third parties view Tenor as an equivalent alternative, that end users cannot distinguish between GIPHY and Tenor, and that some of GIPHY's partners switched away from GIPHY.[500] In general, we do not contest the Parties' position that Tenor is a close alternative to GIPHY.

8.24   According to data submitted by Tenor to the CMA, [✂] (see Chapter 4, Industry Background, Figure 9). [✂].

8.25   The Parties submitted an analysis showing that, following a loss of access to GIPHY for two days in June 2020, 'there was almost perfect substitution with Tenor GIFs', with no discernible reduction in user engagement with GIFs.[501] We agree that this analysis corroborates other types of evidence suggesting that Tenor is a close alternative to GIPHY at present. We note that the Parties submitted that this type of analysis constitutes a 'natural experiment' and is therefore the best available evidence on the possible effects of foreclosure. However, in our view this analysis is not necessarily informative of the impact on user engagement of switching from GIPHY to Tenor beyond the very short term, because user responses to a two-day change in the GIF provider are not necessarily indicative of the effect of such a change over the longer term.[502] This is particularly the case in platforms with strong network effects, such as messaging platforms, where switching requires users to coordinate

---

[500] Parties' response to Provisional Findings, paragraph 7.5.
[501] In other words, while users did not intentionally substitute to Tenor, when the available option switched from GIPHY to Tenor, users did not reduce their GIF usage.
[502] See paragraphs 8.74 to 8.76.

PX0684-242

with one another, and may not be seen as worthwhile in the face of only a temporary dip in the quality of the platform.

8.26   Facebook submitted that 'attempted foreclosure would likely drive users towards Tenor and/or other providers… Any impact on rivals' negotiating power could at most worsen the terms between API partners and GIF providers such as Tenor, but would not impact the quality of service faced by users, therefore there would be no benefit to Facebook'.

8.27   We accept that Tenor presents a reasonable alternative to at least some platforms. We also note that:

(a)   Google's incentives to develop Tenor may be different from Facebook, as Google is not a social media platform. However, [✂].[503]

(b)   [✂], suggesting the acquisition has not necessarily made Tenor less effective from the perspective of third parties.

(c)   [✂] (see Chapter 5, Market Definition and Market Power).

8.28   However, our view is that the availability of Tenor does not in itself preclude an SLC based on foreclosure, for the following reasons.

8.29   First, we consider that the availability of only one, rather than a range of effective alternatives, increases the likelihood that any attempt at foreclosure (total or partial) would lessen the competitive constraint on the only remaining effective alternative, Tenor, reducing its incentive to compete. Tenor itself would then be more likely to offer a service of lesser quality, including by requesting more data, worsening the terms of supply of its current service, prioritising innovation and product development to benefit Google's own commercial interests and product requirements over those of social media platforms, or, should Tenor successfully launch an advertising model, insisting on monetising GIFs without sharing the revenue with the platform or sharing it on worse terms.

8.30   Second, Tenor is part of a large digital firm and, as Google and Tenor's services evolve, it is possible that Google will no longer see Tenor's availability to third parties as a priority, [✂].[504]  Such uncertainty over Tenor's

---

[503] [✂].
[504] The Parties argued that if Google's priorities for Tenor are different to priorities that Facebook may have, this was always the case regardless of the Merger (Parties' response to the Provisional Findings, paragraph 7.6). First, we note that, as explained in paragraph 8.29, following the Merger, the competitive constraint on Tenor lessens, particularly if Facebook engages in a foreclosure strategy. Therefore, the Merger may have an impact on Google's priorities for Tenor. In any event, even if the Merger does not change Google's priorities for Tenor, the uncertainty over Tenor's future is relevant to our assessment of Facebook's ability to foreclose competitors from GIPHY, since Tenor is the closest alternative supplier by far.

PX0684-243

future puts an additional risk to relying on Tenor alone as an alternative to GIPHY. The Parties argued that our assessment of the uncertainty of Tenor is pure speculation;[505] however, [✂].The uncertainty on the part of market participants over Tenor's availability to third parties in the future is also evidenced by the following:

*(a)*  Nir Blumberger commented that a reason for Facebook acquiring GIPHY was that '[✂]'.

*(b)*  [✂].

*(c)*  Alex Chung, in an internal e-mail to GIPHY employees commenting on the Google acquisition of Tenor, commented that, '[✂].

8.31  Third, some social media platforms (including Facebook) multi-home, ie use two or more GIF providers.[506] For such platforms, even if Tenor was an effective substitute to GIPHY, Tenor alone would not enable them to multi-home.[507]

8.32  Finally, GIPHY [✂] and is distinctive in terms of the quality of its content library. Given the varied nature of social media platforms, Tenor may not be perceived as a close substitute by all such platforms.[508]

8.33  In the following, we set out further evidence from Facebook and third parties which demonstrates that many social media platforms consider themselves to be reliant on GIPHY despite the availability of Tenor.

*Evidence on the reliance of social media platforms on GIPHY*

8.34  The evidence below shows that GIPHY plays an important role in shaping social media competition and is uniquely placed to compete and innovate in GIF provision in the future to the benefit of a range of social media platforms.

---

[505] Parties' response to Provisional Findings, paragraphs 7.6 and 5.5.
[506] Chapter 5, Market Definition and Market Power. Platforms have told us that the aim of multi-homing is primarily to mitigate the impact of GIF supply outages on the user experience on these platforms.
[507] The Parties argued that 'there is evidence to suggest that multi-homing is not important. <…> many API partners including Instagram and TikTok use only one provider, and some such as Viber and Telegram use only Tenor. Similarly, there is evidence of other services – such as Baidu and Apple - multi-homing with providers other than GIPHY and Tenor.' We agree that not all platforms multi-home or see that as necessary. However, some of the largest social media platforms, including Facebook, do so, with GIPHY and Tenor, as set out in Chapter 5, Market Definition and Market Power.
[508] As noted in Chapter 5, Market Definition and Market Power, one third party (that integrates with both providers) told us that while Tenor and GIPHY have similar libraries in terms of size and quality, it regards GIPHY as superior, particularly in regard to its content moderation. One third party (which uses GIPHY but not Tenor) considered that the volume and quality of Tenor's sticker offering was relatively on par with GIPHY's, but not quite as good. Another third party stated that it previously tested Tenor and another smaller GIF provider in one of its apps but had chosen to use GIPHY because it offered a more comprehensive library with better content to stimulate user conversation.

PX0684-244

8.35    Facebook, in discussing the acquisition of GIPHY, [✂].

8.36    The importance of access to GIPHY for competition between social media platforms is also evidenced by Facebook's concerns that a rival would acquire GIPHY and prevent Facebook from accessing GIPHY's content. A number of internal Facebook documents indicate such a concern:

   *(a)*  One document notes that while a partnership with GIPHY would address some concerns, Facebook would '[✂]';

   *(b)*  An internal chat comments that there is '[✂]'; and

   *(c)*  Another internal chat noted that '[✂]'.

8.37    Despite the availability of Tenor (and smaller GIF providers), Facebook itself considered the loss of access to GIPHY as a serious risk.

   *(a)*  Facebook noted that moving off GIPHY's API or reducing its dependency on GIPHY in favour of other partners had the disadvantage that [✂].

   *(b)*  In requesting approval for the acquisition, Nir Blumberger (Head of EMEA Corporate Development) notes that [✂].

8.38    Overall, we consider that both Facebook's internal documents set out above and third party views (set out in Chapter 5, Market Definition and Market Power) evidence the reliance of social media platforms on GIPHY. This is further supported by third party reactions to the Merger:

   *(a)*  In response to the Merger, [✂]. [✂] has expressed concerns that it may be foreclosed from GIPHY as a result of the Merger, [✂]. Concerns about losing access to GIPHY post-Merger are also articulated in [✂] internal documents, referring to the risk as 'non-trivial'.

   *(b)*  [✂].

   *(c)*  [✂]. The third party continues to use both GIPHY and Tenor as it considers it important to have two providers to combat technical challenges such as outages.

8.39    Facebook commented that 'none of Facebook's rivals expressed any firm willingness to buy GIPHY, which suggests that they would not experience loss of user engagement to any material degree', [✂] implies that they did not think GIFs were a critical asset and/or that alternatives to GIPHY's GIFs were available and adequate.

PX0684-245

8.40   We note that a decision not to bid does not imply that the platform is not reliant on GIPHY and that there is no harm from losing access to it, particularly if the platform knew or anticipated that it would have to compete against Facebook to acquire GIPHY. In considering whether to bid for GIPHY, a rival social network platform would have had to weigh (i) the value to that platform derived from removing the risk of losing access to GIPHY's services plus (ii) any revenue upside from the acquisition on the one hand, against the higher between (iii) the expected valuation of rival bidders (including Facebook), and (iv) the valuation of GIPHY as an independent company on the other hand. If a platform expected the sum of (i) and (ii) to be lower than either (iii) or (iv), then it may consider its chances of its bid being accepted to be too low and therefore it may decide not to bid. Furthermore, third party platforms gave various reasons for not pursuing the transaction that do not necessarily indicate a lack of concern. These included other priorities ([✂]) or regulatory concerns ([✂]). The sale was also taking place against the backdrop of Coronavirus (COVID-19), which was adversely affecting advertising demand and negatively impacting all of these platforms.

8.41   [✂].

8.42   In our view, [✂] are consistent with it being reliant on GIPHY and thus seeing the acquisition of GIPHY by Facebook as a threat to its business.

*Ease of replicating GIPHY*

8.43   In the context of assessing Facebook's ability to foreclose rivals and in the absence of existing effective alternative GIF suppliers to GIPHY other than Tenor, we consider whether foreclosed social media platforms would be able (and, if so, likely) to easily replicate GIPHY's services via self-supply, or smaller GIF suppliers would be able (and likely) to easily expand and offer a service comparable to GIPHY. If this were the case, Facebook's ability to foreclose its rivals could be mitigated. We set out below the evidence related to the ease of replicability of GIPHY's GIF offering.

8.44   The Parties submitted that GIFs have become a commodity and that GIPHY's library is available everywhere, such that GIPHY's only differentiating factor is the brand image. They also argued that 'less than 1% of GIPHY's content is exclusive to GIPHY, which means that suppliers of GIF libraries have access to the same content', and that 'GIPHY partners and users often upload exactly the same content on other services in order to expand their reach'.

8.45   However, as set out in Chapter 9, Countervailing Factors, there are multiple requirements for replicating the GIPHY service, such that entry (including via self-supply) or expansion is unlikely to be easy. These are a moderated, high-

PX0684-246

quality large content library, a sophisticated search algorithm, scale and brand, a monetisation strategy, and capital.[509] As evidenced above (see paragraph 8.35), Facebook was also of the view that [✂]. Such [✂] is unlikely to be easily replicable.

8.46   Facebook estimated that it would require '[✂]' and noted that at the time of the Merger, GIPHY employed considerably fewer staff than that. The lower headcount of GIPHY, compared to Facebook's estimate, was due to the fact that Facebook's estimate was for replicating GIPHY, which had been developed over several years, over a short period of time. This suggests that replicating GIPHY with more limited resources (similar to the staff count of GIPHY pre-Merger) would take longer than [✂]. Further internal documents from Facebook also demonstrate that recreating the GIFs in GIPHY's library would not be sufficient to replicate the level of quality of service provided by GIPHY (see Chapter 9, Countervailing Factors). Thus, even if copying (ie 'scraping') GIFs off publicly available libraries may be easy, this is unlikely to replicate GIPHY's services.

8.47   It also appears unlikely that expansion of existing smaller GIF providers, such as Gfycat or Holler, would be easy, as existing smaller providers are nowhere near the scale of GIPHY (see Chapter 5, Market Definition and Market Power). In internal Facebook correspondence, Nir Blumberger commented that using Gfycat, the largest GIF supplier after GIPHY and Tenor, with 6 people and [✂] percent coverage to Facebook's knowledge at the time, would be '[✂]'. Consistent with Facebook's view, and as set out above, [✂] (see paragraph 8.20).

8.48   The Parties submitted that our Provisional Findings failed to engage in any analysis as to how a foreclosure strategy would impact the ability and incentive of other suppliers to expand.[510] The Parties further submitted that 'if there were a barrier to entry resulting from GIPHY's presence and scale,[…] this would fall away if Facebook/GIPHY engaged in a (hypothetical) foreclosure strategy since the removal of GIPHY would mean improved opportunities for smaller players to develop relationships with large API partners to grow in size and quality. This is not a case where de novo entry is required: there are a number of existing and viable alternative GIF suppliers, including Gfycat and Holler, which could quickly and easily expand in response to a foreclosure strategy'.

8.49   We recognise that, in principle if Facebook were to engage in total or partial foreclosure to GIPHY services this would, other things equal, make it easier

---

[509] Chapter 9, Countervailing Factors.
[510] Parties' response to Provisional Findings, paragraph 7.7.

PX0684-247

for rival GIF providers to win business from those customers who have been foreclosed. However, our concern is that any expansion or entry by rivals to GIPHY will not be sufficient to address the harm arising from foreclosure.

(a) As set out above, we consider that the availability of Tenor does not preclude an SLC based on foreclosure (paragraphs 8.28 to 8.32). Our reasons for this view do not depend on Tenor's current scale, and would not change were Tenor to expand.

(b) We have also set out our view that other GIF providers are not an effective alternative to GIPHY (paragraphs 8.18 to 8.20). We do not consider that foreclosure of GIPHY would, in itself, create a sufficient opportunity for other GIF providers to expand or enter, to the point of becoming effective alternatives to GIPHY. This is because:

(i) It is not clear that the opportunity created by foreclosure would be sufficient to enable entry/expansion to a scale that would enable a GIF provider to become a meaningful alternative to GIPHY. Both GIPHY and Tenor had access to Facebook platforms while growing to their current scale. We would not expect Facebook to foster growth of rival GIF providers in this way while pursuing a foreclosure strategy. In addition, Facebook could potentially engage in targeted foreclosure of specific platforms, further limiting the opportunity available to smaller providers as a result of foreclosure.[511]

(ii) Furthermore, even if foreclosure made it easier for an entrant to reach distribution agreements (with foreclosed platforms), it would still need to overcome the other barriers to entry we have considered above and in Chapter 9. For example, it would need to spend time developing its library and creative offering[512] and refining its search algorithm, and it would require a viable path to monetisation in order to have a basis for raising capital (see Chapter 9, Countervailing Factors).

8.50 Given the above, we are of the view that GIPHY is not easily replicable by entry (including self-supply) or expansion, as it would require a significant resource and time commitment.

---

[511] Facebook could also engage in partial foreclosure, reducing the quality of GIPHY to an extent that would harm rival platforms, but not necessarily to the point where those platforms would see a much smaller GIF provider as an effective alternative.

[512] Where it would continue to compete with GIPHY for eg brand partnerships.

PX0684-248

*Our view on availability of substitutes*

8.51   We have found a lack of a range of effective alternatives to GIPHY, with only Tenor offering a comparable service and other GIF providers not seen by social media platforms as an effective substitute to GIPHY. Given GIPHY's scale and creative talent, it appears uniquely placed to compete and innovate in GIF provision in the future and GIPHY's offering is not easily replicable.

8.52   Although Tenor appears to be a close alternative, this does not preclude foreclosure. The lack of a wider range of close alternatives reduces incentives for Tenor to compete aggressively in the event of foreclosure, and Facebook and some of its rivals have expressed a perceived risk relating to the uncertainty over the future availability of Tenor to third parties, given its strategic incentives are aligned with those of Google.

8.53   Our view is therefore that social media platforms could not easily substitute away from GIPHY to a range of effective alternative suppliers in response to foreclosure and hence would likely face a lower quality GIF offering, and reduced GIF-related innovation and product development, if they were to switch to an alternative GIF provider (including Tenor) as a result of total or partial foreclosure. We also consider that a GIF service that is of a lower quality than the pre-Merger quality of GIPHY could degrade platforms' ability to compete, given their current reliance on GIPHY (evidenced above in paragraphs 8.34 to 8.42), despite the availability of Tenor and smaller (lower quality) suppliers.

**The importance of GIFs as an input into social media services**

8.54   The Merged Entity could only harm the competitiveness of its rivals if the input it supplies plays an important role in shaping downstream competition.[513] The Merger Assessment Guidelines state that in assessing the importance of an input the CMA:

> 'will have regard to all foreclosure mechanisms, so will consider not only the proportion of rivals' costs that the input accounts for, but also for example the role it plays as a determinant of product quality or the rate of innovation. Its focus will be not on predicting the precise impact of each possible deterioration on rivals' businesses, but on the overall question of whether in aggregate they could be foreclosed'.[514]

---

[513] *Tobii AB v Competition and Markets Authority* [2020] CAT 1, paragraph 426.
[514] Merger Assessment Guidelines (CMA129), paragraph 7.14.

PX0684-249

8.55　The overall importance of GIFs as an input impacts Facebook's ability to employ any of the foreclosure mechanisms identified above (see paragraph 8.10). The more popular GIFs are as a feature, the more likely it is that by refusing or worsening a rival social media platform's access to GIPHY's GIFs Facebook could harm the ability of that platform to compete for user attention (and thus advertising revenue), now or in the future. As further discussed in paragraphs 8.131 to 8.133, the role that GIFs play in attracting user attention creates an incentive for Facebook to strategically foreclose social media rival's access to GIPHY in order to limit or slow down the emergence of competitive threats.

8.56　As set out in Chapter 5, Market Definition and Market Power, the term 'social media' covers a wide variety of platforms, which are differentiated in, for example:

　(a)　Their purpose or what they are typically used for, eg communicating and sharing content with friends and family, sharing ideas and content with other users anonymously, professional networking, and so on.

　(b)　Their formats or popular features, eg messaging (WhatsApp), photos (Snapchat), videos (TikTok).

　(c)　Their target audience, and/or the demographics which adopt them.

8.57　The relevance of GIFs within the platform's format, their popularity among users, and the impact of switching to a lower-quality GIF provider, will also vary across platforms.

8.58　In the following we discuss:

　(a)　Evidence on the importance of GIFs to Facebook's platforms based on the extent of usage of GIFs on Facebook platforms, and Facebook's internal documents discussing the importance of GIPHY to its platforms in driving engagement (paragraphs 8.60 to 8.69);

　(b)　Facebook's empirical analysis, submitted in the context of this investigation, assessing the impact of GIFs on user engagement (paragraphs 8.70 to 8.76); and

　(c)　Evidence on the importance of GIFs to other social media platforms (paragraphs 8.78 to 8.89).

8.59　We consider that the evidence on the importance of GIFs to Facebook's platforms is indicative of the importance of GIFs more generally to social

PX0684-250

media platforms, and in particular to platforms that are trying to compete with Facebook for its users.

*The importance of GIFs to Facebook's platforms*

8.60    First we set out our views on the evidence on the importance of GIFs to Facebook.

8.61    Figure 18 below shows the proportion of users posting content during [✂].

**Figure 18: Proportion of users posting during one week that have used a GIF**

[✂]

Source: CMA analysis [✂].
Note: [✂].

8.62    Facebook told us that 'GIFs are used across Facebook's products and help to drive user engagement on the Instagram service in particular'. Facebook also said that GIFs are 'consumed by users and in turn may help to drive advertising revenues on these [social media] services'.

8.63    Facebook's internal documents also confirm that GIFs are important for user engagement. In making the case for the acquisition, Facebook noted that:

[✂]

8.64    Additionally, in discussing internally the case for acquiring GIPHY, Vishal Shah (Vice President of Product for Instagram) commented that:

[✂]

8.65    A 2018 study commissioned by Facebook to gauge user views on features of Messenger asked participants how they feel about a product's features, what they expect and what delights them. The study identified [✂]. The figure reproduced below shows the proportion of participants considering each feature as 'must have' or 'performance' (two categories encompassing responses where the service was disliked when the feature was unavailable, and liked or at least not disliked when the feature was available). As Figure 19 shows, [✂].

**Figure 19: Ranking of Messenger features in terms of priority identified by a 2018 study by Facebook**

[✂]

Source: [✂].

PX0684-251

8.66    A number of further internal documents evidence Facebook's perception of GIFs as driving a meaningful amount of engagement:

      [✄]

8.67    [✄].

8.68    The Parties commented that in these documents, '[✄]'.

8.69    We note that the effect would be greater as a proportion of Instagram's revenues than of Facebook's total revenues. Such a loss would represent around [✄] of Instagram's revenues, or [✄] at Facebook's most conservative estimate. Facebook appeared to consider that the financial loss from even a much smaller reduction in Instagram Stories than the full [✄] (cited above at paragraph 8.64) was nevertheless significant: in an internal exchange discussing the impact of Instagram losing access to GIPHY, Nir Blumberger comments that, '[✄]'.

*Facebook's empirical analysis*

8.70    Facebook submitted that only a very small minority of content posted on Facebook surfaces contains a GIF: on average, [✄] of content posted across all Facebook surfaces, falling to [✄] for younger users.[515]

8.71    Our representation of the proportions referred to in Facebook's submission is shown in the figure below. The percentages refer to the volume of the respective type of content (for example, comments) including a GIF, as a proportion of the total volume of that type of content.

**Figure 20: Proportion of content that contains a GIF, by Facebook surface**

[✄]

Source: CMA analysis [✄].
Note: [✄].

8.72    The figure shows that [✄].

8.73    Facebook further argued that:

---

[515] Parties' response to Provisional Findings, paragraph 7.8(c).

PX0684-252

(a) Given that the data precisely identifies how important GIFs are, it is not necessary for the CMA to try to assess the importance of GIFs from internal documents.[516]

(b) Even [✂] of Instagram Stories is 'very low' and even so, Stories represent less than [✂] of the content posted on Instagram. Overall, only [✂] of all content on Instagram contains a GIF.

(c) GIFs are used consistently less frequently than other engagement drivers and that therefore GIFs are 'at best of marginal importance to users'.[517] Facebook added that 'The availability of new and increasingly more popular types of content will naturally mean that the user and financial impact of foreclosure of GIFs will be reduced. Users come to Facebook and other services for multiple reasons, of which GIFs are an extremely small part.'

8.74   However, in our view:

(a) On the first and second points above, we note that Facebook's description of these proportions is in contradiction to how similar proportions are evaluated in internal documents, [✂]. Further internal documents set out above all point to Facebook's perception of GIFs as an important feature driving a meaningful amount of engagement and revenue. We also note that [✂] (see paragraph 8.61 above). Thus, in our view the data on its own does not precisely identify the importance of GIFs, and cannot be meaningfully interpreted without using qualitative evidence to understand the business context. The wider evidence demonstrates that these levels of GIF usage are material and important to Facebook.

(b) With respect to the third point, we note that other engagement drivers being shared more than GIFs on Facebook's services, or GIF users sharing content other than GIFs, do not in themselves mean that GIFs are not an important input for user engagement. First, as set out in Chapter 5, Market Definition and Market Power, other user expression features have different characteristics and purposes and are unlikely to be substitutable with GIFs. To illustrate, an internal Facebook presentation summarising research on WhatsApp user expression features suggests that, compared to stickers, GIFs [✂]. Whether or not other formats of user expression are used more frequently in volume does not necessarily indicate the relative

---

[516] Parties' response to Provisional Findings, paragraph 7.8(c).
[517] Specifically, the Parties submit that 'GIFs are only one among myriad different types of content supplied to these downstream offerings. Indeed, GIPHY's API partners can choose between (for example) videos (e.g., from YouTube), live videos, music, news, market data, influencer content, micro-games, animations, emojis, animojis, infographics, memes, etc.'

PX0684-253

satisfaction extracted by users from these formats. Second, as set out in Chapter 4, Industry Background, the Parties' internal documents and our analysis of GIPHY's and other GIF providers' data suggest that there has been a long term growth in GIF usage. Although GIPHY's data suggest that the overall growth may have slowed in 2020 (see Chapter 4, Industry Background, Figure 9), the evidence set out above demonstrates that GIFs continue to be an important input to social media platforms. As set out below in paragraph 8.133, we consider the evidence to suggest that GIFs will continue to be an important input to social media competition going forward.

8.75    Facebook also presented an analysis showing that when its Messenger Kids service experienced a two-day loss of service from GIPHY in May 2020, this did not lead to a discernible impact on the number of messages sent on the service. The Parties claim that this confirms that GIFs are not an important input from the user perspective. The Parties also argued that the analysis of this outage event constitutes a 'natural experiment', the 'gold standard for answering complex questions about cause and effect in social science situations (such as economics)', and as such is superior to other types of evidence gathered in this investigation.

8.76    Whilst we agree that natural experiments can be a valuable tool in testing cause and effect relationships in social sciences, we note that such experiments and the methods used to analyse them must meet certain fundamental criteria in order for the analysis to produce unbiased estimates of the relationships in question. In the present case, we consider that for a natural experiment analysis to be informative, at least the following three conditions need to be met: first, the 'event' in the experiment must be long enough for a reaction to the 'treatment' (ie lack of GIF access) to occur; second, the sample subjected to the experiment must be representative of the broader user base; and third, the analysis must employ metrics that meaningfully capture the impact on consumers. We do not consider that the Parties' analysis meets these criteria. In particular:

(a)    In our view two days is not long enough for users to make a decision to migrate to another platform. The Digital Market Study noted the time cost for users to open an account on another platform and (re)create network connections as a barrier to consumers using other platforms.[518] Such a barrier to switching is likely particularly pronounced on Messenger Kids, which is aimed at children aged 6-12 and requires parents to authorise the creation of an account and allows parents to monitor contacts (both

---

[518] Market Study Final Report, paragraph 3.216,

PX0684-254

via the parent's Facebook account).[519] A child who was potentially dissatisfied with the experience on the app during the GIPHY outage would likely need to seek permission of a parent to help them find and register on an alternative app, in addition to coordinating their friends to do the same. Thus, users may not respond to a two-day loss of access to GIFs, especially in the case of a children's app, but the loss or degraded quality of the feature for a longer period of time (weeks or months) could have an impact on user habits, such as through friend groups migrating to or favouring other platforms, or new users being slower to engage with the platform.

(b) With respect to the representativeness of the analysis sample of the wider population, the Parties argued that we have not presented evidence to suggest that the response of users on the Messenger Kids platform to an absence of GIFs would be any different to the response of any other users. However, we note that Messenger Kids appears to be aimed at meeting a demand by users who are too young to use most other social media apps, and this is evidenced by Facebook's own public presentation of the app on its official website.[520] For example, Facebook Blue, Instagram, Snapchat and TikTok all have a minimum age of 13 or higher.[521] As noted above, the user interactions with the app are also different to regular social media and messaging apps, in that account and contact management is monitored by parents. In our view, this is a significantly different demographic and use case, and it is not clear that the reaction of Messenger Kids users can be indicative of the possible reaction of older users on Facebook's other platforms or rival platforms. We also note that, despite its access to vast amounts of data, Facebook has not provided data in support of its argument that this user group is representative of the broader social media user population, for example in their extent of multi-homing and switching across social media platforms.

(c) Finally, the volume of messages sent does not necessarily capture the level of user satisfaction with using the service, which would likely be observable in the overall volume of usage only in the longer term if service disruptions persist.

8.77   Finally, we note that the Parties' analysis only considers the immediate (2020) impact of losing GIFs. In a dynamic context (i) the use of GIFs may continue

---

[519] https://messengerkids.com/
[520] 'Made for children. Controlled by parents.' (Messenger Kids | The messaging app for kids (facebook.com), accessed 29 November 2021).
[521] Age Restrictions on Social Media Services | Safer Internet Centre, accessed 29 November 2021.

PX0684-255

to grow,[522] and (ii) in a foreclosure scenario, the revenue impact on a social media platform of losing GIFs could be greater if it meant being at a competitive disadvantage to rivals (eg Instagram) who still had access to GIFs. That is, in addition to the platform losing some user engagement that would otherwise have occurred had the user accessed GIFs, over time users of the platform affected by foreclosure may switch (partially or totally) to rival platforms if they find the experience on the platform without GIFs (or with inferior GIFs) to be less satisfactory.[523] Such switching could be amplified further by network effects.

*The importance of GIFs to other social media platforms*

8.78   Next, we consider third party evidence on the importance of GIFs to competition in the supply of social media services.

8.79   We note that GIFs are used widely across social media, with over half of GIPHY's API/SDK search traffic arising from non-Facebook apps (see Figure 10 in Chapter 4, Industry Background). GIFs appear important enough that some of Facebook's main competitors in social media took immediate steps to mitigate the possible impact of the Merger on their access to GIPHY's GIFs (see paragraph 8.38). We also note that, as social media services are significantly differentiated, it is expected that the role and importance of GIFs will vary across providers.[524]

8.80   We have sought third party evidence, including from Facebook's largest competitors, on the importance of GIFs to platforms.[525] Ten third parties commented on the role of GIFs in relation to user experience on their platform. Most platforms said that it was difficult to quantify the importance of GIFs to the engagement of end-users, and have expressed their views qualitatively instead.[526] Some platforms have quoted the percentage or volume of content that included GIFs. Whilst this is useful to consider alongside broader evidence and third party views, in our view the percentage of content including a GIF is not, by itself, a conclusive metric to evaluate the

---

[522] See Chapter 4, Industry Background, Figures 7 and 8 and paragraph 8.133 below.
[523] We note that Facebook considered the risk of GIPHY being acquired by a rival social media platform. However, it is not clear that this scenario informed its estimates of the cost of losing access to GIPHY.
[524] The Parties argued that only two third parties said GIFs were important and that our assessment of the third party submissions mischaracterised them (see Parties' response to Provisional Findings, paragraph 7.8(a)). We set out in detail all third party submissions in paragraphs 8.80-8.87 and explain the weight placed on each submission. Given the differentiation in the provision of social media services, we place more weight on the responses of those platforms that compete more closely with Facebook's platforms.
[525] The Parties claimed that the CMA failed to gather GIF usage data from third parties (see paragraph 7.8(b) of the Parties' response to Provisional Findings). This is not correct. As set out in this paragraph, in the course of the Phase 2 investigation, we have sought third party data on the usage and importance of GIFs.
[526] For example, [✄] indicated that it could not provide specific information on the impact of GIFs on engagement on its platform due to the amount of time it has maintained GIFs on its platforms. [✄].

PX0684-256

importance of GIFs in driving user engagement on a platform. This is illustrated by the evidence set out above (see paragraphs 8.60-8.69), which shows that what may seem like small proportions of content (even [✂] of Instagram, see paragraph 8.69) are considered by Facebook to be a significant driver of engagement and advertising revenue. Furthermore, as discussed in paragraph 8.77, the effects of losing GIFs in a foreclosure scenario are likely to reach beyond the immediate loss of direct user engagement with GIFs, due to GIF users potentially switching away from the foreclosed platforms, and other users switching as a result of network effects.

8.81   Overall the evidence available suggests that GIFs contribute meaningfully to the ability of at least some social media platforms to compete for user engagement. This includes two of Facebook's largest competitors.

8.82   One platform ([✂]), which is among Facebook's largest social media competitors, explained that GIFs are very important for user expression on its platform, as they are a concise and globally recognised form of communicating emotions, with the ability to add humour and flavour in ways that other content cannot. This platform noted that, due to competing platforms offering GIFs, there was an incentive for it to also continue offering them. [✂].

8.83   One platform ([✂]), also among Facebook's largest social media competitors, commented that creative tools (including, but not limited to, GIFs and GIF stickers) were a base requirement to provide a competitive messaging product, and that removing GIPHY would unavoidably degrade its user experience. Approximately 65 million users of this platform use GIPHY each month, [✂]. An internal document commenting on the reliance on GIPHY refers to losing access to GIPHY as 'non-trivial'. [✂] commented that GIPHY's key competitive advantage was in delivering customer satisfaction, and that if searches do not reflect a specific cultural reference or interest the user is looking for, the user would be unlikely to select a GIF. Users may then associate their frustration of being unable find a particular GIF with that platform and switch to a different platform.

8.84   This platform also considered that the impact of foreclosure from GIPHY 'would materialise over time rather than occurring overnight', as it would expect 'to see slow leakage of users heading to rival applications as they realise the poorer functionality of [✂] offering', and considered that the impact would be significant.

8.85   One messaging app ([✂]) considered that users expect to see GIFs as a feature for their communications, but considered their non-GIF stickers (similar to static or animated cartoons) to be a more important feature to their

users than GIFs. Another communications platform ([✕]) commented that 'GIFs help boost user engagement because of their entertaining and visual nature, and having a robust and diverse GIF selection helps [✕] effectively compete with other platforms to a certain degree.' This platform considers supplying GIFs to be important to its chat offering.

8.86   Two other platforms ([✕]) characterised GIFs as 'nice to have' but not critical or foundational to their growth or user engagement. A [✕] internal document indicates that [✕] of global video creates ([✕] in absolute volume), an estimated [✕] of video views ([✕]), and [✕] of global messages ([✕]) include a GIPHY GIF sticker. The lesser importance of GIFs to these platforms is not surprising. [✕] which is likely to have a different user engagement strategy and thus benefit from GIFs less than social media platforms specialising in text or pictures. [✕] and thus competes less closely with Facebook in social media services.

8.87   The other four third parties commenting on the role of GIFs, while noting the popularity of GIFs as a form of communication, considered GIFs to have low to medium importance to their services as a driver of user engagement ([✕]). However, we note that these parties do not operate social media platforms and are not in direct competition to Facebook.

8.88   On the other hand, the Parties submitted that 'GIFs are only one among myriad different types of content supplied to these downstream offerings [ie social media platforms]'. The Parties cited examples including live videos, 'music, news, market data, influencer content, micro-games, animations, emojis, animojis, infographics, memes, etc'. The Parties submitted that all types of content were 'interchangeable for downstream services in driving user engagement'.

8.89   We note that a number of the other engagement tools identified by the Parties, such as news, market data and micro-games, are typically used to improve user engagement in general, rather than specifically being used to enhance the expressiveness of communications between users, and this is likely to limit their interchangeability with GIFs (see Chapter 5, Market Definition and Market Power). In addition, the engagement tools listed by the Parties are widely available across social media platforms. A higher-quality GIF service may help a platform to distinguish itself from rivals which also offer a range of engagement tools, driving user engagement and advertising revenues. For example, if a user who is choosing whether to share content with friends on Instagram or Snapchat prefers to use the service that (in their perception) offers a higher quality GIF service, this will increase engagement with that platform (by both the sender and the receiver of the message).

PX0684-258

*Our view on the importance of GIFs to other social media platforms*

8.90    Given the above, we are of the view that GIFs are an important input to compete in the supply of social media services. As social media platforms differentiate themselves, the role and importance of GIFs varies; however, we note that Facebook faces only limited constraints in social media, [✂] competitors ([✂]) consider that GIFs are very important to driving user engagement on their platforms. Therefore, we are of the view that access to GIFs impacts the competitiveness of at least some of Facebook's main rivals.

**Ability to foreclose using GIPHY's data**

8.91    In the Market Study, the CMA found that successful social media platforms use user data to personalise the experience on that platform for the user. 'By providing better recommendation and personalisation functionalities, platforms may become more appealing to consumers and lead them to spend more time on the platform'. Whilst smaller platforms source the vast majority of their data from their user interactions with the platform, Facebook has the ability to source data from a range of third-party providers, in addition to data from its own platforms.[527] The CMA found that Facebook possesses a significant data advantage over smaller platforms and publishers and that this data advantage both increases the value of Facebook's advertising inventory and creates barriers for its competitors to overcome.[528] The inability of smaller platforms and publishers to access equivalent data reduces their ability to compete on a level playing field and realise the full value of their advertising inventory.[529]

8.92    We consider whether Facebook would have the ability to disadvantage its rivals by using its provision of GIPHY's services to rival platforms as a means of acquiring data on user behaviour or wider trends on these platforms, thereby further weakening its competitors' ability to compete in social media and digital advertising and further raising barriers to entry (due to the differential in access to data). Facebook could, in principle, require apps to return more data to GIPHY as a condition of supply, or otherwise require that the apps do not stop supplying or hide the data already being provided to GIPHY via their integrations pre-Merger. As set out in Appendix G: GIPHY's data, the data acquired could include:

(a)   User-level data on user behaviour on rival social media platforms; and/or

---

[527] Market Study, paragraphs 3.236-3.239.
[528] Market Study, page 211.
[529] Market Study, paragraph 5.165.

PX0684-259

(b) Aggregate data on the usage of rival social media platforms.

8.93   To assess whether this data could be utilised as a mechanism of foreclosure, we consider the likely value to Facebook of these two types of data collected by GIPHY, and the ways in which this data could be used to disadvantage rivals.

8.94   The Parties submitted that gaining access to new data did not form part of the rationale of the Merger. The Parties further submitted that the new data to which Facebook would gain access via GIPHY is limited in scope and value, and would not be useful for targeted advertising. This is due to various factors, as articulated by the Parties:

(a) GIPHY's data is narrow in scope and limited to high-level and non-detailed information on users' interactions with GIPHY's GIF library. GIPHY does not have access to the kind of detailed user, context, or activity data that could provide meaningful insights.

(b) Data on GIF search terms (even if individualised) is not valuable, as the meaning or sentiment of GIFs can depend on the context. Much of this data also contains substantial 'noise' (eg because of pre-loaded terms[530] or searches for parts of words), further undermining their usefulness.

(c) Facebook already accounts for more than half of GIPHY's API traffic. Since user search queries appear largely uniform across GIPHY's API partners, there is little incremental information that Facebook can derive from seeing queries originating from GIPHY's other API partners.

(d) While Facebook logs data in relation to its own users' GIF usage on its platforms, the main purposes of this data logging are to understand the overall popularity of GIFs on its services and to improve GIF recommendations.

(e) There is no guarantee that Facebook would have access to further individualised data, as GIPHY's API partners can and do use proxy servers[531] and content caching servers[532] to prevent GIPHY from accessing user-level data.

---

[530] GIPHY's integration partners can pre-load some searches and GIFs that appear when the user opens the integration.
[531] These are server applications or appliances that act as intermediaries for requests from the users seeking GIFs from GIPHY or other GIF providers.
[532] These are services that save GIFs locally and then serve them to users, preventing GIPHY (or other GIF providers) from serving GIFs to users directly.

PX0684-260

8.95    The Parties further submitted that 'requiring data from API partners would not affect the user experience on competitors' apps or websites therefore if Facebook did require more data and API partners accepted these terms, there would be no foreclosing effect.'

8.96    In contrast, three platforms ([✂]) expressed concerns over the data advantage to Facebook:

(a) [✂].

(b) [✂].

(c) [✂] was concerned that 'relying on a Facebook-owned GIPHY would allow Facebook to collect more unique data from [✂] users and leverage that data in the [✂] market. For example, GIF data would allow Facebook to know what [✂].' [✂] was also of a view that Facebook had already gathered significant quantities of data through the Facebook Login feature and that Facebook had been unwilling to negotiate the terms of using this feature.

8.97    Our assessment of Facebook's ability to use GIPHY's data to disadvantage its rivals is structured as follows. First, we summarise our view on the value of GIPHY data. Second, we set out our assessment on whether ownership of this type of data could enable Facebook to weaken its rivals' ability to compete.

*The value of GIPHY's data*

8.98    Facebook submitted that the Merger 'does not materially add to or enhance these existing sources of information on users' interests, behaviour or trends', noting 'GIPHY data relate to a narrow set of user actions' and that 'Facebook users account for the majority of GIPHY traffic'.

8.99    We note that the fact that Facebook's usage of GIPHY accounts for a significant proportion of GIPHY's traffic (see Chapter 4, Industry Background, Figure 11) is merely reflective of Facebook platforms' significant share of social media (see Chapter 5, Market Definition and Market Power, Table 4). We also note that the Facebook's share of GIPHY's traffic has been declining and was [✂] from 2020 (see Chapter 4, Industry Background, Figure 10). Regardless of the share of Facebook in GIPHY's traffic, many social media platforms, including some of Facebook's largest competitors, use GIFs and rely on GIPHY to supply them; therefore, data derived from GIPHY's traffic covers a significant number of Facebook's rivals. This wide coverage of rivals makes it potentially valuable to Facebook.

PX0684-261

8.100  Based on our review of the Parties' submissions regarding GIPHY's data capabilities, and Facebook's internal documents, as set out in Appendix G: GIPHY's data, we are of the view that:

(a)  GIPHY's **user-level data**, where obtainable via user-level identifiers, may provide information on users' interests in popular culture or brands, and/or user moods and sentiments in real time. The Parties submitted that such user-level data is currently available to GIPHY in only a limited set of circumstances, most notable from SDK integrations rather than from API partners.[533] However, Facebook could require larger partners, that currently do not return user-level identifiers to GIPHY, to request such data as a condition of supply. We understand that this would likely be an incrementally small amount of data compared to the richness of data Facebook already collects both within its own ecosystem and across the wider web and app ecosystem through its existing tools. That said, any value from such data would post-Merger be captured solely by Facebook.

(b)  Facebook already has significant amounts of **aggregate data** on usage of competitor apps (see discussion in paragraphs 27-32 of Appendix G: GIPHY's data). However, evidence suggests that there are gaps and inaccuracies in these data (see paragraph 31 in Appendix G: GIPHY's data). We understand that GIPHY's data on the volume of GIF-related traffic on third party apps may serve as an additional tool to improve and refine Facebook's existing efforts to infer competitor activity. This view is confirmed by an internal communication between Facebook employees, where an employee suggests that inferences about trends for other platform users could be made using GIPHY's data.[534]

*Facebook's ability to use GIPHY's data to disadvantage competitors*

8.101  The Merger Assessment Guidelines state:

'The data held by many digital market firms allow them to hone, improve and personalise their products and services, and this may be difficult for an entrant to replicate in a timely manner. Early mover advantages may be strengthened by the combination of the merger firms'.[535]

---

[533] However, as set out in paragraph 9 of Appendix G: GIPHY's data, [✂].
[534] See paragraphs 33-34 in Appendix G: GIPHY's Data.
[535] Merger Assessment Guidelines (CMA129), paragraph 8.41.

PX0684-262

8.102 We next consider whether Facebook's possession of GIPHY's data would place its rivals at a competitive disadvantage. The harm to rivals could take two forms:

(a) As the Merger Assessment Guidelines suggest, Facebook's rivals that continue to use GIPHY post-Merger could be placed at a competitive disadvantage vis-à-vis Facebook if, for example, Facebook could use the data to analyse activity on rival apps in such a way that would allow it to identify competitive threats or react to emerging market trends before other rivals are able to. Data on competitor trends may also enable Facebook to target its efforts in certain narrow areas (where it identifies stronger rivalry) such that overall innovation (and competition) in other areas (where rivals are weak) would be reduced. Such a data gathering strategy by Facebook would further lessen the ability of other social media platforms to compete, thus reinforcing Facebook's significant market power in social media services and further disadvantaging its rivals. Our assessment in Appendix G: GIPHY's data suggests that although user-level GIPHY data appears to be incrementally small compared to Facebook's existing databases, GIPHY's aggregate data may refine Facebook's existing market intelligence sources rather than serve as a standalone source of intelligence. In any event, given Facebook's significant and enduring market power in social media and display advertising, and its existing significant data advantages, even a small data increment further strengthens its ability to limit competitive threats.

(b) Regardless of whether GIPHY's data could be used by Facebook to disadvantage rivals, rival platforms may be unwilling to share such data with Facebook, for example because they want to differentiate their product by offering greater privacy to their users. Facebook's requirement to share this data would thus be equivalent to raising the price of GIPHY's services to third parties.[536] Such platforms would have the option to stop using GIPHY and either remove the GIF facility altogether, or switch to another provider (ie Tenor or a smaller GIF provider). In the former case, the result would equate to total foreclosure, and our assessment of the incentives and effect of total foreclosure apply. In the latter case, the lack of a range of effective alternatives, as evidenced above (paragraphs 8.15 to 8.53), means that the platform would face a lower quality service in case of switching to an alternative GIF provider, including Tenor (see paragraph 8.53).

---

[536] Data provision as a form of price for receiving a service is discussed in the CMA's Merger Assessment Guidelines in footnotes 16 and 90.

PX0684-263

8.103  With respect to the second point above, we are aware of at least one third party platform that chose to switch away from GIPHY to a different provider following the Merger as a result of the perceived risk of Facebook collecting more data on its users.[537] A second third party platform told us that it would 'very likely switch' away from GIPHY in response to a hypothetical scenario in which GIPHY required it to provide more user data, and that instead of paying for additional measures to prevent 'data leakage' (ie the transfer of user data to Facebook), it would rather stop using GIPHY's service altogether.

8.104  We note that although API/SDK partners could use proxying and/or caching to attempt to hide their data from GIPHY, Facebook could potentially prevent such activities as a condition of supply, or as a requirement to supply GIFs at the same level of quality as they are supplied to Facebook. In this regard, we note that [✂]. In addition, some API/SDK partners may be unaware of, or individually unconcerned about, the use Facebook may be making of this data, or, [✂], may lack the engineering resources to proxy searches. This would be particularly true for smaller apps that are at an early stage of trying to enter the market.

8.105  On that basis, our view is that GIPHY's data enables an additional mechanism of foreclosure. Post-Merger, Facebook may use this mechanism in combination with other foreclosure mechanisms set out in paragraph 8.10. The different mechanisms could be used selectively depending on the level of perceived competitive threat to Facebook from the rival platform, and the role GIFs play on that platform.

### Contractual restrictions to the Merged Entity's ability to foreclose

8.106  Facebook submitted that it 'has signed agreements with Snap which continue to allow Snap to use proxying and caching (which limit data available to GIPHY) and do not include any requirements for additional data provision'. Facebook also submitted that breaking this contractual agreement would incur costs, and that it has made other commitments to keep GIPHY available to other services.

8.107  The Merger Assessment Guidelines state that:[538]

> 'The CMA's assessment of the ability of the merged entity to foreclose its rivals is unlikely to place material weight on contractual protections, for example, to continue supplying both the current version and future upgrades of the input. In practice,

---

[537] [✂].
[538] Merger Assessment Guidelines (CMA129), paragraph 7.15.

PX0684-264

such contracts may not completely remove a firm's ability to harm its rivals, given that certain rivals might not be covered by these contracts, the contracts might not protect all ways in which the competitiveness of rivals could be harmed, and the contracts may be of limited duration. Moreover, over time contracts may be renegotiated or terminated, and firms may waive their rights to enforce any breaches in light of their overall bargaining position (reflecting the change in market structure brought about by a merger). However, the CMA may consider any financial or reputational costs of terminating contracts in its assessment of foreclosure incentives.'

8.108   In our view, these considerations apply to the present case. The provision of GIFs involves ongoing cooperation between the provider and the API/SDK partner, as evidenced by the close engagement between Instagram and GIPHY prior to acquisition. As the service, and the needs of social media platforms, evolve over time there is a risk that important quality aspects of GIF provision will not be covered by contractual terms. In addition, litigating against Facebook for a breach of contract would be resource intensive and third parties' concerns about a risk of retaliation by Facebook (whether real or perceived) could further dampen their incentives to pursue litigation.

### *Our view on the Merged Entity's ability to foreclose*

8.109   In our view, the evidence set out above shows that post-Merger Facebook has the ability to foreclose its rivals in social media:

(a) **Facebook's rivals do not have a range of effective alternative GIF providers to switch to in the event of foreclosure, which means that they would face a lower quality GIF offering relative to our counterfactual if they were to switch to an alternative GIF provider, including Tenor**. Tenor is the only close substitute to GIPHY and the absence of a wider range of close alternatives means that post-Merger the incentives for Tenor to compete (including through innovation), in the event of foreclosure of platforms from GIPHY, are reduced.

(b) **GIFs are an important driver of user engagement for Facebook[539] and some of its main social media rivals.** This is evidenced by Facebook's internal documents, views of third parties and their internal documents, and third party reactions to the Merger. A social media platform that is unable to access GIFs, or is accessing GIFs at a lower

---

[539] The importance of GIFs to Facebook itself is also indicative of the likely importance of GIFs to platforms that compete with Facebook.

263

quality or where development of the GIF product and GIF-related innovations favour Facebook's commercial incentives, would have a weakened ability to compete for user attention. Given the finding above on the distinctiveness of GIPHY as a GIF provider, it follows that GIPHY's GIFs are an important input to social media platforms.

8.110   We consider that **a range of foreclosure mechanisms are available to Facebook**, including complete refusal of supply, degrading the terms of supply of current API/SDK services, reprioritising innovation and development of GIPHY's API/SDK services towards the requirements of Facebook's own social media services over those of other social media platforms, and requiring data as a condition of supply (see paragraph 8.10 for a description of the different mechanisms). These mechanisms could be used alone or in combination, and could be targeted at individual rival platforms (for example, depending on the type of perceived competitive threat to Facebook from a rival platform, and the role GIFs play on that platform).

## Incentive to foreclose

8.111   The Merger Assessment Guidelines state that 'The CMA will […] consider whether the merged entity would have the incentive to pursue a foreclosure strategy, in particular through a consideration of the magnitude and likelihood of the costs and benefits'.[540]

8.112   In the present case, the likely benefits of foreclosure involve Facebook gaining user engagement (and therefore potential ad inventory) from its rivals, while the likely costs of foreclosure are primarily incurred by GIPHY losing some advantages associated with its scale, in the case that a total foreclosure strategy is adopted.

8.113   We consider the following in turn:

(a)  Cost of foreclosure to Facebook;

(b)  Direct benefits of foreclosure to Facebook;

(c)  Strategic benefits of foreclosure to Facebook; and

(d)  The Parties' views.

---

[540] Merger Assessment Guidelines (CMA129), paragraph 7.16.

PX0684-266

***Cost of foreclosure***

8.114   An input foreclosure strategy typically entails a cost for the foreclosing party due to the loss of revenue from sale of the input to third parties, which must be weighed against any benefit from foreclosure. In contrast, in the present case GIPHY's services are provided free of charge to third parties, so there is no direct negative revenue impact to Facebook of withdrawing the service.

8.115   Facebook submitted that:

'[✄]'

8.116   Facebook also submitted that breaking its commitment to provide GIPHY to third parties, and its contract with Snap, would incur a cost.

8.117   We agree that, as the Parties suggest, there is a benefit to the GIPHY service in maintaining widespread distribution of the service, as this makes it attractive for brand partners and other content creators. Evidence shows that GIPHY enjoys network effect advantages over its rival GIF suppliers due in part to its widespread adoption across platforms (see Chapter 5, Market Definition and Market Power), and therefore there would be a cost in losing these advantages should a total foreclosure strategy be adopted. Further costs associated with reduced distribution of GIPHY's GIFs could include a reduction of data collected from GIPHY's traffic (the value of which is discussed in paragraphs 8.98-8.100 above), and a reduced possibility to monetise GIFs should Facebook attempt to do so.

8.118   On the other hand, Facebook's platforms are by far the most widely used social media platforms, and they make up around half of GIPHY's searches (see Figure 11 in Chapter 4, Industry Background). Even if GIPHY were withdrawn from all other platforms apart from Facebook, it would still be very prominent and attractive to content creators (or advertisers), and potentially more so than any other GIF provider – particularly as Facebook could increase GIPHY's user reach by extending the use of GIPHY on its own platforms, at the expense of Tenor. We understand that to date Facebook has chosen not to do so, and continues to use both GIPHY and Tenor extensively. However, an internal communication between Facebook employees suggests that [✄].[541]

8.119   Moreover:

---

[541] In an 20 July 2020 exchange between Samuel Wu and Chia-Hua Li of Facebook about ongoing use of Tenor following the Merger, Mr Wu comments that: [✄].

PX0684-267

(a) Facebook would have the option of withdrawing access to GIPHY only to some platforms – for example those it viewed as a particular competitive threat, those which it considered likely to be particularly vulnerable to a loss of user engagement as a result of foreclosure, or those which declined to provide Facebook with access to user data. This would significantly reduce any cost of foreclosure to Facebook compared to a complete withdrawal of the service from all third parties.

(b) The cost of foreclosure would also be significantly reduced if a partial foreclosure strategy is adopted, in which case the audience reach (and thus attractiveness to content creators) could be maintained to a greater extent.

### Direct benefits of foreclosure

8.120  If a loss of access to GIPHY made a social media platform less attractive to some of its users, this may lead to a reduction in user engagement (ie time spent on the platform), as set out above (see paragraphs 8.54 to 8.90). This was Facebook's concern about the loss of Instagram's access to GIPHY, and it expected the result to be a significant impact on revenues.

8.121  We expect that such a reduction in user engagement would be further amplified by network effects. For example, if a celebrity or popular contributor to a platform decides to switch to another platform with better features, their followers may also switch their attention to the new platform. Similarly, if a group of users of a private messaging app decide to switch to another app, their friends are also more likely to switch, even if they do not use GIFs.

8.122  When user engagement declines on a platform it is likely that at least some, and potentially a substantial proportion, of that engagement will switch to other social media platforms (rather than users choosing to spend less time on social media).[542]

8.123  Other things being equal, users switching away from a social media platform as a result of foreclosure might be expected to switch to other platforms in proportion to the relative market shares of those platforms. In addition, most users of other platforms are also regular users of Facebook platforms (see Chapter 5, Market Definition and Market Power), which makes switching their time to Facebook even easier. Given Facebook platforms' large market share

---

[542] As set out in Chapter 5, Market Definition and Market Power, although a broad range of services seek to capture user attention, the closest competitive constraints on Facebook are imposed by other social media providers.

PX0684-268

in social media, and its existing user relationships, Facebook is uniquely well-placed to benefit from such switching.

8.124  Facebook is very effective at monetising its platform users, as reflected in its high profitability.[543] As a result, it is highly incentivised to increase the time spent on its platforms by users. The US House of Representatives Subcommittee reports a former Facebook employee as saying that as a product manager at Facebook, 'your only job is to get an extra minute. […]. They can monetize a minute of activity at a certain rate. So the only metric is getting another minute.'[544]

8.125  Finally, we note that there is likely to be a cost saving associated with foreclosure, as providing GIFs to API/SDK partners appears to have been a significant cost to GIPHY. In a Facebook internal document from February 2020, Vishal Shah comments that: '[✂]'. Thus, in the case of total foreclosure of some or all third party platforms, Facebook could recoup some of the costs associated with serving this traffic.

8.126  In our view, if Facebook is able to reduce user engagement on rivals' platforms it will likely benefit from doing so, as this would increase user engagement, and hence advertising revenues, on Facebook's own platforms.

***Strategic benefits of foreclosure***

8.127  In addition to any benefit Facebook might achieve from diverting some of its rivals' users' time towards its own platforms to generate higher revenues, we have also considered whether there is a strategic benefit to Facebook from foreclosure using GIPHY.

8.128  The importance of GIPHY to competition between social media platforms is evidenced by Facebook's internal discussions leading to the acquisition. A March 2020 email exchange among Facebook and Instagram executives raises the prospect of an acquisition of GIPHY. [✂] However, the exchange also refers to the '[✂]'. In addition, the 'pros' of an acquisition compared to other options include '[✂]'.

8.129  This email exchange is consistent with a Merger rationale of ensuring access to GIPHY's services for the purpose of maintaining user experience, and of acquiring talent. However, it also indicates that Facebook saw the acquisition

---

[543] In the Market Study, the CMA found that Facebook had a ROCE of 51% globally in 2018 with an estimated WACC of around 9%; see Market Study Appendix D.
[544] US House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law (2020). Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations, page 135.

PX0684-269

as strategic, in the sense that it saw the acquisition of GIPHY by a social
media competitor as a risk to its competitive position.

8.130   We consider that by harming rival social media platforms' or emerging
competitors' ability to innovate, grow and develop, Facebook could prevent or
slow down the emergence of competitive threats and thus protect and further
strengthen its significant market power in social media. In what follows we
discuss three ways in which these strategic benefits could occur:

(a) Given the importance of GIPHY's GIFs to social media platforms'
competitiveness, the Merged Entity could harm rival social media
platforms' competitiveness by foreclosing them from GIPHY's GIFs where
these may be needed as an input to their future innovations and
development of new features;

(b) Given GIPHY's unique position to further innovate and develop GIF-
related user expression products, the Merged Entity could harm rival
social media platforms' competitiveness by reprioritising GIPHY's future
innovations in user expression to benefit only Facebook; and

(c) The Merged Entity could use GIPHY's data to identify and react to
emerging competitive threats to Facebook before they become material.

*GIPHY's GIFs as an input to innovation of new features by social media platforms*

8.131   Social media platforms compete for user attention by offering a wide range of
features. As an example of competition on features, Snapchat was first to
invent Stories (visual content disappearing after a day), followed by Instagram
and other Facebook platforms, and more recently by Twitter with a product
called Fleets. Instagram appears to have been first to introduce GIF stickers
to allow its users to augment Stories, followed by Snapchat in an attempt to
keep up.[545]

8.132   Third party evidence suggests that social media platforms continue to add GIF
functionality into existing or new features:

(a) Twitter launched Fleets in November 2020, and integrated GIFs into that
product.[546]

(b) [✄].

---

[545] Snapchat adds Giphy's GIF stickers to liven up your Stories | Engadget (accessed 29 November 2021).
[546] Twitter informed us that the Fleets product was withdrawn in August 2021.

PX0684-270

*(c)* An internal document provided by [✂] mentions plans to 'double down' on the GIF/sticker feature.

8.133 Facebook's internal documents also suggest that GIFs, and user expression tools more widely, are an important dimension of competition as it evolves. An internal Facebook presentation estimates that GIFs usage in messaging [✂] in 2020 (compared to 0% growth in text). The same presentation notes that '[✂]', giving examples of Viber with custom GIFs, Snapchat with video cameos, WeChat and Apple and Hikemoji with custom stickers, and others.

8.134 The fact that GIFs are only one of a range of features does not necessarily mean that the threat from rivals' innovations is not impaired or delayed by foreclosure of those rivals from GIPHY. An internal Facebook email about competitive threats to WhatsApp notes how historically there have been 'inflection' points for messaging apps (ie one app winning over another) and that in each of those scenarios Facebook had to 'identify the **main** growth driver' (emphasis in original). As an example, in [✂]. We consider this to show that one (or a small number of) features have the potential to tip the market.

8.135 Given the above, we expect that access to GIFs is not only important for user engagement in the shorter term, but also as an input for innovation and strategic development of platforms. By gaining control of a popular user expression feature and its future development, Facebook reduces the likelihood of its competitors developing innovation that may strengthen their competitiveness vis-à-vis Facebook in social media and therefore also in display advertising.

8.136 In the past Facebook has reacted strongly to the emergence of rival social media platforms. For example, internal documents now in the public domain show that Facebook has identified some platforms as a threat to its core business, and has used its market position to undermine these rival platforms, in particular Google+, Vine, Circle and Path.[547]

8.137 Facebook is likely to be particularly threatened by rival services which replicate and/or improve on the features of its core social media platforms, such as messaging on Messenger and WhatsApp, or photo and video content on Instagram. As text messaging and visual content are an important element of these services, and video GIFs and GIF stickers are increasingly important

---

[547] FTC (13 January 2021) 'Complaint for Injunctive and Other Equitable Relief', Case No.: 1:20-cv-03590. See for example paragraphs 140, 153-156.

PX0684-271

to the respective platforms, GIFs may also be important to any new entrant, or innovations by existing rivals, which threatened Facebook's business.

8.138   Therefore we consider that beyond the shorter term possibility to attract some user attention away from rival social media platforms, foreclosure has strategic benefits in that it can reduce the longer term competitive threats by limiting the ability of rivals to replicate Facebook's offering or to innovate in new features. This can include features that drive user engagement and therefore capacity to compete for display advertising, as well as features directly aimed at competing for display advertising (see discussion in Chapter 7, Horizontal Effects).

*GIPHY's future innovations*

8.139   Prior to the Merger, the independent GIPHY had incentives to develop its service in ways that would make it more valuable to a range of social media platforms (including Facebook and Facebook's rivals), for example by developing a range of solutions, related to user expression or digital advertising, that adapt to the different needs of each of these platforms (including for improving this feature on their core social media service).[548]

8.140   In contrast, post-Merger Facebook would not have an incentive to innovate or develop GIPHY's API/SDK services in a way that does not benefit Facebook, and services that give the possibility to a rival social media platform (eg by partnering with GIPHY to develop its service) to compete strongly against Facebook on certain user experience features. For example, in considering whether to monetise GIFs on third party platforms (as GIPHY planned to do pre-Merger), we would expect Facebook to take account of the possibility that doing so would offer a new revenue stream to its rivals, which they could invest in improving their social media services, and potentially cannibalise Facebook's display advertising revenues.

*Strategic value of GIPHY's data*

8.141   Internal documents now in the public domain suggest that Facebook has in the past seen the threat from new rivals as time-critical, in that by delaying the growth of such a rival it can potentially develop its own versions of the features that make the rival distinctive.[549] The timeliness of launching new

---

[548] For example, GIPHY introduced the GIF sticker offering which was particularly suited to video-based communication features such as Stories on Instagram and Snap.
[549] In an email to a colleague Mr.Zuckerberg explains, '[O]ne way of looking at this is that what we're really buying is time. Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if

PX0684-272

social media products or features and responding to competitive threats can thus determine how competition between social media platforms will evolve in the future.

8.142  As we have considered above (see paragraphs 8.98-8.105), Facebook may be able to use GIPHY's data on traffic from third party apps as a means of improving its ability to identify the emergence of competitive threats, such as new social media platforms, or features within those platforms. Acting on this data would have the benefit of Facebook reacting to these threats earlier or faster, thus limiting the ability of these competitors to achieve the network effects necessary to establish themselves in the market as a material competitor to Facebook.

8.143  We therefore consider that by using GIPHY's data to improve its ability to identify emerging competitive threats Facebook could further protect its significant market power in social media, and therefore in display advertising.

**Parties' views**

*Approach to assessing foreclosure incentives*

8.144  The Parties have submitted that the CMA has failed to undertake any analysis to establish the incentive for Facebook to pursue a foreclosure strategy, and claimed that this approach is in contrast to recent CMA cases such as the *Liberty Global Plc/Telefonica S.A.*, *Tesco/Booker* and *ICE/Trayport* merger inquiries in which the CMA presented technical appendices analysing the merged entity's incentives to foreclose. The Parties further submitted that the CMA had made no attempt to quantify the costs and benefits of a foreclosure strategy.[550]

8.145  As set out in our Merger Assessment Guidelines:[551]

>  The assessment of incentives typically involves a combination of quantitative and qualitative evidence, though the balance will vary between cases. ***The CMA may undertake more extensive quantitative analysis in simple markets with high quality data, but focus on a qualitative assessment in complex and dynamic markets, where firms' current positions and margins may not be a good guide to the future, and strategic***

---

we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale'. See paragraph 14 of FTC (13 January 2021) 'Complaint for Injunctive and Other Equitable Relief'. Case No.: 1:20-cv-03590.
[550] Parties' response to Provisional Findings, paragraph 7.9 to 7.11.
[551] Merger Assessment Guidelines (CMA129), paragraph 7.18.

PX0684-273

*considerations may play a greater role'* In any event, its focus will be on the relative magnitude of the overall cost and benefit of foreclosure, not on predicting the exact size of each element'. (emphasis added)

8.146  In the present case, we consider that we have been able to reach a view on the incentives to foreclose without a quantitative assessment. This is because, as discussed above, the evidence shows that the benefits of foreclosure would be positive – including both the shorter term possibility to attract some user attention away from rival social media platforms, as well as wider strategic benefits of reducing the longer term competitive threats by limiting the ability of rivals to replicate Facebook's offering or to innovate in new features – while the costs of foreclosure are limited, and are significantly reduced if a partial foreclosure strategy is adopted (see paragraphs 8.114-8.120). In addition, we consider that a quantitative assessment of incentives to foreclose is not feasible in this case, for the following reasons:

(a)  Social media platforms are characterised by significant network effects. For example, same-side network effects mean that reduced quality or lack of access to GIFs would likely impact not just the volume of content posted (that would have otherwise included a GIF), but also the overall engagement of users who would have been using GIFs, as well as engagement of non-GIF users that interact with GIF users. We have gathered data on metrics capturing the proportion of content on a platform that includes a GIF as these were widely available and are helpful to inform the wider assessment. However, these metrics do not capture the expected amount of user time that would switch in the event that GIF functionality was not available or the quality of GIF functionality was reduced on a given social media platform. This is because, first, they do not reflect the satisfaction derived by users from the GIF facility and thus the extent to which lack of or poor quality GIF services would prompt users to switch, and second, do not reflect any network effects (see also paragraph 8.80). More accurate metrics to quantify switching in response to a change in quality of the services provided by a social media platform were not available to us and to our knowledge have not been developed by social media platforms themselves.[552]

(b)  GIF provision itself is also characterised by cross-side network effects between GIF users and GIF content providers. The size and type of audience reached by a GIF provider impacts the volume and quality of

---

[552] We note that most platforms we contacted indicated that it would be difficult to quantify the importance of GIFs to the engagement of end-users (see paragraph 8.80).

PX0684-274

content providers it can attract to contribute to its library. The presence of such an effect has been confirmed by both the Parties and third parties to this investigation, but a quantification of a causal relationship between audience size and volume and quality of content providers is not possible in the context of GIF supply. This is because any attempt at such quantification would require metrics and data that do not exist in the case of GIF supply, and would involve methods that are prone to biases particularly when data are limited.[553]

(c)  The social media market is complex and dynamic: it is constantly evolving, with ongoing innovation and experimentation with new user features. There is significant differentiation among social media platforms in terms of target audience, and features and functionalities on offer. As set out above (paragraphs 8.79-8.86), the role and importance of GIFs differs across platforms. This makes it difficult to predict with any accuracy the ways in which users of each platform would react to the change in GIF availability.

8.147  In summary, we do not consider that a robust and informative quantitative analysis of incentives is feasible in this case. Nonetheless, our analysis shows that there is a clear incentive to foreclose as there is a positive benefit to Facebook from foreclosing, while the costs of such foreclosure are limited. This analysis is based on a wide range of evidence from Parties' submissions, internal documents, and third party submissions, as set out above.

*Other arguments*

8.148  The Parties submitted that if foreclosure 'was indeed an important (or even peripheral) part of Facebook's plans for the Transaction then one would expect to see this mentioned in the Parties' internal documents. The fact that the CMA has been unable to find any internal documents supporting this speculative concern speaks volumes about the lack of incentives that Facebook has in pursuing foreclosure strategies.'[554]

8.149  Facebook commented in its internal documents that '[✂]'. It also commented that '[✂]'.

8.150  As our Merger Assessment Guidelines indicate, evidence of an intention to restrict competition through an acquisition can be a corroborating factor in the

---

[553] We consider such an analysis to be impossible in the case of the supply of GIFs for two reasons. First, no metrics are available to objectively quantify the quality of a GIF library. Second, even if that were possible, there are only a small number of GIF suppliers whereas an analysis of such causal relationships requires at least a sample that is significantly larger.
[554] Parties' response to Provisional Findings, paragraphs 7.12-7.13.

PX0684-275

assessment of the effects of a merger. However, it is not a necessary factor. Even where a party to a merger has such intent, we would not expect that party to set it out in writing, particularly in the case of sophisticated businesses familiar with merger control. Similarly, we cannot place weight on Facebook's expressed intention to keep access to GIPHY open to third parties[555] given that this intention was communicated in the anticipation of scrutiny by merger authorities.[556]

8.151 This appears to be supported by an exchange between Samuel Wu and Chia-Hua Li of Facebook about ongoing use of Tenor following the Merger. Mr Wu comments that: '[✕]'.

8.152 In their response to our Provisional Findings, the Parties also argued that there are examples of vertical integration, none of which have led to foreclosure. The Parties argue that this must mean that there is no ability and incentive to foreclose.[557] We note that:

(a) With respect to GIPHY, Facebook acknowledged the CMA's hold-separate order, which required independent operation of GIPHY from Facebook, but argued that its commitment to keep access to GIPHY open was evidence of an absence of ability and incentive to foreclose. We would expect Facebook, a sophisticated business familiar with merger controls, not to engage in any foreclosure actions while the Merger is under investigation by competition authorities, regardless of the existence of economic incentives to foreclose (see also paragraph 8.150 and its footnotes).

(b) With respect to Tenor, we consider Google's incentives to foreclose social media platforms from Tenor to be different from the incentives for Facebook to foreclose platforms from GIPHY. This is because Google does not operate social media platforms that could benefit from such foreclosure. As set out above (see paragraph 8.30), Google's incentives to keep Tenor open to third parties are instead likely driven by Tenor's monetisation opportunities on third party platforms. Therefore, Google's

---

[555] Parties' response to Provisional Findings, paragraph 7.9.
[556] The Parties have also claimed that Facebook would incur reputational and tangible costs for reneging on such a public commitment and contractual agreements (Parties' response to Provisional Findings, paragraph 7.10). First, we note that a range of foreclosure mechanisms is available to Facebook, as set out in paragraph 8.10 and 8.11. Not all of these mechanisms require Facebook to explicitly renege on contracts. In addition, with some of these foreclosure strategies (for example, strategies relating to reprioritising innovation or data collection), Facebook would not even need to renege on the public commitment, and the rivals that are foreclosed would not necessarily be aware or have proof of Facebook undertaking such strategies. In any event, Facebook's (strategic) benefits may change over time, increasing Facebook's incentives to implement some of these practices to respond to enhance its competitive position (see by analogy paragraph 8.136), which may be greater than any concern relating to public commitments.
[557] Parties' response to Provisional Findings (2 September 2021), paragraphs 1.33-1.34.

PX0684-276

actions with Tenor are not informative of the incentives Facebook will have with respect to GIPHY's availability and development.

(c) [✂] As such, this is not informative of Facebook's incentives to foreclose rivals from GIPHY.

8.153  With respect to data foreclosure, the Parties argued that Facebook making access to GIPHY conditional on the API/SDK partner providing data about users or aggregate trends would not have a direct impact on the quality of the rivals' social media platform services.[558] We note that, as set out in more detail at paragraph 8.102:

(a) First, the evidence we have received suggests that Facebook may use GIPHY's data to strengthen its ability to limit competitive threats, and without comparable data on competitor activity Facebook's rivals in social media services will be further disadvantaged in their ability to compete against Facebook; and

(b) Second, the quality of rival social media platforms' services may also immediately suffer from the perspective of users that value privacy. That is, users of these platforms may be unwilling to continue using a platform if they are aware that their usage data is being shared with third parties.

***Our view on the Merged Entity's incentive to foreclose***

8.154  In our view, the potential benefits of foreclosure of Facebook's rivals from GIPHY likely outweigh the expected costs of doing so.

(a) The direct benefit of foreclosure to Facebook is the potential for it to gain users, or user time, from rival platforms. Given Facebook's existing significant market power in social media, and the significant degree of multi-homing among social media users in favour of Facebook,[559] users dissatisfied with their experience on rival social media platforms are most likely to substitute to Facebook. In the longer term, Facebook can also disadvantage its rivals strategically as it limits the ability of existing or emerging rivals to innovate with GIPHY's GIFs as an input, and thus reduce the likelihood of competitive threats having an impact on its share.

(b) The costs of foreclosure are limited, and are significantly reduced if a partial foreclosure strategy is adopted. The primary cost is that of losing the advantages associated with the scale of GIPHY's distribution, ie the

---

[558] Parties' response to Provisional Findings (2 September 2021), paragraph 7.20(b).
[559] See Figure 16 in Chapter 5. For example, almost 90% of Twitter users also use Facebook. However, less than half of Facebook users also use Twitter.

PX0684-277

attractiveness of GIPHY as an outlet to brands and GIF content creators, and the potential of monetising and/or collecting user data from this traffic. However, due to its size Facebook alone enables GIPHY to maintain a significant scale, and could grow GIPHY's traffic on Facebook further by reducing the use of Tenor (see paragraph 8.118). Moreover, a range of foreclosure mechanisms is available to Facebook, which would enable Facebook to adopt a strategy which minimises these costs.

8.155  Our view, therefore, is that post-Merger Facebook has a strong incentive to foreclose its rivals from GIPHY.

## Effect of foreclosure on competition

8.156  The Merger Assessment Guidelines state that 'the CMA will consider whether the harm to competitors it has identified will result in substantial harm to overall competition in the downstream market. This will include through raising barriers to entry for potential entrants, where the negative impact on customers may take some time to materialise',[560] and 'Competition concerns may be particularly likely to arise if one of the merger firms has a degree of pre-existing market power in the downstream market, and already faced limited competitive constraints pre-merger'.[561]

8.157  As set out in our assessment above, we consider that post-Merger Facebook has both the ability and incentive to foreclose its rivals.

8.158  The Parties argued that the impact of an attempt to foreclose Facebook's rivals can be quantified, and proposed a formula whereby the expected loss of engagement by a rival is estimated as a function of (i) the share of content affected, (ii) the expected change in quality given a switch to another GIF provider, and (iii) the resulting degree of switching away from the affected platform. The Parties argued that (i) is very low because only a small percentage of content on Facebook includes a GIF, (ii) is zero or close to zero because Tenor is a perfect substitute to GIPHY, and (iii) is also zero or close to zero because users would not switch away even when GIFs were completely unavailable (as they did not switch during the two-day GIPHY outage on Messenger Kids). The Parties then suggested that by multiplying these low proportions, the effect of a foreclosure strategy on the foreclosed platform's user engagement is essentially zero.

8.159  As set out in paragraphs 8.145-8.147 above, we considered that a qualitative approach to assessing the incentives to foreclose was more appropriate in

---

[560] Merger Assessment Guidelines (CMA129), paragraph 7.20.
[561] Merger Assessment Guidelines (CMA129), paragraph 7.22.

PX0684-278

this case, due to the significant network effects, differentiation, and dynamic nature of this market. For the same reasons, we also consider that foreclosure effects in this case need to be assessed qualitatively, and that the Parties' proposed analysis of foreclosure effects is overly simplistic and does not reflect the way social media services are consumed and the way platforms compete for user attention. In particular:

(a) The methodology proposed by the Parties assumes that the harm to the foreclosed platform's competitiveness can be quantified as the proportion of content that would be lost if some content switched to other platforms in the event of reduced quality of GIFs. However, social media services are ever evolving and, as set out above (paragraphs 8.127-8.143), we consider that Facebook's control of GIPHY gives it another tool to disadvantage its existing or emerging rivals in social media, such that rival platforms would not just lose some content in the shorter term but may become less able to innovate and compete in the longer term. This is further amplified by the linkage between a platform's competitiveness in social media and in display advertising.

(b) Even if the broad methodology were appropriate (which we do not consider to be the case), the Parties' proposed assumptions to populate the formula are contradicted by the evidence reviewed in this chapter:

(i) The Parties argue that only a small proportion of content (element (i) of the Parties' formula) involves GIFs and thus would be affected by switching. However, social media platforms are characterised by significant network effects. Along with content that includes GIFs, dissatisfied users may switch more or all of their activities beyond those directly using GIFs. This would be further amplified as at least some of their friends and followers could switch too.[562] In any event, we note that Facebook's internal documents demonstrate that Facebook considers even small proportions of its content to be material (see paragraphs 8.60-8.69).

(ii) As regards the Parties' assumption (ii), the expected change in quality of GIF provision, we refer to our discussion above (see paragraphs 8.23-8.42). Whilst, pre-Merger, Tenor may have been a close substitute to GIPHY, GIPHY remains the largest GIF provider and is preferred by at least some of Facebook's rivals in social media. In any event, post-Merger and in the event of foreclosure, Tenor would face

---

[562] To illustrate, consider that the GIF sticker facility is no longer satisfactory to a Stories user on Instagram. If the user usually posts multiple related Stories in succession in one session, it appears likely that a decision to switch to another platform would involve switching the full set of Stories, rather than just one.

PX0684-279

less incentives to compete. We thus expect that the quality of service of GIF provision would be lowered overall.

(iii) With respect to the term (iii) in the Parties' calculation as described above, the assumption that only a proportion of user time related to content with GIFs would switch again ignores the significant network effects characterising social media platforms.

8.160  We thus consider that the quantification exercise proposed by the Parties is not appropriate.[563] Our view on the effects of foreclosure on overall competition in social media services relies on qualitative evidence set out in our assessment of ability and incentive above, and the evidence on GIPHY's and Facebook's market power set out in Chapter 5.[564] This approach is consistent with our Merger Assessment Guidelines, which state:

'In practice, [the effects of foreclosure] will build on the same evidence as the assessment of the ability and incentive to foreclose. When it has been established that there will be harm to competitors this will often directly imply there will be harm to overall competition, where the foreclosed firms play a sufficiently important role in the competitive process on the downstream market'.[565]

8.161  As set out in Chapter 5, Market Definition and Market Power, Facebook's market power in social media has been sustained over time and reinforced through high barriers to entry. Our assessment on ability and incentives to foreclose set out above suggests that by foreclosing its rivals from GIPHY, Facebook could:[566]

---

[563] In their response to the Provisional Findings, the Parties again argued that the CMA has not attempted any quantification of effects (see Parties' response to Provisional Findings, paragraph 7.16) but did not object to our assessment of their analysis as set out in paragraph 8.159, nor did the Parties propose any improved or new methodology in response to our assessment.

[564] The Parties also argued that our Provisional Findings did not set out an assessment of the effect on end users (Parties' response to Provisional Findings, paragraph 7.17). We note that the framework set out in our Merger Assessment Guidelines (paragraphs 7.20-7.22) requires us to assess the effect of foreclosure on overall competition in the downstream market (in this case, competition between social media service providers), which we do in the remainder of this section. The Merger Assessment Guidelines do not require us to demonstrate the effect on end users. However, we note that if competition between social media service providers is weakened then a harm to end users of these services directly follows.

[565] Merger Assessment Guidelines, paragraph 7.21.

[566] The Parties argued that these effects are 'unsubstantiated, hypothetical scenarios' (Parties' response to Provisional Findings, paragraph 7.16). We note that these are not assumptions, but are instead conclusions drawn from our extensive assessment of evidence set out in this report. For each of the four types of effects, we have pointed to the most relevant parts of the report that set out our analysis.

PX0684-280

(a) Further weaken the already limited competition it faces from rivals, by degrading their functionalities and features that currently use GIFs (see in particular paragraph 8.90 and 8.120-8.126);

(b) Limit the opportunities for rivals to improve existing platform functions that do not yet integrate GIFs, or innovate with new functions that could benefit from GIFs (see paragraphs 8.131-8.138);

(c) Deprive rival social media platforms from the possibility to benefit from any future innovations by GIPHY. Given GIPHY's leading market position and creative team, it is well placed to innovate in the area of user expression (see paragraphs 8.131-8.138); and

(d) Use GIPHY's data to improve its ability to identify emerging trends on rival apps and/or identify emerging competitive threats, further disadvantaging rivals and narrowing Facebook's own innovation efforts to areas of perceived competitive threats (see paragraphs 8.141-8.143).

8.162 With respect to (b) and (c), the Parties argued that if Facebook were to reprioritise GIPHY's innovation to its rivals' disadvantage, this would improve the quality of the user experience on Facebook and would not prevent rivals from innovating, but would instead put competitive pressure on rivals to innovate.[567] First, we note that we have not seen evidence of efficiencies arising from the Merger and thus any hypothetical improvements to the quality of the user experience on Facebook would not be Merger-specific (ie they could have occurred in the Counterfactual). We set out our views on this in paragraph 8.12. Second, in any event, whether or not any such improvements by Facebook would create pressure on rivals to innovate and improve their own products, we consider that such a competitive response by rivals would be undermined because those rivals would be foreclosed from GIPHY, an important input to such innovation. In other words, Facebook's rivals in social media would no longer have access to the same opportunities as Facebook with regards to developing their own GIF-related innovations, which will lessen their ability to compete. As set out in our assessment in this chapter, Facebook's rivals in social media will not have a range of effective alternatives to GIPHY, and this includes alternatives to GIPHY as an input to GIF-related innovation.

8.163 The above would have the effect of weakening Facebook's existing and future rivals in the supply of social media services, thus further reducing the

---

[567] Parties' response to Provisional Findings, paragraph 7.20(a).

competitive constraints it faces and further strengthening its already significant market power in that market.

8.164   Because GIFs are an important driver of user engagement, which in turn drives the amount of time spent on a platform and hence the amount of available advertising space, GIFs are also important to social media platforms' ability to fund their business through the supply of display advertising in competition with Facebook. Therefore, given the linkages between social media and display advertising markets, the harm to the competitiveness of social media platforms in the supply of social media services set out in this Chapter would also translate into a weakening of competition between social media platforms in the market for display advertising. This is particularly concerning given that, as set out in Chapter 5, Market Definition and Market Power, Facebook already holds significant market power in display advertising.

## Conclusion on input foreclosure

8.165   We consider that post-Merger Facebook has the ability to foreclose its rivals:

(a)   Social media platforms do not have a choice of a range of effective GIF suppliers, which means that they would face a lower quality GIF offering if they were to switch to an alternative GIF provider, including Tenor. The only alternative to GIPHY of a similar quality appears to be Tenor. In the scenario where GIPHY is unavailable to platforms, or is available at worse terms or lower quality, Tenor itself would face weaker incentives to compete (including on innovation). Therefore, the possibility of switching to Tenor does not sufficiently weaken Facebook's ability to foreclose.

(b)   GIFs are an important driver of user engagement on social media platforms, and GIPHY had an incentive to develop its service in ways that would make it more valuable to a range of social media platforms (not just Facebook). Without GIFs provided by GIPHY (independent from Facebook) at least some social media platforms would have a weakened ability to compete for user attention (and thus ad revenue), relative to Facebook.

(c)   Post-Merger, Facebook would have a range of mechanisms it could utilise to foreclose rivals. These include total foreclosure (refusing supply), or partial foreclosure through worsened terms of supply of GIPHY's current API/SDK services, reprioritisation of innovation and development of GIPHY's API/SDK services going forward towards the requirements of Facebook's own social media services over those of other social media platforms, or by requiring data as a condition of supply. The mechanisms

PX0684-282

could be used in combination, and selectively depending on the level of competitive threat from each rival.

8.166  Furthermore, we consider that whilst the costs of foreclosure to Facebook are limited (especially if a partial foreclosure strategy is used), the benefits of foreclosure include both direct switching of users or user time from rivals to Facebook, and an overall increased strategic ability of Facebook to protect its pre-existing significant market power (see Chapter 5, Market Definition and Market Power). We are of the view that this creates an incentive for Facebook to foreclose rivals.

8.167  Our view is that the effect of such foreclosure would be the weakening of the competitive constraints exerted by Facebook's existing and future rivals in the supply of social media services, thus further strengthening Facebook's already significant market power in the supply of social media services.

8.168  On that basis, we conclude that the Merger has resulted, or may be expected to result, in a **substantial lessening of competition in the supply of social media services worldwide (including in the UK)**.

8.169  A lessening of competition in the supply of social media services also has an effect on competition in the supply of display advertising. Since user engagement drives the amount of time spent on a platform and hence the amount of available advertising inventory, Facebook's strengthened control over a user engagement feature for which competing platforms have limited alternatives, and which has a role in the development of these platforms in the future, also strengthens its position in competition for display advertising revenues (a market in which it also holds significant market power – see Chapter 5, Market Definition and Market Power). It follows that the effects discussed in this Chapter also exacerbate the effects on competition in display advertising arising from the loss of potential competition set out in Chapter 7, Horizontal Effects.

PX0684-283

# 9.    Countervailing Factors

9.1    The CMA's Merger Assessment Guidelines indicate that, in some instances, there may be countervailing factors that prevent or mitigate any SLC arising from a merger. There are two main ways in which this could happen, though in the CMA's experience it is uncommon for a merger to be cleared on the basis of countervailing factors alone:

   *(a)* entry and/or expansion of third parties in reaction to the effects of a merger; and

   *(b)* merger efficiencies.[568]

## Entry and expansion

9.2    As part of the assessment of the effects of a merger on competition we examine whether, in the event of increasing price or worsening non-price terms to customers and/or suppliers, entry or expansion by third parties would be timely, likely and sufficient to mitigate or prevent an SLC from arising.[569]

9.3    In this case, we have considered whether entry or expansion would be likely to prevent or mitigate the SLCs we have identified as arising from the Merger in relation to the supply of display advertising in the UK, and social media services worldwide. We have considered in that context whether entry and/or expansion would be timely, likely and sufficient to prevent these SLCs. In particular, we have considered whether there are barriers to entry or expansion in relation to the provision of searchable GIF libraries, and in relation to the provision of GIF-based advertising specifically, such as GIPHY's Paid Alignments offering. We also considered recent examples of entry and expansion, and prospects of entry and expansion.

9.4    In our view, for entry or expansion to be sufficient, it would need to prevent or mitigate the adverse effects we have identified in:

   *(a)* display advertising (Chapter 7, Horizontal Effects) – this would require entry or expansion, by a GIF provider or providers, to result in such GIF providers, individually or collectively, playing a similarly important role in

---

[568] Merger Assessment Guidelines (CMA129), paragraph 8.1.
[569] Merger Assessment Guidelines (CMA129), paragraph 8.31.

PX0684-284

the dynamic competitive process to that played by GIPHY at the time of the Merger;[570] and

(b)   the supply of social media services (Chapter 8, Vertical Effects) – this would require entry or expansion by effective alternative GIF providers such that rivals to Facebook's social media services were able to easily switch away from Facebook to a range of effective alternative suppliers of GIF services in the event of foreclosure.[571]

9.5   Our Merger Assessment Guidelines note[572] that '[w]hat is considered to be timely [entry or expansion] in order to prevent or mitigate the adverse effects of a merger will depend on the industry and the characteristics and dynamics of the market, and the timeframe over which the CMA expects an SLC to result from a merger'. In Chapter 7, Horizontal Effects, paragraphs 7.238 to 7.241, we describe the two-sided markets of social media and display advertising in which Facebook operates. In these markets, a competitive advantage or disadvantage can have self-reinforcing effects arising from network effects. As a result, when a firm gains or loses such a competitive advantage it can be difficult for subsequent entry or expansion to reverse the effect, and this difficulty may be greater the longer it takes for entry or expansion to occur.

9.6   In this context, we consider that GIPHY was already important to the dynamic competitive process at the time of the Merger. As discussed below, we consider that a subsequent entrant would not have the same first-mover advantage GIPHY enjoyed as a leading GIF provider or the same importance to the dynamic competitive process. In the event of Facebook foreclosing access to GIPHY, the commercial advantage which this could give to Facebook over rival social-media platforms would not necessarily be reversed even if subsequent entrants developed GIF services of comparable quality to those of GIPHY, because users who had switched to Facebook platforms as a result of foreclosure would not necessarily switch back. Accordingly, for entry or expansion to prevent or mitigate the adverse effects of the Merger it would need to occur within a short timeframe.

---

[570] As we note in Chapter 7, Horizontal Effects, paragraph 7.43, other forms of dynamic competition may be present in the market from existing or potential competitors, centred on activities other than the monetisation of GIFs. However, we consider that dynamic competition from GIPHY was important for the reasons set out in Chapter 7, Horizontal Effects, and the fact that Facebook currently faces limited actual and potential competition in display advertising (as also discussed in Chapter 5, Market Definition and Market Power). On the evidence available, the CMA did not identify another type of entrant that could prevent or mitigate the SLC and its adverse effects.
[571] Merger Assessment Guidelines (CMA129), paragraph 7.14(a).
[572] Merger Assessment Guidelines (CMA129), paragraph 8.33.

PX0684-285

9.7   Our view, as set out below, is that the barriers to entry and expansion prior to the Merger were high, and the effect of the Merger heightens the impact of the pre-existing barriers for potential expansion and/or entry in relation to GIF provision, and the related provision of advertising services utilising GIFs or GIF stickers.

9.8   [✕]. For the reasons set out below, we do not consider that any expansion by Gfycat would be timely or sufficient to prevent the SLCs from arising.

***Parties' views on entry and expansion***

9.9   The Parties submitted that barriers to entry in the supply of GIFs and stickers are low because:

a.   'development costs of creating GIF library…are low and it is relatively straightforward to develop the software/code';

b.   'the rise of cloud-computing platforms…has dramatically decreased the time and capital necessary to start and scale…';

c.   'the majority of the content on GIF libraries is not created by the GIF library providers themselves but by content partners and users…new and existing entrants can gain access to a wide range of content for their libraries';

d.   'other inputs for entry can be purchased or developed in-house…'; and

e.   'network effects do not provide a significant barrier to entry or expansion because the costs of integrating a GIF provider via API are very low, switching GIF providers is very straightforward for downstream apps and many downstream apps multi-home between GIF providers.'

9.10   The Parties also submitted that the 'GIF segment is relatively new and is still developing; GIFs only became widely popular in the 2010s and some of the most well-known GIF suppliers were founded in the last 5-10 years…As a result the market is still at a stage where significant growth and developments can be expected, use cases and business models are still evolving and hence there is a very significant risk of potential entry and expansion by new and existing players in this segment (particularly if, post-acquisition, Facebook were to attempt to deteriorate GIPHY's offering)'.

9.11   The Parties concluded that '[a]ll of this means that there are minimal costs involved for downstream players to switch to new GIF providers, particularly as they do not need to switch away from existing GIF providers to do so'.

PX0684-286

9.12    In response to our Provisional Findings, the Parties submitted that:

(a) The costs of product development were low and that network effects can be accessed by multiple firms simultaneously via end-user multi-homing.[573]

(b) The conditions around barriers to entry would not change as a result of the Merger, as the largest social media and messaging platforms would still have had 'long-standing relationships' with GIF providers.[574]

(c) Our Provisional Findings were inconsistent in the way they considered the counterfactual, the theories of harm and the barriers to entry and expansion, because:

(i) the CMA had assumed in the counterfactual that GIPHY would be able to successfully monetise through advertisement; and

(ii) the CMA had assumed in its assessment of the foreclosure theory of harm that the risk of foreclosure would create a need for social media platforms to contract with another GIF supplier.

The Parties submitted that the CMA must assess barriers to entry or expansion in such a post-Merger environment, and that if these assumptions were correct, the CMA should also consider that:

(iii) [P]aid [A]lignment is a credible route to monetisation for companies such as Gfycat and Holler;[575] and

(iv) if there were any barriers to entry as a result of GIPHY's presence and scale, these would fall away as a result of the Merger, and any hypothetical foreclosure strategy (such as that described in Chapter 8) would mean improved opportunities for smaller players to develop relationships with large API partners to grow in size and quality.[576]

(d) In light of [✂], the CMA did not explain '[✂]'.[577]

9.13    The CMA did not receive any specific views in relation to potential entry from adjacent markets and the Parties were not able to provide an exhaustive list of entry, exit and significant expansion of all relevant competitors in respect of

---

[573] Parties' Response to Provisional Findings, paragraph 8.1.
[574] Parties' Response to Provisional Findings, paragraph 8.2.
[575] Parties' Response to Provisional Findings, paragraph 8.3.
[576] Parties' Response to Provisional Findings, paragraph 8.4.
[577] Parties' Response to Provisional Findings, paragraph 1.27.

PX0684-287

this segment, which they submitted was due to the continuously evolving nature of the landscape that GIPHY operates in.

### *Principal barriers to entry and expansion*

9.14    Barriers to entry and expansion are specific features of a market that give incumbent firms advantages over potential competitors. Where such barriers are low, the merged firm is more likely to be constrained by entry; conversely, this is less likely where barriers are high.[578]

9.15    We have considered whether there are barriers to entry or expansion in relation to the provision of GIFs. This directly informs our views as to whether there are any countervailing factors to the adverse effects we identified in Chapter 8, Vertical Effects (in relation to the supply of social media services worldwide (including in the UK)).

9.16    Barriers to entry and expansion in the provision of GIFs are also relevant to our consideration of countervailing factors in relation to the SLC identified in Chapter 7, Horizontal Effects (relating to the supply of display advertising services in the UK), as developing a GIF business is a precondition to providing GIF-based advertising, such as GIPHY's Paid Alignments offering. In this chapter, we also consider other specific barriers relating to expansion into GIF advertising before setting out our view on whether there are any countervailing factors in relation to the adverse effects we have identified in Chapter 7.

9.17    Based on the evidence gathered from Parties' submissions, the Parties' internal documents and evidence submitted by third parties, we consider that there are at least five key requirements that are needed to effectively compete in the provision of GIFs. These are:

   (i)   A large, high-quality content library;

   (ii)  A sophisticated search algorithm;

   (iii) Scale and brand;

   (iv)  A viable monetisation model; and

   (v)   Capital.

---

[578] Merger Assessment Guidelines (CMA129), paragraph 8.40.

PX0684-288

9.18   These five requirements are explained in further detail below and are also discussed in Chapter 4, Industry Background, and Chapter 5, Market Definition and Market Power.

*A large, high-quality content library*

9.19   The evidence gathered during our investigation indicates that there are several important characteristics of a GIF library that would need to be met by a new entrant looking to provide GIFs at scale or by a smaller provider looking to expand:[579]

(i)   An extensive library of GIFs;

(ii)   The GIFs should be current and culturally relevant;

(iii)   GIFs included in the search index need to be moderated to exclude any offensive, abusive or discriminatory content;

(iv)   The library should contain branded and original GIFs; and

(v)   Content from brands should have relevant intellectual property rights obtained through the official channels.

9.20   GIPHY's internal assessment of its library in comparison with its competitors highlights these features (specifically, a licensed library; content ratings; moderation tech and team; content safety; content formats; and global development tools) and demonstrates the superiority of GIPHY's library when compared to those of its competitors (Figure 21).

**Figure 21: GIPHY internal analysis (2019) of its content compared to its competitors**

[✂]

9.21   We consider that in order to provide users with content that is relevant to a particular search term, it is important that GIF providers **maintain an extensive library.** Indeed, in Chapter 5, Market Definition and Market Power, we discussed how third parties considered it to be an advantage that GIPHY has a large inventory and in Chapter 8, Vertical Effects, we discussed the challenges to replicating GIPHY, including in developing a sizeable GIF library.[580]

---

[579] Further detail on the core activities of a GIF provider, including sourcing, moderating, and hosting a library of GIF content is provided in Chapter 4, Industry Background.
[580] See the section on GIPHY's competitors and substitutability in Chapter 5, Market Definition and Market Power and the section on Ease of replicating GIPHY in Chapter 8, Vertical Effects.

PX0684-289

9.22   Having an extensive library of GIFs is clearly an important characteristic of GIF providers, and we consider that this may present a considerable challenge when entering or expanding. Facebook estimated that it would require '[✂]'. GIPHY's investor documents also demonstrate the amount of time required to build a large content library; for example, [✂].

9.23   [✂] as Gfycat was currently 'significantly behind' GIPHY in relation to both quantity and quality. [✂].

9.24   Evidence obtained during our investigation has also indicated the importance of GIFs being **current and culturally relevant**. Although not included in Figure 21 above, cultural relevance is clearly viewed as important by GIPHY's API partners, along with the speed with which current content is made available to users by GIPHY. As noted in Chapter 8, Vertical Effects, [✂]. As noted in Chapter 2, The Parties, Merger and Rationale, one of Facebook's stated reasons for the Merger related to GIPHY's creative team, who Facebook considered could 'accelerate Facebook's efforts around other creative expression use cases across its services'. For these reasons, we also consider the cultural relevance of GIFs to be an important feature for new entrants or those looking to expand.

9.25   One of the features assessed in Figure 21 is the providers' 'moderation tech and team'. As discussed in Chapter 4, Industry Background, **well-moderated** content is important to social media platforms, including those who partner with GIPHY, as offensive content would degrade the user experience, and may cause reputational damage to the social media platform and expose it to legal liability. Various parties (including Facebook) have told us that they placed importance on the library being well-moderated to remove inappropriate content.[581] In order to attract distribution partners, we therefore consider that moderation is an important feature of the provision of GIFs.

9.26   In relation to the source of a GIF library's content, our investigation has indicated that it is important for a GIF provider to have both **original and branded GIFs**. One API partner that we spoke to stated that GIPHY's library contained a large number of branded and professionally produced content in its searchable library which made its GIFs more commercial from a monetisation perspective. In particular, GIPHY's GIFs contain branded

---

[581] For example, the Parties have submitted that one dimension in which GIF providers compete is by ensuring that their content is appropriately moderated. [✂] noted that it considers GIPHY able to do a better job than competitors of screening out objectionable, controversial content. Gfycat told us that one advantage of GIPHY's library (over its own) is that it is largely free from offensive content, which makes it easier to publish on partner platforms without internal filtering/moderation, [✂].

PX0684-290

content that is in line with the terms that a user may search for on a platform, increasing their monetisation potential.

9.27  Additionally, availability of content from a variety of sources has been raised as an important aspect of GIF-provision, and a distinguishing feature of GIPHY. This is discussed further in Chapter 4, Industry Background and highlights the importance of the volume of GIFs required by users to find a GIF library attractive, as well as the variety of sources of GIFs (user-generated, branded, professionally created by artists or an in-house team). For example, TikTok told us that it believes that a balance between professional-quality branded content (for example, from studios and media providers) and UGC helps to enhance its users' experience. This implies a co-dependency, and cross-side network effects between the size of the library and the scale that a GIF provider has to reach in order to be attractive to users, API partners, brands and advertisers.

9.28  One third party commented on the challenge of generating brand partnerships, noting that GIPHY's 'far greater scale' makes it a more attractive platform for branded content partnerships.

9.29  Finally, in relation to the need for GIF providers to own the relevant **intellectual property rights** to their GIFs, an internal memo of one of GIPHY's investors stated that GIPHY's official licences held for its content were a strong barrier to entry and expansion as it was recognised that in some cases it had taken GIPHY over [✂] to secure them.

9.30  GIPHY presented an alternative view that content rights are not required to enter or compete in relation to GIF provision and noted that it had initially spent a lot of time and money obtaining content rights. The Parties have submitted that GIPHY was incorrect to believe that there was a gap in the market for high-quality, licensed GIFs, and that there is little appetite from brand partners to enforce licence exclusivity as it is not in their interests to do so, instead focusing on ensuring that their content is available as widely as possible.

9.31  However, during the course of our investigation, a number of third parties have mentioned content rights as an important factor for some platforms in being willing to partner with GIPHY. For example, one third party told us that many GIFs contain intellectual property that is owned by others, which meant GIF providers are not able to easily copy each other's content without taking on significant legal risk. Chapter 4, Industry Background contains further discussion of licensing rights to content.

PX0684-291

*A sophisticated search algorithm*

9.32   The Parties submitted that the search functionality used by a GIF provider is relatively straightforward and can be easily replicated. In particular, GIPHY noted that the technology behind GIPHY had become 'commoditised' and had only taken one week to develop.

9.33   However, according to one of GIPHY's internal documents, determining the intent of the search term is much more complex in the context of a GIF than the intent that a user may have when using a search engine such as Google or Bing. GIFs are a method of expression and a GIF provider's search algorithm has to cater for a myriad of possible meanings of what the search term may represent which requires sophisticated search algorithms.

9.34   Another of GIPHY's internal documents sets out GIPHY-specific innovations in relation to the ranking of search terms, as well as the utilisation of behavioural models and image feature models that require large datasets, engineering time and cost to develop in addition to the readily available search programmes.

9.35   One social media platform commented on the strength of GIPHY's search algorithm when compared with that of Gfycat. This platform provided the example of the popular HBO show Mare of Easttown, where a search of the show's name on Gfycat appears to result in the provision of entirely irrelevant content – much of which appears to be GIFs from TV shows and movies with the word 'of' in the title. In contrast, a search of the show's name on GIPHY returns hits which are clearly relevant to Mare of Easttown.

9.36   This point is further reflected in [✂].

9.37   As set out in more detail in Chapter 4, Industry Background, we have also heard from third parties that search algorithms are a particularly important aspect of GIF provision:

   *(a)* Viber noted that the search element of GIF provision is just as important as the quality of the library.

   *(b)* One social media platform described conducting tests on its users' preference for GIFs and stickers provided by one provider when compared to another. In such tests, the users preferred GIPHY's suggested outputs to those provided by the alternative providers. We consider that this further confirms the importance of the search algorithm in the provision of GIFs and GIF stickers.

PX0684-292

9.38    Therefore, we consider that a sophisticated search algorithm is necessary to compete effectively in the supply of GIFs, and the availability of off-the-shelf search algorithms or pre-existing datasets used for other types of search does not facilitate entry into the provision of GIFs to an adequate quality standard.

*Scale and brand*

9.39    In addition to the importance of scale to the GIF provider's ability to train its search algorithms, the scale at which a GIF provider operates has been identified as one of the critical features of GIF provision. Scale relates to the size of the user base, which is determined by the distribution networks (eg social media platforms) through which the content is served. As discussed in Chapter 4, Industry Background, the dependence of content on the amount of user traffic and vice versa may give rise to cross-side network effects which create a barrier for smaller GIF providers to grow and gain access to large API partners.

9.40    One [✄] expressed the views that GIPHY's reach through its distribution network is by far the largest, making it difficult for an entrant to replicate. GIPHY was described as having an elevated reputation in the brand/media space as a result of its first-mover advantage and its partnerships, meaning that it has more consumer brand awareness and more partner integrations. [✄].

9.41    One GIF provider stated it is currently difficult to form relationships with third party platforms as there is little willingness among platforms to allow new, smaller, GIF suppliers to distribute their GIFs through those platforms and so, to compete with the larger GIF suppliers.

9.42    However, as noted above at paragraph 9.12(a), the Parties submitted that the costs of product development are low and network effects can be accessed by multiple firms simultaneously through end user multi-homing (which the Parties submitted is common).

9.43    As noted in Chapter 5, Market Definition and Market Power, multi-homing does appear relatively common among the large social media platforms. For example, WhatsApp is supplied by both GIPHY and Tenor, with individual users randomly assigned to one or the other provider. Facebook Blue and Messenger are also served by both GIPHY and Tenor, as are Twitter, [✄], and Kika.

PX0684-293

9.44    However, some platforms have only one GIF supplier: notably, TikTok and Instagram (which are supplied solely by GIPHY)[582] and [✂], Viber, and [✂] (which are supplied solely by Tenor). Moreover, while a number of platforms use both GIPHY and Tenor, currently, only [✂] and Apple appear to source their GIFs and stickers from *more than* two providers. No evidence has been submitted to us that any significant social media platform is multi-homing with, or has switched to, suppliers other than GIPHY or Tenor. The ability of smaller GIF providers to secure these partnerships in the future and at scale is uncertain as the majority of the existing large social media and messaging platforms appear to already have at least one GIF supplier and these are often with the largest GIF providers (Tenor and GIPHY).[583]

9.45    This view was also supported by one of GIPHY's previous investors, noting there are few natural barriers but GIPHY's scale enabled it to create a strong barrier against its potential competitors. [✂].

9.46    GIPHY's scale and brand are also discussed in Chapter 5, Market Definition and Market Power, which considers GIPHY's position as a provider of GIFs in more detail, and concludes that there is a lack of a range of effective alternatives to GIPHY, with only Tenor offering a comparable service.

9.47    Facebook itself estimates that replicating the relationships with GIPHY's existing API partners would take two years. However, this estimate excluded the time it would have taken for GIPHY to build its relationships with Facebook's family of apps which significantly underestimates the time required to build such relationships, especially as Facebook's applications currently represent a significant proportion of GIPHY's API traffic.[584]

9.48    As noted in Chapter 8, Vertical Effects, GIPHY's prominence on social media platforms offers GIPHY brand recognition with potential brand partners, end users for its O&O channel as well as prospective employees, which reinforces GIPHY's position in GIF provision and allows GIPHY to continue to improve its services to ensure its prominence across social media platforms.

9.49    From a technical perspective, a GIPHY internal note on the assessment of barriers to entry presents the interdependence created when GIPHY's GIFs are integrated into more than one feature on the API partner's platform as follows:

---

[582] TikTok is supplied solely by GIPHY in the UK, Europe, and US.
[583] Further detail on characteristics and trends in GIF supply and usage is provided in Chapter 4, Industry Background.
[584] See Figure 10, in Chapter 4, Industry background, for a breakdown of GIPHY's third party search volume globally, by API partner.

PX0684-294

'[✂]'

9.50　This demonstrates the additional costs, time and technical expertise requirements for both the GIF providers' and the API partners' perspectives when providing multiple points of integration, which can act to some extent as a barrier to switching.

*Viable monetisation model*

9.51　In addition to creating the components required in the provision and distribution of a searchable GIF library, a new entrant or an existing player would also need to formulate a viable monetisation model. Currently, we have identified three possible routes which a GIF provider could take to sustain themselves, though this is not exhaustive:

　　*(a)*　Vertical integration/acquisition;

　　*(b)*　Monetisation through advertising; or

　　*(c)*　Other revenue opportunities (such as a 'platform fee' model).

9.52　Chapter 6, Counterfactual, discusses GIPHY's own consideration of these options. However, when considering whether entry or expansion by third parties would be timely, likely and sufficient to mitigate or prevent an SLC from arising, we are considering the post-Merger world, in which Facebook has acquired GIPHY. Any new entrant or smaller provider looking to expand would likely face considerably greater barriers to monetisation and viability more generally than those experienced by GIPHY prior to the Merger, as they would lack GIPHY's advantages in relation to scale, distribution relationships, and relationships with brands and advertisers, as has been discussed earlier in this chapter.[585] Further detail on GIPHY's market power and the replicability of GIPHY is set out in Chapter 5, Market Definition and Market Power and Chapter 8, Vertical Effects.

9.53　Recent acquisitions of [✂] GIF providers by large online platforms (eg Facebook's acquisition of GIPHY and Google's acquisition of Tenor [✂]) indicate that **vertical integration** with an online platform is an option for GIF providers to secure the resources required for its operations while providing what is perceived as an important input for social and messaging platforms. In practice, such vertical integration could arise either through acquisition or an online platform developing its own GIF service. However, we note that either

---

[585] We note that if Facebook were to foreclose access to GIPHY's services to rival social media platforms, those platforms who were subject to foreclosure might consider switching to a new entrant or a smaller provider looking to expand. Further discussion on foreclosure is contained in paragraph 8.48 of Chapter 8, Vertical Effects.

PX0684-295

of these routes would be costly for the online platform concerned.[586] Moreover, the main interest in acquiring GIPHY came from Facebook and [✂],[587] and in a scenario where Facebook owns GIPHY and [✂], it is not clear that a new entrant – without the established brand and library of GIPHY – would be of interest to any online platform.

9.54   In relation to **monetisation through advertising**, the challenges encountered by GIPHY with its Paid Alignment model (as discussed in more detail in Chapter 7, Horizonal Effects) would be more acute for existing competitors looking to enter similar relationships and commence monetising their content, or for those looking to enter the GIF provision service by generating revenue through digital advertising. In particular, a new entrant will need to focus on developing their monetisation strategy in parallel to scaling the business. If the monetisation model involves entry into the display advertising market (see Chapter 5, Market Definition and Market Power for further detail), in our view, the entrant and/or existing smaller player would have to:

(a)   develop the relationships with the brands and intermediaries (in addition to the development of the relationships with the API partners, and content providers);

(b)   gain brands' trust in a new method of advertising and compete for a portion of the digital advertising budget; and

(c)   scale the number of advertisers to grow revenue (rather than growing revenue with individual advertisers).[588]

9.55   The challenges of monetisation faced by GIF providers are reflected in the Parties' submissions as set out at paragraph 9.10 above, which referred to GIF 'use cases and business models are still evolving' demonstrating the nascence of GIF providers' ability to generate revenue from monetising the provision and distribution of GIFs and stickers.

9.56   In relation to other routes to revenue generation for GIF providers, GIPHY considered the option of introducing a **platform fee** for API partners (see Chapter 6, Counterfactual for further detail). In addition, Imgur charges a fee for commercial use of its API.[589] GIPHY submitted that platform fees were never its preferred option for a number of reasons, including because of its focus on the Paid Alignment model and its view that [✂].

---

[586] See paragraph 9.61 below for further discussion of the capital required to develop a GIF library, and Chapter 6, Counterfactual for discussion of the valuation of GIPHY.
[587] See Chapter 6, Counterfactual, for further detail.
[588] GIPHY established a good relationship with [✂] who since 2017 have spent [✂] with GIPHY. [✂].
[589] See Chapter 5, Market Definition and Market Power.

PX0684-296

9.57   In Chapter 6, Counterfactual (see paragraphs 6.56 to 6.62), we found that this (or some other form of commercial arrangement with API partners) was a potential short-term solution which would have helped to ensure GIPHY's continued survival through the Coronavirus (COVID-19) pandemic. We also note that some key API partners, such as [✂] and Facebook were willing to at least consider paying a platform fee. However, the platform fee option was not GIPHY's preferred method of monetising and was not likely a longer-term strategy of GIPHY, and we think it likely that GIPHY would have sought other sources of funding to pursue its efforts to expand in the relevant markets.[590] For the reasons set out in paragraph 6.61, it is unclear to what extent other providers of GIFs could have relied on a platform fee (or similar arrangement) to monetise their business. In addition, we note that, at the time that it was seeking to negotiate a platform fee arrangement with its API partners, GIPHY was a leading and high-quality GIF provider on which the platforms concerned depended to support their user engagement.[591] In contrast, it would be more challenging for a new entrant to attract online platforms willing to pay a platform fee to access their GIFs, when they are not already a leading provider such as GIPHY.

9.58   Overall, as noted above, post-Merger, a new entrant or a provider looking to expand, would likely face considerably greater barriers to monetisation and viability than those experienced by GIPHY prior to the Merger, as they would lack GIPHY's advantages in relation to scale, distribution relationships, and relationships with brands and advertisers.

*Capital*

9.59   One of GIPHY's competitors explained that GIPHY's early access to capital enabled it to gain scale quickly through the funding it obtained, in comparison to its competitors.

9.60   A new entrant would need to have access to a similar source of internal and/or external funding to facilitate its growth and scale up its operations while potentially incurring losses. [✂]. However, access to capital would also be dependent on expected returns, and the presence of other large GIF providers such as GIPHY and Tenor may influence investor confidence. The preceding discussion on the need for scale and the requirement for a viable model of monetisation indicates a particular challenge for new entrants or smaller providers looking to expand, in that investors may be less willing to fund a new GIF business now, in comparison to when GIPHY and Tenor were

---

[590] See paragraph 6.61 and 6.62.
[591] See Chapter 8, Vertical Effects for more discussion of the importance of GIFs to user engagement.

PX0684-297

new to the market, as the expected returns would be smaller when divided amongst the existing large players.

9.61   The capital required to replicate the size of GIPHY's library would be large. By way of example, one third party submitted that the cost of developing GIF stickers can vary and on average can cost between USD 150 and USD 350 per sticker. GIPHY's existing library of GIF stickers contains [✂] stickers which would imply an average cost to replicate the library of around USD [✂].[592]

9.62   As noted in Chapter 4, Industry Background, GIPHY submitted that content is regularly scraped/copied by competitors implying that a new entrant can easily copy the content from the existing GIF providers. However, GIPHY's API partners have noted the importance of working with a GIF provider that has the required licences for the content included in its searchable library which minimises the legal risks for these partners and makes the GIF providers more attractive to work with.

9.63   Although GIPHY noted the risk of enforcement of licences is low, GIF providers must also take into account their attractiveness to content creators who use their tools and library to publish content.

*Our view on barriers to entry and expansion*

9.64   The long list of attributes required by a GIF provider discussed above demonstrates the existence of high barriers to entry and expansion. This is consistent with the views of one social media platform, that, when presented with a list of parameters that a GIF provider should possess, such as: large quantity of content, varied sources of GIFs and GIF stickers (from brands, celebrities, artists, originally created), large scale/distribution, moderation of content, cultural relevance, relationship with brands, ownership of IP, search algorithm and brand recognition, replied '[a]ll of the above mentioned features are important for a GIF/sticker provider, and a GIF/sticker provider could not be successful unless it excelled in many of these areas'.

**Evidence of recent entry or expansion and prospects of further entry or expansion**

9.65   We now consider whether there have been any examples of entry or expansion in the markets for the provision of searchable GIFs and GIF-based advertising in recent years which may indicate whether this may also be likely

---

[592] The USD 1.5 billion is based on the average cost of USD 250 per sticker which is multiplied by GIPHY's existing number of stickers [✂].

PX0684-298

post-Merger in the event of increasing price or worsening non-price terms to customers and/or suppliers. We also consider the evidence relating to the prospects of entry or expansion following the Merger.

*Evidence of recent entry and prospects of entry in relation to the provision of searchable GIF libraries*

9.66   The Parties provided three examples of recent entries in relation to the provision of GIFs, namely:

(a)   Gfycat,[593] which launched in 2015;

(b)   Vlipsy,[594] which launched in 2017 and reportedly raised USD661k in its latest funding round in 2019;[595] and

(c)   Holler, which the Parties submitted entered the market in 2018 and recently raised USD36m of external funding.[596]

9.67   As set out in Chapter 5, Market Definition and Market Power, our investigation has indicated that these providers are not of the same size, scale or quality as GIPHY and Tenor.

9.68   Facebook's internal assessment of smaller players, as set out in its internal documents, suggests that [✂] GIF and sticker inventory is of a lower standard than that of GIPHY and that [✂] would not be able to replace GIPHY on its own. It also described [✂] reported limitations as relating to its lack of existing integration with Facebook products and limited investments in content moderation. [✂] did not feature in Facebook's internal assessment of alternative providers. During our investigations, Holler told us that it did not consider itself to compete closely with GIF suppliers, and that its business was instead focused on bringing together third party content providers, including GIF suppliers, and users ([✂]).[597]

9.69   The Parties also submitted a list of much smaller-scale GIF providers[598] such as Reaction GIFs, GIFBin, Imgflip, Anmimoto, Sticker Mania and Stipop. The competitive constraints on GIPHY are discussed in more detail in Chapter 5,

---

[593] Gfycat.com Gfycat describes itself as a platform which offers faster speed of GIFs, ability to create larger GIFs or video sizes and unique features for creating GIFs and videos.
[594] Vlipsy.com Vlipsy describes itself as a search engine that enables users to search the internet for trending video clips which then can be shared by the users.
[595] Pitchbook.com.
[596] Techcrunch.com. We note that online sources in fact suggest that Holler entered the market earlier than 2018 with a focus on news and video content before shifting emphasis to messaging in 2016.
[597] The CMA also notes that the Holler website suggests that Holler also has a partnership with GIPHY, Tenor, Gfycat and GIFSKey to offer video GIFs.
[598] These players are categorised as small-scale due to the Parties' inability to provide any information on the size of the library, daily or monthly active users and the volume of GIFs searched and delivered.

PX0684-299

Market Definition and Market Power, which concludes, based on third party evidence and the Parties' submissions, that smaller GIF suppliers do not have the required scale or quality of content that is expected by the distribution partners who utilise GIFs on their platforms.

9.70    In addition, the Parties provided examples of new entrants in the provision of GIF creation tools that are available to users through iOS and Android app stores, such as GifYou,[599] GIF Maker by Momento[600] and GIF Maker – GIF Editor.[601]

9.71    We recognise that although these GIF creation tool providers offer one of the services that GIPHY provides (namely, the ability to create GIFs), they do not supply and distribute a library of GIFs and GIF stickers or serve as a repository to share or retrieve the GIFs and stickers (as set out in Chapter 4, Industry Background). Therefore, they do not impose a significant, if any, competitive constraint on GIPHY, Tenor and Gfycat and are unlikely to do so soon. See Chapter 5, Market Definition and Market Power, and Chapter 8, Vertical Effects, for further discussion of alternative GIF providers and the competitive constraints imposed on GIPHY.

9.72    In addition, we saw no evidence of existing social media platforms which are not currently integrated with a GIF provider planning or intending to enter into GIF provision through self-supply:

   *(a)* Facebook itself considered self-supplying GIFs as an alternative to the Merger but discounted the option (further detail is provided in Chapter 6, Counterfactual); and

   *(b)* The evidence we have seen indicates that [✂] does not currently have any plans to self-supply GIFs, instead extending [✂].[✂]

9.73    As noted in Chapter 4, Industry Background, there has been long-term growth in GIPHY's search traffic. The general long-term growth in GIF usage can be (at least partly) explained by the GIF format becoming more popular among users, which could encourage new entry and provide scope for existing players to expand. However, other factors may deter entry into the supply of searchable GIF libraries:

   *(a)* Following the Merger, the majority of social media and messaging platforms would either own GIF providers, or otherwise have long-

---

[599] GifYou was launched in 2019 and describes itself as an animated sticker maker (available for download through mobile phones).
[600] GIF Maker by Momento was launched in 2016 and can be accessed via a mobile phone only.
[601] GIF Maker – GIF Editor launched in 2018 and is also a mobile app which offers GIF maker tools, GIF editing and video making tools.

PX0684-300

standing relationships with GIF providers. As noted above, the Parties submitted that it was therefore unclear that barriers to entry and expansion would intensify as a result of the Merger. However, we consider that these developments may decrease the incentive for new entrants to enter, since:

(i) The possible route for exit through a sale is diminished, as well as the ability to secure a distribution relationship with these large platforms becoming more challenging.

(ii) While multi-homing may be possible, these relationships between the platforms and GIF providers would reduce the size of the opportunity for a new entrant to gain necessary scale, when compared to the same opportunities for entering and scaling that were present when GIPHY first entered, and therefore may deter such entry and expansion.

(b) Furthermore, at Chapter 5, Market Definition and Market Power, we found that Facebook has significant market power in both social media and display advertising. This was also in line with a finding in the CMA's Market Study that Facebook has significant market power in these markets, supported by its large ecosystem that increases barriers to entry.[602] The Market Study also found that the presence of incumbents which have been found to have significant market power or have been known to respond strongly to new entrants can further deter and/or postpone entry by new players.[603]

9.74 The Parties also submitted that if there were any barriers to entry as a result of GIPHY's presence and scale, these would fall away as a result of the Merger and any hypothetical foreclosure strategy, which would mean improved opportunities for smaller players to develop relationships with large API partners to grow in size and quality.[604] We have considered in Chapter 8, Vertical Effects, paragraph 8.48, whether foreclosure by Facebook would affect the ability and incentive of other platforms to expand. Similar

---

[602] Market Study, Appendix E: ecosystems of Google and Facebook: 'An important characteristic of an ecosystem is the presence of complementarities and interdependencies between economic activities. In a platform ecosystem, these interdependencies can be heightened as the platform owner sets the architectural design of interfaces which determine how other products and services can interconnect. The platform firm also sets rules for participation in the ecosystem by third parties such as app developers, device manufacturers, advertisers and publishers, and decides how its design evolves over time. This position can enable the platform to expand into related markets, which can give rise to potential efficiencies, as well as concerns such as insulating its most profitable products from competition'.
[603] Market Study, paragraph 71 – 72, 2.84, 6.10.
[604] Parties' Response to Provisional Findings, paragraph 8.4.

PX0684-301

considerations apply as to whether such foreclosure would remove barriers to entry.

9.75  Overall, while there has been some evidence of entry into the supply of searchable GIF libraries in recent years, our investigation has indicated that other providers are not of the same size, scale or quality as GIPHY and Tenor. As discussed in further detail in Chapter 5, Market Definition and Market Power and in Chapter 8, Vertical Effects, we also consider that it is it very unlikely that a new GIF-supplier will emerge in the near future as an effective alternative to GIPHY and Tenor for the provision of searchable GIF libraries.

*Evidence of recent expansion and prospects of expansion in relation to the provision of searchable GIF libraries*

9.76  We have also seen limited evidence of any recent expansion, or prospects of expansion, in the provision of searchable GIF libraries.

*Gfycat*

9.77  [✂].

9.78  [✂].

9.79  [✂], as Gfycat's library was 'significantly behind GIPHY's both in terms of quality and quantity', [✂].

9.80  [✂], and that when searching for GIFs of popular TV shows, Gfycat has only a small fraction of the GIFs that GIPHY has (for the popular TV show Bridgerton, for example, Gfycat has less than 2% of the number of GIFs that GIPHY has). [✂].

9.81  In the Parties' Response to Provisional Findings, the Parties submitted that [✂].[605] We considered this argument in Chapter 8, Vertical Effects at paragraph 8.20, where we noted that:

(a)  The evidence set out in Chapter 5, Market Definition and Market Power shows that at the time of this investigation, Gfycat's offering was lower quality and was of significantly smaller size than the offerings of GIPHY and Tenor.

---

[605] Parties' Response to Provisional Findings.

PX0684-302

(b) For the reasons set out at paragraphs 8.20 and 8.21, we consider it very unlikely that Gfycat will emerge in the near future as an effective alternative to GIPHY and Tenor, and in the longer term, given GIPHY's significant scale and head start, we expect that these barriers to expansion will prevail.

9.82   On this basis, and taking into account the barriers to expansion into the provision of GIF libraries that we discuss elsewhere in this chapter, we do not consider that Gfycat would have been likely to expand in the near future to become an effective alternative to GIPHY.

*Holler*

9.83   Holler describes itself as a 'conversational media company' and offers users access to content, including its own, and third party, GIFs and stickers.[606] Holler raised USD36 million of external funding in 2021. This provides evidence of investor appetite for this type of content format and is of particular interest given that Holler does not appear to have yet proven its monetisation model (a sponsored GIF sticker product), and that most large API partners already have GIF provision, with limited appetite from API partners to multi-source GIFs.[607] However, as noted at paragraph 9.61 above, the level of capital required to grow a GIF library of the size of GIPHY's is large, and it is unclear whether this level of funding would be sufficient to enable timely expansion at the scale required, particularly given [✂]. Holler told us that while, as a start-up, [✂].However, Holler is restricted by its current library content and size of its library, which does not appear to be comparable to that of GIPHY's as previously discussed in Chapter 5, Market Definition and Market Power.

9.84   Holler itself described the challenges of developing its business. Namely, [✂]. We also consider that Holler's expansion efforts may be limited by its business model. We understand from discussions with third parties and from Holler's published Terms of Service that Holler's SDK (which is available free of charge) collects a relatively extensive amount of data; whereas its API (for which is has more minimal data requirements) charges a monthly subscription fee, potentially making it less attractive to API partners than the models of GIF provision offered by other providers.[608]

---

[606] We note that Holler does not see itself as competing closely with GIF suppliers such as GIPHY and [✂]. Holler sees itself as a business that brings GIF suppliers and users together. The CMA also notes that the Holler website suggests that Holler also has a partnership with GIPHY, Tenor, Gfycat and GIFSKey to offer video GIFs.
[607] Techcrunch.com. Multi-homing and switching is considered further at Chapter 5, Market Definition and Market Power.
[608] Further discussion is contained at Chapter 5, Market Definition and Market Power.

PX0684-303

9.85    The Parties submitted that, given Holler had recently raised USD36 million in funding (which the Parties submitted [✂]) it was irreconcilable to conclude that it was unclear whether this level of funding would be sufficient to enable timely expansion at the scale required.[609]

9.86    Despite Holler's recent fundraise, we do not consider that this would have enabled it to expand at the scale required in a timely manner. As set out in more detail in Chapter 5, Market Definition and Market Power, the evidence indicates that Holler is very small and does not compete meaningfully with GIPHY (Holler itself does not see itself as competing closely with GIF suppliers). [✂],[610] [✂]. As noted above, the level of capital required to grow a GIF library of the size of GIPHY's is large, and the sum raised by Holler in its recent funding round, though sizeable, is significantly lower than the sum total raised by GIPHY in the past.[611]

9.87    On this basis, and taking into account the barriers to expansion into the provision of GIF libraries that we discuss elsewhere in this chapter, we do not consider that Holler would have been likely to expand in the near future to become an effective alternative to GIPHY.

*Conclusion on entry and expansion into the provision of searchable GIF libraries*

9.88    In view of the evidence set out in Chapter 5, Market Definition and Market Power, Chapter 8, Vertical Effects, and above, we conclude that it is it very unlikely that a new GIF supplier will emerge in the near future as an effective alternative to GIPHY and Tenor for the provision of searchable GIF libraries. As regards existing providers of GIFs, given GIPHY's significant scale and head start, we expect that barriers to expansion will prevail and there will continue to be significant uncertainty over access to effective alternatives to GIPHY.

*Evidence of expansion into GIF-based advertising*

9.89    We have also seen some limited evidence of GIF providers looking to expand into the provision of advertising through GIFs (for example, with formats similar to GIPHY's Paid Alignment model). GIPHY has been making efforts to expand in this area since 2017 (facing considerable barriers to doing so, as

---

[609] Parties' Response to Provisional Findings, paragraph 8.4.
[610] [✂]. The CMA also notes that the Holler website suggests that Holler also has a partnership with GIPHY, Tenor, Gfycat and GIFSKey to offer video GIFs.
[611] As noted in Chapter 6, Counterfactual, GIPHY raised USD40m of funding in 2019 alone.

302

PX0684-304

set out above) and, as set out in Chapter 7, Horizontal Effects, was already important to the dynamic competitive process at the time of the Merger.

9.90   We discussed at paragraph 9.4 that for entry or expansion by a GIF provider or providers to mitigate or prevent the adverse effects arising from the Merger, such entry or expansion would need to result in such GIF providers, individually or collectively, playing a similarly important role in the dynamic competitive process to that played by GIPHY at the time of the Merger. We also noted at paragraph 9.6 above that subsequent entrants would not necessarily have the same first-mover advantage GIPHY enjoyed as a leading GIF provider or, consequently, the same importance to the dynamic competitive process. As such, we consider that these other providers looking to expand into the provision of advertising through GIFs are likely to be some way behind GIPHY's position at the time of the Merger.

9.91   The limited evidence that we have seen of GIF providers looking to expand into the provision of GIF-based advertising is as follows. Further discussion is contained in Chapter 7, Horizontal Effects:

(a)   One of GIPHY's former Paid Alignment customers, told the CMA that Holler [✂]. Another of GIPHY's former Paid Alignment customers currently advertises with Holler for distribution on the Venmo platform. The customer described this engagement as having been 'built off the success we saw with the [GIPHY] team'. Holler told us that its revenue-generation model focuses on [✂]. This is currently available in the US only [✂]. While GIPHY works with some of the largest social media and messaging platforms and has revenue-sharing agreements with platforms such as Samsung, Kika, and Tinder, Holler [✂].[612] Holler emphasised [✂]. Holler also provided its revenue figures for the past 5 years,[613] and we note that its revenues are [✂] below those generated by GIPHY in the same period.

(b)   [✂].

(c)   [✂].

### Our assessment

9.92   In light of the evidence discussed above, we have considered whether entry or expansion in the supply of searchable GIF libraries, and the supply of a GIF-based advertising model, by third parties would be timely, likely and

---

[612] [✂].
[613] Holler started generating advertising revenues in [✂].

PX0684-305

sufficient to mitigate or prevent any SLC from arising. We set out at paragraphs 9.2 to 9.8 above the framework for this assessment.

*Entry or expansion into the provision of searchable GIF libraries*

9.93   We have considered the timeliness, likelihood and sufficiency of any entry and expansion from existing players and third parties into the provision of searchable GIF libraries following the Merger, and the extent to which this could mitigate or reduce the adverse effects identified at Chapter 8, Vertical Effects, above.

9.94   In relation to likelihood, the evidence discussed above shows that recent entrants are not of the same size, scale or quality as GIPHY and Tenor, and various factors may deter entry into the supply of searchable GIF libraries, including the existence of barriers to entry (see paragraph 9.64) and the factors discussed at paragraph 9.73. On this basis, we consider that it is very unlikely that a supplier of searchable GIF libraries will emerge in the near future as an effective alternative to GIPHY and Tenor for the provision of searchable GIF libraries.

9.95   In terms of timeliness, as noted at paragraph 9.6 above, for entry or expansion to prevent or mitigate the adverse effects of the Merger, it would need to occur in a short timeframe. For the reasons set out at paragraph 9.88, the evidence indicates that no such entry or expansion would occur in the near future. In particular with respect to potential expansion by Gfycat and Holler:

(a)   [✕]. We also note that Gfycat is currently considered inferior to GIPHY not just in quantity of GIFs but also quality; even if Gfycat is able to expand the size of its library, it is not clear that it will be able to compete with GIPHY in relation to features such as moderation or provision of branded GIFs in the near future.

(b)   We also note Holler's recent fundraising efforts; however, the timeliness of any expansion as a result of this increased funding, or indeed what this expansion would look like given Holler's differentiated offering (and hence its sufficiency to prevent any SLC from arising), is not clear, particularly in the context of the challenges to entry and expansion, including those emphasised by Holler,[614] set out earlier in this chapter.

9.96   With respect to sufficiency, we note at paragraph 9.4 that in order to be sufficient, entry or expansion would need to result in rivals to Facebook's

---

[614] [✕].

PX0684-306

social media services being able easily to switch away from Facebook to a range of effective alternative suppliers of GIF services.  We note that it had taken each of Tenor and GIPHY at least six years to reach their scale at the time of the Merger. There are no current smaller competitors that have been identified by the CMA as having the potential to grow to be comparable with Tenor or GIPHY in terms of distribution network, user base, or size and quality of their library in the near future. As noted in Chapter 5, Market Definition and Market Power, as yet, other than Tenor and Gfycat, the alternative providers mentioned by the Parties have not been able to reach a size, scale or level of quality to compete meaningfully with GIPHY. Due to the barriers to entry and expansion set out above, we consider it unlikely that any of them will be able to do so at sufficient scale to become an effective alternative supplier of GIF services.

9.97   Therefore, on the basis of the evidence set out above and elsewhere in this Final Report, our view is that it is not likely that entry or expansion into the provision of searchable GIF libraries would occur at sufficient scale or in a timely manner in order to prevent or mitigate the impact of any SLC arising as a result of the Merger.

*Entry or expansion into the provision of GIF-based advertising*

9.98   We have also considered the possibility of entry and expansion into some form of GIF-based advertising model, similar to GIPHY's Paid Alignment offering, and the extent that this would be timely, likely and sufficient to mitigate or prevent any SLC identified at Chapter 7, Horizontal Effects from arising.

9.99   In their response to our Provisional Findings, the Parties submitted that the CMA's treatment of countervailing factors was inconsistent with its treatment of the Counterfactual (Chapter 6) and the theories of harm (Chapters 7 and 8). In particular, the Parties submitted that if the assumption in the CMA's counterfactual and horizontal theory of harm that GIPHY would be able to successfully monetise was correct, the CMA should also consider Paid Alignment a credible route to monetisation for companies such as Gfycat and Holler.[615]

9.100  However, it is not correct that our counterfactual and horizontal theory of harm, as described above, assume that GIPHY will be able to successfully monetise through its Paid Alignment model. To the contrary:

---

[615] Parties' Response to Provisional Findings, paragraph 8.3.

PX0684-307

(a) In Chapter 6, Counterfactual, we conclude that GIPHY would have continued to explore (with the financial and commercial support of its investors) various options to further monetise its products. This included Paid Alignment, and also a platform fee model, whereby GIPHY would charge its API partners for access to its products.

(b) In Chapter 7, Horizontal Effects, we explicitly note that the elimination of a dynamic competitor that is making efforts towards entry or expansion may lead to an SLC even where entry by that entrant is unlikely and may ultimately be unsuccessful. Our horizontal theory of harm therefore does not assume that GIPHY would have successfully monetised GIFs via its Paid Alignment model.

9.101 Further, as we have set out above, while we have seen some limited evidence of GIF providers looking to expand into the provision of advertising through GIFs, these GIF providers appear to be significantly behind GIPHY in terms of monetisation. Indeed, in the case of [✕]; in relation to [✕]; and in the case of [✕].

9.102 As set out at paragraph 7.42(c) of Chapter 7, Horizontal Effects, following the Merger, we do not consider that any other potential competitor is playing, or is likely to play a similarly important role in the dynamic competitive process as GIPHY would have done absent the Merger. GIPHY had succeeded in building a global and UK audience for its GIFs. No other supplier had reached a material market share in the supply of GIFs apart from Tenor. GIPHY ([✕]) had made substantial progress towards establishing its monetisation model.[616] As we have discussed in more detail throughout this chapter, any business seeking to enter the market for searchable GIF libraries faces significant barriers to entry in both GIF provision and the ability to monetise through display advertising.

9.103 In the case of Gfycat and Holler specifically, we conclude at Chapter 5, Market Definition and Market Power, that only Tenor offers a comparable service to GIPHY. As scale and presence were seen as key attractions of GIPHY's advertising model (see Appendix F – GIPHY's Paid Alignment model, paragraph 104),[617] both of these smaller providers also face the initial challenge of growing their GIF libraries in order to successfully develop any

---

[616] See also paragraphs 7.235 to 7.237 in Chapter 7, Horizontal Effects, where we discuss the significance of GIPHY to the efforts of others seeking to monetise GIFs, and conclude that GIPHY was an important player in a potentially growing segment of the display advertising market, and as such (taking account of the economic context, in particular the expected closeness of competition between Facebook and GIPHY) an important part of a dynamic competitive process with Facebook and others.
[617] See also Chapter 5, Market Definition and Market Power which discusses the network effects of a GIF provider and GIPHY's strategy of building its distribution network, in order to rapidly scale its user reach and traffic, which it could then seek to monetise through advertising.

PX0684-308

GIF-based advertising model. The challenges that Gfycat and Holler face to expanding into the supply of GIF libraries are discussed above at paragraph 9.76 to 9.88.

9.104   We are not aware of any entry plans by any other third party into Paid Alignment advertising in the UK or globally utilising GIFs ads or GIF sticker ads.

9.105   With regards to monetisation, the challenges faced by GIF providers are also reflected in the Parties' submissions, as set out in paragraph 9.10 which refers to the fact that GIF 'use cases and business models are still evolving' demonstrating the nascence of GIF providers' ability to generate revenue from the provision and distribution of GIFs and stickers. We therefore consider it unlikely that existing GIF providers would be able to expand into the provision of GIF-based advertising in a timely manner in order to prevent any SLC identified in Chapter 7, Horizontal Effects from arising.

9.106   The likelihood of new entry to mitigate or prevent the effects considered in Chapter 7, Horizontal Effects from arising is low, based on the significant barriers to entry outlined above in both GIF provision and ability to monetise through display advertising. Expansion from existing players is more likely and as noted above has been explored by [✂], although all appeared to be at early stages.

9.107   We set out above in paragraphs 9.4 that for entry or expansion to be sufficient to prevent or mitigate the adverse effects we have identified in display advertising (Chapter 7, Horizontal Effects), this would need to result in other GIF providers, individually or collectively, playing a similarly important role in the dynamic competitive process to that played by GIPHY at the time of the Merger. In paragraph 9.6, we also note that for entry or expansion to prevent or mitigate these adverse effects it would need to occur within a short timeframe.

9.108   On the basis of the evidence set out above and elsewhere in this Final Report, our view is that it is unlikely that entry or expansion of sufficient scale would occur in a timely manner in order to prevent or reduce the impact of either SLC from arising as a result of the Merger.

## Efficiencies

9.109   Efficiencies arising from a merger may enhance rivalry with the result that the merger does not give rise to an SLC. In order for us to take efficiencies into account, they must:

307

PX0684-309

(a) enhance rivalry in the supply of those products where an SLC may otherwise arise;

(b) be timely, likely and sufficient to prevent an SLC from arising;

(c) be merger-specific; and

(d) benefit customers in the UK.[618]

9.110   In this case, the Parties submitted that following the acquisition of GIPHY, Facebook could enhance user experience by significantly investing in additional GIPHY services and by pursuing further integration of GIPHY's library into Facebook's services, thereby allowing Facebook to offer more innovative products to users.

9.111   However, the Parties have not made any further representations that the Merger is likely to lead to rivalry-enhancing efficiencies. We have not seen any evidence that there will be such efficiencies as a direct result of the Merger. Our conclusion therefore is that it is not likely that rivalry enhancing efficiencies arise from the Merger to prevent any SLC from arising.

---

[618] Merger Assessment Guidelines (CMA129), paragraph 8.8.

308

PX0684-310

# 10.   Conclusions

10.1   As a result of our assessment, we have concluded that the completed acquisition by Facebook of GIPHY has resulted in the creation of a relevant merger situation.

10.2   We have also concluded that the creation of this relevant merger situation has resulted or may be expected to result in a substantial lessening of competition:

*(a)*   in the supply of display advertising in the UK due to horizontal unilateral effects arising from a loss of dynamic competition, and

*(b)*   in the supply of social media services worldwide (including in the UK) due to vertical effects resulting from input foreclosure.

10.3   As set out in Chapter 8, Vertical Effects, a lessening of competition in the supply of social media services also has effects on dynamic competition between social media platforms in the supply of display advertising in the UK. These effects exacerbate the effects on the dynamic competitive process in display advertising in the UK arising from the elimination of a potential competitor.

PX0684-311

# 11.  Remedies

## Introduction

11.1  Having found an SLC, we must decide what, if any, action should be taken to remedy, mitigate or prevent that SLC or any adverse effects resulting from the SLC.[619]

11.2  This chapter sets out our assessment of, and final decision on, the appropriate remedy to the SLCs and resulting adverse effects we have found. In particular, this chapter discusses:

(a)  Our remedy consideration process;

(b)  Framework for the assessment of remedies;

(c)  Overview of remedy options;

(d)  Assessment of the effectiveness of a divestiture of GIPHY;

(e)  Assessment of the effectiveness of behavioural remedies put forward by Facebook;

(f)  Assessment of potential relevant customer benefits (**RCBs**) put forward by Facebook;

(g)  Consideration of the proportionality of effective remedies; and

(h)  Our decision on remedies.

## Our remedy consideration process

11.3  Alongside the Provisional Findings[620] we published a Notice of Possible Remedies (**the Remedies Notice**),[621] in which we sought views on possible remedies to the SLCs that we had provisionally found, including in particular the full divestiture of GIPHY. We also invited views on any other practicable remedies to address the SLCs and any resulting adverse effects, including any behavioural remedies. In response, Facebook provided its views on our

---

[619]The Act, Section 35(3).
[620] Provisional Findings report.
[621] The Remedies Notice sets out the actions which the CMA considers it might take for the purpose of remedying the SLC(s) and resulting adverse effects identified in the Provisional Findings report.

PX0684-312

Remedies Notice and submitted a set of behavioural remedy proposals (**Response to the Remedies Notice**).[622]

11.4   We shared a working paper with the Parties (**the Remedies Working paper**) which was prepared after consideration of representations by Facebook, GIPHY and third parties following the Remedies Notice.[623] In response to the Remedies Working paper, both Facebook and GIPHY provided written submissions.

## Framework for the assessment of remedies

11.5   This section sets out the legislative context that the CMA must apply in considering possible remedies. Further explanation can be found in our Merger Remedies Guidance, CMA87 (**Merger Remedies Guidance**).

11.6   The Act requires that the CMA, when considering possible remedial action, 'shall, in particular, have regard to the need to achieve as comprehensive a solution as is reasonable and practicable to the substantial lessening of competition and any adverse effects resulting from it'.[624]

11.7   To fulfil this requirement, the CMA will first seek remedies that are effective in addressing the SLC and any resulting adverse effects. The effectiveness of a remedy is assessed by reference to its:[625]

   (a)   impact on the SLC and the resulting adverse effects;

   (b)   duration and timing – remedies need to be capable of timely implementation and address the SLC effectively throughout its expected duration;

   (c)   practicality in terms of implementation, monitoring and enforcement; and

   (d)   risk profile, relating in particular to the risk that the remedy will not achieve its intended effect.

11.8   If the CMA is choosing between two remedies which it considers will be equally effective, it will select the remedy that imposes the least cost or that is least restrictive.[626] The CMA will seek to ensure that no remedy is disproportionate in relation to the SLC and its adverse effects.[627] The CMA

---

[622] Facebook, Response to Remedies Notice.
[623] During the Remedies phase of the investigation Facebook and GIPHY provided separate responses and evidence to the Group.
[624] Section 35(4) of the Act.
[625] Merger Remedies Guidance, paragraph 3.5.
[626] Merger Remedies Guidance, paragraph 3.6.
[627] Merger Remedies Guidance, paragraphs 3.4 and 3.6.

PX0684-313

may also have regard, in accordance with the Act,[628] to the effect of any remedial action on any RCBs arising from the merger.

## Overview of remedy options

11.9   In the Remedies Notice, we set out that we had identified one potential structural remedy, being the full divestiture of GIPHY. We stated that:[629]

> 'We consider that a full divestiture of GIPHY would be similar to a prohibition of the Merger as it would re-create a similar market structure to that which existed at the time of the Merger. We therefore take the preliminary view that, subject to implementation considerations, a full divestiture of GIPHY would represent a comprehensive and effective remedy to all aspects of the SLCs we have provisionally found, and consequently any resulting adverse effects'.

11.10   We also stated that we had not at that point identified a smaller divestiture package that would be similarly effective.

11.11   We invited views on aspects of remedy design which might be needed to make a divestiture remedy effective and to ensure that no new competition concerns would arise.

11.12   We stated that it was our view at that time that a behavioural remedy was very unlikely to be an effective remedy to the SLCs or any resulting adverse effects that we have provisionally identified. However, we said we would consider any behavioural remedies put forward as part of this consultation. Facebook was the only party that submitted potential behavioural remedies.[630]

11.13   The next section sets out our assessment of the effectiveness of a full divestiture of GIPHY. We assess the behavioural remedies put forward by Facebook from paragraph 11.204 onwards.

## Full divestiture of GIPHY

11.14   To be effective in restoring or maintaining rivalry in a market where the CMA has decided that there is an SLC, a divestiture remedy will involve the sale of an appropriate divestiture package to a suitable purchaser through an effective divestiture process.[631] In reaching its view on effectiveness, the CMA

---

[628] Section 35(5) of the Act.
[629] Remedies Notice, paragraph 12.
[630] Facebook, Response to Remedies Notice.
[631] Merger Remedies Guidance, paragraph 5.2.

PX0684-314

will have regard to the following critical elements of the design of divestiture remedies, each of which we discuss in turn:

*(a)* The scope and composition of the divestiture package;

*(b)* Identification of a suitable purchaser; and

*(c)* The effectiveness of the divestiture process.[632]

### *Remedy design issues and risks relating to divestiture*

11.15 An effective divestiture will address at source the loss of rivalry resulting from the merger by changing or restoring the structure of the market.[633] There are three categories of risk that could impair the effectiveness of any divestiture remedy - composition risk, purchaser risk and asset risk:[634]

*(a)* composition risk arises if the scope of the divestiture package is too narrowly constrained or not appropriately configured to attract a suitable purchaser, or does not allow a purchaser to operate as an effective competitor;

*(b)* purchaser risk arises if a divestiture is made to a weak or otherwise inappropriate purchaser, or if a suitable purchaser is not available; and

*(c)* asset risk arises if the competitive capability of the divestiture package deteriorates before completion of the divestiture.

11.16 We consider each of these three risks throughout this section in our assessment of the effectiveness of the full divestment of GIPHY.

### *Scope and composition of the divestiture package*

11.17 In considering the appropriate scope for a divestiture package, we should ensure that it:

*(a)* is sufficiently broad in scope to address all aspects of the SLC(s) and resulting adverse effects;

*(b)* would enable the eventual purchaser to operate the divested business as an effective competitor (ie one that can comprehensively remedy the SLCs we have found); and

---

[632] Merger Remedies Guidance, paragraphs 5.2 and 5.3.
[633] Merger Remedies Guidance, paragraph 3.38.
[634] Merger Remedies Guidance, paragraph 5.3.

PX0684-315

*(c)* is sufficiently attractive to potential purchasers.

11.18   In the Remedies Notice, we stated that:[635]

*(a)* Although the CMA's Initial Enforcement Order (**IEO**)[636] is intended to preserve GIPHY's competitive independence until completion of our investigation, at the time when the IEO was imposed, GIPHY had already been integrated into Facebook's operations, and currently relies on Facebook for back-office and other functions. GIPHY's sales team has been disbanded and its revenue-generating activities terminated.[637] As a result, it does not currently generate any revenue.

*(b)* It was our initial view that this integration should be reversed as part of a divestiture process, and that the divestiture package should have the requisite functions and capabilities to allow it to compete as a standalone business. Our initial view was that the necessary reversal steps would include (but not be limited to):

(i)   Reconstitution or re-creation of the GIPHY management team;

(i)   Re-creation of GIPHY's sales and partnership functions;

(ii)   Ensuring GIPHY has sufficient numbers of key employees, such as engineers; and

(iii)   Ensuring that GIPHY's proprietary IT systems, its library of GIFs and stickers, and the associated IP rights are included in the divestiture package.

11.19   We invited views on the composition of the divestiture package, whether there were additional GIPHY assets or functions that would be necessary to ensure an effective remedy, and whether additional Facebook assets (for example, back-office systems or personnel) should be included.

11.20   The rest of this section sets out our consideration of the composition of the divestiture package. It is divided into two sub-sections. We first consider three overarching issues that were raised by the Parties in their responses to the Remedies Notice and Remedies Working paper: the financial viability of GIPHY, the re-constitution of GIPHY to its pre-Merger form, and whether a

---

[635] Remedies Notice, paragraphs 20-21.
[636] Initial Enforcement Order, 9 June 2020. This IEO was varied using a Variation Order on 29 June 2021.
[637] Facebook, Response to Remedies Notice, paragraph 1.13. The GIPHY sales team was not acquired by Facebook.

PX0684-316

divested GIPHY would foreclose customers by charging for its GIFs. We then consider other detailed elements of the divestiture package.

11.21 In considering these issues we take into account that, as a consequence of the Merger and Facebook's subsequent actions, GIPHY is in a significantly weaker position than it was pre-Merger. GIPHY's revenue-generating activities were terminated as a result of the Merger, almost all of its employees were transferred to Facebook employment contracts (which included significant long-term incentive payments), and the cash on its balance sheet was returned to shareholders.

11.22 These actions mean the CMA is not able, in this case, to implement its preferred approach to divestment remedies of divesting an existing business or package of assets. Accordingly, composition of an appropriate divestiture package needs to overcome these challenges through mechanisms such as financial support. We note that this situation has arisen from Facebook's decision to complete the Merger and transfer staff. Facebook is not required to notify potential acquisitions to the CMA before completion. However, in not doing so, it assumes the risk that the CMA may decide to investigate the completed transaction. Where such an investigation results in an SLC decision, the acquirer – in this case Facebook – runs the risk that it may bear the financial consequences of unwinding the acquisition (where divestment is the preferred remedy).

***Overarching composition issues***

*The financial viability of GIPHY*

- *Views of the Parties and third parties*

11.23 Facebook submitted that '[✂]'. Facebook also submitted that GIPHY faced a number of 'insuperable hurdles', including legal issues and challenges to its business model and expansion. Facebook noted that pre-Merger, GIPHY was [✂].[638] Facebook further submitted that: '[✂]'.[639]

11.24 GIPHY also argued that it was [✂]. It submitted that:

   *(a)* Revenues achieved pre-Merger were [✂] because [✂]. This was not [✂].

---

[638] The cost figure excludes staff costs that are being paid by Facebook post-Merger.
[639] Facebook, Response to Remedies Notice, paragraph 1.12. See also, Chapter 2, the Parties, the Merger and Rationale for discussion of Facebook's rationale for the Merger.

PX0684-317

(b)  GIPHY's financial forecasts were [✂] because [✂].

(c)  GIPHY had explored [✂].

(d)  [✂] partner platforms are able to proxy and cache in a way that prevents GIPHY from being able to verify that an ad has reached a user.

(e)  [✂].

11.25  In addition, GIPHY stated [✂].

11.26  Further views on GIPHY's financial viability from the Parties and third parties are included in Chapter 6, the Counterfactual.

- *CMA assessment*

11.27  We address the issues of GIPHY's financial position absent the Merger and its likely revenue-generating strategies in Chapters 6 and 7. Facebook has submitted to the CMA that pre-Merger, GIPHY was [✂].However, at the time it was acquired by Facebook, GIPHY was the leading provider of video GIFs and GIF stickers, accounting for a large share ([✂])[640] of GIF searches globally. [✂], we concluded in Chapter 6 (the Counterfactual) that 'GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products.'[641] We also concluded that this situation would have prevailed irrespective of whether GIPHY was independently owned, or acquired by a third party other than Facebook.

11.28  In addition, in Chapter 7, Horizontal Effects, we considered the legal, technical, practical and regulatory challenges that GIPHY submitted it faced in developing its Paid Alignment business, the likelihood of GIPHY's successful expansion of its Paid Alignment services and the likelihood of its entry into the UK market. We found that GIPHY's pre-Merger activities were valuable to the dynamic competitive process in themselves and in driving other competitors' efforts, that it was likely to enter into the supply of Paid Alignment in the UK and that it would have had a significant impact on dynamic competition in the relevant markets.

11.29  As a result, we do not agree with the Parties' arguments that GIPHY was [✂] pre-Merger, and consider that it was capable of continuing to compete independently absent the Merger. However, the Parties' actions in connection

---

[640] Chapter 5, Market Definition and Market Power, Table 3.
[641] Provisional Findings, paragraph 6.150.

316

with the Merger have diminished the value of the GIPHY business, for example through closure of its revenue-generating activities and the transfer of its staff onto Facebook contracts. In our view, specifying a divestiture package that can compete in a way that effectively remedies the SLCs we have found, will require reconstitution of these key elements of the GIPHY business. We discuss this further in the following section.

*Reconstitution of the GIPHY business*

- *Views of the* Parties

11.30   Facebook submitted that it did not have a proposed set of assets for any divestiture, but it should [✂]. It expected that '[✂]'.

11.31   Facebook argued that '[✂]'.[642] It submitted that [✂]. Facebook also stated that: '[✂]'. Further, given the nature of the SLC finding, any suitable purchaser would be highly incentivised to pursue GIPHY's Paid Alignment business model irrespective of whether these activities have been reconstituted pre-divestment. Composition risk as such 'can be dealt with by the identity of the purchaser'.

11.32   Facebook also argued that in seeking to impose 'reconstitution' steps, the CMA proposes going beyond its legal powers in order to place GIPHY in a better position than it was pre-Merger in an attempt to address critical shortcomings associated with its business model. Facebook submitted that the CMA's proposed intervention therefore runs the risk of causing serious market distortions by mandating competitive actions to pursue GIPHY's flawed advertising model, [✂], rather than letting the free market (ie, a suitable purchaser) decide whether this is commercially desirable.

11.33   GIPHY told us that it believed a divestiture would not be effective, [✂] in this case. It considered that it would 'not address the CMA's concerns [✂].

11.34   GIPHY stated that if a divestiture was required 'the assets that were transferred to Facebook would need to be transferred to a buyer'. It considered these were 'necessary but not sufficient'. [✂].

11.35   GIPHY submitted that reconstitution was [✂]

---

[642] Facebook, Response to Remedies Notice, section heading 3.

PX0684-319

- *Views of third parties*

11.36  We received a mixed response from third parties regarding whether a structural remedy was appropriate.[643]

11.37  In relation to what should be included in a divestiture, two third parties told us that they were generally unsure as to what comprised GIPHY and therefore what would be needed in a divestiture, One of them though considered the most important element was that, post-divestment, third parties continued to have access to GIPHY's API. In addition, it noted that if an acquirer were to receive only the current library, but not any of the creative content side of the GIPHY business, this could be of concern. Another third party thought that a divestiture package would need to be enough to allow GIPHY to operate as a standalone business but its main concern was ensuring continued access to the API.[644] Another third party shared the concern about access to the API and expected that a divestiture package for GIPHY would require key intellectual property, important staff, and cash.

- *CMA assessment*

11.38  The CMA's Merger Remedies Guidance views 'competition as a dynamic process of rivalry between firms seeking to win customers' business over time. Restoring this process of rivalry through structural remedies, such as divestitures, which re-establish the structure of the market expected in the absence of the merger, should be expected to address the adverse effects at source.'[645]

11.39  The CMA's Merger Remedies Guidance says that '[i]n identifying a divestiture package, the CMA will take, as its starting point, divestiture of all or part of the acquired business. This is because restoration of the pre-merger situation in the markets subject to an SLC will generally represent a straightforward remedy'.[646]

11.40  The Merger Remedies Guidance also says that '[i]n defining the scope of a divestiture package that will satisfactorily address the SLC, the CMA will normally seek to identify the smallest viable, stand-alone business that can

---

[643] For example, [✂] thought a structural remedy was correct and that behavioural remedies would not work; while [✂] stated that it did not necessarily believe that divestiture was the appropriate remedy.
[644] [✂] also believed it would be important for some of the key GIPHY engineers and business personnel to be in the new entity.
[645] Merger Remedies Guidance, paragraph 3.5(a).
[646] Merger Remedies Guidance, paragraph 5.6.

PX0684-320

compete successfully on an ongoing basis and that includes all the relevant operations pertinent to the area of competitive overlap'.[647]

11.41  We have taken account of the Parties' submissions on the financial viability of GIPHY above and consider that, pre-Merger, GIPHY was capable of continuing to operate as an independent competitor, in line with our counterfactual.[648]

11.42  We consider however, that due to the actions of Facebook immediately before and after the Merger,[649] simply adding back a revenue function and putting a similar level of cash on the balance sheet as immediately pre-Merger would not return GIPHY to its pre-Merger position and thereby recreate the dynamic nature of competition that existed pre-Merger. The termination of the revenue function resulted in GIPHY losing its source of external cash flow as well as the expertise, contacts and relationships it had with advertisers and the actual and potential Paid Alignment advertising contracts. Therefore, as a direct result of the Merger and Facebook's related actions, GIPHY's ability to generate revenue and develop its Paid Alignment business, particularly in the short-term, has been severely diminished.

11.43  In order to restore GIPHY's ability to generate revenue, additional time and resources will be required. GIPHY will require the necessary human resources and significantly more cash on its balance sheet than it had pre-Merger in order to develop its revenue-generating ability and cover the consequent cost outflow associated with this (for example, the acquisition of a sales team) to enable it to compete effectively again following divestiture. This is discussed in more detail below and in the section on 'Elements of the divestiture package' (starting at paragraph 11.49).

11.44  We consider that the combination of staff and IP resources in GIPHY pre-Merger are critical to GIPHY's ability to compete. As a result of the Merger, some of these important assets (staff, some of its back-office operations and its source code) were transferred to Facebook or, in the case of the revenue function, terminated. We consider that these assets are essential for GIPHY's viability and ability to compete successfully and therefore will need to be transferred back from Facebook, or re-created in the GIPHY business, as part of a divestiture package. The assets which have remained within the GIPHY business and have not been transferred to Facebook should also form part of any divestiture package.

---

[647] Merger Remedies Guidance, paragraph 5.7.
[648] See Chapter 6, Counterfactual.
[649] See paragraphs 11.21 and 11.22 above.

PX0684-321

11.45 We do not agree with Facebook's view that 'any composition risk, can be dealt with by the identity of the purchaser'. Although it may be possible, at least in principle, for a specific purchaser to provide additional assets to make good any deficiencies in the composition of the divestiture package, these assets may not be easy to acquire or provide (for example, engineers with experience of creating and supplying GIFs), and/or may take time to put in place in the divested business (for example, recruiting a revenue team). These factors lead to additional composition risks which may reduce the effectiveness of a divestiture in restoring competition, both immediately following the sale and potentially over the longer-term. Furthermore, imposing significant requirements on a purchaser to provide and deploy additional assets, which may not be possible for all potential purchasers, increases the risk that a suitable purchaser will not be found. We consider this issue in more detail in paragraphs 11.49 to 11.137 below.

*Divestiture and risk of partial foreclosure*

*Views of the Parties*

11.46 GIPHY submitted that divestiture increases the risks of partial foreclosure with a purchaser potentially looking to generate revenue from GIPHY through charging for access. It argued that restricting access to the GIPHY API in this way would be harmful for both third party platforms and consumers. It noted that one third party had explained to the CMA that '[t]he most important element…was that post divestment third parties had access to the API' and another third party noted that 'its priority was to maintain access to the API'. GIPHY said that the behavioural remedies put forward by Facebook would be pro-competitive as they would commit Facebook to maintaining third party access on pre-Merger terms (ie free of charge).

*CMA assessment*

11.47 Although GIPHY was not charging any of its API partners for access to its library prior to the Merger, it was talking to [✂] and [✂] about funding, including potentially through a platform fee, to extend its cash runway.[650] Whilst it is possible that GIPHY might, post-divestiture, seek to charge for access to its services, we consider that a firm charging a market price for its services is not, in itself, a competition concern, and does not represent an

---

[650] Cash runway is defined as the period until a business's cash runs out. See Chapter 6, Counterfactual for further detail on these discussions.

PX0684-322

inherent restriction of access or foreclosure of customers. We therefore do not consider this to be a material source of risk associated with full divestiture.

11.48   We address the effectiveness of Facebook's behavioural remedies at paragraph 11.204 onwards.

### Elements of the divestiture package

11.49   We consider that the most effective form of divestiture is the sale of the entire share capital of the GIPHY business. We have identified the following key elements to be included in any divestiture package:

   *(a)* GIPHY's IP assets including the GIF and sticker library, algorithms, and the source code and any supporting documentation;

   *(b)* A strong and experienced senior management team;

   *(c)* Sufficient staff, with the necessary combination of skills and expertise, to enable GIPHY to compete effectively under the conditions of the counterfactual;

   *(d)* The GIPHY brand;

   *(e)* A revenue function, including the necessary staff, to be able to monetise GIPHY's products;

   *(f)* Cash to support operating activities;

   *(g)* Facebook's contractual relationship with GIPHY post-divestiture; and

   *(h)* Back-office services.

11.50   Further to these key elements of a divestiture package, other assets that are owned by GIPHY, such as supply contracts with platforms, office space and other sundry assets may also form part of the divestiture package. We consider the composition risks associated with the individual elements of a divestiture of GIPHY below.

*GIF library and source code*

   • *CMA assessment*

11.51   GIPHY's library of GIFs and stickers is a critical part of any divestiture package that could be effective in remedying the SLC.

PX0684-323

11.52 The Parties have told us that GIPHY retains ownership of the relevant intellectual property of its GIF and sticker libraries (where applicable), and also of its source code. We also understand that a copy of this source code remains on a Facebook 'version control server' with access controls having been implemented by Facebook.[651] We therefore consider the transfer of these assets as part of a divestiture of GIPHY is likely to be relatively straightforward. As part of the divestiture process, we will instruct the Monitoring Trustee to ensure that none of GIPHY's intellectual property is accessible to Facebook and that all steps are taken to delete GIPHY's source code from Facebook's 'version control server', except for that required in the ordinary course of business (for example in order for GIPHY to continue to supply GIFs to Facebook).

*Management team*

11.53 On completion on the Merger, GIPHY's remaining management team were transferred to Facebook employment contracts, which included the award of Facebook RSUs. Under the IEO, the management team continue to work for the held-separate GIPHY business while being contracted to, and paid by, Facebook.

- *Views of the Parties*

11.54 Facebook submitted that '[✂]'.[652] Facebook told us that it 'does not consider that it would be either legal, reasonable or proportionate to take steps to reinstate certain of GIPHY's management'.[653]

11.55 GIPHY stated that all current senior management would be essential for an effective divestiture. It further stated that the current management team originally came to GIPHY because they were attracted by the work and creative opportunities related to GIPHY's core product. The prospect of having to redirect their priorities back to a '[✂]' was, for them, unattractive. GIPHY believed that it is [✂] there are very few candidates that would have the necessary experience or reputations to fill their roles without threatening the viability of the GIPHY business. [✂].

11.56 Finally, GIPHY also said that the loss of the management team would also have a negative effect on the GIPHY brand. GIPHY told us that 'you could

---

[651] Email from Facebook to the CMA, 27 July 2020.
[652] Facebook, Response to Remedies Notice, paragraph 1.13. [✂].
[653] Facebook, Response to Remedies Notice, paragraph 1.13.

PX0684-324

replace all of [the management team] and you would have a GIF company. Would you have GIPHY?  Not really'.

- *CMA Assessment*

11.57  A high-calibre and experienced management team is critical to a successful divestiture remedy. We recognise the importance of the current management team both to the strength of GIPHY's brand and also the attraction of the business to its staff. Ideally therefore, the existing GIPHY management team, who have built the business and have industry-leading knowledge of supplying and monetising GIFs and stickers would remain with the business.

11.58  In order to achieve this, we will require Facebook to provide all necessary incentives, including financial incentives, to secure the transfer of the GIPHY management team's employment contracts from Facebook to GIPHY. We expect these transfers to take place prior to the divestiture so that an experienced management team is part of the divestiture package. In addition, we would expect to see appropriate non-solicitation obligations on Facebook preventing approaches to and re-employment of GIPHY management for a reasonable period post-divestiture, for example through terms in the divestiture contracts and/or provisions in the employment contracts of GIPHY management.

11.59  It may be the case that some of the management team do not wish to transfer back to and stay with the GIPHY business, and be part of the divestiture package, irrespective of the incentives provided.[654] In this event, we consider there are two alternative options:

- *(a)* GIPHY (with CMA approval) recruits new management executives to fill gaps in the management team left by those who do not wish to transfer (or, in the extreme, a full management team). These new hires will have the opportunity to work alongside and learn from the existing management team, for a period, and would transfer with GIPHY on completion; or

- *(b)* the purchaser hires additional members of the management team that join the business on completion.

11.60  There are benefits and risks with each option. A GIPHY-hired team in place before completion of the divestiture is likely to lead to less disruption. New

---

[654] [✂].

PX0684-325

members of the team would be able to learn about the business and begin to put plans in place for GIPHY's post-divestiture operation. [✂].

11.61 However, there are also some potential drawbacks and risks with a management team that is fully hired by GIPHY. The management team would face some uncertainty as they would likely be unaware of a purchaser's identity or strategy. It may also be the case that a purchaser would wish to install its own management team after the acquisition, leading to uncertainty around the GIPHY-hired management team's long-term future and potential additional costs of redundancy to the purchaser.

11.62 Leaving it to the purchaser to finalise the composition of the leadership team would give rise to different risks and benefits. While the team would be aligned with the purchaser's incentives and vision, it would not be in place until after the divestiture. This could adversely affect the competitiveness of the divested business until the new management team was familiar with the GIPHY business, putting the effectiveness of the divestiture at risk. It could also lead to greater uncertainty for the rest of the GIPHY staff. For these reasons we consider this option to be less attractive than having a team hired by GIPHY in place, at the point of divestiture.

11.63 Consequentially, we will require that the Parties should retain GIPHY's management team, transfer their employment contracts back to GIPHY and incentivise them to stay with the GIPHY business up to, and for a period beyond, completion of the divestiture. Where any of the existing management team indicate that they do not wish to transfer, the Parties will be required to recruit replacements promptly to ensure that there is a suitably qualified and experienced management team in place throughout the divestiture period.[655] This requirement is effectively contained in the current IEO and equivalent provisions will be included in a Final Order or any Final Undertakings.[656]

11.64 In order to facilitate the retention of existing GIPHY leadership, we further consider that GIPHY should ensure that there are longer-term incentive plans in place to ensure continuity of its operations after divestiture. This would combine existing incentives put in place by GIPHY and incentives provided as part of the package to transfer the GIPHY managers back onto GIPHY

---

[655] The CMA would rely on provisions in the IEO or equivalent in a Final Order or any Final Undertakings. Paragraph 5(k) of the IEO states Facebook should take 'all reasonable steps to encourage all key staff to remain with the Giphy business and the Facebook business.'. Paragraph 5(b) also states that 'the Giphy business and the Facebook business are maintained as a going concern and sufficient resources are made available for the development of the Giphy business and the Facebook business, on the basis of their respective pre-merger business plans.'

[656] The Merger Remedies Guidance, paragraph 4.67 provides that '[f]ollowing publication of the final report, the CMA has the choice of implementing remedies by obtaining Final Undertakings from the relevant parties or making a Final Order, subject to the limitations set out in Schedule 8 of the Act'. See paragraph 11.200 below for further discussion on making a Final Order or Final Undertakings.

PX0684-326

employment contracts (which may include payments made before, at and subsequent to the closure of a divestiture). These incentives would be funded by Facebook. In addition, a purchaser may wish to offer further post-divestiture incentives to retain key management.

*GIPHY staff*

11.65   In addition to the management team discussed above, we now consider the inclusion of other GIPHY staff in the divestiture package. [✖] GIPHY's staff who remained with GIPHY at the time of the Merger were transferred from GIPHY employment contracts to Facebook employment contracts, which included the award of Facebook RSUs. Under the IEO, these GIPHY employees continue to work for the held-separate GIPHY business while being contracted to, and paid by, Facebook.[657]

- *Views of the Parties and third parties*

11.66   Facebook stated that [✖]. It believed that a [✖]. As such, the 'reversion of GIPHY staff from Facebook employment contracts onto GIPHY employment contracts … would be entirely unnecessary'.[658]

11.67   Facebook stated that moving GIPHY staff onto GIPHY employment contracts could not be achieved legally without the employees' consent[659] and that in its view 'doing so would be detrimental to those employees' personal interests and, [✖]. Similar views were expressed by a third party, Former VP of Revenue at GIPHY, Alex Magnin.

11.68   Facebook submitted that, by providing incentives to GIPHY staff to move to GIPHY contracts pre-divestment, there is a risk that those staff may accept compensation to do so, but then still refuse to transfer with the business to a suitable purchaser in due course (absent further enrichment). This would simply increase the risk that a divestment would be both ineffective and disproportionate. Accordingly, Facebook submitted that any provision of incentives should form part of the negotiation with a suitable purchaser.

11.69   GIPHY told us that staff retention was [✖]. GIPHY also told us that [✖].

11.70   [✖]. GIPHY believed that its staff would be unlikely to make a decision on transferring until they know at least: (i) the identity of the purchaser; and (ii) the purchaser's vision and business plan for GIPHY. In particular, GIPHY staff

---

[657] At the time of this report there are 106 GIPHY staff on Facebook contracts.
[658] Facebook, Response to Remedies Notice, paragraph 1.11.
[659] Facebook, Response to Remedies Notice, paragraph 1.11.

PX0684-327

would want to know their own career development opportunities, how the purchaser compared to Facebook as an employer, and its plans for revenue-generating activities (which GIPHY stated were an unwelcome distraction and unpopular with staff).

11.71  GIPHY submitted that just because GIPHY staff transferred to Facebook on purchase of GIPHY that does not indicate they would be equally willing to transfer back to GIPHY or a new purchaser.

11.72  GIPHY also submitted that it was impractical to move staff onto GIPHY contracts before a sale as GIPHY was currently reliant on Facebook for back-office type functions. These included payroll, accounting, insurance services, certain HR functions and the provision of pension benefits, and some of these services, eg pension, could not be provided after a transfer, but before divestment, as GIPHY would be in effect a third-party to Facebook. Furthermore, in US law all staff transfers are individually negotiated and as such, personnel would need to go through two negotiation processes in quick succession, which would increase costs and execution risk.

- *CMA Assessment*

11.73  GIPHY's staff were recognised by Facebook as having specialist skills, with the acquisition of these staff being one of the reasons for the Merger.[660] We note that GIPHY has also said that [✂].We therefore consider that GIPHY's staff are essential to its success after a divestiture and should, in principle, be part of a divestiture package.

11.74  Currently, [✂]. For an effective divestiture to take place, the counterparty for employees' contracts would need to change from Facebook to either GIPHY or to the purchaser, and key contractors would need to be retained by GIPHY. We recognise that the staff cannot be forced to transfer to GIPHY and would need to be incentivised to choose to do so.

11.75  We considered two options for how the transfer of GIPHY staff might best be achieved to minimise composition risk to the effectiveness of the divestiture:

(a)  GIPHY staff are transferred from Facebook to the purchaser at completion of the divestiture. This is the option favoured by Facebook; or

---

[660] See paragraphs 2.29 and 7.34.

PX0684-328

*(b)* GIPHY staff are transferred back onto GIPHY contracts before completion of the divestiture, and transfer to a new purchaser as GIPHY employees with the business.

11.76 Our view is that the first option gives rise to significant additional risks to the effectiveness of the remedy and places significant composition risk onto the purchaser. It also raises issues as to whether GIPHY would be able to continue its business effectively immediately post-divestiture. Under this option, GIPHY staff would remain employed by Facebook until the sale competed. Therefore, prior to completion, the purchaser would have very little visibility of how many or which staff were prepared to transfer to it. As a result, it would be very difficult for bidders to determine what they need to do from a staffing perspective to ensure that GIPHY is able to continue, uninterrupted, at the time of divestment, to support API partners and deliver GIFs while they are putting their offers together. It would also only become clear very late in the process the extent to which staff are willing to transfer, effectively ruling out the possibility of GIPHY back-filling key roles to reduce composition risk.

11.77 We disagree with Facebook's view that the transfer of staff might be viewed as an 'encumbrance' by a purchaser. Our view is that for GIPHY to be able to compete in a way that effectively remedies the SLCs we have found, it would need a similar roster of staff as it had prior to the Merger. We consider it likely that a prospective purchaser, intent on competing in this way, would prefer to start with this roster, [✕].

11.78 We therefore consider that transferring GIPHY staff at the time of completion direct from Facebook to the purchaser carries significant additional composition risks that would undermine the immediate effectiveness of the remedy. This approach risks failing to put in place the measures and incentives to ensure that former GIPHY staff transfer back to it within a timeframe that is consistent with an effective divestment.

11.79 We now look at the second option of transferring GIPHY staff back to GIPHY contracts before completion of the divestiture.

11.80 We note the comments from Facebook and GIPHY that this option would be difficult to achieve, as GIPHY staff would lose out on benefits that their Facebook contracts provide, that Facebook is seen as an attractive employer, and that GIPHY staff would not wish to transfer until they know the identity of the purchaser.

11.81 Our statutory duty is to decide on an effective remedy to the SLCs we have found. We acknowledge that it may be difficult for some employees to make the decision to move from Facebook contracts onto new GIPHY contracts

PX0684-329

without knowing the identity of the purchaser and its plans. We consider, however, that transferring GIPHY's staff back onto GIPHY employment contracts before completion of the divestiture is necessary to achieve an effective remedy, in light of the critical importance of its staff to the ongoing ability of GIPHY to compete. By transferring staff to GIPHY prior to divestiture, the risks discussed in paragraphs 11.76 would be, to a large extent, mitigated.

11.82   Transferring staff back onto GIPHY contracts cannot be achieved without their consent. While we recognise that it is not straightforward for individual staff members to decide whether to transfer or not we also recognise that GIPHY staff are viewed as critical by GIPHY management and as such we would expect the transfer arrangements to be such that transferring onto a GIPHY contract is the most attractive option for GIPHY staff.

11.83   We note that almost all GIPHY staff transferred to Facebook at the time of the Merger. This indicates to us that employees are prepared to transfer between employers, provided they are given suitable financial and other benefits and incentives to do so. While it may be an inconvenience for staff to transfer contracts twice in a relatively short period, we do not consider this to be sufficient to outweigh the risk to the effectiveness of the remedy of not having GIPHY staff included in the divestiture package and the possible consequent disincentives to potential purchasers.

11.84   We consider that GIPHY will need to provide incentives to its staff and contractors to transfer their employment contracts to GIPHY. These incentives would be funded by Facebook rather than a potential purchaser. Certain GIPHY staff that transferred to Facebook contracts are eligible for future payments from RSUs in Facebook that they were given on completion of the Merger. We consider that it will be necessary at a minimum to compensate these staff for the value attached to their RSUs (or rights to receive RSUs in future) that they would lose by agreeing to transfer to GIPHY employment contracts, including potential future gains from Facebook's share price performance. Additional incentives may also be required such as an up-front payment and/or a sufficiently attractive salary and benefits package, including post-divestiture retention incentives, to encourage staff to transfer and remain with GIPHY throughout the divestiture process and beyond. A purchaser may also wish to provide its own additional post-divestiture incentives – the CMA will consider plans for these incentives as part of the purchaser suitability process.

11.85   The cost of providing these incentives is likely to be significant. For example, Facebook provided RSUs worth [✕] to GIPHY employees when the Merger completed, the value of which has increased as Facebook's share price has appreciated. However, as noted above, the need to provide incentives for

PX0684-330

GIPHY's staff to switch to GIPHY contracts, and the associated costs, are a consequence of the Merger. In line with our Merger Remedies Guidance,[661] we attribute less significance to this type of avoidable costs when assessing the costs of this remedy. We consider the costs of this remedy in our section on proportionality at paragraph 11.314 below.

11.86   We would expect Facebook to fund the costs of these incentives during the pre-divestiture period. It should also fund any post-divestiture liabilities arising from these incentives through, for example, providing cash (possibly in escrow) on GIPHY's balance sheet on completion.[662] This would give GIPHY employees assurance that their long-term incentives were deliverable and provide further incentives to transfer.

11.87   Similar to the position for GIPHY management outlined in paragraph 11.63, where any of the existing staff indicate that they do not wish to transfer, irrespective of any incentives provided, the Parties will be required to recruit replacements promptly to ensure that there is a suitably qualified and experienced staff team in place throughout the divestiture period.[663] This requirement builds on the terms of the current IEO and equivalent provisions will be included in a Final Order or Final Undertakings.[664]

11.88   We turn now to timing and other practical issues in giving effect to this element of the remedy package.

11.89   As an overarching measure, the Monitoring Trustee's role will be expanded to enable them to monitor the staff transfer process.

11.90   To ensure that the transfer of staff provides the purchaser with a degree of certainty as to how many and which employees it is likely to take on with its purchase of GIPHY, the transfer of staff needs to occur at a reasonably early stage in the divestment process. The timetable for the transfer of staff will be decided as part of the divestment process between Facebook, GIPHY and the

---

[661] Merger Remedies Guidance 3.8-3.9.
[662] The objective here is to provide a guarantee that the incentive arrangement would remain in place post-divestiture, that it is/would be funded and that the future owner would not be able to alter the scheme (to the detriment of the staff). We identify two mechanisms for doing this – money on the balance sheet or held in escrow – however, we are open to considering alternative mechanisms put forward to achieve the same objectives by Facebook, or other interested parties. The exact way that cash will be made available for the incentives will be decided by Facebook and approved by the CMA.
[663] The CMA would rely on provisions in the IEO or equivalent in any Final Order or Final Undertakings. Paragraph 5(k) of the IEO states Facebook should take 'all reasonable steps are taken to encourage all key staff to remain with the Giphy business and the Facebook business'. Paragraph 5(b) also states that 'the Giphy business and the Facebook business are maintained as a going concern and sufficient resources are made available for the development of the Giphy business and the Facebook business, on the basis of their respective pre-merger business plans'.
[664] See paragraph 11.200 below on making a Final Order or Final Undertakings.

PX0684-331

CMA. However, we expect this process to start immediately following imposition of the Final Order/acceptance of the Final Undertakings.[665]

11.91  In order to structure the necessary incentives for GIPHY staff and provide expert and timely input into achieving the transfer of employees, we consider that GIPHY should utilise remuneration specialists and any other necessary professional resources as soon as is practicable.[666]

11.92  Similar to the proposals for GIPHY management outlined in paragraph 11.58, we will expect contractual mechanisms to be in place for an appropriate period of time to prevent or deter GIPHY staff from being hired by Facebook after a divestiture.

*GIPHY brand*

- *Views of the Parties*

11.93  GIPHY told us that the GIPHY brand was important and would need to be part of any divestment. GIPHY submitted that [✁]. In GIPHY's view [✁].

- *CMA Assessment*

11.94  We consider that maintaining the integrity of the GIPHY brand is essential in putting GIPHY in a similar position post-divestiture to that which it would have been in absent the Merger. GIPHY's brand is heavily linked to the integrity of the GIF library, the management and the staff, as well as the product itself. As a result, the GIPHY brand should be included in the divestiture package.

*Revenue function*

- *Views of the Parties*

11.95  Facebook stated that it '[✁]'.[667] It argued that this would equate to Facebook having to take '[✁]'.[668]

11.96  [✁].

---

[665] As part of any divestiture agreement we would expect to see appropriate post-divestiture non-solicitation obligations on Facebook preventing approaches to and re-employment of GIPHY management or staff for a reasonable period post-divestiture.
[666] We would expect to see the appointment of these specialists included as a milestone in a divestiture timetable that will be prepared by the Parties and approved by the CMA.
[667] Facebook, Response to Remedies Notice, paragraph 1.13.
[668] Facebook, Response to Remedies Notice, paragraph 1.13.

PX0684-332

11.97  [✂]. GIPHY said it would be far easier for an acquirer to use its own sales team because they know their own products and their own users and, fundamentally, they would be monetising those users.

11.98  GIPHY told us [✂].

11.99  GIPHY also said that the purchaser would need to establish a UK-based sales team to develop relationships with third party platforms, negotiate ad campaigns that appeal to a UK audience and manage UK accounts. This, it believed, would require a huge investment.

- *CMA Assessment*

11.100 GIPHY's revenue function was not part of the business purchased by Facebook.[669] [✂].[670] As a result, GIPHY (as currently configured) has no means of generating revenue, through Paid Alignment or any other form of monetisation.

11.101 In order to operate as an effective supplier of GIFs or a dynamic competitor in display advertising, GIPHY needs to be able to generate revenue. Providing GIPHY with the capacity to generate revenue is, in our view, a fundamental component of an effective divestiture remedy.

11.102 We consider that there are four options for specifying this element of the divestiture package:

- *(a)* GIPHY hires a sales team pre-completion. By 'sales team' we mean staff that would be required for revenue-generating activities such as Paid Alignments, partnerships, platform fees, and any other monetisation activities.

- *(b)* GIPHY is divested without a sales team in place. The purchaser and GIPHY's management team would hire a sales team after completion with some members potentially being drawn from the purchaser's existing business.

- *(c)* GIPHY hires a Chief Revenue Officer (**CRO**) pre-completion, and the purchaser hires the remainder of the revenue function after completion.

---

[669] Facebook, Response to Remedies Notice, paragraph 1.13.
[670] As a result, around 40 members of GIPHY's sales team did not transfer under the Merger.

PX0684-333

    *(d)*  GIPHY engages third-party expert consultants to develop and start to implement a monetisation strategy and plans. These consultants could potentially be retained by a purchaser.

11.103 There are risks and benefits relating to each option. The principal benefit of the first option (hiring a sales team pre-completion) is that a sales team would be in place on completion of the divestiture. Depending on the timing of recruitment, this team could also begin to develop plans for revenue generation before completion. This would allow GIPHY to compete in display advertising without delay, as well as starting to build revenues which would support investment in, and development of, the supply of its GIFs.

11.104 We see three main risks with this option. First, the sales team would face some uncertainty over the identity of the buyer and its longer-term plans for the business, which may mean that well-qualified candidates do not apply for sales roles. However, we consider that this could be mitigated to an extent by providing similar incentives as those offered to other GIPHY staff.

11.105 The second risk is that GIPHY's management may not have strong incentives to recruit a good sales team if they do not expect to stay with GIPHY post-divestiture. However, we consider this risk could be mitigated by providing appropriate incentives for the GIPHY management to stay with the business (see paragraphs 11.57 to 11.64 above) and by involving the Hold Separate Manager in any recruitment process.[671]

11.106 A third risk is that the purchaser may consider it necessary to make redundancies if the sales team that are hired do not meet the purchaser's requirements.

11.107 The principal benefit of the second option (divesting without a sales team in place) is that a purchaser would then be able to either recruit or put its own sales team in place when the divestiture completed. However, this option carries additional execution risk for the purchaser and delays GIPHY's ability to generate revenue, compete in display advertising, and ultimately achieve profitability. This therefore delays the effective operation of the remedy.

11.108 The third option (hiring a CRO prior to divestiture) has the potential to mitigate some of the risks of the first two options. We note GIPHY's views on the position of a CRO in this context.[672] However, we consider that the CRO's role in this context would be to start to develop a monetisation strategy and

---

[671] On 30 July 2020, pursuant to the IEO, the CMA directed Facebook, Inc, Tabby Acquisition Sub, Inc, Facebook UK Limited and GIPHY, Inc to appoint a Hold Separate Manager for the purpose of securing compliance with the IEO.
[672] See paragraph **Error! Reference source not found.** above.

PX0684-334

start recruiting a sales team. The CRO's incentives will therefore relate to these activities rather than the management of a seasoned sales team.

11.109 We also consider that, while a purchaser may need to hire a UK sales team to expand in the UK market in time, it is not a pre-requisite for the effectiveness of the remedy that this sales team is in place prior to the divestiture.

11.110 The fourth option (appointing consultants to advise on a monetisation strategy) has the benefit of putting GIPHY in a better position to make a rapid start post-divestiture than if no revenue planning had been done. This option would be most appropriate for a purchaser with its own revenue function, although any monetisation plans would probably also include developing a hiring plan/strategy for the full revenue team. This option would also reduce the costs and the risks involved in hiring a CRO or staff pre-divestiture.

11.111 We have considered the relative benefits and risks of the four options. In our view, it is important that delays to the implementation of the remedy should be minimised to ensure its timeliness and effectiveness. We also consider that an effective remedy should not place substantial amounts of execution risk on a purchaser where this risk can be mitigated by appropriate design of the composition of the remedy.

11.112 Having considered the risks and benefits of the various options, we have decided that the preferable approaches are the third option (recruiting a CRO) and the fourth option (engaging third party consultants).

11.113 Under the third option, GIPHY would be required to recruit a CRO[673] to be in place before completion of the divestiture. We consider that the risks of this option can be appropriately managed through oversight of the recruitment process by the Hold Separate Manager and Monitoring Trustee and by ensuring an effective and timely divestiture process.

11.114 Under the fourth option, we would expect that shortly after the reference is finally determined, GIPHY would hire a third party to undertake consultancy work to develop a monetisation strategy. The costs of this work would be covered by Facebook. This would reduce the risks of being able to hire a suitable CRO but would mean that GIPHY would not possess an internal resource.

---

[673] This is an indicative job title to denote the member of senior management with responsibility for revenue generation.

PX0684-335

11.115 The decision on which of these two approaches should be taken, or whether to pursue both approaches in combination, should be made by the Hold Separate Manager in concert with GIPHY management. Whichever option is chosen, we expect that GIPHY would be able to present a coherent and worked-up revenue strategy to a potential purchaser and would be taking steps to implement that strategy during the divestiture period. The CMA will monitor progress against these outcomes.

*Cash to support operating activities*

- *Views of the Parties*

11.116 Facebook said that a requirement to add cash to GIPHY's balance sheet is non-Merger-specific, disproportionate and could result in an abuse of the CMA's remedies process. It argued that it is not legally permissible for the CMA to require Facebook to provide cash to GIPHY where no such amounts were transferred as part of the Merger. When Facebook acquired GIPHY, it had approximately [✂] of net working capital on its balance sheet and residual cash was returned to its investors prior to the deal closing. [✂].

11.117 Facebook said that it was unclear what amount of cash injection was proposed; how it would ensure GIPHY's long-term sustainability; on what basis it was tethered to restoring the pre-Merger conditions of competition; and how it considered that this would not be open to an abuse of process by any eventual purchaser, ie, to enrich itself at Facebook's expense by simply siphoning off the proceeds post-sale.

11.118 Facebook stated [✂].

- *CMA Assessment*

11.119 [✂]. [✂], pre-Merger it was generating some revenue through its monetisation activities. Facebook made the decision at the time of the Merger to discontinue these monetisation activities and not take on the GIPHY sales team as part of the Merger. GIPHY's ability to monetise its products and generate revenue was therefore removed as a consequence of the Merger.

11.120 To enable an effective remedy, the revenue function needs to be reinstated (as discussed in paragraphs 11.100 to 11.115). GIPHY will also need to re-activate relationships with advertisers and develop its relationships with platforms and other customers. This will take time and consequently it is likely that [✂]. As a result, the divested business is likely to require significant cash, or access to funds [✂].

PX0684-336

11.121 We considered the level of financial support that GIPHY might need. In 2019, GIPHY had operating costs of [✕]. Under its 'OpEx reduction' scenario, it was forecasting operating costs of [✕] in 2020 and [✕] in 2021. In both years these costs were offset by growing revenues, and for 2022, GIPHY was forecast to break even. In its response to the Remedies Working paper, Facebook said that GIPHY currently [✕] per month (equivalent to [✕] per year), excluding staff costs. Total operating costs at divestiture are likely to be higher as a result of incentives provided for staff to transfer to GIPHY contracts. Using these figures, we estimate that GIPHY's operating costs (including staff costs) at completion of the divestiture would be the equivalent of [✕] per year.

11.122 We also looked at the funds that had been raised by GIPHY in its various funding rounds before the Merger. In its three most recent rounds, GIPHY raised [✕] in 2019, [✕] in October 2016 and [✕] in February 2016.

11.123 Even using an optimistic estimate, where GIPHY starts to earn revenue six months from completion of the divestiture and is breaking even after two years, operating losses in this period could amount to [✕].[674] Using less optimistic assumptions would make this figure materially higher. For example, if GIPHY starts to earn revenue one year from completion and takes three years to break even, operating losses could amount to [✕]. Given the need to rebuild a revenue function and re-activate commercial relationships with advertisers (who may set budgets some time in advance), we consider that the less optimistic scenario is likely to be more reflective of its future performance.

11.124 We consider that this funding is necessary to ensure an effective divestiture, noting that it arises in part due to the termination of all of GIPHY's revenue-generating activities as a result of the Merger. However, we also note that in the absence of the Merger, GIPHY was forecast to be making [✕] in the two years before it broke even, even with its revenue growing as forecast.

11.125 The funds required could be provided by Facebook, a purchaser, or a combination of the two. We consider that, for an effective divestiture, Facebook should provide cash funding of at least [✕] as part of the assets included in a disposal of GIPHY. This figure reflects the midpoint of the forecast we consider more likely, reduced by an estimate of further funding that GIPHY might have required in the absence of the Merger. This is in line with the largest historic funding round in October 2016. We also note that this

---

[674] These figures are simple estimates based on operating costs of [✕] per month, no revenue (net of costs of sales) in months 1-6 and an even rate of growth of revenue in months 7-24 at which point it would equal costs.

figure is in addition to the incentive payments necessary to gain and retain GIPHY staff and management discussed in the sections above.

11.126  This funding would reduce the composition risk of the divestiture package and may also attract a wider pool of purchasers. The funding will also provide a stronger balance sheet, potentially leading to a positive disposal price. Any change to these arrangements arising from negotiations with potential purchasers (for example arising from a purchaser's preference to have less funding in return for a lower sale price for GIPHY) will be examined by the CMA as part of its purchaser suitability assessment and approval of the transaction documentation.

11.127 To mitigate the risk that cash injected into GIPHY is not used for the development of GIPHY, the CMA will evaluate potential purchasers' commitment to using any such funds for the ongoing development of GIPHY as part of the purchaser approval process. In addition, we will review the contractual terms of the divestiture to assess any residual risk, as part of the CMA's process of approval of the divestiture transaction documents.

*Facebook's contractual relationship with GIPHY post-divestiture*

- *Views of the Parties*

11.128 Facebook told us that [✂]. Facebook said that no agreements were in place with GIPHY pre-Merger and it is not open to the CMA to mandate such a requirement on divestment.

- *CMA Assessment*

11.129 We considered Facebook's submission that it is not open for the CMA to mandate a contractual relationship as one was not in place pre-Merger. We do not agree with this argument. As noted in paragraph 11.6, the Act requires us to 'have regard to the need to achieve as comprehensive a solution as is reasonable and practicable to the substantial lessening of competition and any adverse effects resulting from it'. This does not limit us only to remedial actions that restore the pre-Merger position. Consequently, in this section we consider whether a post-divestiture contractual relationship is necessary to achieve a comprehensive solution.

11.130 GIPHY's route to market for the supply of its GIFs is through its APIs and relationships and contracts with other social media platforms. [✂] and Facebook told us [✂]. Given the quality of GIPHY's products and services, we consider that Facebook has relatively few alternatives and therefore may have an incentive in the short- to medium-term to continue to procure

PX0684-338

GIPHY's products (see Chapter 8, Vertical Effects for further discussion of alternatives to GIPHY).

11.131 However, we also note the Parties' Initial Submission, where they commented that if GIPHY had 'established indirect competition between Facebook and its social media rivals, such that these would become even fiercer competitors to Facebook', then 'Facebook could have pulled the plug on its support for GIPHY at any point, which would have severely damaged its future prospects or perhaps even been terminal to these…'.  This suggests a countervailing incentive on Facebook regarding its decision to continue to take GIPHY's products after a divestiture. We would also note that it is under no contractual obligation at present to use GIPHY.

11.132 While there is a benefit to a purchaser of GIPHY in terms of audience size if Facebook continues to use GIPHY's GIFs and stickers, it might not be in the purchaser's interest to have a long-term agreement to do so in place on divestiture. If an agreement is made to provide GIFs to Facebook on the current free terms, this could prove onerous for a purchaser seeking to develop a revenue stream. Such an agreement may also act as a disincentive for innovation, for example through monetising GIFs by charging for access and features.

11.133 Balancing these factors, we consider that while in principle there is mutual benefit in GIPHY continuing to supply Facebook with GIFs in the months after divestiture, GIPHY requires some short-term protection from the consequences of a sudden termination by Facebook of this supply relationship. We also consider that GIPHY requires more flexibility in this relationship over the medium- to long-term as it seeks to innovate and develop its revenue streams. We consider therefore that to ensure the overall competitive capabilities of GIPHY, it is essential that GIPHY continues to have the opportunity to supply Facebook with GIPHY products in the immediate post-divestiture period. However, any agreement to do so must not prevent GIPHY from looking to monetise its products or innovate in the long term. As part of the divestiture process, the CMA will review any supply agreements signed as part of the sales documentation to ensure they reflect these principles and they do not contain terms that may detract from the effectiveness of the remedy.

Back-office services

- *Views of the Parties*

11.134 Facebook stated that back-office functions were outsourced by GIPHY. These services were provided by third parties and re-entering into these

337

contracts would be entirely unnecessary. Furthermore, '[b]ack-office payroll, accounting, HR and insurance services, and the provision of pension benefits, could and would be supplied by any purchaser capable of meeting the CMA's suitability criteria'.[675]

- *CMA assessment*

11.135 Facebook currently provides payroll and some treasury and accounting services to GIPHY. Although we consider these services to be essential to the operation of the GIPHY business, there will be costs and execution risk involved in setting up these functions within GIPHY (either on an in-house or outsourced basis) before divestiture. It is also possible that a purchaser will have its own payroll, treasury and accounting services and would look to migrate GIPHY onto those services post-completion.

11.136 We have concluded that it is not necessary for GIPHY to re-establish these back-office functions on divestiture, provided that Facebook is able to provide these services to employees on GIPHY contracts (see sections above). To mitigate the risk around transitioning these services to a purchaser, we have concluded that Facebook could continue to provide these services under Transitional Service Agreements (**TSAs**) for a short period until a purchaser was able to put these functions in place. These are customary in divestitures and can be managed with low risk. These arrangements should be no longer than six months in duration unless a purchaser can demonstrate there are circumstances that require a longer period.

*Conclusions on the scope and composition of the divestiture package*

11.137 We have concluded that:

(a) A divestment should comprise the sale of all the share capital of GIPHY Inc., and include, as a starting point, all the assets and associated IP that were acquired by Facebook as part of the Merger. This includes all assets that were transferred to Facebook and those that remained within GIPHY, Inc. This includes, but is not limited to, the GIF and sticker library, GIPHY's source code, GIPHY's search algorithms and all supporting documentation.

(b) The Parties should seek to ensure that GIPHY is divested with a complete management team and a staff roster similar to that in place at the time of the Merger. GIPHY's management team and staff who transferred to

---

[675] Facebook, Response to Remedies Notice, paragraph 1.11.

PX0684-340

Facebook should be given sufficient incentives to transfer onto GIPHY contracts and to remain with GIPHY throughout the divestiture process and for a reasonable period beyond.

(c) GIPHY should ensure that it is able to present a coherent and worked-up revenue strategy to a potential purchaser, and that it would be taking steps to implement that strategy during the divestiture period. The CMA will assess this strategy as part of the purchaser suitability assessment process, and also monitor its implementation.

(d) There should be sufficient cash on the balance sheet to enable GIPHY to compete effectively as it grows its revenue post-divestiture. We estimate this figure to be at least [✂].[676] This figure is in addition to the incentive payments necessary to gain and retain GIPHY staff and management (11.125).

(e) Transitional back-office services continue to be provided by Facebook where necessary but for no longer than 6 months following completion of the divestiture. The nature of any TSAs, which will be reviewed by the CMA, will depend on the identity of the purchaser.

(f) In addition, at the purchaser's option, a short-term agreement with Facebook for supply of GIPHY's products and access to GIPHY's GIFs should be in place on completion of the divestiture.

### Identification and availability of a suitable purchaser

11.138 This section sets out evidence received and our assessment of the identification and availability of a suitable purchaser.

11.139 We will wish to be satisfied that a prospective purchaser:

(a) is independent of the main Parties;

(b) has the necessary capability to compete;

(c) is committed to competing in the relevant markets; and

(d) will not create further competition concerns.[677]

---

[676] The exact amount to be determined prior to completion of the divestiture.
[677] Merger Remedies Guidance, paragraph 5.21.

PX0684-341

11.140 In the Remedies Notice we invited views on whether there were any specific factors we should pay particular regard to in assessing purchaser suitability, eg:

(a) Whether a proven capability of operating a GIF supply business or similar, is essential or desirable;

(b) Whether a purchaser should have particular attributes or credentials to allow it to overcome any risks associated with the composition of the divestiture package;

(c) Whether private equity or similar investment buyers would be suitable purchasers; and

(d) Whether there are any other factors that we should consider.

*Views of the Parties*

11.141 Facebook submitted that a 'competitive status quo ante can… plainly be recreated with a transfer of the GIPHY assets to a qualified buyer. Someone, in other words, who: (a) does not have market power in display advertising and does not raise competition concerns; (b) can credibly run GIPHY, and (c) is financially sound'.[678]

11.142 Facebook believed that [✂].

11.143 Facebook also submitted [✂], as the purchaser will be taking on significant financial liability. Further, it believed that no other purchaser would be able to take advantage of the significant vertical merger efficiencies that existed through the Merger for Facebook (as GIPHY's largest third party platform), thus decreasing the attractiveness of GIPHY to third parties. It noted that no third parties had indicated an interest in acquiring GIPHY during our investigation.

11.144 [✂]. It also noted that no third party has indicated it would be interested in acquiring GIPHY.

11.145 GIPHY stated that [✂]. It believed GIPHY was [✂] and noted that this was the [✂].

11.146 In addition, GIPHY stated that it was [✂], [✂]. It also said that delivering GIFs at scale to the entire internet and growing is a very expensive proposition. A potential buyer would have to front all the costs of supplying

---

[678] Facebook, Response to Remedies Notice, paragraph 1.8.

PX0684-342

GIFs to the entire world. GIPHY characterised this as a significant financial burden.

11.147 GIPHY argued that the CMA requirement that the purchaser demonstrate 'a commitment to providing…GIF-based advertising in the UK' was unprecedented, disproportionate, and fraught with difficulty. GIPHY believed that [✂]. GIPHY submitted [✂].

11.148 GIPHY believed that if there were a purchaser it would have to be someone that knows not only how to work in the internet space, but also how to manage a group of young tech engineers and product managers and staff. GIPHY believed that [✂].

11.149 [✂].

11.150 Both Facebook and GIPHY argued that divestment would require ongoing monitoring and enforcement because the purchaser would need to establish a full sales team post-divestiture (to support GIPHY's CRO and direct reports); the expectation that the purchaser pursues Paid Alignment activities in the UK; and the restriction on the purchaser's ability to extract cash unduly from GIPHY in the short term. As there is no legal recourse if the purchaser did not do these things, GIPHY submitted that the CMA would therefore need to consider whether it could impose some form of requirement on the purchaser to agree to CMA monitoring and enforcement of the commitments.

*Views of third parties*

11.151 Third parties were, on the whole, unsure as to who specifically would be interested in acquiring GIPHY. However, the identity of the purchaser was thought to be key in determining whether a divestiture would make the market more competitive with one third party platform specifically stating that the purchaser of GIPHY should not be a dominant market player.[679]

11.152 There was no clear consensus among third parties as to the size of the potential buyer pool. One third party believed that the potential pool of purchasers would probably be both larger and different to those at the time of acquisition. [✂]. This was backed up by another third party comment that there was quite a lot of deal activity at the moment, and public market valuations appeared high. This third party considered that, based on external factors, there could be more interest in the sale of GIPHY now than had been the case in 2020.

---

[679] [✂] stated that [✂].

PX0684-343

11.153 Third parties generally believed that a purchaser would be an operating company interested in acquiring GIPHY as a strategic asset likely in the social media space, for example, a platform, content or media company or advertising company. One third party platform, for example, stated there are theoretically plenty of social media purchasers who use GIFs. It thought that there were creative people in the social media space who may see value in GIPHY where others do not. If it was not to be a social media firm or a user of GIFs, a possible purchaser would be a buyer who considers it can provide a return on investment.

11.154 While a financial investor could not be ruled out, third parties generally thought that GIPHY would not be attractive to this group given its lack of a predictable, stable and growing revenue base. [✂], for example, stated that private equity could be considered, but realistically this was probably a poor fit. This company described how private equity groups are usually looking for companies with a predictable, stable and growing revenue base in which to invest. GIPHY did not have such a revenue base and would probably not be a candidate for this type of buyer. However, this third party thought that the potential pool of purchasers would probably be both larger and different to those at the time of acquisition.

11.155 All third parties told us that they had not looked at GIPHY in detail recently and were not aware of its current operating position under Facebook post-Merger. This restricted their ability to comment accurately on their potential interest in GIPHY if it was to be divested.

11.156 [✂] told us if GIPHY came on the market today, it would not see huge value in presenting a full acquisition to the acquisitions team. This third party also noted that there were [✂]. [✂] also stated that it was unsure on whether it would be interested in the monetisation product of GIPHY. [✂].

11.157 [✂] told us that it had conducted only a limited amount of due diligence when it first looked at GIPHY. It stated that it would 'revisit the possibility' of investing in GIPHY but would need to conduct due diligence. [✂] also stated that the degree of ad monetisation GIPHY was able to generate at this time would not be a determinative factor. [✂], would want to see a stable, if not growing, audience size and user engagement. The monetisation of the ad product may factor into the very final decision making, but at this stage [✂] would entertain the idea without needing to see monetisation, as their initial attraction was based around the size of GIPHY's recurring user base.

PX0684-344

*CMA assessment*

11.158 When implementing a divestiture remedy, the CMA undertakes a process to assess a purchaser's suitability as an acquirer. Purchasers are assessed against the CMA's standard criteria of independence, capability, commitment to enter the relevant the market, and absence of competition concerns.[680] The relative importance that we will attach to each criterion will depend on the circumstances of the case. The criteria are designed to test whether a potential purchaser is suitable and capable of remedying the SLC by its acquisition and management of the divested business. The CMA will gather both written and oral submissions from potential purchasers and third parties on all of the criteria as part of this process. Whilst assessment of commitment to the relevant market is necessarily based on information provided by the potential purchasers, these submissions are carefully examined and tested, and further submissions may be requested until the CMA is satisfied that a potential purchaser meets the criteria, or not. Through this rigorous process, the CMA is able to exercise a level of scrutiny that ensures that any approved potential purchaser is suitable, noting that the selection of the ultimate purchaser is a matter for the divesting party, or divestiture trustee if appointed.

*Independence*

11.159 This criterion specifies that the purchaser should not have a financial interest in, or other connection to, Facebook that may compromise the purchaser's incentives to compete. Noting that Facebook's size and scale of operations means that it may have connections with many potential purchasers, we will examine and consider any connections between it and a potential purchaser of the divestiture package.

*Capability*

11.160 In assessing capability, we consider that a purchaser must have access to appropriate financial resources, expertise and assets to enable GIPHY to be an effective competitor and develop over time.

11.161 [✂]. It currently runs on an operating cost of [✂] per month excluding staff costs, with no revenue. Although we would expect the divestiture package to include funding as discussed in paragraphs 11.119 to 11.127, a purchaser must be able to demonstrate that it has access to and can provide sufficient

---

[680] Merger Remedies Guidance, paragraph 5.21.

PX0684-345

funds to maintain and develop the business as described in the counterfactual (see Chapter 6, Counterfactual).

11.162 In the section above on composition of the divestiture package, we decided that best endeavours should be used to move former GIPHY staff and management from Facebook employment contracts on to GIPHY contracts. While we would expect that, given suitable incentives, this process would not undermine the overall effectiveness of the remedy, it may be the case that new staff and management need to be recruited immediately after completion of the divestiture.

11.163 Consequently, we will consider a purchaser's capability to carry out any subsequent recruitment as part of the purchaser suitability process. This capability may come from existing similar operations within the purchaser's existing business, or from the inclusion of experienced managers as part of the purchaser's 'bid team'.

11.164 GIPHY currently has no revenue function or strategy. GIPHY will need to recruit a Chief Revenue Officer or employ relevant experts to prepare a revenue strategy before completion of the divestiture, which may include developing partnerships, introducing new revenue streams and further monetising GIPHY's GIFs and stickers.

11.165 Given the fundamental importance of this function, and the lack of an existing strategy or revenue team, we consider that a purchaser would need to be able to demonstrate its capability to develop and grow this function effectively post-divestiture.

*Commitment to the relevant markets*

11.166 To remedy the SLCs identified in this Final Report, a suitable purchaser needs to show a commitment to developing and providing:

*(a)* A GIF-based advertising in the UK (eg via GIPHY's previous Paid Alignment advertising model); and

*(b)* GIFs to social media platforms.

11.167 Accordingly, assessment of purchaser business plans will be critical for us to understand the purchaser's commitment to the relevant markets. We would expect those plans to address the issues of building a revenue-generating advertising business and providing continued access to GIFs. Given the extent of GIPHY's Paid Alignment advertising pre-Merger and the lack of a current revenue function (although this will be mitigated through the hiring of a CRO and other sales staff) we do not expect that purchasers will necessarily

344

have a highly detailed plan for GIF-based advertising in the UK. However, we do expect to see consideration being given to routes for entry to the UK in the near future in those plans.

*Free from competition concerns*

11.168 Potential purchasers will be required to demonstrate to our satisfaction that they do not have market power in display advertising and must not otherwise raise competition concerns. This applies both to horizontal and vertical concerns.

11.169 As part of our assessment of purchaser suitability, we will look at whether a divestiture may cause further competition or regulatory concerns. If there is a realistic prospect of these concerns arising, it is likely that a purchaser would not be approved.[681]

11.170 As mentioned above at paragraph 11.158, purchaser assessment is fact sensitive and will depend on the circumstances of the case. In this case, any assessment of competitive or regulatory concerns will be made in the context of Facebook's market position and power in display advertising and social media services (see Chapter 5, Market Definition and Market Power).

*Availability of a suitable purchaser*

11.171 In order to effect a successful divestiture, a suitable purchaser of the divested assets must be available. The lack of availability of a suitable purchaser is a risk to the effectiveness of the remedy. However, our Merger Remedies Guidance provides that 'substantial uncertainty as to whether a suitable purchaser will emerge will generally not be sufficient for the CMA to conclude that any form of divestiture remedy is not feasible… it is normally possible to implement divestiture remedies, despite such uncertainties, given flexibility in the disposal price'.[682]

11.172 Facebook and GIPHY told us that [✄]. Facebook said that this cannot be solved by a reduction in purchase price. Facebook told us that it has efficiencies that other purchasers will not have due to being the largest third-party platform using GIPHY. GIPHY made a similar point, as well as highlighting [✄]. In addition, no third party had expressed an interest, at this stage, in acquiring GIPHY.

---

[681] Merger Remedies Guidance, paragraph 5.21(e).
[682] Merger Remedies Guidance, paragraph 3.51.

PX0684-347

11.173 Based on this evidence, we consider that [✂].

11.174 Our assessment of other potential buyers for GIPHY at the time of the Merger, set out in Chapter 6, Counterfactual, showed that there were other parties interested in acquiring GIPHY. At the time of the Merger, advisers were engaged to look at both a possible investment round and a sale of GIPHY. Once Facebook had made an offer that was acceptable to GIPHY's investors, [✂]. GIPHY has submitted that at the time of the Merger this made sense, because of the unique position Facebook was in to acquire the business and the fact that capital markets were effectively shut as a result of Coronavirus (COVID-19).

11.175 When we gathered evidence from third parties during our consultations on possible remedies, some told us they would not be interested in acquiring GIPHY. However, we were told by others that a lack of understanding of GIPHY's current configuration meant they considered themselves unable to express a definitive view on whether they would be interested in purchasing GIPHY if a divestiture was required.

11.176 We also note that in conjunction with the pause in efforts to market GIPHY as a result of the 'no-shop' provision in the term sheet with Facebook, we found no documentation that showed that [✂].

11.177 A key mitigation for purchaser risk in a divestiture remedy is flexibility in the divestiture price. Facebook paid USD 315 million (equivalent to GBP 260 million)[683] [✂] for GIPHY, with an additional [✂] being provided to certain GIPHY personnel in the form of Facebook RSUs [✂].[684] [✂]. The prospect of obtaining GIPHY at a discount to the price paid by Facebook should, in our view, attract a reasonable pool of potential purchasers.

11.178 We do not accept, as Facebook and GIPHY submitted, that the divestiture would require ongoing monitoring. The purchaser suitability assessment set out above is designed to ensure as far as possible that a purchaser is committed to an appropriate business plan for GIPHY.

11.179 We have concluded that a potential purchaser of GIPHY will need to have capability including expertise, demonstrable commitment to developing GIPHY's business and monetising its GIFs and stickers, independence from Facebook and raise no competition concerns.

---

[683] Bank of England exchange rate as at 15 May 2020 of USD1.2126 to GBP1 on the date of the completion of the Merger.
[684] The purchase price of USD315m is [✂].

PX0684-348

11.180 Although we have not identified specific purchasers at this stage, GIPHY has a number of valuable assets, high calibre staff and a strong market position in its core business, which taken together with the flexibility in the disposal price should, in our view, attract a sufficient number of purchasers to enable an effective divestiture of GIPHY to take place. We consider that a range of purchasers may be suitable and have not excluded any type of purchaser at this stage.

### *Effective divestiture process*

11.181 An effective divestiture process will safeguard the competitive potential of the divestiture package before disposal and will enable a suitable purchaser to be secured in an acceptable timescale, as well as allowing prospective purchasers to make an appropriately informed acquisition decision.[685]

11.182 The incentives of merger parties may serve to increase the risks of divestiture. Although merger parties will normally have an incentive to maximise the disposal proceeds of a divestiture, they will also have incentives to limit the future competitive impact of a divestiture on themselves. Merger parties may therefore seek to sell their less competitive assets/businesses and target them to firms which they perceive as weaker competitors. They may also allow the competitiveness of the divestiture package to decline during the divestiture process.[686]

11.183 We have identified a number of measures to be included within a divestiture package to address composition risk, including the risk of losing employees and the integrity of the GIPHY library. We consider these risks in relation to the divestiture process when assessing:

(a)  the appropriate timescale for divestiture to take place;

(b)  whether, and under what circumstances, there is a need to appoint an external and independent trustee to complete a divestiture (a **Divestiture Trustee**) to mitigate the risk that the divestiture does not complete within the timescales specified; and

(c)  the role of interim measures during the divestiture process.

---

[685] Merger Remedies Guidance, paragraph 3.51.
[686] Merger Remedies Guidance, paragraph 5.4.

PX0684-349

*Timescale allowed for divestiture*

11.184 We have considered what would be an appropriate timescale to allow Facebook to implement the divestiture (the **Initial Divestiture Period**).

11.185 The CMA, when determining the Initial Divestiture Period, will seek to balance factors which favour a shorter duration, such as minimising asset risk and giving rapid effect to the remedy, with factors that favour a longer duration, such as canvassing a sufficient selection of potential suitable purchasers and facilitating adequate due diligence. The Initial Divestiture Period may be extended by the CMA where this is necessary to achieve an effective disposal.[687]

- *Views of the Parties*

11.186 Facebook stated that while it recognised that the starting point for an Initial Divestiture Period is usually six months, there may be [✂]. Facebook believed that as a result of the need to reconstitute GIPHY prior to a divestiture a more realistic timeframe for divestment was [✂].

11.187 GIPHY considered that the Initial Divestiture Period should be at least [✂].

- *CMA assessment*

11.188 Our Merger Remedies Guidance provides for an Initial Divestiture Period of a maximum of six months.[688] We have taken account of Facebook's submission that [✂] was a more realistic period. In our view, the reconstitution requirements required by our remedy and highlighted by Facebook can be undertaken in parallel with the sales process and would not add to the time period. An effective divestiture process requires a detailed plan of action where key milestones are set, for example for transferring staff and recruiting a CRO. We will look to Facebook to provide this plan at the outset of the divestiture process.

11.189 In our view, [✂], [✂] we will set an Initial Divestiture Period of [✂] months. This period would be expected to run from the acceptance of Final Undertakings or the making of a Final Order until legal completion of an effective divestiture (ie a sale to a purchaser approved by the CMA).

---

[687] Merger Remedies Guidance, paragraph 5.41.
[688] Merger Remedies Guidance, paragraph 5.41.

PX0684-350

*Provision for appointment of a Divestiture Trustee*

11.190 It is the CMA's standard practice to provide for the appointment of a Divestiture Trustee to dispose of the divestiture package, if the acquirer fails to achieve an effective disposal within the Initial Divestiture Period, or if the CMA has reason to be concerned that the acquirer will not achieve an effective disposal within the Initial Divestiture Period. This helps ensure that the acquirer has sufficient incentive to implement the divestiture promptly and effectively.

11.191 We invited views on whether the circumstances of this Merger necessitated the appointment of a Divestiture Trustee at the outset of the divestiture process.

- *Views of the Parties*

11.192 Facebook stated that there is no question that it has the capability required to sell the business. It believed a Divestiture Trustee would not solve the concerns raised regarding the potential divestment, nor would a Divestiture Trustee be in a better position than Facebook to sell the business.

- *CMA assessment*

11.193 As set out in our assessment of composition risk (see paragraphs 11.23 to 11.137), we have identified that Facebook and GIPHY will be required to take a number of steps during the Initial Divestiture Period, notably, the retention of senior management and the transfer of GIPHY staff to GIPHY employment contracts. The introduction of a Divestiture Trustee at the beginning of the divestiture period might risk creating some uncertainty among GIPHY management, staff and buyers – for example around the respective roles of Facebook and the Divestiture Trustee – and so might risk undermining the effectiveness of the divestiture process.

11.194 We therefore have concluded that Facebook is in the best position initially to look to sell GIPHY and should be given an opportunity to achieve an effective and timely disposal and we do not propose to appoint a Divestiture Trustee from the outset.

11.195 However, we also recognise that Facebook may have conflicting incentives in relation to achieving an effective and prompt divestiture. In particular, we are concerned about the risks surrounding management retention and staff transfer and the consequences of any delay in addressing these risks on the effectiveness of the divestiture. The ability to appoint a Divestiture Trustee is an important means by which the CMA is able to reduce the risk of the asset

PX0684-351

deteriorating and bring the implementation of this remedy to a timely conclusion. To ensure a timely implementation of this remedy, and in line with our usual practice, we propose to reserve the CMA's right to appoint and deploy a Divestiture Trustee to take control of the divestiture process from Facebook in any one or more of the following situations:

(a) Facebook fails to complete the divestiture process within the Initial Divestiture Period; or

(b) the CMA reasonably believes that there is a risk that the divestiture process would be delayed or fail to complete within the Initial Divestiture Period; or

(c) Facebook is not engaging constructively with the divestiture process (including, in particular, the retention of senior management and the transfer of GIPHY staff); or

(d) There is a material deterioration in the divestiture package during the divestiture process.

11.196 We expect Facebook to engage constructively with the divestiture process and to provide a detailed schedule of the timing of the divestiture process, which includes addressing the areas set out in paragraphs 11.49 to 11.137. The formal requirement to produce this schedule will be incorporated in the Final Undertakings or Final Order. However, so that the divestiture process is not subject to unnecessary delay, we would expect constructive engagement from Facebook to commence immediately after publication of this Final Report.

11.197 In line with the CMA's normal practice, if appointed, a Divestiture Trustee would be tasked with completing the divestiture to a potential purchaser approved by the CMA at the best price possible.[689]

*The role of interim measures during the divestiture process*

11.198 We have put an IEO in place to govern the conduct of Facebook and GIPHY during the investigation,[690] to ensure (amongst other things) that no further integration takes place and to prevent any other action that might impact on the remedies process. The IEO will cease to have effect upon final determination (ie when the CMA accepts Final Undertakings or makes a Final

---

[689] Merger Remedies Guidance, paragraph 5.43.
[690] Initial Enforcement Order, 9 June 2020. This IEO was varied using a Variation Order on 29 June 2021.

PX0684-352

Order). However, in line with usual CMA practice we would seek to include relevant provisions from the IEO in the Final Undertakings or Final Order.

11.199 Following Directions issued by the CMA on 19 June 2020,[691] a Monitoring Trustee was appointed to oversee the Parties' compliance with the IEO.[692] We will continue to use the Monitoring Trustee to provide us with information on compliance with the obligations to maintain the integrity of the GIPHY business and hold it separate during the divestiture period. We have also decided to broaden the role of the Monitoring Trustee to include monitoring of the divestiture process, transfer of staff onto GIPHY contracts, hiring of a CRO or consultants to develop a sales strategy and the Parties' compliance with their commitments.

*Making of a Final Order or Final Undertakings*

11.200 Facebook submitted that the CMA does not have the power to make an order against GIPHY as it does not carry on business in the UK. In their view, the inability of the CMA to issue any order against GIPHY thus raises serious questions as to the enforceability of any divestment order and whether any such order could be effective, particularly where it would expect GIPHY to take actions to implement the divestment.

11.201 In accordance with our normal practice we would seek undertakings from Facebook to divest GIPHY. If undertakings are not forthcoming, we will make a Final Order requiring Facebook to divest GIPHY. In line with our normal practice, we would consult on any undertakings or order before becoming final. We are not required to determine the question of whether GIPHY is carrying on business in the UK for the purposes of implementing our remedy.[693] However, were we required to do so, the fact that GIPHY's products and services are available in the UK would be strong evidence in favour of concluding it was carrying on business in the UK.

*Conclusions on divestiture process*

11.202 Based on the analysis set out above, we have concluded that the following are necessary to support an effective divestiture process:

   *(a)*  The Initial Divestiture Period should be [✂] months;

---

[691] Monitoring Trustee Directions, 19 June 2021.
[692] Merger Remedies Guidance, paragraph 5.37.
[693] The Act requires that an order may extend to a person's (includes company) conduct outside the UK only if the person is a UK national, a UK incorporated body or a person carrying on business in the UK: s.86(1).

PX0684-353

(b)  We do not propose to appoint a Divestiture Trustee at the outset, but will reserve the right to do so should any of the conditions in paragraph 11.195 arise. However, as set out in paragraph 11.199, we have decided to broaden the role of the Monitoring Trustee to include monitoring of the divestiture process; and

(c)  We will continue to monitor, enforce, and update if necessary, the relevant provisions of the IEO, which will be carried over into Final Undertakings or the Final Order. The Monitoring Trustee's role will be expanded so that the risks of this divestiture can be more readily assessed by the CMA.

### *Conclusion on the effectiveness of full divestiture of GIPHY*

11.203 Taking into account the evidence we have received and set out above, we have concluded that a full divestiture of GIPHY, including the provisions set out in paragraphs 11.231 to 11.137 would be an effective remedy for the SLCs we have identified and any adverse effects arising from them.

## Facebook's proposed remedy options

### *Summary of Facebook's proposed remedy options*

11.204 Facebook submitted[694] that divestiture of GIPHY was disproportionate, and unsustainable in the light of less intrusive, equally effective and less costly remedies, and submitted the following remedy options:[695]

(a)  Open Access Remedy to address the vertical theory of harm (the **Open Access Remedy**);

(b)  A Commingling remedy to address the horizontal theory of harm (the **Commingling Remedy**); and

(c)  A white label licensing remedy (the **Licensing Remedy**), which it categorised as a 'partial divestiture'.

11.205 Facebook submitted that a combination of these remedies, or borrowing aspects from one or the other, would effectively address the CMA's concerns.

---

[694] Facebook, Response to Remedies Notice, section B.
[695] We consider that Facebook's 'partial divestment' remedy is a licence remedy, which we assess as a behavioural remedy.

PX0684-354

*The Open Access Remedy*

11.206 Facebook's Open Access Remedy[696] proposed that for a period of five years:

(a)  Facebook would undertake to maintain access to GIPHY's library for existing and new API users under the same terms and conditions as pre-Merger (**Open Access**).

(b)  Facebook would undertake that access to GIPHY's API will not be conditional upon sharing user-specific information with Facebook; GIPHY API Users will remain free to use proxy servers[697] or cache GIPHY traffic, as they are permitted to do (and which in fact they do) today (**No Conditional Access**).

(c)  Facebook would undertake not to use, without the consent of API Users, any individually identifiable user-level or aggregate data obtained through the GIPHY API for Facebook's advertising business in the UK (**No Ads Usage**).[698]

11.207 Facebook stated that 'Such a commitment would eliminate any concerns regarding a SLC "in the supply of social media services worldwide (including in the UK) due to vertical effects resulting from input foreclosure"'.[699] It further stated that the 'remedy effectively resolves all conceivable concerns relating to foreclosure through requiring rival "platforms" to provide more data (eg, on individual or aggregate user behaviour). Moreover, its self-executing nature eliminates concerns that the CMA has previously associated with access remedies'.[700]

11.208 Facebook said that any SLC would be time limited as a consequence of market developments. Facebook told us that five years is a long period in social media and that it considered 'the outer edges of what could be considered under a dynamic loss of competition theory'. Furthermore, there was a real-life example of such contract length with Facebook's contract with [✂].

11.209 Facebook submitted that specification risk can be mitigated by designing the remedy such that developments would be made available or, alternatively, an

---

[696] Facebook had put forward the same remedy as a potential UIL at Phase 1 in a letter dated 5 March 2021.
[697] A proxy server is a server application that acts as an intermediary between a client requesting a resource and the server responding to that resource. It can be used in this context to protect the privacy of the client requesting the resource.
[698] Facebook, Response to Remedies Notice, paragraph 1.18. This is the same remedy put forward as a possible UIL at Phase 1 in a letter dated 5 March 2021.
[699] Facebook, Response to Remedies Notice, paragraph 1.19.
[700] Facebook, Response to Remedies Notice, paragraph 1.21.

PX0684-355

access remedy could be combined with one of the several remedy options put forward by Facebook such that a rival will be able to continue to innovate.

11.210 Facebook submitted that due to the 'extremely straightforward' nature of third-party API access to GIPHY, there are no plausible concerns regarding the effectiveness of the remedy based on a lack of monitoring or enforcement in the event of non-compliance:[701]

   (a) Any attempt by Facebook to deny or degrade Open Access to GIPHY's library would be immediately obvious to the relevant GIPHY API User, which would have every incentive to raise such concerns directly with the CMA (eg, by sending an email).

   (b) The same is true of the No Conditional Access aspect of the undertakings, whereby if Facebook endeavoured to insert conditions to accessing GIPHY's Services, including restrictions on use of proxies and/or caching, then API Users would raise this issue with the CMA and the CMA would have the ability to issue written directions to resolve those concerns.

   (c) With respect to the No Ads Usage, the undertakings enable API Users to protect their user data using proxies and caching. Thus, to the extent an API User has any concern about Facebook's access to its user data, the ability to proxy or cache means that no personally identifiable user data will be available for ad targeting. To the extent that API Users elect not to use the option to control Facebook's access to their user data, Facebook could commit to updating the CMA on the design, implementation and maintenance of additional internal safeguards to prevent the use of any user information that GIPHY receives for ads in the UK.

11.211 Facebook submitted that to ensure compliance with the Open Access remedy, the CMA could consider ordering Facebook to engage a Monitoring Trustee.[702] 'Furthermore, to prevent Facebook accessing user-level GIPHY data for online advertising … the CMA could limit Facebook's use of GIPHY user-level data to providing and improving the service, promoting safety and security, complying with legal obligations, etc., or could simply have prohibited the use of such disaggregated data for advertising purposes. … such a remedy could be effectively self-executing as well.'[703]

---

[701] Facebook, Response to Remedies Notice, paragraph 1.20.
[702] Facebook, Response to Remedies Notice, paragraph 1.23.
[703] Facebook, Response to Remedies Notice, paragraph 1.24.

PX0684-356

*The Commingling Remedy*

11.212 Facebook said that the Commingling Remedy would address the SLC in relation to the supply of display advertising in the UK due to horizontal unilateral effects arising from a loss of dynamic competition. It stated that by removing the sentence: 'In addition, you shall not commingle Giphy search results with search results of another provider without Giphy's express written approval' from GIPHY's terms of service, anyone could start a Paid Alignment business using GIPHY's GIFs.[704] Facebook submitted that the remedy would enable GIPHY's API partners to advertise to their own users via Paid Alignments.

11.213 Facebook told us that this would enable a Paid Alignment competitor to utilise GIPHY's library to increase the attractiveness of its own product and thus compete in Paid Alignments using GIPHY's database. This would occur by allowing the competitor to obtain the GIFs from GIPHY, intersperse its own ads, and then send the commingled feed to its partner.'[705] This, it stated, would enable 'an unlimited number of businesses to compete with their own [P]aid [A]lignment products'.[706]

*The Licensing Remedy*

11.214 Facebook also put forward what it termed 'a partial divestiture remedy' involving:

*(a)* Creation and sale of a white label (ie unbranded) copy of GIPHY's content library; and

*(b)* A licence to use GIPHY's search algorithm (and/or other essential technology) for five years.

11.215 Facebook stated that this remedy would enable a suitable purchaser to utilise GIPHY's content library and IP to drive the dynamic competition in the UK. It stated that a suitable purchaser would likely have its own user base in the UK and perhaps its own sales team and, as a consequence of the licensing remedy, it would have all of the assets necessary to deliver Paid Alignment services for its advertising customers in the UK. This would, in Facebook's view, restore any hypothetically lost dynamic competition in the UK, as well as create a more competitive position then was the case pre-Merger.[707]

---

[704] Facebook, Response to Remedies Notice, paragraph 1.25.
[705] Facebook, Response to Remedies Notice, paragraph 1.27.
[706] Facebook, Response to Remedies Notice, paragraph 1.28.
[707] Facebook, Response to Remedies Notice, paragraph 1.34.

PX0684-357

11.216 Facebook stated that this would 'increase the number of GIPHYs from one to two, or, potentially, [✁].[708]

11.217 Facebook also stated that this remedy would operate on a global rather than a UK basis.[709]

***GIPHY's views***

11.218 GIPHY stated that, in its view, the Open Access and Commingling Remedies should be viewed as one package. It believed that these remedies fully resolved the CMA's concerns and were low risk.

11.219 GIPHY stated that the Open Access Remedy would be effective and that it was, overall, better for competition in social media as all platforms would be able to use GIFs, if they wished. It also submitted that an Open Access Remedy was, overall, better for competition in the advertising market, as all platforms could monetise GIFs as they wished. Also, it considered that [✁].

11.220 GIPHY thought that the Open Access and Commingling Remedies were easy to specify as obligations were clear in GIPHY's standard terms and conditions and it would provide third party platforms continued access to the GIPHY database on the same terms. It stated that terms and conditions had not changed under GIPHY and [✁], to prevent a third party from replicating it.

11.221 GIPHY submitted it could provide a specification of how the rankings of GIPHY's search algorithm are calculated. In addition, GIPHY could provide a reference implementation of performant GIF search algorithms alongside the necessary content. Together these would enable any third party to replicate GIPHY's search feature.

11.222 GIPHY believed it was straightforward to do proxy searches. GIPHY told us that '[✁].' 'It can be done on our side, it can be done on a third party, it can be done at the client side, so there [are] actually three levels, three points at which this can be obfuscated or controlled'. It submitted that the requirement could be placed on Facebook or GIPHY rather than the third party. This, it submitted, could be done transparently and cost-free to any potential or existing third party platform partner.[710]

---

[708] Facebook, Response to Remedies Notice, page 17.
[709] Facebook, Response to Remedies Notice, paragraph 1.35.
[710] GIPHY provided an example of this whereby GIPHY could partner with a third party that would host a proxy on GIPHY's behalf, which would apply to all partners using GIPHY's API. That proxy host could offer contractual assurances to partners that they would not share request-level data with Facebook or GIPHY. [✁]

PX0684-358

11.223 GIPHY also stated that these remedies could not be circumvented. The API for example is free and updates are released universally. GIPHY stated that 'everyone has the same service right now because technically trying to create custom services for people is very difficult, especially at scale. The only case really to be specific is different countries, there are certain restrictions for certain terms across countries and that is something that would probably be maintained like across any individual user platform'. GIPHY stated it is very difficult to create custom services for different partners and doing so would also be more expensive, however, that 'technically it is possible to differentiate service between customers'.

11.224 GIPHY stated that, in its view, Facebook does not have an incentive to degrade GIPHY. It stated that 'if there were two versions of this out there it would ultimately, over time, hurt the GIPHY brand and it would hurt GIPHY's ability to maintain the content, relationships it has which ultimately is bad for Facebook because they want the best content as well, just like everybody else.'

11.225 GIPHY's view was that compliance would also be easily monitored as any change to access would be immediately obvious to third parties. It stated 'from a practical perspective it is very easy to check two random different integrations and make sure that when you search "happy" on one, that you are getting the same content that is the same thing as "happy" on another.' Furthermore there are a lot of competitive tools that can track differences between search engines.

11.226 GIPHY believed that concerns around information asymmetry and the ability of third parties to detect issues in real time could be addressed through competitive tools that could be created easily to track differences between search engines. In addition, the remedies package could require Facebook to incur any costs associated with monitoring compliance; for example, Facebook could publish regular compliance reports.

11.227 GIPHY also thought that commingling would mean third parties would be free to monetise GIFs if they wish to do so, and this would be more effective than a divestiture as it would allow an unlimited number of third parties to drive dynamic competition rather than just one. It stated that CMA concerns relating to Facebook incentives were misplaced as Facebook has no plans to develop its own Paid Alignment advertising and its actions since the Merger in fact demonstrate the opposite: Facebook did not acquire GIPHY's sales team and has made no effort to negotiate Paid Alignments with advertisers.

11.228 GIPHY also submitted that a regulatory regime on digital markets is coming into force in the UK, with the CMA's Digital Markets Unit (**DMU**) being set up

PX0684-359

as a new tech regulator with specific expertise in this space. The DMU could be used for monitoring and enforcement of Facebook's behavioural remedies.

### Views of third parties

11.229 We received mixed views from third parties as to whether a behavioural remedy or remedies would remedy the SLCs identified.

11.230 One third party stated that it would be hesitant to support a remedy that involved Facebook being required to guarantee open access to GIPHY. Its view was, first, that this did not resolve all the competition concerns found in the Provisional Findings and second, that Facebook could find a way to get around behavioural remedies, such as by reducing the quality of the output, or restricting access in a way that technically is not prohibited by the remedy.

11.231 This third party also believed that the white label remedy proposal could face the same issues as the Open Access remedy; for instance, Facebook could reduce the quality of the white label service or continue to collect certain data on its competitors' users.

11.232 One third party platform believed that a behavioural access remedy, as proposed by Facebook, could work. The third party platform also believed there could be a remedy related to continued access, not degrading GIFs and restrictions on competitor access to the API, together with limitations on how data might be used by Facebook. The third party platform noted it did not feel that there was a perfect solution, but the access remedy appeared workable and not intrusive, and could solve any concerns from its perspective.

11.233 In relation to the dynamic nature of the market, a third party platform stated that developments in the technology space made it notoriously difficult for competition regulators in terms of how services are going to evolve and how that changes relationships in the market. This third party platform also said that while there could be challenges in dealing with large dynamic libraries of content, it could be possible to monitor and enforce a behavioural remedy, and this does not seem too different to any other requirement of a contract. However, without regulatory intervention, there may not be an incentive to maintain access to any GIFs, regardless of how they are defined.

11.234 Another third party platform said it was fine with the idea of a behavioural access remedy, as proposed by Facebook, at this point in time. However, it noted that the behavioural remedy proposed did not appear to include any commitments regarding the future creation of GIFs, and so 'library' would have to be defined appropriately to ensure it included both continuity of content creation, and accessibility to all of the content in the library.

PX0684-360

11.235 However, this third party platform believed that it was technically feasible for Facebook to circumvent such a remedy by creating two GIPHY models that provided different service levels through technical limitations, linked to the API, or through creation methods, for instance in instituting a delay from the creation of a GIF, via either an inhouse creative team or licensing.

11.236 The third party platform said it would not easily be able to detect any reduction in the quality of GIFs it was provided with. It suspected it would have to compare GIFs on different platforms, and that it would require effort to assess and monitor this.

11.237 Another third party stated that APIs are liable to change, and these changes can actually be for positive reasons, such as improvement of service or to prevent misuse of the material. However, it was also possible for firms to simply change the API in order to serve their business objectives more fully, for example, by taking greater control of the end user experience.

11.238 Finally, one third party platform noted that there can be an imbalance in negotiating power between small and medium platforms and other larger players. This could have an effect on the ability of the third party to obtain the same service and the third party's willingness to bring up issues concerning its service with a much larger player.

### CMA assessment

11.239 We have assessed Facebook's proposed remedy options and their effectiveness in comprehensively addressing each SLC that we have found. We have considered each of the remedies both on their own and in combination.

11.240 In our view, Facebook's proposed remedy options are largely behavioural in nature. The Open Access Remedy is based on commitments by the Parties and the Commingling Remedy is a change in GIPHY's terms and conditions. While the Licensing Remedy includes the provision of a copy of GIPHY's library, it depends on a licence of GIPHY's technology, including its search algorithm.[711]

11.241 We considered the suitability of behavioural remedies in principle in this case, and, in particular, in relation to the dynamic nature of competition in the relevant markets. We then looked in more detail at effectiveness risks

---

[711] Facebook has not indicated the terms of any such licence or how it would be negotiated.

PX0684-361

concerning specification, circumvention, market distortion and monitoring of the proposed remedies. We set out our assessment of these risks below.

*The appropriateness in principle of behavioural remedies in this case*

11.242 We first considered the overall appropriateness of pursuing behavioural remedies in the circumstances of this case.

### Application of CMA's Merger Remedies Guidance

11.243 The CMA's Merger Remedies Guidance states that, due to their overall risk profile, behavioural remedies are unlikely to deal with an SLC and its adverse effects as comprehensively as structural remedies.[712] However, our Merger Remedies Guidance[713] also says that '[b]ehavioural remedies can operate satisfactorily in limited circumstances, especially where the company operates in a regulated environment and where there are expert monitors. In general, one or more of the following conditions will normally apply in the limited circumstances where the CMA selects behavioural remedies as the primary source of remedial action in a merger investigation:

(a) Divestiture and/or prohibition is not feasible, or the relevant costs of any feasible structural remedy far exceed the scale of the adverse effects of the SLC.

(b) The SLC is expected to have a relatively short duration (eg two to three years) due, for example, to the limited remaining term of a patent or exclusive contract.

(c) RCBs are likely to be substantial compared with the adverse effects of the merger, and these benefits would be largely preserved by behavioural remedies but not by structural remedies.'

11.244 In this case we have concluded that:

(a) a divestiture remedy is feasible and would not give rise to a disproportionate level of relevant costs. Our assessment of the relevant costs of divestiture can be found in the section on proportionality below.

(b) We have not been able to identify with any certainty a clear end point to either SLC. We are therefore unable to conclude that the SLCs have a relatively short duration. Facebook has argued that the industry changes quickly and that the five-year behavioural remedy limit is at 'the outer

---

[712] Merger Remedies Guidance, paragraph 3.5.
[713] Merger Remedies Guidance, paragraph 3.48.

PX0684-362

edges of what could be considered under a dynamic loss of competition theory'. In our view, the dynamic nature of the relevant markets means that there is some uncertainty as to whether the SLCs will endure beyond five years. However, we cannot see a clear reason why they would not persist. We note Facebook provided no evidence to substantiate a view that the SLCs will have been addressed by the end of the five-year period.

(c) Our assessment of RCBs is set out at paragraphs 11.299 to 11.313 below. We found there were no RCBs arising from the Merger.

11.245 We further noted that the relevant markets affected by the SLCs are not heavily regulated environments with expert monitors already in place.

11.246 In our view, any behavioural remedy would not satisfy any of the conditions as set out in our Merger Remedies Guidance for selection, and as a consequence, is unlikely to be effective.

*Experience of the application of behavioural remedies in previous cases*

11.247 The CMA's 2019 update to our programme of evaluations of merger remedies[714] found that 'the circumstances in which behavioural remedies are the right outcome of merger control are rare', and that 'where there is no expectation that the need for the remedy is itself in some way time-limited, the case for behavioural remedies is weaker still, as there is a greater likelihood that the remedy will either become ineffective or start to distort outcomes'.[715]

11.248 While the CMA's 2019 evaluation report found that 'if sufficient care is taken over the design and implementation of behavioural remedies, and if active and informed monitoring arrangements are put in place, behavioural remedies can be at least partially effective for a limited period of time in narrowly defined circumstances',[716] it also found that behavioural remedies 'are more complex and carry significantly higher risks than structural remedies and generally require more work both in upfront design and implementation'.[717]

11.249 In our assessment of the remedies proposed by Facebook, we considered whether behavioural remedies are appropriate in this case. Taking account of the experience of using behavioural remedies in past merger cases and the specific characteristics of each SLC, we conclude that behavioural remedies are unlikely to be effective in this case. We explain our reasons below.

---

[714] Merger Remedy Evaluations – report on case study research, CMA109, June 2019.
[715] Merger Remedy Evaluations – report on case study research, CMA109, paragraph 5.27.
[716] Merger Remedy Evaluations – report on case study research, CMA109, paragraph 5.27.
[717] Merger Remedy Evaluations – report on case study research, CMA109, paragraph 5.26.

PX0684-363

*The nature of competition in the relevant markets and of the SLCs*

11.250 The markets affected by the SLCs are technologically dynamic, fast moving sectors. The horizontal SLC that we have found (Chapter 7, Horizontal Effects) takes the form of unilateral effects arising from a loss of dynamic competition. This SLC finding recognises the uncertainty in the way that competition in display advertising in the UK may develop in the future.

11.251 Behavioural remedies are, by their nature, static restrictions on the conduct of firms and are correspondingly limited in the extent to which they can adjust effectively to changes in competitive conditions. They rely on obligations on firms that are based on the current conditions of competition. While a behavioural remedy may be capable of being designed to be flexible to foreseeable changes in market and competitive conditions (for example, the enactment of proposed legislation), it cannot be drafted to take into account unforeseeable changes in market and competitive conditions. The markets we are concerned with are dynamic and fast changing, which makes it even more likely that changes can occur that are not covered by behavioural remedies. This inherent limitation of behavioural remedies is an important reason why behavioural remedies are generally not preferred in merger control other than in limited circumstances, as specified in the CMA's Merger Remedies Guidance.

11.252 The vertical SLC that we have found (Chapter 8, Vertical Effects) involves effects of the Merger on competition between social media platforms in the supply of social media services. The nature of this competition involves constant innovation and evolution of services. In this context, we have found the development and innovation of GIPHY's business under the Open Access Remedy is likely to be directed in the interests of its owner, Facebook, rather than the interests of the third parties seeking access. Given this overriding incentive, behavioural remedies cannot, in our view, be designed to comprehensively address the substantial lessening of competition that we have found to arise from these vertical effects.

11.253 The technologically dynamic nature of the relevant markets, taken together with the nature of our SLC findings, contribute substantially to our view that behavioural remedies are unlikely to be effective in remedying either of the SLCs that we have found.

*Specific risks relating to Facebook's proposed remedy options*

11.254 Notwithstanding our general view set out above regarding the likely suitability of behavioural remedies in the circumstances of this case, we also considered

PX0684-364

the specific risks arising from Facebook's proposed remedy options and their potential effectiveness in addressing the SLCs that we have found.

11.255 We first look at the extent to which the remedies would have the ability, in principle, to be an effective remedy to each SLC. We then consider in turn issues relating to risks around specification, circumvention, distortion, and monitoring and enforcement.

*Potential for Facebook's proposed remedies to remedy the SLCs*

11.256 We have carefully considered the remedies proposed by Facebook and have found that, taken individually, they do not address the SLCs that we have found. The Open Access Remedy is targeted at the vertical SLC (and does not purport to address the horizontal SLC), and the Commingling Remedy and the Licensing Remedy are targeted at the horizontal SLC (and do not purport to address the vertical SLC). Therefore, to achieve a comprehensive solution to both the horizontal and vertical SLCs, even in principle, a combination of these remedies would be required.

11.257 Facebook has stated that an approach taking elements of different remedies and combining them would address the SLCs. Facebook has not provided details as to how such an approach would work and which elements could be combined to address our concerns. However, we consider that our approach to our assessment of possible remedies encompasses any such approach by looking at the constituent parts of the proposed remedies and whether they address the SLCs alone or in combination.

11.258 In addition, all of the proposed remedies (except for some elements of the Licensing Remedy) are of limited duration. Our Merger Remedies Guidance sets out that a behavioural remedy may be suitable for SLCs with a short duration.[718] However, the SLCs that we have found are not time limited. We consider that this presents a significant inherent weakness to these proposed remedies, whether considered individually or in combination.

11.259 Facebook submitted that it is incumbent on the CMA to 'proactively gather information on remedies and consider other relevant options'. In this case we have invited and received both written and oral submissions from Facebook and GIPHY as well as oral submissions from third parties. Facebook's remedy proposals have also been published on the inquiry web page.[719] This has

---

[718] Merger Remedies Guidance, paragraph 3.48 (b).
[719] Facebook, Response to Remedies Notice.

PX0684-365

formed the basis of our assessment of possible remedies, including Facebook's proposed remedy options.

11.260 Where parties propose an alternative remedy, they are expected to provide sufficient detail for us to assess their remedy option. This is particularly the case where those in the industry have a depth of knowledge that we do not, or could not, possess. While the CMA will consider all options for remedies that are put forward, it is incumbent upon parties putting remedy options forward to provide sufficient detail to enable us to assess their effectiveness. In this case, Facebook's submissions overall have lacked sufficient detail as to how its remedies would be constructed, delivered and managed, and importantly how they would comprehensively remedy the SLCs that we have found. Facebook provided no detail on the proposed terms of its Licensing Remedy, Open Access Remedy or Commingling Remedy except for the deletion of one term in GIPHY's current terms and conditions. Facebook's submissions on the Open Access Remedy have assumed that the dynamism of the market will remedy the SLC in five years' time. Our statutory duty is to 'have regard to the need to achieve as comprehensive a solution as is reasonable and practicable to the [SLC]'.[720] Facebook has not demonstrated how the Open Access Remedy will achieve this in the time frame. We have identified such a solution, namely the divestiture of GIPHY, and how the remedy will achieve its aim as set out in paragraphs 11.14 to 11.203 above.

- *Potential impact on the horizontal SLC*

11.261 Facebook said that the Commingling Remedy would allow a competitor to GIPHY in Paid Alignment to utilise GIPHY's library to increase the attractiveness of its own product and thus compete in Paid Alignments using GIPHY's database.

11.262 We do not consider that this Commingling Remedy would remedy the loss of horizontal dynamic competition that we have found (see Chapter 7, Horizontal Effects). The size and quality of GIPHY's library was a feature of competitive differentiation, giving it a large user base that could be leveraged to develop a Paid Alignments model in competition with Facebook and others. The Commingling Remedy would not preserve this source of competitive differentiation because Facebook would retain control over the content of GIPHY's library. In addition, Facebook has not provided any evidence that this remedy would reduce the strong incentives Facebook has to develop GIPHY's business (including its library, search algorithms and API) to fit with Facebook's own business, to the detriment of any third party trying to

---

[720] Sections 35(4) and 36(3) of the Act.

PX0684-366

compete in display advertising. Facebook would also benefit from the many other sources of content at its disposal, to which would now be added control over content of GIPHY's library. In our view, these considerations reduce the likelihood that entry would, in fact, take place, as a result of this remedy.

11.263 We identified similar issues with the Licensing Remedy proposed by Facebook.

11.264 First, the purchaser of a white label copy of GIPHY's library would have to compete with an initially identical copy of the library that was owned by Facebook. In addition, Facebook would retain the critical staff who have developed the library (which few other companies have) and as such the white label copy will quickly become outdated, leading to a significant diminishing in its competitiveness.

11.265 Second, the licensed library appears to be a static copy but Facebook has not provided any proposed licensing terms so this is not clear. As noted above, a static copy could rapidly become obsolete as Facebook-owned GIPHY developed and added to its library. However, even if the white label version were not static, Facebook has not set out how it would ensure the white label copy remained updated, for example in terms of speed of updating GIFs, which would compromise the white label provider in competition with Facebook.

11.266 Third, the CMA's Merger Remedies Guidance[721] provides that 'for licensing of IP alone to be effective as a remedy, it must be sufficient to enhance significantly the acquirer's ability to compete with the merger parties and thus address the SLC and any resulting adverse effects. Such a remedy may not be effective if the IP needs to be accompanied by other resources (eg technical expertise and sales networks) to enable effective competition if these resources are unlikely to be available to the potential purchasers of the IP'. We note that Facebook has not proposed that the Licensing Remedy be accompanied by these other resources, such as creative staff and experienced technology engineers, which further reduces the potential effectiveness of this proposed remedy.

11.267 Taking the above into account, we have concluded that the Licensing Remedy, even if accompanied with a licence to associated technology, is not an effective, comprehensive remedy to the horizontal SLC.

---

[721] Merger Remedies Guidance, paragraph 6.3.

PX0684-367

- *Potential impact on the vertical SLC*

11.268 Access remedies have sometimes been used to remedy input foreclosure. The CMA's Merger Remedies Guidance provides that 'if divestiture is not appropriate or feasible … then behavioural measures may enable continued access to necessary products or facilities on appropriate terms, or prevent the merged entity exploiting privileged access to information'.[722]

11.269 While the Open Access Remedy may be capable in principle of maintaining continued access to GIPHY's products, the limitations discussed in paragraphs 11.242 to 11.253 are likely to undermine the effectiveness of the remedy in practice. We have further concerns relating to specific risks that are set out in the sections below.

*Specification Risks*

11.270 Specification risks arise if the form of conduct required to address the SLC or its adverse effects cannot be specified with sufficient clarity to provide an effective basis for monitoring and compliance. Facebook have argued that it is easy to specify what GIPHY's library is for the Open Access Remedy, that access to it is set out in GIPHY's standard terms and conditions and this access is all that is required for both the Open Access and Commingling Remedies.

11.271 We consider that it may be possible to specify what GIPHY's library currently comprises, and the search algorithm. However, the CMA's Merger Remedies Guidance says that specifications must include details of 'the product or facility to be provided, including quality and technical parameters, and the terms of supply of the product or facility, including service levels'.[723] Facebook did not provide details of how these specifications could be defined to cover future changes in GIPHY's products.

11.272 We have seen a high degree of product innovation and evolution in the supply of GIFs (including GIF Stickers) in recent years. This includes, for example, GIPHY's development and introduction of a GIF Sticker product at the start of 2018. We would expect to see further product development and innovation, and also evolution of the markets for display advertising and social media services. As a result, we consider that, over time, there is a risk that current definitions of the relevant product and its technical parameters,

---

[722] Merger Remedies Guidance, paragraph 7.16.
[723] Merger Remedies Guidance, paragraph 7.18.

PX0684-368

quality, supply and service levels may become increasingly obsolete, rendering the remedy ineffective.

11.273 Any future changes to the specification and definition of the products may be complex and impractical to implement, given the information asymmetry between Facebook, third parties and the CMA or any independent monitor. We cannot see how this issue might be satisfactorily addressed, and Facebook has not indicated to us how the specification and definition of products may change over time to mitigate this risk. This therefore reduces the likely effectiveness and increases the monitoring costs of the remedy.[724]

11.274 As an independent company, GIPHY did not have an incentive to develop its products for any one specific customer, as it was looking to maximise the reach of its content rather than develop content to a specific customer's requirements. [✕]

11.275 In our view, under the Open Access Remedy, Facebook is likely, as both the [✕] and owner of GIPHY, to have a significant incentive to concentrate on or prioritise the development of GIFs/stickers in line with its own requirements rather than those of third parties. By focussing GIPHY's product development roadmap on relevant aspects of Facebook's social media platforms it is likely to gain a significant advantage over GIPHY's other customers. These customers would not have similar access/insight into developments and would be at a competitive disadvantage to Facebook. This could lead to third parties possibly not having the content in the form or format they require for their products and possibly having to forego their own product developments to allow for the continued use of GIFs and stickers on their products.

11.276 This change in incentives would be likely to reduce competition downstream in the supply of social media services and make the remedy ineffective. We do not agree with GIPHY's view that Facebook does not have an incentive to degrade the service to third parties. We have found that there are sufficient incentives for Facebook to lead us to find a vertical SLC (see Chapter 8, Vertical Effects) in relation to the supply of GIFs.

11.277 In relation to specification risk, we also note that Facebook's proposed remedy regarding concerns about Facebook's access to user data is for third parties (including competing social media platforms) to be able to use caching/proxy servers to prevent Facebook accessing their data.[725] We note

---

[724] Merger Remedies Guidance, paragraph 7.19 states '[w]here a market is likely to be subject to frequent technological change or other wide-ranging market developments, there is likely to be a significant risk that an access remedy will become ineffective if the terms of the access commitment do not accommodate these changes'.
[725] Facebook, Response to Remedies Notice, paragraph 1.20(c).

PX0684-369

that this relies on third parties adopting this approach, rather than imposing an obligation on Facebook. The implication is that to ensure that Facebook does not have access to this data, third parties would have to incur additional costs in setting up and maintaining proxy servers.

11.278 GIPHY has put forward a suggestion to use third party proxy hosts to ensure that Facebook does not have access to user data. While this may provide a work-around, it adds complexity and costs to the remedy and would require monitoring to ensure that data is being processed according to the remedy.

11.279 Similar issues with specification apply to the Licensing Remedy, in particular in relation to the specification of GIPHY's search algorithm where the specification could alter over time to benefit Facebook over other API users.

*Circumvention Risk*

11.280 Behavioural remedies do not deal with the source of the SLC. As a consequence, there is the risk that other adverse forms of behaviour may arise if particular forms of behaviour are restricted.[726] Circumvention risks increase if the behavioural remedy cannot be accurately specified.

11.281 In this case, circumvention of the Open Access Remedy could be achieved by reducing quality or service levels associated with providing access to GIFs or stickers to a third party.

11.282 For example, one readily foreseeable risk associated with circumvention of the Open Access Remedy would be for Facebook to use GIPHY's engineers to develop 'Facebook-only' GIFs and stickers, while neglecting to update the 'open' GIPHY library, or 'slow-walking' it to detrimental effect. This would lead, over time, to Facebook's GIF library being of higher quality than the open library, distorting competition in social media services.

11.283 Facebook could also carry out other practices to degrade the GIPHY brand such as delaying new, sought-after GIFs (eg relating to sporting events, or other topical matters) being available through the library to third parties for a few hours or slowing API searches down for third parties. This would have a negative effect on the users of third-party platforms, who would be looking for rapid, up to the minute content. [✂] for example told us that it [✂]. In our view, even small changes like this could affect the attractiveness of that third party to content users.

---

[726] Merger Remedies Guidance, paragraph 7.4.

PX0684-370

11.284 Facebook has argued that any attempt at circumvention would be obvious to third parties, who could therefore rapidly raise concerns with the CMA.[727] We disagree. The information asymmetry which exists between Facebook and third-party users means that the types of circumvention described above would be difficult to detect in real time. Third parties would also have to incur costs to monitor the libraries for differences and incur further costs to pursue and seek redress for any circumventions.

11.285 These sources of circumvention would also reduce the effectiveness of the Commingling Remedy, which relies on the completeness and quality of the 'open' GIPHY library. Circumvention of the Licensing Remedy is also possible. For example, Facebook might choose to update and improve GIPHY's search algorithms, but not apply these updates to the licensed version provided to a purchaser of the white-label copy of GIPHY's library.

*Distortion Risks*

11.286 Distortion risks are risks that behavioural remedies may create market distortions that reduce the effectiveness of these measures and/or increase their effective costs.

11.287 Distortion risks may arise from the creation of a copy of GIPHY's library under the Licensing Remedy. While the Commingling Remedy may allow third parties to develop new sponsored GIFs, the ability to access GIPHY's library presents a disincentive for these third parties to develop their own broader libraries of unique content and therefore would appear to increase the likelihood of dependence on Facebook-produced GIFs.

*Monitoring and enforcement risks*

11.288 The CMA's Merger Remedies Guidance states that 'even clearly specified remedies may be subject to significant risks of ineffective monitoring and enforcement.'[728] The significant issues we have found in relation to potential specification and circumvention risks of Facebook's proposed remedies give rise to a substantial likelihood of monitoring and enforcement risk.

11.289 Facebook has argued that monitoring of such remedies is straightforward as third parties would easily be able to see if the remedy package was being adhered to.[729] As set out above in the circumvention section (paragraphs 11.280 to 11.285) of this chapter, we disagree with this view of the remedy.

---

[727] Facebook, Response to Remedies Notice, paragraph 1.20.
[728] Merger Remedies Guidance, paragraph 7.4(d).
[729] Facebook, Response to Remedies Notice, paragraph 1.20.

PX0684-371

Rather, our view is that the information asymmetry and the ability and incentive for Facebook to manipulate service, quality and development mean that it would be difficult for third parties to easily monitor the remedy.

11.290 These concerns are similar to those set out in paragraph 7.6 of the CMA's Merger Remedies Guidelines, which states that '[c]ustomers and competitors of the merged entity may be in a strong position to report to the CMA on instances of non-compliance where they have appropriate resources and incentives. However, such persons may be inhibited from fulfilling this reporting role by lack of resources and verifiable information, lack of understanding of the measures, fear of reprisals and other disincentives'.[730] In this case, the difference in scale between Facebook (one of the largest social media companies in the world) and most third parties, could lead third parties to feel unable or unwilling to verify compliance with the remedy or come forward with issues and potential breaches to the CMA. This point was made by one third party, which noted that there can be an imbalance in negotiating power between small and medium platforms and other larger players.

11.291 Facebook stated that the CMA could consider ordering Facebook to engage a Monitoring Trustee at its own expense for the duration of the undertakings.[731] While a Monitoring Trustee might be able to reduce the monitoring risk, the Monitoring Trustee will still be subject to significant information asymmetries. In this context, we note that the CMA Merger Remedies Guidance also says 'the practicality of any remedy is likely to be reduced if elaborate and intrusive monitoring and compliance programmes are required'.[732]

11.292 GIPHY has suggested that the CMA's DMU could be used for monitoring and enforcement of Facebook's behavioural remedies. We note that this unit is not currently operational and in any case does not have a mandate to oversee remedies, and therefore cannot monitor or enforce Facebook's proposed remedies.

### Conclusions on Facebook's remedy proposals

11.293 The SLCs we have found, and the markets that are affected by them, do not have the characteristics that the CMA Merger Remedies Guidance would suggest make behavioural remedies suitable in principle. Each SLC we have found is dynamic in nature and enduring, further reducing the likelihood that

---

[730] Merger Remedies Guidance, paragraph 7.6.
[731] Facebook, Response to Remedies Notice, paragraph 1.23.
[732] Merger Remedies Guidance, paragraph 3.5.

PX0684-372

even the best-designed behavioural remedy would provide an effective, comprehensive solution.

11.294 In addition, we have found a number of serious deficiencies and effectiveness risks in Facebook's proposed remedy options, both individually and in combination (see paragraphs 11.270 to 11.292).

11.295 Accordingly based on the analysis set out above, we have concluded that Facebook's proposed remedy options (the Open Access Remedy, the Commingling Remedy and the Licensing Remedy) would not be effective, either individually or in combination, in remedying either of the SLCs we have found.

## Conclusions on remedy effectiveness

11.296 We have concluded that the full divestiture of GIPHY Inc, as specified in paragraph 11.137 is an effective remedy to the SLCs and adverse effects that we have found.

11.297 Based on the evidence provided to us, we have concluded that the following remedies are unlikely to be effective, either individually or in combination, to the SLCs and adverse effects that we have found:

*(a)* The Open Access Remedy;

*(b)* The Commingling Remedy; and

*(c)* The Licensing Remedy.

11.298 Having identified an effective remedy, we next consider whether there are any RCBs which we need to take into account, before considering the issue of proportionality.

## Relevant Customer Benefits (RCBs)

11.299 The Act allows the effect of a proposed remedy on RCBs to be taken into account.[733] RCBs are defined by the Act as benefits to relevant customers (current and future customers) in the form of: (a) 'lower prices, higher quality or greater choice of goods or services in any market in the United Kingdom (whether or not in the market(s) in which the SLC has occurred or may occur) or (b) greater innovation in relation to such goods or services'.[734] The Act

---

[733] The Act, section 41(5).
[734] Merger Remedies Guidance, paragraph 3.17 and s.30 of the Act.

PX0684-373

provides that a benefit is only an RCB if it accrues or may be expected to accrue from the merger and would be unlikely to accrue without the merger 'or a similar lessening of competition.'[735]

11.300 RCBs that will be foregone due to the implementation of a particular remedy may be considered as costs of that remedy and may be taken into account in our assessment of the proportionality of a remedy. An effective remedy to an SLC might be considered disproportionate if it prevents customers from realising any RCBs arising from the Merger, where these benefits outweigh the SLC and any resulting adverse effects.

11.301 The CMA may modify a remedy to ensure retention of RCBs or it may change its remedy selection. For instance, it may decide to implement an alternative effective remedy which retains RCBs, or it may decide that no remedy is appropriate.[736]

11.302 The burden of proof of whether RCBs arise from a merger is on the merging parties: '[t]he merger parties will be expected to provide convincing evidence regarding the nature and scale of RCBs that they claim to result from the merger and demonstrate that these fall within the Act's definition of such benefits'.[737]

### Views of the Parties and third parties

11.303 Facebook told us that GIPHY would evolve much more quickly with the resources of Facebook, and if it had to divest GIPHY there would be a lost opportunity to:

*(a)* Provide innovative updates to the GIPHY offering, including personalisation of the GIPHY service to 44 million UK Facebook's users thereby delivering direct end-user benefits;

*(b)* Maintain open access for GIPHY's API partners, consistent with Facebook's public commitments and the behavioural undertakings already offered to the CMA;

*(c)* Preserve, enhance, and expand GIPHY's GIF content library; and

*(d)* [✕].[738]

---

[735] The Act, section 30.
[736] Merger Remedies Guidance, paragraph 3.16.
[737] Merger Remedies Guidance, paragraph 3.20.
[738] Facebook, Response to Remedies Notice, paragraph 1.38. Note that the cost element does not include staff costs which are being paid by Facebook.

PX0684-374

11.304 Facebook told us that it considered these to be RCBs as they involve [✂].

11.305 No other parties proposed any RCBs.

11.306 We consider in turn each of the four potential benefits proposed by Facebook and set out above.

*Personalisation of the GIPHY service to Facebook users*

11.307 Facebook has not provided convincing evidence that personalisation of GIPHY services to Facebook users or the provision of 'innovative updates' are merger-specific benefits which could not have been achieved through other less anti-competitive means such as a partnership or other contractual relationship between Facebook and GIPHY under independent ownership. Furthermore, Facebook has not provided any evidence to enable assessment of the scale of any such benefits, when they would be expected to accrue or if they might be expected to accrue within a reasonable time following the Merger.

11.308 As a result, we have found that neither the personalisation of the GIPHY service nor the provision of 'innovative updates' can be considered to be an RCB as neither arises only as a result of the Merger and both could be achieved by another plausible less anti-competitive means such as partnerships or contractual agreements.

*Maintenance of access to GIPHY's open APIs*

11.309 A benefit is only an RCB if it arises from the creation of the Relevant Merger Situation. Before the Merger, GIPHY had no plans to limit access to its APIs and had strong incentives to broaden access to its GIFs and stickers, in order to make itself more attractive to advertising partners and content creators. We have also found that this situation was not likely to change in our counterfactual (Chapter 6, Counterfactual).

11.310 We have found, therefore, that Facebook's proposal to maintain access to GIPHY's open APIs cannot be considered to be an RCB as this has not arisen as a result of the Merger and would have continued under GIPHY's pre-Merger plans absent the Merger.

PX0684-375

*Preservation enhancement and expansion of GIPHY's content library*

11.311 Facebook also submitted that preservation, enhancement and expansion of GIPHY's content library was a benefit of the Merger.[739] However, we found that preservation, enhancement and expansion of GIPHY's content library was a key component of GIPHY's pre-Merger competitive strategy and would be expected to persist absent the Merger. We therefore do not consider preservation, enhancement and expansion of GIPHY's content library to be an RCB as it does not arise only as a result of the Merger.

*Stabilisation of GIPHY's financial position*

11.312 We considered the financial position of GIPHY in the counterfactual (Chapter 6, Counterfactual) and found that 'GIPHY would have continued to supply GIFs, innovate, develop its products and services, generate revenue and explore (with the financial and commercial support of investors) various options to further monetise its products.'[740] We also concluded that this situation would have prevailed irrespective of whether GIPHY was independently owned, or acquired by a third party other than Facebook. We therefore do not consider the stabilisation of GIPHY's financial position to be an RCB, as it was likely to have been achieved absent the Merger.

**Conclusion on RCBs**

11.313 Based on the analysis set out above, we have found none of the benefits claimed by Facebook amount to RCBs as required by the Act and further, Facebook has not provided us with convincing evidence that these benefits would only accrue as a result of the Merger. We have not found any RCBs that we should take into account in our evaluation of the only effective remedy we have found (full divestment of GIPHY).

## Proportionality

11.314 In order to be reasonable and proportionate, the CMA will seek to select the least costly remedy, or package of remedies, that it considers will be effective. If the CMA is choosing between two remedies which it considers will be equally effective, it will select the remedy that imposes the least cost or that is least intrusive or restrictive. In addition, the CMA will seek to ensure that no remedy is disproportionate in relation to the SLC and its adverse effects.[741]

---

[739] Facebook, Response to Remedies Notice, paragraph 1.38.
[740] Chapter 6, Counterfactual. Paragraph 6.167.
[741] Merger Remedies Guidance, paragraph 3.6.

PX0684-376

11.315 When considering the costs of an effective remedy, the CMA's considerations may include (but are not limited to):[742]

(a)  distortions in market outcomes;

(b)  compliance and monitoring costs incurred by the Parties, third parties, or the CMA; and

(c)  the loss of any RCBs that may arise from the Merger which are foregone as a result of the remedy.

11.320 The CMA's Merger Remedies Guidance states that '[as] the merger parties have the choice of whether or not to proceed with the merger, the CMA will generally attribute less significance to the costs of a remedy that will be incurred by the merger parties than the costs that will be imposed by a remedy on third parties. In particular, for completed mergers, the CMA will not normally take account of costs or losses that will be incurred by the merger parties as a result of a divestiture remedy',[743] as it is 'for the merger parties to assess whether there is a risk that a completed merger would be subject to an SLC finding, and the CMA would expect this risk to be reflected in the agreed acquisition price'.[744] As has been noted by the Competition Appeal Tribunal, by completing a merger, the parties have taken a foreseeable risk that the CMA may order a divestiture.[745]

### Views of the Parties

11.321 In its Response to the Remedies Notice, Facebook said 'complete divestiture of an acquired business is the ultimate remedy and a "normal sale" is the way in which that remedy is implemented (…). To be clear, although Facebook disputes that a "normal sale" would be a reasonable and proportionate remedy in this case, anything exceeding a "normal sale" -- such as the CMA's R&S remedy [the full divestiture remedy the CMA set out in the Remedies Notice] -- would plainly be unreasonable and disproportionate, not to mention unattractive to any would-be purchaser'.[746]

---

[742] Merger Remedies Guidance, paragraph 3.10.
[743] Merger Remedies Guidance, paragraph 3.8.
[744] Merger Remedies Guidance, paragraph 3.9.
[745] *Intercontinental Exchange Inc v CMA, [2017]* CAT 6, paragraph 101.
[746] Facebook, Response to Remedies Notice, paragraph 1.14.

PX0684-377

*CMA assessment*

11.322 We have found one effective remedy – the divestiture of GIPHY. We have not found another, less costly, effective remedy.

11.323 We have identified adverse effects relating to, among other things, choice, quality and innovation. In a dynamic and growing sector, these adverse effects are likely to be substantial and to increase over time, absent effective action. We therefore consider that the divestiture of GIPHY is necessary to achieve the aim of remedying the SLCs that we have found.

11.324 We have considered the relevant costs of the divestiture remedy. We have received no evidence that the divestiture of GIPHY to a suitable purchaser is likely to cause market distortions. Similarly, a divestiture remedy has no monitoring costs as it does not require ongoing monitoring. As set out above, we did not find any RCBs that would be foregone as a result of the remedy.

11.325 We note Facebook's comments in paragraph 11.321 above that the divestiture of GIPHY will incur significant costs for Facebook. It may receive considerably less for the business than it paid, and will also have to provide cash to incentivise staff to transfer back onto GIPHY contracts and to cover losses while GIPHY is rebuilding its revenue function. As we have noted, costs associated with staff transfer and rebuilding the revenue function are a consequence of or associated with the Merger. However, we have found no other equally effective remedy which gives rise to lower costs to Facebook. In addition, as set out in our Merger Remedies Guidance, we do not normally take account of costs to the Parties arising from the divestiture[747] and there is no reason to depart from this approach in the current case. Accordingly, we consider the relevant costs of this remedy to be very low and we find that the remedy does not produce adverse effects such as costs to third parties or loss of RCBs.

11.326 As a result, we have concluded that the divestiture of GIPHY is both an effective and a proportionate remedy to the SLCs we have found, when considered both individually and in combination.

## Conclusion on remedies

11.327 We have decided, in order to remedy the SLCs that we have found, to require the full divestiture of GIPHY.

---

[747] Merger Remedies Guidance, paragraph 3.9.

PX0684-378

# PX0685

5/21/24, 4:05 PM                                          Messenger - Facts

 Messenger                                          Features    For Developers

MESSENGER

# Everything you need to know.

Messenger is the best way to keep in touch with your friends, family and even the businesses and organizations you love. Get in touch from anywhere in the world—on your phone or your computer—at any time.



By the Numbers          Using Messenger                 Brands          Common Questions

# Messenger by the numbers:

Messenger was first released in **August of 2011**

Messenger was the **fastest growing app of 2015** in the U.S. (Nielsen)

Messenger is the **second most popular iOS app of all time**, behind Facebook (App Annie)

PX0685-001

Messenger has been downloaded more than **1 billion times** on Android

People send more than **21 billion** photos to friends through Messenger every month

Messenger already accounts for more than **10%** of all mobile VoIP calls globally

On average, more than **5 million** GIFs are sent every day via Messenger

Just two days after launching video calling in Messenger, **1 million calls** had been made

More than **1 billion** people use Messenger each month

Over **1 billion** messages are sent between people and businesses on Messenger each month

Since the launch of Messenger Platform, a number of Messenger apps have gotten more than **1 million installs**, including Talking Tom, GIPHY and Sound Clips

There are **34,000** developers and **33,000** bots on the Messenger platform

More than **375,000** people from over **200** countries engage with bots on Messenger every day

The number of messages sent to businesses on Facebook has doubled in the past year

---

# More than 900 million people use Messenger every month

See when people have read your texts                    Choose from thousands of stickers

PX0685-002

Make HD calls from anywhere in the
world

Send voice messages

Take photos and videos

Chat with your favorite groups

PHOTO AND VIDEO

# Capture all those magic moments

**Send photos and videos instantly**. Messenger lets you capture moments as they happen and add drawings or text to personalize your photos.

PX0685-003

5/21/24, 4:05 PM                                    Messenger - Facts



STICKERS, EMOJI, GIFS AND MORE

# When words aren't enough

Send delightful and expressive characters to help you say just about anything

Search almost **200 sticker packs** and find just the right one to match your mood or activity

PX0685-004

Messenger - Facts

Express yourself with over 1,500 new emoji that look the same on web and mobile



# Let friends know where you are

Send a map of any location in just a few taps. Choose where to meet friends and keep them in the loop when you're on the go.

PAYMENTS

# Pay friends back

Pay a friend back for last night's dinner or gas money from the weekend. Messenger lets people in the U.S. send money securely and easily.

It's **free, safe and secure** to send and receive money right from a conversation.



VOICE AND VIDEO

# Make connections matter

PX0685-006

Messenger - Facts

You can reach out to people even if you don't have their phone numbers or aren't friends with them on Facebook.

Calls sound clear and close in HD. Calls are **free** (data rates apply).



MAKING LIFE EASIER RIGHT IN YOUR MESSENGER THREAD

# Catch a ride. Book a flight. Make a purchase. Get ahold of customer service.

The number of messages sent to businesses on Facebook has doubled in the past year.

Believing that the **future of communication is in chat apps**, Messenger began opening to businesses in April 2015 to help people connect with the brands they love.

7/10

PX0685-007

Messenger threads are becoming critical to daily life—and they bring with them the opportunity to build conversations between businesses and people in a new conversational way.

**Millions** of people all over the world use Messenger every month to engage with businesses because it's simple, secure, convenient and keeps everything in one place.



# Connect with the brands you love.

PX0685-008

# In case you were wondering...

**WHY DO I NEED TO INSTALL MESSENGER AS A SEPARATE APP?**

At Messenger, we're committed to providing fast, reliable and delightful experiences so anyone in the world can reach all the people who matter to them. Over the last few years we've introduced video calling, chatting with groups, sending stickers and GIFs, making payments, connecting with businesses and much more. By installing the Messenger app, you will unlock faster access to all of these awesome features and, on average, the people you want to reach will respond faster.

**DO I NEED A FACEBOOK ACCOUNT TO USE MESSENGER?**

No. You don't need a Facebook account to use Messenger—sign up with just your name and phone number.

**WHO CAN I SEND MESSAGES TO?**

You can reach out to anyone on Messenger, regardless of whether or not you have their phone number or are friends with them on Facebook. Just search their name, number or username to get started.

**IF I SEND A MESSAGE TO SOMEONE I'M NOT FACEBOOK FRIENDS WITH, WHERE DOES IT GO?**

When you send a message to someone who isn't connected to you, your message will become a request. They'll need to accept your request before you can start having a conversation.

PX0685-009

When you receive a message request, you'll get a notification. You can decide to ignore or accept it.

**HOW OLD DO YOU HAVE TO BE TO USE MESSENGER?**

Anyone 13 years of age or older can install and use Messenger.



# Ready to build your app for Messenger?

GET STARTED

The fine print: All uncredited stats are direct Messenger data.

PX0685-010

# PX0686


**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook

FTC settlement imposes historic penalty, and significant requirements to boost accountability and transparency

July 24, 2019    

**Tags:** Consumer Protection | Bureau of Consumer Protection | Privacy and Security | Consumer Privacy | Data Security | Social Media

*NOTE: The FTC hosted an IN-PERSON press conference at FTC Headquarters, 600 Pennsylvania Ave, NW, Washington D.C., on July 24, 2019. Watch archival video of the press conference.*

*Participants included: FTC Chairman Joe Simons, FTC Commissioners Noah Joshua Phillips and Christine S. Wilson, and Gustav W. Eyler, Director of the Department of Justice Civil Division's Consumer Protection Branch.*

Facebook, Inc. will pay a record-breaking $5 billion penalty, and submit to new restrictions and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy, to settle Federal Trade Commission charges that the company violated a 2012 FTC order by deceiving users about their ability to control the privacy of their personal information.

The $5 billion penalty against Facebook is the largest ever imposed on any company for violating consumers' privacy and almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide. It is one of the largest penalties ever assessed by the U.S. government for any violation.

The settlement order announced today also imposes unprecedented new restrictions on Facebook's business operations and creates multiple channels of compliance. The order requires Facebook to restructure its approach to privacy from the corporate board-level down, and establishes strong new

Give Feedback

PX0686-001

mechanisms to ensure that Facebook executives are accountable for the decisions they make about privacy, and that those decisions are subject to meaningful oversight.



"Despite repeated promises to its billions of users worldwide that they could control how their personal information is shared, Facebook undermined consumers' choices," said FTC Chairman Joe Simons. "The magnitude of the $5 billion penalty and sweeping conduct relief are unprecedented in the history of the FTC. The relief is designed not only to punish future violations but, more importantly, to change Facebook's entire privacy culture to decrease the likelihood of continued violations. The Commission takes consumer privacy seriously, and will enforce FTC orders to the fullest extent of the law."

"The Department of Justice is committed to protecting consumer data privacy and ensuring that social media companies like Facebook do not mislead individuals about the use of their personal information," said Assistant Attorney General Jody Hunt for the Department of Justice's Civil Division. "This settlement's historic penalty and compliance terms will benefit American consumers, and the Department expects Facebook to treat its privacy obligations with the utmost seriousness."

More than 185 million people in the United States and Canada use Facebook on a daily basis. Facebook monetizes user information through targeted advertising, which generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share information on its platform, Facebook promises users they can control the privacy of their information through Facebook's privacy settings.

Following a yearlong investigation by the FTC, the Department of Justice will file a complaint on behalf of the Commission alleging that Facebook repeatedly used deceptive disclosures and settings to undermine users' privacy preferences in violation of its 2012 FTC order. These tactics allowed the company to share users' personal information with third-party apps that were downloaded by the user's Facebook "friends." The FTC alleges that many users were unaware that Facebook was sharing such information, and therefore did not take the steps needed to opt-out of sharing.

PX0686-002

Case 1:20-cv-03590-JEB Document 344-3 Filed 05/24/24 Page 465 of 509

In addition, the FTC alleges that Facebook took inadequate steps to deal with apps that it knew were violating its platform policies.

In a related, but separate development, the FTC also announced today separate law enforcement actions against data analytics company Cambridge Analytica, its former Chief Executive Officer Alexander Nix, and Aleksandr Kogan, an app developer who worked with the company, alleging they used false and deceptive tactics to harvest personal information from millions of Facebook users. Kogan and Nix have agreed to a settlement with the FTC that will restrict how they conduct any business in the future.

**New Facebook Order Requirements**

To prevent Facebook from deceiving its users about privacy in the future, the FTC's new 20-year settlement order overhauls the way the company makes privacy decisions by boosting the transparency of decision making and holding Facebook accountable via overlapping channels of compliance.



The order creates greater accountability at the board of directors level. It establishes an independent privacy committee of Facebook's board of directors, removing unfettered control by Facebook's CEO Mark Zuckerberg over decisions affecting user privacy. Members of the privacy committee must be independent and will be appointed by an independent nominating committee. Members can only be fired by a supermajority of the Facebook board of directors.

The order also improves accountability at the individual level. Facebook will be required to designate compliance officers who will be responsible for Facebook's privacy program. These compliance officers will be subject to the approval of the new board privacy committee and can be removed only by that committee—not by Facebook's CEO or Facebook employees. Facebook CEO Mark Zuckerberg and designated compliance officers must independently submit to the FTC quarterly certifications that the company is in compliance with the privacy program mandated by the order, as well as an

PX0686-003

annual certification that the company is in overall compliance with the order. Any false certification will subject them to individual civil and criminal penalties.

The order also strengthens external oversight of Facebook. The order enhances the independent third-party assessor's ability to evaluate the effectiveness of Facebook's privacy program and identify any gaps. The assessor's biennial assessments of Facebook's privacy program must be based on the assessor's independent fact-gathering, sampling, and testing, and must not rely primarily on assertions or attestations by Facebook management. The order prohibits the company from making any misrepresentations to the assessor, who can be approved or removed by the FTC. Importantly, the independent assessor will be required to report directly to the new privacy board committee on a quarterly basis. The order also authorizes the FTC to use the discovery tools provided by the Federal Rules of Civil Procedure to monitor Facebook's compliance with the order.

As part of Facebook's order-mandated privacy program, which covers WhatsApp and Instagram, Facebook must conduct a privacy review of every new or modified product, service, or practice before it is implemented, and document its decisions about user privacy. The designated compliance officers must generate a quarterly privacy review report, which they must share with the CEO and the independent assessor, as well as with the FTC upon request by the agency. The order also requires Facebook to document incidents when data of 500 or more users has been compromised and its efforts to address such an incident, and deliver this documentation to the Commission and the assessor within 30 days of the company's discovery of the incident.

Additionally, the order imposes significant new privacy requirements, including the following:

- Facebook must exercise greater oversight over third-party apps, including by terminating app developers that fail to certify that they are in compliance with Facebook's platform policies or fail to justify their need for specific user data;

- Facebook is prohibited from using telephone numbers obtained to enable a security feature (e.g., two-factor authentication) for advertising;

- Facebook must provide clear and conspicuous notice of its use of facial recognition technology, and obtain affirmative express user consent prior to any use that materially exceeds its prior disclosures to users;

- Facebook must establish, implement, and maintain a comprehensive data security program;

- Facebook must encrypt user passwords and regularly scan to detect whether any passwords are stored in plaintext; and

Give Feedback

PX0686-004

Case 1:20-cv-03590-JEB   Document 344-3   Filed 05/24/24   Page 467 of 509

- Facebook is prohibited from asking for email passwords to other services when consumers sign up for its services.



## Alleged Violations of 2012 Order

The settlement stems from alleged violations of the FTC's 2012 settlement order with Facebook. Among other things, the 2012 order prohibited Facebook from making misrepresentations about the privacy or security of consumers' personal information, and the extent to which it shares personal information, such as names and dates of birth, with third parties. It also required Facebook to maintain a reasonable privacy program that safeguards the privacy and confidentiality of user information.

The FTC alleges that Facebook violated the 2012 order by deceiving its users when the company shared the data of users' Facebook friends with third-party app developers, even when those friends had set more restrictive privacy settings.

In May 2012, Facebook added a disclosure to its central "Privacy Settings" page that information shared with a user's Facebook friends could also be shared with the apps used by those friends. The FTC alleges that four months after the 2012 order was finalized in August 2012, Facebook removed this disclosure from the central "Privacy Settings" page, even though it was still sharing data from an app user's Facebook friends with third-party developers.

Additionally, Facebook launched various services such as "Privacy Shortcuts" in late 2012 and "Privacy Checkup" in 2014 that claimed to help users better manage their privacy settings. These services, however, allegedly failed to disclose that even when users chose the most restrictive sharing settings, Facebook could still share user information with the apps of the user's Facebook friends—unless they also went to the "Apps Settings Page" and opted out of such sharing. The FTC alleges the company did not disclose anywhere on the Privacy Settings page or the "About" section of

Give Feedback

the profile page that Facebook could still share information with third-party developers on the Facebook platform about an app users Facebook friends.

Facebook announced in April 2014 that it would stop allowing third-party developers to collect data about the friends of app users ("affected friend data"). Despite this promise, the company separately told developers that they could collect this data until April 2015 if they already had an existing app on the platform. The FTC alleges that Facebook waited until at least June 2018 to stop sharing user information with third-party apps used by their Facebook friends.

In addition, the complaint alleges that Facebook improperly policed app developers on its platform. The FTC alleges that, as a general practice, Facebook did not screen the developers or their apps before granting them access to vast amounts of user data. Instead, Facebook allegedly only required developers to agree to Facebook's policies and terms when they registered their app with the Facebook Platform. The company claimed to rely on administering consequences for policy violations that subsequently came to its attention after developers had already received data about Facebook users. The complaint alleges, however, that Facebook did not enforce such policies consistently and often based enforcement of its policies on whether Facebook benefited financially from its arrangements with the developer, and that this practice violated the 2012 order's requirement to maintain a reasonable privacy program.

The FTC also alleges that Facebook misrepresented users' ability to control the use of facial recognition technology with their accounts. According to the complaint, Facebook's data policy, updated in April 2018, was deceptive to tens of millions of users who have Facebook's facial recognition setting called "Tag Suggestions" because that setting was turned on by default, and the updated data policy suggested that users would need to opt-in to having facial recognition enabled for their accounts.

In addition to these violations of its 2012 order, the FTC alleges that Facebook violated the FTC Act's prohibition against deceptive practices when it told users it would collect their phone numbers to enable a security feature, but did not disclose that it also used those numbers for advertising purposes.

The Commission vote to refer the complaint and stipulated final order to the Department of Justice for filing was 3-2. The Department will file the complaint and stipulated final order in the U.S. District Court for the District of Columbia. Chairman Simons along with Commissioners Noah Joshua Phillips and Christine S. Wilson issued a statement on this matter. Commissioners Rohit Chopra and Rebecca Kelly Slaughter issued separate statements on this matter.

PX0686-006

**NOTE:** The Commission files a complaint when it has "reason to believe" that the named defendants are violating or are about to violate the law and it appears to the Commission that a proceeding is in the public interest. Stipulated final orders have the force of law when approved and signed by the district court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about consumer topics and file a consumer complaint online or by calling 1-877-FTC-HELP (382-4357). Like the FTC on Facebook, follow us on Twitter, read our blogs, and subscribe to press releases for the latest FTC news and resources.

Press Release Reference

FTC Sues Cambridge Analytica, Settles with Former CEO and App Developer

FTC Approves Final Settlement With Facebook

FTC Gives Final Approval to Modify FTC's 2012 Privacy Order with Facebook with Provisions from 2019 Settlement

FTC Approves Final Settlement With Facebook

# Contact Information

**MEDIA CONTACTS:**
Juliana Gruenwald Henderson
*Office of Public Affairs*
202-326-2924

Peter Kaplan
*Office of Public Affairs*
202-326-2334

**STAFF CONTACT:**
James Kohm
*Bureau of Consumer Protection*
202-326-2640

# PX0688

Pinterest Policy

 Policy                                                                    ≡



# Transparency report

At Pinterest, our mission is to bring everyone the inspiration to create a life they love, and it's our guiding light in drafting and enforcing our content policies.

Not everything on the internet is inspiring, so we have guardrails for what's acceptable on Pinterest and what isn't allowed. Our moderation practices are always evolving to keep up with new behaviors and trends and to create a more positive corner of the internet for the people on our platform. We continue to invest heavily in measures like machine learning technology to fight policy-violating content on Pinterest. We also continue to work with outside experts and organizations to inform our policies and content moderation practices.

We started publishing a biannual transparency report in 2013, and began expanding it starting with Q4 2020 to include more information on the actions we take to uphold our Community Guidelines. In this transparency report, you'll find information on our efforts to keep our platform safe and inspiring, such as the number of Pin and account deactivations. It also includes insight into the volume of information and deactivation requests we received from law enforcement and government entities. The report covers the first half of 2023, from January through June 2023, and encompasses more than 400 distinct data points.

## Table of Contents

Community safety and wellbeing

Community Guidelines enforcement

Intellectual property policies enforcement

Law enforcement and government requests

Building toward a safer internet

PX0688-001

 Policy                                                                    ≡

campaign ads to calling on the industry to unite with the common goal of making the internet a safer and healthier place for everyone, Pinterest is at the forefront. We want to advance the industry on these issues so that—together—we can create a more positive internet.

## What's new in this report

This past half, we made it easier to report content, boards, or accounts, and expanded the options a person filing the report could select. For example, users can now more easily report accounts and individual boards, and specify more granular policy violations.

Additionally, we launched updates to the platform that leverage new machine learning models, refined our enforcement to detect bad actors, and have increased our work with third parties who can help identify platform misuse on Pinterest. The safety of our users will always be our most important priority, and we will continue our work and investment in this area.

As always, we remain committed to providing transparency into how we keep Pinterest safe and positive, and we'll continue to iterate on this report going forward.

# Community safety and wellbeing

We continue to invest in our policies, products and partnerships to support the safety and wellbeing of our community. Here are just some of the key updates we made in the first half of 2023.

## Environmental, Social, and Governance Impact Report

In February Pinterest shared its first Environmental, Social, and Governance (ESG) Impact Report. Under the theme

Pinterest Policy

 Policy

business and within communities.

## Creator Inclusion Fund

In April we expanded our Creator Inclusion Fund to five new
countries: Canada, Germany, Austria, Switzerland, and France.
The Fund is Pinterest's incubator program to elevate Creators
from historically marginalized communities through financial and
educational support. The program was started in 2021 because
Pinterest saw a need to uplift Creators from communities that
have been disproportionately underrepresented – including Black,
Latiné, LGBTQIA+, Asian, Indigenous people and people with
disabilities. Since its inception, the program has provided support
and a path to success to over 100 Creators from the US, UK and
Brazil across Fashion, Beauty, Lifestyle, Wellness and Food. They
have received training and deep industry insights from experts in
the field, personalized consulting and financial grants in cash and
ad credits.

## Teen Safety

In April, we also introduced new features and tools to protect
teens' personal space and safety on Pinterest. For teens
under 16, this included private by default profile settings and
making boards and Pins only visible to followers approved by
these users. In addition, we gave caregivers the ability to require a
passcode to change certain account settings for their teens and
expanded our age verification process.

## Inspired Internet Pledge

In June, Pinterest announced its support of the Inspired
Internet Pledge. The pledge, created by the Digital Wellness
Lab at Boston Children's Hospital in collaboration with Pinterest,
is a call to action for tech companies and the broader digital

PX0688-003

Pinterest Policy

 Policy                                                                            ☰

to take meaningful, measurable actions to support positive
mental and emotional wellbeing outcomes both on- and offline.
By deliberately putting mental health and emotional wellbeing at
the forefront of these efforts, the pledge guides participating
companies to address the ongoing mental health crisis with
accountability built in.

# Community Guidelines enforcement

Pinterest's Community Guidelines are designed to support our
mission of inspiration. They govern what we do and don't allow on
Pinterest, and all users must abide by them.

We have additional Guidelines for merchants and advertisers
to set clear expectations about what is and is not acceptable for
product Pins and advertisements. These Guidelines include
especially high standards that are for the safety of all audiences
who use Pinterest. We believe you can't feel inspired if you don't
first feel safe.

To help us cultivate a safe and inspired community, we develop
and enforce content policies that help ensure our platform is a
positive place where people can find real-life ideas for what to try
next, cook next, wear next or do next. We work hard to identify
and deactivate harmful content from our site, and our content
policies and moderation practices are always evolving to keep up
with new behaviors and trends.

We may block, limit the distribution of or deactivate content and
the accounts, individuals and groups that create or spread that
content, based on how much harm the content poses. In the
event that a user believes a deactivation was in error, Pinterest
provides options to appeal the deactivation, where appropriate.

## Methodology

PX0688-004

5/22/24, 4:51 PM                                                                 Pinterest Policy

 Policy                                                              ≡

to create, discover and save new ideas that are shared in Pins. To understand how we approach content moderation, it's helpful to differentiate between two types of Pins: organic Pins and ads. Our Community Guidelines apply to both.

Organic Pins include all Pins created and saved on Pinterest that are not promoted as ads. For example, this could include merchants' product Pins, which aren't always ads and may appear organically to people who are searching for products or following their interests on Pinterest. We have additional requirements for merchants and their product Pins, such as that the Pin image and description must accurately represent the product. All types of organic Pins actioned under our Community Guidelines are included in our transparency reports.

Ads are Pins that businesses pay to promote. We have additional policies for advertisers that hold ads and advertisers to even higher standards. Ad policies are enforced differently than organic content, and are not included in this transparency report.

Much of the content on Pinterest has been saved repeatedly, meaning that the same image may appear in multiple Pins. So when it comes to reporting actions we take on organic Pins under our policies, we include the number of Pins deactivated as well as the number of distinct images deactivated to provide greater insight into our moderation practices for this type of content.

We report boards and accounts deactivated separately. Boards are where you save, collect, and organize your Pins. To avoid double-counting deactivations, our count of distinct images and Pins deactivated does not include those on boards or from user accounts that were deactivated.

Different methodology was used in another recently published report, following regulatory guidance for the European Union's new Digital Services Act (DSA) Transparency Report. We believe the methodology offered in our Global Transparency Report

PX0688-005

5/22/24, 4:51 PM                                       Pinterest Policy

 Policy                                                                ☰

# How we deactivate Pins

We deactivate policy-violating Pins through automated tools, manual review and a hybrid approach that combines elements of both.

**Automated deactivations**. Our automated tools use a combination of signals to identify and take action against potentially violating content. For example, our machine learning models assign scores to content added to our platform. Our automated tools can then use those scores to perform appropriate enforcement actions.

**Manual deactivations**. We manually deactivate Pins through our human review process. Pins deactivated through this process may include those identified internally and those reported to us by third parties. It also includes the Pins that are reviewed and deactivated by one of our team members after a user report.

**Hybrid deactivations**. Hybrid deactivations include those where a team member determines that a Pin violates policy, and automated systems help expand that decision to enforce against machine-identified matching Pins. Depending on the volume of matching Pins, a hybrid deactivation may result in a number of Pins deactivated or none at all.

The mechanisms used to address different potential policy violations may vary based on the state of available technology, the volume of violative content and other factors such as the complexity of evaluation. We continue to iterate and evolve our tools and expect ongoing improvements going forward.

Deactivations for a policy category may not add up to 100% due to rounding.

# Reach of Pins deactivated for violating policy

PX0688-006

 Policy                                                                 ☰

For example, 91% of Pins that we deactivated for dangerous goods and activities in Q1 2023 were never seen by users in this reporting period—even with hundreds of millions of people visiting Pinterest per month.

Reach is one of our key indicators of user experience. To calculate this metric, we start by looking at each policy-violating Pin deactivated in a reporting period. Then we count the number of unique users that saw each of those Pins during the reporting period for at least 1 second before it was deactivated. Reach for a policy category may not add up to 100% due to rounding.

## Actioned user reports

Users can report Pins they think violate our policies by clicking on the three small dots on any Pin and hitting "Report Pin." Once we confirm that an item violates our Community Guidelines and take appropriate action, we consider the report an actioned user report.

The total number of actioned user reports is another key indicator of user experience on Pinterest. So is the number of reporters: fewer than 0.03% of monthly active users reported a Pin that resulted in a Pin deactivation in Q1 2023.

## Boards deactivated

When users find Pins they like or want to come back to, they can save them to boards that they've created. Over time, our users have created billions of boards.

When a board is deactivated for violating policy, all the Pins on that board are also deactivated. Similarly, when we deactivate an entire account, that user's boards are also deactivated. To avoid double-counting deactivations, our count of boards deactivated does not include those from user accounts that were deactivated.

## Accounts deactivated

PX0688-007

Pinterest Policy

 Policy                                                                              ≡

individual user account or an account for a business, advertiser, merchant or creator. Boards and Pins can be private, shared with a limited number of other accounts, or visible to the public.

Any account, regardless of privacy settings, may be deactivated for violating our policies. When an account is deactivated, all of its Pins and boards are also deactivated. That means that if you search for them or click on an old link to their profile, that profile won't show up anymore. Their Pins won't appear anywhere on Pinterest. And the deactivated user won't be able to access their own Pins or boards, either.

## Account appeals and reinstatements

If people believe their accounts have been deactivated by mistake, they can appeal to try to have their accounts reinstated. We review appeal requests and grant the appeal if we determine we made a mistake, or in some cases to give people another chance to abide by our Community Guidelines.

We also process appeals for deactivated Pins and boards and expect to include that data as we iterate on this report in the future.

## Reporting periods

Our reporting on Community Guidelines enforcement in this transparency report covers the first half of 2023, from January through June 2023. We've split that time into two reporting periods: Q1 and Q2.

Q1 covers the first quarter of the year, from January through March, while Q2 covers the second quarter of the year, from April through June. Sometimes we also refer to Q3 (July through September) or Q4 (October through December) when we're talking about quarter-over-quarter trends.

## Adult content

PX0688-008

Pinterest Policy

 Policy

best to differentiate between pornography and other content that could involve some nudity. For example, we do not prohibit users from saving content about breastfeeding or mastectomies.

**Recent trends**

We deactivated fewer Pins for violating this policy in Q1 2023 than in Q2 2023. Of the Pins we deactivated in Q2, 98% were seen by 100 or fewer users in this reporting period. We expanded our efforts to identify more account-level violations during this period, which led to more account deactivations including some erroneous deactivations that were later reversed.

## Content enforcement

**Reach\* of Pins deactivated for adult content**

|  | Q1 2023 | Q2 2023 |
|---|---|---|
| Seen by 0 users | 66% | 67% |
| Seen by 1-9 users | 27% | 27% |
| Seen by 10-100 users | 5% | 4% |
| Seen by >100 users | 2% | 2% |

*\* See our methodology section above for details on how we calculate reach.*

In Q1 2023, we deactivated **2,439,235** distinct images, which comprised **29,396,667** Pins, for violating this policy. Of these Pins, **93%** were seen by fewer than 10 users in this reporting period. We deactivated **fewer than 1%** manually and **more than 99%** with hybrid tools. We actioned **102,282** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **42,679** boards and **29,703** accounts. We received **4,544** account appeals and reinstated **3,511** accounts.

PX0688-009

 Policy

period. We deactivated **fewer than 1%** manually and **more than 99%** with hybrid tools. We actioned **54,787** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **49,262** boards and **17,172** accounts for violating this policy. We received **3,409** account appeals and reinstated **1,769** accounts.

## Adult sexual services

We prohibit adult sexual services on Pinterest. Adult sexual services may involve sexual exploitation or commercial sex work, such as escort services, sex cams, or sex- or nudity-for-money services.

**Recent trends**

We deactivated more boards in Q2 2023 than Q1 2023. The launch of expanded reporting options for boards led to an increase in board deactivations in this category, and a corresponding decrease in deactivations of individual Pins. While all Pins on a deactivated board are also deactivated, we do not include them in our Pin deactivation totals to avoid double-counting in this report. Of the Pins we deactivated in Q2, 99% were seen by fewer than 10 users in this reporting period.

## Content enforcement

**Reach of Pins deactivated for adult sexual services**

|                        | Q1 2023 | Q2 2023 |
| ---------------------- | ------- | ------- |
| Seen by 0 users        | 50%     | 97%     |
| Seen by 1-9 users      | 41%     | 2%      |
| Seen by 10-100 users   | 6%      | <1%     |
| Seen by >100 users     | 2%      | <1%     |

PX0688-010

5/22/24, 4:51 PM                                                        Pinterest Policy

 Policy                                                                         ☰

deactivated **fewer than 1%** manually and **more than 99%** with
hybrid tools. We actioned **142** user reports that resulted in a Pin
deactivated for violating this policy. We also deactivated **88**
boards and **365** accounts. We received **9** account appeals and
reinstated **1** account.

In Q2 2023, we deactivated **8,308** distinct images, which
comprised **10,045** Pins, for violating this policy. Of these Pins,
**99%** were seen by fewer than 10 users in this reporting period.
We deactivated **fewer than 1%** manually and **more than 99%** with
hybrid tools. We actioned **80** user reports that resulted in a Pin
deactivated for violating this policy. We also deactivated **2,837**
boards and **955** accounts for violating this policy. We received
**153** account appeals and reinstated **7** accounts.

## Child safety

Pinterest does not tolerate child sexual exploitation (CSE) of any
kind on our platform. That means we enforce a strict, zero-
tolerance policy for any content—including imagery, video, or
text— or accounts that might exploit or endanger minors.
Detecting and removing this type of content is of the utmost
importance, and we will continue to invest heavily in this area.

Pinterest's Child Safety policy prohibits not just illegal child sexual
abuse material (CSAM), but goes a step further to prohibit any
content that contributes to the sexualization of minors. For
example, we prohibit the intentional misuse of content depicting
minors engaging in non-sexualized activities, like modeling
clothing or participating in athletics. Also, we do not tolerate
content that suggests the sexualization of minors in the form of
cartoons or anime.

We proactively identify CSE images and videos by leveraging our
own internal tools and shared industry resources such as
PhotoDNA, which uses a shared industry hash database of known
CSAM, and CSAI Match to identify video content. We also work

PX0688-011

5/22/24, 4:51 PM                                    Pinterest Policy

 Policy                                               ☰

June 2023, our team of specialists was responsible for 34,203 CyberTipline reports to NCMEC.

**A note on what we're reporting and why**

CSE is one of the most serious harms addressed by Trust and Safety teams at Pinterest and across the internet. Because of this sensitivity, it deserves extra consideration as we decide how to present information in this report. After consulting with industry experts, Pinterest ultimately chose to include all of the same metrics for CSE that we include for our other content policies, including reach and actioned user reports. These types of metrics are our indicators for how policy-violating content impacts the experience of users on the site. However, we want to be very clear: By sharing reach and actioned user reports for CSE content, we are not implying in any way that harm to children is somehow lessened if fewer people see it. The content is violative and wrong, no matter how many people see it. We share the data only to be transparent in our efforts to remove CSE from our platform.

We also count all deactivations for CSE, no matter what other actions may have already been taken against the Pin, board or user. For example, if a Pin has been automatically deactivated—meaning no one on the platform can see it—for violating our Spam policy but we later learn that it contains material that violates our CSE policy, the Pin is counted in both our Spam and CSE deactivation numbers. Even though that Pin had not been visible or accessible on Pinterest, we still need to take appropriate action, like making a report to NCMEC if we determine that the image is illegal CSAM. We've included those deactivations in our reporting on CSE to provide more accurate insight into these violations, even though it can sometimes result in counting one Pin under two different policy categories. It's also important to note that higher rates of account reinstatement can be found in this area because our policy is to first err on the side of deactivation when child safety may be at issue, and to address appeals as appropriate.

PX0688-012

Pinterest Policy

 Policy                                                                    ≡

content, there is always more work to do—and we are committed
to doing it.

# Content enforcement

**Reach of Pins deactivated for child sexual exploitation (CSE)**

|                        | Q1 2023 | Q2 2023 |
| ---------------------- | ------- | ------- |
| Seen by 0 users        | 65%     | 83%     |
| Seen by 1-9 users      | 26%     | 14%     |
| Seen by 10-100 users   | 6%      | 2%      |
| Seen by >100 users     | 3%      | <1%     |

In Q1 2023, we deactivated **8,393** distinct images, which
comprised **1,846,326** Pins, for violating our CSE policy. Of these,
we determined that **2,348** distinct images, which comprised
**23,479** Pins, were illegal CSAM, and we reported them to
NCMEC. Of the total Pins deactivated this quarter for CSE, **91%**
were seen by fewer than 10 users in this reporting period. We
deactivated **fewer than 1%** manually and **more than 99%** with
hybrid tools. We actioned **5,726** user reports that resulted in a Pin
deactivated for violating this policy. We also deactivated **17,715**
boards and **63,761** accounts. We received **8,524** account appeals
and reinstated **3,925** accounts.

In Q2 2023, we deactivated **9,691** distinct images, which
comprised **3,877,286** Pins, for violating our CSE policy. Of these,
we determined that **1,071** distinct images, which comprised
**16,336** Pins, were illegal CSAM, and we reported them to
NCMEC. Of the total Pins deactivated this quarter for CSE, **97%**
were seen by fewer than 10 users in this reporting period. We
deactivated **fewer than 1%** manually and **more than 99%** with
hybrid tools. We actioned **3,896** user reports that resulted in a
Pin deactivated for violating this policy. We also deactivated

PX0688-013

5/22/24, 4:51 PM

Pinterest Policy

 Policy

# Civic misinformation

Our civic misinformation policy is one of several policies in our Community Guidelines that prohibit misinformation and disinformation on Pinterest. This policy prohibits false or misleading content on Pinterest that impedes an election's integrity or an individual's or group's civic participation, including registering to vote, voting and being counted in a census. Moreover, since 2018 we've prohibited political ads, and we also do not monetize elections-related content.

**Recent trends**

Fighting misinformation is complex and always evolving. Content enforcement numbers in this policy area are particularly susceptible to fluctuations quarter-to-quarter depending on real-world events, such as regional elections. Of the Pins we deactivated in Q1, 99% were seen by fewer than 10 users in this reporting period.

# Content enforcement

**Reach of Pins deactivated for civic misinformation**

|  | Q1 2023 | Q2 2023 |
| --- | --- | --- |
| Seen by 0 users | 71% | 67% |
| Seen by 1-9 users | 27% | 26% |
| Seen by 10-100 users | <1% | 2% |
| Seen by >100 users | 1% | 6% |

In Q1 2023, we deactivated **93** distinct images, which comprised **2,545** Pins, for violating this policy. Of these Pins, **98%** were seen by fewer than 10 users in this reporting period. We deactivated **20%** of Pins manually and **80%** with hybrid tools. We actioned **39** user reports that resulted in a Pin deactivated for violating this

Pinterest Policy

 Policy                                                                ☰

In Q2 2023, we deactivated **162** distinct images, which
comprised **1,425** Pins, for violating this policy. Of these Pins, **93%**
were seen by fewer than 10 users in this reporting period. We
deactivated **12%** of Pins manually and **88%** with hybrid tools. We
actioned **80** user reports that resulted in a Pin deactivated for
violating this policy. We also deactivated **46** boards and **15**
accounts for violating this policy. We received **5** account appeals
and reinstated **3** accounts.

## Climate misinformation

Our climate misinformation policy prohibits content that denies
the existence or impacts of climate change as well as false or
misleading content about natural disasters and extreme weather
events. This policy is yet another step in Pinterest's journey to
combat misinformation and create a safe space online. We work
with climate experts, including the Climate Disinformation
Coalition and the Conscious Advertising Network, to help inform
our policy and enforcement practices based on common
misinformation themes they're seeing across platforms.

**Recent trends**

We deactivated more Pins for violating our climate
misinformation policy in Q1 2023 than in Q2 2023.

We determined that four of the distinct images deactivated in Q1
2023 and three of the distinct images deactivated in Q2 2023
were incorrectly deactivated, and we reinstated that content after
identifying the error. Of the Pins that we believe were correctly
deactivated Q2, 16 were seen by 100 or fewer users in this
reporting period.

We've included those false positives in the Q1 and Q2
enforcement data, but we excluded them from the reach metric
for this policy in an effort to provide more accurate insight into the
number of users who saw a Pin that actually violates this policy
before the Pin was deactivated.

PX0688-015

5/22/24, 4:51 PM                                     Pinterest Policy

 Policy                                                           ☰



|                      | Q1 2023 | Q2 2023 |
|----------------------|---------|---------|
| Seen by 0 users      | <1%     | 3%      |
| Seen by 1-9 users    | 15%     | 13%     |
| Seen by 10-100 users | 16%     | 24%     |
| Seen by >100 users   | 68%     | 61%     |

In Q1 2023, we deactivated **126** distinct images, which comprised **136** Pins, for violating this policy. Of these Pins, **32%** were seen by 100 or fewer users in this reporting period. We deactivated **98%** manually and **2%** with hybrid tools. We actioned **19** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **133** boards and **1** account for violating this policy. We received **0** account appeals.

In Q2 2023, we deactivated **37** distinct images, which comprised **41** Pins, for violating this policy. Of these Pins, **39%** were seen by 100 or fewer users in this reporting period. We deactivated **100%** manually. We actioned **10** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **10** boards and **13** accounts for violating this policy. We received **3** account appeals and reinstated **2** accounts.

## Conspiracy theories

Our conspiracy theories policy is one of several policies in our Community Guidelines that prohibit misinformation and disinformation on Pinterest. Conspiracy theories include content that turns or encourages turning individuals, groups of people, places or organizations into targets of harassment or physical violence, such as hate-based conspiracy theories and misinformation about mass atrocities.

**Recent trends**

PX0688-016

5/22/24, 4:51 PM                                                      Pinterest Policy

 Policy                                                         ☰

Our change to make it easier to report accounts led to an increase
in the amount of accounts deactivated.

# Content enforcement

**Reach of Pins deactivated for conspiracy theories**

|                        | Q1 2023 | Q2 2023 |
| ---------------------- | ------- | ------- |
| Seen by 0 users        | 91%     | 94%     |
| Seen by 1-9 users      | 6%      | 2%      |
| Seen by 10-100 users   | 1%      | 1%      |
| Seen by >100 users     | 2%      | 3%      |

In Q1 2023, we deactivated **641** distinct images, which comprised
**4,412** Pins, for violating this policy. Of these Pins, **91%** were seen
by 0 users in this reporting period. We deactivated **69%** of Pins
manually and **31%** with hybrid tools. We actioned **64** user reports
that resulted in a Pin deactivated for violating this policy. We also
deactivated **37** boards and **3** accounts. We received **7** account
appeals and reinstated **3** accounts.

In Q2 2023, we deactivated **510** distinct images, which
comprised **2,404** Pins, for violating this policy. Of these Pins,
**94%** were seen by **0** users in this reporting period. We
deactivated **16%** manually and **84%** with hybrid tools. We
actioned **53** user reports that resulted in a Pin deactivated for
violating this policy. We also deactivated **41** boards and **36**
accounts for violating this policy. We received **14** account appeals
and reinstated **6** accounts.

# Dangerous goods and activities

Pinterest isn't a place for trading or selling dangerous goods or
engaging in dangerous activities. Dangerous goods are products

PX0688-017

 **Policy**                                                                          ☰

welcome on Pinterest. In addition, this category includes content that facilitates the sale of wild animals or protected and endangered wildlife and other types of animal exploitation. Pinterest partners with the World Wildlife Fund and its Coalition to End Wildlife Trafficking Online to tackle wildlife trafficking and get feedback on approaches we can use to continue to combat wrongdoing.

**Recent trends**

We deactivated more Pins for violating our dangerous goods and activities policy in Q1 2023 than in Q2 2023 due in part to a focus on proactive sweeps as well as increased matches identified and actioned by our hybrid tools in Q1.

We determined that six of the distinct images deactivated in Q1 2023, and five of the distinct images deactivated in Q2 2023 were incorrectly deactivated, and we reinstated that content after identifying the error. Of the Pins that we believe were correctly deactivated in Q1, more than 99% were seen by fewer than 10 users in this reporting period.

We've included those false positives in the Q1 and Q2 enforcement data, but we excluded them from the reach metric for this policy in an effort to provide more accurate insight into the number of users who saw a Pin that actually violates this policy before the Pin was deactivated.

## Content enforcement

**Reach of Pins deactivated for dangerous goods and activities**

|                    | Q1 2023 | Q2 2023 |
|--------------------|---------|---------|
| Seen by 0 users    | 91%     | 74%     |
| Seen by 1-9 users  | 9%      | 23%     |
| Seen by 10-100 users | <1%   | <1%     |

PX0688-018

 Policy

≡

In Q1 2023, we deactivated **12,050** distinct images, which comprised **1,214,227** Pins, for violating this policy. Of these Pins, **91%** were never seen by users in this reporting period. We deactivated **11%** manually, **fewer than 1%** automatically and **89%** with hybrid tools. We actioned **2,575** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **445** boards and **858** accounts. We received **34** account appeals and reinstated **7** accounts.

In Q2 2023, we deactivated **7,079** distinct images, which comprised **71,961** Pins, for violating this policy. Of these Pins, **97%** were seen by fewer than 10 users in this reporting period. We deactivated **6%** of Pins manually, **10%** automatically and **84%** with hybrid tools. We actioned **2,049** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **472** boards and **667** accounts for violating this policy. We received **52** account appeals and reinstated **28** accounts.

## Graphic violence and threats

We prohibit graphic violence and threats on Pinterest. This includes most content that shows the use of violence, threats and language that glorifies violence.

**Recent trends**

We deactivated more Pins for violating our graphic violence and threats policy in Q1 2023 than in Q2 2023. Of the Pins we deactivated in Q1, 98% were seen by fewer than 10 users in this reporting period.

## Content enforcement

**Reach of Pins deactivated for graphic violence and threats**

PX0688-019

 Policy                                                                       ☰

| | | |
|---|---|---|
| Seen by 1-9 users | 32% | 20% |
| Seen by 10-100 users | <1% | <1% |
| Seen by >100 users | 1% | 2% |

In Q1 2023, we deactivated **22,692** distinct images, which comprised **824,035** Pins, for violating this policy. Of these Pins, **98%** were seen by fewer than 10 users in this reporting period. We deactivated **2%** of Pins manually and **98%** with hybrid tools. We actioned **7,872** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **1,041** boards and **116** accounts. We received **47** account appeals and reinstated **23** accounts.

In Q2 2023, we deactivated **31,213** distinct images, which comprised **262,823** Pins, for violating this policy. Of these Pins, **97%** were seen by fewer than 10 users in this reporting period. We deactivated **3%** of Pins manually and **97%** with hybrid tools. We actioned **4,396** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **1,232** boards and **265** accounts for violating this policy. We received **84** account appeals and reinstated **51** accounts.

## Harassment and criticism

Pinterest is not a place for harassment, and we prohibit content that insults, hurts or antagonizes individuals or groups of people. This includes manipulated images intended to degrade or shame, shaming people for their bodies or assumed sexual or romantic history, sexual remarks about people's bodies, solicitations or offers of sexual acts, and mocking someone for experiencing sadness, grief, loss or outrage.

**Recent trends**

PX0688-020

5/22/24, 4:51 PM                                           Pinterest Policy

 Policy                                                    ≡

identifying the error. Of the Pins that we believe were correctly
deactivated in Q1, 96% were seen by fewer than 10 users in this
reporting period.

We've included those false positives in the Q1 enforcement data,
but we excluded them from the reach metric for this policy in an
effort to provide more accurate insight into the number of users
who saw a Pin that actually violates this policy before the Pin was
deactivated.

## Content enforcement

**Reach of Pins deactivated for harassment and criticism**

|                      | Q1 2023 | Q2 2023 |
| -------------------- | ------- | ------- |
| Seen by 0 users      | 77%     | 65%     |
| Seen by 1-9 users    | 19%     | 27%     |
| Seen by 10-100 users | 1%      | 5%      |
| Seen by >100 users   | 2%      | 3%      |

In Q1 2023, we deactivated **2,615** distinct images, which
comprised **482,401** Pins, for violating this policy. Of these Pins,
**96%** were seen by fewer than 10 users in this reporting period.
We deactivated **17%** of Pins manually and **83%** with hybrid tools.
We actioned **2,012** user reports that resulted in a Pin deactivated
for violating this policy. We also deactivated **368** boards and **192**
accounts. We received **61** account appeals and reinstated **36**
accounts.

In Q2 2023, we deactivated **2,327** distinct images, which
comprised **89,215** Pins, for violating this policy. Of these Pins,
**92%** were seen by fewer than 10 users in this reporting period.
We deactivated **2%** of Pins manually and **98%** with hybrid tools.
We actioned **1,673** user reports that resulted in a Pin deactivated
for violating this policy. We also deactivated **331** boards and **284**

PX0688-021

Pinterest Policy

 Policy

# Hateful activities

We prohibit hateful content and the people and groups that promote hateful activities on Pinterest. Hateful activities include slurs and negative stereotypes, caricatures and generalizations, as well as support for hate groups and people promoting hateful activities.

We believe all people deserve a safe space to cultivate their interests and seek inspiration—regardless of their actual or perceived race, color, caste, ethnicity, immigration status, national origin, religion or faith, sex or gender identity, sexual orientation, disability or medical condition.

**Recent trends**

We deactivated fewer distinct images - but more Pins - in Q1 2023 than in Q2 2023 for violating our hateful activities policy due to the increased number of matches identified and actioned by our hybrid tools in Q1. Our updated reporting form, which made it easier for users to report content at the board and account level, led to an increase in accounts and boards deactivated. Of the Pins we deactivated in Q1, 90% were seen by fewer than 10 users in this reporting period.

## Content enforcement

**Reach of Pins deactivated for hateful activities**

|  | Q1 2023 | Q2 2023 |
| --- | --- | --- |
| Seen by 0 users | 53% | 74% |
| Seen by 1-9 users | 37% | 17% |
| Seen by 10-100 users | 5% | 3% |
| Seen by >100 users | 5% | 6% |

PX0688-022

5/22/24, 4:51 PM                                                      Pinterest Policy

 Policy                                                   ☰

We deactivated **21%** of Pins manually and **79%** with hybrid tools.
We actioned **3,608** user reports that resulted in a Pin deactivated
for violating this policy. We also deactivated **1,244** boards and
**228** accounts. We received **84** account appeals and reinstated
**27** accounts.

In Q2 2023, we deactivated **19,492** distinct images, which
comprised **109,206** Pins, for violating this policy. Of these Pins,
**91%** were seen by fewer than 10 users in this reporting period. We
deactivated **6%** of Pins manually and **94%** with hybrid tools. We
actioned **2,274** user reports that resulted in a Pin deactivated for
violating this policy. We also deactivated **1,761** boards and **1,087**
accounts for violating this policy. We received **274** account
appeals and reinstated **176** accounts.

## Medical misinformation

Our medical misinformation policy is one of several policies in our
Community Guidelines that prohibit misinformation and
disinformation on Pinterest. This policy prohibits medically
unsupported health claims that pose a risk to a user's health or
wider public health and safety, including the promotion of false
cures, anti-vaccination advice, or misinformation about public
health or safety emergencies. We rely on information from
nationally and internationally recognized institutions, including
the Centers for Disease Control and World Health Organization,
to help us determine if content violates these Guidelines.

**Recent trends**

We deactivated more Pins for violating this policy in Q2 2023
than in Q1 2023. Of the Pins we deactivated in Q2, 99% were
seen by fewer than 10 users in this reporting period.

## Content enforcement

**Reach of Pins deactivated for medical misinformation**

PX0688-023

5/22/24, 4:51 PM                                                    Pinterest Policy

 Policy                                                                    ☰

| | | |
|---|---|---|
| Seen by 1-9 users | 23% | 6% |
| Seen by 10-100 users | 1% | <1% |
| Seen by >100 users | 2% | 1% |

In Q1 2023, we deactivated **2,444** distinct images, which comprised **10,602** Pins, for violating this policy. Of these Pins, **97%** were seen by fewer than 10 users in this reporting period. We deactivated **8%** of Pins automatically, **9%** manually and **82%** with hybrid tools. We actioned **196** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **89** boards and **8** accounts. We received **3** account appeals and reinstated **2** accounts.

In Q2 2023, we deactivated **3,336** distinct images, which comprised **43,319** Pins, for violating this policy. Of these Pins, **93%** were seen by 0 users in this reporting period. We deactivated **2%** of Pins automatically, **<1%** manually and **98%** with hybrid tools. We actioned **110** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **85** boards and **17** accounts for violating this policy. We received **7** account appeals and reinstated **6** accounts.

## Self-injury and harmful behavior

Combating self-harm is a priority for us as we strive to ensure Pinterest plays a positive role in people's lives. Content that displays, rationalizes or encourages suicide, self-injury, eating disorders or substance abuse isn't welcome on our platform. This includes self-harm instructions, sensitive imagery and suicidal thinking and quotes. We also block search terms related to self-harm.

Our ongoing partnership with Samaritans, an organization dedicated to reducing suicide by providing listening and support to people and communities in times of need, continues to help us

PX0688-024

Pinterest Policy

 Policy                                                          ≡

people in need can find support, no matter what app or website they use. We've also chosen to partner with third-party content safety services to independently test our moderation efforts in this and other important areas.

**Recent trends**

We continue our investments to improve content moderation for self-harm content. We saw fewer total Pins deactivated in H1 2023 than H2 2022, and of the Pins we deactivated during this half, 95% were seen by fewer than 10 users in this reporting period.

## Content enforcement

**Reach of Pins deactivated for self-injury and harmful behavior**

|  | Q1 2023 | Q2 2023 |
| --- | --- | --- |
| Seen by 0 users | 70% | 71% |
| Seen by 1-9 users | 25% | 24% |
| Seen by 10-100 users | 4% | 4% |
| Seen by >100 users | 1% | 1% |

In Q1 2023, we deactivated **72,015** distinct images, which comprised **10,997,375** Pins, for violating this policy. Of these Pins, **95%** were seen by fewer than 10 users in this reporting period. We deactivated **fewer than 1%** of Pins automatically, **fewer than 1%** manually and **98%** with hybrid tools. We actioned 1,**814** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **1,977** boards and **177** accounts. We received **70** account appeals and reinstated **23** accounts.

In Q2 2023, we deactivated **61,014** distinct images, which comprised **11,556,880** Pins, for violating this policy. Of these Pins, **95%** were seen by fewer than 10 users in this reporting

PX0688-025

5/22/24, 4:51 PM                                                    Pinterest Policy

 Policy                                                          ☰

deactivated **1,439** boards and **251** accounts for violating this
policy. We received **79** account appeals and reinstated **45**
accounts.

# Spam

We want the inspiration and ideas on Pinterest to be high-quality
and useful, so we deactivate spam when we find it. The goal of
spammers is to make money, and the best way to do this is to
spam at scale. It's a numbers game: one million spam emails are
much more effective than one spam email. The same kinds of
spamming efforts can happen on any content distribution
platform, including Pinterest. Platforms' interactions with
spammers are generally both adversarial and iterative, with users
who intentionally try to evade the system and continually update
their techniques.

**Recent trends**

At Pinterest, we use the latest in machine learning technology to
build automated models that swiftly detect and act against spam
of all kinds. We iterate on these models at regular intervals by
adding new data and exploring new technical breakthroughs to
either maintain or improve their performance over time to
effectively address spam. Given the adversarial, iterative nature of
fighting spam, content enforcement numbers may vary greatly
quarter-to-quarter.

We deactivated more accounts in Q1 2023 than in Q4 2022; this
fluctuation in volume is typical for spam, which is a policy
violation where large numbers are part of the nature of the
violation. Of the Pins we deactivated in Q1, 97% were seen by
fewer than 10 users in this reporting period.

# Content enforcement

**Reach of Pins deactivated for spam**

PX0688-026

5/22/24, 4:51 PM                                           Pinterest Policy

 Policy                                                      ☰

| Seen by 1-9 users | 21% | 20% |
| Seen by 10-100 users | 3% | 2% |
| Seen by >100 users | <1% | 1% |

In Q1 2023, we deactivated **45,333** distinct images, which comprised **94,327** Pins, for violating this policy. Of these Pins, **97%** were seen by fewer than 10 users in this reporting period. We deactivated **100%** of Pins automatically. We also deactivated **7,500,856** accounts for violating this policy. We received **128,725** account appeals and reinstated **100,594** accounts.

In Q2 2023, we deactivated **39,490** distinct images, which comprised **88,638** Pins, for violating this policy. Of these Pins, **96%** were seen by fewer than 10 users in this reporting period. We deactivated **100%** of Pins automatically. We also deactivated **3,463,510** accounts for violating this policy. We received **78,331** account appeals and reinstated **56,352** accounts.

## Violent actors

Pinterest isn't a place for violent content, groups or individuals. We limit the distribution of or remove content and accounts that encourage, praise, promote or provide aid to dangerous actors or groups and their activities. This includes extremists, terrorist organizations, and gangs and other criminal organizations. We work with industry, government and security experts to help us identify these groups. For example, Pinterest since 2019 has been a member of the Global Internet Forum to Counter Terrorism (GIFCT), a non-governmental organization designed to prevent terrorists and violent extremists from exploiting digital platforms.

**Recent trends**

We deactivated more Pins for violating this policy in Q1 2023 than in Q2 2023. Of the Pins we deactivated in Q1, 95% were seen by

PX0688-027

 Policy

**Reach of Pins deactivated for violent actors**

|                      | Q1 2023 | Q2 2023 |
|----------------------|---------|---------|
| Seen by 0 users      | 75%     | 67%     |
| Seen by 1-9 users    | 20%     | 27%     |
| Seen by 10-100 users | 3%      | 4%      |
| Seen by >100 users   | 2%      | 2%      |

In Q1 2023, we deactivated **2,506** distinct images, which comprised **178,484** Pins, for violating this policy. Of these Pins, **95%** were seen by fewer than 10 users in this reporting period. We deactivated **fewer than 1%** of Pins manually and **more than 99%** with hybrid tools. We actioned **1,300** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **465** boards and **109** accounts. We received **12** account appeals and reinstated **2** accounts.

In Q2 2023, we deactivated **684** distinct images, which comprised **95,604** Pins, for violating this policy. Of these Pins, **94%** were seen by fewer than 10 users in this reporting period. We deactivated **fewer than 1%** of Pins manually and **more than 99%** with hybrid tools. We actioned **270** user reports that resulted in a Pin deactivated for violating this policy. We also deactivated **295** boards and **51** accounts for violating this policy. We received **3** account appeals and reinstated **1** account.

# Intellectual property policies enforcement

Pinterest respects the intellectual property rights of others and we expect people on Pinterest to do the same. It's our policy to disable content in response to complete and valid claims of infringement and, in appropriate circumstances, to deactivate the

PX0688-028

Pinterest Policy

 Policy

☰

issues are set out in our Copyright policy and Trademark policy, respectively.

# Intellectual property notices

Pinterest provides multiple mechanisms for IP rights holders to submit notices alleging intellectual property infringement. The first can be found in-product right next to the content at issue. Rights holders or their authorized representatives can report Pins they believe infringe their intellectual property rights by clicking on the three small dots on any Pin and selecting "Report Pin," where they will find a link to report for IP infringement. We also provide standalone, publicly-available reporting forms and dedicated email addresses, as well as our physical address, for submitting intellectual property notices, all of which can be easily located on our Policy site.

Rights holders have the option to identify one piece of content in each report, or many. We assess each piece of content identified in a submission and when we determine a report is complete and valid, we will promptly process the report and action the content as appropriate. If we need more information about the reporting party or about any content identified, we engage with the person or entity that submitted that notice to give them the opportunity to provide that information. If at any point they are able to submit a complete and valid notice alleging intellectual property infringement, Pinterest will process the notice and deactivate the content identified.

We may consider a notice to be invalid and decline to deactivate content identified when appropriate, such as when the notice:

- Does not include all legally required information
- Does not make a plausible intellectual property claim, as when a use is non-infringing
- Is not actionable, including when the content has already been deactivated

PX0688-029

Pinterest Policy

 Policy                                                                              ≡

Given the complex nature of intellectual property cases, we've included a number of metrics to provide greater insight into the steps that we take to assess intellectual property submissions and engage with the people or entities who submit them.

## Appeals

When a user's content is deactivated as the result of an intellectual property notice, we send them an email notification that includes information on how to appeal our actions if they wish to do so. We evaluate appeals, which may be in the form of a counter-notice under the US Digital Millennium Copyright Act (DMCA), and remedy the situation if we determine that there was an actionable appeal. As we do with intellectual property notices, we engage with the person or entity who submitted the appeal to get more information if necessary. If at any point they are able to submit a complete and valid appeal, Pinterest will take appropriate action to remedy the situation.

## Copyright

Pinterest has always been a place for content creators, brands and publishers worldwide to feature their content and build value. Many creators upload their own content or encourage users to do so using buttons on their websites designed to facilitate saving to Pinterest, and welcome the exposure and user traffic generated when users save images. We work hard to give creators control over their content, including by designating which websites should be linked to and receive traffic from saved images, using features like our "No Pin" code if they wish to restrict saving from their websites, or claiming content on Pinterest through our Content Claiming Portal.

In cases where rights holders do not want their content to appear on Pinterest, we offer several mechanisms for content removal. Copyright owners and those authorized to act on their behalf can report alleged copyright infringements through our copyright

PX0688-030

Pinterest Policy

 Policy                                                                        ≡

action, which may include removing the reported content from Pinterest. We also offer the Content Claiming Portal, a tool launched in 2021 that enables rights holders to claim their content and decide if and how it appears on Pinterest. When we take action based on a copyright notice or information gathered in the Content Claiming Portal, we notify affected users and provide information on how to appeal our actions if they wish to do so.

Copyright and other forms of intellectual property present unique content moderation challenges. While moderators can often identify content that violates our other policies, like those prohibiting adult content or threats, simply by looking at the content, this is not the case for copyright. Identifying copyright infringement generally requires additional knowledge about the content's origin, legal status, ownership, licensing or other information that is not readily apparent—such as whether the owner authorized use by another party through agreements that Pinterest is not privy to. Because of this, rightsholders alone are in a position to know whether a particular use is or is not authorized. The notification process is a means for rights holders to provide this necessary information to Pinterest. Copyright is also unique because the proper response to infringement is not always to deactivate the content. Some rights holders may choose to deactivate content, while others prefer to keep their content on Pinterest but correct its attribution or add a link to their website.

For these reasons, both our moderation process and the data reported here are not always directly comparable to our other sections on Community Guidelines enforcement. That's why, for example, we've added metrics such as the number of notices we processed based on the initial submission and the number of times we sought more information, and omitted our metric showing the reach of deactivated Pins. We're committed to providing greater transparency into how we enforce intellectual

PX0688-031

5/22/24, 4:51 PM                                      Pinterest Policy

 **Policy**                                                                        ☰

# Content enforcement

In Q1 2023, we received **18,660** submissions through our copyright reporting mechanisms. Of these submissions, **1,113** were determined to be spam and we discarded them. We determined that another **248** were requests unrelated to intellectual property and forwarded to the appropriate team at Pinterest. We found **12,307** to be complete upon submission, and we processed all content identified in each notice. We sought information for an additional **4,447** submissions which we determined to be incomplete and ultimately processed **627** of those submissions. In total, we processed **12,934** notices and deactivated **49,249** distinct images, which comprised **16,652,995** Pins, under our copyright policies. We deactivated **fewer than 1%** of Pins manually and **more than 99%** with hybrid tools. We deactivated **828** accounts for violating our policy against repeat infringers. We received **892** appeals, found **352** to be complete and facially valid, and took appropriate action.

We also received **2,029** requests through the Content Claiming Portal in Q1 2023. We processed **1,755** requests, which included deactivating **8,088** distinct images, comprising **159,582** Pins. We received **16** appeals for content deactivated in this manner, found **10** to be complete and facially valid, and took appropriate action.

In Q2 2023, we received **16,795** submissions through our copyright reporting mechanisms. Of these submissions, **1,153** were determined to be spam and we discarded them. We determined that another **518** were requests unrelated to intellectual property and forwarded to the appropriate team at Pinterest. We found **10,002** to be complete upon submission, and we processed all content identified in each notice. We sought information for an additional **4,432** submissions which we determined to be incomplete and ultimately processed **536** of those submissions. In total, we processed **10,538** notices and deactivated **38,103** distinct images, which comprised **9,900,675** Pins, under our copyright policies. We deactivated **fewer than 1%**

PX0688-032

5/22/24, 4:51 PM                                 Pinterest Policy

 Policy                                                ☰

valid, and took appropriate action.

We also received **2,790** requests through the Content Claiming Portal in Q2 2023. We processed **2,364** requests, which included deactivating **6,675** distinct images, comprising **133,981** Pins. We received **6** appeals for content deactivated in this manner, found **3** to be complete and facially valid, and took appropriate action.

## Trademark

Pinterest respects the trademark rights of others. Trademark owners can contact us through our trademark reporting mechanisms, such as our in-product reporting option, the [trademark complaint form](#) or by emailing us at [trademark@pinterest.com](#), if they have concerns that content on Pinterest infringes their trademark rights. We review submissions we receive and take appropriate action, including removal of the content at issue from Pinterest.

As with copyright, both our moderation process and the data reported here are not always directly comparable to our other Community Guidelines enforcement. That's why, for example, we've added metrics such as the number of notices we processed based on the initial submission and the number of times we sought more information, and omitted our metric showing the reach of deactivated Pins.

We expanded our focus on account-level deactivations for the sale of counterfeit goods during the reporting period, which led to an increase in accounts deactivated.

## Content enforcement

In Q1 2023, we received **4,723** submissions through our trademark reporting mechanisms. Of these submissions, **813** were determined to be spam and we discarded them. We determined that another **8** were requests unrelated to intellectual

PX0688-033

Pinterest Policy

 Policy

additional **1,934** submissions which we determined to be incomplete and ultimately processed **135** of those submissions. In total, we processed **1,612** notices and deactivated **31,179** distinct images, which comprised **39,732** Pins, under our trademark policies. We deactivated **100%** of Pins manually. We deactivated **135** boards and **466** accounts under our trademark and related policies. We received **5** appeals, found **1** to be complete and facially valid, and took appropriate action.

In Q2 2023, we received **3,854** submissions through our trademark reporting mechanisms. Of these submissions, **370** were determined to be spam and we discarded them. We determined that another **29** were requests unrelated to intellectual property and forwarded to the appropriate team at Pinterest. We found **1,427** to be complete upon submission, and we processed all content identified in each notice. We sought information for an additional **1,651** submissions which we determined to be incomplete and ultimately processed **132** of those submissions. In total, we processed **1,559** notices and deactivated **25,270** distinct images, which comprised **29,321** Pins, under our trademark and related policies. We deactivated **100%** of Pins manually. We deactivated **43** boards and **582** accounts under our trademark and related policies. We received **4** appeals, but found **0** to be complete and facially valid.

# Law enforcement and government requests

This section provides insight into the volume of information and deactivation requests received from law enforcement and government entities in the first half of 2023, from January through June 2023. For more information on how we respond to requests for account information, refer to our Law enforcement guidelines.

PX0688-034

 **Policy**                                                                ☰

government entities for Pinterest account information. We diligently review each request, and only produce data for those that meet the requirements of the law and our policies. Our policy is to notify users of government requests for their information prior to disclosing any account information, except in specific circumstances, such as where we are prohibited by law or in emergency situations.

### United States

| Types | Requests | Some information produced | Accounts identified |
|---|---|---|---|
| Subpoena | 77 | 48 | 50 |
| Court Order | 7 | 5 | 12 |
| Warrant | 49 | 40 | 46 |
| Other* | 6 | 1 | 1 |
| **Total** | **139** | **94** | **109** |

◄ ▬▬▬▬▬▬▬▬▬▬▬▬▬ ►

*\* Law enforcement requests such as wiretap orders, pen registers, trap and trace, and emergency disclosure requests.*

*\*\* The account owner was notified before production. This does not include situations where account owners were notified at a later date following the disclosure of their account information once the legal prohibition period had lapsed.*

### International

| Country | Types | Requests | Some information produced |
|---|---|---|---|
| Austria | Other* | 1 | 0 |

PX0688-035

5/22/24, 4:51 PM                                    Pinterest Policy

🅟 Policy                                                                    ☰

| | | | |
|---|---|---|---|
| Brazil | Other* | 5 | 0 |
| Canada | Other* | 1 | 0 |
| France | Other* | 2 | 0 |
| Germany | Other* | 7 | 0 |
| India | Other* | 7 | 1 |
| Italy | Other* | 3 | 0 |
| Norway | Other* | 1 | 0 |
| Spain | Other* | 2 | 0 |
| United Kingdom | Other* | 7 | 0 |
| **Total** | | **36** | **1** |

*\* Law enforcement requests such as emergency disclosure requests and requests issued pursuant to local law.*
*\*\* The account owner was notified before production. This does not include situations where account owners were notified at a later date following the disclosure of their account information once the legal prohibition period had lapsed.*

### National security requests*

| Time period | No. of requests |
|---|---|
| January through June 2023 | 0-249 |

*\* Any national security letters and orders issued under the US Foreign Intelligence Surveillance Act for user information.*

## Government content deactivation requests

PX0688-036

Pinterest Policy

 Policy ≡

requests to determine if the content identified violates our **Community Guidelines** or local law. Our teams take action on violations, ranging from deactivating the content globally to restricting access to the content within the relevant country if it appears to violate local law but does not violate our policies.

Pinterest received a total of **13,785** content removal requests from government entities from January through June 2023, all of them from outside the U.S. We deactivated the content in **11,544** of those requests for violating our Community Guidelines and restricted content on an additional **1,534** requests. Content for **633** requests was inactive by the time it was reviewed in response to the government removal request. This can happen when, for instance, the content was deactivated in response to a user report prior to Pinterest receiving the government removal request.

| Country | Requests | Community Guidelines deactivations* | Local deact |
|---|---|---|---|
| Australia | 3 | 3 | 0 |
| Brazil | 4 | 1 | 3 |
| Denmark | 233 | 149 | 26 |
| Indonesia | 9 | 6 | 3 |
| South Korea | 12,187 | 10,931 | 1,205 |
| Russia | 1,343 | 450 | 286 |
| Turkey | 15 | 3 | 11 |
| United Arab Emirates | 1 | 1 | 0 |
| **Total** | **13,785** | **11,544** | **1,534** |

PX0688-037

Pinterest Policy

 Policy

≡

*our Community Guidelines and was restricted from appearing only in the country where the request originated, based on local law.*
*\*\*\* Content was no longer available on the platform by the time it was reviewed in response to the government removal request.*

# Building toward a safer internet

Creating the most positive space online doesn't happen by accident: It happens through proactive policy and product decisions. We have industry-leading positions on content safety that are informed by inputs and advice from outside experts, civil society and government. We also invest heavily in measures like machine learning technology to maintain a safe and positive space for people on the internet. We're proud of what we're doing to keep Pinterest safe and to move the broader industry forward.

Let's create a safer, more inspired internet, together.



Languages

PX0688-038

5/22/24, 4:51 PM                                          Pinterest Policy

 Policy                                                    ≡

**About us**                    **Our policies**                    **More info**

What's Pinterest                Copyright                           For businesses

Our Pinterest page              Personalized ads                    For developers

Engineering blog                Terms of service                    For press

Brand guidelines                Privacy                             For investors

Careers

Help Center

Pinterest Labs

© Pinterest 2024

PX0688-039