# PX14484

4/26/23, 9:43 AM                                    Scott Coleman - Adviser - Omaze | LinkedIn

                                                                          



## Scott Coleman

President | Adviser

San Francisco, California, United States

4K followers   ·   500+ connections

Join to follow

  **Omaze**

## About

I'm a traveler at heart and have spent my career (20+ years) at the intersection of consumer technology and international. Currently, I advise companies on international expansion strategy (product, go-to-market, people).

My expertise spans product-led growth, partnerships, marketing, and operations. I joined two companies pre-IPO (Pinterest, Google) and was part of the team that scaled them. I served as President at Omaze, a series C company raising money for charities around the world, overseeing the US P/L, product and technology, and company planning. I participated at the board for Omaze and was board director for Pinterest Europe Limited (overseeing all international entities).

Highlights are scaling the ads business for Google in Latin America and India, launching new

PX14484-001

4/26/23, 9:43 AM    Scott Coleman - Adviser - Omaze | LinkedIn

 

product.

---

# Experience



**Omaze**
1 year 1 month

### Adviser
Apr 2023 - Present · 1 month

### President
Apr 2022 - Apr 2023 · 1 year 1 month
- PM, Eng, Design, Mktg, Partnerships
- Company strategy & ops ($xxxm run rate)
- Product, Tech, Infosec (web, app, backend)
- US P/L and GTM ($xxm run rate)
- Charity funding ($xxm distributed)
- Quarterly Board of Directors



### Founder and President
Wayfinder Global Advisers

2018 - Present · 5 years

Adviser for small and mid-sized technology companies on international growth strategy. Former clients include Glassdoor and Noom.



**Pinterest**
6 years 10 months

### Head of Growth & International Product
Jan 2020 - Mar 2022 · 2 years 3 months
- Led growth for 450m+ global user base
- Site founder for Eng. office in Mexico City
- Board Member for Pinterest Europe Limited
- Director for all International entities
- Contributor quarterly earnings releases

PX14484-002

4/26/23, 9:43 AM

Scott Coleman - Adviser - Omaze | LinkedIn





- Intl product strategy for 300m+ users
- Led International GTM team of 200+
- Product Marketing (consumer & ads)



### Google

12 years

### Head of Partnerships

2008 - 2015 · 7 years

San Francisco, Kampala, Nairobi

- BD team for products across 50 countries
- Built fiber network in Africa (csquared.com)
- Incubated hardware and software products
- Startup team energy and climate products

### Manager, Google AdSense

Oct 2003 - 2008 · 5 years

Mountain View, Buenos Aires, Sao Paulo, Hyderabad

- Built teams in US, LatAm, and India to create a multi-billion dollar business
- Led scaled customer ops for 1m+ clients

# Education

PX14484-003

4/26/23, 9:43 AM                    Scott Coleman - Adviser - Omaze | LinkedIn

                                                                                  

2009 - 2011

**University of California, Berkeley**

Bachelor of Arts · Spanish and Portuguese and Political Economy

Graduate with honors, Phi Beta Kappa.

## View Scott's full profile

See who you know in common

Get introduced

Contact Scott directly

Join to view full profile

## People also viewed

PX14484-004

4/26/23, 9:43 AM                                   Scott Coleman - Adviser - Omaze | LinkedIn

                                                                          

Mexico City, Mexico

**Eric Edge**

Dad, Husband, CMO, Advisor, LGBTQ+ Advocate

San Francisco, CA

**Nicholas Marlin**

We take emerging brands looking for explosive growth to the next level.

Los Angeles Metropolitan Area

**James Oakes**

Chief International Officer at Omaze

London

**Jessie Segal**

Operations Executive

Los Angeles Metropolitan Area

**Gabriela Lamond, Esq.**

Business Affairs Executive at WME

Los Angeles, CA

**Silvia Oviedo Lopez**

Content and Product Leader | Angel investor | Advisor

San Francisco, CA

**Matias G. Spinetta**

Vice President, Revenue Operations at Eightfold

San Francisco, CA

**Ryan Cummins**

Founder, Heroic | Special Advisor, Lieber Institute for Brain Development | Startup Investor & Advisor

Nashville, TN

**Anoushka Millard**

VP of Experiences at Omaze

Los Angeles Metropolitan Area

Show more profiles ⌄

PX14484-005

Scott Coleman - Adviser - Omaze | LinkedIn

                                                                        

View Career Advice Hub

## Others named **Scott Coleman**


**Scott Coleman**
Enterprise Software Architect at Amdocs
Pine Grove, CA


**Scott Coleman**
Co-Owner at Coleman Rentals
Percy, IL


**Scott Coleman**
Owner, ThomCo Associates Insurance Services
Fresno, CA


**Scott Coleman**
Realtor - Keller Williams, Allen TX
Wylie, TX


**scott coleman**
President at Steele+ Marketing
Marietta, GA

525 others named Scott Coleman are on LinkedIn

See others named **Scott Coleman**

## Scott's public profile badge

Include this LinkedIn profile on other websites


**Scott Coleman**
President | Adviser

PX14484-006

4/26/23, 9:43 AM                          Scott Coleman - Adviser - Omaze | LinkedIn





View profile                                                          Linked in

**View profile badges**

© 2023                              About

Accessibility                       User Agreement

Privacy Policy                      Your California Privacy Choices

Cookie Policy                       Copyright Policy

Brand Policy                        Guest Controls

Community Guidelines                Language

PX14484-007

# PX14779



Engineering    Home    Blog    Data    Open Source    Trust    Infrastructure

# A Brief History of Scaling LinkedIn

Josh Clemm   July 20, 2015    Share    Tweet    Share

LinkedIn started in 2003 with the goal of connecting to your network for better job opportunities. It had only 2,700 members the first week. Fast forward many years, and LinkedIn's product portfolio, member base, and server load has grown tremendously.

Today, LinkedIn operates globally with more than 350 million members. We serve tens of thousands of web pages every second of every day. We've hit our mobile moment where mobile accounts for more than 50 percent of all global traffic. All those requests are fetching data from our backend systems, which in turn handle millions of queries per second.

***So, how did we get there?***

### The early years

### Leo

LinkedIn started as many sites start today, as a single monolithic application doing it all. That single app was called Leo. It hosted web servlets for all the various pages, handled business logic, and connected to a handful of LinkedIn databases.



*Ah, the good old days of website development - nice and simple*

### Member Graph

*One of the first things to do as a social network is to manage member to member connections. We needed a system that queried connection data using graph traversals and lived in-memory for top efficiency and performance. With this different usage profile, it was clear it needed to scale independently of Leo, so a separate system for our **member graph** called Cloud was born - LinkedIn's first service. To keep this graph service separate from Leo, we used Java RPC for communication.*

*It was around this time we needed search capabilities. Our member graph service started feeding data into a new search service running Lucene.*

*Replica read DBs*

PX14779-001

*As the site grew, so did Leo, increasing its role and responsibility, and naturally increasing its complexity. Load balancing helped as multiple instances of Leo were spun up. But the added load was taxing LinkedIn's most critical system - its **member profile database**.*

*An easy fix we did was classic vertical scaling - throw more CPUs and memory at it! While that bought some time, we needed to scale further. The profile database handled both read and write traffic, and so in order to scale, replica slave DBs were introduced. The replica DBs were a copy of the member database, staying in sync using the earliest version of* databus *(now* open-sourced*). They were set up to handle all read traffic and logic was built to know when it was safe (consistent) to read from a replica versus the main master DB.*



*\* While the master-slave model worked as a medium-term solution, we've since moved to partitioned DBs*

*As the site began to see more and more traffic, our single monolithic app Leo was often going down in production, it was difficult to troubleshoot and recover, and difficult to release new code. High availability is critical to LinkedIn. It was clear we needed to "Kill Leo" and break it up into many small functional and* stateless services*.*



*"Kill Leo" was the mantra internally for many years...*

### Service Oriented Architecture

*Engineering started to extract micro services to hold APIs and business logic like our search, profile, communications, and groups platforms. Later, our presentation layers were extracted for areas like our recruiter product or public profile. For new products, brand new services were created outside of Leo. Over time, vertical stacks emerged for each functional area.*

*We built frontend servers to fetch data models from different domains, handle presentation logic, and build the HTML (via JSPs). We built mid-tier services to provide API access to data models and backend data services to provide consistent access to its database(s). By 2010, we already had over 150 separate services.*

PX14779-002



*An example multi-tier service oriented architecture within LinkedIn*

*Being stateless, scaling could be achieved by spinning up new instances of any of the services and using hardware load balancers between them. We actively started to redline each service to know how much load it could take, and built out early provisioning and performance monitoring capabilities.*

### Caching

*LinkedIn was seeing hypergrowth and needed to scale further. We knew we could reduce the load altogether by adding more layers of cache. Many applications started to introduce mid-tier caching layers like memcache or couchbase. We also added caches to our data layers and started to use Voldemort with precomputed results when appropriate.*

*Over time, we actually removed many mid-tier caches. Mid-tier caches were storing derived data from multiple domains. While caches appear to be a simple way to reduce load at first, the complexity around invalidation and the call graph was getting out of hand. Keeping the cache closest to the data store as possible keeps latencies low, allows us to scale horizontally, and reduces the cognitive load.*

### Kafka

*To collect its growing amount of data, LinkedIn developed many custom data pipelines for streaming and queueing data. For example, we needed our data to flow into data warehouse, we needed to send batches of data into our Hadoop workflow for analytics, we collected and aggregated logs from every service, we collected tracking events like pageviews, we needed queueing for our inMail messaging system, and we needed to keep our people search system up to date whenever someone updated their profile.*

*As the site grew, more of these custom pipelines emerged. As the site needed to scale, each individual pipeline needed to scale. Something had to give. The result was the development of Kafka, our distributed pub-sub messaging platform. Kafka*

PX14779-003

with speed and scalability in mind. It enabled near realtime access to any data source, empowered our Hadoop jobs, allowed us to build realtime analytics, vastly improved our site monitoring and alerting capability, and enabled us to visualize and track our call graphs. Today, Kafka handles well over 500 billion events per day.



*Kafka as the universal data stream broker*

### Inversion

Scaling can be measured across many dimensions, including organizational. In late 2011, LinkedIn kicked off an internal initiative called Inversion. This initiative put a pause on feature development and allowed the entire engineering organization to focus on improving tooling and deployment, infrastructure, and developer productivity. It was successful in enabling the engineering agility we need to build the scalable new products we have today.

## The modern years

### Rest.li

When we transformed from Leo to a service oriented architecture, the APIs we extracted assumed Java-based RPC, were inconsistent across teams, were tightly coupled with the presentation layer, and it was only getting worse. To address this, we built out a new API model called Rest.li. Rest.li was our move towards a data model centric architecture, which ensured a consistent stateless Restful API model across the company.

By using JSON over HTTP, our new APIs finally made it easy to have non-Java-based clients. LinkedIn today is still mainly a Java shop, but also has many clients utilizing Python, Ruby, Node.js, and C++ both developed in house as well as from tech stacks of our acquisitions. Moving away from RPC also freed us from high coupling with presentation tiers and many backwards compatibility problems. Plus, by using Dynamic Discovery (D2) with Rest.li, we got automated client based load balancing, discovery, and scalability of each service API.

Today, LinkedIn has over 975 Rest.li resources and over 100 billion Rest.li calls per day across all our datacenters.

PX14779-004

*Rest.li R2/D2 tech stack*

## Super Blocks

Service oriented architectures work well to decouple domains and scale services independently. But there are downsides. Many of our applications fetch many types of different data, in turn making hundreds of downstream calls. This is typically referred to as a "call graph", or "fanout" when considering all the many downstream calls. For example, any Profile page request fetches much more beyond just profile data including photos, connections, groups, subscription info, following info, long form blog posts, connection degrees from our graph, recommendations, etc. This call graph can be difficult to manage and was only getting more and more unruly.

We introduced the concept of a super block - groupings of backend services with a single access API. This allows us to have a specific team optimize the block, while keeping our call graph in check for each client.

## Multi-Data Center

Being a global company with a fast growing member population, we needed to scale beyond serving traffic from one data center. We began an effort years ago to address this, first by serving public profiles out of two data centers (Los Angeles and Chicago). Once proven, we embarked on enhancing all our services to handle data replication, callbacks from different origins, one-way data replication events, and pinning users to a geographically close data center.

Many of our databases run on Espresso (a new in-house multi-tenant datastore). Espresso was built with multi data centers in mind. It provides master / master support and handles much of the difficult replication.

Multiple data centers are incredibly important to maintain "site-up" and high availability. You need to avoid any single point of failure not just for each individual service, but the entire site. Today, LinkedIn runs out of three main data centers, with additional PoPs around the globe.



*LinkedIn's operational setup as of 2015 (circles represent data centers, diamonds represent PoPs)*

### What else have we done?

Of course, our scaling story is never this simple. There's a countless number of things we've done over the years across all engineering and operations teams, including some of these larger initiatives:

Many of our most critical systems have their own rich history and evolution to address scale over the years. This includes our member graph service (our first service outside from Leo), search (our second service), news feed, communications platform, and member profile backend.

We've built data infrastructure that enables long term growth. This was first evident with Databus and Kafka, and has continued with Samza for data streams, Espresso and Voldemort for storage solutions, Pinot for our analytics systems, as well as other custom solutions. Plus, our tooling has improved such that developers can provision this infra automatically.

We've developed a massive offline workflow using Hadoop and our Voldemort data store to precompute data insights like People You May Know, Similar profiles, Notable Alumni, and profile browse maps.

We've rethought our frontend approach, adding client templates into the mix (Profile page, University pages). This enables more interactive applications, requiring our servers to send only JSON or partial JSON. Plus, templates get cached in CDNs and the browser. We also started to use BigPipe and the Play framework, changing our model from a threaded web server to a non-blocking asynchronous one.

Beyond the application code, we've introduced multiple tiers of proxies using Apache Traffic Server and HAProxy to handle load balancing, data center pinning, security, intelligent routing, server side rendering, and more.

And finally, we continue to improve the performance of our servers with optimized hardware, advanced memory and system tuning, and utilizing newer Java runtimes.

### What's next

LinkedIn continues to grow quickly and there's still a ton of work we can do to improve. We're working on problems that very few ever get to solve - come join us!

Thanks to Steve, Swee, Venkat, Eran, Ram, Brandon, Mammad, and Nick for the help in reviewing.

---

Topics

---

scale, rest.li, Play, Open Source, Galene, Pinot, engineering culture, ESPRESSO, Kafka, inversion, Architecture, Voldemort, operations, Java, Search, Samza

PX14779-006

Related story
How we retired Python 2 and improved developer
happiness

Related story
The impact of slow NFS on data systems

Blog    Data    Open Source    Trust    Infrastructure

LinkedIn Corporation © 2023    About    Cookie Policy    Privacy Policy    User Agreement    Accessibility    Your California Privacy Choices

LinkedIn.com

PX14779-007

# PX14865

4/13/23, 5:12 PM                                                                                                                     About LinkedIn



## About LinkedIn

Welcome to LinkedIn, the world's largest professional network with more than
900 million members in more than 200 countries and territories worldwide.

## Vision

Create economic opportunity for every member of the global workforce.

## Mission

The mission of LinkedIn is simple: connect the world's professionals to make them more productive and successful.

## Who are we?

LinkedIn began in co-founder Reid Hoffman's living room in 2002 and was officially launched on May 5, 2003.

Today, LinkedIn leads a diversified business with revenues from membership subscriptions, advertising sales and recruitment solutions under the leadership of Ryan
Roslansky. In December 2016, Microsoft completed its acquisition of LinkedIn, bringing together the world's leading professional cloud and the world's leading
professional network.

For more information about our company:

Company page →

Products and services →

Pressroom →

Branding policies →

About
Cookie Policy
Privacy Policy
Your California Privacy Choices
User Agreement
Accessibility

**Linked**in © LinkedIn Corporation 2023

PX14865-001

4/13/23, 5:12 PM                                     About LinkedIn



PX14865-002

# PX14867

4/28/23, 9:33 AM                                    LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW    LOGIN    🔍

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE            FASTCO WORKS

ADVERTISEMENT

03-07-23 | PLUGGED IN

# LinkedIn turns 20: An oral history of an unlikely champion

Social media, for work? The world was skeptical. But 20 years and a few white-knuckle moments later,
LinkedIn has become synonymous with networking—and it's got more momentum than ever.

  

  

[Illustration: Janne Iivonen]

▾ **MORE LIKE THIS**

YouTuber Marques Brownlee
gets into the sneaker game
with high tops for Atoms

Auto-GPT and BabyAGI: How
'autonomous agents' are
bringing generative AI to the
masses

Roblox grows up

BY HARRY McCRACKEN
LONG READ

When LinkedIn launched, on May 5, 2003, it wasn't a given that it would thrive. Born during the doldrums after the original dotcom bust, it arrived at the same time as a flurry of other social networking upstarts, most of which quickly fizzled. Its emphasis on members' professional lives rather than personal pursuits was seen by some as a strategic blunder. Even the notion of posting your résumé in public was jarringly unfamiliar and likely to be taken as an act of disloyalty.

Rather than falling victim to preexisting assumptions, LinkedIn changed them. Eventually, it was *not* having a LinkedIn profile that was perceived as a weird career move. As the pandemic and its aftermath have reshaped work, the service has both reflected that new world and equipped workers and employers to succeed in it. Its emphasis on professionalism also offers a safe harbor from more toxic and polarizing social platforms.

LinkedIn hasn't escaped the current tech downturn—in February, it announced layoffs—but it's a rare example of a company seeing its greatest success after being bought. When its stock plunged by more than 40% in 2016, Microsoft swooped in and snapped it up for $26.2 billion—but then let it continue to chart its own destiny. Today, more than 4,500 job applications are submitted and 8 hires are now made every minute on the platform. Its revenue surpassed $14 billion in the past 12 months, close to quadruple the figure at the time of acquisition.

The lesson? "The less exciting turtle does win the race sometimes," says Reid Hoffman, the company's cofounder, original guiding light, and first CEO, who went on to become one of the most influential people in Silicon Valley. "We just kept going."

PX14867-001

LinkedIn turns 20: An oral history of an unlikely champion

[Illustration: *Janne Iivonen*]

### IN THE BEGINNING (1997–2003)

Before LinkedIn, there was SocialNet. Cofounded in 1997 by Reid Hoffman—who held a master's in philosophy from the University of Oxford and had helped develop online communities for Apple and Fujitsu—the proto-social network had a few business-oriented features. But they weren't the main point.

**Hoffman:** The natural thing, when everyone starts doing social products, is they always go to dating. We did that with SocialNet. We focused on, "How do we build a much better dating engine?" And we added the professional networking as an afterthought.

**Patrick Ferrell, cofounder, SocialNet:** Reid and I would sit some nights with our glasses of cabernet, and we would argue about various attributes of social networking until 2 in the morning.

**Allen Blue, SocialNet director of product design, LinkedIn cofounder:** It was a weird time, when [the web] was open to anyone who wanted to participate in it. Everything was based on HTML 1, so you could jump in pretty easily. I'd built websites and things for the Stanford Department of Drama, so when I got a call from a friend who knew Reid, I ended up joining [SocialNet].

**Ferrell:** We were a little too early. We had a non-clever board. I don't want to be too critical of them, but . . . if we had a more aggressive and clever board, I think that would have helped.

*When SocialNet didn't take off, Hoffman became COO of budding platform PayPal, where he was on the board. eBay acquired it in 2002, for $1.5 billion. Hungry to start a new company, Hoffman quit and pulled in friends to brainstorm possibilities—including a site focused on business networking. The startup economy was still struggling to recover from the bursting of the original dotcom bubble.*

**Mark Pincus, founder of early social network Tribe.net and Zynga:** We were in what I call the nuclear winter for the consumer internet, especially in San Francisco. It was a quiet, dark, sad place here.

**Mark Jeffrey, cofounder of social network ZeroDegrees, launched in 2003 and sold to IAC in 2004:** It sort of felt like the internet wasn't really a thing. That it wasn't really more important than the fax machine.

**Hoffman:** While I thought, at SocialNet, [that] our dating product was better [than existing dating sites], it wasn't 10x better. And yet there was this huge new need where no one was operating and that was a much better place to be. People have their careers for their entire lives.

**Blue:** Reid had us over to his apartment on Castro Street [in Mountain View, California], above a pizzeria. We talked over a bunch of ideas.

## A LOT OF BLOGGERS WOULD SAY, "LOOK, YOU GUYS DON'T HAVE A FUTURE."

**Keith Rabois, LinkedIn VP of business and corporate development (2005-2007):** One was basically a way of creating an archive of all your memories, of all society's memories. And it would be buried and then opened in 10 or 20 years. Fortunately, he didn't do that one.

**Hoffman:** We kicked around different things, but I'd say that we started with the LinkedIn idea and nothing was even remotely as good. So we came back to it.

**Eric Ly, LinkedIn cofounder:** The basic premise was to keep track of your network. Those of us who were in the startup world, there was so much job mobility. When you wanted to figure out where one of your friends was, in case you wanted to pull them into your startup, having that information was very valuable.

*Hoffman and his LinkedIn cofounders—Blue, Ly, Konstantin Guericke, and Jean-Luc Vaillant—hashed out their plans in the midst of a social networking boomlet, amid other contenders such as Ryze, Tribe.net, ZeroDegrees, and Friendster.*

PX14867-002

LinkedIn turns 20: An oral history of an unlikely champion

ADVERTISEMENT

**Pincus:** [Tribe.net was] Craigslist meets Friendster. Why wouldn't you want to see a picture of the person who's coming over to get your couch or be your roommate?

**Guericke:** A lot of bloggers would say, "Look, you guys don't have a future. Once Friendster allows you to put in where you've worked and when, then there's no room, because Friendster is a hundred times as big as you."

*Hoffman and Pincus teamed up to pay $700,000 for a patent associated with SixDegrees, which by some definitions had been the first true social network. Launched in 1997, it was dormant by 2000.*

**Andrew Weinreich, founder, SixDegrees:** The original vision of SixDegrees was we would index people's relationships in a single database. We wrote a patent on what a social network was, and, specifically, how a social network is formed.

**Pincus:** Reid came to me and said, "Mark, we have to buy this patent on social networking. It's going to be important and fundamental." He made the case. And I said, "You're right."

**Hoffman:** Part of why Pincus and I bought it is that we thought that there was going to be an entire explosion of new services that would be modeled on SixDegrees. We were bidding against—I guess it's safe to say now—Yahoo. And we were worried that it would be used as a weapon to quell entrepreneurship.

**Pincus:** There were articles written saying that Reid and I were patent trolls and we were going to hold up the whole industry. And you know, I think history showed that we bought it for the right reasons. We wanted to protect the industry, and we never did anything with it.

*In 2005, LinkedIn still had to clearly explain what it was and why you might want to use it. [Screenshot: courtesy of LinkedIn]*

*At first, the LinkedIn network consisted only of the company's initial employees. It grew—slowly at first—from there.*

**Hoffman:** It all started with 13 people out of an office in Mountain View. They were generation zero.

PX14867-003

FOLLOW     LOGIN

CO.DESIGN     TECH     WORK LIFE     NEWS     IMPACT     VIDEO     IF360     SUBSCRIBE          FASTCO WORKS

might be [one of] the first humans to get in." It was pretty rudimentary.

**Tina Mitiguy, who was trying to find a marketing job after earning an MBA:** I had an interest in healthcare. A friend of mine from college said, "Hey, if you're looking for a job, this is where you should upload your profile." So I did. There was a bit of a downturn, and it occurred to me that I was never going to get a job sending résumés out.

**Kevin Werbach, founder, the tech consultancy Supernova Group, and one of the first few hundred LinkedIn members:** I joined because we were all exploring new social networking platforms back then. We knew something was developing.

**Rafe Needleman, whose June 2003 column on LinkedIn for** *Business 2.0* **magazine was a critical early piece of media attention:** Kevin Werbach sent me a request and I was flattered because he's a really smart guy. It seemed more professional than the other stuff that was out there, so I gave it a shot.

In August 2004, in a pitch deck for its Series B funding, LinkedIn showed its success in a crowded field of business-oriented social networks. [Screenshot: courtesy of Reid Hoffman/Greylock]

*When another LinkedIn member found Mitiguy through shared connections and ended up offering her a job in June 2003, weeks after the site's launch, it was so novel that it received coverage in* The Wall Street Journal *and other publications.*

**Mitiguy:** The job was at a startup providing personal health information in case of emergencies, and it seemed like just the right fit for me. I felt very fortunate.

PX14867-004

FOLLOW     LOGIN     🔍

CO.DESIGN     TECH     WORK LIFE     NEWS     IMPACT     VIDEO     IF360     SUBSCRIBE          FASTCO WORKS

[Illustration: Janne Iivonen]

**GETTING BIG, CHANGING PERCEPTIONS (2004–2006)**

Early on, LinkedIn allowed new members to invite all their contacts to join the network with a few clicks—greatly boosting its vitality but leaving some people with a spammy impression of the service.

**Russell Glass, LinkedIn VP of product (2014–2017); CEO, Headspace Health:** When LinkedIn figured out that you can incentivize people to bring their contacts in and help them join the network, that was kind of a game changer in the growth curve.

**Rabois:** Reid was the one who made the decision to invest a team in [enabling] uploads from Microsoft Outlook address books. At the time, almost everybody, certainly in Silicon Valley, ran on Outlook email. That is the way we did business.

**Thornton:** In the early months, pushback came in the form of "I don't want to take my Outlook contacts and expose myself and those in my network online. Why would I want to do that?"

**Adam Nash, LinkedIn VP (2007–2011); Wealthfront CEO (2013-2016), cofounder, Daffy:** Your relationships are a big asset in your career, and we could help people a lot more if they were better connected. The flip side was that sending a LinkedIn invite to someone you didn't mean to send it to could really be a negative experience.

**Guericke:** We would send out a reminder that your invitation was going to expire. And some people were like, "Oh yeah, I forgot to accept this invitation—I meant to, I was just going into a meeting." And some were like, "That's annoying!"

*Originally, members' profiles were visible only to other members. In 2006, LinkedIn boosted growth by making user information public and allowing it to be found via search engines—giving people who weren't ardent business networkers a reason to join the service.*

**Rabois:** Normal people were aware that friends, family, and potential dates would be googling them. So it made it a little bit more intuitive to a normal person why a LinkedIn profile could be valuable.

PX14867-005

LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW    LOGIN

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE    FASTCO WORKS

In 2005, a still-tiny LinkedIn team celebrates a big member milestone. [Photo: courtesy of LinkedIn]

*The service grew from 30,000 users in October 2003 to 3.8 million in October 2005 to 8 million in April 2006. It launched its first major monetization efforts—such as charging employers $95 per job listing and offering premium accounts that allowed recruiters and others to contact members they weren't connected with—and revenue jumped from $1.1 million in 2005 to $32 million in 2007. But even as the service scaled, there was skepticism about the very concept of a business-focused social network.*

**Hoffman:** If you wind all the way back to 2003, it was like, "Oh, aren't you advertising disloyalty if you put your [résumé] online?"

## IF YOU'RE SOMEONE A LOT OF PEOPLE WANT TO CONNECT WITH, YOU HAVE A DIFFERENT EXPERIENCE THAN A TYPICAL USER."

**David Sze, partner at venture firm Greylock, which led LinkedIn's Series B funding round in 2004:** A big moment early on was when major banks limited access to LinkedIn on company-owned computers. They said, "Whoa, whoa, whoa, we don't want anyone on this. We don't want anyone out there with their profile out in the world."

**Hoffman:** Part of the thing that LinkedIn was doing was getting people psychologically comfortable with having a professional identity. Because pre-LinkedIn, a public professional identity was something for bloggers, or a very small number of people who'd set up a website, or journalists.

**Arvind Rajan, LinkedIn VP, managing director (2008–2014); cofounder, Cricket Health:** I remember there was some interview with Mark Zuckerberg where he said that having a separate professional and personal identity reflects a lack of integrity. A lot of people thought that was the case.

**Kay Luo, LinkedIn senior director of corporate communications (2006–2010):** For many years, LinkedIn never had photos on the website. And there were two camps in the company on that. There was the camp that said, "No, if you put photos, it's going to turn into a dating site." And then there was the other side that felt like it's part of your professional reputation and brand.

**Ly:** If we introduced that feature too early, it could have gone wrong in so many different ways. It was carefully introduced at the right time.

**Nash:** We really nudged people: "Not you and your friend at a beach party. You want a headshot."

**Jay Kreps, LinkedIn engineer (2007–2014); cofounder, Confluent:** Now it's become such a staple that people call in professional photographers to update their headshots for LinkedIn specifically.

PX14867-006

FOLLOW    LOGIN    🔍

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE         FASTCO WORKS

LinkedIn in 2017, by which time it had picked up on some of the design elements popular in more consumer-focused social networks. [Image: courtesy of LinkedIn]

*Not everyone instinctively grasped LinkedIn's utility or used it as intended.*

**Chris Selland, founder, research firm Reservoir Partners and veteran business development executive:** There was this whole thing for a while where people called LIONs [LinkedIn Open Networkers] would just basically blast everybody and say, "Connect with me." I remember that almost killed it for me. It's like, "I don't know you. What's the value?"

**Luo:** They were basically super networkers that tried to connect with as many people as possible, and that's really not how to use LinkedIn.

**John Kovacevich, marketer and longtime LinkedIn power user:** Early on, I made the decision to only [connect] with people that I'd actually worked with and not accept invitations from random strangers. The weirdo growth hackers who rack up connections like video-game points don't make any sense to me.

**Luo:** We had what Reid called "the rock-star problem." If you're someone a lot of people want to connect with, you have a different experience than a typical user. And it would probably be a fairly spammy, low-value proposition to you.

**Guy Kawasaki, tech-industry evangelist, author, and influencer:** I understood why people would want to get to me, but I didn't have the need to get to millions of people, not initially, because I wasn't trying to apply for a job. So it was a little asymmetric.

**Luo:** Guy was not shy about bashing LinkedIn. So one of the first things I did was help him draft a post on 10 ways you can use LinkedIn. He ended up publishing that post on his blog, and it became the most-read post he had ever published.

**Kawasaki:** I completely changed my mind.

PX14867-007

FOLLOW      LOGIN

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE          FASTCO WORKS

[Illustration: Janne Iivonen]

**BUILDING A CULTURE—AND A BUSINESS (2007–2010)**

In February 2007, Hoffman handed the CEO role to former Intuit executive Dan Nye, but he took it back in late 2008. In June 2009, Hoffman was succeeded by Yahoo alum Jeff Weiner, who sought to elevate the company's purpose.

**Weiner:** Like many others, I thought of LinkedIn primarily as a Rolodex and networking tool. After the opportunity to become CEO [came up], I started to learn more and was struck by the enormity of the potential of the platform as a means to facilitate the flow of human, intellectual, and working capital.

**Ryan Roslansky, LinkedIn (2009–present), chief product officer, CEO:** When Jeff joined LinkedIn, he called and asked me to join him as his first hire. It took him maybe 10 minutes to explain that if you can digitally map all the professionals in the world, and all the companies and jobs and skills, you can create meaningful economic opportunity for every member of the global workforce.

**Weiner:** Shortly after I joined, we implemented a framework called "Vision to Values."

**Kreps:** I was actually very suspicious of it when he came in. I was like, "Why is this guy spending all this time talking about values? We just need to figure out how to ship the software faster."

**Charlene Li, founder, Altimeter Group; chief research officer, PA Consulting:** Every time I met with somebody from LinkedIn, I would ask, "Why did you decide to do this?" And they would always bring it back to purpose and mission and values. I've never seen a company do that so consistently.

PX14867-008

4/28/23, 9:33 AM                                    LinkedIn turns 20: An oral history of an unlikely champion

**Rajan:** Our most important stakeholders were members. Ninety-five percent of them would never pay us a dime. And so we were really, really clear that if there were any ways that we had to make money, they had to be value accretive to the free member. That meant we turned down lots of revenue opportunities back in 2007, 2008.

**DJ Patil, LinkedIn chief scientist (2008–2011), chief data scientist of the U.S. Office of Science and Technology Policy (2015–2017):** People just wanted us to sell the database. And we could have. There's nothing legally preventing you from doing that. There was an ethical and moral obligation to the people that we served.

**Dan Shapero, LinkedIn (2008–present), VP, chief business officer, chief operating officer:** When I joined, the conversation at LinkedIn was something like, "Seems like recruiters really love LinkedIn. Maybe we could build something that would help them. Seems like small-business owners really love LinkedIn. Maybe we could build something just for them."

**Kreps:** By and large, all of those efforts succeeded and turned into big businesses.

**Edgmond:** Someone had built a hack-day project so that if someone wanted to pay us to send a sponsored message, they could. I put that on a server and hosted paid messages to millions of users. The stuff we were using to make beaucoup bucks every year came out of a little toaster that fit under someone's desk.

**Tim O'Reilly, technologist and founder, O'Reilly Media:** The thing that was most important about LinkedIn was that it found a business model for social that really worked, and it wasn't [just] advertising.

*The company started to think seriously about giving members stuff to do beyond racking up connections and hunting for jobs, incentivizing them to visit more than just occasionally.*

**Dan Roth, LinkedIn (2011–present), executive editor, editor-in-chief:** Your professional reputation lived on LinkedIn. The idea of content showing up there as well seemed very foreign.

**Shannon Brayton, LinkedIn (2010–2020), VP of communications, CMO, CMO and partner at VC firm Bessemer Venture Partners:** There was no content. People weren't posting anything. I remember at one meeting in 2010, we were looking through the feed and basically every single post or action was from a LinkedIn employee.

**Roslansky:** We partnered with Twitter to help people send their tweets into LinkedIn to create some liquidity.

**Akshay Kothari, LinkedIn (2013–2018), product lead, VP of product, head of LinkedIn India; cofounder, Notion:** Then Twitter shut it off because they were trying to keep [tweets] to their products. And what ended up being a crisis for LinkedIn ended up becoming a huge opportunity, because that pushed us to really drive our own content.

# IT WAS AMAZING TO SEE PEOPLE [REACT] WHEN THEY SAW SOMEONE LIKE RICHARD BRANSON OR BILL GATES WRITING ON LINKEDIN."

**Roslansky:** We tried to find leaders across the world to share their knowledge. And that kick-started this idea of LinkedIn being more of a vibrant network than just a place where you create your résumé and your profile.

**Roth:** One thing [people] liked is that we said, "We're not going to edit you. You can do this on your own. We'll build you a big following." A big yes for us was Richard Branson.

**Richard Branson, founder, The Virgin Group:** I saw it as a great opportunity to connect with people, highlight the work being done across the Virgin Group, shine a light on global issues I am passionate about, and share my thoughts.

**Arianna Huffington, founder, *The Huffington Post* and Thrive:** I started posting on LinkedIn in 2012, around the same time I joined Richard Branson's B-Team, a group he created to get business to prioritize people and the planet and not just profits. I wanted to be part of that conversation.

**Roth:** We delayed the launch because we were hoping to get Oprah. And we didn't.

**Beth Kanter, trainer, author, and early LinkedIn influencer:** I was out to dinner, and all of a sudden my phone blew up with text messages saying, "Hey, Conan O'Brien is talking about you." At the time, on my profile [photo], I had this big red cowboy hat. He did this hilarious bit about how he was going to get to the top of the LinkedIn influencer list and he said, "There's this woman, Beth Kanter, with a Randy 'Macho Man' Savage red hat. If she can get all these followers, then I can get all these followers, and I'm going to put a red hat on my profile. But it's going to be me with a red hat standing in the palm of the Pope next to [several U.S. presidents] with red hats on." It became my claim to fame. And I got, and I still have, more followers than he does.

**Blue:** It was amazing to see people [react] when they saw someone like Richard Branson or Bill Gates writing on LinkedIn. They were surprised to see these voices, writing in a way native to the network.

**Branson:** I remember celebrating with the team on the day I became the first person to hit 1 million followers in 2012.

*Along the way, LinkedIn also had to rethink itself for the smartphone era that dawned with the iPhone's introduction in 2007. Like many companies that had built their products for use on PCs, it stumbled at first.*

**Kothari:** There was a big transition to mobile that was an existential threat because so much of the advertising business was display advertising on the desktop.

**Rahul Vohra, LinkedIn mobile products (2012-2014); founder and CEO, Superhuman:** Facebook famously messed this up by building their entire mobile app in, essentially, HTML before realizing that wasn't going to cover it, and then they had to rewrite the whole thing again. The LinkedIn mobile app was actually even worse.

**Erran Berger, LinkedIn VP of product engineering (2009–present):** We could see that greater than 50% of our members' usage of LinkedIn was going to be on mobile. And yet so much of our R&D talent was people who grew up developing web applications.

**Tomer Cohen, LinkedIn (2012–present), head of mobile product, VP of product, chief product officer:** LinkedIn was a desktop-first company since it was established in 2003. And we literally had hundreds if not thousands of pages being built differently than if we came from mobile. Mobile was a very focused, concentrated experience. It didn't allow for a lot of complexity.

**Berger:** We had to completely reimagine how we build products here, from the way that we design them through the infrastructure to the type of people that we have on our teams. It was maybe the most intense period I can think of in my time here, a full year of rebuilding everything from the ground up.

**Cohen:** Within two or three years, most of LinkedIn [usage] became mobile.

PX14867-009

FOLLOW      LOGIN

CO.DESIGN     TECH     WORK LIFE     NEWS     IMPACT     VIDEO     IF360     SUBSCRIBE                    FASTCO WORKS

[Illustration: Janne Iivonen]

**AN IPO, A STOCK DROP, AND AN ACQUISITION (2011–2016)**

On May 19, 2011, LinkedIn became the first social media company to IPO. The stock more than doubled on its first day of trading, reaching a market cap of $9 billion. But it ended up spending only a half decade as a public company.

**Weiner:** During the first internet boom, I had seen far too many examples of employees becoming distracted by their company's IPOs, with negative consequences. I wanted to ensure that didn't happen to us.

**Brayton:** We went public at 1 o'clock or whatever on the East Coast, and we all took a flight home that night to make sure we were back in the office the next day. We wanted to make sure people felt like, "Okay, that was a moment in time, but now we've got a lot of work to do."

**Rajan:** When we went public, the month or two afterward felt no different than the way it was before we had gotten public because we were just a really well-run, tight ship.

**Sze:** A company journey's doesn't end when there's a IPO. There was definitely a little malaise about, "Okay, can you continue to grow? Is there another chapter here? Will it continue to be an interesting business? Should it be a public business?" All those kind of things. And we could see the value that we were creating.

PX14867-010

LinkedIn turns 20: An oral history of an unlikely champion

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE            FASTCO WORKS

LinkedIn staffers celebrate the company's IPO on the NYSE on May 9, 2011. [Photo: courtesy of LinkedIn]

*A moment of truth occurred when LinkedIn's stock plunged by 43.6% on February 5, 2016, after the company forecasted earnings far short of Wall Street expectations (due to the sunsetting of a sales feature called Lead Accelerator, foreign currency issues, ad challenges, etc.). Eleven billion in market value evaporated, and LinkedIn reassessed its prospects as an independent entity.*

**Brayton:** Jeff and I did a lot of strategizing [after the drop]. He showed up two days later at our regular scheduled all hands and completely nailed the message to the company. He basically said, "We're not 40% less valuable than we were a day ago. Markets do what they do." He gave this incredible, impassioned speech.

**Glass:** I remember Jeff's talk to the company—I remember the seat I was sitting in, the message, the tone, the narrative, the whole notion of "We are the same company we were yesterday."

**Kothari:** We could see our net worth go down, but we also realized, "Hey, we still are here to create jobs for other people. I can create economic opportunity." It kept us going.

**Brayton:** We got a bunch of calls from other companies interested in potentially buying us.

**Hoffman:** It might have had some psychological influence on our receptivity to [being acquired]. We'd gotten a lot of interest over the years.

PX14867-011

LinkedIn turns 20: An oral history of an unlikely champion

Then–LinkedIn CEO **Jeff Weiner**, Microsoft CEO **Satya Nadella**, and LinkedIn cofounder **Reid Hoffman** show solidarity as LinkedIn's blockbuster acquisition by Microsoft is announced in June 2016. [Photo: courtesy of LinkedIn]

*On June 13, Microsoft announced that it was buying LinkedIn—which had 433 million users at the time—for $26.2 billion.*

**Satya Nadella, CEO, Microsoft:** I'm a deep believer in democratizing productivity and communication tools, because that's what empowers people to be able to be great at their job, acquire new skills, and grow their economic opportunity. Reid, Jeff, and I discussed all of this for a while, and the potential of the two companies was something that I'd been thinking about for a long time.

**Sze:** We spent a bunch of time at the operating levels with the teams. It felt really good—the alignment of mission, style, and goals.

**Josh Graff, LinkedIn (2011–present), various executive roles related to global operations, VP of global enterprise:** When the acquisition was announced, there was a combination of anxiety and curiosity.

**Tanya Staples, LinkedIn (2015–2022), senior director of content, VP of product:** Like "Why Microsoft? Why not Google, or insert-any-other-company-here?"

## A LOT OF TIMES, LARGE COMPANIES BUY OTHER COMPANIES AND THEY WANT TO INTEGRATE THEM."

**Hoffman:** We said, "Hey, our missions are friends, right?" Microsoft's mission is to empower every individual and organization to do their best work. LinkedIn's mission is to empower every individual to have the maximum deployment of their talent for their work and their career. It's like peanut butter and chocolate.

**Roslansky:** A lot of times, large companies buy other companies and they want to integrate them.

**Nadella:** I knew we needed to take a different approach. We made the decision early that LinkedIn [would] retain its distinct brand, culture, and independence.

**Staples:** Once we became part of Microsoft and saw what Satya was doing and how he was leading the company, it did very much feel like a fit.

**Brayton:** I think we ended up adopting their paternity policy or something because it was better than ours. But honestly, pretty much everything stayed the same.

PX14867-012

LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW      LOGIN

CO.DESIGN      TECH      WORK LIFE      NEWS      IMPACT      VIDEO      IF360      SUBSCRIBE            FASTCO WORKS

[Illustration: Janne Iivonen]

**BEYOND THE "BLUE MAN IN A SUIT" (2017–PRESENT)**

Now part of Microsoft, LinkedIn began the process of reimagining itself for a new world of work. Then COVID-19 hit—right before Roslansky succeeded Weiner as CEO. Today, LinkedIn's momentum shows no sign of peaking.

**Meg Garlinghouse, LinkedIn VP of social impact (2010–present):** I don't think that, six or seven years ago, [everyone] thought [LinkedIn] was a place they should be. They weren't sure that they belonged.

**Melissa Selcher, LinkedIn (2016–present), VP, SVP, chief marketing and communications officer:** We did a lot of qualitative research along with the quantitative, and someone said, "LinkedIn, to me, feels like a faceless blue man in a suit." It's funny when someone says that. But you're also like, "Ouch, that hurts." And then you're like, "I can kind of see it."

**Sarah Alpern, LinkedIn (2007–2013 and 2017–present), senior designer, user experience design director, VP of design:** We had this internal rallying cry: "We are not a faceless blue man in a suit! We are so much more."

**Cohen:** Gen Zs bring their full selves to work, so being able to tailor their profiles to showcase all dimensions of themselves is really important.

**Selcher:** We own this responsibility to extend the definition of "professional" to include all kinds of professionals and success. "Professional" should include talking about mental health and sharing your diversity journey.

**Cohen:** Now, some of our most engaged segments are first-line [workers], entry roles, students, Gen Z. Fifty-five percent of our sign-ups are coming from those segments.

PX14867-013

FOLLOW     LOGIN

CO.DESIGN     TECH     WORK LIFE     NEWS     IMPACT     VIDEO     IF360     SUBSCRIBE          FASTCO WORKS

LinkedIn in its modern form, including an "#OPENTOWORK" avatar indicating that the member is looking for new opportunities. [Image: courtesy of LinkedIn]

*International usage has also helped drive recent growth—and opened up opportunities for even more expansion.*

**Cohen:** Close to 80% of our members are outside of the U.S., engagement is predominantly outside of the U.S., growth is predominantly outside of the U.S. So in many ways, we are much more international than we are U.S. focused.

**Graff:** India is our fastest-growing market. Members are highly engaged. We're on track to be a hundred million members very soon. And if you look at India broadly, there's a workforce of half a billion people. There's a middle class larger than the whole population of Australia.

**Roslansky:** Three days ago, we had our largest sign-up day in the history of LinkedIn, which is very rare for a consumer internet company that is 20 years old.

**Cohen:** We saw a surge in usage [during the pandemic]. Almost overnight, [people] didn't have that workplace environment like they had before.

**Mohak Shroff, LinkedIn (2008–present), engineering lead, director of engineering, VP of engineering, senior VP of engineering:** North of 50% of jobs on our platform now indicate themselves as being open to remote work.

*The company defines itself in loftier terms than a mere social network, though users continue to embrace it as such.*

**Roslansky:** We don't view ourselves as a social network. We are a platform that exists to create economic opportunity.

**Teuila Hanson, chief people officer (2020-present):** If you ever get to an impasse or are in a situation where you need to make a decision and you're not quite sure which way to go, you ask, "Is this decision going to create economic opportunity for every member of the global workforce?"

**Kawasaki:** I don't know if the LinkedIn people would like me saying this, but I think that LinkedIn is simply the best social network.

**Branson:** It continues to play a crucial role in how I communicate with leaders, customers, peers, employees, and entrepreneurs.

**Kreps:** On Twitter, the thing that makes people popular is amplifying the worst thing that somebody else said. That creates this cycle of negativity. The worst thing on LinkedIn is probably just some stupid article about stuff you do at the office.

**Kothari:** In the last few years, when things have really gone out of control [on other platforms], LinkedIn has been a safe place for people to write. It's always had this professional filter. Sometimes, people may feel like it's kind of boring, but I think it's actually helped.

*A version of this article appeared in the March/April 2023 issue of Fast Company magazine.*



**Be in the Know.** Subscribe to Fast Company Newsletters.

Email

☑ Top Tech     ☑ Co.Design     ☑ Work Smarter

☑ Plugged In     ☑ Impact     ☑ Top 10

PX14867-014

4/28/23, 9:33 AM                                    LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW     LOGIN     🔍

CO.DESIGN     TECH     WORK LIFE     NEWS     IMPACT     VIDEO     IF360     SUBSCRIBE          FASTCO WORKS

Privacy Policy

**ABOUT THE AUTHOR**

Harry McCracken is the global technology editor for *Fast Company*, based in San Francisco. In past lives, he was editor at large for *Time* magazine, founder and editor of *Technologizer*, and editor of *PC World* More

## Today's Top Stories:

01      **CO-DESIGN**
**The Life And Death Of Technicolor**

02      **CO-DESIGN**
**Sweetgreen is asking customers to pay $10 a month for its new loyalty program**

03      **CO-DESIGN**
**This is how a 3-year-old sees a city—and it's not very pleasant**

04      **TECHNOLOGY**
**Unity CEO John Riccitiello describes the realities—and distractions—of the metaverse**

05      **NEWS**
**What do apple cider vinegar gummies actually do? Goli's $438 million business may or may not have the answer**

**More Top Stories:**

▶

SPONSORED CONTENT

# FROM OUR PARTNERS

Dianomi ▷



**SMARTASSET**
District of Columbia: The List Of The Top Financial Advisor Firms I...



**CITI® CHECKING**
Don't miss out on zero overdraft fees with Citi checking. Member FDIC.



**NERDWALLET**
APYs Are On the Rise. Discover Standout Savings Accounts.



**CHAIKIN ANALYTICS**
Sell Alert: Sell This Popular Stock Now

ADVERTISEMENT

PX14867-015

4/28/23, 9:33 AM

LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW    LOGIN

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE    FASTCO WORKS

**CO-DESIGN**
**How the 'New York Times' wooed a new generation of readers**

**CO-DESIGN**
**Do you have ADHD? This web browser is designed to make it easier to focus**

**LEADERSHIP**
**A neuroscientist reveals the untapped solution to create better working relationships**

**IDEAS**
**5 steps to making better cities**

**TECHNOLOGY**
**What I learned by trying 6 Twitter alternatives**

**LEADERSHIP**
**How to train your brain to increase your attention span**

**TECHNOLOGY**
**Dropbox layoffs: AI to blame for 16% job cut, CEO says**

**IDEAS**
**The secret money fueling the conservative anti-ESG push**

**IDEAS**
**The dark paradox of traffic jams**

**TECHNOLOGY**
**When is social media stalking illegal? The Supreme Court is about to decide**

**TECHNOLOGY**
**John Mulaney escapes the prison of likability in his new Netflix special**

**CO-DESIGN**
**Ukraine's sneaky submarine may change naval warfare forever**



**CO-DESIGN**
**Can this tiny device save you from the flu?**



**CO-DESIGN**
**How design (and salt) are fueling Ukraine's drone program**



ADVERTISEMENT



**TECHNOLOGY**
**How a microwave-sized device could make personalized cancer treatment more accessible**

**TECHNOLOGY**
**How AI could power advertising's next creative revolution**

4/28/23, 9:33 AM                    LinkedIn turns 20: An oral history of an unlikely champion

FOLLOW    LOGIN

CO.DESIGN    TECH    WORK LIFE    NEWS    IMPACT    VIDEO    IF360    SUBSCRIBE         FASTCO WORKS

**TECHNOLOGY**
This is the AI we didn't see coming: artificial imagination

**TECHNOLOGY**
POV: Digital advertising is dead. Good riddance

**IDEAS**
This sleek electric RV was designed by former Tesla engineers

**IDEAS**
Spotted lanternflies are about to hatch—and they're going to be thirsty

**TECHNOLOGY**
Slack Canvas arrives, but don't call it a Notion clone

**LEADERSHIP**
Your toxic workplace could be affecting your gut health—I know from experience

**LEADERSHIP**
CEOs are throwing tantrums about productivity and return-to-office plans

**CO-DESIGN**
Marc Newson designed his Knoll task chair to last 'forever'

**CO-DESIGN**
The striking consistency of Mastercard's logo

**LEADERSHIP**
How companies stopped worrying and are giving workers the hybrid workplace they want

**NEWS**
Insider staffers say they are walking off the job today as layoffs sweep the media industry

ADVERTISEMENT

# TECH

TECH
Twitter's plan to limit the reach of controversial tweets might be a good thing

TECH
How IoT-powered soil sensors helped a California golf resort save millions of gallons of water per month

TECH
How tech startups are rethinking funding now after the collapse of SVB

# NEWS

NEWS
Tony Hawk is right on time as the new face of Citizen smartwatches

NEWS
The pandemic led to a resurgence of independent retail

PX14867-017

LinkedIn turns 20: An oral history of an unlikely champion

## CO.DESIGN

CO.DESIGN
**AI is going to turn everyone into a designer**

CO.DESIGN
**Google spills the secrets of its design**

CO.DESIGN
**How the designers of 'Paint' created a Bob Ross universe for the anti-Bob Ross**

## WORK LIFE

WORK LIFE
**Build company growth through creativity and freedom**

WORK LIFE
**6 times you should say no at work (and exactly how to do it)**

WORK LIFE
**One simple question and 7 surprising practices that will transform any relationship**

Advertise  |  Careers  |  Privacy Policy  |  Terms  |  Notice of Collection  |  Do Not Sell My Data  |  Permissions  |  Help Center  |  About Us  |  Site Map  |  Fast Company & Inc © 2023 Mansueto Ventures, LLC

PX14867-018

# PX14868

4/25/23, 11:15 PM    Full transcript: LinkedIn Executive Editor Daniel Roth on Recode Media - Vox



**We have a request**    This is the last week of Vox's birthday month pledge drive. We're so close to our goal of adding 1,500 financial contributions by the end of April, support that helps keep Vox free year-round. Will you give today?    | **Yes, I'll Give** |    ×

# Full transcript: LinkedIn Executive Editor Daniel Roth on Recode Media

He revisits his 2004 profile of Donald Trump.

By Recode Staff | Feb 3, 2017, 10:00am EST



Taylor Hill / Getty Images

*Most Read*

1 **What we know so far about Tucker Carlson's shocking Fox News departure**

2 **Tucker Carlson was doing something different — and darker — than most Fox hosts**

3 **No, seriously, why did Fox News fire Tucker Carlson?**

4 **The expensive, unrealistic, and extremely white world of "momfluencers"**

5 **The quiet radicalism of Joe Biden's presidency**



Recode Media
Why is there no fake news on LinkedIn? (Daniel R...

00:00:00

SHARE  SUBSCRIBE  COOKIE POLICY



**Future Perfect**

Each week, we explore unique solutions to some of the world's biggest problems.

Email (required)

By submitting your email, you agree to our Terms and Privacy Notice. You can opt out at any time. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply. For more newsletters, check out our newsletters page.

SUBSCRIBE

On a recent episode of **Recode Media, hosted by Peter Kafka, Daniel Roth explained why he made the leap from traditional to digital media** to become executive editor at LinkedIn. When he began to feel like "a polar bear, jumping from smaller ice floe to smaller ice floe" as a magazine writer, he took a big chance — one that looked like it wasn't going to work for the first year — and has helped the job-listing site become a content destination.

You can read some of the highlights from the interview at that link, or listen to it in the audio player above. Below, we've posted a lightly edited complete transcript of their conversation.

If you like this, be sure to subscribe to **Recode Media** on **iTunes, Google Play Music, TuneIn, Stitcher** and **SoundCloud.**

*Transcript by Celia Fogel.*

**Peter Kafka: I'm here with Dan Roth, who's also a funny guy, a wry guy. How are ya?**

**Dan Roth**: Good, how you doing?

**Dan and I used to work together a looong time ago. Nearly 20 years ago.**

That's right.

**Holy shit, we're old. And now you work at Microsoft.**

Oh my god, yeah, that's true.

**Have you thought about that yet?**

You know, it's been an interesting progression, because the deal happened, it feels like, so long ago now, and we've all been living with it for a long time.

**I'm doing a terrible podcasting hosting job. I should explain what your actual job is. You work at LinkedIn running their content. You are the content czar at LinkedIn.**

I'm the executive editor of LinkedIn. So I oversee all of the original content on LinkedIn, the influence program, which is this group of sort of celebrities of the business world.

**You're the most powerful man in business journalism, I read when I was googling you this morning.**

That was written by your old boss [PK laughs] Henry Blodget. There was nothing better than a Business Insider headline, just the superlatives are awesome and they get repeated everywhere. The SEO value is … that will be on my tombstone, I think.

**So we'll talk about all that. But what I was saying was, you now work for Microsoft because LinkedIn got bought by Microsoft, and I think the deal just went through like days or weeks ago.**

That's right.

**Probably by the time you hear this, a few weeks ago. So how has life changed for you now that Microsoft is paying for your salary?**

So far, there have been no changes. It's been an incredibly smooth process where we started laying out … As soon as the deal happened [we] started thinking through what this could be like if and when the merger goes through. And there are some pretty powerful opportunities to create if you've seen any of the …. Jeff Weiner, our CEO, and Satya Nadella, Microsoft's CEO, both wrote posts on LinkedIn about what this could look like, and one of the things they called out was creating the world's largest business newsdesk. The world's largest business newsdesk.

**Right, so from the get-go … Sometimes when a merger like this happens they'll say, "Nothing's going to change, completely autonomous, everyone's going to go ahead and do their job, and obviously some things are going to change down the line." But from the get-go your boss and the CEO of Microsoft said, "We're going to work together, we're going to figure out ways to import LinkedIn in some capacity to Microsoft." So that meant your job was going to change in some capacity.**

The way that Jeff put it to us — the phrasing was pretty cool. [He said,] think about your — and this is LinkedIn so we tend to speak in language about how great things could be — your dreams amplified. All the programs, everything we're working on, how does Microsoft help amplify what we're doing? And all of the discussions that we've had is how does Microsoft help grow LinkedIn.

So the questions are how do we team up with MSN to be able to grow LinkedIn? How to we think about — in particular for content — what does content look like in a world where Microsoft's running this massive news portal? And then there's other things. We know that professionals start their day with Microsoft. They open their PC, they go and search for things. They are in Microsoft Office products all the time. How does the news and the views and the stuff that my team works on, and the entire content ecosystem at LinkedIn, how does that play in that world?

**So you guys have been sketching this out in your head for … A deal like this gets announced months ago, now it's a thing, so do you start working on it immediately? Do you wait for the deal to get done before you start working on it? How does that process work?**

You have to wait for the deal to be done to be able to launch, to be able to do anything.

**Noodling in the back of your head.**

Exactly.

**But you've got some ideas.**

Absolutely.

**But in the meantime you got to go ahead and do your job. So explain what your job actually is, day to day.**

I'm the executive editor of LinkedIn, which means I oversee an editorial team. We have about 20, almost 25 editors, who are around the world and in New York.

**Human beings.**

Human beings, human editors. We all have sweatshirts, hoodies, that say "human editors" on them. [PK laughs] And they are mostly people who come from the business journalism world: Forbes, Fortune, AP, Reuters, Le Figaro. The role of the editors at LinkedIn is to really focus on high-quality content and high-quality people. How do we make sure that we get the best stories and the best shares and people weighing in on the most important topics of the day?

**Because there's a couple different things going on at LinkedIn on the editorial side, right? Average people are just writing stuff and posting it.**

That's right.

**That stuff's automated, right? I submit something and it just sort of goes into the system at some point. And then you guys are also going to Bill Gates and whomever and saying, "Would you like to write something for us?" Are you guys writing your own stories as well? Or it's all contributors?**

Yeah, so we call it … Actually, this shows you the big jump I've made since leaving traditional media — I now have an acronym that I use in talking about it. The three Cs, we talk about. I talk about.

**I just winced a little bit.**

[laughs] Create, cultivate and curate. By the way, the fact that you winced, that's — everyone on my team winces every time I bring this up.

**It's good, it's good. They're still human.**

Yeah, but at one point, I'm going to hear someone repeat this, and I'll be like, "Yes."

**[laughs] That's your victory.**

"I've succeeded."

**You've absorbed them.**

So the *create* is the editors are supposed to write, shoot videos, be out there talking to people, Q&As …

**Yeah, you do some great interviews still.**

Thank you. And then we *curate*, so that is what you [were talking] about, we have 160,000 posts a week being written on LinkedIn. There's three million writers. It's by far the world's largest business platform and publisher if you think about it that way. And that content can either be distributed by algorithms or editors.

The system is an editorial-plus-algorithm operation. The algorithms help identify good content, the editors identify good content, what the editors choose helps train the algorithms, the algorithms help the editors make better choices. And so you can see things that are … you can have a member writing a piece about why radio traffic reporting jobs are not going to die in the Waze era. It's a super-narrow topic. But it could start blowing up in the algorithms, like,"Hey, editor, this thing seems like it's actually good. Can you check it out?"

**And you know a lot about the members, so you can say, "Oh, you might be interested in this."**

Exactly.

**Are you generating revenue for LinkedIn? What's the purpose of your team, the purpose of the work you guys are doing? Lots of people would love to have this platform, but what does it do for LinkedIn, and how do they measure what you're doing?**

Yeah, so first I have to say the last C, which is *cultivate*.

**I'm sorry.**

It's the idea of going out and reaching out to people, either individuals or thousands of people at a time, asking them to write, to contribute content. So — and I'll get to your question —

**No, no, finish the Cs.**

So the way that that works is, we have certain editors who have specialities. We have a health care editor, a finance editor, an editor just for software engineers. And that editor has certain

PX14868-003

people that he or she will turn to all the time and say, like, "Oh, the Muni system in San Francisco just got hacked. Hey, I know you're an expert in protecting systems, why don't you write a piece about why this thing happened?"

**An actual assignment, and an assignment editor.**

Exactly. So we talk about the world's largest news desk, this is what it is. We want to take the insights that are trapped in the heads of professionals everywhere and get them out to the world's professionals.

**So I get why people would like to write for LinkedIn, because ideally you get lots of distribution, it helps buff up your professional reputation, helps the company you work for. What do you guys get out of it? Because you're not selling ads against this stuff, are you?**

No. Well, there are ads that run on LinkedIn but we're not …

**That's not your business.**

That's not the main business. If people are coming to LinkedIn every day because they have this great information that makes them better at what they do, there's all kinds of benefits to the system. They will update their profiles, they'll start looking for a job that they might be interested in. They will write something that gets someone they work with, their colleagues, their boss, interested in checking it out. They'll get jobs from it and then they'll come back to LinkedIn more.

**Because the value of LinkedIn still is, it's for job seekers, people who want to hire people. It's that network, right? And then there's some advertising based around it. But it's really still a professional network, and the idea is, I'm going there fundamentally when I want to connect with someone professionally, usually to hire or get hired. And you want them to be more engaged generally.**

When I joined LinkedIn five years ago, that is what LinkedIn was, exactly what you described, and people would come here to get jobs. Over the years, especially because of the content that's flowing through LinkedIn now, people will come just to get smarter at what they do.

And so we think about "get a job," but also "get better, get smarter, be more successful." And being more successful doesn't always mean getting a job. It could mean … I just heard yesterday from someone who said, "I wrote these posts and I got two speaking opportunities."

**Right, but for LinkedIn the company, you just want them more engaged generally. Put it this way: Facebook wants people engaged so they can eventually show them ads. Right? That's not what LinkedIn does, and that's not really where you guys are headed.**

Well, we'll do two things. We'll do three things. We show them ads, so that's one thing. And so you might say, if someone wants to reach — when people buy ads on LinkedIn, they're buying ads for a specific community. I want to reach software engineers in Minnesota. And they can do that. And we need software engineers from Minnesota to be on LinkedIn, contributing, reading, so they can see those ads in their feed. They also might want to get jobs. That's part of it.

But you know, recruiters make up 60 percent of our revenue. So if you are Oracle and you're buying recruiting seats for LinkedIn, you want to have access to all of this LinkedIn data. Let's say that you're hiring someone who's just graduating from college. You're a recruiter and you're looking at all of these resumes, essentially, these profiles of people. Someone who's written a post or has shared content, the recruiter gets much more information about that person.

**Right, right, so you want me — or whomever — more engaged with LinkedIn broadly. So when the Oracle recruiter comes in, they've got a better pool of people to look at and they know more about that pool, and it makes it more valuable to that audience.**

That is one leg of the stool.

**Is there another acronym? Or there's a stool.**

[laughs] No, this is all I got, this is a stool. One part of it is the recruiter, and the second one is ads, and then subscriptions [are] the other big business.

**Right, got it. I'll stop grilling you about the business model. But it is interesting. Because it is this really big publishing platform. A lot of people would like to have a publishing platform as big as yours, but it's not Facebook, it's not Twitter, you're doing something different.**

**So I was thinking about how you guys are different [from] them. One way that's different is we just passed through an entire election cycle and there was nothing controversial that came out of LinkedIn. There's no fake news there, there's no one yelling racist**

PX14868-004

**comments. I'm assuming both candidates probably put something up there at some point? Did Trump submit something?**

Trump never did come.

**Not his thing?**

[Ted] Cruz is on there. Hmm, who else? [Marco] Rubio, I think, was on.

**And so the reason we're not reading about fake news on LinkedIn, the reason we don't have to worry about people doing hate speech on LinkedIn, is what? It's a professional network? People are using their real names?**

That's a big one. When you write or share or comment on LinkedIn, your boss sees it, your employees see it, your future business partners see it. So people tend to be much more careful about what they say. It's fascinating to watch how self-policing LinkedIn is. When people start talking about politics, you will see this flood of comments beneath what they are writing, saying, "This isn't Facebook, please don't put that here — this is LinkedIn, please talk about business." This is not the company saying it at all. It's users.

**Right, you're not discouraging people who are saying, "This is not the place for this sort of thing."**

Right. Now, we have certain rules in place. There are terms of service, and you can say, "This is not a professional conversation, please remove it." We also, though, have — because we're an editorial and algorithmic operation — largely kept a lot of the fake news out of it. It is very hard to input any kind of fake news on LinkedIn. You can share it, but it won't go wide. First of all, if you share it, you can see exactly who shared it. It is always tied to your identity. So you have to be someone who's comfortable saying, "I have now shared this fake news that has nothing to do with the business world."

**Although that's not slowing it down on Facebook, right?**

I think it's not because it's not your professional identity.

**People are saying awful things on Facebook with their real name attached to it.**

And I wonder, though, if that changes when you enter the workplace — what people say at work versus what they say at home are just two different things.

**They've got some dividing line in their head even if they're not even conscious about it. And some people are conscious about it.**

That's right.

**So did you guys see a spike in traffic and engagement, like a lot of other publishing companies did in the fall? Or not really?**

We saw a spike in content about the election. And a lot of people writing about what they were going to do, what a Trump administration would mean to business, what it would mean to protecting their workforces. A lot of open letters. Man, really, open letters had a great year this year.

**So people were doing politics there.**

People were doing politics, but again, you would then see the comments, people saying, "Why am I seeing this on here?" And I would talk to people who were writing it, asking whether they should be writing this kind of stuff on LinkedIn. My take was always, look, if you want to write about policy, that's awesome. That's essential. Write about what the future is of Obamacare. Or what changes in a Trump administration, how is that going to affect net neutrality. Those are the kind of topics, if you want to geek out on that kind of stuff on LinkedIn, it blows up because you get the right experts weighing in, pushing back and telling you what the right answer maybe should be.

If you were just going to say, "Trump's a terrible guy," "Hillary Clinton is a cheater and should be in jail," that kind of stuff dies on LinkedIn.

**What about "Hillary Clinton runs a child sex ring out of a pizza parlor?"**

No pizza. I don't want to jinx myself, but pizzagate, that hashtag has not shown up on LinkedIn.

**All right. During the commercial break I'm going to go check LinkedIn, see if we can find some pizzagate stories.**

I'm just realizing I probably shouldn't have said that. Now we'll find something in the dark reaches. [PK laughs]

PX14868-005

Full transcript: LinkedIn Executive Editor Daniel Roth on Recode Media - Vox

**We'll be right back.**

[ad]

**Back here with Dan Roth, whose title I keep forgetting. I call him the most powerful man in business journalism. He works at LinkedIn.**

I love that, that's my new title. It's executive editor, but I like yours better.

**I met you because we were fact checkers at Forbes magazine back when there was a Forbes magazine. I guess there still is one.**

Yeah.

**A long time ago. You had a much more successful career. You moved up through Fortune and Wired. You were a great writer, still are a great writer.**

Thank you.

**But you had a great career in business journalism, and then at one point you were managing fortune.com. You seem like the kind of guy who might be the editor of Fortune Magazine at some point. And then you ended up at LinkedIn. How'd you get to LinkedIn?**

It's a long path, but I'll take you back to kind of the beginning of it.

**Because the path looks pretty linear up until the LinkedIn part, right? You're moving up various mastheads, you're doing great work, you do great business profiles, you wrote a great Trump story, I'll ask you about that in a minute. And it's a narrow path, right? There's not a lot of people who can rise to the top of these publications, but you were on that track.**

It was a path that made a lot of sense to me in a certain era. So when we got into magazine writing, there was a very clear career ladder for magazine journalists. You start as a fact checker, you start writing bigger pieces, you then decide whether you're an editor or whether you're a writer, you pick which path you're going to go on. I used to go back and forth between being a writer and editor.

I was at Forbes and then I went to Fortune, I was at Fortune for eight years, I was a tech editor for a number of years, and then I went fully into writing. Went to Portfolio, helped start Portfolio magazine at Conde Nast.

**R.I.P. Portfolio.**

R.I.P. Portfolio. Then, I went to Wired. I was writing these big feature stories, it was a great job, I'd do four features a year and they were awesome stories.

**You wrote four stories a year.**

Four stories a year. It was phenomenal. When the Kazaa guys were starting Skype, I traveled with them through Europe to see what they were creating. None of us knew what it was going to turn into. Shai Agassi, when he was going to launch Better Place, I spent all this time with him.

**And the idea was you'd spend months on these things, they'd be multiple thousands of words, you weren't expected to blog on the side.**

Right, no, that was it.

**"Just deliver us four awesome stories."**

Exactly. And when I was at Wired doing this, the No. 2 at Wired, a guy named Bob Cohn, every single thing we did — he was the kind of soul of the place, and he left to go to theatlantic.com and be the editor of theatlantic.com. This was in 2007, I think. And at the time we were just shocked because — and this is hard to realize now, but that was a demotion. That was a weird step for someone to take.

**Yeah, the websites were still JV.**

Right, exactly. And I was talking to Bob about it, and Bob was like, "This is the future. This is not just the future, this is actually the present. And the door's going to close very shortly for high-level people in the print world to become high-level people in the dot-com world. At some point, there will be enough digital natives that the print people will no longer be able to make that transition."

**Right, because there was a period, we're nearing the end of it now, where you'd say, "If I really want to up my website, I've got to go hire somebody from the New York Times or**

PX14868-006

**the Atlantic or the New Yorker." And more and more people are saying, "Well, we don't need to do that — in fact, that might be a bad idea."**

That's right. That was a total eye-opener to me. It was like, of course that's what's going to happen. All my news, I'm reading online. These magazines are not going to [survive]. This is not the way the media world is going to look.

And Wired, this is during the financial crisis, Wired was having cutbacks and I realized that I'm a polar bear, I'm going to be jumping from smaller ice floe to smaller ice floe as a magazine writer. And so Fortune had closed down its website and was restarting it. And I talked to Andy Serwer who was the editor of Fortune, said, "I'd love to come in and be the editor of fortune.com." I had no digital cred at all [but I] put together a plan, got hired there. And that was a very deliberate move to do exactly what Bob had done.

**Right, gotta get in on this internet thing.**

[laughs] Exactly, this internet thing. And while I was there ...

**So that still makes sense. You're still a guy writing and editing business. You're still connected to big media companies.**

Yeah, and now I'm part of the future. And I'm like, "All right, great, I'm digital. I'm good to go. I've got three kids, I'm going to be able to support them for a while."

And then I went to San Francisco to go meet with advertisers — you have to go and do meet-and-greets with advertisers. And one of the guys I met with was a San Francisco ad boss, took me to lunch with someone who was in ad tech, and this guy said, "Oh, you know, great to meet with you, just so you know, I've just put together a way to be able to sell to exactly your audience across thousands of different websites."

**He's not saying this as a threat, but it is a threat.**

No, yeah, he was just like, "This is really cool. I can now sell ... I know people come to Fortune, buy fortune.com, because they want to reach people with 100,000+ household income who are men in their 30s and I can do exactly the same thing at a tenth your cost." And he's just kind of throwing it out there.

**Right, so what he's saying is, "I'm in a business where the plan is to eviscerate your business and take some of the margin."**

Exactly.

**He doesn't think that's threatening to you, because he's not really thinking it through.**

Right, he's just chatting.

**And this is the way he's talking to his clients and he's talking to his investors. But this is, "We are going to destroy traditional media and we're going to suck up their audience."**

It's not just traditional media, it was digital media too.

**Right. "Any kind of media where they're spending money and taking time to develop and create a brand, we're just going to basically suck up all the data and leave the brand as sort of a desiccated host."**

Exactly. "This brand no longer is going to be able to help you sell." And so then once again I was like ...

**Did you pick up on what he was saying?**

As he was saying it, I was like, "I think I've made this move because I'm now part of the future, but if the advertisers don't think this is the future, it's not the future. It doesn't make any difference."

**Guess what! You're still a polar bear, you've gotta keep jumping.**

Exactly. When I was at Fortune, one of the things we were launching was an app for salespeople. It's called the Fortune 500 Plus. It's this thing I developed with Josh Quittner, who went to Flipboard. And I came to LinkedIn at one point to talk about using LinkedIn APIs for it.

**And LinkedIn at this point is a job network.**

A job site, exactly.

**There's no content there.**

PX14868-007

There was a little bit. LinkedIn at the time had started to use the Twitter Firehose. [It] had access to the Twitter hose. Now, people could combine their Twitter accounts with their LinkedIn accounts, and you would go on there and see what people were tweeting.

The idea for my app was, if you were a salesperson and you're trying to sell to Oracle, you walk in and meet with your Oracle rep, and you can see exactly what he's been tweeting. And you would use your LinkedIn data to help you do that. And at that meeting, I met Jeff Weiner, the CEO, and I don't even know how much longer it was, but a couple weeks later, maybe, he approached me and said, "We're going to be pushing much harder into media." I don't even remember how he phrased it, but it was something like, "We are going to become a professional publisher."

**And what happens when some who's not in the publishing business says, "We're going to get into the publishing business," to you. Do you take that seriously?**

No, I definitely didn't take it seriously.

**Jeff Weiner is a persuasive guy, but it didn't register.**

Very persuasive, but it wasn't even my mind-set yet. I hadn't made that move to think what this could even look like.

And then I just started sitting with it. At the time, Fortune was part of CNN Money, and we were having these constant discussions about stuff we wanted to launch, and there were just not enough resources to launch anything. You wanted to change the website, it took forever and there were always problems. It occurred to me that what we were trying to do was ... it was a tech game, and we were a media company trying to figure out technology. And here is Jeff Weiner saying, "We are a tech company trying to figure out media," and that just seemed like a much better bet to me.

**So what did you need to do to get comfortable? Because the cynical/skeptical/just conservative view of a thing like that is, even if Jeff Weiner means well, they're not in the media business. They don't know what they're doing. And maybe he really wants to do this and he's going to put resources behind it, but also maybe he's going to try it and. after six months. it turns out it wasn't a good thing and we're going to transition to something else, give it away. It seems like an incredibly risky jump.**

I felt like it was a risk. I agree with you, and I think that it felt like a risk worth taking. I figured that, look, I'll go to LinkedIn, I'll learn how a tech company works.

**And by the way, they're public, right? So it's not like you're getting in before the IPO.**

That's right, exactly, it's already happened.

**You're not going to get a windfall from this.**

Yeah, it was a month after the IPO, I think, this happened. So I was already too late. Or it looked like I was too late. I wasn't doing it for the money. I was thinking about my career: "Look, I could spend two years, I'll spend two years at LinkedIn. Even if this thing's a disaster and it doesn't work out the way I think it's going to, I will have learned how a tech company works and that will benefit me when I get back into media. And, best-case scenario, it works phenomenally and it lives up to this image that Jeff has for it, and it's going to be amazing.

**So your thought was, "Maybe I can jump back. I'm not leaving media, I'm still in media, and if goes to zero I can come back and I can say, 'By the way, I get tech now.'"**

Right. And I remember having these conversations with Jeff about this. And saying, "Look, if I leave media, I can't go back." And he said, "Why?" I said, "That's not the way it works. When you leave you're leaving. This is the priesthood. You don't just leave and come back." And Jeff said, "Well, that's stupid. Why is that the case?"

**Yeah, he's right.**

And I was like, "Oh, you're right. Why is that the case?"

**You can totally come back.**

Of course you can go back.

**Do you want to come back?**

[laughs] Right, I'm good.

**Come work at Recode? So I've told this story before, I think I told it onstage so I don't think I'm speaking totally out of school, but I went and saw you, maybe a year into your job there, and you were not happy.**

PX14868-008

Full transcript: LinkedIn Executive Editor Daniel Roth on Recode Media - Vox

It was a hard transition.

**And you picked up a chart and you showed it to me, it had a bunch of different lines, it was a graph, and said, "Can you read this?" And I said, "No. I'm a liberal arts major, I have no idea." And he goes, "I can't read it either, but everyone else in this company knows what this means and they can read it. And I'm a writer and everyone else here is not a writer and I can't figure out how to make this work." And it looked like you were going to have to leave. So what happened? How did it work for you?**

Thank you for bring up that very painful moment.

**It's a good — what do we call it? A learning ...**

A learning moment.

**Yeah, that's right.**

There were so many things that changed. One is that I started learning how to speak the language and I started learning what ... What I thought I was going to learn at LinkedIn has been totally true, but I've also learned way beyond that. One example is learning how engineers and product managers think about what they're building.

**Which is radically different than the way you ...**

Radically different.

**At least the way I approach something isn't the way you used to approach things. How is it different?**

So as an example, I remember being in a meeting with an engineer one time, we were discussing putting news into — there are various modules when you're on your LinkedIn feed that will have news in it. And there's always a question of, should an editor be able to rank the content that shows up in this module. So the question is, if there's something that's breaking news, should an editor push something to the very top of this module and say, "This is breaking."

**That's literally what an editor is supposed to do, is say, "This is important."**

Yeah, exactly. So I'm in this meeting with an engineer, and I'm presenting this very philosophical argument to him about, "Look, this is what an editor does, and you put this thing at the top and this is how it works, and I can tell you what is important and what's not and this is what people are going to talk about and this is the thing."

We're going back and forth, it's like a half-hour meeting, and about 15 minutes into it, he's like, "Wait, all I need from you is instructions for how to turn this into an actual product." We weren't even arguing about the philosophical nature, he just needed to understand if he was going to make this into a project, if he was going to code this.

**"Just tell me what the specs look like."**

What are the specs? And it took a while to realize, all right, what language are we speaking here? Are we talking philosophically or are we [not]? And there are certain times where you're talking philosophically, and there are other times where you're just saying, "If we do this, what are the trade-offs? What happens if we do this and not that?"

The other part about being a journalist is that everything is important. Anywhere I've worked, LinkedIn, Wired, anywhere, *everything* is of the utmost importance. It's "drop everything," you're always on fire. You can't operate like that when you're at a tech company. You have roadmaps and engineers have to work over a certain period of time. And you've got to think, "If I build this, how does it affect this other product?"

**"And if I ask you to stop working on that so you can build this, how's that going to work?"**

Exactly. [laughs] I remember having a meeting ...

**I'm starting to run into some of this now.**

Oh really? It's fascinating.

**Just for little things that seem like, "Well, obviously this should get fixed, because it's broken." And they say, "It is. And we'll put it in the queue."**

That's right.

**And it's a real challenge to like get it moved up in the queue and explain that process, and there's a method to it, right? There's logic behind the difficulty in getting that stuff done.**

PX14868-009

Yeah, and learning how to prioritize has been something that I think will stay with me forever now, and it's surprising that it took being in my 40s before I realized how important that was. But you start realizing that not everything ... you look at the world differently, because before you go through a process like that, you pick up a product and you're like, "These idiots, why did they make this thing this way?"

Once you're actually making the sausage, you realize that there are trade-offs for everything and you have to figure out what the right trade-offs are. So the discussions I have now are about ... we're all on the same page about how media works on LinkedIn. And now it's about what kind of trade-offs we're willing to make to do what we want to do.

**And did you have to cross some hump within LinkedIn to say, "This product's working, now it's doing what it's supposed to."? When did that click in? Or was it always working?**

It's a great question. We started with something called LinkedIn Today, which was a curation program. If you look on a website and you see an "in" share button below a story, that would take the information about who was sharing what and it would share it out. So we could see that there were people who were in the financial services industry reading a particular story, and we would say, "This is great for everyone in financial services." And a starter that says curation play.

That was a tough one because to move in that direction, to make a better curation, people don't totally notice if you're 20 percent better than you were yesterday. They only really notice when you mess up. When you give someone who's in financial services ...

**You mean the reader?**

The reader. Yeah. When you give someone in financial services a story about McDonald's changing their menu, they notice that we messed up. So that wasn't moving the needle.

Then, we launched original content on LinkedIn, and that's when everything changed for me. We launched the influencer program, which at the time was 150 people. Only 150 people could write content, long-form content, on LinkedIn. And it changed for me, because this was the first time that someone said, "Hey, Dan, this is your expertise, go and do this."

**So the original idea was, "We're going to be an almost-traditional newspaper and we're going to tell you about news stories that are important," and it switched over to, "We're going to bring interesting people who are going to talk about news but also things that are not news."**

Yeah. Originally, it was just curation, it was exactly that. But the second one became, "What if we become more about views? What if we can take what people know, what they see, if we can get Richard Branson explaining how he takes the risks he's taking. If we can get Jamie Dimon to talk about why he thinks this regulation should go away or how he runs his business?" That is something that people can't get otherwise and professionals will gain from having heard this.

**So that took a couple years, for that to click in.**

This came from my boss, Ryan Roslansky, who's the head of consumer product. [He] had an idea of doing this. It was about a year into being at LinkedIn, a little bit over a year, I think.

**Was there anything that LinkedIn guys wanted to do that made sense in their orderly engineer brain, and you said, "Oh no, no, no, we can't do that"?**

I can't think of any time that there was something that was so out of whack. You know, I'll give you one example: In the early days we'd have frequent talks about the value of press releases. And you would have engineers saying, "Well, we're looking at PR Newswire, Business Wire, and this content, this is clearly about this company, so this should go at the top." I would have conversations with them, my team would have conversations, saying, "There's a value in press releases, but it's not news. Don't mistake this with news. This is a company giving its point of view."

**"It's not that we shouldn't have it. We should just know what it is."**

Yeah. But if you put this at the top of someone's feed and say, "This is the most important thing going on about a company," you're making a big mistake.

And that was an education. "What do you mean by that?" They just hadn't ... And it's not that there was any kind of ill will, it's just [that] no one thinks this way.

**I know this is not your thing, but why do you think it took them so long to figure [out] that shoving email after email after email in my inbox about someone in my network was negative, was a bad idea? It took them years to come around to that. LinkedIn was famously spamming.**

PX14868-010

Right.

**And now it's not. So they changed it.**

Right. This is before my time, when this was happening, but my understanding is that when you're in a growth phase and you're thinking like growth hackers, there are certain things you do to grow the company. Email was a phenomenally successful way to grow the company. There were negative implications of sending people that much email.

**But there was still a bar going up and to the right, or a line going up and to the right.**

Well, at some point there was, and I think Jeff completely owned this, that this is not a great experience, and if people don't have a great experience they're not going to come back. So there's been a concerted effort to remove email as a ... y'know. You don't hear the late-night comedians making the email jokes about LinkedIn anymore. That's the measure that we measure. So that's a really good thing.

**Yeah, that's messed up. Maybe they'll make ... Well, they are going to make new Microsoft jokes.**

Exactly.

**We'll figure out what those are. You're actually pals with one of those comedians.**

With Seth Meyers.

**With Seth Meyers.**

Yeah. We went to college together.

**It's a cool group, right? It's you, Seth, Mike Lazerow ...**

Mike Lazerow. Pete Grosz, do you know Pete? He's in the Sonic ads. Do you ever watch "Veep"?

**Yeah.**

He's the oil lobbyist. Sydney, um ...

**Oh yeah! He's great.**

We all went to college together.

**And so Mike becomes an entrepreneur, Seth becomes a comedian, you become the LinkedIn guy. Do they give you shit about that?**

You know, first of all, Mike writes for LinkedIn, so there is a ...

**He gives you content, he doesn't give you shit.**

Exactly. And Seth, when I was at Portfolio, Seth used to do the back page of Portfolio, like funny things. This is before he became as big as he is now, he wouldn't do it now. No, these guys ... they probably do behind my back.

**Yeah.**

But to my face, they realize ... they don't mess with the 3 Cs, they know I'm going to drop the 3 Cs on them.

**No, real friends tease you in front of your face, that's how that works. [DR laughs]**

**So I was looking at your Trump article from 2004. A big, long feature piece on Trump. It's great, because it really holds up well, it's well-written — obviously, because you wrote it. But it gives you a good sense of his personality in that he's blowhard-y and blustery and nimble with facts. I'm sorry, that's the wrong way of putting it. Lies a lot, but may not even be aware that he's lying. It certainly doesn't have the sense of menace that a lot of people feel about Donald Trump, myself included, now.**

**You spent some time with him to do a piece like that, right? You're on the plane with him, you're hanging out with him. Do you get, and now you probably have not [been] hanging out with him, but do you get a sense that his personality has changed since 2004, when you wrote that piece?**

I actually get the opposite take, which is that it is ... I think when I see him talking, it is exactly the same, he seems like the same guy. Yeah. Just on a much bigger stage.

PX14868-011

**Before, he's doing things like calling up a supplier for one of his buildings and yelling at him. Sort of as a show for you guys in the audience.**

Exactly. It was clear he was like putting on a show the entire time.

**And now just a different audience and it's the entire world.**

He knows how to read a room incredibly well. But he's also … when we were doing the story, he was very focused on this idea that I would realize that he was successful as a business person. I went in, this story was 2004, it was right when "The Apprentice" had become the biggest show in America, we wanted to do a piece on: What is he like as a business person?

And here was this guy who was incredibly successful, clearly very successful, and he went out of his way to try to make sure that I, the reporter, realized he was successful. Showing me clip after clip of articles written about his golf courses. And I had never had an experience where someone had tried so baldly to let me know that they were important and other people thought they were successful.

**And you've interviewed lots of big, bold-faced names, none that seem that needy. Do you remember, did you deal with him on the "rich list" at Forbes?**

Who? Oh, Trump?

**Trump, yeah.**

No, no, I would just hear the stories, [like] when he'd call Pete Newcomb and complain that we were devaluing him.

**It was the whole ritual he would do. He would call up the guy who ran "The Richest 400 Americans" and they would have a back-and-forth that went on for months, that would involve, like, Trump would take him out and give him a helicopter tour and show him around the properties. A lot of the things were not properties, they were, like, patches of dirt. He would say, "That's worth $2 billion." It would go back and forth. And basically, in the end, I think Trump would say, "I'm worth $6 billion," and Forbes would just sort of shrug and go, "It's $3, leave it there."**

Give him a haircut every year.

**So your piece, when you wrote about it, I mean — you have a skeptical take at the time, like, "Well, maybe he's not worth as much, and maybe some of his businesses aren't going to work as well." But it's still largely positive about it.**

The feeling was — you gotta remember, in the end, when you stripped everything back, he was a reality-TV host with some hotel properties and some golf courses. There was nothing super-negative to say. It was, "Hey, here's a guy." It's like, "He's having fun doing this and he's fun to watch."

**And the last line is him sort of shrugging and going, "I'm just a fucking businessman."**

Right, exactly.

**And what was his reaction to the piece?**

I saw him about a month later. He used to call me every day when I was working on this story, and then the calls stopped as soon as the piece came out.

**And he would call as himself, he wasn't calling as his fake publicist.**

I never got that. And in fact, the first time, when I pitched the story, I got his assistant and I said, "I'm Dan Roth from Fortune, I'm interested in doing a story on Donald Trump," and assumed I would get his PR person. A second later, "Dan, this is Donald." [PK laughs] And there was no fake person in there. So I saw him about a month later and he said he thought the story was somewhat fair.

**That's high praise from him right?**

Yeah!

**Did he give you … he famously does the thing with the silver Sharpie.**

I got none of that.

**None of that.**

None of that.

**Was he on the cover?**

PX14868-012

He was on the cover.

**So there you go. He was probably just happy he was on the cover.**

When I pitched the story to him, he said he wasn't going to talk to me. And I said "That's fine, I'm going to do the story anyway, and I hope that you'll talk to me for the fact-checking at least. Oh and by the way, this is a cover story."

And then he said, "Oh, you know, I'm flying to LA tomorrow, why don't you fly with me?" So that was like, within half a second, suddenly all doors opened.

**So in that story, he doesn't use a computer. Like it's not plugged in, it's on the side, I think that's still the case. But you've been able to get Richard Branson and Bill Gates. When you're an online publication, and now you're an online publication that's part of LinkedIn, do you still find that there's difficulty getting a certain kind of CEO to engage with you, or do most of them now get what it is?**

It has gotten easier and easier to do, and people just get it now. An example: I just interviewed Indra Nooyi about, I don't know, a month ago — the CEO of Pepsi. Pepsi was releasing their second 10-year plan and she wanted to release it on LinkedIn. Howard Schultz, when he wanted to announce that he was going to be giving free college educations to all Starbucks baristas, we got the call saying, "Howard wants to debut this on LinkedIn." Because they know they can reach the right and a massive audience. And in both those cases, I went and did interviews with both those people to talk about what they were doing.

**Right, and you do these whole packaged things now, where you'll write stories about them and there's video and they like all that.**

We have them write, they put the video at the top of it, and then all the comments start coming in. And part of this is when we go to them and say, "You have to understand, we're not going to tell you what the questions are in advance."

**This is actual journalism.**

"This is real journalism going on. Here are the topics I probably want to cover, but we're going to come in and talk about whatever's going on in the world, and you can engage with it or not."

**And do you think there's an audience within LinkedIn for the 4,000-, 6,000-, 10,000-word pieces that you used to do at Wired, at Fortune? Do you have an itch to do that?**

I think there is. There might be. I do not have an itch to do that.

**You're done.**

You know what? Those pieces take a long time and there's so much more ... I think my system is now operating at a totally different speed. I don't think I could do that kind of sit-back-and-spend-a-lot-of-time ...

**I remember talking, I was working for Henry Blodget, it was then Silicon Alley Insider, and you thought you might want to write about it at Wired. And it took months just to get the pitch through. And I thought, "Oh my god, I can't believe ..." And that used to be life for me, too, like you have to get approval from various people, and yes, you may now go do the piece, and that's going to take X number of weeks. I can't imagine that world anymore, it still exists.**

Yeah, no, but it's crazy. And at the time it was you, Henry and Dan Frommer who's now the editor of **Recode**.

**Now my boss.**

Your boss.

**We just shuffled the org chart, I now report to Dan.**

That's crazy.

**[laughs] It is crazy.**

He used to report to you, right? At that point, right? Was he reporting to you or were you peers, or colleagues I guess?

**I think he probably reported to me. I don't think I was managing, but yeah.**

That story was a very early story and BI was really just getting started at that point. You guys had kind of just changed your name from Alley Insider to Business Insider. You were out of the loading dock. But you were still sharing space.

PX14868-013

**We kept getting pushed aside by Gilt Groupe, which was going to be the big company. Things change.**

So I think that those kinds of stories do well on LinkedIn. I don't particularly have a desire to do those kinds of stories anymore, but I love promoting them. And we make a very big deal, the editors, when they are promoting stories and there's various different ways those stories show up on LinkedIn. Those kind of long-form big-business features get a lot of love.

**So we've been talking about stories, that's what people are submitting to you. There's a big push in media to go figure out video, primarily from companies that want to get some of that advertising money.**

Exactly.

**It seems like you do a little bit of video like you just talked about, like you'll go film something with Howard Schultz. Are you intentionally not doing much video, because there's not an ad business there for you?**

I think we can be a little bit more thoughtful in how we go after video, because it is not an ad play. It's just an engagement play. If the professional world wants to engage, wants to get their ideas from video, we should be doing video. If they want to shoot video and put it up there, we should be doing video.

But you've seen a lot of publishers who go after video purely because of the higher CPMs, and you do stuff that's not in the service of your readers. If people aren't watching it, what's the point in doing it? So yes, we want to do video and we're doing video, and video shows up on LinkedIn. But not in a way that is just trying to go after [clicks]. It's not a gold rush.

**Right, it seems like there's probably a play for, like, get lessons or testimonials, but you're going to figure that out on your own time, there's not a rush for it.**

We have a studio. Members are sharing videos all the time, publishers share videos, the editorial team shoots videos, we do about three videos a day at this point. We do a daily news wrap-up every morning, we do a daily news kind of agenda-setter every morning, we have people in the studio all the time. Like Spencer Rascoff just came by and we talked about his latest quarterly earnings and we talked about lessons for real estate agents. And there's Lynda, or LinkedIn Learning as it's called now, so you've got full courses. If you want to learn how to program Java or use Photoshop, you can take courses on that. So there's all kinds of video all around LinkedIn. But chasing this one sort of news video is not a core part of who we are now.

**That puts you in a very rare place right now, since everyone else is chasing it.**

Right. Are you chasing it?

**Not me personally.**

All right.

**But we just hired Gavin Purcell from NBC.**

Oh wow.

**Jimmy Fallon's guy.**

Yeah, sure. I follow him on Twitter.

**So he's the guy that's going to figure it out for Vox Media.**

Awesome.

**So that's pretty cool.**

That's very cool.

**We're all excited about that. But yeah, I do audio.**

I love audio, I think audio's the way to go.

**Me too. And this is a fun interview.**

Good. Well, Peter, thank you very much. I appreciate you having me.

**Thanks for joining us.**

PX14868-014

## Subscribe to the Recode Newsletter

☑ Sign up for our Recode Daily newsletter to get the top tech and
business news stories delivered to your inbox.

Your email                                                    GO

*This article originally appeared on Recode.net.*

*You've read 2 articles in the last 30 days.*

**We're nearly there!**

Since Vox launched in 2014, our audience has
supported our mission in so many meaningful ways.
More than 80,000 people have responded to
requests to help with our reporting. Countless
teachers have told us about how they're using our
work in their classroom. And in the three years since
we launched the Vox Contributions program, tens of
thousands of people have chipped in to help keep our
unique work free. We're aiming to add 1,500 financial
contributions from readers by the end of April, and
we're 87% of the way there. **If you, like us, believe
that explanatory journalism is a public good, will
you help us close the gap?**

| One-Time | Monthly | Annual |
|----------|---------|--------|

○ $95/year          ● $120/year
○ $250/year         ○ $350/year
○ Other

**Yes, I'll give $120/year**

We accept credit card, Apple Pay, and
Google Pay. You can also contribute via

*P* PayPal

PX14868-015

# PX14869

4/23/23, 3:23 PM                          How Tomer Cohen, chief product officer at LinkedIn, figures out works best - The Verge

The Verge    /   Tech  /  Reviews  /  Science  /  Entertainment  /  More **✛**

DECODER

# 'We might be wrong, but we're not confused': how Tomer Cohen, chief product officer at LinkedIn, figures out what works best

We dive into managing the relationships between designers, engineers, and PMs.

By **NILAY PATEL** / **@reckless**
Dec 20, 2022, 1:00 PM EST  |  🗩 3 Comments / 3 New



Image illustration by William Joel / The Verge

**T**omer Cohen is the chief product officer at LinkedIn, and actually, I talked to Tomer twice. Here's a little secret about *Decoder*: we do the interviews, and then often, the guest and I just keep chatting for a while. So after my first interview with Tomer, we were hanging out, talking about the perpetual battles between engineers, product managers, and designers. And he said something that completely jumped out at me:

"We might be wrong, but we're not fucking confused."

This isn't a totally new line — it's been floating around for a while, you can Google it — but you know I love an f-bomb, and honestly, it's one of the most simple and clarifying things a manager can say, especially when managing across large teams. So I asked Tomer to come back and really dig in on that idea.

PX14869-001

How Tomer Cohen, chief product officer at LinkedIn, figures out what works best - The Verge

On top of that, we've been talking a lot about running social networks lately, and LinkedIn is a fascinating social network because it doesn't have the same engagement-based success metrics as other social platforms like Twitter and Instagram. Tomer doesn't care about time spent on LinkedIn; the platform is designed to be successful when people get new jobs. That means his ideas for features and user experiences are just really different.



*The following transcript has been lightly edited for clarity.*

**Tomer Cohen you are the chief product officer at LinkedIn. Welcome to *Decoder.***



POWERED BY CONCERT                    FEEDBACK

Thank you, Nilay. I look forward to our conversation.

**Well, by the end of this everyone will have a new job. That's the promise of a LinkedIn interaction.**

That's the goal. We have a lot of jobs to fill, so that's a good outcome for this conversation.

**Let's actually start there. LinkedIn is a social network and it's thriving. I would say we live in a time of great change for social networks, but LinkedIn is unique. What is the goal of LinkedIn? Do you sign in to it, eventually get a new job, and LinkedIn helped you do that? Is that the purpose of it?**



I love that we're starting there because it's always great to understand what LinkedIn is for everybody. So first and foremost, LinkedIn exists to create economic opportunity for every member of the global workforce.

I remember my first real interaction learning about LinkedIn when I came to the Valley in 2008. I went to a lecture about social networks at the Stanford engineering school, and all the buzz was about time spent on the internet and traffic. The founder of LinkedIn, Reid Hoffman, was on stage, and he talked about how LinkedIn exists so people can reach out to professional communities and get their jobs done, whether that's

Listen to *Decoder*, a show hosted by *The Verge*'s Nilay Patel about big ideas – and other problems. Subscribe here!

PX14869-002

accelerating their career, partnering, fundraising, or getting a job. That was kind of my first hook in LinkedIn. I was extremely impressed. Later on, Jeff Winter codified it into our vision statement.

That's the reason we exist. LinkedIn, at its core, is a community of professionals who come together to share ideas and expertise, but also to get and give help to each other.

**Those ideas about time spent and traffic are still the core metrics of every social network and every web platform that I have the pleasure of talking to people about. You have to get people there, you want them to have a good time, you want them to stay longer, you want them to connect and get hired, or maybe you want them to transact — there are ways to transact on LinkedIn. Are those the core metrics for you for LinkedIn? What are the things that you measure that determine success?**

### "I have no idea what the time spent on LinkedIn is."

I have no idea what the time spent on LinkedIn is, but I can tell you that we track the opportunities that are created on LinkedIn a lot. For example, right now on LinkedIn, every minute, eight people are getting hired.

**How do you track that? So if I get a job on LinkedIn, do I tell you? Does someone else tell you? How does that work?**

That's part of the beauty of the system. We know if you saw a job on LinkedIn and if you applied for that job, and we can actually track if you change your profile later. You can think about it as somewhat of a nice closed ecosystem of seeing job changes. In fact, some of the great economic data that we get is from seeing how the economy is performing for people transitioning in their job, which is a good stat given the macroeconomics right now.

A year ago the job change rate was 40 percent year-over-year. Now it's declining year-over-year. We've seen massive growth in job change rate, to a declining job change rate, and we see it through the data in LinkedIn. So back to your data, this is just one aspect of where the LinkedIn economic graph comes to life.

**You and I are talking on the day that the federal government released the jobs report. The number was higher than most economists and analysts predicted. Did you know it was going to be higher?**

We always publish our workforce report in concert and we see a lot of those trends coming to life. For the most part, we actually share data. We share it externally, and we share it with members to show them how it's performing on LinkedIn.

Yes, there is actually a pretty strong signal on LinkedIn because we have 875 million professionals. It's not the world's 3 billion professionals— the whole workforce—but it's a pretty good representative sample. We're also seeing trends in terms of behavior, which I think tends to be some of the most impactful. For example, skills are becoming one of those tremendous behavior changes we're seeing on the platform as well.

**What do you mean by skills as a tremendous behavior change?**

### There is a tremendous change towards focusing on skills rather than pedigree.

I think for many years we really believed in the notion that there was a primary focus for every professional, and believed in skill matching between an employer and employees. If I want to hire somebody on your team for a job, I would look first and foremost at their skills. For years, the industry has relied primarily on pedigree and which companies you work for. Now we're seeing more and more that

PX14869-003

there is, in my opinion, a tremendous change towards focusing on the skills you have.

For example, we have tools that we offer to recruiters, which are able to create a pipeline of candidates, to source, and to reach out. We're seeing close to almost 50 percent of recruiters using skills right now to look for professionals. That's a big deal. That wasn't the case before, and it's increasing a lot.

On the other side of the marketplace, we're seeing many professionals add more skills into their profile. In fact, this past year there were close to 365 million skills added to people's profiles, and that's about a 40 percent year-over-year change. This matters when you really accelerate towards the future.

My eldest child is my 10-year-old daughter, and I think about the jobs she might have in the future. It's really hard to tell right now because the job market is changing rapidly. We measured the skill sets for jobs now versus five, six years ago, and they have changed by 25 percent. We think that in the next five to six years it will change by another 50 percent, so the type of skill sets you need for a job are changing rapidly. Being able to focus on the ability to learn and pick up skills is becoming one of the most impactful ways to make sure we have a great match in the workforce.

**I think you have a data problem there. I can tell LinkedIn that I have all the skills in the world. "I'm the world's best carpenter." A recruiter can search for really good carpenters and now they find me. How do you verify that I'm telling the truth, and that the skills they think they need are the skills they actually need?**

That's such a great question, because when it comes to skills, it is not an easy problem to solve in terms of how you actually certify and verify them. Just a few months ago, we acquired a company called EduBrite and their entire offering is certifications. One of the things we're investing in the most right now is doing professional certifications on skills you have. Let's say I started my career as a semiconductor engineer a long time ago, then worked up to embedded systems and think I'm pretty good in C++. Great. Let's go for a certification process to assess and verify that skill.

The great thing is that once they verify that skill, we can actually show it to the recruiter. It's not enough for you to say, "I have this skill." When a recruiter sees a candidate, they can see what verified skills they have on the profile. It's a great way to perform a match, because we know being able to say, "I have this skill," is a starting point. Being able to verify it is where the quality really gets made.

**Okay. I have a lot of questions about that, because adding that kind of economics to this entire process probably changes the incentives and changes how people participate. I want to come back to that, because I think that's really interesting.**

**LinkedIn is unique because it is a professional social network. You can layer in things. If you want to tell people you're good at C++, you can pay some money to take a test to get a check mark that says you're good at C++. Other social networks cannot do that.**

PX14869-004

**My thesis about social networks is that the product is effectively content moderation. The way that you moderate the content that gets published, the way that you amplify the reach of some content and diminish the reach of other content, the way that you allow some things and not others, and then most importantly, the way that you design the product itself to make it clear what things you do or do not want, these are all the same thing. Is that how you think of LinkedIn? Do you need to make sure that everyone is participating in a professional way? Or is everyone just doing what you told them to do?**

Yeah, you're talking about content in the artifact kind of way, with people exchanging information with each other. If you put it that way, I would agree. I think at the end of the day it's about matching people.

When you think about the core of LinkedIn, at the heart of it, you have this extraordinary professional community. Then you have marketplaces built on top of that. It could start at the basic layer. When most people hear content moderation, they think of content exchange or information exchange. For us, it's about knowledge exchange. Let's say I have a question about how I set up my payments. "I'm using Shopify, what's the best way to set up my payment system?" Then somebody responds back. That's one way of exchange. The other way is if somebody is looking for a job, the content really becomes my profile and my skills. Maybe that's to your point.

The other aspect is building a business. If I'm a visual effects designer who really wants to build my business and I'm showcasing my abilities and talent on LinkedIn, then that becomes my content. Really the match is done when somebody says, "This is actually a phenomenal skill you have and I would want to hire you for a gig." That is a real example that happens all the time. If you use content in that manner, that becomes the matching opportunity of those marketplaces. Ultimately the value comes when we see the hire.

So back to your point, somebody applying for a job is a great starting point for a match. Somebody getting invited to an interview means there's substance there in terms of that process. Somebody getting hired is also a good example. Somebody becoming an excellent employee is kind of the holy grail.

That is the funnel. How many folks are coming into that funnel, and ultimately, what is that amazing match in the end?  If it's in the commerce world, how many are becoming customers? All of those are happening on LinkedIn. Sometimes we can close the loop because we see the full engagement back when somebody's looking for a job, for example. Sometimes we only see a few steps into the funnel, not the full closed loop.

**So the metric that you care about the most seems to be the number of people getting hired and changing their profiles on LinkedIn to say**

PX14869-005

**they got a new job.**

That's one of our true north metrics. I'm sure you covered this in previous episodes, but we look at input metrics and output metrics. Basically, what are the input metrics that can ultimately drive value in the ecosystem? Then for our economic opportunity metrics, we look at true north.

For example, in the hiring marketplace, we look at how many people are being hired in the economy right now. We know in the last year, eight people were hired per minute. We know we influenced a lot more, we are just not able to capture the entire feedback loop, and that's just one side of the marketplace. If you look at the commerce or the products and services side, we look at how many outcomes. How many buyers are we connecting with brands? If a brand is doing an event, how many people joined that event? How many folks showed interest in that? How many converted to that product? It's mostly in the B2B advertising context.

We also look at knowledge conversations. This is a really important distinction that we put a lot of emphasis on right now. Ultimately, we believe that the foundation of economic opportunity starts with knowledge exchange. We believe that when you have hundreds of millions of professionals in the ecosystem, they all have a unique craft, a unique expertise in their field. I could be two years into my role, but the niche that I know really well, very few people know in the industry. Being able to exchange that with others becomes extremely powerful as inspiration and for idea exchanges.

We actually look at how many knowledge exchange conversations are happening in the ecosystem. We know that when they happen, they accelerate the other marketplaces I talked about. For example, we brought in creators to LinkedIn and they talked about their craft, like visual effects, or their ability, like negotiation skills or diversity skills. The biggest feedback we got was that the platform was powerful for them because they were able to get opportunities from it. It wasn't revenue share. It was stuff like, "Oh, I was hired," "Three months into the program, I got my gig," "I got multiple speaking opportunities," or "I got hired for campaigns." I think that is the unique part of the platform.

**Let's go from there into what I think of as the *Decoder* questions. I have a sense of what LinkedIn is, and I have a sense of what you care about for metrics. You're the chief product officer of LinkedIn, which is a small part of a giant company at Microsoft. Microsoft has a lot of bits and bobs, a lot of pieces of the puzzle. Once you're on LinkedIn, you can go to GitHub or you can go to Microsoft Excel. You can see a bigger Microsoft strategy to just own work from top to bottom. What do you do as the chief product officer of LinkedIn to align the strategy? What does your day-to-day look like?**

Taking a step back, if I were to put it simply, as the chief product officer, I am responsible for everything we build. It starts with setting the product strategy for the company, to then overseeing the teams building it. That includes the product leaders on my team who are leading specific areas, the design team, the business development team,

PX14869-006

the news and editorial team, and then our content production teams as a whole.

When you specifically think about the role of chief product officer, it's relatively new in the industry in many ways. I think many companies are shifting to think more around the customer at the center of their offering. From that you go directly to the product side, and then you're seeing a lot more head of product or chief product officer roles. A lot of the work we're doing from there starts from how we align to our vision statement as a company, and from there you go to the strategy level and the execution across the teams.

**What do you think is the difference between vision and strategy?**

Early on, when I joined, Jeff Winter was the CEO. This is something that was an extremely big part of how we operated and thought at LinkedIn. Jeff codified the vision as being the dream. Ultimately, if you're successful, what change are you making in the world? The mission was more of that tangible aspect that you can almost start measuring on a daily basis.

Then we go all the way to values, by the way. We call this the "vision to values" process. It's an incredible exercise that everyone went through in the company. The vision for LinkedIn is to create economic opportunity for every member of the global workforce. Our work will never be done. This would be one of those incredible things, and we can always do a lot more. The mission is to connect the world's professionals to make them more productive and successful.

That brings me back to our conversation about marketplaces. I can see if I create a great hire or a great outcome for a buyer or seller. I can see if I create a great outcome for a knowledge seeker or a knowledge creator. Then we go from that all the way to the strategy. Obviously the vision and mission are more evergreen. They don't change. They're constant. The strategy evolves with time based on the market needs. Then all the way to the values of how we operate. What is the culture of the company itself?

**When you think about this strategy changing on a different time scale than the vision and the values... or was it the vision and the mission? We need to make a flowchart.**

I have a flowchart, I can share it with you.

**Yeah. You have to share the flowchart with us. We'll put it in the show notes.**

**When you think about the strategy changing more rapidly than the vision and the mission, that to me is the ball game. The strategy of**

PX14869-007

the company is pretty big. Everything should ladder into the strategy, but the market changes, people change, people stop using their desktop computers and start using their mobile phones, then maybe one day we're all going to be in headsets.

**The product has to change really rapidly to get ahead of those big shifts. Do you sit around worrying about the metaverse? Do you think, "Oh man, there was a boom in PC sales last year and more people are working from home, which means more people have the opportunity to have LinkedIn open on their laptops, which they could not do in their cubicles at work." Is that stuff that comes up to you, or is that happening way below, at a more tactical level?**

I sit around getting excited about it. Just a quick story there. So I joined LinkedIn...

**Did you join LinkedIn via LinkedIn?**

Not really.

**Have you ever "dogfooded" LinkedIn? Have you ever answered a cold recruiter pitch on LinkedIn in an InMail?**

Of course. All the time.

**It's pretty thirsty, man. The recruiters in the InMail are pretty intense.**

When you start leveraging LinkedIn and its full abilities, it's an incredible superpower skill for everybody.

**Have you ever gotten an offer on LinkedIn, then gone to your boss to pretend the offer was more serious than it was?**

I have not.

**Okay, because that is the true LinkedIn power move, to get the raise just out of the InMails.**

That's not uncommon though. Sometimes those become real. In fact, one of the beautiful things about my job is when you go to meet people and they tell you, "The way I got this gig is through LinkedIn, and it started with a cold email."

Three months ago, somebody called me and said, "I can't believe how I just fundraised. I sent an investor I really respect my deck on LinkedIn and he said, 'Can we talk?' I never believed I could do that so effectively on LinkedIn." They were like, "Oh, mind blown. I can do a lot more on LinkedIn."

**Again, have you just primed the community to open this website or app and be ready for these kinds of interactions? That's the thing that I keep coming back to. I can cold pitch a deck to anyone at any time on the internet. We can put someone's deck up on our TikTok channel, but it doesn't seem like that will convert into a fundraising round. It just doesn't seem likely.**

**On LinkedIn though, it does seem likely, and maybe it's the same people. They're just pushing a different app icon on their phone, but it's because you've primed them to participate in the marketplace in LinkedIn. That just feels like it has to be a different kind of product.**

PX14869-008

### "You come to LinkedIn to check in, not to check out."

It is, and it is 100 percent a different type of product. I think if you want to understand LinkedIn, the analogy that I would give is that you come to LinkedIn to check in, not to check out. I think it's a big difference versus the other social platforms we sometimes get compared to. Ultimately, LinkedIn is a productivity tool. It's hard to call the other social platforms a productivity tool. That is why it's really safe to open it up at your workplace. We want you to open it up at your workplace.

**I don't know, man. I feel like if the boss is walking the floor and they see everyone has LinkedIn open, then something is wrong at that workplace.**

You need that today as a base to ask questions. Sometimes all you're doing is seeing what's happening in the economy, asking questions, or coming back with the recent Twitter news — which is hard to escape.

Let's go back to your original question on why LinkedIn is unique. The context matters a ton because it brings the right audience in. You wear a hat right now at work — literally, you're wearing a hat — and I'm assuming it's your professional hat. When you walk out of work, you're going to wear a different hat. You might go and use a different tool. That makes a big difference in what type of exchange you expect at that moment.



POWERED BY CONCERT                                          FEEDBACK

That's why the power of the ecosystem is about who is in it right now and the type of interactions you're looking for. If I'm going to a soccer match for my kids, I don't want somebody to go and pitch me why their startup is fantastic. I'm watching my kid's game right now. But if I'm on LinkedIn, then I'm in that mindset of doing work.

There's more affordability in my mind to actually accept to bring that in. You asked the question around strategy and evolution, and how technological revolutions play to it. That's how I joined LinkedIn. In 2011, I had a conversation with Deep Nishar, who was in my job at the time, chief product officer for LinkedIn. We had a chat about LinkedIn and he asked me, "How would you build LinkedIn as a mobile product?" Back then LinkedIn was heavily desktop-oriented. We had a great conversation. Then he said, "Instead of talking about it, how about you come and build it?" That was the way I joined. That was the first conversation going into it.

Obviously ever since then it has been AI, and it's going to continue to be AI for a long time. But specifically, when you look at technological revolutions, they inherently change strategies for companies because they inherently change the product you're working on and the abilities of the product. AI is going to continue to be that forcing function for a long time. In fact, I think it's just accelerating in power. Ultimately, if you are a tech company, it has to impact the offering, the product, and the way you service your members. That's why the strategicness of it changes significantly.

PX14869-009

I'm going to make a prediction that next year, 15 percent of your podcast in some shape or form will be mentioning generative AI.

**Do you think that is because it's useful and it's actually changing things? Or do you mean that in the way that people would just say Web3 to me last summer?**

No. This is very different from Web3. Web3 I think was trying to find applications. This will have so many applications.

**For you, what are the applications?**

I think we're getting started, but think about creativity. I heard from Reid [Hoffman] recently that with AI in a way everybody will have their own co-pilot, their own personal assistant for things. The notion of starting from scratch would no longer exist. You would always have some draft in mind or some knowledge base you can start from.

I think there's already a creative base for things, which is pretty unique. It used to be that whole notion of tabula rasa and starting from scratch, but that no longer exists. I think about the applications across healthcare and medicine, across assistant information like decision-making, and obviously across the creative roles and the arts, which we talked about. We're literally just getting started. You can take me up on that bet we talked about before. I'm pretty positive on it.

**You're a creative person. You had to come up the hard way, and the way a lot of creative people come up is they build copies of things to get good at it. The classic example is art. Students go to art museums and they copy the masters' paintings. People who design cars grow up copying cars.**

**At every stage of being a master of creativity, it is useful to just try to make the thing yourself in the way that your predecessors made it so that you can expand on it. Your example takes that entire piece out of it. Where do you think the expertise comes from in that situation?**

You'll still need to learn how it comes to life, but you'll have a stronger base to start from. Again, there's always that implication. That notion that it can be very scary, because it's going to reform and re-disrupt things, and we don't know exactly how and how much. There's the form around, "Wow, the creative base is just going to expand so much and human capacity will be elevated." I think that is the positive side of it.

You're a hundred percent right. I think creativity starts from mimicking and learning from others, then building your edge or your nuance around it. I think that is still going to continue. In fact, it might be elevated, because your base or starting point is going to be so strong.

PX14869-010

**Is it strong? That's what I'm getting at. Is it strong? When you see the output of ChatGPT on social media, there is a strong human filter between the actual outputs and what you're seeing, because people are picking the best, the funniest, or the most interesting output — and that's cool. Then you actually use it. This is just spitting out a remix of all the stuff that has ever existed before, and the remixes are really cool.**

**I saw someone use it to make guitar tablature the other day, and it was awesome. I don't think the OpenAI people thought that it could make guitar tablature. That is really cool. But at the same time, a person just playing the guitar tablature and a person trying to learn how to play the guitar, they're different directions in a way. Not being able to evaluate whether or not the output is good and worth building on seems like the challenge, especially for you to build it into a tool like LinkedIn, where people are just going to ask questions and assume that the output is useful or worthwhile.**

Yeah. Here's an example you can think of. Often at LinkedIn, we see scientists who want to share their craft and their research. It's hard, because how do you bring something that is very complex to the masses? That's one application of it. You can take something very complex and potentially use it to simplify a concept.

The flip side is that you can start with a kernel of an idea, then start adding depth to it. It's that feedback loop between — I guess you can call it bionic — the machine and the human being. Again, it has repercussions that could be very scary, but it has repercussions that could be very exciting at the same time. I think we're literally just getting started, so we're going to see a lot over the next one, two, three years that will tell us a lot about the capabilities here.

**All right. Here's the classic *Decoder* question. We have talked a lot about the kinds of decisions you might make and the ways you might make decisions, but how do you make decisions? What's your framework to make decisions?**

I think you can guess that we start from the vision and mission. We truly do. That's like the main currency, and I can't emphasize this enough. Then it goes all the way to our values as a company that kind of ground the day-to-day.

For example, there is member-first, so we start from members. Early days at LinkedIn, we used to have conversations around, "Hey, can we get this information from members?" It is like, "No, we are first and foremost a member-first company, those are the constituents we serve." Now that sets the overall framing, and that's true across LinkedIn, but that framing is kind of wide. When it comes to how we choose what to build, there are three things that matter the most to me, as a product organization.

First, LinkedIn is extremely interconnected. We talked about multiple marketplaces. At the heart of it, you have a professional community. On one hand we're trying to connect job seekers and hirers, but we're also trying to connect brands and sellers. So context really matters, and being a learning organization is a critical part of connecting the dots. You can be extremely powerful at LinkedIn if you're able to connect the dots between how this amazing economic system works. We have a lot of open forums. We go over performance and we learn from member

PX14869-011

feedback. I get tons of direct and indirect outreaches from members giving me feedback. Experiments are shared broadly so everybody can learn how experiments are doing.

Then the second part that matters a lot to me is being very opinionated. As an organization, one construct we have is what I call product jams. When people come in to present a new product or a new strategy, what's important for me is that they come in really clear on what job is going to be done. What are they serving? What does the audience need? What is the problem statement?

There are so many times when people think the product statement is clear, but then you realize people are thinking of two completely different problems and that sets them in a whole different direction. Be clear on your principles and what opinions you have there and you can actually have really deep, tremendous decision-making conversations, because there's so much clarity in the thinking that it leads to, from my perspective, a much better outcome.

**Who comes and presents when that happens? Is that a single product manager? Is it a cross-functional team with a product manager [PM], some designers, and some engineers? Is it two people who met in the hallway that had a skunkworks product and they came and showed you? How does that work?**

It's all of those, but it's really a team of cross-functional leaders: the PM, the designer, the engineering lead, the marketing lead. Depending on the product, there could be the go-to market lead as well. They come and present their local view of what they believe they should be building and how. Then in that session, I have my entire executive team join, and they all bring questions like, "What's the job seeker's view? What's the buyer's view? What's the seller's view? What's the knowledge seeker's view?" It's a great match between the global view and the local view. The more clarity you have in the thinking, the better those conversations become in terms of decision-making.

We have multiple small venture bet experiments we are thinking about. It could be a very small team of five people, or it could be a team of 500 people. There is a strategy that the leaders of that team are coming and presenting. It really depends on the type of conversation. It could go from 10,000 feet to 100 feet depending on the conversation itself. I would say that when it comes to decision-making.

**You run a very professional social network. There's commercial aspects to it and you have described it as a collection of marketplaces. I don't think people think of consumer social networks as a collection of marketplaces, even if they have some marketplace functionality. If you walked up to a regular Instagram user and said "Instagram is a collection of marketplaces," I don't think they would have any idea what you were talking about. Whereas I think if you asked a LinkedIn user, "Is this a bunch of marketplaces?" They might just say yes. They might perceive the whole product that way.**

PX14869-012

⚡ POWERED BY CONCERT                                    FEEDBACK

**I think it's going to be really hard for Twitter to add a bunch of those paid products. Maybe they'll be successful, maybe they won't, but I think it'll be challenging. There's a flip side though. LinkedIn has tried to add a bunch of consumer features to the more-professional social network.**

**This is a show about decisions. You launched Stories and then you took it away. There was a bit of a Clubhouse competitor, a live audio space program, but it seems to have diminished. Talk me through the decisions here, including, "We're going to do Stories like everybody else is doing and then we're going to shut it down because it's not working." And then let's talk broadly about why those consumer-style features may or may not work.**

Let's take a step back. With consumer products, ultimately you are trying to support the member in whatever they're trying to do. Earlier I mentioned the "job to be done." If I'm trying to express myself, what's the best way to express myself? Stories is actually a great example. For us, there were two reasons why Stories was a really interesting experiment — and I classify it as an experiment because that's exactly what it was. One aspect was, it's a better way to tell a professional journey. I can have the multiple taps. I can have that imagery and rich media coming through in a visceral way, and I can tell my story better. If I'm trying to communicate, "I have advice on how to fundraise," I can do that in a story-like way.

## Stories didn't work on LinkedIn because its users are not looking for ephemerality.

The other hypothesis behind Stories was that we used to hear a lot from members that one of the concerns around potentially sharing on LinkedIn was that a post persists, it's always on their profiles, and Stories had that ephemerality notion that could potentially solve that. What we learned was exactly the opposite. Things remaining on your profile is a feature, a benefit of LinkedIn. What you share on LinkedIn, you see as part of your professional identity. People actually share and engage on LinkedIn. They were not looking for ephemerality. In fact, they were looking to feature it on their profile, not to make it disappear.

I think that was a phenomenal underscore for us on the role of content in your profile. When I share on LinkedIn, it's not about virals and likes and comments coming through. It's really about showcasing to everybody who's looking at potentially hiring me or selling to me or partnering with me. What do I stand for? What's my thought leadership? What's the stuff I care about?

**This is all personal marketing in a way, right? What you're describing is a large ad for me and the services I can provide for you. That is what my LinkedIn profile is and what my LinkedIn interactions are communicating.**

PX14869-013

POWERED BY CONCERT                                                                            FEEDBACK

It's your professional identity. If done authentically, it's who you are.

**The reason I frame it that starkly is that almost every other social network is getting away from that, right? Facebook, once upon a time, was about a profile and you would curate an image of yourself in your profile. Instagram famously was the most curated identity platform of all time, where people would create these artificial versions of themselves being extraordinarily beautiful, whether or not that had anything to do with reality. I may or may not have been guilty of this. Who knows?**

**LinkedIn is still that thing. You are creating a professional identity for yourself that you are marketing and you don't even want it to be ephemeral. You want it to last because it stacks up over time and accumulates value. Everyone else is down to make a piece of content and hopefully it will go viral in the slot machine. Why do you think that has broken in such different directions?**

Honestly, I just think it showcases how LinkedIn is unique and different in its professional context.

**That's very good. LinkedIn is special, but why do you think it's so different?**

Yeah because when I interact with you, being able to understand who I am... Think about any interactions. Our members are looking to fill a need. I'm looking for my next interviewee for my podcast. Who's somebody interesting to look at? Okay, look at the LinkedIn profile. I can see what they're sharing and talking about. That could be interesting material for me for my show. I'm looking for a great person to partner with me on my startup, be my engineering co-partner, be my product co-partner. LinkedIn is a phenomenal way to understand who this person is, their professional identity, and what they say.

POWERED BY CONCERT                                                                            FEEDBACK

**This is another Twitter question, I apologize, but it's right there. It's the Death Star hanging over this conversation. A lot of people say to me, "I need Twitter for my job." Reporters especially. "This is where I find my sources. This is where I market my material. This is where the other reporters are. This is where the editors are." Authors, too. There are publishing houses in this country that will give you a book deal if you have enough Twitter followers, basically without knowing**

PX14869-014

what your book is going to be, because they know they have a marketing channel. There are lots of comedians. There are just tons of people who are on Twitter and the reason they're on Twitter is like, "I need it for my job," which is a really weird way to think about Twitter, but it's how they think about it.
**Isn't that LinkedIn? Shouldn't you be going and trying to get all those people to come use LinkedIn, especially in this moment when Twitter seems like a disaster?**

I think it depends on what they're trying to do. We actually learn a lot from journalists that they're doing a lot of their job on LinkedIn, trying to find leads to stories. If I'm looking for a cybersecurity story...

**In this moment, you've got a huge audience of people on Twitter that maybe for the first time ever is at scale reconsidering its relationship to this platform. I can't think of another time this has happened for a social network like this. Usually, the network effect just takes you from Friendster to MySpace to Facebook. It's usually not, "Something bad happened and we're all going to quit." Twitter's in the middle of that moment where everyone's reconsidering the relationship to the platform, and a lot of them are like, "I need this for work. I'm panicked about what I'm going to do in my career if I don't have this tool." Are you doing outbound marketing to say, "Hey, come work here. Actually, we are better for this because we are work"?**



POWERED BY CONCERT

We're not doing any outbound marketing. I think in many ways it depends on how they see the value they're getting from the platform. For many of them, they're already on LinkedIn. Many of them are actually getting their job done on LinkedIn. That's the stuff we hear. So for example, you mentioned audio events briefly. Two days ago, TechCrunch ran an interactive audio event on LinkedIn. It was about Twitter. It was their entire editorial team having conversations, taking questions from the audience regarding their thoughts about the business model, what should be done, and what should be the interaction model going forward.

LinkedIn is highly professional, so it was a professional conversation about Twitter. So I think what's naturally happening is people are realizing you can actually get a lot of what you're trying to do on LinkedIn already, and that's coming through for the system as well.

Here's another example. One of the very successful products we have right now is newsletters. People are building new newsletters. It's a great way for individuals to cultivate intimate relationships with the audiences. So we have 150 million newsletter subscriptions running right now on the platform, growing extremely quickly. Forbes launched a newsletter-plus-group combo right now, so they run the newsletter and it gives them direct access to their subscribers. And then there's also a group for discussion about the material shown in the newsletter. It was done naturally. It was done before the Elon news. It will be done many times after. And I think generally, publishers, audiences, whether it's professional identity as a person or as entities, are always looking for a better way to get their stuff done. LinkedIn tends to be a phenomenal way for them to do so.

PX14869-015

The best product teams are usually composed of a product manager, some engineering people, and some designers, and ideally they're all aligned. You said something to me that I am just never going to forget, which is, "You can disagree, just don't be fucking confused," which is incredible. We should make T-shirts of that.

ChatGPT is like that. These tools are the place where a product team like that is going to disagree. We can even put that into practice here. You have product teams and you have to manage them. They often disagree. No one knows how to use these tools, no one knows what the right outcomes of these tools are, no one knows if they're moral and ethical in some cases, and no one knows if they're useful. They're cool, but we haven't put them into practice, so there is no set of best practices or industry secrets to learn from. We just have to invent new patterns. How do you manage a product team through that?

## "We might be wrong, but we're not confused."

Yeah, the exact quote is, "We might be wrong, but we're not confused."

**Oh yeah, okay.**

It's a very powerful way to lead a large organization in general, but there is also some clarity of thought and clarity of execution for everybody.

**Do you want to say that again with the F-bomb? Because the F-bomb was very powerful to me.**

Well, we can play it through. It'll be more natural as we go into the podcast.

**Fine.**

It might come up a couple of times. Last time, you called it tension between designers, product managers, and engineers. I think what you find is that they're solving different things, and that's the problem. They're not saying it, but they are solving different things.

This is where the confusion starts. That's why I say I would rather be wrong than confused. To come with clarity of thought lends itself into clarity of execution. I love that you and your podcast talk a lot about decision-making and frameworks. Those are super useful, but there is very little discussion about actual clarity of thought in those decisions and carrying it through with focused execution.



POWERED BY CONCERT                    FEEDBACK

Whether you're leading an organization of thousands of people or just leading yourself, I believe that when you are confused, it becomes impossible for you to rally people, especially when your target is really challenging and you lack that confidence. It's about striving for clarity and conviction, while at the same time trying to remain humble and self-reflective to make sure you can still go through the process.

Start from what we talked about before, with designers and engineers. I think you'll find that if you take each into a room and ask, "What are you solving for with this proposal?" They will tell you different things. There's no point discussing if they're both coming in with different

PX14869-016

problems. Maybe you should discuss the problem first. You can start a conversation by saying, "Hey, what is the problem we're solving for?" Don't give me a headline. Give me a nuanced, articulated definition of a problem. In fact, get uncomfortable with the problem. Give me the trade-offs of the problem.

You'll see people saying, "Oh whoa, that's not what I'm solving for, but are you solving for that?" This is a guesstimate based on experience, but the engineer might say, "Hey, I want to make sure we can leverage the platform capabilities we built. We worked for a year, we built a platform, and now you're building something very different. Why the fuck did we build that?" They're right. The designer would say, "Wait, we're not innovating. There are so many innovative patterns and motion graphics today, we can start playing into this. This looks like it was built two decades ago." They're also right, but they are solving for different things.

Going back to, "Hey, let's just align with the problem," that would probably be the most important thing you can do as an organization. This is true for everything. I don't want to talk politics, but we can talk politics really quickly — you'll see they're solving for different things. I think that's like number one. Once you have that and there is alignment on the problem, it's actually shocking how easy the solution can be, because sometimes we just spend that time talking about the problem a lot.

When we come into the solution, I ask my team to write down their principles. When we do a product jam and bring in a new product strategy or design, I ask them to lay out their principles. Good principles have teeth. You're supposed to see the trade-off from a good principle. A bad principle is like, "We should have simplicity in the product." That's amazing, that's beautiful.

For example, we should add some friction to our signup process so we can make sure we don't allow bad actors in at the expense of signup growth. We can debate that for hours, because you want to build the most frictionless experience possible. But sometimes with frictionless experience, you're also introducing an entry point for bad actors. You don't want to have that, especially in a product like LinkedIn. We want to make sure the trust is very high. Then you go into, "Okay, is there a way to build a frictionless experience?" You can spend time debating that for a long time. There's potentially something innovative that you could do there, but the constraint is very clear.

A bad principle is like, "We should optimize for the members having a great experience and for the customers on LinkedIn." That's great, but you didn't tell me much. I don't feel uncomfortable. I think it's the moment you start feeling like, "Wow, if I decide on this axiom, this type of principle, then I'm letting go of something else." I think great principles have trade-offs embedded into them.

Now, sometimes when I talk about how I might be wrong or confused, it can come across somewhat as, "I know I'm right." It's not about knowing I'm right, it's about being humble and letting go of being right. It's about not caring whether you come across as smart or not, but caring about if the company is successful. If you go back to those examples of team

PX14869-017

dynamics and tensions, there's a lot about the interests for my organization, for my function, for what I need, and it's less about the company.



POWERED BY CONCERT                                                      FEEDBACK

People get attached more to company goals, clarity, and focus, and they get detached from being right and wrong. You'll get phenomenal conversations. Now, this is just the opinion part. We haven't gotten to execution. Many companies tend to think that if they have clarity on the decision, the execution will just come for free. That's not correct. There's so much confusion in execution, and we see this quite a lot.

**This actually relates to something I've been wanting to ask you about. When you think about product organizations, most people think about what you have described at LinkedIn. A product manager [PM], some designers, and some engineers. The PMs in most situations are powerful. That culture of product managers being very powerful is pervasive throughout the tech industry. We had Tony Fadell on the podcast, and he will go on and on about how having a great PM is basically the secret to all success in life. If you go to Google, PM culture there is like its own thing. It's its own universe.**

**There are companies that run in other ways — I'm thinking of Apple — where design is much more prominent and they have product marketing managers who connect the designers and engineers to the customers. Maybe these are all just different names, but the companies and their products are expressed very differently. There's an inherent trade-off to that: how are we going to structure the jobs? How are we going to give them titles? Who's going to have the ownership of the decisions? How do you think about all of that?**

It's a great call. With product management and different organizations, it really depends on the company you join. If you look at product management as a skill, some designers do it amazingly well, and some engineers have phenomenal design skills. Some of the best people I work with can play all roles. They can be very technical, they can be focused on the customer and the business, they can focus really well on the craft of the design, and it depends from company to company.

POWERED BY CONCERT                                                      FEEDBACK

When I started as an engineer, we didn't have any product managers. As an engineer, I was the product manager. We used to pride ourselves on

PX14869-018

building great technology, but we didn't actually understand who it was for. So we had the best technology, but not really a solution for it. It was kind of odd.

To your question about the product management side of the world and how it comes to life, for me, it's kind of a good description of roles and responsibilities. What about execution? I run an organization that is composed of product managers, designers, business development, an editorial team that is responsible for our content and plays a big role in decision-making, and our content production team, so it's a very diverse team of product builders. We have a lot of clarity on the roles and responsibilities, and it could be different for different projects.

We have a process we call RAPID [recommend, agree, perform, input, decide]. For every project there is a decision maker and there is a recommender who tends to be the subject matter expert. The decision-maker could be somebody who has multiple objectives they're trying to prioritize in running the organization. There is a performing team, inputting team, and approving team. You can think of legal in some cases as an approving team. We want to make sure we stay away from doing anything illegal and that we do everything with high trust. We make sure that whenever we start a process or a project, there is clarity on roles and responsibilities.

### "Only one person can be the decider."

Only one person can be the decider. That allows for velocity of decision-making. For example, design gets what we call "the complete D," which is the decision on how the product is going to look. Engineers have the complete D about how we build it, and product managers have that for what we are building and the features. The roadmap is a product management decision. Now, they all brainstorm with each other. We hardly have any conflict within core teams of PM, design, and engineers. I can't think of the last time it happened. Usually it's a bit across different product teams that have competing objectives based on resources. That's usually where the tension comes from.

**You know that I'm really interested in structures. You're saying you have these core teams and you oversee it all, so it all ladders up to you and maybe you just break all the ties. I see it at other companies. They have a design department and an engineering department, and then they make cross-functional teams and say, "Make this number go up." Then there might be some argument within the larger organization that prevents the team from making that number go up. Do you see this?**

**I can just pick any large company, like Microsoft. This is a thing that happens at any company that hits any scale, so I don't mean to pick on any one company. I hear about it all the time as I talk to people like you. These are the actual problems you solve in your day. How are you structured? Are you structured to have an engineering department that lends engineers to cross-functional teams? Do you have PMs that run teams of engineers and designers?**

At the company level, we roll up functionally to our CEO, Ryan Roslansky. So I run the product team, my counterpart runs the engineering team, we also have the legal team, the marketing team, and the sales team. In my organization there are the product managers, the designers, business development, content production, editorial, and so on. We then run product areas. We talked about how we have a team dedicated to the talent marketplace, connecting job seekers with recruiters. We have a team dedicated to our products and services marketplaces, connecting marketers and sellers to buyers. We have a big team dedicated to knowledge exchange between knowledge seekers and knowledge creators.

Those run separately, and they have every function represented. So, the job seeker team has a PM, a designer, an engineer, and a marketer. It's rare — I can't think of the last time it happened — that within a team

PX14869-019

there is a need for an escalation, because they usually start from a very clear understanding of roles and responsibilities and there is a roadmap. It is not rare that there is escalation across teams. For example, the trust team and the growth team talked about our signup flow and how much friction there was. This is where we actually encourage escalations.

### "Are we disagreeing or misunderstanding each other?"

There's another thing that I use often that I learned from a good friend. "Are we disagreeing or misunderstanding each other?" You will find that in large organizations, teams debate stuff forever and usually it starts with, "But wait, I don't understand you." What they mean to say is, "I disagree with you." There's a big difference between misunderstanding and disagreeing. I would tell my team that if you disagree, escalate and move it up. If you misunderstand each other, spend the night explaining to each other until you're both clear on what everybody is trying to accomplish. If there's a disagreement, it's not worth the time to just try to convince each other to death, just move it up.

**In a large organization, when that type of conflict is healthy, it is very efficient. When it is unhealthy it gets very toxic very quickly. How do you manage that kind of conflict in an organization as large as yours?**

To your point, I think it is culture. It starts from the leadership and your role model at the organization.

For us, we have what we call a clean escalation. You escalate with everybody else on the thread. You don't escalate separately, where everybody escalates to their boss and has their own information that is not shared. Everything is out in the open, because honestly it's all about LinkedIn for us. It's about delivering its incredible vision and purpose. If you let go of your ego, it's less, "Am I right or wrong about this?" and more about LinkedIn becoming successful.

POWERED BY CONCERT                                                          FEEDBACK

It's very easy to do clean escalations. It's very easy to say, "Okay, all I want to do is continue on my job." Most of the time all people want is to just have progress. The last thing you want is to just stay put. That is the most dysfunctional organization possible. You're not doing anything when you're debating things forever and trying to be right or wrong, versus focusing on the company and the purpose.

All the way from Jeff, our former CEO, to Ryan, our current CEO, it's about role modeling that all we care about is fulfilling the vision and purpose of the company. Whenever things linger for no reason or somebody sends me an escalation in an improper way, I will add everybody to it and ask for a clear understanding of what we are trying to solve for and the principle thinking behind it. It has to be role modeled. This is one where if you don't show it to your team, they will not do it.

**You mentioned designers having a decision about how things looked, product managers having the decision over what features would be**

PX14869-020

built, and engineers having the decision about how it's built. If I had to sum up *The Verge* in a sentence, I would say it's a publication that has persisted for 10 years because we are very interested in buttons, who puts them there, and why we push them. It is the simplest thesis statement of our entire publication that the presence of every button that you encounter on every product is actually a long and complicated story, from the genesis of the button all the way to how some person is going to push that button at some rate.

I often find that at big tech companies, the politics of, "we should put this button here," and, "here's what it looks like," are not two different decisions. It's often the same decision. How big the button should be and what order the buttons should be in are not design decisions, they are product decisions. The product managers and the designers often fight quite a bit over what buttons go where and in what order, or how big they should be and what they should look like. How do you make the determination between the two?

That's an easy one because you can just experiment. Honestly, it's not worth a discussion on if the button should be blue or yellow.

**But that pisses people off. That example carried all the way is Google testing 41 shades of blue and the design culture of Google just leaving.**

So here's a good example. Now if somebody says, "Hey, I want to use multiple types of fonts all over the site. I think if I can get somebody to squint their eyes all the time, it will lead to more engagement." This is one where you say, "I don't think your design judgment is very good, even if you can show me some movement in numbers." That's not a good design if you think about the aesthetics of how the product looks and how simple it is. Sometimes it's 100 percent a belief system. Data cannot tell you everything. Data should give an answer based on your hypothesis, but it should not tell you data without a hypothesis. It should start from something.

There is a notion of the simplicity of the experience and how you build it, and sometimes those translate over time, so you want to build something in. "I think the button should be here or there," doesn't make any sense unless the design itself doesn't make sense when you zoom out. Like, "Hey, I think we should have 'sign up now' instead of 'join now.' Test it." That is not worth the debate. This is a good example of debating the sand, not the big rocks.

I think great debates come from asking, "What type of experiences are we building?" LinkedIn serves so many audiences — job seekers, marketers, we try to serve every functional hat on LinkedIn, and that could lend themselves to a very complex product.

Imagine everybody wants to have a tab. "I want a tab for job seekers, I want a tab for buyers, I want a tab for recruiters." That's a really complicated experience to build. The flip side of it is, "How do I build something very simple that caters to every audience?" That's a great thing. With no specific audience having its own tab and experience, that's where you start to push the design into true innovation. You say, "Okay, to really perform on that, we have to have incredible relevance."

PX14869-021

If I want to make sure nobody needs their own hub and their own home, and I want to build it for a really simple experience through search, feed, and notifications, then we better understand the intent really well when somebody comes to the site.



POWERED BY CONCERT                                                    FEEDBACK

Then when Nilay comes in I can serve him a great experience. I don't have to say, "Oh, Nilay is looking for a job, so he has to go to the job seeking tab." "Oh, Nilay is now recruiting somebody for his team, so he has to go to the recruiting tab." "Oh, Nilay is trying to market something," et cetera. That's where you start building what I would say is like an octopus, very much a complex experience.

Building something simple is very hard. That's where you start pushing the elements. I think those are the discussions where healthy confrontation and good tension are actually amazing. You can start pushing the experience tremendously with those.

**A lot of that is healthy confrontation and good tension. You started off by saying good principles have the trade-offs built inherently into them. I want to bring that all the way back around to where we started, which is that in AI — particularly in generative AI — there are no best practices for this stuff yet like there are with almost everything else.**

**"Should the buttons be bigger or smaller? We should test it. We shouldn't argue about it." There is now a universe of product design's best practices that might at least tell you where to begin or where the pitfalls are. There's an institutional base of knowledge that good PMs can just access. There's also an institutional base of knowledge for good designers and good engineers. There's none of that with generative AI. How do you avoid those pitfalls? How do you engage and test that stuff? That is a blank slate for groups of people who have to make pretty intense decisions that could have gigantic positive returns for your business and also gigantic negative consequences.**

I think that is the biggest question right now for every technologist who has had a chance to go deep on this technology. What are the best practices? I think we had years to develop best practices with technologies that we understand really well that we can go deep on. When it comes to the capabilities of generative AI, I think we're going to start seeing some good but potentially scary disruption in the market. Building that playbook is going to be one of the most important things we can do.

PX14869-022

POWERED BY CONCERT                                    FEEDBACK

I think we're getting to a place where technology is leapfrogging society's ability to comprehend it, and we're starting to put more muscle and more intelligence around building guardrails for what is okay and what is not okay. I'm a big fan of the work happening out of Microsoft with responsible AI. There are so many elements to it that are really key, from fairness to equity to how transparent it is. Sometimes those are constraining AI, but constraining it in a way that helps society move forward with it. A lot of that is needed from many companies. We haven't talked about the roles of governments or third-party institutions in this, but I think that's going to be the biggest conversation coming upon us in the next few years.

**We can talk about governance and regulators. I think they're pretty far behind the curve in general.**

Especially in the US.

**Yeah, that feels like a safe statement. But a big company like Microsoft is not. It's a big company that has a responsible AI initiative. It is a leader in many of these services, for many of these kinds of bleeding-edge technologies. You run a pretty sizable team that is part of LinkedIn, which is part of Microsoft. Is there a place at LinkedIn where the internal Microsoft AI regulatory body shows up and says, "I need you to stop helping people write their own resumes on LinkedIn using our generative AI product until we get it right"?**

I would say that it is aligned. We are a proud part of Microsoft, and they are leading the industry in this. They care tremendously, and there is ethics built into every element of how responsible AI is built. We learn from them in many ways.

At the same time, LinkedIn is unique. User-generated content happens a lot more frequently on LinkedIn than on the other parts of Microsoft tools. There are parts we see that are really unique to how we build it very correctly. Sometimes on purpose we will constrain it, because it's valuable for our vision. And it's helpful for us to go deeper into what type of elements we're talking about.

**"Not everything is great on LinkedIn. It's not conducive for every type of conversation, but we want to make sure it has the most productive conversations in the workplace."**

For example, when it comes to content. By definition, we say on LinkedIn that we expect professional content. Not everything is great on LinkedIn. It's not conducive for every type of conversation, but we want to make sure it has the most productive conversations in the workplace. People talk about work, how they work, and their craft. We can go deep on a vertical like workplace conversations, so that's something we can contribute back to the brother Microsoft elements.

We are so aligned on this. There's a massive understanding of the importance of it, because of Microsoft's diverse portfolio and the

PX14869-023

different aspects of their product — from search, to social professional networks like LinkedIn, to gaming, to productivity tools like Office. I can go on and on. Every business brings their best intellect and principles to the table to showcase how it's unique for them. I think we're pretty unique within the Microsoft landscape.

**I want to do a two-minute, "Would you allow this AI feature?" lightning round to end this conversation.**

This is a new one. You just thought about it?

**I just thought about it. It's just in the context of this. It's user-generated content.**

I might steal it. We'll see.



⊡ POWERED BY CONCERT                                            FEEDBACK

**No, I want royalties for all of these, but some of them are going to be crazy as I think of them. Generate a profile picture of me where I'm wearing a suit.**

Your face?

**I'll take a selfie. Make a profile picture where I'm wearing a suit, which is the most LinkedIn thing I can think of.**

For us, the principle is about proper reflection of who you are. I think that I would have to look at the picture of you in a suit to make sure it's a good reflection of who you are. As long as somebody can recognize you easily. For us, the authenticity of who you are is really important. If it's in line with that...

**So that's a yes?**

That could pass.

**With some guardrails, that's a yes.**

That sounds like a yes.

**Write me a resume where it says, "I know how to operate a forklift."**

"Write me a resume..." I think right now you can write yourself a resume and bring it to LinkedIn.

**I'm saying I want to type into a box on LinkedIn, the same way I would in ChatGPT, and say, "Write a resume that says, 'I know how to operate a forklift.'" By the way, just to be very clear, I do not know how to operate a forklift. I think it would be cool to try, but I do not at this time know how to operate a forklift.**

You and I have similar childhood dreams, so I think it comes to life really well. It's important that it starts from your profile and is authentic to who you are. To emphasize something for both the product builders and the audience, it starts at, "What do you exist for?" For us, as long as what you're presenting is authentic. "Hey, here's my work. I worked for this forklifting company or this inventory company. This is my work, but help me craft it better."

PX14869-024

▣ POWERED BY CONCERT                                                              FEEDBACK

**The line for you here is "don't lie," because right now I could lie.**

Don't lie.

**You don't want to help people lie.**

If it's about potentially better crafting or better articulating the work you've done, that's a nice way to elevate and make it clearer for others about what type of work you actually do. Most of our members and most of our engagement is international, but the vast majority of the profiles are in English. Somebody comes and says, "Hey, I don't have great English, but this is my work," and they write it in Chinese. "Can you make sure it's written well in English?" I think that is a great example of generative AI.

**I picked "operate a forklift" because I feel like the truth comes out in that scenario very quickly. You get hired to run a forklift and you show up to your first day of work, it's going to become very obvious that you lied. What about writing me a resume that says, "I have great interpersonal skills"? Write me a resume with some examples of my great interpersonal skills, which is obviously impossible to measure, but that will take months, if not years, for the truth to reveal itself.**

**"People's ability to write something intelligent is going to be somewhat commoditized, because you can easily copy-paste from a ChatGPT bot."**

Here's a nice generative AI prediction for you, which I think will happen. People's ability to write something intelligent is going to be somewhat commoditized, because you can easily copy-paste from a ChatGPT bot or something like that. Authentically showing it through a video that is something we do today.

**Oh, interesting.**

When you want to showcase your soft skills, you can make a video. Let's say you're trying to get a sales rep job. How would you sell this product? You do a one-minute video of how you would sell. There's a lot that comes across in video, that even if you're running off a script, you can see live. That could work. For that, there's nothing very unique about it, because people can have somebody else write their soft skills, but video would be a good element of showcasing it in a more authentic way.

**Last one. I think this is one that you, Google, and basically every platform will be confronted with first. Write me a 2,000-word blog post about content marketing that I can just spam to LinkedIn all day and night.**

It's a great example. What's going to happen really depends on your identity. Let's say somebody is a scientist in the field of genome research. If you can show credibility to what you just shared through the work you've done and your experience, if you can add content to it and somehow attach it to the things you know about and work on, I

PX14869-025

How Tomer Cohen, chief product officer at LinkedIn, figures out what works best - The Verge

think that's actually really interesting. There's a community there to potentially challenge you and contribute back.

I think this is where people talking about their craft would be amazing. Maybe they come up with some idea and they want to add more depth to it. Maybe they have a lot of potentially complex notions and ideas and they want to simplify them. This is where the combination of identity, what you've done, who you worked with, and what you have to say, your knowledge, will be a really important combination. Just sharing something and coming across as smart will not be enough. Showcasing it depends on your craft and the stuff you've worked on. I think your reputation will start to be more and more important in this world where you can generate things pretty easily like you've never been able to do before.

**That sounds like a yes on the content marketing blog post. I cannot wait for this feature to roll out. Tomer, this was great. Thank you so much for talking to me. I love chatting with you about this stuff.**

Thank you, Nilay. 🖊

---

**Decoder with Nilay Patel** / A podcast from The Verge about big ideas and other problems.

SUBSCRIBE NOW!

---

💬 3 COMMENTS (3 NEW)

---

FEATURED VIDEOS FROM THE VERGE

## Samsung Galaxy Unpacked 2023 in 10 minutes



Samsung's new S series lineup is here. The S23 and S23 Plus have adopted the floating camera design of the Ultra, making for a much more cohesive trio this time around. The S23 also comes with a new 200MP camera. Plus, a look at Samsung's Galaxy Book3 which now has a 120Hz AMOLED display, RTX 4050 (or 4070), and 13th-Gen Intel chips. Here's everything you missed.

---

More from **Business**

 **BuzzFeed News is being shut down**

---

PX14869-026

 **Meta's latest layoffs cut employees in technical roles**

 **Reddit's upcoming API changes will make AI companies pony up**

 **Netflix delays its password-sharing crackdown to sometime before July**





TERMS OF USE  /  PRIVACY NOTICE  /  COOKIE POLICY  /  DO NOT SELL OR SHARE MY PERSONAL INFO  /  LICENSING FAQ  /  ACCESSIBILITY  /  PLATFORM STATUS
/  HOW WE RATE AND REVIEW PRODUCTS

CONTACT  /  TIP US  /  COMMUNITY GUIDELINES  /  ABOUT  /  ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US  /  JOBS @ VOX MEDIA

© 2023 VOX MEDIA, LLC. ALL RIGHTS RESERVED

PX14869-027

# PX14877

**CIO NETWORK**

# Reid Hoffman Shares Lessons From His Career In Blitzscaling

**Peter High** Contributor ⓘ                                              Follow

Apr 22, 2019, 08:57am EDT

Reid Hoffman is one of the legends of Silicon Valley, having been part of two of the most influential tech companies: PayPal and LinkedIn. His start in business came much earlier, however, for as a precocious 12 year old, he found his way into the offices of a company called Chaosium, which produced one of his favorite video games, RuneQuest. He advised the CEO on improvements he should make to the game, and was given other assignments to help improve the company's games.

Hoffman's first attempt at entrepreneurship, a social media company called SocialNet, failed, but it would provide invaluable insights that he would use in founding LinkedIn years later. In the interregnum between those experiences, Hoffman would become a member of the "PayPal mafia," an extraordinary group of entrepreneurs who were successful in launching one of the original fintech companies. He cemented his legacy as an entrepreneur identified by his first name only through LinkedIn.

Hoffman has gone on to become a successful investor with Greylock Partners, having invested in companies such as Airbnb, Aurora, and Convoy, among others. He shares the lessons from across his career in his book, *Blitzscaling: The Lightning-Fast Path to Building Massively Valuable Companies*. He shares lessons from the book and from his career in this in depth interview.

(To listen to an unabridged podcast version of this interview, please click this link. This is the 32nd interview in the Tech Influencers series. To listen to past interviews with the likes of former Mexican President Vicente Fox, Sal Khan, Sebastian Thrun, Steve Case, Craig Newmark, Stewart Butterfield, and Meg Whitman, please visit **this link**. To read future articles in this series, please follow me on on Twitter **@PeterAHigh**.)

**Peter High:** You told a great story in a recent episode of *Masters of Scale* about your love of gaming. There was a gaming company called Chaosium that had a game called RuneQuest, which you were obsessed with as a kid. Through a friend of yours who lived near the offices of the organization, you were able to get some feedback about the game to the executives. Could you please re-tell that story?

**Reid Hoffman:** Many kids have total focus obsessions, and when I was 12, fantasy role-playing games were mine. My friend told me, "The offices of the gaming company that we play are in my neighborhood, and I can go in." The company was not supposed to have offices in a residential neighborhood, so they were nice to the neighbors. In response, I asked him if I could go in with him. I had previously looked at one of the games the company had published, and I believed it was done wrong because the story arc were needed to be different, the math was bad in some places, and the gameplay design needed to be fixed. I was a geek, and at the time, fantasy role-playing was on my mind all day long. With these edits in mind, I followed my friend in, and they sarcastically felt, "Great; 12-year-olds." I told them the edits that I had in mind, and I can still see Steve Perrin rolling his eyes. To his credit, he opened what I had, and he said, "Interesting. Alright, I have something else that I am working on, would you mind taking a look at it for us?" I took it home that Wednesday, I worked on it for the next four days straight, and I went back in on Monday because I did not have school. He said, "This is great work. I am going to give you a check." I took my first check home, which shifted my father's thinking from, "I have lost my son to this weird cult fantasy"



LinkedIn Co-Founder & Greylock Partners Investor Reid Hoffman   CREDIT: LINKEDIN

**4 of 4** free articles

This is your last free article.  Become a member today to keep reading.   Subscribe

PX14877-001

years back to catch up. The experience was a delightful journey that showed me how I could start to express my creativity and be entrepreneurial.

**CxO: C-suite news, analysis, and advice for top decision makers right to your inbox.**

| Email address | Sign Up |
|---|---|

You may opt out any time. By signing up for this newsletter, you agree to the Terms and Conditions and Privacy Policy

**High**: It is amazing to think of a 12-year-old having the chutzpah to do that. I can only imagine the confidence you gained from this.

**Hoffman:** This may be a bit strange, but I did not feel proud, arrogant, nor insecure. If he told me, "This feedback is totally wrong," I would have asked why, and I would use it as a learning opportunity. Everything else was extraneous because all I cared about was doing it well. For me, part of what made fantasy role-playing games interesting was that it was a way to play being adults. It was about determining, "What is the narrative arc of how we are going on the hero's journey of our lives?" That was what made me so obsessed with the game, so once I started becoming an adult and going through my own life, I felt as if I did not need the game anymore.

**High:** There are many entrepreneurs who go into business with the advantage of never having been in that particular industry before. As a result, there is no inherited logic that they are adhering to, and there are no shibboleths that they bow to. This allows them to view a problem that has been around for a while in a completely different light. As I am reflecting on your story, you had a similar advantage because you did not know enough to be aware that what you were doing was abnormal.

**Hoffman:** Exactly. Sometimes a lack of knowledge is extremely helpful. The nature of a problem changes when the experts do not realize it has changed. A personal experience on the entrepreneurial side was PayPal. When we launched PayPal, none of us knew what a credit card chargeback was because we were incredibly out of touch with how the financial system operated. We did not know that the reason no one tried to do something similar to PayPal was that they knew about fraud, criminal agents, and industries that were potentially trying to steal money from credit cards. We did not know about any of that, so we simply thought it would be a useful service. Fortunately for us, we were quick learners because we would have been dead otherwise.

That freshness of approach allowed us to experiment in ways that the traditional industry did not try. It is likely that when the traditional industry learned how to deal with fraud, the new tools were not yet available. We learned and applied the new tools, and we drove out halfway into a minefield. Once you are halfway into a minefield, you may as well go all the way.

**High:** Prior to LinkedIn, you started a company called SocialNet. Could you talk about why that business did not succeed?

**Hoffman:** I believe the idea was incomplete. This was back when the Internet was considered a weird new space that was totally different. At that time, people would go into cyberspace, and they would adopt a pseudonym. People went there because it was this dangerous wild west space. However, what truly matters to us is how we go through our personal, romantic, and work life, and I knew that at SocialNet. The idea around SocialNet was trying to figure out how to make a great bi-directional matching system that was a platform across all of the contexts of human life. That is still a useful idea, and there may still be some way that gets expressed in a company. However, part of successfully starting a company is having some knowledge or a theory of how a business is grown in the space. The mistake I made was not thinking of the Internet as an entirely new medium. How you go to market and acquire your customers is just as important as the business you construct. I thought all that mattered was having a genius new business, and from there, all I would have to do was go and traditionally market it.

At SocialNet, we had partnerships with newspapers and magazines. Specifically, we put a great deal of effort into a partnership with a newspaper in Arizona. Despite all the hard work we put in, we only got six signups from that partnership in the first month. When I was debriefing with my team, I told them that if we had taken the time and

4 of 4 free articles

This is your last free article. Become a member today to keep reading.    Subscribe

PX14877-002

failures at SocialNet were around not comprehending the dynamics of search engine optimization. We did not understand the patterns that worked in that space. Further, sometimes in the early Internet, there was a natural growth because people would be intrigued by something new on the web. This experience taught me that as an entrepreneur, you need to have as firm a grasp on your go to market strategy as your product. I needed to learn how to be an entrepreneur.

**High:** Prior to launching LinkedIn, Peter Thiel convinced you to stay with PayPal before going off to launch your own business. What was it about that opportunity that pushed you to sideline the idea you had been thinking about?

**Hoffman:** Max Levchin and Peter, who met through a talk that Peter gave at Stanford, came up with the idea of encryption on mobile phones as an interesting platform. Each of them decided to have their closest entrepreneurial friend on the board to help them. I was Peter's friend, and Scott Bannister was Max's. They came to me and said, "We have this great idea, we want to start a company, you have been in the startup space for a while, so will you come and help us?" My answer was, "You are a close friend, I am super happy to go down this path with you, but it is a terrible idea that is never going to work." This is because getting people to generically adopt an encryption platform on their mobile device with the theory that people would start using digital cash on their phone was arcanely difficult to do. This was back in the era of flip phones, so this was not similar to driving through a landmine field, but it was similar to lining up the landmines and deliberately driving over each one of them. From this experience, I learned that super smart, hard-driving talent that is capable of learning and pivoting can go places. On the board, they went from an encryption platform on flip phones to encryption technology on PalmPilots to an economic payment service on PalmPilots and the web. They quickly focused on the web, which was beginning to take off. Peter's pitch to me was, "We got traction, we have done a ton of pivoting, and we found our way to our product market fit." He told me it was a better tour of duty for me to join PayPal first and then do whatever else I wanted to. I said in response, "Yes, product market fit truly matters, that is difficult to find, and I will help." That is when I stepped off the board and joined the company full-time.

**High:** One of the keys to LinkedIn is carving out the space to connect people, especially in a business context. LinkedIn allows individuals to develop and leverage a great network for the pursuit of ideas and to find new colleagues. The network that was developed within PayPal is almost miraculous. The group consisted of extraordinary entrepreneurs, such as yourself, Peter Thiel, Max Levchin, and Elon Musk. What was it about that idea that brought these people together, and to what extent did that experience become instrumental in launching all of the ideas that have come since?

**Hoffman:** Max, Peter, and later Elon learned a great deal from me, and I learned a great deal from them. In particular, one of Peter and Max's philosophies from the early stages is now part of my tool chest. When I fund startups at Greylock Partners and when I build companies myself, I borrow their idea of the learning curve. As opposed to hiring someone who had 10+ years of experience doing something similar, they put together a group of people who were voracious and quick learners. These people, who were typically in their late twenties, had baseline engineering skills, but they wanted the job to prove themselves because they believed it was their shot. This applied to me as well because I was still a young kid who wanted to show that I could do what was important to the world. While I wanted to make that contribution, I had not yet proven that I could do so.

On top of this, when you have a 10-20 year plan for where the company needs to get, many people feel as if they did what they needed to do by the end. PayPal got acquired in just three years, so there was all this talent that still felt that they needed to prove themselves. These people had some money in their pocket because the company worked. Moreover, in 2002, the general feeling in Silicon Valley was that the Internet was over and played out. People thought that the big players, such as Yahoo!, Amazon, Google, eBay, and PayPal, had already arrived. However, many of us from PayPal were contrarian enough to say, "No. While it might be in a dip, it is just getting started." We had the ability to angel invest together and talk about which ideas we were going after, so we were all in communication. We all believed that we had more to do because the

4 of 4 free articles

This is your last free article. Become a member today to keep reading.          Subscribe

PX14877-003

**Hoffman:** I was able to reflect on what worked and what did not work at SocialNet. At SocialNet, we emphasized the dating service because we knew that was what people would most naturally want. SocialNet was a platform across areas, but we were more similar to Match.com. Everyone knows that single people are more willing to put the effort in to find someone to connect with. I learned that as an entrepreneur, you have to do what people think is crazy at the time and what they will think is obvious several years down the line. That is the contrarian and the right part of it. Rather than emphasizing the dating part, I had to focus on the professional and economic side. This is the side where people would say, "What? I know your network matters, but those networking people who introduce themselves and give me their card at a cocktail party make me uncomfortable." That said, I had to focus on that side because it involves the transformation of people's economic lives. Once you begin to prove to people how important and valuable that is to them, you are then unique in a category, rather than competing against dozens of players. From there, I applied much of what I learned at SocialNet. These lessons included using your real identity, rather than an avatar, using real relationships, and having vitality as a core measure. I had these ideas when I was exiting SocialNet, but Peter convinced me to stay at PayPal before I was able to chase them. When PayPal was bought by eBay, I realized that the idea was still there. Because of the contrarians, people had yet to occupy that space. As I began to get into it, I realized that people were just beginning to do the same because there were enterprise versions. Specifically, there were ideas where the company would drive your social network. This included ZeroDegrees, Spoke, and Visible Contacts. When I saw that others were beginning to occupy the space, I knew that I needed to go right then and fast.

**High:** I want to pivot into your book, *Blitzscaling*. In the book, you talk about having an offensive aspect to this, but you also say to avoid the other blitzscalers. You were an early investor in Facebook, and while you are not the same company, you were generally in similar situations. How did you think about the evolution of your idea while there was another one that was likewise blitzscaling?

**Hoffman:** There was definitely somewhat of a difficult shadow in the early days. First, there was Friendster, then Myspace, then Facebook. In each case, the height and volume of the social network arc were so large that when we launched LinkedIn, the only way we could get journalists to cover us was that we were Friendster but for business. Journalists saw that there were a bunch of people using Friendster, and we represented something else, the "business thingy." While Friendster for business did not make much sense, it is better to have press than not, so we were totally fine with them talking about us that way.

People began realizing that, in fact, they had different expressions of their identity. Who they connected with, how they filled out their profile, how they represented themselves, and what they shared was dependent on the platform. There are many people in their work lives that they would not be sharing family and vacation pictures with, and there many people from their personal life that they would not want to be connecting with in their professional life. For example, if someone was trying to make clear what their professional skills are, it would look odd in a social context. It took a while to realize that. This was partially because entrepreneurs tend to go after the biggest possible idea. If an entrepreneur went to the social network, people would say, "Professional networks are included, but they are just a small part of what we do." This represents the small vertical that will go away versus a distinct network.

There were at least three times during the LinkedIn path where a meme that essentially declared LinkedIn dead was accepted as true in the business press. The meme was of the moon orbiting the Earth, which suggested that LinkedIn was over. Specifically, the business press was suggesting that Facebook had this new idea. The biggest arc of that was the launch of its platform and social graph at F8 where they said that "this is the platform that all social networks are going to be on." People believed that LinkedIn was just going to be built there. In a short period of time, we had to make some difficult decisions around where we wanted to make our strategic bets. In each case, I made the right calls and said, "No, the Facebook platform is the wrong network, it is the wrong identity system, and it is the wrong social contract." I knew there would be 30 new developments that would try to be LinkedIn on the Facebook platform. That said, we

**4 of 4** free articles

**This is your last free article.** Become a member today to keep reading.          Subscribe

PX14877-004

about three months, in each of these cases, we turned out to be correct, and what the
business press was saying about us was overturned.

**High:** You have described blitzscaling as prioritizing speed over efficiency in an
environment of uncertainty. Could you talk a bit about that?

**Hoffman:** Being the first to scale is extremely important. One of the ways we try to
make this visceral for people is through a great movie and play called Glengarry Glen
Ross. In an increasingly hyper-connected world, there are more Glengarry Glen Ross
markets. In the movie, there is a sales contest, and Alec Baldwin's character says if you
get first place, the prize is a Cadillac, the second prize is steak knives, and the third prize
is you are fired. The general awards within the Glengarry Glen Ross markets follow this.
It truly matters if you are the first to scale because the first to scale represents winning a
Cadillac. There can sometimes be room for second, and steak knives are a decent prize.
However, if you get the third prize, you are going to be fired. Since the first to get there
is the Cadillac, you have to determine what you have to do to prioritize speed. This does
not just mean getting big fast because you want to have a valuable business at the end.
Instead of just having a blind adhesion to size, you need to determine which
components put you in the best possible position. For example, if you scale fast, but you
do not have network effects, it likely will not play out that well for you or for society.

The book explains lessons that are not taught at business schools. Instead, they are
generally learned through the network of learning, experience, and trial and error
within Silicon Valley, China, and some other places. The paradox of moving as fast as
possible to get to scale is that you lose efficiency. Part of the environment of uncertainty
is that you frequently may not know what your customer acquisition cost is, what your
long-term value is, what your unit economics are, and sometimes, what your business
model is. When we were building PayPal, we were iterating through whether we were a
bank, whether we were doing loans, or something totally different. When we got down
to it, we realized that we only had one shot, but for a while, we did not fully know. While
you may not know exactly what you are doing, you know that the player who gets to the
network first is the player who is going to have the best shot to create the world
transforming company. You need to determine how you can make that happen. The
book is a combination of theory, techniques, and stories from some of these iconic
companies, including LinkedIn and PayPal, that have made that journey.

**High:** The nine counterintuitive rules of blitzscaling include embracing chaos, hiring
Ms. Right Now rather than Ms. Right, practicing bad management, launching a product
that embarrasses you, and letting fires burn. A special type of leader is required who can
lead through that and motivate a team so they do not get disheartened. It seems as if
you need to focus on your culture and on who you are hiring to be able to thrive in an
environment such as that. Could you elaborate on this?

**Hoffman:** You have to have a high willingness to make and survive mistakes, learn
from them quickly, change your mind, and have an infinite learning curve. Part of the
reason we wrote the book is that there were two aspects that we were trying to help
companies do, even those in Silicon Valley who were already doing so.

We do not suggest embracing all chaos, but instead, you have to tolerate certain chaos.
You have to accept that you are going to get chaos in certain areas because you are
trying to move quickly. What matters is how you are going to make a judgment on that.
We wanted to distribute the book across the employees. For example, when Airbnb CEO
Brian Chesky read the book, he bought it for his entire executive staff, and they bought
it for their teams. The book helps create the culture of, "Here is what is ok, here is what
we will fix later, and here is what we need to fix now." That notion was a personal
delight to me because this was not just directed towards the general business audience,
but it is how the technology companies of the future are going to be built. Further, these
are the ways to see how technology trends are coming, the ways to think about how you
need to play when you are in a Glengarry Glen Ross market, and they even apply to
Silicon Valley people;

We have a chapter called *responsible blitzscaling* in the book. As you are growing and
becoming multi-threaded, you need to determine how you pre-identify the risks that
may be important for your customers and for society. From there, you need to start

4 of 4 free articles

This is your last free article. Become a member today to keep reading.          Subscribe

PX14877-005

extremely fast while the ones who take their social responsibilities seriously go extremely slow. If that is the case, only the unethical ones will be left. The question is how to get the ethical fast ones, how to blend that, and how to add ethics to your tool kit while not slowing down.

Regarding your talent question, there needs to be a willingness to know that you are operating in an environment of risk and uncertainty, which means that you will inevitably fail sometimes. It is impossible to not fail when you have risk and uncertainty. You have to be focused on what the key aspects are to win the game, and you have to be constantly correcting. Sometimes this means you will not succeed, but you will have a higher probability of doing so by being part of this infinite learning curve.

**High:** What is the role of strategy in this type of environment, and how does that differ from past decades?

**Hoffman:** Strategy always has to be set against how the pace of the competitive environment looks. For example, if you have an industrial age where you build a plant, and your scope is for decades, then obviously your strategy should be measured in that type of time frame. Usually, the time frame is measured by competition and the speed they are moving at. That is because if you are moving at a slower speed, you will almost always lose. You can have a more clever strategy and the competition is not building the long-term the way it should, and while it can play out, it is extremely brittle. This is similar to putting all of your chips on a roulette table on one or two numbers.

There is still a deep role for strategy because you have to determine what is truly going on in the game, the key priorities you should and should not work on, what you have to get right earlier than your competition, how you prioritize different customers, which risk trade-offs you are willing to take, and how much you are going to invest in your product before you show it off. One part of strategy that many people mistake is that as the time frames get compressed, the ability to quickly react to opportunity becomes a much more important part of strategy. When you are on a decade-long strategy, it is extremely hard to have the visibility of how the decade opportunity looks. Because of this, you are more planning from your current assets, and you are thinking it through from your current position out while still looking at your competition. However, when you are in a market that moves in weeks and months, part of your strategy is about paying attention to what is going on around you. By doing so, you can learn and adapt to aspects that are unpredictable regarding which product may work, which technology might come onto the scene, or what your competitors are doing. That ability to respond and adjust quickly needs to be part of your toolkit, including your strategy toolkit. That becomes a different conception of how strategy plays. One of the *Masters of Scale* ideas we talk about is the OODA [observe, orient, decide, act] loop as one of the key ways to think about that.

**High:** Strategy innovation is one of three techniques that you talk about in your book. The other two were business model innovation and management innovation. Could you elaborate on both of these?

**Hoffman:** It is important to be connected to business model innovation when you are blitzscaling. This is because you are usually bringing in a huge amount of capital, both financial and human, and you are typically deploying that capital in a ridiculously efficient way. For example, you may be hiring twice as many people as usual over a six-month span. Nobody can do that without massive chaos and inefficiency. You need to recognize that on the other side, you are likely to have a truly interesting business model. While you may be putting the components in now, you should at least have a theory of how it may play out. One of the benefits of a business model built on a network is that the network tends to be super difficult to rebuild, so you can build out your business model on top of it. When I was giving my series A and series B pitch to Greylock for LinkedIn, I argued that it was good that we had not done revenue yet. That was because we wanted to be totally focused on building the network first, and that showed that we knew what we were doing. We would get to the revenue part later. My advice to entrepreneurs is to take what your audience might believe are weaknesses and position them as strengths. If you do not know how to do that, that makes you weaker as an entrepreneur. Typically, in the consumer internet space, each massive company at

4 of 4 free articles

This is your last free article. Become a member today to keep reading.        Subscribe

PX14877-006

Reid Hoffman Shares Lessons From His Career In Blitzscaling

what your model is going to be even if the implementation is years into it. For example, Google did not have AdWords when they were starting because they thought they were going to be enterprise search. However, they were always thinking about how their plan B, C, or D could look, so they had AdWords in mind for a while. When they realized they needed to do advertising, they saw that they already had some great ideas on how to do that and build it out.

Regarding management innovation, when you are building a company, it is key to realize that you are all going on a learning journey together. You likely do not have the time to read books, listen to podcasts, and do coursework, so it is not just about learning as individuals. Instead, you need to learn together and set up the intensity of that learning environment. You want to hire executives who are learners, and you want to have a culture which spreads explicit information and learning as much as possible. This should be in terms of operating fast while sharing what you are learning, what you are changing, and what you are doing. For example, at PayPal, I learned from Peter that you have to quickly make decisions. As a result, a tool that I have, which I did not have at SocialNet, was that when you are confronted with every single decision, you need to think about what decision you would make on the spot. You do not have time to talk to people about it, so you need to think fast. This could involve hiring somebody or making a complete shift in your business model. From there, you need to figure out how the cost curve looks when you go out and talk to specific people, research a certain idea, or understand something specific. You need to determine the time frame that you have, the cost-benefit of additional ideas you anticipate, and whether you should make the decision now or delay it for something specific. The speed in which you make these decisions are key, so you want a culture of quickly making decisions together.

Culture is super important in businesses, and culture can be different depending on the organization. A culture can be, "We are all high IQ, we can tell each other whether we are idiots, that is how we operate, and that is who we are." People who want to be part of that culture will join that company, while people who are A-players will not. Another culture can be about being professional, studying ideas deeply, only arguing on the basis of data, and making sure that everyone's voice is heard. All of these are viable business cultures. There are a few cultural tests.

1. Companies should not hire all A-players. Instead, you have to identify the unique A-players who you want to form a coherent team around;
2. Culture is the worst behavior that you will tolerate, which is the downside of culture. You have to determine what that standard is. You may allow people to be a little snippy and angry because while that is not ideal, it is not the worst that could happen. In the book, we say we tolerate bad management, but we do not tolerate criminal management. If you have a sexual harassment problem in your company, stamp it out. That is unacceptable, and you would rather lose than tolerate that.

**High:** As an investor, how do you determine if somebody who has an idea and a small team have the necessary ingredients to blitzscale?

**Hoffman:** It is always a risk assessment, so there is no set of predictors. Some of the questions involve if they are hungry for the win, if they are savvy about learning, and if they truly care a great deal about the mission they are on as it relates to bettering society.

**High:** In your book, you mention that China is the land of blitzscaling. It was not too long ago that people hypothesized that China did not have the necessary ingredients to truly compete with Silicon Valley. Arguments ranged from the fact that China is not an immigrant culture, their venture culture was not as mature, and their risk tolerance was different. What are some of the aspects of China that impressed you such that you gave it this moniker?

**Hoffman:** Before I traveled to China, whenever I left Silicon Valley, everything seemed to move in slow motion. While others claimed to move faster, China truly does so. The speed at which China moves is off the charts. When they have a corporate strategy priority, they will highlight that it is important, and they will start three different groups in three different cities to compete against each other because they want one of them to

4 of 4 free articles

This is your last free article. Become a member today to keep reading.     Subscribe

PX14877-007

have the raw talent to do so. On the contrary, having a massive amount of talent allows for that in China.

Everything that is written in the tech business world in English is translated to Chinese within minutes after it is written. On the flip side, if something is written in Chinese, we never translate it to English. China has an intensity of learning and drawing from anywhere.

While they are not immigrants, the Chinese are hungry to win. When I first met Lei Jun, the founder of Xiaomi, he told me that Silicon Valley entrepreneurs are lazy. I said to him, "Really? I do not feel lazy." He told me their policy is 9-9-6, which means for six days a week, you are discoverable at your desk from 9 AM to 9 PM. When I talked to some of the executives who worked for him, they told me that it was not atypical for them to be asleep at midnight, have the phone ring, and have to come into the office right then because a decision was being made. I do not believe that is sustainable, but it is competitively strong and powerful. Further, it leads to a set of interesting blitzscaling techniques. Blitzscaling is always a phase, so it is never forever. For new companies, it is most often the stage in which you establish your ecosystem.

**High:** Could you elaborate on the application of blitzscaling concepts to larger organizations?

**Hoffman:** It is certainly doable. For example, Amazon was thought to be just a bookstore, but they launched AWS. Not to pick on the business media too much, but the cover of many business magazines said that Amazon should just focus on the store. Of course, AWS is the new revolution, so it is clear that launching new ideas is possible. Through this, you must have buy-in from your investors in order to do blitzscaling. Having this allows you to go on extraordinary journeys, such as Elon Musk's with Tesla. When you are a traditional company and someone else is blitzscaling in an area that matters to you, it comes down to a judgment call. If you cannot blitzscale, you have to determine what they are going to do because it is going to have a big impact. While they could blow themselves up, you are going to have to deal with the ripple effects of that. If that is your bet, you have to determine how you are going to navigate that. Another approach would be to change and shift a bit, leave room for that, and go in your own direction. This is similar to the IBM saying of, "We are not doing hardware anymore. Instead we are going to do services. This is the way we are going to change the play, and we are going to stay a significant company through it." Any company that is beginning to be transformed by software needs to pay attention to the blitzscaling techniques because they are most firmly rooted within software. You have to say, "As my industry is much more in touch with this, I need to be much more cognizant of these types of techniques. I need to constantly determine if I am deploying them or if others are, how I respond to them, and the way in which I need to operate in order to do that."

*Peter High is President of Metis Strategy, a business and IT advisory firm. His latest book is Implementing World Class IT Strategy. He is also the author of World Class IT: Why Businesses Succeed When IT Triumphs. Peter moderates the Technovation podcast series. He speaks at conferences around the world. Follow him on Twitter @PeterAHigh.*

Peter High                                          Follow

I am the president of Metis Strategy, a business and IT strategy firm that I founded in 2001. I have advised many of the best chief information officers at... **Read More**

Editorial Standards                    Print                              Reprints & Permissions

ADVERTISEMENT

4 of 4 free articles

This is your last free article.  Become a member today to keep reading.        Subscribe

PX14877-008

# PX14903

 Store   Mac   iPad   iPhone   Watch   AirPods   TV & Home   Entertainment   Accessories   Support

**App Store** Preview

This app is available only on the App Store for iPhone and iPad.



### LinkedIn: Network & Job Finder [12+]
Connect, Apply & Get Hired
LinkedIn Corporation

**#3 in Business**
★★★★☆ 4.2 • 73.9K Ratings

Free · Offers In-App Purchases

---

**Screenshots**   iPhone   iPad





---

Welcome professionals! LinkedIn is the social network for job seekers, professionals, and businesses. Build your network, find business contacts, connect with recruiters, and use your professional profile as an online resume.

LinkedIn's job search filters help you narrow down from the millions of jobs posted to the job that's right for you. Use job search alerts to get notified when new positions open up in companies you're interested in, all the while connecting directly with recruiters or employees in your network. Tap into your network to ask for a referral for companies you're applying to and get your resume noticed. You can also apply on-the-go to save time and be the first application to the job of your dreams.

Use LinkedIn to navigate your career with confidence--whether you want to find a new job, keep in touch with your network, or stay up-to-date on the latest from your connections and your industry.

Why you'll love using the LinkedIn app:

1. Job search: Browse on-the-go and set job alerts so that you can be the first to apply
2. Job apply: Apply easily to millions of jobs with your resume, right from the app
3. Industry news: Stay on top of the latest news and conversations happening in your industry
4. Chat with your network: Send messages and get alerted when your contacts reply
5. Business networking: Use Find Nearby and QR code scanner features to easily find and connect to people you meet in the moment

SOCIAL NETWORKING
• Find friends, classmates, and colleagues to add to your network
• See updates on their activity and reach out on the app to stay in touch
• Share articles, comments, and knowledge with your network
• Follow hashtags to get updates on topics you care about the most

BUSINESS NETWORKING
• Follow companies, influencers, and topics you're interested in
• Reach out to connections at companies you're interested in for referrals and advice
• Learn about what's happening in your industry with curated content

JOB SEARCH
• Search and apply to millions of openings
• Upload and easily submit your resume to jobs that fit
• Save searches and create alerts to be the first to know about new openings

CAREER FINDER PROFILE
• Use your LinkedIn profile as a virtual resume
• Highlight your accomplishments, responsibilities, and experience
• Add a picture to help people you know and potential employers find you

GET MORE OUT OF LINKEDIN BY USING THE APP
• Find nearby: allows you to connect to people in your vicinity
• QR code scanner: share your unique code so people can connect with you instantly
• Push notifications: know immediately when someone responds or wants to connect

Whether you want to build your professional reputation, find a new job, share your knowledge, or just need a lightweight way to stay in touch, LinkedIn is the professional social network for you.

PX14903-001

Start your job search with the LinkedIn app today.

The LinkedIn app is free to use and download.

----------------------------

Want to make the most of LinkedIn? Upgrade to a Premium subscription for exclusive tools to find a job, grow your business, find sales leads, or hire talent--priced from $29.99 monthly to $119.95 monthly.

Subscriptions will automatically renew each month and be charged to your iTunes account within 24-hours of the end of the current period, unless auto-renew is turned off at least 24-hours before the end of the current period. You can turn off auto-renew at any time from your iTunes account settings, but refunds will not be provided for any unused portion of the term. These prices are for United States customers. Pricing in other countries may vary and actual charges may be converted to your local currency depending on the country of residence.

Privacy Policy: https://www.linkedin.com/legal/privacy-policy

Terms of Service: https://www.linkedin.com/legal/user-agreement

## What's New

When you're in a conversation, speed and stability matter. The LinkedIn app is now more reliable than ever. This update contains bug fixes.

Version History

Version 9.1.312

## Ratings and Reviews

See All

**4.2** out of 5          73.9K Ratings



| StrawberryBananaOrange, 01/31/2023 | Jade Getchell, 06/07/2022 | Jinjarella, 06/25/2021 |
|---|---|---|
| ★★★★★ | ★★☆☆☆ | ★☆☆☆☆ |
| **Love LinkedIn! But the app...** | **Not able to access on cellular, only WiFi** | **Need Auto-Saving for Drafts** |
| Update: LinkedIn heard my prayers and r... more | I recently transferred Service from Verizon to AT&T. The LinkedIn app only works on Wi-Fi it does not work connected to cellular service. I have gone through all of the troubleshoo... more | I spent about an hour carefully crafting a... more |
| **Developer Response,** | | **Developer Response,** |
| We appreciate you taking the time to re... more | | We appreciate you taking the time to lea... more |

## App Privacy

See Details

The developer, **LinkedIn Corporation**, indicated that the app's privacy practices may include handling of data as described below. For more information, see the developer's privacy policy.



**Data Linked to You**

The following data may be collected and linked to your identity:

| | | | |
|---|---|---|---|
| Purchases | | Financial Info | |
| Location | | Contact Info | |
| Contacts | | User Content | |
| Search History | | Identifiers | |
| Usage Data | | Sensitive Info | |
| Diagnostics | | Other Data | |

Privacy practices may vary, for example, based on the features you use or your age. Learn More

## Information

| Seller | Size | Category |
|---|---|---|
| LinkedIn Corporation | 405.4 MB | Business |

| Compatibility | Languages | Age Rating |
|---|---|---|
| **iPhone** Requires iOS 13.0 or later. | English, Arabic, Czech, Danish, Dutch, French, German, Hindi, Indonesian, Italian, Japanese... more | 12+ Infrequent/Mild Medical/Treatment Information Infrequent/Mild Cartoon or Fantasy Violence Infrequent/Mild Alcohol, Tobacco, or Drug Use or References Infrequent/Mild Profanity or Crude Humor |
| **iPad** Requires iPadOS 13.0 or later. | | |
| **iPod touch** Requires iOS 13.0 or later. | | |

| Copyright | Price | In-App Purchases |
|---|---|---|
| © Copyright 2020 LinkedIn Corporation. All rights reserved. | Free | 1. Premium Career                         $39.99 2. Premium Career Subscription with Fre...  $29.99 3. Premium Career                         $39.99 more |

Developer Website ↗    App Support ↗    License Agreement ↗    Privacy Policy ↗

## Featured In



PX14903-002



PHOTO 101
Take a Better LinkedIn Headshot
Want a new job? You've gotta nail your résumé photo....

---

**More By This Developer**



LinkedIn Learning
Education



LinkedIn Sales
Navigator
Business



LinkedIn Recruiter
Business

---

**You Might Also Like**                                                                                    See All



Handshake Jobs &
Careers
Business



Glassdoor | Jobs &
Community
Business



Upwork for Freelancers
Business



Monster Job Search
Business



CareerBuilder: Job
Search
Business



Freelancer – Hire & Find
Jobs
Business

---

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2023 Apple Inc. All rights reserved.        Privacy Policy    Terms of Use    Sales and Refunds    Legal    Site Map        Choose your country or region

PX14903-003

PX14903-004

# PX15178

This document was produced in native format

YouTube: TechCrunch Fireside Chat With Facebook Founder and
CEO Mark Zuckerberg
https://www.youtube.com/watch?v=o2wPzjH2xwA
20:30 - 21:13

PX15178-001

# PX15183

This document was produced in native format

YouTube: TechCrunch Fireside Chat With Facebook Founder and CEO Mark Zuckerberg

https://www.youtube.com/watch?v=o2wPzjH2xwA

10:59 – 12:25

PX15183-001

# PX15324

PUBLISHED

PAO-2021-02

# Meta's cross-check program

This policy advisory opinion analyzes Meta's cross-check program, raising important questions around how Meta treats its most powerful users.

## Platform

Facebook

Instagram

## Attachments

Full Policy Advisory Opinion

Meta's request for Policy Advisory Opinion

Public comments appendix

Spanish - cross-check PAO

Portuguese - cross-check PAO

Hindi - cross-check PAO

Arabic - cross-check PAO

PX15324-001

Oversight Board | Independent Judgment. Transparency. Legitimacy.

PX15324-002

Oversight Board | Independent Judgment. Transparency. Legitimacy.

In October 2021, following disclosures about Meta's cross-check program in the Wall Street Journal, the Oversight Board accepted a request from the company to review cross-check and make recommendations for how it could be improved. This policy advisory opinion is our response to this request. It analyzes cross-check in light of Meta's human rights commitments and stated values, raising important questions around how Meta treats its most powerful users.

To read the full version of our policy advisory opinion on Meta's cross-check program, click here.

*Please note: While translations of the summary of our policy advisory opinion are already available, the full opinion is currently only available in English. Translations into other languages are underway and will be uploaded to our website as soon as possible in 2023.*

As the Board began to study this policy advisory opinion, Meta shared that, at the time, it was performing about 100 million enforcement attempts on content every day. At this volume, even if Meta were able to make content decisions with 99% accuracy, it would still make one million mistakes a day. In this respect, while a content review system should treat all users fairly, the cross-check program responds to broader challenges in moderating immense volumes of content.

According to Meta, making decisions about content at this scale means that it sometimes mistakenly removes content that does not violate its policies. The cross-check program aims to address this by providing additional layers of human review for certain posts initially identified as breaking its rules. When users on Meta's cross-check lists post such content, it is not immediately removed as it would be for most people, but is left up, pending further human review. Meta refers to this type of cross-check as "Early Response Secondary Review" (ERSR). In late 2021, Meta broadened cross-check to include certain posts flagged for further review based on the content itself, rather than the identity of the person who posted it. Meta refers to this type of cross-check as "General Secondary Review" (GSR).

In our review, we found several shortcomings in Meta's cross-check program. While Meta told the Board that cross-check aims to advance Meta's human rights commitments, we found that the program appears more directly structured to satisfy business concerns. The Board understands that Meta is a business, but by providing extra protection to certain users selected largely according to business interests, cross-check allows content which would otherwise be removed quickly to remain up for a longer period, potentially causing harm. We also found that

Oversight Board | Independent Judgment. Transparency. Legitimacy.

Meta has failed to track data on whether cross-check results in more accurate decisions, and we expressed concern about the lack of transparency around the program.

In response, the Board made several recommendations to Meta. Any mistake-prevention system should prioritize expression which is important for human rights, including expression of public importance. As Meta moves towards improving its processes for all users, the company should take steps to mitigate the harm caused by content left up during additional review, and radically increase transparency around its systems.

### Key findings

The Board recognizes that the volume and complexity of content posted on Facebook and Instagram pose challenges for building systems that uphold Meta's human rights commitments. However, in its current form, cross-check is flawed in key areas which the company must address:

**Unequal treatment of users.** Cross-check grants certain users greater protection than others. If a post from a user on Meta's cross-check lists is identified as violating the company's rules, it remains on the platform pending further review. Meta then applies its full range of policies, including exceptions and context-specific provisions, to the post, likely increasing its chances of remaining on the platform. Ordinary users, by contrast, are much less likely to have their content reach reviewers who can apply the full range of Meta's rules. This unequal treatment is particularly concerning given the lack of transparent criteria for Meta's cross-check lists. While there are clear criteria for including business partners and government leaders, users whose content is likely to be important from a human rights perspective, such as journalists and civil society organizations, have less clear paths to access the program.

**Delayed removal of violating content.** When content from users on Meta's cross-check lists is identified as breaking Meta's rules and while undergoing additional review, it remains fully accessible on the platform. Meta told the Board, that, on average, it can take more than five days to reach a decision on content from users on its cross-check lists. This means that, because of cross-check, content identified as breaking Meta's rules is left up on Facebook and Instagram when it is most viral and could cause harm. As the volume of content selected for cross-check may exceed Meta's review capacity, the program has operated with a backlog which delays decisions.

PX15324-004

Oversight Board | Independent Judgment. Transparency. Legitimacy.

**Failure to track core metrics.** The metrics that Meta currently uses to measure cross-check's effectiveness do not capture all key concerns. For example, Meta did not provide the Board with information showing it tracks whether its decisions through cross-check are more or less accurate than through its normal quality control mechanisms. Without this, it is difficult to know whether the program is meeting its core objectives of producing correct content moderation decisions, or to measure whether cross-check provides an avenue for Meta to deviate from its policies.

**Lack of transparency around how cross-check works.** The Board is also concerned about the limited information Meta has provided to the public and its users about cross-check. Currently, Meta does not inform users that they are on cross-check lists and does not publicly share its procedures for creating and auditing these lists. It is unclear, for example, whether entities that continuously post violating content are kept on cross-check lists based on their profile. This lack of transparency impedes the Board and the public from understanding the full consequences of the program.

### The Oversight Board's recommendations

To comply with Meta's human rights commitments and address these problems, a program that corrects the most high-impact errors on Facebook and Instagram should be structured substantially differently. The Board has made 32 recommendations in this area, many of which are summarized below.

**As Meta seeks to improve its content moderation for all users, it should prioritize expression that is important for human rights, including expression which is of special public importance.** Users that are likely to produce this kind of expression should be prioritized for inclusion in lists of entities receiving additional review above Meta's business partners. Posts from these users should be reviewed in a separate workflow, so they do not compete with Meta's business partners for limited resources. While the number of followers can indicate public interest in a user's expression, a user's celebrity or follower count should not be the sole criterion for receiving additional protection. If users included due to their commercial importance frequently post violating content, they should no longer benefit from special protection.

**Radically increase transparency around cross-check and how it operates.** Meta should

PX15324-005

Oversight Board | Independent Judgment. Transparency. Legitimacy.

measure, audit, and publish key metrics around its cross-check program so it can tell whether the program is working effectively. The company should set out clear, public criteria for inclusion in its cross-check lists, and users who meet these criteria should be able to apply to be added to them. Some categories of entities protected by cross-check, including state actors, political candidates and business partners, should also have their accounts publicly marked. This will allow the public to hold privileged users accountable for whether protected entities are upholding their commitment to follow the rules. In addition, as around a third of content in Meta's cross-check system could not be escalated to the Board as of May-June 2022, Meta must ensure that cross-checked content, and all other content covered by our governing documents, can be appealed to the Board.

**Reduce harm caused by content left up during enhanced review.** Content identified as violating during Meta's first assessment that is high severity should be removed or hidden while further review is taking place. Such content should not be allowed to remain on the platform accruing views simply because the person who posted it is a business partner or celebrity. To ensure that decisions are taken as quickly as possible, Meta should invest the resources necessary to match its review capacity to the content it identifies as requiring additional review.

PX15324-006

# PX15344



VOLUME 3 | NUMBER 1 | SPRING 2007

# Competition Policy International

## Market Definition: Use and Abuse

*Dennis W. Carlton*

Copyright © 2007
eSapience, Ltd.
Published in *Competition Policy International* (print ISSN 1554-0189, online ISSN 1554-6853), Spring 2007, Vol. 3, No. 1.
*Competition Policy International* is a free publication. To order or download additional copies, visit eSapience.org.

Electronic copy available at: http://ssrn.com/abstract=937061

PX15344-001

# Market Definition: Use and Abuse

## *Dennis W. Carlton*

Market definition is a crude though sometimes useful tool for identifying market power. The ambiguity in what analysts mean by market power (price above marginal cost, or excess profits) cannot be resolved by market share. When used to analyze a merger or U.S. Sherman Act Section 2 case, it is not just the level of market shares, but also the changes in market shares that are relevant to calculate whether any increase in market power occurs. Despite this, in Section 2 cases courts often use market definition to figure out whether market power exists, a question that can be especially problematic to answer by using market definition. In Section 2 cases, the full antitrust analysis is difficult because any increase in market power typically has to be weighed against any benefits of the alleged bad act. The procedure for defining a market in a merger case or Section 2 case can be rigorously described, but the information required to implement the procedure is typically unavailable. Few analysts (or courts) follow the rigorous procedure in either merger or Section 2 cases. Instead, most markets are defined with some guidance from theory and some qualitative knowledge. Econometric studies using market definition may be helpful both in testing various definitions and in understanding the economic consequences of either the merger or the bad act.

My view is that the definition of a market and the use of market shares and changes in market shares are at best crude first steps to begin an analysis. I would use them to eliminate frivolous antitrust cases when shares are low, but would use them cautiously for anything else. Their usefulness in Section 2 cases is especially weak. Despite their limitations, when they can be used to eliminate frivolous antitrust cases, that use can contribute enormous value to society.

The author is Professor of Economics, University of Chicago, Research Associate at the National Bureau for Economic Research in Cambridge, MA, and Deputy Assistant Attorney General at the U.S. Department of Justice. He thanks Thomas Barnett, David Evans, Kenneth Heyer, James O'Connell, Richard Schmalensee, Hill Wellford, and Gregory Werden for helpful discussions. The views expressed in this paper do not necessarily represent those of the Department of Justice.

Electronic copy available at: http://ssrn.com/abstract=987061

PX15344-002

Dennis W. Carlton

# I. Introduction

Market definition and the market shares based on it continue to be a central focus of many antitrust cases. This is so despite the well understood limitations of such a methodology in providing an accurate guide to the competitiveness of an industry. The simplicity of the methodology is both its strength and weakness. Its strength is that it is easy to understand and seems intuitively correct—high market shares indicate that competition is weak, while low ones indicate the reverse. The weakness of the methodology is its failure to identify when high market shares may in fact not convey accurate information about an industry's competitiveness, or conversely when low market shares can mask a lack of competition. Although some may call for the elimination of the methodology as an analytic tool because of its limitations, its great strength is that it may prevent decisionmakers from making egregious errors. I think its best use is to provide safe harbors so that firms in relatively competitive industries are not harassed with senseless antitrust suits and, if they are, such suits can be dispensed with at summary judgment.

A "market" can be rigorously and precisely defined quantitatively, but the information to do so is typically not available. Instead, markets are often defined based on qualitative information, leading to the possibility of errors. I make some practical suggestions to mitigate such errors. When markets are correctly defined, it is the change in market shares that is central to the antitrust analysis, though this is not how courts typically use market definition and shares to analyze cases that are brought under Section 2 of the U.S. Sherman Act (Section 2 cases). Unfortunately, there is only a weak link between change in market share and change in competitive performance, and that is why market definition and the use of market shares are very crude tools of analysis. That is why their best use is as safe harbors to quickly screen out frivolous cases from those where the economic forces governing industry behavior need to be carefully studied. But, I explain why even this use of market definition and market shares can be problematic in Section 2 cases.

Although market definition, together with the calculation of market shares, is a crude methodology, if it is to be used, there are certain logical principles that one should follow. Otherwise, this methodology will become even cruder or, worse yet, misleading. Once one has defined a market, one must understand why market shares are a very imprecise way of characterizing competition and are, at most, the beginning point for an analysis, not the endpoint. The government agencies responsible for antitrust, the U.S. Federal Trade Commission (FTC) and U.S. Department of Justice (DOJ), recognize this limitation—it is explicit in the *Horizontal Merger Guidelines*, for example—but courts often have less experience in antitrust matters and that can create problems with the use of market shares.[1]

---

1　*See* U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines (1992, revised 1997) *available at* http://www.ftc.gov/bc/docs/horizmer.htm.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-003

This paper is organized as follows. Section II explains the purpose of market definition, namely the identification of "market power", a term whose meaning is often ambiguous. The section explains that it is the change, not the level, of market power that is relevant in most antitrust cases. Despite this, most single-firm conduct (hereinafter Section 2) cases focus on the level of market power, a calculation for which market definition surprisingly turns out to be particularly problematic.[2] Section III explains how economic theory combined with applicable assumptions tells us precisely what we want to know about the economic effect of mergers, cartels and various types of Section 2 behavior. Using Section III as a framework, Section IV explains the economic principles underlying market definition and market share analysis, emphasizing the sometimes extreme information requirements one must have to define markets, or lacking that information the arbitrariness of market definition. This analysis naturally leads to a discussion of the limitations of market definition and market shares as tools to use to arrive at the correct answer. It pays special attention to feasibility of implementation, and discusses merger and Section 2 cases separately. Section V explains how market definition can be a useful research tool, while Section VI discusses some common mistakes made in applying market definition. Section VII describes how one would apply market definition in two complicated settings: one where research and development (R&D) is central and the other where goods are interrelated as complements, such as in two-sided markets where different market participants exert strong effects on each other. Section VIII concludes with a discussion of how the best use of market definition and market shares is as a safe harbor.

## II. What Is the Purpose of Market Definition?

This section makes four points. First, it answers what the goal of market definition is, namely to measure market power. Second, it explains an ambiguity in the definition of market power. Third, it explains why it is the change in market power, not the level of market power, that is relevant to most antitrust analyses. Finally, it explains the limitations of using predicted changes in market shares to estimate the change in market power.

Markets are defined so that when one calculates the share that a firm (or group of firms) comprises, one can assess whether that firm has significant market power. Roughly speaking, "market power" means that the industry's behavior deviates from perfect competition. One standard definition of market power is the ability to set price profitably above the competitive level, which is usually taken to mean marginal cost. For this definition to make sense there must be a possibility that competition could establish the competitive level. Let's suppose that is so—for example, consider an industry where there are constant returns to

---

2  Some of what I label single-firm conduct cases (e.g., tying, vertical restraints) are covered by Section 1 of the Sherman Act. I mean to include those cases when I refer to Section 2 cases.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-004

scale (it costs C to produce each unit) and many firms. We can contrast price in that industry to an industry with only one (or a few firms) and ask whether the price in the latter case is above the competitive price, C. If it is, we can then ask whether the deviation is big enough to be considered a significant deviation from the competitive level to justify an antitrust concern that could trigger an antitrust intervention as, for example, when the market power is created by merger or some other action. Of course, any such intervention carries the risk that the decision will be in error and will do more harm than good.

As far as I know, there are no judicial standards to determine how large a deviation of price from C constitutes significant. The consequence of declaring a specific deviation level as "significant" is that antitrust decisions based on market shares will be made and therefore a decision theoretic framework in which one trades off the expected costs of type I and type II errors is the only one capable of answering the question of what constitutes a significant level. I have never seen any quantitative attempt to use such a framework to answer the question of how large a deviation of price from C should be considered significant. Furthermore, there is a time dimension that must also be analyzed. For how long should a price elevated above marginal cost persist before we attach the label significant? Answers to these questions can be specified based not on any such quantitative assessment but based on what seems reasonable. So, for example, Areeda and Turner suggest using a 5 percent threshold in a discussion about what might constitute a significant price increase.[3]

Before readily accepting this 5 percent threshold, I note that numerous attempts to measure the gap between price and marginal cost estimate gaps in excess of 5 percent for industries that many would consider to be relatively competitive in that there is free entry and several firms. Roughly speaking, a monopolist facing a demand elasticity of 20 would price at about 5 percent above constant marginal cost, but many (most?) firms face much lower elasticities. Perhaps, in light of this, 5 percent may be okay to use to determine whether the change in market power is significant but a higher number may be appropriate to determine whether the level of market power is significant.[4]

---

3   Philip E. Areeda & Donald F. Turner, 2 Antitrust Law 347 (vol. 2, 1978). Notice that if one uses a 5 percent price deviation (or any specified percent) as a criterion for significant deviation, then there can be a logical problem. Consider the following. Firm A and Firm B merge in New York City causing prices to rise there from $100 to $105, or a five percent increase. The product is also shipped for $100 to Chicago and therefore, the Chicago price rises from $200 to $205, a two and a half percent price increase. Is it sensible to say that a New York City consumer has suffered a significant loss, but not the Chicago one, if each consumes one unit of the product? The problem arises because a percent criterion does not measure the deadweight loss to society, nor does it measure the harm to consumers.

4   Marginal cost can be difficult to estimate. If one approximates it as average variable cost, then one may erroneously measure that there is a gap between price and marginal cost when there is none as, for example, when price equals marginal and average cost and the marginal cost is upward sloping. In this situation, average variable cost underestimates marginal cost. Similarly, economic profit, which requires the calculation of a competitive rate of return, can be difficult to estimate.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-005

Suppose that unlike the previous example in which a competitive price could be defined, the industry is one in which there cannot be an equilibrium where price equals marginal cost. A good example is an industry in which there is a fixed cost of entry and then Cournot competition. Suppose further that there is free entry. The free entry condition guarantees that (economic) profits are zero (i.e., a competitive rate of return is earned on capital), but price will exceed C, marginal cost. There is often confusion between pricing at marginal cost and earning zero profits. In most industries, there is a deviation from perfect competition in that price exceeds marginal cost, yet free entry can still guarantee zero (expected) economic profit. Suppose profits are zero yet price exceeds marginal cost. Should we attach the label "market power" to describe this circumstance, or should we reserve that label for the case in which price exceeds marginal cost and profits are positive? Alternatively, as my textbook suggests, should we label the first situation as "market power" and the second as "monopoly power"?[5] Courts and analysts often fail to specify what definition they are using.

The fact that typically it is difficult to calculate either marginal cost or economic profits foreshadows that the direct determination of the level of market power is going to be hard no matter what definition is used. That is one reason why analysts use market share as a proxy for market power, but, as we will soon see, it may be no easier to define markets to calculate market share than it is to measure market power directly.

THE FACT THAT TYPICALLY IT IS DIFFICULT TO CALCULATE EITHER MARGINAL COST OR ECONOMIC PROFITS FORESHADOWS THAT THE DIRECT DETERMINATION OF THE LEVEL OF MARKET POWER IS GOING TO BE HARD NO MATTER WHAT DEFINITION IS USED.

Although we have been discussing the level of market power, it is the change in market power (which includes any changes in future market power or, alternatively stated, in the durability of market power) that is (or should be) the focal point of most antitrust analysis. (This is not quite right. It is the change in welfare that should be the ultimate focus. But changes in market power can be informative about changes in welfare.) In a merger setting[6], it is a comparison between the market power in two different industry structures that one must analyze in order to predict whether price will rise post-merger. For example, all else equal, is a market where there are five firms with shares 15, 15, 20, 25, 25 significantly less competitive than a market in which the first two firms merge so that there are only four firms with shares 30, 20, 25 and 25? This strikes me as a well-posed question. Notice that the pre-merger level of market power is irrelevant for answering the question. It is only the change in market power that matters. One can answer a question about the change even though

---

5  DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 93 (4th ed. 2005).

6  Cartels and mergers involve similar considerations. For simplicity, I focus on mergers throughout the paper.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-006

one does not know the initial level. Indeed, one can see why a market power definition based on price ($P$) in excess of marginal cost is particularly convenient to use here. Let $P_2$ be the post-merger price and $P_1$ be the pre-merger price. The change in market power equals ($P_2 - C$) minus ($P_1 - C$) or $P_2 - P_1$. As long as C is unchanged as a result of the merger, the change in market power is measured as the change in prices. Notice how this approach focuses on the change in price (in the absence of other changes). To the extent that the merger creates efficiencies, so that the marginal cost of the merging parties will fall, this will make an analysis that focuses only on price in a hypothetical where costs do not change a conservative one in the sense that if a merger does not significantly raise price under the assumption of unchanged costs, one would reach the same conclusion if one took further account of any cost efficiencies.[7]

Consider now a Section 2 case in which the issue is whether some alleged bad act (e.g., exclusive dealing) harmed competition. How should one measure whether there is significant market power? Should one measure it before or after the alleged bad act? Following the same logic as in the merger case, one should focus on the change in market power as a result of the alleged bad act and ask how much market power exists absent the alleged bad act and compare it to the market power that exists with the alleged bad act, keeping all else constant. The conceptual difficulty is that the alleged bad act may have some efficiency justification, but price must typically rise in order to create the incentives to generate the efficiency. Indeed, an increase in market power may be desirable if it enables the firm to provide a higher quality product.[8]

For example, exclusive territories can provide incentives for firms to engage in the provision of services by giving them the ability to raise price as a result of the elimination of competition. Therefore, the product characteristics (including service) are not being held constant when one compares the price with and without the alleged bad act. This means that even if the alleged bad act is desirable in that it creates incentives for the provision of valued services to at least some consumers, and even if there are perfect substitutes to the product both with and without services, the analyst who looks at only price will mistakenly conclude that market power is created even though none is. The analyst concludes this

---

7   Suppose price rose but quality improved. Although the next section shows how to handle this case precisely, for purposes here one should focus on the quality-adjusted price. Suppose price falls, but not as much as marginal cost. Consumers and society gain, so there should be no antitrust concern even though market power has increased. Suppose price rose, but some costs (e.g., fixed costs) fell. Then one would have to do a more complicated analysis to determine whether total welfare rose if one believes that total welfare, not just consumer surplus, should be the proper objective of antitrust. These examples illustrate that it is the change in welfare, not market power, which is the ultimate focus of analysis. *See* Dennis W. Carlton, Does Antitrust Need to Be Modernized? (Economic Analysis Group, Discussion Paper No. 07-3, 2007) and Ken Heyer, *Welfare Standards and Merger Analysis: Why Not the Best?*, 2(2) Competition Pol'y Int'l 29 (2006).

8   I use the term "product quality" broadly to include not just the physical characteristic of the product, but also the way it is sold.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-007

because the analyst observes a lower price in the absence of the alleged bad act and, therefore, incorrectly reasons that the bad act created additional market power. This is why Section 2 cases can be much more complicated than a typical merger case. One expects a price increase as a result of the alleged bad act if the alleged bad act harms competition, but one could also expect a price increase even when the alleged bad act does not harm competition but improves product quality. Therefore, looking only at the behavior of price before and after the alleged bad act does not answer whether the bad act really is harmful. One must dig further and examine, for example, in the case of exclusive distribution, whether some consumers are served better and whether rival manufacturers can still obtain efficient distribution. It is typically hard to trade off the benefit to some consumers from the improved service against the harm to others as a result of the elevated price. Moreover, especially when the services have been provided for many years, it would be wrong to postulate that a reduction in price from elimination of the special services associated with exclusive territories will not harm consumers. For the short term, that may be so, but eventually as the failure to educate consumers mounts over time, the long-run impact on demand could be substantial.

Despite the logic of looking at the change in market power, courts in Section 2 cases often inquire about only the level of market power. In doing so, they are trying to create a safe harbor and shortcut the need to investigate whether market power increased and harmed competition. I discuss this point more fully in Section IV.

Because it is change in market power that is (or should be) the focus of an antitrust analysis, when one is using market shares as a proxy for market power one must focus on the change in shares that results from some particular antitrust decision. But it may be hard to predict the change in share. For example, if Firm A merges with Firm B, the industry will be more concentrated as a result and the analysis measures how that concentration changes as a result of the merger. The concentration measure is based on the pre-merger market shares of the individual firms as in, for example, the Herfindahl-Hirschman Index (HHI) index of concentration, which equals the sum of the squared market shares of firms. So, if there are five firms, each with a market share of 20, and two merge so that the new firm has a share of 40, the HHI rises from 2000 to 2800. We then ask whether that increase warrants concern that price might rise.[9] Notice that I have assumed that the post-merger share of the merged firm equals the sum of the pre-merger shares. That may be so the day after the merger, but need not remain so in the new equilibrium post-merger. When it is not so, then this method will be inaccurate as a guide to predicting how price will change based on how industry

---

9   In answering that question, the linkage between a change in HHI and a change in price could also depend on the level of HHI.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-008

concentration (which depends on market shares) will change.[10] And, of course, this analysis presumes that a change in concentration will cause a change in price, a relationship that may not be true. Similarly, in a Section 2 context, one should be interested in answering how the alleged bad act alters the market share of the firm engaged in the action. If there are not observations on market share both before and after the alleged bad act began, this calculation could be a source of difficulty.

## III. Getting It Exactly Right

As a theoretical matter, if one knows the structure of demand for a product and all its substitutes, knows the cost curves of firms that currently produce (or could produce) the product, and knows the game that describes the competitive environment (e.g., static Cournot, static Bertrand, dynamic trigger strategies), then one can write down a model whose equilibrium reflects the outcome of all these economic forces. This is of course a tall order, but it is critical to know what one would want to measure before turning to proxies, such as market share.

Consider the case in which a merger is to occur. Suppose that Firm A is a dominant firm facing a competitive fringe with supply curve $S^*(p)$. Firm A wishes to merge with a large segment of the competitive fringe so that after merger the competitive fringe will have supply of only $S^{**}(p)$ where $S^{**} < S^*$ for all $p$. If industry demand is $D(p)$, then the demand pre-merger facing the dominant firm is $D(p) - S^*(p)$ and the profit maximization yields that the pre-merger price $p^*$ is determined by:

$$\frac{p^* - mc}{p^*} = \frac{-1}{E^*} , \tag{1}$$

where $mc$ = marginal cost of Firm A, $E^*$ = elasticity of demand facing Firm A which equals

$$\frac{1}{s}E^D - E^S\left(\frac{1-s}{s}\right),$$

where $E^D$ = demand elasticity of $D(p)$, $E^S$ = supply elasticity of $S(p)$, and $s$ = share of sales of Firm A.

Landes and Posner use Equation (1) to develop insights about how to define markets in their seminal 1981 paper.[11] It is of course easy to see that the deviation of price from marginal cost depends not only on share $s$ (in the way intuition sug-

---

10  This method can be adapted as long as one can use pre-merger shares to predict post-merger shares. I show how this can be done in the next section.

11  William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-009

gests: the firm has more market power when $s$ is larger), but also on $E^D$ and $E^S$, elasticity concepts that depend on how demand or supply changes as price changes. A share will not necessarily reflect either of these elasticities accurately.

If Firm A merges, then the exact calculation of how price changes is the difference between the pre-merger price $p^*$ and the post-merger price $p^{**}$ which is calculated exactly as in Equation (1) but with $S^{**}(p)$ replacing $S^*(p)$. We see that $p^{**}$ will depend on not just how the merger affects the shares of the dominant firm but also on supply and demand elasticities. We could enhance the model and recognize that the merger could lower Firm A's marginal cost, and that could easily be reflected in the calculation of $p^{**}$.

We can expand the analysis to include market structures other than a homogeneous product with a dominant firm and competitive fringe. Suppose, for example, that each firm $i$ faces demand $d_i(p_1, p_2, \ldots, p_n)$ where $i = 1, 2, \ldots, n$ is a listing of all products. If we know each firm's costs, and know the competitive game (e.g., Bertrand), we can solve for equilibrium prices pre-merger and post-merger. One does not necessarily need to know the cost curves if one is willing to specify the game. For example, if the game is Bertrand, then one can use profit maximization to derive an equation like (1), and calculate $mc$ from $p$ and the elasticity. This is a now standard type of merger simulation used to estimate so-called "unilateral" effects.

There is no reason to limit these simulations to cases where Bertrand is the competitive game, where the competitive game remains unchanged pre- and post-merger, where product quality is unchanged, or to static situations. If one allows for dynamic (repeated) games, one can address what the *Merger Guidelines* call "coordinated effects". All of these complications are difficult to implement, but at least theoretically, these models allow the analyst to focus on what are the underlying forces that matter in influencing how the price will change as a result of the merger. These models show exactly why in the case of merger, market shares or changes in them, however measured, cannot possibly be anything but a crude guide to market power or its change, or to the change in price resulting from a merger.

THESE MODELS SHOW EXACTLY WHY IN THE CASE OF MERGER, MARKET SHARES OR CHANGES IN THEM, HOWEVER MEASURED, CANNOT POSSIBLY BE ANYTHING BUT A CRUDE GUIDE TO MARKET POWER OR ITS CHANGE, OR TO THE CHANGE IN PRICE RESULTING FROM A MERGER.

Now consider Section 2 cases. In Section 2 cases, again the theoretically correct model can be described, though it may be difficult to implement in practice. Let $a$ be the alleged bad acts(s) and let $a^*$ be the act(s) that would occur if $a$ were not allowed. Then, the analyst needs to compare $p(a)$ to $p(a^*)$ where $p$ is the vector of all prices of the relevant products and $a$ and $a^*$ are actions that influence demand (e.g., selling effort) and costs. (The acts could also influence the types of competitive game.) A full analysis of the competitive

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-010

consequences of act *a* as compared to act *a*\* requires an analysis of not just prices, but also how the different acts affect the quality of the product to (some) consumers. For example, if *a* represents vertical restrictions designed to increase sales information to the consumer, then the demand curve for a firm will be affected by whether *a* or *a*\* occurs. Similarly, the supply capabilities of the firm and its rivals could depend on the firm's actions. Taking these effects into account one can then calculate, at least theoretically, whether banning *a* and replacing it with *a*\* leads to an increase in welfare.[12]

Let me summarize this section. Although perhaps difficult to implement empirically, theoretical models produce clear results about how to calculate the effect of mergers or alleged bad acts under Section 2 on prices and consumer plus producer welfare. I do not mean to suggest that the assumptions underlying the models are not contentious, or that these models can easily be implemented.[13] I do mean that theory tells us how price and welfare will be determined and therefore theory tells us how to calculate the effect of either mergers or Section 2 behavior.

There is no model that I am aware of where market share (or more precisely its change) is the only variable that matters in predicting the change in either price or welfare. Moreover, it is clear from most models, especially those involving differentiated products, that there is no theoretical need even to define a market to get to the correct answer. At best, market definition and market shares can be used as a shortcut to start the analysis, especially when the correct analysis is hard to do.

---

12 Even if in the context of a particular case one could show that an act caused a decline in welfare, it could still be incorrect to create antitrust liability for the act. The goal of antitrust law should be to create a decision process that leads to maximization of expected welfare. Since the legal process consumes resources and since courts (and economists) can be wrong, it is sensible to create safe harbors for certain types of conduct, even if an economist can show that it is possible that the conduct could under certain circumstances harm welfare. For example, even though it is well-known that above-cost pricing can theoretically harm competition by driving inefficient rivals out of business, there is a safe harbor for such behavior. Even though it is well-known that the choice of product variety or advertising can theoretically fail to maximize welfare, the choice of product quality or advertising typically does not subject a firm to antitrust inquiry. Such behavior falling within safe harbors is sometimes called "competition on the merits". Choosing the appropriate safe harbors is an exercise that should depend on the frequency with which a practice is used in ways that harm society compared to its frequency of use in ways that benefit society, the ability of courts to identify the two uses, the harms from incorrect identifications, and the benefits from correct identifications. As experience with the effect of an act accumulates, the safe harbors should be adjusted. The calculation described in the text of the net effect of an act on social welfare should be done only for those acts that fall outside safe harbors. (A logic similar to that for creation of safe harbors applies to the creation of per se violations.)

13 For a critique of how these models have been used, *see* Dennis W. Carlton, *The Relevance of Antitrust Policy of Theoretical and Empirical Advances in Industrial Organization*, 12 Geo. Mason L. Rev. 47 (2003) and Dennis W. Carlton, *Using Economics to Improve Antitrust Policy*, 2004(2) Colum. Bus. L. Rev. 283 (2004).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-011

Merger cases are typically much easier to analyze than Section 2 cases. Merger cases will usually be handled by answering whether price will rise as a result of the merger. Section 2 cases will usually be handled by asking whether the price increase is offset by some beneficial product change. A focus on the level of market power (rather than its change) can allow a court to provide a safe harbor for either merger or Section 2 behavior if the level of market power after the merger or alleged bad act is low. Courts often use market share to decide that market power is low and we now turn to an examination of whether they can do that in a rigorous way.

## IV. Market Definition

We have seen that the theoretically correct analysis may be difficult to implement empirically. In such cases, it is reasonable to resort to a simpler analysis as a first step and that is exactly what market definition and the use of market shares is designed to do. I will discuss merger cases separately from Section 2 cases because, as I have already explained, merger cases are logically easier to analyze.

### A. MARKET DEFINITION IN MERGER CASES

#### 1. Mergers: Theory of Market Definition

In a merger case, one uses market shares to calculate industry concentration so as to determine the level of industry concentration and the change in industry concentration as a result of the merger. The implicit assumption is that increases in industry concentration lead to increases in price. (The effect of any particular change in concentration could depend on the level of concentration.) A typical starting assumption is that the post-merger share of the merged firm equals the sum of the pre-merger shares of the merging firms. This of course may not be so as, for example, when entry is easy. In such a case, the use of pre-merger market shares in this way may be inappropriate. But let's suppose that we are in an industry where post-merger the share of the merged firm is well predicted by the sum of the pre-merger shares of the merging firms, so that the use of pre-merger market shares is sensible. There are two virtually equivalent ways to define markets.

One is to rely on demand substitution to identify products and the geographic areas where they are sold and then separately to consider as market participants all those who would supply the product at the current price plus, say, 5 percent. This is roughly the approach of the *Merger Guidelines*. A second and virtually equivalent approach is to combine this procedure into one step and define the market to include all those products and areas that constrain prices of the product under analysis from either the demand or supply side. Product A is a demand substitute for Product B if a price increase in B causes consumers to substitute to A. Product A is a supply substitute for Product B, if a price increase in B causes firms that produce A to shift their capacity to the production of B.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-012

To see the difference between the two alternative ways of defining a market, consider the following example. There are two products golf clubs for right-handed golfers (right-handed golf clubs) and golf clubs for left-handed golfers (left-handed golf clubs). Consumers do not substitute between them, so there is no substitution on the demand side. For simplicity, assume that initially firms make either right-handed or left-handed golf clubs. A monopolist of right-handed golf clubs could profitably raise price by 5 percent above current levels as a result of a merger of all current and potential producers of right-handed golf clubs. Firm A makes left-handed golf-clubs, but could and would switch to producing right-handed golf clubs if the price of right-handed golf clubs rose by 5 percent, holding constant the price of left-handed golf clubs, so there is supply substitution. Under the *Merger Guidelines'* approach, the market is right-handed golf clubs, but when calculating shares, one considers all those right-handed golf clubs that would be produced by Firm A and other firms if only right-handed golf club prices rose 5 percent.[14] Under the second approach, the market would consist of right-handed golf clubs plus left-handed golf clubs (somehow appropriately weighted, perhaps by value), and shares would be calculated accordingly. I will follow the first approach, but recognize that the second approach can also be a sensible way to proceed. Since market shares are only crude proxies for market power, these roughly equivalent approaches for calculating shares should not differ and, if they do, one should delve deeper into the underlying economics.[15]

The *Merger Guidelines* recognize the need to define a time dimension, a magnitude of increase, and a benchmark price to approach the question of whether a merger raises an antitrust concern by increasing market power. For example, one could ask whether, after the merger, prices could be profitably increased above current levels[16] by a significant amount (e.g., 5 percent) for a significant time (e.g., 2 years). The *Guidelines* define a market to be consistent with this

---

14  Typically, one uses the likely capacity of the firm to produce a product as a measure of its market participation. Needless to say, capacity can be hard to measure or even define. As a technical matter, this artifice of holding constant all prices of products outside the market need not be a correct description of what would happen if the price of the product under analysis rose. For example, in the example in the text, the price of left-handed golf clubs could rise as left-handed golf club producers start producing right-handed golf clubs, causing less switching to right-handed golf clubs than in the text. This strikes me as one of many details that should not matter to the analysis and if they do, the analyst must think hard about the underlying economics using the theory of the previous section.

15  Proxies obviously can lead to erroneous conclusions under certain hypotheticals. I am not saying that these two approaches always yield the same result, but if they don't one should reexamine the underlying economics to make sure it is not a peculiarity of the proxy that is generating a strange result. *See* Jonathan B. Baker, *Market Definition: An Analytical Overview* (Nov. 2006) (mimeo, Am. Univ. Wash. Coll. of Law), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=854025.

16  The *Merger Guidelines* use the expected future price (absent merger) if that can be predicted to be different from the current price. They also indicate they may use the competitive price if the current price exceeds it. The logic for the latter approach presumably is that the competitiveness of the industry is expected to increase in the future.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-013

phrasing of the issue. A market is defined by thinking about a hypothetical monopolist. A monopolist of all of the products in a market would raise price profitably above current levels by, say 5 percent, for some time, say two years, on the assumption that the prices of all the products excluded from the market remain unchanged. In this thought experiment of using a hypothetical monopolist, there is not necessarily a unique set of products that determines the market, nor is there an unambiguous methodology of how to raise the price of each product in the market (should each go up by 5 percent or just on average rise by 5 percent?).[17] These strike me as details that again, if they matter, would cause me to pause about the usefulness of the proxy of market shares and to delve more deeply into the underlying economics as described in the previous section.

Aside from determining which products belong in the market, one must determine the geographic scope of the market. I would handle this in the same ways as product market definition is handled: by treating location as a product characteristic and asking the same type of questions as one does for inclusion of a product in the market. For example, apples in Chicago are in the same market as apples in Milwaukee, if an increase in the price of apples in Chicago would induce buyers to switch to buying apples in Milwaukee in such quantities as to defeat a price increase. Suppose no buyer would literally go to Milwaukee to buy these apples, but instead that DC Transport would pick them up and bring them to sell in Chicago. Technically, DC Transport has become a market participant in the market for apples in Chicago. Alternatively stated, there is supply substitution between apples in Milwaukee and those in Chicago. I would treat these two cases—one involving the buyer traveling, the other involving DC Transport traveling—in the same way. One could define the market to be apples in Milwaukee and Chicago, or one could define it using the other approach, in which the market is only Chicago, but DC Transport is a participant in that market. Again, this seems like a detail.[18] If it matters, one should delve more deeply into the underlying economics.

## 2. Mergers: Practical Implementation of Market Definition

The theory underlying market definition for mergers is logically coherent. A separate issue is whether it is able to be implemented. It is possible to describe an

---

17  One could add the condition, as the *Merger Guidelines* do, that one use the smallest market and when it is necessary to add products to the candidate market one adds products to the market sequentially with the closest substitute product to the candidate market being added. Regarding which price to focus on, one could focus on the price of the products of the firms involved in the transaction when asking whether price will rise and one could assume that the hypothetical monopolist sets the price of each product in the market optimally. I return to these points in the next section.

18  The *Merger Guidelines* define the geographic area based on the location of production, not consumption. Although this initially may seem odd, it really is not. Because there is an assumption of no geographic price discrimination in this part of the *Guidelines*, they come to the same result as I do above. Notice that the prices in Chicago and Milwaukee become linked in my example.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-014

econometric procedure to define markets.[19] For any set of products $(a_1, a_2, \ldots, a_n)$, estimate econometrically a demand system in which the demand for product $a_i$ depends on its own price and that of all other products. Suppose that Product 1 is the product under analysis, such as when two producers of Product 1 want to merge, and that we have ordered the products so that Product 2 is the closest substitute for (Product 1) and so on.[20] Now, assuming costs are known, calculate the price that a monopolist of just $a_1$ would charge. If that price exceeds the current average price for $a_1$ by, say, 5 percent, stop. If not, add $a_2$, and calculate the optimal prices for $a_1$ and $a_2$. If (by some measure) the average price of $a_1$ and $a_2$ rises above current levels by, say, a 5 percent, stop. If not, continue. In this way, a market can be defined.

This econometric approach requires a tremendous amount of information about a demand system, information that is typically not available. Moreover, if it were available it seems odd to use it only in this way. The reason is that with such a detailed demand system available, it might well make sense to calculate directly the effect of the proposed merger. This can be done by a merger simulation, as described in the previous section, where one uses the demand system combined with various assumptions of the competitive game (e.g., Cournot or Bertrand) and perhaps cost, to predict what the new pricing will be if there is a merger.[21] This direct approach requires no market definition, but utilizes all the same information required to define a market. It is a much more refined way of making predictions on pricing than one based solely on market share. Indeed, this methodology can also account for the fact that products outside the market can affect the price under analysis and the prices of those products may themselves change in response to the merger, in contrast to the procedures for market definition under the *Merger Guidelines*.[22] Market definition, with its dichotomous "in" or "out" classification (is a product in or out of the market?), is a crude simplification; a merger simulation can be a more accurate approach that automatically takes account of demand and supply substitutability.

---

19  *See, e.g.,* GREGORY J. WERDEN, MARKET DELINEATION ALGORITHMS BASED ON THE HYPOTHETICAL MONOPOLIST PARADIGM (Economic Analysis Group, Discussion Paper No. 02-8, 2002), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=327282.

20  It is a bit tricky to define exactly what one means by closest substitute to $a_1$. One could say it is the product $a_2$ such that the joint pricing of $a_1$ and $a_2$ allows the price of $a_1$ to be the highest. When the market consists of more than one product, it is less clear what a unique sensible definition is and differences in this definition can lead to differences in the products included in the market. Moreover, the procedure of adding the closest substitute does not necessarily lead to the smallest market in which a hypothetical monopolist would raise the price of $a_1$ by 5 percent. Again, these strike me as details that if they mattered to the analysis then one should examine more deeply the underlying economics.

21  As discussed in the previous section, one could at least theoretically assume a repeated game (and so deal with a coordinated effects analysis). Although possible in theory, such simulations are not commonly used in antitrust matters, unlike merger simulations based on static games (e.g, Bertrand).

22  The *Merger Guidelines* would look at price changes in other products, entry responses, and other supply responses, but after the market is defined.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-015

The drawback of merger simulation is that it requires not only extensive demand estimation, but also assumptions about how firms will compete. Even if one has information on the former, many are uncomfortable about assumptions on the latter.[23]

There are really two responses to this reluctance to use merger simulation. The merger simulation, when done under different assumptions, is really a way of revealing to the analyst the constraints on pricing that the demand system imposes and makes transparent all the underlying assumptions. The different merger simulations allow the analyst to see whether these constraints hold under a variety of assumptions. Second, if instead of doing a merger simulation, one defines a market and uses pre-merger market shares to calculate the change in the HHI, one is assuming that these market shares allow one to predict the price effect of a merger. That is, the price is assumed post-merger to depend on (pre-merger) market shares in a simple way (e.g., price is assumed to depend on just the HHI). There is no such model that I am aware of that has this property. There are models in which price depends on current concentration and other things such as elasticities, but not only are those models premised on assumptions that may not be relevant to the industry under analysis, worse yet, in such models there may not be a profit incentive to merge.[24] This is all a very long way of saying that the use of changes in market shares to calculate the change in the HHI is a very crude methodology for predicting whether a merger will increase price. The use of market shares is at best viewed as a crude merger simulation, but lacks the logical consistency underlying merger simulation. Its main attractiveness is its simplicity.

But there is a further problem. I had assumed that a detailed econometric demand system together with knowledge of costs was available. When it is not, then it is not possible to delineate a market with the precision that its definition demands.[25] Instead, one attempts to use various types of evidence to do one's best to see whether the price constraining effect of one product on another will be sufficient to prevent a significant price rise. Although the clear theoretical construct of market definition can guide one, the absence of estimates of the demand (or cost) system subject this exercise to possible error and arbitrary judgments.

---

23  *See* Carlton (2003, 2004), *supra* note 12.

24  For example, in a Cournot model with constant returns to scale, one can show that *(P- C)/P = HHI/E* where *P* is price, *C* is cost, *E* is the absolute value of the industry demand elasticity, and *HHI* is the sum of squared market shares. *See* Stephen W. Salant et al., *Losses from Horizontal Merger: the Effects of an Exogenous Chance in Industry Structure on Cournot Nash Equilibrium*, 98 Q. J. Econ. 185 (1983), and Joseph Farrell & Carl Shapiro, *Horizontal Mergers: An Equilibrium Analysis*, 80 Am. Econ. Rev. 107 (1990).

25  To define a market using the hypothetical monopolist test, one must specify marginal cost. To do a merger simulation, one could also use cost information, or alternatively infer cost from the profit-maximizing conditions that emerge from equilibrium of the assumed competitive game.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-016

These errors can be mitigated by some of the types of econometric studies that I describe in the next section.

One alternative path to market definition in the absence of detailed econometric estimates of a demand system is simply to ask consumers to which products they would turn if price of the product under analysis rose by, say, 5 percent. Notice that this set of products does not satisfy the market definition under the *Merger Guidelines* because it may include products that attract so few switches that those products would not prevent a price increase. Therefore, although this method is simple, markets defined in this way will tend to be overbroad unless one includes only those products for which there is significant substitution (how much is significant?—well if I define it precisely then I am back to an approach like that of the *Guidelines*). However, consumer responses as to their switching possibilities can give one a rough estimate of demand price elasticities and cross elasticities, and those can assist in defining a market.[26]

I have not discussed critical loss analysis, because it is not an alternative method for defining markets. When done correctly (as Harris and Simons recognize)[27], it is simply a rephrasing of the hypothetical monopolist test. It asks what is the critical amount of demand that has to be lost in response to a price rise before the price rise is unprofitable. That is a question about how big the demand elasticity has to be to make a price increase unprofitable. Critical loss can help one describe this critical demand elasticity, but it is not a new analytic tool and has been misused.[28]

> THE METHODOLOGY OF MARKET DEFINITION AND MARKET SHARES IS AN EXTREMELY CRUDE WAY OF ASSESSING A MERGER'S COMPETITIVE EFFECT, ESPECIALLY SINCE MARKET DEFINITION IS USUALLY NOT BASED ON THE EXTENSIVE QUANTITATIVE INFORMATION REQUIRED TO DEFINE IT RIGOROUSLY.

The methodology of market definition and market shares is an extremely crude way of assessing a merger's competitive effect, especially since market definition is usually not based on the extensive quantitative information required to define it rigorously. The methodology can certainly be informative in many cases, but it is only the first

---

26  For a more skeptical view of the value of relying on consumer responses, *see* Ken Heyer, *Predicting the Competition Effects of Mergers by Listening to Customers*, 74 Antitrust L.J. 1 (forthcoming 2007). Another procedure to define markets is to identify products whose prices are highly correlated. Stigler and Sherwin recommend this procedure. *See* George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28(3) J. L. & Econ. 555-85 (1985). Although the procedure can sometimes be a useful way to start an analysis, it has quite serious drawbacks. *See* Carlton & Perloff, *supra* note 54, at ch. 20 and Gregory J. Werden and Luke M. Froeb, *Correlation, Casualty, and All that Jazz: The Inherent Shortcomings of Price Tests for Antitrust Market Delineation*, 8 Rev. Indus. Org. 329 (1993).

27  *See* Barry Harris & Joseph Simons, *Focusing Market Definition: How Much Substitution Is Necessary?*, *in* Research in Law & Economics 207 (Richard O. Zerbe, Jr. ed., 1989).

28  *See* Carlton (2004), *supra* note 12.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-017

step in an analysis that must delve into the economic facts of the industry. It can be a useful guide, but only if subsequent analysis confirms its message. The methodology's 0 or 1 nature (i.e., "in" or "out") together with the arbitrariness of certain decisions (e.g., why hold the price of products outside the market constant?), emphasizes its crudeness. Still, the use of market shares (or changes in them) is simple, and it can be thought of as the first step in a merger analysis. Its best use is likely to provide a safe harbor when industry concentration and shares of merging firms are low.

## B. MARKET DEFINITION IN SECTION 2 CASES

We have already discussed how the central issue in a Section 2 case is whether some alleged bad act enables additional market power to be exercised, and, if so, whether any exercise of additional market power is offset by the additional provision of valuable services made profitable as a result of the price increase. Estimating market power while adjusting for services provided can be difficult and it is even more difficult to figure out whether an increase in market power is offset by improved services—the traditional pro-competitive explanation for many alleged bad acts.

Instead of focusing on whether the alleged bad act increases market power, the courts typically focus on whether there is market power and, if so, whether the alleged bad act is justified on pro-competitive grounds. One reason, I think, for this current emphasis on the level of market power (whether it is measured before or after the bad act often seems not to be a focus of attention) is because at the summary judgment stage, a case can be thrown out if there is no market power, while it is thought to be more difficult to get the case thrown out at summary judgment if one concedes market power but defends by claiming that the action is pro-competitive. Because the courts focus on existing levels of market power, this has required markets to be defined in Section 2 cases to see whether market power exists (presumably, after the alleged bad act has occurred). My experience is that courts ask whether market power exists in the presence of the alleged bad act, a question with the potential to be answered in a misleading way if one ignores the efficiency justification for the alleged bad act, as I explained in a previous section. Moreover, such an analysis fails to consider whether the bad act creates any additional market power. Still, the procedure does have a logic because if there is no market power after the alleged bad act, then the antitrust inquiry ends.

To answer the question of whether the firm has market power, some have tried to adapt the procedure of the *Merger Guidelines* to define a market in a Section 2 context. As a logical matter, this initially seems fine with the benchmark price now no longer being the current price but rather the competitive price. So the hypothetical monopolist test to define a market is as follows: consider all those products such that a hypothetical monopolist of those products would raise price above the competitive level by, say, 5 percent. One then calculates the market

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-018

share of the firm in this market and if it is high one concludes that there is market power. But what sense does this make? Suppose the current price is $10. If one knows that the competitive price is $5, then the market definition exercise is useless! One can observe whether the current price ($10) exceeds the competitive price ($5) and the deviation is the measure of market power. There is no need to define a market and calculate market share in order to see whether the market share is so high that one can safely conclude that $10 is higher than $5. Alternatively, if one does not know the competitive price, there is no way to implement this market definition test.[29]

But a bit more analysis shows that the logic of using the competitive price as the benchmark price is not necessarily correct. In a merger case, we typically use the current price as the benchmark, not the competitive price. That is sensible because the relevant question is whether the merger will raise price from current levels. By similar logic, in a Section 2 case we should use the price that would prevail in the absence of the bad act as the benchmark price in order to define a market and calculate market shares in an effort to determine whether the firm has enough market power so that it could possibly use (or have used) the bad act to elevate price.[30] The hypothetical monopolist test for market definition in a Section 2 case should be: include all those products such that the hypothetical monopolist would raise price by 5 percent above the benchmark price, defined as the price that would prevail absent the bad act. If the firm's market share is low, the inquiry should end.[31] It may sometimes be difficult to figure out the benchmark price, though not always. For example, if the bad act has not yet taken effect, the current price can be used as the benchmark price.[32] But when, as will commonly occur, this is not the case, the analyst could have difficulty.

In this situation, one is in the uncomfortable position of realizing how arbitrary market definition can be in Section 2 cases and how this arbitrariness can lead to errors. Perhaps the best one can say is that one might look at similar firms and throw out the antitrust case if there are enough of them—but that is a cop-out

---

29  It is also correct to say that in the absence of cost information, one cannot define a market in a merger case using the *Guidelines* in the rigorous way I described earlier.

30  If possible, the expected post-bad act market share of the firm should be used. The well-known *Cellophane* fallacy arises when one uses the post-bad act price as the benchmark price.

31  If one concludes that there is market power, then as described previously, one should compare the price effect of the bad act to any efficiency effects associated with the bad act. The change in market share pre- and post-bad act may give insight into the likely price effect.

32  If the benchmark price is known and the price after the bad act is known, then, as already explained, there is no need to go to the effort to define a market. If the benchmark price is not known, one cannot define the correct market. If the benchmark price is known, but the price after the bad act is not known, then one may benefit from defining a market and asking whether the bad act is likely to allow the firm to achieve a sufficiently high market share that market power concerns arise. If not, the inquiry ends.

Electronic copy available at: https://ssrn.com/abstract=987061

**PX15344-019**

unless one can define what "similar" means. If one is able to establish a benchmark price because there is a consensus that in some areas (or time periods) there are no bad acts, one can then use econometric techniques to try to use those benchmark areas and their characteristics to calculate the benchmark price in any area. This can be a useful approach, and one I describe in the next section.

## V. Is Market Definition a Useful Tool for Understanding Market Behavior?

So far I have discussed market definition only in the context of antitrust cases, but what about as a research tool to understand economic behavior? Should economists study market definition and market shares in their academic research and if so wouldn't such studies be relevant in antitrust cases? It is undeniable that most of the current interest in market definition stems from its use in antitrust cases. But, although it is no longer as popular as it once was, there was a flourishing literature in relating market performance to market structure measured by market shares. This literature has been heavily criticized,[33] because, among other reasons, a market share does not have the same economic effect across industries, which differ enormously, and because market share is an outcome of industry fundamentals, not a basic characteristic of them. Such studies are sometimes still used in academic studies and can be done properly. They are used in antitrust studies and, under appropriate circumstances, can be a powerful tool not just for checking market definition, but also for understanding the economic behavior of the industry.[34]

Consider a proposed merger between two firms. One may well be able to use the past historical relationship between price and concentration to predict the effect of the merger. One could use regression analysis to estimate this relationship, though caution is needed to deal with the determination of concentration.[35] Simply analyzing the relation between price and concentration over time may tell one nothing about the relation of competitiveness to concentration absent a theory explaining why concentration might be changing over time. However, it is sometimes possible to construct such theories and to use the estimated relationship between price and concentration as a predictor of a merger's effects. For example, in the railroad industry where tracks were laid many years ago, it seems sensible to predict the effect of a merger of two railroads that will

---

33  *See, e.g.,* Carlton & Perloff, *supra* note 5, at ch. 8.

34  *See, e.g.,* Dennis W. Carlton & Hal Sider, *Market Power and Vertical Restraints in Retailing: An Analysis of FTC v. Toys 'R' Us, in* The Role of the Academic Economist in Litigation Support (Daniel Slottje ed., 1999); Carlton (2003), *supra* note 12; and Carlton (2004), *supra* note 12.

35  The statistical issue is whether concentration should be treated as an exogenous or endogenous variable.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-020

reduce the number of railroads serving a route from 3 to 2 by comparing pricing on routes with 3 railroads to those with 2, after adjusting for other route characteristics. In fact, a recent paper by Peters, analyzing the airline industry shows that such predictions based on the historical relationship of price to concentration are often as or more accurate than those based on merger simulation.[36]

Such econometric studies can also shed light on the appropriate market definition. For example, suppose there is a question whether Product B is in the same market with Product A. A regression reveals that there is a relation between the price of Product A and market concentration based on a market definition excluding Product B, but no relation based on a market definition including Product B. Under appropriate statistical circumstances, that can be quite informative as to the correct market definition and can indicate that Product B is not in the same market as Product A. I have often found these types of econometric analyses helpful in understanding both market definition and predicting the consequence of mergers.[37]

Similarly, in the context of Section 2 cases, one can use econometric techniques to explore the direct effect of a bad act if one is fortunate enough to have data on periods when the bad act was in use and not in use. Again, one has to make sure that one can deal with the statistical issue of exogeneity properly, but if so these studies can be valuable. One can also use the same type of studies as just described in the merger context to test which definitions of market make sense and are useful for prediction.

## VI. Common Mistakes in Defining Markets

Although I have stressed the limitations of the methodology of using market definition and market share, I have also explained that the methodology still can sometimes be useful if done in a way that captures the underlying economics, especially in the context of merger cases. In this section, I list a few of what I have found to be common mistakes:

(1) **Firm 2 is producing at capacity. Hence, it cannot increase supply to offset a hypothetical price increase by Firm 1, and accordingly should be excluded as a participant from the market.** This logic correctly recognizes that Firm 2's zero supply elasticity means that increases in Firm 2's output cannot constrain Firm 1's price. But it fails to recognize that Firm 2's existing production constrains Firm 1's ability to raise price. Suppose it costs $1 to make one unit of wheat. In equilibri-

---

36 Craig T. Peters, *Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry*, 49 J. Law & Econ. 627-49 (2006).

37 *See* Carlton (2003), *supra* note 5, and the similar views of Coleman and Scheffman *in* David T. Scheffman & Mary Coleman, *Quantitative Analyses of Potential Competitive Effects from a Merger*, 12 Geo. Mason L. Rev. 319 (2003).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-021

um, 1,000 units are sold at $1 each. Imagine 1,000 wheat farmers including Firms 1 and 2 each of which produces one (and only one) unit. Each wheat farmer likely faces a highly elastic demand precisely because of the output of the others, and would on its own be unable to increase the price of wheat. Excluding capacity constrained wheat farmers would incorrectly indicate that Firm 1 has market power.[38]

(2) **Firm 1 produces steel. It has several long-term customers. The capacity to serve those customers should not be considered in calculating the market for steel in evaluating a merger involving other firms.** If the customers have signed long-term, fixed-price contracts with Firm 1, but the steel can be resold, then the capacity to produce that steel should be in the market, but should not be attributed to Firm 1. If the steel cannot be resold, the contract will not be breached, and the output produced by these customers does not affect other customers of steel, then the steel sold to these customers should be excluded from the market. However, if the output of these customers does constrain the prices of the products of other steel customers, then the steel output to these customers should be included in the market, but should not be attributed to Firm 1. The presence of these customers constrains the price that these other steel customers can pay for steel. If there is no fixed-price contract, then the capacity is attributable to Firm 1. The price to long-term customers will be set in the marketplace where the price reflects competition amongst many other steel producers.

(3) **Used goods sell for a lower price than new goods and therefore are not part of the same market as new goods.** Used goods sell for a lower price than new goods for many reasons, including the fact that they have fewer years of service to provide. Whether they are in the same market as new goods depends on how good a substitute they are for various demanders. For example, if used goods have greater reliability problems than new goods, there may be a class of consumers willing to pay a (length-adjusted) price that reflects a premium for the reliability. That could mean that used and new goods do not tightly constrain each other's prices, but that is an empirical question.[39]

# VII. Market Definition in Complicated Settings

I now discuss two somewhat complicated settings and see how useful market definition can be. Since we have already seen its limitations in even relatively sim-

---

[38] The elasticity of the residual demand curve facing a single farmer equals $E/s$ where $E$ is the aggregate demand elasticity and $s$ is the market share of our single farmer. This elasticity facing a farmer will be large for small $s$.

[39] *See* Dennis W. Carlton & Robert Gertner, *Market Power and Mergers in Durable-Good Industries*, 32 J. L. & Econ. 203 (1989).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-022

ple settings, we should not be surprised that its limitations are even more severe as the circumstances become more complicated. We discuss two settings. One is where R&D is important. In such settings, I ask whether it is sensible to think of an "R&D innovation market", a concept that was used by the DOJ in the 1990s. The second setting is one involving what are called "two-sided markets".[40] These are markets where multiple inputs and outputs require coordination in order to produce desirable products. One example is a mall in which the mall owner must account for the fact that some stores attract customers to the mall, yet those customers buy at other stores in the mall. Another example is an operating system for computers, where the owner of the operating system wishes to induce application programmers to write applications programs for its operating system so as to make its operating system attractive to users. In such cases, there are interactions between different sides of the market that should be internalized. So, for example, the mall owner subsidizes the rent of the bookstore, but charges a high rent to the restaurant. Or, the owner of the operating system subsidizes application programmers, but charges users a high price for the operating system. Other common examples of two-sided markets include dating clubs, game stations and games, and card payment systems. As far as I know, there has been no recognition yet by courts of market definition in two-sided markets.

## A. INNOVATION MARKETS

An innovation market consists of the future innovations in some area, presumably measured by the resources devoted to R&D in the particular area.[41] Shares are calculated for each firm in the obvious way. Notice that this analysis is focused on an input (R&D) not the output (new products). It is a departure from the usual procedures of basing market definition on products. It would be a justifiable procedure if it were easy to predict which R&D will lead to which new product, but in many (most?) cases it is not possible to do this. The success of R&D is highly uncertain and predicting from where R&D breakthroughs will come is very hard. Perhaps pharmaceuticals are an exception because one can see exactly how far along a drug development is in its U.S. Food and Drug Administration trials. Yet a market for particular drugs in development really is not an R&D market, instead it is a market for a future product (uncertain as it may be). This is different from a market based on R&D for a particular general type of product. Moreover, we lack a theoretical framework for defining markets for R&D innovation markets. What is the analogue to a 5 percent price increase? What price is being measured if the product cannot be defined? Furthermore, the

---

40  *See* David Evans & Richard Schmalensee, *The Industrial Organization of Markets with Two-Sided Platforms*, 3(1) Competition Pol'y Int'l 151–179 (2007) and Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, RAND J. Econ. (Autumn 2006).

41  Richard J. Gilbert & Stephen C. Sunshine, *Incorporating Dynamic Efficiency Concerns in Merger Analysis: The Use of Innovation Markets*, 63 Antitrust L. J. 569 (1995).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-023

link between R&D concentration and new product output is quite weak.[42] For all these reasons, I am skeptical that the already crude theoretical construct of market can be of much use in analyzing industries where R&D is key.[43] Of course, this does not mean that the effect of a merger on innovation in such industries requires no analysis. Instead, it does mean that the tool of innovation markets is likely to be of little help in the analysis.

### B. TWO-SIDED MARKETS

In two-sided markets, one party (e.g., mall developer, owner of a computer operating system) internalizes the externalities across agents by effectively taxing and subsidizing different groups so that a total package is produced. There has been a literature questioning the empirical relevance of these two-sided markets (or the related concept of industries with network economies). In such markets, without the coordinating ability of a third party, markets cannot produce the efficient result. The lack of a third party could then indicate either no need for one or the existence of a market failure.[44] For purposes of this discussion, I assume that a third party is needed and does exist in order to coordinate activity among different groups. What is a sensible procedure to define a market in such a case?

To take a concrete example, suppose two shopping malls want to merge.[45] To simplify, assume that there are no surrounding competing retail stores that are not in malls. We start out by recognizing that a mall owner puts together a portfolio of stores that complement each other and whose existence he coordinates by lowering the rent of one type of store to stimulate demand (and elevate rent) at another. Suppose that the mall owner charges each store a rent based on its retail sales. Following an approach similar to the *Merger Guidelines*, we ask: Which nearby malls must a hypothetical monopolist control in order for it to be profitable for the merged firm to raise the price by, say five percent? But just as in the earlier discussion of market definition when multiple products were in the market, one must define what "price" means. Is it the rent of one particular retail store, average rent, or total rent that has to rise? Or, to complicate matters fur-

---

42  *Antitrust Modernization Committee Hearings* (2005) (statement of Richard J. Gilbert, Professor, Univ. of Cal. at Berkeley, "New Antitrust Laws for the 'New Economy'," Nov. 8, 2005), *available at* http://www.amc.gov/commission_hearings/pdf/Statement_Gilbert.pdf.

43  For a more detailed critique, *see* Dennis W. Carlton & Robert Gertner, *Intellectual Property, Antitrust and Strategic Behavior*, *in* Innovation Policy & The Economy (Adam Jaffee & Joshua Lerner eds., 2003).

44  For example, when cars were being developed, the car manufacturers could have perhaps benefited from subsidizing location of gas stations. The fact that no such subsidization occurred shows either the market was inefficient, or alternatively, that whatever inefficiency existed, it was too small to cause it to be corrected. *See* S.J. Liebowitz & Stephen E. Margolis, *Network Externality: An Uncommon Tragedy*, 8(2) J. Econ. Persp. 133-50, 133 (1994).

45  For an application of market definition to credit cards, *see* Eric Emch & Scott Thompson, *Market Definition and Market Power in Payment Card Networks*, 5 Rev. Network Econ. (2006).

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-024

ther, if customers pay a parking fee, or are provided with elegant surroundings, how should those be changed when this hypothetical monopolist raises "price"? In the earlier discussion of market definition when the market contained multiple products, I recognized the ambiguity in the definition of price but said that I doubted that it should matter much, though I indicated a preference to focus on the products of the merging firms, rather than all products in the market. But here, there is no one type of retail store to focus on.[46] Therefore, one should focus on an aggregate measure of rent. Moreover, we know that because of the two-sided nature of the market it is unlikely that it is optimal for the hypothetical monopolist to raise rents to all stores by 5 percent. Indeed, the whole point of having a mall is to charge different rents to different types of stores. Failure to allow the hypothetical monopolist to set rents optimally could lead one to a misleading market definition and, depending on the circumstances, to either over-state or understate the market power of a mall owner. For example, one might conclude that post-merger there is no market power (i.e., a very broad market in which the post-merger mall owner has a small share) when with optimal pricing the market is narrower and the mall owner has a large market share reflecting market power created by the merger. Conversely, if one ignores the ways in which mall owners can compete to attract customers directly or indirectly through low rents to some stores, one could find market power when in fact there is none. My sense is that this problem of using the right price will make market definition in two-sided markets more difficult than in the typical case and will therefore further limit reliability of market definition and market shares.

> MY SENSE IS THAT THIS PROBLEM OF USING THE RIGHT PRICE WILL MAKE MARKET DEFINITION IN TWO-SIDED MARKETS MORE DIFFICULT THAN IN THE TYPICAL CASE AND WILL THEREFORE FURTHER LIMIT RELIABILITY OF MARKET DEFINITION AND MARKET SHARES.

## VIII. Conclusion

Market definition is a crude though sometimes useful tool for identifying market power. The ambiguity in what analysts mean by market power (price above marginal cost, or excess profits) cannot be resolved by market share. When being

---

46   Notice that the product is malls, not individual retail stores. If one does mistakenly focus on rent to only a particular type of retail store, one must recognize the two-sided nature of the market in which feedback effects occur in other retail stores in the mall. An increase in the percent of sales charged as rent to the bookstore could lead to higher book prices and fewer customers to the bookstore and, thereby, to all other stores in the mall. The fall in mall customers leads to a decline in sales in other retail stores and a decline in rents from these stores. Failure to understand this feedback effect could lead one to overestimate the profitability to the mall owner of raising rents to the bookstore and, thereby, lead one to define markets too narrowly and overestimate market power.

Notice that this type of feedback effect can also arise in one-sided markets, when a firm sells complementary products. The price increase in one product will adversely affect sales of the other, and that effect will temper the profitability of a price increase in the initial product.

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-025

used to analyze a merger or Section 2 case, it is not just the level of market share, but also the changes in market shares that are relevant to calculate whether any increase in market power occurs. Despite this, in Section 2 cases courts often use market definition to figure out whether market power exists, a question that we have shown can be especially problematic to answer by using market definition. In Section 2 cases, the full antitrust analysis is difficult because any increase in market power typically has to be weighed against any benefits of the alleged bad act. The procedure for defining a market in a merger case or Section 2 case can be rigorously described, but the information required to implement the procedure is typically unavailable. Few analysts (or courts) follow the rigorous procedure in either merger or Section 2 cases. Instead, most markets are defined with some guidance from theory and some qualitative knowledge. Econometric studies using market definition may be helpful both in testing various definitions and in understanding the economic consequences of either the merger or the bad act.

My view is that the definition of a market and the use of market shares and changes in market shares are at best crude first steps to begin an analysis. I would use them to eliminate frivolous antitrust cases when shares are low, but would use them cautiously for anything else. Their usefulness in Section 2 cases is especially weak. Despite their limitations, when they can be used to eliminate frivolous antitrust cases, that use can contribute enormous value to society. ◀

Electronic copy available at: https://ssrn.com/abstract=987061

PX15344-026

# PX15346

# Horizontal Merger Guidelines

 

U.S. Department of Justice

and the

Federal Trade Commission

Issued: August 19, 2010

PX15346-001

# Table of Contents

1.    Overview..................................................................................................................1

2.    Evidence of Adverse Competitive Effects ..............................................................2
2.1      Types of Evidence..............................................................................................3
2.1.1      Actual Effects Observed in Consummated Mergers.......................................3
2.1.2      Direct Comparisons Based on Experience .....................................................3
2.1.3      Market Shares and Concentration in a Relevant Market ................................3
2.1.4      Substantial Head-to-Head Competition .........................................................3
2.1.5      Disruptive Role of a Merging Party ...............................................................3
2.2      Sources of Evidence...........................................................................................4
2.2.1      Merging Parties .............................................................................................4
2.2.2      Customers ......................................................................................................5
2.2.3      Other Industry Participants and Observers ....................................................5

3.    Targeted Customers and Price Discrimination ........................................................6

4.    Market Definition....................................................................................................7
4.1      Product Market Definition .................................................................................8
4.1.1      The Hypothetical Monopolist Test .................................................................8
4.1.2      Benchmark Prices and SSNIP Size ..............................................................10
4.1.3      Implementing the Hypothetical Monopolist Test .........................................11
4.1.4      Product Market Definition with Targeted Customers...................................12
4.2      Geographic Market Definition .........................................................................13
4.2.1      Geographic Markets Based on the Locations of Suppliers............................13
4.2.2      Geographic Markets Based on the Locations of Customers..........................14

5.    Market Participants, Market Shares, and Market Concentration ............................15
5.1      Market Participants ..........................................................................................15
5.2      Market Shares ..................................................................................................16
5.3      Market Concentration ......................................................................................18

6.    Unilateral Effects ..................................................................................................20
6.1      Pricing of Differentiated Products ...................................................................20
6.2      Bargaining and Auctions..................................................................................22
6.3      Capacity and Output for Homogeneous Products .............................................22
6.4      Innovation and Product Variety .......................................................................23

7.    Coordinated Effects ..............................................................................................24
7.1      Impact of Merger on Coordinated Interaction ..................................................25
7.2      Evidence a Market is Vulnerable to Coordinated Conduct ...............................25

8.    Powerful Buyers....................................................................................................27

PX15346-002

9.   Entry.................................................................................................................27
9.1     Timeliness.................................................................................................29
9.2     Likelihood.................................................................................................29
9.3     Sufficiency.................................................................................................29

10.   Efficiencies ......................................................................................................29

11.   Failure and Exiting Assets .............................................................................32

12.   Mergers of Competing Buyers.......................................................................32

13.   Partial Acquisitions.........................................................................................33

PX15346-003

# 1.    Overview

These Guidelines outline the principal analytical techniques, practices, and the enforcement policy of the Department of Justice and the Federal Trade Commission (the "Agencies") with respect to mergers and acquisitions involving actual or potential competitors ("horizontal mergers") under the federal antitrust laws.[1] The relevant statutory provisions include Section 7 of the Clayton Act, 15 U.S.C. § 18, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Most particularly, Section 7 of the Clayton Act prohibits mergers if "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The Agencies seek to identify and challenge competitively harmful mergers while avoiding unnecessary interference with mergers that are either competitively beneficial or neutral. Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not. Given this inherent need for prediction, these Guidelines reflect the congressional intent that merger enforcement should interdict competitive problems in their incipiency and that certainty about anticompetitive effect is seldom possible and not required for a merger to be illegal.

These Guidelines describe the principal analytical techniques and the main types of evidence on which the Agencies usually rely to predict whether a horizontal merger may substantially lessen competition. They are not intended to describe how the Agencies analyze cases other than horizontal mergers. These Guidelines are intended to assist the business community and antitrust practitioners by increasing the transparency of the analytical process underlying the Agencies' enforcement decisions. They may also assist the courts in developing an appropriate framework for interpreting and applying the antitrust laws in the horizontal merger context.

These Guidelines should be read with the awareness that merger analysis does not consist of uniform application of a single methodology. Rather, it is a fact-specific process through which the Agencies, guided by their extensive experience, apply a range of analytical tools to the reasonably available and reliable evidence to evaluate competitive concerns in a limited period of time. Where these Guidelines provide examples, they are illustrative and do not exhaust the applications of the relevant principle.[2]

---

[1]    These Guidelines replace the Horizontal Merger Guidelines issued in 1992, revised in 1997. They reflect the ongoing accumulation of experience at the Agencies. The Commentary on the Horizontal Merger Guidelines issued by the Agencies in 2006 remains a valuable supplement to these Guidelines. These Guidelines may be revised from time to time as necessary to reflect significant changes in enforcement policy, to clarify existing policy, or to reflect new learning. These Guidelines do not cover vertical or other types of non-horizontal acquisitions.

[2]    These Guidelines are not intended to describe how the Agencies will conduct the litigation of cases they decide to bring. Although relevant in that context, these Guidelines neither dictate nor exhaust the range of evidence the Agencies may introduce in litigation.

PX15346-004

The unifying theme of these Guidelines is that mergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise. For simplicity of exposition, these Guidelines generally refer to all of these effects as enhancing market power. A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives. In evaluating how a merger will likely change a firm's behavior, the Agencies focus primarily on how the merger affects conduct that would be most profitable for the firm.

A merger can enhance market power simply by eliminating competition between the merging parties. This effect can arise even if the merger causes no changes in the way other firms behave. Adverse competitive effects arising in this manner are referred to as "unilateral effects." A merger also can enhance market power by increasing the risk of coordinated, accommodating, or interdependent behavior among rivals. Adverse competitive effects arising in this manner are referred to as "coordinated effects." In any given case, either or both types of effects may be present, and the distinction between them may be blurred.

These Guidelines principally describe how the Agencies analyze mergers between rival suppliers that may enhance their market power as sellers. Enhancement of market power by sellers often elevates the prices charged to customers. For simplicity of exposition, these Guidelines generally discuss the analysis in terms of such price effects. Enhanced market power can also be manifested in non-price terms and conditions that adversely affect customers, including reduced product quality, reduced product variety, reduced service, or diminished innovation. Such non-price effects may coexist with price effects, or can arise in their absence. When the Agencies investigate whether a merger may lead to a substantial lessening of non-price competition, they employ an approach analogous to that used to evaluate price competition. Enhanced market power may also make it more likely that the merged entity can profitably and effectively engage in exclusionary conduct. Regardless of how enhanced market power likely would be manifested, the Agencies normally evaluate mergers based on their impact on customers. The Agencies examine effects on either or both of the direct customers and the final consumers. The Agencies presume, absent convincing evidence to the contrary, that adverse effects on direct customers also cause adverse effects on final consumers.

Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers. See Section 12.

## 2.    Evidence of Adverse Competitive Effects

The Agencies consider any reasonably available and reliable evidence to address the central question of whether a merger may substantially lessen competition. This section discusses several categories and sources of evidence that the Agencies, in their experience, have found most informative in predicting the likely competitive effects of mergers. The list provided here is not exhaustive. In any given case, reliable evidence may be available in only some categories or from some sources. For each category of evidence, the Agencies consider evidence indicating that the merger may enhance competition as well as evidence indicating that it may lessen competition.

PX15346-005

## 2.1        Types of Evidence

### 2.1.1              *Actual Effects Observed in Consummated Mergers*

When evaluating a consummated merger, the ultimate issue is not only whether adverse competitive effects have already resulted from the merger, but also whether such effects are likely to arise in the future. Evidence of observed post-merger price increases or other changes adverse to customers is given substantial weight. The Agencies evaluate whether such changes are anticompetitive effects resulting from the merger, in which case they can be dispositive. However, a consummated merger may be anticompetitive even if such effects have not yet been observed, perhaps because the merged firm may be aware of the possibility of post-merger antitrust review and moderating its conduct. Consequently, the Agencies also consider the same types of evidence they consider when evaluating unconsummated mergers.

### 2.1.2              *Direct Comparisons Based on Experience*

The Agencies look for historical events, or "natural experiments," that are informative regarding the competitive effects of the merger. For example, the Agencies may examine the impact of recent mergers, entry, expansion, or exit in the relevant market. Effects of analogous events in similar markets may also be informative.

The Agencies also look for reliable evidence based on variations among similar markets. For example, if the merging firms compete in some locales but not others, comparisons of prices charged in regions where they do and do not compete may be informative regarding post-merger prices. In some cases, however, prices are set on such a broad geographic basis that such comparisons are not informative. The Agencies also may examine how prices in similar markets vary with the number of significant competitors in those markets.

### 2.1.3              *Market Shares and Concentration in a Relevant Market*

The Agencies give weight to the merging parties' market shares in a relevant market, the level of concentration, and the change in concentration caused by the merger. See Sections 4 and 5. Mergers that cause a significant increase in concentration and result in highly concentrated markets are presumed to be likely to enhance market power, but this presumption can be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

### 2.1.4              *Substantial Head-to-Head Competition*

The Agencies consider whether the merging firms have been, or likely will become absent the merger, substantial head-to-head competitors. Such evidence can be especially relevant for evaluating adverse unilateral effects, which result directly from the loss of that competition. See Section 6. This evidence can also inform market definition. See Section 4.

### 2.1.5              *Disruptive Role of a Merging Party*

The Agencies consider whether a merger may lessen competition by eliminating a "maverick" firm, i.e., a firm that plays a disruptive role in the market to the benefit of customers. For example, if one of the merging firms has a strong incumbency position and the other merging firm threatens to

3

disrupt market conditions with a new technology or business model, their merger can involve the loss of actual or potential competition. Likewise, one of the merging firms may have the incentive to take the lead in price cutting or other competitive conduct or to resist increases in industry prices. A firm that may discipline prices based on its ability and incentive to expand production rapidly using available capacity also can be a maverick, as can a firm that has often resisted otherwise prevailing industry norms to cooperate on price setting or other terms of competition.

## 2.2        Sources of Evidence

The Agencies consider many sources of evidence in their merger analysis. The most common sources of reasonably available and reliable evidence are the merging parties, customers, other industry participants, and industry observers.

### 2.2.1          Merging Parties

The Agencies typically obtain substantial information from the merging parties. This information can take the form of documents, testimony, or data, and can consist of descriptions of competitively relevant conditions or reflect actual business conduct and decisions. Documents created in the normal course are more probative than documents created as advocacy materials in merger review. Documents describing industry conditions can be informative regarding the operation of the market and how a firm identifies and assesses its rivals, particularly when business decisions are made in reliance on the accuracy of those descriptions. The business decisions taken by the merging firms also can be informative about industry conditions. For example, if a firm sets price well above incremental cost, that normally indicates either that the firm believes its customers are not highly sensitive to price (not in itself of antitrust concern, see Section 4.1.3[3]) or that the firm and its rivals are engaged in coordinated interaction (see Section 7). Incremental cost depends on the relevant increment in output as well as on the time period involved, and in the case of large increments and sustained changes in output it may include some costs that would be fixed for smaller increments of output or shorter time periods.

Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety, withdraw products or delay their introduction, or curtail research and development efforts after the merger, or explicit or implicit evidence that the ability to engage in such conduct motivated the merger, can be highly informative in evaluating the likely effects of a merger. Likewise, the Agencies look for reliable evidence that the merger is likely to result in efficiencies. The Agencies give careful consideration to the views of individuals whose responsibilities, expertise, and experience relating to the issues in question provide particular indicia of reliability. The financial terms of the transaction may also be informative regarding competitive effects. For example, a purchase price in excess of the acquired firm's stand-alone market value may indicate that the acquiring firm is paying a premium because it expects to be able to reduce competition or to achieve efficiencies.

---

[3]     High margins commonly arise for products that are significantly differentiated. Products involving substantial fixed costs typically will be developed only if suppliers expect there to be enough differentiation to support margins sufficient to cover those fixed costs. High margins can be consistent with incumbent firms earning competitive returns.

PX15346-007

*2.2.2*        *Customers*

Customers can provide a variety of information to the Agencies, ranging from information about their own purchasing behavior and choices to their views about the effects of the merger itself.

Information from customers about how they would likely respond to a price increase, and the relative attractiveness of different products or suppliers, may be highly relevant, especially when corroborated by other evidence such as historical purchasing patterns and practices. Customers also can provide valuable information about the impact of historical events such as entry by a new supplier.

The conclusions of well-informed and sophisticated customers on the likely impact of the merger itself can also help the Agencies investigate competitive effects, because customers typically feel the consequences of both competitively beneficial and competitively harmful mergers. In evaluating such evidence, the Agencies are mindful that customers may oppose, or favor, a merger for reasons unrelated to the antitrust issues raised by that merger.

When some customers express concerns about the competitive effects of a merger while others view the merger as beneficial or neutral, the Agencies take account of this divergence in using the information provided by customers and consider the likely reasons for such divergence of views. For example, if for regulatory reasons some customers cannot buy imported products, while others can, a merger between domestic suppliers may harm the former customers even if it leaves the more flexible customers unharmed. See Section 3.

When direct customers of the merging firms compete against one another in a downstream market, their interests may not be aligned with the interests of final consumers, especially if the direct customers expect to pass on any anticompetitive price increase. A customer that is protected from adverse competitive effects by a long-term contract, or otherwise relatively immune from the merger's harmful effects, may even welcome an anticompetitive merger that provides that customer with a competitive advantage over its downstream rivals.

> *Example 1:* As a result of the merger, Customer C will experience a price increase for an input used in producing its final product, raising its costs. Customer C's rivals use this input more intensively than Customer C, and the same price increase applied to them will raise their costs more than it raises Customer C's costs. On balance, Customer C may benefit from the merger even though the merger involves a substantial lessening of competition.

*2.2.3*        *Other Industry Participants and Observers*

Suppliers, indirect customers, distributors, other industry participants, and industry analysts can also provide information helpful to a merger inquiry. The interests of firms selling products complementary to those offered by the merging firms often are well aligned with those of customers, making their informed views valuable.

Information from firms that are rivals to the merging parties can help illuminate how the market operates. The interests of rival firms often diverge from the interests of customers, since customers normally lose, but rival firms gain, if the merged entity raises its prices. For that reason, the Agencies do not routinely rely on the overall views of rival firms regarding the competitive effects of the

PX15346-008

merger. However, rival firms may provide relevant facts, and even their overall views may be instructive, especially in cases where the Agencies are concerned that the merged entity may engage in exclusionary conduct.

> *Example 2:* Merging Firms A and B operate in a market in which network effects are significant, implying that any firm's product is significantly more valuable if it commands a large market share or if it is interconnected with others that in aggregate command such a share. Prior to the merger, they and their rivals voluntarily interconnect with one another. The merger would create an entity with a large enough share that a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market. The interests of rivals and of consumers would be broadly aligned in preventing such a merger.

# 3.    Targeted Customers and Price Discrimination

When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. The possibility of price discrimination influences market definition (see Section 4), the measurement of market shares (see Section 5), and the evaluation of competitive effects (see Sections 6 and 7).

When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers. A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away. When discrimination is reasonably likely, the Agencies may evaluate competitive effects separately by type of customer. The Agencies may have access to information unavailable to customers that is relevant to evaluating whether discrimination is reasonably likely.

For price discrimination to be feasible, two conditions typically must be met: differential pricing and limited arbitrage.

First, the suppliers engaging in price discrimination must be able to price differently to targeted customers than to other customers. This may involve identification of individual customers to which different prices are offered or offering different prices to different types of customers based on observable characteristics.

> *Example 3:* Suppliers can distinguish large buyers from small buyers. Large buyers are more likely than small buyers to self-supply in response to a significant price increase. The merger may lead to price discrimination against small buyers, harming them, even if large buyers are not harmed. Such discrimination can occur even if there is no discrete gap in size between the classes of large and small buyers.

In other cases, suppliers may be unable to distinguish among different types of customers but can offer multiple products that sort customers based on their purchase decisions.

Second, the targeted customers must not be able to defeat the price increase of concern by arbitrage, e.g., by purchasing indirectly from or through other customers. Arbitrage may be difficult if it would void warranties or make service more difficult or costly for customers. Arbitrage is inherently impossible for many services. Arbitrage between customers at different geographic locations may be

PX15346-009

impractical due to transportation costs. Arbitrage on a modest scale may be possible but sufficiently costly or limited that it would not deter or defeat a discriminatory pricing strategy.

# 4.    Market Definition

When the Agencies identify a potential competitive concern with a horizontal merger, market definition plays two roles. First, market definition helps specify the line of commerce and section of the country in which the competitive concern arises. In any merger enforcement action, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition. Second, market definition allows the Agencies to identify market participants and measure market shares and market concentration. See Section 5. The measurement of market shares and market concentration is not an end in itself, but is useful to the extent it illuminates the merger's likely competitive effects.

The Agencies' analysis need not start with market definition. Some of the analytical tools used by the Agencies to assess competitive effects do not rely on market definition, although evaluation of competitive alternatives available to customers is always necessary at some point in the analysis.

Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market. Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares.

Where analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects.

Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry.

Customers often confront a range of possible substitutes for the products of the merging firms. Some substitutes may be closer, and others more distant, either geographically or in terms of product attributes and perceptions. Additionally, customers may assess the proximity of different products differently. When products or suppliers in different geographic areas are substitutes for one another to varying degrees, defining a market to include some substitutes and exclude others is inevitably a simplification that cannot capture the full variation in the extent to which different products compete against each other. The principles of market definition outlined below seek to make this inevitable simplification as useful and informative as is practically possible. Relevant markets need not have precise metes and bounds.

PX15346-010

Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market.

> *Example 4:* Firms A and B, sellers of two leading brands of motorcycles, propose to merge. If Brand A motorcycle prices were to rise, some buyers would substitute to Brand B, and some others would substitute to cars. However, motorcycle buyers see Brand B motorcycles as much more similar to Brand A motorcycles than are cars. Far more cars are sold than motorcycles. Evaluating shares in a market that includes cars would greatly underestimate the competitive significance of Brand B motorcycles in constraining Brand A's prices and greatly overestimate the significance of cars.

Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers. However, a group of products is too narrow to constitute a relevant market if competition from products outside that group is so ample that even the complete elimination of competition within the group would not significantly harm either direct customers or downstream consumers. The hypothetical monopolist test (see Section 4.1.1) is designed to ensure that candidate markets are not overly narrow in this respect.

The Agencies implement these principles of market definition flexibly when evaluating different possible candidate markets. Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term "market."

Section 4.1 describes the principles that apply to product market definition, and gives guidance on how the Agencies most often apply those principles. Section 4.2 describes how the same principles apply to geographic market definition. Although discussed separately for simplicity of exposition, the principles described in Sections 4.1 and 4.2 are combined to define a relevant market, which has both a product and a geographic dimension. In particular, the hypothetical monopolist test is applied to a group of products together with a geographic region to determine a relevant market.

## 4.1    Product Market Definition

When a product sold by one merging firm (Product A) competes against one or more products sold by the other merging firm, the Agencies define a relevant product market around Product A to evaluate the importance of that competition. Such a relevant product market consists of a group of substitute products including Product A. Multiple relevant product markets may thus be identified.

### 4.1.1    *The Hypothetical Monopolist Test*

The Agencies employ the hypothetical monopolist test to evaluate whether groups of products in candidate markets are sufficiently broad to constitute relevant antitrust markets. The Agencies use the

PX15346-011

hypothetical monopolist test to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms.

The hypothetical monopolist test requires that a product market contain enough substitute products so that it could be subject to post-merger exercise of market power significantly exceeding that existing absent the merger. Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.[4] For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant. The SSNIP is employed solely as a methodological tool for performing the hypothetical monopolist test; it is not a tolerance level for price increases resulting from a merger.

Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose. The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in response to a price increase.

> *Example 5:* Products A and B are being tested as a candidate market. Each sells for $100, has an incremental cost of $60, and sells 1200 units. For every dollar increase in the price of Product A, for any given price of Product B, Product A loses twenty units of sales to products outside the candidate market and ten units of sales to Product B, and likewise for Product B. Under these conditions, economic analysis shows that a hypothetical profit-maximizing monopolist controlling Products A and B would raise both of their prices by ten percent, to $110. Therefore, Products A and B satisfy the hypothetical monopolist test using a five percent SSNIP, and indeed for any SSNIP size up to ten percent. This is true even though two-thirds of the sales lost by one product when it raises its price are diverted to products outside the relevant market.

When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product. The third product is a closer substitute if, in response to a SSNIP on the first product, greater revenues are diverted to the third product than to the second product.

> *Example 6:* In Example 5, suppose that half of the unit sales lost by Product A when it raises its price are diverted to Product C, which also has a price of $100, while one-third are diverted to Product B. Product C is a closer substitute for Product A than is Product B. Thus Product C will normally be included in the relevant market, even though Products A and B together satisfy the hypothetical monopolist test.

The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market. The Agencies may evaluate a merger in any relevant market

---

[4]    If the pricing incentives of the firms supplying the products in the candidate market differ substantially from those of the hypothetical monopolist, for reasons other than the latter's control over a larger group of substitutes, the Agencies may instead employ the concept of a hypothetical profit-maximizing cartel comprised of the firms (with all their products) that sell the products in the candidate market. This approach is most likely to be appropriate if the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market. This could occur, for example, if the candidate market is one for durable equipment and the firms selling that equipment derive substantial net revenues from selling spare parts and service for that equipment.

PX15346-012

satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects. Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.

> *Example 7:* In Example 4, including cars in the market will lead to misleadingly small market shares for motorcycle producers. Unless motorcycles fail the hypothetical monopolist test, the Agencies would not include cars in the market in analyzing this motorcycle merger.

## 4.1.2    *Benchmark Prices and SSNIP Size*

The Agencies apply the SSNIP starting from prices that would likely prevail absent the merger. If prices are not likely to change absent the merger, these benchmark prices can reasonably be taken to be the prices prevailing prior to the merger.[5] If prices are likely to change absent the merger, e.g., because of innovation or entry, the Agencies may use anticipated future prices as the benchmark for the test. If prices might fall absent the merger due to the breakdown of pre-merger coordination, the Agencies may use those lower prices as the benchmark for the test. In some cases, the techniques employed by the Agencies to implement the hypothetical monopolist test focus on the difference in incentives between pre-merger firms and the hypothetical monopolist and do not require specifying the benchmark prices.

The SSNIP is intended to represent a "small but significant" increase in the prices charged by firms in the candidate market for the value they contribute to the products or services used by customers. This properly directs attention to the effects of price changes commensurate with those that might result from a significant lessening of competition caused by the merger. This methodology is used because normally it is possible to quantify "small but significant" adverse price effects on customers and analyze their likely reactions, not because price effects are more important than non-price effects.

The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value. However, what constitutes a "small but significant" increase in price, commensurate with a significant loss of competition caused by the merger, depends upon the nature of the industry and the merging firms' positions in it, and the Agencies may accordingly use a price increase that is larger or smaller than five percent. Where explicit or implicit prices for the firms' specific contribution to value can be identified with reasonable clarity, the Agencies may base the SSNIP on those prices.

> *Example 8:* In a merger between two oil pipelines, the SSNIP would be based on the price charged for transporting the oil, not on the price of the oil itself. If pipelines buy the oil at one end and sell it at the other, the price charged for transporting the oil is implicit, equal to the difference between the price paid for oil at the input end and the price charged for oil at the output end. The relevant product sold by the pipelines is better described as "pipeline transportation of oil from point A to point B" than as "oil at point B."

---

5    Market definition for the evaluation of non-merger antitrust concerns such as monopolization or facilitating practices will differ in this respect if the effects resulting from the conduct of concern are already occurring at the time of evaluation.

PX15346-013

*Example 9:* In a merger between two firms that install computers purchased from third parties, the SSNIP would be based on their fees, not on the price of installed computers. If these firms purchase the computers and charge their customers one package price, the implicit installation fee is equal to the package charge to customers less the price of the computers.

*Example 10:* In Example 9, suppose that the prices paid by the merging firms to purchase computers are opaque, but account for at least ninety-five percent of the prices they charge for installed computers, with profits and implicit fees making up five percent of those prices at most. A five percent SSNIP on the total price paid by customers would at least double those fees or profits. Even if that would be unprofitable for a hypothetical monopolist, a significant increase in fees might well be profitable. If the SSNIP is based on the total price paid by customers, a lower percentage will be used.

*4.1.3        Implementing the Hypothetical Monopolist Test*

The hypothetical monopolist's incentive to raise prices depends both on the extent to which customers would likely substitute away from the products in the candidate market in response to such a price increase and on the profit margins earned on those products. The profit margin on incremental units is the difference between price and incremental cost on those units. The Agencies often estimate incremental costs, for example using merging parties' documents or data the merging parties use to make business decisions. Incremental cost is measured over the change in output that would be caused by the price increase under consideration.

In considering customers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including, but not limited to:

- how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions;

- information from buyers, including surveys, concerning how they would respond to price changes;

- the conduct of industry participants, notably:

  - sellers' business decisions or business documents indicating sellers' informed beliefs concerning how customers would substitute among products in response to relative changes in price;

  - industry participants' behavior in tracking and responding to price changes by some or all rivals;

- objective information about product characteristics and the costs and delays of switching products, especially switching from products in the candidate market to products outside the candidate market;

- the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market, with a higher recapture percentage making a price increase more profitable for the hypothetical monopolist;

- evidence from other industry participants, such as sellers of complementary products;

11

PX15346-014

- legal or regulatory requirements; and

- the influence of downstream competition faced by customers in their output markets.

When the necessary data are available, the Agencies also may consider a "critical loss analysis" to assess the extent to which it corroborates inferences drawn from the evidence noted above. Critical loss analysis asks whether imposing at least a SSNIP on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. While this "breakeven" analysis differs from the profit-maximizing analysis called for by the hypothetical monopolist test in Section 4.1.1, merging parties sometimes present this type of analysis to the Agencies. A price increase raises profits on sales made at the higher price, but this will be offset to the extent customers substitute away from products in the candidate market. Critical loss analysis compares the magnitude of these two offsetting effects resulting from the price increase. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the price increase. The price increase raises the hypothetical monopolist's profits if the predicted loss is less than the critical loss.

The Agencies consider all of the evidence of customer substitution noted above in assessing the predicted loss. The Agencies require that estimates of the predicted loss be consistent with that evidence, including the pre-merger margins of products in the candidate market used to calculate the critical loss. Unless the firms are engaging in coordinated interaction (see Section 7), high pre-merger margins normally indicate that each firm's product individually faces demand that is not highly sensitive to price.[6] Higher pre-merger margins thus indicate a smaller predicted loss as well as a smaller critical loss. The higher the pre-merger margin, the smaller the recapture percentage necessary for the candidate market to satisfy the hypothetical monopolist test.

Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition. The Agencies follow the hypothetical monopolist test to the extent possible given the available evidence, bearing in mind that the ultimate goal of market definition is to help determine whether the merger may substantially lessen competition.

*4.1.4        Product Market Definition with Targeted Customers*

If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a SSNIP. Markets to serve targeted customers are also known as price discrimination markets. In practice, the Agencies identify price discrimination markets only where they believe there is a realistic prospect of an adverse competitive effect on a group of targeted customers.

> *Example 11:* Glass containers have many uses. In response to a price increase for glass containers, some users would substitute substantially to plastic or metal containers, but baby food manufacturers would not. If a

---

[6]    While margins are important for implementing the hypothetical monopolist test, high margins are not in themselves of antitrust concern.

PX15346-015

hypothetical monopolist could price separately and limit arbitrage, baby food manufacturers would be vulnerable to a targeted increase in the price of glass containers. The Agencies could define a distinct market for glass containers used to package baby food.

The Agencies also often consider markets for targeted customers when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product. If prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers (see also Section 6.2 on bargaining and auctions). Nonetheless, the Agencies often define markets for groups of targeted customers, i.e., by type of customer, rather than by individual customer. By so doing, the Agencies are able to rely on aggregated market shares that can be more helpful in predicting the competitive effects of the merger.

## 4.2       Geographic Market Definition

The arena of competition affected by the merger may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers. Both supplier and customer locations can affect this. The Agencies apply the principles of market definition described here and in Section 4.1 to define a relevant market with a geographic dimension as well as a product dimension.

The scope of geographic markets often depends on transportation costs. Other factors such as language, regulation, tariff and non-tariff trade barriers, custom and familiarity, reputation, and service availability may impede long-distance or international transactions. The competitive significance of foreign firms may be assessed at various exchange rates, especially if exchange rates have fluctuated in the recent past.

In the absence of price discrimination based on customer location, the Agencies normally define geographic markets based on the locations of suppliers, as explained in subsection 4.2.1. In other cases, notably if price discrimination based on customer location is feasible as is often the case when delivered pricing is commonly used in the industry, the Agencies may define geographic markets based on the locations of customers, as explained in subsection 4.2.2.

### *4.2.1        Geographic Markets Based on the Locations of Suppliers*

Geographic markets based on the locations of suppliers encompass the region from which sales are made. Geographic markets of this type often apply when customers receive goods or services at suppliers' locations. Competitors in the market are firms with relevant production, sales, or service facilities in that region. Some customers who buy from these firms may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP from at least one location, including at least one location of one of the merging firms. In this exercise the terms of sale for all products produced elsewhere are held constant. A single firm may operate in a number of different geographic markets, even for a single product.

13

PX15346-016

*Example 12:* The merging parties both have manufacturing plants in City X. The relevant product is expensive to transport and suppliers price their products for pickup at their locations. Rival plants are some distance away in City Y. A hypothetical monopolist controlling all plants in City X could profitably impose a SSNIP at these plants. Competition from more distant plants would not defeat the price increase because supplies coming from more distant plants require expensive transportation. The relevant geographic market is defined around the plants in City X.

When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, regardless of the location of the customer making the purchase.

In considering likely reactions of customers to price increases for the relevant product(s) imposed in a candidate geographic market, the Agencies consider any reasonably available and reliable evidence, including:

- how customers have shifted purchases in the past between different geographic locations in response to relative changes in price or other terms and conditions;

- the cost and difficulty of transporting the product (or the cost and difficulty of a customer traveling to a seller's location), in relation to its price;

- whether suppliers need a presence near customers to provide service or support;

- evidence on whether sellers base business decisions on the prospect of customers switching between geographic locations in response to relative changes in price or other competitive variables;

- the costs and delays of switching from suppliers in the candidate geographic market to suppliers outside the candidate geographic market; and

- the influence of downstream competition faced by customers in their output markets.

### 4.2.2       Geographic Markets Based on the Locations of Customers

When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers.[7] Geographic markets of this type often apply when suppliers deliver their products or services to customers' locations. Geographic markets of this type encompass the region into which sales are made. Competitors in the market are firms that sell to customers in the specified region. Some suppliers that sell into the relevant market may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region would impose at least a SSNIP on some customers in that region. A region forms a relevant geographic market if this price increase would not be defeated by substitution away from the relevant product or by arbitrage,

---

[7]    For customers operating in multiple locations, only those customer locations within the targeted zone are included in the market.

PX15346-017

e.g., customers in the region travelling outside it to purchase the relevant product. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.

> *Example 13:* Customers require local sales and support. Suppliers have sales and service operations in many geographic areas and can discriminate based on customer location. The geographic market can be defined around the locations of customers.

> *Example 14:* Each merging firm has a single manufacturing plant and delivers the relevant product to customers in City X and in City Y. The relevant product is expensive to transport. The merging firms' plants are by far the closest to City X, but no closer to City Y than are numerous rival plants. This fact pattern suggests that customers in City X may be harmed by the merger even if customers in City Y are not. For that reason, the Agencies consider a relevant geographic market defined around customers in City X. Such a market could be defined even if the region around the merging firms' plants would not be a relevant geographic market defined based on the location of sellers because a hypothetical monopolist controlling all plants in that region would find a SSNIP imposed on all of its customers unprofitable due to the loss of sales to customers in City Y.

When the geographic market is defined based on customer locations, sales made to those customers are counted, regardless of the location of the supplier making those sales.

> *Example 15:* Customers in the United States must use products approved by U.S. regulators. Foreign customers use products not approved by U.S. regulators. The relevant product market consists of products approved by U.S. regulators. The geographic market is defined around U.S. customers. Any sales made to U.S. customers by foreign suppliers are included in the market, and those foreign suppliers are participants in the U.S. market even though located outside it.

# 5.     Market Participants, Market Shares, and Market Concentration

The Agencies normally consider measures of market shares and market concentration as part of their evaluation of competitive effects. The Agencies evaluate market shares and concentration in conjunction with other reasonably available and reliable evidence for the ultimate purpose of determining whether a merger may substantially lessen competition.

Market shares can directly influence firms' competitive incentives. For example, if a price reduction to gain new customers would also apply to a firm's existing customers, a firm with a large market share may be more reluctant to implement a price reduction than one with a small share. Likewise, a firm with a large market share may not feel pressure to reduce price even if a smaller rival does. Market shares also can reflect firms' capabilities. For example, a firm with a large market share may be able to expand output rapidly by a larger absolute amount than can a small firm. Similarly, a large market share tends to indicate low costs, an attractive product, or both.

## 5.1     Market Participants

All firms that currently earn revenues in the relevant market are considered market participants. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently earning revenues in the relevant market, but that have committed to entering the market in the near future, are also considered market participants.

Firms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP, without incurring

PX15346-018

significant sunk costs, are also considered market participants. These firms are termed "rapid entrants." Sunk costs are entry or exit costs that cannot be recovered outside the relevant market. Entry that would take place more slowly in response to adverse competitive effects, or that requires firms to incur significant sunk costs, is considered in Section 9.

Firms that produce the relevant product but do not sell it in the relevant geographic market may be rapid entrants. Other things equal, such firms are most likely to be rapid entrants if they are close to the geographic market.

> *Example 16:* Farm A grows tomatoes halfway between Cities X and Y. Currently, it ships its tomatoes to City X because prices there are two percent higher. Previously it has varied the destination of its shipments in response to small price variations. Farm A would likely be a rapid entrant participant in a market for tomatoes in City Y.

> *Example 17:* Firm B has bid multiple times to supply milk to School District S, and actually supplies milk to schools in some adjacent areas. It has never won a bid in School District S, but is well qualified to serve that district and has often nearly won. Firm B would be counted as a rapid entrant in a market for school milk in School District S.

More generally, if the relevant market is defined around targeted customers, firms that produce relevant products but do not sell them to those customers may be rapid entrants if they can easily and rapidly begin selling to the targeted customers.

Firms that clearly possess the necessary assets to supply into the relevant market rapidly may also be rapid entrants. In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier with efficient idle capacity, or readily available "swing" capacity currently used in adjacent markets that can easily and profitably be shifted to serve the relevant market, may be a rapid entrant.[8] However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.

## 5.2     Market Shares

The Agencies normally calculate market shares for all firms that currently produce products in the relevant market, subject to the availability of data. The Agencies also calculate market shares for other market participants if this can be done to reliably reflect their competitive significance.

Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share

---

[8]  If this type of supply side substitution is nearly universal among the firms selling one or more of a group of products, the Agencies may use an aggregate description of markets for those products as a matter of convenience.

PX15346-019

overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

The Agencies measure market shares based on the best available indicator of firms' future competitive significance in the relevant market. This may depend upon the type of competitive effect being considered, and on the availability of data. Typically, annual data are used, but where individual transactions are large and infrequent so annual data may be unrepresentative, the Agencies may measure market shares over a longer period of time.

In most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market. Revenues in the relevant market tend to be the best measure of attractiveness to customers, since they reflect the real-world ability of firms to surmount all of the obstacles necessary to offer products on terms and conditions that are attractive to customers. In cases where one unit of a low-priced product can substitute for one unit of a higher-priced product, unit sales may measure competitive significance better than revenues. For example, a new, much less expensive product may have great competitive significance if it substantially erodes the revenues earned by older, higher-priced products, even if it earns relatively few revenues. In cases where customers sign long-term contracts, face switching costs, or tend to re-evaluate their suppliers only occasionally, revenues earned from recently acquired customers may better reflect the competitive significance of suppliers than do total revenues.

In markets for homogeneous products, a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in the relevant market in response to a price increase or output reduction by others in that market. As a result, a firm's competitive significance may depend upon its level of readily available capacity to serve the relevant market if that capacity is efficient enough to make such expansion profitable. In such markets, capacities or reserves may better reflect the future competitive significance of suppliers than revenues, and the Agencies may calculate market shares using those measures. Market participants that are not current producers may then be assigned positive market shares, but only if a measure of their competitive significance properly comparable to that of current producers is available. When market shares are measured based on firms' readily available capacities, the Agencies do not include capacity that is committed or so profitably employed outside the relevant market, or so high-cost, that it would not likely be used to respond to a SSNIP in the relevant market.

> *Example 18:* The geographic market is defined around customers in the United States. Firm X produces the relevant product outside the United States, and most of its sales are made to customers outside the United States. In most contexts, Firm X's market share will be based on its sales to U.S. customers, not its total sales or total capacity. However, if the relevant product is homogeneous, and if Firm X would significantly expand sales to U.S. customers rapidly and without incurring significant sunk costs in response to a SSNIP, the Agencies may base Firm X's market share on its readily available capacity to serve U.S. customers.

When the Agencies define markets serving targeted customers, these same principles are used to measure market shares, as they apply to those customers. In most contexts, each firm's market share is based on its actual or projected revenues from the targeted customers. However, the Agencies may instead measure market shares based on revenues from a broader group of customers if doing so would more accurately reflect the competitive significance of different suppliers in the relevant market. Revenues earned from a broader group of customers may also be used when better data are thereby available.

PX15346-020

## 5.3     Market Concentration

Market concentration is often one useful indicator of likely competitive effects of a merger. In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger. Market shares may not fully reflect the competitive significance of firms in the market or the impact of a merger. They are used in conjunction with other evidence of competitive effects. See Sections 6 and 7.

In analyzing mergers between an incumbent and a recent or potential entrant, to the extent the Agencies use the change in concentration to evaluate competitive effects, they will do so using projected market shares. A merger between an incumbent and a potential entrant can raise significant competitive concerns. The lessening of competition resulting from such a merger is more likely to be substantial, the larger is the market share of the incumbent, the greater is the competitive significance of the potential entrant, and the greater is the competitive threat posed by this potential entrant relative to others.

The Agencies give more weight to market concentration when market shares have been stable over time, especially in the face of historical changes in relative prices or costs. If a firm has retained its market share even after its price has increased relative to those of its rivals, that firm already faces limited competitive constraints, making it less likely that its remaining rivals will replace the competition lost if one of that firm's important rivals is eliminated due to a merger. By contrast, even a highly concentrated market can be very competitive if market shares fluctuate substantially over short periods of time in response to changes in competitive offerings. However, if competition by one of the merging firms has significantly contributed to these fluctuations, perhaps because it has acted as a maverick, the Agencies will consider whether the merger will enhance market power by combining that firm with one of its significant rivals.

The Agencies may measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure revenues in the relevant market. The Agencies also may consider the combined market share of the merging firms as an indicator of the extent to which others in the market may not be able readily to replace competition between the merging firms that is lost through the merger.

The Agencies often calculate the Herfindahl-Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual firms' market shares,[9] and thus gives proportionately greater weight to the larger market shares. When using the HHI, the Agencies

---

[9]     For example, a market consisting of four firms with market shares of thirty percent, thirty percent, twenty percent, and twenty percent has an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI ranges from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). Although it is desirable to include all firms in the calculation, lack of information about firms with small shares is not critical because such firms do not affect the HHI significantly.

PX15346-021

consider both the post-merger level of the HHI and the increase in the HHI resulting from the merger. The increase in the HHI is equal to twice the product of the market shares of the merging firms.[10]

Based on their experience, the Agencies generally classify markets into three types:

- Unconcentrated Markets: HHI below 1500

- Moderately Concentrated Markets: HHI between 1500 and 2500

- Highly Concentrated Markets: HHI above 2500

The Agencies employ the following general standards for the relevant markets they have defined:

- *Small Change in Concentration:* Mergers involving an increase in the HHI of less than 100 points are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Unconcentrated Markets:* Mergers resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Moderately Concentrated Markets:* Mergers resulting in moderately concentrated markets that involve an increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny.

- *Highly Concentrated Markets:* Mergers resulting in highly concentrated markets that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny. Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power. The presumption may be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

The purpose of these thresholds is not to provide a rigid screen to separate competitively benign mergers from anticompetitive ones, although high levels of concentration do raise concerns. Rather, they provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration. The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood that the Agencies will request additional information to conduct their analysis.

---

[10]  For example, the merger of firms with shares of five percent and ten percent of the market would increase the HHI by 100 ($5 \times 10 \times 2 = 100$).

PX15346-022

# 6.    Unilateral Effects

The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition. Such unilateral effects are most apparent in a merger to monopoly in a relevant market, but are by no means limited to that case. Whether cognizable efficiencies resulting from the merger are likely to reduce or reverse adverse unilateral effects is addressed in Section 10.

Several common types of unilateral effects are discussed in this section. Section 6.1 discusses unilateral price effects in markets with differentiated products. Section 6.2 discusses unilateral effects in markets where sellers negotiate with buyers or prices are determined through auctions. Section 6.3 discusses unilateral effects relating to reductions in output or capacity in markets for relatively homogeneous products. Section 6.4 discusses unilateral effects arising from diminished innovation or reduced product variety. These effects do not exhaust the types of possible unilateral effects; for example, exclusionary unilateral effects also can arise.

A merger may result in different unilateral effects along different dimensions of competition. For example, a merger may increase prices in the short term but not raise longer-term concerns about innovation, either because rivals will provide sufficient innovation competition or because the merger will generate cognizable research and development efficiencies. See Section 10.

## 6.1    Pricing of Differentiated Products

In differentiated product industries, some products can be very close substitutes and compete strongly with each other, while other products are more distant substitutes and compete less strongly. For example, one high-end product may compete much more directly with another high-end product than with any low-end product.

A merger between firms selling differentiated products may diminish competition by enabling the merged firm to profit by unilaterally raising the price of one or both products above the pre-merger level. Some of the sales lost due to the price rise will merely be diverted to the product of the merger partner and, depending on relative margins, capturing such sales loss through merger may make the price increase profitable even though it would not have been profitable prior to the merger.

The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects. Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice. The Agencies consider any reasonably available and reliable information to evaluate the extent of direct competition between the products sold by the merging firms. This includes documentary and testimonial evidence, win/loss reports and evidence from discount approval processes, customer switching patterns, and customer surveys. The types of evidence relied on often overlap substantially with the types of evidence of customer substitution relevant to the hypothetical monopolist test. See Section 4.1.1.

Substantial unilateral price elevation post-merger for a product formerly sold by one of the merging firms normally requires that a significant fraction of the customers purchasing that product view

20

PX15346-023

products formerly sold by the other merging firm as their next-best choice. However, unless pre-merger margins between price and incremental cost are low, that significant fraction need not approach a majority. For this purpose, incremental cost is measured over the change in output that would be caused by the price change considered. A merger may produce significant unilateral effects for a given product even though many more sales are diverted to products sold by non-merging firms than to products previously sold by the merger partner.

> *Example 19:* In Example 5, the merged entity controlling Products A and B would raise prices ten percent, given the product offerings and prices of other firms. In that example, one-third of the sales lost by Product A when its price alone is raised are diverted to Product B. Further analysis is required to account for repositioning, entry, and efficiencies.

In some cases, the Agencies may seek to quantify the extent of direct competition between a product sold by one merging firm and a second product sold by the other merging firm by estimating the diversion ratio from the first product to the second product. The diversion ratio is the fraction of unit sales lost by the first product due to an increase in its price that would be diverted to the second product. Diversion ratios between products sold by one merging firm and products sold by the other merging firm can be very informative for assessing unilateral price effects, with higher diversion ratios indicating a greater likelihood of such effects. Diversion ratios between products sold by merging firms and those sold by non-merging firms have at most secondary predictive value.

Adverse unilateral price effects can arise when the merger gives the merged entity an incentive to raise the price of a product previously sold by one merging firm and thereby divert sales to products previously sold by the other merging firm, boosting the profits on the latter products. Taking as given other prices and product offerings, that boost to profits is equal to the value to the merged firm of the sales diverted to those products. The value of sales diverted to a product is equal to the number of units diverted to that product multiplied by the margin between price and incremental cost on that product. In some cases, where sufficient information is available, the Agencies assess the value of diverted sales, which can serve as an indicator of the upward pricing pressure on the first product resulting from the merger. Diagnosing unilateral price effects based on the value of diverted sales need not rely on market definition or the calculation of market shares and concentration. The Agencies rely much more on the value of diverted sales than on the level of the HHI for diagnosing unilateral price effects in markets with differentiated products. If the value of diverted sales is proportionately small, significant unilateral price effects are unlikely.[11]

Where sufficient data are available, the Agencies may construct economic models designed to quantify the unilateral price effects resulting from the merger. These models often include independent price responses by non-merging firms. They also can incorporate merger-specific efficiencies. These merger simulation methods need not rely on market definition. The Agencies do not treat merger simulation evidence as conclusive in itself, and they place more weight on whether their merger simulations consistently predict substantial price increases than on the precise prediction of any single simulation.

---

[11]   For this purpose, the value of diverted sales is measured in proportion to the lost revenues attributable to the reduction in unit sales resulting from the price increase. Those lost revenues equal the reduction in the number of units sold of that product multiplied by that product's price.

PX15346-024

A merger is unlikely to generate substantial unilateral price increases if non-merging parties offer very close substitutes for the products offered by the merging firms. In some cases, non-merging firms may be able to reposition their products to offer close substitutes for the products offered by the merging firms. Repositioning is a supply-side response that is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency. See Section 9. The Agencies consider whether repositioning would be sufficient to deter or counteract what otherwise would be significant anticompetitive unilateral effects from a differentiated products merger.

## 6.2    Bargaining and Auctions

In many industries, especially those involving intermediate goods and services, buyers and sellers negotiate to determine prices and other terms of trade. In that process, buyers commonly negotiate with more than one seller, and may play sellers off against one another. Some highly structured forms of such competition are known as auctions. Negotiations often combine aspects of an auction with aspects of one-on-one negotiation, although pure auctions are sometimes used in government procurement and elsewhere.

A merger between two competing sellers prevents buyers from playing those sellers off against each other in negotiations. This alone can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger. The Agencies analyze unilateral effects of this type using similar approaches to those described in Section 6.1.

Anticompetitive unilateral effects in these settings are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business. These effects also are likely to be greater, the greater advantage the runner-up merging firm has over other suppliers in meeting customers' needs. These effects also tend to be greater, the more profitable were the pre-merger winning bids. All of these factors are likely to be small if there are many equally placed bidders.

The mechanisms of these anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according to the bargaining practices used, the auction format, and the sellers' information about one another's costs and about buyers' preferences. For example, when the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers; when sellers are less well informed, such effects are more apt to be spread over a broader class of buyers.

## 6.3    Capacity and Output for Homogeneous Products

In markets involving relatively undifferentiated products, the Agencies may evaluate whether the merged firm will find it profitable unilaterally to suppress output and elevate the market price. A firm may leave capacity idle, refrain from building or obtaining capacity that would have been obtained absent the merger, or eliminate pre-existing production capabilities. A firm may also divert the use of capacity away from one relevant market and into another so as to raise the price in the former market. The competitive analyses of these alternative modes of output suppression may differ.

PX15346-025

A unilateral output suppression strategy is more likely to be profitable when (1) the merged firm's market share is relatively high; (2) the share of the merged firm's output already committed for sale at prices unaffected by the output suppression is relatively low; (3) the margin on the suppressed output is relatively low; (4) the supply responses of rivals are relatively small; and (5) the market elasticity of demand is relatively low.

A merger may provide the merged firm a larger base of sales on which to benefit from the resulting price rise, or it may eliminate a competitor that otherwise could have expanded its output in response to the price rise.

> *Example 20:* Firms A and B both produce an industrial commodity and propose to merge. The demand for this commodity is insensitive to price. Firm A is the market leader. Firm B produces substantial output, but its operating margins are low because it operates high-cost plants. The other suppliers are operating very near capacity. The merged firm has an incentive to reduce output at the high-cost plants, perhaps shutting down some of that capacity, thus driving up the price it receives on the remainder of its output. The merger harms customers, notwithstanding that the merged firm shifts some output from high-cost plants to low-cost plants.

In some cases, a merger between a firm with a substantial share of the sales in the market and a firm with significant excess capacity to serve that market can make an output suppression strategy profitable.[12] This can occur even if the firm with the excess capacity has a relatively small share of sales, if that firm's ability to expand, and thus keep price from rising, has been making an output suppression strategy unprofitable for the firm with the larger market share.

## 6.4    Innovation and Product Variety

Competition often spurs firms to innovate. The Agencies may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger. That curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products.

The first of these effects is most likely to occur if at least one of the merging firms is engaging in efforts to introduce new products that would capture substantial revenues from the other merging firm. The second, longer-run effect is most likely to occur if at least one of the merging firms has capabilities that are likely to lead it to develop new products in the future that would capture substantial revenues from the other merging firm. The Agencies therefore also consider whether a merger will diminish innovation competition by combining two of a very small number of firms with the strongest capabilities to successfully innovate in a specific direction.

The Agencies evaluate the extent to which successful innovation by one merging firm is likely to take sales from the other, and the extent to which post-merger incentives for future innovation will be lower than those that would prevail in the absence of the merger. The Agencies also consider whether the merger is likely to enable innovation that would not otherwise take place, by bringing together

---

[12]    Such a merger also can cause adverse coordinated effects, especially if the acquired firm with excess capacity was disrupting effective coordination.

PX15346-026

complementary capabilities that cannot be otherwise combined or for some other merger-specific reason. See Section 10.

The Agencies also consider whether a merger is likely to give the merged firm an incentive to cease offering one of the relevant products sold by the merging parties. Reductions in variety following a merger may or may not be anticompetitive. Mergers can lead to the efficient consolidation of products when variety offers little in value to customers. In other cases, a merger may increase variety by encouraging the merged firm to reposition its products to be more differentiated from one another.

If the merged firm would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product. If there is evidence of such an effect, the Agencies may inquire whether the reduction in variety is largely due to a loss of competitive incentives attributable to the merger. An anticompetitive incentive to eliminate a product as a result of the merger is greater and more likely, the larger is the share of profits from that product coming at the expense of profits from products sold by the merger partner. Where a merger substantially reduces competition by bringing two close substitute products under common ownership, and one of those products is eliminated, the merger will often also lead to a price increase on the remaining product, but that is not a necessary condition for anticompetitive effect.

> *Example 21:* Firm A sells a high-end product at a premium price. Firm B sells a mid-range product at a lower price, serving customers who are more price sensitive. Several other firms have low-end products. Firms A and B together have a large share of the relevant market. Firm A proposes to acquire Firm B and discontinue Firm B's product. Firm A expects to retain most of Firm B's customers. Firm A may not find it profitable to raise the price of its high-end product after the merger, because doing so would reduce its ability to retain Firm B's more price-sensitive customers. The Agencies may conclude that the withdrawal of Firm B's product results from a loss of competition and materially harms customers.

# 7.    Coordinated Effects

A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. These reactions can blunt a firm's incentive to offer customers better deals by undercutting the extent to which such a move would win business away from rivals. They also can enhance a firm's incentive to raise prices, by assuaging the fear that such a move would lose customers to rivals.

Coordinated interaction includes a range of conduct. Coordinated interaction can involve the explicit negotiation of a common understanding of how firms will compete or refrain from competing. Such conduct typically would itself violate the antitrust laws. Coordinated interaction also can involve a similar common understanding that is not explicitly negotiated but would be enforced by the detection and punishment of deviations that would undermine the coordinated interaction. Coordinated interaction alternatively can involve parallel accommodating conduct not pursuant to a prior understanding. Parallel accommodating conduct includes situations in which each rival's response to competitive moves made by others is individually rational, and not motivated by

24

retaliation or deterrence nor intended to sustain an agreed-upon market outcome, but nevertheless emboldens price increases and weakens competitive incentives to reduce prices or offer customers better terms. Coordinated interaction includes conduct not otherwise condemned by the antitrust laws.

The ability of rival firms to engage in coordinated conduct depends on the strength and predictability of rivals' responses to a price change or other competitive initiative. Under some circumstances, a merger can result in market concentration sufficient to strengthen such responses or enable multiple firms in the market to predict them more confidently, thereby affecting the competitive incentives of multiple firms in the market, not just the merged firm.

## 7.1    Impact of Merger on Coordinated Interaction

The Agencies examine whether a merger is likely to change the manner in which market participants interact, inducing substantially more coordinated interaction. The Agencies seek to identify how a merger might significantly weaken competitive incentives through an increase in the strength, extent, or likelihood of coordinated conduct. There are, however, numerous forms of coordination, and the risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof. Therefore, the Agencies evaluate the risk of coordinated effects using measures of market concentration (see Section 5) in conjunction with an assessment of whether a market is vulnerable to coordinated conduct. See Section 7.2. The analysis in Section 7.2 applies to moderately and highly concentrated markets, as unconcentrated markets are unlikely to be vulnerable to coordinated conduct.

Pursuant to the Clayton Act's incipiency standard, the Agencies may challenge mergers that in their judgment pose a real danger of harm through coordinated effects, even without specific evidence showing precisely how the coordination likely would take place. The Agencies are likely to challenge a merger if the following three conditions are all met: (1) the merger would significantly increase concentration and lead to a moderately or highly concentrated market; (2) that market shows signs of vulnerability to coordinated conduct (see Section 7.2); and (3) the Agencies have a credible basis on which to conclude that the merger may enhance that vulnerability. An acquisition eliminating a maverick firm (see Section 2.1.5) in a market vulnerable to coordinated conduct is likely to cause adverse coordinated effects.

## 7.2    Evidence a Market is Vulnerable to Coordinated Conduct

The Agencies presume that market conditions are conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market, unless competitive conditions in the market have since changed significantly. Previous express collusion in another geographic market will have the same weight if the salient characteristics of that other market at the time of the collusion are comparable to those in the relevant market. Failed previous attempts at collusion in the relevant market suggest that successful collusion was difficult pre-merger but not so difficult as to deter attempts, and a merger may tend to make success more likely. Previous collusion or attempted collusion in another product market may also be given substantial weight if the salient characteristics of that other market at the time of the collusion are closely comparable to those in the relevant market.

25

A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. Even if terms of dealing are not transparent, transparency regarding the identities of the firms serving particular customers can give rise to coordination, e.g., through customer or territorial allocation. Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

A market typically is more vulnerable to coordinated conduct if a firm's prospective competitive reward from attracting customers away from its rivals will be significantly diminished by likely responses of those rivals. This is more likely to be the case, the stronger and faster are the responses the firm anticipates from its rivals. The firm is more likely to anticipate strong responses if there are few significant competitors, if products in the relevant market are relatively homogeneous, if customers find it relatively easy to switch between suppliers, or if suppliers use meeting-competition clauses.

A firm is more likely to be deterred from making competitive initiatives by whatever responses occur if sales are small and frequent rather than via occasional large and long-term contracts or if relatively few customers will switch to it before rivals are able to respond. A firm is less likely to be deterred by whatever responses occur if the firm has little stake in the status quo. For example, a firm with a small market share that can quickly and dramatically expand, constrained neither by limits on production nor by customer reluctance to switch providers or to entrust business to a historically small provider, is unlikely to be deterred. Firms are also less likely to be deterred by whatever responses occur if competition in the relevant market is marked by leapfrogging technological innovation, so that responses by competitors leave the gains from successful innovation largely intact.

A market is more apt to be vulnerable to coordinated conduct if the firm initiating a price increase will lose relatively few customers after rivals respond to the increase. Similarly, a market is more apt to be vulnerable to coordinated conduct if a firm that first offers a lower price or improved product to customers will retain relatively few customers thus attracted away from its rivals after those rivals respond.

The Agencies regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.

Coordinated conduct can harm customers even if not all firms in the relevant market engage in the coordination, but significant harm normally is likely only if a substantial part of the market is subject to such conduct. The prospect of harm depends on the collective market power, in the relevant market, of firms whose incentives to compete are substantially weakened by coordinated conduct. This collective market power is greater, the lower is the market elasticity of demand. This collective market power is diminished by the presence of other market participants with small market shares and little stake in the outcome resulting from the coordinated conduct, if these firms can rapidly expand their sales in the relevant market.

PX15346-029

Buyer characteristics and the nature of the procurement process can affect coordination. For example, sellers may have the incentive to bid aggressively for a large contract even if they expect strong responses by rivals. This is especially the case for sellers with small market shares, if they can realistically win such large contracts. In some cases, a large buyer may be able to strategically undermine coordinated conduct, at least as it pertains to that buyer's needs, by choosing to put up for bid a few large contracts rather than many smaller ones, and by making its procurement decisions opaque to suppliers.

# 8.    Powerful Buyers

Powerful buyers are often able to negotiate favorable terms with their suppliers. Such terms may reflect the lower costs of serving these buyers, but they also can reflect price discrimination in their favor.

The Agencies consider the possibility that powerful buyers may constrain the ability of the merging parties to raise prices. This can occur, for example, if powerful buyers have the ability and incentive to vertically integrate upstream or sponsor entry, or if the conduct or presence of large buyers undermines coordinated effects. However, the Agencies do not presume that the presence of powerful buyers alone forestalls adverse competitive effects flowing from the merger. Even buyers that can negotiate favorable terms may be harmed by an increase in market power. The Agencies examine the choices available to powerful buyers and how those choices likely would change due to the merger. Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.

> *Example 22:* Customer C has been able to negotiate lower pre-merger prices than other customers by threatening to shift its large volume of purchases from one merging firm to the other. No other suppliers are as well placed to meet Customer C's needs for volume and reliability. The merger is likely to harm Customer C. In this situation, the Agencies could identify a price discrimination market consisting of Customer C and similarly placed customers. The merger threatens to end previous price discrimination in their favor.

Furthermore, even if some powerful buyers could protect themselves, the Agencies also consider whether market power can be exercised against other buyers.

> *Example 23:* In Example 22, if Customer C instead obtained the lower pre-merger prices based on a credible threat to supply its own needs, or to sponsor new entry, Customer C might not be harmed. However, even in this case, other customers may still be harmed.

# 9.    Entry

The analysis of competitive effects in Sections 6 and 7 focuses on current participants in the relevant market. That analysis may also include some forms of entry. Firms that would rapidly and easily enter the market in response to a SSNIP are market participants and may be assigned market shares. See Sections 5.1 and 5.2. Firms that have, prior to the merger, committed to entering the market also will normally be treated as market participants. See Section 5.1. This section concerns entry or adjustments to pre-existing entry plans that are induced by the merger.

PX15346-030

As part of their full assessment of competitive effects, the Agencies consider entry into the relevant market. The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers.

The Agencies consider the actual history of entry into the relevant market and give substantial weight to this evidence. Lack of successful and effective entry in the face of non-transitory increases in the margins earned on products in the relevant market tends to suggest that successful entry is slow or difficult. Market values of incumbent firms greatly exceeding the replacement costs of their tangible assets may indicate that these firms have valuable intangible assets, which may be difficult or time consuming for an entrant to replicate.

A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. Entry is that easy if entry would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.

The Agencies examine the timeliness, likelihood, and sufficiency of the entry efforts an entrant might practically employ. An entry effort is defined by the actions the firm must undertake to produce and sell in the market. Various elements of the entry effort will be considered. These elements can include: planning, design, and management; permitting, licensing, or other approvals; construction, debugging, and operation of production facilities; and promotion (including necessary introductory discounts), marketing, distribution, and satisfaction of customer testing and qualification requirements. Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of practical entry efforts. They also can be informative regarding the scale necessary for an entrant to be successful, the presence or absence of entry barriers, the factors that influence the timing of entry, the costs and risk associated with entry, and the sales opportunities realistically available to entrants.

If the assets necessary for an effective and profitable entry effort are widely available, the Agencies will not necessarily attempt to identify which firms might enter. Where an identifiable set of firms appears to have necessary assets that others lack, or to have particularly strong incentives to enter, the Agencies focus their entry analysis on those firms. Firms operating in adjacent or complementary markets, or large customers themselves, may be best placed to enter. However, the Agencies will not presume that a powerful firm in an adjacent market or a large customer will enter the relevant market unless there is reliable evidence supporting that conclusion.

In assessing whether entry will be timely, likely, and sufficient, the Agencies recognize that precise and detailed information may be difficult or impossible to obtain. The Agencies consider reasonably available and reliable evidence bearing on whether entry will satisfy the conditions of timeliness, likelihood, and sufficiency.

PX15346-031

## 9.1        Timeliness

In order to deter the competitive effects of concern, entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect.

Even if the prospect of entry does not deter the competitive effects of concern, post-merger entry may counteract them. This requires that the impact of entrants in the relevant market be rapid enough that customers are not significantly harmed by the merger, despite any anticompetitive harm that occurs prior to the entry.

The Agencies will not presume that an entrant can have a significant impact on prices before that entrant is ready to provide the relevant product to customers unless there is reliable evidence that anticipated future entry would have such an effect on prices.

## 9.2        Likelihood

Entry is likely if it would be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits. Profitability depends upon (a) the output level the entrant is likely to obtain, accounting for the obstacles facing new entrants; (b) the price the entrant would likely obtain in the post-merger market, accounting for the impact of that entry itself on prices; and (c) the cost per unit the entrant would likely incur, which may depend upon the scale at which the entrant would operate.

## 9.3        Sufficiency

Even where timely and likely, entry may not be sufficient to deter or counteract the competitive effects of concern. For example, in a differentiated product industry, entry may be insufficient because the products offered by entrants are not close enough substitutes to the products offered by the merged firm to render a price increase by the merged firm unprofitable. Entry may also be insufficient due to constraints that limit entrants' competitive effectiveness, such as limitations on the capabilities of the firms best placed to enter or reputational barriers to rapid expansion by new entrants. Entry by a single firm that will replicate at least the scale and strength of one of the merging firms is sufficient. Entry by one or more firms operating at a smaller scale may be sufficient if such firms are not at a significant competitive disadvantage.

# 10.    Efficiencies

Competition usually spurs firms to achieve efficiencies internally. Nevertheless, a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products. For example, merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, e.g., by combining complementary assets. In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price. Efficiencies also may lead to new or improved products, even if they do not immediately and directly affect price. In a

29

coordinated effects context, incremental cost reductions may make coordination less likely or effective by enhancing the incentive of a maverick to lower price or by creating a new maverick firm. Even when efficiencies generated through a merger enhance a firm's ability to compete, however, a merger may have other effects that may lessen competition and make the merger anticompetitive.

The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies.[13] Only alternatives that are practical in the business situation faced by the merging firms are considered in making this determination. The Agencies do not insist upon a less restrictive alternative that is merely theoretical.

Efficiencies are difficult to verify and quantify, in part because much of the information relating to efficiencies is uniquely in the possession of the merging firms. Moreover, efficiencies projected reasonably and in good faith by the merging firms may not be realized. Therefore, it is incumbent upon the merging firms to substantiate efficiency claims so that the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific.

Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process. By contrast, efficiency claims substantiated by analogous past experience are those most likely to be credited.

Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service. Cognizable efficiencies are assessed net of costs produced by the merger or incurred in achieving those efficiencies.

The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.[14] To make the requisite determination, the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price

---

[13]  The Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns, such as divestiture or licensing. If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency.

[14]  The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market. In some cases, however, the Agencies in their prosecutorial discretion will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s). Inextricably linked efficiencies are most likely to make a difference when they are great and the likely anticompetitive effect in the relevant market(s) is small so the merger is likely to benefit customers overall.

PX15346-033

increases in that market.[15] In conducting this analysis, the Agencies will not simply compare the magnitude of the cognizable efficiencies with the magnitude of the likely harm to competition absent the efficiencies. The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to customers, for the Agencies to conclude that the merger will not have an anticompetitive effect in the relevant market. When the potential adverse competitive effect of a merger is likely to be particularly substantial, extraordinarily great cognizable efficiencies would be necessary to prevent the merger from being anticompetitive. In adhering to this approach, the Agencies are mindful that the antitrust laws give competition, not internal operational efficiency, primacy in protecting customers.

In the Agencies' experience, efficiencies are most likely to make a difference in merger analysis when the likely adverse competitive effects, absent the efficiencies, are not great. Efficiencies almost never justify a merger to monopoly or near-monopoly. Just as adverse competitive effects can arise along multiple dimensions of conduct, such as pricing and new product development, so too can efficiencies operate along multiple dimensions. Similarly, purported efficiency claims based on lower prices can be undermined if they rest on reductions in product quality or variety that customers value.

The Agencies have found that certain types of efficiencies are more likely to be cognizable and substantial than others. For example, efficiencies resulting from shifting production among facilities formerly owned separately, which enable the merging firms to reduce the incremental cost of production, are more likely to be susceptible to verification and are less likely to result from anticompetitive reductions in output. Other efficiencies, such as those relating to research and development, are potentially substantial but are generally less susceptible to verification and may be the result of anticompetitive output reductions. Yet others, such as those relating to procurement, management, or capital cost, are less likely to be merger-specific or substantial, or may not be cognizable for other reasons.

When evaluating the effects of a merger on innovation, the Agencies consider the ability of the merged firm to conduct research or development more effectively. Such efficiencies may spur innovation but not affect short-term pricing. The Agencies also consider the ability of the merged firm to appropriate a greater fraction of the benefits resulting from its innovations. Licensing and intellectual property conditions may be important to this enquiry, as they affect the ability of a firm to appropriate the benefits of its innovation. Research and development cost savings may be substantial and yet not be cognizable efficiencies because they are difficult to verify or result from anticompetitive reductions in innovative activities.

---

[15] The Agencies normally give the most weight to the results of this analysis over the short term. The Agencies also may consider the effects of cognizable efficiencies with no short-term, direct effect on prices in the relevant market. Delayed benefits from efficiencies (due to delay in the achievement of, or the realization of customer benefits from, the efficiencies) will be given less weight because they are less proximate and more difficult to predict. Efficiencies relating to costs that are fixed in the short term are unlikely to benefit customers in the short term, but can benefit customers in the longer run, e.g., if they make new product introduction less expensive.

PX15346-034

# 11.   Failure and Exiting Assets

Notwithstanding the analysis above, a merger is not likely to enhance market power if imminent failure, as defined below, of one of the merging firms would cause the assets of that firm to exit the relevant market. This is an extreme instance of the more general circumstance in which the competitive significance of one of the merging firms is declining: the projected market share and significance of the exiting firm is zero. If the relevant assets would otherwise exit the market, customers are not worse off after the merger than they would have been had the merger been enjoined.

The Agencies do not normally credit claims that the assets of the failing firm would exit the relevant market unless all of the following circumstances are met: (1) the allegedly failing firm would be unable to meet its financial obligations in the near future; (2) it would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Act; and (3) it has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed merger.[16]

Similarly, a merger is unlikely to cause competitive harm if the risks to competition arise from the acquisition of a failing division. The Agencies do not normally credit claims that the assets of a division would exit the relevant market in the near future unless both of the following conditions are met: (1) applying cost allocation rules that reflect true economic costs, the division has a persistently negative cash flow on an operating basis, and such negative cash flow is not economically justified for the firm by benefits such as added sales in complementary markets or enhanced customer goodwill;[17] and (2) the owner of the failing division has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed acquisition.

# 12.   Mergers of Competing Buyers

Mergers of competing buyers can enhance market power on the buying side of the market, just as mergers of competing sellers can enhance market power on the selling side of the market. Buyer market power is sometimes called "monopsony power."

To evaluate whether a merger is likely to enhance market power on the buying side of the market, the Agencies employ essentially the framework described above for evaluating whether a merger is likely to enhance market power on the selling side of the market. In defining relevant markets, the Agencies

---

[16]   Any offer to purchase the assets of the failing firm for a price above the liquidation value of those assets will be regarded as a reasonable alternative offer. Liquidation value is the highest value the assets could command for use outside the relevant market.

[17]   Because the parent firm can allocate costs, revenues, and intra-company transactions among itself and its subsidiaries and divisions, the Agencies require evidence on these two points that is not solely based on management plans that could have been prepared for the purpose of demonstrating negative cash flow or the prospect of exit from the relevant market.

PX15346-035

focus on the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist.

Market power on the buying side of the market is not a significant concern if suppliers have numerous attractive outlets for their goods or services. However, when that is not the case, the Agencies may conclude that the merger of competing buyers is likely to lessen competition in a manner harmful to sellers.

The Agencies distinguish between effects on sellers arising from a lessening of competition and effects arising in other ways. A merger that does not enhance market power on the buying side of the market can nevertheless lead to a reduction in prices paid by the merged firm, for example, by reducing transactions costs or allowing the merged firm to take advantage of volume-based discounts. Reduction in prices paid by the merging firms not arising from the enhancement of market power can be significant in the evaluation of efficiencies from a merger, as discussed in Section 10.

The Agencies do not view a short-run reduction in the quantity purchased as the only, or best, indicator of whether a merger enhances buyer market power. Nor do the Agencies evaluate the competitive effects of mergers between competing buyers strictly, or even primarily, on the basis of effects in the downstream markets in which the merging firms sell.

> *Example 24:* Merging Firms A and B are the only two buyers in the relevant geographic market for an agricultural product. Their merger will enhance buyer power and depress the price paid to farmers for this product, causing a transfer of wealth from farmers to the merged firm and inefficiently reducing supply. These effects can arise even if the merger will not lead to any increase in the price charged by the merged firm for its output.

# 13.   Partial Acquisitions

In most horizontal mergers, two competitors come under common ownership and control, completely and permanently eliminating competition between them. This elimination of competition is a basic element of merger analysis. However, the statutory provisions referenced in Section 1 also apply to one firm's partial acquisition of a competitor. The Agencies therefore also review acquisitions of minority positions involving competing firms, even if such minority positions do not necessarily or completely eliminate competition between the parties to the transaction.

When the Agencies determine that a partial acquisition results in effective control of the target firm, or involves substantially all of the relevant assets of the target firm, they analyze the transaction much as they do a merger. Partial acquisitions that do not result in effective control may nevertheless present significant competitive concerns and may require a somewhat distinct analysis from that applied to full mergers or to acquisitions involving effective control. The details of the post-acquisition relationship between the parties, and how those details are likely to affect competition, can be important. While the Agencies will consider any way in which a partial acquisition may affect competition, they generally focus on three principal effects.

First, a partial acquisition can lessen competition by giving the acquiring firm the ability to influence the competitive conduct of the target firm. A voting interest in the target firm or specific governance rights, such as the right to appoint members to the board of directors, can permit such influence. Such

33

influence can lessen competition because the acquiring firm can use its influence to induce the target firm to compete less aggressively or to coordinate its conduct with that of the acquiring firm.

Second, a partial acquisition can lessen competition by reducing the incentive of the acquiring firm to compete. Acquiring a minority position in a rival might significantly blunt the incentive of the acquiring firm to compete aggressively because it shares in the losses thereby inflicted on that rival. This reduction in the incentive of the acquiring firm to compete arises even if cannot influence the conduct of the target firm. As compared with the unilateral competitive effect of a full merger, this effect is likely attenuated by the fact that the ownership is only partial.

Third, a partial acquisition can lessen competition by giving the acquiring firm access to non-public, competitively sensitive information from the target firm. Even absent any ability to influence the conduct of the target firm, access to competitively sensitive information can lead to adverse unilateral or coordinated effects. For example, it can enhance the ability of the two firms to coordinate their behavior, and make other accommodating responses faster and more targeted. The risk of coordinated effects is greater if the transaction also facilitates the flow of competitively sensitive information from the acquiring firm to the target firm.

Partial acquisitions, like mergers, vary greatly in their potential for anticompetitive effects. Accordingly, the specific facts of each case must be examined to assess the likelihood of harm to competition. While partial acquisitions usually do not enable many of the types of efficiencies associated with mergers, the Agencies consider whether a partial acquisition is likely to create cognizable efficiencies.

PX15346-037

# PX15347




# Merger Guidelines

**U.S. Department of Justice and the Federal Trade Commission**

Issued: December 18, 2023

PX15347-001

# 1.  Overview

These Merger Guidelines identify the procedures and enforcement practices the Department of Justice and the Federal Trade Commission (the "Agencies") most often use to investigate whether mergers violate the antitrust laws. The Agencies enforce the federal antitrust laws, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; and Sections 3, 7, and 8 of the Clayton Act,[1] 15 U.S.C. §§ 14, 18, 19.[2] Congress has charged the Agencies with administering these statutes as part of a national policy to promote open and fair competition, including by preventing mergers and acquisitions that would violate these laws. "Federal antitrust law is a central safeguard for the Nation's free market structures" that ensures "the preservation of economic freedom and our free-enterprise system."[3] It rests on the premise that "[t]he unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions."[4]

Section 7 of the Clayton Act ("Section 7") prohibits mergers and acquisitions where "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Competition is a process of rivalry that incentivizes businesses to offer lower prices, improve wages and working conditions, enhance quality and resiliency, innovate, and expand choice, among many other benefits. Mergers that substantially lessen competition or tend to create a monopoly increase, extend, or entrench market power and deprive the public of these benefits. Mergers can lessen competition when they diminish competitive constraints, reduce the number or attractiveness of alternatives available to trading partners, or reduce the intensity with which market participants compete.

Section 7 was designed to arrest anticompetitive tendencies in their incipiency.[5] The Clayton Act therefore requires the Agencies to assess whether mergers present risk to competition. The Supreme Court has explained that "Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect '*may be* substantially to lessen competition'" or to tend to create a monopoly.[6] Accordingly, the Agencies do not attempt to

---

[1] As amended under the Celler-Kefauver Antimerger Act of 1950, Pub. L. No. 81-899, 64 Stat. 1125 (1950), and the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

[2] Although these Guidelines focus primarily on Section 7 of the Clayton Act, the Agencies consider whether any of these statutes may be violated by a merger. The various provisions of the Sherman, Clayton, and FTC Acts each have separate standards, and one may be violated when the others are not.

[3] *North Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015).

[4] *NCAA v. Board of Regents*, 468 U.S. 85, 104 n.27 (1984) (quoting *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4-5 (1958)); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2147 (2021) (quoting *Board of Regents*, 468 U.S. at 104 n.27).

[5] *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 318 nn.32-33 (1962); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (Section 7 "halt[s] incipient monopolies and trade restraints outside the scope of the Sherman Act." (quoting *Brown Shoe*, 370 U.S. at 318 n.32)); *Saint Alphonsus Medical Center-Nampa v. St. Luke's*, 778 F.3d 775, 783 (9th Cir. 2015) (Section 7 "intended to arrest anticompetitive tendencies in their incipiency." (quoting *Brown Shoe*, 370 U.S. at 322)); *Polypore Intern., Inc. v. FTC*, 686 F.3d 1208, 1213-14 (11th Cir. 2012) (same). Some other aspects of *Brown Shoe* have been subsequently revisited.

[6] *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18 with emphasis) (citing *Brown Shoe*, 370 U.S. at 323).

PX15347-002

predict the future or calculate precise effects of a merger with certainty. Rather, the Agencies examine the totality of the evidence available to assess the risk the merger presents.

Competition presents itself in myriad ways. To assess the risk of harm to competition in a dynamic and complex economy, the Agencies begin the analysis of a proposed merger by asking: how do firms in this industry compete, and does the merger threaten to substantially lessen competition or to tend to create a monopoly?

The Merger Guidelines set forth several different analytical frameworks (referred to herein as "Guidelines") to assist the Agencies in assessing whether a merger presents sufficient risk to warrant an enforcement action. These frameworks account for industry-specific market realities and use a variety of indicators and tools, ranging from market structure to direct evidence of the effect on competition, to examine whether the proposed merger may harm competition.

*How to Use These Guidelines:* When companies propose a merger that raises concerns under one or more Guidelines, the Agencies closely examine the evidence to determine if the facts are sufficient to infer that the effect of the merger may be to substantially lessen competition or to tend to create a monopoly (sometimes referred to as a "prima facie case").[7] **Section 2** describes how the Agencies apply these Guidelines. Specifically, Guidelines 1-6 describe distinct frameworks the Agencies use to identify that a merger raises prima facie concerns, and Guidelines 7-11 explain how to apply those frameworks in several specific settings. In all of these situations, the Agencies will also examine relevant evidence to determine if it disproves or rebuts the prima facie case and shows that the merger does not in fact threaten to substantially lessen competition or tend to create a monopoly. **Section 3** identifies rebuttal evidence that the Agencies consider, and that merging parties can present, to rebut an inference of potential harm under these frameworks.[8] **Section 4** sets forth a non-exhaustive discussion of analytical, economic, and evidentiary tools the Agencies use to evaluate facts, understand the risk of harm to competition, and define relevant markets.

These Guidelines are not mutually exclusive, as a single transaction can have multiple effects or raise concerns in multiple ways. To promote efficient review, for any given transaction the Agencies may limit their analysis to any one Guideline or subset of Guidelines that most readily demonstrates the risks to competition from the transaction.

**Guideline 1: Mergers Raise a Presumption of Illegality When They Significantly Increase Concentration in a Highly Concentrated Market.** Market concentration is often a useful indicator of a merger's likely effects on competition. The Agencies therefore presume, unless sufficiently disproved or rebutted, that a merger between competitors that significantly increases concentration and creates or further consolidates a highly concentrated market may substantially lessen competition.

**Guideline 2: Mergers Can Violate the Law When They Eliminate Substantial Competition Between Firms.** The Agencies examine whether competition between the merging parties is substantial since their merger will necessarily eliminate any competition between them.

---

[7] *See, e.g.*, *United States v. AT&T, Inc.*, 916 F.3d at 1032 (explaining that a *prima facie* case can demonstrate a "reasonable probability" of harm to competition either through "statistics about the change in market concentration" or a "fact-specific" showing (quoting *Brown Shoe*, 370 U.S. at 323 n.39)); *United States v. Baker Hughes*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).

[8] These Guidelines pertain only to the Agencies' consideration of whether a merger or acquisition may substantially lessen competition or tend to create a monopoly. The consideration of remedies appropriate for mergers that pose that risk is beyond the Merger Guidelines' scope. The Agencies review proposals to revise a merger in order to alleviate competitive concerns consistent with applicable law regarding remedies.

2

**Guideline 3: Mergers Can Violate the Law When They Increase the Risk of Coordination.** The Agencies examine whether a merger increases the risk of anticompetitive coordination. A market that is highly concentrated or has seen prior anticompetitive coordination is inherently vulnerable and the Agencies will infer, subject to rebuttal evidence, that the merger may substantially lessen competition. In a market that is not highly concentrated, the Agencies investigate whether facts suggest a greater risk of coordination than market structure alone would suggest.

**Guideline 4: Mergers Can Violate the Law When They Eliminate a Potential Entrant in a Concentrated Market.** The Agencies examine whether, in a concentrated market, a merger would (a) eliminate a potential entrant or (b) eliminate current competitive pressure from a perceived potential entrant.

**Guideline 5: Mergers Can Violate the Law When They Create a Firm That May Limit Access to Products or Services That Its Rivals Use to Compete.** When a merger creates a firm that can limit access to products or services that its rivals use to compete, the Agencies examine the extent to which the merger creates a risk that the merged firm will limit rivals' access, gain or increase access to competitively sensitive information, or deter rivals from investing in the market.

**Guideline 6: Mergers Can Violate the Law When They Entrench or Extend a Dominant Position.** The Agencies examine whether one of the merging firms already has a dominant position that the merger may reinforce, thereby tending to create a monopoly. They also examine whether the merger may extend that dominant position to substantially lessen competition or tend to create a monopoly in another market.

**Guideline 7: When an Industry Undergoes a Trend Toward Consolidation, the Agencies Consider Whether It Increases the Risk a Merger May Substantially Lessen Competition or Tend to Create a Monopoly.** A trend toward consolidation can be an important factor in understanding the risks to competition presented by a merger. The Agencies consider this evidence carefully when applying the frameworks in Guidelines 1-6.

**Guideline 8: When a Merger is Part of a Series of Multiple Acquisitions, the Agencies May Examine the Whole Series.** If an individual transaction is part of a firm's pattern or strategy of multiple acquisitions, the Agencies consider the cumulative effect of the pattern or strategy when applying the frameworks in Guidelines 1-6.

**Guideline 9: When a Merger Involves a Multi-Sided Platform, the Agencies Examine Competition Between Platforms, on a Platform, or to Displace a Platform.** Multi-sided platforms have characteristics that can exacerbate or accelerate competition problems. The Agencies consider the distinctive characteristics of multi-sided platforms when applying the frameworks in Guidelines 1-6.

**Guideline 10: When a Merger Involves Competing Buyers, the Agencies Examine Whether It May Substantially Lessen Competition for Workers, Creators, Suppliers, or Other Providers.** The Agencies apply the frameworks in Guidelines 1-6 to assess whether a merger between buyers, including employers, may substantially lessen competition or tend to create a monopoly.

**Guideline 11: When an Acquisition Involves Partial Ownership or Minority Interests, the Agencies Examine Its Impact on Competition**. The Agencies apply the frameworks in Guidelines 1-6 to assess if an acquisition of partial control or common ownership may substantially lessen competition.

*    *    *

3

PX15347-004

This edition of the Merger Guidelines consolidates, revises, and replaces the various versions of Merger Guidelines previously issued by the Agencies. The revision builds on the learning and experience reflected in those prior Guidelines and successive revisions. These Guidelines reflect the collected experience of the Agencies over many years of merger review in a changing economy and have been refined through an extensive public consultation process.

As a statement of the Agencies' law enforcement procedures and practices, the Merger Guidelines create no independent rights or obligations, do not affect the rights or obligations of private parties, and do not limit the discretion of the Agencies, including their staff, in any way. Although the Merger Guidelines identify the factors and frameworks the Agencies consider when investigating mergers, the Agencies' enforcement decisions will necessarily continue to require prosecutorial discretion and judgment. Because the specific standards set forth in these Merger Guidelines will be applied to a broad range of factual circumstances, the Agencies will apply them reasonably and flexibly to the specific facts and circumstances of each merger.

Similarly, the factors contemplated in these Merger Guidelines neither dictate nor exhaust the range of theories or evidence that the Agencies may introduce in merger litigation. Instead, they set forth various methods of analysis that may be applicable depending on the availability and/or reliability of information related to a given market or transaction. Given the variety of industries, market participants, and acquisitions that the Agencies encounter, merger analysis does not consist of uniform application of a single methodology. The Agencies assess any relevant and meaningful evidence to evaluate whether the effect of a merger may be substantially to lessen competition or to tend to create a monopoly. Merger review is ultimately a fact-specific exercise. The Agencies follow the facts and the law in analyzing mergers as they do in other areas of law enforcement.

These Merger Guidelines include references to applicable legal precedent. References to court decisions do not necessarily suggest that the Agencies would analyze the facts in those cases identically today. While the Agencies adapt their analytical tools as they evolve and advance, legal holdings reflecting the Supreme Court's interpretation of a statute apply unless subsequently modified. These Merger Guidelines therefore reference applicable propositions of law to explain core principles that the Agencies apply in a manner consistent with modern analytical tools and market realities. References herein do not constrain the Agencies' interpretation of the law in particular cases, as the Agencies will apply their discretion with respect to the applicable law in each case in light of the full range of precedent pertinent to the issues raised by each enforcement action.

4

## 2. Applying the Merger Guidelines

This section discusses the frameworks the Agencies use to assess whether a merger may substantially lessen competition or tend to create a monopoly.

### 2.1. Guideline 1: Mergers Raise a Presumption of Illegality When They Significantly Increase Concentration in a Highly Concentrated Market.

Market concentration and the change in concentration due to the merger are often useful indicators of a merger's risk of substantially lessening competition. In highly concentrated markets, a merger that eliminates a significant competitor creates significant risk that the merger may substantially lessen competition or tend to create a monopoly. As a result, a significant increase in concentration in a highly concentrated market can indicate that a merger may substantially lessen competition, depriving the public of the benefits of competition.

The Supreme Court has endorsed this view and held that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market[,] is so inherently likely to lessen competition substantially that it must be enjoined in the absence of [rebuttal] evidence."[9] In the Agencies' experience, this legal presumption provides a highly administrable and useful tool for identifying mergers that may substantially lessen competition.

An analysis of concentration involves calculating pre-merger market shares of products[10] within a relevant market (see Section 4.3 for a discussion of market definition and Section 4.4 for more details on computing market shares). The Agencies assess whether the merger creates or further consolidates a highly concentrated market and whether the increase in concentration is sufficient to indicate that the merger may substantially lessen competition or tend to create a monopoly.[11]

The Agencies generally measure concentration levels using the Herfindahl-Hirschman Index ("HHI").[12] The HHI is defined as the sum of the squares of the market shares; it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm. Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase.[13] A merger that creates or further consolidates a highly

---

[9] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *see, e.g.*, *FTC v. v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172-73 (3d Cir. 2022); *United States v. AT&T, Inc.*, 916 F.3d at 1032.

[10] These Guidelines use the term "products" to encompass anything that is traded between firms and their suppliers, customers, or business partners, including physical goods, services, or access to assets. Products can be as narrow as an individual brand, a specific version of a product, or a product that includes specific ancillary services such as the right to return it without cause or delivery to the customer's location.

[11] Typically, a merger eliminates a competitor by bringing two market participants under common control. Similar concerns arise if the merger threatens to cause the exit of a current market participant, such as a leveraged buyout that puts the target firm at significant risk of failure.

[12] The Agencies may instead measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure shares in the relevant market.

[13] For illustration, the HHI for a market of five equal firms is 2,000 (5 x $20^2$ = 2,000) and for six equal firms is 1,667 (6 x $16.67^2$ = 1667).

5

concentrated market that involves an increase in the HHI of more than 100 points[14] is presumed to substantially lessen competition or tend to create a monopoly.[15] The Agencies also may examine the market share of the merged firm: a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points.[16]

| Indicator | Threshold for Structural Presumption |
|---|---|
| Post-merger HHI | Market HHI greater than 1,800<br>AND<br>Change in HHI greater than 100 |
| Merged Firm's Market Share | Share greater than 30%<br>AND<br>Change in HHI greater than 100 |

When exceeded, these concentration metrics indicate that a merger's effect may be to eliminate substantial competition between the merging parties and may be to increase coordination among the remaining competitors after the merger. This presumption of illegality can be rebutted or disproved. The higher the concentration metrics over these thresholds, the greater the risk to competition suggested by this market structure analysis and the stronger the evidence needed to rebut or disprove it.

## 2.2.    Guideline 2: Mergers Can Violate the Law When They Eliminate Substantial Competition Between Firms.

A merger eliminates competition between the merging firms by bringing them under joint control.[17] If evidence demonstrates substantial competition between the merging parties prior to the

---

[14] The change in HHI from a merger of firms with shares $a$ and $b$ is equal to $2ab$. For example, in a merger between a firm with 20% market share and a firm with 5% market share, the change in HHI is $2 \times 20 \times 5 = 200$.

[15] The first merger guidelines to reference an HHI threshold were the merger guidelines issued in 1982. These guidelines referred to mergers with HHI above 1,000 as concentrated markets, with HHI between 1,000 and 1,800 as "moderately concentrated" and above 1,800 as "highly concentrated," while they referred to an increase in HHI of 100 as a "significant increase." Each subsequent iteration until 2010 maintained those thresholds. *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Horizontal Merger Guidelines § 1.51 (1997); Fed. Trade Comm'n & U.S. Dep't of Justice, Horizontal Merger Guidelines § 1.51 (1992); U.S. Dep't of Justice, Merger Guidelines § 3(A) (1982). During this time, courts routinely cited to the guidelines and these HHI thresholds in decisions. *See, e.g., Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1211 (11th Cir. 1991). Although the Agencies raised the thresholds for the 2010 guidelines, based on experience and evidence developed since, the Agencies consider the original HHI thresholds to better reflect both the law and the risks of competitive harm suggested by market structure and have therefore returned to those thresholds.

[16] *Phila. Nat'l Bank*, 374 U.S. at 364-65 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

[17] The competitive harm from the elimination of competition between the merging firms, without considering the risk of coordination, is sometimes referred to as unilateral effects. The elimination of competition between the merging firms can also lessen competition with and among other competitors. When the elimination of competition between the merging firms

6

merger, that ordinarily suggests that the merger may substantially lessen competition.[18]Although a change in market structure can also indicate risk of competitive harm (see Guideline 1), an analysis of the existing competition between the merging firms can demonstrate that a merger threatens competitive harm independent from an analysis of market shares.

Competition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition. This can include competition to research and develop products or services, and the elimination of such competition may result in harm even if such products or services are not yet commercially available. The more the merging parties have shaped one another's behavior, or have affected one another's sales, profits, valuation, or other drivers of behavior, the more significant the competition between them.

The Agencies examine a variety of indicators to identify substantial competition. For example:

**Strategic Deliberations or Decisions.** The Agencies may analyze the extent of competition between the merging firms by examining evidence relating to strategic deliberations or decisions in the regular course of business. For example, in some markets, the firms may monitor each other's pricing, marketing campaigns, facility locations, improvements, products, capacity, output, input costs, and/or innovation plans. This can provide evidence of competition between the merging firms, especially when they react by taking steps to preserve or enhance the competitiveness or profitability of their own products or services.

**Prior Merger, Entry, and Exit Events.** The Agencies may look to historical events to assess the presence and substantiality of direct competition between the merging firms. For example, the Agencies may examine the competitive impact of recent relevant mergers, entry, expansion, or exit events.

**Customer Substitution.** Customers' willingness to switch between different firms' products is an important part of the competitive process. Firms are closer competitors the more that customers are willing to switch between their products. The Agencies use a variety of tools, detailed in Section 4.2, to assess customer substitution.

**Impact of Competitive Actions on Rivals.** When one firm takes competitive actions to attract customers, this can benefit the firm at the expense of its rivals. The Agencies may gauge the extent of competition between the merging firms by considering the impact that competitive actions by one of the merging firms has on the other merging firm. The impact of a firm's competitive actions on a rival is generally greater when customers consider the firm's products and the rival's products to be closer substitutes, so that a firm's competitive action results in greater lost sales for the rival, and when the profitability of the rival's lost sales is greater.

**Impact of Eliminating Competition Between the Firms.** In some instances, evidence may be available to assess the impact of competition from one firm on the other's actions, such as firm choices

---

leads them to compete less aggressively with one another, other firms in the market can in turn compete less aggressively, decreasing the overall intensity of competition.

[18] *See also United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 669-70 (1964) (per curiam) ("[I]t [is] clear that the elimination of significant competition between [merging parties] constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act. . . . It [can be] enough that the two . . . compete[], that their competition [is] not insubstantial and that the combination [would] put an end to it."); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568-70 (6th Cir. 2014), *cert. denied*, 575 U.S. 996 (2015).

PX15347-008

about price, quality, wages, or another dimension of competition. Section 4.2 describes a variety of approaches to measuring such impacts.

***Additional Evidence, Tools, and Metrics.*** The Agencies may use additional evidence, tools, and metrics to assess the loss of competition between the firms. Depending on the realities of the market, different evidence, tools, or metrics may be appropriate.

Section 4.2 provides additional detail about the approaches that the Agencies use to assess competition between or among firms.

## 2.3.    Guideline 3: Mergers Can Violate the Law When They Increase the Risk of Coordination.

The Agencies determine that a merger may substantially lessen competition when it meaningfully increases the risk of coordination among the remaining firms in a relevant market or makes existing coordination more stable or effective.[19] Firms can coordinate across any or all dimensions of competition, such as price, product features, customers, wages, benefits, or geography. Coordination among rivals lessens competition whether it occurs explicitly—through collusive agreements between competitors not to compete or to compete less—or tacitly, through observation and response to rivals. Because tacit coordination often cannot be addressed under Section 1 of the Sherman Act, the Agencies vigorously enforce Section 7 of the Clayton Act to prevent market structures conducive to such coordination.

Tacit coordination can lessen competition even when it does not rise to the level of an agreement and would not itself violate the law. For example, in a concentrated market a firm may forego or soften an aggressive competitive action because it anticipates rivals responding in kind. This harmful behavior is more common the more concentrated markets become, as it is easier to predict the reactions of rivals when there are fewer of them.

To assess the extent to which a merger may increase the likelihood, stability, or effectiveness of coordination, the Agencies often consider three primary factors and several secondary factors. The Agencies may consider additional factors depending on the market.

### 2.3.A.    Primary Factors

The Agencies may conclude that post-merger market conditions are susceptible to coordinated interaction and that the merger materially increases the risk of coordination if any of the three primary factors are present.

***Highly Concentrated Market.*** By reducing the number of firms in a market, a merger increases the risk of coordination. The fewer the number of competitively meaningful rivals prior to the merger, the greater the likelihood that merging two competitors will facilitate coordination. Markets that are highly concentrated after a merger that significantly increases concentration (see Guideline 1) are presumptively susceptible to coordination. If merging parties assert that a highly concentrated market is not susceptible to coordination, the Agencies will assess this rebuttal evidence using the framework

---

[19] *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 229-30 (1993) ("In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits.").

8

described below. Where a market is not highly concentrated, the Agencies may still consider other risk factors.

***Prior Actual or Attempted Attempts to Coordinate.*** Evidence that firms representing a substantial share in the relevant market appear to have previously engaged in express or tacit coordination to lessen competition is highly informative as to the market's susceptibility to coordination. Evidence of failed attempts at coordination in the relevant market suggest that successful coordination was not so difficult as to deter attempts, and a merger reducing the number of rivals may tend to make success more likely.

***Elimination of a Maverick.*** A maverick is a firm with a disruptive presence in a market. The presence of a maverick, however, only reduces the risk of coordination so long as the maverick retains the disruptive incentives that drive its behavior. A merger that eliminates a maverick or significantly changes its incentives increases the susceptibility to coordination.

### 2.3.B.  Secondary Factors

The Agencies also examine whether secondary factors demonstrate that a merger may meaningfully increase the risk of coordination, even absent the primary risk factors. Not all secondary factors must be present for a market to be susceptible to coordination.

***Market Concentration.*** Even in markets that are not highly concentrated, coordination becomes more likely as concentration increases. The more concentrated a market, the more likely the Agencies are to conclude that the market structure suggests susceptibility to coordination.

***Market Observability.*** A market is more susceptible to coordination if a firm's behavior can be promptly and easily observed by its rivals. Rivals' behavior is more easily observed when the terms offered to customers are readily discernible and relatively observable (that is, known to rivals). Observability can refer to the ability to observe prices, terms, the identities of the firms serving particular customers, or any other competitive actions of other firms. Information exchange arrangements among market participants, such as public exchange of information through announcements or private exchanges through trade associations or publications, increase market observability. Regular monitoring of one another's prices or customers can indicate that the terms offered to customers are relatively observable. Pricing algorithms, programmatic pricing software or services, and other analytical or surveillance tools that track or predict competitor prices or actions likewise can increase the observability of the market.

***Competitive Responses.*** A market is more susceptible to coordination if a firm's prospective competitive reward from attracting customers away from its rivals will be significantly diminished by its rivals' likely responses. This is more likely to be the case the stronger and faster the responses from its rivals because such responses reduce the benefits of competing more aggressively. Some factors that increase the likelihood of strong or rapid responses by rivals include: (1) the market has few significant competitors, (2) products in the relevant market are relatively homogeneous, (3) customers find it relatively easy to switch between suppliers, (4) suppliers use algorithmic pricing, or (5) suppliers use meeting-competition clauses. The more predictable are rivals' responses to strategic actions or changing competitive conditions, and the more interactions firms have across multiple markets, the greater the susceptibility to coordination.

***Aligned Incentives.*** Removing a firm that has different incentives from most other firms in a market can increase the risk of coordination. For example, a firm with a small market share may have

9

less incentive to coordinate because it has more to gain from winning new business than other firms. The same issue can arise when a merger more closely aligns one or both merging firms' incentives with the other firms in the market. In some cases, incentives might be aligned or strengthened when firms compete with one another in multiple markets ("multi-market contact"). For example, firms might compete less aggressively in some markets in anticipation of reciprocity by rivals in other markets. The Agencies examine these and any other market realities that suggest aligned incentives increase susceptibility to coordination.

>    ***Profitability or Other Advantages of Coordination for Rivals.*** The Agencies regard coordinated interaction as more likely to occur when participants in the market stand to gain more from successful coordination. Coordination generally is more profitable or otherwise advantageous for the coordinating firms the less often customers substitute outside the market when firms offer worse terms.

>    ***Rebuttal Based on Structural Barriers to Coordination Unique to the Industry.*** When market structure evidence suggests that a merger may substantially lessen competition through coordination, the merging parties sometimes argue that anticompetitive coordination is nonetheless impossible due to structural market barriers to coordinating. The Agencies consider this rebuttal evidence using the framework in Section 3. In so doing, the Agencies consider whether structural market barriers to coordination are "so much greater in the [relevant] industry than in other industries that they rebut the normal presumption" of coordinated effects.[20] In the Agencies' experience, structural conditions that prevent coordination are exceedingly rare in the modern economy. For example, coordination is more difficult when firms are unable to observe rivals' competitive offerings, but technological change has made this situation less common than in the past and reduced many traditional barriers or obstacles to observing the behavior of rivals in a market. The greater the level of concentration in the relevant market, the greater must be the structural barriers to coordination in order to show that no substantial lessening of competition is threatened.

## 2.4.    Guideline 4: Mergers Can Violate the Law When They Eliminate a Potential Entrant in a Concentrated Market.

Mergers can substantially lessen competition by eliminating a potential entrant. For instance, a merger can eliminate the possibility that entry or expansion by one or both firms would have resulted in new or increased competition in the market in the future. A merger can also eliminate current competitive pressure exerted on other market participants by the mere perception that one of the firms might enter. Both of these risks can be present simultaneously.

A merger that eliminates a potential entrant into a concentrated market can substantially lessen competition or tend to create a monopoly.[21] The more concentrated the market, the greater the magnitude of harm to competition from any lost potential entry and the greater the tendency to create a monopoly. Accordingly, for mergers involving one or more potential entrants, the higher the market concentration, the lower the probability of entry that gives rise to concern.

---

[20] *See H.J. Heinz Co.*, 246 F.3d at 724.
[21] *United States v. Marine Bancorp.*, 418 U.S. 602, 630 (1974). A concentrated market is one with an HHI greater than 1,000 (See Guideline 1, n.15).

10

### 2.4.A.  Actual Potential Competition: Eliminating Reasonably Probable Future Entry

In general, expansion into a concentrated market via internal growth rather than via acquisition benefits competition.[22] Merging a current and a potential market participant eliminates the possibility that the potential entrant would have entered on its own—entry that, had it occurred, would have provided a new source of competition in a concentrated market.

To determine whether an acquisition that eliminates a potential entrant into a concentrated market may substantially lessen competition,[23] the Agencies examine (1) whether one or both[24] of the merging firms had a reasonable probability of entering the relevant market other than through an anticompetitive merger, and (2) whether such entry offered a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects.[25]

*Reasonable Probability of Entry.* The Agencies' starting point for assessment of a reasonable probability of entry is objective evidence regarding the firm's available feasible means of entry, including its capabilities and incentives. Relevant objective evidence can include, for example, evidence that the firm has sufficient size and resources to enter; evidence of any advantages that would make the firm well-situated to enter; evidence that the firm has successfully expanded into similarly situated markets in the past or already participates in adjacent or related markets; evidence that the firm has an incentive to enter; or evidence that industry participants recognize the company as a potential entrant. This analysis is not limited to whether the company could enter with its pre-merger production facilities, but also considers overall capability, which can include the ability to expand or add to its capabilities on its own or in collaboration with someone other than the acquisition target.

Subjective evidence that the company considered entering absent the merger can also indicate a reasonable probability that the company would have entered without the merger. Subjective evidence that the company considered organic entry as an alternative to merging generally suggests that, absent the merger, entry would be reasonably probable.

*Likelihood of Deconcentration or Other Significant Procompetitive Effects.* New entry can yield a variety of procompetitive effects, including increased output or investment, higher wages or improved working conditions, greater innovation, higher quality, and lower prices. If the merging firm had a reasonable probability of entering a highly concentrated relevant market, this suggests benefits that would have resulted from its entry would be competitively significant, unless there is substantial direct evidence that the competitive effect would be *de minimis*. To supplement the suggestion that new entry yields procompetitive effects, the Agencies will consider projections of the potential entrant's

---

[22] *See Ford Motor Co. v. United States*, 405 U.S. 562, 587 (1972) (referring to the "typical[]" competitive concern when "a potential entrant enters an oligopolistic market by acquisition rather than internal expansion" as being "that such a move has deprived the market of the pro-competitive effect of an increase in the number of competitors").

[23] Harm from the elimination of a potential entrant can occur in markets that do not yet consist of commercial products, even if the market concentration of the future market cannot be measured using traditional means. Where there are few equivalent potential entrants, including one or both of the merging firms, that indicates that the future market, once commercialized, will be concentrated. The Agencies will consider other potential entrants' capabilities and incentives in comparison to the merging potential entrant to assess equivalence.

[24] *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964) (holding that a merger between two firms, each or both of which might have entered the relevant market, could violate Section 7).

[25] *See id.* at 175-76; *Marine Bancorp.*, 418 U.S. at 622, 633 ("[T]he proscription expressed in § 7 against mergers 'when a "tendency" toward monopoly or [a] "reasonable likelihood" of a substantial lessening of competition in the relevant market is shown' applies alike to actual- and potential-competition cases." (quoting *Penn-Olin*, 378 U.S. at 171)); *see also Yamaha Motor Co. v. FTC*, 657 F.2d 971, 980-981 (8th Cir. 1981) (acquisition of potential entrant violated Section 7).

11

competitive significance, such as market share, its business strategy, the anticipated response of competitors, or customer preferences or interest.

A merger of two potential entrants can also result in a substantial lessening of competition. The merger need not involve a firm that has a commercialized product in the market or an existing presence in the same geographic market. The Agencies analyze similarly mergers between two potential entrants and those involving a current market participant and a potential entrant.

### 2.4.B.  Perceived Potential Competition: Lessening of Current Competitive Pressure

A perceived potential entrant can stimulate competition among incumbents. That pressure can prompt current market participants to make investments, expand output, raise wages, increase product quality, lower product prices, or take other procompetitive actions. The acquisition of a firm that is perceived by market participants as a potential entrant can substantially lessen competition by eliminating or relieving competitive pressure.

To assess whether the acquisition of a perceived potential entrant may substantially lessen competition, the Agencies consider whether a current market participant could reasonably consider one of the merging companies to be a potential entrant and whether that potential entrant has a likely influence on existing competition.[26]

***Market Participant Could Reasonably Consider a Firm to Be a Potential Entrant.*** The starting point for this analysis is evidence regarding the company's capability of entering or applying competitive pressure. Objective evidence is highly probative and includes evidence of feasible means of entry or communications by the company indicating plans to expand or reallocate resources in a way that could increase competition in the relevant market. Objective evidence can be sufficient to find that the firm is a potential entrant; it need not be accompanied by any subjective evidence of current market participants' internal perceptions or direct evidence of strategic reactions to the potential entrant. If such evidence is available, it can weigh in favor of finding that a current market participant could reasonably consider the firm to be a potential entrant.

***Likely Influence on Existing Rivals.*** Direct evidence that the firm's presence or behavior has affected or is affecting current market participants' strategic decisions is not necessary but can establish a showing of a likely influence. Even without such direct evidence, circumstantial evidence that the firm's presence or behavior had an effect on the competitive reactions of firms in the market may also show likely influence. Objective evidence establishing that a current market participant could reasonably consider one of the merging firms to be a potential entrant can also establish that the firm has a likely influence on existing market participants. Subjective evidence indicating that current market participants—including, for example, customers, suppliers, or distributors—internally perceive the merging firm to be a potential entrant can also establish a likely influence.

### 2.4.C.  Distinguishing Potential Entry from Entry as Rebuttal

When evaluating a potentially unlawful merger of current competitors, the Agencies will assess whether entry by other firms would be timely, likely, and sufficient to replace the lost competition using the standards discussed in Section 3.2. The existence of a perceived or actual potential entrant may not meet that standard when considering a merger between firms that already participate in the relevant market. The competitive impact of perceived and actual potential entrants is typically attenuated

---

[26] *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-36 (1973); *Marine Bancorp.*, 418 U.S. at 624-25.

PX15347-013

compared to competition between two current market participants. However, because concentrated markets often lack robust competition, the loss of even an attenuated source of competition such as a potential entrant may substantially lessen competition in such markets. Moreover, because the Agencies seek to prevent threats to competition in their incipiency, the likelihood of potential entry that could establish that a merger's effect "may be" to substantially lessen competition will generally not equal the likelihood of entry that would rebut a demonstrated risk that competition may be substantially lessened.

## 2.5.    Guideline 5: Mergers Can Violate the Law When They Create a Firm that May Limit Access to Products or Services That Its Rivals Use to Compete.

The Agencies evaluate whether a merger may substantially lessen competition when the merged firm can limit access to a product, service, or route to market[27] that its rivals may use to compete. Mergers involving products or services rivals may use to compete can threaten competition in several ways, for example: (A) the merged firm could limit rivals' access to the products or services, thereby weakening or excluding them, lessening competition; (B) the merged firm may gain or increase access to rivals' competitively sensitive information, thereby facilitating coordination or undermining their incentives to compete; or (C) the threat of limited access can deter rivals and potential rivals from investing.

These problems can arise from mergers involving access to any products, services, or routes to market that rivals use to compete, and that are competitively significant to those rivals, whether or not they involve a traditional vertical relationship such as a supplier and distributor relationship. Many types of related products can implicate these concerns, including products rivals currently or may in the future use as inputs, products that provide distribution services for rivals or otherwise influence customers' purchase decisions, products that provide or increase the merged firm's access to competitively sensitive information about its rivals, or complements that increase the value of rivals' products. Even if the related product is not currently being used by rivals, it might be competitively significant because, for example, its availability enables rivals to obtain better terms from other providers in negotiations. The Agencies refer to any product, service, or route to market that rivals use to compete in that market as a "related product."

The Agencies analyze competitive effects in the relevant market in which the merged firm competes with rivals that use the related product. The Agencies do not always define a market around the related product, although they may do so (see Section 2.5.A.2).

### 2.5.A.    The Risk that the Merged Firm May Limit Access

A merger involving products, services, or routes to market that rivals use to compete may substantially lessen competition when the merged firm has both the ability and incentive to limit access to the related product so as to weaken or exclude some of its rivals (the "dependent" rivals) in the relevant market.

The merged firm could limit access to the related product in different ways. It could deny rivals access altogether, deny access to some features, degrade its quality, worsen the terms on which rivals

---

[27] A "route to market" refers to any way a firm accesses its trading partners, such as distribution channels, marketplaces, or customers.

13

can access the related product, limit interoperability, degrade the quality of complements, provide less reliable access, tie up or obstruct routes to market, or delay access to product features, improvements, or information relevant to making efficient use of the product. All these ways of limiting access are sometimes referred to as "foreclosure."[28]

Dependent rivals can be weakened if limiting their access to the related product would make it harder or more costly for them to compete; for example, if it would lead them to charge higher prices or offer worse terms in the relevant market, reduce the quality of their products so that they were less attractive to trading partners, or interfere with distribution so that those products were less readily available. Competition can also be weakened if the merger facilitates coordination among the merged firm and its rivals, for example by giving the merged firm the ability to threaten to limit access to uncooperative rivals.

Rivals or potential rivals may be excluded from the relevant market if limiting their access to the related product could lead them to exit the market or could deter them from entering. For example, potential rivals may not enter if the merged firm ties up or obstructs so many routes to market that the remaining addressable market is too small. Exclusion can arise when a new entrant would need to invest not only in entering the relevant market, but also in supplying its own substitute for the related product, sometimes referred to as two-stage entry or multi-level entry.

Because the merged firm could use its ability to limit access to the related product in a range of ways, the Agencies focus on the overall risk that the merged firm will do so, and do not necessarily identify which precise actions the merged firm would take to lessen competition.

### 2.5.A.1.        Ability and Incentive to Foreclose Rivals

The Agencies assess the merged firm's ability and incentive to substantially lessen competition by limiting access to the related product for a group of dependent rivals in the relevant market by examining four factors.

*1. Availability of Substitutes.* The Agencies assess the availability of substitutes for the related product. The merged firm is more able to limit access when there are few alternative options to the merged firm's related product, if these alternatives are differentiated in quality, price, or other characteristics, or if competition to supply them is limited.

*2. Competitive Significance of the Related Product.* The Agencies consider how important the related product is for the dependent firms and the extent to which they would be weakened or excluded from the relevant market if their access was limited.

*3. Effect on Competition in the Relevant Market.* The Agencies assess the importance of the dependent firms for competition in the relevant market. Competition can be particularly affected when the dependent firms would be excluded from the market altogether.

*4. Competition Between the Merged Firm and the Dependent Firms.* The merged firm's incentive to limit the dependent firms' access depends on how strongly it competes with them. If the dependent firms are close competitors, the merged firm may benefit from higher sales or prices in the relevant market when it limits their access. The Agencies may also assess the potential for the merged

---

[28] *See Illumina, Inc. v. FTC*, No. 23-60167, slip op. at 17 (5th Cir. Dec. 15, 2023) ("[T]here are myriad ways in which [the merged firm] could engage in foreclosing behavior . . . such as by making late deliveries or subtly reducing the level of support services.").

14

firm to benefit from facilitating coordination by threatening to limit dependent rivals' access to the related product. These benefits can make it profitable to limit access to the related product and thereby substantially lessen competition, even though it would not have been profitable for the firm that controlled the related product prior to the merger.

The Agencies assess the extent of competition with rivals and the risk of coordination using analogous methods to the ones described in Guidelines 2 and 3, and Section 4.2.

\*     \*     \*

In addition to the evidentiary, analytical, and economic tools in Section 4, the following additional considerations and evidence may be important to this assessment:

*Barriers to Entry and Exclusion of Rivals*. The merged firm may benefit more from limiting access to dependent rivals or potential rivals when doing so excludes them from the market, for example by creating a need for the firm to enter at multiple levels and to do so with sufficient scale and scope (multi-level entry).

*Prior Transactions or Prior Actions*. If firms used prior acquisitions or engaged in prior actions to limit rivals' access to the related product, or other products its rivals use to compete, that suggests that the merged firm has the ability and incentive to do so. However, lack of past action does not necessarily indicate a lack of incentive in the present transaction because the merger can increase the incentive to foreclose.

*Internal Documents*. Information from business planning and merger analysis documents prepared by the merging firms might identify instances where the firms believe they have the ability and incentive to limit rivals' access. Such documents, where available, are highly probative. The lack of such documents, however, is less informative.

*Market Structure*. Evidence of market structure can be informative about the availability of substitutes for the related product and the competition in the market for the related product or the relevant market. (See Section 2.5.A.2)

### 2.5.A.2.    *Analysis of Industry Factors and Market Structure*

The Agencies also sometimes determine, based on an analysis of factors related to market structure, that a merger may substantially lessen competition by allowing the merged firm to limit access to a related product.[29] The Agencies' assessment can include evidence about the structure, history, and probable future of the market.

**Structure of the Related Market**. In some cases, the market structure of the related product market can give an indication of the merged firm's ability to limit access to the related product. In these cases, the Agencies define a market (termed the "related market") around the related product (see Section 4.3). The Agencies then define the "foreclosure share" as the share of the related market to which the merged firm could limit access. If the share or other evidence show that the merged firm is

---

[29] *See Brown Shoe*, 370 U.S. at 328-34; *Illumina*, slip op. at 20-22 ("There is no precise formula when it comes to applying these factors. Indeed, the Supreme Court has found a vertical merger unlawful by examining only three of the *Brown Shoe* factors." (cleaned up)); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979); *U.S. Steel Corp. v. FTC*, 426 F.2d 592, 599 (6th Cir. 1970).

15

approaching or has monopoly power over the related product, and the related product is competitively significant, those factors alone are a sufficient basis to demonstrate that the dependent firms do not have adequate substitutes and the merged firm has the ability to weaken or exclude them by limiting their access to the related product. (See Considerations 1 and 2 in Section 2.5.A.1).[30]

*Structure of the Relevant Market.* Limiting rivals' access to the related product will generally have a greater effect on competition in the relevant market if the merged firm and the dependent rivals face less competition from other firms. In addition, the merged firm has a greater incentive to limit access to the dependent firms when it competes more closely with them. Market share and concentration measures for the merged firm, the dependent rivals, and the other firms, can sometimes provide evidence about both issues.

*Nature and Purpose of the Merger.* When the nature and purpose of the merger is to foreclose rivals, including by raising their costs, that suggests the merged firm is likely to foreclose rivals.

*Trend Toward Vertical Integration.* The Agencies will generally consider evidence about the degree of integration between firms in the relevant and related markets, as well as whether there is a trend toward further vertical integration and how that trend or the factors driving it may affect competition. A trend toward vertical integration may be shown through, for example: a pattern of vertical integration following mergers by one or both of the merging companies; or evidence that a merger was motivated by a desire to avoid having its access limited due to similar transactions among other companies that occurred or may occur in the future.

*      *      *

If the parties offer rebuttal evidence, the Agencies will assess it under the approach laid out in Section 3.[31] When assessing rebuttal evidence focused on the reduced profits of the merged firm from limiting access from rivals, the Agencies examine whether the reduction in profits would prevent the full range of reasonably probable strategies to limit access. When evaluating whether this rebuttal evidence is sufficient to conclude that no substantial lessening of competition is threatened by the merger, the Agencies will give little weight to claims that are not supported by an objective analysis, including, for example, speculative claims about reputational harms. Moreover, the Agencies are unlikely to credit claims or commitments to protect or otherwise avoid weakening the merged firm's rivals that do not align with the firm's incentives. The Agencies' assessment will be consistent with the principle that firms act to maximize their overall profits and valuation rather than the profits of any particular business

---

[30] *See Brown Shoe*, 370 U.S. at 328 ("If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated . . . ."). The Agencies will generally infer, in the absence of countervailing evidence, that the merging firm has or is approaching monopoly power in the related product if it has a share greater than 50% of the related product market. A merger involving a related product with share of less than 50% may still substantially lessen competition, particularly when that related product is important to its trading partners.

[31] A common rebuttal argument is that the merger would lead to vertical integration of complementary products and as a result, "eliminate double marginalization," since in specific circumstances such a merger can confer on the merged firm an incentive to decrease prices to purchasers. The Agencies examine whether elimination of double marginalization satisfies the approach to evaluating procompetitive efficiencies in Section 3.3, including examining: (a) whether the merged firm will be more vertically integrated as a result of the merger, for example because it increases the extent to which it uses internal production of an input when producing output for the relevant market; (b) whether contracts short of a merger have eliminated or could eliminate double marginalization such that it would not be merger-specific, and (c) whether the merged firm has the incentive to reduce price in the relevant market given that such a reduction would reduce sales by the merged firm's rivals in the relevant market, which would in turn lead to reduced revenue and margin on sales of the related product to the dependent rivals.

16

unit. A merger may substantially lessen competition or tend to create a monopoly regardless of the claimed intent of the merging companies or their executives. (See Section 4.1)

If the merged firm has the ability and incentive to limit access to the related product and lessen competition in the relevant market, there are many ways it could act on those incentives. The merging parties may put forward evidence that there are no reasonably probable ways in which they could profitably limit access to the related product and thereby make it harder for rivals to compete, or that the merged firm will be more competitive because of the merger.

### 2.5.B. Mergers Involving Visibility into Rivals' Competitively Sensitive Information

If rivals would continue to access or purchase a related product controlled by the merged firm post-merger, the merger can substantially lessen competition if the merged firm would gain or increase visibility into rivals' competitively sensitive information. This situation could arise in many settings, including, for example, if the merged firm learns about rivals' sales volumes or projections from supplying an input or a complementary product; if it learns about promotion plans and anticipated product improvements or innovations from its role as a distributor; or if it learns about entry plans from discussions with potential rivals about compatibility or interoperability with a complementary product it controls. A merger that gives the merged firm increased visibility into competitively sensitive information could undermine rivals' ability or incentive to compete aggressively or could facilitate coordination.

*Undermining Competition.* The merged firm might use visibility into a rival's competitively sensitive information to undermine competition from the rival. For example, the merged firm's ability to preempt, appropriate, or otherwise undermine the rival's procompetitive actions can discourage the rival from fully pursuing competitive opportunities. Relatedly, rivals might refrain from doing business with the merged firm rather than risk that the merged firm would use their competitively sensitive business information to undercut them. Those rivals might become less-effective competitors if they must rely on less-preferred trading partners or accept less favorable trading terms because their outside options have worsened or are more limited.

*Facilitating Coordination.* A merger that provides access to rivals' competitively sensitive information might facilitate coordinated interaction among firms in the relevant market by allowing the merged firm to observe its rivals' competitive strategies faster and more confidently. (See Guideline 3.)

### 2.5.C. Mergers that Threaten to Limit Rivals' Access and Thereby Create Barriers to Entry and Competition

When a merger gives a firm the ability and incentive to limit rivals' access, or where it gives the merged firm increased visibility into its rivals' competitively sensitive information, the merger may create entry barriers as described above. In addition, the merged firm's rivals might change their behavior because of the risk that the merged firm could limit their access. That is, the risk that the merger will give a firm the ability and incentive to limit rivals' access or will give the merged firm increased visibility into sensitive information can dissuade rivals from entering the market or expanding their operations.

Rivals or potential rivals that face the threat of foreclosure, or the risk of sharing sensitive information with rivals, may reduce investment or adjust their business strategies in ways that lessen competition. Firms may be reluctant to invest in a market if their success is dependent on continued supply from a rival, particularly because the merged firm may become more likely to foreclose its

17

competitor as that competitor becomes more successful. Firms may use expensive strategies to try to reduce their dependence on the merged firm, weakening the competitiveness of their products and services. Even if the merged firm does not deliberately seek to weaken rivals, rivals or potential rivals may fear that their access will be limited if the merged firm decides to use its own products exclusively. These effects may occur irrespective of the merged firm's incentive to limit access and are greater as the merged firm gains greater control over more important inputs that those rivals use to compete.

## 2.6.  Guideline 6: Mergers Can Violate the Law When They Entrench or Extend a Dominant Position.

The Agencies consider whether a merger may entrench or extend an already dominant position. The effect of such mergers "may be substantially to lessen competition" or "may be . . . to tend to create a monopoly" in violation of Section 7 of the Clayton Act. Indeed, the Supreme Court has explained that a merger involving an "already dominant[] firm may substantially reduce the competitive structure of the industry by raising entry barriers."[32] The Agencies also evaluate whether the merger may extend that dominant position into new markets.[33] Mergers that entrench or extend a dominant position can also violate Section 2 of the Sherman Act.[34] At the same time, the Agencies distinguish anticompetitive entrenchment from growth or development as a consequence of increased competitive capabilities or incentives.[35] The Agencies therefore seek to prevent those mergers that would entrench or extend a dominant position through exclusionary conduct, weakening competitive constraints, or otherwise harming the competitive process.

To undertake this analysis, the Agencies first assess whether one of the merging firms has a dominant position based on direct evidence or market shares showing durable market power. For example, the persistence of market power can indicate that entry barriers exist, that further entrenchment may tend to create a monopoly, and that there would be substantial benefits from the emergence of new competitive constraints or disruptions. The Agencies consider mergers involving dominant firms in the context of evidence about the sources of that dominance, focusing on the extent to which the merger relates to, reinforces, or supplements these sources.

Creating or preserving dominance and the profits it brings can be an important motivation for a firm to undertake an acquisition as well as a driver of the merged firm's behavior after the acquisition. In particular, a firm may be willing to undertake costly short-term strategies in order to increase the chance that it can enjoy the longer-term benefits of dominance. A merger that creates or preserves dominance may also reduce the merged firm's longer-term incentives to improve its products and services.

A merger can result in durable market power and long-term harm to competition even when it initially provides short-term benefits to some market participants. Thus, the Agencies will consider not just the impact of the merger holding fixed factors like product quality and the behavior of other industry participants, but they may also consider the (often longer term) impact of the merger on market

---

[32] *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577-578 (1967); *see, e.g.*, *Fruehauf*, 603 F.2d at 353 (the "entrenchment of a large supplier or purchaser" can be an "essential" showing of a Section 7 violation).

[33] *Ford*, 405 U.S. at 571 (condemning acquisition by dominant firm to obtain a foothold in another market when coupled with incentive to create and maintain barriers to entry into that market).

[34] *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (acquisitions are among the types of conduct that may violate the Sherman Act).

[35] *See, e.g.*, *id.* at 570-71.

18

power and industry dynamics. Important dynamic competitive effects can arise through the entry, investment, innovation, and terms offered by the merged firm and other industry participants, even when the Agencies cannot predict specific reactions and responses with precision. If the ultimate result of the merger is to protect or preserve dominance by limiting opportunities for rivals, reducing competitive constraints, or preventing competitive disruption, then the Agencies will approach the merger with a heightened degree of scrutiny. The degree of scrutiny and concern will increase in proportion to the strength and durability of the dominant firm's market power.

### 2.6.A.  Entrenching a Dominant Position

*Raising Barriers to Entry or Competition.* A merger may create or enhance barriers to entry or expansion by rivals that limit the capabilities or competitive incentives of other firms. Barriers to entry can entrench a dominant position even if the nature of future entry is uncertain, if the identities of future entrants are unknown, or if there is more than one mechanism through which the merged firm might create entry barriers. Some examples of ways in which a merger may raise barriers to entry or competition include:

- *Increasing Switching Costs.* The costs associated with changing suppliers (often referred to as switching costs) can be an important barrier to competition. A merger may increase switching costs if it makes it more difficult for customers to switch away from the dominant firm's product or service, or when it gives the dominant firm control of something customers use to switch providers or of something that lowers the overall cost to customers of switching providers. For example, if a dominant firm merges with a complementary product that interoperates with the dominant firm's competitors, it could reduce interoperability, harming competition for customers who value the complement.

- *Interfering With the Use of Competitive Alternatives.* A dominant position may be threatened by a service that customers use to work with multiple providers of similar or overlapping bundles of products and services. If a dominant firm acquires a service that supports the use of multiple providers, it could degrade its utility or availability or could modify the service to steer customers to its own products, entrenching its dominant position. For example, a closed messaging communication service might acquire a product that allowed users to send and receive messages over several competing services through a single user interface, which facilitates competition. The Agencies would examine whether the acquisition would entrench the messaging service's market power by leading the merged firm to degrade the product or otherwise reduce its effectiveness as a cross-service tool, thus reducing competition.

- *Depriving Rivals of Scale Economies or Network Effects.* Scale economies and network effects can serve as a barrier to entry and competition. Depriving rivals of access to scale economies and network effects can therefore entrench a dominant position. If a merger enables a dominant firm to reduce would-be rivals' access to additional scale or customers by acquiring a product that affects access such as a customer acquisition channel, the merged firm can limit the ability of rivals to improve their own products and compete more effectively.[36] Limiting access by rivals to customers in the short run can lead to long run entrenchment of a dominant position and tend to create monopoly power.

---

[36] The Agencies' focus here is on the artificial acquisition of network participants that occurs directly as a result of the merger, as opposed to future network growth that may occur through competition on the merits.

19

For example, if two firms operate in a market in which network effects are significant but in which rivals voluntarily interconnect, their merger can create an entity with a large enough user base that it may have the incentive to end voluntary interconnection. Such a strategy can lessen competition and harm trading partners by creating or entrenching dominance in this market. This can be the case even if the merging firms did not appear to have a dominant position prior to the merger because their interoperability practices strengthened rivals.

***Eliminating a Nascent Competitive Threat.*** A merger may involve a dominant firm acquiring a nascent competitive threat—namely, a firm that could grow into a significant rival, facilitate other rivals' growth, or otherwise lead to a reduction in its power.[37] In some cases, the nascent threat may be a firm that provides a product or service similar to the acquiring firm that does not substantially constrain the acquiring firm at the time of the merger but has the potential to grow into a more significant rival in the future. In other cases, factors such as network effects, scale economies, or switching costs may make it extremely difficult for a new entrant to offer all of the product features or services at comparable quality and terms that an incumbent offers. The most likely successful threats in these situations can be firms that initially avoid directly entering the dominant firm's market, instead specializing in (a) serving a narrow customer segment, (b) offering services that only partially overlap with those of the incumbent, or (c) serving an overlapping customer segment with distinct products or services.

Firms with niche or only partially overlapping products or customers can grow into longer-term threats to a dominant firm. Once established in its niche, a nascent threat may be able to add features or serve additional customer segments, growing into greater overlap of customer segments or features over time, thereby intensifying competition with the dominant firm. A nascent threat may also facilitate customers aggregating additional products and services from multiple providers that serve as a partial alternative to the incumbent's offering. Thus, the success and independence of the nascent threat may both provide for a direct threat of competition by the niche or nascent firm and may facilitate competition or encourage entry by other, potentially complementary providers that may provide a partial competitive constraint. In this way, the nascent threat supports what may be referred to as "ecosystem" competition. In this context, ecosystem competition refers to a situation where an incumbent firm that offers a wide array of products and services may be partially constrained by other combinations of products and services from one or more providers, even if the business model of those competing services is different.

Nascent threats may be particularly likely to emerge during technological transitions. Technological transitions can render existing entry barriers less relevant, temporarily making incumbents susceptible to competitive threats. For example, technological transitions can create temporary opportunities for entrants to differentiate or expand their offerings based on their alignment with new technologies, enabling them to capture network effects that otherwise insulate incumbents from competition. A merger in this context may lessen competition by preventing or delaying any such beneficial shift or by shaping it so that the incumbent retains its dominant position. For example, a dominant firm might seek to acquire firms to help it reinforce or recreate entry barriers so that its dominance endures past the technological transition. Or it might seek to acquire nascent threats that might otherwise gain sufficient customers to overcome entry barriers. In evaluating the potential for entrenching dominance, the Agencies take particular care to preserve opportunities for more competitive markets to emerge during such technological shifts.

---

[37] The Agencies assess acquisitions of nascent competitive threats by non-dominant firms under the other Guidelines.

20

Separate from and in addition to its Section 7 analysis, the Agencies will consider whether the merger violates Section 2 of the Sherman Act. For example, under Section 2 of the Sherman Act, a firm that may challenge a monopolist may be characterized as a "nascent threat" even if the impending threat is uncertain and may take several years to materialize.[38] The Agencies assess whether the merger is reasonably capable of contributing significantly to the preservation of monopoly power in violation of Section 2, which turns on whether the acquired firm is a nascent competitive threat.[39]

### 2.6.B.  Extending a Dominant Position into Another Market

The Agencies also examine the risk that a merger could enable the merged firm to extend a dominant position from one market into a related market, thereby substantially lessening competition or tending to create a monopoly in the related market. For example, the merger might lead the merged firm to leverage its position by tying, bundling, conditioning, or otherwise linking sales of two products. A merger may also raise barriers to entry or competition in the related market, or eliminate a nascent competitive threat, as described above. For example, prior to a merger, a related market may be characterized by scale economies but still experience moderate levels of competition. If the merged firm takes actions to induce customers of the dominant firm's product to also buy the related product from the merged firm, the merged firm may be able to gain dominance in the related market, which may be supported by increased barriers to entry or competition that result from the merger.

These concerns can arise notwithstanding that the acquiring firm already enjoys the benefits associated with its dominant position. The prospect of market power in the related market may strongly affect the merged firm's incentives in a way that does not align with the interests of its trading partners, both in terms of strategies that create dominance for the related product and in the form of reduced incentives to invest in its products or provide attractive terms for them after dominance is attained. In some cases, the merger may also further entrench the firm's original dominant position, for example if future competition requires the provision of both products.

\*       \*       \*

If the merger raises concerns that its effect may be to entrench or extend a dominant position, then any claim that the merger also provides competitive benefits will be evaluated under the rebuttal framework in Section 3. For example, the framework of Section 3 would be used to evaluate claims that a merger would generate cost savings or quality improvements that would be passed through to make their products more competitive or would otherwise create incentives for the merged firm to offer better terms. The Agencies' analysis will consider the fact that the incentives to pass through benefits to customers or offer attractive terms are affected by competition and the extent to which entry barriers insulate the merged firm from effective competition. It will also consider whether any claimed benefits are specific to the merger, or whether they could be instead achieved through contracting or other means.

---

[38] *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).

[39] *See id*. at 79 ("[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will. . . .").

21

## 2.7.  Guideline 7: When an Industry Undergoes a Trend Toward Consolidation, the Agencies Consider Whether It Increases the Risk a Merger May Substantially Lessen Competition or Tend to Create a Monopoly.

The recent history and likely trajectory of an industry can be an important consideration when assessing whether a merger presents a threat to competition. The Supreme Court has explained that "a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anticompetitive effect of a merger may be."[40] It has also underscored that "Congress intended Section 7 to arrest anticompetitive tendencies in their incipiency.[41] The Agencies therefore examine whether a trend toward consolidation in an industry would heighten the competition concerns identified in Guidelines 1-6.

The Agencies therefore closely examine industry consolidation trends in applying the frameworks above. For example:

*Trend Toward Concentration.* If an industry has gone from having many competitors to becoming concentrated, it may suggest greater risk of harm, for example, because new entry may be less likely to replace or offset the lessening of competition the merger may cause. Among other implications, in the context of a trend toward concentration, the Agencies identify a stronger presumption of harm from undue concentration (see Guideline 1), and a greater risk of substantially lessening competition when a merger eliminates competition between the merging parties (see Guideline 2) or increases the risk of coordination (see Guideline 3).

*Trend Toward Vertical Integration.* The Agencies will generally consider evidence about the degree of integration between firms in the relevant and related markets and whether there is a trend toward further vertical integration. If a merger occurs amidst or furthers a trend toward vertical integration, the Agencies consider the implications for the competitive dynamics of the industry moving forward. For example, a trend toward vertical integration could magnify the concerns discussed in Guideline 5 by making entry at a single level more difficult and thereby preventing the emergence of new competitive threats over time.

*Arms Race for Bargaining Leverage.* The Agencies sometimes encounter mergers through which the merging parties would, by consolidating, gain bargaining leverage over other firms that they transact with. This can encourage those other firms to consolidate to obtain countervailing leverage, encouraging a cascade of further consolidation. This can ultimately lead to an industry where a few powerful firms have leverage against one another and market power over would-be entrants or over trading partners in various parts of the value chain. For example, distributors might merge to gain leverage against suppliers, who then merge to gain leverage against distributors, spurring a wave of mergers that lessen competition by increasing the market power of both. This can exacerbate the problems discussed in Guidelines 1-6, including by increasing barriers to single-level entry, encouraging coordination, and discouraging disruptive innovation.

---

[40] *United States v. Pabst Brewing*, 384 U.S. 546, 552-53 (1966).
[41] *Phila. Nat'l Bank*, 374 U.S. at 362 (quoting *Brown Shoe*, 370 U.S. at 317).

PX15347-023

*Multiple Mergers.* The Agencies sometimes see multiple mergers at once or in succession by different players in the same industry. In such cases, the Agencies may examine multiple deals in light of the combined trend toward concentration.

## 2.8.    Guideline 8: When a Merger is Part of a Series of Multiple Acquisitions, the Agencies May Examine the Whole Series.

A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7.[42] In these situations, the Agencies may evaluate the series of acquisitions as part of an industry trend (see Guideline 7) or evaluate the overall pattern or strategy of serial acquisitions by the acquiring firm collectively under Guidelines 1-6.

In expanding antitrust law beyond the Sherman Act through passage of the Clayton Act, Congress intended "to permit intervention in a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize."[43] As the Supreme Court has recognized, a cumulative series of mergers can "convert an industry from one of intense competition among many enterprises to one in which three or four large [companies] produce the entire supply."[44] Accordingly, the Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies.

The Agencies may examine a pattern or strategy of growth through acquisition by examining both the firm's history and current or future strategic incentives. Historical evidence focuses on the strategic approach taken by the firm to acquisitions (consummated or not), both in the markets at issue and in other markets, to reveal any overall strategic approach to serial acquisitions. Evidence of the firm's current incentives includes documents and testimony reflecting its plans and strategic incentives both for the individual acquisition and for its position in the industry more broadly. Where one or both of the merging parties has engaged in a pattern or strategy of pursuing consolidation through acquisition, the Agencies will examine the impact of the cumulative strategy under any of the other Guidelines to determine if that strategy may substantially lessen competition or tend to create a monopoly.

## 2.9.    Guideline 9: When a Merger Involves a Multi-Sided Platform, the Agencies Examine Competition Between Platforms, on a Platform, or to Displace a Platform.

Platforms provide different products or services to two or more different groups or "sides" who may benefit from each other's participation. Mergers involving platforms can threaten competition, even when a platform merges with a firm that is neither a direct competitor nor in a traditional vertical relationship with the platform. When evaluating a merger involving a platform, the Agencies apply Guidelines 1-6 while accounting for market realities associated with platform competition. Specifically,

---

[42] Such strategies may also violate Section 2 of the Sherman Act and Section 5 of the FTC Act. Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, at 12-14 & nn.73 & 82 (Nov. 10, 2022) (noting that "a series of . . . acquisitions . . . that tend to bring about the harms that the antitrust laws were designed to prevent" has been subject to liability under Section 5).

[43] H.R. Rep. No. 81-1191, at 8 (1949).

[44] *See Brown Shoe*, 370 U.S. at 334 (citing S. Rep. No. 81-1775, at 5 (1950); H.R. Rep. No. 81-1191, at 8 (1949)).

PX15347-024

the Agencies consider competition *between* platforms, competition *on* a platform, and competition to *displace* the platform.

Multi-sided platforms generally have several attributes in common, though they can also vary in important ways. Some of these attributes include:

- Platforms have multiple sides. On each side of a platform, platform participants provide or use distinct products and services.[45] Participants can provide or use different types of products or services on each side.

- A platform operator provides the core services that enable the platform to connect participant groups across multiple sides. The platform operator controls other participants' access to the platform and can influence how interactions among platform participants play out.

- Each side of a platform includes platform participants. Their participation might be as simple as using the platform to find other participants, or as involved as building platform services that enable other participants to connect in new ways and allow new participants to join the platform.

- Network effects occur when platform participants contribute to the value of the platform for other participants and the operator. The value for groups of participants on one side may depend on the number of participants either on the same side (direct network effects) or on the other side(s) (indirect network effects).[46] Network effects can create a tendency toward concentration in platform industries. Indirect network effects can be asymmetric and heterogeneous; for example, one side of the market or segment of participants may place relatively greater value on the other side(s).

- A conflict of interest can arise when a platform operator is also a platform participant. The Agencies refer to a "conflict of interest" as the divergence that can arise between the operator's incentives to operate the platform as a forum for competition and its incentive to operate as a competitor on the platform itself. As discussed below, a conflict of interest sometimes exacerbates competitive concerns from mergers.

Consistent with the Clayton Act's protection of competition "in any line of commerce," the Agencies will seek to prohibit a merger that harms competition within a relevant market for any product or service offered on a platform to any group of participants—i.e., around one side of the platform (see Section 4.3).[47]

---

[45] For example, on 1990s operating-system platforms for personal computer (PC) software, software developers were on one side, PC manufacturers on another, and software purchasers on another.

[46] For example, 1990s PC manufacturers, software developers, and consumers all contributed to the value of the operating system platform for one another.

[47] In the limited scenario of a "special type of two-sided platform known as a 'transaction' platform," under Section 1 of the Sherman Act, a relevant market encompassing both sides of a two-sided platform may be warranted. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2280 (2018). This approach to Section 1 of the Sherman Act is limited to platforms with the "key feature . . . that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* Because "they cannot sell transaction services to [either user group] individually . . . transaction platforms are better understood as supplying only one product—transactions." *Id.* at 2286. This characteristic is not present for many types of two-sided or multi-sided platforms; in addition, many platforms offer simultaneous transactions as well as other products and services, and further they may bundle these products with access to transact on the platform or offer quantity discounts.

24

The Agencies protect competition *between* platforms by preventing the acquisition or exclusion of other platform operators that may substantially lessen competition or tend to create a monopoly. This scenario can arise from various types of mergers:

A. Mergers involving two platform operators eliminate the competition between them. In a market with a platform, entry or growth by smaller competing platforms can be particularly challenging because of network effects. A common strategy for smaller platforms is to specialize, providing distinctive features. Thus, dominant platforms can lessen competition and entrench their position by systematically acquiring firms competing with one or more sides of a multi-sided platform while they are in their infancy. The Agencies seek to stop these trends in their incipiency.

B. A platform operator may acquire a platform participant, which can entrench the operator's position by depriving rivals of participants and, in turn, depriving them of network effects. For example, acquiring a major seller on a platform may make it harder for rival platforms to recruit buyers. The long-run benefits to a platform operator of denying network effects to rival platforms create a powerful incentive to withhold or degrade those rivals' access to platform participants that the operator acquires. The more powerful the platform operator, the greater the threat to competition presented by mergers that may weaken rival operators or increase barriers to entry and expansion.

C. Acquisitions of firms that provide services that facilitate participation on multiple platforms can deprive rivals of platform participants. Many services can facilitate such participation, such as tools that help shoppers compare prices across platforms, applications that help sellers manage listings on multiple platforms, or software that helps users switch among platforms.

D. Mergers that involve firms that provide other important inputs to platform services can enable the platform operator to deny rivals the benefits of those inputs. For example, acquiring data that helps facilitate matching, sorting, or prediction services may enable the platform to weaken rival platforms by denying them that data.

The Agencies protect competition *on* a platform in any markets that interact with the platform. When a merger involves a platform operator and platform participants, the Agencies carefully examine whether the merger would create conflicts of interest that would harm competition. A platform operator that is also a platform participant may have a conflict of interest whereby it has an incentive to give its own products and services an advantage over other participants competing on the platform. Platform operators must often choose between making it easy for users to access their preferred products and directing those users to products that instead provide greater benefit to the platform operator. Merging with a firm that makes a product offered on the platform may change how the platform operator balances these competing interests. For example, the platform operator may find it is more profitable to give its own product greater prominence even if that product is inferior or is offered on worse terms after the merger—and even if some participants leave the platform as a result.[48] This can harm competition in

---

[48] However, few participants will leave if, for example, the switching costs are relatively high or if the advantaged product is a small component of the overall set of services those participants access on the platform. Moreover, in the long run few participants will leave if scale economies, network effects, or entry barriers enable the advantaged product to eventually gain market power of its own, with rivals of the advantaged product exiting or becoming less attractive. After these dynamics play

PX15347-026

the product market for the advantaged product, where the harm to competition may be experienced both on the platform and in other channels.

The Agencies protect competition to *displace* the platform or any of its services. For example, new technologies or services may create an important opportunity for firms to replace one or more services the incumbent platform operator provides, shifting some participants to partially or fully meet their needs in different ways or through different channels. Similarly, a non-platform service can lessen dependence on the platform by providing an alternative to one or more functions provided by the platform operators. When platform owners are dominant, the Agencies seek to prevent even relatively small accretions of power from inhibiting the prospects for displacing the platform or for decreasing dependency on the platform.

In addition, a platform operator that advantages its own products that compete *on* the platform can lessen competition *between* platforms and to *displace* the platform, as the operator may both advantage its own product or service, and also deprive rival platforms of access to it, limiting those rivals' network effects.

## 2.10.  Guideline 10: When a Merger Involves Competing Buyers, the Agencies Examine Whether It May Substantially Lessen Competition for Workers, Creators, Suppliers, or Other Providers.

A merger between competing buyers may harm sellers just as a merger between competing sellers may harm buyers.[49] The same—or analogous—tools used to assess the effects of a merger of sellers can be used to analyze the effects of a merger of buyers, including employers as buyers of labor. Firms can compete to attract contributions from a wide variety of workers, creators, suppliers, and service providers. The Agencies protect this competition in all its forms.

A merger of competing buyers can substantially lessen competition by eliminating the competition between the merging buyers or by increasing coordination among the remaining buyers. It can likewise lead to undue concentration among buyers or entrench or extend the position of a dominant buyer. Competition among buyers can have a variety of beneficial effects analogous to competition among sellers. For example, buyers may compete by raising the payments offered to suppliers, by expanding supply networks, through transparent and predictable contracting, procurement, and payment practices, or by investing in technology that reduces frictions for suppliers. In contrast, a reduction in competition among buyers can lead to artificially suppressed input prices or purchase volume, which in turn reduces incentives for suppliers to invest in capacity or innovation. Labor markets are important buyer markets. The same general concerns as in other markets apply to labor markets where employers are the buyers of labor and workers are the sellers. The Agencies will consider whether workers face a risk that the merger may substantially lessen competition for their labor.[50] Where a merger between

---

out, the platform operator could advantage its own products without losing as many participants, as there would be fewer alternative products available through other channels.

[49] *See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948) ("The [Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.").
[50] *See, e.g.*, *Alston*, 141 S. Ct. 2141 (applying the Sherman Act to protect workers from an employer-side agreement to limit compensation).

26

employers may substantially lessen competition for workers, that reduction in labor market competition may lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality.[51] When assessing the degree to which the merging firms compete for labor, evidence that a merger may have any one or more of these effects can demonstrate that substantial competition exists between the merging firms.

Labor markets frequently have characteristics that can exacerbate the competitive effects of a merger between competing employers. For example, labor markets often exhibit high switching costs and search frictions due to the process of finding, applying, interviewing for, and acclimating to a new job. Switching costs can also arise from investments specific to a type of job or a particular geographic location. Moreover, the individual needs of workers may limit the geographical and work scope of the jobs that are competitive substitutes.

In addition, finding a job requires the worker and the employer to agree to the match. Even within a given salary and skill range, employers often have specific demands for the experience, skills, availability, and other attributes they desire in their employees. At the same time, workers may seek not only a paycheck but also work that they value in a workplace that matches their own preferences, as different workers may value the same aspects of a job differently. This matching process often narrows the range of rivals competing for any given employee. The level of concentration at which competition concerns arise may be lower in labor markets than in product markets, given the unique features of certain labor markets. In light of their characteristics, labor markets can be relatively narrow.

The features of labor markets may in some cases put firms in dominant positions. To assess this dominance in labor markets (see Guideline 6), the Agencies often examine the merging firms' power to cut or freeze wages, slow wage growth, exercise increased leverage in negotiations with workers, or generally degrade benefits and working conditions without prompting workers to quit.

If the merger may substantially lessen competition or tend to create a monopoly in upstream markets, that loss of competition is not offset by purported benefits in a separate downstream product market. Because the Clayton Act prohibits mergers that may substantially lessen competition or tend to create a monopoly in *any* line of commerce and in *any* section of the country, a merger's harm to competition among buyers is not saved by benefits to competition among sellers. That is, a merger can substantially lessen competition in one or more buyer markets, seller markets, or both, and the Clayton Act protects competition in any one of them.[52] If the parties claim any benefits to competition in a relevant buyer market, the Agencies will assess those claims using the frameworks in Section 3.

Just as they do when analyzing competition in the markets for products and services, the Agencies will analyze labor market competition on a case-by-case basis.

---

[51] A decrease in wages is understood as relative to what would have occurred in the absence of the transaction; in many cases, a transaction will not reduce wage levels, but rather slow wage growth. Wages encompass all aspects of pecuniary compensation, including benefits. Job quality encompasses non-pecuniary aspects that workers value, such as working conditions and terms of employment.

[52] Often, mergers that harm competition among buyers also harm competition among sellers as a result. For example, when a monopsonist lowers purchase prices by decreasing input purchases, they will generally decrease sales in downstream markets as well. (See Section 4.2.D)

PX15347-028

## 2.11.  Guideline 11: When an Acquisition Involves Partial Ownership or Minority Interests, the Agencies Examine Its Impact on Competition.

In many acquisitions, two companies come under common control. In some situations, however, the acquisition of less-than-full control may still influence decision-making at the target firm or another firm in ways that may substantially lessen competition. Acquisitions of partial ownership or other minority interests may give the investor rights in the target firm, such as rights to appoint board members, observe board meetings, influence the firm's ability to raise capital, impact operational decisions, or access competitively sensitive information. The Agencies have concerns with both cross-ownership, which refers to holding a non-controlling interest in a competitor, as well as common ownership, which occurs when individual investors hold non-controlling interests in firms that have a competitive relationship that could be affected by those joint holdings.

Partial acquisitions that do not result in control may nevertheless present significant competitive concerns. The acquisition of a minority position may permit influence of the target firm, implicate strategic decisions of the acquirer with respect to its investment in other firms, or change incentives so as to otherwise dampen competition. The post-acquisition relationship between the parties and the independent incentives of the parties outside the acquisition may be important in determining whether the partial acquisition may substantially lessen competition. Such partial acquisitions are subject to the same legal standard as any other acquisition.[53]

The Agencies recognize that cross-ownership and common ownership can reduce competition by softening firms' incentives to compete, even absent any specific anticompetitive act or intent. While the Agencies will consider any way in which a partial acquisition may affect competition, they generally focus on three principal effects:

First, a partial acquisition can lessen competition by giving the partial owner the ability to influence the competitive conduct of the target firm.[54] For example, a voting interest in the target firm or specific governance rights, such as the right to appoint members to the board of directors, influence capital budgets, determine investment return thresholds, or select particular managers, can create such influence. Additionally, a nonvoting interest may, in some instances, provide opportunities to prevent, delay, or discourage important competitive initiatives, or otherwise impact competitive decision making. Such influence can lessen competition because the partial owner could use its influence to induce the target firm to compete less aggressively or to coordinate its conduct with that of the acquiring firm.

Second, a partial acquisition can lessen competition by reducing the incentive of the acquiring firm to compete.[55] Acquiring a minority position in a rival might blunt the incentive of the partial owner to compete aggressively because it may profit through dividend or other revenue share even when it loses business to the rival. For example, the partial owner may decide not to develop a new product feature to win market share from the firm in which it has acquired an interest, because doing so will

---

[53] *See United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592 (1957) ("[A]ny acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of [Section 7 of the Clayton Act] whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce.").

[54] *See United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 860-61 (6th Cir. 2005).

[55] *See Denver & Rio Grande v. United States*, 387 U.S. 485, 504 (1967) (identifying Section 7 concerns with a 20% investment).

28

reduce the value of its investment in its rival. This reduction in the incentive of the acquiring firm to compete arises even when it cannot directly influence the conduct or decision making of the target firm.

Third, a partial acquisition can lessen competition by giving the acquiring firm access to non-public, competitively sensitive information from the target firm. Even absent any ability to influence the conduct of the target firm, access to competitively sensitive information can substantially lessen competition through other mechanisms. For example, it can enhance the ability of the target and the partial owner to coordinate their behavior and make other accommodating responses faster and more targeted. The risk of coordinated effects is greater if the transaction also facilitates the flow of competitively sensitive information from the investor to the target firm. Even if coordination does not occur, the partial owner may use that information to preempt or appropriate a rival's competitive business strategies for its own benefit. If rivals know their efforts to win trading partners can be immediately appropriated, they may see less value in taking competitive actions in the first place, resulting in a lessening of competition.

*    *    *

The analyses above address common scenarios that the Agencies use to assess the risk that a merger may substantially lessen competition or tend to create a monopoly. However, they are not exhaustive. The Agencies have in the past encountered mergers that lessen competition through mechanisms not covered above. For example:

    A. A merger that would enable firms to avoid a regulatory constraint because that constraint was applicable to only one of the merging firms;

    B. A merger that would enable firms to exploit a unique procurement process that favors the bids of a particular competitor who would be acquired in the merger; or

    C. In a concentrated market, a merger that would dampen the acquired firm's incentive or ability to compete due to the structure of the acquisition or the acquirer.

As these scenarios and these Guidelines indicate, a wide range of evidence can show that a merger may lessen competition or tend to create a monopoly. Whatever the sources of evidence, the Agencies look to the facts and the law in each case.

Whatever frameworks the Agencies use to identify that a merger may substantially lessen competition or tend to create a monopoly, they also examine rebuttal evidence under the framework in Section 3.

29

### 3.  Rebuttal Evidence Showing that No Substantial Lessening of Competition is Threatened by the Merger

The Agencies may assess whether a merger may substantially lessen competition or tend to create a monopoly based on a fact-specific analysis under any one or more of the Guidelines discussed above.[56] The Supreme Court has determined that analysis should consider "other pertinent factors" that may "mandate[] a conclusion that no substantial lessening of competition [is] threatened by the acquisition."[57] The factors pertinent to rebuttal depend on the nature of the threat to competition or tendency to create a monopoly resulting from the merger.

Several common types of rebuttal and defense evidence are subject to legal tests established by the courts. The Agencies apply those tests consistent with prevailing law, as described below.

### 3.1.  Failing Firms

When merging parties suggest the weak or weakening financial position of one of the merging parties will prevent a lessening of competition, the Agencies examine that evidence under the "failing firm" defense established by the Supreme Court. This defense applies when the assets to be acquired would imminently cease playing a competitive role in the market even absent the merger.

As set forth by the Supreme Court, the failing firm defense has three requirements:

A.  "[T]he evidence show[s] that the [failing firm] face[s] the grave probability of a business failure."[58] The Agencies typically look for evidence in support of this element that the allegedly failing firm would be unable to meet its financial obligations in the near future. Declining sales and/or net losses, standing alone, are insufficient to show this requirement.

B.  "The prospects of reorganization of [the failing firm are] dim or nonexistent."[59] The Agencies typically look for evidence suggesting that the failing firm would be unable to reorganize successfully under Chapter 11 of the Bankruptcy Act, taking into account that "companies reorganized through receivership, or through [the Bankruptcy Act] often emerge[] as strong competitive companies."[60] Evidence of the firm's actual attempts to resolve its debt with creditors is important.

C.  "[T]he company that acquires the failing [firm] or brings it under dominion is the only available purchaser."[61] The Agencies typically look for evidence that a company has made unsuccessful good-faith efforts to elicit reasonable alternative offers that pose a less severe danger to competition than does the proposed merger.[62]

---

[56] See United States v. AT&T, Inc., 916 F.3d at 1032.

[57] See United States v. Gen. Dynamics Corp., 415 U.S. 486, 498 (1974); Baker Hughes, 908 F.2d at 990 (quoting General Dynamics and describing its holding as permitting rebuttal based on a "finding that 'no substantial lessening of competition occurred or was threatened by the acquisition'").

[58] Citizen Publ'g Co. v. United States, 394 U.S. 131, 138 (1969).

[59] Id.

[60] Id.

[61] Id. at 136-39 (quoting Int'l Shoe Co. v. FTC, 280 U.S. 291, 302 (1930)).

[62] Any offer to purchase the assets of the failing firm for a price above the liquidation value of those assets will be regarded as a reasonable alternative offer. Parties must solicit reasonable alternative offers before claiming that the business is failing.

PX15347-031

Although merging parties sometimes argue that a poor or weakening position should serve as a defense even when it does not meet these elements, the Supreme Court has "confine[d] the failing company doctrine to its present narrow scope."[63] The Agencies evaluate evidence of a failing firm consistent with this prevailing law.[64]

## 3.2. Entry and Repositioning

Merging parties sometimes raise a rebuttal argument that a reduction in competition resulting from the merger would induce entry or repositioning[65] into the relevant market, preventing the merger from substantially lessening competition or tending to create a monopoly in the first place. This argument posits that a merger may, by substantially lessening competition, make the market more profitable for the merged firm and any remaining competitors, and that this increased profitability may induce new entry. To evaluate this rebuttal evidence, the Agencies assess whether entry induced by the merger would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."[66]

**Timeliness.** To show that no substantial lessening of competition is threatened by a merger, entry must be rapid enough to replace lost competition before any effect from the loss of competition due to the merger may occur. Entry in most industries takes a significant amount of time and is therefore insufficient to counteract any substantial lessening of competition that is threatened by a merger. Moreover, the entry must be durable: an entrant that does not plan to sustain its investment or that may exit the market would not ensure long-term preservation of competition.

**Likelihood.** Entry induced by lost competition must be so likely that no substantial lessening of competition is threatened by the merger. Firms make entry decisions based on the market conditions they expect once they participate in the market. If the new entry is sufficient to counteract the merger's effect on competition, the Agencies analyze why the merger would induce entry that was not planned in pre-merger competitive conditions.

The Agencies also assess whether the merger may increase entry barriers. For example, the merging firms may have a greater ability to discourage or block new entry when combined than they would have as separate firms. Mergers may enable or incentivize unilateral or coordinated exclusionary

---

Liquidation value is the highest value the assets could command outside the market. If a reasonable alternative offer was rejected, the parties cannot claim that the business is failing.

[63] *Citizen Publ'g*, 394 U.S. at 139.

[64] The Agencies do not normally credit claims that the assets of a division would exit the relevant market in the near future unless: (1) applying cost allocation rules that reflect true economic costs, the division has a persistently negative cash flow on an operating basis, and such negative cash flow is not economically justified for the firm by benefits such as added sales in complementary markets or enhanced customer goodwill; and (2) the owner of the failing division has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its assets in the relevant market and pose a less severe danger to competition than does the proposed acquisition. Because firms can allocate costs, revenues, and intra-company transactions among their subsidiaries and divisions, the Agencies require evidence that is not solely based on management plans that could have been prepared for the purpose of demonstrating negative cash flow or the prospect of exit from the relevant market.

[65] Repositioning is a supply-side response that is evaluated like entry. If repositioning requires movement of assets from other markets, the Agencies will consider the costs and competitive effects of doing so. Repositioning that would reduce competition in the markets from which products or services are moved is not a cognizable rebuttal for a lessening of competition in the relevant market.

[66] *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019).

31

strategies that make entry more difficult. Entry can be particularly challenging when a firm must enter at multiple levels of the market at sufficient scale to compete effectively.

**Sufficiency.** Even where timely and likely, the prospect of entry may not effectively prevent a merger from threatening a substantial lessening of competition. Entry may be insufficient due to a wide variety of constraints that limit an entrant's effectiveness as a competitor. Entry must at least replicate the scale, strength, and durability of one of the merging parties to be considered sufficient. The Agencies typically do not credit entry that depends on lessening competition in other markets.

As part of their analysis, the Agencies will consider the economic realities at play. For example, lack of successful entry in the past will likely suggest that entry may be slow or difficult. Recent examples of entry, whether successful or unsuccessful, provide the starting point for identifying the elements of practical entry barriers and the features of the industry that facilitate or interfere with entry. The Agencies will also consider whether the parties' entry arguments are consistent with the rationale for the merger or imply that the merger itself would be unprofitable.

### 3.3.    Procompetitive Efficiencies

The Supreme Court has held that "possible economies [from a merger] cannot be used as a defense to illegality."[67] Competition usually spurs firms to achieve efficiencies internally, and firms also often work together using contracts short of a merger to combine complementary assets without the full anticompetitive consequences of a merger.

Merging parties sometimes raise a rebuttal argument that, notwithstanding other evidence that competition may be lessened, evidence of procompetitive efficiencies shows that no substantial lessening of competition is in fact threatened by the merger. This argument asserts that the merger would not substantially lessen competition in any relevant market in the first place.[68] When assessing this argument, the Agencies will not credit vague or speculative claims, nor will they credit benefits outside the relevant market that would not prevent a lessening of competition in the relevant market. Rather, the Agencies examine whether the evidence[69] presented by the merging parties shows each of the following:

**Merger Specificity.** The merger will produce substantial competitive benefits that could not be achieved without the merger under review.[70] Alternative ways of achieving the claimed benefits are considered in making this determination. Alternative arrangements could include organic growth of one of the merging firms, contracts between them, mergers with others, or a partial merger involving only those assets that give rise to the procompetitive efficiencies.

---

[67] *Phila. Nat'l Bank*, 374 U.S. at 371; *Procter & Gamble Co.*, 386 U.S. at 580 ("Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition.").

[68] *United States v. Anthem*, 855 F.3d 345, 353-55 (D.C. Cir. 2017) (although efficiencies not a "defense" to antitrust liability, evidence sometimes used "to rebut a prima facie case"); *Saint Alphonsus Medical Center-Nampa*, 778 F.3d at 791 ("The Clayton Act focuses on competition, and the claimed efficiencies therefore must show that the prediction of anticompetitive effects from the prima facie case is inaccurate.").

[69] In general, evidence related to efficiencies developed prior to the merger challenge is much more probative than evidence developed during the Agencies' investigation or litigation.

[70] If inter-firm collaborations are achievable by contract, they are not merger specific. The Agencies will credit the merger specificity of efficiencies only in the presence of evidence that a contract to achieve the asserted efficiencies would not be practical. *See Anthem*, 855 F.3d at 357.

PX15347-033

*Verifiability.* These benefits are verifiable, and have been verified, using reliable methodology and evidence not dependent on the subjective predictions of the merging parties or their agents. Procompetitive efficiencies are often speculative and difficult to verify and quantify, and efficiencies projected by the merging firms often are not realized. If reliable methodology for verifying efficiencies does not exist or is otherwise not presented by the merging parties, the Agencies are unable to credit those efficiencies.

*Prevents a Reduction in Competition.* To the extent efficiencies merely benefit the merging firms, they are not cognizable. The merging parties must demonstrate through credible evidence that, within a short period of time, the benefits will prevent the risk of a substantial lessening of competition in the relevant market.

*Not Anticompetitive.* Any benefits claimed by the merging parties are cognizable only if they do not result from the anticompetitive worsening of terms for the merged firm's trading partners.[71]

Procompetitive efficiencies that satisfy each of these criteria are called cognizable efficiencies. To successfully rebut evidence that a merger may substantially lessen competition, cognizable efficiencies must be of a nature, magnitude, and likelihood that no substantial lessening of competition is threatened by the merger in any relevant market. Cognizable efficiencies that would not prevent the creation of a monopoly cannot justify a merger that may tend to create a monopoly.

---

[71] The Agencies will not credit efficiencies if they reflect or require a decrease in competition in a separate market. For example, if input costs are expected to decrease, the cost savings will not be treated as an efficiency if they reflect an increase in monopsony power.

33

# 4.  Analytical, Economic, and Evidentiary Tools

The analytical, economic, and evidentiary tools that follow can be applicable to many parts of the Agencies' evaluation of a merger as they apply the factors and frameworks discussed in Sections 2 and 3.

## 4.1.  Sources of Evidence

This subsection describes the most common sources of evidence the Agencies draw on in a merger investigation. The evidence the Agencies rely upon to evaluate whether a merger *may* substantially lessen competition or tend to create a monopoly is weighed based on its probative value. In assessing the available evidence, the Agencies consider documents, testimony, available data, and analysis of those data, including credible econometric analysis and economic modeling.

***Merging Parties***. The Agencies often obtain substantial information from the merging parties, including documents, testimony, and data. Across all of these categories, evidence created in the normal course of business is more probative than evidence created after the company began anticipating a merger review. Similarly, the Agencies give less weight to predictions by the parties or their employees, whether in the ordinary course of business or in anticipation of litigation, offered to allay competition concerns. Where the testimony of outcome-interested merging party employees contradicts ordinary course business records, the Agencies typically give greater weight to the business records.

Evidence that the merging parties intend or expect the merger to lessen competition, such as plans to coordinate with other firms, raise prices, reduce output or capacity, reduce product quality or variety, lower wages, cut benefits, exit a market, cancel plans to enter a market without a merger, withdraw products or delay their introduction, or curtail research and development efforts after the merger, can be highly informative in evaluating the effects of a merger on competition. The Agencies give little weight, however, to the lack of such evidence or the expressed contrary intent of the merging parties.

***Customers, Workers, Industry Participants, and Observers***. Customers can provide a variety of information to the Agencies, ranging from information about their own purchasing behavior and choices to their views about the effects of the merger itself. The Agencies consider the relationship between customers and the merging parties in weighing customer evidence. The ongoing business relationship between a customer and a merging party may discourage the customer from providing evidence inconsistent with the interests of the merging parties.

Workers and representatives from labor organizations can provide information regarding, among other things, wages, non-wage compensation, working conditions, the individualized needs of workers in the market in question, the frictions involved in changing jobs, and the industry in which they work.

Similarly, other suppliers, indirect customers, distributors, consultants, and industry analysts can also provide information helpful to a merger inquiry. As with other interested parties, the Agencies give less weight to evidence created in anticipation of a merger investigation and more weight to evidence developed in the ordinary course of business.

***Market Effects in Consummated Mergers***. Evidence of observed post-merger price increases or worsened terms is given substantial weight. A consummated merger, however, may substantially lessen competition even if such effects have not yet been observed, perhaps because the merged firm may be aware of the possibility of post-merger antitrust review and is therefore moderating its conduct.

34

Consequently, in evaluating consummated mergers, the Agencies also consider the same types of evidence when evaluating proposed mergers.

*Econometric Analysis and Economic Modeling.* Econometric analysis of data and other types of economic modeling can be informative in evaluating the potential effects of a merger on competition. The Agencies give more weight to analysis using high quality data and adhering to rigorous standards. But the Agencies also take into account that in some cases, the availability or quality of data or reliable modeling techniques might limit the availability and relevance of econometric modeling. When data is available, the Agencies recognize that the goal of economic modeling is not to create a perfect representation of reality, but rather to inform an assessment of the likely change in firm incentives resulting from a merger.

*Transaction Terms.* The financial terms of the transaction may also be informative regarding a merger's impact on competition. For example, a purchase price that exceeds the acquired firm's stand-alone market value can sometimes indicate that the acquiring firm is paying a premium because it expects to be able to benefit from reduced competition.

## 4.2.    Evaluating Competition Among Firms

This subsection discusses evidence and tools the Agencies look to when assessing competition among firms. The evidence and tools in this section can be relevant to a variety of settings, for example: to assess competition between rival firms (Guideline 2); the ability and incentive to limit access to a product rivals use to compete (Guideline 5); or for market definition (Section 4.3), for example when carrying out the Hypothetical Monopolist Test (Section 4.3.A).

For clarity, the discussion in this subsection often focuses on competition between two suppliers of substitute products that set prices. Analogous analytic tools may also be relevant in more general settings, for example when considering: competition among more than two suppliers; competition among buyers or employers to procure inputs and labor; competition that derives from customer willingness to buy in different locations; and competition that takes place in dimensions other than price or when terms are determined through, for example, negotiations or auctions.

Guideline 2 describes how different types of evidence can be used in assessing the potential harm to competition from a merger; some portions of Guideline 2 that are relevant in other settings are repeated below.

### 4.2.A.  Generally Applicable Considerations

The Agencies may consider one or more of the following types of evidence, tools, and metrics when assessing the degree of competition among firms:

*Strategic Deliberations or Decisions.* The Agencies may analyze the extent of competition among firms, for example between the merging firms, by examining evidence of their strategic deliberations or decisions in the regular course of business. For example, in some markets, the firms may monitor each other's pricing, marketing campaigns, facility locations, improvements, products, capacity, output, input costs, and/or innovation plans. This can provide evidence of competition between the merging firms, especially when they react by taking steps to preserve or enhance the competitiveness or profitability of their own products or services.

PX15347-036

**Prior Merger, Entry, and Exit Events.** The Agencies may look to historical events to assess the presence and substantiality of direct competition between the merging firms. For example, the Agencies may examine the impact of recent relevant mergers, entry, expansion, or exit events on the merging parties or their competitive behavior.

**Customer Substitution.** Customers' willingness to switch between different firms' products is an important part of the competitive process. Firms are closer competitors the more that customers are willing to switch between their products, for example because they are more similar in quality, price, or other characteristics.

Evidence commonly analyzed to show the extent of substitution among firms' products includes: how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions; documentary and testimonial evidence such as win/loss reports, evidence from discount approval processes, switching data, customer surveys, as well as information from suppliers of complementary products and distributors; objective information about product characteristics; and market realities affecting the ability of customers to switch.

**Impact of Competitive Actions on Rivals.** When one firm takes competitive actions to attract customers, this can benefit the firm at the expense of its rivals. The Agencies may gauge the extent of competition among firms by considering the impact that competitive actions by one firm have on the others. The impact of a firm's competitive actions on a rival generally depends on how many sales a rival would lose as a result of the competitive actions, as well as the profitability of those lost sales. The Agencies may use margins to measure the profitability of the sale a rival would have made.[72]

**Impact of Eliminating Competition Between the Firms.** In some instances, evidence may be available to assess the impact of competition from one or more firms on the other firms' actions, such as firm choices about price, quality, wages, or another dimension of competition. This can be gauged by comparing the two firms' actions when they compete and make strategic choices independently against the actions the firms might choose if they acted jointly. Actual or predicted changes in these results of competition, when available, can indicate the degree of competition between the firms.

To make this type of comparison, the Agencies sometimes rely on economic models. Often, such models consider the firms' incentives to change their actions in one or more selected dimensions, such as price, in a somewhat simplified scenario. For example, a model might focus on the firms' short-run incentives to change price, while abstracting from a variety of additional competitive forces and dimensions of competition, such as the potential for firms to reposition their products or for the merging firms to coordinate with other firms. Such a model may incorporate data and evidence in order to produce quantitative estimates of the impact of the merger on firm incentives and corresponding choices. This type of exercise is sometimes referred to by economists as "merger simulation" despite the fact that the hypothetical setting considers only selected aspects of the loss of competition from a merger. The Agencies use such models to give an indication of the scale and importance of competition, not to precisely predict outcomes.

---

[72] The margin on incremental units is the difference between incremental revenue (often equal to price) and incremental cost on those units. The Agencies may use accounting data to measure incremental costs, but they do not necessarily rely on accounting margins recorded by firms in the ordinary course of business because such margins often do not align with the concept of incremental cost that is relevant in economic analysis of a merger.

36

### 4.2.B.  Considerations When Terms Are Set by Firms

The Agencies may use various types of evidence and metrics to assess the strength of competition among firms that set terms to their customers. Firms might offer the same terms to different customers or different terms to different groups of customers.

Competition in this setting can lead firms to set lower prices or offer more attractive terms when they act independently than they would in a setting where that competition was eliminated by a merger. When considering the impact of competition on the incentives to set price, to the extent price increases on one firm's products would lead customers to switch to products from another firm, their merger will enable the merged firm to profit by unilaterally raising the price of one or both products above the pre-merger level. Some of the sales lost because of the price increase will be diverted to the products of the other firm, and capturing the value of these diverted sales can make the price increase profitable even though it would not have been profitable prior to the merger.

A measure of customer substitution between firms in this setting is the diversion ratio. The diversion ratio from one product to another is a metric of how customers likely would substitute between them. The diversion ratio is the fraction of unit sales lost by the first product due to a change in terms, such as an increase in its price, that would be diverted to the second product. The higher the diversion ratio between two products made by different firms, the stronger the competition between them.

A high diversion ratio between the products owned by two firms can indicate strong competition between them even if the diversion ratio to another firm is higher. The diversion ratio from one of the products of one firm to a group of products made by other firms, defined analogously, is sometimes referred to as the aggregate diversion ratio or the recapture rate.

A measure of the impact on rivals of competitive actions is the value of diverted sales from a price increase. The value of sales diverted from one firm to a second firm, when the first firm raises its price on one of its products, is equal to the number of units that would be diverted from the first firm to the second, multiplied by the difference between the second firm's price and the incremental cost of the diverted sales. To interpret the magnitude of the value of diverted sales, the Agencies may use as a basis of comparison either the incremental cost to the second firm of making the diverted sales, or the revenues lost by the first firm as a result of the price increase. The ratio of the value of diverted sales to the revenues lost by the first firm can be an indicator of the upward pricing pressure that would result from the loss of competition between the two firms. Analogous concepts can be applied to analyze the impact on rivals of worsening terms other than price.

### 4.2.C.  Considerations When Terms Are Set Through Bargaining or Auctions

In some industries, buyers and sellers negotiate prices and other terms of trade. In bargaining, buyers commonly negotiate with more than one seller and may play competing sellers off against one another. In other industries, sellers might sell their products, or buyers might procure inputs, using an auction. Negotiations may involve aspects of an auction as well as aspects of one-on-one negotiation. Competition among sellers can significantly enhance the ability of a buyer to obtain a result more favorable to it, and less favorable to the sellers, compared to a situation where the elimination of competition through a merger prevents buyers from playing those sellers off against each other in negotiations.

Sellers may compete even when a customer does not directly play their offers against each other. The attractiveness of alternative options influences the importance of reaching an agreement to the

37

negotiating parties and thus the terms of the agreement. A party that has many attractive alternative trading partners places less importance on reaching an agreement with any one particular trading partner than a party with few attractive alternatives. As alternatives for one party are eliminated (such as through a merger), the trading partner gains additional bargaining leverage reflecting that loss of competition. A merger between sellers may lessen competition even if the merged firm handles negotiations for the merging firms' products separately.

Thus, qualitative or quantitative evidence about the leverage provided to buyers by competing suppliers may be used to assess the extent of competition among firms in this setting. Analogous evidence may be used when analyzing a setting where terms are set using auctions, for example, procurement auctions where suppliers bid to serve a buyer. If, for some categories of procurements, certain suppliers are often among the most attractive to the buyer, competition among that group of suppliers is likely to be strong.

Firms sometimes keep records of the progress and outcome of individual sales efforts, and the Agencies may use these data to generate measures of the extent to which customers would likely substitute between the two firms. Examples of such measures might include a diversion ratio based on the rate at which customers would buy from one firm if the other one was not available, or the frequency with which the two firms bid on contracts with the same customer.

### 4.2.D.  Considerations When Firms Determine Capacity and Output

In some markets, the choice of how much to produce (output decisions) or how much productive capacity to maintain (capacity decisions) are key strategic variables. When a firm decreases output, it may lose sales to rivals, but also drive up prices. Because a merged firm will account for the impact of higher prices across all of the merged firms' sales, it may have an incentive to decrease output as a result of the merger. The loss of competition through a merger of two firms may lead the merged firm to leave capacity idle, refrain from building or obtaining capacity that would have been obtained absent the merger, lay off or stop hiring workers, or eliminate pre-existing production capabilities. A firm may also divert the use of capacity away from one relevant market and into another market so as to raise the price in the former market. The analysis of the extent to which firms compete may differ depending on how a merger between them might create incentives to suppress output.

Competition between merging firms is greater when (1) the merging firms' market shares are relatively high; (2) the merging firms' products are relatively undifferentiated from each other; (3) the market elasticity of demand is relatively low; (4) the margin on the suppressed output is relatively low; and (5) the supply responses of non-merging rivals are relatively small. Qualitative or quantitative evidence may be used to evaluate and weigh each of these factors.

In some cases, competition between firms—including one firm with a substantial share of the sales in the market and another with significant excess capacity to serve that market—can prevent an output suppression strategy from being profitable. This can occur even if the firm with the excess capacity has a relatively small share of sales, as long as that firm's ability to expand, and thus keep prices from rising, makes an output suppression strategy unprofitable for the firm with the larger market share.

Output or capacity reductions also may affect the market's resilience in the face of future shocks to supply or demand, and the Agencies will consider this loss of resilience in assessing whether the merger may substantially lessen competition or tend to create a monopoly.

PX15347-039

### 4.2.E.  Considerations for Innovation and Product Variety Competition

Firms can compete for customers by offering varied and innovative products and features, which could range from minor improvements to the introduction of a new product category. Features can include new or different product attributes, services offered along with a product, or higher-quality services standing alone. Customers value the variety of products or services that competition generates, including having a variety of locations at which they can shop.

Offering the best mix of products and features is an important dimension of competition that may be harmed as a result of the elimination of competition between the merging parties.

When a firm introduces a new product or improves a product's features, some of the sales it gains may be at the expense of its rivals, including rivals that are competing to develop similar products and features. As a result, competition between firms may lead them to make greater efforts to offer a variety of products and features than would be the case if the firms were jointly owned, for example, if they merged. The merged firm may have a reduced incentive to continue or initiate development of new products that would have competed with the other merging party, but post-merger would "cannibalize" what would be its own sales.[73] A service provider may have a reduced incentive to continue valuable upgrades offered by the acquired firm. The merged firm may have a reduced incentive to engage in disruptive innovation that would threaten the business of one of the merging firms. Or it may have the incentive to change its product mix, such as by ceasing to offer one of the merging firms' products, leaving worse off the customers who previously chose the product that was eliminated. For example, competition may be harmed when customers with a preference for a low-price option lose access to it, even if remaining products have higher quality.

The incentives to compete aggressively on innovation and product variety depend on the capabilities of the firms and on customer reactions to the new offerings. Development of new features depends on having the appropriate expertise and resources. Where firms are two of a small number of companies with specialized employees, development facilities, intellectual property, or research projects in a particular area, competition between them will have a greater impact on their incentives to innovate.

Innovation may be directed at outcomes beyond product features; for example, innovation may be directed at reducing costs or adopting new technology for the distribution of products.

## 4.3.  Market Definition

The Clayton Act protects competition "in any line of commerce in any section of the country."[74] The Agencies engage in a market definition inquiry in order to identify whether there is any line of commerce or section of the country in which the merger may substantially lessen competition or tend to create a monopoly. The Agencies identify the "area of effective competition" in which competition may be lessened "with reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country.')."[75] The Agencies refer to the process of identifying market(s) protected by the Clayton Act as a "market definition" exercise and the markets so defined as "relevant antitrust markets,"

---

[73] Sales "cannibalization" refers to a situation where customers of a firm substitute away from one of the firm's products to another product offered by the same firm.

[74] 15 U.S.C. § 18.

[75] *Brown Shoe*, 370 U.S. at 324.

PX15347-040

or simply "relevant markets." Market definition can also allow the Agencies to identify market participants and measure market shares and market concentration.

A relevant antitrust market is an area of effective competition, comprising both product (or service) and geographic elements. The outer boundaries of a relevant product market are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[76] Within a broad relevant market, however, effective competition often occurs in numerous narrower relevant markets.[77] Market definition ensures that relevant antitrust markets are sufficiently broad, but it does not always lead to a single relevant market. Section 7 of the Clayton Act prohibits any merger that may substantially lessen competition "in any line of commerce" and in "any section of the country," and the Agencies protect competition by challenging a merger that may lessen competition in any one or more relevant markets.

Market participants often encounter a range of possible substitutes for the products of the merging firms. However, a relevant market cannot meaningfully encompass that infinite range of substitutes.[78] There may be effective competition among a narrow group of products, and the loss of that competition may be harmful, making the narrow group a relevant market, even if competitive constraints from significant substitutes are outside the group. The loss of both the competition between the narrow group of products and the significant substitutes outside that group may be even more harmful, but that does not prevent the narrow group from being a market in its own right.

Relevant markets need not have precise metes and bounds. Some substitutes may be closer, and others more distant, and defining a market necessarily requires including some substitutes and excluding others. Defining a relevant market sometimes requires a line-drawing exercise around product features, such as size, quality, distances, customer segment, or prices. There can be many places to draw that line and properly define a relevant market. The Agencies recognize that such scenarios are common, and indeed "fuzziness would seem inherent in any attempt to delineate the relevant . . . market."[79] Market participants may use the term "market" colloquially to refer to a broader or different set of products than those that would be needed to constitute a valid relevant antitrust market.

The Agencies rely on several tools to demonstrate that a market is a relevant antitrust market. For example, the Agencies may rely on any one or more of the following to identify a relevant antitrust market.

    A. Direct evidence of substantial competition between the merging parties can demonstrate that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

---

[76] *Id.* at 325.

[77] *Id.* ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."). Multiple overlapping markets can be appropriately defined relevant markets. For example, a merger to monopoly for food worldwide would lessen competition in well-defined relevant markets for, among others, food, baked goods, cookies, low-fat cookies, and premium low-fat chocolate chip cookies. Illegality in any of these in any city or town comprising a relevant geographic market would suffice to prohibit the merger, and the fact that one area comprises a relevant market does not mean a larger, smaller, or overlapping area could not as well.

[78] *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964); *see also FTC v. Advoc. Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) ("A geographic market does not need to include all of the firm's competitors; it needs to include the competitors that would substantially constrain the firm's price-increasing ability." (cleaned up)).

[79] *Phila. Nat'l Bank*, 374 U.S. at 360 n.37.

PX15347-041

B. Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

C. A relevant market can be identified from evidence on observed market characteristics ("practical indicia"), such as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[80] Various practical indicia may identify a relevant market in different settings.

D. Another common method employed by courts and the Agencies is the hypothetical monopolist test.[81] This test examines whether a proposed market is too narrow by asking whether a hypothetical monopolist over this market could profitably worsen terms significantly, for example, by raising price. An analogous hypothetical monopsonist test applies when considering the impact of a merger on competition among buyers.

The Agencies use these tools to define relevant markets because they each leverage market realities to identify an area of effective competition.

Section 4.3.A below describes the Hypothetical Monopolist Test in greater detail. Section 4.3.B addresses issues that may arise when defining relevant markets in several specific scenarios.

### 4.3.A.  The Hypothetical Monopolist Test

This Section describes the Hypothetical Monopolist Test, which is a method by which the Agencies often define relevant antitrust markets. As outlined above, a relevant antitrust market is an area of effective competition. The Hypothetical Monopolist/Monopsonist Test ("HMT") evaluates whether a group of products is sufficiently broad to constitute a relevant antitrust market. To do so, the HMT asks whether eliminating the competition among the group of products by combining them under the control of a hypothetical monopolist likely would lead to a worsening of terms for customers. The Agencies generally focus their assessment on the constraints from competition, rather than on constraints from regulation, entry, or other market changes. The Agencies are concerned with the impact on economic incentives and assume the hypothetical monopolist would seek to maximize profits.

When evaluating a merger of sellers, the HMT asks whether a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ("hypothetical monopolist") likely would undertake at least a small but significant and non-transitory increase in price ("SSNIP") or other worsening of terms ("SSNIPT") for at least one

---

[80] *Brown Shoe*, 370 U.S. at 325, *quoted in United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia to evaluate relevant product market that included, based on the unique facts of the industry, those distributors who "could counteract monopolistic restrictions by releasing their own supplies").

[81] *See FTC v. Penn State Hershey Med. Center*, 838 F.3d 327, 338 (3d Cir. 2016). While these guidelines focus on applying the hypothetical monopolist test in analyzing mergers, the test can be adapted for similar purposes in cases involving alleged monopolization or other conduct. *See, e.g., McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015).

41

product in the group.[82] For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant. Analogously, when considering a merger of buyers, the Agencies ask the equivalent question for a hypothetical monopsonist. This Section often focuses on merging sellers to simplify exposition.

### 4.3.B.  Implementing the Hypothetical Monopolist Test

*The SSNIPT*. A SSNIPT may entail worsening terms along any dimension of competition, including price (SSNIP), but also other terms (broadly defined) such as quality, service, capacity investment, choice of product variety or features, or innovative effort.

*Input and Labor Markets*. When the competition at issue involves firms buying inputs or employing labor, the HMT considers whether the hypothetical monopsonist would undertake at least a SSNIPT, such as a decrease in the offered price or a worsening of the terms of trade offered to suppliers, or a decrease in the wage offered to workers or a worsening of their working conditions or benefits.

*The Geographic Dimension of the Market*. The hypothetical monopolist test is generally applied to a group of products together with a geographic region to determine a relevant market, though for ease of exposition the two dimensions are discussed separately, with geographic market definition discussed in Section 4.3.D.2.

*Negotiations or Auctions*. The HMT is stated in terms of a hypothetical monopolist *undertaking* a SSNIPT. This covers settings where the hypothetical monopolist sets terms and makes them worse. It also covers settings where firms bargain, and the hypothetical monopolist would have a stronger bargaining position that would likely lead it to extract a SSNIPT during negotiations, or where firms sell their products in an auction, and the bids submitted by the hypothetical monopolist would result in the purchasers of its products experiencing a SSNIPT.

*Benchmark for the SSNIPT*. The HMT asks whether the hypothetical monopolist likely would worsen terms relative to those that likely would prevail absent the proposed merger. In some cases, the Agencies will use as a benchmark different outcomes than those prevailing prior to the merger. For example, if outcomes are likely to change absent the merger, e.g., because of innovation, entry, exit, or exogenous trends, the Agencies may use anticipated future outcomes as the benchmark. Or, if suppliers in the market are coordinating prior to the merger, the Agencies may use a benchmark that reflects conditions that would arise if coordination were to break down. When evaluating whether a merging firm is dominant (Guideline 6), the Agencies may use terms that likely would prevail in a more competitive market as a benchmark.[83]

---

[82] If the pricing incentives of the firms supplying the products in the group differ substantially from those of the hypothetical monopolist, for reasons other than the latter's control over a larger group of substitutes, the Agencies may instead employ the concept of a hypothetical profit-maximizing cartel comprised of the firms (with all their products) that sell the products in the candidate market. This approach is most likely to be appropriate if the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market. This could occur, for example, if the candidate market is one for durable equipment and the firms selling that equipment derive substantial net revenues from selling spare parts and service for that equipment. Analogous considerations apply when considering a SSNIPT for terms other than price.

[83] In the entrenchment context, if the inquiry is being conducted after market or monopoly power has already been exercised, using prevailing prices can lead to defining markets too broadly and thus inferring that dominance does not exist when, in

PX15347-043

***Magnitude of the SSNIPT***. What constitutes a "small but significant" worsening of terms depends upon the nature of the industry and the merging firms' positions in it, the ways that firms compete, and the dimension of competition at issue. When considering price, the Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value. The Agencies, however, may consider a different term or a price increase that is larger or smaller than five percent.[84]

The Agencies may base a SSNIP on explicit or implicit prices for the firms' specific contribution to the value of the product sold, or an upper bound on the firms' specific contribution, where these can be identified with reasonable clarity. For example, the Agencies may derive an implicit price for the service of transporting oil over a pipeline as the difference between the price the pipeline firm paid for oil at one end and the price it sold the oil for at the other and base the SSNIP on this implicit price.

### 4.3.C.  Evidence and Tools for Carrying Out the Hypothetical Monopolist Test

Section 4.2 describes some of the qualitative and quantitative evidence and tools the Agencies can use to assess the extent of competition among firms. The Agencies can use similar evidence and analogous tools to apply the HMT, in particular to assess whether competition among a set of firms likely leads to better terms than a hypothetical monopolist would undertake.

To assess whether the hypothetical monopolist likely would undertake at least a SSNIP on one or more products in the candidate market, the Agencies sometimes interpret the qualitative and quantitative evidence using an economic model of the profitability to the hypothetical monopolist of undertaking price increases; the Agencies may adapt these tools to apply to other forms of SSNIPTs.

One approach utilizes the concept of a "recapture rate" (the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market). A price increase is profitable when the recapture rate is high enough that the incremental profits from the increased price plus the incremental profits from the recaptured sales going to other products in the candidate market exceed the profits lost when sales are diverted outside the candidate market. It is possible that a price increase is profitable even if a majority of sales are diverted outside the candidate market, for example if the profits on the lost sales are relatively low or the profits on the recaptured sales are relatively high.

Sometimes evidence is presented in the form of "critical loss analysis," which can be used to assess whether undertaking at least a SSNIPT on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. Critical loss analysis compares the magnitude of the two offsetting effects resulting from the worsening of terms. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the worsening of terms. The worsening of terms raises the hypothetical monopolist's profits if the predicted loss is less than the

---

[84] fact, it does. The problem with prevailing prices to define the market when a firm is already dominant is known as the "Cellophane Fallacy."

[84] The five percent price increase is not a threshold of competitive harm from the merger. Because the five percent SSNIP is a minimum expected effect of a hypothetical monopolist of an *entire* market, the actual predicted effect of a merger within that market may be significantly lower than five percent. A merger within a well-defined market that causes undue concentration can be illegal even if the predicted price increase is well below the SSNIP of five percent.

PX15347-044

critical loss. While this "breakeven" analysis differs somewhat from the profit-maximizing analysis called for by the HMT, it can sometimes be informative.

The Agencies require that estimates of the predicted loss be consistent with other evidence, including the pre-merger margins of products in the candidate market used to calculate the critical loss. Unless the firms are engaging in coordinated interaction, high pre-merger margins normally indicate that each firm's product individually faces demand that is not highly sensitive to price. Higher pre-merger margins thus indicate a smaller predicted loss as well as a smaller critical loss. The higher the pre-merger margin, the smaller the recapture rate[85] necessary for the candidate market to satisfy the hypothetical monopolist test. Similar considerations inform other analyses of the profitability of a price increase.

### 4.3.D.  Market Definition in Certain Specific Settings

This Section provides details on market definition in several specific common settings. In much of this section, concepts are presented for the scenario where the merger involves sellers. In some cases, clarifications are provided as to how the concepts apply to merging buyers; in general, the concepts apply in an analogous way.

#### 4.3.D.1.      *Targeted Trading Partners*

If the merged firm could profitably target a subset of customers for changes in prices or other terms, the Agencies may identify relevant markets defined around those targeted customers. The Agencies may do so even if firms are not currently targeting specific customer groups but could do so after the merger.

For targeting to be feasible, two conditions typically must be met. First, the suppliers engaging in targeting must be able to set different terms for targeted customers than other customers. This may involve identification of individual customers to which different terms are offered or offering different terms to different types of customers based on observable characteristics.[86] Markets for targeted customers need not have precise metes and bounds. In particular, defining a relevant market for targeted customers sometimes requires a line-drawing exercise on observable characteristics. There can be many places to draw that line and properly define a relevant market. Second, the targeted customers must not be likely to defeat a targeted worsening of terms by arbitrage (e.g., by purchasing indirectly from or through other customers). Arbitrage may be difficult if it would void warranties or make service more difficult or costly for customers, and it is inherently impossible for many services. Arbitrage on a modest scale may be possible but sufficiently costly or limited, for example due to transaction costs or search costs, that it would not deter or defeat a discriminatory pricing strategy.

If prices are negotiated or otherwise set individually, for example through a procurement auction, there may be relevant markets that are as narrow as an individual customer. Nonetheless, for analytic convenience, the Agencies may define cluster markets for groups of targeted customers for whom the

---

[85] The recapture rate is sometimes referred to as the aggregate diversion ratio, defined in Section 4.2.B.

[86] In some cases, firms offer one or more versions of products or services defined by their characteristics (where brand might be a characteristic). When customers can select among these products and terms do not vary by customer, the Agencies will typically define markets based on products rather than the targeted customers. In such cases, relevant antitrust markets may include only some of the differentiated products, for example products with only "basic" features, or products with "premium features." The tools described in Section 4.2 can be used to assess competition among differentiated products.

44

conditions of competition are reasonably similar. (See Section 4.3.D.4 for further discussion of cluster markets.)

Analogous considerations arise for a merger involving one or more buyers or employers. In this case, the analysis considers whether buyers target suppliers, for example by paying targeted suppliers or workers less, or by degrading the terms of supply contracts for targeted suppliers. Arbitrage would involve a targeted supplier selling to the buyer indirectly, through a different supplier who could obtain more favorable terms from the buyer.

If the HMT is applied in a setting where targeting of customers is feasible, it requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the targeted group would undertake at least a SSNIPT on some, though not necessarily all, customers in that group. The products sold to those customers form a relevant market if the hypothetical monopolist likely would undertake at least a SSNIPT despite the potential for customers to substitute away from the product or to take advantage of arbitrage. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.

### 4.3.D.2.        Geographic Markets

A relevant antitrust market is an area of effective competition, comprising both product (or service) and geographic elements. A market's geography depends on the limits that distance puts on some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers. Factors that may limit the geographic scope of the market include transportation costs, language, regulation, tariff and non-tariff trade barriers, custom and familiarity, reputation, and local service availability.

### 4.3.D.2.a.  Geographic Markets Based on the Locations of Suppliers

The Agencies sometimes define geographic markets as regions encompassing a group of supplier locations. When they do, the geographic market's scope is determined by customers' willingness to switch between suppliers. Geographic markets of this type often apply when customers receive goods or services at suppliers' facilities, for example when customers buy in-person from retail stores. A single firm may offer the same product in a number of locations, both within a single geographic market or across geographic markets; customers' willingness to substitute between products may depend on the location of the supplier. When calculating market shares, sales made from supplier locations in the geographic market are included, regardless of whether the customer making the purchase travelled from outside the boundaries of the geographic market (see Section 4.4 for more detail about calculating market shares).

If the HMT is used to evaluate the geographic scope of the market, it requires that a hypothetical profit-maximizing firm that was the only present or future supplier of the relevant product(s) at supplier locations in the region likely would undertake at least a SSNIPT in at least one location. In this exercise, the terms of sale for products sold to all customers at facilities outside the region are typically held constant.[87]

---

[87] In some circumstances, as when the merging parties operate in multiple geographies, if applying the HMT, the Agencies may apply a "Hypothetical Cartel" framework for market definition, following the approach outlined in Section 4.3.A, n.81.

45

*4.3.D.2.b.  Geographic Markets Based on Targeting of Customers by Location*

When targeting based on customer location is feasible (see Section 4.3.D.1), the Agencies may define geographic markets as a region encompassing a group of customers.[88] For example, geographic markets may sometimes be defined this way when suppliers deliver their products or services to customers' locations, or tailor terms of trade based on customers' locations. Competitors in the market are firms that sell to customers that are located in the specified region. Some suppliers may be located outside the boundaries of the geographic market, but their sales to customers located within the market are included when calculating market shares (see Section 4.4 for more detail about calculating market shares).

If prices are negotiated individually with customers that may be targeted, geographic markets may be as narrow as individual customers. Nonetheless, the Agencies often define a market for a cluster of customers located within a region if the conditions of competition are reasonably similar for these customers. (See Section 4.3.D.4 for further discussion of cluster markets.)

A firm's attempt to target customers in a particular area with worsened terms can sometimes be undermined if some customers in the region substitute by travelling outside it to purchase the product. Arbitrage by customers on a modest scale may be possible but sufficiently costly or limited that it would not deter or defeat a targeting strategy.[89]

If the HMT is used to evaluate market definition when customers may be targeted by location, it requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region likely would undertake at least a SSNIPT on some, though not necessarily all, customers in that region. The products sold in that region form a relevant market if the hypothetical monopolist would undertake at least a SSNIPT despite the potential for customers to substitute away from the product or to locations outside the region. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.[90]

*4.3.D.3.    Supplier Responses*

Market definition focuses solely on demand substitution factors, that is, on customers' ability and willingness to substitute away from one product or location to another in response to a price increase or other worsening of terms. Supplier responses may be considered in the analysis of competition between firms (Guideline 2 and Section 4.2), entry and repositioning (Section 3.2), and in calculating market shares and concentration (Section 4.4).

*4.3.D.4.    Cluster Markets*

A relevant antitrust market is generally a group of products that are substitutes for each other. However, when the competitive conditions for multiple relevant markets are reasonably similar, it may be appropriate to aggregate the products in these markets into a "cluster market" for analytic convenience, even though not all products in the cluster are substitutes for each other. For example, competing hospitals may each provide a wide range of acute health care services. Acute care for one health issue is not a substitute for acute care for a different health issue. Nevertheless, the Agencies may

---

[88] For customers operating in multiple locations, only those customer locations within the targeted region are included in the market.

[89] Arbitrage by suppliers is a type of supplier response and is thus not considered in market definition. (See Section 4.3.D.3)

[90] In some circumstances, as when the merging parties operate in multiple geographies, the Agencies may apply a "Hypothetical Cartel" framework for market definition, as described in Section 4.3.A, n.81.

46

aggregate them into a cluster market for acute care services if the conditions of competition are reasonably similar across the services in the cluster.

The Agencies need not separately analyze market definition for each product included in the cluster market, and market shares will typically be calculated for the cluster market as a whole.

Analogously, the Agencies sometimes define a market as a cluster of targeted customers (see Section 4.3.D.1) or a cluster of customers located in a region (see Section 4.3.D.2.b).

### 4.3.D.5.    Bundled Product Markets

Firms may sell a combination of products as a bundle or a "package deal," rather than offering products "*a la carte*," that is, separately as standalone products. Different bundles offered by the same or different firms might package together different combinations of component products and therefore be differentiated according to the composition of the bundle. If the components of a bundled product are also available separately, the bundle may be offered at a price that represents a discount relative to the sum of the *a la carte* product prices.

The Agencies take a flexible approach based on the specific circumstances to determine whether a candidate market that includes one or more bundled products, standalone products, or both is a relevant antitrust market. In some cases, a relevant market may consist of only bundled products. A market composed of only bundled products might be a relevant antitrust market even if there is significant competition from the unbundled products. In other cases, a relevant market may include both bundled products and some unbundled component products.

Even in cases where firms commonly sell combinations of products or services as a bundle or a "package deal," relevant antitrust markets do not necessarily include product bundles. In some cases, a relevant market may be analyzed as a cluster market, as discussed in Section 4.3.D.4.

### 4.3.D.6.    One-Stop Shop Markets

In some settings, the Agencies may consider a candidate market that includes one or more "one-stop shops," where customers can select a combination of products to purchase from a single seller, either in a single purchase instance or in a sequence of purchases. Products are commonly sold at a one-stop shop when customers value the convenience, which might arise because of transaction costs or search costs, savings of time, transportation costs, or familiarity with the store or web site.

A multi-product retailer such as a grocery store or online retailer is an example of a one-stop shop. Customers can select a particular basket of groceries from a range of available goods and different customers may select different baskets. Some customers may make multiple stops at specialty shops (e.g., butcher, baker, greengrocer), or they may do the bulk of their shopping at a one-stop shop (the grocery store) but also shop at specialty shops for particular product categories.

There are several ways in which markets may be defined in one-stop shop settings, depending on market realities, and the Agencies may further define more than one relevant antitrust market for a particular merger. For example, a relevant market may consist of only one-stop shops, even if there is significant competition from specialty shops; or it may include both one-stop shops and specialty shops. When a product category is sold by both one-stop shops and specialty suppliers (such as a type of produce sold in grocery stores and produce stands), the Agencies may define relevant antitrust markets for the product category sold by a particular type of supplier, or it may include multiple types of suppliers.

47

### 4.3.D.7.    *Market Definition When There is Harm to Innovation*

When considering harm to competition in innovation, market definition may follow the same approaches that are used to analyze other dimensions of competition. In the case where a merger may substantially lessen competition by decreasing incentives to innovate, the Agencies may define relevant antitrust markets around the products that would result from that innovation if successful, even if those products do not yet exist.[91] In some cases, the Agencies may analyze different relevant markets when considering innovation than when considering other dimensions of competition.

### 4.3.D.8.    *Market Definition for Input Markets and Labor Markets*

The same market definition tools and principles discussed above can be used for input markets and labor markets, where labor is a particular type of input. In input markets, firms compete with each other to attract suppliers, including workers. Therefore, input suppliers are analogous to customers in the discussions above about market definition. In defining relevant markets, the Agencies focus on the alternatives available to input suppliers. An antitrust input market consists of a group of products and a geographic area defined by the location of the buyers or input suppliers. Just as buyers of a product may consider products to be differentiated according to the brand or the identity of the seller, suppliers of a product or service may consider different buyers to be differentiated. For example, if the suppliers are contractors, they may have distinct preferences about who they provide services to, due to different working conditions, location, reliability of buyers in terms of paying invoices on time, or the propensity of the buyer to make unexpected changes to specifications.

The HMT considers whether a hypothetical monopsonist likely would undertake a SSNIPT, such as a reduction in price paid for inputs, or imposing less favorable terms on suppliers. (See Section 4.2.C for more discussion about competition in settings where terms are set through auctions and negotiations, as is common for input markets.)

When defining a market for labor the Agencies will consider the job opportunities available to workers who supply a relevant type of labor service, where worker choice among jobs or between geographic areas is the analog of consumer choices among products and regions when defining a product market. The Agencies may consider workers' willingness to switch in response to changes to wages or other aspects of working conditions, such as changes to benefits or other non-wage compensation, or adoption of less flexible scheduling. Depending on the occupation, alternative job opportunities might include the same occupation with alternative employers, or alternative occupations. Geographic market definition may involve considering workers' willingness or ability to commute, including the availability of public transportation. The product and geographic market definition may involve assessing whether workers may be targeted for less favorable wages or other terms of employment according to factors such as education, experience, certifications, or work locations. The Agencies may define cluster markets for different jobs when firms employ workers in a variety of jobs characterized by similar competitive conditions (see Section 4.3.D.4).

## 4.4.    Calculating Market Shares and Concentration

This subsection further describes how the Agencies calculate market shares and concentration metrics.

---

[91] *See Illumina*, slip op. at 12 (affirming a relevant market defined around "what . . . developers reasonably sought to achieve, not what they currently had to offer").

48

As discussed above, the Agencies may use evidence about market shares and market concentration as part of their analysis. These structural measures can provide insight into the market power of firms as well as into the extent to which they compete. Although any market that is properly identified using the methods in Section 4.3 is valid, the extent to which structural measures calculated in that market are probative in any given context depends on a number of considerations. The following market considerations affect the extent to which structural measures are probative in any given context.[92]

First, structural measures may be probative if the market used to estimate them includes the products that are the focus of the competitive concern that the structural inquiry intends to address. For example, the concentration measures discussed in Guideline 1 will be most probative about whether the merger eliminates substantial competition between the merging parties when calculated on a market that includes at least one competing product from each merging firm.

Second, the market used to estimate shares should be broad enough that it contains sufficient additional products so that a loss of competition among all the suppliers of the products in the market would lead to significantly worse terms for at least some customers of at least one product. Markets identified using the various tools in Section 4.3 can satisfy this condition—for example, all markets that satisfy the HMT do so.

Third, the competitive significance of the parties may be understated by their share when calculated on a market that is broader than needed to satisfy the considerations above, particularly when the market includes products that are more distant substitutes, either in the product or geographic dimension, for those produced by the parties.

### 4.4.A.  Market Participants

All firms that currently supply products (or consume products, when buyers merge) in a relevant market are considered participants in that market. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently supplying products in the relevant market, but that have committed to entering the market in the near future, are also considered market participants.

Firms that are not currently active in a relevant market, but that very likely would rapidly enter with direct competitive impact in the event of a small but significant change in competitive conditions, without incurring significant sunk costs, are also considered market participants. These firms are termed "rapid entrants." Sunk costs are entry or exit costs that cannot be recovered outside a relevant market. Entry that would take place more slowly in response to a change in competitive conditions, or that requires firms to incur significant sunk costs, is considered in Section 3.2.

Firms that are active in the relevant product market but not in the relevant geographic market may be rapid entrants. Other things equal, such firms are most likely to be rapid entrants if they are already active in geographies that are close to the geographic market. Factors such as transportation

---

[92] For simplicity, the discussion in the text focuses on the case where concerns arise that involve competition among the suppliers of products; analogous considerations may also arise for suppliers of services, or when concerns arise about competition among buyers of a product or service, or when analyzing market shares in certain specific settings (see Section 4.3.D).

49

costs are important; or for services or digital goods, other factors may be important, such as language or regulation.

In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier with efficient idle capacity, or readily available "swing" capacity currently used in adjacent markets that can easily and profitably be shifted to serve the relevant market, may be a rapid entrant. However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.

### 4.4.B.  Market Shares

The Agencies normally calculate product market shares for all firms that currently supply products (or consume products, when buyers merge) in a relevant market, subject to the availability of data. The Agencies measure each firm's market share using metrics that are informative about the market realities of competition in the particular market and firms' future competitive significance. When interpreting shares based on historical data, the Agencies may consider whether significant recent or reasonably foreseeable changes to market conditions suggest that a firm's shares overstate or understate its future competitive significance.

How market shares are calculated may further depend on the characteristics of a particular market, and on the availability of data. Moreover, multiple metrics may be informative in any particular case. For example:

- Revenues in a relevant market often provide a readily available basis on which to compute shares and are often a good measure of attractiveness to customers.

- Unit sales may provide a useful measure of competitive significance in cases where one unit of a low-priced product can serve as a close substitute for one unit of a higher-priced product. For example, a new, much less expensive product may have great competitive significance if it substantially erodes the revenues earned by older, higher-priced products, even if it earns relatively low revenues.

- Revenues earned from recently acquired customers (or paid to recently acquired buyers, in the case of merging buyers) may provide a useful measure of competitive significance of firms in cases where trading partners sign long-term contracts, face switching costs, or tend to re-evaluate their relationships only occasionally.

- Measures based on capacities or reserves may be used to calculate market shares in markets for homogeneous products where a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in a relevant market in response to a price increase or output reduction by others in that market (or to rapidly expand its purchasing in the case of merging buyers).

- Non-price indicators, such as number of users or frequency of use, may be useful indicators in markets where price forms a relatively small or no part of the exchange of value.

50