# PX15517

EXCERPT

'By far the best book I've ever read on the how and why of scaling'

**Angela Duckworth**, Founder and CEO of Character Lab and *New York Times* bestselling author of *Grit*

How to Make Good Ideas Great and Great Ideas Scale

# The VOLTAGE Effect

## JOHN A. LIST

PROFESSOR OF ECONOMICS
UNIVERSITY OF CHICAGO

PX15517-001

EXCERPT

*Contents*

Introduction                                                    3

*Part One:*
CAN YOUR IDEA SCALE?

1. Dupers and False Positives                                  21

2. Know Your Audience                                          45

3. Is It the Chef or the Ingredients?                          69

4. Spillovers                                                  89

5. The Cost Trap                                              107

*Part Two:*
FOUR SECRETS TO HIGH-VOLTAGE SCALING

6. Incentives That Scale                                      131

7. Revolution on the Margins                                  159

8. Quitting Is for Winners                                    183

9. Scaling Culture                                           201

   Conclusion                                                229

*Acknowledgments*                                            235

*Notes*                                                      239

*Index*                                                      257

shoppers, who dashed over to snag the savings before it was too late. And just like that, Kmart's famous Blue Light Special—one of the first incarnations of what's now known as a "flash sale"—was born.

Word of the technique spread, and soon every Kmart across the country began running Blue Light Specials with similar success. As a promotional innovation, it scaled brilliantly. The eye- and ear-catching hyping of the sale and the sense of urgency it fostered among customers were part of the brilliance. The other part was that the choice of the products on sale was up to the individual store managers, who knew their customers. They talked to them, plus they also lived in the same communities and had certain shared experiences. So pretty soon the Kmart managers began selecting not only items that were languishing on the shelves but also products catering to the needs of the particular shoppers at that particular place and time, like shovels or ice-melting salt the morning after a heavy snow. Sam Walton, founder of Walmart, called the Blue Light Special "one of the greatest sales promotion ideas ever."

Then Kmart screwed the whole thing up. Instead of permitting each individual store to choose the goods to be discounted, all goods sold on Blue Light Specials would now be dictated months in advance from the corporate office in Hoffman Estates, Illinois. This meant that on any given day, the same exact goods were sold as Blue Light Specials regardless of whether the store was located in Laramie, Wyoming; Sarasota, Florida; or Seattle, Washington. So when a summer heat wave hit Sarasota or a rainy spell hit Seattle, managers in Florida and Washington no longer had the autonomy to tailor the promotion to better serve their customers. By ignoring the unique needs of different customer segments, this new policy short-circuited the proven scalability of the program.

### From Selection Biases to WEIRD People

The inevitable variability across different audiences and customer segments poses another challenge for scaling. To truly achieve wide-

EXCERPT

THE VOLTAGE EFFECT                                    57

spread impact, it's not enough to understand how your current customers or audience differs across geographies, demographic groups, and so on. You also need to think about how your current audience might differ from your future one.

Put another way, is the initial audience—or test subjects, or market segment—that yielded your early success a representative snapshot of the larger group of people whom you hope to serve at scale? When looking at results in the early stages of any enterprise, you must check that you're correctly gauging what scientists call the *representativeness of population*.

Non-representativeness can occur either accidentally or through willful selection of the sample. When it occurs accidentally, it is a phenomenon known as *selection bias*—when people opt in to programs in a non-random way. This is problematic because people who choose to participate in a pilot program or study are the most likely to benefit. Of course insomniacs flock to the medical trial for a new sleeping pill! But when a disproportionate part of the sample is made up of people who opt in because they are most likely to benefit, this has the potential to distort the results, painting a more optimistic picture that wouldn't hold up at scale—what scientists call a "selection effect." Similarly, the people who opt in to a health program may be more motivated to improve their health—and therefore more likely to engage in any number of other healthy behaviors—than those who did not opt in. In these cases you might incorrectly attribute improved health outcomes to the intervention instead of to other healthy habits: a false positive. If the research and development team for the new sleep medication, for example, fails to anticipate and correct for selection bias, the results may indicate the medication is effective, when in fact it's effective only for a subset of the population, not the whole group. This is bad for the company that invested in the sleep medication and will now lose money on it, and also it's bad for the people in need of a new drug to help them sleep better.

My talented former student Tova Levin leads experimental strategy at Humana, a healthcare company that makes decisions through

PX15517-004

rapid testing and therefore relies on well-designed studies to ensure that the desired effects hold up at scale. For example, in a few different studies looking to improve social determinants of health, such as loneliness and food insecurity, Tova's team designed studies comparing statistically significant, randomized populations across the country, thereby ensuring that the results weren't just a fluke or a product of the selection effect.

This can happen elsewhere in the business world, too. In the mid-1990s, McDonald's did extensive focus-group testing on a new item it would hail as a more sophisticated and slightly more expensive hamburger: the Arch Deluxe. The people who participated in the focus groups liked it, so scaling it across the United States seemed like a sure bet. But in fact, the Arch Deluxe turned out to be a deluxe failure. It didn't scale.

How did this massive misfire occur? The people who participated in the focus groups weren't a faithful reflection of McDonald's customers as a whole. After all, a person who signs up to take part in a McDonald's focus group is probably someone who is crazy about McDonald's, or loves all kinds of burgers, or both. But the average person, it turns out, goes to McDonald's for the Big Mac, not a fancier version of one. The lesson here should be clear: don't assume that your initial audience is necessarily representative of the population as a whole.

In the preceding examples, the selection effect resulted from a non-representative sample of people opting to participate in the trial. However, the threat of the selection effect unraveling your scaling hopes can also occur in sample populations that have been deliberately selected. Take what happened when researchers set out to find a treatment for the iron deficiencies that result in anemia, which is a widespread problem in India and elsewhere. People who suffer from anemia are short on the healthy red blood cells that shuttle oxygen to the body's tissues, resulting in fatigue, inflammation, and other effects damaging to one's health and quality of life. As a possible path

EXCERPT

4

---

SPILLOVERS

In 1965, the legendary consumer-rights crusader Ralph Nader, a thirty-one-year-old lawyer at the time, published his first book, *Unsafe at Any Speed: The Designed-In Dangers of the American Automobile*. An explosive and unexpected bestseller, Nader's book took a gloves-off approach from its very first sentence: "For over half a century the automobile has brought death, injury and the most inestimable sorrow and deprivation to millions of people."

In each chapter that followed, Nader unpacked a different facet of car design that needlessly or excessively endangered drivers, passengers, and pedestrians. He examined the science of collisions, for example, and showed how manufacturers were ordering engineers to prize style over safety; he discussed air pollution caused by cars in traffic-heavy cities like Los Angeles. His jeremiad was an impassioned call for regulation—and it worked. Within months of the book's publication, the usually sluggish U.S. government moved quickly to create the National Highway Traffic Safety Administration. By 1968, a flagship federal law was passed requiring all personal vehicles to be outfitted with seatbelts.

On the surface, it appeared that Ralph Nader had succeeded at making America's roads safer. Or was it more complex than that?

Flash forward to 1975, when my adroit University of Chicago colleague Sam Peltzman published a paper titled "The Effects of Automobile Safety Regulation." The unassuming title belied Peltzman's

PX15517-006

striking conclusion: the decade of measures spearheaded by Nader to increase automotive safety hadn't actually made people safer at all. As Peltzman put it, "The one result of this study that can be put forward most confidently is that auto safety regulation has not affected the highway death rate." More surprising than this, perhaps, was his explanation for why. Drivers felt safer because of the legislated measures put in place to protect them, so they took *more* risks while driving, and in turn had more accidents. *Since I'm so safe with my seatbelt,* a driver might reason (consciously or not), *why not lay the pedal to the metal?* Seatbelts make any individual driver safer in the event of an accident, but at scale, they also appeared to lead to more total accidents. It was as if one voltage gain had been wiped out by a consequent voltage drop—an unintended and shocking consequence.

While Peltzman's paper was controversial at the time— unsurprisingly, it was politicized by pro- and anti-regulation advocates—much research in the intervening years has borne out similar conclusions in other domains. It turns out people have a tendency to engage in riskier behaviors when measures are imposed to keep them safer. Give a biker a safety helmet and he rides more recklessly—and, even worse, cars around him drive more haphazardly. And a 2009 study directly following the line of research pioneered by Peltzman found that NASCAR drivers who used a new head and neck restraint system experienced fewer serious injuries but saw a rise in accidents and car damage. In short, safety measures have the potential to undermine their own purpose.

This phenomenon—which came to be known as the Peltzman effect—is often used as a lens for studying *risk compensation,* the theory that we make different choices depending on how secure we feel in any given situation (i.e., we take more risk when we feel more protected and less when we perceive that we are vulnerable). This is why, in the wake of the 9/11 attacks and the rise in fear of terrorists gaining access to nuclear weapons, political scientist Scott Sagan argued that increasing security forces to guard nuclear facilities might actually make them less secure. The Peltzman effect also reaches into

insurance markets, whereby people who have coverage engage in riskier behavior than those without coverage, a phenomenon known as *moral hazard*. Clearly, this pattern of human behavior has potentially huge implications when taken to scale.

The most obvious takeaway here is that seemingly free-will choices we make every day may in fact be shaped by hidden effects we are not aware of. (Also, you should wear a seatbelt *and* drive safely!) But in the context of scaling, this illuminates another cause of voltage drops that we must avoid: the *spillover effect*. This is the unintended impact one event or outcome can have on another event or outcome, a classic example being when a city opens a new factory and the air pollution it produces impacts the health of residents in the surrounding area. That this effect occurs speaks to the inescapable web linking events, the things humans create, and the natural world. The term "spillover effect" has been applied in fields as far-ranging as psychology, sociology, marine biology, ornithology, and nanotechnology, but for the purposes of this book we will define it in a human sense, as the unintended impact of one group of people's actions on another group. And nothing makes spillovers more likely and visible than scaling an endeavor to a wide swath of people. Remember the Murphy's law of scaling: anything that can go wrong will go wrong . . . *at scale*. Or to put it slightly less memorably, something unexpected has a much higher probability of occurring at scale than not at scale.

### Spillovers That Emerge at Scale

The spillover effect falls under a larger umbrella category popularly known as the law of unintended consequences. The idea is self-explanatory: sometimes an action with a planned outcome creates a subsequent surprise outcome. As we saw with Ralph Nader's well-intentioned campaign for automotive reform and regulation, just because you design something to have one effect doesn't mean it won't yield other effects, too. And this phenomenon usually becomes most visible at scale.

PX15517-008

EXCERPT

One of the ways that spillovers can perilously flood a scaled-up operation results from what economists call *general equilibrium effects,* a term describing shifts in an overall market or system that likely don't manifest on a small scale. In economics, general equilibrium effects refer to the self-adjusting relationship between supply and demand that is shaped by developments in the marketplace. More broadly, this simply means that when the equilibrium of a system is disrupted in one area, the system will adjust itself in other areas until that equilibrium is restored. One tweak ends up tweaking the entire system.

We see many examples of this in the job market. Let's say that in a certain year, 50 percent of all college sophomores decided to change their major to economics. What would happen a few years later when they entered the workforce? Assuming no sudden spike in employer demand for economics majors, a large influx of new economists on the market (increased supply) would cause their wages to plummet—a huge voltage drop. However, let's say I conducted an experiment where I randomly chose just one hundred college sophomores, forced half of them to change their major to economics, then looked at how much they were earning in their first job. These additional new majors would not have a negative impact on their earning power at all, because a mere fifty students is not enough to disrupt the equilibrium of the job market overall.

Here is the rub: our experiments typically give us answers along the lines of my small-scale experiment. They don't speak to large movements, such as everyone, or even 50 percent of college sophomores. Yet, in a very real sense, this is exactly what we want to know before we scale, especially in the policy world: what are the total effects of my idea in a world where *everyone* changes and *anything and everything* else can change? Ideas don't exist in petri dishes. And an innovation can have negative consequences that are at odds with its purpose but *only become visible at scale.*

You can imagine a similar outcome with large-scale job-training programs intended to give people more opportunities. They seem great in theory, but in reality, the more people who become highly

EXCERPT

skilled, the greater the competition for those high-paying jobs. This competition has the potential to lower wages for all high-skilled workers, making job-training initiatives problematic and less attractive, or at the very least a mixed blessing, at scale. Once again, general equilibrium effects can upend expectations.

The world of ride-sharing is another perfect laboratory for uncovering general equilibrium effects. For example, when I was at Uber, Travis Kalanick agreed to try to raise drivers' incomes by increasing their base fare. It sounded like a logical approach—higher fares equal more money, right? Yet looks can be deceiving.

When economists Jonathan Hall, John Horton, and Daniel Knoepfle examined Uber base fare increases across thirty-six cities over 105 weeks, they found an interesting pattern: the rise in base fares led to significant increases in driver earnings for several weeks, but by week six, driver earnings had dropped to just slightly above where they had been before the base fare increase, and by the fifteenth week, the earnings increase had disappeared entirely. Why? Because the fare increase made driving for Uber a more attractive proposition, which incentivized existing Uber drivers to offer more rides, while also attracting new drivers. As a result, the supply side of the market became more competitive, which meant that on average each individual driver got fewer trips overall, erasing the intended gains from the wage bump. The unintended consequence—or spillover—of the increased base fare on drivers at scale thwarted the well-intentioned deed by Uber.

I later observed a similar spillover effect among Uber riders in Seattle. What happened was fairly simple. We gave one group of Uber users $5-off coupons for rides on a specific Friday afternoon, then we compared their behavior on that Friday afternoon to that of users who hadn't received the coupon. Sure enough, the couponers took more rides than the no-couponers, and the increased earnings from those rides were more than enough to offset the discounts the coupons provided. On the surface, it seemed like we'd hit the jackpot: a tiny tweak with the potential to generate big bucks.

Buoyed by this early success, we scaled up the $5 coupon initiative to include a much larger group of Seattle riders. Instead of leading to more gains, however, this expansion produced a punishing voltage drop. The coupons increased the number of rides immediately; just as they had in our initial test run. But then came market imbalance, the number of trips fell suddenly, across the whole city. It appeared that the initially attractive offer had turned repellent overnight, like a delicious plate of food that is left out and spoils. Why had this happened?

When we looked at the data, the reason became crystal clear. It wasn't that our first small-scale success had been a false positive, nor was it because the riders who took part in the pilot didn't accurately represent Seattle riders as a whole. At scale, the coupon deal initially caused demand to spike to the point of reducing the available supply of drivers. The shortage of drivers resulted in an increase in fare prices and wait times, which in turn decreased overall demand. The living, breathing market was simply settling into a new equilibrium. While the strategy had seemed foolproof among a small subset of users, it shape-shifted into a failure at scale. To borrow Malcolm Gladwell's term, there was a tipping point at which a good idea became a bad one.

Even at the most macro level, spillover effects work in the same way. For example, epidemiologists commonly report that many air and water pollutants are harmless; because they are present at such low levels, the body's natural protective mechanisms can repair any damage, so there is no ill effect. Yet if the power plant that emits those pollutants expands, or a new one comes online, the critical threshold might be exceeded. Or just look at our history with automotive and air travel. These technological innovations in transportation have wonderfully revolutionized human life. Our ancestors from the nineteenth century would marvel at how easy and fast it is for us to see places and visit people all over the world. But at scale, over time, our advances in transportation technology have also vastly contributed to climate change, which threatens to radically alter human life on our planet.

EXCERPT

While we tend to focus on the unforeseen problems that can arise from spillovers, unintended effects aren't by any means all negative when it comes to scaling. In the world of international development, there has been much concern over the downstream impacts that foreign-aid organizations can have on local communities. In particular, in development economics, cash transfers to residents in poverty-stricken locales are an area of worthwhile scrutiny. For example, a nongovernmental organization eager to stimulate the local economy by giving money or microloans to a significant number of residents would want to be aware of any possible spillovers. Will this scaled-up infusion of cash trigger inflation, or might class stratification increase?

In 2014, a group of noteworthy economists—Dennis Egger, Johannes Haushofer, Edward Miguel, Paul Niehaus, and Michael W. Walker—sought to answer these questions with a field experiment in a poverty-stricken area of rural Kenya. They provided randomized, one-time cash transfers of $1,000 apiece to some ten thousand thatched-roof households spread across 653 villages of the Siaya region near Lake Victoria. That's right—a total of $10 million! As the researchers noted, "The cash transfers amounted to over 15 percent of local GDP during the peak 12 months of the program."

Over the next two and a half years, they collected all manner of economic data and found no evidence of negative spillovers. For example, inflation didn't spike, as they had feared. But several positive spillovers had occurred. It turned out that the cash infusions significantly increased consumption not only among families that received the money—this was a given—but also among households that *weren't* part of the experiment. Naturally, the rise in consumption among recipients of the cash meant more profits for local businesses, which in turn meant the owners of those businesses now could afford to employ more local workers—the result being that both business owners and the workers they employed all had more money to spend themselves. The overarching result of such a large cash infusion into the economy created a proverbial rising tide that lifted all boats; a

EXCERPT

JOHN A. LIST

family didn't have to receive a cash payment to benefit from the payments' effect on the region's economy as a whole. This was thanks to a general-equilibrium spillover.

In the world of business, you can think of the buzzword "disruption" as another way of describing general-equilibrium spillovers. Our digital age has brought several waves of disruption, and will continue to do so. The rapid pace of innovation has upset the equilibrium in seismic ways, sending many companies and even whole industries, like travel agencies and print magazines, sliding toward the dustbin of history. Yet, like any system that desires equilibrium, the business landscape continues to self-adjust, with new companies and industries constantly emerging in the place of those that have been lost.

At a macro level, spillovers can make headlines. How many cases have there been of a factory that creates jobs but also produces pollution runoff that harms the health of a nearby community? Or a new highway that benefits a city's transportation infrastructure but also depresses the value of adjacent homes that now face elevated levels of noise and air pollution? There are countless examples like these—economists call them *externalities*—since the generation of unintentional reactions to intentional actions is both widespread and common.

At scale, these unintended reactions can create ripples across the globe, but it's important to remember that spillovers bubble up out of a vast web of individual choices that eventually hit a critical mass. Understanding how this occurs on a macro level is essential for designing and sustaining a scalable enterprise; however, focusing entirely on the macro is a mistake.

On a more micro level, spillover effects can have just as much impact, though they often manifest in indirect or even undetectable ways. This hit home for me firsthand when I tried to do a good deed and raise money for our local youth baseball organization, the Flossmoor Firebirds, in Flossmoor, Illinois.

PX15517-013

EXCERPT

## *The Social Side of Spillovers*

In the summer of 2010, I hired more than two hundred solicitors (or canvassers) to go door-to-door asking for donations for a team of young underprivileged ballplayers called the Firebirds. I was unsure of how much to pay them for their time, but then it dawned on me that I had serendipitously stumbled into an opportunity for a field experiment. Would $10 an hour be enough to incentivize the solicitors to successfully amass the desired donations? And would raising the cash incentive raise their motivation levels, resulting in even more donations? So I did a bit of experimentation: after splitting them into two groups (at random), I hired half the solicitors at $15 per hour and the other half at $10 per hour. Naturally, this was done in private, so only they knew their hourly pay. Then they all piled into vans that took them to different neighborhoods to canvass. For ease of transportation logistics, the two groups were mixed together in the vans. I figured they wouldn't talk too much about pay, but if they asked me, I had a stock response that pay differences were possible (no one asked).

In reviewing the data, it became clear that the canvassers earning $15 per hour had worked much harder. They approached more houses per hour and raised more money from each house compared to those who were paid $10 per hour. The extra $5 was well worth it.

So when fundraising season came around again the following summer, I hired hundreds of solicitors once again and this time paid them all $15 per hour, thinking that I was going to leverage my scientific findings from the previous summer for the good of the underprivileged ballplayers. All was going well until one weekend late in the summer when we began running short on cash. Realizing we needed to pinch our pennies to reach our fundraising goal, we paid a new vanload of solicitors just $10 per hour. I expected that they wouldn't secure quite as many donations as the $15-per-hour canvassers, but that the $10-per-hour investment would still be worth it. Yet

EXCERPT

much to my surprise, these low-wage solicitors worked just as hard and raised just as much money as their higher-wage peers.

This plot twist was puzzling. Could it be that the size of the cash incentive really had no demonstrable effect on the canvassers' motivation or performance? Clearly, I would have to run another field experiment to get to the bottom of these wage effects.

So the following summer we designed an experiment with three van configurations. The first set of vans had some solicitors who were paid $15 per hour and others who earned $10 per hour. This was the design from the first summer, which mixed the low- and high-wage workers. The second set of vans included only solicitors earning $15 per hour. Meanwhile, the third set of vans shuttled only solicitors who were paid $10 per hour. Importantly, the solicitors in the second and third groups had no idea about each other or that other solicitors were making a different amount than they were.

What happened next was fascinating. I found no differences in performance when comparing solicitors in vans two and three. Each group canvassed with the same effectiveness, their differing pay having no impact on how well they did out there knocking on doors and asking for donations. But in the mixed group (the set in the first van), we again found differences in how much money they raised and how hard they worked: the higher-paid solicitors considerably outperformed the lower-paid solicitors on every dimension.

As it turned out, it wasn't the extra $5 that incentivized the higher-paid solicitors to work harder. It was the $5 *less* that *disincentivized* the lower-paid workers when they knew others were making more than them. The fact was, at odds with my original belief in the very first summer, the solicitors did talk about pay and this served to *disincentivize* the lower wage earners. This group shirked their duties by visiting fewer houses, and even engaged in more theft, pocketing donations at a much higher rate than the higher-paid solicitors.

This is an example of the psychological phenomenon called *resentful demoralization*. It's the flip side of the famous John Henry effect, which is the bias introduced into experiments when members of the

EXCERPT

control group are aware that they are being compared to the experimental group and react by trying harder than they typically would. In my field experiment, the solicitors did the opposite. The feelings of resentment resulting from the knowledge of the wage disparity (i.e., that they were being underpaid compared to their peers) created an unintended effect that undercut our fundraising.

It might make sense intuitively that if you pay someone more money you'll get more effort from them. But inside the tapestry of events, people, and circumstances, this seeming truth can break down in an unexpected manner. I should have just paid everyone $10 per hour, and we would have raised more money for the underprivileged ballplayers.

The results of this field experiment have broader implications beyond just fundraising. It is relevant to a new push in many sectors of the economy for companies and organizations to be more transparent about employee compensation. The idea is that salary data should be made publicly available—at least inside the company—so that everyone knows how much everyone else is making, from the bottom all the way up to the top. Based on my experience with the baseball fundraising, one would expect that making salaries transparent could drive resentful demoralization if people saw peers making more. But that is not the full story.

In 2017, two crafty economists, Zoë Cullen and Ricardo Perez-Truglia, ran an ingenious field experiment with 2,060 employees of a multibillion-dollar commercial bank in Asia to explore how employees' misperceptions about the salaries of their managers and peers might impact their motivation and behavior. At the bank Cullen and Perez-Truglia studied, managers on average made between 114 percent and 634 percent more than other employees. Meanwhile, salaries for non-managerial employees varied between 16 percent more than and 16 percent less than the average salary of their peers with the same title from the same unit. When given a survey designed to elicit employees' perceptions of their colleagues' salaries, employees underestimated the salaries of their managers by 14.1 percent but were

PX15517-016

EXCERPT

slightly better at guessing how much their peers made. This is significant because it suggests that if employees were to learn that their managers made even *more* than they thought, they might experience even more resentment, and thus be even less motivated.

Then came the fun part. The researchers provided the employees information about managers' and peers' salaries and observed their behavior for the next several months. After analyzing the results, they found that employees who were told their manager made 10 percent more than they originally thought actually worked slightly *harder;* the average number of hours they worked increased by 1.5 percent over the next ninety days. Conversely, when employees learned that peers made 10 percent more than they did, they worked 9.4 percent *less* over the next ninety days. It even demoralized employees to the extent that they were more likely to leave the company.

It turns out that when people find out their managers earn more than they thought, it can have a motivating effect. This is because they become more optimistic about their future salaries—and this effect on the whole is stronger than any resentful demoralization about a superior receiving a much higher salary than them. In contrast, when it comes to peers earning more, the resentment over what is perceived (perhaps rightly) as an unfair discrepancy eclipses any possible optimism about the future.

So what are the possible spillover effects of this type of salary transparency at scale? First, it's important to recognize that as organizations grow, they tend to add fewer managerial positions than non-managerial ones; for each manager a company hires, they generally hire several lower-level employees, so as the company grows, the ratio of managers to employees shrinks. In a large company, then, one is likely to have many more peers than managers. Accordingly, if companies wish to share managers' salaries, the value proposition of that choice improves as the organization scales. Which is to say you could expect a voltage gain. Sharing salaries of lower-level employees, however, would likely produce a voltage drop as you scale (assuming those employees are not all compensated equally) since there

EXCERPT

are more employees who may experience resentful demoralization, leading to lower effort and inducing some to seek jobs elsewhere.

More broadly, leaders should recognize that people don't make choices in a vacuum. Individual behavior is also a function of the information we have available, particularly when we compare our situation with that of others. As these wage examples drive home, hidden spillover effects like these are crucial to watch out for, and it requires great agility to respond to them effectively. There is much we can learn from surprises that unleash unexpected results and reveal new insights.

### High-Voltage Social Spillovers

Whether we're aware of it or not, our peers can influence our behavior in powerful and unexpected ways. And while understanding these dynamics in the workplace is invaluable, the workplace does not have a monopoly on peer-to-peer spillovers. Being a parent has led me to think hard about the impact of my children's peers on their human capital formation (that is economese for their education). Indeed, peer effects in education have recently received a great deal of attention from researchers and teachers, many of whom argue that peer composition is as important a determinant of student outcomes as other widely cited factors including teacher quality, class size, and parental involvement. The wonderful work of economist Bruce Sacerdote reveals that in elementary, secondary, and postsecondary education, within certain contexts and for certain outcomes, peer effects are indeed a powerful determinant of why students turn out the way they do. This research, combined with my personal experiences as a parent, played into my expectations as my team prepared to launch the Chicago Heights Early Childhood Center.

From the day we opened our school's doors, I believed that early childhood learning was fundamentally a social activity. So spillovers had the potential to spring up, and I hoped they would be the good kind. Previous research had shown that in experiments like ours, ef-

EXCERPT

fects on the *treatment group* (the participants who were randomly selected to receive the intervention, which in our case was our special preschool curriculum) could, through sheer proximity, have an inadvertent influence on the *control group* (the participants who don't receive the intervention but who are measured as a comparison sample).

A "treatment effect" spilling over in this fashion seemed highly likely in the context of CHECC because kids and parents from both groups lived in the same neighborhoods and belonged to the same communities. Of course, the big question was how these effects might manifest if we scaled the CHECC program to other schools and to more children. But first we would have to be sure the spillovers helped rather than hurt, and my clever colleagues Fatemeh Momeni and Yves Zenou joined me to examine how this might play out.

Months passed, then a couple of years. Meanwhile, day after day, the adorable kiddos filed into our classrooms, where our hardworking teachers faithfully followed our curriculum. Our main curriculum for the treatment group involved special techniques designed to strengthen both the children's cognitive skills (activities involving intellectual effort, like reasoning and remembering) and their noncognitive skills (interpersonal skills like teamwork and sharing). At the end of each day, the kids from both groups would go home, and many would spend time together. They would play tag and sports, invent imaginative games, have fun, and of course have conflicts to resolve. In short, they were kids being kids, and to do all these things together they communicated constantly. Which is how the *direct spillover* occurred—from the treatment group to the control group.

Essentially, kids who were in our treatment program were imparting their rapidly developing cognitive and noncognitive skills to the control group children *simply by their proximity and daily interactions*. When the kids spent time together, the way the treatment kids talked, shared, and played subtly and unconsciously registered among the kids in the control group, who eventually began to emulate the behaviors, choices, and skills their peers had been taught in our program. This effect was even highly localized, increasing as spa-

EXCERPT

tial distance decreased (i.e., among kids who were neighbors). We see yet again the rising-tide-lifts-all-boats principle, where the benefits to some members of a group spilled over to benefit the group as a whole. This spillover all but guarantees that, when scaled, the program will generate a voltage gain for most children in a community.

We saw a similar effect within the treatment groups as well, in that the kids in our program who shot ahead in cognitive and non-cognitive skills created a self-reinforcing cycle that caused the group as a whole to accelerate. Put simply, the children spurred each other to develop faster. The treatment group gains spilled over right back into the treatment group, unlocking an exponential voltage gain—benefits squared! This effect is built to scale because the advantages that accrue are magnified with more participants.

Meanwhile, there was also another spillover at work in Chicago Heights. While kids in the community played together, their parents inevitably talked. The adults in the treatment group actively discussed their kids' participation in our program, and their own participation in our Parent Academy, perhaps even mentioning some of the new techniques they were learning. In other words, the news was getting around about CHECC, and parents' motivation about their kids' futures spreads like wildfire! Naturally, the parents in the control group (who had signed up for the program but lost the lottery, so their child didn't get randomly assigned to our treatment program) cared as much about their children's futures as the other parents did, so just hearing about the program from those parents motivated them to get creative and look for ways to independently support their children's cognitive and noncognitive development—perhaps through after-school programs or other supplementary support, or by implementing techniques they heard about from adults who participated in Parent Academy.

In a way, this effect is similar to the employees who worked harder when they knew their managers were paid more. Instead of resenting the fact that they hadn't been (randomly) selected for the program, the parents in the control group worked harder to get involved in

EXCERPT

their kids' education because the CHECC parents gave them a model to aspire to, and instilled optimism that their kids could realize the same gains as the program kids. It was as if the CHECC parents had opened their eyes to a new horizon of possibilities, and they wanted to make sure their kids didn't fall behind. This unplanned effect of the CHECC program represented a massive positive spillover. All told, when we included the spillover effects alongside the original measurement of program efficacy, the overall impact of the program expanded at least tenfold. High voltage in action!

Yet there was also one negative spillover that should be recognized. The extra time those CHECC parents were investing in the educa-tion of the child in the program had to come from somewhere, and our data showed that often it came from time spent with the child's sibling(s). So one unintended consequence was that siblings received much less parental attention. While this effect was small compared to the direct spillover discussed earlier, a failure to account for this effect would make the intervention seem more beneficial than it actually was. To obtain the complete picture, we had to look at the entire ecosystem and account for the program's impact on *all* of the kids within it.

The positive spillovers we observed with CHECC are a type of spillover known as the *network effect*, or a *network externality*, and it is potently relevant to business in the digitized twenty-first century. Take the examples of Facebook and LinkedIn (or pretty much any social networking platform). If only ten other people use these plat-forms, the benefits they provide are small because the network is small. In Facebook's case, you want to stay connected to the lives of many people you know, and in LinkedIn's case you won't have much new terrain to explore for professional contacts if there are few users. But if lots of people are on these services, then benefits are far greater. This type of voltage gain is called *parabolic growth*. And as a network scales, the benefits to its members get bigger and bigger and bigger—often to the point of what is known as "lock-in," which means members are almost shackled to using these platforms.

Or think about Lyft Pink from Chapter 2. As more riders join the

EXCERPT

marketplace, more drivers will join, too. This allows wait times and prices to drop because there are many more readily available driver-rider matches. And when wait time and prices are low, more riders join, starting the cycle all over again. This is very good news at scale.

Network externalities also play out in other areas of society. Take vaccinations, for instance. Whether we're talking about polio, measles, the flu, or Covid-19, the aim of administering a vaccine to someone is to reduce the likelihood of that person getting sick or dying. This is the primary benefit, but at scale—that is, when a critical portion of the population receives a vaccine—there is a spillover benefit as well: herd immunity. If herd immunity is reached, the people who were not vaccinated still benefit indirectly from the vaccine since everyone around them is immune. The flip side of this, of course, is that the greater the number of people who refuse the vaccination, the greater the risk to the population as a whole. This is one reason modern societies might use social messaging intended to shame the anti-vaxxers: to curb the negative spillovers.

*    *    *

THE LESSON OF spillovers in all their surprising manifestations is that the moment you begin to scale up your enterprise, you need to keep a very close eye out not just for the effects that you intended but also for the unexpected and sometimes hidden ones you didn't intend. Everything is interconnected, and the web you weave will only become more tangled and complex at scale.

As a quick recap of what to look for, you should consider and measure spillovers in three basic categories:

1. *General equilibrium effects.* These tend to occur at scale and lead to unintended consequences that can have large positive or negative market-wide effects. This type of spillover emerges as a tipping point.
2. *Social-side behavioral spillovers.* These occur when others affect your behavior, either through observation or through direct

PX15517-022

EXCERPT

impact. Observing others causes people (consciously or unconsciously) to change their own behavior in ways that can be either positive or negative.

3.  *Network effect spillovers*. These occur when the use of some product or adoption of some policy amplifies the benefits or costs for all users/adopters. These may be built in intentionally or emerge organically as you scale.

If you find negative spillovers, address them right away. And if you see positive spillovers, exploit them, as they contain the key to unlocking the true promise that your idea holds at scale. Once you have done so, you have cleared the fourth hurdle to scaling. But the fifth and final pitfall of the Five Vital Signs can still kill your voltage: unsustainable costs at scale.

PX15517-023

EXCERPT

projects or work at the International Space Station. SpaceX also created a public-private partnership with NASA, for which it receives enormous subsidies. These revenue streams will help to offset the tremendous investments needed for their bigger goals.

Yet those parallel revenue channels aren't likely to be enough. The key to scaling space exploration will revolve around the cost side—that is, finding economies of scale.

Perhaps nothing sets Elon Musk apart as a businessperson more than his obsession with economies of scale. Ever since he transformed the world of online banking long ago, each major innovation he has undertaken thrives on scale economies. Consider Tesla, his electric car start-up. A stock market darling that is worth more than half a trillion dollars, its massive success can be traced to economies of scale of its two most important components: batteries and solar power generation cells, both of which can be manufactured significantly cheaper in higher numbers. In addition, everything at Tesla is geared toward increasing the efficiency of "the machine that makes the machines," or what Musk affectionately calls his "Alien Dreadnought"—that is, a highly advanced, fully automated production facility.

Even SpaceX has found a way to capitalize on the idea of scale economies. This can be seen vividly in a remarkable video in which two of its rockets land at the same time at the Kennedy Space Center. This is where the real brilliance begins: a manufacturing strategy based on reusable components. Manufacturing in a completely automated way and reusing as much as possible is the basis for SpaceX to build more than one rocket per week. This strategy has already allowed the company to put a network of satellites, Starlink, into orbit at a fraction of the usual cost (much to the chagrin of the telecommunications companies). Indeed, using reusable rockets to exploit the benefits of economies of scale, SpaceX cut cost-to-orbit by a factor of eighteen.

It is possible that space travel will one day be scaled to the point of allowing humans to settle other planets, but it is a long way off and would cost astronomical (ha!) amounts of money. But in the mean-

EXCERPT

118                                    JOHN A. LIST

time, these companies are shrewdly leveraging economies of scale to reduce their average mission costs, and this at least gives them a better shot at one day scaling up.

The investment capital required for moonshots speaks more broadly to a challenge that many scalable innovations face in their infancy: the up-front cost to create the innovation. For start-ups, this often requires attracting funders willing to put in the capital necessary to get past this initial cost obstacle. For researchers with a big idea that will take time to produce reliable data, it means landing big grants, finding deep-pocketed donors, or establishing corporate partnerships (each of which, as we have learned, comes with a risk of mission drift). In many industries, these up-front costs are prohibitively expensive for outsiders with little financial backing, acting as a barrier to entry. I may have a game-changing idea for a new social media platform that filters out fake news and hate speech, but I'm just John List, an economist and professor with no computer-engineering skills to build my great new platform, no relevant experience that would convince investors I know what I'm doing, and no pilot data showing that my idea isn't just a misguided daydream. And in the absence of the capital to hire engineers, lure more experienced partners, and test a prototype, my idea will never get off the ground.

The wonderful thing about fixed costs is that once you have the technology, prototype, data proof, or whatever innovation is the foundation of your enterprise, you never have to spend that money again. Unlike ongoing operating costs like ingredients and employee salaries, or biometric tests and health coaching, a big up-front investment pays its dividends by not needing further big investment. (This is why patents and copyright laws exist—to allow the entity that put the sweat, blood, and money into creating something new to benefit exclusively from their up-front efforts for a while.) If what you are supplying generates demand in the marketplace, ideally you will then move on to the gratifying part of scaling: taking advantage of economies of scale.

Look at ride-sharing. Lyft and Uber required significant up-front

PX15517-025

EXCERPT

fixed costs in order to launch their innovative transportation model, the most expensive part being the computer engineering to create the digital infrastructure that does so much: connecting drivers and passengers with real-time data through the vendor and customer interfaces, determining the ride price, facilitating financial transactions, updating a rating system for drivers and passengers, providing a venue for complaints, and a million other small but essential functions. This wasn't cheap to build! But once all of it was up and running, economies of scale kicked in—every extra rider that comes on the platform allows Lyft to spread out more of their fixed cost, so the average cost of each ride decreases.

The lesson here is to take stock of what your fixed costs are likely to be right from the outset. Then make sure you have sufficient funding, and even if you do, look for ways to reduce the up-front costs involved in launching your idea. This is largely an unattainable goal for costly endeavors like space travel, but more doable when it comes to software and other start-up ventures. For instance, you may be able to balance lower salaries for employees by offering equity in the company, which in some cases can lead to a big future payday. The less you spend on up-front costs, the less you will have to charge customers to recover it later, which will undoubtedly increase demand. You can also look for ways to offset an up-front cost by reusing some materials, or even creating and selling a byproduct of the main production process. For example, it is not a coincidence that many companies that produce crude oil also produce natural gas. This happens because natural gas is a byproduct of the oil drilling process, in the same way that molasses is a byproduct of sugar refining, sawdust is a byproduct of the lumber industry, and feathers are a byproduct of poultry processing.

And wherever you can, try to build in the potential for economies of scale as you grow in the future. In many cases, there might be important trade-offs to fixed and variable cost. As some of the preceding examples suggest, high costs up front can mean significantly lower marginal costs later on. In this way, a high up-front cost can actually

PX15517-026

# PX15531

the antitrust source ■ www.antitrustsource.com ■ December 2010    1

# Response to Gopal Das Varma's *Market Definition, Upward Pricing Pressure, and the Role of Courts: A Response to Carlton and Israel*

Dennis W. Carlton and Mark Israel

In our article, *Will the New Guidelines Clarify or Obscure Antitrust Policy?*, published in the October 2010 issue of *The Antitrust Source*,[1] we praised the new Horizontal Merger Guidelines[2] as an excellent summary of how the government agencies currently analyze mergers, but also raised concerns about three ways in which the 2010 Guidelines may be unclear to courts and foreign antitrust agencies, which may lack economic sophistication. Those concerns are: de-emphasis of market definition as a tool in antitrust analysis, failure to emphasize sufficiently the role of non-price competition, and excessive focus on particular techniques (such as "upward pricing pressure") rather than general principles for antitrust analysis.

In his reply to our article, Gopal Das Varma takes issue with our critique of the 2010 Guidelines. In particular, he argues that rigorous market definition can itself be a difficult technique for courts to implement or evaluate. He also argues that, for mergers involving differentiated products, it makes sense to shift away from market definition and toward "metrics that seek to measure actual effects," particularly the "value of diverted sales," an index that, according to the 2010 Guidelines (p. 21), "can serve as an indicator of the upward pricing pressure . . . resulting from the merger."[3]

In our view, Das Varma fundamentally misinterprets our main points and thus fails to address our true concerns. In this response, we attempt to clarify our key concerns.[4]

## De-emphasis of Market Definition

Das Varma appears to interpret our concern over the de-emphasis of market definition as a call for agencies and courts to undertake a rigorous approach to market definition and then to compute market concentration as part of a "structural paradigm" that can determine whether a merger is "presumptively anticompetitive."[5] We are calling for no such thing. To the contrary, we believe

■

*Dennis W. Carlton is the Katherine Dusak Miller Professor of Economics, Booth School of Business, University of Chicago; Senior Managing Director, Compass Lexecon; Research Associate, National Bureau of Economic Research.*

*Mark Israel is the Senior Vice President and Managing Director, Compass Lexecon, Washington D.C.*

---

[1] Dennis Carlton & Mark Israel, *Will the New Guidelines Clarify or Obscure Antitrust Policy?*, ANTITRUST SOURCE, Oct. 2010, http://www.abanet.org/antitrust/at-source/10/10/Oct10-Carlton10-21f.pdf.

[2] U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010), *available at* http://www.ftc.gov/os/2010/08/100819hmg.pdf [hereinafter 2010 Guidelines].

[3] Gopal Das Varma, *Market Definition and Upward Pricing Pressure: A Response to Carlton and Israel*, ANTITRUST SOURCE, Dec. 2010, at 3, http://www.abanet.org/antitrust/at-source/10/12/Dec10-DasVarma12-21f.pdf.

[4] For a more complete statement of our views, see the comments that one of us filed on the 2010 Guidelines. Dennis W. Carlton, Comment on Department of Justice and Federal Trade Commission Proposed Horizontal Merger Guidelines (June 4, 2010), *available at* http://www.ftc.gov/os/comments/hmgrevisedguides/548050-00034.pdf.

[5] Das Varma, *supra* note 3, at 2.

market definition is not typically the result of a rigorous or formulaic procedure.[6] Instead, in our view, market definition is a crude first step in an antitrust analysis, one that should often be followed by the use of additional analyses. Any attempt to characterize our approach as calling for reliance only on the crude construct of market definition combined with the application of threshold concentration levels creates a straw man. Rather, our point is simply that market definition is often a highly useful first step—particularly for courts, foreign antitrust agencies, or others with limited antitrust experience.

Before describing our concerns with the treatment of market definition in the 2010 Guidelines, we should be clear that we agree with the 2010 Guidelines' statement that "[e]ven when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence . . . ." (Section 4.1.3). We also support the wide range of qualitative and quantitative evidence (e.g., buyer surveys, business documents, industry participants' pricing behavior) listed in this section as potentially useful in market definition.

However, as noted in footnote 10 of our October 2010 article, in addition to these sources of evidence, we believe that appropriate empirical tests should also be used to ask whether, using any candidate market definition, higher market shares and concentration (in particular areas or time periods) are in fact correlated with margins. In this way, government agencies and courts can confirm whether a particular market definition makes sense via an appropriate empirical test.[7]

In addition, we are concerned with the statement in Section 4.1.4 of the 2010 Guidelines (on differentiated products) that "[d]iagnosing unilateral price effects based on the value of diverted sales need not rely on market definition." This statement could be read—perhaps more broadly than the authors of the 2010 Guidelines intended—to suggest that in many cases, market definition can be skipped altogether. In our view, given the value that market definition can often have as a useful (though admittedly crude) first step, this would be a costly mistake.

Importantly, market definition can serve as a useful screen for frivolous antitrust investigations. *If* the quantitative and qualitative evidence laid out in the 2010 Guidelines points clearly toward a particular market definition, *and especially if* this definition can be confirmed with empirical tests, then it is appropriate to evaluate the merger based on the pre- and post-merger market shares using that market definition. If the share levels and changes are low, then this should end the antitrust analysis.[8] In our view, the ability to screen out frivolous antitrust cases in this way is an enormous benefit that should not be lost by giving government agencies or courts more leeway to ignore market definition.

Of course, Das Varma is correct that in other cases—perhaps including Whole Foods' acquisition of Wild Oats—available evidence may not resolve the controversy about the proper definition of the market or, even if no such controversy exists, may not resolve whether the resulting pre-

*[T]he ability to screen out frivolous antitrust cases . . . is an enormous benefit that should not be lost by giving . . . courts more leeway to ignore market definition.*

---

[6] For more on this topic, see, for example, Dennis W. Carlton, *Market Definition: Use and Abuse*, COMPETITION POL'Y INT'L, Spring 2007, at 3.

[7] For more on such empirical tests, see Dennis W. Carlton, Use and Misuse of Empirical Methods in the Economics of Antitrust, Keynote Address, Annual Conference of the Competition Law and Policy Institute of New Zealand (Aug. 2010).

[8] As we noted in our October 2010 article, *supra* note 1, the standard for how low the shares need to be to end the investigation should not necessarily be based on uniform HHI cutoffs. Rather, if at all possible, the empirical tests described above—applied to the specific industry in question—should be used to identify the range of market shares/concentration levels for which changes in shares (on the order of those resulting from the merger) have not historically led to significant price increases. If such empirical evidence is not available, then it does seem reasonable to rely on the low threshold in the 2010 Guidelines, absent countervailing factors.

PX15531-002

dicted change in market concentration should trigger concern. We agree that in such cases it is appropriate to consider additional evidence on the likely competitive effects of the transaction, rather than limiting debate to the appropriate market definition and its implications for threshold concentration levels. Market definition is a first step: it will not resolve the antitrust concerns in all cases, but that is hardly a reason to skip the step altogether and thus potentially lose the power of the screen where it does apply.

Finally, we note that the fact that market definition is controversial in many cases (and that analysis is often required beyond this first step) does not mean that evaluation of market definition is not useful to the remainder of the investigation. Quite the opposite is true: as we have already indicated, and as the 2010 Guidelines themselves note, market definition tees up the questions at the heart of all merger analyses: which firms constrain the prices of the merging parties and to what extent does the merger reduce the power of those constraints? In the Whole Foods matter, the market definition debate isolated a critical question regarding the extent to which Whole Foods and Wild Oats pricing was constrained by "conventional supermarkets." And there is no sense in which market definition asked this question in the wrong way—to the contrary, to prove its case, the government would have needed to demonstrate that the merger of Whole Foods and Wild Oats would lead to a significant price increase, which is precisely the same thing as saying that the market is narrow and concentration is large under the 2010 Guidelines' (hypothetical monopolist) approach to market definition. In our view, by setting this critical question up in a way that focuses on which firms are most relevant to constraining prices (rather than jumping right to cross-elasticities, diversion ratios, or other more complicated metrics), market definition often provides a more manageable framework for courts and others to grapple with available evidence.

### Focus on Upward Pricing Pressure

Das Varma also takes issue with our concern about the emphasis in the 2010 Guidelines on the upward pricing pressure (UPP) method for evaluating mergers.[9] Once again, he does not address our actual concerns. In particular, much of his response on this point consists of a defense of the use of cross-price elasticities, diversion ratios, and the UPP test (or its more sophisticated counterpart, merger simulation) as part of antitrust analyses.[10] We agree that these techniques can be useful; indeed, we frequently use them ourselves (along with many other techniques) as part of a complete antitrust analysis. However, our concern is that specifically identifying the UPP technique in the Guidelines will elevate its use over that of other techniques and effectively guarantee that it will be used on a regular basis as evidence in antitrust cases. As a result, the use and development of other techniques may be discouraged.

---

[9] Das Varma notes that "the 2010 Guidelines do not refer explicitly to the specific UPP test that was proposed in an article by Joseph Farrell and Carl Shapiro." Das Varma, *supra* note 3, at 3. Though possibly merely a semantic observation, his statement seems to imply that we are wrong to say that the 2010 Guidelines are endorsing the UPP approach of Farrell and Shapiro. It is true that the 2010 Guidelines contain no explicit cite to Farrell and Shapiro's paper on the topic. *See* Joseph Farrell & Carl Shapiro, *Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition*, B.E. J. Theoretical Econ.: Policies & Perspectives, vol. 10, issue 1, art. 9 (2010), http://www.bepress.com/bejte/vol10/iss1/art9. However, as we noted in our October 2010 article, *supra* note 1, the 2010 Guidelines refer at some length to the specific computations outlined in Farrell and Shapiro's paper. *See* 2010 Guidelines, *supra* note 2, at 21. In our experience, it appears now to be common practice to present these computations to the antitrust agencies as part of economic presentations on mergers. Hence, as we predicted, the effect of the 2010 Guidelines has been to emphasize this particular method for merger analysis.

[10] Note that market definition is not divorced from the concepts of elasticities, cross-elasticities, diversion ratios, and merger simulation. For the connection, see, for example, Carlton, *supra* note 6.

the**antitrust**source ■ www.antitrustsource.com ■ December 2010     4

Das Varma is correct that UPP indexes would not be the only evidence on which a court would be asked to evaluate a merger,[11] but they will surely be important evidence in many cases, with their use supported by citation to the discussion in the 2010 Guidelines. This raises at least two specific concerns.

First, using the upward pricing pressure technique as an important source of evidence in merger cases could be a recipe for confusion in the courts or at foreign antitrust agencies that lack economic sophistication. On this point, Das Varma himself refers to the value of diverted sales (the metric that underlies the UPP technique) as a metric "that seek[s] to measure actual effects" of mergers on prices.[12] It is not. In fact, contrary to the view of many highly sophisticated individuals to whom we have spoken, the UPP technique does not seek to measure the magnitude of a merger's expected effect on prices. Even if all of the assumptions underlying the UPP technique are correct, the technique reveals nothing about the magnitude of any price effects from a merger but at most reveals only the direction (up or down, after accounting for efficiencies) of "pricing pressure."[13] Moreover, the UPP index for a specific product cannot even reveal whether the pricing pressure on that product is positive or negative—at best, the UPP technique says only that if the UPP indexes (net of merger-induced efficiencies) are positive for *all* products involved in the merger, then (if all other assumptions underlying the technique hold), the price of all these products will rise (by some undefined positive amount) following the merger.

*[M]any individuals fall into the traps of . . . viewing the magnitude of UPP indexes as predictive of the magnitude of price changes.*

In our experience, many individuals fall into the traps of viewing the UPP index for one particular product as predictive of the direction of the merger-induced price change for that product and/or viewing the magnitude of UPP indexes as predictive of the magnitude of price changes. Neither of these views is correct. Given that economists commit these errors, we are deeply concerned about what could happen in courts or at foreign antitrust agencies that lack economic sophistication.

Second, not only is there no theoretical basis to say the UPP index predicts the magnitude of merger-induced price changes, we know of no empirical evidence that the UPP index even serves as a useful guide. It could be that the UPP index is always a good predictor, that it is a good predictor only if certain conditions hold, or that it is rarely a good predictor. Based on the extant economic literature, we simply do not know.

We would have preferred that, rather than refer to specific analytical techniques, the 2010 Guidelines: (1) stressed general principles for antitrust analysis, (2) identified economic measures that are often useful in assessing merger effects (market shares, concentration levels, cross-price elasticities, diversion ratios), and (3) emphasized the need for empirical evidence to identify which specific economic measures and techniques are most predictive in particular industries. With this approach, the 2010 Guidelines could have noted that, in differentiated product markets, measures of cross-product substitution often provide information beyond that contained in concentration measures, with the ultimate question of which measures and techniques are most relevant for a given merger appropriately based on empirical evidence.[14]

---

[11] Das Varma, *supra* note 3, at 6.

[12] *Id.* at 3.

[13] Farrell and Shapiro are themselves quite clear on this point. *See* Farrell & Shapiro, *supra* note 9, at 19.

[14] As an example of the type of empirical evidence that would be useful, see Craig Peters, *Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry*, 49 J.L. & Econ. 627 (2006). Peters examines previous airline mergers to ask whether merger simulations yield accurate predictions. He finds that simple regressions of price on measures of market concentration actually yield more accurate predictions, on average, than merger simulations, suggesting that in this industry, defining a market and computing concentration levels may yield useful evidence.

the**antitrust**source ■ www.antitrustsource.com ■ December 2010     5

We stress that our comments indicate only what we view as the appropriate subject matter for merger guidelines. We, of course, value the development and refinement of new approaches and techniques for merger analysis and have often used these approaches and techniques before the antitrust authorities. However, in our view, the discussion of such techniques should be contained in periodic commentaries on the Guidelines (e.g., the 2006 Commentary),[15] in which the antitrust agencies can provide timely updates on the techniques they currently find most useful, including a more fulsome discussion of the strengths and weaknesses of those techniques.

### Conclusion

We appreciate the opportunity to engage in this dialogue with Das Varma. It is this type of discourse on the 2010 Guidelines that we hope will lead to more clarity on how the Guidelines should be used by courts, foreign antitrust agencies, and others. There are certainly many areas on which we agree with Das Varma, notably that market definition is a crude technique and that more sophisticated tests like upward pricing pressure or merger simulation can be useful. However, we do not believe that the limitations of market definition mean that it should be omitted from antitrust analysis, as we believe market definition provides a useful screen for frivolous antitrust investigation and a useful framework to help judges and foreign antitrust authorities avoid egregious errors. In contrast, we are concerned that reliance on the upward pricing pressure technique as a standard piece of evidence could *generate* errors. More generally, we disagree with the elevation of particular techniques over others in the Guidelines, particularly when the evidence supporting the superiority of such techniques is lacking. ●

---

[15] U.S. Dep't of Justice & Fed. Trade Comm'n, Commentary on the Horizontal Merger Guidelines (2006), *available at* http://www.justice.gov/atr/public/guidelines/215247.htm.

PX15531-005